**UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS**

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**GREGORY LEMELSON and LEMELSON CAPITAL
MANAGEMENT, LLC,**

**Defendants,**

**and**

**THE AMVONA FUND, LP,**

**Relief Defendant.**

Civ. No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "Commission"), alleges the following against Defendants Gregory Lemelson ("Lemelson") and Lemelson Capital Management, LLC, and Relief Defendant The Amvona Fund, LP, and hereby demands a trial by jury:

## SUMMARY OF ALLEGATIONS

1.      Between May and October of 2014, Lemelson devised and carried out a fraudulent scheme in which he purchased "short positions" in the stock of Ligand Pharmaceuticals, Inc. ("Ligand") and then sought to manipulate the stock price to make a profit. A short position is an investment technique whereby an investor seeks to profit when the price of a stock falls.  Lemelson publicly disseminated a series of false statements about Ligand to drive

down the price of the stock, while engaging in a series of purchases and sales of Ligand stock that enabled him to profit from the lowered stock price.

2.      An investor takes a "short position" in a stock by borrowing a company's stock from a broker.  The investor then sells the stock at its current market price (which the investor hopes is overvalued and will soon drop).  If the price of the stock goes down, the investor profits from the "short sale" by purchasing the stock at the lower price, referred to as "covering" the short sale, returning the borrowed stock to the broker, and keeping the difference between the initial sale and the later purchase at a lower price.

3.      Beginning in May 2014 and continuing through October 2014, Lemelson took short positions in Ligand stock through his hedge fund, The Amvona Fund, LP ("Amvona").  He then orchestrated a public campaign attacking Ligand with the intent to convince the investing public that Ligand's stock was overvalued.  As part of his campaign, Lemelson made a series of false statements of material fact about Ligand that were intended to shake investor confidence in the company, drive down the price of Ligand's stock, and, consequently, increase the value of Lemelson's short positions.

4.      Starting in June 2014 and continuing through August 2014, Lemelson authored and published multiple "research reports" that contained false statements of material fact about Ligand and that were intended to create a negative view of the company and its value and, consequently, to drive down the price of the company's stock.  Further, between June and October of 2014, Lemelson participated in live and written interviews in which he made additional false statements of material fact about Ligand which also were intended to create a negative view of the company and its value and, consequently, to drive down the price of the company's stock.

5.     Each of Lemelson's false statements was intended to drive down the price of Ligand's stock.  For example, in a June 2014 report, Lemelson stated that Ligand's flagship drug product, and main source of licensing revenue, was imminently "going away."  To bolster and lend credence to his report, Lemelson, in a widely available radio interview, falsely stated that a Ligand representative agreed with his analysis.  Lemelson also falsely claimed that Ligand engaged in a sham licensing transaction with another pharmaceutical company and had run up so much debt that the company had virtually no value.  None of these statements was true, none had a reasonable basis in fact, and each concerned significant aspects of Ligand's financial condition, business dealings, and the viability of its products that reasonable investors would consider important in evaluating Ligand's prospects.  Lemelson made each of these false statements intentionally or recklessly for the purpose of driving down Ligand's stock price.

6.     Between June and October 2014, Lemelson publicly and widely disseminated false statements about Ligand in press releases, on Amvona's blog, through social media, in various other media outlets, and also in appearances on radio shows.  In doing so, Lemelson intended to create a negative view of the company and its value and, consequently, to drive down the price of the company's stock.

7.     In addition to deceiving the investing public by making false statements of material fact about Ligand, Lemelson and Lemelson Capital Management, LLC ("LCM") deceived investors and prospective investors in The Amvona Fund by making and disseminating false statements about Ligand as part of their efforts to obtain and retain Amvona Fund investors.  Defendants further misled investors and potential investors by not disclosing that The Amvona Fund's positive returns from its short position in Ligand were based on Defendants' stock price manipulation.

