**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:18-cv-11926-PBS |
| ) | |
| GREGORY LEMELSON and LEMELSON CAPITAL ) | |
| MANAGEMENT, LLC, ) | |
| ) | **ORAL ARGUMENT REQUESTED** |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE AMVONA FUND, LP, ) | |
| ) | |
| Relief Defendant ) | |
| ) | |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

Douglas S. Brooks (BBO No. 636697)
LIBBYHOOPES, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617) 338-9300
dbrooks@libbyhoopes.com

Defendants Rev. Fr. Emmanuel Lemelson (identified in the Complaint as "Gregory Lemelson") and Lemelson Capital Management, LLC ("LCM") (collectively, "Lemelson"), along with Relief Defendant The Amvona Fund, LP ("Amvona"), submit this memorandum in support of their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

The SEC alleges Lemelson violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, through allegedly false and misleading statements concerning Ligand Pharmaceuticals, Inc. ("Ligand"), a public company in which LCM, through Amvona, had taken, and very publicly disclosed, a "short" position. Lemelson's challenged conduct is radically different from the conduct present in *all* previous so-called "short and distort" cases brought by the SEC. In every one of those prior cases, the defendant used artifice and deceit to promulgate a deliberately false rumor or "breaking news"-type story about the company he had shorted, and then, immediately after publishing the intentional falsehood, covered the short position to profit from the sudden drop in the share price he had fraudulently and surreptitiously caused. Here, by contrast, Lemelson always operated openly and transparently, with notice to all that he was short Ligand and was offering his own opinions and views about what he believed to be Ligand's overvaluation and materially misleading statements in its disclosures. Further, he held the vast majority of his short position for about four months, thus exposing himself and his fund to the risk of tremendous loss.

Not surprisingly given the absence of such "short and distort" conduct, in an effort to cast Lemelson's statements as securities fraud, the SEC resorts to distorting the facts, claiming as false statements that are demonstrably true, misrepresenting what Lemelson actually said, and ignoring the plain language of the very documents upon which it purportedly relies. In sum, the SEC's Complaint fails to state a viable claim under 10b-5 because: (1) at least four of the

allegedly false statements were demonstrably true; (2) several others constitute constitutionally protected opinions that the SEC fails (fatally) to allege Lemelson did not actually hold; and (3) to the extent that the lone remaining challenged statement can be deemed false or misleading at the motion to dismiss stage, it—like *all* the statements at issue—was immaterial as a matter of law.

The SEC also alleges Lemelson violated Section 206(4) of the Investment Advisers Act, 15 U.S.C. § 80b-6, and Rule 206(4)-8 thereunder, 17 C.F.R. 275.206(4)-8, by sharing the allegedly false and misleading statements about Ligand with Amvona's investors and by failing to disclose that the profitability of the fund depended on the alleged manipulation of Ligand's stock. The first theory is based on a novel interpretation of Section 206(4) that the SEC has never previously put forward—because Section 206(4) does not cover such conduct. The latter theory fails for the additional reason that Lemelson did not manipulate Ligand's stock.

Therefore, because the SEC cannot establish either its Section 10(b) or 206(4) claims as a matter of law, the Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

Lemelson is a canonically ordained priest in the Greek Orthodox Church. He also serves as the Chief Investment Officer of LCM. Compl. ¶ 17. LCM is the general partner to Amvona, a pooled investment vehicle. *Id.* ¶¶ 18, 19.

In 2014, Lemelson publicly shorted and criticized Ligand, which he believes was engaged in accounting and securities fraud. Lemelson's criticism of Ligand included his belief that (1) Ligand's product, Promacta, a fourth-line indication used in conjunction with interferon-based Hepatitis C treatments, faced a serious competitive threat from a new drug, Sovaldi, which cures Hepatitis C, and (2) Viking Therapeutics, Inc. ("Viking"), a company to which Ligand

loaned money and entered into a licensing agreement, as well as a tenant that leased space from Ligand, was nothing more than a "shell" or an alter-ego of Ligand.[1]

The SEC alleges that certain of Lemelson's criticisms of Ligand and Viking were false and misleading and drove down Ligand's stock price, thus constituting securities fraud. Compl. ¶¶ 1, 3-4. The SEC alleges the following statements Lemelson made are false or misleading:

1. That he "'had discussions with [Ligand] management just yesterday – excuse me, their [Ligand's] IR [investor relations] firm. And they basically agreed. They said, "Look, we understand Promacta's going away."'" *Id*. ¶ 37 (quoting June 19, 2014 interview);

2. That he had information about Promacta from "'an Associate Clinical Professor of Medicine and Surgery at one of the largest transplant Hepatology departments at a major U.S. university hospital and also with the Chief of abdominal surgery and transplantation at a major European university hospital.'" *Id*. ¶ 40 (quoting June 16, 2014 report);

