# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| Plaintiff, ) | |
| v. ) | |
| GREGORY LEMELSON and LEMELSON CAPITAL ) MANAGEMENT, LLC, ) | Civil Action No. 1:18-cv-11926-PBS |
| Defendants, ) | **LEAVE TO FILE GRANTED ON NOVEMBER 13, 2018** |
| and ) | |
| THE AMVONA FUND, LP, ) | |
| Relief Defendant ) | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Douglas S. Brooks (BBO No. 636697)
LIBBYHOOPES, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617) 338-9300
dbrooks@libbyhoopes.com

Beginning in 2014, Lemelson published five research reports, issued 16 articles/press releases, posted 66 tweets, gave 13 interviews, and wrote two letters to Congress concerning what he views as accounting and securities fraud perpetrated by Ligand Pharmaceuticals, Inc., a publicly traded company.  In all, Lemelson publicly made nearly 1,000 distinct allegations about Ligand, both during and after the period he held a well-disclosed short position (for four months) in the company.  In its Opposition to Defendants' motion to dismiss, the SEC acknowledges that it is challenging only *four* of Lemelson's statements, less than one-half of one percent of the total number of statements Lemelson made regarding Ligand.

Of these four, the SEC tacitly concedes that two are demonstrably true.  Rather than admit any error in its pleadings and withdraw these two claims, however, the SEC instead radically changes its theories concerning these statements.  It completely walks away from its explicit allegations in the Complaint about *why* these statements were false (allegations which Lemelson demonstrated were themselves unquestionably false), and instead asserts the frivolous theory that although the statements were true, they were somehow misleading.  This argument is not only meritless but cannot be advanced in good faith.

The other two statements (which Lemelson also maintains were true) are the type that the Court can and should deem immaterial as a matter of law.  Tellingly, in setting forth its argument as to why these two statements are allegedly material, the SEC once again fabricates what Lemelson said, because relying on his actual language would sink its case.  Moreover, the reaction (or lack thereof) of Ligand's stock price in response to these two statements—of which the Court can take judicial notice for purposes of a motion to dismiss—further demonstrates that they were not material.  In fact, the *SEC's* purported reliance on Ligand's stock price to

demonstrate the alleged materiality of Lemelson's statements is based on false and misleading allegations about the movement of the stock price during the relevant period.

Finally, the SEC continues to rely on factual distortions in attempting to explain why Lemelson's statements are allegedly actionable. For example, the SEC cites to language in a ***private rough draft*** of one of Lemelson's reports, which was never disseminated to the public and which language did not appear in any published report. It is ironic that the SEC seeks to hold Lemelson liable for four statements it claims (erroneously) are false or misleading, notwithstanding that its Complaint and Opposition contain a multitude of *actually* false allegations that are proven so by the very source documents upon which the SEC relies.

## I. NONE OF THE CHALLENGED STATEMENTS ARE ACTIONABLE.

### A. Lemelson's Calculation of Ligand's Debt-to-Tangible Equity Ratio Was (and Is) Accurate.

In its Complaint, the SEC alleged that "Lemelson intentionally misstated Ligand's debt-to-equity ratio, or was reckless as to the truth or falsity of his statement." Compl. ¶ 52. The SEC claimed this statement was false because "*Lemelson included the new debt but not the proceeds of the loan,* which would have yielded a debt-to-equity ratio closer to 1:1." *Id.* (emphasis added). As Lemelson pointed out in his principal memorandum, however, proceeds of a loan are never included when calculating a debt-to-equity ratio, and therefore his calculation was (and is) 100% accurate.[1] The SEC tacitly concedes this indisputable point in its Opposition by completely backtracking from its allegation in the Complaint that Lemelson misstated Ligand's debt-to-tangible equity ratio. *See* Opp. at 8.

---

[1] Even if loan proceeds were included, the debt-to-tangible equity ratio here would have been nowhere close to 1:1 as the SEC erroneously claimed. Moreover, although the SEC repeatedly and misleadingly refers to Lemelson's calculation as a "debt-to-equity ratio," Lemelson always made clear that he was calculating the commonly-used "debt-to-*tangible* equity ratio." *See* Declaration of Douglas S. Brooks ("Brooks Decl.") Ex. 5 at 3 (ECF No. 12-2).

