IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE          )
COMMISSION,                      )
                                 )
                Plaintiff        )
                                 )   CA No. 18-11926-PBS
          -VS-                   )   Pages 1 - 51
                                 )
GREGORY LEMELSON, et al,         )
                                 )
                Defendants       )


**MOTION HEARING/SCHEDULING CONFERENCE**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES CHIEF DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts  02210
December 6, 2018, 11:20 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1   A P P E A R A N C E S:

2        ALFRED A. DAY, ESQ. and MARC J. JONES, ESQ.,
    United States Securities and Exchange Commission,
3   33 Arch Street, 23rd Floor, Boston, Massachusetts,
    02110-1424, for the Plaintiff.
4
         DOUGLAS S. BROOKS, ESQ., Libby Hoopes, P.C.,
5   399 Boylston Street Suite 200, Boston, Massachusetts, 02116,
    for the Defendants.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          THE CLERK:  Court calls Civil Action 18-11926, SEC

3    v. Lemelson, et al.  Could counsel please identify

4    themselves.

5          MR. DAY:  Good morning, your Honor.  Alfred Day

6    for plaintiff, the Securities and Exchange Commission.  With

7    me is Marc Jones.

8          MR. JONES:  Good morning, your Honor.

9          THE COURT:  Good morning.

10          MR. BROOKS:  Good morning, your Honor.  Doug

11    Brooks for the defendants.

12          THE COURT:  Good morning.  So it's your motion.

13          MR. BROOKS:  Thank you, your Honor.  I want to be

14    clear, first, why we're here, and I want to take, as I

15    anticipate, what the SEC put in their opposition what

16    they're going to argue, but our arguments about why this

17    case should be dismissed on 12(b)(6), as to the four

18    statements that we now know are at issue, are based on the

19    four corners of the complaint and the documents incorporated

20    therein by reference.  I think it's important to keep in

21    mind that the SEC's entire scienter allegations, for

22    instance, are based on what they say is -- are based on the

23    documents that we have attached.  They say that the scienter

24    is obvious because Lemelson --

25          THE COURT:  Can I start off by asking the basic

1    law here?

2              MR. BROOKS:  Yes.

3              THE COURT:  We all -- well, let me just ask you.

4    What do you think the requirements are with respect to

5    scienter?  It's not the Private Securities Litigation Act?

6              MR. BROOKS:  No.  No, no, no, no, it's not.

7              THE COURT:  So it's the basic what?  Just a --

8              MR. BROOKS:  *Iqbal/Twombly*.

9              THE COURT:  Yes.  There's no heightened

10   requirement or any of that?

11             MR. BROOKS:  No, no, we're not arguing any --

12             THE COURT:  Strong inference rather than --

13             MR. BROOKS:  Right.  We don't get that with the

14   SEC.

15             THE COURT:  Right, okay.  I just want to make sure

16   that you're --

17             MR. BROOKS:  Yeah, no, no, no.  So my point with

18   scienter is, what they say is that the reason they allege

19   that these statements were said intentionally falsity is

20   because the documents that Father Emmanuel sourced in his

21   reports that they say are false, those documents the SEC

22   claims says the exact opposite of what he said, and

23   therefore --

24             THE COURT:  Who's Father Emmanuel?  This is

25   Mr. Lemelson, right?

1          MR. BROOKS:  He's a priest, your Honor.

2          THE COURT:  But you don't call him -- well, all

3     right.

4          MR. BROOKS:  We're happy to call him --

5          THE COURT:  Well, all right.  I just --

6          MR. BROOKS:  In the papers we refer to him as

7     Lemelson, your Honor.  I'm sorry.  It might be what I

8     referred to him as, so I apologize.  So we'll just say

9     Lemelson, and that will cover all the defendants.

10         So the SEC put these documents into play, the ones

11    that we've attached, because they say, "Look, he said X."

12    And all you have to do is, you look at the document; it

13    said Y.  And therefore we know that not only what he said

14    was allegedly false, but we know he did it intentionally

15    because he could have just looked at those documents.

16         And so what we've done is, we've attached those

17    documents, and based on those documents, you can see that

18    those allegations are not false.  The statements he made are

19    true on their face.  And the *Shaw* case, your Honor, says

20    that you can consider these and you should consider these

21    for 12(b)(6) purposes.  So, again, I think this goes to your

22    question.  We're not asking --

23         THE COURT:  Why don't we go through all four

24    statements that are at issue --

25         MR. BROOKS:  Okay.

1    THE COURT:  -- because one of them was

2  incomprehensible to me, and neither of your briefs helped me

3  at all, which is the accounting issue and how you deal with

4  the loans.  I don't know that one, and I don't know that I

5  can resolve it on this record.  That said, there was one

6  that seemed flat out to be a factual dispute.

7    MR. BROOKS:  Yeah, so, well, why don't I take the

8  accounting one first, see if I can --

9    THE COURT:  Well, I think the more important one

10  because if even one survives, this goes forward.

11    MR. BROOKS:  Right.  Which one do you want me to

12  address, your Honor?

13    THE COURT:  The one that the SEC leads with for

14  good reason and one you acknowledge involves a dispute as to

15  whether a lie was made, and it had to do with whether

16  someone said this drug is what --

17    MR. BROOKS:  Yes, going away.

18    THE COURT:  Going away.

19    MR. BROOKS:  So on that, your Honor, we did not

20  argue in either the motion to dismiss or the reply, we did

21  not argue that that's demonstrably true because the SEC has

22  adequately alleged, yes, this IR person says that I didn't

23  say that.  What we've argued, your Honor, is that that

24  statement is immaterial as a matter of law.  And, again, I

25  understand that normally -- normally materiality is a

question of fact for the fact-finder, but not always.  The
*Shaw* case says that and the *Parnes* case in our papers says
that.  And I think all you need to do to see that they
haven't hit the *Iqbal/Twombly* standard is to look at their
allegations as to why it's material.  They say in their
papers that it's material because what investor wouldn't
consider it material that Ligand, the company at issue, said
it was going away?  But Lemelson didn't say that Ligand said
it was going away.  What Lemelson said was -- in fact, he
specifically said when it was on a radio interview, he said,
"Ligand," he said, "No, no, no, stop.  It wasn't Ligand.  It
was Ligand's IR firm," their investor relations firm.

So what Lemelson said was that an unidentified
person at an unidentified firm agreed that this drug was
going away at some time in the future.  The SEC must have
realized how vague and immaterial that is because otherwise
they would have said that.  What they said was, it's
material because Ligand acknowledged it, and that's just
flat out not true, your Honor.  He never ever said that
Ligand acknowledged it.  That's one thing they say about --

THE COURT:  Even if Ligand didn't acknowledge it,
if you have somebody's investor relations person saying it's
a goner and I'm an investor, why would you ever invest in
it?

MR. BROOKS:  Well, I think you can -- for that,

1  your Honor, I think you can look at the fact that if you

2  were an investor because you can look at what happened, and

3  the stock actually went up that day.  The SEC relies on the

4  stock price --

5         THE COURT:  So what you're relying on, because

6  they've alleged plenty, so what you're relying on for

7  materiality is what happened to the stock that day?

8         MR. BROOKS:  Well, we were relying on, your Honor,

9  though it sounds like you're not persuaded by that argument,

10  but the fact that some unknown, unidentified, "Oh, yeah,

11  their IR firm said it was going away," I don't know, does

12  that really alter the total mix of material?

