# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| GREGORY LEMELSON and LEMELSON CAPITAL ) | |
| MANAGEMENT, LLC, ) | Civil Action No. 1:18-cv-11926-PBS |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE AMVONA FUND, LP, ) | |
| ) | |
| Relief Defendant ) | |
| ) | |

## DEFENDANTS' OPPOSITION TO THE SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR PROTECTIVE ORDER

The Securities and Exchange Commission brought this so-called "short and distort" case against Reverend Father Emmanuel Lemelson, f/k/a Gregory Lemelson ("Fr. Emmanuel"), a canonically ordained priest in the Greek Orthodox Church, his management company, Lemelson Capital Management, LLC, and his hedge fund, The Amvona Fund, LP. The Commission alleges that over a two-plus-month period in 2014, during a time when his Fund had a publicly announced short position in Ligand Pharmaceuticals, Inc., a billion-dollar, publicly traded company, Fr. Emmanuel made false and misleading statements about Ligand. Over this period, Fr. Emmanuel published five research reports (totaling 56 pages) and gave at least three internet radio interviews concerning Ligand. *See* Affidavit of Douglas S. Brooks ("Brooks Aff.") Exhibits ("Exs.") 1-5; Amended Complaint (Am. Compl.), Dkt. No. 33 at ¶ 30. Among Fr. Emmanuel's vast commentary on Ligand, the Commission challenges just four statements as

being false or misleading.  *See* Plaintiff's Opposition to Defendants' Motion to Dismiss, ("Opp. to MTD") Dkt. No. 16 at 2.  Only two of the four actually involve Ligand.  *Id.* at 3-4.

The Commission's case against Fr. Emmanuel is unprecedented.  As far as the undersigned is aware: never before has the Commission brought a short-and-distort case against an individual who *publicly disclosed* that he was short the stock he was discussing; never before has the Commission brought a short-and-distort case against an individual for statements contained in a short report, as opposed to someone who simply fabricated a rumor or "breaking news"-type story to intentionally drive down the stock; never before has the Commission brought a short-and-distort case against an individual based on *opinion* commentary; never before has the Commission brought a short-and-distort case against an individual who held his short position for a significant period of time—here, *four months* after publishing his original report and nearly *two months* after his final report—as opposed to someone who covered a short position almost immediately upon publicizing the allegedly false statement to profit from the sudden (and temporary) drop in share price; never before has the Commission brought a short-and-distort case where the share price of the shorted company *increased* on the day the challenged statements were made; never before has the Commission brought a short-and-distort case based on statements an individual made about a company that he was not even shorting; never before has the Commission brought a short-and-distort case against an individual who had previously filed a formal whistleblower complaint with the Commission against the company he had shorted; and never before has the Commission brought a short-and-distort case under the

theory it advances here, *i.e.,* that someone in Fr. Emmanuel's position somehow defrauded his *own* investors in profiting from a successful short position.[1]

There is good reason the Commission has never before brought such as case.  Among other things, as will become clearer when Defendants file their motion for summary judgment, this enforcement action represents a brazen attack on, and an unprecedented violation of, Fr. Emmanuel's free speech rights that are protected under the First Amendment to the United States Constitution.

Moreover, Ligand and its counsel's role in this enforcement action—and the Commission's reliance thereon—is troubling.  Initially, Ligand and its counsel made a presentation to the Boston office of the Commission in September 2014, urging the Commission to charge Fr. Emmanuel with securities fraud.  *See* Brooks Aff. Exs. 6, 7.  It appears the Commission took no action based on that presentation.  In response to the Commission's inaction, Ligand changed counsel and hired Attorney Bradley Bondi, a former high-ranking enforcement attorney with the Commission who reached out to his former colleagues in the Commission's Washington, D.C. office.  Brooks Aff. Ex. 7.  Thereafter, in June 2015, Ligand and its new counsel made a similar and renewed presentation to the Commission about Fr. Emmanuel and his statements from a year earlier.  Brooks Aff. Ex. 8.  Ligand's presentations to the Commission were replete with false and misleading statements as well as egregiously offensive commentary about Fr. Emmanuel's religious vocation and activities.  Ultimately, the Washington office of the Commission initiated an investigation that led to this enforcement

