# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GREGORY LEMELSON and LEMELSON CAPITAL | ) |
| MANAGEMENT, LLC, | ) Civil Action No. 1:18-cv-11926-PBS |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| THE AMVONA FUND, LP, | ) |
| | ) |
| Relief Defendant | ) |
| | ) |

## DEFENDANTS' RESPONSE TO THE
## SECURITIES AND EXCHANGE COMMISSION'S MOTION
## FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN
## CONTEMPT FOR VIOLATING PROTECTIVE ORDERS

Defendant Fr. Emmanuel Lemelson ("Fr. Emmanuel") acknowledges violating the

protective orders (Dkt. Nos. 25 and 39) in this litigation by providing certain documents to a

journalist at Barron's, which third-party Ligand Pharmaceuticals, Inc. had produced.  Affidavit

of Father Emmanuel Lemelson ("Lemelson Aff.") ¶ 2.  Fr. Emmanuel apologizes to this Court

and takes full responsibility for his action.  Lemelson Aff. ¶ 3.  Fr. Emmanuel has not provided

anyone else with discovery materials produced in this litigation or otherwise violated the

protective orders.  Lemelson Aff. ¶ 4.  Now understanding the seriousness of this matter, Fr.

Emmanuel will not violate the protective orders again.  Lemelson Aff. ¶ 5.

Defendants do not submit this Response to the Commission's motion for order to show

cause to justify Fr. Emmanuel's action.  However, Defendants believe that should the Court wish

to impose sanctions on Fr. Emmanuel, it is important for the Court to understand the full context in which the violation occurred and how it relates to this claim by the Commission. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982) (in awarding sanctions for violations of a protective order, a district court's discretion is limited to a sanction that is "just" and "specifically related" to the particular claim which was at issue in the order to provide discovery). In short, as detailed further below:

- Ligand at first failed but then successfully exerted pressure (including political) on the Commission to bring this case against Fr. Emmanuel;

- The Commission improperly leaked the existence of its nonpublic investigation of Fr. Emmanuel to Ligand, and Bloomberg News broadcast it to the public, causing great damage to Fr. Emmanuel;

- After caving to Ligand's pressure, the Commission brought a Complaint (more than three years in the making) riddled with clear factual errors, some of which it cribbed directly from Ligand;

- The complete novelty of the Complaint against Fr. Emmanuel—lacking all the hallmarks of a "short and distort" scheme—evidence the politics and bias at play;

- The Commission has wrongly shielded Ligand from public criticism and went so far as to promote the company's stock price in its Complaint shortly before the stock price collapsed;

- The discovery materials sent do not contain commercially or personally sensitive information.

- The Barron's journalist was already writing the article when the discovery material was sent and only referenced one document sent to him—a six-year old email that has nothing to do with Ligand's current business.

The case itself has drawn significant media attention—initiated by the Commission's press release at the start of the litigation. The coverage, as a result of the Commission's "spin", has been misleading and negatively biased against Fr. Emmanuel, giving rise to significant public indignation against him. Barron's apparently has been following the litigation from the beginning, and Fr. Emmanuel believed that Barron's would engage in true investigative

journalism in its story of this litigation, not simply parrot the Commission's and Ligand's baseless claims against him. Lemelson Aff. ¶¶ 6-9. Believing the involvement of a fair and objective journalist was in the public interest in light of the false narrative that Ligand and the Commission have together spread against him, Fr. Emmanuel improperly provided the journalist with the documents described below. The journalist referenced one (and only one) of the documents in the story that Barrons.com published on February 19, 2020.

## THE DOCUMENTS FR. EMMANUEL SENT TO BARRON'S

On January 23, 2020, Fr. Emmanuel provided 50 pages of discovery material to the journalist. Lemelson Aff. ¶¶ 9-10.[1] The 50 pages consist of five emails and certain excerpted slides from various PowerPoint presentations. Of the 50 pages, 15 pages are drafts of slides that contained substantively the same information as slides that Ligand presented to the Commission, which have been *publicly filed* in this matter. Dkt. Nos. 46-6 & 46-8. Another three pages reflect single-page cover emails that contain nothing of *substance*. Two pages consist of a cover email forwarding a *public article* to "undisclosed recipients." Another two pages constitute the document referenced in the Barron's article—a six-year old email discussing a product whose rights Ligand sold almost a year ago. The remaining 28 pages are documents that are approximately *five years old* and do not contain information relating to Ligand's current business. Many of those pages simply reflect Ligand's accusations against Fr. Emmanuel that Ligand repeatedly brought to the attention of the Commission years ago in urging it to bring an enforcement action against him.

---

[1] In addition to these 50 pages, Fr. Emmanuel sent two letters from Ligand's counsel (dated December 18, 2019 and January 13, 2020), a New York Post article, and an excerpt from Fr. Emmanuel's own June 16, 2014 report that he had previously posted on his own website. Lemelson Aff. ¶ 11.

