UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>GREGORY LEMELSON and<br>LEMELSON CAPITAL MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>THE AMVONA FUND, LP,<br><br>Relief Defendant. | Civil Action No. 1:18-cv-11926-PBS |

**REPLY MEMORANDUM IN SUPPORT OF NOTICE OF JOINDER
OF INTERESTED PARTY LIGAND PHARMACEUTICALS, INC.**

Interested party Ligand Pharmaceuticals Incorporated ("Ligand") hereby submits this memorandum in reply to Defendant Lemelson's Response in Opposition ("Def. Opp.," ECF No. 85) to Plaintiff United States Securities and Exchange Commission's (the "SEC") Motion for Order to Show Cause Why Defendants Should Not Be Held In Contempt for Violating Protective Orders (the "Contempt Motion," ECF No. 68).

1. Defendant Lemelson is not remorseful for intentionally violating the Protective Orders; he is sorry he got caught. So rather than take responsibility and propose what sanction he believes to be appropriate, he has submitted a quasi-summary judgment brief full of invective and conspiracy theories. He contends this is not to justify his misconduct, but to provide context. Nonsense. The baseless smears of Ligand and its executive is a classic blame-the-victim routine.

2. It is a routine Defendant Lemelson often uses, including with the Barron's reporter.[1] He leaked the confidential documents—including several pages of privileged information[2]—to unfairly malign Ligand and its executives, which is harmful in itself and is to say nothing of the cost he has caused the company to incur in enforcing its interests under the Protective Orders.

3. To be sure, Defendant Lemelson is correct that the leaked documents concern either Ligand's business activities in or around 2014, or the company's discussions about him.[3] But that is not a revelation—this case is *about* his false statements about Ligand in 2014, so of course those are the topics that the documents concern. And it is not an excuse—he negotiated and agreed to abide by the Protective Orders knowing full well that they protect these types of documents.

---

[1] For example, in the midst of the SEC's investigation, Defendant Lemelson wrote letters to Congress and the Office of the Inspector General of the SEC that contained many and varied false allegations against Ligand and its executives, as well as the SEC, but he neglected to disclose that he was under investigation for manipulating Ligand's stock. Incredibly, instead he cast himself as a purported whistleblower who brought Ligand to the attention of the SEC. Fr. Emmanuel Lemelson, *Lantern Foundation Founder Urges Senate Committee to Commence Investigation into Ligand Pharmaceuticals*, December 19, 2016, *available at* https://www.amvona.com/featured/finding-alpha/item/43503-lantern-foundation-founder-urges-senate-committee-to-commence-investigation-into-ligand-pharmaceuticals; Fr. Emmanuel Lemelson, *Rev. Fr. Emmanuel Lemelson Calls on Congress, Office of Inspector General to Investigate SEC Failures*, July 13, 2018, *available at* https://www.amvona.com/featured/finding-alpha/item/43521-rev-fr-emmanuel-lemelson-calls-on-congress-office-of-inspector-general-to-investigate-sec-failures.

[2] Defendant Lemelson leaked 27 pages (out of 50 pages) that came respectively from three documents subject to clawback demands at the time. Specifically, he leaked 14 pages from the first document (LGND_0048070, 0048091, 0048113, 0048118-20, and 0048122-29); two pages from the second document (LGND_0052230-31); and 11 pages from the third document (LGND_0056231, 0056234-37, and 0056270-75). Defendants and Ligand have resolved their clawback dispute, as part of which Ligand has now withdrawn its clawback of the first and second documents, but is maintaining, and Defendants are not challenging, its clawback of six pages from the third document, which contain attorney-client privileged material. *See* Def. Opp. at 4 (acknowledging that Defendant Lemelson leaked six pages containing attorney-client privileged material that Ligand clawed back (Bates Nos. LGND_0056270-275), which clawback he is not challenging).

[3] *See* Def. Opp. at 3-5.

