```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   SECURITIES AND EXCHANGE COMMISSION,   )
                         Plaintiff,        )
 4                                         )
     vs.                                   )
 5                                         )
     GREGORY LEMELSON and LEMELSON         )   NO. 18CV11926-PBS
 6   CAPITAL MANAGEMENT, LLC,              )
                         Defendants,       )
 7   and                                   )
                                           )
 8   THE AMVONA FUND, L.P.,                )
                         Relief Defendant. )
 9


10


11
                    BEFORE THE HONORABLE PATTI B. SARIS
12                 UNITED STATES DISTRICT COURT JUDGE
                       TELEPHONIC MOTION HEARING
13


14


15
                John Joseph Moakley United States Courthouse
16                        Courtroom No. 19
                          One Courthouse Way
17                   Boston, Massachusetts 02210


18
                           March 18, 2020
19                           9:15 a.m.


20


21
                    Kathleen Mullen Silva, RPR, CRR
22                      Official Court Reporter
                John Joseph Moakley United States Courthouse
23                   One Courthouse Way, Room 7209
                       Boston, Massachusetts 02210
24                   E-mail: kathysilva@verizon.net


25           Mechanical Steno - Computer-Aided Transcript
```

```
1    APPEARANCES:

2

3            United States Securities and Exchange Commission
             Alfred A. Day, Esq.
             Marc J. Jones, Esq.
4            33 Arch Street, 23rd Floor
             Boston, Massachusetts 02110-1424
5            617.573.4590
             for Plaintiff

6

7
             Libby Hoopes, P.C.
8            Douglas S. Brooks, Esq.
             Brian J. Sullivan, Esq.
9            399 Boylston Street, Suite 200
             Boston, Massachusetts 02116
10           617.338.9911
             for Defendants Gregory Lemelson, Lemelson Capital
11           Management, LLC, The Amvona Fund, L.P.

12

13           Cahill Gordon & Reindel LLP
             Sean P. Tonolli, Esq.
14           1990 K Street N.W., Suite 950
             Washington, D.C. 20009
15           202.862.8960
             For Interested Party Ligand Pharmaceuticals, Inc.
16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  Court calls Civil Action 18-11926,
 3   Securities and Exchange Commission v. Lemelson, et al.
 4          Will counsel please identify themselves on the phone.
 5          MR. JONES:  Good morning, Your Honor.  This is Marc
 6   Jones for the Securities and Exchange Commission.
 7          MR. DAY:  Good morning, Your Honor.  This is Al Day
 8   for the Securities and Exchange Commission.
 9          MR. BROOKS:  Good afternoon, Your Honor.  This is Doug
10   Brooks and Brian Sullivan from the firm LibbyHoopes on behalf
11   of defendants, and also on the call is defendant Father
12   Emmanuel Lemelson.
13          MR. TONOLLI:  And good morning, Your Honor.  This is
14   Sean Tonolli of the law firm Cahill Gordon & Reindel appearing
15   on behalf of Ligand Pharmaceuticals.
16          THE COURT:  I missed your name, sir.
17          MR. TONOLLI:  It's Sean Tonolli, and the last name is
18   T-o-n-o-l-l-i.
19          THE COURT:  All right.  So I probably won't recognize
20   everyone's voices.  If you could identify yourself when you
21   speak.  We have a court reporter here, and I -- the courtroom
22   is open, and there's a gentleman who is here.  So it is not a
23   sealed courtroom.
24          All right.  So I think there are a number of motions,
25   but let me start off with a basic fact, which is this may be
```

1  the only civil case I am handling either this week or for the

2  next few weeks, but I viewed it as enough urgency to go

3  forward.  I'm not sure there will be any follow-up.  I think

4  the whole courthouse is only on an urgent emergency basis.  So

5  let's just focus on the things that are critical to resolve

6  today.

7          So there's a particular motion to compel discovery

8  that has to do with the church.  I will not be addressing that.

9          All right.  So going in order, I believe -- I think

10 Ligand -- am I pronouncing that correctly?

11         MR. TONOLLI:  You are, Your Honor.  This is Sean

12 Tonolli.  Yes.

13         THE COURT:  You're seeking to intervene in this

14 motion, right, or is it in the whole case?

15         MR. TONOLLI:  Not in the whole case, Your Honor.

16 We're the victim of the conduct at issue, and with regard to

17 the SEC's motion for contempt, we have joined in that motion,

18 to explain to Your Honor the harm that Ligand has incurred

19 because it was our client's documents that the defendant leaked

20 to the press.  But it is the SEC's motion.

21         THE COURT:  I haven't had time to do the research on

22 it.  I have no problems with your expressing views, but I

23 didn't know if someone could intervene just for purposes of a

24 discovery matter, or a court order.  Does anyone know?

25         MR. JONES:  Your Honor, the is Marc Jones for the

1   Commission.  I have encountered in the past in past cases where

2   there is a third party who has interests under Rule 26,

3   particularly where there's a protective order, that that party

4   has been found, just for the limited purposes of a discovery

5   dispute, to be allowed to essentially intervene and to seek

6   remedy from the court for getting a protective order or seeking

7   sanctions for a violation of that protective order.

8         THE COURT:  For some reason, Mr. Jones, you're

9   muffled.  Are you on a speaker phone?

10         MR. JONES:  I'm actually talking to you right on the

11   phone, Your Honor.  Is that any better?

12         THE COURT:  I was just getting a kickback, but we're

13   doing our best here.  I think I understood you.

14         Essentially, the SEC supports Ligand's motion to

15   intervene for the limited purpose of this discovery matter.

16         What is Mr. Brooks' point of view?

17         MR. BROOKS:  Your Honor, we don't take a view on the

18   motion.  We don't oppose it.  We don't have a view.

19         THE COURT:  Well, I'm not sure, but I will allow,

20   without opposition, Ligand's motion to intervene for the

21   limited purpose of being heard on this discovery matter as

22   somebody who is directly affected by it.  So that is allowed,

23   only for purposes of discovery, this discovery dispute.  Okay.

24         Now, I guess it's up to the SEC to make its

25   presentation now.

1          MR. JONES:  Yes, Your Honor.

2          THE COURT:  Let me begin by saying as I read the

3    papers -- please correct me if I'm wrong, Mr. Brooks -- as I

4    read the papers, Mr. Lemelson does not contest that he violated

5    the protective order, and what is at play or in dispute is what

6    the correct sanction should be.  Is that right, Mr. Brooks?

7          MR. BROOKS:  Yes, Your Honor, that's correct.

8          THE COURT:  Okay.  So I don't believe there's a need

9    for an evidentiary hearing.  Does anybody?

