UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>THE AMVONA FUND, LP,<br><br>Relief Defendant. | Civil Action No. 1:18-cv-11926-PBS |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56(a) and Local Rule 56.1, plaintiff, the United States Securities and Exchange Commission (the "Commission" or "SEC") submits this memorandum in support of its motion for partial summary judgment.

**PRELIMINARY STATEMENT**

Defendants' selective enforcement defense has no merit. Defendants carry a heavy burden of proof and persuasion to establish a defense that is viable only in "truly horrendous situations" that do not exist here. Defendants have no evidence that they were singled out for some improper purpose, that the Commission lacked a rational basis to institute this fraud case, or that the Commission did so because of any malice toward Defendants. Nor do Defendants have evidence that this case was authorized outside the ordinary course of Commission business. Defendants' affirmative defense of selective enforcement should be rejected.

# BACKGROUND

I. **The Defendants and the Commission's Allegations**

Between May and October 2014, investment adviser and hedge fund manager Gregory Lemelson ("Lemelson") and investment advisory firm Lemelson Capital Management, LLC ("LCM") purchased short positions[1] in the stock of Ligand Pharmaceuticals, Inc. ("Ligand") for Lemelson's hedge fund, The Amvona Fund. [Statement of Facts, ¶¶1-3 ("[¶_]").] Between June and August 2014, Lemelson authored and published several "research reports" concerning Ligand. [¶4]. He also participated in live and written interviews concerning Ligand. [¶*id*.] These reports and interviews "questioned the legitimacy of Ligand's business model and practices." [¶5 .]

The Commission alleges the Defendants violated the securities laws in three ways: *First*, Defendants made four false factual statements about the viability of Ligand's flagship drug, the nature of Ligand's relationship with Viking Therapeutics, Inc., and Ligand's financial condition. *Second*, through these false statements and other conduct, Defendants engaged in a fraudulent "short and distort" scheme to profit from Defendants' short position by manipulating the market price of Ligand shares. *Third*, Defendants deceived investment advisory clients and prospective clients by making and disseminating false statements about The Amvona Fund's Ligand investment and by failing to disclose that the fund's positive returns from that position resulted from Defendants' stock price manipulation. [ECF 33 (Amended Complaint).]

II. **Defendants' Selective Enforcement Defense**

Defendants did not plead a selective enforcement defense in their answer, or at any time

---

[1] A short position is an investment technique whereby an investor seeks to profit when the price of a stock falls. [¶3.]

thereafter. Instead, they first asserted it at the close of discovery, as justification for the inclusion of certain Rule 30(b)(6) deposition topics about which the Commission sought a protective order. [ECF 45, pp. 16-17 (mentioning a "potential selective enforcement defense").] At that time, Defendants stated only that "some of the statements on which Ligand urged the Commission implicate Fr. Emmanuel's First Amendment rights to free speech and religious practice." [*Id.*, p. 18.]² When the SEC moved for a more definite statement about their potential defense, Defendants argued that the Commission treated them differently than other financial analysts because of Lemelson's religious affiliation or because the Commission was unduly influenced by Ligand's purported desire to suppress Lemelson's free speech rights. [ECF 108, p. 2 n. 1.]

In denying the Commission's motion for a more definite statement, Magistrate Judge Cabell found that the Commission had adequate notice of a defense predicated on the following snippets from Defendants' various court filings:

> "[N]ever before has the Commission brought a short-and-distort case against an individual who publicly disclosed that he was short the stock he was discussing" (D. 45 at 2), and the reason the Commission brought the case was because of extreme pressure from Ligand, who had falsely accused the defendant of using his "religious credentials to inspire false confidence and raise money." (D. 55). Or as the defendant most recently stated, "In essence, Defendants allege that they were treated differently by the Commission than other financial analysts because of Fr. Emmanuel's religious affiliation and because Ligand improperly convinced the Commission to pursue this meritless action to suppress Fr. Emmanuel's First Amendment right to free speech." (D. 108 at 2, n. 1).

[ECF 112.]

