UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>THE AMVONA FUND, LP,<br><br>Relief Defendant. | Civil Action No. 1:18-cv-11926-PBS |

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 56.1, plaintiff Securities and Exchange Commission ("the Commission") submits this statement of undisputed facts in support of its motion for summary judgment against Defendants.

**Gregory Lemelson and Lemelson Capital Management, LLC**

1. Lemelson Capital Management, LLC ("LCM") is the investment adviser to The Amvona Fund, LP. [ECF No. 34 (Defendants' Answer) at ¶18.]

2. Gregory Lemelson (a/k/a "Father Emmanuel," hereinafter "Lemelson") is an exempt reporting adviser [Appendix of Exhibits, Ex. 1 (hereinafter "Ex.__") (Lemelson Dep., Oct. 16, 2019), 22:14-21.]

3. Between May 2014 and October 2014, Lemelson purchased short positions in the stock of Ligand Pharmaceuticals, Inc. through his hedge fund, The Amvona Fund. A short

position is an investment technique whereby an investor seeks to profit when the price of a stock falls. [ECF No. 34 (Defendants' Answer) at ¶¶1, 3.]

4. Between June 2014 and August 2014, Lemelson authored research reports concerning Ligand. Between June 2014 and October 2014, Lemelson participated in live and written interviews concerning Ligand. [*Id.*, ¶4.]

5. Lemelson and LCM, through these reports and interviews, publicly disseminated information "that questioned the legitimacy of Ligand's business model and practices." [*Id.*, ¶¶22-23.]

**The Commission's Prosecution of Cases Similar to this One**

6. When an entity or individual makes fraudulent misrepresentations designed to drive up the price of a stock they own, that scheme is known as a "pump-and-dump." [Ex. 2 (pump and dump explanation from SEC website).]

7. In *SEC v. Nielsen*, the Commission brought an enforcement action against an investor in a public company who, while partially disclosing his long position in the company's stock, issued numerous false and misleading statements intended to drive up the price of the stock while quietly selling his shares. *SEC v. Nielsen*, N.D. Cal. Case No. 5:20-cv-03788 (complaint filed June 9, 2020). [Ex. 3.]

8. In *SEC v. Musk*, SEC Press Rel. No. 2018-226 (Sept. 29, 2018), the Commission brought and settled an action against Tesla, Inc. founder and CEO Elon Musk arising out of misleading tweets that caused Tesla stock to jump by over six percent in value. [Ex. 4.]

9. In *SEC v. Thompson, et al.*, SEC Lit. Rel. No. 23137 (Nov. 21, 2014), the Commission brought a securities fraud action against three penny stock promoters who engaged in a pump-and-dump scheme with respect to disclosed long positions in five public companies. [Ex. 5]

10. When an entity or individual makes fraudulent misrepresentations designed to drive down the price of the stock in which they have taken a short position, that scheme is known as a "short-and-distort." [Ex. 6 (Investopedia short and distort explanation).]

11. Both the Commission and the United States Attorney's Office in the Southern District of Florida brought actions related to the securities fraud of Barry Minkow. *See In the Matter of Minkow*, Inv. Adv. Release IA-3320 (November 22, 2011). Minkow—a pastor at the time—orchestrated a scheme to drive down the price of the stock of a publicly-traded company he had shorted, through false and misleading statements on the Internet, in press releases, emails, YouTube videos, and the mail. Like Defendants, Minkow alleged wide-spread improprieties in the targeted company's financial reporting and business structure, as well as attacking the personal character of the company's management. Both the USAO and the Commission investigated the case; the USAO indicted Minkow (who pled guilty and received a five-year sentence) and the Commission barred Minkow from association with any investment adviser, broker, or other specified securities-related entities. [Ex. 7 (USAO Press Release and SEC follow-on)].

