1            UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3          CIVIL ACTION NO. 1:18-CV-11926-PBS

4

5    _____

6    SECURITIES AND EXCHANGE COMMISSION,

7              PLAINTIFF,

8    V.

9    GREGORY LEMELSON AND LEMELSON CAPITAL

10   MANAGEMENT, LLC,

11             DEFENDANTS,

12        AND

13   THE AMVONA FUND, LP,

14             RELIEF DEFENDANT.

15   _____

16

17

18              30(b)(6) DEPOSITION OF:

19          DAVID BECKER ON BEHALF OF THE SEC

20              CONDUCTED REMOTELY

21              BETHESDA, MARYLAND

22       THURSDAY, AUGUST 6TH, 2020 AT 9:43 A.M.

23

24

1                    A P P E A R A N C E S

2

3   ON BEHALF OF THE SECURITIES AND EXCHANGE COMMISSION:

4        MARC JONES

5        AL DAY

6        33 ARCH STREET, 24TH FLOOR

7        BOSTON, MASSACHUSETTS 02110

8        TELEPHONE NO. (617) 573-8900

9        E-MAIL: JONESMARC@SEC.GOV

10

11  ON BEHALF OF DEFENDANTS, GREGORY LEMELSON, ET AL.:

12       DOUGLAS S. BROOKS

13       BRIAN J. SULLIVAN

14       LIBBYHOOPES, P.C.

15       399 BOYLSTON STREET

16       BOSTON, MASSACHUSETTS 02116

17       TELEPHONE NO. (617) 338-9300

18       FACSIMILE NO. (617) 338-9911

19       E-MAIL:  DBROOKS@LIBBYHOOPES.COM

20                BSULLIVAN@LIBBYHOOPES.COM

21

22

23  ALSO PRESENT:

24       FATHER EMANUEL LEMELSON

3

1                                I N D E X

2                                                             PAGE

3    DIRECT EXAMINATION BY MR. BROOKS                         6

4    CROSS-EXAMINATION BY MR. JONES                           132

5    REDIRECT EXAMINATION BY MR. BROOKS                       137

6                        _____

7                              E X H I B I T S

8    NUMBER                    DESCRIPTION                    PAGE

9    EXHIBIT 167    NOTICE OF DEPOSITION                      9

10   EXHIBIT 168    COMPLAINT                                 20

11   EXHIBIT 169    POWERPOINT PRESENTATION, 9-25-2014        32

12   EXHIBIT 170    POWERPOINT PRESENTATION, 6-8-2015         38

13   EXHIBIT 171    BLOOMBERG ARTICLE                         44

14   EXHIBIT 172    E-MAIL, RE: NEW MATTER                    74

15   EXHIBIT 173    E-MAIL, RE: LIGAND PHARMACEUTICALS        82

16   EXHIBIT 174    E-MAIL, RE: LIGAND                        92

17   EXHIBIT 175    E-MAIL, RE: LEMELSON'S LETTER TO SENATE 101

18   EXHIBIT 176    E-MAIL, RE: LEMELSON'S TWEET ABOUT LIGAND 104

19   EXHIBIT 177    E-MAIL, RE: CONFIDENTIAL                  109

20   EXHIBIT 178    STEPHANIE AVAKIAN WIKIPEDIA PAGE          121

21   EXHIBIT 179    STEVEN PEIKIN WIKIPEDIA PAGE              123

22   EXHIBIT 180    BRADLEY J. BONDI WIKIPEDIA PAGE           124

23   EXHIBIT 181    SEC FORM 1662                             131

24   EXHIBIT 182    LETTER FROM MR. BONDI, 3-21-2016          135

4

1                          S T I P U L A T I O N S

2

3   The 30(b)(6) deposition of DAVID BECKER on behalf of the

4   Securities and Exchange Commission taken remotely via Zoom in

5   Bethesda, Maryland on Thursday, the 6th day of August, 2020 at

6   9:43 a.m., said deposition was taken pursuant to Notice for use

7   in accordance with Federal Rules of Civil Procedure.

8

9   It is agreed that Kelley K. Bohan, being a Notary Public and

10  Court Reporter for the State of Massachusetts, may swear the

11  witness remotely and that the reading and signing of the

12  completed transcript by the witness is not waived.

