## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

SECURITIES AND EXCHANGE COMMISSION,   )
                                      )
            Plaintiff                    )
                                       )
       v.                              )

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil Action No. 1:18-cv-11926-PBS |
| | ) |
| GREGORY LEMELSON and LEMELSON CAPITAL | ) |
| MANAGEMENT, LLC, | ) **Leave to File in Excess of Pages Permitted by** |
| | ) **Local Rule 7.1(b)(4), Granted September 21,** |
| Defendants, | ) **2020, Dkt. No. 119** |
| | ) |
| and | ) |
| | ) |
| THE AMVONA FUND, LP, | ) |
| | ) |
| Relief Defendant | ) |
| | ) |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Pages**

**Table of Contents**................................................................ i

**Table of Authorities**.......................................................... iv

**I.    INTRODUCTION** ....................................................... 1

**II.   FACTUAL BACKGROUND**.......................................... 2

    **A.    The Amvona Fund**................................................. 2

    **B.    Fr. Emmanuel's Short Position and Reports Regarding Ligand**.. 3

        1.    June 16, 2014 Report......................................... 3

        2.    June 19, 2014 Interview..................................... 4

        3.    July 3, 2014 Report and Viking's July 1, 2014 S-1................ 6

        4.    August 4, 2014 Report........................................ 8

        5.    August 14 and August 22, 2014 Report................................ 8

    **C.    Negative Commentary About Ligand Between June and August 2014 From *Other* Securities Analysts**............................................... 10

    **D.    Ligand's Requests to the Commission to Investigate Fr. Emmanuel**........................................................................... 11

    **E.    The Commission's Complaint**.............................................. 12

    **F.    The Commission Failed to Produce the Expert Evidence Required to Support its Market-Manipulation Claim**.................... 13

**III.  ARGUMENT**.................................................................... 14

    **A.    Legal Standard**............................................................. 14

    **B.    The Commission Has Failed to Meet its Burden of Establishing a Rule 10b-5 Claim Based on the Four Challenged Statements**........ 14

        1.    The Commission has Failed as a Matter of Law to Establish That Any of the Four Challenged Statements Were Material.. 15

i

i.     *The Commission's Failure to Produce Evidence that the Four Challenged Statements Caused Ligand's Stock Price to Decrease is Fatal to its Claims.*.......................... 15

ii.     *Fr. Emmanuel's Disclosure of his Short Position and Other Cautionary Language Renders Them Immaterial as a Matter of Law*............................................. 21

iii.     *The Undisputed Facts Regarding the Challenged Statements Further Demonstrate that the Commission Has Failed to Show Materiality.*.................................... 22

    a.     June 19, 2014 Statement that Ligand's IR Firm "Basically Agreed" Promacta was Going Away ............................................... 22

    b.     July 3, 2014 Statements that Viking Did Not Consult with its Auditors and Did Not Conduct Pre-Clinical Studies.......................... 23

    c.     August 14 and 22, 2014 Statements ............... 24

2.     The Commission's Rule 10b-5 Claim Also Fails Because the Commission Did Not Produce Any Evidence to Establish Scienter.................................................................................. 24

    i.     *The Absence of the Hallmarks of an Actual Short-and-Distort Scheme Demonstrate the Commission Cannot Prove Scienter*.................................................. 24

    ii.     *The First Challenged Statement Fails for Lack of Scienter for Additional Reasons.*..................................... 28

3.     Each of the Four Challenged Statements is Either Demonstrably True or Constitutes Opinion Commentary Protected by the First Amendment..................................... 29

    i.     *The First Amendment Protects Opinions Unless They are Both Objectively Wrong and Subjectively Not Believed by the Author*.................................................... 29

    a.     June 19, 2014 Statement that Ligand's IR Firm "Basically Agreed" Promacta was Going Away ............................................... 31

b.      July 3, 2014 Statement that Viking Did Not Consult with Its Auditors on Material Issues and the Financial Statements Were Unaudited…………………………………      31

c.      July 3, 2014 Statement that Viking Did Not Conduct Pre-Clinical Studies………………..      32

d.      August 14 and 22, 2014 Statements Regarding Ligand's Debt-to-Tangible Equity Ratio…………………………………………      33

**C.      The Commission Has Failed to Provide Evidence to Support its IAA Claim**...........................................................................      34

**IV.      CONCLUSION**...........................................................................      35

**TABLE OF AUTHORITIES**

**Cases**

| Case | Pages |
|---|---|
| *Aaron v. SEC,* 446 U.S. 680 (1980)................................................... | 24 |
| *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697 (D. Md. 2000)........................ | 31, 33 |
| *Ahmed v. Johnson,* 752 F.3d 490 (1st Cir. 2014)............................................. | 14 |
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)....................................... | 14 |
| *Aurelius v. Bofl Fed. Bank*, No. MC 16–71 DSF (FFM), 2016 WL 8925145 (C.D. Cal. Sept. 20, 2016)................................................................ | 25, 26 |
| *Basic v. Levinson*, 485 U.S. 224 (1988)............................................................ | 15, 23 n.7 |
| *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)....................... | 23 n.7 |
| *Brumbaugh v. Wave Systems Corp.,* 416 F. Supp. 2d 239 (D. Mass. 2006)..... | 16, 19 |
| *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)........................ | 31, 33 |
| *City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Waters Corp.*, 632 F.3d 751 (1st Cir. 2011)....................................................... | 26 |
| *Doe v. SEC*, No. C 11-80209, 2011 WL 5600513 (N.D. Cal. Nov. 17, 2011)................................................................. | 26 |
| *Emerson v. Genocea Biosciences, Inc*. 353 F. Supp. 3d 28 (D. Mass. 2018)..... | 15, 16, 19 |
| *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011)................................. | 29, 31, 33 |
| *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015)................................................................. | 24 n.9, 26 |
| *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001)....................................... | 25 |
| *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir. 1977)........................................... | 14, 15 |

| Case | Pages |
|------|-------|
| *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999)........................... | 24 n.9, 26 n.10 |
| *Gross v. Summa Four*, Inc., 93 F.3d 987 (1st Cir. 1996)................................. | 14 |
| *In re Biogen Sec. Litig.*, 179 F.R.D. 25 (D. Mass. 1997)................................. | 15, 16, 20 |
| *In re Boston Technology Inc. Sec. Litig.*, 8 F. Supp. 2d 43 (D. Mass. 1998)...... | 22, 23 |
| *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410 (3rd Cir. 1997)................................................................................................ | 16, 19 |
| *In re Credit Suisse First Boston Corp. Sec. Litig.*, No. 97 CIV. 4760 (JGK), 1998 WL 734365 (S.D.N.Y. Oct. 20, 1998)........................................................ | 26 n.10 |
| *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561 (S.D.N.Y. 2012)................................................................................................ | 25 |
| *In re Northern Telecom Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000)........ | 20, 21 |
| *In Re Polymedica Corp. Sec. Lit.*, 432 F.3d 1 (1st Cir. 2005)........................... | 19 |
| *In Re Vivendi Universal, SA. Sec. Litig.*, 634 F. Supp. 2d 352 (S.D.N.Y. 2009)................................................................................................ | 20 |
| *In Re Xcelera.com Securities Litig.*, 430 F.3d 503 (1st Cir. 2005).................... | 15, 19 |
| *Immuno AG. v. Moor–Jankowski*, 77 N.Y.2d 235 (N.Y. 1991) ........................ | 30 n.14 |
| *Ingram v. Brink's, Inc.*, 414 F.3d 222 (1st Cir. 2005)........................................ | 14 |
| *Lowe v. SEC*, 472 U.S. 181 (1985)..................................................................... | 29 |
| *Maraj v. Massachusetts*, 953 F. Supp. 2d 325 (D. Mass. 2013)........................ | 13 n.4 |
| *Mayer v. Mylod*, 988 F.2d 635 (6th Cir. 1993)................................................. | 30 |
| *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5 (1st Cir. 1990)........ | 25 |
| *Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020).................... | 26 |

| Case | Pages |
|------|-------|
| *MHC Mut. Conversion Fund v. Sandler O'Neill Partners, L.P.*, 761 F.3d 1109 (10th Cir. 2014)............................................................ | 29, 30 |
| *Milton v. Van Dorn*, 961 F.2d 965 (1st Cir. 1992)................................ | 15 |
| *Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp.*, 649 F.3d 5 (1st Cir. 2011)..... | 24 n.9 |
| *Moldea v. New York Times Co.,* 15 F.3d 1137 (D.C. Cir.1994)...................... | 31, 33 |
| *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).................................... | 24 n.9 |
| *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000)................................... | 16 |
| *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997)...................... | 22 |
| *Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995)........................... | 30, 31, 33, 34 |
| *Phantom Touring*, Inc. v. Affiliated Publications, 953 F.2d 724 (1st Cir. 1992)................................................................. | 33 |
| *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341 (S.D.N.Y. 1977)................ | 27 |
| *Ryan v. Smith,* 904 F.2d 112 (1st Cir. 1990)..................................... | 14 |
| *Saltzberg v. TM Sterling/Austin Assoc., Ltd.*, 45 F.3d 399 (11th Cir. 1995)....... | 21 |
| *SEC v. Aly*, No. 16 Civ. 3853 (PGG), 2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018).............................................................. | 18, 27 |
| *SEC v. Berlacher*, No. 07-3800, 2010 WL 3566790 (E.D. Pa. Sept. 13, 2010)............................................................. | 16, 20 |
| *SEC v. Berliner,* No. 1:08-cv-03859-JES (S.D.N.Y. Apr. 24, 2008)................. | 27 |
| *SEC v. Butler,* No. 00-1827, 2005 WL 5902637 (W.D. Pa. Apr. 18, 2005)....... | 17 |
| *SEC v. Curshen*, 372 Fed. App'x 872, No. 09-1196, 2010 WL 1444910 (10th Cir. Apr. 13, 2010)................................................................. | 26 |
| *SEC v. Dubovoy*, No. 15-6076, 2016 WL 5745099 (D.N.J. Sept. 29, 2016)...... | 27 |

