# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| GREGORY LEMELSON and LEMELSON CAPITAL ) | |
| MANAGEMENT, LLC, ) | Civil Action No. 1:18-cv-11926-PBS |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE AMVONA FUND, LP, ) | |
| ) | |
| Relief Defendant ) | |

## DEFENDANTS' CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, the Defendants hereby provide the following statement of undisputed facts in support of their motion for summary judgment.

## I.    The Amvona Fund's Origins and Routine Business Practices

1.      Fr. Emmanuel formed a hedge fund, the Amvona Fund LP, in 2012.  Affidavit of Douglas S. Brooks ("Brooks Aff.") Exhibit ("Ex.") 1 at 32:4-13.

2.      Lemelson Capital Management is the general partner of the Amvona Fund. Brooks Aff. Ex. 1 at 32:4-13.

3.      Throughout its existence, Amvona has mostly held long positions in stocks, but has also occasionally taken short positions.  Brooks Aff. Ex. 1 at 239:17-22; Affidavit of Fr. Emmanuel Lemelson ("Lemelson Aff.") ¶ 3.

4.      Since 2010, Fr. Emmanuel has published approximately 200 research and commentary pieces discussing economics, securitization fraud, and high-level security analysis of common stocks.  Lemelson Aff. ¶ 4.  *See also,* Amvona Economic Analysis, *available at* https://www.amvona.com/economic-analysis.

5.      Fr. Emmanuel's regular course of business was to include disclosures in all of his published reports about the positions he had in the securities being discussed and that the reports contained Fr. Emmanuel's opinions based on public information, and that he may not necessarily publish updated opinions if circumstances changed.  Lemelson Aff. ¶ 5.  *See also, e.g.,* Brooks Aff. Ex. 2 at 4 (disclosing position held in company being discussed and providing disclaimer that "THIS REPORT INCLUDES INFORMATION BASED ON DATA FOUND IN FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION, INDEPENDENT INDUSTRY PUBLICATIONS AND OTHER SOURCES. ALTHOUGH WE BELIEVE THAT THE DATA IS RELIABLE, WE HAVE NOT SOUGHT, NOR HAVE WE RECEIVED, PERMISSION FROM ANY THIRD-PARTY TO INCLUDE THEIR INFORMATION IN THIS PRESENTATION. MANY OF THE STATEMENTS IN THIS PRESENTATION REFLECT OUR SUBJECTIVE BELIEF"); Brooks Aff. Ex. 3 at 2-3(same); Brooks Aff. Ex. 4 at 2 (disclosing that Lemelson Capital had no position in stock being discussed and including same disclosure as above).

## II.      Fr. Emmanuel's Short Position and Reports Regarding Ligand

### A.      June 16, 2014 Report

6.      In 2014, Fr. Emmanuel identified Ligand as a company whose stock he believed was overvalued.  Based on this belief, Fr. Emmanuel took a short position in Ligand.  Brooks Aff. Ex. 1 at 239:19-22; Brooks Aff. Ex. 5 at 44:24-45:1.

7.     On June 16, 2014, Fr. Emmanuel published a 25-page opinion commentary concerning his thesis on Ligand.  Brooks Aff. Ex. 6.

8.     In the *first* sentence of his June 16, 2014 report on Ligand, Fr. Emmanuel disclosed that "Lemelson Capital is short shares of (NASDAQ:LGND)."  Brooks Aff. Ex. 6 at 1.

9.     Fr. Emmanuel additionally disclosed that "[a]ll content in this report represents the *opinions* of Lemelson Capital."  Brooks Aff. Ex. 6 at 24 (emphasis added).

10.    The June 16, 2014 report also included the following disclosure language:

> All expressions of opinion are subject to change without notice, and Lemelson Capital does not undertake to update or supplement this report or any information contained herein . . . . The information included in this document . . . reflects prevailing conditions and Lemelson Capital's views as of this date, all of which are accordingly subject to change. Lemelson Capital's opinions and estimates constitute a best efforts judgment and should be regarded as indicative, preliminary and for illustrative purposes only . . . . This report's estimated fundamental value only represents a best efforts estimate of the potential fundamental valuation of a specific security, and is not expressed as, or implied as, assessments of the quality of a security, a summary of past performance, or an actionable investment strategy for an investor . . . . Lemelson Capital may benefit from any change in the valuation of any other companies, securities, or commodities discussed in this document.

Brooks Aff. Ex. 6 at 24.

11.    Among his many opinions in the June 16, 2014 report, Fr. Emmanuel stated Ligand's largest royalty-generating drug, Promacta, faced an imminent threat from a new drug, which he believed would "virtually eliminate demand for Promacta."  Brooks Aff. Ex. 6 at 4.

