THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                    )
                                     )  File No. HO-12718-A
TRADING IN THE SECURITIES OF  )
LIGAND PHARMACEUTICALS, INC.  )


WITNESS:  Gregory Lemelson
PAGES:    1 through 360
PLACE:    Securities and Exchange Commission
          100 F Street, NE
          Washington, D.C.
DATE:     Wednesday, July 20, 2016


     The above-entitled matter came on for hearing,
pursuant to notice, at 9:25 a.m.




Diversified Reporting Services, Inc.
(202) 467-9200

 1   APPEARANCES:

 2

 3   On behalf of the Securities and Exchange Commission:

 4        VIRGINIA M. ROSADO DESILETS, ESQ.

 5        JEFFREY FINNELL, ESQ.

 6        SONIA TORRICO, ESQ.

 7        Securities and Exchange Commission

 8        100 F Street Northeast

 9        Washington, D.C. 20549

10        (202) 5510-4955

11

12   On behalf of the Witness:

13        DOUGLAS F. MacLEAN, ESQ.

14        Armor Compliance

15        22 Batterymarch Street

16        Boston, Massachusetts 02109

17        (617) 501-2055

18

19   ALSO PRESENT:

20        LUCY GAUTHIER, Intern

21

22

23

24

25

1                    C O N T E N T S
2
3    WITNESS                                    EXAMINATION
4    Gregory Lemelson                                5
5
6    EXHIBITS   DESCRIPTION                      IDENTIFIED
7         1   Form 1662                              7
8         2   Subpoena                               8
9         3   Subpoena                              15
10        4   Subpoena                              15
11        5   Background Questionnaire              25
12        6   Fund Information                     110
13        7   E-mail                               120
14        8   E-mail                               161
15        9   Report                               198
16       10   Prequin Ranking                      202
17       11   Barron Ranking                       203
18       12   Barron Ranking                       204
19       13   Barclays Ranking                     206
20       14   Descriptions                         246
21       15   Summary                              261
22       16   Summary                              262
23       17   Report                               270
24       18   Report                               271
25       19   Report                               272

1                    C O N T E N T S (CONT.)

2

3    EXHIBITS   DESCRIPTION                  IDENTIFIED

4          20 Report                          274

5          21 Report                          275

6          22 E-mail                          287

7          23 E-mail                          289

8          24 Article                         349

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S
2              MS. DESILETS:  On the record at 9:25 a.m.
3              Can you raise your right hand, please.  Do
4    you swear or affirm to tell the truth, the whole truth
5    and nothing but the truth?
6              THE WITNESS:  I do.
7    Whereupon,
8                    GREGORY LEMELSON
9    was called as a witness and, having been first duly
10   sworn, was examined and testified as follows:
11                       EXAMINATION
12             BY MS. DESILETS:
13       **Q    Please state and spell your full name for**
14   **the record.**
15       A    My legal name is Gregory M. Lemelson, but
16   I'm referred to as Father Emmanuel Lemelson, which is
17   my ecclesiastical name or baptismal name.
18       **Q    You can put your hand down.**
19       A    Oh, sorry.
20       **Q    So would you prefer it if we refer to you as**
21   **Father Lemelson today?**
22       A    Father Emmanuel.
23       **Q    My name is Virginia Rosado Desilets.  This**
24   **is Sonia Torrico, and this is Lucy Gauthier.**
25             MS. DESILETS:  Did I pronounce that right?

1    I think, and received on September 1st.

2        Q    **Have you produced documents to the staff**

3    **pursuant to the requests in Exhibits 2 through 4 in**

4    **this later subpoena that we marked earlier?**

5        A    Yeah, I believe I produced everything that's

6    responsive.  If there were any exceptions, I think I

7    noted them in my responses.  Sometimes it was

8    difficult to ferret out relevant e-mails, but I think

9    we gave you the entire .pst files from Outlook.

