

United States District Court

District of Massachusetts


Securities and Exchange          )

Commission,                      )

       Plaintiff,            )    1:18-cv-11926-PBS

   v.                            )

Gregory Lemelson and Lemelson    )

Capital Management, LLC,         )

       Defendants,           )

   and                           )

The Amvona Fund, LP,             )

       Relief Defendant.     )

_____



Video Deposition of TODD PETTINGILL

San Diego, California

December 12, 2019



Reported by:

Veronica S. Thompson

CSR 6056, RPR, CRR, CCRR

KEY Discovery

United States District Court

District of Massachusetts

| | | |
|---|---|---|
| Securities and Exchange | ) | |
| Commission, | ) | |
| Plaintiff, | ) | 1:18-cv-11926-PBS |
| v. | ) | |
| Gregory Lemelson and Lemelson | ) | |
| Capital Management, LLC, | ) | |
| Defendants, | ) | |
| and | ) | |
| The Amvona Fund, LP, | ) | |
| Relief Defendant. | ) | |

_____

Video Deposition of TODD PETTINGILL
was taken on behalf of Defendants at 600 West Broadway,
Suite 300, San Diego, California 92101, commencing at
7:00 AM and ending at 10:50 AM, on Thursday,
December 12, 2019, before Veronica S. Thompson,
CSR 6056.

APPEARANCES

For Plaintiff:
     U.S. Securities and Exchange Commission
     By:  Alfred A. Day, Sr. Trial Counsel
     33 Arch Street
     Boston, Massachusetts 02110
     617-573-4537
     daya@sec.gov

For Defendants:
     Libby Hoopes
     By:  Douglas A. Brooks, Esq.
     399 Boylston Street
     Boston, Massachusetts 02116
     617-338-9300
     dbrooks@libbyhoopes.com

For Ligand Pharmaceuticals, John Higgins, and Viking
Therapeutics:

     Cahill Gordon & Reindel LLP
     By:  Bradley J. Bondi, Esq.
     By:  Sean P. Tonolli, Esq.
     By:  William C. McCaughey, Esq.
     1990 K Street, N.W., Suite 950
     Washington, D.C. 20006
     202-862-8900
     bbondi@cahill.com
     stonolli@cahill.com
     wmccaughey@cahill.com
Also Present:
     Fr. Emmanuel Lemelson
Videographer:
     Daniel Bermudez, KEY Discovery

INDEX


EXAMINATION                                              PAGE

By Mr. Brooks                                              7



EXHIBITS

NUMBER                    DESCRIPTION                    PAGE

Exhibit 151  Email string ending 11/05/13 from     29

             John Higgins to Todd Pettingill;

             LGND_0018094

Exhibit 152  Email string ending 08/22/14 from     91

             Todd Pettingill to Eric Vajda;

             LGND_0041208-0041210

Exhibit 153  Email string ending 09/19/14 from     95

             Todd Pettingill to Nishan de Silva;

             LGND_0047276-0047278

Exhibit 154  Marked and withdrawn (not attached);  108

             LGND_0047298-0047307

Exhibit 155  Marked and withdrawn (not attached);  123

             LGND_0052340-0052343

Exhibit 156  Email string ending 08/22/14 from     132

             Todd Pettingill to Glenn Dourado and

             Eric Vajda; LGND_0041211-41213

Exhibit 157   Email string ending 08/10/14 from      138

              Melanie Herman to Todd Pettingill;

              LGND_0040984, 0041028-0041031

Exhibit 158   Email string ending 07/21/16 from      139

              Todd Pettingill to Bruce Voss;

