```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF MASSACHUSETTS
 3
 4  SECURITIES AND EXCHANGE      ) Civil Action No.
    COMMISSION,                  ) 1:18-cv-11926-PBS
 5                               )
              Plaintiff,         )
 6                               )
        vs.                      )
 7                               )
    GREGORY LEMELSON and LEMELSON)
 8  CAPITAL MANAGEMENT, LLC,     )
                                 )
 9            Defendants,        )
                                 )
10        and                    )
                                 )
11  THE AMVONA FUND, LP,         )
                                 )
12            Relief Defendant.  )
    _____)
13
14
15
16
17            Oral deposition of MICHAEL JOHNS, taken at
18  THE SECURITIES AND EXCHANGE COMMISSION, 1617 J.F.K.
19  Blvd., Suite 520, Philadelphia, Pennsylvania, 19103,
20  beginning at 1:00 p.m., on Wednesday, November 20,
21  2019, before Karen A. Stevens, Court Reporter and
22  Notary Public, there being present:
23
24  JOB No. 191120ZRV
```

A P P E A R A N C E S :


        MARC JONES, ESQUIRE
        ALFRED A. DAY, ESQUIRE
        U.S. SECURITIES AND EXCHANGE COMMISSION
        BOSTON REGIONAL OFFICE
        Division of Enforcement
        33 Arch Street
        Boston, Massachusetts  02110
        jonesm@sec.gov
        daya@sec.gov
        -- Representing the Plaintiff



        DOUGLAS S. BROOKS, ESQUIRE
        LIBBY HOOPES
        399 Boylston Street
        Boston, Massachusetts  02116
        dbrooks@libbyhoopes.com
        -- Representing the Defendant



        ALSO PRESENT: Father Lemelson

```
 1                    I N D E X

 2                      * * *

 3   WITNESS:  MICHAEL JOHNS

 4   QUESTIONED BY:                      PAGE

 5   Mr. Jones                             4

 6   Mr. Brooks                          116

 7

 8                  E X H I B I T S

 9                      * * *

10

11   NUMBER              DESCRIPTION       MK'D.

12   Exhibit 50          Phone Call List      41

13   Exhibit 51          E-Mail               41

14   Exhibit 52          Payment Record       41

15   Exhibit 53          Wikipedia Document   87

16   Exhibit 54          E-Mail               91

17   Exhibit 55          E-Mail               98

18   Exhibit 56          Letter               98

19   Exhibit 57          E-Mail              101

20   Exhibit 58          E-Mail              105

21   *Exhibit 59         Voice Mail Message  113

22   (*Exhibit retained by Counsel.)

23

24

                                             3
```

```
 1                      * * *

 2                   PROCEEDINGS

 3                      * * *

 4                 MICHAEL JOHNS,

 5         after having been first duly sworn, was

 6         examined and testified as follows:

 7                      * * *

 8           E X A M I N A T I O N

 9                      * * *

10  BY MR. JONES:

11       Q    Good afternoon, Mr. Johns.  My name is

12  Marc Jones.  I'm with the Securities and Exchange

13  Commission.  This is Al Day.  He's also with the

14  SEC, and we are going to ask you some questions

15  today in a deposition format.  Are you appearing

16  here today pursuant to a subpoena?

17       A    Yes.

18       Q    Okay.  And have you been deposed before?

19       A    By the SEC?

20       Q    No, just in general.  Have you sat for a

21  deposition before?

22       A    Yes.

23       Q    And how many times?

24       A    Half a dozen roughly.
```

```
 1  content.  I always allowed him, and I think he would
 2  acknowledge that he insisted on ultimate
 3  responsibility for the content of all of those
 4  publications.
 5               The subject at hand, that of a
 6  possible conflict, was one that I always
 7  impressively noted that he was very up front about
 8  in issuing disclaimers on.  And not just in the
 9  written content, but even in some of the radio
10  interviews that I had heard, it was always mentioned
11  that he was long this position or short this
12  position.  And I took as a given that the content he
13  gave me from the standpoint of the actual financials
14  or prospects of the company was accurate to his
15  satisfaction.  So I wasn't involved in
16  doublechecking these facts or verifying them or
17  developing them in any way.
18      Q    We'll look at some of that written
19  material, but generally speaking, picking up on
20  where you left off, is it right to say that you
21  never doublechecked the statements, the factual
22  truth or falsity of the statements in Father
23  Lemelson's research reports?
24      A    I think it would be fair to say that was
```

27

1   not my primary responsibility.  There may have been

2   time to time where I had shared with him information

3   that I had obtained that I thought was worth looking

4   at, and some of which may have validated his views,

5   some of which may have invalidated his views.  I

6   think generally it's fair to say that that was not a

7   functional responsibility of mine.

