UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY LEMELSON and LEMELSON CAPITAL<br>MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>THE AMVONA FUND, LP,<br><br>Relief Defendant. | Civil Action No. 1:18-cv-11926-PBS |

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# CONTENTS

OVERVIEW OF THE CASE ................................................................................ 2

ARGUMENT ....................................................................................................... 2

   I.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS, BOTH INDIVIDUALLY AND COLLECTIVELY, WERE MATERIAL ........................... 3

       A.   An Event Study Is not Required to Prove Materiality ...................... 5

       B.   Lemelson's Disclosure of his Short Position Does not Insulate Defendants from Liability ................................................................ 8

  II.   EACH OF LEMELSON'S STATEMENTS OF FACT WAS FALSE, MISLEADING, AND MATERIAL ............................................................ 10

       A.   False Statement 1:  The Purported Demise of Promacta (June 19, 2014) ..... 10
          1.   What Lemelson Said .......................................................... 10
          2.   The Truth of Lemelson's Statement is Disputed ..................... 11
          3.   Lemelson Stated Facts, not Opinions..................................... 12
          4.   A Reasonable Juror Could Find Lemelson's Falsehood about Promacta to be Material ......................................................... 13

       B.   Statements 2 & 3:  The Ligand-Viking Transaction (July 3, 2014) ............... 14
          1.   What Lemelson Said .......................................................... 14
          2.   Whether Lemelson's Statements about Viking were True is Disputed .... 15
          3.   Lemelson Stated Facts, not Opinions..................................... 16
          4.   A Reasonable Juror Could Find Lemelson's Misstatements about Viking Material ........................................................... 19

       C.   Statement 4:  Ligand's Supposed Insolvency (August 14 and 22, 2014)........ 19
          1.   What Lemelson Said .......................................................... 19
          2.   The Jury Must Determine whether Lemelson's Statements were False and Misleading........................................................ 20
          3.   Lemelson States Facts, not Opinions ..................................... 21
          4.   A Reasonable Juror Could Find this Statement to be Material................. 22

 III.  LEMELSON ACTED WITH SCIENTER ........................................... 22

       A.   Ample Evidence of Scienter Here Creates a Triable Issue of Fact................. 23

       B.   Defendants Cannot Overcome the Presumption that Scienter is a Jury Question ................................................................................ 26

 IV.  DEFENDANTS' ADVISERS ACT ARGUMENT IGNORES THE STATUTORY LANGUAGE AND THE ELEMENTS OF THE VIOLATION ............................... 28

CONCLUSION ................................................................................................. 29

Plaintiff, the United States Securities and Exchange Commission (the "Commission" or "SEC"), submits this memorandum in opposition to Defendants' motion for summary judgment.

## PRELIMINARY STATEMENT

From June through September 2014, Lemelson engaged in a deceptive scheme to drive down the stock price of Ligand Pharmaceuticals, Inc. ("Ligand") and profit from his fund's short position in that stock. The Commission has adduced extensive evidence that the false statements of fact Lemelson employed to further his scheme were misleading, material, and made with scienter. The record is replete with disputed facts and credibility determinations that must be resolved by the jury.

Defendants' arguments to the contrary should be rejected. Defendants principally argue that an event study is necessary to prove materiality. This position is wrong on the law and ignores extensive evidence that Lemelson's falsehoods—many of which concerned topics of obvious importance to investors—were material. Defendants also contend that Lemelson's falsehoods are protected opinions. But Lemelson made false statements about existing facts. Even if his statements were somehow construed as opinions, they are still actionable because the embedded facts in those opinions are false. Lastly, Defendants say that the Commission has no evidence that Lemelson acted with scienter. To the contrary, there is extensive evidence that Lemelson knew he was publishing falsehoods (or was extremely reckless in doing so) and was motivated to manipulate Ligand's stock price for his own benefit. In any event, like materiality, Lemelson's state of mind is an issue reserved for the jury in all but the most unusual circumstances, none of which are present here.

Diverting attention from the material facts and law, Defendants once again rail about how this case is different from all others (it's not, as detailed in the Commission's Motion for Partial

Summary Judgment), how the Commission "seeks to punish" Lemelson (it does, but only for his fraud), how the allegations are "cherry-picked" (or, as the Commission sees it, carefully selected to focus on false statements of fact), and how prosecuting Lemelson for his fraud will apparently "have a dangerously chilling impact given its brazen attack on the First Amendment" (it won't, the Commission has pursued cases about false statements for almost ninety years without that happening).  [Br. at 1.]  Defendants' table thumping does not amount to a viable defense at this juncture or at trial.

Defendants' motion for summary judgment should be denied.

## OVERVIEW OF THE CASE

Defendants violated the federal securities laws in three ways:  *First*, Defendants engaged in a fraudulent "short and distort" scheme to profit from Defendants' short position by driving down the price of Ligand shares.  *Second*, to further their scheme, Defendants made four false and misleading statements of fact about the viability of Ligand's flagship drug, the nature of Ligand's relationship with Viking Therapeutics, Inc. ("Viking"), and Ligand's financial condition.  *Third*, Defendants deceived investors and prospective investors by making and disseminating false statements about The Amvona Fund's Ligand investment and by failing to disclose that the fund's positive returns from that position resulted from Defendants' stock price manipulation  The first two of these violations comprise the Commission's First Claim, violations of Exchange Act Section 10(b) and Rule 10b-5.  The third is the Commission's Second Claim, violation of Advisers Act Section 206(4) and Rule 206(4)-8.

## ARGUMENT

Summary judgment should only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of

material fact and then support[ing] that assertion by affidavits, admissions, or other materials of

evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). "A factual

issue is genuine if it may reasonably be resolved in favor of either party and, therefore, requires

the finder of fact to make a choice between the parties' differing versions of the truth at trial."

*DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (internal citations omitted). The

evidence submitted in connection with a motion for summary judgment must be considered in

the light most favorable to the non-moving party and all reasonable inferences must be drawn on

that party's behalf. *Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d

1, 5 (1st Cir. 2000).

## I.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS, BOTH INDIVIDUALLY AND COLLECTIVELY, WERE MATERIAL

The Commission has charged Defendants with engaging in a fraudulent "short-and-

distort" scheme to drive down the price of Ligand's stock through a series of fraudulent acts,

false statements, and material omissions designed to make their short position in Ligand pay off.

[Compl. ¶58.] The crux of Lemelson's reports and public statements was that Ligand was

essentially a fraud and in terrible financial shape—in Lemelson's words, Ligand had "100%

downside risk" and its shares were worth "$0." [Statement of Material Facts (hereinafter,

"56.1"), ¶142.] Lemelson propped up this "thesis" by embedding false and misleading

statements of fact in his reports and public statements, as detailed in Part II, below.

