## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| GREGORY LEMELSON and LEMELSON CAPITAL ) | Civil Action No. 1:18-cv-11926-PBS |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE AMVONA FUND, LP, ) | |
| ) | |
| Relief Defendant ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") respectfully submits its response to Defendants' Statement of Undisputed Material Facts. As detailed below, Defendants' have failed to establish that there is no dispute of material fact here, and, as a result, their Motion for Summary Judgment should be denied.

Below the responses to the Defendants' statements, the Commission has set forth additional statements of material fact (Paragraphs 142 through 201, below) cited in its opposition to Defendants' Motion for Summary Judgment. The Commission has included with this response an Appendix of Supplemental Exhibits, which contains Exhibits 51 through 86 in support of the Commission's response to Defendants' statement of undisputed facts and the Commission's statement of additional material facts.

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**STATEMENT OF UNDISPUTED FACTS (1-141)**

**I.      The Amvona Fund's Origins and Routine Business Practices**

1.      Fr. Emmanuel formed a hedge fund, the Amvona Fund LP, in 2012.  Affidavit of Douglas S. Brooks ("Brooks Aff.") Exhibit ("Ex.") 1 at 32:4-13.

**SEC Response:**  Undisputed.

2.      Lemelson Capital Management is the general partner of the Amvona Fund. Brooks Aff. Ex. 1 at 32:4-13.

**SEC Response:**  Undisputed.

3.      Throughout its existence, Amvona has mostly held long positions in stocks, but has also occasionally taken short positions.  Brooks Aff. Ex. 1 at 239:17-22; Affidavit of Fr. Emmanuel Lemelson ("Lemelson Aff.") ¶ 3.

**SEC Response:**  Undisputed but immaterial.

4.      Since 2010, Fr. Emmanuel has published approximately 200 research and commentary pieces discussing economics, securitization fraud, and high-level security analysis of common stocks.  Lemelson Aff. ¶ 4.  *See also,* Amvona Economic Analysis, *available at* https://www.amvona.com/economic-analysis.

**SEC Response:**  Disputed in part, but immaterial.  The referenced documents, which are

not attached, speak for themselves and the Commission disputes Defendants' characterization.

5.      Fr. Emmanuel's regular course of business was to include disclosures in all of his published reports about the positions he had in the securities being discussed and that the reports contained Fr. Emmanuel's opinions based on public information, and that he may not necessarily publish updated opinions if circumstances changed.  Lemelson Aff. ¶ 5.  *See also, e.g.,* Brooks Aff. Ex. 2 at 4 (disclosing position held in company being discussed and providing disclaimer that "THIS REPORT INCLUDES INFORMATION BASED ON DATA FOUND IN FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION, INDEPENDENT INDUSTRY PUBLICATIONS AND OTHER SOURCES. ALTHOUGH WE BELIEVE THAT THE DATA IS RELIABLE, WE HAVE NOT SOUGHT, NOR HAVE WE RECEIVED, PERMISSION FROM ANY THIRD-PARTY TO INCLUDE THEIR INFORMATION IN THIS PRESENTATION. MANY OF THE STATEMENTS IN THIS PRESENTATION REFLECT OUR SUBJECTIVE BELIEF"); Brooks Aff. Ex. 3 at 2-3(same); Brooks Aff. Ex. 4 at 2 (disclosing that Lemelson Capital had no position in stock being discussed and including same disclosure as above).

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the asserted facts in paragraph 5, which are not supported by the exhibits cited, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Specifically, the exhibits cited make no reference to Defendant Lemelson's "regular course of business" nor to inclusion of "disclosures in all of his published reports about the positions he had in the securities being discussed and that the reports contained [his] opinions based on public information, and that he may not necessarily publish updated opinions if circumstances changed."  Rather, the exhibits contain anecdotal examples of specific disclosures in specific reports, none of which states that the reports contain Defendant Lemelson's opinions nor that he "may not necessarily publish updated opinions if circumstances changed."  The Commission does not dispute that the quoted parenthetical language appears in Brooks Aff. Exs. 2-3. The referenced documents speak for themselves and the Commission disputes Defendants' characterization.

## II.    Fr. Emmanuel's Short Position and Reports Regarding Ligand

A.    <u>June 16, 2014 Report</u>

6.    In 2014, Fr. Emmanuel identified Ligand as a company whose stock he believed was overvalued.  Based on this belief, Fr. Emmanuel took a short position in Ligand.  Brooks Aff. Ex. 1 at 239:19-22; Brooks Aff. Ex. 5 at 44:24-45:1.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the asserted facts in paragraph 6, which are not supported by the exhibits cited, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Specifically, the exhibits do not state that Defendant Lemelson "identified Ligand as a company whose stock he believed was overvalued," nor that his short position was "[b]ased on this belief."  The referenced documents speak for themselves and the Commission disputes Defendants' characterization.  The Commission does not dispute that The Amvona Fund took a short position in Ligand in 2014.

7.      On June 16, 2014, Fr. Emmanuel published a 25-page opinion commentary concerning his thesis on Ligand.  Brooks Aff. Ex. 6.

**SEC Response:**  <u>Disputed in part and not supported</u>.  The Commission disputes in part the asserted facts in paragraph 7, which are not supported by the exhibits cited, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Specifically, Exhibit 6 does not state that it is "opinion commentary concerning [Defendant Lemelson's] thesis on Ligand."  The referenced document speaks for itself and the Commission disputes Defendants' characterization.  The Commission does not dispute that Defendant Lemelson published a 25-page document about Ligand.  The Commission disputes that the document was "opinion commentary."  In their Answer, Defendants did not characterize any of the challenged statements as opinions, instead treating them as statements of fact.  [*See, e.g.*, Am. Compl. (ECF No. 33) ¶37, Answer (ECF No. 34) ¶37 (statement about Promacta was "truthful[]"; no allegation it was opinion); Am. Compl. ¶¶40-50, Answer ¶¶49-50 (statements about Viking were not "false"; no allegation they were opinions); Am. Compl. ¶¶51-54, Answer ¶¶51-54 (statements about Ligand's financial condition were not "misleading"; no allegation they were opinions)].

8.      In the *first* sentence of his June 16, 2014 report on Ligand, Fr. Emmanuel disclosed that "Lemelson Capital is short shares of (NASDAQ:LGND)."  Brooks Aff. Ex. 6 at 1.

**SEC Response:**  <u>Undisputed</u>.

9.      Fr. Emmanuel additionally disclosed that "[a]ll content in this report represents the *opinions* of Lemelson Capital."  Brooks Aff. Ex. 6 at 24 (emphasis added).

**SEC Response:**  <u>Disputed in part.</u>  Undisputed as to the quote, but the Commission disputes Defendants' characterization of the statements at issue as "opinions."

10.      The June 16, 2014 report also included the following disclosure language:

All expressions of opinion are subject to change without notice, and Lemelson Capital does not undertake to update or supplement this report or any information contained herein . . . .  The information included in this document . . . reflects prevailing conditions and Lemelson Capital's views as of this date, all of which

are accordingly subject to change. Lemelson Capital's opinions and estimates constitute a best efforts judgment and should be regarded as indicative, preliminary and for illustrative purposes only . . . . This report's estimated fundamental value only represents a best efforts estimate of the potential fundamental valuation of a specific security, and is not expressed as, or implied as, assessments of the quality of a security, a summary of past performance, or an actionable investment strategy for an investor . . . . Lemelson Capital may benefit from any change in the valuation of any other companies, securities, or commodities discussed in this document.

Brooks Aff. Ex. 6 at 24.

**SEC Response:**  Disputed in part.  Undisputed as to the quote, but Commission disputes

Defendants' characterization of the statements at issue as "opinions."

11.     Among his many opinions in the June 16, 2014 report, Fr. Emmanuel stated Ligand's largest royalty-generating drug, Promacta, faced an imminent threat from a new drug, which he believed would "virtually eliminate demand for Promacta."  Brooks Aff. Ex. 6 at 4.

**SEC Response:**  Disputed in part.  The Commission disputes Defendants'

characterization of statements in the June 16 report as "opinions."  The Commission does not

dispute that the quoted language appears in the June 16 report, nor that Promacta was, in June

2014, Ligand's largest royalty-generating drug.

12.     The Commission is not challenging any statements contained in the June 16, 2014 report.  *See* Brooks Aff. Ex. 7; Brooks Aff. Ex. 8 at 2-3.

**SEC Response:**  Disputed.  While the Commission did not identify a specific

misrepresentation in the June 16, 2014 report, the Commission challenges the statements in the

report as being made in support of the fraudulent scheme.  [*See, e.g.*, Am. Compl. (ECF No. 33)

¶¶22-24.]

13.     Ligand's stock price fell on the date Fr. Emmanuel issued this report.  Brooks Aff. Ex. 14 at 31.

**SEC Response:**  Undisputed.

B.      June 19, 2014 Interview

14.     Following the publication of Fr. Emmanuel's first report on Ligand, on June 17, 2014, Ligand's Investor Relations representative, Bruce Voss, exchanged a number of emails with high-ranking personnel at Ligand discussing Fr. Emmanuel's report and whether and how to speak with Fr. Emmanuel about the report.  Brooks Aff. Ex. 9.  In the course of these email exchanges, John Higgins, the CEO of Ligand, instructed Mr. Voss to not "jump into content or a rebuttal" on the call with Fr. Emmanuel.  Brooks Aff. Ex. 9 at EPROD-SEC-LIT-E-000000940.

**SEC Response:**  Disputed.  Defendants' selective quotation from the referenced

document is taken out of context, changing its meaning.  The referenced document speaks for

itself and the Commission disputes Defendants' characterization.

15.     Mr. Voss and Fr. Emmanuel spoke over the phone on June 18, 2014.  According to Mr. Voss' handwritten notes, the call lasted from approximately 12:56 p.m. ET until 1:16 p.m. ET.  Brooks Aff. Ex. 10 at 34:20-35:3, 113:5-20; Brooks Aff. Ex. 11 at 1.

**SEC Response:**  Undisputed.

16.     Fr. Emmanuel took notes of the call, which stated that Mr. Voss agreed with his opinion that Promacta was going away.  Brooks Aff. Ex. 12 at EPROD-SEC-LIT-E-00589567.

**SEC Response:**  Disputed in part.  The referenced document speaks for itself and the

Commission disputes Defendants' characterization.  As is evident from the exhibit cited, the

notes contain many self-serving conclusions, impressions, and opinions, and were taken only

*after* the call had concluded.  Brooks Aff. Ex. 12 (indicating that Defendant Lemelson's

purported impression was in "hindsight").  Further, Lemelson's notes do not say that Mr. Voss

agreed that "Promacta was going away."  The notes state: "He [Voss] said the company agreed

that Gilead's drug [Sovaldi] would eliminate the need for Promacta and understood that."  In his

deposition, Defendant Lemelson admitted that Mr. Voss—if he said anything of the sort—was

talking only about Promacta's use a supportive therapy for certain Hepatitis C patients.  [Ex. 51[1]

(Lemelson Dep. Day 2 (11/12/19) at 183:12-186:13, 187:5-188:3.]  Promacta was approved to

---

[1] Defendants attached Exs. 1-50 in support of their motion; the Commission is therefore numbering its exhibits beginning at Ex. 51.

treat multiple other conditions, and Ligand's revenue derived from sales of Promacta was growing in 2014.  [¶152-54, 162.]

17.    The metadata from these notes shows that they were drafted June 18, 2014 at 1:21 p.m. ET and last modified that day at 1:42 p.m. ET.  Brooks Aff. Ex. 12 at 3-4.

**SEC Response:**  Disputed in part.  Undisputed that the metadata indicates this information, but disputed that the metadata proves that the notes were drafted on that date and time.

18.    Mr. Voss' emails indicated that he listened to Mr. Higgins' instruction not to engage in any rebuttal of Fr. Emmanuel's opinions during this call.  Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statement in paragraph 18, which is not supported by the exhibit cited, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Specifically, nothing in Mr. Voss' emails indicates that "he listened to Mr. Higgins' instruction not to engage in any rebuttal" during his conversation with Defendant Lemelson.  The referenced document speaks for itself and the Commission disputes Defendants' characterization.

In addition, other evidence demonstrates both that Mr. Voss did not understand Mr. Higgins to be instructing him not to engage in any rebuttal and that he did, in fact, engage in rebuttal.  [*See*, *e.g.*, Ex. 52 (Voss Dep.). at 100:10-20, 120:15-121:8, 122:2-7; Ex. 53 (Voss email to Lemelson following Benzinga interview correcting Lemelson's misstatements about their conversation, and writing, *inter alia*, "I specifically pointed out that HCV is *only one* of several indications for this drug, and that even within HCV there exists a market for Promacta independent of Sovaldi, noting price considerations and the potential for continued use of interferon in certain OUS markets." (emphasis in original).]

19.    Mr. Voss testified that he did not engage in any rebuttal of Fr. Emmanuel's opinions during this call.  Brooks Aff. Ex. 10 at 99:15-100:9.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statement in

paragraph 18, which is not supported by the exhibit cited, as required under Fed. R. Civ. P. 56(c)

and Local Rule 56.1.  In fact, the cited exhibit demonstrates precisely the opposite:  Mr. Voss did

not understand Mr. Higgins to be directing what Mr. Voss should or should not say in terms of

content or rebuttal during the call.  [Ex. 52 (Voss Dep.) 100:18-20.]  Rather, Mr. Voss testified

that, when Mr. Higgins suggested that the first call with Defendant Lemelson should not be

focused on jumping into content or rebuttal, Mr. Voss understood that to mean that there was no

need for Mr. Foehr, the subject-matter expert, to participate in the call.  [*Id.* at 99:15-17, 100:10-

16.]

In addition, Mr. Voss testified affirmatively that he *did* engage in rebuttal during his

conversation with Defendant Lemelson [Ex. 52 (Voss Dep.) at 120:15-121:8, 122:2-7] and

summarized some of that rebuttal conversation in an email to Lemelson shortly after the

Lemelson's June 19 interview [Ex. 53].

