**EXHIBIT 52**

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC, | ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| THE AMVONA FUND, LP, | ) ) |
| Relief Defendant. | ) ) |

Case No.
1:18-CU-11926-PBS

Deposition of BRUCE VOSS

San Diego, California

December 3, 2019

Reported by:
Sheri L. Somers
CSR No. 9734
Job No. 10062968

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE            )
COMMISSION,                        )
                                   )
            Plaintiff,             )  Case No.
                                   )  1:18-CU-11926-PBS
vs.                                )
                                   )
GREGORY LEMELSON and               )
LEMELSON CAPITAL                   )
MANAGEMENT, LLC,                   )
                                   )
            Defendants,            )
                                   )
and                                )
                                   )
THE AMVONA FUND, LP,               )
                                   )
            Relief Defendant.      )
                                   )


        Deposition of BRUCE VOSS, taken on behalf of
defendant, at 600 West Broadway, Suite 300, San Diego,
California, beginning at 8:57 a.m., and ending at
5:52 p.m., on Tuesday, December 3, 2019, before
Sheri L. Somers, CSR No. 9734.

BRUCE VOSS                                        December 3, 2019

        APPEARANCES:

        For Plaintiff:
                U.S. SECURITIES AND EXCHANGE COMMISSION
                BOSTON REGIONAL OFFICE
                33 Arch Street, 24th Floor
                Boston, Massachusetts 02110
                617.573.8947
                617.573.4590 fax
                        By:  Marc Jones, Esq.
                             Jonesmarc@sec.gov
                             Alfred A. Day, Esq.
                             Daya@sec.gov

        For Defendants GREGORY LEMELSON and LEMELSON CAPITAL
        MANAGEMENT, LLC:

                LIBBY HOOPES
                399 Boylston Street
                Boston, Massachusetts 02116
                617.338.9300
                617.338.9911 fax
                        By:  Douglas S. Brooks, Esq.
                             Dbrooks@libbyhoopes.com

        For LIGAND PHARMACEUTICALS and BRUCE VOSS:
                CAHILL GORDON & REINDEL LLP
                1900 K Street, Suite 950
                Washington, D.C., 20006
                202.862.8900
                202.862.8958 fax
                        By:  Sean P. Tonolli, Esq.
                             Stonolli@cahill.com
                             Bradley J. Bondi, Esq.
                             Bbondi@cahill.com
                             William C. McCaughey, Esq.
                             Wmccaughey@cahill.com

BRUCE VOSS                                         December 3, 2019

Page 4

APPEARANCES (Continued):


The Videographer:

        Ryan Asanas

        Key Discovery


Also present:

        Gregory Lemelson

BRUCE VOSS                                    December 3, 2019

Page 5

INDEX

WITNESS:  BRUCE VOSS

                                                      PAGE
EXAMINATION BY MR. BROOKS                               12

EXHIBITS

DEFENDANT'S                                           PAGE
Exhibit 75      E-mail string, top e-mail to            39
                various recipients from Bruce
                Voss dated 6/16/2014, Bates Nos.
                LCM_SEC0000220 to '221
Exhibit 76      E-mail to Bruce Voss from John          52
                Higgins dated 6/17/2014, Bates
                Nos. LCM_SEC0000826
Exhibit 77      E-mail string, top e-mail to            59
                John Higgins from Bruce Voss
                dated 6/17/2014, Bates Nos.
                LCM_SEC0000259 to '261

Exhibit 78      E-mail string, top e-mail to            79
                John Higgins from Bruce Voss
                dated 6/17/2014, Bates Nos.
                LCM_SEC0000276 to '279
Exhibit 79      E-mail string, top e-mail to            85
                Keith Lippert from Bruce Voss
                dated 6/17/2014, Bates Nos.
                LCM_SEC0000289 to '292
Exhibit 80      E-mail string, top e-mail to            91
                Matt Foehr from Bruce Voss dated
                6/17/2014, Bates Nos.
                LCM_SEC0000295 to '296
Exhibit 81      E-mail string, top e-mail to            95
                John Higgins and Matt Foehr from
                Bruce Voss dated 6/17/2014,
                Bates Nos. LCM_SEC0000303 to
                '306

BRUCE VOSS                                December 3, 2019

                              EXHIBITS
          DEFENDANT'S                                      PAGE
          Exhibit 82    Top page says, "This document       103
                        was produced natively, and
                        attached notes of Bruce Voss,
                        Bates Nos. LCM_SEC0000001 to
                        '002

          Exhibit 83    E-mail string, top e-mail to        132
                        John Higgins and Matt Foehr from
                        Bruce Voss dated 6/18/2014,
                        Bates Nos. LCM_SEC0000316 to
                        '318

          Exhibit 84    E-mail to Bruce Voss from John      139
                        Higgins dated 6/20/2014, Bates
                        Nos. LCM_SEC0000883

          Exhibit 85    E-mail string, top e-mail to        144
                        John Higgins from Bruce Voss
                        dated 6/20/2014, Bates Nos.
                        LCM_SEC0000324 to '325


