United States District Court

District of Massachusetts


Securities and Exchange          )

Commission,                      )

       Plaintiff,               )   1:18-cv-11926-PBS

   v.                           )

Gregory Lemelson and Lemelson    )

Capital Management, LLC,         )

      Defendants,              )

  and                          )

The Amvona Fund, LP,             )

     Relief Defendant.         )

_____


Highly Confidential

30(b)(6) Video Deposition of LIGAND PHARMACEUTICALS

JOHN HIGGINS

San Diego, California

December 11, 2019


Reported by:

Veronica S. Thompson

CSR 6056, RPR, CRR, CCRR

KEY Discovery Job 371

JOHN HIGGINS                                    December 11, 2019

Page 2

United States District Court

District of Massachusetts


Securities and Exchange              )

Commission,                          )

            Plaintiff,               )   1:18-cv-11926-PBS

      v.                             )

Gregory Lemelson and Lemelson        )

Capital Management, LLC,             )

            Defendants,              )

      and                            )

The Amvona Fund, LP,                 )

            Relief Defendant.        )

_____



Highly Confidential

30(b)(6) Video Deposition of Ligand Pharmaceuticals

JOHN HIGGINS

was taken on behalf of Defendants at 600 West Broadway,

Suite 300, San Diego, California 92101, commencing at

9:03 AM and ending at 7:03 PM, on Wednesday,

December 11, 2019, before Veronica S. Thompson,

CSR 6056.

JOHN HIGGINS                              December 11, 2019

Page 3

APPEARANCES

For Plaintiff:
        U.S. Securities and Exchange Commission
        By:  Alfred A. Day, Sr. Trial Counsel
        33 Arch Street
        Boston, Massachusetts 02110
        617-573-4537
        daya@sec.gov

For Defendants:
        Libby Hoopes
        By:  Douglas A. Brooks, Esq.
        399 Boylston Street
        Boston, Massachusetts 02116
        617-338-9300
        dbrooks@libbyhoopes.com

For Ligand Pharmaceuticals, John Higgins, and Viking
Therapeutics:

        Cahill Gordon & Reindel LLP
        By:  Bradley J. Bondi, Esq.
        By:  Sean P. Tonolli, Esq.
        By:  William C. McCaughey, Esq.
        1990 K Street, N.W., Suite 950
        Washington, D.C. 20006
        202-862-8900
        bbondi@cahill.com
        stonolli@cahill.com
        wmccaughey@cahill.com
Also Present:
        Fr. Emmanuel Lemelson
Videographer:
        Daniel Bermudez, KEY Discovery

JOHN HIGGINS                                    December 11, 2019

                                                      Page 8

 1     SAN DIEGO, CALIFORNIA, DECEMBER 11, 2019, 9:03 AM

 2              VIDEOGRAPHER:  We are now on the record.

 3     Today's date is December 11, 2019, and the time is

 4     9:04 AM.

 5              This is the video deposition of John Higgins

 6     being taken in the matter of SEC versus Lemelson Capital

 7     Management LLC pending in the United States District

 8     Court, District of Massachusetts.

 9              We are at Aptus Court Reporting, San Diego.

10     My name is Daniel Bermudez of Aptus Court Reporting

11     located at 600 West Broadway, Suite 300, in San Diego,

12     California 92101.

13              Will counsel please identify yourself and

14     state whom you represent.

15              MR. BROOKS:  Yes.  Doug Brooks, law firm Libby

16     Hoopes, and I represent the defendants in this matter.

17              MR. DAY:  Al Day for the Securities and

18     Exchange Commission.

19              MR. McCAUGHEY:  William McCaughey, Cahill

20     Gordon & Reindel on behalf of Ligand Pharmaceuticals and

21     the witness.

22              MR. TONOLLI:  Sean Tonolli at Cahill Gordon &

23     Reindel representing John Higgins.

24              MR. BONDI:  Brad Bondi of Cahill Gordon &

JOHN HIGGINS                                    December 11, 2019

Page 9

1    Reindel on behalf of Ligand Pharmaceuticals and

2    Mr. Higgins.

3              VIDEOGRAPHER:  The court reporter today is

4    Veronica Thompson, and she may now swear in the witness.

5                        JOHN HIGGINS,

6        having been duly sworn, testified as follows:

7              MR. BROOKS:  Before we get going, let's put

8    the stipulations on the record that we've been using

9    throughout this case.

10             All objections and motions to strike other

11   than to the form are preserved until trial.

12             And will -- 30 days to read and sign the

13   transcript, but we'll waive the notary, and one

14   objection by the SEC or by deponent's counsel is good

15   for all.  Is that okay?

16             MR. DAY:  Yes.

17             MR. BONDI:  Agree.

18                       EXAMINATION

19   BY MR. BROOKS:

20       **Q.**   Good morning, Mr. Higgins.  We met briefly off

21   the record.  My name is Doug Brooks, and I represent the

22   defendants in this matter.

23             Have you ever been deposed before today?

24       **A.**   Yes.

JOHN HIGGINS                                    December 11, 2019

Page 31

1        **A.**    What -- so Amgen was a direct competitor.

