**EXHIBIT 57**

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE | ) |
| COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) 1:18-CU-11926-PBS |
| vs. | ) |
| | ) |
| GREGORY LEMELSON and | ) |
| LEMELSON CAPITAL | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| THE AMVONA FUND, LP, | ) |
| | ) |
| Relief Defendant. | ) |

Deposition of MATTHEW FOEHR

San Diego, California

December 5, 2019

Reported by:

Sheri L. Somers

CSR No. 9734

Job No. 10062971

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE | ) |
| COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) 1:18-CU-11926-PBS |
| vs. | ) |
| | ) |
| GREGORY LEMELSON and | ) |
| LEMELSON CAPITAL MANAGEMENT, | ) |
| LLC, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| THE AMVONA FUND, LP, | ) |
| | ) |
| Relief Defendant. | ) |

Deposition of MATTHEW FOEHR, taken on behalf of
defendant, at 600 West Broadway, Suite 300, San Diego,
California, beginning at 8:59 a.m., and ending at
6:35 p.m., on Thursday, December 5, 2019, before
Sheri L. Somers, CSR No. 9734.

MATTHEW FOEHR                                December 5, 2019

          APPEARANCES:

          For Plaintiff:
                    U.S. SECURITIES AND EXCHANGE COMMISSION
                    BOSTON REGIONAL OFFICE
                    33 Arch Street, 24th Floor
                    Boston, Massachusetts 02110
                    617.573.8947
                    617.573.4590 fax
                         By:  Marc Jones, Esq.
                              Jonesmarc@sec.gov

          For Defendants:
                    LIBBY HOOPES
                    399 Boylston Street
                    Boston, Massachusetts 02116
                    617.338.9300
                    617.338.9911 fax
                         By:  Douglas S. Brooks, Esq.
                              Dbrooks@libbyhoopes.com

          For LIGAND PHARMACEUTICALS and MATTHEW FOEHR:

                    CAHILL GORDON & REINDEL LLP
                    1900 K Street, Suite 950
                    Washington, D.C., 20006
                    202.862.8900
                    202.862.8958 fax
                         By:  Bradley J. Bondi, Esq.
                              Bbondi@cahill.com
                              William C. McCaughey, Esq.
                              Wmccaughey@cahill.com

          The Videographer:
                    Ryan Asanas and Mike Tisa
                    Key Discovery
          Also present:
                    Gregory Lemelson

MATTHEW FOEHR                                    December 5, 2019

Page 8

1        SAN DIEGO, CALIFORNIA; THURSDAY, DECEMBER 5, 2019

2                      8:59 A.M. - 6:35 P.M.

3

4

5        THE VIDEOGRAPHER:  We are now on the record.

6   Today's date is December 5, 2019, and the time is

7   8:59 a.m.  This begins the video-recorded deposition of

8   Matt Foehr being taken in the matter of SEC versus

9   Lemelson Capital Management, LLC, et al., on behalf of

10   the defendant, pending in the United States District

11   Court, District of Massachusetts, Civil Action

12   No. 1:18-CV-11926-PBS.

13            This deposition is taking place at Aptus

14   Court Reporting located at 600 West Broadway,

15   Suite 300, San Diego, California 92101.  My name is

16   Ryan Asanas, the videographer, of Key Discovery located

17   at 40 Court Street, Boston, Massachusetts 02108.

18            Will all counsel present identify yourselves

19   and state whom you represent starting with the taking

20   attorneys.

21        MR. BROOKS:  Doug Brooks from the law firm Libby

22   Hoopes and I represent the defendants in this matter.

23        MR. JONES:  Marc Jones, Securities and Exchange

24   Commission, representing the plaintiffs.

MATTHEW FOEHR                                    December 5, 2019

Page 9

```
 1       MR. McCAUGHEY:  William McCaughey, Cahill Gordon &
 2  Reindel, on behalf of Matt Foehr.
 3       MR. BONDI:  Brad Bondi, Cahill Gordon & Reindel,
 4  on behalf of Ligand Pharmaceuticals and the witness.
 5       THE VIDEOGRAPHER:  Thank you.  The court reporter
 6  today is Sheri Somers also with Key Discovery, and she
 7  may now swear in or affirm the deponent.
 8
 9                      MATTHEW FOEHR,
10  having been administered an oath, was examined and
11  testified as follows:
12
13                      EXAMINATION
14  BY MR. BROOKS:
15     Q.   Good morning, Mr. Foehr.  My name is Doug
16  Brooks.  We met briefly off the record.  I represent
17  the defendants in this matter.
18          Have you ever been deposed before?
19     A.   I have.
20     Q.   How many times?
21     A.   Approximately five.  I'm not sure exactly.
22     Q.   When was the last time you were deposed?
23     A.   Within the last six months.
24     Q.   And what was the nature of that deposition,
```

