**EXHIBIT 59**

Page 1

1   SECURITIES AND EXCHANGE COMMISSION
2
3
4
5  - - - - - - - - - - - - - - )
6  In the Matter of:          ) Matter No. HO-12718
7  Trading in the Securities of  )
8  Ligand Pharmaceuticals, Inc.   )
9  - - - - - - - - - - - - - - )
10
11
12          V O L U M E  I
13
14     TESTIMONY OF GREGORY M. LEMELSON
15          WASHINGTON, D.C.
16      WEDNESDAY, JULY 20, 2016
17            9:25 A.M.
18
19
20
21
22
23  Job No. 65155
24  Pages 1 - 359
25  Reported by:  Leslie Anne Todd

Page 2

1     Deposition of GREGORY M. LEMELSON was held at:
2
3     Securities and Exchange Commission
4     100 F Street Northeast
5     Washington, D.C. 20549
6
7     Pursuant to agreement, before Leslie Anne Todd,
8  Notary Public of the District of Columbia.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          A P
2
3  For the Securities and Exchange Commission:
4     VIRGINIA M. ROSADO DESILETS, ESQUIRE
5     JEFFREY FINNELL, ESQUIRE
6     SONIA TORRICO, ESQUIRE
7     Securities and Exchange Commission
8     100 F Street Northeast
9     Washington, D.C. 20549
10    (202) 5510-4955
11
12  For the Witness:
13    DOUGLAS F. MacLEAN, ESQUIRE
14    Armor Compliance
15    22 Batterymarch Street
16    Boston, Massachusetts 02109
17    (617) 501-2055
18
19  ALSO PRESENT:
20    LUCY GAUTHIER (Intern)
21
22
23
24
25

Page 4

1            C O N T E N T S
2
3            -------
4
5          E X H I B I T S
6          (Retained by SEC)
7

8   NUMBER    PAGE      NUMBER    PAGE
9    1      7       13    206
10    2      8       14    245
11    3     15       15    261
12    4     15       16    262
13    5     24       17    270
14    6    110       18    271
15    7    119       19    272
16    8    161       20    273
17    9    198       21    275
18   10    202       22    287
19   11    203       23    289
20   12    204       24    349
21
22
23
24
25

Page 5

1        P R O C E E D I N G S
2        -------------------
3        MS. DESILETS:  On the record at 9:25 a.m.
4        Can you raise your right hand, please.  Do
5 you swear or affirm to tell the truth, the whole truth
6 and nothing but the truth?
7        THE WITNESS:  I do.
8        EXAMINATION BY THE SECURITIES AND
9               EXCHANGE COMMISSION
10 BY MS. DESILETS:
11    Q    Please state and spell your full name for
12 the record.
13    A    My legal name is Gregory M. Lemelson, but
14 I'm referred to as Father Emmanuel Lemelson, which is
15 my ecclesiastical name or baptismal name.
16    Q    You can put your hand down.
17    A    Oh, sorry.
18    Q    So would you prefer it if we refer to you as
19 Father Lemelson today?
20    A    Father Emmanuel.
21    Q    My name is Virginia Rosado Desilets.  This
22 is Sonia Torrico, and this is Lucy Gauthier.
23        MS. DESILETS:  Did I pronounce that right?
24        MS. GAUTHIER:  Gauthier.
25 BY MS. DESILETS:

Page 6

1    Q    Lucy is an intern with the SEC, and she
2 would like to observe this testimony, if you don't
3 have any objection to that.
4        Do you have any objection to her observing
5 today?
6    A    Not at all.
7    Q    Thank you very much.  I appreciate that.
8 And this is Jeffrey Finnell.
9        MR. FINNELL:  Good morning.
10        THE WITNESS:  Good morning.
11 BY MS. DESILETS:
12    Q    Sonia, Jeffrey and I are all officers of the
13 Commission for purposes of this proceeding.
14    A    Okay.
15    Q    This is an investigation by the United
16 States Securities and Exchange Commission in the
17 matter of Ligand Pharmaceuticals to determine whether
18 there have been violations of certain provisions of
19 the federal securities laws.
20        However, the facts developed in this
21 investigation might constitute violations of other
22 federal or state civil or criminal laws.
23        Prior to the opening of the record, you were
24 provided with a copy of the formal order of
25 investigation in this matter.  It will be available

Page 7

1 for your examination during the course of this
2 proceeding.
3        Father Emmanuel, have you had the
4 opportunity to review the formal order?
5    A    Yes, I have.
6    Q    Prior to the opening of the record, you were
7 provided with a copy of the Commission's supplemental
8 information form.  A copy of that notice has been
9 marked as Exhibit No. 1.
10        Father Emmanuel, have you had the
11 opportunity to read Exhibit No. 1?
12    A    Yes, I have.
13    Q    Have you had an opportunity to discuss the
14 contents of that Form 1662 with your counsel?
15    A    More or less, yes.
16    Q    Do you have any questions concerning this
17 notice?
18    A    No.
19    Q    Did you want to take time to discuss with
20 your counsel?
21    A    No.
22    Q    Are you represented by counsel here today?
23    A    Yes, I am.
24        MS. DESILETS:  Would counsel please identify
25 yourself for the record.

Page 8

1        MR. MacLEAN:  Yes, Douglas MacLean from Armor
2 Compliance, LLC, in Boston, Massachusetts.
3        (Exhibit No. 2 was marked for
4        identification.)
5 BY MS. DESILETS:
6    Q    Father Emmanuel, I've just handed you a copy
7 of a subpoena marked Exhibit No. 2.
8        Are you appearing here today pursuant to the
9 subpoena?
10    A    Yes.
11    Q    Have you provided testimony before, either
12 before a government agency or in a deposition?
13    A    In a deposition but not before a government
14 agency.
15    Q    So you are familiar with the process with
16 the court reporter here?
17    A    Yes, I am.
18    Q    So the court reporter is transcribing every
19 word that anyone in this room says today, so it's very
20 important that we not speak over one another,
21 interrupt one another, and that you give only verbal
22 answers.  It will be difficult for her to transcribe
23 nods or shaking the head.
24    A    Sure.
25    Q    If you don't understand a question today,

1  my photo study, and it kind of left an impression on
2  me.  Just things here and there like that.
3     Q    You never worked in the industry, though?
4     A    No.
5     Q    Do you have an understanding of how
6  pharmaceutical drugs are developed, approved, or
7  marketed?
8     A    I do have a working knowledge of that, yes.
9     Q    How did you obtain that knowledge?
10    A    From reading filings and listening to
11  conference calls.
12    Q    Did you --
13    A    Studying other analyst reports.
14    Q    Did you conduct that research before you
15  started looking into Ligand or as part of your Ligand
16  research?
17    A    As part of my Ligand research.
18    Q    You mentioned reviewing filings I think; is
19  that right?
20    A    Yes.  SEC filings.
21    Q    Of which companies?
22    A    Well, I really took a hard look at Ligand
23  because when I first came across it, it was
24  immediately clear to me that much of what management
25  was saying was not adding up.  So I took a great

1  interest in it almost immediately.
2        After you have read so many annual reports
3  and studied so many securities for so many years, in
4  this case six years, at that time I guess it was four
5  or four and a half, of unmitigated focus on that,
6  things start to stand out to you when they don't add
7  up.  And so I took a great interest in Ligand.
8     Q    Any other companies whose filings you looked
9  at as part of --
10    A    I did.  I looked at their partners' filings.
11  Retrophin, TG Therapeutics, Sage, those sorts of
12  companies.
13        And of course now this year I've taken a
14  great interest in Valeant as well, after the Senate
15  special committee hearings.  And I began to take also
16  greater interest after Janet Yellen began to comment
17  on abuses in the pharmaceutical industry.  And later
18  Hillary Clinton would also make public comments.  This
19  is after I had begun my research and published some of
20  my reports.
21    Q    So back in the 2014 period, your
22  understanding of how the pharmaceutical drugs are
23  developed, approved, and marketed came mainly from the
24  filings of Ligand and its partners?
25    A    Yes.  I studied Merrick and GSK, Novartis,

1  their licensees.  And then they have in-licensing
2  agreements with other partners.  Some of them are
3  opaque.
4        For example, they have an agreement with a
5  company called Biotech Value Fund, which is not easy
6  to get to the bottom of, exactly, what the arrangement
7  is.  But I try to read everything I can for all
8  related parties as well.  So you build a competence
9  from reading these things, what is going on.
10    Q    When did you first hear about Ligand?
11    A    I remember very clearly I was sitting in my
12  driveway and I was reading on my iPad and I was
13  looking through some screeners and generally the
14  thought on my mind was that bubbles were being
15  created.
16        The market had been in an upward march for
17  five years, and I began to be of the opinion that it
18  was safer for my investors to be short than to be
19  long.  Even though I had not done a lot of shorting,
20  the first issue we really shorted was World Wrestling
21  Entertainment.
22        And I was screening through companies that
23  had really very, very high statistics multiples,
24  things like Enterprise Value EBITDA or
25  price-to-earnings or price-to-book on some of these

1  things.  And I came across this company Ligand that
2  was just off the charts, and I decided to start
3  reading about it.  And that's how it started.
4        And I remember feeling immediately confused
5  by -- I couldn't get to the bottom of what the
6  business was, who owned what, where the money was
7  coming from and what the earnings were.  It was one of
8  the most convoluted group of statements and filings I
9  had ever come across.
10    Q    In that initial period when you were sort of
11  looking for short and looking through these screeners,
12  are there any other companies that caught your
13  attention?
14    A    Yeah, I'm sure there were many.
15    Q    Do you remember any of them?
16    A    Not offhand.
17    Q    Did you decide to look into any of them
18  beyond Ligand?
19    A    I'm sure I did.  I'm sure.  And we had just
20  shorted World Wrestling Entertainment, so that was
21  quite a bit of analysis that went into that.
22        And a fairly a new area for me as well.  It
23  dealt with TV and things that I had not necessarily
24  worked in.  It was an industry I had to learn, but it
25  wasn't a complicated one either.

