TODD PETTINGILL                                    December 12, 2019

**EXHIBIT 61**

United States District Court

District of Massachusetts


Securities and Exchange                )

Commission,                            )

                Plaintiff,             )    1:18-cv-11926-PBS

         v.                            )

Gregory Lemelson and Lemelson          )

Capital Management, LLC,               )

                Defendants,           )

         and                           )

The Amvona Fund, LP,                   )

                Relief Defendant.      )

_____



Video Deposition of TODD PETTINGILL

San Diego, California

December 12, 2019



Reported by:

Veronica S. Thompson

CSR 6056, RPR, CRR, CCRR

KEY Discovery

TODD PETTINGILL                                    December 12, 2019

Page 2

United States District Court

District of Massachusetts

Securities and Exchange          )

Commission,                      )

      Plaintiff,            )    1:18-cv-11926-PBS

   v.                            )

Gregory Lemelson and Lemelson    )

Capital Management, LLC,         )

     Defendants,            )

   and                           )

The Amvona Fund, LP,             )

     Relief Defendant.      )

_____

Video Deposition of TODD PETTINGILL
was taken on behalf of Defendants at 600 West Broadway,
Suite 300, San Diego, California 92101, commencing at
7:00 AM and ending at 10:50 AM, on Thursday,
December 12, 2019, before Veronica S. Thompson,
CSR 6056.

TODD PETTINGILL                                    December 12, 2019

Page 3

APPEARANCES

For Plaintiff:
        U.S. Securities and Exchange Commission
        By:  Alfred A. Day, Sr. Trial Counsel
        33 Arch Street
        Boston, Massachusetts 02110
        617-573-4537
        daya@sec.gov

For Defendants:
        Libby Hoopes
        By:  Douglas A. Brooks, Esq.
        399 Boylston Street
        Boston, Massachusetts 02116
        617-338-9300
        dbrooks@libbyhoopes.com

For Ligand Pharmaceuticals, John Higgins, and Viking
Therapeutics:

        Cahill Gordon & Reindel LLP
        By:  Bradley J. Bondi, Esq.
        By:  Sean P. Tonolli, Esq.
        By:  William C. McCaughey, Esq.
        1990 K Street, N.W., Suite 950
        Washington, D.C. 20006
        202-862-8900
        bbondi@cahill.com
        stonolli@cahill.com
        wmccaughey@cahill.com
Also Present:
        Fr. Emmanuel Lemelson
Videographer:
        Daniel Bermudez, KEY Discovery

TODD PETTINGILL                          December 12, 2019

Page 6

 1     SAN DIEGO, CALIFORNIA, DECEMBER 12, 2019, 7:00 AM

 2          VIDEOGRAPHER:  We are now on the record.

 3     Today's date is December 12, 2019, and the time is

 4     7:00 AM.  This is the video deposition of Todd

 5     Pettingill being taken in the matter of SEC versus

 6     Lemelson Capital Management LLC pending in the United

 7     States District Court, District of Massachusetts.

 8              We are at Aptus Court Reporting, San Diego.

 9              My name is Daniel Bermudez of Aptus Court

10     Reporting located at 600 West Broadway, Suite 300,

11     San Diego, California 92101.

12              Will counsel please identify yourselves and

13     state whom you represent.

14          MR. BROOKS:  Doug Brooks, law firm Libby

15     Hoopes, for the defendants in this action.

16          MR. DAY:  Al Day for the Securities and

17     Exchange Commission.

18          MR. McCAUGHEY:  William McCaughey, Cahill

19     Gordon & Reindel, on behalf of Ligand Pharmaceuticals

20     and the witness.

21          MR. TONOLLI:  Sean Tonolli of Cahill Gordon &

22     Reindel on behalf of Mr. Pettingill and Ligand

23     Pharmaceuticals.

24          MR. BONDI:  Brad Bondi, Cahill Gordon &

TODD PETTINGILL                                December 12, 2019

                                                        Page 7

1    Reindel, on behalf of Ligand Pharmaceuticals and the

2    witness.

3            VIDEOGRAPHER:  The court reporter is Veronica

4    Thompson, and she may now swear in the witness.

5                      TODD PETTINGILL,

6        having been duly sworn, testified as follows:

7                       EXAMINATION

8    BY MR. BROOKS:

9        Q.   Good morning, Mr. Pettingill.  My name is Doug

10   Brooks.  We met briefly off the record.  I represent the

11   defendants in this action.

