```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2

 3    SECURITIES AND EXCHANGE              )
      COMMISSION,                          )
 4                                         )
                    Plaintiff              )
 5                                         )  CA No. 18-11926-PBS
             -VS-                          )  Pages 1 - 51
 6                                         )
      GREGORY LEMELSON, et al,             )
 7                                         )
                    Defendants             )
 8

 9
                   MOTION HEARING/SCHEDULING CONFERENCE
10
                    BEFORE THE HONORABLE PATTI B. SARIS
11                   UNITED STATES CHIEF DISTRICT JUDGE

12

13

14

15
                                        United States District Court
16                                      1 Courthouse Way, Courtroom 19
                                        Boston, Massachusetts  02210
17                                      December 6, 2018, 11:20 a.m.

18

19

20

21

22
                              LEE A. MARZILLI
23                         OFFICIAL COURT REPORTER
                         United States District Court
24                        1 Courthouse Way, Room 7200
                              Boston, MA  02210
25                             (617)345-6787
```

1   made, and on the day this statement was made, the stock
2   price went up.  And not only did it go up that day, it went
3   up the next day, and it went up seven of the next eleven
4   days.  So the SEC is saying, "Look, look, your Honor, take a
5   look at the stock price," but the stock price doesn't help
6   them at all.  In fact, it hurts them because it's clear that
7   this statement was not material.  Otherwise, you would have
8   expected to see obviously a different movement of the stock
9   price.
10              So is there any other order you want me to address
11  the other three in because I think they all have distinct
12  arguments, your Honor?
13              THE COURT:  Well, that one, I mean, when all
14  reasonable inferences are drawn in favor of the SEC, it was
15  a false statement; and what you're trying to say is, it
16  wasn't material because the stock market went up.  Is there
17  a case that says, if it goes up, it defeats materiality?
18              MR. BROOKS:  There's not, your Honor.  There's not
19  a case that says that specifically, but, again, the fact
20  that the SEC has only alleged materiality, and both of their
21  allegations are sort of factually incorrect, I don't think
22  they've met their *Iqbal* and *Twombly* standard.  I don't see
23  how they have.  They said it's material because of X, and
24  it's just not borne out.  What we have, your Honor --
25              THE COURT:  Well, I disagree with you.  It's a

1   material statement if you say someone's IR firm said it's a
2   goner.
3           MR. BROOK:  Okay.  Well, then --
4           THE COURT:  So now the question is whether it's a
5   material misstatement, and you're saying, no, it isn't as a
6   matter of law because the stock market went up.
7           MR. BROOKS:  That is the argument, your Honor, and
8   we've put in the stock prices so you can see what it did.
9   How can you say that a reasonable investor would have -- you
10  know, this would have altered the total mix of what a
11  reasonable investor would do?  We see what the market did,
12  and it had no impact.
13          THE COURT:  Right.  So that's the issue, all
14  right.
15          MR. BROOKS:  That's the issue on that one.  Is
16  there any specific order you want to go in?  The others,
17  I'll tick them off.  We only have three left.
18          THE COURT:  Just go down the other ones.
19          MR. BROOKS:  So the accounting one that you said,
20  your Honor, the first one, that one is -- the statement he
21  made, that Lemelson made, it's a calculation.  He said,
22  "Here is the debt-to-tangible equity ratio."
23          THE COURT:  What does "tangible equity" mean?
24          MR. BROOKS:  The equity in a company that a common
25  shareholder has, leaving aside intangibles like goodwill.

```
 1    preclinical studies and clinical trials, and we control only
 2    certain aspects of their activities."
 3             The SEC completely glosses over the fact that not
 4    only are they disclosing they're not doing it, they
 5    specifically disclose that they're not even in control of a
 6    lot of the aspects of these third-party companies.
 7             Then they go on to say, "We're maintaining legal
 8    responsibility."  But so what?  What does that have to do
 9    with it?  He never said that they weren't maintaining legal
10    responsibility.
11             THE COURT:  Wouldn't an investor think that Viking
12    wasn't going to be doing clinical studies and it was all a
13    farce?
14             MR. BROOKS:  No, because that's not the point of
15    his article at all.  These preclinical studies and trials
16    are going to be going on forever.  And he sources the S1.
17    He specifically -- it's in there.  Literally, if you look at
18    the S1, every page of this 100-page document talks about all
19    the studies and trials that are going on.  The point was
20    just that this Viking entity --
21             THE COURT:  Wouldn't be the one.
22             MR. BROOKS:  -- wouldn't be the one doing it.  And
23    in fact --
24             THE COURT:  So when you say wouldn't be the one
25    doing it --
```

