

EXHIBIT 76

In the Matter of *Trading in the Securities of Ligand Pharmaceuticals, Inc.* (HO-12718)

## SUBMISSION ON BEHALF OF LEMELSON CAPITAL MANAGEMENT LLC and REV. FR. EMMANUEL LEMELSON

SPEARS & IMES LLP
David Spears
David B. Mesrobian

51 Madison Avenue
New York, New York 10010
(212) 213-6996
dspears@spearsimes.com

*Attorneys for Lemelson Capital Management LLC and Rev. Fr. Emmanuel Lemelson*

FOIA TREATMENT REQUESTED
PURSUANT TO 17 C.F.R. § 200.83

percentage higher than most consumer credit card debt)." He added: "This is before the 0.75 percent interest payment kicks-in and reflects the real risk premium demanded by Ligand's new lenders. . . ." He argued that the "real purpose" of the debt issuance "appears to be to enable large institutional Ligand shareholders to unload large numbers of shares in private transactions that will not negatively affect the prices of the shares traded in public markets." He also questioned the Company's ability to fulfill its promised share repurchases, stating: "Between the derivative hedge transaction ($33.5 million), the private transaction ($45 million), and the $40 million repurchase, $118.5 million of the $225 million, or 53 percent, will be used immediately, therefore making it impossible for the company to make 'repurchases up to a total of $200 million' as it stated in its press release."

In the August 22 Report, Lemelson summarized the final figures Ligand had disclosed regarding the issuance ($245 million in debt, $36.5 million for the hedge transactions, $5.9 million (or 2.4%) commission, and the 0.75% stated interest), and he noted that this reflected a debt cost in the first year of 18.5% – a "usury" rate. He also remarked upon a recent disclosure by BVF, Inc., Ligand's largest shareholder, that it had sold 484,524 Ligand shares,[36] arguing that the disclosure of this private sale fulfilled his forecast that the debt issuance was designed to benefit institutional shareholders who wanted to "dump" Ligand stock. In this Report, Lemelson also stated that after the debt issuance, "Ligand common shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt."

Lemelson now acknowledges that he made errors in his recitations of certain numbers relating to the debt issuance. First, he made an obvious error in failing to include the cash proceeds from the issuance in his equity-to-debt statement in the August 22 Report. (*See* Tr. at

---

[36] The Schedule 13G/A filed by Ligand and BVF only lists BVF's current holdings in Ligand shares, not the transacted amount. *See* Schedule 13G/A (Aug. 21, 2014), https://www.sec.gov/Archives/edgar/data/886163/000092189514001927/sc13ga907422012_08192014.htm.

FOIA TREATMENT REQUESTED
PURSUANT TO 17 C.F.R. § 200.83

824-25, 832-34.) Second, he incorrectly stated in the August 14 Report that there was both a $45 million private transaction and a $40 million repurchase – in fact, these were one and the same thing. (*See* Tr. at 840-41.) Nevertheless, these two numerical errors were readily discernible from a quick comparison to the referenced Ligand filings. They clearly were not material, in that no reasonable investor would rely on a short seller's version of financial numbers set out in an issuer's public filings.

The Staff also challenged the basis for Lemelson's characterization of the BVF transaction as a private, negotiated transaction. (*See* Tr. at 848-850.) Lemelson testified that he does not recall all the sources for that statement, but he noted – in an observation that is borne out by trading data – that he did not recall "seeing a volume commensurate on the open market for 484,000 shares" being sold by a single entity.[37] (Tr. at 850.)

Finally, the Staff challenged Lemelson's opinion regarding the true cost to Ligand of the debt issuance. Specifically, the Staff asked whether he understood "what those transactions were intended to do and how it functioned?" (Tr. at 830.) Leaving aside the Staff's renewed suggestion that an investor must meet a prescribed level of competence before he can express his opinions, Lemelson was simply setting out his view that, taking into account all the costs of the debt, the issuance was far too expensive from the point of view of Ligand's shareholders. That he was offering an opinion was obvious from the fact that he dressed up his analysis with hyperbole and sarcasm. For example, he stated that as an alternative to the debt offering, "Ligand could have simply contacted Capital One and applied for a consumer credit card with a very large line of credit, which undoubtedly would have had a lower lending cost. Indeed, the

---

[37] According to NASDAQ, the total volume of Ligand shares traded on August 19, 2014 was 599,531. During the week of August 18-22, 2014, the average daily trading volume was 463,473 shares per day. Accordingly, it appears highly unlikely that a single institution could have sold in the open market nearly 500,000 shares in a single day without a more significant effect on the open market trading volume.

31