**EXHIBIT 77**

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3    _____

                                    )
4    SECURITIES AND EXCHANGE         )
     COMMISSION,                     )
5                                    )
              Plaintiff,             )
6                                    ) Civil Action No.
              v.                     ) 1:18-cv-11926-PBS
7                                    )
     GREGORY LEMELSON and LEMELSON   )
8    CAPITAL MANAGEMENT, LLC,        )
                                    )
9              Defendants,           )
                                    )
10             and                   )
                                    )
11   THE AMVONA FUND, LP,            )
                                    )
12             Relief Defendant. )
     _____)
13

14                  VOLUME 1

15       VIDEOTAPED DEPOSITION OF GREGORY (EMMANUEL)

16   LEMELSON, taken on behalf of the Plaintiff at the

17   U.S. Securities and Exchange Commission, 33 Arch

18   Street, Boston, Massachusetts, beginning at 9:35

19   a.m. and ending at 4:55 p.m., on Wednesday,

20   October 16, 2019, before Carol H. Kusinitz,

21   Registered Professional Reporter and Notary Public

22   in and for the Commonwealth of Massachusetts.

23

24

25   JOB No. 191016DWA

                                                        1

```
 1   APPEARANCES:

 2

     For Plaintiff:
 3
         U.S. Securities and Exchange Commission
 4       Boston Regional Office
         Division of Enforcement
 5       BY: Marc Jones, Esq.
             617.573.8947, JonesMarc@sec.gov
 6           Alfred A. Day, Esq.
             617.573.4537, DAYA@sec.gov
 7       33 Arch Street, Suite 2400
         Boston, MA  02110
 8
         - and -
 9
         U.S. Securities and Exchange Commission
10       Division of Enforcement
         BY: Sonia G. Torrico, Esq.
11           202.551.3515, torricos@sec.gov
         100 F Street, N.E.
12       Washington, DC 20549

13

     For Defendants and Relief Defendant:
14
         Libby Hoopes
15       BY: Douglas S. Brooks, Esq.
             617.338.9300, dbrooks@libbyhoopes.com
16       399 Boylston Street
         Boston, MA  02116
17

18   Also Present:  Elyse Elsenbrook

19

20   Videographer:  Garner Willis

21

22

23

24

25                      * * * *
```

2

```
1                      I N D E X

2   WITNESS              EXAMINATION                PAGE

3   GREGORY (EMMANUEL)
    LEMELSON
4
                         BY MR. JONES                 8
5
                         *  *  *  *
6
                      E X H I B I T S
7
8   NO.                  DESCRIPTION                PAGE

9   Exhibit 1    13-page printout from Lemelson      10
                 Capital Management website headed
10               "Lemelson Capital - History"

11  Exhibit 2    Answer of Defendants to Amended    100
                 Complaint
12
    Exhibit 3    Tables and spreadsheets relating to 110
13               The Amvona Fund, LP, Bates Nos.
                 Amvona_00001-13
14
    Exhibit 4    Multi-page Lemelson Capital        172
15               Management document headed "Document
                 12-1, Ligand Pharmaceuticals
16               (NASDAQ:LGND)"

17  Exhibit 5    Multi-page Lemelson Capital        172
                 Management document headed "Document
18               12-2 Ligand Pharmaceuticals (NASDAQ:
                 LGND): Appendix"
19
    Exhibit 6    Multi-page Lemelson Capital        172
20               Management document headed "Document
                 12-3, Update: Lemelson Capital
21               Further Increases Short Stake in
                 Ligand Pharmaceuticals (NASDAQ:
22               LGND) as LGND EPS Plunges 76 percent
                 in Q2 2014"

23

24

25
                                                     3
```

```
 1              E X H I B I T S (Continued)

 2   NO.                   DESCRIPTION                    PAGE

 3   Exhibit 7    Multi-page Amvona document headed       172
                  "Document 12-4, Lemelson Capital
 4                Says Ligand Pharmaceuticals'
                  (NASDAQ: LGND) $225M Debt Issuance
 5                Solidifies Company's Insolvency,
                  Substantially Raises Specter of
 6                Bankruptcy"

 7   Exhibit 8    Six-page document headed "Document      172
                  12-5, Ligand Pharmaceuticals
 8                (NASDAQ: LGND): Institutional
                  holders wasting no time dumping
 9                stock in response to mounting
                  insolvency and bankruptcy risks"
10
     Exhibit 9    Multi-page GSK document headed          208
11                "Press Release, Second quarter 2014,
                  Issued:  Wednesday, 23 July 2014,
12                London U.K."

13   Exhibit 10   Multi-page GSK document headed          215
                  "Press release, First quarter 2014,
14                Issued: Wednesday, 30 April 2014,
                  London U.K."
15
     Exhibit 11   Multi-page GSK document headed          226
16                "Press Release, Fourth Quarter 2012,
                  Issued:  Wednesday, 6 February 2013,
17                London, U.K."

18   Exhibit 12   Four-page email to Jesse Perkins        261
                  from Emmanuel Lemelson dated
19                9/6/2014, with list of attachments

20   Exhibit 13   Four-page email to allanrudolf          265
                  @yahoo.com from Emmanuel Lemelson
21                dated 9/7/2014, with list of
                  attachments
22
     Exhibit 14   Four-page email to johnx99y             266
23                @yahoo.com from Emmanuel Lemelson
                  dated 9/7/2014, with list of
24                attachments

25
```

