**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| GREGORY LEMELSON and LEMELSON CAPITAL ) | Civil Action No. 1:18-cv-11926-PBS |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE AMVONA FUND, LP, ) | |
| ) | |
| Relief Defendant ) | |
| ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL**
**<u>SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES...................................................................................... ii

I.  INTRODUCTION........................................................................................ 1

II.  FACTUAL BACKGROUND.......................................................................... 5

    A.  **Fr. Emmanuel's Published Analysis of Ligand**................................. 5

    B.  **Ligand's Discussions Mocking Fr. Emmanuel and His Beliefs and
    Evidencing an Intent to Prevent Him from Expressing His
    Opinions**………………………………………………………………… 5

    C.  **Ligand Lobbied the Commission to Bring an Enforcement Action
    Against Fr. Emmanuel with the Assistance of Counsel who has
    Connections to the Commission and Received Preferential
    Treatment During the Investigation**………………………………….. 7

    D.  **The Complaint Contained a Number of Errors, Some of Which
    Were Copied Directly from Ligand's Presentations**……………… 11

    E.  **Subsequent Pleadings Relevant to the Issue of Selective
    Enforcement**………………………………………………………. 12

III.  ARGUMENT………………………………………………………………… 13

    A.  **The Cases the Commission Cites to Argue that It Regularly
    Pursues "Market Manipulation" Cases Similar to this One are so
    Easily Distinguishable that it Demonstrates the Unprecedented
    Nature of the Present Claims**………………………………….. 13

    B.  **The Facts Here Permit Defendants to Pursue their Bias and
    Selective Enforcement Defense**………………………………….... 16

IV.  CONCLUSION………………………………………………………… 20

# TABLE OF AUTHORITIES

**Pages**

*Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778 (2d Cir. 2007)…………………...   17

*Ginorio v. Contreras*, 409 F. Supp. 2d 101 (D.P.R. 2006)……………………………   20

*Ginorio v. Contreras*, Civ. No. 03-2317, 2008 WL 11424136
(D.P.R. June 13, 2008)………………………………………………………………...   20

*Lozman v. City of Riviera Beach,* 39 F. Supp. 3d 1392 (S.D. Fla. 2014)……………..   16

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568
(S.D.N.Y. 2010)…………………………………………………………………………   18

*Norton v. Autoridad de Acueductos y Alcantarillados*, 898 F. Supp. 2d 396
(D.P.R. 2012)…………………………………………………………………………… 18, 20

*Oyler v. Boles,* 368 U.S. 448 (1962)……………………………………………………   18

*Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747 (1st Cir. 1996)………………… 17, 18

*Rubinovitz v. Rogato*, 60 F.3d 906 (1st Cir. 1995)……………………………………   16

*United States v. Al Jibori,* 90 F.3d 22 (2d Cir. 1996)…………………………………   18

*United States v. Tuitt*, 68 F. Supp. 2d 4 (D. Mass. 1999)……………………………..   19

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)……………………………….   16

ii

## I.    INTRODUCTION

The Commission's argument for partial summary judgment on Fr. Emmanuel's bias and selective enforcement defense is based on the ***false*** premise that the Commission "regularly pursues market manipulation cases similar to this one."  SEC's Memorandum in Support of Motion for Partial Summary Judgment, ECF No. 122 at 4-5.  It does nothing of the sort.  Even a cursory review of the supposedly similar cases upon which the Commission relies proves that the current action is unprecedented.  Indeed, these cases do not refute a showing of bias and selective enforcement but instead affirm it.  As discussed in more detail in Defendants' Motion for Summary Judgment, this case lacks all the hallmarks of an actual short-and-distort claim, as Fr. Emmanuel disclosed his short position in Ligand Pharmaceuticals, published his reports in his own name, held on to his short position for months, and cited the bases for his opinions—all of which were publicly available.  Further, there is no evidence that the challenged statements had any impact on Ligand's stock price.  ***No prior case brought by the Commission is remotely similar, which begs the question <u>why</u>.***

The undisputed facts support Defendants' contention that the Commission lost all objectivity in its investigation and subsequent enforcement action against Fr. Emmanuel, both improperly inserting itself in the shoes of Ligand, which was trying to quash Fr. Emmanuel's free speech rights, and improperly injecting Fr. Emmanuel's religious practices into a case where his priesthood is—or should have been—entirely irrelevant to the Commission's claims.

After the publication of Fr. Emmanuel's first Ligand report, internal Ligand communications show that its personnel were extremely angry, levied personal insults against Fr. Emmanuel, made offensive attacks on his religious vocation, and ultimately adopted a strategy of using high-powered law firms and politicians to persuade the Commission to silence Fr.

Emmanuel's criticism of the company rather than make any public statements to address it directly.  Defendants' Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, ECF No. 126 ¶¶ 90-116; Defendants' Statement of Additional Material Facts Pursuant to Local Rule 56.1 ("Opp. SOF") at ¶¶ 4-20.

