UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

GREGORY LEMELSON and LEMELSON CAPITAL
MANAGEMENT, LLC,

Defendants,

and

THE AMVONA FUND, LP,

Relief Defendant.

Civil Action No. 1:18-cv-11926-PBS

---

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED
FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
AND STATEMENT OF ADDITIONAL MATERIAL FACTS
<u>PURSUANT TO LOCAL RULE 56.1</u>**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants Fr.

Emmanuel Lemelson (f/k/a Gregory Lemelson), Lemelson Capital Management, LLC, and the

Amvona Fund, LP hereby submit the following response to the Plaintiff's Local Rule 56.1

Statement of Undisputed Material Facts.

**<u>Gregory Lemelson and Lemelson Capital Management, LLC</u>**

1.      **Plaintiff's Statement:**  Lemelson Capital Management, LLC ("LCM") is the
investment adviser to The Amvona Fund, LP.  [ECF No. 34 (Defendants' Answer) at ¶18.]

**<u>Defendants' Response:</u>**  Not disputed.

2.      **Plaintiff's Statement:**  Gregory Lemelson (a/k/a "Father Emmanuel," hereinafter
"Lemelson") is an exempt reporting adviser [Appendix of Exhibits, Ex. 1 (hereinafter "Ex.__")
(Lemelson Dep., Oct. 16, 2019), 22:14-21.]

**<u>Defendants' Response:</u>**  Not disputed.

3.     **Plaintiff's Statement:**  Between May 2014 and October 2014, Lemelson purchased short positions in the stock of Ligand Pharmaceuticals, Inc. through his hedge fund, The Amvona Fund.  A short position is an investment technique whereby an investor seeks to profit when the price of a stock falls.  [ECF No. 34 (Defendants' Answer) at ¶¶1, 3.]

**Defendants' Response:**  Disputed to the extent that one does not "purchase short positions in

stock."  Not disputed that Fr. Emmanuel took a short position in shares of Ligand

Pharmaceuticals.

4.     **Plaintiff's Statement:**  Between June 2014 and August 2014, Lemelson authored research reports concerning Ligand.  Between June 2014 and October 2014, Lemelson participated in live and written interviews concerning Ligand.  [*Id.*, ¶4.]

**Defendants' Response:**  Not disputed.

5.     **Plaintiff's Statement:**  Lemelson and LCM, through these reports and interviews, publicly disseminated information "that questioned the legitimacy of Ligand's business model and practices."  [*Id.*, ¶¶22-23.]

**Defendants' Response:**  Not disputed.

**The Commission's Prosecution of Cases Similar to this One**

6.     **Plaintiff's Statement:**  When an entity or individual makes fraudulent misrepresentations designed to drive up the price of a stock they own, that scheme is known as a "pump-and-dump."  [Ex. 2 (pump and dump explanation from SEC website).]

**Defendants' Response:**  Not disputed for purposes of this Motion.

7.     **Plaintiff's Statement:**  In *SEC v. Nielsen*, the Commission brought an enforcement action against an investor in a public company who, while partially disclosing his long position in the company's stock, issued numerous false and misleading statements intended to drive up the price of the stock while quietly selling his shares.  *SEC v. Nielsen*, N.D. Cal. Case No. 5:20-cv-03788 (complaint filed June 9, 2020).  [Ex. 3.]

**Defendants' Response:**  Not disputed that the Commission brought the action as described and

made the allegations set forth in the complaint attached as an exhibit, but Defendants have no

basis to confirm or deny the truth of the allegations made by the Commission in this unrelated

matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion

for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to

the Commission's claims in this case.

8.   **Plaintiff's Statement:**  In *SEC v. Musk*, SEC Press Rel. No. 2018-226 (Sept. 29, 2018), the Commission brought and settled an action against Tesla, Inc. founder and CEO Elon Musk arising out of misleading tweets that caused Tesla stock to jump by over six percent in value.  [Ex. 4.]

**Defendants' Response:**  Not disputed that the Commission brought the action as described and made the allegations set forth in the press release attached as an exhibit, but Defendants have no basis to confirm or deny the truth of the allegations made by the Commission in this unrelated matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to the Commission's claims in this case.

9.   **Plaintiff's Statement:**  In *SEC v. Thompson, et al.*, SEC Lit. Rel. No. 23137 (Nov. 21, 2014), the Commission brought a securities fraud action against three penny stock promoters who engaged in a pump-and-dump scheme with respect to disclosed long positions in five public companies.  [Ex. 5]

**Defendants' Response:**  Not disputed that the Commission brought the action as described and made the allegations set forth in the press release attached as an exhibit, but Defendants have no basis to confirm or deny the truth of the allegations made by the Commission in this unrelated matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to the Commission's claims in this case.

10.   **Plaintiff's Statement:**  When an entity or individual makes fraudulent misrepresentations designed to drive down the price of the stock in which they have taken a short position, that scheme is known as a "short-and-distort."  [Ex. 6 (Investopedia short and distort explanation).]

**Defendants' Response:**  Not disputed for purposes of this Motion.

11.   **Plaintiff's Statement:**  Both the Commission and the United States Attorney's Office in the Southern District of Florida brought actions related to the securities fraud of Barry Minkow.  *See In the Matter of Minkow*, Inv. Adv. Release IA-3320 (November 22, 2011).  Minkow—a pastor at the time—orchestrated a scheme to drive down the price of the

stock of a publicly-traded company he had shorted, through false and misleading statements on the Internet, in press releases, emails, YouTube videos, and the mail.  Like Defendants, Minkow alleged wide-spread improprieties in the targeted company's financial reporting and business structure, as well as attacking the personal character of the company's management.  Both the USAO and the Commission investigated the case; the USAO indicted Minkow (who pled guilty and received a five-year sentence) and the Commission barred Minkow from association with any investment adviser, broker, or other specified securities-related entities.  [Ex. 7 (USAO Press Release and SEC follow-on)].

**Defendants' Response:**  Not disputed that the Commission and U.S. Attorney's Office brought

the action as described and made the allegations set forth in the press release attached as an

exhibit, but Defendants have no basis to confirm or deny the truth of the allegations made by the

Commission and the U.S. Attorney's Office in this unrelated matter.  By way of further response,

as described in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment,

Defendants deny that these allegations are in any way similar to the Commission's claims in this

case.

