# In the Matter of:

*Securities and Exchange Commission vs*

*Gregory Lemelson, et al*

---

*David Becker*

*August 06, 2020*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



1                    UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF MASSACHUSETTS

3                   CIVIL ACTION NO. 1:18-CV-11926-PBS

4

5      _____

6      SECURITIES AND EXCHANGE COMMISSION,

7              PLAINTIFF,

8      V.

9      GREGORY LEMELSON AND LEMELSON CAPITAL

10     MANAGEMENT, LLC,

11              DEFENDANTS,

12          AND

13     THE AMVONA FUND, LP,

14              RELIEF DEFENDANT.

15     _____

16

17

18                    30(b)(6) DEPOSITION OF:

19               DAVID BECKER ON BEHALF OF THE SEC

20                      CONDUCTED REMOTELY

21                     BETHESDA, MARYLAND

22          THURSDAY, AUGUST 6TH, 2020 AT 9:43 A.M.

23

24

                                                                                        2

1                    A P P E A R A N C E S

2

3    ON BEHALF OF THE SECURITIES AND EXCHANGE COMMISSION:

4         MARC JONES

5         AL DAY

6         33 ARCH STREET, 24TH FLOOR

7         BOSTON, MASSACHUSETTS 02110

8         TELEPHONE NO. (617) 573-8900

9         E-MAIL: JONESMARC@SEC.GOV

10

11   ON BEHALF OF DEFENDANTS, GREGORY LEMELSON, ET AL.:

12        DOUGLAS S. BROOKS

13        BRIAN J. SULLIVAN

14        LIBBYHOOPES, P.C.

15        399 BOYLSTON STREET

16        BOSTON, MASSACHUSETTS 02116

17        TELEPHONE NO. (617) 338-9300

18        FACSIMILE NO. (617) 338-9911

19        E-MAIL:  DBROOKS@LIBBYHOOPES.COM

20                 BSULLIVAN@LIBBYHOOPES.COM

21

22

23   ALSO PRESENT:

24        FATHER EMANUEL LEMELSON

3

1                              I N D E X

2                                                                    PAGE

3   DIRECT EXAMINATION BY MR. BROOKS                                 6

4   CROSS-EXAMINATION BY MR. JONES                                   132

5   REDIRECT EXAMINATION BY MR. BROOKS                               137

6                       _____

7                            E X H I B I T S

8   NUMBER                    DESCRIPTION                            PAGE

9   EXHIBIT 167    NOTICE OF DEPOSITION                              9

10  EXHIBIT 168    COMPLAINT                                         20

11  EXHIBIT 169    POWERPOINT PRESENTATION, 9-25-2014                32

12  EXHIBIT 170    POWERPOINT PRESENTATION, 6-8-2015                 38

13  EXHIBIT 171    BLOOMBERG ARTICLE                                 44

14  EXHIBIT 172    E-MAIL, RE: NEW MATTER                            74

15  EXHIBIT 173    E-MAIL, RE: LIGAND PHARMACEUTICALS                82

16  EXHIBIT 174    E-MAIL, RE: LIGAND                                92

17  EXHIBIT 175    E-MAIL, RE: LEMELSON'S LETTER TO SENATE 101

18  EXHIBIT 176    E-MAIL, RE: LEMELSON'S TWEET ABOUT LIGAND 104

19  EXHIBIT 177    E-MAIL, RE: CONFIDENTIAL                          109

20  EXHIBIT 178    STEPHANIE AVAKIAN WIKIPEDIA PAGE                  121

21  EXHIBIT 179    STEVEN PEIKIN WIKIPEDIA PAGE                      123

22  EXHIBIT 180    BRADLEY J. BONDI WIKIPEDIA PAGE                   124

23  EXHIBIT 181    SEC FORM 1662                                     131

24  EXHIBIT 182    LETTER FROM MR. BONDI, 3-21-2016                  135

4

1                    S T I P U L A T I O N S

2

3   The 30(b)(6) deposition of DAVID BECKER on behalf of the

4   Securities and Exchange Commission taken remotely via Zoom in

5   Bethesda, Maryland on Thursday, the 6th day of August, 2020 at

6   9:43 a.m., said deposition was taken pursuant to Notice for use

7   in accordance with Federal Rules of Civil Procedure.

8

9   It is agreed that Kelley K. Bohan, being a Notary Public and

10  Court Reporter for the State of Massachusetts, may swear the

11  witness remotely and that the reading and signing of the

12  completed transcript by the witness is not waived.

13

14

15

16

17

18

19

20

21

22

23

24

5

P R O C E E D I N G S

1

2      COURT REPORTER:  This is Kelley Bohan.  I am a court

3  reporter, and I am a notary public in the Commonwealth of

4  Massachusetts.

5          This deposition is being taken remotely.  This witness

6  is appearing remotely from Bethesda, Maryland

7          The attorneys participating in this proceeding

8  acknowledge their understanding that I am not physically present

9  in the proceeding room, nor am I physically present with the

10  witness and that I will be reporting this proceeding remotely.

11  They further acknowledge that, in lieu of an oath administered

12  in person, the witness will verbally declare his testimony in

13  this matter under the pains and penalties of perjury.  The

14  parties and their counsel consent to this arrangement and waive

15  any objections to this manner of proceeding.

16          Please indicate your agreement by stating your name

17  and your agreement on the record, after which I will swear in

18  the witness and we may begin.

19          MR. BROOKS:  This is Doug Brooks, I agree.

20          MR. JONES:  This is Marc Jones for the plaintiff, we

21  agree as well.

22          MR. SULLIVAN:  Brian Sullivan for the defendants, and

23              I echo Mr. Brooks, we agree.

24          _____

6

```
 1                        DAVID BECKER
 2           having been duly sworn, was examined and
 3           testifies as follows:
 4  DIRECT EXAMINATION
 5  BY MR. BROOKS:
 6       Q.   Good morning, Mr. Becker.  My name is Doug Brooks and
 7  I represent the defendants in this matter.  Could you please
 8  state your full name for the record?
 9       A.   It's David Aaron Becker.
10       Q.   And, Mr. Becker, have you ever been deposed before?
11       A.   No.
12       Q.   Okay.  Have you ever testified in any litigation
13  before?
14       A.   Yes.
15       Q.   And what was the nature of that litigation?
16       A.   This was 1992 or so, I was a witness in a housing
17  discrimination action.
18       Q.   Was that the most recent time you've testified?
19       A.   I believe so, yes.
20           MR. JONES:  Doug?  Doug?
21           MR. BROOKS:  Yeah?
22           MR. JONES:  Before we go too much further, we may want
23  to put the stipulations on the record.  I don't know if you
24  wanted to do that or not?
```

Securities and Exchange Commission vs        30(b)(6)                      David Becker
Gregory Lemelson, et al                                                August 06, 2020

18

1    Q.   Okay.  And do you have anyone who reports to you?

2    A.   Yes.

3    Q.   How many people report to you?

4    A.   I believe it's currently five.

5    Q.   Okay.  Who are those people?

6    A.   Sonia Torrico, Virginia Rosado Desilets, Laura

7  Bennett, David Newman, and David Bloom.

8    Q.   And do those people all have the same position within

9  the SEC?

