UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

  Plaintiff,

v.

GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC,

  Defendants

and

THE AMVONA FUND, LP,

  Relief Defendant.

CA No. 18-11926-DJC

## ORDER ON PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

CABELL, U.S.M.J.

The Securities and Exchange Commission (the Commission) alleges that Gregory Lemelson (Lemelson)[1] and his firm, Lemelson Capital Management, violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, through allegedly false and misleading statements concerning Ligand Pharmaceuticals, Inc. (Ligand). Lemelson has noticed a Rule 30(b)(6) deposition of

---

[1] The complaint names "Gregory Lemelson" but in his affidavit and other filings, the defendant refers to himself as Father Emmanuel Lemelson. The court will use "Lemelson" for the sake of convenience.

the Commission for three topics relating to origins of the Commission's investigation of his statements. The Commission moves for a protective order preventing the deposition from taking place. (D. 40; Plaintiff's Motion For Protective Order to Prevent Rule 30(b)(6) Deposition). For the reasons explained below the Commission's motion is DENIED.

**Background**

The court assumes familiarity with the facts as alleged and sets forth here only those needed to frame the issue presented. According to the complaint, Lemelson is the Chief Investment Officer of Lemelson Capital Management LLC, a private investment firm which he founded to manage a hedge fund called "The Amvona Fund, LLP". (D. 1). In 2014 Lemelson "devised and carried out a fraudulent scheme in which he purchased 'short positions'[2] in the stock of Ligand Pharmaceuticals, Inc. and then sought to manipulate the stock price to make a profit." Lemelson then "publicly disseminated a series of false statements about Ligand to drive down the price of the stock, while engaging in a series of purchases and sales of Ligand stock that enabled him to profit from the lowered stock price."

Lemelson disputes the allegations and counters in his memorandum that the Commission's case against him amounts to an

---

[2] A short position is an investment technique whereby an investor seeks to profit when the price of a stock falls.

2

"unprecedented" and "brazen" attack on his free speech rights, and is tainted by bias and selective enforcement. (D. 45 at 3). Lemelson seeks to depose the Commission to learn all the facts supporting his contentions of bias and selective enforcement.

Lemelson contends there is in fact a basis to wonder whether the Commission has exercised bias and selective enforcement because before now it has "never brought a 'short and distort' case against an individual who publicly disclosed that he was short the stock he was discussing." (Id.) Lemelson also suggests that Ligand made a concerted effort to persuade the Commission to investigate him after he made public statements about them. He contends that Ligand and their counsel gave a biased presentation to the Commission in Boston, during which they claimed Lemelson "uses religious credentials to inspire false confidence and raise money." (Id. at 8). Lemelson has also produced emails between Ligand officials where they write that, "He [Lemelson] needs to be silenced for good." (D. 46, Ex. 14, Brooks Aff. at 2).[3]

Further, Lemelson avers that when Ligand officials could not convince the Boston staff of the Commission to investigate, they hired a former Commission staff member, Attorney Bradley

---

[3] The email continues, "I'm not saying anything specific (for fear it could be misconstrued) but this is a total farce." (Id.)

3

Bondi, who used his influence to get the matter referred to the Commission in Washington, D.C. (D. 45 at 9-10). Lemelson also alleges that Ligand used its influence in Congress to get former California Representative Duncan Hunter to write a letter to the Commission recommending that Lemelson be investigated. (Id. at 11).

Finally, Lemelson alleges that the Commission informed Ligand's counsel that a nonpublic investigation had begun (D. 46, Ex. 18, Brooks Aff., Email from Commission to Bondi), and he suggests that the Commission "may have" violated their own policy on neither confirming nor denying the existence of an investigation. (D. 45 at 11). Lemelson suggests this was the source of a "leak" which led to the publishing of a Bloomberg article entitled, "Hedge Fund Priest's Trades Probed by Wall Street Cop". (Id.)

Against this backdrop, Lemelson noticed a 30(b)(6) deposition of the Commission on November 19, 2019 for the following topics:

> 1) The SEC's analysis and mathematical calculations of Ligand's debt-to-tangible equity ratio;
> 
> 2) Communications between the SEC and media sources concerning its non-public investigation of Defendants; and
> 
> 3) Pre-litigation communications between the SEC and Ligand regarding Defendants, including but not limited to meetings between Ligand and the SEC, how such meetings were arranged, and the relationships between SEC and Ligand's counsel.

