# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

                        Plaintiff,

        v.

GREGORY LEMELSON and LEMELSON CAPITAL            Civil Action No. 1:18-cv-11926-PBS
MANAGEMENT, LLC,

                        Defendants,

        and

THE AMVONA FUND, LP,

                        Relief Defendant.

## PLAINTIFF'S REPLY IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

As much as Defendants would like to make this case about something other than their fraud, they fail to produce any evidence to make it so. Defendants bear the burden of proving their affirmative defense of selective enforcement—an especially heavy burden reserved for "truly horrendous situations" that are not present here. To survive summary judgment, Defendants must provide the Court with "strong evidence" that the Commission singled them out from similarly situated others out of malice or bias. Defendants provide the Court with nothing creating a genuine dispute of material fact as to these elements. Instead, they offer unsupported conjecture and evidence immaterial to their claim. Defendants do not even offer authority that selective enforcement is a defense to a Commission enforcement action, or that dismissal is the remedy. At trial, their "defense" would result in a lengthy sideshow with no purpose other than to confuse issues properly before the jury. The Commission's motion should be granted.

## ARGUMENT

Defendants do not dispute that selective enforcement is reserved for "truly horrendous situations." *Baker v. Coxe*, 230 F.3d 470, 474-75 (1st Cir. 2000). Nor do they dispute that they bear the burden of proof and must produce substantial evidence that they were (1) treated differently than other similarly situated individuals and (2) that such alleged treatment was malicious. *Cordi-Allen v. Conlon*, 494 F.3d 245, 250 (1st Cir. 2007); *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995). Finally, they do not contest the presumption that government officials have properly discharged their duties. *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

Though they don't dispute the legal framework, Defendants have failed to put forward evidence supporting their claim of selective enforcement. Instead, Defendants assert facts that are irrelevant to selective enforcement. The Commission has responded to each fact asserted by Defendants in Plaintiff's Reply to Defendants' Response to Plaintiff's Statement of Undisputed Facts and Statement of Additional Material Facts. While Defendants assert more than sixty facts, the bulk are about (1) the supposed motives of victim Ligand in reporting this matter to the Commission or (2) short sellers who took short positions in Ligand Pharmaceuticals, Inc. ("Ligand") four or more years after Defendants. Neither of these categories of facts could lead a reasonable juror to find either that Defendants had been singled out by the Commission from a group of similarly situated others, or had done so out of malice or prejudice.

Much of Defendants' real complaint is that they didn't get special treatment from the Commission. To illustrate, Defendants repeatedly claim that the Enforcement Division Co-Director only met with their counsel once after the Commission had issued its Wells Notice, when members of the investigative staff met twice with representatives of Ligand. Opp. at 2, 10-

11; Ds' 56.1 Response (Docket No. ("D.") 135), ¶¶18, 33, 41, 42; Ds' Addt'l Facts (also D. 135), ¶34; Brooks Aff. (D. 136), ¶36; Ds' SJ Memo. at 12.  But the Commission's Enforcement Manual specifically states, "A Wells recipient generally will not be accorded more than one post-Wells meeting."  D. 123-11, at 22.  Defendants are complaining that the Commission did not make an exception for them when they decided to get new counsel.[1]

Defendants also complain that the Commission asked multiple questions about Defendant Lemelson's clerical vocation.  How dare the Commission—their argument goes—question a defendant/potential defendant about that?  It must be biased!  Nonsense.  The Commission staff regularly asks potential defendants about their education, training, experience, other occupations, or sideline businesses.  E.g., Declaration of Alfred A. Day ("Day Decl.) ¶2.  And when those aspects of a potential defendant's life feature prominently in their public persona or professional statements and advertisements, of course the Commission will ask about those aspects to understand whether and how they relate to the possible securities law violations the Commission's staff is investigating.  Day Decl. Ex. A.  Finally, Defendant Lemelson may make his clerical vocation prominent at trial, so the Commission's counsel appropriately inquired about various aspects of that vocation.  Yet because Defendant Lemelson is a priest, he maintains that he should get special treatment and not be asked about his experience, vocation, and how those both relate to his work as an investment adviser.  What's worse is that Defendants attempt to bootstrap this questioning about his background and vocation into a claim of religious prejudice by the attorneys who investigated and are litigating this case.  Such a serious

---

[1] In fiscal year 2018, when this action was brought, the Commission filed 490 standalone enforcement actions and 821 actions total.  https://www.sec.gov/files/enforcement-annual-report-2020.pdf, at 16.  Even at an hour of preparation time and an hour of meeting time with one of the two Enforcement Co-Directors (likely a significant underestimation on both counts), even one post-Wells meeting is a substantial investment of time by the Commission.  Yet Defendants complain they didn't get two.

accusation on such a thin reed of "evidence" is irresponsible and harmful.

