UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>THE AMVONA FUND, LP,<br><br>Relief Defendant. | Civil Action No. 1:18-cv-11926-PBS |

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

Plaintiff, the United States Securities and Exchange Commission (the "Commission" or "SEC") respectfully submits this reply to Defendants' response to the Commission's statement of facts in support of its motion for partial summary judgment.  Plaintiff has reprinted the entirety of Defendants' response to Plaintiff's statement of facts and has replied to certain of Defendants' responses.  The Plaintiff's replies are highlighted for ease of reference.

**Gregory Lemelson and Lemelson Capital Management, LLC**

1.    **Plaintiff's Statement:**  Lemelson Capital Management, LLC ("LCM") is the investment adviser to The Amvona Fund, LP.  [ECF No. 34 (Defendants' Answer) at ¶18.]

**Defendants' Response:**  Not disputed.

2.    **Plaintiff's Statement:**  Gregory Lemelson (a/k/a "Father Emmanuel," hereinafter "Lemelson") is an exempt reporting adviser [Appendix of Exhibits, Ex. 1 (hereinafter "Ex.__") (Lemelson Dep., Oct. 16, 2019), 22:14-21.]

**Defendants' Response:**  Not disputed.

3.      **Plaintiff's Statement:**  Between May 2014 and October 2014, Lemelson purchased short positions in the stock of Ligand Pharmaceuticals, Inc. through his hedge fund, The Amvona Fund.  A short position is an investment technique whereby an investor seeks to profit when the price of a stock falls.  [ECF No. 34 (Defendants' Answer) at ¶¶1, 3.]

**Defendants' Response:**  Disputed to the extent that one does not "purchase short positions in stock."  Not disputed that Fr. Emmanuel took a short position in shares of Ligand Pharmaceuticals.

4.      **Plaintiff's Statement:**  Between June 2014 and August 2014, Lemelson authored research reports concerning Ligand.  Between June 2014 and October 2014, Lemelson participated in live and written interviews concerning Ligand.  [*Id.*, ¶4.]

**Defendants' Response:**  Not disputed.

5.      **Plaintiff's Statement:**  Lemelson and LCM, through these reports and interviews, publicly disseminated information "that questioned the legitimacy of Ligand's business model and practices."  [*Id.*, ¶¶22-23.]

**Defendants' Response:**  Not disputed.

**The Commission's Prosecution of Cases Similar to this One**

6.      **Plaintiff's Statement:**  When an entity or individual makes fraudulent misrepresentations designed to drive up the price of a stock they own, that scheme is known as a "pump-and-dump."  [Ex. 2 (pump and dump explanation from SEC website).]

**Defendants' Response:**  Not disputed for purposes of this Motion.

7.      **Plaintiff's Statement:**  In *SEC v. Nielsen*, the Commission brought an enforcement action against an investor in a public company who, while partially disclosing his long position in the company's stock, issued numerous false and misleading statements intended to drive up the price of the stock while quietly selling his shares.  *SEC v. Nielsen*, N.D. Cal. Case No. 5:20-cv-03788 (complaint filed June 9, 2020).  [Ex. 3.]

**Defendants' Response:**  Not disputed that the Commission brought the action as described and made the allegations set forth in the complaint attached as an exhibit, but Defendants have no basis to confirm or deny the truth of the allegations made by the Commission in this unrelated matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to the Commission's claims in this case.

8.      **Plaintiff's Statement:**  In *SEC v. Musk*, SEC Press Rel. No. 2018-226 (Sept. 29, 2018), the Commission brought and settled an action against Tesla, Inc. founder and CEO Elon Musk arising out of misleading tweets that caused Tesla stock to jump by over six percent in value.  [Ex. 4.]

**Defendants' Response:**  Not disputed that the Commission brought the action as described and made the allegations set forth in the press release attached as an exhibit, but Defendants have no basis to confirm or deny the truth of the allegations made by the Commission in this unrelated matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to the Commission's claims in this case.

9.   **Plaintiff's Statement:**  In *SEC v. Thompson, et al.*, SEC Lit. Rel. No. 23137 (Nov. 21, 2014), the Commission brought a securities fraud action against three penny stock promoters who engaged in a pump-and-dump scheme with respect to disclosed long positions in five public companies.  [Ex. 5]

**Defendants' Response:**  Not disputed that the Commission brought the action as described and made the allegations set forth in the press release attached as an exhibit, but Defendants have no basis to confirm or deny the truth of the allegations made by the Commission in this unrelated matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to the Commission's claims in this case.

10.   **Plaintiff's Statement:**  When an entity or individual makes fraudulent misrepresentations designed to drive down the price of the stock in which they have taken a short position, that scheme is known as a "short-and-distort."  [Ex. 6 (Investopedia short and distort explanation).]

**Defendants' Response:**  Not disputed for purposes of this Motion.

11.   **Plaintiff's Statement:**  Both the Commission and the United States Attorney's Office in the Southern District of Florida brought actions related to the securities fraud of Barry Minkow.  *See In the Matter of Minkow*, Inv. Adv. Release IA-3320 (November 22, 2011).  Minkow—a pastor at the time—orchestrated a scheme to drive down the price of the stock of a publicly-traded company he had shorted, through false and misleading statements on the Internet, in press releases, emails, YouTube videos, and the mail.  Like Defendants, Minkow alleged wide-spread improprieties in the targeted company's financial reporting and business structure, as well as attacking the personal character of the company's management.  Both the USAO and the Commission investigated the case; the USAO indicted Minkow (who pled guilty and received a five-year sentence) and the Commission barred Minkow from association with any investment adviser, broker, or other specified securities-related entities.  [Ex. 7 (USAO Press Release and SEC follow-on)].

**Defendants' Response:**  Not disputed that the Commission and U.S. Attorney's Office brought the action as described and made the allegations set forth in the press release attached as an exhibit, but Defendants have no basis to confirm or deny the truth of the allegations made by the Commission and the U.S. Attorney's Office in this unrelated matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to the Commission's claims in this case.

12.   **Plaintiff's Statement:**  The Commission brought a short-and-distort case in 2008

known as *SEC v. Berliner*, SEC Lit. Rel. No. 20537 (April 24, 2008). In *Berliner,* a trader was alleged to have spread false rumors about pending acquisition of public company to drive stock price down and profit from short position).  [Ex. 8.]

    **Defendants' Response:**  Not disputed that the Commission brought the action as described and made the allegations set forth in the press release attached as an exhibit, but Defendants have no basis to confirm or deny the truth of the allegations made by the Commission in this unrelated matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to the Commission's claims in this case.

   13. **Plaintiff's Statement:**  The Commission brought a short-and-distort case in 2000 known as *SEC v. Jakob*, SEC Lit. Rel. No. 16671 (Aug. 31, 2000); *U.S. v. Jakob*, CR-00-1002 (C.D. Cal. 2000).  *Jakob* involved parallel civil and criminal actions against trader who issued fake press release to drive down stock price and profit from a short position.  [Ex. 9.]

    **Defendants' Response:**  Not disputed that the Commission brought the action as described and made the allegations set forth in the press release attached as an exhibit, but Defendants have no basis to confirm or deny the truth of the allegations made by the Commission in this unrelated matter.  By way of further response, as described in Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment, Defendants deny that these allegations are in any way similar to the Commission's claims in this case.

**The Commission's Authorization Process**

   14. **Plaintiff's Statement:**  The Commission, not the staff, authorizes enforcement actions.  [Ex. 10 (Enforcement Manual), at p. 22.]

    **Defendants' Response:**  Not disputed for purposes of this Motion.

   15. **Plaintiff's Statement:**  The Commission has five Commissioners, each of whom is appointed by the President and confirmed by the Senate.  15 U.S.C. § 78d(a).  When this case was considered, the Commission only had four Commissioners.

    **Defendants' Response:**  Not disputed that by statute, the Commission has five Commissioners, each of whom is appointed by the President and confirmed by the Senate.  There is no record evidence of the number of Commissioners at the time "this case was considered," which is inadequate under Fed. R. Civ. P. 56(c).

**Plaintiff's Reply:**  The composition of the Commission is a matter of public record of which the

Court may take judicial notice.

   16. **Plaintiff's Statement:**  After investigating potential violations of the federal securities laws, the staff of the SEC's Division of Enforcement may recommend to the Commission that it authorize the filing of a civil enforcement action, as it did in this case.  [Ex. 10, at 22-23.]

    **Defendants' Response:**  Not disputed for purposes of this Motion that the

Commission's Enforcement Manual provides that the staff of the SEC's Division of Enforcement may recommend to the Commission that it authorize the filing of a civil enforcement action. There is no record evidence that this procedure was followed in this case, which is inadequate under Fed. R. Civ. P. 56(c).

**Plaintiff's Reply:**  Defendants bear the burden of proof as to their baseless claim of selective enforcement.  Defendants have offered no evidence that the Commission's procedures, as set forth in the SEC's Enforcement Manual, were *not* followed in this case.

17.  **Plaintiff's Statement:**  A Wells notice—named for former SEC Commissioner John Wells—is a communication from the staff of the SEC's Division of Enforcement to a person involved in an investigation that: (1) informs the person the staff has made a preliminary determination to recommend that the Commission file an action or institute a proceeding against them; (2) identifies the securities law violations that the staff has preliminarily determined to include in the recommendation; and (3) provides notice that the person may make a submission to the Division and the Commission concerning the proposed recommendation.  [*Id.* at 19.]

  **Defendants' Response:**  Not disputed for purposes of this Motion.

18.  **Plaintiff's Statement:**  The putative Defendant(s) typically have an opportunity to address the staff's preliminary determination to recommend an enforcement action through a "Wells process" that typically includes written submissions ("Wells submissions") and in-person meetings with senior officers of the Division of Enforcement.  [*Id.* at 19-22].

  **Defendants' Response:**  Not disputed for purposes of this Motion.  However, the undersigned counsel were expressly denied an opportunity to meet with senior officers of the Division of Enforcement in this case to discuss the staff's determination to recommend its novel Investment Advisors Act claim.  Affidavit of Douglas Brooks In Support of Defendants' Response to Plaintiff's Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment and Statement of Additional Material Facts Pursuant to Local Rule 56.1 ("Brooks Opp. Aff.") ¶ 36.

