TODD PETTINGILL                                    December 12, 2019

**EXHIBIT F**

United States District Court

District of Massachusetts

Securities and Exchange        )
Commission,                    )
       Plaintiff,              )    1:18-cv-11926-PBS
  v.                           )
Gregory Lemelson and Lemelson  )
Capital Management, LLC,       )
       Defendants,             )
  and                          )
The Amvona Fund, LP,           )
       Relief Defendant.       )
_____

Video Deposition of TODD PETTINGILL

San Diego, California

December 12, 2019

Reported by:

Veronica S. Thompson

CSR 6056, RPR, CRR, CCRR

KEY Discovery

Page 132

1    a full year before the Viking IPO?

2         A.   Yeah.  Yeah, you're correct.

3         Q.   Let's get this one.

4              (Exhibit 156 was marked.)

5    BY MR. BROOKS:

6         Q.   Mr. Pettingill, you've been handed what's been

7    marked as Exhibit 156.  I'd ask you to take a moment and

8    look at this.

9         A.   Seemed like the same chain we --

10        Q.   Yeah, it's actually -- yes.  This is actually

11   a continuation of it, if you see.

12             So if you turn to the second page of this

13   exhibit after the email that you wrote that we've

14   already discussed, see at the top an email from Glenn

15   Dourado?

16        A.   Yeah.

17        Q.   He writes, "Unfortunately he's winning because

18   the stock keeps going down.  He needs to be silenced for

19   good.  I'm not saying anything specific, for fear it

20   could be misconstrued, but this is a total farce."

21             You understood he was talking about

22   Fr. Lemelson.  Correct?

23        A.   Assume so.

24        Q.   All right.  And then if you look at the next

 1   page --
 2        A.   Just to be clear, like, this is us joking
 3   around.  He wasn't implying that somebody needs to put
 4   out a hit or something like that.
 5        Q.   If you look at the bottom of the next page,
 6   your response says, "I dunno.  Correlation doesn't
 7   always equal causality."  What did you mean by that?
 8        A.   Again, this is -- you know, in context, this
 9   is the time period before I was involved in invest- --
10   with speaking to investors and I had assumed that --
11   that everybody looked past the garbage reports.
12             So when I said, "Correlation doesn't equal
13   causality," I was implying that -- you know, I was, you
14   know, trying to discredit his impact on the market.
15        Q.   Then the next thing you wrote was, "I think
16   he's behind on everything and just trying to make it
17   look like he's moving the stock."  What did you mean by
18   "he's behind on everything"?
19        A.   Everything -- everything in his reports, to
20   me, was completely inaccurate.  Well, that -- not to me.
21   It was -- well, not everything, but there -- is littered
22   with inaccuracies, misleading statements, things that
23   were just not even -- not even well, you know, staged,
24   using fake -- fake and misleading ratios, the tangible

1  equity, you know.  It just seemed like he was behind on
2  even being able to do financial analysis, and then he
3  was just claiming that he was, you know, beating his
4  chest that he had done great things.
5           Again, this was all before I had had any
6  direct conversation with investors --
7           (Interruption by reporter.)
8           THE WITNESS:  -- to realize that he was
9  actually affecting mainly the retail investors.
10 BY MR. BROOKS:
11     Q.   Well, from your conversation -- what do you
12 mean, "affecting retail investors"?
13     A.   Getting under their skin.
14     Q.   Okay.  The next sentence says, "Sure.  It
15 moves a little when he puts out these garbage reports,
16 but, for the most part, with the exception of his first
17 one, some morons listen and sell, but everyone else just
18 ignores him."  What was the distinction you were trying
19 to make between his first report and the other ones?
20     A.   I think -- again, I've already said the
21 context, but I think what I was saying was I saw a big
22 movement after the first one.  That chart you showed me
23 showed there were actually two before the big one.
24           But basically he had -- I was saying -- again,

1   this is my attempt to discredit him to my buddies.  You
2   know, he made a small impact, but all these other
3   follow-up reports saying, "Hey, you know, I've done this
4   and I've done that," you know, was -- in my opinion at
5   the time, I thought it was a joke.  That was before I
6   had been speaking to actual retail investors realizing
7   that they were actually being affected by it.
8       **Q.**   Who are the "morons" you're referring to in
9   that email?
10      **A.**   Poor choice of words, but basically, I -- it
11  was more -- it was more of a comment on the quality of
12  the analysis.  "If somebody is going to listen to this,
13  they're a moron."  So I guess indirectly, me not having
14  spoken to a single investor in Ligand up to this point,
15  was calling the people who were, in my opinion, not able
16  to see through his -- his lies and misstatements.
17      **Q.**   In the next email up from Mr. Dourado, he
18  writes, "I definitely agree.  It's just easier to fixate
19  on an individual rather than market dynamics."
20           I understand you didn't write that, but what
21  was your understanding of what Mr. Dourado was saying
22  there?
23      **A.**   Again, I can't speak for Glenn.  It sounds
24  like he was saying the same -- same general rationale I

```
 1                I, the undersigned, a Certified Shorthand
 2    Reporter of the State of California, do hereby certify:
 3                That the foregoing proceedings were taken
 4    before me at the time and place herein set forth; that
 5    any witnesses in the foregoing proceedings, prior to
 6    testifying, were duly sworn; that a record of the
 7    proceedings was made by me using machine shorthand,
 8    which was thereafter transcribed by me; that the
 9    foregoing is a true record of the testimony given.
10                Further, that if the foregoing pertains to the
11    original transcript of a deposition in a federal case,
12    before completion of the proceedings, review of the
13    transcript [ X ] was [  ] was not requested.
14                I further certify I am neither financially
15    interested in the action nor a relative or employee of
16    any attorney or party to this action.
17                In witness whereof, I have this date
18    subscribed my name.
19
20    Dated:  December 27, 2019
21
22
23        _____
24             Veronica S. Thompson
                CSR 6056, RPR, CRR, CCRR
```