**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff<br><br>v.<br><br>GREGORY LEMELSON and LEMELSON CAPITAL<br>MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>THE AMVONA FUND, LP,<br><br>Relief Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:18-cv-11926-PBS

**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF UNDISPUTED FACTS AND RESPONSE TO
PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendants Fr. Emmanuel Lemelson

(f/k/a Gregory Lemelson), Lemelson Capital Management, LLC, and the Amvona Fund, LP

(collectively referred to as "Fr. Emmanuel") reply to Plaintiff's Response to Defendants'

Statement of Undisputed Facts in Support of their Motion for Summary Judgment and respond to

Plaintiff's Statement of Additional Material Facts submitted in support of Plaintiff's Opposition

to Defendants' Motion for Summary Judgment.

**I.     The Amvona Fund's Origins and Routine Business Practices**

1.      Fr. Emmanuel formed a hedge fund, the Amvona Fund LP, in 2012.  Affidavit of
Douglas S. Brooks ("Brooks Aff.") Exhibit ("Ex.") 1 at 32:4-13.

**SEC Response:**  <u>Undisputed</u>.

2.      Lemelson Capital Management is the general partner of the Amvona Fund. Brooks Aff. Ex. 1 at 32:4-13.

**SEC Response:**  <u>Undisputed</u>.

3.      Throughout its existence, Amvona has mostly held long positions in stocks, but has also occasionally taken short positions.  Brooks Aff. Ex. 1 at 239:17-22; Affidavit of Fr. Emmanuel Lemelson ("Lemelson Aff.") ¶ 3.

**SEC Response:**  <u>Undisputed but immaterial</u>.

4.      Since 2010, Fr. Emmanuel has published approximately 200 research and commentary pieces discussing economics, securitization fraud, and high-level security analysis of common stocks.  Lemelson Aff. ¶ 4.  *See also,* Amvona Economic Analysis, "Watch Fr. Emmanuel on Russia's The Central TV Show Discussing US Economic Policy," (Apr. 11, 2018) https://www.amvona.com/economic-analysis.

**SEC Response:**  <u>Disputed in part, but immaterial</u>.  The referenced documents, which are

not attached, speak for themselves and the Commission disputes Defendants' characterization.

5.      Fr. Emmanuel's regular course of business was to include disclosures in all of his published reports about the positions he had in the securities being discussed and that the reports contained Fr. Emmanuel's opinions based on public information, and that he may not necessarily publish updated opinions if circumstances changed.  Lemelson Aff. ¶ 5.  *See also, e.g.,* Brooks Aff. Ex. 2 at 4 (disclosing position held in company being discussed and providing disclaimer that "THIS REPORT INCLUDES INFORMATION BASED ON DATA FOUND IN FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION, INDEPENDENT INDUSTRY PUBLICATIONS AND OTHER SOURCES. ALTHOUGH WE BELIEVE THAT THE DATA IS RELIABLE, WE HAVE NOT SOUGHT, NOR HAVE WE RECEIVED, PERMISSION FROM ANY THIRD-PARTY TO INCLUDE THEIR INFORMATION IN THIS PRESENTATION. MANY OF THE STATEMENTS IN THIS PRESENTATION REFLECT OUR SUBJECTIVE BELIEF"); Brooks Aff. Ex. 3 at 2-3(same); Brooks Aff. Ex. 4 at 2 (disclosing that Lemelson Capital had no position in stock being discussed and including same disclosure as above).

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the asserted

facts in paragraph 5, which are not supported by the exhibits cited, as required under Fed. R. Civ.

P. 56(c) and Local Rule 56.1.  Specifically, the exhibits cited make no reference to Defendant

Lemelson's "regular course of business" nor to inclusion of "disclosures in all of his published

reports about the positions he had in the securities being discussed and that the reports contained

2

[his] opinions based on public information, and that he may not necessarily publish updated opinions if circumstances changed." Rather, the exhibits contain anecdotal examples of specific disclosures in specific reports, none of which states that the reports contain Defendant Lemelson's opinions nor that he "may not necessarily publish updated opinions if circumstances changed." The Commission does not dispute that the quoted parenthetical language appears in Brooks Aff. Exs. 2-3. The referenced documents speak for themselves and the Commission disputes Defendants' characterization.

## II.   Fr. Emmanuel's Short Position and Reports Regarding Ligand

### A.   June 16, 2014 Report

6.      In 2014, Fr. Emmanuel identified Ligand as a company whose stock he believed was overvalued. Based on this belief, Fr. Emmanuel took a short position in Ligand. Brooks Aff. Ex. 1 at 239:19-22; Brooks Aff. Ex. 5 at 44:24-45:1.

**SEC Response:** Disputed and not supported. The Commission disputes the asserted facts in paragraph 6, which are not supported by the exhibits cited, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1. Specifically, the exhibits do not state that Defendant Lemelson "identified Ligand as a company whose stock he believed was overvalued," nor that his short position was "[b]ased on this belief." The referenced documents speak for themselves and the Commission disputes Defendants' characterization. The Commission does not dispute that The Amvona Fund took a short position in Ligand in 2014.

7.      On June 16, 2014, Fr. Emmanuel published a 25-page opinion commentary concerning his thesis on Ligand. Brooks Aff. Ex. 6.

**SEC Response:** Disputed in part and not supported. The Commission disputes in part the asserted facts in paragraph 7, which are not supported by the exhibits cited, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1. Specifically, Exhibit 6 does not state that it is "opinion commentary concerning [Defendant Lemelson's] thesis on Ligand." The referenced

document speaks for itself and the Commission disputes Defendants' characterization.  The
Commission does not dispute that Defendant Lemelson published a 25-page document about
Ligand.  The Commission disputes that the document was "opinion commentary."  In their
Answer, Defendants did not characterize any of the challenged statements as opinions, instead
treating them as statements of fact.  [*See, e.g.*, Am. Compl. (ECF No. 33) ¶37, Answer (ECF No.
34) ¶37 (statement about Promacta was "truthful[]"; no allegation it was opinion); Am. Compl.
¶¶40-50, Answer ¶¶49-50 (statements about Viking were not "false"; no allegation they were
opinions); Am. Compl. ¶¶51-54, Answer ¶¶51-54 (statements about Ligand's financial condition
were not "misleading"; no allegation they were opinions)].

   **<u>Fr. Emmanuel's Reply:</u>**  The Commission has misrepresented the allegations
and answers to the Amended Complaint in an effort to misconstrue them as an admission of
statements being facts, not opinions.  Specifically, ¶ 37 of the Amended Complaint alleged that
Fr. Emmanuel appeared on the June 19, 2014 pre-market Benzinga show and made the statement
quoted about Ligand.  Fr. Emmanuel admitted the statement was made, but made no
characterization of the statement being fact or opinion.  Similarly, ¶¶ 49-50 of the Amended
Complaint alleged that each of the statements Fr. Emmanuel made about Viking were false and
material.  Fr. Emmanuel denied these allegations.  Likewise, ¶¶ 51-54 of the Amended
Complaint include allegations about what Fr. Emmanuel stated in his August 14 and 22, 2014
reports and allegations they were false or misleading.  Fr. Emmanuel denied any allegations
inconsistent with the report and denied any of the statements were false or misleading.  The
Commission seems to fundamentally misunderstand or misconstrue how pleading works by
arguing Fr. Emmanuel failed to allege that certain statements were opinions, as defendants do not
make any allegations, but rather respond to plaintiff's allegations.  It is clear that the

Commission was making factual allegations about what Fr. Emmanuel said in reports or during interviews and Fr. Emmanuel answered as to the factual allegation of making the statements at issue.  Whether those statements are opinions was beyond the scope of the allegation and Fr. Emmanuel was under no obligation to make any such "allegation" in its Answer.  Further, Fr. Emmanuel has consistently characterized his reports as opinion commentary throughout this litigation.  *E.g.,* ECF No. 11 at 2, 3, 9, 12-17; ECF No. 45 at 2, 4, 5, 8; ECF No. 85 at 5, 6, 9, 15.

8.      In the *first* sentence of his June 16, 2014 report on Ligand, Fr. Emmanuel disclosed that "Lemelson Capital is short shares of (NASDAQ:LGND)."  Brooks Aff. Ex. 6 at 1.

**SEC Response:**  Undisputed.

9.      Fr. Emmanuel additionally disclosed that "[a]ll content in this report represents the *opinions* of Lemelson Capital."  Brooks Aff. Ex. 6 at 24 (emphasis added).

**SEC Response:**  Disputed in part.  Undisputed as to the quote, but the Commission disputes Defendants' characterization of the statements at issue as "opinions."

**Fr. Emmanuel's Reply:**  *See* Fr. Emmanuel's reply to paragraph 7.

10.     The June 16, 2014 report also included the following disclosure language:

All expressions of opinion are subject to change without notice, and Lemelson Capital does not undertake to update or supplement this report or any information contained herein . . . . The information included in this document . . . reflects prevailing conditions and Lemelson Capital's views as of this date, all of which are accordingly subject to change. Lemelson Capital's opinions and estimates constitute a best efforts judgment and should be regarded as indicative, preliminary and for illustrative purposes only . . . . This report's estimated fundamental value only represents a best efforts estimate of the potential fundamental valuation of a specific security, and is not expressed as, or implied as, assessments of the quality of a security, a summary of past performance, or an actionable investment strategy for an investor . . . . Lemelson Capital may benefit from any change in the valuation of any other companies, securities, or commodities discussed in this document.

Brooks Aff. Ex. 6 at 24.

**SEC Response:**  Disputed in part.  Undisputed as to the quote, but Commission disputes Defendants' characterization of the statements at issue as "opinions."

**Fr. Emmanuel's Reply:**  *See* Fr. Emmanuel's reply to paragraph 7.

11.     Among his many opinions in the June 16, 2014 report, Fr. Emmanuel stated Ligand's largest royalty-generating drug, Promacta, faced an imminent threat from a new drug, which he believed would "virtually eliminate demand for Promacta."  Brooks Aff. Ex. 6 at 4.

**SEC Response:**  Disputed in part.  The Commission disputes Defendants' characterization of statements in the June 16 report as "opinions."  The Commission does not dispute that the quoted language appears in the June 16 report, nor that Promacta was, in June 2014, Ligand's largest royalty-generating drug.

**Fr. Emmanuel's Reply:**  *See* Fr. Emmanuel's reply to paragraph 7.

12.     The Commission is not challenging any statements contained in the June 16, 2014 report.  *See* Brooks Aff. Ex. 7; Brooks Aff. Ex. 8 at 2-3.

**SEC Response:**  Disputed.  While the Commission did not identify a specific misrepresentation in the June 16, 2014 report, the Commission challenges the statements in the report as being made in support of the fraudulent scheme.  [*See, e.g.*, Am. Compl. (ECF No. 33) ¶¶22-24.]

**Fr. Emmanuel's Reply:**  As a matter of law, the Commission cannot support a claim that legal conduct, such as publishing a report containing no challenged statements, can be a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 4-5.

13.     Ligand's stock price fell on the date Fr. Emmanuel issued this report.  Brooks Aff. Ex. 14 at 31.

**SEC Response:**  Undisputed.

B.     June 19, 2014 Interview

14.     Following the publication of Fr. Emmanuel's first report on Ligand, on June 17, 2014, Ligand's Investor Relations representative, Bruce Voss, exchanged a number of emails with high-ranking personnel at Ligand discussing Fr. Emmanuel's report and whether and how to speak with Fr. Emmanuel about the report.  Brooks Aff. Ex. 9.  In the course of these email

exchanges, John Higgins, the CEO of Ligand, instructed Mr. Voss to not "jump into content or a rebuttal" on the call with Fr. Emmanuel.  Brooks Aff. Ex. 9 at EPROD-SEC-LIT-E-000000940.

   **SEC Response:**  Disputed.  Defendants' selective quotation from the referenced

document is taken out of context, changing its meaning.  The referenced document speaks for

itself and the Commission disputes Defendants' characterization.

   **Fr. Emmanuel's Reply:**  Fr. Emmanuel denies any quote being taken out of

context and changing its meaning.  Further, to the extent the Commission wanted to assert such

an argument, they are obligated to support their argument with facts on the record pursuant to

Fed. R. Civ. P. 56 and Local Rule 56.1.

   15.   Mr. Voss and Fr. Emmanuel spoke over the phone on June 18, 2014.  According to Mr. Voss' handwritten notes, the call lasted from approximately 12:56 p.m. ET until 1:16 p.m. ET.  Brooks Aff. Ex. 10 at 34:20-35:3, 113:5-20; Brooks Aff. Ex. 11 at 1.

   **SEC Response:**  Undisputed.

   16.   Fr. Emmanuel took notes of the call, which stated that Mr. Voss agreed with his opinion that Promacta was going away.  Brooks Aff. Ex. 12 at EPROD-SEC-LIT-E-00589567.

   **SEC Response:**  Disputed in part.  The referenced document speaks for itself and the

Commission disputes Defendants' characterization.  As is evident from the exhibit cited, the

notes contain many self-serving conclusions, impressions, and opinions, and were taken only

*after* the call had concluded.  Brooks Aff. Ex. 12 (indicating that Defendant Lemelson's

purported impression was in "hindsight").  Further, Lemelson's notes do not say that Mr. Voss

agreed that "Promacta was going away."  The notes state: "He [Voss] said the company agreed

that Gilead's drug [Sovaldi] would eliminate the need for Promacta and understood that."  In his

deposition, Defendant Lemelson admitted that Mr. Voss—if he said anything of the sort—was

talking only about Promacta's use a supportive therapy for certain Hepatitis C patients.  [Ex. 51[1]

---

[1] Defendants attached Exs. 1-50 in support of their motion; the Commission is therefore numbering its exhibits beginning at Ex. 51.

(Lemelson Dep. Day 2 (11/12/19) at 183:12-186:13, 187:5-188:3.]  Promacta was approved to treat multiple other conditions, and Ligand's revenue derived from sales of Promacta was growing in 2014.  [¶152-54, 162.]

      **Fr. Emmanuel's Reply:**  To the extent that the Commission argues the notes were made in "hindsight," that was limited to five minutes, as the metadata shows that the notes were created at 1:21 p.m. on June 18, 2014 and Mr. Voss's notes indicate the call ended at 1:16 p.m. that day.  ECF No. 127 Ex. 12 at 4; Paragraph 15.  Fr. Emmanuel disagrees that a spoken summary that Mr. Voss "basically agreed … Promacta was going away" is in any way inconsistent with Fr. Emmanuel's notes indicating that Mr. Voss said Sovaldi "would eliminate the need for Promacta and understood that," but the documents speak for themselves.  With regard to the Commission's characterization of Fr. Emmanuel's deposition testimony that if Voss made such a statement it was only about Promacta's use a supportive therapy for certain Hepatitis C patients, Fr. Emmanuel disagrees with this characterization of the testimony as Fr. Emmanuel stated that "it was unclear from his notes" in the testimony cited by the Commission at Ex. 51 at 187:5-11.  Further, Fr. Emmanuel later testified in that same deposition that he believed the primary indication of Promacta was for Hepatitis C, so that elimination of Promacta's use for that indication would mean the drug would essentially go away in its entirety. Affidavit of Douglas S. Brooks in Support of Defendant's Reply to Plaintiff's Response to Defendants' Statement of Undisputed Facts and Response to Plaintiff's Statement of Additional Facts ("Brooks Reply Aff.") Ex. 87[2] at 194:5-195:4.  With regard to the Commission's factual statement that "Promacta was approved to treat multiple other conditions" Fr. Emmanuel does

---

[2] To remain consistent with the numbering of exhibits, the additional exhibits submitted in support of this Reply to Plaintiff's Response to Defendants' Statement of Undisputed Facts and Response to Plaintiff's Statement of Additional Facts will begin with Exhibit 87 to follow Exhibit 86 submitted by the Commission in its Opposition to Defendants' Motion for Summary Judgment.

not object.  With regard to the Commission's contention that "Ligand's revenue derived from sales of Promacta was growing in 2014" that appears to be unsupported by the record as required pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.  Further, it appears the Commission is relying on ECF No. 132 ¶162, which quotes the Commission's rebuttal expert report as support.  That evidence is not admissible in the Commission's affirmative case and therefore cannot be relied upon in this Motion for Summary Judgment.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

17.     The metadata from these notes shows that they were drafted June 18, 2014 at 1:21 p.m. ET and last modified that day at 1:42 p.m. ET.  Brooks Aff. Ex. 12 at 3-4.

**SEC Response:**  Disputed in part.  Undisputed that the metadata indicates this information, but disputed that the metadata proves that the notes were drafted on that date and time.

**Fr. Emmanuel's Reply:**  The Commission has not supported its objection that the metadata does not establish the date and time of drafting the notes, seemingly making an unsupported allegation that this evidence was tampered in some manner.  Such a bare allegation is inadequate pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.

18.     Mr. Voss' emails indicated that he listened to Mr. Higgins' instruction not to engage in any rebuttal of Fr. Emmanuel's opinions during this call.  Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statement in paragraph 18, which is not supported by the exhibit cited, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Specifically, nothing in Mr. Voss' emails indicates that "he listened to Mr.

Higgins' instruction not to engage in any rebuttal" during his conversation with Defendant Lemelson.  The referenced document speaks for itself and the Commission disputes Defendants' characterization.

In addition, other evidence demonstrates both that Mr. Voss did not understand Mr. Higgins to be instructing him not to engage in any rebuttal and that he did, in fact, engage in rebuttal.  [*See*, *e.g.*, Ex. 52 (Voss Dep.). at 100:10-20, 120:15-121:8, 122:2-7; Ex. 53 (Voss email to Lemelson following Benzinga interview correcting Lemelson's misstatements about their conversation, and writing, *inter alia*, "I specifically pointed out that HCV is *only one* of several indications for this drug, and that even within HCV there exists a market for Promacta independent of Sovaldi, noting price considerations and the potential for continued use of interferon in certain OUS markets." (emphasis in original).]

**Fr. Emmanuel's Reply:**  The email from Bruce Voss, Ex. 13, states "[a]s I wrote last night, he made that statement with a rhetorical 'don't you agree' and I moved on to the next subject as we had more to cover …" which appears consistent with instructions not to engage in any rebuttal with Fr. Emmanuel.  Further, Higgins replied that "the non-rebuttal approach with lemelson [*sic*] is more passive than ideal."  Ex. 13 at EPROD-SEC-LIT-E-000000407.

With regard to the additional response from the Commission, Fr. Emmanuel disagrees that communications and interpretations after the interview took place show that the clear instructions provided in emails before the telephone call and referenced in one of the first emails following the June 19, 2014 were not followed.[3]  But, in any event, the documents speak for themselves and Fr. Emmanuel disputes any characterizations from the Commission.

---

[3] The referenced writing from the night before in Mr. Voss' email was not produced.  *See infra* paragraph 31.

19.     Mr. Voss testified that he did not engage in any rebuttal of Fr. Emmanuel's opinions during this call.  Brooks Aff. Ex. 10 at 99:15-100:9.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statement in paragraph 18, which is not supported by the exhibit cited, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  In fact, the cited exhibit demonstrates precisely the opposite:  Mr. Voss did not understand Mr. Higgins to be directing what Mr. Voss should or should not say in terms of content or rebuttal during the call.  [Ex. 52 (Voss Dep.) 100:18-20.]  Rather, Mr. Voss testified that, when Mr. Higgins suggested that the first call with Defendant Lemelson should not be focused on jumping into content or rebuttal, Mr. Voss understood that to mean that there was no need for Mr. Foehr, the subject-matter expert, to participate in the call.  [*Id.* at 99:15-17, 100:10-16.]

In addition, Mr. Voss testified affirmatively that he *did* engage in rebuttal during his conversation with Defendant Lemelson [Ex. 52 (Voss Dep.) at 120:15-121:8, 122:2-7] and summarized some of that rebuttal conversation in an email to Lemelson shortly after the Lemelson's June 19 interview [Ex. 53].

**Fr. Emmanuel's Reply:**  Disputed for the same reasons stated in reply to paragraph 18.

20.     Mr. Voss recalled that Fr. Emmanuel asked multiple times if Mr. Voss agreed with his positions and, specifically that Fr. Emmanuel stated that he believed Promacta was going away and then asked, "don't you agree?"  Brooks Aff. Ex. 10 at 131:1-23.  Mr. Voss admitted that he remained silent in response to this question.  Brooks Aff. Ex. 10 at 146:1-15.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statement in paragraph 18, which is not supported by the exhibit cited, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Specifically, Mr. Voss testified that he did not understand Defendant Lemelson to be asking Mr. Voss whether he agreed with his positions; rather, he understood that

Defendant Lemelson employed a verbal tick that conveyed dismissiveness but did not seek confirmation:

> "had a pattern of speech during that call where after many of his statements he would say the phrase, 'Don't you agree?' But the way he said it was just that, it was a pattern of speech. It was a very dismissive, 'Don't you agree?' and then the conversation would go on. And it struck me as just a personal tick that I hadn't heard before, which is why I remembered it."

[Ex. 52 (Voss Dep.) at 131:8-16. Further, Mr. Voss did not testify that he "remained silent in response to this question." At the transcript page cited by Defendants [*id.* at 146:1-15], Mr. Voss simply read from a contemporaneous email that stated that he had "moved on to the next subject as we had more to cover and his statement was ridiculous." [*Id.* at 146: 1-8.] He also repeated the comment that Defendant Lemelson had made during his Benzinga interview. [*Id.* at 146: 10-15.] He did not testify that he "remained silent."

        **Fr. Emmanuel's Reply:** The Commission misconstrues the deposition testimony, because while Mr. Voss testified that he supposedly thought Fr. Emmanuel asking "don't you agree?" was a verbal tic, Mr. Voss clearly testified that he did not respond to those questions posed by Fr. Emmanuel, *i.e.* Mr. Voss remained silent. For example:

> Q: And in response to him saying, "Don't you agree?" did you explicitly disagree as to any of his points when he phrased it like that?
>
> A: I don't recall specifically addressing any of those because, like I said, they were so regular and they were so basically dismissive that they were just part of his speech pattern.

Ex. 10 at 131:17-23

        Further, while the Commission tries to argue that Mr. Voss simply read from a contemporaneous email that stated that he had "moved on to the next subject as we had more to cover and his statement was ridiculous," the Commission omits the portion of the transcript immediately thereafter in which Mr. Voss was asked "Do you stand by that, sitting here today?

Is that what happened?" to which Mr. Voss answered, "That is what I wrote on June 20. . . . I wrote it at a time when all this was extremely fresh in my mind and now it's been more than five years."  Brooks Reply Aff. Ex. 88 at 168:13-169:6.

21.     On June 19, 2014, Fr. Emmanuel was interviewed by an outlet called Benzinga. Brooks Aff. ¶ 15.

**SEC Response:**  Undisputed.

22.     There is no evidence of the number of people that listened to this interview.

**SEC Response:**  Disputed in part.  The Commission does not dispute that no evidence of the specific number of people that listened to the interview has been presented in this litigation. However, while Defendants' expert, Aaron Dolgoff, contends there was no stock price movement after the interview, Ligand's stock in fact declined in value during and after the interview, suggesting that the interview was widely disseminated and material, given that a sufficient number of investors appear to have relied on Lemelson's statement and sold stock. [Ex. 54 (Dolgoff Report) at ¶¶ 30-33; Ex. 55 (Smith Report) at ¶¶ 26-27 & Ex. 5.]

**Fr. Emmanuel's Reply:**  The Commission's response to the basic, undisputed fact that there is no evidence of how many people listened to the June 19, 2014 Benzinga pre-market interview includes an unresponsive contention about Ligand's stock price.  The Commission's attempt to rely on its expert's rebuttal report (Ex. 55 Smith Report) is not permitted, however, as evidence to support Commission's affirmative case.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).  Therefore, to the extent the Commission is attempting to insert an unresponsive fact about Ligand's stock price into its response to

paragraph 22, it has failed to support that contention with admissible evidence as required under

Fed. R. Civ. P. 56 and Local Rule 56.1.

