Page 361

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:           )
                            )   File No. HO-12718-A
TRADING IN THE SECURITIES OF )
LIGAND PHARMACEUTICALS, INC. )

WITNESS:   Gregory Lemelson
PAGES:     361 through 707
PLACE:     Securities and Exchange Commission
           100 F Street, NE
           Washington, D.C.
DATE:      Wednesday, July 21, 2016

     The above-entitled matter came on for hearing, pursuant to notice, at 9:25 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200

```
                                                          Page 362
 1   APPEARANCES:
 2
 3   On behalf of the Securities and Exchange Commission:
 4        VIRGINIA M. ROSADO DESILETS, ESQ.
 5        JEFFREY FINNELL, ESQ.
 6        SONIA TORRICO, ESQ.
 7        Securities and Exchange Commission
 8        100 F Street Northeast
 9        Washington, D.C. 20549
10        (202) 5510-4955
11
12   On behalf of the Witness:
13        DOUGLAS F. MacLEAN, ESQ.
14        Armor Compliance
15        22 Batterymarch Street
16        Boston, Massachusetts 02109
17        (617) 501-2055
18
19   ALSO PRESENT:
20        LUCY GAUTHIER, Intern
21
22
23
24
25
```

Page 363

1                       C O N T E N T S
2
3   WITNESS                                          EXAMINATION
4   Gregory Lemelson                                        365
5
6   EXHIBITS    DESCRIPTION                           IDENTIFIED
7         25   E-mail                                        368
8         26   E-mail                                        370
9         27   E-mail                                        389
10        28   E-mail                                        396
11        29   E-mail                                        413
12        30   E-mail                                        414
13        31   E-mail                                        417
14        32   E-mail                                        421
15        33   E-mail                                        422
16        34   E-mail                                        427
17        35   E-mail                                        428
18        36   Press Release                                 453
19        37   10-Q                                          494
20        38   E-mail                                        518
21        39   E-mail                                        520
22        40   E-mail                                        528
23        41   Statements                                    539
24        42   Information                                   556
25        43   Statements                                    578

```
                                                          Page 364
 1                       C O N T E N T S  (CONT.)
 2
 3    EXHIBITS   DESCRIPTION                              IDENTIFIED
 4         44    Article                                       585
 5         45    E-mail                                        628
 6         46    E-mail                                        629
 7         47    E-mail                                        631
 8         48    Transcript                                    641
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              P R O C E E D I N G S
 2         MS. DESILETS:  Back on the record at
 3   9:25 a.m.
 4   Whereupon,
 5               GREGORY LEMELSON
 6   was recalled as a witness and, having been
 7   previously duly sworn, was examined and testified
 8   further as follows:
 9                  EXAMINATION
10         BY MS. DESILETS:
11      Q   Good morning, Father Emmanuel.  Welcome
12   back.
13      A   Good morning.  Thank you.
14      Q   Before we continue, I wanted to summarize a
15   conversation that we had after we went off the record
16   last night.  You had asked us about the formal order
17   of investigation and whether we are investigating
18   Ligand or any other parties, and I informed you that
19   that wasn't information we were at liberty to share or
20   are really ever at liberty to share.
21         You also asked whether it was customary for
22   us to ask background questions about a witness, and
23   particularly about your wife, and I explained that we
24   do usually ask background questions about the witness,
25   and in this particular case, your wife is the owner of
```

```
                                                           Page 476
 1    ascribe value to a company that loses money.
 2         Q    So you can't remember sitting here today
 3    whether you said that they were essentially
 4    insolvent --
 5         A    I think that's --
 6         Q    -- because in your view they were not
 7    technically insolvent.
 8         A    Well, I probably put "essentially" in there
 9    because it -- it needed to be -- this statement needed
10    to be connected to the broader research report.  You
11    know, I needed people -- you know, the word
12    "essential" needs to be in there because you have to
13    see the broader picture, which is what I'm saying
14    about how they handle their financial statements.
15         Q    And the reason for that is that they weren't
16    actually insolvent, right?
17         A    Well, I consider them to be.
18         Q    In your opinion?
19         A    I think the overwhelming evidence about
20    Ligand is that their financial statements are
21    extraordinary manipulated in order to give the
22    appearance of solvency.  And I think that that is done
23    in order for management to grant themselves huge
24    amounts of stock options that they can then sell in
25    the market at a high price.  That's what I think the
```

