## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                      )
SECURITIES AND EXCHANGE               )
COMMISSION,                           )
                                      )
                  Plaintiff,          )        Civil Action
v.                                    )        No. 18-11926-PBS
                                      )
GREGORY LEMELSON and LEMELSON         )
CAPITAL MANAGEMENT, LLC,              )
                                      )
                  Defendants,         )
                                      )
and                                   )
                                      )
THE AMVONA FUND, LP,                  )
                                      )
                  Relief Defendant.   )
_____)


### MEMORANDUM AND ORDER

April 6, 2021

Saris, D.J.

### INTRODUCTION

This dispute centers on an enforcement action brought by the United States Securities and Exchange Commission (SEC) against defendants Gregory Lemelson; Lemelson Capital Management, LLC (LCM); and the Amvona Fund, LP. The SEC alleges that defendants Lemelson and LCM violated Section 10(b) of the Exchange Act and Rule 10b-5 and Section 206(4) of the Advisers Act and Rule 206(4)-8. Specifically, the SEC claims that the defendants engaged in an unlawful "short-and-distort scheme" involving fraudulent,

1

deceptive, or manipulative conduct.  Dkt. 131 at 4. The SEC brings separate claims based on theories of unjust enrichment and constructive trust against the Amvona Fund.

The defendants have moved for summary judgment, arguing that the SEC has not met its burden on either the alleged Rule 10b-5 violation or the alleged Rule 206(4)-8 violation.  The SEC, in turn, has moved for partial summary judgment, seeking dismissal of the defendants' affirmative defense of selective enforcement.

For the reasons set forth below, the Court **DENIES** the defendants' motion for summary judgment (Dkt. 124) and **ALLOWS** the SEC's motion for partial summary judgment (Dkt. 121).

## Factual Background

The following facts are taken from the parties' statements of material fact and the associated exhibits.  Except as otherwise noted, the facts are undisputed.

## I.   Alleged false or misleading statements

LCM is the investment adviser to the Amvona Fund.  In 2014, through the Amvona Fund, Lemelson took a short position in shares of the stock of Ligand Pharmaceuticals, Inc. (Ligand).  Between June 2014 and October 2014, Lemelson participated in interviews and authored several research reports concerning Ligand.  Four statements from these interview appearances and reports are now challenged by the SEC as fraudulent misrepresentations.

### A.   Statement 1

After taking the short position in Ligand, Lemelson published a 25-page report expressing his opinion that Ligand's stock was overvalued.  Lemelson based this theory on his belief that demand for Promacta, Ligand's largest royalty-generating asset, would soon be eliminated by competitor drugs.  Specifically, he theorized that the Hepatitis C drug Sovaldi would soon replace Promacta, which is in part used as a supportive therapy for Hepatitis C patients.  The SEC alleges that Promacta and Sovaldi are not direct competitors because Promacta does not treat Hepatitis C.

Two days later, Ligand's Investor Relations representative Bruce Voss contacted Lemelson by phone to discuss the report. Accounts of the substance of the phone conversation are disputed. Prior to the conversation, Voss had been advised via email by Ligand's CEO, John Higgins, to not "jump into content or a rebuttal" with Lemelson.  Dkt. 127-9 at 1.  Voss testified, however, that during the call he in fact actively rebutted Lemelson's theory that Promacta would be squeezed out of the market.  See Dkt. 133-2 at 18 ("I recall on that conversation telling Father Lemelson that Promacta has more approved indications than hepatitis C and more to come and more geographies than it's in now.").  Lemelson, meanwhile, indicated in notes taken after the call that Voss "said the company [Ligand] agreed that Gilead's drug would eliminate the need for Promacta and understood that."  Dkt. 127-12 at 2. In support of this conclusion, Lemelson

relies on the fact that, during the call, Lemelson had stated that Promacta was going away and asked Voss, "don't you agree?"—a question to which Voss responded with silence.  Dkt. 126 ¶¶ 18-20.  Voss, for his part, explained that he had interpreted Lemelson's phrase "don't you agree" as a "personal tick" and a rhetorical question. See Dkt. 127-10 at 18. In either case, Higgins emailed Voss afterwards, implying that Voss had "tacit[ly] agree[d]" with Lemelson that Promacta was basically going away. Dkt. 127-13 at 1.

The next day, on June 19, 2014, Lemelson was interviewed by a radio outlet called Benzinga.  In one of the statements that is now challenged by the SEC, Lemelson claimed during the interview that Ligand's Investor Relations representative had "basically agreed" that Promacta was going away.  Dkt. 127 ¶ 15.  During the interview, Lemelson repeatedly referred to "the Ligand short." Dkt. 132 at 10.  Ligand's stock price fell during, and immediately in the aftermath of, the interview.

