```
                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS


    SECURITIES AND EXCHANGE              )
    COMMISSION,                          )
                                         )
              Plaintiff                  )
                                         )  CA No. 18-11926-PBS
         -VS-                            )  Pages 1 - 19
                                         )
    GREGORY LEMELSON, et al,             )
                                         )
              Defendants                 )
```

**STATUS CONFERENCE BY VIDEO**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts  02210
April 14, 2021, 2:30 p.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
leemarz@aol.com

```
 1   A P P E A R A N C E S:

 2         MARC J. JONES, ESQ., United States Securities and
     Exchange Commission, 33 Arch Street, 23rd Floor, Boston,
 3   Massachusetts, 02110-1424, for the Plaintiff.

 4         DOUGLAS S. BROOKS, ESQ. and BRIAN SULLIVAN, ESQ.,
     Libby Hoopes Brooks, P.C., 399 Boylston Street Suite 200,
 5   Boston, Massachusetts, 02116, for the Defendants.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  Good afternoon, Judge.
 3            THE COURT:  Good afternoon.
 4            THE CLERK:  All counsel are on and connected.  I can
 5   call the case if you'd like.
 6            THE COURT:  Okay, go ahead.
 7            THE CLERK:  The Court calls Civil Action 18-11926, SEC
 8   v. Lemelson, et al.  Could counsel please identify themselves.
 9            MR. JONES:  Good afternoon, your Honor.  This is Marc
10   Jones for the Securities and Exchange Commission.
11            THE COURT:  Thank you.
12            MR. BROOKS:  Good afternoon, your Honor.  Doug Brooks
13   and Brian Sullivan, Libby Hoopes Brooks, for the defendants.
14            THE COURT:  Thank you.  So where are we on this?  I
15   just issued an opinion.  We have a trial in October.  A few
16   questions.  I was asking Maryellen, do you remember why we set
17   this up?  And I'm not a hundred percent sure, but I think
18   partly it was to sort of -- we didn't know then what the
19   situation would be with COVID and what trial dates made sense.
20   Maryellen was pointing out we could probably have an earlier
21   trial date if we wanted one, assuming everyone can get a
22   vaccine by some date over the summer.  What do you want to do?
23            MR. JONES:  Well, your Honor, for our purposes, I
24   think, you know, our team probably will be able to get the
25   vaccine over the summer.  Obviously there's a lot of witnesses
```

1   that we have not asked about their medical status at this
2   point, but at the Court's will, we could.  You know, we're
3   ready.  It looks like the case is rolling forward toward trial.
4   One of the reasons I think your Honor set this date is, both
5   parties represented that we wouldn't really know the status of
6   whether or not this case could settle till after summary
7   judgment was decided.  Obviously your Honor has decided it now.
8           We conferred with Mr. Brooks and Mr. Sullivan earlier
9   this week actually.  It looks like the case is going to roll
10  forward to trial.  We don't think it's going to settle at this
11  point, unless Mr. Brooks and Mr. Sullivan tell me something
12  different right now.  We're happy with the October trial date
13  to get that done.  That's I think where we stand now.
14          THE COURT:  How about you for the defense?
15          MR. BROOKS:  Yes, I think that's an accurate
16  representation, your Honor, and we were, too, happy with the
17  October date.  I did have one request.  We had mentioned --
18          THE COURT:  Excuse me.  You were or were not?
19          MR. BROOKS:  Yes, we are happy with that date.
20          THE COURT:  Okay.
21          MR. BROOKS:  I have one request.  We had mentioned
22  back in December when we scheduled that date, I mentioned that
23  Mr. Sullivan and I would be just finishing up an arbitration in
24  New York, and I see that the final pretrial conference is
25  October 6, the week before the trial starts.  Mr. Sullivan and

