1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MASSACHUSETTS
2

3    SECURITIES AND EXCHANGE              )
     COMMISSION,                         )
4                                        )
                    Plaintiff            )
5                                        )   CA No. 18-11926-PBS
           -VS-                          )   Pages 1 - 67
6                                        )
     GREGORY LEMELSON, et al,            )
7                                        )
                    Defendants           )
8

9                    **MOTION HEARING BY VIDEO**

10
               BEFORE THE HONORABLE PATTI B. SARIS
11                  UNITED STATES DISTRICT JUDGE

12

13

14

15
                           United States District Court
16                         1 Courthouse Way, Courtroom 19
                           Boston, Massachusetts  02210
17                         December 17, 2020, 9:35 a.m.

18

19

20

21

22
                           LEE A. MARZILLI
23                       OFFICIAL COURT REPORTER
                      United States District Court
24                    1 Courthouse Way, Room 7200
                          Boston, MA  02210
25                         leemarz@aol.com

1    A P P E A R A N C E S:

2        ALFRED A. DAY, ESQ. and MARC J. JONES, ESQ.,
     United States Securities and Exchange Commission,
3    33 Arch Street, 23rd Floor, Boston, Massachusetts, 02110-1424,
     for the Plaintiff.

4
         DOUGLAS S. BROOKS, ESQ. and BRIAN SULLIVAN, ESQ.,
5    Libby Hoopes Brooks, P.C., 399 Boylston Street Suite 200,
     Boston, Massachusetts, 02116, for the Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2      THE CLERK:  Court calls Civil Action 18-11926, SEC v.

3  Lemelson, et al.  Could counsel please identify themselves for

4  the record.

5      MR. JONES:  Good morning, your Honor.  This is Mark

6  Jones for the Securities and Exchange Commission.  With me is

7  Al Day.

8      THE COURT:  Okay.

9      MR. BROOKS:  Good morning, your Honor.  Doug Brooks

10  and Brian Sullivan, Libby Hoopes Brooks, for the defendants.

11      THE COURT:  Okay, Mr. Brooks, I think it's your motion

12  for summary judgment.  We actually have on two separate kinds

13  of motions.  One is your motion on the whole case and the SEC's

14  on an affirmative defense, so I think we should start with

15  yours.

16      MR. BROOKS:  Okay, thank you, your Honor.  Your Honor,

17  this case arises from statements that defendants made about a

18  publicly traded company, Ligand Pharmaceuticals, between June

19  and August, 2014.  And specifically during that time period,

20  Defendant Father Emmanuel Lemelson published five research

21  reports and gave two radio interviews discussing Ligand, and in

22  the vast number of statements he made about Ligand in these

23  reports and interviews, the Commission claims that two are

24  false or misleading.  In addition, the Commission claims that

25  two statements Father Emmanuel made about a company called

1    Viking Therapeutics, which is a company that Ligand had entered

2    into a licensing agreement, were false.

3         Now, the Commission's papers are replete with

4    assertions that Father Emmanuel committed fraud, but what you

5    won't find in the papers is any admissible evidence that

6    satisfies the Commission's burden of proof as to the required

7    elements of its claims.

8         I'd like to start with materiality because our

9    materiality argument applies to the entire case, and if you

10   find the statements weren't material, the case must be

11   dismissed.  And effectively I submit that this Court has

12   already made that decision and did so during the pendency of

13   this case, and I'm talking about your Honor's decision which is

14   discussed at length in our papers and which the Commission

15   effectively ignores in *Emerson v. Genocea Biosciences*.  That

16   case was also a securities fraud case.  So your Honor dismissed

17   at the motion to dismiss stage the plaintiff's securities fraud

18   claim on the exact same ground that we are asking you to do so

19   here, and that is because the challenged statements did not

20   impact the company's stock price, and you held --

21        THE COURT:  I'm wondering whether you had an

22   overemphasis on *Emerson v. Genocea*.  I went back and reread

23   that case, which is quite complex, and it involved several

24   releases of information, different traunches of information and

25   whether or not the release of some but not of the other ones

1    made a difference.  So I'm not sure it carries the weight you

2    are putting on it.

3             MR. BROOKS:  Well, your Honor, in that case you held,

4    and I'm quoting, that "The alleged omission could not have been

5    material to investors because the stock price did not drop when

6    that material --"

7             THE COURT:  That was in connection with the traunch of

8    information that was produced.  In other words, there was the

9    twelve-month data and six-month data, and they were both

10   produced -- one was produced and one wasn't, but the

11   twelve-month wasn't.  The failure to release the six months,

12   once they did, it just didn't make a difference.  So I don't

13   know if it's the same kind of case.  It's an omission case for

14   starters and a private case in another.  Just the factual

15   differences are so dramatic to put on one line in an opinion.

16            MR. BROOKS:  Well, so a couple of things, your Honor.

17   It is a private case, which is the only way that the Commission

18   tries to distinguish it, but that's irrelevant as a matter of

19   law.  The Supreme Court held in the *Basic* case that the

20   Securities and Exchange Commission and private plaintiffs have

21   the same burden on materiality.  And as to the omission, it's

22   also the same standard.  Whether it's a material

23   misrepresentation or material omission, it's the same standard.

24            THE COURT:  Well, let me be clear.  I was not

25   intending to reverse the Supreme Court standing.  I was looking

1   at the available evidence in the record and deciding whether or

2   not it was material.  I'm not even sure, was that appealed?  I

3   don't even know, but it was several releases of information and

4   the question of whether failure to release one kind was

5   material, and it was one of several strands that I relied on.

6           MR. BROOKS:  So --

7           THE COURT:  So let me just say this:  I do not rely

8   too much on that case.  I want to go back to the Supreme Court

9   standard and decide it based on that standard.

10          MR. BROOKS:  Okay.  So, your Honor, in that situation,

11  I certainly don't think, regardless of how much stock is put

12  into it, *Emerson* certainly didn't reverse any Supreme Court

13  standard.

14          THE COURT:  It didn't intend to; let's put it that

15  way.  It certainly didn't intend to.

16          MR. BROOKS:  I understand, your Honor.  That decision,

17  even as we read it, anyway, is consistent with what the First

18  Circuit has hinted it would do.

19          Now, there is a circuit split, as we mentioned.  The

20  Third Circuit has held one hundred percent per se materiality

21  is measured by stock price movement.  And, frankly, to the

22  extent it goes to the Supreme Court, I'd note that that

23  decision was penned by now Justice Alito.  The Second Circuit

24  has taken a different position.  The Second Circuit has said,

25  you know, it's a major factor, but it is just one factor.  The

1     First Circuit has not ruled on it directly, but as we mention

2     in our papers, and as is found by Judge Ponsor in the *Bromlaw*

3     case, the First Circuit has cited the Third Circuit decision

4     with approval.  And given the language in the First Circuit

5     cases that we cite, I think all the indication is that the

6     First Circuit will agree with the Third Circuit that the

7     movement of stock --

8          THE COURT:  Even if Father Lemelson deliberately sent

9     false information into the marketplace, no harm, no foul,

10    tough.  I mean, even if there was a reasonable investor would

11    have relied on it, and even if it was with the wrong scienter,

12    even if it could have affected the -- what's the basic

13    test? -- the mix of information that a reasonable investor

14    would rely on, no penalty because the stock market didn't move.

15    Is that your basic position?

16         MR. BROOKS:  Not exactly, your Honor.

17         THE COURT:  No pun intended.

18         MR. BROOKS:  Not exactly, your Honor, because what the

19    Third Circuit has held is, it is the *Basic* standard.  But we

20    don't have -- otherwise we're just guessing.

21         THE COURT:  But follow my hypothetical.  He

22    intentionally puts false information into the marketplace.  A

23    reasonable investor would have relied on it -- like, for

24    example, whether someone's drug was, you know, signature drug

25    was no longer going to be marketable -- but the market ignores

 1    it because he's just one guy, one investor, and, as you pointed

 2    out, he's disclosed he shorted it.  They don't view it as

 3    something they're going to credit.  So you're view is -- just

 4    to push it to the extreme -- you admit every single thing:

 5    It's fraudulent, it's done with bad scienter, it's something a

 6    reasonable investor -- but the stock market doesn't respond.

 7    You're saying you're not liable.  That's really where you're

 8    going.

 9         MR. BROOKS:  Not exactly, your Honor.  I understand

10    the hypothetical, but that's the whole point.  The whole point

11    is, if the stock market didn't react, then we know that a

12    reasonable investor doesn't believe it altered the total mix of

13    information.

14         THE COURT:  No.  Maybe they don't believe him because

15    he's just an investor.  Let me put it this way:  If I said

16    something fraudulent and wrong, people would say, "What the

17    heck does she know?  She's just a judge."  But that doesn't

18    mean I haven't violated the law.  What you're saying is, you

19    don't violate the law unless you've had a -- the logical

20    extreme:  No matter how bad your intent was, no matter how

21    false the statement, it doesn't matter as long as the stock

22    market doesn't move?

23         MR. BROOKS:  Yes, your Honor, but that's because, as

24    the Third Circuit has held and the First Circuit has I think

25    indicated by citing with approval, what we're doing is, because

1    the stock market didn't move, then we know that a reasonable

2    investor would not have thought it altered the total mix.  We

3    don't have to guess.  We can look at it and say --

4              THE COURT:  I would have to look at the speaker,

5    though.  Let's assume somebody attacked the primary product,

6    which is the drug -- what's it called, Promacta? -- that

7    somebody attacked the viability of the primary drug Promacta,

8    which is the lead allegation here -- and there's a disputed

9    issue of fact as to what was said, so I don't buy the argument

10   there's no disputed issue of what was said -- you're saying

11   that even if somebody does something plainly going at the heart

12   of somebody's business, it's not material as a matter of law if

13   people don't believe him, and so the stock market doesn't move?

14             MR. BROOKS:  Well, yes, your Honor, because if

15   somebody -- if somebody did that and it really was at the

16   heart -- what they said was at the heart of the business, in an

17   efficient market, which this is, we would necessarily see

18   movement of the stock price.

19             THE COURT:  Not if you discount the credibility of the

20   person who's the spokesman.

