UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>THE AMVONA FUND, LP,<br><br>Relief Defendant. | Civil Action No. 1:18-cv-11926-PBS |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE TO PRECLUDE CATEGORIES
OF IRRELEVANT AND UNFAIRLY PREJUDICIAL EVIDENCE**

Defendants seek to exclude several categories of relevant evidence, including (1) a newspaper article in which Defendant Lemelson crowed about his ability to "crash" stocks following the success of his fraudulent campaign to manipulate the price of Ligand stock, (2) evidence that he had significant financial incentives to engage in fraud, and (3) how margin calls in 2020 wiped out The Amvona Fund, contrary to Defendants' position that trading on margin is no big deal.  These topics are plainly relevant, affirmatively and/or for rebuttal/impeachment.  Their use should not be precluded pretrial.

**ARGUMENT**

**A.  The Wall Street Journal Article Is Relevant and Is Not Unfairly Prejudicial**

Defendants seek to preclude reference to a 2015 Wall Street Journal article that was based on an interview of Defendant Lemelson.  The subtitle of the article is "Greek Orthodox

priest boasts of ability to 'crash' stocks" and the reporter goes on to write:

> There are thousands of hedge funds in the world, but only one is run by a traveling priest *who boasts of his ability to "crash" stocks* in between baptisms, funerals and Sunday sermons in this bucolic New Hampshire town.

[Ex. A at 1 (emphasis added).] By twice using quotes, the article's author is indicating that the word "crash" is something Defendant Lemelson said.

Defendant Lemelson's boast that he had the ability to "crash" a stock is directly relevant to his intent. If he can "crash" a stock, he can profit from a short position. As the interview and resulting article came shortly after Defendants' 2014 short-and-distort campaign, Defendant Lemelson's boast appears to reference that scheme, with which he is charged here. The jury should be permitted to draw its own conclusions from Defendant Lemelson's boasting about his short-selling prowess in the context of evidence that his profit came from disseminating falsehoods about Ligand.

This evidence is not *unfairly* prejudicial, as Defendants assert. It is reported as what Defendant Lemelson said. It may be prejudicial, in the sense that it doesn't help his defense, but there is nothing unfair about letting the jury hear that Defendant Lemelson thought he could move stock prices.

### B. Evidence of Financial Motives for Defendants To Commit Fraud Should Be Admitted.

Defendants next argue that the Commission should not be allowed to adduce certain evidence of Defendant Lemelson's scienter. Specifically, the Commission provided evidence at summary judgment that (1) less than two weeks before he took his short position in Ligand, he was shopping for a $2.5 million mortgage to purchase a ~$2.9 million home in the Greater Boston area. [ECF No. 132, ¶191.] A reasonable juror may find that there is a connection between Defendant Lemelson's potentially significant financial commitment in connection with

plans to buy real estate was a motive to commit fraud.

Likewise, Defendant Lemelson had a strong motive to push his agenda to avoid financial difficulties for The Amvona Fund ("TAF"). TAF was highly leveraged, meaning Lemelson borrowed from his brokerage firm to finance his positions—a practice known as trading on margin. [ECF No. 132, ¶194.] After Lemelson established his short position in Ligand, a series of margin calls were imposed by his broker—essentially a demand to increase a fund's equity (by liquidating securities or infusing cash) to maintain a certain ratio of equity to amounts owed to the broker. One cause of these margin calls—which Defendants acknowledge totaled in the hundreds of thousands of dollars (Br. at 3-4)—was that the price of Ligand's stock increased, causing TAF's Ligand position to lose value. The jury may infer that Defendants had yet another incentive to unlawfully assail Ligand, drive down the price of its stock, and avoid further margin calls.

Defendants make various claims about why these factors were small potatoes—they say the margin calls weren't a big deal and that Defendant Lemelson wasn't really shopping for an expensive house. Br. at 3-4. They also worry about "mini-trials" regarding Defendant Lemelson's real estate plans and TAF's finances. Defendants' professed concerns are overblown. Defendants are free to explain to the jury why they think the evidence is not probative—something they did in about two pages of their brief.

The challenged evidence is facially relevant and probative of scienter. It does not require mini-trials—the only basis for unfair prejudice Defendants identify—and there is therefore no basis to exclude it under Fed. R. Evid. 403. In the end, Defendants' arguments go to the weight of the evidence, at most, and not its admissibility.

C. Evidence About The Amvona Fund's 2020 Demise

The Commission does not intend to affirmatively raise events surrounding the demise of

3

The Amovna Fund in March 2020—specifically, that TAF was decimated by margin calls it could not meet, which had caused the TAF's brokerage to liquidate the fund's positions. Undersigned counsel's understanding, both from the FINRA arbitration papers and a TAF investor witness, is that the fund lost 100% of its value—a roughly $27 million loss—and its investors were wiped out.  Unsurprisingly, Defendant Lemelson blames his broker for this turn of events, a claim that remains pending in the arbitration.

There are, however, many ways this evidence could become relevant at trial, irrespective of how the arbitration turns out.  For example, if Defendant Lemelson claims at trial that margin calls are not a big deal (which, as noted above, is a near-certainty), the fact that margin calls wiped out his fund in 2020 strongly suggests otherwise.  Another example:  A TAF investor witness—Nicolas Jabbour, MD—is on both side's witness lists.  Undersigned counsel understands that Dr. Jabbour lost his entire investment—the bulk, if not all, of his savings—in March 2020.  Defendants may well attack Dr. Jabbour's testimony as biased based on his complete loss at Defendants' hands.  These are but a few examples.  The point is that it is inappropriate to categorically preclude use of this evidence at trial.

## CONCLUSION

For the reasons stated above, the Commission respectfully requests that the Court deny Defendants' motion.

Dated: October 12, 2021

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its Attorneys,

*/s/ Alfred A. Day*
Marc J. Jones (Mass. Bar #645910)
Alfred A. Day (Mass. Bar #654436)
Boston Regional Office
33 Arch Street
Boston, MA  02110
(617) 573-4537 (Jones direct)
jonesmarc@sec.gov
daya@sec.gov

## CERTIFICATE OF SERVICE

I certify that on October 12, 2021, a copy of the foregoing was electronically filed through the ECF system and will be sent electronically to all persons identified in the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants.

*/s/ Alfred A. Day*