UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff<br><br>v.<br><br>GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>THE AMVONA FUND, LP,<br><br>Relief Defendant | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:18-cv-11926-PBS |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE
TO EXCLUDE EVIDENCE AND ARGUMENTS ABOUT REJECTED
<u>SELECTIVE ENFORCEMENT DEFENSE (ECF No. 159)</u>**

Defendants Father Emmanuel Lemelson (f/k/a Gregory Lemelson), Lemelson Capital Management LLC, and the Amvona Fund LP submit this opposition to Plaintiff, Securities and Exchange Commission's (the "Commission") motion *in limine* to exclude evidence and arguments about Defendants' rejected selected enforcement defense (ECF No. 159).[1]

The Commission's motion is largely a red herring, as Defendants agree selective enforcement is not at issue at trial. Bias, however, clearly is. Bias is always permissible to explore at trial – through cross-examination of witnesses, though affirmative evidence and through argument based upon both. The Court did not rule that evidence of bias on the part of

---

[1] The Commission subsequently filed another *motion in limine* entitled "Plaintiff's Motion in Limine to Exclude Irrelevant Evidence and Argument. (ECF No. 184). However, as between the two, it is in this motion (ECF No. 159) that the Commission first questioned the admissibility of bias and so it is in this motion Defendants primarily respond to that argument.

Ligand and its related personnel was to be excluded from trial, and, in fact, the Court even commented that certain of the evidence that the Commission seeks to exclude would be good argument at trial.  *See* December 17, 2020 Summary Judgment Transcript at 25:17-26:3.

Contrary to the Commission's apparent thinking, the jury's role in deciding the case is to assess the credibility of the witnesses.  *See Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate to issues or personalities in the case at hand.  The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'") (quoting 3A J. Wigmore Evidence, § 940 at 775 (1970)).  Bias or motive to lie may be *the* crucial component in the jury's assessment of credibility including the "[cross-examination and] exposure of a witness' motivation in testifying."  *See Delaware v. Van Arsdall*, 475 U.S. 673, 677-78 (1986); *United States v. Lynn*, 856 F.2d 430, 432 n. 3 (1st Cir. 1988) (stating bias is always relevant); *see generally United States v. Sanabria*, 645 F. 3d 505 (1st Cir. 2011) (defendant improperly denied opportunity to impeach a witness, explore potential witness intimidation, and explore bias).  "Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party.  Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest.  Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."  *See United States. v. Abel*, 469 U.S. 45, 52 (1984).  The forms of bias are "infinite."  Federal Practice and Procedure (Wright & Miller), Federal Rules of Evidence, 27 Fed. Prac. &

Proc. Evid., Sec. 6095 (2d ed.) at n.12.  Bias may be tied to both individuals and organizations. *See Abel*, 469 U.S. at 52 ("A witness' and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tents, is certainly probative of bias"); *DiBenedetto v. Hall*, 272 F.3d 1, 8-9 (1st Cir. 2001) ("Third-party bias is a proper topic for cross-examination").[2]

The Commission's motion seeks to exclude various categories of evidence of bias. Below the Defendants address each (and other broad categories of evidence of Ligand's bias for purposes of alerting the court).

**Financial Bias** – Many of the Ligand witnesses have compensation packages tied to the performance of Ligand's stock.  Others are highly compensated employees of Ligand, whose income and livelihood depend on the company.  Still others are outside contractors for Ligand with a longstanding, lucrative business relationship.  These financial motives may well give rise to bias against Defendants and the jury should be permitted to consider this evidence.  Financial bias is a fair subject of cross-examination.  *See, e.g. United States v. Georgiadis*, 819 F.3d 3d 4, 15-16 (1st Cir. 2016) (acknowledging error for government to withhold evidence of witness' financial bias and affirming remedy of recalling witnesses to permit cross-examination); *Crowe v. Bolduc*, 334 F.3d 124, 131-32 (1st Cir. 2003) (finding trial court error by excluding evidence

