1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2

3     SECURITIES AND EXCHANGE              )
      COMMISSION,                          )
4                                          )
                      Plaintiff            )
5                                          )  CA No. 18-11926-PBS
                 -VS-                       )  Pages 1 - 93
6                                          )
      GREGORY LEMELSON, et al,             )
7                                          )
                      Defendants           )
8

9
                   **FINAL PRETRIAL CONFERENCE**
10
            BEFORE THE HONORABLE PATTI B. SARIS
11              UNITED STATES DISTRICT JUDGE

12

13

14

15
                              United States District Court
16                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts  02210
17                            October 14, 2021, 10:07 a.m.

18

19

20

21

22
                         LEE A. MARZILLI
23                    OFFICIAL COURT REPORTER
                  United States District Court
24                1 Courthouse Way, Room 7200
                      Boston, MA  02210
25                    leemarz@aol.com

A P P E A R A N C E S:

    ALFRED A. DAY, ESQ. and MARC J. JONES, ESQ.,
United States Securities and Exchange Commission,
33 Arch Street, 23rd Floor, Boston, Massachusetts, 02110-1424,
for the Plaintiff.

    THOMAS M. HOOPES, ESQ., DOUGLAS S. BROOKS, ESQ.,
and BRIAN SULLIVAN, ESQ., Libby Hoopes Brooks, P.C.,
399 Boylston Street Suite 200, Boston, Massachusetts, 02116,
for the Defendants.

P R O C E E D I N G S

THE CLERK:  The Court calls Civil Action 18-11926, SEC v. Father Lemelson, et al.  Could counsel please identify themselves.

MR. JONES:  Good morning, your Honor.  Marc Jones for the Securities and Exchange Commission.

MR. DAY:  Al Day for the SEC as well, and we have Cole Taylor, Alyssa DiPaolo, and Jesse Tingson.

THE COURT:  Thank you.

MR. BROOKS:  Good morning, your Honor.  Doug Brooks for the defendants.

MR. HOOPES:  Tom Hoopes.

MR. SULLIVAN:  And Brian Sullivan for the defendants.

THE COURT:  I couldn't hear you.  You've got to belt it out now with masks.

MR. SULLIVAN:  Brian Sullivan for the defendants, your Honor.

MR. HOOPES:  And Karen Murphy is in the back.

THE COURT:  Okay.  Let me start off by thanking the paralegals, the unsung heroes of this case.  Ms. Molloy basically sings your praise.  There's a lot of documents, there's a lot going on, and we're going to sit down and try and sort things out right now.  Please be seated.

My primary first-off issue is impanelling a jury.  I asked you to consider the issue -- I think, Mr. Brooks, you

 1    were otherwise occupied -- about whether or not I should screen

 2    out any juror who's unvaccinated.  Right now we do not ask

 3    questions of the jury on whether they are vaccinated or not.

 4            MR. BROOKS:  Yes, we do not want to screen out anybody

 5    regardless of their vaccine status, your Honor.

 6            THE COURT:  Okay.  So the second question will be,

 7    that does affect a lot.  What it affects is our ability to go

 8    to sidebar with the jury during voir dire.  The way I used to

 9    do it back in the good-old days, as in a year and a half ago,

10:09 10    was, you know, if somebody answered positively to any of the

11    questions, we would then have a little sidebar, I'd ask a

12    question, you all could ask follow-up questions.  I'm reluctant

13    to do that because I won't know if they're vaccinated or not,

14    and I don't want to imperil all of you or my staff.  So I think

15    that's not going to work.

16            What we're going to do is probably -- I haven't

17    decided yet what I should do -- actually do a questionnaire

18    that they fill in, and then I take anyone who answers "yes,"

19    have the rest of them wait out there and pull them in one by

10:09 20    one, or just do it by a show of hands.  But now I'm reluctant

21    to imperil, if you will, the other jurors by having them all

22    sit outside in a packed-in kind of setting.  So I'm going to

23    have to think of the logistics of it.  I may -- Maryellen, I

24    think the way Judge Woodlock did it the other day for that

25    trial --

| | |
|---|---|
| 1 | THE CLERK:  So they each had numbers, and they called |
| 2 | them in their seats downstairs, and then they'd go to podium. |
| 3 | THE COURT:  They'd go to the podium.  We keep |
| 4 | everybody in masks throughout the trial in the courtroom.  I |
| 5 | don't see a way around it. |
| 6 | MR. HOOPES:  Your Honor, and just a second, I heard |
| 7 | very good feedback about Judge Woodlock's method.  My only |
| 8 | question to you is, is everybody in masks including the counsel |
| 9 | who is speaking at the time? |
| 10:10 10 | THE COURT:  Well, let me ask about that.  I know all |
| 11 | of you -- well, actually, I haven't talked to Mr. Brooks, but |
| 12 | are all counsel vaccinated? |
| 13 | MR. BROOKS:  Yes, and our client is as well. |
| 14 | MR. JONES:  Yes. |
| 15 | MR. BROOKS:  Father Lemelson. |
| 16 | THE COURT:  Father Lemelson is vaccinated.  And we |
| 17 | don't know about witnesses.  The witnesses for sure will not be |
| 18 | masked.  That's part of the rules.  I was going to suggest that |
| 19 | we could take the masks off if everybody in the room is |
| 10:11 20 | vaccinated, but I don't think I can do that.  But perhaps what |
| 21 | I could do is ask the question, and given what a large |
| 22 | percentage of people are vaccinated in this state, we may just |
| 23 | luck out and be able to have a fully vaccinated group, which |
| 24 | means I'm going to be a lot less uptight. |
| 25 | MR. HOOPES:  Whatever you -- my experience recently is |

         1    twice:  If you're speaking as counsel, you get to take your

         2    mask off.  If you're not speaking, your mask is on.

         3            THE COURT:  Why would you risk yourself if --

         4            MR. HOOPES:  If I'm over there, then -- I'm triple

         5    vaccinated, even though there's breakthrough, but if I'm six

         6    feet away and they're over there, I'm okay.  But that's just

         7    me.

         8            THE COURT:  Well, let me put it this way:  I haven't

         9    thought through that question.  The vote of the court was, it's

10:12   10    my decision with respect to my courtroom.  Out in the main

        11    areas of the court, everyone wears a mask.  I certainly

        12    understand.  I've been through a trial where everyone is

        13    wearing a mask the whole time.  It's horrible.  You just go

        14    crazy.  And at some point the jury is going to want to know if

        15    they can take off their masks in the jury room.  And we may try

        16    and see if there's another courtroom available so they can

        17    spread out a little bit more in the jury room.

        18            Maryellen, I'm told by Jim MacAlear, the Jury

        19    Commissioner, that Judge Stearns did it that way, so I think

10:12   20    we're going to try and do it that way.  But I think I am going

        21    to ask the question during voir dire, "Are you vaccinated?" so

        22    that you can make decisions on peremptories, et cetera.  You

        23    only get a limited number, but that's what it is.

        24            MR. JONES:  Judge, is there any way we could ask the

        25    Court to exercise the Court's discretion to require, over the

1   defendant's objection obviously, to require vaccinated jurors?

2        THE COURT:  I just am reluctant to do that without the

3   agreement.  It's tainted from the get-go.

4        MR. JONES:  I understand there's strategic

5   considerations in every trial, but it is a matter of safety,

6   and also a matter of comfort.  If the jury knows that some of

7   them are vaccinated, some are not, that's a dynamic I don't

8   think any of us want.

9        THE COURT:  We haven't done that as a court.  I'm

10:13 10  completely willing to ask the question, have you exercise

11  peremptories that way.  I'm also more than willing to consider

12  something by agreement, but I'm not going to exclude anyone not

13  by agreement.

14        MR. JONES:  If your Honor is going to ask the

15  question, would your Honor consider throwing in a couple extra

16  peremptories so that we could take that into account as well?

17        THE COURT:  Well, before I get there, though, you only

18  get three a side for eight jurors.  I could consider it if I go

19  to ten jurors.  I was thinking of ten just simply because we're

10:14 20  in COVID time and it's a three-week trial, so if I did, I'd

21  give you four a side.  But I have to tell you, our yield is a

22  lot less.  Just to make it clear on the record that we do send

23  out a questionnaire in advance, and during that, a lot of

24  unvaccinated people say they're nervous about coming in, and

25  they get postponed.  But not everyone tells us.  We don't know.

```
 1    They're getting another questionnaire right beforehand in case

 2    they have any symptoms, so we're doing what we can.  So we'll

 3    do four peremptories a side.

 4         Now, let me just ask, I'm treating all three

 5    defendants as one?

 6         MR. JONES:  Yes, your Honor, and --

 7         THE COURT:  And I didn't see why you had a separate

 8    verdict question with respect to the both of them.  As far as

 9    I'm concerned, Father Lemelson is Lemelson Capital, LLC.  Is he

10    the only member of it or --

11         MR. BROOKS:  Yes.  We don't view any distinction.

12         MR. JONES:  Your Honor, we're happy to treat them as

13    one as well.  I mean, they are individual defendants, so we put

14    two questions because --

15         THE COURT:  Yes, you did, and I didn't know if there's

16    something about their -- we haven't focused on the LLC very

17    much, but he is the LLC, right?

18         MR. BROOKS:  That's correct.  At least for purposes of

19    this case, there's no meaningful distinction.

20         MR. JONES:  His wife owns it, but he controls it.  He

21    is the sole employee.  He's the manager.

22         THE COURT:  What about the fund?  Now, technically,

23    the claim is that he defrauded the investors in the fund, but

24    you're representing the fund for purposes of this, and then

25    we'll have to figure it out?
```

1           MR. BROOKS:  Yeah, I mean, the fund doesn't really, as

2    I understand the SEC's theory, the fund doesn't really come

3    into play during the trial itself.

4           THE COURT:  And so to the extent that we hit the

5    equity phase, maybe they'll get a different lawyer, maybe they

6    won't; is that it?

7           MR. BROOKS:  Yeah, we haven't --

8           THE COURT:  No one has dealt with that yet, okay.

9           MR. JONES:  No, your Honor.  But I agree with

10:16 10    Mr. Brooks.  During the liability phase, the fund is just a

11    third party that we don't need to worry about as a defendant.

12           THE COURT:  So should we read the name of the fund in

13    the header for the case?  When we read the case name, it's the

14    Securities and Exchange Commission versus what?

15           MR. JONES:  Your Honor, I'm happy with not using the

16    name of the defendant --

17           THE COURT:  Just Father Lemelson, period,

18    Father Gregory Lemelson, with an agreement or stipulation that

19    a verdict against him is a verdict against the LLC and the

10:17 20    fund.

21           MR. BROOKS:  Well, I guess not the fund, the LLC.

22           THE COURT:  I guess not the fund, other than for

23    purposes of liability.  And, Mr. Brooks, that flags another

24    issue.  I noticed throughout your pleadings you refer to him as

25    "Father Lemelson."  Is that how you would like me to refer to

1    him?

2           MR. BROOKS:  That's fine because we -- he's

3    professionally and personally referred to as Father Emmanuel,

4    but for the Court's --

5           THE COURT:  Up to you.  Oh, Father Emmanuel?

6           MR. BROOKS:  Father Emmanuel, which is his ordained

7    name, but Father Lemelson, understanding that last names are

8    usually used, is perfectly fine as well.

9           THE COURT:  I'm going to use "Father Gregory

10:17 10   Lemelson."  And I'm going to ask the question that you both

11   agree I should ask:  Is there any bias or prejudice involving

12   the Greek Orthodox religion or someone who is a priest?

13          MR. BROOKS:  Yes.

14          THE COURT:  A priest in the -- is it Greek Orthodox?

15          MR. BROOKS:  He's a Greek Orthodox priest, yes.

16          THE COURT:  Remember, there was some issue about

17   whether it was Albanian Orthodox?  Anyway, Eastern Orthodox

18   religion.  Okay, all right.

19          So, Maryellen, when you read the case, we're not going

10:18 20   to read Lemelson Capital Management, LLC.  Everybody agrees

21   right now, a stipulation that a verdict against Father Lemelson

22   is the same as a verdict against Lemelson Capital, LLC.  Is

23   that correct?

24          MR. JONES:  We agree, your Honor.

25          MR. BROOKS:  That's correct.

1           THE COURT:  Now, I Googled this last night, and I

2     think I know the answer.  When you watch PBS News Hour or NPR,

3     this is a different Lemelson, right?

4           MR. JONES:  Your Honor, yes, this is a different

5     Lemelson than the Lemelson Foundation you hear about on NPR.

6     It would be good to clarify that.  I was going to clarify that

7     on questioning, but it may be good to clarify that on the

8     voir dire as well.

9           THE COURT:  Well, I just wanted to make sure.  I mean,

10:19 10    it's a well-publicized -- what would you call them? -- sponsor

11    of public radio and public TV, so I just want to make sure that

12    it's not the same person or relationship or anything like that.

13          So I don't think there was anything else I wanted to

14    ask about it.

15          All right, I haven't yet figured out what questions to

16    ask, but I'll ask a lot of the questions that you both wanted

17    to know.  I'm not going to ask who reads the Wall Street

18    Journal, but I will focus in on many of the questions; and then

19    at the end of my asking the questions, if there's something you

10:19 20    really feel I missed, I allow you to come up to sidebar, or use

21    the Whisper Tech -- I haven't figured that out yet -- and ask

22    for supplemental questions, speaking of which, have you been

23    educated in Whisper Tech?

24          MR. BROOKS:  We have, your Honor.

25          MR. JONES:  Yes.

```
 1              THE COURT:  It's far from ideal, but it's safe.  So
 2     once I've got a jury and once we're all impaneled, I'm going to
 3     have to talk to Lee Marzilli, my Court Reporter, as well as
 4     Maryellen about comfort levels on side bars.  For sure, I can't
 5     expose them if we don't know whether a juror is vaccinated or
 6     not.  But, anyway, we will have to just discuss it.  But
 7     because, one, it's my practice, and, two, because I want to
 8     minimize sidebars, I'm hoping we'll meet every morning at 8:30
 9     and go through any exhibits for the day that might be contested
10:20 10   so that we'll minimize the number of sidebars.
11              Okay, so I thought we'd now just jump in, unless
12     somebody has another question, on the motions in limine.  Is
13     there anything else, like, on the impanelment piece of it?  No.
14     But let me ask a threshold question:  Is this a definite trial?
15     You've briefed it as if it is.
16              MR. BROOKS:  Yes, your Honor, it is.
17              MR. JONES:  We think so too, your Honor.
18              THE COURT:  Okay.  I'm almost positive, subject to
19     Murphy's law, that this will impanel on the time and at the
10:21 20   spot that we talked about.  I think we're the first one up, the
21     second one up.
22              THE CLERK:  Judge Sorokin is first.
23              THE COURT:  Is it civil or criminal?
24              THE CLERK:  It's a civil, and it's going, I believe.
25     I checked the docket yesterday.  It's against the City of
```

1    Boston Police.

2         THE COURT:  A police case against the City of Boston.

3    Judge Sorokin is before us.  It's hard to believe it's older,

4    but it is, so this must be right up there.

