# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff | )<br>) |
| v. | )<br>) |
| GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC, | )<br>)<br>) Civil Action No. 1:18-cv-11926-PBS |
| Defendants, | )<br>) |
| and | )<br>) |
| THE AMVONA FUND, LP, | )<br>)<br>) |
| Relief Defendant | )<br>) |

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Pursuant to Fed. R. Civ. P. 50, Defendants Father Emmanuel Lemelson and Lemelson Capital Management respectfully submit this Motion for Judgment as a Matter of Law on all claims asserted by Plaintiff Securities and Exchange Commission's (the "Commission").

In addition to the reasons stated below, Defendants also expressly incorporate herein as support for this motion the grounds stated in prior memoranda, motions to dismiss, motions for summary judgment, motions *in limine*, and arguments made at hearing and during trial.

## LEGAL STANDARD

A motion under Rule 50(a) must be granted if there is no "legally sufficient evidentiary basis to find for the [non-moving party]." Rule 50(a) provides, in relevant part:

> (1) If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (a) resolve the issue against the party; and

1

  (b) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a).

  Judgment as a matter of law should be entered when the court, viewing the evidence and all permissible inferences in favor of the non-moving party, finds that a reasonable jury could not render a verdict for that party. *See Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 273 (1st Cir. 2000). In making its finding, "the court may not take into account the credibility of witnesses, resolve evidentiary conflicts, nor ponder the weight of the evidence introduced at trial." *Id.* Where the non-moving party has the burden of proof, there must be "more than a mere scintilla of evidence in its favor" and it may not "rely on conjecture or speculation in support of its position." *Invest Almaz v. Temple-Inland Forest Products Corp.*, 243 F.3d 57, 76 (1st Cir. 2001) (internal quotations omitted).

## ARGUMENT

**I. Section 10(b) and Rule 10b-5 of the Securities Exchange Act**

  The Commission's claims were based on four alleged misstatements. The Commission has failed to admit sufficient evidence from which a reasonable jury could find a violation of Rule 10b-5.

  **A. *July 3, 2014 Statement that Viking Does Not Intend to Conduct any Preclinical Studies or Trials was Objectively True***

  One of the four alleged false statements that form the basis of the Commission's Rule 10b-5 claims is that Fr. Lemelson's July 3, 2014 report stated, "Viking does not intend to **conduct** any preclinical studies or trials …." Trial Ex. 4 at 7 (emphasis added). The testimony from Viking's CEO, Dr. Lian, unequivocally established that this statement was true.

  On direct examination, Dr. Lian provided the following conclusory testimony:

2

> Q: In the second paragraph defendant writes "Viking does not intends [sic] to conduct any preclinical studies or trials." Do you see that?
>
> A: Yes.
>
> Q: Was that true?
>
> A: No.

Day 2 Trial Tr. (Rough) 171:2-7. However, Dr. Lian proceeded to clarify in his testimony that Viking planned to have third party vendors *conduct* preclinical studies and clinical trials, and Viking's role would be limited to "*managing*" third parties. Specifically, on cross-examination, Dr. Lian testified as follows:

> Q: And I believe you testified on direct that it's your opinion that statement was false?
>
> A: That is false. We planned to conduct – and conduct here it's sort of understood in a small biotech company conduct means you're going to contract somebody to perform those for you. So they're one and the same in the small cap, small biotechnology universe.

Day 2 Trial Tr. (Rough) 182:14-20. *See also,* Day 2 Trial Tr. (Rough) 176:7-12 (direct testimony).

When pressed on cross-examination about the distinction between conducting and managing preclinical studies or trials, Dr. Lian said, "We were going to hire people to manage the vendors that conduct those clinical trials. We don't – I mean, **small companies typically don't *conduct* trials**." Day 2 Trial Tr. (Rough) 187:14-16 (emphasis added). "We were going to hire people in-house to *manage* the **external vendors that would *conduct* the studies**." Day 2 Trial Tr. (Rough) 187:20-21 (emphasis added). "Q: So **Viking was going to have third parties conduct the preclinical and clinical trials**, right? A: **Correct**." Day 2 Trial Tr. (Rough) 193:10-12 (emphasis added). This testimony was consistent with the language in Viking's S-1, on which Fr. Lemelson based his statement, which provided: "**We intend to rely**

3

**on third parties to *conduct* our preclinical studies and clinical trials and perform other tasks for us.**" Trial Ex. 58 at 21 (emphasis added). None of this contradicts Fr. Lemelson's challenged statement in any way, shape, or form.

