**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ) | |
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| GREGORY LEMELSON and LEMELSON CAPITAL ) | Civil Action No. 1:18-cv-11926-PBS |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE AMVONA FUND, LP, ) | |
| ) | |
| Relief Defendant ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Pursuant to Fed. R. Civ. P. 50, Defendants Father Emmanuel Lemelson and Lemelson

Capital Management (Fr. Lemelson) respectfully submit this Renewed Motion for Judgment as a

Matter of Law on the portions of the one claim brought by Plaintiff Securities and Exchange

Commission's (the "Commission") for which the jury found Defendants liable.  *See* ECF No.

232.

In addition to the reasons stated below, Defendants also expressly incorporate herein as

support for this motion the grounds stated in prior memoranda, motions to dismiss, motions for

summary judgment, motions *in limine*, and arguments made at hearing and during trial.

## LEGAL STANDARD

A motion under Rule 50(a) must be granted if there is no "legally sufficient evidentiary

basis to find for the [non-moving party]."  Rule 50(a) provides, in relevant part:

1

> (1) If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (a) resolve the issue against the party; and
>
> (b) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a).  Under Fed. R. Civ. P. 50(b), the movant for judgment of a matter of law may renew his motion no later than 28 days after judgment and the court may "direct the entry of judgment as a matter of law."

Judgment as a matter of law should be entered when the court, viewing the evidence and all permissible inferences in favor of the non-moving party, finds that a reasonable jury could not render a verdict for that party.  *See Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 273 (1st Cir. 2000).  In making its finding, "the court may not take into account the credibility of witnesses, resolve evidentiary conflicts, nor ponder the weight of the evidence introduced at trial."  *Id.*  Where the non-moving party has the burden of proof, there must be "more than a mere scintilla of evidence in its favor" and it may not "rely on conjecture or speculation in support of its position."  *Invest Almaz v. Temple-Inland Forest Products Corp.*, 243 F.3d 57, 76 (1st Cir. 2001) (internal quotations omitted).

## ARGUMENT

The jury found Fr. Lemelson not liable for (1) engaging in a scheme to defraud in violation of Rule 10b-5(a) and (c); (2) violating the Investment Advisors Act intentionally or recklessly; (3) violating the Investment Advisors Act negligently; and (4) making untrue statements of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Rule 10b-5(b) with respect to Defendants' various statements concerning Ligand's

2

insolvency.  *See* ECF No. 232 (numbers 1, 2(d), 3, and 4).  The jury found Fr. Lemelson liable

for a violation of Rule 10b-5(b) based on a statement he attributed to Ligand's Investor Relations

representative during a June 19, 2014 Benzinga interview, and two statements he made about a

company called Viking Therapeutics in his July 3, 2014 report.  *See* ECF No. 232 (numbers 1(a),

(b), and (c)).  Fr. Lemelson did not trade any Viking stock, then a non-public company, at the

time.  The evidence at trial did not support those liability findings, and this Court should rule that

Fr. Lemelson is not liable as a matter of law.

I.    **Fr. Lemelson's July 3, 2014 Statement that Viking Does Not Intend to Conduct any Preclinical Studies or Trials was Objectively True**

The trial testimony of Viking's CEO, Dr. Brian Lian, established that Fr. Lemelson's

statement in his July 3, 2014 report that "Viking does not intend to conduct any preclinical

studies or trials …" (Trial Ex. 4 at 7) was objectively true.

On direct examination, Dr. Lian provided the following conclusory testimony:

Q: In the second paragraph defendant writes "Viking does not intends [*sic*] to conduct any preclinical studies or trials."  Do you see that?

A: Yes.

Q: Was that true?

A: No.

Day 2 Trial Tr. (Rough) 171:2-7.  However, Dr. Lian proceeded to clarify in his testimony that

Viking planned to have ***third party*** vendors ***conduct*** preclinical studies and clinical trials, and

Viking's own role would be limited to "***managing***" third parties.  Specifically, on cross-

examination, Dr. Lian testified as follows:

Q: And I believe you testified on direct that it's your opinion that statement was false?

