UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC, <br><br> Defendants, <br><br> and <br><br> THE AMVONA FUND, LP, <br><br> Relief Defendant. | Civil Action No. 1:18-cv-11926-PBS |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR ENTRY OF FINAL JUDGMENT**

Plaintiff Securities and Exchange Commission submits this memorandum in support of its

Motion for Entry of Final Judgment against Defendants Gregory Lemelson ("Lemelson") and

Lemelson Capital Management, LP ("LCM").  The Commission respectfully requests this Court

enter the attached proposed final judgment ordering:

a) An injunction permanently restraining and enjoining Defendants from violating Section 10(b) of the Securities Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5];

b) a $656,500 civil penalty against Lemelson;

c) a $775,000 civil penalty against LCM;

d) $656,500 in joint and several disgorgement against Lemelson and LCM; and

e) Prejudgment interest of $208,624.

## **BACKGROUND**

The Commission's complaint charged Lemelson and LCM with violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") and Section 206(4) and Rule 206(4)-8 of the Investment Advisers Act of 1940, stemming from a series of fraudulent misstatements made by Defendants about Ligand Pharmaceuticals, Inc. ("Ligand") while holding a short position in Ligand's stock.

After a seven-day trial, the jury found Lemelson (and by agreement of the parties, Lemelson Capital Management) liable for three fraudulent misrepresentations in violation of Section 10(b) and Rule 10b-5.  *First*, Defendants fraudulently misrepresented that Ligand's investor relations representative had affirmatively stated that Ligand agreed that its most profitable drug was "going away."  The evidence at trial showed that Defendants used this misrepresentation as the tent-pole for their assertion that Ligand was worth $0 per share. *Second*, Defendants fraudulently misrepresented that Ligand's partner, Viking Therapeutics, Inc. ("Viking") had not consulted its auditor on any material issues and its financial statements were unaudited.  Defendants used this misstatement as a key part of their assertion that Ligand had entered into a sham transaction with an unaudited shell company, Viking, to pad its balance sheet.  This misrepresentation was also significant because, without audited financial statements, Viking would not have been able to obtain approval for a public offering of its stock.  *Third*, Defendants fraudulently misrepresented that Viking did not intend to conduct preclinical studies or clinical trials — that it was not really going to develop drugs at all.  Defendants used this misrepresentation to advance their story that Viking was an empty shell (in what Defendants called a game of three-card Monte) that Ligand was using to engage in an illegal transaction.

Over the course of Lemelson's fraud, from taking the short position in May 2014 to

2

covering the position in October 2014, Ligand's share price dropped from about $67 to $45, roughly a 33% drop from the opening share price before Lemelson published his first report. The evidence at trial showed that Lemelson took credit for the decline in Ligand's stock price and boasted that he had "erased" $500 million of Ligand's market capitalization.  [*E.g.*, Ex. A (Trial Ex. 50); Ex. B (Trial Ex. 82) at 11; Ex. C (Trial Ex. 70) at 1; Ex. D (Trial Ex. 99) at 7.]). The Amvona Fund profited roughly $1.3 million from the short position in Ligand and Lemelson's fraudulent misstatements.  [Ex. E (Parties' Agreed-To Facts) ¶¶8, 11.]

## ARGUMENT

## I.    The Court Should Enter a Permanent Injunction against Defendants.

Section 21(d) of the Exchange Act provides that, upon a showing that a person has engaged in an act or practice that violates the Act, a permanent injunction "shall be granted without bond."  15 U.S.C. §78u(d)(1).  "An injunction is appropriate if the Court determines there is a reasonable likelihood that the defendant will violate the laws again in the future."  *SEC v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 283 (D. Mass. 2015) (quoting *SEC v. Druffner*, 517 F. Supp. 2d 502, 513 (D. Mass. 2007)).  To make this determination, a court considers "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future."  *Druffner*, 517 F. Supp. 2d at 513.  (quoting *SEC v. Bilzerian*, 29 F.3d 689, 695 (D.C. Cir. 1994)).