8.      As Lemelson intended, the price of Ligand stock fell during his scheme to mislead investors about its value.  The day Lemelson began disseminating his false statements, June 16, 2014, Ligand's opening share price was $67.26.  By October 13, 2014, Ligand's share price had dropped by nearly than $23—a decline of approximately 34 percent.  Also by that time, Lemelson had "covered" the vast majority of Amvona's short position in Ligand generating approximately $1.3 million in illegal profits.  Ligand's stock price subsequently recovered, and today, Ligand stock trades at over $250 per share.

9.      By engaging in this conduct, Lemelson and LCM violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)], and both Lemelson and LCM violated Section 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

10.     The Commission seeks injunctive relief, disgorgement of ill-gotten gains together with prejudgment interest, and civil penalties.

## JURISDICTION AND VENUE

11.     The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].  The Commission seeks the imposition of a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

12.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209(d), 209(e) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14],  and 28 U.S.C. § 1331.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1331(b)(2), Sections 21(d)-(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)-(e) and 78aa], and Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d) , 80b-14], because a substantial part of the acts constituting the alleged violations occurred in the District of Massachusetts, Lemelson lived and worked in Massachusetts during the relevant time period, and the principal place of business of Amvona and Lemelson Capital Management LLC ("LCM") is in Massachusetts.

14.     In connection with the conduct alleged in this Complaint, Lemelson directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of national securities exchanges, or the mails.

15.     Lemelson's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

16.     Unless enjoined, Lemelson will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate federal securities laws.

## DEFENDANTS AND RELIEF DEFENDANTS

17.     **Gregory Lemelson**, 42, resides in Mansfield, Massachusetts.  He is the Chief Investment Officer and portfolio manager of Lemelson Capital Management LLC, a private investment firm he founded to manage The Amvona Fund, LP.  At all relevant times, Lemelson was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].  Lemelson is LCM's founder, Chief Investment Officer, and portfolio manager.  In those capacities, Lemelson controls LCM and makes all decisions on behalf of LCM.

18.     **Lemelson Capital Management, LLC** is a Massachusetts company formed on June 14, 2012, with its principal office in Marlborough, Massachusetts.  LCM is an Exempt

5

Reporting Adviser registered with the Commission and the Commonwealth of Massachusetts. LCM is the investment manager and investment adviser to The Amvona Fund, LP.  At all relevant times, LCM was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

19.     **The Amvona Fund, LP** is a Delaware company formed on July 24, 2012, with its principal office in Marlborough, Massachusetts.  Amvona is a pooled investment vehicle under Rule 206(4)-8(b) promulgated under the Advisers Act [17 C.F.R. § 275.206(4)-8] and Sections 3(a) and 3(c)(1) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(a) and (c)(1)]. Lemelson is the General Partner of Amvona.  Lemelson launched Amvona as a hedge fund in September 2012, and began accepting limited partner investments shortly thereafter.  On January 4, 2013, Lemelson formed The Amvona Fund Ltd. ("Amvona Limited") in the British Virgin Islands.  Amvona Limited operates as a feeder fund into Amvona (Amvona Limited and Amvona are hereinafter referred to together as "Amvona").  Lemelson is the Director of Amvona Limited. Amvona advertises itself as a long-position fund, *i.e.*, a fund that seeks to profit from appreciation in the price of securities it holds.  Amvona has approximately $15 million of assets under management, more than half of which belong to Lemelson and his family.

## RELATED ENTITIES

20.     **Ligand Pharmaceuticals, Inc.** ("Ligand") is a Delaware corporation with its principal place of business in San Diego, California.  Ligand is a biopharmaceutical company involved in the development and licensing of medicines and technologies.  Ligand's common stock is registered with the Commission under Section 12(b) of the Exchange Act and trades on NASDAQ under the symbol "LGND."

21.     **Viking Therapeutics, Inc.** ("Viking") is a Delaware corporation with its principal place of business in San Diego, California.  Viking is a clinical-stage biotherapeutics

company focused on developing treatments for metabolic and endocrine disorders.  Viking's

common stock is registered with the Commission under Section 12(b) of the Exchange Act and

trades on NASDAQ under the symbol "VKTX."  Through a Master License Agreement between

Ligand and Viking dated May 2014, Ligand became a 49.8% owner of Viking common stock.