3. That "'Ligand appears to be indirectly creating a shell company through Viking to generate paper profits to stuff its own balance sheet,'" "Ligand had 'engaged in a "creative transaction" with an affiliate shell company called Viking Therapeutics' to the detriment of Ligand shareholders," and "Viking was 'an affiliate shell company' that Ligand used to 'create almost a veritable pyramid scheme of shell companies' that was 'guaranteed to lose money.'" *Id*. ¶¶ 44, 46 (quoting July 3, 2014 report);

4. That "Viking had 'yet to consult with [its auditors] on any material issues' and that the 'financial statements provided in the S1 accordingly are unaudited.'" *Id*. ¶ 46 (quoting July 3, 2014 report);

5. That "'Viking does not intend to conduct any preclinical studies or trials.'" *Id*. ¶ 46 (quoting July 3, 2014 report);

6. That "Ligand 'issued 245 million in new debt, against tangible equity of just $21,000, giving rise to a debt to tangible equity ratio of 11,667 to 1 (that is $11,667 dollars (sic) in debt for every $1 in tangible common shareholder equity)'" and that Ligand "'shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt.'" *Id*. ¶ 51 (quoting August 14 & 22, 2014 reports).[2]

---

[1] Lemelson felt (and continues to feel) so strongly in his opinions about Ligand that in January 2016—more than 2.5 years before the SEC filed this action—he filed a whistleblower complaint with the SEC against Ligand and has continued to declaim publicly against what he sees as a massive accounting and securities fraud.

[2] Remarkably, among the more than 650 allegations Lemelson raised concerning Ligand and Viking in his reports, interviews, and tweets, the SEC identified only a handful as allegedly false or misleading—another example of how this case differs from all the SEC's other short-and-distort cases.

The SEC alleges Amvona earned $1.3 million from its short position in Ligand. *Id.* ¶ 8.[3]

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "'Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the court] to draw on [its] judicial experience and common sense.'" *Henderson v. Bank of New York Mellon Corp.*, 146 F. Supp. 3d 438, 441 (D. Mass. 2015) (quotation omitted).[4]

---

[3] Ligand's share price was extremely volatile during 2014, frequently experiencing sharp declines before Lemelson issued any of his reports, and climbing on some of the days he issued his allegedly misleading statements. *See, e.g.*, Yahoo! Finance, NASDAQ:LGND Historical Share Price (Jan. 2, 2014-Dec. 31, 2014), *available at* https://finance.yahoo.com/quote/LGND/history?period1=1388552400&period2=1420002000&interval=1d&filter=history&frequency=1d; *see also* Ligand, Form 10-Q (May 7, 2014) at 41 ("Our stock price has been volatile and could experience a sudden decline in value."). Indeed, Ligand's share price continues to be volatile, dropping (as of market close the day prior to filing the instant motion) *more than 40% and more than $111 per share* in October 2018 alone. Yahoo! Finance, NASDAQ: LGND Historical Share Price (Oct. 1-24, 2018), *available at* https://finance.yahoo.com/quote/LGND/history?period1=1506830400&period2=1540353600&interval=1d&filter=history&frequency=1d. Accordingly, the SEC's promotional language concerning Ligand's stock price in its Complaint that "today, Ligand's stock trades at over $250.00," Compl. ¶ 8, is not only irrelevant to its claims but also a completely improper effort to trumpet the company's purported value and success.

[4] "In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (citations omitted) (superseded by statute on other grounds). Thus, Defendants submit herewith the Declaration of Douglas S. Brooks (Oct. 25, 2018) (hereafter, "Ex. [#]"), with the relevant reports and other documents relied upon in the Complaint attached.

## ARGUMENT

## I.     THE SEC'S SECTION 10(b) AND RULE 10b-5 CLAIM FAILS.

For its Section 10(b) claim to survive, the SEC must allege that Lemelson (1) "engaged in fraudulent conduct; (2) in connection with the purchase or sale of securities; (3) through the means or instruments of transportation or communication in interstate commerce or the mails; and (4) with the requisite scienter." *SEC v. Tambone*, 417 F. Supp. 2d 127, 131 (D. Mass. 2006) (citing *Aaron v. SEC*, 446 U.S. 680, 695 (1980)). To establish that Lemelson engaged in fraud, the SEC must show he "(1) made an untrue statement of material fact; (2) omitted a fact that rendered a prior statement misleading; or (3) committed a manipulative or deceptive act as part of a scheme to defraud." *Id.* at 132 (citing *Gross v. Summa Four, Inc.* 93 F.3d 987, 992 (1st Cir. 1996) (superseded by statute on other grounds)). The SEC cannot meet its burden.