Nonetheless, the SEC tries to salvage its claim by alleging that Lemelson's *accurate* calculation was somehow *misleading*.  The SEC alleges that in stating Ligand's "common shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt,"—an undeniably true statement based entirely on his accurate debt-to-tangible equity calculation— Lemelson "ignored that Ligand now had $245 million to spend."  Opp. at 8.  But, as the SEC knows, the amount that a company "has to spend" has no bearing whatsoever on the company's debt or its equity (and therefore is wholly irrelevant to the company's debt-to-tangible equity ratio).[2]

The SEC continues its flawed reasoning by arguing that because Ligand had "$245 million to spend," its "shareholders thus had vastly more than $21,000 as a 'shield' against debt…."  Opp. at 8.  Lemelson, however, said nothing to the contrary.  As set forth above, Lemelson stated—*correctly*—that Ligand's "common shareholders have only the protection of $21,000 *in tangible equity* to shield them from $245 million in debt."  (Emphasis added).  Clearly, where this sentence came *immediately after* the sentence in which Lemelson provided the company's debt-to-tangible equity ratio, his statement was limited on its face to identifying the amount of *tangible equity* the common shareholders had in relation to the company's debt.  Accordingly, the SEC's argument that this statement—while undeniably true—somehow violates federal securities laws is entirely without merit.[3]

---

[2] In addition to being irrelevant, the SEC's allegation that "Ligand now had $245 million to spend" is just flat wrong.  According to Ligand's own public SEC filing made in connection with the bond offering, of the $245 million, after deductions for discounts, commissions, fees, and share repurchases, the company netted only $164.8 million (or, stated differently, *had $80-plus million less "to spend" than the SEC alleges*).  *See* https://investor.ligand.com/all-sec-filings?form_type=8-K&page=8#document-4837-0001193125-14-313479 at 2. Had Lemelson made a similar misstatement—*misrepresenting Ligand's cash position by nearly 50%*—the SEC certainly would have claimed it actionable.

[3] In desperation, the SEC attaches an excerpt from a pre-litigation submission made by Lemelson's prior counsel, in which counsel incorrectly conceded that Lemelson miscalculated Ligand's debt-to-tangible equity ratio.  Opp. at 8, n.2; Day Decl. Ex. 2.  As an initial matter, this submission is outside the four corners of the Complaint and not

3

### B. Lemelson's Statement That Viking Did Not Intend to Conduct Preclinical Studies Was Demonstrably True.

In the Complaint, the SEC alleged Lemelson's statement that "Viking does not intend to conduct any preclinical studies" was false because "[t]hrough the Master License Agreement, Viking obtained licenses to develop drugs, and *leased space from Ligand to conduct the necessary research and development activities, which include preclinical studies and trials.*" Compl. ¶ 48 (emphasis added). As Lemelson demonstrated in his principal memorandum, however, *his* statement was demonstrably true—and the italicized statement of the SEC above is correspondingly false—because Viking disclosed that it had **no experience in, and would rely on third parties to conduct,** any pre-clinical studies and trials (and thus obviously did not lease space from Ligand for such purposes as the SEC falsely claimed). Brooks Decl. Ex. 6 at 17, 21 (ECF No. 12-6).

Once again, despite tacitly conceding that Lemelson's statement was true by acknowledging the falsity of its assertion that Viking would be conducting preclinical studies and trials in the space it leased from Ligand, the SEC changes course and argues that Lemelson's *true* statement was misleading. Specifically, the SEC argues that its claim should survive because, in addition to disclosing that Viking would not be conducting pre-clinical studies and trials (a point the SEC misrepresented entirely in its Complaint), Viking also disclosed that it would "maintain responsibility" for the activities of the third parties who were actually performing such tasks. Opp. at 7. Lemelson's statement, however, is not in any way inconsistent with the unremarkable notion that Viking would ultimately remain responsible for

---

incorporated by reference and therefore not appropriate for consideration on a motion to dismiss. *See Alharbi v. Beck,* 62 F. Supp. 3d 202, 205 (D. Mass. 2014). More fundamentally, an erroneous allegation that a demonstrably true statement is false does not make it so. Prior counsel's misunderstanding of the components that factor into a debt-to-tangible equity ratio does not change how such a ratio *must* be calculated, any more than claiming the sky is red changes the color of the sky.

the actions of its third-party vendors. *Indeed, if merely remaining responsible for third parties was the functional equivalent of conducting preclinical studies and trials in its own space, Viking would have had no reason to disclose in its SEC filing that it would **not** be doing so*. Moreover, Lemelson explicitly cited to the source document itself (Viking's S-1), so investors reading his report could see all of this for themselves.[4]  Brooks Decl. Ex. 2 at 7-8 (ECF No. 12-2).