13         THE COURT:  It does for purposes of a motion to

14  dismiss.

15         MR. BROOKS:  Okay.

16         THE COURT:  So you need now to move on to --

17         MR. BROOKS:  Okay, so if it does, let's look at

18  the real world and see what happened, and the SEC, again,

19  they put this into play.  They say, and this is in their

20  opposition, that not only have they alleged that -- not only

21  have they alleged that -- again, Ligand, we have a dispute

22  on that, whether who said what, but they've alleged more.

23  And they say, "What we've alleged is that the stock price

24  plummeted on his statements."  But, respectfully, I don't

25  think the SEC did its homework because this statement was

1 made, and on the day this statement was made, the stock

2 price went up.  And not only did it go up that day, it went

3 up the next day, and it went up seven of the next eleven

4 days.  So the SEC is saying, "Look, look, your Honor, take a

5 look at the stock price," but the stock price doesn't help

6 them at all.  In fact, it hurts them because it's clear that

7 this statement was not material.  Otherwise, you would have

8 expected to see obviously a different movement of the stock

9 price.

10   So is there any other order you want me to address

11 the other three in because I think they all have distinct

12 arguments, your Honor?

13   THE COURT:  Well, that one, I mean, when all

14 reasonable inferences are drawn in favor of the SEC, it was

15 a false statement; and what you're trying to say is, it

16 wasn't material because the stock market went up.  Is there

17 a case that says, if it goes up, it defeats materiality?

18   MR. BROOKS:  There's not, your Honor.  There's not

19 a case that says that specifically, but, again, the fact

20 that the SEC has only alleged materiality, and both of their

21 allegations are sort of factually incorrect, I don't think

22 they've met their *Iqbal* and *Twombly* standard.  I don't see

23 how they have.  They said it's material because of X, and

24 it's just not borne out.  What we have, your Honor --

25   THE COURT:  Well, I disagree with you.  It's a

1  material statement if you say someone's IR firm said it's a

2  goner.

3          MR. BROOK:  Okay.  Well, then --

4          THE COURT:  So now the question is whether it's a

5  material misstatement, and you're saying, no, it isn't as a

6  matter of law because the stock market went up.

7          MR. BROOKS:  That is the argument, your Honor, and

8  we've put in the stock prices so you can see what it did.

9  How can you say that a reasonable investor would have -- you

10  know, this would have altered the total mix of what a

11  reasonable investor would do?  We see what the market did,

12  and it had no impact.

13          THE COURT:  Right.  So that's the issue, all

14  right.

15          MR. BROOKS:  That's the issue on that one.  Is

16  there any specific order you want to go in?  The others,

17  I'll tick them off.  We only have three left.

18          THE COURT:  Just go down the other ones.

19          MR. BROOKS:  So the accounting one that you said,

20  your Honor, the first one, that one is -- the statement he

21  made, that Lemelson made, it's a calculation.  He said,

22  "Here is the debt-to-tangible equity ratio."

23          THE COURT:  What does "tangible equity" mean?

24          MR. BROOKS:  The equity in a company that a common

25  shareholder has, leaving aside intangibles like goodwill.

 1          THE COURT:  All right, like what?  Other than

 2     the -- I don't know on my own knowledge whether it includes

 3     loan proceeds.

 4          MR. BROOKS:  Well, it doesn't, your Honor, and I

 5     think you can -- it certainly doesn't.  For instance --

 6          THE COURT:  It certainly does or does not?

 7          MR. BROOKS:  Does not.

 8          THE COURT:  Does not, tangible equity does not

 9     include loan proceeds?

10          MR. BROOKS:  Any equity doesn't include loan

11     proceeds.  Otherwise --

12          THE COURT:  That's what I would assume.  So what

13     are you saying, that changes the calculation?

14          MR. BROOKS:  He said, "Here is the

15     debt-to-tangible equity ratio."  Basically the common

16     shareholders, based on the financial statement, the common

17     shareholders have $21,000 in tangible equity.  Now they just

18     did a bond offering, so now there's $245 million in debt.

19     So he's talking about the debt-to-tangible equity of $21,000

20     to $245 million.  In their complaint, the SEC said, "Uh-Uh,

21     that's false because you didn't account for the loan

22     proceeds."  But loan proceeds are never included in a

23     debt-to-tangible equity or a debt-to-equity ratio.  If they

24     were, that's like saying, "I have this much equity in my --"

25          THE COURT:  I understand.

1        MR. BROOKS:  Okay.

2        THE COURT:  So how do you account for loan

3    proceeds?

4        MR. BROOKS:  It's not a factor in a debt-to-equity

5    or tangible-equity ratio.  It's just not --

6        THE COURT:  Maybe, but is there an implication

7    that they're about to go under without taking into account

8    the amount of money that they have at their disposal so

9    they're fluid?

10       MR. BROOKS:  Well, that's not -- what the SEC said

11   was, he miscalculated the debt-to-tangible equity ratio.  I

12   mean, there's not -- that's just a mistake that they made in

13   their complaint.  I mean, there's nothing --

14       THE COURT:  There's no way I could know this.

15       MR. BROOKS:  Well, it's like, your Honor, I mean,

16   anybody -- I feel like anybody with a mortgage, I mean, if I

17   have a certain amount of equity in my house and I go --

18       THE COURT:  I'll hear from the SEC on that, but it

19   was not well explained in the briefs as to how you deal with

20   loan proceeds.

21       MR. BROOKS:  Well --

22       THE COURT:  The bond proceeds.

23       MR. BROOKS:  Well, so you don't deal with them at

24   all in a debt-to-tangible ratio.  It's completely irrelevant

25   because when you take a money from a bond offering, you've

increased the debt in the company.

THE COURT:  Yes.

MR. BROOKS:  They may have some assets, but it doesn't affect equity.  Just like if I go borrow money from a bank --

THE COURT:  But how do you deal with the proceeds from the bond offering on a balance sheet?

MR. BROOKS:  On a balance sheet, they go into the assets, I suppose, but it doesn't increase the equity.  I mean, what I think they have done is -- and it also depends what the company does with the assets.  I mean, for instance, in this one --

THE COURT:  Are you guessing?  Are you an accountant?

MR. BROOKS:  I'm not an accountant, your Honor, but, I mean, I've seen -- I think this is kind of basic stuff that when you borrow money, you don't increase the equity in a company for the common shareholders, just like --

THE COURT:  Yes, that's true.

MR. BROOKS:  And this money, you know, they also say, oh, that they had all this money to spend, but common shareholders don't -- the money that is from a debt offering, that money doesn't belong to the common shareholders.  It's owed to the bondholders.  So it's not

1     like all of a sudden as a common shareholder I have money.

2     So their argument that, like, oh, there was more money in

3     the bank, that doesn't have anything to do with common

4     shareholders, and the statement is all about common

5     shareholders.

6            THE COURT:  All right, so I understand your

7     position there.  What about the next statement?