---

[1] As far as we are aware, neither the Commission nor or any other regulatory body has ever received any complaints about Fr. Emmanuel from his consistently growing body of investors.  Affidavit of Father Emmanuel Lemelson ("Lemelson Aff.") ¶ 2.  In fact, since the inception of Fr. Emmanuel's fund in September 2012, he has had only one investor exit the fund and has added investors consistently through the years, notwithstanding the existence of the Commission's enforcement action against him.  Lemelson Aff. ¶ 4.

action, which the Commission filed in September 2018, more than four years after Fr. Emmanuel published his original opinion commentary. Complaint, Dkt. No. 1. During the pendency of this case, Ligand's stock price has plummeted (as Fr. Emmanuel had predicted), at one point losing nearly 70% of its value. *See* Brooks Aff. Ex. 9 at 2-7. On the other hand, Fr. Emmanuel's fund returned over 150% in 2019.[2] Lemelson Aff. ¶ 5.

It is in the context of this *unprecedented backdrop* that Defendants seek to take a *limited* 30(b)(6) deposition of the Commission.[3] *See* Brooks Aff. Ex. 10. *First*, Defendants seek information about the Commission's calculation of Ligand's debt-to-tangible equity that gave rise to one of its original claims in its Complaint. In short, both of Ligand's presentations to the Commission claimed that Fr. Emmanuel had intentionally miscalculated the company's debt-to-tangible equity. Brooks Aff. Ex. 6 at 36; Ex. 8 at 51. Ligand's claim was plainly erroneous. Yet the Commission fell hook, line, and sinker for Ligand's claim and included this same allegation in its Complaint as one of four statements that it claimed constituted securities fraud. Compl., Dkt No. 1 ¶ 52. After Defendants pointed out that the allegation was based on a fundamental misunderstanding of basic accounting principles and the claim was dismissed, the Commission amended its Complaint and alleged that Fr. Emmanuel's calculation, despite being accurate, was somehow "misleading." *See* Defendants' Memorandum In Support of Their Motion to Dismiss ("Memo ISO MTD"), Dkt. No. 11 at 7-8; Am. Compl., Dkt. No. 33 at ¶¶ 52-54.

*Second*, while the Commission's non-public investigation was ongoing, someone leaked the existence of the investigation to Bloomberg News. *See* Brooks Aff. Ex. 11. Defendants have

---

[2] Since inception, Fr. Emmanuel's fund's average annual rate of return is approximately 25%, roughly twice that of the S&P 500 and about five times that of the Barclay's Hedge Fund Index. Lemelson Aff. ¶ 6.

[3] For its part, the Commission has already taken 30(b)(6) depositions of *both* corporate Defendants in this matter. Brooks Aff. ¶ 12.

a right to probe this leak both in terms of Commission bias and as evidence of selective enforcement.

*Third*, Defendants seek to depose the Commission about its pre-litigation communications with Ligand and its counsel.  As it appears the Commission dealt mostly with Ligand's counsel—no surprise given counsel's strong Commission ties—Defendants were unable to meaningfully probe this area during its depositions of Ligand and its employees.  As was the situation with the second topic area of questioning, this implicates Commission bias and selective enforcement—both proper areas of discovery.

## FACTUAL BACKGROUND

### I.      Fr. Emmanuel's 2014 Short Reports About Ligand

Fr. Emmanuel has run an extremely successful hedge fund (Amvona) since 2012. Throughout its existence, Amvona has mostly held long positions in stocks, but has also occasionally taken short positions.  Lemelson Aff. ¶ 9.  Since 2010 (even before launching Amvona), Fr. Emmanuel has published approximately 200 research and commentary pieces discussing economics, securitization fraud, and high-level security analysis of common stocks— none of which, apart from Ligand, has been challenged by the Commission.  Lemelson Aff. ¶ 11. In 2014, Fr. Emmanuel identified Ligand as a company whose stock he believed was overvalued and engaged in fraud.  On June 16, 2014, consistent with his prior practice when taking positions in stocks, Fr. Emmanuel issued a 25-page opinion commentary concerning his thesis on Ligand. Brooks Aff. Ex. 1.  Among his many opinions, Fr. Emmanuel stated Ligand's largest royalty- generating drug, Promacta, faced an imminent threat from a new drug, which he believed would "virtually eliminate demand for Promacta."  Brooks Aff. Ex. 1 at 4.  The Commission is not

challenging any statements contained in this 25-page original report. *See* Opp. to MTD, Dkt. No. 16 at 2; Am. Compl., Dkt. No. 33.