Although the documents are years old and do not contain sensitive commercial or personal information, six of the pages sent by Fr. Emmanuel reflect unredacted versions of attorney-client privileged communications (LGND_0056270-LGND_0056275). These pages come from a document that Ligand produced in this litigation—apparently inadvertently. Defendants entered this document as an exhibit at the deposition of one of Ligand's executives. Affidavit of Douglas Brooks ("Brooks Aff.") ¶ 27. At that point, Ligand's counsel stated that certain pages of the document (including the above-referenced pages) were privileged. *Id.* Fr. Emmanuel was present at the deposition. Lemelson Aff. ¶ 12. Fr. Emmanuel did not recognize that the materials he sent included information that Ligand had requested to clawback at the deposition but acknowledges being aware of the clawback request in hindsight. Lemelson Aff. ¶ 12. Ligand's counsel later produced redacted versions of that document (and similar documents containing the same information that Ligand had also previously produced). Brooks Aff. ¶ 27. Although privileged, these slides merely consist of accusations against Fr. Emmanuel that were substantively similar to those contained in Ligand's presentations to the Commission, which are now part of the public record in this case.

In addition, two pages at issue (LGND_0052230-LGND_0052231) are currently subject to a clawback request from Ligand. Defendants are in the process of contesting Ligand's clawback on the grounds of improper invocation of attorney work product, and (even if work product applied) both an intentional and an unintentional waiver.[2] Finally, Fr. Emmanuel sent 14 pages of a document (LGND_0048070-LGND_0048129) that Ligand (i) produced to Defendants, (ii) did not list in its clawback request; but (iii) nonetheless listed in its supplemental

---

[2] Defendants and Ligand have engaged in ongoing negotiations to try to resolve the issue without need for Court intervention. Defendants and Ligand agreed that in light of this issue with the Protective Order, they would suspend those negotiations until Defendants filed the present Opposition.

privilege log.  Given this discrepancy, on February 12 and February 19, 2020, Defendants'

counsel emailed Ligand's counsel seeking to clarify whether Ligand wished to include this

document in its clawback request or whether it had mistakenly listed the document in the

privilege log.  Brooks Aff. Ex. 20.  On February 19, Ligand's counsel responded that they were

"still going through the documents and evaluating."  Brooks Aff. Ex. 20.  These 14 pages consist

solely of Ligand's accusations against Fr. Emmanuel.

Fr. Emmanuel is in the process of deleting all electronic copies of the documents subject

to the clawback requests, including but not limited to those sent to Barron's.  Lemelson Aff. ¶

13.[3]

In sum, the documents that Fr. Emmanuel sent in violation of the Protective Orders

consist either of outdated business communications that have no impact on Ligand's current

operations or Ligand's accusations of misconduct against Fr. Emmanuel.  As for the documents

that Ligand produced and later claimed as privileged, Fr. Emmanuel sent these without

appreciating that Ligand had done so.  Lemelson Aff. ¶ 12.

## **FACTUAL BACKGROUND**

I.      **Fr. Emmanuel's 2014 Opinion Commentary About Ligand.**

Fr. Emmanuel, an eccentric investment philosopher, Greek Orthodox Priest, and prolific

speaker and writer, created the Amvona Fund in 2012.  Lemelson Aff. ¶ 14.  Throughout its

existence, Amvona has mostly held long positions in stocks, but has also occasionally taken short

positions.  Lemelson Aff. ¶ 15.  Since 2010 (even before launching Amvona), Fr. Emmanuel has

published approximately 200 research and commentary pieces discussing economics,

securitization fraud, and high-level security analysis of common stocks—none of which, apart

---

[3] Fr. Emmanuel is currently traveling and will destroy all hard copies of documents subject to Ligand's clawback
requests upon returning home.  Lemelson Aff. 13.  This will be completed no later than Monday, March 2, 2020. *Id.*

from Ligand, has been challenged by the Commission. Lemelson Aff. ¶ 16. In 2014, Fr. Emmanuel identified Ligand as a company whose stock he believed was overvalued and engaged in fraud. Lemelson Aff. ¶ 17. On June 16, 2014, consistent with his prior practice when taking positions in stocks, Fr. Emmanuel issued a 25-page opinion commentary concerning his thesis on Ligand. Brooks Aff. Ex. 1; Lemelson Aff. ¶ 18. Also consistent with his prior practice, Fr. Emmanuel **expressly disclosed** that his Fund was short Ligand and further **expressly disclosed** that the report contained his opinion commentary. Brooks Aff. Ex. 1; Lemelson Aff. ¶ 18. Among his many opinions, Fr. Emmanuel stated that Ligand's largest royalty-generating drug, Promacta, faced an imminent threat from a new drug, which he believed would "virtually eliminate demand for Promacta." Brooks Aff. Ex. 1 at 4. The Commission is not challenging any statements contained in this 25-page original report. *See* Opp. to MTD, Dkt. No. 16 at 2-3; Dkt. No. 33 ("Am. Compl.").