4.      Defendant Lemelson's attempt to downplay the significance of the documents begs the question why did he leak them? Contrary to what he says now that he has been caught, he clearly does believe at least some of the documents "cut to the heart of the case," specifically his and Ligand's views of the viability of Promacta. *Big Top USA, Inc. v. Wittern Group*, 183 F.R.D. 331, 338 (D. Mass. 1998) (Saris, J.).[4]

5.      Defendant Lemelson describes Foehr Deposition Exhibit 128, the leaked email quoted in the Barron's Article, as merely "a six-year old email discussing a product whose rights Ligand sold almost a year ago."[5] What he does not say is that the product is Promacta, which, as the Amended Complaint alleges, was "Ligand's flagship drug and primary source of revenue" in June 2014, when Defendant Lemelson falsely claimed that Ligand believed the drug was "going away" due to "competitive pressure from a new competing drug, Sovaldi."[6] Defendant Lemelson leaked the email because when taken completely out of context, it could suggest, as the Barron's Article puts it, that "Ligand itself appeared internally frightened for [Promacta's] prospects, in the wake of . . . Sovaldi."[7] In fact, and as Defendant Lemelson well knows, although Ligand did seek to understand the potential impact of Sovaldi on Promacta sales, the company *never* expressed concern that Sovaldi would or could make Promacta "go away." Indeed, Ligand continued to

---

[4] Def. Opp. at 20 (citing *Big Top* and arguing that the leaked documents do not "cut to the heart of the case").

[5] *Id*. at 3.

[6] *See* Amend. Compl. ¶¶ 36-43 (ECF. No. 33).

[7] Bill Alpert, *Hedge Fund Alleges SEC Bias in Short-Selling Case*, Bloomberg News, February 19, 2020, *available at* https://www.barrons.com/articles/hedge-fund-manager-alleges-sec-bias-in-short-selling-case-51582111800 ("Barron's Article"). *See also* Def. Opp. at 18 ("At the end of the article, the author quotes from a six-year old email that had not yet been made public through this case to show that Ligand's years-long campaign urging the Commission to bring an enforcement action against Fr. Emmanuel appeared to be inconsistent with its own view of the facts.").

3

project that Promacta would earn millions for the company—and it did, through March 2019 when Ligand sold its rights to the drug for $827 million.[8]

6. Most of the other documents Defendant Lemelson leaked concern Ligand's internal correspondence about him, primarily in preparation to meet with the SEC to report his illegal stock manipulation.[9] It appears that Defendant Lemelson used these documents to support his ridiculous accusation to the Barron's reporter that "the SEC is doing Ligand's bidding,"[10] which relates directly to his representation to the Court that he is pursuing a "potential selective enforcement defense."[11]

---

[8] Ligand Pharmaceuticals, Inc., *Ligand Sells Promacta Assets and Royalty for $827 Million*, March 5, 2019, *available at* https://www.ligand.com/news-events/press-releases/detail/375/ligand-sells-promacta-assets-and-royalty-for-827-million. Promacta, by all accounts, is a blockbuster drug that remains widely used to this day.

[9] Def. Opp. at 3-5.

[10] Barron's Article. Ligand declines to take Defendant Lemelson's bait and focus this reply on all the reasons why his political intrigue fantasy is just that, fantasy. But Ligand cannot let go unchallenged the notion at the core of his fantasy, namely, that if "Ligand truly believed he made false statements about it," "one might reasonably expect" the company to have sued him for defamation rather than reported him to the SEC. Def. Opp. at 9. Ligand is far from unique in how it chose to handle this situation: the SEC's mission is to protect the investing public, which it accomplishes in significant part by investigating "complaints or tips that [it] *receives from the public*." U.S. Securities and Exchange Commission, *Investor Bulletin: SEC Investigations*, October 22, 2014 (emphasis added), *available at* https://www.sec.gov/oiea/investor-alerts-bulletins/ib_investigations.html (also attached as Exhibit 17 to the February 28, 2020 Affidavit of Douglas S. Brooks (ECF No. 86); *see also* U.S. Securities and Exchange Commission, *2019 Annual Report to Congress: Whistleblower Program*, at 22 (showing that, through the Office of the Whistleblower alone, the SEC has received approximately 33,000 tips since fiscal year 2012). And the broader implication of Defendant Lemelson's criticism is malicious: that a victim of unlawful conduct—from securities fraud to violent crime—is not to be believed, and indeed should be viewed as a "bully," if they turn to the government to enforce the law rather than sue the perpetrators themselves. Def. Opp. at 9.