10         MR. JONES:  No, Your Honor, from the Commission's

11   perspective, we do not think there needs to be an evidentiary

12   hearing.

13         MR. TONOLLI:  On behalf of Ligand, no, Your Honor, we

14   do not believe there needs to be a hearing.

15         THE COURT:  Mr. Brooks?

16         MR. BROOKS:  On behalf of the defendant, we do not

17   feel there needs to be a hearing either.

18         THE COURT:  All right.  So I find that Mr. Lemelson

19   has violated the protective order issued by this court, and now

20   the debate is on what the appropriate sanction should be.  All

21   right.

22         Now I'll hear from the SEC.

23         MR. JONES:  Your Honor, this is Marc Jones.  We have

24   laid out what we believe should be the appropriate sanctions

25   for this conduct in the reply, and I can list those off to you

1  if you'd like.

2        We think that the -- excuse me, Your Honor.

3        THE COURT:  No, no.  There were a series of requests I

4  was not inclined to grant, which were in the nature of

5  discovery requests of Mr. Lemelson.  I think I would like to

6  cut to the chase on the violation of this order.  In other

7  words, you asked for all this discovery from him on all these

8  other issues, anybody else he touched base with, et cetera.

9        MR. JONES:  Yes, Your Honor.

10       THE COURT:  I would like to just go to what the

11 sanctions should be for the violation of this order, at least

12 for right now.

13       MR. JONES:  Yes, Your Honor.  What we have requested

14 for remedies for the violations are a finding of civil contempt

15 against the defendants, requiring the defendants to return to

16 their counsel or destroy all of the discovery materials in

17 their possession, prohibiting the defendants from taking

18 possession of any discovery materials in the future.

19       THE COURT:  Well, can I stop you there?  Mr. Jones,

20 let me stop you right there.  I did read that.  Is every

21 document subject to the protective order?  I assume that there

22 are a fair number that are not confidential under anybody's

23 theory, under any theory.

24       MR. JONES:  That's right, Your Honor.  There are many,

25 many documents that are not confidential.  However, the first

1    order that the court entered, protective order number one,

2    essentially states that all of the discovery material will be

3    used only for the purposes of litigation.  And regardless --

4    the issue of confidential or not confidential under the second

5    protective order really is beside the point, whether or not

6    something is marked confidential or should be.  That's a bit of

7    a side show.

8         THE COURT:  Well, no, I disagree with that, because to

9    the extent that I'm banning him from looking at it or banning

10   him from discussing it, I think in the context of this

11   litigation with someone other than his lawyer, it to me matters

12   whether it's confidential or not, particularly with respect to

13   whether or not I'm going to find him in contempt of something

14   if something under any theory is already in the public arena.

15        But anyway, at least I understand your rationale.

16        MR. JONES:  Yes, Your Honor.  I think that the

17   question is really is it in the public arena.  The confidential

18   designation is not necessarily one that distinguishes whether

19   or not it's in the public arena or not.  The discovery material

20   in this case is not essentially in the public arena.  None of

21   it really is, with some exceptions, obviously through a fairly

22   large production.  But the purpose of the original protective

23   order was that, you know, the victim here or one of the

24   victims, Ligand Pharmaceuticals, has turned over a very large

25   number of documents, and the harm that the protective order is

1    designed to prevent is essentially that by reporting the

2    alleged stock manipulation by the defendant, that Ligand's

3    internal communications and documents are all subject to

4    essentially being played out in the press or used for other

5    purposes, such as, you know, the defendant's investing

6    activities.

7         So the purpose of the original protective order was to

8    say that the defendant could have all this material, obviously,

9    but that the parties would agree that it would only be used for

10   litigation purposes.  And it is that provision, the only using

11   it for litigation purposes, that the defendant has really

12   flagrantly violated when he decided that he didn't like what

13   was going on in the case, and so he would play the case out in

14   the press.

15        THE COURT:  Well, let me ask you this:  Is the

16   material that was disclosed to Barron's, was that subject to --

17   was that deemed confidential or was that public information?

18        MR. JONES:  It is in large measure, and Mr. Tonolli

19   can correct me if I'm wrong, in large measure that material was

20   designated confidential, and, in fact, Your Honor, what we have

21   learned based on the defendant's affidavit is, it wasn't just

22   the leak of one document.  It was actually 50 documents,

23   including about 27 pages -- 50 pages of documents, including 27

24   pages that were from documents subject to a clawback request

25   from Ligand Pharmaceuticals.  Ligand had stated that some of

1    its materials had been inadvertently produced and were

2    privileged.  And despite defendant Lemelson's claim that he

3    didn't understand that he was producing privileged material to

4    Barron's, or at least there was a claim of privilege on that

5    material, the defendant Lemelson actually gave the Barron's

6    reporter the letters where Ligand requested a clawback of the

7    material as privileged.  So it's really not believable when

8    Lemelson says --

9          THE COURT:  Are those letters among the 50 pages?

10         MR. JONES:  No, Your Honor.  Those letters are in

11   addition to the 50 pages, and they are described in the

12   defendant's affidavit I believe around paragraph 4 or 5,

13   although I'll need to check that.

14         THE COURT:  Let me ask you, the 50 pages, were they

15   all stamped confidential?

16         MR. JONES:  I believe they were, although I'd have to

17   double-check with Mr. Tonolli.

18         MR. TONOLLI:  Your Honor, yes, they were all marked

19   confidential.

20         THE COURT:  So I don't have to deal with that little

21   nuance about whether or not they're used for purposes of the

22   litigation or not.  Under either theory they were stamped

23   confidential?

24         MR. TONOLLI:  Correct, Your Honor.

25         THE COURT:  All right.  All right.  So I interrupted

1   you.

2          So you want everything -- all discovery materials

3   either returned or destroyed, and that includes I'm assuming

4   everything online, and --

5          MR. JONES:  Yes, Your Honor.

6          THE COURT:  And what was the next thing?

7          MR. JONES:  Essentially, there is the bar from --

8   barring the defendant from communicating about discovery

9   materials with people other than their counsel.

10          And then, Your Honor, apart from that, there were a

11   few other remedies in the reply.  The first is to prohibit the

12   defendants from using or making arguments based on the

13   discovery materials they disclosed in violation of the orders.

14   And then the next would be imposing on defendant Lemelson a

15   penalty of $100 per page of confidential discovery materials

16   disclosed in violation of the order.  And finally, prohibiting

17   the defendants from taking any position in Ligand stock or

18   Ligand stock derivatives for the duration of the action.

19          THE COURT:  Thank you.  Does Ligand want to add to any

20   of that before I hear from Mr. Lemelson, or more accurately his

21   attorney?