---

² At that time, Defendants did not assert that the Commission brought this case based on Defendants' exercise of free speech or religion. *Id.*

**ARGUMENT**

**I.   Summary Judgment on Defendants' Selective Enforcement Defense is Appropriate**

Defendants bear the burdens of proof and persuasion on an affirmative defense of selective enforcement. *Cordi-Allen v. Conlon*, 494 F.3d 245, 250 (1st Cir. 2007). To survive summary judgment, Defendants must produce competent evidence sufficient to persuade the Court that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995) (quoting *Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen*, 878 F.2d 16, 21 (1st Cir. 1989)); *see Aponte-Ramos v. Álvarez-Rubio*, 783 F.3d 905, 908 (1st Cir. 2015) (same). Courts frequently reject selective enforcement claims on summary judgment when the claimant fails to adduce strong evidence supporting each element. *See, e.g., Cordi-Allen*, 494 F.3d at 252 (affirming summary judgment for failure to establish "extremely high degree of similarity" required); *Baker v. Coxe*, 230 F.3d 470, 474-75 (1st Cir. 2000) (affirming summary judgment for failure to establish malice) (quoting *Rubinovitz*, 60 F.3d at 912). Defendants cannot carry their burden here, and the Commission's motion for partial summary judgment should be granted.

**II.   Defendants Have Not Been Treated Differently From Others Similarly Situated**

Defendants claim that they were singled out for enforcement when others similarly situated were not. This equal protection claim is available only "in truly horrendous situations." *Baker*, 230 F.3d at 474-75 (selective enforcement claim rejected absent evidence of the type of "extreme 'malicious orchestrated campaign' needed to surmount the constitutional threshold").

To date, Defendants have not identified anyone who was similarly situated to them but not charged. Nor can they. The Commission regularly pursues market manipulation cases

similar to this one. To illustrate, in 2011, both the Commission and the United States Attorney's Office in the Southern District of Florida brought actions related to the securities fraud of Barry Minkow. [¶11]. Minkow—a pastor at the time—orchestrated a scheme to drive down the price of the stock of a publicly-traded company he had shorted, through false and misleading statements on the Internet, in press releases, emails, YouTube videos, and the mail. Like Defendants, Minkow alleged wide-spread improprieties in the targeted company's financial reporting and business structure, as well as attacking the personal character of the company's management. [*Id.*] Both the USAO and the Commission investigated the case; the USAO indicted Minkow (who pled guilty and received a five-year sentence) and the Commission barred Minkow from association with any investment adviser, broker, or other specified securities-related entities. [*id.*] As another example, in *SEC v. Nielsen*, the Commission brought an enforcement action against an investor in a public company who, while partially disclosing his long position in the company's stock, issued numerous false and misleading statements intended to drive up the price of the stock while quietly selling his shares. [¶7.] This is the same conduct Defendants engaged in here, but instead of driving the stock price down, Nielsen sought to drive it up. *See also* Part III, *infra* (discussing these and other market manipulation cases brought by the Commission).

Defendants have not identified anyone who is similarly situated and not charged, and instead posit a hypothetical similarly situated individual who, among other things, publicly disclosed that he was short the stock he was discussing [ECF 45 at 2-3], or "other financial analysts." [ECF 108, at 2, n.1.] Neither is sufficient. *Freeman v. Town of Hudson*, 714 F.3d 29, 39-40 (1st Cir. 2013) (finding "failure to do more than conclusorily state that the [plaintiffs] were both similarly situated to and treated differently from unspecified 'other contractors' is

5

insufficient to survive the defendant's motion to dismiss"); *Comley v. Town of Rawley*, 296 F. Supp. 3d 327, 335 (D. Mass. 2017) (selective enforcement claim dismissed for failure to establish that others were similarly situated)*; Gianfresco v. Town of Wrentham*, 712 F.3d 634, 639 (1st Cir. 2013) (equal protection not adequately pled by identifying one other similarly situated entity).