12. The Commission brought a short-and-distort case in 2008 known as *SEC v. Berliner*, SEC Lit. Rel. No. 20537 (April 24, 2008). In *Berliner,* a trader was alleged to have spread false rumors about pending acquisition of public company to drive stock price down and profit from short position). [Ex. 8.]

13. The Commission brought a short-and-distort case in 2000 known as *SEC v. Jakob*, SEC Lit. Rel. No. 16671 (Aug. 31, 2000); *U.S. v. Jakob*, CR-00-1002 (C.D. Cal. 2000). *Jakob* involved parallel civil and criminal actions against trader who issued fake press release to drive down stock price and profit from a short position. [Ex. 9.]

3

## The Commission's Authorization Process

14. The Commission, not the staff, authorizes enforcement actions. [Ex. 10 (Enforcement Manual), at p. 22.]

15. The Commission has five Commissioners, each of whom is appointed by the President and confirmed by the Senate. 15 U.S.C. § 78d(a). When this case was considered, the Commission only had four Commissioners.

16. After investigating potential violations of the federal securities laws, the staff of the SEC's Division of Enforcement may recommend to the Commission that it authorize the filing of a civil enforcement action, as it did in this case. [Ex. 10, at 22-23.]

17. A Wells notice—named for former SEC Commissioner John Wells—is a communication from the staff of the SEC's Division of Enforcement to a person involved in an investigation that: (1) informs the person the staff has made a preliminary determination to recommend that the Commission file an action or institute a proceeding against them; (2) identifies the securities law violations that the staff has preliminarily determined to include in the recommendation; and (3) provides notice that the person may make a submission to the Division and the Commission concerning the proposed recommendation. [*Id.* at 19.]

18. The putative Defendant(s) typically have an opportunity to address the staff's preliminary determination to recommend an enforcement action through a "Wells process" that typically includes written submissions ("Wells submissions") and in-person meetings with senior officers of the Division of Enforcement. [*Id.* at 19-22].

19. The Enforcement staff's recommendation that the Commission authorize the filing of a civil enforcement action, along with any Wells submission, is reviewed by senior officers and staff in the Division of Enforcement and then each relevant Division and Office

within the Commission, including the Office of General Counsel and Enforcement's Office of Chief Counsel. [*Id.* at 22-23]

20. Once the recommendation has gone through this process, it is submitted to the Commissioners for their consideration. [*Id.*]

21. The Commissioners and their staff review the recommendation and any Wells submissions. [*Id.*]

22. Then, and only then, do the Commissioners vote on the recommendation. [*Id.* at 23.]

**Defendants' Submission to the Commission**

23. On October 20, 2016, Defendants' prior counsel submitted a 36-page white paper to staff of the Commission's Division of Enforcement setting out the reasons they believed they should not be charged. [Ex. 11 (Day Decl.) at ¶2.]

24. On May 25, 2017, Defendants were given a Wells notice, informing them of the charges the staff of the Commission's Division of Enforcement were prepared to recommend to the Commission and the factual basis underlying each of those charges. [*Id.* at ¶3.]

25. On June 30, 2017, Defendants submitted a 40-page Wells response detailing their reasons why the staff should not recommend the charges detailed in the Wells notice. [*Id.* at ¶4.]

26. On October 4, 2017, Defendants' prior counsel met with a Co-Director of the SEC's Division of Enforcement, Steven Peikin, as well as with Enforcement staff, to discuss the investigation and possible charges. [*Id.* at ¶5.]

27. On April 26, 2018, Defendants were given a Supplemental Wells Notice, informing them of further charges the staff of the Commission's Division of Enforcement were prepared to recommend to the Commission and the factual basis underlying each of those charges. The additional charges concerned violations of the Investment Advisers Act of 1940. [*Id.* at ¶6.]

28. On June 15, 2018, Lemelson submitted an 11-page supplemental Wells response detailing reasons why the staff should not recommend the Advisers Act charges. The same day, LCM and The Amvona Fund submitted a 5-page supplemental Wells response. [*Id.* at ¶7.]