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    P R O C E E D I N G S
 2            COURT REPORTER:  This is Kelley Bohan.  I am a court
 3    reporter, and I am a notary public in the Commonwealth of
 4    Massachusetts.
 5            This deposition is being taken remotely.  This witness
 6    is appearing remotely from Bethesda, Maryland
 7            The attorneys participating in this proceeding
 8    acknowledge their understanding that I am not physically present
 9    in the proceeding room, nor am I physically present with the
10    witness and that I will be reporting this proceeding remotely.
11    They further acknowledge that, in lieu of an oath administered
12    in person, the witness will verbally declare his testimony in
13    this matter under the pains and penalties of perjury.  The
14    parties and their counsel consent to this arrangement and waive
15    any objections to this manner of proceeding.
16            Please indicate your agreement by stating your name
17    and your agreement on the record, after which I will swear in
18    the witness and we may begin.
19            MR. BROOKS:  This is Doug Brooks, I agree.
20            MR. JONES:  This is Marc Jones for the plaintiff, we
21    agree as well.
22            MR. SULLIVAN:  Brian Sullivan for the defendants, and
23                I echo Mr. Brooks, we agree.
24            _____
```

1    knowledge, please answer.

2          THE WITNESS:  Yeah, it wasn't my understanding that we

3    were ever tasked with determining the source for the Bloomberg

4    article, so no.

5    BY MR. BROOKS:

6          Q.    Okay.  Let's switch gears to the third topic of

7    today's 30(b)(6) deposition.

8                As of 2014, was there a protocol in place with the SEC

9    for people outside the SEC to report perceived securities

10   violations to the commission?

11         A.    Yes.  I think as long as I've been at the commission,

12   we have a system called the Tips, Complaints, and Referrals

13   system where people -- -

14         Q.    I'm sorry, Mr. Becker, you just broke up a little bit.

15   What's the system called?

16         A.    Tips, Complaints, and Referrals, TCR, that people can

17   just refer complaints or tips or violations to.

18         Q.    And can you just briefly describe how the TCR system

19   works?

20         A.    It's changed over time in the sense that the database

21   has been revamped, but it's basically a database that is

22   operated by a group within enforcement.  I think it's the Office

23   of Market Intelligence that handles it.  And there's a group of

24   people who are responsible for taking in tips, complaints, and

1    referrals; making an initial determination of whether or not
2    there might be any merit to it; and then assigning it to a group
3    within enforcement for further evaluation.
4        Q.   Okay.  Is the --
5        A.   Sorry, go ahead.
6        Q.   Can you finish?  Yeah, why don't you finish.  I
7    interrupted you.
8        A.   I was just going to say it's recorded within the TCR
9    system.
10       Q.   Is the TCR system any different if the people
11   reporting the perceived security violations are counsel?
12            MR. JONES:  If you know from personal knowledge,
13   David.
14       A.   I don't know the answer to that.
15       Q.   We've looked at the two PowerPoint presentations dated
16   September 25th, 2014 and June 8th, 2015; correct?
17       A.   We've looked, yeah, we looked at the presentations.
18       Q.   And I believe you testified that you were aware that
19   there was a meeting between the SEC and representatives for
20   Ligand concerning Defendants on September 25th, 2014; right?
21       A.   Yes.
22       Q.   Was that the first in-person meeting between the SEC
23   and representatives for Ligand concerning Defendants?
24       A.   It is the first one that we have been able to

1  identify, yes.

2       Q.   Okay.  And who was at that September 25th, 2014

3  meeting?

4       A.   On behalf of Ligand, it was I believe two attorneys

5  from Latham & Watkins, I believe the Chicago office, John Sikora

6  and an associate who -- were not sure, but it was either Heather

7  Waller or Andrea Lofgren.

8            And then on behalf of Ligand itself: John Higgins,

9  Matt Foehr, Charles Berkman, and Nishan de Silva.

10           And on behalf of the commission, I believe it was

11 Kevin Kelcourse and Scott Stanley.

12      Q.   And at the time, what were the positions within the

13 commission of Mr. Kelcourse and Mr. Stanley?

14      A.   Mr. Stanley was a staff attorney.  Mr. Kelcourse was

15 an assistant director, I believe.

16      Q.   Okay.  Were they assigned to a particular regional

17 office?

18      A.   They both worked out of Boston, the Boston office.

19      Q.   Okay.  Did you know any of those Latham & Watkins

20 attorneys from your time at that firm?

21      A.   No.  John Sikora and I overlapped briefly at the SEC.

22 I think he left in maybe 2012 or so.  He was in the Asset

23 Management Unit while I was in the Asset Management Unit, but I

24 don't believe I ever actually met or spoke with him.

1       Q.    Okay.  So we've just talked about the first in-person

2   meeting between the SEC and Ligand, which as far as you're

3   aware, occurred on September 25th, 2014; correct?

4       A.    Yes.

5       Q.    When was the first communication of any kind between

6   the SEC and representatives for Ligand concerning Defendants?

7       A.    The first one that we are aware of was on September

8   11th, 2014.

9       Q.    What was the nature of that communication?

10      A.    Ligand submitted a TCR tip complaint or a referral

11   regarding the defendants through Mr. Sikora.

12      Q.    Okay.  Was that submitted to anybody in particular?

13      A.    Not to my knowledge.

14      Q.    Okay.  And after September 11th, 2014, what was the

15   next communication between the SEC and representatives for

16   Ligand?

17      A.    I believe that Mr. Kelcourse spoke with Mr. Sikora by

18   phone at some point between September 11th and September 22nd,

19   but we don't know the exact date.

20      Q.    Was anyone else on that call?

21      A.    Not to my knowledge, no.

22      Q.    What was discussed on that call?

23      A.    I don't know.  And I don't believe Mr. Kelcourse

24   recalls.

1        Q.    What, if any, relationship did Mr. Sikora and

2   Mr. Kelcourse have prior to September 2014?

3        A.    I believe that they were both assistant directors in

4   the Asset Management Unit at the SEC prior to Mr. Sikora's

5   departure.  I don't know for how long they overlapped.  I don't

6   know if they -- how often they spoke to each other or if they

7   ever spoke to each other.

8        Q.    Okay.  Did Mr. Sikora specifically reach out to

9   Mr. Kelcourse prior to the phone call?

10       A.    Prior to the phone call, Mr. Kelcourse is not sure.

11  He said it's possible that Mr. Sikora reached out to him before

12  that phone call.

13       Q.    Is Mr. Kelcourse still with the SEC?

14       A.    He is.

15       Q.    Okay.  In the same position?

16       A.    No.

17       Q.    What's his position today?

18       A.    He is in the Office of Compliance Inspections and

19  Examinations.  I believe he is an associate director or

20  associate regional director, but I'm not positive about that.

21       Q.    After the September 2014 phone call between Mr.

22  Kelcourse and Mr. Sikora, what is the next communication that

23  occurred between the SEC and representatives for Ligand?

24       A.    On September 24th of 2014, John Sikora e-mailed Kevin

 1  Kelcourse and saying effectively: thanks for agreeing to meet

 2  with us, and we'll bring four Ligand personnel with us.

 3      Q.   What was he referring to when he -- strike that.

 4           When had Mr. Kelcourse agreed to meet with Mr. Sikora?

 5      A.   I don't know.  It's possible that occurred on that

 6  September 22nd call, but I don't know the answer to that.

 7      Q.   Does the SEC perceive anything unusual with Mr.

 8  Kelcourse agreeing to meet with representatives of Ligand?

 9           MR. JONES:  Objection.  Does the SEC perceive anything

10  as unusual?  I don't understand the question.

11      Q.   Well, is there anything unusual about the SEC's

12  agreeing to meet with Ligand to hear its complaints against

13  Defendants?

14           MR. JONES:  Again, that's beyond topic 3.  But to the

15  extent that you know, David, from your personal knowledge,

16  please answer.

17      A.   From my personal knowledge, no.  I'm not aware of

18  anything unusual about that.

19      Q.   Okay.  Were there any communications between the SEC

20  and representatives for Ligand between the September 24th, 2014

21  e-mail you just mentioned and the in-person meeting the

22  following day?

23      A.   If I said September 24th, 2014, I should have said

24  September 22nd.

58

1      Q.   Okay.  So --

2      A.   Did I say 24th?

3      Q.   So that's what I wrote down in my notes, but I could

4   have got that wrong.  In any event, you're clarifying that the

5   e-mail you discussed was September 22nd?

6      A.   Yes, the one that says thanks for agreeing to meet

7   with us.

8      Q.   Yeah.

9      A.   Okay.  And I -- I...

10      Q.   Go ahead.

11      A.   I believe there was a subsequent e-mail on September

12   24th from Latham & Watkins to Mr. Kelcourse and Scott Stanley

13   which included a presentation that they were going to use at the

14   meeting.

15      Q.   Okay.  As far as you're aware, is that the

16   presentation that we saw earlier today?

17      A.   As far as I'm aware, yes.

18      Q.   Okay.  Just so we kind of close the loop, were there

19   any communications between the SEC and representatives of Ligand

20   between the e-mail you referenced on September 22nd, 2014 and

21   the e-mail you referenced on September 24th of 2014?

22      A.   Not that I'm aware of.

23      Q.   Okay.  Were there any communications between the SEC

24   and representatives for Ligand after the September 24th, 2014

59

1   e-mail and before the September 25th, 2014 in-person meeting?

2        A.   Again, not that I'm aware of.

3        Q.   All right.  And I believe you testified that meeting

4   took place in the Boston regional office?

5        A.   I'm not sure I did, but I believe that's correct.

6        Q.   Was the location of the meeting something that the SEC

7   decided?

8        A.   I don't know the answer to that.  I'd say that

9   typically in the enforcement division when someone wants to meet

10  us, we usually host them at our offices if possible.

11       Q.   Why was it at the Boston regional office as opposed to

12  another regional office?

13       A.   Mr. Kelcourse and Mr. Stanley are based in the Boston

14  regional office.

15       Q.   So --

16       A.   I should say I don't know for a fact that that's the

17  case, but it would have been odd for that meeting to be held

18  anywhere else.

19       Q.   But did Ligand's TCR complaint go specifically to the

20  Boston office?

21       A.   Did it go specifically to the Boston office?  Not that

22  I'm aware of.  It looks like it may have been assigned to Mr.

23  Kelcourse and Mr. Stanley after it was submitted.

24       Q.   Okay.  And who makes the decision of how it gets

60

1   assigned?

2       A.   There are people within the office --

3            MR. JONES:  Objection.  David, just -- I want to

4   object that this is beyond topic 3.  To the extent, David, that

5   you know from your personal knowledge, you can answer, but

6   that's not exactly a pre-litigation communication with Ligand.

7   So if you know personally, go ahead.

8            THE WITNESS:  Sure.  My understanding is that there

9   are certain people within the Office of Market Intelligence

10  whose job it is to [inaudible] tips, complaints, and referrals

11  --

12           COURT REPORTER:  I didn't hear the beginning of that,

13  I'm sorry.

14           THE WITNESS:  Sure.  It's my understanding that there

15  are people within OMI, the Office of Market Intelligence, whose

16  responsibility is to assign TCRs out to teams within

17  enforcement.

18  BY MR. BROOKS:

19      Q.   But you don't know how it happened specifically with

20  this communication, correct?

21      A.   In this case, no, I do not.

22      Q.   Okay.  So let's talk about the September 25th, 2014

23  meeting.  Other than the people you've mentioned, was there

24  anyone else there?

1    A.   Not that I'm aware of, no.

2    Q.   Okay.  How long approximately did the meeting last?

3    A.   Approximately one hour.

4    Q.   Okay.  And was that PowerPoint presentation that we've

5    looked at, was that presented during the meeting?

6    A.   Yes.

7    Q.   Okay.  Did Ligand's representatives provide any other

8    documentation to the SEC in connection with that meeting?

9    A.   Are you asking at that meeting, or what time frame are

10   you talking about?

11   Q.   Well, let's break it down then.  At the meeting, did

12   Ligand's representatives provided the SEC with any additional

13   documentation?

14   A.   I don't believe so.

15   Q.   Did Ligand's representatives provide the SEC with any

16   additional documentation before the meeting?

17   A.   Not that I'm aware of, no.

18   Q.   And did Latham & Watkins on behalf of Ligand ever

19   provide the SEC with additional documentation concerning

20   Defendants?

21   A.   On September 26th, 2014, its law firm Latham & Watkins

22   e-mailed a PowerPoint presentation to Kevin Kelcourse.

23   Q.   Was that a different PowerPoint presentation than had

24   previously been e-mailed by Latham?

1          A.   I don't know.

2          Q.   Okay.  Does the SEC still have a copy of that

3     PowerPoint presentation that was e-mailed on September 26th,

4     2014?

5          A.   I don't know the answer to that.

6          Q.   Did anyone from the SEC take notes at the September

7     25th, 2014 meeting?

8          A.   If they did, we do not have them.  To my knowledge,

9     no.

10         Q.   Other than the September 26th, 2014 e-mail that you

11    just referenced, were there any communications between Ligand's