| Case | Pages |
|---|---|
| *SEC v. Fife*, 311 F.3d 1 (1st Cir. 2002)............................................................ | 15 |
| *SEC v. Garcia*, No. 10 CV 5268, 2011 WL 6812680 (N.D. Ill. Dec. 28, 2011)........................................................................... | 17 |
| *SEC v. Goldstone*, CIV 12-0257 JB/LFG, 2016 WL 3135651 (D.N.M. May 10, 2016)...................................................................... | 18, 19 |
| *SEC v. Hamdan*, SEC Lit. Rel. No. 23470, (Feb. 17, 2016).............................. | 26, 27 |
| *SEC v. Hoover*, 903 F. Supp. 1135 (S.D. Tex. 1995)....................................... | 17 |
| *SEC v. Leslie*, No. C 07-3444, 2010 WL 2991038 (N.D. Cal. July 29, 2010).................................................................... | 18 |
| *SEC v. Mangan*, 598 F. Supp. 2d 731 (W.D.N.C. 2008)................................... | 17, 18, 20 |
| *SEC v. Tambone*, 417 F. Supp. 2d 127 (D. Mass. 2006).................................. | 14 |
| *SEC v. Ustian,* No. 16 C 3885, 2019 WL 7486835 (N.D. Ill. Dec. 13, 2019).... | 17, 18 |
| *SEC v. World Radio Mission*, 544 F.2d 535 (1st Cir. 1976)............................. | 24 |
| *SEC v. Ficken*, 546 F.3d 45 (1st Cir. 2008)....................................................... | 25 |
| *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996)............................ | 22 |
| *Silvercorp Metals Inc. v. Anthion Mgmt., LLC*, 959 N.Y.S.2d 92 (Sup. Ct. 2012) (table)..................................................................... | 30 |
| *Sturm v. Marriot Marquis Corp.*, 26 F. Supp. 2d 1358 (N.D. Ga. Nov. 16, 1998).................................................................... | 21, 22 |
| *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173 (1st Cir. 1998)........................... | 28 n.13 |
| *Veleron Holding, B.V. v. Stanley,* 117 F. Supp. 3d 404 (S.D.N.Y. 2015)........... | 21 |
| *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991)................................. | 29, 31, 33 |

## Statutes, Rules, and Regulations

15 U.S.C. § 77q(a) …………………………………………………………  14

17 C.F.R. § 240.10b–5 ………………………………………………………  14

Fed. R. Civ. P. 56(a) …………………………………………………....  14

## I. INTRODUCTION

The Securities and Exchange Commission has never brought an enforcement action remotely resembling its case against Defendant Father Emmanuel Lemelson (f/k/a Gregory Lemelson).  And for good reason.  The Commission seeks to punish Fr. Emmanuel in this so-called "short-and-distort" case based on four statements he made that (i) are each either demonstrably true or constitute opinion commentary protected by the First Amendment, (ii) had no impact on the subject company's stock price and therefore were immaterial as a matter of law; and (iii) were made without the requisite scienter.

From June to August 2014, Fr. Emmanuel published five reports, consisting of 56 pages, and gave two internet radio interviews expressing his opinions as to why Ligand Pharmaceuticals, a publicly traded company, was overvalued.  Of the large number of statements and opinions Fr. Emmanuel made concerning *Ligand*, the Commission cherry-picks just *two* as allegedly being false or misleading.  Curiously, the other two challenged statements involve a different company entirely, in which Fr. Emmanuel did not hold a short position.  On the days the challenged statements were made, Ligand's stock price actually *increased*, and the Commission has failed to produce any evidence (expert or otherwise) that Fr. Emmanuel's statements *negatively impacted* Ligand's stock price.  As this Court (and others) have previously held, this renders the four challenged statements immaterial *as a matter of law*.

Moreover, this case lacks *all* the hallmarks of a true short-and-distort scheme, distinguishing it from all others the Commission has ever brought.  For example, Fr. Emmanuel (1) published all his reports under his own name; (2) expressly disclosed at the beginning of each report that he had taken a short position in Ligand and that he was only expressing his opinions; (3) specifically cited all source materials giving rise to his commentary concerning Ligand; and

(4) held on to his short position for months after he issued his reports. Because the Commission has failed to produce *any* evidence of scienter, the absence of these short-and-distort hallmarks is fatal to its case. Indeed, there are no facts in the undisputed record upon which a factfinder could infer that Fr. Emmanuel intentionally or recklessly defrauded the market.

In addition, the Commission's novel attempt to use Rule 206 of the Investment Advisers Act in an alleged market-manipulation case based on allegedly false statements fails because the Commission has provided no evidence that Fr. Emmanuel defrauded his *own* investors.

In short, in the face of the undisputed facts that Fr. Emmanuel lacked any intent to defraud, the Commission challenges four statements (which were each demonstrably true or opinion commentary protected by the First Amendment) that had no impact on Ligand's stock price: one based on a mathematically *correct* calculation, which the Commission charges was misleading because Fr. Emmanuel's chosen metric (of which it disapproves) made Ligand "look[] really bad"; two statements about a *different company* than the one he shorted; and one statement based on a telephone call in which the other participant essentially conceded the truth of Fr. Emmanuel's statement and for which Fr. Emmanuel's *real-time* notes corroborate his statement. To say this enforcement action is unprecedented is a gross understatement. Indeed, the Commission's case, taken after years of lobbying by Ligand and its counsel, is not only frivolous but if not disposed of on summary judgment, it will have a dangerously chilling impact given its brazen attack on the First Amendment.

## II.   FACTUAL BACKGROUND

### A.   The Amvona Fund

In 2012, Fr. Emmanuel created the Amvona Fund LP. Defendants' Concise Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("SOF") ¶ 1.

Lemelson Capital Management is the general partner of Amvona.  SOF ¶ 2.  Throughout its existence, Amvona has mostly held long positions in stocks, but has also occasionally taken short positions.  SOF ¶ 3.  Since 2010 (even before launching Amvona), Fr. Emmanuel has published approximately 200 academic research and commentary pieces discussing economics, securitization fraud, and high-level security analysis of common stocks—none of which, apart from Ligand, has been challenged by the Commission.  SOF ¶ 4.

B.      **Fr. Emmanuel's Short Position and Reports Regarding Ligand**

1.      June 16, 2014 Report

In 2014, Fr. Emmanuel identified Ligand as a company whose stock he believed was overvalued and accordingly took a short position in the company.  SOF ¶ 6.  On June 16, 2014, consistent with his prior practice, Fr. Emmanuel issued a 25-page opinion commentary concerning his Ligand thesis.  SOF ¶ 7.  Fr. Emmanuel qualified his report with cautionary language, including full disclosure that he was "shorting" Ligand.[1]  SOF ¶ 8.  Indeed, **starting with the *first* sentence of his *first* report on Ligand, and continuing in every one of the reports at issue, Fr. Emmanuel disclosed that "Lemelson Capital is short shares of (NASDAQ:LGND)."**  SOF ¶ 8 (emphasis added); SOF ¶ 36; SOF ¶ 59; SOF ¶ 63.  Fr. Emmanuel additionally disclosed that "[a]ll content in this report represents the *opinions* of Lemelson Capital."  SOF ¶ 9 (emphasis added).  This report also included the following:

> All expressions of opinion are subject to change without notice, and Lemelson Capital does not undertake to update or supplement this report or any information contained herein . . . . Lemelson Capital may benefit from any change in the valuation of any other companies, securities, or commodities discussed in this document.

SOF ¶ 10.

---

[1] As far as the undersigned are aware, Fr. Emmanuel's disclosure that he was short Ligand distinguishes this case from all other short-and-distort actions brought by the Commission.

Among his many opinions in the June 16, 2014 report, Fr. Emmanuel stated Ligand's largest royalty-generating drug, Promacta, faced an imminent threat from a new drug, which he believed would "virtually eliminate demand for Promacta." SOF ¶ 11. Ligand's stock price fell on the date Fr. Emmanuel published this first 25-page report; *however, the Commission is not challenging any statements contained in it*. SOF ¶¶ 12, 13.

2.  June 19, 2014 Interview

Following the publication of Fr. Emmanuel's June 16, 2014 report, high-ranking Ligand personnel exchanged emails with the company's Investor Relations ("IR") representative, Bruce Voss, expressing anger about the report and discussing whether to speak with Fr. Emmanuel about it. SOF ¶ 14. Ligand decided to have Mr. Voss call Fr. Emmanuel. SOF ¶¶ 14, 15. Ligand's CEO, John Higgins, specifically instructed Mr. Voss not to "jump into content or a rebuttal" on the call with Fr. Emmanuel. SOF ¶ 14.

On June 18, 2014, Mr. Voss and Fr. Emmanuel spoke by phone. SOF ¶ 15. According to Mr. Voss' handwritten notes, the call lasted from 12:56 p.m. ET to 1:16 p.m. ET. SOF ¶ 15. Fr. Emmanuel took extensive electronic notes of the call, which reflect that Mr. Voss *agreed* with his opinion that Promacta was going away. SOF ¶ 16. The metadata from these notes shows that Fr. Emmanuel created them at 1:21 p.m. ET and completed them at 1:42 p.m. ET. SOF ¶ 17.