12.    The Commission is not challenging any statements contained in the June 16, 2014 report.  *See* Brooks Aff. Ex. 7; Brooks Aff. Ex. 8 at 2-3.

13.    Ligand's stock price fell on the date Fr. Emmanuel issued this report.  Brooks Aff. Ex. 14 at 31.

B. <u>June 19, 2014 Interview</u>

14.    Following the publication of Fr. Emmanuel's first report on Ligand, on June 17, 2014, Ligand's Investor Relations representative, Bruce Voss, exchanged a number of emails with high-ranking personnel at Ligand discussing Fr. Emmanuel's report and whether and how to speak with Fr. Emmanuel about the report.  Brooks Aff. Ex. 9.  In the course of these email exchanges, John Higgins, the CEO of Ligand, instructed Mr. Voss to not "jump into content or a rebuttal" on the call with Fr. Emmanuel.  Brooks Aff. Ex. 9 at EPROD-SEC-LIT-E-000000940.

15.    Mr. Voss and Fr. Emmanuel spoke over the phone on June 18, 2014.  According to Mr. Voss' handwritten notes, the call lasted from approximately 12:56 p.m. ET until 1:16 p.m. ET.  Brooks Aff. Ex. 10 at 34:20-35:3, 113:5-20; Brooks Aff. Ex. 11 at 1.

16.    Fr. Emmanuel took notes of the call, which stated that Mr. Voss agreed with his opinion that Promacta was going away.  Brooks Aff. Ex. 12 at EPROD-SEC-LIT-E-00589567.

17.    The metadata from these notes shows that they were drafted June 18, 2014 at 1:21 p.m. ET and last modified that day at 1:42 p.m. ET.  Brooks Aff. Ex. 12 at 3-4.

18.    Mr. Voss' emails indicated that he listened to Mr. Higgins' instruction not to engage in any rebuttal of Fr. Emmanuel's opinions during this call.  Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407.

19.    Mr. Voss testified that he did not engage in any rebuttal of Fr. Emmanuel's opinions during this call.  Brooks Aff. Ex. 10 at 99:15-100:9.

20.    Mr. Voss recalled that Fr. Emmanuel asked multiple times if Mr. Voss agreed with his positions and, specifically that Fr. Emmanuel stated that he believed Promacta was going away and then asked, "don't you agree?"  Brooks Aff. Ex. 10 at 131:1-23.  Mr. Voss admitted that he remained silent in response to this question.  Brooks Aff. Ex. 10 at 146:1-15.

21.     On June 19, 2014, Fr. Emmanuel was interviewed by an outlet called Benzinga. Brooks Aff. ¶ 15.

22.     There is no evidence of the number of people that listened to this interview.

23.     The June 19, 2014 interview lasted approximately 21 minutes, 41 seconds. *See* Brooks Aff. ¶ 15.

24.     About five minutes of the interview discussed Fr. Emmanuel's short thesis regarding Ligand. Specifically, the interview first mentions Father Emmanuel's short position in Ligand at the 14 minute, 40 second mark in the interview and the discussion regarding Ligand ended at approximately the 19 minute, 30 second mark in the interview. Brooks Aff. ¶ 15.

25.     When the topic of Ligand was first raised on the interview, Fr. Emmanuel stated that he had taken a short position in Ligand's stock. Brooks Aff. ¶ 15.

26.     At approximately the 16-minute mark of this interview, Fr. Emmanuel initially stated that he had spoken to Ligand, and then corrected himself to say that he spoken to Ligand's Investor Relations ("IR") firm which had "basically agreed" with his thesis concerning Promacta "that Promacta was going away." Brooks Aff. ¶ 15.

27.     There is no evidence that any individual decided to sell his or her Ligand shares as a result of this statement.

28.     Bruce Voss, the referenced representative of the IR firm, denies having made this statement. Brooks Aff. Ex. 7 ¶ 38.

29.     This is the first of the Commission's four challenged statements. Brooks Aff. Ex. 7 ¶¶ 36-43; Brooks Aff. Ex. 8 at 3.

30.     Subsequent to the June 19, 2014 interview, Mr. Voss spoke with Ligand executives John Higgins and Matthew Foehr about his conversation with Fr. Emmanuel on June 18, 2014 and Fr. Emmanuel's June 19, 2014 interview.  Brooks Aff. Ex. 10 at 152:11-23.

31.     There is an email on June 20, 2014 that refers to a written summary shared by Mr. Voss regarding the phone conversation between Mr. Voss and Fr. Emmanuel on June 19, 2014. Specifically, Mr. Voss wrote "As I wrote last night, he made that statement with a rhetorical 'don't you agree' and I moved on to the next subject as we had more to cover and his statement was ridiculous."  No such document was produced in this litigation.  Ligand's counsel stated that they looked for the document but could not locate it.  Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407; Brooks Aff. Ex. 10 at 146:5-147:20.