10        Q    **Have you withheld any documents on the**

11    **grounds of attorney-client privilege or any other**

12    **privilege?**

13        A    No, I think we waived the attorney-client

14    privilege.

15        Q    **You knowingly and willingly waived the**

16    **protections of the attorney-client privilege by**

17    **producing privileged attorney-client communications to**

18    **us?**

19        A    I believe we did.

20        Q    **Can you describe the search that was**

21    **conducted for the subpoena documents?**

22        A    You mean like on my computer?

23        Q    **Did you look anywhere other than your**

24    **computer for responsive documents?**

25        A    Well, I -- I have pretty much digital copies

1    of everything nowadays, so I don't think I did.  I

2    mean anything that's a hard copy would have existed on

3    my Cloud drive or on my hard drive.

4           But to my recollection, it was pretty easy

5    to put together the subpoena materials because my

6    files are fairly organized.  And then I just used a

7    search feature in Outlook to search for e-mails, but

8    it became clear it was difficult to move such a large

9    quantity of e-mails.  So I asked Doug to just give you

10   the entire folders of the e-mails.  Make the .pst

11   files, the data files, which were, I believe, 8 or 9

12   gigabytes or something like that.

13       **Q**    **So on your computer -- which computer was**

14   **this that the documents were on?**

15       A    My home office.

16       **Q**    **Your home office computer?**

17       A    Yeah.

18       **Q**    **And that's the one that you use for all of**

19   **your Lemelson Capital Management and Amvona Fund**

20   **business?**

21       A    That's right.

22       **Q**    **And you have folders on that desktop that**

23   **were organized by topic?**

24       A    That's right.

25       **Q**    **Did you review all of the folders that you**

1    **thought might have documents responsive to the**

2    **subpoenas?**

3        A    Yes.

4        **Q    And you provided any documents that you**

5    **thought might be responsive to the subpoenas?**

6        A    Yes.  If there were exceptions, I believe I

7    noted them.  For example, in the second subpoena,

8    there was a lot to reference to correspondence

9    regarding the word "SEC," so there was no easy way to

10   figure out -- to eliminate word fragments.  So -- but

11   I think, you know, I spot-checked everything I

12   provided -- I mean I didn't read everything I gave

13   you.  I just gave it to you wholesale.  But I believe

14   mostly everything that is responsive -- it's possible

15   that there are some things that might have had the

16   word "SEC" in it, but chances are it's in an e-mail

17   chain.  So I'm sure there's a lot of duplicates

18   because of the e-mail chain format Outlook uses.

19       **Q    With respect to your initial production, you**

20   **provided the .pst of your full e-mail account?**

21       A    I believe so, yes.

22       **Q    And which e-mail account was that?**

23       A    It was on my business e-mail accounts.

24       **Q    Which e-mail addresses are those?**

25       A    It should be el@lemelsoncapital.com.  There

1  should be -- there might be some legacy e-mails from

2  gml@lemelsoncapital.com.  Could involve the e-mail

3  address cc@lemelsoncapital.com.  There could have been

4  e-mails sent from my personal e-mail account,

5  elemelson@outlook.com.  I think that's all of them.

6  **Q    And did you produce the full .pst for each**

7  **of those accounts?**

8  A    Well, the way my Outlook is set up is that

9  so anytime someone e-mails me, it goes into my general

10  in box, and then I file everything in folders in

11  Outlook.  So everything related to business in the

12  business .pst file I gave you.  I have nothing -- so

13  my personal folders would only have things about my

14  personal life, like vendors or electric company or

15  something like that.

16  **Q    And do you file your sent items as well as**

17  **received items?**

18  A    I don't file the sent.  They're in the sent

19  folder, but I never delete them either, so they should

20  all be in the .pst file.

21  **Q    Do you produce the sent items as well as the**

22  **business folder?**

23  A    They should all be in the .pst file, yeah.

24  They should all be in the file I gave you.  I almost

25  never delete anything ever.  I can't think of an

1    I consider myself, I'm referred to as a priest with a

2    lay vocation, and my lay vocation is as a securities

3    analyst and a fund manager.