              LCM_SEC0000774-0000776


          FIRST REFERENCE TO PREVIOUSLY MARKED EXHIBITS

    NUMBER                              PAGE    LINE

    Exhibit 4                            37       2

    Exhibit 7                            58      16

    Exhibit 8                            85      17

    Exhibit 114                          49       4

    Exhibit 146                         110       6

1     SAN DIEGO, CALIFORNIA, DECEMBER 12, 2019, 7:00 AM

2            VIDEOGRAPHER:  We are now on the record.

3     Today's date is December 12, 2019, and the time is

4     7:00 AM.  This is the video deposition of Todd

5     Pettingill being taken in the matter of SEC versus

6     Lemelson Capital Management LLC pending in the United

7     States District Court, District of Massachusetts.

8            We are at Aptus Court Reporting, San Diego.

9            My name is Daniel Bermudez of Aptus Court

10    Reporting located at 600 West Broadway, Suite 300,

11    San Diego, California 92101.

12            Will counsel please identify yourselves and

13    state whom you represent.

14            MR. BROOKS:  Doug Brooks, law firm Libby

15    Hoopes, for the defendants in this action.

16            MR. DAY:  Al Day for the Securities and

17    Exchange Commission.

18            MR. McCAUGHEY:  William McCaughey, Cahill

19    Gordon & Reindel, on behalf of Ligand Pharmaceuticals

20    and the witness.

21            MR. TONOLLI:  Sean Tonolli of Cahill Gordon &

22    Reindel on behalf of Mr. Pettingill and Ligand

23    Pharmaceuticals.

24            MR. BONDI:  Brad Bondi, Cahill Gordon &

1    Reindel, on behalf of Ligand Pharmaceuticals and the

2    witness.

3              VIDEOGRAPHER:  The court reporter is Veronica

4    Thompson, and she may now swear in the witness.

5                        TODD PETTINGILL,

6         having been duly sworn, testified as follows:

7                        EXAMINATION

8    BY MR. BROOKS:

9        **Q.**   Good morning, Mr. Pettingill.  My name is Doug

10   Brooks.  We met briefly off the record.  I represent the

11   defendants in this action.

12             Have you ever been deposed before?

13       **A.**   I have not.

14       **Q.**   Okay.  So just a few ground rules then.

15             As you know, you're under oath.  Everything

16   you're saying is being transcribed.  We should both do

17   our best not to talk over each other because then it

18   becomes hard for the court reporter.

19             And all your responses should be verbal

20   because there is a videographer, but the court

21   reporter -- it's hard to get a nod of the head.

22       **A.**   Makes sense.

23       **Q.**   Does that all make sense?

24       **A.**   Yes.

1   media posts.  You know, he's got like three different

2   Wikipedia pages.  He's got his own -- oh, and they all,

3   kind of, cross-reference each other, so very -- you

4   know, very good at promoting himself in multiple ways

5   across different platforms.

6           So we would follow that and, kind of,

7   unders- -- you know, look -- look at history and just

8   try to understand.

9           Again, it was purely out of understanding who

10  was this guy that was coming at us with, you know, false

11  and misleading statements.

12          MR. BROOKS:  Can we take a quick bathroom

13  break?

14          VIDEOGRAPHER:  We're off the record at

15  7:56 AM.

16          (Recess, 7:56 AM - 8:05 AM.)

17          VIDEOGRAPHER:  We are on the record at

18  8:05 AM.

19  BY MR. BROOKS:

20      Q.   Mr. Pettingill, were you involved in any

21  discussions at Ligand about whether the company should

22  publicly respond to Fr. Lemelson's reports?

23      A.   I don't recall specifically, but I'd imagine

24  so.

1    **Q.**   Do you recall generally what was discussed at

2    Ligand about that issue?

3    **A.**   Yes.  I would say -- well, again, it was a

4    long time ago.  Key talking points, though, that I

5    imagine we discussed were, you know, is this -- is it

6    worth -- you know, is this guy trying to put out a fair

7    report?  Are we -- is -- you know, is, you know,

8    contacting him and trying to set the record straight --

9    you know, is this -- is this deliberate, or is this --

10   is this just a -- you know, a -- just a mistake?  And

11   would it make sense to -- you know, to try to, you know,

12   set him straight.