8       Q    So you provided him some information that

9   you had found, correct, from time to time?

10          MR. BROOKS:  Objection to the form.

11          THE WITNESS:  Periodically, sparingly,

12      rarely.

13  BY MR. JONES:

14      Q    Rarely.  Okay.  But you did not take the

15  source materials that Father Lemelson had found and

16  checked to make sure that he was accurately

17  representing it?

18      A    No.  I took as a given that he was

19  comfortable with that.  Maybe either by E-mail or by

20  phone conversation I may have from time to time --

21  because my agenda in all this was his success, and

22  his success in my view was based on his credibility

23  on these issues.  So I may periodically have

24  inquired about doublechecking or looking further

                                                    28

1    into things, but, you know, not in a dogmatic way.

2    And I took for granted that he had ultimately

3    satisfaction with the content that he was providing.

4    And of course my name is not appearing on any

5    publications.  I'm not the author of them.

6         Q    Right.

7         A    And, yeah, I think we're both

8    understanding that I would be helpful for more the

9    editorial presentation development, not substantive

10   work associated with it.

11        Q    In terms of that editorial work, at any

12   time that you can recall did you change the

13   substance of what Father Lemelson had written?

14        A    I don't believe I did.  I should say I

15   took a phone call from your Washington, DC office a

16   year and a half, two years ago that came up as a

17   subject of conversation.  Any revisions or changes

18   that I did were based on information that he had

19   provided to me or that was available to both of us

20   and that he ultimately finally reviewed and

21   approved, authorized the distribution of.

22              There may have been even times where

23   we had gone back and revised some things.  I think I

24   may recall a few instances of that.  This is more a

subjective perception. My view as we did this work
together is that he had a satisfactory commitment to
the accuracy of his work. I never sensed in any way
there was any conscious effort to misrepresent
anything. On the other hand, I can't say for a fact
that everything was accurate, because I wasn't
charged with and involved in any fact checking
function.

Q     So your impression that Father Lemelson
was dedicated to the accuracy of his work was based
on reading his materials and talking with him on the
phone and E-mails?

A     Yeah, communication, watching him work
through his analysis, you know, kind of noticing
what I thought was his general commitment to the
accuracy of these things. It wasn't simply that he
was putting out written material that was evaluated
and looked at. As things moved along, his
publications got covered in financial media, he
appeared on financial radio pretty consistently,
even financial TV a few times. So, you know, he
was -- I would say he was very believing in the
communications that he was issuing and passionate
about it.

30

1  know, maybe any notes that I had made on our calls,

2  which weren't many.  Because I think you guys asked

3  me to preserve that and there wasn't a lot to

4  preserve really.

5      Q    Okay.  Let me give you a copy of what's

6  been previously marked as Exhibit 4.  Mr. Johns, do

7  you generally recognize what Exhibit 4 is?

8      A    Yeah.  This looks like one of the several

9  research reports that Lemelson Capital issued on

10 Ligand Pharmaceuticals.

11     Q    Did you play a role in editing this

12 document?

13     A    Yeah.  We describe it as line editing.

14 For instance, paragraph one, two, three, four you

15 might see it says "percent" spelled out, which is

16 more consistent with what you'd see in corporate

17 writing.  I probably changed percent amount to

18 percent.  I'm sure I made grammatical adjustments to

19 it.  I tried to clarify some sentencing.  But the

20 substantive content, for instance, like paragraph

21 two when he refers to an exceedingly high PE ratio

22 of 115, which answers both your question now and one

23 previously, that's not something I would have gone

24 and independently verified.  That was, in fact,

1  their PE ratio at that time.

2      Q      So the goal was improving the writing

3  essentially?

4      A      The presentability of it, yeah.

5      Q      Would you characterize your contributions

6  on this report as entirely non-substantive?

7      A      Non-substantive.

8      Q      Did you do any work checking this report

9  for factual accuracy?

10     A      I may have asked him questions about what

11  he meant in case of sentences that didn't

12  immediately make sense to me.  But I did no

13  independent fact checking and was not asked to do

14  any independent fact checking.

15     Q      Okay.  Can I have you turn to Page 5 of

16  this document?

17     A      Sure.

18     Q      In the middle of the page you'll see a

19  quote and right above it it says, "Ligand has

20  described their biggest royalty generating asset."

21  Do you see that?

22     A      Yes.

23     Q      Did you have any role in choosing to

24  include this quote within this report?

50

1  this report.  And if there were any substantive

2  revisions at all, it would have been ones that we

3  had jointly agreed with and that he ultimately

4  reviewed and authorized.  So I'm not discounting the

5  fact that there might have been cases where he said,

6  "Add this," and even given me the phraseology, and I

7  would have plugged it in.  But from my standpoint

8  that's an editorial function, not substantive.  I

9  made no decisions from a substantive standpoint

10 about the content of this report or any report he

11 ever issued.