Defendants invite this Court to assess the materiality of Lemelson's false and misleading

statements of fact in isolation. But, "the inquiry is not whether isolated statements within a

document were true, but whether the defendants' representations or omissions, considered

together and in context, would . . . mislead a reasonable investor" *Rombach v. Chang*, 355 F.3d

164, 173 (2d Cir. 2004) (quotation omitted); *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (a

fact is material if "a reasonable investor would have viewed the misrepresentation or omission as

'having significantly altered the total mix of information made available.'"). Because of the fact-

intensive nature of determining whether a misstatement is material, summary judgment is rarely

appropriate. *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996) (citing *Basic*, 485

U.S. at 236); *SEC v. Johnston*, 310 F. Supp. 3d 265, 270 (D. Mass. 2018) (denying summary

judgment on materiality).

 Materiality must be assessed in context; here, a fraudulent scheme to depress Ligand's

stock price through a series of reports and other public statements disparaging the company.

Lemelson's falsehoods were essential to his scheme, propping up his "thesis" that Ligand had no

value. *See SEC v. Fiore*, 416 F. Supp. 3d 306, 322-23 (S.D.N.Y. 2019) (omissions that were part

of "overarching deceptive scheme" to manipulate stock price could be material when viewed in

that context) (citing multiple authorities).

 With this context in mind, ample evidence shows that Lemelson's deceptive scheme and

falsehoods were material:

- Numerous investors contacted Ligand and its investor relations firm to express concern over Lemelson's allegations and to seek assurance that his statements were not true. [56.1, ¶146.]

- Ligand's stock price dropped by 34% during the time Lemelson was publishing his reports. [56.1, ¶143.]

- Ligand's stock price dropped 5.4% immediately in the wake of Lemelson publishing his first report on June 16, 2014—a decline Lemelson's own expert attributes to Lemelson's report. [56.1, ¶144.] This shows that the subject matter of Lemelson's reports—*i.e.*, his allegation that the company had no value—was material to investors.

- Moreover, while Defendants' expert claims that Lemelson's falsehoods didn't

move Ligand's stock, Lemelson's scheme in fact caused a statistically significant
decline in Ligand's stock price.  [56.1, ¶145.]

- Lemelson himself, along with at least one media outlet, attributed Ligand's falling
  stock price to Lemelson's misstatements.  [56.1, ¶147.]

- Lemelson's choice to include these facts in his reports about the value of Ligand
  stock shows that he considered them material.  Viewed in the light most favorable
  to the Commission, the inclusion of these facts shows Lemelson's belief that a
  reasonable investor would consider them as part of the total mix of information
  about the value of Ligand's stock.

### A.  An Event Study Is not Required to Prove Materiality

Defendants devote much of their brief to their argument that the Commission cannot

prove materiality because it did not put forward an event study in its case-in-chief.  [Br. at 15-

21.]  This is not the law.  "[W]hether a public company's stock price moves up or down or stays

the same . . . does not establish the materiality of the statements made, though stock movement is

a factor the jury may consider relevant."  *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d

Cir. 1991); *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1265 (S.D. Fla. 2011) (same).  Here, there

is extensive evidence of materiality, including evidence of stock price movement, but also going

far beyond that (*see* Parts I.A, II.A.4, II.B.4, and II.C.4).  *United States v. Ferguson*, 676 F.3d

260, 275 (2d Cir. 2011) (testimony from two stock analysts and the defendant's investor-relations

manager sufficient to establish materiality); *Veleron Holding, B.V. v. Stanley*, 117 F. Supp. 3d

404, 433 (S.D.N.Y. 2015) (event study not required to prove materiality).

Defendants' argument is not only contrary to law, it makes no sense.  To be material, "a

fact need not be outcome determinative—that is, it need not be important enough that it would

necessarily cause a reasonable investor to change his investment decision."  *SEC v. Meltzer*, 440

F. Supp. 2d 179, 190 (E.D.N.Y. 2006); *see Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 165 (2d

Cir. 2000) ("[I]t is not necessary to assert that the investor would have acted differently if an

accurate disclosure was made.").  Rather, the information need only be important enough that it

"would have assumed actual significance in the deliberations of the reasonable shareholder." *Folger Adam Co. v. PMI Indus., Inc.*, 938 F.2d 1529, 1533 (2d Cir. 1991). The idea that stock price must move up or down in response to materially misleading information—reflecting either the sale or purchase of securities in reliance on that information—makes no sense if material information need not cause an investor to act.

In the end, an event study is but one form of evidence that may be probative of materiality.[1] *United States v. Martoma*, 993 F. Supp. 2d 452, 458 (S.D.N.Y. 2014). Defendants cite a raft of Commission cases in which an event study was offered as evidence of materiality [Br. at 17-18.] But these cases merely show that an event study may be probative of materiality in some cases; none hold that an event study is *always* required. *E.g., SEC v. Aly*, 2018 WL 1581986, at \*20-\*21 (S.D.N.Y. March 27, 2018) (misstatements about a tender offer are material as a matter of law, a conclusion merely "confirmed" by subsequent rise in stock price).[2]

Many of the cases Defendants cite for the proposition that a lack of stock price movement *per se* precludes a finding of materiality arose in private securities litigation. In that context, private plaintiffs often use an event study to demonstrate reliance. *See In re Xcelera.com Sec. Litig.*, 430 F.3d 503 (1st Cir. 2005) (discussing fraud-on-the-market theory to prove reliance in private securities litigation). In alleging a fraud-on-the-market, private securities plaintiffs attempt to show that a class of investors relied on a misstatement in purchasing or selling a security, without direct evidence that each member of the class did so. If the stock price changes when the truth is revealed, the theory goes, that is evidence that investors relied on the information. In showing reliance in this way, the plaintiffs may also show materiality—if a large

---

[1] Indeed, the Supreme Court has warned against "confining materiality to a rigid formula." *Basic*, 485 U.S. at 236.

[2] Defendants cite *Aly* for the unremarkable proposition that the Commission sometimes offers event studies in market manipulation cases. [Br. at 18.]

enough number of investors relied on the information to buy or sell their stock and move the price, it must also be something that altered the total mix of information.[3]  *Id.* at 507-08.  To require the Commission to show materiality through an event study would thus be to require the Commission to prove reliance, an element this Court already held inapplicable in this enforcement action.  *SEC v. Lemelson*, 355 F. Supp. 3d 107, 109 (D. Mass. 2019).

Defendants' citation to fraud-on-the-market cases [Br. at 15-16] therefore doesn't help their cause.  *E.g., In re Biogen Sec. Litig.*, 179 F.R.D. 25, 35-36 (D. Mass. 1997) (fraud-on-the-market theory); *Emerson v. Genocea Biosciences, Inc.*, 353 F. Supp. 3d 28, 38-41 (D. Mass. 2018) (allegation that omission artificially inflated stock price undermined when stock price went up after even worse information was disclosed).  Moreover, far from a bright line, the absence of stock price movement isn't dispositive even in the fraud-on-the-market context.  *E.g.*, *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 254-55 (D. Mass. 2006) (discussing fraud-on-the-market theory and denying motion to dismiss notwithstanding no movement in stock price); *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011) ("Materiality in securities fraud does not depend on demonstration of market reaction to the misstatements.").