20.    Mr. Voss recalled that Fr. Emmanuel asked multiple times if Mr. Voss agreed with his positions and, specifically that Fr. Emmanuel stated that he believed Promacta was going away and then asked, "don't you agree?"  Brooks Aff. Ex. 10 at 131:1-23.  Mr. Voss admitted that he remained silent in response to this question.  Brooks Aff. Ex. 10 at 146:1-15.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statement in

paragraph 18, which is not supported by the exhibit cited, as required under Fed. R. Civ. P. 56(c)

and Local Rule 56.1.  Specifically, Mr. Voss testified that he did not understand Defendant

Lemelson to be asking Mr. Voss whether he agreed with his positions; rather, he understood that

Defendant Lemelson employed a verbal tick that conveyed dismissiveness but did not seek

confirmation:

"had a pattern of speech during that call where after many of his statements he
would say the phrase, 'Don't you agree?' But the way he said it was just that, it
was a pattern of speech. It was a very dismissive, 'Don't you agree?' and then the
conversation would go on. And it struck me as just a personal tick that I hadn't
heard before, which is why I remembered it."

[Ex. 52 (Voss Dep.) at 131:8-16. Further, Mr. Voss did not testify that he "remained silent in

response to this question." At the transcript page cited by Defendants [*id.* at 146:1-15], Mr. Voss

simply read from a contemporaneous email that stated that he had "moved on to the next subject

as we had more to cover and his statement was ridiculous." [*Id.* at 146: 1-8.] He also repeated

the comment that Defendant Lemelson had made during his Benzinga interview. [*Id.* at 146: 10-

15.] He did not testify that he "remained silent."

21.     On June 19, 2014, Fr. Emmanuel was interviewed by an outlet called Benzinga.
Brooks Aff. ¶ 15.

**SEC Response:** Undisputed.

22.     There is no evidence of the number of people that listened to this interview.

**SEC Response:** Disputed in part. The Commission does not dispute that no evidence of

the specific number of people that listened to the interview has been presented in this litigation.

However, while Defendants' expert, Aaron Dolgoff, contends there was no stock price

movement after the interview, Ligand's stock in fact declined in value during and after the

interview, suggesting that the interview was widely disseminated and material, given that a

sufficient number of investors appear to have relied on Lemelson's statement and sold stock.

[Ex. 54 (Dolgoff Report) at ¶¶ 30-33; Ex. 55 (Smith Report) at ¶¶ 26-27 & Ex. 5.]

23.     The June 19, 2014 interview lasted approximately 21 minutes, 41 seconds. See
Brooks Aff. ¶ 15.

**SEC Response:** Undisputed.

24.     About five minutes of the interview discussed Fr. Emmanuel's short thesis
regarding Ligand. Specifically, the interview first mentions Father Emmanuel's short position in

Ligand at the 14 minute, 40 second mark in the interview and the discussion regarding Ligand ended at approximately the 19 minute, 30 second mark in the interview.  Brooks Aff. ¶ 15.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes that Defendant Lemelson stated in

the interview that he had taken a short position in Ligand's stock.  In discussing his reports,

Defendant Lemelson references briefly in passing "the Ligand short," but does not say that he, or

any of the other Defendants, have taken a short position in Ligand's stock. [Brooks Aff. ¶15.]

26.   When the topic of Ligand was first raised on the interview, Fr. Emmanuel stated that he had taken a short position in Ligand's stock.  Brooks Aff. ¶ 15.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes that Defendant Lemelson stated in

the interview that he had taken a short position in Ligand's stock.  In discussing his reports,

Defendant Lemelson references briefly in passing "the Ligand short," but does not say that he, or

any of the other Defendants, have taken a short position in Ligand's stock. [Brooks Aff. ¶15.]

26.   At approximately the 16-minute mark of this interview, Fr. Emmanuel initially stated that he had spoken to Ligand, and then corrected himself to say that he spoken to Ligand's Investor Relations ("IR") firm which had "basically agreed" with his thesis concerning Promacta "that Promacta was going away."  Brooks Aff. ¶ 15.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes this characterization, which is not

supported by the recording, which speaks for itself.  Lemelson said:

> "It's literally going to go away, I mean, I had discussions with
> [Ligand] management just yesterday – excuse me, their [Ligand's]
> IR [investor relations] firm.  And they basically agreed.  They said,
> 'Look, we understand Promacta's going away.'"

[Brooks Aff. ¶15; *see also* Am. Compl. (ECF No. 33) ¶37; Answer (ECF No. 34) ¶37 (admitting substance of quote from Benzinga interview).]

27.   There is no evidence that any individual decided to sell his or her Ligand shares as a result of this statement.

**SEC Response:**  <u>Disputed</u>.  While Defendants' expert, Aaron Dolgoff, contends there

was no stock price movement after the interview, Ligand's stock in fact declined in value during

and after the interview.  [Ex. 54 (Dolgoff Report) at ¶¶ 30-33; Ex. 55 (Smith Report) at ¶¶ 26-27, Ex. 5]

28.     Bruce Voss, the referenced representative of the IR firm, denies having made this statement.  Brooks Aff. Ex. 7 ¶ 38.

**SEC Response:**  Undisputed.

29.     This is the first of the Commission's four challenged statements.  Brooks Aff. Ex. 7 ¶¶ 36-43; Brooks Aff. Ex. 8 at 3.

**SEC Response:**  Disputed in part.  The Commission does not dispute that this is the earliest of the four statements focused on in the Complaint.  But the Commission alleges a fraudulent scheme to manipulate the price of Ligand's stock, of which all of Defendants' reports and statements about Ligand, including the four challenged false statements of fact, were an integral component.  [E.g., Am. Compl. (ECF No. 33) ¶¶1, 8, 22, 42.]

30.     Subsequent to the June 19, 2014 interview, Mr. Voss spoke with Ligand executives John Higgins and Matthew Foehr about his conversation with Fr. Emmanuel on June 18, 2014 and Fr. Emmanuel's June 19, 2014 interview.  Brooks Aff. Ex. 10 at 152:11-23.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statements in paragraph 30, which are not supported by the exhibit cited.  The testimony cited references a conversation between Mr. Voss and Mr. Higgins, but makes no mention of Mr. Foehr.  Further, the conversation referenced purports to be about the conversation between Mr. Voss and Defendant Lemelson; it does not reference the June 19 interview.  Testimony taken in this matter make it clear that the conversation between Mr. Voss, Mr. Higgins, and Mr. Foehr occurred on June 18, shortly after the call between Mr. Voss and Defendant Lemelson, and that none of the participants was even aware at that time of the interview Defendant Lemelson would provide to Benzinga the following day.  [Ex. 56 (Higgins Dep.) at 143:2-21; Ex. 52 (Voss Dep.) at 132:11-133:22; Ex. 57 (Foehr Dep.) at 267:2-8.]

31.     There is an email on June 20, 2014 that refers to a written summary shared by Mr. Voss regarding the phone conversation between Mr. Voss and Fr. Emmanuel on June 19, 2014. Specifically, Mr. Voss wrote "As I wrote last night, he made that statement with a rhetorical 'don't you agree' and I moved on to the next subject as we had more to cover and his statement was ridiculous."  No such document was produced in this litigation.  Ligand's counsel stated that they looked for the document but could not locate it.  Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407; Brooks Aff. Ex. 10 at 146:5-147:20.

**SEC Response:**  <u>Disputed in part and not supported</u>.  The Commission disputes the

statements in paragraph 31, which are not supported by the exhibits cited--neither the email nor

the testimony states that Mr. Voss composed a "written summary."  The Commission does not

dispute that the exhibit cited contains the quoted text, that the referenced June 19, 2014 email

was not produced, and that Ligand's counsel stated that they had looked for the email but could

not locate it.

32.     Subsequent to the June 19, 2014 interview, Mr. Voss and Mr. Higgins exchanged emails regarding the June 18, 2014 conversation between Mr. Voss and Fr. Emmanuel.  In one of those emails, Mr. Higgins expressed that he was upset that Mr. Voss remained silent and left Fr. Emmanuel with the impression of "tacit agreement" with Fr. Emmanuel's thesis regarding Promacta going away.  Specifically, Mr. Higgins stated:

> Also, if he [Lemelson] said the CEO beats his employees would you just move on because "there were more things to cover."  Or would you take a moment to stick up for the CEO?  Promacta is a big deal, and a big part of our value and business model.  He knows it too.  He gave you a softball and you just moved on?  Even 1 minute of soft info would have left him with a different impression than tacit agreement.

Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407.

**SEC Response:**  <u>Disputed in part and not supported</u>.  The Commission disputes the

statements in paragraph 32, which are not supported by the exhibits cited.  Specifically, the

exhibits make no reference to Mr. Higgins being upset, and do not state that Mr. Voss remained

silent, nor that Mr. Voss left Defendant Lemelson with the impression of tacit agreement.  The

referenced document speaks for itself and the Commission disputes Defendants'

characterization.

33.     In response to that email from Mr. Higgins, Mr. Voss replied by writing, inter alia, "[t]he comment about Promacta was not a legitimate question but rather it was made in passing and then he chose to take that piece of the dialogue out of context."  Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407.

**SEC Response:**  Disputed.  The Commission disputes the statements in paragraph 33, as

the partial quote does not accurately convey the witness statement.  In the same exhibit, the

witness continues by stating "Quite simply I did not agree with that statement nor did I agree

with any number of statements he made."

34.     Ligand's stock price closed higher on the day of the interview than it had the previous day.  Brooks Aff. Ex. 14 at 31.

**SEC Response:**  Disputed in part and not material.  The Commission does not dispute

that Ligand's stock price closed approximately seven cents higher on the day of the interview

than it had the previous day, but asserts that this is not material, as price change is not the only

indication of materiality of a statement.  Further, while Defendants' expert, Aaron Dolgoff,

contends there was no stock price movement attributable to the interview, Ligand's stock in fact

declined in value during and after the interview.  [Ex. 54 (Dolgoff Report) at ¶¶ 30-33; Ex. 55

(Smith Report) at ¶¶ 26-27, Ex. 5]

C.     July 3, 2014 Report

35.     On July 3, 2014, Fr. Emmanuel issued his second analysis report discussing Lemelson Capital Management's short position on Ligand.  Brooks Aff. Ex. 15.

**SEC Response:**  Undisputed.

36.     This report also included the disclosure that Fr. Emmanuel had taken a short position in Ligand, that Fr. Emmanuel was expressing his own opinions, and that Fr. Emmanuel may not necessarily amend his opinions if circumstances changed.  Brooks Aff. Ex. 15 at 1-2.

**SEC Response:**  Disputed in part and not supported.  The Commission disputes the

statement in paragraph 36, which is not supported by the exhibit cited.  The report disclosed that

Defendant Lemelson Capital Management, *not* Defendant Lemelson, had taken a short position

in Ligand.  It did not state that Defendant Lemelson "may not necessarily amend his opinions if

circumstances changed." Instead, the report states, "All expressions of opinion are subject to change without notice, and Lemelson Capital does not undertake to update this report or any information contained herein." Brooks Aff. Ex. 15 at 2. The Commission disputes Defendants' characterization of the report as solely opinion.

37. The July 3, 2014 report included a discussion of a company called Viking Therapeutics, with whom Ligand had just entered into a licensing agreement. Brooks Aff. Ex. 15 at 7-10.

**SEC Response:** <u>Undisputed</u>.

38. Two of the Commission's four challenged statements in this case are based on Fr. Emmanuel's statements about Viking contained in the July 3, 2014 report. Brooks Aff. Ex. 8 at 3; Brooks Aff. Ex. 7 ¶¶ 44-50.

**SEC Response:** <u>Disputed in part</u>. The Commission alleges a fraudulent scheme to manipulate the price of Ligand's stock, of which all of Defendants' reports and statements about Ligand, including the four challenged false statements of fact, were an integral component.

[*E.g.*, Am. Compl. (ECF No. 33) ¶¶1, 8, 22, 42.]

39. In both the Original Complaint and the Amended Complaint, the SEC has alleged that as of May 2014, "Ligand became a 49.8% owner of Viking common stock." Brooks Aff. Ex. 16 ¶ 21; Brooks Aff. Ex. 7 ¶ 21.

**SEC Response:** <u>Undisputed</u>.

40. Ligand did not own any portion of Viking at the time this report was published. Brooks Aff. Ex. 17 at 53:6-18; Brooks Aff. Ex. 18 at 131:24-132:2.

**SEC Response:** <u>Disputed, not supported, and not material</u>. The Commission disputes the statement in paragraph 40, which is not supported by the exhibits cited. As of the closing of the Viking-Ligand transaction, Ligand owned 49.9% of Viking shares outstanding. [Ex. 58 (Ligand press release) at 2.] The timing of when Ligand actually took possession of the shares is not relevant or material.

41.     Fr. Emmanuel did not hold a short position in Viking at the time these statements were made.  Brooks Ex. 5 at 47:7-14.

**SEC Response:**  Undisputed, but immaterial.  It is undisputed that Lemelson held a short position in Ligand through LCM/Amvona at all relevant times.  Undisputed that Lemelson did not hold any position in Viking, but irrelevant and immaterial because the statements about Viking were intended to cast doubt on the legitimacy of the Ligand-Viking transaction and cast aspersions on Ligand's management.

42.     The first statement from this report that the Commission challenged is: "the company [Viking] has not yet even consulted with the firm [auditors] on any material issues." Brooks Aff. Ex. 8 at 3; Brooks Aff. Ex. 7 ¶¶ 44-50.

**SEC Response:**  Disputed in part.  The Commission also challenges the statement and the report as a whole as part of Defendants' fraudulent scheme.

43.     In the July 3, 2014 report, Fr. Emmanuel quoted Viking's S-1 statement and noted that Viking engaged MaloneBailey to audit their financial statements for the fiscal year ending December 31, 2012, but then Viking terminated MaloneBailey on April 7, 2014.  Brooks Aff. Ex. 15 at 9.

**SEC Response:**  Disputed in part and not supported.  The Commission disputes in part the statement in paragraph 43, which is not supported by the exhibit cited.  Specifically, the report only partially and selectively quoted from Viking's S-1 statement and noted that Viking engaged MaloneBailey to audit their financial statements for both fiscal years 2012 and 2013. [Brooks Aff. Ex. 19 (Viking Form S-1) at 158.]  The report further stated that the Viking board of directors approved the dismissal of MaloneBailey effective April 7, 2014.  [*Id.*]  The referenced document speaks for itself and the Commission disputes Defendants' characterization.