          Exhibit 86    E-mail to Matt Foehr from Bruce     159
                        Voss dated 6/20/2014, Bates Nos.
                        LCM_SEC0000323


          Exhibit 87    E-mail string, top e-mail to        164
                        John Higgins from Bruce Voss
                        dated 6/20/2014, Bates Nos.
                        LCM_SEC0000327 to '328

          Exhibit 88    Draft #1, June 20, 2014, Ligand     164
                        Pharmaceuticals Response to the
                        Lemelson Capital Management
                        Report, Bates Nos.
                        LCM_SEC0000332 to '333

          Exhibit 89    E-mail string, top e-mail to        172
                        Matt Foehr and John Higgins from
                        Bruce Voss dated 6/20/2014,
                        Bates Nos. LCM_SEC0000329 to
                        '330

BRUCE VOSS                                    December 3, 2019

EXHIBITS

| DEFENDANT'S | | PAGE |
|---|---|---|
| Exhibit 90 | E-mail to John Higgins and Matt Foehr from Bruce Voss dated 6/20/2014, Bates Nos. LCM_SEC0000331 | 173 |
| Exhibit 91 | E-mail string, top e-mail to Matt Foehr and John Higgins from Bruce Voss dated 6/20/2014, Bates Nos. LCM_SEC0000334 to '337 | 179 |
| Exhibit 92 | E-mail string, top e-mail to Bruce Voss from John Higgins dated 6/20/2014, Bates Nos. LCM_SEC0000902 to '907 | 188 |
| Exhibit 93 | E-mail string, top e-mail to John Higgins from Bruce Voss dated 6/23/2014, Bates Nos. LCM_SEC0000346 to '350 | 189 |
| Exhibit 94 | E-mail string, top e-mail to Fr. Lemelson from Bruce Voss dated 6/23/2014, Bates Nos. LCM_SEC0000351 to '352 | 191 |
| Exhibit 95 | E-mail string, top e-mail to Erika Luib from Bruce Voss dated 6/23/2014, Bates Nos. LCM_SEC0000354 to '359 | 195 |
| Exhibit 96 | E-mail string, top e-mail to Bruce Voss from John Higgins dated 6/24/2014, Bates Nos. LCM_SEC0000923 to '924 | 200 |
| Exhibit 97 | E-mail string, top e-mail to Bruce Voss from John Higgins dated 6/24/2014, Bates Nos. LCM_SEC0000928 to '930 | 204 |
| Exhibit 98 | E-mail string, top e-mail to Bruce Voss from Matt Foehr dated 6/25/2014, Bates Nos. LCM_SEC0000936 to '937 | 207 |

BRUCE VOSS                                December 3, 2019

Page 8

EXHIBITS

| DEFENDANT'S | | PAGE |
|---|---|---|
| Exhibit 99 | E-mail string, top e-mail to John Higgins from Matt Foehr dated 7/7/2014, Bates Nos. LCM_SEC0000991 to '1005 | 217 |
| Exhibit 100 | E-mail string, top e-mail to various recipients from John Higgins dated 7/9/2014, Bates Nos. LCM_SEC0001027 | 221 |
| Exhibit 101 | E-mail string, top e-mail to Bruce Voss from Erika Luib dated 7/14/2014, Bates Nos. LCM_SEC0001036 to '037 | 225 |
| Exhibit 102 | E-mail string, top e-mail to Bruce Voss from Erika Luib dated 6/12/2014, Bates Nos. LCM_SEC0000806 to '808 | 229 |
| Exhibit 103 | E-mail string, top e-mail to Bruce Voss from Vincent dated 7/14/2014, Bates Nos. LCM_SEC0001038 to '039 | 230 |
| Exhibit 104 | E-mail string, top e-mail to John Higgins from Bruce Voss dated 7/22/2014, Bates Nos. LCM_SEC0000431 to '433 | 230 |
| Exhibit 105 | E-mail string, top e-mail to Bruce Voss from Erika Luib dated 8/14/2014, Bates Nos. LCM_SEC0001084 to '085 | 242 |
| Exhibit 106 | E-mail string, top e-mail to John Higgins and Charles Berkman from Bruce Voss dated 8/18/2014, Bates Nos. LCM_SEC0000491 to '495 | 247 |
| Exhibit 107 | E-mail string, top e-mail to Bruce Voss from John Higgins dated 8/19/2014, Bates Nos. LCM_SEC0001133 to '138 | 252 |