2   There were other treatments available, but Amgen was

3   probably the most obvious.  It got approved the same

4   time period and commercially was probably the most

5   obvious competition for it.

6        **Q.**    Is that Nplate?

7        **A.**    Correct.

8        **Q.**    You've heard of Sovaldi.  Correct?

9        **A.**    Yes.

10       **Q.**    Did you view Sovaldi as a competitive threat

11   to Promacta?

12       **A.**    Promacta's a supportive care medicine.  It

13   boosts platelets.

14            Sovaldi is not a competitor in that Sovaldi

15   treats hepatitis.  Promacta does not.  But the

16   environment -- Sovaldi, Incivek -- there's a number of

17   drugs that was a new class of medicines that were

18   entering the space that were expected to have a very

19   significant impact on -- on the way hepatitis is

20   treated.  So we -- we were certainly aware of that

21   change in landscape, but, again, Sovaldi would not be

22   marketed against -- it's not like, "Hey, Doctor.  Use

23   Sovaldi instead of Promacta."  But we were certainly

24   aware of the evolution of the market space.

JOHN HIGGINS                                December 11, 2019

                                                        Page 33

 1   not be available.  So we're looking at GSK and

 2   eventually Novartis's plan to roll out and expand

 3   marketing of Promacta in markets where Sovaldi was

 4   not --

 5        Q.   So I think you've just testified to what you

 6   were looking at in terms of Sovaldi in 2014.  Did you

 7   come to any conclusions about how the introduction of

 8   Sovaldi into the marketplace would impact Promacta

 9   sales?

10             MR. BONDI:  Object to the form, timing.

11             THE WITNESS:  So Promacta had been approved in

12   '08 for ITP.  ITP was the -- not only the first

13   indication, it was then, and still is, the largest

14   market.  And what we're looking at with GSK is

15   understanding where are they.  It was their choice to

16   make.  Where are they seeing other -- other markets to

17   go after.

18             Typically, unless the drug is labeled for use,

19   it's not available for reimbursement.  So companies

20   realize you really do need to make that investment, get

21   the drug on-label.

22             So ITP was one part of our analysis where

23   we're realizing this market is growing.  It's going to

24   keep growing.  The new markets that are coming in, how

JOHN HIGGINS                                    December 11, 2019

Page 34

1   are they going to support the further growth?  We knew

2   there was chronic liver disease, other oncology

3   indications, aplastic anemia, and hepatitis in this

4   window, kind of 20- -- 2012 to 2014 is when not only was

5   GSK making progress getting the drug registered and

6   launched in markets, but it, coincidentally, was the

7   same period that these new hepatitis drugs were coming

8   on the market.  So there's a loss of analysis going on

9   about this new product, the new indication launching,

10  and then the other products entering the category as

11  well.

12  BY MR. BROOKS:

13       **Q.**    Okay.  Did you ultimately conclude at any

14  point that Sovaldi and the other new antivirals were

15  going to cause a decrease in Promacta sales?

16       **A.**    We did not conclude that, no.  We -- we

17  believed that without Sovaldi -- and in '08, '09, 2010,

18  the -- the opportunity to go into hepatitis supportive

19  care was in the plan for GSK.

20            So our understanding was ITP, hepatitis,

21  oncology -- this would be a label expansion strategy.

22  In 20- -- in '09, 2010, we were not aware of Sovaldi or

23  these other factors.  Okay.

24            The evolution of our thinking was Promacta

JOHN HIGGINS                              December 11, 2019

Page 35

1   would be a highly valuable product in the hepatitis

2   supportive care space, but as the market evolved and new

3   products came along, the sales would probably be

4   attenuated.  Not decrease, but instead of it being, you

5   know, some large quantity, it would be a smaller

6   quantity.  But if it's a new label and new territories

7   are launching, it would -- it would still grow and add

8   to the revenue trends over time.

9       Q.    Am I correct that in certain cases ITP is

10  caused by the hepatitis C virus?

11      A.    Not ITP.  Just to be clear.  Thrombocytopenia

12  is a condition of low platelets.  ITP is actually a

13  specific disease, but -- so -- so hepatitis -- hepatitis

14  result in low platelets.

15            So what happens is the virus resides in the

16  liver.  It destroys the liver.  The growth factor that

17  stimulates the production of platelets comes from the

18  liver.  So if you have a damaged liver because -- you

19  know, whether it's HIV or hepatitis A, B, C, liver

20  cancers, there's a whole variety of maladies.  If you

21  have a damaged liver, your liver cannot adequately

22  produce platelets.  The word thrombocytopenia means low

23  platelets.  So yeah.  So the -- the virus can cause --

24  does cause a damaged liver that result in low platelet

JOHN HIGGINS                                    December 11, 2019

Page 63

1   for hepatitis C if, for example, Sovaldi is a cure for

2   hepatitis C?

3            MR. BONDI:  Object to the form.

4            THE WITNESS:  Can you ask the question again.

5   BY MR. BROOKS:

6       Q.   Yeah.  Do you believe that -- strike that.

7            Do you understand that Sovaldi is a cure for

8   hepatitis C?