MATTHEW FOEHR                                    December 5, 2019

Page 85

1    statements?

2         MR. JONES:  Objection.

3         THE WITNESS:  I don't know.  I would refer you to

4    our audited financials.

5    BY MR. BROOKS:

6         Q.   So is it fair to say that Ligand received

7    various questions about the statements in Father

8    Lemelson's reports from investors?

9         A.   Yes.

10        Q.   And did you handle any of those personally?

11        A.   Yes.

12        Q.   And do you recall any specific complaints by

13   investors concerning Father Lemelson's statements about

14   Viking?

15        A.   I recall questions from investors about

16   Viking as a result of the reports.

17        Q.   And what do you specifically recall?

18        A.   I recall general questions about the licenses

19   and the programs, I recall investors asking questions

20   about the accounting related to Viking subsequent to

21   the reports.  I would generally refer those to my

22   colleagues.  I'm usually the person that -- one of the

23   people that investors ask questions more about our

24   pipeline and the science and the technologies in the

MATTHEW FOEHR                                    December 5, 2019

Page 86

1    programs.

2        **Q.**   Do you have any written communications with

3    investors concerning Father Lemelson's reports, you

4    personally?

5        MR. JONES:   Objection.

6        MR. BONDI:   Objection to form.

7        MR. JONES:   When you say "you personally," you

8    mean other than productions or -- I'm unclear what

9    you're asking about.

10   BY MR. BROOKS:

11       **Q.**   Okay.  Let me ask you again.

12           We were just talking about communications

13   that you had with investors, correct?

14       **A.**   Correct.

15       **Q.**   Are any of those communications you've had

16   with investors concerning Father Lemelson in writing?

17       MR. JONES:   Objection.

18       THE WITNESS:   I received e-mails to my Ligand

19   account from some investors who were asking questions

20   about the topics that were raised in the reports.

21   BY MR. BROOKS:

22       **Q.**   Were any of the communications that you had

23   with investors concerning Father Lemelson's reports and

24   interviews that he gave by telephone?

MATTHEW FOEHR                                        December 5, 2019

Page 87

1         **A.**    Yes.

2         **Q.**    Did you log those in any way?

3         MR. BONDI:   Object to the form.

4              You can answer, but you should not reveal any

5    attorney work product or attorney-client privilege

6    associated with directions that you may have received

7    from counsel.

8         THE WITNESS:   At the direction of internal

9    counsel, I noted calls that I had received.

10   BY MR. BROOKS:

11        **Q.**    Did you end up noting all the calls you

12   received?

13        **A.**    I don't know.

14        **Q.**    Did any of the communications you had

15   concerning Father Lemelson with investors involve

16   Father Lemelson's statement that Viking did not intend

17   to conduct preclinical studies or clinical trials?

18        MR. JONES:   Objection.

19        THE WITNESS:   In general, yes.

20   BY MR. BROOKS:

21        **Q.**    How so?

22        **A.**    The questions centered around asking about if

23   Viking was real, if they were moving the programs

24   forward, what were the indications, things like that.

MATTHEW FOEHR                                December 5, 2019

Page 88

1      Q.    And how did you respond to that?

2      A.    I would -- as I do with many of our partners,

3    when investors have specific questions about programs,

4    I only revert to publicly available information that

5    they have disclosed about their programs that they are

6    comfortable disclosing, and I'll often refer investors

7    to our partner to answer any other questions that they

8    may have, and I do that today with Viking and many

9    other partners.