Page 293

1 report; is that right?
2     A   Oh, I'm sorry.  What was that question
3 again?
4     Q   You said you were continuing to short?
5     A   Yes, that's what I said.  On July 3rd, yes.
6     Q   July 3rd.  Your next short was July 3rd
7 which is the date of your second report.
8     A   Okay.
9     Q   Is that right?
10     A   I guess.  I don't really recall now, but if
11 those are the dates of the reports...
12     Q   Do you have any reason to believe that this
13 transaction report from BTIG is incorrect?
14     A   No.  I think what we did say in the reports
15 we issued is that we're continuing to short the stock.
16 That we've continued to short it.  I guess, on
17 August 7th, we short it again.  On August 22nd, we
18 shorted a substantial amount.  And it looks like --
19 maybe that was a buy to cover that we shorted in
20 October again.  Buy to cover, so short again through
21 March and April.  So it was a number of transactions.
22     Q   Right.  And so we'll kind of go through all
23 of those.
24         So on July 3rd, you published your second
25 report, the appendix that we have marked as

Page 294

1 Exhibit 18.  And on the same day, you sold a little
2 over a thousand shares short.  Did you sell those
3 additional shares anticipating that your reports would
4 bring down the price of Ligand?
5     A   No.  I never know what the effect the
6 reports are going to have.  I think I even said that
7 on one of my interviews, that I have no way of knowing
8 what's going to happen with the stock.  I don't think
9 anybody does.
10     Q   Did you publish a report hoping that it
11 would bring down the price of the shares?
12     A   No.  I've never published anything, ever,
13 with the intention of changing the stock price.  All
14 of my reports have always been educational to, A, bring
15 public scrutiny to my work; and to, B, be instructive.
16         My hope when publishing those reports,
17 Virginia, with all of the essays I've published --
18 which probably total more than 70 -- has always been
19 to show people to think.  How to think about their
20 investments and what constitutes risk.  I can do that
21 on the long side or I can do it on the short side.
22 It's not to affect a stock -- the stock price.
23     Q   So if you were successful in publishing
24 these reports on Ligand and getting people, investors,
25 in Ligand to think about the risks that you saw with

Page 295

1 Ligand, what would the impact on the price have been?
2     A   It could just as easily have gone up.  I
3 mean, many times I buy a stock long and the price goes
4 down and many times I short it and it goes up.  I have
5 no way of knowing.  I mean, I put that in all my
6 reports.  That, if the price goes up or down, we can
7 buy it or sell it.  We have no way of knowing.  All we
8 know is that our research is good and it's right.
9         And I think, at the time, I was asked
10 specifically about that in a Benzinga interview.  And
11 he said, "Well, the stock went down.  I suppose you're
12 proud."
13         I said, "Well, I have no way of knowing
14 what's going to happen.  All I know is that our
15 research is good.  I stand by everything I say.  I'm
16 going to share this with the world."
17     Q   So my question is:  If investors found your
18 research compelling, what impact would that have had
19 on the price of Ligand stock?
20     A   I don't know.  It's hard to know how other
21 people behave or how they act.  My opinion is, as I've
22 stated earlier, that groups of people act in
23 irrational ways and often do precisely the wrong
24 thing.  And I was surprised that the price went down,
25 frankly.

Page 296

1         I mean, I've been criticized before, going
2 back to 2010.  I don't expect people to agree with
3 what I write.  Probably a minority agree with what I
4 write.  In fact, today I'm sure a minority of people,
5 probably less so after Valeant, but a minority of
6 people probably understand what I've been saying about
7 Ligand for the time being.
8     Q   You were surprised that the price went down
9 after you released your negative research reports on
10 Ligand?
11     A   I don't think they are negative.  I think
12 that they're an accurate, factually accurate and
13 rationale recounting of the flaws I see in the
14 company.
15     Q   You are not sure whether these reports are
16 negative about Ligand?
17     A   Well, I think what they are doing is
18 negative.  I think I'm recounting it and bringing it
19 to light in the reports.
20     Q   In a negative light?
21     A   I think in an accurate, truthful, and
22 rational light.
23     Q   Do you have a negative view of Ligand?
24     A   I do.
25     Q   Do you think your reports reflect that

Page 297

1 negative view of Ligand?
2    A   I don't think that they are subjective.  I
3 think they are objective.  I think it's an objective
4 recounting of a negative company.  It's not the
5 superimposition of a negative opinion of a positive
6 company.
7    Q   Do you think that Ligand is -- you think
8 that a company can be objectively positive or
9 negative?
10    A   Absolutely.  I think financial statements
11 don't lie.  I think numbers don't lie, unless they've
12 been manipulated fraudulently.  Like I said earlier,
13 accounting is not something that is open to creativity
14 or subjectivity.  When PAWC decides to move a tax into
15 operating expenses, that's a problem.  It's incorrect.
16 It's wrong.
17    Q   So you were surprised when your reports on
18 Ligand -- sorry -- you were surprised when, following
19 your reports on Ligand, the price went down?
20    A   Yes.
21    Q   Did you expect the price to go up?
22    A   I didn't even ask the question.  I just
23 thought this is important research and I'm going to
24 share it with the world, like all my research reports.
25 And I think it's a bubble.  It's part of the

Page 298

1 pharmaceutical industry and I think these are abuses
2 of part of that bubble.  And this is an important
3 story to share and to show what's really going on in
4 terms of this company's real earnings and its real
5 financial condition versus what they're saying in
6 earnings calls, investor presentations, and press
7 releases.
8        And I think that's probably the motivation,
9 I would guess, of most activist short sellers, is a
10 desire for truth and justice when you see something
11 wrong.  I think it's probably very similar to how
12 detectives feel, I would imagine.  When they uncover
13 something wrong, they want to find the answer and they
14 want to pursue the answer.  I think that's the
15 motivation most short sellers probably feel.
16    Q   Do you consider yourself an activist short
17 seller?
18    A   Maybe.  Maybe I am an activist.
19    Q   Do you consider yourself a detective?
20    A   I think all good investors do detective
21 work.  Whether they are long or short.
22    Q   When you short a stock -- when you are
23 making an investment decision on a company, would you
24 short a stock if you expected the price to go up?
25    A   I would probably take a small short position

Page 299

1 to watch it but I've never been able to gauge whether
2 a stock goes up or down.  I've said that countless
3 times on interviews, TV, annual reports.  I have no
4 clue where prices will go.  I never know.
5        You know, I see these silly reports in
6 Bloomberg saying he thinks he's a clairvoyant.  When
7 have I ever said that?  The only thing I've ever said
8 is that I have no clue where prices are going to go.
9 And I've been consistent on that for six years.
10    Q   Didn't you testify this morning that you've
11 never been wrong about what would happen with a stock?
12    A   No.  I don't recall saying that.  I said
13 that I've been wrong and I've made mistakes.  I've
14 recounted them in the annual reports.
15    Q   You never suggested that you know things
16 before they happen?
17    A   When I met with the Wall Street Journal
18 reporter, I told him that when I met my wife I know I
19 was going to marry her and he translated that into an
20 article that I would know things before they happen.
21    Q   You didn't say that?
22    A   Well, sometimes I do know things before they
23 happen.  I knew I was going to marry my wife when I
24 first met her, but a lot of people say that.  It's
25 instincts.  I was not talking about securities markets

Page 300

1 when I said that.  He twisted that.
2    Q   You said if -- you thought -- if you thought
3 the price of a stock would go up you might take a
4 small short position?
5    A   Well, I don't even ask the question if the
6 price is going to go up or down.  I never -- it never
7 enters my mind.  And you can say maybe a hundred
8 thousand words of reports have been published by me.
9 I don't recall speculating how a price will go.
10        Now, what I do talk about is intrinsic
11 value, what I think the company's really worth.  When
12 it will get there or if it will be recognized, ever,
13 my appraisal of value, I don't know.  But I always say
14 that an appraisal of value is approximate.  I talk
15 about intrinsic value.  I don't talk about price
16 targets or when they are going to be reached.
17    Q   If you took a large short position in a
18 company using the Amvona Fund's investors' funds and
19 the price never went down, your investors would lose a
20 lot of money wouldn't they?
21    A   It depends on how much the price went up.
22 If it went up 5 percent, they'd lose 5 percent.  If it
23 went up 100 percent, they'd lose 100 percent.
24    Q   If it was a large investment, 5 percent
25 would be a lot of money, wouldn't it?