12           Have you ever been deposed before?

13       A.   I have not.

14       Q.   Okay.  So just a few ground rules then.

15           As you know, you're under oath.  Everything

16   you're saying is being transcribed.  We should both do

17   our best not to talk over each other because then it

18   becomes hard for the court reporter.

19           And all your responses should be verbal

20   because there is a videographer, but the court

21   reporter -- it's hard to get a nod of the head.

22       A.   Makes sense.

23       Q.   Does that all make sense?

24       A.   Yes.

TODD PETTINGILL                                  December 12, 2019

Page 54

1       Q.   Do you recall generally what was discussed at
2    Ligand about that issue?
3       A.   Yes.  I would say -- well, again, it was a
4    long time ago.  Key talking points, though, that I
5    imagine we discussed were, you know, is this -- is it
6    worth -- you know, is this guy trying to put out a fair
7    report?  Are we -- is -- you know, is, you know,
8    contacting him and trying to set the record straight --
9    you know, is this -- is this deliberate, or is this --
10   is this just a -- you know, a -- just a mistake?  And
11   would it make sense to -- you know, to try to, you know,
12   set him straight.
13            I think ultimate- -- and then as far as, like,
14   you know, going to the public, you know, I think it was,
15   Do we put more fuel on the fire if we give this guy more
16   credence than -- you know, than he deserves?
17      Q.   In the 2014 time frame, did you personally
18   have an opinion on how, if at all, Ligand should
19   respond?
20      A.   You know, it's very difficult to recall
21   specifically.  I can tell you that in general in
22   hindsight I'm glad we didn't engage.  I think that would
23   have, you know, put -- again, just seeing how he reacted
24   to other things such as this -- you know, the Wall

TODD PETTINGILL                              December 12, 2019

Page 68

1    not what happened.  They had authorized 200 million

2    share repurchase, but there wasn't actually a

3    repurchase.

4            And his statement that because BVF sold --

5    sold out of Ligand that he thought that -- or, you know,

6    he was implying to the market in a -- I'm assuming --

7    I'm assuming -- you know, it was definitely false,

8    misleading.  And I'm assuming with ill intent because he

9    had his short position on so he could benefit from any

10   misstatements about us.  I'm assuming it was bad intent

11   behind it.  But the fact that he was saying that we

12   bought back the shares from BVF with no basis, you know,

13   it was -- I think it was just another, kind of, red

14   herring to throw out to the market to try to drive the

15   stock price down.

16       Q.    You testified that the market knew he was

17   wrong in connection with the buyback of $200 million

18   worth of shares.  Why do you say that?

19            MR. BONDI:  Object to the form.

20            THE WITNESS:  I -- maybe I would probably

21   restate it.  My opinion was that.  I have no idea -- no

22   way to know specifically, but what I will say is there

23   are two -- there are two groups of investors.

24            People who own majority of companies are

TODD PETTINGILL                          December 12, 2019

Page 69

1   institutional investors, you know, the BlackRocks of the

2   world, the Fidelities of the world.  And then you have

3   different funds, you know, that are, you know, qualified

4   investors that -- that -- you know, they raise a fund,

5   and they -- they, you know, invest on their own.  Those

6   are all considered institutional investors.

7           Then you have another class of investors that

8   are people that are, kind of, investing their own money.

9   They don't have, you know, necessary -- you know, they

10  don't have -- they don't have a significant deal of, you

11  know, financial experience.  They've never, you know,

12  run -- worked in a fund.  They're just investing their

13  own money.  They're the people that, you know, the

14  Charles Schwabs of the world are marketing to when

15  they're out there, like, "Hey, come invest in us."

16          So based on my opinion and maybe some

17  conversations after the fact, I think most of the

18  institutional investors were smart enough to see past

19  the shenanigans that were included in all of these

20  reports.

21          The problem was the -- kind of the mom and

22  pops of the world that were investing their own money

23  and, you know, taking big risk.  They -- they were not

24  actually, you know -- they had a hard time looking past

TODD PETTINGILL                                    December 12, 2019

Page 70

1    this.  They were the ones that were calling me when I

2    was in investor relations later.  They were confused.