1   day.  There's no more trading for four days because of the
2   July 4th holiday, so the market has a chance to digest it.
3   It goes down slightly the next day, but it's still higher
4   than it was the day before he made the statement.
5           So we're in this, you know, this so-called "short
6   and distort" type of case, but where's the harm?  I mean,
7   not the harm in terms of proving damages at this point, but
8   where is the argument that, well, obviously it was material
9   because look how reasonable investors reacted.  And don't
10  forget, again, the SEC is the one who said that your Honor
11  should look at what the stock price did to show materiality.
12          THE COURT:  Okay, thank you.  Now I'll hear from
13  the SEC.  Thank you.
14          MR. DAY:  Good morning, your Honor.
15          THE COURT:  Good morning.
16          MR. DAY:  I don't want to repeat what's in our
17  briefs, but I certainly want to address your Honor's
18  questions, and I have a few responses to what we just heard
19  from Mr. Brooks.  As an initial matter, I think it's
20  important to, at the risk of stating the obvious --
21          THE COURT:  Can I ask Maryellen to shut the door
22  behind you because for some reason the glare from out
23  there is making it hard for me to see.
24          (Discussion off the record.)
25          MR. DAY:  A few words about the nature of this

1    case.  Your Honor, the Commission alleges that the
2    defendants engaged in a form of market manipulation called a
3    "short and distort" scheme.  The four material
4    misrepresentations that we're talking about here today are
5    part of that scheme, but they're also independently
6    actionable as material misrepresentations under Exchange Act
7    Rule 10b5-B.  Defendant's motion doesn't address our
8    allegation that this was a scheme under Exchange Act
9    Rule 10b5-A and C.  So I just want to be clear at the outset
10   what we're talking about here today, which is the 10b5-B
11   allegations, and that's why I believe defendants have
12   focused on the elements of falsity and materiality.
13           THE COURT:  I don't understand what you just said.
14   So you're saying I can't just think about these four
15   statements because you're alleging a broader scheme?
16           MR. DAY:  Well, it's not that you can't think
17   about them, your Honor, obviously, but the --
18           THE COURT:  Even if I agree with him on every
19   single one of these points, you still have a cause of
20   action?
21           MR. DAY:  Not necessarily, but the point is that
22   the defendants haven't challenged -- if these statements, if
23   any of these statements stay in the case, they haven't
24   challenged the sufficiency of our scheme allegations under
25   10b5-A and C.  So I just want to be clear that this is not

1  just a 10b5-B case. It's also a 10b5-A and C case.
2              THE COURT: But you are saying, even if I agree
3  with him on all of these, you still have a case?
4              MR. DAY: Not necessarily, your Honor. I think,
5  if all of the misstatements went away, there's not a lot of
6  other conduct that we've alleged in the complaint, but I
7  just want to be clear that there are multiple theories in
8  this case.
9              Addressing the misstatements that were discussed
10 previously, regarding Promacta, the misstatement about
11 Promacta, our argument is that that misstatement was
12 material because it suggested that the major source of
13 revenue for the company was about to become obsolete, was
14 about to go away. A reasonable investor would necessarily
15 consider it material to know that 70 percent of the revenue
16 of a company was on the brink of obsolescence.
17             The argument that I'm hearing from the defense in
18 their reply brief and today is drawing a distinction without
19 a difference between the investor relations firm and the
20 company itself. To the extent that there is a dispute
21 somewhere down the road about whether the investor relations
22 firm was authorized or was acting as an agent, that has to
23 await fact discovery and a decision on the merits. That is
24 not something that can be decided at the motion to dismiss
25 stage.