4

```
 1              E X H I B I T S (Continued)

 2   NO.                 DESCRIPTION                PAGE

 3   Exhibit 15  Three-page email to Dimitrios        269
                 Karakoutas from Emmanuel Lemelson
 4               dated 9/17/2014, with list of
                 attachments
 5
     Exhibit 16  Three-page email to William Ware     272
 6               from Emmanuel Lemelson dated
                 10/3/2014, with list of attachments
 7
     Exhibit 17  Five-page email to ruvent@gmail.com  276
 8               from Emmanuel Lemelson dated
                 11/10/2014, with list of attachments
 9
     Exhibit 18  Email to Edward Gu from Emmanuel      279
10               Lemelson dated 10/9/2014, Bates No.
                 SEC-Lemelson-E-0366451
11
     Exhibit 19  Email to el@lemelsoncapital.com and  286
12               a long list of bcc's from Emmanuel
                 Lemelson dated 6/16/2014,  Bates No.
13               SEC-Lemelson-E-0184019

14   Exhibit 20  Email to el@lemelsoncapital.com and  290
                 a long list of bcc's from Emmanuel
15               Lemelson dated 6/19/2014, Bates Nos.
                 SEC-Lemelson-E-0117738 - 7740
16
     Exhibit 21  Email chain, the top email to        296
17               Jennifer Bloom from Emmanuel
                 Lemelson dated 7/2/2014, with list
18               of attachments, Bates Nos.
                 SEC-Lemelson-E-0117738 - 7740
19
     Exhibit 22  Email chain, the top email to Lori   299
20               Schumacher from Emmanuel Lemelson
                 dated 7/21/2014, Bates Nos.
21               SEC-Lemelson-E-0042035 - 2039

22   Exhibit 23  Email to Emmanuel Lemelson from       304
                 Michael Johns dated 9/3/2014, Bates
23               Nos. SEC-Lemelson-E-0073067 - 3071

24

25
                                                        5
```

```
1                    E X H I B I T S (Continued)

2    NO.                    DESCRIPTION                    PAGE

3    Exhibit 24   Lemelson Capital Management letter       305
                  dated September 4, 2014, headed
4                 "Dear Partners," from Emmanuel
                  Lemelson, with Appendix, Bates Nos.
5                 SEC-Lemelson-E-0073131 - 3136

6    Exhibit 25   Multi-page slide deck titled "The        312
                  Amvona Fund, LP, Long-biased US
7                 equity fund"

8    Exhibit 26   Email chain, the top email to Lori       325
                  Schumacher from Emmanuel Lemelson
9                 dated 8/14/2014, Bates Nos.
                  SEC-Lemelson-E-0119248 - 250 with
10                attached document headed "Section
                  3 - Investor Signature Page"
11
     Exhibit 27   Objections and Responses to              332
12                Plaintiff's First Set of
                  Interrogatories to Defendants
13
                             *  *  *  *
14

15                    EXHIBITS BOUND SEPARATELY

16

17

18

19

20

21

22

23

24

25
                                                              6
```

```
 1                     P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  We are now recording and
 3      on the record.  My name is Garner Willis.  I'm a
 4      Legal Video Specialist on behalf of Gradillas Court
 5      Reporting.
 6                  Today's date is October 16, 2019, and the
 7      time is 9:35 a.m.  This is the deposition of Gregory
 8      Lemelson in the matter of Securities and Exchange
 9      Commission, Plaintiff, versus Gregory Lemelson, et
10      al., Defendant, in the U.S. District Court of
11      Massachusetts, Case No. 1:18-cv-11926-PBS.
12                  This deposition is being taken at 33 Arch
13      Street, Boston, Mass. 02110, on behalf of the
14      Plaintiff.  The court reporter is Carol Kusinitz of
15      Doris O. Wong and Associates.
16                  Counsel will state their appearance, and
17      the court reporter will administer the oath.
18              MR. JONES:  Good morning.  I'm Marc Jones
19      for the Plaintiff Securities and Exchange
20      Commission.
21              MR. DAY:  Al Day for Plaintiff Securities
22      and Exchange Commission.
23              MS. TORRICO:  Sonia Torrico for Plaintiff
24      Securities and Exchange Commission.
25              MR. BROOKS:  Good morning.  Doug Brooks,
```