To further its goal of silencing Fr. Emmanuel, in September 2014, Ligand and its counsel met with the Commission's Boston Regional Office (Fr. Emmanuel was a Massachusetts resident at the time) and made baseless accusations that Fr. Emmanuel engaged in "affinity fraud," had a "questionable personal history," and misrepresented the performance of his fund. ECF No. 126 ¶¶ 95-96.  The Boston Regional Office subsequently informed Ligand that it would not be following up with an investigation of Fr. Emmanuel.  ECF No. 126 ¶ 104.  As a result, Ligand hired new counsel with connections to the Commission, and thereafter received VIP treatment from the Commission (especially when compared to Defendants' counsel).  ECF No. 126 ¶ 105-108; Opp. SOF ¶¶ 24-25, 34.  At the request of its new counsel, Ligand received a *second* meeting with the Commission—this time with headquarters in Washington, D.C, where there was no geographical connection to Ligand or Fr. Emmanuel but was, not coincidentally, the location where Ligand's new counsel previously worked as a high-ranking Commission employee.  Opp. SOF ¶¶ 24; ECF No. 126 ¶¶ 106-107.  In contrast, after the Commission's enforcement staff indicated it would be recommending bringing a novel Investment Advisers Act claim, Fr. Emmanuel's counsel was denied even a *first* meeting with the Commission on the grounds that predecessor counsel had previously been afforded a meeting to discuss *other* proposed causes of action.  Opp. SOF ¶ 34.

After the Commission's Washington, D.C. regional office decided to move forward with an investigation, Ligand, through its well-connected counsel, maintained a consistent line of

communication with the Commission, receiving information about the pending investigation in violation of Commission policy.  Opp. SOF ¶¶ 28-29, Plaintiff's Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment, ECF No. 123 ¶ 41.  And while unable to identify the source of the leaked information, the news of a pending investigation (which should have been confidential) was publicly reported in the media.  Opp. SOF ¶ 31.

During the Commission's investigation, the enforcement staff deposed Fr. Emmanuel on three consecutive days for a total of nearly 27 hours.  Opp. SOF ¶ 32.  Demonstrating its bias against Fr. Emmanuel, among other questions, based on a mischaracterization of a non-public email between Fr. Emmanuel and his legal counsel, the Commission asked Fr. Emmanuel if he compared himself to "the son of God."  Opp. SOF ¶ 33.

After refusing to meet with Fr. Emmanuel's counsel to discuss the novel claims, the Commission filed a Complaint in this Court that contained *objectively false* information.  Opp. SOF ¶¶ 35-37; ECF No. 126 ¶¶ 39-40, 70-73.  Even after having been alerted to these factual errors, the Commission refused to remove the false information from the public record when it filed its Amended Complaint.  *Id*.  Moreover, demonstrating the Commission's bias, the Complaint shockingly touted and promoted the then-current stock price of Ligand, *boasting* that it was trading above $250/share.[1]  Opp. SOF ¶ 38.  It is notable that Ligand's stock price plummeted during this case by nearly 80 percent.  Opp. SOF ¶ 39.[2]

Contrary to the Commission's assertion in its motion, during discovery, it was the *Commission* (and not Fr. Emmanuel) that again brought Fr. Emmanuel's religious vocation into

---

[1] That is, the Commission *promoted* Ligand's stock price in its Complaint, which was riddled with objectively false information, which dramatically overstated the financial condition of the company.  Ironically, this is precisely the nature of its *alleged* market-manipulation claims the Commission brought against Fr. Emmanuel.

[2] Ligand's stock price was as high as $278.62 per share (on October 1, 2018), but dropped as low as $57.24 per share (on March 17, 2020).  Opp. SOF ¶ 39.

play, asking him repeated questions during his deposition about his priesthood, his rank, his

bishop, and his history of service.  Opp. SOF ¶ 44.  In addition, the Commission told the

undersigned that it intended to subpoena the Greek Orthodox Archdiocese in Boston for

purposes of determining whether Fr. Emmanuel was lying about his status as a Greek Orthodox

Priest (he was not).  Opp. SOF ¶¶ 45-46.

Moreover, the Commission has continued to improperly treat this action as if it is

bringing it directly on behalf of *Ligand* as opposed to the market as a whole.  The Commission

no longer even tries to hide this impropriety, referring to Ligand as a ***victim*** in its papers, despite

the fact that this is not a private defamation case but instead a purported Commission-brought

*market manipulation case*.  Opp. SOF ¶ 47.  Under no meaningful definition of such a case can

Ligand be considered a *victim*.  In fact, because Ligand authorized a share repurchase[3] during the

time of Fr. Emmanuel's reports, the company would have actually ***benefitted*** from any artificial

reduction in the share price, because Ligand could have purchased back shares at the

(supposedly) artificially low price and then reaped the benefit of the market correction to the

(allegedly) accurate higher price.[4]  Opp. SOF ¶¶ 3, 61.

In sum, the Commission has treated Fr. Emmanuel differently than ***every other*** similarly

situated financial analyst; *i.e.,* analysts who disclosed their short position, expressed their

opinions while citing publicly available data for the basis of those opinions, and held on to their

short positions for a significant period of time after making the statements.  As recognized by

Magistrate Judge Cabell when *twice* denying the Commission's attempt to block discovery

related to Fr. Emmanuel's selective enforcement and bias defense, at minimum, evidence exists

---

[3] Defined as "a transaction whereby a company buys back its own shares from the marketplace," which is typically done when management considers their shares to be undervalued.  Opp. SOF ¶ 61.
[4] Of course, no such artificial reduction to Ligand's share price occurred, as the Commission failed to present evidence that any of the alleged misstatements materially impacted Ligand's stock price.  ECF No. 125 at 15-21.

supporting the notion that this disparate treatment is grounded in an effort to punish Fr.