12.   **Plaintiff's Statement:**  The Commission brought a short-and-distort case in 2008 known as *SEC v. Berliner*, SEC Lit. Rel. No. 20537 (April 24, 2008). In *Berliner*, a trader was alleged to have spread false rumors about pending acquisition of public company to drive stock price down and profit from short position).  [Ex. 8.]

**Defendants' Response:**  Not disputed that the Commission brought the action as described and

made the allegations set forth in the press release attached as an exhibit, but Defendants have no

basis to confirm or deny the truth of the allegations made by the Commission in this unrelated

matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion

for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to

the Commission's claims in this case.

13.   **Plaintiff's Statement:**  The Commission brought a short-and-distort case in 2000 known as *SEC v. Jakob*, SEC Lit. Rel. No. 16671 (Aug. 31, 2000); *U.S. v. Jakob*, CR-00-1002 (C.D. Cal. 2000).  *Jakob* involved parallel civil and criminal actions against trader who issued fake press release to drive down stock price and profit from a short position.  [Ex. 9.]

**Defendants' Response:**  Not disputed that the Commission brought the action as described and

made the allegations set forth in the press release attached as an exhibit, but Defendants have no

basis to confirm or deny the truth of the allegations made by the Commission in this unrelated

matter. By way of further response, as described in Defendants' Opposition to Plaintiff's Motion

for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to

the Commission's claims in this case.

**The Commission's Authorization Process**

14.    **Plaintiff's Statement:** The Commission, not the staff, authorizes enforcement
actions. [Ex. 10 (Enforcement Manual), at p. 22.]

**Defendants' Response:** Not disputed for purposes of this Motion.

15.    **Plaintiff's Statement:** The Commission has five Commissioners, each of whom
is appointed by the President and confirmed by the Senate. 15 U.S.C. § 78d(a). When this case
was considered, the Commission only had four Commissioners.

**Defendants' Response:** Not disputed that by statute, the Commission has five Commissioners,

each of whom is appointed by the President and confirmed by the Senate. There is no record

evidence of the number of Commissioners at the time "this case was considered," which is

inadequate under Fed. R. Civ. P. 56(c).

16.    **Plaintiff's Statement:** After investigating potential violations of the federal
securities laws, the staff of the SEC's Division of Enforcement may recommend to the
Commission that it authorize the filing of a civil enforcement action, as it did in this case. [Ex.
10, at 22-23.]

**Defendants' Response:** Not disputed for purposes of this Motion that the Commission's

Enforcement Manual provides that the staff of the SEC's Division of Enforcement may

recommend to the Commission that it authorize the filing of a civil enforcement action. There is

no record evidence that this procedure was followed in this case, which is inadequate under Fed.

R. Civ. P. 56(c).

17.    **Plaintiff's Statement:** A Wells notice—named for former SEC Commissioner
John Wells—is a communication from the staff of the SEC's Division of Enforcement to a
person involved in an investigation that: (1) informs the person the staff has made a preliminary

determination to recommend that the Commission file an action or institute a proceeding against them; (2) identifies the securities law violations that the staff has preliminarily determined to include in the recommendation; and (3) provides notice that the person may make a submission to the Division and the Commission concerning the proposed recommendation.  [*Id.* at 19.]

**Defendants' Response:**  Not disputed for purposes of this Motion.

18.    **Plaintiff's Statement:**  The putative Defendant(s) typically have an opportunity to address the staff's preliminary determination to recommend an enforcement action through a "Wells process" that typically includes written submissions ("Wells submissions") and in-person meetings with senior officers of the Division of Enforcement.  [*Id.* at 19-22.]

**Defendants' Response:**  Not disputed for purposes of this Motion.  However, the undersigned counsel were expressly denied an opportunity to meet with senior officers of the Division of Enforcement in this case to discuss the staff's determination to recommend its novel Investment Advisors Act claim.  Affidavit of Douglas Brooks In Support of Defendants' Response to Plaintiff's Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment and Statement of Additional Material Facts Pursuant to Local Rule 56.1 ("Brooks Opp. Aff.") ¶ 36.

19.    **Plaintiff's Statement:**  The Enforcement staff's recommendation that the Commission authorize the filing of a civil enforcement action, along with any Wells submission, is reviewed by senior officers and staff in the Division of Enforcement and then each relevant Division and Office within the Commission, including the Office of General Counsel and Enforcement's Office of Chief Counsel.  [*Id.* at 22-23]

**Defendants' Response:**  Not disputed for purposes of this Motion.

20.    **Plaintiff's Statement:**  Once the recommendation has gone through this process, it is submitted to the Commissioners for their consideration.  [*Id.*]

**Defendants' Response:**  Not disputed for purposes of this Motion.

21.    **Plaintiff's Statement:**  The Commissioners and their staff review the recommendation and any Wells submissions.  [*Id.*]

**Defendants' Response:**  Not disputed for purposes of this Motion.

22.    **Plaintiff's Statement:**  Then, and only then, do the Commissioners vote on the recommendation.  [*Id.* at 23.]

**Defendants' Response:**  Not disputed for purposes of this Motion.

**Defendants' Submission to the Commission**

23.    **Plaintiff's Statement:**  On October 20, 2016, Defendants' prior counsel submitted a 36-page white paper to staff of the Commission's Division of Enforcement setting out the reasons they believed they should not be charged.  [Ex. 11 (Day Decl.) at ¶2.]

**Defendants' Response:**  Not disputed in substance.  Defendants note that if the title page and table of contents were included, then this Wells submission was 38 pages long.

24.    **Plaintiff's Statement:**  On May 25, 2017, Defendants were given a Wells notice, informing them of the charges the staff of the Commission's Division of Enforcement were prepared to recommend to the Commission and the factual basis underlying each of those charges.  [*Id.* at ¶3.]

**Defendants' Response:**  Not disputed.

25.    **Plaintiff's Statement:**  On June 30, 2017, Defendants submitted a 40-page Wells response detailing their reasons why the staff should not recommend the charges detailed in the Wells notice.  [*Id.* at ¶4.]

**Defendants' Response:**  Not disputed.

26.    **Plaintiff's Statement:**  On October 4, 2017, Defendants' prior counsel met with a Co-Director of the SEC's Division of Enforcement, Steven Peikin, as well as with Enforcement staff, to discuss the investigation and possible charges.  [*Id.* at ¶5.]