10    A.   They are all staff attorneys within the SEC in the

11  Division of Enforcement, so yes.

12    Q.   Okay.  And do you work out of the Washington office?

13    A.   I do.

14    Q.   Outside of this deposition process, did you have any

15  role in the investigation of Defendants?

16    A.   I did.

17    Q.   What was that role?

18    A.   When I became an assistant director in January of

19  2018, I became responsible for supervising the staff who were

20  investigating this case.

21    Q.   Had you heard of Father Emmanuel Lemelson before

22  January of 2018?

23    A.   I don't believe I had.

24    Q.   Okay.  And specifically, what did the supervision of

19

1  the staff, as it relates to Defendants here, look like for you

2  beginning in January of 2018?

3           MR. JONES:  Objection.  I'm going to object, Doug.

4  That's a little vague in terms of what did it look like.  And

5  also, I'm not sure, that's getting into one attorney's

6  supervision of other attorney inside the SEC, and I'm worried

7  that's going to tread on, you know, attorney-to-attorney

8  communications, attorney-client communications, and work product

9  pretty heavily.  Is there something more specific that you're

10 looking for?

11 BY MR. BROOKS:

12     Q.   What did you do when you were supervising the

13 investigation involving Defendants?

14           MR. JONES:  David, you can talk generally about what

15 the tasks of supervision are, but try to stay away from anything

16 more specific than that.

17     A.   Sure.  I assisted the staff attorneys with their

18 review of the evidence.  I assisted them in putting together

19 their recommendation for the commission.

20     Q.   Okay.  Anything else?

21     A.   [Inaudible] -- commission, I assisted them with

22 preparing for that.

23     Q.   I'm sorry, you broke up a little bit there,

24 Mr. Becker, can you just repeat that?

Securities and Exchange Commission vs      30(b)(6)                    David Becker
Gregory Lemelson, et al                                                August 06, 2020

22

1      Q.   Were you aware of the allegation contained in

2   paragraph 52 prior to today?

3      A.   Prior to today?

4      Q.   Yes.

5      A.   Yes.

6      Q.   When did you first become aware of the allegation

7   contained in paragraph 52?

8           MR. JONES:  Objection.  That's getting into attorney

9   work product about when and what he did on the complaint.

10          MR. BROOKS:  So are you instructing him not to answer?

11          MR. JONES:  Yeah, because it's privileged.

12   BY MR. BROOKS:

13      Q.   And, Mr. Becker, I assume it's safe to say you're

14   going to follow your counsel's instruction on that?

15      A.   That's correct.

16          MR. JONES:  I sure hope so.

17      Q.   Does the SEC still maintain that the proceeds of the

18   loan should have been included in the calculation of equity?

19          MR. JONES:  Objection.  The topic is -- topic 1 I

20   assume you're asking about, which is the SEC analysis and

21   mathematical calculation of Ligand's debt-to-tangible equity

22   ratio; how does that question relate to that topic?

23          MR. BROOKS:  Well, I think it's obvious how it

24   relates.  So are you instructing him not to answer?

23

1           MR. JONES:  I'm saying your question is vague and

2    outside of the topic, and I'm asking you for a clarification

3    about it.

4           MR. BROOKS:  Well, I don't think it's my job to

5    clarify.  You can instruct him not to answer or he can do the

6    best he can, Marc.

7           MR. JONES:  Well, Doug, I'm trying to work with you

8    here to make sure that, you know, we're not not answering if

9    there's a hook between your question and the topic.  So I'm not

10   trying to, you know, step on your toes here, I'm just saying is

11   there a connection between what the SEC's allegations are and

12   the topic 1 there?

13          MR. BROOKS:  Sure.  It's the analysis of the

14   calculation of Ligand's debt-to-tangible equity ratio, and I'm

15   asking if the SEC still maintains that the proceeds of the loan

16   should have been included in the calculation.

17          MR. JONES:  David, you can answer to the extent that

18   the SEC has made a public statement about what its allegations

19   are; as to the internal thought processes and opinions of the

20   SEC, that is privileged and you cannot answer as to that.

21          THE WITNESS:  Can you please restate the question?  I

22   understand, Marc, but I want to make sure I'm answering the

23   question.

24   BY MR. BROOKS:

24

1      Q.   Sure.  Do you see in paragraph 52 where -- first of

2   all, okay, let's break it down.  It says, "Lemelson included the

3   new debt but not the proceeds of the loan, which would have

4   yielded a debt-to-equity ratio closer to 1-to-1."

5           Do you see that?

6      A.   I do.

7      Q.   Does the SEC still maintain that that allegation is

8   accurate?

9      A.   I think the SEC's position is currently what is stated

10  in paragraph 52 of the amended complaint, that's what we've

11  stated publicly.

12     Q.   Okay.  Are you aware of any accounting principle that

13  justifies including the proceeds of a loan as equity?

14          MR. JONES:  Objection.  Mr. Becker, is not here to

15  testify as an accounting expert, and accounting principles are

16  not within topic 1, and I mean he's not going to answer that.

17  BY MR. BROOKS:

18     Q.   Prior to the SEC filing its original complaint in this

19  matter, who at the SEC was involved in the analysis of Ligand's

20  debt-to-tangible equity?

21     A.   Do you mean -- are you saying the SEC's analysis of

22  debt-to-tangible equity?

23     Q.   Yes.

24          MR. JONES:  And I'm going to object here, Doug,

25

1  because I'm not sure to what you're referring to.  I notice the

2  topic says: "The SEC's analysis and mathematical calculation of

3  Ligand's debt-to-tangible equity ratio."  Are you, Doug, aware

4  of any calculation of the SEC's -- by the SEC of a

5  debt-to-tangible equity ratio?  I don't believe paragraph 52

6  talks about a debt-to-tangible equity ratio calculated by the

7  SEC.

8              MR. BROOKS:  Marc, are you testifying here today?  I

9  mean you knew the topics --

10             MR. JONES:  I'm objecting --

11             MR. BROOKS:  -- ordered to have a witness to testify,

12  I mean what's going on here?

13             MR. JONES:  I'm objecting to the question to the

14  extent that it asks about the SEC's calculation of a

15  debt-to-tangible equity ratio, I'm asking what that refers to.

16             MR. BROOKS:  But you're not the witness, Marc.

17             MR. JONES:  Yes, I am the lawyer.  I am objecting.

18  I'm objecting that the question is vague and asking you to

19  clarify what you're referring to by the SEC's calculation of the

20  debt-to-tangible equity ratio.  I will tell you that we are

21  prepared to testify about a debt-to-equity ratio calculation

22  that we did.  But we would note that we have a standing

23  objection because you're talking about the SEC's calculation of

24  a debt-to-tangible equity ratio, and you're not specifying where

Securities and Exchange Commission vs     30(b)(6)                    David Becker
Gregory Lemelson, et al                                           August 06, 2020

26

 1   that calculation happened or whether it happened.

 2            MR. BROOKS:  I don't have to testify.

 3   BY MR. BROOKS:

 4       Q.   So, Mr. Becker, let me ask you this:  Prior to

 5   bringing this complaint, did the SEC ever calculate Ligand's

 6   debt-to-tangible equity ratio as of August 2014?