4

The Commission timely moved for a protective order to prevent Lemelson from pursuing any of the topics at a deposition. (D. 40)

**Legal Framework**

Rule 26(c)(1) provides that "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending.... The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Fed. R. Civ. P. 26(c)(1).

Rule 26 "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). "As specified in [Rule] 26(c), however, a showing of good cause is required to justify any protective order." *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 7 (1st Cir. 1986). The party seeking a protective order has the burden of demonstrating good cause. *Id.* at 8.

Courts are "extremely hesitant to prohibit the taking of a discovery deposition, and it is very unusual for a court to prohibit the taking of a deposition altogether...." 10A Fed. Proc., L. Ed. § 26:301. While there are circumstances under which an order to vacate a notice of taking a deposition may be

5

appropriate, "such an order is generally regarded by the courts as both unusual and unfavored in view of the general philosophy of full discovery of relevant facts, the broad scope of discovery provided for by Fed. R. Civ. P. 26, and the power of the court under Rule 26(c) and Fed. R. Civ. P. 30(d) to control the details of time, place, scope, and financing for the protection of the deponents and parties." *Id.* (collecting cases).

**Discussion**

The court acknowledges at the outset the Commission's citation to multiple instances where a court quashed an SEC deposition notice on the ground that it amounted to an impermissible attempt to discover the Commission's legal strategy. *See, e.g., S.E.C. v. Nacchio*, 614 F. Supp. 2d 1164, 1179 (D. Colo. 2009); *In re* Bilzerian, 258 B.R. 846, 849 (Bankr. M.D. Fla. 2001); *S.E.C. v. Morelli,* 143 F.R.D. 42, 48 (S.D.N.Y. 1992). For his part, however, Lemelson cites to cases contrarily allowing such discovery to proceed. *See, e.g., S.E.C. v. Navellier & Assocs., Inc.,* No. CV 17-11633-DJC, 2019 WL 688164, at *2 (D. Mass., Feb. 19, 2019); *S.E.C. v. McCabe*, No. 2:13-CV-00161-TS-PMW, 2015 WL 2452937, at *4 (D. Utah, May 22, 2015); *S.E.C. v. Merkin,* 283 F.R.D. 689, 698 (S.D. Fla.

6

2012); *S.E.C. v. Kramer,* 778 F. Supp. 2d 1320, 1328 (M.D. Fla. 2011).

Taking these cases in the aggregate as standing for the proposition that a deposition of the SEC should not summarily be countenanced, but may nonetheless be appropriate in some instances, the court finds that the defendant here has asserted enough facts, even if just barely so, to warrant discovery on his claim of selective enforcement and bias.[4] Conversely, the Commission has not demonstrated that Lemelson is acting for purposes of "annoyance, embarrassment, oppression, or undue burden or expense...." Fed. R. Civ. P. 26(c)(1). The deposition therefore may go forward.

In so ruling, however, the court reminds the parties that defendants "are permitted to learn the facts" underlying their selective enforcement defense and the SEC's "[c]ounsel may protect against the disclosure of work product or privileged information in [a] 30(b)(6) deposition[ ] by interposing

---

[4] The Commission argues that Lemelson has not properly raised selective enforcement as an affirmative defense in an answer or other filing. This is true but the law in the First Circuit suggests that a strict mechanical application of the "raise-or-waive" rule is not warranted here. *See e.g., Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 52 (1st Cir. 2015) (affirming trial judge's decision to give jury instruction on an unpled statute of frauds defense)("A district court may relax the raise-or-waive rule when equity so dictates and there is no unfair prejudice to any opposing party..."). The Commission has not demonstrated how prejudice will occur if Lemelson is allowed to pursue his selective enforcement at this still relatively early stage of the case.

7

appropriate objections and giving instructions on a question-by-question basis." *S.E.C. v. Merkin*, 283 F.R.D. 689, 698 (S.D. Fla. 2012); *see also S.E.C. v. Kramer*, 778 F. Supp. 2d 1320, 1328 (M.D. Fla. 2011). The SEC may therefore lodge objections and give instructions to the deponent as to work product and other privileged matters at the deposition. *See S.E.C. v. Navellier & Assocs., Inc.*, No. CV 17-11633-DJC, 2019 WL 688164, at *2 (D. Mass. Feb. 19, 2019).

**Conclusion**

For the foregoing reasons, the Plaintiff's Motion For Protective Order To Prevent Rule 30(B)(6) Deposition (D. 40) is **DENIED**.

*SO ORDERED.*

                                                                      */s/ Donald L. Cabell*
                                                                      DONALD L. CABELL, U.S.M.J.

DATED: January 28, 2020