Because Defendants can't muster much about the Commission's investigation and counsel, they must perform a sleight-of-hand:  substituting statements made by Ligand personnel (one of Defendants' victims) for actual evidence about the *Commission's* motives.  One-third of the facts Defendants propose concern statements made by Ligand executives, affiliates, and others criticizing Lemelson.  (Ds' Addt'l Facts, ¶¶ 4-21).  Defendants, in effect, argue that people associated with Ligand made statements that the Defendants contend are bad;[2] people associated with the Commission met with people from Ligand; therefore, the Commission must harbor religious prejudice against Lemelson.  But those dots do not connect.  This unsupported conjecture cannot form the basis of a selective enforcement defense.

## I.     DEFENDANTS HAVE NO EVIDENCE OF SIMILARLY SITUATED PARTIES WHO COULD HAVE BEEN PROSECUTED BUT WERE NOT

Defendants cannot meet their burden to show that similarly situated others were treated differently, so they first attempt to shift that burden.  They write that "it is the Commission that has failed to identify any market manipulation case…." and "[i]f the Commission wants specific similarly situated people identified" it must do so.  Opp. at 16.  But Defendants, not the Commission, must produce evidence of specific similarly situated others.  They have not.

To be similarly situated, "the test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Barrington Cove Ltd. P'ship v. Rhode Island Housing & Mtg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001) (internal quotation omitted).  A party claiming selective enforcement "must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated

---

[2] In truth, prior to the litigation, the Commission did not even have some of the emails Defendants cite.  Day Decl. ¶ 3.

differently, instances which have the capacity to demonstrate that [Defendants were] singled ...

out for unlawful oppression." *Rubinovitz*, 60 F.3d at 909-10 (quoting *Dartmouth Review v.*

*Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989)).  Defendants must "show an extremely high

degree of similarity between themselves and the persons to whom they compare themselves."

*Snyder v. Gaudet*, 756 F.3d 30, 35 (1st Cir. 2014) (citing *Cordi-Allen v. Conlon*, 494 F.3d 245,

251 (1st Cir. 2007)).  The First Circuit considers the similarly situated requirement to be a "very

significant burden."  *Cordi-Allen*, 494 F.3d at 250-51.

Defendants cite as comparators, "other entities that published reports critical of Ligand

between January 4, 2013 and January 16, 2019, who are not subject to a Commission

enforcement action."[3]  Defendants suggest that because there are other negative reports about

Ligand, and only Defendants were charged, they have been singled out.  But Defendants are not

charged with being critical of Ligand; they are charged with making false factual statements and

engaging in a fraudulent scheme.

Defendants cannot preserve their claim merely by pointing to other commentators about

Ligand.  They have to (1) explain *how* the others were similarly situated and (2) submit *evidence*

substantiating that explanation.  *Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134 (1st

Cir. 2016) (affirming dismissal when complaint merely identified other development projects,

but failed to explain how they were similarly situated).  The First Circuit has held that failing to

provide *details* of the alleged similarities "does not cut it, even at the pleading stage."  *Id.*  Here

at summary judgment, it should be fatal to Defendants' claim.  *See Freeman v. Town of Hudson*,

714 F.3d 29, 39-40 (1st Cir. 2013) (failure to do more than "conclusorily state" that claimants

---

[3] Prior to filing their opposition to this motion, Defendants never identified these or any other allegedly similarly situated parties.

were both similarly situated to and treated differently from "unspecified 'other contractors'" defeated claim on motion to dismiss); *Barrington Cove Ltd. P'ship*, 246 F.3d at 8 ("incumbent" on selective enforcement claimant to "allege these correlations with reasonable particularity").