**Plaintiff's Reply:**  Defendants' prior and current counsel were afforded the opportunity to provide four (4) submissions to the staff totaling 89 pages with respect to each and every claim the Commission ultimately pursued in this case.  Defendants' prior counsel met with Division of Enforcement Co-Director Steve Peiken to discuss the potential charges before this case was filed.  There is no right to a meeting with Senior Officers of the Division of Enforcement, particularly when, as here, the recommended charges were fully briefed by Defendants' counsel. Indeed, the Commission's Enforcement Manual specifically states, "A Wells recipient generally

will not be accorded more than one post-Wells meeting." D. 123-11 at 22.

19.   **Plaintiff's Statement:**  The Enforcement staff's recommendation that the Commission authorize the filing of a civil enforcement action, along with any Wells submission, is reviewed by senior officers and staff in the Division of Enforcement and then each relevant Division and Office within the Commission, including the Office of General Counsel and Enforcement's Office of Chief Counsel.  [*Id.* at 22-23]

 **Defendants' Response:**  Not disputed for purposes of this Motion.

20.   **Plaintiff's Statement:**  Once the recommendation has gone through this process, it is submitted to the Commissioners for their consideration.  [*Id.*]

 **Defendants' Response:**  Not disputed for purposes of this Motion.

21.   **Plaintiff's Statement:**  The Commissioners and their staff review the recommendation and any Wells submissions.  [*Id.*]

 **Defendants' Response:**  Not disputed for purposes of this Motion.

22.   **Plaintiff's Statement:**  Then, and only then, do the Commissioners vote on the recommendation.  [*Id.* at 23.]

 **Defendants' Response:**  Not disputed for purposes of this Motion.

**Defendants' Submission to the Commission**

23.   **Plaintiff's Statement:**  On October 20, 2016, Defendants' prior counsel submitted a 36-page white paper to staff of the Commission's Division of Enforcement setting out the reasons they believed they should not be charged.  [Ex. 11 (Day Decl.) at ¶2.]

 **Defendants' Response:**  Not disputed in substance.  Defendants note that if the title page and table of contents were included, then this Wells submission was 38 pages long.

24.   **Plaintiff's Statement:**  On May 25, 2017, Defendants were given a Wells notice, informing them of the charges the staff of the Commission's Division of Enforcement were prepared to recommend to the Commission and the factual basis underlying each of those charges.  [*Id.* at ¶3.]

 **Defendants' Response:**  Not disputed.

25.   **Plaintiff's Statement:**  On June 30, 2017, Defendants submitted a 40-page Wells response detailing their reasons why the staff should not recommend the charges detailed in the Wells notice.  [*Id.* at ¶4.]

 **Defendants' Response:**  Not disputed.

26.   **Plaintiff's Statement:**  On October 4, 2017, Defendants' prior counsel met with a Co-Director of the SEC's Division of Enforcement, Steven Peikin, as well as with Enforcement

staff, to discuss the investigation and possible charges.  [*Id.* at ¶5.]

      **Defendants' Response:**  Not disputed.

27.    **Plaintiff's Statement:**  On April 26, 2018, Defendants were given a Supplemental Wells Notice, informing them of further charges the staff of the Commission's Division of Enforcement were prepared to recommend to the Commission and the factual basis underlying each of those charges.  The additional charges concerned violations of the Investment Advisers Act of 1940.  [*Id.* at ¶6.]

      **Defendants' Response:**  Not disputed.

28.    **Plaintiff's Statement:**  On June 15, 2018, Lemelson submitted an 11-page supplemental Wells response detailing reasons why the staff should not recommend the Advisers Act charges.  The same day, LCM and The Amvona Fund submitted a 5-page supplemental Wells response.  [*Id.* at ¶7.]

      **Defendants' Response:**  Not disputed.

29.    **Plaintiff's Statement:**  In their white paper and subsequent Wells submissions, Defendants did not raise or otherwise articulate selective enforcement as a reason the staff should not recommend charges to the Commission.  [*Id.* at ¶8.]

      **Defendants' Response:**  Not disputed.  By way of further response, Defendants note that they had access to no discovery at the time of these submissions.

**Defendants' Failure to Adduce Evidence About of Religious Bias, Punishment for Exercise of Free Speech, or Other Improper Motive**

30.    **Plaintiff's Statement:**  In a Notice of Deposition dated July 30, 2020, Defendants sought 30(b)(6) testimony from the Commission on three topics:

      1.  The SEC's analysis and mathematical calculation of Ligand's debt-to-tangible equity ratio.

      2.  Communications between the SEC and media sources concerning its non-public investigation of Defendants.

      3.  Pre-litigation communications between the SEC and Ligand regarding Defendants, including but not limited to meetings between Ligand and the SEC, how such meetings were arranged, and the relationships between SEC and Ligand's counsel.

[Ex. 12 (July 30, 2020 Notice of Deposition to the SEC).]

      **Defendants' Response:**  Not disputed that Defendants served a Third Amended Notice of Deposition with those listed topics on July 30, 2020.  By way of further response, Defendants note that they sent an initial Notice to Depose the Commission pursuant to Fed. R. Civ. P. 30(b)(6) on October 28, 2019 and the subject of the deposition and topics for testimony

were the subject of litigation in this matter leading up to the Third Amended Notice of Deposition being sent and the deposition being held.  *See* Brooks Opp. Aff. Ex. 1; ECF Nos. 40-42, 45-47, 51, 99-100, 108.

31.  **Plaintiff's Statement:**  The July 30, 2020 Notice of Deposition did not contain any topics referring to Defendant Lemelson's religious affiliation or his exercise of First Amendment rights. [*Id.*]

**Defendants' Response:**  Disputed.  Both topics 2 and 3, relating to the Commission's communications with the media and the Commission's communications with Ligand and its counsel referred and related to Fr. Emmanuel's religious affiliation and exercise of his First Amendment rights.

==Plaintiff's Reply==:  The Commission reiterates that it is clear from the face of the document that the July 30, 2020 Notice of Deposition did not contain any topics expressly referring to Defendant Lemelson's religious affiliation or his exercise of his First Amendment rights, and Defendants have provided no basis on which to dispute this.  Certainly, Defendants' 30(b)(6) topics did not "refer" to Defendant Lemelson's religious affiliation or his exercise of First Amendment rights, as Defendants assert.

32.  **Plaintiff's Statement:**  The 30(b)(6) deposition of the Commission took place on August 6, 2020.  The Commission's 30(b)(6) designee was David Becker, an Assistant Director in the SEC's Division of Enforcement.  [Ex. 13 (Deposition of Commission's Rule 30(b)(6) designee, Aug. 6, 2020).]

**Defendants' Response:**  Not disputed.

33.  **Plaintiff's Statement:**  There were no questions posed during the 30(b)(6) deposition of the Commission regarding Defendant Lemelson's exercise of First Amendment rights.  Further, the phrases "First Amendment" and "free speech" do not appear in any of the deposition transcripts or transcripts on investigative testimony in this matter.  [Ex. 11 (Day Decl.) at ¶10.]

**Defendants' Response:**  Disputed.  The deposition discussed the presentations made by Ligand to the Commission in detail, which include baseless accusations of Fr. Emmanuel engaging in an affinity fraud and misrepresenting the performance of his fund, which from internal Ligand communications were attempts to "silence" Fr. Emmanuel from expressing his opinions about Ligand.  *See* Brooks Opp. Aff. Ex. 2 at 33:19-42:18, 62:14-63:7, 75:6-76:3, 79:18-80:6, 120:20-121:6.  Further, the Commission consistently objected to any question about the thought process of the Commission in bringing the claims here, thus, preventing any questions about whether the Commission's enforcement action was based on religious animus or in an effort to prevent Fr. Emmanuel from expressing his opinions.  Brooks Opp. Aff. Ex. 2 at 18:24-19:16, 22:6-11, 30:10-31:4, 40:10-20, 73:22-74:12, 99:19-100:18, 137:2-139:1.  The

questions objected to included (1) why the Commission disclosed the existence of the investigation to Mr. Bondi (the public reporting of which Defendants have argued evidence an attempt to suppress Fr. Emmanuel from expressing his opinions); (2) what was the role of the supervising staff in the decision to bring this claim (which the Commission asserted is support for finding it acted with no discrimination for purposes of selective enforcement); (3) how the Commission decided to bring the allegations that Fr. Emmanuel incorrectly excluded the proceeds of a loan from his calculation of Ligand's debt to tangible equity ratio, which is factually incorrect, but appeared in Ligand's presentations (which Defendants have argued evidence an overly familiar relationship between the Commission and Ligand, indicating that the Commission was acting in a manner to achieve Ligand's goal of silencing Fr. Emmanuel); (4) where the Commission first came up with the notion that proceeds from the loan should have been included in Fr. Emmanuel's debt to tangible equity ratio (same); and (5) why the Commission declined to grant Defendants' counsel a second meeting after giving Ligand's counsel multiple meetings (which Defendants have argued evidence preferential treatment provided to Ligand).  It is improper for the Commission to selectively object to producing discovery as attorney work product and then assert that the absence of such information supports their argument on selective enforcement.  *See Columbia Data Products, Inc. v. Autonomy Corp. Ltd.,* 2012 WL 6212898, at *17 (D. Mass. Dec. 12, 2012) ("a subject matter waiver of work product material is appropriate where a party is attempting to use otherwise protected information as 'both a sword and a shield' in order to gain an unfair tactical advantage over the opposing party"); *In re PolyMedica Corp. Securities Litig.*, 235 F.R.D. 28, 32-33 (D. Mass. 2006) ("'Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials,' the Court reasoned, 'than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination'").

==Plaintiff's Reply==:  Although Defendants' purport to "dispute" the Commission's statement in Paragraph 33, in fact nothing in their response refutes the facts set forth in Paragraph 33.  There were no questions posed during the 30(b)(6) deposition of the Commission regarding Defendant Lemelson's exercise of First Amendment rights, and Defendants have pointed to none in their response.  Likewise, the terms "First Amendment" and "free speech" do not appear in the transcripts of the depositions or investigative testimony, and Defendants have not pointed to any incidence of those terms being used in depositions or testimony.  As a result, there is no genuine dispute as to the Commission's statement of fact in Paragraph 33.  Defendants' claim that the Commission's objections prevented Defendants from posing such questions is unsupported by any evidence or cites to the transcripts.  Defendants have mischaracterized the questions asked and objections posed during the depositions, while failing to provide any record cites supporting

their position.  Further, Defendants did not challenge any of the Commission's assertions of

privilege, and have therefore waived any claim that such assertions of privilege were improper.