23.     The June 19, 2014 interview lasted approximately 21 minutes, 41 seconds.  See Brooks Aff. ¶ 15.

**SEC Response:**  <u>Undisputed</u>.

24.     About five minutes of the interview discussed Fr. Emmanuel's short thesis regarding Ligand.  Specifically, the interview first mentions Father Emmanuel's short position in Ligand at the 14 minute, 40 second mark in the interview and the discussion regarding Ligand ended at approximately the 19 minute, 30 second mark in the interview.  Brooks Aff. ¶ 15.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes that Defendant Lemelson stated in the interview that he had taken a short position in Ligand's stock.  In discussing his reports, Defendant Lemelson references briefly in passing "the Ligand short," but does not say that he, or any of the other Defendants, have taken a short position in Ligand's stock. [Brooks Aff. ¶15.]

**Fr. Emmanuel's Reply:**  The context of the interview is clear that Lemelson Capital Management had taken a short position in Ligand.  The interview introduces Fr. Emmanuel as the head of Lemelson Capital Management and the host of the radio interview when brining up Ligand for the first time in the interview, asked Fr. Emmanuel to talk about his thesis, as noted by the Commission, Fr. Emmanuel references the Ligand short, and the host later asks about the "target price" for the Ligand short.  *See* Brooks Aff. ¶ 15.

25.     When the topic of Ligand was first raised on the interview, Fr. Emmanuel stated that he had taken a short position in Ligand's stock.  Brooks Aff. ¶ 15.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes that Defendant Lemelson stated in the interview that he had taken a short position in Ligand's stock.  In discussing his reports, Defendant Lemelson references briefly in passing "the Ligand short," but does not say that he, or any of the other Defendants, have taken a short position in Ligand's stock. [Brooks Aff. ¶15.]

**Fr. Emmanuel's Reply:**  *See* reply to paragraph 24.

26.     At approximately the 16-minute mark of this interview, Fr. Emmanuel initially stated that he had spoken to Ligand, and then corrected himself to say that he spoken to Ligand's Investor Relations ("IR") firm which had "basically agreed" with his thesis concerning Promacta "that Promacta was going away."  Brooks Aff. ¶ 15.

**SEC Response:**  Disputed.  The Commission disputes this characterization, which is not supported by the recording, which speaks for itself.  Lemelson said:

> "It's literally going to go away, I mean, I had discussions with
> [Ligand] management just yesterday – excuse me, their [Ligand's]
> IR [investor relations] firm.  And they basically agreed.  They said,
> 'Look, we understand Promacta's going away.'"

[Brooks Aff. ¶15; see also Am. Compl. (ECF No. 33) ¶37; Answer (ECF No. 34) ¶37 (admitting substance of quote from Benzinga interview).]

**Fr. Emmanuel's Reply:**  Fr. Emmanuel disagrees with the Commission's contention that the characterization is not supported by the recording or the transcription provided, but agree that the recording speaks for itself and do not dispute the transcription in the Commission's response to paragraph 26.

27.     There is no evidence that any individual decided to sell his or her Ligand shares as a result of this statement.

**SEC Response:**  Disputed.  While Defendants' expert, Aaron Dolgoff, contends there was no stock price movement after the interview, Ligand's stock in fact declined in value during and after the interview.  [Ex. 54 (Dolgoff Report) at ¶¶ 30-33; Ex. 55 (Smith Report) at ¶¶ 26-27, Ex. 5]

**Fr. Emmanuel's Reply:**  The Commission's reliance on its expert rebuttal report to assert affirmative facts to support its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

28.     Bruce Voss, the referenced representative of the IR firm, denies having made this statement.  Brooks Aff. Ex. 7 ¶ 38.

**SEC Response:**  Undisputed.

29.     This is the first of the Commission's four challenged statements.  Brooks Aff. Ex. 7 ¶¶ 36-43; Brooks Aff. Ex. 8 at 3.

**SEC Response:**  Disputed in part.  The Commission does not dispute that this is the earliest of the four statements focused on in the Complaint.  But the Commission alleges a fraudulent scheme to manipulate the price of Ligand's stock, of which all of Defendants' reports and statements about Ligand, including the four challenged false statements of fact, were an integral component.  [E.g., Am. Compl. (ECF No. 33) ¶¶1, 8, 22, 42.]

**Fr. Emmanuel's Reply:**  As a matter of law, the Commission cannot support a claim that legal conduct, such as publishing a report containing no challenged statements, can be a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 4-5.

30.     Subsequent to the June 19, 2014 interview, Mr. Voss spoke with Ligand executives John Higgins and Matthew Foehr about his conversation with Fr. Emmanuel on June 18, 2014 and Fr. Emmanuel's June 19, 2014 interview.  Brooks Aff. Ex. 10 at 152:11-23.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statements in paragraph 30, which are not supported by the exhibit cited.  The testimony cited references a conversation between Mr. Voss and Mr. Higgins, but makes no mention of Mr. Foehr.  Further, the conversation referenced purports to be about the conversation between Mr. Voss and Defendant Lemelson; it does not reference the June 19 interview.  Testimony taken in this matter make it clear that the conversation between Mr. Voss, Mr. Higgins, and Mr. Foehr occurred on June 18, shortly after the call between Mr. Voss and Defendant Lemelson, and that none of the participants was even aware at that time of the interview Defendant Lemelson would provide to

Benzinga the following day.  [Ex. 56 (Higgins Dep.) at 143:2-21; Ex. 52 (Voss Dep.) at 132:11-

133:22; Ex. 57 (Foehr Dep.) at 267:2-8.]

**Fr. Emmanuel's Reply:**  To clarify, as indicated in the Commission's response,

the parties do not dispute that Ligand executives spoke with Mr. Voss about Mr. Voss' June 18,

2014 conversation with Fr. Emmanuel at some point after the phone call and before Fr.

Emmanuel's June 19, 2014 email.  Then, as indicated in the email referenced as an exhibit to the

cited deposition testimony (and attached here as Ex. 13), the Ligand executives engaged in email

conversations with Mr. Voss about both Fr. Emmanuel's June 19, 2014 interview and the June

18, 2014 conversation between Fr. Emmanuel and Mr. Voss.

31.     There is an email on June 20, 2014 that refers to a written summary shared by Mr.
Voss regarding the phone conversation between Mr. Voss and Fr. Emmanuel on June 19, 2014.
Specifically, Mr. Voss wrote "As I wrote last night, he made that statement with a rhetorical
'don't you agree' and I moved on to the next subject as we had more to cover and his statement
was ridiculous."  No document was produced in this litigation.  Ligand's counsel stated that
they looked for the document but could not locate it.  Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-
000000407; Brooks Aff. Ex. 10 at 146:5-147:20.

**SEC Response:**  Disputed in part and not supported.  The Commission disputes the

statements in paragraph 31, which are not supported by the exhibits cited--neither the email nor

the testimony states that Mr. Voss composed a "written summary."  The Commission does not

dispute that the exhibit cited contains the quoted text, that the referenced June 19, 2014 email

was not produced, and that Ligand's counsel stated that they had looked for the email but could

not locate it.

**Fr. Emmanuel's Reply:**  The document speaks for itself.

32.     Subsequent to the June 19, 2014 interview, Mr. Voss and Mr. Higgins exchanged
emails regarding the June 18, 2014 conversation between Mr. Voss and Fr. Emmanuel.  In one of
those emails, Mr. Higgins expressed that he was upset that Mr. Voss remained silent and left Fr.
Emmanuel with the impression of "tacit agreement" with Fr. Emmanuel's thesis regarding
Promacta going away.  Specifically, Mr. Higgins stated:

> Also, if he [Lemelson] said the CEO beats his employees would you just move on because "there were more things to cover." Or would you take a moment to stick up for the CEO? Promacta is a big deal, and a big part of our value and business model. He knows it too. He gave you a softball and you just moved on? Even 1 minute of soft info would have left him with a different impression than tacit agreement.

Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407.

**SEC Response:** <u>Disputed in part and not supported</u>. The Commission disputes the statements in paragraph 32, which are not supported by the exhibits cited. Specifically, the exhibits make no reference to Mr. Higgins being upset, and do not state that Mr. Voss remained silent, nor that Mr. Voss left Defendant Lemelson with the impression of tacit agreement. The referenced document speaks for itself and the Commission disputes Defendants' characterization.

**Fr. Emmanuel's Reply:** Fr. Emmanuel maintains that the characterization of the email was accurate, but agrees that the document speaks for itself.

33.    In response to that email from Mr. Higgins, Mr. Voss replied by writing, *inter alia*, "[t]he comment about Promacta was not a legitimate question but rather it was made in passing and then he chose to take that piece of the dialogue out of context." Brooks Aff. Ex. 13 at EPROD-SEC-LIT-E-000000407.

**SEC Response:** <u>Disputed</u>. The Commission disputes the statements in paragraph 33, as the partial quote does not accurately convey the witness statement. In the same exhibit, the witness continues by stating "Quite simply I did not agree with that statement nor did I agree with any number of statements he made."

**Fr. Emmanuel's Reply:** The document speaks for itself.

34.    Ligand's stock price closed higher on the day of the interview than it had the previous day. Brooks Aff. Ex. 14 at 31.

**SEC Response:** <u>Disputed in part and not material</u>. The Commission does not dispute that Ligand's stock price closed approximately seven cents higher on the day of the interview

than it had the previous day, but asserts that this is not material, as price change is not the only indication of materiality of a statement.  Further, while Defendants' expert, Aaron Dolgoff, contends there was no stock price movement attributable to the interview, Ligand's stock in fact declined in value during and after the interview.  [Ex. 54 (Dolgoff Report) at ¶¶ 30-33; Ex. 55 (Smith Report) at ¶¶ 26-27, Ex. 5]

**Fr. Emmanuel's Reply:**  The Commission's response goes beyond the scope of the statement of fact in paragraph 34.  To the extent that the Commission attempts to assert facts about certain time windows of stock price change and the causes thereof, the Commission's reliance on its expert rebuttal report to assert facts in support of its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).  Further, the Commission's unsupported statement that the change in stock price is not material because "price change is not the only indication of materiality of a statement" is a straw man argument, as even the Commission acknowledged the change in stock price can be considered in determining materiality under Rule 10b-5, thus making it a material fact.  *See* ECF No. 131 at 6 (Commission arguing that change in stock price supported materiality); *id.* at 7 ("'stock movement is a factor the jury may consider relevant [to materiality]'") (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991)).

C.     July 3, 2014 Report

35.     On July 3, 2014, Fr. Emmanuel issued his second analysis report discussing Lemelson Capital Management's short position on Ligand.  Brooks Aff. Ex. 15.

**SEC Response:**  Undisputed.

36.     This report also included the disclosure that Fr. Emmanuel had taken a short position in Ligand, that Fr. Emmanuel was expressing his own opinions, and that Fr. Emmanuel may not necessarily amend his opinions if circumstances changed.  Brooks Aff. Ex. 15 at 1-2.

**SEC Response:**  Disputed in part and not supported.  The Commission disputes the

statement in paragraph 36, which is not supported by the exhibit cited.  The report disclosed that

Defendant Lemelson Capital Management, *not* Defendant Lemelson, had taken a short position

in Ligand.  It did not state that Defendant Lemelson "may not necessarily amend his opinions if

circumstances changed."  Instead, the report states, "All expressions of opinion are subject to

change without notice, and Lemelson Capital does not undertake to update this report or any

information contained herein."  Brooks Aff. Ex. 15 at 2.  The Commission disputes Defendants'

characterization of the report as solely opinion.

**Fr. Emmanuel's Reply:**  To clarify, as is apparently unchallenged, the disclaimer

was in the name of Lemelson Capital Management, for which Fr. Emmanuel serves as the Chief

Investment Officer.  ECF No. 128 ¶ 1.  With regard to the Commission's dispute regarding the

Defendants' characterization of the report as opinion, Fr. Emmanuel incorporates his response to

paragraph 7 as if fully stated herein.

37.     The July 3, 2014 report included a discussion of a company called Viking Therapeutics, with whom Ligand had just entered into a licensing agreement.  Brooks Aff. Ex. 15 at 7-10.

**SEC Response:**  Undisputed.

38.     Two of the Commission's four challenged statements in this case are based on Fr. Emmanuel's statements about Viking contained in the July 3, 2014 report.  Brooks Aff. Ex. 8 at 3; Brooks Aff. Ex. 7 ¶¶ 44-50.

**SEC Response:**  Disputed in part.  The Commission alleges a fraudulent scheme to

manipulate the price of Ligand's stock, of which all of Defendants' reports and statements about

Ligand, including the four challenged false statements of fact, were an integral component.

[*E.g.*, Am. Compl. (ECF No. 33) ¶¶1, 8, 22, 42.]

**Fr. Emmanuel's Reply:**  As a matter of law, the Commission cannot support a claim that legal conduct, such as publishing a report containing no challenged statements, can be a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 4-5.

39.     In both the Original Complaint and the Amended Complaint, the SEC has alleged that as of May 2014, "Ligand became a 49.8% owner of Viking common stock."  Brooks Aff. Ex. 16 ¶ 21; Brooks Aff. Ex. 7 ¶ 21.

**SEC Response:**  Undisputed.

40.     Ligand did not own any portion of Viking at the time this report was published. Brooks Aff. Ex. 17 at 53:6-18; Brooks Aff. Ex. 18 at 131:24-132:2.

**SEC Response:**  Disputed, not supported, and not material.  The Commission disputes the statement in paragraph 40, which is not supported by the exhibits cited.  As of the closing of the Viking-Ligand transaction, Ligand owned 49.9% of Viking shares outstanding.  [Ex. 58 (Ligand press release) at 2.]  The timing of when Ligand actually took possession of the shares is not relevant or material.

**Fr. Emmanuel's Reply:**  Disputed that the timing is not material.  The Commission alleged that Ligand owned this near-half portion **at the time Fr. Emmanuel published the report**, so the Commission seemed to believe the timing of the ownership was material.  This makes sense, as it is difficult to fathom how statements about another company, that Ligand did not own, could be material to Ligand's stock price.  The Commission has offered no support for how statements about Viking in July 2014 had a material impact on Ligand, when Ligand became a nearly 50% owner in May 2015, almost ten months after the last alleged misstatement and seven months after the latest date in the Commission's unsupported scheme liability claim.

41.     Fr. Emmanuel did not hold a short position in Viking at the time these statements were made.  Brooks Ex. 5 at 47:7-14.

**SEC Response:**  <u>Undisputed, but immaterial</u>.  It is undisputed that Lemelson held a short

position in Ligand through LCM/Amvona at all relevant times.  Undisputed that Lemelson did

not hold any position in Viking, but irrelevant and immaterial because the statements about

Viking were intended to cast doubt on the legitimacy of the Ligand-Viking transaction and cast

aspersions on Ligand's management.

**Fr. Emmanuel's Reply:**  *See* reply to paragraph 40.  Fr. Emmanuel also disputes

the unsupported accusation in the Commission's response that "the statements about Viking were

intended to cast doubt on the legitimacy of the Ligand-Viking transaction and cast aspersions on

Ligand's management," which is inadequate under Fed. R. Civ. P. 56 and Local Rule 56.1.

42.     The first statement from this report that the Commission challenged is: "the company [Viking] has not yet even consulted with the firm [auditors] on any material issues." Brooks Aff. Ex. 8 at 3; Brooks Aff. Ex. 7 ¶¶ 44-50.

**SEC Response:**  <u>Disputed in part</u>.  The Commission also challenges the statement and

the report as a whole as part of Defendants' fraudulent scheme.

**Fr. Emmanuel's Reply:**  As a matter of law, the Commission cannot support a

claim that legal conduct, such as publishing a report containing no challenged statements, can be

a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants'

Motion for Summary Judgment at 4-5.

43.     In the July 3, 2014 report, Fr. Emmanuel quoted Viking's S-1 statement and noted that Viking engaged MaloneBailey to audit their financial statements for the fiscal year ending December 31, 2012, but then Viking terminated MaloneBailey on April 7, 2014.  Brooks Aff. Ex. 15 at 9.

**SEC Response:**  <u>Disputed in part and not supported</u>.  The Commission disputes in part

the statement in paragraph 43, which is not supported by the exhibit cited.  Specifically, the

report only partially and selectively quoted from Viking's S-1 statement and noted that Viking

engaged MaloneBailey to audit their financial statements for both fiscal years 2012 and 2013. [Brooks Aff. Ex. 19 (Viking Form S-1) at 158.] The report further stated that the Viking board of directors approved the dismissal of MaloneBailey effective April 7, 2014. [*Id.*] The referenced document speaks for itself and the Commission disputes Defendants' characterization.

**Fr. Emmanuel's Reply:** To the extent the Commission objects to paragraph 43, because Fr. Emmanuel's report "only partially and selectively quoted from Viking's S-1," Fr. Emmanuel that it never maintained the entire contents of Viking's 196-page S-1 Statement were quoted and reproduced in Fr. Emmanuel's report, rather that Fr. Emmanuel cited the portions of the S-1 upon which he based his analysis.

44.     Then, Fr. Emmanuel noted Marcum LLP was hired to perform the audit and directly quoted Viking's S-1 again, which stated:

> Effective as of April 7, 2014, our board of directors appointed Marcum LLP, or Marcum, as our independent registered public accounting firm to audit our financial statements as of and for the fiscal years ended December 31, 2012 and 2013, and for the fiscal year ending December 31, 2014. From September 24, 2012 (Inception) through April 7, 2014, neither we nor anyone on our behalf consulted with Marcum regarding (1) the application of accounting principles to a specified transaction, either completed or proposed, (2) the type of audit opinion that might be rendered on our financial statements, or (3) any matter that was either the subject of a disagreement, as described in Item 304(a)(1)(iv) of Regulation S-K and the related instructions thereto, or a "reportable event" as described in Item 304(a)(1)(v) of Regulation S-K.

Brooks Aff. Ex. 15 at 9; Brooks Aff. Ex. 19 at 162.

**SEC Response:** Disputed in part and not supported. The Commission disputes in part this statement, which is not supported by the exhibit cited. The Commission disputes Defendants' characterization of the referenced document, which speaks for itself. Specifically, the report contained the following quote (strikethrough indicates portion of quote included in paragraph 44 but omitted from the report):

~~Effective as of April 7, 2014, our board of directors appointed Marcum LLP, or Marcum, as our independent registered public accounting firm to audit our financial statements as of and for the fiscal years ended December 31, 2012 and 2013, and for the fiscal year ending December 31, 2014.~~  From September 24, 2012 (Inception) through April 7, 2014, neither we nor anyone on our behalf consulted with Marcum regarding (1) the application of accounting principles to a specified transaction, either completed or proposed, (2) the type of audit opinion that might be rendered on our financial statements, or (3) any matter that was either the subject of a disagreement, as described in Item 304(a)(1)(iv) of Regulation S-K and the related instructions thereto, or a "reportable event" as described in Item 304(a)(1)(v) of Regulation S-K.

[Brooks Aff. Ex. 19 (Viking Form S-1) at 158.]

45.      Fr. Emmanuel then made the statement that the Commission is challenging ("In other words, Marcum was merely hired, but the company [Viking] has not yet even consulted with the firm [auditors] on any material issues") as a summary of this quoted passage.  Brooks Aff. Ex. 15 at 10.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes Defendants' characterization of the quoted statement as "a summary of this quoted passage."  Nothing in the cited exhibit indicates that it is a summary of the quoted passage.  The Commission also challenges the statement and the report as a whole as part of Defendants' fraudulent scheme.

**Fr. Emmanuel's Reply:**  Fr. Emmanuel maintains that quoting the portion of the S-1 Statement and then immediately starting the next sentence with "***In other words***" is a strong indication that Fr. Emmanuel was summarizing the quoted passage.  Further, to the extent that the Commission's response relies on its purported scheme liability theory, as a matter of law, the Commission cannot support a claim that legal conduct, such as publishing a report containing no challenged statements, can be a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 4-5.

46.      Viking's July 1, 2014 S-1 statement also noted that a number of its financial statements were unaudited.  Brooks Aff. Ex. 19 at 13-14, 56, 60-61, 69-70, 72, 166-69, 171-73, 176-77, 180.  Indeed, the term "unaudited" appears 56 times in Viking's S-1, while the term "audited" appears seven times.  Brooks Aff. ¶ 22.

**SEC Response:**  Disputed.  The Viking S-1 makes clear that all full year financial statements presented were audited, and that interim financial statements were not audited (as they were for or included partial-year periods, which are customarily not audited [SEC Reg. S-X §§3-01(f), 3-02(b), and 10-01(a)(1) (interim financial statements need not be audited)]).

Moreover, The Viking S-1 states:

> Our unaudited financial statements have been prepared on the same basis as the audited financial statements and, in the opinion of our management, include all adjustments, consisting of normal recurring adjustments and accruals, necessary for a fair statement of the information for the interim periods.

[Brooks Aff. Ex. 19 at 9; *see also id.* at F-7 (interim financial statement "in accordance with GAAP").]  Further, Viking auditor stated:

> In our [Marcum LLP's] opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Viking Therapeutics, Inc., as of December 31, 2012 and 2013, and the results of its operations and its cash flows for the period from September 24, 2012 (Inception) through December 31, 2012 and for the year ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America.

[Ex. 74 (Viking S-1 excerpt) at F-1.]  The more frequent appearance of the word "unaudited" than "audited" is immaterial (and misleading) as the S-1's presentation of financial statements presumes that they are audited unless otherwise specified.  The Defendants' statement that the "financial statements provided in the S-1 accordingly are unaudited" is an unquestionably false and misleading statement—indeed, even Lemelson testified that the financial statements provided in the S-1 are audited.  [Ex. 59 (Lemelson Inv. Test.) 729:3-16.]

**Fr. Emmanuel's Reply:**  Disputed that the "Defendants' statement that the 'financial statements provided in the S-1 accordingly are unaudited' is an unquestionably false and misleading statement" for the reasons stated in Defendants' Memorandum in Support of

Their Motion for Summary Judgment, ECF No. 125 at 23-24, 31.  Fr. Emmanuel disputes the

Commission's unsupported contention that "the S-1's presentation of financial statements

presumes that they are audited unless otherwise specified" which is inadequate under Fed. R.

Civ. P. 56 and Local Rule 56.1.  Further, Fr. Emmanuel disputes the characterization of Fr.

Emmanuel's testimony offered by the Commission, and state that the testimony speaks for itself.

Specifically, Fr. Emmanuel never testified that the financial statements in the S-1 were audited,

but rather when presented with a letter from the auditors that stated so in a separate section of the

S-1 statement, Fr. Emmanuel, testified "I wouldn't have seen it or else I wouldn't have written

that," and "I'm sure at the time I wrote it, I believed it to be true and it was based on my

research."  Ex. 59 at 729:3-16.

47.     There is no evidence of any investor of Ligand or Viking raising concerns about
this specific statement.

**SEC Response:**  Disputed.  There is significant evidence that investors raised concerns

about these statements.  For example, at least one Ligand investor raised concerns about

Lemelson's statements about Viking with Ligand's COO.  [Ex. 57 (Foehr Dep.) at 92:1-92:13.]

And Ligand's stock price fell after Lemelson published his July 3, 2014 Report.  [Ex. 55 (Smith

Report) at ¶¶28-30.]

**Fr. Emmanuel's Reply:**  The Commission's reliance on its expert rebuttal report

to support an affirmative part of its case-in-chief is not permissible under Fed. R. Civ. P. 56 and

Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013)

(granting summary judgment where plaintiff did not provide affirmative expert evidence, but

only a rebuttal expert report because "there is no need to consider rebuttal evidence" in

plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

Further, Fr. Emmanuel disputes the Commission's characterization of Matthew Foehr's

deposition testimony and regardless, the deposition testimony about what some other entity may have said about the report is inadmissible hearsay that is inadequate to create a dispute of a material fact at the summary judgment stage. *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 29 (1st Cir. 2007) ("'[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment'") (quoting *Dávila v. Corporación De Puerto Rico Para La Difusión Pública,* 498 F.3d 9, 17 (1st Cir.2007)); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("[h]earsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment").

48.     The second statement from the July 3, 2014 report that the Commission challenged is: "Viking does not intend to conduct any preclinical studies or trials …"  Brooks Aff. Ex. 15 at 7; Brooks Aff. Ex. 7 ¶ 46; Brooks Aff. Ex. 8 at 3.

**SEC Response:**  Disputed in part.  The Commission does not dispute that it challenges the quoted language from the July 3, 2014 Report.  The Commission disputes Defendants' attempt to isolate individual statements or portions of statements from their context.  The Commission's complaint asserts that Defendants made a number of "material misstatements of fact regarding Ligand's licensing agreement with Viking and Viking's Form-S-1 registration statement" to "bolster and lend credence to" other accusations that he made about Ligand's business relationship with Viking.  [Am. Compl. (ECF No. 33) ¶44.]