Page 477

1  purpose of the entity is.  I don't think it's research
2  and development.  I think they have no control
3  whatsoever over their future revenue profitability,
4  and I think they own no real assets.  That's my
5  opinion.  No assets that have any value.  I mean maybe
6  you might ascribe a dollar of value to the company,
7  for example, or two, you know, in an optimistic case.
8  That's my view of the company.
9       Q    Do you say when you refer to them as
10 essentially insolvent that that was your opinion?
11      A    I don't recall.  And I don't recall --
12      Q    Well, you have the report in front of you.
13      A    I have to read all the reports to see and I
14 have to listen to my radio interviews.  I don't know
15 if I used the word "opinion" or not.
16      Q    Okay.  So we're specifically referring to
17 your Q2 2014 performance results.  Which we marked as
18 Exhibit 36.  That's where you use the term
19 "essentially insolvent."
20           You say there that:  "Extensive research
21 affirms that the company is radically overvalued and
22 essentially insolvent."
23      A    Mm-hmm.
24      Q    Do your reference to extensive research
25 imply that's a fact, not an opinion?

```
                                                      Page 478
 1        A    I don't know.  I just wanted to make note of
 2   the fact that I've been reading about this thing
 3   forever, and, you know, I published all these research
 4   reports, and I've investigated, you know, turned over
 5   every stone and read every report, and at the end of
 6   the day, the conclusion one comes to again is this is
 7   an operation which is unable to meets its obligations
 8   without accessing either private equity or public debt
 9   markets.  As a going concern, it simply cannot stand
10   on its own.
11        Q    **In this Exhibit 36, you don't say, My**
12   **extensive research has led me to the opinion that the**
13   **company is essentially insolvent because their**
14   **intangible assets are valueless.  You say:  "Extensive**
15   **research affirms the company is radically overvalued**
16   **and essentially insolvent."**
17             **Doesn't that imply to your investors that**
18   **that is a fact that you have confirmed through your**
19   **research?**
20        A    I don't know.  I mean, the tail end of the
21   quote said Emmanuel Lemelson.
22        Q    **You don't say facts, you only say opinions?**
23        A    I say what I see and what the results of my
24   research is.
25        Q    **So you've stated facts at some point in your**
```

```
                                                          Page 479
 1   life, right?
 2        A    I would like to believe all my reports are
 3   objective and that I've laid out the best case I
 4   can --
 5        Q    I'm not asking about whether your reports
 6   are objective in your opinion.  I'm asking about
 7   whether this statement that the company is essentially
 8   insolvent is your opinion or fact, and whether you
 9   disclosed to your investors whether that was a
10   statement of fact or of opinion.
11        A    I don't know.  I don't know.  I mean, at the
12   time it was written, I'm just saying the results of my
13   research, and that it's essentially insolvent.
14        Q    You don't know whether that's a fact or
15   opinion?
16        A    Well, the word "essentially" is likely being
17   used in this case, and it's been two years, but likely
18   to account for the fact that some people would try to
19   ascribe value to these intangibles, which I'm saying
20   have no value.  So there is a dispute.  And it's
21   probably allowing room for the dispute or a
22   hypothetical dispute.  Somebody, of course, was going
23   to want to argue that, probably management themselves.
24        Q    Do you think it's clear to investors reading
25   this that that's what the word "essentially" is
```

```
                                                       Page 486
 1              And I think, you know, to express in summary
 2   form what the research report -- the extensive
 3   research has concluded and found, I don't see a fault
 4   in that statement.
 5        Q    You think by using the term "essentially,"
 6   you're changing the definition of what "insolvent"
 7   means?
 8        A    Well, again, it's a word designed to point
 9   to the fact that you have to get into the accounting,
10   you have to do the financial statements, and you have
11   to read what we're actually saying.  I mean what we're
12   saying in these research reports and why we've come to
13   this conclusion, it's really an invitation for people
14   say that, you know, you need to take a closer look at
15   this, and I think that's the language I've used
16   throughout on the radio and everywhere else is saying
17   you have to take a closer look at the financials, you
18   have to get into it.
19        Q    How does the word "essentially" convey that
20   you need to take a closer look at something?
21        A    Well, I suppose "essentially," the
22   qualifier, is indicative of saying, again, it opens
23   the door up to the likelihood that somebody is going
24   to have an opposing opinion, most likely the company.
25        Q    When you say "essentially," do you mean not
```