**B.   Statements 2 & 3**

Viking Therapeutics (Viking) is a start-up company with which Ligand had entered into a licensing agreement.  At the time of the closing of the Viking-Ligand transaction, Ligand had taken an approximately 50% stake in Viking.  Lemelson did not hold a short position in Viking at this time.

4

On July 1 2014, Viking released a Form S-1.[1]  In a July 3, 2014 report, Lemelson cited the Form S-1 for the proposition that Viking had "not yet even consulted with [its auditors] on any material issues.  The financial statements provided on the S1 are accordingly unaudited."  Dkt. 127-15 at 10.  He further claimed that, based on Viking's public filings, Viking "does not intend to conduct any preclinical studies or trials."  Dkt. 127-15 at 7.  Lemelson had expressed in the report that LCM was short shares of Ligand stock.

In the July 1, 2014 Form S-1, Viking had in fact expressed that its 2013 financial information was derived from "audited financial statements included elsewhere in this prospectus."  Dkt. 127-19 at 8.  The Form S-1 also expressly explained that Viking expected to enlist third parties to perform clinical trials for a variety of its drugs.  See, e.g., Dkt. 127-19 at 6 ("We intend to rely on third parties to conduct our preclinical studies and clinical trials and perform other tasks for us." (emphasis removed)); Dkt. 133-24 at 2 ("We expect to commence Phase 2 clinical trials for both VK0612 and VK5211 in early 2015 and to

---

[1] A Form S-1, or a "Registration Statement under the Securities Act of 1933," is filed by a company seeking to make a public stock offering.  See, e.g., Versyss Inc. v. Coopers & Lybrand, 982 F.2d 653, 654 (1st Cir. 1992).

complete the clinical trials in 2016."). On the basis of the July
1, 2014 Form S-1, the SEC challenges as false and misleading
Lemelson's July 3, 2014 statements about Viking's unaudited
financials (Statement 2) and intention to conduct clinical trials
(Statement 3).

## C.   Statement 4

In an August 14 report, Lemelson stated that "[o]n August 4,
2014, Ligand released their Q2 earnings report and financial
statements in which the company boasted that it was debt free.
Prior to this August 4 release, the company's liabilities exceeded
tangible assets, meaning the company was insolvent." Dkt. 127-23
at 2.  He further stated that, "[o]n August 11, [Ligand] announced
that they would be taking on $225 million in new debt, vis-à-vis
a new convertible debt offering. If the bond offering succeeds,
the company's liabilities will again far exceed its assets, and
the company will be technically insolvent once more."  Id.

Shortly thereafter, in an August 22 report, Lemelson wrote
that Ligand had "issued $245 million in new debt against [Ligand's]
tangible equity of just $21,000, giving rise to a debt to tangible
equity ratio of 11,667-to-1 (that is to say, $11,667 dollars in
debt for every $1 dollar in tangible common shareholder equity)."
Dkt. 127-24 at 3.  Similarly, he stated that Ligand's "shareholders
have only the protection of $21,000 in tangible equity to shield
them from $245 million in debt."  Id. at 6. Both the August 14 and

the August 22 reports disclosed that LCM had a short position in Ligand stock.

Ligand's CEO, John Higgins, stated in his deposition testimony that Ligand was not insolvent and had never been insolvent during his tenure with the company.

## II. Allegations Surrounding Lemelson's Selective-Enforcement Defense

### A. Communications at Ligand

Lemelson alleges that several Ligand employees made mocking statements about him in email correspondence. For instance, he cites evidence that Ligand employees referred to Lemelson as "lamelson," "a quack," "slimy," and a "narcissistic psychopath." Dkt. 136-4 at 1; Dkt. 136-6 at 1; Dkt. 136-9 at 1.

As is relevant here, Lemelson also cites multiple examples showing that Ligand employees mocked his status as an ordained Orthodox priest. For instance, he cites an email chain in which one Ligand employee asked of Lemelson's actions, "does being a priest make that ok?" Dkt. 136-9 at 1. As another example, Lemelson points to an email in which Bruce Voss wrote, "BTW, Lemelson is an ordained Eastern Orthodox priest, and is constantly photographed in his priestly robes and collar. It would be funny if it wasn't my client!" Dkt. 136-10 at 1.