1  I will be in an arbitration in New York, so I was wondering if
2  we might be able to participate in a final pretrial conference
3  by Zoom or by phone because we will be in New York.
4         THE COURT:  No.  Well, let me put it this way:  If
5  it's just perfunctory, you know, not perfunctory but just sort
6  of catching up, but if you have a million motions in limine or
7  possibly *Daubert* motions, I don't want to do that over Zoom, or
8  at least I'd want to know what I'm biting off.  Do we have
9  experts where there will be motions in limine?
10         MR. JONES:  Yes.  Yes, your Honor, we do.  For the
11  Commission's part, your Honor, we're happy to push the pretrial
12  conference earlier so that we could accommodate Mr. Brooks's
13  and Mr. Sullivan's schedule and be in person in front of the
14  Court.  We're also happy to push expert motions, I think to the
15  extent that there might be motions, even *Daubert* motions over
16  the summer, and get that done so that the Court doesn't have
17  that hanging over.  Our expert schedule is still pending.  It
18  looks like we're going to do a deposition of the defendant's
19  expert in May, the plaintiff's expert in June, and then any
20  motion practice would be filed essentially at the end of July
21  or middle to end of July, so your Honor would have it at that
22  point.
23         THE COURT:  So do you want to set up -- well, let me
24  just ask, what are the experts on?  Do you know yet?  Is it
25  just damages, or is it --

1          MR. JONES:  It's not damages, your Honor.  Actually
2    they are event study experts.  The defendants have put forth --
3          THE COURT:  Oh, the famous event study.
4          MR. JONES:  Exactly.  The defendants have put forth an
5    expert that says that they are unable to find a correlation
6    between the events and a price movement, and the expert that
7    the Commission has says that that methodology is somewhat
8    flawed, and then that, also, some of the conclusions of the
9    defendant's experts go too far for what's actually (Inaudible).
10         THE COURT:  Well, so there's that issue.  There's the
11   events.  The one I keep coming back to and harping on, which I
12   think is the weakest point, both in my analysis and in the
13   SEC's case, is, I don't understand what insolvency is in this
14   context, and I didn't know whether that would end up requiring
15   accounting testimony.  It's never been a hundred percent
16   explained to me how you think about that issue in the context
17   of this case and whether that opinion is a reasonable opinion
18   or whether it's misleading.  I know that the president of
19   Ligand says, "No, we're not insolvent."  He said, well, given
20   the definition he had, you know, that's what I was thinking of.
21   And I just need to, and I'm sure a jury would need to,
22   understand it better, so I don't know where that comes from.
23         MR. JONES:  Your Honor, we're anticipating explaining
24   that better to a jury and to the Court than we have already.
25   That was very clear from your opinion.  We don't feel that it

1    is necessary to bring in an accounting expert on insolvency.
2    This is not about whether an auditor or whether a public
3    company represented an insolvency or lack of insolvency under
4    generally accepted accounting principles.  It's about a
5    statement that the defendant made based on, A, Ligand, you
6    know, based on this ratio, Ligand is insolvent; and we
7    anticipate having both the company and the company's auditors
8    to be able to talk about whether or not there was any risk of
9    insolvency.
10             THE COURT:  All right, so you're relying on the
11   auditors.  Is that it?
12             MR. JONES:  In part, your Honor, yes.
13             THE COURT:  And are you pulling in an expert on that
14   issue, about whether or not that's considered -- whether or not
15   there's a bona fide belief that that's insolvent with those
16   kinds of ratios?
17             MR. BROOKS:  No, your Honor, there's no expert opinion
18   on that.  We had argued on the motion for summary judgment that
19   because there's no expert opinion --
20             THE COURT:  No, I'm going to a jury on this one.
21             MR. BROOKS:  No, no, I understand.  So at this point
22   it's too late anyway.  We don't believe it's --
23             THE COURT:  All right, all right, so I don't know what
24   I'm going to do with it if I don't understand it at a directed
25   verdict stage, in terms of whether or not, given the situation,