21             MR. BROOKS:  Well, if the credibility is so completely

22   off, then it wouldn't affect -- then a reasonable investor

23   wouldn't --

24             THE COURT:  I don't know that the Third Circuit was

25   trying to say that, maybe it was, that --

1          MR. BROOKS:  Well, what the Third --

2          THE COURT:  -- in an SEC case.  Now, on a private

3    reliance case, there's no harm.  There's economic loss

4    causation -- that's a different thing -- but if you're just

5    trying to punish a mal feasor --

6          MR. BROOKS:  Your Honor, respectfully, it is the same

7    standard whether it's a private case or it's the SEC.  The

8    Supreme Court, we cited another case from the Second Circuit,

9    there's no dispute:  The materiality standard is the same.  And

10   here, your Honor, it's, frankly, even stronger.  And I

11   understand what you're saying about *Emerson*, but in that case

12   we were talking about one alleged omission, the six months

13   shredding things.  Here, there were four alleged misstatements,

14   and none moved the stock price.  And I'd also, your Honor,

15   point out that --

16         THE COURT:  It's ironic looking back at *Emerson*

17   actually; we're all very cognizant of viral shedding now.

18         MR. BROOKS:  Yes, your Honor.

19         THE COURT:  At the time I had never heard the term

20   before.

21         MR. BROOKS:  The decision was certainly ahead of its

22   time.  But here, your Honor, there were four alleged

23   misstatements.  None moved the stock price.  And, again, if you

24   look at what the Third Circuit said in the case cited with

25   approval by the First Circuit, otherwise we're just guessing

1    what a hypothetical -- we're all just guessing:  Well, would a

2    reasonable person, would they view that as important to the

3    total mix?  Here we have the proof because the market didn't

4    move.  And I note, and we put this in our papers, frankly, it's

5    a little disingenuous for the SEC to say it doesn't matter

6    because when the market, when the stock price does move, that's

7    what they use to prove materiality; and we cited about five SEC

8    cases in our papers where they made that argument, and I'd say

9    it's a little --

10          THE COURT:  A lot of tools in your toolbox as to what

11   materiality is; you know, everything ranging from what a

12   reasonable person, you know, a juror thinking, "Yeah, I'd want

13   to know that," to a movement in the stock market.  I mean, it

14   could be a bunch of different things they could prove.

15          MR. BROOKS:  Well, and under the Second Circuit,

16   that's what they've held, your Honor, but the SEC in their

17   papers has gone so far as to argue that it's irrelevant.  And

18   my point is, when it suits them, they argue that it's

19   important, critical; and now they're arguing it doesn't matter

20   because they have four bites at the apple, and they miss all

21   four.

22          So I'll move on to -- I understand your point about

23   *Emerson*, but, again, I think it's pretty clear that the First

24   Circuit would, when faced with it, adopt what the Third Circuit

25   has held, given that they've cited that case with approval.

1    But even beyond that, the Commission we believe has failed to

2    produce evidence of materiality, not just allege it but produce

3    evidence of it.

4         THE COURT:  Right, the "no reasonable juror" standard

5    as opposed to a "per se" rule is what you're saying.

6         MR. BROOKS:  Yes, and --

7         THE COURT:  You're moving back into the summary

8    judgment standard.

9         MR. BROOKS:  Right.  So, your Honor, again, we believe

10   that the materiality knocks out all four statements; lack of

11   materiality knocks out all four statements in one fell swoop.

12   So what the Commission tries to do is confuse the issue by

13   invoking its so-called scheme liability claim, and this fails

14   as a matter of law for at least two reasons.  So, first, the

15   Commission scheme liability claim here is no broader than its

16   false statement claim because it doesn't allege any illegal

17   acts other than the four challenged statements at issue.  So

18   whether the Commission casts its cause of action as a false

19   statements case or a scheme liability case, or both, is

20   entirely irrelevant to the issue of materiality because this

21   case rises or falls on the four challenged statements and the

22   four challenged statements alone.  And the Commission -- we

23   cited this in our reply brief -- the Commission admitted this

24   at the motion to dismiss hearing.

25         The second reason they're trying to use the scheme

1    liability claim as kind of a back door to prop up materiality,

2    the second reason it fails is because the Commission argued --

3    their argument that Father Emmanuel caused a drop in Ligand's

4    stock price, and, again, apparently based on lawful conduct

5    because as mentioned here, there's nothing beyond the four

6    statements that they claim was illegal, and that he did that

7    over a four-month period when the stock kind of yo-yo'd up and

8    down on a daily basis, it's premised entirely on their rebuttal

9    expert's opinion.  But as the Commission well knows, it is

10   precluded as a matter of well-settled law from relying on its

11   rebuttal expert evidence to prove its affirmative case for

12   purposes of summary judgment, and we've cited a number of cases

13   in our papers for that, your Honor.

14        Look, the Commission chose not to retain an expert for

15   any purpose in this case, including to show that

16   Father Emmanuel's statements had an impact on the stock price,

17   and, again, we cite in our papers numerous cases where they

18   have done so.  And so I think it's pretty clear why the

19   Commission didn't hire an affirmative expert here, but

20   regardless of the reason, it now has to face the consequences

21   of that decision, and one of the consequences is, it can't use

22   its rebuttal expert to testify to prove its materiality

23   argument.

24        And it bears noting, the Commission's failure to

25   designate an affirmative expert witness in this case, it's not

 1   only fatal to its ability to prove the required element of

 2   materiality but to a whole host of arguments the Commission

 3   makes in opposition to the defendants' motion for summary

 4   judgment.

 5          THE COURT:  Is the expert necessary, would you say,

 6   even if I say there's no bright-line rule in saying --

 7          MR. BROOKS:  Well, if you say there's -- so if you say

 8   there's no bright-line rule --

 9          THE COURT:  Like the Third.

10          MR. BROOKS:  Yeah, you're right, if you say, "I don't

11   agree with the Third Circuit," there's no bright-line rule.

12   What I would say, if that's the line, then I would say an

13   expert event analysis isn't necessary in every case.  So, for

14   instance, what the Second Circuit has held, again in our

15   papers, is that -- and, again, that circuit says price is just

16   one of the issues.

17          THE COURT:  Right.

18          MR. BROOKS:  What they've said is that an expert event

19   study is almost obligatory.  So I would agree with that.  If

20   there was real obvious materiality -- again, one would be even

21   without an expert, you can see just a dramatic, you know, drop

22   in the stock price, or, you know, some other kind of evidence

23   that shows, wow, reasonable investors really obviously would

24   believe this was critical information.  So while I don't think

25   it would be, under that hypothetical, I don't think it would be

1    required in every case, but I certainly would think it would be

2    required in this case because they haven't provided any other

3    evidence of materiality.

4              THE COURT:  Thank you.

5              MR. BROOKS:  Again, their arguments --

6              THE COURT:  I think you've laid out your argument.  So

7    why don't we move on to the four statements.  I've pretty much

8    signaled what I'm doing on the Promacta statement.  I mean, I

9    don't see how you get away from the fact there's a disputed

10   issue of fact as to what he said.

11             MR. BROOKS:  Can I talk about -- before we get to the

12   four, can we just talk about scienter too because that affects

13   all four?

14             THE COURT:  Oh, sure, sure.

15             MR. BROOKS:  So I want to be clear.  I think scienter,

16   especially given what your Honor has said so far, actually

17   becomes very important because the First Circuit has held --

18   and one example is the *Flannery* case that we cite -- that this

19   element is inextricably linked to materiality.  So if despite

20   the fact that there was no movement on the stock price, I would

21   submit that at absolute best, materiality could only be deemed

22   marginal here.  And that leads to the conclusion that there's

23   no scienter because what the First Circuit held in *Flannery* is,

24   they looked at materiality, and it was a close call, they said,

25   but because materiality is thin, there's therefore no scienter.

1    And I think that equally applies here and even more so because

2    this is the area where the completely unprecedented nature of

3    this case directly supports our motion for summary judgment

4    because in all the other short-and-distort or pump-and-dump

5    cases that we're aware of that the Commission has ever brought,

6    scienter is so clear and obvious that the court could basically

7    just take judicial notice of it.  And it's always a fact

8    pattern like an anonymous blogger posts a blatantly false

9    rumor that a company's CEO is about to get arrested for

10   extortion, and the stock immediately drastically plummets, and

11   within minutes or even seconds, the defendant covers his short

12   and makes an immediate profit.  That's what the Commission uses

13   to satisfy scienter in these kinds of cases, but they can't do

14   it here because none of these hallmarks is present.  And so

15   there's a giant hole in the Commission's scienter case, and

16   it's a hole that the Commission has been unable to fill with

17   any admissible, competent evidence.

18          So their core contention on the scienter, it's

19   circular.  They basically take two circular arguments:  One is,

20   they argue, well, because the statements were false, he must

21   have known they were false, and therefore he acted with

22   scienter.  And, two, they argue, because he had a scheme to

23   defraud, he had a motive to lie to further that scheme.  So, in

24   other words, because he made a false statement, he therefore

25   had scienter; and this type of logic just cannot satisfy the

1    Commission's burden on summary judgment.

2          And the remaining scienter arguments they make are

3    entirely speculative and so insufficient for summary judgment.

4    They say there's evidence that Father Emmanuel was looking for

5    a mortgage and to expand his business.  So, first of all, I

6    mean, what business owner isn't always looking to expand his

7    business, and what person who's moved isn't at least

8    contemplating a mortgage?  But, more importantly, the

9    Commission -- and this is critical -- they don't provide any

10   evidence that defendants were having trouble obtaining a

11   mortgage or trouble expanding the business, and they can't

12   provide any legal support that this kind of general and

13   speculative evidence can be used to establish scienter.

14         And their final scienter argument actually refutes

15   both the fact that he had scienter, and, frankly, the entire

16   theory of the case.  The Commission claims that after -- I want

17   to stress that -- after Father Emmanuel began publishing his

18   reports on Ligand, defendants received a margin call.  So the

19   Commission's lawyers then go on to try to explain to the Court

20   what a margin call means, even though, respectfully, the

21   Commission's lawyers are not experts on margin calls or their

22   effect on hedge funds, and they don't explain how this is

23   admissible evidence absent an expert.  But, regardless, the

24   Commission's argument is that the margin call occurred after it

25   claims this alleged fraudulent scheme began.  So there's no

1    support for the notion that defendants engaged in this scheme

2    as a result of the margin call.

3          In addition, its argument, like the rest of their

4    scienter argument, is totally speculative, and it can't defeat

5    summary judgment.  The Commission doesn't allege, much less

6    provide any meaningful admissible evidence, that defendants

7    would have had any difficulty whatsoever in meeting the margin

8    call absent the Ligand short.