---

[2] *See also, N.L.R.B. v. Indiana & Michigan Electric Co.*, 318 U.S. 9, 24 (1943) (ruling that witnesses who were members of local union organization should be subject to cross-examination on involvement in other acts of organization that "might reveal bias in their testimony and might also explain acts of alleged discrimination against them"); *Dist. of Columbia v. Clawans*, 300 U.S. 617, 630-31 (1937) (holding preclusion of cross-examination of witnesses, all of whom were affiliated with company that was alleged victim of defendant's actions was improper as "[c]ommon experience teaches us that the testimony of such witnesses, especially when uncorroborated, is open to the suspicion of bias"); *Bearbones, Inc. v. Peerless Indemnity Ins. Co.*, No. 3:15-30017-KAR, 2016 WL 5928799, at *5 (D. Mass. Oct. 11, 2016) (commenting that witness was properly subjected to cross-examination on theory that her "long-standing employment relationship with [defendant] or its affiliates rendered her testimony biased toward [defendant] and unreliable"); *Pan American Grain Mfg. Co. v. Puerto Rico Ports Authority*, 121 F. Supp. 2d 710, 715 (D.P.R. 1999) (recounting cross-examination about long-standing business relationship between witness and plaintiff-company and the desire of the witness for future business with the plaintiff-company and commenting it was "sufficient to cast a pall over [the witness'] credibility for purposes of this trial, and to cause the Court seriously to discount his claims").

of witnesses' contingent fee agreement with party which "might color [witness's] testimony due to financial incentives"); *Wheeler v. United States*, 351 F.2d 946, 947 (1st Cir. 1965) (finding it "clear that inquiry into the possible financial stake of a witness in a particular outcome of a case in which the witness is testifying is a proper subject for cross-examination").

**Expressions of Personal or Religious Bias** – There are a litany of emails from named Ligand witnesses expressing personal or religious bias toward Fr. Lemelson – some insulting – others disturbing.  From the exhibits that Defendants intend to introduce, such insults include: (1) mocking Fr. Lemelson for being "an Eastern Orthodox priest, and is constantly photographed in his priestly robes and collar.  It would be funny if it wasn't my client!"; (2) mocking Fr. Lemelson's religious background by stating "[w]e may want to enter into a group with God.  Any thoughts you have are welcome.  We want to pray for the success of this holy company" and "Every time I see the report, I feel I should go to the River Jordan to be cleansed"; and (3) calling Fr. Lemelson a "DB," which the author later admitted meant "douche bag."  Personal bias that may color witnesses' testimony is clearly a permissible line of cross-examination.

**Ligand's Decision Not to Issue a Public Statement or File a Private Lawsuit, but Rather to "Lean on the SEC"** – Ligand decided not to issue a public response to Defendants' statements or file its own lawsuit.  Rather, as stated in Ligand's CEO's own words, and shared with Ligand's board of directors, Ligand decided to "to work with our attorneys **to lean on the SEC** to get an injunction on Lemelson's activities." ECF No. 136-22 (emphasis added).  The reasons for Ligand not to undertake these available options and instead lobby the Commission to bring an enforcement action are within the scope of proper cross-examination for Ligand witnesses and their bias against Defendants in this case.

As to a *public rebuttal*, Ligand chose to stand silent – despite strong urging to the contrary by some investors. Ligand claimed the decision was made to avoid giving the reports or statements enhanced attention or even credibility. Unbeknownst to many, both Ligand's CEO (John Higgins) and its investor relations person (Bruce Voss) expressed concern themselves about the impact of the new drug Sovaldi – **before** Fr. Lemelson's public reports and statements. In an email sent on February 1, 2014, just a few months before Fr. Lemelson's first report, CEO Higgins questioned: "[W]ill any Sovaldi patients need Promacta?" Bruce Voss also testified that although he does not recall any specific conversations with Ligand about Sovaldi, "I'm sure we had [communications] because Sovaldi was a new entrant into a disease category where my client's licensed drug was also used." Therefore, in reality, Ligand could hardly publicly criticize Fr. Lemelson when it had just recently been working through the same concerns. Ligand was stuck with its strategy of silence, and likewise attempting to *silence* critics, and was arguably even more desperate for the Commission to bring an enforcement action and the *desired success* of that action – which equates to bias.