5         All right, let's just start going through the

6    various -- oh, another threshold issue:  Are there summary

7    charts?  I got confused by these motions in limine.  Are there

8    going to be charts, and have you sent them over?

9         MR. DAY:  Yes, your Honor.  Yesterday, pursuant to

10:22 10   your order, we sent the draft summary charts and the underlying

11   data to the defense.  We haven't had a chance to meet and

12   confer about it yet, but I think what we sent does cover what

13   was ordered in --

14        THE COURT:  Yes, you cited correctly 1006.  That also

15   says it should be produced in advance in a reasonable time.  I

16   don't know what they are.  Let me ask you, have you had a

17   chance even to review them yet?

18        MR. BROOKS:  We had a chance.  I think the charts was

19   six pages and the spreadsheets is, like, thousands of entries,

10:22 20   I'm not sure, so obviously we didn't get to review that piece

21   of it.

22        THE COURT:  I don't want to deal with it on the first

23   day of trial.  When do you think that you might have a chance

24   to spend time with it?

25        MR. BROOKS:  Well, I would think over the next couple

1    of days.  I think our -- you know, we have objections for

2    different reasons that we can address today, but in terms of

3    whether or not we actually take issue -- you know, we think the

4    numbers are wrong or something -- I guess we can get back to

5    the SEC on that early next week depending --

6         THE COURT:  I know, but it's got to be early because

7    they've got to be able to fix it, or I need to be able to rule

8    on it.

9         MR. BROOKS:  Yes.

10:23 10        MR. JONES:  And on that, your Honor, I think a couple

11   of things.  One, if we got the witness the first day -- and we

12   think it will be the first day because the SEC's summary

13   witness will be the SEC's first witness -- and then definitely

14   we're going to put in the charts because we think those are

15   fundamental to understand what's going on as sort of a prologue

16   kind of issue.  But also --

17        THE COURT:  Can I just say, you waited so long to

18   produce the summary charts, the day activity, not the other

19   activity but within the day activity, if I have a problem with

10:23 20   it and I can't rule, I don't know what to do.  I guess what

21   we'll have to do is have you have another backup witness or

22   come back to it.

23        MR. JONES:  I understand, your Honor, although I would

24   say that these charts are substantially the same as charts that

25   were produced earlier.  They've had some information stripped

1    out and the like, but I don't think there's a lot of surprise

2    about the unit day prices.  Unit day prices were in the expert

3    reports.  Even these pricing charts have been out for --

4           THE COURT:  So they've had these specific charts or

5    close to them?

6           MR. JONES:  We've taken out stuff that shouldn't go in

7    front of the jury, but in terms of the stock price minute by

8    minute on the day that we produced, I think those are all

9    produced along with the expert report.

10:24 10           MR. DAY:  Yes.

11           THE COURT:  Oh, they're already produced.  Why didn't

12   you say that in the opposition, "We just did it in the expert

13   report"?  It would have helped me a lot.

14           MR. SULLIVAN:  I think there's two things at issue

15   here, your Honor.  As I said, the six pages of charts were

16   virtually similar.  It's whatever, how many gigabytes, but

17   however much data there is, that we hadn't seen.

18           THE COURT:  I'm unlikely to allow that to go in.

19           MR. SULLIVAN:  I'm sorry.  What?

10:25 20           THE COURT:  I am unlikely to allow 30 gigabytes of

21   intraday trading to go into the record.  It would confuse the

22   jury, me, and be --

23           MR. SULLIVAN:  Right.  I was confused last night, I

24   know that.  But I can say, your Honor -- I don't know if you

25   want to launch into this now -- the point about it being

```
 1    previously discoverable is actually one of our issues

 2    because -- that's one of our motions in limine, that what

 3    they've done is they've taken -- and everybody acknowledges, I

 4    think, that they cannot use their witness as an expert because

 5    she was originally designated as a rebuttal witness, and it's

 6    black letter law that they're not allowed to --

 7              THE COURT:  Yes, yes, yes.  They're not asking that.

 8              MR. SULLIVAN:  Right, except what they're doing is,

 9    they're using the same witness --

10              THE COURT:  Can we get to that when we get to that?

11              MR. SULLIVAN:  Yes.

12              THE COURT:  Just you had it, and there was no unfair

13    surprise.  And, also, the way we had talked about -- maybe I

14    just read them too quickly because so much came in -- I hadn't

15    understood you had already had deposition testimony about

16    intraday trading.

17              MR. SULLIVAN:  We did not depose this witness.

18              THE COURT:  Well, what were you referring to, an

19    expert report?

20              MR. DAY:  An expert report.

21              THE COURT:  Okay.

22              MR. SULLIVAN:  So --

23              THE COURT:  So you knew it was going to be in play,

24    and so --

25              MR. SULLIVAN:  No, we didn't -- and maybe I'm jumping
```

1   ahead again -- we didn't think it was going to be in play

2   because it's an expert thing and --

3           THE COURT:  But it's not like you found out about it

4   this week, so I --

5           MR. SULLIVAN:  That's correct, your Honor.

6           THE COURT:  All right, so, you know, I understand the

7   SEC not only has this whole team here, but also folks in D.C.,

8   they have better staffing than you do and deal with these

9   intraday numbers probably more than you do.  That said, it's

10:26 10  part of their case, so if you knew about it, even through a

11  rebuttal, it's not unfair surprise.  So, anyway, okay.  So

12  that's going to be my touchstone, unfair surprise.

13          Motion in limine -- this is Docket No. 159 -- motion

14  in limine to exclude evidence and arguments about rejected

15  selective enforcement defense.  As I understand it, you agree

16  with that.

17          MR. HOOPES:  We don't agree to the motion.  We agree

18  nothing about selective enforcement, yes.  Everything else, in

19  other words, there's pieces of evidence that could go to one or

10:27 20  could go to the other, so --

21          THE COURT:  Right, but let me just more generally say,

22  of course I ruled as a matter of law selective enforcement,

23  there wasn't an iota of information, as far as I was concerned,

24  about selective enforcement based on the SEC's part, and I'll

25  exclude evidence of bad faith on the SEC's part for selective

1    enforcement.

2            I do not necessarily hold the same position that the

3    SEC does with respect to Ligand's motive.  That's a different

4    issue about the motive of Ligand, and I'm not dealing with that

5    and ruling on this motion.  There should be no argument

6    regarding exhibits that go only to the issue of selective

7    enforcement.

8            MR. HOOPES:  Understood, your Honor.

9            THE COURT:  All right, so that's that.

10:28 10          MR. JONES:  Your Honor, may I ask a couple of

11   questions on that?  In terms of the Commission's 30(b)(6)

12   witness, your Honor granted the 30(b)(6) witness over our

13   motion for a protective order to allow the defense to learn the

14   facts about that selective enforcement.  That was the point of

15   the 30(b)(6) witness, and yet a lot of their testimony is being

16   proffered by the defendants -- by the defendant now -- on a

17   deposition transcript.  They say that --

18           THE COURT:  I have no idea what you're talking about.

19   Like what?

10:29 20          MR. JONES:  Like, what were the meetings all about?

21   You know, was Ligand's attorney somehow influencing the SEC?

22           THE COURT:  Right, and I will exclude that.  But what

23   I won't exclude is, I do think, going to the motive and the

24   bias of the Ligand witnesses, there are some questions that

25   have some overlap.  So it goes to the motive of a witness or

1      the bias of a witness; and Ligand's president and CEO are some

2      of the people who are testifying, and they can ask about

3      certain things.  Like, you didn't think it was material enough

4      to put in the comments about Viking?  So I think that's fair

5      game, and that has some overlap if it was presented to the SEC.

6      So I will take it with that prism.  If it's only going to the

7      bad faith of the SEC, the alleged bad faith of the SEC somehow,

8      it's excluded, and hopefully that will exclude the 70 exhibits

9      on point.  The SEC claims there are close to 70 exhibits that

10:30  10     go to the issue of the bad faith of the SEC.

11           MR. HOOPES:  There's 70 exhibits that go to executive

12     compensation, your Honor.  The summary chart -- I mean, I don't

13     think there's any question that financial compensation is an

14     area for bias under the case law.

15           MR. JONES:  Your Honor, just in terms of the bias

16     under the case law, the cases that are cited by the defense are

17     when a witness has an interest in the outcome of the case.

18     That's not the case here.  The evidence that's being

19     proffered --

10:30  20           THE COURT:  Can I just get to that when I get to that?

21     Right now I'm dealing with selective enforcement.  There will

22     be no argument or exhibits, the only relevance of which is

23     selective enforcement.  Some of it may come in with respect to

24     the bias or the state of Ligand.

25           MR. HOOPES:  If I may, your Honor, the mirror image of

```
 1   159 is 184, and they work together.  In other words, 184 filed

 2   by the SEC is a motion to exclude --

 3            THE COURT:  Can I just -- I'm just a very sequential

 4   person.

 5            MR. HOOPES:  I apologize.  I was trying to be helpful.

 6            THE COURT:  Not to scare you all, but this is what I

 7   got within the last three days, so I'm trying to do a quick

 8   catch-up.  And I was in court all yesterday with a preliminary

 9   injunction hearing, so I'm catching up.

10:31 10       Okay, so No. 160, plaintiff's motion in limine to

11   exclude evidence or arguments about any alleged adverse

12   consequences for the defendant.

13            MR. HOOPES:  Yes, your Honor.

14            THE COURT:  So like what?

15            MR. HOOPES:  Well, in this case --

16            THE COURT:  You said you weren't going to do that

17   anyway, right?

18            MR. HOOPES:  Not as to selective enforcement, but as

19   to the issue of, in this case Ligand made a decision they

10:31 20   weren't going to speak publicly, they weren't going to bring

21   their own private suit; and instead they wanted to go the route

22   of pressuring, as they said, lean on the SEC in order to get

23   for them what is essentially a death penalty.  In fact, the

24   email that I --

25            THE COURT:  So what you want to put in is --
```

```
 1            MR. HOOPES:  On bias, adverse consequences going to
 2   the issue of bias.  In other words --
 3            THE COURT:  I thought you responded and said you
 4   weren't going to put in anything about the adverse consequences.
 5            MR. HOOPES:  No, I don't believe.  I apologize, your
 6   Honor.  I think what we said in the first part was, we weren't
 7   going to go into selective enforcement for the purpose of bias
 8   of Ligand.  That would be about halfway through the motion of
 9   the opposition --
10:32 10          THE COURT:  I may have read it.  In any event, what do
11   you want to put in?
12            MR. HOOPES:  For the purpose of the issue of --
13            THE COURT:  I honestly don't even myself know what the
14   adverse consequences are, so it would be a little hard -- it's
15   not like it's a sentencing where I know ultimately he's facing
16   a statutory maximum of X or the mandatory minimum of Y.  So I
17   actually don't know what I will do.
18            MR. HOOPES:  Right, it's not an option when you speak
19   publicly like Facebook did last week when they had choices --
10:33 20          THE COURT:  It's fine to ask Ligand, "What were you
21   hoping for when you went to the SEC?"
22            MR. HOOPES:  Yeah, well, "Did any one of your
23   employees say you have to be silent?"  I mean, the bias
24   questions, only as to bias.
25            MR. JONES:  Your Honor, those questions are not the
```

1    subject of this motion.  The subject of this motion is whether

2    you can ask something like, "And you knew that the SEC could

3    impose a penalty up to X amount of dollars, and you knew that

4    the SEC could impose an injunction --"

5            THE COURT:  What's wrong with that?

6            MR. JONES:  Well, it's the same reason that adverse

7    consequences are excluded:  It's an appeal to the sympathy of

8    the juror.  It's like saying, your Honor, to a complaining

9    witness, "You knew that the defendant could get 15 to 20 in the

10:33 10  state penitentiary, and that's why you went to the police?"

11   And that's regularly excluded because it's an appeal to a --

12           THE COURT:  In a criminal case.

13           MR. JONES:  Here, this is not a criminal case

14   obviously, your Honor --

15           THE COURT:  Although it does come up a fair amount

16   with people in plea agreements and whether or not a cooperating

17   witness did X, Y, Z because they were trying to get out of a

18   tough man-min.

19           MR. JONES:  Sure, but that's not the situation we have

10:34 20  here.  We don't have an incentive to lie to get a plea

21   agreement.  What we have is an attempted argument to say, "You

22   went to the SEC," and to squeeze in the idea that there could

23   be an industry bar for Father Lemelson, or there could be a

24   penalty for Father Lemelson, or a disgorgement award.  And

25   we're telling the jury not to consider any of that.  It doesn't

1    go to bias.  There's no bias argument that says, "Well, you

2    knew that there was a potential penalty here, and therefore

3    you're biased."  That's a non sequitur.

4          THE COURT:  I will allow questions of Ligand about

5    what they did vis-a-vis the SEC, but it's not going to be a

6    long line of questioning.

7          MR. HOOPES:  I understand.

8          THE COURT:  "And you understood you could get an

9    injunction in damages in front of the SEC?" period, move on.

10:35 10          MR. HOOPES:  I understand, your Honor.

11          THE COURT:  So this is allowed subject to motive of

12   Ligand.  None of this is about the motive of the SEC.

13          MR. HOOPES:  No, just to be crystal clear, the --

14          THE COURT:  Motion in limine to exclude evidence or

15   argument that the statements challenged in the complaint were

16   opinions.  I actually find this to be one of the hardest ones.

17   I didn't actually rule on this.  In particular, there are

18   certain things that are clearly facts:  What did Mr. Locke say

19   or he didn't say?  What does it say about audited statements

10:35 20   versus unaudited?  The first three of them do not appear to be

21   opinion.

22          The one that I have consistently been stuck on is

23   insolvency, which may well be a opinion.  Opinions can be

24   actionable if they imply facts.  We all know that.  And so

25   neither of you have given me expert testimony, and

1    unfortunately we've been researching ourselves because we got

2    no guidance on what the bankruptcy laws say because it says

3    that there's a specter of bankruptcy in one of the headlines.

4         So the Bankruptcy Code actually does a basic balancing

5    test, which is assets versus liabilities, but leaves a little

6    vague what I should do about intangible assets.  So I think

7    that there are different tests for insolvency, and I think that

8    this may be one where there's a dispute of the underlying facts

9    as to whether or not it was an opinion or a fact.  I have

10:37 10   consistently dodged that question because I felt I didn't get

11   enough information from attorneys on either side.