Thus, the trial record has shown that Fr. Lemelson's statement that "Viking does not intend to conduct any preclinical studies or trials" was objectively true. Therefore, Fr. Lemelson cannot be held liable under Rule 10b-5 for this statement, and this Court should enter judgment in favor of Fr. Lemelson on this statement as a matter of law.

      **B.**    ***The Commission Has Failed to Submit Evidence from which a Reasonable Jury Could Find that Either of the Viking Statements were Material***

In addition to the objectively true statement that Viking did not intend to conduct preclinical studies or trials, the Commission has also alleged that Fr. Lemelson committed a Rule 10b-5 violation when he wrote, "In other words, Marcum was merely hired, but the company has not yet even consulted with the firm on any material issues. The financial statements provided on the S1 accordingly are unaudited." Trial Ex. 4 at 9-10. However, the Commission has failed to provide any evidence from which a reasonable jury could find either of these statements were material.

      Viking's CEO, Dr. Lian, testified as follows:

      THE COURT: Listen to his question did any investor call you up or call anyone
      in the company and say I'm worried about these two statements?

      THE WITNESS: No.

Day 2 Trial Tr. (Rough) 202:12-15.

      Q: My question is simply after you forwarded them the report nobody you worked
      with ever expressed any concern to you about it, correct?

      A: After I reported the report, they did not.

Day 2 Trial Tr. (Rough) 203:1-4.

4

Also, specifically relating to the statement regarding unaudited financial statements, Dr. Lian testified as follows:

> Q: We're on the same page. My question is simply nobody ever came up to you and expressed exacerbation like how could you file an S-1 with unaudited – with unaudited financials?
>
> A: No. Everybody understand [*sic*] an S-1 has audited financials.

Day 2 Trial Tr. (Rough) 201:25-202:4.

Moreover, Ligand itself did not mention either of the Viking statements in either of its presentations to the Commission. Trial Exs. 163, 166. *See SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir.1997) ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it"). There is absolutely no evidence of any investor selling Ligand stock as a result of these Viking statements. *See Basic Inc. v. Levinson,* 485 U.S. 224, 241 n.18 (1988) ("[T]rading (and profit making) by insiders can serve as an indication of materiality ....") (emphasis omitted); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 851 (2d Cir. 1968) (noting that a "major factor in determining whether [discovery of mineral ore] was a material fact" was "the importance attached to the drilling results by those who knew about it"). Indeed, when Ligand made their second presentation to the SEC, not only did they fail to mention the Viking statements, Ligand failed to include the time period from June 24, 2014 to July 13, 2014 in their own (cherrypicked) selection of time periods in which Ligand claimed Fr. Lemelson's statements caused Ligand's stock price to decrease. Ex. 166 at 55.

Given the lack of any reported concerns regarding the two Viking statements, Ligand not identifying these statements as material in its submissions to the Commission, and the lack of any evidence of stock price impact, there is no evidence from which a reasonable jury could find these Viking statements were material. Accordingly, Fr. Lemelson is entitled to judgment as a matter of law on the Rule 10b-5 claims relating to this statement.

### C. *The Viking Statements and Insolvency Statement were Based on Public Information that was Disclosed — Making Those Statements Protected Speech Under the First Amendment*

The First Amendment protects statements analyzing securities. *See Lowe v. SEC*, 472 U.S. 181, 210 n.58 (1985). Where the uncontroverted evidence shows that Fr. Lemelson disclosed the bases for his statements about Viking and his definition of insolvency were disclosed and publicly available, these statements are protected under the First Amendment as a matter of law. *See Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995); *see also Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir. 1992).

Well-settled and controlling First Circuit case law demonstrates that the First Amendment bars any claim arising from these three statements, because Fr. Lemelson provided the factual basis underlying the challenged statements and, most critically, did not lead readers of the reports to believe that Fr. Lemelson had information about Ligand/Viking that was not available to others. *See, e.g., Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir. 1992); *McKee v. Cosby*, 874 F.3d 54, 63-64 (1st Cir. 2017); *Piccone v. Bartels,* 785 F.3d 766, 771-72 (1st Cir. 2015); *Riley v. Harr*, 292 F.3d 282, 289-90 (1st Cir. 2002). *See also Ayyadurai v. Floor64, Inc.*, 270 F. Supp. 3d 343, 360-61 (D. Mass. 2017).