A: That is false.  We planned to conduct – and conduct here it's sort of understood in a small biotech company conduct means you're going to contract

somebody to perform those for you.  So they're one and the same in the small cap, small biotechnology universe.

Day 2 Trial Tr. (Rough) 182:14-20.  *See also,* Day 2 Trial Tr. (Rough) 176:7-12 (direct testimony). Notably, Viking's S-1 contains no language  explaining that the reader should interpret the word "conduct" to mean that third parties were going to conduct these studies on Viking's behalf.  *See* Trial Ex. 58.

When pressed on cross-examination about the distinction between *conducting* and *managing* preclinical studies or trials, Dr. Lian said, "We were going to hire people to manage the vendors that conduct those clinical trials.  We don't – I mean, **small companies typically don't *conduct* trials**."  Day 2 Trial Tr. (Rough) 187:14-16 (emphasis added).  "We were going to hire people in-house to ***manage*** the **external vendors that would *conduct* the studies**."  Day 2 Trial Tr. (Rough) 187:20-21 (emphasis added).  And to make this point abundantly clear:

> Q: So **Viking was going to have third parties conduct the preclinical and clinical trials**, right?
>
> A: **Correct**.

Day 2 Trial Tr. (Rough) 193:10-12 (emphasis added).

This testimony was consistent with the language in Viking's S-1, on which Fr. Lemelson based his statement, which provided: "**We intend to rely on third parties to *conduct* our preclinical studies and clinical trials and perform other tasks for us.**"  Trial Ex. 58 at 21 (emphasis added).  None of this contradicts Fr. Lemelson's challenged statement in any way, shape, or form, in fact, Dr. Lian's testimony unequivocally affirms the accuracy of Fr. Lemelson's statement.

Thus, the trial record proved that Fr. Lemelson's statement that "Viking does not intend to conduct any preclinical studies or trials" was objectively true.  Therefore, Fr. Lemelson cannot

be held liable under Rule 10b-5(b) for this statement, and this Court should enter judgment in favor of Fr. Lemelson on this statement as a matter of law.

## II.     The Commission Failed to Submit Evidence from which a Reasonable Jury Could Find that Either of the Viking Statements were Material

### A.     *Any Alleged Omission that Third Parties Would Conduct Preclinical Studies Did Not Alter the Total Mix of Information Available to Investors, Because That Information was Available in Public Filings*

Because the statement that Viking did not intend to conduct preclinical studies was objectively true, the only plausible argument the Commission had regarding this statement was what it advanced in its closing argument—that this statement ***omitted*** the fact that third parties would be conducting the preclinical studies.  Day 7 Trial Tr. (Rough) 64:4-65:25.  However, in *multiple* places in his three-page discussion of Viking, Fr. Lemelson *expressly cited* Viking's S-1, which contained the specific information allegedly omitted.  As such, ***as a matter of law***, such a purported omission cannot serve as the basis for a Rule 10b-5 violation.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (explaining that "total mix" includes information readily available in public domain or facts known or reasonably available to shareholders).

Consistent with this fundamental proposition of securities law, the First Circuit affirmed summary judgment in favor of a defendant accused of violating Rule 10b-5 for improperly including the balances of a cash management account ("CMA") in a reported statutory surplus. *Wells v. Monarch Capital Corp.*, 129 F.3d 1253, 1997 WL 693032, at *2 (1st Cir. Oct. 29, 1997)*.  In doing so, the First Circuit agreed with the district court's reasoning that the "total mix" of information was not altered by the statement, because "[o]ther public filings … were available to the Class and clearly revealed the existence and true nature of the CMA."  *Id.* at *4.

Other courts have also consistently held, ***as a matter of law***, that a purported omission is not actionable if the allegedly withheld information was otherwise available in public filings.