Defendants' violations were "flagrant and deliberate," not "merely technical in nature." *See Tropikgadget*, 146 F. Supp. 3d at 283.  To begin with, the jury found that Defendants acted with scienter—a "conscious intent to defraud" or an "extreme departure from the standards of ordinary care [that] presents a danger of misleading buyers or sellers which is either known to

the defendant or is so obvious that the defendant must have been aware of it." [Ex. F (Trial Tr., November 3, 2021 (jury charge), at 105-06.)]  The jury found that Defendants acted with scienter, not accidentally.  And Defendants did so multiple times about multiple topics to support their "thesis" that Ligand was a sham worth $0 (and to make money from the anticipated stock drop).

Defendants' violations were not merely technical departures from the securities laws. Violations of Exchange Act Section 10(b) are not accidental violations of complex securities regulations.  Rather, they are the kinds of core fraudulent violations the securities laws are designed to prevent.  And Defendants' fraudulent misrepresentations did not take place in a vacuum.  As detailed above, these misrepresentations were key parts of multiple reports designed to drive down the price of Ligand's stock.  Because Defendants' fraudulent statements were about Ligand's most important product (Promacta) and a vital new business relationship (Viking), they were deliberately calculated to strike at the heart of Ligand's business, and therefore its value.  And Defendants' underlying allegation about Ligand—that it was a fraud, engaged in fraud, and worth nothing (spurious allegations for which there has never been any evidence)—compounds the egregious nature of these misrepresentations.  [Ex. G (Trial Tr., November 1, 2021, at 19-21).]

The Court should find that Defendants' conduct was egregious and repetitive.  First, the jury found that Defendants' made three separate fraudulent statements about Promacta and Viking.  [Ex. H (Verdict Form).]  These fraudulent statements were made to the investing public on two occasions: *First*, in a June 19, 2014 internet radio interview that reiterated and sought to bolster, via a false statement of fact, prior statements about Promacta's alleged demise [Ex. I (Trial Ex. 3) at 16; *see also* Ex. J (June 16, 2014 report describing "[s]evere competitive threat to

key royalty program" (Trial Ex. 1)] and, *second*, in Defendants' July 3, 2014 report, which contained false statements of fact about Viking [Ex. K (Trial Ex. 4)].  Defendants never corrected their false statement that Ligand's investor relations representative, Bruce Voss, agreed that Promacta was "going away" and never acknowledged publicly that Mr. Voss denied his claim.  [Ex. L (Trial Ex. 197).]

Next, when deciding whether to enter a permanent injunction, courts consider if "the defendants will, owing to their occupation, be in a position to violate again." *Sargent*, 329 F.3d at 39.  Defendant Lemelson is still the Chief Investment Officer for LCM, an active investment adviser.  And, even after apparently losing all the money in The Amvona Fund in 2020, Defendants are raising money again in a new fund called Spruce Peak Fund.  [Ex. M (Spruce Peak Fund, LP SEC Form D).]  Further, highlighting the need for an injunction, in October 2015, Defendant Lemelson boasted to the Wall Street Journal of Defendants' ability to "crash" stocks. [Ex. N.]

But not only will Defendants be in a position to violate again.  They have, by their actions, signaled that they will violate again by continuing their bad conduct well after the 2014 events discussed at trial, engaging in improper behavior during the litigation of this case, and minimizing and mischaracterizing the meaning and import of the jury verdict against them.

**A.      Defendants Continued Their Campaign Against Ligand After the Summer of 2014, Including Republishing Their False and Misleading Reports.**

Defendants continued to assail Ligand for years after the summer of 2014, hurling baseless allegations at the company while again shorting the company in 2015 and 2019.  For example:

- Lemelson appeared on the Benzinga radio show and stated that Ligand had created a "pyramid scheme of shell companies," echoing his statements about the Ligand-Viking partnership.  (June 7, 2015.)

- Defendants made false and misleading statements about Ligand through LCM's Twitter account where they called Ligand an "extensive fraud," and invited people to review all of Lemelson's prior false statements about Ligand beginning with his first report in June 2014. (March 13 and March 21, 2017.)

- Defendants hurled additional, baseless invective at Ligand, including claiming that Ligand has committed "abuses [that] jeopardize lives" and "fleece[d] taxpayers + shareholders." (March 21, 2017.)

- Defendants repeated the false and misleading allegation about the "existential threat" from the "momentous impairment of its largest royalty generating asset, Promacta" (from the June 16, 2014 report)—the day Ligand announced that it was selling the royalty rights to Promacta for $827 million.  (March 7, 2019 – well after this case was filed.)