## FACTS

**A.     Lemelson Published and Disseminated Negative Reports about Ligand While
         Increasing Amvona's Short Position in Ligand**

22.     On May 22, 2014, Lemelson and LCM took an initial short position in Ligand of

579 shares on behalf of Amvona.  Shortly thereafter, Lemelson began publicly disseminating

negative information about Ligand—including a series of false and misleading statements—as

part of a fraudulent scheme to drive down Ligand's share price and profit from his short position.

23.     Between June 16 and August 22, 2014, Lemelson published a total of five reports

that discussed Ligand.  Lemelson was the sole author and solely responsible for the content of

each report.  All of Lemelson's reports about Ligand were negative and took a dim view of the

company's value and prospects.  Certain of the reports also contained false and misleading

statements of material fact, as detailed in Part B below.  Lemelson used these false and

misleading statements to bolster and lend credence to the overall attack levied against Ligand

and its valuation.

24.     Lemelson published the first of his negative reports about Ligand on June 16,

2014, titled "Ligand Pharmaceuticals (NASDAQ: LGND)" (the "June 16th Report").  As

detailed below, Lemelson stated, without a reasonable basis in fact, that Ligand's primary source

of licensing revenue, the drug Promacta, was on the brink of obsolescence.  Lemelson then

doubled down on this misstatement by falsely claiming in a June 19 interview that a Ligand

representative stated the company knew Promacta was "going away."   Lemelson thus concluded

that "Ligand's fair value is roughly $0 per share, or 100 percent below the current stock price."
By this time, Lemelson had increased his short position in Ligand by borrowing and selling short
68,528 shares for approximately $4.6 million.  In the days following the June 16 report Ligand's
stock price dropped approximately 16%.

25.     Lemelson continued his efforts to drive Ligand's stock price even lower.  In his
next report, dated July 3, 2014 and titled "Ligand Pharmaceuticals (NASDAQ: LGND);
Appendix" (the "July 3rd Report"), Lemelson characterized a transaction between Ligand and
Viking as a sham by making false statements about Viking's finances and operations.  Lemelson
went on to state that "the intrinsic value of Ligand shares must be reaffirmed as $0 with
downside risk justifiably calculated at 100%."

26.     Lemelson's next report, dated August 4, 2014 and titled "Update: Lemelson
Capital Further Increases Short Stake in Ligand Pharmaceuticals (NASDAQ: LGND) as LGND
EPS Plunges 76 percent in Q2 2014" (the "August 4th Report"), repeated his false statement
about Promacta becoming obsolete and concluded that "the intrinsic value of Ligand shares must
be reaffirmed as $0 with downside risk justifiably calculated at 100 percent."

27.     In another report dated August 14, 2014, titled "Lemelson Capital Says Ligand
Pharmaceuticals' (NASDAQ: LGND) $225M Debt Issuance Solidifies Company's Insolvency,
Substantially Raises Specter of Bankruptcy" (the "August 14th Report"), Lemelson claimed that
Ligand was teetering on the brink of bankruptcy.

28.     Finally, on August 22, 2014, Lemelson issued a report titled "Ligand
Pharmaceuticals' (NASDAQ: LGND) – Institutional Holders waste no time dumping stock in
response to Insolvency and bankruptcy risk" (the "August 22nd Report"), in which he

mischaracterized Ligand's financial condition, as detailed below, and claimed that "common shareholders could be wiped out almost entirely without notice."

29.     Lemelson published his Ligand reports under the heading of LCM; posted them on Amvona's website; distributed them to various press sources – among them, PR Newswire, Globe Newswire, Seeking Alpha, Benzinga, Street Insider, Value Walk, and USA Today – the day they were published; and posted links to the reports on various social media accounts under his control.  The published press releases contained abbreviated summaries of the report and included links to the reports on Amvona's website.