### A.     At Least Four of the Challenged Statements Were Demonstrably True.

The documents on which the SEC purports to rely show that at least four of the challenged statements are undeniably true. Perhaps in tacit acknowledgement of the meritless nature of its claims, the SEC attributes inflammatory language to Lemelson that he never said and makes erroneous factual assertions. For example, the SEC claims Lemelson said that (1) Ligand was "teetering on the brink of bankruptcy,'" Compl. ¶ 27 (citing August 14 report), despite that Lemelson *never* used that phrase in his August 14 report or elsewhere;[5] (2) Ligand "was saddled with crippling debt," *id.* ¶ 51, although Lemelson never used those words to describe Ligand's financial situation; (3) Ligand's drug was on the "brink of obsolescence," another phrase that the SEC fabricates rather than accurately quoting Lemelson; and (4) the

---

[5] *See generally* Ex. 4 (August 14 report). The SEC unfairly exacerbates this untrue allegation by placing quotations around that specific language in its press release announcing its filing of this lawsuit, thereby misleading readers that Lemelson actually uttered those exact words. *See* SEC, "SEC Charges Hedge Fund Adviser with Short-and-Distort Scheme" (Sept. 12, 2018), *available at* https://www.sec.gov/news/press-release/2018-190.

Viking-Ligand business relationship was a "sham" or "fraud," despite that he never used those words to describe the relationship. *See id.* ¶¶ 5, 25, 50. Finally, the SEC purports to *quote* Lemelson as saying Ligand's "'common shareholders could be wiped out almost entirely without notice,'" *id.* ¶ 28 (purportedly quoting August 22 report), although Lemelson did not say that and his actual quote on the subject was vastly different. It makes a mockery of Fed. R. Civ. P. 9(b)'s particularity requirement for the SEC to *invent* Lemelson's words to boost its case, rather than simply rely on what he *actually* said.

The Complaint also contains clear misstatements of fact to bolster its claims. For example, the SEC alleges that as of July 3, 2014 "Ligand had bought just under half of [Viking] before Lemelson started trying to drive Ligand's stock price down." Compl. ¶ 45. This is false. Under the Master License Agreement between Viking and Ligand, Viking was to provide Ligand with $29 million worth of shares "upon the consummation by Viking of a firmly underwritten public offering," an event which did not occur until April *2015*. Ex. 7 (Master License Agreement) at Art. 5.1(b); Viking, "Viking Therapeutics, Inc. Announces Pricing of Initial Public Offering" (April 29, 2015), *available at* http://ir.vikingtherapeutics.com/2015-04-29-Viking-Therapeutics-Inc-Announces-Pricing-of-Initial-Public-Offering. In any event, even where the SEC accurately quotes Lemelson, its allegations fail to state a claim.

### 1. The July 3 report accurately describes that Viking did not intend to conduct preclinical studies or trials.

The SEC claims Lemelson's statement that "'Viking does not intend to conduct any preclinical studies or trials,'"—made to support his thesis that Viking was a "shell" of a company—was false. Compl. ¶ 46 (quoting July 3 report). As Viking's S-1 unequivocally shows, however, Lemelson accurately reported this information from Viking's own disclosures. In support of its erroneous position, the SEC curiously seeks to establish Viking's *bona fides* by

asserting that Viking "leased space from Ligand to conduct the necessary research and development activities, *which include preclinical studies and trials*." *Id.* ¶ 48 (emphasis added). The italicized language, however, is *directly contradicted* by Viking's S-1, where Viking explicitly stated that, "as a company, we do not have any experience in conducting clinical trials for our drug candidates." Ex. 6 (Viking S-1) at 13. Viking then disclosed:

> **We intend to rely on third parties to conduct our preclinical studies and clinical trials** and perform other tasks for us. . . .

*Id.* at 17 (bold in original, italics added). Thus, as Lemelson correctly put it, "*Viking* does not intend to conduct any preclinical studies or trials." Ex. 2 (July 3 report) at 7 (emphasis added). Lemelson never claimed—and the SEC does not allege otherwise—that *no* clinical studies would be performed. Indeed, the focus of Lemelson's July 3 report was not the unremarkable fact that preclinical studies would be performed *by someone*, but on Lemelson's belief that Viking was merely a "single-purpose vehicle created to raise more capital from public markets for its sponsor, Ligand Pharmaceuticals." *Id.* at 7. Consistent with the above, Lemelson simply related Viking's disclosure that Viking, as an entity, did not intend to conduct any preclinical studies or trials. Accordingly, Lemelson's statement is unequivocally true.[6]

### 2. Lemelson's Statement Concerning the Debt-to-Tangible Equity Ratio Arising from Ligand's Bond Offering Was Demonstrably True.

In alleging that Lemelson falsely stated Ligand's debt-to-tangible equity ratio, the SEC cites to the following language in his reports: "Ligand 'issued 245 million in new debt, against

---

[6] Lemelson's statements about Viking fail to state a claim under Section 10(b) or Rule 10b-5 for the additional reason that Lemelson did not make them "in connection with the purchase or sale" of Viking securities. The SEC does not allege that Defendants "shorted" Viking or otherwise traded in Viking securities. Indeed, Viking did not undergo its IPO until April 2015 (8 months after Lemelson published his last report), and Ligand did not own any shares of Viking until that time. Therefore, any impact on Viking could not reasonably have impacted the financial condition or share price of Ligand. *See* Viking Therapeutics, Inc. Announces Pricing of Initial Public Offering, *supra*; Ex. 7 at Art. 5.1(b).