### C. Lemelson's Statement Regarding the IR Firm Was Immaterial as a Matter of Law.[5]

The SEC challenges Lemelson's statement made during a June 19, 2014 interview in which he stated: "I had discussions with [Ligand] management just yesterday – excuse me, their IR [investor relations] firm. And they basically agreed. They said, 'Look, we understand Promacta's going away.'" Compl. ¶ 37.[6]

In its Opposition, the SEC argues that Lemelson's statement was material because: "What reasonable investor would consider it unimportant that *Ligand* acknowledged that its main revenue source was about to dry up?" Opp. at 13 (emphasis added). Even assuming the SEC's contention is true, it has no relevance, because once again the SEC attributes a statement to Lemelson that he did not make. Lemelson did *not* claim that *Ligand* agreed Promacta was

---

[4] Further, the SEC's argument as to why this statement is allegedly material fails because it mischaracterizes what Lemelson said about the Ligand-Viking transaction. The SEC argues that "[a] reasonable investor plainly would consider it important that Ligand's management was inappropriately expending significant resources to go into business with a 'shell company.'" Opp. at 13. Lemelson never said, however, that Ligand was expending "significant resources" on Viking, which it was not. In fact, Lemelson's thesis was just the opposite. Ligand—with a market cap of approximately $1.4 billion at that time—loaned Viking $2.5 million, which Viking correspondingly used to pay Ligand rent. Lemelson's thesis was—and is—that Viking was an alter ego of Ligand, and therefore Ligand was *not* expending significant resources in the deal. *See generally* Brooks Decl. Ex. 2 at 8 (ECF No. 12-2).

[5] *See generally Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996) (holding courts can find statements immaterial as a matter of law); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (same).

[6] Unlike the other statements at issue, Lemelson did not argue in his principal memorandum that this statement was demonstrably true. Lemelson recognizes that any such argument would be beyond the purview of Rule 12(b)(6) because the SEC alleges that the IR firm denies making this statement. Compl. ¶ 38. Nonetheless, although not directly relevant for purposes of the motion to dismiss, Lemelson has provided the SEC with his contemporaneous electronic notes from his conversation with the IR firm—containing a digital date/time stamp that the SEC's forensic personnel could easily confirm as true—which precisely corroborate his account of the conversation.

5

"going away." Rather, he stated that an *unidentified individual* at an *unidentified investor relations firm* agreed that Promacta was "going away" at some *unspecified date in the future*. *See Parnes,* 122 F.3d at 547 (finding statement lacking specificity immaterial as a matter of law). In fact, after initially misspeaking, Lemelson *expressly clarified* that Ligand itself did *not* make this statement. That the SEC feels it necessary to incorrectly attribute Lemelson's statement to Ligand itself in making its materiality argument is telling, and its reliance on this faulty assertion dooms its claim with respect to this statement.

What is more, as set forth in Lemelson's principal memorandum, the reaction of Ligand's stock further demonstrates the lack of materiality. Ligand's stock price increased (based on the prior day's close) on both the day of the interview in which the comment was made as well as the next day, and including the day of the interview, 7 of the following 11 days. *See* https://www.nasdaq.com/symbol/lgnd/historical at 38.[7] (A true and accurate printout of Ligand's historical stock prices for the past five years is attached to the Declaration of Douglas S. Brooks in Support of Reply Memorandum ("Brooks Reply Decl.") as Exhibit 1).

### D. The Fact that *Some* of Viking's Financial Statements Were Audited is Immaterial as a Matter of Law.

In his July 3, 2014 report, Lemelson stated that Viking "has not yet even consulted with [Marcum, its new auditing firm] on any material issues. The financial statements provided on the S1 accordingly are unaudited." Brooks Dec. Ex. 2 at 10 (ECF No. 12-2).[8] The SEC rests its materiality argument for this statement on the following allegation: "A reasonable investor

---

[7] The Court can take judicial notice of a publicly traded company's stock price on a given date. *See, e.g., Wang Yen v. ReWalk Robotics Ltd.*, 2018 WL 4039357, at *4, n.3 (D. Mass. Aug. 23, 2018); *In re The First Marblehead Corp. Securities Litig.*, 639 F. Supp. 2d 145, 165 n.167 (D. Mass. 2009).