8            MR. BROOKS:  Well, the next one, your Honor, is

9     that Viking did the not intend to conduct preclinical

10    studies and trials, okay?  The SEC -- as background, when

11    Lemelson was discussing in one of his reports, he was

12    discussing the relationship between Ligand and Viking

13    Therapeutics, okay?  Now, Viking was a self-described

14    clinical stage biopharmaceutical company that Ligand -- so

15    Lemelson's thesis is:  It's not a real company.  This is

16    basically a shell or an alterego of Ligand.  And so he

17    pointed out in his report that, look, supposedly this is a

18    clinical stage biopharmaceutical company, and they're not

19    even going to be conducting the preclinical studies and the

20    clinical trials.  The full sentence of what he says is this:

21    "Viking does not intend to conduct any preclinical studies

22    or trials and does not own any products or intellectual

23    property or manufacturing abilities and leases space from

24    Ligand."

25            So the SEC -- there's sort of five allegations in

1    that.  The SEC takes the first part of the sentence and

2    says, well, that was false because they did intend to

3    conduct preclinical --

4            THE COURT:  Well, you don't have to do it

5    yourself.  Can't you hire someone to do it?  There are whole

6    companies that do that stuff.

7            MR. BROOKS:  Right, but his whole point, there was

8    no issue.  He never said anything to the contrary.  He never

9    said there would be no preclinical studies or clinical

10   trials going on in the drug.  There were, and in fact he

11   pointed to the S1 which talked all about all these things

12   they're doing.  His point was that Viking itself wasn't much

13   of a company, and they wouldn't be doing this.  And the SEC

14   in their complaint, your Honor, the SEC says it's false

15   because they said in the S1 it specifically said that Ligand

16   was renting space to Viking for the purpose so that Viking

17   could conduct these studies and trials, and that was just --

18   I mean, the master license agreement doesn't say anything

19   about that.  They just got that wrong.  And the S1 says the

20   opposite.  They specifically say, "We are not going to do

21   it."

22           So what the SEC does is, when they realize, when

23   they saw that we were all -- all Lemelson said was basically

24   quoting Viking from its S1, the SEC changed its tune.  They

25   backtracked from their statement in the complaint which

1    says, "Oh, well, they rented space for this," because it was

2    obvious they didn't.  I mean, this wasn't a laboratory.

3    They rented corporate office space.

4          So then what the SEC said is, "Well, wait.  Yes, I

5    guess it's technically true that Viking itself didn't intend

6    to do that, but they were going to maintain responsibility.

7    That's fine, but it's a non sequitur because Lemelson never

8    said anything to the contrary.  He never said anything about

9    whether or not they would maintain responsibility.  His

10   whole point in the report which we've attached is that this

11   company really isn't doing much; they're not the ones doing

12   the study.

13         And think about it.  If -- if -- so, well, two

14   things.  So, first of all, the SEC changes it.  First they

15   said they were going to conduct it.  Then we pointed out:

16   No.  In fact, they specifically disclosed that they would

17   not be conducting it.  And the SEC said, well, it's still

18   misleading because they said they would maintain

19   responsibility.  But I want to read the exact thing, your

20   Honor, from the S1 because the SEC omits critical language,

21   which really dooms their argument.

22         So after explaining that Ligand itself, their

23   preclinical studies and trials were conducted by third

24   parties, Viking writes, "We have relied and expect to

25   continue to rely on these parties for execution of our

1   preclinical studies and clinical trials, and we control only

2   certain aspects of their activities."

3           The SEC completely glosses over the fact that not

4   only are they disclosing they're not doing it, they

5   specifically disclose that they're not even in control of a

6   lot of the aspects of these third-party companies.

7           Then they go on to say, "We're maintaining legal

8   responsibility."  But so what?  What does that have to do

9   with it?  He never said that they weren't maintaining legal

10  responsibility.

11          THE COURT:  Wouldn't an investor think that Viking

12  wasn't going to be doing clinical studies and it was all a

13  farce?

14          MR. BROOKS:  No, because that's not the point of

15  his article at all.  These preclinical studies and trials

16  are going to be going on forever.  And he sources the S1.

17  He specifically -- it's in there.  Literally, if you look at

18  the S1, every page of this 100-page document talks about all

19  the studies and trials that are going on.  The point was

20  just that this Viking entity --

21          THE COURT:  Wouldn't be the one.

22          MR. BROOKS:  -- wouldn't be the one doing it.  And

23  in fact --

24          THE COURT:  So when you say wouldn't be the one

25  doing it --

1              MR. BROOKS:  Wouldn't be the one conducting them.

2              THE COURT:  -- if I hire an agent, I'm a company

3      and I hire an agent to do it for me, Viking would be doing

4      it.

5              MR. BROOKS:  They wouldn't.  They say, your

6      Honor --

7              THE COURT:  Excuse me.  If Viking hires a company

8      with experience, isn't Viking doing clinical trials?

9              MR. BROOKS:  I disagree with that for a couple

10     reasons.  One, if that was the case, why would they have to

11     disclose in bold -- the S1 in bold, they disclose, "We have

12     no experience in conducting preclinical studies and clinical

13     trials, and we intend to rely on third parties."  If it was

14     the functional equivalent as you were saying, there would be

15     no reason for them not only to have to disclose it in their

16     public filing, but they put it in bold.

17             Okay, so literally, though, they're saying it's a

18     false statement.  He is just merely reciting what Viking

19     itself disclosed, and there's no way that can be securities

20     fraud, your Honor.

21             The final one is the unaudited versus audited

22     statements.  So in one of his reports, Lemelson said that

23     the financial statements in the S1, again, talking about

24     Viking, were unaudited.  And as we pointed out in our motion

25     to dismiss, it's true insofar as some of them were --

1        THE COURT:  Some were.

2        MR. BROOKS:  Some were and some weren't, right?

3   And so he could have been more clear.

4        THE COURT:  One wasn't, right?

5        MR. BROOKS:  Well, there were a bunch that were

6   not.  There were the ones from 2014 as well as some of the

7   cumulative ones.  We list them all in our motion to dismiss.

8   There's various different financial statements.  Some are

9   audited; some aren't.  And in fact if you just kind of look

10  at all the disclosures, you know, the word "audit" is

11  mentioned like seven times.  "Unaudited" is mentioned

12  fifty-six, so there's clearly a focus on the unaudited ones,

13  but he certainly could have been more clear, your Honor.

14       But what is clear is that, again, just under

15  *Twombly* and *Iqbal*, it's hard to imagine how this could be

16  material, where any reasonable investor would go to the S1,

17  and every financial statement is clearly labeled as either

18  audited or unaudited.  The SEC, again, their scienter

19  argument is, like, "Oh, well, he must have known it was

20  false because the document says the opposite."  But for

21  materiality purposes, that argument actually should be

22  flipped on its head because what reasonable investor is not

23  going to look at the S1 themselves to see, "Oh, yeah, okay,

24  I see.  So there's some that are audited and some that are

25  unaudited."

1           And, again, the SEC does the same thing, frankly,

2     that they did with the first statement we talked about, your

3     Honor, which is, in their opposition they explain, "Okay,

4     well, here's why it's material."  And what they say is that

5     a reasonable investor would find it material that Viking had

6     never consulted with an auditor and had never been audited.

7     But he never said that.  He never said they had never

8     consulted with an auditor and that they had never been

9     audited.  He said, "Hey, the ones in the S1 are unaudited."

10    And, again, any reasonable investor could go and see, okay,

11    well, we're talking about some, not all.  But, again, the

12    SEC's materiality argument fails as a matter of law because

13    he never said the things that they're saying would have made

14    a reasonable investor kind of think twice about this.

15          And, likewise, again with the stock price, the day

16    that --

17          THE COURT:  So you're saying, even if something is

18    false, if it's obviously false because you can find out the

19    truth readily in the S1, it's not material?