Three days later, on June 19, 2014, Fr. Emmanuel was interviewed by an outlet called Benzinga.com. Brooks Aff. ¶ 14. The interview lasted approximately 22 minutes, five minutes of which included a discussion of his short thesis on Ligand. *Id.* During this interview, Fr. Emmanuel stated that he had spoken to Ligand's Investor Relations firm which had "basically agreed" with his thesis concerning Promacta. *Id.* The representative of the IR firm denies having made this statement. *See* Am. Compl. ¶ 38. This is the first of the Commission's four challenged statements. *See* Am. Compl., Dkt. No. 33 at ¶¶ 36-43. Ligand's stock price closed higher on the day of the interview than it had the previous day. Brooks Aff. Ex. 9 at 31.

On July 3, 2014, Fr. Emmanuel issued his second short report on Ligand. Brooks Aff. Ex. 2. This report included a discussion of a company called Viking Therapeutics, with whom Ligand had just entered into a licensing agreement. Brooks Aff. Ex. 2 at 7-10. Two of the Commission's four challenged statements in this case are based on Fr. Emmanuel's statements about Viking, not Ligand, contained in the July 3, 2014 report. *See* Opp. to MTD, Dkt. No. 16 at 3; Am. Compl., Dkt. No. 33 at ¶¶ 44-50. Fr. Emmanuel did not hold a short position in Viking at the time these statements were made. Lemelson Aff. ¶ 12. Ligand's stock price closed higher on the day this article came out than it did the previous day. *See* Brooks Aff. Ex. 9 at 31.

On August 4, 2014, Fr. Emmanuel published his third report on Ligand. Brooks Aff. Ex. 3. The Commission is not challenging any of Fr. Emmanuel's statements contained in that report. *See* Opp. to MTD, Dkt. No. 16 at 2-4; Am. Compl., Dkt. No. 33. On that date, Ligand's share price skyrocketed, closing 9% higher than it did the previous trading day. *See* Brooks Aff. Ex. 9 at 30.

6

On August 14 and 22, 2014, Fr. Emmanuel published his fourth and fifth reports on Ligand. Brooks Aff. Exs. 4, 5. On August 14, Ligand's stock price closed higher than it did the previous day. *See* Brooks Aff. Ex. 9 at 30. On August 22, it closed down slightly. *Id.* These last two reports discussed, *inter alia,* $245 million in new debt that Ligand was taking on through a bond offering. Brooks Aff. Ex. 4 at 1-3, Ex. 5 at 2-6. Among the many points Fr. Emmanuel made in criticizing the bond offering, he wrote:

> On August 18 [2014], Ligand filed a form 8-K with the Securities and Exchange Commission (SEC) revealing that the company had issued $245 million in new debt against the company's tangible equity of jut $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars in debt for every $1 dollar in tangible common shareholder equity).

Brooks Aff. Ex. 5 at 3. In its original Complaint, the Commission incorrectly claimed Fr. Emmanuel's calculation was wrong because, the Commission posited, he failed to include the cash from the loan proceeds as part of shareholder tangible equity. Compl., Dkt. No. 1 at ¶ 52. Notably, this same erroneous allegation was contained in both presentations Ligand and its counsel made to the Commission. Brooks Aff. Ex. 6 at 36; Ex. 8 at 51. Of course, it was no truer when the Commission alleged it than when Ligand did. To the contrary, one need not be an accountant to understand that cash that one borrows does not increase equity. If it did, homeowners would need only to borrow money through home equity loans to increase the equity in their homes. After the Court dismissed this claim from the original Complaint, the Commission re-plead it, now arguing not that the calculation is false, but that despite being true, it is misleading.[4] Am. Compl., Dkt. No. 33 at ¶¶ 52-54.

---

[4] Notwithstanding the amendment, in a footnote in its motion for protective order, the Commission alleges it still maintains Fr. Emmanuel's calculation itself was wrong. *See* Plaintiff's Memorandum in Support of its Motion for Protective Order to Prevent Rule 30(b)(6) Deposition ("Memo. ISO Mot. for Prot. Ord."), Dkt. No. 41 at 6 n.2.