Three days later, on June 19, 2014, Fr. Emmanuel was interviewed by an outlet called Benzinga.com. Brooks Aff. ¶ 12. The interview lasted approximately 22 minutes, five minutes of which included a discussion of his short thesis on Ligand. *Id.* During this interview, Fr. Emmanuel stated that he had spoken to Ligand's Investor Relations firm which had "basically agreed" with his thesis concerning Promacta. *Id.* Although the representative of the IR firm denies having made this statement, s*ee* Am. Compl. ¶ 38, Fr. Emmanuel has produced to the Commission his *real-time* electronic notes of this conversation, which include an unalterable, embedded date and time stamp in the document's metadata from Microsoft corporation (made years before any allegation of wrongdoing) which corroborate his statement. Brooks Aff. Ex. 11. This is the first of the Commission's four challenged statements against Fr. Emmanuel. *See* Am.

Compl., Dkt. No. 33 at ¶¶ 36-43. Ligand's stock price closed higher on the day of the interview than it had the previous day. Brooks Aff. Ex. 9 at 32.

On July 3, 2014, Fr. Emmanuel issued his second short report on Ligand. Brooks Aff. Ex. 2. This report included a discussion of a company called Viking Therapeutics, with whom Ligand had just entered into a licensing agreement. Brooks Aff. Ex. 2 at 7-10. Two of the Commission's four challenged statements in this case are based on Fr. Emmanuel's statements about *Viking*, not Ligand, contained in the July 3, 2014 report. *See* Opp. to MTD, Dkt. No. 16 at 3; Am. Compl., Dkt. No. 33 at ¶¶ 44-50. Fr. Emmanuel did not hold a short position in Viking at the time these statements were made; indeed, Viking was not even a public company at the time. Lemelson Aff. ¶ 20. Ligand's stock price closed higher on the day this article came out than it did the previous day. *See* Brooks Aff. Ex. 9 at 31.

On August 4, 2014, Fr. Emmanuel published his third report on Ligand. Brooks Aff. Ex. 3. The Commission is not challenging any of Fr. Emmanuel's statements contained in that report. *See* Opp. to MTD, Dkt. No. 16 at 2-4; Am. Compl., Dkt. No. 33. On that date, Ligand's share price skyrocketed, closing 9% higher than it did the previous trading day. *See* Brooks Aff. Ex. 9 at 31.

On August 14 and 22, 2014, Fr. Emmanuel published his fourth and fifth reports on Ligand. Brooks Aff. Exs. 4, 5. On August 14, Ligand's stock price closed higher than it did the previous day. *See* Brooks Aff. Ex. 9 at 31. On August 22, it closed down slightly. *Id.* These last two reports discussed, *inter alia,* $245 million in new debt that Ligand was taking on through a bond offering. Brooks Aff. Ex. 4 at 1-3, Ex. 5 at 2-6. Among the many points Fr. Emmanuel made in criticizing the bond offering, he wrote:

> On August 18 [2014], Ligand filed a form 8-K with the Securities and Exchange
> Commission (SEC) revealing that the company had issued $245 million in new

> debt against the company's tangible equity of jut $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars in debt for every $1 dollar in tangible common shareholder equity).

Brooks Aff. Ex. 5 at 3. In its original Complaint, the Commission incorrectly claimed Fr. Emmanuel's calculation was wrong because, the Commission posited, he failed to include the cash from the loan proceeds as part of shareholder tangible equity. Compl., Dkt. No. 1 at ¶ 52. As discussed further below, ***this same erroneous allegation was contained (virtually verbatim) in both presentations that Ligand and its counsel made to the Commission.***[4] Brooks Aff. Ex. 6 at 36; Ex. 8 at 51.

Meanwhile, on July 22 and August 5, 2014—within the time period that Fr. Emmanuel published his reports on Ligand that contained the statements being challenged by the Commission—an entity called Empire Asset Management issued two short reports concerning Ligand. Brooks Aff. Exs. 12, 13. On the date of the first, Ligand's stock price plunged by more than 5%—more movement on the stock price than on any day that Fr. Emmanuel published one of his reports (except for the day the stock went *up* by more than 9%). *See* Brooks Aff. Ex. 9 at 31. On the date of the second Empire short report, Ligand's stock sank more than 2%.[5] *See id.*

Although Fr. Emmanuel covered a portion of his short position in Ligand during the above time frame, he waited nearly two months after his final report to cover the bulk of his position—belying any notion that he engaged in a short-and-distort scheme. Lemelson Aff. ¶ 21.

---

[4] After the Court dismissed this claim from the original Complaint, the Commission re-plead it, now arguing not that the calculation is false, but that despite being true, it is somehow misleading. Am. Compl., Dkt. No. 33 at ¶¶ 52-54.
[5] Since that time, at least five more short reports about Ligand have been published by different entities. Lemelson Aff. ¶ 19. In one instance, on January 16, 2019, Ligand's stock price dropped as much as 25% on the day of the report. Lemelson Aff. ¶ 19; Brooks Aff. Ex. 9 at 7.