Suffice it to say that Ligand and its counsel have conducted themselves ethically and professionally throughout the investigation of Defendants and this litigation, as has the SEC and its non-partisan attorneys in the Enforcement Division.

[11] Defendants Opposition to the SEC's Motion for Protective Order, at 17 (ECF No. 45).

7. In sum, Defendant Lemelson leaked the confidential documents precisely because he believes they are important and would damage the public perception of Ligand, Ligand's executives, and the SEC's enforcement action. And he did so while maintaining a short position in Ligand stock, meaning any adverse impact on the stock as a result of a negative Barron's story would financially benefit him.

8. Ligand therefore supports the SEC's requests for the sanctions articulated in its Reply Brief (ECF No. 98), which are reasonably and appropriately tailored to redress Defendant Lemelson's violation and deter future violations. If anything, those sanctions may be too lenient because it is not clear that Defendant Lemelson has been fully forthcoming about the extent of his violation. He included over 300 pages of exhibits to support his allegations against Ligand and the SEC, but not anything—not a single page—to corroborate the thin account of his own misconduct. For instance, he could have at least included the cover email(s) by which he sent the documents to the reporter. The absence of such corroboration suggests he could be holding something back, such as proof that he did know most of the documents he leaked were the subject of Ligand's pending clawback demands.[12]

9. As for Defendant Lemelson's shorting of Ligand stock, his convenient closing of that position is not a mitigating factor (if he even did close it; he provides no corroboration on this point either). It is not a coincidence that this trading purportedly began on February 13, 2020, one day after Ligand's counsel first confronted his attorney about the leak and expressed concern that he could be (again) violating the securities laws, namely the prohibitions on insider trading and market manipulation. The immediacy of his trading, if it did occur, indicates that he knew it was

---

[12] Notably, Defendant Lemelson fails to tell the Court that the two letters from Ligand's counsel that he also sent to the reporter were about the clawback demands. *See* Def. Opp. at 3 n.1.

5

improper to maintain the short position while leaking documents he had a duty to keep confidential, and doing so with the purpose of generating negative press on Ligand and its executives. And if he did exit the short position before the Barron's Article went to press, that was just a fortuity and does not speak to his intent in leaking or excuse his violation—he did not control the publication date, Barron's did (just as it does the decision about whether to publish any more of the confidential Ligand documents that it now has in its possession).

**WHEREFORE**, Ligand respectfully requests that the Court impose the sanctions on Defendants requested by the SEC in its Reply Brief (ECF No. 98), and impose any other sanction or relief the Court deems just and proper.

Dated:   March 13, 2020

Respectfully Submitted,

CAHILL GORDON & REINDEL LLP

By: /s/ Sean P. Tonolli
Bradley J. Bondi (*pro hac vice*)
Sean P. Tonolli (*pro hac vice*)
Andrea Abarca (BBO #703151)
1990 K Street N.W., Suite 950
Washington, D.C. 20006
Tel: 202.862.8910
Fax: 866.836.0501
bbondi@cahill.com

*Attorneys for Interested Party*
*Ligand Pharmaceuticals Incorporated*

## **CERTIFICATE OF SERVICE**

I certify that on March 13, 2020, a copy of the foregoing was electronically filed through the ECF system and will be sent electronically to all persons identified in the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants.

| | |
|---|---|
| Dated:   March 13, 2020 | By:   /s/ Sean P. Tonolli<br>        Sean P. Tonolli |