22          MR. TONOLLI:  Yes, Your Honor.  And this is Sean

23   Tonolli again, and thank you.  I'll speak briefly.  We support

24   the request that the SEC is making for sanctions, and I just

25   want to elaborate that through supporting these requests,

1    Ligand does not seek and does not believe the SEC is seeking to

2    prevent Mr. Lemelson from forcefully presenting this case in

3    court and through this litigation.

4         I should note that Mr. Brooks, on behalf of

5    Mr. Lemelson, has filed several pleadings with the court

6    attached to which have been many confidential documents that

7    Ligand has produced in the case.  And per the confidentiality

8    orders, Mr. Brooks has had to come to Ligand to say, "We intend

9    to use these.  If you're going to challenge us using these, you

10   can go to the court."  We have not objected to his use of any

11   of those confidential documents.  Our client understands that

12   Mr. Lemelson has the right to litigate this case fairly, and to

13   use the documents in discovery to do so.

14        Why we are here is because he chose to do this -- to

15   leak these documents to the press, and to violate his word that

16   he would only use our client's documents fairly and

17   transparently in the course of litigation.  So we are not

18   seeking to keep him from having his day in court.  In fact, we

19   very much look forward to that day in court, but we do believe

20   that the sanctions the SEC has requested are appropriate, and

21   are appropriately tailored to what he has done, and to keep him

22   from doing it again.

23        THE COURT:  Does either the SEC or Ligand know whether

24   or not Mr. Lemelson made money off of shorting Ligand?  It's a

25   little hard to say now that the stock market has dropped so

1    dramatically.  But do you know?

2          MR. TONOLLI:  Your Honor, this is Mr. Tonolli.  In his

3    affidavit Mr. Lemelson claims to have made money off a short

4    position, but also to have closed those trades prior to the

5    decline in the market that has been suffered recently.  I think

6    he said he closed it --

7          THE COURT:  How much money did he make?  Does he say?

8    I missed that.

9          MR. TONOLLI:  He does not.  He provides no details

10   about his trading, other than the representation that he closed

11   a position the day after we, counsel for Ligand, and the SEC

12   notified his attorney that Barron's had these emails.

13         THE COURT:  Do you know how much he made off of the

14   trade?

15         MR. JONES:  We do not, Your Honor, because defendants

16   did not disclose in their reply to the order to show cause

17   their trading activity as the Commission had requested them to

18   do.  So we know neither what the starting price was nor the

19   size the position was that the Amvona Fund and defendants took.

20   The only thing we can determine is when they sold and obviously

21   looking at the price on that.

22         THE COURT:  Let me ask this:  We couldn't find

23   anything on point.  Is disgorgement an appropriate remedy for a

24   discovery violation?

25         MR. JONES:  Your Honor, I have not seen disgorgement

1    as a --

2         THE COURT:  Who's this?  Excuse me.  You need to

3    identify yourself for the court reporter.

4         MR. JONES:  I'm sorry, Your Honor.  This is Marc

5    Jones.

6         Generally, discovery violations have not -- you know,

7    it's not under the Rule 37 sanctions, obviously, but I've read

8    a lot of cases about sanctions lately and the inherent power of

9    the court to impose them, and basically the court has broad

10   equitable powers to impose whatever sanction the court deems is

11   the appropriate remedy, and there are several cases at the

12   district and circuit level upholding the court's power to

13   essentially fashion the best remedy that it can.

14        THE COURT:  All right.  Thank you.  Mr. Brooks, your

15   turn.

16        MR. BROOKS:  Thank you, Your Honor.

17        My client, Father Emmanuel Lemelson, has admitted

18   violating the protective order and through his affidavit in our

19   pleadings has provided the specifics and the nature and scope

20   of that violation.

21        Also in our papers we provided the overall context in

22   which the violation arose.  We did not do so in any way to

23   justify the violation, but just to explain it more fully so

24   Your Honor had the full background, so ultimately the court can

25   make its decision on what to do here.

1          In terms of what, if any, sanctions the court wishes

2     to impose, you know, we've laid out in our papers the guiding

3     case law, and why we don't believe the harsh and Draconian

4     sanctions that the SEC is proposing are appropriate.  I

5     think -- in pertinent part, again, we do not deny that this

6     violated the protective order.  However, these were not

7     particularly sensitive documents.  Yes, they were stamped

8     confidential.  We're not disputing that.  But Ligand stamped

9     over 99 percent of the documents that they produced to us

10    confidential, including certain public documents.  So

11    effectively they just stamped everything confidential.

12         THE COURT:  Excuse me.  Were any of the 50 already in

13    the public arena?

14         MR. BROOKS:  So in sum and substance they were.  The

15    particular documents were not.  But many, in sum and substance,

16    were in the public arena, because a lot of these were draft

17    slides of things that have been attached to our pleadings.

18         THE COURT:  Well, that's different.

19         MR. BROOKS:  But certainly not everything.  They're

20    pretty much identical, Your Honor, sort of different pages, but

21    not everything.  Not everything that was sent was effectively

22    in the public arena.  And the email -- and to be candid, the

23    one email that was referenced in the Barron's article was not

24    yet in the public record.  It might have been later as part of

25    summary judgment, but it was not yet, and we've acknowledged

```
 1  that.
 2         However, again, it's not a particularly sensitive
 3  document.  It's a six-year-old email that has nothing to do
 4  with Ligand's current business.  So the idea that somehow
 5  disclosure of that email, or anything else that was disclosed,
 6  would somehow aid the Amvona Fund's short position in Ligand is
 7  preposterous.
 8         THE COURT:  Let me ask you this:  How much money did
 9  he make when he shorted?
10         MR. BROOKS:  I don't have the exact amount, Your
11  Honor, but a few thousand dollars is my understanding.
12         Again, if you look at the impact on the price of the
13  stock the day the article came out, Ligand's stock went up
14  significantly.  And the reason is that there's no reasonable
15  investor would look at something six years ago about a product
16  that Ligand no longer owns and say, oh, this is a problem for
17  this company.  It just would have no impact whatsoever on the
18  stock.  So the idea that he had an open short position at the
19  time to me is a complete red herring.  He no longer has that.
20  He no longer has that short position.  However, he closed it
21  out before the article came out in any event.  But I just don't
22  think -- I know --
23         THE COURT:  Wait a minute.  He closed out his position
24  before the article came out?
25         MR. BROOKS:  Yes, Your Honor.
```

1           THE COURT:  All right.  Thank you.  All right.

2    Anything else?

3           MR. JONES:  Your Honor.

4           THE COURT:  Yes.  Mr. Brooks, are you done?  I'm

5    sorry.