Defendants bear the burden here, and their vague references to hypothetical categories of people do not suffice to define a class of similarly situated, yet uncharged, parties. They must produce evidence of "*specific instances* where persons *situated similarly in all relevant aspects* were treated differently.*"*[3] *Cordi-Allen*, 494 F.3d at 250–51 (emphasis in original); *see Aponte-Ramos*, 783 F.3d at 909 ("the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result."). And those persons must "have engaged in the *same* activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile." *Cordi-Allen*, 494 F.3d at 251 (citing *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996). Defendant Lemelson is an investment adviser acting as financial analyst who is alleged to have publicly made specific false factual statements about Ligand in an effort to drive down its stock price while disclosing his fund's short position.[4] They identify no such person.

But even if Defendants could identify some similarly situated yet uncharged person, they would also have to show that the government entity "knew of other violations but declined to

---

[3] Indeed, by failing to identify any similarly situated parties, Defendants have effectively denied the Commission the ability to do any investigation or discovery of whether those parties are, in fact, similarly situated.

[4] Insofar as Defendants claim that they were charged because of their religion, they would also need to show that the similarly situated yet uncharged individuals did not share Defendant Lemelson's religion (and show evidence that religion was the Commission's motive).

prosecute them.'" *LaTrieste Rest. v. Vill. of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999); *see also U.S. v. Armstrong*, 517 U.S. 456, 470 (1996) (discussing whether those similarly situated "were known to federal law enforcement officers, but not prosecuted in federal court"). Defendants would therefore have to produce evidence that the Commission knew about the allegedly similarly situated persons and nevertheless declined to enforce the securities laws—an evidentiary hurdle that Defendants cannot meet.

Further, the "agency's decision not to bring an enforcement action should be presumed immune from judicial review." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985). The fact that an agency's decision "involve[d] discretionary decisionmaking on a vast array of subjective, individualized assessments" can defeat a class-of-one claim even where other similarly situated parties have been identified. *Caesars Mass. Mgmt. Co. v. Crosby*, 778 F.3d 327, 336 (1st Cir. 2015) (finding *Engquist v. Oregon Dept. of Agric.*, 553 U.S. 591 (2008), limited class-of-one claims). Indeed, "[i]n the realm of . . . regulatory enforcement . . . an individual generally has no right to have the law go unenforced against him simply because others equally or more culpable than he have gone unpunished." *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1416 (S.D. Fla. 2014). When, for instance, a police officer tickets one speeding driver and not others, no "class-of-one" claim exists absent an improper motive for selecting that driver. *Engquist*, 553 U.S. at 603-604. To hold otherwise would mean that the Commission would have no charging discretion; to charge one person, it would be required to charge *every* party.

### III. The Commission Had A Rational Basis to Bring this Case.

If the Defendants could establish that they were similarly situated to specific others who were treated differently, their claim would still falter because no evidence shows that the Commission lacked a rational basis for initiating this action. Here, the Court should apply an "exceptionally deferential" standard to the Commission's decisions, allowing a claim for

7

selective enforcement to succeed only if "the decision to treat an individual differently than those similarly situated is wholly arbitrary or irrational." *Wojcik v. Mass. State Lottery Comm'n,* 300 F.3d 92, 104 (1st Cir. 2002). In discretionary decision-making about regulatory enforcement even similarly situated parties may be treated differently for myriad reasons, including new decision-makers, new or renewed enforcement priorities, the egregiousness of a particular case, or any other legitimate reason. *See Caesars Mass. Mgmt. Co.*, 778 F.3d at 336 (recognizing that *Engquist*, 553 U.S. 951, extends well beyond public employment context).

The Commission has a Congressional mandate to root out misconduct in the securities markets, including market manipulation of any stripe. *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (discussing Congress's objective in passing the Securities Exchange Act). While Defendants claim this case is "unprecedented,"[5] it's not. The Commission has charged lots of individuals and entities for similar conduct:[6] making false statements about a stock they were holding in an effort to move the price of that stock and make a profit. [*e.g.,* ¶¶6-13.] When the statements are designed to drive up the price of the stock, that scheme is known as a "pump-and-dump." [¶6.] When the aim is to drive down the price of the stock, we call that a "short-and-distort." [¶10.] While the Commission has brought more pump-and-dumps than short-and-distorts, at base, they are similar schemes that the Commission prosecutes frequently.

Further, the Commission pursues this type of misconduct—market manipulation—

---

[5] Even if it were so, the fact that a particular case is the first of its kind is irrelevant; there will always be a "first case" challenging any type of misconduct.