29. In their white paper and subsequent Wells submissions, Defendants did not raise or otherwise articulate selective enforcement as a reason the staff should not recommend charges to the Commission. [*Id.* at ¶8.]

**Defendants' Failure to Adduce Evidence About of Religious Bias, Punishment for Exercise of Free Speech, or Other Improper Motive**

30. In a Notice of Deposition dated July 30, 2020, Defendants sought 30(b)(6) testimony from the Commission on three topics:

> 1. The SEC's analysis and mathematical calculation of Ligand's debt-to-tangible equity ratio.
>
> 2. Communications between the SEC and media sources concerning its non-public investigation of Defendants.
>
> 3. Pre-litigation communications between the SEC and Ligand regarding Defendants, including but not limited to meetings between Ligand and the SEC, how such meetings were arranged, and the relationships between SEC and Ligand's counsel.

[Ex. 12 (July 30, 2020 Notice of Deposition to the SEC).]

31. The July 30, 2020 Notice of Deposition did not contain any topics referring to Defendant Lemelson's religious affiliation or his exercise of First Amendment rights. [*Id.*]

32. The 30(b)(6) deposition of the Commission took place on August 6, 2020. The Commission's 30(b)(6) designee was David Becker, an Assistant Director in the SEC's Division of Enforcement. [Ex. 13 (Deposition of Commission's Rule 30(b)(6) designee, Aug. 6, 2020).]

33. There were no questions posed during the 30(b)(6) deposition of the Commission

regarding Defendant Lemelson's exercise of First Amendment rights. Further, the phrases "First Amendment" and "free speech" do not appear in any of the deposition transcripts or transcripts on investigative testimony in this matter. [Ex. 11 (Day Decl.) at ¶10.]

34. Defendant Lemelson's religious affiliation only came up in passing during the 30(b)(6) deposition of the Commission:

> Q. Were there ever any communications between the SEC and any representative of Ligand concerning Father Emmanuel Lemelson's status as a priest?
>
> MR. JONES: Are you talking before filing the litigation or at any time?
>
> MR. BROOKS: Yeah, before the filing of litigation.
>
> A. I think if you look at the PowerPoint decks that Ligand provided to the SEC and presented at -- during the meetings, there is an indication of that and it appears that that was mentioned in passing during the presentation, but that's all I'm aware of.

[Ex. 13, at 120:20-121:6.]

35. There are no other instances of the following words and phrase in the transcript—"religion," religious," "priest," "church," or "Greek Orthodox." [Ex. 11 (Day Decl.) at ¶11.]

36. Ligand's CEO, John Higgins, was also asked a handful of questions about Defendant Lemelson's religious affiliation, only one of which concerned communications with Commission staff. He did not recall the subject of that question ever being discussed with the Commission's staff. [Ex. 14 (Deposition of John Higgins, Dec. 11, 2019) at 223:14-17.]

37. The Commission frequently investigates and prosecutes securities law violations by individuals with religious occupations. *See, e.g., SEC v. Ovid*, *et al.*, SEC Lit. Rel. No.

7

20998 (Apr. 14, 2009) (seven church leaders charged with fraudulent investment scheme targeting elderly parishioners); *SEC v. Feiner, et al.*, SEC Lit. Rel. No. 24848 (July 6, 2020) (rabbi and others charged in connection with fraudulent investment scheme targeting Orthodox Jewish community); *SEC v. Holley, et al.*, SEC Press Rel. 2017-74 (March 30, 2017) (pastor charged with fraudulent real estate investment scheme targeting churchgoers). [Exs. 15, 16, 17 (litigation releases/complaints).]