12    representatives and the SEC related to Defendants in 2014?

13         A.   I'm sorry, can you repeat that?

14         Q.   Yeah.  So let's -- well, let's do it like this, so --

15    well, let's step back.  Let's talk about the September 25th,

16    2014 meeting first.  What was discussed?

17         A.   Ligand and its counsel and representatives presented

18    the material in their PowerPoint presentation, and, you know, it

19    was an hour long meeting so my understanding is that the

20    discussion didn't deviate much from that.

21         Q.   Okay.  What, if anything, did the SEC representatives

22    at that meeting say to Ligand's representatives?

23         A.   We don't have a record of that, and I'm not aware that

24    they actually said anything to Ligand representatives of

1   substance.

2      Q.   Okay.  Do you know how that meeting ended?

3      A.   I do not.

4      Q.   Okay.  So after that September 25th, 2014 meeting, was

5   the next communication between the SEC and Ligand the September

6   26th, 2014 e-mail that you've previously discussed?

7      A.   Yes.

8      Q.   After Latham sent the e-mail on September 26th, 2014,

9   what was the next communication between the SEC and Ligand's

10  representatives?

11     A.   On October 27th, 2014, John Sikora sent Kevin

12  Kelcourse a letter from Mr. Berkman at Ligand with attachments

13  that had been submitted as an updated version of the TCR.

14     Q.   Okay.  And does the SEC still have a copy of that?

15     A.   I believe so, but not I'm sure.

16     Q.   Okay.  After that October 27th, 2014 e-mail --

17         Well, first of all, did the SEC ever respond to Mr.

18  Sikora based on that October 27th, 2014 e-mail?

19     A.   Based on that e-mail?  I don't believe so.

20     Q.   Okay.  And I missed this, I'm sorry, was that e-mail

21  on October 27th, 2014 sent to anyone in particular at the SEC?

22     A.   The e-mail I believe went to Mr. Kelcourse, I thought

23  I said that.

24     Q.   Oh, okay.  But as far as you know, Mr. Kelcourse

64

1   didn't respond?

2        A.   As far as I'm aware, he did not.

3        Q.   Okay.  After October 27th, 2014, what was the next

4   communication between the SEC and Ligand's representatives?

5        A.   On November 12th, 2014, Mr. Sikora e-mailed Mr.

6   Kelcourse asking to touch base regarding the TCR.

7        Q.   Does the SEC have that e-mail?

8        A.   I would expect so, but I don't know.

9        Q.   Did Mr. Kelcourse respond to Mr. Sikora's November

10  12th, 2014 e-mail?

11       A.   Mr. Kelcourse recalls a telephone call to follow up.

12       Q.   When did that phone call take place?

13       A.   I believe it took place the same day, but I'm not

14  certain.

15       Q.   Okay.  What was said on the phone call that took place

16  on or around November 12th, 2014?

17       A.   Okay, I should take back -- I don't know when this

18  phone call took place.  I don't even know whether to say I

19  believe it took place the same day, so it was after that.

20       Q.   Okay.

21       A.   What was discussed on the phone call?  I believe Mr.

22  Kelcourse informed Mr. Sikora that the Boston regional office

23  didn't currently have the resources to pursue the allegations

24  that Ligand was making against Defendants and that the matter

1   was being referred to the Massachusetts Securities Division, and

2   he provided a contact point at the Massachusetts Securities

3   Division to Mr. Sikora.

4        Q.   Who was that contact point?

5        A.   I'm sorry?

6        Q.   Who was the contact point --

7        A.   I don't know.

8        Q.   -- at the Massachusetts Securities Division?

9        A.   Yes, I don't know.

10       Q.   What else, if anything, was said on this telephone

11  call between Mr. Kelcourse and Mr. Sikora?

12       A.   Mr. Kelcourse doesn't recall if he raised this or if

13  this was a question that Mr. Sikora had brought up, but he

14  advised Mr. Sikora that the Boston office didn't have any

15  objection to Latham approaching the home of office of the SEC

16  about the TCR.

17       Q.   I'm sorry, you broke up a little there.  He didn't

18  have any objection to Latham approaching?

19       A.   To Latham approaching the home office, which is

20  Washington, of the SEC about the TCR.

21       Q.   Did Latham approach the home office of the SEC about

22  the TCR?

23       A.   It appears that they did, yes.

24       Q.   Okay.  So when was that?

1      A.   On December 16th of 2014 -- [inaudible] -- in the

2  Office of Market Intelligence, OMI, spoke to Mr. Sikora on the

3  -- [inaudible] -- from Mr. Kelcourse.

4          MR. JONES:  Can I just pause for one second?  David,

5  can you just make sure that you don't have your paper on top of

6  your microphone, it may be muffling your microphone.

7          COURT REPORTER:  Can we go off the record for one

8  moment?

9          MR. BROOKS:  We can go off, yeah, sure.

10         MR. JONES:  Yes.

11  (OFF THE RECORD, 11:38 A.M. TO 11:39 A.M.)

12  BY MR. BROOKS:

13      Q.   So, I'm sorry, I had a little trouble hearing you, so

14  what was the communication, Mr. Becker, that took place on

15  December 16th, 2014?

16      A.   Sure.  The Office of Market Intelligence, a gentleman

17  named Vincente Martinez spoke to John Sikora and Sikora had been

18  referred to him by Kevin Kelcourse.

19      Q.   And what was discussed on that call?

20      A.   That Mr. Martinez informed Mr. Sikora that OMI could

21  not reassign a closed TCR to the home office.  The TCR that had

22  been submitted to Boston had been closed out in the TCR system.

23      Q.   When was the TCR closed out?

24      A.   Sometime at or around September -- I'm sorry,

67

1  November, mid-November, but I don't know the exact date.

2      Q.   Was anything else said on this December 16th, 2014

3  call?

4      A.   Not that I know of.

5      Q.   Okay.  Just to step back to make sure I didn't miss

6  anything, were there any communications, other than what you've

7  already testified about, between October 27th, 2014 and December

8  16th, 2014 between the SEC and any representatives for Ligand?

9      A.   No.

10      Q.   So after the December 16th, 2014 phone call that

11  you've testified about, what was the next communication between

12  the SEC and any representatives for Ligand?

13      A.   That would have occurred in what we believe to be late

14  April or early May of 2015.

15      Q.   And what was the nature of that communication that

16  you're referring to?

17      A.   Counsel for Ligand mentioned to Scott Friestad that he

18  would be referring a short-and-distort case to the SEC.

19      Q.   Okay.  Let's take this step by step.  Who was that

20  counsel for Ligand?

21      A.   I believe it was Brad Bondi at Cahill.

22      Q.   Okay.  And was this an in-person communication?

23      A.   It's not clear whether it was in person, phone, or

24  e-mail.

1      Q.   Okay.  What, if any, record does the SEC have

2 concerning this communication between Mr. Bondi and Mr. Friestad

3 in late April or early May 2015?

4      A.   I actually don't know the answer to that.  It may have

5 been purely Mr. Friestad's recollection.

6      Q.   During this communication, did Mr. Bondi tell

7 Mr. Friestad that Ligand had previously submitted a TCR

8 concerning Defendants?

9      A.   I don't know and I don't believe we have any record

10 that that was part of the conversation.  I think all we know is

11 that Mr. Bondi was reaching out because Scott Friestad had

12 previously handled a previous matter called Berliner, which is

13 what we sometimes refer to as a short-and-distort action.

14      Q.   What, if any, relationship did Mr. Bondi and

15 Mr. Friestad have at the time of this late April or early May

16 2015 communication?

17      A.   I think they knew who each other was, beyond that, I

18 don't believe they had any relationship.

19           MR. JONES:  Doug, can I interrupt for one minute?  I

20 just want to put on the record that, and I think you know this,

21 Mr. Friestad has passed away.  So we were not able to talk to

22 him in preparation, so we're a little limited in this.

23           MR. BROOKS:  Yeah, of course.  Thank you, Marc.

24 BY MR. BROOKS:

1        Q.   Let me ask, as part of any preparation for today's

2   deposition, do you know if the SEC looked at e-mails between

3   Mr. Friestad and Mr. Bondi that were in the SEC's possession?

4        A.   Relating to this matter?

5        Q.   Yes.

6        A.   Are you asking if we looked for or looked at or both?

7        Q.   Looked for.

8        A.   Yes, I believe we did.

9        Q.   Okay.  Do you know if the SEC found any communications

10   between Mr. Friestad and Mr. Bondi other than those that the SEC

11   had already produced to Defendants in this case?

12        A.   I have --

13            MR. JONES:  Just let me object.  I'm not sure that

14   Mr. Becker knows every document that's actually been produced to

15   the defendants.  So to the extent that you know, David, please

16   answer.  And, Doug, to the extent you want to follow up with us,

17   we can follow up.

18            THE WITNESS:  If your question is whether I'm aware of

19   any e-mails between Mr. Friestad and Mr. Bondi relating to this

20   matter that was not produced, I am not aware of any such

21   e-mails.

22   BY MR. BROOKS:

23        Q.   Did Mr. Bondi or any of his colleagues ever submit a

24   complaint through the TCR system?

1      A.    I believe they did.

2      Q.    When was that?

3      A.    Well, let me back up to the start of your question.

4   Was your question whether Mr. Bondi submitted a TCR?

5      Q.    Well, whether Mr. Bondi or anyone at his law firm

6   submitted a TCR.

7      A.    I am not aware of anybody at his law firm having

8   submitted a TCR.  There was a TCR that was submitted I believe

9   by Ligand's CEO.

10     Q.    When was that?

11     A.    It would have been in the first half of 2015.  I don't

12  know the exact date.

13     Q.    Okay.  Do you know whether it was before the initial

14  contact between Mr. Bondi and Mr. Friestad?

15     A.    No.  In other words, I think I mentioned that that

16  initial contact appears to have been late April or early May.

17  Do I know if it occurred before that?  No, I don't know.

18     Q.    Okay.  After that initial contact between Mr. Bondi

19  and Mr. Friestad, when was the next time the SEC communicated

20  with any representative for Ligand concerning the defendants?

21     A.    On May 18th, 2015, Mr. Friestad e-mailed Mr. Bondi.

22     Q.    Okay --

23     A.    I should say that, you're probably going to ask what

24  was the substance of the e-mail, he e-mailed to find out the

1  status of the referral that Mr. Bondi had mentioned before.  And

2  Mr. Bondi told him that they would be submitting shortly, which

3  suggests that the TCR may not have gone in until after that

4  date, but I don't know that for a fact.

5      Q.   Okay.  And we'll get into some of these communications

6  in a minute, but let me just skip ahead slightly a couple of

7  weeks.  Ultimately, was there an in-person meeting between the

8  SEC and representatives for Ligand on June 8th, 2015?

9      A.   Yes.

10     Q.   Was that the first in-person meeting between the SEC

11 and representatives for Ligand since the September 25th, 2014

12 meeting concerning Defendants?

13     A.   Yes, regarding this matter.  And the only reason I'm

14 giving that as a caveat is other divisions of the SEC may be

15 meeting with Ligand for completely unrelated reasons, I have no

16 knowledge about that.

17     Q.   I may have misspoke.  I meant to bake that into my

18 question, but thanks for that clarification.

19          And where did the June 8th, 2015 meeting take place?

20     A.   The home office of the SEC.

21     Q.   Okay.  Why did the second meeting take place in a

22 different office than the first meeting?

23     A.   Well, I think I mentioned that the Boston office had

24 advised Ligand that they didn't have the resources at the time

1    to pursue the matter but didn't object to a referral of the

2    matter to the home office in D.C., and I think the expectation

3    was that it would be a D.C. based team to investigate the matter

4    if it were to go forward.

5           Q.   In your experience, is that unusual at the SEC to have

6    a second office take a look at the same case?

7           A.   In my experience?

8           Q.   Yes.

9           A.   No.

10          Q.   Has it happened before?

11          A.   Yes.

12          Q.   How many times?

13          A.   I don't know.

14          Q.   And I may have asked you this, I'm sorry if I did, but

15   can you tell me who was present at the June 8th, 2015 meeting

16   between the SEC and representatives for Ligand?

17          A.   Sure.  On the SEC's behalf it was Scott Friestad,

18   Virginia Rosado Desilets, Jeffrey Finnell, Jennifer Clark, and

19   Rachel Leggett.

20               On Ligand's behalf it was John Higgins, Matt Foehr,

21   Charles Berkman, and James Oberdahl (phonetic).

22               And from Cahill, Ligand's counsel, they had Brad

23   Bondi, Sean Tonolli, and Devon Holstad.

24          Q.   For each of the SEC representatives, can you just tell

1  me what their positions at the SEC were at the time of the June

2  2015?

3      A.   Scott Friestad was an associate director in

4  enforcement.  Virginia Rosado Desilets was senior counsel in

5  enforcement.  Jeff Finnell was an assistant director in

6  enforcement.  Jennifer Clark was a legal assistant in

7  enforcement.  And Rachel Leggett was an intern with the

8  enforcement division.

9      Q.   Okay.  And I think you testified that in your

10  experience it's not necessarily unusual to get a second meeting

11  with a different regional office; is that fair?

12      A.   I think what I said was it's not necessarily unusual

13  for a second office to take a look at a matter.

14      Q.   Are you aware that my request for a Wells meeting in

15  the case was denied by the SEC?

16          MR. JONES:  Objection.  It's beyond the scope of the

17  topics.  David, if you know for a fact whether or not that's