For his part, according to his real-time emails, Mr. Voss followed his client's express instructions and did not engage in any rebuttal of Fr. Emmanuel's opinions during this call. SOF ¶ 18. Specifically, according to Mr. Voss, Fr. Emmanuel stated his opinion that Promacta was going away and then asked Mr. Voss, "don't you agree?" SOF ¶¶ 18-20. Mr. Voss stated that he did not respond to this question; instead he remained silent. SOF ¶ 20.

The following day, June 19, 2014, Fr. Emmanuel was interviewed by an internet radio outlet called Benzinga. SOF ¶ 21. There is no evidence of the number of people that listened to this interview. SOF ¶ 22. The interview lasted approximately 22 minutes, only five of which included a discussion of Fr. Emmanuel's thesis on Ligand. SOF ¶¶ 23, 24. When the topic of Ligand was first raised around the 15-minute mark of the interview, Fr. Emmanuel disclosed he had a short position in Ligand. SOF ¶ 25. At approximately the 16-minute mark, Fr. Emmanuel stated that he had spoken to Ligand—and then corrected himself by saying he spoke to Ligand's *IR firm*—which had "basically agreed" with his thesis concerning Promacta. SOF ¶ 26. This statement, which did not appear in any of Fr. Emmanuel's four subsequent reports, is the first of the four challenged statements. SOF ¶ 29. Ligand's stock price closed higher on the day of the interview than it had the previous day. SOF ¶ 34.

After the interview, Mr. Higgins and Mr. Voss spoke by phone that same day about both Mr. Voss's discussion with Fr. Emmanuel and the radio interview. SOF ¶ 30. Thereafter, Mr. Higgins and Mr. Voss continued their conversation in writing. SOF ¶¶ 31-32. In an email written the day after the interview, Mr. Voss explained his position as to what transpired on the call: "***As I wrote last night,*** he [Fr. Emmanuel] made the statement with a rhetorical 'don't you agree' and I moved on to the next subject as we had more to cover and his statement was ridiculous." SOF ¶ 31 (emphasis added). Critically, the writing that Mr. Voss refers to from the previous night is ***missing***. SOF ¶ 31. Ligand claims it cannot find it. SOF ¶ 31.

In response to (i) their initial telephone conversation; (ii) the missing written document; and (iii) the email that Ligand *did* produce, Mr. Higgins sent an email to Mr. Voss expressing his anger that Mr. Voss remained silent and left Fr. Emmanuel with the impression of a "tacit agreement" with Fr. Emmanuel's thesis. SOF ¶ 32. Specifically, Mr. Higgins stated:

> Also, if he [Lemelson] said the CEO beats his employees would you just move on because "there were more things to cover." Or would you take a moment to stick up for the CEO? Promacta is a big deal, and a big part of our value and business model. He knows it too. He gave you a softball and you just moved on? Even 1 minute of soft info would have left him with a different impression than ***tacit agreement.***

SOF ¶ 32 (emphasis added).

In other words, based on his multiple communications with Mr. Voss, Mr. Higgins ***agreed with Fr. Emmanuel*** that Mr. Voss had "basically" (or in Mr. Higgins' words, "tacit[ly]") agreed with Fr. Emmanuel's thesis. Mr. Voss responded to Mr. Higgins' contention of a tacit agreement not by claiming Fr. Emmanuel lied, but instead by stating that Fr. Emmanuel took "that piece of the dialogue ***out of context***." SOF ¶ 33 (emphasis added).

### 3. July 3, 2014 Report and Viking's July 1, 2014 S-1

On July 3, 2014, Fr. Emmanuel issued his second report on Ligand. SOF ¶ 35. This report included a critical discussion of a company called Viking Therapeutics, with whom Ligand had just entered into a licensing agreement. SOF ¶ 37. Fr. Emmanuel did not hold a short position in Viking (a private, pre-operational company) at the time. SOF ¶ 41. Moreover, contrary to the Commission's patently false allegations in both its Complaint and Amended Complaint, Ligand did *not* own any portion of Viking at this time. SOF ¶¶ 39-40. Two of the Commission's four challenged statements in this case are based on Fr. Emmanuel's statements about Viking (not Ligand) contained in this report. SOF ¶ 38.

In his July 3, 2014 report, Fr. Emmanuel disclosed that the basis for his comments concerning Viking came solely and directly from his analysis of Viking's *publicly filed* Form S-1 Registration Statement, *and he cited to the document so that readers could review the document for themselves.* SOF ¶¶ 42-45. In its S-1, Viking disclosed that it had terminated its auditor one month after hiring it and then disclosed the following concerning the new auditor:

Effective as of April 7, 2014, our board of directors appointed Marcum LLP, or Marcum, as our independent registered public accounting firm to audit our financial statements as of and for the fiscal years ended December 31, 2012 and 2013, and for the fiscal year ending December 31, 2014. From September 24, 2012 (Inception) through April 7, 2014, neither we nor anyone on our behalf consulted with Marcum regarding (1) the application of accounting principles to a specified transaction, either completed or proposed, (2) the type of audit opinion that might be rendered on our financial statements, or (3) any matter that was either the subject of a disagreement, as described in Item 304(a)(1)(iv) of Regulation S-K and the related instructions thereto, or a "reportable event" as described in Item 304(a)(1)(v) of Regulation S-K.

SOF ¶ 44. ***Immediately after quoting the above passage and expressly sourcing it as coming from Viking's publicly filed S-1,*** Fr. Emmanuel opined: "*In other words*, Marcum was merely hired, but the company has not yet even consulted with the firm on any material issues. The financial statements provided on the S1 accordingly are unaudited." SOF ¶ 45 (emphasis added). In fact, the S-1 contained a combination of audited and unaudited statements.[2] SOF ¶ 46. Notwithstanding that, at worst, this statement was merely an *incomplete* interpretation of publicly-filed information, it serves as the first of the Commission's two challenged statements about Viking. SOF ¶ 42.

Viking's S-1 also disclosed details concerning that company's *total inexperience* conducting preclinical studies and clinical trials. For example, the company disclosed that, "All clinical trials, preclinical studies and other analyses performed to date with respect to our drug candidates have been conducted by Ligand. *Therefore, as a company, we do not have any experience in conducting clinical trials for our drug candidates.*" SOF ¶ 50 (emphasis added). Viking further disclosed, **_IN BOLD_**, "**We intend to rely on third parties to conduct our preclinical studies and clinical trials and perform other tasks for us.**" SOF ¶ 49 (emphasis in original). Based on these disclosures, Fr. Lemelson correctly concluded in his July 3, 2014

---

[2] The term "unaudited" appears 56 times in the S-1, while the term "audited" appears only seven times. SOF ¶ 46.

report that: "***Viking*** does not intend to conduct any preclinical studies or trials …." SOF ¶ 48 (emphasis added). This is the second challenged statement from the July 2014 report. *Id.*

There is no evidence that any investor of Ligand or Viking raised concerns about either of these statements. SOF ¶¶ 47, 53. Moreover, Viking's CEO, Brian Lian, testified that he does not recall if he even read Fr. Emmanuel's July 3, 2014 report, did not speak with any investor about this report in any depth, and does not recall any of his colleagues expressing any concern about the statements. SOF ¶ 54. Ligand's stock price closed higher on the day this report came out than it did the previous day. SOF ¶ 57.

### 4.    August 4, 2014 Report

On August 4, 2014, Fr. Emmanuel published his third report on Ligand. SOF ¶ 58. The Commission is not challenging any of Fr. Emmanuel's statements contained in the August 4, 2014 report. SOF ¶ 60. On that date, Ligand's share price skyrocketed, closing 9% higher than it did the previous trading day. SOF ¶ 61.

### 5.    August 14 and August 22, 2014 Reports

On August 14 and 22, 2014, Fr. Emmanuel published his fourth and fifth reports on Ligand. SOF ¶ 62. These last two reports discussed, *inter alia,* $245 million in new debt that Ligand was incurring through a *publicly announced* bond offering. SOF ¶ 66. Among the many points he made in analyzing the bond offering, in the August 14 Report, he wrote:

> **Tangible equity:** On August 4, 2014, Ligand released their Q2 earnings report and financial statements in which the company boasted that it was debt free. Prior to this August 4 release, the company's liabilities exceeded tangible assets, meaning the company was insolvent. With the August 4, 2014 earnings release and its updated financials, the company presented tangible equity of just $21,000 upon which rested an extraordinary market capitalization of approximately $1.1 billion.

SOF ¶ 67 (emphasis in original).

In the August 22, 2014 Report, Fr. Emmanuel continued his analysis of the bond offering based on his review of Ligand's recent publicly filed 8-K, writing:

> On August 18 [2014], Ligand filed a form 8-K with the Securities and Exchange Commission (SEC) revealing that the company had issued $245 million in new debt against the company's tangible equity of jut $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars in debt for every $1 dollar in tangible common shareholder equity).

SOF ¶ 68.

> Fr. Emmanuel then concluded his analysis of the bond offering as follows:

> There is no question that the cost of this preferential treatment of a few large Ligand shareholders at the expense of remaining investors places a burden on Ligand and its shareholders that is both unsustainable and further deepens the company's insolvency and likelihood of liquidation or reorganization under Chapter 7 or Chapter 11 of the bankruptcy code under which remaining Ligand common shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt.

SOF ¶ 69.