32.     Subsequent to the June 19, 2014 interview, Mr. Voss and Mr. Higgins exchanged emails regarding the June 18, 2014 conversation between Mr. Voss and Fr. Emmanuel.  In one of those emails, Mr. Higgins expressed that he was upset that Mr. Voss remained silent and left Fr. Emmanuel with the impression of "tacit agreement" with Fr. Emmanuel's thesis regarding Promacta going away.  Specifically, Mr. Higgins stated:

> Also, if he [Lemelson] said the CEO beats his employees would you just move on because "there were more things to cover."  Or would you take a moment to stick up for the CEO?  Promacta is a big deal, and a big part of our value and business model.  He knows it too.  He gave you a softball and you just moved on?  Even 1 minute of soft info would have left him with a different impression than tacit agreement.

Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407.

33.     In response to that email from Mr. Higgins, Mr. Voss replied by writing, *inter alia*, "[t]he comment about Promacta was not a legitimate question but rather it was made in passing and then he chose to take that piece of the dialogue out of context."  Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407.

34.     Ligand's stock price closed higher on the day of the interview than it had the previous day.  Brooks Aff. Ex. 14 at 31.

C.     July 3, 2014 Report

35.     On July 3, 2014, Fr. Emmanuel issued his second analysis report discussing Lemelson Capital Management's short position on Ligand.  Brooks Aff. Ex. 15.

36.     This report also included the disclosure that Fr. Emmanuel had taken a short position in Ligand, that Fr. Emmanuel was expressing his own opinions, and that Fr. Emmanuel may not necessarily amend his opinions if circumstances changed.   Brooks Aff. Ex. 15 at 1-2.

37.     The July 3, 2014 report included a discussion of a company called Viking Therapeutics, with whom Ligand had just entered into a licensing agreement.  Brooks Aff. Ex. 15 at 7-10.

38.     Two of the Commission's four challenged statements in this case are based on Fr. Emmanuel's statements about Viking contained in the July 3, 2014 report.  Brooks Aff. Ex. 8 at 3; Brooks Aff. Ex. 7 ¶¶ 44-50.

39.     In both the Original Complaint and the Amended Complaint, the SEC has alleged that as of May 2014, "Ligand became a 49.8% owner of Viking common stock."  Brooks Aff. Ex. 16 ¶ 21; Brooks Aff. Ex. 7 ¶ 21.

40.     Ligand did not own any portion of Viking at the time this report was published. Brooks Aff. Ex. 17 at 53:6-18; Brooks Aff. Ex. 18 at 131:24-132:2.

41.     Fr. Emmanuel did not hold a short position in Viking at the time these statements were made.  Brooks Ex. 5 at 47:7-14.

42.     The first statement from this report that the Commission challenged is: "the company [Viking] has not yet even consulted with the firm [auditors] on any material issues." Brooks Aff. Ex. 8 at 3; Brooks Aff. Ex. 7 ¶¶ 44-50.

43.     In the July 3, 2014 report, Fr. Emmanuel quoted Viking's S-1 statement and noted that Viking engaged MaloneBailey to audit their financial statements for the fiscal year ending December 31, 2012, but then Viking terminated MaloneBailey on April 7, 2014. Brooks Aff. Ex. 15 at 9.

44.     Then, Fr. Emmanuel noted Marcum LLP was hired to perform the audit and directly quoted Viking's S-1 again, which stated:

> Effective as of April 7, 2014, our board of directors appointed Marcum LLP, or Marcum, as our independent registered public accounting firm to audit our financial statements as of and for the fiscal years ended December 31, 2012 and 2013, and for the fiscal year ending December 31, 2014. From September 24, 2012 (Inception) through April 7, 2014, neither we nor anyone on our behalf consulted with Marcum regarding (1) the application of accounting principles to a specified transaction, either completed or proposed, (2) the type of audit opinion that might be rendered on our financial statements, or (3) any matter that was either the subject of a disagreement, as described in Item 304(a)(1)(iv) of Regulation S-K and the related instructions thereto, or a "reportable event" as described in Item 304(a)(1)(v) of Regulation S-K.

Brooks Aff. Ex. 15 at 9; Brooks Aff. Ex. 19 at 162.

45.     Fr. Emmanuel then made the statement that the Commission is challenging ("In other words, Marcum was merely hired, but the company [Viking] has not yet even consulted with the firm [auditors] on any material issues") as a summary of this quoted passage. Brooks Aff. Ex. 15 at 10.

46.     Viking's July 1, 2014 S-1 statement also noted that a number of its financial statements were unaudited. Brooks Aff. Ex. 19 at 13-14, 56, 60-61, 69-70, 72, 166-69, 171-73, 176-77, 180. Indeed, the term "unaudited" appears 56 times in Viking's S-1, while the term "audited" appears seven times. Brooks Aff. ¶ 22.