4         **Q    Where are you employed in your lay vocation?**

5         A    In Lemelson Capital Management.

6         **Q    What is Lemelson Capital Management?**

7         A    It's the general partner of a fund called

8    the Amvona LP.  It's a Massachusetts LLC.

9         **Q    How long -- did you found Lemelson Capital**

10   **Management?**

11        A    Yes, I helped to establish it.

12        **Q    When was that?**

13        A    2012.

14        **Q    When you say you helped to establish it, who**

15   **else was involved?**

16        A    The attorney who helped set up it.  His name

17   was Kevin Cott.  Initially I was going to form the

18   entity also with my brother, but ultimately it didn't

19   work out that way.  I mean my initial thought was to

20   form it, and then he was going to be involved, and

21   then he wasn't going to be involved, and then I just

22   moved forward on my own.

23        **Q    What is your brother's name?**

24        A    Jason.

25        **Q    What is his last name?**

1      A     Yes.  I studied Merrick and GSK, Novartis,

2   their licensees.  And then they have in-licensing

3   agreements with other partners.  Some of them are

4   opaque.

5           For example, they have an agreement with a

6   company called Biotech Value Fund, which is not easy

7   to get to the bottom of, exactly, what the arrangement

8   is.  But I try to read everything I can for all

9   related parties as well.  So you build a competence

10  from reading these things, what is going on.

11     **Q     When did you first hear about Ligand?**

12     A     I remember very clearly I was sitting in my

13  driveway and I was reading on my iPad and I was

14  looking through some screeners and generally the

15  thought on my mind was that bubbles were being

16  created.

17          The market had been in an upward march for

18  five years, and I began to be of the opinion that it

19  was safer for my investors to be short than to be

20  long.  Even though I had not done a lot of shorting,

21  the first issue we really shorted was World Wrestling

22  Entertainment.

23          And I was screening through companies that

24  had really very, very high statistics multiples,

25  things like Enterprise Value EBITDA or

 1          I mean, I've been criticized before, going
 2     back to 2010.  I don't expect people to agree with
 3     what I write.  Probably a minority agree with what I
 4     write.  In fact, today I'm sure a minority of people,
 5     probably less so after Valeant, but a minority of
 6     people probably understand what I've been saying about
 7     Ligand for the time being.
 8          **Q     You were surprised that the price went down**
 9     **after you released your negative research reports on**
10     **Ligand?**
11          A     I don't think they are negative.  I think
12     that they're an accurate, factually accurate and
13     rationale recounting of the flaws I see in the
14     company.
15          **Q     You are not sure whether these reports are**
16     **negative about Ligand?**
17          A     Well, I think what they are doing is
18     negative.  I think I'm recounting it and bringing it
19     to light in the reports.
20          **Q     In a negative light?**
21          A     I think in an accurate, truthful, and
22     rational light.
23          **Q     Do you have a negative view of Ligand?**
24          A     I do.
25          **Q     Do you think your reports reflect that**

1                    PROOFREADER'S CERTIFICATE

2

3    In the Matter of:    TRADING IN THE SECURITIES OF

4                         LIGAND PHARMACEUTICALS, INC.

5    Witness:             Emmanuel Lemelson

6    File Number:         HO-12718-A

7    Date:                July 20, 2016

8    Location:            Washington, D.C.

9

10

11        This is to certify that I, Nicholas Wagner,

12    (the undersigned), do hereby swear and affirm

13    that the attached proceedings before the U.S.

14    Securities and Exchange Commission were held

15    according to the record and that this is the

16    original, complete, true and accurate transcript

17    that has been compared to the reporting or recording

18    accomplished at the hearing.

19

20

21

22    _____      _____

23    (Proofreader's Name)            (Date)

24

25