13          I think ultimate- -- and then as far as, like,

14   you know, going to the public, you know, I think it was,

15   Do we put more fuel on the fire if we give this guy more

16   credence than -- you know, than he deserves?

17   **Q.**   In the 2014 time frame, did you personally

18   have an opinion on how, if at all, Ligand should

19   respond?

20   **A.**   You know, it's very difficult to recall

21   specifically.  I can tell you that in general in

22   hindsight I'm glad we didn't engage.  I think that would

23   have, you know, put -- again, just seeing how he reacted

24   to other things such as this -- you know, the Wall

1      **Q.**   If I could turn your attention back to the

2   exhibit.  See number 3, in bold, it says "Tangible

3   equity"?

4      **A.**   Uh-huh.

5      **Q.**   And if you go to the third line, it says,

6   "With the August 4, 2014, earnings release and its

7   updated financials, the company presented tangible

8   equity of just 21,000 upon which rested an extraordinary

9   market capitalization of approximately 1.1 billion."  Do

10   you recall reading this at the time?

11      **A.**   Yes.

12      **Q.**   Did you think there was anything inaccurate

13   with his tangible equity calculation of 21,000?

14      **A.**   So tangible equity is not a commonly used

15   financial metric.  Prior to reading this, I'd never

16   heard of it.  I've heard of tangible assets, which is

17   your assets minus your intangible assets.  That's

18   something people talk about.

19           Tangible equity in itself is an oxymoron.

20   Equity is -- equity means your ownership.  You have

21   equity in your house.  Tangible means existing,

22   something you put your hands on.

23           So I defy you to show me the tangible equity

24   you own in your house.  You don't have physical -- a

1   physical, you know, amount that you owe of your house.

2   I guess you could say, "Okay.  Half of my house belongs

3   to the bank because I haven't paid it back, and half

4   belongs to me."  I guess you could say that, but that's

5   not how people view tangible equity.

6            Tangible equity was -- it was a fabricated and

7   misleading financial metric that was brought up here.

8       **Q.**   But the way he describes it, do you believe

9   the 21,000 is a true or false calculation?

10           MR. BONDI:  Object to the form, asked and

11  answered.

12           THE WITNESS:  Yeah, I'm not sure how to answer

13  that because I could say -- you know, I could make up a

14  metric and, you know, dis- -- and calculate it

15  correctly, but if the metric has no financial meaning,

16  then I believe it's an inaccurate metric.

17           Now, I will say, I mean, just specifically, if

18  you're asking about the accuracy of that metric, as --

19  when we were, kind of, going through this process and

20  trying to understand what was going on and who this guy

21  was and what he was talking about, John had me start to

22  track this tangible equity to figure out what it was

23  and -- John, my CEO -- and one of the things I realized

24  is, even in his reports, he wasn't being -- Mr. Lemelson

1   wasn't even being consistent on how he was calculating

2   it.

3           At one point he was excluding certain

4   intangible assets; in other ones, he wasn't.  To me it

5   seemed like he didn't even know what he was talking

6   about.  He was just -- you know, if it was that much of

7   a -- kind of a metric that was used by the financial

8   community, it seemed like he would be able to calculate

9   it consistently, but he wasn't even consistent between

10  reports.

11  BY MR. BROOKS:

12     **Q.**   So are you saying -- is it your testimony here

13  today that you've never heard of tangible equity outside

14  of Fr. Lemelson?

15     **A.**   Yes.

16          MR. BONDI:  Object to form, asked and

17  answered.

18  BY MR. BROOKS:

19     **Q.**   So if I google "tangible equity," presumably I

20  won't find anything on it?

21     **A.**   I'm not testifying that.  I'm testifying I've

22  never heard of it.  In my experience as an investor,

23  I've never heard that as a use- -- as a commonly used

24  term.

1          I've heard of tangible assets.  And tangible

2    assets and tangible equity are not the same thing.