12     Q    On Page 7 there are in the middle three

13 quotes to -- or three citations.  Do you see those

14 there?

15     A    FDA and Forbes.

16     Q    Yes.

17     A    Yes.

18     Q    Did you ever look at or check either the

19 FDA material quoted here or cited here or the Forbes

20 articles?

21     A    No.  I wasn't asked to.

22     Q    Let me put that Exhibit 4 aside for now.

23 I'll now give you Exhibit 5.  Do you also recognize

24 this document, Mr. Johns?

1    A    Yes.  I don't recall exactly how many

2    substantive reports were put out on Ligand.  There

3    were more than one, so this appears to be one that

4    appended the previous report.

5        Q    In the 2014 time period when these reports

6    are coming out, do you believe that you worked on

7    all of the reports about Ligand that came out?

8        A    I was not involved in any of the media

9    commentator on it; radio, television, print, media.

10   On the printed reports I likely reviewed them from

11   an editorial formatting standpoint.

12       Q    In your memory, you don't recall in that

13   time period, 2014, seeing a report about Ligand that

14   you hadn't already seen in draft?

15       A    Repeat that, please.

16       Q    Sure.  I'm just saying do you remember any

17   reports that came out about Ligand that you hadn't

18   previously seen to provide some editing work?

19       A    I can't discount that possibility.  I

20   didn't -- I don't immediately recall any that came

21   out that I didn't review.

22       Q    For Exhibit 5 can I have you turn to the

23   third page, please?

24       A    Yes.

                                                        56

1    A    Yeah.  I guess that's what I'm saying, is

2    that even after they came out, which was probably a

3    mutual frustration, I don't want to say it was

4    exclusively mine.  In my view, don't release the

5    report until you're completely comfortable with it,

6    would be my view.  And I would feel the same way.  I

7    don't say I'm done with my work until I look at it

8    and feel it's completely done.  But as I recall, and

9    I don't remember the specifics of it, I think there

10   were a few examples where a report came out, it was

11   released and either he identified something or I may

12   have identified something that warranted revising on

13   the website.

14   Q    Do you recall any -- I know it was a while

15   ago, but do you recall any specific instances of

16   parts of reports being changed after they were

17   published?

18   A    No.

19   Q    Do you recall that occurring in the

20   contexts of the reports on Ligand?

21   A    I can't say yes or no to that.  Ligand was

22   a sizeable portion of the work we did, so it's quite

23   possible.

24   Q    I believe I can only ask you what you

                                                      59

1  remember, so I understand.  Looking at that line,

2  "Once the Hep C application is lost there is no

3  evidence of a significant commercially viable market

4  from Promacta," did you know whether that was true

5  or not?

6       A    I would not have known if that was or was

7  not true.  I will say that Father Emmanuel felt very

8  adamant about this company, that it was not just

9  overvalued but may have actually no material value.

10 And I may have -- from time to time I may have said,

11 "Is this in fact true?"  And he felt passionately,

12 adamantly insistent on many of these statements.

13 Which, to be honest, from my perspective, it is both

14 concerning but on the other hand reassuring, meaning

15 he was so adamant about it that I never felt the

16 need to push back any further.  On the other hand,

17 these were very bold statements than what you would

18 see in a typical investor report.

19       Q    Apart from --

20       A    And knowing not oblivious to the fact that

21 this company would likely take issue with it.

22       Q    Apart from Defendant Lemelson's adamance

23 about the truthfulness of this, you have no way to

24 judge whether or not this is truthful, or you had no

60

```
 1        A    No.

 2        Q    Did you change the substance of these

 3   lines in any material way?

 4        A    No.

 5        Q    Did you do any fact checking on this part

 6   of the document?

 7        A    No.  I wasn't asked to.

 8        Q    We have been going for about an hour and

 9   20.  Do you need a break?

10        A    I'm okay if you guys are.

11        Q    Okay.  This is Exhibit 6, Mr. Johns.  Is

12   this another Ligand report that you worked on?

13        A    Yes, looks like it.

14        Q    Can I have you turn to the top of the

15   second page, please?

16        A    (Witness complies.)

17        Q    Do you see where it says, "Between June 16

18   and August 1st, 2014," see that bullet?

19        A    Yes.

20        Q    Would you please read that to yourself?

21        A    (Witness complies.)

22        Q    This is talking about the decline in

23   Ligand Pharmaceutical stock price?

24        A    Right.
```

1  questions, Mr. Johns.  Thank you for your patience.

2  And before I turn it over to Doug, thank you for

3  your efforts in being here today.