Defendants concede that "significant other evidence of materiality" suffices even in the absence of an event study.  [Br. at 21 (citing *Veleron Holding, B.V. v. Stanley*, 117 F. Supp. 3d 404 (S.D.N.Y. 2015).]  They nevertheless latch onto certain Third Circuit cases they say require an event study in *all* cases.[4]  [Br. at 19.]  But once again, the cases Defendants cite arose in the

---

[3] The converse is not true.  As noted above, a false or misleading fact may be material without causing a reasonable investor to change his or her behavior.  *E.g.*, *Ganino*, 228 F.3d at 165.  A lack of stock price movement is only probative of a lack of reliance; it says nothing about materiality.

[4] Defendants selectively quote from a response to an interrogatory to argue that the Commission somehow conceded that an event study is required in this case.  [Br. at 18.]  To the contrary, the Commission merely noted that it "may" rely on expert testimony and detailed other evidence of materiality.  [SEC Response to 56.1 ¶126 (citing Brooks Aff. Ex. 44 at 11-12).]  In any event, the Commission *did* put forward expert evidence rebutting Defendants' misplaced

inapplicable context of a fraud-on-the-market theory in private securities litigation.[5]  *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424-25 (3d Cir. 1997) (noting, in dicta, that lack of stock movement undermined claim of materiality); *Oran v. Stafford* 226 F.3d 275, 282 (3d Cir. 2000) (discussing *Burlington*).

The *Berlacher* case—also from a district within the Third Circuit—doesn't help Defendants' cause either.  [Br. at 16, 20.]  After a bench trial, the court found that the defendant's expert, who presented an event study showing no price movement, was more persuasive than the Commission's expert in the context of an insider trading claim.  *SEC v. Berlacher*, 2010 WL 3566790, at *12 (E.D. Pa. Sept. 13, 2010).  Significantly, the court had previously *denied* defendants' motion for summary judgment on materiality citing the uncontroversial rule that assessment of materiality is "'peculiarly for the trier of fact.'" *Berlacher*, 2009 WL 6608486, at *2 (quotation omitted).  Here, unlike *Berlacher*, there is abundant evidence of materiality and the Commission has disclosed an expert to rebut Defendants' expert's flawed event study.  [56.1 ¶148.]  As in *Berlacher*, the finder of fact should therefore be allowed to weigh the parties' competing evidence on materiality.

## B.  Lemelson's Disclosure of his Short Position Does not Insulate Defendants from Liability

Defendants claim that disclosing their short position and including cautionary language in Lemelson's reports insulates them from liability for lying.  [Br. at 21.]  They do not cite any analogous authority for this proposition—*i.e.*, cases concerning a generic disclaimer in the

---

reliance on a flawed event study.  [56.1, ¶148.]

[5] Defendants cite *SEC v. Goldstone*, 2016 WL 3135651 (D.N.M. (May 10, 2016), apparently for the proposition that the Third Circuit's decision in *Burlington Coat Factory* has been applied in a Commission enforcement action outside the Third Circuit.  To the contrary, the *Goldstone* court specifically rejected the Third Circuit's approach—to the extent the Third Circuit cases can be read as broadly as Defendants suggest—and instead held that event studies are not required, but may be probative of materiality. 2016 WL 3135651 at *46-*47.

context of a market manipulation case.[6]  To the contrary, misstatements of present or historical

fact, even if mixed with forward looking elements, cannot be disclaimed.  *Iowa Pub. Emps.' Ret.*

*Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141-44 (2d Cir. 2010 ).  Disclosing a short position is not a

free pass to commit fraud.  Nor can generic disclaimers (either about the short position or about

the reports being opinion) shield Defendants from liability.  As the D.C. Circuit observed in

finding that integration clauses do not bar fraud-in-the-inducement claims, "[s]uch a reading

would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of

boilerplate."  *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995).

   In a similar vein, Defendants claim that labelling their reports as containing opinions

insulates them from liability.  [Br. at 30.]  The *Omnicare* court rejected that argument:  Using

"magic words" such as "we believe" or "we think" does not change the statutory requirement for

those statements about securities transactions not be misleading because "magic words can

preface nearly any conclusion, and the resulting statements . . . remain perfectly capable of

misleading investors."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*

575 U.S. 175, 192-93 (2015).  Defendants' position, "would punch a hole in the statute for half-

truths in the form of opinion statements" and create a "virtual carte blanche to assert opinions . . .

free from worry" about the federal securities laws.  *Id.*; *see also Gray v. St. Martin's Press, Inc.*,

221 F.2d 243, 248 (1st Cir. 2000) ("to say 'I think' is not enough to turn fact into opinion . . .

where what is supposedly 'thought' is, or implies, a proposition of fact").

---

[6] The cases Defendants cite are inapposite:  *Saltzberg v. TM Sterling/Austin Assoc., Ltd.*, 45 F.3d 399, 400 (11th Cir. 1995), involved forward-looking "projections," unlike this case, and *Sturm v. Marriot Marquis Corp*., 26 F. Supp. 2d 1358, 1366 (N.D. Ga. 1998), concerned alleged omissions that were *actually* disclosed.

## II.  EACH OF LEMELSON'S STATEMENTS OF FACT WAS FALSE, MISLEADING, AND MATERIAL

As an initial matter, Defendants' argument that the challenged statements were opinions, not false statements of fact, should be rejected.  First, Defendants already made that argument in their motion to dismiss [ECF No. 11 at 11-16], which the Court denied.  [ECF No. 29.]  Second, in their subsequent Answer to the Amended Complaint, Defendants did not contend that any of the challenged statements were opinions, instead alleging that each was true.  [Am. Compl. (ECF No. 33) ¶37, Answer (ECF No. 34) ¶37 (statement about Promacta was "truthful[]"; no allegation it was opinion); Am. Compl. ¶¶40-50, Answer ¶¶49-50 (statements about Viking were not "false"; no allegation they were opinions); Am. Compl. ¶¶51-54, Answer ¶¶51-54 (statements about Ligand's financial condition were not "misleading"; no allegation they were opinions).]  In any event, each of the challenged statements is, on its face, one of fact, as addressed below.

### A.  False Statement 1:  The Purported Demise of Promacta (June 19, 2014)

#### 1.  What Lemelson Said

In a June 19, 2014, interview with an Internet program known as Benzinga's Pre-Market Prep Show, Lemelson falsely stated:  "I had discussions with [Ligand] management just yesterday – excuse me, their [Ligand's] IR [investor relations] firm.  And they basically agreed. They said, '*Look, we understand Promacta's going away.*'"  [56.1, ¶149 (Benzinga Interview) (emphasis added).]

In his reports and public statements, Lemelson repeatedly claimed that one of Ligand's main sources of revenue—a drug called Promacta—was "going away" in the face of a "competitive threat" from a Hepatitis C drug called Sovaldi.  [56.1, ¶150; Brooks Aff. Ex. 6 at 1, 6 (June 16, 2014 Report stating Sovaldi will "eliminate demand for Promacta"); Brooks Aff.

Ex. 25 at 5 (August 4, 2014 Report stating Sovaldi "a severe competitive threat to future Promacta sales").]  His invented quotation from Ligand's investment relations representative supported this claim by declaring that Ligand *agreed* with him.