44.     Then, Fr. Emmanuel noted Marcum LLP was hired to perform the audit and directly quoted Viking's S-1 again, which stated:

Effective as of April 7, 2014, our board of directors appointed Marcum LLP, or Marcum, as our independent registered public accounting firm to audit our

financial statements as of and for the fiscal years ended December 31, 2012 and 2013, and for the fiscal year ending December 31, 2014.  From September 24, 2012 (Inception) through April 7, 2014, neither we nor anyone on our behalf consulted with Marcum regarding (1) the application of accounting principles to a specified transaction, either completed or proposed, (2) the type of audit opinion that might be rendered on our financial statements, or (3) any matter that was either the subject of a disagreement, as described in Item 304(a)(1)(iv) of Regulation S-K and the related instructions thereto, or a "reportable event" as described in Item 304(a)(1)(v) of Regulation S-K.

Brooks Aff. Ex. 15 at 9; Brooks Aff. Ex. 19 at 162.

> **SEC Response:**  <u>Disputed in part and not supported</u>.  The Commission disputes in part this statement, which is not supported by the exhibit cited.  The Commission disputes Defendants' characterization of the referenced document, which speaks for itself.  Specifically, the report contained the following quote (strikethrough indicates portion of quote included in paragraph 44 but omitted from the report):

> > **~~Effective as of April 7, 2014, our board of directors appointed Marcum LLP, or Marcum, as our independent registered public accounting firm to audit our financial statements as of and for the fiscal years ended December 31, 2012 and 2013, and for the fiscal year ending December 31, 2014.~~**  From September 24, 2012 (Inception) through April 7, 2014, neither we nor anyone on our behalf consulted with Marcum regarding (1) the application of accounting principles to a specified transaction, either completed or proposed, (2) the type of audit opinion that might be rendered on our financial statements, or (3) any matter that was either the subject of a disagreement, as described in Item 304(a)(1)(iv) of Regulation S-K and the related instructions thereto, or a "reportable event" as described in Item 304(a)(1)(v) of Regulation S-K.

> [Brooks Aff. Ex. 19 (Viking Form S-1) at 158.]

> 45.     Fr. Emmanuel then made the statement that the Commission is challenging ("In other words, Marcum was merely hired, but the company [Viking] has not yet even consulted with the firm [auditors] on any material issues") as a summary of this quoted passage.  Brooks Aff. Ex. 15 at 10.

> **SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes Defendants' characterization of the quoted statement as "a summary of this quoted passage."  Nothing in the

cited exhibit indicates that it is a summary of the quoted passage.  The Commission also

challenges the statement and the report as a whole as part of Defendants' fraudulent scheme.

46.     Viking's July 1, 2014 S-1 statement also noted that a number of its financial

statements were unaudited.  Brooks Aff. Ex. 19 at 13-14, 56, 60-61, 69-70, 72, 166-69, 171-73,

176-77, 180.  Indeed, the term "unaudited" appears 56 times in Viking's S-1, while the term

"audited" appears seven times.  Brooks Aff. ¶ 22.

**SEC Response:**  <u>Disputed</u>.  The Viking S-1 makes clear that all full year financial

statements presented were audited, and that interim financial statements were not audited (as

they were for or included partial-year periods, which are customarily not audited [SEC Reg. S-X

§§3-01(f), 3-02(b), and 10-01(a)(1) (interim financial statements need not be audited)]).

Moreover, The Viking S-1 states:

> Our unaudited financial statements have been prepared on the
> same basis as the audited financial statements and, in the opinion
> of our management, include all adjustments, consisting of normal
> recurring adjustments and accruals, necessary for a fair statement
> of the information for the interim periods.

[Brooks Aff. Ex. 19 at 9; *see also id.* at F-7 (interim financial statement "in accordance with

GAAP").]  Further, Viking auditor stated:

> In our [Marcum LLP's] opinion, the financial statements referred
> to above present fairly, in all material respects, the financial
> position of Viking Therapeutics, Inc., as of December 31, 2012 and
> 2013, and the results of its operations and its cash flows for the
> period from September 24, 2012 (Inception) through December 31,
> 2012 and for the year ended December 31, 2013 in conformity
> with accounting principles generally accepted in the United States
> of America.

[Ex. 74 (Viking S-1 excerpt) at F-1.]  The more frequent appearance of the word "unaudited"

than "audited" is immaterial (and misleading) as the S-1's presentation of financial statements

presumes that they are audited unless otherwise specified.  The Defendants' statement that the

"financial statements provided in the S-1 accordingly are unaudited" is an unquestionably false

and misleading statement—indeed, even Lemelson testified that the financial statements

provided in the S-1 are audited.  [Ex. 59 (Lemelson Inv. Test.) 729:3-16.]

47.     The Commission does not dispute that the term "unaudited" appears more often
than the term "audited" because, as is also standard in public company filings, the company only
labeled unaudited financial data was unaudited.  Where the data was part of the year-end audited
financial statements, Viking did not specify "audited" next to each number; rather, it included a
letter from its independent auditor confirming that the year-end financials had been audited.
There is no evidence of any investor of Ligand or Viking raising concerns about this specific
statement.

**SEC Response:**  Disputed.  There is significant evidence that investors raised concerns

about these statements.  For example, at least one Ligand investor raised concerns about

Lemelson's statements about Viking with Ligand's COO.  [Ex. 57 (Foehr Dep.) at 92:1-92:13.]

And Ligand's stock price fell after Lemelson published his July 3, 2014 Report.  [Ex. 55 (Smith

Report) at ¶¶28-30.]

48.     The second statement from the July 3, 2014 report that the Commission
challenged is: "Viking does not intend to conduct any preclinical studies or trials …"  Brooks
Aff. Ex. 15 at 7; Brooks Aff. Ex. 7 ¶ 46; Brooks Aff. Ex. 8 at 3.

**SEC Response:**  Disputed in part.  The Commission does not dispute that it challenges

the quoted language from the July 3, 2014 Report.  The Commission disputes Defendants'

attempt to isolate individual statements or portions of statements from their context.  The

Commission's complaint asserts that Defendants made a number of "material misstatements of

fact regarding Ligand's licensing agreement with Viking and Viking's Form-S-1 registration

statement" to "bolster and lend credence to" other accusations that he made about Ligand's

business relationship with Viking.  [Am. Compl. (ECF No. 33) ¶44.]

In particular, the Complaint alleged the following with respect to the partial quote above:

In the July 3rd Report, Lemelson falsely stated that, as of the filing of Viking's
July 1, 2014 Form S-1 registration statement, Viking had "yet to consult with [its
auditors] on any material issues" and that the "financial statements provided in the
S1 accordingly are unaudited."  Lemelson also falsely stated in the same report
that "Viking does not intend to conduct any preclinical studies or trials."  None of

these statements were true, and each was made to support Lemelson's false claim that Viking was "an affiliate shell company" that Ligand used to "create almost a veritable pyramid scheme of shell companies" that was "guaranteed to lose money."

[Am. Compl. (ECF No. 33) ¶47 (brackets in original).]  In addition, the Commission alleges a fraudulent scheme to manipulate the price of Ligand's stock, of which all of Defendants' reports and statements about Ligand, including the four challenged false statements of fact, were an integral component.  [*E.g., id.* ¶¶1, 8, 22, 42.]

49.     Viking's S-1 statement stated in bold that **"We intend to rely on third parties to conduct our preclinical studies and clinical trials and perform other tasks for us."**  Brooks Aff. Ex. 19 at 21 (emphasis in original).

**SEC Response:**  Disputed in part.  Undisputed that the S-1 contains the quoted language. Defendants take the quoted language out of context as it appears in a "risk factors" section of the S-1.  Defendants also omit that it is typical for pharmaceutical development companies to rely on third parties with specialized expertise to conduct clinical trials on the company's behalf.  The Commission further notes that Lemelson's purported reliance on the quoted section of Viking's S-1 *was not mentioned or disclosed* in Lemelson's reports.  Moreover, Lemelson admitted that his statement was inconsistent with Viking's SEC filings.  [Ex. 59 (Lemelson Inv. Test.) at 722:12-723:11.]

50.     Viking's S-1 statement also stated, "All clinical trials, preclinical studies and other analyses performed to date with respect to our drug candidates have been conducted by Ligand.  Therefore, as a company, we do not have any experience in conducting clinical trials for our drug candidates."  Brooks Aff. Ex. 19 at 17.

**SEC Response:**  Disputed in part.  Undisputed that the quoted language appears in the S-1. However, the quoted language is found on page 13 of the cited exhibit, not page 17, and continues, "Since our experience with our drug candidates is limited, we will need to train our existing personnel and hire additional personnel in order to successfully administer and manage

our clinical trials and other studies as planned." [Brooks Aff. Ex. 19 at 13.]  The Commission

therefore disputes Defendants' characterization of the document, which speaks for itself.

51.     Viking's CEO, Brian Lian, testified that Viking did not intend to conduct its own
preclinical studies, but rather "to hire third parties to conduct their experiments."  Brooks Aff.
Ex. 20 at 76:6-77:14.

**SEC Response:**  Disputed and not supported.  The Commission disputes Defendants'

characterization and selective quoting from the testimony transcript of Viking's CEO, Brian

Lian, specifically that he said that Viking did not intend to conduct its own preclinical studies,

but rather "to hire third parties to conduct their experiments."  Mr. Lian in fact went on to testify

that "the model of Viking, and 75 percent of the industry, is to hire third parties to conduct their

experiments." [Brooks Aff. Ex. 20 at 77:9-14.]  Hiring third parties to conduct clinical trials is

therefore typical in the industry, and it was misleading for Defendants to suggest otherwise.

52.     Fr. Emmanuel's opinion in this section of his report was that Ligand's transaction
with Viking appeared to be for the purposes of shifting various liabilities to another entity to
portray a more positive accounting perspective for Ligand.  Brooks Aff. Ex. 15 at 8-9.

**SEC Response:**  Disputed.  The Commission disputes Defendants' characterization of

the report and specifically disputes that Lemelson was stating an opinion.  The language in the

report speaks for itself.

53.     There is no evidence of any investor of Ligand or Viking raising concerns about
this specific statement.

**SEC Response:**  Disputed.  Both Ligand and investors raised concerns about these

statements. [*E.g.*, Ex. 57 (Foehr Dep.) at 92:1-92:13.]  Further Ligand's stock price fell after

Lemelson published his July 3, 2014 Report. [Ex. 55 (Smith Report) at ¶¶28-30.]

54.     Viking's CEO, Brian Lian, testified that he did not recall if he read Fr.
Emmanuel's July 3, 2014 report, did not speak with any investor about this report in any depth,

and did not recall any of his colleagues at Viking expressing any concern about these statements. Brooks Aff. Ex. 20 at 56:6-19, 129:3-132:6.

**SEC Response:** <u>Disputed and unsupported</u>.  The Commission disputes Defendants' characterization of Mr. Lian's testimony that "he did not speak with any investor about this report in any depth."  The cited exhibit indicates that Mr. Lian only asked about his communications with Viking investors, not Ligand investors.

55.    Ligand's CEO, John Higgins, also could not offer any explanation as to how these statements were material.  Brooks Aff. Ex. 21 at 278:4-279:2.

**SEC Response:** <u>Disputed</u>.  The Commission disputes the statement in paragraph 55, which is not supported by the cited exhibit.  In the testimony submitted by Defendants, Mr. Higgins was never asked to offer any explanation as to how these statements were material. [Brooks Aff. Ex. 21 at 278:4-279:2.]

56.    The July 3, 2014 report also acknowledged and addressed a June 17, 2014 report authored by Joseph Pantginis of Roth Capital that was critical of the June 16, 2014 report. Brooks Aff. Ex. 15 at 6-7.

**SEC Response:** <u>Disputed and not supported</u>.  The Commission disputes Defendants' characterization of the July 3 report which speaks for itself.  The July 3 report purports to quote "Roth Capital Analyst Joseph Pantginis," but neither mentioned nor "acknowledged and addressed" a June 17, 2014 report by Mr. Pantginis.  [Brooks Aff. Ex. 15 at 6-7.]

57.    Ligand's stock price closed higher on July 3, 2014 than it did the previous day. Brooks Aff. Ex. 14 at 31.

**SEC Response:** <u>Disputed in part and not material</u>.  The Commission does not dispute that Ligand's stock price closed 71 cents, or about 1%, higher on July 3, 2014, than on the previous day.  The Commission disputes that this fact is material, as a change in price is not the only indicator of materiality.  The Commission further disputes that the July 3 report did not cause a change in price, as intraday trading shows a drop in price immediately after the report

was posted on Seeking Alpha; a further drop on July 7, when the report was published on PR

Newswire, and a subsequent recovery after Seeking Alpha published a report that was critical of

Defendants' reports.  [Ex. 55 (Smith Report) at ¶¶ 28-30, Ex. 6.]

       D.    <u>August 4, 2014 Report</u>

    58.    On August 4, 2014, Fr. Emmanuel published his third report on Ligand.  Brooks
Aff. Ex. 22.

**SEC Response:**  <u>Undisputed</u>.

    59.    This report disclosed that Fr. Emmanuel had taken a short position in Ligand,
contained Fr. Emmanuel's own opinions, and that Fr. Emmanuel may not necessarily amend his
opinions in a published report if circumstances changed.  Brooks Aff. Ex. 22 at 1-2.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the statements

in paragraph 59, which are not supported by the exhibit cited.  The report makes no disclosures

about any positions taken or held by Defendant Lemelson, nor does it disclose that the report

contains Defendant Lemelson's own opinions.  The report only reflects a position of Lemelson

Capital Management LLC.  The report does not disclose that Defendant Lemelson "may not

necessarily amend his opinions in a published report if circumstances changed."

    60.    The Commission is not challenging any of Fr. Emmanuel's statements contained
in the August 4, 2014 report.  See Brooks Aff. Ex. 8 at 2-4; Brooks Aff. Ex. 7.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes the statement in paragraph 60.