BRUCE VOSS                                    December 3, 2019

Page 9

EXHIBITS

| DEFENDANT'S | | PAGE |
|---|---|---|
| Exhibit 108 | E-mail to Randy Osborne from Bruce Voss dated 9/5/2014, Bates Nos. LCM_SEC0000524 | 261 |
| Exhibit 109 | E-mail string, top e-mail to John Higgins, Matt Foehr and Charles Berkman from Bruce Voss dated 9/23/2014, Bates Nos. LCM_SEC0000528 to '535 | 263 |
| Exhibit 110 | E-mail string, top e-mail to Matt Foehr from Bruce Voss dated 9/23/2014, Bates Nos. LCM_SEC0000543 to '544 | 267 |
| Exhibit 111 | E-mail string, top e-mail to Jody Burfening from Bruce Voss dated 11/17/2014, Bates Nos. LCM_SEC0000578 to '579 | 270 |
| Exhibit 112 | E-mail string, top e-mail to Bruce Voss from John Higgins dated 10/27/2015, Bates Nos. LCM_SEC0000676 to '682 | 289 |
| Exhibit 113 | E-mail string, top e-mail to Bruce Voss from Todd Pettingill dated 5/14/2015, Bates Nos. LCM_SEC0001268 to '270 | 299 |
| Exhibit 114 | E-mail string, top e-mail to John Higgins from Bruce Voss dated 10/27/2015, Bates Nos. LCM_SEC0000102 to '108 | 302 |
| Exhibit 115 | E-mail string, top e-mail to Bruce Voss from Matt Foehr dated 3/18/2016, Bates Nos. LCM_SEC0000755 to '757 | 303 |

BRUCE VOSS                                    December 3, 2019

PREVIOUSLY MARKED EXHIBITS

EXHIBIT NO.                    PAGE

        4                       33

BRUCE VOSS                                              December 3, 2019

Page 11

1          SAN DIEGO, CALIFORNIA; TUESDAY, DECEMBER 3, 2019

2                      8:57 A.M. - 5:52 P.M.

3

4          THE VIDEOGRAPHER:  We are now on the record.

5     Today's date is December 3rd, 2019, and the time is

6     8:57 a.m.  This begins the video-recorded deposition of

7     Bruce Voss being taken in the matter of SEC versus

8     Lemelson Capital Management, LLC, on behalf of the

9     defendants, pending in the United States District

10    Court, District of Massachusetts, Case

11    No. 1:18-CU-11926-PBS.

12          This deposition is taking place at Aptus

13    Court Reporting located at 600 West Broadway,

14    Suite 300, San Diego, California 92101.  My name is

15    Ryan Asanas, the videographer, of Key Discovery.

16          Will all counsel please identify yourselves

17    and state whom you represent starting with the taking

18    attorney.

19          MR. BROOKS:  Good morning.  Doug Brooks, law firm

20    of Libby Hoopes, and I represent the defendants in this

21    matter.

22          MR. JONES:  Good morning.  Marc Jones for the

23    plaintiff, Securities and Exchange Commission.

24          MR. DAY:  Al Day for the Securities and Exchange

BRUCE VOSS                                    December 3, 2019

Page 12

1    Commission.

2        MR. BONDI:  Brad Bondi of Cahill Gordon & Reindel

3    for the witness, Bruce Voss.

4        MR. McCAUGHEY:  William McCaughey of Cahill Gordon

5    for Bruce Voss.

6        MR. TONOLLI:  Sean Tonolli of Cahill Gordon on

7    behalf of Mr. Voss.

8        THE VIDEOGRAPHER:  Thank you.  The court reporter

9    today is Sheri Somers also with Key Discovery, and she

10   may now swear in or affirm the deponent.

11

12                     BRUCE VOSS,

13   having been administered an oath, was examined and

14   testified as follows:

15

16                     EXAMINATION

17   BY MR. BROOKS:

18       Q.   Good morning, Mr. Voss.  We met briefly off

19   the record.  My name is Doug Brooks and I represent the

20   defendants in this matter.

21            Can you please state and spell your last name

22   for the record.

23       A.   Last name is Voss, V -- like "Victor" --

24   o-s-s -- like "Sam."

BRUCE VOSS                                December 3, 2019

Page 27

1        **A.**    Yes, I did.

2        **Q.**    Is that something you knew prior to

3   June 2014?

4        **A.**    That's always been the relationship between

5   Ligand and Promacta.  So as long as I've known about

6   Promacta, I've known it was a royalty-bearing product.

7        **Q.**    In June 2014, did you have an understanding

8   as to the importance of Promacta to Ligand?

9        **A.**    My understanding of the importance to of

10   Promacta to Ligand in June 2014 was that it was a very

11   important contributor to the company's revenues.

12        **Q.**    Where did you get that information from?

13        **A.**    Ligand, like all public companies, reports

14   financial results on a quarterly basis.  And so each

15   quarter we would be reporting what the royalty revenue

16   was from Promacta.  At that time we reported it for the

17   previous quarter.

18        **Q.**    What was your role in 2014 in terms of

19   Ligand's reporting?

20        MR. TONOLLI:  Objection.  Vague.  Financial

21   reporting or --

22        THE WITNESS:  Are you referring to quarterly

23   financial reporting --

24   BY MR. BROOKS:

BRUCE VOSS                                December 3, 2019

Page 63

1    conversation with Mr. Foehr.

2        Q.    What did Father Lemelson say in that phone

3    conversation that you had with him that led you to

4    think he wasn't open to rethinking anything?

5        A.    As I recall in that conversation, my

6    impression was that Father Lemelson was very closed

7    minded about everything he wrote as having a potential

8    other side of it or that it was wrong or that it was

9    incomplete.  He was hard and fast in his view in

10   support for his report.