9       A.   Sovaldi is very effective at reducing the

10  virus in hepatitis -- in some hepatitis patients, but it

11  has not cured hepatitis.  I guess that's the connection

12  I'm trying to make.  It hasn't cured hepatitis.

13      Q.   Does it cure hepatitis in certain patients?

14      A.   It -- yes.

15      Q.   Okay.  So I guess my question is, if Sovaldi

16  cures hepatitis in certain patients, why is Promacta

17  still being used, if you know, on hepatitis C patients?

18      A.   One, Sovaldi is not approved in all markets.

19           Secondly, Sovaldi is not effective in all

20  patients.

21           And thirdly, it's a supportive care medicine,

22  so it doesn't treat the virus, but it helps rejuvenate

23  platelet production in damaged liver.  So if you have

24  hepatitis for 30 years, you can have a severely damaged

JOHN HIGGINS                                    December 11, 2019

Page 64

1   liver, or even after the fact the virus is gone, you're

2   protecting the body health going forward, but you still

3   need to help produce platelets.

4            So there are a number of factors, despite

5   Sovaldi's success -- and it's great drug, for sure --

6   but despite Sovaldi's success, there's a number of

7   factors where Promacta would still be used as a

8   supportive care medicine.

9   **Q.**   Is -- to your knowledge, is Promacta ever

10  given to hep C patients in the United States currently?

11  **A.**   In 2019 I'm -- I'm not current on that

12  information.

13  **Q.**   Okay.  Do you know if -- do you know if

14  Promacta was ever given to hep C patients in the United

15  States in 2018?

16  **A.**   I don't know exactly, but I presume it -- it

17  was.  It's still registered for hepatitis -- for use in

18  supportive care in hepatitis in the United States.

19  **Q.**   Mr. Higgins, I'm going to hand you what's been

20  previously marked as Exhibit 128.

21           So, Mr. Higgins, I'll ask you, once you've had

22  a chance to review it, whether or not you recognize

23  Exhibit 128 which appears to be a email exchange between

24  you and Mr. Foehr dated February 1, 2014.

JOHN HIGGINS                                    December 11, 2019

Page 99

1       **Q.**   And have you spoken with Mr. Foehr about his

2    deposition?

3       **A.**   No.

4       **Q.**   In the -- if you turn to the first page of

5    Exhibit 75, so the first email on the exhibit which

6    would be the last email in time, it's about a half-page

7    email from Mr. Voss.  Do you see that?

8       **A.**   Yes.

9       **Q.**   And he writes, "I've quickly read the report,

10   and here are my thoughts.  It's TBD what impact, if any,

11   this report will have on trading and valuation, but the

12   only reason we would respond publicly would be if there

13   were a meaningful negative impact and there were errors

14   we needed to address."  Do you see that?

15      **A.**   Yes.

16      **Q.**   Did you agree with that statement made by

17   Mr. Voss?

18      **A.**   Well, I agree with the first part.  It's to be

19   determined what impact it would have.

20      **Q.**   Okay.

21      **A.**   I do not agree that the only reason we'd

22   respond is if this or that.

23      **Q.**   Okay.  Did Ligand ever publicly respond to any

24   of Fr. Lemelson's reports or statements about the

JOHN HIGGINS                                    December 11, 2019

Page 100

1    company?

2        **A.**   We talked -- we talked with investors who

3    would have questions, calls, or emails.

4        **Q.**   Did Ligand ever make any kind of a public

5    statement?

6        **A.**   No.

7        **Q.**   Why not?

8        **A.**   We're certain of the -- the falseness, the

9    lies in the reports.  We're certain of that.  We didn't

10   know who Mr. Lemelson was, and we felt that this is so

11   off base, without a relationship, this -- this is going

12   to go away, this -- this will die out.  You know, it's a

13   rock thrown through our window, but it will go away.  We

14   felt that it was a hit job, somebody who admitted he was

15   short, to profit.  And so we were not going to publicly

16   talk about it or legitimize it.

17       **Q.**   You just said that the thought was that it

18   would go away.  Did it, in fact, go away?

19       **A.**   No.

20       **Q.**   Why then did Ligand never publicly respond to

21   Fr. Lemelson's reports or statements?

22       **A.**   It was crystal clear after the interviews and

23   then the successive reports, not only doubling down on

24   the lies but writing new lies, that this was illegal,

JOHN HIGGINS                                    December 11, 2019

Page 115

1      **Q.**   Uh-huh.

2      **A.**   Is that what you're asking?

3      **Q.**   That's what I'm asking about.

4      **A.**   Because, to be clear, the first report, I

5      don't believe he excluded cash.

6            In the August report he describes a financing

7      and says, This company just took on 225 million of debt,

8      and continued to go down -- well, tangible analysis, and

9      now they've got this extra liability, 225 million more

10     of liability.  So he just added that to his math that he

11     was doing, still not including intangible assets and not

12     including the net cash proceeds of that financing.

13     **Q.**   Are you referring to Fr. Lemelson's

14     debt-to-tangible equity ratio or something else?

15     **A.**   I -- I don't know exactly what -- how he was

16     describing, but it was this -- this message to investors

17     that -- I believe the number was like $11,000 of debt

18     for 1,000 -- for one dollar of tangible equity.  So

19     basically we are insolvent; that was false.  We were not

20     insolvent.