10     Q.    When you were speaking with any of the

11   investors about Father Lemelson's statements concerning

12   Viking, did you refer any of those investors to

13   Viking's S-1?

14     A.    Yes.

15     Q.    In connection with the telephone calls that

16   you had with investors concerning Father Lemelson's

17   statements about Viking, did any of them raise the

18   issue about Father Lemelson's statement concerning

19   Viking's financial statements being unaudited?

20     A.    I don't recall.

21     Q.    So without getting into any attorney-client

22   communications, how did you log the telephone calls

23   with investors concerning Father Lemelson?

24          MR. BONDI:  Objection.  I think that calls for --

MATTHEW FOEHR                                    December 5, 2019

Page 89

1    it gets into work product.  I would just caution the

2    witness, you can describe generally, but I don't want

3    you to do -- to reveal any advice or direction you

4    received from counsel.

5         THE WITNESS:  I record them in a digital format.

6    ///

7    BY MR. BROOKS:

8         Q.   And I assume that was done on Ligand servers?

9         A.   Yes.

10        Q.   Okay.  Was it an Excel spreadsheet?  Was it a

11   Word document?  Do you remember?

12        A.   I don't recall whether it was an Excel

13   spreadsheet or a Word document.  It was a Microsoft

14   product, I guess, is the best way to say it.

15        Q.   And how many such telephone calls,

16   approximately, did you end up logging?

17        A.   I don't recall.

18        Q.   Do you know, was it more than 50?

19        A.   I don't know.

20        Q.   And in addition to those -- sorry.  Strike

21   that.

22             The log we're talking about, whatever form

23   it's in, was that only for telephone conversations?

24        A.   I don't recall whether telephone

MATTHEW FOEHR                                    December 5, 2019

Page 90

1    conversations and e-mails were included.  I'm not sure.

2        Q.    Were there any in-person meetings with

3    investors concerning Father Lemelson?

4        A.    There were certainly in-person meetings where

5    the topics raised in the reports were raised to me, and

6    I believe those may have been included in the log as

7    well.

8        Q.    Okay.  Who do you remember having an

9    in-person meeting with concerning Father Lemelson?  And

10   again, I think we're talking about investors here.

11       MR. BONDI:  Object to the form.

12       THE WITNESS:  I remember it coming up frequently

13   with investors.  I remember specific meetings with Joe

14   Frohna at 1492, who is based in Milwaukee; I remember

15   the team had Wells Fargo asking specifically; I

16   remember the team at Cardinal Capital asking

17   specifically in person.  I'm just recalling in-person

18   meetings.

19   BY MR. BROOKS:

20       Q.    Sure.

21       A.    And there were others as well.  Those are

22   just ones that come to mind.

23       Q.    What, if anything, did Joe Frohna raise

24   during your meeting with him concerning Father

MATTHEW FOEHR                                December 5, 2019

Page 91

1    Lemelson's statements about Viking?

2        A.    I believe he asked about the programs

3    themselves.  He was also very focused on the

4    misstatements and misrepresentations around Captisol,

5    very focused on Captisol.

6        Q.    What were the misrepresentations and

7    misstatements around Captisol that you are referring

8    to?

9        A.    It largely related to our supply and quality

10   and a number of other factors.

11       Q.    Do you remember what the misstatements were,

12   in your opinion?

13       A.    That our -- there was a general

14   representation or misrepresentation that our supply

15   chain was somehow tenuous or not well maintained, and I

16   was answering his questions related to that.  He was

17   satisfied with our answers given that we had multiple

18   distribution sites, multiple qualified sites.

19       Q.    Okay.  What, if anything, did the team at

20   Wells Fargo say to you about Father Lemelson's

21   statements concerning Viking?

22       A.    I believe, again, their questions were

23   related to the development programs, but -- and there

24   may have been other issues as well.  I don't recall.

MATTHEW FOEHR                                    December 5, 2019

Page 92

1      Q.   And same question.  So what, if anything, did

2   the team at Cardinal Capital say to you about Father

3   Lemelson's statements concerning Viking?

4      A.   The team at Cardinal Capital knew -- had done

5   a lot of research on Viking and knew Ligand's pipeline

6   well, and their questions were more related to how

7   something like this could be said.  They knew Viking,

8   they knew the work that Viking was doing.

9      Q.   When you say "something like this could be

10   said," what are you specifically referring to?