Page 357

1      MS. DESILETS:  Why don't we go off the record
2  at 6:18 p.m.
3      (A discussion was held off the record.)
4      MS. DESILETS:  So back on the record at 6:19
5  p.m.
6      Father Emmanuel, thank you for your time
7  today.
8      We're going to recess for the evening and
9  return back here at nine o'clock in the morning.  And
10 you can leave all of the exhibits here with us.
11     THE WITNESS:  Yeah, I will.
12     MS. DESILETS:  But you are free to take your
13 binder with you.
14     And, Counsel, I will ask you to leave your
15 copies of the exhibits here as well.
16     MR. MacLEAN:  Oh, yeah, sure.
17     THE WITNESS:  Can you make a copy of this so
18 I can take it and read it?
19     MS. DESILETS:  We'll make a copy right now
20 and we'll give it back to you.  But we'll keep the
21 original here, and we will send you home with a copy
22 tonight.
23     THE WITNESS:  Okay.  I have other documents
24 you might want to copy.  Do you want them now or do you
25 want them tomorrow?  Like, these are even more

Page 358

1  important, I think, than this (indicating).  This is
2  almost, like, just a funny article I wrote for myself.
3  The other ones are really more intense analysis.
4      MS. DESILETS:  Sure.  If there's any
5  documents that you want to provide to us today, we can
6  make a copy of those now when we go off the record and
7  give you the originals back.
8      So we're going to go off the record at 6:20
9  p.m.
10     (Whereupon, the proceedings adjourned
11     at 6:20 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 359

1      CERTIFICATE OF NOTARY PUBLIC
2      I, LESLIE A. TODD, the officer before whom
3  the foregoing proceedings were taken, do hereby
4  certify that the proceedings were taken down by me in
5  stenotypy and thereafter reduced to typewriting under
6  my direction; that said transcript is a true record of
7  the proceedings; that I am neither counsel for, related
8  to, nor employed by any of the parties to the action in
9  which these proceedings were taken; and, further, that
10 I am not a relative or employee of any counsel or
11 attorney employed by the parties hereto, nor
12 financially or otherwise interested in the outcome of
13 this action.
14
15 Dated this 21st day of July 2016.
16
17     _____
       LESLIE A. TODD
18     Notary Public in and for the
       District of Columbia
19
   My commission expires:
20 November 14, 2017
21
22
23
24
25

Page 360

```
1          SECURITIES AND EXCHANGE COMMISSION
2
3
4
5  - - - - - - - - - - - - - - )
6  In the Matter of:        ) Matter No. HO-12718
7  Trading in the Securities of  )
8  Ligand Pharmaceuticals, Inc.   )
9  - - - - - - - - - - - - - - )
10
11
12            V O L U M E  II
13
14      TESTIMONY OF GREGORY M. LEMELSON
15            WASHINGTON, D.C.
16          THURSDAY, JULY 21, 2016
17                9:25 A.M.
18
19
20
21
22
23  Job No. 65156
24  Pages 360 - 705
25  Reported by:  Leslie Anne Todd
```

Page 361

```
1      Deposition of GREGORY M. LEMELSON was held at:
2
3      Securities and Exchange Commission
4      100 F Street Northeast
5      Washington, D.C. 20549
6
7      Pursuant to agreement, before Leslie Anne Todd,
8  Notary Public of the District of Columbia.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 362

```
1              A P P E A R A N C E S
2
3  For the Securities and Exchange Commission:
4      VIRGINIA M. ROSADO DESILETS, ESQUIRE
5      JEFFREY FINNELL, ESQUIRE
6      SONIA TORRICO, ESQUIRE
7      Securities and Exchange Commission
8      100 F Street Northeast
9      Washington, D.C. 20549
10     (202) 5510-4955
11
12  For the Witness:
13     DOUGLAS F. MacLEAN, ESQUIRE
14     Armor Compliance
15     22 Batterymarch Street
16     Boston, Massachusetts 02109
17     (617) 501-2055
18
19  ALSO PRESENT:
20     LUCY GAUTHIER (Intern)
21
22
23
24
25
```

Page 363