3    They didn't understand, you know, is this true.  They

4    were the people that -- you know, they didn't have the

5    financial training to -- to, kind of, see that this was

6    all nonsense.  And so I think that that was probably --

7    again, this is speculation.  But I think that's who he

8    was going after, and that's what moved the stock price.

9            One other dynamic, I'll say.  Although we have

10   20 million shares outstanding, our -- our float, meaning

11   the number of shares that is, you know, traded every

12   day -- our average daily flow, you know, is somewhere

13   around 100,000 to 200,000 shares.  So you don't have to

14   convince all shareholders that -- that a company is bad

15   or whatever to get them to sell.  All you have to do is

16   you have to convince enough people to go out there and

17   get scared and short the market -- or short the company

18   and you can move the stock price that way because the

19   stock price is only -- is determined on a daily basis by

20   the people who are at the market trying to sell their

21   shares.

22           On top of it, if you have somebody who is

23   specifically there to -- you know, to sell shares short,

24   meaning, you know, sell shares they don't even own, you

TODD PETTINGILL                        December 12, 2019

Page 71

1   know, they're putting downward pressure on the market

2   too.  So I believe that's how he was able to move the

3   market so much.

4   BY MR. BROOKS:

5       Q.    You said that you spoke to investors directly?

6       A.    Yes.

7       Q.    During what time frame?

8       A.    I -- I joined the investor relations function

9   in March of 2015.  Prior to that, you know, I'd never

10  spoken to an investor.  Anything that I thought or

11  whatever was pure speculation based on, kind of, my

12  academic training, but it was, you know, just pure

13  speculation until I started talking to investors.  And

14  actually, to be honest, I didn't even -- I didn't

15  realize the impact that he was having on people until --

16  until I started talking to people.

17          As an academic, I viewed his reports as pure

18  hogwash, as littered with inaccuracies, littered with

19  misstatements, and littered with, you know, material,

20  you know, attempts to deceive people.

21          What I didn't realize is that there's a whole

22  class of investors that -- you know, that -- that I --

23  that I assume -- I assume -- once I started talking to

24  people and -- and figuring out what they were

TODD PETTINGILL                           December 12, 2019

Page 72

1    thinking -- I didn't realize the impact that he was

2    having on people until then.

3         **Q.**    Do you have records of any of these

4    communications with investors?

5              MR. BONDI:  Object to the form.

6              THE WITNESS:  No, I didn't keep any formal

7    records.  There are probably some emails back and forth

8    with people, but, for the most part, these are people

9    calling me up who are scared, didn't understand what was

10   going on, and were asking me questions.

11   BY MR. BROOKS:

12        **Q.**    Did any of these people tell you that they

13   traded Ligand stock in response to reading

14   Fr. Lemelson's articles?

15        **A.**    Nobody I ever spoke to in the investor

16   function would say, "Hey, I just sold shares" or "I just

17   bought shares," but you could imply by their line of

18   questioning what they were -- or at least I could.  I --

19   I guess, I don't have any definite answer either way.

20             But if somebody calls me up and says, "This

21   guy says you guys are a fraud.  This guy says this,

22   this, and this.  I can't take this kind of risk because

23   this is my hard-earned money," you know, I have to

24   assume that they're probably doing something.  And I'd

TODD PETTINGILL                               December 12, 2019

Page 73

1   see the stock price going down.  Okay.  They're probably

2   bailing out.

3            Other people who are kind of, you know,

4   excited about the stock -- I'm assuming they're buying,

5   but as far as the actual trade history, I don't have

6   access to that.

7       Q.   If you thought that Fr. Lemelson was the cause

8   of Ligand's stock price dropping, why didn't you make a

9   public statement refuting his allegations?

10           MR. BONDI:  Object to the form.  You mean him

11  personally?

12           MR. BROOKS:  Yes.  Let's start with that.

13           THE WITNESS:  I -- I never had the

14  authorization or ability to make a public statement.

15  When I spoke to investors, I definitely said that, you

16  know, this -- I would try to set the record straight

17  when I would speak to investors.

18  BY MR. BROOKS:

19      Q.   Do you think that had Ligand issued a public

20  statement in response to Fr. Lemelson it would have

21  impacted the stock price?