09:35:27  (line 5)
09:35:44  (line 10)
09:36:12  (line 15)
09:36:20  (line 20)
09:36:30  (line 25)

7

1    counsel for Father Emmanuel Lemelson, Lemelson

2    Capital Management and The Amvona Fund.

3                   GREGORY (EMMANUEL) LEMELSON

4    a witness called for examination by counsel for the

5    Plaintiff, having been satisfactorily identified by

6    the production of his driver's license and being

7    first duly sworn by the Notary Public, was examined

8    and testified as follows:

9                   DIRECT EXAMINATION

09:36:48 10    BY MR. JONES:

11       Q.   Good morning.

12       A.   Good morning.

13       Q.   My name is Marc Jones.  I'm a Plaintiff --

14    attorney for the Plaintiff, Securities and Exchange

09:37:01 15    Commission.

16            Are you appearing here today pursuant to a

17    subpoena in this litigation?

18       A.   It appears so.

19       Q.   Okay.  Is that a yes?

09:37:12 20       A.   To the best of my knowledge.

21       Q.   Okay.  And for the course of the day, I'm

22    only going to ask you to the best of your knowledge.

23    I can only ask you what you know, and if you don't

24    know, please tell me.

09:37:24 25            If you don't understand one of my

8

         1      Q.   What is Promacta, Father?

         2      A.   I just call it Promacta.

         3      Q.   What is it?

         4      A.   It's a -- my understanding is that it's a

12:10:35 5  fourth-line indication that as of 2014 was used to

         6  treat Hepatitis C patients who were receiving

         7  interferon-based therapies.

         8      Q.   Only Hepatitis C?

         9      A.   That how it was characterized in 2014 by

12:10:49 10 Ligand.

        11      Q.   I'm asking you what you know now.

        12      A.   I'm not sure how they characterize it

        13 today.

        14      Q.   I'm not asking how they characterize it.

12:10:53 15 I'm asking you, what is it?

        16      A.   My understanding is that it's a drug which

        17 has been protected under the Orphan Drug Act of

        18 1983, an old drug.

        19      Q.   So a drug?

12:11:04 20     A.   A drug, sure.

        21      Q.   Promacta is a drug?

        22      A.   Perhaps.  I don't know.

        23      Q.   Did you research Promacta?

        24      A.   I did.

12:11:09 25     Q.   And you researched it how?

                                                              150

1          A.    Reading primarily Ligand and GSK's

2    commentary regarding Promacta.  So that is --

3    third-party websites like the FDA, Mayo Clinic and

4    so forth.

12:11:24  5          Q.    Okay.  Let me just break that down.

6                So you read what Ligand wrote about

7    Promacta?

8          A.    Yes.

9          Q.    And you read what Ligand said about

12:11:30  10   Promacta in their calls?

11         A.    Uh-huh.

12         Q.    You have to say yes.

13         A.    Yes.  Habit.

14         Q.    Understood.

12:11:37  15               And you possibly listened to what Ligand

16   said about Promacta on their calls?