Emmanuel for criticizing a company with whom the Commission appears to be unusually cozy,

in violation of his free speech rights and/or based on his religious vocation.  Opp. SOF ¶¶ 40-43.

Accordingly, if Defendants' motion for summary judgment is not granted, a jury should be

permitted to consider the facts underlying Defendants' bias and selective enforcement defenses.

## II.    FACTUAL BACKGROUND

### A.    Fr. Emmanuel's Published Analysis of Ligand

From June to August 2014, Fr. Emmanuel published five reports, consisting of 56 pages,

and gave two internet radio interviews expressing why he believed Ligand was overvalued.  ECF

No. 126 ¶¶ 6-10, 21-25, 35-36, 58-59, 62-63; Opp. SOF ¶ 1-2.  In all of the reports and

interviews, Fr. Emmanuel disclosed he had taken a short position in Ligand.  ECF No. 126 ¶¶ 8-

10, 25, 36, 59, 63.  The reports also contained disclaimers that the contents reflected Fr.

Emmanuel's opinions, which may change without additional publications on the topic.  *Id.*

### B.    Ligand's Discussions Mocking Fr. Emmanuel and His Beliefs and
    Evidencing an Intent to Prevent Him from Expressing His Opinions

Internal Ligand communications show that the company was angry over Fr. Emmanuel's

commentary, and its high-ranking personnel repeatedly insulted Fr. Emmanuel.  For example,

Ligand personnel referred to Fr. Emmanuel as "lamelson," "part pit bull," "a quack," and a "DB"

(the author later admitted this was short for "douchebag").  Opp. SOF ¶¶ 4-7.  Bruce Voss,

Ligand's Investor Relations representative and a critical witness in this case, engaged in his own

name-calling, was involved in communications that referred to Fr. Emmanuel as "slimy," a

"narcissistic psychopath," and that openly mocked his religion, writing things such as,  "lordy,

lordy" and "does being a priest make that ok?"  Opp. SOF ¶ 8.  In another email, Mr. Voss

wrote, "BTW, Lemelson is an ordained Eastern Orthodox priest, and is constantly photographed

in in his priestly robes and collar.  It would be funny if it wasn't my client!"  Opp. SOF ¶ 9.

Similarly, Ligand personnel mocked Fr. Emmanuel's religious beliefs and demonstrated their desire to prevent him from expressing his opinions freely rather than seek to publicly counter any of his commentary.  For example, John Higgins, Ligand's CEO, received an email that said: "We may want to enter into a group with God. Any thoughts you have are welcome. We want to pray for the success of this holy company. Thank you for being the true voice."  Mr. Higgins replied: "Every time I see the report, I feel I should go to the River Jordan to be cleansed."  Opp. SOF ¶ 10.  One Ligand executive mocked a Wall Street Journal article commenting on Fr. Emmanuel's house, stating, "I now covet his earthly possessions.  Do you think he would give them to me, because they mean nothing to him?"  Opp. SOF ¶ 11.  In commenting on this article, Mr. Voss stated, "I wish they [*sic*] were more dirt on him in this article then [*sic*] simply saying he's pushing it by being both a priest and a wealthy hedge fund manager."  Opp. SOF ¶ 12.  Ligand tried to find such "dirt" on Fr. Emmanuel by attempting to identify any relatives that might have engaged in misbehavior to show that Fr. Emmanuel "comes from a family of crooks."  Opp. SOF ¶ 13.

In addition to the insults and religious bigotry, Ligand also pressured media outlets not to publish Fr. Emmanuel's analysis.  Opp. SOF ¶¶ 15-19.  For example, the day after Fr. Emmanuel's first report, Ligand's CEO requested that Mr. Voss contact USA Today and "undress" the publication for writing about it.  Opp. SOF ¶ 15.  Ligand discussed trying to have SeekingAlpha block Fr. Emmanuel's future publications.  Opp. SOF ¶ 16.  Ligand's CEO also instructed Mr. Voss to take BioWorld "to task" for printing information about Fr. Emmanuel's analysis.  Opp. SOF ¶ 17.  After Mr. Voss followed the CEO's demand and confronted BioWorld, the reporter there supposedly promised not to publish anything else about Fr.

Emmanuel or his analysis of Ligand, "regardless of what he hears." *Id*. BioWorld apparently made this promise even though its representative said he typically allowed readers to sort out **the opinions of** others, which is consistent with the free right to exchange ideas under the First Amendment. *Id*. Ligand discussed other options, including stock surveillance, hiring a private investigator and editing Lemelson Capital Management's Wikipedia page. Opp. SOF ¶¶ 18-19.

### C. Ligand Lobbied the Commission to Bring an Enforcement Action Against Fr. Emmanuel with the Assistance of Counsel who has Connections to the Commission and Received Preferential Treatment During the Investigation

Ultimately, Ligand never responded publicly to any of Fr. Emmanuel's statements. Opp. ECF No. 126 ¶¶ 90-92. However, it engaged in an effort to lobby the Commission to bring an enforcement action to "silence" him.[5] Indeed, Ligand succinctly stated its goal to its Board of Directors that "[w]e continue to work with our attorneys to lean on the SEC to get an injunction on Lemelson's activities." Opp. SOF ¶ 21.