**Defendants' Response:**  Not disputed.

27.    **Plaintiff's Statement:**  On April 26, 2018, Defendants were given a Supplemental Wells Notice, informing them of further charges the staff of the Commission's Division of Enforcement were prepared to recommend to the Commission and the factual basis underlying each of those charges.  The additional charges concerned violations of the Investment Advisers Act of 1940.  [*Id.* at ¶6.]

**Defendants' Response:**  Not disputed.

28.    **Plaintiff's Statement:**  On June 15, 2018, Lemelson submitted an 11-page supplemental Wells response detailing reasons why the staff should not recommend the Advisers Act charges.  The same day, LCM and The Amvona Fund submitted a 5-page supplemental Wells response.  [*Id.* at ¶7.]

**Defendants' Response:**  Not disputed.

29.    **Plaintiff's Statement:**  In their white paper and subsequent Wells submissions, Defendants did not raise or otherwise articulate selective enforcement as a reason the staff should not recommend charges to the Commission.  [*Id.* at ¶8.]

**Defendants' Response:**  Not disputed.  By way of further response, Defendants note that they had access to no discovery at the time of these submissions.

**Defendants' Failure to Adduce Evidence About of Religious Bias, Punishment for Exercise of Free Speech, or Other Improper Motive**

30.    **Plaintiff's Statement:**  In a Notice of Deposition dated July 30, 2020, Defendants sought 30(b)(6) testimony from the Commission on three topics:

> 1.  The SEC's analysis and mathematical calculation of Ligand's debt-to-tangible equity ratio.
>
> 2.  Communications between the SEC and media sources concerning its non-public investigation of Defendants.
>
> 3.  Pre-litigation communications between the SEC and Ligand regarding Defendants, including but not limited to meetings between Ligand and the SEC, how such meetings were arranged, and the relationships between SEC and Ligand's counsel.

[Ex. 12 (July 30, 2020 Notice of Deposition to the SEC).]

**Defendants' Response:**  Not disputed that Defendants served a Third Amended Notice of Deposition with those listed topics on July 30, 2020.  By way of further response, Defendants note that they sent an initial Notice to Depose the Commission pursuant to Fed. R. Civ. P. 30(b)(6) on October 28, 2019 and the subject of the deposition and topics for testimony were the subject of litigation in this matter leading up to the Third Amended Notice of Deposition being sent and the deposition being held.  *See* Brooks Opp. Aff. Ex. 1; ECF Nos. 40-42, 45-47, 51, 99-100, 108.

31.    **Plaintiff's Statement:**  The July 30, 2020 Notice of Deposition did not contain any topics referring to Defendant Lemelson's religious affiliation or his exercise of First Amendment rights. [*Id.*]

**Defendants' Response:**  Disputed.  Both topics 2 and 3, relating to the Commission's communications with the media and the Commission's communications with Ligand and its counsel referred and related to Fr. Emmanuel's religious affiliation and exercise of his First Amendment rights.

32.   **Plaintiff's Statement:**  The 30(b)(6) deposition of the Commission took place on August 6, 2020.  The Commission's 30(b)(6) designee was David Becker, an Assistant Director in the SEC's Division of Enforcement.  [Ex. 13 (Deposition of Commission's Rule 30(b)(6) designee, Aug. 6, 2020).]

**Defendants' Response:**  Not disputed

33.   **Plaintiff's Statement:**  There were no questions posed during the 30(b)(6) deposition of the Commission regarding Defendant Lemelson's exercise of First Amendment rights.  Further, the phrases "First Amendment" and "free speech" do not appear in any of the deposition transcripts or transcripts on investigative testimony in this matter.  [Ex. 11 (Day Decl.) at ¶10.]

**Defendants' Response:**  Disputed.  The deposition  discussed the presentations made by Ligand to the Commission in detail, which include baseless accusations of Fr. Emmanuel engaging in an affinity fraud and misrepresenting the performance of his fund, which from internal Ligand communications were attempts to "silence" Fr. Emmanuel from expressing his opinions about Ligand.  *See* Brooks Opp. Aff. Ex. 2 at 33:19-42:18, 62:14-63:7, 75:6-76:3, 79:18-80:6, 120:20-121:6.  Further, the Commission consistently objected to any question about the thought process of the Commission in bringing the claims here, thus, preventing any questions about whether the Commission's enforcement action was based on religious animus or in an effort to prevent Fr. Emmanuel from expressing his opinions.  Brooks Opp. Aff. Ex. 2 at 18:24-19:16, 22:6-11, 30:10-31:4, 40:10-20, 73:22-74:12, 99:19-100:18, 137:2-139:1.  The questions objected to included (1) why the Commission disclosed the existence of the investigation to Mr. Bondi (the public reporting of which Defendants have argued evidence an attempt to suppress Fr. Emmanuel from expressing his opinions); (2) what was the role of the supervising staff in the decision to bring this claim (which the Commission asserted is support for finding it acted with no discrimination for purposes of selective enforcement); (3) how the Commission decided to bring the allegations that Fr. Emmanuel incorrectly excluded the proceeds of a loan from his calculation of Ligand's debt to tangible equity ratio, which is factually incorrect, but appeared in

Ligand's presentations (which Defendants have argued evidence an overly familiar relationship between the Commission and Ligand, indicating that the Commission was acting in a manner to achieve Ligand's goal of silencing Fr. Emmanuel); (4) where the Commission first came up with the notion that proceeds from the loan should have been included in Fr. Emmanuel's debt to tangible equity ratio (same); and (5) why the Commission declined to grant Defendants' counsel a second meeting after giving Ligand's counsel multiple meetings (which Defendants have argued evidence preferential treatment provided to Ligand).  It is improper for the Commission to selectively object to producing discovery as attorney work product and then assert that the absence of such information supports their argument on selective enforcement.  *See Columbia Data Products, Inc. v. Autonomy Corp. Ltd.,* 2012 WL 6212898, at *17 (D. Mass. Dec. 12, 2012) ("a subject matter waiver of work product material is appropriate where a party is attempting to use otherwise protected information as 'both a sword and a shield' in order to gain an unfair tactical advantage over the opposing party"); *In re PolyMedica Corp. Securities Litig.*, 235 F.R.D. 28, 32-33 (D. Mass. 2006) ("'Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials,' the Court reasoned, 'than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination'").

34.   **Plaintiff's Statement:**  Defendant Lemelson's religious affiliation only came up in passing during the 30(b)(6) deposition of the Commission:

> Q.   Were there ever any communications between the SEC and any representative of Ligand concerning Father Emmanuel Lemelson's status as a priest?