 7       A.   Debt-to-tangible equity ratio?

 8       Q.   Yes.

 9       A.   I'm not aware of whether we did or didn't.  I believe

10   that paragraph 52 of the amended complaint explains why we

11   thought that Defendants' calculation of that ratio was

12   misleading, but I'm not -- I don't know one way or the other of

13   whether or not SEC staff calculated a debt-to-tangible equity

14   ratio.

15       Q.   Did SEC staff ever calculate a debt-to-equity ratio

16   for Ligand?

17       A.   I think that's also laid out in paragraph 52 of both

18   the original and amended complaint.

19       Q.   I'm sorry, you just broke up.  I'm sorry, you froze.

20       A.   Yeah, no problem.  What I said was I believe that that

21   was set forth in paragraph 52 of both the original and amended

22   complaint.

23       Q.   Okay.  So turning back to 52, paragraph 52, it states,

24   "Lemelson included the new debt but not the proceeds of the

Securities and Exchange Commission vs        30(b)(6)                              David Becker
Gregory Lemelson, et al                                                      August 06, 2020

27

1   loan, which would have yielded a debt-to-equity ratio closer to

2   1-to-1."

3          Do you see that?

4   A.   I do.

5   Q.   Is that an accurate allegation?

6   A.   To my understanding, yes.

7   Q.   And what is that understanding based on?

8   A.   That understanding is based on our analysis and

9   calculation of Ligand's debt-to-equity ratio.

10  Q.   So do you believe that proceeds of a loan impact

11  debt-to-equity ratio?

12         MR. JONES:  Objection.  What Mr. Becker believes is

13  not -- were in a 30(b)(6), Mr. Becker's personal beliefs should

14  not enter in here.

15  Q.   Well, when I say "you," sorry, Mr. Becker, I'm talking

16  about the SEC, so let me rephrase.

17         Does the SEC believe as of today that the proceeds of

18  a loan impact debt-to-equity ratio?

19         MR. JONES:  Are you asking him what SEC's general

20  accounting policy is?

21         MR. BROOKS:  Marc, I'm not going to do this all day.

22  I asked a question, if he can answer, he can answer.

23         MR. JONES:  David, to the extent that you understand

24  the question you can answer.

28

1              THE WITNESS:  If I understand the question, yes, I

2    believe in this context we, the SEC, believe that it's

3    appropriate to include the proceeds of a loan in calculation or

4    analysis of a debt-to-equity ratio.

5    BY MR. BROOKS:

6         Q.   Okay.  I earlier asked you who at the SEC was involved

7    in analyzing Ligand's debt-to-tangible equity ratio, and I

8    believe you told me that nobody was; correct?

9         A.   No, I don't believe I said that.  A debt-to-tangible

10   equity ratio?

11        Q.   Yes.

12        A.   I don't think I said nobody was.  I said I'm not aware

13   of the SEC making such a calculation.

14        Q.   Okay.  Are you aware of anyone at the SEC who analyzed

15   Ligand's debt-to-equity ratio as of August 2014?

16        A.   The question is debt-to-equity ratio?

17        Q.   Right.

18        A.   Yes.

19        Q.   Who?

20        A.   I'm not sure that this is an exhaustive list, but I

21   know that an SEC accountant named Michael Hoess was involved.

22        Q.   Michael Hess?

23        A.   Yes.

24        Q.   Is that H-E-S-S?

29

1      A.   No.  It's H-O-E-S-S.

2      Q.   And is Mr. Hoess still an accountant at the SEC?

3      A.   He is.

4      Q.   How long has Mr. Hoess worked as an accountant at the

5  SEC?

6      A.   I don't know.

7      Q.   Did you speak with Mr. Hoess to help prepare for your

8  testimony today?

9      A.   No.

10     Q.   Okay.  Other than Mr. Hoess, was anyone at the SEC

11  involved in calculating Ligand's debt-to-equity ratio prior to

12  bringing the lawsuit?

13     A.   I don't know who Mr. Hoess consulted, so I don't know

14  the answer to that.

15     Q.   So prior to filing the complaint, what was the result

16  of the SEC's mathematical calculation of Ligand's debt-to-equity

17  ratio?

18     A.   What was the result?  I believe as set forth in

19  paragraph 52 of both the amended and original complaints, the

20  result was a debt-to-equity ratio something like 1.1-to-1

21     Q.   And that was based on, among other things, taking into

22  account the proceeds of the loan; correct?

23     A.   Yes.  I would note that if you didn't take into

24  account the proceeds of the loan, you would have ended up with a

30

1   debt-to-equity ratio that would have been about 5-to-1, I think
2   5.2-to-1.
3        Q.   What is that based on?
4        A.   That's based on taking total liabilities on the
5   company's balance sheet as of third quarter of 2014 and dividing
6   them by shareholders' equity as of that date.
7        Q.   And again you're talking about debt-to-equity ratio,
8   not debt-to-tangible equity ratio; correct?
9        A.   That is correct.
10       Q.   Where did the SEC first come up with the notion that
11  Defendants should have included the proceeds of a loan in a
12  debt-to-equity ratio?
13            MR. JONES:  Objection.  I'm instructing the witness
14  not to answer.  Where the SEC came up with something is attorney
15  work product.
16  BY MR. BROOKS:
17       Q.   Did the SEC first come up with the notion that
18  Defendants should have included the proceeds of a loan in a
19  debt-to-equity ratio from Ligand?
20            MR. JONES:  Again, Doug, you're asking what was in the
21  minds of SEC attorneys as they prepared for, wrote, and filed a
22  complaint, that's attorney work product.
23            MR. BROOKS:  Are you instructing him not to answer,
24  Marc?

Securities and Exchange Commission vs        30(b)(6)                        David Becker
Gregory Lemelson, et al                                                      August 06, 2020

33

1           MR. SULLIVAN:  Can everyone else see Exhibit 169?

2           MR. BROOKS:  Yeah, I do.

3           MR. JONES:  I don't see it.

4           THE WITNESS:  No, I don't have it.  I don't know, I

5    tried refreshing a couple of times.  I don't know if there's

6    another way for me to do it.

7           MR. JONES:  Brian, do you have any ability to send it

8    again or something like that?

9           COURT REPORTER:  Do we want to go off the record for a

10   second?

11          MR. BROOKS:  Yeah, let's go off.

12          MR. JONES:  Yes.

13   (OFF THE RECORD, 10:25 A.M. TO 10:27 A.M.)

14   BY MR. BROOKS:

15       Q.   So first of all let me ask, is Exhibit 169 a document

16   that you reviewed to help prepare for your testimony today?

17       A.   I can't say with confidence it was this exact exhibit,

18   but yes, I think so.

19       Q.   And do you recognize this Exhibit 169 as a PowerPoint

20   presentation that Ligand made to the SEC?

21       A.   Yes.

22       Q.   Okay.  And I believe -- I don't know how to scroll

23   through this quickly -- but I believe the first page indicates

24   that it was dated September 25th, 2014; is that right?