What do Defendants show about the other commentators they claim are similarly situated? Not much. For the entities listed in Defendants' chart (Opp. at 17), paragraphs 48-59 of their Statement of Facts contain the *only* factual showings regarding these other analyst reports.[4] Defendants pair bare claims that a commentator published an "analysis regarding Ligand" with claims that the stock price moved on the publication dates. That's it. They provide no facts and no analysis to show any similarities between themselves and the comparators, other than their writing that Ligand's then-current stock price was too high (and not even that in every case). This doesn't come close to carrying Defendants' burden. Moreover, a closer examination of the commentators Defendants identify demonstrates that none are in fact similarly situated:

***No false statements.*** Defendants have not identified any other comparator who made a false statement of fact. The closest they come is pointing to just two reports that address topics similar to those about which Lemelson made false statements. Defendants are not charged for commentary on forbidden topics; they are charged for false representations of fact, such as Defendants' statement that Ligand's investment relations representative said something he didn't (*i.e.*, that Promacta was "going away"). Defendants point to no misstatements of fact or material omissions to show that the other commentators were similarly situated. In fact, Defendants concede that "there is no reason to believe these other entities that criticized Ligand violated any securities laws" (Opp. at 18), an admission fatal to their claim.

---

[4] One of the reports is listed at Paragraphs 83-85 in Docket No. 126.

In *Freeman v. Town of Hudson*, the First Circuit found that the plaintiffs' selective enforcement claim failed where those identified as similarly situated were not alleged to have violated the same conservation easement that plaintiffs had.  714 F.3d 28, 39 (1st Cir. 2013).  In other words, the plaintiff could not maintain their claim where they failed to identify similarly situated parties who had committed the same violations.  Similarly, in *Every v. Littleto*n, the district court dismissed plaintiff's selective enforcement claim when the complaint did not allege than "any of these [supposedly similarly situated] businesses were also thought to be violating the sewer ordinance."  No. 18-cv-43-SM, 2018 WL 4344998, at *8-9 (D.N.H. Sept. 11, 2018) (citing *Freeman*, 714 F.3d at 39).  "There is an 'obvious alternative explanation' for those business not being charged," the court wrote, "they were likely not violating or not thought to be violating the ordinance."  *Id.* at *9; *see also Touponce v. Lee*, 2018 WL 1698264, at *7 (D. Mass., Apr. 6, 2018) (dismissal of selective enforcement claim where plaintiff failed to "substantiate how those comparators are similarly situated" instead relying on "conclusory allegations of similarity").  Here, too, there is an obvious alternative explanation:  Defendants made false statements of fact and fraudulent misrepresentations in their reports and interviews when, as Defendants concede, the other commentators they identify did not.

One of Defendants' comparators, Lakewood Capital, does not appear even to have written a report or made other statements, at least not ones Defendants have provided to the Court or the Commission.  D. 136-45.  Defendants' citation to Lakewood's announcement of their short position underscores the inadequacy of their selective enforcement claim.  How can Defendants maintain that Lakewood Capital is similarly situated, if Defendants submit no evidence that Lakewood Capital made any statements or omissions?  In effect, Defendants are

suggesting that they are similarly situated to *all* short sellers in Ligand, which is not sufficient to meet their burden.

Defendants point out that one of the reports (Seven Corners) commented (four years later) on Ligand's convertible note offering.  (Opp. at 17 and SOF, ¶52.)  They add that one other report (Favus, again four years later) took the position that Promacta sales might go down because of new liver treatment drugs.  (Opp. at 17; SOF, ¶ 56.)  Apart from commenting on similar topics during a different time period, Defendants do not explain any other similarities. They rest on the unsupported notion that all those who commented on Ligand are similarly situated to them in all material respects.

*No scheme to defraud.*  Defendants published five reports about Ligand in nine weeks, between June 16 and August 22, 2014.  Lemelson discussed Ligand in four interviews between June and October 2014.  D. 33 (Amended Complaint) at ¶¶ 23, 30; D. 34 (Answer) at ¶¶23, 30. Only one of their comparators appear to have published more than once about Ligand (Empire), and there are no allegations of any media appearances related to any of these reports.  Opp. at 17. In addition to the other factors here, these comparators are not sufficiently similar because they don't come close to the concerted campaign in which Defendants engaged.