34.    **Plaintiff's Statement:**  Defendant Lemelson's religious affiliation only came up
in passing during the 30(b)(6) deposition of the Commission:

> Q.    Were there ever any communications between the SEC and any representative of
> Ligand concerning Father Emmanuel Lemelson's status as a priest?
>
> MR. JONES:  Are you talking before filing the litigation or at any time?
>
> MR. BROOKS:  Yeah, before the filing of litigation.
>
> A.    I think if you look at the PowerPoint decks that Ligand provided to the SEC and
> presented at -- during the meetings, there is an indication of that and it appears
> that that was mentioned in passing during the presentation, but that's all I'm
> aware of.
>
> [Ex. 13, at 120:20-121:6.]

**Defendants' Response:**  Disputed for the same reasons as stated in response to
paragraph

==Plaintiff's Reply==:  As discussed in the Commission's Reply to Defendants' Response to

Paragraph 33, there is no genuine dispute as to any fact asserted in the Commission's statement.

35.    **Plaintiff's Statement:**  There are no other instances of the following words and
phrase in the transcript—"religion," religious," "priest," "church," or "Greek Orthodox."  [Ex. 11
(Day Decl.) at ¶11.]

**Defendants' Response:**  Not disputed.  By way of further response, Defendants
refer to their response and objections to paragraph 33.

==Plaintiff's Reply==:  As discussed in the Commission's Reply to Defendants' Response to

Paragraph 33, there is no genuine dispute as to any fact asserted in the Commission's statement.

36.    **Plaintiff's Statement:**  Ligand's CEO, John Higgins, was also asked a handful of
questions about Defendant Lemelson's religious affiliation, only one of which concerned
communications with Commission staff.  He did not recall the subject of that question ever being
discussed with the Commission's staff.  [Ex. 14 (Deposition of John Higgins, Dec. 11, 2019) at
223:14-17.]

**Defendants' Response:**  Disputed.  As an initial matter, the characterization of a "handful" of
questions is vague and unsupported in violation of Fed. R. Civ. P. 56(c).  Moreover, many of the
questions relating to Fr. Emmanuel's religious affiliation were in the context of the *presentations
Ligand made to the Commission*.  Brooks Opp. Aff. Ex. 3 at 222:1-223:13, 263:14-24.

==Plaintiff's Reply==:  Defendants quibble over the meaning of the word "handful," but concede, or at least have pointed to no evidence refuting, the fact that Mr. Higgins was asked a small number of questions touching on Lemelson's religious affiliation.  Defendants have not refuted that only one of the questions posed to Higgins about Defendant Lemelson's religious affiliation concerned communications with Commission staff (and that Mr. Higgins did not recall any such communications).  Contrary to Defendants' response, the exhibit pages they cite do not reflect that "many of the questions relating to [Lemelson's] religious affiliation were in the context of the presentations Ligand made to the Commission."  To the contrary, as stated in Paragraph 36, only *one* of the questions in the exhibit cited by Defendants concerns communications with Commission staff.  (Higgins was asked whether anyone at Ligand ever told Commission staff that Lemelson's investors were members of his congregation, and the answer was no.  (Brooks Opp. Aff. Ex. 3 at 223:14-17.)

37.     **Plaintiff's Statement:**  The Commission frequently investigates and prosecutes securities law violations by individuals with religious occupations.  *See, e.g., SEC v. Ovid*, *et al.*, SEC Lit. Rel. No. 20998 (Apr. 14, 2009) (seven church leaders charged with fraudulent investment scheme targeting elderly parishioners); *SEC v. Feiner, et al.*, SEC Lit. Rel. No. 24848 (July 6, 2020) (rabbi and others charged in connection with fraudulent investment scheme targeting Orthodox Jewish community); *SEC v. Holley, et al.*, SEC Press Rel. 2017-74 (March 30, 2017) (pastor charged with fraudulent real estate investment scheme targeting churchgoers).  [Exs. 15, 16, 17 (litigation releases/complaints).]

**Defendants' Response:**  Disputed.  Three examples spanning 2009-2020 is not evidence of "frequently" investigating any type of behavior.  By way of further response, Defendants state that the "examples" provided in Exhibits 15-17 are not relevant as they involve allegations of misappropriation of funds, not a "pump and dump" or "short and distort" scheme.

==Plaintiff's Reply==:  Defendants' apparent objection to the word "frequently" ignores the context in which it was used (*examples* of cases the Commission has brought).  Defendants do not (and cannot) dispute that the Commission investigates and prosecutes securities law violations by individuals with religious occupations.

**No Evidence of Improper Influence by Ligand or Ligand's Counsel**

38.     **Plaintiff's Statement:**  With one exception, the Commissioners who authorized this case had nothing more than a passing professional acquaintance with counsel for Ligand, including Ligand's lead outside counsel, Bradley J. Bondi of Cahill, Gordon & Reindel LLP, who was once employed at the Commission.  Commissioner Peirce knows Mr. Bondi and considers him a friend; she communicates with him a few times a year but did not discuss this case—or any other Commission business—with him.  [Ex. 13 (R. 30(b)(6) Dep.), at 127:6-130:17.]

**Defendants' Response:**  Not disputed based on the deposition testimony.

39.     **Plaintiff's Statement:**  In preparing Mr. Becker to testify as the Commission's 30(b)(6) designee with respect to Topic 3, Commission counsel inquired of 29 current and former Commissioners, Commissioners' counsel, senior officers of the Division of Enforcement, and Division of Enforcement staff who were involved in investigating, recommending charges to the Commission, and/or authorizing this enforcement action.  While Defendants' counsel did not ask, this inquiry revealed that none had anything more than a passing professional familiarity with any of Ligand's inside or outside counsel, including Mr. Bondi (with the exception of Commissioner Peirce as noted above).  [Ex. 11 (Day Decl.) at ¶12.]

**Defendants' Response:**  Defendants dispute the assertions of fact in paragraph 39 to the extent that they are not supported by evidence in the record, which is inadequate under Fed. R. Civ. P. 56(c).  By way of further response, Defendants take exception with the comment that "Defendants did not ask" as the Commission appears to be selectively disclosing attorney work product after objecting at the 30(b)(6) deposition on the grounds of attorney work product multiple times.  The Commission cannot object to certain questions on subject matter as work product and then selectively reveal part of that work product to gain a tactical advantage without an entire subject matter waiver.  *See Columbia Data Products, Inc. v. Autonomy Corp. Ltd.,* 2012 WL 6212898, at *17 (D. Mass. Dec. 12, 2012) ("a subject matter waiver of work product material is appropriate where a party is attempting to use otherwise protected information as 'both a sword and a shield' in order to gain an unfair tactical advantage over the opposing party"); *In re PolyMedica Corp. Securities Litig.*, 235 F.R.D. 28, 32-33 (D. Mass. 2006) ("'Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials,' the Court reasoned, 'than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination'").

<mark>**Plaintiff's Reply**</mark>:  Defendants purport to dispute the facts in Paragraph 39 on the ground that they were prevented from exploring the topic in the 30(b)(6) owing to assertion of privilege.  Defendants identify no questions asked on this topic that Plaintiff's 30(b)(6) designee was instructed not to answer.  In fact, the Commission's 30(b)(6) designee answered multiple question on this topic.  D. 123-14 at 127-29.

40.   **Plaintiff's Statement:**  The SEC maintains a system for persons with knowledge of potential violations of the securities laws to report relevant information to the SEC.  The system, which is accessible via the SEC's public website, is referred to as the TCR system, which stands for "tips, complaints, and referrals."  [Ex. 13 (R. 30(b)(6) Dep.), at 52:8-53:9.]  The Commission encourages people who believe themselves to be victims of a securities law violation to bring to the Commission's attention the facts and circumstances underlying that belief.  [Ex. 10 (Enforcement Manual), at 7-9]

**Defendants' Response:**  Not disputed for purposes of this Motion.

41.   **Plaintiff's Statement:**  Ligand and its counsel brought Defendants' conduct to the attention of the Division of Enforcement by filing two TCRs—one in 2014 and another in 2015.  [Ex. 13 (R. 30(b)(6) Dep.), at 55:5-13, 69:23-70:12.]  Before this case was filed, Ligand representatives and counsel met twice with Division of Enforcement staff regarding the two TCRs—once on September 25, 2014 and again on June 8, 2015.  [Ex. 13 (R. 30(b)(6) Dep.), at 53:15-55:4, 62:14-63:1, 72:14-73:8; 84:24-87:9.]  In addition to the two in-person meetings, Ligand's counsel communicated with Division of Enforcement staff via email, voicemail, and telephone from time to time during the period September 2014 through March 2018.  [*See generally id.* at 53:15-121:6.]  These communications were all routine:  several concerned meeting logistics.  [*See, e.g., id.* at 56:21-57:2, 79:10-80:6.]  A number of communications reflect Ligand's counsel providing additional information about Defendants' conduct—such as new tweets by Lemelson, an interview of Lemelson in which he discussed Ligand, and a letter to Congress written by Lemelson—after the June 8, 2020 meeting.  [*See, e.g., id.* at 88:6-23, 90:12-21, 91:4-20, 98:1-19, 102:20-103:5, 104:7-12.]  Ligand's counsel also asked for updates about any investigation into Defendants' conduct and was informed by the staff—repeatedly—that the staff cannot provide any detail other than to say that the investigation is ongoing.  [*See, e.g., id.* at 98:20-99:7, 107:17-108:11, 110:3-20, 115:14-116:7, 117:10-24.]

**Defendants' Response:**  Disputed.  Defendants' object to any improper characterizations of the communications between Ligand and the Commission as "routine" as not based on evidence in the record, which is inadequate under Fed. R. Civ. P. 56(c).  Further, while Defendants do not dispute that the Commission's 30(b)(6) witness reported that other staff members had conversations with Ligand in which they offered no additional information other than the investigation was "ongoing," it strains credulity that there were multiple 15-20 minute telephone conversations over years in which the only substance discussed was "an investigation is ongoing."  Further, it appears that once again the Commission is attempting to use attorney work product as both a sword and shield as the Commission objected to questions like why the Commission informed Ligand's counsel of the existence of an investigation as attorney work product, but now wants to assert that all such communications were "routine."  *See* 30(b)(6) Dep. Tr. 99:19-100:18; *Columbia Data Products, Inc. v. Autonomy Corp. Ltd.,* 2012 WL 6212898, at *17 (D. Mass. Dec. 12, 2012) ("a subject matter waiver of work product material is appropriate where a party is attempting to use otherwise protected information as 'both a sword and a shield' in order to gain an unfair tactical advantage over the opposing party"); *In re PolyMedica Corp. Securities Litig.*, 235 F.R.D. 28, 32-33 (D. Mass. 2006) ("'Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials,' the Court reasoned, 'than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination'").