In particular, the Complaint alleged the following with respect to the partial quote above:

In the July 3rd Report, Lemelson falsely stated that, as of the filing of Viking's July 1, 2014 Form S-1 registration statement, Viking had "yet to consult with [its auditors] on any material issues" and that the "financial statements provided in the S1 accordingly are unaudited."  Lemelson also falsely stated in the same report that "Viking does not intend to conduct any preclinical studies or trials."  None of these statements were true, and each was made to support Lemelson's false claim that Viking was "an affiliate shell company" that Ligand used to "create almost a veritable pyramid scheme of shell companies" that was "guaranteed to lose money."

[Am. Compl. (ECF No. 33) ¶47 (brackets in original).]  In addition, the Commission alleges a fraudulent scheme to manipulate the price of Ligand's stock, of which all of Defendants' reports

and statements about Ligand, including the four challenged false statements of fact, were an integral component.  [*E.g., id.* ¶¶1, 8, 22, 42.]

**Fr. Emmanuel's Reply:**  As a matter of law, the Commission cannot support a claim that legal conduct, such as publishing a report containing no challenged statements, can be a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 4-5.  Further, the Commission clearly laid out the four statements it was challenging in its Opposition to the Motion to Dismiss, Ex. 8, ECF No. 16 at 2-4,  and while the Amended Complaint included other quotes from Fr. Emmanuel's reports for context, if the Commission is now trying to change its allegations about what statements it is challenging, it is untimely and impermissible.  *Wells v. Monarch Capital Corp.*, No. 91–10575–ADM, 1996 WL 728125, at *9-10 (D. Mass. Oct. 22, 1996) (denying motion to amend complaint filed on date opposition to summary judgment due as it indicated it was an attempt to avoid summary judgment and would require reopening discovery) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) (stating motion to amend following motion for summary judgment constitutes "an attempt to alter the shape of the case in order to defeat summary judgment")); *Melendez-Ortiz v. Wyeth Pharmaceutical Co.*, 775 F. Supp. 2d 349, 374 (D.P.R. 2011) ("Courts generally cannot entertain claims on summary judgment that never appeared in the complaint, as the defendant has an 'inalienable right to know in advance the nature of the cause of action being asserted against him.'" (quoting *Ruíz Rivera v. Pfizer Pharms., LLC,* 521 F.3d 76, 84 (1st Cir. 2008)).

49.    Viking's S-1 statement stated in bold that **"We intend to rely on third parties to conduct our preclinical studies and clinical trials and perform other tasks for us."**  Brooks Aff. Ex. 19 at 21 (emphasis in original).

SEC Response:  Disputed in part.  Undisputed that the S-1 contains the quoted language.  Defendants take the quoted language out of context as it appears in a "risk factors" section of the

S-1.  Defendants also omit that it is typical for pharmaceutical development companies to rely on third parties with specialized expertise to conduct clinical trials on the company's behalf.  The Commission further notes that Lemelson's purported reliance on the quoted section of Viking's S-1 *was not mentioned or disclosed* in Lemelson's reports.  Moreover, Lemelson admitted that his statement was inconsistent with Viking's SEC filings.  [Ex. 59 (Lemelson Inv. Test.) at 722:12-723:11.]

**Fr. Emmanuel's Reply:**  Fr. Emmanuel disputes the Commission's bare, unsupported and unexplained assertion that the quoted language is somehow "out of context" because it appears in the "risk factors" section of the S-1 Statement.  Likewise, the Commission's unsupported allegation of a supposed omission that "it is typical for pharmaceutical development companies to rely on third parties with specialized expertise to conduct clinical trials on the company's behalf" is insufficient to create a disputed material fact pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Pelletier v. Main Street Textiles, LP*, 470 F.3d 48, 55 (1st Cir. 2006) ("the customs and practices of an industry are proper subjects for expert testimony" (citing *Levin v. Dalva Bros.,* 459 F.3d 68, 79 (1st Cir. 2006)).  Fr. Emmanuel further objects to the Commission's response as it totally misrepresents Fr. Emmanuel's testimony.  Fr. Emmanuel never testified that his statement was inconsistent with Viking's SEC filings, but rather he testified, "The statements in my research report are derived from the public filings and if I had access to the S-1 statement, I believe that is where it was derived from."  Ex. 59 at 722:12-18.  The remainder of the testimony cited by the Commission merely discusses the date when the S-1 Statement was released (July 1, 2014) and the date of Fr. Emmanuel's next report (July 3, 2014).  There is nothing in the testimony close to an alleged admission that Fr. Emmanuel's statement was inconsistent with Viking's SEC filings.

50.     Viking's S-1 statement also stated, "All clinical trials, preclinical studies and other analyses performed to date with respect to our drug candidates have been conducted by Ligand.  Therefore, as a company, we do not have any experience in conducting clinical trials for our drug candidates."  Brooks Aff. Ex. 19 at 17.

**SEC Response:**  Disputed in part.  Undisputed that the quoted language appears in the S-

1.  However, the quoted language is found on page 13 of the cited exhibit, not page 17, and

continues, "Since our experience with our drug candidates is limited, we will need to train our

existing personnel and hire additional personnel in order to successfully administer and manage

our clinical trials and other studies as planned."  [Brooks Aff. Ex. 19 at 13.]  The Commission

therefore disputes Defendants' characterization of the document, which speaks for itself.

**Fr. Emmanuel's Reply:**  The document speaks for itself.

51.     Viking's CEO, Brian Lian, testified that Viking did not intend to conduct its own preclinical studies, but rather "to hire third parties to conduct their experiments."  Brooks Aff. Ex. 20 at 76:6-77:14.

**SEC Response:**  Disputed and not supported.  The Commission disputes Defendants'

characterization and selective quoting from the testimony transcript of Viking's CEO, Brian

Lian, specifically that he said that Viking did not intend to conduct its own preclinical studies,

but rather "to hire third parties to conduct their experiments."  Mr. Lian in fact went on to testify

that "the model of Viking, and 75 percent of the industry, is to hire third parties to conduct their

experiments."  [Brooks Aff. Ex. 20 at 77:9-14.]  Hiring third parties to conduct clinical trials is

therefore typical in the industry, and it was misleading for Defendants to suggest otherwise.

**Fr. Emmanuel's Reply:**  Fr. Emmanuel disputes that the testimony of Mr. Lian is

sufficient to establish that hiring third parties to conduct clinical trials is "typical in the industry,"

as this is evidence for which expert testimony is required.  *See Pelletier v. Main Street Textiles,*

*LP*, 470 F.3d 48, 55 (1st Cir. 2006) ("the customs and practices of an industry are proper subjects

for expert testimony" (citing *Levin v. Dalva Bros.,* 459 F.3d 68, 79 (1st Cir. 2006)).  Further, Fr.

Emmanuel disputes that the undisputed fact that Viking's CEO testified third parties were to conduct their experiments was in any way misleading, as the Commission misconstrued Fr. Emmanuel's statement to mean that he was accusing Viking of attempting to release drugs on the market without conducting preclinical studies (which is impossible). *In re Vertex Pharmaceuticals Inc., Sec. Litig.*, 357 F. Supp. 2d 343, 345-46 (D. Mass. 2005) (discussing approval process for drugs to be released to market, which included preclinical studies); U.S. Food & Drug Administration, "The Drug Development Process," (Jan. 04, 2018) *https://www.fda.gov/patients/learn-about-drug-and-device-approvals/drug-development-process* (last updated Jan. 4, 2018) (outlining process for drugs to be released to market, which included preclinical studies). But rather, Fr. Emmanuel was opining that he did not see what function Viking offered for Ligand other than being an entity to shift accounting losses to, and as part of that opinion, noting that Viking did not intend to conduct preclinical studies, but rather rely on third parties, which Ligand could have done on its own. Ex. 15 at 7.

52.     Fr. Emmanuel's opinion in this section of his report was that Ligand's transaction with Viking appeared to be for the purposes of shifting various liabilities to another entity to portray a more positive accounting perspective for Ligand. Brooks Aff. Ex. 15 at 8-9.

**SEC Response:** Disputed. The Commission disputes Defendants' characterization of the report and specifically disputes that Lemelson was stating an opinion. The language in the report speaks for itself.

53.     There is no evidence of any investor of Ligand or Viking raising concerns about this specific statement.

**SEC Response:** Disputed. Both Ligand and investors raised concerns about these statements. [*E.g.*, Ex. 57 (Foehr Dep.) at 92:1-92:13.] Further Ligand's stock price fell after Lemelson published his July 3, 2014 Report. [Ex. 55 (Smith Report) at ¶¶28-30.]

**Fr. Emmanuel's Reply:**  The Commission's reliance on its expert rebuttal report to assert facts in support of its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).  Further, Fr. Emmanuel disputes the Commission's characterization of Matthew Foehr's deposition testimony and regardless, the deposition testimony about what some other entity may have said about the report is inadmissible hearsay that is inadequate to create a dispute of a material fact at the summary judgment stage.  *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 29 (1st Cir. 2007) ("'[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment'") (quoting *Dávila v. Corporación De Puerto Rico Para La Difusión Pública,* 498 F.3d 9, 17 (1st Cir.2007)); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("[h]earsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment").

54.     Viking's CEO, Brian Lian, testified that he did not recall if he read Fr. Emmanuel's July 3, 2014 report, did not speak with any investor about this report in any depth, and did not recall any of his colleagues at Viking expressing any concern about these statements. Brooks Aff. Ex. 20 at 56:6-19, 129:3-132:6.

**SEC Response:**  Disputed and unsupported.  The Commission disputes Defendants' characterization of Mr. Lian's testimony that "he did not speak with any investor about this report in any depth."  The cited exhibit indicates that Mr. Lian only asked about his communications with Viking investors, not Ligand investors.

**Fr. Emmanuel's Reply:**  Despite the Commission's unsupported contention to the contrary, Mr. Lian was asked directly "Have you ever spoken with any **Ligand investor** about Fr. Lemelson or his reports?"  Ex. 20 at 129:22-23.  Mr. Lian responded that he "may have

been made aware of the **initial report** [presumably the June 16, 2014 report, not the July 3, 2014 report that mentioned Viking] from someone at Ligand" and that other than that he engaged in "small talk" with Matt Foehr about the issue, but it was "[n]othing substantive that I can remember."  Ex. 20 at 129:24-130:11.

55.    Ligand's CEO, John Higgins, also could not offer any explanation as to how these statements were material.  Brooks Aff. Ex. 21 at 278:4-279:2.

**SEC Response:**  Disputed.  The Commission disputes the statement in paragraph 55, which is not supported by the cited exhibit.  In the testimony submitted by Defendants, Mr. Higgins was never asked to offer any explanation as to how these statements were material. [Brooks Aff. Ex. 21 at 278:4-279:2.]

**Fr. Emmanuel's Reply:**  Fr. Emmanuel does not dispute that his counsel did not explicitly ask Mr. Higgins to explain how the July 3, 2014 statements about Viking were material to Ligand's stock price.  However, Fr. Emmanuel states that the testimony speaks for itself, as Mr. Higgins was unable to provide any reason for the rise in Ligand's stock price from July 3, 2014 (the date of the two alleged misstatements about Viking) until the next period of time Ligand identified as Fr. Emmanuel's reports impacting its stock price in its second meeting with the Commission on June 8, 2015 or why Ligand failed to mention the Viking statements in either of its presentations to the Commission.  Ex. 21 at 278:4-279:2.

56.    The July 3, 2014 report also acknowledged and addressed a June 17, 2014 report authored by Joseph Pantginis of Roth Capital that was critical of the June 16, 2014 report. Brooks Aff. Ex. 15 at 6-7.

**SEC Response:**  Disputed and not supported.  The Commission disputes Defendants' characterization of the July 3 report which speaks for itself.  The July 3 report purports to quote "Roth Capital Analyst Joseph Pantginis," but neither mentioned nor "acknowledged and addressed" a June 17, 2014 report by Mr. Pantginis.  [Brooks Aff. Ex. 15 at 6-7.]

33

**Fr. Emmanuel's Reply:**  Fr. Emmanuel's July 3, 2014 report quotes Joseph Pantginis' report and then links to a website where the report could be found and stated "Joseph Pantginis, Roth Capital analyst, on June 17, 2014, referred to the original June 16, 2014 Lemelson Capital Management research report on LGND as 'silly.'"  Ex. 15 at 6.  Subsequently, Fr. Emmanuel addressed the quoted portions of the June 17, 2014 report criticizing Fr. Emmanuel's original June 16, 2014 report and offered counter-opinions.  Ex. 15 at 6-7. Therefore, Fr. Emmanuel is unsure of the basis for the Commission's assertion that the report neither mentioned nor acknowledged and addressed the June 17, 2014 report by Mr. Pantginis.

57.     Ligand's stock price closed higher on July 3, 2014 than it did the previous day. Brooks Aff. Ex. 14 at 31.

**SEC Response:**  Disputed in part and not material.  The Commission does not dispute that Ligand's stock price closed 71 cents, or about 1%, higher on July 3, 2014, than on the previous day.  The Commission disputes that this fact is material, as a change in price is not the only indicator of materiality.  The Commission further disputes that the July 3 report did not cause a change in price, as intraday trading shows a drop in price immediately after the report was posted on Seeking Alpha; a further drop on July 7, when the report was published on PR Newswire, and a subsequent recovery after Seeking Alpha published a report that was critical of Defendants' reports.  [Ex. 55 (Smith Report) at ¶¶ 28-30, Ex. 6.]

**Fr. Emmanuel's Reply:**  The Commission's reliance on its expert rebuttal report to support facts in support of its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

Further, the Commission's unsupported statement that the change in stock price is not material because "price change is not the only indication of materiality of a statement" is a straw man argument, as even the Commission acknowledged the change in stock price can be considered in determining materiality under Rule 10b-5, thus making it a material fact. *See* ECF No. 131 at 6 (Commission arguing that change in stock price supported materiality); *id.* at 7 ("'stock movement is a factor the jury may consider relevant [to materiality]'") (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991)).

D.    August 4, 2014 Report

58.    On August 4, 2014, Fr. Emmanuel published his third report on Ligand.  Brooks Aff. Ex. 22.

**SEC Response:**  Undisputed.

59.    This report disclosed that Fr. Emmanuel had taken a short position in Ligand, contained Fr. Emmanuel's own opinions, and that Fr. Emmanuel may not necessarily amend his opinions in a published report if circumstances changed.  Brooks Aff. Ex. 22 at 1-2.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statements in paragraph 59, which are not supported by the exhibit cited.  The report makes no disclosures about any positions taken or held by Defendant Lemelson, nor does it disclose that the report contains Defendant Lemelson's own opinions.  The report only reflects a position of Lemelson Capital Management LLC.  The report does not disclose that Defendant Lemelson "may not necessarily amend his opinions in a published report if circumstances changed."

**Fr. Emmanuel's Reply:**  To clarify, as is apparently unchallenged, the disclaimer was in the name of Lemelson Capital Management, for which Fr. Emmanuel serves as the Chief Investment Officer.  ECF No. 128 ¶ 1.

60.    The Commission is not challenging any of Fr. Emmanuel's statements contained in the August 4, 2014 report.  See Brooks Aff. Ex. 8 at 2-4; Brooks Aff. Ex. 7.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes the statement in paragraph 60.

The Commission alleges a fraudulent scheme to manipulate the price of Ligand's stock, of which

all of Defendants' reports and statements about Ligand, including the four challenged false

statements of fact, were an integral component.  [Am. Compl. (ECF No. 33) ¶¶1, 8, 22, 42.]

> **Fr. Emmanuel's Reply:**  As a matter of law, the Commission cannot support a
>
> claim that legal conduct, such as publishing a report containing no challenged statements, can be
>
> a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants'
>
> Motion for Summary Judgment at 4-5.

61.     On August 4, 2014, Ligand's share price closed 9% higher than it did the previous
trading day.  Brooks Aff. Ex. 14 at 30.

**SEC Response:**  <u>Disputed in part and not material</u>.  The Commission does not dispute

that on August 4, 2014, Ligand's share price closed higher than it did on the previous trading

day.  The Commission disputes that this fact is material, as change in share price is not the only

indicator of materiality.  The Commission further disputes that the statements in the August 4

report did not impact the share price, which experienced an increase in reaction to a positive

earnings surprise that morning.  That increase in price was diminished, and the price dropped,

after the report was posted to PR Newswire and Seeking Alpha.  The share price closed lower

than its intraday high, which it hit shortly before the report was published.  [Ex. 55 (Smith

Report) at ¶¶ 41-42, Ex. 11.]

> **Fr. Emmanuel's Reply:**  The Commission's reliance on its expert rebuttal report
>
> in support of its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.
>
> *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary
>
> judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert
>
> report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-

chief, rather its use is limited solely to plaintiff's rebuttal case).  Further, the Commission's

unsupported statement that the change in stock price is not material because "price change is not

the only indication of materiality of a statement" is a straw man argument, as even the

Commission acknowledged the change in stock price can be considered in determining

materiality under Rule 10b-5, thus making it a material fact.  *See* ECF No. 131 at 6 (Commission

arguing that change in stock price supported materiality); *id.* at 7 ("'stock movement is a factor

the jury may consider relevant [to materiality]'") (quoting *United States v. Bilzerian*, 926 F.2d

1285, 1298 (2d Cir. 1991)).

E.    August 14 and August 22, 2014 Reports

62.    On August 14 and 22, 2014, Fr. Emmanuel published his fourth and fifth reports
on Ligand.  Brooks Aff. Ex. 23; Brooks Aff. Ex. 24.

**SEC Response:**  Undisputed.

63.    Both of these reports disclosed that Fr. Emmanuel had taken a short position in
Ligand, contained Fr. Emmanuel's own opinions, and that Fr. Emmanuel may not necessarily
amend his opinions in a published report if circumstances changed.  Brooks Aff. Ex. 23 at 3-4;
Brooks Aff. Ex. 24 at 1.

**SEC Response:**  Disputed and not supported.  The Commission disputes the statements

in paragraph 63 as not supported by the exhibits cited.  In particular, neither report contains any

disclosures about Defendant Lemelson's positions or opinions.  In addition, while Exhibit 23

contains some reference to the position and opinions of The Amvona Fund and Lemelson Capital

Management, respectively, Exhibit 24 references only the short position.  Exhibit 24 contains no

disclosures regarding the existence or obligation to amend opinions in the report.

**Fr. Emmanuel's Reply:**  To clarify, as is apparently unchallenged, the disclaimer

was in the name of Lemelson Capital Management, for which Fr. Emmanuel serves as the Chief

Investment Officer.  ECF No. 128 ¶ 1.  Further, while the Commission vaguely states that

Exhibit 23 contains "some reference to the position and opinions of the Amvona Fund and

Lemelson Capital Management," the disclaimer states directly "As of the publication date of this

report, Lemelson Capital Management LLC has a short position in the Company covered herein

(Ligand Pharmaceuticals) and stands to realize gains in the event that the price of the stock

declines." Ex. 23 at 3. And, "All content in this report represents the opinions of Lemelson

Capital." *Id.* Exhibit 24 includes links to previous reports containing the full disclaimer, but as

is undisputed, also affirmatively discloses Lemelson Capital Management's short position in

Ligand. Ex. 24 at 1.

64.     On August 14, 2014, Ligand's stock price closed higher than it did the previous
day. Brooks Aff. Ex. 14 at 30.

**SEC Response:** Undisputed. The Commission does not dispute that on August 14,

2014, Ligand's stock price closed nine cents, or about .1%, higher than it had the previous day.

[Ex. 55 (Smith Report) at ¶¶ 32-33, Ex. 4.]

**Fr. Emmanuel's Reply:** While stating the fact is undisputed, the Commission

attempts to insert additional facts beyond the scope of paragraph 64. In doing so, the

Commission's reliance on its expert rebuttal report in support of its case-in-chief is not

permissible under Fed. R. Civ. P. 56 and Local Rule 56.1. *See Maraj v. Massachusetts*, 953 F.

Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide

affirmative expert evidence, but only a rebuttal expert report because "there is no need to

consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely

to plaintiff's rebuttal case).

65.     On August 22, 2014, Ligand's stock price closed down slightly. Brooks Aff. Ex.
14 at 30.

**SEC Response:**  Undisputed.  The Commission does not dispute that Ligand's stock price closed down by 51 cents, or a little over 1%, on August 22.  [Ex. 55 (Smith Report) at ¶¶ 35-36, Ex. 8.]

**Fr. Emmanuel's Reply:**  While stating the fact is undisputed, the Commission attempts to insert additional facts beyond the scope of paragraph 65.  In doing so, the Commission's reliance on its expert rebuttal report in support of its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

66.    The August 14 and 22, 2014 reports discussed, *inter alia*, $245 million in new debt that Ligand was taking on through a publicly announced bond offering.  Brooks Aff. Ex. 23 at 2-3; Brooks Aff. Ex. 24 at 2-3.

**SEC Response:**  Disputed in part.  The Commission disputes in part the statements in paragraph 66 as unsupported by the cited exhibits.  Specifically, the August 14 report discussed a $225 million issuance of convertible debt, while the August 22 report referenced a $245 million debt offering.

**Fr. Emmanuel's Reply:**  The documents speak for themselves.

67.    As part of his discussion of the bond offering in the August 14 Report, Fr. Emmanuel wrote:

> **Tangible equity:** On August 4, 2014, Ligand released their Q2 earnings report and financial statements in which the company boasted that it was debt free. Prior to this August 4 release, the company's liabilities exceeded tangible assets, meaning the company was insolvent. With the August 4, 2014 earnings release and its updated financials, the company presented tangible equity of just $21,000 upon which rested an extraordinary market capitalization of approximately $1.1 billion.

Brooks Aff. Ex. 23 at 2 (emphasis in original).

    **SEC Response:** <u>Undisputed</u>.

    68.    As part of his discussion of the bond offering in the August 22 Report, Fr. Emmanuel wrote:

> On August 18 [2014], Ligand filed a form 8-K with the Securities and Exchange Commission (SEC) revealing that the company had issued $245 million in new debt against the company's tangible equity of jut $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars in debt for every $1 dollar in tangible common shareholder equity).

Brooks Aff. Ex. 24 at 3.

    **SEC Response:** <u>Undisputed</u>.

    69.    Fr. Emmanuel concluded his analysis of the bond offering in the August 22 Report as follows:

> There is no question that the cost of this preferential treatment of a few large Ligand shareholders at the expense of remaining investors places a burden on Ligand and its shareholders that is both unsustainable and further deepens the company's insolvency and likelihood of liquidation or reorganization under Chapter 7 or Chapter 11 of the bankruptcy code under which remaining Ligand common shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt.

Brooks Aff. Ex. 24 at 6.

    **SEC Response:** <u>Disputed in part</u>.  The Commission disputes that Lemelson "concluded his analysis of the bond offering in the August 22 Report" with the quoted language, but does not dispute that the quoted language appeared in that report.

    70.    In its original Complaint, the Commission alleged Fr. Emmanuel's calculation was wrong, because it failed to include the cash from the loan proceeds as part of shareholder tangible equity.  See Brooks Aff. Ex. 16 ¶ 52.

    **SEC Response:** <u>Disputed and not supported</u>.  The Commission disputes the statement in paragraph 70 as unsupported by the cited documents.  The paragraph cited says nothing about shareholder tangible equity.  The Commission also alleged that Lemelson falsely stated that Ligand was insolvent based on his misleading calculation.  [Compl. (ECF No. 1) ¶¶51-52.]  The

Commission further notes that the "original Complaint" was superseded by the Amended Complaint (ECF No. 33) and is therefore irrelevant.