Page 487

1  **really?**
2      A    What I mean is that it tries to summarize
3  the research that the financial statements are highly
4  doctored.
5      **Q    The word "essentially" tries to summarize**
6  **your research?**
7      A    Well, I don't know how else to say it.  I
8  mean when you say "essentially insolvent," it means --
9  to me it's like saying, Well, of course, we're aware
10 that they're manipulating their financial statements.
11 We're aware that they're doing crazy things that
12 amount to fraud in our opinion and in our research.
13 So we have to qualify it a little bit because if you
14 took just a cursory look, you might say well -- you
15 know, I mean, there was a time when Bernard Madoff was
16 not insolvent but actually he was.
17          So -- so, I mean, any time you have
18 financials that are not sound and people are relying
19 especially on a summary presentation of the
20 financials, you have to be able to say to them, you
21 know, when you put -- to use your word, a qualifier,
22 you are really pointing them to say, Take a closer
23 look.  In my view, that's how I see it.
24      **Q    And you think when you use a qualifier, you**
25 **are trying to signal to investors that they should**

Page 593

1  question, on Exhibit 17, on page 16 --
2       **Q    What question are you answering?**
3       A    Oh, you asked me how the market
4  capitalization was relevant.
5       **Q    To the commercial viability of Promacta.**
6       A    Well, because the market capitalization the
7  price of the stock should reflect the value of the
8  company.  So when we do an appraisal of value, an
9  analyst, we're trying to figure out what the assets
10 are worth.
11      **Q    I'm not asking you about the value of**
12 **Ligand.  You are saying Promacta has never been**
13 **commercially viable because the revenues are nominal**
14 **in comparison to the market capitalization.**
15      A    Yeah, so --
16      **Q    What does the market capitalization of**
17 **Ligand have to do with the commercial viability of the**
18 **Promacta?**
19      A    I think what I actually said was slightly
20 different than that.
21      **Q    Okay.  Go ahead and tell me what you said.**
22      A    So what I would like to say is that -- and I
23 think I did say this earlier, is that -- but I don't
24 believe I said this in the reports.  What I actually
25 said in the reports is that these severe competitive

1  threats and the fact that hepatitis C is not curable
2  is going to be a problem for the future commercial
3  viability of Promacta.  That's a summary of the
4  reports.
5           And then I further say in the reports that
6  there's been no evidence provided of a significant
7  alternative revenue stream.  What I also said a little
8  bit earlier is if Promacta had been -- and this is
9  their largest royalty-generating program -- had been
10 commercially viable for this company they would not
11 have an accumulated deficit of $660 million.
12          Usually the purpose of any company,
13 pharmaceutical or otherwise, is to create shareholder
14 value.  Sometimes in a startup situation, which is not
15 usually associated with publicly traded companies, a
16 company might have -- when they are first getting
17 started, may not be profitable.  But one would expect
18 that after I believe 27 years of operation, that the
19 company would have provided value to the shareholders,
20 and if the retained earnings account is a minus, at
21 one point it was even more, it was almost minus
22 700 million, you know, that, in my opinion, and I
23 think in any rational or reasonable opinion or
24 assessment, you could not call the revenue-generating
25 programs then commercially viable because they are

Page 595

```
 1   giving rise only to losses.
 2        Q    So in your opinion, a product on its own
 3   cannot be -- the commercial viability of a product
 4   cannot be considered separately from the value of the
 5   company?
 6        A    Well, the purpose of a company is to make
 7   money.  So when you look at the value of a company,
 8   you want to look at the value of its assets or its
 9   productive assets.
10        Q    I'm not talking about the value of the
11   company.  You are saying Promacta has never had
12   commercial viability?
13        A    No, I didn't say that in the reports.  I'm
14   saying that commercial viability moving forward --
15        Q    You said that here.
16        A    Yeah.
17        Q    Today, just now.
18        A    Yeah.
19        Q    How do you define commercial viability of a
20   product?
21        A    Well, profitability, it would allow the
22   company to be profitable in return --
23        Q    Profitability of the product.
24        A    Well, in the case of Ligand it's not really
25   distinguishable because this is their chief
```

```
                                                          Page 706
 1                  PROOFREADER'S CERTIFICATE
 2
 3    In the Matter of:    TRADING IN THE SECURITIES OF
 4                         LIGAND PHARMACEUTICALS, INC.
 5    Witness:             Gregory Lemelson
 6    File Number:         HO-12718-A
 7    Date:                July 21, 2016
 8    Location:            Washington, D.C.
 9
10
11        This is to certify that I, Nicholas Wagner,
12    (the undersigned), do hereby swear and affirm
13    that the attached proceedings before the U.S.
14    Securities and Exchange Commission were held
15    according to the record and that this is the
16    original, complete, true and accurate transcript
17    that has been compared to the reporting or recording
18    accomplished at the hearing.
19
20
21
22    _____       _____
23    (Proofreader's Name)             (Date)
24
25
```