### B. Referral to the SEC

On its website, the SEC maintains a publicly accessible "tips, complaints, and referrals" (TCR) system for persons with knowledge of potential violations of the securities laws to report relevant information.  Ligand and its counsel filed two TCRs, one in 2014 and another in 2015.  Before this case was filed, Ligand's representative and counsel met twice with the SEC Division of Enforcement staff regarding the two TCRs—once in September 2014 and again in June 2015.  At the September 2014 meeting, Ligand representatives used a PowerPoint presentation which included photos of Lemelson in his priestly robes.  This presentation accused Lemelson of engaging in an "affinity fraud."  Dkt. 127-36 at 23.

In addition to the September 2014 and June 2015 meetings, Ligand's counsel also communicated with SEC staff by email and telephone between September 2014 and March 2018.  Ligand's counsel asked the SEC for updates on the investigation into Ligand, but the SEC staff informed Ligand's counsel that they could not provide any detailed information about the investigation.

In October of 2014, Higgins wrote an email to Ligand's Board in which he explained: "With the recent stock weakness, it is obvious we continue to be impacted by the Lemelson shorting and related reports. Selling is leading to more technical selling and shorting. We continue to work with our attorneys to lean on the

SEC to get an injunction on Lemelson's activities." Dkt. 136-22 at 1.

### C.   The SEC Investigation

#### 1.   *The SEC Authorization Process*

The staff of the SEC's Division of Enforcement is responsible for recommending that the Commission authorize the filing of a civil enforcement action.  After receiving notice, the putative defendants in the action are given the opportunity to address the recommendation through a "Wells process."  See Dkt. 123 ¶ 18.  This process involves written submissions by the putative defendants and meetings with SEC officers.  The initial recommendation that a civil enforcement action be filed and the Wells submissions are then reviewed by senior officers and staff in both the SEC's Division of Enforcement and each relevant Division and Office within the SEC.

At the next step in the process, the SEC's Commissioners consider the recommendation, which is held to a vote.  At the time that that the recommendation to file a civil enforcement action against the defendants in the present case was considered, the SEC had four Commissioners.

Ligand's lead outside counsel, Bradley J. Bondi, was once employed by the SEC.  All but one of the Commissioners were acquaintances of Bondi.  The SEC's 30(b)(6) designee testified that one of the Commissioners, Hester Peirce, is friends with Bondi

and talked with him a "couple of times per year."  Dkt. 123-14 at
77.  The designee further explained, however, that Pierce and Bondi
have "never discussed this case or any other SEC business when
they talk or communicate."  Id.

   2. *Events Preceding the Investigation*

  Ligand's representatives met with members of the SEC's Boston
regional office on September 25, 2014.  Ligand sought to convince
the SEC to bring an enforcement action against the defendants,
presenting a PowerPoint slide deck to the Commission.  Among other
allegations, Ligand argued before the SEC that Lemelson had engaged
in an "affinity fraud."  Dkt. 127-36 at 21.  The SEC's Boston
regional office informed Ligand after the meeting that it would
not open an investigation into Lemelson.

  At some point after the meeting with the Boston regional
office, Ligand changed counsel and hired Bondi.  Bondi contacted
a former colleague at the SEC and arranged for a second meeting
between SEC staff and Ligand at the SEC's Washington, D.C. regional
office on June 8, 2015.  The SEC filed its complaint against the
defendants on September 12, 2018.

   3. *Communications with Ligand's Counsel*

  The SEC's Investor Bulletin states that, as a policy, the SEC
"will not confirm or deny the existence of an investigation unless
the SEC brings charges against a person or entity involved.
Enforcement also will not provide updates on the status of any

pending SEC investigation." Dkt. 136-26 at 1.  In September 2017, Bondi emailed several SEC staff asking about the status of the investigation into the defendants.  Virginia Rosado Desilets, senior counsel for the SEC, responded, explaining that the email recipients could not share information about the nonpublic investigation into Ligand, aside from the fact that the investigation is ongoing.

4.    *Refusal to Grant Defendants' Counsel's Request for a Meeting*

Lemelson's current counsel, Douglas Brooks, requested a meeting with the SEC before it filed a complaint containing its new claim under the Investment Advisers Act.  The Commission denied this request for a second meeting.  The parties dispute whether Attorney Brooks was given a reason for the denial of his request. The defendants allege that the Commission explained that it was denying Brooks' request because Lemelson's prior counsel was already granted a meeting with the Commission.  The SEC contends that it did not offer a reason for denying the request for a meeting.  It also points to the SEC's Enforcement Manual, which states that "[a] Wells recipient generally will not be accorded more than one post-Wells meeting." Dkt. 139 at 29.