1  your client could have in good faith believed that that
2  reflected insolvency, even if the company's president had
3  another good-faith opinion, "No, it doesn't."  I don't
4  understand it well enough to -- we actually even went in and
5  tried to look up Bankruptcy Court rules on, is there a
6  definition of it if you're bringing in all this debt money?
7  And I don't know.
8          MR. JONES:  Well, your Honor, we did submit some
9  Bankruptcy Code on that.  I doubt we would argue that Code to a
10 jury on the other hand, so --
11         THE COURT:  Yes.  All right, so -- but the other three
12 were really straightforward, and I'm not sure you need an
13 expert on it.  Do you?  There's no experts on the other three,
14 right?
15         MR. BROOKS:  Just to the issue that goes to the price
16 and materiality, not an expert on the substance of those
17 statements.
18         THE COURT:  Yes, because some of them were plainly
19 false, and so --
20         MR. BROOKS:  Well, we --
21         THE COURT:  So then the question is state of mind, and
22 did he know it, and is it material, and all that kind of stuff,
23 but --
24         MR. BROOKS:  Well, just that we disagree that any were
25 false, your Honor, but I understand that's a disputed fact.

1        THE COURT:  Yes.  I mean, some of them -- well, you're
2   right; you've stated it better.  I'll let you argue it to a
3   jury, but it's just it's plainly enough to go to a jury.  That
4   would be a better way to put it.
5        All right, so how long a trial do we think this is?
6        MR. JONES:  Your Honor, we did a little talking among
7   the parties, and then we went back and looked through a witness
8   list.  I think it's a ten- to twelve-day trial all in, including
9   jury selection, openings, and closings.
10       THE COURT:  And that's a 9:00 to 1:00 or 9:00 to 5:00?
11       MR. JONES:  That's 9:00 to 1:00, your Honor.
12       THE COURT:  You think it's a what?  What kind of?  So
13  assume for a minute -- let me just -- so you're saying, on a
14  9:00 to 1:00, you think it's how many trial days?
15       MR. JONES:  Probably about ten to twelve, your Honor.
16  Probably twelve.
17       THE COURT:  So basically I'd have to count on --
18  because you don't know how long deliberations is.  Did you
19  include deliberations?
20       MR. JONES:  I did not, your Honor.  Just through
21  closings.
22       THE COURT:  Does that sound good to you, Mr. Brooks
23  and Mr. Sullivan?
24       MR. BROOKS:  It does, your Honor.  I mean, just we had
25  sort of thought it would be fewer days than that, but, you

1    know, the SEC knows its case better.  So it sounds general
2    ballpark to us, again, on the long side but not out of the --
3              THE COURT:  Well, basically, let me just talk to you
4    about a three-week trial in October.  First of all, I think
5    we've had maybe two trials in this court since COVID began, two
6    serious trials, two serious jury trials.  There have been a few
7    bench trials, but the backlog is unbelievable.  So the way
8    we're going to do it is criminal custody first, criminal
9    non-custody second, civil; and then my guess is I'm going to
10   have to fight for my civil cases.  And the reason I'm saying it
11   is, we no longer -- you look puzzled, appropriately so because
12   you don't know how we've been doing it.  What's unclear is, if
13   I'm going to go back to my old courtroom, you've got me; we've
14   got the courtroom, we're all fine, I'm good.  But right now we
15   only have, let's say, four or so courtrooms that are geared for
16   a COVID world, and we're doing all our impanelments on the
17   first floor in that jury area, and we only have one spot to
18   impanel.  So if we're still keeping with COVID protocols, we're
19   on a rolling list, and that's terrible for people like all of
20   you where you have many witnesses and it's a complex case.  If
21   I can get my old courtroom back, I can be pretty certain of the
22   date, more or less.  And also I may end up being told I only
23   have a certain slot.  So three weeks may be too long; I have to
24   be honest with you.  I may have to either go full days because
25   people will be backed behind me to release the courtrooms if