9          THE COURT:  Didn't they cite some statement made by

10   Father Lemelson to the effect of, you know, "Yahoo, we got the

11   stock to drop"?  In other words, that was his intent.

12         MR. BROOKS:  There's no --

13         THE COURT:  And regardless of whether he had mortgage

14   problems or, I don't know, margin call problems, he said he

15   wanted it to drop.

16         MR. BROOKS:  I don't -- I'm not aware of that

17   evidence, your Honor.

18         THE COURT:  Am I right?  Am I -- I thought he said --

19         MR. BROOKS:  I don't believe so, your Honor.  There is

20   evidence that he noted a drop.  There's nothing where he's

21   saying "I caused this drop" or specifically "I caused this drop

22   with the four statements."  But, no, the Commission overstates

23   that evidence.

24         THE COURT:  There was a lot of reading to do in this

25   case.  I may have misremembered it, but I thought --

1          MR. BROOKS:  Well, I think the Commission makes that

2     argument, but I don't think that's borne out by the facts.

3          THE COURT:  I see.

4          MR. BROOKS:  He mentions it, but the way the

5     Commission makes it sounds is, he's taking, you know --

6          THE COURT:  He took credit for it, I thought.

7          MR. BROOKS:  Yeah.

8          THE COURT:  Maybe I'm wrong.  I'll go back and look at

9     the record.

10          MR. BROOKS:  But it has nothing to do, your Honor

11     with -- again, he's not tying it -- even when he's talking

12     about --

13          THE COURT:  My great law clerk just shot me the quote,

14     so -- but, of course, she's not sitting next to me because

15     we're much snow behind, so let me see if I can find it.

16          MR. BROOKS:  Yes, and I think we address this in our

17     papers, your Honor.

18          THE COURT:  It was an email, I think.

19          MR. BROOKS:  Yes.

20          THE COURT:  Maybe -- wait a minute, here it goes.

21     "The SEC points to an email --" I'm reading it -- "by Lemelson

22     claiming that 'Our multi-month battle with LGND has also been

23     paying off.  Our shares are now down 40 percent,'"

24     blah-blah-blah.  And similarly he said that "Shares of LGND

25     dropped 2 percent during the interview."  In another slide it

1    says, "Ligand shares dropped 16 percent within six trading

2    days.  Lemelson Capital is credited with the drop in market cap

3    by USA Today, ValueWalk, Benzinga, SeekingAlpha and others."

4            So good for her.  Good, Alex.

5            But, anyway, so she shot me the -- I mean, that's what

6    I remember.

7            MR. BROOKS:  Right, your Honor.  So in terms of

8    crediting, he's viewing that other people have credited him.

9    And, again, what I would say here is, there's nothing

10   inherently illegal with trying to -- with even trying to

11   deflate the price of a stock.  We're not saying that's what

12   happened here, but the point is that there are only four

13   challenged statements, and he never claimed that any of those

14   statements had any impact on -- they have to tie it to the four

15   statements, your Honor, and he never -- none of these -- this

16   is the most scienter, I agree, that's the closest they get to

17   scienter, and none had anything to do with the four statements.

18           So what they're really saying there, that argument is,

19   he had scienter with respect to statements that we don't

20   challenge as false and misleading, and I would submit there's

21   no authority that that could ever support scienter because that

22   scienter doesn't go to false and misleading statements.  And

23   again --

24           THE COURT:  I think we need to move on.  You know,

25   unfortunately, I think I have an 11:00 clock, so I don't have

 1    the whole morning here.

 2         MR. BROOKS:  Okay, your Honor.  Well, then I'll

 3    quickly move on to the four statements itself, and I --

 4         THE COURT:  I want to give you time for your

 5    affirmative motion for summary judgment, unless you want to

 6    leave it on the papers.  No, actually, it's the government's

 7    affirmative motion.  But, anyway, let's try and keep going.

 8         MR. BROOKS:  Okay, and I understood you didn't want to

 9    hear argument on the first statement, your Honor?  Is that

10    correct?

11         THE COURT:  Right.

12         MR. BROOKS:  Okay.

13         THE COURT:  That's just a plain dispute of fact, "He

14    said, he said."

15         MR. BROOKS:  So the second and third challenged

16    statements, these are the ones that do not involve Ligand at

17    all but involve a preoperational company called Viking with

18    whom Ligand did enter into a licensing agreement.  And these

19    are contained in the July 3, 2014 report, and the overall

20    thesis of that report is that the licensing agreement for

21    Ligand with Viking didn't make sense for Ligand's shareholders

22    and was a transaction aimed at stuffing Ligand's balance sheet.

23    And, critically, the report makes clear that the analysis about

24    Viking came entirely from Viking's publicly filed S-1

25    registration statement, which is cited throughout the report.

1          The first statement at issue is that Viking had not

2     consulted with its new auditor on anything material, and

3     therefore the financial statements in the S-1 were unaudited.

4     And in fact, as it turned out, the S-1 contained both audited

5     and unaudited financial statements.

6          I'd say the Commission fails to explain with any

7     admissible evidence how it is material to Ligand whether a

8     preoperational company with whom it had a licensing agreement

9     included some audited financials in addition to the unaudited

10    financials.  Nor can the Commission establish scienter as to

11    the statement where the defendant specifically cited a public

12    document that forms the basis of the statement, and then, in

13    describing it, said "in other words."  So he specifically cites

14    it and then says "in other words."  We put the cases in our

15    papers, your Honor, that talk about how that cuts against it.

16         The second statement about Viking is that Viking

17    didn't intend to conduct preclinical studies and clinical

18    trials, and we submit, your Honor, this statement is

19    demonstrably true and is consistent with the overall context of

20    the defendants' discussion that Viking was not adding value to

21    Ligand.  And this statement also stems directly from Viking's

22    own disclosure in it's S-1.

23         So specifically Viking disclosed the following.  This

24    is a quote:  "As a company, we do not have any experience in

25    conducting clinical trials for our drug candidates."  It then

1    went on to disclose in bold:  "We intend to rely on third

2    parties to conduct our preclinical studies and clinical trials

3    and perform other tasks for us."

4         So the Commission's position, as I understand it, is

5    that Father Emmanuel's statement is false because there's no

6    difference between Viking doing the preclinical studies and

7    clinical trials themselves or their relying on third parties to

8    conduct them for them.  But in making this argument, the

9    Commission fails to explain at all, if this truly is a

10   distinction without a difference, why Viking itself felt the

11   need not only to specifically disclose this fact in its

12   publicly filed S-1, but why it did so in bold.  Clearly Viking

13   thought this was a material difference that needed to be

14   disclosed.

15        And, finally, with respect to the two Viking

16   statements --

17        THE COURT:  One of them was misleading, right, the

18   first one, the S-1 one?  And obviously it was audited, and the

19   audit included material things, so it was at best misleading,

20   at worse false.

21        MR. BROOKS:  Well --

22        THE COURT:  The first part, the first part.  I

23   understand your point on the second part.

24        MR. BROOKS:  Well, I don't -- I don't know that it --

25   I'm not sure why it's -- I understood, your Honor -- I mean,

1    it's -- it's clearly --

2         THE COURT:  It was just wrong.  It was just wrong.

3         MR. BROOKS:  It's clearly incomplete, but I'm not sure

4    why -- I don't know -- so I understand it's incomplete, but I

5    don't see any evidence of scienter or materiality.  We're

6    talking about -- I mean, in terms of materiality, Viking was a

7    preoperational company, so what difference does it make whether

8    its financial statements are audited or unaudited?  The

9    Commission certainly hasn't explained that.  I think that would

10   need expert evidence, why does it matter whether --

11        THE COURT:  You're asking too much of me because I'm

12   supposed to draw all reasonable inferences in favor of the

13   nonmoving party.  It looks false.  I mean, it was audited, and

14   he said it wasn't.  The second one is harder because they

15   weren't doing clinical trials, Viking wasn't doing the clinical

16   trials themselves, was hiring others to do it.

17        MR. BROOKS:  But, your Honor, so I think on the first

18   one, the Commission has the burden to provide evidence of

19   materiality.  I'm not sure how they could do that without an

20   expert in this case.  But while all the reasonable inferences

21   must go to them, they still need to provide evidence.

22        And I also don't think they've shown any evidence of

23   scienter because the defendants specifically cited the

24   provision in their report that they were relying on.  Now, they

25   apparently had misread that, but where is the scienter?  If you

1    really were trying to get people to believe that there were

2    only unaudited statements when it was actually a combination of

3    both, why would you cite in your report, why would you cite to

4    the product that disproves that?  And, again, we've cited case

5    law in our papers that, you know, that says they've got to --

6    that cuts against scienter, so --

7              THE COURT:  All right, so let's move on.  I get the

8    point, but moving on to the last one, which was the hardest

9    one, we're at the motion to dismiss stage, and it's shifted a

10   little since that time.

11             MR. BROOKS:  Yeah.  So the Commission takes aim at the

12   fact that defendants provided a debt-to-tangible-equity

13   calculation for Ligand in connection with -- oh, can I raise

14   one other thing, your Honor, I'm sorry, just on those two

15   statements very quickly?

16             THE COURT:  Yes.

17             MR. BROOKS:  With materiality, the company itself,

18   Ligand, made two lengthy PowerPoint presentations, over 60

19   pages each, using large international law firms, and they never

20   once brought up either of these statements related to Viking.

21   And again we've cited case law.  I think that goes to the point

22   that Ligand itself did not view these as material.  Otherwise,

23   they certainly would have made it into the presentations that

24   were 60-plus pages.

25             THE COURT:  Mr. Brooks, you make some good arguments.

1    I'm just -- I think you're forgetting the summary judgment

2    standard.  You may win the point.  I don't know how I, when I

3    draw all reasonable inferences their way --

4         MR. BROOKS:  Well, these are undisputed.  Thank you,

5    your Honor, but these are -- I'm saying these are undisputed

6    facts.  It's not like there's a dispute that Ligand, you know,

7    "Well, you know, we raised it.  We didn't put it in our

8    PowerPoint, but it was --"  It's undisputed.  We have an

9    undisputed 260 pages.  I think that the only reasonable

10   inference is that Ligand did not think it was material.