As to a *private lawsuit*, of which Ligand apparently wanted no part, the jury is entitled to know that such a lawsuit would require Ligand to show actual harm, including that the challenged statements negatively impacted the stock price and, as the alleged victim, the company and its personnel would be subject to far broader discovery than if the Commission did the company's bidding, as happened here. Similarly, the jury is entitled to know that an enforcement action carries a potential industry bar (thus achieving at least one of Ligand's employee's stated goal of "silencing [Fr. Emmanuel] for good"), while a private lawsuit would not – in addition to the financial cost of the litigation being borne by Ligand rather than taxpayers.

**Ligand's Communications with the Commission** – Ligand's history of interactions with the Commission is also relevant to bias. As an overview, Defendants are entitled to inform the jury of the following interactions:

- Ligand paid counsel to meet with the Boston office of the Commission and make a PowerPoint presentation.

- Ligand made unsupported accusations that it admittedly did not attempt to verify beforehand.

- The Commission's **Boston** office *declined* to investigate the Defendants.

- The Commission's **Washington, D.C**. office initially also *declined* to investigate the Defendants.

- Ligand then hired a *different attorney* with experience specifically working in the Commission's Washington, D.C. office as a high-ranking enforcement official.

- The Commission's Washington D.C. office granted Ligand's request for a second meeting.

- The second meeting included a similar PowerPoint presentation as had been made in Boston and included similar unsupported accusations.

- Ligand's second counsel had repeated communications with the Commission before the Commission filed an enforcement action – during which the Commission informed Ligand that an investigation was ongoing.

The frequency and nature of the contacts by Ligand though its attorneys demonstrate that Commission action was a critical goal for Ligand, which is directly relevant to the issue of bias.

**Testimony from the Commission's Rule 30(b)(6) Witness -** The story of Ligand's communications with the Commission and some of the most important evidence of bias has been told by the Commission's Rule 30(b)(6) witness – David Becker. Under Fed. R. Civ. P. 32(a)(3): "An adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) …" The Commission has availed itself of this rule by designating certain portions of Fr.

6

Lemelson's deposition testimony. Defendants are entitled to avail themselves of the same process regarding Mr. Becker. Defendants designated only targeted portions of the Commission's 30(b)(6) deposition. Specifically, the designations are limited to brief background on Mr. Becker's position with the Commission, the history of the communications between Ligand and the Commission, and clarification of the Commission's allegations regarding the debt-to-tangible equity ratio statement.

As to *communications*, Mr. Becker's deposition lays the foundation for the depth of Ligand's persistence and pressure through its new, well-connected Washington-based counsel (an alumnus of the Commission) despite the Commission's previous, double declination to investigate. This is all evidence of bias – of the depth Ligand felt the need to "lean" on the SEC.

As to the *debt-to-tangible equity ratio statement*, Defendants are clearly entitled to present testimony from the Commission's own representative about how the Commission is not challenging the accuracy of Defendants' calculation of the debt-to-tangible equity ratio, but rather whether the metric is appropriate. Defendants contend this testimony puts that statement squarely in the realm of First Amendment protection and, regardless, the concession of the accuracy of the calculation is an important point regarding the allegations that this was one of the four allegedly false statements that initially formed the basis of the Commission's claims.

**Ligand's PowerPoint Presentations to the Commission –** It is truly incredible that the Commission is seeking to exclude Ligand's PowerPoint presentations submitted to the Commission that explicitly requested the Commission conduct an investigation and bring an enforcement action against Defendants. As an initial matter, the importance attached to a statement by people with knowledge about it is an important factor that can be considered in determining materiality. *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir.1997) ("[A] major factor in

7

determining whether information was material is the importance attached to it by those who knew about it"). The presentations are thus critical to show what Ligand failed to identify as problematic. Defendants maintain it is compelling that Ligand failed to identify in its presentations to the Commission at least two of the four statements alleged in the present Complaint. In fact, this Court recognized that the argument about the absence of the Viking statements from Ligand's presentations to the Commission was a good argument that "may win the point" but simply was not adequate to grant *summary judgment* to Defendants. December 17, 2020 Summary Judgment Hearing Transcript at 25:17-26:3.