12        We've done some of our own research at this point, and

13   some of the questions that Mr. Day put forward I think for some

14   of the witnesses struck me that you'd be asking an opinion from

15   the president of Ligand about whether he was insolvent or not.

16   I would assume that Mr. Lemelson will say, "It was my

17   good-faith opinion based on X, Y, Z," and I'll leave it to a

18   jury as to whether or not it was based on improper facts and

19   misleading facts.  I will allow that argument on insolvency

10:37 20   based on what I know now.  I could change my mind later by the

21   time I get to directed verdict or jury instructions.

22        MR. BROOKS:  Your Honor, can I ask for clarification

23   on that one?  They don't have an expert, and I thought you just

24   said correctly that they plan to ask opinion questions.

25        THE COURT:  I'm going to get to that.

            1          MR. BROOKS:  Okay.

            2          THE COURT:  I'm going to get to that.  Obviously

            3   there's no evidence that I have seen that Ligand was unable to

            4   pay its debts.  If you look it up in Black's Law Dictionary,

            5   one of the definitions is inability to pay your debt.  There's

            6   absolutely no evidence in the record that there was an

            7   inability to pay Ligand's debt.  However, another one is the

            8   balance sheet rule and how do you measure intangibles?  And as

            9   I understand it, different places have different rules on that.

    10:38  10          MR. JONES:  Your Honor, if I may, Mr. Lemelson said on

           11   the Internet radio show what he meant by insolvency:  "That's

           12   my inability to pay the debts."  That's what we're talking

           13   about.

           14          THE COURT:  No.  He also says debt to tangible equity.

           15          MR. JONES:  Your Honor, it's like saying essentially,

           16   "This person is broke because they have a nice car."  That

           17   doesn't prove anything.  The statement "Ligand is insolvent,"

           18   it's either true or not true.

           19          THE COURT:  That's not accurate, okay?  Now, because I

    10:39  20   expected to get expert testimony on this, I am in the

           21   unfortunate position of just looking at the Bankruptcy Code and

           22   some cases, et cetera, and Black's Law Dictionary, and I even

           23   had an intern going through the way different companies value

           24   intangible assets.  I've gotten almost no help on this issue,

           25   and I'm not prepared to rule on it right now.  But I'm also not

1    prepared to say they aren't able to put in testimony on point.

2    So I will defer on that issue till I hit, A, directed verdict,

3    and, B, my jury instructions.

4         So the motion in limine to exclude evidence or

5    arguments that the statements challenged were opinions is

6    denied, particularly with respect to the insolvency issue.

7         MR. JONES:  Is it just with respect to the insolvency

8    issue or --

9         THE COURT:  I don't know how you say it, whether

10:40 10   Mr. Locke did or did not say something.

11        MR. SULLIVAN:  Well, your Honor, I thought because of

12   the way it was said on the first -- I think there are two

13   buckets.  There's a second, third, and fourth, and then there's

14   the first.  So the one on Mr. Voss, we understood from the

15   summary judgment you specifically said, because we argued that

16   it should be dismissed as a matter of law, and you said, at

17   this point it may be construed as a fact, "may."  I think

18   there's a lot of opinion in that statement.  He says, "Look, he

19   basically agreed," and then if you listen to the rest of it --

10:41 20        THE COURT:  I think what you're talking about goes to

21   his good faith.  The fact is what he did.

22        MR. SULLIVAN:  Well --

23        THE COURT:  Excuse me.  I cannot rule at this point.

24   You can't argue it's First Amendment protected if he lied about

25   what Mr. Voss did or didn't do.  It's just not protected if

1    it's a misstatement of fact.  So if he mistakenly understood

2    silence for something, then it goes to his good faith.  I mean,

3    you can talk about it -- God, that's like a major big deal,

4    that particular comment -- and introduce all the evidence you

5    want on the point; but whether or not it goes to good faith or

6    opinion I'm reserving on.

7            MR. BROOKS:  Okay.  If I could just be heard on the

8    two Viking statements, this is the case law we cited in our

9    opposition to their motion in limine, your Honor, and it's the

10:41  10   First Circuit talking about, the opinion versus fact thing

11   isn't what controls the First Amendment.  In cases like this

12   where it's based on one of these reports, there's a steady line

13   of First Circuit cases; and they say what the crucial

14   distinction is, is whether the reader understands that the

15   person is saying something that only that person knows or

16   whether the reader understands that "I get where

17   Father Lemelson is getting his information, and I'm free, I'm

18   free to go look at it."  It doesn't matter whether fact

19   opinion --

10:42  20   THE COURT:  What about there's a banner headline:

21   "Giant gold specter of bankruptcy"?  It does take your going

22   down along with the small print and the link to get to the

23   "This is how I measured it."  I don't know what I'm going to

24   do.  I'm not ruling on it.

25           MR. BROOKS:  I'm talking about the two Viking ones,

1   your Honor, because he specifically, and this is what is the

2   *Phantom Touring* case, it's *Riley v. Harr* --

3          THE COURT:  I have not looked at those yet.  I got

4   them last night.

5          MR. BROOKS:  Yes.  Your Honor, they are --

6          THE COURT:  I'm not ruling on this.

7          MR. BROOKS:  Oh, you're not ruling.  Sorry, your

8   Honor.

9          THE COURT:  But I'm saying, at the very least,

10:43 10  insolvency will be considered a mixed fact/opinion kind of

11  thing.

12         MR. BROOKS:  Thank you, your Honor.

13         MR. JONES:  Does that mean the defendants can open

14  these arguments or --

15         THE COURT:  I'm not going to control at this point

16  opinions, particularly with respect to insolvency.  I think it

17  would be smarter, in case I end up instructing against you, to

18  talk about motive and his belief, good-faith belief, because

19  the reality is, he was flat-out wrong about Viking being

10:43 20  audited, and it was a mis- -- it says it in there.  And you'll

21  probably say, yeah, he just flat out assumed that (Inaudible)

22  and seen that they were actually audited.  It's not a question

23  of whether it's an opinion or not.  It's they were audited.  Am

24  I right, they were audited?

25         MR. BROOKS:  I don't think we agree.  It was a

1   combination of audited and unaudited financials.  And then it

2   comes in, if you see something that's both, does that mean it's

3   audited or not?  To us, that's an opinion because they were --

4           THE COURT:  I'll hear him.  Let's see how the jury

5   deals with that.  But, in any event, it may go to good faith,

6   "This is what I thought," and that sort of thing.  So I'm

7   deferring on the motion in limine to exclude evidence or

8   argument that the statements challenged were opinions,

9   particularly with respect to the insolvency.  We will look at

10:44 10  those cases.  There it is.

11          Motion in limine to exclude argument that the

12  Commission must prove investor reliance, you're not going to do

13  that, right?  That's allowed.  You can discuss materiality, but

14  that's different than reliance.

15          MR. BROOKS:  Yes.  So the only issue we have on that

16  one was their proposed jury instructions.  I don't know if

17  you want --

18          THE COURT:  All right, I'm just allowing that you

19  cannot argue in your opening statement that they can't prove

10:44 20  investor reliance, and you can't put in a lack of evidence on

21  that because they don't have to prove it.  What they do have to

22  prove is materiality, which is a question of fact, which I

23  don't even understand how different they are; but one is, you

24  don't have to prove reliance, and one is, you just have to

25  prove it would be important to the typical investor.

1          MR. JONES:  Your Honor, the one thing I'm concerned

2     about here is that the defendant in his brief argues, well,

3     this is some sort of fraud on the market.  So to show

4     materiality, we're not going to argue reliance, but to show

5     materiality, you have to show the stock price.

6          THE COURT:  I think they can show lack of evidence of

7     stock price.

8          MR. JONES:  But there's two things.  One is whether or

9     not they can argue that the lack of stock price moving is

10:45 10     somehow dispositive, and it's not.  Your Honor ruled that

11     already.

12          THE COURT:  They can't.  They've already agreed

13     they're not going to do that.  They're not going to argue

14     investor reliance.  To the extent they want to argue the lack

15     of stock price movement shows lack of materiality, I think they

16     have freedom to do that.

17          MR. JONES:  And that's why, your Honor, we asked for

18     the jury instructions because --

19          THE COURT:  I'm not going to jury instructions.  I

10:46 20     haven't even read those yet.

21          MR. JONES:  But, your Honor, I'm just talking about

22     essentially an "at the time the evidence comes in" instruction.

23          THE COURT:  I don't know, maybe if you want a curative

24     instruction, but it would be a balanced one:  "They don't have

25     to prove investor reliance, but they do have to show that it

          1    was material."  I won't be devising jury instructions until
          2    week two, I guaranty it.
          3         MR. JONES:  It's actually in the motion that your
          4    Honor is considering now.  It's Page 3 or 4 of the motion where
          5    we have proposed essentially what we consider to be a balanced
          6    essentially curative instruction to say, "You can consider it
          7    for this reason.  You can't consider it for that reason," and
          8    we'd just ask your Honor to take a look at that and consider
          9    it.
10:46    10         THE COURT:  Maybe.  I don't know.  Okay, but they
         11    cannot argue that you have to prove it, but you can argue that
         12    a lack of it shows a lack of materiality, so that's how I'll
         13    limit you.
         14         On your summary witnesses, there was a motion to
         15    exclude them.  You put forth evidence that they were disclosed
         16    during discovery; is that right, Mr. Day?
         17         MR. DAY:  Are you referring to the two investor
         18    witnesses?
         19         THE COURT:  Yes, you're right.
10:47    20         MR. DAY:  Yes.  These witnesses were well-known third
         21    parties at exactly the same time in discovery, which was during
         22    depositions of Ligand personnel who were questioned by
         23    defendants about investors who had contacted the company with
         24    concerns about Father Lemelson's reports.  Both names, Joe
         25    Frohna and Bob Fields, came out in those depositions.  And then

1    in a subsequent deposition, a document specific to Mr. Fields

2    was introduced in the deposition by defense counsel, and Tom

3    Pettingill, another Ligand employee, testified about his

4    knowledge of Mr. Fields.  So both parties knew about these

5    individuals.  Investor reaction to Father Lemelson's statements

6    has been an issue throughout this case because it goes to

7    materiality.

8         THE COURT:  Well, let me ask you this:  Were the names

9    disclosed during depositions and in documents?

10:48  10        MR. SULLIVAN:  They were, your Honor.  However, as far

11    as the document production, Joseph Frohna does not show up once

12    in the entire data base of over a hundred thousand documents.

13        THE COURT:  Well, let me ask you this.  There are two

14    different issues here.  One is, it's true that they weren't

15    initially disclosed as part of disclosures, but that's not the

16    test.  The test is -- I keep going back to unfair surprise --

17    if they were disclosed during the -- not just, like, one needle

18    in a haystack but also during the depositions, I think there's

19    no unfair surprise.

10:48  20        MR. SULLIVAN:  I mean, the depositions, I mean, there

21    is literally one document that we show because there is, you

22    know, one discussion with some of these Ligand people, and it

23    just happens to mention, you know, one particular investor, but

24    that doesn't -- that is not adequate notice for us to have then

25    anticipated, when they didn't even disclose Ligand investors as

```
 1    a category, of what witnesses they were going to put forward in
 2    any of their --
 3         THE COURT:  They're normally disclosed during
 4    discovery, during the depositions, both of them, right, as well
 5    as in the documents?  I won't allow them to put forward any
 6    documents that weren't produced, so no documents that weren't
 7    produced, no testimony, you know, like, that goes afield from
 8    what was discussed during the depositions.  I mean, what's the
 9    gist of it?  (Inaudible) and we were concerned?
10    10:49    MR. DAY:  Very, very narrow testimony about their
11    reaction of the two investor witnesses' reaction to
12    Father Lemelson's report.
13         THE COURT:  And what companies are they in?
14         MR. DAY:  Cardinal Capital and 1492 Capital, two
15    institutional investors.
16         THE COURT:  They asked about those companies?
17         MR. JONES:  I believe we put them on our list of
18    (Inaudible), your Honor.
19         THE COURT:  And what about -- I'm sorry, I've diverted
20    10:50    here.  Why did you ask me to ask about GlaxoSmithKline?
21         MR. DAY:  GlaxoSmithKline was the partner with Ligand
22    at the relevant time in 2014.
23         THE COURT:  So if someone had stock in Glaxo, it would
24    exclude them?
25         MR. DAY:  I mean, eventually, so in an abundance of
```

1    caution, we thought it was worth asking about.

2            THE COURT:  All right, anything else on this topic?

3            MR. SULLIVAN:  Your Honor, if the testimony is going

4    to be limited to what was discussed at the deposition, it's

5    literally three lines.  The same question was asked of the four

6    witnesses.  It was a general question of, you know -- in one

7    context it was, you know, "Did you ever discuss with investors

8    various elements of the report?" and it's like, "Yeah, I have a

9    vague memory --"

10:51 10            THE COURT:  The investor can say what he said.

11            MR. SULLIVAN:  Excuse me, your Honor?

12            THE COURT:  The investor can say what he said.

13            MR. SULLIVAN:  It's just a lack of notice, your Honor.

14    There's literally eighteen --

15            THE COURT:  -- what they're going to say?

16            MR. DAY:  Yes, we can do that, your Honor.

17            THE COURT:  So it's not a surprise so you can cross,

18    okay?