As this Court recognized in its summary judgment decision, "[w]hen determining whether a statement is opinion or fact, 'the relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact.'" ECF No. 146 at 23 (quoting *Phantom Touring*, 953 F.2d at 727). "A statement, even if 'couch[ed] . . . as an opinion,' will give rise to liability if it 'implies the existence of underlying [false and] defamatory facts' as its basis; **conversely, a statement is 'immunize[d]' so long as the speaker discloses all of the facts undergirding it and none of**

***them are both false and defamatory***." *McKee v. Cosby*, 874 F.3d at 61 (quoting *Piccone*, 785 F.3d at 771) (alterations and omissions in original) (emphasis added).

In *Phantom Touring*, the earliest of the multiple First Circuit decisions directly on point (all of which involve the court deciding the First Amendment issue as a matter of law) the court started its analysis by analyzing the *nature* of the series of articles as a whole, not just the challenged statements in isolation. 953 F.2d at 729; *accord McKee*, 874 F.3d at 62 ("We focus first on the message of the [defamatory letter] as a whole, before considering individual statements"); *Piccone*, 785 F.3d at 772 ("This task *requires* an examination of the totality of the circumstances in which the specific challenged statements were made, including the general tenor and context of the conversation and *any cautionary terms used by the person publishing the statement*") (emphasis added). Here, such an initial analysis clearly militates in favor of First Amendment protection. The reports contain express disclaimers at the beginning and the end, letting the reader know both that the contents reflect the *opinions* of Fr. Lemelson and, of equal importance, that Fr. Lemelson held a *short position* in Ligand. While not dispositive in and of itself, such language plainly puts the reader on notice of Fr. Lemelson's intent. *See Phantom Touring*, 953 F.2d at 729 ("The nonfactual nature of Kelly's articles is indicated at first glance by the format. Both appeared as a regularly run theater column, a type of article generally known to contain more opinionated writing than the typical news report").

Fr. Lemelson's reports here are also chock full of hyperbole and colorful language, further telltale signs of the type of writing that is immunized by the First Amendment. *See, e.g.,* Trial Ex. 4 at 9 ("The casual observer might even mistake what Ligand leadership has coined a 'creative transaction' as a common game of three-card Monte, played on the street corner—shills

7

included"). *See Riley*, 292 F.3d at 297 ("The First Amendment protects the rhetorical hyperbole and imaginative expression that enlivens writers' prose.") (internal quotations omitted).

To the extent any doubt remains, such doubt is easily put to rest by Fr. Lemelson having *repeatedly **quoted Ligand personnel and others who disagreed with his views and expressly sourcing the basis for his position***. "Of greatest importance, however, is the breadth of Kelly's articles, which not only discussed all the facts underlying his views but also gave information form which readers might draw contrary conclusions." *Phantom Touring*, 953 F.2d at 730.  The same holds true here.  For example, with respect to the two challenged statements concerning Viking, in his report, Fr. Lemelson quoted Ligand's CEO, John Higgins, concerning the *company's* perspective on its disputed business relationship with Viking as follows:

- A relationship such as this one with Viking gives Ligand the opportunity to entrust valuable internal programs to a dedicated team with the operational resources to take them to the next level.

- This is a creative transaction that establishes a bold portfolio of early- and mid-stage assets that have the potential to generate substantial news flows.

Trial Ex. 4 at 7.  Moreover, in the same report, Fr. Lemelson pointed out that other analysts disagreed with his commentary on Ligand.  Fr. Lemelson quoted another analyst as having referred to his initial report on Ligand as "silly" and "foolish."  Trial Ex. 4 at 6.

Further, Fr. Lemelson discussed—*and expressly sourced*—"the facts underlying [his] views." *Phantom Touring*, 953 F.2d at 730.  The July 3 report makes clear that Fr. Lemelson's *entire* understanding of Viking came from having read the company's publicly filed S-1 registration statement, a document Fr. Lemelson cited no fewer than four times in his three-page discussion of that company.