5

*See Whitehead v. Inotek Pharmaceuticals Corp.*, No. 17-CV-10025-LTS, 2018 WL 4732774, at *6 (D. Mass. June 27, 2018) (alleged omissions of certain negative results in statements about progress of clinical studies "are not 'material' as required by Section 10(b) because the statistically significant results of the Phase II trials were disclosed in the publically available SEC filings"); *In re Freemarkets, Inc. Securs. Litig.*, No. 00-024, 2000 WL 33914766, at *7 (W.D. Pa. Dec. 26, 2000) (dismissing Rule 10b-5 claim alleging material omission from Registration Statement and Prospectus because the allegedly withheld information was disclosed in a press release that "was available to the investing public" reasoning that if press release should have put defendants on notice of third party breaking a contract, then "it should also have put plaintiffs on notice of the same likelihood"); *Alexander v. Citigroup Glob. Markets. Inc.*, No. SACV1200813JVSANX, 2013 WL 12077818, at *5 (C.D. Cal. Apr. 10, 2013) ("'Securities laws do not require disclosure of information that is readily available in the public domain,' and there is no evidence that omission of the margin rate in the Brochure is material because it 'would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available'") (internal quotations omitted); *In re Seagate Tech. II Sec. Litig.*, No. C 88-20489 RPA, 1989 WL 222969, at *3 (N.D. Cal. May 3, 1989) ("However, at a threshold level***, if the material containing the alleged omissions, actually discloses the facts plaintiffs claim are absent, there is obviously no omission***. In a similar vein, if the information to be disclosed is already known, even if through another source, it cannot be considered material") (citing *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1 (2d Cir.1983)). Here, Dr. Lian specifically testified that the nature of the relationship between small biotech firms and third-party providers of clinical studies was already widely known and understood. Day 2 Trial Tr. (Rough) 182:14-20.  Further, the fact that third parties were conducting

preclinical studies was disclosed in the S-1. Trial Ex. 58. Therefore, Fr. Lemelson's statement that Viking was not going to conduct these studies did not alter the total mix of information available to investors.

**B.**     ***There is No Support for Finding Either of the Viking Statements Were Material Where Viking's CEO Testified that Nobody was Concerned with Either of the Viking Statements, Everyone Knew the Statement about Unaudited Financial Statements was Incorrect, and it was Legally Impossible for Drugs to be Marketed without Preclinical Studies***

In addition to the objectively true statement that Viking did not intend to conduct preclinical studies or trials, the Commission also asserted that Fr. Lemelson committed a Rule 10b-5(b) violation when he wrote, "In other words, Marcum was merely hired, but the company has not yet even consulted with the firm on any material issues. The financial statements provided on the S1 accordingly are unaudited." Trial Ex. 4 at 9-10. However, the Commission has failed to provide any evidence from which a reasonable jury could find either of these statements were material.

Viking's CEO, Dr. Lian, testified as follows:

THE COURT: Listen to his question did any investor call you up or call anyone in the company and say I'm worried about these two statements?

THE WITNESS: No.

Day 2 Trial Tr. (Rough) 202:12-15.

Q: My question is simply after you forwarded them the report nobody you worked with ever expressed any concern to you about it, correct?

A: After I reported the report, they did not.

Day 2 Trial Tr. (Rough) 203:1-4.

Also, specifically relating to the statement regarding unaudited financial statements, Dr. Lian testified as follows:

> Q:  We're on the same page.  My question is simply nobody ever came up to you and expressed [exasperation] like how could you file an S-1 with unaudited – with unaudited financials?
>
> A: No.  Everybody understand [*sic*] an S-1 has audited financials.

Day 2 Trial Tr. (Rough) 201:25-202:4.

And specifically relating to the statement regarding preclinical studies, Dr. Lian testified

as follows:

> Q:  Right.  So nobody as far as you knew misunderstood and said oh, my God these drugs are going to go to market and no one's going to have done any trials on them.  Right?
>
> A:  No one would ever think that.  They could never get to market.
>
> Q: It would be impossible.  It would be physically impossible.  That could never happen?
>
> A:  I think it's legally impossible.