[Exs. O, P, Q, and R.]  In short, Defendants doubled down on their fraud by continuing their assaults on Ligand and referencing reports that the jury found contained fraudulent misrepresentations.

### B.    Improper Litigation Conduct.

Lemelson's improper conduct during this litigation also demonstrates that he breaks the rules when he perceives a personal advantage.  First, Lemelson violated the Court's protective order by leaking 50 pages of confidential and privileged discovery materials to the press. Lemelson admitted his breach of the protective order, but tried to excuse his violations by asserting that this case was "unfair" and that he provided the discovery materials to a reporter to counter a "false public narrative about this litigation."  [Ex. S at ¶¶7-9.]  The Court held Lemelson in contempt, sanctioned him $100 per page of materials he leaked, and prohibited him from taking any position in Ligand stock or its derivatives for the duration of this action. [Ex. T.]

Second, Lemelson, through his counsel, threatened a priest who had provided information about Lemelson to the Commission.  [Ex. U.]  Specifically, Defendant Lemelson's counsel emailed the General Counsel of the Greek Orthodox Archdioceses of America.  The email

conveyed Defendant Lemelson's "demand" to Fr. Theodore Barbas, the Chancellor of the Greek

Orthodox Metropolis of Boston, with respect to certain statements Barbas made to the

Commission.  Through counsel, Defendant Lemelson demanded that Barbas—then a potential

witness against Lemelson—(i) swear under oath in writing to a set of nine statements provided

by Defendant Lemelson, (ii) acknowledge under oath that any statements Barbas made to the

Commission that are inconsistent with Lemelson's nine statements were false, and (iii) pay

Defendant Lemelson $10,000.  If Barbas did not accede, Lemelson, through counsel, threatened

to launch a defamation suit as to which he would "spare no expense."

     The Court, after reviewing this conduct, stated:

> Because it [Lemelson's status in the Greek Orthodox Church]
> matters to me in terms of the letter that you sent to that Greek
> Orthodox priest threatening him with a lawsuit unless he answered
> ten things correctly.  I found that extremely troubling.  There may
> be nuances here that none of us understand, but it was a pretty
> hardball tactic.

[Ex. V at 27; *see id.* at 28 (the Court: "I was deeply, deeply troubled by that letter.").]  In short,

Lemelson has no compunction about resorting to "hardball tactics" to get what he wants.

* * *

     An injunction also provides a basis for the Commission to bar Defendants from

continuing to work in the securities industry through an administrative proceeding, further relief

warranted here to protect the investing public.  For all of these above reasons, the Court should

impose an injunction against Defendants prohibiting future violations of the securities laws.

## II.  Civil Penalties.

     The Court should impose civil penalties against Lemelson and LCM in the amounts of

$656,500 and $775,000, respectively.  These amounts adhere to Exchange Act Section

21(d)(3)(B)(iii) [15 U.S.C. § 78u], which authorizes the Commission to obtain a third-tier

penalty of the greater of the illicit proceeds or a statutorily specified dollar amount during the relevant period, for each violation involving a "fraud, deceit, manipulative, or deliberate or reckless disregard for a regulatory requirement" and that "resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* The imposition of a civil penalty furthers "the dual goals of punishment of the individual violator and deterrence of future violations." *Official Committee of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006) (citation omitted); *see Happ*, 392 F.3d. at 32. In determining the appropriate civil penalty, courts consider various factors, "including the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter involved, the defendant's cooperation with authorities or lack thereof, and the defendant's current financial condition." *SEC v. Esposito*, No. 16-cv-10960-ADB, 2018 WL 2012677 *1, *9 (D. Mass. Apr. 30, 2018) (internal citations omitted).