30.     Between June and October 2014, Lemelson also conducted various audio and written interviews in which he stated that Ligand's stock had no intrinsic value and provided additional commentary on Ligand.  He conducted many such interviews with Benzinga, an online financial media outlet, including appearing on Benzinga's "Premarket Prep" show, which provides investors with information prior to market open.  Lemelson discussed Ligand in at least four of these live and written interviews:

a.     On June 19, 2014, Lemelson appeared on Benzinga's Premarket Prep show, for an audio interview (the "June 19th Interview") in which he falsely stated that a Ligand representative agreed with Lemelson's statements about Promacta in the June 16 Report and subsequently reiterated in the August 4 report.

b.     On August 13, 2014, Lemelson appeared for a second time on the Benzinga Premarket Prep Show for an audio interview (the "August 13th Interview").

c.     On September 16, 2014, Lemelson appeared for a third time on the Benzinga Premarket Prep Show for an audio interview (the "September 16th Interview").

d.     On October 16, 2014, Lemelson appeared for a fourth time on the Benzinga Premarket Prep Show for an audio interview (the "October 16th Interview").

31.     The purpose of Lemelson's reports and interviews was to shake investor confidence in Ligand and drive down Ligand's share price.  For example, in a solicitation to a prospective Amvona investor, Lemelson touted the June 19th Interview and asserted that "[s]hares of Ligand dropped ~2% during the interview."  Similarly, a major financial news organization noted that Ligand's stock price "fell more than 7 percent" after Lemelson published his report claiming that demand for Promacta was rapidly declining.

32.     Lemelson took affirmative steps to suppress commentary that highlighted his bias, his lack of familiarity with the pharmaceutical industry, and his motivation to drive down the price of Ligand stock.  For example, Lemelson successfully petitioned Seeking Alpha to remove commentary on his Ligand-related reports on or around at least the following dates:

|   |   |   |
|---|---|---|
| a. | June 22, 2014 (five separate comments by five separate accounts removed), |
| b. | June 23, 2014, |
| c. | June 24, 2014, |
| d. | August 4, 2014 (two separate comments by two separate accounts removed), |
| e. | August 23, 2014 (two separate comments by two separate accounts removed), |
| f. | August 26, 2014, and |
| g. | May 1, 2015. |

Lemelson also unsuccessfully attempted to remove comments critical of his Ligand-related reports on July 7, 2014.

33.     Lemelson expanded Amvona's short position in Ligand stock between May 22 and August 4, 2014, to 65,736 shares.  He covered a significant portion of this position in August 2014, after Ligand's share price dropped from $68.72 on June 16, 2014, to $51.75 on August 22, 2014, in the wake of Lemelson's negative reports and interviews.  Lemelson covered the bulk of Amvona's remaining short position in October 2014.  In total, Lemelson sold short (and bought to cover) 77,836 shares of Ligand in 2014.

34.     Amvona profited by approximately $1.3 million from this trading, and, as a part owner of Amvona, Lemelson personally profited from his fraudulent trading activity.

**B.      Lemelson's False and Misleading Statements Concerning Ligand.**

35.     Lemelson presented his negative reports on Ligand as a purported exposé on the company's inner workings, and claimed that his statements about Ligand were based on extensive research and discussions with the company's representatives and with medical experts. In his reports and other public statements, Lemelson intentionally or recklessly made the following material misstatements of fact.

**1)      Lemelson Falsely States that Ligand's Flagship Product was "Going Away."**

36.     The central thesis of Lemelson's June 16th Report was that Promacta, Ligand's flagship drug and primary source of revenue, was facing competitive pressure from a new competing drug, Sovaldi, which would soon render Promacta obsolete.  Lemelson subsequently sought to lend credence to his thesis by falsely stating that a Ligand representative agreed with him and acknowledged that Promacta was going to become obsolete.

37.     Specifically, following publication of the June 16 Report, Lemelson appeared on Benzinga's Pre-Market Prep show on June 19, 2014.  During the June 19th Interview, Lemelson made the following false statement of material fact:  "I had discussions with [Ligand] management just yesterday – excuse me, their [Ligand's] IR [investor relations] firm.  And they basically agreed.  They said, "'Look, we understand Promacta's going away.'"