tangible equity of just $21,000, giving rise to a debt to tangible equity ratio of 11,667 to 1 (that is

$11,667 dollars (sic) in debt for every $1 in tangible common shareholder equity)'" and that

Ligand "'shareholders have only the protection of $21,000 in tangible equity to shield them from

$245 million in debt.'" Compl. ¶ 51 (quoting August 14 & 22 reports). From this, the SEC

mistakenly concludes:

> In calculating Ligand's 'debt to equity[7] ratio of 11,667 to 1,' Lemelson included
> the new debt but not the proceeds of the loan, which would have yielded a debt-
> to-equity ratio closer to 1:1. Lemelson intentionally misstated Ligand's debt-to-
> equity ratio, or was reckless as to the truth or falsity of the statement.

*Id.* ¶ 52. The SEC's allegation is flat-out wrong and exposes a complete lack of understanding of

the most elementary principles of accounting. *See, e.g.*, *SEC's Beginners Guide to Financial*

*Statements*.[8] That Ligand received $245 million in cash from its bond offering has no bearing

whatsoever on Ligand's *equity*, but obviously increases its *debt*. *See generally id.*[9]  Accordingly,

the *SEC's* contention that Ligand's true debt-to-equity ratio was closer to 1:1 is false and

misleading. Indeed, contrary to the SEC's assertion, it would have violated basic accounting

principles for Lemelson to include "the new proceeds of the loan" in any valid debt-to-tangible

equity ratio. His statement concerning that ratio was therefore undeniably true.

### 3.    The June 16 report does not mislead readers about information Lemelson obtained from a European and American doctor.

The SEC alleges that the "June 16 Report cites information provided by 'an Associate

Clinical Professor of Medicine and Surgery at one of the largest transplant Hepatology

departments at a major U.S. university hospital and also with the Chief of abdominal surgery and

---

[7] Here again, the SEC misquotes Lemelson, as his calculation related to the common shareholder's "*tangible*"
equity—a word which the SEC conveniently omits from this quotation.

[8] *Available at* https://www.sec.gov/oiea/reportspubs/investor-publications/beginners-guide-to-financial-statements.html.

[9] The SEC confuses the very distinct concepts of "assets," "liabilities," and "equity."

transplantation at a major European university hospital,'" which misled readers about "other 'evidence' [Lemelson] had about Promacta" to "bolster his false representation that Promacta was on the brink of obsolescence." Compl. ¶ 40. Contrary to the SEC's assertion, however, Lemelson's June 16 report does *not* cite the information from the two doctors to suggest that Promacta was "on the brink of obsolescence." Rather, the June 16 Report states:

> The purpose and applicability of Promacta® was discussed with an Associate Clinical Professor of Medicine and Surgery at one of the largest transplant Hepatology departments at a major U.S. university hospital and also with the Chief of abdominal surgery and transplantation at a major European university hospital, with *the latter* commenting after consultation with his US counter-part:
>> "I spoke to one of my colleague[s] (the chief of transplant Hepatology at the largest liver transplant program in the US) regarding the future of Hep C treatment: he is very impressed by the new drug from Gilead (Sovaldi®) in his patients, it is very well tolerated even in patients with advanced disease (including ones with thrombocytopenia). Though the drug is used with or without interferon currently he expects that in the near future with more drugs close to being approved on the market he sees a shorter treatment cycle without interferon and with even better tolerance…"
>
> Chief of abdominal surgery and transplantation<br>Major European university hospital<br>June 12th, 2014.

Ex. 1 at 6-7 (emphasis added). Lemelson never claimed that either doctor said Promacta was "on the brink of obsolescence," as the SEC erroneously alleges. Compl. ¶ 40. Rather, the entire quotation concerned the prospects of another drug, Sovaldi, with no comment on Promacta.[10]

---

[10] Likewise, the SEC alleges that "Lemelson cited two articles in the June 16th Report as 'references to the obsolete nature of [Hepatitis C] supportive care treatments such as Promacta,' despite the fact that neither article discussed Promacta, and neither article could be fairly construed as implying or suggesting that Sovaldi would render Promacta obsolete." Compl. ¶ 41 (brackets in original). But Lemelson never claimed the articles discussed Promacta or its prospects. *See generally* Ex. 1. He simply cited them in support of his *opinion* that sales of Sovaldi—the prospects of which both articles discuss, including that "Wall Street has already declared a winner in the race to develop new treatments for hepatitis C" and Sovaldi was "already the best drug launch ever with $2.3 billion in sales in its first quarter, is set to dominate this new [Hepatitis C] market"— posed a serious threat to Promacta royalties. *Id.* at 7.