[8] Once again, the SEC misquotes Lemelson when discussing this statement. *Compare* Opp. at 3 with Brooks Decl. Ex. 2 at 10.

plainly would consider it important that . . . [Viking] . . . had never been audited . . . ." Opp. at 13. As was the case with the SEC's materiality argument concerning Lemelson's conversation with the IR representative, even if this were true, it is totally irrelevant here, because Lemelson did not claim that Viking had *never* been audited. Rather, Lemelson stated that the financial statements in the S-1 were unaudited. Here again, the SEC believes it necessary to *change* Lemelson's actual words to salvage its claim from dismissal.[9]

Moreover, in the report where he stated that the financial statements in the S-1 were unaudited, Lemelson cited to the S-1 itself. Brooks Decl. Ex. 2 at 9-10 (ECF No. 12-2). As a result, any investor could easily identify the specific financial statements to which Lemelson referred, because the S-1 clearly identifies which financial statements were audited and which were not. Accordingly, "a reasonable investor could not have been swayed by [the] alleged misrepresentation" and the "court may determine, as a matter of law, that the alleged misrepresentation is immaterial." *Parnes*, 122 F.3d at 546 (internal citation omitted).

*Virginia Bankshares*, *Inc. v. Sandberg*, 501 U.S. 1083 (1991), is instructive. There, in a related context, the Court discussed when the joinder of true statements can make allegedly misleading ones immaterial and noted that "publishing accurate facts in a proxy statement can render a misleading proposition too unimportant to ground liability." *Id.* at 1097. The Court went on to note that this rule would not apply where "it would take a financial analyst to spot the tension between the one and the other . . . ." *Id.* Applying this reasoning here makes clear that—even if the Court finds Lemelson's statement misleading because *some* of the financial

---

[9] Likewise, elsewhere in the Opposition, in yet another example of the SEC mischaracterizing what Lemelson said, the SEC falsely alleges that Lemelson stated Viking had "*never* consulted an auditor. . . ." Opp. at 14 (emphasis in original). Lemelson said no such thing. Rather, his report stated that Ligand had yet to consult with its *new* auditor (who had been hired less than three months earlier) on any material issues. Brooks Decl. Ex. 2 at 10 (ECF No. 12-2).

statements were audited—the statement is immaterial as a matter of law. A reader need not be a financial analyst to *effortlessly* ascertain from the S-1 which of the financial statements were audited, and which were not, as they are clearly labeled as such. Accordingly, "the inconsistency would exhaust the [alleged] misleading conclusion's capacity to influence the reasonable [investor]" and the "action fail[s] on the element of materiality." *Id.* at 1097-98.[10]

Finally, the lack of materiality is further demonstrated by the response of Ligand's stock price. On July 3, 2014, the date Lemelson published his report containing the above language, Ligand's stock price increased. Brooks Reply Decl. Ex. 1 at 38. The next trading day (four days later), the stock price closed down slightly but was still higher than it closed the day *before* Lemelson made the statement about the unaudited financial statements. *Id.* Indeed, the stock did not significantly drop until July 14, 2014—11 days after the statement at issue.[11] *Id.*

E. **The SEC's Additional Materiality Argument Based on Ligand's Stock Price Relies on False and Misleading Numbers.**

In further support of its materiality argument, the SEC relies extensively on Ligand's stock price. In citing to the Complaint, the SEC states that it "alleges that Ligand's share price dropped 34% during the period Defendants were disseminating their false statements." Opp. at 14 (citing Compl. ¶ 8). Here again, the SEC's allegation is demonstrably wrong. The SEC claims Defendants made four false statements: one on June 19, 2014, two on July 3, 2014, and one on August 22, 2014. *Id.* at 3. While the stock price did decline during this period (notwithstanding interim periods of significant gains consistent with the stock's volatility

---

[10] The SEC also mischaracterizes Lemelson's comments concerning Viking's financial statements as involving "a significant financial transaction." The issue of which financial statements were audited, however, does not in any way involve a "significant financial transaction," and the SEC's argument therefore fails.