20          MR. BROOKS:  Yes.  That's *Parnes* and *Virginia*

21    *Bankshares*, your Honor, which we cite in our papers.  And

22    the *Virginia* --

23          THE COURT:  So you're acknowledging that it was an

24    overstatement.  Of course some of them were audited but not

25    all of them.  You're saying, well, all an investor would

1  have to do is go into the S1?

2      MR. BROOKS:  Yes, all an investor would have to do

3  is go into an S1.  And what *Virginia Bankshares* says in a

4  related context -- it was a proxy statement, but it was

5  dealing with securities fraud -- is, yeah, but if you would

6  need to be a financial analyst to figure it out, you can't

7  kind of rely on the fact of, well, it was true and you could

8  have figured it out.  You do not need to be a financial

9  analyst.  You can go yourself.  The financial statements

10  that are listed, they say "audited" or "unaudited."  It

11  explains exactly which ones.

12      THE COURT:  That's an interesting question.  If

13  you're an investor, you're just hearing what he has to say.

14  Not many people go back and cross fact check.

15      MR. BROOKS:  I think reasonable investors do.  I

16  don't think -- I mean, the idea that you would just take

17  what somebody said who's telling -- again, with all sorts of

18  disclosures in his reports, you can see them, and it's

19  citing the references.  I mean, it might be different if he

20  just said, "I've seen their financial statements and X," but

21  he's literally pointing to the public filing, not something

22  that he has; he's pointing and sourcing the public filing.

23  So what reasonable investor is going to invest without doing

24  some sort of due diligence on their own?

25      And, again, it's borne out by the actual facts,

1    your Honor, because if we look at what happened to the stock

2    price on the day his report is issued, it goes up.  And the

3    next day --

4              THE COURT:  You don't have to prove reliance,

5    right?

6              MR. BROOKS:  You don't have to prove reliance, but

7    you have to prove materiality.

8              THE COURT:  If something is material, it clearly

9    is material but palpably false, if you do due diligence, is

10   that the legal question?

11             MR. BROOKS:  Well, the legal question is that if

12   you -- what those cases talk about, for instance, that if

13   you include -- if you source your material and it would be

14   readily available to anybody, at that point it becomes

15   unreasonable for somebody to rely on the statement.

16             THE COURT:  So you're going to have to prove

17   reliance.  That's --

18             MR. BROOKS:  But it still -- but it still --

19   that's what a -- you don't have to prove reliance in terms

20   of bringing some person in and saying, "I relied on it," but

21   they do have to prove materiality, and it's based on what a

22   reasonable investor would do.  And that's *Virginia*

23   *Bankshares* and *Parnes,* your Honor.

24             And, again, if you look at the stock price, the

25   report comes out on July 3.  The stock price goes up that

1    day.  There's no more trading for four days because of the

2    July 4th holiday, so the market has a chance to digest it.

3    It goes down slightly the next day, but it's still higher

4    than it was the day before he made the statement.

5            So we're in this, you know, this so-called "short

6    and distort" type of case, but where's the harm?  I mean,

7    not the harm in terms of proving damages at this point, but

8    where is the argument that, well, obviously it was material

9    because look how reasonable investors reacted.  And don't

10   forget, again, the SEC is the one who said that your Honor

11   should look at what the stock price did to show materiality.

12           THE COURT:  Okay, thank you.  Now I'll hear from

13   the SEC.  Thank you.

14           MR. DAY:  Good morning, your Honor.

15           THE COURT:  Good morning.

16           MR. DAY:  I don't want to repeat what's in our

17   briefs, but I certainly want to address your Honor's

18   questions, and I have a few responses to what we just heard

19   from Mr. Brooks.  As an initial matter, I think it's

20   important to, at the risk of stating the obvious --

21           THE COURT:  Can I ask Maryellen to shut the door

22   behind you because for some reason the glare from out

23   there is making it hard for me to see.

24           (Discussion off the record.)

25           MR. DAY:  A few words about the nature of this

1    case.  Your Honor, the Commission alleges that the

2    defendants engaged in a form of market manipulation called a

3    "short and distort" scheme.  The four material

4    misrepresentations that we're talking about here today are

5    part of that scheme, but they're also independently

6    actionable as material misrepresentations under Exchange Act

7    Rule 10b5-B.  Defendant's motion doesn't address our

8    allegation that this was a scheme under Exchange Act

9    Rule 10b5-A and C.  So I just want to be clear at the outset

10   what we're talking about here today, which is the 10b5-B

11   allegations, and that's why I believe defendants have

12   focused on the elements of falsity and materiality.

13           THE COURT:  I don't understand what you just said.

14   So you're saying I can't just think about these four

15   statements because you're alleging a broader scheme?

16           MR. DAY:  Well, it's not that you can't think

17   about them, your Honor, obviously, but the --

18           THE COURT:  Even if I agree with him on every

19   single one of these points, you still have a cause of

20   action?

21           MR. DAY:  Not necessarily, but the point is that

22   the defendants haven't challenged -- if these statements, if

23   any of these statements stay in the case, they haven't

24   challenged the sufficiency of our scheme allegations under

25   10b5-A and C.  So I just want to be clear that this is not

just a 10b5-B case.  It's also a 10b5-A and C case.

THE COURT:  But you are saying, even if I agree with him on all of these, you still have a case?

MR. DAY:  Not necessarily, your Honor.  I think, if all of the misstatements went away, there's not a lot of other conduct that we've alleged in the complaint, but I just want to be clear that there are multiple theories in this case.

Addressing the misstatements that were discussed previously, regarding Promacta, the misstatement about Promacta, our argument is that that misstatement was material because it suggested that the major source of revenue for the company was about to become obsolete, was about to go away.  A reasonable investor would necessarily consider it material to know that 70 percent of the revenue of a company was on the brink of obsolescence.

The argument that I'm hearing from the defense in their reply brief and today is drawing a distinction without a difference between the investor relations firm and the company itself.  To the extent that there is a dispute somewhere down the road about whether the investor relations firm was authorized or was acting as an agent, that has to await fact discovery and a decision on the merits.  That is not something that can be decided at the motion to dismiss stage.

1          THE COURT:  What about the argument, all right,

2     the stock market didn't go down?

3          MR. DAY:  Yes, your Honor, we don't believe we

4     have to show a stock movement -- that's the first response

5     to that -- to prove materiality.  Your Honor, I can certainly

6     provide additional research to the Court.  I'm not aware of

7     one as I stand here today.  I don't believe that there's a

8     requirement that we have to show a market movement to prove

9     materiality.  It's an objective standard:  What would a

10    reasonable investor consider important in altering the total

11    mix of information available in the market?

12         THE COURT:  If the market goes up, let's say,

13    significantly after the statements, is that evidence that it

14    wasn't material?

15         MR. DAY:  That could support an argument, but, no.

16    I think there are several things to keep in mind about that.

17    First of all, this is not a case like many disclosure cases

18    where there was a contemporaneous announcement by a company

19    to the market, and then you look at what happened to the

20    stock price after the announcement by the company.  This is

21    more akin to an analyst talking about what's going on with

22    the company.

23         The statements expressed by the defendants in this

24    case take time to propagate into the market.  I don't think

25    that it is necessarily the case that you would expect to see

1    a stock price reaction immediately, especially when these

2    statements were disseminated to the market over a period of

3    time to different forums, and, you know, it's just not the

4    same thing as a corporate announcement.