Meanwhile, on July 22 and August 5, 2014—within the time period that Fr. Emmanuel published the reports on Ligand that contained the statements being challenged by the Commission—an entity called Empire Asset Management issued two short reports concerning Ligand.  Brooks Aff. Exs. 12, 13.  On the date of the first, Ligand's stock price plunged by more than 5%—more movement on the stock price than on any day that Fr. Emmanuel published one of his reports (except for the day the stock went *up* by more than 9%).  *See* Brooks Aff. Ex. 9 at 30.  On the date of the second Empire short report, Ligand's stock sank more than 2%.[5]  *See id.*

## II.    Ligand Urged the Commission to Bring This Lawsuit

To this day, Ligand has never made a public statement contesting anything Fr. Emmanuel has written or said about the company.  It has, however, worked hard behind the scenes to have the Commission charge Fr. Emmanuel for his opinion commentary about the company.[6]

On September 25, 2014, Ligand and its counsel, a large international law firm, met with Commission staff in Boston to request that the Commission pursue an investigation into alleged securities fraud committed by Fr. Emmanuel.  *See* Brooks Aff. Ex. 6.  As part of this meeting, Ligand provided a PowerPoint presentation to the Commission staff.  *See id.*  That presentation contained false, misleading, and offensive content.  Just by way of example, Ligand and its counsel claimed that Fr. Emmanuel "[u]ses religious credentials to inspire false confidence and raise money," *id.* at 18, despite the fact that none of Amvona's investors were, are, or ever have been Fr. Emmanuel's parishioners.  Lemelson Aff. ¶ 3.  The PowerPoint presentation also

---

[5] Since that time, at least five more short reports about Ligand have been published by different entities, and in one instance, Ligand's stock price dropped as much as 25% on the day of the report.  Lemelson Aff. ¶ 14; Brooks Aff. Ex. 9 at 6.

[6] Emblematic of this approach is an internal email between Ligand personnel, dated August 22, 2014 (the date of Fr. Emmanuel's final report), in which one Ligand employee, referring to Fr. Emmanuel, wrote: "He needs to be silenced for good."  Brooks Aff. Ex. 14 at 2.

included photographs of Fr. Emmanuel in his priestly robes in church and baldly claimed that Fr.

Emmanuel—presumably based *solely* on the fact he is a priest—bears the "Hallmarks of an

Affinity Fraud." Brooks Aff. Ex. 6 at 21. The presentation also claimed that Fr. Emmanuel's

"self-reported 257% overall gain over 24 month of life of fund may be too good to be true," *id.* at

18, notwithstanding that this *was* true, Lemelson Aff. ¶ 7, and that Ligand and its counsel

apparently took no steps to try to verify its false assertion.[7] Perhaps most pertinently, the

presentation incorrectly stated, "Lemelson's '11,667-to-1' debt to tangible equity ratio ignores

**all** the cash proceeds from the debt," even though cash proceeds from debt have no relevance to

equity—tangible or otherwise. Brooks Aff. Ex. 6 at 36 (emphasis in original). Finally, the

presentation conspicuously omitted any mention of the Empire short reports or the obvious

negative impact those reports had on Ligand's stock during the relevant time frame, as well as

the significant volatility of Ligand's stock price *before* Fr. Emmanuel published his reports.[8] *See*

Brooks Aff. Ex. 6.

Apparently unhappy with the lack of any response from the Commission after the

meeting in Boston, the following year, Ligand, while still not having contested any of Fr.

Emmanuel's claims publicly, renewed its efforts to have the Commission charge him with

securities fraud. As part of this process, Ligand changed counsel, hiring Attorney Bradley Bondi

of the law firm Cahill Gordon & Reindel, who, according to his Wikipedia page, previously

served on the executive staff of the Commission. Brooks Aff. ¶ 18. According to discovery in

this matter, in or around early May 2015, Mr. Bondi reached out to a former colleague at the

---

[7] This would not have been a difficult task. All of Fr. Emmanuel's audited reports from 2012-2016, which include full audited returns, were publicly available on Lemelson Capital Management's website. Lemelson Aff. ¶ 10. Fr. Emmanuel's returns also demonstrated that his successful position in Ligand accounted for only approximately 10% of his Fund's returns from inception through year end 2014. Lemelson Aff. ¶ 13.

[8] For example, over a one-month period between March and April 2014, Ligand's stock price fell as much as 30 percent. *See* Brooks Aff. Ex. 9 at 32-33.