## II.     Ligand Urged the Commission to Bring This Lawsuit.

To this day, Ligand has never made a public statement contesting anything Fr. Emmanuel has written or said about the company.  Nor did it take the step of suing Fr. Emmanuel for defamation as one might reasonably expect it to do if the company truly believed he made false statements about it.  Instead, Ligand's goal seemed to be to "silence" Fr. Emmanuel and use the Commission to bully him into submission.[6]  To this end, Ligand spent untold resources engaging two large international law firms and worked tirelessly *behind the scenes* for more than four years in an ongoing effort to convince the Commission to charge Fr. Emmanuel for his opinion commentary about the company that took place over a two-month period in 2014.  Ligand likely calculated that, as often happens, the mere existence of an enforcement action would cause the destruction of Fr. Emmanuel's Fund, and thus by using the Commission, Ligand could silence a vocal critic without having to litigate on the merits. Fortunately, however, Fr. Emmanuel has persevered, and the Amvona Fund returned over 150% net to its investors in 2019.  Lemelson Aff. ¶ 22.

Ligand's efforts to use the Commission to silence Fr. Emmanuel commenced in earnest on September 25, 2014, when Ligand and its counsel, a large international law firm, met with Commission staff in Boston to request that the Commission bring an action for alleged securities fraud against Fr. Emmanuel.  *See* Brooks Aff. Ex. 6.  As part of this meeting, Ligand provided a PowerPoint presentation to the Commission staff.  *See id.*  That presentation contained false, misleading, and offensive content.  By way of example, Ligand claimed that Fr. Emmanuel "[u]ses religious credentials to inspire false confidence and raise money," *id.* at 18,

---

[6] Emblematic of this approach is an internal email between Ligand personnel, dated August 22, 2014 (the date of Fr. Emmanuel's final report), in which one Ligand employee, referring to Fr. Emmanuel, wrote: "He needs to be silenced for good."  Brooks Aff. Ex. 14 at 2.  In addition, Ligand used its Investor Relations firm to bully the media into not reporting on Fr. Emmanuel's opinion commentary about the company.

despite the fact that none of Amvona's investors were, are, or ever have been Fr. Emmanuel's parishioners. Lemelson Aff. ¶ 23. In fact, all of the Amvona Fund's investors are accredited investors as defined by the Commission in 17 C.F.R. § 230.501. Lemelson Aff. ¶ 24. The PowerPoint presentation also included photographs of Fr. Emmanuel in his priestly robes in church and baldly claimed that Fr. Emmanuel—presumably based *solely* on the fact he is a priest—bears the "Hallmarks of an Affinity Fraud." Brooks Aff. Ex. 6 at 21. The presentation further claimed that Fr. Emmanuel's "self-reported 257% overall gain over 24 month of life of fund may be too good to be true," *id.* at 18, notwithstanding that this *was* true, Lemelson Aff. ¶ 25, and that Ligand and its counsel apparently took no steps to try to verify its false assertion.[7] Perhaps most pertinently, the presentation incorrectly stated, "Lemelson's '11,667-to-1' debt to tangible equity ratio ignores **all** the cash proceeds from the debt," even though cash proceeds from debt have no relevance to equity—tangible or otherwise. Brooks Aff. Ex. 6 at 36 (emphasis in original). Finally, the presentation conspicuously omitted any mention of the Empire short reports or the obvious negative impact those reports had on Ligand's stock during the relevant time frame, as well as the significant volatility of Ligand's stock price *before* Fr. Emmanuel published his reports.[8] *See* Brooks Aff. Ex. 6.

Notwithstanding the above meeting, the Commission's Boston regional office apparently (and rightly) decided not to move forward with an investigation. Presumably unhappy with this result, the following year, Ligand, while still not having contested any of Fr. Emmanuel's claims publicly, renewed its efforts to have the Commission charge him with securities fraud. As part

---

[7] This would not have been a difficult task. All Amvona's audited reports from 2012-2016, which include full audited returns and extensive explanations of how the returns were earned, were publicly available on Lemelson Capital Management's website. Lemelson Aff. ¶ 26.

[8] For example, over a one-month period between March and April 2014, Ligand's stock price fell as much as 30 percent. *See* Brooks Aff. Ex. 9 at 32-33. Ligand itself specifically listed its stock volatility as a risk factor in its annual reports. *See* Brooks Aff. Ex. 19 at 41. Indeed, over the past two trading days alone, Ligand's stock price dropped over 27% at one point.

of this process, Ligand changed counsel, hiring Attorney Bradley Bondi of the law firm Cahill

Gordon & Reindel, who, according to his Wikipedia page, previously served on the executive

staff of the Commission.  Brooks Aff. ¶ 17.  According to discovery in this matter, in or around

early May 2015, Mr. Bondi reached out to a former colleague at the Commission in the

Washington, D.C. office (apparently recognizing the Boston office was not interested) to refer

this matter for investigation.  *See* Brooks Aff. Ex. 7.