6           MR. BROOKS:  No.  Just a couple more points, Your

7    Honor, that I want to make.

8           THE COURT:  Yeah.

9           MR. BROOKS:  In addition, obviously we're not

10   contesting the violation, but these are not -- these were not

11   particularly sensitive documents.  They don't cut to the heart

12   of the matter.  They provide relative background, background

13   that the Barron's reporter was apparently interested in.  But

14   they don't go to the heart of the matter here.  And we believe,

15   as we put in our papers, that there's been no prejudice, either

16   to the Commission or Ligand.  I don't see how there could be

17   any prejudice to the Commission.  Again, these are six-year-old

18   emails talking about a product that, while the product --

19           THE COURT:  You know what -- I don't know who the

20   gentleman is who is sitting here, but this is not a closed

21   proceeding.  Anybody who would brave forth given this almost

22   shutdown city must really care, so I would be careful not to

23   disclose the contents in a public hearing.  Okay?

24           MR. BROOKS:  I believe that's now part of the public

25   record, but I won't get into any more specifics, Your Honor,

1  again, other than to describe it generally to say that it

2  doesn't have anything to do with Ligand's current business.

3  Again, I think that's reflected by the fact that obviously the

4  market took no interest whatsoever in this article.

5          So for those reasons, and as laid out in our papers,

6  we do not believe that the Commission's Draconian sanctions are

7  appropriate or warranted here.  Thank you.

8          THE COURT:  All right.  Was there any reply?

9          MR. JONES:  Yes, Your Honor.  This is Marc Jones.

10          A few points in response to defense counsel.  First,

11  the claim that these documents are somehow tangential to what

12  we're doing here is really, in the Commission's opinion, not

13  fair or accurate.  The documents essentially fall into two

14  categories.  One has to do with the tentpole claim that --

15          THE COURT:  You know, that muffled.  Neither the court

16  reporter nor I could hear it.  Could you please repeat that.

17          MR. JONES:  All right, Your Honor.  Let me try again.

18  I apologize.

19          It's not fair for Mr. Brooks to characterize these

20  documents as tangential to the case.

21          Is that better, Your Honor?

22          THE COURT:  Much.

23          MR. JONES:  Okay.  Excellent.  Thank you.

24          The two categories of documents that were leaked, the

25  first has to do with the claim that Mr. -- that defendant

1    Lemelson made in the case that the central product that Ligand

2    makes is going away, and there are documents about internal

3    communications about that very intention.

4          The second group of documents really has to do with

5    the victim's communications to the SEC here reporting the

6    alleged violations, and they are central to defendant

7    Lemelson's purported selective enforcement claim and purported

8    improper connections between Ligand and the SEC.  So it's not

9    accurate to say that these documents are somehow tangential.

10   Of course they're not.  Because otherwise, why would defendant

11   Lemelson be trying to get a reporter interested in them?

12         That goes to the second rebuttal point, Your Honor,

13   which is whether or not the stock price moved the day the

14   article came out is irrelevant.  What is relevant is what was

15   the defendant's intention in putting them out there.  He may

16   not have been successful in accomplishing that, but he's very

17   clear that he was attempting to have a different narrative

18   about this litigation and about the allegations against him and

19   to change that perception that what he had said was false, and

20   that, you know, it could obviously affect stock prices.  But

21   even if they don't, it's about trying to get bad publicity for

22   the victim here in an attempt to play -- you know, A, play out

23   this litigation in the press; and, B, potentially affect the

24   stock price.  So it's really about his intention.

25         Your Honor, this is all part and parcel to an apology

1    that doesn't come with any real remorse.  By paragraph 8 of his

2    supposed mea culpa, he's talking about how this action is

3    unfair and how he was justified in leaking the documents

4    because he wanted to help counter the existing false public

5    narrative, and then by paragraph 14, the whole second part of

6    the affidavit is about how good an investment advisor he is,

7    and how much he's made money, and where people can download his

8    reports.  There doesn't seem to be any real remorse here.  In

9    fact, this justification that these documents really weren't

10   that important and maybe they shouldn't have been marked

11   confidential, it really shows a lack of understanding that a

12   court order is a court order, and you don't just get to decide,

13   well, maybe the harm of this one isn't so bad, so I can do it

14   despite what the court said.

15          There's a real harm to the institution of the court's

16   power here in what the defendant has done, and there's a real

17   harm to the SEC.  The SEC relies on being able to go to victims

18   and say, you know, please come to us with, you know, violations

19   that have been done to you.  Share your information with us.

20   We will try to keep that information protected to the extent

21   that the court will let us.  And if you cooperate, this won't

22   be a net negative for you; it will be a net positive.

23          By the defendant basically taking those matters into

24   his own hands, in violation of the court's two orders, he has

25   harmed both the court and the SEC and an attempt to harm

1    investors by putting out another narrative based on discovery

2    material that he's not entitled to use for that purpose.  So we

3    think that the remedies are not Draconian, as Mr. Brooks keeps

4    suggesting, but rather very appropriate for a blatant and

5    really unremorseful violation of the court's orders.

6         THE COURT:  Anything else from anyone?  Okay.

7         MR. BROOKS:  Your Honor, if I could respond.  This is

8    Doug Brooks, if I could respond to that.

9         I don't know how the SEC is coming to the conclusion

10   that my client is not remorseful.  He is.  We are not saying

11   that -- at no point did he say or did we say in any of the

12   papers that he was justified in doing this.  He's acknowledged

13   in his affidavit that he was not justified.  However, the case

14   law calls for an understanding of the entire context in which

15   it happened, and that's what we tried to portray to the court.

16   So we're not saying that simply -- we're not saying that he was

17   justified at all.  So I don't know where the SEC is getting

18   that, but it's not coming from me.  It's not coming from my

19   client, and it's not in any of our papers.  So for them to

20   get --

21        THE COURT:  All right.  I understand.  So let me -- I

22   think I have the gravamen of this dispute, and I have drafted

23   an order.  We are very short-staffed, as you can imagine, at

24   this time during the coronavirus, but I'm not sure when you're

25   going to get a full-blown one.  I will try today, but I will at

1    least read it out loud, and there is a court reporter here.

2    I'm not sure when, if she can get you an order, so please get

3    your pen and paper out.  Do you have it?