[6] This is not to say that all market manipulators are necessarily similarly situated to Defendants, but rather that the Commission has a rational and compelling interest in enforcing the securities laws to combat market manipulation, generally. *See Walker v. Exeter Region Coop. Sch. Dist.*, 284 F.3d 42, 44 (1st Cir. 2002) ("Decisions may sometimes use the similarly situated language to conflate the two inquiries—by pointing to a differentiating characteristic so self-evidently a basis for a reasonable classification as to show both dissimilarity and reasonableness at the same time.").

wherever it is found and in whatever form it takes, including in the instant case. For example,[7] the Commission has brought the following "pump-and-dump" and "short-and-distort" enforcement actions:

*Pump-and-Dump Cases*:

- *SEC v. Nielsen*, N.D. Cal. Case No. 5:20-cv-03788 (June 9, 2020) (action against investor with partially disclosed long position who sought to drive stock price up with false and misleading public statements). [¶7.]

- *SEC v. Musk*, SEC Press Rel. No. 2018-226 (Sept. 29, 2018) (settled action against Tesla, Inc. founder and CEO Elon Musk arising out of misleading tweets that caused Tesla stock to jump by over six percent in value). [¶8.]

- *SEC v. Thompson, et al.*, SEC Lit. Rel. No. 23137 (Nov. 21, 2014) three penny stock promoters charged with engaging in pump-and-dump scheme with respect to disclosed long positions in five public companies). [¶9.]

*Short-and-Distort Cases*:

- *U.S. v. Minkow,* 11-cr-20209 (S.D. Fla. 2011); *In the Matter of Minkow*, Inv. Adv. Release IA-3320 (November 22, 2011) (parallel SEC/DOJ investigation of pastor-investment adviser who engaged in short-and-distort campaign; after guilty plea, defendant sentenced to five years in prison and barred from industry). [¶11.]

- *SEC v. Berliner*, SEC Lit. Rel. No. 20537 (April 24, 2008) (short-and-distort case in which trader spread false rumor about pending acquisition of public company to drive stock price down and profit from short position). [¶12.]

- *SEC v. Jakob*, SEC Lit. Rel. No. 16671 (Aug. 31, 2000); *U.S. v. Jakob*, CR-00-1002 (C.D. Cal. 2000) (parallel civil and criminal actions against trader who issued fake press release to drive down stock price and profit from short position). [¶13.]

While the scheme charged in this case is of a kind the Commission frequently prosecutes, this case has an additional factor not usually present in market manipulation cases: Defendants are investment advisers with clients and concomitant fiduciary duties, and not simply market commentators trading on their own account. [¶¶1-3.] Defendants are charged with violating

---

[7] These are but a few illustrative examples; it is not a comprehensive list of market manipulation cases.

both Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] ("Manipulative and Deceptive Devices") and Section 206 of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-6] ("Prohibited transactions by investment advisers") and Rule 204(4)-8 thereunder. [ECF 33, ¶9.] Defendants' misrepresentations about Ligand were made not only to the investing public, but to Defendants' clients and prospective clients in violation of that rule. [*Id.*, ¶¶ 7, 31, 55-56.] This additional bad behavior provides a rational basis for any difference in treatment from financial analysts who are not investment advisers and who did not use a fraudulent short-and-distort campaign to solicit new hedge fund business.

There is another reason to view Defendants' selective prosecution argument with skepticism. The Commission, not the staff, authorizes enforcement actions. [¶14.] That determination is the culmination of an extensive internal process. The Commission has up to five Commissioners (four when this case was authorized). [¶15; 15 U.S.C. § 78d(a).] After investigating potential violations of the federal securities laws, the staff of the SEC's Division of Enforcement may recommend to the Commission that it authorize the filing of a civil enforcement action. [¶16.] The putative Defendant(s) typically have an opportunity to address the staff's preliminary determination to recommend an enforcement action through a "Wells process"[8] that typically includes written submissions ("Wells submissions") and in-person meetings with senior officers of the Division of Enforcement.[9] [¶18.] The staff's

---

[8] A Wells notice—named for former SEC Commissioner John Wells—is a communication from the staff of the SEC's Division of Enforcement to a person involved in an investigation that: (1) informs the person the staff has made a preliminary determination to recommend that the Commission file an action or institute a proceeding against them; (2) identifies the securities law violations that the staff has preliminarily determined to include in the recommendation; and (3) provides notice that the person may make a submission to the Division and the Commission concerning the proposed recommendation. [¶17.]