**No Evidence of Improper Influence by Ligand or Ligand's Counsel**

38. With one exception, the Commissioners who authorized this case had nothing more than a passing professional acquaintance with counsel for Ligand, including Ligand's lead outside counsel, Bradley J. Bondi of Cahill, Gordon & Reindel LLP, who was once employed at the Commission. Commissioner Peirce knows Mr. Bondi and considers him a friend; she communicates with him a few times a year but did not discuss this case—or any other Commission business—with him. [Ex. 13 (R. 30(b)(6) Dep.), at 127:6-130:17.]

39. In preparing Mr. Becker to testify as the Commission's 30(b)(6) designee with respect to Topic 3, Commission counsel inquired of 29 current and former Commissioners, Commissioners' counsel, senior officers of the Division of Enforcement, and Division of Enforcement staff who were involved in investigating, recommending charges to the Commission, and/or authorizing this enforcement action. While Defendants' counsel did not ask, this inquiry revealed that none had anything more than a passing professional familiarity with any of Ligand's inside or outside counsel, including Mr. Bondi (with the exception of Commissioner Peirce as noted above). [Ex. 11 (Day Decl.) at ¶12.]

40. The SEC maintains a system for persons with knowledge of potential violations of the securities laws to report relevant information to the SEC. The system, which is accessible via the SEC's public website, is referred to as the TCR system, which stands

for "tips, complaints, and referrals." [Ex. 13 (R. 30(b)(6) Dep.), at 52:8-53:9.] The Commission encourages people who believe themselves to be victims of a securities law violation to bring to the Commission's attention the facts and circumstances underlying that belief. [Ex. 10 (Enforcement Manual), at 7-9]

41. Ligand and its counsel brought Defendants' conduct to the attention of the Division of Enforcement by filing two TCRs—one in 2014 and another in 2015. [Ex. 13 (R. 30(b)(6) Dep.), at 55:5-13, 69:23-70:12.] Before this case was filed, Ligand representatives and counsel met twice with Division of Enforcement staff regarding the two TCRs—once on September 25, 2014 and again on June 8, 2015. [Ex. 13 (R. 30(b)(6) Dep.), at 53:15-55:4, 62:14-63:1, 72:14-73:8; 84:24-87:9.] In addition to the two in-person meetings, Ligand's counsel communicated with Division of Enforcement staff via email, voicemail, and telephone from time to time during the period September 2014 through March 2018. [*See generally id.* at 53:15-121:6.] These communications were all routine: several concerned meeting logistics. [*See, e.g., id.* at 56:21-57:2, 79:10-80:6.] A number of communications reflect Ligand's counsel providing additional information about Defendants' conduct—such as new tweets by Lemelson, an interview of Lemelson in which he discussed Ligand, and a letter to Congress written by Lemelson—after the June 8, 2020 meeting. [*See, e.g., id.* at 88:6-23, 90:12-21, 91:4-20, 98:1-19, 102:20-103:5, 104:7-12.] Ligand's counsel also asked for updates about any investigation into Defendants' conduct and was informed by the staff—repeatedly—that the staff cannot provide any detail other than to say that the investigation is ongoing. [*See, e.g., id.* at 98:20-99:7, 107:17-108:11, 110:3-20, 115:14-116:7, 117:10-24.]

42. Ligand's counsel's communications to the staff often elicited no response from the staff at all. [*See, e.g., id.* at 88:6-13, 90:12-21, 91:4-20, 98:1-19, 113:2-15.] And, although

Ligand's counsel requested meetings with the staff and/or the Co-Directors of the Division of Enforcement on several occasions, those requests were declined. [*See, e.g., id.* at 92:11-93:12, 111:19-112:10, 117:10-24.] Ligand's counsel was not informed that this action had been authorized before it was publicly filed. [*Id.* at 119:5-13.]

DATED: September 30, 2020

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

*/s/ Marc J. Jones*
Marc J. Jones (BBO #645910)
Alfred A. Day (BBO #654436)
Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
617-573-4537 (Day)
617-573-8947 (Jones)
JonesMarc@sec.gov
DayA@sec.gov
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that, on September 30, 2020, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

*/s/ Marc Jones*
Marc Jones