18  true, you can testify from personal knowledge.

19      A.   From my personal knowledge, I understand that that's

20  correct.  I also understand that Defendants' counsel got a

21  previous Wells meeting.

22      Q.   Right.  And so your understanding is the reason I was

23  denied a Wells meeting was because Defendants' prior counsel

24  already had one, correct?

74

1          A.   I have --

2               MR. JONES:  Objection.  I instruct him not to answer.

3      You're asking what the reason the SEC's attorneys decided to

4      give or not give a second meeting, that's attorney-client

5      opinion work product.

6      BY MR. BROOKS:

7          Q.   Do you know one way or another that whether if I had

8      previously worked for the SEC I would have been able to get a

9      second Wells meeting?

10              MR. JONES:  Objection, that's hypothetical, and it's

11     actually quite argumentative, and I'm going to instruct him not

12     to answer.

13              MR. BROOKS:  It's hypothetical.  I didn't intend it to

14     be argumentative.

15              MR. JONES:  It's not about inten --

16              MR. BROOKS:  Brian, if you could pull up tab 9?  I

17     think this is the e-mail that Mr. Becker was referring to

18     earlier.

19              (EXHIBIT 172 MARKED FOR IDENTIFICATION)

20              MR. SULLIVAN:  I have now distributed what is Exhibit

21     172.  If people could just confirm that they have access to it.

22     It begins with --

23              MR. BROOKS:  I do.

24              MR. SULLIVAN:  Okay.

1              THE WITNESS:   I've got it.  When we have a chance,
2    Doug, can we take a break?
3              MR. BROOKS:  Now is perfect, let's do it.
4    (OFF THE RECORD, 11:54 A.M. TO 12:05 P.M.)
5    BY MR. BROOKS:
6         Q.   Mr. Becker, I understand from your counsel that you
7    have a clarification concerning the September 26th, 2014 e-mail
8    which contained a copy of a PowerPoint presentation?
9         A.   Yeah.  So I think I indicated earlier that this is a
10   PowerPoint presentation.  I didn't know if it differed from the
11   one that had been provided a couple of days earlier, from
12   checking it was indicated to the SEC by Latham that the
13   presentation contained a minor revision, and they listed
14   investors in Ligand, but was otherwise the same.
15        Q.   And you cut out a little bit.  So the only change was
16   a list of Ligand's investors?
17        A.   A minor revision and a list of Ligand's investors.
18   And if you're going to ask what the minor revision was, I don't
19   know that.
20        Q.   Okay.  And was a list of Ligand's investors added the
21   first time?
22        A.   Is your question was that list entirely new?
23        Q.   Yes.
24        A.   I believe so.

1      Q.   Okay.  Does that exhaust your knowledge about the

2  September 26th, 2014 e-mail with the PowerPoint presentation?

3      A.   It does.

4      Q.   Okay.  So right before the break you were shown an

5  e-mail which is -- is that Exhibit 172 now?

6      A.   Yes.

7      Q.   Okay.  Do you have that in front of you?

8      A.   I do.

9      Q.   And so if you go to the last page or -- yes, the last

10  page, do you see an e-mail from Mr. Friestad to Mr. Bondi dated

11  May 18th, 2015?

12      A.   May 18th, 2015, yes.

13      Q.   Okay.  And is this the e-mail that you've previously

14  testified about?

15      A.   You're going to have to refresh my memory.

16      Q.   I believe, but obviously correct me if I'm wrong, I

17  had asked what the next communication was between the SEC and

18  Ligand after the late April/early May 2015 communication between

19  Mr. Friestad and Mr. Bondi, and you indicated there was an

20  e-mail from Mr. Friestad to Mr. Bondi on May 18th, 2015?

21      A.   Yes.

22      Q.   Is this the --

23      A.   I believe this is the e-mail that I was talking about

24  there, yeah.

77

1        Q.   Okay.  This particular e-mail chain runs from May 18th

2   to May 21, 2015; do you see that?

3        A.   Yes.

4        Q.   Okay.  Other than what's contained in Exhibit 172,

5   were there any communications between the SEC and any

6   representatives of Ligand between May 18th and May 21, 2015?

7        A.   I'm just looking to see whether or not this is

8   included in the e-mail string that we're looking at now.

9             All right, so as not to take up a bunch of time, on

10  May 20th, Ligand e-mailed Scott Friestad through Mr. Bondi about

11  the impact of Defendants' short reports on the company; and

12  whether that's part of this chain or not, I can't actually tell.

13       Q.   Do you know who Mr. Bondi is?

14       A.   Generally, yes.

15       Q.   Okay.  Are you aware of whether Mr. Bondi used to work

16  at the SEC?

17       A.   I am aware that he did, yes.

18       Q.   Okay.  Do you know what his role was at the SEC?

19       A.   I know that at a certain point in time he was counsel

20  to two different commissioners.

21       Q.   Do you know which commissioners those were?

22       A.   I believe it was Commissioner Troy Paredes and Paul

23  Atkins.  I should mention that at some point while he was

24  employed at the SEC, he was also detailed to the Financial

1  Crisis Inquiry Commission as deputy general counsel; that's not
2  within in the SEC, but it's something that he did while he was,
3  I believe, still on the SEC's payroll.
4        Q.   Okay.  I had previously asked you whether Mr. Bondi
5  had a relationship with Mr. Friestad prior to May 2015, let me
6  ask:  Did Mr. Bondi have any relationship with Jeffrey Finnell
7  prior to May 2015?
8        A.   I don't believe so other than a general awareness of
9  who the other person is.
10       Q.   Prior to May 2015, did Mr. Bondi have any relationship
11 with Virginia Rosado Desilets?
12       A.   No.
13            MR. JONES:  Doug, can we just clarify, by
14 relationship, do you mean like a personal relationship,
15 socializing, having worked closely with the person; that's what
16 you mean, right?
17            MR. BROOKS:  I mean personal or professional.
18            THE WITNESS:  I mean I guess a question I have when
19 you say professional relationship, does that potentially
20 include, you know, just being aware of who the other person is,
21 does it include having worked on matters on the other side, it's
22 a little unclear.
23 BY MR. BROOKS:
24       Q.   Well, let's -- but, yeah, I get it -- let's do this,

1    let me ask it a little bit differently.  Prior to May 2015,

2    what, if any, relationship did Mr. Bondi have with Jeffrey

3    Finnell?

4         A.    None that I'm aware of.

5         Q.    Okay.  Same question as between Mr. Bondi and

6    Ms. Rosado Desilets?

7         A.    None that I'm aware of.

8         Q.    Okay.  So after the first e-mail in Exhibit 172 --

9    strike that.  I guess it's the last one.

10              After the e-mail at the top of page 1 on Exhibit 172

11   which is dated May 21st, 2015, what was the next communication

12   between the SEC and any representative of Ligand?

13        A.    There was an e-mail between Mr. Bondi and Mr. Friestad

14   just about moving the timing of the meeting from 10:30 to 2:00

15   for travel schedules.

16        Q.    What was the date of that e-mail?

17        A.    May 23rd, 2015.

18        Q.    Okay.  After that May 23rd, 2015 e-mail that you've

19   just mentioned, what was the next communication between Ligand

20   and any representative -- or between Ligand and the SEC?

21        A.    Sean Tonolli at Cahill e-mailed Virginia Rosado

22   Desilets on June 4th of 2015 to ask how many copies of the

23   binder or presentation materials he should bring to the meeting.

24        Q.    Okay.  And so -- yeah, yeah, go ahead, I'm sorry.

1        A.    You can ask more questions or I can...

2        Q.    You can finish your thought.  I didn't mean interrupt,

3    I thought you were done.

4        A.    Sure.  And he also was confirming that they would

5    deliver a PowerPoint presentation and who the attendees on

6    Ligand's behalf would be.

7                MR. JONES:  Just a pause for one minute.  Doug or

8    Brian, I think every time you guys get a text or an e-mail,

9    we're getting a noise alert.  I don't know if there's a way to

10   mute that.  I don't know if you're getting texts or e-mails or

11   something, but we're definitely getting that chime, and it's

12   overriding David's microphone much the way I was back before I

13   was muting.

14               MR. BROOKS:  I don't know if it's me or not, but I

15   will do my best.

16               MR. JONES:  I appreciate it, Doug, thanks.

17   [Alert noises]

18               THE WITNESS:  That's the one.

19               MR. BROOKS:  Yeah.  Why don't we do this, I didn't

20   realize, let's go off the record and let me see if I can fix

21   that, if that's okay.

22               MR. JONES:  That's fine with us.

23   (OFF THE RECORD, 12:15 P.M. TO 12:19 P.M.)

24               MR. BROOKS:  Can you read back the last question and

1    answer so I can make sure I don't skip anything.
2            COURT REPORTER:  [Reads back requested testimony]
3    BY MR. BROOKS:
4        Q.   Mr. Becker, just to confirm, between May 23rd, 2015
5    and June 4th, 2015, there were no telephone calls between the
6    SEC and any representatives for Ligand; is that right?
7        A.   Not that I'm aware of.  We don't have a record of any.
8        Q.   What about text messages?
9        A.   I'm not aware of any, and I'm not aware of any texts
10   occurring between any of the investigative team and anybody on
11   Ligand's behalf.
12       Q.   Do you know whether as part of the SEC's preparation
13   for today's deposition, the SEC inquired of any of its staff as
14   to text messages with representatives for Ligand concerning
15   Defendants?
16       A.   I don't know whether staff was specifically asked
17   about text messages, but they were asked about any
18   communications with Ligand or its counsel, which would have
19   included text messages.
20       Q.   Are you aware of any communications concerning
21   Defendants, before this litigation was brought, between the SEC
22   and Ligand other than e-mails, in person or telephone
23   communications?
24       A.   Other than texts, I don't know what you would be

1   referring to, so the answer is no.

2      Q.   Okay.  So like, for instance, no WhatsApp messages

3   that you're aware of?

4      A.   No.

5        MR. BROOKS:  Okay, Brian, could you pull up tab

6   10?

7        (EXHIBIT 173 MARKED FOR IDENTIFICATION)

8        MR. SULLIVAN:  I just distributed what is now marked

9   Exhibit 173.

10  BY MR. BROOKS:

11      Q.   And, Mr. Becker, of course, take whatever time you

12  need to review this, but I'm going to be asking you initially to

13  turn your attention to page 7 and ask if the e-mail on page 7 is

14  the June 4th, 2015 e-mail from Mr. Tonolli to Ms. Rosado

15  Desilets that you previously referred to?

16      A.   The one at 9:58 a.m. you're referring to?

17      Q.   Yes.

18      A.   Yes.  I think the communication that I was referring

19  to spans actually several e-mails, but they all occur on the

20  same date.  If you go back to page 4 and forward, I haven't gone

21  back further than that yet, but...

22      Q.   In terms of, if you look at page 7, are you aware of

23  any communications between Ligand and the SEC that took place

24  before the e-mail on page 7 and after May 23rd, 2015?

83

1        A.   Between May 23rd, 2015 and this e-mail on June 4th?

2        Q.   Yes.  Are you aware of any communications during that

3    time between Ligand and the SEC?

4        A.   No.

5        Q.   Okay.  If you can turn to page 5 of Exhibit 173.

6        A.   I'm there.

7        Q.   Do you see there's an e-mail that starts about a third

8    or a half of the way down from Ms. Rosado Desilets to

9    Mr. Tonolli on June 4th, 2015 at 10:30 a.m.?

10       A.   Yes.

11       Q.   Okay.  And it indicates that Mr. Friestad, Mr.

12   Finnell, and Jennifer Clark will be at the meeting?

13       A.   Yes.

14       Q.   Can you remind me who Ms. Clark is?

15       A.   She was a legal assistant.

16       Q.   Okay.  Is she still with the SEC?

17       A.   She passed away about two months ago.

18       Q.   I'm sorry to hear that.

19            Do you know if Mr. Bondi had any relationship with

20   Ms. Clark in 2015?

21       A.   I don't believe he did, no.

22       Q.   Okay.  And Ms. Rosado Desilets also references two

23   interns who might sit in on the meeting?

24       A.   Yes.

84

1      Q.    Did those interns sit in on the meeting?

2      A.    I think I mentioned that Rachel Leggett attended the

3    meeting on June 8th and she was an intern.  I don't know who the

4    other intern was she was referring to, but no other interns

5    attended.

6      Q.    Thanks.  And you may have said this, but is

7    Ms. Leggett still with the SEC?

8      A.    Unlikely.  Well, not that I know of.  She's almost

9    certainly not with the enforcement division.  Interns are

10   usually there during law school, and we don't typically hire

11   people until they've been out for several years; so unless she

12   joined a different division, she's not at the SEC.

13     Q.    If you could turn to page 1 of Exhibit 173.

14     A.    Okay.

15     Q.    Do you see that the second e-mail from the top from

16   Mr. Tonolli to Ms. Rosado Desilets, it's on July 10th, 2015?

17     A.    I see that.

18     Q.    Do you see how it references an individual named Ted

19   Reilly who would be starting in the enforcement division?

20     A.    Yes.

21     Q.    And did Mr. Reilly end up working on matter involving

22   Defendants?

23     A.    No.

24     Q.    Okay.  Let's talk about the June 8th, 2015 meeting.

1          A.    Sure.

2          Q.    I believe you've already identified the people that

3    were there, correct?

4          A.    Yes.

5          Q.    How long did that meeting last?

6          A.    That's a good question.  Well, I think the e-mail that

7    we looked at before talked about blocking off two and half

8    hours.  I don't know whether it took up that entire time.