In its original Complaint, the Commission based its final challenged statement on Fr. Emmanuel's calculation of Ligand's debt-to-tangible equity ratio. SOF ¶ 70. Specifically, the Commission *falsely* claimed the calculation was wrong because Fr. Emmanuel failed to include the cash from the loan proceeds as part of shareholder tangible equity, notwithstanding that cash proceeds of a loan do not constitute equity (tangible or otherwise).[3] SOF ¶¶ 70-71. After the Court dismissed this claim from the original Complaint, the Commission re-plead it, now arguing not that the calculation was wrong but that despite being true and accurate, it was (along with the accompanying discussion) somehow "misleading." SOF ¶¶ 72-73.

In making his debt-to-tangible equity ratio calculation, Fr. Emmanuel *explained* to his readers that he was comparing only Ligand's *tangible* equity to its debt (and therefore *expressly*

---

[3] Notably, this exact same erroneous allegation was contained in both presentations Ligand and its counsel made to the Commission, which are discussed further below. SOF ¶¶ 100, 112.

*excluded* the company's intangible assets from his analysis).  SOF ¶¶ 74-75.  Further, in both the August 14 and 22 Reports, Fr. Emmanuel told readers that the figures he used in making his calculation came directly from Ligand's *publicly available* regulatory filings, and therefore his calculation of the debt-to-tangible equity ratio and related commentary did not constitute any *new* information not previously available to investors.  SOF ¶¶ 74-75.

On August 14, 2014, Ligand's stock price closed higher than it did the previous day.  SOF ¶ 64.  On August 22, 2014, Ligand's stock price closed down slightly (a statistically insignificant amount).  SOF ¶¶ 65, 133.

Notably, despite the Commission's dubious claim that Fr. Emmanuel's constitutionally-protected decision to exclude Ligand's intangible assets from his calculation and his related discussion of "tangible equity" amounted to securities fraud, these concepts were not unique to his financial analysis of Ligand.  He had previously questioned the value of intangible assets when analyzing *other* companies. SOF ¶¶ 80-82.  For example, just a few months earlier in March 2014, when discussing WWE, Fr. Emmanuel wrote, "Intangible assets (the kind you can't sell easily when things turn south) increased from roughly 100 k in 2010 to just under 27 M in 2013, an increase of 268 fold in 3 years – these 'ghost assets' of course can bolster a balance sheet nicely. . . . Current price exceeds tangible book [a synonym for "tangible equity"] by a factor of nearly 10x."  SOF ¶ 81 (brackets added).  Similarly, in Fr. Emmanuel's published analysis concerning Geospace Technologies, Fr. Emmanuel noted that he believed Geospace was undervalued *because* of its significant *tangible* assets.  SOF ¶ 82.

### C.  Negative Commentary About Ligand Between June and August 2014 From *Other* Securities Analysts

Meanwhile, on July 22 and August 5, 2014—within the time period that Fr. Emmanuel published the reports and gave the interviews on Ligand at issue—a research firm called Empire

Asset Management issued two reports, which were *extremely critical* of Ligand. SOF ¶ 83. On the date of the first, Ligand's stock price plunged by approximately 4.5%—more movement of the stock price than on any day Fr. Emmanuel published one of his reports (except for the day the stock went *up* by more than 9%). SOF ¶ 84. On the date of the second Empire report, Ligand's stock sank more than 2%. SOF ¶ 85.

Also, on July 15, 2014, then-Federal Reserve Chair Janet Yellen made statements about valuations of biotech stocks being "substantially stretched." SOF ¶ 86. On that date, Ligand's stock price fell by more than 4.5%. SOF ¶ 87. Internal Ligand emails reflect that company personnel believed Ms. Yellen's statements—not Fr. Emmanuel's opinion commentary— may have been the cause of negative movement in Ligand's stock during this time. SOF ¶ 88.

### D. Ligand's Requests to the Commission to Investigate Fr. Emmanuel

To this day, Ligand has never made a public statement contesting anything Fr. Emmanuel has written or said about the company, despite a NASDAQ rule suggesting it should do so if it believed his statements were false and impacted its stock price. SOF ¶¶ 90-92. Instead, Ligand engaged two large international law firms in an effort to silence Fr. Emmanuel by persuading the Commission to bring an enforcement action against him. SOF ¶¶ 93-94, 104-109.

On September 25, 2014, Ligand and its first law firm met with the Commission's *Boston* regional office. SOF ¶ 93. Ligand made a 60-slide PowerPoint presentation to the Commission, including offensive references to, and photographs of, Fr. Emmanuel's faith and religious practice, in addition to false and baseless allegations that Fr. Emmanuel engaged in an "affinity fraud," misrepresented the performance of the Amvona Fund, and had a "questionable personal history." SOF ¶¶ 95-96. *Notably, the PowerPoint presentation made no mention whatsoever of the first three challenged statements.* SOF ¶¶ 97-98. As to the fourth challenged statement, the

PowerPoint erroneously claimed that the debt-to-tangible equity ratio was wrong, because Fr. Emmanuel failed to include the cash proceeds from the loan in his calculation.  SOF ¶ 99.  *This is the same false allegation that the Commission included in its original Complaint.*  SOF ¶ 70.

Sometime after the September 25, 2014 meeting, the Boston regional office informed Ligand that it would *not* be opening an investigation concerning Fr. Emmanuel.  SOF ¶ 104.

As a result, Ligand hired *new* counsel, who had previously served as a high-ranking employee at the Commission in Washington, D.C.  SOF ¶¶ 105-107.  This new attorney arranged a *second* meeting, this time with his former colleagues at the Commission's *Washington, D.C.* regional office, on June 8, 2015—nine months after Ligand's first, failed meeting.  SOF ¶ 107.  Ligand again made a PowerPoint presentation to the Commission, this time containing 62 slides.  SOF ¶ 108.  And again, Ligand made no mention of either of the two challenged statements concerning Viking.  SOF ¶ 112.  Also, once again, Ligand included the false contention concerning Fr. Emmanuel's calculation of its debt-to-tangible equity ratio.  SOF ¶ 113.

### E.    The Commission's Complaint

On September 12, 2018, more than four years after Fr. Emmanuel published his final report on Ligand, the Commission filed this enforcement action.  SOF ¶ 117.  On March 21, 2019, the Commission filed the operative Amended Complaint.  SOF ¶ 118.  Based on the four challenged statements, the Commission brought claims under 10b-5 (both for the statements themselves and claiming "scheme" liability, even though the Commission has not identified any alleged fraud outside the challenged statements).  SOF ¶¶ 119-121.  The Commission also alleged a violation of Section 206 of the Investment Advisers Act ("IAA"), based on the completely novel (and unsupportable) theory that Fr. Emmanuel defrauded his own investors by

not disclosing that the profits from the Ligand short were allegedly the result of the four challenged statements.  SOF ¶ 122.

F.     **The Commission Failed to Produce the Expert Evidence Required to Support its Market-Manipulation Claim**

Given the fact that Ligand's stock price increased on all but one of the five dates on which he made the four challenged statements, and the fact that there were other negative reports about the company during the relevant timeframe (which appear to have directly corresponded with Ligand's stock price decreasing), Defendants sought discovery on the Commission's theory that *Fr. Emmanuel's* statements caused Ligand's stock price to drop.  SOF ¶¶ 124.  Among this discovery, Fr. Emmanuel served an interrogatory seeking the basis for the Commission's contention that Defendants' statements influenced or otherwise impacted the stock price for Ligand.  SOF ¶ 125. The Commission objected to the interrogatory as "a premature request for matter that may be the subject of expert testimony."  SOF ¶ 126.  The Commission made the same objection to Fr. Emmanuel's request for documents supporting the Commission's position that he caused Ligand's stock price to drop.  SOF ¶¶ 127-128.

Notwithstanding the Commission's discovery responses and its customary use of expert event studies to prove its theories in similar cases (discussed further below), ***the Commission, incredibly, did not designate an affirmative expert witness in this case***.[4]  SOF ¶ 129.

---

[4] The Commission did designate a rebuttal expert in response to Defendants' expert who had conducted an event study, SOF ¶ 130, and determined the four challenged statements did not impact Ligand's stock price; however, pursuant to well-established caselaw, the testimony of the rebuttal witness cannot be considered for purposes of summary judgment. *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment because "there is no need to consider rebuttal evidence" in order to create a genuine issue of material fact).

**III.    ARGUMENT**

**A.    Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson,* 752 F.3d 490, 495 (1st Cir. 2014).  A genuine issue of material fact "does not spring into being simply because a litigant claims that one exists.  Neither wishful thinking nor mere promises to produce admissible evidence at trial, nor conclusory responses unsupported by evidence, will serve to defeat a properly focused Rule 56 motion." *Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990) (internal citations omitted).  In opposition, the Commission may not rest on the pleadings but must present "significant probative evidence" demonstrating that a genuine dispute of material fact exists. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-51 (1986) (presenting a mere "scintilla of evidence" is insufficient). "Summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Ingram v. Brink's, Inc*., 414 F.3d 222, 228–29 (1st Cir. 2005).

**B.    The Commission Has Failed to Meet its Burden of Establishing a Rule 10b-5 Claim Based on the Four Challenged Statements**

To prevail on its Rule 10b–5 claim, the Commission must prove that Fr. Emmanuel: "(1) engaged in fraudulent conduct; (2) in connection with the purchase or sale of securities; (3) through the means or instruments of transportation or communication in interstate commerce or the mails; (4) with the requisite scienter." *SEC v. Tambone*, 417 F. Supp. 2d 127, 131 (D. Mass. 2006); 15 U.S.C. § 77q(a); 17 C.F.R. § 240.10b–5.  In addition, the Commission must establish that each of the four challenged statements was *material.  See Gross v. Summa Four*, Inc., 93 F.3d 987, 992 (1st Cir. 1996) (superseded by statute on other grounds); *Goldberg v. Meridor*,

567 F.2d 209, 220 (2d Cir. 1977) (stating the test for materiality is no different in SEC enforcement actions than in a private action).