47.     There is no evidence of any investor of Ligand or Viking raising concerns about this specific statement.

48.     The second statement from the July 3, 2014 report that the Commission challenged is: "Viking does not intend to conduct any preclinical studies or trials …"  Brooks Aff. Ex. 15 at 7; Brooks Aff. Ex. 7 ¶ 46; Brooks Aff. Ex. 8 at 3.

49.     Viking's S-1 statement stated in bold that "**We intend to rely on third parties to conduct our preclinical studies and clinical trials and perform other tasks for us.**"  Brooks Aff. Ex. 19 at 21 (emphasis in original).

50.     Viking's S-1 statement also stated, "All clinical trials, preclinical studies and other analyses performed to date with respect to our drug candidates have been conducted by Ligand.  Therefore, as a company, we do not have any experience in conducting clinical trials for our drug candidates."  Brooks Aff. Ex. 19 at 17

51.     Viking's CEO, Brian Lian, testified that Viking did not intend to conduct its own preclinical studies, but rather "to hire third parties to conduct their experiments."  Brooks Aff. Ex. 20 at 76:6-77:14.

52.     Fr. Emmanuel's opinion in this section of his report was that Ligand's transaction with Viking appeared to be for the purposes of shifting various liabilities to another entity to portray a more positive accounting perspective for Ligand.  Brooks Aff. Ex. 15 at 8-9.

53.     There is no evidence of any investor of Ligand or Viking raising concerns about this specific statement.

54.     Viking's CEO, Brian Lian, testified that he did not recall if he read Fr. Emmanuel's July 3, 2014 report, did not speak with any investor about this report in any depth,

and did not recall any of his colleagues at Viking expressing any concern about these statements. Brooks Aff. Ex. 20 at 56:6-19, 129:3-132:6.

55.     Ligand's CEO, John Higgins, also could not offer any explanation as to how these statements were material.  Brooks Aff. Ex. 21 at 278:4-279:2.

56.     The July 3, 2014 report also acknowledged and addressed a June 17, 2014 report authored by Joseph Pantginis of Roth Capital that was critical of the June 16, 2014 report. Brooks Aff. Ex. 15 at 6-7.

57.     Ligand's stock price closed higher on July 3, 2014 than it did the previous day. Brooks Aff. Ex. 14 at 31.

D.      August 4, 2014 Report

58.     On August 4, 2014, Fr. Emmanuel published his third report on Ligand.  Brooks Aff. Ex. 22.

59.     This report disclosed that Fr. Emmanuel had taken a short position in Ligand, contained Fr. Emmanuel's own opinions, and that Fr. Emmanuel may not necessarily amend his opinions in a published report if circumstances changed.  Brooks Aff. Ex. 22 at 1-2.

60.     The Commission is not challenging any of Fr. Emmanuel's statements contained in the August 4, 2014 report.  *See* Brooks Aff. Ex. 8 at 2-4; Brooks Aff. Ex. 7.

61.     On August 4, 2014, Ligand's share price closed 9% higher than it did the previous trading day.  Brooks Aff. Ex. 14 at 30.

E.      August 14 and August 22, 2014 Reports

62.     On August 14 and 22, 2014, Fr. Emmanuel published his fourth and fifth reports on Ligand.  Brooks Aff. Ex. 23; Brooks Aff. Ex. 24.

63. Both of these reports disclosed that Fr. Emmanuel had taken a short position in Ligand, contained Fr. Emmanuel's own opinions, and that Fr. Emmanuel may not necessarily amend his opinions in a published report if circumstances changed. Brooks Aff. Ex. 23 at 3-4; Brooks Aff. Ex. 24 at 1.

64. On August 14, 2014, Ligand's stock price closed higher than it did the previous day. Brooks Aff. Ex. 14 at 30.

65. On August 22, 2014, Ligand's stock price closed down slightly. Brooks Aff. Ex. 14 at 30.

66. The August 14 and 22, 2014 reports discussed, *inter alia,* $245 million in new debt that Ligand was taking on through a publicly announced bond offering. Brooks Aff. Ex. 23 at 2-3; Brooks Aff. Ex. 24 at 2-3.

67. As part of his discussion of the bond offering in the August 14 Report, Fr. Emmanuel wrote:

> **Tangible equity:** On August 4, 2014, Ligand released their Q2 earnings report and financial statements in which the company boasted that it was debt free. Prior to this August 4 release, the company's liabilities exceeded tangible assets, meaning the company was insolvent. With the August 4, 2014 earnings release and its updated financials, the company presented tangible equity of just $21,000 upon which rested an extraordinary market capitalization of approximately $1.1 billion.

Brooks Aff. Ex. 23 at 2 (emphasis in original).