3        **Q.**   Right.  But Fr. Lemelson describes what he

4    means by tangible equity.  Right?

5          MR. BONDI:  Objection.

6          THE WITNESS:  I don't know.  Where's -- I

7    mean, let's -- is there -- is that described in this

8    calculation here?

9          I see 21,000.  I see a number, but I don't see

10   any breakdown in calculation.  Maybe it's there.  I'm

11   just not seeing it.

12   BY MR. BROOKS:

13       **Q.**   Did -- so I just want to get -- so do you

14   believe that Fr. Lemelson invented the metric of

15   tangible equity?

16       **A.**   Yes.

17       **Q.**   I'm handing you what's previously been marked

18   as Exhibit 8.

19       **A.**   Are we done with Exhibit 7?

20   **Q.**   Yes.

21          Are you familiar with that document?

22   **A.**   Sorry.  I should have looked in detail.

23          Yes, I believe so.

24   **Q.**   Can -- can I ask you -- and I apologize.

1   BY MR. BROOKS:

2        **Q.**   So turning back to the exhibit in front of

3   you, if I could turn your attention to the bottom of

4   page 2 and the last -- page before that.  Yeah.

5            The bottom of it is a statement from his

6   report that you reproduced that says, "On August 18,

7   Ligand filed a Form 8-K with the Securities and Exchange

8   Commission, SEC, revealing that the company had issued

9   245 million in new debt against the company's tangible

10  equity of just 21,000 giving a rise to a debt" -- "to a

11  debt to tangible equity ratio of 11,667 to one.  That is

12  to say $11,667 in debt for every one dollar in tangible

13  common shareholder equity."  Do you see that?

14       **A.**   Correct.

15       **Q.**   Okay.  Then your response was, "Calculation

16  incorrect because he leaves out the cash which would

17  increase the tangible equity value."  Do you see that?

18       **A.**   Yep.

19       **Q.**   How would cash increase tangible equity value?

20       **A.**   I think at this point I was, you know, trying

21  to wrestle with a new term.  I didn't understand how it

22  meant.  I agree.  That actually probably isn't the -- it

23  would have affected net debt.  Tangible equity value,

24  again, was a new term that I was struggling to keep up

1   with.

2       **Q.**   The -- did -- leaving aside tangible equity,

3   did common shareholder equity in Ligand go up or down

4   after the 2014 bond offering?

5       **A.**   It wasn't affected by it.

6       **Q.**   Now --

7       **A.**   Well, actually, you mean just the accounting

8   impact?  Because there's two things.  So just to make

9   sure we're not confusing terms, market cap -- when

10  people talk about, like, you know, the value of the

11  company's equity, generally they're talking about market

12  cap, which is number of shares outstanding times the

13  market -- the per share price.

14          So assuming you're not talking about that,

15  assuming you're talking about in the context of -- the

16  other context is the accounting definition of equity.

17  Tangible equity -- ignore that for a second.

18          Equity in general is you -- basically, you

19  take the assets.  That's -- you mark up, you total up,

20  you sum up everything the company has, tangible or

21  intangible.  You back out liabilities which is, kind of,

22  like the near-term payables, the thing they need to back

23  out -- the things they need to pay people, debt

24  outstanding, things like that.  And then whatever is

1  they sold when they came out with good SARM -- or with

2  good NASH data, they went up to $20 a share.

3          All of this time, Mr. Lemelson was putting out

4  reports saying that they were a sham, you know, just

5  not -- you know, a fake company and a fake transaction

6  from Ligand.

7      Q.    Fr. Lemelson put out reports about Viking

8  after the IPO?

9      A.    Dur- -- yeah, yeah.  He referenced -- no.

10  Well, he didn't put the specific report about Viking,

11  but he did re- -- he referred to -- a big section of one

12  of his reports was about how Viking was a fraud.

13     Q.    That was -- wasn't that before the IPO,

14  though?