4       A    Happy to do it.

5       Q    First question is, do you have a sense in

6  terms of a total number of dollars what you got paid

7  for work for Father Lemelson?

8       A    I anticipated you asking that and I

9  haven't done an actual accounting of it.  I'm going

10  to guess that over roughly three years of working

11  with him it did not exceed $20,000.

12       Q    $20,000 total or per year?

13       A    Total, over the three-year period.

14       Q    Got it.  Lastly, sir, earlier you said in

15  talking with Father Lemelson about the SEC

16  investigation you didn't believe that there was

17  cause to investigate him.  What was your basis for

18  saying that?

19       A    Based on what I knew at that time, meaning

20  as I interacted with him I sensed someone who was

21  admittedly new to financial analysis, who admittedly

22  sometimes in my view probably over-spoke of his

23  capabilities in the field, but who wasn't, at least

24  as far as I could tell in working with him on these

115

things, consciously trying to misrepresent anything.
He passionately believed these -- in each one of
these stocks, whether it was long or short, that he
was adamantly correct.  In fact, it was a point of
some degree of at least modest tension between us,
because I would push back a little bit on that
sometimes.  But I had no firsthand, at least,
observation of anything that even brushed up against
a violation of any securities laws, at least as I
understand securities laws.

MR. JONES:  Understood.  That concludes
the Plaintiff's questioning.  Over to you,
Mr. Brooks.

* * *

E X A M I N A T I O N

* * *

BY MR. BROOKS:

Q    Good afternoon, Mr. Johns.  We have met
off the record.  My name is Doug Brooks and I
represent the Defendants in this action.  I just
have a few questions actually following up on your
last answer.  You worked with Father Lemelson during
the time period between June 2014 and August 2014
when he wrote his various reports and gave his

116

1  various interviews concerning Ligand

2  Pharmaceuticals?

3      A    Yes, I'm reasonably sure I did.

4      Q    Was it your opinion that Father Lemelson

5  believed everything he said and wrote about Ligand?

6      A    Yes.  He believed this company was on a

7  fast track to bankruptcy and was, the phrase he used

8  repeatedly, a going concern risk, and believed that

9  with -- I had no way to independently gauge it, but

10  I believe that he really passionately believed that

11  to be the case.

12      Q    Was it also your opinion that Father

13  Lemelson believed everything he said and wrote about

14  Viking?

15      A    Yes.

16      Q    Do you recall Mr. Jones asking you some

17  questions about the quotation from a clinician in

18  one of Father Lemelson's reports?

19      A    Yes.

20      Q    Do you have any knowledge that Father

21  Lemelson misquoted the clinician that is quoted in

22  his reports?

23      A    I have no knowledge at all about the

24  clinicians he quoted or whether the quotes were

117

CERTIFICATION

I, Karen A. Stevens, a Court Reporter
and Notary Public, do hereby certify the
foregoing to be a true and accurate transcript
of the proceedings in this matter, as
transcribed from the stenographic notes taken
by me.

_____
Karen A. Stevens
Court Reporter
Notary Public

(The foregoing certification of this
transcript does not apply to any reproduction
of the same by any means, unless under the
direct control and/or supervision of the
certifying reporter.)

119

I, MICHAEL JOHNS, do hereby declare under penalty of perjury that I have read the entire foregoing transcript of my deposition testimony, or the same has been read to me, and certify that it is a true, correct and complete transcript of my testimony given on November 20, 2019, save and except for changes and/or corrections, if any, as indicated by me on the attached Errata Sheet, with the understanding that I offer these changes and/or corrections as if still under oath.

\_\_\_\_\_ I have made corrections to my deposition.

\_\_\_\_\_ I have NOT made any changes to my deposition.

Signed

_____

MICHAEL JOHNS

Dated this _____ day of _____ of 20\_\_\_\_.

120

```
                         ERRATA SHEET
Deposition of: MICHAEL JOHNS
Date taken: NOVEMBER 20, 2019
Case:  SEC v. LEMELSON, et al.
PAGE  LINE
_____ _____    CHANGE: _____
               REASON: _____
_____ _____    CHANGE: _____
               REASON: _____

_____ _____    CHANGE: _____
               REASON: _____
_____ _____    CHANGE: _____
               REASON: _____

_____ _____    CHANGE: _____
               REASON: _____
_____ _____    CHANGE: _____
               REASON: _____

_____ _____    CHANGE: _____
               REASON: _____
_____ _____    CHANGE: _____
               REASON: _____

_____ _____    CHANGE: _____
               REASON: _____
_____ _____    CHANGE: _____
               REASON: _____

_____ _____    CHANGE: _____
               REASON: _____
_____ _____    CHANGE: _____
               REASON: _____

Signed_____
Dated_____
```

121