### 2.   The Truth of Lemelson's Statement is Disputed

Ligand's investor relations representative, Bruce Voss, testified that he did not say what Lemelson attributed to him, because it wasn't true.  [56.1, ¶151.]  Further, Defendants *admitted* in their 56.1 statement that Mr. Voss denied Lemelson's characterization of their conversation, and Lemelson's notes of the conversation don't even reflect what he claims Mr. Voss said. [56.1, ¶28, ¶152.]  There is therefore a dispute of fact as to the content of the conversation between Lemelson and Voss that must be resolved by the jury.

Moreover, ample circumstantial evidence supports the credibility of Mr. Voss' testimony. Lemelson was operating from the false premise that Promacta faced a competitive threat from a Hepatitis C drug called Sovaldi.  But Promacta does *not* treat Hepatitis C, and Sovaldi and Promacta are therefore not direct competitors.  [56.1, ¶¶152-154.]  Promacta boosts platelet counts in patients suffering from a number of different conditions.  [56.1, ¶153.][7]  Its use as a supportive therapy[8] in certain Hepatitis C patients was not a "major driver" of Ligand's revenue growth.  [56.1, ¶153.]  As multiple witnesses testified, Ligand's revenue from Promacta was *growing* at the time Lemelson made his false statement,[9] not "going away," notwithstanding

---

[7] Lemelson purports to have relied on a doctor, who was also an investor in the Amvona fund, in formulating his misguided "thesis" about Promacta.  [56.1 ¶161.]  That doctor, however, testified that he had no understanding of Promacta's indications outside of its use as a supportive therapy for certain Hepatitis C patients, and did not have any knowledge of how much of Ligand's revenue was attributable to different indications.  [56.1 ¶161.]

[8] Promacta is used as supportive care to boost platelet production in patients whose livers are damaged by diseases including Hepatitis C.  [56.1, ¶154.]

[9] Far from revenue from Promacta "going away," Ligand sold its rights to Promacta in 2019 for $827 million dollars.  [56.1, ¶155.]

Sovaldi being approved to treat Hepatitis C.  [56.1, ¶155.]  Mr. Voss explained all of this to Lemelson, yet Lemelson stubbornly clung to his unsupportable thesis that Promacta's days were numbered by Solvadi.  [56.1, ¶157.]  Further, Mr. Voss emailed Lemelson after the interview specifically challenging the accuracy of Lemelson's statements and denying that he agreed with anything Lemelson said.  [56.1, ¶159.]  Indeed, Defendants admit that Mr. Voss denies Lemelson's account.  [56.1, ¶158.]

Defendants nevertheless trot out a number of reasons they say Lemelson's account of his conversation with Mr. Voss is more credible.  [Br. at 27-29.]  For example, they say Lemelson's after-the-fact notes, which they mistakenly characterize as "real-time," of the call corroborate his false statement.  [Br. at 28.]  But Lemelson's notes *do not* say that Mr. Voss agreed that "Promacta was going away."  The notes say that, "[h]e [Voss] said the company agreed that Gilead's drug [Sovaldi] would eliminate the need for Promacta and understood that."  [56.1, ¶152.]  In his deposition, Defendant Lemelson admitted that Mr. Voss—assuming he said anything of the sort, which Mr. Voss denies—was talking about Promacta's use a supportive therapy for certain Hepatitis C patients and not other indications.  [56.1, ¶152.]  In any event, summary judgment is obviously not the time to resolve questions of credibility about what Mr. Voss said or didn't say.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The jury will have to resolve which account of the conversation is accurate.

### 3.  Lemelson Stated Facts, not Opinions

Defendants characterize Lemelson's version of what Mr. Voss said as a statement of opinion.  [Br. at 30-31.]  Not so.  "A fact is a thing done or existing or an actual happening . . . An opinion is a belief, a view, or a sentiment which the mind form of persons or things." *Omnicare,* 575 U.S. at 185 (internal citations and quotations omitted).  "A statement of fact expresses certainty about a thing. . . ." *Id.*  The "relevant question is not whether challenged

language may be described as opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact." *Phantom Touring v. Affiliated Publ'ns*, 953 F.2d 724, 727 (1st Cir. 1992) (citation omitted); *see Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995).

Lemelson's account of his conversation with Mr. Voss concerned an "actual happening[,]" that is, Lemelson claimed that Mr. Voss said a particular thing. Defendants argue, without authority, that the inclusion of the words "basically agreed" makes Lemelson's statement an opinion. They quote only part of Lemelson's statement in their brief [Br. at 29-30], and their argument falls apart when the whole statement is considered. Mr. Voss either said the company "understood that Promacta [was] going away," or he didn't—it is not a matter of opinion.[10]

Defendants also say that Lemelson's falsehood was too vague to be actionable. [Br. at 22.] But considering the whole statement, rather than Defendants' selective quotation, there is nothing vague about it.[11]

### 4. A Reasonable Juror Could Find Lemelson's Falsehood about Promacta to be Material

Lemelson's falsehood about Promacta was plainly material because it concerned Ligand's main source of revenue. *SEC v. Husain*, 2017 WL 810269, at *8 (C.D. Cal. Mar. 1, 2017) ("Other than a corporation's financials, its leadership, the nature of its operations, and its plan for the future would seem to be the most important pieces of information available to an investor.") (citation omitted); *San Leandro Emerg. Med. Grp. Profit Sharing Plan v. Philip*

---

[10] Moreover, when a statement "suggest[s] that the speaker had access to information not accessible to others," as Lemelson did here by saying he had information from a company insider, even a statement dressed up as an opinion is actionable. *See Mullane v. Breaking Media, Inc.*, 433 F. Supp. 3d 102, 112 (D. Mass 2020).

[11] The cases Defendants' cite are inapposite—this case does not involve "loosely optimistic" platitudes about future performance, *Shaw*, 82 F.3d at 1217-18, but rather a firm statement of existing fact (*i.e.*, that Ligand's investor relations firm had confirmed that Promacta was doomed). *See also In re Boston Tech Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 70 (D. Mass. 1998) (debatable characterization of an order cancellation as an "aberration" was not actionable).

*Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996) (material facts include those "which affect the probable future of the company") (emphasis added) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)).  A reasonable investor would unquestionably consider it significant that Ligand's investor relations firm had allegedly acknowledged that Ligand's main revenue source was about to dry up in the near future.  [56.1, ¶200 ("THE COURT:  It's a material statement if you say someone's IR firm said [Promacta is] going away.").]  Certainly Lemelson hoped investors would find it significant, writing on June 16 that Sovaldi and other drugs "will likely eliminate demand for Promacta, which is the largest royalty generating asset" and ". . . the imminent conclusion of the commercial viability of the Company's largest royalty generating product, Promacta, made Ligand wholly unsuitable as an investment and its shares fundamentally worthless."  [56.1, ¶160.]

Further, Ligand and its investor relations firm received numerous inquiries from investors concerned about Promacta's prospects based on Lemelson's falsehoods.  [56.1, ¶146.] Unsurprisingly, given the attention Lemelson's falsehood about Promacta garnered among investors, Ligand's stock price fell during and immediately after the June 19, 2014 interview. [56.1, ¶162.]