The Commission alleges a fraudulent scheme to manipulate the price of Ligand's stock, of which

all of Defendants' reports and statements about Ligand, including the four challenged false

statements of fact, were an integral component.  [Am. Compl. (ECF No. 33) ¶¶1, 8, 22, 42.]

    61.    On August 4, 2014, Ligand's share price closed 9% higher than it did the previous
trading day.  Brooks Aff. Ex. 14 at 30.

**SEC Response:**  <u>Disputed in part and not material</u>.  The Commission does not dispute

that on August 4, 2014, Ligand's share price closed higher than it did on the previous trading

day.  The Commission disputes that this fact is material, as change in share price is not the only

indicator of materiality.  The Commission further disputes that the statements in the August 4

report did not impact the share price, which experienced an increase in reaction to a positive

earnings surprise that morning.  That increase in price was diminished, and the price dropped,

after the report was posted to PR Newswire and Seeking Alpha.  The share price closed lower

than its intraday high, which it hit shortly before the report was published.  [Ex. 55 (Smith

Report) at ¶¶ 41-42, Ex. 11.]

      E.    <u>August 14 and August 22, 2014 Reports</u>

      62.    On August 14 and 22, 2014, Fr. Emmanuel published his fourth and fifth reports
on Ligand.  Brooks Aff. Ex. 23; Brooks Aff. Ex. 24.

    **SEC Response:**  <u>Undisputed</u>.

      63.    Both of these reports disclosed that Fr. Emmanuel had taken a short position in
Ligand, contained Fr. Emmanuel's own opinions, and that Fr. Emmanuel may not necessarily
amend his opinions in a published report if circumstances changed.  Brooks Aff. Ex. 23 at 3-4;
Brooks Aff. Ex. 24 at 1.

    **SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the statements

in paragraph 63 as not supported by the exhibits cited.  In particular, neither report contains any

disclosures about Defendant Lemelson's positions or opinions.  In addition, while Exhibit 23

contains some reference to the position and opinions of The Amvona Fund and Lemelson Capital

Management, respectively, Exhibit 24 references only the short position.  Exhibit 24 contains no

disclosures regarding the existence or obligation to amend opinions in the report.

      64.    On August 14, 2014, Ligand's stock price closed higher than it did the previous
day.  Brooks Aff. Ex. 14 at 30.

    **SEC Response:**  <u>Undisputed</u>.  The Commission does not dispute that on August 14,

2014, Ligand's stock price closed nine cents, or about .1%, higher than it had the previous day.

[Ex. 55 (Smith Report) at ¶¶ 32-33, Ex. 4.]

65.     On August 22, 2014, Ligand's stock price closed down slightly.  Brooks Aff. Ex. 14 at 30.

**SEC Response:**  Undisputed.  The Commission does not dispute that Ligand's stock price closed down by 51 cents, or a little over 1%, on August 22.  [Ex. 55 (Smith Report) at ¶¶ 35-36, Ex. 8.]

66.     The August 14 and 22, 2014 reports discussed, inter alia, $245 million in new debt that Ligand was taking on through a publicly announced bond offering.  Brooks Aff. Ex. 23 at 2-3; Brooks Aff. Ex. 24 at 2-3.

**SEC Response:**  Disputed in part.  The Commission disputes in part the statements in paragraph 66 as unsupported by the cited exhibits.  Specifically, the August 14 report discussed a $225 million issuance of convertible debt, while the August 22 report referenced a $245 million debt offering.

67.     As part of his discussion of the bond offering in the August 14 Report, Fr. Emmanuel wrote:

> **Tangible equity:** On August 4, 2014, Ligand released their Q2 earnings report and financial statements in which the company boasted that it was debt free. Prior to this August 4 release, the company's liabilities exceeded tangible assets, meaning the company was insolvent. With the August 4, 2014 earnings release and its updated financials, the company presented tangible equity of just $21,000 upon which rested an extraordinary market capitalization of approximately $1.1 billion.

Brooks Aff. Ex. 23 at 2 (emphasis in original).

**SEC Response:**  Undisputed.

68.     As part of his discussion of the bond offering in the August 22 Report, Fr. Emmanuel wrote:

> On August 18 [2014], Ligand filed a form 8-K with the Securities and Exchange Commission (SEC) revealing that the company had issued $245 million in new debt against the company's tangible equity of jut $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars in debt for every $1 dollar in tangible common shareholder equity).

Brooks Aff. Ex. 24 at 3.

**SEC Response:**  <u>Undisputed</u>.

69.     Fr. Emmanuel concluded his analysis of the bond offering in the August 22 Report as follows:

> There is no question that the cost of this preferential treatment of a few large Ligand shareholders at the expense of remaining investors places a burden on Ligand and its shareholders that is both unsustainable and further deepens the company's insolvency and likelihood of liquidation or reorganization under Chapter 7 or Chapter 11 of the bankruptcy code under which remaining Ligand common shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt.

Brooks Aff. Ex. 24 at 6.

**SEC Response:**  <u>Disputed in part</u>.  The Commission disputes that Lemelson "concluded his analysis of the bond offering in the August 22 Report" with the quoted language, but does not dispute that the quoted language appeared in that report.

70.     In its original Complaint, the Commission alleged Fr. Emmanuel's calculation was wrong, because it failed to include the cash from the loan proceeds as part of shareholder tangible equity.  See Brooks Aff. Ex. 16 ¶ 52.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the statement in paragraph 70 as unsupported by the cited documents.  The paragraph cited says nothing about shareholder tangible equity.  The Commission also alleged that Lemelson falsely stated that Ligand was insolvent based on his misleading calculation.  [Compl. (ECF No. 1) ¶¶51-52.]  The Commission further notes that the "original Complaint" was superseded by the Amended Complaint (ECF No. 33) and is therefore irrelevant.

71.     The Commission has not presented any accounting principle that would support this theory.  Brooks Aff. Ex. 25 at 42:11-18.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the asserted facts in paragraph 71, which are misleading.  The Commission's 30(b)(6) designee, Assistant Director David Becker, testified that the Commission's position on why Lemelson's debt-to-tangible equity ratio is misleading is set forth in ¶52 of the Amended Complaint:

In his August 22 Report, titled "Ligand Pharmaceuticals (NASDAQ: LGND): Institutional holders wasting no time dumping stock in response to mounting insolvency and bankruptcy risks," Lemelson again painted a misleading picture of Ligand's financial health. He wrote that Ligand "issued $245 million in new debt against the company's [Ligand's] tangible equity of just $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars (sic) in debt for every $1 dollar (sic) in tangible common shareholder equity)" and that "shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt." This statement was misleading for the following reasons. First, this statement ignores the cash proceeds of the debt issuance – i.e., while Ligand took on debt, it also received cash, tens of millions of which remained at Ligand's disposal as of the end of the third quarter of 2014. Moreover, Lemelson's statement that Ligand's shareholders "have only the protection of $21,000 in tangible equity to shield them from $245 million in debt" compares apples to oranges. Shareholder equity is not "protection from debt"; it is a balance sheet figure that represents the difference between assets and liabilities. Assets – including cash – "protect" shareholders from debt. Yet, without explanation, Lemelson cited a "debt to tangible equity" ratio that discarded the value of Ligand's intangible assets, such as intellectual property – the most significant asset of a pharmaceutical company whose business is built on licensing intellectual property rights to its drugs. Lemelson then compounded the misleading nature of his statement by comparing "tangible equity" as of June 30, 2014 – a figure that has no bearing on "protection from debt" – to the full amount of the August 2014 debt offering ($245 million). Lemelson thus compared an apple ("tangible equity," which omitted existing intangible assets) to an orange (the full amount of the new debt, ignoring the cash proceeds of the issuance) at two different points in time to concoct a ratio that looks really bad (11,667 dollars of debt for every dollar of shareholder equity) but has no bearing on the actual financial wherewithal of the Company. [Am. Compl. (ECF No. 33) at ¶52.]

Further, there are no Generally Accepted Accounting Principles (GAAP) that govern the calculation of a debt-to-tangible equity ratio because it is a non-GAAP metric and no such accounting principles exist for non-GAAP metrics.

72.    This Court dismissed the claim that Fr. Emmanuel's calculation was wrong from the original Complaint, with leave to the Commission to replead it.  Brooks Aff. Ex. 26 at 4-5.

**SEC Response:**  Disputed and not supported.  The Commission disputes the asserted facts in paragraph 72, which are not supported by the Court's January 23, 2019 Order as cited by Defendants.  [Brooks Aff. Ex. 26 at 4-5.]  The Court's January 23rd Order did not state that it dismissed the Commission's claim because Defendant's calculation of debt-to-tangible equity was wrong or right, but rather because the Commission did not adequately plead how Defendant's "statement about Ligand's debt-to-tangible-equity ratio is materially false or misleading to a reasonable investor" and gave leave for the SEC to re-plead the claim.  [Brooks Aff. Ex. 26 at 4-5.]

73.    The Commission amended the allegation to allege that the calculation is false, but that despite being true, it is misleading.  Brooks Aff. Ex. 7 ¶ 52.

**SEC Response:**  Disputed and unsupported.  The Commission disputes the asserted facts in paragraph 73, which are not supported by the Amended Complaint as cited by Defendants.  [Am. Compl. (ECF No. 33) at ¶52.]  Pursuant to the Court's January 23rd Order, the Commission amended its claim in Paragraph 52 of the Complaint to plead with particularity that Defendant's statement about Ligand's 11,667-to-1 debt-to-tangible equity ratio was misleading because it did not support Lemelson's "thesis" that Ligand was insolvent and was otherwise misleading as to Ligand's financial health.  *Id.* at ¶52.  The Commission's Amended Complaint did not state that Defendant's calculation is true, but rather that it was misleading for numerous reasons:  1) the statement ignores the $245 million in cash proceeds of the debt issuance, 2) shareholder equity is not "protection from debt," rather, assets –including cash – are what protect shareholders from debt, and 3) Defendant does not state that he is discarding the value of Ligand's intellectual property, the most significant asset of a pharmaceutical company whose business is built on licensing intellectual property rights to its drugs, to calculate this ratio.  *Id.*

74.     In presenting this calculation, Fr. Emmanuel explained that he excluded Ligand's intangible assets from his calculation and was comparing just Ligand's tangible equity to its debts.  Brooks Aff. Ex. 24 at 3.

SEC Response:  <u>Disputed and not supported</u>.  The Commission disputes the asserted

facts in paragraph 74, which are not supported by the cited exhibit.  [Brooks Aff. Ex. 24.]

Defendant's August 22, 2014 Report states that Defendant is comparing Ligand's "$245 million

in new debt against [its] tangible equity for just $21,000, giving rise to a debt to tangible equity

ratio of 11,667-to-1" but does not explain which intangible assets he is excluding nor that he

excluded the cash proceeds of the debt from this calculation.  *Id.* at 2-3.  Lemelson's omission of

this information made any "explanation" misleading.

75.     Fr. Emmanuel disclosed the numbers he used in making his calculation in his reports.  Specifically, Fr. Emmanuel's August 14, 2014 report, citing Ligand's Q2 financial report, noted that Ligand reported just $21,000 in tangible equity.  Brooks Aff. Ex. 23 at 2.  Fr. Emmanuel's August 22, 2014 report, citing Ligand's August 18, 2014 8K filing, noted that Ligand reported issuing $245 million in new debt.  Brooks Aff. Ex. 24 at 3.  Dividing the reported debt of $245 million by the $21,000 in reported tangible equity yields a ratio of 11,667 to 1, as stated in Fr. Emmanuel's August 22, 2014 report.  Brooks Aff. Ex. 24 at 3.

SEC Response:  <u>Disputed in part</u>. The language quoted by Defendants from the August

14 and August 22 reports is accurate.  But the quoted language and the larger context of the

reports do not explain which intangible assets Defendants excluded, nor that he excluded the

cash proceeds of the debt issuance from his calculation.  [Brooks Aff., Ex. 23 at 1-3, Ex. 24 at 2-

3.]  Nor is Defendants' conclusions that "he disclosed the numbers he used in making his

calculation" accurate, as neither report disclosed *both* the tangible equity figure and the debt

figure.  So an investor would, at best, have to know to put both reports together to have an

explanation of Lemelson's calculation.  Regarding the August 14 report, Defendant also fails to

disclose that he used figures from Ligand's financial statements as of June 30, 2014, as the basis

for his calculation of its tangible equity, and contrasts this figure against the August 18, 2014

$245 million debt issuance without explaining why or attempting to reconcile how Ligand's balance sheet would have changed as a result of the debt issuance.

76.     No witness has challenged the accuracy of this calculation.  Brooks Aff. Ex. 25 at 31:6-11.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the asserted facts in paragraph 76, which are not supported by the exhibit cited, Brooks Aff. Ex. 25, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  The cited text states out of context that the Commission did not make an "allegation that Defendants' [mathematical] calculation of debt-to-tangible equity ratio was incorrect[,]" but does not state that the Commission is challenging Lemelson's use of a debt-to-tangible equity ratio that was misleading for all of the reasons stated in the Commission's Amended Complaint and not a test for insolvency.  Brooks Aff. Ex. 7 at ¶52, Ex. 60 (Rule 30(b)(6) Dep. of Commission's designee, Assistant Director David Becker) at 24:1-11, 26:4-22, 31:6-11, 38:1-8, 42:2-18.]  And, at least one witness challenged the accuracy of using this calculation to determine whether a company is insolvent. [Ex. 61 (Pettingill Dep.) at 99:3-102:14.]

77.     Internal Ligand emails, dated September 19, 2014, reflected that Ligand understood this calculation based on reading the reports.  Specifically, Todd Pettingill corrected a PowerPoint presentation regarding Fr. Emmanuel's statement that originally alleged Fr. Emmanuel incorrectly stated Ligand had $21,000 in cash assets to properly acknowledge that Fr. Emmanuel stated Ligand had $21,000 in tangible equity.  Brooks Aff. Ex. 27 at LGND_0047298.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the facts asserted by Defendant in paragraph 77, which are not supported by the record.  Defendant mischaracterizes the cited September 19, 2014 email by stating that "Ligand understood this calculation based on reading the reports."  The precise language from Mr. Pettingill's September 19, 2014 emails is, "I deleted one of your bullets on 'The Facts' page; the one which referred to Lemelson claiming we had $21k in cash.  I killed it because he was actually claiming we had that

amount in net tangible equity (the metric he made up)[.]"  [Brooks Aff. Ex. 27 at

LGND_0047298.]  Mr. Pettingill testified that he had never heard of tangible equity until

Defendant's reports and that "[t]angible equity in itself is an oxymoron…it was a fabricated and

misleading financial metric that was brought up" by Defendant, inconsistently calculated by

Defendant, and that was inaccurate because it had no financial meaning.  [Ex. 61 (Pettingill

Deposition) at 82:12-84:15.]