11       Q.    As I mentioned, we'll get into that

12   conversation in more detail, but -- so sticking with

13   Exhibit 77 for now, do you see in the final paragraph

14   in Mr. Higgins' June 17 e-mail to you he references

15   Viking?

16       A.    I do.

17       Q.    Did you know what Viking was at the time?

18       A.    Viking -- yes.

19       Q.    When did you first hear about Viking?

20       A.    I don't recall when I first heard about them.

21       Q.    In June 2014, what was your understanding of

22   what Viking was?

23       A.    My understanding of Viking roughly at that

24   time was that Viking was a company that had licensed

BRUCE VOSS                                    December 3, 2019

Page 99

1            Do you see that?

2      **A.**   I do.

3      **Q.**   Other than this e-mail, do you know if he

4    ever provided you a proposed narrative in writing?

5      **A.**   I don't recall ever receiving a proposed

6    narrative in writing.

7      **Q.**   Do you recall ever seeing a proposed

8    narrative outside of this e-mail on a phone call with

9    Mr. Higgins?

10     **A.**   I don't follow, seeing on a phone call.

11     **Q.**   I misspoke.  I'm sorry.

12            So did you ever receive a proposed narrative

13   from Mr. Higgins on a phone call?

14     **A.**   I don't recall.

15     **Q.**   He then writes, "Specifically, in my proposal

16   I do not think the first call should be jump into

17   content or a rebuttal."

18            Do you see that?

19     **A.**   I do.

20     **Q.**   Did you agree with that suggestion?

21     **A.**   That's him making a suggestion.

22     **Q.**   Did you agree with it?

23     **A.**   It's -- was presented for consideration.

24     **Q.**   And what did you consider about it?

BRUCE VOSS                                     December 3, 2019

Page 100

1      **A.**    This is ultimately what happened.

2      **Q.**    Meaning ultimately that's the way the call

3   went --

4      **A.**    Right.

5      **Q.**    -- without jumping into content or rebuttal,

6   correct?

7      **A.**    I think what's key here is that he's --

8   Mr. Higgins is suggesting that I call Father Lemelson

9   first to feel him out for tone and approach.

10     **Q.**    Right.  And he's writing in that first call

11   he doesn't want you to jump into content or rebuttal,

12   correct?

13     **A.**    I don't -- I think what he's responding to is

14   that the previous suggestion was to have Matt on with

15   me because so much of Father Lemelson's report was

16   about topics where Matt is the subject matter expert.

17     **Q.**    Right.

18     **A.**    And I'm not sure that Mr. Higgins here was

19   talking in very definitive terms on content or

20   rebuttal.

21     **Q.**    So if you look at the fourth line down,

22   Mr. Higgins writes, "To me, if we jump right into

23   rebuttal mode without knowing our counterparty, it

24   seems we are less prepared for any call we could have

BRUCE VOSS                                    December 3, 2019

Page 120

 1       A.   I did not agree because that's not true.

 2       Q.   Did you recall stating that?

 3       A.   I don't recall a specific exchange on that

 4   topic.

 5       Q.   Okay.  What's the last line on page 1?

 6       A.   It says, "Our own KOL," which is key opinion

 7   leader, "research," rsch, "said Promacta," arrow sign,

 8   going to zero with Silvadi, misspelled, slash, "won't

 9   prosper under Novartis."

10       Q.   Okay.  And that's something that Father

11   Lemelson said?

12       A.   It is, yes.

13       Q.   Okay.  Did you agree with that?

14       A.   Absolutely not.

15       Q.   Did you say anything in response to that?

16       A.   Absolutely, yes.

17       Q.   What did you say in response to that?

18       A.   We had a conversation -- as part of this

19   conversation, we spoke about Promacta.  It's one of the

20   key elements of Father Lemelson's research report and

21   it's one of the comments that I had typed out ahead of

22   time to address during this call.  And this comment, as

23   I recall, is a concluding rather dismissive comment in

24   response to what I had told him is Ligand's view about

BRUCE VOSS                                December 3, 2019

Page 121

1    Promacta and Promacta's future.  I recall on that

2    conversation telling Father Lemelson that Promacta has

3    more approved indications than hepatitis C and more to

4    come and more geographies than it's in now, and I

5    recall speaking with Father Lemelson specifically about

6    the hepatitis C indication, expressing Ligand's point

7    of view that Sovaldi is not the category killer of that

8    drug for that indication.

9        **Q.**   Okay.  And you're saying that your

10   handwritten note on the bottom of page 1 was his

11   response to what you said?

12       **A.**   I believe it is.

13       **Q.**   Okay.  Let's turn to page 2.  What's at the

14   top of page 2?

15       **A.**   "LGND," which Ligand, "not now diversified,

16   maybe in the future/gives no credence to potential

17   future revenues."  That's a combination of Father

18   Lemelson saying that Ligand is not diversified in terms

19   of its revenue stream or its business or its

20   technology.  Maybe it will be in the future.  And then

21   my comment -- my writing is that Father Lemelson gives

22   no credence to any potential future revenues.

23       **Q.**   Okay.  Did you agree with Father Lemelson's

24   statement in that regard?

BRUCE VOSS                                    December 3, 2019

Page 122

1      **A.**   No.