21            In my tenure with the company, we've never

22     been insolvent.  And it was a comment about manipulating

23     the presentation so that we're counting all of the

24     liability and then making this extreme conclusion that

JOHN HIGGINS                                    December 11, 2019

Page 116

1   there's near $12,000 versus -- of debt versus one dollar

2   of value.

3       **Q.**   Was it false that the debt-to-tangible equity

4   was approximately 11,000 to one?

5       **A.**   It -- the -- the message he gave is,

6   "Investors, you gotta get out now.  They can't cover

7   their debt," that bonds are going to be called.  "They

8   can't cover their debt.  Look -- and I'll tell you

9   why -- I've done the math.  There is 11,667 of debt for

10  a dollar of value.  Get out now."

11          And it's an analysis.  Investors don't --

12  don't -- he made up the analysis.  And then he chose

13  what he included or not.  It was a completely false

14  premise for how to present the underlying value of the

15  company.  Didn't give credit to intangibles, to the

16  value of royalties, to our tax assets.  So it completely

17  manipulated the story for -- for investors to draw the

18  conclusion that they should get out now to drive the

19  stock price down.

20      **Q.**   Was Fr. Lemelson's math wrong?

21      **A.**   His -- his A-plus-B may have been correct.

22  The formula he was trying to convince people to follow

23  was misplaced, and what he chose to include or not

24  include was misplaced.

JOHN HIGGINS                              December 11, 2019

Page 139

1    approximately?

2         A.   I do not recall.

3         Q.   Okay.  As best you can recall, tell me what

4    was said during that conversation.

5         A.   This was a call to get organized for this

6    pre-call.  Again, fairly standard operations the way we

7    work where Bruce will work to get us information about

8    our counter-party, the group we're going to be meeting

9    or speaking with.  And in this case, it was now two days

10   later after the report.  A tremendous distraction,

11   disruption.  Investors, board members, employees

12   calling.  The USA -- USA Today report came out.

13             And it was basically let's have a pre-call to

14   learn about this guy's background to tell him he's

15   wrong, this is way off base, to push back on that, and

16   to just ask him basic questions around his background

17   and where he got his ideas from and to try to get a

18   sense of his tone, his professionalism, his willingness

19   to listen to management.  We believed that we could

20   easily rectify and correct his views, to set this up as

21   a pre-call, then we would follow up with our -- the

22   management call that afternoon.

23        Q.   Other than what you've just testified to, do

24   you recall anything else that was said in your call with

JOHN HIGGINS                                    December 11, 2019

Page 143

 1   record shows, but --

 2        Q.   Okay.  Now, do you recall having a phone

 3   conversation with Mr. Voss after Mr. Voss had spoken to

 4   Fr. Lemelson?

 5        A.   Yes.

 6        Q.   Okay.  And what was your understanding of how

 7   soon after that -- strike that.

 8             What was your understanding of how soon after

 9   Mr. Voss's call with Fr. Lemelson that you spoke with

10   Mr. Voss?

11        A.   It was, I'd say, within an hour or two after

12   he called.

13        Q.   Was anyone else on this telephone call?

14        A.   I believe Matt was.  Matt Foehr.

15        Q.   Okay.  Anyone else?

16        A.   I don't recall.

17        Q.   Do you recall where you were during that phone

18   call?

19        A.   No.

20        Q.   But that was also on June 18?

21        A.   Correct.

22        Q.   So if I have the timeline correct, you spoke

23   to Mr. Voss on the morning of the 18th.  He then spoke

24   to Fr. Lemelson.  And then you later spoke to him about

JOHN HIGGINS                                    December 11, 2019

Page 161

1        **A.**    Yep.

2        **Q.**    Do you recall this email chain?

3        **A.**    Yes.

4        **Q.**    Okay.  So the bottom email appears to be a

5    draft email from Mr. Voss that -- to be sent to

6    Fr. Lemelson.  Correct?

7        **A.**    Correct.

8        **Q.**    Okay.  And above that, you see that Mr. Foehr

9    asked about looking to block Fr. Lemelson on

10    SeekingAlpha?

11        **A.**    I see that, yes.

12        **Q.**    Did you ever take any steps to try to block

13    Fr. Lemelson from SeekingAlpha?

14        **A.**    No.

15        **Q.**    Do you know if anybody at Ligand did?

16        **A.**    I'm not aware of anybody.

17        **Q.**    Okay.  So I'm handing you now -- we'll miss

18    that before.

19            So this is actually what was previously marked

20    as Exhibits 90 and 88.  So I think 90 was the email and

21    88 was the attachment because we originally kind of had

22    it attached to the wrong document.

23            MR. BONDI:  90 email, 88 attachment.  Right?

24            MR. BROOKS:  Yes.

JOHN HIGGINS                                    December 11, 2019

                                                          Page 162

 1              THE WITNESS:  Okay.

 2   BY MR. BROOKS:

 3        Q.   Just -- do you remember this email and the

 4   attachment?

 5        A.   Yes.

 6        Q.   Okay.  What was your understanding of the

 7   purpose of the attachment to the email?