11      A.   Misstatements that Viking is somehow not

12   progressing programs, those kinds of things.

13      Q.   Did anyone ever say to you that they

14   understood Father Lemelson to be saying that Viking --

15   that -- strike that.

16           Did anyone ever tell you that they understood

17   Father Lemelson to be saying that preclinical studies

18   were not being conducted on the drugs that Ligand

19   licensed to Viking?

20      MR. JONES:  Objection.

21      THE WITNESS:  I don't recall.

22   BY MR. BROOKS:

23      Q.   Have you read -- or strike that.  Let me say

24   it again.

MATTHEW FOEHR                                    December 5, 2019

Page 93

 1                    Have you read Father Lemelson's reports

 2      concerning Ligand?

 3           A.    I have, yes.

 4           Q.    Have you read his reports that also involve

 5      Viking?

 6           A.    I have read reports that reference Viking,

 7      yes.

 8           Q.    Do you recall him ever saying that the

 9      programs that Viking had were not progressing?

10           MR. JONES:  Objection.  The documents say what

11      they say.

12           THE WITNESS:  I would need to reference the

13      documents.

14      BY MR. BROOKS:

15           Q.    So without referencing the documents, you

16      don't know either way?

17           MR. BONDI:  Objection.

18           THE WITNESS:  There was an implication that the

19      programs were not moving forward or that Viking was

20      somehow not real or a shell company, and none of that

21      was true.

22      BY MR. BROOKS:

23           Q.    So you don't view Viking as a shell company?

24           A.    I do not.

MATTHEW FOEHR                                December 5, 2019

Page 94

1        **Q.**   When you were speaking to the investors

2    concerning Father Lemelson's reports, did you refer any

3    of them to the SEC?

4        **A.**   No.

5        **Q.**   Did you refer any of them to the media?

6        **A.**   No.

7        **Q.**   Mr. Foehr, you've just been shown what's been

8    marked as Exhibit 120.

9             (Exhibit 120 was marked for identification.)

10       **A.**   Yes, I have it.

11       **Q.**   I will note obviously you are not copied on

12   this, but have you ever seen this e-mail chain before?

13       **A.**   I have not.

14       **Q.**   Okay.  If I could turn your attention to the

15   last page, which is the sort of first page in time of

16   120.

17            I assume you're familiar with Mr. Bondi?

18       **A.**   I am familiar with Mr. Bondi, yes.

19       **Q.**   And he represents Ligand; is that correct?

20       **A.**   He represents Ligand, correct.

21       **Q.**   Do you know a Scott Friestad?

22       **A.**   I know the name, yes.

23       **Q.**   And how do you know the name Scott Friestad?

24       **A.**   I believe -- I believe he was in a meeting

MATTHEW FOEHR                                December 5, 2019

                                                      Page 144

 1        **A.**    Yeah.  I'm there.

 2        **Q.**    If you look at the third bullet point, it

 3   says, "Lemelson uses a highly unusual definition of

 4   'insolvency' to assert that Ligand is insolvent."

 5             Do you see that?

 6        **A.**    I see that.

 7        **Q.**    And then it says, "According to Lemelson,

 8   'liabilities exceeded tangible assets, meaning the

 9   company was insolvent,'" right?

10        **A.**    Yeah.  The sub-bullet reads, "According to

11   Lemelson, quote, liabilities exceeded tangible assets,

12   meaning the company was insolvent," unquote.

13        **Q.**    Did you agree that that's a highly unusual

14   definition?

15        **A.**    Yes.

16        Q.    Do you agree that Father Lemelson disclosed

17   his definition?

18        MR. JONES:  Objection.

19        THE WITNESS:  I don't know.

20   BY MR. BROOKS:

21        Q.    Can you turn to slide 39.  So it looks like

22   Ligand was explaining Promacta to the SEC; is that

23   right?

24        **A.**    That's correct.

MATTHEW FOEHR                                    December 5, 2019

Page 178

1    geographies, its label was beginning to expand, new

2    data was being presented at important medical meetings

3    that described the safety and efficacy of Promacta, and

4    I think those factors likely contributed to its broader

5    use.

6        **Q.**   Prior to the introduction to the market of

7    Sovaldi, did Promacta have any other competitors

8    besides Nplate?