```
1              C O N T E N T S
2
3               - - - - - - -
4
5             E X H I B I T S
6             (Retained by SEC)
7
8   NUMBER   PAGE        NUMBER    PAGE
9     25     367      37      493
10    26     368      38      517
11    27     388      39      519
12    28     395      40      526
13    29     411      41      538
14    30     413      42      555
15    31     415      43      583
16    32     419      44      583
17    33     421      45      626
18    34     425      46      628
19    35     426      47      629
20    36     452      48      640
21
22
23
24
25
```

Page 364

1      P R O C E E D I N G S
2      -------------------
3      MS. DESILETS:  Back on the record at
4  9:25 a.m.
5  BY MS. DESILETS:
6    Q    Good morning, Father Emmanuel.  Welcome
7  back.
8    A    Good morning.  Thank you.
9    Q    Before we continue, I wanted to summarize a
10  conversation that we had after we went off the record
11  last night.  You had asked us about the formal order
12  of investigation and whether we are investigating
13  Ligand or any other parties, and I informed you that
14  that wasn't information we were at liberty to share or
15  are really ever at liberty to share.
16      You also asked whether it was customary for
17  us to ask background questions about a witness, and
18  particularly about your wife, and I explained that we
19  do usually ask background questions about the witness,
20  and in this particular case, your wife is the owner of
21  Lemelson Capital Management, which makes her a little
22  bit more relevant.
23      You also asked about your -- I think you
24  referred to it as your whistleblower complaint, a
25  complaint that you submitted through our Tips,

Page 365

1  Complaints and Referral system, and I let you know
2  that those get triaged through our Office of Market
3  Intelligence and are referred to attorneys if there is
4  already an open investigation relevant to the
5  complaint.  So that was referred to us and we do have
6  that complaint that you submitted.
7      And that's my recollection of the
8  conversation.  Is that an accurate summary of that
9  conversation?
10    A    That's more or less what I recall.
11    Q    Did I leave anything out?
12    A    Well, yeah, I don't think anything too
13  important, just the specificity of my question dealt
14  with when we were married and when we met, that kind
15  of thing, my wife, but I don't know if that's
16  relevant.
17    Q    Sure.  No, I mean, let's -- I want the
18  record to reflect what you can recall about the
19  conversation.  So if there's more that you want --
20      THE WITNESS:  Are we allowed to ask that?
21      MR. MacLEAN:  I think the only thing was just
22  we asked about whether Friday will be necessary, and I
23  think you indicated that it looks like Friday will be
24  necessary.  That's the only thing I can remember.
25      THE WITNESS:  I think you said half the day

Page 366

1  on Friday would be necessary.  Other than that, I'm
2  trying to remember.
3  BY MS. DESILETS:
4    Q    So I think based on the pace that we've been
5  going, that went on the first day, it does look like
6  Friday will be necessary.  I don't know whether it
7  will be a half or a full day.  It depends on what
8  happens today.
9    A    Yeah, I think what I asked yesterday too was
10  if you seek to understand the whole person, I probably
11  used some expression like that.  It's probably not
12  relevant the exact expression, but if the record is
13  important --
14    Q    Is that everything?
15    A    I think so.
16    Q    Okay, great.
17      Father Emmanuel, do you understand that the
18  oath that you took yesterday still applies to your
19  testimony today?
20    A    Yes.
21    Q    Great.  I want to go back a little bit to
22  the timeline of your trading and your interviews with
23  Benzinga.  There are a few interviews we talked about
24  yesterday that you couldn't recall specifically.  And
25  I have some documents that might help with that.

Page 367

1      And I can refer you -- but you have in front
2  of you Exhibit 16 that has your trading.
3      So we talked about March 23rd, 2015 sales.
4  Do you see that?
5    A    I see them, yes.
6    Q    And I asked if you had participated in an
7  interview with Benzinga on March 24th, and I think you
8  weren't entirely sure about that.  Is that right?
9    A    Yeah, I don't recall the dates.
10      (Exhibit No. 25 was marked for
11      identification.)
12  BY MS. DESILETS:
13    Q    I'm handing you what has been marked as
14  Exhibit 25.  This is a document with page numbers
15  SEC-Lemelson-E-0067121 through 125.
16      Do you recognize this document?
17    A    It looks like an e-mail that -- an exchange
18  between myself and Brianna Valleskey.  I don't
19  particularly remember it.
20    Q    Do you have any reason to believe you didn't
21  receive this e-mail?
22    A    No.
23    Q    Does it appear from this e-mail that the
24  March 24th, 2015 interview on Benzinga was scheduled
25  on March 23rd, 2000 -- I'm sorry, February 23rd, 2015?

Page 372

1   Q    That was Exhibit 24.  It should be on the
2 top of your stack.  That was the June 7th article
3 about your June 5th --
4   A    Yes, this is the article you asked me if I
5 had asked them to write, and I said no.  I remember
6 this now.
7   Q    That is a summary of your -- that is a
8 description of your June 5th appearance on Benzinga,
9 right?
10   A    It appears to be.
11   Q    If you look again to Exhibit 16, your
12 trading in Ligand, there's also a sale of 200 shares
13 on May 18th, 2015.
14   A    Yes.
15   Q    By May 18th, 2015, you also had been
16 informed that you would be appearing on Benzinga on
17 June 5th; is that right?
18   A    That was, yes, Brianna's request for me to
19 appear on that day.
20   Q    To which you had agreed?
21   A    Presumably, if I appeared on the show.
22   Q    I'm going to go back to the reports that we
23 discussed yesterday, which are Exhibits 17 through 21,
24 the reports that you released relating to Ligand.
25   A    Just a moment.  I have to find them.

Page 373

1   Q    Sure.  Take your time.
2   A    You said 17 through 21, right?
3   Q    Yes.
4   A    Okay.  I have them in front of me.
5   Q    Great.  You testified yesterday that these
6 reports were objective, factual, and accurate.  Is
7 that right?
8   A    Yes.  That's how I view them.
9   Q    Don't these reports include your opinions
10 about Ligand?
11   A    I try to be as objective as I can in writing
12 any report.
13   Q    What do you mean by that?
14   A    Well, I think it's always good to be
15 objective in investing and in life in general.
16   Q    Do these reports contain your opinions about
17 Ligand?
18   A    I don't recall.  I -- my general approach to
19 writing articles is to try to be as objective as
20 possible.
21   Q    You don't recall whether these opinions
22 include -- whether these research reports include your
23 opinions versus facts?
24   A    Well, it's been over two years, so I haven't
25 really reviewed these since then.

Page 374

1   Q    So you have a pretty hefty binder here of
2 materials that you reviewed in anticipation of this
3 testimony today; is that right?
4   A    Well, I -- I compiled it.  I didn't have
5 nearly enough time to review it.  And most of it I
6 wish I had had more time, but it was a cursory review.
7 And most of what I spend my time doing is compiling
8 the new notes, which I gave you yesterday.
9   Q    But you didn't review the five research
10 reports in preparation for your testimony today?
11   A    Not carefully, no.  I just -- just a real
12 quick review of what are the reports, printed them,
13 and it was all done the day -- the day before we left
14 and the day we left, in between a number of other
15 tasks.  So...
16   Q    So your testimony is that sitting here
17 today, you are not aware of whether or not these five
18 reports contain your opinions about Ligand?
19   A    Well, my recollection is that after our
20 October phone call, I went back and read them.  I
21 didn't read them before our October phone call either,
22 actually.  I probably should have.  But I did go back
23 and read them after the October phone call, and my
24 recollection of it is that I thought it was very good
25 research and that it was all factual and that it was

Page 375

1 all information which was publicly available, either
2 from the company's management team's comments or their
3 filings with the SEC.
4   Q    So your recollection is that these research
5 reports include facts, not opinions.
6   A    That's my recollection.
7   Q    What sources did you use as a basis for
8 these reports?
9   A    Public filings with the SEC, conference call
10 transcripts, quarterly filings.
11   Q    Anything else?
12   A    Interviews, investor presentations.
13   Q    Anything else?
14   A    I probably used other things.  I may have
15 referenced some information from analysts, other
16 analysts.  I remember a particular one company, Empire
17 Capital, shared with me their research report.  They
18 called me and wanted to talk to me about my research
19 report.
20   Q    Any other sources?
21   A    There may be others.  I don't recall.  I
22 received some messages from an individual who worked
23 for a university for Ligand who had been, I think,
24 perhaps making Captisol sales, he shared some
25 information with me.

Page 376

1    THE REPORTER:  Perhaps making?
2    THE WITNESS:  Captisol.  C-A-P-T-I-S-O-L.
3    But I never really looked at his complaint.
4 I think I shared that with you on the phone last
5 October.  He sent me some subsequent messages, but I
6 really haven't read them.  So I don't think anything he
7 gave me was included, but he contacted me.
8 BY MS. DESILETS:
9    Q    Any other sources you can think of today?
10    A    Not off the top of my mind.  There could be
11 others, though.  It's been a couple of years.
12    Q    You mentioned public filings.  For which
13 companies did you look at public filings in your
14 research for these reports?
15    A    Well, I looked at Ligand's, of course, and I
16 looked at their partners, Novartis, GSK, Merck,
17 Retrophin, TG Therapeutics, Sage.  There were probably
18 others as well.
19    Q    But none you can think of today?
20    A    There was probably other research.  I just
21 can't think of it today.
22    Q    For Ligand, which public filings did you
23 look at?
24    A    Everything.  I looked at their proxy
25 statements, their quarterly filings, their annual

Page 377

1 reports and all of their amendments.  I think they had
2 11 amendments in the last couple of years.
3    Q    Amendments to what?
4    A    Their SEC filings.
5    Q    Do you know which SEC filings were amended?
6    A    I think there were several annual reports,
7 quarterly reports.  I don't remember exactly which
8 ones.  I think there was 11 I counted in the last
9 three years.
10    Q    And that was -- your recollection was that
11 that was 10-Ks and 10-Qs?
12    A    I believe so, yeah.
13    Q    When you say you looked at everything for
14 all of Ligand's public filings, going back to when?
15    A    I probably went back -- probably I focused
16 on the last four or five years, but I probably went
17 back ten or fifteen years at some point.  I was
18 interested in the previous version of Ligand.  I later
19 learned that, actually through the company's press
20 releases, that Dan Loeb had been involved in the
21 company.  I just learned yesterday in fact that he got
22 a $250 million special dividend as part of his, I