22           MR. BONDI:  Object to the form, hypothetical,

23  calls for speculation.

24           MR. BROOKS:  Well, in fairness, everything

TODD PETTINGILL                               December 12, 2019

```
                                                        Page 82
 1        Q.   If I could turn your attention back to the
 2   exhibit.  See number 3, in bold, it says "Tangible
 3   equity"?
 4        A.   Uh-huh.
 5        Q.   And if you go to the third line, it says,
 6   "With the August 4, 2014, earnings release and its
 7   updated financials, the company presented tangible
 8   equity of just 21,000 upon which rested an extraordinary
 9   market capitalization of approximately 1.1 billion."  Do
10   you recall reading this at the time?
11        A.   Yes.
12        Q.   Did you think there was anything inaccurate
13   with his tangible equity calculation of 21,000?
14        A.   So tangible equity is not a commonly used
15   financial metric.  Prior to reading this, I'd never
16   heard of it.  I've heard of tangible assets, which is
17   your assets minus your intangible assets.  That's
18   something people talk about.
19             Tangible equity in itself is an oxymoron.
20   Equity is -- equity means your ownership.  You have
21   equity in your house.  Tangible means existing,
22   something you put your hands on.
23             So I defy you to show me the tangible equity
24   you own in your house.  You don't have physical -- a
```

TODD PETTINGILL                                    December 12, 2019

Page 83

1    physical, you know, amount that you owe of your house.

2    I guess you could say, "Okay.  Half of my house belongs

3    to the bank because I haven't paid it back, and half

4    belongs to me."  I guess you could say that, but that's

5    not how people view tangible equity.

6             Tangible equity was -- it was a fabricated and

7    misleading financial metric that was brought up here.

8        Q.   But the way he describes it, do you believe

9    the 21,000 is a true or false calculation?

10            MR. BONDI:  Object to the form, asked and

11   answered.

12            THE WITNESS:  Yeah, I'm not sure how to answer

13   that because I could say -- you know, I could make up a

14   metric and, you know, dis- -- and calculate it

15   correctly, but if the metric has no financial meaning,

16   then I believe it's an inaccurate metric.

17            Now, I will say, I mean, just specifically, if

18   you're asking about the accuracy of that metric, as --

19   when we were, kind of, going through this process and

20   trying to understand what was going on and who this guy

21   was and what he was talking about, John had me start to

22   track this tangible equity to figure out what it was

23   and -- John, my CEO -- and one of the things I realized

24   is, even in his reports, he wasn't being -- Mr. Lemelson

TODD PETTINGILL                              December 12, 2019

Page 84

1  wasn't even being consistent on how he was calculating

2  it.

3          At one point he was excluding certain

4  intangible assets; in other ones, he wasn't.  To me it

5  seemed like he didn't even know what he was talking

6  about.  He was just -- you know, if it was that much of

7  a -- kind of a metric that was used by the financial

8  community, it seemed like he would be able to calculate

9  it consistently, but he wasn't even consistent between

10  reports.

11  BY MR. BROOKS:

12      Q.   So are you saying -- is it your testimony here

13  today that you've never heard of tangible equity outside

14  of Fr. Lemelson?

15      A.   Yes.

16          MR. BONDI:  Object to form, asked and

17  answered.

18  BY MR. BROOKS:

19      Q.   So if I google "tangible equity," presumably I

20  won't find anything on it?

21      A.   I'm not testifying that.  I'm testifying I've

22  never heard of it.  In my experience as an investor,

23  I've never heard that as a use- -- as a commonly used

24  term.

TODD PETTINGILL                              December 12, 2019

                                                        Page 85

 1                    I've heard of tangible assets.  And tangible

 2    assets and tangible equity are not the same thing.

 3        Q.    Right.  But Fr. Lemelson describes what he

 4    means by tangible equity.  Right?

 5                    MR. BONDI:  Objection.

 6                    THE WITNESS:  I don't know.  Where's -- I

 7    mean, let's -- is there -- is that described in this

 8    calculation here?

 9                    I see 21,000.  I see a number, but I don't see

10    any breakdown in calculation.  Maybe it's there.  I'm

11    just not seeing it.

12    BY MR. BROOKS:

13        Q.    Did -- so I just want to get -- so do you

14    believe that Fr. Lemelson invented the metric of

15    tangible equity?