17         A.    I'm sure I listened to what they said,

18   pretty sure.  Yeah, I would have listened to those

19   calls.

12:11:45  20         Q.    Okay.  When you say you would have listened

21   to the calls, would you have listened to them in

22   real time, or did you sort of go back and listen to

23   historical calls?

24         A.    I don't recall now.  I don't recall.  It

12:11:56  25   could have been one or the other.  Probably -- I

151

1    don't know.  I'm guessing it was historical, but I

2    don't know for sure.

3        Q.    Okay.  And you mentioned GSK as well?

4        A.    Yes.

12:12:05  5        Q.    Who is GSK?

6        A.    GlaxoSmithKline.

7        Q.    And how are they related to Promacta?

8        A.    It is my understanding that they were the

9    owner of Promacta's intellectual properties patents.

12:12:14  10        Q.    Did they sell Promacta?

11        A.    I don't know.

12        Q.    You don't know whether they sold Promacta

13    or not?

14        A.    I don't know.

12:12:19  15        Q.    Do you know whether they sold Promacta

16    in --

17        A.    I don't recall seeing that specific

18    language in their annual reports.  "We sell

19    Promacta," I don't recall seeing that language.

12:12:27  20        Q.    So you, sitting here today, have no idea

21    whether GSK sold Promacta?

22        A.    I don't know if they sell it themselves or

23    sell it through other third-party companies.  I

24    don't believe they disclosed that in their annual

12:12:39  25    reports.

152

1       Q.   So you're making a difference between

2  whether or not they sell it directly or whether they

3  may have intermediaries?

4       A.   Well, you asked me if they sold it, but you

12:12:46  5  weren't clear who was doing the selling, and I don't

6  believe it appears in their annual report.

7       Q.   Do you believe that GSK made money from the

8  sale of Promacta?

9       A.   When you say "the sale of Promacta," do you

12:12:56  10  mean the sale during the course of their ownership

11  of Promacta?

12       Q.   The selling of the drug during the course

13  of their ownership.

14       A.   During the course of their ownership.  It's

12:13:06  15  my understanding they did.

16       Q.   Okay.  What's the basis of that

17  understanding?

18       A.   It likely appeared in their annual reports.

19       Q.   And you read those?

12:13:13  20       A.   Yes.

21       Q.   Did you study them?

22       A.   What do you mean by "study"?

23       Q.   Use them as part of your research; how

24  about that?

12:13:21  25       A.   I don't recall the specifics, but it's very

153

```
        1   likely I referenced their annual reports.
        2       Q.    Why is that likely?
        3       A.    Well, because that was the purported
        4   partner of Ligand, the Ligand fraud.
12:13:32 5      Q.    So if you wanted to know how Promacta was
        6   selling, you needed to look at the GSK reports?
        7            MR. BROOKS:  Objection.
        8       A.    Well, not necessarily.
        9       Q.    Okay.
12:13:44 10     A.    I was interested in Ligand's financial
       11   condition, and their representations and their
       12   misrepresentations to the markets, and the
       13   securities fraud they were involved in.
       14       Q.    Okay.  You said that you covered because
12:13:56 15  you got -- you came to the point where you thought
       16   the effort on the research was not worth it,
       17   correct?
       18            MR. BROOKS:  Objection.
       19       A.    I don't think I said that.
12:14:05 20     Q.    Well, why did you cover your Ligand short?
       21       A.    Hold on.  Those weren't my words.  The
       22   efforts on the research, those weren't my words.
       23       Q.    Well, Father Lemelson, I do my best to
       24   characterize what you say earlier.  To the extent
12:14:15 25  that it doesn't comport with what you want your
```