Ligand initially hired a large international law firm and together with its counsel met with the Commission's Boston Regional Office in September 2014. ECF No. 126 ¶ 93. Ligand made a 60-slide PowerPoint presentation to the Commission, in which it falsely claimed that Fr. Emmanuel "[u]ses religious credentials to inspire false confidence and raise money," ***despite the fact that none of Amvona's investors were, are, or ever have been Fr. Emmanuel's parishioners.*** ECF No. 126-36 at LGND_0080695; Opp. SOF ¶ 23. The presentation also included photographs of Fr. Emmanuel in his priestly robes in church and baldly claimed that Fr. Emmanuel—presumably based *solely* on the fact he is a priest—bears the "Hallmarks of an Affinity Fraud." Opp. SOF ¶ 22. The PowerPoint presentation further falsely claimed that Fr.

---

[5] Emblematic of this approach is an internal email between Ligand personnel, dated August 22, 2014 (the date of Fr. Emmanuel's final report), in which one Ligand employee, referring to Fr. Emmanuel, wrote: "He needs to be silenced for good." Opp. SOF ¶ 20.

Emmanuel misrepresented the Amvona Fund's performance, even though Ligand had no basis in fact to make such accusations. ECF No. 126 ¶ 96, 110; Opp. SOF ¶ 25. The presentation also included a slide falsely alleging that Fr. Emmanuel's calculation of Ligand's debt-to-tangible-equity ratio was wrong because he had failed to include the proceeds from a debt offering as equity in his calculation. ECF No. 126 ¶¶ 99. At some point after this meeting, the Boston Regional Office told Ligand that it would not pursue an investigation. ECF No. 126 ¶ 104.

Subsequently, Ligand changed counsel, hiring Cahill Gordon & Reindel attorney Bradley Bondi, who previously served on the executive staff of the Commission. ECF No. 126 ¶¶ 105-106. In or around early May 2015, Mr. Bondi reached out to a former colleague at the Commission in Washington, D.C. to refer this matter for investigation, despite the fact that there was no geographical connection to Washington D.C., as Fr. Emmanuel was a Massachusetts resident and Ligand a California company. ECF No. 126 ¶ 107.

On June 8, 2015, several Ligand representatives and its counsel met with the Commission staff in Washington, D.C. to *again* advocate for an enforcement action against Fr. Emmanuel based on his reports that pre-dated the *first* such meeting. ECF No. 126 ¶ 108-109. Ligand made a PowerPoint presentation to the Commission that was similar to the one Ligand presented nine months earlier to a different Commission office. ECF No. 126 ¶ 108. Among other things, Ligand again appeared to question Fr. Emmanuel's investment returns—apparently having taken no steps to verify them, which, if it had, would have demonstrated their veracity.[6] Opp. SOF ¶¶ 25-26. The second presentation contained the same false allegation about Fr. Emmanuel's debt-

---

[6] Both Ligand's CEO and CFO testified that they did not know whether the statements that Ligand listed in its presentation to the Commission as misrepresentations by Fr. Emmanuel were true or not and were unaware of any efforts by Ligand to investigate the veracity of these accusations. Opp. SOF ¶ 25. This information could have easily been verified by reviewing the 2012-2016 audit reports for the Amvona Fund that were publicly available on the Amvona Fund's website. Opp. SOF ¶ 26.

to-tangible equity ratio.  ECF No. 126 ¶ 113.  Notably, Ligand's efforts to pressure the Commission to bring unprecedented and baseless charges against Fr. Emmanuel did not stop with hiring a former high-ranking Commission attorney.  On the same day Ligand and its counsel met with Commission staff in Washington, Ligand used its sway with Congress and had now-disgraced United States Congressmen Duncan Hunter send a letter to the Commission, urging it to bring charges against Fr. Emmanuel.[7]  Opp. SOF ¶ 27.

The Commission ultimately decided to commence an investigation targeting Fr. Emmanuel.  The Commission's policies prevent its staff from disclosing the existence of its investigations prior to bringing an enforcement action.  Opp. SOF ¶ 28.  "Because SEC investigations are generally nonpublic, Enforcement will not confirm or deny the existence of an investigation unless the SEC brings charges against a person or entity involved."  *Id*.  Despite this policy, emails between the Commission and Ligand's counsel make clear that the Commission informed Ligand's counsel of the existence of its non-public investigation.  Opp. SOF ¶ 29.  On September 15, 2017, Ligand's counsel wrote to Commission staff to further complain about Fr. Emmanuel's public comments concerning Ligand.  *Id*.  On September 18, 2017, Commission staff responded in writing: "Unfortunately we cannot share information about our nonpublic investigation in the matter of Trading in the Securities of Ligand Pharmaceuticals, Inc. beyond what we shared last time, *i.e., **that the investigation is ongoing**.*"  *Id.* (emphasis added).  The Commission staff then provided proposed times for a ***telephone call*** with Ligand's counsel, which the parties scheduled.[8]  *Id*.

---

[7] In March 2020, Hunter was sentenced to 11 months in federal prison for stealing campaign funds.  Opp. SOF ¶ 27.