MR. JONES:  Are you talking before filing the litigation or at any time?

MR. BROOKS:  Yeah, before the filing of litigation.

> A.   I think if you look at the PowerPoint decks that Ligand provided to the SEC and presented at -- during the meetings, there is an indication of that and it appears

that that was mentioned in passing during the presentation, but that's all I'm aware of.

[Ex. 13, at 120:20-121:6.]

**Defendants' Response:**  Disputed for the same reasons as stated in response to paragraph 33.

35.     **Plaintiff's Statement:**  There are no other instances of the following words and phrase in the transcript—"religion," religious," "priest," "church," or "Greek Orthodox."  [Ex. 11 (Day Decl.) at ¶11.]

**Defendants' Response:**  Not disputed.  By way of further response, Defendants refer to their

response and objections to paragraph 33.

36.     **Plaintiff's Statement:**  Ligand's CEO, John Higgins, was also asked a handful of questions about Defendant Lemelson's religious affiliation, only one of which concerned communications with Commission staff.  He did not recall the subject of that question ever being discussed with the Commission's staff.  [Ex. 14 (Deposition of John Higgins, Dec. 11, 2019) at 223:14-17.]

**Defendants' Response:**  Disputed.  As an initial matter, the characterization of a "handful" of

questions is vague and unsupported in violation of Fed. R. Civ. P. 56(c).  Moreover, many of the

questions relating to Fr. Emmanuel's religious affiliation were in the context of the *presentations*

*Ligand made to the Commission*.  Brooks Opp. Aff. Ex. 3 at 222:1-223:13, 263:14-24.

37.     **Plaintiff's Statement:**  The Commission frequently investigates and prosecutes securities law violations by individuals with religious occupations.  *See, e.g., SEC v. Ovid, et al.*, SEC Lit. Rel. No. 20998 (Apr. 14, 2009) (seven church leaders charged with fraudulent investment scheme targeting elderly parishioners); *SEC v. Feiner, et al.*, SEC Lit. Rel. No. 24848 (July 6, 2020) (rabbi and others charged in connection with fraudulent investment scheme targeting Orthodox Jewish community); *SEC v. Holley, et al.*, SEC Press Rel. 2017-74 (March 30, 2017) (pastor charged with fraudulent real estate investment scheme targeting churchgoers). [Exs. 15, 16, 17 (litigation releases/complaints).]

**Defendants' Response:**  Disputed.  Three examples spanning 2009-2020 is not evidence of

"frequently" investigating any type of behavior.  By way of further response, Defendants state

that the "examples" provided in Exhibits 15-17 are not relevant as they involve allegations of

misappropriation of funds, not a "pump and dump" or "short and distort" scheme.

**No Evidence of Improper Influence by Ligand or Ligand's Counsel**

38.     **Plaintiff's Statement:**  With one exception, the Commissioners who authorized this case had nothing more than a passing professional acquaintance with counsel for Ligand, including Ligand's lead outside counsel, Bradley J. Bondi of Cahill, Gordon & Reindel LLP, who was once employed at the Commission.  Commissioner Peirce knows Mr. Bondi and considers him a friend; she communicates with him a few times a year but did not discuss this case—or any other Commission business—with him.  [Ex. 13 (R. 30(b)(6) Dep.), at 127:6-130:17.]

**Defendants' Response:**  Not disputed based on the deposition testimony.

39.     **Plaintiff's Statement:**  In preparing Mr. Becker to testify as the Commission's 30(b)(6) designee with respect to Topic 3, Commission counsel inquired of 29 current and former Commissioners, Commissioners' counsel, senior officers of the Division of Enforcement, and Division of Enforcement staff who were involved in investigating, recommending charges to the Commission, and/or authorizing this enforcement action.  While Defendants' counsel did not ask, this inquiry revealed that none had anything more than a passing professional familiarity with any of Ligand's inside or outside counsel, including Mr. Bondi (with the exception of Commissioner Peirce as noted above).  [Ex. 11 (Day Decl.) at ¶12.]

**Defendants' Response:**  Defendants dispute the assertions of fact in paragraph 39 to the extent that they are not supported by evidence in the record, which is inadequate under Fed. R. Civ. P. 56(c).  By way of further response, Defendants take exception with the comment that "Defendants did not ask" as the Commission appears to be selectively disclosing attorney work product after objecting at the 30(b)(6) deposition on the grounds of attorney work product multiple times.  The Commission cannot object to certain questions on subject matter as work product and then selectively reveal part of that work product to gain a tactical advantage without an entire subject matter waiver.  *See Columbia Data Products, Inc. v. Autonomy Corp. Ltd.,* 2012 WL 6212898, at *17 (D. Mass. Dec. 12, 2012) ("a subject matter waiver of work product material is appropriate where a party is attempting to use otherwise protected information as 'both a sword and a shield' in order to gain an unfair tactical advantage over the opposing party"); *In re PolyMedica Corp. Securities Litig.*, 235 F.R.D. 28, 32-33 (D. Mass. 2006) ("'Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial

use of work-product materials,' the Court reasoned, 'than he could elect to testify in his

own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on

matters reasonably related to those brought out in direct examination'").

40.     **Plaintiff's Statement:**  The SEC maintains a system for persons with knowledge
of potential violations of the securities laws to report relevant information to the SEC.  The
system, which is accessible via the SEC's public website, is referred to as the TCR system,
which stands for "tips, complaints, and referrals."  [Ex. 13 (R. 30(b)(6) Dep.), at 52:8-53:9.]  The
Commission encourages people who believe themselves to be victims of a securities law
violation to bring to the Commission's attention the facts and circumstances underlying that
belief.  [Ex. 10 (Enforcement Manual), at 7-9]