34

1        A.    It's what it says.

2        Q.    Okay.  All right, if I could -- and just before I do

3    that, are you aware -- we'll get to this more in detail as we

4    get to topic number 3, but are you aware that there was an

5    in-person meeting between Ligand, its counsel, and the SEC on

6    September 25th, 2014?

7        A.    Yes.

8        Q.    If I could ask you to turn your attention to page 36.

9              MR. JONES:  Is that 3-6, Doug?

10             MR. BROOKS:  Yes, I'm sorry, 3-6.

11             MR. JONES:  Okay.  Yeah, you just cut out there for a

12   minute...for me.

13             MR. BROOKS:  I think the Bates stamp at the bottom

14   ends with 13 if that's easier.

15             THE WITNESS:  Yes, I'm there.

16             MR. JONES:  Also, Doug, just for the record, I don't

17   see the Bates stamps on these documents.

18             MR. BROOKS:  Really?

19             MR. JONES:  So if you could go with pages numbers and

20   not Bates stamps.

21             MR. BROOKS:  Oh sure.  Yeah, mine shows it, sorry, I

22   don't why.

23             THE WITNESS:  You can see it at the bottom, Marc, on

24   the bottom --

35

1              MR. JONES:  Oh, all right, maybe it's a --

2              MR. BROOKS:  Yeah, in any event.

3              MR. JONES:  Maybe it's a setting or something, yeah.

4              MR. BROOKS:  I just wanted to double-check we're on

5    the same page, so.

6    BY MR. BROOKS:

7         Q.   On page 36, do you see, Mr. Becker, at the bottom the

8    last bullet point says:  Lemelson's, quote, 11,667-to-1, end

9    quote, debt-to-tangible equity ratio ignores all the cash

10   proceeds from the debt?

11        A.   Yes, I see that.

12        Q.   Okay.  And are you aware that Defendants' statements

13   in their reports concerned Ligand's debt-to-tangible equity

14   ratio?

15        A.   I'm sorry, can you repeat that again?  I missed the

16   first part.

17        Q.   Yeah, sure.  Are you aware that Defendants' reports,

18   which are the subject of this litigation, referred to Ligand's

19   debt-to-tangible equity ratio?

20             MR. JONES:  Objection as to form.

21        A.   Yes, I believe I was aware that.

22        Q.   Did the SEC analyze Ligand's claim in the final bullet

23   point on page 36 of Exhibit 169?

24             MR. JONES:  Objection, vague.

36

1      A.   Did we analyze Ligand's claim?

2      Q.   Yes.

3      A.   I'm not sure how to answer that.  I think one of many

4   statements by Defendants were a thing that we considered during

5   the course of our investigation, including the use of this

6   debt-to-tangible equity ratio, which is why it appears in our

7   complaint.  I don't know that I can say that we looked at that

8   specifically because it was raised as a claim by Ligand.

9      Q.   Does the SEC -- well, first of all, does the SEC agree

10  with the statement on page 36 of Ligand's September 25th, 2014

11  presentation that Defendants' debt-to-tangible equity ratio

12  ignored all the cash proceeds from the debt?

13          MR. JONES:  David, I want to caution you to the extent

14  that your answer would include internal communications for the

15  SEC, those are attorney-client privileged and attorney work

16  product.  To the extent that the SEC has made outward facing or

17  public statements about that, you can answer.

18          THE WITNESS:  Yeah, I mean I think our view on this is

19  set forth in paragraph 52 of the amended complaint which is that

20  the use of that ratio was misleading and we set forth the

21  reasons why.

22          MR. BROOKS:  Let's take a, if we can, let's take a

23  five-minute break now.  I think we've been going for just about

24  an hour.  Does that work for everyone?

37

1              MR. JONES:  Sure.  David, yeah?

2              THE WITNESS:  It's good for me.

3   (OFF THE RECORD, 10:33 A.M. TO 10:46 A.M.)

4              MR. JONES:  All right, as I mentioned to Mr. Brooks on

5   the break, Mr. Becker has a clarification to a prior question

6   that he was asked.  Mr. Becker, what's that clarification?

7              THE WITNESS:  Sure.  I think you had asked whether the

8   SEC had undertaken its own analysis of Ligand's debt-to-tangible

9   equity ratio, and I just wanted to clarify that we did seek to

10  get an understanding of what Defendants' calculation was based

11  on, what the inputs were when coming up with the number that was

12  used in the report, and we did come to such an understanding.

13       Q.   Okay.  When was that analysis undertaken?

14       A.   I don't know.

15       Q.   Okay.  Let me break that down for you a little

16  further.  Was that analysis undertaken before the lawsuit was

17  filed?

18       A.   Before the lawsuit was filed?  I believe it was.

19       Q.   Who was involved from the SEC in that analysis?

20       A.   I'm aware that Michael Hoess was involved in that

21  analysis.  I don't know who he consulted when doing that

22  analysis.

23       Q.   Do you know the result of Mr. Hoess' analysis?

24       A.   I'm not sure it came up with a single result.

Securities and Exchange Commission vs      30(b)(6)                    David Becker
Gregory Lemelson, et al                                          August 06, 2020

38

1      Q.   Well, did the SEC disagree with Defendants'

2   calculation of Ligand's debt-to-tangible equity ratio as laid

3   out in Defendants' reports from August 2014?

4      A.   Well, I think as laid out in paragraph 52 of the

5   amended complaint, we disagree that that was an appropriate

6   measure to be using, but I don't think that we disagreed with

7   the math once we understood what the inputs were that

8   Mr. Lemelson was using.

9           MR. BROOKS:  Okay, Brian, can you pull up tab 7?

10          (EXHIBIT 170 MARKED FOR IDENTIFICATION)

11          MR. SULLIVAN:  I've distributed what we marked as tab

12   7, which should be marked as Exhibit 170 now.

13          THE WITNESS:  I see it.

14          MR. BROOKS:  I have it.

15          MR. JONES:  I have it as well.  I think we're good to

16   go.

17   BY MR. BROOKS:

18      Q.   And, Mr. Becker, have you seen Exhibit 170 prior to

19   today?

20      A.   I think I have.  Again, I'm not positive if it's this

21   particular draft, but I have seen some version of this, yes.

22      Q.   And you'll agree Exhibit 170 is dated June 8th, 2015?

23      A.   Yes.

24      Q.   And did the SEC meet with representatives from Ligand

39

1    in person on June 8th, 2015?

2        A.   Yes.

3        Q.   If I can, mine takes a little to load, I'd like to

4    turn your attention to page 51 of Exhibit 170.

5        A.   Oh boy, can somebody tell me again how you flip to a

6    specific page?

7            MR. SULLIVAN:  So in the bottom left, you'll see a

8    gray box that should say page number of number, if you click in

9    that box, a dialog box will come up and you can put the number

10   in of the page you want to go.

11           THE WITNESS:  I've got it, thank you.  I'm there.

12           MR. JONES:  Thanks, Brian.

13           MR. SULLIVAN:  You're welcome.

14   BY MR. BROOKS:

15       Q.   And are you there, Mr. Becker?

16       A.   I am.

17       Q.   Do you see about two-thirds of the way down or so,

18   there's a heading "Solvency"?

19       A.   Yes.

20       Q.   Okay.  And then it states:  Lemelson, quote, Ligand

21   shareholders have only the protection of $21,000 in tangible

22   equity to shield them from $245 million in debt, closed quote,

23   and this, quote, gives rise to a debt-to-tangible equity ratio

24   of 11,667-to-1, end quote.