*Investment advisers?*  Defendants are investment advisers, but make no showing about whether the other commentators they identify are too.  Citron Research, while affiliated with an adviser, is not an adviser, and the report is "solely attributable to the applicable Citron entity and not attributable to any Citron Related Person."  D. 136-47 at 23.  Alan Biloski appears to be a Seeking Alpha commentator, unaffiliated with an adviser.[5]  Favus Institutional Research is "an

---

[5] The FINRA broker check database indicates that there is a FINRA-regulated broker with Brock Securities named Alan John Biloski.  But Defendants provide no facts about Biloski, who cannot be similarly situated if he is not an adviser.

independent healthcare equity research firm…." Day Decl. Ex. B. There is an adviser entity called Cantor Fitzgerald Investment Advisers, but the report cited by Defendants appears to be published out of an affiliated company, not the adviser. Seven Corners Capital Management may or may not be an investment adviser; there is no showing from the Defendants that they are and "Seven Corners Capital" (one of the Seeking Alpha posts Defendants submit) does not appear in the Investment Adviser Public Disclosure database.[6] For those that may be investment advisers (though Defendants have not made that showing), Defendants cite nothing that suggests that those advisers marketed to potential investors based on their success driving down the price of an equity through a fraudulent short campaign.

*Most of the commentators' reports were published much later in time.* One of the commentators, Citron Research, published its report after the Commission brought its Complaint. Five of the seven came after the Commission's Enforcement Division notified Defendants that it intended to recommend charges to the Commission. Opp. at 17; D. 123 (P's Facts), ¶24. In other words, Defendants are claiming they were singled out from a group that didn't exist at the time.

*Similar positions in Ligand?* Defendants concede that not all of their comparators held a position in the stock about which they wrote. (Opp. at 17 ("these reports generally … disclos[ed] what position, if any, the author held….")). But they don't offer many specifics about who held the stock. Favus Institutional Research said it did not have any position in Ligand. D. 136-46 at 8. So did the author of the Cantor Fitzgerald report. D. 136-42 at LGND_0000191, 197.

*No evidence about religion.* Defendants are claiming that they were singled out from this group because of their religion or religious vocation. Yet, Defendants offer no evidence

---

[6] There is a website, but it is unclear whether Seven Corners is managing any client accounts.

about the religion or religious vocation of the other commentators they identify.  How can Defendants maintain they are singled out because of some kind of religious bias, without any showing about the religious affiliations of their comparators?

      ***Defendants do not meet their own "similarly situated" definition.***  Defendants even fail to produce evidence supporting their own (erroneous) definition of who is similarly situated, *i.e.*, "analysts who disclosed their short position, expressed their opinions while citing publicly available data for the basis of those opinions, and held on to their short positions for a significant period of time after making the statements."  Opp. at 4.  Defendants produce no evidence of whether the commentators they identify cited "publicly available data for the basis of [their] opinions."  Nor do Defendants produce any evidence that these commentators held on to whatever short positions they had for a "significant" time after they made their statements.[7] Indeed, some of the other commentators didn't have short positions at all, and there is no evidence presented about what short positions the others held or when they were covered. Defendants submitted no evidence that Lakewood Capital wrote a report.  Even if Defendants posed the correct factors defining "similarly situated," their claim would fail because they present no evidence on those factors.  Defendants just haven't made the serious effort to gather and produce evidence of similarly situated parties being treated differently, so the Court should enter summary judgment against them.

---

[7] Defendants try to distort the facts of their covering of the Ligand short position when they distinguish *Berliner* (as well as elsewhere).  Opp. at 15.  Defendants made the earliest of the four challenged statements, about Ligand's investment relations representative saying that Promacta was going away, on June 19 in the morning in the Benzinga interview.  Far from holding their short position for a long while, Defendants covered a portion *within hours* of the June 19 interview.  D. 132 at ¶¶89, 195-197.

## II.     DEFENDANTS SUBMIT NO EVIDENCE THAT THE COMMISSION ACTED IN BAD FAITH

Defendants point to three buckets of evidence they claim demonstrate malice toward Lemelson's religious affiliation.[8]  None of them, either individually or collectively, establishes any bias or malice by the Commission, let alone bias that rises to the level of a "gross abuse of power, personal hostility, extreme vindictive action, illegitimate animus or ill will."  *Walsh v. Town of Lakeville*, 431 F. Supp. 2d 134, 145 (D. Mass. 2006).