**Plaintiff's Reply**: Defendants have provided no factual or evidentiary refutation to the facts set forth in Paragraph 41, which are supported by citations to the record.  Defendants incorrectly assert that the Commission's characterization of the communications as "routine" is unsupported by the record.  As described in Paragraph 41, the record contains ample evidence that the communications were routine, including the text of the actual emails and testimony from Mr. Becker as to what was discussed on the telephone calls.  Defendants have presented no evidence that the communications were anything other than routine.  Defendants purport to dispute the facts in Paragraph 41 on the ground that they were prevented from exploring the topic in the 30(b)(6) owing to assertion of privilege.  Defendants identify no questions asked on this topic that Plaintiff's 30(b)(6) designee was instructed not to answer.  The Commission has not and cannot assert attorney-client privilege protecting the communications between the Commission's staff and counsel for Ligand.

42.    **Plaintiff's Statement:**  Ligand's counsel's communications to the staff often elicited no response from the staff at all.  [*See, e.g., id.* at 88:6-13, 90:12-21, 91:4-20, 98:1-19, 113:2-15.]  And, although Ligand's counsel requested meetings with the staff and/or the Co-Directors of the Division of Enforcement on several occasions, those requests were declined. [*See, e.g., id.* at 92:11-93:12, 111:19-112:10, 117:10-24.]  Ligand's counsel was not informed that this action had been authorized before it was publicly filed.  [*Id.* at 119:5-13.]

**Defendants' Response:**  Disputed as to the characterizations that "often" the Commission did not respond to communications from Ligand.  Not disputed that certain requests by Ligand for meetings were declined, but Ligand did receive the benefit of multiple in-person meetings and telephone calls with the Commission.  *See* paragraph 41.  Disputed that Ligand's counsel was not informed that this action had been authorized before it was publicly filed, as the deposition testimony was simply that there was no record of any such communication taking place.  Brooks Opp. Aff. Ex. 2 at 19:5-13.

**Plaintiff's Reply**: Defendants do not dispute that Ligand's counsel's communications to the staff at times elicited no response from the staff at all.  Defendants do not dispute that Ligand's counsel requested meetings with the staff and/or the co-Directors of the Division of Enforcement, nor do they dispute that those requests were declined.  Counsel for Ligand never

obtained a meeting with the co-directors of the Division of Enforcement.  The Commission

disputes Defendants' claim that Ligand received a "benefit" from its communications with the

Commission.  Defendants offer no evidence that Ligand's counsel was informed that this action

was authorized until after it had been publicly filed.


## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Defendants hereby incorporate their Local Rule 56.1 Statement of Undisputed Material

Facts (ECF No. 126) in its entirety.  In addition, Defendants state below the following additional

material facts relevant to their Opposition to Plaintiff's Motion for Partial Summary Judgment.

**I.      Fr. Emmanuel's Published Analysis of Ligand**

1.      On August 13, 2014, Fr. Emmanuel was interviewed by an outlet called
Benzinga.com.  Brooks Opp. Aff. ¶ 5.

**SEC Response:**  Undisputed.

2.      When the topic of Ligand was first raised on the interview, it was disclosed that
Fr. Emmanuel had taken a short position in Ligand's stock.  Brooks Opp. Aff. ¶ 6.

**SEC Response:**  Disputed and not supported.  The Commission disputes the facts

asserted in Paragraph 2, which are not supported by the evidence cited, as required under Fed. R.

Civ. P. 56(c) and Local Rule 56.1.  Specifically, Defendant does not mention being short on

Ligand at any point during the video of the August 13, 2014 Benzinga interview.

3.      Fr. Emmanuel's August 14 and 22, 2014 reports on Ligand discussed, *inter alia*,
Ligand's August 11, 2014 announcement that it would assume $245 million in convertible debt
to finance a $200 million share repurchase.  Affidavit of Douglas Brooks in Support of
Defendants' Motion for Summary Judgment, ECF No. 127, Ex. 23 at 1-3; Ex. 24 at 3, 5.

**SEC Response:**  Disputed.  The Commission disputes the facts as asserted in Paragraph

3, which are not supported by the exhibits cited, ECF No. 127, Exs. 23 and 24.  Defendants'

August 14, 2014 report discusses Ligand's announcement of the assumption of $225 million in

convertible debt to finance $200 million share repurchase, ECF No. 127-23 at 1-3, but the August 22, 2014 report discusses a $245 million debt issuance and a $45 million share repurchase plan for institutional investors.  ECF No. 127-24 at 3, 5.

## II.   Ligand's Discussions Mocking Fr. Emmanuel and his Beliefs and Evidencing an Intent to Prevent Fr. Emmanuel from Expressing his Opinions

4.     On June 17, 2014, John Higgins sent an email to Bruce Voss and Matt Foehr referring to Fr. Emmanuel as "lamelson" multiple times.  Brooks Opp. Aff. Ex. 4 at EPROD-SEC-LIT-E-000000106.

**SEC Response:**  Disputed in part and not material.  The Commission disputes in part Defendant's characterization of the facts asserted in Paragraph 4.  Mr. Higgins' June 17, 2014 email mentions Defendant only four times.  Of those four mentions, he typed "lemelson" in two instances and "lamelson" in two other instances.  In any event, Paragraph 4 is not material because it is not probative of any bias or malice by the Commission in bringing this case, or to any other claim or defense in this case.  It is also not material because the email does not contain any disparagement of Defendant's beliefs or an attempt to silence Lemelson as the header to this section states.

5.     On October 28, 2015, Bruce Voss sent an email to John Higgins, Charles Berkman, and Todd Pettingill that stated Fr. Emmanuel is "clearly part pit bull."  Brooks Opp. Aff. Ex. 5 at EPROD-SEC-LIT-E-000000212.

**SEC Response:**  Disputed in part and not material.  The Commission does not dispute that the email contains the words quoted.  But the Commission disputes Paragraph 4 as mischaracterizing the contents of the exhibit cited, Brooks Opp. Aff. Ex. 5.  The full quote from Mr. Voss' October 28, 2015 email is as follows, "Lemelson is clearly part pit bull and he's being called out publicly, so any tweeting or anything else by Ligand will only inflame him and put us in his crosshairs."  [*Id.* at EPROD-SEC-LIT-E-000000212.]  The context of the quote demonstrates that the quote was aimed more at discussing Defendant's aggressive position

against Ligand and not as commentary about his beliefs or as any evidence that Ligand prevented

him from expressing himself.  In any event, Paragraph 5 is not material because it is not

probative of any bias or malice by the Commission in bringing this case, or to any other claim or

defense in this case.  It is also not material because the email does not contain any disparagement

of Defendant's beliefs or an attempt to silence Lemelson as the header to this section states.

6.      On June 17, 2014, Matt Foehr sent an email to Bruce Voss, calling Fr. Emmanuel
"a quack."  Brooks Opp. Aff. Ex. 6 at EPROD-SEC-LIT-E-000000380.

**SEC Response:**  <u>Disputed in part and not material.</u>  The Commission does not dispute

that the email contains the words quoted.  But the Commission disputes Paragraph 6 as

mischaracterizing the contents of the exhibit cited, Brooks Opp. Aff. Ex. 6.  Defendant's fails to

note the context in which Mr. Foehr's July 17, 2014 email refers to Defendant, which is, as the

email states, "The fact that he puts a $0 price target [on Ligand] says it all -- he has no idea what

he's talking about."  [Id. at at EPROD-SEC-LIT-E-000000380.]  In any event, Paragraph 6 is not

material because it is not probative of any bias or malice by the Commission in bringing this

case, or to any other claim or defense in this case.  It is also not material because the email does

not contain any disparagement of Defendant's beliefs or an attempt to silence Lemelson as the

header to this section states.

7.      On August 22, 2014, Todd Pettingill sent an email to Eric Vajda and Glenn
Dourado, in which he stated "what a DB" in reference to Fr. Emmanuel.  Brooks Opp. Aff. Ex. 7
at LGND_0041208.  At his deposition, Mr. Pettingill admitted that "DB" in this email was short
for "douchebag."  Brooks Opp. Aff. Ex. 8 at 92:8-11.

**SEC Response:**  <u>Disputed in part and not material.</u>  The Commission does not dispute

that the exhibits as cited by Defendant in Paragraph 7 state what Defendant states they do, but

the Commission does dispute Defendant's characterization of Mr. Pettingill's testimony from

Brooks Opp. Aff. Ex. 8.  During his deposition, Mr. Pettingill goes on to explain that he was

upset at the time he wrote that email because believed Defendant to be putting out unfair and

misleading statements attacking Ligand.  [Pettingill Deposition 92:8-94:15.]  In any event,

Paragraph 7 is not material because it is not probative of any bias or malice by the Commission

in bringing this case, or to any other claim or defense in this case.  The Commission did not

obtain the cited materials during its investigation of Defendants (they were produced in

discovery in this matter), and Ligand did not otherwise communicate the subject matter to the

Commission during the investigation.  Declaration of Alfred Day ("Day Decl."), ¶ 3.  It is also

not material because the email does not contain any disparagement of Defendant's beliefs or an

attempt to silence Lemelson as the header to this section states.

8.     On October 28-29, 2015, Bruce Voss and Kristen Chapman engaged in an email chain, in which they referred to Fr. Emmanuel as "slimy," "a narcissistic psychopath," wrote "Forgive me, but lordy, lordy," and "does being a priest make that ok?"  Brooks Opp. Aff. Ex. 9 at EPROD-SEC-LIT-E-000000805.

**SEC Response:**  <u>Disputed in part and not material</u>.  The Commission does not dispute

the facts asserted in Paragraph 8.  The Commission does dispute the attribution of the quoted

remarks to Bruce Voss.  All of the statements cited by Defendant were made by Kristen

Chapman, who did not work at Ligand or represent Ligand as an investor relations professional,

which is clear from the context of the email when she asks Mr. Voss "Is he in [sic] one of your

clients?" [Brooks Opp. Aff. Ex. 9 at EPROD-SEC-LIT-E-000000805.]  The comments of a

person unrelated to Ligand or the Commission are not relevant to this case.  In any event,

Paragraph 8 is not material because it is not probative of any bias or malice by the Commission

in bringing this case, or to any other claim or defense in this case.  It is also not material because

the email does not contain any disparagement of Defendant's beliefs or an attempt to silence

Lemelson as the header to this section states.