**Fr. Emmanuel's Reply:**  The Commission's facile objection that the paragraph cited did not say anything about shareholder tangible equity ignores that this was what Fr. Emmanuel calculated, and the Commission alleged his calculation was wrong because he "included the new debt, but not the proceeds of the loan."  Ex. 16 ¶ 52.  Further, the Commission clearly laid out the four statements it was challenging in its Opposition to the Motion to Dismiss, Ex. 8, ECF No. 16 at 2-4,,  and while the Amended Complaint included other quotes from Fr. Emmanuel's reports for context, if the Commission is now trying to change its allegations about what statements it is challenging, it is untimely and impermissible.  *Wells v. Monarch Capital Corp.*, No. 91–10575–ADM, 1996 WL 728125, at *9-10 (D. Mass. Oct. 22, 1996) (denying motion to amend complaint filed on date opposition to summary judgment due as it indicated it was an attempt to avoid summary judgment and would require reopening discovery) (citing *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) (stating motion to amend following motion for summary judgment constitutes "an attempt to alter the shape of the case in order to defeat summary judgment")); *Melendez-Ortiz v. Wyeth Pharmaceutical Co.*, 775 F. Supp. 2d 349, 374 (D.P.R. 2011) ("Courts generally cannot entertain claims on summary judgment that never appeared in the complaint, as the defendant has an 'inalienable right to know in advance the nature of the cause of action being asserted against him.'" (quoting *Ruíz Rivera v. Pfizer Pharms., LLC,* 521 F.3d 76, 84 (1st Cir. 2008)).

71.     The Commission has not presented any accounting principle that would support this theory.  Brooks Aff. Ex. 25 at 42:11-18.

**SEC Response:**  Disputed and not supported.  The Commission disputes the asserted facts in paragraph 71, which are misleading.  The Commission's 30(b)(6) designee, Assistant

Director David Becker, testified that the Commission's position on why Lemelson's debt-to-

tangible equity ratio is misleading is set forth in ¶52 of the Amended Complaint:

> In his August 22 Report, titled "Ligand Pharmaceuticals
> (NASDAQ: LGND): Institutional holders wasting no time
> dumping stock in response to mounting insolvency and bankruptcy
> risks," Lemelson again painted a misleading picture of Ligand's
> financial health. He wrote that Ligand "issued $245 million in new
> debt against the company's [Ligand's] tangible equity of just
> $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-
> 1 (that is to say, $11,667 dollars (sic) in debt for every $1 dollar
> (sic) in tangible common shareholder equity)" and that
> "shareholders have only the protection of $21,000 in tangible
> equity to shield them from $245 million in debt." This statement
> was misleading for the following reasons. First, this statement
> ignores the cash proceeds of the debt issuance – i.e., while Ligand
> took on debt, it also received cash, tens of millions of which
> remained at Ligand's disposal as of the end of the third quarter of
> 2014. Moreover, Lemelson's statement that Ligand's shareholders
> "have only the protection of $21,000 in tangible equity to shield
> them from $245 million in debt" compares apples to oranges.
> Shareholder equity is not "protection from debt"; it is a balance
> sheet figure that represents the difference between assets and
> liabilities. Assets – including cash – "protect" shareholders from
> debt. Yet, without explanation, Lemelson cited a "debt to tangible
> equity" ratio that discarded the value of Ligand's intangible assets,
> such as intellectual property – the most significant asset of a
> pharmaceutical company whose business is built on licensing
> intellectual property rights to its drugs. Lemelson then
> compounded the misleading nature of his statement by comparing
> "tangible equity" as of June 30, 2014 – a figure that has no bearing
> on "protection from debt" – to the full amount of the August 2014
> debt offering ($245 million). Lemelson thus compared an apple
> ("tangible equity," which omitted existing intangible assets) to an
> orange (the full amount of the new debt, ignoring the cash
> proceeds of the issuance) at two different points in time to concoct
> a ratio that looks really bad (11,667 dollars of debt for every dollar
> of shareholder equity) but has no bearing on the actual financial
> wherewithal of the Company. [Am. Compl. (ECF No. 33) at ¶52.]

Further, there are no Generally Accepted Accounting Principles (GAAP) that govern the

calculation of a debt-to-tangible equity ratio because it is a non-GAAP metric and no such

accounting principles exist for non-GAAP metrics.

**Fr. Emmanuel's Reply:**  The Commission cannot simply rely on allegations in its complaint at the summary judgment stage, but rather must present admissible evidence.  *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) ("a party cannot successfully oppose a motion for summary judgment by resting 'upon mere allegations or denials of his pleading'") (quoting *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir. 1993)); *Theidon v. Harvard University*, 948 F.3d 477, 494 (1st Cir. 2020) (plaintiff seeking to avoid summary judgment "cannot rely on 'conclusory allegations, improbable inferences, acrimonious invective, or rank speculation'") (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).  Further, the Commission made the allegation that the metric was calculated in the wrong manner, so it is their burden to support the basis for such an allegation.  Finally, the Commission's unsupported assertion that "there are no Generally Accepted Accounting Principles (GAAP) that govern the calculation of a debt-to-tangible equity ratio because it is a non-GAAP metric and no such accounting principles exist for non-GAAP metrics" is properly the subject of expert evidence, which the Commission has failed to provide.  *Calisi v. Abbott Laboratories*, No. 11–10671–DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (where determinations are beyond the jury's lay knowledge i.e. "'generally beyond the scope of an average person's knowledge'" failure to present expert evidence on the topic is fatal to plaintiff's claims) (quoting *Esturban v. Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry of summary judgment after excluding expert)); *Morse v. Ford Motor Co.,* No. 08-11930-RGS, 2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect (such as this case), expert testimony is required because the answers to the highly technical and specialized questions raised by such claims lie outside the knowledge of most lay jurors ....As the only expert witness identified by the [plaintiff] has been disqualified [as not

qualified to offer an expert opinion], summary judgment may appropriately enter for [the defendant]"); *Alves v. Mazda Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that "[a]s expert evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to prevail now that their evidence [of experts' testimony] is being excluded"). *See also, Pegasus Management Co., Inc. v. Lyssa, Inc.*, 995 F. Supp. 29, 41-43 (D. Mass. 1998) (discussing expert reports regarding GAAP accounting principles and compliance therewith).

72.    This Court dismissed the claim that Fr. Emmanuel's calculation was wrong from the original Complaint, with leave to the Commission to replead it.  Brooks Aff. Ex. 26 at 4-5.

**SEC Response:**  Disputed and not supported.  The Commission disputes the asserted facts in paragraph 72, which are not supported by the Court's January 23, 2019 Order as cited by Defendants.  [Brooks Aff. Ex. 26 at 4-5.]  The Court's January 23rd Order did not state that it dismissed the Commission's claim because Defendant's calculation of debt-to-tangible equity was wrong or right, but rather because the Commission did not adequately plead how Defendant's "statement about Ligand's debt-to-tangible-equity ratio is materially false or misleading to a reasonable investor" and gave leave for the SEC to re-plead the claim.  [Brooks Aff. Ex. 26 at 4-5.]

**Fr. Emmanuel's Reply:**  The Court's Order speaks for itself, but briefly Fr. Emmanuel states that the order denied the motion to dismiss "**except** with respect to the Tangible Equity Statement."  Ex. 26 at 5.

73.    The Commission amended the allegation to allege that the calculation is false, but that despite being true, it is misleading.  Brooks Aff. Ex. 7 ¶ 52.

**SEC Response:**  Disputed and unsupported.  The Commission disputes the asserted facts in paragraph 73, which are not supported by the Amended Complaint as cited by Defendants. [Am. Compl. (ECF No. 33) at ¶52.]  Pursuant to the Court's January 23rd Order, the Commission amended its claim in Paragraph 52 of the Complaint to plead with particularity that

Defendant's statement about Ligand's 11,667-to-1 debt-to-tangible equity ratio was misleading because it did not support Lemelson's "thesis" that Ligand was insolvent and was otherwise misleading as to Ligand's financial health. *Id.* at ¶52. The Commission's Amended Complaint did not state that Defendant's calculation is true, but rather that it was misleading for numerous reasons: 1) the statement ignores the $245 million in cash proceeds of the debt issuance, 2) shareholder equity is not "protection from debt," rather, assets –including cash – are what protect shareholders from debt, and 3) Defendant does not state that he is discarding the value of Ligand's intellectual property, the most significant asset of a pharmaceutical company whose business is built on licensing intellectual property rights to its drugs, to calculate this ratio. *Id.*

   **Fr. Emmanuel's Reply:** The Amended Complaint speaks for itself. Further, the Commission's unsupported assertions about the inclusion of cash proceeds of the debt issuance, whether shareholder equity is protection from debt, and whether intellectual property is "the most significant asset of a pharmaceutical company whose business is built on licensing intellectual property rights to its drugs" are all properly the subject of expert evidence, which the Commission has failed to provide. *Calisi v. Abbott Laboratories*, No. 11–10671–DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (where determinations are beyond the jury's lay knowledge i.e. "'generally beyond the scope of an average person's knowledge'" failure to present expert evidence on the topic is fatal to plaintiff's claims) (quoting *Esturban v. Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry of summary judgment after excluding expert)); *Morse v. Ford Motor Co.,* No. 08-11930-RGS, 2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect (such as this case), expert testimony is required because the answers to the highly technical and specialized questions raised by such claims lie outside the knowledge of most lay

jurors ....As the only expert witness identified by the [plaintiff] has been disqualified [as not qualified to offer an expert opinion], summary judgment may appropriately enter for [the defendant]"); *Alves v. Mazda Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that "[a]s expert evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to prevail now that their evidence [of experts' testimony] is being excluded").

74.     In presenting this calculation, Fr. Emmanuel explained that he excluded Ligand's intangible assets from his calculation and was comparing just Ligand's tangible equity to its debts.  Brooks Aff. Ex. 24 at 3.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the asserted facts in paragraph 74, which are not supported by the cited exhibit.  [Brooks Aff. Ex. 24.] Defendant's August 22, 2014 Report states that Defendant is comparing Ligand's "$245 million in new debt against [its] tangible equity for just $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1" but does not explain which intangible assets he is excluding nor that he excluded the cash proceeds of the debt from this calculation.  *Id.* at 2-3.  Lemelson's omission of this information made any "explanation" misleading.

**Fr. Emmanuel's Reply:**  Fr. Emmanuel's August 22, 2014 report, stated "On August 18, Ligand filed a form 8-K with the Securities and Exchange Commission (SEC), revealing that the company had issued $245 million in new debt against the company's **tangible** equity of just $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars in debt for every $1 dollar in **tangible** common shareholder equity)."  (emphasis added).  Ex. 24 at 3.  Fr. Emmanuel cited the 8-K from which he got his data, twice stated that he was calculating just tangible equity (necessarily to the exclusion of intangible equity), and a quick glance at the 8-K would show that the $21,000 figure was gathered from excluding all intangible assets listed by Ligand.  Further, while the Commission continues to repeat its allegation that Fr. Emmanuel failed to explain excluding the cash proceeds from the loan, the

Commission has failed to set forth any of the necessary expert evidence to support its position. Mere allegations at this stage are not adequate. *Calisi v. Abbott Laboratories*, No. 11–10671–DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (where determinations are beyond the jury's lay knowledge i.e. "'generally beyond the scope of an average person's knowledge'" failure to present expert evidence on the topic is fatal to plaintiff's claims) (quoting *Esturban v. Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry of summary judgment after excluding expert)); *Morse v. Ford Motor Co.,* No. 08-11930-RGS, 2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect (such as this case), expert testimony is required because the answers to the highly technical and specialized questions raised by such claims lie outside the knowledge of most lay jurors ....As the only expert witness identified by the [plaintiff] has been disqualified [as not qualified to offer an expert opinion], summary judgment may appropriately enter for [the defendant]"); *Alves v. Mazda Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that "[a]s expert evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to prevail now that their evidence [of experts' testimony] is being excluded"). *See also, Pegasus Management Co., Inc. v. Lyssa, Inc.*, 995 F. Supp. 29, 41-43 (D. Mass. 1998) (discussing expert reports regarding GAAP accounting principles and compliance therewith).

75.     Fr. Emmanuel disclosed the numbers he used in making his calculation in his reports.  Specifically, Fr. Emmanuel's August 14, 2014 report, citing Ligand's Q2 financial report, noted that Ligand reported just $21,000 in tangible equity.  Brooks Aff. Ex. 23 at 2.  Fr. Emmanuel's August 22, 2014 report, citing Ligand's August 18, 2014 8K filing, noted that Ligand reported issuing $245 million in new debt.  Brooks Aff. Ex. 24 at 3.  Dividing the reported debt of $245 million by the $21,000 in reported tangible equity yields a ratio of 11,667 to 1, as stated in Fr. Emmanuel's August 22, 2014 report.  Brooks Aff. Ex. 24 at 3.

**SEC Response:**  <u>Disputed in part</u>. The language quoted by Defendants from the August 14 and August 22 reports is accurate.  But the quoted language and the larger context of the reports do not explain which intangible assets Defendants excluded, nor that he excluded the

cash proceeds of the debt issuance from his calculation.  [Brooks Aff., Ex. 23 at 1-3, Ex. 24 at 2-3.]  Nor is Defendants' conclusions that "he disclosed the numbers he used in making his calculation" accurate, as neither report disclosed *both* the tangible equity figure and the debt figure.  So, an investor would, at best, have to know to put both reports together to have an explanation of Lemelson's calculation.  Regarding the August 14 report, Defendant also fails to disclose that he used figures from Ligand's financial statements as of June 30, 2014, as the basis for his calculation of its tangible equity, and contrasts this figure against the August 18, 2014 $245 million debt issuance without explaining why or attempting to reconcile how Ligand's balance sheet would have changed as a result of the debt issuance.

**Fr. Emmanuel's Reply:**  *See* Fr. Emmanuel's reply to paragraph 74.  Further, the Commission's assertion that neither report disclosed *both* the tangible equity figure and the debt figure is false, as the August 24, 2014 report states, "On August 18, Ligand filed a form 8-K with the Securities and Exchange Commission (SEC), revealing that the company had issued **$245 million in new debt** against the company's **tangible equity of just $21,000**, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars in debt for every $1 dollar in tangible common shareholder equity)."  (emphasis added).  Ex. 24 at 3.  Finally, the Commission's claim here relies on the unsupported assertion that Fr. Emmanuel failed to explain or failed to "reconcile how Ligand's balance sheet would have changed as a result of the debt issuance," for which the Commission has failed to set forth any of the necessary expert evidence to support its position. *Calisi v. Abbott Laboratories*, No. 11–10671–DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (where determinations are beyond the jury's lay knowledge i.e. "'generally beyond the scope of an average person's knowledge'" failure to present expert evidence on the topic is fatal to plaintiff's claims) (quoting *Esturban v. Mass. Bay Transp.*

*Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry

of summary judgment after excluding expert)); *Morse v. Ford Motor Co.,* No. 08-11930-RGS,

2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of

product defect (such as this case), expert testimony is required because the answers to the highly

technical and specialized questions raised by such claims lie outside the knowledge of most lay

jurors ....As the only expert witness identified by the [plaintiff] has been disqualified [as not

qualified to offer an expert opinion], summary judgment may appropriately enter for [the

defendant]"); *Alves v. Mazda Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass.

2006) (noting that "[a]s expert evidence is essential to [the plaintiff's] case, the defendants are

clearly entitled to prevail now that their evidence [of experts' testimony] is being excluded").

Mere allegations at this stage are not adequate.  *Pina v. Children's Place*, 740 F.3d 785, 795 (1st

Cir. 2014) ("a party cannot successfully oppose a motion for summary judgment by resting

'upon mere allegations or denials of his pleading'") (quoting *LeBlanc v. Great Am. Ins. Co.,* 6

F.3d 836, 841 (1st Cir. 1993)); *Theidon v. Harvard University*, 948 F.3d 477, 494 (1st Cir. 2020)

(plaintiff seeking to avoid summary judgment "cannot rely on 'conclusory allegations,

improbable inferences, acrimonious invective, or rank speculation'") (quoting *Ahern v. Shinseki*,

629 F.3d 49, 54 (1st Cir. 2010)).

76.     No witness has challenged the accuracy of this calculation.  Brooks Aff. Ex. 25 at
31:6-11.

**SEC Response:**  Disputed and not supported.  The Commission disputes the asserted

facts in paragraph 76, which are not supported by the exhibit cited, Brooks Aff. Ex. 25, as

required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  The cited text states out of context

that the Commission did not make an "allegation that Defendants' [mathematical] calculation of

debt-to-tangible equity ratio was incorrect[,]" but does not state that the Commission is

challenging Lemelson's use of a debt-to-tangible equity ratio that was misleading for all of the reasons stated in the Commission's Amended Complaint and not a test for insolvency.  Brooks Aff. Ex. 7 at ¶52, Ex. 60 (Rule 30(b)(6) Dep. of Commission's designee, Assistant Director David Becker) at 24:1-11, 26:4-22, 31:6-11, 38:1-8, 42:2-18.]  And, at least one witness challenged the accuracy of using this calculation to determine whether a company is insolvent. [Ex. 61 (Pettingill Dep.) at 99:3-102:14.]

**Fr. Emmanuel's Reply:**  The Commission seemingly does not dispute that the mathematical correction was correct.  To the extent that the Commission purports to set forth reasons and arguments why the metric used in inappropriate, that is the subject of expert testimony, which the Commission has failed to provide.  *Calisi v. Abbott Laboratories*, No. 11–10671–DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (where determinations are beyond the jury's lay knowledge i.e. "'generally beyond the scope of an average person's knowledge'" failure to present expert evidence on the topic is fatal to plaintiff's claims) (quoting *Esturban v. Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry of summary judgment after excluding expert)); *Morse v. Ford Motor Co.,* No. 08-11930-RGS, 2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect (such as this case), expert testimony is required because the answers to the highly technical and specialized questions raised by such claims lie outside the knowledge of most lay jurors ....As the only expert witness identified by the [plaintiff] has been disqualified [as not qualified to offer an expert opinion], summary judgment may appropriately enter for [the defendant]"); *Alves v. Mazda Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that "[a]s expert evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to prevail now that their evidence [of experts' testimony] is

being excluded").  *See also, Pegasus Management Co., Inc. v. Lyssa, Inc.*, 995 F. Supp. 29, 41-

43 (D. Mass. 1998) (discussing expert reports regarding GAAP accounting principles and

compliance therewith).

77.     Internal Ligand emails, dated September 19, 2014, reflected that Ligand
understood this calculation based on reading the reports.  Specifically, Todd Pettingill corrected
a PowerPoint presentation regarding Fr. Emmanuel's statement that originally alleged Fr.
Emmanuel incorrectly stated Ligand had $21,000 in cash assets to properly acknowledge that Fr.
Emmanuel stated Ligand had $21,000 in tangible equity.  Brooks Aff. Ex. 27 at
LGND_0047298.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the facts

asserted by Defendant in paragraph 77, which are not supported by the record.  Defendant

mischaracterizes the cited September 19, 2014 email by stating that "Ligand understood this

calculation based on reading the reports."  The precise language from Mr. Pettingill's September

19, 2014 emails is, "I deleted one of your bullets on 'The Facts' page; the one which referred to

Lemelson claiming we had $21k in cash.  I killed it because he was actually claiming we had that

amount in net tangible equity (the metric he made up)[.]"  [Brooks Aff. Ex. 27 at

LGND_0047298.]  Mr. Pettingill testified that he had never heard of tangible equity until

Defendant's reports and that "[t]angible equity in itself is an oxymoron…it was a fabricated and

misleading financial metric that was brought up" by Defendant, inconsistently calculated by

Defendant, and that was inaccurate because it had no financial meaning.  [Ex. 61 (Pettingill

Deposition) at 82:12-84:15.]

**<u>Fr. Emmanuel's Reply:</u>**  The document speaks for itself.  Further, while the

Commission has included a number of additional facts unresponsive to paragraph 77, about a

fact witness' opinions on expert subject matter (which is inadmissible and should not be

considered, *see* Fed. R. Evid. 701(c); *Freedom Wireless, Inc. v. Boston Communications Group,
Inc.*, 369 F. Supp. 2d 155, 157 (D. Mass. 2005) (barring lay opinion testimony that was based on

scientific, technical, or other specialized knowledge that required expert evidence pursuant to

Fed. R. Evid. 702); *Alexis v. McDonald's Restaurants of Mass., Inc.*, 67 F.3d 341, 347-48 (1st

Cir. 1995) (affirming exclusion of lay opinion testimony and summary judgment because lay

opinion testimony was only evidence plaintiff offered on material fact)), the fundamental point

remains that Mr. Pettingill was able to determine Fr. Emmanuel's calculation of $21,000 in

tangible equity from his review of Fr. Emmanuel's reports.

78.     At depositions, Ligand representatives did not challenge the calculation itself, but
stated that the metric of a debt-to-tangible equity was not a traditional metric used to evaluate the
value of a security.  Brooks Aff. Ex. 21 at 116:20-24; Brooks Aff. Ex. 18 at 82:12-83:7, 84:19-
85:16, 103:2-104:1.

**SEC Response:**  <u>Disputed in part</u>.  The Commission disputes Defendant's statement that

"Ligand representatives did not challenge the calculation itself," which is not an accurate

characterization of the cited testimony.  As outlined above, in his deposition, Mr. Pettingill stated

"I could make up a metric and…calculate it correctly, but if the metric has no financial meaning,

then I believe it's an inaccurate metric" and "I see 21,000.  I see a number, but I don't see any

breakdown in calculation.  Maybe it's there.  I'm just not seeing it."  [Ex. 61 (Pettingill Dep.) at

82:12-85:16.]  Ligand's CEO also testified, "I don't know exactly…how he was describing, but

it was this – this message to investors that – I believe the number was like $11,000 of debt

for…one dollar of tangible equity.  So basically we are insolvent; that was false.  We were not

insolvent.  In my tenure at the company, we've never been insolvent.  And it was a comment

about manipulating the presentation so that we're counting all of the liability and then making

this extreme conclusion…it was a completely false premise for how to present the underlying

value of the company…it completely manipulated the story for – for investors to draw the

conclusions that they should get out now to drive the stock price down…[Lemelson's ] A-plus-B

may have been correct.  The formula he was trying to convince people to follow was misplaced,

and what he chose to include or not include was misplaced." [Ex. 56 (Higgins Dep.) at 115:13–

116:24.]

**Fr. Emmanuel's Reply:** *See* Fr. Emmanuel's reply to paragraph 76.

79.     The SEC alleged that "Lemelson thus compared an apple ("tangible equity," which omitted existing intangible assets) to an orange (the full amount of the new debt, ignoring the cash proceeds of the issuance) at two different points in time to concoct a ratio that looks really bad (11,667 dollars of debt for every dollar of shareholder equity) but has no bearing on the actual financial wherewithal of the Company."  Brooks Aff. Ex. 7 ¶ 52.

**SEC Response:**  Undisputed.

80.     In prior published opinions, Fr. Emmanuel disregarded or diminished the value of intangible assets in valuating companies.  Lemelson Aff. ¶ 6.

**SEC Response:**  Undisputed, but immaterial.  What Lemelson said about other

companies has no bearing on whether his statements about Ligand were misleading.

81.     For example, In discussing his short position in World Wrestling Entertainment in March 2014, Fr. Emmanuel wrote, "Intangible assets (the kind you can't sell easily when things turn south) increased from roughly 100 k in 2010 to just under 27 M in 2013, an increase of 268 fold in 3 years – these 'ghost assets' of course can bolster a balance sheet nicely. . . . Current price exceeds tangible book by a factor of nearly 10x."  Brooks Aff. Ex. 28 at 11.

**SEC Response:**  Undisputed, but immaterial.  The Commission does not dispute that the

referenced language appears in another of Lemelson's reports.  What Lemelson said about other

companies has no bearing on whether his statements about Ligand were misleading.  The

Commission further notes that Lemelson did not provide any similar definition or methodology

as to how he determined which items from Ligand's balance sheet he excluded and why.

82.     As another example, in Fr. Emmanuel's published analysis of his long position in Geospace Technologies, he noted multiple times that he believed Geospace was undervalued because of its significant tangible assets, stating: "Given the extraordinary volatility in revenues and earnings from year to year, it is a more sound approach to focus on the tangible assets buttressing the share price as consideration for the margin of safety in the commitment. . . ." Brooks Aff. Ex. 29 at 6.

**SEC Response:**  Undisputed, but immaterial.  What Lemelson said about Geospace

Technologies has no bearing on whether his statements about Ligand were misleading.

III.     **Negative Commentary About Ligand Between June and August 2014 From Other Securities Analysts**

83.     On July 22 and August 5, 2014, an entity called Empire Asset Management issued two reports concerning Ligand.  Brooks Aff. Ex. 30; Brooks Aff. Ex. 31.