5.    *Questioning of Lemelson*

During the investigation, Lemelson provided testimony for approximately 27 hours on July 20-22, 2016. During the questioning

on July 22, 2016, Lemelson was asked about an email in which he appeared to compare himself to activist investors like Bill Ackman, Michael Burry, and Harry Markopolos, as well as to Ghandi, Jesus, and Martin Luth King, Jr.  Specifically, Lemelson was asked, "Did Socrates, Martin Luther King, Ghandi or the son of God have a financial incentive to cause investors to sell stock in a particular company to bring the price down?" Dkt. 136-32 at 7.

## DISCUSSION

### I.   Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]t summary judgment a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the same." Chadwick v. WellPoint, Inc., 561 F.3d 38, 41 (1st Cir. 2009) (citation omitted).  "A genuine [dispute] exists when, based on the evidence, a reasonable jury could resolve the issue in favor of the non-moving party." Napier v. F/V DEESIE, Inc., 454 F.3d 61, 66 (1st Cir. 2006).

### II.  Analysis

#### A.   The Defendants' Motion for Summary Judgment

In their motion for summary judgment, the defendants argue that the four challenged statements (1) had no impact on Ligand's

12

stock price and were therefore immaterial as a matter of law, (2) were made without the requisite scienter, and (3) are either demonstrably true or constitute opinion commentary protected by the First Amendment.  They further contend that the SEC's claim based on Rule 206 of the Investment Advisers Act must fail because the SEC has provided no evidence that Lemelson defrauded his own investors.  I address these arguments in turn.

      *1.   Materiality*

"To establish a violation of Section 10(b) and Rule 10b-5, the SEC must prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." <u>VanCook v. SEC</u>, 653 F.3d 130, 138 (2d Cir. 2011) (citation omitted); <u>see also</u> 15 U.S.C. § 77q(a); 17 C.F.R. § 240.10b-5.

The defendants argue that the statements made by Lemelson are not material because they did not have any demonstrable effect on Ligand's stock price. They further claim that the SEC has failed as a matter of law to prove the materiality element because it did not produce an "event study." Dkt. 125 at 27-28.

The materiality of a statement is determined by the "total mix" test put forth in <u>Basic Inc. v. Levinson, 485 U.S. 224</u> (1988). That is, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made available."   Id. at 233 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Whether a drop in Ligand's stock price accompanied Lemelson's statements is in dispute. The defendants argue that the SEC failed to produce any evidence that the challenged statements caused Ligand's stock price to drop.   The SEC, on the other hand, points to several disputed assertions in its statement of facts that Lemelson's statements were accompanied by a drop in stock price or other evidence of materiality.   Specifically, the SEC puts forth evidence that:

   (1)   "Ligand's stock price dropped by 34% during the time Lemelson was publishing his reports."   Dkt. 132 ¶ 143.

   (2)   "Ligand's stock price dropped 5.4% immediately in the wake of Lemelson publishing his first report on June 16, 2014." Dkt. 132 ¶ 144.

   (3)   "Lemelson himself, along with at least several media outlets, attributed Ligand's falling stock price to Lemelson's misstatements."   Dkt. 132 ¶ 147.

In support of the final allegation, the SEC cites an email by Lemelson claiming that "[o]ur multi-month battle with [Ligand] has also been paying off[.] [S]hares are now down ~40% since LCM published its first (of six) report(s)."   Dkt. 133-21 at 1. In an email to his investors, Lemelson similarly claimed that "[s]hares

of [Ligand] dropped ~2% during the [Benzinga] interview." Dkt. 133-22 at 1.  And a slide in an Amvona Fund presentation asserted that "[Ligand] shares drop ~16% within 6 trading days [of the June 16 report]—Lemelson Capital is credited with the drop in market cap by USAToday, ValueWalk, Benzinga, SeekingAlpha and others." Dkt. 133-23 at 2.

When the evidence is viewed in the light most favorable to the SEC, a reasonable jury could find that Lemelson's statements "significantly altered the total mix of information made available."  See Basic, 485 U.S. at 233 (cleaned up).  This is especially so because the determination of materiality is normally reserved for the jury.  See In re Cabletron Sys., Inc., 311 F.3d 11, 34 (1st Cir. 2002).

The defendants allege that the evidence that "Ligand's stock price dropped by 34% during the time Lemelson was publishing his reports," Dkt. 132 ¶ 143, can only support a claim of "scheme liability," which they contend the SEC has not adequately pleaded because "the Commission's scheme liability claim is no broader than its false statements claim."  Dkt. 140 at 8-9.  This is because the 34% drop in stock price occurred over a four-month period, rather than immediately after any of Lemelson's four challenged statements. But the SEC has also provided other evidence of materiality, including Lemelson's own claims that the statements caused a drop in Ligand's stock price.