1    they're still being allocated, so I might have to go full days.
2    Another option is to give you a clock and give you each a week
3    with so many hours in it.  So you're coming as the big bubble
4    is about to burst of civil litigation and criminal litigation,
5    so I just need you to be flexible on a few things.
6             The first is, you're going to have to get your experts
7    on trial videotape because I'm not going to be able to adjust
8    around their schedules, and I'm assuming Mr. Lemelson will be
9    here.  It's going to be -- I hate to say it -- tough luck for
10   the president.  The president of Ligand I assume is a witness.
11   Where is that company?  Is it in Boston?
12            MR. JONES:  No, your Honor.  They're in San Diego,
13   California.
14            THE COURT:  I'm just saying, it's a hassle.
15            MR. JONES:  Yes, your Honor.
16            THE COURT:  So maybe you could think about how to
17   handle that.  I'd be open to Zoom testimony if he's afraid to
18   fly across country, but I think that's a problem for you,
19   Mr. Brooks, for cross-examination, for example.
20            MR. BROOKS:  We talked.  I really don't want to be
21   difficult, but I think under the circumstances of this case --
22            THE COURT:  I get it, I get it, it's not as good.
23   Just saying, it's not as good.  But I may really press you on,
24   if there are people like custodians of the records, to either
25   agree to it or essentially Zoom it.

1              MR. BROOKS:  We understand, your Honor.

2              THE COURT:  Now, let's go to my favorite topic, which

3    is settlement.  Is it absolutely dead in the water?  Can I send

4    you to a mediator?  Have you tried a private mediator?

5              MR. JONES:  Your Honor, I guess as the plaintiff,

6    we'll go first.  We did talk about this with Mr. Brooks and

7    Mr. Sullivan earlier in the week.  It is unlikely that the case

8    will settle, in large part because the Commission settlement --

9    the Commission would, based on these charges and the conduct

10   that we believe happened, ask for an injunction from the Court.

11   That injunction is probably not the main sticking point.  It's

12   the collateral consequence of that injunction, which is a

13   potential bar by the SEC from acting as an investment advisor

14   or other categories of securities law professional.  In these

15   kind of cases involving investment advisors, it's not unusual

16   for that provision to hang up settlement.  So even if the

17   parties could agree on money -- and I'm not sure we could --

18   that seems to be, it usually is, the sticking point.  You know,

19   the Commission is willing -- you know, if the defendant wanted

20   to, the Commission would be absolutely willing to go to a

21   mediator, a magistrate judge, a mediator or other kind of

22   mediator.

23             THE COURT:  But isn't there -- well, I don't want to

24   get involved because ultimately I'm the one who needs to issue

25   the injunction, so maybe I should just be quiet, but, in any

1    event, often the terms of that can be negotiated.
2            MR. JONES:  Yes, your Honor, you're absolutely right
3    that the terms of the bar, you know, generally the Commission
4    negotiates at times the length of the time that a person needs
5    to wait before applying for readmission.  Generally speaking,
6    the Commission, you know, goes from one to five years.
7    Generally speaking, in a Section 10(b) scienter case, the
8    Commission usually goes at the long end of all of that and
9    basically says it's either no right of readmission --
10           THE COURT:  Can I just say, just because I'm going to
11   be deciding that at some point -- I mean, I'm sure it will be
12   argued to me -- I'm just simply saying that you've tried to
13   negotiate that as well, and it's --
14           MR. JONES:  Your Honor, I wouldn't represent that we
15   tried to negotiate it.  What we've done is asked defendants
16   whether or not it's worthwhile to negotiate, and it seems like
17   there -- unless Mr. Brooks feels differently, and I see him
18   getting ready to talk, it seems like there has not been a
19   willingness to accept that sort of bar.
20           THE COURT:  Well, Mr. Brooks, I don't want to get into
21   the weeds because ultimately I'm going to be the one deciding
22   this, based on what I hear, I assume, at trial.  I am just
23   wondering, is it worth having a mediator, or do you think --
24           MR. BROOKS:  You know, I don't think so, your Honor,
25   because, you know, one, leaving aside the defendants denying