11   Otherwise, it would have been in there.

12        THE COURT:  Okay, let's move on to --

13        MR. BROOKS:  Yes, so the final statement, this is the

14   one that takes aim at the fact that Father Emmanuel provided a

15   debt-to-tangible-equity calculation for Ligand in connection

16   with a discussion on his opinion of Ligand's financial

17   wherewithal, and specifically he was discussing Ligand's

18   $245 million bond offering.  And a little bit of background is

19   necessary here.  So in its initial complaint, the Commission

20   alleged that Father Emmanuel's calculation was false, and they

21   said it was false because he included the proceeds from the

22   bond offering as equity in his calculation.  And the Commission

23   went so far as to claim that this was such an obvious error

24   that it must have been done with the intent to defraud.  And

25   there was just one problem with this allegation, is that that

1    allegation was what was patently false because proceeds from

2    debt are not equity, as the Commission has subsequently

3    acknowledged.  So the Commission had to concede that despite

4    its allegation in the complaint, Father Emmanuel's

5    debt-to-tangible-equity calculation is actually correct.

6         Now, instead of just moving on with the other three

7    challenged statements, the Commission pulled a 180 and said,

8    "Okay, the calculation is mathematically correct, but it's

9    misleading."  And I just want to pause for a second to reflect

10   on what the Commission is saying.  It's saying that a

11   mathematically correct calculation can constitute securities

12   fraud.  That's an astounding claim because the Commission isn't

13   arguing, for example, that Father Emmanuel claimed he was

14   calculating a debt-to-equity ratio but secretly excluded the

15   intangible assets.  They're effectively saying that a

16   debt-to-tangible-equity calculation is a per se violation of

17   the federal securities laws; and, as an initial matter, this

18   claim has to fail because they don't have an expert witness who

19   can testify in support of this claim.  They make arguments as

20   to the statement based on the definition of insolvency and that

21   a debt to tangible equity isn't a good measure --

22        THE COURT:  What do you think the definition is of

23   insolvency?  Why can't I just use the Bankruptcy Code or

24   something like that?  I mean, there's got to be a legal

25   definition of insolvency.  Or you think I can just only rely on

1    whatever -- like, different formulas could --

2         MR. BROOKS:  I'm not an expert, your Honor.  I don't

3    know that there is only --

4         THE COURT:  What if I just took the Bankruptcy Code?

5    Is there a legal definition in the case law or in the Tax Code?

6    I mean, this is not a new issue.

7         MR. BROOKS:  Yeah, well, either way you could do that,

8    your Honor, although I don't think it really has any relevance

9    here because that's kind of the background.  Their core

10   allegation is found in Paragraph 185 of the Statement of Facts,

11   and this is the key thing:  They say, "Lemelson's

12   debt-to-tangible-equity ratio is not a test of insolvency."  I

13   don't know how they can possibly say that without an expert.

14   Again, not just the definition of insolvency --

15        THE COURT:  Why can't I rely on the statement of the

16   CEO who said, "I was never insolvent ever"?  Why isn't that a

17   fact dispute?  And you can say, "Oh, yeah, you were.  Look at

18   this mathematical ratio --"

19        MR. BROOKS:  And that's a fact dispute.  What they're

20   saying, your Honor, is that the misleading part is his

21   debt-to-tangible-equity ratio.

22        THE COURT:  Once again, it was a thick record.

23   Doesn't he basically claim that they're insolvent?

24        MR. BROOKS:  I believe the words are "essentially

25   insolvent," and then he goes on to explain it.  But their

claim, your Honor, is based on -- they're saying that the false
or misleading part is that he used the debt to tangible equity
when discussing insolvency.  And, your Honor, it was flagged at
the motion to dismiss.  You said this is the kind of things for
experts, and the SEC agreed.  The SEC agreed, "Yeah, we're
going to get an expert."

They want to say that his debt-to-tangible-equity
ratio is not a test for insolvency.  What lay witness could
possibly testify to that?  I mean, they cite some employee at
Ligand for that.

THE COURT:  Well, let me ask you, did Ligand ever go
into bankruptcy?

MR. BROOKS:  Ligand did not go into bankruptcy, and he
never claimed they went into bankruptcy, your Honor.

THE COURT:  But when I think of insolvency, well, I
think of the Bankruptcy Code, but at least there's got to be a
legal test, so -- but that might mean, well, maybe
Father Lemelson didn't understand that, so I guess that may go
to scienter, you know, as to what's the test.

MR. BROOKS:  Well --

THE COURT:  So I suppose you could have reasonable
people disagreeing on what the test for insolvency is and --

MR. BROOKS:  But what you can't have -- that very well
may be, your Honor, but what you can't have is a claim based on
an argument that his debt-to-tangible-equity ratio calculation,

1    which was correct, was misleading because they don't think it's

2    a test for insolvency, and whether or not that's a dispute,

3    that's not --

4         THE COURT:  I agree with you that the actual formula

5    was not misleading; it was mathematically correct, as you point

6    out; but then he says that's essentially insolvent, and that's

7    the part that could be misleading to someone.

8         MR. BROOKS:  Well, we certainly disagree it's

9    misleading, but how does the Commission meet its burden where

10   it doesn't have an expert on that; it's relying on a Ligand

11   employee?

12        THE COURT:  Well, not just --

13        MR. BROOKS:  I mean, this is clearly -- how have they

14   met their burden without an expert on this?

15        THE COURT:  Not just an employee.  Wasn't it the CEO?

16        MR. BROOKS:  No.  The one I'm talking about, your

17   Honor, it's not the CEO.  It was a lower-level employee.

18        THE COURT:  I see.

19        MR. BROOKS:  But, again, I'm specifically talking --

20   you may be referring to something else.  I'm referring to

21   Paragraph 185, which is kind of the home-run point they make

22   about the debt-to-tangible-equity ratio.  And, again, I don't

23   see how this case moves forward without an expert.  And, again,

24   I think it's telling that they didn't get an expert because the

25   Commission always gets experts in these kind of cases.

 1           And just the final point on this is, what the
 2    Commission says, the Commission says the mathematically correct
 3    calculation was misleading and says it two ways.  It says
 4    because he failed to explain why the cash proceeds were not
 5    relevant and why he discounted Ligand's intangible assets.  So
 6    leaving aside the lack of authority for the Commission's
 7    position that a securities analyst must provide an explanation
 8    for every part of its mathematical calculation, those issues
 9    the Commission has are inherent and intrinsic as to every
10    debt-to-tangible-equity ratio.  You always exclude intangible
11    assets.  It wouldn't make sense otherwise.
12           THE COURT:  We've gone on for 50 minutes now, so I
13    really do need to give the SEC a chance because I need to split
14    off and --
15           MR. BROOKS:  Yes.  Thank you, your Honor.
16           THE COURT:  So who's going to argue this?
17           MR. JONES:  Your Honor, I'll argue the opposition to
18    the defendants' summary judgment, and Mr. Day will argue the
19    Commission's --
20           THE COURT:  What I don't understand is, first of all,
21    do you claim that the stock did drop?
22           MR. JONES:  Yes, your Honor.  We have provided
23    evidence in the rebuttal expert report, not as a matter of
24    expert opinion but even just as a matter of summary, that if
25    you look at intraday trading immediately following -- and

1    actually this is what Father Lemelson was talking about in the

2    email that your clerks found more quickly than I could find --

3    he argues that the price drops as soon as he says the

4    statements about Ligand.  And it does, it drops during the day,

5    and then it comes back up because of other factors in the

6    market and other factors involving Ligand.  And so it is a

7    dispute of fact whether or not there is stock price movement.

8             THE COURT:  What about the fact that it's put in as a

9    rebuttal rather than in your case in chief?

10            MR. JONES:  Well, your Honor, the idea that the

11   Commission is -- well, the fact that it is a rebuttal is not a

12   problem for the Commission.  Here's why:  The argument that

13   materiality requires an event study is just not supported in

14   the case law, and not even supported in the Third Circuit, and

15   I'll go into that in a minute.  But materiality in this circuit

16   is a question for the jury almost always.  It is not a

17   formulaic test.  It is not the "yes" or "no" on stock price

18   movement that defendants want to make it.  It is a multifactor

19   test about what a reasonable investor would do.  The jury is

20   the proxy for the reasonable investor.

21            But just putting that aside for a moment, your Honor,

22   if the defendants are going to claim, as they have here in the

23   summary judgment, that there was no stock price movement that

24   is attributable to these statements, a claim which actually is

25   itself a factually incorrect statement based on what the event

1    study is, but if they're going to claim that, then of course

2    the Commission's evidence rebutting that comes in.  The

3    Commission doesn't need it in its affirmative case in chief

4    because there's lots of different parts of materiality, and the

5    Supreme Court has said it shouldn't be reduced to a single

6    factor; it shouldn't be a formulaic test.  That's what they

7    said in *Basic*.

8            THE COURT:  Excuse me.  There's a difference between

9    private litigation, the private litigation test and the SEC

10   test.

11           MR. JONES:  Your Honor, there's a difference in what

12   private litigants need to show, and your Honor alluded to this.

13   Private litigants need to show reliance and loss causation.

14   The Commission doesn't need to show either, as the Court

15   recognized in the order on the motion to dismiss.

16           The problem is here that defendants are conflating

17   reliance and materiality.  If stock price moves, that means

18   that a whole bunch of people who either, you know, relied on

19   the information, either bought or sold.  That's reliance.

20   Materiality, as your Honor I think was recognizing in her

21   responses to Mr. Brooks's argument, materiality means somebody

22   figures it in.  It doesn't mean it's dispositive.  If it was

23   dispositive, there would be no difference between materiality

24   and reliance.  And this goes to sort of the argument that

25   Mr. Brooks was making -- yes, your Honor.

1          THE COURT:  If you lose on the issue of the stock

2     dropping as a result of this statement, is that the end of the

3     SEC case?  Or do you have free-ranging authority to just, under

4     the statute, to, I don't know, to essentially be the police

5     officer for the market, so if somebody says something bad, even

6     if it doesn't have an effect on the market, you can stop it?

7          MR. JONES:  Well, your Honor, I would submit that in a

8     way, yes, we do.  That is why the Supreme Court and all lower

9     courts have recognized the Commission neither needs to prove

10    reliance or loss causation as long as something is material.

11    And the courts have recognized there is a difference between a

12    stock price drop attributable to news and materiality.  As long

13    as something is material --

14         THE COURT:  And you're saying, yes, if it's a bad

15    actor -- I'm not saying this of Father Lemelson -- but if a bad

16    actor deliberately makes fraudulent statements that are

17    material, but no one believes him so nothing happens in the

18    stock market, you're saying you still have the right to police

19    that statement?