In addition, the PowerPoint presentations are compelling evidence of Ligand's bias, which, as noted above, is always relevant. The jury is entitled to know that Ligand made broad, sweeping allegations against Defendants during the investigation. And, further, that Ligand had not researched or taken any steps to confirm the veracity of a number of those allegations before presenting those accusations to the Commission. Indeed, the Commission itself has argued in favor of using evidence of its own investigations against witnesses in cross-examination to show bias. *See SEC v. Goldstone*, 317 F.R.D. 147, 165-66 (D.N.M. 2016) (permitting SEC to reference its investigation and lawsuit against witness during cross examination to show bias). Finally, the presentations are compelling evidence of Ligand's influence on the allegations in this case to show that allegations the Commission is no longer pursuing, but were in the original complaint, came nearly verbatim from Ligand's presentations. In other cases brought by the Commission, courts have ruled that defendants "may vigorously cross-examine [witnesses] about their bias, and whether they sought to cooperate in this and other investigations in exchange for

8

more lenient treatment by the New York State Attorney General and the SEC." *SEC v. Treadway*, 438 F. Supp. 2d 218, 221 (S.D.N.Y. 2006).  The same result should apply here.

**The Leak of the Commission's Investigation Reflected in Bloomberg** – The Bloomberg article disclosing the existence of what should have been a confidential investigation is also relevant to the issue of bias.  While Defendants do not have any direct evidence of who leaked the investigation, there is a reasonable inference that it was either the Commission or Ligand.  As noted by the Court at the Summary Judgment hearing, there is a strong inference that Ligand was the leak.  December 17, 2020 Summary Judgment Hearing Transcript at 55:7-22 (responding to statement that the Commission could have disclosed the investigation to someone who then leaked the investigation to the media by stating, "I can imagine [who] that might be, can't you?" and then stating, "Given the acrimony between Ligand and Father Emmanuel, I don't know why you'd want me to draw the inference it was the SEC who leaked it").  The strong inference of Ligand's role in leaking the investigation to the media is directly relevant to the critical issue of Ligand's bias, and thus this evidence should not be excluded.

**Duncan Hunter** – Finally, the Commission's motion is unclear with regard to what it is seeking to exclude regarding Duncan Hunter, a former Congressman who was later indicted, and sentenced to eleven months in prison for campaign fraud before being pardoned by President Trump on his way out of office.  On the second page of the motion *in limine*, the Commission refers to "an article about former Congressman Duncan Hunter," but later in the motion, the Commission refers to "the material about Rep. Hunter."  ECF No. 159 at 2, 4.  To the extent the Commission is seeking to exclude only the article about Duncan Hunter's arrest, the Defendants agree that they will not offer that affirmatively.  However, the letter that Duncan Hunter wrote, on Ligand's behalf, to the Commission requesting that the Commission investigate and file an

enforcement action against Defendants, sent on the same day Ligand's new counsel was meeting with the Commission, and remarkably, setting a deadline of less than two weeks for the Commission to inform Mr. Hunter "whether the Commission has begun or will be pursuing this issue," is directly relevant to Ligand's bias. Defendants do not plan to offer the article about Mr. Hunter's arrest unless Plaintiff's witnesses open the door to such material by attempting to portray Mr. Hunter as a credible, independent complaining party.

**Ligand's Efforts to Remove and Prevent Publication of Defendants' Analysis –** Ligand also pressured a number of media publications to pull down any publication of Defendants' reports and prevent future publication of his analysis. Email communications show that Ligand and its Investor Relations firm worked together to pressure USA Today, BioWorld, and SeekingAlpha to remove any publications discussing Defendants' opinions of Ligand and prospective publications from Defendants. There were also discussions of hiring private investigators to look into Fr. Lemelson's personal history, have him surveilled (an activity that Ligand's counsel continues to engage in as recently as 2021), and working to delete Lemelson Capital Management's Wikipedia page. All of this is relevant to the bias of Ligand's witnesses.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiff's motion *in limine* to exclude argument and evidence about "rejected selective enforcement defense" (ECF No. 159), which in actuality is seeking to exclude relevant argument and evidence about the Commission admitting the accuracy of a calculation related to one of the four allegedly false statements, materiality of statements that form the basis of the Commission's claims, and the bias of Ligand witnesses.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
Thomas M. Hoopes (BBO No. 239340)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com
thoopes@lhblaw.com

Dated:  October 13, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on October 13, 2021.

*/s/ Douglas S. Brooks*
Douglas S. Brooks