19            MR. SULLIVAN:  Thank you, your Honor.

10:51 20            THE COURT:  I have an unopposed motion to permit

21    witnesses to appear virtually, and I think we can accomplish

22    that.  I'm not sure we can accomplish letting your team from

23    the SEC watch from Washington.  I'm not sure that that's

24    doable.  You may have to fly them up.  It's a lovely time of

25    year in Boston.  But, of course, we can Zoom them in if a

1   witness isn't testifying virtually.  But our biggest problem is
2   that there are so many disputed exhibits, how to present them
3   to the witnesses in California.  We can't use the screens, and
4   so we need a witness book for each of the -- it's a lot of work
5   for you paralegals -- I know you're terrific -- there's going
6   to have to be a separate exhibit book for each virtual witness,
7   which will have to include contested exhibits.  I don't know
8   any other way to do it, unless you had maybe one exhibit book
9   where it says "contested exhibits" -- I mean, it would be too
10:52 10  obvious -- and I would just say, "Do not flip to any document
11  unless I tell you to," and we'll be sitting here watching them.
12  But realistically I'm going to rule on those in the morning.  I
13  just don't see how you can adjust your binders that quickly.
14  So I think that's the way to do it is that one exhibit -- you
15  have five witnesses?  Is that what we're talking about?
16          MR. JONES:  It's actually I think going to be three,
17  your Honor, and they are not document-intensive witnesses.
18  These are the two auditor witnesses who are basically going to
19  say, "Yes, we were there.  We audited --"
10:53 20          THE COURT:  For Viking?
21          MR. JONES:  Viking and Ligand as well.  That's the two
22  different auditors, two different companies, and then
23  Mr. Frohna.  None of those witnesses are very document-intensive,
24  at least on our side, and I don't think on the other side.
25          THE COURT:  Why don't you try and work out as best you

```
 1   can all the exhibits on the virtual.  Maryellen and I were

 2   talking at length on how to deal with the objected-to exhibits,

 3   and I think you could either have two separate binders, but

 4   then that flags for the jury there's a difference between them.

 5   What I've done in many criminal cases, even though there's

 6   going to be a challenge to just portions of a wiretap, it's

 7   just in a different tab, and you say, "Don't turn to that tab,

 8   any tab until I tell you to."  And we're going to be watching

 9   them, so we won't send anything into the jury room with them
10   that has a contested exhibit.  So I think that's our best bet.
11   And similarly with the witness, they have both contested and
12   uncontested exhibits.  It doesn't matter to them, but it does
13   matter for the jury.

14           MR. JONES:  And Ms. Molloy has been great and very
15   involved in this, and we're going to get together, and I think
16   for these witnesses, we can really come to some --

17           THE COURT:  My hope is that a bunch of these exhibits
18   can go out anyway because I'm not going to rule on 350 exhibits.
19   It's not feasible.  It's not feasible.

20           MR. JONES:  Yes.

21           THE COURT:  So I allow the motion to permit witnesses
22   to appear virtually.

23           And now I'm jumping over to the requested verdict
24   form.  I can get to that later, but I did have a question for
25   the SEC.  Sometimes -- as you say, you're not going to have a
```

1    separate question for Lemelson Capital Management LLC.  There

2    are two separate counts.  I had a question.  Have either of you

3    asked me to go -- this is primarily about four false

4    statements, opinions, whatever, four items.  Should I ask about

5    each item?  I know it's a scheme liability case.

6              MR. JONES:  Your Honor, we think not, and here's why.

7    There's a few reasons why not.  Because there is scheme and

8    because the jury can find on scheme, to ask them about all four

9    and then ask them about scheme, now you're getting into

10:55 10   multiple questions you'd have to ask twice.

11             THE COURT:  As a matter of law, could they find scheme

12   if they found all four --

13             MR. JONES:  Yes, your Honor.  Actually, there is case

14   law in the First Circuit that says -- this is the brute facts

15   theory of a scheme, that the jury does not need to be

16   specifically unanimous on the brute facts of a scheme.  They

17   can have different ideas about a scheme, and so --

18             THE COURT:  I know, but I can't have them all

19   speculating.

10:55 20             MR. JONES:  No.  That's why I think a specific

21   instruction -- not a specific but an instruction that they all

22   have to be unanimous.  They don't need a separate instruction

23   they all need to be unanimous about a particular statement.

24   You know, they can follow the regular unanimity instruction.

25   Then we don't have to get into explaining, well, this is the

law, brute facts, and this.  You know, you just have to agree
there was a scheme, but over here you have to decide -- it
starts to become very confusing very quickly.  We tried it.  It
starts to become really confusing when you try to say, well,
you don't have to be specifically unanimous here, but you do
have to be specifically unanimous there but not here.  And just
to ask them about each of the four statements, there's no need.

THE COURT:  It's clear there was a scheme here.  He
would say that.  He thought it was a lousy stock, and he was
trading short on it.  But that doesn't make him liable.  It's
only if he does something intentionally false and misleading.
I forget what the exact words are.  So I need to make sure
they're not hooking it to the fact that he's just engaged in a
negative to drive the stock down because if you think it's a
lousy stock and you're telling the truth about it, that's not
a --

MR. JONES:  We agree, your Honor, and in both -- well,
particularly in the Exchange Act, in 10(b)(5), that's where the
intent comes in.  You have to have the scienter or recklessness.
You have to have the intent to defraud, deceive, or manipulate.
So if you're just engaged in a good-faith, honest, you know,
attempt to drive the stock down through great analysis, that's
not an attempt to defraud; and it's covered there with the
recklessness, a reckless disregard for the truth, and it seems
like it's departing from the standard of ordinary care.  That's

1    also not --

2         THE COURT:  -- one thing, at least one thing that's

3    deceptive, so if they came back with four that were all true --

4    you didn't ask for it either, the defense didn't.  I was just

5    curious.  When I was thinking in my mind how I would sketch out

6    a verdict form, I was thinking of --

7         MR. HOOPES:  Your Honor, we didn't, and --

8         THE COURT:  Can you all think about that?

9         MR. HOOPES:  Yes.  Thank you.

10:58 10        THE COURT:  I'm not going to rule on it, but I --

11        MR. JONES:  I would say, your Honor, because there is

12   the scheme part and because there's 10(b)(5)(A) and (C) where

13   they don't have to be specifically unanimous about any one of

14   the statements, but there's 10(b)(5)(B) where conceivably you

15   do, that starts to get into a real issue.

16        THE COURT:  Would you think about it?  Think about

17   that issue.  I'm not sure what to do if they say that all four

18   statements are true.  Maybe it's just a jury instruction:  "If

19   you find all four statements were true, you need to return a

10:58 20   'not liable' verdict," and maybe that's the way to do it.

21   Anyway, think about it.  It was a question I had.  Neither of

22   you asked for it.  It was how, when I was thinking through as I

23   do in the beginning, how do I make this manageable to a jury, I

24   was actually thinking about just asking about the four

25   statements.  And then I could rule more easily on a directed

1   verdict, for example.  For example, if they found that all four

2   were false -- I don't care so much about insolvency.  The Voss

3   thing in and of itself could carry it.  In any event, just

4   think about it.

5         I will say, on the verdict slip for the defendants as

6   well, you had a separate question on the LLC.  I'm assuming you

7   all -- is there was a stipulation we don't need that?

8         MR. BROOKS:  Correct.  Thank you, your Honor.

9         THE COURT:  All right.  So, now, I think moving into

11:00 10   the defendants, so let me just go through them because many of

11   these, even though I limited the number of motions in limine,

12   have many subparts.  So were you planning, SEC, on putting in

13   any data regarding The Amvona Fund at this stage, not the

14   equity stage but on this stage?

15         MR. DAY:  Are you referring to the events of 2020?

16         THE COURT:  Yes.

17         MR. DAY:  Okay, not affirmatively.  We don't intend to

18   bring that up in our case in chief as, you know, evidence that

19   goes towards the false statements or the scheme, but we want to

11:01 20   reserve our right to bring it up in rebuttal or as impeachment.

21         THE COURT:  What is the issue?  I mean, let me just

22   start from basics here.  So something happened in 2020.  The

23   events in question with us is 2014.  Why would it ever be

24   relevant?

25         MR. DAY:  I think there are two obvious reasons, but

1   there could be others.  The first is that Father Lemelson has

2   claimed that a fund in leverage, you know, trading on borrowed

3   money essentially, wasn't a big deal back in 2014.  2020,

4   leverage of his funds hit again, a complete loss.  So I don't

5   think it's credible --

6           THE COURT:  Why is it important to this case?  It

7   could be confusing to the jury.

8           MR. DAY:  We may put on evidence -- we haven't decided

9   yet, but we may put on evidence related to the amount of

11:01 10  leverage that the fund had in 2014 as motive, so it essentially

11  goes to scienter to engage in the conduct to avoid having the

12  kind of problem that he had in 2020.

13          THE COURT:  You could ask about that.  You can ask

14  about 2014 all you want as a motive for why he's doing it, but

15  just stay away from the 2020.

16          MR. DAY:  Okay.  Second reason that it may come up is,

17  Father Lemelson historically has touted his prowess as a hedge

18  fund manager.

19          THE COURT:  I couldn't hear you.

11:02 20         MR. DAY:  Yes, I'm sorry.  Father Lemelson has

21  historically touted his prowess as a hedge fund manager on the

22  very good returns of the fund.  To our knowledge, what happened

23  to the fund in 2020 has not been disclosed publicly, and it

24  could be used as impeachment, again --

25          THE COURT:  No, we're not going to do it.  It's under

1    403.  We're not going into 2020, but you can talk about the

2    amount of leverage in 2014.

3              MR. DAY:  Okay, thank you, your Honor.

4              THE COURT:  The FINRA arbitration is the same issue,

5    right?

6              MR. DAY:  Yes, it is.

7              THE COURT:  Okay, so that piece is allowed unless you

8    come up with something we're not thinking about.

9         Evidence of defendant's purportedly seeking to

11:03 10   purchase a home and deficit.

11             MR. DAY:  Yes, your Honor, that actually overlaps a

12   little bit.  Part of what is trying to be excluded there is the

13   leverage point.  The other point was home shopping.  We've

14   addressed this in our motion for summary judgment.  It appears

15   that in 2014, immediately prior to the scheme, Father Lemelson

16   was looking to purchase very expensive real estate and take on

17   a lot of debt.  Again, we think this goes to motive to engage

18   in the scheme, not to lose money in the fund in which he had to

19   pay --

11:03 20         THE COURT:  But did he actually buy something?

21             MR. DAY:  Not to my knowledge, your Honor.

22             THE COURT:  I pointed this out before.  I actually had

23   a mortgage foreclosure case -- bad luck that I happened to get

24   it -- so I happen to know about it.  So was that this period?

25   It was before this, right?

1          MR. JONES:  Yes, your Honor.

2          MR. SULLIVAN:  It was before, and, in addition, that

3    foreclosure case is more Father Lemelson's activism.  It was

4    not an issue of --

5          THE COURT:  It was more of a --

6          MR. SULLIVAN:  It was an issue of Father Lemelson's

7    activism.  He was trying to make a point about the mortgage

8    market.  It had nothing to do with --

9          THE COURT:  He was sitting back there the whole time

11:04 10    on a run-of-the-mill assignment mortgage foreclosure case, I

11    mean, but, in any event, I think it's more confusing, more

12    prejudicial than probative.  I'm not inclined to let it in that

13    he was looking at houses or whatever.  Now, if he was in debt

14    at this time on the houses and he was under water, that may be

15    a motive.

16          MR. DAY:  Your Honor, it may also go to scienter, to

17    the extent that this proposed or potential purchase of real

18    estate meant that Father Lemelson expected a windfall from his

19    position in Ligand Pharmaceuticals.

11:05 20          THE COURT:  I just think right now under 403, I'm

21    going to exclude that he's looking at expensive houses.  And,

22    by the way, I don't think -- what kind of houses was he looking

23    for?

24          MR. DAY:  I believe the mortgage would have been

25    $2.6 million, somewhere in that --

```
 1              THE COURT:  That's not very expensive anymore.

 2              MR. DAY:  Fair point, your Honor.

 3              MR. JONES:  It will be to the jury, your Honor.

 4              THE COURT:  I mean, we're, like, one of the most --

 5     that's all they talked about in the Mayor's debate last

 6     night -- we're one of the most expensive.  I don't know what it

 7     was in 2014, but I think it was no bargain either.  All right,

 8     so we're going to keep that out for the time being.  If you had

 9     told me a $20 million house --

10              MR. DAY:  Fair enough.

11              MR. JONES:  It wasn't that big a fund, your Honor.

12              THE COURT:  All right.  So to the SEC, were you

13     planning on putting in a Wall Street Journal article?

14              MR. DAY:  Yes, your Honor.  We believe that the Wall

15     Street Journal --

16              THE COURT:  Isn't that hearsay?  It's hearsay.

17              MR. DAY:  Yes, your Honor, it is hearsay.  We believe

18     that we can cross Father Lemelson on what he did or did not say

19     to the Wall Street Journal.  There's very clear reference to a

20     statement by Father Lemelson that he could crash stocks, that

21     he had that ability, and it came on the heels --

22              THE COURT:  You can ask him about it, but you can't

23     put in the article.

24              MR. DAY:  On hearsay grounds, your Honor?

25              THE COURT:  Yes.
```

          1          MR. DAY:  I will just point out that the defendants

          2     did not object to it on the grounds of hearsay but rather --

          3          THE COURT:  I'm saying hearsay.  It's hearsay.  But

          4     you can say, "Isn't it true you think you can crash the

          5     market?"  Yes, no.  If he says "yes," it's the end of the

          6     story.  If he says "no," then you say, "Here, can I refresh

          7     your recollection?  Read this article in the Wall Street

          8     Journal.  Did you make a prior inconsistent statement?"

          9          MR. DAY:  Yes, your Honor, thank you.

11:06    10          MR. SULLIVAN:  Your Honor, if I just may on that

         11     point --

         12          THE COURT:  What is his point?  Did he tell the

         13     Wall Street Journal that, or do you think they got it wrong?

         14          MR. SULLIVAN:  The article itself, it's unclear

         15     whether crash -- there are times in this article that, you

         16     know, there are full quotes from parishioners, from investors.

         17          THE COURT:  It's out, it's out.  It's not coming in.

         18     We are not pulling Trump politics into this.  We are not

         19     pulling in whether some parishioners think that this is a good

11:07    20     or bad thing for a priest to be doing this.  We're not doing

         21     that.  But if he said, "I can crash the market," it shows a

         22     motive, so I will allow that to be asked.

         23          MR. SULLIVAN:  Thank you, your Honor.

         24          THE COURT:  Wall Street Journal, that's allowed.

         25          Is there a corresponding video where they have him on

1    tape saying, "I can crash the market"?

2           MR. DAY:  Your Honor, there is a corresponding video,

3    but that statement is not in the video, and we do not intend

4    to --

5           THE COURT:  Bad luck for you, but, in any event, you

6    can ask about inconsistent statement.

7           All right, I'm going to allow in Fields and Frohna.

8    No documents can be introduced that weren't already produced as

9    part of the document production.  And while they can talk about

11:08 10   their reaction to whatever it is that they heard or saw -- I'm

11   assuming that's what it is -- nothing far afield like their

12   long investment history or something like that.

13          MR. JONES:  Understood, your Honor.

14          THE COURT:  Now, defendant's -- this is more

15   complicated -- this is No. 180 -- motion in limine to preclude

16   plaintiff from presenting expert testimony through lay

17   witnesses.  I am worried about the summary witness without

18   knowing exactly what he or she is going to say.  Some of it is

19   clearly summary evidence; some of it may morph into expert

11:08 20   testimony.

21          MR. BROOKS:  For now just on the summary?  You want to

22   hear on just the summary witnesses in that, correct?

23          THE COURT:  Well, you can do the whole motion in

24   limine.