Specifically, while Fr. Lemelson admits he made a mistake in stating that Viking's financial statements were unaudited, he cited the basis of that statement in his report.  *See* Trial

Ex. 4 at 9-10.  Fr. Lemelson quoted directly from two passages of Viking's S-1 and then wrote, "***In other words***, Marcum was merely hired, but the company has not yet even consulted with the firm on any material issues.  The financial statements provided on the S1 accordingly are unaudited." *Id.*  This clearly demonstrates that Fr. Lemelson was relying on the S-1 and drawing conclusions from the passage he quoted.  Under these circumstances, such statements are protected by the First Amendment, as a matter of law.

Moreover, as the Supreme Court has emphasized, even inaccurate and controversial speech merits protection under the First Amendment:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. . . . Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate. . . . And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).

As he did with Viking statements, with respect to the fourth challenged statement concerning insolvency, Fr. Lemelson expressly provided his definition of the term as it relates to Ligand and the underlying source from which it derived the numbers:

> On August 4, 2014, Ligand released their Q2 earnings report and financial statements in which the company boasted it was debt free.  Prior to this August 4 release, ***the company's liabilities exceeded tangible assets, meaning the company was insolvent.***  With the August 4, 2014 earnings release and its updated financials, the company presented tangible equity of just $21,000 upon which rested an extraordinary market capitalization of approximately $1.1 billion.

Trial Ex. 6 at 2.  Notably, in his first report, Fr. Lemelson explained the *reason* behind his *opinion* that Ligand's intangible assets were not worth much.

> The balance sheet is ~66 percent intangibles.  Once removed, the Company has just about minus $4 million in equity.  This point is important since management boasted recently of 'doubling' shareholder equity.  If there was any appreciable evidence that the Company's existing programs were likely to produce materially

9

>   higher revenues or profits in the future, the intangible entry might have some value. But as it stands today, it is just padding the balance sheet to disguise just how precarious the Company's financial situation continues to be.

Trial Ex. 1 at 21.  Indeed, ***in every report and the August 13, 2014 interview prior to the August 14 and 22, 2014 challenged statement on insolvency, Fr. Lemelson disclosed that he questioned the value of Ligand's and labeled Ligand as insolvent <u>if you removed their intangible assets</u>***."  Trial Ex. 1 at 4, 9, 11, 21; Trial Ex. 4 at 8, 10 (describing partner in transaction as "essentially insolvent, just as Ligand is **once intangibles are removed from its balance sheet**") (emphasis added); Trial Ex. 5 at 2, 6, 7 ("**Once intangibles are removed from the balance sheet**, company shareholder equity is just $21,000 to shield the common shareholder from the litany of growing liabilities and sever competitive threats the company faces") (emphasis added); Trial Ex. 143 ("But **when you back out intangibles from this company before their August 4th release, they were technically insolvent** if you're looking at – you know, removing these intangibles, which are questionable to begin with") (emphasis added).

> Removing any doubt that Fr. Lemelson's definition of insolvency was fully disclosed, Ligand's presentation to the Commission expressly stated, "Lemelson uses a highly unusual definition of insolvency to assert that Ligand is insolvent."  Ex. 163 at 29.  Mr. Higgins similarly testified:

>   Q: Well, so also in that first PowerPoint, you noted that Father Lemelson uses a highly unusual definition of insolvency to assert that Ligand is insolvent. Remember that?
>
>   A: Yes.
>
>   Q: And according to Lemelson, liabilities exceeded tangible assets, meaning the company was insolvent.  Do you remember that?
>
>   A: Yes.

>Q: You understood that this was the definition that Father Lemelson was using, correct?
>
>A: Correct.

Day 4 Trial Tr. (Rough) 135:17-136:2.

Under these circumstances, the First Circuit has *repeatedly* held that statements like the ones the Commission challenges here, which were accompanied by the factual basis underlying them, are ***absolutely*** protected by the First Amendment. *Phantom Touring*, 953 F.2d at 729-31 (holding full disclosure of facts underlying author's judgment rendered statement that plaintiff was "marketing its production dishonestly—that it deliberately was confusing the public" not actionable because neither of the columns indicated that the author had more information about the marketing practices than what was reported in the articles); *Riley v. Harr*, 292 F.3d at 297-98 (statement that plaintiff was "the guy who killed your kids" not actionable where author disclosed the facts upon which statement was based); *McKee*, 874 F.3d at 63-64 (holding statement that plaintiff's rape allegations against comedian Bill Cosby were false was not actionable because the letter containing the statement was "based on facts accessible to everyone," and therefore "a reasonable reader would not understand [the author] to be suggesting that he was singularly capable of evaluating [plaintiff's] credibility based on undisclosed evidence"); *Piccone*, 785 F.3d at 773-74 (holding statement that was "sufficiently factual to be proved true or false" was nonetheless not actionable, because "full disclosure of the non-defamatory facts" did not imply that "only one conclusion was possible"). Because the evidence has established that the bases for each of these statements were disclosed, the Commission has failed to present evidence from a which a reasonable jury could find Fr. Lemelson liable and, thus, he is entitled to judgment as a matter of law.