Day 2 Trial Tr. (Rough) 201:8-15.

Moreover, Ligand itself did not mention either of the Viking statements in either of its

two separate presentations to the Commission made approximately nine months apart.  Trial Exs.

163, 166.  Dr. Lian and Viking never reported the allegedly false statements to the Commission

either.  *See SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir.1997) ("[A] major factor in determining

whether information was material is the importance attached to it by those who knew about it").

The Commission presented no evidence of any investor selling Ligand stock as a result of these

Viking statements.  *See Basic Inc. v. Levinson,* 485 U.S. 224, 241 n.18 (1988) ("[T]rading (and

profit making) by insiders can serve as an indication of materiality ....") (emphasis omitted); *SEC*

*v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 851 (2d Cir. 1968) (noting that a "major factor in

determining whether [discovery of mineral ore] was a material fact" was "the importance

attached to the drilling results by those who knew about it").  Indeed, when Ligand made their

second presentation to the SEC, nine months after the first, not only did they fail to mention the Viking statements, Ligand failed to include the time period from June 24, 2014 to July 13, 2014 in their own (cherrypicked) selection of time periods in which Ligand claimed Fr. Lemelson's statements caused Ligand's stock price to decrease.  Ex. 166 at 55.  This demonstrated Ligand and its counsel's own understanding of the necessary relationship between materiality and stock price movement.

Here, there is not just an absence of evidence regarding the materiality of the two Viking statements, but the uncontroverted testimony of Viking's CEO *affirmatively established* these statements were not material, and in one instance, unequivocally correct.  Accordingly, Fr. Lemelson is entitled to judgment as a matter of law on the Rule 10b-5 claims relating to these two statements.

## III.   The Viking Statements were Based on Public Information that was Repeatedly Disclosed— Making Those Statements Protected Speech Under the First Amendment

The First Amendment protects statements analyzing securities.  *See Lowe v. SEC*, 472 U.S. 181, 210 n.58 (1985).  The Commission itself has acknowledged that whether a statement is protected by the First Amendment is a legal question for the *Court* to decide.  *See* ECF No. 161 at 2.  Where the uncontroverted evidence shows that Fr. Lemelson repeatedly disclosed the bases for his statements about Viking and the sources were publicly available, these statements are protected under the First Amendment as a matter of law.  *See Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995); *see also Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir. 1992).

Well-settled and controlling First Circuit case law demonstrates that the First Amendment bars any claim arising from these two statements, because Fr. Lemelson provided the factual basis underlying the Viking statements and, most critically, did not lead readers of the

9

reports to believe that he had information about Ligand/Viking that was not available to others. *See, e.g., Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir. 1992); *McKee v. Cosby*, 874 F.3d 54, 63-64 (1st Cir. 2017); *Piccone v. Bartels,* 785 F.3d 766, 771-72 (1st Cir. 2015); *Riley v. Harr*, 292 F.3d 282, 289-90 (1st Cir. 2002).  *See also Ayyadurai v. Floor64, Inc*., 270 F. Supp. 3d 343, 360-61 (D. Mass. 2017).

As this Court recognized in its summary judgment decision, "[w]hen determining whether a statement is opinion or fact, 'the relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact.'"  ECF No. 146 at 23 (quoting *Phantom Touring*, 953 F.2d at 727).  "A statement, even if 'couch[ed] . . . as an opinion,' will give rise to liability if it 'implies the existence of underlying [false and] defamatory facts' as its basis; ***conversely, a statement is 'immunize[d]' so long as the speaker discloses all of the facts undergirding it and none of them are both false and defamatory***."  *McKee v. Cosby*, 874 F.3d at 61 (quoting *Piccone*, 785 F.3d at 771) (alterations and omissions in original) (emphasis added).