## A.  The Court Should Impose Third-Tier Penalties.

Lemelson should be ordered to pay a third-tier civil penalty of $656,500. This amount represents Lemelson's pecuniary interest in the $1.3 million of profits gained by The Amvona Fund from the 2014 short selling of Ligand.[1] During the relevant timeframe, Lemelson and his family held 34% of the assets in The Amvona Fund (all of which was controlled by Lemelson). Using this percentage, Lemelson and his family received $442,000 of the $1.3 million The Amvona Fund gained from its short position in Ligand (*i.e.*, 34% of the profits). Defendants also collected a 25% performance fee from the profits above on the Ligand investment. Defendants

---

[1] The $1.3 return on the Ligand short position can be determined by adding the amount realized from covering the Ligand short position from paragraph 11 of the parties' Agreed-to Facts [Ex. E] and deducting the amount paid to establish the short position in paragraph 8.

thus received approximately $214,500 in performance fees (25% of the remaining 66% in profits

because The Amvona Fund was over the 6% hurdle).[2]  These amounts are a reasonable

calculation of the profits gained by Lemelson and LCM from Defendants' fraud.  *SEC v. Wall*,

No. 2:19-cv-00139-JHR, 2020 WL 1539919 *1, *9-10 (D. Me. Mar. 31, 2020); *see also SEC v.

First Jersey Sec. Inc.*, 101 F.3d at 1474-75 (2d Cir. 1996); *SEC v. Locke Capital Management,

Inc.*, 794 F. Supp. 2d 355, 369-70 (D. Mass. 2011).

       LCM should pay a third-tier penalty of $775,000, the amount authorized at the time of

the offending conduct against entities under Exchange Act Section 21(d)(3)(B)(iii).  Despite the

parties' agreement at trial to focus on Lemelson as a proxy for LCM as to the fraudulent conduct

at issue, a separate penalty against LCM is appropriate.  LCM is an investment adviser, it has

operations, it is owned by Lemelson's wife, it has other staff such as compliance and finance

consultants, and it employed an editor during the relevant period.  LCM files Forms ADV and

related disclosures with the Commission for itself and The Amvona Fund, which permitted

Defendants to purchase and sell securities in the hedge fund.  In short, LCM's operations go

beyond Lemelson himself.  LCM was a key part of the fraudulent conduct because each of the

fraudulent misrepresentations was published by LCM and LCM collected the fees associated

with The Amvona Fund's short position in Ligand.  In essence, LCM gave Lemelson the

platform necessary to accomplish Defendants' fraud.  And, as LCM is still operating as an

investment adviser to a new fund, this penalty amount is appropriate for both specific and

general deterrence.

---

[2] The remaining profits realized by The Amvona Fund were allocated to other investors in the fund who were not involved in the fraud.  Those profits have since been redeemed or lost due to circumstances unrelated to the misconduct underlying this case.  The Commission intends to separately move to dismiss The Amvona Fund as a relief defendant.

**B.      Third-Tier Penalties Are Justified Under the *Esposito* Factors.**

*Defendants' conduct was repetitive and egregious, was undertaken with a high degree of scienter, and continued after the relevant period.*  The jury found that Defendants acted with scienter.  The evidence established that Defendants made the fraudulent statements for which they were found liable to drive down Ligand's stock price and earn an illicit profit.  They did so at least three times, they never corrected any of the false statements, and continued to repeat falsehoods about Ligand for years.  And they took credit for driving down Ligand's stock through at least 2017.  [*E.g.*, Ex. C (Trial Ex. 3) at 9; Ex. E (Trial Ex. 99) at 7; Ex. W (Trial Ex. 211); Ex. X (Trial Ex. 90); Ex. Y (Trial Ex. 143) ("Run, Bambi, Run!").]  This is egregious behavior, whether the jury thought Defendants acted knowingly or so recklessly that they must have known their conduct was likely to mislead investors.  And the jury found that Defendants chose to engage in that fraudulent behavior three times.  Further, as detailed above, Defendants' misconduct conduct continued after the relevant period, including republishing reports about Promacta's supposed demise and the Ligand-Viking relationship.

*Defendants have failed to take any responsibility for their misconduct.*  At his deposition, at trial, and after the jury's verdict, Defendants have refused to take responsibility for their conduct.  As the evidence at trial showed, Ligand thrived after Defendants' 2014 campaign against it, even selling the royalty rights to Promacta for about $827 million in March 2019.  Yet Defendants have been steadfast in unreasonably claiming Ligand was and remains a "fraud."  In a portion of deposition played at trial, Defendant Lemelson testified:

> Q.  What kind of company is Ligand?
> A.  Fraud.
> Q.  What does Ligand do for business?
> A.  Commit fraud.
> Q.  Anything else?