38.     Lemelson's statement referenced a conversation he had on June 18, 2014, with a representative of Ligand's investor relations firm (the "IR Representative").  The IR Representative, however, never made any such statement.  The IR representative notified Lemelson of that fact via email after hearing Lemelson's Benzinga interview.  Lemelson never

responded to the email.  Nor did Lemelson correct or withdraw his false statement, or disclose

that the IR Representative denied having made the statement Lemelson attributed to him.

39.     Lemelson made this false statement of material fact to support his argument that

one of Ligand's main revenue sources—royalties from licensing Promacta—was imperiled and

that Ligand's stock was therefore overvalued.

40.     Lemelson also attempted to bolster his false representation that Promacta was on

the brink of obsolescence by misleading the readers of his reports about other "evidence" he had

about Promacta. The June 16 Report cites information provided by "an Associate Clinical

Professor of Medicine and Surgery at one of the largest transplant Hepatology departments at a

major U.S. university hospital and also with the Chief of abdominal surgery and transplantation

at a major European university hospital."  This statement was itself misleading because: a)

Lemelson did not disclose that the European hospital doctor was actually Amvona's largest

investor (and thus had a significant financial interest in making Ligand's stock price fall), and b)

Lemelson never spoke with the U.S. hospital doctor, relying only on a report from his largest

investor on what the U.S. hospital doctor had said.

41.     Further, none of the information Lemelson identified as the source of his

statement about Promacta suggested that Sovaldi would render Promacta obsolete.  Specifically,

Lemelson cited two articles in the June 16th Report as "references to the obsolete nature of

[Hepatitis C] supportive care treatments such as Promacta," despite the fact that neither article

discussed Promacta, and neither article could be fairly construed as implying or suggesting that

Sovaldi would render Promacta obsolete.

42.     In sum, Lemelson's false statements about Promacta were falsely attributed to Ligand and had no other reasonable basis in fact.  He either intentionally lied about Promacta's viability, or was reckless as to the truth or falsity of his statements.

43.     Lemelson's false statements about Promacta were material.  Each concerned the viability of one of Ligand's main sources of revenue.  These material falsehoods supported Lemelson's misrepresentations that Ligand's revenue streams were in peril, and were thus central to his scheme to drive down Ligand's stock price.

**2)     Misstatements About Viking Therapeutics, Inc.**

44.     Lemelson published another report about Ligand on July 3, 2014.  In that report, in addition to repeating his claims about Promacta, Lemelson also took aim at Ligand's business relationship with Viking.  Lemelson stated that "Ligand appears to be indirectly creating a shell company through Viking to generate paper profits to stuff its own balance sheet."  He further stated that Ligand had "engaged in a 'creative transaction' with an affiliate shell company called Viking Therapeutics" to the detriment of Ligand shareholders.  To bolster and lend credence to these accusations, Lemelson made material misstatements of fact regarding Ligand's licensing agreement with Viking and Viking's Form S-1 registration statement (the form the SEC requires initially to register securities for public sale).

45.     Viking was not a "shell."  It was in the business of developing treatments for certain kinds of illnesses.  Ligand had five drugs that it licensed to Viking to develop.  Ligand had also invested in Viking and bought just under half of the company before Lemelson started trying to drive Ligand's stock price down.  In short, Viking was working on developing certain of Ligand's drugs with financial support from Ligand.

46.     In the July 3rd Report, Lemelson falsely stated that, as of the filing of Viking's July 1, 2014 Form S-1 registration statement, Viking had "yet to consult with [its auditors] on

any material issues" and that the "financial statements provided in the S1 accordingly are unaudited." Lemelson also falsely stated in the same report that "Viking does not intend to conduct any preclinical studies or trials." None of these statements were true, and each was made to support Lemelson's false claim that Viking was "an affiliate shell company" that Ligand used to "create almost a veritable pyramid scheme of shell companies" that was "guaranteed to lose money."

47.     Lemelson's statements about auditors and financial statements were false and contradicted by Viking's July 1, 2014 Form S-1, which Lemelson relied upon when writing his July 3 report. The Form S-1 contains a letter from Viking's new auditors stating that they have "audited the balance sheets of Viking . . . as of December 31, 2012, and 2013."