The SEC nevertheless alleges Lemelson's statement constituted securities fraud because he "did not disclose that the European hospital doctor was actually Amvona's largest investor (and thus had a significant financial interest in making Ligand's stock price fall)," and that he "never spoke with the U.S. hospital doctor, relying only on a report from his largest investor on what the U.S. hospital doctor had said." Compl. ¶ 40. Again, the SEC is distorting the facts to sustain its claims. Lemelson never alleged to have spoken to the U.S. doctor directly; in fact, he explicitly disclosed that it was the European doctor—not Lemelson—who spoke to the U.S. doctor. *See* Ex. 1 at 6-7. Further, it is not clear how the failure to disclose the European doctor's investment in Amvona could possibly be deemed materially misleading, especially where (i) the SEC does not allege that the European doctor conspired to commit securities fraud; (ii) the SEC has not challenged the veracity of the U.S. doctor, who had no financial interest in Amvona; and (iii) the European doctor did not comment—*at all*—on Promacta, but rather merely conveyed his American colleague's view on *another drug*. *See also* Section I.C., *infra*.

### 4. *The July 3 report accurately stated that Viking's 2014 financial statements were unaudited.*

The SEC also claims Lemelson's statements that "as of the filing of Viking's July 1, 2014 Form S-1 registration statement, Viking had 'yet to consult with [its auditors] on any material issues' and that the 'financial statements provided in the S1 accordingly are unaudited,'" Compl. ¶ 46 (quoting July 3, 2014 report), are untrue. The SEC alleges the statements are false because Viking's S-1 "contains a letter from Viking's new auditors stating that they have 'audited the balance sheets of Viking . . . as of December 31, 2012, and 2013.'" *Id.* ¶ 47.

The SEC, however, ignores that certain financial statements provided in the S-1, including the three months ended March 31, 2013 and the cumulative period from inception through March 31, 2014, *were* unaudited. *See, e.g.*, Ex. 6 at 9 ("The summary statement of

operations data for the three months ended March 31, 2013 and 2014 and the cumulative period

from September 24, 2012 (Inception) through March 31, 2014, and the balance sheet data as of

March 31, 2014, are derived from our *unaudited* financial statements included elsewhere in this

prospectus.") (with subsequent charts identifying unaudited numbers) (emphasis added).[11]

Particularly where Lemelson cited the S-1 such that investors could easily identify which

financials were audited and which were not, his statement is not false or misleading.[12]

### B.    Several of the Statements the SEC Challenges Are Protected Opinions.

"Under the First Amendment there is no such thing as a false idea. However pernicious

an opinion may seem, we depend for its correction not on the conscience of judges and juries but

on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). It

is "fundamental" that liability "will not lie for misstatements of opinion, as distinguished from

those of fact." *MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761

F.3d 1109, 1111 (10th Cir. 2014). While "matters of belief and opinion are not beyond the

purview of" the securities laws, "liability lies only to the extent that the statement was both

objectively false and *disbelieved by the defendant at the time it was expressed*." *Fait v. Regions

Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (citing *Virginia Bankshares v. Sandberg*, 501 U.S.

1083, 1095-96 (1991)) (emphasis added); *MHC Mutual*, 761 F.3d at 1113 ("To warrant liability

on this view, then, a plaintiff must show *both* that the defendant expressed an opinion that wasn't

his real opinion (sometimes called 'subjective disbelief') *and* that the opinion didn't prove out in

---

[11] *See also id.* at 56, 65, 67, F-2, F-3, F-5, F-6 ("Information as of March 31, 2014 and thereafter and for the three months ended March 31, 2013 and 2014 is unaudited . . . . The financial statements as of March 31, 2014, for the three months ended March 31, 2013 and 2014, and for the cumulative period from September 24, 2012 (Inception) through March 31, 2014 are unaudited.").

[12] Of note, the word "unaudited" appears 56 times in Viking's S-1, whereas the word "audited" appears only 7, demonstrating the heavy reliance of the S-1 on *unaudited* financial statements.

the end (sometimes called 'objective falsity').") (emphasis in original); *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) ("Material statements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded.") (citations omitted).

The opinion statements the SEC challenges include that (1) Ligand's product Promacta was "going to become obsolete"; (2) "'Ligand appears to be indirectly creating a shell company through Viking to generate paper profits to stuff its own balance sheet'"; (3) "Ligand had 'engaged in a "creative transaction"[13] with an affiliate shell company called Viking Therapeutics' to the detriment of Ligand shareholders"; and (4) "Viking was 'an affiliate shell company' that Ligand used 'to create almost a veritable pyramid scheme of shell companies' that was 'guaranteed to lose money.'" Compl. ¶¶ 36, 44, 46. Critically, the SEC *never* alleges that Lemelson did not believe these opinions. This failure is fatal. *See Fait*, 655 F.3d 105 (affirming dismissal where plaintiff failed to allege defendant did not believe allegedly misleading opinions when made); *MHC Mutual*, 761 F.3d at 1114 (affirming dismissal where plaintiffs did "not include any plausible allegations in their complaint suggesting that the defendants' expressed opinion wasn't their true opinion"); *see also id.* at 1114 ("the failure of an opinion about future events just isn't enough, standing all by itself, to suggest plausibly that the opinion was an insincere (or untrue or misleading) one").