[11] The SEC also fails to mention that Lemelson did not cover any of his Ligand short position during this time period, because this critical fact is wholly inconsistent with the required scienter of a "short and distort" scheme.

8

generally), the decline was approximately 22%, far less than the SEC's grossly exaggerated claim, which is overstated by more than 50%. Brooks Reply Decl. Ex. 1 at 37-38.

Similarly, in citing to an unnamed "financial news organization" report (rank hearsay which, even if true, provides no assistance to the SEC's dubious claims), the SEC alleges that "Ligand's stock price 'fell more than 7 percent' after Defendants spread their falsehood about Promacta." Opp. at 14 (citing Compl. ¶ 31). Given the volatility of Ligand's stock (from 2014 through the present, where it dropped more than 46% in six weeks alone during the pendency of this lawsuit),[12] it is of course true that *at some point*, the stock price "fell more than 7 percent" after Lemelson's June 19, 2014 interview, but the SEC's allegation is wildly misleading. For example, on June 24, 2014 alone (three trading days after the interview), the *intraday* high/low range of Ligand's stock price fluctuated *more than 8%*. Brooks Reply Decl. Ex. 1 at 38. Further, in the three months *before* Lemelson made any allegedly false statement about Promacta (March 19, 2014-June 19, 2014), Ligand's stock price plunged *more than 17%. Id.* at 38-40. Accordingly, the SEC's reliance on Ligand's stock price to allege the materiality of Lemelson's statements proves only the opposite; *i.e.,* Lemelson was not responsible for any meaningful movement of this already highly volatile stock.[13]

---

[12] Brooks Reply Decl. Ex. 1 at 1-2.

[13] In its Opposition, in arguing materiality, the SEC claims that Lemelson chose to include in his reports (1) a statement that Ligand's stock price fell 2% during the June 19, 2014 interview and (2) the statement about the IR representative agreeing that Promacta was going away, which "demonstrates that [Defendants] considered the subject matter of their false statements important to investors." Opp. at 14. However, contrary to the SEC's allegation, Lemelson never included these two statements in any of his reports. *See* Brooks Decl. Exs. 1-5 (ECF Nos. 12-1–12-5).

## II. THE SEC RELIES UPON A PRIVATE, ROUGH DRAFT OF ONE OF LEMELSON'S REPORTS IN MAKING ADDITIONAL MISSTATEMENTS OF FACTS IN ITS OPPOSITION.

In his principal memorandum, Lemelson explained that the SEC repeatedly attributed inflammatory statements to him that he never said in an effort to make his constitutionally-protected advocacy on behalf of Ligand's shareholders seem nefarious. In its Opposition, the SEC tacitly acknowledges most of this, but takes issue with the following alleged quotation: "If the call feature is exercised common shareholders could be wiped out almost entirely without notice." Opp. at 5. In support of its argument that this is an accurate quote from one of Lemelson's reports, the SEC attaches a ***private rough draft*** of the report, which was never publicly disseminated.[14] Day Decl. Ex. 1. The true, published version of the report—which is significantly different than the rough draft the SEC submitted to the Court and did *not* contain the quoted language—is both publicly available on the Internet and attached to the undersigned's affidavit accompanying Lemelson's motion to dismiss. *See* Brooks Decl. Ex. 5 (ECF No. 12-5).[15] There is no good-faith explanation for the SEC's use and reliance on an unpublished document where the final report was not only provided to it but is also publicly available.

### CONCLUSION

For the foregoing reasons and those set forth in Defendants' principal memorandum, the Court should dismiss the Complaint in its entirety with prejudice.

---

[14] Indeed, outside of Lemelson, his counsel, and his editor, the only people who had ever seen the rough draft prior to the SEC filing it as part of its Opposition were SEC personnel, who obtained it when Lemelson voluntarily provided essentially his entire hard drive—including attorney-client privileged material—to the SEC to demonstrate full transparency.

[15] The SEC exacerbates its error by relying on *additional* language from the rough draft that never made its way into Lemelson's published reports, when it repeatedly claims that Lemelson stated Ligand was "deep in the context of insolvency." *E.g.,* Opp. at 8.

Respectfully submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT, LLC,
and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
LIBBYHOOPES, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617) 338-9300
dbrooks@libbyhoopes.com

Dated:  November 21, 2018

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on November 21, 2018.

*/s/ Douglas S. Brooks*
Douglas S. Brooks