5              THE COURT:  Where was the statement made, the one

6    about the key drug going away?

7              MR. DAY:  It was in an interview on June 19 of

8    2014.

9              THE COURT:  What kind of an interview?

10             MR. DAY:  It was an interview with an Internet

11   radio show called PreMarket Prep, I believe was the name of

12   the show.  So it was broadcast.

13             THE COURT:  It wasn't like an investor call or --

14             MR. DAY:  No, but it was also available to people

15   to listen to later.  It was sent in emails to prospective

16   and existing investors in the Amvona Fund.  It was made

17   available through Amvona's website and LCM's website, so it

18   had a lot of capability to be propagated out into the total

19   mix of information available to the market over time.

20             THE COURT:  But you're saying it might not have

21   happened precipitously?

22             MR. DAY:  Exactly, your Honor.

23             With respect to the debt-to-tangible equity

24   ratio --

25             THE COURT:  You're ready to do Accounting 101?

1          MR. DAY:  Well, no, your Honor, and I think that

2     underscores why this is inappropriate for resolution at the

3     motion to dismiss.

4          THE COURT:  You've got to give me something to

5     show whether it's plausible.

6          MR. DAY:  Yes.

7          THE COURT:  I mean, I just didn't understand it,

8     what you do with those proceeds from a bond offering.

9          MR. DAY:  Your Honor, let me see if I can walk

10    through this with you.

11         THE COURT:  Are you an accountant?

12         MR. DAY:  I am not an accountant, your Honor.  I

13    have a fair amount of exposure to accounting through my

14    work, but I'm not an accountant.

15         THE COURT:  My first year in law school I -- the

16    second year, I think, took a pass/fail accounting class, and

17    that was about the extent of it.  But usually I have experts

18    and some explanation of it and I can pick it up, so go

19    ahead.

20         MR. DAY:  Okay.  Your Honor, our fundamental

21    position on this is that it is misleading to state the

22    shareholders only have $21,000 as a shield against hundreds

23    of millions in debt, and that the company was in effect

24    insolvent, without taking into account the whole picture of

25    the financial condition of the company.  Defendants are

1  urging a very --

2        THE COURT:  You have the bonds, right?

3        MR. DAY:  Yes.

4        THE COURT:  And tangible assets you would say are

5  what he's saying, cash in the account, right, in terms of

6  what they owned?

7        MR. DAY:  Well, your Honor, let me continue.  We

8  are not saying that there was a problem in the calculation

9  of the numbers, okay?  That's not the issue.  The problem is

10  that the way that this was presented suggested that this

11  company was insolvent and that there was only $21,000

12  available to shareholders as sort of a backstop against bad

13  things that could happen to the company.  That grossly

14  mischaracterizes the actual financial condition of the

15  company at the time for a number of reasons.

16        THE COURT:  Does he use the word "insolvent"?  No.

17        MR. DAY:  Sorry?

18        THE COURT:  Does he use the word "insolvent"?

19        MR. DAY:  Yes, I believe so, your Honor.  In the

20  same report that makes the statement that we've called out

21  about the debt-to-tangible equity ratio, there is a

22  statement that the company is on -- "deep in the context of

23  insolvency" I believe was the phrase used, and that is

24  important context for understanding why this statement is

25  materially misleading.

1       THE COURT:  I see.  So you're saying that

2  statement is misleading that that ratio puts it into

3  insolvency?

4       MR. DAY:  Yes, your Honor, and it's misleading

5  because it omits intangible assets.  Now, recall that this

6  is a pharmaceutical company that's primary source of revenue

7  is licensing its intellectual property.  This statement

8  about the financial condition of the company omits

9  intangible assets.  It also omits cash proceeds of the debt.

10  The reason that this is important is that, as defendants

11  acknowledge in their reply, there was at least $168 million

12  left after this debt offering in cash at the company.  So it

13  is not correct to say that the indebtedness was fully

14  $245 million when there's that much cash which could be used

15  to repay debt, for example.

16       Now, what I heard Mr. Brooks say was that in

17  calculating a --

18       THE COURT:  I see.  So you're saying -- I just

19  want to understand what the materially misleading statement

20  is -- is that by saying the amount in debt without

21  acknowledging they had this $165 million to pay it back, it

22  exaggerates the --

23       MR. DAY:  Exactly, your Honor.

24       THE COURT:  -- the financial --

25       MR. DAY:  And there is an accounting concept for

1    this, which is the concept of net debt, which means it's the

2    amount that's been drawn down essentially on, for example, a

3    line of credit.  It's a very different thing to say that a

4    company has --

5              THE COURT:  I understand it.  The net debt does it

6    for me.

7              MR. DAY:  Okay.

8              THE COURT:  So there's a different way under the

9    accounting rules to describe this that doesn't make someone

10   feel as if they're on the brink of insolvency.

11             MR. DAY:  Exactly, exactly.

12             THE COURT:  Although it does still put them at

13   risk, right, the difference, what did you say, $240 million

14   in a bond offering, and they only have $168 million left?

15             MR. DAY:  Yes, your Honor, but I think that's a

16   question that would have to be answered by experts and with

17   reference to testimony in this case.

18             THE COURT:  So you're just saying, don't do it

19   now?

20             MR. DAY:  Actually, backing up a little bit, even

21   for the Court to determine whether the debt-to-tangible

22   equity ratio was calculated correctly, the record is

23   insufficient to even make that determination.

24             THE COURT:  I know, but even the SEC has to state

25   a plausible claim in a way that I can understand it.

1          MR. DAY:  Yes, your Honor.

2          THE COURT:  Whenever plaintiffs say to me, "Oh,

3     don't worry, I'll explain it to you later," I have to get

4     past that I understand what the claim is.  All right, so

5     you're saying, by not saying net debt, they're exaggerating

6     the extent of the disparity?

7          MR. DAY:  Yeah, essentially, your Honor, yes.  By

8     not giving a full picture of the financial health of the

9     company and suggesting that it was insolvent and that there

10    is only a tiny amount of cash available to the shareholders

11    as protection, that misrepresents the true financial

12    condition of the company.

13         THE COURT:  I see.

14         MR. DAY:  Moving on to the clinical trials by

15    Viking, again, the issue here has to be viewed in context.

16    The context, as alleged in the complaint, is an allegation

17    by defendants that this transaction was a sham or a fraud;

18    and to support that allegation, there are these

19    misstatements of material fact, both about the intent to

20    conduct clinical trials and whether the company had ever

21    consulted with auditors or had audited financial statements.

22    I'll take both of those in turn.

23         I think your Honor picked up right away on our

24    fundamental argument on the clinical trials.  The fact that

25    Viking might hire somebody else to help perform clinical

1   trials doesn't mean that they're not doing clinical trials.

2   That would be like saying Apple doesn't make iPhones because

3   they contract out the manufacturing.  It's a distinction

4   that is of no relevance for the purposes of this motion.

5   The --

6           THE COURT:  But I do get what they're saying is,

7   all right, maybe these two subsequent things are false about

8   the audited or whatever, but you just have to take a quick

9   peek at the S1, and you know exactly what's going on.

10          MR. DAY:  Your Honor, there is no requirement that

11  reasonable shareholders go searching through public

12  documents to try to discover the truth about false

13  statements.  There are ample cases in this district on that

14  point; for example, *In Re Credit Suisse-AOL Securities*

15  *Litigation*, 465 F. Supp. 2d 34.