Commission in the Washington, D.C. office (apparently recognizing the Boston office was not interested) to refer this matter for investigation.  *See* Brooks Aff. Ex. 7.

On June 8, 2015, several Ligand representatives and its counsel met with the Commission staff in Washington, D.C. to pitch a potential enforcement action against Fr. Emmanuel.  *See* Brooks Aff. Ex. 8.  Like Ligand's prior counsel had the year before, during this meeting, Ligand again made a PowerPoint presentation to the Commission.  *Id.*  In substance, it was similar to the one Ligand had presented nine months earlier to a different Commission office.  Among other things, Ligand again appeared to question Fr. Emmanuel's investment returns—apparently having taken no steps to verify them, which, if it had, would have demonstrated their veracity. Brooks Aff. Ex. 8 at 17.  In addition, in an attempt to show that Fr. Emmanuel's reports caused Ligand's stock price to decline (despite the obvious evidence to the contrary), Ligand misleadingly cherry-picked four random time periods bookended by Fr. Emmanuel's first and last short reports on Ligand, again omitting any reference to Empire's short reports.  *See id.* at 55.  For example, Ligand simply ignored the period between June 25 and July 12, 2014 (in which the price of the company's stock rose), even though Fr. Emmanuel's second report, *which contains two of the four challenged statements,* fell in the middle of this period.  *Id.*  Ligand also opted to exclude from its four (random) time periods the date of August 4, 2014, when Fr. Emmanuel's third report came out, and Ligand's stock price skyrocketed by more than 9%.  *Id.* Finally, even though nine months had passed, Ligand apparently had not recognized its fundamental error concerning the debt-to-tangible equity calculation and still claimed Fr. Emmanuel's (correct) calculation constituted securities fraud, because the ratio "ignores all the cash proceeds from the debt itself."  Brooks Aff. Ex. 8 at 51.

Notably, Ligand's efforts to pressure the Commission to bring unprecedented charges against Fr. Emmanuel did not stop with hiring a former high-ranking Commission attorney.  On the very same day Ligand and its counsel met with Commission staff in Washington, Ligand used its sway with Congress to exert leverage on the Commission.  On June 8, 2015, then-United States Congressmen Duncan Hunter penned a letter to the Commission, urging it to bring charges against Fr. Emmanuel.[9]  Brooks Aff. Ex. 15.

### III.    Bloomberg Runs an Article Disclosing the Commission's Non-Public Investigation

The Commission's own policies prevent its staff from disclosing the existence of its investigations prior to bringing an enforcement action.  Brooks Aff. Ex. 17.  "Because SEC investigations are generally nonpublic, Enforcement will not confirm or deny the existence of an investigation unless the SEC brings charges against a person or entity involved."  *Id.* at 1.  This policy may have been violated here, and Defendants intend to probe whether any such violation occurred at the 30(b)(6) deposition.

On March 18, 2016, Bloomberg published an article titled, "Hedge Fund Priest's Trades Probed by Wall Street Cop."  Brooks Aff. Ex. 11.  The original version of the online article contained an image of a crucifix at the top of the article, until Bloomberg, apparently recognizing the offensive nature of using a religious image in this context, removed that image later in the day.  Lemelson Aff. ¶ 15.  In revealing the Commission's non-public investigation, the article quoted "people with knowledge of the matter."  Brooks Aff. Ex. 11 at 1.  It stated, "The Securities and Exchange Commission is examining whether the Reverend Emmanuel Lemelson

---

[9] In December 2019, Congressman Hunter pled guilty to federal charges of conspiracy to misuse campaign funds and faces sentencing in March 2020.  Brooks Aff. Ex. 16.

of Massachusetts made false statements about companies he was shorting, said the people who

asked not to be named because the probe isn't public." *Id.*

Emails between the Commission and Ligand's counsel make clear that the Commission

informed Ligand's counsel of the existence of its investigation.  Brooks Aff. Ex. 18.  On

September 15, 2017, Ligand's counsel wrote to Commission staff to further complain about Fr.

Emmanuel's public comments about Ligand.  *Id.* at 3-4.  On September 18, 2017, Commission

staff responded in writing: "Unfortunately we cannot share information about our nonpublic

investigation in the matter of Trading in the Securities of Ligand Pharmaceuticals, Inc. beyond

what we shared last time, *i.e.,* that the investigation is ongoing."  *Id.* at 2.  The Commission staff,

however, then provided proposed times for a *telephone call* with Ligand's counsel, which

Ligand's counsel confirmed on the same day.[10]  *Id.* at 1-2.