On June 8, 2015, several Ligand representatives and its counsel met with the Commission

staff in Washington, D.C. to ***again*** pitch a potential enforcement action against Fr. Emmanuel.

*See* Brooks Aff. Ex. 8.  Like Ligand's prior counsel had the year before, during this meeting,

Ligand made a PowerPoint presentation to the Commission.  *Id.*  In substance, it was similar to

the one Ligand presented nine months earlier to a different Commission office.  Among other

things, Ligand again appeared to question Fr. Emmanuel's investment returns—apparently

having taken no steps to verify them, which, if it had, would have demonstrated their veracity.

Brooks Aff. Ex. 8 at 17.  In addition, in an attempt to show that Fr. Emmanuel's reports caused

Ligand's stock price to decline (despite the obvious evidence to the contrary), Ligand

misleadingly cherry-picked four random time periods bookended by Fr. Emmanuel's first and

last short reports on Ligand, again omitting any reference to Empire's short reports.  *See id.* at

55.  For example, Ligand simply ignored the period between June 25 and July 12, 2014 (in which

the price of the company's stock rose), even though Fr. Emmanuel's second report, *which*

*contains two of the four challenged statements,* fell in the middle of this period.  *Id.*  Ligand also

opted to exclude from its four (random) time periods the date of August 4, 2014, when Fr.

Emmanuel's third report came out, and Ligand's stock price skyrocketed by more than 9%.  *Id.*

Finally, even though nine months had passed, Ligand apparently had not recognized its

fundamental error concerning the debt-to-tangible equity calculation and still claimed Fr. Emmanuel's (correct) calculation constituted securities fraud, because the ratio "ignores all the cash proceeds from the debt itself." Brooks Aff. Ex. 8 at 51. Shortly after Ligand's second bite at the apple, the Commission launched its investigation into Fr. Emmanuel.[9]

Notably, Ligand's efforts to pressure the Commission to bring unprecedented and baseless charges against Fr. Emmanuel did not stop with hiring a former high-ranking Commission attorney. On the very same day Ligand and its counsel met with Commission staff in Washington, Ligand used its sway with Congress to exert leverage on the Commission. On June 8, 2015, now disgraced United States Congressmen Duncan Hunter penned a letter to the Commission, urging it to bring charges against Fr. Emmanuel.[10] Brooks Aff. Ex. 15.

The Commission's investigation of Fr. Emmanuel began shortly after its second meeting with Ligand and its counsel, and thus began Ligand's U.S. taxpayer-funded retaliatory campaign against Fr. Emmanuel.

## III. The Commission Revealed the Existence of its Non-Public Investigation to Ligand, and Bloomberg News Ran an Article Disclosing the Commission's Non-Public Investigation.

The Commission's own policies prevent its staff from disclosing the existence of its investigations prior to bringing an enforcement action. Brooks Aff. Ex. 17. "Because SEC investigations are generally nonpublic, Enforcement will not confirm or deny the existence of an

---

[9] While *Ligand's* counsel was afforded a second meeting with a different regional office of the Commission after the first meeting failed to bear fruit, the undersigned was denied a similar opportunity. Brooks Aff. ¶ 25. After the Commission informed the undersigned that it intended to bring the current enforcement action, the undersigned requested a meeting with the Commission's Head of Enforcement. Brooks Aff. ¶ 25. The Commission informed the undersigned that such a meeting would not occur, because Defendant's prior counsel had met with the Head of Enforcement a year earlier. Brooks Aff. ¶ 25.
[10] In December 2019, Congressman Hunter pled guilty to federal charges of conspiracy to misuse campaign funds and faces sentencing in March 2020. Brooks Aff. Ex. 16.

investigation unless the SEC brings charges against a person or entity involved." *Id.* at 1. This policy appears to have been violated here.

On March 18, 2016, Bloomberg published an article titled, "*Hedge Fund Priest's Trades Probed by Wall Street Cop.*" Brooks Aff. Ex. 10. In revealing the Commission's non-public investigation, the article quoted "people with knowledge of the matter." Brooks Aff. Ex. 10 at 1. It stated, "The Securities and Exchange Commission is examining whether the Reverend Emmanuel Lemelson of Massachusetts made false statements about companies he was shorting, said the people who asked not to be named because the probe isn't public." *Id.*

Emails between the Commission and Ligand's counsel make clear that the Commission informed Ligand's counsel of the existence of its non-public investigation. Brooks Aff. Ex. 18.[11] On September 15, 2017, Ligand's counsel wrote to Commission staff to further complain about Fr. Emmanuel's public comments concerning Ligand. *Id.* at 3-4. On September 18, 2017, Commission staff responded in writing: "Unfortunately we cannot share information about our nonpublic investigation in the matter of Trading in the Securities of Ligand Pharmaceuticals, Inc. beyond what we shared last time, *i.e., that the investigation is ongoing*." *Id.* at 2 (emphasis added). The Commission staff, however, then provided proposed times for a *telephone call* with Ligand's counsel, which Ligand's counsel confirmed on the same day.[12] *Id.* at 1-2.