4            MR. JONES:  Yes, Your Honor.

5            THE COURT:  So after hearing on the SEC's motion

6    pursuant to Federal Rules of Civil Procedure 37, I find that

7    the defendants are in contempt of this court's protective

8    orders, in the plural.  Defendant Lemelson concedes that he

9    violated this order by giving a journalist at Barron's copies

10   of materials deemed confidential under the protective orders.

11   As a sanction, the court orders as follows:  First, defendants

12   and any persons acting on their behalf or at their direction

13   are enjoined from communicating directly or indirectly with any

14   person, other than counsel -- and by "counsel" I include, let's

15   say, a paralegal or an expert working with counsel -- directly

16   or indirectly with any person other than counsel about

17   discovery materials subject to the protective orders.  And that

18   picks up both kinds of discovery:  Those deemed confidential

19   and those deemed not confidential.

20           Defendants shall return to their counsel -- let me

21   just add that adds to the fact that you're not supposed to be

22   communicating with the press anyway about ongoing litigation.

23           Anyway, point 2, defendants shall return to their

24   counsel or destroy all discovery materials marked

25   "confidential" in their possession.  I am drawing the

1   distinction here between the two protective orders.  So only

2   the confidential materials need to be returned to counsel or

3   destroyed, and you should submit an affidavit within one week

4   saying that you have done that.

5        When I say "destroyed" I'm not saying you have to go

6   out and hire some computer expert to get through every piece of

7   metadata.  It needs to be deleted off of your computer or it

8   needs to be, anything that's printed out, returned to counsel.

9   This only applies to those things marked "confidential."  So

10  that doesn't mean everything.

11       Three, defendants shall not take any position in

12  Ligand stock, or its derivatives, for the duration of this

13  action, including appeal.

14       And four, defendants shall pay a penalty of $100 per

15  page for each of the confidential discovery matters, that means

16  those marked "confidential," disclosed in violation of the

17  court's protective orders, plural.  Now, that shall be paid, I

18  don't know, within -- I don't mean counsel.  I mean the

19  defendants.  So that will be paid within 30 days.

20       Now, the one concern I have is where to pay it to.  I

21  don't know if the clerk's office is going to be open and

22  accepting money.  So make an effort, and if you can't reach

23  somebody, Mr. Brooks, I'm sure you can just send us a letter or

24  something saying you tried, and you're holding it in escrow.

25  Okay?

1          MR. BROOKS:  Yes, Your Honor.

2          THE COURT:  I just don't know where this virus, this

3    pandemic is taking us to say whether we'll have staff to take

4    such a check.  That money goes into the court's coffers, I

5    think.

6          So now quite clearly I am not granting the SEC's

7    request that you cannot use these discovery materials during

8    the proceedings.  They may be quite relevant, and at the end of

9    the day my job is to get to the merits.  First of all, I don't

10   have the materials in front of me, so I don't know how

11   important or not important they are, but I do take Mr. Jones's

12   point that they must be important enough or you wouldn't have

13   disclosed them to Barron's.  So the clawback material should be

14   completely sent back to counsel, and I think that pretty much

15   does it.  I'm not ordering disgorgement, because I think it

16   would involve me too deeply into what positions were taken, and

17   at what point was the position closed, and did it have anything

18   to do with this.  You've persuaded me, Mr. Brooks, that he

19   closed his position before the Barron's article.  So I'm not

20   going there, even if I had the power to.

21         All right.  Now, the next issue is -- there's a motion

22   to compel documents from the church.  Has that been resolved?

23   Because I'll send it to Judge Cabell.  I think it's resolved,

24   right?

25         MR. BROOKS:  Yes, it is.  Judge Cabell found it moot.

1   We alerted Judge Cabell that the church ended up producing the

2   documents, so Judge Cabell --

3           THE COURT:  Who's talking now?

4           MR. BROOKS:  I'm sorry.  This is Doug Brooks, Your

5   Honor.

6           THE COURT:  All right.  So Mr. Brooks, based on those

7   documents, is it accurate that he was not ordained a priest in

8   the -- I don't know all the different sects, the different

9   parts of the Eastern Orthodox Church and the Greek Orthodox

10  Metropolis, if that's the correct name.

11          MR. BROOKS:  He's a Greek Orthodox priest, Your Honor.

12  I don't know where this alternative information is coming from.

13          THE COURT:  Excuse me, but --

14          MR. BROOKS:  Nothing in -- this is Doug Brooks.

15  Nothing in those documents confirmed that -- confirmed what the

16  SEC had apparently been told, that Father Emmanuel Lemelson was

17  not an ordained priest.

18          THE COURT:  It doesn't answer my question.  Is there

19  any paper in those documents that confirms he is a priest in

20  that church?

21          MR. BROOKS:  No, there was no document --

22  respectfully, there was no document speaking to that issue.

23          THE COURT:  Well, does he have any documents that

24  he's -- once again, I don't pretend, and I'm sorry to not

25  understand the different divisions of the Eastern Orthodox

1  religion.  Are there any documents confirming that he is a

2  Greek Orthodox priest as opposed to some other, for example,

3  Albanian?

4          MR. BROOKS:  Yes, Your Honor.

5          THE COURT:  Is there -- do I have that correctly, that

6  he's a member of -- is it the Albanian church priesthood, is

7  that it?  Do I have that right?

8          MR. BROOKS:  Right now he's a member of the Albanian

9  Orthodox -- I'm not sure I have it all correct, Your Honor.

10          THE COURT:  All right.  But that does not --

11          MR. BROOKS:  I'm not sure why the SEC --

12          THE COURT:  Is that different than the Greek Orthodox,

13  right?  It would be like the difference between Methodist and

14  Presbyterian or something hike that?

15          MR. BROOKS:  He is a Greek -- I don't know how to say

16  it.  He is a Greek Orthodox priest, Your Honor.  I don't have a

17  document --

18          THE COURT:  No, you're not listening to the precision

19  I'm talking about.  I understand like someone says, "I'm

20  Christian," that sort of picks up a lot of things.  I

21  understand your position is that he is a priest with the

22  Albanian Church.  Is that a synonym for Greek Orthodox?

23          MR. BROOKS:  Your Honor, I do not want to misspeak

24  here.  I don't see the relevance, but I would like to turn this

25  over, if you'd be willing, to my client, who can answer this

1  better than me.

2         THE COURT:  Yes.  Because it matters to me in terms of

3  the letter that you sent to that Greek Orthodox priest

4  threatening him with a lawsuit unless he answered ten things

5  correctly.  I found that extremely troubling.  There may be

6  nuances here that none of us understand, but it was a pretty

7  hardball tactic.