[9] Defendants availed themselves of that process by making two written submissions addressing the staff's recommendation, and meeting with one of the co-directors of the Division of Enforcement. [¶¶23-28.] Defendants did not raise a selective enforcement defense in their submissions or meeting with the co-director. [¶29.]

recommendation—along with any Wells submission—is reviewed by senior officers and staff in the Division of Enforcement and then each relevant Division and Office within the Commission, including the Office of General Counsel and Enforcement's Office of Chief Counsel. [¶19.] Then the Enforcement staff submits the recommendation to the Commissioners. [¶20.] Commissioners and their staff then review the recommendation and any Wells submissions. [¶21.] Then, and only then, do the Commissioners vote on the recommendation. [¶22.]

Defendants undertook discovery focusing on their selective prosecution claim and found no evidence that suggests that this process was insufficient to protect against cases being brought in bad faith, that it was not followed, or that the Commission's decision to authorize this case lacked a rational basis. Indeed, Courts presume that government officials have properly discharged their official duties. *U.S. v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926); *U.S. Postal Service v. Gregory*, 534 U.S. 1, 10 (2001) ("a presumption of regularity attaches to the actions of Government agencies"); *U.S. v. Armstrong*, 517 U.S. 456, 464 (1996) (same).

## IV.   No Evidence of Malicious or Bad Faith Intent to Injure Defendants

Defendants' allegation of bad faith or malicious intent is unsupported by any facts. Even at summary judgment, the "malice/bad faith standard should be scrupulously met." *Rubinovitz*, 60 F.3d at 911. Defendants must establish a "gross abuse of power, personal hostility, extreme vindictive action, illegitimate animus or ill will." *Walsh v. Town of Lakeville*, 431 F. Supp. 2d 134, 145 (D. Mass. 2006); *see also Rubinovitz*, 60 F.3d at 912 (gross abuse of power is a "malicious orchestrated campaign causing substantial harm."). To get relief, the "bad faith" should be "wholly unrelated to any legitimate state objective." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Purportedly uneven enforcement of the law is insufficient to support a claim of bad faith. *Martex Farms, S.E. v. U.S. E.P.A*, 559 F.3d 29, 32 (1st Cir. 2009).

Here, Defendants allege three ill-defined bases for why they think they were treated

unfairly: (1) undue influence by Ligand's counsel; (2) hostility to Defendant Lemelson's religion; or (3) an effort to suppress Defendant Lemelson's free speech rights. These vague allegations look nothing like the bad faith courts have found sufficient to sustain a selective enforcement defense. *Compare Rubinovitz*, 60 F.3d at 912 (finding official's "malicious orchestrated campaign" against landlord who had evicted official's friend, involving the recruitment of other city officials to retaliate against landlord, was "barely enough" for summary judgment); *Tapalian v. Tusino*, 377 F.3d 1, 7 (1st Cir. 2004) (Saris, J.) (town official's demand for "a forty-foot boat and two girls" to approve a project and retaliation after plaintiff refused was sufficient to constitute gross abuse of power) *with Barrington Cove Ltd. P'ship v. R.I. Hous. and Mortgage Fin. Corp.*, 246 F.3d 1, 10-11 (1st Cir. 2001) ("mere fact" that defendants "may have violated or abused federal or state regulatory regimes in wrongfully imposing an excessive fee" not sufficient); *Wojcik*, 300 F.3d at 105 (termination of employee to protect public perception of agency not sufficient).

### A. *No Evidence of Undue Influence by Ligand or its Counsel.*

Defendants' suggest that Ligand's counsel had an improper motive or exerted undue influence when it (supposedly) convinced the Commission to authorize this case. But *Ligand's* motive is irrelevant to the selective enforcement defense, which must rest on the motives of the Commission, and not a victim of the fraud. Insofar as Defendants rest their claim on Ligand's motives, without any evidence that the Commission acted because of those motives, their affirmative defense is legally deficient. *E.g., Tapalian*, 377 F.3d at 5-6 (focusing on actions of government official and whether official's actions constituted a "gross abuse of power.").