9          Q.    Were there any telephone communications between June

10   4th and June 8th of 2015 between the SEC and Ligand concerning

11   Defendants?

12         A.    Can you give me the date range again, please?

13         Q.    June 4th and June 8th, 2015.

14         A.    Was your question telephone communications?

15         Q.    Yes.

16         A.    I don't believe so.

17         Q.    Okay.  Other than the e-mails contained in Exhibit

18   173, were there any e-mail communications between Ligand and the

19   SEC between June 4th and the June 8th, 2015 meeting?

20         A.    No e-mails.  I think on June 5th, Mr. Tonolli sent

21   over the binders to the SEC.  I don't know if there was an

22   exchange of e-mails just confirming receipt or anything like

23   that.  On June 8th, Mr. Tonolli requested that we block off

24   those two and a half hours; I'm not sure whether that occurred

1    via e-mail or whether it's in here somewhere or elsewhere.

2        Q.   Okay.  As best you can, can you describe for me the

3    June 8th, 2015 meeting?

4        A.   Sure.  So the substance of the PowerPoint that was

5    provided to the SEC was presented by the Ligand team, and the

6    SEC staff was basically in listening mode, you know, listening

7    to hear what they had to say.  There were some follow-up

8    questions from the staff to clarify some of the points that were

9    presented.  For example, some notes that we have of the meeting

10   indicate that Scott Friestad asked for additional information

11   about Promacta.  The records that we have of the meeting don't

12   indicate any significant deviation from what was in the

13   PowerPoint itself, so it appears that they basically walked

14   through the material in the PowerPoint.  There was one exchange

15   at the beginning of the meeting where the Ligand team suggested

16   that if the staff had curiosity about Defendants' conduct, that

17   that would be sufficient to open the investigation, and Mr.

18   Friestad responded to the effect that the commission would

19   require more than just curiosity to open the investigation.

20       Q.   Who on behalf of Ligand made the comment about

21   curiosity?

22       A.   I don't think it's reflected in the notes.

23       Q.   Okay.  Who at the SEC took notes during this meeting?

24       A.   I think the most comprehensive set of notes was by the

87

1    intern Rachel Leggett.  I think we also have notes of the

2    meeting from Mr. Finnell and Ms. Rosado Desilets.

3        Q.   Okay.  Other than what you've already testified to,

4    are you aware of anything else being discussed at the meeting?

5        A.   No.

6        Q.   Do you know what, if anything, the SEC communicated to

7    Ligand's representatives at the end of the June 8th, 2015

8    meeting?

9        A.   I do not.

10       Q.   Okay.  Was there any discussion at the meeting about

11   the fact that Latham had previously met with representatives of

12   the SEC from the Boston regional office concerning Defendants?

13       A.   I don't believe so, but I'd need to double-check the

14   notes to be sure.

15       Q.   Is that something that you're able to do now or no?

16       A.   I can do it during a break.

17       Q.   Oh, okay.  All right, let's do that then so we can

18   keep moving on.

19            MR. JONES:  Doug, before you go on, can you say

20   specifically what you want him to check during the break just so

21   I can write it down and make sure we do.

22            MR. BROOKS:  Sure.  Whether or not there was any

23   discussion at the June 8th, 2015 meeting about the fact that

24   Latham & Watkins on behalf of Ligand had previously met with

1    representatives of the SEC's Boston regional office concerning

2    Defendants.

3              MR. JONES:  Okay, yeah, we can check that at the

4    break.

5    BY MR. BROOKS:

6         Q.   After the June 8th, 2015 meeting, what was the next

7    communication between the SEC and any representatives for

8    Ligand?

9         A.   On July 1st of 2015, Mr. Bondi forwarded Scott

10   Friestad an article on Ligand from Forbes.

11        Q.   Did Mr. Friestad respond to that July 1st, 2015 e-mail

12   from Mr. Bondi?

13        A.   I don't believe so.

14        Q.   Okay.  After that July 1st, 2015 e-mail, what was the

15   next communication between the SEC and any representative of

16   Ligand concerning the defendants?

17        A.   On July 10th of 2015, Mr. Bondi forwarded Scott

18   Friestad an announcement that Mr. Lemelson would be on the

19   Benzinga show that upcoming Friday, and I think Mr. Tonolli also

20   told Virginia Rosado Desilets the same thing.

21        Q.   Okay.  Did Mr. Friestad respond to Mr. Bondi's July

22   10th, 2015 e-mail?

23        A.   I don't believe so.

24        Q.   Did Ms. Desilets -- well, strike that.

89

1           How did Mr. Tonolli communicate that information to

2    Ms. Rosado Desilets?

3        A.   I don't know.  I'm not certain if that was an e-mail

4    or a phone call.

5        Q.   Do you know how, if at all, Ms. Rosado Desilets

6    responded to the information provided by Mr. Tonolli?

7        A.   I do not know.

8        Q.   Okay.  So I understand of course, unfortunately, that

9    Mr. Friestad has passed away and you were of course unable to

10   talk to him, does the SEC have any records reflecting any

11   telephone conversations between Mr. Bondi and Mr. Friestad in

12   2015?

13       A.   In 2015, no.

14       Q.   Did the SEC take any steps in preparation of today's

15   deposition to determine whether phone calls occurred between Mr.

16   Friestad and Mr. Bondi concerning the defendants?

17       A.   Yes.

18       Q.   What were those steps?

19       A.   We looked at internal e-mails that would have

20   reflected such communications, and we looked at notes that would

21   have reflected such communications.

22       Q.   Okay.  Anything else?

23       A.   No, not that I'm aware of.

24       Q.   Is it fair to say then as part of the preparation for

1    this deposition, the SEC did not ask Mr. Bondi about any

2    telephone conversations he had with Mr. Friestad?

3        A.   Your question was as part of the preparation for this

4    deposition?

5        Q.   Yes.

6        A.   That is correct.

7        Q.   At any time has the SEC inquired of Mr. Bondi about

8    communications he had with the SEC concerning Defendants?

9        A.   I'm not sure understand your --

10        MR. JONES:  If you know, David.

11        A.   If I know?  I don't know.

12        Q.   Okay.  Turning back, after the July 10th, 2015 e-mail

13    from Mr. Bondi to Mr. Friestad concerning the fact that Father

14    Emmanuel Lemelson was going to be on the Benzinga radio program,

15    what was the next communication between the SEC and any

16    representatives of Ligand concerning the defendants?

17        A.   On July 30th, 2015, Mr. Bondi e-mailed Scott Friestad

18    a link to certain additional statements that Defendant Lemelson

19    had made in which he called Ligand a pyramid scheme.

20        Q.   Did Mr. Friestad respond to that?

21        A.   I don't believe so.

22        Q.   And was the link, just so I understand, was the link

23    to something that Father Emmanuel Lemelson had either written or

24    spoken about?

91

1    A.   Yes.

2    Q.   Do you know specifically what that link was?

3    A.   Off the top of my head, no.

4    Q.   Okay.  After July 30th, 2015, when was the next
5    communication between the SEC and any representative of Ligand
6    concerning the defendants?

7    A.   On August 5th of 2015, Mr. Bondi forwarded to Scott
8    Friestad a screen capture of a Tweet from Defendant Lemelson and
9    a link to an article that he had published on Benzinga.com about
10   Ligand.

11   Q.   And what was the Tweet about?

12   A.   I don't know.

13   Q.   Okay.  Did Mr. Friestad respond to Mr. Bondi's August
14   5th, 2015 e-mail?

15   A.   Can I back up for a just a moment?  I believe that the
16   Tweet related to Ligand, beyond that I don't know.

17        Okay, sorry, the next question was?

18   Q.   Was whether Mr. Friestad responded to Mr. Bondi's
19   August 5th, 2015 e-mail?

20   A.   I don't believe he did.

21   Q.   After August 5th, 2015, what is the next communication
22   between the SEC and any representative of Ligand concerning the
23   defendants?

24   A.   On October 29th of 2015, Mr. Bondi forwarded to Scott

 1  Friestad, Jeff Finnell, and Virginia Rosado Desilets a letter

 2  concerning recent media activities of Defendant Lemelson.

 3          MR. BROOKS:  Brian, can you pull up tab 13.

 4          (EXHIBIT 174 MARKED FOR IDENTIFICATION)

 5          MR. SULLIVAN:  I have just distributed what will be

 6  Exhibit 174, and I can represent that the Bates numbers are

 7  EPROD-SEC-LIT-E-001189342 through 45.

 8          MR. JONES:  I have it.  Do you have it, David?

 9          THE WITNESS:  I do.

10  BY MR. BROOKS:

11      Q.   So, Mr. Becker, turning your attention to kind of the

12  bottom of the third page of this four-page document, there's an

13  e-mail from Mr. Bondi to a number of people at the SEC and he

14  specifically addresses Mr. Friestad dated October 29th, 2015 at

15  6:59 p.m.; do you see that?

16      A.   I do.

17      Q.   Is that the communication that you just referred to?

18      A.   Yes.

19      Q.   Okay.  If you turn to the top of the first page in

20  Exhibit 174, there's an e-mail from Ms. Rosado Desilets to Mr.

21  Bondi dated November 6th, 2015; do you see that?

22      A.   Yes.

23      Q.   And Ms. Desilets writes:  "Thanks for forwarding these

24  materials.  We don't currently have any further questions for

 1    you, but I noted that in your letter you requested a meeting or

 2    a telephone call.  If you have additional information you'd like

 3    to share with us, and if you think a telephone call would be

 4    productive, I can set one up.  Just let me know your

 5    availability."

 6               Do you see that?

 7        A.   I do.

 8        Q.   Do you know if a telephone call was set up between Mr.

 9    Bondi and the SEC as a result of this e-mail?

10        A.   I don't believe so.  And I'd also note that there was

11    no meeting that was set up as a result of this, although Mr.

12    Bondi asked on at least one or two occasions.

13        Q.   Okay.  So let's step back.  Other than the e-mails

14    reflected in Exhibit 174, were there any communications between

15    the SEC and any representatives of Ligand between October 29th,

16    2015 and November 6th, 2015?

17        A.   Give me a moment to flip through this to make sure I'm

18    capturing anything that's not included in this e-mail

19    string.

20    [Witness reviews document]

21               Other than what's captured in this e-mail string, no.

22        Q.   So after the e-mail that is at the top of page 1 of

23    Exhibit 174 which is dated November 6th, 2015, what was the next

24    communication between the SEC and any representative of Ligand

1   concerning Defendants?

2       A.    On March 21st of 2016, Mr. Bondi wrote to request a

3   copy of the formal order of investigation in this matter.

4       Q.    Had anyone at the SEC informed Mr. Bondi that there

5   was a formal order of investigation in this matter?

6       A.    I don't know that he was informed in those terms, and

7   I don't recall -- or I don't know when requests for documents

8   and material were issued to Ligand in this matter, but the cover

9   letter for those would typically indicate whether there was a

10   formal investigation occurring; and if it was issued in a

11   subpoena, there has be to be a formal investigation.

12       Q.    As part of -- you broke up a little bit. So if it

13   wasn't a subpoena, what's the other way that it, what would the

14   cover letter have been to that you were talking about? I just

15   didn't hear.

16       A.    Well, a cover letter that accompanies a subpoena will

17   typically indicate that there's a formal order of investigation,

18   but that's almost irrelevant because you can't issue a subpoena

19   without a formal order. So the existence of a subpeona

20   indicates that there was a formal order.

21       Q.    But did the SEC send a subpoena to any representative

22   of Ligand in this matter?

23       A.    I don't know the answer to that.

24       Q.    Okay. But that would be a communication between

 1    Ligand and the SEC, right?

 2         A.   It would, yes.

 3         Q.   Right.  So fair to say presumably it would be

 4    contained in the summary provided to you by counsel, right?

 5         A.   I believe so, yes.

 6         Q.   Okay.  So sitting here today, do you know how Mr.

 7    Bondi learned that there was a formal order of investigation as

 8    of March 21st, 2016?

 9         A.   I don't know.

10         Q.   Okay.  And, I'm sorry, that March 21st, 2016 e-mail

11    from Mr. Bondi, was that to Mr. Friestad?

12         A.   Yes.

13         Q.   Was anyone else copied?

14         A.   No -- well, I don't know the answer to that.

15         Q.   Okay.  Did Mr. Friestad respond to that?

16         A.   He didn't respond directly.  The formal order was sent

17    to Mr. Bondi from Virginia Rosado Desilets on April 4th of 2016.

18         Q.   And why did she do that?

19    [Zoom meeting interruption]

20         Q.   -- is that consistent with SEC protocol-?

21              COURT REPORTER:  Excuse me, I'm sorry, I didn't get

22    the answer to that last question, my screen froze.  The question

23    was: "Why did she do that?"

24              THE WITNESS:  The answer was it was in response to the

1    March 21st, 2016 request.

2    BY MR. BROOKS:

3        Q.    So is it consistent with SEC's policies to provide a

4    third-party with a formal order of investigation?

5              MR. JONES:  I'm going to object that SEC policies is

6    beyond the scope of topic 3 or 1 or 2.

7              David, to the extent you know from the course of your

8    work at the SEC, you can answer that one.

9              THE WITNESS:  My understanding of SEC policies is

10   that, you know, until an action is actually implemented against