      1.      The Commission has Failed as a Matter of Law to Establish That Any of <u>the Four Challenged Statements Were Material</u>

A statement "is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether or not to invest his money in a particular security." *SEC v. Fife*, 311 F.3d 1, 9 (1st Cir. 2002) (citing *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)). A statement is only material if it "significantly altered the 'total mix' of information." *Basic,* 485 U.S. at 232. The fact that "an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement." *Milton v. Van Dorn*, 961 F.2d 965, 969 (1st Cir. 1992).

      i.      *The Commission's Failure to Produce Evidence that the Four Challenged Statements Caused Ligand's Stock Price to Decrease is Fatal to its Claims*

As both the First Circuit and this Court have recognized, in cases like the present involving the alleged manipulation of a publicly-traded company operating in an efficient market, ***materiality is proven or disproven by the impact the alleged statements have on the price of the company's stock***.[5] "In an efficient market, the defendant's misrepresentations are absorbed into, and reflected by, the market price." *In Re Xcelera.com Securities Litig.*, 430 F.3d 503, 507 (1st Cir. 2005). Following this principle, in *Emerson v. Genocea Biosciences, Inc.*, this Court dismissed a securities fraud case on the ground that disclosure of the allegedly material information did not impact the company's stock price, and therefore plaintiffs could not establish materiality as a matter of law. 353 F. Supp. 3d 28, 41 (D. Mass. 2018) (Saris, J.). *See also In re*

---

[5] Both Defendants' *affirmative* expert and Plaintiff's *rebuttal* expert agree that the market for Ligand was efficient during the relevant time period. SOF ¶ 132.

*Biogen Sec. Litig.*, 179 F.R.D. 25, 35 (D. Mass. 1997) (noting defendants can rebut presumption of materiality if they can show "'the market price was not affected by their misrepresentations'") (Saris, J.) (internal citation omitted); *Brumbaugh v. Wave Systems Corp.,* 416 F. Supp. 2d 239, 254-55 (D. Mass. 2006) ("[t]he concept of materiality translates into information that alters the price of the firm's stock); (quoting *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock. . . . This is so because efficient markets are those in which information important to reasonable investors (in effect, the market, is immediately incorporated into stock prices)") (internal citations omitted); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (Materiality "may be measured post hoc by looking to the movement ... of the price of the firm's stock."); *SEC v. Berlacher*, No. 07-3800, 2010 WL 3566790, at *7 (E.D. Pa. Sept. 13, 2010) ("As opposed to guessing what a reasonable investor would find important or what could alter the total mix of information in the market, the United States Court of Appeals for the Third Circuit has adopted a concrete method of measuring the materiality of information... [i]f there is no movement in the stock price, then the disclosed information is immaterial as a matter of law").

This Court's decision in *Emerson*, decided three months after the Commission filed this case, is both dispositive and instructive. 353 F. Supp. 3d 28. There, plaintiff asserted that a company's failure to disclose six-month post-dosing clinical trials of genital herpes immunotherapy treatment on viral shedding process was a material omission from an otherwise positive announcement about the clinical trial that violated Rule 10b-5. *Id.* at 38. The company later released the 12-month viral shedding results, and the company's stock price increased on the day it released the data. *Id.* at 40-41. This Court held, in deciding a *motion to dismiss, "[t]he*

release of the negative twelve month viral shedding results without consequence is **fatal** to Plaintiffs' allegations." *Id.* at 41 (emphasis added). The same result must follow here (especially at the *summary judgment* stage), where Ligand's stock price also increased on the days of the alleged misstatements, reflecting that reasonable investors in the marketplace did *not* consider the statements to be material *as a matter of law. Id.*

Moreover, the Court should disregard any argument the SEC might make to the contrary, because when it suits the Commission's needs, the Commission argues that stock price movement proves materiality. *See, e.g., SEC v. Ustian,* No. 16 C 3885, 2019 WL 7486835, at *27 (N.D. Ill. Dec. 13, 2019) (expert retained by SEC opined that stock at issue traded in efficient market meaning any news would be reflected in stock within one day and considered whether announcement at issue had material impact); *SEC v. Garcia*, No. 10 CV 5268, 2011 WL 6812680, at *13 (N.D. Ill. Dec. 28, 2011) (SEC questioned defendant's explanations for trading activity by noting that stock traded in efficient market and so reports published before defendant made his investment and that defendant claimed to have relied upon would have already been incorporated into market price); *SEC v. Butler,* No. 00-1827, 2005 WL 5902637, at *11-12 (W.D. Pa. Apr. 18, 2005) (SEC argued that evidence of efficient market and quick market reaction supported finding of materiality); *SEC v. Mangan*, 598 F. Supp. 2d 731, 733 (W.D.N.C. 2008) (SEC expert opined that stock traded in efficient market, and the SEC argued that the movement in stock proved materiality); *SEC v. Hoover*, 903 F. Supp. 1135, 1144 (S.D. Tex. 1995) (SEC argued in insider trading case that the negative market reaction to an 8-K disclosure showed that an earlier, non-public projection was material).

Given the required correlation between changes in stock price and materiality, and the Commission's historical reliance on that correlation to prove materiality, it is not surprising that

in market-manipulation cases like the present, the Commission *routinely* relies on event-study analyses (expert reports that identify and isolate the causes of changes in market prices) to prove materiality. *See, e.g., SEC v. Aly*, No. 16 Civ 3853, 2018 WL 1581986, at *15-16 (S.D.N.Y March 27, 2018) (SEC permitted to present evidence of expert's event study to prove materiality); *Mangan*, 598 F. Supp. 2d at 735 (SEC sought to avoid summary judgment by submitting expert event window analysis that concluded movement in stock price showed materiality); *SEC v. Goldston*e, CIV 12-0257 JB/LFG, 2016 WL 3135651, at *46 (D.N.M. May 10, 2016) (SEC successfully argued for its expert's event study to be admitted to prove materiality); *Ustian,* 2020 WL 416289, at *10 (SEC successfully argued for the admission of its expert's event study to prove materiality); *SEC v. Leslie*, No. C 07-3444, 2010 WL 2991038, at *11-14 (N.D. Cal. July 29, 2010) (addressing SEC's argument in favor of admitting its expert's event study to prove materiality). Such evidence would have been especially important under the factually unique circumstances of this case, where there were no sudden or calamitous drops in Ligand's share price on the days Fr. Emmanuel made his challenged statements (a fact present in every other short-and-distort case as far as the undersigned are aware).

In fact, in response to Defendants' discovery requests concerning the impact Fr. Emmanuel's statements had on Ligand's stock price, the Commission suggested it would be providing expert evidence in response. SOF ¶¶ 124-128. **However, the Commission subsequently failed to designate an affirmative expert to provide an event-study analysis here or otherwise opine on the impact the challenged statements had on the stock price.** SOF ¶ 129. **This failure is telling given the Commission's discovery responses and its customary practice of doing so in similar cases, and *is itself fatal to its claims.***

Admittedly, the Circuits are split on whether event studies in securities fraud cases are *mandatory* for plaintiffs to prove materiality or whether they are merely "*almost obligatory.*" While the First Circuit has not *directly* ruled on the issue, it has cited the "mandatory" cases with approval, and its decisions (and those from this Court) finding that the impact of misstatements is reflected in the movement of a company's stock price, strongly indicate it believes event studies are mandatory. Regardless, in light of the complete absence of other evidence of materiality in this case (both with respect to stock price movement as set forth above, and more generally as set forth below), no matter which line of cases the Court decides to follow, the Commission's conspicuous failure not to offer an affirmative event study provides an additional reason why the Commission has failed to establish the required element of materiality as a matter of law.

The Third Circuit "has essentially made event studies mandatory" to prove materiality in securities fraud cases. *Goldston*e, 2016 WL 3135651, at *46 (citing *Burlington Coat Factory Factory*, 114 F.3d at 1425). The First Circuit has cited *Burlington Coat Factory* with approval. *See In Re Polymedica Corp. Sec. Lit.*, 432 F.3d 1, 13-14 (1st Cir. 2005) (adopting definition of efficient market from *Burlington Coat Factory*, *i.e.,* that the market price of a stock fully reflects all publicly available information, and noting that Third Circuit held the concept of materiality in an efficient market translates into information that alters the firm's stock). Moreover, the First Circuit's holding in *In Re Xcelera.com* that "in an efficient market, the defendant's misrepresentations are absorbed into, and reflected by, the market price," only makes sense if event studies are mandatory, at least in cases like the present where there are multiple statements with no immediate and obvious drop in the share price. 430 F.3d at 507. The same is true of <u>*this Court's*</u> holdings in *Emerson, In re Biogen,* and *Brumbaugh, supra*.

In addition, the lack of an event study is dispositive here, because it means the Commission failed to provide evidence that *Fr. Emmanuel's* alleged misstatements, as opposed to any other market forces, caused a drop in Ligand's stock price. *See Berlacher*, 2010 WL 3566790, at *8 (finding SEC failed to prove materiality where defendant presented event study concluding that information was not material, and the court declined to credit and rely upon the SEC's expert, who failed to submit an event study, because his proposed methodology did not account for stock's volatility or isolate alleged misconduct); *Mangan*, 598 F. Supp. 2d at 735-36 (granting defendant's motion for summary judgment where SEC failed to present sufficient evidence regarding materiality where expert's analysis did not distinguish cause of drop in market price from leakage of information at issue and other market forces). This is a particularly glaring deficiency here, where Ligand's *own* disclosures noted it had a history of stock price volatility, SOF ¶ 102, and Ligand's stock price fell by as much as 30 percent over a one-month period between March and April 2014, just a few months prior to Fr. Emmanuel's reports. SOF ¶ 103. Accordingly, by failing to produce affirmative expert evidence of an event study showing that the four challenged statements negatively impacted Ligand's stock price, the Commission has failed to meet its burden on materiality as a matter of law.