68. As part of his discussion of the bond offering in the August 22 Report, Fr. Emmanuel wrote:

> On August 18 [2014], Ligand filed a form 8-K with the Securities and Exchange Commission (SEC) revealing that the company had issued $245 million in new debt against the company's tangible equity of jut $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars in debt for every $1 dollar in tangible common shareholder equity).

Brooks Aff. Ex. 24 at 3.

69.     Fr. Emmanuel concluded his analysis of the bond offering in the August 22

Report as follows:

> There is no question that the cost of this preferential treatment of a few large
> Ligand shareholders at the expense of remaining investors places a burden on
> Ligand and its shareholders that is both unsustainable and further deepens the
> company's insolvency and likelihood of liquidation or reorganization under
> Chapter 7 or Chapter 11 of the bankruptcy code under which remaining Ligand
> common shareholders have only the protection of $21,000 in tangible equity to
> shield them from $245 million in debt.

Brooks Aff. Ex. 24 at 6.

70.     In its original Complaint, the Commission alleged Fr. Emmanuel's calculation

was wrong, because it failed to include the cash from the loan proceeds as part of shareholder

tangible equity.  *See* Brooks Aff. Ex. 16 ¶ 52.

71.     The Commission has not presented any accounting principle that would support

this theory.  Brooks Aff. Ex. 25 at 42:11-18.

72.     This Court dismissed the claim that Fr. Emmanuel's calculation was wrong from

the original Complaint, with leave to the Commission to replead it.  Brooks Aff. Ex. 26 at 4-5.

73.     The Commission amended the allegation to allege that the calculation is false, but

that despite being true, it is misleading.  Brooks Aff. Ex. 7 ¶ 52.

74.     In presenting this calculation, Fr. Emmanuel explained that he excluded Ligand's

intangible assets from his calculation and was comparing just Ligand's tangible equity to its

debts.  Brooks Aff. Ex. 24 at 3.

75.     Fr. Emmanuel disclosed the numbers he used in making his calculation in his

reports.  Specifically, Fr. Emmanuel's August 14, 2014 report, citing Ligand's Q2 financial

report, noted that Ligand reported just $21,000 in tangible equity.  Brooks Aff. Ex. 23 at 2.  Fr.

Emmanuel's August 22, 2014 report, citing Ligand's August 18, 2014 8K filing, noted that

Ligand reported issuing $245 million in new debt.  Brooks Aff. Ex. 24 at 3.  Dividing the

reported debt of $245 million by the $21,000 in reported tangible equity yields a ratio of 11,667 to 1, as stated in Fr. Emmanuel's August 22, 2014 report. Brooks Aff. Ex. 24 at 3.

76. No witness has challenged the accuracy of this calculation. Brooks Aff. Ex. 25 at 31:6-11.

77. Internal Ligand emails, dated September 19, 2014, reflected that Ligand understood this calculation based on reading the reports. Specifically, Todd Pettingill corrected a PowerPoint presentation regarding Fr. Emmanuel's statement that originally alleged Fr. Emmanuel incorrectly stated Ligand had $21,000 in cash assets to properly acknowledge that Fr. Emmanuel stated Ligand had $21,000 in tangible equity. Brooks Aff. Ex. 27 at LGND_0047298.

78. At depositions, Ligand representatives did not challenge the calculation itself, but stated that the metric of a debt-to-tangible equity was not a traditional metric used to evaluate the value of a security. Brooks Aff. Ex. 21 at 116:20-24; Brooks Aff. Ex. 18 at 82:12-83:7, 84:19-85:16, 103:2-104:1.

79. The SEC alleged that "Lemelson thus compared an apple ("tangible equity," which omitted existing intangible assets) to an orange (the full amount of the new debt, ignoring the cash proceeds of the issuance) at two different points in time to concoct a ratio that looks really bad (11,667 dollars of debt for every dollar of shareholder equity) but has no bearing on the actual financial wherewithal of the Company. Brooks Aff. Ex. 7 ¶ 52.

80. In prior published opinions, Fr. Emmanuel disregarded or diminished the value of intangible assets in valuating companies. Lemelson Aff. ¶ 6.

81. For example, In discussing his short position in World Wrestling Entertainment in March 2014, Fr. Emmanuel wrote, "Intangible assets (the kind you can't sell easily when things

turn south) increased from roughly 100 k in 2010 to just under 27 M in 2013, an increase of 268 fold in 3 years – these 'ghost assets' of course can bolster a balance sheet nicely. . . . Current price exceeds tangible book by a factor of nearly 10x."  Brooks Aff. Ex. 28 at 11.