15     A.    I don't believe so.  Maybe -- maybe I'm

16  getting things mixed up, but the point is, you know, he

17  was very actively, you know, trying to discredit the

18  transaction --

19     Q.    Right.

20     A.    -- in the markets --

21     Q.    Right.

22     A.    -- using -- using things that were just

23  misleading.

24     Q.    But my question is, weren't all of his reports

1    a full year before the Viking IPO?

2        **A.**    Yeah.  Yeah, you're correct.

3        **Q.**    Let's get this one.

4             (Exhibit 156 was marked.)

5    BY MR. BROOKS:

6        **Q.**    Mr. Pettingill, you've been handed what's been

7    marked as Exhibit 156.  I'd ask you to take a moment and

8    look at this.

9        **A.**    Seemed like the same chain we --

10       **Q.**    Yeah, it's actually -- yes.  This is actually

11   a continuation of it, if you see.

12            So if you turn to the second page of this

13   exhibit after the email that you wrote that we've

14   already discussed, see at the top an email from Glenn

15   Dourado?

16       **A.**    Yeah.

17       **Q.**    He writes, "Unfortunately he's winning because

18   the stock keeps going down.  He needs to be silenced for

19   good.  I'm not saying anything specific, for fear it

20   could be misconstrued, but this is a total farce."

21            You understood he was talking about

22   Fr. Lemelson.  Correct?

23       **A.**    Assume so.

24       **Q.**    All right.  And then if you look at the next

1    I, the undersigned, a Certified Shorthand

2 Reporter of the State of California, do hereby certify:

3    That the foregoing proceedings were taken

4 before me at the time and place herein set forth; that

5 any witnesses in the foregoing proceedings, prior to

6 testifying, were duly sworn; that a record of the

7 proceedings was made by me using machine shorthand,

8 which was thereafter transcribed by me; that the

9 foregoing is a true record of the testimony given.

10    Further, that if the foregoing pertains to the

11 original transcript of a deposition in a federal case,

12 before completion of the proceedings, review of the

13 transcript [ X ] was [  ] was not requested.

14    I further certify I am neither financially

15 interested in the action nor a relative or employee of

16 any attorney or party to this action.

17    In witness whereof, I have this date

18 subscribed my name.

19

20 Dated:  December 27, 2019

21

22

23    _Veronica S. Thompson_

24    _____
      Veronica S. Thompson
      CSR 6056, RPR, CRR, CCRR

Page 154

1              DECLARATION UNDER PENALTY OF PERJURY

2

3    Case Name:  SEC v. Lemelson

4    Date of Deposition:  12/12/19

5    KEY Discovery Job

6

7              I, TODD PETTINGILL, hereby certify under

8    penalty of perjury under the laws of the State of

9    _____ that the foregoing is true and correct.

10             Executed this _____ day of _____,

11   20_____, at _____.

12

13

14                       _____

15                       TODD PETTINGILL

16

17

18

19

20

21

22

23

24

1                    DEPOSITION ERRATA SHEET

2    Case Name:  SEC v. Lemelson

     Name of Witness:  TODD PETTINGILL

3    Date of Deposition:  12/12/19

     KEY Discovery Job

4    Reason Codes:  1.  To clarify record.

                    2.  To conform to facts.

5                   3.  To correct transcription errors.

6

7    Page _____ Line _____ Reason _____

8    From _____ to _____

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23   Page _____ Line _____ Reason _____

24   From _____ to _____

Page 156

1    Page _____ Line _____ Reason _____

2    From _____ to _____

3    Page _____ Line _____ Reason _____

4    From _____ to _____

5    Page _____ Line _____ Reason _____

6    From _____ to _____

7    Page _____ Line _____ Reason _____

8    From _____ to _____

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   _____ Subject to the above changes, I certify that the
            transcript is true and correct.

22   _____ No changes have been made.  I certify that the
            transcript is true and correct.

23

     _____   _____

24   Date         Todd Pettingill