### B.  Statements 2 & 3:  The Ligand-Viking Transaction (July 3, 2014)

#### 1.  What Lemelson Said

In his July 3 report, Lemelson falsely stated that (1) Viking had "yet to consult with [its auditors] on any material issues" and that the "financial statements provided in the S1 accordingly are unaudited" and (2) Viking "does not intend to conduct any preclinical studies or trials."  [56.1, ¶163.]

One of the main contentions of Lemelson's July 3 report was his claim that the Ligand-Viking transaction was conceived to "generate paper profits to stuff [Ligand's] own balance

14

sheet" and that Ligand's management was engaged in "a common game of three-card Monte,
played on any street corner—shills included."  [56.1, ¶162.]  Lemelson's statements about
Viking's auditors and its intention to conduct trials were key supports for his claim.

### 2.   Whether Lemelson's Statements about Viking were True is Disputed

Whether Lemelson's statements about Viking were true is, at a minimum, disputed,
although there is overwhelming evidence that each of Lemelson's statements about Viking was
false.  As Lemelson acknowledged, his statements were inconsistent with Viking's public filings,
upon which he purportedly relied.  [56.1, ¶165.]  Indeed, Viking's July 1, 2014 Form S-1 stated
that its 2013 financial information was derived from "audited financial statements included
elsewhere in this prospectus."  [56.1, ¶166; ¶167 ("In our [auditor Marcum LLP's] opinion, the
financial statements referred to above present fairly, in all material respects, the financial
position of Viking Therapeutics, Inc., as of December 31, 2012 and 2013, and the results of its
operations and its cash flows for the period from September 24, 2012 (Inception) through
December 31, 2012 and for the year ended December 31, 2013 in conformity with accounting
principles generally accepted in the United States of America."); ¶168 (Viking CEO testimony
about audit completed by Marcum); ¶169 (Lemelson testimony that he believed statement about
unaudited financials to be true but agreeing that the statement was clearly contradicted by the
public filings).]

With respect to clinical trials, Viking did intend to conduct clinical trials (and
subsequently did), employing and working with specialized companies that perform the various
tasks necessary to complete clinical trials.  [56.1, ¶173, ¶174.]  Lemelson ignored the actual
narrative of what Viking intended to do, which was set forth on the *first page* of the Viking S-1:

> We [Viking] have exclusive worldwide rights to a portfolio of five drug candidates
> *in clinical trials or preclinical studies*, which are based on small molecules licensed
> from Ligand Pharmaceuticals Incorporated, or Ligand.  Our lead clinical program

is VK0612, a first-in-class, orally available drug candidate entering a Phase 2b clinical trial for type 2 diabetes, one of the largest global healthcare challenges today.  *Preliminary clinical data* suggest VK0612 has the potential to provide substantial glucose-lowering effects, with an attractive safety and convenience profile compared with existing type 2 diabetes therapies.  Our second clinical program is VK5211, an orally available drug candidate *entering a Phase 2 clinical trial* for the treatment of cancer cachexia, a complex disease characterized by an uncontrolled decline in muscle mass.  VK5211 is designed to selectively produce the therapeutic benefits of testosterone in muscle tissue, with improved safety, tolerability and patient acceptance compared with administration of exogenous testosterone.  *We expect to commence Phase 2 clinical trials for both VK0612 and VK5211 in early 2015 and to complete the clinical trials in 2016.*  We are also developing three preclinical programs targeting metabolic diseases and anemia. Our most advanced preclinical program is VK0214, a novel liver-selective thyroid hormone receptor beta, or TRß, agonist for lipid disorders such as dyslipidemia and nonalcoholic steatohepatitis, or NASH.  *We expect to file an investigational new drug application, or IND, and commence clinical trials for this program in 2015.*

[56.1, ¶172 (quoting Viking Form S-1) (emphasis added).]  Lemelson claims he based his falsehood on "risk factors" identified in Viking's S-1.  [Br. at 6-7.]  But by doing so, while deliberately ignoring what Viking management had said about clinical trials, Lemelson either knowingly painted a misleading picture of the company, or recklessly disregarded the facts in the S-1.  [56.1, SEC Response to ¶49.]

### 3.  Lemelson Stated Facts, not Opinions

Lemelson's falsehoods about Viking concerned existing facts, and did not express opinions.  The financial statements in Viking's S-1 filing were either audited, or were not (as Lemelson claimed).  Put another way, an auditor had either rendered an opinion on the financials, or it had not.  Defendants grasp at the inclusion of "any material issues" to suggest that at least that part of the statement is Lemelson's implicit opinion about what *he* considers to be material about Viking.  But to state that an auditor has not been consulted on "any material issue" is to state that the auditor has not audited the company.  *See* 17 C.F.R. § 210.2-02(c), "Accountant's reports and attestation reports" (requiring accountant's reports to give the opinion of the accountant about a company's financial statements, the consistency of the application of

16

the accounting principles, as well as the effectiveness of the company's internal controls over

financial reporting).

Defendants also argue that an investor could independently review the Viking S-1 to

determine whether the financial statements, or some portion of them, were audited.  The fact

that, in some cases, accurate information contradicting Lemelson's misstatements was available

in other public documents is no defense.  *See, e.g.*, *In re Credit Suisse-AOL Sec. Litig.*, 465 F.

Supp. 2d 34, 51 (D. Mass. 2006); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 251-52

(D. Mass. 2006); *Swack*, 383 F. Supp. 2d at 237; *SEC v. Mozilo*, No. CV 09-3994-JFW, 2010

WL 3656068, at *9 (C.D. Cal. Sept. 16, 2010); *SEC v. Reys*, 712 F. Supp. 2d 1170, 1175-76

(W.D. Wash. 2010).

Defendants argue that this possibility of independent review bootstraps these false

statements into ones of opinion.  [Br. at 31.]  Their argument is this:  Because Lemelson

"specifically identified" that he was relying on language in the S-1, someone could check

whether the statements were true, and the statement was thus "shielded from liability by the First

Amendment" because opinions gain greater protections when they are accompanied by the facts

they are based on.  [Br. at 31.]  *See Partington*, 56 F.3d 1147, 1153, 1157 (statement that is

arguably opinion actionable if it implies a false assertion of fact) (citation omitted).[12]  But

Defendants just assume their desired conclusion.  The fact that Lemelson said he was looking at

the S-1 when he made his false statements affords no protection.  Lemelson's statements here are

the *bases* for his conclusion that the Viking-Ligand transaction was a sham.  That is, they are the

"embedded facts" that he says support his conclusions.  *Omnicare*, 575 U.S. at 185 (finding that

---

[12] Contrary to Defendants' assertion, *Partington* does not stand for the proposition that statements of opinion are
protected if the underlying factual basis is disclosed.  Indeed, that position is inconsistent with *Omnicare*, which
holds opinions based on false "embedded" facts are actionable.  575 U.S. at 185.

even where a statement may be considered an opinion, that statement may "contain embedded statements of fact" and liability can attach were the supplied embedded fact is untrue); *Miller Inv. Tr. v. Morgan Stanley & Co., LLC*, 308 F.3d 411, 429 (D. Mass. 2018) (subjective falsity only an issue in the "absence of allegations that an embedded statement of fact was untrue at the time or there was a material omission in the opinion").