78.     At depositions, Ligand representatives did not challenge the calculation itself, but
stated that the metric of a debt-to-tangible equity was not a traditional metric used to evaluate the
value of a security.  Brooks Aff. Ex. 21 at 116:20-24; Brooks Aff. Ex. 18 at 82:12-83:7, 84:19-
85:16, 103:2-104:1.

**SEC Response:**  Disputed in part.  The Commission disputes Defendant's statement that

"Ligand representatives did not challenge the calculation itself," which is not an accurate

characterization of the cited testimony.  As outlined above, in his deposition, Mr. Pettingill stated

"I could make up a metric and…calculate it correctly, but if the metric has no financial meaning,

then I believe it's an inaccurate metric" and "I see 21,000.  I see a number, but I don't see any

breakdown in calculation.  Maybe it's there.  I'm just not seeing it."  [Ex. 61 (Pettingill Dep.) at

82:12-85:16.]  Ligand's CEO also testified, "I don't know exactly…how he was describing, but

it was this – this message to investors that – I believe the number was like $11,000 of debt

for…one dollar of tangible equity.  So basically we are insolvent; that was false.  We were not

insolvent.  In my tenure at the company, we've never been insolvent.  And it was a comment

about manipulating the presentation so that we're counting all of the liability and then making

this extreme conclusion…it was a completely false premise for how to present the underlying

value of the company…it completely manipulated the story for – for investors to draw the

conclusions that they should get out now to drive the stock price down…[Lemelson's ] A-plus-B

may have been correct.  The formula he was trying to convince people to follow was misplaced,

and what he chose to include or not include was misplaced." [Ex. 56 (Higgins Dep.) at 115:13–

116:24.]

79.     The SEC alleged that "Lemelson thus compared an apple ("tangible equity," which omitted existing intangible assets) to an orange (the full amount of the new debt, ignoring the cash proceeds of the issuance) at two different points in time to concoct a ratio that looks really bad (11,667 dollars of debt for every dollar of shareholder equity) but has no bearing on the actual financial wherewithal of the Company."  Brooks Aff. Ex. 7 ¶ 52.

**SEC Response:**  Undisputed.

80.     In prior published opinions, Fr. Emmanuel disregarded or diminished the value of intangible assets in valuating companies.  Lemelson Aff. ¶ 6.

**SEC Response:**  Undisputed, but immaterial.  What Lemelson said about other

companies has no bearing on whether his statements about Ligand were misleading.

81.     For example, In discussing his short position in World Wrestling Entertainment in March 2014, Fr. Emmanuel wrote, "Intangible assets (the kind you can't sell easily when things turn south) increased from roughly 100 k in 2010 to just under 27 M in 2013, an increase of 268 fold in 3 years – these 'ghost assets' of course can bolster a balance sheet nicely. . . . Current price exceeds tangible book by a factor of nearly 10x."  Brooks Aff. Ex. 28 at 11.

**SEC Response:**  Undisputed, but immaterial.  The Commission does not dispute that the

referenced language appears in another of Lemelson's reports.  What Lemelson said about other

companies has no bearing on whether his statements about Ligand were misleading.  The

Commission further notes that Lemelson did not provide any similar definition or methodology

as to how he determined which items from Ligand's balance sheet he excluded and why.

82.     As another example, in Fr. Emmanuel's published analysis of his long position in Geospace Technologies, he noted multiple times that he believed Geospace was undervalued because of its significant tangible assets, stating: "Given the extraordinary volatility in revenues and earnings from year to year, it is a more sound approach to focus on the tangible assets buttressing the share price as consideration for the margin of safety in the commitment. . . ."  Brooks Aff. Ex. 29 at 6.

**SEC Response:**  Undisputed, but immaterial.  What Lemelson said about Geospace

Technologies has no bearing on whether his statements about Ligand were misleading.

III.    **Negative Commentary About Ligand Between June and August 2014 From Other Securities Analysts**

83.     On July 22 and August 5, 2014, an entity called Empire Asset Management issued two reports concerning Ligand.  Brooks Aff. Ex. 30; Brooks Aff. Ex. 31.

**SEC Response:**  Undisputed.  The full name of the entity is Empire Asset Management Company.

84.     On July 22, 2014, Ligand's stock price decreased by approximately 4.5%.  Brooks Aff. Ex. 14 at 30.

**SEC Response:**  Undisputed.

85.     On August 5, 2014, Ligand's stock price decreased by more than 2%.  Brooks Aff. Ex. 14 at 30.

**SEC Response:**  Undisputed.

86.     On July 15, 2014, Federal Reserve Chair Janet Yellen made statements about valuations of biotech stocks being "substantially stretched."  Brooks Aff. Ex. 32 at 20.

**SEC Response:**  Disputed and not supported.  The Commission disputes the facts in paragraph 86, which are not supported by Brooks Aff. Ex. 32 as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Defendant mischaracterizes the exhibit by asserting that quotes from the exhibit are statements made by Federal Reserve Chair Janet Yellen, and inaccurately paraphrases the quoted language.  The exhibit cited by Defendant is the *Monetary Policy Report* authored by the Board of Governors for the Federal Reserve System, of which Janet Yellen is the Chair and on whose behalf Ms. Yellen is transmitting a copy of the report to the U.S. House and Senate on July 15, 2014.  Defendant's assertion that Ms. Yellen "made statements about valuations of biotech stocks being 'substantially stretched.'" is also inaccurate.  The page cited by Defendant instead states, "Nevertheless, valuation *metrics* in some sectors do appear to be substantially stretched—particularly those for *smaller firms* in the social media and biotechnology industries…" (emphasis added).  [Brooks Aff. Ex. 32 at 20.]

87.     On that date, Ligand's stock price fell by more than 4.5%.  Brooks Aff. Ex. 14 at 30-31.

**SEC Response:**  Undisputed.

88.     Internal emails at Ligand reflect that Ligand personnel believed that Ms. Yellen's statements may have been the cause of negative movement in Ligand's stock.  Brooks Aff. Ex. 33 at LGND_0000052.

**SEC Response:**  Disputed in part and incomplete.  The Commission disputes in part the facts in paragraph 88, which are a mischaracterization of the cited exhibit.  [Brooks Aff. Ex. 33.] In the July 16, 2019 internal Ligand email cited by Defendant, John Higgins, Ligand's CEO states, "We have no idea what is causing the sharp pressure on our stock over the last three trading days aside from Yellen's remarks yesterday generally about the Biotech sector."  [*Id.* at LGND_0000052.]  In his deposition, Mr. Higgins reiterated that Ligand was unsure of the underlying cause for the pressure on Ligand's stock in July 2014 and that Ms. Yellen's comments were one of several contributing factors the company considered to be the cause, among which were also Defendant's negative reports about Ligand.  [Ex. 56 (Higgins Dep.) at 189:9-192:19.]

## IV.     Timeline of Fr. Emmanuel Covering His Short Position

89.     The chart below reflects the relevant dates from June-October 2014 on which Fr. Emmanuel took and covered short positions on Ligand:

| Date | # of Shares Covered (If Applicable) | Total Short Position |
|---|---|---|
| June 16, 2014 | 0 | 68,528 |
| June 19, 2014 | 4,050 | 64,478 |
| July 3, 2014 | 0 | 65,556 |
| Aug. 4, 2014 | 0 | 65,736 |
| Aug. 13, 2014 | 0 | 65,736 |
| Aug. 22, 2014 | 30,729 | 35,007 |
| Aug. 26, 2014 | 3,500 | 31,507 |
| Sept. 16, 2014 | 0 | 31,507 |
| Oct. 10, 2014 | 14,673 | 16,834 |

| Date | # of Shares Covered (If Applicable) | Total Short Position |
|---|---|---|
| Oct. 13, 2014 | 16,717 (net) | 117 |

Brooks Aff. Ex. 34.

**SEC Response:**  <u>Undisputed.</u>

**V.    Ligand's Requests to the Commission to Investigate Fr. Emmanuel**

90.    Ligand never made a public statement contesting or correcting any of Fr. Emmanuel's statements that are now being challenged by the Commission.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the asserted

facts in paragraph 90, which do not contain any reference or citation and therefore are not

supported as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.

91.    NASDAQ Rule IM-5250-1 states in pertinent part: "In certain circumstances, it may also be appropriate to publicly deny false or inaccurate rumors, which are likely to have, or have had, an effect on the trading in its securities or would likely have an influence on investment decisions."  Brooks Aff. Ex. 35.

**SEC Response:**  <u>Disputed and immaterial</u>.  The Commission disputes the asserted facts

in paragraph 91 as immaterial.  Insofar as Defendant suggests that issuers are required to publicly

deny false or inaccurate rumors "which are likely to have, or have had, an effect on the trading in

its securities or would likely have an influence on investment decisions," the plain text of the

exhibit as cited by Defendant makes clear there is no such obligation under Regulation FD.

[Brooks Aff. Ex. 35.]  Further, Regulation FD is clear that issuers have an obligation to disclose

to shareholders any disclosures made to stock analysts.  *Id.*, *see also* SEC Reg. FD FAQs,

https://www.sec.gov/fast-answers/answers-regfdhtm.html.

92.    Ligand representatives testified that they decided not to issue any such statement because they viewed Fr. Emmanuel as too marginal of a voice.  Brooks Aff. Ex. 10 at 228:15-22; Brooks Aff. Ex. 18 at 53:20-54:16; Brooks Aff. Ex. 21 at 99:23-100:16.

**SEC Response:**  <u>Disputed in part and not supported</u>.  The Commission disputes

Defendants characterization of Brooks Aff. Ex. 10, and disputes the asserted facts as unsupported

by Brooks Aff. Ex. 18 and Brooks Aff. Ex. 21.  The Commission disputes Defendants'

characterization that Ligand representatives did not publicly deny Defendant's statements as

false or inaccurate rumors because they viewed Defendant as too marginal a voice.  Bruce Voss'

deposition, as cited by Defendants in Brooks Aff. Ex. 10, states that Ligand chose not to respond

to Defendant's reports because it viewed the report's content as "so egregious and the author so

marginal[,]" implying that any response would lend credibility to the egregious statements.  This

is further supported by other parts of the record, which further make clear that the primary reason

Ligand did not publicly deny Defendant's statements was because it did not wish to amplify

Lemelson's statements or lend them more credibility.  [Ex. 61 (Pettingill Dep.) at 54:13-16; Ex.

56 (Higgins Dep.) at 100:13-16.]

     93.    Ligand initially engaged Latham & Watkins as legal counsel and met with the
Commission's Boston regional office on September 25, 2014.  Brooks Aff. Ex. 21 at 212:9-
213:7; Brooks Aff. Ex. 10 at 274:3-12; Brooks Aff. Ex. 17 at 98:11-99:21; Brooks Aff. Ex. 36 at
LGND_0080678.

     **SEC Response:**  <u>Undisputed</u>.

     94.    The purpose of the September 25, 2014 meeting between the Commission and
Ligand (being represented by Latham & Watkins) was for Ligand to convince the Commission to
investigate and bring an enforcement action against Fr. Emmanuel.  Brooks Aff. Ex. 36 at
LGND_0080737.

     **SEC Response:**  <u>Undisputed</u>.

     95.    Ligand submitted a PowerPoint presentation to the Commission at this September
25, 2014 meeting.  Brooks Aff. Ex. 36 at LGND_0080678.

     **SEC Response:**  <u>Undisputed</u>.

     96.    Among the allegations in the September 25, 2014 PowerPoint, Ligand accused Fr.
Emmanuel of engaging in an "affinity fraud," misrepresenting the performance of the Amvona
Fund, and that Fr. Emmanuel had a "questionable personal history."  Brooks Aff. Ex. 36 at

Brooks Aff. Ex. 36 at LGND_0080695; Brooks Aff. Ex. 36 at LGND_0080698-701; Brooks Aff. Ex. 36 at LGND_0080703-04.

**SEC Response:** <u>Disputed in part</u>.  The Commission disputes in part the facts asserted in paragraph 96 in which Defendant characterizes Ligand's September 25, 2014 PowerPoint presentation as accusing him of engaging in affinity fraud.  The referenced exhibit speaks for itself.  The PowerPoint lists Defendant's use of religious credentials as one of several potentially questionable investment practices, and goes on to list how these practices bear some hallmarks of affinity fraud.  [Brooks Aff. Ex. 36 at LGND_0080695, LGND_0080698-702.]

97.     The September 25, 2014 PowerPoint did not reference the Commission's challenged statement by Fr. Emmanuel in the June 19, 2014 Benzinga interview.  *See* Brooks Aff. Ex. 36.

**SEC Response:** <u>Disputed</u>.  The Commission does not dispute that Ligand's September 25, 2014 PowerPoint did not include the full statement from Defendant's June 19, 2014 Benzinga interview, but the presentation does contain a chart noting the Benzinga interview followed by a steep decline in Ligand's share price.  [Brooks Aff. Ex. 36 at LGND_0080735.]  The PowerPoint also cites evidence to refute that Promacta is "going away," which is responsive to the June 19 Benzinga interview.  [*Id.* at LGND_0080727.]  In fact, the PowerPoint contains an entire nine-page section entitled "Lemelson's False Claims Regarding Promacta."  [*Id.* at LGND_0080718-27.]  The section states that "Lemelson's false and misleading claims about Promacta were the first and one of the most central arguments to start his illegal short-selling spree."  [*Id*. at LGND_0080718; *see also id.* at LGND_0080721-25 ("Promacta:  Lemelson's False Claims").]

98.     The September 25, 2014 PowerPoint did not reference either of the statements about Viking on July 3, 2014 that the Commission is challenging in this litigation.  *See* Brooks Aff. Ex. 36.