2      **Q.**   Did you voice your disagreement on the call?

3      **A.**   I recall having a conversation that with

4    development-stage technology in biotechnology

5    companies, the future is what it's all about.  It's not

6    about the here and now.  These are high growth,

7    entrepreneurial, earlier stage companies.

8      **Q.**   And did Father Lemelson respond to that?

9      **A.**   As I recall, he had -- he gives no credence

10   and no value to things that might happen in the future.

11     **Q.**   I see.  What's the next line?

12     **A.**   It says, "Bird in hand versus two in bush,"

13   which is Father Lemelson saying a bird in the hand is

14   worth two in the bush, which relates to exactly what I

15   just said.  The current and historic financial

16   performance is worth two of those in the future.

17     **Q.**   And you disagreed with that?

18     **A.**   I wrote this as a note as just a phrase that

19   he had said, but, yes, I disagreed with that as with

20   the previous point.

21     **Q.**   What about next line?

22     **A.**   "Company has negative equity."

23     **Q.**   And did you disagree with that?

24     **A.**   I don't recall whether or not we had a

BRUCE VOSS                                    December 3, 2019

Page 124

1    accounting convention.

2        Q.    Do you recall having a specific back and

3    forth with Father Lemelson on this call on any of those

4    things you just read?

5        A.    I don't recall specifically other than I do

6    recall that at this point in the conversation, it was

7    becoming increasingly clear that Father Lemelson was

8    not open to Ligand's view of really anything, from

9    Promacta to how they prepare their financial

10   statements, on and on.

11       Q.    What's next?

12       A.    Over on the right it says, "But what could

13   they disclose to me that's not public?"  And that's

14   attributed to Father Lemelson, what could Ligand tell

15   me in a conversation that I don't already know from

16   public information.

17       Q.    Okay.  Did you respond to that?

18       A.    No.  That's more just an observation from him

19   that if I were to talk to them, I'm not going to get

20   anything new.

21       Q.    Did you agree with that?

22       A.    I don't recall if I responded to that

23   statement or not.

24       Q.    Internally did you agree or disagree with

BRUCE VOSS                                      December 3, 2019

Page 131

 1              Do you recall anything that Father Lemelson

 2    said during your June 18, 2014 telephone conversation

 3    that is not written in your notes that are Exhibit 82,

 4    I believe?

 5         A.   There's a lot he said not in these notes.  I

 6    don't recall all of it.  The notes are not a

 7    transcription of the call.  They are my best ability.

 8    But to answer your question, I recall that Father

 9    Lemelson had a pattern of speech during that call where

10    after many of his statements he would say the phrase,

11    "Don't you agree?"  But the way he said it was just

12    that, it was a pattern of speech.  It was a very

13    dismissive, "Don't you agree?" and then the

14    conversation would go on.  And it struck me as just a

15    personal tick that I hadn't heard before, which is why

16    I remembered it.

17         Q.   And in response to him saying, "Don't you

18    agree?" did you explicitly disagree as to any of his

19    points when he phrased it like that?

20         A.   I don't recall specifically addressing any of

21    those because, like I said, they were so regular and

22    they were so basically dismissive that they were just

23    part of his speech pattern.

24         Q.   And I believe -- is it one of your

BRUCE VOSS                                    December 3, 2019

Page 132

1   contentions that one of the times he said that was

2   about his comment about Promacta going away or words to

3   that effect?

4        A.   I believe that was one of the times he used

5   it.

6        Q.   When else did he use that verbal tick, as you

7   referred it to?

8        A.   I recall he used it a lot.

9        Q.   Do you recall any other specifics?

10       A.   I recall -- no.  Not specifically, no.

11       Q.   Mr. Voss, you are being shown what's been

12   marked as Exhibit 83.  Do you see that?

13       A.   I do.

14            (Exhibit 83 was marked for identification.)

15       Q.   Take a moment to look at it and let me know

16   if you recognize this document.

17       A.   I recognize it and I've read it.

18       Q.   Okay.  Is it fair to say that at the bottom

19   of the first page of this exhibit it's -- you reach out

20   to Mr. Foehr and Mr. Higgins to schedule a call to

21   discuss your call with Father Lemelson?

22       A.   That's right.

23       Q.   Did you speak with anyone other than

24   Mr. Foehr and Mr. Higgins on the day of your call with

BRUCE VOSS                                           December 3, 2019

Page 133

1    Father Lemelson about the call with Father Lemelson?

2         **A.**    Before or afterwards?

3         **Q.**    I'm sorry.  Well, after your call with Father

4    Lemelson, did you speak with anyone before you ended up

5    speaking with Mr. Foehr and Mr. Higgins?

6         **A.**    As I recall, the first time I spoke about my

7    call with Father Lemelson was in a group debrief.

8         **Q.**    With who on -- who was part of that group

9    debrief?

10        **A.**    I don't recall specifically.  I would be

11   speculating if I said who was on the debrief.  I don't

12   have notes.

13        **Q.**    Was Mr. Higgins on that call?