 8        A.   It was a summary of our view of the

 9   circumstance.  We're getting a tremendous amount of

10   inquiries, calls.  And -- from -- from

11   everybody:  analysts, investors, some partners.  And so

12   we were basically documenting in a concise manner our

13   response, what we've been sharing, by putting it in a

14   written narrative.

15        Q.   Was that document ever used by Ligand?

16        A.   I do not recall.

17        Q.   Do you recall whether you or anyone at Ligand

18   made any edits to it?

19        A.   I do not recall.

20        Q.   Okay.  Mr. Higgins, I'll hand you what's been

21   previously marked as Exhibit 91 and ask you to take a

22   look and let me know if -- when you're finished.

23        A.   Okay.

24        Q.   All right.  So do you recall this email

JOHN HIGGINS                                    December 11, 2019

Page 168

1      **Q.**   Who did the analyses?

2      **A.**   A third-party biostatistician that this law

3   firm recommended.

4      **Q.**   Okay.

5            MR. BONDI:  And I just want to object to the

6   extent that it gets into the work product of our work

7   with an outside expert, but, for the record, Doug, we've

8   provided that to the SEC, and the SEC has provided that

9   to you.

10  BY MR. BROOKS:

11     **Q.**   Do you know the name of this outside party?

12     **A.**   Right off right now, I do not.

13     **Q.**   Did Ligand hire that outside party or did

14  counsel?

15           MR. BONDI:  Objection.  That calls for work

16  product, but it was -- counsel hired him.  We engaged

17  the expert, Doug.

18  BY MR. BROOKS:

19     **Q.**   Leaving that expert aside, did Ligand ever

20  perform any analyses of whether or not Fr. Lemelson's

21  statements impacted its stock price?

22     **A.**   So -- yes.  We did our own evaluation of

23  what's coming out, day of report, day of interviews.

24  Listening to the words and the verbal interviews of

JOHN HIGGINS                              December 11, 2019

Page 169

1    Mr. Lemelson boasting about his impact on the stock.

2    Our belief is these are damaging statements.  He's

3    telling people, "I've done the work; you haven't.  Get

4    out fast."

5              So our -- our antenna's up that he's really

6    trying to get people's attention.  And then he's

7    boasting about it.  "You see, while I'm talking, the

8    stock is down.  I rock the stock.  It's coming down even

9    more."

10             Over this period of time, it's all -- so we at

11   first were concerned this could have a negative impact

12   on the stock, but -- but then after seeing the weakness

13   over time and the sustained decline in our stock, we

14   were doing that analysis and kind of overlapping that.

15   We did not do a technical statistical regression

16   analysis.

17        Q.   Okay.  The analysis that you're talking about

18   done in-house at Ligand -- was that reduced to writing?

19        A.   It was reduced to slides or graphics.  You

20   know, we print a graph and then just study what happened

21   with the business in this period of time.

22             I've been doing this for 25 years.  Got a good

23   sense of execution, relationship with investors.  There

24   are positive events -- things work out -- and negative

JOHN HIGGINS                                    December 11, 2019

Page 170

1    events, but we're -- we're evaluating this period of

2    time in our news flow and our operations and overlaying

3    that with this -- this assault on the stock, and so

4    we -- we put that in writing in a graphical

5    illustration.

6         Q.   Who created that graphical illustration?

7         A.   I don't recall.

8         Q.   Were you involved in that process?

9         A.   Yes, suggesting, "Let's plot this period of

10   time and overlay."

11        Q.   Earlier you testified that Fr. Lemelson said,

12   "I rocked the stock."  When did he say that?

13        A.   It was in an interview.  There are times

14   when -- over -- I forget if there were three or four or

15   five interviews but a series of interviews with this

16   person named Joel -- I forget his last name, but --

17   where he would boast about the stock going down, either

18   inter-day, bragging about inter-day impact, bragging

19   about over this period of time.  Joel may have said, "I

20   rock the stock," or something.  I forget who said it,

21   but it was in that context.

22        Q.   In the 2014 time frame but prior to June 16,

23   2014, did you consider Ligand stock volatile?

24        A.   Yeah, I don't know if I thought about that

JOHN HIGGINS                                    December 11, 2019

Page 171

1    every day, but it was Ligand -- sure.  I mean, the stock

2    is volatile or -- or could be.

3         Q.   When you say "is," do you mean today?

4         A.   No.  Is back then.

5         Q.   All right.

6         A.   The question was --

7              (Reporter interrupts overlapping speakers.)

8    BY MR. BROOKS:

9         Q.   Let me ask again just so we get a clear

10   record.

11             Would you consider the Ligand stock to have

12   been volatile from January 1, 2014, to June 16, 2014?

13        A.   Reasonably so for a biotech company.  For what

14   we're operating, I'd say we were within the norms of

15   volatility.

16        Q.   Have you ever heard Mr. Voss refer to Ligand's

17   stock at any point in 2014 as trading at a frothy high?

18        A.   I do not recall.

19        Q.   Do you agree that Ligand stock traded at a

20   frothy high at any point in 2014?

21        A.   I -- I don't believe I ever thought that

22   during 2014.