9        **A.**   In terms of other treatment modalities for

10   ITP, there were drugs -- steroids were commonly used.

11   Splenectomy is a medical procedure but also is a way of

12   potentially treating ITP.  And I would hear at medical

13   meetings there were also drugs that may have been used

14   off label in ITP.  But I believe that Promacta was the

15   first drug that was indicated to boost platelets in

16   patients that suffered from hepatitis C.  I want to

17   clarify that Promacta does not treat hepatitis C.  It's

18   not a drug for hepatitis C.  It's a drug to boost

19   platelets.  It gets a little scientific, but it's

20   relevant that your liver produces a growth hormone that

21   tells your body to make platelets, and platelets are

22   very critical for blood clotting.  And patients with a

23   sick liver and from a variety of -- for a variety of

24   reasons can suffer from low platelets, and that puts

MATTHEW FOEHR                                December 5, 2019

Page 179

1    those patients at significant risk of bruising and

2    bleeding and other serious medical conditions.

3         **Q.**    You like it more when I ask medical questions

4    than finance ones, don't you?

5         **A.**    I know much more about --

6         **Q.**    So I'm going to ask some questions and

7    referencing a date of June 16, 2014, and that's just --

8    I'll represent that that was the date of Father

9    Lemelson's first report on Ligand.  So that's why I'm

10   sort of picking that date.

11           Prior to June 16, 2014, had you ever heard of

12   Sovaldi?

13        **A.**    Yes.

14        **Q.**    What did you know about Sovaldi prior to

15   June 16, 2014?

16        **A.**    The drug that became Sovaldi was the subject

17   of a lot of attention in the pharmaceutical industry

18   starting really in, I believe, the March, April time

19   frame of 2011 when a company called PharmaSet presented

20   data showing direct antiviral impact on patients with

21   hepatitis C.  That company PharmaSet was subsequently

22   bought by Gilead in large part, it is believed, because

23   of that data that was presented in early 2011.  There

24   are plenty of public statements about that data saying

MATTHEW FOEHR                                    December 5, 2019

                                                        Page 180

1    it wowed the medical community, et cetera.  That

2    company was purchased by Gilead for, I believe,

3    $11 billion.  Gilead -- then additional studies were

4    published, later stage, larger studies were followed at

5    the EASL meeting, the European Association of Liver

6    Disease meeting in 2012, and I believe at that point

7    Gilead owned the drug, they then ran additional trials,

8    and ultimately commercialized the drug.

9        Q.   When did Gilead commercialize the drug?

10       A.   I would need to reference public statements.

11   They obviously announced it.  I believe it was likely

12   in the late 2013, early 2014 time frame, but it was a

13   matter of a public announcement.

14       Q.   Did Ligand consider Sovaldi to a competitive

15   threat to Promacta?

16       A.   Again, Promacta does not treat hepatitis C.

17   It was not a drug for treating hepatitis C.  The -- and

18   Sovaldi is an antiviral agent that treats the

19   hepatitis C virus.  So they are in different treatment

20   areas.  The majority of Promacta sales were and still

21   are, in our view, in ITP.  That's what we've heard from

22   both GSK and then subsequently Novartis.  So ITP is a

23   large and still growing market for Promacta where

24   there's a significant medical need for patients, and

MATTHEW FOEHR                                          December 5, 2019

Page 181

1    Sovaldi was a new -- pardon me -- use in patients with

2    HCV was a new indication for Promacta.

3         **Q.**   Right.  And I appreciate that.  I think my

4    question sort of just -- understanding the differences

5    between Sovaldi and Promacta, did Ligand consider

6    Sovaldi to be a competitive threat to Promacta sales?

7         MR. BONDI:  Objection.

8         MR. JONES:  Objection.

9         THE WITNESS:  Ligand understood that Sovaldi was

10   an important element of the hepatitis C landscape.  I

11   think virtually anyone who was following hepatitis C

12   knew that Sovaldi was an important development in the

13   landscape.

14   BY MR. BROOKS:

15        **Q.**   So --

16        **A.**   But, again, Promacta is treating patients who

17   may present to the doctor with low platelets and need

18   their platelets boosted before they get treatment for

19   their disease.

20        **Q.**   Let me ask another way.  Did Ligand believe

21   that sales of Promacta would decrease as a result of

22   the commercialization of Sovaldi?