23 guess, activist role in the company.  And at the time
24 I went back and studied that.  I studied actually Dan
25 Loeb's reports when he made commentary on Ligand.

Page 378

1 That's another source I accessed.
2    I read research reports that other people
3 published online.  I don't think they have any value.
4 I don't think I used any of that material.  I read --
5 I think I mentioned this already -- but the research
6 reports from analysts.  I mean everything that I could
7 find that was publicly available I read.
8    Q    So for the Ligand public filings, you
9 focused on the last four or five years.  The first
10 report was issued in June 2014, so your focus would
11 have been roughly the filings made between 2010 and
12 2014; is that right?
13    A    Probably, yes.  I mean when I researched the
14 finances of the company, though, I would have went
15 back further.  When I look at just the financial
16 numbers, I probably would have went back 15 or 20
17 years.  You know, I have -- I use GuruFocus for that,
18 and I can export all of the financial statements in a
19 nice Excel format where I can analyze them.
20    Q    What kind of filings did you look at for
21 Ligand's partners?
22    A    The same sorts of things.  Public filings.
23 I used BamSEC for my testimony yesterday, and it would
24 have been annual reports, quarterly reports,
25 conference calls, proxy statements.

Page 379

1    Q    For what period?
2    A    Probably two or three years.  Probably the
3 years that were relevant to their relationship with
4 Ligand.
5    Q    For Ligand, do you recall which conference
6 call transcripts you looked at?
7    A    Probably read all of them for those years.
8 I read --
9    Q    For the four or five years?
10    A    Yeah.  I don't know for sure, but I probably
11 would have read the majority, if not all of them, for
12 at least three or four years.  I mean I was interested
13 in getting as much information as I could on what the
14 company was saying or trying to say.
15    Q    Did you also look at Viking public filings
16 or documents?
17    A    I did.
18    Q    Which ones?
19    A    I looked at their S-1 registration.  I
20 looked at management's commentary in those filings.  I
21 looked at their annual reports when they became
22 available, which was later.  I reengaged with the
23 story after the Viking IPO.  You know, it wasn't clear
24 in 2014 if the Viking IPO would succeed.  So I had
25 begun to talk about if this were to succeed, what does

Page 680

1    Q   Do you think that investors take away from
2  what you say more than the actual words you've said?
3    A   I have no way of knowing what other people
4  think or take away.  What I do know is in the Ligand
5  short, people generally discredited everything I said
6  was my experience of reading online message board and
7  so forth.
8    Q   We talked earlier about your use of the word
9  "essentially" as a qualifier to insolvent.  You had
10  some opinions about what that word would convey to
11  readers beyond just the definition of essentially.  Is
12  that the only instance in which you gave thought to
13  how people might interpret what you say?
14    A   Well, in the case of insolvent, because
15  we're leaving the door open to how the management team
16  would probably defend their use of intangibles, but in
17  the Benzinga interview, I'm simply recounting the
18  results of my research.  So it's not subjective that I
19  could find no evidence.  That was the result of my
20  research.  I couldn't find any evidence of Novartis
21  saying they were going to continue to invest in it.
22    Q   You think all of your interviews with
23  Benzinga were simply objective recountings of fact?
24    A   They're me sharing my research that I
25  conducted and how I saw that research.

Page 681

1    Q   Your facts.  The facts that you found.
2    A   Well, yes.  I mean, I always want my
3  research to be based on facts and to be objective.
4  Absolutely.
5    Q   Did you ever share your opinions with the
6  Benzinga audience?
7    A   I don't recall.  Perhaps.
8    Q   Did you ever make recommendations to the
9  Benzinga audience?
10    A   Perhaps.  It's a lot of interviews.
11    Q   So you weren't just sharing the facts that
12  you encountered in your research, you were going
13  beyond that in your interviews.
14    A   Well, I probably was sharing conclusions.
15    Q   Opinions?
16    A   I suppose.  I don't know.  I haven't
17  listened to those interviews in a long time.
18    Q   So even though you shared your opinions,
19  shared your conclusions, made recommendations, in this
20  particular instance, you did not expect people to draw
21  conclusions from the facts that you were sharing with
22  them.
23    A   What I recall, Virginia, from reading again,
24  all the commentary was that it was nobody -- I
25  shouldn't say nobody -- I think one person I read in

Page 682

1  all the research reactions on Seeking Alpha or Yahoo
2  message boards, I don't recall anyone being supportive
3  of my thesis.
4    Q   So because nobody credited what you were
5  saying, you could say whatever you wanted?
6    A   No, no.  Benzinga would invite me on and ask
7  me about these things and I would share, you know, the
8  results and conclusions of my research.  So, of
9  course, I want all my statements to be fact-based and
10  truthful.  And that's how I believe all of it was.
11    Q   Did you read every statement, every press
12  release, every public filing, every word that Novartis
13  had put out since it acquired Promacta before making
14  this statement?
15    A   I probably tried to.  I probably tried to
16  find all the ones that were available publicly.
17    Q   Why would you say, "Novartis has given no
18  indication" instead of "I have found no indication"?
19    A   I suppose it's just a difference in choice
20  of words how you describe something.
21    Q   You think they're both equally accurate?
22    A   Well, if you say I -- "Novartis has given no
23  indication" and you're talking about your research,
24  then I think it's implicit in the commentary that
25  you're talking at this time about your research and,

Page 683

1  you know, your view of what you've concluded from
2  that.
3    Q   If you say, "Novartis has given no
4  indication whatsoever," isn't it implicit in that that
5  you've looked at every word that they've said?
6    A   It's implicit in everything I've looked at
7  at least.
8    Q   Well, you don't say, "Novartis has given no
9  indication in the documents I reviewed."
10    A   I mean, it seems to me that you could
11  probably take any statement from anybody on any day of
12  the week and find an improvement to the way something
13  is worded.  But at that point it's me talking about my
14  research and at that point I had no indication,
15  couldn't find any indication of Novartis saying they
16  were going to continue to invest in Promacta.
17        The thing I've learned reading a lot of
18  financial statements over the years is that if
19  something cannot be found easily, there's probably a
20  reason for it.  Because when there's really good news
21  about something in a company, it's usually easy to
22  find.
23    Q   Turning to Exhibit 18, which is the
24  July 3rd, 2014 report titled "Appendix."
25    A   Yes.  I have it.

Page 704

1  you?

2    A    Yes.

3        MS. DESILETS:  Okay.  Going off the record at

4  6:20.  I'm sorry?

5        THE WITNESS:  Should we plan on being here

6  the whole day tomorrow?

7        MS. DESILETS:  I think so.  Yes.  I think it

8  probably will be the whole day tomorrow.

9        THE WITNESS:  Okay.

10       MS. DESILETS:  So off the record at 6:20 p.m.

11       (Whereupon, the proceedings adjourned

12       at 6:20 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 705

1        CERTIFICATE OF NOTARY PUBLIC

2      I, LESLIE A. TODD, the officer before whom

3  the foregoing proceedings were taken, do hereby

4  certify that the proceedings were taken down by me in

5  stenotypy and thereafter reduced to typewriting under

6  my direction; that said transcript is a true record of

7  the proceedings; that I am neither counsel for, related

8  to, nor employed by any of the parties to the action in

9  which these proceedings were taken; and, further, that

10 I am not a relative or employee of any counsel or

11 attorney employed by the parties hereto, nor

12 financially or otherwise interested in the outcome of

13 this action.

14

15 Dated this 22nd day of July 2016.

16

17  _____

          LESLIE A. TODD

18        Notary Public in and for the

          District of Columbia

19

    My commission expires:

20 November 14, 2017

21

22

23

24

25

Page 708

1 THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3 In the Matter of:          )

4                    )  File No. HO-12718-A

5 TRADING IN THE SECURITIES OF  )

6 LIGAND PHARMACEUTICALS, INC.  )

7

8 WITNESS:  Gregory Lemelson

9 PAGES:   708 through 1009

10 PLACE:    Securities and Exchange Commission

11        100 F Street, NE

12        Washington, D.C.

13 DATE:    Friday, July 22, 2016

14

15     The above-entitled matter came on for hearing,

16 pursuant to notice, at 9:15 a.m.

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25          (202) 467-9200

---

Page 709

1 APPEARANCES:

2

3 On behalf of the Securities and Exchange Commission:

4     VIRGINIA M. ROSADO DESILETS, ESQ.

5     JEFFREY FINNELL, ESQ.

6     SONIA TORRICO, ESQ.

7     Securities and Exchange Commission

8     Division of Enforcement

9     100 F Street Northeast

10     Washington, D.C. 20549

11     (202) 5510-4955

12

13 On behalf of the Witness:

14     DOUGLAS F. MacLEAN, ESQ.

15     Armor Compliance

16     22 Batterymarch Street

17     Boston, Massachusetts 02109

18     (617) 501-2055

19

20 ALSO PRESENT:

21     LUCY GAUTHIER, Intern

22

23

24

25

---

Page 710

1           C O N T E N T S

2

3 WITNESS                    EXAMINATION

4 Gregory Lemelson                712

5

6 EXHIBITS    DESCRIPTION            IDENTIFIED

7     50    Agreement          721

8     51    Form S-1          722

9     52    Excel Document        794

10     53    Form 8-K          826

11     55    E-mail          851

12     56    Spreadsheet        854

13     57    E-mail          903

14     58    E-mail          913

15     59    E-mail          915

16     61    E-mail          931

17     62    Correspondence        937

18     63    E-mail          958

19     64    Article          968

20     65    Response          969

21     66    Response          970

22     67    Article          974

23

24

25

---

Page 711

1          C O N T E N T S (CONT.)

2

3 EXHIBITS    DESCRIPTION            IDENTIFIED

4     68    Article          975

5     69    Press Release        989

6     70    E-mail          1001

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 712

1              P R O C E E D I N G S
2         MS. DESILETS:  Going back on the record at
3  9:15 a.m.
4  Whereupon,
5              GREGORY LEMELSON
6  was recalled as a witness and, having been
7  previously duly sworn, was examined and testified
8  further as follows:
9              EXAMINATION
10       BY MS. DESILETS:
11    Q   Welcome back, Father Emmanuel.
12    A   Thank you.
13    Q   While we were off the record, did you have
14  any substantive communications with the staff of the
15  SEC?
16    A   No.  But I did want to say that yesterday
17  off the record, I did have a -- I don't think it's
18  substantive at all, but I did just discuss with our
19  transcriptionist, you know, her work and transcribing