16        A.    Yes.

17        Q.    I'm handing you what's previously been marked

18    as Exhibit 8.

19        A.    Are we done with Exhibit 7?

20        Q.    Yes.

21                    Are you familiar with that document?

22        A.    Sorry.  I should have looked in detail.

23                    Yes, I believe so.

24        Q.    Can -- can I ask you -- and I apologize.

TODD PETTINGILL                                December 12, 2019

Page 94

1    job, didn't I?  I'm, you know, a great -- I'm a great

2    investor.

3        Q.   He said that during that interview?

4        A.   I don't know specifically, but in my -- from

5    my recollection, that was the general tone of the

6    conversation.  Maybe the specific words weren't said.

7             So at this point, I was -- I was referring to

8    the fact that I had assumed that investors were just,

9    you know, realizing that it was, you know, just hogwash

10   and so ignoring him.

11            And so that's what I meant by that, is that,

12   you know, he keeps talking about himself saying he's a

13   great investor when he's really not.  It was more of a

14   comment -- I guess, indirectly, it was more of a comment

15   on the quality of his analysis than anything else.

16       Q.   What did you mean by "he was jumping in after

17   things have already happened"?

18       A.   Again, that's -- you know, my -- my assumption

19   was that -- you know, that -- at that time, again, maybe

20   I was a little bit naive.  You know, I hadn't been

21   directly speaking to investors at that point, but I had

22   assumed that all investors were smart -- were looking

23   past the misstatements and ignoring his reports, and so

24   the fact that Lemelson was saying, Hey, I've -- you

TODD PETTINGILL                                    December 12, 2019

Page 95

1   know, I'm driving this company -- stock price down.

2   I'm -- you know, I'm -- I'm the cause of this.

3           To me, it seemed like he was taking credit for

4   something else.

5      Q.    When did he say he was the one driving the

6   stock price down?

7      A.    I don't have it specifically in front of me,

8   and I -- you know, again, this is a bit of, kind of,

9   recollection of something that happened five years ago.

10          But I do recall that when he was talking to

11  these -- the guy on Benzinga, the guy was telling him,

12  Hey, you really, you know -- you really walloped those

13  guys, or something along those lines.  And it was just

14  kind of a -- you know, that was the conversation, was,

15  You're the reason that this is happening to this

16  company.  And from my recollection, Mr. Lemelson agreed.

17          (Exhibit 153 was marked.)

18  BY MR. BROOKS:

19     Q.    Mr. Pettingill, I've just -- you've just been

20  handed what's been marked as Exhibit 153.  Ask you to

21  take a look.  Let me know if you recognize this.

22          Do you recall this email chain and the

23  attachment?

24     A.    I do now, yeah.

TODD PETTINGILL                          December 12, 2019

Page 99

1       **Q.**    So if you look at the first one, let's focus

2    on your comments.   So the italics -- it says,

3    "Intangibles are actually closer to approximately

4    70 million, but who cares?   Investors don't value

5    companies based on tangible assets unless they are at an

6    immediate risk of running out of cash."   Is that true of

7    all investors?

8               MR. BONDI:   Object to the form.

9               THE WITNESS:   I wouldn't know how to answer

10   that question.

11   BY MR. BROOKS:

12       **Q.**    What is that based on?

13       **A.**    So when you look at a company, there's

14   different ways to value a company.   So you -- one way is

15   to just project out your cash flows for as long as you

16   want to and -- and then take a discounted cash flow

17   approach.   So you just take -- you take those cash

18   flows.   You do a net present value.

19               Another one is, if a company is publicly

20   traded, you find comparable companies, and you attach a

21   multiple to -- generally it's their earnings, like a

22   price earnings multiple.   Sometimes you'll do an EBITDA

23   multiple, which is earn- -- it's, you know, a different

24   metric, but other ones people use.   Sometimes people use

TODD PETTINGILL                           December 12, 2019

Page 100

1   a revenue multiple.  It just, kind of, depends.  But

2   generally earnings is the best way there.

3          Another -- another valuation approach is to

4   look at how the company would be valued if it were

5   acquired.  So, you know, when people acquire other

6   companies, they generally -- it generally gets

7   calculated.  Hey, they paid a premium of 20, 30, 40,

8   100 percent even sometimes.