                                                            154

```
          1      A.   It's likely the word "sale" is in there,

          2  but "selling" or "sells," I don't recall seeing that

          3  in a GSK.  But, again, it's been five years.

          4           MR. JONES:  Can we mark this as the next

14:00:39  5  exhibit, please.

          6                     (Document marked as Lemelson

          7                     Exhibit 9 for identification)

          8      Q.   Father Lemelson, the court reporter has put

          9  in front of you a GlaxoSmithKline document entitled

14:01:05 10  "Press release, Second quarter 2014."  Do you see

         11  that?

         12      A.   Yes.

         13      Q.   And it purports to be issued Wednesday, 23

         14  July 2014, from London U.K.  Do you see that?

14:01:15 15      A.   Yes.

         16      Q.   And this appears to be a report from

         17  GlaxoSmithKline about its pharmaceutical business,

         18  correct?

         19      A.   It appears to be, yes.

14:01:25 20      Q.   Okay. And one of the things that

         21  GlaxoSmithKline is selling in 2014 is Promacta,

         22  correct?

         23      A.   I have to read the report.

         24      Q.   All right.  Well, let's turn to, if you

14:01:38 25  would -- the numbers are tiny in the bottom right
```

1    corner, but there's a tiny 6 on the first page I'd

2    like you to turn to.  Are you on 6, sir?

3        A.   I am.

4        Q.   All right.  And it says, "Oncology products

14:01:57  5  in the US contributed strongly to the quarter."

6            Do you see where I am in the third

7    paragraph?

8        A.   Yes.

9        Q.   And then it says, "With sales up 42 percent

14:02:05  10  to #119 million, benefitting from strong

11   performances from Votrient and Promacta."

12           Do you see that there?

13       A.   Yes.

14       Q.   Okay.  And this would be the kind of

14:02:19  15  information that you would have been looking for

16   in -- that you were looking for in 2014 to

17   determine --

18       A.   I don't think so necessarily.

19       Q.   You weren't looking to see how Promacta was

14:02:26  20  selling in 2014?

21       A.   Well, I believe these reports provide

22   projections of what Ligand would earn at different

23   sales points of Promacta.  I'd have to read them

24   again, but I seem to recall that.

14:02:37  25  Q.   Let's clear up the record.  We have two

209

1          MR. JONES:  Can we mark this as the next

2    exhibit, please.

3               (Document marked as Lemelson

4               Exhibit 11 for identification).

14:18:45  5     Q.   Father, do you have Exhibit 11 in front of

6    you?

7     A.   I do.

8     Q.   And is this a GlaxoSmithKline press release

9    from the fourth quarter of 2012?

14:18:53 10     A.   Well, yes, it appears to be, but I don't

11    know if it relates to fiscal year or calendar year.

12     Q.   Okay.  Does it make a difference?

13     A.   No -- hold on a moment here.  (Reviewing

14    document).  It does make a difference.  It says "for

14:19:05 15    the year ended December 31, 2012."  Yes, the fourth

16    quarter.  So I assume it's calendar.

17     Q.   Okay.  In fact it could be both fiscal and

18    calendar, correct?

19     A.   Sure.

14:19:14 20     Q.   Okay.  And it says this was issued

21    Wednesday, 6 February 2013, correct?

22     A.   It appears to be.

23     Q.   And, again, there's tiny little numbers on

24    the bottom of the page, but unhelpfully they kind of

14:19:24 25    run out.  So if I could have you turn to a page that

226

```
 1   looks, without the highlighting, like this page
 2   (indicating).  It says "Cardiovascular & Metabolic"
 3   at the top.
 4            It's about halfway through.  I apologize I
 5   don't have a tab for you ahead of time.  It looks
 6   like this (indicating), and on the probably fifth or
 7   six line down it talks about "Promacta/Revolade."
 8   Do you see that?
 9        A.   Yes.
10            MR. JONES:  Doug, are you there?
11            MR. BROOKS:  Yes.
12            MR. JONES:  Okay.  Great.
13        Q.   And it says, "Promacta/Revolade, Hepatitis
14   C thrombocytopaenia," correct?
15        A.   Yes.
16        Q.   And then what's the next column state?
17        A.   "Approved November 2012."
18        Q.   And that column is marked "US"?
19        A.   Yes.
20        Q.   And what's the next column state?
21        A.   "EU, Filed May 2012."
22        Q.   Okay.  And then it says, "News update in
23   the quarter."  What's the news update for Promacta?
24        A.   "Approved in US on 16th of November 2012."
25        Q.   So from that do you take it that Promacta
```

14:19:43 (line 5)
14:19:55 (line 10)
14:20:04 (line 15)
14:20:13 (line 20)
14:20:27 (line 25)

227

1  was approved in the United States on 16 November

2  2012 for use with Hepatitis C patients?