[8] Curiously, during the time period of this email exchange (September 16-18, 2017), when Ligand's counsel was continuing efforts to persuade the Commission to bring an enforcement action against Fr. Emmanuel, a Wikipedia user who had never before created a Wikipedia page created three new ones.  Opp. SOF ¶ 30.  Two of the pages were created for the then-Co-Heads of the Commission's Enforcement Division.  *Id*.  The third page this Wikipedia user created was for Ligand's counsel, Mr. Bondi.  *Id*.  In the three-plus years since that time, this Wikipedia user has created only a single additional page (for a former U.S. naval officer).  *Id*.

On March 18, 2016, Bloomberg published an article titled, "*Hedge Fund Priest's Trades Probed by Wall Street Cop*." Opp. SOF ¶ 31. In revealing the Commission's non-public investigation, the article quoted "people with knowledge of the matter." *Id*. It stated, "The Securities and Exchange Commission is examining whether the Reverend Emmanuel Lemelson of Massachusetts made false statements about companies he was shorting, said the people who asked not to be named because the probe isn't public." *Id*. While the Commission and Ligand have denied leaking the existence of the investigation to the media, it is difficult to imagine that the source of the leak to the media was anyone else, unless the Commission improperly disclosed the existence of the investigation to other people.

During its investigation, the enforcement staff of the Commission deposed Fr. Emmanuel over three days for approximately 27 hours and asked questions related to his religion. Opp. SOF ¶ 32. The Commission asked: "Gandhi and the son of God. Are you comparing yourself to them?" Opp. SOF ¶ 33. The Commission continued this offensive line of questioning by asking, "Did Socrates, Martin Luther King, Gandhi or the son of God have a financial incentive to cause investors to sell stock in a particular company to bring the price down?" *Id*.

Further demonstrating its disparate treatment of Fr. Emmanuel, the enforcement staff of the Commission refused to meet with undersigned counsel to discuss its recommendation that the Commission bring a novel Investment Advisers Act claim. Opp. SOF ¶ 34. The stated reason for denying this meeting was that the Commission had already met with predecessor counsel, **even though Ligand was able to arrange a <u>second</u> meeting with new counsel at an unrelated regional office to lobby for the investigation in the first place**. ECF No. 126 ¶ 107; Opp. SOF ¶ 34. While the Commission asserts in a footnote that Defendants were able to avail themselves of the Wells submission process, ECF No. 122 at 10 n.9, the Commission conspicuously omits that

it *expressly denied* Defendants' current counsel a requested Wells meeting after the Commission indicated it would be adding a new claim *for the first time*.  Opp. SOF ¶ 34.

### D. The Complaint Contained a Number of Errors, Some of Which Were Copied Directly from Ligand's Presentations

The Commission's Complaint (and Amended Complaint) contain clear factual misstatements.  While it is never expected that the Commission will make objectively false allegations in a Complaint, it was all the more shocking here, because the Complaint followed a *three-year* investigation.  For example, the Commission erroneously alleged that the $245 million in proceeds that Ligand received from a debt offering constituted equity, and therefore Fr. Emmanuel's debt-to-tangible equity calculation was knowingly false.  ECF No. 126 ¶ 70.  In fact, it was the Commission's allegation that was patently false, and the Commission has presented no evidence of an accounting principle to support this claim.[9]  ECF No. 126 ¶ 71.  The Commission's false assertion was taken directly from Ligand's presentations, and overstated Ligand's equity by approximately $245 million, a public misrepresentation of the company's finances that investors might have reviewed and taken as true.  ECF No. 126 ¶¶ 70, 99, 113.

Additionally, in purporting to set forth Fr. Emmanuel's alleged false statements in his reports, the Commission cited to language from *private, draft* reports that were never publicly disseminated.  Opp. SOF ¶¶ 35-37.  In an attempt to bolster its claim that Fr. Emmanuel's statements concerning *Viking* were somehow *material* to his *Ligand* short (a required element of the Commission's claims), the Commission falsely alleged, both in its Original Complaint **and its Amended Complaint**, that at the time Fr. Emmanuel made those statements, Ligand owned just under half of Viking.  ECF No. 126 ¶¶ 39-40.  In fact, Ligand owned *none* of Viking at that

---

[9] The Court dismissed this challenged statement, and the Commission amended the claim to allege that, despite being mathematically correct, Fr. Emmanuel's calculation was somehow misleading.  ECF No. 126 ¶¶ 72-73.

point in time, a fact readily ascertainable from both Ligand and Viking's public filings. *Id*.

Ultimately, the Commission challenged four alleged misstatements contained in the five reports and two interviews between June and August 2014. ECF No. 126 ¶ 119. Ligand's stock price went up on each of the days the alleged misstatements were published, except one (which even the Commission's rebuttal expert agreed was not statistically significant), and the Commission has offered no admissible evidence that Fr. Emmanuel's alleged misstatements had any impact on Ligand's stock price.[10] ECF No. 126 ¶¶ 34, 57, 64-65, 129-133. All the interviews and reports disclosed that Fr. Emmanuel had a short position in Ligand. ECF No. 126 ¶ 8-10, 25, 36, 59, 63. The reports also disclosed that the reports reflected Fr. Emmanuel's opinions. *Id*. These facts render this case entirely unprecedented and materially different than the cases to which the Commission purports to compare it.