**Defendants' Response:**  Not disputed for purposes of this Motion.

41.     **Plaintiff's Statement:**  Ligand and its counsel brought Defendants' conduct to
the attention of the Division of Enforcement by filing two TCRs—one in 2014 and another in
2015.  [Ex. 13 (R. 30(b)(6) Dep.), at 55:5-13, 69:23-70:12.]  Before this case was filed, Ligand
representatives and counsel met twice with Division of Enforcement staff regarding the two
TCRs—once on September 25, 2014 and again on June 8, 2015.  [Ex. 13 (R. 30(b)(6) Dep.), at
53:15-55:4, 62:14-63:1, 72:14-73:8; 84:24-87:9.]  In addition to the two in-person meetings,
Ligand's counsel communicated with Division of Enforcement staff via email, voicemail, and
telephone from time to time during the period September 2014 through March 2018.  [*See
generally id.* at 53:15-121:6.]  These communications were all routine:  several concerned
meeting logistics.  [*See, e.g., id.* at 56:21-57:2, 79:10-80:6.]  A number of communications
reflect Ligand's counsel providing additional information about Defendants' conduct—such as
new tweets by Lemelson, an interview of Lemelson in which he discussed Ligand, and a letter to
Congress written by Lemelson—after the June 8, 2020 meeting.  [*See, e.g., id.* at 88:6-23, 90:12-
21, 91:4-20, 98:1-19, 102:20-103:5, 104:7-12.]  Ligand's counsel also asked for updates about
any investigation into Defendants' conduct and was informed by the staff—repeatedly—that
the staff cannot provide any detail other than to say that the investigation is ongoing.  [*See, e.g., id.*
at 98:20-99:7, 107:17-108:11, 110:3-20, 115:14-116:7, 117:10-24.]

**Defendants' Response:**  Disputed.  Defendants' object to any improper characterizations of the

communications between Ligand and the Commission as "routine" as not based on evidence in

the record, which is inadequate under Fed. R. Civ. P. 56(c).  Further, while Defendants do not

dispute that the Commission's 30(b)(6) witness reported that other staff members had

conversations with Ligand in which they offered no additional information other than the

investigation was "ongoing," it strains credulity that there were multiple 15-20 minute telephone

conversations over years in which the only substance discussed was "an investigation is

ongoing." Further, it appears that once again the Commission is attempting to use attorney work product as both a sword and shield as the Commission objected to questions like why the Commission informed Ligand's counsel of the existence of an investigation as attorney work product, but now wants to assert that all such communications were "routine." *See* 30(b)(6) Dep. Tr. 99:19-100:18; *Columbia Data Products, Inc. v. Autonomy Corp. Ltd.,* 2012 WL 6212898, at *17 (D. Mass. Dec. 12, 2012) ("a subject matter waiver of work product material is appropriate where a party is attempting to use otherwise protected information as 'both a sword and a shield' in order to gain an unfair tactical advantage over the opposing party"); *In re PolyMedica Corp. Securities Litig.*, 235 F.R.D. 28, 32-33 (D. Mass. 2006) ("'Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials,' the Court reasoned, 'than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination'").

  42. **Plaintiff's Statement:**  Ligand's counsel's communications to the staff often elicited no response from the staff at all. [*See, e.g., id.* at 88:6-13, 90:12-21, 91:4-20, 98:1-19, 113:2-15.] And, although Ligand's counsel requested meetings with the staff and/or the Co-Directors of the Division of Enforcement on several occasions, those requests were declined. [*See, e.g., id.* at 92:11-93:12, 111:19-112:10, 117:10-24.] Ligand's counsel was not informed that this action had been authorized before it was publicly filed. [*Id.* at 119:5-13.]

**Defendants' Response:** Disputed as to the characterizations that "often" the Commission did not respond to communications from Ligand. Not disputed that certain requests by Ligand for meetings were declined, but Ligand did receive the benefit of multiple in-person meetings and telephone calls with the Commission. *See* paragraph 41. Disputed that Ligand's counsel was not informed that this action had been authorized before it was publicly filed, as the deposition testimony was simply that there was no record of any such communication taking place. Brooks Opp. Aff. Ex. 2 at 19:5-13.

## Defendants' Statement of Additional Material Facts

Defendants hereby incorporate their Local Rule 56.1 Statement of Undisputed Material Facts (ECF No. 126) in its entirety.  In addition, Defendants state below the following additional material facts relevant to their Opposition to Plaintiff's Motion for Partial Summary Judgment.

## I.      Fr. Emmanuel's Published Analysis of Ligand

1.      On August 13, 2014, Fr. Emmanuel was interviewed by an outlet called Benzinga.com.  Brooks Opp. Aff. ¶ 5.

2.      When the topic of Ligand was first raised on the interview, it was disclosed that Fr. Emmanuel had taken a short position in Ligand's stock.  Brooks Opp. Aff. ¶ 6.

3.      Fr. Emmanuel's August 14 and 22, 2014 reports on Ligand discussed, *inter alia*, Ligand's August 11, 2014 announcement that it would assume $245 million in convertible debt to finance a $200 million share repurchase.  Affidavit of Douglas Brooks in Support of Defendants' Motion for Summary Judgment, ECF No. 127, Ex. 23 at 1-3; Ex. 24 at 3, 5.

## II.     Ligand's Discussions Mocking Fr. Emmanuel and his Beliefs and Evidencing an Intent to Prevent Fr. Emmanuel from Expressing his Opinions

4.      On June 17, 2014, John Higgins sent an email to Bruce Voss and Matt Foehr referring to Fr. Emmanuel as "lamelson" multiple times.  Brooks Opp. Aff. Ex. 4 at EPROD-SEC-LIT-E-000000106.

5.      On October 28, 2015, Bruce Voss sent an email to John Higgins, Charles Berkman, and Todd Pettingill that stated Fr. Emmanuel is "clearly part pit bull."  Brooks Opp. Aff. Ex. 5 at EPROD-SEC-LIT-E-000000212.

6.      On June 17, 2014, Matt Foehr sent an email to Bruce Voss, calling Fr. Emmanuel "a quack."   Brooks Opp. Aff. Ex. 6 at EPROD-SEC-LIT-E-000000380.

7.      On August 22, 2014, Todd Pettingill sent an email to Eric Vajda and Glenn Dourado, in which he stated "what a DB" in reference to Fr. Emmanuel.  Brooks Opp. Aff. Ex. 7 at LGND_0041208.  At his deposition, Mr. Pettingill admitted that "DB" in this email was short for "douchebag."  Brooks Opp. Aff. Ex. 8 at 92:8-11.

8.      On October 28-29, 2015, Bruce Voss and Kristen Chapman engaged in an email chain, in which they referred to Fr. Emmanuel as "slimy," "a narcissistic psychopath," wrote "Forgive me, but lordy, lordy," and "does being a priest make that ok?"  Brooks Opp. Aff. Ex. 9 at EPROD-SEC-LIT-E-000000805.