Securities and Exchange Commission vs        30(b)(6)                        David Becker
Gregory Lemelson, et al                                                   August 06, 2020

40

1              Did I read that correctly?

2        A.   Yes.

3        Q.   Okay.  And then underneath that there's another bullet

4   point that says:

5              Truth: This purported, quote, 11,667-to-1, closed

6   quote, ratio is concocted and ignores all the cash proceeds from

7   the debt itself.

8              Do you see that?

9        A.   I do.

10       Q.   Okay.  And would you agree that these allegations were

11  virtually cut and pasted by the SEC into its original complaint

12  in this matter?

13             MR. JONES:  Objection as to form, and vague as to "cut

14  and pasted."

15             And also to the extent that your answer involves

16  thought processes of attorneys inside the SEC, David, in

17  formulating the complaint, I instruct you not to answer as to

18  that.  To the extent that you can make your answer based on

19  non-attorney-client communications and work product, please do

20  so.

21             THE WITNESS:  I'm not positive I understand the

22  question.  Are you asking if the wording is similar between this

23  presentation and what showed up in, which document, the original

24  complaint?

Securities and Exchange Commission vs          30(b)(6)                          David Becker
Gregory Lemelson, et al                                                      August 06, 2020

41

1   BY MR. BROOKS:

2       Q.    Yeah, let's go with that, what would be the answer to

3   that question.

4       A.    What exhibit number is the original complaint?

5            MR. SULLIVAN:  168.

6       A.    All right, my eDepoze login just expired, and it

7   booted me out so I don't have that document in front of me.

8            MR. BROOKS:  Can we -- let me ask Brian --

9            MR. JONES:  All right, let's --

10           THE WITNESS:  Can you just give me the session number

11  again and I'll get back in?

12           MR. SULLIVAN:  Sure, the session number is --

13           MR. JONES:  Let's go off the record for a minute and

14  not put this on record and have Kelley type it all in; is that

15  okay?

16           MR. BROOKS:  Yeah, that's fine.

17  (OFF THE RECORD, 10:54 A.M. TO 10:57 A.M.)

18           MR. JONES:  Doug, obviously, if you could just put the

19  question to him again so we know where we were.

20           MR. BROOKS:  Yeah.  Well, I think we're going to have

21  to go over a couple of documents.

22  BY MR. BROOKS:

23      Q.    So I guess if you go to Exhibit 170, and then you go

24  to page 51.

42

1        A.   I'm there.

2        Q.   Okay.  And I believe the question was something to the

3   effect of:  Do you agree that the allegations in Ligand's

4   presentation as set forth on page 51 of Exhibit 170 under the

5   word "solvency" were also contained in the SEC's original

6   complaint in this matter?

7        A.   It's not word for word what appears in the

8   presentation, but the original complaint does indicate that the

9   11,667-to-1 debt-to-equity ratio does not include -- what's the

10  actual wording -- does not include the proceeds of the loan.

11       Q.   And what is the basis for the SEC's contention that

12  cash proceeds from a loan should be included in a debt-to-equity

13  ratio?

14       A.   I think our basis for that is set forth in paragraph

15  52 of the amended complaint which explains why we think that the

16  debt-to-tangible equity ratio was misleading.

17       Q.   Okay.  Anything else?

18       A.   I'm not an accounting expert, but no.

19       Q.   Okay.  I'd like to turn your attention now to the

20  second topic of the deposition which involves communications

21  between the SEC and media sources, all right?

22       A.   Okay.

23       Q.   What is the SEC's policy regarding communications with

24  people outside of the commission concerning ongoing

Securities and Exchange Commission vs        30(b)(6)                    David Becker
Gregory Lemelson, et al                                                  August 06, 2020

                                                                              62
1        A.   I don't know.

2        Q.   Okay.  Does the SEC still have a copy of that

3   PowerPoint presentation that was e-mailed on September 26th,

4   2014?

5        A.   I don't know the answer to that.

6        Q.   Did anyone from the SEC take notes at the September

7   25th, 2014 meeting?

8        A.   If they did, we do not have them.  To my knowledge,

9   no.

10       Q.   Other than the September 26th, 2014 e-mail that you

11  just referenced, were there any communications between Ligand's

12  representatives and the SEC related to Defendants in 2014?

13       A.   I'm sorry, can you repeat that?

14       Q.   Yeah.  So let's -- well, let's do it like this, so --

15  well, let's step back.  Let's talk about the September 25th,

16  2014 meeting first.  What was discussed?

17       A.   Ligand and its counsel and representatives presented

18  the material in their PowerPoint presentation, and, you know, it

19  was an hour long meeting so my understanding is that the

20  discussion didn't deviate much from that.

21       Q.   Okay.  What, if anything, did the SEC representatives

22  at that meeting say to Ligand's representatives?

23       A.   We don't have a record of that, and I'm not aware that

24  they actually said anything to Ligand representatives of

63

 1    substance.

 2        Q.   Okay.  Do you know how that meeting ended?

 3        A.   I do not.

 4        Q.   Okay.  So after that September 25th, 2014 meeting, was

 5    the next communication between the SEC and Ligand the September

 6    26th, 2014 e-mail that you've previously discussed?

 7        A.   Yes.

 8        Q.   After Latham sent the e-mail on September 26th, 2014,

 9    what was the next communication between the SEC and Ligand's

10    representatives?

11        A.   On October 27th, 2014, John Sikora sent Kevin

12    Kelcourse a letter from Mr. Berkman at Ligand with attachments

13    that had been submitted as an updated version of the TCR.

14        Q.   Okay.  And does the SEC still have a copy of that?

15        A.   I believe so, but not I'm sure.

16        Q.   Okay.  After that October 27th, 2014 e-mail --

17             Well, first of all, did the SEC ever respond to Mr.

18    Sikora based on that October 27th, 2014 e-mail?

19        A.   Based on that e-mail?  I don't believe so.

20        Q.   Okay.  And I missed this, I'm sorry, was that e-mail

21    on October 27th, 2014 sent to anyone in particular at the SEC?

22        A.   The e-mail I believe went to Mr. Kelcourse, I thought

23    I said that.

24        Q.   Oh, okay.  But as far as you know, Mr. Kelcourse

Securities and Exchange Commission vs       30(b)(6)                David Becker
Gregory Lemelson, et al                                           August 06, 2020

                                                                            64

1   didn't respond?

2       A.   As far as I'm aware, he did not.

3       Q.   Okay.  After October 27th, 2014, what was the next

4   communication between the SEC and Ligand's representatives?

5       A.   On November 12th, 2014, Mr. Sikora e-mailed Mr.

6   Kelcourse asking to touch base regarding the TCR.

7       Q.   Does the SEC have that e-mail?

8       A.   I would expect so, but I don't know.

9       Q.   Did Mr. Kelcourse respond to Mr. Sikora's November

10  12th, 2014 e-mail?

11      A.   Mr. Kelcourse recalls a telephone call to follow up.

12      Q.   When did that phone call take place?

13      A.   I believe it took place the same day, but I'm not

14  certain.

15      Q.   Okay.  What was said on the phone call that took place

16  on or around November 12th, 2014?