First, Defendants point to questions the staff asked during Lemelson's investigative testimony and deposition.  Defendants cite *five lines* out of 1007 pages of investigative testimony in which the staff asked questions about something *Lemelson* wrote about activist investors and historical figures.  Opp. at 10; D. 135 at p.21, ¶33.  As for Lemelson's deposition, Defendants merely note that counsel asked questions about Lemelson's religious vocation.  It was a natural topic to explore for all the reasons explained above and in the Commission's opposition to Defendants' motion to compel documents from the Greek Orthodox Metropolis of Boston.  D. 64 (Opposition) at 2-6, 65 (Day Decl.).  It cannot be the case that asking questions that may yield relevant information can be the basis for a claim of bias.  Further, Defendants identify no disrespectful questions, epithets, or other indicia of bias.  Nothing about the evidence Defendants' cite supports an inference that the Commission acted with malice.  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) ("Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and

---

[8] Although Defendants claim Ligand representatives wanted to silence Lemelson, they offer no evidence, authority, or argument in support of their baseless contention that the Commission wanted to do so in violation of his First Amendment rights.  Their purported defense on that ground should be rejected.

unsupported speculation.")).

Second, Defendants cite internal communications among *Ligand* personnel that Defendants say show *Ligand's* animus toward Lemelson's religious affiliation. Opp., Part II.C. But they offer *no* evidence that the Commission or its staff were aware of the communications they cite, much less that the Commission or staff endorsed them or were influenced by them in any way. Simply put, the evidence Defendants rely upon are statements of people associated with Ligand, not statements by the Commission, and thus are not probative of any intent, motive, bad faith, or animus on the part of the Commission or its staff. Further, Defendants cite no authority for the proposition that alleged animus of a private party may be imputed to a government agency.

Finally, Defendants point to two PowerPoint presentations that Ligand displayed during its counsel's presentations to the staff, both of which made passing reference to Lemelson's religious affiliation. Opp. at 7-8; D. 127-36, 127-40. But Defendants offer *no* evidence that the Commission or its staff put any stock in those passing references, much less that they influenced the investigation or the ultimate decision to bring this case. The record is actually quite the opposite. The Commission's Rule 30(b)(6) designee testified that there is no evidence that Commission personnel discussed Lemelson's religion with Ligand representatives and Ligand's CEO testified he did not recall any discussion of that either. D. 123 (P's Facts) at ¶34.

### A.   Defendants' Efforts to Distinguish Other Market Manipulation Cases Brought by the Commission Miss the Point

In support of its motion, the Commission cited a number of market manipulation cases as evidence that it regularly brings such cases (including short-and-distort cases), contrary to Defendants' incorrect assertion that this case is "unprecedented." *E.g.*, Opp. at 1. The point was

not that this case is on all fours with the cited cases, but that the Commission regularly enforces the securities laws against market manipulators like Defendants, and has a rational basis to do so.

Defendants illogically argue that the cases being different in their particulars "proves" that the Commission acted in bad faith or out of malice.  Opp. at 14.  The Commission's citation to similar (but not identical) cases is not *evidence* in support of Defendants' accusations.  One has nothing to do with the other.  Further, the logical extension of Defendants' argument is that anytime the Commission brings a case that doesn't have a close-to-exact factual predecessor, it would be deemed to have acted in bad faith.

### B.   Magistrate Judge Cabell Made No Finding that Supports Defendants' Claim

Defendants claim that Magistrate Judge Cabell found that "evidence exists supporting the notion that this disparate treatment is grounded in an effort to punish Fr. Emmanuel…."  Opp. at 4-5.  Not so.  Judge Cabell made no findings about the evidence in either of his rulings.  He wrote, "the court finds that the defendant here has *asserted* enough facts, even if just barely so, to warrant discovery on his claim of selective enforcement and bias."  D. 55 at 6 (emphasis added).  In his Order on the Commission's Rule 12(e) motion, he clarified that, "The Commission does not need to agree with or accept any of the defendant's assertions, but they have at least been provided with notice of what the defendant intends to argue."  D. 112.  Judge Cabell's orders merely held that Defendants' unproven assertions justified a R. 30(b)(6) deposition and not a more definite statement.  They do not help Defendants' failure to produce evidence here.

### CONCLUSION

Defendants have failed to submit evidence creating a genuine dispute of material fact as to any element of their affirmative defense.  The Commission's motion for partial summary judgment should be granted.

Dated:  November 13, 2020

Respectfully submitted,

SECURITIES AND EXCHANGE
COMMISSION

By its attorneys,

*/s/ Marc J. Jones*
Marc J. Jones (BBO #645910)
Alfred A. Day (BBO #654436)
Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
617-573-8947 (Jones)
617-573-4537 (Day)
JonesMarc@sec.gov
DayA@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on November 13, 2020, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

*/s/ Marc J. Jones*
Marc J. Jones