9.     On November 17, 2014, Bruce Voss sent an email to Jody Burfening, in which he wrote, "BTW, Lemelson is an ordained Eastern Orthodox priest, and is constantly photographed in his priestly robes and collar.  It would be funny if it wasn't my client!"  Brooks Opp. Aff. Ex. 10 at EPROD-SEC-LIT-E-000000661.

**SEC Response:**  <u>Disputed in part and not material</u>.  The Commission does not dispute

that the exhibits as cited by Defendant in Paragraph 9 state what Defendant states they do, but

the Commission does dispute Defendant's characterization of the exhibit, Brooks Opp. Aff. Ex.

10.  The quoted email is focused on describing Ligand's decision to not respond publicly to any

of Defendant's reports or commentary earlier in 2014.  In an event, Paragraph 9 is not material

because it is not probative of any bias or malice by the Commission in bringing this case, or to

any other claim or defense in this case.  It is also not material because the email does not contain

any disparagement of Defendant's beliefs or an attempt to silence Lemelson as the header to this

section states.

10.     From June 19-20, 2014, John Higgins engaged in an email chain with Matthew
Perry, Mark Lampert, and Kanishka Pothula in which Matthew Perry wrote, "We may want to
enter into a group with God. Any thoughts you have are welcome. We want to pray for the
success of this holy company. Thank you for being the true voice."  To which Mr. Higgins
replied: "Every time I see the report, I feel I should go to the River Jordan to be cleansed."
Brooks Opp. Aff. Ex. 11 at LGND_0037566.

**SEC Response:**  <u>Disputed in part and not material</u>.  The Commission disputes in part

exhibit Brooks Opp. Aff. Ex. 11 as cited by Defendant in Paragraph 10 for mischaracterizing the

content of Mr. Higgin's June 19-20, 2014 email thread.  It is not relevant or material what Mr.

Perry said about Defendant's report in his email to Mr. Higgins because he does not work at

Ligand.  The Commission did not obtain the cited materials during its investigation of

Defendants (they were produced in discovery in this matter), and Ligand did not otherwise

communicate the subject matter to the Commission during the investigation.  Day Decl., ¶3.  In

any event, Paragraph 10 is not material because it is not probative of any bias or malice by the

Commission in bringing this case, or to any other claim or defense in this case.

11.     On October 28, 2015, Todd Pettingill sent an email to Bruce Voss commenting on
Fr. Emmanuel's house as it appeared in a video interview in the Wall Street Journal stating, "I
now covet his earthly possessions.  Do you think he would give them to me, because they mean
nothing to him?"  Brooks Opp. Aff. Ex. 12 at EPROD-SEC-LIT-E-000000210.

**SEC Response:** <u>Undisputed but not material</u>.  Paragraph 11 is not material because it is not probative of any bias or malice by the Commission in bringing this case, or to any other claim or defense in this case.

12.     On October 27, 2015, Bruce Voss sent an email to John Higgins and Todd Pettingill forwarding a Wall Street Journal article about Fr. Emmanuel and stating, "I wish they [*sic*] were more dirt on him in this article then [*sic*] simply saying he's pushing it by being both a priest and a wealthy hedge fund manager."  Brooks Opp. Aff. Ex. 13 at EPROD-SEC-LIT-E-000000217.

**SEC Response:** <u>Undisputed but not material</u>.  Paragraph 12 is not material because it is not probative of any bias or malice by the Commission in bringing this case, or to any other claim or defense in this case.  It is also not material because the email does not contain any disparagement of Defendant's beliefs or an attempt to silence Lemelson as the header to this section states.

13.     On September 23, 2014, Bruce Voss sent an email to Matt Foehr discussing research into Fr. Emmanuel's background, in which Mr. Voss sent an article about a Jerome Lemelson engaging in misconduct and stating, "if Jerome is a relative then Gregory comes from a family of crooks."  Brooks Opp. Aff. Ex. 14 at EPROD-SEC-LIT-E-000000626.

**SEC Response:** <u>Undisputed but not material</u>.  Paragraph 13 is not material because it is not probative of any bias or malice by the Commission in bringing this case, or to any other claim or defense in this case.  It is also not material because the email does not contain any disparagement of Defendant's beliefs or an attempt to silence Lemelson as the header to this section states.

14.     On October 30, 2015, Glenn Dourado emailed J.D. Pipkin about an entity called "Laidlaw" and stated, "[m]aybe they are like Lemelson and just get told by a higher power what to invest in."  Brooks Opp. Aff. Ex. 15 at LGND_0068636.

**SEC Response:** <u>Undisputed but not material</u>.  Paragraph 14 is not material because it is not probative of any bias or malice by the Commission in bringing this case, or to any other claim or defense in this case.  The Commission did not obtain the cited materials during its investigation of Defendants (they were produced in discovery in this matter), and Ligand did not

otherwise communicate the subject matter to the Commission during the investigation.  Day

Decl., ¶3.  It is also not material because the email does not contain any disparagement of

Defendant's beliefs or an attempt to silence Lemelson as the header to this section states.

15.     On June 17, 2014, John Higgins sent an email to Bruce Voss and Matt Foehr, stating, "As for USA Today.  I think you or Keith should call and UNDRESS them."  Brooks Opp. Aff. Ex. 16 at EPROD-SEC-LIT-E-000000909.

**SEC Response:**  Disputed in part and not material.  The Commission does not dispute

that Brooks Opp. Aff. Ex. 16 contains the quote Defendants cite in Paragraph 15, but does

dispute Defendants' characterization of the email.  A plain reading of Mr. Higgins' June 17,

2014 email demonstrates that Ligand's intent in calling *USA Today* would have been to protest

their decision to print Defendant's report because it contained clear misstatements about the

Ligand (*i.e.*, that the report valued Ligand at $0/share), not as an attempt to suppress Defendant

or his report in any way.  Defendants also fails to mention that, in that same email, Mr. Higgins

also states, "maybe we just let it pass.  that might still be best...Please put the A-team and

thinking on this[,]" meaning that the email is not evidence of whether Ligand called *USA Today*

in the first place.  In any event, Paragraph 15 is not material because it is not probative of any

bias or malice by the Commission in bringing this case, or to any other claim or defense in this

case.  It is also not material because the email does not contain any disparagement of

Defendant's beliefs or an attempt to silence Lemelson as the header to this section states.

16.     On June 20, 2014, Matt Foehr wrote an email to Bruce Voss and John Higgins, stating "I'd also be interested in your thoughts of if it's worth contacting SeekingAlpha to block Lemelson."  Brooks Opp. Aff. Ex. 17 at EPROD-SEC-LIT-E-000000412.

**SEC Response:**  Undisputed but not material.  The Commission does not dispute

facts asserted in Paragraph 16, but notes that they are not material because there is no evidecen to

suggest that Ligand did contact SeekingAlpha.  A plain reading of Brooks Opp. Aff. Ex. 17 also

shows that it does not contain any evidence that Ligand attempted to suppress Defendant or his

report:  in the context of the email, Mr. Voss does not advise Ligand to ask that SeekingAlpha

block Defendant, but rather provides a past example where another client contacted

SeekingAlpha to point out errors in a post.  In any event, Paragraph 16 is not material because it

is not probative of any bias or malice by the Commission in bringing this case, or to any other

claim or defense in this case.

17.     On August 18, 2014, John Higgins wrote an email to Bruce Voss, Nishan de
Silva, Matt Foehr, Erika Luib, and Charles Berkman, discussing a publication about Fr.
Emmanuel in BioWorld.  John Higgins wrote, "Please take them to task on this…. This should
go all the way to the top of the Editor staff at BioWorld."  Later in that same email chain, on the
following day, Bruce Voss summarized a conversation he had with a representative of BioWorld.
In the course of that summary, Mr. Voss wrote: "He included Lemelson in the story because it
'seemed like another aspect of the story … another opinion" (ellipses in original); "He said 'I
rely on readers to sort these things out [the opinions of others]" (brackets in original); "he says
he's sorry he included mention, is sorry you're disappointed in the article and won't write
anything about Ligand/Lemelson in the future ('I won't give him anymore space')"
(parenthetical in original); "After getting him to agree not to write anything on Lemelson
regardless of what he hears, he's going to call Lemelson to see if as a journalist he can learn
more about him, his fund, his position, his alliances, etc. and will report back to me."  Brooks
Opp. Aff. Ex. 18 at EPROD-SEC-LIT-E-000001216- EPROD-SEC-LIT-E-000001218.

SEC Response:  Undisputed but not material.  Paragraph 17 is not material because it is

not probative of any bias or malice by the Commission in bringing this case, or to any other

claim or defense in this case.

18.     On June 24, 2014, John Higgins emailed Matt Foehr and Bruce Voss regarding
Fr. Emmanuel and wrote, "Bruce please let me know your thoughts on my stock surveillance
question."  Bruce Voss replied, "Regarding stock surveillance, it's not what it once was.  It used
to be you would get pretty good information because the surveillance firms were bribing people
at the depository trust companies.  They got caught and all that has stopped.  Now you pay a lot
of money and don't get much, if any intelligence out of them.  If we'd like to consider it, there's
always the option of engaging a private investigator to check out Emmanuel, Lemelson Capital
and Lantern."  Brooks Opp. Aff. Ex. 19 at EPROD-SEC-LIT-E-000001019- EPROD-SEC-LIT-
E-000001020.

SEC Response:  Undisputed and not material.  The Commission does not dispute that the

email contains the words quoted, but notes that neither Ligand nor Mr. Voss' investor relations

firm paid for any stock surveillance or hired a private investigator to investigate Defendants (Day

Decl., Ex. C (Higgins Depo.) at 174:24-176:3, Day Decl., Ex. D (Voss Depo.) at 204:4-205:2),

making the exhibit as cited by Defendants immaterial.  Paragraph 18 is also not material because

it is not probative of any bias or malice by the Commission in bringing this case, or to any other

claim or defense in this case.