**SEC Response:**  <u>Undisputed</u>.  The full name of the entity is Empire Asset Management Company.

84.     On July 22, 2014, Ligand's stock price decreased by approximately 4.5%.  Brooks Aff. Ex. 14 at 30.

**SEC Response:**  <u>Undisputed</u>.

85.     On August 5, 2014, Ligand's stock price decreased by more than 2%.  Brooks Aff. Ex. 14 at 30.

**SEC Response:**  <u>Undisputed</u>.

86.     On July 15, 2014, Federal Reserve Chair Janet Yellen made statements about valuations of biotech stocks being "substantially stretched."  Brooks Aff. Ex. 32 at 20.

**SEC Response:**  <u>Disputed and not supported</u>.  The Commission disputes the facts in paragraph 86, which are not supported by Brooks Aff. Ex. 32 as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Defendant mischaracterizes the exhibit by asserting that quotes from the exhibit are statements made by Federal Reserve Chair Janet Yellen, and inaccurately paraphrases the quoted language.  The exhibit cited by Defendant is the *Monetary Policy Report* authored by the Board of Governors for the Federal Reserve System, of which Janet Yellen is the Chair and on whose behalf Ms. Yellen is transmitting a copy of the report to the U.S. House and Senate on July 15, 2014.  Defendant's assertion that Ms. Yellen "made statements about valuations of biotech stocks being 'substantially stretched.'" is also inaccurate.  The page cited by Defendant instead states, "Nevertheless, valuation *metrics* in some sectors do appear to be substantially stretched—particularly those for *smaller firms* in the social media and biotechnology industries…" (emphasis added).  [Brooks Aff. Ex. 32 at 20.]

**Fr. Emmanuel's Reply:**  The document speaks for itself.

87.  On that date, Ligand's stock price fell by more than 4.5%.  Brooks Aff. Ex. 14 at 30-31.

**SEC Response:**  Undisputed.

88.  Internal emails at Ligand reflect that Ligand personnel believed that Ms. Yellen's statements may have been the cause of negative movement in Ligand's stock.  Brooks Aff. Ex. 33 at LGND_0000052.

**SEC Response:**  Disputed in part and incomplete.  The Commission disputes in part the

facts in paragraph 88, which are a mischaracterization of the cited exhibit.  [Brooks Aff. Ex. 33.]

In the July 16, 2019 internal Ligand email cited by Defendant, John Higgins, Ligand's CEO

states, "We have no idea what is causing the sharp pressure on our stock over the last three

trading days aside from Yellen's remarks yesterday generally about the Biotech sector."  [*Id.* at

LGND_0000052.]  In his deposition, Mr. Higgins reiterated that Ligand was unsure of the

underlying cause for the pressure on Ligand's stock in July 2014 and that Ms. Yellen's

comments were one of several contributing factors the company considered to be the cause,

among which were also Defendant's negative reports about Ligand.  [Ex. 56 (Higgins Dep.) at

189:9-192:19.]

**Fr. Emmanuel's Reply:**  The document speaks for itself.

IV.  **Timeline of Fr. Emmanuel Covering His Short Position**

89.  The chart below reflects the relevant dates from June-October 2014 on which Fr. Emmanuel took and covered short positions on Ligand:

| Date | # of Shares Covered (If Applicable) | Total Short Position |
|------|-------------------------------------|----------------------|
| June 16, 2014 | 0 | 68,528 |
| June 19, 2014 | 4,050 | 64,478 |
| July 3, 2014 | 0 | 65,556 |
| Aug. 4, 2014 | 0 | 65,736 |
| Aug. 13, 2014 | 0 | 65,736 |

| Date | # of Shares Covered (If Applicable) | Total Short Position |
|---|---|---|
| Aug. 22, 2014 | 30,729 | 35,007 |
| Aug. 26, 2014 | 3,500 | 31,507 |
| Sept. 16, 2014 | 0 | 31,507 |
| Oct. 10, 2014 | 14,673 | 16,834 |
| Oct. 13, 2014 | 16,717 (net) | 117 |

Brooks Aff. Ex. 34.

    **SEC Response:**  Undisputed.

**V.**    **Ligand's Requests to the Commission to Investigate Fr. Emmanuel**

    90.    Ligand never made a public statement contesting or correcting any of Fr. Emmanuel's statements that are now being challenged by the Commission.

    **SEC Response:**  Disputed and not supported.  The Commission disputes the asserted facts in paragraph 90, which do not contain any reference or citation and therefore are not supported as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.

        **Fr. Emmanuel's Reply:**  It is impossible to provide a citation to the absence of evidence.  The Commission bears the burden of proof in this claim and has failed to present any evidence of a public statement made by Ligand contesting or correcting any of Fr. Emmanuel's statements that are now being challenged by the Commission and, therefore, this fact should be considered undisputed pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Center for Behavioral Health v. Westerly Zoning Bd. of Review*, 394 F. Supp. 2d 493, 497 (D.R.I. 2005) (when a moving party points out the lack of evidence supporting a case, the "party opposing a motion for summary judgment must do more than merely assert allegations in order to raise a genuine issue of material fact; 'it must set forth specific facts demonstrating that there is a genuine issue for trial.'") (quoting *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 105 (1st Cir. 1988)).

91.     NASDAQ Rule IM-5250-1 states in pertinent part: "In certain circumstances, it may also be appropriate to publicly deny false or inaccurate rumors, which are likely to have, or have had, an effect on the trading in its securities or would likely have an influence on investment decisions."  Brooks Aff. Ex. 35.

**SEC Response:**  <u>Disputed and immaterial</u>.  The Commission disputes the asserted facts

in paragraph 91 as immaterial.  Insofar as Defendant suggests that issuers are required to publicly

deny false or inaccurate rumors "which are likely to have, or have had, an effect on the trading in

its securities or would likely have an influence on investment decisions," the plain text of the

exhibit as cited by Defendant makes clear there is no such obligation under Regulation FD.

[Brooks Aff. Ex. 35.]  Further, Regulation FD is clear that issuers have an obligation to disclose

to shareholders any disclosures made to stock analysts.  *Id.*, *see also* SEC Reg. FD FAQs,

https://www.sec.gov/fast-answers/answers-regfdhtm.html.

**Fr. Emmanuel's Reply:**  The Commission does not appear to dispute the quoted

rule and their remaining response is beyond the proper scope of objections to facts pursuant to

Fed. R. Civ. P. 56 and Local Rule 56.1.

92.     Ligand representatives testified that they decided not to issue any such statement because they viewed Fr. Emmanuel as too marginal of a voice.  Brooks Aff. Ex. 10 at 228:15-22; Brooks Aff. Ex. 18 at 53:20-54:16; Brooks Aff. Ex. 21 at 99:23-100:16.

**SEC Response:**  <u>Disputed in part and not supported</u>.  The Commission disputes

Defendants characterization of Brooks Aff. Ex. 10, and disputes the asserted facts as unsupported

by Brooks Aff. Ex. 18 and Brooks Aff. Ex. 21.  The Commission disputes Defendants'

characterization that Ligand representatives did not publicly deny Defendant's statements as

false or inaccurate rumors because they viewed Defendant as too marginal a voice.  Bruce Voss'

deposition, as cited by Defendants in Brooks Aff. Ex. 10, states that Ligand chose not to respond

to Defendant's reports because it viewed the report's content as "so egregious and the author so

marginal[,]" implying that any response would lend credibility to the egregious statements.  This

is further supported by other parts of the record, which further make clear that the primary reason

Ligand did not publicly deny Defendant's statements was because it did not wish to amplify

Lemelson's statements or lend them more credibility.  [Ex. 61 (Pettingill Dep.) at 54:13-16; Ex.

56 (Higgins Dep.) at 100:13-16.]

93.     Ligand initially engaged Latham & Watkins as legal counsel and met with the
Commission's Boston regional office on September 25, 2014.  Brooks Aff. Ex. 21 at 212:9-
213:7; Brooks Aff. Ex. 10 at 274:3-12; Brooks Aff. Ex. 17 at 98:11-99:21; Brooks Aff. Ex. 36 at
LGND_0080678.

**SEC Response:**  Undisputed.

94.     The purpose of the September 25, 2014 meeting between the Commission and
Ligand (being represented by Latham & Watkins) was for Ligand to convince the Commission to
investigate and bring an enforcement action against Fr. Emmanuel.  Brooks Aff. Ex. 36 at
LGND_0080737.

**SEC Response:**  Undisputed.

95.     Ligand submitted a PowerPoint presentation to the Commission at this September
25, 2014 meeting.  Brooks Aff. Ex. 36 at LGND_0080678.

**SEC Response:**  Undisputed.

96.     Among the allegations in the September 25, 2014 PowerPoint, Ligand accused Fr.
Emmanuel of engaging in an "affinity fraud," misrepresenting the performance of the Amvona
Fund, and that Fr. Emmanuel had a "questionable personal history."  Brooks Aff. Ex. 36 at
Brooks Aff. Ex. 36 at LGND_0080695; Brooks Aff. Ex. 36 at LGND_0080698-701; Brooks Aff.
Ex. 36 at LGND_0080703-04.

**SEC Response:**  Disputed in part.  The Commission disputes in part the facts asserted in

paragraph 96 in which Defendant characterizes Ligand's September 25, 2014 PowerPoint

presentation as accusing him of engaging in affinity fraud.  The referenced exhibit speaks for

itself.  The PowerPoint lists Defendant's use of religious credentials as one of several potentially

questionable investment practices, and goes on to list how these practices bear some hallmarks of

affinity fraud.  [Brooks Aff. Ex. 36 at LGND_0080695, LGND_0080698-702.]

97.     The September 25, 2014 PowerPoint did not reference the Commission's challenged statement by Fr. Emmanuel in the June 19, 2014 Benzinga interview.  *See* Brooks Aff. Ex. 36.

**SEC Response:**  Disputed.  The Commission does not dispute that Ligand's September 25, 2014 PowerPoint did not include the full statement from Defendant's June 19, 2014 Benzinga interview, but the presentation does contain a chart noting the Benzinga interview followed by a steep decline in Ligand's share price.  [Brooks Aff. Ex. 36 at LGND_0080735.] The PowerPoint also cites evidence to refute that Promacta is "going away," which is responsive to the June 19 Benzinga interview.  [*Id.* at LGND_0080727.]  In fact, the PowerPoint contains an entire nine-page section entitled "Lemelson's False Claims Regarding Promacta."  [*Id.* at LGND_0080718-27.]  The section states that "Lemelson's false and misleading claims about Promacta were the first and one of the most central arguments to start his illegal short-selling spree."  [*Id.* at LGND_0080718; *see also id.* at LGND_0080721-25 ("Promacta:  Lemelson's False Claims").]

**Fr. Emmanuel's Reply:**  The document speaks for itself.  By way of further reply, the Commission's response is beyond the scope of the fact stated in paragraph 97 and, therefore, should not be considered pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.

98.     The September 25, 2014 PowerPoint did not reference either of the statements about Viking on July 3, 2014 that the Commission is challenging in this litigation.  *See* Brooks Aff. Ex. 36.

**SEC Response:**  Disputed in part and immaterial.  The Commission does not dispute that Ligand's September 25, 2014 PowerPoint did not explicitly reference Lemelson's false statements about Viking contained in his July 3 report, but the presentation covers the entire period of Lemelson's conduct and notes changes in Ligand's share price.  [Brooks Aff. Ex. 36 at LGND_0080735; *see also* ¶176, below (citing Ex. 55 (Smith Report) at ¶¶28-30) (discussing decline in Ligand's stock price attributable to July 3 report).]  Whether counsel for Ligand chose

to include these statements as part of its presentation to the Commission is not material to whether Defendants violated the securities laws.

**Fr. Emmanuel's Reply:**  The document speaks for itself.  By way of further reply, the Commission's response is beyond the scope of the fact stated in paragraph 97 and, therefore, should not be considered pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.  Further, the Commission's reliance on its expert rebuttal report to support its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

99.    The September 25, 2014 PowerPoint from Ligand mentioned Fr. Emmanuel's statement about Ligand's debt to tangible equity ratio, but claimed it was incorrect because the calculation did not include the cash proceeds from the loan.  Brooks Aff. Ex. 36 at LGND_0080713.

**SEC Response:**  Disputed in part and immaterial.  The Commission does not dispute that the PowerPoint mentioned Lemelson's statement, but the exhibit as cited by Defendant does not that state that Defendant's debt-to-tangible equity is incorrect because it does not include the cash proceeds from the loan.  Rather, it simply states that the ratio is a false *insolvency* claim because Lemelson ignored the cash proceeds from the debt.  [Brooks Aff. Ex. 36 at LGND_0080713.]  Further, what counsel for Ligand chose to include in its presentation to the Commission is not material to whether the Defendants violated the securities laws.

**Fr. Emmanuel's Reply:**  The document speaks for itself.

100.    The September 25, 2014 PowerPoint did not mention the Empire reports published on July 22 and August 5, 2014.  *See* Brooks Aff. Ex. 36.

**SEC Response:**  Undisputed and immaterial.

101.   The September 25, 2014 PowerPoint did not mention Ligand's historically volatile stock prices.  *See* Brooks Aff. Ex. 36.

**SEC Response:**  Disputed in part.  The Commission does not dispute that the September 25, 2014 PowerPoint does not explicitly reference any "historically volatile stock price" but disputes the characterization as "historically volatile" as unsupported by the Defendants' cited evidence.

**Fr. Emmanuel's Reply:**  *See* response to paragraph 102.

102.   Ligand's own financial disclosures identifies its historically volatile stock prices as an area of concern.  Brooks Aff. Ex. 37 at 45.

**SEC Response:**  Disputed in part.  The Commission does not dispute that Ligand's second quarter Form 10-Q contained a disclosure that its stock price has "experienced significant price and volume fluctuations and may continue to experience volatility in the future[,]" the Commission does dispute that this was an area of concern for Ligand.  [Brooks Aff. Ex. 37 at 45; Ex. 56 (Higgins Dep.) at 170:22-171:15.]  The risk language included in Ligand's Form 10-Q also states this type of market price volatility is typical for biotechnology and pharmaceutical companies.  *Id.*  The Commission disputes the characterization as "historically volatile" as unsupported by the Defendants' cited evidence.

**Fr. Emmanuel's Reply:**  While the Commission objects for some reason to the term "historically volatile," the risk disclosures (Ex. 37) by Ligand speaks for itself and includes the fundamental point that Ligand's stock price had fluctuated and was volatile in the past, and may continue to be so in the future.

103.   Ligand's stock price dropped as much as 30% between March 2014 and April 2014.  Brooks Aff. Ex. 14 at 32-33.

**SEC Response:**  Disputed in part.  The Commission does not dispute that Ligand's stock price dropped 30% from an intraday high of $80.21 on March 19, 2014, to an intraday low of

$55.90 on April 15, 2014.  [Brooks Aff. Ex. 14 at 32-33.]  This calculation mischaracterizes

Ligand's stock price during that same timeframe, however, because the exhibit shows that

Ligand's closing price only fell 23% between those same dates, and only fell a little over 8.58%

between March 3, 2014, and April 30, 2014.  *Id.*

        **Fr. Emmanuel's Reply:**  The data speaks for itself.

104.    Sometime after the September 25, 2014 meeting, the Commission's Boston regional office informed Ligand that it would not be opening an investigation concerning Fr. Emmanuel.  Brooks Aff. Ex. 25 at 64:3-65:3.

**SEC Response:**  Undisputed.

105.    Following the September 25, 2014 meeting, Ligand changed counsel to Bradley Bondi of Cahill Gordon.  Brooks Aff. Ex. 17 at 108:2-109:20; Brooks Aff. Ex. 21 at 254:11-255:10; Brooks Aff. Ex. 10 at 287:22-288:6.

**SEC Response:**  Undisputed.  Mr. Bondi was, and is, one of the lawyers for Ligand in

this matter.

106.    Bradley Bondi used to work for the Commission.  *See* Brooks Aff. Ex. 38.

**SEC Response:**  Undisputed.

107.    Bradley Bondi contacted a former colleague at the Commission and scheduled a second meeting between Ligand and the Commission's Washington, D.C. regional office on June 8, 2015.  Brooks Aff. Ex. 39 at E-PROD-SEC-LIT-E-001189144-47.

**SEC Response:**  Disputed in part and unsupported.  The Commission disputes in part

some of the facts asserted in paragraph 107 as unsupported by the exhibit cited.  [Brooks Aff.

39.]  The Commission does not dispute that Bradley Bondi reached out to a member of the

Commission's staff to schedule a June 8, 2015 meeting between Ligand and members of the

Division of Enforcement at the Commission's home office in Washington, D.C.  In the exhibit

cited, however, Mr. Bondi does not make any mention that he is a former colleague of the

individual he is emailing or that he previously worked for the Commission.  [*See* Brooks Aff. Ex.

39.]  Further, the email set up the first meeting between Ligand and a team from the

Commission's home office in Washington, D.C., not a second meeting.  *See id.*

        **Fr. Emmanuel's Reply:**  The document speaks for itself.  As established in the

undisputed record, Ligand had already met with the Commission's Boston Regional Office

regarding Fr. Emmanuel on September 25, 2014, *see* paragraph 93, so this meeting with the

Washington, D.C. Regional Office was its second meeting with the Commission on the same

topic.  *See* paragraph 93.

    108.    Ligand submitted a PowerPoint presentation to the Commission at this June 8,
2015 meeting.  Brooks Aff. Ex. 40.

    **SEC Response:**  Undisputed.

    109.    The purpose of the June 8, 2015 meeting between the Commission and Ligand
(being represented by Cahill Gordon) was for Ligand to convince the Commission to investigate
and bring an enforcement action against Fr. Emmanuel.  Brooks Aff. Ex. 40 at LGND_0080797

    **SEC Response:**  Undisputed.

    110.    Among the allegations in the June 8, 2015 PowerPoint, Ligand accused Fr.
Emmanuel of engaging in an "affinity fraud," misrepresenting the performance of the Amvona
Fund, and that Fr. Emmanuel had a "questionable personal history."  Brooks Aff. Ex. 40 at
LGND_0080752-55.

    **SEC Response:**  Disputed in part and not supported.  The Commission disputes the facts

asserted in paragraph 110 as unsupported by the cited exhibit.  [Brooks Aff. Ex. 40.]  Ligand's

June 8, 2015 PowerPoint, and specifically the pages cited by Defendant, do not contain any

reference to "affinity fraud" or any "questionable personal history."  [Brooks Aff. Ex. 40 at

LGND_0080752, LGND_0080755.]  Specifically, the pages cited by Defendant state that

Defendant is an ordained Greek Orthodox priest; has no formal investment education, training,

or experience; and tweets from accounts that mix religious commentary and current events,

mixed with stock performance.  [*Id.*]  The Commission does not dispute that the cited pages do

state that Defendant self-reports outperformance claims.  [*Id.* at LGND_0080753-54.]

**Fr. Emmanuel's Reply:**  The document speaks for itself.

111.    The June 8, 2015 PowerPoint only referenced the Commission's challenged statement by Fr. Emmanuel in the June 19, 2014 Benzinga interview on one slide.  Brooks Aff. Ex. 40 at LGND_0080771.

**SEC Response:**  Disputed and not supported.  The Commission disputes the facts as asserted in paragraph 111 as unsupported by the cited exhibit.  [Brooks Aff. Ex. 40.]  The June 8, 2015 PowerPoint includes a reference to Defendant's statement from the June 19, 2014 Benzinga interview on page 55.  [Brooks Aff. Ex. 40 at LGND_0080792.]  And, the entire slide cited by Defendants addresses the June 19, 2014 statement.  [*Id.* at LGND_0080771.]  Further, what Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether Defendants violated the federal securities laws.

**Fr. Emmanuel's Reply:**  The document speaks for itself.  By way of further response, it is at best ambiguous whether the reference on page 55 (Brooks Aff. Ex. 40 at LGND_0080792) to "Promacta going away" was to the June 19, 2014 interview or the June 16, 2014 report, which does not contain any specific statements being challenged by the Commission.

112.    The June 8, 2015 PowerPoint did not reference either of the statements about Viking on July 3, 2014 that the Commission is challenging in this litigation.  *See* Brooks Aff. Ex. 40.

**SEC Response:**  Undisputed and immaterial.  What Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether Defendants violated the federal securities laws.

113.    The June 8, 2015 PowerPoint from Ligand mentioned Fr. Emmanuel's statement about Ligand's debt to tangible equity ratio, but claimed it was incorrect because the calculation did not include the cash proceeds from the loan.  Brooks Aff. Ex. 40 at LGND_0080788.

**SEC Response:**  Disputed in part and immaterial.  The Commission disputes in part the facts asserted in paragraph 113 because the exhibit as cited by Defendant does not that state that

64

Defendant's debt-to-tangible equity is incorrect because it does not include the cash proceeds from the loan.  Rather, it simply states that the ratio is a potential false or misleading statement regarding Ligand's solvency because it ignored all cash proceeds from the debt.  [Brooks Aff. Ex. 40 at LGND_0080788.]  Further, what Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether Defendants violated the federal securities laws.

**Fr. Emmanuel's Reply:**  The document speaks for itself.

114.    The June 8, 2015 PowerPoint did not mention the Empire reports published on July 22 and August 5, 2014.  *See* Brooks Aff. Ex. 40.

**SEC Response:**  Undisputed and immaterial.  Whether Ligand's counsel discussed the reports of someone other than the Defendants during their meeting with the Commission is immaterial to any issue in this case.  Further, what Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether Defendants violated the federal securities laws.

115.    The June 8, 2015 PowerPoint did not mention Ligand's historically volatile stock prices.  *See* Brooks Aff. Ex. 40.

**SEC Response:**  Disputed in part and immaterial.  The Commission does not dispute that Ligand's June 8, 2015 PowerPoint does not contain language that referring to Ligand's stock prices as being historically volatile.  The presentation, however, does contain a chart showing its price fluctuation and a steady increase in price quarter over quarter since at least the second quarter of 2013 and performance ahead of its peer index.  [Brooks Aff. Ex. 36 at LGND_0080757 (slide 20).]  The Commission does dispute the characterization as "historically volatile" as unsupported by the Defendants' cited evidence.  [*See also* SEC response to ¶¶101-02, above.]  Further, what Ligand's counsel did or did not include in the PowerPoint presentation is irrelevant to whether Defendants violated the federal securities laws.

**Fr. Emmanuel's Reply:**  The document speaks for itself.  By way of further response, Fr. Emmanuel incorporates his reply to paragraph 102 as if fully stated herein.

116.     The June 8, 2015 PowerPoint identified four periods of time that it claimed Fr. Emmanuel's reports caused Ligand's stock price to decrease.  These time periods were: (1) June 16, 2014 to June 24, 2014; (2) July 13, 2014 to July 17, 2014; (3) August 7, 2014; and (4) August 22, 2014 to August 25, 2014.  Brooks Aff. Ex. 40 at LGND_0080763.

**SEC Response:**  <u>Undisputed</u>.

## V.     The Commission's Complaint

117.     The Commission filed its original Complaint on September 12, 2018.  Brooks Aff. Ex. 16.

**SEC Response:**  <u>Undisputed</u>.

118.     The Commission filed its Amended Complaint on March 21, 2019.  Brooks Aff. Ex. 7.

**SEC Response:**  <u>Undisputed</u>.

119.     The Commission has alleged that Fr. Emmanuel made four misstatements in violation of Rule 10b-5.  *See* Brooks Aff. Ex. 8 at 2-4; Brooks Aff. Ex. 7 ¶¶ 36-53.

**SEC Response:**  <u>Disputed in part</u>.  The Commission's Amended Complaint alleged that

each of the four statements of fact were false and misleading, that the four statements of facts

were collectively false and misleading and part of a fraudulent scheme to depress Ligand's share

price, and that Defendant's violated the Advisers Act.  [Am. Compl. (ECF No. 33) ¶¶ 57-61.]

**Fr. Emmanuel's Reply:**  As a matter of law, the Commission cannot support a

claim that legal conduct, such as publishing a report containing no challenged statements, can be

a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants'

Motion for Summary Judgment at 4-5.

120.     The Commission has also alleged a scheme liability theory.  Brooks Aff. Ex. 7 ¶¶ 58-59.

**SEC Response:**  <u>Undisputed</u>.

121.     At oral argument, the Commission conceded that they do not have much alleged behavior beyond the four alleged misstatements to support its scheme liability theory.  Brooks Aff. Ex. 41 at 24:13-25:8.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes the facts asserted in paragraph 121 as an inaccurate characterization of the Commission's allegations against Defendant and its discussion with the Court.  During the December 6, 2018 hearing that Defendant cites, the Commission informed the Court that the four alleged misstatements by Defendant form the basis for the Commission's Exchange Act Rule 10b-5(b) case and are part of its Rule 10b-5(a) and (c) case against Defendants.  [Ex. 62 (Tr. of 12/6/18 Mot. Hearing) at 23:25-24:12, 24:21-25:1.] Further, the Commission has alleged further conduct, for example, evidence that Defendants took affirmative steps to suppress commentary highlighting his bias against Ligand and lack of familiarity with the pharmaceutical industry.  [*See* ¶189, below.]