The defendants contend that the materiality element requires a showing of an immediate drop in stock price in civil enforcement cases brought by the SEC.  The defendants cite one decision of this Court, Emerson v. Genocea Biosciences, Inc., 353 F. Supp. 3d 28 (D. Mass 2018), which concluded that the absence of a stock-price drop after the release of an allegedly misleading press release disclosing twelve-month virus-shedding testing results but not the six-month results was "fatal to Plaintiffs' allegations" of materiality.  See id. at 41.  But the defendants' reliance on Emerson is misplaced.  Not only is Emerson factually distinguishable because the plaintiffs there failed to satisfy the materiality element in part because the release of the twelve-month data was "without consequence," id., but it also involved claims by private plaintiffs under Rule 10b-5, see id. at 37. The plaintiffs in Emerson were therefore required to make a showing of "reliance" not required here. See Sec. & Exch. Comm'n v. Lemelson, 355 F. Supp. 3d 107, 109 (D. Mass. 2019) (explaining that, "[u]nlike private litigants, the SEC need not prove the additional elements of reliance or loss causation" (quoting SEC v. Pirate Inv'r LLC, 580 F.3d 233, 239 n.10 (4th Cir. 2009)).

By requiring the SEC in the present case to show that the Ligand market price dropped after Lemelson's statements, the Court would essentially be requiring the SEC to prove the reliance element in a civil enforcement action.  Such a requirement is

16

unsupported by the caselaw, and it would go against the Supreme Court's admonition that the materiality element not be "confin[ed] . . . to a rigid formula." Basic, 485 U.S. at 236.

Thus, although a change in stock price is relevant to a jury's analysis of the materiality element, an absence of change in stock price is not dispositive. See United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991), cert. denied, 502 U.S. 813 (1991) ("[W]hether a public company's stock price moves up or down or stays the same . . . does not establish the materiality of the statements made, though stock movement is a factor the jury may consider relevant."). This conclusion is consistent with the Second Circuit's holding that the materiality element does not require a showing "that the investor would have acted differently if an accurate disclosure was made." See Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted).

The defendants' argument that the SEC has failed to prove materiality because it did not provide an event study fares no better. To be sure, event studies, or expert reports that examine the causes of changes in stock prices, are one important factor that a jury may consider in assessing materiality. Courts in the Third Circuit, in particular, have given heavy weight to event studies. See Sec. & Exch. Comm'n v. Berlacher, No. 07-3800, 2010 WL 3566790, at *7 (E.D. Pa. Sept. 13, 2010) (explaining that the defendant's expert conducted an event study "[c]onsistent with the

Third Circuit's <u>post hoc</u> analysis of stock price movement to determine materiality"); <u>Sec. & Exch. Comm'n v. Goldstone</u>, No. 12-0257, 2016 WL 3135651, at *46 (D.N.M. May 10, 2016) (noting that event studies are "essentially . . . mandatory" in the Third Circuit).  But the defendants cite no decisions of the First Circuit in which an event study was required at the summary judgment stage in an action brought by the SEC.  Their argument therefore fails for the same reasons as discussed above.

As an additional argument, the defendants contend that Lemelson's statements could not have altered the "total mix" of information because he disclosed his short position in the interview and the reports and had characterized the reports as opinion commentary.  <u>See Basic</u>, 485 U.S. at 233.  In some contexts, a report's analysis may be "accompanied by meaningful cautionary statements and specific warnings of the risks involved," and "that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law."  <u>See Saltzberg v. TM Sterling/Austin Assocs., Ltd.</u>, 45 F.3d 399, 400 (11th Cir. 1995) (involving an offering document); <u>see also Sturm v. Marriott Marquis Corp.</u>, 26 F. Supp. 2d 1358, 1366 (N.D. Ga. 1998) (finding that misrepresentations did not alter the total mix of facts available where, among other disclaimers, the risk of reduced distributions and equity share to limited partners, the details surrounding a fairness opinion, and conflicts of interest were

disclosed). In this context, Lemelson's statements regarding his short position and the status of his reports as opinion commentary are not specific enough in light of the alleged misstatements of fact to immunize him against a finding of materiality as a matter of law.

The defendants argue that Lemelson's statement that a member of Ligand's investor relations firm "basically agreed" that Promacta was going away was too vague to satisfy the materiality element. See Dkt. 127 ¶ 15. To the contrary, Lemelson described an alleged "actual happening" during his call with Voss, and not a nonspecific conjecture. See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 183 (2015) (describing a fact as an "actual happening" that "expresses certainty about a thing" (cleaned up)). His statement was not too vague to be found material by a reasonable jury.