1   any wrongdoing here, Mr. Jones is right:  As a practical
2   matter, it's not like a regular private case; any settlement
3   with the SEC effectively takes away a defendant's livelihood.
4   And even talking about negotiating the length, I recently went
5   through this, and a high-ranking person at the Commission told
6   me that you were better off as a defendant asking for a
7   lifetime bar than you were a one-year bar because they actually
8   have a better chance of lifting it.  So even a one-year bar is
9   effectively a lifetime bar.  It just allows you to petition at
10  some point for it.  So I guess, you know, basically any
11  settlement results in taking --
12          THE COURT:  And is that because of our regional office,
13  or that's a national policy?
14          MR. BROOKS:  That's national is my understanding.
15          THE COURT:  All right.  Well, let me put it this way:
16  It sounds like you're going to trial, and I assume it's a jury
17  trial.  And I am a little worried about you because it's a long
18  trial, and let me tell you, people are clawing at the schedule
19  because there's been nothing for so long.  It could drift into
20  the new year, depending on how many criminal cases are backed
21  up.  That's all I'm saying.
22          MR. JONES:  Your Honor, for the Commission's purposes,
23  and obviously the Commission is putting in the bulk of the
24  evidence here as the plaintiff, if we had the option to in that
25  second week drop to full days, I'm reasonably confident that we

1     could have the whole thing done in the two weeks.  That may
2     mean we still slip into the new year, but we'd be happy to be
3     as flexible as we need with scheduling around those kind of
4     considerations.
5              THE COURT:  Well, all right, we're not there yet.  I
6     was mostly scheduling this to see if there was any possibility
7     of settlement, which it sounds like no, and also to schedule up
8     the *Daubert* hearings.  So let's get a day for the *Daubert*
9     hearings, which I'm assuming -- and I want to put limits --
10    have I already done that? -- on the motions in limine.
11             MR. BROOKS:  I think there's a limit of five that you
12    ordered.
13             THE COURT:  Yes, that's what I always do.  Okay, good,
14    with not a thousand subparts.  It's too much, and no replies
15    and surreplies and supplemental replies to the surreplies on
16    the motions in limine because, I mean, I need to get through
17    them.  I learn best by hearing from people, so if we do have an
18    evidentiary hearing on the *Daubert*, it would be by Zoom.  I
19    don't see any reason to fly people all over the place and spend
20    that kind of money on a *Daubert* hearing.  So when would the
21    motion and op come in on the *Daubert*?
22             MR. JONES:  Your Honor, we had talked about if in fact
23    there's going to be such a motion -- and we haven't done the
24    depositions yet, so I don't want to represent it as a
25    certainty -- we agreed that we would do it 30 days after the

1    plaintiff's expert was deposed, so likely sometime between
2    July 15 and July 30, the motion would come in, and then the
3    opposition in kind with that.
4          THE COURT:  So perhaps we would have *Daubert* motions,
5    would you be saying sometime in August, mid-August?
6          MR. JONES:  Late August might be safer, your Honor,
7    but, yeah, I think that that's right.
8          THE COURT:  I still haven't figured out my summer
9    schedule yet, and maybe you haven't either.
10         MR. JONES:  There's a lot of question marks there,
11   your Honor.
12         THE COURT:  Yes.  Do you want to do, assuming --
13   excuse me, let me look at a calendar.  Assuming -- so you'd do
14   a *Daubert* motion, would you say the 23rd?  Is that possible for
15   any *Daubert* motions?
16         MR. BROOKS:  Of August or September?
17         THE COURT:  July for the motion.
18         MR. BROOKS:  Oh, oh, I'm sorry.
19         MR. JONES:  Yes, your Honor, I think that seems
20   entirely doable.
21         THE COURT:  So by the 23rd, and then we have two
22   weeks, and perhaps the week of the 9th for any hearing?
23         THE CLERK:  So, Judge, you want the -- okay, so
24   *Daubert* motions would be due on 7/23?
25         THE COURT:  Yes, and any op due on August 6, and maybe