20         MR. JONES:  That's right, your Honor, if that

21    information was material or something that a reasonable

22    investor would have figured in.  So posit that, you know, a bad

23    actor comes out and says something, says that, you know, that

24    there's been an explosion at the company and that the company

25    is gone, well, a reasonable investor would figure that in.

1    Now, a reasonable investor, before they went to sell their

2    stock, might go on CNN and check whether or not that happened,

3    but the fact that they're going to check and find out that

4    that's a lie doesn't mean that the information wasn't material

5    at the time.

6              THE COURT:  But more accurately, you would then say

7    the SEC still has the right to sue that person --

8              MR. JONES:  Yes, your Honor.

9              THE COURT:  -- even if they can't get disgorgement

10   because in fact they never gained anything from it and no one

11   ever lost anything from it?

12             MR. JONES:  Correct, your Honor.  That would be a

13   penalties case.

14             THE COURT:  That would be a penalty case.  All right,

15   I just wanted to understand, so --

16             MR. JONES:  Right, and that's essentially why there's

17   a difference, I think, why the Commission seeks both

18   disgorgement and penalty because there is wrong behavior that

19   the Commission is told by Congress to go out and stop wherever

20   we can find it, and that's why we can impose --

21             THE COURT:  So you're just going to view it as part of

22   your case in chief, as I'm understanding.  You don't actually

23   care that much about whether it dropped or it didn't drop

24   because you think that that's just one indicia of materiality?

25   Is that what you're saying?

1          MR. JONES:  That's right, your Honor.  And in fact,

2     you know, to the extent that -- Mr. Brooks makes the point, oh,

3     the Commission gets an expert on event study all the time.

4     Well, to the extent that there is a stock price movement, there

5     is evidence of materiality.  If a bunch of people relied on it,

6     then they must have been figuring it into the total mix of

7     information that they use to make their investment decisions.

8     If there's no stock price movement, it doesn't say the

9     converse.  It doesn't say that people didn't figure it in.  It

10    just said it wasn't dispositive to their decision.

11          And further, your Honor, the defendants are trying to

12    bootstrap this idea of stock price movement into a requirement

13    for event study, but event study can show you that there was a

14    stock price movement that was different from the market's

15    background movement, but the converse is not true, your Honor.

16    The fact that the event study is inconclusive doesn't say that

17    there's no stock price movement in response to the news, and in

18    fact there's a dispute between the two experts on this.

19          What an event study that shows no movement shows is

20    that at a statistically significant level, you cannot

21    distinguish the market movement from whatever might have been

22    the movement from the news.  And there can be lots of reasons

23    for this, but it is a --

24          THE COURT:  I'm just assuming this because there was a

25    big point made by Mr. Brooks that you didn't put it in in your

1    case in chief; you just put it in your rebuttal.  And sort of

2    what I'm hearing you say is, at least from the SEC's point of

3    view, they don't view it as part of their case, the elements

4    they have to prove.

5         MR. JONES:  We don't see the stock price movement as

6    one of the elements we need to prove, that's absolutely right,

7    your Honor.  And if it was, it would reverse a whole lot of

8    things.  It would basically say -- if an event study was

9    required in the Commission's case in chief that showed a

10   statistically significant level that there was a stock price

11   movement, it would preclude the Commission, for instance, ever

12   pursuing the case where there are two pieces of news in the

13   same day because, as both experts say, if there's two pieces of

14   news in the same day, an event study can't disaggregate what

15   the effect of one is over the other.  If there are two pieces

16   of news that, you know, go opposite ways from each other, the

17   Commission couldn't bring a case because the stock price, the

18   event study wouldn't be able to show what happened.  If there

19   was, you know, a piece of information that --

20        THE COURT:  All right, I get it.  I get it.  All

21   right, so on the materiality thing, do you want to say anything

22   else about that before you go through the statements or

23   scienter?

24        MR. JONES:  Your Honor, I think we made our points,

25   unless your Honor wants to hear anything more.  It would

1    reverse all the cases that say that, you know, stock price

2    movement is not dispositive.  It would collapse materiality and

3    reliance, and it would prevent the Commission from bringing a

4    case wherever the event study, which is an inefficient tool to

5    determine whether or not something is material in the first

6    place, it would preclude us from ever bringing a case where

7    there was confounding or conflated information; and that's not

8    what anyone has intended, either in the courts or in the

9    Congress.  So unless the Court wants to hear more, I'll move

10   on.

11        THE COURT:  I don't want to hear anything on scienter

12   unless you want to add anything, but on the four statements,

13   I've always said, don't do anything with Promacta or Viking.

14   But I am always concerned about this tangible assets issue

15   because if it's mathematically correct, and then

16   Father Lemelson says, "And that's why we think it's essentially

17   insolvent," so he's setting forth the factual basis for why he

18   thinks it's essentially insolvent, the actual mathematical

19   equation isn't false; the question is whether the "and

20   therefore it's essentially insolvent" is misleading or not.  So

21   at least that's how I'm thinking about it.  So what is the test

22   for insolvency?

23        MR. JONES:  Your Honor, the test for insolvency is

24   liabilities exceed assets, and --

25        THE COURT:  And is that the Bankruptcy Code, or is

1  that a separate SEC regulatory definition?

2          MR. JONES:  It is the Bankruptcy Code, your Honor.

3          THE COURT:  I see.

4          MR. BROOKS:  "Where the sum of an entity's debts is

5  greater than all of such entity's property, at a fair

6  valuation..."  That's what we quoted to the Court.  It's 11

7  U.S.C. 101(32)(a).

8          THE COURT:  Yes, and I think that's what I was asking

9  Mr. Brooks about.  So that's the one the SEC follows as well?

10          MR. JONES:  Your Honor, to the extent that that's the

11  one we're following in this case.  I'm not sure the SEC has a

12  policy about insolvency, but that goes to, you know, this whole

13  ratio in the first place and whether or not we would need an

14  expert about it.  The Commission's contention is not that this

15  is wrong accounting.  This is not GAP.  No one says it is

16  generally accepted accounting practice to do a

17  debt-to-tangible-equity ratio, but that's not the basis of the

18  Commission's complaint.  You know, it says, you know, who would

19  you call as an expert on a ratio that Father Lemelson

20  essentially, in this context at least, uses when nobody else

21  does?  Our contention is that Father Lemelson has said

22  "A, therefore B.  A, this ratio.  B, therefore insolvency.

23  This ratio; therefore insolvency."  We said that statement is

24  misleading because it leaves out all the things that we put in

25  our amended complaint, and it suggests an analysis that is, you

1  know, factually deficient.

2       And so when Father Lemelson says, "The company's

3  liabilities will again far exceed its assets and the company

4  will be technically insolvent once more," that's a factual

5  statement.  That's a factual statement that's wrong.  When he

6  says that "Even before the new day, that issuance, the

7  company's liabilities exceeded tangible assets," meaning the

8  company was insolvent, that's again a factual statement.

9       THE COURT:  What is the evidence that you have that

10  the liabilities did not exceed the assets?

11       MR. JONES:  The defendants actually in the Rule 56-1

12  statement, it's Paragraph 185, I believe that they have

13  actually admitted that assets exceeded liabilities.

14       The other evidence that we would produce are the

15  company's actual financial statements; the company's executives

16  who will testify that, yes, liabilities exceeded assets, and,

17  no, no auditor ever brought up insolvency or bankruptcy with

18  them; they were never found to be insolvent or bankrupt.

19  There's plenty of evidence that the company was not insolvent

20  and that no one other than Father Lemelson said it was.  And

21  so, you know, we think that it is a misleading factual

22  statement to say, A, the ratio -- or in fact even before he

23  starts talking about the ratio, he talks about the company's

24  liabilities and assets, and he says the liabilities exceed the

25  assets, and the company will be technically insolvent.  But

1    even if it was a statement of opinion, your Honor, the embedded

2    facts under *Omnicare*, there are embedded facts in that opinion,

3    and they have to be true.  And, further, your Honor has said in

4    *MAZ Partners v. Shear*, a case that you decided in 2016,

5    "Whether a defendant's statement of opinion was misleading is a

6    mixed question of law and fact for the jury."

7           So we submit that the Court need not even reach this

8    question here about whether or not what defendants' statements

9    are are misleading.  We say they are; defendants say they're

10   not.  That's a question for the jury.  It's not an undisputed

11   question of material fact.  It is in fact disputed, and we've

12   told you the evidence that we have disputing it, and so it

13   should go to the jury.

14          THE COURT:  Thank you.  And did you want to address

15   scienter?

16          MR. JONES:  I'll address scienter to the extent that

17   your Honor wants to hear it, although I know time is short, and

18   we want to make sure we have enough time to --

19          THE COURT:  Yes, I would want to make sure since I

20   have -- maybe what we should do is 15 and 15 or something like

21   that.  Does that make sense?

22          MR. JONES:  Then I'd better stop talking now and turn

23   it over to Mr. Day on our motion.

24          THE COURT:  I think -- well, it's what, 10:30 now?  So

25   if we did 15 and 15, and then I can get off a few minutes

```
 1   between the next hearing.

 2        Mr. Brooks, did you want any quick rebuttal to

 3   Mr. Jones?  But I can only let you go till quarter of, so it's

 4   your use of time.

 5        MR. BROOKS:  Your Honor, just on the point of the last

 6   statement, I mean, I think it's telling that Mr. Jones said,

 7   you know, that this is a great metric or ratio or calculation

 8   that only Father Emmanuel uses.  Again, how do you get that in

 9   without some kind of expert evidence?  You can't.  And so with

10   that, we'll rest on our paper.

11        THE COURT:  Okay, thank you.  All right, now let's

12   just move on to the affirmative defense, and I think this is

13   the SEC's motion.  So who's arguing that?  Are you, Mr. Day?

14        MR. DAY:  Yes, your Honor.  I'll be addressing the

15   motion for partial summary judgment.

16        THE COURT:  Thank you.

17        MR. DAY:  I know we're a little short on time, so I'll

18   try to be as brief as possible.  The fundamental argument we

19   make in our motion is that the defendants have failed to come

20   forward with sufficient evidence supporting both elements of a

21   selective enforcement claim.  This is a serious allegation,

22   and, as the courts recognize, this type of defense is reserved

23   for egregious instances of bad faith or vindictiveness that are

24   wholly unrelated to a legitimate government purpose.

25        On that last point, wholly unrelated to a legitimate
```

1    government purpose, the reason that we cited so many market

2    manipulation cases in our opening brief is that the Commission

3    regularly pursues market manipulation cases, both pump-and-dump

4    schemes and short-and-distort schemes.  The Commission is

5    charged with policing the market, as discussed earlier in this

6    argument, and that is exactly what the Commission is doing in

7    this case.