25          MR. BROOKS:  Okay, all right.  So, yes, for the

1    summary witnesses -- I'm sorry for going out of order -- I

2    mentioned earlier, the summary witness is by no coincidence the

3    rebuttal expert who apparently is going to come in and it seems

4    rely on the same graphics --

5            THE COURT:  Who is it?

6            MR. BROOKS:  Dr. Erin Smith is her name.  She's an SEC

7    employee out of the Salt Lake office.

8            THE COURT:  What's her background?

9            MR. BROOKS:  Financial economist is I believe what

11:09  10    she's listed as on the website.

11            MR. DAY:  Your Honor, if I may add on her background,

12    she's a member of the Division of Economic Risk Analysis.  She

13    has a Ph.D.  She is a financial economist.  She is within an

14    office within DERA, the Office of Litigation Economics.

15    They're an independent group within the SEC that is

16    specifically tasked with supporting the Division of Enforcement

17    and also exam teams in litigation or exams.  She has served

18    previously as a summary witness in a number of cases.  This is

19    right within the wheelhouse of people in the office --

11:10  20            THE COURT:  I don't know all your acronyms.  A summary

21    of the witnesses --

22            MR. DAY:  I'm sorry.  DERA is the Division of Economic

23    and Risk Analysis.  That's a division of the SEC, and within

24    DERA, there's the Office of Litigation Economics, which is

25    basically the --

1          THE COURT:  She's a Ph.D. in economics?

2          MR. DAY:  She is, yes.

3          THE COURT:  All right, so at least I have a sense of

4     the background.  And what is it that you're concerned about?

5          MR. BROOKS:  So I think it's a couple things.  One,

6     again, it's just re- -- it's no coincidence it's their rebuttal

7     expert testifying exactly what's contained in her rebuttal

8     report, and so --

9          THE COURT:  Do I have her rebuttal report, by the way?

11:11 10   Was that filed?  I don't think it was.

11         MR. BROOKS:  I don't think so.

12         MR. DAY:  I believe it was filed in conjunction with

13    our summary judgment.

14         MR. BROOKS:  Yes.

15         THE COURT:  We'll try and find it, and if not, we'll

16    call you.  All right.

17         MR. BROOKS:  So, as I understand it, I think what

18    they're saying, in the rebuttal, she did a study where she

19    claims that if you look at intraday prices for some of the

11:11 20   statements, you know, it was material; the statements had a

21    material impact on the stock if you look at the intraday prices

22    for some, not others.  So I understand now what they're saying,

23    basically they're going to show all the similar graphics, but

24    they're just not going to have her issue an opinion.  But then

25    I guess, what is the relevance then?  All you're doing -- it

becomes very prejudicial because all they're doing is showing a

graph that Father Emmanuel said X, and, you know, the stock did

this or it did this or it did this.  The only reason that could

be relevant is to try to show some causation, but, as the SEC

has to concede, you can't show causation --

THE COURT:  Well, no.  It's a question of materiality.

MR. BROOKS:  Right, but it would have to be

materiality that he, as opposed to some other factor, had an

impact, right?  So, in other words, that his statement, after

his statement, this is what happened to the stock.  That's only

relevant if there's a causation element.  Otherwise it's not

material.  And what they've acknowledged is, you can't look at

that in a vacuum because there's a million other things going

on, you know, in the world.  So what they do in normal cases

where they're showing market manipulation is, they get an

expert like Dr. Smith to come in and say, yeah, yeah, I've

looked at all of these various things.  You know, there's a

million different things.  I've substituted them out, and I can

say either Father Lemelson caused this drop in the market or

this uptick caused it, or he didn't have a material effect.

Here now, they just want to show what they want to show but

without any of that foundation to show that there's any

relation between his statement and what happened to the stock.

So if it's true that she's not going to be giving an

opinion, I get that point, but then it becomes, what's the

relevance of her summary testimony?  How does it have any

relevance to the case if they can't tie it together?  And they

can't tie it together because you need an expert to do so.

THE COURT:  You're focused just on the intraday or the

multiple day?

MR. BROOKS:  They I believe are just focused on the

intraday because if they go ten minutes later, it doesn't help

them.  So that's another issue with their charts is, they want

to show the four challenged statements, they want to show one

11:14 10  of his other reports, but they don't show the other reports.

So they're just sort of cherry-picking data, which is one of

our problems from the beginning.

THE COURT:  So you're going to want to put in these

other reports and other investment reports for this --

MR. BROOKS:  Yes.  If the stock price did go down, we

have to be able to show why it's misleading.

THE COURT:  So if you do that -- all right, so just

assume for a minute I'm going to let you do that, put in all

the negative stuff flowing about Ligand at the same period of

11:14 20  time, it becomes a jury finding.

MR. BROOKS:  Right, oh, yes.  I mean, I think if --

THE COURT:  You have a very powerful argument there's

no evidence of the stock moving.  I mean, I found that before.

If there's no (Inaudible) at all, that's hurtful to the

plaintiff's case.

1          MR. DAY:  Your Honor, if I may, a couple of responses.

2     We already talked about this earlier in the hearing that we

3     don't have to show reliance, and your Honor ruled on summary

4     judgment that the stock price or the lack of stock price

5     movement is relevant to this question.

6          THE COURT:  It is relevant, but this woman isn't going

7     to say anything, right?  She's just going to show movement?

8          MR. DAY:  Exactly.

9          THE COURT:  Why don't you have an expert?  You've been

11:15 10    talking about it from the get-go; we've been talking about

11     whether you need an expert or not.

12          MR. DAY:  I don't want to get too far into our trial

13     strategy, but we elected to respond to their expert instead of

14     putting in affirmative evidence.

15          THE COURT:  I'll allow them to argue that you've heard

16     testimony that there was some sort of relationship between the

17     stock and --

18          MR. JONES:  Your Honor, just in terms of those

19     instructions, there was an expert, and defendants have now

11:15 20    withdrawn the expert.  So they're basically -- to give them the

21     benefit then of saying there's no expert, we should at least be

22     able to say, "Well, defendants had an expert, and they had to

23     pull it after a horrible deposition."

24          THE COURT:  You would be allowed to say that, and I

25     agree with you, tit for tat.

1          MR. JONES:  Well, at that point, your Honor, they

2     should be able to say, "We had an expert, and they pulled her."

3          THE COURT:  No, no.  The absence of a witness is

4     sometimes telling.  But, in any event, I'm going to let the

5     summary witness testify about the stock movement but not give

6     an opinion that it was material or caused it.

7          So what else?  Is there anything?  There were other

8     things.

9          MR. BROOKS:  Yes, there were other things on that.

11:16 10          MR. DAY:  Under summary witness?

11          MR. BROOKS:  I thought we were doing the lay witness

12     as expert?  There's a little overlap.

13          THE COURT:  Yes, No. 180.

14          MR. BROOKS:  So, you know, the other -- I think the

15     next biggest piece of that goes to the fourth challenged

16     statement on insolvency.  And, you know, at the motion to

17     dismiss hearing, and we've cited it, you asked the SEC about

18     the insolvency specifically, and they responded, "Yes, I think

19     that's a question that would have to be answered by experts."

11:17 20     And since that time, their case hasn't become any less expert.

21     It's still the same claim.  And, frankly, I think the only

22     reasonable inference on that piece why they didn't get an

23     expert is because they couldn't.  And the issue of insolvency,

24     that's an opinion.  We've cited the cases --

25          THE COURT:  You haven't given me an expert either.

1  I've been asking for help on this.

2       MR. BROOKS:  Your Honor, I mean, they have the burden.

3  If they don't have an expert on this, they can't go forward,

4  and there's no specific --

5       THE COURT:  No one has even briefed it for me, okay?

6  But there is a statutory section in the Bankruptcy Code that

7  defines insolvency as sort of a balance sheet type of test.

8  And there may be differences of opinion how you value

9  intangible or not.  We have a knowledgeable investor,

11:18 10  Mr. Lemelson.  We have Ligand.  I don't know how -- that's the

11  opinion issue.  I don't know how I'm coming out on that yet.

12       MR. BROOKS:  Okay.

13       THE COURT:  I don't know how I'm going to come out on

14  it.  But when Mr. Lemelson says it raises the specter of

15  bankruptcy, even if I find that's an opinion, it certainly is

16  relevant to what his motive is to drive down the price of the

17  stock by perhaps a misleading headline, if in fact its patents

18  are worth a lot.  I don't know yet enough about his patents.  I

19  don't know anything really.  Nobody's briefed the balance sheet

11:18 20  test for me.  I don't know what they had.

21       MR. BROOKS:  Well, I mean --

22       THE COURT:  Do you know?  Mr. Day, did they have

23  patents that had a valuation to them?

24       MR. DAY:  Your Honor, our understanding is that it's

25  primarily royalty streams from the drugs that they licensed to

1    companies like Glaxo to commercialize and sell into the market.

2    They got money back from that, and they got a lot of money back

3    from it.  That's part of their business model.  So that is not

4    a tangible --

5        THE COURT:  So that money going back is part of a

6    tangible asset?

7        MR. DAY:  Yes.  I don't know.  Not tangible.  I guess

8    the future revenue stream from royalties --

9        THE COURT:  That you can borrow from.

11:19 10      MR. DAY:  Potentially borrow from, yes.

11       THE COURT:  Okay, I just learned more right now than I

12   knew about this issue.

13       MR. DAY:  Sure, and that's part of the testimony we

14   intend --

15       THE COURT:  I know, but you're asking me to rule on

16   all these things with blinders on.  So you're saying that it's

17   not just the intangible valuation, the valuation of a patent

18   that's sort of unproven in the market.  It's really a set of

19   patents that they're getting licensing revenue from.

11:19 20      MR. DAY:  Correct.  I'm not sure patents is exactly

21   right.  Intellectual property.

22       THE COURT:  What are they?  Are they trade secrets?

23       MR. BROOKS:  Well, I can only say that they, getting

24   to the balance sheets in draft, your Honor, they previously

25   said that the reason it was unfair for Father Lemelson to take

1    out the intangibles is that the intellectual property for a

2    company like Ligand, that's the most important thing.  We went

3    back and looked at the balance sheet.  Of the intangible

4    assets, there was exactly zero tied to intellectual property.

5    So we're at a loss as to why.  I mean, I think more

6    fundamentally --

7         THE COURT:  I don't know.  That's why I haven't been

8    ruling on this issue.  I have been putting blinders on.  I

9    don't know how their evaluation on their balance sheet might

10   look.  I would imagine maybe the Ligand auditor might be able

11   to help us with the balance sheet analysis on this thing.  But

12   the reality is, if this summary witness or a lay witness --

13   were you planning on having that lay witness look at the

14   balance sheet?  Is that what you were planning?

15        MR. DAY:  Well, your Honor, one of the witnesses, for

16   example, is John Higgins, the CEO of Ligand.  He's been the CEO

17   for a long time.  He was a CFO of a public company before that.

18        THE COURT:  Which one?

19        MR. DAY:  Oh, I don't remember the name of it.

20        MR. HOOPES:  Connetics, C-o-n-n-e-c-t-i-c-s.

21        THE COURT:  It's publicly traded?

22        MR. DAY:  A publicly traded company.

23        THE COURT:  Well, he may have enough information just

24   to give his opinion about insolvency and whether they were

25   insolvent, of course.  I know if I'm insolvent, and you

probably want to know if you're insolvent, but it's based on

your definition.  That doesn't necessarily mean that he's right

and that Mr. Lemelson is wrong.  But the summary witness,

that's not what a summary witness does.

MR. DAY:  No, no, no.  The summary witness is not

going to get into that at all.

THE COURT:  Well, who's going to say it for you other

than Mr. Higgins?

MR. DAY:  The chief operating officer.

THE COURT:  Mr. Voss?

MR. DAY:  That is Mr. Foehr, and the CEO of the

company, who has an extensive background.

THE COURT:  They may be able to testify about that.

MR. DAY:  The kind of questions I envision are, you

know, "You've been doing this for a really long time?"

THE COURT:  They'd better darn well have a basis for

them saying it.

MR. DAY:  Absolutely.

THE COURT:  And I'm going to let Mr. Lemelson talk

about why he said that.  I mean, at some level, a jury or I

will decide, not at directed verdict, but, in any event, we'll

give it to the jury.  And so that's one of the reasons I was

thinking of sending out this other statement, the one I don't

know enough about to even rule on yet.  So, all right, thank

you.

1          What are the other issues?

2          MR. BROOKS:  The other ones are, to kind of tick these

3     off quickly, hopefully, you know, custom and practices of the

4     pharmaceutical industry.  You know, that's typically expert

5     opinion.

6          THE COURT:  No, not necessarily.  I had a case once

7     where a janitor talked about the custom in the industry, how

8     often you clean the ladies' room.  It depends.  It depends what

9     his experience is.

11:23 10        MR. BROOKS:  So I think that's fair.  So if the

11     janitor can testify, "I clean the women's room twice a day --"

12          THE COURT:  "And I have been in other stores, and

13     that's basically what the industry practice is."

14          MR. BROOKS:  Based on his personal knowledge.

15          THE COURT:  Yes.

16          MR. BROOKS:  Not based on some -- the custom and

17     practice, you know, expert is a whole field where they come in

18     and talk about an entire industry.  It's not necessarily

19     based on personal knowledge.

11:23 20        THE COURT:  It's got to be based on his personal

21     knowledge of the industry, fair enough.

22          MR. DAY:  Yes, your Honor, that's what we envision on

23     that point.

24          MR. BROOKS:  It doesn't seem there's any dispute

25     there.

1          The next piece, it has to do with Promacta, and they

2    want to get into the science behind Promacta, the physiological

3    effects.  Whether there's a commercially viable market for it

4    we are not challenging.  Their witnesses can get up and say,

5    "Yes, Promacta is indicated for this," but they want to get

6    into the science of it, which is not only expert testimony but

7    it's wholly irrelevant here.

8          THE COURT:  What's ITP?  What is that?

9          MR. BROOKS:  I'm going to butcher the acronym, but

11:24 10    there's a dispute as to whether separate and apart from --

11          THE COURT:  What is it?  I don't think you told me

12    what it was.

13          MR. DAY:  Idiopathic thrombocytopenia, which is a very

14    fancy word for you have a low platelet count in your blood.

15          THE COURT:  Like you have what?

16          MR. DAY:  A variety of infections.

17          THE COURT:  Hepatitis C?

18          MR. DAY:  Hepatitis C is one of many causes of ITP,

19    people with ITP.  Aplastic anemia is another one.

11:25 20          MR. JONES:  It refers to the red blood cells, your

21    Honor, and what causes the anemia, but the point is, there's a

22    lot of different causes that the drug is approved for.