      **D.**     *The Commission Has Failed to Present Necessary Expert Evidence to Support its Claim Regarding the Insolvency Statement*

At the beginning of this case, the Commission represented that it would present expert testimony on the statement relating to insolvency. At the motion to dismiss hearing, the Court addressed the issue underlying the Commission's fourth challenged statement involving Fr. Lemelson's calculation of Ligand's debt-to-tangible equity ratio and whether the proceeds from a loan should have been included as equity in that calculation. The Court engaged in the following exchange with counsel for the Commission:

>  THE COURT: Are you an accountant?
>
>  MR. DAY: I am not an accountant, your Honor. I have a fair amount of exposure to accounting through my work, but I'm not an accountant.
>
>  THE COURT: My first year in law school I -- the second year, I think, took a pass/fail accounting class, and that was about the extent of it. But **usually I have experts and some explanation of it** and I can pick it up, so go ahead.

ECF No. 142-3 at 28:11-19 (emphasis added).

Later in that same hearing, the Court addressed the issue of insolvency as raised in Fr. Lemelson's reports regarding Ligand.

>  THE COURT: So there's a different way under the accounting rules to describe this that doesn't make someone feel as if they're on the brink of insolvency.
>
>  MR. DAY: Exactly, exactly.
>
>  THE COURT: Although it does still put them at risk, right, the difference, what did you say, $240 million in a bond offering, and they only have $168 million left?
>
>  MR. DAY: Yes, your Honor, **but I think that's a question that would have to be answered by experts** and with reference to testimony in this case.

ECF NO. 142-3 at 31:8-17 (emphasis added).

The Commission ultimately decided not to engage an expert to testify in this case.  At the April 14, 2021 status conference, this Court once again asked whether the Commission planned to use an expert on the insolvency issue.

> THE COURT: Well, so there's that issue. There's the events. The one I keep coming back to and harping on, which I think is the weakest point, both in my analysis and in the SEC's case, is, I don't understand what insolvency is in this context, and I didn't know whether that would end up requiring accounting testimony. It's never been a hundred percent explained to me how you think about that issue in the context of this case and whether that opinion is a reasonable opinion or whether it's misleading. I know that the president of Ligand says, "No, we're not insolvent." He said, well, given the definition he had, you know, that's what I was thinking of. And I just need to, and I'm sure a jury would need to, understand it better, so I don't know where that comes from.
>
> MR. JONES: Your Honor, we're anticipating explaining that better to a jury and to the Court than we have already. That was very clear from your opinion. We don't feel that it is necessary to bring in an accounting expert on insolvency. This is not about whether an auditor or whether a public company represented an insolvency or lack of insolvency under generally accepted accounting principles. It's about a statement that the defendant made based on, A, Ligand, you know, based on this ratio, ***Ligand is insolvent; and we anticipate having both the company and the company's auditors to be able to talk about whether or not there was any risk of insolvency.***
>
> THE COURT: All right, so you're relying on the auditors. Is that it?
>
> MR. JONES: In part, your Honor, yes.

April 14, 2021 Status Conference Tr. at 6:10-7:12 (emphasis added).  Despite this representation from the Commission, Ligand's former auditor, Ms. Hyodo, testified to the contrary. In response to a question from the Commission on re-direct, Ms. Hyodo testified, ***"We do not assess insolvency.  That term is not within our regulatory standards."***  Day 3 Trial Tr. (Rough) 182:2-3 (emphasis added).  Ms. Hyodo confirmed this testimony on re-cross examination:

> Q: I believe you testified that you don't opine, give an opinion on insolvency when you're looking at going concern. Is that correct?
>
> A: That's correct.

Day 3 Trial Tr. (Rough) 183:16-19.