In *Phantom Touring*, the earliest of the multiple First Circuit decisions directly on point (all of which involve the court deciding the First Amendment issue ***as a matter of law)*** the court started its analysis by analyzing the *nature* of the series of articles as a whole, not just the challenged statements in isolation.  953 F.2d at 729; *accord McKee*, 874 F.3d at 62 ("We focus first on the message of the [defamatory letter] as a whole, before considering individual statements"); *Piccone*, 785 F.3d at 772 ("This task *requires* an examination of the totality of the circumstances in which the specific challenged statements were made, including the general tenor and context of the conversation and *any cautionary terms used by the person publishing the statement*") (emphasis added).

Here, such an initial analysis clearly demonstrates the Viking statements warrant First Amendment protection.  The July 3, 2014 report contains express disclaimers at the beginning and the end, letting the reader know both that the contents reflect the *opinions* of Fr. Lemelson and, of equal importance, that Fr. Lemelson held a *short position* in Ligand.  Trial Ex. 4 at 1-2, 11-12.  While not dispositive in and of itself, such language plainly puts the reader on notice that Fr. Lemelson had a financial interest in Ligand stock and, thus, may be biased.  *See Phantom Touring*, 953 F.2d at 729 ("The nonfactual nature of Kelly's articles is indicated at first glance by the format.  Both appeared as a regularly run theater column, a type of article generally known to contain more opinionated writing than the typical news report").

Fr. Lemelson's reports here are also chock full of hyperbole and colorful language, further telltale signs of the type of writing that is immunized by the First Amendment.  *See, e.g., * Trial Ex. 4 at 9 ("The casual observer might even mistake what Ligand leadership has coined a 'creative transaction' as a common game of three-card Monte, played on the street corner—shills included").  *See Riley*, 292 F.3d at 297 ("The First Amendment protects the rhetorical hyperbole and imaginative expression that enlivens writers' prose.") (internal quotations omitted).

To the extent any doubt remains, such doubt is easily put to rest by Fr. Lemelson having ***repeatedly quoted Ligand personnel and others who disagreed with his views and expressly sourcing the basis for his position***.  "Of greatest importance, however, is the breadth of Kelly's articles, which not only discussed all the facts underlying his views but also gave information form which readers might draw contrary conclusions."  *Phantom Touring*, 953 F.2d at 730.  The same holds true here.  For example, with respect to the two Viking statements, Fr. Lemelson quoted Ligand's CEO, John Higgins, concerning that *company's* perspective on its disputed business relationship with Viking as follows:

- A relationship such as this one with Viking gives Ligand the opportunity to entrust valuable internal programs to a dedicated team with the operational resources to take them to the next level.

- This is a creative transaction that establishes a bold portfolio of early- and mid-stage assets that have the potential to generate substantial news flows.

Trial Ex. 4 at 7. Moreover, in the same report, Fr. Lemelson pointed out that other analysts disagreed with his commentary on Ligand. Indeed, Fr. Lemelson quoted another analyst as having referred to his initial report on Ligand as "silly" and "foolish." Trial Ex. 4 at 6.

Further, Fr. Lemelson discussed—*and expressly sourced*—"the facts underlying [his] views." *Phantom Touring*, 953 F.2d at 730. The July 3 report makes clear that Fr. Lemelson's *entire* understanding of Viking came from having read the company's *publicly* filed S-1 registration statement, a document Fr. Lemelson *cited no fewer than four times* in his three-page discussion of that company.

Specifically, while Fr. Lemelson admitted he made a mistake in stating that Viking's financial statements were unaudited, he cited the basis of that statement in his report. *See* Trial Ex. 4 at 9-10. Fr. Lemelson quoted directly from two passages of Viking's S-1 and then wrote, "***In other words***, Marcum was merely hired, but the company has not yet even consulted with the firm on any material issues. The financial statements provided on the S1 accordingly are unaudited." *Id.* This clearly demonstrates that Fr. Lemelson was relying on the S-1 and drawing conclusions from the passage he quoted. Under these circumstances, such statements are protected by the First Amendment *as a matter of law*.

Moreover, as the Supreme Court has emphasized, even inaccurate and controversial speech merits protection under the First Amendment:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. . . . Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless

inevitable in free debate. . . . And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).