A.   Defraud their shareholders, make money for investment banks,
enrich their executives.

[Ex. Z (Lemelson Dep.) at 146).]  He wouldn't even admit that Ligand is a pharmaceutical

company.  [*Id.* at 146-47.]  At trial, Lemelson maintained his position despite extensive evidence

that his statements about Promacta and Viking were false, material, and fraudulent.  [Ex.G at 19-

21.]

Then, after the jury's verdict finding Defendants liable for three-times violating the

antifraud provision of the Exchange Act, Lemelson tweeted (from three accounts) that he had

beaten the short-and-distort claims and been absolved of fraud claims, knowing that neither of

those statements were true.  [Exs. AA, BB, and CC.]  He tweeted only part of the first line of a

Law360 article, falsely claiming that he was found not liable:  "A Boston federal jury on Friday

*absolved* a Greek Orthodox Priest of *fraud claims* in a U.S. SEC suit alleging he launched a short

and distort scheme through his hedge fund…"  [*E.g.*, Ex. AA (emphasis supplied).]



Compounding this deceit, the linked article is behind a "pay wall," meaning that anyone

following the link would be required to sign up for access to Law360 to view the rest of the

article.

As they know, Defendants were in no way "absolved" of fraud claims—the jury

specifically found that they made three separate fraudulent statements in violation of the

antifraud provisions of Exchange Act Section 10(b) and Rule 10b-5. Defendants' amplified this "not liable" message on his blog and on the investor website, Seeking Alpha, under the headline, "Jury Verdict Finds Fr. Emmanuel 'Not Liable' For Key Allegations" stating, "We would like to thank the jury for their service, and verdict of "Not Liable" for the key allegations contained in the Complaint." Defendants' social media efforts to spread the word that they (supposedly) did not commit fraud is grossly misleading. [Ex. DD.] And when the Commission informed defense counsel of misleading nature of these statements, Defendants refused to revise them.

In sum, Defendants' efforts to minimize and mislead the public (and their investors and prospective investors) about the seriousness of the jury's finding and the fraudulent nature of their conduct spotlights the need for specific deterrence, in both a significant penalty and an injunction from future violations.

*Defendants' fraud created a risk of significant losses to Ligand investors and Defendants reaped significant illicit gains.* Defendants' fraud created a risk of significant harm to others. As noted above, Lemelson crowed that his reports caused a loss of $500 million of Ligand's market capitalization. In other words, Lemelson took credit for harming Ligand investors to the tune of half a billion dollars. Whether Defendants in fact caused such a massive hit to Ligand investors or whether it resulted from other factors doesn't matter—at a minimum, his fraudulent conduct created that risk. Indeed, the statutory language makes clear that Defendants need not have driven down the price of Ligand's stock—the Exchange Act authorizes the Court to impose a third-tier penalty that "resulted in substantial losses *or* created a significant risk of substantial losses to other persons." [15 U.S.C. § 78u]. A risk of a massive hit to Ligand's market capitalization—Defendants themselves put the number at $500 million—is substantial by any measure.

As to Lemelson, the penalty amount equals his pecuniary gain of $656,500, as discussed above, and LCM's is a one-time statutorily specified third-tier penalty amount.  A separate and higher penalty amount is appropriate against LCM for the reasons stated above, but also to deter future misconduct by Lemelson, who appears to have formed a new hedge fund.

## III.    <u>The Court Should Order the Defendants to Pay Disgorgement.</u>

Under Exchange Act Sections 21(d)(5) and 21(d)(7), federal district courts can order disgorgement in Commission enforcement actions.  *SEC v. Present*, No. 14-cv-14692-LTS, 2018 WL 1701972, at *2 (D. Mass. Mar. 20, 2018) (citing *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004)).  The purpose of disgorgement is "to prevent unjust enrichment."  *E.g.*, *Druffner*, 517 F. Supp. 2d at 511.  Disgorgement forces the defendant to give up the amount by which he was unjustly enriched, even if it exceeds actual damages to victims.  *Present*, 2018 WL 1701972, at *2 (quoting *SEC v. Cavanagh*, 445 F.3d 105,117 (2d Cir. 2006)).  The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation," and the "risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty."  *Happ*, 392 F.3d at 31 (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231-1232 (D.C. Cir. 1989)).  In addition, courts have discretion to add prejudgment interest to a defendant's disgorgement amount to prevent the defendant from benefitting from the use of his/her ill-gotten gains interest free.  *First Jersey*, 101 F.3d at 1475; *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978*)*.