48.     Further, the May 21, 2014 Master License Agreement between Ligand and Viking, which was attached to the Viking Form S-1, stated that "Viking is engaged in the research, development, manufacturing and commercialization of pharmaceuticals products." Through the Master License Agreement, Viking obtained licenses to develop drugs, and leased space from Ligand to conduct the necessary research and development activities, which include preclinical studies and trials. Lemelson's statement that "Viking does not intend to conduct any preclinical studies or trials" is thus contradicted by the very document Lemelson supposedly relied upon.

49.     In short, each of Lemelson's false statements about Viking is contradicted by the source Lemelson supposedly relied upon. Lemelson therefore either intentionally lied about, or was reckless as to the truth or falsity of, his statements.

50.     Lemelson's falsehoods about Viking were material. Each concerned a significant financial transaction and sought to both cast doubt on the stated benefits of the transaction to

Ligand and to allege misconduct by Ligand management.  These material falsehoods supported Lemelson's false claim that the Ligand-Viking business relationship was a sham or fraud designed to artificially inflate Ligand's profits, and were thus central to his scheme to drive down Ligand's stock price.

### 3) Lemelson Makes False and Misleading Statements about Ligand's Finances.

51.     In his August 14 and August 22 Reports, Lemelson stated that Ligand was saddled with crippling debt and therefore insolvent.  To support this claim, Lemelson falsely stated that Ligand "issued 245 million in new debt, against tangible equity of just $21,000, giving rise to a debt to tangible equity ratio of 11,667 to 1 (that is $11,667 dollars (sic) in debt for every $1 in tangible common shareholder equity)" and that "shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt."

52.     In calculating Ligand's "debt to equity ratio of 11,667 to 1," Lemelson included the new debt but not the proceeds of the loan, which would have yielded a debt-to-equity ratio closer to 1:1.  Lemelson intentionally misstated Ligand's debt-to-equity ratio, or was reckless as to the truth or falsity of his statement.

53.     This false statement was material.  Lemelson made his false statement about Ligand's debt-to-equity ratio to support his argument that Ligand had rendered itself insolvent by issuing excessive debt.  Lemelson's false statement went to the heart of Ligand's overall financial viability and supported his argument that Ligand's stock was worthless.

## C.     Lemelson and LCM Misled Prospective Investors.

54.     Both LCM and Lemelson, intentionally or recklessly, and by failing to exercise reasonable care, disseminated the material false statements of fact detailed above to LCM's investors and prospective investors.  By doing so, and by omitting to disclose material

information, they caused disclosures by Lemelson and LCM about Amvona's investment strategy and about Lemelson's abilities as a financial adviser to be materially misleading.

55.     Lemelson and LCM sent Lemelson's reports and links to his interviews, which contained multiple misstatements of material fact as detailed above, to current and prospective Amvona investors, including in emails dated June 16, June 19 (boasting that Ligand shares dropped two percent during his interview), July 2, July 3, and July 18, 2014.  He also touted his results in driving down Ligand's stock price in communications to investors and prospective investors, including in an email dated July 18, 2014; letters to Amvona Fund partners dated July 17, 2014 (claiming that Lemelson's research report and appendix on Ligand "have begun to be proven correct") and October 9, 2014 (citing the decline in Ligand's stock price); an investor presentation dated September 4, 2014 (falsely noting that Lemelson Capital had been credited with the drop in Ligand's market capitalization by certain media outlets); and in multiple posts to his Amvona website.   In addition, in using Lemelson's reports to solicit potential investors to entrust their funds to him, Lemelson and LCM did not disclose that the profitability of their short-selling strategy depended upon Lemelson's fraudulent manipulation of Ligand stock through false statements, rather than his ability to identify a company whose stock would decrease on its own based on its inherent lack of value.  This omission also made other disclosures about Amvona's value-focused investing strategy materially false and misleading.

## FIRST CLAIM FOR RELIEF

**Fraud in the Purchase or Sale of Securities in
Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Lemelson and LCM)**

56.     The Commission realleges and incorporates by reference paragraphs 1 through 55 above, as if set forth fully herein.