---

[13] In just another egregious example of an erroneous allegation in the Complaint, the SEC targets Lemelson for referring to the Viking-Ligand licensing deal as a "creative transaction," even though Lemelson was simply quoting *Ligand's own President and CEO*, who referred to the deal as a "creative transaction" in a May 22, 2014 press release. *See* Ex. 2 at 7 (quoting Viking, "Viking Signs Broad Licensing Deal with Ligand Pharmaceuticals for Rights to Five Novel Therapeutic Programs" (May 22, 2014), *available at* https://www.vikingtherapeutics.com/ 2014/05/22/viking-signs-broad-licensing-deal-with-ligand-pharmaceuticals-for-rights-to-five-novel-therapeutic-programs/.

Lemelson anticipates the SEC may argue these statements were not opinions, but fact. Such an argument is belied by the SEC's own words, which, for example, describe Lemelson's "thesis" about the future of Promacta. Compl. ¶ 36. Further, Lemelson's figurative and hyperbolic language, the overall context of his statements, and their inability to be characterized as true or false demonstrate the nature of the statements as opinions. *See, e.g.*, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (to determine fact versus opinion, the court must (1) examine whether the language used is "loose, figurative, or hyperbolic . . . which would negate the impression that the writer" was stating fact and (2) look at the context and "general tenor" of the article); *Ollman v. Evans*, 750 F.2d 970, 979, 983 (D.C. Cir. 1984) (to determine whether statement is opinion or fact, a court should (1) consider the author's choice of words; (2) decide whether the challenged statement is "capable of being objectively characterized as true or false"; (3) examine the context of the challenged statement within the writing as a whole; and (4) consider "the broader social context into which the statement fits"); *Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 (4th Cir. 1987) (if "defendant's words cannot be described as either true or false, they are not actionable").

Lemelson's discussion of Viking as a "shell company" designed to create "paper profits" to "stuff" its balance sheet is exactly the type of "loose, figurative, [and] hyperbolic" language that "negate[s] the impression that the writer" is stating a fact. *Milkovich*, 497 U.S. at 21. Similarly, Lemelson's statement about a "veritable pyramid scheme of shell companies" is hyperbole that lacks any verifiable meaning. *See Levinsky's Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir. 1997) ("The vaguer the term, or the more meanings it reasonably can convey, the less likely it is to be actionable."); *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1238 (N.D. Cal. 2014) (that statement was "clearly hyperbolic and cannot be considered to be defamatory,"

13

provided "further proof that [defendant's] earlier statements were opinions, and not factual assertions"). Indeed, the overall vague and hyperbolic tone and tenor of Lemelson's reports demonstrate the nature of his statements as opinions. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (finding "breezy rather than solemn tone" of article demonstrated a context and tone that "reflect[] the writer's subjective and speculative supposition"). As the SEC notes, Lemelson several times claimed that Ligand's "'fair value is roughly $0 per share, or 100 percent below the current stock price," Compl. ¶ 24 (quoting June 16 report); *see also id.* ¶¶ 25-26, and that common shareholders could be "'wiped out.'" *Id.* ¶ 28 (quoting August 22 report). This is not the language of factual assertions, but of strongly held opinions.

What is more, Lemelson always cited the bases for his opinions—most notably Ligand and Viking's respective securities filings—which weighs heavily in favor of finding that these statements were unactionable opinions. *See Chapin v. Knight-Rider, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) (when "the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related"); *see also Wynn*, 75 F. Supp. 3d at 1233 ("when the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts'") (quoting *Standing Comm'n on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995)). Indeed, the SEC itself alleges that "each of Lemelson's false statements about Viking is contradicted by the source Lemelson supposedly relied upon." Compl. ¶ 49. Rather than demonstrate that these statements are actionable under 10b-5, as the SEC posits, this allegation unequivocally renders

14

the statements protected opinions, because they show Lemelson disclosed the bases for his opinions and left it to his readers to evaluate his interpretation of the facts presented.

Lemelson also qualified his statements with cautionary language, including, most notably, full disclosure that he was "shorting" Ligand.[14] Starting with the *first* sentence of his *first* report on Ligand, and continuing from there, Lemelson disclosed that "Lemelson Capital is short shares of (NASDAQ:LGND)." Ex. 1 at 1.[15] This alone renders the above statements protected opinions. *See Silvercorp Metals Inc. v. Anthion Mgmt. LLC,* 959 N.Y.S.2d 92 (Table), 2012 WL 3569952 (N.Y. Sup. Ct. 2012). In that case, the court held that a declared short's public statements (like Lemelson's) laying out his analysis were not actionable for defamation because they revealed "the author's self-interest through the disclosure that he 'works for a firm that currently has a short position' in Silvercorp.'" *Id.* at *9. The court noted: "[T]hat [the author] disclosed its short position, namely to the particular group of addressees who would appreciate the significance of a short-position, is sufficient to indicate to these particular readers that [the author] was not disinterested," and the author's obvious "motive" "indicates to the reader that the author is expressing his opinion." *Id.*

Lemelson additionally disclosed that "[a]ll content in this report represents the *opinions* of Lemelson Capital." Ex. 1 at 24 (emphasis added).[16] Such qualifications further demonstrate

---

[14] As far as the undersigned is aware, Lemelson's acknowledgment that he was short Ligand distinguishes this case from all other short-and-distort actions brought by the SEC.