16          THE COURT:  Okay, slow down.  465 F. Supp. 2d?

17          MR. DAY:  Yes, 34.

18          THE COURT:  Okay.

19          MR. DAY:  *Brumbaugh v. Wave Systems Corporation*,

20  416 F. Supp. 2d 239, and the *Swack* case, which I believe was

21  cited in our brief, 383 F. Supp. 2d at 237.  I don't have

22  the non-pinpoint number in front of me.

23          THE COURT:  Thank you.  I'm sure they're in your

24  briefs.

25          MR. DAY:  But the point is that a materially false

1   statement, the onus is not on the reasonable investor who

2   hears the materially false statement to go hunt around in

3   public documents to try to find contradictory evidence.  The

4   statement stands on its own.  There's no requirement that

5   investors engage in that kind of activity to be considered

6   reasonable.

7           Now, with respect to the Viking audit, one

8   argument I wanted to respond to is, defendants say that they

9   never claimed that Viking had never consulted an auditor and

10  had no audited financial statements.  Your Honor, viewed in

11  context, if you look at the S1, the financial statements

12  covered the entire period of Viking's existence.  So when

13  defendants go out to the market and say, based on the S1,

14  that Viking had not consulted an auditor and had no audited

15  financial statements, it's in reference to a document that

16  contains financial statements for the entire period of

17  Viking's existence.  The only reasonable inference that

18  anybody could draw from that is that they've never talked to

19  a auditor; they've never had their financial statements

20  audited.

21          The exact language was, "Viking had yet to consult

22  with its auditors on any material issues.  The financial

23  statements provided in the S1," again, which cover the

24  entire period of its existence, "accordingly are unaudited."

25              So, as a factual matter, our allegation is that

1  defendants went out with a materially false statement about

2  all of the financial statements of Viking.

3          Your Honor, those were the issues that I wanted to

4  address with respect to the statements that were discussed

5  today.  Are there any other issues that your Honor would

6  like to hear from the SEC on?

7          THE COURT:  No.  Thank you.

8          MR. BROOKS:  Can I briefly respond, your Honor?

9          THE COURT:  Yes, you may.

10          MR. BROOKS:  Thank you.  So, and I know this

11  sounds like the one you least want to hear about, but if

12  you'd allow me, on the one with the debt-to-tangible equity

13  ratio --

14          THE COURT:  Oh, I'm right there.  All right.

15          MR. BROOKS:  All right, now we got you.

16  Respectfully, what Mr. Day just said is not what was in

17  their complaint.  He said, "Oh, we don't have a problem with

18  the calculation."  In their complaint, Paragraph 52, it says

19  that "In calculating the debt-to-equity ratio --" and,

20  again, he didn't calculate the debt-to-tangible equity, and

21  he always made that clear -- "Lemelson included the new debt

22  but not the proceeds of the loan, which would have yielded a

23  debt-to-equity ratio closer of one to one," which itself is

24  wrong.  "Lemelson intentionally misstated Ligand's

25  debt-to-equity ratio."  That's what they said in their

1  complaint.  They have now completely changed course.

2  THE COURT:  That may be, but if worst comes to

3  worst, they amend.  I mean, in other words, he's clarified

4  now what he's talking about.

5  MR. BROOKS:  But there's no other claim, and he

6  complains, said, "Well, one of the things that was

7  misleading was that he didn't include goodwill," but

8  Lemelson never ever said, "Here's the company's

9  debt-to-equity ratio."  He said, "Here's the debt-to-tangible

10  equity ratio."  How can that be misleading if you disclose

11  what ratio you're doing?

12  THE COURT:  Well, what about the point, and maybe

13  I'd make them replead it, but that if you have $240 million

14  in debt but you actually still have outstanding most of it,

15  the majority of it, then that is a misleading ratio --

16  MR. BROOKS:  A debt-to --

17  THE COURT:  -- to show that you're on the verge of

18  insolvency?

19  MR. BROOKS:  They will not -- this is so unfair,

20  your Honor, because all they want to do is get this past a

21  motion to dismiss.

22  THE COURT:  But can I say, they're going to do

23  that on the first statement.

24  MR. BROOKS:  On the first statement, no, no, okay.

25  I mean, I respectfully disagree, but I understand.  You made

 1    that clear.  I'm talking about this one, and this one is

 2    especially unfair, your Honor, because there's not an

 3    accountant in the world who's going to come in here and say

 4    that that statement was misleading.  And what they're doing

 5    by just trying to get it over the hump is, they're going to

 6    force us now to hire an expert on something that there's no

 7    way any reputable accountant, much less all the great

 8    accountants they have at the SEC, are going to come in here

 9    and say, when you calculate a debt-to-tangible equity, it's

10    misleading if you don't do this net debt.  That is not

11    something that accountants do.  He didn't say anything to

12    the contrary of that.  He said here's the debt-to-tangible

13    equity ratio --

14         THE COURT:  I don't know if -- all right, this

15    case isn't going to go up or down on this.  I mean, even if

16    I agree with you, I certainly didn't understand it before.

17    They've explained what their theory is.  So, you know, the

18    other three --

19         MR. BROOKS:  Well, the other piece, can I just,

20    your Honor --

21         THE COURT:  Yes.

22         MR. BROOKS:  He also said, well, it's misleading

23    because he used the term "deep in the context of

24    insolvency."  That wasn't said.  The SEC continues to rely

25    on a draft report.  We have put in the report that was

1    actually used --

2            THE COURT:  He never actually said that in a --

3            MR. BROOKS:  He never used those words, no.

4    That's in a draft report that was given to the SEC.  That is

5    not in the public version that was out there for investors.

6    Now, I'm not saying he didn't talk about it, but insolvency

7    is defined as when you're --

8            THE COURT:  You're saying he didn't publicly use

9    the word "insolvency"?

10           MR. BROOKS:  No, he didn't say what they said,

11   which was "deep in the context of insolvency."

12           THE COURT:  Did he use the word "insolvency"?

13           MR. BROOKS:  He talked about how this raises

14   the --

15           THE COURT:  Specter --

16           MR. BROOKS:  -- specter of insolvency.  Well, but

17   by definition, the company is insolvent once its liability

18   outweigh its assets.  I mean, that's not something that's

19   misleading.

20           THE COURT:  Yes, but if you don't include

21   intangibles and you also don't take into account this net

22   debt thing --

23           MR. BROOKS:  No, but the net debt --

24           THE COURT:  -- it certainly exaggerates it, right?

25           MR. BROOKS:  How does it exaggerate it if you're

1  not saying -- what -- again, obviously when do you a bond

2  offering -- I mean, I think what Mr. Day said is that it

3  didn't take into account.  The debt, the debt from a bond

4  offering is $245 million.  It doesn't matter whether they

5  got $245 million and they're sitting there on the cash, or

6  they got $160 million, which is what they got here.

7           THE COURT:  Agreed.

8           MR. BROOKS:  The debt is $245 million.  That's all

9  he said.  He made factually true statements.  He said the

10  tangible equity is $21,000, and the debt from this is

11  $245 million.  There's nothing that could possibly be

12  misleading about that.  What else does he need to say?  He's

13  stating facts.