To be sure, there are legitimate ways a third party can learn about the existence of a non-

public investigation that the Commission is conducting.  One obvious example is when the

Commission serves a third party with an investigative subpoena.  However, based on the

discovery in this case, it does not appear that the Commission served Ligand with a subpoena

during the non-public investigation phase.[11]  Accordingly, Defendants seek testimony from the

Commission as to why it informed Ligand's counsel about the existence of its investigation

---

[10] Curiously, during the same time period of this email exchange (September 16-18, 2017), when Ligand's counsel was continuing efforts to persuade the Commission to bring an enforcement action against Fr. Emmanuel, a Wikipedia user who had never before created a Wikipedia page created three new ones.  Brooks Aff. ¶ 19.  Two of the pages were created for the Co-Heads of the Commission's Enforcement Division.  *Id.*  The third page this Wikipedia user created was for Ligand's counsel, Mr. Bondi.  *Id.*  In the two-plus years since that time, this Wikipedia user has created only a single additional page (for a former U.S. naval officer), while continuing to make multiple additions to Ligand's counsel's Wikipedia page.  *Id.*  Given that the creation of these three Wikipedia pages overlapped with Ligand's communications with the Commission about Fr. Emmanuel, to the extent there were communications between the Commission and Ligand or its counsel concerning the creation of these Wikipedia pages, Defendants should be able probe the Commission about them.

[11] Moreover, the caption was "In the Matter of Trading in Ligand Pharmaceuticals," and therefore even a subpoena itself would not have provided the information contained in the Bloomberg article.  *See* Brooks Aff. Ex. 19.

(which disclosure might have led to the leak to Bloomberg, the television subsidiary of which, according to his Wikipedia page, Ligand's counsel is a regular contributor).  Brooks Aff. ¶ 18.

## ARGUMENT

**I.      The Rules of Discovery Should be Interpreted Broadly in Favor of Permitting Defendants to Depose the SEC**

The Federal Rules of Civil Procedure governing discovery should be broadly and liberally construed in favor of permitting parties to seek discovery where possible.  *See Schlagenhauf v. Holder*, 379 U.S. 104, 114-15 (1964) ("We enter upon determination of this construction with the basic premise 'that the deposition-discovery rules are to be accorded a broad and liberal treatment,' to effectuate their purpose that 'civil trials in the federal courts no longer need be carried on in the dark.'") (quoting *Hickman v. Taylor*, 329 U.S. 495, 501, 507 (1947)); *Koninklijke Philips Electronics N.V. v. ZOLL Medical Corp.*, 2013 WL 1833010, at *1 (D. Mass. Apr. 30, 2013) ("'[T]he Federal Rules of Civil Procedure are to be construed liberally in favor of discovery.'") (quoting *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 244 F.3d 189, 192 (1st Cir. 2001)).

"The SEC is not exempt from Rule 30(b)(6) depositions."  *SEC v. Present*, No. CV 14-14692-LTS, 2016 WL 10998439, at *2 (D. Mass. May 12, 2016) (citing *SEC v. Merkin*, 283 F.R.D. 689, 698 (S.D. Fla. 2012)); *see also SEC v. Navellier & Assocs., Inc.*, No. CV 17-11633-DJC, 2019 WL 688164 (D. Mass. Feb. 19, 2019) (allowing Rule 30(b)(6) deposition of the SEC).  Indeed, "government agencies embroiled in litigation are generally subject to the same discovery rules as private litigants." *Merkin*, 283 F.R.D. at 698.  Here, the Commission is seeking a protective order to prohibit *any* deposition of the SEC pursuant to Rule 30(b)(6). Protective orders "totally prohibiting a deposition are rarely granted absent extraordinary circumstances."  *Hardy v. UPS Ground Freight, Inc.*, No. CV 17-30162-MGM, 2018 WL

6832083, at *2 (D. Mass. Dec. 27, 2018).  *See also, Alexander v. F.B.I.*, 186 F.R.D. 71, 75

(D.D.C. 1998) (complete prohibition of a deposition is an "extraordinary measure[] which should

be resorted to only in rare occasions").  In fact, a party moving for a protective order prohibiting

the taking of a deposition "has a heavy burden of showing 'extraordinary circumstances' based

on 'specific facts' that would justify such an order."  *Prozina Shipping Co., Ltd. v. Thirty-Four*

*Automobiles*, 179 F.R.D. 41 (D. Mass. 1998) (internal citations omitted).  The Commission has

failed to make such a showing here.