---

[11] Both counsel for the Commission and Ligand have denied that the Commission or Ligand leaked the existence of the non-public investigation to Bloomberg. However, it is difficult to imagine that the source of the leak could be anyone else, unless the Commission *also* improperly leaked the existence of its non-public investigation to someone other than Ligand.

[12] Curiously, during the same time period of this email exchange (September 16-18, 2017), when Ligand's counsel was continuing efforts to persuade the Commission to bring an enforcement action against Fr. Emmanuel, a Wikipedia user who had never before created a Wikipedia page created three new ones. Brooks Aff. ¶ 18. Two of the pages were created for the Co-Heads of the Commission's Enforcement Division. *Id.* The third page this Wikipedia user created was for Ligand's counsel. *Id.* In the two-plus years since that time, this Wikipedia user has created only a single additional page (for a former U.S. naval officer), while continuing to make multiple additions to Ligand's counsel's Wikipedia page. *Id.*

The leak to Bloomberg had devastating effects on Fr. Emmanuel's business. For example, the publication of the article set forth a chain of events that led to Defendants losing a string of critical service providers and the reversal of favorable terms and restrictions on their capital allocation decisions, which have cost the Amvona Fund and its investors millions of dollars. Lemelson Aff. ¶ 27. Despite these effects, Fr. Emmanuel persevered and avoided the collapse of his Fund.

## IV. The Commission's Complaint was Riddled with Factual Errors and Lacks the Hallmarks Inherent in Any Short-and-Distort Scheme.

The Commission's Complaint (and subsequent Amended Complaint) contained the type of clear factual mistakes that one does not expect in Commission filings—especially following a three-year investigation concerning relatively discrete issues. For example:

- As discussed above, *virtually cutting and pasting from Ligand's presentations,* the Commission erroneously alleged that proceeds from debt constitute equity, and therefore Fr. Emmanuel's debt-to-tangible equity calculation was knowingly false. *See* Dkt. No. 1 ("Compl.") ¶ 52; Brooks Aff. Ex. 6 at 36; Ex. 8 at 51.

- In purporting to set forth Fr. Emmanuel's alleged false statements contained in his reports, the Commission mistakenly cited to *private, draft* reports that Fr. Emmanuel never publicly disseminated. *See, e.g.* Compl. ¶ 28.

- In an attempt to bolster its claim that Fr. Emmanuel's statements concerning *Viking* were somehow *material* to his *Ligand* short (a necessary element of the Commission's claims), the Commission falsely alleged that at the time Fr. Emmanuel made those statements, Ligand owned just under half of Viking. In fact, Ligand owned *none* of Viking at that point in time. *See* Compl. ¶ 45.

The above were among a number of clear and obvious factual errors, which could have been discovered by even a cursory fact check. The most reasonable conclusion is that the Commission was more interested in simply bringing an enforcement action against Defendants—

perhaps thinking that its mere existence would cause the demise of the Amvona Fund and thus an inevitable settlement—than getting it right.[13]

In addition to the above, the Amended Complaint seeks disgorgement of the $1.3 million positive return that Amvona made on its Ligand short. Am. Compl. p. 21. As such, the Commission *again* borrows from erroneous allegations in Ligand's presentations that claimed the drop in Ligand's stock price between June and October 2014 resulted from Fr. Emmanuel's alleged misstatements about the company. *See* https://www.sec.gov/oiea/investor-alerts-bulletins/ib_recovermoney.html ("When the SEC brings a successful enforcement action, the court or the SEC may order a wrongdoer to disgorge (give up) the ill-gotten gains *resulting from* the illegal conduct.") (emphasis added). However, the Commission has produced *no* evidence that the drop in Ligand's stock price had anything whatsoever to do with Fr. Emmanuel's commentary about the company. This lack of evidence is not surprising as the four challenged statements clearly did not impact Ligand's stock price.

Even setting aside the glaring *factual* errors, the Commission's Complaint (and subsequent Amended Complaint) is unlike any prior short-and-distort case because it lacks the elements necessary to establish such a scheme. For example:

- <u>Never before</u> has the Commission brought a short-and-distort case against an individual who *publicly disclosed* that he was short the stock he was discussing.

- <u>Never before</u> has the Commission brought a short-and-distort case against an individual for statements contained in an openly published opinion commentary, as opposed to someone who simply fabricated a rumor or "breaking news"-type story to intentionally drive down the stock.

- <u>Never before</u> has the Commission brought a short-and-distort case against an individual based on *opinion* commentary.

---

[13] Despite being on notice of these factual errors from Defendants' motion to dismiss papers, the Commission took no steps to correct them when it filed its Amended Complaint (other than changes to the dismissed count itself), thus permitting knowingly erroneous allegations against Fr. Emmanuel to remain in the public record.

- Never before has the Commission brought a short-and-distort case against an individual who held his short position for a significant period of time—here, *four months* after publishing his original report and nearly *two months* after his final report—as opposed to someone who covered a short position almost immediately upon publicizing the allegedly false statement to profit from the sudden (and temporary) drop in share price.