8         MR. BROOKS:  So Your Honor -- this is Doug Brooks.

9  What is your question for --

10        THE COURT:  I understand, Mr. Brooks, that you sent a

11 letter to the church -- I can't remember the name of it.  I may

12 have this wrong, but the reverend -- I'm sorry if I'm not

13 getting this correctly -- the reverend of the Greek Orthodox

14 Metropolis Church saying that unless he agreed to certain

15 things, you would sue him for $10,000.  And I think the issue

16 really is regardless of whether that falls in violation of some

17 criminal statute or not, that's a pretty hard-edged tactic, and

18 I want to understand what is the basis for your belief that he

19 is a member of the Greek Orthodox Church as opposed to the

20 Albanian Church, which I believe Mr. Lemelson says he was

21 ordained in?

22        MR. BROOKS:  So, Your Honor, this is Doug Brooks.  All

23 of those statements in that letter were correct, and I will --

24 now I'd like to turn it over to my client, so I don't misspeak,

25 because, as you said, there might be some nuances.  He can

1   explain why those were correct.

2          THE COURT:  Excuse me, Mr. Brooks, you signed that

3   letter, right?

4          MR. BROOKS:  No, I did, Your Honor, and it was after

5   consultation.  And everything in there, every one of those nine

6   points is true.

7          THE COURT:  Can I say --

8          MR. BROOKS:  Right now I --

9          THE COURT:  -- that was pretty hardball against a

10  priest.

11         MR. BROOKS:  Well, Your Honor, I understand that, but

12  I am representing a priest who Father -- who the other priest

13  has been out there defaming.

14         THE COURT:  I was deeply, deeply troubled by that

15  letter.  And I just want to understand what could have prompted

16  someone from such a fine firm to have sent that letter.  So I

17  want --

18         MR. BROOKS:  Your Honor --

19         THE COURT:  Maybe I'll ask Mr. Lemelson.

20         MR. BROOKS:  Okay.

21         THE COURT:  Mr. Lemelson, do you have any documents in

22  your possession that you are an ordained priest in the Greek

23  Orthodox Church?

24         DEFENDANT LEMELSON:  Yes, Your Honor.  This is Father

25  Emmanuel Lemelson.  I'm a canonically ordained Greek Orthodox

1   priest.

2          THE COURT:  I couldn't hear you.  I cannot hear you,

3   Mr. Lemelson.  Say it again.

4          DEFENDANT LEMELSON:  Is this better?

5          THE COURT:  I want to know, do you have a document

6   that shows you have been ordained a Greek Orthodox minister?

7          DEFENDANT LEMELSON:  Yeah.  Can you hear me now, Your

8   Honor?  Is this sufficient?

9          THE COURT:  A little better, yes.

10          DEFENDANT LEMELSON:  Can you hear me?

11          THE COURT:  Yes.

12          DEFENDANT LEMELSON:  Yes?

13          THE COURT:  Yes.

14          DEFENDANT LEMELSON:  Okay.  This is Father Emmanuel

15   Lemelson.  I am a Greek Orthodox priest canonically ordained by

16   the archbishop of the Greek Orthodox Church in America, an

17   exarchate of the Ecumenical Patriarchate, which is the

18   spiritual authority for all --

19          THE COURT:  I'm sorry.  The court reporter can't hear

20   you.  We're getting kickback here.

21          DEFENDANT LEMELSON:  Just one moment.  Let me try

22   taking off my --

23          THE COURT:  No, I had a simpler question.  Do you have

24   any documentation to prove that, yes or no?

25          DEFENDANT LEMELSON:  Yes.  I have my letter of

1  ordination, yes, from the archbishop of the Greek Orthodox

2  Church, who signed my ordination and who ordained me.

3          THE COURT:  All right.  Please submit that to the

4  court.

5          Is there a difference --

6          DEFENDANT LEMELSON:  Yes, I've given it to my counsel,

7  and I will provide it to the court, yes.

8          THE COURT:  Is there a difference between the Greek

9  Orthodox Church and the Albanian Orthodox Church?

10          DEFENDANT LEMELSON:  No.  Orthodoxy, all of Eastern

11  Orthodoxy, unlike the Western church, is one body.  Typically

12  it runs along ethnic lines.  I agreed, at the request of the

13  Albanian bishop, to serve his diocese after being ordained by

14  the archbishop of the Greek Orthodox Church in the Metropolis

15  of Boston.  The priest, who has the same standing as me in the

16  church, Father Ted Barbas, repeatedly has lied to federal

17  investigators about my status, complicating our case.

18          THE COURT:  Excuse me.  Why don't I do this:  First of

19  all, I want to see the letter, and I want you to submit it

20  under pains and penalties of perjury that that is a valid

21  document that ordains you, and then we'll sort out --

22          DEFENDANT LEMELSON:  Absolutely, no problem.

23          THE COURT:  We'll sort things out from there.

24          Have you seen that, Mr. Jones or Mr. Day, or I guess

25  Mr. -- the Ligand counsel, Tonolli?  Have you seen that?

1          MR. JONES:  Your Honor, this is Marc Jones.

2          THE COURT:  Yes.

3          MR. JONES:  We have not seen that document, but that

4    document, although it may establish that defendant Lemelson is

5    ordained Greek Orthodox, it doesn't really go to the nine

6    different things that the defendants through counsel threatened

7    Father Barbas that he had to swear to, and it doesn't address

8    the fact that Mr. Brooks's threat to Father Barbas was also

9    that he had to recant anything he had told the SEC --

10   specifically the SEC -- in contravention of the nine things

11   that he was going to be required to swear to, and it doesn't

12   take into account the $10,000 fee demand, supposed fee demand

13   or the potential defamation case that they threatened.

14          So although Father Lemelson may be able to establish

15   that he was ordained as a Greek Orthodox priest, there are far

16   more factual contentions that he required Father Barbas to

17   swear to and recant anything in the contrary than just whether

18   or not he was ordained.