Defendants appear to claim that Ligand and its counsel somehow improperly influenced the Commission, and that the Commission thus elected to authorize this case in bad faith. But there is no evidence Ligand's counsel actually exerted undue influence here. Defendants'

amended Rule 30(b)(6) notice sought testimony, which was provided, on the topic of "the relationships between SEC and Ligand's counsel."  [¶30.]  The theory, apparently, was that Ligand's lead counsel (Bradley J. Bondi of Cahill, Gordon & Reindel LLP), who was once employed at the Commission, leveraged "relationships" with SEC personnel to cause this case to be brought.  In fact, no one who had any involvement in the investigation, supervision, review, or authorization of this case had anything more than a passing professional acquaintance with Mr. Bondi (most hadn't heard of him at all), with one exception:  Commissioner Peirce knows Mr. Bondi and considers him a friend; she communicates with him a few times a year but did not discuss this case—or any other Commission business—with him.  [¶38.]  One of four Commissioners knowing counsel for a victim (but not talking to him about the case) is far too thin a reed to support the weight of an accusation that the Commission was strong-armed into violating Defendants' constitutional rights.

Defendants also sought 30(b)(6) testimony on "[p]re-litigation communications between the SEC and Ligand regarding Defendants, including but not limited to meetings between Ligand and the SEC."  [¶30.]  Defendants imagine that Ligand's counsel was too cozy with Commission staff.  The Commission's designee testified that Ligand and its counsel brought Defendants' conduct to the attention of the Division of Enforcement, met twice with the staff, and communicated with the staff on a number of subjects, such as meeting logistics and alerting the staff to new public statements by Lemelson about Ligand.  [¶¶39-41.]  None of this was unusual or untoward.  Indeed, there is nothing wrong with people who believe themselves to be victims of a securities law violation bringing to the Commission's attention the facts and circumstances underlying that belief.  In fact, it is encouraged.  [¶40.]  And there is nothing wrong with a victim or the victim's counsel encouraging the SEC to take action.

13

There is also no evidence that Ligand's counsel had some special access to or influence over the staff.  Many of Ligand's communications to the staff elicited no response.  [¶42.]  When seeking updates about the status of any investigation into Defendants' conduct, Ligand's counsel was repeatedly told that the staff couldn't provide any detail.  [¶41.]  Ligand's counsel requested additional in-person meetings, including proposing a meeting with the Co-Directors of the Division of Enforcement, but each request was declined.  [¶42.]  Ligand's counsel was not informed that this action had been authorized before it was publicly filed.  [¶42.]  In the end, Ligand's routine interactions with the SEC fall far short of demonstrating the malicious intent Defendants must show to maintain affirmative selective enforcement defense.

### B. *No Evidence of Animosity Based on Defendant Lemelson's Religion.*

Defendants' claim of religious discrimination fares even worse.  Defendants have no evidence whatsoever that animus toward Defendant Lemelson's religion prompted the filing of this case.  What is more, Defendants could have asked about the subject in discovery but barely raised the topic.  Defendants' 30(b)(6) notice to the Commission did not contain any topics referring to Defendant Lemelson's religious affiliation.  [¶¶30-31.]  At the 30(b)(6) deposition, when the subject came up tangentially, the Commission's witness testified there were *no* communications between Ligand representatives and Commission staff about Defendant Lemelson's religious affiliation other than a passing reference in a presentation.  [¶¶32-35.] Ligand's CEO, John Higgins, was also asked a handful of questions about Defendant Lemelson's religious affiliation, only one of which concerned communications with Commission staff.  Mr. Higgins did not recall the subject of that question being discussed with the staff.  [¶36.]