11   somebody, everybody is a third-party.  But people who could

12   potentially be impacted by or implicated in an investigation may

13   request a copy of the formal order, and if the commission

14   doesn't have reason to believe that improper use will be made of

15   the formal order, it is typically provided, subject to certain

16   restrictions.

17       Q.    What are those restrictions?

18       A.    That you can't use it for any purpose other than the

19   investigation at hand and cannot distribute it to anybody else.

20       Q.    And I apologize for the back and forth, I may have

21   asked this and I apologize, but do you know how Mr. Bondi

22   learned of the formal order of investigation here?

23       A.    No.

24       Q.    Okay.  When Ms. Rosado forwarded the formal order of

1  investigation to Mr. Bondi on April 4th, 2016, did she write

2  anything else or did she just forward it to him?

3      A.   I don't have the document in front of me, but we have

4  a standard letter that goes when we provide a formal order to

5  somebody, pursuant to their request, which sets forth the

6  restrictions under which it's being provided.

7      Q.   Okay.  Between March 21st, 2016 and April 4th, 2016,

8  were there any communications between the SEC and any

9  representative of Ligand concerning the defendants?

10     A.   I don't believe so.

11     Q.   Did Mr. Bondi respond to Ms. Rosado Desilets' April

12  4th, 2016 e-mail forwarding the formal order of investigation?

13     A.   No.

14     Q.   Was anyone else copied on Ms. Rosado Desilets' April

15  4th, 2016 e-mail?

16     A.   Not that I'm aware of.

17     Q.   When was the --strike that.

18          After Ms. Rosado --

19     A.   I'm sorry, but --

20     Q.   Go ahead.

21     A.   Are you asking anybody within the SEC or outside?  It

22  doesn't matter because I'm not aware one way or the another.

23     Q.   I was asking for everybody, but that clarifies it,

24  thanks.

1              After Ms. Rosado Desilets' April 4th, 2016 e-mail

2     forwarding the formal order of investigation to Mr. Bondi, when

3     was the next communication between the SEC and any

4     representative of Ligand concerning the defendants.

5              A.   On October 18th, 2016 -- I'm sorry, not October.  Did

6     I say October?  August 18th, 2016, Mr. Bondi left Scott Friestad

7     a voicemail regarding a Benzinga article that related to Ligand

8     and e-mailed the link to the article.

9              Q.   Did you say that was August 18th?

10             A.   August 18th, 2016, yes.

11             Q.   Does the SEC have a copy of that voicemail?

12             A.   Of the voicemail?

13             Q.   Yes.

14             A.   I don't know.

15             Q.   How does the SEC know about that voicemail?

16             A.   I don't know, it would be speculating to state how.

17             Q.   Okay.  Did Mr. Friestad respond either to Mr. Bondi's

18    e-mail or voicemail of August 18th, 2016?

19             A.   I don't believe so.

20             Q.   After August 18th, 2016, when was the next

21    communication between the SEC and any representative of Ligand

22    concerning the defendants?

23             A.   On August 25th, 2016, Mr. Bondi left a voicemail for

24    Virginia Rosado Desilets asking for a call.  And Ms. Rosado

1   Desilets returned the call the next day, August 26th, and

2   informed Mr. Bondi that we couldn't share any information with

3   him about the investigation other than that the investigation

4   was ongoing and that we would let them know if we needed

5   anything further from them; and if they had any additional

6   information that they thought would be helpful, we would be

7   happy to receive it.

8        Q.   And did Ms. Rosado Desilets describe for Mr. Bondi

9   what investigation she was talking about?

10            MR. JONES:  Objection, vague.

11       A.   I'm not sure I understand that question.

12       Q.   Well, she said she couldn't confirm anything about the

13  investigation other than the investigation was ongoing, what

14  investigation was Ms. Rosado Desilets referring to?

15       A.   Well, I think that Mr. Bondi's e-mail referred to the

16  investigation relating to the defendants in this case and

17  Ligand, and the understanding was that that was the

18  investigation that was being referred to.

19       Q.   Why did Ms. Rosado Desilets confirm the existence of

20  the ongoing investigation to Mr. Bondi?

21            MR. JONES:  Objection.  You're asking for why a

22  particular attorney did a particular thing at the SEC, that's

23  attorney-client privilege and attorney work product; so, David,

24  you can't answer that.

1           MR. BROOKS:  Well, it can't be attorney-client
2    privilege because she was talking to Mr. Bondi.  And are you
3    taking the position that her conversation with Mr. Bondi
4    confirming the existence of the investigation was in
5    anticipation of litigation?
6           MR. JONES:  No, I'm not taking that.  I'm taking the
7    -- well, first of all, everything about an investigation is in
8    anticipation of litigation, you're trying to decide whether
9    you're going to file a piece of litigation.  Second of all,
10   opinion work product covers, you know, the thought process of
11   the attorneys.  In terms of attorney-client communication to the
12   extent that Ms. Rosado Desilets communicated it to another
13   attorney or supervisor or someone else at the SEC, that would be
14   intra-attorney-client communication.  And we're not taking the
15   position that's the communication between Rosado Desilets and
16   Bondi, but you asked why she did a particular thing and that's
17   the objectionable part.  The fact that she did it, it's
18   absolutely fair game; "why" is off limits I think.
19   BY MR. BROOKS:
20       Q.   How long did that conversation between Mr. Bondi and
21   Ms. Rosado Desilets last?
22       A.   My understanding is that it was a very brief call,
23   beyond that, I don't know.
24       Q.   Other than what you've already testified to, what else

1  was discussed on that call?

2       A.   Other than what I've already testified to, I don't

3  believe anything else was discussed on that call.

4       Q.   After the call between Mr. Bondi and Ms. Rosado

5  Desilets on August 26th, 2016, what was the next communication

6  between the SEC and any representative of Ligand concerning the

7  defendants?

8       A.   On December 22nd, 2016, Mr. Bondi left voicemails for

9  both Mr. Friestad and Virginia Rosado Desilets and followed up

10 with an e-mail regarding Mr. Lemelson's letter to Senators

11 Collins and McCaskill.

12      Q.   Okay.  Does the SEC have copies of these voicemails?

13      A.   I don't know.

14           MR. BROOKS:  Brian, can you pull up tab 15.

15           (EXHIBIT 175 MARKED FOR IDENTIFICATION)

16           MR. SULLIVAN:  So I've distributed what is Exhibit 175

17 that has Bates numbers beginning EPROD-SEC-LIT-E-001188712

18 through 24.

19           THE WITNESS:  I don't have this yet, so we may need to

20 reboot here.  You said Exhibit 175, Brian?

21           MR. SULLIVAN:  That is correct, 175.

22           THE WITNESS:  Okay, got it.

23 BY MR. BROOKS:

24      Q.   So again, Mr. Becker, take whatever time you need, but

Securities and Exchange Commission vs 30(b)(6) David Becker
Gregory Lemelson, et al August 06, 2020
102

1  my question is whether or not the e-mail on page 1 of Exhibit

2  175 dated December 22th, 2016 is the e-mail you just referenced?

3       A.   Yes.

4       Q.   Okay.  And as you indicated in your testimony, Mr.

5  Bondi writes in this e-mail that he left voicemails for both Mr.

6  Friestad and Ms. Rosado Desilets; right?

7       A.   Correct.

8       Q.   Okay.  And he's asking them him to contact him; do you

9  see that?

10      A.   Yes.

11      Q.   Do you know whether either Ms. Rosado Desilets or Mr.

12  Friestad contacted Mr. Bondi in response to the e-mail on the

13  first page of Exhibit 175?

14      A.   The next communications between the SEC and Mr. Bondi

15  occurred on January 5th, and it's not clear to me whether or not

16  that was in response to the December 22nd voicemail or not.

17      Q.   Okay.  Let's --

18      A.   Other than that -- I should say -- other than that,

19  no.

20      Q.   Okay.  So since you've said the next communication was

21  January 5th, 2017, can you describe the nature of that

22  communication?

23      A.   Sure.  There was an exchange of voicemails with Mr.

24  Bondi.  I believe that Ms. Rosado Desilets tried to reach him;

1    was unable to reach him.  Mr. Bondi also called back and left a

2    message indicating that he just wanted to make the staff aware

3    of Mr. Lemelson's letter to the Senate subcommittee, and it does

4    not appear that the staff and Mr. Bondi ever actually spoke

5    about that.

6         Q.  After those communications that you just testified

7    about on January 5th, 2017, what was the next communication

8    between the SEC and any representative for Ligand concerning the

9    defendants?

10        A.  On January 30th of 2017, Scott Friestad received an

11    e-mail from Mr. Bondi, apparently he received the e-mail the

12    previous week -- not positive when exactly that occurred, but it

13    was in the week leading up to January 30th -- and in that

14    voicemail, Mr. Bondi was complaining that the Defendant Lemelson

15    had been talking publicly about the letter he sent to the

16    Senate.

17        Q.  I'm sorry, so before January 30, 2017, Mr. Bondi had

18    left a voicemail for Mr. Friestad?

19        A.  Yes.

20        Q.  And then on January 30th, 2017, Mr. Bondi left an

21    e-mail for Mr. Friestad?

22        A.  No, there's no e-mail.  Sorry for confusing this.

23    January 30th, 2017 is when Mr. Friestad communicated that

24    voicemail to other members of the investigative team; he

1    received it earlier, we don't know exactly when he received it.

2        Q.   Okay.  So after Mr. Bondi's voicemail -- well, first

3    of all, other than what you've testified to, was there anything

4    else communicated by Mr. Bondi in the voicemail he left for Mr.

5    Friestad sometime prior to January 30th, 2017?

6        A.   I don't believe so.

7        Q.   Okay.  So after that January 2017 voicemail, when's

8    the next time the SEC had any communication with any

9    representative of Ligand concerning the defendants?

10       A.   On March 14th of 2017, Mr. Bondi e-mailed to inform

11   the team of Mr. Lemelson's recent misleading Tweets about

12   Ligand.

13            MR. BROOKS:  Okay, so, Brian, can you pull up tab

14   16.

15            (EXHIBIT 176 MARKED FOR IDENTIFICATION)

16            MR. SULLIVAN:  So I just distributed what is now

17   Exhibit 176.  It's an e-mail with Bates numbers

18   EPROD-SEC-LIT-E-001188427 through 30.

19            MR. JONES:  I see it.

20            MR. BROOKS:  And do you have that, Mr. Becker?

21            THE WITNESS:  I have it as well.

22   BY MR. BROOKS:

23       Q.   So, Mr. Becker, I would ask you to turn to, once

24   you've had a chance to review it, the second page of Exhibit

1  176.  And, I don't know, halfway or two-thirds down, there's an

2  e-mail from Mr. Bondi to Mr. Friestad, Ms. Rosado Desilets, and

3  Ms. Torrico dated March 14th, 2017; do you see that?

4       A.   Yes.

5       Q.   Is this the e-mail you were just referring to?

6       A.   Yes, it is.

7       Q.   All right.  And prior to this e-mail, had anyone at

8  the SEC communicated to Mr. Bondi that Ms. Torrico was working

9  on the matter?

10      A.   I don't know.

11      Q.   Do you know when Ms. Torrico began working on this

12  matter?

13      A.   I don't.  Probably not long before this e-mail, but I

14  don't know.

15      Q.   All right.  And we'll see on the first page of Exhibit

16  176, do you see an e-mail from Mr. Tonolli to the SEC dated

17  March 21, 2017?

18      A.   I see that.

19      Q.   Were there any communications between the SEC and any

20  representatives for Ligand between March 14th and March 21st,

21  2017 other than what's reflected in Exhibit 176?

22      A.   I don't believe so.

23      Q.   Okay.  And then you'll also see at the top there's

24  sort of a confirmation e-mail for Ms. Rosado Desilets to

1  Mr. Tonolli and Mr. Bondi dated the following day, March 22nd,

2  2017?

3       A.   I see that.

4       Q.   Were there any other communications between the SEC

5  and any representatives for Ligand on March 21st or March 22nd,

6  2017 other than those that are reflected in Exhibit 176?

7       A.   I don't believe so, no.

8       Q.   Okay.  Did Ms. Torrico and Mr. Bondi have any prior

9  relationship before 2017?

10      A.   Ms. Torrico and Mr. Bondi?

11      Q.   Yes.

12      A.   No.

13           MR. BROOKS:  So can we go off the record quickly?

14           MR. JONES:  Sure.

15  (OFF THE RECORD, 1:08 P.M. TO 1:21 P.M.)

16           MR. BROOKS:  First off, is there any clarifications on

17  any answers necessary?

18           MR. JONES:  We have a couple of things that you had

19  asked us about earlier that we can clarify for you that we

20  agreed to check on during the break.  David, we'll start with

21  the notes of the home office meeting and about Rachel Leggett,

22  can you clarify your answers on those?

23           THE WITNESS:  Sure.  I think you had asked whether or

24  not it was discussed at the June 8th, 2015 meeting at the home

1   office whether or not there had been a previous meeting with

2   Boston office staff and I think we said we'd go back and check,

3   and there's nothing in our records to indicate that there was

4   any discussion of that.

5            MR. BROOKS:  Got it, thank you.

6            THE WITNESS:  With respect to Ms. Leggett, I think you

7   had asked if she was still employed with the commission and I

8   said I didn't think so unless she was hired by a different

9   division.  It turns out that she actually is currently with the

10  Office of Compliance Inspections and Examinations' National Exam

11  Program.  I don't know how long she has held that position.

12           MR. BROOKS:  Okay, thank you.  Is that it for

13  clarifications?