Moreover, even if this Court were to determine an event study is not mandatory in *all* market-manipulation cases, Defendants would still be entitled to summary judgment here, because the Commission has presented no other evidence to show that any of the alleged misstatements were material. While the Second Circuit, for example, has not adopted a *per se* requirement as has the Third Circuit, courts in that Circuit have noted that event study analyses are nonetheless "almost obligatory." *In Re Vivendi Universal, SA. Sec. Litig.*, 634 F. Supp. 352, 364 (S.D.N.Y. 2009). Indeed, in *In re Northern Telecom Sec. Litig.*, 116 F. Supp. 2d 446,

460 (S.D.N.Y. 2000), the court granted defendants summary judgment because plaintiffs'

expert's testimony was "fatally deficient in that he did not perform an event study or similar

analysis to remove the effects on stock price of market and industry information..." In other

words, the exception to the event-study requirement (in Circuits where its use is not mandatory)

arises when a securities plaintiff provides significant other evidence of materiality. *See Veleron*

*Holding, B.V. v. Stanley,* 117 F. Supp. 3d 404 (S.D.N.Y. 2015*)* (finding plaintiff's failure to

present event study not dispositive on materiality because "plenty of evidence" of materiality

based on testimony concerning *non-public* information used by short seller). For the reasons set

forth below, the Commission has entirely failed to do so here.

ii.     *Fr. Emmanuel's Disclosure of his Short Position and Other*
        *Cautionary Language Renders Them Immaterial as a Matter of*
        *Law*

In addition to the absence of evidence (expert or otherwise) that Fr. Emmanuel's

challenged statements impacted Ligand's stock price, the Commission's claims fail because Fr.

Emmanuel disclosed his short position and included cautionary language that his reports

constituted opinion commentary. *See, e.g., Saltzberg v. TM Sterling/Austin Assoc., Ltd.*, 45 F.3d

399, 400 (11th Cir. 1995) ("The context in which a statement is made is important. When an

offering documents' projections are accompanied by meaningful cautionary statements and

specific warnings of the risks involved, that language may be sufficient to render the alleged

omissions immaterial as a matter of law."); *Sturm v. Marriot Marquis Corp.*, 26 F. Supp. 2d

1358, 1366 (N.D. Ga. 1998) (granting defendant's motion to dismiss 10b-5 claims because the

defendants adequately disclosed their conflicts of interest, noting that "[g]iven these disclosures,

the difference between what is said ... and what the Plaintiffs say should have been said ... would

not alter the total mix of facts available to an investor."). Given Fr. Emmanuel's disclosures, his commentary could not alter the total mix of information available.[6]

        iii.    *The Undisputed Facts Regarding the Challenged Statements Further Demonstrate that the Commission Has Failed to Show Materiality*

Even if the Court ignores that (i) the Commission failed to produce an event-study analysis; (ii) the Commission failed to produce any other evidence that the challenged statements negatively impacted Ligand's stock price; (iii) the stock price rose on the days of three of the four challenged statements and only decreased negligibly on the date of the fourth, which its own rebuttal expert concedes was not statistically significant; (iv) Fr. Emmanuel disclosed his short position and included other cautionary language in his reports, and (v) the Commission failed to produce any other evidence (as opposed to bare allegations) of materiality, summary judgment is still warranted, because the statements themselves do not support a finding of materiality.

        a.    June 19, 2014 Statement that Ligand's IR Firm "Basically Agreed" Promacta was Going Away

Without more, this statement itself is too vague to support a claim that it was material. Fr. Emmanuel said only that some **unidentified individual** at an **unidentified investor relations firm "*basically*** agreed" that Promacta was "going away" at some **unspecified date in the future**. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996) (noting statements lacking specificity or clearly constituting the opinions of the speaker are considered immaterial as a matter of law); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547-48 (8th Cir. 1997) (finding statement lacking specificity immaterial as a matter of law); *In re Boston Technology Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 70-71 (D. Mass. 1998) (finding analyst's statement that problem with

---

[6] Fr. Emmanuel even went so far as to disclose *opposing* opinions that contradicted his own in his reports, SOF ¶ 56, another fact that distinguishes this case from any the Commission has previously brought.

product order cancellation was an aberration and corporation's comments about exciting new opportunities to be too vague to be material).

        b.     July 3, 2014 Statements that Viking Did Not Consult with its Auditors and Did Not Conduct Pre-Clinical Studies

The Commission has presented no evidence to support its allegation that the two alleged misstatements in Fr. Emmanuel's report about **Viking, a start-up company with no operations**[7] had a material impact on **Ligand**. Tellingly, Ligand failed to mention either of these alleged misstatements in its two separate presentations to the Commission. SOF ¶¶ 98, 112. Additionally, Viking's CEO does not recall if he even read Fr. Emmanuel's July 3, 2014 report, did not speak with any investor about this report in depth, and does not recall anyone at Viking expressing any concern about these statements. SOF ¶ 54. When questioned, Ligand's CEO also could not offer any explanation as to how these statements were material. SOF ¶ 55.

The lack of materiality of the two Viking statements is further underscored by Ligand's second presentation to the Commission, which included a (cherrypicked) selection of time periods in which Ligand claimed Fr. Emmanuel's statements caused Ligand's stock price to decrease,[8] but conspicuously excluded the period from June 24, 2014 to July 13, 2014 (which covers the nine days before the two Viking statements and the 10 days thereafter). SOF ¶ 116.

Finally, the Commission all but conceded the lack of materiality as to the Viking statements when it alleged in its Amended Complaint—in order to support its claim of

---

[7] These statements were made before Viking was publicly traded and neither Fr. Emmanuel nor his entities owned or shorted any Viking securities at the time (an impossibility at any rate for a private company with no operations). In addition to not being material, these statements are also not "in connection with the purchase or sale of securities." *See Basic,* 485 U.S. at 261 (White, J. concurring) (doubting Rule 10b-5's requirement that a statement is "in connection with purchase or sale of securities" was satisfied where defendants did not purchase or sell securities at issue during the relevant time period and noting that "in previous cases, we had recognized that Rule 10b–5 is concerned primarily with cases where the fraud is committed by one trading the security at issue") (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736 n.8 (1975)).

[8] The Commission did not adopt Ligand's argument in this regard.

materiality—that Ligand owned nearly half of Viking at the time the statements were made. SOF ¶ 39. This contention was false, as Ligand did not own any part of Viking. SOF ¶ 40.

c.     August 14 and 22, 2014 Statements

The Commission apparently takes umbrage at Fr. Emmanuel's debt-to-tangible-equity ratio because it claims it was improper to exclude Ligand's intangible assets. However, Fr. Emmanuel **expressly disclosed** that he was only considering Ligand's tangible assets, and thus reasonable investors (whether they agreed with him or not) *understood* the components of his financial analysis and were free to disregard it. Indeed, if Fr. Emmanuel's chosen metric was, as the Commission claims, irrelevant given Ligand's particular business model, no reasonable investor would have relied upon it in deciding whether to purchase or sell Ligand stock.

2.     The Commission's Rule 10b-5 Claim Also Fails Because the Commission Did Not Produce Any Evidence to Establish Scienter

i.     *The Absence of the Hallmarks of an Actual Short-and-Distort Scheme Demonstrate the Commission Cannot Prove Scienter*

To prove scienter, the Commission must prove Fr. Emmanuel acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Aaron v. SEC,* 446 U.S. 680, 686 n.5 (1980).[9] In other words, the Commission must show that Fr. Emmanuel had the "*intent to say something ... that is not believed to be true.*" *SEC v. World Radio Mission*, 544 F.2d 535, 540 (1st Cir. 1976) (emphasis added). While the issue of scienter is usually a jury question, summary judgment is appropriate "if the nonmoving party rests merely upon conclusory allegations,

---

[9] Proof of "a high degree of recklessness" is also enough. *Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp.*, 649 F.3d 5, 20 (1st Cir. 2011). However, recklessness in this context "does not include ordinary negligence but is closer to being a lesser form of intent." *Fire and Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 240 (1st Cir. 2015) (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 188 (1st Cir. 1999) (recklessness is "a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it"). *See also Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (recklessness is "a state of mind 'approximating actual intent, and not merely a heightened form of negligence'").

improbable inferences, and unsupported speculation.'" *SEC v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)). That is precisely what the Commission does here.

The undisputed factual record demonstrates that the Commission's *only* potential argument is that scienter should be inferred based on Fr. Emmanuel having held a short position in Ligand, which would have benefitted from a drop in the company's stock price. Such evidence is legally inadequate. "[C]learly evidence of mere motive and opportunity cannot suffice against a motion for summary judgment on the issue of scienter." *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001) (granting summary judgment to defendants in securities fraud case because "[e]ven if the statements at issue were material and false or misleading, the evidence does not support a finding that defendants *knew* the statements would materially mislead the investing public") (emphasis in original).