82.     As another example, in Fr. Emmanuel's published analysis of his long position in Geospace Technologies, he noted multiple times that he believed Geospace was undervalued because of its significant tangible assets, stating: "Given the extraordinary volatility in revenues and earnings from year to year, it is a more sound approach to focus on the tangible assets buttressing the share price as consideration for the margin of safety in the commitment. . . ." Brooks Aff. Ex. 29 at 6.

## III.     Negative Commentary About Ligand Between June and August 2014 From Other Securities Analysts

83.     On July 22 and August 5, 2014, an entity called Empire Asset Management issued two reports concerning Ligand.  Brooks Aff. Ex. 30; Brooks Aff. Ex. 31.

84.     On July 22, 2014, Ligand's stock price decreased by approximately 4.5%.  Brooks Aff. Ex. 14 at 30.

85.     On August 5, 2014, Ligand's stock price decreased by more than 2%.  Brooks Aff. Ex. 14 at 30.

86.     On July 15, 2014, Federal Reserve Chair Janet Yellen made statements about valuations of biotech stocks being "substantially stretched."  Brooks Aff. Ex. 32 at 20.

87.     On that date, Ligand's stock price fell by more than 4.5%.  Brooks Aff. Ex. 14 at 30-31.

88.     Internal emails at Ligand reflect that Ligand personnel believed that Ms. Yellen's statements may have been the cause of negative movement in Ligand's stock.  Brooks Aff. Ex. 33 at LGND_0000052.

**IV. Timeline of Fr. Emmanuel Covering His Short Position**

89.    The chart below reflects the relevant dates from June-October 2014 on which Fr.

Emmanuel took and covered short positions on Ligand:

| Date | # of Shares Covered (If Applicable) | Total Short Position |
|------|-------------------------------------|----------------------|
| June 16, 2014 | 0 | 68,528 |
| June 19, 2014 | 4,050 | 64,478 |
| July 3, 2014 | 0 | 65,556 |
| Aug. 4, 2014 | 0 | 65,736 |
| Aug. 13, 2014 | 0 | 65,736 |
| Aug. 22, 2014 | 30,729 | 35,007 |
| Aug. 26, 2014 | 3,500 | 31,507 |
| Sept. 16, 2014 | 0 | 31,507 |
| Oct. 10, 2014 | 14,673 | 16,834 |
| Oct. 13, 2014 | 16,717 (net) | 117 |

Brooks Aff. Ex. 34.

**V. Ligand's Requests to the Commission to Investigate Fr. Emmanuel**

90.    Ligand never made a public statement contesting or correcting any of Fr.

Emmanuel's statements that are now being challenged by the Commission.

91.    NASDAQ Rule IM-5250-1 states in pertinent part: "In certain circumstances, it

may also be appropriate to publicly deny false or inaccurate rumors, which are likely to have, or

have had, an effect on the trading in its securities or would likely have an influence on

investment decisions."  Brooks Aff. Ex. 35.

92.    Ligand representatives testified that they decided not to issue any such statement

because they viewed Fr. Emmanuel as too marginal of a voice.  Brooks Aff. Ex. 10 at 228:15-22;

Brooks Aff. Ex. 18 at 53:20-54:16; Brooks Aff. Ex. 21 at 99:23-100:16.

93.    Ligand initially engaged Latham & Watkins as legal counsel and met with the

Commission's Boston regional office on September 25, 2014.  Brooks Aff. Ex. 21 at 212:9-

213:7; Brooks Aff. Ex. 10 at 274:3-12; Brooks Aff. Ex. 17 at 98:11-99:21; Brooks Aff. Ex. 36 at LGND_0080678.

94.     The purpose of the September 25, 2014 meeting between the Commission and Ligand (being represented by Latham & Watkins) was for Ligand to convince the Commission to investigate and bring an enforcement action against Fr. Emmanuel.  Brooks Aff. Ex. 36 at LGND_0080737.

95.     Ligand submitted a PowerPoint presentation to the Commission at this September 25, 2014 meeting.  Brooks Aff. Ex. 36 at LGND_0080678.

96.     Among the allegations in the September 25, 2014 PowerPoint, Ligand accused Fr. Emmanuel of engaging in an "affinity fraud," misrepresenting the performance of the Amvona Fund, and that Fr. Emmanuel had a "questionable personal history."  Brooks Aff. Ex. 36 at Brooks Aff. Ex. 36 at LGND_0080695; Brooks Aff. Ex. 36 at LGND_0080698-701; Brooks Aff. Ex. 36 at LGND_0080703-04.

97.     The September 25, 2014 PowerPoint did not reference the Commission's challenged statement by Fr. Emmanuel in the June 19, 2014 Benzinga interview.  *See* Brooks Aff. Ex. 36.

98.     The September 25, 2014 PowerPoint did not reference either of the statements about Viking on July 3, 2014 that the Commission is challenging in this litigation.  *See* Brooks Aff. Ex. 36.