Then, in a "heads-I-win-tails-you-lose" argument on Viking's intent to conduct clinical trials, Defendants claim that if the statement is demonstrably true there can be no liability for it, and if it is not demonstrably true, it must be opinion and there can be no liability for it.  On the "heads" side, Defendants argue that the statement is "objectively and demonstrably true."  [Br. at 32.]  In doing so, Defendants effectively concede that this statement is one of fact.  Despite Defendants' confidence, there is a dispute of material fact about the truth of this statement, as detailed above.

On the "tails" side (that if it is not true, then it is opinion), Defendants twist themselves in a knot.  First, they claim that "it was fair to point out" that Viking planned to rely on third parties to conduct clinical trials.  But that's not even close to what Lemelson said, which was that Viking did not intend to conduct clinical trials.  Second, they argue that the disclosure of Lemelson's reliance on the Viking S-1 makes his statement a protected opinion.  But a statement doesn't become opinion because you cite a source, otherwise every footnoted statement would suddenly become an opinion.  Moreover, Lemelson's report does *not* cite to the S-1 as a source for his statement about clinical trials.  *See* Def's Ex. 15 at 7.  Third, Defendants claim there is no evidence Lemelson disbelieved his opinion.  But his statement was not one of opinion, so this claim is inapposite.  And even if it wasn't, whether Lemelson believed what he wrote is very much in dispute in this case; the evidence shows that he was at least reckless in making his

18

statements about Viking in the face of plainly contrary information.  [56.1, ¶175 (Lemelson's

admission that statements in the Viking Master Licensing Agreement contradicted his thesis

about Viking).]

### 4.   A Reasonable Juror Could Find Lemelson's Misstatements about Viking Material

Defendants' false statements about Viking were material because they sought to cast

doubt on the benefits of the Ligand-Viking transaction and to allege misconduct by Ligand

management.  [56.1, ¶201 ("The Court:  Wouldn't an investor think that Viking wasn't going to

be doing clinical studies and it was all a farce?").]  Indeed, at least one Ligand investor raised

concerns about Lemelson's statements about Viking with Ligand's COO.  [56.1, ¶176.]  And

Ligand's stock price again fell after Lemelson published his July 3, 2014 Report.  [56.1, ¶177.]

Defendants' arguments about Lemelson's Viking-related falsehoods are entirely

collateral to whether they were material.  [Br. at 23-24.]  They complain that Ligand didn't raise

the Viking misstatements in presentations to Commission staff.  So what?  It doesn't mean the

statements weren't material, and certainly doesn't mean they were immaterial as a matter of law.

They also split hairs about whether Ligand technically owned part of Viking when Lemelson

made his false statements.  This is a red herring—Ligand had committed to taking just under a

50% stake in Viking and the exact timing of when the transaction closed is irrelevant.  [56.1,

¶178.]  Lemelson's falsehoods had nothing to do with the timing of the transaction; his point was

that the transactions between Ligand and Viking were a sham because Viking was not a real

company, which was not true.  [56.1, ¶179.]

### C.  Statement 4:  Ligand's Supposed Insolvency (August 14 and 22, 2014)

#### 1.   What Lemelson Said

In his August 14 report, Lemelson said that Ligand's "announcement that it would

19

assume $225 million in convertible debt . . . further deepens the already significant concerns

about Ligand's imminent insolvency and the company's substantial risk of bankruptcy." [56.1,

¶180.] He also stated that "the company's liabilities will again far exceed its assets and the

company will technically be insolvent once more" and that, even before the new debt issuance,

"the company's liabilities exceeded tangible assets, meaning the company was insolvent." [56.1,

¶181.] In the August 22 report, Lemelson wrote that Ligand "issued $245 million in new debt

against the company's [Ligand's] tangible equity of just $21,000, giving rise to a debt to tangible

equity ratio of 11,667-to-1 (that is to say, $11,667 dollars (sic) in debt for every $1 dollar (sic) in

tangible common shareholder equity)" and that "shareholders have only the protection of

$21,000 in tangible equity to shield them from $245 million in debt." [56.1, ¶182.]

### 2. The Jury Must Determine whether Lemelson's Statements were False and Misleading

Lemelson's statements were deceptive and misleading, leaving out key information and

misusing financial terms and concepts. For at least two reasons, Lemelson's statements about

Ligand's financial condition present a jury question. First, he falsely stated that Ligand was

insolvent, when it was not. Insolvency is the financial condition that occurs when "the sum of

[an] entity's debts is greater than *all* of [the] entity's property, at a fair valuation," 11 U.S.C.

§ 101(32)(A) (emphasis added), or the entity has insufficient cash to service its debt. [56.1,

¶183.] Under either formulation, Ligand was never insolvent when Lemelson said it was in

2014. [56.1, ¶184.]

Second, concerning Lemelson's "debt-to-tangible-equity ratio," Defendants—without

citation to fact or law—claim that "reasonable investors . . . *understood* the components of his

[Lemelson's] financial analysis and were free to disregard it. [Br. at 24 (emphasis in original).]

This speculative and unsourced argument about what investors "understood" about Lemelson's

questionable financial analysis should be rejected.  A reasonable juror could easily conclude that

the ratio was materially misleading—Lemelson claimed it showed that Ligand was insolvent,

when it was not.

### 3.  Lemelson States Facts, not Opinions

Defendants are again wrong on the law in arguing that Lemelson's claim about Ligand

being insolvent—and his use of a misleading ratio—was all opinion.  Both factual statements

and opinions violate Rule 10b-5 when they omit enough key information to be misleading.

*Abramson v. NewLink Genetics, Corp.*, 965 F.3d 165, 174 (2d Cir. 2020) (misleading omissions

clause of Rule 10b-5 "renders both statements of fact *and* those of opinion actionable").  Here,

Lemelson omitted *at least* the following facts and context:  (1) Ligand's assets exceeded its

liabilities both before and after the August 2014 debt issuance [56.1, ¶18], (2) Lemelson's "debt-

to-tangible-equity" ratio was not a test for insolvency [56.1, ¶183], (3) any explanation of why

the cash proceeds that Ligand would have after the debt issuance were not relevant—as much as

$160 million at the end of the third quarter,[13] and (4) any explanation of why Lemelson

discounted Ligand's intangible assets entirely.  It is also no defense that Lemelson got the math

right with respect to his misleading debt-to-tangible-equity ratio.  [Br. at 34.]  *See McMahan &*

*Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (in determining whether

particular statements are misleading, the focus is not on the technical accuracy of such

statements, but instead on whether the statements, taken together and in context, would have

misled a reasonable investor).