**SEC Response:**  Disputed in part and immaterial.  The Commission does not dispute that Ligand's September 25, 2014 PowerPoint did not explicitly reference Lemelson's false statements about Viking contained in his July 3 report, but the presentation covers the entire period of Lemelson's conduct and notes changes in Ligand's share price.  [Brooks Aff. Ex. 36 at LGND_0080735; *see also* ¶176, below (citing Ex. 55 (Smith Report) at ¶¶28-30) (discussing decline in Ligand's stock price attributable to July 3 report).]  Whether counsel for Ligand chose to include these statements as part of its presentation to the Commission is not material to whether Defendants violated the securities laws.

99.     The September 25, 2014 PowerPoint from Ligand mentioned Fr. Emmanuel's statement about Ligand's debt to tangible equity ratio, but claimed it was incorrect because the calculation did not include the cash proceeds from the loan.  Brooks Aff. Ex. 36 at LGND_0080713.

**SEC Response:**  Disputed in part and immaterial.  The Commission does not dispute that the PowerPoint mentioned Lemelson's statement, but the exhibit as cited by Defendant does not that state that Defendant's debt-to-tangible equity is incorrect because it does not include the cash proceeds from the loan.  Rather, it simply states that the ratio is a false *insolvency* claim because Lemelson ignored the cash proceeds from the debt.  [Brooks Aff. Ex. 36 at LGND_0080713.]  Further, what counsel for Ligand chose to include in its presentation to the Commission is not material to whether the Defendants violated the securities laws.

100.    The September 25, 2014 PowerPoint did not mention the Empire reports published on July 22 and August 5, 2014.  *See* Brooks Aff. Ex. 36.

**SEC Response:**  Undisputed and immaterial.

101.    The September 25, 2014 PowerPoint did not mention Ligand's historically volatile stock prices.  *See* Brooks Aff. Ex. 36.

**SEC Response:**  Disputed in part.  The Commission does not dispute that the September 25, 2014 PowerPoint does not explicitly reference any "historically volatile stock price" but disputes the characterization as "historically volatile" as unsupported by the Defendants' cited evidence.

102.    Ligand's own financial disclosures identifies its historically volatile stock prices as an area of concern.  Brooks Aff. Ex. 37 at 45.

**SEC Response:**  Disputed in part.  The Commission does not dispute that Ligand's second quarter Form 10-Q contained a disclosure that its stock price has "experienced significant price and volume fluctuations and may continue to experience volatility in the future[,]" the Commission does dispute that this was an area of concern for Ligand.  [Brooks Aff. Ex. 37 at 45; Ex. 56 (Higgins Dep.) at 170:22-171:15.]  The risk language included in Ligand's Form 10-Q also states this type of market price volatility is typical for biotechnology and pharmaceutical companies.  *Id.*  The Commission disputes the characterization as "historically volatile" as unsupported by the Defendants' cited evidence.

103.    Ligand's stock price dropped as much as 30% between March 2014 and April 2014.  Brooks Aff. Ex. 14 at 32-33.

**SEC Response:**  Disputed in part.  The Commission does not dispute that Ligand's stock price dropped 30% from an intraday high of $80.21 on March 19, 2014, to an intraday low of $55.90 on April 15, 2014.  [Brooks Aff. Ex. 14 at 32-33.]  This calculation mischaracterizes Ligand's stock price during that same timeframe, however, because the exhibit shows that Ligand's closing price only fell 23% between those same dates, and only fell a little over 8.58% between March 3, 2014, and April 30, 2014.  *Id.*

104.     Sometime after the September 25, 2014 meeting, the Commission's Boston regional office informed Ligand that it would not be opening an investigation concerning Fr. Emmanuel.  Brooks Aff. Ex. 25 at 64:3-65:3.

**SEC Response:**  Undisputed.

105.     Following the September 25, 2014 meeting, Ligand changed counsel to Bradley Bondi of Cahill Gordon.  Brooks Aff. Ex. 17 at 108:2-109:20; Brooks Aff. Ex. 21 at 254:11-255:10; Brooks Aff. Ex. 10 at 287:22-288:6.

**SEC Response:**  Undisputed.  Mr. Bondi was, and is, one of the lawyers for Ligand in this matter.

106.     Bradley Bondi used to work for the Commission.  *See* Brooks Aff. Ex. 38.

**SEC Response:**  Undisputed.

107.     Bradley Bondi contacted a former colleague at the Commission and scheduled a second meeting between Ligand and the Commission's Washington, D.C. regional office on June 8, 2015.  Brooks Aff. Ex. 39 at E-PROD-SEC-LIT-E-001189144-47.

**SEC Response:**  Disputed in part and unsupported.  The Commission disputes in part some of the facts asserted in paragraph 107 as unsupported by the exhibit cited.  [Brooks Aff. Ex. 39.]  The Commission does not dispute that Bradley Bondi reached out to a member of the Commission's staff to schedule a June 8, 2015 meeting between Ligand and members of the Division of Enforcement at the Commission's home office in Washington, D.C.  In the exhibit cited, however, Mr. Bondi does not make any mention that he is a former colleague of the individual he is emailing or that he previously worked for the Commission.  [*See* Brooks Aff. Ex. 39.]  Further, the email set up the first meeting between Ligand and a team from the Commission's home office in Washington, D.C., not a second meeting.  *See id.*

108.     Ligand submitted a PowerPoint presentation to the Commission at this June 8, 2015 meeting.  Brooks Aff. Ex. 40.

**SEC Response:**  Undisputed.

109.    The purpose of the June 8, 2015 meeting between the Commission and Ligand (being represented by Cahill Gordon) was for Ligand to convince the Commission to investigate and bring an enforcement action against Fr. Emmanuel.  Brooks Aff. Ex. 40 at LGND_0080797

**SEC Response:**  Undisputed.

110.    Among the allegations in the June 8, 2015 PowerPoint, Ligand accused Fr. Emmanuel of engaging in an "affinity fraud," misrepresenting the performance of the Amvona Fund, and that Fr. Emmanuel had a "questionable personal history."  Brooks Aff. Ex. 40 at LGND_0080752-55.

**SEC Response:**  Disputed in part and not supported.  The Commission disputes the facts

asserted in paragraph 110 as unsupported by the cited exhibit.  [Brooks Aff. Ex. 40.]  Ligand's

June 8, 2015 PowerPoint, and specifically the pages cited by Defendant, do not contain any

reference to "affinity fraud" or any "questionable personal history."  [Brooks Aff. Ex. 40 at

LGND_0080752, LGND_0080755.]  Specifically, the pages cited by Defendant state that

Defendant is an ordained Greek Orthodox priest; has no formal investment education, training,

or experience; and tweets from accounts that mix religious commentary and current events,

mixed with stock performance.  [*Id.*]  The Commission does not dispute that the cited pages do

state that Defendant self-reports outperformance claims.  [*Id.* at LGND_0080753-54.]

111.    The June 8, 2015 PowerPoint only referenced the Commission's challenged statement by Fr. Emmanuel in the June 19, 2014 Benzinga interview on one slide.  Brooks Aff. Ex. 40 at LGND_0080771.

**SEC Response:**  Disputed and not supported.  The Commission disputes the facts as

asserted in paragraph 111 as unsupported by the cited exhibit.  [Brooks Aff. Ex. 40.]  The June 8,

2015 PowerPoint includes a reference to Defendant's statement from the June 19, 2014 Benzinga

interview on page 55.  [Brooks Aff. Ex. 40 at LGND_0080792.]  And, the entire slide cited by

Defendants addresses the June 19, 2014 statement.  [*Id.* at LGND_0080771.]  Further, what

Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether

Defendants violated the federal securities laws.

112.    The June 8, 2015 PowerPoint did not reference either of the statements about Viking on July 3, 2014 that the Commission is challenging in this litigation.  *See* Brooks Aff. Ex. 40.

**SEC Response:**  Undisputed and immaterial.  What Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether Defendants violated the federal securities laws.

113.    The June 8, 2015 PowerPoint from Ligand mentioned Fr. Emmanuel's statement about Ligand's debt to tangible equity ratio, but claimed it was incorrect because the calculation did not include the cash proceeds from the loan.  Brooks Aff. Ex. 40 at LGND_0080788.

**SEC Response:**  Disputed in part and immaterial.  The Commission disputes in part the facts asserted in paragraph 113 because the exhibit as cited by Defendant does not that state that Defendant's debt-to-tangible equity is incorrect because it does not include the cash proceeds from the loan.  Rather, it simply states that the ratio is a potential false or misleading statement regarding Ligand's solvency because it ignored all cash proceeds from the debt.  [Brooks Aff. Ex. 40 at LGND_0080788.]  Further, what Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether Defendants violated the federal securities laws.

114.    The June 8, 2015 PowerPoint did not mention the Empire reports published on July 22 and August 5, 2014.  *See* Brooks Aff. Ex. 40.

**SEC Response:**  Undisputed and immaterial.  Whether Ligand's counsel discussed the reports of someone other than the Defendants during their meeting with the Commission is immaterial to any issue in this case.  Further, what Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether Defendants violated the federal securities laws.

115.    The June 8, 2015 PowerPoint did not mention Ligand's historically volatile stock prices.  *See* Brooks Aff. Ex. 40.

**SEC Response:**  Disputed in part and immaterial.  The Commission does not dispute that Ligand's June 8, 2015 PowerPoint does not contain language that referring to Ligand's stock prices as being historically volatile.  The presentation, however, does contain a chart showing its

41

price fluctuation and a steady increase in price quarter over quarter since at least the second quarter of 2013 and performance ahead of its peer index. [Brooks Aff. Ex. 36 at LGND_0080757 (slide 20).] The Commission does dispute the characterization as "historically volatile" as unsupported by the Defendants' cited evidence. [*See also* SEC response to ¶¶101-02, above.] Further, what Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether Defendants violated the federal securities laws.

116.   The June 8, 2015 PowerPoint identified four periods of time that it claimed Fr. Emmanuel's reports caused Ligand's stock price to decrease. These time periods were: (1) June 16, 2014 to June 24, 2014; (2) July 13, 2014 to July 17, 2014; (3) August 7, 2014; and (4) August 22, 2014 to August 25, 2014. Brooks Aff. Ex. 40 at LGND_0080763.

   **SEC Response:**  <u>Undisputed</u>.

## V.   The Commission's Complaint

117.   The Commission filed its original Complaint on September 12, 2018. Brooks Aff. Ex. 16.

   **SEC Response:**  <u>Undisputed</u>.

118.   The Commission filed its Amended Complaint on March 21, 2019. Brooks Aff. Ex. 7.

   **SEC Response:**  <u>Undisputed</u>.

119.   The Commission has alleged that Fr. Emmanuel made four misstatements in violation of Rule 10b-5. *See* Brooks Aff. Ex. 8 at 2-4; Brooks Aff. Ex. 7 ¶¶ 36-53.

   **SEC Response:**  <u>Disputed in part</u>. The Commission's Amended Complaint alleged that each of the four statements of fact were false and misleading, that the four statements of facts were collectively false and misleading and part of a fraudulent scheme to depress Ligand's share price, and that Defendant's violated the Advisers Act. [Am. Compl. (ECF No. 33) ¶¶ 57-61.]

120.   The Commission has also alleged a scheme liability theory. Brooks Aff. Ex. 7 ¶¶ 58-59.

   **SEC Response:**  <u>Undisputed</u>.

121.    At oral argument, the Commission conceded that they do not have much alleged behavior beyond the four alleged misstatements to support its scheme liability theory.  Brooks Aff. Ex. 41 at 24:13-25:8.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes the facts asserted in paragraph 121

as an inaccurate characterization of the Commission's allegations against Defendant and its

discussion with the Court.  During the December 6, 2018 hearing that Defendant cites, the

Commission informed the Court that the four alleged misstatements by Defendant form the basis

for the Commission's Exchange Act Rule 10b-5(b) case and are part of its Rule 10b-5(a) and (c)

case against Defendants.  [Ex. 62 (Tr. of 12/6/18 Mot. Hearing) at 23:25-24:12, 24:21-25:1.]

Further, the Commission has alleged further conduct, for example, evidence that Defendants

took affirmative steps to suppress commentary highlighting his bias against Ligand and lack of

familiarity with the pharmaceutical industry.  [*See* ¶189, below.]

122.    The Commission has also alleged violations of the Investment Advisers Act on the theory that Fr. Emmanuel did not disclose his alleged misstatements in violation of Rule 10b-5 to his investors.  Brooks Aff. Ex. 7 ¶¶ 63-67.

**SEC Response:**  <u>Disputed in part</u>.  The Commission disputes the facts as asserted in

paragraph 122 as unsupported by the exhibit cited.  The Commission alleged violations of the

Investment Advisers Act by Defendant for "making any untrue statement of material fact or

omitting to state a material fact necessary to make the statements made, in the light of the

circumstances under which they were made, not misleading, to any investor or prospective

investor in the pooled vehicle[,]" in violation of Section 206(4) and Rule 206(4)-8 of the

Investment Advisers Act, not Rule 10b-5 of the Exchange Act.  [Brooks Aff. Ex. ¶¶ 62-67.]

123.    Based on the discovery responses provided by the Commission, it does not appear the Commission interviewed any of Fr. Emmanuel's investors prior to filing this claim.  Brooks Aff. ¶ 45.

**SEC Response:**  <u>Undisputed but immaterial</u>.  The Commission need not offer testimony from any current investor to prove its case, and certainly has no obligation to interview current investors prior to the filing of an enforcement action.

## VI.    The Commission Failed to Produce the Expert Evidence Required to Support Its Market-Manipulation Claim

124.    Defendants sought discovery from the Commission seeking any evidence it had that Fr. Emmanuel's alleged misstatements caused Ligand's stock to drop.  Brooks Aff. Exs. 42-43.

**SEC Response:**  <u>Undisputed</u>.

125.    Specifically, on June 13, 2019, Defendants served the Commission with its First Set of Interrogatories.  Interrogatory No. 3 requested the Commission:

> State the basis for Your contention that Defendants' statements influenced or otherwise impacted the stock price for Ligand, including but not limited to (i) a detailed description of all data sources and other materials You considered, and (ii) each alternative cause, influence, or reason for the decline in Ligand's stock price that You considered, analyzed, and/or reviewed with a detailed explanation for how you ruled out that alternative form of causation.