14        **A.**    Definitely John Higgins was on the call,

15   definitely Matt Foehr was on the call.  What I don't

16   recall is whether Charles Berkman was on it or whether

17   Nishan was on it or anybody else.

18        **Q.**    Understanding you don't remember whether

19   those people were specifically on the call, do you

20   recall for certain that other people were on the call

21   or no?

22        **A.**    I don't recall the details, no.

23        **Q.**    Okay.  With your notes that are Exhibit 82,

24   did you ever type those up?

BRUCE VOSS                                        December 3, 2019

Page 146

1       Q.    So if you go down in that first paragraph of

2   your thing towards the end, do you see where, three

3   lines up, it says, "As I wrote last night"?

4       A.    I see that.

5       Q.    You said, "As I wrote last night, he made

6   that statement with a rhetorical, "Don't you agree?"

7   and I moved on to the next subject as we had more to

8   cover and his statement was ridiculous."

9             What were you referring to there?

10      A.    This refers to a comment Father Lemelson made

11  during the Benzinga interview whereby he mentioned that

12  he had talked to Ligand's IR representative, meaning

13  me, and that I had said to him in agreement that we,

14  meaning Ligand, agree and know that Promacta is going

15  to go to zero in sales.

16      Q.    Okay.  And that's what you're referring to in

17  that sentence I just read, correct?

18      A.    That's the statement that I'm referencing.

19      Q.    You wrote, "As I wrote last night."  Do you

20  know what you're referring to there?

21      A.    I don't.

22      Q.    So I'll just represent for the record that we

23  do not have any e-mails from you from -- that relate to

24  this in any way from the prior night.  So to the extent

BRUCE VOSS                                          December 3, 2019

Page 194

1   not.

2       **A.**   I think we have the report.

3       **Q.**   I meant in your interview, though.

4       **A.**   Oh, I don't recall specific word choice KOL

5   being used or not.

6       **Q.**   You mentioned something about the -- I think

7   the revenues from Promacta sales in 2018?

8       **A.**   Right.

9       **Q.**   Do you know whether or not the demand for

10  Promacta increased from 2014 to 2018?

11      **A.**   Meaning sales increased or the demand?

12      **Q.**   Demand, not sales.

13      **A.**   I'm going to take demand to mean sales.

14  Sales of Promacta, end-user sales by GSK and ultimately

15  Novartis did increase from 2014 to 2018.

16      **Q.**   Are you talking about based on dollars?

17      **A.**   I'm talking about revenue.  So sales in

18  dollars.

19      **Q.**   Were there price increases in Promacta

20  between 2014 and 2018?

21      **A.**   I don't know.  It wasn't my client's drug to

22  commercialize.

23      **Q.**   So you don't know one way or another whether

24  or not the increase in sales between 2014 and 2018 was

BRUCE VOSS                                     December 3, 2019

Page 210

1   we'd like to consider it, there's always the option of

2   engaging a private investigator to check out Emmanuel,

3   Lemelson Capital, and Lantern."

4            Did you -- did Ligand, to your knowledge,

5   ever engage a private investigator?

6       **A.**   Not to my knowledge.  I don't know.

7       **Q.**   Do you know why it did not?

8       **A.**   They may have.  I don't know if they did or

9   they did not.

10      **Q.**   You then wrote, "I think we all agree the

11  whole situation has a stench to it, but we can't quite

12  put our finger on it."

13           What did you mean by that?

14      **A.**   It gets back to the earlier conversation of

15  it's one thing to have a short report.  It's another

16  thing to have a short report with a price target of

17  zero.  And then it gets into the conversation I had

18  with Father Lemelson and the subsequent report whereby

19  lies were reported about that conversation.  So the

20  whole situation between the report, the content of the

21  report, how it was being marketed or merchandised or

22  publicized all seemed a little bit suspicious.  It was

23  not -- it was not typical.

24      **Q.**   I think you just testified that lies were

BRUCE VOSS                                    December 3, 2019

Page 211

1   said about your conversation with Father Emmanuel?

2       **A.**   Correct.

3       **Q.**   Now, I understand you disagreed with what he

4   attributed to you concerning Promacta.  What are the

5   other lies that you're alleging that he said about your

6   interview?

7       **A.**   That's the lie.  It should be singular.

8       Q.   Were you aware of any other individuals or

9   entities that released short reports about Ligand in

10  2014?

11      A.   I don't believe any others were issued in

12  2014.

13      Q.   So in a few of these e-mails that we've

14  looked at so far, Mr. Voss, you've mentioned either

15  Father Lemelson's foundation or his religion or the

16  fact that he's a priest.  Did you view that as having

17  any relevance here?

18      MR. JONES:  Objection to the characterization.

19      THE WITNESS:  I have total respect to men of the

20  cloth.  So no, there was no personal harm intended.

21  BY MR. BROOKS:

22      Q.   Mr. Voss, if you look up at your -- sorry.

23  Yes.  If you look up at Mr. Higgins' e-mail in response

24  to yours, the one dated June 24, 2014 at 11:47 p.m.?

BRUCE VOSS                                          December 3, 2019

Page 212

1        A.    Yes.

2        Q.    You'll see in the second paragraph of this

3    his e-mail, third line down, Mr. Higgins writes,

4    "Generally they were disregarding the report and not

5    giving it credence, but nonetheless it's a distraction

6    for investors and a drag on our meetings."