23        Q.   At the time of Fr. Lemelson's June 2014

24   report, had Ligand been authorized to do a buyback?

JOHN HIGGINS                                    December 11, 2019

Page 189

1   again, the lies, the narrative was creating a drag on

2   our stock, and the concern was there'd be a

3   computer-driven amplification of what Lemelson wanted to

4   instigate to support his illegal stock trading to try to

5   benefit off of shorting.  So just trying to figure out

6   how our -- how we could have a relationship with these

7   investors if Carol's gone to try to talk with these

8   investors.

9       Q.    Did that computer-driven instigation that you

10  were concerned about come to pass?

11      A.    In this period of time, Lemelson's first

12  report until when he -- he claimed he shorted -- in that

13  period of time, we saw many interventions with his

14  research and interviews that was creating a negative

15  pressure on the stock.

16            Once he covered, and the day he said he

17  covered, shortly after the stock recovered, within that

18  period, it was impossible for us to know if the

19  computers were driving the trading or not, but certainly

20  Lemelson was having an impact on it.

21      Q.    You then said, "Obviously the remarks this

22  week by Yellen and now the Ukraine mess is impacting

23  biotech stocks further pressing our shares."  What

24  remarks by Yellen were you referring to?

JOHN HIGGINS                                December 11, 2019

Page 190

1      **A.**    She was the chairman of the Federal Reserve

2    and was just making remarks about the economy for

3    biotech or health care stocks at the time.

4      **Q.**    And, for the record, we're talking about Janet

5    Yellen?

6      **A.**    Janet Yellen, yes.

7      **Q.**    What -- do you recall specifically what she

8    said the week of July 14, 2014?

9      **A.**    I -- I do not recall specifically what she

10   said.  I -- I know in this summer there's some

11   commentary about the overall biotech industry.  I do not

12   recall what she said specifically, though.

13     **Q.**    Do you recall what you meant by "the Ukraine

14   mess"?

15     **A.**    Just a geopolitical strife.  You know, their

16   invasion of Russia into Crimea and how that was

17   impacting stock market.  So it's just a commentary about

18   these other events, the macro market events.

19     **Q.**    Okay.  And did those events have an impact on

20   Ligand's stock price?

21     **A.**    They had an impact on the macro markets.

22   These were not Ligand-specific issues.  Inasmuch as

23   Ligand trades in the market, it would have an impact

24   like it would on the other thousand publicly traded

JOHN HIGGINS                                    December 11, 2019

Page 191

1    biotech stocks up or down, but our trading was detached

2    from the macro markets.  I mean, we started to observe

3    that our performance was separated from the regular

4    trend lines.

5        Q.   Did Ligand ever conduct any analysis to

6    determine what changes in the stock price were due to

7    Janet Yellen's comments as opposed to Fr. Lemelson's

8    comments?

9        A.   No.  We -- we didn't.  We looked at -- Janet

10   Yellen's comment -- this wasn't a sustained narrative

11   from the Chair of the Federal Reserve.  It was perhaps

12   at one of her quarterly luncheon conversations that

13   caught a headline for a day or something.  So, no, we

14   didn't analyze that over a pattern.  We did analyze

15   Lemelson's attack over a period of time.

16       Q.   And similar question.  Did Ligand ever analyze

17   the impact, if any, of the so-called Ukraine mess on its

18   stock price as opposed to Fr. Lemelson's statements?

19       A.   As a one-off event, no.  And when I tee up the

20   question, it's -- you know, this is a banker, not the

21   analyst who'd left but just trying to find out from him

22   what is he hearing and trying to get, you know, a bank

23   or macro market opinion about -- about these matters.

24       Q.   And other than whatever's in the email, did

JOHN HIGGINS                                    December 11, 2019

Page 192

1    you ever get such an opinion?

2         A.   Yeah, I -- I remember talking to Matt a few

3    times, and he kept coming back to "I'll be your contact

4    while Carol is off her desk.  If you ever got questions

5    as a relationship, you can call me."

6              And I think, as I said here, I mean, he kept

7    coming back to this Lemel- -- getting a lot of -- a lot

8    concerned investors about the Lemelson piece.

9         Q.   Do --

10        A.   And that's what he kept reporting.  So I'm --

11   I'm positing other -- like, what's going on in macro

12   market, and he kept coming back to me saying, "John,

13   investors are really concerned about these things."

14        Q.   Did Mr. --

15             (Reporter interrupts overlapping speakers.)

16             MR. BONDI:  He had more to his answer.

17             THE WITNESS:  Yeah.  It's just the investors

18   were very concerned about -- about the Lemelson reports

19   and -- and narrative -- or the interviews.

20   BY MR. BROOKS:

21        Q.   Did Mr. Dormer ever identify which investors

22   were concerned?

23        A.   I -- I presume he did, yes.

24        Q.   Do you recall which ones?

JOHN HIGGINS                                    December 11, 2019

Page 247

1   paragraph that's in orange, you see it says, "Ligand

2   issued $245 million in convertible debt.  Had Lemelson

3   not been viciously attacking Ligand and inciting a

4   revolt-like short-selling environment, Ligand could have

5   priced its convertible bonds at a higher stock price

6   saving the company over $10 million."  Was that true?