23        **A.**   No.  No.  Sovaldi was a new indication adding

24   on to ITP that was growing, and it was a new expansion

MATTHEW FOEHR                           December 5, 2019

Page 182

1   of the label.  It was approved very shortly before

2   Sovaldi, Promacta, in the hepatitis C landscape, but

3   the majority of sales were in ITP.  ITP was still

4   growing in markets and it was being spread into new

5   geographies quite rapidly.  Hepatitis C was new.  Early

6   in the launch period for Sovaldi, it was unclear

7   whether Sovaldi would move to all the geographies.

8   There was also a time-lapse before Sovaldi was widely

9   used and so it was -- Promacta was beginning to see

10  some contribution likely from hepatitis C, although the

11  majority of the sales were in ITP --

12        Q.   Okay.

13        A.   -- and as I said, continue to be today.

14        Q.   So Ligand wasn't concerned at all that sales

15  in Promacta would go down as a result of Sovaldi?

16        MR. JONES:  Objection to form.

17        THE WITNESS:  I did not see -- what we saw in that

18  period was Promacta sales were increasing as ITP was

19  used more broadly.  Hepatitis C was added on.

20  Subsequent to that aplastic anemia was added on to the

21  label.  So the label was expanding.  New safety data

22  had been added to ITP, which was very important.

23  BY MR. BROOKS:

24        Q.   Let's talk about the label a bit.

MATTHEW FOEHR                                December 5, 2019

```
                                               Page 183
 1              When was Promacta first approved by the FDA?

 2      A.   I believe it was in 2008.

 3      Q.   And what -- for what indication?

 4      A.   For idiopathic thrombocytopenia or ITP.

 5      Q.   Okay.  We can call it ITP going forward.

 6      A.   ITP.

 7      Q.   And you've mentioned that the label has been

 8 expanded?

 9      A.   It has.

10      Q.   What was the next indication that was

11 approved?

12      A.   I would need to look back at the timing.  The

13 original label was in adults with idiopathic

14 thrombocytopenia.  I can't recall whether pediatrics

15 with ITP -- pediatrics with ITP was added before or

16 after boosting platelets in patients with hepatitis C.

17 Following that was aplastic anemia, which is another

18 disease where patients suffer from low platelets.  And

19 all of those were a matter of public announcements from

20 GSK and/or Novartis.

21      Q.   And I'm sorry if I missed it.  When did the

22 Hep C indication happen?

23      A.   Again I would need to reference it, but I

24 believe it was in the late 2012 or 2013 time frame.
```

MATTHEW FOEHR                                    December 5, 2019

Page 213

1       MR. JONES:  122, is that what we're looking at?

2       MR. BROOKS:  Yes.

3       MR. BONDI:  What slide?

4       MR. BROOKS:  53.

5  ///

6  BY MR. BROOKS:

7       Q.   And I guess the question is just, would you

8  agree with me that the PE multiplier that Father

9  Lemelson used that the SEC was discussing was 24x?

10      A.   This slide states at the top in quotes, "At a

11  PE ratio of 24x diluted," and goes on to say, and it's

12  a quote attributed to Emmanuel Lemelson in June of '16.

13      Q.   And 24x falls in between the 15 and 30 that

14  Ligand itself used, correct?

15      A.   The number 24 falls between the numbers 15

16  and 30.

17      MR. JONES:  Now that we got that on the record.

18  BY MR. BROOKS:

19      Q.   Do you know the change in revenues -- strike

20  that.

21           Do you know the change in revenues to Ligand

22  from sales of Promacta in 2014 and 2015?

23      MR. BONDI:  Object to the form.

24      THE WITNESS:  Again, we -- that's clearly a matter

MATTHEW FOEHR                                    December 5, 2019

Page 214

1    of public record the announced sales numbers from GSK

2    at the time and then our disclosed royalty rates, which

3    we at the time disclosed both in our website and in our

4    SEC filings, all of that is public knowledge.

5    BY MR. BROOKS:

6        Q.   And which -- just so I'm clear, which SEC

7    filings would contain all of that information?