20  and so forth, where she used to work, that kind of
21  thing.  I don't think it's substantive, but just in
22  the interest of having full disclosure.
23    Q   Sure.  Sure.  That's not what we would
24  typically consider substantive.  I think you're right
25  about that, but it's fine to summarize just so that

Page 713

1  we're clear.
2         Do you understand that the oath that you
3  took two days ago is still applicable to today's
4  testimony?
5    A   I do.
6         And if it's okay, Virginia, with you, I had
7  just a few follow-on comments from our discussion
8  yesterday that occurred to me after our time.
9    Q   Okay.
10    A   So if the beginning is appropriate, I would
11  like to share those.
12    Q   Sure.
13    A   If not, I can do it at a later time.
14    Q   Sure.  Go ahead.
15    A   We talked yesterday about some of the
16  representations made in the report, the Lemelson
17  reports, and it occurred to me that we do have a full
18  disclaimer on those reports that would indicate to the
19  reader that their sources are not necessarily
20  independently verified.  But I could read part of it,
21  it's approximately just over a one-page disclaimer.
22    Q   So the exhibit is in the record.  I don't
23  think you need to read it into the record.
24    A   Okay.  Another issue is that we talked a
25  little bit about the commercial viability of some the

Page 714

1  key royalty programs at Ligand, including Promacta,
2  and although I alluded to it in the last two days, I
3  thought it was probably worth just clarifying again
4  that the general thesis of the 2014 reports was that
5  these assets would not produce materially for the
6  company.  That's paraphrasing.  And between 2014 and
7  2015, sans what Lemelson Capital believes were fraud
8  entries on the financial statements of the company,
9  the company's actual earnings declined 80 percent
10  between fiscal year end 2014 and 2015.  And we believe
11  that, above all else, that's a validation of the
12  thesis.
13         On a slightly different note, I just wanted
14  the record to reflect that in the last day or two, and
15  I alluded to this as well, I have felt quite tired and
16  a bit worn down.  And while I'm trying to do my best
17  to testify, and I will continue to try to do my best,
18  I hope that my testimony has been adequate and as
19  straightforward as the SEC would like, and that I've
20  been able to answer all of your questions.
21         But I have felt from time to time that I'm
22  being interviewed by more than one person because,
23  Virginia, your assistant Sonia consistently hands you
24  notes, and I feel a bit distracted by that when I'm
25  speaking, and I feel that I'm not interviewed by one

Page 715

1  but actually two people, and I don't think the record
2  reflects that.
3         I've also felt, given the huge amount of
4  information here, it simply isn't possible to find
5  answers as quickly without the benefit of a laptop or
6  an iPad, which the interviewers have the benefit of.
7  I'm not saying there is anything wrong with that.  I'm
8  just saying that I am mostly responding from memory.
9  So if there are any inadequacies in my testimony, and
10  I hope there aren't, it's likely due to that.
11    Q   So let me clarify a couple of things.
12  Ms. Torrico, who is sitting next to me, is not my
13  assistant.
14    A   Okay.
15    Q   She is an officer of the Commission for
16  purposes of this proceeding.
17    A   Okay.
18    Q   She is an attorney with the Enforcement
19  Division of the Commission, and as an officer of the
20  Commission named in the formal order, she is entitled
21  to ask you questions.
22    A   Absolutely, yeah.
23    Q   As well as to -- and the reason she
24  sometimes passes a note to me rather than asking you a
25  question is so that you won't feel that you're

Page 720

1    A    No.

2    Q    Do you know what you were relying on when
3  you made this statement about Viking's intentions?

4    A    It was likely their S-1.

5    Q    Is it your recollection that their S-1 said
6  that they don't intend to conduct any preclinical
7  studies or trials?

8    A    Yes, that is my recollection.

9    Q    And that they don't own any products or
10  intellectual property?

11    A    That's my understanding of it, yes.

12    Q    If that language were included in Viking's
13  S-1, wouldn't you have included that language from the
14  S-1 in this report?

15    A    I believe that language is derived from the
16  S-1.

17    Q    Is there a reason you didn't put the
18  language from the S-1 into the report?

19    A    I believe that is either a summary or a
20  paraphrasing of the language.

21    Q    Is there a reason you didn't cite to the S-1
22  here?

23    A    No, no particular reason I can think of.  It
24  may have also been taken from Ligand's public filings
25  as well.

Page 721

1        (Exhibit No. 50 was marked for
2        identification.)
3        BY MS. DESILETS:

4    Q    I just handed you what's been marked as
5  Exhibit 50.  Do you recognize this document?

6    A    No.

7    Q    This is the master license agreement between
8  Ligand Pharmaceuticals and Viking Therapeutics.

9    A    Do you have a copy of the 2014 filings,
10  public filing for Viking aside from the MLA?

11    A    I have the S-1 filing which I will show you,
12  yes.

13    A    Okay, great.

14    Q    If you can look at -- I'm sorry, did you
15  read the master license agreement between Ligand and
16  Viking?

17    A    I don't recall.  I may have.

18    Q    You don't recall whether you read this at
19  the time you were writing your report?

20    A    No, I don't recall.

21    Q    If you look at the bottom of that first
22  page, the last paragraph on that page, does that
23  indicate that Viking is engaged in research,
24  development, manufacturing and commercialization of
25  pharmaceutical products, and is interested in

Page 722

1  developing and commercializing products containing or
2  comprising compounds?

3    A    Yes, it does indicate that.

4    Q    Is that inconsistent with your statement
5  in --

6    A    It was inconsistent with my research, yes.
7  My research indicated that Viking Therapeutics did not
8  have enough capital to pay their rent to Ligand
9  Pharmaceuticals, let alone engage in research and
10  development and manufacturing and the
11  commercialization of pharmaceutical products.

12    Q    Is your statement about what Viking intends
13  to do relying on your understanding about what amount
14  of cash they had on hand?

15    A    The statements in my research report are
16  derived from the public filings and if I had access to
17  the S-1 statement, I believe that is where it was
18  derived from.

19    Q    Did you read the exhibits to the S-1
20  statement?

21    A    I don't recall now.

22        (Counsel conferring.)

23        (Exhibit No. 51 was marked for

24        identification.)

25        BY MS. DESILETS:

Page 723

1    Q    I just handed you what's been marked
2  Exhibit 51.  This is the Form S-1 registration
3  statement filed by Viking Therapeutics.

4        This is the filing you're referring to?

5    A    Well, this was filed with the Commission on
6  July 1st.

7    Q    Yes, it was.  July 1st, 2014.

8    A    And what was the date of the Exhibit 18?

9    Q    Your report?  I believe the testimony
10  reflected on the first day that that was published on
11  July 3rd, 2014.

12        Okay.  (Perusing document.)

13    Q    Is this the document that you relied on in
14  your statement in the report on page 7 about Viking's
15  intentions?

16    A    It likely is, although I don't have a
17  specific memory of it now.

18    Q    Do you know where in the document you got
19  that information from?

20    A    On page 9 of 196 of the Form S-1, it says:
21  "We have a very limited operating history and are
22  expecting to incur significant operative losses."

23        THE REPORTER:  It says --

24        THE WITNESS:  I'm sorry.  Please remind me as
25  often as possible.

Page 724

1      THE REPORTER:  Okay, I will.
2      THE WITNESS:  I don't mean to do that.  I
3   just keep forgetting.
4      "During the early stage of our corporate
5   development, we are substantially dependent on
6   technologies we license from Ligand.  If we lose the
7   right to those licenses, such technologies or the MLA
8   with Ligand is terminated for any reason, our ability
9   to develop existing and new drug candidates would be
10  harmed.  We are dependent on the success of our current
11  drug candidates, and we cannot be certain that any of
12  them will receive regulatory approval or be
13  commercialized."
14      BY MS. DESILETS:
15   Q   You're reading from the section titled --
16   A   Where the -- yes.
17   Q   So let me just get the questions out before
18  you answer.
19   A   Okay, sorry.
20   Q   So the section at the bottom, there is a
21  number 5, and below that it says 9 of 196, and the
22  section is titled "Risks Related to Our Business."
23   A   Yes.
24   Q   And this section "Risks Related to Our
25  Business" is what you're relying on for this statement

Page 725

1   in page 7 of Exhibit 18?
2      A    In part.  I mean it's been two years, and
3   I'm sure most of everything I got was from public
4   filings.  I mean this is only one of 196 pages, but
5   this is part of it.
6      Q   And does it say under the risk section that
7   Viking does not intend to conduct any preclinical
8   studies or trials?
9      A   What it indicates under the risk section is
10  that Viking doesn't have the resources to conduct
11  preclinical trials.
12     Q   So not that it doesn't intend to, but that
13  you didn't believe it had sufficient resources to do
14  so.
15     A   That's what this page is indicating.
16      I also would just note for the record that
17  on page 3 of 196, I just noticed that Roth Capital
18  Partners, who we discussed yesterday, Joseph
19  Pantginis, one of the advocates for Ligand, and one of
20  the research analysts, who curiously criticized us as
21  selling the stock short, appears to be an underwriter
22  of the IPO, if I'm reading this correctly.
23     Q   Could you turn to page 10 of your
24  Exhibit 18.
25     A   Exhibit 18.  Yes.

Page 726

1      Q   Page 10.  That sentence on the very top of
2   the page:  "In other words, Marcum was merely hired,
3   but the company has not yet even consulted with the
4   firm on any material issues.  The financial statements
5   provided on the S-1 accordingly are unaudited."
6      A   I believe that statement is directly from
7   the company in their public filings.
8      Q   Where did you find that?
9      A   Well, it's a very large document, so I'd
10  have to spend some time looking for it.
11     Q   Turn to page 158 of the document.  It's
12  page 158.  In the larger numbers, 162 of 196.  There
13  is a section called "Changes in and disagreements with
14  independent registered public accounting firm on
15  accounting and financial disclosures."
16      And the last paragraph of that section
17  relates to the retention of Marcum.
18     A   Are there public filings for Viking prior to
19  this S-1?
20     Q   I don't know the answer to that right now.
21  Do you think there are public filings that you looked
22  at prior to this S-1?
23     A   Could be, yes.
24     Q   And what kind of public filings would those
25  be?

Page 727

1      A   I don't know.  I just need to know if there
2   is anything else filed with the SEC prior to this S-1
3   registration.