9          Basically what that means is, Okay.  Well,

10  before they announced this deal, the stock was trading

11  at $10 a share and they bought it for $20 a share.

12         Those are all, kind of -- and so what you do

13  is you find those premiums, and then you say, Okay.  In

14  this industry, if Ligand were acquired, they'd probably

15  get a premium of this."

16         So those are the three common, kind of, like,

17  hey -- when you're valuing a company, that's, like, a

18  common, like, healthy company approach to value a

19  company.

20         There's also another approach where people

21  just basically say, Okay.  This company is going into

22  bankruptcy.  It is -- you know, it is -- you know, It's

23  going into bankruptcy.  It's not going to be there in a

24  little bit, and so there's no real trading value.  We're

TODD PETTINGILL                              December 12, 2019

Page 101

1    just -- we're just valuing what assets are left over.

2              And so that's what I meant here was, you know,

3    if they are looking at tangible assets, like, Hey, we're

4    going to have a garage sale and sell every- -- sell

5    everything we can, that's only -- you do that if the

6    company is literally, like, in bankruptcy court and

7    they're getting ready to -- you know, the judge is

8    dissolving the company.

9         Q.    Would you do that if you think that bankruptcy

10   is likely even if they're not yet in bankruptcy court?

11             MR. BONDI:  Object to the form.

12             THE WITNESS:  Potentially, but -- how would

13   you -- how would -- I guess, how would you define if

14   somebody is, you know, about to go into bankruptcy?

15             Well, they would have to be insolvent, meaning

16   they can't pay their bills, meaning they have

17   245 million of debt outstanding and that 245 of million

18   of debt is due today and they don't have enough cash to

19   pay it.  Okay.

20             So in this case, you know, the analysis that

21   would have been more appropriate to take would be, how

22   much cash do they have on hand today?  When is this debt

23   due?  Which it's due in 2019.  It was a five-year note.

24             So you would calculate the cash that was going

TODD PETTINGILL                           December 12, 2019

Page 102

1    to be brought in over that time period, and if you

2    thought that there was no -- you know, I get -- you

3    never -- you wouldn't have -- you wouldn't ever conclude

4    that they were insolvent now because they had five years

5    to pay -- heard that we had five years to pay back our

6    debt.  But, I mean, if you wanted to do the analysis

7    anyway, you would take into account cash on hand versus

8    cash that was going to be generated in five years.  So

9    we had more than enough to pay back our debt at that

10   point.

11   BY MR. BROOKS:

12        Q.    Is inability to pay debt the only definition

13   of insolvency?

14        A.    That I'm aware of.

15             MR. BROOKS:  Let's take a break.  The tape is

16   about to run out, so we need to take a break.

17             VIDEOGRAPHER:  This marks the end of media

18   number one of the deposition of Todd Pettingill.  We're

19   off the record at 9:07 AM.

20             (Recess, 9:07 AM - 9:19 AM.)

21             VIDEOGRAPHER:  We're on the record at 9:20 AM,

22   and this marks the beginning of media number two of the

23   deposition of Todd Pettingill.

24   ///

1          I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand,

8   which was thereafter transcribed by me; that the

9   foregoing is a true record of the testimony given.

10          Further, that if the foregoing pertains to the

11  original transcript of a deposition in a federal case,

12  before completion of the proceedings, review of the

13  transcript [ X ] was [  ] was not requested.

14          I further certify I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney or party to this action.

17          In witness whereof, I have this date

18  subscribed my name.

19

20  Dated:  December 27, 2019

21

22

23          _Veronica S. Thompson_

24  _____
    Veronica S. Thompson
    CSR 6056, RPR, CRR, CCRR

TODD PETTINGILL                          December 12, 2019

Page 154

1              DECLARATION UNDER PENALTY OF PERJURY

2

3    Case Name:  SEC v. Lemelson

4    Date of Deposition:  12/12/19

5    KEY Discovery Job

6

7            I, TODD PETTINGILL, hereby certify under

8    penalty of perjury under the laws of the State of

9    _____ that the foregoing is true and correct.

10           Executed this _____ day of _____,

11    20_____, at _____.

12

13

14                    _____

15                    TODD PETTINGILL

16

17

18

19

20

21

22

23

24