3      A.   That appears to be what it's saying.

4      Q.   Okay.

14:20:40  5      A.   Which I think comports with my earlier

6  commentary.

7      Q.   I think it does.

8          Can I have you turn one, two -- to the

9  third piece of paper prior, to a chart that says,

14:20:51 10  "Sales from new pharmaceutical and vaccine

11  launches," and has a chart on the top.

12      A.   Yes.

13      Q.   Do you see it?

14          MR. JONES:   Doug, do you see it?

14:21:01 15          MR. BROOKS:   Yes.

16          MR. JONES:   Okay.

17      A.   Oh, wait.  I'm on the wrong page.

18      Q.   Oh.  Let me -- this is the page that I am

19  on.  It looks like this (indicating).  It's got

14:21:08 20  chart at the top, text in the bottom.  It's just two

21  pages before where we were just looking.

22      A.   Two pages before?

23      Q.   Yes, that's correct.  And if you have a

24  problem, feel free to hand it over to me, and I'll

14:21:30 25  point you to the document, if you are having a

228

```
 1    problem locating it.
 2         A.   I don't think that will be necessary just
 3    yet.  There we go.
 4         Q.   Do you see here a chart of sales from new
14:21:41  5    pharmaceutical and vaccine launches?
 6         A.   Yes.
 7         Q.   GlaxoSmithKline is talking about its sales
 8    of these various drugs?
 9         A.   Yes.
14:21:48 10        Q.   Okay.
11         A.   It appears to be.
12         Q.   And about halfway down that chart, do you
13    see a line for Promacta?
14         A.   Yes.
14:21:53 15        Q.   And then do you see a series of columns out
16    to the right?
17         A.   Yes.
18         Q.   And do you see the first two columns
19    reference 2012?
14:22:01 20        A.   I see 2012 and I see Q4 2012.
21         Q.   Okay.  And there's two columns for each of
22    those headings?
23         A.   Yes.
24         Q.   Okay.  So we saw that Hepatitis C
14:22:11 25    indication was approved in November of 2012,
```

229

1          correct?

2               A.    I believe that's what it says.

3               Q.    Okay.  And that would be in Q4 2012?

4               A.    I think that's what it said.

14:22:21   5    Q.    About halfway through Q4 2012; is that

6          right?

7               A.    I don't recall.  Actually I can go back and

8          look.  Was it July 2012?  I'll take a look.

9               Q.    It was 16 November 2012.

14:22:32  10    A.    Okay.  So that's more than halfway through

11         2012.

12              Q.    I'm sorry.  Through the quarter.  I was

13         talking about the fourth quarter.  I apologize if

14         that was ambiguous.

14:22:38  15    A.    Okay.

16              Q.    Is it about halfway through Quarter 4 of

17         2012?

18              A.    Apparently.  If that's the date, yes.

19              Q.    Okay.  How much Promacta was sold in

14:22:49  20    millions of pounds in Quarter 4 of 2012?

21              A.    Well, it appears to say #130 million.

22              Q.    I'm actually looking at the Quarter 4 2012

23         column.

24              A.    #38 million.

14:23:06  25    Q.    Okay.  And so part of that 38 million

230

1  apparently is -- or at least could be before the

2  approval for Hep C and part of it after, correct?

3       A.   There's no way of knowing.

4       Q.   No way of knowing?  Okay.

14:23:16  5       A.   Not from this.

6       Q.   So in 2012, the first column, do you see

7  there #130 million?

8       A.   Yes.

9       Q.   So it appears that GlaxoSmithKline sold #92

14:23:32  10  million worth of Promacta prior to being approved

11  for the Hepatitis C?  Did I do that math right?

12       A.   It appears to be the case.  We don't really

13  know, of course, much about that.  We don't know

14  what part is attributed to price increases versus

14:23:50  15  demand for the product.  But -- we also don't know

16  the relationship to Ligand sales.

17       Q.   I'm not asking about any of those things,

18  am I?  I'm asking about --

19       A.   No.  I'm speaking out loud.

14:23:57  20       Q.   -- GlaxoSmithKline.  This is again where

21  I'm asking you to wait for the question and then --

22       A.   Sure.

23       Q.   -- answer if you can.

24       A.   Sure.

14:24:02  25       Q.   So 92 million, at least -- #92 million in

231

1   sales of Promacta prior to the Hep C indication --

2          MR. BROOKS:   Objection.

3      Q.   -- being approved?

4      A.   We don't know that actually.   We don't know

14:24:17  5   that. It could have been sold off label for Hep C.