### E.    Subsequent Pleadings Relevant to the Issue of Selective Enforcement

In response to a notice for deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Commission filed a Motion for Protective Order, asking the Court to prohibit Defendants from inquiring as to issues related to bias and selective enforcement. Opp. SOF ¶ 40. Magistrate Judge Cabell denied the Commission's Motion, finding Defendants made an adequate factual showing to permit discovery on those issues. Opp. SOF ¶ 41. Not to be dissuaded, the Commission *again* tried to block this discovery, filing a motion seeking a more definite statement from Defendants concerning their selective enforcement defense. Opp. SOF ¶ 42. Judge Cabell also denied the Commission's second motion. Opp. SOF ¶ 43.

Finally, in the course of this litigation, the Commission improperly brought Fr. Emmanuel's religious vocation into play, asking him repeated questions about his priesthood and

---

[10] Even certain Ligand personnel doubted that Fr. Emmanuel caused any movement of Ligand's stock, with one referring to some of the company's own shareholders as "morons." Opp. SOF ¶ 20.

representing that it intended to subpoena the Greek Orthodox Archdiocese in Boston for purposes of determining whether Fr. Emmanuel was lying about his status as a Greek Orthodox Priest (he was not).  Opp. SOF ¶¶ 44-45.  Ultimately, the Commission asserted the baseless and offensive claim that Fr. Emmanuel was not a Greek Orthodox Priest, casting doubt on the veracity of his religious vocation and affiliation, and unfairly forcing Fr. Emmanuel to expend significant resources to prove this fact to this Court.  Opp. SOF ¶¶ 45-46.

## III.   ARGUMENT

### A.   The Cases the Commission Cites to Argue that It Regularly Pursues "Market Manipulation" Cases Similar to this One are so Easily Distinguishable that it Demonstrates the Unprecedented Nature of the Present Claims

The crux of the Commission's argument is that the Commission regularly pursues similar cases and has not treated Fr. Emmanuel differently than others similarly situated.  The cases it cites prove just the opposite.  ECF No. 122 at 4-5.  The Commission first cites an action involving Barry Minkow, a former convicted felon.  *Id.* at 5.  The ***only*** comparison the Commission can draw here is that the reports at issue were published on the internet, and the defendant was allegedly a pastor.  Otherwise, the *Minkow* matter bears no resemblance whatsoever to this case.  *Minkow* involved a concurrent *criminal* investigation and evidence that "Minkow was hired to put economic pressure on Lennar to pay money demanded by a business partner in a prior land deal."  ECF No. 123-8 at 1.  Nothing of the sort occurred here.  Further, Minkow used his relationship with federal law enforcement agencies to cause an investigation of Lennar, and once he succeeded, used that information to trade Lennar securities illegally.[11]  *Id.* In stark contrast here, Fr. Emmanuel's statements were all based on his analysis of ***publicly filed*** information, and he held his short position for months.  Also, critically, Minkow shorted Lennar

---

[11] Ironically, in co-opting regulatory bodies to do his bidding, Minkow engaged in similar behavior to *Ligand*—not Fr. Emmanuel.

stock prior to publishing his report "**unbeknownst to the public**." *Id.* at 3 (emphasis added). Here, Fr. Emmanuel openly disclosed his short position. The litany of other behavior in the Minkow case included embezzling church funds by forging signatures, opening unauthorized bank accounts, spending church funds on personal expenses, and running a Ponzi scheme. *Id.* at 2-3. In short, the *Minkow* matter has absolutely no similarities to this case, apart from comparisons that can be drawn to *Ligand's* conduct, and the Commission's reliance on it only proves Defendants' assertion of Commission bias and selective enforcement.

The Commission next tries to argue that this case is similar to *SEC v. Nielsen*. ECF No. 122 at 5. *Nielsen* involved an investor who *anonymously* encouraged others to buy shares while he planned to sell the shares he secretly owned. ECF No. 123-4 at 1-2. Here, Fr. Emmanuel held a short position, disclosed that position, and then published his analysis about why he took that position in his own name—making his situation completely inapposite to *Nielsen*. Further, Nielsen engaged in "spoofing," *i.e.,* purchasing a large order of shares to give the impression of high demand, and then canceling the order and falsely posting that others had caused the (fake) demand. *Id.* at 2. No such behavior occurred here.

The Commission's attempt to equate this case to *SEC v. Musk* fares no better. Elon Musk, a corporate insider at Tesla, announced via Twitter that he could take the company private at a certain price despite the uncertainty of any deal existing at the time. ECF No. 123-5 at 1. Here, Fr. Emmanuel was not a corporate insider and based all his analysis on publicly filed documents.

Fr. Emmanuel's alleged conduct is also markedly different than defendants in *SEC v. Thompson*. Fr. Emmanuel held his short position and explained why he took such a position. In contrast, the *Thompson* defendants encouraged others to buy certain penny stocks while they were *selling* the same stocks, and failed to disclose the compensation they received for

promoting the stocks.  ECF No. 123-6 at 1-2.  Further, the *Thompson* defendants did not disclose that their trading significantly contributed to the price increase and that they coordinated to drive up the stock prices of  companies by promoting them in separate promotional outlets they controlled, while planning to sell their shares.  *Id*.  No such coordinated effort, failure to disclose compensation, or conduct directly contradicting the published analysis exists here.  Moreover, unlike the *Thompson* defendants, Fr. Emmanuel did not control the sites that published his work.