9.      On November 17, 2014, Bruce Voss sent an email to Jody Burfening, in which he wrote, "BTW, Lemelson is an ordained Eastern Orthodox priest, and is constantly photographed in his priestly robes and collar.  It would be funny if it wasn't my client!"  Brooks Opp. Aff. Ex. 10 at EPROD-SEC-LIT-E-000000661.

10.     From June 19-20, 2014, John Higgins engaged in an email chain with Matthew Perry, Mark Lampert, and Kanishka Pothula in which Matthew Perry wrote, "We may want to enter into a group with God. Any thoughts you have are welcome. We want to pray for the success of this holy company. Thank you for being the true voice."  To which Mr. Higgins replied: "Every time I see the report, I feel I should go to the River Jordan to be cleansed."  Brooks Opp. Aff. Ex. 11 at LGND_0037566.

11.     On October 28, 2015, Todd Pettingill sent an email to Bruce Voss commenting on Fr. Emmanuel's house as it appeared in a video interview in the Wall Street Journal stating, "I now covet his earthly possessions.  Do you think he would give them to me, because they mean nothing to him?"  Brooks Opp. Aff. Ex. 12 at EPROD-SEC-LIT-E-000000210.

12.     On October 27, 2015, Bruce Voss sent an email to John Higgins and Todd Pettingill forwarding a Wall Street Journal article about Fr. Emmanuel and stating, "I wish they

16

[*sic*] were more dirt on him in this article then [*sic*] simply saying he's pushing it by being both a priest and a wealthy hedge fund manager."  Brooks Opp. Aff. Ex. 13 at EPROD-SEC-LIT-E-000000217.

13.    On September 23, 2014, Bruce Voss sent an email to Matt Foehr discussing research into Fr. Emmanuel's background, in which Mr. Voss sent an article about a Jerome Lemelson engaging in misconduct and stating, "if Jerome is a relative then Gregory comes from a family of crooks."  Brooks Opp. Aff. Ex. 14 at EPROD-SEC-LIT-E-000000626.

14.    On October 30, 2015, Glenn Dourado emailed J.D. Pipkin about an entity called "Laidlaw" and stated, ""[m]aybe they are like Lemelson and just get told by a higher power what to invest in."  Brooks Opp. Aff. Ex. 15 at LGND_0068636.

15.    On June 17, 2014, John Higgins sent an email to Bruce Voss and Matt Foehr, stating, "As for USA Today.  I think you or Keith should call and UNDRESS them."  Brooks Opp. Aff. Ex. 16 at EPROD-SEC-LIT-E-000000909.

16.    On June 20, 2014, Matt Foehr wrote an email to Bruce Voss and John Higgins, stating "I'd also be interested in your thoughts of if it's worth contacting SeekingAlpha to block Lemelson."  Brooks Opp. Aff. Ex. 17 at EPROD-SEC-LIT-E-000000412.

17.    On August 18, 2014, John Higgins wrote an email to Bruce Voss, Nishan de Silva, Matt Foehr, Erika Luib, and Charles Berkman, discussing a publication about Fr. Emmanuel in BioWorld.  John Higgins wrote, "Please take them to task on this…. This should go all the way to the top of the Editor staff at BioWorld."  Later in that same email chain, on the following day, Bruce Voss summarized a conversation he had with a representative of BioWorld. In the course of that summary, Mr. Voss wrote: "He included Lemelson in the story because it 'seemed like another aspect of the story … another opinion" (ellipses in original); "He said 'I rely on readers to sort these things out [the opinions of others]" (brackets in original); "he says

he's sorry he included mention, is sorry you're disappointed in the article and won't write anything about Ligand/Lemelson in the future ('I won't give him anymore space')" (parenthetical in original); "After getting him to agree not to write anything on Lemelson regardless of what he hears, he's going to call Lemelson to see if as a journalist he can learn more about him, his fund, his position, his alliances, etc. and will report back to me."  Brooks Opp. Aff. Ex. 18 at EPROD-SEC-LIT-E-000001216- EPROD-SEC-LIT-E-000001218.

18.     On June 24, 2014, John Higgins emailed Matt Foehr and Bruce Voss regarding Fr. Emmanuel and wrote, "Bruce please let me know your thoughts on my stock surveillance question."  Bruce Voss replied, "Regarding stock surveillance, it's not what it once was.  It used to be you would get pretty good information because the surveillance firms were bribing people at the depository trust companies.  They got caught and all that has stopped.  Now you pay a lot of money and don't get much, if any intelligence out of them.  If we'd like to consider it, there's always the option of engaging a private investigator to check out Emmanuel, Lemelson Capital and Lantern."  Brooks Opp. Aff. Ex. 19 at EPROD-SEC-LIT-E-000001019- EPROD-SEC-LIT-E-000001020.

19.     On July 9, 2014, John Higgins emailed Matt Foehr, Charles Berkman, Nishan de Silva, Bruce Voss, and Todd Pettingill, attaching Lemelson Capital Management's Wikipedia page and wrote, "Should we try to edit this, or otherwise get Wikipedia to delete it?  I am not familiar with how that works or if Ligand will have visibility in the process.  Are their [sic] firms we can hire to edit wikileaks?  Should we have investors edit the page?"  Brooks Opp. Aff. Ex. 20 at EPROD-SEC-LIT-E-000001110.

20.     On August 22, 2014, Glenn Dourado wrote an email to Todd Pettingill and Eric Vajda discussing Fr. Emmanuel's reports in which he stated, "Unfortunately, he's winning because the stock keeps going down.  He needs to be silenced for good.  I'm not saying anything

specific (for fear it could be misconstrued)."  Todd Pettingill replied, "I dunno [*sic*], correlation doesn't always equal causality.  I think he's behind on everything and just trying to make it look like he's moving the stock.  Sure it moves a little when he puts out these garbage reports, but for the most part (with the exception of his first one), some moron's [*sic*] listen and sell, but everyone else just ignores him.  The stock went up after he issued his last two."  Brooks Opp. Aff. Ex. 21 at LGND_0041211.

### III.   Ligand Lobbied the Commission to Bring an Enforcement Action Against Fr. Emmanuel with the Assistance of Counsel who has Connections to the Commission and Received Preferential Treatment During the Investigation

21.     On October 7, 2014, John Higgins wrote an email to the Board of Directors for Ligand, stating "With the recent stock weakness, it is obvious we continue to be impacted by the Lemelson shorting and related reports.  Selling is leading to more technical selling and shorting. We continue to work with our attorneys to lean on the SEC to get an injunction on Lemelson's activities."  Brooks Opp. Aff. Ex. 22 at LGND_0048604.