17      A.   Okay, I should take back -- I don't know when this

18  phone call took place.  I don't even know whether to say I

19  believe it took place the same day, so it was after that.

20      Q.   Okay.

21      A.   What was discussed on the phone call?  I believe Mr.

22  Kelcourse informed Mr. Sikora that the Boston regional office

23  didn't currently have the resources to pursue the allegations

24  that Ligand was making against Defendants and that the matter

65

1   was being referred to the Massachusetts Securities Division, and

2   he provided a contact point at the Massachusetts Securities

3   Division to Mr. Sikora.

4        Q.   Who was that contact point?

5        A.   I'm sorry?

6        Q.   Who was the contact point --

7        A.   I don't know.

8        Q.   -- at the Massachusetts Securities Division?

9        A.   Yes, I don't know.

10       Q.   What else, if anything, was said on this telephone

11  call between Mr. Kelcourse and Mr. Sikora?

12       A.   Mr. Kelcourse doesn't recall if he raised this or if

13  this was a question that Mr. Sikora had brought up, but he

14  advised Mr. Sikora that the Boston office didn't have any

15  objection to Latham approaching the home of office of the SEC

16  about the TCR.

17       Q.   I'm sorry, you broke up a little there.  He didn't

18  have any objection to Latham approaching?

19       A.   To Latham approaching the home office, which is

20  Washington, of the SEC about the TCR.

21       Q.   Did Latham approach the home office of the SEC about

22  the TCR?

23       A.   It appears that they did, yes.

24       Q.   Okay.  So when was that?

73

1  me what their positions at the SEC were at the time of the June

2  2015?

3       A.   Scott Friestad was an associate director in

4  enforcement.  Virginia Rosado Desilets was senior counsel in

5  enforcement.  Jeff Finnell was an assistant director in

6  enforcement.  Jennifer Clark was a legal assistant in

7  enforcement.  And Rachel Leggett was an intern with the

8  enforcement division.

9       Q.   Okay.  And I think you testified that in your

10 experience it's not necessarily unusual to get a second meeting

11 with a different regional office; is that fair?

12      A.   I think what I said was it's not necessarily unusual

13 for a second office to take a look at a matter.

14      Q.   Are you aware that my request for a Wells meeting in

15 the case was denied by the SEC?

16           MR. JONES:  Objection.  It's beyond the scope of the

17 topics.  David, if you know for a fact whether or not that's

18 true, you can testify from personal knowledge.

19      A.   From my personal knowledge, I understand that that's

20 correct.  I also understand that Defendants' counsel got a

21 previous Wells meeting.

22      Q.   Right.  And so your understanding is the reason I was

23 denied a Wells meeting was because Defendants' prior counsel

24 already had one, correct?

Securities and Exchange Commission vs        30(b)(6)                          David Becker
Gregory Lemelson, et al                                                      August 06, 2020

74

1       A.   I have --

2            MR. JONES:  Objection.  I instruct him not to answer.

3   You're asking what the reason the SEC's attorneys decided to

4   give or not give a second meeting, that's attorney-client

5   opinion work product.

6   BY MR. BROOKS:

7       Q.   Do you know one way or another that whether if I had

8   previously worked for the SEC I would have been able to get a

9   second Wells meeting?

10           MR. JONES:  Objection, that's hypothetical, and it's

11  actually quite argumentative, and I'm going to instruct him not

12  to answer.

13           MR. BROOKS:  It's hypothetical.  I didn't intend it to

14  be argumentative.

15           MR. JONES:  It's not about inten --

16           MR. BROOKS:  Brian, if you could pull up tab 9?  I

17  think this is the e-mail that Mr. Becker was referring to

18  earlier.

19           (EXHIBIT 172 MARKED FOR IDENTIFICATION)

20           MR. SULLIVAN:  I have now distributed what is Exhibit

21  172.  If people could just confirm that they have access to it.

22  It begins with --

23           MR. BROOKS:  I do.

24           MR. SULLIVAN:  Okay.

Securities and Exchange Commission vs        30(b)(6)                    David Becker
Gregory Lemelson, et al                                                  August 06, 2020

75

```
1              THE WITNESS:  I've got it.  When we have a chance,
2   Doug, can we take a break?
3              MR. BROOKS:  Now is perfect, let's do it.
4   (OFF THE RECORD, 11:54 A.M. TO 12:05 P.M.)
5   BY MR. BROOKS:
6       Q.   Mr. Becker, I understand from your counsel that you
7   have a clarification concerning the September 26th, 2014 e-mail
8   which contained a copy of a PowerPoint presentation?
9       A.   Yeah.  So I think I indicated earlier that this is a
10  PowerPoint presentation.  I didn't know if it differed from the
11  one that had been provided a couple of days earlier, from
12  checking it was indicated to the SEC by Latham that the
13  presentation contained a minor revision, and they listed
14  investors in Ligand, but was otherwise the same.
15      Q.   And you cut out a little bit.  So the only change was
16  a list of Ligand's investors?
17      A.   A minor revision and a list of Ligand's investors.
18  And if you're going to ask what the minor revision was, I don't
19  know that.
20      Q.   Okay.  And was a list of Ligand's investors added the
21  first time?
22      A.   Is your question was that list entirely new?
23      Q.   Yes.
24      A.   I believe so.
```

76

1      Q.    Okay.  Does that exhaust your knowledge about the

2   September 26th, 2014 e-mail with the PowerPoint presentation?

3      A.    It does.

4      Q.    Okay.  So right before the break you were shown an

5   e-mail which is -- is that Exhibit 172 now?

6      A.    Yes.

7      Q.    Okay.  Do you have that in front of you?

8      A.    I do.

9      Q.    And so if you go to the last page or -- yes, the last

10  page, do you see an e-mail from Mr. Friestad to Mr. Bondi dated

11  May 18th, 2015?

12     A.    May 18th, 2015, yes.

13     Q.    Okay.  And is this the e-mail that you've previously

14  testified about?

15     A.    You're going to have to refresh my memory.

16     Q.    I believe, but obviously correct me if I'm wrong, I

17  had asked what the next communication was between the SEC and

18  Ligand after the late April/early May 2015 communication between

19  Mr. Friestad and Mr. Bondi, and you indicated there was an

20  e-mail from Mr. Friestad to Mr. Bondi on May 18th, 2015?

21     A.    Yes.

22     Q.    Is this the --

23     A.    I believe this is the e-mail that I was talking about

24  there, yeah.

Securities and Exchange Commission vs        30(b)(6)                        David Becker
Gregory Lemelson, et al                                                   August 06, 2020

79

1  let me ask it a little bit differently.  Prior to May 2015,
2  what, if any, relationship did Mr. Bondi have with Jeffrey
3  Finnell?
4        A.   None that I'm aware of.
5        Q.   Okay.  Same question as between Mr. Bondi and
6  Ms. Rosado Desilets?
7        A.   None that I'm aware of.
8        Q.   Okay.  So after the first e-mail in Exhibit 172 --
9  strike that.  I guess it's the last one.
10            After the e-mail at the top of page 1 on Exhibit 172
11 which is dated May 21st, 2015, what was the next communication
12 between the SEC and any representative of Ligand?
13       A.   There was an e-mail between Mr. Bondi and Mr. Friestad
14 just about moving the timing of the meeting from 10:30 to 2:00
15 for travel schedules.
16       Q.   What was the date of that e-mail?
17       A.   May 23rd, 2015.
18       Q.   Okay.  After that May 23rd, 2015 e-mail that you've
19 just mentioned, what was the next communication between Ligand
20 and any representative -- or between Ligand and the SEC?
21       A.   Sean Tonolli at Cahill e-mailed Virginia Rosado
22 Desilets on June 4th of 2015 to ask how many copies of the
23 binder or presentation materials he should bring to the meeting.
24       Q.   Okay.  And so -- yeah, yeah, go ahead, I'm sorry.