19.    On July 9, 2014, John Higgins emailed Matt Foehr, Charles Berkman, Nishan de
Silva, Bruce Voss, and Todd Pettingill, attaching Lemelson Capital Management's Wikipedia
page and wrote, "Should we try to edit this, or otherwise get Wikipedia to delete it?  I am not
familiar with how that works or if Ligand will have visibility in the process.  Are their [*sic*] firms
we can hire to edit wikileaks?  Should we have investors edit the page?"  Brooks Opp. Aff. Ex.
20 at EPROD-SEC-LIT-E-000001110.

**SEC Response:**  <u>Undisputed and not material</u>.  The Commission does not dispute that the

email contains the words quoted, but the Commission notes that neither Ligand nor Mr. Voss'

investor relations firm edited or had anyone edit any portion of Defendants' Wikipedia pages

(Day Decl., Ex. C (Higgins Depo.) at 183:10-184:9; Ex. D (Voss Depo.) at 221:11-223:11; Ex. E

(Foehr Depo.) at 137:3-15), making the fact cited by Defendants immaterial.  Paragraph 19 is

also not material because it is not probative of any bias or malice by the Commission in bringing

this case, or to any other claim or defense in this case.

20.    On August 22, 2014, Glenn Dourado wrote an email to Todd Pettingill and Eric
Vajda discussing Fr. Emmanuel's reports in which he stated, "Unfortunately, he's winning
because the stock keeps going down.  He needs to be silenced for good.  I'm not saying anything
specific (for fear it could be misconstrued)."  Todd Pettingill replied, "I dunno [*sic*], correlation
doesn't always equal causality.  I think he's behind on everything and just trying to make it look
like he's moving the stock.  Sure it moves a little when he puts out these garbage reports, but for
the most part (with the exception of his first one), some moron's [*sic*] listen and sell, but
everyone else just ignores him.  The stock went up after he issued his last two."  Brooks Opp.
Aff. Ex. 21 at LGND_0041211.

**SEC Response:**  <u>Undisputed but not material</u>.  The Commission does not dispute that the

email contains the words quoted, but the Commission notes that Brooks Opp. Aff. Ex. 21

because it does not provide evidence that Ligand attempted to suppress Defendant or his report,

thereby making the exhibit immaterial.  In his deposition, Mr. Pettingill describe his statement

that Defendant "needs to be silenced for good" as a joke in response to how inaccurate he

thought Defendants' reports were before Ligand had a chance to speak to any Ligand investors

and saw that the reports influenced them.  (Day Decl., Ex. F (Pettingill Depo.) at 132:6-135:16).

Paragraph 20 is also not material because it is not probative of any bias or malice by the

Commission in bringing this case, or to any other claim or defense in this case.  The Commission

did not obtain the cited materials during its investigation of Defendants (they were produced in

discovery in this matter), and Ligand did not otherwise communicate the subject matter to the

Commission during the investigation.  Day Decl., ¶ 3.

### III.    Ligand Lobbied the Commission to Bring an Enforcement Action Against Fr. Emmanuel with the Assistance of Counsel who has Connections to the Commission and Received Preferential Treatment During the Investigation

21.     On October 7, 2014, John Higgins wrote an email to the Board of Directors for
Ligand, stating "With the recent stock weakness, it is obvious we continue to be impacted by the
Lemelson shorting and related reports.  Selling is leading to more technical selling and shorting.
We continue to work with our attorneys to lean on the SEC to get an injunction on Lemelson's
activities."  Brooks Opp. Aff. Ex. 22 at LGND_0048604.

**SEC Response:**  Undisputed but not material.  The Commission does not dispute the

contents of Brooks Opp. Aff. Ex. 22 as cited by Defendants, but it is not material because it is

not evidence that Ligand received preferential treatment by the Commission.  Paragraph 21 is

also not material because it is not probative of any bias or malice by the Commission in bringing

this case, or to any other claim or defense in this case.  The Commission did not obtain the cited

materials during its investigation of Defendants (they were produced in discovery in this matter),

and Ligand did not otherwise communicate the subject matter to the Commission during the

investigation.  Day Decl., ¶ 3.

22.     The presentation included pictures of Fr. Emmanuel in his priestly robes.  ECF
No. 127, Ex. 36 at LGND_0080698, LGND_0080701.

**SEC Response:**  Undisputed but not material.  The Commission does not dispute that the

Ligand presentation Defendants cite in Paragraph 22 include pictures of Defendant in his priestly

robes, but disputes this as immaterial because the photos are not evidence that Ligand lobbied the

Commission or received any preferential treatment during the course of its investigation into

Defendants' conduct.  The Commission notes that at all hearings and depositions he attended in

this matter, Lemelson appeared in his clerical collar.

23.     None of the Amvona Fund investors are or have been Fr. Emmanuel's
parishioners.  Affidavit of Father Emmanuel Lemelson in Support of Defendants' Opposition to
Plaintiff's Motion for Partial Summary Judgment ("Lemelson Opp. Aff.") ¶ 2.

**SEC Response:**  Undisputed but not material.  Undisputed, but not material because the

Commission did not make any claims related to affinity fraud or allege that any of Defendants'

investors were Lemelson's parishioners.

24.     Bradley Bondi used to work for the Commission on the executive staff located in
Washington, D.C.  *See* ECF No. 127, Ex. 38.

**SEC Response:**  Undisputed.  .

25.     Ligand did not take any steps to verify its accusations of Fr. Emmanuel
misrepresenting the performance of the fund.  Brooks Opp. Aff. Ex. 23 at 131:1-11; 137:16-
139:10; Brooks Opp. Aff. Ex. 3 at 223:24-226:13.  For example, Matt Foehr was asked at
deposition, "Are you aware of anyone at Ligand taking any steps to verify the truth or falsity of
the statements set forth on slide 28?" to which he responded, "I don't know."  Brooks Opp. Aff.
Ex. 23 at 138:24-139:3.  Mr. Foehr was then asked, "Sitting here today, do you know whether
these are true or false [in substance]?" to which he responded, "I don't know."  Brooks Opp. Aff.
Ex. 23 at 139:4-10.  Similarly, John Higgins was asked at his deposition, "Sitting here today, do
you believe that any of the statements contained on slide 27 that Fr. Lemelson made are untrue?"
to which he responded, "I – I do not know if these statements are true or not."  Brooks Opp. Aff.
Ex. 3 at 226:9-13.

**SEC Response:**  Disputed in part, not supported, and immaterial.  The Commission does

not dispute the testimony is cited accurately, but disputes that the testimony supports the

conclusion that "Ligand did not take any steps to verify its accusations."  The facts as asserted in

Paragraph 25 are not material to any claim or defense in this action because the Commission

does not allege that the performance of The Amvona Fund was inaccurate.

26.     All of Amvona's audited reports from 2012-2016, which include full audited
returns, were publicly available on Lemelson Capital Management's website.  Lemelson Opp.
Aff. ¶ 3.

**SEC Response:**  Undisputed but not material.   The facts as asserted in Paragraph 26 are

not material to any claim or defense in this action because the Commission does not allege that

the performance of The Amvona Fund was inaccurate.

27.     Also, on June 8, 2015, then-Member of Congress, Duncan Hunter, sent a letter to
the Chair of the Securities and Exchange Commission, Mary Jo White, requesting the
Commission investigate Fr. Emmanuel.  Brooks Opp. Aff. Ex. 24 at LGND_0080800.  Duncan
Hunter was later sentenced to 11 months in prison for stealing campaign funds.  Brooks Opp.
Aff. Ex. 25.

**SEC Response:**  Undisputed but not material.  Paragraph 27 is not material because it is

not relevant to any claim or defense in this litigation.

28.     As stated in the Commission's Investor Bulletin the Commission's policy is to
neither confirm nor deny the existence of ongoing investigations.  Specifically, the Commission
stated that: "Because SEC investigations are generally nonpublic, Enforcement will not confirm
or deny the existence of an investigation unless the SEC brings charges against a person or entity
involved.  Enforcement also will not provide updates on the status of any pending SEC
investigation."  Brooks Opp. Aff. Ex. 26.

**SEC Response:**  Undisputed but not material.  The Commission may disclose

information concerning an investigation "to any persons during the course of any inquiry,

examination, or investigation conducted by the SEC's staff, or in connection with civil litigation,

if the staff has reason to believe that the person to whom the record is disclosed may have further

information about the matters related therein, and those matters appear to be relevant at the time

to the subject matter of the inquiry."  Day Decl., Ex. G (Commission R. 30(b)(6) Depo.), at

134:10-135:16.

29.     Despite this policy, on September 15, 2017, Mr. Bondi, on behalf of Ligand,
emailed Scott Friestad, Virginia Rosado-Desilets, and Sonia Torrico of the Commission and
wrote: "We would appreciate an opportunity to speak with you by phone next week **about the
status of the investigation.**"  (emphasis added).  On September 18, 2017, Ms. Rosado-Desilets
replied, "Unfortunately we cannot share information about our nonpublic investigation in the
matter of Trading in the Securities of Ligand Pharmaceuticals, Inc. beyond what we shared last
time, *i.e.*, **that the investigation is ongoing**."  (emphasis added).  The Commission and Ligand's
counsel then scheduled a time to have a telephone call.  Brooks Opp. Aff. Ex. 27 at E-PROD-
SEC-LIT-E-001189503- E-PROD-SEC-LIT-E-001189504.

**SEC Response:**  <u>Undisputed but not material</u>.  The Commission may disclose

information concerning an investigation "to any persons during the course of any inquiry,

examination, or investigation conducted by the SEC's staff, or in connection with civil litigation,

if the staff has reason to believe that the person to whom the record is disclosed may have further

information about the matters related therein, and those matters appear to be relevant at the time

to the subject matter of the inquiry."  Day Decl., Ex. G (Commission R. 30(b)(6) Depo.), at

134:10-135:16.

30.    Between September 16-18, 2017, the user that created the Wikipedia page for Mr.
Bondi, created three pages: one for Mr. Bondi and two for the Co-Heads of Enforcement for the
Securities and Exchange Commission.  This user had never created a Wikipedia page before
September 2017.  This Wikipedia user has created only one additional page for a former U.S.
naval officer.   Brooks Opp. Aff. Ex. 28; Brooks Opp. Aff. ¶ 31.

**SEC Response:**  <u>Undisputed but not material</u>.  The Commission has no independent

knowledge regarding the facts asserted in Paragraph 30, and has not reason to dispute the, but the

cited exhibit is not material because it is not probative of any contact between Mr. Bondi and the

Commission or anyone else related to this litigation, and is therefore not relevant to any claim or

defense in this litigation.  Further, the exhibit does reveal the identity of the user who made the

Wikipedia edits and, contrary to Defendant's implication in Paragraph 30, does show the user

editing a number of other pages unrelated to Mr. Bondi or the Commission.