**Fr. Emmanuel's Reply:**  As a matter of law, the Commission cannot support a claim that legal conduct, such as publishing a report containing no challenged statements, can be a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 4-5.  Further, the transcript is quite clear:

> Q (Judge Saris):  But you are saying, even if I agree with him on all of these, you still have a case?
>
> A (Mr. Day):  Not necessarily, your Honor. I think, if all of the misstatements went away, **there's not a lot of other conduct that we've alleged in the complaint**, but I just want to be clear that there are multiple theories in this case.

Ex. 24 at 25:2-8 (emphasis added).

122.    The Commission has also alleged violations of the Investment Advisers Act on the theory that Fr. Emmanuel did not disclose his alleged misstatements in violation of Rule 10b-5 to his investors.  Brooks Aff. Ex. 7 ¶¶ 63-67.

**SEC Response:**  <u>Disputed in part</u>.  The Commission disputes the facts as asserted in paragraph 122 as unsupported by the exhibit cited.  The Commission alleged violations of the Investment Advisers Act by Defendant for "making any untrue statement of material fact or omitting to state a material fact necessary to make the statements made, in the light of the

circumstances under which they were made, not misleading, to any investor or prospective

investor in the pooled vehicle[,]" in violation of Section 206(4) and Rule 206(4)-8 of the

Investment Advisers Act, not Rule 10b-5 of the Exchange Act.  [Brooks Aff. Ex. ¶¶ 62-67.]

> **Fr. Emmanuel's Reply:**  The document speaks for itself.

123.    Based on the discovery responses provided by the Commission, it does not appear
the Commission interviewed any of Fr. Emmanuel's investors prior to filing this claim.  Brooks
Aff. ¶ 45.

**SEC Response:**  <u>Undisputed but immaterial</u>.  The Commission need not offer testimony

from any current investor to prove its case, and certainly has no obligation to interview current

investors prior to the filing of an enforcement action.

## VI.    The Commission Failed to Produce the Expert Evidence Required to Support Its Market-Manipulation Claim

124.    Defendants sought discovery from the Commission seeking any evidence it had
that Fr. Emmanuel's alleged misstatements caused Ligand's stock to drop.  Brooks Aff. Exs. 42-
43.

**SEC Response:**  <u>Undisputed</u>.

125.    Specifically, on June 13, 2019, Defendants served the Commission with its First
Set of Interrogatories.  Interrogatory No. 3 requested the Commission:

> State the basis for Your contention that Defendants' statements influenced or
> otherwise impacted the stock price for Ligand, including but not limited to (i) a
> detailed description of all data sources and other materials You considered, and
> (ii) each alternative cause, influence, or reason for the decline in Ligand's stock
> price that You considered, analyzed, and/or reviewed with a detailed explanation
> for how you ruled out that alternative form of causation.

Brooks Aff. Ex. 42 at 4.

**SEC Response:**  <u>Undisputed</u>.

126.    The Commission objected to this Interrogatory, stating, *inter alia*, it was "a
premature request for matter that may be the subject of expert testimony."  Brooks Aff. Ex. 44 at
11.

**SEC Response:**  <u>Disputed in part and incomplete</u>.  The Commission does not dispute that

it objected to the interrogatory as a premature request for a matter that may be subject of expert

testimony, however, the Commission disputes Defendant's characterization of the Commission's response to interrogatories, as it is misleadingly incomplete.  The Commission also stated that the interrogatory 1) as a premature request because it was served before substantial discovery had taken place, and 2) because the Commission did not need to prove causality between Defendant's actions and the fall of Ligand's stock price because the SEC is not required to show harm/actual damages or reliance by individual investors.  [*See* Brooks Aff. Ex. 44 at 11-12.]  The Commission also detailed other evidence establishing that Defendants' statements and conduct were material.  Further, the requests were the subject of subsequent expert discovery.

   **Fr. Emmanuel's Reply:**  The document speaks for itself.  To the extent that the Commission's assertion that "the requests were the subject of subsequent expert discovery" is in reference to its rebuttal report, the Commission's reliance on its expert rebuttal report is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

  127. Defendants also served the Commission with its First Set of Requests for Production of Documents on June 13, 2019.  Request Nos. 20-21 sought: "All Documents or Communications relating, concerning, or supporting the position that Fr. Lemelson's statements listed in [paragraphs 36 through 50] of the Amended Complaint caused any changes in the price of Ligand's stock."  Brooks Aff. Ex. 43 at 5.

  **SEC Response:**  Undisputed.

  128. The Commission objected to these document requests, stating, *inter alia*, it was "a premature request for matter that may be the subject of expert testimony."  Brooks Aff. Ex. 45 at 12-13.

  **SEC Response:**  Undisputed, but incomplete.  The Commission's other objections included that the request "attributes to the Commission a 'position' that had not been made by

the Commission in its Amended Complaint or elsewhere."  Further, the requests were the subject

of subsequent expert discovery.

**Fr. Emmanuel's Reply:**  *See* Fr. Emmanuel's reply to paragraph 126.

129.    The Commission did not serve any affirmative expert report.  Brooks Aff. ¶ 50.

**SEC Response:**  Undisputed but immaterial.  The Commission is under no obligation to

retain an affirmative expert or to proffer an event study to support its claims of materiality, as

Defendants' incorrectly assert.

**Fr. Emmanuel's Reply:**  Fr. Emmanuel disputes the Commission's unsupported

legal contention that it is "under no obligation to retain an affirmative expert or to proffer an

event study to support its claims of materiality."  *See* Defendants' Reply Memorandum in

Support of their Motion for Summary Judgment at 5-6, 13-14.  Further, there are other issues in

this case that require expert evidence, including the Commission's contentions about typical

practices of the pharmaceutical industry, the alleged improper calculation of the debt to tangible

equity ratio, including the apparent challenge to the metric itself, for which the Commission has

failed to present the required expert evidence.  *See* Brooks Reply Aff. Ex. 89 at 27:23-28:19

(when counsel for the Commission began to explain its position on the accounting principles for

how to account for the proceeds of Ligand's loan in the debt to tangible equity ratio, the Court

asked whether counsel was an accountant and commented that "usually I have experts and some

explanation of it and I can pick it up"); Brooks Reply Aff. Ex. 89 at 31:8-17 (discussing the

potential risk of Ligand's insolvency where Court noted by Commission's own statements

Ligand only had $168 million left after a $240 million bond offering to which counsel for the

Commission responded, "Yes, your Honor, but I think that's a question that would have to be

answered by experts and with reference to testimony in this case"); *Calisi v. Abbott*

*Laboratories*, No. 11–10671–DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (where

determinations are beyond the jury's lay knowledge i.e. "'generally beyond the scope of an

average person's knowledge'" failure to present expert evidence on the topic is fatal to plaintiff's

claims) (quoting *Esturban v. Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 911

(2007) (affirming trial court's entry of summary judgment after excluding expert)); *Morse v.*

*Ford Motor Co.,* No. 08-11930-RGS, 2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating

that "[i]n cases involving claims of product defect (such as this case), expert testimony

is required because the answers to the highly technical and specialized questions raised by such

claims lie outside the knowledge of most lay jurors ....As the only expert witness identified by

the [plaintiff] has been disqualified [as not qualified to offer an expert

opinion], summary judgment may appropriately enter for [the defendant]"); *Alves v. Mazda*

*Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that

"[a]s expert evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to

prevail now that their evidence [of experts' testimony] is being excluded").  *See also, Pegasus*

*Management Co., Inc. v. Lyssa, Inc.*, 995 F. Supp. 29, 41-43 (D. Mass. 1998) (discussing expert

reports regarding GAAP accounting principles and compliance therewith).

130.    On January 17, 2020, Defendants served the Commission their expert report of
Aaron Dolgoff.  Brooks Aff. ¶ 51.

**SEC Response:**  Undisputed.  The Expert Report of Aaron Dolgoff, which Defendants

reference, is attached as Ex. 54.

131.    On February 28, 2020, the Commission served the Defendants its rebuttal expert
report of Erin Smith.  Brooks Aff. ¶ 52.

**SEC Response:**  Undisputed.  The Expert Report of Erin Smith is attached as Ex. 55.

**Fr. Emmanuel's Reply:**  Fr. Emmanuel does not dispute that the exhibit is the

rebuttal expert report served by the Commission, but any reliance on the rebuttal expert report to

help support the Commission's affirmative claims to avoid summary judgment here is not

allowed.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

132.    The experts agreed that Ligand traded in an efficient market.  Brooks Aff. ¶ 53.

**SEC Response:**  Disputed and not supported.  The Commission disputes the asserted facts in paragraph 132, which are not supported by the exhibit cited, Brooks Aff. ¶ 53, as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  The Commission's rebuttal expert did not perform this analysis and did not opine on whether Ligand traded in an efficient market.  *See* Ex. 55 (Smith Report).]  The Commission's rebuttal expert was asked to review and comment on whether Defendants' expert report reliably assessed the impact of the Lemelson's campaign on Ligand's stock price. [*Id.* at 4.]

**Fr. Emmanuel's Reply:**  The Commission's expert rebuttal report offered a number of opinions beyond the scope of rebuttal of Aaron Dolgoff's report (which, if necessary, will be the subject of motions to strike in the future), including offering opinions that Fr. Emmanuel's reports impacted the intraday price of Ligand's stock.  Offering opinions on the cause of changes in stock price within minutes or hours of the alleged misstatements in this case, necessarily depends on the assumption of an efficient market.  *See In Re PolyMedica Sec. Litig.*, 453 F. Supp. 2d 260, 278 (D. Mass. 2006) (discussing First Circuit's definition of efficient market and noting that "stock price must quickly and fully reflect the release of public information such that ordinary investors cannot profitably trade on the basis of it, requires that the reaction to news be fully completed on the same trading day as its release—and perhaps even within hours or minutes") (citing *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (approving a finding of market efficiency "because Plaintiffs' event study capture[d] the

same-day reaction to Xcelera's stock price to company-specific events").  Further, to the extent

that the Commission argues it did not rebut Mr. Dolgoff's expert opinion that the Ligand stock

traded in an efficient market, that fact is uncontradicted on the record and, thus, should be

undisputed for the purposes of this Motion for Summary Judgment.  *EEOC v. Texas Roadhouse,*

*Inc.*, 215 F. Supp. 3d 140, 164 (D. Mass. 2016) (pursuant to Rule 37, a party that fails to adhere

to the Rule 26(a) requirements of disclosing any expert rebuttal to proffered expert opinions

within 30 days "'is not allowed to use that [untimely] information ... to supply evidence on a

motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'"

(quoting Fed. R. Civ. P. 37(c)(1)).

133.    The experts also agreed that there was no statistically significant evidence that Fr. Emmanuel's statement about the debt to tangible equity ratio, which is the Commission's fourth alleged misstatement in this case, had any material impact on Ligand's stock price.  Brooks Aff. ¶ 54.

**SEC Response:**  <u>Disputed in part and not supported</u>.  The Commission disputes the

asserted facts in paragraph 133, which are not supported by the exhibit cited.  [Brooks Aff. ¶ 54],

as required under Fed. R. Civ. P. 56(c) and Local Rule 56.1.  Specifically, the Commission

disputes Defendant's statement that the experts agree as to the underlying reasons why there was

not statistically significant evidence that Defendant's August 14, 2014 statement about Ligand's

debt-to-tangible equity ratio had a material impact on Ligand's stock price.  The Commission's

February 28, 2020 rebuttal expert report states that Defendant's expert report omitted follow-on

coverage of all of Defendant's reports, which would have contributed to the perceived credibility

of Defendant's statements about Ligand, helped disseminate his statements, and impacted

Ligand's stock price beyond the date the statement was made.  [Ex. 55 (Smith Expert Report) at

¶¶11-15, 31-34.]  Further, the Commission's rebuttal expert concluded that Defendant's expert

did not take into account that the statistically insignificant result of the August 14, 2014 report could be due to confounding news about Ligand that same day.  [*Id.* at ¶ 34.]

**Fr. Emmanuel's Reply:**  The Commission's response is beyond the scope of the stated fact in paragraph 133, which is simply that the experts agreed there was no statistically significant evidence that Fr. Emmanuel's statement about the debt to tangible equity ratio, which is the Commission's fourth alleged misstatement in this case, had any material impact on Ligand's stock price.  As acknowledged in the response, the experts do not dispute this fact, so it should be accepted for the purposes of summary judgment.  To the extent, the Commission wrongfully tries to shoehorn in its response its expert's rebuttal opinion regarding follow-on coverage (which, if necessary, will be the subject of motions to strike in the future), such an effort is improper as it is beyond the scope of rebuttal and an expert rebuttal report cannot create affirmative evidence to avoid summary judgment.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case); *Crawford-Brunt v. Kruskall*, No. 17-11432-FDS, 2020 WL 5790462, at *3 (D. Mass. Sept. 28, 2020) ("the general rule is that rebuttal expert testimony should be exactly that—testimony that responds to an opponent's expert, not part of the plaintiff's case-in-chief. *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013) (finding that plaintiff's expert report that did not directly contradict or rebut a defendant's expert report could not be characterized as a rebuttal report but was rather an untimely affirmative report).

## VII.   Evidence Regarding Fr. Emmanuel's Subjective Belief in the Veracity of His Opinions

134.    Fr. Emmanuel has testified consistently that he believed in the veracity of his opinions when he published them.  Brooks Aff. Ex. 1 at 296:8-22; Brooks Aff. Ex. 46 at 391:2-21; Brooks Aff. Ex. 47 at 772:24-773:2, 774:19-775:2.

SEC Response:  Disputed.  The Commission disputes the facts asserted in paragraph 134 as to Defendant believing his statements were opinions at the time of publication.  Over the course of three days in July 2016, Defendant testified under oath before the Commission that his reports were neutral, objective, factual, and accurate, and that the "research reports included facts, not opinions."  [Ex. 59 (Lemelson Inv. Test.) at 296:8-297:6, 373:5-375:6, 680:8-681:4, 682:6-10, 737:10-13, 737:17-22, 770:21-771:9.]  Defendant also testified that he would have corrected his prior reports in later reports if he found any inaccuracies, despite including a disclaimer in all of his reports as to their accuracy or completeness.  [*Id.* at 772:5-775:2.]

Fr. Emmanuel's Reply:  The characterization of statements of fact or opinion is a matter of law.  *Riley v. Harr*, 292 F.3d 282, 291 (1st Cir. 2002) ("'the courts treat the issue of labeling a statement as verifiable fact or as [protected] opinion as one ordinarily decided by judges as a matter of law'") (quoting *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000) (citing *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 510–11 (1984)).  Further, both the Commission in its questions and Fr. Emmanuel in various answers referred to much of his analysis as containing his opinions during the same three-day deposition period and the deposition transcripts reflect lengthy back and forth discussions about what constituted opinions.  *See e.g.,* Brooks Reply Aff. Ex. 90 at 476:15-479:23, 486:19-487:23, 593:16-595:9; Brooks Reply Aff. Ex. 91 at 808:2-809:16, 812:2-813:14, 815:10-817:20, 845:3-13.  Finally, and fundamentally to the purpose of this paragraph, there was no deposition

testimony that Fr. Emmanuel did not believe in the veracity of his opinions at the time of publication, which the Commission does not dispute in its response.

135.    Fr. Emmanuel produced his entire hard drive to the Commission in this case, including all communications with counsel to aid in the Commission's investigation.  Brooks Aff. Ex. 1 at 16:2-19:20; Brooks Aff. Ex. 5 at 106:11-25, 328:2-9; Brooks Aff. Ex. 48 at 51:10-52:2, 153:8-154:9.

**SEC Response:**  <u>Disputed</u>.  The Commission disputes the facts asserted in paragraph 135, specifically that Defendant Lemelson produced his entire hard drive to the Commission in this case.  Lemelson testified under oath in 2016 that he searched his hard drive and Outlook for relevant documents and produced to the Commission what he found, which included all of the emails in his .pst email file related to Lemelson Capital Management and The Amvona Fund, including sent files.  [Brooks Aff. Ex. 1 at 16:2-19:20.]  Lemelson's cover letter at the time of his initial production confirms that he provided a 32 GB flash storage device, on which he copied all of his business-related files and emails.  [Ex. 63 (9/14/15 Lemelson Production Letter) 1-2.]

136.    There is no document in Fr. Emmanuel's hard drive that indicates Fr. Emmanuel did not believe in the veracity of his opinions when he published them.

**SEC Response:**  <u>Disputed and unsupported</u>.  Defendants offer no evidentiary support for the facts asserted in paragraph 136, contrary to Rule 56 and Local Rule 56.1.  The Commission believes that many of the documents produced by Defendants, some of which are cited in the Commission's Statement of Material Facts below, show Defendants' motivations to lie.  The Commission also disputes Defendants' characterization of the reports in their entirety as "opinions."  As the Commission argues in its brief, Lemelson's reports contain statements of fact to support his theses.  [*See* Commission's response to paragraph 134 (citing Lemelson's statements that this reports were factual and contained facts).]

**Fr. Emmanuel's Reply:**  It is impossible to provide a citation to the absence of evidence.  The Commission bears the burden of proof in this claim and has failed to present any

direct evidence that Fr. Emmanuel did not believe in his opinions at the time he published them.

*See Center for Behavioral Health v. Westerly Zoning Bd. of Review*, 394 F. Supp. 2d 493, 497

(D.R.I. 2005) (when a moving party points out the lack of evidence supporting a case, the "party

opposing a motion for summary judgment must do more than merely assert allegations in order

to raise a genuine issue of material fact; 'it must set forth specific facts demonstrating that there

is a genuine issue for trial.'") (quoting *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 105 (1st Cir.

1988)).  The Commission's weak evidence of a "motive" to lie is pure speculation and not

adequate to survive summary judgment.  *Theidon v. Harvard University*, 948 F.3d 477, 494 (1st

Cir. 2020) (plaintiff seeking to avoid summary judgment "cannot rely on 'conclusory allegations,

improbable inferences, acrimonious invective, or rank speculation'") (quoting *Ahern v. Shinseki*,

629 F.3d 49, 54 (1st Cir. 2010)).  To the extent the Commission incorporates its response to

paragraph 134 in the response to this paragraph, Fr. Emmanuel incorporates his reply as if fully

stated herein.

137.    Fr. Emmanuel worked with an editor, Michael Johns, on the five reports
published regarding Ligand.  Brooks Aff. Ex. 49 at 27:18-29:10, 49:5-50:1, 55:22-56:21, 64:11-
13.

**SEC Response:**  Undisputed.

138.    Mr. Johns testified that Fr. Emmanuel believed in the veracity of his opinions
when he published them.  Brooks Aff. Ex. 49 at 30:9-24, 59:24-60:21, 115:14-116:10, 117:4-15.

**SEC Response:**  Disputed in part.  While the testimony cited establishes that Johns

thought Lemelson tried to be accurate, and that Lemelson really believed in what he was writing,

nowhere in the cited excerpts does Johns describe what Lemelson was writing as Lemelson's

"opinions."

139.    Dr. Nicholas Jabbour is Fr. Emmanuel's largest and longest-standing investor.
Brooks Aff. Ex. 50 at 29:20-23; 34:5-19

**SEC Response:**  Disputed in part and unsupported.  The Commission does not dispute

that Dr. Jabbour is Defendants' longest-standing investor, but Brooks Aff. Ex. 50 as cited does

not support that he was the largest investor.  In the exhibit as cited, Dr. Jabbour testified that he

knew he was the largest investor in 2015, but is not sure if that remains the case. [Brooks Aff.

Ex. 50 at 34:5-19.]

140.    Dr. Jabbour testified at deposition that he never had any concern about Fr.
Emmanuel's candor or truthfulness.  Brooks Aff. Ex. 50 at 112:23-113:4.

**SEC Response:**  Undisputed.

141.    Dr. Jabbour testified that based on his own analysis of Promacta and the market in
2014, he agreed with Fr. Emmanuel's thesis that Promacta was going away.  Brooks Aff. Ex. 50
at 85:1-23.

**SEC Response:**  Disputed in part.  The Commission does not dispute that Dr. Jabbour

agreed with Defendant's thesis that Promacta was going away, but Defendants do not accurately

characterize the analysis performed by Dr. Jabbour.  Dr. Jabbour testified during this deposition

that he agreed with this thesis based on his limited research, and spent a fair portion of his

deposition focused on the fact that he did minimal research and did not analyze market factors as

part of this minimal research.  [Ex. 64 (Jabbour Dep.) at 48:1-49:16, 50:16-51:2, 51:24-52:22,

53:2-55:16, 56:8-59:13, 68:6-72:3; 73:16-74:4, 87:1-88:3, 103:4-104:7, 109:24-112:1.]  Dr.

Jabbour also testified that he would not be the one to prescribe Promacta or Sovaldi because he is

a transplant doctor rather than a hepatologist or hematologist.  [Ex. 64 (Jabbour Dep.) at 78:11-

79:21.]

**Fr. Emmanuel's Reply:**  The testimony speaks for itself.

### THE COMMISSION'S STATEMENT OF
### ADDITIONAL MATERIAL FACTS (142-201)

142.    The crux of Lemelson's reports and public statements was that Ligand was,
essentially a fraud, in terrible financial shape and had limited prospects in 2014—in Lemelson's

words, Ligand had "100% downside risk" and that its shares were worth "$0."  [*E.g.*, Brooks Aff. Ex. 15 (July 3 report) at 10.]

**Fr. Emmanuel's Response:**  Disputed as to the characterizations and overly simplistic summary of Fr. Emmanuel's published opinions.  Fr. Emmanuel states that the reports and public statements speak for themselves.

143.    Ligand's stock price dropped by 34% during the time Lemelson was publishing his reports.  [Am. Compl. (ECF No. 33) ¶8; Answer (ECF No. 34) ¶8]

**Fr. Emmanuel's Response:**  Disputed and immaterial.  Fr. Emmanuel published five reports regarding Ligand from June 16, 2014 to August 22, 2014.  *See* paragraphs 7, 35, 58, 62. The Commission's allegations in ¶8 of its Amended Complaint reference the change in Ligand's stock price from June 16, 2014 until October 13, 2014 (almost two months after Fr. Emmanuel's last report regarding Ligand).  ECF No. 33 ¶ 8.  Finally, as discussed in the Defendants' Memorandum in Support of Their Motion for Summary Judgment, ECF No. 125 at 15-19, and as the undisputed record shows, *see* paragraph 132, Ligand traded in an efficient market meaning that new information was absorbed into the market price almost immediately.  *See In Re PolyMedica Sec. Litig.*, 453 F. Supp. 2d 260, 278 (D. Mass. 2006) (discussing First Circuit's definition of efficient market and noting that "stock price must quickly and fully reflect the release of public information such that ordinary investors cannot profitably trade on the basis of it, requires that the reaction to news be fully completed on the same trading day as its release— and perhaps even within hours or minutes") (citing *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (approving a finding of market efficiency "because Plaintiffs' event study capture[d] the same-day reaction to Xcelera's stock price to company-specific events"). Therefore, to the extent the Commission purports to argue that the change in stock price over four months is somehow attributable to the various reports and interviews of Fr. Emmanuel, such a theory is unsupported by the necessary expert evidence.  The Commission cannot rely on

presenting evidence in support its case-in-chief through its expert's rebuttal report to create a material dispute of facts. *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

144.    Ligand's stock price dropped 5.4% immediately in the wake of Lemelson publishing his first report on June 16, 2014—a decline Lemelsons' own expert attributes to Lemelson's report.  [Ex. 54 (Dolgoff Report) at ¶29 n. 39; Ex. 55 (Smith Report) at ¶12.]