With regard to Lemelson's statements that Viking did not consult with its auditors or conduct clinical studies, the defendants contend that Lemelson's statements about a third-party company could not have been construed as material to Ligand. It is no coincidence, however, that the statements about Viking appeared in Lemelson's report on Ligand, in which he expressly explained that Viking and Ligand had reached a "broad licensing deal." Dkt. 127-15 at 7. The defendants further argue that the statements were not raised by Ligand in its presentations to the SEC. But

Ligand's failure to highlight these statements in these presentations does not render them immaterial as a matter of law.

Finally, the defendants argue that Lemelson's fourth statement was not material because Lemelson disclosed that he was considering only Ligand's tangible assets in calculating the debt-to-tangible-equity ratio. This disclosure does not address the overarching problem that Lemelson falsely described Ligand as "insolvent" on the basis of his calculations. See Dkt. 127-23 at 2. The defendants have therefore failed to show that the fourth statement was immaterial as a matter of law.

### 2. *Scienter*

The Supreme Court has defined the term "scienter" in the Rule 10b-5 context as "a mental state embracing intent to deceive, manipulate, or defraud." Aaron v. Sec. & Exch. Comm'n, 446 U.S. 680, 686 n.5 (1980) (citation omitted). The First Circuit has clarified that evidence of "a high degree of recklessness" may also satisfy the scienter element. Mississippi Pub. Emps. Ret. Sys. v. Bos. Sci. Corp., 649 F.3d 5, 20 (1st Cir. 2011) (cleaned up). "Recklessness in this context means a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it." Id. (cleaned up). "Knowingly

20

omitting material information is probative, although not determinative, of scienter." Id. (cleaned up).

Arguing that the SEC has provided no evidence of scienter, the defendants point to the fact that Lemelson published all of his reports under his own name, disclosed that he had taken a short position in Ligand stock, cited the source materials behind his commentary, and retained his short position for months. The first three of these arguments fail for the same reasons described above: Lemelson's generic disclosures are not enough to demonstrate that he was not at least reckless in making the four challenged statements. Lemelson's argument that he did not have the requisite scienter because he retained his short position for several months is similarly unavailing. Although Lemelson's delay in cashing in on his short position is a factor that a jury might consider in determining whether Lemelson had the requisite scienter, this fact is not dispositive at the summary judgment stage. Moreover, the record shows that Lemelson in fact covered some of his shares in Ligand immediately after the June 14, 2014 and August 14 and 22, 2014 statements.

The defendants argue that the first of Lemelson's challenged statements fails for a lack of scienter for additional reasons. Specifically, they argue that (1) Lemelson took real-time notes of his call with Voss that support his version of the call, (2) Ligand CEO Higgins suggested that Voss's silence on the call might have

21

been construed as tacit agreement, and (3) the context of Lemelson's statement, which was a brief moment in a 22-minute interview, demonstrates a lack of scienter. But once again, although these contextual details might support Lemelson's case before a jury, they do not suffice to show that Lemelson lacked scienter as a matter of law.

Moreover, the SEC has provided sufficient evidence of scienter to support bringing this case to trial. Lemelson's claim that Voss agreed that Promacta was "going away" appears to be hotly contested by the parties. See 132 at 8. Although the defendants argue that this first challenged statement fails for a lack of scienter because it is based on an unsupported "he said/he said" situation, they do not explain why Voss's account of his exchange with Lemelson should be completely discredited by the Court at this juncture.

Similarly, a reasonable jury could find that Lemelson was aware of the risk that his statements about Viking and Ligand's alleged insolvency could mislead investors. And, as discussed above, Lemelson's repeated attempts to take credit for the drop in Ligand's stock price, in particular, support the conclusion that he believed the statements that he made were material. In light of the series of disputed facts in this case, as well as the general principle that scienter is usually a question reserved for the jury, the Court denies the defendants' motion for summary

judgment on this issue.  See Sec. & Exch. Comm'n v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008) ("[I]t is unusual to grant summary judgment on scienter.")

>   3.   *First Amendment*

Courts have held that, although expressions of opinion may be considered misrepresentations and omissions under securities laws, when a plaintiff asserts a claim based on an opinion, "liability lies only to the extent that the statement was both objectively false and disbelieved by the defendant at the time it was expressed." Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011); see also Mayer v. Mylod, 988 F.2d 635, 639 (6th Cir. 1993) ("Material statements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded.")(citations omitted).  Moreover, "when a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment." Partington v. Bugliosi, 56 F.3d 1147, 1156 (9th Cir. 1995).