1  something along the lines of the 12th, a Daubert hearing?
2          Now, I'm not sure of my personal family vacation yet,
3  and you may not be of yours either, so we might need to juggle
4  that.  And should we do the same with motions in limine, or
5  should we just limit that to *Daubert*?  When do we have the
6  motions in limine due to come in?
7          THE CLERK:  That's in the pretrial order.  I don't
8  have it in front of me.  I can pull it up if you want.
9          THE COURT:  I think we should because I don't want to
10 have multiple --
11         MR. JONES:  Yes, September 22 is motions in limine
12 apparently.
13         THE COURT:  All right, well, that's still worth doing
14 because those are usually easier.
15         THE CLERK:  Okay, Judge, and then I can set up a
16 hearing for August for the *Daubert* hearing, the week of the
17 16th?  The ops are due --
18         THE COURT:  Here's my issue:  I lose my law clerks, so
19 I would like to have the one who's been working on this, so
20 perhaps we could do August 12?  Is that doable?
21         MR. BROOKS:  Yes, your Honor.
22         MR. JONES:  Yes, your Honor.
23         THE CLERK:  August 12 at 9:30?
24         THE COURT:  Right.  And then at least --
25         THE CLERK:  Is this by --

1        THE COURT:  Before I let her leave me and go on to
2   greener pastures, she at least knows this case inside out.
3        THE CLERK:  Judge, by Zoom or in person on *Daubert*?
4        THE COURT:  I'm hoping we're back in the courtroom by
5   then.  I know you're all local, right?  So that's not a
6   problem.  But if we need to have -- the experts may not be
7   local, and I'm happy to do that by Zoom rather than put them on
8   a plane.
9        MR. JONES:  That would be helpful, your Honor.  Our
10  expert is in Utah.
11       THE COURT:  Mr. Brooks, do you have a --
12       MR. BROOKS:  Ours is in Boston.
13       THE COURT:  Okay.  Well, I'm not positive yet I even
14  need an evidentiary hearing.  I've never done one on these
15  event studies, so I'm not an expert in those, but --
16       MR. JONES:  Your Honor, to the extent that we're
17  thinking about a Daubert hearing, we're not currently thinking
18  that it is going to be an evidentiary issue, but that is
19  subject to change; but just for the Court's planning purposes,
20  I expect that on the 12th we would probably be fine with just
21  argument.  If I can sort of reserve the right to change that as
22  we flush out the motion, that would be great.
23       THE COURT:  Okay.  So I guess that's it, right?  I was
24  sort of hoping this would blossom into a full-blown discussion
25  of settlement, but that is not to be, but I'm actually quite

```
1    eager to have trials, so what can I say?  Quite eager to
2    actually see human beings again.  So there's nothing else I
3    need to deal with, right?
4            MR. JONES:  I don't believe so, your Honor, from our
5    perspective.
6            THE COURT:  All right.  Well, I guess this will be
7    interesting.  Good.  All right, so be it.  Bye-bye.
8            MR. JONES:  Good to see you, your Honor.  Thanks,
9    everyone.
10           THE COURT:  Stay healthy.
11           MR. BROOKS:  You too.
12           (Adjourned, 2:55 p.m.)
```

C E R T I F I C A T E

```
UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )
```

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 19 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 18-11926-PBS, Securities and Exchange Commission v. Gregory Lemelson, et al, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

Dated this 15th day of May, 2021.

/s/ Lee A. Marzilli
_____
LEE A. MARZILLI, CRR
OFFICIAL COURT REPORTER