8          The law imposes a heavy burden on the defendants to

9    produce evidence supporting their claim.  There has to be hard

10   evidence of both similarly situated persons who could have been

11   charged but weren't, and that the reason for the difference in

12   treatment resulted from malice or some other improper purpose.

13         With respect to the similarly situated requirement,

14   this is a very significant burden, to quote the First Circuit

15   in *Cordi-Allen*.  Defendants must produce evidence of an

16   extremely high degree of similarity in all material respects.

17   Here, the defendants merely identify other persons who publicly

18   commented on Ligand.  They provide very little information

19   about these other parties, and there's certainly not enough

20   evidence in the record to establish that any of them were

21   similarly situated; in other words, that they could have been

22   charged for the same conduct that the defendants are charged

23   with here.

24         There are a lot of reasons detailed in our papers that

25   I won't repeat here why the evidentiary record is insufficient

1    on this element.  Most glaringly, however, the defendants don't

2    even argue that these other parties did anything wrong.  By

3    their own admission, there's an obvious explanation for why the

4    Commission charged defendants here and didn't charge anybody

5    else.  It's that the defendants are alleged to have committed

6    fraud when none of these other parties did anything wrong.

7    This is fatal to the claim of selective prosecution.

8            With respect to the element of malice, the defendants

9    also failed to bring forth evidence that the Commission brought

10   this case for some improper purpose.  The defendants --

11           THE COURT:  So what does malice mean?  I mean, can it

12   mean -- I think the allegation sounds like a typical one.  I

13   don't know, Mr. Day, are you from Boston or the Washington

14   office?

15           MR. DAY:  Boston.

16           THE COURT:  Boston.  So, I mean, the argument was that

17   this case got no traction in Boston, and then it went down to

18   DC, and because this gentleman who represented Ligand --

19   because Ligand got a new attorney that had an inside track to

20   the SEC, that there was a cozy relationship between him and the

21   staff, and therefore he got preferential treatment.

22           MR. DAY:  Yes, your Honor.

23           THE COURT:  I don't know if that qualifies as malice,

24   but, you know, it is one of the things that you worry about.

25           MR. DAY:  Yes, your Honor, I'd be happy to address

1    that.  I agree that that does not necessarily constitute

2    malice, even if the defendants' allegations are credited.  It's

3    not clear to me that advocating on behalf of a client who

4    claims to have been a victim of a fraud would ever in any

5    circumstance constitute the kind of malice that's --

6                THE COURT:  Is there like a revolving-door policy?

7    Like, you can't advocate in front of the SEC for so many years

8    after you've left or some such?

9                MR. DAY:  Yes, there are certain restrictions on

10   appearing before the Commission if you were previously

11   employed.  I'm not aware of any of those applying to Ligand's

12   counsel.  The service at the Commission was many years before

13   the allegation.

14               THE COURT:  It was multiple years?

15               MR. DAY:  Yes.

16               THE COURT:  It wasn't like a revolving-door kind of

17   thing?

18               MR. DAY:  No, no.  No, your Honor.  And the other

19   thing is that this whole notion that there was a cozy

20   relationship between Ligand's counsel and the Commission just

21   did not pan out at all in discovery.  One of the 30(b)(6)

22   topics for the Commission was whether there were relationships,

23   then current relationships between Ligand's counsel and either

24   the Commissioners or the staff, and the testimony was that

25   there was no meaningful personal relationship between anybody

1    at the Commission and Ligand's counsel.

2          The other thing that the defendants point to are the

3    two meetings that you alluded to, but there's also nothing

4    unusual about counsel for a party that believes it was a victim

5    of a fraud meeting with the staff of the Commission.

6          Finally, the defendants point to a number of telephone

7    conversations between Ligand's counsel and the staff of the

8    Commission seeking updates on the status of the investigation.

9    Again, there's nothing unusual or untoward about that.  So this

10   whole idea that there was some kind of undue influence from

11   Ligand's counsel to the Commission, there is no evidence of

12   that that was adduced in discovery.

13         And I think this is underscored by the argument in

14   defendants' papers that there were Wikipedia pages for Ligand's

15   counsel and the then co-directors of the Division of

16   Enforcement that were created around the same time by an

17   unknown person.  That's pure speculation about some connection

18   between those Wikipedia pages.  It's far too thin a read to

19   hang an allegation --

20         THE COURT:  Could you spell that out a little?  I may

21   have missed that.

22         MR. DAY:  Sure.

23         THE COURT:  The Wikipedia page one.

24         MR. DAY:  Yeah, there's a footnote in their brief

25   saying that three Wikipedia pages, one for Ligand's counsel and

1     two for the co-directors of the Division of Enforcement, were
2     created around the same time by an unknown person, and from
3     this, we're supposed to conclude --
4              THE COURT:  I totally missed that point.  It was in a
5     footnote?
6              MR. DAY:  Uh-huh.
7              THE COURT:  My basic philosophy on footnotes is, it
8     means you don't have to read them, so --
9              MR. DAY:  Fair enough, your Honor.
10             THE COURT:  So I'm not hanging anything on a footnote.
11    So, all right, all right, I'm sorry, I missed that point.
12             So, in any event, the second claim was religious
13    discrimination.
14             MR. DAY:  Yes, your Honor, and the defendants
15    primarily point to emails that were Ligand emails.  They
16    provide no evidence whatsoever that anybody at the Commission
17    even looked at those emails, much less that they adopted them
18    or were influenced by them.  There is just no connection
19    between the Ligand emails and any conduct by anybody at the
20    Commission.
21             The only thing defendants point to concerning
22    pre-filing conduct of anybody at the Commission are a handful
23    of questions from investigative testimony concerning an email
24    that Defendant Lemelson wrote concerning his Ligand reports.
25    That email made reference to certain prominent investors,

```
 1    prominent historical figures, and prominent religious figures,

 2    and there were a handful of questions about what

 3    Defendant Lemelson wrote.  Again, this is far, far too thin a

 4    read to support a claim of religious discrimination.

 5              Your Honor, unless you have any other questions --

 6              THE COURT:  I don't, other than I would like to hear

 7    from Mr. Brooks, and hopefully, if he says that there were

 8    certain cases that he cited over time which you felt were

 9    similarly situated, I wouldn't mind a quick rebuttal on the

10    facts of those.  So why don't I let Mr. Brooks go ahead and let

11    you reserve your last five minutes for a rebuttal opportunity.

12              Mr. Brooks, go ahead.

13              MR. BROOKS:  Thank you, your Honor.  As we've laid out

14    in our papers, and I know there were a lot of papers, and so

15    we've made the point --

16              THE COURT:  Yes.  My judicial assistant volunteered to

17    bring them down in a cart to my car, so --

18              MR. BROOKS:  And so --

19              THE COURT:  If I missed the Wikipedia footnote, I

20    apologize.  I missed it.

21              MR. BROOKS:  That's quite all right, your Honor.  If

22    you want to hear more about it, we can explain it, but --

23              THE COURT:  No.  If it's in a footnote, it doesn't

24    merit attention, so I'm not dealing with it.  So if it's in the

25    main text and I missed it and it was a big point, you maybe
```

1    should mention it.

2        MR. BROOKS:  Okay.  Your Honor, as we pointed out,

3    this case is entirely unprecedented.  None of the hallmarks of

4    a short-and-distort case is present here.  The Commission's own

5    cases they cite in their motion for summary judgment, they cite

6    a number of cases to say, "See, we bring these cases all the

7    time."  And I know I have limited time here, so I'll rely on my

8    papers.

9        THE COURT:  Could you just give me one or two of your

10   top candidates of cases that were similarly situated to yours

11   but were not the subject of an enforcement action or

12   prosecuted?

13       MR. BROOKS:  Well, your Honor, our argument is the

14   reverse, is that the Commission never brings cases like this

15   because it's so clear there's not fraud involved, and what we

16   point to is that, you know --

17       THE COURT:  Can I press you before you move on.  I'll

18   let you talk about the ones that you want to, but -- I know you

19   went through a lot of cases, but were there any cases of

20   similarly situated companies to yours involving, I don't know,

21   an investor who deliberately went about shorting a stock, and

22   admitted it and was open about that, but who was not the

23   subject of an enforcement action, something like apples to

24   apples, one apple was prosecuted and the other one wasn't?

25       MR. BROOKS:  There's no cases because they've never

1   brought one, your Honor, so it would be proving a negative.

2   Every case they've ever brought is entirely different.  So what

3   we say is, everybody else in the history of the world who's

4   ever done what Father Emmanuel did has not had an enforcement

5   action against him, so --

6               THE COURT:  I don't know.  It's hard to prove a

7   negative.  How do I know that?

8               MR. BROOKS:  Because we cited --

9               THE COURT:  You cited cases where they did prosecute,

10  right?

11              MR. BROOKS:  Yeah, there's no -- and so what I'm

12  representing is, we have looked, and there are no cases which

13  we can cite that have even remotely analogous facts and

14  circumstances here.  So that's the only way we can answer that

15  question is, there are no cases to cite because they've never

16  brought them.

17              THE COURT:  Well, are there other situations like

18  this?  I mean, I'm not --

19              MR. BROOKS:  No, because --

20              THE COURT:  Are there other cases that -- maybe he's a

21  unique guy.

22              MR. BROOKS:  Yeah, I mean, people -- what we did --

23  there aren't cases, but we cited -- we put a table in our

24  papers, your Honor, that talked about all the other people who

25  issued reports.  Some of them also were short the stock during

1  the relevant time period or right during the relevant time

2  period, some shortly thereafter, that also did this.

3          Now, we don't say they did anything illegal because

4  we're saying Father Emmanuel didn't do anything illegal, but we

5  have shown that this is a -- I mean, this is a very common

6  thing for people to short stocks and issue short reports.  What

7  we're saying is, the SEC has brought short-and-distort cases.

8  None of them are even remotely like this, not even close.

9  Again, as we said, they all involve the same type of situation

10 where there's clearly fraud:  Somebody makes up a wildly false

11 rumor, waits for the stock to instantly plummet, and

12 immediately covers their short and makes an immediate profit.

13         It doesn't make any sense, none of the -- I mean, I

14 don't want to redo the scienter thing, but the allegations here

15 make no sense that this was a scheme to defraud.  Nobody who

16 was short a stock would ever, you know, have the patience to

17 wait months when these things hit the market immediately.  So

18 our point is, there's never been a case like this, and so the

19 question becomes "why," why in the history of the Commission

20 have they never brought a case like this?