23          THE COURT:  I'll allow them to say what the FDA

24    approved it for.

25          MR. BROOKS:  Yes, there's no dispute there.  That

1      makes perfect sense.  They want to get into the physiological

2      effects of Promacta, commercial marketing.  If this indeed goes

3      away and this one comes in, I mean, it's classic expert

4      testimony.  It doesn't even --

5              THE COURT:  Why can't the president of a company talk

6      about where he's marketing?

7              MR. BROOKS:  Well, where he's marketing, but this is

8      all based on, like, a hypothetical future.

9              THE COURT:  Well, what has happened to the drug?  I

11:25 10    mean, it is true that this other company beat them to the punch

11     on the Hep C.

12             MR. DAY:  The drug continued to grow in markets around

13     the world.  Ligand sold the rights to the drug in 2019 for

14     nearly a billion dollars.

15             THE COURT:  I'm denying the motion in limine on that.

16     I think the president of a company gets to talk about other

17     markets, even if they lost the battle to win Hep C.

18             MR. BROOKS:  That's fine, but it's not relevant to any

19     of the four challenged statements because they're not

11:26 20    challenging his thesis on Promacta.  At least I didn't think

21     they were.  They've always said there were four challenged

22     statements, and for the first time yesterday, they filed

23     something and added two new ones related to Promacta.

24             THE COURT:  I missed that actually.

25             MR. BROOKS:  Your Honor, let me just get the exact

           1    pages on this.  Yes, so they said yesterday -- it's their

           2    opposition to preclude the use of expert testimony, so it's

           3    what we're talking about now, ECF 189 at Page 6.  They allege,

           4    first, they say that Father Lemelson falsely said that Promacta

           5    is only used to treat hepatitis C, not one of the four

           6    challenged statements, and that "Father Emmanuel also falsely

           7    said that a then new hepatitis C treatment would render

           8    Promacta obsolete."  And then they say, "Defendant Lemelson is

           9    flat wrong about Promacta, and the Commission should be allowed

    11:27 10    to present evidence to prove it."

          11         So two new statements never before challenged.  And we

          12    went, your Honor, and we rounded up --

          13         THE COURT:  I'm still trying to find it.  189, Page 6,

          14    line -- it's on Page 6, right?

          15         MR. DAY:  Your Honor, I think counsel is referring to

          16    the second full paragraph on Page 6.

          17         MR. BROOKS:  Second paragraph, the first time that we

          18    ever heard that they're alleging false and misleading

          19    statements related to any of this.

    11:28 20         MR. DAY:  Your Honor, I strongly disagree with that

          21    statement.  This has been an issue throughout this case.

          22    Father Lemelson claims that Promacta is only used to treat

          23    hep C.  That is not true.  We've had extensive discovery on

          24    that point.  It is at a minimum a context evidence for why the

          25    statement was false.

1          THE COURT:  -- the value if in fact it's clear that
2     there are other uses for the drug.
3          MR. BROOKS:  But these are not two new challenged
4     statements because they also, your Honor, in their motion in
5     limine --
6          THE COURT:  I don't know if they're two new
7     challenged, but certainly it's relevant as to whether or not
8     Promacta had a use other than the Hep C.
9          MR. BROOKS:  So what I'll say, your Honor, is, they
11:28 10   say in their motion in limine -- and this is ECF No. 184 at the
11    second page -- "This trial, however, is not a vehicle for
12    Lemelson to prove his accusations correct or to litigate the
13    long-term merits of an investment, uses, or opinions about
14    Ligand."  So, in other words, what they're saying is, they get
15    to go beyond the four challenged statements.
16         THE COURT:  I agree with that.  Of course he's got to
17    prove he believed it.  That's part of the good faith.  He
18    thought it was a lousy stock.  They get to say, what are you
19    talking about?  We've got our eggs in one basket, and they can
11:29 20   have a huge battle about other markets as well.  I mean, that's
21    part of the context for both of you.  So what's the next issue?
22         MR. BROOKS:  I think on that one, I think we're done
23    on that particular motion.
24         THE COURT:  Anything else?  All right, so then we're
25    on --

1          MR. DAY:  I believe, your Honor, the last motion from

2     the defendants is the scheme liability.

3          THE COURT:  That's Document No. 181?  I mean, they've

4     always had scheme liability.

5          MR. BROOKS:  Right, and we don't -- so --

6          THE COURT:  And that Supreme Court case.

7          MR. BROOKS:  Yes, we're not saying they don't have

8     scheme liability.  What we're saying is, there's some notion of

9     basic fairness that we understand what scheme they're alleging.

11:30 10  And the reason I bring this up is, if you look at the second

11    sentence in their opposition, they say --

12         THE COURT:  Which docket?

13         MR. BROOKS:  I apologize, your Honor, for not having

14    the number.  186, your Honor.  So they say, second sentence,

15    that "They have alleged a scheme involving fraudulent acts,

16    false statements, and material omissions."  So we are here two

17    weeks before trial, and I do not know what they're talking

18    about.  I've never heard of them saying anything about the

19    material omission that forms the basis of their case.  I know

11:30 20  there are four challenged statements.  I guess, you know, the

21    act of disseminating the reports that they claim are false,

22    those could be acts; but if there's anything else, we feel we

23    have the right to know.  And what they added in this for the

24    first time is things that happened two years later.  So in

25    their own opposition, they take the position, look, this scheme

         1    took place between May, 2014, and October, 2014.  Then they say

         2    the things that happened years later formed part of the scheme.

         3              THE COURT:  Like what?

         4              MR. BROOKS:  Like his response to the Wall Street

         5    Journal article and his suing Bloomberg, things that happened

         6    in 2016, years after this, so --

         7              THE COURT:  That's not going to come in.

         8              MR. BROOKS:  But that's what they're saying is part of

         9    the scheme.

11:31   10              MR. JONES:  We've never said that's part of the

        11    scheme.  That's just false.  Is the Wall Street Journal

        12    relevant to his scienter because, at least according to the

        13    Wall Street Journal, he tried to buy back his stock?  Yes.  The

        14    Bloomberg article, is it fair impeachment to say that he

        15    represented to the First Circuit that he's never been

        16    investigated after he got a letter from the Commission saying,

        17    "We intend to charge you"?  Yes, that's an impeachment, but

        18    it's not part of the scheme.

        19              THE COURT:  I have no idea what you're now talking

11:32   20    about.

        21              MR. BROOKS:  Your Honor?

        22              THE COURT:  No, let me just ask him.  What

        23    investigation?  What Bloomberg article?  Do I have this?

        24              MR. JONES:  It's referenced in the motion a little

        25    bit.  Let me give you the background.  There was a Bloomberg

article.  The Bloomberg article said Father Lemelson is under

investigation for manipulating stocks.

    THE COURT:  What year?

    MR. JONES:  2015.

    THE COURT:  After the period of time?

    MR. JONES:  After the period.  And it's difficult.

Let me preface this, your Honor.  This is only about

impeachment for honesty.  That's it.  We're not going through

the rest of this.  What the background is, your Honor, there

was a lawsuit --

    THE COURT:  "So isn't it true that --"  So you want a

608, is that it, of prior false statements?

    MR. JONES:  Yes.

    THE COURT:  And you can't introduce it because it's

extrinsic evidence.  All you do is get to say, "Did you tell

Bloomberg you weren't under investigation?  That wasn't true,

was it?"

    MR. JONES:  Well, actually, "Did you tell the First

Circuit that you were not under investigation, even after you

got a letter from the Commission saying that you were?"

    THE COURT:  I'm sorry.  I thought this was Bloomberg.

So where?  Was there a lawsuit that went up to the First

Circuit?

    MR. JONES:  There was, your Honor.  Father Lemelson

sues Bloomberg for defamation.

         1            THE COURT:  I see.

         2            MR. JONES:  The suit is tossed because Father Lemelson

         3   is considered to be a public figure and there's no showing of

         4   malice.  It goes up to the First Circuit brief.  And when

         5   Mr. Lemelson and his lawyer filed the First Circuit brief, they

         6   say, you know, "Father Lemelson hasn't been under

         7   investigation.  This is false."  Well, at that point

         8   Father Lemelson has known that he's gotten a letter from the

         9   SEC saying, "The SEC intends to charge you with the following

11:33   10   offenses."  And it's a lie.

        11            THE COURT:  Who was the attorney?

        12            MR. BROOKS:  Your Honor, we have a name of Thomas

        13   Nathan.

        14            THE COURT:  So you're saying that as his agent, the

        15   attorney made a false representation to the First Circuit.  So

        16   I have to think about that.  So it wasn't actually a false

        17   statement by Father Lemelson; it was by his agent.  What's the

        18   response to -- I'm just thinking through the 608 issue.

        19            MR. BROOKS:  Well, first, if I could, your Honor,

11:34   20   again, we got started on this scheme, and Mr. Jones said we've

        21   never alleged any of this as part of the scheme, but that's

        22   exactly what they did yesterday.  They said, "The Commission

        23   has alleged additional specific acts in furtherance of the

        24   scheme.  For example --" and they get into the Wall Street

        25   Journal and the Bloomberg responses.

1        THE COURT:  Those can't be part of the scheme, but if

2   they're impeachment, do you have anything to tell me about the

3   First Circuit brief, whether he was or was not under

4   investigation at the time the brief was submitted?

5        MR. BROOKS:  I think at the time that brief was

6   submitted, he was.  He had a different attorney representing

7   him, so whether or not that attorney understood that he was

8   under investigation at that point.

9        THE COURT:  So I guess the way to rehabilitate him

11:35 10   would be to say, "Did you read that?"  Do you happen to know

11   whether he knew that or not one way or another that it was in

12   the brief?

13        MR. BROOKS:  I don't, your Honor.

14        THE COURT:  I tell you what, it may be appropriate

15   608(b), but the brief doesn't come in and neither does the

16   Bloomberg article.  But it may be, I suppose the correct thing

17   is, "No, I never made that statement.  I didn't know it was

18   being made," and that's the end of the discussion actually.

19        MR. JONES:  And he knew that the suit was being filed

11:35 20   with the First Circuit, the whole premise of the suit being, "I

21   wasn't under investigation."

22        THE COURT:  Is that the whole premise?

23        MR. JONES:  Yes.  There's multiple prongs, but the

24   principal prong was, "You said there was an investigation when

25   there wasn't."

```
 1              THE COURT:  What did the First Circuit do?

 2              MR. JONES:  The First Circuit also tossed it.

 3              THE COURT:  Because he was a public figure?  Why?

 4              MR. JONES:  Yes.

 5              MR. BROOKS:  Your Honor, it's sort of a sideshow.  His

 6      position is, he was told by the SEC lawyer that he was under

 7      investigation.  This issue then -- I'm not sure what the

 8      relevance is to begin with, but it turns into a complete

 9      separate sideshow.

11:36 10              THE COURT:  I don't know enough about it.  Normally,

11      if someone lies to the First Circuit or lies, you can impeach

12      under 608(b) and that you can't use extrinsic evidence.  But if

13      in fact it was more complicated than that, that he was told by

14      the SEC, no, he wasn't under investigation, it becomes a

15      sideshow, and I would want to rule on it in advance before it

16      got in.

17              MR. JONES:  Yes, we'll figure this out.  But going

18      back to scheme, there's a lot of acts that we talked about all

19      along the way that are part of this scheme in addition to the

11:36 20      statements:  all the efforts to disseminate all those

21      statements, all the efforts --

22              THE COURT:  Right, right, right.  It's clear there was

23      a scheme.  The only question is -- "scheme" makes it sound

24      nefarious.  There was an effort, a scheme, a plan because he

25      hated the stock, and he was shorting it.  And so the question
```

```
 1   is, did he use lawful or unlawful means?  That's what's
 2   happening here.  So of course he can talk about all the things
 3   he did and the interviews he gave and the press releases he
 4   issued.  A good example is that headline, "Raises Specter of
 5   Bankruptcy."  That may be an opinion, but it's sure hard to
 6   make it part of a scheme --
 7            MR. BROOKS:  Well --
 8            THE COURT:  -- because he's trying to drive down the
 9   price.
10           MR. BROOKS:  Well, I mean, yes, that's a statement
11   that -- I mean, I haven't specifically challenged that, that
12   statement.
13           THE COURT:  But it could be part of the scheme.  No,
14   they haven't specifically.  I've been talking intangible equity
15   and debt ratios, but the reality is, it's more than just the
16   specific statement.  It's the whole thing.  You won't even
17   dispute that there was a plan.  You're just saying it was
18   lawful.
19           MR. BROOKS:  Yes.
20           THE COURT:  And he's saying it was unlawful.
21           MR. BROOKS:  Well, the plan was to -- well, he had a
22   plan to issue reports because he thought they -- you know, he
23   thought a company was overvalued.
24           THE COURT:  Yes.
25           MR. BROOKS:  But I think all we're asking for is
```

```
 1   notice of what they are saying constitute the overt fraudulent
 2   acts or statements.
 3            THE COURT:  Well, I think you've had it, I mean,
 4   discovery, so I --
 5            MR. BROOKS:  But my point is, it seems to be changing.
 6   We just got two new statements yesterday, and now two now acts
 7   have been given, and so our only concern is, we're going to be,
 8   you know, kind of bamboozled at trial.
 9            THE COURT:  If it's something brand-new you've never
10   heard of before, but you sure saw that headline, and you for
11   sure heard -- what was the other false statement that you said
12   you never heard before?
13            MR. BROOKS:  I never said I never heard it.  I didn't
14   know that they were -- they said four challenged statements.
15   They added two new ones.
16            THE COURT:  Well, if it's something you never heard
17   before, let me know.
18            So defendant's motion to restrict evidence of attorney
19   scheme liability is denied.  However, I do add that unless
20   there's something that -- unfair surprise is my touchstone,
21   unfair surprise, unless it's something you never heard before.
22            I do think it's appropriate for a summary witness or a
23   lay witness to discuss what short selling is.  I think many
24   people might know in common parlance what it means to sell
25   short, but they may not understand actually the mechanism for
```

11:38 (line 10)
11:39 (line 20)

1   it and may be curious, and I don't see why that will hurt to

2   have someone explain that.

3          MR. BROOKS:  Yes, I think that one makes sense, your

4   Honor.  I think the more difficult one is having a lay witness

5   read into -- what they want to do is a regulation.  And we both

6   cited the *Adams* case, and in that case, it was an expert

7   witness who was allowed to read in a regulation.  I'm just not

8   familiar with a nonexpert witness being allowed to speak as to

9   the law.

11:40  10          THE COURT:  I'll allow them to put in a regulation.  I

11   mean, I don't know what the big deal is.  I mean, they can't

12   tell you what it means.  They can explain the terms of it.