13

The *only* evidence the Commission elicited that Ligand was allegedly not insolvent comes from the lay opinion testimony of Mr. Higgins and Mr. Foehr. Day 2 Trial Tr. (Rough) 83:20-84:1; Day 4 Trial Tr. (Rough) 28:15-29:4. But even Mr. Higgins noted that, "there are many ways to consider insolvency." Day 4 Trial Tr. (Rough) 28:22. Mr. Higgins also confirmed his understanding that insolvency involves a "***judgment call***." Day 4 Trial Tr. (Rough) 136:22-25.

As the Supreme Court stated, "commercial law actually knows a number of different insolvency concepts." *Rowland v. California Men's Colony Unit II Men's Advisory Council*, 506 U.S. 194, 206 (1993) (citing 11 U.S.C. § 101(32) (defining solvency as used in the Federal Bankruptcy Code); *Kreps v. Commissioner*, 351 F.2d 1, 9 (2d Cir. 1965) (discussing type of "equity" insolvency); Uniform Commercial Code § 1-201(23) (combining three different types of insolvency)). *See also, Payne v. S. S. Tropic Breeze*, 274 F. Supp. 324, 335 (D.P.R. 1967) ("The meaning of the term insolvency may have different meanings in different contexts"). The meaning of insolvency and the proper definition to apply in the certain contexts is "specialized knowledge" that falls within the scope of Fed. R. Evid. 702. This is evidenced by the fact that multiple courts have accepted expert opinion testimony regarding insolvency. *See, e.g., In re Industrial Commercial Elec., Inc.*, No. 02–45451–JBR, 02–4591–JBR, 2004 WL 1354530, at *7 (D. Mass. Apr. 27, 2004) (admitting expert testimony in bankruptcy case to opine on the issue of insolvency and noting that this expert had opined on the same issue in other bankruptcy courts in the First Circuit); *Connolly Geaney Ablitt & Willard, PC*, 614 B.R. 133, 141 n.7 (1st Cir. 2020) (noting expert reports of debtor's insolvency at time certain transfers were made); *Branch v. Ernst & Young U.S.*, 311 F. Supp. 2d 179, 183-84 (D. Mass. 2004) (noting how competing

experts disagreed on opinion of insolvency and denying summary judgment on that issue accordingly).

Moreover, precedent from this district establishes that a company's negative working capital is an acceptable definition for insolvency. *See 4 MVR LLC v. Warren W. Hill Constr. Co. Inc.*, No. 12-10674-DJC, 2016 WL 4775451, at *13 (D. Mass. Sept. 13, 2016) (expert "explain[ed] that 'negative working capital is a primary indication that a debtor cannot pay its obligations as they become due. Moreover, according to [the expert], the fact that Hill Construction's current liabilities exceeded its current assets means that Hill Construction satisfied the definition of insolvency, as it is defined by both the Uniform Voidable Transactions Act and the United States Bankruptcy Code section 101(32)(A)") (quoting expert report). Notably, Ligand had negative working capital from 2011-2013, the last annual report submitted by Ligand prior to Fr. Lemelson's reports. Ms. Hyodo confirmed that negative working capital meant that the company's current assets were less than its current liabilities. Day 3 Trial Tr. (Rough) 168:7-9. Thus, under this definition, the statement regarding Ligand's insolvency was true.

The Commission's own witnesses establish that its decision not to present expert testimony is fatal to its claim that is premised on determining whether Fr. Lemelson's selection of the metric to opine on insolvency was appropriate. As the Commission concedes, it is not challenging any of Fr. Lemelson's mathematical calculations, just whether the metric he selected was appropriate.[1] The burden was on the Commission to prove why and how the removal of intangible assets to determine insolvency was intentionally misleading so as to form the basis of

---

[1] As noted above, given the nature of this claim and the fact that Fr. Lemelson disclosed his definition, this is protected First Amendment speech.

a Rule 10b-5 claim. There is not a shred of evidence from which the jury can make such a determination here.