In sum, the First Circuit has *repeatedly* held that statements like the ones the Commission challenges here, which were accompanied by the factual basis underlying them (and where Fr. Lemelson even went so far as to provide the competing ideas), are ***absolutely*** protected by the First Amendment.  *Phantom Touring*, 953 F.2d at 729-31 (holding full disclosure of facts underlying author's judgment rendered statement that plaintiff was "marketing its production dishonestly—that it deliberately was confusing the public" not actionable because neither of the columns indicated that the author had more information about the marketing practices than what was reported in the articles); *Riley v. Harr*, 292 F.3d at 297-98 (statement that plaintiff was "the guy who killed your kids" not actionable where author disclosed the facts upon which statement was based); *McKee*, 874 F.3d at 63-64 (holding statement that plaintiff's rape allegations against comedian Bill Cosby were false was not actionable because the letter containing the statement was "based on facts accessible to everyone," and therefore "a reasonable reader would not understand [the author] to be suggesting that he was singularly capable of evaluating [plaintiff's] credibility based on undisclosed evidence"); *Piccone*, 785 F.3d at 773-74 (holding statement that was "sufficiently factual to be proved true or false" was nonetheless not actionable, because "full disclosure of the non-defamatory facts" did not imply that "only one conclusion was possible").

Because the evidence has established that the bases for each of the Viking statements were disclosed, the Commission has failed to present evidence from a which a reasonable jury could find Fr. Lemelson liable and, thus, he is entitled to judgment as a matter of law.

**IV.**    **The Commission's Failure to Prove that Fr. Lemelson's Statements Negatively**
<u>**Impacted Ligand's Stock Price is Fatal to its Claims**</u>

Judgment as a matter of law is appropriate for the additional reason that the Commission

did not present any evidence that the three statements for which the jury found Fr. Lemelson

liable had a negative impact to Ligand's stock price and, thus, failed to prove they were material.

The Third Circuit has squarely held that materiality "may be measured post hoc by

looking to the movement ... of the price of the firm's stock." *Oran v. Stafford*, 226 F.3d 275, 282

(3d Cir. 2000). *See also, In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1425

(3d Cir. 1997)) ("In the context of an 'efficient' market, the concept of materiality translates into

information that alters the price of the firm's stock. . . . This is so because efficient markets are

those in which information important to reasonable investors (in effect, the market, is

immediately incorporated into stock prices").

The reasoning for using this metric is that instead of having to *guess* what a hypothetical

reasonable investor would find important or what would alter the total mix of information

available, the stock price is an objective metric to determine whether actual reasonable investors

considered the statements material. *See SEC v. Berlacher*, No. 07-3800, 2010 WL 3566790, at

*7 (E.D. Pa. Sept. 13, 2010) ("As opposed to guessing what a reasonable investor would find

important or what could alter the total mix of information in the market, the United States Court

of Appeals for the Third Circuit has adopted a concrete method of measuring the materiality of

information... [i]f there is no movement in the stock price, then the disclosed information is

immaterial as a matter of law").

This reasoning is particularly compelling here where Ligand itself did not identify the

three statements for which Fr. Lemelson was found liable as material in its initial presentation to

the Commission.  Similarly, Viking never made any report or complaint regarding the

14

statements.  And, the undisputed evidence at trial demonstrated that the stock prices on June 19,

2014 (the day of the Benzinga interview) and July 3, 2014 (the day of the Viking statements)

closed higher than the stock prices at the end of the previous trading days.  Ex. 96.  In other

words, Ligand's stock price moved in the *opposite* manner of what one would expect if Fr.

Lemelson's statements were truly material to Ligand investors.  This is even more compelling

when compared with the significant decreases in Ligand's stock price on days of other

statements, including the comments of the Board of Governors of the Federal Reserve System on

July 15, 2014 (Ex. 159) and reports published by Empire Asset Management Company on July

22, 2014 and August 5, 2014 (Exs. 160 & 161).  Ligand's stock price decreased 4.6%

($2.71/share), 4.5% ($2.31/share), and 2.2% ($1.18/share) on those dates, respectively.