For the reasons set forth in the prior section, Defendants ill-gotten pecuniary gain was $656,500, and that amount should be disgorged.[3]  Further, disgorgement here should be ordered

---

[3] The Commission desires to distribute collected civil penalties, disgorgement, and prejudgment interest to affected investors via a Fair Fund established pursuant to Section 308(a) of the Sarbanes-Oxley Act, if feasible.  Once the Defendants pay the ordered disgorgement and penalties, the Commission will determine the feasibility of a distribution and petition this Court to establish the Fair Fund.

to be joint and several.  Courts may order that an owner-officer and a company pay disgorgement on a joint and several basis.  *Esposito,* 2018 WL 2012688, at *9 (ordering managing director and entity jointly and severally liable for total disgorgement and prejudgment interest where violations are closely intertwined); *Locke Capital Mgmt., Inc.*, 794 F. Supp. 2d at 369 (holding entity and entity's sole owner, an individual, jointly and severally liable for disgorgement); *Tropikgadget FZE*, 146 F. Supp. 3d at 282 (holding defendants "jointly and severally liable" for disgorgement amount with prejudgment interest).  Lemelson, is the Chief Investment Officer of LCM and the personal beneficiary of his fraud through his family's investment in TAF.  And, LCM, also an investment adviser, was the entity responsible for the conduct at issue and separately received a substantial performance fee.  Thus, the Court should order that any disgorgement be paid jointly and severally by the Defendants.

**IV.**    **The Court Should Order the Defendants to Pay Prejudgment Interest.**

A district court has "broad discretion" to order a defendant to pay prejudgment interest on the disgorgement amount.  *First Jersey*, 101 F.3d at 1476.  "Courts have recognized that an assessment of prejudgment interest, like the disgorgement remedy, is intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws."  *Sargent*, 329 F.3d at 40 (citation omitted).  Without an award of prejudgment interest, a securities law violator receives an "interest-free loan" on his unjust enrichment.  *Id*. at 41.  In SEC cases, courts typically calculate prejudgment interest using the rate established by the Internal Revenue Service for tax underpayment, which reasonably approximates the unjust benefit of a defendant's use of the money.  *See First Jersey*, 101 F.3d at 1476; *Druffner*, 517 F. Supp. 2d at 512-13.

Here, the Court should order the Defendants to pay prejudgment interest because they have enjoyed the financial benefits of their wrongful conduct since 2014.  Using the Internal

Revenue Service's interest rate for unpaid balances, prejudgment interest on $656,500 is $208,624 for a total disgorgement amount of $865,124.  Attached is the calculation of prejudgment interest using the IRS interest rates, calculated from February 1, 2015 (after the Defendants received both the profits and performance fees from the trade) through January 1, 2022 (the last month before briefing is complete on remedies).  [Ex. EE.]  The Court should order the Defendants to pay prejudgment interest, because they have enjoyed the financial benefits of their wrongful conduct since 2014.

## **CONCLUSION**

For the reasons set forth above, the Court should enter the attached final judgment against the Defendants that imposes:

a) An injunction permanently restraining and enjoining Defendants from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

b) a $656,500 civil penalty against Lemelson;

c) a $775,000 civil penalty against LCM;

d) $656,500 in joint and several disgorgement against Lemelson and LCM; and

e) Prejudgment interest of $208,624.

[*Remainder of page intentionally left blank.*]

DATED:  December 22, 2022                    Respectfully submitted,

                                             SECURITIES AND EXCHANGE COMMISSION

                                             By its attorneys,

                                             */s/ Alfred A. Day*
                                             Alfred A. Day (BBO #654436)
                                             Marc J. Jones (BBO #645910)
                                             Boston Regional Office
                                             33 Arch Street, 24th Floor
                                             Boston, MA  02110
                                             617-573-4537 (Day)
                                             617-573-8947 (Jones)
                                             JonesMarc@sec.gov
                                             DayA@sec.gov

## CERTIFICATE OF SERVICE

I certify that on December 22, 2021, a copy of the foregoing was electronically filed through the ECF system and will be sent electronically to all persons identified in the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants.

                                             */s/ Alfred A. Day*