57.     As detailed above, Defendants Lemelson and LCM engaged in a fraudulent scheme through a series of fraudulent acts, statements, and material omissions designed to drive Ligand's stock price down and profit from a short position in Ligand stock.

58.     By engaging in the conduct above, these Defendants, directly or indirectly, acting intentionally, knowingly, or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons, or, in the alternative, aided and abetted these violations.

59.     The conduct of these Defendants involved fraud, deceit, manipulation, and/or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in losses to other persons.

60.     By engaging in the foregoing conduct, Lemelson violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Fraudulent, Deceptive, or Manipulative Act or Practice
to Investors or Potential Investors in Pooled Investment Vehicle in
Violation of Section 206(4) of the Investment Advisers Act and Rule 206(4)-8 Thereunder**

**(Lemelson and LCM)**

61.     The Commission realleges and incorporates by reference paragraphs 1 through 60 above.

62.     Section 206(4) of the Advisers Act prohibits an investment adviser from, directly or indirectly, engaging in any act, practice, or course of business that is fraudulent, deceptive, or manipulative.  Rule 206(4)-8(a)(1) prohibits an adviser to a pooled investment vehicle from making any untrue statement of a material fact or omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled vehicle.

63.     By the actions described above, Lemelson and LCM, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently made untrue statements of material fact and omissions that rendered Lemelson's statements misleading to investors and prospective investors in Amvona.

64.     At all relevant times, Lemelson and LCM were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].  Lemelson was an "investment adviser" by virtue of his ownership, management and control of LCM, and his provision of investment advice to Amvona.  Both Lemelson and LCM were in the business of providing investment advice concerning securities, for compensation.

65.     At all relevant times, Amvona was a "pooled investment vehicle" within the meaning of Rule 206(4)-8(b) promulgated under the Advisers Act [17 C.F.R. § 275.206(4)-8]

and Sections 3(a) and 3(c)(1) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(a) and (c)(1)].

66.     By engaging in the conduct described above, Lemelson and LCM violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### THIRD CLAIM FOR RELIEF

**Other Equitable Relief, Including
Unjust Enrichment and Constructive Trust**

**(As to Relief Defendant The Amvona Fund, LP)**

67.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 66 above as if set forth fully herein.

68.     Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

69.     Relief Defendant Amvona has received investor funds derived from the unlawful acts or practices of the Defendants under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

70.     Further, specific property acquired by Relief Defendant Amvona is traceable to Defendants' wrongful acts and there is no reason in equity why Relief Defendant should be entitled to retain that property.

71.     As a result, Relief Defendant Amvona is liable for unjust enrichment and should be required to return its ill-gotten gains, in an amount to be determined by the Court.  The Court

should also impose a constructive trust on property in the possession of the Relief Defendant that is traceable to Defendants' wrongful acts.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully request that the Court enter Final Judgment:

### I.

Permanently restraining and enjoining Defendants, and their agents, servants, employees, attorneys and those persons in active concert or participation with them, who receive actual notice of the order by personal service or otherwise, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

### II.

Ordering Defendants and Relief Defendant to disgorge the proceeds their ill-gotten gains, plus prejudgment interest;

### III.

Ordering Lemelson and LCM to pay appropriate civil monetary penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

### IV.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application of motion for additional relief within the jurisdiction of this Court; and

## V.

Granting such other and further relief as this Court may determine to be just and necessary.

Dated: September 12, 2018                    Respectfully submitted,

                                        */s/ Alfred A. Day*
                                        Alfred A. Day (BBO #654436)
                                        Marc J. Jones (BBO #645910)
                                        Securities and Exchange Commission
                                        Boston Regional Office
                                        33 Arch Street, 24th Floor
                                        Boston, MA  02110
                                        617-573-4537 (Day)
                                        617-573-8947 (Jones)
                                        DayA@sec.gov
                                        JonesMarc@sec.gov
                                        Attorneys for Plaintiff

                                        Virginia M. Rosado Desilets
                                        Sonia G. Torrico
                                        Securities and Exchange Commission
                                        100 F Street, N.E.
                                        Washington, DC 20549