[15] Lemelson continued with more fulsome disclosures at the end of each report that, "[a]s of the publication date of this report, Lemelson Capital Management LLC has a short position in the Company covered herein (Ligand Pharmaceuticals) and stands to realize gains in the event that the price of the stock declines." Ex. 1 at 24.

[16] *See also id.* ("All expressions of opinion are subject to change without notice, and Lemelson Capital does not undertake to update or supplement this report or any information contained herein . . . . The information included in this document . . . reflects prevailing conditions and Lemelson Capital's views as of this date, all of which are accordingly subject to change. Lemelson Capital's opinions and estimates constitute a best efforts judgment and should be regarded as indicative, preliminary and for illustrative purposes only . . . . This report's estimated fundamental value only represents a best efforts estimate of the potential fundamental valuation of a specific

these statements are opinions. *See MHC Mutual*, 761 F.3d at 1120 (finding statements were

opinions because none "was definite; all were qualified; all provided reasonable notice to the

recipient that the speaker might be wrong [and] . . . . each necessarily required the speaker to

exercise judgment about matters on which reasonable minds could well come to different

conclusions"); *id.* at 1119 ("The more a speaker qualifies a statement, the less people will be

misled if the statement turns out to be false.") (quotations omitted); *see also Shaw v. Digital*

*Equip. Corp.*, 82 F.3d 1194, 1213 (1st Cir. 1996) ("if a statement is couched in or accompanied

by prominent cautionary language that clearly disclaims or discounts the drawing of a particular

inference, any claim that the statement was materially misleading because it gave rise to that

very inference may fail as a matter of law") (quotation omitted).

### C.     All the Challenged Statements Are Immaterial as a Matter of Law.

A misrepresentation or omission is material if there is "a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix of information made available.'" *Basic v. Levinson*, 485 U.S.

224, 231-32 (1988) (quotations and citations omitted).

To be sure, "[i]n most circumstances, disputes over the materiality of allegedly false or

misleading statements must be reserved for the trier of fact." *Shaw*, 82 F.3d at 1217. But where,

as here, statements are "so vague, so lacking in specificity, or so clearly constituting the opinions

of the speaker, that no reasonable investor could find them important to the total mix of

information available," the Court may find them immaterial as a matter of law. *Id.* (citations

omitted). Likewise, statements that "any reasonable investor . . . would easily recognize as

---

security, and is not expressed as, or implied as, assessments of the quality of a security, a summary of past
performance, or an actionable investment strategy for an investor . . . . Lemelson Capital may benefit from any
change in the valuation of any other companies, securities, or commodities discussed in this document.").

nothing more than a kind of self-directed corporate puffery" are immaterial as a matter of law. *Id.* at 1218 (discussing materiality in context of fraud on the market theory); *see also Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) ("Where a reasonable investor could not have been swayed by an alleged misrepresentation, . . . a court may determine, as a matter of law, that the alleged misrepresentation is immaterial.") (citation omitted).

"To determine whether a statement is mere puffery, the Court must examine whether a statement is so 'exaggerated' or 'vague' that no reasonable investor would rely on the statement when considering the total mix of available information." *In re Metawave Comm'ns Corp. Sec. Litig'n*, 298 F. Supp. 2d 1056, 1086 (W.D. Wash. 2003) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200-0 (3d Cir. 1990), and *In re Splash Tech. Holdings, Inc. Sec. Litig'n*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001)) (finding alleged misstatements "vague and opinions that a reasonable investor would not rely on in making investment decisions"); *see also Parnes*, 122 F.3d at 546-47 (statements that "are so vague and such obvious hyperbole that no reasonable investor would rely upon them" are immaterial as a matter of law). Lemelson's opinions that Viking was a "shell company" and Ligand is worth $0/share are precisely the type of "exaggerated" and "vague" statements that do not alter the total mix of information available.

Statements are also immaterial if they "present or conceal such insignificant data that, in the total mix of information, it simply would not matter to a reasonable investor." *Parnes*, 122 F.3d at 546-47; *see also TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976) ("Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good."); *MHC Mutual*, 761 F.3d at 1117 ("Requiring more extensive disclosure of evidence tending to undermine a sincerely held opinion may, in the view of some, do more to invite information overload than materially benefit the consumer.") (citations omitted). As

discussed above, that the European doctor Lemelson quoted was one of Amvona's largest investors is of dubious significance where the doctor was sharing the views of his non-investor American colleague, not his own, and the view expressed was favorable toward Solvadi, with no comment on how—if at all— it would affect Promacta's prospects. Similarly, the failure to disclose that *some* of the financials in Viking's S-1 were audited cannot be deemed material where any investor could see this by reviewing the S-1 specifically cited in the report.