14           THE COURT:  Okay, I understand your point.

15           MR. BROOKS:  Okay, the one other point is that

16  again on the -- I'll just talk about one more thing on

17  Viking on the preclinical studies and trials.  What Mr. Day

18  said is, well, you know, it would be like, you know, if

19  Apple doesn't make its iPhones.  I doubt that Apple needs to

20  disclose the fact in bold that they're not doing it.  Again,

21  if it was unimportant, if there's no difference -- he said

22  distinction without a difference -- if Viking not conducting

23  preclinical studies and trials is the same as them

24  maintaining responsibilities over third parties, why did

25  they need to disclose that in bold?  And how can it

1    possibly, possibly be securities fraud for Lemelson simply

2    to put in his report exactly what Viking not only disclosed

3    but disclosed publicly and in bold because somebody thought

4    it was so important that they needed to say that?

5          THE COURT:  All right, thank you.

6          MR. BROOKS:  Thank you, your Honor.

7          THE COURT:  I understand your point.

8          All right, so scheduling, it's not like the PSLRA,

9    right?  You can go forward with discovery right away, I

10   think.

11         MR. BROOKS:  Well, we could, your Honor.  We've

12   asked in our thing to hold off on it until the motion --

13         THE COURT:  That's denied.  At least a piece of

14   this is going to survive.  So what do you want?

15         MR. JONES:  Your Honor, in the Joint Scheduling

16   Statement, we proposed a calendar.  As your Honor just

17   ruled, there was a dispute of the parties about when to

18   start.  We understand now, start now.  We have proposed

19   essentially a six-month fact discovery.  Defendants have

20   proposed ten months for fact discovery.  We at the

21   Commission don't think it's that complicated a fact

22   discovery case, and we're about to turn over a whole bunch

23   of documents that we have obtained, and so fact discovery

24   can get right off and be completed in six months.

25         The parties agree on the remainder -- this is on

1    Page 5 of the Joint Scheduling Statement, your Honor.  I

2    have it right here.

3              THE COURT:  I look forward to it, so...

4              MR. JONES:  The only dispute between the parties

5    not resolved by the Court now is whether or not we should

6    take six or ten months for fact discovery.

7              THE COURT:  You want ten months?

8              MR. BROOKS:  Well, your Honor, the reason --

9              THE COURT:  You want ten months?

10             MR. BROOKS:  Yes.

11             THE COURT:  You've got ten months.  It's an

12    individual versus the SEC.  I get it.  You're with Libby

13    Hoopes, is that it?

14             MR. BROOKS:  Yes, your Honor.

15             THE COURT:  So it's a smaller firm, so I will give

16    ten months, and then you can just stagger everything after

17    that.  But let me ask -- I'm not going to deal with the

18    Investment Managers Act, which seems to hinge primarily on

19    the misrepresentations.  I know you say it's a novel theory,

20    and you pretty much acknowledge it's a novel theory.  I

21    don't know why I have to deal with that now.  But let me ask

22    about, how much money do you think -- what happened here?

23             MR. JONES:  Your Honor, so this is an area where

24    obviously with the SEC, we're not talking about damages.

25    We're talking about disgorgement.  So the question is, how

1   much money did Mr. Lemelson personally profit by driving the

2   stock price down?  We're going to need to get that in

3   discovery.  We don't have that now.  We need to know --

4           THE COURT:  Yes, but when you say it's obvious,

5   it's less obvious to me because I'm dealing with this fund.

6   So does it mean that the whole fund has to disgorge?  Is

7   that what you're saying?

8           MR. JONES:  Your Honor, that could be disgorgement

9   because the manager of the fund has manipulated the stock on

10  behalf of the investors in the fund, and so the fund itself

11  could have to disgorge the profit --

12          THE COURT:  Does the fund have other investments?

13          MR. BROOKS:  I mean, it's an ongoing fund, your

14  Honor.

15          THE COURT:  I'm just trying to understand how it

16  works.  Are there payouts?  I mean, are there times when --

17          MR. BROOKS:  It actually strikes me that if the

18  fund had to pay, I gather it would just harm investors, so

19  I'm not -- but --

20          THE COURT:  So that's why I don't know the answer.

21          MR. JONES:  Well, your Honor, the Commission has

22  pled the fund as a relief defendant, and the Commission

23  would need to show, when we got to that, that the fund had

24  essentially received ill-gotten gains as a result of the

25  defendant's conduct.  Here, the defendant's conduct led to a

1    profit in the short sale.  The investors could in fact have

2    to disgorge that profit in the same way that if you looked

3    at it on its head, if in fact the manager of a fund engaged

4    in insider trading on behalf of the investors, those

5    investors might have to give back the profits from that

6    insider trading.  From Father Lemelson's and the Lemelson

7    Capital Management entity, Father Lemelson, if found liable,

8    might have to give back what his personal profit from the

9    trading, but also there are fees that Lemelson Capital

10   Management, and by extension Father Lemelson, received for

11   managing --

12         THE COURT:  Are there other investments in this

13   fund, or this was solely about Ligand?

14         MR. BROOKS:  Oh, there are other investments, your

15   Honor.  Yeah, I mean, that's another thing -- well, a little

16   far afield, but, I mean, it's not like this was, yeah,

17   Ligand only.  I mean, that's the other thing.  This fund has

18   been going on for a while.  Lemelson has been writing

19   everything for a while.  So it's kind of like the idea that

20   all of a sudden in one of his investments over the years he

21   just decided to do a fraud, and the idea that, you know,

22   he's out there, he makes a thousand statements about Ligand

23   and four are false and it's some kind of overarching scheme

24   is kind of ludicrous, your Honor.  I know we're getting a

25   little far afield of 12(b)(6), but it just kind of shows the

1    overall --

2            THE COURT:  Yes, but at this point I'm past

3    12(b)(6), and I'm now thinking about the life of this case

4    as to whether or not -- well, let me just say, I've never

5    had a case like this, so would you be typically representing

6    these investors, or do they get their own attorney?

7            MR. BROOKS:  Well, right now I'm not --

8            THE COURT:  I don't know.

9            MR. JONES:  Your Honor, these investors are

10   limited partners in a hedge fund.

11           THE COURT:  Right.

12           MR. JONES:  Presumably the fund is a growing

13   entity.  It's not just a sort of fiction.  It is actually a

14   corporate structure.  It is a limited partnership which has

15   other investments and pays management fees to Lemelson

16   Capital Management.  It would not be difficult -- there

17   would be a dispute about it, but the methodology of

18   determining the amount made on this investment from the

19   beginning of what we say is the short campaign to when the

20   short is covered, basically the sale off of the investment,

21   is a very determinable amount.  We know how much the fund

22   invested in --

23           THE COURT:  Is it still alive, Ligand?

24           MR. JONES:  Yes.  Ligand has profited quite

25   handsomely and has its drug out in the market and is traded

1  and --

2       MR. BROOKS:  It's dropped 46 percent since they

3  filed the lawsuit, so to say it's profited quite handsomely,

4  that's not the full story.  It's a very volatile stock, your

5  Honor, which we pointed out, which is another issue with

6  some of these allegations.

7       THE COURT:  Well, I'm just trying to get to how to

8  settle this matter, and what point in this litigation does

9  it make sense to try to put you either before a magistrate

10  judge or your own private mediator, or just talk among

11  yourselves kind of thing?

12       MR. JONES:  Your Honor, the Commission, as it sees

13  it, sees two fundamental obstacles to settling this matter.