## II.  Defendants Narrowly Tailored the Deposition Topics to Avoid Seeking Attorney Work Product, and Topic 1 Seeks Underlying Factual Information Relating to the Commission's Allegations

The Commission argues that Topic 1 seeks attorney work product.  It does not.  Topic 1

is specifically limited to the "SEC's analysis and mathematical calculation of Ligand's debt-to-

tangible equity ratio."  Brooks Aff. Ex. 10 at 3.  Notably, this is the precise type of topic on

which the Commission agreed to be deposed in *Present*, and which the Court noted was an

appropriate area for a Rule 30(b)(6) deposition of the Commission.  *Present*, 2016 WL

10998439, at *3.  Indeed, this topic is targeted to the underlying *facts* of the allegations and the

calculations to support it, not any attorney's mental impressions.

Nonetheless, without any supporting citation, the Commission argues that the analysis

and calculations constitute attorney work product.  Memo. ISO Mot. for Prot. Ord., Dkt. No. 41

at 6.  As an initial matter, this argument is directly contradicted by the Commission's position in

*Present*.  2016 WL 10998439, at *3.  Moreover, courts have consistently held that simply

because an investigation was conducted solely by counsel for the Commission does not mean

that all inquiries about the investigation are protected attorney work product.  *See, e.g., SEC v.*

*Kramer*, 778 F. Supp. 2d 1320, 1328 (M.D. Fla. Apr. 1, 2011) (permitting deposition of

Commission because defendant sought information about facts underlying claims and rejecting

argument that any deposition would necessarily intrude upon work product because only counsel worked on the investigation as Rule 30(b)(6) allows the Commission to "designate any person (i.e., someone other than counsel) to depose in response to [defendant's] request"); *SEC v. McCabe*, 2:13-cv-00161-TS-PMW, 2015 WL 2452937 (D. Utah May 22, 2015) ("the SEC cannot defeat the provisions of 30(b)(6) by using an investigator with an 'esq.' after his name, or by subsequently naming an investigator as part of the SEC's trial team.  Ultimately, it is up to the SEC to designate someone who is not conflicted either by status or privilege issues").

In addition to its faulty work product argument, the Commission argues that this topic is irrelevant because it relates to an allegation in the original Complaint that is no longer in the Amended Complaint.  Memo. ISO Mot. for Prot. Ord., Dkt. No. 41 at 5.  However, the Amended Complaint, ¶¶ 51-53, still addresses Fr. Emmanuel's comparison of Ligand's debt to its tangible equity, and, in its present motion, the Commission asserts that while the Commission is no longer challenging the accuracy of the calculation, it still maintains it is incorrect.  Memo. ISO Mot. for Prot. Ord., Dkt. No. 41 at 6 n.2.  Knowing the basis for that position is important, as a jury would likely want to know whether an allegedly misleading calculation was mathematically correct.  Clearly, the issue of how the Commission calculated Ligand's debt-to-tangible-equity ratio will be a live issue at trial.  And, as is the purpose of discovery, Defendants are entitled to know in advance of trial the method of the Commission's calculation, why it believes the loan proceeds should have been included in the debt to tangible equity ratio, and the accounting principles, if any, supporting such a position, so that they can prepare their defense.

Further, as discussed above, both the 2014 and 2015 presentations from Ligand to the Commission falsely claimed that Fr. Emmanuel erred in calculating the debt to tangible equity ratio because he did not account for the money being received by Ligand through a loan—the

identical allegation the Commission erroneously included in its original Complaint and, according to its present motion, is still indirectly pursuing today.  *See* Brooks Aff. Ex. 6 at 36; Ex. 8 at 51; Compl., Dkt. No. 1 at ¶ 52; Memo. ISO Mot. for Prot. Ord., Dkt. No. 41 at 6 n.2. Understanding how this erroneous allegation, which originated from *Ligand*, made its way into the Complaint is relevant to better understand the troubling relationship between the Commission and Ligand, as well as Ligand's seemingly untoward influence on the Commission's investigation and allegations in this case.  It is also relevant to any allegations that Fr. Emmanuel's calculation was somehow misleading enough to form the basis of an alleged securities violation, notwithstanding that the calculation was correct.