- Never before has the Commission brought a short-and-distort case where the share price of the shorted company *increased* on the day the challenged statements were made.

- Never before has the Commission brought a short-and-distort case based on statements an individual made about a company that he was not even shorting.

- Never before has the Commission brought a short-and-distort case under the theory it advances here, *i.e.,* that someone in Fr. Emmanuel's position somehow defrauded his *own* investors in generating a positive return from a successful short position.

## V.     The Barron's Article and the Current Motion.

The above factual background is relevant to the Commission's motion, because it is against this backdrop that the violation of the protective orders occurred. Fr. Emmanuel has been under attack by Ligand (behind the scenes) and the Commission for nearly six years. The Bloomberg article and the subsequent (meritless) enforcement action—including the Commission's corresponding press release to ensure maximum media coverage—has caused significant harm to his business interests. Lemelson Aff. ¶ 27. By January 2020, Fr. Emmanuel held a firm conviction that this enforcement action and Ligand's role in it were demonstrably unfair. Lemelson Aff. ¶ 8.

Following the SEC's press release in September 2018, multiple media outlets wrote about this litigation—most of which simply parroted the Commission's and Ligand's groundless claims of securities fraud. Lemelson Aff. ¶ 7. Barron's and Lemelson communicated at that time, and briefly discussed the case in an October 2018 article. Lemelson Aff. ¶ 6.

More recently, Fr. Emmanuel and Barron's communicated about an article Barron's was in the process of writing. Lemelson Aff. ¶ 6. It became clear to Fr. Emmanuel that Barron's was

16

likely to engage in serious, impartial investigative reporting of the background and nature of this matter. Lemelson Aff. ¶ 9. Recognizing that an *objective* article could finally change the patently false public narrative, Fr. Emmanuel shared the above-referenced hodge-podge of documents with Barron's believing they might help the reporter's understanding of the facts. Lemelson Aff. ¶ 9.[14]

On Wednesday, February 12, 2020, Ligand's counsel reached out to counsel for Defendants and the Commission to discuss the violation of the protective orders. Sullivan Aff. ¶ 2. Ligand apparently discovered the violation when Barron's contacted the company for a second time, looking for comment. *See* Sullivan Aff. ¶ 2. Unsurprisingly, given the cozy relationship between Ligand and the Commission detailed above, during the above-referenced call, Ligand's counsel disclosed to counsel for Defendants that it had *already* spoken about the issue with the Commission. Sullivan Aff. ¶ 2. On the call, Ligand's counsel stated that Ligand intended to file a motion for sanctions against Fr. Emmanuel for violating the Protective Order. Sullivan Aff. ¶ 2. Yet, two days later, on February 14, 2020, the *Commission*, not Ligand, filed a Motion for Order to Show Cause. Dkt. No. 68.[15]

On February 19, 2020, Barron's.com ran a story entitled, "*Hedge Fund Alleges SEC Bias in Short-Selling Case*." Bill Alpert, *Hedge Fund Alleges SEC Bias in Short-Selling Case*, Barron's, Feb. 19, 2020, https://www.barrons.com/articles/hedge-fund-manager-alleges-sec-bias-in-short-selling-case-51582111800. The article principally focused on Defendants' *public* allegations of (i) improper collusion between Ligand and the Commission, which Defendants

---

[14] The reporter from Barron's reportedly contacted Ligand and its IR representative, Bruce Voss, between January 9-10, 2020, weeks before Fr. Emmanuel sent any discovery materials. Affidavit of Brian Sullivan ("Sullivan Aff.") ¶ 2.

[15] Subsequently, Ligand filed a notice of joinder adopting and incorporating the Commission's Motion for Order to Show Cause. Dkt. No. 74.

allege led the Commission to wrongfully bring this meritless action (previously detailed in Defendants' Opposition to the Commission's Motion for Protective Order seeking to prevent a Rule 30(b)(6) deposition, Dkt. No. 45);[16] (ii) Magistrate Judge Cabell's related decision allowing Defendants to depose the Commission concerning its communications with Ligand and its counsel (Dkt. No. 55); and (iii) the fact that this case lacks the hallmarks present in all true short-and-distort schemes.  At the end of the article, the author quotes from a six-year old email that had not yet been made public through this case to show that Ligand's years-long campaign urging the Commission to bring an enforcement action against Fr. Emmanuel appeared to be inconsistent with its own view of certain facts.  This was the only non-public document referenced in the article.

## VI.    The Commission's Claims that Fr. Emmanuel has Previously Abused the Discovery Process in this Case have no Merit.