19          THE COURT:  Well, I do not believe I have a current

20   record to resolve this dispute.  I was troubled by it,

21   Mr. Brooks.  It's unusual, to say the least.  You're from a

22   firm that I'd be surprised if they've ever done anything like

23   that before, an excellent law firm.  I looked you up.  You have

24   an excellent reputation.  I don't understand how that kind of a

25   letter could have been sent.  But that said, I first want to

```
 1   find out the truth behind all of this as to whether or not
 2   Mr. Lemelson is, in fact, an ordained minister of the Greek
 3   Orthodox Church.  Reverend.  I had thought perhaps the debate
 4   boiled down to whether someone was ordained in the Albanian
 5   division versus the Greek division, and I don't know if that
 6   makes a difference, but then if there are nuances of the other
 7   statements I don't know, but it is a troubling thing to do
 8   something like that, essentially that kind of a forcing
 9   mechanism against a religious man.
10           So let's just say I'm putting that on my back burner
11   for right now in the middle of this pandemic, but I am not
12   forgetting it.
13           DEFENDANT LEMELSON:  Your Honor, may I speak a bit
14   further?
15           THE COURT:  Yes.  This is Mr. Brooks?
16           DEFENDANT LEMELSON:  This is Father Emmanuel speaking.
17           THE COURT:  Oh, Father Emmanuel.  I'm sorry.
18           DEFENDANT LEMELSON:  This is Father Emmanuel speaking,
19   yes.
20           Your Honor, I would just point out that I'm also a
21   religious man, who dedicated my entire adult life to the
22   church, and Father Theodore Barbas, we will provide the court
23   with evidence --
24           THE COURT:  Okay.
25           DEFENDANT LEMELSON:  -- that he lied repeatedly to the
```

1    SEC.  And the really key and important thing here is that we

2    have all of the correspondence from the Metropolis of Boston

3    essentially begging me to serve their diocese and me declining,

4    which I served for many years without pay the poorest

5    communities.  My entire life has been given over to service to

6    the church.  I was ordained by the Ecumenical Patriarchate, the

7    highest authority in the Orthodox world.  The man who ordained

8    me is now the archbishop of the Greek Orthodox Church in

9    America.

10            My counsel, who is also the most ethical person I have

11    ever met in my life, thought because of the injustice that Ted

12    Barbas was committing against his client and his litany of lies

13    and his deception and his violations --

14            THE COURT:  You know what, can I say this --

15            DEFENDANT LEMELSON:  -- are severe.

16            THE COURT:  Let me say this:  I want to see your

17    documentation of everything you just described.

18            DEFENDANT LEMELSON:  Certainly.

19            THE COURT:  And that will be provided to the SEC.  At

20    this point Ligand is out of it.

21            And then if there's anything else anyone wants to do

22    with this dispute, you can let me know, but at least right now

23    that was a very troubling letter, even if --

24            MR. BROOKS:  Your Honor.

25            THE COURT:  Even if -- it's possible -- the Reverend,

 1   what's his name again, Barbas?

 2          DEFENDANT LEMELSON:  Barbas.

 3          THE COURT:  Barbas.  It's possible he was wrong.  It's

 4   possible.  But in any event, as far as I'm concerned, they

 5   apparently don't have that documentation, because you've

 6   compelled production, and they don't have it, so it would be

 7   useful to have it if it, in fact, exists.  So you tell me it

 8   does.  You'll give it to me.

 9          DEFENDANT LEMELSON:  Absolutely, Your Honor.

10          And I would just point out that, you know, it's

11   interesting that everyone refers to me as Mr. Lemelson but

12   refers to Father Barbas as Father or Reverend Barbas on this

13   call.  I just don't want me to be prejudiced because of a

14   misperception or perhaps the Commission's effort to situate

15   this narrative in a certain light.  I think with de minimis

16   investigation it will be very easy to uncover that it is Father

17   Barbas, and not myself, who has lied.

18          THE COURT:  Excuse me.  "Lie" goes a long way.  It's

19   possible he didn't have your documentation.  So if you have

20   valid documentation that shows an ordination, it puts this

21   issue to bed.

22          MR. BROOKS:  This is Doug Brooks.  Thank you, Your

23   Honor.

24          MR. JONES:  Your Honor, may I be heard?

25          THE COURT:  I don't understand why you didn't show

1  that to the reverend if you have it.

2          MR. BROOKS:  Your Honor, this is Doug Brooks.

3          Reverend Barbas knows that he's not telling the truth.

4  This goes back to -- this is a, unfortunately, an ongoing

5  dispute that stems from Father Emmanuel Lemelson calling for

6  Father Barbas's removal in the wake of a child sexual abuse

7  scandal.  And since then, unfortunately, it has turned

8  personal.  But this is not a question of Father Barbas not

9  having the appropriate documentation or not knowing.

10          THE COURT:  Well, we'll see when I get it.  When I get

11  it submitted by Mr. Lemelson, all documentation that he has on

12  point, and then the SEC can do further --

13          Mr. Jones, Mr. Day, do you have any independent

14  knowledge, one way or another, on this issue?

15          MR. JONES:  Your Honor, we don't, but we have a couple

16  of requests that might go along with Your Honor's order.

17          THE COURT:  Which is?

18          MR. JONES:  If Your Honor is going to take evidentiary

19  material on this matter, there are nine contentions that they

20  asked Father Barbas to swear to.  We would ask, if the court

21  wants further factual information, that the defendant submit

22  documentation about all nine.

23          THE COURT:  No, because at this point I don't have

24  anything.  I don't have a request from the church.  I don't

25  have a request from you to do anything.  It just definitely

1   spawned a flurry of correspondence to me and, of course, I want

2   to make sure that no one is being unfairly dealt with in the

3   context of this litigation.

4          So if anyone wants me to do something, let me know,

5   but right now I just want to put this issue to bed one way or

6   another.  If there's -- let's assume for a minute, because

7   Mr. Brooks is an experienced attorney, that he has the

8   information that, indeed, he is an ordained reverend with the

9   Greek Orthodox Church, then if you want to show me why these

10  other things are untrue, you can, but right now I have no

11  motion pending in front of me, as I understand it.

12         MR. JONES:  Your Honor, yes, thank you.  This is Marc

13  Jones.

14         We did not make a motion essentially in order to talk

15  to Your Honor about this first, but in particular, the

16  Commission would point out that this behavior is troubling

17  whether or not those nine contentions are true.  Defendant,

18  through counsel, threatened a costly -- threatened to spare no

19  expense in a frivolous litigation, that defense counsel should

20  know that these statements are not subject to definition.

21  They're subject to the privilege that has to do with litigation

22  and particularly with investigations made by the government and

23  statements made.

24         And the Commission, although it has no authority to,

25  you know, enforce these rules, would point out under its --

1    under counsel's ethical obligations under the rules of

2    professional conduct, that this kind of behavior violates

3    several of the canons of professional misconduct, including

4    3.3, 3.4 and 8.4.  And in particular, you know, under 3.4, it's

5    not permitted to obstruct another party's access to evidence

6    unlawfully or to counsel or assist a witness or offer an

7    inducement to a witness, contrary to law, nor to

8    request another person --

9              THE COURT:  You know, but I'm not -- I get it.  I'm

10   not in a position to rule on that.  I want to get past the

11   threshold issue of whether Mr. Lemelson is Reverend Lemelson.