While Defendant Lemelson's dual roles as hedge fund manager and priest were the topic of several questions during the Commission's investigative testimony and the Defendant's deposition, nothing about that questioning shows animus.  Naturally, when a defendant occupies

14

two positions of trust (priest and investment adviser) and a victim has raised the possibility of an affinity fraud, the Commission's staff *must* ask questions about those dual roles.  In fact, the Commission frequently investigates and prosecutes securities law violations by individuals with religious occupations—not because of the defendants' religious affiliations, but because they abused their positions of trust and confidence to commit securities fraud.  *See, e.g., SEC v. Ovid, et al.*, SEC Lit. Rel. No. 20998 (Apr. 14, 2009) (seven church leaders charged with fraudulent investment scheme targeting elderly parishioners); *SEC v. Feiner, et al.*, SEC Lit. Rel. No. 24848 (July 6, 2020) (rabbi and others charged in connection with fraudulent investment scheme targeting Orthodox Jewish community); *SEC v. Holley, et al.*, SEC Press Rel. 2017-74 (March 30, 2017) (pastor charged with fraudulent real estate investment scheme targeting churchgoers). [¶37.]  And, when Commission counsel will be cross-examining a priest who has put his religious affiliation at issue, deposition questions on the subject are appropriate.  Under these circumstances, questioning about the Defendant's religious occupation does not evince the sort of discriminatory conduct that could establish selective enforcement.

In short, nothing in the record remotely suggests that anyone at the Commission decided to investigate or charge this case because of Defendant Lemelson's religious affiliation.

        **C.**      *No Evidence of Intent to Punish the Exercise of Free Speech.*

While Defendants claim that Ligand wished to suppress Defendant Lemelson's free speech rights (presumably his right to criticize the company in ways that are not misleading), they do not appear to allege that was the Commission's motive.  [ECF No. 108, at 2, n. 1; ECF No. 112.]  As detailed above, whatever Ligand's or its counsel's motive was in reporting Defendants' fraud to the Commission is irrelevant to the question of selective enforcement *by the Commission*.

As a threshold matter, Lemelson's misrepresentations do not fall within the protection of

15

the First Amendment for two reasons: First, "the First Amendment does not shield fraud." *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) (addressing fraudulent charitable solicitation). The intentional lie is "no essential part of any exposition of ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). "Laws directly punishing fraudulent speech survive constitutional scrutiny even where applied to pure, fully protected speech." *Commodity Trend Serv., Inc. v. CFTC*, 233 F.3d 981, 992 (7th Cir. 2000). And second, the "First Amendment deals with the free exchange of ideas and not with commercial 'factual' speech." *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1305-06 (2d Cir. 1971) (citing *Valentine v. Chrestensen*, 316 U.S. 52, 62 S. Ct. 920, 86 L. Ed. 2d 1262 (1942)). Communications concerning the sale and purchase of securities (the subject of the allegations here) form "a distinct category of communications in which the government's power to regulate is at least as broad with respect to the general rubric of commercial speech." *SEC v. Wall St. Publ'g*, 851 F.2d 365, 373 (D.C. Cir. 1998). Either way, "[p]unishing fraud, whether it be common law fraud or securities fraud, simply does not violate the First Amendment." *SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 255 (4th Cir. 2009).

In any event, there is no evidence at all that the Commission was motivated to punish Defendants for commenting on Ligand. Defendants did not even propose a 30(b)(6) topic on the subject of Defendants' First Amendment rights and there were no questions on that subject in any deposition in this case. [¶¶30-33.] Nothing in the record suggests that the Commission was motivated by any improper purpose to suppress Defendants' rights—First Amendment or otherwise.

## **CONCLUSION**

Defendants have made serious accusations about the actions and motives of the

Commission and its counsel without any evidence—or even a good faith basis—to support those accusations. Their unsupported allegation of selective enforcement fails on both facts and law. The Court should enter summary judgment for the Commission on the affirmative defense of selective enforcement.

Dated: September 30, 2020

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

*/s/ Marc J. Jones*
Marc J. Jones (BBO #645910)
Alfred A. Day (BBO #654436)
Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
617-573-8947 (Jones)
617-573-4537 (Day)
JonesMarc@sec.gov
DayA@sec.gov

**CERTIFICATE OF SERVICE**

    I hereby certify that, on September 30, 2020, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

                                        */s/ Marc J. Jones*
                                        Marc J. Jones