14           MR. JONES:  I believe so.

15           MR. BROOKS:  Okay.

16  BY MR. BROOKS:

17       Q.   Right before the break we had looked at an e-mail from

18  Ms. Rosado Desilets to Mr. Tonolli and Mr. Bondi dated March

19  22nd, 2017, when was the next communication between the SEC and

20  Ligand concerning Defendants?

21       A.   August 27th -- I'm sorry, August 31st, 2017, there was

22  a call between Mr. Bondi, Mr. Tonolli, Virginia Rosado Desilets,

23  and Sonia Torrico.

24       Q.   How long was that call?

1      A.   It looks like it was 13, 14 minutes.

2      Q.   Okay.  What was discussed on that call?

3      A.   Mr. Bondi asked what the status of the investigation

4  was and requested a meeting with the co-directors, Mr. Friestad,

5  and the investigating team.  And we informed Mr. Bondi that he

6  should forward any statements by Mr. Lemelson to us and that we

7  can't comment on the status of the investigation, and he would

8  need to wait a few weeks to see if it made any sense for him to

9  try and set up a meeting with the co-directors.

10     Q.   Okay.  How did Mr. Bondi respond to that?

11     A.   I don't think we have any record of how he responded.

12     Q.   Do you know which member of the SEC told him that

13  during that call?

14     A.   I don't.  It's typically the lead staff attorney who

15  makes the call, which would have been Ms. Rosado Desilets, but I

16  don't know for a fact that it was her on that occasion.

17     Q.   Other than what you just testified about, are you

18  aware of anything else that was said on that call?

19     A.   No.

20     Q.   Did anyone from the SEC take notes on that call?

21     A.   I believe we have notes of that call, yes.

22     Q.   After the August 31st, 2017 telephone call that you

23  just discussed, when was the next communication between the SEC

24  and any representative for Ligand concerning Defendants?

Securities and Exchange Commission vs  30(b)(6)    David Becker
Gregory Lemelson, et al             August 06, 2020

109

1   A.  On August 31st, 2017, same date, Mr. Tonolli e-mailed

2 a link to the investigating staff to an August 25th, 2017

3 Benzinga appearance by Defendant Lemelson.

4   Q.  After that e-mail from Mr. Tonolli, when was the next

5 communication between the SEC and any representative to Ligand

6 concerning the defendants?

7   A.  On September 15th, 2017, Mr. Bondi e-mailed the team

8 with additional Tweets by Mr. Lemelson regarding Ligand and

9 asked again for an opportunity to speak regarding the status of

10 our investigation.

11     MR. BROOKS: Okay, Brian, can you pull up tab 18.

12     (EXHIBIT 177 MARKED FOR IDENTIFICATION)

13     MR. SULLIVAN: So I've distributed what's now marked

14 as Exhibit 177. It's a document that's Bates labeled

15 EPROD-SEC-LIT-E-001189502 through 505.

16 BY MR. BROOKS:

17   Q.  So, Mr. Becker, my first question will be to turn your

18 attention to page 3 of Exhibit 177, and you'll see an e-mail

19 from Mr. Bondi to various people dated September 15th, 2017; do

20 you see that?

21   A.  Yes.

22   Q.  Is that the e-mail you were just referring to?

23   A.  Yes.

24   Q.  Okay. One of the cc's is Michael Wheatley, is that

1   somebody at the SEC?

2        A.   I don't believe so.

3        Q.   Okay.  If you turn to page 2 of Exhibit 177, you'll

4   see an e-mail from Ms. Rosado Desilets dated September 18, 2017?

5        A.   Yes.

6        Q.   Was this the first communication between the SEC and

7   any representative of Ligand concerning the defendants after Mr.

8   Bondi's September 15th, 2017 e-mail?

9        A.   Yes.

10        Q.   And Ms. Desilets writes: "Brad, unfortunately, we

11   cannot share information about our non-public investigation in

12   the matter of Trading in the Securities of Ligand

13   Pharmaceuticals, Inc. beyond what we shared last time, i.e.,

14   that the investigation is ongoing."

15             What was she referring to when she stated "last time"?

16        A.   I don't know specifically.  I think we've discussed a

17   couple of e-mails or other communications in which we advised

18   counsel for Ligand that we can't share any information about the

19   investigation other than that it's ongoing, but I don't know

20   specifically what she's referring to here.

21        Q.   Okay.  And then she writes, "If you still wish to

22   speak, Sonia and I are available," and she lists some times; do

23   you see that?

24        A.   Yes.

1      Q.   Was there a follow-up telephone call as a result of

2  this e-mail?

3      A.   There was.

4      Q.   When did that phone call take place?

5      A.   Same day.

6      Q.   Okay.  And who was on that phone call?

7      A.   Mr. Bondi, Mr. Tonolli, Michael Wheatley -- who I

8  believe was from Cahill to answer your earlier question -- and

9  Charles Berkman from Ligand was also on the line.

10     Q.   Okay.  Who from the SEC?

11     A.   I believe it was Ms. Rosado Desilets and Ms. Torrico.

12 I see an indication in the e-mail that Marc Jones may join.  I

13 actually don't know one way or another whether he was there.

14     Q.   Okay.  Did Mr. Bondi and Mr. Jones know each prior to

15 September 18th, 2017?

16     A.   Mr. Bondi and Mr. Jones?

17     Q.   Yes.

18     A.   I don't believe so.

19     Q.   Okay.  What was discussed on the September 18, 2017

20 telephone call that you justified testified about?

21     A.   Mr. Bondi expressed ongoing concern about Defendant

22 Lemelson's conduct with respect to Ligand, and he asked for an

23 update on the investigation again and requested a meeting with

24 Steven Peikin or Stephanie Avakian, who are the co-directors of

1    the Division of Enforcement.  Ms. Rosado Desilets told him that

2    we can't comment on status only to say that the investigation is

3    ongoing and that we would pass along his request for a meeting

4    with co-directors of enforcement.

5        Q.   How did Mr. Bondi respond?

6        A.   I don't know that we have a record of that, I don't

7    know.

8        Q.   Did Mr. Bondi ever meet with Mr. Peikin or Ms. Avakian

9    concerning Defendants?

10       A.   No.

11       Q.   Did the SEC ever respond to Mr. Bondi's request that

12   he meet with Mr. Peikin or Ms. Avakian?

13       A.   Do you mean did we ever tell him that that request for

14   a meeting is being declined?

15       Q.   Or something to that effect.

16       A.   I'd say it's likely, but I don't actually know of a

17   specific record that says so.

18       Q.   Okay.  How long was the telephone conversation on

19   September 18th, 2017?

20       A.   I believe it was about 18 minutes or so.

21       Q.   And other than the e-mails reflected in Exhibit 177

22   and the telephone call that you've just discussed, were there

23   any communications between the SEC and any representatives for

24   Ligand between September 15th and September 18th, 2017?

1       A.    I don't believe so, no.

2       Q.    So after the telephone conversation that you've

3   described on September 18th, 2017, when was the next

4   communication between the SEC and any representative of Ligand

5   concerning Defendants?

6       A.    On October 20th of 2017, Mr. Bondi e-mailed Scott

7   Friestad and Virginia Rosado to note certain additional Tweets

8   by Mister -- Defendant Lemelson regarding Ligand and also

9   mentioned a positive analyst report on Ligand.

10      Q.    Okay.   And, I'm sorry, could you repeat that date

11   again?

12      A.    October 20th, 2017.

13      Q.    Okay.   Did the SEC ever respond to Mr. Bondi's October

14   20th, 2017 e-mail?

15      A.    No.

16      Q.    So after that e-mail, when was the next communication

17   between the SEC and any representative of Ligand concerning

18   Defendants?

19      A.    On December 18th, 2017, Mr. Bondi left a voicemail for

20   Virginia Rosado Desilets, and I believe that Mr. Tonolli was

21   also on the voicemail in which they noted an additional Tweet

22   from Defendant Lemelson that linked to a Washington Post article

23   that did not mention Ligand.   They also asked about the status

24   of the investigation and indicated that they thought that

114

1   Defendant Lemelson's campaign against Ligand was escalating.

2        Q.   What was the nature of the Washington Post article?

3        A.   Other than the fact that the article did not mention

4   Ligand, I don't know the answer to that.

5        Q.   After that December 18th, 2017 -- strike that.

6             Did you say that was a voicemail?

7        A.   That was a voicemail, yes.

8        Q.   I've asked this before about other voicemails, but

9   does the SEC have a copy of that voicemail?

10       A.   I don't believe so.

11       Q.   All right.  Are you aware of whether the SEC has

12  copies of any voicemails from Mr. Bondi or Mr. Tonolli

13  concerning the defendants?

14       A.   I'm not aware of any -- and if you're talking about an

15  audio file of voicemails, I'm not aware of any copies of those

16  communications.  I will say that to the extent that there was

17  any substance in those communications, they would have been

18  memorialized in either a note or an e-mail that was distributed

19  to other members of the team.

20            MR. JONES:  Doug, let me just jump in here.  I'll

21  confirm that we've looked for voicemails and we don't have them,

22  and so to the extent that we're testifying about voicemails,

23  it's because we have some other record of them usually in some

24  sort of attorney note.

1          MR. BROOKS:  Okay, thanks.

2    BY MR. BROOKS:

3         Q.   And just one quick follow-up:  As of 2017, did the SEC

4    have a system that if a particular staff member received a

5    voicemail, that they would also receive an audio file by e-mail?

6         A.   I don't believe we've ever had such a system.

7         Q.   Okay.

8          MR. JONES:  That would be nice.

9         Q.   I may have missed -- let me just ask again because I

10   may have missed -- so if I leave somebody at the SEC a

11   voicemail, they don't get an e-mail notification of that?

12        A.   No.  I wish.

13         MR. JONES:  Me too.

14        Q.   Okay.  So I think the last thing we talked about was a

15   December 18th, 2017 e-mail -- oh, sorry, voicemail from Mr.

16   Bondi; after that, when is the next communication between the

17   SEC and any representative for Ligand concerning the defendants?

18        A.   The following day, December 19th, 2017, Ms. Rosado

19   Desilets and Ms. Torrico had a call with Mr. Bondi and Mr.

20   Tonolli.

21        Q.   And how long did that call last?

22        A.   Ten minutes.

23        Q.   What was discussed on that call?

24        A.   Mr. Bondi asked what was happening with the

1    investigation.  Ms. Rosado Desilets responded that we didn't

2    have any updates to share, but that the investigation was

3    ongoing.  Beyond that, I don't believe there was any substance.

4        Q.   How did Mr. Bondi respond to what Ms. Rosado Desilets

5    said?

6        A.   We don't have any record that he responded one way or

7    the other.

8        Q.   Okay.  After this December 19, 2017 telephone

9    conversation, when's the next communication between the SEC and

10   any representative of Ligand's concerning Defendants?

11       A.   On February 27th, 2017, Ms. Rosado Desilets received

12   an e-mail -- or, I'm sorry, a voicemail from Mr. Bondi, yeah.

13       Q.   And what was the nature of that e-mail?

14       A.   I corrected that, I think it's a voicemail, not an

15   e-mail.

16       Q.   Oh, I'm sorry, I didn't hear that.

17            And what did Mr. Bondi say in that voicemail?

18       A.   I believe it was just a request for a callback.

19       Q.   And that was to Ms. Rosado Desilets?

20       A.   Yes.

21       Q.   Did Ms. Rosado Desilets call back Mr. Bondi?

22       A.   Not that day.  There was another call which ended up

23   being with Mr. Tonolli on March 5th which may have been in

24   response to that voicemail.

1       Q.    Were there any communications between the SEC and any

2   representative of Ligand between February 27th, 2018 and March

3   5th, 2018?

4       A.    No.

5       Q.    Okay.   How long was the telephone conversation on

6   March 5th, 2018?

7       A.    I don't know if we have a record of that, but let me

8   check.

9       I don't know.

10      Q.    What was discussed on the March 5th, 2018 telephone

11   call?

12      A.    So I believe I mentioned that the call ended up being

13   with Mr. Tonolli rather than Mr. Bondi, and I gather that Mr.

14   Bondi was just not available at that time.   I'm sorry,

15   Ms. Rosado Desilets left a message for Mr. Bondi, but then

16   called Mr. Tonolli who said that they had just called to ask for

17   an update and asked if they should try to meet with anyone at

18   the commission and to ask what the timeline was for the case; in

19   other words, when it might be either pursued or shut down.

20      Q.    Go ahead.   What was the response?

21      A.    And the response was that we didn't -- we, the staff,

22   did not see any benefit to them meeting with anyone else at the

23   commission and that the investigation was ongoing and we could

24   not provide any information other than saying that.

1          MR. BROOKS:  Marc, are you... Marc?  Oh.  I think
2  Marc got cut off so let's hold on.  It's actually great because
3  he can't object so it's sort of perfect.

4          THE WITNESS:  Can I do my own objections?

5          MR. BROOKS:  Yeah, absolutely.

6          Kelley, let's go off the record while Marc -- because
7  my screen is showing he's not connected to the audio, so let's
8  wait for him.  We can go off the record.

9  (OFF THE RECORD, 1:41 P.M. TO 1:42 P.M.)

10  BY MR. BROOKS:

11      Q.  You were describing, Mr. Becker, the conversation
12  between Ms. Rosado Desilets and Mr. Tonolli on March 5th, 2018,
13  other than what you've already testified to, what else was
14  discussed during that call?

15      A.  I don't think there was anything else discussed.  I
16  will note that the call lasted four minutes based on the record
17  that I was able to find.

18          COURT REPORTER:  It looks like his audio has cut out