Here, not only has the Commission failed to produce any evidence to support scienter, but *all* the hallmarks of an actual short-and-distort scheme that might otherwise allow a factfinder to infer scienter are conspicuously absent. First, Fr. Emmanuel *disclosed his short position* in all of his reports and during the internet radio interview at issue. "Short sellers operate by speculating that the price of a security will decrease. They can perform a useful function by bringing information that securities are overvalued to the market. However, they have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577 (S.D.N.Y. 2012) (granting motion to dismiss Rule 10b-5 claims). Applying this logic, multiple courts have found that identification of a short position or other conflict of interest, and fulsome disclosures generally, militate against liability for alleged securities violations. *See, e.g., Aurelius v. Bofl Fed. Bank*,

No. MC 16–71 DSF (FFM), 2016 WL 8925145, at *3 (C.D. Cal. Sept. 20, 2016) (granting

motion to quash subpoena and reasoning that defendant "stated in each of his articles that he was

'short' Bofl stock. It would seem unlikely for [defendant] to make such a proclamation if he

were part of a scheme to manipulate the market."); *Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d

194, 208 (1st Cir. 2020) (reasoning that disclosure of FDA Form 483 in same filing that stated

company was using good manufacturing practices "undercut any inference that defendants

intentionally or recklessly misled investors"); *Abiomed, Inc.*, 778 F.3d at 243-44

(finding scienter was undercut by company's disclosure to investors of correspondence with the

FDA and potential consequences of the agency's negative determination); *City of Dearborn

Heights Act 345 Police & Fire Retirement Sys. v. Waters Corp.*, 632 F.3d 751, 760 (1st Cir.

2011) ("[A]ttempts to provide investors with warnings of risks generally weaken the inference

of scienter").[10]

Second, Fr. Emmanuel published his reports in his own name, something a short seller

with an intent to defraud would not do. *Compare Doe v. SEC*, No. C 11-80209, 2011 WL

5600513, at *1 (N.D. Cal. Nov. 17, 2011) (denying motion to quash SEC's subpoena to Google

seeking the identity of anonymous email account suspected to be involved in pump-and-dump

scheme); *SEC v. Curshen*, 372 Fed. App'x 872, No. 09-1196, 2010 WL 1444910, at *7-10 (10th

Cir. Apr. 13, 2010) (affirming liability and injunction against individual that shared false

information about company by anonymous postings); SEC Lit. Rel. No. 23470, *SEC v. Hamdan*

(Feb. 17, 2016), *available at* https://www.sec.gov/litigation/litreleases/2016/lr23470.htm (noting

---

[10] *Compare Greebel,* 194 F.3d at 196 (listing examples of evidence that can be used to raise inference of scienter
and including personal interest of corporate executives not to inform others of impending sale of stock); *In re Credit
Suisse First Boston Corp. Sec. Litig.*, No. 97 CIV. 4760 (JGK), 1998 WL 734365, at *10 (S.D.N.Y. Oct. 20, 1998)
(reasoning that a reasonable trier of fact could conclude failure to disclose short position was evidence of scienter).

settlement with defendant who manipulated market prices through multiple postings and employing numerous tactics to hide his true identity).

Third, the SEC also establishes scienter in a typical short-and-distort case by showing that after making a false statement aimed at driving down the stock, the offender covered his short position almost immediately before the market had a chance to discover the truth. *See, e.g.,* Complaint, *SEC v. Berliner,* No. 1:08-cv-03859-JES (S.D.N.Y. Apr. 24, 2008) (SEC alleged defendant acted intentionally because he sold short 10,000 shares of stock "within minutes" of disseminating false information); *Aly*, 2018 WL 1581986, at *23 (establishing scienter based on temporal proximity of defendant filing Schedule 13D with false information and then selling his call options within 10 minutes); *SEC v. Dubovoy*, No. 15-6076, 2016 WL 5745099, at *2, 5 (D.N.J. Sept. 29, 2016) (finding intent to trade on hacked information supported by temporal proximity of closing positions within minutes or hours after information released publicly). In stark contrast here, Fr. Emmanuel held on to a substantial portion of his short position in Ligand until October 13, 2014 (SOF ¶ 89)—almost four months after he published his initial report regarding Ligand and almost two months after he published his final one. *See Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341, 1353 (S.D.N.Y. 1977) (granting summary judgment in part because defendants did not purchase or sell any of the subject securities at or about the time of the offending article).[11]

> ii. *The First Challenged Statement Fails for Lack of Scienter for Additional Reasons*

The Commission's first challenged statement differs from the others in that it arises from

---

[11] In addition, at the outset of the Commission's investigation, Fr. Emmanuel voluntarily turned over his *entire* hard drive to the Commission—including all attorney-client privileged communications—in an effort to be as transparent as possible. SOF ¶ 135. This, too, is entirely inconsistent with someone whose goal was to intentionally defraud the market.

a radio interview as opposed to a written report and is based on a disputed conversation involving only two people, Fr. Emmanuel and Mr. Voss.[12] The Commission must prove that Fr. Emmanuel *knowingly* lied when he stated that Mr. Voss "***basically*** agreed" that Promacta was going away. The undisputed facts, however, demonstrate the Commission has failed to produce any evidence that he did not believe his statement was true; all the evidence is to the contrary.

First, Fr. Emmanuel took *real-time* notes (years before he knew this statement would be the subject of a Commission action against him) of his phone call with Mr. Voss, which state that Mr. Voss agreed with his thesis about Promacta. SOF ¶¶ 16-17.

Second, Mr. Voss and Ligand's CEO John Higgins' *real-time* discussions demonstrate that, at minimum, Mr. Voss left Fr. Emmanuel with the *reasonable belief* that he "basically agreed" with Fr. Emmanuel's concerning Promacta. *In fact, that is the very impression with which Mr. Voss left Mr. Higgins.* Mr. Voss claims that Fr. Emmanuel stated that Promacta was going away and asked Mr. Voss, "don't you agree?" Rather than voicing any disagreement as one would expect if he in fact disagreed, Mr. Voss claimed he remained silent. SOF ¶ 20. Indeed, after Mr. Voss described the conversation to Mr. Higgins (both by phone and in writing), the latter wrote an email that chastised Mr. Voss for leaving Fr. Emmanuel with the impression of a "tacit agreement."[13] SOF ¶ 32. In response, Mr. Voss did not disagree with Mr. Higgins' assessment; instead, he claimed that Fr. Emmanuel took the "piece of dialogue ***out of context***." SOF ¶ 33 (emphasis added). ***Indeed, to succeed with respect to this challenged statement, the***

---

[12] The undersigned are unaware of any other case where the Commission alleges securities fraud based on a disputed "he said/he said" oral conversation involving only the defendant and one other person with no other witnesses.

[13] In an email, Mr. Voss refers to another writing that he sent to Mr. Higgins on the day of the Benzinga interview about his conversation with Fr. Emmanuel that Ligand has failed to produce. SOF ¶ 31. A factfinder is permitted to draw a negative inference against Ligand for the failure to produce this document. *See Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998) ("[w]e have held with some regularity that a trier of fact may (but need not) infer from a party's obliteration of a document relevant to a litigated issue that the contents of the document were unfavorable to that party").

***Commission would effectively need to prove that Ligand's own CEO was lying when he
stated—based on his conversations with Mr. Voss—that Mr. Voss tacitly agreed with Fr.
Emmanuel's thesis concerning Promacta.***

Third, the recording of the statement and the context in which it was made demonstrate
the lack of scienter.  The interview with Benzinga lasted approximately 22 minutes.  SOF ¶ 23.
Ligand was not even mentioned until nearly the 15-minute mark, and Fr. Emmanuel's statement
that Ligand's IR firm "basically agreed" with his thesis that Promacta was going away was made
at around the 16-minute mark.  SOF ¶¶ 24-26.  Fr. Emmanuel initially attributed the statement to
Ligand, before correcting himself to clarify he spoke with Ligand's IR representative.  SOF ¶ 26.
Such a correction is not consistent with an intent to defraud.  Further, Fr. Emmanuel did not
include this statement in his subsequent reports as he would have presumably done if he
fabricated it for the purposes of trying to cause Ligand's stock price to plummet.

> 3.  Each of the Four Challenged Statements is Either Demonstrably True or
>     <u>Constitutes Opinion Commentary Protected by the First Amendment</u>

>> i.  *The First Amendment Protects Opinions Unless They Are Both
>>     Objectively Wrong and Subjectively Not Believed by the Author*

The First Amendment's protection of free speech applies to statements analyzing
securities.  See *Lowe v. SEC*, 472 U.S. 181, 210 n.58 (1985) ("because we have squarely held
that the expression of opinion about a commercial product such as a loudspeaker is protected by
the First Amendment . . . it is difficult to see why the expression of an opinion about a
marketable security should not also be protected") (internal citation omitted).  While "matters of
belief and opinion are not beyond the purview of" the securities laws, "liability lies only to the
extent that the statement was both objectively false *and disbelieved by the defendant at the time
it was expressed.*"  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (citing *Virginia
Bankshares v. Sandberg*, 501 U.S. 1083, 1095-96 (1991)) (emphasis added); *MHC Mut.*

29

*Conversion Fund v. Sandler O'Neill Partners, L.P.*, 761 F.3d 1109, 1113 (10th Cir. 2014) ("To warrant liability on this view, then, a plaintiff must show *both* that the defendant expressed an opinion that wasn't his real opinion (sometimes called 'subjective disbelief') *and* that the opinion didn't prove out in the end (sometimes called 'objective falsity')") (emphasis in original); *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993) ("Material statements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded.") (citations omitted).

In determining whether a statement is a fact or a constitutionally protected opinion, the Court must look at the context it was made. Where a short seller discloses his short position, the readers know he is not disinterested, and this weighs in favor of the statement being one of opinion. *Silvercorp Metals Inc. v. Anthion Mgmt., LLC*, 959 N.Y.S.2d 92, *9 (Sup. Ct. 2012) (table) (dismissing securities fraud case on New York State First Amendment grounds against short sellers who disclosed their short position and provided the basis for their conclusions about the subject company).[14] The First Amendment protects even false and libelous opinions provided that the facts supporting the opinions are provided. *See id; Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995) ("[W]hen a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment").