99.     The September 25, 2014 PowerPoint from Ligand mentioned Fr. Emmanuel's statement about Ligand's debt to tangible equity ratio, but claimed it was incorrect because the calculation did not include the cash proceeds from the loan.  Brooks Aff. Ex. 36 at LGND_0080713.

100.    The September 25, 2014 PowerPoint did not mention the Empire reports published on July 22 and August 5, 2014.  *See* Brooks Aff. Ex. 36.

101.    The September 25, 2014 PowerPoint did not mention Ligand's historically volatile stock prices.  *See* Brooks Aff. Ex. 36.

102.    Ligand's own financial disclosures identifies its historically volatile stock prices as an area of concern.  Brooks Aff. Ex. 37 at 45.

103.    Ligand's stock price dropped as much as 30% between March 2014 and April 2014.  Brooks Aff. Ex. 14 at 32-33.

104.    Sometime after the September 25, 2014 meeting, the Commission's Boston regional office informed Ligand that it would not be opening an investigation concerning Fr. Emmanuel.  Brooks Aff. Ex. 25 at 64:3-65:3.

105.    Following the September 25, 2014 meeting, Ligand changed counsel to Bradley Bondi of Cahill Gordon.  Brooks Aff. Ex. 17 at 108:2-109:20; Brooks Aff. Ex. 21 at 254:11-255:10; Brooks Aff. Ex. 10 at 287:22-288:6.

106.    Bradley Bondi used to work for the Commission.  *See* Brooks Aff. Ex. 38.

107.    Bradley Bondi contacted a former colleague at the Commission and scheduled a second meeting between Ligand and the Commission's Washington, D.C. regional office on June 8, 2015.  Brooks Aff. Ex. 39 at E-PROD-SEC-LIT-E-001189144-47.

108.    Ligand submitted a PowerPoint presentation to the Commission at this June 8, 2015 meeting.  Brooks Aff. Ex. 40.

109.    The purpose of the June 8, 2015 meeting between the Commission and Ligand (being represented by Cahill Gordon) was for Ligand to convince the Commission to investigate and bring an enforcement action against Fr. Emmanuel.  Brooks Aff. Ex. 40 at LGND_0080797

110.    Among the allegations in the June 8, 2015 PowerPoint, Ligand accused Fr. Emmanuel of engaging in an "affinity fraud," misrepresenting the performance of the Amvona Fund, and that Fr. Emmanuel had a "questionable personal history."  Brooks Aff. Ex. 40 at LGND_0080752-55.

111.    The June 8, 2015 PowerPoint only referenced the Commission's challenged statement by Fr. Emmanuel in the June 19, 2014 Benzinga interview on one slide.  Brooks Aff. Ex. 40 at LGND_0080771.

112.    The June 8, 2015 PowerPoint did not reference either of the statements about Viking on July 3, 2014 that the Commission is challenging in this litigation.  *See* Brooks Aff. Ex. 40.

113.    The June 8, 2015 PowerPoint from Ligand mentioned Fr. Emmanuel's statement about Ligand's debt to tangible equity ratio, but claimed it was incorrect because the calculation did not include the cash proceeds from the loan.  Brooks Aff. Ex. 40 at LGND_0080788.

114.    The June 8, 2015 PowerPoint did not mention the Empire reports published on July 22 and August 5, 2014.  *See* Brooks Aff. Ex. 40.

115.    The June 8, 2015 PowerPoint did not mention Ligand's historically volatile stock prices.  *See* Brooks Aff. Ex. 40.

116.    The June 8, 2015 PowerPoint identified four periods of time that it claimed Fr. Emmanuel's reports caused Ligand's stock price to decrease.  These time periods were: (1) June 16, 2014 to June 24, 2014; (2) July 13, 2014 to July 17, 2014; (3) August 7, 2014; and (4) August 22, 2014 to August 25, 2014.  Brooks Aff. Ex. 40 at LGND_0080763.

**V.    The Commission's Complaint**

117. The Commission filed its original Complaint on September 12, 2018. Brooks Aff. Ex. 16.

118. The Commission filed its Amended Complaint on March 21, 2019. Brooks Aff. Ex. 7.

119. The Commission has alleged that Fr. Emmanuel made four misstatements in violation of Rule 10b-5. *See* Brooks Aff. Ex. 8 at 2-4; Brooks Aff. Ex. 7 ¶¶ 36-53.

120. The Commission has also alleged a scheme liability theory. Brooks Aff. Ex. 7 ¶¶ 58-59.

121. At oral argument, the Commission conceded that they do not have much alleged behavior beyond the four alleged misstatements to support its scheme liability theory. Brooks Aff. Ex. 41 at 24:13-25:8.