Moreover, even if Lemelson's statements about Ligand's financial condition could be

---

[13] Lemelson initially conceded that his purported "debt-to-tangible-equity" analysis failed to account for the proceeds of Ligand's debt financing.  [56.1, ¶187.]

characterized as a potentially misleading opinion, that would be a question for the jury, not summary judgment. *MAZ Partners LP v. Shear*, 218 F. Supp. 3d 132, 135-37 (D. Mass. 2016) ("Whether [a] defendants' statement of opinion . . . was . . . misleading is a mixed question of law and fact for a jury.") (Saris, J.).  That question always "depends on the context." *Omnicare*, 595 U.S. at 190.  Here, the context was a formally written research report sent to investors, prospective investors, and the wider public.  A reasonable juror could find, in this context, that the omissions listed above would render the so-called opinion misleading. *Id.* at 189 (liability for opinion that "omits material facts about the [defendant's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself").

### 4. A Reasonable Juror Could Find this Statement to be Material

Lemelson used his concocted and misleading balance sheet "analysis" to conclude that Ligand was *insolvent*.  For the reasons set forth above and explained in the Commission's Amended Complaint, Lemelson's "analysis" was misleading for a number of reasons [Am. Compl (ECF No. 33) ¶52], including his suggestion that a "debt-to-tangible-equity" ratio is a test for insolvency, which it is not.  [56.1, ¶186.]  In fact, as also noted above, Ligand was *never* insolvent.  A reasonable juror could therefore easily conclude that Lemelson's "analysis" was materially misleading. *SEC v. Blavin*, 760 F.2d 706, (6th Cir. 1985) (where investment adviser "misstated the financial condition, solvency, and profitability of the companies his newsletter recommended . . . the materiality of such information is not subject to serious challenge.") (internal quotation omitted).

## III.   LEMELSON ACTED WITH SCIENTER

Scienter may be established upon proof of intent to defraud or recklessness. *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 37 (1st Cir. 2017).  Recklessness is "an extreme

departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 39 (1st Cir. 2020) (quotation omitted). Knowingly omitting material information may establish scienter. *Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 212-13 (D. Mass. 2018) (quotation and citation omitted).

### A.   Ample Evidence of Scienter Here Creates a Triable Issue of Fact

A defendant's state of mind—like materiality—is typically a question left for a jury to consider. *See SEC v. Ficke*n, 546 F.3d 45, 51 (1st Cir. 2008) ("it is unusual to grant summary judgment on scienter"); *In re Boston Scientific Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 123 (D. Mass. 2010) (same); *SEC v. EagleEye Asset Mgmt., LLC*, 975 F. Supp. 2d 151, 160-61 (D. Mass. 2013) ("[e]ncroaching upon the province of juries to decide questions of fact, such as the determination of a defendant's state of mind, violates not only the constitutional rights of the parties in a suit, but also the constitutional rights of the jurors themselves.").

Although summary judgment can be appropriate "if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation," that is not the case here.  [Br. at 24-25 (citing *Ficken*, 546 F.3d at 51 (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).]

There is extensive evidence from which the jury may conclude that Lemelson acted intentionally or recklessly:

*First,* as to Lemelson's statements about Promacta "going away":  As set forth in Part II.A.2, above, Lemelson was at least reckless in believing that Mr. Voss had agreed that the company understood that Promacta was "going away," in light of all of the facts and circumstances surrounding their conversation.  Further, in deposition, Lemelson said he reviewed sales data for Promacta, which showed substantial Promacta sales prior to its approval as a

supportive therapy for Hepatitis C patients and overall increasing sales of the drug. [56.1, ¶188.]

*Second*, as to Lemelson's statements about Viking, as set forth in Part II.B.2, above, Lemelson's statements are flatly inconsistent with the documents he purported to rely upon, as he himself has admitted. The jury is thus entitled to conclude that these matters were "so obvious the actor must have been aware of [them]." *Yan*, 973 F.3d at 39.

*Third*, regarding Lemelson's statements about Ligand's financial condition: As set forth in Part II.C.2, above, Defendants admit that Ligand was solvent both before and after the August 2014 debt issuance, based on publicly filed documents. Lemelson's statements were therefore reckless, at best, in that they were facially inconsistent with the public filing upon which he supposedly relied.

*Fourth,* Lemelson took credit for his falsehoods driving down Ligand's stock price. [56.1, ¶147.] This is powerful evidence that Lemelson acted intentionally in his efforts to manipulate the market for Ligand stock.

*Fifth*, Lemelson attempted to have comments critical of his reports removed from a popular investing forum, Seeking Alpha. [56.1, ¶189.] The jury is entitled to infer that Lemelson did not want critical commentary to interfere with his deceptive campaign.

There is also extensive evidence from which the jury may conclude that Lemelson had a motive to lie:

*First*, Lemelson engaged in a lengthy campaign assailing Ligand in an effort to drive down its stock price and profit from his short position. This provided ample reason for Lemelson to bolster his "thesis" that Ligand stock had no value with false and misleading statements.

*Second*, Lemelson touted his prowess in short-selling to attract investors. [56.1, ¶190.]

He therefore had yet another incentive to make his short position in Ligand pay off.

*Third,* Lemelson appears to have been planning a substantial expansion of his business and his personal financial commitments at the time he is alleged to have begun his short-and-distort campaign. Less than two weeks before he took his short position in Ligand, he was shopping for a $2.5 million mortgage to purchase a ~$2.9 million home in the Greater Boston area. [56.1, ¶191.] Then, in the first two weeks of June, several large asset managers were introduced to LCM and TAF through his broker, BTIG. [56.1, ¶192.] Further, on June 16, he said his assets under management were "likely to jump next month (expecting many new subs)." [56.1, ¶193.] A reasonable juror could draw the connection between Lemelson's expansion plans and his contemporaneous short campaign against Ligand, and determine that Lemelson's misrepresentations were intentional.

*Finally*, Lemelson had a strong motive to push his agenda to avoid financial difficulties. After Lemelson established his short position in Ligand, a series of "house calls" were imposed on his account by his broker. A "house call"[14] is a demand by a brokerage firm that an account holder deposit enough cash to cover a shortfall in the amount of money deposited in a margin account. If the account holder fails to make up the shortfall in the time specified by the brokerage house, the account holder's positions will be liquidated without further notice until the minimum requirements are met. *See* "Margin: Borrowing Money to Pay for Stocks," *available at* https://www.sec.gov/reportspubs/investor-publications/investorpubsmarginhtm.html.

Here, The Amvona Fund was highly leveraged, meaning Lemelson borrowed from his brokerage to finance his positions—a practice known as trading on margin. [56.1, ¶194.][15]

---

[14] A house call is a type of margin call. *See* https://www.investopedia.com/terms/h/housecall.asp.

[15] As is typical, brokerages require collateral—either in the form of cash or liquid securities positions—against sums lent on margin. If the collateral falls below a certain percentage of the outstanding debt—the "maintenance

Shortly after Lemelson issued his June 16 report on Ligand, Defendants faced hundreds of thousands of dollars in house calls and a "federal call" (a legally mandated margin call), and covered over $250,000 of the Ligand short to meet the house and federal calls.  [56.1, ¶195.] This financial stress placed additional pressure on the Defendants.  Indeed, the threat of margin calls is recognized as creating powerful incentives for overextended investors to engage in fraud. *See, e.g., In the Matter of Andrew Doherty*, 50 S.E.C. 624 (1991) (respondent engaged in market manipulation to avoid margin calls); *In the matter of Myron S. Levin*, 50 S.E.C. 1245 (1992) (same); *United States v. Ebbers*, 458 F.3d 110, 113-14 (2d Cir. 2006) (defendant engaged in fraud to buoy stock price and avoid margin calls); *United States v. Broumas*, 69 F.3d 1178, 1180-81 (D.C. Cir. 1995) (defendant engaged in "check kiting" scheme to meet margin calls).