Brooks Aff. Ex. 42 at 4.

**SEC Response:**  <u>Undisputed</u>.

126.    The Commission objected to this Interrogatory, stating, *inter alia*, it was "a premature request for matter that may be the subject of expert testimony."  Brooks Aff. Ex. 44 at 11.

**SEC Response:**  <u>Disputed in part and incomplete</u>.  The Commission does not dispute that it objected to the interrogatory as a premature request for a matter that may be subject of expert testimony, however, the Commission disputes Defendant's characterization of the Commission's response to interrogatories, as it is misleadingly incomplete.  The Commission also stated that the interrogatory 1) as a premature request because it was served before substantial discovery had taken place, and 2) because the Commission did not need to prove causality between

Defendant's actions and the fall of Ligand's stock price because the SEC is not required to show harm/actual damages or reliance by individual investors.  [*See* Brooks Aff. Ex. 44 at 11-12.]  The Commission also detailed other evidence establishing that Defendants' statements and conduct were material.  Further, the requests were the subject of subsequent expert discovery.

127.    Defendants also served the Commission with its First Set of Requests for Production of Documents on June 13, 2019.  Request Nos. 20-21 sought: "All Documents or Communications relating, concerning, or supporting the position that Fr. Lemelson's statements listed in [paragraphs 36 through 50] of the Amended Complaint caused any changes in the price of Ligand's stock."  Brooks Aff. Ex. 43 at 5.

**SEC Response:**  Undisputed.

128.    The Commission objected to these document requests, stating, *inter alia*, it was "a premature request for matter that may be the subject of expert testimony."  Brooks Aff. Ex. 45 at 12-13.

**SEC Response:**  Undisputed, but incomplete.  The Commission's other objections included that the request "attributes to the Commission a 'position' that had not been made by the Commission in its Amended Complaint or elsewhere."  Further, the requests were the subject of subsequent expert discovery.

129.    The Commission did not serve any affirmative expert report.  Brooks Aff. ¶ 50.

**SEC Response:**  Undisputed but immaterial.  The Commission is under no obligation to retain an affirmative expert or to proffer an event study to support its claims of materiality, as Defendants' incorrectly assert.

130.    On January 17, 2020, Defendants served the Commission their expert report of Aaron Dolgoff.  Brooks Aff. ¶ 51.

**SEC Response:**  Undisputed.  The Expert Report of Aaron Dolgoff, which Defendants reference, is attached as Ex. 54.

131.    On February 28, 2020, the Commission served the Defendants its rebuttal expert report of Erin Smith.  Brooks Aff. ¶ 52.

**SEC Response:**  Undisputed.  The Expert Report of Erin Smith is attached as Ex. 55.

132.    The experts agreed that Ligand traded in an efficient market.  Brooks Aff. ¶ 53.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the asserted

facts in paragraph 132, which are not supported by the exhibit cited, Brooks Aff. ¶ 53, as

required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  The Commission's rebuttal expert did

not perform this analysis and did not opine on whether Ligand traded in an efficient market.  *See*

Ex. 55 (Smith Report).]  The Commission's rebuttal expert was asked to review and comment on

whether Defendants' expert report reliably assessed the impact of the Lemelson's campaign on

Ligand's stock price. [*Id.* at 4.]

133.    The experts also agreed that there was no statistically significant evidence that Fr.
Emmanuel's statement about the debt to tangible equity ratio, which is the Commission's fourth
alleged misstatement in this case, had any material impact on Ligand's stock price.  Brooks Aff.
¶ 54.

**SEC Response:**  <u>Disputed in part and not supported</u>.  The Commission disputes the

asserted facts in paragraph 133, which are not supported by the exhibit cited.  [Brooks Aff. ¶ 54],

as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Specifically, the Commission

disputes Defendant's statement that the experts agree as to the underlying reasons why there was

not statistically significant evidence that Defendant's August 14, 2014 statement about Ligand's

debt-to-tangible equity ratio had a material impact on Ligand's stock price.  The Commission's

February 28, 2020 rebuttal expert report states that Defendant's expert report omitted follow-on

coverage of all of Defendant's reports, which would have contributed to the perceived credibility

of Defendant's statements about Ligand, helped disseminate his statements, and impacted

Ligand's stock price beyond the date the statement was made.  [Ex. 55 (Smith Expert Report) at

¶¶11-15, 31-34.]  Further, the Commission's rebuttal expert concluded that Defendant's expert

did not take into account that the statistically insignificant result of the August 14, 2014 report

could be due to confounding news about Ligand that same day.  [*Id.* at ¶ 34.]

## VII.   Evidence Regarding Fr. Emmanuel's Subjective Belief in the Veracity of His Opinions

134.   Fr. Emmanuel has testified consistently that he believed in the veracity of his opinions when he published them.  Brooks Aff. Ex. 1 at 296:8-22; Brooks Aff. Ex. 46 at 391:2-21; Brooks Aff. Ex. 47 at 772:24-773:2, 774:19-775:2.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes the facts asserted in paragraph 134 as to Defendant believing his statements were opinions at the time of publication.  Over the course of three days in July 2016, Defendant testified under oath before the Commission that his reports were neutral, objective, factual, and accurate, and that the "research reports included facts, not opinions."  [Ex. 59 (Lemelson Inv. Test.) at 296:8-297:6, 373:5-375:6, 680:8-681:4, 682:6-10, 737:10-13, 737:17-22, 770:21-771:9.]  Defendant also testified that he would have corrected his prior reports in later reports if he found any inaccuracies, despite including a disclaimer in all of his reports as to their accuracy or completeness.  [*Id.* at 772:5-775:2.]

135.   Fr. Emmanuel produced his entire hard drive to the Commission in this case, including all communications with counsel to aid in the Commission's investigation.  Brooks Aff. Ex. 1 at 16:2-19:20; Brooks Aff. Ex. 5 at 106:11-25, 328:2-9; Brooks Aff. Ex. 48 at 51:10-52:2, 153:8-154:9.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes the facts asserted in paragraph 135, specifically that Defendant Lemelson produced his entire hard drive to the Commission in this case.  Lemelson testified under oath in 2016 that he searched his hard drive and Outlook for relevant documents and produced to the Commission what he found, which included all of the emails in his .pst email file related to Lemelson Capital Management and The Amvona Fund, including sent files.  [Brooks Aff. Ex. 1 at 16:2-19:20.]  Lemelson's cover letter at the time of his initial production confirms that he provided a 32 GB flash storage device, on which he copied all of his business-related files and emails.  [Ex. 63 (9/14/15 Lemelson Production Letter) 1-2.]

136.    There is no document in Fr. Emmanuel's hard drive that indicates Fr. Emmanuel did not believe in the veracity of his opinions when he published them.

**SEC Response:**  Disputed and unsupported.  Defendants offer no evidentiary support for the facts asserted in paragraph 136, contrary to Rule 56 and Local Rule 56.1.  The Commission believes that many of the documents produced by Defendants, some of which are cited in the Commission's Statement of Material Facts below, show Defendants' motivations to lie.  The Commission also disputes Defendants' characterization of the reports in their entirety as "opinions."  As the Commission argues in its brief, Lemelson's reports contain statements of fact to support his theses.  [*See* Commission's response to paragraph 134 (citing Lemelson's statements that this reports were factual and contained facts).]

137.    Fr. Emmanuel worked with an editor, Michael Johns, on the five reports published regarding Ligand.  Brooks Aff. Ex. 49 at 27:18-29:10, 49:5-50:1, 55:22-56:21, 64:11-13.

**SEC Response:**  Undisputed.

138.    Mr. Johns testified that Fr. Emmanuel believed in the veracity of his opinions when he published them.  Brooks Aff. Ex. 49 at 30:9-24, 59:24-60:21, 115:14-116:10, 117:4-15.

**SEC Response:**  Disputed in part.  While the testimony cited establishes that Johns thought Lemelson tried to be accurate, and that Lemelson really believed in what he was writing, nowhere in the cited excerpts does Johns describe what Lemelson was writing as Lemelson's "opinions."

139.    Dr. Nicholas Jabbour is Fr. Emmanuel's largest and longest-standing investor.  Brooks Aff. Ex. 50 at 29:20-23; 34:5-19

**SEC Response:**  Disputed in part and unsupported.  The Commission does not dispute that Dr. Jabbour is Defendants' longest-standing investor, but Brooks Aff. Ex. 50 as cited does not support that he was the largest investor.  In the exhibit as cited, Dr. Jabbour testified that he

knew he was the largest investor in 2015, but is not sure if that remains the case. [Brooks Aff.

Ex. 50 at 34:5-19.]

140.    Dr. Jabbour testified at deposition that he never had any concern about Fr.
Emmanuel's candor or truthfulness.  Brooks Aff. Ex. 50 at 112:23-113:4.

**SEC Response:  Undisputed.**

141.    Dr. Jabbour testified that based on his own analysis of Promacta and the market in
2014, he agreed with Fr. Emmanuel's thesis that Promacta was going away.  Brooks Aff. Ex. 50
at 85:1-23.

**SEC Response:  Disputed in part.**  The Commission does not dispute that Dr. Jabbour

agreed with Defendant's thesis that Promacta was going away, but Defendants do not accurately

characterize the analysis performed by Dr. Jabbour.  Dr. Jabbour testified during this deposition

that he agreed with this thesis based on his limited research, and spent a fair portion of his

deposition focused on the fact that he did minimal research and did not analyze market factors as

part of this minimal research.  [Ex. 64 (Jabbour Dep.) at 48:1-49:16, 50:16-51:2, 51:24-52:22,

53:2-55:16, 56:8-59:13, 68:6-72:3; 73:16-74:4, 87:1-88:3, 103:4-104:7, 109:24-112:1.]  Dr.

Jabbour also testified that he would not be the one to prescribe Promacta or Sovaldi because he is

a transplant doctor rather than a hepatologist or hematologist.  [Ex. 64 (Jabbour Dep.) at 78:11-

79:21.]

## THE COMMISSION'S STATEMENT OF
## ADDITIONAL MATERIAL FACTS (142-201)

142.    The crux of Lemelson's reports and public statements was that Ligand was,

essentially a fraud, in terrible financial shape and had limited prospects in 2014—in Lemelson's

words, Ligand had "100% downside risk" and that its shares were worth "$0."  [*E.g.*, Brooks

Aff. Ex. 15 (July 3 report) at 10.]

143.    Ligand's stock price dropped by 34% during the time Lemelson was publishing

his reports.  [Am. Compl. (ECF No. 33) ¶8; Answer (ECF No. 34) ¶8]

144.   Ligand's stock price dropped 5.4% immediately in the wake of Lemelson publishing his first report on June 16, 2014—a decline Lemelsons' own expert attributes to Lemelson's report.  [Ex. 54 (Dolgoff Report) at ¶29 n. 39; Ex. 55 (Smith Report) at ¶12.]

145.   While Defendants' expert claims that Lemelson's falsehoods didn't move Ligand's stock, Lemelson's scheme in fact caused a statistically significant decline in Ligand's stock price.  [Ex. 55 (Smith Report) at ¶¶16-20, 37-45.]

146.   Numerous investors contacted Ligand and its investor relations firm to express concern over Lemelson's allegations and seek assurance that his statements were not true.  [Ex. 57 (Foehr Dep.) at 85:6-94:6, 277:9-280:14; Ex. 56 (Higgins Dep.) at 99:4-100:3, 139:3-12, 161:17-162:14, 247:23-248:15, 302:4-303:5; Ex. 61 (Pettingill Dep.) 68:16-73:17; Ex. 52 (Voss Dep.) at 212:12-217:17, 234:20-236:3; Brooks Aff. Ex. 13 at LCM SEC0000325; Exs. 65-70 (investor inquiries about Lemelson's statements).]

147.   Lemelson himself, along with at least several media outlets, attributed Ligand's falling stock price to Lemelson's misstatements.  [Ex.56 (Higgins Dep.) at 168:19-169:16; 170:11-21, 283:22-284:7; Ex. 61 (Pettingill Dep.) at 94:16-95:16; Ex. 71 (Lemelson: "multi-month battle with LGND has also been paying off – shares are now down ~40% since LCM published its first . . . report[.]"); Ex. 72 (Lemelson to Amvona Fund investors: "Shares of Ligand dropped ~2% during the [June 19] interview); Ex. 73 (Amvona Fund Investor Presentation: "LGND shares drop "16% within 6 trading days[of June 16 report]—Lemelson Capital is credited with the drop in market cap by USAToday, ValueWalk, Benzinga, SeekingAlpha and others.").]

148.   The Commission has proffered a rebuttal expert report from Dr. Erin Smith to rebut Defendants' flawed event study.  [Ex. 55 (Smith Report).]

149.     In a June 19, 2014, interview with an Internet program known as the Benzinga

Pre-Market Prep Show, Lemelson falsely stated:  "I had discussions with [Ligand] management

just yesterday – excuse me, their [Ligand's] IR [investor relations] firm.  And they basically

agreed.  They said, '*Look, we understand Promacta's going away*.'"  [Brooks Aff. ¶15; *see also*

Am. Compl. (ECF No. 33) ¶37; Answer (ECF No. 34) ¶37 (admitting substance of quote from

Benzinga interview).]

150.     Lemelson repeatedly claimed that one of Ligand's main sources of revenue—a

drug called Promacta—was "going away" in the face of a "competitive threat" from a Hepatitis

C drug called Sovaldi.  [Brooks Aff. Ex. 6 at 1, 6 (June 16, 2014 Report stating Sovaldi will

"eliminate demand for Promacta"); Brooks Aff. Ex. 25 at 5 (August 4, 2014 Report stating

Sovaldi "a severe competitive threat to future Promacta sales").]

151.     Ligand's investor relations representative, Bruce Voss, testified that he did not

say what Lemelson attributed to him, because it wasn't true.  [Ex. 52 (Voss Dep.) at 27:7-17,

120:5-121:8, 124:2-20, 210:10-211:7.]