7              Do you see that?

8        A.    I do.

9        Q.    And did you understand that Mr. Higgins was

10   saying that the investors he had spoken with were not

11   giving Father Lemelson's report much credence?

12       A.    I understand that's what he heard or

13   interpreted from those investors.  I would add, if I

14   might, you can't always trust what people say.  And an

15   investor may say to your face, "I don't give this

16   report any credence," but they really do, or it has

17   sewn the seeds of doubt and they are still wrestling

18   with that, but when you're speaking to management, they

19   may take the position of I'm dismissing this because

20   they feel that's what management needs or wants to

21   hear.

22       Q.    Are you aware, sitting here today, of any

23   investors who gave credence to Father Lemelson's

24   reports?

BRUCE VOSS                                          December 3, 2019

Page 213

1       **A.**   I received a number of calls on the report

2   and the calls in the main were from investors who were

3   very concerned and they were very worried and they

4   wanted assurances that the report was inaccurate.  They

5   came to me with the bias that the report was inaccurate

6   but wanted to talk to a company representative.

7   Whether they -- after our conversation, whether they

8   truly dismissed the report or not, I don't know.

9       **Q.**   Did you tell those investors that the report

10  was inaccurate?

11      **A.**   I was very specific and firm with those

12  investors saying, in essence, we disagree with

13  everything in that report.

14      **Q.**   And the calls you've just described, what --

15  over what period of time did those take place?

16      **A.**   They went on for a long time.  There was

17  definitely a bolus of calls at the time the initial

18  research report was made public, and then they would

19  continue sometimes catalyzed by new announcements by

20  Father Lemelson or sometimes they'd just be out of the

21  blue.

22      **Q.**   What do you recall were the issues that those

23  investors raised specifically?

24      **A.**   My recollection of those phone calls were

BRUCE VOSS                                          December 3, 2019

Page 214

1    that, pretty much to a call, they were very general,

2    that they didn't go point by point into the report.

3    Frankly, there are too many points in the report and

4    none or a few did not necessarily stand out to those

5    investors.  It was just the whole of what was being

6    said with the zero price target.

7         Q.   Was the zero price target of particular

8    import to the investors that called you?

9         A.   It's of import because frankly I think it

10   discredited the report.  I think when you have a zero

11   price target, that's saying the company is worth

12   nothing.  And you can argue about different aspects of

13   the company and what they might be worth, but to say

14   there's nothing there of any value is a really

15   egregious statement.

16        Q.   Why, as of June 2014, was the statement that

17   the value of Ligand was zero so egregious, in your

18   opinion?

19        A.   The company had a one- to two billion dollar

20   market cap and had built up that market cap over time

21   under the new business model.  So it wasn't like a

22   massive spike flash market cap.  It was earned over

23   time.  You had a number of sell-side analysts saying

24   that the price target is actually higher then where it

BRUCE VOSS                                    December 3, 2019

Page 215

1    is.  It's not overvalued.  There is more room for this

2    stock to go.  And I know management and they very, very

3    credible.  They are not con men.  They are not running

4    a business that is a sham.  They are extremely

5    transparent.  And to hear that all that is worth zero

6    it's -- it's so farfetched as to be meaningless.  And

7    I'd add I would speculate that price target was created

8    for shock value because surely there was some value in

9    that company, no matter how you look at it.

10        Q.   Do you recall any investors calling you and

11   specifically raising the issue that you or someone with

12   the investor relations firm had basically agreed that

13   Promacta was going away?

14        A.   None.  I got zero calls that flagged that.

15        Q.   Did you get any calls from investors

16   concerning Father Lemelson's reports regarding anything

17   he said about Viking Therapeutics?

18        A.   As I mentioned, I don't believe any of the

19   calls I got went into any specific detail or aspect of

20   the report.  It was the report as a whole, is there

21   validity to this or not, and my response was we take

22   exception with virtually everything that's in that

23   report.

24        Q.   Just to be clear we're talking about the same

BRUCE VOSS                                    December 3, 2019

Page 216

1   thing, because you're saying "report" singular.  You

2   understand, because I think you've testified, that

3   Father Lemelson ended up writing several reports

4   about --

5        A.   He did.  And it was an evolution of the

6   initial viewpoint.

7        Q.   Okay.  So I guess my question is, at any

8   point do you recall investors calling up and

9   specifically asking you questions about Father

10  Lemelson's allegations that concerned Viking

11  Therapeutics?

12       A.   I don't recall any conversation regarding

13  Viking.  I just want to add --

14       MR. TONOLLI:  There's not a question pending.

15  BY MR. BROOKS:

16       Q.   What were you going to add, Mr. Voss?

17       A.   I forgot.

18       Q.   Is it your testimony that you really forgot

19  what you were about to add?  That's your testimony here

20  today?

21       MR. JONES:  Objection.

22       THE WITNESS:  I am -- I did not forget, but I am

23  not going to state what I was going to state.