7        **A.**   We believe that was true.

8        **Q.**   Based on what?

9        **A.**   We believe that Lemelson, by our own analysis

10  and by listening to his boasting about his negative

11  impact on the stock -- that our stock was depressed

12  because of Lemelson.

13            This bond -- the bond issuance, a convertible,

14  is secured -- it's lent against the stock price and the

15  chance that investors will pay a low coupon for the

16  potential to convert the bonds into equity in the

17  future.

18            The stock had been in the mid-60s -- 65,

19  $66 -- and if we had priced the convert off of 65, the

20  premium would have been 85 or $90.  But, instead, the

21  bond was priced in the low 50s, and so the premium was

22  about $75.

23        **Q.**   Did any of the qualified institutional

24  investors who purchased the convertible senior notes

JOHN HIGGINS                                December 11, 2019

Page 248

1    express any concerns about Fr. Lemelson's reports?

2        **A.**   Yes.

3        **Q.**   Which ones?

4        **A.**   I do not remember by name, but the banks,

5    Deutsche Bank and Bank of America, hosted marketing

6    calls.  We launched the transaction.  The investors were

7    invited to join calls.  We had calls with probably 40 or

8    50 investors over the course of a day.  Very standard

9    routine.

10             And in every one of those calls, investors

11   asked us to explain what is going on with the Lemelson

12   reports.  The bankers told us that it's bad timing, it's

13   creating depression, there are some investors that don't

14   want to participate and others were concerned about it

15   and voiced it in our diligence calls.

16       **Q.**   Which investors chose not to participate?

17       **A.**   I -- I do not know for sure.

18       **Q.**   At -- talking about this convertible note

19   offering, around this time was there also a -- did

20   Ligand also repurchase certain of its shares?

21       **A.**   As a part of the convert, a fairly common

22   practice is to buy back stock.  Use some of the proceeds

23   to buy back stock.

24       **Q.**   Okay.  Who proposed that -- the repurchase

JOHN HIGGINS                                    December 11, 2019

Page 283

 1              MR. BONDI:  Same objection, but to the extent

 2      you can --

 3              THE WITNESS:  Well --

 4              MR. BONDI:  -- answer based on the meeting and

 5      what was said at the meeting, you may do so.

 6      BY MR. BROOKS:

 7          Q.   And I'll refer you to slide 45.

 8              MR. BONDI:  Uh-huh.

 9              THE WITNESS:  Yes.

10      BY MR. BROOKS:

11          Q.   Okay.  And --

12          A.   And this is -- again, the sense --

13              THE REPORTER:  I'm sorry.

14              THE WITNESS:  The sensitization.  Just, the

15      market was sensitive to Lemelson's reports coming out

16      and what he's going to say, and -- and so this is just

17      stating the fact that this happened this day.  There's

18      no other negative news.  This is a -- a significant

19      decline that would be a factor why it was a one-day

20      analysis just being very specific within.

21      BY MR. BROOKS:

22          Q.   Do you believe the stock dropped 5.1 percent

23      because of Fr. Lemelson's Benzinga interview?

24          A.   We read on many occasions Lemelson boasting

JOHN HIGGINS                          December 11, 2019

Page 284

1   about his ability to impact -- negatively impact the

2   stock price, not only over time saying his lies are

3   trues and this is why it's going down, but also

4   intra-day trades.  He made a comment once that, "While I

5   was doing my interview, the stock was down," taking

6   credit for that.  So we -- we are listening to his own

7   words.  He believes it, and -- and we believed it.

8       Q.   So you believed Fr. Lemelson?

9            MR. BONDI:  You know, objection.

10           THE WITNESS:  He believed he was causing

11   impact.  We believe that his behavior -- his illegal

12   stock manipulation was damaging our stock and stock

13   trading.

14   BY MR. BROOKS:

15       Q.   But I thought you were saying you believed it

16   in part because Fr. Lemelson said that.  Is that what

17   you were saying?

18       A.   I believed that he was manipulating the stock

19   illegally.  His tactics were successful.  I believe

20   that.

21       Q.   Okay.  So do you believe the drop of

22   5.1 percent on August 7 was due to Fr. Lemelson's

23   Benzinga interview on that date?

24       A.   It was a collective period of time where --

JOHN HIGGINS                              December 11, 2019

Page 302

 1                (Recess, 5:55 PM - 5:57 PM.)

 2                VIDEOGRAPHER:  We're on the record at 5:57 PM.

 3       BY MR. BROOKS:

 4           Q.   Did you see, Mr. Higgins, on this document,

 5       sort of the bottom of page -- first page, top of the

 6       second, looks like Mr. Foehr is asking Miss Luib if she

 7       has received emails from investors that reference

 8       Lemelson directly?

 9           A.   Yes.

10           Q.   And she's asking for an Excel spreadsheet?

11           A.   Yes.

12           Q.   All right.  Then she responds that most of the

13       inquiries have come from retired retail.  Do you know

14       what retired retail means?

15           A.   I do not.

16           Q.   Okay.  And so then she attached a log of the

17       emails and calls received, and that's the last page of

18       this document.