8        A.   Well, we report our sales numbers and we --

9    we report our revenue numbers and we also report the

10   royalty rates for our programs and the -- and we had

11   included in our presentations publicly the sales of the

12   products as well.  All of that we felt was relevant.

13       Q.   Can you explain the difference, if any,

14   between ITP and thrombocytopenia?

15       A.   In a general sense, they are related.  ITP is

16   an abbreviation for idiopathic thrombocytopenia, and

17   "idiopathic" just means essentially low platelets for

18   unknown reasons, in a general sense.

19       Q.   If you could on the -- let me just look

20   back -- back to Exhibit 125, if you go to slide 65.

21       A.   125, slide 65?

22       Q.   Yes.

23       A.   Okay.

24       Q.   The one that says "License with Purdue," do

MATTHEW FOEHR                                    December 5, 2019

Page 222

1   24 weeks for chronic hepatitis C patients with

2   genotype 1 who are interferon ineligible, and Promacta

3   was indicated for interferon-based therapy for patients

4   who needed their platelets boosted.  So patients who

5   come to the doctor looking for treatment and need their

6   platelets boosted, which you'll need whether or not

7   you're getting a direct antiviral or something else.

8   And I think there's some reference to that in this

9   e-mail chain.

10  BY MR. BROOKS:

11        Q.   So at this time in February 2014, then, you

12  didn't view Sovaldi as a competitive threat to

13  Promacta?

14        MR. JONES:  Objection.

15        THE WITNESS:  Again, Sovaldi is a direct antiviral

16  agent treating the hepatitis C virus.  Promacta boosts

17  platelets.

18  BY MR. BROOKS:

19        Q.   So I understand they are different.  But I'm

20  just wondering whether you viewed Sovaldi as

21  competitive threat to Promacta, yes or no.

22        MR. BONDI:  Object to the form.

23        THE WITNESS:  The drugs are in different therapy

24  areas.  They treat a different condition.

MATTHEW FOEHR                                December 5, 2019

Page 223

1    BY MR. BROOKS:

2         **Q.**   Okay.  So not a competitive threat then?

3         **A.**   Promacta boosts platelets.  Sovaldi is

4    treating the hepatitis C virus.  They are both in the

5    hepatitis C environment, and, again, Promacta is also

6    used in ITP, and at this point I believe was close to

7    being launched in aplastic anemia and was also

8    expanding into other geographies.

9         **Q.**   Maybe you -- are you -- is it not a fair

10   question to ask, yes or no, whether or not you viewed

11   Sovaldi as a competitive threat to Promacta?

12        MR. BONDI:  Object to the form.

13        THE WITNESS:  Again, Sovaldi is treating the

14   virus.  Promacta does not, will not, never did treat

15   hepatitis C.  Doesn't treat the virus.  It boosts

16   platelets in patients.  And often patients with

17   diseased livers can't make the growth factor that tells

18   your body to make platelets.

19   BY MR. BROOKS:

20        **Q.**   Let me try it again.  Understanding that

21   Sovaldi and Promacta are very different, in

22   February 2014, did you view Sovaldi as a competitive

23   threat to sales of Promacta?

24        MR. JONES:  Objection.

MATTHEW FOEHR                                December 5, 2019

Page 267

1        A.    I may have.  I don't recall.

2        Q.    Do you recall participating in a phone

3   conversation with Mr. Voss and Mr. Higgins shortly

4   after Mr. Voss's call with Father Lemelson?

5        A.    I do.

6        Q.    And was anyone else on that call, as far as

7   you know?

8        A.    I don't think so.

9        Q.    Do you recall where you were?

10        A.    Yes.

11        Q.    Where?

12        A.    I -- earlier that week I had been in the --

13   at the American Academy of Diabetes Scientific

14   Session's meeting, and I was in Northern California,

15   and I was in my office at home in the San Francisco Bay

16   area.

17        Q.    And nobody was with you on your end, right?

18        A.    No.

19        Q.    How long did that call last?

20        A.    I don't recall exactly.

21        Q.    Did you take notes?

22        A.    No.

23        Q.    Best you can recall, what did Mr. Voss say

24   about the call?

MATTHEW FOEHR                                    December 5, 2019

Page 276

1    period of time.