4      Q   Is this the paragraph that you're referring
5   to?
6      A   I don't recall.
7      Q   Can you read through that paragraph, please.
8      A   I'm reading it now.  (Perusing document.)
9       This appears to be the paragraph that was
10  referenced.
11     Q   And are you specifically referencing the
12  sentence that says:  "From September 24, 2012,"
13  parens, "inception," "through April 7, 2014, neither
14  we nor anyone on our behalf consulted with Marcum
15  regarding," and the sentence continues.
16      Is that the sentence you're referring to?
17     A   Yes, it's quoted above that sentence that
18  you are reading on the previous page of that exhibit,
19  page 9.
20     Q   Do you know when this Form S-1 was filed?
21     A   It appears to be July 1st, 2014.
22     Q   So it's your contention that Marcum could
23  not have audited Viking's financials between April 7,
24  2014, and July 1st, 2014?
25     A   Well, it says that they've had no one -- it

Page 728

1  says "neither we nor anyone on our behalf has
2  consulted Marcum."
3      Q   From September 24, 2012, through April 7,
4  2014.
5      A   Okay.  Yes.
6      Q   Is it your contention that Marcum could not
7  have audited Viking's financials between April 7,
8  2014, and July 1st, 2014, when the S-1 was filed?
9      A   I don't recall where that statement
10 regarding the audited financials comes from, but I
11 believe it comes from the publicly filed documents,
12 and perhaps if there were any available that were
13 filed before the S-1.
14     Q   Turn two more pages in this Exhibit 51.  At
15 the bottom it says 165 of 196, and the larger number
16 is F-1.
17         Do you see this Report of Independent
18 Registered Public Accounting Firm?
19     A   Yes.
20     Q   Is this a letter from Marcum, LLP, saying:
21 "We have audited the accompanying balance sheets of
22 Viking Therapeutics"?
23     A   Yes.
24     Q   Is that something you would have seen at the
25 time that you were writing your report?

Page 729

1      A   I wouldn't have seen it or else I wouldn't
2  have written that.
3      Q   In writing your report and making the
4  statement that Viking's financial statements are
5  unaudited, you don't think it would have been
6  important to look at the financial statements to see
7  whether they were audited or not?
8      A   I'm not sure at this time why that statement
9  was made.
10     Q   The statement in your report?
11     A   Yes.  I'm sure at the time I wrote it, I
12 believed it to be true and it was based on my
13 research.
14     Q   But it seems clearly contradicted by the
15 public filings, right?
16     A   It appears to be.
17     Q   Turn to page 8 of your Exhibit 18.
18     A   Yes.
19     Q   And in the last paragraph of that page, you
20 say:  "Ligand appears to be indirectly creating a
21 shell company through Viking."
22     A   Yes.
23     Q   How do you define a "shell company"?  How
24 are you using the term "shell company" in this
25 document?

Page 730

1      A   Well, in this case we're talking about a
2  company which has no assets.  It doesn't own the
3  molecules that it's licensed from Ligand, and based on
4  my research had no real assets.  They needed a loan in
5  fact from Ligand, $2.5 million.
6      Q   What do you mean by "real assets"?
7      A   Well, there was -- they didn't own real
8  estate.  It's my understanding they recorded a
9  $2.5 million loan just to continue their operations.
10 I believe they reported in both filings they didn't
11 have enough cash to continue operations for the next
12 12 months.
13     Q   But they did have assets listed on their
14 balance sheet, didn't they?
15     A   Well, I think the thrust of all of these
16 reports is that those assets are greatly inflated in
17 value and that they have no real value.
18     Q   But it's not accurate to say they had no
19 assets.
20     A   In my estimation, they had no assets.  As an
21 analyst, that's how I view Viking Therapeutics having
22 no real assets.
23     Q   In your estimation the assets they listed --
24     A   In my appraisal, I should say.
25     Q   In your appraisal the assets they listed on

Page 731

1  their balance sheet were overvalued.
2      A   So according to the audited financial
3  statements, the balance sheet I'm looking at on
4  page 166, the company had $179,000 in cash, total --
5      Q   Is that an asset?
6      A   Yes.  And $180,000 in total assets and total
7  liabilities of $430,000 at that time.
8      Q   So the company did have assets.
9      A   Well, the company was technically insolvent
10 at that point.
11     Q   But you're not saying they're insolvent.
12 You're saying they're a shell company.
13     A   That's right.  It's a single-purpose entity
14 in my estimation that was nursed into existence
15 through a loan through Ligand in order to stuff
16 Ligand's balance sheet with equity from the IPO.
17     Q   When you say "nursed into existence," is
18 that what you're referring to in your report by
19 indirectly -- that Ligand is indirectly creating
20 Viking?
21     A   Yes.
22     Q   How did Ligand indirectly create Viking?
23     A   Well, as you notice if you read the public
24 filings of Viking, there is 348 references to Ligand
25 in their reports.  They provide office space, a loan

Page 736

1 do you employ hyperbole in those reports?
2    A   In this particular sense that we're speaking
3 about now, the meaning intended to be conveyed is that
4 this is a company which is a shell; that is to say
5 there is no content, it's just the shell of a company.
6 And as the financial statements bear out, in fact, the
7 liabilities exceed the assets at that point by more
8 than a matter of twofold.
9    Q   Do you need me to repeat my question?
10   A   Yes.
11   Q   Specifically with respect to Exhibit 17
12 through 21, the research reports that you published on
13 Ligand, do you employ hyperbole?
14   A   I believe without having read them all at
15 this moment or even in the recent future thoroughly, I
16 believe, like all of my reports, they employ these
17 literary devices.
18   Q   Including hyperbole?
19   A   It could be.  I'm not sure without reading
20 them.
21   Q   Did you disclose to readers of the report or
22 to your investors or to Ligand investors that you were
23 exaggerating in your reports?
24   A   I didn't say I was exaggerating.  I said --
25   Q   You don't think hyperbole is using

Page 737

1 exaggeration?
2    A   I said I wasn't sure.  I said it could be,
3 without reading all of them again.
4    Q   Did you disclose that?
5    A   I don't think it's necessary.  When I
6 disclose something that is cynical or meant to be
7 humorous, it's never disclosed.  It should be obvious
8 that there is a particular genre or writing style
9 employed.
10   Q   Did you testify on Wednesday of this week
11 that these reports were neutral, objective, factual,
12 and accurate?
13   A   I try to keep them that way, yes.
14   Q   Is that consistent with the use of
15 hyperbole?
16   A   I don't know.  I think it could be.
17   Q   Did you expect readers of these reports to
18 read them as if they were neutral, objective, factual
19 and accurate?
20   A   It's always my hope that the reports will be
21 objective and accurate and factual.  That's my aim and
22 my goal with everything I write.
23   Q   And do you convey that to your readers?
24   A   I try to and I try to make the reading
25 interesting.  I think if you read the comments on the

Page 738

1 "About Us" section on the Amvona website, you will
2 find most commentators or those who comment on the
3 articles have commented specifically on the quality of
4 the research but also the entertaining style in which
5 it was written.
6    Q   Do you know whether Viking at the time you
7 wrote this July 3rd report was legally a shell
8 company?
9    A   I don't know.
10       Is it possible to provide the legal
11 definition of a "shell company"?
12   Q   I'm not testifying here today.
13   A   Is there a document available that can be
14 shared?
15   Q   Do you know whether Viking had any
16 operations at the time that you published this report?
17   A   They appeared to be, yes.  There is a
18 subtenant to Ligand Pharmaceuticals.
19   Q   Do you know whether Viking's assets at the
20 time of this report consisted entirely of cash or cash
21 equivalents?
22   A   According to the balance sheet I'm reviewing
23 now on the statement of the S-1, their liabilities
24 exceeded assets by approximately a factor of 2.5-fold.
25 So the company, as I stated earlier, was insolvent.

Page 739

1    Q   Did the company have assets other than
2 simply cash and cash equivalents at the time of your
3 report?
4    A   They appeared to have $775 in deposits,
5 which are cash equivalents.  There is no other assets
6 listed on the S-1.
7        I'm sorry, the column was blocked here.
8 Just -- the page was folding over it.  So they had --
9 I'm sorry, they did not have $179,000 in cash.  They
10 had $78,000 in cash.  They had total current assets of
11 86,000.  They were showing deferred IPO financing
12 costs of $189,000.  They were showing total assets of
13 $276,000, and total liabilities of $755,000.  So
14 liabilities exceeded assets by a factor of more than
15 threefold actually, not two and a half.
16   Q   In your report at that same page 8 of
17 Exhibit 18, that last paragraph at the bottom of the
18 page, you refer to "dilution and "inevitable losses."
19   A   Yes.
20   Q   Can you tell me what you're referring to?
21   A   Their public filings, their risk
22 disclosures.
23   Q   Viking's risk disclosures or Ligand's?
24   A   I believe that's where it came from -- well,
25 I'm sorry.  Which sentence were you --

Page 768

1  call them, the model would fail.
2        Like, for example, if you took 28 million
3  from the Viking IPO out of the Ligand income
4  statement, the company would be forced to show a
5  massive decline in profits.  And that of course, any
6  sort of press release like that would result I'm sure
7  in a precipitous decline in the stock price.
8        So the company increasingly becomes
9  dependent on positive news flow and increasingly
10  positive financial news flow.  That means making sure
11  that capital is available to the company, not from
12  product sales but from the general public and public
13  markets.
14    Q    Terms like "pyramid scheme," "shell," "house
15  of cards," "Three Card Monte," "shill," "padding the
16  balance sheet," those are terms that add color to the
17  report?
18    A    I think so.  I mean I think they are a way
19  of communicating passionately a thought.  Perhaps
20  colorfully a thought.  I don't know the right way to
21  describe it.  I mean they are common words that one
22  hears when describing what one believes to be a fraud.
23    Q    Passionately implies emotion, doesn't it?
24    A    That may not be the right word.  Think
25  colorfully.

Page 769

1    Q    These words all have negative connotations,
2  don't they?
3    A    They do.
4    Q    And many of them are exaggerations.
5    A    I don't think so.  Not in this case.
6    Q    You don't think Three Card Monte is an
7  exaggeration?
8    A    Three Card Monte describes a game played on
9  sidewalks that is, in my understanding, it's basically
10  illegal.  It's designed to defraud somebody.
11    Q    You think that the use of the term "Three
12  Card Monte" to describe Ligand Pharmaceuticals is not
13  an exaggeration?
14    A    That's a different question.
15    Q    You've used the term "Three Card Monte" in
16  your report to describe Ligand.  Is that an
17  exaggeration?