6      Q.   Would being sold off label for Hep C have

7   been prior to the approval for the Hep C

8   designation?

9      A.   I think we have to take a look at the

14:24:31 10   designation and find out.   I think it's possible, in

11   my understanding, that doctors had flexibility to

12   prescribe drugs off label.

13      Q.   You don't know.

14      A.   I believe that Ligand has spoken about

14:24:47 15   their drugs being prescribed off label.

16      Q.   My question, Father, is whether or not you

17   have an understanding of whether or not this $130

18   million (sic) in sales contains off label and to

19   what extent.

14:25:01 20      A.   Well --

21          MR. BROOKS:   Objection to the form.

22      A.   -- my report wasn't about GSK or its sales.

23   My reports were about Ligand and its sales.

24      Q.   But my question is about GSK and its sales.

14:25:12 25   So let's take that.   130 million sold by GSK in 2012

232

1    of Promacta, correct?

2         A.    It appears to say that.

3         Q.    And that's pounds, correct?

4         A.    Appears to be.

14:25:21    5    Q.    Okay.  And the significant portion of that

6    prior to the approval of Hepatitis C as an approved

7    indication for Promacta?

8         A.    It appears to be.

9         Q.    Okay.  Can I have you turn in that

14:25:50   10    report -- I'm going to count number of pages from

11    the front.  One piece of paper, two --

12         A.    My feeling in answering these questions is

13    these questions are designed to deflect away from my

14    actual reports and the information I provided in

14:26:02   15    them.

16              MR. BROOKS:  Just answer the question.

17         Q.    You are entitled to feel that way, sir --

18    Father.

19         A.    I just wanted to put it on the record.

14:26:08   20              MR. BROOKS:  Just answer the questions.

21              THE WITNESS:  I will.

22         Q.    I'd like you to turn to -- it's about seven

23    pieces of paper in.  It is a piece of paper that is

24    on the right side.  It says, "Press Release,

14:26:18   25    Metabolic" at the top.  It looks, without the

233

```
 1   you had taken on margin from the brokerage?
 2        A.   I don't know.
 3        Q.   How would you determine whether it did or
 4   not?
15:55:52  5        A.   I'd have to go back and see the calculation
 6   I used for that.
 7        Q.   Okay.  Did you take money on margin from
 8   the brokerage?
 9        A.   We used leverage, yes.  We used margin.
15:55:59 10        Q.   Okay.  And how much leverage were you using
11   in 2014?
12        A.   I don't recall.
13        Q.   Do you recall at one point having $21
14   million in leverage?
15:56:10 15        A.   Not specifically.
16        Q.   Okay.  How about generally?
17        A.   Not specifically, no.  Not that specific
18   amount.
19        Q.   Okay.  Well, what is the largest amount of
15:56:20 20   leverage that you remember?
21        A.   We probably at one point had about 20
22   million in leverage, around there, approximately.  I
23   don't know the exact numbers.
24        Q.   And did you communicate that amount, that
15:56:30 25   20 million in leverage, as an amount that you had
```

310

1    and we're off the record.

2         (Recess)

3         THE VIDEOGRAPHER:  The time is now 4:54,

4    and we're back on the record.

16:54:38  5       MR. JONES:  Back on the record.

6       BY MR. JONES:

7       Q.   Father Lemelson, we broke because I believe

8    you were telling us before the break that

9    essentially your energy has flagged and that you

16:54:49 10   feel essentially unable to continue with the

11   questioning.  Is that correct?

12      A.   I think it would be better, given my long

13   drive I have ahead of me this evening, if we

14   continued on another day.

16:54:59 15       MR. JONES:  Okay.  The attorneys have

16   spoken about continuing another day, and we have

17   agreed to do that, and we've agreed with a couple

18   of, we'll call them, stipulations to put a label on

19   it.