The Commission's attempt to point to "similar" short-and-distort claims also fails.  In *Berliner*, the defendant was alleged to have *anonymously* spread a false rumor that was picked up by the media and caused the stock price to immediately plummet.  ECF No. 123-9 at 1.  Here, the alleged misstatements were all published in Fr. Emmanuel's name and did not consist of any "rumors."  Further, Berliner spread the rumor between 1:10 p.m. and 1:15 p.m., and covered his short position *just four minutes later*, before the market could discover it was false.  Opp. SOF ¶ 60.  In contrast here, Fr. Emmanuel held on to the majority of his short position for *months* (not minutes) after making the last challenged statement in this case.

The Commission's reliance on *SEC v. Jakob* is similarly misplaced.  In *Jakob*, the defendant used an *alias* to issue a press release, falsely stating that (i) the Commission was investigating the company in which he held a short position, (ii) the company's CEO resigned, and (iii) its earnings would be revised to report a loss.  ECF No. 123-10 at 1.  Within *16 minutes* of the publication of the fake press release, the stock price plummeted by over $61 per share.  *Id.* The defendant covered his short position *immediately*, and then purchased a long position that he quickly sold at a profit as the stock price recovered after the market learned defendant's press release was a hoax.  *Id.*  Again, Fr. Emmanuel published his analysis in his own name, held on to his position for months (not minutes), and disclosed his short position in his publications.

**B.      The Facts Here Permit Defendants to Pursue their Bias and Selective Enforcement Defense**

Given the unprecedented nature of this case, and with no evidence of any impact to Ligand's stock price, any reasonable factfinder would fairly question why the Commission chose to bring such a claim.  The record evidence here supports a finding that these claims are being enforced selectively against Fr. Emmanuel in an effort to prevent him from expressing his First Amendment-protected opinions or based on Fr. Emmanuel's religious vocation.

The Fourteenth Amendment of the Constitution guarantees all persons equal protection of the law, which includes the right to be protected from the government's selective enforcement of the law.  *Lozman v. City of Riviera Beach,* 39 F. Supp. 3d 1392, 1411 (S.D. Fla. 2014); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Selective enforcement is established when: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Rubinovitz v. Rogato*, 60 F.3d 906, 909-10 (1st Cir. 1995).

The Commission argues that Fr. Emmanuel cannot identify a similarly situated person that was treated differently.  However, it is the Commission that has failed to identify any market manipulation case brought against a person or entity that disclosed their short position, published analysis in their own name, disclosed they were providing their opinions, and held on to their short position for a significant period of time following the alleged misstatement.  This is because such conduct is antithetical to any fraud and, thus, the Commission has never charged anyone who was similarly situated.  If the Commission wants specific similarly situated people identified, it need look no further than the multiple other entities that published reports critical of Ligand between January 4, 2013 and January 16, 2019, who are not subject to a Commission

16

enforcement action, listed in the table below:

| Name of Author/Entity that Published Report Critical of Ligand | Date of Publication | Change in Ligand's Stock Price from Close of Day of Publication to Closing Price from Prior Trading Day |
|---|---|---|
| Cantor Fitzgerald | January 4, 2013 | Decreased by over 5% |
| Empire Asset Management Company | July 22, 2014 | Decreased by approximately 4.5% |
| Empire Asset Management Company | August 5, 2014 | Decreased by over 2% |
| Alan Biloski | January 30, 2018 | Decreased by approximately 2% |
| Seven Corners Capital Management | April 4, 2018 | Increased about 1% |
| Lakewood Capital Management | April 24, 2018 | Decreased by over 3% |
| Favus Institutional Research LLC | August 7, 2018 | Increased by approximately 9% |
| Citron Research[12] | January 16, 2019 | Decreased by over 16% |

ECF No. 126 ¶¶ 83-85; Opp. SOF ¶¶ 48-59.

Some of these reports included commentary about Ligand similar to Fr. Emmanuel's. For example, the Seven Corners Capital Management report (published in April 2018) also criticized Ligand's $245 million convertible note offering in August 2014, questioning whether Ligand had enough "real dollars" to pay the debt when due. Opp. SOF ¶ 52. This is remarkably similar to Fr. Emmanuel's analysis, including the debt to tangible equity ratio statement that is being challenged by the Commission. Favus Institutional Research LLC theorized that new drugs in the liver treatment area would drive down Promacta sales, which is remarkably similar to Fr. Emmanuel's analysis regarding Promacta. Opp. SOF ¶ 56. Also, these reports generally included disclosures similar to the ones that Fr. Emmanuel included in his reports, including that the report contained the author's opinions and disclosing what position, if any, the author held in Ligand's stock. *See e.g.*, Opp. SOF ¶¶ 50, 52, 56, 58. These undisputed facts are sufficient for the Court to deny the Commission's motion for partial summary judgment. *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007). ("Generally, whether two entities are

---

[12] The report published by Citron Research also noted that Grant's Interest Rate Observer had also published a report critical of Ligand on January 11, 2019, but that report could not be republished for copyright reasons.

similarly situated is a factual issue that should be submitted to the jury."); *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996) (holding such a comparator only needs to be "similarly situated in material respects").