22.     The presentation included pictures of Fr. Emmanuel in his priestly robes.  ECF No. 127, Ex. 36 at LGND_0080698, LGND_0080701.

23.     None of the Amvona Fund investors are or have been Fr. Emmanuel's parishioners.  Affidavit of Father Emmanuel Lemelson in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment ("Lemelson Opp. Aff.") ¶ 2.

24.     Bradley Bondi used to work for the Commission on the executive staff located in Washington, D.C.  *See* ECF No. 127, Ex. 38.

25.     Ligand did not take any steps to verify its accusations of Fr. Emmanuel misrepresenting the performance of the fund.  Brooks Opp. Aff. Ex. 23 at 131:1-11; 137:16-139:10; Brooks Opp. Aff. Ex. 3 at 223:24-226:13.  For example, Matt Foehr was asked at deposition, "Are you aware of anyone at Ligand taking any steps to verify the truth or falsity of

the statements set forth on slide 28?" to which he responded, "I don't know."  Brooks Opp. Aff.

Ex. 23 at 138:24-139:3.  Mr. Foehr was then asked, "Sitting here today, do you know whether

these are true or false [in substance]?" to which he responded, "I don't know."  Brooks Opp. Aff.

Ex. 23 at 139:4-10.  Similarly, John Higgins was asked at his deposition, "Sitting here today, do

you believe that any of the statements contained on slide 27 that Fr. Lemelson made are untrue?"

to which he responded, "I – I do not know if these statements are true or not."  Brooks Opp. Aff.

Ex. 3 at 226:9-13.

26.     All of Amvona's audited reports from 2012-2016, which include full audited

returns, were publicly available on Lemelson Capital Management's website.  Lemelson Opp.

Aff. ¶ 3.

27.     Also, on June 8, 2015, then-Member of Congress, Duncan Hunter, sent a letter to

the Chair of the Securities and Exchange Commission, Mary Jo White, requesting the

Commission investigate Fr. Emmanuel.  Brooks Opp. Aff. Ex. 24 at LGND_0080800.  Duncan

Hunter was later sentenced to 11 months in prison for stealing campaign funds.  Brooks Opp.

Aff. Ex. 25.

28.     As stated in the Commission's Investor Bulletin the Commission's policy is to

neither confirm nor deny the existence of ongoing investigations.  Specifically, the Commission

stated that: "Because SEC investigations are generally nonpublic, Enforcement will not confirm

or deny the existence of an investigation unless the SEC brings charges against a person or entity

involved.  Enforcement also will not provide updates on the status of any pending SEC

investigation."  Brooks Opp. Aff. Ex. 26.

29.     Despite this policy, on September 15, 2017, Mr. Bondi, on behalf of Ligand,

emailed Scott Friestad, Virginia Rosado-Desilets, and Sonia Torrico of the Commission and

wrote: "We would appreciate an opportunity to speak with you by phone next week **about the**

**status of the investigation.**"  (emphasis added).  On September 18, 2017, Ms. Rosado-Desilets replied, "Unfortunately we cannot share information about our nonpublic investigation in the matter of Trading in the Securities of Ligand Pharmaceuticals, Inc. beyond what we shared last time, *i.e.*, **that the investigation is ongoing**."  (emphasis added).  The Commission and Ligand's counsel then scheduled a time to have a telephone call.  Brooks Opp. Aff. Ex. 27 at E-PROD-SEC-LIT-E-001189503- E-PROD-SEC-LIT-E-001189504.

30.     Between September 16-18, 2017, the user that created the Wikipedia page for Mr. Bondi, created three pages: one for Mr. Bondi and two for the Co-Heads of Enforcement for the Securities and Exchange Commission.  This user had never created a Wikipedia page before September 2017.  This Wikipedia user has created only one additional page for a former U.S. naval officer.  Brooks Opp. Aff. Ex. 28; Brooks Opp. Aff. ¶ 31.

31.     On March 18, 2016, Bloomberg published an article titled, "*Hedge Fund Priest's Trades Probed by Wall Street Cop.*"  The article began by stating, "[a] priest who sidelines as a hedge-fund manager is being investigated by U.S. regulators for possible stock manipulation, prompting scrutiny of trading skills that the cleric has described as a 'gift from God,' **according to people with knowledge of the matter**.  The Securities and Exchange Commission is examining whether the Reverend Emmanuel Lemelson of Massachusetts made false statements about companies he was shorting, **said the people who asked not to be named because the probe isn't public**."  Brooks Opp. Aff. Ex. 29.

32.     During the course of the investigation, Fr. Emmanuel was deposed on July 20-22, 2016, for an approximate total of 27 hours.  Brooks Opp. Aff. Exs. 30-32.

33.     During the July 22, 2016 deposition, the Commission questioned Fr. Emmanuel about one of his emails and asked, "Gandhi and the son of God.  Are you comparing yourself to them?"  Brooks Opp. Aff. Ex. 32 at 904:21-22.  The Commission then continued this line of

questioning by asking, "Did Socrates, Martin Luther King, Gandhi or the son of God have a financial incentive to cause investors to sell stock in a particular company to bring the price down?"  Brooks Opp. Aff. Ex. 32 at 905:8-11.

34.     Fr. Emmanuel's current counsel, Mr. Brooks, requested a meeting with the Commission prior to the Commission filing a complaint with a novel Investment Advisers Act claim that had not been addressed in the prior Wells submission process.  The Commission denied Mr. Brooks' request for a meeting.  The Commission stated that it was denying Mr. Brooks' meeting request, because Fr. Emmanuel's prior counsel had already been granted a meeting with the Commission.  Brooks Opp. Aff. ¶ 36.

## IV.     The Complaint Contained a Number of Errors, Some of Which Were Copied Directly from Ligand's Presentations

35.     In its original Complaint, the Commission purported to quote Fr. Emmanuel's August 22, 2014 report and quoted the following language: "'common shareholders could be wiped out almost entirely without notice.'"  ECF No. 127, Ex. 16 ¶ 28.

36.     This quote is not from the August 22, 2014 report that Fr. Emmanuel published, but rather appears in a draft report that was produced in discovery.  *See* ECF No. 127, Ex. 24.

37.     Nevertheless, the Commission repeated this same exact allegation in its Amended Complaint.  ECF No. 127, Ex. 7 ¶ 28.