80

1      A.   You can ask more questions or I can...

2      Q.   You can finish your thought.  I didn't mean interrupt,

3  I thought you were done.

4      A.   Sure.  And he also was confirming that they would

5  deliver a PowerPoint presentation and who the attendees on

6  Ligand's behalf would be.

7           MR. JONES:  Just a pause for one minute.  Doug or

8  Brian, I think every time you guys get a text or an e-mail,

9  we're getting a noise alert.  I don't know if there's a way to

10 mute that.  I don't know if you're getting texts or e-mails or

11 something, but we're definitely getting that chime, and it's

12 overriding David's microphone much the way I was back before I

13 was muting.

14          MR. BROOKS:  I don't know if it's me or not, but I

15 will do my best.

16          MR. JONES:  I appreciate it, Doug, thanks.

17 [Alert noises]

18          THE WITNESS:  That's the one.

19          MR. BROOKS:  Yeah.  Why don't we do this, I didn't

20 realize, let's go off the record and let me see if I can fix

21 that, if that's okay.

22          MR. JONES:  That's fine with us.

23 (OFF THE RECORD, 12:15 P.M. TO 12:19 P.M.)

24          MR. BROOKS:  Can you read back the last question and

99

1   Desilets returned the call the next day, August 26th, and

2   informed Mr. Bondi that we couldn't share any information with

3   him about the investigation other than that the investigation

4   was ongoing and that we would let them know if we needed

5   anything further from them; and if they had any additional

6   information that they thought would be helpful, we would be

7   happy to receive it.

8        Q.   And did Ms. Rosado Desilets describe for Mr. Bondi

9   what investigation she was talking about?

10            MR. JONES:  Objection, vague.

11       A.   I'm not sure I understand that question.

12       Q.   Well, she said she couldn't confirm anything about the

13  investigation other than the investigation was ongoing, what

14  investigation was Ms. Rosado Desilets referring to?

15       A.   Well, I think that Mr. Bondi's e-mail referred to the

16  investigation relating to the defendants in this case and

17  Ligand, and the understanding was that that was the

18  investigation that was being referred to.

19       Q.   Why did Ms. Rosado Desilets confirm the existence of

20  the ongoing investigation to Mr. Bondi?

21            MR. JONES:  Objection.  You're asking for why a

22  particular attorney did a particular thing at the SEC, that's

23  attorney-client privilege and attorney work product; so, David,

24  you can't answer that.

100

1          MR. BROOKS:  Well, it can't be attorney-client
2  privilege because she was talking to Mr. Bondi.  And are you
3  taking the position that her conversation with Mr. Bondi
4  confirming the existence of the investigation was in
5  anticipation of litigation?
6          MR. JONES:  No, I'm not taking that.  I'm taking the
7  -- well, first of all, everything about an investigation is in
8  anticipation of litigation, you're trying to decide whether
9  you're going to file a piece of litigation.  Second of all,
10 opinion work product covers, you know, the thought process of
11 the attorneys.  In terms of attorney-client communication to the
12 extent that Ms. Rosado Desilets communicated it to another
13 attorney or supervisor or someone else at the SEC, that would be
14 intra-attorney-client communication.  And we're not taking the
15 position that's the communication between Rosado Desilets and
16 Bondi, but you asked why she did a particular thing and that's
17 the objectionable part.  The fact that she did it, it's
18 absolutely fair game; "why" is off limits I think.
19 BY MR. BROOKS:
20     Q.   How long did that conversation between Mr. Bondi and
21 Ms. Rosado Desilets last?
22     A.   My understanding is that it was a very brief call,
23 beyond that, I don't know.
24     Q.   Other than what you've already testified to, what else

Securities and Exchange Commission vs         30(b)(6)                    David Becker
Gregory Lemelson, et al                                              August 06, 2020

120

1   of Ligand concerning Defendants between the beginning of 2014 up

2   to the time of the filing of the complaint of this matter in

3   September 2018?

4        A.    I believe you hit on everything that we have a record

5   of.  You know, I will note that we have done everything we can

6   to determine every communication that occurred, and I believe

7   that we've hit on all of them here.  I will say that it is

8   possible that we might not have included an e-mail that says

9   thanks or acknowledging receipt or something like that, but even

10  that, I'm not aware of.  So the short answer is, no, I think

11  you've hit everything.

12            MR. JONES:  Yeah, and just to clarify, Doug, I mean

13  we've testified as to everything we have found through a

14  diligent investigation, and so when David says no, it's to

15  indicate that you have all the information that we have.  Can we

16  guarantee there wasn't some other voicemail or phone call, we

17  can't guarantee it, but we've done our best to get you

18  everything that we know about.

19  BY MR. BROOKS:

20       Q.    Were there ever any communications between the SEC and

21  any representative of Ligand concerning Father Emmanuel

22  Lemelson's status as a priest?

23            MR. JONES:  Are you talking before filing the

24  litigation or at any time?

121

1           MR. BROOKS:  Yeah, before the filing of litigation.

2       A.   I think if you look at the PowerPoint decks that

3   Ligand provided to the SEC and presented at -- during the

4   meetings, there is an indication of that and it appears that

5   that was mentioned in passing during the presentation, but

6   that's all I'm aware of.

7       Q.   Okay.  As of September 2017, what, if any,

8   relationship did Mr. Bondi have with Stephanie Avakian?

9       A.   I don't believe she had, other than the two probably

10  being aware who each other are, I don't believe they had any

11  kind of relationship.

12          MR. BROOKS:  Brian, can you pull up tab 20.

13          (EXHIBIT 178 MARKED FOR IDENTIFICATION)

14          MR. JONES:  Is this 177?

15          THE WITNESS:  I think it's going to be 178.

16          MR. SULLIVAN:  This will be Exhibit 178, and I just

17  distributed it now.

18          THE WITNESS:  I have it now.

19  BY MR. BROOKS:

20      Q.   And Exhibit 178 is a Wikipedia printout of a Wikipedia

21  page of Stephanie Avakian.  Mr. Becker, have you ever seen this

22  before?

23      A.   I don't believe I have.

24      Q.   Okay.  And just for the record if it hasn't been said,

137

1   BY MR. BROOKS:

2       Q.    Okay, just briefly going back to the language in Form

3   1662.  What information did the SEC believe Mr. Bondi had at the

4   time you e-mailed him the formal order of investigation to

5   justify it doing so?

6           MR. JONES:  I'm going to object to that.  You're

7   getting into opinion work product.  You're asking what was in

8   the thoughts of various SEC attorneys that guided them in taking

9   whatever actions they took, and I don't think we can testify

10  about that.  Do you want to maybe rephrase it somehow?