31.    On March 18, 2016, Bloomberg published an article titled, "*Hedge Fund Priest's
Trades Probed by Wall Street Cop.*"  The article began by stating, "[a] priest who sidelines as a
hedge-fund manager is being investigated by U.S. regulators for possible stock manipulation,
prompting scrutiny of trading skills that the cleric has described as a 'gift from God,' **according
to people with knowledge of the matter**.  The Securities and Exchange Commission is
examining whether the Reverend Emmanuel Lemelson of Massachusetts made false statements
about companies he was shorting, **said the people who asked not to be named because the
probe isn't public**."  Brooks Opp. Aff. Ex. 29.

**SEC Response:**  <u>Undisputed but not material</u>.  The Commission does not dispute that

Brooks Opp. Aff. Ex. 29 contains the quotes cited by Defendants.  The fact is immaterial because

it is not evidence probative of any claim or defense in this litigation, particularly as the article

does not indicate that the Commission was the source of any information in the article. Further,

the Commission's 30(b)(6) deponent stated that this information did not come from the

Commission. Day Decl., Ex. G (Commission R. 30(b)(6) Depo.), at 45:14-46:16.

32.    During the course of the investigation, Fr. Emmanuel was deposed on July 20-22,
2016, for an approximate total of 27 hours. Brooks Opp. Aff. Exs. 30-32.

**SEC Response:** <u>Disputed in part and not material</u>.  The Commission disputes the facts

as asserted by Paragraph 32, though they are not material to this motion. Defendant was not

deposed on July 20-22, 2016, because the Commission's investigative testimony is not subject to

the Rules of Civil Procedure. The duration of questioning of Lemelson during the course of the

investigation is not relevant to any claim or defense in this litigation.

33.    During the July 22, 2016 deposition, the Commission questioned Fr. Emmanuel
about one of his emails and asked, "Gandhi and the son of God. Are you comparing yourself to
them?" Brooks Opp. Aff. Ex. 32 at 904:21-22. The Commission then continued this line of
questioning by asking, "Did Socrates, Martin Luther King, Gandhi or the son of God have a
financial incentive to cause investors to sell stock in a particular company to bring the price
down?" Brooks Opp. Aff. Ex. 32 at 905:8-11.

**SEC Response:** <u>Disputed in part and not material</u>.  The Commission does not dispute

that quoted words appear in the testimony. However, the Commission disputes the facts asserted

in Paragraph 33 as mischaracterizing Defendant's investigative testimony by taking the quoted

portion out of context. Read in context, the full line of questioning demonstrates that Defendant

was asked to provide details about an email in which he appeared to compare himself to activist

investors like Bill Ackman, Michael Burry, and Harry Markopolos, as well as to Ghandi, Jesus,

and Martin Luther King, Jr., for "ruffling feathers" with his "true" reports about Ligand and

other topics. Day Decl., Ex. H (Lemelson Inv. Test.) at 903:4-905:12; Ex. I  Paragraph 33 is not

material to this motion and does not provide evidence that the Commission had any bias against

Defendant for his beliefs.

34.    Fr. Emmanuel's current counsel, Mr. Brooks, requested a meeting with the
Commission prior to the Commission filing a complaint with a novel Investment Advisers Act

claim that had not been addressed in the prior Wells submission process. The Commission denied Mr. Brooks' request for a meeting. The Commission stated that it was denying Mr. Brooks' meeting request, because Fr. Emmanuel's prior counsel had already been granted a meeting with the Commission. Brooks Opp. Aff. ¶ 36.

**SEC Response:** Disputed in part and not material. The Commission does not dispute

that Defendant's current counsel was not granted a *second* meeting as asserted in Paragraph 32,

but does the dispute the reason why he was denied. When asked why Defendant's current

counsel was denied this second meeting during the Commission's 30(b)(6) deposition, the

Commission's representative did not provide a response because doing so would have revealed

attorney-client privileged communications and/or attorney work product. D. 123-14 (Ex. 13,

Becker Dep.) at 73:14-74:12. The Commission's Enforcement Manual specifically states, "A

Wells recipient generally will not be accorded more than one post-Wells meeting." D. 123-11 at

22. Defendants got neither better nor worse treatment than the Commission's policies dictate.

This fact is not probative of any claim or defense in this litigation.

## IV.   The Complaint Contained a Number of Errors, Some of Which Were Copied Directly from Ligand's Presentations

35.    In its original Complaint, the Commission purported to quote Fr. Emmanuel's August 22, 2014 report and quoted the following language: "'common shareholders could be wiped out almost entirely without notice.'" ECF No. 127, Ex. 16 ¶ 28.

**SEC Response:** Undisputed.

36.    This quote is not from the August 22, 2014 report that Fr. Emmanuel published, but rather appears in a draft report that was produced in discovery. *See* ECF No. 127, Ex. 24.

**SEC Response:** Undisputed but not material. Not disputed that this language was taken

from the version of the report that Defendants produced to the SEC. The Commission quoted

from a version of the report Lemelson identified in his investigate testimony (that Defendants

now claim was a draft) and which contained nearly identical language. Day Decl., Ex. H

(Lemelson Inv. Test.) at 275:4-276:13. Further, the facts stated in Paragraph 36 are not material

because it is not relevant to any claim or defense in this litigation.

37.     Nevertheless, the Commission repeated this same exact allegation in its Amended Complaint.  ECF No. 127, Ex. 7 ¶ 28.

**SEC Response:**  Undisputed but not material.  See response to Paragraph 36.

38.     In the original Complaint, the Commission alleged that Ligand's stock price was trading at over $250 per share.  ECF No. 127, Ex. 16 ¶ 8.

**SEC Response:**  Undisputed.

39.     During the course of this litigation, Ligand's stock was as high as $278.62 per share (on October 1, 2018), but has dropped as low for the day as $57.24 per share (on March 17, 2020), which is a decrease of nearly 80%.  Brooks Opp. Aff. Ex. 33 at 4, 12.

**SEC Response:**  Undisputed but not material.  Not disputed that Ligand's common stock

traded as high as $278.62 on October 1, 2018 and as low as $57.24 on March 17, 2020, a

decrease of 79.4%.  Ligand's stock price during the course of this litigation, four or more years

after the relevant time period of the Complaint, is not relevant to any claim or defense in this

litigation.

## V.     Subsequent Pleadings Relevant to the Issue of Selective Enforcement

40.     In response to a notice for deposition of the Commission pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Commission filed a Motion for Protective Order.  Brooks Opp. Aff. Ex. 34.

**SEC Response:**  Undisputed and not material.  Motion practice during the litigation of

this case is not relevant to any claim or defense in this case, particularly because it is not

probative of the Commission's intent in bringing this case.

41.     Magistrate Judge Cabell denied the Commission's Motion, and found there was an adequate factual basis to permit discovery on the issues of bias and selective enforcement.  Brooks Opp. Aff. Ex. 35.

**SEC Response:**  Disputed in part and not material.  The Commission disputes

Defendants' inaccurate characterization of Magistrate Judge Cabell's order denying the

Commission's motion.  Magistrate Judge Cabell's order held that the Defendants had *alleged*

enough facts, "even if barely so," to warrant discovery on this issue.  Brooks Opp. Aff. Ex. 35.

Further, motion practice during the litigation of this case is not relevant to any claim or defense in this case, particularly as it is not probative of the Commission's intent in bringing this case.

42.     The Commission then filed a motion for a more definite statement of Defendants' selective enforcement defense.  Brooks Opp. Aff. Ex. 36.

**SEC Response:**  Undisputed but not material.  Motion practice during the litigation of this case is not relevant to any claim or defense in this case, particularly as it is not probative of the Commission's intent in bringing this case.

43.     This Motion was also denied by Magistrate Judge Cabell.  Brooks Opp. Aff. Ex. 37.

**SEC Response:**  Undisputed but not material.  Motion practice during the litigation of this case is not relevant to any claim or defense in this case, particularly as it is not probative of the Commission's intent in bringing this case.

44.     At Fr. Emmanuel's October 16, 2019 and November 12, 2019 depositions, the Commission asked a number of questions about Fr. Emmanuel's religious affiliation, his priesthood, his rank, his bishop, and his history of service.  Brooks Opp. Aff. Ex. 38 at 14:13-16:23; Brooks Opp. Aff. Ex. 39 at 7:20-21:20, 27:19-47:1.

**SEC Response:**  Undisputed but not material.  Asking questions about a witness's background and vocations is routine and does not reflect and bias.

45.     The Commission repeated an allegation from another individual that Fr. Emmanuel was not a Greek Orthodox priest and told counsel for Defendants that they intended to subpoena information about this allegation.  Brooks Opp. Aff. Ex. 40 at 3-4; Brooks Aff. ¶ 44.

**SEC Response:**  Disputed in part.  Undisputed that, in the Commission's opposition to Defendants' motion for sanctions and to compel documents, the Commission informed the Court that a representative of the Greek Orthodox Metropolis of Boston had informed the Commission that Defendant Lemelson was not a Greek Orthodox priest.  ECF No. 64 (Opposition) at 2-6 & 65 (Day Decl.).  Undisputed that counsel for the Commission informed counsel for Defendants that the Commission intended to issue a subpoena for certain documents to the Greek Orthodox Metropolis of Boston.  Disputed that these facts establish that the Commission "repeated" an

allegation, insofar as it implies that the Commission in reporting the allegation endorsed it. The Commission's inquiry about the matter did not and does not equate to the Commission making that allegation.

46.     Eventually Fr. Emmanuel had to present evidence to this Court to prove this allegation was false and Fr. Emmanuel is, in fact, a duly ordained Greek Orthodox priest. Brooks Opp. Aff. Ex. 41 at ¶ 18-19.

**SEC Response:** Disputed in part and not material. As the Court will recall, Defendant Lemelson had to present evidence to this Court about his status as a Greek Orthodox priest as a result of Defendant and his counsel improperly threatening a Greek Orthodox priest and the Greek Orthodox Church with costly litigation if the priest did not submit an affidavit swearing to certain facts dictated by Defendant and his counsel and recant other statements not consistent with Lemelson's dictates. Thus, this fact is immaterial, as it shows nothing about the Commission's motive or intent, and is entirely related to improper behavior by Defendant and his counsel, and not the Commission.