**Fr. Emmanuel's Response:**  Disputed and immaterial.  Fr. Emmanuel's expert's report noted in a footnote only that an analyst's report stated that Fr. Emmanuel's June 16, 2014 was "likely responsible" for the drop in Ligand's stock price that afternoon, but clarified that "I have not conducted a statistical test of this price movement, nor removed the effects of market and industry factors."  Ex. 54 at ¶ 29 n.39.  To the extent that the Commission seeks to rely on its expert rebuttal report to support its case-in-chief, such reliance is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).  Finally, the Commission has not alleged any false statements contained in Fr. Emmanuel's June 16, 2014 report, but rather claims it was part of a scheme, but as a matter of law, the Commission cannot support a claim that legal conduct, such as publishing a report containing no challenged statements, can be a part of a "scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 4-5.

145.    While Defendants' expert claims that Lemelson's falsehoods didn't move Ligand's stock, Lemelson's scheme in fact caused a statistically significant decline in Ligand's stock price.  [Ex. 55 (Smith Report) at ¶¶16-20, 37-45.]

**Fr. Emmanuel's Response:**  Disputed and unsupported.  The Commission's reliance on its expert rebuttal report to present facts in support of its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

146.    Numerous investors contacted Ligand and its investor relations firm to express concern over Lemelson's allegations and seek assurance that his statements were not true.  [Ex. 57 (Foehr Dep.) at 85:6-94:6, 277:9-280:14; Ex. 56 (Higgins Dep.) at 99:4-100:3, 139:3-12, 161:17-162:14, 247:23-248:15, 302:4-303:5; Ex. 61 (Pettingill Dep.) 68:16-73:17; Ex. 52 (Voss Dep.) at 212:12-217:17, 234:20-236:3; Brooks Aff. Ex. 13 at LCM SEC0000325; Exs. 65-70 (investor inquiries about Lemelson's statements).]

**Fr. Emmanuel's Response:**  Disputed and unsupported.  As an initial matter, the deposition testimony and email communications about what other investors, many of whom are unidentified and not listed as potential witnesses for the Commission, is inadmissible hearsay that is inadequate to support a statement of material fact at summary judgment.  *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 29 (1st Cir. 2007) ("'[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment'") (quoting *Dávila v. Corporación De Puerto Rico Para La Difusión Pública,* 498 F.3d 9, 17 (1st Cir.2007)); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("[h]earsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment").  Further, the Commission ignores that Mr. Pettingill's testimony states that he did not speak directly with any investors until March of 2015 (over five months after the Commission's alleged "scheme" had ended) when he began working in investor relations.  Ex. 61 at 71:8-16.  Further, even if the cited exhibits were considered, with the exception of one document, none of the purported comments and questions raised by Ligand

investors related to any of the four alleged misstatements in the Commission's case.  In fact, Mr.

Voss testified directly that no investor spoke with him about the June 19, 2014 interview

statement that Fr. Emmanuel said Ligand's IR firm had "basically agreed" that "Promacta was

going away" nor did he speak with any investor directly about Fr. Emmanuel's statements

concerning Viking.  Ex. 52 at 215:10-23.

147.    Lemelson himself, along with at least several media outlets, attributed Ligand's
falling stock price to Lemelson's misstatements.  [Ex.56 (Higgins Dep.) at 168:19-169:16;
170:11-21, 283:22-284:7; Ex. 61 (Pettingill Dep.) at 94:16-95:16; Ex. 71 (Lemelson: "multi-
month battle with LGND has also been paying off – shares are now down ~40% since LCM
published its first . . . report[.]"); Ex. 72 (Lemelson to Amvona Fund investors: "Shares of
Ligand dropped ~2% during the [June 19] interview); Ex. 73 (Amvona Fund Investor
Presentation: "LGND shares drop "16% within 6 trading days[of June 16 report]—Lemelson
Capital is credited with the drop in market cap by USAToday, ValueWalk, Benzinga,
SeekingAlpha and others.").]

**Fr. Emmanuel's Response:**  Disputed and immaterial.  As an initial matter, the

testimony cited by the Commission in Exhibits 56 and 61 about vague recollections of what the

witnesses recalled Fr. Emmanuel or others saying about the stock price is not competent

evidence.  *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 29 (1st Cir. 2007) ("'[i]t is black-letter

law that hearsay evidence cannot be considered on summary judgment'") (quoting *Dávila v.*

*Corporación De Puerto Rico Para La Difusión Pública,* 498 F.3d 9, 17 (1st Cir.2007)); *Garside*

*v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("[h]earsay evidence, inadmissible at trial,

cannot be considered on a motion for summary judgment").  With regard to Exhibits 71-73, Fr.

Emmanuel responds that the documents speak for themselves and disputes any characterization

by the Commission that differs from the documents.  Further, the attribution of falling stock

prices to a specific cause is the matter of expert testimony, so lay witness statements and media

reports are not competent evidence on the cause of the change in price and thus paragraph 147 is

immaterial.  *Calisi v. Abbott Laboratories*, No. 11–10671–DJC, 2013 WL 5441355, at *15 (D.

Mass. Sept. 27, 2013) (where determinations are beyond the jury's lay knowledge i.e. "'generally

beyond the scope of an average person's knowledge'" failure to present expert evidence on the topic is fatal to plaintiff's claims) (quoting *Esturban v. Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry of summary judgment after excluding expert)); *Morse v. Ford Motor Co.,* No. 08-11930-RGS, 2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect (such as this case), expert testimony is required because the answers to the highly technical and specialized questions raised by such claims lie outside the knowledge of most lay jurors ....As the only expert witness identified by the [plaintiff] has been disqualified [as not qualified to offer an expert opinion], summary judgment may appropriately enter for [the defendant]"); *Alves v. Mazda Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that "[a]s expert evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to prevail now that their evidence [of experts' testimony] is being excluded").  Finally, none of the sources cited by the Commission isolate whether any of Fr. Emmanuel's challenged statements were the cause of any purported drop in Ligand's stock price, as opposed to the majority of the reports that have not been challenged by the Commission.  *See* ECF No. 125 at 20.

148.    The Commission has proffered a rebuttal expert report from Dr. Erin Smith to rebut Defendants' flawed event study.  [Ex. 55 (Smith Report).]

**Fr. Emmanuel's Response:**  Disputed that Defendants' event study is "flawed," otherwise undisputed.

149.    In a June 19, 2014, interview with an Internet program known as the Benzinga Pre-Market Prep Show, Lemelson falsely stated:  "I had discussions with [Ligand] management just yesterday – excuse me, their [Ligand's] IR [investor relations] firm.  And they basically agreed.  They said, '*Look, we understand Promacta's going away.*'"  [Brooks Aff. ¶15; *see also* Am. Compl. (ECF No. 33) ¶37; Answer (ECF No. 34) ¶37 (admitting substance of quote from Benzinga interview).]

**Fr. Emmanuel's Response:**  Disputed the characterization that Fr. Emmanuel "falsely" stated anything, otherwise undisputed.

150.    Lemelson repeatedly claimed that one of Ligand's main sources of revenue—a drug called Promacta—was "going away" in the face of a "competitive threat" from a Hepatitis C drug called Sovaldi.  [Brooks Aff. Ex. 6 at 1, 6 (June 16, 2014 Report stating Sovaldi will "eliminate demand for Promacta"); Brooks Aff. Ex. 25 at 5 (August 4, 2014 Report stating Sovaldi "a severe competitive threat to future Promacta sales").]

**Fr. Emmanuel's Response:**  Undisputed.

151.    Ligand's investor relations representative, Bruce Voss, testified that he did not say what Lemelson attributed to him, because it wasn't true.  [Ex. 52 (Voss Dep.) at 27:7-17, 120:5-121:8, 124:2-20, 210:10-211:7.]

**Fr. Emmanuel's Response:**  Undisputed as to what Mr. Voss testified with regard to the June 19, 2014 challenged statement.

152.    Lemelson's notes of his conversation with Mr. Voss say that, "[h]e [Voss] said the company agreed that Gilead's drug [Sovaldi] would eliminate the need for Promacta and understood that."  [Brooks Aff. Ex. 12 at 2.]  In his deposition, Defendant Lemelson admitted that Mr. Voss was talking only about Promacta's use a supportive therapy for certain Hepatitis C patients.  [Ex. 51 (Lemelson Dep. (Day 2)) at 187:5-24.]  Promacta does *not* treat Hepatitis C, and Sovaldi and Promacta are therefore not direct competitors.  [Ex. 57 (Foehr Dep.) at 222:11-24, 178:16-19, 180:14-181:2; Ex. 56 (Higgins Dep.) at 31:8-23.]

**Fr. Emmanuel's Response:**  Disputed in part.  Undisputed as to the quote from Fr. Emmanuel's notes.  Disputed that Fr. Emmanuel "admitted that Mr. Voss was talking only about Promacta's use [as] a supportive therapy for certain Hepatitis C patients."  Fr. Emmanuel stated that it was unclear from his notes in the testimony cited by the Commission at Ex. 51 at 187:5-11.  Further, Fr. Emmanuel later testified in that same deposition that he believed the primary indication of Promacta was for Hepatitis C, so that elimination of Promacta's use for that indication would mean the drug would essentially go away in its entirety.  Brooks Reply Aff. Ex. 87 at 194:5-195:4.  Disputed as to Sovaldi and Promacta not being direct competitors, as the term "direct competitors" is vague and undefined.  While the testimony cited differentiated that Sovaldi treated Hepatitis C, and Promacta was for patients with low platelets as a result of Hepatitis C, the elimination of Hepatitis C through use of Sovaldi could have eliminated the need for Promacta to treat symptoms of Hepatitis C.  The witnesses cited by the Commission both

seemed to acknowledge this by saying that Sovaldi represented a "change in the landscape" for

Hepatitis C.  Ex. 56 at 31:15-23 ("But the environment – Sovaldi, Incivek – there's a number of

drugs that was a new class of medicines that were entering the space that were expected to have a

very significant impact on – on the way hepatitis is treated.  So we – we were certainly aware of

that change in landscape…"); Ex. 57 at 181:9-13 ("Ligand understood that Sovaldi was an

important element of the hepatitis C landscape.  I think virtually anyone who was following

hepatitis C knew that Sovaldi was an important development in the landscape").

153.    Promacta boosts platelet counts in patients suffering from a number of different
conditions and its use as a supportive therapy in certain Hepatitis C patients was not a "major
driver" of Ligand's revenue growth.  [Ex. 56 (Higgins Dep.) at 33:5-35:8; Ex. 57 (Foehr Dep.) at
183:10-20; 223:2-18.]

**Fr. Emmanuel's Response:**  Disputed and unsupported by the cited testimony.  The

physiological effects of Promacta is a matter for expert testimony.  Further, to the extent that the

cited testimony relies on "ITP" as a driver of Promacta sales, as opposed to Hepatitis C, that

ignores the fact that Hepatitis is a cause of ITP and there was no proper expert testimony as to

the prevalence of ITP cases independent of Hepatitis or how that would impact sales of

Promacta.  *See* Mayo Clinic, "Immune thrombocytopenia (ITP)" (Apr. 30, 2019)

*https://www.mayoclinic.org/diseases-conditions/idiopathic-thrombocytopenic-*

*purpura/symptoms-causes/syc-*

*20352325#:~:text=Immune%20thrombocytopenia%20usually%20happens%20when,bacteria%2*

*0that%20causes%20stomach%20ulcers.  See also, Calisi v. Abbott Laboratories*, No. 11–10671–

DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (where determinations are beyond the

jury's lay knowledge i.e. "'generally beyond the scope of an average person's knowledge'"

failure to present expert evidence on the topic is fatal to plaintiff's claims) (quoting *Esturban v.*

*Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry of

summary judgment after excluding expert)); *Morse v. Ford Motor Co.,* No. 08-11930-RGS, 2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect (such as this case), expert testimony is required because the answers to the highly technical and specialized questions raised by such claims lie outside the knowledge of most lay jurors ....As the only expert witness identified by the [plaintiff] has been disqualified [as not qualified to offer an expert opinion], summary judgment may appropriately enter for [the defendant]"); *Alves v. Mazda Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that "[a]s expert evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to prevail now that their evidence [of experts' testimony] is being excluded"). Further, internal projections at Ligand appear to directly oppose the deposition testimony that Hepatitis C was not a "major driver" of Ligand's revenue growth, as a slide from a September 18, 2013 Ligand Board Meeting states "HCV [Hepatitis C] needs to be a big market for Promacta to keep driving Ligand's growth."  Brooks Reply Aff. Ex. 92 at LGND_0078960.

154.    Promacta is used as supportive care to boost platelet production in patients whose livers are damaged by diseases including Hepatitis C.  [Ex. 56 (Higgins Dep.) at 63:15-64:8.]

**Fr. Emmanuel's Response:**  Undisputed that Promacta was approved for such use.

155.    Ligand's revenue from Promacta was *growing* at the time Lemelson made his false statement, not "going away," notwithstanding Sovaldi being approved to treat Hepatitis C. [*E.g.,* Ex. 57 (Foehr Dep.) at 180:14-182:22; Ex. 56 (Higgins Dep.) at 31:8-35:8; Ex. 52 (Voss Dep.) at 194:6-18.]

**Fr. Emmanuel's Response:**  Disputed and immaterial.  Testimony about alleged revenues violates the best evidence rule for supporting such a claim.  Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise"); *Caban-Rodriguez v. Jimenez-Perez*, 558 Fed. App'x 1 at 6-7 (1st Cir. 2014) (noting best evidence rule precluded plaintiff from proving contents of letter and granting summary judgment).  Disputed that any statement by Fr.

Emmanuel was "false."  Further, the revenue being generated at the time of Fr. Emmanuel's

statement is immaterial, as Fr. Emmanuel offered his opinion that the approval of Sovaldi was

going to eliminate the demand for Promacta in the future.  Ex. 6 at 6.

156.   Far from revenue from Promacta "going away," Ligand sold its rights to Promacta
in 2019 for $827 million dollars.  [Ex. 57 (Foehr Dep.) at 288:1-17.]

**Fr. Emmanuel's Response:**  Undisputed as to Ligand's selling of its rights to Promacta

in 2019 for $827,000,000.  Fr. Emmanuel disputes all other characterizations in paragraph 156.

157.   Mr. Voss explained the substance of the information in paragraphs 153 to 156 to
Lemelson.  [Ex. 52 (Voss Dep.) at 63:2-10, 120:5-122:7.]

**Fr. Emmanuel's Response:**  Disputed.  The cited testimony does not contain the

information referred in paragraphs 153-156.  Further, Mr. Voss' recollection of his conversation

with Fr. Emmanuel is a matter of credibility that is to be determined by the finder of fact and is

not proper for summary judgment.  *Simas v. First Citizens' Fed. Credit Union,* 170 F.3d 37, 49

(1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court

at summary judgment").

158.   Defendants admit that Mr. Voss denies that he said what Lemelson attributed to

him.  [*See* ¶28, above.]

**Fr. Emmanuel's Response:**  Undisputed.

159.   Mr. Voss emailed Lemelson after the interview specifically challenging the
accuracy of Lemelson's statements and denying that he agreed with anything Lemelson said.
[Ex. 53.]

**Fr. Emmanuel's Response:**  Undisputed that Mr. Voss sent the email in Exhibit 53 and

the document speaks for itself.  Disputed as to the characterization that Mr. Voss denied that he

agreed "with anything Lemelson said."

160.   Certainly Lemelson hoped investors would find it significant, writing on June 16
that Sovaldi and other drugs "will likely eliminate demand for Promacta, which is the largest
royalty generating asset" and "… the imminent conclusion of the commercial viability of the

Company's largest royalty generating product, Promacta, made Ligand wholly unsuitable as an investment and its shares fundamentally worthless." [Brooks Aff. Ex. 6 at 4, 23.]

**Fr. Emmanuel's Response:** Undisputed as to the quotes of Fr. Emmanuel's June 16, 2014 report with the exception of the word "made" in the second sentence should be "makes." Disputed as to the preceding language of "[c]ertainly Lemelson hoped investors would find it significant" as vague and unsupported, which is inadequate under Rule 56 of The Federal Rules of Civil Procedure and Local Rule 56.1.

161.    Lemelson purports to have relied on a doctor, who was also an investor in the Amvona fund, in formulating his misguided "thesis" about Promacta. [¶¶139, 141, *above*.] That doctor, however, testified that he had no understanding of Promacta's indications outside of its use as a supportive therapy for certain Hepatitis C patients, and did not have any knowledge of how much of Ligand's revenue was attributable to different indications. [Ex. 64 (Jabbour Dep.) at 54:1-55:16.]

**Fr. Emmanuel's Response:** Disputed. Disputed as to any characterizations of Fr. Emmanuel's thesis being "misguided." Undisputed that Fr. Emmanuel consulted with Dr. Jabbour about Promacta while formulating his thesis regarding Ligand and that Dr. Jabbour provided information from a colleague who was an expert in his field. Lemelson 10/16/2019 Dep. Tr. 185:4-186:8, 190:13-191:2. Disputed to the characterizations of Dr. Jabbour's testimony that "he had no understanding of Promacta's indications," as that is inconsistent with the cited testimony, which speaks for itself. By way of further response, Dr. Jabbour's knowledge of the financial markets for Promacta is immaterial and outside the scope of anything for which Fr. Emmanuel based his opinions.

162.    Ligand's stock price fell during and immediately after the June 19, 2014 interview. [Ex. 55 (Smith Report) at ¶¶26-27.]

**Fr. Emmanuel's Response:** Disputed. The Commission's reliance on its expert rebuttal report in support of its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1. *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary

judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

163.    Lemelson stated that Viking (1) had "yet to consult with [its auditors] on any material issues" and that the "financial statements provided in the S1 accordingly are unaudited" and (2) "does not intend to conduct any preclinical studies or trials."  [Brooks Aff. Ex. 15 at 7, 10].

**Fr. Emmanuel's Response:**  Undisputed as to (2).  With regard to (1) that quote does not appear in the published version of Fr. Emmanuel's July 3, 2014 report.  Fr. Emmanuel wrote in his July 3, 2014 report: "In other words, Marcum was merely hired, but the company has not yet even consulted with the firm on any material issues. The financial statements provided on the S1 accordingly are unaudited."  Ex. 15 at 10.

164.    In his July 3 report, Lemelson claimed that the Ligand-Viking transaction was conceived to "generate paper profits to stuff [Ligand's] own balance sheet" and that Ligand's management was engaged in "a common game of three-card Monte, played on any street corner—shills included."  [Brooks Aff. Ex. 15 at 8, 9.]

**Fr. Emmanuel's Response:**  Undisputed as to the quoted portions.  Disputed to the extent that the Commission included characterizations about Fr. Emmanuel's opinions outside the quoted portions and Fr. Emmanuel states that his report speaks for itself.

165.    Lemelson acknowledged that his statements were inconsistent with Viking's public filings, upon which he purportedly relied.  [Ex. 59 (Lemelson Inv. Test.) at 721:7-722:11, 725:12-15, 728:20-729:16.]

**Fr. Emmanuel's Response:**  Disputed.  While ambiguous about which statements this paragraph is referring to, Fr. Emmanuel assumes the Commission is referring to the two statements in paragraph 164.  Fr. Emmanuel disputes the characterization of Fr. Emmanuel's testimony offered by the Commission, and state that the testimony speaks for itself.  Specifically, Fr. Emmanuel never testified that the financial statements in the S-1 were audited, but rather when presented with a letter from the auditors that stated so in a separate section of the S-1

statement, Fr. Emmanuel, testified "I wouldn't have seen it or else I wouldn't have written that," and "I'm sure at the time I wrote it, I believed it to be true and it was based on my research."  Ex. 59 at 729:3-16.  Also, with regard to Viking's intent to conduct preclinical studies, Fr. Emmanuel never testified that his statement was inconsistent with Viking's SEC filings, but rather he testified, "The statements in my research report are derived from the public filings and if I had access to the S-1 statement, I believe that is where it was derived from."  Ex. 59 at 722:12-18.  The remainder of the testimony cited by the Commission merely discusses the date when the S-1 Statement was released (July 1, 2014) and the date of Fr. Emmanuel's next report (July 3, 2014).  There is nothing in the testimony close to an alleged admission that Fr. Emmanuel's statement about Viking's intent to conduct preclinical studies was inconsistent with Viking's SEC filings.

166.    Viking's July 1, 2014 Form S-1 stated that 2013 financial information was derived from "audited financial statements included elsewhere in this prospectus."  [Brooks Aff. Ex. 19 at 9.]

**Fr. Emmanuel's Response:**  Undisputed.

167.    Viking's July 1, 2014 Form S-1 stated, "In our [auditor Marcum LLP's] opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Viking Therapeutics, Inc., as of December 31, 2012 and 2013, and the results of its operations and its cash flows for the period from September 24, 2012 (Inception) through December 31, 2012 and for the year ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America." [Ex. 74 (Viking Form S-1 excerpt) at F-1.]

**Fr. Emmanuel's Response:**  Undisputed.

168.    Viking's CEO, Brian Lian, testified that Viking's audit was completed by auditor Marcum LLP.  [Ex. 75 (Lian Dep.) at 94:11-21.]

**Fr. Emmanuel's Response:**  Undisputed.

169.    Lemelson testified that he believed his statement about unaudited financials to be true but agreed that the statement was clearly contradicted by the public filings.  [Ex. 59 (Lemelson Inv. Test.) at 729:14-16]

**Fr. Emmanuel's Response:**  Fr. Emmanuel states that the testimony speaks for itself. Fr. Emmanuel would add for context that Fr. Emmanuel testified that "Yes.  I'm sure at the time I wrote it, I believed it to be true and it was based on my research."  Ex. 59 at 729:11-13.

170.    Viking set forth its intention to conduct clinical trials on the first page of the Viking S-1:

> We [Viking] have exclusive worldwide rights to a portfolio of five drug candidates *in clinical trials or preclinical studies*, which are based on small molecules licensed from Ligand Pharmaceuticals Incorporated, or Ligand. Our lead clinical program is VK0612, a first-in-class, orally available drug candidate entering a Phase 2b clinical trial for type 2 diabetes, one of the largest global healthcare challenges today. *Preliminary clinical data* suggest VK0612 has the potential to provide substantial glucose-lowering effects, with an attractive safety and convenience profile compared with existing type 2 diabetes therapies. Our second clinical program is VK5211, an orally available drug candidate *entering a Phase 2 clinical trial* for the treatment of cancer cachexia, a complex disease characterized by an uncontrolled decline in muscle mass. VK5211 is designed to selectively produce the therapeutic benefits of testosterone in muscle tissue, with improved safety, tolerability and patient acceptance compared with administration of exogenous testosterone. *We expect to commence Phase 2 clinical trials for both VK0612 and VK5211 in early 2015 and to complete the clinical trials in 2016.* We are also developing three preclinical programs targeting metabolic diseases and anemia. Our most advanced preclinical program is VK0214, a novel liver-selective thyroid hormone receptor beta, or TRß, agonist for lipid disorders such as dyslipidemia and nonalcoholic steatohepatitis, or NASH. *We expect to file an investigational new drug application, or IND, and commence clinical trials for this program in 2015.*

[Ex. 74 (Viking Form S-1 excerpt) at 1 (emphasis added).]

**Fr. Emmanuel's Response:**  Undisputed as to the contents of the quote.  The quote is immaterial however, as the Commission misconstrued Fr. Emmanuel's statement regarding preclinical studies to mean that he was accusing Viking of attempting to release drugs on the market without conducting preclinical studies (which is impossible).  *In re Vertex Pharmaceuticals Inc., Sec. Litig.*, 357 F. Supp. 2d 343, 345-46 (D. Mass. 2005) (discussing approval process for drugs to be released to market, which included preclinical studies); U.S. Food & Drug Administration, "The Drug Development Process," (Jan. 04, 2018) *https://www.fda.gov/patients/learn-about-drug-and-device-approvals/drug-development-process* (last updated Jan. 4, 2018) (outlining process for drugs to be released to market, which included preclinical studies).  But rather, Fr. Emmanuel was opining that he did not see what function Viking offered for Ligand other than being an entity to shift accounting losses to, and as part of that opinion, noting that Viking did not intend to conduct preclinical studies, but rather rely on third parties, which Ligand could have done on its own. Ex. 15 at 7.

173.    Ligand's CEO stated that Viking intended to, and did, conduct clinical trials.  [Ex. 56 (Higgins Dep.) at 328:19-329:9.]

**Fr. Emmanuel's Response:**  Undisputed as to the contents of the testimony.  By way of further response, Fr. Emmanuel incorporates his response to paragraph 172 regarding materiality.