When determining whether a statement is opinion or fact, "the relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact." Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 727 (1st Cir. 1992), cert. denied, 504 U.S. 974 (1992) (citation

omitted).  The Supreme Court has explained that "a fact is a thing done or existing or an actual happening," while "an opinion is a belief, a view, or a sentiment which the mind forms of persons or things.  Most important, a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."  Omnicare, 575 U.S. at 183 (cleaned up).

The defendants argue that Lemelson's four statements were either demonstrably true or were expressions of his opinion that are protected by the First Amendment.  They further argue that Lemelson believed that his opinions were true at the time he made them.  For instance, they argue that Lemelson's statement during the June 19, 2014 interview that Voss "basically agreed" that Promacta was going away was an opinion, and not a fact.  As discussed above, however, Lemelson's statement characterized a past "actual happening," see id., and may therefore be construed to characterize a statement of fact, not an opinion.

The defendants similarly argue that Lemelson's statement that Viking had "yet to consult with [its auditors] on any material issues" was a protected opinion.  See Dkt. 127-15 at 10.  They focus on the word "material," implying that Lemelson believed that Viking had consulted with auditors on only immaterial issues. But this argument misses the second relevant sentence in Lemelson's report, which stated that "[t]he financial statements provided on

the S1 are accordingly unaudited." Id.  This unqualified assertion that the financial statements provided on the S1 are unaudited cannot reasonably be construed as an opinion at this juncture.

The defendants contend, likewise, that Lemelson's statement that "Viking does not intend to conduct any preclinical studies or trials" was not false.  Dkt. 140 at 14.  They assert that Lemelson was merely commenting on the fact that Viking itself would not conduct any clinical studies, and that it would instead rely on third parties to do so.  They further claim that the context of Lemelson's report, which "opined that Viking offered no value to Ligand shareholders" and that "Ligand's transaction with Viking appeared to be for the purpose of shifting various liabilities to another entity for financial/accounting reasons," makes this inference clear.  Dkt. 125 at 41 (citing Dkt. 132 ¶ 52).  Although Lemelson's statement that Viking offered no value to Ligand shareholders might have been an opinion, the basis of this opinion— that Viking did not intend to conduct any preclinical studies or trials—is a fact statement that could reasonably be construed as misleading.  Moreover, Viking's CEO testified that "the model of Viking, and 75 percent of the industry, is to hire third parties to conduct their experiments."  Dkt. 132 ¶ 51. In this broader context, Lemelson's statement that "Viking does not intend to conduct any preclinical studies or trials," Dkt. 140 at 14, could be construed to mean that Viking did not intend to conduct

preclinical studies or trials through third parties or otherwise. A jury could reasonably conclude that it is a misleading half truth.

The defendants also argue that Lemelson's statements about Viking were opinion evidence protected under the First Amendment because (1) Lemelson disclosed that the basis for his statements was the Form S-1 and (2) the SEC has presented no evidence showing that Lemelson believed the statements to be false. But Lemelson does not show how this context might have converted his characterizations of fact about Viking's reliance on auditors and its intent to conduct clinical trials into opinion evidence.

Finally, the defendants argue that Lemelson's statements regarding Ligand's debt-to-tangible-equity ratio are protected under the First Amendment because they were not false or misleading. But the SEC argues that Lemelson's conclusion based on his calculation of the debt-to-tangible-equity ratio that Ligand was insolvent was false. Because Ligand's CEO testified that Ligand was not insolvent at the time of Lemelson's statement or during his tenure at the company, and because the defendants have not put forth testimony showing that Ligand was insolvent, this issue involves a fact dispute. And although the defendants argue that Ligand's insolvency is a matter of expert opinion, neither party has explained the accounting issue well to the Court or how expert testimony is required.

4.      *Investment Advisers Act claim*

As a final matter, the defendants argue that the SEC has failed to provide any evidence that Lemelson defrauded his current investors, and that the SEC's claim under Section 206(4) of the Investment Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8, must fail.  Section 206(4) makes it unlawful for any investment adviser "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."  15 U.S.C. § 80b-6(4).  17 C.F.R. § 275.206(4)-8 prohibits investment advisers to a pooled investment vehicle from "[m]ak[ing] any untrue statement of a material fact or omit[ting] to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle."

Based on the language of 17 C.F.R. § 275.206(4)-8, the SEC argues that it has provided evidence that the defendants violated the Investment Advisers Act by directing false and misleading statements to prospective investors.  In support, the SEC cites evidence of Lemelson's emails to his prospective investors, which highlighted the reports containing the alleged misleading statements.  The SEC contends that Lemelson may also be liable based on similar emails sent to current investors.  Because the SEC has provided evidence supporting its Investment Advisers Act

claims, I deny the defendants' motion for summary judgment as to this issue.