21         And I'll also say, this doesn't just only go to the

22 core fraud claims.  It goes to the Commission's Investment

23 Advisers Act.  They have never ever, ever brought a case under

24 Rule 206, which they do here, saying that the fraud is a

25 violation of 206 because by not disclosing it to investors and

1   potential investors, it was fraud on those investors.  They've

2   brought thousands of cases under 206, and they've never brought

3   one under this type of market manipulation theory.  And so the

4   question again is "why," and if I have a few minutes, I can lay

5   out the facts, but we think these are facts that if the case

6   survives summary judgment, the jury should be free to consider.

7   If the reason this case is so unprecedented -- again, and we

8   say it makes no sense because nobody who is committing a fraud

9   would ever do it like this, but we think the jury has the right

10  to understand why the Commission chose Father Emmanuel Lemelson

11  for this purpose.

12          THE COURT:  So what evidence do you have -- I

13  understand you've cited -- so let's assume -- essentially what

14  you're saying is that "No, I don't have any cases that were

15  similarly situated and that were not prosecuted, but all the

16  other cases that actually were prosecuted are really

17  different."

18          MR. BROOKS:  Correct.

19          THE COURT:  Okay, so let's assume for a minute that

20  that's enough.  I'm not sure it is, but let's assume.  And what

21  is the evidence that the SEC acted with malice?  You had lots

22  of comments in there about, and I read them, where you were

23  upset about Ligand and what Ligand was saying; but it's got to

24  be, how do you have a belief that the SEC adopted that mental

25  state?

 1          MR. BROOKS:  Well, what we say, your Honor, I'll walk

 2     through it and I'll do it quickly because I understand I only

 3     have a few minutes.  So what we've alleged is that the

 4     undisputed -- well, the undisputed facts, but, of course,

 5     whether they're disputed or not, we're defending this one, so

 6     that would matter, but that the Commission lost all objectivity

 7     and improperly inserted itself into the shoes of a publicly

 8     traded pharmaceutical company here, and, in so doing, tried to

 9     quash Father Emmanuel's rights to free speech and improperly

10     injected his religious practices into a case where his

11     priesthood should have been irrelevant, and that's the basis

12     for the selective enforcement defense.  Again, it started

13     during the investigation stage where Ligand's counsel, former

14     Commission, you know, we allege received preferential

15     treatment.  They get a second meeting to pitch the case after

16     the first one failed --

17          THE COURT:  That goes to Part B, which is whether or

18     not there was preferential treatment for Ligand, whether it was

19     a cozy relationship or for whatever reason; but I'm just not

20     seeing any evidence that the SEC was prejudice against --

21          MR. BROOKS:  Well, okay, so during the three-day

22     deposition of Father Emmanuel, during the investigation before

23     they brought the case, we believe they injected his religion

24     into the proceeding improperly.  They actually asked him, "Are

25     you comparing yourself to the Son of God?"  Keep in mind, none

1  of the --

2       THE COURT:  But they say it was based on an email he

3  wrote.

4       MR. BROOKS:  Well, first of all, it was an email he

5  wrote to his attorney, but --

6       THE COURT:  Oh, that's --

7       MR. BROOKS:  It had nothing to do with the underlying

8  case, so I don't know how that was relevant.  None of the

9  claims --

10       THE COURT:  How did that come in?  Wasn't it

11  privileged?

12       MR. BROOKS:  Yeah, but at the time I think the

13  production -- Father Emmanuel basically produced, other than

14  taking some family photos out, he produced all of his computer

15  hard drive to the Commission, and it included attorney-client

16  privilege.  I wasn't representing him at the time.  I don't

17  know why the Commission looked at that instead of sending it to

18  him.  They thought there was a waiver, I assume, but --

19       THE COURT:  Let's assume for a minute that he waived

20  the attorney-client -- this took me by surprise -- and then he

21  says -- I don't remember what he said, but he says whatever he

22  says in the email about various religious figures, do you think

23  that the SEC can't ask about that?

24       MR. BROOKS:  Frankly, personally, I mean, they can

25  ask, there's no rule they can't, but it's irrelevant and seems

1    offensive and seems like they're focused on his religion, which

2    should be totally irrelevant.  None of the fund's clients are,

3    were, or ever have been parishioners of his.  So it would be a

4    different story if there were allegations of affinity fraud,

5    et cetera, but I think that's the beginning of the SEC

6    injecting his religion into it.

7           You know, again, with malice, we've said that during

8    the pendency of what was supposed to be a confidential

9    investigation, someone leaked the existence of it to Bloomberg,

10   which ran a hit piece on Father Emmanuel.  Now, I get it, the

11   SEC says they didn't, but they must have leaked it to somebody

12   who then leaked it to Bloomberg.  I think that's another

13   fact --

14          THE COURT:  I can imagine that might be, can't you?

15          MR. BROOKS:  I'm sorry, what's that, your Honor?  I

16   missed that.

17          THE COURT:  Given the acrimony between Ligand and

18   Father Emmanuel, I don't know why you'd want me to draw the

19   inference it was the SEC who leaked it.

20          MR. BROOKS:  The SEC shouldn't have been telling

21   Ligand what was going on in the investigation.  We've alleged

22   that --

23          THE COURT:  Is that the "under investigation, it's

24   still under investigation" quote?

25          MR. BROOKS:  This is while it was still under

1  investigation.  Oh, it was after the -- once it becomes public,

2  we wouldn't be making it.  This was before it became public.

3  Then, your Honor, what we say next is that the Commission filed

4  a complaint here that was riddled with objectively false

5  information.  And I'm not talking about the disputed facts.  I

6  get it; there are disputed facts in every case.  I'm talking

7  about the ones that were demonstrably false and we pointed it

8  out.  For instance, we've already talked about the

9  debt-to-tangible-equity ratio.  The Commission also was relying

10 on -- although they took three years to investigate this, they

11 cited from private draft reports that weren't the reports that

12 went out to the public and therefore didn't form the basis of

13 their fraud.  They made false statements about when Ligand

14 purchased a share of Viking.  And we laid this out in our

15 motion to dismiss, so there's a lot of -- again, these aren't

16 the disputed facts.  These are just errors in the complaint.

17        Now, I understand the Commission is alleging, look,

18 these were just mistakes.  It's a little bit ironic to us

19 because when Father Emmanuel makes a mistake, you know, they

20 have to infer, oh, it must have been done on purpose; it's

21 securities fraud.  But, you know, take them at their word,

22 these were mistakes.  But we pointed out these mistakes to them

23 by the time they filed their amended complaint, and they didn't

24 bother to fix them, so to this day, the record still contains

25 false information about their allegations.  And, again, we

1    think this is something that a jury, they may agree with us,

2    they may not, but if it goes to a jury, the jury should be able

3    to consider it; and for purposes of today, all the inferences

4    should go in our favor on this motion.

5        In addition, the reason that what Ligand had to say

6    was relevant is because, again, the Commission stepped into

7    their shoes in a shocking way here.  The Commission actually

8    touted Ligand's stock price as trading at $250 a share in the

9    complaint, as if it's the Commission's job to tout the stock

10   price of a public company.  In any event, that backfired

11   because Ligand's stock prices plummeted and, you know, lost at

12   some point more than 80 percent of its value since the

13   Commission filed the case.

14       But, again, it just shows that the Commission is

15   viewing itself here as Ligand, and they continue to do it.

16   They actually refer to Ligand as a victim in their summary

17   judgment papers.  This is not a private defamation action.

18   This is the Commission bringing a market manipulation case.

19   Ligand is most decidedly not a victim in this case.  The

20   victim, if there is one, and we say there isn't, the victim is

21   the market.  Ligand is not the victim.  It's just more evidence

22   that the SEC here is just doing Ligand's bidding.

23       THE COURT:  Okay, excuse me, I need to cut this off,

24   and I need to give a brief opportunity for a rebuttal because

25   we're really hitting close to 11:00, so --

1          MR. BROOKS:  Thank you, your Honor.

2          THE COURT:  Thank you.

3          MR. DAY:  There was a lot there.  I know I only have a

4    few minutes to address this.  If I heard correctly, the

5    defendants concede that there are no similarly situated parties

6    who could have been charged for this conduct.  That is the end

7    of the story for this defense.  Without similarly situated

8    parties who could have been charged, the case law is clear:

9    You cannot maintain a selective enforcement claim.

10          On the malice point, there is no evidence backing up

11   the entire argument that the Court just heard.  There is simply

12   nothing in the record showing that the Commission stepped into

13   the shoes of Ligand.  The few of the points that --

14          THE COURT:  Well, why did you ask him about being the

15   Son of God or being like the Son of God?

16          MR. DAY:  It's something that he said in an email

17   about his Ligand reports, and it wasn't --

18          THE COURT:  What exactly did he say?

19          MR. DAY:  I have it here.

20          THE COURT:  Do you remember?

21          (Pause.)

22          MR. DAY:  "Activists who speak the truth are always at

23   great risk.  See Socrates, MLK, Gandhi, and none other than the

24   Son of God."  The question was, essentially, what did he mean

25   by that?

1          THE COURT:  Well, did you think this was an affinity

2    fraud?

3          MR. DAY:  Your Honor, I think it was fair for the

4    staff in investigating a potential fraud to inquire about

5    whether there was any significance to Father Lemelson's

6    religious affiliation.  It turns out there were no charges

7    brought by the SEC related to any kind of affinity fraud or

8    other religious affiliation; but in the course of an

9    investigation, when somebody holds themselves out as both an

10   investment advisor and a priest, absolutely fair to ask about

11   that second vocation and determine whether there was any basis

12   there for any sort of problematic behavior.

13          The last point I'd like to make, your Honor, and I

14   know we're essentially out of time, is that even if the Court

15   were to credit any of the arguments that Mr. Brooks just put

16   forward, this does not look anything like cases in the First

17   Circuit where selective enforcement has gone forward:  the

18   *Rabinovitz* case, for example, where there was an orchestrated

19   campaign of harassment of a landlord who had evicted an

20   official's friends; the *Topalian* case that I'm sure the Court

21   is very familiar with where an official demanded totally

22   inappropriate concessions from a developer to approve a

23   project, and when the official didn't get those concessions,

24   another orchestrated campaign of harassment and retaliation.

25   This just does not look anything like those cases, even if the

1    Court were to credit these arguments.

2            THE COURT:  Okay, thank you.

3            Now, let me just go on a completely different point.

4    If I deny the motion for summary judgment, which, as I've

5    indicated, is one likely possibility, I'm not sure on

6    everything, but there's likely to be something that goes to

7    trial here.  I am trying to figure it out because we're in the

8    days of COVID and there are no civil trials.  Let's just be

9    quite clear about this; there are none, and there are none for

10   the foreseeable future.  So it's a jury trial for sure, and I

11   didn't know whether or not there were efforts being made to, A,

12   settle it, and, B, whether we should set a backup trial date

13   for some time over the, let's say -- this is a huge trial, I

14   mean, right, would you say, Mr. Brooks, Mr. Jones, Mr. Day?

15   Wouldn't it be like three weeks?

16           MR. JONES:  Your Honor, I don't know if it would run

17   three weeks.  I wouldn't be surprised if it ran a week and a

18   half to two weeks, you know, for the Commission's case.

19           THE COURT:  Half days?  Half days?

20           MR. JONES:  You know, eight half days potentially,

21   although, you know, I certainly have not sat down, your Honor,

22   and done what I know your Honor likes to do, which is basically

23   have a witness by witness how long.

24           THE COURT:  Because the other issue is, I've sometimes

25   been going full days when I did my one criminal jury trial,

1   just because I wanted to minimize the exposure of counsel,

2   staff, and the jurors.  So I'd be open to full days, but a

3   three-week full day is really difficult for my session, but

4   should we -- I just think we can't have a jury until everybody

5   has been vaccinated.

6          MR. JONES:  Your Honor, for the Commission's part, I

7   don't think that we have been anticipating that this is going

8   to an in-person trial before the fall, you know, just because

9   of what's going on with the number of criminal cases that the

10   Court has to deal with and trials there, and the Court's

11   statements to other litigants that, you know, civil trials are

12   just not happening and they're not going to happen for a while.

13   So it's been our assumption that we're probably not going to

14   see you for a jury trial for a while.  There is --

15          THE COURT:  There's a chance that over the summer, I

16   mean, one thing is, we could just set a status, or I could set

17   a fallback trial date in the fall.  I don't know what you all

18   would want.

19          MR. JONES:  Your Honor, I think a status would be

20   good.  I think also I would worry, if we forewent a fallback

21   trial date, that we will basically go to the back of the line

22   where people --

23          THE COURT:  Yes, why don't I put this on, Maryellen,

24   for right after Labor Day.  Does that make sense for folks?

25          THE CLERK:  Okay.

 1          THE COURT:  And if everybody gets a vaccine before

 2    then, we could consider moving it up.  But I have another

 3    question which is -- and, Mr. Brooks, you're really in the

 4    driver's seat on this one, and I shouldn't ignore Mr. Sullivan,

 5    but would you want to use this time period while I am

 6    considering the motions for summary judgment, partial summary

 7    judgment, would you want to consider that for purposes of

 8    mediation, or is it just too angry?

 9          MR. BROOKS:  I don't think it's a question of angry at

10    all.  I don't think that would be an impediment.  I just think

11    that the position of defendants is, they didn't commit any

12    fraud, so I'm not sure what mediation would look like.

13          THE COURT:  No, I understand Father Emmanuel feels

14    that strongly, and he may want a trial no matter what.  The

15    question is whether or not you want to try a mediation

16    approach.  Do you want to talk to him about it?

17          MR. BROOKS:  Yes.  I think we should probably do that

18    offline and then --

19          THE COURT:  Oh, yeah, yeah, yeah, of course.  So what

20    I'm thinking of is essentially if you all could get back to me,

21    say -- I know we're going into the Christmas season -- is

22    perhaps mid-January, you know, confer by then, and then send me

23    a letter if you want us to refer you to either the magistrate

24    judge, or if you want to use private mediators, or just

25    yourself.  I mean, you're very experienced people.  I often

1   find a mediator helps.

2          MR. JONES:  Your Honor, just on the timing of that,

3   you know, the Commission has certainly, you know, opened the

4   door to that in the past, and Mr. Brooks has been quite

5   cordial, you know, in his dealings with us, but our

6   understanding is that the defendant has no interest in doing

7   that, in settling, either to admit or deny settlement.  It's

8   possible that after the summary judgment, things might look

9   different.  It's possible, in fact I would say probable, that

10  they won't.  And so I would say, in terms of a productive

11  mediation session, it's very unlikely there will be a

12  productive mediation session in advance of the summary judgment

13  rulings.

14         THE COURT:  Okay, well, that's very helpful to me.  So

15  why don't I do this:  We will take your arguments under

16  advisement, and then --

17         THE CLERK:  Do you want a status, Judge, for

18  September?

19         THE COURT:  Yes, I think we should probably do a

20  status in the spring.  We for sure will have ruled by then, in

21  which case I'll put it flat out to your client because you've

22  now expended the money for the summary judgment, but have you

23  all spent the money already on the experts?  So that's not a

24  cost saving, right?  You think that the donnybrook is,

25  Mr. Brooks, is the motion for summary judgment?  That would

 1  clear the way one way or another maybe?

 2          MR. BROOKS:  I don't know, your Honor, again, because

 3  I don't want to -- I don't want to prejudge anything, but --

 4          THE COURT:  I tell you what, let's have a status in

 5  April, Maryellen.

 6          THE CLERK:  April?  Okay, give me a minute.  Let me

 7  just quickly look at the calendar.  Okay, but remote, right,

 8  Judge?  Okay, so we could do, how about Wednesday, April 14 at

 9  2:30 by Zoom?

10          THE COURT:  Let's do it by Zoom.  I may have a vaccine

11  by then, but many of you look too young, not all of you, but

12  you won't have a vaccine by then, so I don't want to risk

13  anybody.  I actually don't have any idea how old

14  Father Lemelson is, so, I mean, I don't know if he'll have a

15  vaccine by then, but at least a few of you don't look old

16  enough, so why don't we do it by Zoom.

17          THE CLERK:  A status?

18          THE COURT:  Yes, and then with a September trial date.

19  That would still leave plenty of time for a mediator.

20          MR. BROOKS:  Your Honor, I would just ask,

21  Mr. Sullivan and I both have back-to-back arbitrations that are

22  going to basically last from the beginning of August until at

23  least through the first week in October.  I was wondering if we

24  might be able to push it back and put it on for a November

25  trial date?

```
 1          THE COURT:  I don't know about that, okay?  November,
 2   I'm happy to put it off -- so your arbitration -- because all
 3   these things keep moving, everything, so then your arbitration
 4   could get moved.
 5          MR. BROOKS:  The arbitrations, both of them will go
 6   forward by Zoom if they can't happen live, so I don't think,
 7   like, the trials, those will --
 8          THE COURT:  Your arbitration is when?
 9          MR. BROOKS:  So one begins the first week in August
10   and is expected to go three weeks or so, and the next one
11   starts I think September 20, so there would be no meaningful
12   time to prepare for this trial if it happened in September.
13          THE COURT:  So I could go till October 1, or the first
14   week in October would be fine.
15          MR. BROOKS:  That's actually during the arbitration,
16   the second one.  Those dates are already taken.  I could seek
17   to move it, but there are a lot of parties in that arbitration,
18   so it would be difficult for us to move it.
19          THE COURT:  So I just don't want to go completely
20   behind arbitrations, not that those --
21          MR. BROOKS:  I understand.
22          THE COURT:  But I could do October 15 or something?  I
23   don't feel strongly about it.
24          MR. BROOKS:  I understand that --
25          THE COURT:  I'm not willing to put it off months.  I
```

1    could do it earlier.  Do you want to -- if we can get a -- I

2    just can't be sure we're going to -- I tell you what:  Let's do

3    the backup date the second week in October, Maryellen.

4            THE CLERK:  Okay, so it's going to be a Tuesday

5    because the second week in October is Columbus Day, so it would

6    be Tuesday, October 12 at 9:00 o'clock for a jury trial, and we

7    can do a pretrial the week before.  We could do Wednesday,

8    October 6 at 2:30, and you'll get those dates in the clerk

9    notes.

10           MR. BROOKS:  Your Honor -- and I understand it's your

11   court, it's your schedule -- I just want to forecast that I

12   anticipate that I don't think we'll be able to meaningfully

13   represent Father Lemelson.  It's a complicated trial, and we

14   won't have any time to prepare.  So we'll schedule it, but I

15   just wanted to --

16           THE COURT:  Well, we're going to schedule it because I

17   don't trust anything right now.  Arbitrations can get kicked.

18   Everything can get kicked.  And plus you're from a big firm,

19   not a super big firm, but I know you're from an excellent firm

20   with lots of help there.  So hopefully we can do that

21   mid-October.  There's some wiggle room there, but if I don't

22   put a date down, we're in trouble.  And I don't want to have a

23   monthlong trial.  Well, how long do you think the trial will

24   be?

25           MR. BROOKS:  So I think that will largely depend on

1  the scope of the summary judgment decision.  So it's a little

2  hard to say.  I didn't view this going more than a week and a

3  half anyway.  I think there's a chance that it could be much,

4  much shorter, depending on which claims survive and which

5  don't.

6           THE COURT:  So my main goal is not to jump over

7  Thanksgiving week or go into the Christmas week.  That's my

8  main goal.  And I'm not willing to go behind two arbitrations

9  completely, so I'm accommodating the two you told me about,

10 but --

11          MR. BROOKS:  Yes, okay.

12          THE COURT:  Just the prep, staff up, realistically,

13 and Mr. Sullivan I'm sure will be a great help, and there it

14 is.

15          Okay, sounds good.  And stay healthy, Happy Holidays

16 to all of you, and I'll take this under advisement.  Thank you.

17          MR. JONES:  Thank you, your Honor stay healthy.

18          MR. BROOKS:  Thank you, your Honor.

19          (Adjourned, 11:09 a.m.)

20

21

22

23

24

25

1                       C E R T I F I C A T E

2


3
     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5


6


7             I, Lee A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 1

9    through 67 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Civil Action No. 18-11926-PBS,

11   Securities and Exchange Commission v. Gregory Lemelson, et al,

12   and thereafter by me reduced to typewriting and is a true and

13   accurate record of the proceedings.

14            Dated this 8th day of June, 2021.

15


16


17


18


19            /s/ Lee A. Marzilli
              _____
20            LEE A. MARZILLI, CRR
              OFFICIAL COURT REPORTER
21


22


23


24


25