13          MR. DAY:  It is relevant to anticipated later

14   testimony by other witnesses, so --

15          THE COURT:  Like what?

16          MR. DAY:  So Bruce Voss, one thing that he will

17   testify to is that Reg FD, which is the regulation in question,

18   I think it's fair disclosure.  And the gist of it is, if a

19   company tells one investor some material nonpublic information,

11:40  20   like the fact that its biggest drug is about to go away,

21   they've got to tell everybody.  And Bruce Voss knew that.  He's

22   a professional.  He's been in this industry, investor

23   relations, for a long, long time.

24          THE COURT:  Can I just say, from the point of view of

25   putting your summary witness first or your lay witness first,

 1    is this still the same person?

 2              MR. DAY:  Yes.

 3              THE COURT:  It's going to be deadening to have that be

 4    your first witness without them understanding the context.

 5              MR. DAY:  For the Reg FD?

 6              THE COURT:  Yes, the stock trade.

 7              MR. DAY:  Pardon?

 8              THE COURT:  The four flow charts.

 9              MR. DAY:  Oh, yeah, that is by far for the jury what

11:41 10    we're going to be doing with the summary witness.

11              THE COURT:  I'm saying it will be deadening.  They

12    will not understand context.  But you do it your way.

13              So other than the flowcharts or the summary charts and

14    putting in that regulation, what else will this person be

15    doing?

16              MR. DAY:  The short selling, explanation of what it

17    means.

18              THE COURT:  Sure.

19              MR. DAY:  Possibly some other basic terms about

11:42 20    investing, like what's a brokerage?  What's a hedge fund?

21    What's a pooled investment vehicle?  I don't think there's any

22    dispute about any of this.

23              THE COURT:  Fine, but I don't want this morphing into

24    insolvency.

25              MR. DAY:  No, no, no, not with the summary witness,

1    no.

2              THE COURT:  Was there anything else in that?  Oh, yes,

3    there was quite a bit more.  So, as I understand it, Martin

4    Shkreli is not going to be part of this, but let's talk about

5    executive compensation.

6              MR. HOOPES:  Yes.

7              THE COURT:  There are 70 exhibits that relate to

8    Ligand executive compensation?

9              MR. HOOPES:  We only filed them to support the

11:42 10   questions with regard to his compensation.  That's all.

11             THE COURT:  I'm sorry, we're not doing 70 exhibits on

12   compensation.  You can certainly ask --

13             MR. HOOPES:  No, I hear you.  So if I hear your

14   message, if I could think and talk, we'll try to figure out a

15   way to narrow it.

16             THE COURT:  Yes, because this says it's between 2011

17   and 2020.  Stock compensations during 2014 and maybe the

18   bookend years may be relevant but not that span of time.

19             MR. HOOPES:  It arguably goes to his testimony here

11:43 20   today, which is 2021, but I understand your general point.

21             THE COURT:  To some level, his compensation hinges on

22   the stock price.  It has some relevance.

23             MR. JONES:  During the time period?  Sure.  But we're

24   very worried about the following:  They put in 2011 to 2020.

25   What are they trying to do?  They're trying to basically say,

1    "These rich drug executives getting rich off drugs, they've got

2    it coming to them."  It's a plain appeal to the sympathy of the

3    jury to say, "Look, this guy is making $4 million a year.

4    He --"

5            THE COURT:  We're not going to allow that.  So I think

6    the executive compensation during the relevant time period,

7    which is roughly 2014.  It may be that 2015 or 2013 might be

8    relevant.

9            MR. HOOPES:  And, your Honor, if I can respond as the

11:44 10   SEC responded, which is, the incident occurs in 2014.  He's

11   testifying in 2021.  I think I can under case law indicate that

12   he still has motive and bias to testify to a particular amount

13   today.  It's not something about these rich guys; it's talking

14   about the financial incentive within the case law.  I

15   understand that you want to confine that, and I certainly --

16           THE COURT:  Yes, work out the exhibits.  The basic

17   argument in terms of motive is that -- he's going to be on the

18   stand as well as the --

19           MR. JONES:  Your Honor, just on that, if in fact this

11:44 20   were some Ligand stood to gain financially or Ligand stock

21   stood to gain financially, then, yes, that would make sense as

22   a financial bias impeachment.  That's not the case here.  This

23   is an enforcement case for the SEC.  No one thinks that Ligand

24   stock is rocketing up and Father Lemelson --

25           THE COURT:  There's no doubt that Ligand is a major

1   player in this.

2          MR. JONES:  Oh, and no question, your Honor.  I'm not

3   arguing that.  What I'm arguing is --

4          THE COURT:  So lest you have a financial incentive

5   with respect to the case as the beneficiary or the victim,

6   whichever way you want to look at it, I will allow for the

7   Ligand executives to be impeached on whether or not their

8   executive compensation hinged on the stock price as the motive

9   for why they're testifying or why there was a tick-off.  So we

11:45 10   will allow that, but only cabined by the years that are

11   relevant.

12          MR. JONES:  The other thing, your Honor, there's

13   apparently some proffered summary here that's not on the

14   exhibit list.  We don't see it, and we don't see a witness

15   that's going to introduce it.

16          MR. HOOPES:  It's one page.  We don't have to have a

17   summary.  As of last night, I got a one-page summary, which I

18   intend to share today, which is two weeks before trial, and

19   it's not 22 gigabytes.

11:46 20          THE COURT:  Ligand's presentations to the Commission.

21          MR. HOOPES:  This is the two PowerPoints, your Honor,

22   by Ligand, which have not only bias with regard to religious

23   accusations and other matters that they did not support by

24   investigation.  I would suggest that they're admissible.

25          THE COURT:  What do they say on the presentation to

1    prove religious bias?

2          MR. HOOPES:  Oh, they say it should be affinity fraud,

3    you know, because he was marketing these funds to members of

4    his congregation.  They make other accusations, all different

5    things.

6          THE COURT:  On these charts?

7          MR. HOOPES:  Yes.  They have nothing about the Viking.

8    They're all in the charts.

9          THE COURT:  I had thought the relevance of it was that

11:46 10   they didn't complain about the Viking.

11          MR. HOOPES:  That too, and then --

12          MR. JONES:  Your Honor, I will say a couple of things

13    about that.  One is, I think Mr. Hoopes's characterization is

14    just that; it's a characterization.  Yes, did they say the

15    words "affinity fraud" as something the SEC should potentially

16    look into?  But that's not a religious bias, and it shouldn't

17    be suggested to the jury that it is.  And then the idea that

18    these PowerPoints --

19          THE COURT:  In the abstract, I would agree with you,

11:47 20   but they did say some pretty upsetting things.

21          MR. JONES:  And we're not saying that they can't --

22          THE COURT:  -- not to the SEC, but I do think it may

23    go to the motive of Ligand.

24          MR. JONES:  And, your Honor, that's not what we're

25    contesting here.  We're contesting this selective enforcement

          evidence.  It was all in the selective enforcement brief about

          Ligand came to the Commission and told them this, and look what

          the Commission did.  And that's what they want to do, like,

          "Oh, look at this.  This is in the presentation, and here it is

          in the complaint, and isn't there something wrong with that,

          ladies and gentlemen?  Isn't that kind of nefarious?"

          THE COURT:  I will allow the fact that the Viking

          statements weren't in there.  I don't know about the affinity.

          I think you can put that in in other ways.

11:47     MR. HOOPES:  We'll definitely try.  We'll definitely

          preview it before we do.

          THE COURT:  And maybe even white out that piece of it.

          You can put in the part about the --

          MR. HOOPES:  Your Honor, there's --

          THE COURT:  I haven't seen them, so it's hard for me

          to --

          MR. HOOPES:  Yes, I think we need them.  But, you

          know, just to forecast it, I mean, there are a half a dozen

          emails internal to Ligand even before they get to the SEC where

11:48     they're talking about the sort of same religious bias in there,

          and, you know, it should be this and (Inaudible), whatever

          these things are, and it carries over into the PowerPoint.

          THE COURT:  But can I say, I haven't thought this

          through because I haven't seen them, and I don't know what it

          is.  If any of these were from the chair, the people who are

1　testifying, they certainly go to the motive for testifying.  I

2　don't know if I'm going to allow those in with respect to some

3　underling who has a religious bias here.

4　　　　　MR. HOOPES:  I understand.

5　　　　　THE COURT:  I'm not giving a whitewash blank check to

6　do that.

7　　　　　MR. JONES:  There's a couple risks there.  First,

8　we're not calling Mr. Pettingill, who worked at Ligand and was

9　deposed.  I see that they're calling Mr. Pettingill and flying

11:49 10　him across the country --

11　　　　　THE COURT:  Who is he?

12　　　　　MR. JONES:  He is in part of the management structure

13　of Ligand.  He's sort of a second-level executive.  He wrote a

14　couple of emails.  He called Father Lemelson a "DB" and, you

15　know --

16　　　　　THE COURT:  What's that?

17　　　　　MR. JONES:  He explained in testimony, your Honor,

18　that it's a douche bag.  You know, is it colorful?  Yes.  Does

19　he wish he didn't say it?  Yes.  Is it worth it to fly him

11:49 20　across the country to say that there's a bias --

21　　　　　MR. HOOPES:  That's a different question.  All he has

22　to do is pick up the phone, call me, talk about the issue, and

23　we'll see what we can work out.

24　　　　　THE COURT:  I'm not ruling on that issue right now.

25　I'm ruling only on the fact that the failure to put in a

          1    concern about the two Viking statements are relevant to whether

          2    or not they're material as to whether or not Ligand

          3    (Inaudible) --

          4         MR. JONES:  But, your Honor, do you agree that part of

          5    the foundation of that is that the witness has to testify that

          6    they described it or played a role in deciding what statements

          7    would go into that PowerPoint?  I mean, this is a PowerPoint by

          8    a lawyer to the Commission about possible charges.  It's not

          9    a --

11:50    10         THE COURT:  They do have to authenticate them.

         11         MR. HOOPES:  And they have, and they were present for

         12    his presentation.

         13         THE COURT:  But this religious thing, if there was

         14    some -- unfortunately we've learned a lot of people have -- if

         15    they were statements made or adopted by the people who are

         16    testifying for the SEC, I will allow them to come in.  I don't

         17    know, no one has flagged Pettingill for me, so I would have to

         18    think about that.

         19         MR. HOOPES:  And, honestly, I've seen -- I've got his

11:51    20    latest little email, and I haven't given him a lot of thought

         21    other than he was one of the people who was listed as their key

         22    witness.  But, again, if I get a phone call on this issue -- I

         23    understand first and foremost you're trying to let the parties

         24    present the case as efficiently as possible -- if I get a phone

         25    call, I'll try to work it out.

```
 1              THE COURT:  Try and work it out, but, in any event,
 2      those two PowerPoints come in.
 3              Drug pricing and Martin Shkreli are out, right?
 4              MR. HOOPES:  Yes.
 5              THE COURT:  The Congressman is out.  What's his name
 6      now?
 7              MR. HOOPES:  Duncan Hunter.  And so there's a letter
 8      from Duncan Hunter sent the day of roughly the second
 9      presentation to the SEC in Washington, and he basically makes
11:51 10  their case and then says, "I want to hear from you in two
11      weeks, SEC."  And there's testimony from John Higgins, who is
12      going to be here as the CEO, saying, "Ah, we got to Duncan
13      Hunter through members of the Board, and we discussed --" and I
14      can give you the exact language.
15              THE COURT:  I'm not saying you can't ask Higgins about
16      that, but you cannot ask -- we're not going to put in the
17      letter.  It's hearsay.
18              MR. JONES:  The thing, your Honor, the whole comment
19      is about, why did the SEC bring the case?  And they want to
11:52 20  suggest that there was some sort of improper pressure to have
21      the SEC bring the case, which we already agreed --
22              THE COURT:  We're not putting in the letter, but
23      Higgins' credibility is key here.
24              MR. JONES:  But what's the credibility?
25              THE COURT:  Is he the CEO?
```

1          MR. JONES:  He is the CEO, your Honor, yes.

2          THE COURT:  Right, his credibility as to what's

3    material, what isn't, what's insolvent, what isn't.  How much

4    did this all matter to them is relevant.  So I'm not going to

5    do this in a sterile vacuum.  They cared a lot.  They cared a

6    lot, and that both helps you and hurts you.

7          MR. JONES:  But the question is, your Honor, you know,

8    a year, more than a year, two years, you know, more than a year

9    after the events at hand where Ligand is trying to get a case

11:53 10   brought, I'm not sure to what -- it doesn't go to a bias.

11         MR. HOOPES:  That's exactly the bias.

12         THE COURT:  It may go to the bias of a witness with

13   respect to -- well, not necessarily even bias.  It's what they

14   thought was material and wasn't material.

15         MR. JONES:  But, your Honor, this is just -- the

16   letter is not about -- we're not talking about the substance

17   of --

18         THE COURT:  I already ruled for you.  You just won a

19   victory.  I'm not putting in the letter.  I'm not going to let

11:53 20   it go in.  But you can ask Higgins, "You really cared a lot,

21   didn't you?  How much does the stock matter to you with respect

22   to compensation?"  As someone who cared so much about this, you

23   didn't mention these two statements as material.  I mean,

24   they've got to be able to put on their case on materiality

25   because there was apparently a lot of other negative things

 1    going on, right?

 2              MR. HOOPES:  Yes.

 3              MR. JONES:  The one thing with those PowerPoints, your

 4    Honor, is, if they're going to make a point we didn't put these

 5    in, there's a whole lot of other statements that are in there.

 6              THE COURT:  They take that risk.  They take that risk.

 7              MR. JONES:  So once they put it in, we can talk about

 8    all the other things that --

 9              THE COURT:  If it's in.  It's in.

11:54 10         MR. HOOPES:  You're looking at me like "of course

11    that's the rule."

12              MR. JONES:  As long as they agree.

13              THE COURT:  What's sauce for the goose is sauce for

14    the gander, so that's fine.

15              Okay, now, we just need to go through this.  We've

16    been going straight for an hour and a half.  So the question --

17    is, let me ask Lee, do you want to take a break at this point?

18              (Discussion off the record.)

19              MR. BROOKS:  One thing you just mentioned, your Honor,

11:54 20   so you mentioned that drug prices are out, and we had said we

21    didn't plan to affirmatively use that.

22              THE COURT:  Yes, you did.

23              MR. BROOKS:  But the reason, now we understand that

24    the SEC is going to be allowed to get in from your Honor's

25    ruling that, "Oh, he was wrong about Promacta," you know,

1    "Promacta kept going."  The response to that is, what

2    Father Emmanuel did not realize was that the price of it was

3    going to get jacked up so high.  So it wasn't an issue of, oh,

4    yeah, the demand for it kept growing because --

5            THE COURT:  It goes to a good-faith belief.

6            MR. BROOKS:  Yes, it goes to a good-faith belief.

7    Okay, I just wanted to be clear for the record.

8            THE COURT:  By the way, speaking of which, I'm not

9    going to allow all this stuff in about errors in the complaint.

11:55 10          MR. HOOPES:  I understand that.

11           THE COURT:  That's not coming in.

12           MR. HOOPES:  I understand your ruling.

13           THE COURT:  I'm sitting here looking at everything

14   else I haven't ruled on.

15           MR. JONES:  Can you say that part again, your Honor?

16   You're not going to allow what?

17           THE COURT:  That there were mistakes in the initial

18   complaint or alleged leaks to the press.

19           MR. HOOPES:  Your Honor, I'm sorry.  With regard to --

11:55 20          THE COURT:  I know, we're all fading here.  Alleged

21   leaks to the press.

22           MR. HOOPES:  You are or are not?

23           THE COURT:  We're going to exclude that.

24           MR. HOOPES:  I understand, your Honor, and you ruled

25   on Duncan Hunter.

1          THE COURT:  Yes.

2          MR. HOOPES:  So the only other thing that I am aware

3   of, your Honor, is in their 184 -- I'm looking at our

4   response -- there were three check-the-box issues.  One was

5   other analysts' reports, and, of course, that goes to good

6   faith and to materiality and all of that.  There's three other

7   bad reports regarding Ligand during the relevant time period

8   they want to move exclude, and of course they come in.

9          MR. JONES:  Your Honor, the good faith here is --

11:56 10          THE COURT:  Is it the time period 2014?

11          MR. HOOPES:  Yes.

12          MR. JONES:  I believe so, your Honor.  There are other

13   short reports.  We don't necessarily have evidence that

14   Father Lemelson read them.  But, more importantly, what is the

15   good faith of we're talking about here?  There's no context

16   that Father Lemelson in good faith believed that the stock

17   price of Ligand should come down, which is what these other

18   short reports say as well, the stock price is likely to come

19   down.  But that's not what the case is about.  The case is

11:57 20   about whether in good faith he believed it when he said "Bruce

21   Voss said the following," or whether he believed it in good

22   faith when he said "Viking was not audited" or "Viking --"

23          THE COURT:  I am allowing the other analysts' reports

24   but will give a limiting instruction, it's not for the truth of

25   the matter asserted; it's what Father Lemelson -- Father

1    Lemelson said he read them, did he?

2         MR. HOOPES:  I believe he did.  He read everything

3    with regard to this.

4         THE COURT:  Okay, and it may also go to the issue of

5    materiality as far as stock movement.

6         MR. HOOPES:  If we can -- I'm sorry, your Honor.

7         THE COURT:  So I think I'm going to allow those in

8    with a limiting instruction as to what information was in the

9    marketplace, not whether it was true or not.

11:57 10        MR. HOOPES:  I understand.  Thank you.  And if we

11   could just bookmark the statements by Mr. Jones, which is this

12   case is about whether or not Voss said X, Y, Z and the good

13   faith and two or three others, but we'll order the transcript.

14   That's what we're trying to limit this case to, both for time

15   purposes and for then the notice issues.

16        There's also a Federal Reserve report.  In other

17   words, Ms. Yellen, you know, issued a report in which she noted

18   that biotech stocks were a little bit bloated at the particular

19   point and --

11:58 20        THE COURT:  Does it satisfy a public statement, I

21   mean, a public report?

22        MR. HOOPES:  Yes.

23        MR. JONES:  The statement of, you know, someone at the

24   Federal Reserve Bank, Janet Yellen.

25        THE COURT:  Does it come in under that hearsay

1    exception?

2              MR. HOOPES:  Yes.

3              MR. JONES:  I don't know that it's being offered for

4    its truth, your Honor, so --

5              MR. HOOPES:  Well, it's being offered for the truth,

6    what it was that she said, but also --

7              THE COURT:  If he ties her in and he read it.

8    Otherwise we would have to do a lot more work to see if it

9    qualified under the hearsay exception, as to his state of mind

11:58 10   rather than as a -- but he has to say he read it and was aware

11   of it.

12             MR. HOOPES:  Yes, I understand, your Honor.  And the

13   last item I think I have is, they wanted to exclude the issue

14   of Ligand's counsel monitoring (Inaudible) statement.  You

15   know, a Ligand attorney actually misrepresented himself in

16   writing to a potential private investor using his personal

17   email and business address in giving answers to a private

18   capital management (Inaudible).  I'm not sure what his status

19   is today, but the buyer where he was, certainly I think that

11:59 20   goes to bias on the part of Ligand.

21             THE COURT:  I don't know.  That seems under 403, I'm

22   likely to exclude it, so -- and nothing should come in about

23   this whistleblower.

24             MR. HOOPES:  The whistleblower, that's not coming in.

25   I think we had noted that in our --

```
 1              THE COURT:  Mr. Jones, Mr. Day, is there anything else
 2    that I've missed of yours that you can think of right now?
 3              MR. JONES:  Let me just double-check real quickly,
 4    your Honor.
 5              (Pause.)
 6              MR. JONES:  Your Honor, I do not believe so.  I think
 7    we have covered it all.
 8              THE COURT:  It's possible because we're all tired, so
 9    much came in within the last 48 hours, we missed something.
10    And so you might want to just flag it for Maryellen if there's
11    something in here, but no more briefing, so this is it unless
12    there's something we didn't anticipate.
13              MR. DAY:  Your Honor, I just wanted to respond to
14    something Mr. Hoopes said a few moments ago about the scope of
15    the case.  Mr. Jones obviously was talking about the truth of
16    the statements, the four statements that are part of our case.
17    Obviously it is very much at issue whether Father Lemelson in
18    good faith proceeded on this scheme to depress the stock of
19    Ligand.  We say it was in bad faith, it was fraudulent.
20              THE COURT:  Right.
21              MR. DAY:  I just want it to be very clear that there
22    was nothing in our presentation today which is intended to
23    limit our case to those four statements.  I just want to --
24              THE COURT:  I didn't take it that way.
25              MR. DAY:  Thank you.
```

1        THE COURT:  But I am still interested in this

2   question:  If they find that none of the four statements were

3   false or misleading, what's left of this case?  Because those

4   are the four that you all flagged for me.  I don't know what

5   else there is.  And I think it would be a complete pivot, if

6   you will, to say there's something else that was the scheme,

7   the falseness.  So just think about that issue.  I mean, I --

8        MR. HOOPES:  Yes, your Honor.

9        THE COURT:  I suppose I could ask, is this scheme

12:01 10   liability, and then just ask separately about each of the four

11   statements, and I would then address later on, if all four of

12   them were true, what's left.  Anyway --

13        MR. DAY:  Your Honor, the statements are obviously a

14   big part of this case.

15        THE COURT:  That's all I knew about till I got your

16   filing.  That's what I knew of, those four statements.  I spent

17   endless time on motions to dismiss and motions for summary

18   judgment on the four statements, you know?

19        MR. DAY:  Yes, your Honor, but in the complaint,

12:02 20   amended complaint, in the motion to dismiss and then summary

21   judgment, we had argued that disseminating these statements was

22   part of the scheme.  We argued that trying to get --

23        THE COURT:  Of course.

24        MR. DAY:  Okay, but --

25        THE COURT:  Yes.  If they're all true, then he's off

1    the hook.

2            MR. DAY:  Yes, we need to brief this issue for your

3    Honor.  I think this is --

4            THE COURT:  No, no more briefing.

5            (Laughter.)

6            MR. DAY:  Sorry.

7            THE COURT:  I'm done.  I'm done.  I'm just warning

8    you, if you lose on all four statements, as Mr. Jones has

9    indicated, it's the hook.  On the other hand, I must say, you

12:02 10  can put in lots of other stuff, I mean, you know, because it

11   was more than just the statements.  It was his whole approach

12   to the investor information and the blogs and the journalist,

13   et cetera.

14           So, okay, I think that that's it right now.  I do want

15   to warn you, however, that I have a criminal trial starting on

16   November 16 involving sex trafficking with four alleged

17   victims, and the speedy trial clock ends on that date.  So I

18   will be trying that case on November 16.  I am hoping, just in

19   terms of scheduling for personal reasons, I had planned on

12:03 20  taking November 11, 12, 13 and 14 off; but if I'm running close

21   on a trial, I'll go on the 12th.  But don't forget, the 11th is

22   a federal holiday.  We're closed.

23           So I think we can probably do it.  We're going full

24   days -- and we're going to give you a chart on it -- by which I

25   mean till 4:00 o'clock.  And typically I go 9:00 to 11:00, half

1    an hour for a break, 11:30 to 1:00, an hour for lunch, and then

2    2:00 to 4:00.  If I'm running too tight on time, I may narrow

3    this, but it's really hard to get a jury in and out of here in

4    15 minutes.  Maybe some judges are tougher than I am:  "No, you

5    have five minutes to go to the bathroom."

6          So I'm a little nervous about it because I will hold

7    people to time limits, and I'm hoping, what I would really love

8    to do is get this to the jury -- I don't know if this is

9    feasible, but I would love to get it to the jury on the 8th but

12:04 10   no later than the 9th and give them two days to deliberate.  If

11   we can't, we can't.  I can have them deliberating while I

12   impanel the other trial.  So if we don't, we don't, but I am

13   going to hold people to the timetable.  If he decides to plead

14   at the last minute or there's a motion for a continuance, then

15   I will let you know so we're not all just frantic about the

16   timing of it.  I'll tell the jury that they have to be

17   available through the 19th, but we would definitely not go past

18   Thanksgiving because people will be -- I'll tell them we'll

19   likely be done the previous week, but there's a chance it will

12:05 20   go into this week as we're impanelling.

21         I think we've narrowed the case quite a bit at this

22   point, but it's still a big case.  You've waited a long time.

23   There's a lot at stake.

24         Just one last question.  So let's assume for a minute,

25   which I'm not, that there's some liability, what happens then?

           1    Do I do an immediate follow-on trial, or is it all briefing at

           2    that point?

           3         MR. JONES:  Your Honor, it's your discretion.

           4    Generally speaking, what happens at that point is, we enter a

           5    briefing phase.  We put in what we think are the factors for

           6    penalty and why the penalties should be X amount under the

           7    statute and under the factors, called the Steadman factors.  We

           8    put in what we think the disgorgement should be based on what

           9    our discovery has been on ill-gotten gains -- I don't think

12:05     10    that's going to be a big issue here -- and we make a case to

          11    you for injunctive relief.

          12         THE COURT:  But you're not planning on me having time

          13    available for you that week?

          14         MR. JONES:  No, your Honor.  And in fact usually it's,

          15    you know, come back in a couple months with your briefs; and

          16    then if your Honor wants to have an hearing, great.  If your

          17    Honor wants to have an evidentiary hearing, I don't think

          18    that's going to be an issue here, but obviously we could put

          19    that together as well.  But obviously there's no time frame on

12:06     20    that, and it's all at your Honor's discretion.

          21         THE COURT:  So you all agree that that following week

          22    does not need to be blocked for the second half of this if

          23    there's a finding of liability?

          24         MR. BROOKS:  We agree with that, your Honor.  We agree

          25    with the way Mr. Jones just outlined it as the way we

1   understand it typically works.

2        THE COURT:  Okay, so I can move right into that other

3   trial without inconveniencing witnesses and that sort of thing;

4   having them fly here twice, for example.

5        Okay, and the one thing just to think about here is,

6   make sure you have backup.  We have had situations called

7   "unstable Internet."  Where three to five of the witnesses will

8   be virtual, you don't want to lose that time if we can't hear

9   them, and that has happened.  So I'm not quite sure what to do

12:07 10   about that.  I wouldn't -- is your summary witness going to be

11   here in person?

12        MR. DAY:  Yes, your Honor.

13        THE COURT:  You put in the case you want.  I wouldn't

14   think it would be crazy to put in a lot of the virtual

15   witnesses first.  The summary witness could also jump in if we

16   lose time based on a bad Internet connection because I'm

17   worried about losing time if it goes down, and that has

18   happened.

19        MR. JONES:  Your Honor, sorry to ask this question.

12:07 20   What happens if we get someone who has a COVID scare, and what

21   do we do, and what does that do in terms of your Honor's --

22        THE COURT:  I excuse them instantly.

23        MR. JONES:  Do we tell the rest of the jury and --

24        THE COURT:  No, I don't tell the rest of the jury.

25   Everyone is going to be wearing a mask.  Essentially I tell

people -- when you say a "COVID scare," that's a very broad

term.

     MR. JONES:  It is.

     THE COURT:  It's not whether that person themselves

have it.  I'm going to ask if any family member had contact

with COVID, and I will excuse them immediately.  So assuming

for a minute if that person himself or herself has COVID, we

may need to talk about that because that may eventually affect

the people sitting on either side of them.

     MR. JONES:  I'm just wondering what we'll do if we

have a hard stop, your Honor, and what we do at that point.

     THE COURT:  At the minute you're persuading me, but,

no, it's not a hard stop.  It's like if you say, "My son got

COVID."

     MR. JONES:  Yeah, I think the criminal trial is a hard

stop, your Honor.  You know, we can't afford to be down for two

days and still get the case done in the time frame that your

Honor --

     THE COURT:  No.  The question is what I do about the

rest of them.  If you're persuading me that -- Maryellen, I'm

thinking eight jurors because then I can do every other chair.

So if one of the jurors themselves gets COVID and everyone is

wearing a mask, it wouldn't be such a big deal.  And we'll get

the courtroom next door?  Why don't we ask if that's available.

And then I'm going to ask the question about whether people

1    have been vaccinated, and you can use that if you want as a

2    basis for a peremptory.

3              MR. JONES:  Thank you, your Honor.

4              MR. HOOPES:  Thank you, your Honor.

5              THE COURT:  Thank you.

6              THE CLERK:  All rise.

7              (Adjourned, 12:09 p.m.)

1                         C E R T I F I C A T E

2


3
UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS   ) ss.
CITY OF BOSTON                )
5

6


7              I, Lee A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 1

9    through 93 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Civil Action No. 18-11926-PBS,

11   Securities and Exchange Commission v. Gregory Lemelson, et al,

12   and thereafter by me reduced to typewriting and is a true and

13   accurate record of the proceedings.

14              Dated this 23rd day of October, 2021.

15

16

17

18

19              /s/ Lee A. Marzilli
                _____
20              LEE A. MARZILLI, CRR
                OFFICIAL COURT REPORTER
21

22

23

24

25