### E. The Commission's Failure to Prove that Fr. Lemelson's Statements Negatively Impacted Ligand's Stock Price is Fatal to its Claims

Judgment as a matter of law is appropriate for the additional reason that there is no sufficient evidence that Fr. Lemelson's statements, even if they were not protected by the First Amendment, were material. The Commission failed to present any expert evidence on the impact the challenged statements had on Ligand's stock price. *See Emerson v. Genocea Biosciences, Inc.*, 353 F. Supp. 3d 28, 41 (D. Mass. 2018); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 154-55 (D. Mass. 2006). As argued in summary judgment and incorporated by reference herein, Fr. Lemelson maintains that in cases alleging fraud on the market, there is no need to rely on a hypothetical reasonable investor, but rather materiality must be proven by means of an event study showing market price impact.

### F. There Is No Legally Sufficient Evidentiary Basis for a Reasonable Jury to Conclude That Fr. Lemelson Acted with Scienter

Finally, judgment as a matter of law is appropriate because there is no sufficient evidence that Fr. Lemelson acted with scienter. To prove scienter, the Commission had to show that Fr. Lemelson acted with "a mental state embracing intent to deceive, manipulate or defraud," *Aaron v. SEC*, 446 U.S. 680, 686 n.5 (1980), or a "high degree of recklessness." *Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp.*, 649 F.3d 5, 20 (1st Cir 2011). The Commission has failed to meet its burden. Fr. Lemelson disclosed his short position in all of his reports and during the internet radio interview, published his reports in his own name, and held onto a substantial part of his short position in Ligand nearly two months after his final statement. Accordingly, no reasonable jury could find for the Commission on the element of scienter.

II.     **Section 206(4) of the Investment Advisers Act**

The Commission's IAA claim is premised on the distribution of Fr. Lemelson's analysis of Ligand to investors and prospective investors without "disclos[ing] that the profitability of their short-selling strategy depended upon Lemelson's fraudulent manipulation of Ligand stock through false statements, rather than his ability to identify a company whose stock would decrease on its own based on its inherent lack of value." ECF No. 33 at ¶¶ 55-56. The Commission alleged that this "omission also made other disclosures about Amvona's value-focused investing strategy materially false and misleading." ECF No. 33 at ¶ 56. ***In other words, the Commission's IAA claim is premised entirely on the existence of liability for violations of Rule 10b-5.*** As discussed *supra*, there is no sufficient evidence that Fr. Lemelson violated Rule 10b-5. Thus, judgment as a matter of law is appropriate on the Commission's corresponding IAA claim.

Further, to the extent the Commission is permitted to pursue its IAA claim on a negligence standard, the Commission failed to provide any evidence that the statements were **<u>material</u>** to an investor or potential investor of the Amvona Fund.[2] As noted above, the Commission has weak evidence regarding materiality as it applies to Ligand investors for the four alleged misstatements. There is absolutely *no* evidence of materiality as to investors or potential investors of the Amvona Fund. It strains credulity that any of the challenged

---

[2] The Final Rule 206(4)-8, as announced by the Commission itself, stated this limitation clearly and repeatedly. "The rule prohibits advisers from (i) making false or misleading statements **to investors or prospective investors in hedge funds and other pooled investment vehicles they advise**, or (ii) otherwise defrauding **these investors**." 72 Fed. Reg. 44756, 44757 (Aug. 9, 2007) (emphasis added). Similarly, the Commission stated "[t]he rule we are adopting today applies to investment advisers **with respect to any 'pooled investment vehicle' they advise**." 72 Fed. Reg. 44756, 44758 (emphasis added). "Rule 206(4)-8(a)(1) prohibits any investment adviser to a pooled investment vehicle from making an untrue statement of a material fact **to any investor or prospective investor in the pooled investment vehicle**, or omitting to state a material fact necessary in order to make the statements made **to any investor or prospective investor in the pooled investment vehicle**, in the light of the circumstances under which they were made, not misleading." 72 Fed. Reg. 44756, 44758-59 (emphasis added).

statements, allegedly made negligently, and which are contained in over 55 pages of reports and four interviews would have a material impact on the decision of an investor or potential investor in the Amvona Fund to invest, not invest, or continue to invest.

## CONCLUSION

For the foregoing reasons, Fr. Lemelson respectfully requests that the Court grant judgment as a matter of law on his behalf.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
Thomas M. Hoopes (BBO No. 239340)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com
thoopes@lhblaw.com

Dated: November 2, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed in hand and served to counsel for the Securities and Exchange Commission in hand on November 2, 2021, and was then filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on November 3, 2021.

*/s/ Douglas S. Brooks*
Douglas S. Brooks