 While the First Circuit has not addressed whether a showing of stock price movement is

required in cases like this alleging fraud on the market through publicly issued statements, the

First Circuit has cited *Burlington Coat Factory* with approval.  *See In Re Polymedica Corp. Sec.*

*Lit.*, 432 F.3d 1, 13-14 (1st Cir. 2005) (adopting definition of efficient market from *Burlington*

*Coat Factory*, *i.e.,* that the market price of a stock fully reflects all publicly available

information, and noting that Third Circuit held the concept of materiality in an efficient market

translates into information that alters the firm's stock).  *See also In Re Xcelera.com Securities*

*Litig.*, 430 F.3d 503, 507 (1st Cir. 2005) ("In an efficient market, the defendant's

misrepresentations are absorbed into, and reflected by, the market price").

 Further, multiple district court decisions in Massachusetts have followed this principle.

In *Emerson v. Genocea Biosciences, Inc.*, this Court dismissed a securities fraud case and found

that, as a matter of law, plaintiffs could not establish materiality where the disclosure of the

allegedly material information did not negatively impact the company's stock price.  353 F.

Supp. 3d 28, 41 (D. Mass. 2018) (Saris, J.).  *See also In re Biogen Sec. Litig.*, 179 F.R.D. 25, 35 (D. Mass. 1997) (noting defendants can rebut presumption of materiality if they can show "'the market price was not affected by their misrepresentations'") (Saris, J.) (internal citation omitted); *Brumbaugh v. Wave Systems Corp.,* 416 F. Supp. 2d 239, 254-55 (D. Mass. 2006) ("'[t]he concept of materiality translates into information that alters the price of the firm's stock'") (quoting *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock. . . . This is so because efficient markets are those in which information important to reasonable investors (in effect, the market, is immediately incorporated into stock prices")) (internal citations omitted).

The same result should apply here.  Particularly in light of the lack of evidence on materiality in this case (*e.g.,* Ligand itself did not initially identify these statements at all, let alone as "material" when it met with the Commission on either or two occasions spanning a period of many months the information about the Viking statements that was omitted was publicly available), it is not plausible that a "hypothetical reasonable" investor could find these statements material.  And the lack of stock price movement here cements that the actual reasonable investing public did not consider the statements material.  Therefore, the findings of liability against Fr. Lemelson should be rejected as a matter of law.

## V.   There Is No Legally Sufficient Evidentiary Basis for a Reasonable Jury to Conclude That Fr. Lemelson Acted with Scienter

Finally, judgment as a matter of law is appropriate because there is not sufficient evidence that Fr. Lemelson acted with scienter.  To prove scienter, the Commission had to show that Fr. Lemelson acted with "a mental state embracing intent to deceive, manipulate or defraud," *Aaron v.* SEC, 446 U.S. 680, 686 n.5 (1980), or a "high degree of recklessness."  *Miss.*

*Pub. Emps. Ret. Sys. v. Boston Sci. Corp.*, 649 F.3d 5, 20 (1st Cir 2011).  The Commission failed to meet its burden.  Fr. Lemelson disclosed his short position in all of his reports and during the internet radio interview, cited to his sources, published his reports in his own name, and held onto a substantial part of his short position in Ligand nearly two months after his final statement. Accordingly, no reasonable jury could find for the Commission on the element of scienter, a point buttressed by the jury's determination that Fr. Lemelson did *not* engage in a scheme to defraud

## **CONCLUSION**

For the foregoing reasons, Fr. Lemelson respectfully requests that the Court grant judgment as a matter of law on his behalf.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
Thomas M. Hoopes (BBO No. 239340)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com
thoopes@lhblaw.com

Dated:  December 3, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed in hand and served to counsel for the Securities and Exchange Commission in hand on December 3, 2021, and was then filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on December 3, 2021.

*/s/ Douglas S. Brooks*
Douglas S. Brooks