Finally, Lemelson's "cautionary statements rendered immaterial all [his] alleged misrepresentations" because "[o]nly by discarding common sense and ignoring the multitude of explicit and on-point warnings contained in [his reports] could investors be misled by the misrepresentations allegedly made." *Parnes*, 122 F.3d at 548-49. Thus, the lone remaining challenged statement—that Lemelson "'had discussions with [Ligand] management just yesterday – excuse me, their [Ligand's] IR [investor relations] firm. And they basically agreed. They said, "Look, we understand Promacta's going away,"'" Compl. ¶ 37 (quoting a June 19, 2014 interview)—is immaterial given the extensive cautionary statements included in his reports and his interview statement that he was shorting Ligand. *See also Virginia Bankshares*, 501 U.S. at 1097 ("true statements may discredit the other one so obviously that the risk of real deception drops to nil").

Moreover, to the extent the Court allows this case to proceed on the basis of this sole alleged misstatement, it is worth noting that it comes down to "he said/he said" (where Ligand's investment relations firm had an incentive to deny that it told Lemelson that Promacta was "going away") and is hardly sufficient to establish a fraudulent scheme under Section 10(b).[17]

---

[17] In addition, it is also noteworthy that Ligand's stock *rose* on both the day of this interview as well as the next day, and including the day of the interview, rose 7 of the 11 following days. *See* Yahoo! Finance, *supra* n.3. It cannot seriously be argued that Lemelson's statement was material when, in immediate response, Ligand's stock price rose.

## II.      THE SEC'S 206(4) CLAIM FAILS AS A MATTER OF LAW.

Section 206(4) of the Advisers Act prohibits an investment adviser from (1) "employ[ing] any device, scheme, or artifice to defraud any client or prospective client"; (2) "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client"; or (3) engag[ing] in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." Rule 206(4)-8 prohibits the (1) "mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle"; or (2) "otherwise engag[ing] in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle."

### A.      Rule 206(4)-8 Was Not Intended for, Has Never Been Used to Address, and Does Not Apply to, Statements Like Those at Issue Here.

Even if one were to accept the SEC's view of the challenged statements as false and misleading, such a view places the statements in the "short and distort" line of cases, to which Rule 206(4)-8 is plainly inapplicable. The Final Rule concerning 206(4)-8 provides five examples the SEC intended the rule to prohibit: (1) "the experience and credentials of the adviser (or its associated persons)"; (2) "the risks associated with an investment in the pool"; (3) "the performance of the pool or other funds advised by the adviser"; (4) "the valuation of the pool or investor accounts in it"; and (5) "practices the adviser follows in the operation of its advisory business such as how the adviser allocates investment opportunities." 72 Fed. Reg. 44756, 44759 (Aug. 9, 2007). While not exhaustive, these examples nonetheless make clear that 206(4)-8 was intended to target misleading statements that fund managers make about *the fund or the manager*

19

*himself*—and not to punish a fund manager's statements concerning a publicly traded stock.[18]

The SEC's proposed use of Rule 206(4)-8 (and its lower negligence standard) here is nothing

more than an impermissible end run around Rule 10b-5's scienter requirement.

> **B.      Because the SEC Cannot Establish the Underlying "Fraudulent
> Manipulation" of Ligand Stock, Its 206(4) Claim Fails.**

The SEC also bases its 206(4) claim on Lemelson's alleged failure to "disclose that the

profitability of their short-selling strategy depended upon Lemelson's fraudulent manipulation of

Ligand stock through false statements, rather than his ability to identify a company whose stock

would decrease on its own based on its inherent lack of value." Compl. ¶ 55. As established

above, however, the SEC cannot establish that Lemelson engaged in any "fraudulent

manipulation" of Ligand stock. Thus, where the SEC's 10b-5 claim fails, its 206(4) claim based

on the same conduct likewise fails as a matter of law.[19]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion to Dismiss

be ALLOWED and the Court dismiss the Complaint with prejudice in its entirety.

---

[18] Not surprisingly, in the 11 years since Rule 206(4)-8's promulgation, the SEC has *never* used it to bring an enforcement action against a fund manager for statements concerning a specific stock. Counsel surveyed the 1082 litigation releases, 30 enforcement releases, and 31 news and public statement releases (and associated complaints, judgments, and orders) concerning Rule 206(4)-8 available on www.sec.gov as of October 24, 2018, as well as the 70 cases and 57 administrative decisions concerning the Rule available on Westlaw as of October 24, 2018, and have not found a single instance (besides this case) in which the SEC brought an enforcement action against an investment advisor under Rule 206(4)-8 for statements about another company.

[19] Further, the SEC's novel theory would require finding a 206(4) violation in *every* 10(b) case involving a fund manager—something clearly beyond the intended purview of the rule.

Respectfully submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT, LLC,
and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
LIBBYHOOPES, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617) 338-9300
dbrooks@libbyhoopes.com

Dated:  October 25, 2018

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on October 25, 2018.

*/s/ Douglas S. Brooks*
Douglas S. Brooks