14  One is, our understanding is, the defendant -- and this is

15  not unusual -- feels that he was in the right and would have

16  a hard time even doing a "neither admit nor deny" settlement

17  to admit that --

18       THE COURT:  I assume it's a jury trial, right?

19       MR. JONES:  Yes, your Honor.  The other

20  fundamental difficulty in settling the matter -- and this is

21  true in most of our investment advisor cases -- is that in

22  the case of fraud, the Commission would ask the Court for

23  injunctive relief.  That injunctive relief would in a

24  subsequent Commission matter form the basis for a bar from

25  association with an investment advisor or broker/dealer.

1    That often becomes the sticking point in a settlement as

2    well.  If we can get over that hurdle, it's very possible we

3    could settle it and agree on an --

4            THE COURT:  They're temporary and they're not

5    lifetime, and there are ways of talking about it, so --

6            MR. JONES:  Your Honor, with the injunctive

7    relief, the way the Commission imposes it, there is

8    sometimes a just permanent -- they're all permanent.

9    Sometimes there is a period after which the person has a

10   right to reapply.  And then there are ones where there's no

11   particularized time but the right to reapply; it's just you

12   can reapply anytime, but it's sort of a heightened burden.

13           THE COURT:  Let me ask you this:  I have a series

14   of Lemelson cases.  I actually just went onto the docket.  I

15   don't know if they're all the same gentleman, but he does

16   other things too, right?  Is this the same one who --

17           MR. BROOKS:  I believe he had one other case

18   before your Honor.  I'm not aware of anything else.

19           THE COURT:  So maybe there are different

20   Lemelsons.

21           MR. JONES:  Your Honor, there was a case that went

22   up in fact to the First Circuit here where Mr. Lemelson --

23   my understanding is Mr. Lemelson sued Bloomberg News Service

24   for writing that he was under investigation by the

25   Commission at a time he was under investigation by the

1    Commission, and that case was essentially dismissed by the

2    District Court and then affirmed at the Circuit level.

3              THE COURT:  I think that was my case.

4              MR. BROOKS:  No, I think there was a -- I wasn't

5    involved, your Honor.  My --

6              THE COURT:  It was a mortgage case.

7              MR. BROOKS:  A mortgage-back case, yeah, which

8    settled.  That case settled, yeah.

9              THE COURT:  Yes, I remember that, about whether or

10   not he had to pay back his mortgage.  I'm just wondering

11   whether, just based on that case, whether he has the assets.

12   So this may be something where I don't know the issue here

13   in terms of settlement, kind of thing.  So I think --

14             MR. BROOKS:  Your Honor, at this point settlement

15   doesn't seem particularly --

16             THE COURT:  You don't want me to send you for

17   settlement?  This is, like, definitely a trial?

18             MR. BROOKS:  To the extent it gets that far, I

19   suppose.  I mean, we say that three of the statements were

20   true.  Again, one we understand for 12(b)(6) you can.  The

21   one about the unaudited was -- you know, he could have been

22   more clear that he was talking about certain, not all of

23   them.  Even -- again, I'm not a statistician.  We'll

24   obviously need to get one, but anybody can look at just the

25   volatility of the stock in 2014, and I don't see how they

1    get any meaningful disgorgement.  The stock plummets

2    17 percent in the three months before he makes any

3    statements, and then it's going up and down, 7, 8 percent a

4    day.

5            THE COURT:  You're right, damages may be a serious

6    issue -- not damages, disgorgement amount.

7            All right, well, listen, for right now I've

8    adopted this.  I've given you your ten months, which is not

9    very long in the scheme of what we do here in Federal Court.

10   The case will be going forward, and I'll just have to figure

11   out which of the statements.  The accounting thing I'm

12   understanding now, but I'm not sure it was pled that way.  I

13   just have to go back and look at it.  If I think it isn't,

14   did you want to replead it?

15           MR. JONES:  Your Honor, if your Honor thought that

16   the pleading was not sufficient, we would replead it and

17   make perhaps more clear what we've said here today.

18           Your Honor, before you leave the bench, there is

19   one outstanding issue.  Yesterday the parties filed a joint

20   motion for protective order.  It's a limited protective

21   order that says that the discovery material would be used

22   for the purpose of this litigation only.  I call it to your

23   attention just so your Honor gets a chance to look at it

24   sometime soon.

25           THE COURT:  No dispute?

1    MR. BROOKS:  It's a joint one.  We worked it out.

2    THE COURT:  Allowed.  It's easy, allowed.

3    All right, so I think there it goes.  So --

4    (Discussion between the Court and Clerk.)

5    THE COURT:  Yes, do you need to file another joint

6  statement that extends all the deadlines?

7    MR. JONES:  If it would be helpful to the Court,

8  we could just sort of right now agree what those deadlines

9  would be and write them down.  If the Court wants another

10  filing, we can, but we can also just stay and write those

11  dates down if that's --

12    THE CLERK:  An amended one is easier.

13    THE COURT:  And you agree, because there seemed to

14  be some split in the case law, what's the showing on

15  scienter for the SEC?

16    MR. JONES:  On the 10(b), your Honor, it is a

17  showing of scienter.

18    THE COURT:  Not a strong inference like in --

19    MR. JONES:  Oh, on the pleading?  No, your Honor,

20  it is not.  We do not fall under that PSLRA strong

21  inference.

22    THE COURT:  At all, but there was a split in the

23  case law about whether I should still be doing something

24  like that.

25    MR. JONES:  If a claim sounds in fraud, as

1    obviously the 10(b) does, it is subject to that standard

2    that, you know, there has to be -- what is it?

3              MR. DAY:  It's a Rule 9(b) standard.

4              THE COURT:  Just the plain old 9(b), not what the

5    PSLRA demands?

6              MR. JONES:  That's right, your Honor.

7              THE COURT:  Which I always find -- it's not just

8    an inference, it's a strong inference, and there's a

9    balancing.  So you say you're not bound by that, even under

10   the case law --

11             MR. JONES:  We are not, your Honor.

12             THE COURT:  -- subsequent to the enactment of

13   that?

14             MR. JONES:  That would be the P.  Congress

15   specifically carved us out with the private securities.

16             THE COURT:  Yes, I know that, but then I saw some

17   cases afterwards that -- do you know what I'm talking

18   about? -- that started upping the ante as far as what you

19   had to prove?

20             MR. JONES:  There have been some cases about how

21   much when a case sounds in fraud, the 9(b) standard, what

22   the 9(b) standard requires, but not the PSLRA strong

23   inference of scienter standard.

24             THE COURT:  All right, thank you very much.  Have

25   a lovely holiday to everybody.

1          MR. BROOKS:  Thank you, your Honor.

2          MR. JONES:  Thank you.

3          MR. DAY:  Thank you.

4          THE CLERK:  All rise.

5          (Adjourned, 12:17 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     ) ss.
CITY OF BOSTON                )


          I, Lee A. Marzilli, Official Federal Court

Reporter, do hereby certify that the foregoing transcript,

Pages 1 through 51 inclusive, was recorded by me

stenographically at the time and place aforesaid in Civil

Action No. 18-11926-PBS, SEC v. Gregory Lemelson, et al, and

thereafter by me reduced to typewriting and is a true and

accurate record of the proceedings.

          Dated this 15th day of February, 2019.


                    /s/ Lee A. Marzilli
                    _____
                    LEE A. MARZILLI, CRR
                    OFFICIAL COURT REPORTER