Likewise, the Commission's argument that no one at the Commission has direct knowledge of the events giving rise to the lawsuit (Memo. ISO Mot. for Prot. Ord.", Dkt. No. 41 at 3) is unavailing.  *See SEC v. Kovzan*, No. 11-2017-JWL, 2013 WL 653611, *2 (D. Kan. Feb. 21, 2013) ("personal knowledge of the designated subject matter by the selected deponent is of no consequence.  The fact that Commission attorneys may be involved in preparing a witness to testify is not itself a reason to prohibit the deposition").  The Commission should have knowledge of the calculations underlying an allegation it filed with this Court (and lack of such knowledge would also be extremely relevant to the defense).  In sum, such calculations are not attorney work product, but rather go to the critical facts underlying the allegations in this case, which are well within the broad scope of permissible discovery allowed under the Federal Rules of Civil Procedure.

### III. Topics 2 and 3 Relate to the Defenses of Bias and Selective Enforcement, which are Within the Bounds of Permissible Discovery

This enforcement action is unprecedented, and as such, the investigation raises a number of troubling questions concerning bias and selective enforcement.

16

Defendants are entitled to seek discovery regarding the potential for bias in the course of the Commission's investigation.  *See First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.*, 273 F.R.D. 360, 361 (D. Mass. 2011) (denying protective order because discovery sought was relevant to possible bias).  This includes the relationship between Ligand's counsel and the Commission, how Ligand was able to arrange for *multiple* meetings with *different* offices of the Commission, what Ligand told Commission staff at these meetings outside of what was contained in the written presentations, and whether the Commission directly or indirectly spoke to the media or other third parties that could have informed the media about the investigation. While Defendants have been able to depose two Ligand representatives that were present at the meetings, it has not been able to depose anyone from the Commission about these meetings.[12]  It is certainly proportional to the needs of this case to seek a deposition of the Commission to obtain testimony from both sides about these two critical meetings.

Defendants are also entitled to seek discovery here for a potential selective enforcement defense.  *See Navellier & Associates, Inc.*, 2019 WL 688164, at *2 (allowing 30(b)(6) deposition on certain topics because "Defendants 'are permitted to learn the facts' underlying their selective enforcement defense") (internal citations omitted).  A selective enforcement defense applies when a defendant can show "(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights."

---

[12] If Defendants are not allowed to ask about the Commission about its relationship with counsel for Ligand, Defendants intend to file a motion for leave to continue the discovery period to seek the deposition of Mr. Bondi, counsel for Ligand, to ascertain this information about his relationship and communications with the Commission in this matter.

17

*United States v. Modarressi*, 690 F. Supp. 87, 91 (D. Mass. 1988). *See also, Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004) (applying selective enforcement in civil case where someone was selectively treated "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, *or* malicious or bad faith intent to injure a person"). Ligand first approached the Commission about Fr. Emmanuel in 2014. *See* Brooks Aff. Ex. 6. Some of the statements on which Ligand urged the Commission to bring charges implicate Fr. Emmanuel's First Amendment rights to free speech and religious practice. *See* Brooks Aff. Ex. 6 at 21-24, 26-27. It appears that the Commission wisely did not pursue any investigation at that time. Thereafter, however, Ligand hired new counsel with personal connections to Commission enforcement personnel, who arranged another meeting with a different office of the Commission. *See* Brooks Aff. Ex. 7. The Commission then reversed course and decided to pursue an investigation. The Commission's discussions with Ligand in the process of making the decision to investigate Fr. Emmanuel and ultimately bring this enforcement action against him are well within the bounds of permissible discovery.

## CONCLUSION

For the foregoing reasons, the Commission's Motion for a Protective Order should be denied, and Defendants should be permitted to pursue a deposition on the three topics designated in its Amended Deposition Notice pursuant to Fed. R. Civ. P. 30(b)(6).

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
LIBBYHOOPES, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@libbyhoopes.com
bsullivan@libbyhoopes.com

Dated:  January 7, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-participants on January 7, 2020.

*/s/ Douglas S. Brooks*
Douglas S. Brooks