In order to bolster its claim for sanctions, the Commission posits that "[t]his incident appears to be the latest (and perhaps not the last) in a series of discovery abuses" that Lemelson has committed.  Dkt. No. 69 at 2.  This is baseless.  The Commission first argues that Defendants' subpoena to Bloomberg—issued by the undersigned—has no relevance to this case. However, as demonstrated by Magistrate Judge Cabell's decision allowing Defendants to depose the Commission as to communications between the Commission and media sources (including Bloomberg), this topic is indeed relevant to Defendants' defenses in this action.  Dkt. No. 55

Second, the Commission argues that Defendants—again through the undersigned— sought to compel nonresponsive and irrelevant documents from the Greek Orthodox Metropolis

---

[16] The unfair collaboration about which Defendants allege resulted in the Commission bringing this unprecedented action continues to be on full display.  For example, not only did the Commission file the Motion to Show Cause, but the ***Commission*** actually lodged an objection to Defendants' request to ***Ligand***, made pursuant to specific protocols contained in the Protective Order, concerning the filing of ***Ligand*** documents.  Sullivan Aff. Ex. 1.  In addition, during counsels' various communications concerning this issue, the ***Commission*** specifically asked the undersigned if he was going to answer a question posed by ***Ligand's*** counsel.  Sullivan Aff. Ex. 2.

of Boston (the "Metropolis"). Dkt. No. 69 at 4. The Commission's argument is disingenuous, as it fails to inform the Court that Defendants served the subpoena on the Metropolis *after* the Commission told the undersigned that it planned to issue its own subpoena to the Metropolis in order to obtain documents that it claimed would demonstrate Fr. Emmanuel's alleged lack of credibility. Brooks Aff. ¶ 26. Indeed, the Commission did not object to the subpoena when it received notice, as afforded by the Rules of Civil Procedure. *See* Advisory Committee Notes to Fed. R. Civ. P. 45 ("The purpose of such notice is to afford other parties an opportunity to object to the production or inspection"). Only *after* the Commission apparently learned that its witness at the Metropolis had lied did the Commission change course and argue that Defendants' subpoena sought irrelevant documents.[17]

Third, the Commission's theory that Fr. Emmanuel might have committed securities fraud based on his sharing information with Barron's—*a theory that the Commission acknowledges originated from Ligand*—is ludicrous. *See* Dkt. No. 69 at 2. As an initial matter, the information disclosed is all five to seven years old and has nothing to do with Ligand's current business. Moreover, Fr. Emmanuel covered the Amvona Fund's profitable short position in Ligand on February 13 and 14, five days before the Barron's article came out. Lemelson Aff. ¶ 28.[18] Finally, Barron's published the article before the market opened on February 19, 2020. On that day, Ligand's stock opened almost 1% higher, went up nearly 5% intraday, and closed approximately 3.3% higher for the day. Brooks Aff. Ex. 9 at 1. Clearly, the article—which had nothing to do with Ligand's current business practices—had no impact on the company's stock price.

---

[17] The Metropolis ultimately produced the documents at issue but not before the taxpayer-funded Commission expended resources opposing a motion (which only existed because of the Commission's own actions) on behalf of the Metropolis that the Metropolis itself did not even see fit to oppose. *See* Dkt. No. 78

[18] Fr. Emmanuel also covered Amvona's profitable short position in Viking at the same time. Lemelson Aff. ¶ 28.

## CONCLUSION

Courts look to the following factors in determining the appropriate sanction for violation of a protective order: "(1) the willfulness or bad faith of the noncomplying party; (2) the prejudice of the opposing party; (3) whether the procedural history indicates 'protracted inaction or deliberate delay'; (4) the disregard of earlier warning of the consequences of the misconduct; and (5) the availability of less draconian factors." *Big Top USA, Inc. v. Wittern Group*, 183 F.R.D. 331, 338 (D. Mass. 1998) (Saris, J.). Harsher sanctions are typically reserved for violations involving information that is completely sensitive and confidential in nature or "cut to the heart of the case." *Id.* at 339; *Hi-Tek Bags, Ltd. v. Bobtron Intern, Inc.,* 144 F.R.D. 379 (C.D. Cal. 1992). These factors weigh against a harsh sanction here. The documents at issue were not highly sensitive, nor do they cut to the heart of the matter. There is no prejudice to the Commission as the opposing party. Moreover, because the only document discussed in the Barrons.com article was a six-year old email with no relevance to Ligand's current business, Ligand has not been prejudiced. Fr. Emmanuel did not engage in any deliberate delay and did not disregard any Court warning of the consequences of his conduct. Accordingly, the Commission's proposed sanctions are not appropriate.

Fr. Emmanuel acknowledges violating the protective orders. Lemelson Aff. ¶ 2. He apologizes to the Court for this violation and takes full responsibility for his actions. Lemelson Aff. ¶ 3. As attested, Fr. Emmanuel will not violate the protective orders again. Lemelson Aff. ¶ 5. He understands that this Court can order sanctions, but suggests that under the factors set forth above, the Commission's proposed draconian sanctions are not warranted. In light of the foregoing, Defendants submit to the discretion of the Court as to the appropriate result.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
LIBBYHOOPES, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@libbyhoopes.com
bsullivan@libbyhoopes.com

Dated: February 28, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on February 28, 2020.

*/s/ Douglas S. Brooks*
Douglas S. Brooks