12   He says he has the documentation to prove it.  You can have

13   access to it.  And then once we get past that, then I can deal

14   with all the sub-issues, whether this was a threat of malicious

15   prosecution, intimidation, any of those kinds of things.  I

16   don't have anything before me, and I'm making no rulings on

17   that right now.  But I have to say it was sufficiently

18   troubling that I was raising it today.

19             MR. BROOKS:  Your Honor, this is Doug Brooks.  I just

20   want to -- what Mr. Jones just said is patently false.  The

21   litigation privilege would not apply here, and the Commission's

22   letter to the court failing to alert the court that it made

23   clear that it was not -- that it was not -- that Father Barbas

24   was not a witness in this case was to me deeply troubling, and

25   I know, Your Honor, you referenced a couple of times the firm I

1  come from, and I appreciate that.  And having run this by my

2  partners and given them all of the background, they were deeply

3  troubled by Commission's letter to the court as well.  I just

4  wanted the record to reflect that given Mr. Jones's comments

5  just now.

6          THE COURT:  Well, it will start sorting out when I

7  start seeing the documentation.  In any event, I have nothing

8  pending in front of me.  And I --

9          DEFENDANT LEMELSON:  Your Honor, if I could just speak

10  briefly again.

11          THE COURT:  Yes.  Is this Mr. Lemelson?

12          DEFENDANT LEMELSON:  Yes, it's Father Emmanuel.  I'm

13  sorry.  Your Honor, I just want to say I will comply swiftly

14  with your request to provide all of the documentation,

15  including dozens of text messages.  I served the Greek Orthodox

16  Metropolis of Boston for approximately four years directly at

17  the request of Reverend Father Barbas.

18          Just a quick clarification.

19          THE COURT:  No.  Excuse me.  That may be true, but I

20  also want the papers ordaining you, if that's the right word --

21          DEFENDANT LEMELSON:  Absolutely.

22          THE COURT:  -- a reverend, a father.

23          DEFENDANT LEMELSON:  Absolutely, yes.  Absolutely,

24  Your Honor.  I also -- I would just implore Your Honor to

25  please keep in the back of your mind that there is a priest

1  being crucified here, but it's not Father Ted Barbas, and I

2  will give you all of the documentation to substantiate in

3  writing every one of those nine points that my counsel asked

4  for.  It was never extortionate.  The $10,000 is a very

5  conservative estimate of our actual legal costs to simply get

6  Reverend Barbas to comply with the subpoena which the SEC gave

7  rise to.  And he repeatedly, over five or six weeks, lied to

8  our counsel.  He lied to Attorneys Marc Jones and --

9        THE COURT:  You know, I think at this point I'm

10  cutting this off because I have no motion in front of me, but I

11  do have, as I've said now three times, a troubling letter sent

12  by counsel to someone in a church, and I want to make sure that

13  there's a good faith basis for it, and you're going to be

14  filing that with me.  Right?

15        DEFENDANT LEMELSON:  Absolutely, yes.  Yes, Your

16  Honor, I will.

17        THE COURT:  All right.

18        DEFENDANT LEMELSON:  I will provide everything, and my

19  counsel already has almost all of it, actually, but we'll make

20  sure he has a hundred percent.

21        THE COURT:  And you've seen it, Mr. Brooks?

22        MR. BROOKS:  Yes, Your Honor, I have.

23        THE COURT:  Okay.  And you have not seen it, Mr. Jones

24  or Mr. Day?

25        MR. JONES:  Your Honor, this is Mr. Jones.  We have

1  not seen it, I don't believe.

2       THE COURT:  All right.  So to the best of your

3  knowledge, those documents are not existing in the

4  Metropolis of -- I may I have this wrong -- in the Greek

5  Orthodox Church here in Boston?

6       MR. JONES:  Your Honor, they do not seem to have been

7  produced in response to the subpoena, and they do not seem to

8  have been produced in our request to Father Barbas for

9  documentation when he said he didn't have it.

10       THE COURT:  Okay.  All right.  Thank you.  I'm not

11  taking any action on that, but I am imposing that order on

12  sanctions, and I think that's all for right now.  Is that

13  right?

14       MR. DAY:  Your Honor, this Al Day for the SEC.  With

15  the court's permission, we'd like to raise a few scheduling

16  matters at this point.

17       THE COURT:  Do you know, we may be the only proceeding

18  in the courthouse right now?

19       MR. DAY:  Okay.

20       THE COURT:  I don't know what the issues are that

21  could possibly not be able -- don't we have an order for things

22  going forward?

23       MR. DAY:  Yes, Your Honor.  We wanted to apprise the

24  court that I believe our next scheduled deadline is for summary

25  judgment briefing April 20.  We have agreed with counsel for

1  the defendants to put off expert depositions at this point.

2       THE COURT:  You know what, I'm not doing this.  If you

3  want to agree to this, just file -- I'm basically liberally

4  granting all motions for an extension at this point.

5       MR. DAY:  Okay.

6       THE COURT:  I don't need to deal with all of this.

7  Just stipulate and we'll add it in.  Okay?  This is -- this

8  court -- you literally are the only civil matter I'm hearing,

9  and other than a few criminal matters, I am not going to be

10  here.  I will be working virtually, and it's very difficult.

11  We have another criminal matter coming right up, and I need to

12  prepare for it.  So as far as I'm concerned this hearing is

13  over, and we will issue that order on sanctions.  And I hope

14  you all stay healthy, because I think this --

15       MR. JONES:  Your Honor, to you and all of the court

16  staff as well, we very much appreciate -- on behalf of all the

17  parties, I'm sure, we really appreciate your time today and

18  your dedication, and thank you for hearing us telephonically.

19  We very much appreciate it, and I apologize for any

20  awkwardness.

21       THE COURT:  We have a full staff in for this hearing.

22  So I want to thank them in particular as well.  We've made a

23  general exception to our rule that most civil has been closed

24  down and done and postponed basically, but this was enough of a

25  concern about shorting Ligand stock that I wanted to hold the

```
 1   hearing.
 2            All right.  Thank you very much.  We'll stand in
 3   recess.
 4   (Hearing adjourned 10:13 a.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1             C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8           I certify that the foregoing is a correct transcript

9    from the record of proceedings taken March 18, 2020 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    4/25/20

16

17   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
18

19

20

21

22

23

24

25