19  again.

20          MR. BROOKS:  Marc's?

21          COURT REPORTER:  Mr. Jones, can you hear us?  Off the
22  record?

23          MR. BROOKS:  Yeah, let's go off the record.

24  (OFF THE RECORD, 1:43 P.M. TO 1:44 P.M.)

1  BY MR. BROOKS:

2      Q.   Mr. Becker, I think you said that the call lasted

3  about four minutes according to your records?

4      A.   Yes.

5      Q.   And after that March 5th, 2018 call, what was the next

6  communication between the SEC and any representative of Ligand

7  concerning Defendants?

8      A.   Prior to the litigation, I don't believe there were

9  any additional communications.

10     Q.   So no one at the SEC alerted Mr. Bondi that the SEC

11  would be filing a complaint against the defendants prior to

12  actually doing so?

13     A.   I don't have any record of that occurring, no.

14     Q.   I did my best to go through methodically to capture

15  it, but were there any investigations between any representative

16  of Ligand and the SEC starting in 2014 up through the filing of

17  the complaint in September 2018 that we haven't discussed yet?

18          MR. JONES:  Did you say communications or

19  investigations, Doug?

20          MR. BROOKS:  Let me rephrase that because I think I

21  said a bunch of things wrong there.

22  BY MR. BROOKS:

23     Q.   So other than what you've already testified to, were

24  there any communications between the SEC and any representative

1  of Ligand concerning Defendants between the beginning of 2014 up

2  to the time of the filing of the complaint of this matter in

3  September 2018?

4       A.   I believe you hit on everything that we have a record

5  of.  You know, I will note that we have done everything we can

6  to determine every communication that occurred, and I believe

7  that we've hit on all of them here.  I will say that it is

8  possible that we might not have included an e-mail that says

9  thanks or acknowledging receipt or something like that, but even

10 that, I'm not aware of.  So the short answer is, no, I think

11 you've hit everything.

12      MR. JONES:  Yeah, and just to clarify, Doug, I mean

13 we've testified as to everything we have found through a

14 diligent investigation, and so when David says no, it's to

15 indicate that you have all the information that we have.  Can we

16 guarantee there wasn't some other voicemail or phone call, we

17 can't guarantee it, but we've done our best to get you

18 everything that we know about.

19 BY MR. BROOKS:

20      Q.   Were there ever any communications between the SEC and

21 any representative of Ligand concerning Father Emmanuel

22 Lemelson's status as a priest?

23           MR. JONES:  Are you talking before filing the

24 litigation or at any time?

1          MR. BROOKS:  Yeah, before the filing of litigation.

2     A.   I think if you look at the PowerPoint decks that

3  Ligand provided to the SEC and presented at -- during the

4  meetings, there is an indication of that and it appears that

5  that was mentioned in passing during the presentation, but

6  that's all I'm aware of.

7     Q.   Okay.  As of September 2017, what, if any,

8  relationship did Mr. Bondi have with Stephanie Avakian?

9     A.   I don't believe she had, other than the two probably

10 being aware who each other are, I don't believe they had any

11 kind of relationship.

12          MR. BROOKS:  Brian, can you pull up tab 20.

13          (EXHIBIT 178 MARKED FOR IDENTIFICATION)

14          MR. JONES:  Is this 177?

15          THE WITNESS:  I think it's going to be 178.

16          MR. SULLIVAN:  This will be Exhibit 178, and I just

17 distributed it now.

18          THE WITNESS:  I have it now.

19 BY MR. BROOKS:

20    Q.   And Exhibit 178 is a Wikipedia printout of a Wikipedia

21 page of Stephanie Avakian.  Mr. Becker, have you ever seen this

22 before?

23    A.   I don't believe I have.

24    Q.   Okay.  And just for the record if it hasn't been said,

1    part.

2         Q.    Yeah.   Are you aware of any communications between Mr.

3    Bondi and anyone at the SEC concerning the creation of the

4    Wikipedia pages of Mr. Peikin or Ms. Avakian?

5         A.    No.

6         Q.    So I'm going to ask a series of questions, Mr. Becker,

7    concerning Mr. Bondi's relationship with various commissioners

8    and former commissioners of the SEC, so I'm just giving you a

9    heads up just so we can do this as efficiently as possible.   And

10   we can focus on the time period between 2015 when Mr. Bondi got

11   involved for Ligand and the filing of the complaint in September

12   of 2018, what, if any, relationships did Mr. Bondi have with

13   Robert Jackson?

14             MR. JONES:   Can we pause for a minute, Doug, just in

15   terms of that question.   The topic was about relationships, so I

16   don't know if we specified when we did the research on this when

17   any particular relationships might have started.   So I mean we

18   have, you know, we can -- I just don't want to -- you had

19   limited it in a way we didn't anticipate, so we can only testify

20   --

21             MR. BROOKS:   All I was trying to do -- I'm sorry, Marc

22   -- all I was trying to do is really focus on, I mean if the

23   relationship -- basically just before the litigation, so that's

24   all.   It doesn't have to be --

1                MR. JONES:  I appreciate it.  I just -- we have very

2   little to tell you, but the little bit we have to tell you, we

3   don't know whether or not it fits that time frame or not, so.

4                MR. BROOKS:  All right, that's fine then.  Let's just

5   eliminate the time frame.

6   BY MR. BROOKS:

7        Q.   Do you know the nature of Mr. Bondi's relationship, if

8   any, with Robert Jackson?

9        A.   They have no close personal relationship.  Beyond

10  that, I'm not aware of any relationship.

11       Q.   Same question with Jake Clayton.

12       A.   Same answer: They have no close personal relationship.

13  Beyond that, I'm not aware of any relationship.

14       Q.   Same question with Hester Peirce.

15       A.   Commissioner Peirce is friends with Mr. Bondi, and

16  they e-mail and talk a couple of times per year.  They've never

17  discussed this case or any other SEC business when they talk or

18  communicate.

19       Q.   Do you know anything further about the relationship

20  with Mr. Bondi and Commissioner Peirce?

21       A.   No.

22       Q.   Same question with -- if I'm pronouncing it correctly

23  -- Elad Roisman?

24       A.   Commissioner Roisman has no close personal

1    relationships with Mr. Bondi, and beyond that, I'm not aware of

2    any relationship at all.

3         Q.   Same question with Allison Herren.

4         A.   If you're talking about Commissioner Lee, Allison

5    Herren Lee?

6         Q.   I'm sorry, Allison Herren Lee.

7         A.   Same answer: She has no close personal relationship

8    with Mr. Bondi, and no other relationship that I'm aware of.

9         Q.   Same question concerning Mary Jo White.

10        A.   And the same answer with respect to Mary Jo White, no

11   close personal relationship with Mr. Bondi or other relationship

12   that we're aware of.

13        Q.   Same question with Kara Stein.

14        A.   And same question with respect to Commissioner Stein,

15   no close personal relationship with Mr. Bondi or other

16   relationship that we're aware of.

17        Q.   Same question with Michael Piwowar?

18        A.   And same answer with respect to Commissioner Piwowar,

19   no close personal relationship or no other relationship that

20   we're aware of.

21        Q.   Did the nature of Mr. Bondi's relationship --

22             MR. JONES:  Doug?  Doug?  Can we go off the record for

23   a minute?  I need to talk to my client.

24             MR. BROOKS:  Absolutely.

 1   (OFF THE RECORD, 2:01 P.M. TO 2:03 P.M.)

 2          MR. JONES:  On the break, Doug, we consulted with Mr.

 3   Becker and talked about a few things in the answers that he just

 4   gave, and there's some clarifications to make.  Mr. Becker, take

 5   it away.

 6          THE WITNESS:  Sure.  Yeah, I went through those a

 7   little bit too fast.  With respect to Commissions Roisman and

 8   Lee, we did not specifically ask them about relationships with

 9   Mr. Bondi.  Neither of them were at the commission in the time

10   period leading up to approval of the case here, so we hadn't

11   spoken to them specifically about a relationship with Mr.

12   Roisman.  And as I think I mentioned previously, we have not

13   been able to reach Commissioner Stein who has been gone from the

14   commission for some number of years.  You know, I'd just note

15   that we don't have any records or evidence that they have any

16   sort of relationship with Mr. Bondi, but I wanted to make that

17   clear.

18          MR. BROOKS:  Okay.  We're just about done.  Let's just

19   take a quick two-minute break to see if I have anything else.

20          MR. JONES:  Actually, can we -- if you think you're

21   just about done, can we make this a ten-minute break, and I'll

22   see if I have any cross-ex?

23          MR. BROOKS:  Sure.

24          MR. JONES:  Okay, let's do that and combine the

142

1

2          The original of the Errata Sheet has been delivered to Marc

3    Jones, Esquire.

4          When the Errata Sheet has been completed by the deponent

5    and signed, a copy thereof should be delivered to each party of

6    record and the ORIGINAL forwarded to Douglas Brooks, Esquire, to

7    whom the original deposition transcript was delivered.

8

9                              INSTRUCTIONS TO DEPONENT

10

11          After reading this volume of your deposition, please

12   indicate any corrections or changes to your testimony and the

13   reasons therefor on the Errata Sheet supplied to you and sign

14   it.  DO NOT make marks or notations on the transcript volume

15   itself.  Add additional sheets if necessary.  Please refer to

16   the above instructions for Errata Sheet distribution

17   information.

18

19

20

21   PLEASE ATTACH TO THE DEPOSITION OF DAVID BECKER, SEC

22   CASE:  SEC V. GREGORY LEMELSON, ET AL.

23   DATE TAKEN:  AUGUST 6, 2020

24                              ERRATA SHEET

143

1     Please refer to Page 142 for Errata Sheet instructions and

2  distribution instructions.

3     PAGE LINE    CHANGE          REASON

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12     I have read the foregoing transcript of my deposition,

13  and except for any corrections or changes noted above, I hereby

14  subscribe to the transcript as an accurate record of the

15  statements made by me.

16

17     Executed this _____ day of _____, 2020.

18

19                          _____

20                          DAVID BECKER

21  COMMONWEALTH OF MASSACHUSETTS                HAMPSHIRE, SS.

22

23     I, KELLEY K. BOHAN, a Court Reporter and Notary Public
     duly commissioned and qualified in and for the Commonwealth of
24  Massachusetts, do hereby certify that there came before me on
     the 6th day of August, 2020, at 9:43 a.m., the person

1  hereinbefore named, identification as prescribed by Executive
Order 455 (03-13) issued by the Governor of the Commonwealth of
2  Massachusetts, was by me duly sworn to testify to the truth and
nothing but the truth of his knowledge concerning the matters in
3  controversy in this cause; that he was thereupon examined upon
his oath, and his examination reduced to typewriting under my
4  direction; and that this is a true record of the testimony given
by the witness to the best of my ability.

5         I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of the parties
6  to the action in which this deposition is taken, and further,
that I am not a relative or employee of any attorney or counsel
7  employed by the parties hereto or financially interested in the
action.

8

9

10       My Commission Expires:  December 25, 2026

11

12

13

14

15        _____

16        Kelley K. Bohan
          Court Reporter/Notary Public
17

18

19

20

21

22

23

24

1        Please refer to Page 142 for Errata Sheet instructions and

2   distribution instructions.

3    PAGE LINE          CHANGE                 REASON

4    _____

5    SEE ATTACHED

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12       I have read the foregoing transcript of my deposition,

13   and except for any corrections or changes noted above, I hereby

14   subscribe to the transcript as an accurate record of the

15   statements made by me.

16

17       Executed this _____ day of _____, 2020.

18

19                                  _____

20                                  DAVID BECKER

21   COMMONWEALTH OF MASSACHUSETTS                    HAMPSHIRE, SS.

22

23       I, KELLEY K. BOHAN, a Court Reporter and Notary Public
     duly commissioned and qualified in and for the Commonwealth of
24   Massachusetts, do hereby certify that there came before me on
     the 6th day of August, 2020, at 9:43 a.m., the person

**SEC v. Lemelson, et al., D. Mass. Case No. 1:18-cv-11926**

**Errata for Deposition of David Becker 8/6/20**

Additions noted in <u>underlined</u> text; reason for edit in [brackets].

Global:  Capitalize "Commission" [proper noun]

8:5 – "counsel <u>and then</u> senior counsel" [clarification]

11:21-22 – "I reviewed the SEC's original complaint <u>in</u> the filed action.  I reviewed the amended complaint <u>in</u> the filed action." [typo]

18:7 – "David <u>Neuman</u>" [correction]

49:10 – "email <u>pull</u>" [correction/typo]

49:14 – "email <u>pull</u>" [correction/typo]

49:15 – "email <u>pull</u>" [correction/typo]

49:24 – "did a <u>pull</u>" [[correction/typo]

50:6 – "email <u>pull</u>" [correction/typo]

54:6 – "<u>we're</u>" not "were" [typo]

72:21 – "<u>Overdahl</u>" not "Oberdahl" [spelling]

75:13 – "<u>provided a list of</u>" not "listed" [clarification]

128:11 – "<u>Jay</u>" not "Jake" [correction]

137:21 – delete comma [clarification]

139:3-8 – replace "I don't know" with "Yes, Defendant Lemelson's counsel on or about April 26, 2016."  [correction/clarification]

_____          September 14, 2020
                                                                            _____
Signed                                                               Date