> a. June 19, 2014 Statement that Ligand's IR Firm
> "Basically Agreed" Promacta was Going Away

As set forth above, the Commission cannot prove scienter with respect to the first challenged statement. Even analyzing this statement in the light most favorable to the Commission, at worst, Fr. Emmanuel formed an *opinion* that Mr. Voss "basically" agreed with

---

[14] The New York Court of Appeals has observed that the New York State Constitution provides broader speech protections than does the United States Constitution. *See Immuno AG. v. Moor–Jankowski*, 77 N.Y.2d 235, 243 (1991).

his thesis concerning Promacta when Mr. Voss admittedly failed to challenge it after Fr.

Emmanuel asked him to do so. The Commission has failed to produce any evidence that Fr.

Emmanuel did not believe this opinion, and therefore not only does it fail for lack of scienter, but

it is also protected by the First Amendment. *Fait*, 655 F.3d at 110 (citing *Virginia Bankshares*,

501 U.S. at 1095-96)).

> b. July 3, 2014 Statement that Viking Did Not Consult with
> its Auditors on Material Issues and the Financial
> <u>Statements Were Unaudited</u>

Fr. Emmanuel's statement about Viking not consulting with its auditors on any material

issues and the financial statements in Viking's publicly available S-1 therefore being unaudited

was a conclusion he drew from the disclosures in the S-1 itself. SOF ¶¶ 43-45. Moreover, he

cited to and *specifically identified* for his readers the particular language in the S-1 that led to his

conclusion. Accordingly, any reasonable investor could have reviewed the S-1 to see that while

many of the statements were unaudited (as Fr. Emmanuel correctly stated), certain others were

audited. This statement, therefore, is shielded from liability by the First Amendment. *See*

*Partington*, 56 F.3d at 1156; *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 704 (D. Md. 2000)

("[t]he principle that opinions based on disclosed facts are protected is well established");

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) (stating that when "the bases

for the ... conclusion are fully disclosed, no reasonable reader would consider the term anything

but the opinion of the author drawn from the circumstances related"); *Moldea v. New York Times

Co.,* 15 F.3d 1137, 1144–45 (D.C. Cir.1994) ("Because the reader understands that such

supported opinions represent the writer's interpretation of the facts presented, and because the

reader is free to draw his or her own conclusions based upon those facts, this type of statement is

not actionable in defamation"). Further, Fr. Emmanuel's statement that Viking had not consulted

with its auditors on any "*material*" issues is clearly a protected *opinion*.

Fr. Emmanuel's statement that *Viking* did not intend to conduct pre-clinical studies or trials is objectively and demonstrably true. In its publicly available S-1, Viking disclosed that as a company, it had *no experience* conducting pre-clinical studies. It then disclosed, ***in bold***, "**We intend to rely on third parties to conduct our preclinical studies and clinical trials and perform other tasks for us.**" SOF ¶ 49 (emphasis in original). Based on these disclosures, Fr. Emmanuel, whose theory in the report was that the licensing agreement with Viking made no sense for Ligand shareholders, and that Viking was essentially an alter-ego of Ligand, accurately concluded that ***Viking*** would not be conducting preclinical studies and clinical trials. SOF ¶ 52. Viking's CEO has confirmed this statement to be true. SOF ¶¶ 51.

Nonetheless, the Commission has argued that the statement was misleading because it could have been interpreted to mean that *nobody* was going to conduct preclinical studies and clinical trials on Ligand's drugs. This argument must fail. First, it is far too speculative to survive summary judgment. Second, it is completely undermined by the plain context of the report, in which Fr. Emmanuel opined that Viking offered no value to Ligand shareholders, and Ligand's transaction with Viking appeared to be for the purpose of shifting various liabilities to another entity for financial/accounting reasons. SOF ¶ 52. Nothing in Fr. Emmanuel's thesis as set forth in the report even came close to touching upon the issue of whether Ligand or Viking were pushing drugs to the market without conducting *any* preclinical studies and clinical trials (something that would be an impossibility in any event).

Similarly, at the motion to dismiss hearing, the Commission argued that Fr. Emmanuel's statement was false because Viking—while not actually conducting the preclinical studies and trials itself—was going to use third parties for this purpose. This argument too must fail,

because it ignores the large elephant in the room that *Viking itself* felt this distinction was so important it needed ***not only to disclose it in the S-1, but to do so in bold text***.  Clearly, Viking did not agree with the Commission's position that this was a distinction without a difference.

In addition, even if the Court determines that this statement is not capable of being deemed demonstrably true, it would be barred as protected *opinion* by the First Amendment for at least three reasons.  First, at minimum, the statement reflects Fr. Emmanuel's reasonable *opinion* that if Viking was going to rely on third parties to actually conduct the studies and trials, it was fair to point out that *Viking* was not going to conduct those studies and trials.  (Again, Viking felt this was an important enough difference to highlight it in bold to the readers of its S-1).  Second, Fr. Emmanuel expressly disclosed that he was relying on the publicly filed S-1 as the basis for his statement in his July 3 report, which readers could easily review for themselves.  *See Phantom Touring*, *Inc. v. Affiliated Publications*, 953 F.2d 724, 731 n.13 (1st Cir. 1992); *Partington*, 56 F.3d at 1156; *Agora,* 90 F. Supp. 2d at 704; *Chapin*, 993 F.2d at  1093; *Moldea,* 15 F.3d at 1144–45.  Third, the Commission has produced no evidence that Fr. Emmanuel *subjectively* believed his opinion to be false.  *See Fait*, 655 F.3d at 110 (citing *Virginia Bankshares*, 501 U.S. at 1095-96).

d.      August 14 and 22, 2014 Statements Regarding Ligand's
Debt-to-Tangible-Equity Ratio

The Commission originally alleged that Fr. Emmanuel's calculation of Ligand's debt-to-tangible-equity ratio was knowingly false, because he did not include the cash proceeds from the loan.  SOF ¶ 70.  In fact, it was the *Commission's* contention that was false, because proceeds from a loan do not constitute equity, and the Commission has not presented any evidence of any accounting principle to the contrary.  The Court dismissed the Commission's original claim, and the Commission replead it, no longer claiming that Fr. Emmanuel's correct calculation was false,

but instead that it was somehow misleading despite being mathematically infallible. SOF ¶ 73. The Commission's claim fails for a number of reasons.

First, the undisputed facts in this case show that Fr. Emmanuel's calculation of Ligand's debt-to-tangible equity was accurate. No witness has challenged the accuracy of the actual calculation (as opposed to the chosen metric). SOF ¶ 76. Second, Fr. Emmanuel expressly explained to his readers that he was comparing only Ligand's *tangible* assets to its debt. The Commission's claim that the statement was misleading notwithstanding that the calculation was correct and that Fr. Emmanuel accurately explained the components of the ratio cannot stand First Amendment scrutiny. ***Certainly, the Commission cannot tell individuals what metrics and ratios they can and cannot use when analyzing securities without utterly destroying the First Amendment.*** Third, Fr. Emmanuel disclosed all the facts underlying his calculations. *See Partington*, 56 F.3d at 1156. Fourth, Fr. Emmanuel has historically disregarded the value of intangible assets when analyzing *other* companies, SOF ¶¶ 80-82, eliminating any inference that he *subjectively believed* he was misleading his readers by excluding from his calculation Ligand's intangible assets here.

### C. The Commission Has Failed to Provide Evidence to Support its IAA Claim

The Commission's theory behind its entirely unprecedented IAA claim is that the alleged misstatements that form the basis of the Commission's Rule 10b-5 claims rendered all Fr. Emmanuel's communications with his investors or potential investors misleading. Am. Compl. ¶¶ 62-64. For the reasons discussed above, the Commission has failed to present adequate evidence to support its Rule 10b-5 claim, which destroys the entire premise of their IAA claim.

In addition, the Commission has failed to provide any evidence that Fr. Emmanuel defrauded his investors. Incredibly, despite investigating this matter for more than three years,

based on the discovery provided to Defendants, ***it appears the Commission brought its novel IAA claim without bothering even to speak with any of Fr. Emmanuel's investors.***  SOF ¶ 123.

After bringing its baseless IAA claim, the Commission deposed Fr. Emmanuel's longest and largest investor, a liver transplant specialist and hospital director. SOF ¶¶ 139-140.  The investor testified that he never has had any concern about Fr. Emmanuel's candor or truthfulness. SOF ¶ 140.  In addition, the physician-investor testified that based on his own analysis of Promacta and the market in 2014, he agreed with Fr. Emmanuel's thesis that Promacta was going away.  SOF ¶ 141.

Further, Fr. Emmanuel worked with an editor on all the Ligand reports.  SOF ¶ 137.  The Commission deposed the editor who testified unequivocally that Fr. Emmanuel believed in all his opinions.  SOF ¶ 138.  ("I never sensed in any way there was any conscious effort to misrepresent anything"); ("I will say that Father Emmanuel felt very adamant about [Ligand], that it was not just overvalued but may have actually no material value"); ("He passionately believed these – in each one of these stocks, whether it was long or short, that he was adamantly correct. . . . But I had no firsthand, at least, observation of anything that even brushed up against a violation of any securities laws, at least as I understand securities laws").

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant them summary judgment on all counts of the Amended Complaint.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com

Dated:  September 30, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on September 30, 2020.

*/s/ Douglas S. Brooks*
Douglas S. Brooks