122. The Commission has also alleged violations of the Investment Advisers Act on the theory that Fr. Emmanuel did not disclose his alleged misstatements in violation of Rule 10b-5 to his investors. Brooks Aff. Ex. 7 ¶¶ 63-67.

123. Based on the discovery responses provided by the Commission, it does not appear the Commission interviewed any of Fr. Emmanuel's investors prior to filing this claim. Brooks Aff. ¶ 45.

## VI. The Commission Failed to Produce the Expert Evidence Required to Support Its Market-Manipulation Claim

124. Defendants sought discovery from the Commission seeking any evidence it had that Fr. Emmanuel's alleged misstatements caused Ligand's stock to drop. Brooks Aff. Exs. 42-43.

125. Specifically, on June 13, 2019, Defendants served the Commission with its First Set of Interrogatories. Interrogatory No. 3 requested the Commission:

State the basis for Your contention that Defendants' statements influenced or otherwise impacted the stock price for Ligand, including but not limited to (i) a detailed description of all data sources and other materials You considered, and (ii) each alternative cause, influence, or reason for the decline in Ligand's stock price that You considered, analyzed, and/or reviewed with a detailed explanation for how you ruled out that alternative form of causation.

Brooks Aff. Ex. 42 at 4.

126. The Commission objected to this Interrogatory, stating, *inter alia*, it was "a premature request for matter that may be the subject of expert testimony." Brooks Aff. Ex. 44 at 11.

127. Defendants also served the Commission with its First Set of Requests for Production of Documents on June 13, 2019. Request Nos. 20-21 sought: "All Documents or Communications relating, concerning, or supporting the position that Fr. Lemelson's statements listed in [paragraphs 36 through 50] of the Amended Complaint caused any changes in the price of Ligand's stock." Brooks Aff. Ex. 43 at 5.

128. The Commission objected to these document requests, stating, *inter alia*, it was "a premature request for matter that may be the subject of expert testimony." Brooks Aff. Ex. 45 at 12-13.

129. The Commission did not serve any affirmative expert report. Brooks Aff. ¶ 50.

130. On January 17, 2020, Defendants served the Commission their expert report of Aaron Dolgoff. Brooks Aff. ¶ 51.

131. On February 28, 2020, the Commission served the Defendants its rebuttal expert report of Erin Smith. Brooks Aff. ¶ 52.

132. The experts agreed that Ligand traded in an efficient market. Brooks Aff. ¶ 53.

133. The experts also agreed that there was no statistically significant evidence that Fr. Emmanuel's statement about the debt to tangible equity ratio, which is the Commission's fourth

alleged misstatement in this case, had any material impact on Ligand's stock price. Brooks Aff. ¶ 54.

**VII. Evidence Regarding Fr. Emmanuel's Subjective Belief in the Veracity of His Opinions**

134.     Fr. Emmanuel has testified consistently that he believed in the veracity of his opinions when he published them. Brooks Aff. Ex. 1 at 296:8-22; Brooks Aff. Ex. 46 at 391:2-21; Brooks Aff. Ex. 47 at 772:24-773:2, 774:19-775:2.

135.     Fr. Emmanuel produced his entire hard drive to the Commission in this case, including all communications with counsel to aid in the Commission's investigation. Brooks Aff. Ex. 1 at 16:2-19:20; Brooks Aff. Ex. 5 at 106:11-25, 328:2-9; Brooks Aff. Ex. 48 at 51:10-52:2, 153:8-154:9.

136.     There is no document in Fr. Emmanuel's hard drive that indicates Fr. Emmanuel did not believe in the veracity of his opinions when he published them.

137.     Fr. Emmanuel worked with an editor, Michael Johns, on the five reports published regarding Ligand. Brooks Aff. Ex. 49 at 27:18-29:10, 49:5-50:1, 55:22-56:21, 64:11-13.

138.     Mr. Johns testified that Fr. Emmanuel believed in the veracity of his opinions when he published them. Brooks Aff. Ex. 49 at 30:9-24, 59:24-60:21, 115:14-116:10, 117:4-15.

139.     Dr. Nicholas Jabbour is Fr. Emmanuel's largest and longest-standing investor. Brooks Aff. Ex. 50 at 29:20-23; 34:5-19

140.     Dr. Jabbour testified at deposition that he never had any concern about Fr. Emmanuel's candor or truthfulness. Brooks Aff. Ex. 50 at 112:23-113:4.

141.     Dr. Jabbour testified that based on his own analysis of Promacta and the market in 2014, he agreed with Fr. Emmanuel's thesis that Promacta was going away.  Brooks Aff. Ex. 50 at 85:1-23.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
LIBBYHOOPES, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@libbyhoopes.com
bsullivan@libbyhoopes.com

Dated:  September 30, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on September 30, 2020.

*/s/ Douglas S. Brooks*
Douglas S. Brooks