## B.  Defendants Cannot Overcome the Presumption that Scienter is a Jury Question

Citing a case decided under the exacting standard of the PSLRA, Defendants claim that evidence of motive and opportunity is *never* sufficient to establish scienter.  [Br. at 25 (citing *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001).]  However, even under the PSLRA, the First Circuit has since "specifically rejected the contention that facts showing motive and opportunity can *never* be enough to permit the drawing of a strong inference of scienter."  *See Bielski v. Cabletron Sys.*, 311 F.3d 11, 39 (1st Cir. 2002) (internal citations and quotation marks omitted) (emphasis added).  Here, as detailed above, there is ample evidence that Lemelson had many incentives to engage in fraud.  And, contrary to Defendants arguments [Br. at 25], that evidence goes far beyond the fact that Lemelson was short Ligand.

---

margin"—the broker can make a "margin call" under which the investor has a limited period to deposit cash or sell securities to replenish the maintenance margin.  The brokerage can also force a sale of securities if the investor does not comply with the margin call.  "Margin:  Borrowing Money to Pay for Stocks," *available at* https://www.sec.gov/reportspubs/investor-publications/investorpubsmarginhtm.html.

Defendants also argue, again, that Lemelson cannot have acted with scienter because he disclosed his short position. [Br. at 25-26.] However, as noted above, a general disclaimer is insufficient to inoculate Defendants against a finding of scienter. *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 141-44. The cases Defendants cite (*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751 (1st Cir. 2011), *Mehta, et al v. Ocular Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020), and *Fire and Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015))[16] are inapposite—they are private actions subject to the PSLRA and each involved the sufficiency of disclosure as to the *specific* facts at issue and each recognized that disclosure is but one factor relevant to scienter.[17]

Defendants next argue that Lemelson cannot have acted with scienter because he didn't cover his short position immediately after concluding his deceptive campaign. [Br. at 27.] Not so. As an initial matter, this is a half-truth. Lemelson covered his short position over time, including during the pendency of his fraudulent short-and-distort scheme. [Answer (ECF No. 34) ¶¶23, 30; *see* 56.1, ¶196.] He covered approximately 4,000 shares on June 19, 2014, and approximately 35,000 shares on August 22 and 26, 2014—all at a profit. [56.1, ¶197; Answer (ECF No. 34) at ¶¶33, 34 (admitting covers in June and August, and that The Amvona Fund profited from short position).] Further, contrary to Defendants' assertion, the remaining covers in October were less than a month after Lemelson's September 16 interview about Ligand. [*See*

---

[16] Defendants' citation to *Aurelius v. Bofl Fed. Bank*, 2016 WL 8925145 (C.D. Cal. Sept. 20, 2016), is inapposite, as it involved a motion to quash a subpoena seeking to "unmask" an anonymous Seeking Alpha. The court quashed the subpoena citing insufficient evidence that the anonymous poster was part of a *clandestine* short-and-distort scheme, including that the poster stated he was short Bofl—something the court considered the poster unlikely to do if part of a clandestine scheme.

[17] Defendants say that Lemelson publishing his reports under his own name undercuts an inference of scienter. [Br. at 26-27.] At best, this is a jury argument, and a weak one, at that—Defendants cite no authority for the proposition that it is permissible to lie under one's own name.

56.1 ¶89; Am. Compl. (ECF No. 33) ¶30; Answer (ECF No. 34) ¶30.]  All this aside, the timing of Lemelson's trades is just one factor that Defendants can argue to the jury; it is not a basis for summary judgment.

## IV.   DEFENDANTS' ADVISERS ACT ARGUMENT IGNORES THE STATUTORY LANGUAGE AND THE ELEMENTS OF THE VIOLATION

Finally, Defendants argue that the Commission's Second Claim, for violation of Section 206(4) of the Investment Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], lacks evidentiary support because the Commission has not produced evidence of an investor who claims to have been defrauded.  Defendants' argument misses the mark because they ignore the language of the statute and the rule, and the required elements of a claim under these provisions.

Section 206(4) makes it unlawful for an investment adviser "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative" and gives the Commission the authority to issue regulations further defining that prohibited conduct.  The Commission issued Rule 206(4)-8, which prohibits any investment adviser to a pooled investment vehicle (such as The Amvona Fund) [56.1, ¶199] from "mak[ing] any untrue statement of material fact or omit[ting] to state a material fact necessary to make the statements made . . . not misleading, to any investor or prospective investor in the pooled investment vehicle" or "otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle."

Defendants ignore the Rule's inclusion of "prospective investor[s]."  The Commission need not show that Defendants made untrue or misleading statements, or engaged in deceptive acts or practices, to The Amvona Fund's then-current investors.  The Commission can show that

28

Defendants directed those statements and acts toward prospective investors, as the statutory language provides.  The Commission easily makes this showing through emails from Lemelson to prospective investors attaching and highlighting the reports containing the misleading statements discussed above, and his touting of his results without disclosing that those results were, at least in part, the product of misleading factual statements designed to drive down the price of Ligand stock.  [56.1, ¶190 (emails to prospective investors).]  The Commission can also meet its burden by showing that Lemelson directed the same materials and same claims to his current investors when touting his results to them.  [56.1, ¶147 Exs. 71-73), ¶190 (letter to investors).]

Defendants also claim that the Commission must provide evidence that investors were actually deceived.  [Br. at 34-35.]  But the Commission does not need to prove that investors or prospective investors relied on the fraudulent information to their detriment.  *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 192 (1953) ("It would defeat the manifest purpose of the Advisers Act . . . to require proof of intent to injure and actual injury to clients"); *SEC v. C. R. Richmond & Co.*, 565 F2d 1101, 1105 (9th Cir. 1977) (affirming trial court's finding that advertisements violated Rule 206(4)-1 under Section 206(4) of the Investment Advisers Act, citing with approval the *Capital Gains* court's holding "that the Commission does not have to show, in injunctive actions, that an investment adviser's activities injured his clients or were intended to harm clients or prospective clients).

## CONCLUSION

Disputed issues of material fact abound as to falsity, materiality, and scienter—fact issues reserved for the jury in all but the most unusual of cases, none of which are present here. Defendants' motion for summary judgment should be denied.

Dated:  October 30, 2020

Respectfully submitted,

SECURITIES AND EXCHANGE
COMMISSION

By its attorneys,

*/s/ Marc J. Jones*
Marc J. Jones (BBO #645910)
Alfred A. Day (BBO #654436)
Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
617-573-8947 (Jones)
617-573-4537 (Day)
JonesMarc@sec.gov
DayA@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 30, 2020, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

*/s/ Marc J. Jones*
Marc J. Jones