152.     Lemelson's notes of his conversation with Mr. Voss say that, "[h]e [Voss] said

the company agreed that Gilead's drug [Sovaldi] would eliminate the need for Promacta and

understood that."  [Brooks Aff. Ex. 12 at 2.]  In his deposition, Defendant Lemelson admitted

that Mr. Voss was talking only about Promacta's use a supportive therapy for certain Hepatitis C

patients.  [Ex. 51 (Lemelson Dep. (Day 2)) at 187:5-24].  Promacta does *not* treat Hepatitis C,

and Sovaldi and Promacta are therefore not direct competitors.  [Ex. 57 (Foehr Dep.) at 222:11-

24, 178:16-19, 180:14-181:2; Ex. 56 (Higgins Dep.) at 31:8-23.]

153.     Promacta boosts platelet counts in patients suffering from a number of different

conditions and its use as a supportive therapy in certain Hepatitis C patients was not a "major

driver" of Ligand's revenue growth.  [Ex. 56 (Higgins Dep.) at 33:5-35:8; Ex. 57 (Foehr Dep.) at 183:10-20; 223:2-18.]

154.    Promacta is used as supportive care to boost platelet production in patients whose livers are damaged by diseases including Hepatitis C.  [Ex. 56 (Higgins Dep.) at 63:15-64:8.]

155.    Ligand's revenue from Promacta was *growing* at the time Lemelson made his false statement, not "going away," notwithstanding Sovaldi being approved to treat Hepatitis C. [*E.g.,* Ex. 57 (Foehr Dep.) at 180:14-182:22; Ex. 56 (Higgins Dep.) at 31:8-35:8; Ex. 52 (Voss Dep.) at 194:6-18.]

156.    Far from revenue from Promacta "going away," Ligand sold its rights to Promacta in 2019 for $827 million dollars.  [Ex. 57 (Foehr Dep.) at 288:1-17.]

157.    Mr. Voss explained the substance of the information in paragraphs 153 to 156 to Lemelson.  [Ex. 52 (Voss Dep.) at 63:2-10, 120:5-122:7.]

158.    Defendants admit that Mr. Voss denies that he said what Lemelson attributed to him.  [*See* ¶28, above.]

159.    Mr. Voss emailed Lemelson after the interview specifically challenging the accuracy of Lemelson's statements and denying that he agreed with anything Lemelson said. [Ex. 53.]

160.    Certainly Lemelson hoped investors would find it significant, writing on June 16 that Sovaldi and other drugs "will likely eliminate demand for Promacta, which is the largest royalty generating asset" and "… the imminent conclusion of the commercial viability of the Company's largest royalty generating product, Promacta, made Ligand wholly unsuitable as an investment and its shares fundamentally worthless."  [Brooks Aff. Ex. 6 at 4, 23.]

161.    Lemelson purports to have relied on a doctor, who was also an investor in the Amvona fund, in formulating his misguided "thesis" about Promacta.  [¶¶139, 141, *above*.]  That doctor, however, testified that he had no understanding of Promacta's indications outside of its use as a supportive therapy for certain Hepatitis C patients, and did not have any knowledge of how much of Ligand's revenue was attributable to different indications.  [Ex. 64 (Jabbour Dep.) at 54:1-55:16.]

162.    Ligand's stock price fell during and immediately after the June 19, 2014 interview.  [Ex. 55 (Smith Report) at ¶¶26-27.]

163.    Lemelson stated that Viking (1) had "yet to consult with [its auditors] on any material issues" and that the "financial statements provided in the S1 accordingly are unaudited" and (2) "does not intend to conduct any preclinical studies or trials."  [Brooks Aff. Ex. 15 at 7, 10].

164.    In his July 3 report, Lemelson claimed that the Ligand-Viking transaction was conceived to "generate paper profits to stuff [Ligand's] own balance sheet" and that Ligand's management was engaged in "a common game of three-card Monte, played on any street corner—shills included."  [Brooks Aff. Ex. 15 at 8, 9.]

165.    Lemelson acknowledged that his statements were inconsistent with Viking's public filings, upon which he purportedly relied.  [Ex. 59 (Lemelson Inv. Test.) at 721:7-722:11, 725:12-15, 728:20-729:16.]

166.    Viking's July 1, 2014 Form S-1 stated that 2013 financial information was derived from "audited financial statements included elsewhere in this prospectus."  [Brooks Aff. Ex. 19 at 9.]

167.   Viking's July 1, 2014 Form S-1 stated, "In our [auditor Marcum LLP's] opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Viking Therapeutics, Inc., as of December 31, 2012 and 2013, and the results of its operations and its cash flows for the period from September 24, 2012 (Inception) through December 31, 2012 and for the year ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America." [Ex. 74 (Viking Form S-1 excerpt) at F-1.]

168.   Viking's CEO, Brian Lian, testified that Viking's audit was completed by auditor Marcum LLP.  [Ex. 75 (Lian Dep.) at 94:11-21.]

169.   Lemelson testified that he believed his statement about unaudited financials to be true but agreed that the statement was clearly contradicted by the public filings.  [Ex. 59 (Lemelson Inv. Test.) at 729:14-16]

170.   Viking set forth its intention to conduct clinical trials on the first page of the Viking S-1:

> We [Viking] have exclusive worldwide rights to a portfolio of five drug candidates *in clinical trials or preclinical studies*, which are based on small molecules licensed from Ligand Pharmaceuticals Incorporated, or Ligand. Our lead clinical program is VK0612, a first-in-class, orally available drug candidate entering a Phase 2b clinical trial for type 2 diabetes, one of the largest global healthcare challenges today. *Preliminary clinical data* suggest VK0612 has the potential to provide substantial glucose-lowering effects, with an attractive safety and convenience profile compared with existing type 2 diabetes therapies. Our second clinical program is VK5211, an orally available drug candidate *entering a Phase 2 clinical trial* for the treatment of cancer cachexia, a complex disease characterized by an uncontrolled decline in muscle mass. VK5211 is designed to selectively produce the therapeutic benefits of testosterone in muscle tissue, with improved safety, tolerability and patient acceptance compared with administration of exogenous testosterone. *We expect to commence Phase 2 clinical trials for both VK0612 and VK5211 in early 2015 and to complete the clinical trials in 2016.* We are also developing three preclinical programs targeting metabolic diseases and

anemia. Our most advanced preclinical program is VK0214, a novel liver-selective thyroid hormone receptor beta, or TRß, agonist for lipid disorders such as dyslipidemia and nonalcoholic steatohepatitis, or NASH. *We expect to file an investigational new drug application, or IND, and commence clinical trials for this program in 2015.*

[Ex. 74 (Viking Form S-1 excerpt) at 1 (emphasis added).]

173.    Ligand's CEO stated that Viking intended to, and did, conduct clinical trials.  [Ex. 56 (Higgins Dep.) at 328:19-329:9.]

174.    Viking did intend to conduct clinical trials (and subsequently did), employing and working with specialized companies that perform the various tasks necessary to complete clinical trials.  [Ex. 75 (Lian Dep.) at 61:11-18; 77:5-22; Ex. 56 (Higgins Dep.) at 328:19-329:9 (Viking intended to conduct, and has subsequently conducted, clinical trials).]

175.    Lemelson admitted that statements in the Ligand-Viking Master Licensing Agreement contradicted his thesis about Viking.  [Ex. 59 (Lemelson Inv. Test.) at 722:12-723:11.]

176.    At least one Ligand investor raised concerns about Lemelson's statements about Viking with Ligand's COO.  [Ex. 57 (Foehr Dep.) at 92:1-92:13.]

177.    Ligand's stock price again fell after Lemelson published his July 3, 2014 Report. [Ex. 55 (Smith Report) at ¶¶28-30.]

178.    Ligand had committed to taking just under a 50% stake in Viking and the exact timing of when the transaction closed is irrelevant.  [Ex. 58.]

179.    Lemelson's contention that the transactions between Ligand and Viking were a sham and that Viking was not a real company were, and are, not true.  [Ex. 57 (Foehr Dep.) at 92:1-93:24, 296:5-17.]

180.    In his August 14 report, Lemelson said that Ligand's "announcement that it would assume $225 million in convertible debt . . . further deepens the already significant concerns

about Ligand's imminent insolvency and the company's substantial risk of bankruptcy." [Brooks Aff. Ex. 23 at 1.]

181. In that same report, Lemelson stated that "the company's liabilities will again far exceed its assets and the company will technically be insolvent once more" and that, even before the new debt issuance, "the company's liabilities exceeded tangible assets, meaning the company was insolvent." [Brooks Aff. Ex. 23 at 2.]

182. In the August 22 report, Lemelson wrote that Ligand "issued $245 million in new debt against the company's [Ligand's] tangible equity of just $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars (sic) in debt for every $1 dollar (sic) in tangible common shareholder equity)" and that "shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt." [Brooks Aff. Ex. 24 at 3, 6.]

183. Insolvency is the financial condition that occurs when "the sum of [an] entity's debts is greater than *all* of [the] entity's property, at a fair valuation," 11 U.S.C. § 101(32)(A) (emphasis added), or the entity has insufficient cash to service its debt. [Ex. 61 (Pettingill Dep.) at 99:3-102:14.]

184. Ligand was never insolvent, much less bankrupt, when Lemelson said it was in 2014. [Ex. 56 (Higgins Dep.) at 115:15-116:24; Ex. 57 (Foehr Dep.) at 144:2-15; Ex. 61 (Pettingill Dep.) at 99:3-102:14.]

185. Ligand's assets exceeded its liabilities both before and after the August 2014 debt issuance. [Answer (ECF No. 34) ¶51 (admitting assets exceeded liabilities both before and after the August 2014 debt issuance).]

186.    Lemelson's debt-to-tangible-equity ratio is not a test for insolvency.  [Ex. 61 (Pettengill Dep.) at 99:3-102:14.]

187.    Lemelson conceded that his purported "debt-to-tangible-equity" analysis failed to account for the proceeds of Ligand's debt financing.  [Ex. 76 (Lemelson submission to the Commission) at 30-31.]

188.    Lemelson said he reviewed sales data for Promacta, which showed substantial Promacta sales prior to its approval as a supportive therapy for Hepatitis C patients and sales of the drug increasing overall.  [Ex. 77 (Lemelson Dep. (Day 1)) at 150:23-154:4, 191:17-19, 208:6-209:13, 226:4-233:8; Ex. 59 (Lemelson Inv. Test.) at 238:21-239:1, 376:12-18 ; *see also* Ex. 57 (Foehr Dep.) at 179:6-23, 213:21-214:12 (Promacta sales a matter of public record).]

189.    Lemelson attempted to have comments critical of his reports removed from a popular investing forum, Seeking Alpha.  [Exs. 78-81.]

190.    Lemelson touted his prowess in short-selling to attract investors.  [Ex. 82 (emails to prospective investors and existing investors touting Ligand short).]

191.    Less than two weeks before he took his short position in Ligand, he was shopping for a $2.5 million mortgage to purchase a ~$2.9 million home in the Greater Boston area. [Ex. 83.]

192.    In the first two weeks of June, several large asset managers were introduced to LCM and TAF through his broker, BTIG.  [Ex. 84.]

193.    On June 17, Lemelson said his assets under management were "likely to jump next month (expecting many new subs)."  [Ex. 85.]

194.     The Amvona Fund was highly leveraged, meaning Lemelson borrowed from his

brokerage to finance his positions—a practice known as trading on margin.  [Ex. 77 (Lemelson

Dep. (Day 1)) at 310:7-23 (The Amvona Fund traded as much as $20 million on margin).]

195.     Shortly after Lemelson issued his June 16 report on Ligand, Defendants faced

hundreds of thousands of dollars in house calls and a "federal call" (a legally mandated margin

call) and covered over $250,000 of the Ligand short to meet the house and federal calls.  [Ex.

86.]

196.     Lemelson covered his short position over time, including during the pendency of

his deceptive scheme that spanned June 16, 2014 (first report) to September 16, 2014 (last radio

interview).  [*See* ¶89 above; Answer (ECF No. 34) ¶¶23, 30; Ex. 55 (Smith Report) ¶11 & Table

1.]

197.     Lemelson covered approximately 4,000 shares on June 19, 2014 and

approximately 35,000 shares on August 22 and 26, 2014—all at substantial profit.  [*See* ¶89

above.]

198.     Lemelson himself characterized his statements as statements of fact.  [Ex. 59

(Lemelson Inv. Test.) at 296:8-297:6, 373:5-375:6, 680:8-681:4, 682:6-10, 737:10-13, 737:17-

22, 770:21-771:9.]

199.     The Amvona Fund is a pooled investment vehicle under Rule 206(4)-8,

promulgated under the Advisers Act [17 C.F.R. § 275.206(4)-8] and Sections 3(a) and 3(c)(1) of

the Investment Company Act of 1940 [15 U.S.C. § 80-3(a) and (c)(1).  [ECF No. 33 (Amended

Complaint) at ¶19; ECF No. 34 (Answer) at ¶19 (admitting non-denied facts in ¶19).]

200.     A reasonable investor would unquestionably consider it significant that Ligand's

investor relations firm had allegedly acknowledged that Ligand's main revenue source was about

to dry up.  [Ex. 62 (Dec. 16, 2018 Hearing Tr.) at 9:25-10:2 ("THE COURT:  It's a material

statement if you say someone's IR firm said [Promacta is] going away.").]

201.    Defendants' false statements about Viking were material because they sought to

cast doubt on the benefits of the Ligand-Viking transaction and to allege misconduct by Ligand

management.  [Ex. 62 (Dec. 16, 2018 Hearing Tr.) at 17:11-13 ("The Court:  Wouldn't an

investor think that Viking wasn't going to be doing clinical studies and it was all a farce?").]

Dated:  October 30, 2020                  Respectfully submitted,

                                          SECURITIES AND EXCHANGE COMMISSION

                                          By its attorneys,

                                          */s/ Marc J. Jones*
                                          Marc J. Jones (BBO #645910)
                                          Alfred A. Day (BBO #654436)
                                          Securities and Exchange Commission
                                          Boston Regional Office
                                          33 Arch Street, 24th Floor
                                          Boston, MA  02110
                                          617-573-8947 (Jones)
                                          JonesMarc@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that, on October 30, 2020, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

           */s/ Marc J. Jones*
           Marc J. Jones