24  BY MR. BROOKS:

BRUCE VOSS                                  December 3, 2019

Page 217

1        Q.   And why not?

2        A.   Because at the advice of counsel, I have not

3   been asked a question.

4        Q.   Now you have.

5             Are you instructing him not to answer?

6        MR. TONOLLI:  No.  He's now asked you -- the point

7   is, he asks questions, you answer them.  But when he's

8   not asking questions, you don't answer in the meantime.

9   BY MR. BROOKS:

10       Q.   What were you going to add, Mr. Voss?

11       A.   I was going to add that -- I believe I keep

12  using the word -- and now I really am forgetting -- in

13  referring to Father Lemelson's report as his opinion,

14  and "opinion" is not really the right word to refer to

15  that report because an opinion is an interpretation of

16  facts and has some truth to it, and that report was not

17  an opinion.  That report was just very egregiously off.

18       Q.   And, again, are you talking about the June 16

19  report or all five of his reports?

20       A.   They are kind of one in the same, but

21  specifically the June 16 report.

22       MR. BROOKS:  Now that nobody is talking, we'll

23  mark it.

24             (Exhibit 99 was marked for identification.)

BRUCE VOSS                                    December 3, 2019

Page 234

1      Q.    Did -- regardless of whether you responded,

2  did you agree with it?

3      A.    He said the same thing in his first e-mail.

4  He said, "Will there be any legal action taken against

5  Lemelson Management?"  So clearly this person had

6  litigation on his mind.

7      Q.    Did you agree that litigation should be

8  commenced against Father Lemelson?

9      A.    I am not an attorney, so I don't know if,

10  when, understand what circumstances it might be

11  brought.

12      MR. TONOLLI:  Is this a good time to take a break?

13      MR. BROOKS:  Yes, it is.

14      THE VIDEOGRAPHER:  Going off the record at

15  3:41 p.m.

16          (Recess.)

17      THE VIDEOGRAPHER:  We are back on the record at

18  3:53 p.m.

19  BY MR. BROOKS:

20      Q.    Mr. Voss, earlier you testified about calls

21  that you received from investors of Ligand concerning

22  Father Lemelson, correct?

23      A.    I did.

24      Q.    Do you know approximately how many such calls

BRUCE VOSS                                    December 3, 2019

Page 235

1    there were?

2        A.    I'd be estimating because I don't keep a

3    formal call log, and it definitely ebbed and flowed.

4    But around the time of the June 16 report and the

5    subsequent weeks, I would estimate 20, 25 calls,

6    thereabouts.

7        Q.    And then -- so overall more than 25, would

8    you say?

9        A.    If yes, not a lot.  In that ballpark.

10       Q.    And by that I meant, there were -- you said

11   20 to 25 in that time period and then there were

12   others.  So I meant overall did you field -- have you

13   field 25 calls from investors concerning Father

14   Lemelson?

15       MR. TONOLLI:  Object just to clarify the time

16   frame.

17       MR. BROOKS:  I mean any time.  That's what I'm

18   talking about.

19       THE WITNESS:  A lot of the calls I received about

20   Father Lemelson and his report were more in the early

21   weeks and then maybe a few stragglers later on.

22   BY MR. BROOKS:

23       Q.    Okay.  When's the last time you remember

24   receiving a call from an investor concerning Father

BRUCE VOSS                                    December 3, 2019

Page 236

1   Lemelson?

2       A.   I don't have a last call in mind, moreover a

3   date.

4       Q.   Mr. Voss, you've just been handed what's been

5   marked as Exhibit 104.  If could you take a look and

6   let me know --

7            (Exhibit 104 was marked for identification.)

8       A.   Okay.  I've read it.

9       Q.   Are you familiar with Empire Asset Management

10  Company?

11      A.   I am not.

12      Q.   Do you recall receiving Exhibit 104 back in

13  July of 2014?

14      A.   I don't recall receiving it then, and as I

15  read it now, it's not really even coming back to me.

16      Q.   Mr. Higgins forwarded you the Empire report,

17  correct?

18      A.   Yes.  Actually I got it initially from Matt.

19      Q.   I'm sorry.  Mr. Foehr did.

20           Was that unusual?

21      A.   This e-mail chain is in July of 2014, so it's

22  a little more than a month after Father Lemelson's

23  initiation report.  So the information exchange was

24  pretty complete at that time.

BRUCE VOSS                                    December 3, 2019

Page 310

1            I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3            That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand,

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11           Further, that if the foregoing pertains to the

12   original transcript of a deposition in a federal case,

13   before completion of the proceedings, review of the

14   transcript [ X ] was [ ] was not requested.

15

16           I further certify I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or party to this action.

19           IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: December 16, 2019

23   _____

     Sheri L. Somers

24   CLR, CSR No. 9734

BRUCE VOSS                                      December 3, 2019

```
                                              Page 311
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3      I, BRUCE VOSS, hereby certify under penalty of

 4   perjury under the laws of the State of California that

 5   the foregoing is true and correct.

 6

 7      Executed this _____ day of _____, 2019

 8   at _____, California.

 9

10

11

12                         _____

13                                   BRUCE VOSS

14

15

16

17

18

19

20

21

22

23

24
```