19           A.   Uh-huh.

20           Q.   It looks like there's eight such emails?

21           A.   And some calls, yeah.

22           Q.   Yeah.  I'm sorry.  You're right.  Six emails

23       and two calls?

24           A.   Yes.

JOHN HIGGINS                                December 11, 2019

Page 303

1        **Q.**   Okay.  Were these -- is this the entire

2    universe of retail investors that inquired of Ligand

3    about Fr. Lemelson's reports and statements?

4              MR. BONDI:  Objection.  Misstates the record.

5              THE WITNESS:  No.

6    BY MR. BROOKS:

7        **Q.**   Okay.  Is there any other listing of retail

8    investors who inquired of Ligand about Fr. Lemelson?

9        **A.**   Not that I'm aware of.

10       **Q.**   Okay.  Do you understand what this, then,

11   subset of retail investors is?

12       **A.**   I'll just offer my thoughts on how this came

13   about.  We have a web page -- investor web page.  If

14   they have a question, go to investor whatever, so it's a

15   generic email account.  I believe that's what Erika is

16   pulling.  Again, the first time I've seen this.

17       **Q.**   Yeah.

18       **A.**   And so it's -- it's that email account that

19   people go to on the web.  I know it's not the complete

20   list because I know a few of these names, not all, but

21   obviously none of the interactions I've had with

22   investors, emails, calls, et cetera, are logged here, so

23   this is just a --

24       **Q.**   Did you have interactions with retail

JOHN HIGGINS                                    December 11, 2019

                                                      Page 328

 1    transaction.

 2              And we use this with our board discussions to

 3    really -- to have a discussion, no surprises, and really

 4    for the board to, then, with their experience in the

 5    industry, to come back and say, Good point, got it, yep.

 6    So it's a discussion point.  But our objective is to be

 7    thorough and kind of outline all the either real or

 8    perceived risks --

 9         Q.   Did you believe --

10         A.   -- that could occur.

11         Q.   Did you believe the Viking transaction was a

12    poorly conceived deal?

13         A.   No.

14         Q.   Did you believe it was dilutive to earnings?

15         A.   Short-term, yes.

16         Q.   Okay.  Did you believe it was a distraction to

17    Ligand management?

18         A.   No.

19         Q.   Has Ligand ever conducted preclinical studies

20    on Viking's behalf?

21         A.   Not that I'm aware of.  Viking -- and this

22    goes back to another falsehood that Lemelson stated.

23              Viking has never run preclinical or clinical

24    trials.  They have -- that was their mission and intent.

JOHN HIGGINS                                    December 11, 2019

Page 329

1             We did work with all of these programs prior

2    to license so that the SARM program, the TR Beta

3    program, so we knew the assets, but specifically I'm not

4    aware of any other work that we were doing after these

5    licenses were done and transferring their rights to

6    Viking.

7         Q.    Has Viking conducted clinical trials on its

8    assets?

9         A.    Yes.

10        Q.    Do you recall being at a meeting with Novartis

11   when they discussed -- when Novartis discussed

12   increasing the price of Promacta?

13        A.    Do I recall being at the meeting?

14        Q.    Yeah.

15             MR. BONDI:  Objection.

16             THE WITNESS:  I was -- no.

17   BY MR. BROOKS:

18        Q.    Okay.

19        A.    I -- I do not -- I was not -- I have not been

20   at any Novartis meetings.

21        Q.    Did anyone at Ligand tell you that they were

22   at a meeting with Novartis where Novartis indicated they

23   would be increasing the price of Promacta?

24             MR. BONDI:  Objection.

```
 1              I, the undersigned, a Certified Shorthand

 2    Reporter of the State of California, do hereby certify:

 3              That the foregoing proceedings were taken

 4    before me at the time and place herein set forth; that

 5    any witnesses in the foregoing proceedings, prior to

 6    testifying, were duly sworn; that a record of the

 7    proceedings was made by me using machine shorthand,

 8    which was thereafter transcribed by me; that the

 9    foregoing is a true record of the testimony given.

10              Further, that if the foregoing pertains to the

11    original transcript of a deposition in a federal case,

12    before completion of the proceedings, review of the

13    transcript [x] was [ ] was not requested.

14              I further certify I am neither financially

15    interested in the action nor a relative or employee of

16    any attorney or party to this action.

17              In witness whereof, I have this date

18    subscribed my name.

19

20    Dated:  December 27, 2019

21

22

23          Veronica S. Thompson

24          _____
            Veronica S. Thompson
            CSR 6056, RPR, CRR, CCRR
```

JOHN HIGGINS                                    December 11, 2019

Page 350

1               DECLARATION UNDER PENALTY OF PERJURY

2

3    Case Name:  SEC v. Lemelson

4    Date of Deposition:  12/11/19

5    KEY Discovery Job 371

6

7             I, JOHN HIGGINS, hereby certify under penalty

8    of perjury under the laws of the State of

9    _____ that the foregoing is true and correct.

10            Executed this _____ day of _____,

11   20_____, at _____.

12

13

14                         _____

15                              JOHN HIGGINS

16

17

18

19

20

21

22

23

24