2        Q.    Did you ever have any telephone conversations

3    other than the one you've already talked to -- talked

4    about with Mr. Voss concerning Father Lemelson's

5    June 19, 2014 interview?

6        A.    I recall the debrief call I discussed earlier

7    where he talked about Mr. Lemelson being entrenched,

8    and I recall other conversations -- I don't know

9    specifically when -- where after this came out, he

10   indicated he didn't -- what he said here, "I did not

11   agree with that statement, I didn't say it."  I don't

12   know exactly when those calls were.  And this is not

13   something that Mr. Voss would agree with or say.

14   He's -- I wouldn't see that.

15       Q.    Do you recall asking Mr. Voss about possibly

16   blocking Father Lemelson from Seeking Alpha?

17       A.    I recall there was discussion.  At the time I

18   know Seeking Alpha was looking at false posts and

19   things like that on their page.  And so there may have

20   been some discussion about how Seeking Alpha is

21   policing or monitoring the information that is

22   disseminated on its site.

23       Q.    Do you recall e-mail exchanges involving you,

24   Mr. Voss, and Mr. Higgins about an e-mail that Mr. Voss

MATTHEW FOEHR                                December 5, 2019

Page 288

1        **Q.**   Did you have an opinion as to the merits of

2   the deal from the perspective of Ligand?

3        **A.**   Yes.

4        **Q.**   What was that opinion?

5        **A.**   I think -- I thought and I still think it was

6   a very good deal.

7        **Q.**   For Ligand?

8        **A.**   For Ligand.

9        **Q.**   Why?

10        **A.**   Because of the valuation that was granted to

11   it and it brought in a substantial amount of cash to

12   Ligand, $827 million, that allows us to further invest

13   in the business.  And it was at a time where most of

14   the data -- the new data for Promacta had come out now,

15   as we sit here today in 2019, and there was a moment

16   where we had the ability to sell it for a very healthy

17   price.

18        **Q.**   Were you surprised Royalty Pharma was willing

19   to pay that much for Promacta in March 2019?

20        **A.**   No.

21        **Q.**   How come?

22        **A.**   Because it's part of their business to

23   acquire established royalty streams for best-in-class

24   drugs that are meeting major medical needs on a global

MATTHEW FOEHR                                    December 5, 2019

Page 296

1    not an accurate statement?

2         **A.**   The statement itself is sort of a

3    hypothetical.  It also -- it's based on what I would

4    consider something of a false premise.

5         **Q.**   What's the false premise?

6         **A.**   The false premise is the idea that Ligand

7    somehow does not believe that Viking's pipeline is

8    valuable.  Some of the drugs that Viking is developing

9    could be major contributors to the medical landscape.

10   They have a novel TR-beta agonist that could transform

11   liver health.  They have fantastic Phase II data for

12   muscle wasting that could greatly impact patients,

13   mostly older women with broken hips, and how they

14   respond and recover from that, that's often thought to

15   be a death sentence today, could be transformed.  Major

16   medicines that are really important.  So this is a

17   false premise.

18        **Q.**   So what's your response then to their point,

19   which is if that was the case, Ligand would either buy

20   Viking stock or buy the whole company?

21        MR. JONES:  I'm objecting to this whole line.

22   This is a 2019 short report.  It comes five years after

23   the substance of the case.  The defendants have an open

24   stock position as to the companies that are involved

MATTHEW FOEHR                                    December 5, 2019

Page 305

1         I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3         That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand,

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11        Further, that if the foregoing pertains to the

12   original transcript of a deposition in a federal case,

13   before completion of the proceedings, review of the

14   transcript [ X ] was [ ] was not requested.

15

16        I further certify I am neither financially

17   interested in the action nor a relative or employee of

18   any attorney or party to this action.

19        IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21   Dated: December 19, 2019

22

23   _____

     Sheri L. Somers

24   CLR, CSR No. 9734

MATTHEW FOEHR                                        December 5, 2019

Page 306

1              DECLARATION UNDER PENALTY OF PERJURY

2

3       I, MATTHEW FOEHR, hereby certify under penalty of

4    perjury under the laws of the State of California that

5    the foregoing is true and correct.

6

7       Executed this _____ day of _____, 2019

8    at _____, California.

9

10

11

12                        _____

13                                 MATTHEW FOEHR

14

15

16

17

18

19

20

21

22

23

24