18    A    No.
19    Q    You also use a number of adjectives and
20  adverbs in your report.  Is that to add color?
21    A    I think adjectives are a normal part of
22  writing or expression.
23    Q    You testified that you thought these reports
24  were objective and neutral.  Do you think the terms
25  "extraordinary," "momentous," "existential,"

Page 770

1  "radically," "dangerous," "sharply," "extremely,"
2  "tremendous," "volatile," "anemic," are those
3  objective, neutral terms?
4    A    I think they're a good description of Ligand
5  Pharmaceuticals.
6    Q    Are they neutral?
7    A    I think they're accurate.
8    Q    Are they neutral?
9    A    I think an adjective is either accurate or
10  inaccurate.  I don't think neutrality is the way to
11  define an adjective.
12    Q    You don't think adjectives and adverbs
13  can make a statement less neutral?
14    A    Are you talking about adverbs or adjectives?
15    Q    Both.
16    A    Okay.
17    Q    I've given you examples of both.
18    A    I think in this case because they're
19  accurate, they're also neutral.  It's an accurate
20  description of the Ligand business model.
21    Q    In your reports, aren't you really doing
22  more than just conveying facts or characterizing those
23  facts?
24    A    I'm doing my best in those reports to
25  explain to the reader, and the same thing on the radio

Page 771

1  interviews, what the Ligand business model is, and
2  others like it.
3    Q    And are you attempting to do that in a
4  factual way or are you attempting to convey your
5  opinions about Ligand?
6    A    I'm attempting to do it in an objective and
7  factual way.  And I'm also attempting to do it in the
8  best way that I think is most readable and most
9  interesting to the readers.
10    MS. DESILETS:  Why don't we take a break.
11  Off the record at 10:27 a.m.
12    (Recess.)
13    MS. DESILETS:  Back on the record at
14  10:40 a.m.
15    BY MS. DESILETS:
16    Q    Welcome back, Father Emmanuel.
17    A    Thank you, Virginia.
18    Q    While we were off the record, did you have
19  any substantive conversations with the staff of the
20  SEC?
21    A    Just a pleasant but not substantive
22  communication with Leslie.
23        Can I just reiterate one thing I was
24  thinking of --
25    Q    If you are reiterating something you've

Page 772

1 already said, I would rather we move along.
2    A    Okay.  There is one new thing then I just
3 wanted to add.
4    Q    Go ahead.
5    A    It's not totally new, but I just wanted to
6 say that in regard to any inaccuracies or completeness
7 or errors of omission, unknown errors of omission, I
8 believe our full disclaimer covers those again on
9 page 24 of Exhibit 17 where we specifically speak to
10 that.
11       We say:  "Lemelson Capital makes no
12 representations, express or implied, as to the
13 accuracy, timeliness or completeness of any such
14 information or with regard to the results obtained
15 from its use."
16       So we -- we certainly I think made an effort
17 to anticipate that there may be errors or inaccuracies
18 despite our best efforts to avoid them.
19    Q    Why did you disclaim the accuracy of your
20 reports?
21    A    Well, at all times when I conduct any
22 research I always aim for absolute accuracy, but it's
23 human nature to make errors.
24    Q    Were these reports accurate to the best of
25 your ability?

Page 773

1    A    To the best of my knowledge.  To the best of
2 my ability.  To the best of my knowledge.
3    Q    The disclaimer also notes that your opinions
4 are subject to change without notice.
5    A    Yes.
6    Q    Are there opinions in these reports?
7    A    There may be.  I try to keep them as
8 objective as possible, but there may be.
9       I did want to add one other thing I forgot
10 to add earlier, and that is that yesterday you asked
11 me if anyone else had worked on these reports, and I
12 mentioned that Michael Johns edited them, and at least
13 one sentence I was able to attribute to him that we
14 discussed.  But I wanted to add that I do believe I
15 did send all of my reports to counsel for review as
16 well.  So I wouldn't say he contributed to them, but I
17 did ask counsel to review them.
18    Q    Did counsel recommend any changes to your
19 reports?
20    A    I don't recall.  But I -- I have been in the
21 practice of having counsel review all of my work and
22 my annual and interim reports, and almost everything.
23    Q    Did you make any changes to the reports as a
24 result of the advice of counsel?
25    A    I don't recall.  I don't -- I don't think

Page 774

1 so, but I don't recall.
2    Q    Your disclaimer also notes that you are not
3 undertaking to update the report.
4    A    Yes.
5    Q    But you did update the report several times,
6 didn't you?
7    A    I don't think I changed the existing
8 reports.  I created new reports that were add-ons to
9 it.
10    Q    That were updates to the original report?
11    A    Well, they continued along the same theme
12 and subject.
13    Q    Isn't one of them even called "Update"?
14    A    I believe so.
15    Q    And one is called "Appendix"?
16    A    Yeah, but I don't view them as an update of
17 this report.  I view it as a separate update on the
18 topic.
19    Q    In the course of updating your readers and
20 investors on the topic of Ligand, if you learned that
21 any information or statements or conclusions that you
22 included in your prior reports were inaccurate, would
23 you have corrected them in those later reports?
24    A    Absolutely.
25    Q    Did you do that?

Page 775

1    A    I don't recall finding any inaccuracies or
2 errors.
3       And earlier when you asked me if I had any
4 substantive statements, comments with members of the
5 SEC, I don't think this is substantive either, but
6 just out of an abundance of caution, I want to say
7 that off the record I did apologize to --
8       -- Ms. Torrico; is that correct?
9       MS. TORRICO:  Yes.
10       THE WITNESS:  -- for what may have come off
11 as a diminutive expression of being your assistant.  I
12 didn't mean it in that sense.  I meant it in a general
13 sense.  I recognize she is a lawyer and a full-time
14 staff member of the SEC.  I don't know if that is
15 substantive, but I did express that.
16       MS. DESILETS:  Thank you.
17       BY MS. DESILETS:
18    Q    If you can turn back to Exhibit 18.  That's
19 the July 3rd, 2014 report.  Page 10 of that report.
20    A    Okay.  Okay, I've found it, page 10.
21    Q    The fourth paragraph under the section
22 "Speculation has no intrinsic value," that first
23 sentence you refer to Ligand engaging in a creative
24 transaction with an affiliate shell company called
25 Viking Therapeutics.

Page 1004

1 battle, frankly.  My reports were responsive to what
2 they were saying.  Every time I looked at the things
3 they were doing, I was in disbelief.  And later as I
4 rested and got some distance from it, I wanted to
5 short it again, and I did short it again, and,
6 honestly, I would probably continue to short it but
7 for the advice of my counsel.
8      MS. DESILETS:  Let's take a break.  Going off
9 the record at 4:45 p.m.
10      (Recess.)
11      MS. DESILETS:  Back on the record at
12 4:52 p.m.
13      BY MS. DESILETS:
14   Q   Welcome back, Father Emmanuel.
15   A   Thank you.
16   Q   While we were off the record, did you have
17 any substantive communications with the staff of the
18 SEC?
19   A   No, I didn't.
20   Q   That's all the questions that we have for
21 you at this time.
22      Before we end, do you wish to clarify any
23 statement that you've made or add anything to the
24 testimony that you've given today?
25   A   Yes.  Just one moment, if you don't mind.  I

Page 1005

1 just need a second.
2   Q   Take your time.  Take your time.
3   A   So there's two issues -- I alluded to this
4 but I just wanted to clarify a little more.
5      On further reflection, Michael Johns did do
6 some editing on most things I wrote.  And a recurring
7 problem we had is that he would not use redlines.  Not
8 always deliberately.  Sometimes he said it was a
9 mistake or a fault with his editing software.  And I
10 found it very difficult sometimes to track changes.
11 And it's possible, I'm not saying in every case, but
12 it's possible there are some things in there that are
13 not my writing and I may not have been aware of.  I'm
14 not disclaiming responsibility for the reports.
15      I'm just saying that -- and I'm sure that
16 would be in the e-mails, I'm sure it will be in the
17 files I gave you, and I will probably go back and look
18 to find out more.
19      The second thing I wanted to bring up is
20 that during testimony today, counsel checked his
21 e-mails, and he was not able to find an area where I
22 provided reports to him for his review.  I will check
23 my folders as well when I go back, and/or I'm sure
24 they are in the e-mails that I've given you if they
25 exist because I think you have everything.

Page 1006

1      I also testified to this today, but I will
2 just say it again briefly.  Please forgive me for the
3 redundancy.  But it's my sincere hope and prayer that
4 at some point, perhaps through my testimony, that it
5 will eventually result in greater protections for the
6 shareholders at Ligand, and that I am of the firm
7 conviction that the firm is ultimately at risk of a
8 collapse in its stock price.  And that that could
9 create a great deal of destruction for shareholder
10 wealth and harm investors.  It's my hope that my
11 research, while perhaps imperfect, still in its whole
12 conveys enough material that will allow for, as hoped
13 in my complaint filed online with the SEC, for some
14 action to be taken.
15      Finally, I would just conclude by saying
16 that I continue to be grateful for the opportunity to
17 come here and testify for three days.  I consider it
18 an honor and a privilege to have that opportunity on
19 this important issue.  Maybe I wasn't always the
20 easiest witness.  If I spoke too often or too fast for
21 the reporter, forgive me.
22      I'm sure you probably already know this, but
23 Doug and I are available any time for any additional
24 information or materials that you might like from us.
25 So thank you very much.

Page 1007

1      MS. DESILETS:  Thank you.
2      Counsel, do you have any clarifying
3 questions?
4      MR. MacLEAN:  No clarifying questions.
5 Thanks for your time.
6      MS. DESILETS:  Thank you, Father Emmanuel.
7      We have no further questions at this time.
8 We may, however, call you again to testify in this
9 investigation.  Should this be necessary, we will
10 contact your counsel.
11      Off the record at 4:55 p.m.
12      (Whereupon, at 4:55 p.m., the examination
13 was concluded.)
14      * * * * *
15
16
17
18
19
20
21
22
23
24
25

Page 1008

```
1          PROOFREADER'S CERTIFICATE
2
3  In the Matter of:   TRADING IN THE SECURITIES OF
4              LIGAND PHARMACEUTICALS, INC.
5  Witness:      Gregory Lemelson
6  File Number:      HO-12718-A
7  Date:          July 22, 2016
8  Location:       Washington, D.C.
9
10
11      This is to certify that I, Nicholas Wagner,
12  (the undersigned), do hereby swear and affirm
13  that the attached proceedings before the U.S.
14  Securities and Exchange Commission were held
15  according to the record and that this is the
16  original, complete, true and accurate transcript
17  that has been compared to the reporting or recording
18  accomplished at the hearing.
19
20
21
22  _____   _____
23  (Proofreader's Name)        (Date)
24
25
```