16:55:11 20       Those stipulations are essentially that,

21   No. 1, when we come back, you, Father Lemelson, will

22   have read your six Ligand reports from 2014 prior to

23   coming here, within a couple of days coming here, so

24   that you're familiar with them and that you could

16:55:29 25   answer questions about them.

                                                        337

1          Are you willing to do that, Father?

2          THE WITNESS:  Yes.

3          MR. JONES:  Okay. And then the other is

4 that we will add approximately a rough half an hour

16:55:37  5 to account for the time of putting down the

6 deposition today and picking it up another day.

7          Mr. Brooks, do you agree to that?

8          MR. BROOKS:  Yes.

9          MR. JONES:  And, Father Lemelson, do you

16:55:47 10 agree with that?

11          THE WITNESS:  That's fine.

12          MR. JONES:  And with that and understanding

13 that we're reserving both time for the Plaintiff and

14 if the Defendant wants to do cross-examination that

16:55:55 15 day, we will suspend at this point.

16          MR. BROOKS:  Excellent.  Agreed.

17          THE VIDEOGRAPHER:  The time is now 4:55.

18 This is the conclusion of the deposition.  We're off

19 the record.

20              (Whereupon the deposition

21              was adjourned at 4:55 p.m.)

22

23

24

25

338

```
 1                  C E R T I F I C A T E
 2     I, Gregory (Emmanuel) Lemelson, do hereby
 3  declare under penalty of perjury that I have read
 4  the foregoing transcript of my deposition; that I
 5  have made such corrections as noted herein, in ink,
 6  initialed by me, or attached hereto; that my
 7  testimony as contained herein, as corrected, is true
 8  and correct.
 9     _____  I have made corrections to my deposition.
10     _____  I have NOT made any changes to my deposition.
11
12     EXECUTED this _____ day of _____, 2019, at
13  _____,  _____.
14       (City)                       (State)
15
16                        _____
17                        GREGORY (EMMANUEL) LEMELSON
                          VOLUME 1
18
19
20
21
22
23
24
25
                                                     339
```

```
 1                          ERRATA SHEET

 2   Deposition of: GREGORY (EMMANUEL) LEMELSON, VOL. 1
     Date taken: October 16, 2019
 3   Case: SEC vs. LEMELSON, et al.
     PAGE LINE
 4   ____ ____    CHANGE: _____
                  REASON: _____
 5
     ____ ____    CHANGE: _____
 6                REASON: _____

 7   ____ ____    CHANGE: _____
                  REASON: _____
 8
     ____ ____    CHANGE: _____
 9                REASON: _____

10   ____ ____    CHANGE: _____
                  REASON: _____
11
     ____ ____    CHANGE: _____
12                REASON: _____

13   ____ ____    CHANGE: _____
                  REASON: _____
14
     ____ ____    CHANGE: _____
15                REASON: _____

16   ____ ____    CHANGE: _____
                  REASON: _____
17
     ____ ____    CHANGE: _____
18                REASON: _____

19   ____ ____    CHANGE: _____
                  REASON: _____
20
     ____ ____    CHANGE: _____
21                REASON: _____

22   ____ ____    CHANGE: _____
                  REASON: _____
23

24
     Signed  _____
25   Dated   _____

                                                        340
```

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                    )

3       I, Carol H. Kusinitz, RPR and Notary Public in

4   and for the Commonwealth of Massachusetts, do hereby

5   certify that there came before me on the 16th day of

6   October, 2019, at 9:35 a.m., the person hereinbefore

7   named, who was by me duly sworn to testify to the

8   truth and nothing but the truth of his knowledge

9   touching and concerning the matters in controversy

10  in this cause; that he was thereupon examined upon

11  his oath, and his examination reduced to typewriting

12  under my direction; and that the deposition is a

13  true record of the testimony given by the witness.

14      I further certify that I am neither attorney or

15  counsel for, nor related to or employed by, any

16  attorney or counsel employed by the parties hereto

17  or financially interested in the action.

18

19      Under Federal Rule 30:

20          X Reading and Signing was requested

21            Reading and Signing was waived

22            Reading and Signing was not requested.

23

24

25

342

1      In witness whereof, I have hereunto set my hand

2   and affixed my notarial seal this 23rd day of

3   October, 2019.

4

5

6   Notary Public

7    Commission expires 5/22/20

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25