The Commission also argues that Defendants have the burden to show that the Commission knew of other violations but chose not to enforce them.  This argument makes no sense, because there is no reason to believe these other entities that criticized Ligand violated any securities laws, just as there is no actual evidence that Defendants did so.  Notwithstanding the Commission's contention, bringing an enforcement action where there is no violation of the law *can* give rise to a selective treatment defense.  "Abuse of power and selective enforcement often arise in governmental administration of regulatory schemes and programs whereby the government interprets and applies its own rules.  How government selectively enforces its regulations may result from a variety of reasons: political, personal, discrimination, retaliation, arbitrary and some at whim, which may amount to abuse of power."  *Norton v. Autoridad de Acueductos y Alcantarillados*, 898 F. Supp. 2d 396, 409-10 (D.P.R. 2012).  *See also, United States v. Al Jibori,* 90 F.3d 22, 25 (2d Cir. 1996) (noting that while prosecutors retain "broad discretion" to enforce criminal laws, the Constitution prohibits a prosecutor from bringing charges based on "'an unjustifiable standard such as race, religion, or other arbitrary classification'") (quoting *Oyler v. Boles,* 368 U.S. 448, 456 (1962)); *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568, 603 (S.D.N.Y. 2010) ("the actions of municipalities in undertaking litigation must also be consistent with the Constitution. Thus, as relevant here, municipal officials may not pursue even potentially meritorious claims if they do so in a discriminatory fashion").  That is precisely the case here, as the Commission echoed Ligand's baseless accusations and has failed to demonstrate any evidence consistent with a short-

and-distort scheme.

The Commission also argues that its process of having enforcement staff present recommendations to the Commissioners, who decide whether to bring enforcement actions, precludes a finding of selective enforcement here.  ECF No. 122 at 10.  However, discriminatory intent in any link in the chain of the government's decision to prosecute a claim can be adequate to state a selective enforcement defense.  "If, for example, the investigators and police authorities exercised discriminatory intent in Defendant's arrest and/or their referral to the United States Attorney's Office, his selective prosecution claim may be meritorious even without a showing of the prosecutor's intent when deciding to seek an indictment."  *United States v. Tuitt*, 68 F. Supp. 2d 4, 15 (D. Mass. 1999).  Similarly here, selective enforcement can apply, even absent showing of the Commissioners' intent.[13]

Without any support, the Commission states that Ligand's motive is irrelevant.  ECF No. 122 at 12.  However, the evidence here permits a factfinder to find (1) that Ligand held animus toward Fr. Emmanuel based on his status as a priest and securities analyst, and wanted to prevent Fr. Emmanuel from being able to freely express his opinions about the company; (2) that Ligand used its connections to gain special treatment and consideration from the Commission to investigate and pursue baseless claims in an effort to "silence" Fr. Emmanuel's criticism of the firm; (3) the Commission pursued these baseless accusations levied by Ligand for over three years and still made demonstrably false allegations in the Complaint that parroted Ligand's false claims; (4) the Commission regurgitated other baseless claims about Fr. Emmanuel's religion, ordination as a priest and religious affiliation while simultaneously claiming it was irrelevant to the litigation; (5) the Commission did not pursue claims against any other analysts or funds that

---

[13] Moreover, if the staff included in its presentation to the Commissioners the same objectively false information contained in its Complaint, the Commissioners' vote would not serve to cleanse the staff's bias.

authored reports stating Ligand was overvalued; and (6) the Commission has never pursued a claim against an analyst that published opinions in his own name, with disclosures of his position, in which the analyst acted consistently with the opinions provided, cited publicly-available information on which he based his opinion, and held on to the short position for months after the challenged statements.

This is sufficient to find that the Commission treated Fr. Emmanuel differently than other analysts because of his status as a priest, that the Commission gave preferential treatment to Ligand to effectuate the company's goal of suppressing Fr. Emmanuel's right to free speech, or both.  Accordingly, Fr. Emmanuel's selective enforcement defense should survive summary judgment.  *See Norton*, 898 F. Supp. 2d at 409 (denying summary judgment because finder of fact could conclude from circumstantial evidence of long lapse in time, plaintiff's numerous attempts to get water service, the multiple obstacles imposed in process to get water services, and the comparative ease of neighboring properties to get water that there may have been concerted action by agency against plaintiff); *Ginorio v. Contreras*, 409 F. Supp. 2d 101, 110 (D.P.R. 2006) (denying summary judgment on selective enforcement claim where plaintiff proffered evidence of other insurers sharing commissions without being subject to intrusive investigation and punitive order); *Ginorio v. Contreras*, Civ. No. 03-2317, 2008 WL 11424136, at *11 (D.P.R. June 13, 2008) (affirming denial of summary judgment for selective enforcement defense from 2006, *supra*, and affirming jury verdict on selective enforcement because reasonable juror could have found the investigation was unprecedented and plaintiffs were treated selectively).

## IV.    CONCLUSION

For the foregoing reasons, the Commission's Motion for Partial Summary Judgment should be denied.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com

Dated:  October 30, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on October 30, 2020.

*/s/ Douglas S. Brooks*
Douglas S. Brooks