38.     In the original Complaint, the Commission alleged that Ligand's stock price was trading at over $250 per share.  ECF No. 127, Ex. 16 ¶ 8.

39.     During the course of this litigation, Ligand's stock was as high as $278.62 per share (on October 1, 2018), but has dropped as low for the day as $57.24 per share (on March 17, 2020), which is a decrease of nearly 80%.  Brooks Opp. Aff. Ex. 33 at 4, 12.

**V.      Subsequent Pleadings Relevant to the Issue of Selective Enforcement**

40.     In response to a notice for deposition of the Commission pursuant to Rule

30(b)(6) of the Federal Rules of Civil Procedure, the Commission filed a Motion for Protective

Order.  Brooks Opp. Aff. Ex. 34.

41.     Magistrate Judge Cabell denied the Commission's Motion, and found there was

an adequate factual basis to permit discovery on the issues of bias and selective enforcement.

Brooks Opp. Aff. Ex. 35.

42.     The Commission then filed a motion for a more definite statement of Defendants'

selective enforcement defense.  Brooks Opp. Aff. Ex. 36.

43.     This Motion was also denied by Magistrate Judge Cabell.  Brooks Opp. Aff. Ex.

37.

44.     At Fr. Emmanuel's October 16, 2019 and November 12, 2019 depositions, the

Commission asked a number of questions about Fr. Emmanuel's religious affiliation, his

priesthood, his rank, his bishop, and his history of service.  Brooks Opp. Aff. Ex. 38 at 14:13-

16:23; Brooks Opp. Aff. Ex. 39 at 7:20-21:20, 27:19-47:1.

45.     The Commission repeated an allegation from another individual that Fr.

Emmanuel was not a Greek Orthodox priest and told counsel for Defendants that they intended

to subpoena information about this allegation.  Brooks Opp. Aff. Ex. 40 at 3-4; Brooks Aff. ¶ 44.

46.     Eventually Fr. Emmanuel had to present evidence to this Court to prove this

allegation was false and Fr. Emmanuel is, in fact, a duly ordained Greek Orthodox priest.

Brooks Opp. Aff. Ex. 41 at ¶ 18-19.

47.     Despite this case being an alleged claim for market manipulation, the Commission

has referenced Ligand as the "victim" in a number of pleadings, including its Memorandum in

Support of its Motion for Partial Summary Judgment.  *See, e.g.,* ECF No. 51 at 1-2; ECF No. 54 at 1-5; ECF No. 69 at 5; ECF No. 98 at 2; ECF No. 122 at 12, 13, 15.

## VI.    Other Financial Analyst Reports Published Stating that Ligand Stock was Overvalued

48.    On January 4, 2013, an entity called Cantor Fitzgerald published analysis regarding Ligand, titled "Lowering Promacta HCV Estimates; Downgrading to HOLD and $23 PT from $28."  Brooks Opp. Aff. Ex. 42 at LGND_0000193-98.

49.    On January 4, 2013, Ligand's stock price decreased by over 5%.  CITE

50.    On January 30, 2018, Alan Biloski published analysis regarding Ligand titled, "Ligand Pharma Is a Short."  The report disclosed that Mr. Biloski had a short position in Ligand and that the report contained his opinions.  Brooks Opp. Aff. Ex. 43 at 7.

51.    On January 30, 2018, Ligand's stock price decreased by around 2%.  Brooks Opp. Aff. Ex. 33 at 16.

52.    On April 4, 2018, Seven Corners Capital Management published analysis regarding Ligand titled, "Ligand's Market Valuation Does Not Withstand Scrutiny."  Brooks Opp. Aff. Ex. 44.  Part of this analysis included criticism of Ligand's $245 million convertible note offering in August 2014, and questioning whether Ligand had adequate "real dollars" to pay this debt when it came due.  Brooks Opp. Aff. Ex. 44 at 11-12.  The report disclosed that Seven Corners Capital Management had a short position in Ligand and that the report contained his opinions.  Brooks Opp. Aff. Ex. 44 at 19.

53.    On April 4, 2018, Ligand's stock price increased about 1%.  Brooks Opp. Aff. Ex. 33 at 15.

54.    On April 24, 2018, Lakewood Capital Management disclosed that it recently initiated a short position in Ligand.  Brooks Opp. Aff. Ex. 45.

55.     On April 24, 2018, Ligand's stock price decreased by over 3%.  Brooks Opp. Aff.
Ex. 33 at 14.

56.     On August 7, 2018, Favus Institutional Research LLC published analysis
regarding Ligand titled, "Ligand (LGND: Sell Recommendation)."  Brooks Opp. Aff. Ex. 46.
Part of this analysis theorized that new drugs in the liver treatment area would drive down
Promacta sales.  Brooks Opp. Aff. Ex. 46 at 1.  The report disclosed that Favus held no interest
in Ligand and that the report contained the author's views.  Brooks Opp. Aff. Ex. 46 at 8.

57.     On August 7, 2018, Ligand's stock price increased by almost 9%.  Brooks Opp.
Aff. Ex. 33 at 13.

58.     On January 16, 2019, Citron Research published analysis regarding Ligand titled,
"Citron Publishes the Smoking Gun on Ligand Pharmaceuticals."  Brooks Opp. Aff. Ex. 47.  The
report included disclaimers that the views expressed in the report were the opinions of Citron.
Brooks Opp. Aff. Ex. 47 at 23.

59.     On January 16, 2019, Ligand's stock price decreased by over 16%.  Brooks Opp.
Aff. Ex. 33 at 10.

## VII.   Berliner Complaint

60.     The complaint filed in *SEC v. Berliner*, No. 08-CV-3859, in the Southern District
of New York alleged that defendant Berliner wrote and disseminated a false rumor "[b]etween
1:10 p.m. and 1:15 p.m." and then began profiting covering his short position "at approximately
1:19 p.m."  Brooks Opp. Aff. Ex. 48 ¶¶ 13, 19.

## VIII.  Definition of Share Repurchase

61.     Investopedia defines a share repurchase as "a transaction whereby a company
buys back its own shares from the marketplace" and notes that a "company might buy back its
shares because management considers them undervalued."  Brooks Opp. Aff. Ex. 49 at 1.  The

article also notes that advantages of a share repurchase are that it "shows the corporation believes its shares are undervalued." Brooks Opp. Aff. Ex. 49 at 2.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com

Dated:  October 30, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on October 30, 2020.

*/s/ Douglas S. Brooks*
Douglas S. Brooks