11  BY MR. BROOKS:

12      Q.    I mean did the SEC believe that sending Mr. Bondi a

13  copy of the formal order of investigation complied with the

14  passage of 1662 that was read into the record and highlighted?

15          MR. JONES:  David, to the extent that you can answer

16  from your personal knowledge, great.  I mean we're beyond the

17  topics here, but to the extent that you know from your personal

18  knowledge, you can answer.

19          THE WITNESS:  From my personal knowledge, my

20  understanding is yes.

21          Did we just lose, Marc?

22          MR. JONES:  I'm here.  But in unmuting, it somehow

23  muted my video.  So I am here and I heard everything.

24  BY MR. BROOKS:

138

 1      Q.    What information did Mr. Bondi have that justified
 2    sending him a formal order of investigation?
 3            MR. JONES:  Objection.  Again, you're asking how the
 4    SEC thought about what information Mr. Bondi had and how it was
 5    valuable, I'm not sure how we can answer that without revealing
 6    our thought processes.
 7            MR. BROOKS:  I mean you can instruct the witness all
 8    you want, I'm just asking what the information was.
 9            MR. JONES:  Well, but you're asking what did the SEC
10    consider to be important, aren't you?
11            MR. BROOKS:  Well, I mean I think you opened the door,
12    Marc, but if you're going to instruct him not to answer, you can
13    do so.  I'm just wondering what the information was that Mr.
14    Bondi had in late March 2016 that would justify sending him the
15    formal order of investigation.
16            MR. JONES:  Well, I don't believe I opened the door to
17    anything other than a follow-up cross-examination to your
18    questions about the policy about sharing information about an
19    investigation; so that was the topic, we answered about that
20    topic.  We already testified to the policies beyond the scope,
21    but we brought back some information about the policy.  What was
22    in the minds of SEC attorneys?  That's opinion work product.
23            MR. BROOKS:  Okay.  So you're instructing the witness
24    not to answer?

139

1          MR. JONES:  Yes, I am.

2    BY MR. BROOKS:

3        Q.   Did the SEC share the formal order of investigation

4    with anyone other than Mr. Bondi in this case?

5          MR. JONES:  If you know, David.  And that's beyond the

6    topic, so I'm not sure we've done research on that to educate

7    David about that.

8        A.   I don't know.

9        Q.   Okay.  Did the SEC provide information pursuant to the

10   paragraph we looked at in section 1662 to anyone other than Mr.

11   Bondi in this case?

12         MR. JONES:  Again, David, to the extent you know from

13   your personal knowledge.  The topic is about communications with

14   Ligand and its representative.  To the extent you know about

15   others, you can testify as to a yes or no, but only from your

16   personal knowledge.

17         THE WITNESS:  I'm not sure I caught the first part of

18   the question, Doug, if you don't mind repeating?

19   BY MR. BROOKS:

20       Q.   Sure.  Other than Mr. Bondi, did the SEC provide

21   information pursuant to the paragraph that was highlighted in

22   Exhibit 181 as part of this case to anyone else?

23       A.   I don't know.

24         MR. JONES:  Doug, is your question as to any

141

1   about the existence of the investigation to outside of the

2   commission; right?

3        A.   I'm sorry, can you repeat that one?  And if you don't

4   mind telling me what the date was of the Bloomberg article just

5   to help frame it, that would be helpful.

6        Q.   Yeah, I don't know how to go back on exhibits.  I

7   believe it was March 18th, 2016.

8             MR. SULLIVAN:  That is correct.

9        Q.   That was three days before this letter.  As of that

10  time, do you know who the SEC had communicated and provided

11  information from its files pursuant to section 1662 to?

12       A.   I do not know.

13            MR. BROOKS:  Nothing further.

14            MR. JONES:  I have nothing further either except to

15  say thank, guys, and thanks to you, Kelley, and Javier also.

16            MR. BROOKS:  Thanks, everyone.

17  (DEPOSITION CONCLUDED AT 2:34 P.M.)

18

19

20

21           ERRATA SHEET DISTRIBUTION INFORMATION

22           DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

23

24           ERRATA SHEET DISTRIBUTION INFORMATION

Securities and Exchange Commission vs        30(b)(6)                      David Becker
Gregory Lemelson, et al                                                 August 06, 2020

142

1

2      The original of the Errata Sheet has been delivered to Marc

3   Jones, Esquire.

4      When the Errata Sheet has been completed by the deponent

5   and signed, a copy thereof should be delivered to each party of

6   record and the ORIGINAL forwarded to Douglas Brooks, Esquire, to

7   whom the original deposition transcript was delivered.

8

9                    INSTRUCTIONS TO DEPONENT

10

11     After reading this volume of your deposition, please

12  indicate any corrections or changes to your testimony and the

13  reasons therefor on the Errata Sheet supplied to you and sign

14  it.  DO NOT make marks or notations on the transcript volume

15  itself.  Add additional sheets if necessary.  Please refer to

16  the above instructions for Errata Sheet distribution

17  information.

18

19

20

21  PLEASE ATTACH TO THE DEPOSITION OF DAVID BECKER, SEC

22  CASE:  SEC V. GREGORY LEMELSON, ET AL.

23  DATE TAKEN:  AUGUST 6, 2020

24                    ERRATA SHEET

Securities and Exchange Commission vs       30(b)(6)                          David Becker
Gregory Lemelson, et al                                                     August 06, 2020

                                                                                    143

1        Please refer to Page 142 for Errata Sheet instructions and

2   distribution instructions.

3        PAGE LINE        CHANGE                REASON

4        _____

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12            I have read the foregoing transcript of my deposition,

13  and except for any corrections or changes noted above, I hereby

14  subscribe to the transcript as an accurate record of the

15  statements made by me.

16

17            Executed this _____ day of _____, 2020.

18

19                              _____

20                              DAVID BECKER

21  COMMONWEALTH OF MASSACHUSETTS                        HAMPSHIRE, SS.

22

23            I, KELLEY K. BOHAN, a Court Reporter and Notary Public
    duly commissioned and qualified in and for the Commonwealth of
24  Massachusetts, do hereby certify that there came before me on
    the 6th day of August, 2020, at 9:43 a.m., the person

Securities and Exchange Commission vs          30(b)(6)                    David Becker
Gregory Lemelson, et al                                               August 06, 2020

144

1  hereinbefore named, identification as prescribed by Executive
   Order 455 (03-13) issued by the Governor of the Commonwealth of
2  Massachusetts, was by me duly sworn to testify to the truth and
   nothing but the truth of his knowledge concerning the matters in
3  controversy in this cause; that he was thereupon examined upon
   his oath, and his examination reduced to typewriting under my
4  direction; and that this is a true record of the testimony given
   by the witness to the best of my ability.
5          I further certify that I am neither attorney or
   counsel for, nor related to or employed by, any of the parties
6  to the action in which this deposition is taken, and further,
   that I am not a relative or employee of any attorney or counsel
7  employed by the parties hereto or financially interested in the
   action.
8

9

10         My Commission Expires:  December 25, 2026

11

12

13

14         _____

15

16         Kelley K. Bohan
           Court Reporter/Notary Public

17

18

19

20

21

22

23

24