47.     Despite this case being an alleged claim for market manipulation, the Commission has referenced Ligand as the "victim" in a number of pleadings, including its Memorandum in Support of its Motion for Partial Summary Judgment. *See, e.g.,* ECF No. 51 at 1-2; ECF No. 54 at 1-5; ECF No. 69 at 5; ECF No. 98 at 2; ECF No. 122 at 12, 13, 15.

**SEC Response:** Disputed in part and not material. The Commission does not dispute that it has characterized Ligand as *a* victim of Defendants' fraud, as the Commission believes Ligand was harmed as the result of the Defendants' fraudulent scheme, both economically and reputationally. Buyers and sellers of Ligand stock during the relevant time period are also victims of Defendants' fraudulent schemes. The Commission disputes that it has referred to Ligand as "the" victim, and Defendants' cited sources fail to establish that the Commission has used that construction. The Commission's reference to Ligand as a victim of Defendants' fraudulent scheme is not material because it is not probative of the Commission's motive or intent and is not otherwise relevant to any claim or defense in this litigation.

## VI.     Other Financial Analyst Reports Published Stating that Ligand Stock was Overvalued

48.     On January 4, 2013, an entity called Cantor Fitzgerald published analysis regarding Ligand, titled "Lowering Promacta HCV Estimates; Downgrading to HOLD and $23 PT from $28."  Brooks Opp. Aff. Ex. 42 at LGND_0000193-98.

**SEC Response:**  Undisputed.

49.     On January 4, 2013, Ligand's stock price decreased by over 5%.  CITE [sic]

**SEC Response:**  Disputed, unsupported, vague, and not material.  Defendants submitted no evidence supporting this allegation, which is untrue and also not material.

50.     On January 30, 2018, Alan Biloski published analysis regarding Ligand titled, "Ligand Pharma Is a Short."  The report disclosed that Mr. Biloski had a short position in Ligand and that the report contained his opinions.  Brooks Opp. Aff. Ex. 43 at 7.

**SEC Response:**  Undisputed but not material.  The Biloski report is not material, as it was published almost four years after the relevant time period in the Complaint, and months after the Commission investigative staff notified Defendants that they intended to recommend charges to the Commission (May 25, 2017).  Thus, the Biloski report is not relevant to whether Defendants were singled out from a group of similarly situated others.

51.     On January 30, 2018, Ligand's stock price decreased by around 2%.  Brooks Opp. Aff. Ex. 33 at 16.

**SEC Response:**  Disputed, not supported, vague, and not material.  It is unclear what Defendants mean by a price decrease "on January 30."  The cited document shows that the price of Ligand's common stock decreased on January 30 from an opening price of $166.77 to a low of $164.05, a 1.6% decrease, before increasing to a closing price of $164.86.  The decrease of Ligand's share price on this date, almost four years after the relevant time period in the Complaint, has no relevance to this litigation.

52.     On April 4, 2018, Seven Corners Capital Management published analysis regarding Ligand titled, "Ligand's Market Valuation Does Not Withstand Scrutiny."  Brooks Opp. Aff. Ex. 44.  Part of this analysis included criticism of Ligand's $245 million convertible note offering in August 2014, and questioning whether Ligand had adequate "real dollars" to pay this debt when it came due.  Brooks Opp. Aff. Ex. 44 at 11-12.  The report disclosed that Seven

Corners Capital Management had a short position in Ligand and that the report contained his opinions.  Brooks Opp. Aff. Ex. 44 at 19.

**SEC Response:**  <u>Disputed in part and not material.</u>  The Commission does not dispute

that on April 4, 2018, Seven Corners Capital Management published analysis regarding Ligand

titled, "Ligand's Market Valuation Does Not Withstand Scrutiny."  Disputed that the analysis

criticizes Ligand's 2014 debt offering; the report criticizes the accounting for the debt, not the

offering itself.  Disputed that the report questions whether Ligand had adequate "real dollars" to

pay the debt when it came due.  Not disputed that the report disclosed that the author had a short

position in Land and that the report contained the opinions of the author.  The Seven Corners

report is not material, as it was published almost four years after the relevant time period in the

Complaint, and months after the Commission investigative staff notified Defendants that they

intended to recommend charges to the Commission (May 25, 2017).  Thus, the Seven Corners

report is not relevant to whether Defendants were singled out from a group of similarly situated

others.

53.     On April 4, 2018, Ligand's stock price increased about 1%.  Brooks Opp. Aff. Ex. 33 at 15.

**SEC Response:**  <u>Disputed, not supported, vague, and not material.</u>  It is unclear what

Defendants' are referencing in this statement.  On April 4, the price of Ligand's common stock

opened at $156.45 and increased to $161.03 (2.9%) before closing at $160.59.  The increase of

Ligand's share price on this date, almost four years after the relevant time period in the

Complaint, has no relevance to this litigation.

54.     On April 24, 2018, Lakewood Capital Management disclosed that it recently initiated a short position in Ligand.  Brooks Opp. Aff. Ex. 45.

**SEC Response:**  <u>Disputed, not supported, and not material.</u>  The documents cited reflect

a short description that appears to come from a website called "The Fly" that claims that

"Lakewood Capital Management disclosed in its quarterly letter that it recently initiated short

positions in both iRythm Technologies (ITRC) and Ligand Pharmaceuticals (LGND)."  The

exhibit cited does not include the purported quarterly letter or any confirmation from Lakewood

Capital.  The Commission is not aware of the veracity of this unverified online claim, and

Defendants' have presented no reliable or admissible evidence to support it.  This statement also

has no relevance to this litigation, as it purports to be a statement almost four years after the

relevant time period in this litigation.  This fact is also immaterial because Defendants have

provided no evidence that Lakewood Capital made any statements or omissions about its short

position, in the way that Defendants did.

     55.     On April 24, 2018, Ligand's stock price decreased by over 3%.  Brooks Opp. Aff.
Ex. 33 at 14.

     **SEC Response:**  <u>Disputed in part as vague, and not material</u>.  On April 24, 2018,

Ligand's stock price opened at $167.47, hit a low of $161.06 (a decrease of 3.8%), and closed at

$161.77.  The decrease in Ligand's share price on this date, almost four years after the relevant

time period in this litigation, has no relevance to this litigation.

     56.     On August 7, 2018, Favus Institutional Research LLC published analysis
regarding Ligand titled, "Ligand (LGND: Sell Recommendation)."  Brooks Opp. Aff. Ex. 46.
Part of this analysis theorized that new drugs in the liver treatment area would drive down
Promacta sales.  Brooks Opp. Aff. Ex. 46 at 1.  The report disclosed that Favus held no interest
in Ligand and that the report contained the author's views.  Brooks Opp. Aff. Ex. 46 at 8.

     **SEC Response:**  <u>Undisputed but not material</u>.  The Favus report is not material, as it was

published almost four years after the relevant time period in the Complaint, and months after the

Commission investigative staff notified Defendants that they intended to recommend charges to

the Commission (May 25, 2017).  Thus, the Favus report is not relevant to whether Defendants

were singled out from a group of similarly situated others.

     57.     On August 7, 2018, Ligand's stock price increased by almost 9%.  Brooks Opp.
Aff. Ex. 33 at 13.

**SEC Response:**  Disputed, not supported, vague, and not material.  On August 7, 2018, Ligand's stock price opened at $235 and hit a high of $254.24 (an increase of 8.1%) before closing at $247.02.  The increase in Ligand's share price on this date, almost four years after the relevant time period in this litigation, has no relevance to this litigation.

58.     On January 16, 2019, Citron Research published analysis regarding Ligand titled, "Citron Publishes the Smoking Gun on Ligand Pharmaceuticals."  Brooks Opp. Aff. Ex. 47.  The report included disclaimers that the views expressed in the report were the opinions of Citron. Brooks Opp. Aff. Ex. 47 at 23.

**SEC Response:**  Disputed, not supported, and not material.  The Commission has no basis on which to verify the date on which Ex. 47 was published, or even that it was published, based on the information provided in Ex. 47.  Likewise, while the authenticating affidavit indicates that the article is from January 2019, it does not provide a specific date of January 16, nor does it say where or how the article was published.  The Commission does not dispute that Ex. 47 purports to be an analysis by Citron Research titled "Citron Publishes the Smoking Gun on Ligand Pharmaceuticals," and that the document contains a disclaimer that the "research and reports made available by Citron reflect express [sic] the opinion of the applicable Citron Entity as of the time of the report only."  The Citron report is not material, as it was published more than four years after the relevant time period in the Complaint, and months after the Commission filed the Complaint (Sept. 12, 2018).  Thus, the Citron report is not relevant to whether Defendants were singled out from a group of similarly situated others.

59.     On January 16, 2019, Ligand's stock price decreased by over 16%.  Brooks Opp. Aff. Ex. 33 at 10.

**SEC Response:**  Disputed, not supported, vague, and not material.  On January 16, 2019, Ligand's stock price opened at $130.50, hit a low of $98.56 (a decrease of 24%) and closed at $110.05.  The decrease in Ligand's share price on this date, more than four years after the relevant time period in this litigation, has no relevance to this litigation.

## VII.   Berliner Complaint

60.    The complaint filed in *SEC v. Berliner*, No. 08-CV-3859, in the Southern District of New York alleged that defendant Berliner wrote and disseminated a false rumor "[b]etween 1:10 p.m. and 1:15 p.m." and then began profiting covering his short position "at approximately 1:19 p.m."  Brooks Opp. Aff. Ex. 48 ¶¶ 13, 19.

**SEC Response:**  Undisputed.

## VIII.   Definition of Share Repurchase

61.    Investopedia defines a share repurchase as "a transaction whereby a company buys back its own shares from the marketplace" and notes that a "company might buy back its shares because management considers them undervalued."  Brooks Opp. Aff. Ex. 49 at 1.  The article also notes that advantages of a share repurchase are that it "shows the corporation believes its shares are undervalued."  Brooks Opp. Aff. Ex. 49 at 2.

**SEC Response:**  Undisputed.

Dated:  November 13, 2020

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

*/s/ Marc J. Jones*
Marc J. Jones (BBO #645910)
Alfred A. Day (BBO #654436)
Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
617-573-8947 (Jones)
617-573-4537 (Day)
JonesMarc@sec.gov
DayA@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on November 13, 2020, a true and correct copy of the foregoing document was filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case.

*/s/ Marc J. Jones*
Marc J. Jones