174.    Viking did intend to conduct clinical trials (and subsequently did), employing and working with specialized companies that perform the various tasks necessary to complete clinical trials.  [Ex. 75 (Lian Dep.) at 61:11-18; 77:5-22; Ex. 56 (Higgins Dep.) at 328:19-329:9 (Viking intended to conduct, and has subsequently conducted, clinical trials).]

**Fr. Emmanuel's Response:**  Undisputed as to the contents of the testimony.  By way of further response, Fr. Emmanuel incorporates his response to paragraph 172 regarding materiality.

175.    Lemelson admitted that statements in the Ligand-Viking Master Licensing Agreement contradicted his thesis about Viking.  [Ex. 59 (Lemelson Inv. Test.) at 722:12-723:11.]

**Fr. Emmanuel's Response:**  Disputed.  Fr. Emmanuel never testified that his statement was inconsistent with Viking's SEC filings, but rather he testified, "The statements in my research report are derived from the public filings and if I had access to the S-1 statement, I believe that is where it was derived from."  Ex. 59 at 722:12-18.  The remainder of the testimony cited by the Commission merely discusses the date when the S-1 Statement was released (July 1, 2014) and the date of Fr. Emmanuel's next report (July 3, 2014).  There is nothing in the testimony close to an alleged admission that Fr. Emmanuel's statement about Viking's intent to conduct preclinical studies was inconsistent with Viking's SEC filings.

176.    At least one Ligand investor raised concerns about Lemelson's statements about Viking with Ligand's COO.  [Ex. 57 (Foehr Dep.) at 92:1-92:13.]

**Fr. Emmanuel's Response:**  Disputed.  Fr. Emmanuel disputes the Commission's characterization of Matthew Foehr's deposition testimony and regardless, the deposition testimony about what some other entity may have said about the report is inadmissible hearsay that is inadequate to create a dispute of a material fact at the summary judgment stage.  *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 29 (1st Cir. 2007) ("'[i]t is black-letter law that hearsay evidence cannot be considered on summary judgment'") (quoting *Dávila v. Corporación De Puerto Rico Para La Difusión Pública,* 498 F.3d 9, 17 (1st Cir.2007)); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("[h]earsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment").

177.    Ligand's stock price again fell after Lemelson published his July 3, 2014 Report.  [Ex. 55 (Smith Report) at ¶¶28-30.]

**Fr. Emmanuel's Response:**  Disputed.  The Commission's reliance on its expert rebuttal report to support its case-in-chief is not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not provide affirmative expert evidence, but only a rebuttal expert

report because "there is no need to consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely to plaintiff's rebuttal case).

178.    Ligand had committed to taking just under a 50% stake in Viking and the exact timing of when the transaction closed is irrelevant.  [Ex. 58.]

**Fr. Emmanuel's Response:**  Disputed that the timing is not material.  The Commission alleged that Ligand owned this near-half portion **at the time Fr. Emmanuel published the report**, so the Commission seemed to believe the timing of the ownership was material.  Ex. 7 at ¶ 21.  This makes sense, as it is difficult to fathom how statements about another company, that Ligand did not own, could be material to Ligand's stock price.  The Commission has offered no support for how statements about Viking had a material impact on Ligand, when Ligand became a nearly 50% owner in May 2015, almost nine months after the last alleged misstatement and six months after the latest date in the Commission's unsupported scheme liability claim.

179.    Lemelson's contention that the transactions between Ligand and Viking were a sham and that Viking was not a real company were, and are, not true.  [Ex. 57 (Foehr Dep.) at 92:1-93:24, 296:5-17.]

**Fr. Emmanuel's Response:**  Disputed.  Matthew Foehr's opinion testimony disagreeing with Fr. Emmanuel's opinion is not adequate evidence to establish the truth or falsity of any opinion.  *Simas v. First Citizens' Fed. Credit Union,* 170 F.3d 37, 49 (1st Cir. 1999) (credibility determinations are for the factfinder at trial, not for the court at summary judgment").

180.    In his August 14 report, Lemelson said that Ligand's "announcement that it would assume $225 million in convertible debt . . . further deepens the already significant concerns about Ligand's imminent insolvency and the company's substantial risk of bankruptcy." [Brooks Aff. Ex. 23 at 1.]

**Fr. Emmanuel's Response:**  Undisputed.

181.    In that same report, Lemelson stated that "the company's liabilities will again far exceed its assets and the company will technically be insolvent once more" and that, even before the new debt issuance, "the company's liabilities exceeded tangible assets, meaning the company was insolvent."  [Brooks Aff. Ex. 23 at 2.]

**<u>Fr. Emmanuel's Response:</u>**  Not disputed in substance.  There appear to be a couple typographical errors in the second quotation in paragraph 181.  The quote is: "the company's liabilities will again far exceed its assets, and the company will be technically insolvent once more."  Ex. 23 at 2.

182.    In the August 22 report, Lemelson wrote that Ligand "issued $245 million in new debt against the company's [Ligand's] tangible equity of just $21,000, giving rise to a debt to tangible equity ratio of 11,667-to-1 (that is to say, $11,667 dollars (sic) in debt for every $1 dollar (sic) in tangible common shareholder equity)" and that "shareholders have only the protection of $21,000 in tangible equity to shield them from $245 million in debt."  [Brooks Aff. Ex. 24 at 3, 6.]

**<u>Fr. Emmanuel's Response:</u>**  Undisputed.

183.    Insolvency is the financial condition that occurs when "the sum of [an] entity's debts is greater than *all* of [the] entity's property, at a fair valuation," 11 U.S.C. § 101(32)(A) (emphasis added), or the entity has insufficient cash to service its debt.  [Ex. 61 (Pettingill Dep.) at 99:3-102:14.]

**<u>Fr. Emmanuel's Response:</u>**  Disputed.  The concept of insolvency and how it applies in hypothetical financial analyses regarding when debt may become due and discounting intangible assets is the subject of expert evidence, which the Commission has failed to provide.  *Calisi v. Abbott Laboratories*, No. 11–10671–DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (where determinations are beyond the jury's lay knowledge i.e. "'generally beyond the scope of an average person's knowledge'" failure to present expert evidence on the topic is fatal to plaintiff's claims) (quoting *Esturban v. Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry of summary judgment after excluding expert)); *Morse v. Ford Motor Co.,* No. 08-11930-RGS, 2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect (such as this case), expert testimony

is required because the answers to the highly technical and specialized questions raised by such

claims lie outside the knowledge of most lay jurors ....As the only expert witness identified by

the [plaintiff] has been disqualified [as not qualified to offer an expert

opinion], summary judgment may appropriately enter for [the defendant]"); *Alves v. Mazda*

*Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that

"[a]s expert evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to

prevail now that their evidence [of experts' testimony] is being excluded").

184.    Ligand was never insolvent, much less bankrupt, when Lemelson said it was in 2014. [Ex. 56 (Higgins Dep.) at 115:15-116:24; Ex. 57 (Foehr Dep.) at 144:2-15; Ex. 61 (Pettingill Dep.) at 99:3-102:14.]

**Fr. Emmanuel's Response:**  Disputed.  *See* Fr. Emmanuel's response to paragraph 183.

185.    Ligand's assets exceeded its liabilities both before and after the August 2014 debt issuance.  [Answer (ECF No. 34) ¶51 (admitting assets exceeded liabilities both before and after the August 2014 debt issuance).]

**Fr. Emmanuel's Response:**  Undisputed that Ligand's *total* assets (both tangible and

intangible) listed in its public filings before and after the August 2014 debt issuance exceeded its

listed liabilities.  This is immaterial to evaluation of Fr. Emmanuel's opinion regarding the debt

to *tangible* equity ratio.  Ex. 24 at 3.

186.    Lemelson's debt-to-tangible-equity ratio is not a test for insolvency.  [Ex. 61 (Pettengill Dep.) at 99:3-102:14.]

**Fr. Emmanuel's Response:**  Disputed.  The lay opinion testimony of a witness is not

adequate to establish what is test for insolvency.  *See* Fed. R. Evid. 701(c); *Freedom Wireless,*

*Inc. v. Boston Communications Group, Inc.*, 369 F. Supp. 2d 155, 157 (D. Mass. 2005) (barring

lay opinion testimony that was based on scientific, technical, or other specialized knowledge that

required expert evidence pursuant to Fed. R. Evid. 702); *Alexis v. McDonald's Restaurants of*

*Mass., Inc.*, 67 F.3d 341, 347-48 (1st Cir. 1995) (affirming exclusion of lay opinion testimony

and summary judgment because lay opinion testimony was only evidence plaintiff offered on

material fact).  By way of further response, the selection and use of a metric is protected by the

First Amendment.  *See Lowe v. SEC*, 472 U.S. 181, 210 n.58 (1985) ("because we have squarely

held that the expression of opinion about a commercial product such as a loudspeaker is

protected by the First Amendment . . . it is difficult to see why the expression of an opinion about

a marketable security should not also be protected") (internal citation omitted).

187.    Lemelson conceded that his purported "debt-to-tangible-equity" analysis failed to
account for the proceeds of Ligand's debt financing.  [Ex. 76 (Lemelson submission to the
Commission) at 30-31.]

**Fr. Emmanuel's Response:**  Disputed.  The portion of the Wells submission relied upon

by the Commission was an error by predecessor counsel.  This error does not alter how the debt

to tangible equity ratio must be calculated and is, therefore, immaterial.  Further, the

Commission bears the burden of proof in this case and has offered no accounting principle or

expert evidence explaining why the proceeds of Ligand's loan should have been included in the

calculation of Ligand's tangible equity for purposes of Fr. Emmanuel's debt to tangible equity

ratio calculation, and therefore the Commission has failed to provide adequate evidence to

establish this statement of fact.  *See Center for Behavioral Health v. Westerly Zoning Bd. of*

*Review*, 394 F. Supp. 2d 493, 497 (D.R.I. 2005) (when a moving party points out the lack of

evidence supporting a case, the "party opposing a motion for summary judgment must do more

than merely assert allegations in order to raise a genuine issue of material fact; 'it

must set forth specific facts demonstrating that there is a genuine issue for trial.'") (quoting

*Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 105 (1st Cir. 1988)).

188.    Lemelson said he reviewed sales data for Promacta, which showed substantial
Promacta sales prior to its approval as a supportive therapy for Hepatitis C patients and sales of
the drug increasing overall.  [Ex. 77 (Lemelson Dep. (Day 1)) at 150:23-154:4, 191:17-19,
208:6-209:13, 226:4-233:8; Ex. 59 (Lemelson Inv. Test.) at 238:21-239:1, 376:12-18 ; *see also*
Ex. 57 (Foehr Dep.) at 179:6-23, 213:21-214:12 (Promacta sales a matter of public record).]

**Fr. Emmanuel's Response:**  The testimony and sales data speaks for itself.  Fr. Emmanuel disputes any characterizations that are unsupported, specifically that the sales data showed "substantial Promacta sales prior to its approval as a supportive therapy for Hepatitis C patients."  The statement that "sales of the drug increasing overall" is also untethered to any reference to time or subject matter, and so, Fr. Emmanuel disputes such an assertion.

189.    Lemelson attempted to have comments critical of his reports removed from a popular investing forum, Seeking Alpha.  [Exs. 78-81.]

**Fr. Emmanuel's Response:**  Disputed as to characterization.  Fr. Emmanuel does not dispute the contents of Exhibits 78-81 and the documents speak for themselves.  Fr. Emmanuel disputes the characterization that he "attempted to have comments critical of his reports removed" as there were a number of critical posts that Fr. Emmanuel did not seek to remove and Seeking Alpha's policies on comments (as stated in the exhibits cited) did not permit comments to be removed because they were critical of the author's opinion.  *See* Ex. 81 at 3 ("While we strive to make Seeking Alpha a place for polite discussion, and we do not tolerate attacks on users or contributors, we do not fact-check user posts and **never delete material merely because it disagrees with an author's opinion**.") (emphasis added); Ex. 80 at 1 ("we never delete material merely because it disagrees with an author's opinion").  Fr. Emmanuel submitted his requests to remove certain comments to Seeking Alpha, because they included personal attacks and/or accusations of bad faith, and it was Seeking Alpha's discretion to apply its policies as it saw fit.

190.    Lemelson touted his prowess in short-selling to attract investors.  [Ex. 82 (emails to prospective investors and existing investors touting Ligand short).]

**Fr. Emmanuel's Response:**  Disputed as to characterization.  Fr. Emmanuel does not dispute the contents of Exhibit 82 and the documents speak for themselves.  Fr. Emmanuel disputes the characterization that he "touted his prowess in short-selling to attract investors" as

he merely provided links to past analyses (which included some of his short positions),

performance reports, and links to media coverage of Lemelson Capital Management and the

Amvona Fund (some of which included discussions of his short positions).  This is permissible

information to provide and is not "touting" any "prowess in short-selling."

191.    Less than two weeks before he took his short position in Ligand, he was shopping
for a $2.5 million mortgage to purchase a ~$2.9 million home in the Greater Boston area.
[Ex. 83.]

**Fr. Emmanuel's Response:**  Disputed.  The Commission stated that Fr. Emmanuel was

seeking a mortgage "less than two weeks" before taking his Ligand short position, but the most

recent email communication in Exhibit 83 was dated May 13, 2014, which was over a month

before Fr. Emmanuel published his first report regarding Ligand on June 16, 2014.  *See* Ex. 83,

paragraph 7.  Further, as reflected in the emails, communications on the topic of seeking to buy a

house started in December 2013.  Moreover, this point is immaterial without context of Fr.

Emmanuel's finances at this time, which the Commission chose not to pursue in discovery in this

matter, and now is just engaging in rank speculation about Fr. Emmanuel's personal finances.

*Theidon v. Harvard University*, 948 F.3d 477, 494 (1st Cir. 2020) (plaintiff seeking to avoid

summary judgment "cannot rely on 'conclusory allegations, improbable inferences, acrimonious

invective, or rank speculation'") (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).

192.    In the first two weeks of June, several large asset managers were introduced to
LCM and TAF through his broker, BTIG.  [Ex. 84.]

**Fr. Emmanuel's Response:**  Disputed as unsupported and immaterial.  Without any

support, the Commission assets that the emails contained in Exhibit 84 were introductions to

"several large asset managers."  As an initial matter, it appears there were only two introductions

and there is no evidence that the people to whom Fr. Emmanuel was introduced were "large asset

managers."  Further, this point is immaterial as the Commission has offered no competent

evidence about the purpose of such communications, but rather has engaged in rank speculation that this could be interpreted as an intent of Fr. Emmanuel to expand his business. *Theidon v. Harvard University*, 948 F.3d 477, 494 (1st Cir. 2020) (plaintiff seeking to avoid summary judgment "cannot rely on 'conclusory allegations, improbable inferences, acrimonious invective, or rank speculation'") (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).

193.    On June 17, Lemelson said his assets under management were "likely to jump next month (expecting many new subs)."  [Ex. 85.]

**Fr. Emmanuel's Response:**  Undisputed but immaterial to the extent that the Commission has offered no competent evidence about the purpose of such communications, but rather has engaged in rank speculation that this could be interpreted as an intent of Fr. Emmanuel to expand his business. *Theidon v. Harvard University*, 948 F.3d 477, 494 (1st Cir. 2020) (plaintiff seeking to avoid summary judgment "cannot rely on 'conclusory allegations, improbable inferences, acrimonious invective, or rank speculation'") (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).

194.    The Amvona Fund was highly leveraged, meaning Lemelson borrowed from his brokerage to finance his positions—a practice known as trading on margin.  [Ex. 77 (Lemelson Dep. (Day 1)) at 310:7-23 (The Amvona Fund traded as much as $20 million on margin).]

**Fr. Emmanuel's Response:**  Disputed that the Amvona Fund was "highly leveraged." Fr. Emmanuel simply testified that the largest amount of leverage he could remember (at no specific time) was "about 20 million in leverage, around there, approximately.  I don't know the exact numbers."  Ex. 77 at 310:19-23.  Given the lack of context about at what time this leverage existed and the lack of expert evidence about the significance of this amount of leverage for Fr. Emmanuel's fund, the Commission has failed to provide adequate evidence to support this fact pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1.  *Calisi v. Abbott Laboratories*, No. 11–10671–DJC, 2013 WL 5441355, at *15 (D. Mass. Sept. 27, 2013) (where determinations are

beyond the jury's lay knowledge i.e. "'generally beyond the scope of an average

person's knowledge'" failure to present expert evidence on the topic is fatal to plaintiff's claims)

(quoting *Esturban v. Mass. Bay Transp. Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming

trial court's entry of summary judgment after excluding expert)); *Morse v. Ford Motor Co.,* No.

08-11930-RGS, 2010 WL 2773527, at * 1 (D. Mass. July 13, 2010) (stating that "[i]n cases

involving claims of product defect (such as this case), expert testimony is required because the

answers to the highly technical and specialized questions raised by such claims lie outside

the knowledge of most lay jurors ....As the only expert witness identified by the [plaintiff] has

been disqualified [as not qualified to offer an expert opinion], summary judgment may

appropriately enter for [the defendant]"); *Alves v. Mazda Motor of Am., Inc.,* 448 F. Supp. 2d

285, 301 (D. Mass. 2006) (noting that "[a]s expert evidence is essential to [the plaintiff's] case,

the defendants are clearly entitled to prevail now that their evidence [of experts' testimony] is

being excluded").

195.    Shortly after Lemelson issued his June 16 report on Ligand, Defendants faced
hundreds of thousands of dollars in house calls and a "federal call" (a legally mandated margin
call) and covered over $250,000 of the Ligand short to meet the house and federal calls.  [Ex.
86.]

**Fr. Emmanuel's Response:**  The documents speak for themselves.  By way of further

response, Fr. Emmanuel states that to the extent that the Commission purports to rely on

argument concerning the import of house calls and a "federal call," such argument requires

expert evidence that the Commission has failed to produce, likewise the Commission has failed

to provide any evidence regarding Amvona Fund's financial condition making any argument

about financial stress nothing more than rank speculation, inadequate pursuant to Fed. R. Civ. P.

56 and Local Rule 56.1.  *Calisi v. Abbott Laboratories*, No. 11–10671–DJC, 2013 WL 5441355,

at *15 (D. Mass. Sept. 27, 2013) (where determinations are beyond the jury's lay knowledge i.e.

"'generally beyond the scope of an average person's knowledge'" failure to present expert

evidence on the topic is fatal to plaintiff's claims) (quoting *Esturban v. Mass. Bay Transp.*

*Auth.,* 68 Mass. App. Ct. 911, 911 (2007) (affirming trial court's entry of summary judgment

after excluding expert)); *Morse v. Ford Motor Co.,* No. 08-11930-RGS, 2010 WL 2773527, at *

1 (D. Mass. July 13, 2010) (stating that "[i]n cases involving claims of product defect (such as

this case), expert testimony is required because the answers to the highly technical and

specialized questions raised by such claims lie outside the knowledge of most lay jurors ....As the

only expert witness identified by the [plaintiff] has been disqualified [as not qualified to offer an

expert opinion], summary judgment may appropriately enter for [the defendant]"); *Alves v.*

*Mazda Motor of Am., Inc.,* 448 F. Supp. 2d 285, 301 (D. Mass. 2006) (noting that "[a]s expert

evidence is essential to [the plaintiff's] case, the defendants are clearly entitled to prevail now

that their evidence [of experts' testimony] is being excluded"); *Theidon v. Harvard University*,

948 F.3d 477, 494 (1st Cir. 2020) (plaintiff seeking to avoid summary judgment "cannot rely on

'conclusory allegations, improbable inferences, acrimonious invective, or rank speculation'")

(quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).

196.    Lemelson covered his short position over time, including during the pendency of
his deceptive scheme that spanned June 16, 2014 (first report) to September 16, 2014 (last radio
interview).  [*See* ¶89 above; Answer (ECF No. 34) ¶¶23, 30; Ex. 55 (Smith Report) ¶11 & Table
1.]

**Fr. Emmanuel's Response:**  Disputed that Fr. Emmanuel engaged in any "deceptive

scheme."  The Commission's reliance on its expert rebuttal report to support its case-in-chief is

not permissible under Fed. R. Civ. P. 56 and Local Rule 56.1.  *See Maraj v. Massachusetts*, 953

F. Supp. 2d 325, 328 (D. Mass. 2013) (granting summary judgment where plaintiff did not

provide affirmative expert evidence, but only a rebuttal expert report because "there is no need to

consider rebuttal evidence" in plaintiff's affirmative case-in-chief, rather its use is limited solely

to plaintiff's rebuttal case).  Also, as a matter of law, the Commission cannot support a claim that

legal conduct, such as publishing a report containing no challenged statements, can be a part of a

"scheme" under Rule 10b-5.  *See* Reply Memorandum in Support of Defendants' Motion for

Summary Judgment at 4-5.  The chart of when Fr. Emmanuel covered his short position and in

what amounts is provided in paragraph 89 and is undisputed.

197.   Lemelson covered approximately 4,000 shares on June 19, 2014 and
approximately 35,000 shares on August 22 and 26, 2014—all at substantial profit.  [*See* ¶89
above.]

**Fr. Emmanuel's Response:**  Fr. Emmanuel refers to the chart provided in paragraph 89

listing when Fr. Emmanuel covered his short position and in what amounts and disputes any

characterizations or estimates inconsistent with the data provided on the undisputed chart.

198.   Lemelson himself characterized his statements as statements of fact.  [Ex. 59
(Lemelson Inv. Test.) at 296:8-297:6, 373:5-375:6, 680:8-681:4, 682:6-10, 737:10-13, 737:17-
22, 770:21-771:9.]

**Fr. Emmanuel's Response:**  Disputed.  The characterization of statements of fact or

opinion is a matter of law.  *Riley v. Harr*, 292 F.3d 282, 291 (1st Cir. 2002) ("'the courts treat the

issue of labeling a statement as verifiable fact or as [protected] opinion as one ordinarily decided

by judges as a matter of law'") (quoting *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st

Cir. 2000) (citing *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 510–11

(1984)).  Further, both the Commission in its questions and Fr. Emmanuel in various answers

referred to much of his analysis as containing his opinions during the same three-day deposition

period and the deposition transcripts reflect lengthy back and forth discussions about what

constituted opinions.  *See e.g.,* Brooks Reply Aff. Ex. 90 at 476:15-479:23, 486:19-487:23,

593:16-595:9; Brooks Reply Aff. Ex. 91 at 808:2-809:16, 812:2-813:14, 815:10-817:20, 845:3-

13.

199.    The Amvona Fund is a pooled investment vehicle under Rule 206(4)-8, promulgated under the Advisers Act [17 C.F.R. § 275.206(4)-8] and Sections 3(a) and 3(c)(1) of the Investment Company Act of 1940 [15 U.S.C. § 80-3(a) and (c)(1). [ECF No. 33 (Amended Complaint) at ¶19; ECF No. 34 (Answer) at ¶19 (admitting non-denied facts in ¶19).]

**Fr. Emmanuel's Response:**  Undisputed.

200.    A reasonable investor would unquestionably consider it significant that Ligand's investor relations firm had allegedly acknowledged that Ligand's main revenue source was about to dry up.  [Ex. 62 (Dec. 16, 2018 Hearing Tr.) at 9:25-10:2 ("THE COURT:  It's a material statement if you say someone's IR firm said [Promacta is] going away.").]

**Fr. Emmanuel's Response:**  Disputed as this is a matter of law and on the bases

explained in Defendants' Memorandum in Support of their Motion for Summary Judgment, ECF

No. 125 at 15-23 and Defendants' Reply Memorandum in Support of their Motion for Summary

Judgment at 2-9.

201.    Defendants' false statements about Viking were material because they sought to cast doubt on the benefits of the Ligand-Viking transaction and to allege misconduct by Ligand management.  [Ex. 62 (Dec. 16, 2018 Hearing Tr.) at 17:11-13 ("The Court:  Wouldn't an investor think that Viking wasn't going to be doing clinical studies and it was all a farce?").]

**Fr. Emmanuel's Response:**  Disputed as this is a matter of law and on the bases

explained in Defendants' Memorandum in Support of their Motion for Summary Judgment, ECF

No. 125 at 15-22, 23-24 and Defendants' Reply Memorandum in Support of their Motion for

Summary Judgment at 2-9.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
LIBBYHOOPES, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@libbyhoopes.com
bsullivan@libbyhoopes.com

Dated:  November 13, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on November 13, 2020.

*/s/ Douglas S. Brooks*
Douglas S. Brooks