**B.    The SEC's Motion for Partial Summary Judgment**

The SEC has moved for summary judgment on the defendants' affirmative defense of selective enforcement.  To establish a claim for an equal protection violation based on selective enforcement, a defendant must show that "(1) the [defendant], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Rubinovitz v. Rogato, 60 F.3d 906, 910 (1st Cir. 1995) (quoting Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen, 878 F.2d 16, 21 (1st Cir. 1989)).  The defendants shoulder the burden of production and persuasion on an affirmative defense of selective enforcement. Cordi-Allen v. Conlon, 494 F.3d 245, 250 (1st Cir. 2007).

*1.    Similarly Situated Persons*

The party "claiming an equal protection violation must first identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently." Cordi-Allen, 494 F.3d at 250–51 (emphasis in original) (cleaned up). To determine whether individuals or entities are similarly situated, "the test is whether a prudent person, looking

28

objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . . The relevant aspects are those factual elements which determine whether reasoned analogy supports, or demands, a like result." Aponte-Ramos v. Alvarez-Rubio, 783 F.3d 905, 909 (1st Cir. 2015) (cleaned up). To carry the burden of proving substantial similarity, "plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." Snyder v. Gaudet, 756 F.3d 30, 35 (1st Cir. 2014) (quoting Cordi-Allen, 494 F.3d at 251). An "exact correlation" is not required, but "there must be sufficient proof on the relevant aspects of the comparison to warrant a reasonable inference of substantial similarity." Cordi-Allen, 494 F.3d at 251 (cleaned up).

The defendants argue that the SEC has failed to bring enforcement actions against entities and individuals engaged in conduct like that on which the SEC bases its claims in the present case. Specifically, the defendants cite as comparators "entities that published reports critical of Ligand between January 4, 2013 and January 16, 2019 and who are not subject to a Commission enforcement action." Dkt. 134 at 19-20. However, none of the entities cited by the defendants are alleged to have made false or misleading statements of fact about Ligand. Nor have the defendants provided evidence of the nature of their short positions in Ligand. For this reason, the defendants have failed to point

to persons with whom they share "an extremely high degree of similarity," see Snyder, 756 F.3d at 35, who were not charged by the SEC.  The defendants have therefore not provided sufficient evidence in support of their selective-enforcement defense, and their argument fails for this reason alone.

   2.  *Impermissible Considerations*

   The defendants have also failed to provide evidence that the SEC relied on impermissible considerations in deciding to charge them.  "[I]n the absence of invidious discrimination or the abuse of a fundamental right, a party may establish an equal protection violation with evidence of bad faith or malicious intent to injure."  Rubinovitz, 60 F.3d at 911 (citation omitted).  "Bad-faith or malicious-intent-to-injure cases are infrequent," and "the malice/bad faith standard should be scrupulously met."  Id. (cleaned up).

   The defendants argue that the SEC impermissibly considered Lemelson's religion, was motivated by Ligand's undue influence, and sought to suppress Lemelson's free speech.  With regard to Lemelson's religious affiliation, although the defendants have pointed to some evidence demonstrating potential bias on the part of Ligand employees, who joked about Lemelson's status as a priest in internal emails, the link between the Ligand employees and the SEC is too attenuated to support a finding that the SEC impermissibly considered Lemelson's religion.  And although the

SEC posed a snarky question to Lemelson about his religion at deposition, the SEC's questioning was in direct response to statements made by Lemelson about comparisons that he drew between himself and Jesus.  The defendants have provided no evidence showing that this litigation was the result of bias.

The defendants' argument that the SEC was biased against them because of its relationship with Ligand also fails.  Although the defendants have shown that Ligand's attorney Bondi was once employed by the SEC, they have not provided evidence that this former employment relationship influenced the decision of the Commissioners to bring the present action against the defendants. One of the Commissioners (Hester Peirce) appears to have maintained a friendship with Bondi, but the defendants have not demonstrated that the two ever discussed the Ligand action.  Moreover, the defendants have provided little evidence that either they or Ligand received preferential or negative treatment outside the scope of the SEC's rules.

Finally, any argument by the defendants that the SEC targeted Lemelson because of his exercise of his protected speech must fail for the reasons discussed in this Court's analysis of the defendants' motion for summary judgment.  Namely, Lemelson's statements could reasonably be construed as fraudulent or misleading, and a rational basis existed for the SEC to charge Lemelson for making the statements.

31

## **ORDER**

For the reasons set forth above, the Court **DENIES** the defendants' motion for summary judgment (Dkt. 124) and **ALLOWS** the SEC's motion for partial summary judgment (Dkt. 121).


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge