UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,         Civil Action
                                       No. 18-11926-PBS
v.
                                       October 29, 2021
GREGORY LEMELSON,                      9:08 a.m.

                    Defendant.
_____



TRANSCRIPT OF JURY TRIAL DAY 4

BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3    MARC J. JONES, ESQ.
      ALFRED A. DAY, ESQ.
 4    Securities and Exchange Commission
      33 Arch Street
 5    23rd Floor
      Boston, MA 02110
 6    617-573-8900
      jonesmarc@sec.gov
 7    daya@sec.gov

 8    FOR THE DEFENDANT:

 9    DOUGLAS S. BROOKS, ESQ.
      THOMAS M. HOOPES, ESQ.
10    BRIAN J. SULLIVAN, ESQ.
      Libby Hoopes Brooks, P.C.
11    399 Boylston Street, Suite 600
      Boston, MA 02116
12    617-338-9300
      dbrooks@lhblaw.com
13    thoopes@lhblaw.com
      bsullivan@lhblaw.com
14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2               (The following proceedings were held in open

3     court before the Honorable Patti B. Saris, United States

4     District Judge, United States District Court, District of

5     Massachusetts, at the John J. Moakley United States Courthouse,

6     1 Courthouse Way, Boston, Massachusetts, on October 29, 2021.)

7               THE CLERK:  All rise.

8               THE COURT:  Good morning.  The first witness, is he --

9               MR. JONES:  The first witness is here.  It's John

10    Higgins, the CEO of Amvona.

11              THE COURT:  Good.

12              (Jury entered the courtroom.)

13              THE COURT:  Good morning to everyone.  Anybody see

14    anything in the press, speak about the case, do any independent

15    research?

16              I find the jury has complied.  It's a little warm in

17    here, but Mary Ellen is trying to get that rectified.  So --

18              Okay.  Mr. Higgins, you may be seated.  Let's get

19    going.

20              MR. JONES:  Your Honor, for the record, the Commission

21    calls John Higgins.

22              JOHN HIGGINS, having been duly sworn by the Clerk, was

23    examined and testified as follows:

24              THE CLERK:  Could you please state and spell your name

25    for the record.

```
1              THE WITNESS:  John Higgins.

2              THE CLERK:  You can be seated.

3              THE COURT:  Thank you.

4                       DIRECT EXAMINATION

5    BY MR. JONES:

6    Q.   Good morning, Mr. Higgins.

7    A.   Good morning.

8    Q.   If you could just pull that microphone right up close to

9    you, sometimes it needs to be close to pick you up.

10             Let me try that.

11             Good morning.

12   A.   Good morning, sir.

13   Q.   Excellent, thank you.

14             Mr. Higgins, are you currently employed?

15   A.   Yes.

16   Q.   Where?

17   A.   Ligand Pharmaceuticals.

18   Q.   What is Ligand Pharmaceuticals?

19   A.   It's a medical research company.

20   Q.   And how long have you worked there?

21   A.   Fifteen years.

22   Q.   What's your job at Ligand Pharmaceuticals?

23   A.   The chief executive officer.

24   Q.   What is the day-to-day work of a chief executive officer

25   at a company like Ligand?
```

1    A.    Managing the team, the programs, and also setting the

2    direction of the company, the investment decisions, the

3    strategy, also interacting with our customers, our business

4    partners and our investors.

5    Q.    And has it been basically the same role since you started?

6    A.    Yes.  It's grown significantly, but the same

7    responsibilities.

8    Q.    And in what ways has it grown significantly?

9    A.    We have probably 30 to 50 times more partners.  We have

10   more revenues, more assets.  We have many more employees, more

11   laboratories around the country, so it's just a much larger

12   business.

13   Q.    Therefore, a lot more work to run the whole thing?

14   A.    Generally, yes.

15   Q.    Okay.  I take it CEO of Ligand was not your first job,

16   correct?

17   A.    No.

18   Q.    What did you do before you were CEO of Ligand?

19   A.    When I started my career out of college, I was an

20   investment banker in New York City working with healthcare

21   companies, hospitals, other biotech and research companies.

22           After that, went into industry, working at companies

23   essentially in various jobs around the country, working for

24   other biotech companies.

25   Q.    Okay.  Let me break that down.

1              You said you were working at an investment bank.  What
2     did you do there?
3              THE COURT:  Can you back up?  What's your educational
4     background?
5              THE WITNESS:  I went to Colgate University, university
6     in New York State, graduated with a degree in economics.
7     BY MR. JONES:
8     Q.    Okay.  And then you said you left college and you went to
9     work for an investment bank, correct?
10    A.    Correct.
11    Q.    When you worked for an investment bank, what was your job?
12    A.    Investment banks provide financing for companies.  In my
13    circumstance, I was assigned to the healthcare unit of Dillon
14    Reed, and the opportunity was to work with hospitals, with
15    HMOs, healthcare companies and medical research companies to
16    basically finance their business, to understand what their
17    product lines are, what their business plans are, and then find
18    the optimal way to finance the company to let them grow.
19    Q.    When you say to "let them grow," is that to fund their
20    research or their expansion?
21    A.    Correct.
22    Q.    And what did you have to learn about that industry in
23    order to be able to perform that financing function?
24    A.    Well, generally, so investment banks, obviously they are
25    representing investors who are providing the capital, the cash,

1    but they're also doing the diligence.  They're analyzing

2    companies.  They're representing to their investors, the people

3    who are providing the capital, that these are qualified

4    companies that deserve their investment.  So part of what I

5    would do is, as a young banker, would be to analyze the company

6    and the industry to understand the quality of those businesses,

7    but then specifically to look at their financial statements,

8    their businesses to determine what the optimal capital

9    structure would be for those companies.

10   Q.   And the "capital structure" is -- can you explain what

11   that term means for us?

12   A.   Sure.  The capital structure, given the business, how long

13   will it be before they may make money, before they may generate

14   profits.  So you can either do an equity financing where

15   investors give capital, they give money, and they get a share

16   of ownership, that's equity; or there may be debt, where you

17   don't sell ownership, but you lend money with the expectation

18   in one or two years or five years that money is actually

19   repaid.

20          So there are different ways for companies to bring in

21   capital, and it was our job as the investment bank to find the

22   right investor, to qualify the company, and then to determine

23   what the appropriate form of that capital would be.

24   Q.   Okay.  And as part of that you said you needed to -- I may

25   be paraphrasing you here, so if I don't quite get it right, let

```
 1        me know -- I think you said you had to determine whether the
 2        companies that you were trying to arrange finance for,
 3        financing for, were qualified companies that deserved the
 4        investments.
 5        A.    That's correct.
 6        Q.    Can you explain what you meant by that?
 7        A.    Sure.  So the -- qualifying a company, it comes down to
 8        what are their ideas, are they going down -- in the case of a
 9        hospital, are they expanding into pediatrics, are they
10        expanding into women's health, are there other hospitals in
11        that particular region.  So you can look at what is the need
12        and is their plan to expand a new wing or a neonatal unit, a
13        facility for babies, is it needed in that community, can they
14        get enough business to justify that cost.  Medical research,
15        it's looking at the number of scientists they have, the
16        laboratories, are the ideas they have for the medicines they're
17        trying to develop in the right market.  So it's just generally
18        are these quality investments.
19              And then the right structure is just, again, finding
20        for that particular business what the appropriate sort of
21        investment would be and matching them, their idea in that
22        company with the right investors.
23        Q.    So is it right to say part of what you're doing in that
24        job is analyzing their business and the business model?
25        A.    Yes, absolutely.
```

1    Q.   I believe you talked about financial statements before.

2    Were you analyzing their financial statements as well?

3    A.   It was, yes, a requirement of the projects.

4    Q.   Okay.  And can you explain why it was a requirement of

5    those projects?

6    A.   So, again, investors -- you know, investment banks, the

7    role that we served was to bring together investors, people who

8    want to participate in this industry and companies.  So we sit

9    in the middle, but it's our role to use our experience, our

10   analysis to identify good companies, but then ultimately to

11   represent to investors that these are quality investments, that

12   you should participate, and you can expect this sort of return.

13        So that was ultimately the role that we played, and

14   that's, again, the team that I sat on, in the middle between

15   those two parties.

16   Q.   As an investment banker is there a responsibility to

17   represent the finances of a company in a truthful and accurate

18   way?

19   A.   Absolutely.

20   Q.   And that was one of the responsibilities you had as a

21   person working at an investment bank?

22   A.   Yes.  We'd work on maybe hundreds of transactions a year,

23   you know, maybe half of them we would choose to fund or

24   underwrite.  So not all the projects we took on could we

25   justify or say this is worth pursuing right now.  But we'd make

1    our analysis, we'd make our decision, and then the bank would

2    choose to underwrite or help finance a company.

3           Banks are obligated to provide capital, but after they

4    do their work and validate and get confirmation that it's a

5    quality company, then they will literally put their reputation

6    on the line as they bring investors along to underwrite a deal

7    or to bring the capital together.

8           So it was intrinsic in our work, it was just a

9    necessary, integral part of our work that we did very thorough

10   analysis and that we were really representing the quality of

11   these companies.  To get it wrong would be a real problem.  The

12   company may fail, investors would be disappointed, they may

13   lose their money, and that doesn't last long.  So it was really

14   up to us to make sure we got it right and delivered quality

15   transactions.

16   Q.   And the investors that you would bring in to invest in the

17   projects that you had decided were worthy, were they

18   sophisticated investors?

19           THE COURT:  Are we talking in general?  Should we jump

20   to this?

21           MR. JONES:  We're talking in general, your Honor, but

22   we'll jump ahead.

23   BY MR. JONES:

24   Q.   Just in general, the investors that were brought in to

25   fund the projects that you're talking about, what was the level

1    of sophistication in terms of evaluating those projects?

2    A.   Highly sophisticated.  They not only had their own teams

3    of analysts, they had a track record of investing, but they

4    really understood the process and the role that we were

5    playing.  So it was highly qualified investors.

6    Q.   How many years did you work at the investment bank?

7    A.   About two.

8    Q.   And how many projects in that time do you think you worked

9    on?

10   A.   I'd say hundreds, two or three hundred.  In terms of

11   evaluating or being pitched ideas we may have actively

12   financed, 50 or 60.

13   Q.   But before you left the investment bank you had evaluated

14   300 different companies for their financing, their worthiness?

15   A.   Two to three hundred, yes.

16   Q.   Then you said you went to industry, that's probably an

17   industry term, what industry are you talking about?

18   A.   Medical research, biotechnology or pharmaceutical.

19   Pharmaceutical generally describes much larger companies that

20   also market, manufacture, and sell drugs.  The biotech are

21   smaller in size maybe in employees, but they're more focused on

22   drug discovery or earlier stage medical research.  So I was at

23   a biotech or medical research company.

24   Q.   What was the name of that company?

25   A.   BioCryst Pharmaceuticals.

1    Q.    How long were you there?

2    A.    Three years.

3    Q.    Where did you go after that?

4    A.    Connetics Corporation.

5    Q.    And what was Connetics Corporation?

6    A.    Another medical research company.  It was spun out of

7    Genentech, perhaps we know the name of that company.  Genentech

8    is a very large biotech company in San Francisco.  They had two

9    or three research projects that they were excited about but

10   they wanted to create a new company around that.  So they

11   created a spinout company in the San Francisco area, and I

12   joined that company a few years after it was founded.

13   Q.    What did Connetics do?

14   A.    So medical research, drug discovery.  So identifying areas

15   for medical need and then using our science to try to generate

16   new medicines to treat those particular diseases.

17         One indication was called scleroderma.  It's a

18   severely debilitating disease where your skin scars over.  You

19   get these hard scars on your skin, but also your organs, your

20   lungs, your heart.  So that's an example of one area of medical

21   research.

22         We also developed drugs for dermatology, for

23   psoriasis, eczema, acne, skin problems, and then we marketed

24   those products.

25   Q.    It sounds like Connetics and Ligand did similar things

1    just with different diseases; is that fair?

2    A.   Yes, correct.

3    Q.   Okay.  And how long did you stay at Connetics?

4    A.   I was there for ten years.

5    Q.   And when you first came to Connetics, what was your role?

6    A.   I was the chief financial officer.

7    Q.   Did you stay chief financial officer for the entire time?

8    A.   Yes.

9    Q.   What was your role as chief financial officer at

10   Connetics?  When I say "what was your role," what were your

11   responsibilities?

12   A.   So with corporations, there are a whole range of staff,

13   but the senior most people -- the CEO is the senior most

14   executive; the chief financial officer is often considered the

15   second most senior, but it is the top of the financial

16   organization.  It's the person who has full responsibility for

17   managing all of the financial affairs: collecting money,

18   collecting revenue, paying bills, financing projects, reporting

19   out to the investors and the SEC for annual reports.  So that

20   was my role as chief financial officer.

21   Q.   As part of that role as a chief financial officer, did you

22   have to interact with auditors, for instance?

23   A.   Yes.

24   Q.   And did you have to facilitate the audits of Connetics?

25   A.   Yes.

1    Q.    Was Connetics a public company?

2    A.    Yes.

3    Q.    Okay.  And that means it traded its stock on a stock

4    exchange?

5    A.    Correct.

6    Q.    And so did Connetics have to have filings with the SEC

7    every year, every quarter?

8    A.    Every quarter, regular standard filings every quarter,

9    every year.  Other filings for disclosures, contracts we'd

10   enter, et cetera.

11   Q.    Same requirements that are on Ligand now.

12   A.    Correct.

13   Q.    And as CFO of Connetics, did you get experience valuing

14   the assets of the company?

15   A.    Yes.

16   Q.    And can you describe what that experience was?

17   A.    Yes.  So, again, the company in my ten years grew

18   significantly.  It was -- the company had maybe 60 to 70

19   million dollar market cap.  After ten years investments and

20   growth we wound up being acquired by another company for eight

21   or nine hundred million dollars.

22         During the growth, of course, we funded projects, we

23   chose which medical research programs to fund.  We received

24   approvals for numerous products, probably four or five products

25   were approved that we wound up marketing, and along the way, as

1    the company grew, of course our cash grew or value grew, but

2    the amount of our investments grew as well, the various

3    projects.  And along the way, monitoring this growth, we would

4    look at, you know, how can we optimize the assets that we have.

5    So I was playing a role in all of that during that period of

6    growth.

7    Q.   And just for clarity, when you're talking about your

8    investments here, you're not talking about a stock portfolio,

9    you're talking about something else, yes?

10   A.   Right.  Again, the choices we make every year, we have a

11   budget, we decide in a given year what do we want to fund.

12   Some projects were ongoing, they make take two or three years,

13   so we would continue to fund those.  Every year we would make

14   decisions about which new projects to fund.  So we call those

15   our investments, the research projects that we chose to fund.

16   Q.   Okay.  Why did you leave -- excuse me.  Why did you leave

17   Connetics?

18   A.   The company had been acquired, and typically, while most

19   of the staff, the researchers, stayed on with the business, the

20   senior executives typically are more or less out of a job;

21   they're redundant in an acquisition.

22   Q.   Is that because the company that's acquiring you already

23   has a CFO?

24   A.   Correct.  They already have a senior financial officer

25   that can then consolidate those numbers and manage that

1    business under their existing staff.

2    Q.   So where did you go?

3    A.   I went to Ligand Pharmaceuticals.

4    Q.   And how did the opportunity to go to Ligand come up?

5    A.   While I was aware of the company as just a participant in

6    the industry, I was not aware that they were looking for a CEO.

7    Some investors who were active in Connetics for several years

8    who knew me, who interacted with me as investors, thought that

9    I would be a really good fit, my style, my approach, my

10   thinking.  The value that I had helped create at Connetics they

11   thought would be a really good fit for what Ligand was doing.

12   So they recruited me.  Early on the first pass I said I'm

13   actually very happy, I've got a great position at my current

14   job, and I'm not looking to switch firms.  Several months

15   later, the company was acquired, and of course it created an

16   opportunity, but essentially these investors sought me out, and

17   after an interview process over four or five weeks, it looked

18   to be a good opportunity, a good fit.

19   Q.   Was your training at Connetics a good preparation for your

20   role as CEO at Ligand?

21   A.   Yes.

22   Q.   In what way?

23   A.   The business is very similar.  While we were funding,

24   investing in different research projects, the business is about

25   the same.  We have scientists, biologists, we have chemists, we

1    have statisticians, a number of people that we employ in our

2    own laboratories, but also we work with contractors, we work

3    with other people in the industry.  So the way we go about

4    funding research and getting answers for our projects was very,

5    very similar.

6           What a senior leader would need to do is identify how

7    much can we afford, what should we fund, where are the markets

8    going, what would -- what is the medical need in five or ten

9    years, what would other partners who may share the costs with

10   us want to license?

11          So those sort of decisions were very similar between

12   the two companies.  So that's one reason.

13          Another reason, any company along the way has to make

14   decisions.  Do we hire more people now or do we wait a year or

15   two?  And so those basic business decisions, again, were very

16   similar at Connetics as they wound up being at Ligand as well.

17   Q.   Okay.  So if I'm doing my math right, you've now had 24

18   years as an executive, high-level executive at a company like

19   Ligand and Connetics; is that right?

20   A.   Correct.

21   Q.   Okay.

22   A.   Twenty-four -- actually, 26 or 27.

23   Q.   I apologize, I may be a little off on my math.

24          Are you familiar with a concept known as a duty to

25   shareholders?

1    A.    Sure, yes.

2    Q.    Can you explain what that concept means?

3    A.    So, I mean, the words are self-describing, but the -- the

4    idea is that senior executives, the top one or two executives

5    have a duty to shareholders.  As much as you want to manage a

6    good company and hire well and have a good workplace

7    environment, there's a duty to employees, as there is in any

8    relationship working team.

9         Ultimately, there's an expectation of trust, of

10   reliability, of integrity with your investors.  Investors, they

11   don't have to invest, they choose to.  They make a decision and

12   they will do their own diligence, their own analysis, but

13   often, once the investment is made, the investors aren't

14   looking or asking questions every day or every week

15   necessarily.  There's a duty to shareholders.  There's a

16   necessary expectation that the senior most people are honest,

17   they're getting it correct, they're being transparent, and that

18   is the duty to shareholders.

19   Q.    And is part of that duty to shareholders essentially a

20   trust that you'll preserve the money that they've invested with

21   you?

22   A.    Correct.

23   Q.    Okay.  As part of your role as CEO, do you play a role in

24   the SEC filings?  We talked a little bit about this before.

25        Let me cut to it.  What is your role with the SEC

1    filings that Ligand is making with the Commission?

2    A.    Yes.  So there are some filings that are one-off required

3    for material contracts.  If you enter a new contract, there's

4    something significant, we have an obligation within two days

5    typically to announce that.  So that's one form.

6          The routine filings, every quarter we are obligated to

7    file what's called a 10-Q.  Every year we're obligated to file

8    a 10-K.  And these standardized forms, the SEC tells us in an

9    outline form everything we have to disclose, and then we write

10   that document.

11         The document, in our case, the quarterly filing, may

12   be 40 or 50 pages.  Eighty percent are paragraphs just written

13   explanation describing our business, describing what happened

14   that period, describing our financial results; and then the

15   other 20 percent are tables, are financial tables.

16         So this is the routine, it's every three months.  For

17   us it's about six weeks of work that starts kind of in the

18   middle of that three-month period.  We start to gather

19   information, we start to write, draft and edit, we review

20   multiple times.  We work with our auditors who come and do

21   quarterly reviews, they do checks; and then we have to review

22   and ultimately sign off and certify the document right before

23   filing.

24   Q.    Just picking right up there at the end, you said you have

25   to certify the document.  What does that mean?

1    A.    There are two or three forms that the senior executives,

2    in our case the CEO, myself, and our CFO, have to sign, but

3    it's a very specific list of things that we are saying are true

4    and accurate.  And it's basically -- it's a certification to

5    our auditors and a certification to our investors that we put

6    the resources in, put the time in, and we are putting our name,

7    our personal name and office on the line as being responsible

8    for those filings.

9    Q.    And if the filings are not correct, can there be personal

10   responsibility for you?

11   A.    Yes.

12   Q.    And what are the consequences of that, if you know?

13   A.    So, if after the fact there's -- we learn that a mistake

14   was made, it's either an error, a number was wrong or something

15   was not appropriately described, the -- one method is what's

16   called a restatement, where you have to refile, and basically

17   you correct the error; you refile an amended version of that

18   document, and you explain what was the basis for the error, was

19   it a spreadsheet error, was it a staff mistake.  So that's one

20   way to accommodate.

21           The other is if there's -- the other extreme, if

22   there's deemed to be some fraud or some manipulation, something

23   that was not fully transparent that may have been deceiving to

24   shareholders, then the consequence is there's regulatory

25   enforcement action that could be more significant.  That could

1    result in the board ultimately firing the executive for not

2    doing the job properly or the SEC could fine the company, could

3    possibly, at the extreme, if there's real determined fraud,

4    fine the individual, possibly prevent that individual from

5    serving as an executive going forward.

6    Q.    There's real consequences to getting this right.

7    A.    Very, very significant consequences, yes.

8    Q.    When the company has a quarterly report or an annual

9    report, does -- when I say "the company" -- when Ligand has a

10   quarterly report or annual report, does it also put out some

11   sort of press release or announcement of those results?

12   A.    Yes.  It's common for public companies to not only file

13   the SEC document, which is instantly available publicly off the

14   internet, but it's common to also host a -- put out a press

15   release, four- or five-page summary, and then have a conference

16   call, which winds up being about a half an hour call, but

17   basically just provide some information in a verbal form and

18   you open the line for questions.

19   Q.    Is that sometimes called an earnings call?

20   A.    Correct.

21   Q.    And is that because you're talking about what the company

22   earned during the previous quarter?

23   A.    Correct.

24   Q.    Okay.  So that conference call, you said there's sort of a

25   part where you have a scripted part; is that right?

1    A.   That's right.  In our case, it winds up being about a 30-

2    to 40-minute call.  We'll have maybe half of that scripted

3    remarks, and then the other half we leave open for questions.

4    Q.   Does that mean people can call in and ask the company

5    questions about its results and its announcement?

6    A.   Correct.

7    Q.   Okay.  And do people call?

8    A.   Yes.

9    Q.   Generally who calls in?

10   A.   There are analysts called sell-side analysts who write

11   research.  Their job is to understand the industry and to

12   understand companies.  They choose which companies to write

13   research on.  Generally they may have 20 companies, but these

14   are companies that they follow and in their -- their customers

15   are investors.  They listen, they follow companies, they write

16   reports, but their customers are investors who are investing in

17   companies.  So they typically are the most common people asking

18   questions.

19        Sometimes individual investors actually ask questions

20   as well.

21   Q.   Has that happened at Ligand?

22   A.   Yes.

23   Q.   In 2014, do you recall about how many analysts were

24   writing research reports about Ligand?

25   A.   I would estimate six to seven is my memory.

1    Q.   And the six to seven, they would all work at different

2    investment houses?

3    A.   Correct.

4    Q.   Did you ever in an earnings call indicate that Promacta

5    was going away as a source of revenue for Ligand

6    Pharmaceuticals?

7    A.   No.

8    Q.   Did you ever say in an earnings call anything to indicate

9    that Ligand Pharmaceuticals was insolvent?

10    A.   No.

11    Q.   Did you ever say anything that indicated Ligand was near

12    insolvent?

13    A.   No.

14    Q.   Did you ever say anything that indicated that Ligand was

15    perhaps going to have to file bankruptcy?

16    A.   No.

17    Q.   How about in the actual filings themselves, the 10-K and

18    the 10-Q, did you ever indicate in those documents that

19    Promacta was no longer going to be a source of revenue for

20    Ligand?

21    A.   No.

22    Q.   And did you ever indicate in those documents that Ligand

23    Pharmaceuticals was insolvent?

24    A.   No.

25    Q.   Did you ever indicate that it was bankrupt or near

1    bankrupt?

2    A.    No.

3    Q.    How about in any other public statements of the company,

4    did you ever make any other public statements that Promacta was

5    going away as a source of revenue?

6    A.    No.

7    Q.    How about any public statement that indicated that the

8    company was even near insolvency?

9    A.    No.

10   Q.    I want to shift gears for a minute, Mr. Higgins.  I know

11   we're going to talk about this today, so we might as well get

12   to this now, I want to talk about how you're paid at Ligand

13   Pharmaceuticals or compensation, if that's okay.

14   A.    Yes.

15   Q.    Can you describe in the 2014 time period -- let's focus on

16   that for now -- in the 2014 time period, can you describe the

17   parts of your compensation package?

18   A.    Yes.  Throughout my time at the company there are

19   basically three parts to it: a salary, kind of usual every

20   two-week paycheck; a cash bonus paid once a year, the board of

21   directors sets independent goals and every year they then look

22   at our performance against those goals and determine what the

23   cash payout would be on a bonus; and thirdly, equity.  The idea

24   in public companies, it's very common, in biotech, I'd say

25   most, maybe all, executives have equity.  The board says, we'll

1    allocate to you some stock and maybe options, which is a right

2    to buy in the future if the stock goes up or they'll grant

3    restricted shares, they'll give you ownership but invest over

4    time.  You don't get it all at once.  If you stay long, you

5    wind up earning it over time.

6              So those three parts, every year I'd get a salary, I

7    was eligible to earn a cash bonus, and then the board would

8    give me some sort of an equity grant.

9    Q.   That cash bonus, did you have to meet certain goals or

10   milestones in order to get that bonus?

11   A.   Yes.

12   Q.   And in the 2014 time period, were you able to meet those

13   milestones?

14   A.   Yes.

15   Q.   How about in 2015?

16   A.   Yes.

17   Q.   And how about in 2013?

18   A.   Yes.

19   Q.   So you were meeting the goals that your board was setting

20   for you?

21   A.   Correct.

22   Q.   And are those generally about the financial performance of

23   the company?

24   A.   Yes.  There -- maybe in two areas, one financial

25   performance, running a good business financially, and the other

1    would be making sure projects were moving along.  Again,

2    medical research, our projects, it's not a two-week answer,

3    it's not a quick answer, it's often a year, two, three, four

4    years, and so staying on schedule, not letting timelines slip,

5    so managing those projects and timelines was also a big part of

6    measuring our performance every year.

7    Q.    Okay.  You talked about getting stock, getting equity

8    from -- as part of your compensation package.  One of the

9    things you said is you had some vested over time.  Does that

10   mean you couldn't sell them right away?

11   A.    Correct.

12   Q.    You had to hold onto them for a time period?

13   A.    Correct.

14   Q.    And is it, like, two weeks or is it ten years?  What kind

15   of time period are we talking?

16   A.    Typically it's a four-year period.  So that the grant

17   would be granted, you would not be able to get any value or

18   touch it at all for at least six months, the first six months,

19   and then after six months, basically 1/48th, one small amount

20   vests every months for a period of four years.  So it's -- it's

21   an incentive in that you have some equity, and if you create

22   value, that equity will also create value.

23            This is a very common structure for public companies

24   where you want the management to really be aligned with

25   shareholders, building value and participating.  But at the

1     same time, it's a retention element.  It's not a here's your

2     stock and thank you, you can leave.  The idea is the board

3     wants you to keep doing good work and building value --

4                THE COURT:  I think we need to jump ahead a little

5     bit.

6                MR. JONES:  Yes, your Honor.  We're just going to

7     cover what options are and then --

8                THE COURT:  Maybe not at such length.

9     BY MR. JONES:

10    Q.   Just briefly, Mr. Higgins, you said you got options.  Did

11    those options -- you have a right to buy at a certain price?

12    A.   Correct.

13    Q.   And is that price sometimes above what the current price

14    of the stock is at the time?

15    A.   Yes.

16    Q.   And that means that unless the stock price goes up, those

17    options aren't worth anything?

18    A.   Correct.  An option is a right to purchase the stock, but

19    it sets a stock price, and unless the stock is higher than that

20    stock price, that option is not worth anything.

21    Q.   Who sets your compensation?

22    A.   The -- there's a compensation committee, independent

23    directors that analyze with an outside compensation consulting

24    firm, and then ultimately the full board of independent

25    directors approves the compensation.

1    Q.   Okay.  In 2014, would it be fair to say that you had stock

2    in Ligand Pharmaceuticals?

3    A.   Yes.

4    Q.   Did you have a lot?

5    A.   I had -- I was satisfied -- yeah, it was a small portion

6    of the total company, but it was appropriate for my level of

7    service and years in the industry.

8    Q.   Okay.  Are you aware that the stock price of Ligand

9    Pharmaceuticals went down in the summer of 2014 when Father

10   Lemelson was engaged in writing his reports?

11   A.   Yes.

12   Q.   All right.  And did that affect the value of your stock

13   holdings?

14   A.   Yes.

15   Q.   What happened?  Did the value of your stock holdings go

16   down?

17   A.   Yes.

18   Q.   Did you lose any money as a result of the value of that

19   stock going down?

20   A.   I lost value as a shareholder.  The value of my holdings

21   decreased.  I didn't lose money exactly.  Unless you sell the

22   stock, the stock isn't worth cashing.  So I lost value, but

23   I've been at the company 15 years, I'm really a long-term

24   holder, so I was not actively selling or losing money on sales

25   at that moment, but I certainly lost value in terms of my

1   holdings in and the stock price going down.

2   Q.   Is it fair to say on paper, less, but in the bank account,

3   not less?

4   A.   Correct.

5   Q.   Okay.  Did the stock recover after Father Lemelson stopped

6   writing his reports?

7              MR. HOOPES:  Objection.

8              THE COURT:  Overruled.

9   A.   Eventually, yes.

10   Q.   What effect does the fact that you owned Ligand stock in

11   2014 have on the truthfulness of your testimony today?

12              MR. HOOPES:  Objection, that's --

13              THE COURT:  Sustained.

14              I think you need to --

15              MR. JONES:  Yes, your Honor.

16   BY MR. JONES:

17   Q.   How does the day-to-day stock price affect your running of

18   Ligand?  What impact does it have on running Ligand?

19   A.   That the stock price -- ultimately, my responsibility is

20   to run a good company.  So it's to manage well, to hire well,

21   to manage projects well, to pick the right projects, to have

22   good partnerships with our pharmaceutical customers.  It's

23   ultimately to run a good company.

24              If we run a good company, the understanding is we will

25   eventually create value, and the value is the value of our

1    stock price.

2            So at any specific day, it's running a good company,

3    but it's having relationships with investors where investors

4    like the company, they trust the company, they share the

5    vision, the promise and potential, and ultimately, if we're

6    successful, they will be rewarded by owning Ligand.

7            If we don't do good work, if we don't create value,

8    business won't perform well and investors will choose to go

9    somewhere else.  They'll leave Ligand as an investment and

10   choose to invest in other companies.

11   Q.   Are you familiar with a concept called "insolvency"?

12   A.   Yes.

13   Q.   I'd like to talk about insolvency for the time being.

14   What is it?

15   A.   It's an inability to pay debts.

16   Q.   Is there a sort of assets and liabilities way of thinking

17   about insolvency as well?

18   A.   Yes.  I mean, there are many ways to consider insolvency,

19   but fundamentally, it's an inability to pay off your

20   obligations, be it to lenders, debt holders, creditors, other

21   people that you owe money to.

22   Q.   Okay.  Was Ligand insolvent in 2014?

23   A.   No.

24   Q.   Was Ligand insolvent at any point after 2014?

25   A.   Ligand has never been insolvent.

1    Q.   I'd like to focus you on August of 2014.

2         Did Ligand engage in something called a debt offering

3    at that time?

4    A.   Yes.

5    Q.   What was that?

6    A.   So it's financing.  I described my time as an investment

7    banker, and you can invest equity, where you take ownership or

8    debt.  In this case, it was a debt financing.  The debt

9    financing was for $225 million, and it was -- basically our

10   decision, we wanted to borrow money so we could invest in other

11   projects.

12        Most biotech companies, because of their situation,

13   are not able to access the debt markets.  In our case, we were

14   doing well as a company and we had some ideas for what we

15   wanted to invest in.  We spoke with two very large investment

16   banks, Deutsche Bank and Bank of America, very, very

17   sophisticated banks, about structuring this debt offering, and

18   we wound up borrowing the money as way to plan for the future.

19        We had some ideas in mind for other companies we

20   wanted to acquire and other areas of investment and we needed

21   the capital first before we could pursue those projects.

22   Q.   So in that debt offering, you said that's being run

23   through a couple of investment banks, correct?

24   A.   Right.

25   Q.   And you described that before, that the investment bank

1    has to check you out, right?

2    A.    Correct.

3    Q.    Did that happen here in the Ligand case?

4    A.    Yes.

5    Q.    What kind of process did Ligand have to get through to get

6    checked out?

7    A.    Well, so, first, the relationship rarely is overnight.  In

8    our case, we knew these banks for quite a while.  We were

9    exploring what would be required, how much could be raised.  So

10   there was months, six, seven, eight months of exploring and

11   really kind of getting this relationship under way.

12          When we decided -- when the bank decided that we did

13   want to borrow money and structure it in this way, it was a

14   very intense four-week process.  Not only did the banks -- the

15   banks probably had 20 to 25 people from the two banks on staff

16   doing the diligence, looking at our patents, looking at our

17   contracts, looking at our financial statements, but there are

18   also legal teams represented by not only the company but also

19   the banks.  So a very large -- it's called a working group.

20   But a very large group that does an intensive project to really

21   understand and satisfy the role that I played, satisfy that

22   they're comfortable that the structure and the quality was

23   right to pull off a financing.

24   Q.    You said a lot of companies in your biopharmaceutical drug

25   discovery space don't get funding like that, correct?

1    A.    That's correct.

2    Q.    Is that because something happens during that process?

3    A.    Yeah, either something happens where at the bank is not

4    comfortable or they don't think it's the right time.  It

5    doesn't mean it's a bad business, but it's just timing or what

6    investors' interests are.

7         Specific to the structure, this was a debt, it was a

8    borrowing.  The idea, we would borrow, it was a five-year note,

9    we agreed in five years we would pay off that loan, not in

10   equity, not in paper, but we agreed we would pay it off in

11   cash.

12        And most biotech companies are funding research

13   projects.  The drug might not work.  So instead of lending

14   money with a promise to pay back in cash, most biotechs have to

15   take equity, they -- where an investor gives money but they own

16   it, if it doesn't work out, the ownership isn't worth anything.

17        But in our case, we were in the fortunate position to

18   be able to borrow money with the expectation that we wind up

19   repaying it.

20   Q.    Does a big investment -- your knowledge, based on your

21   experience, does a big investment bank lend money to a company

22   if it doesn't think that company is going to able to pay it

23   back?

24   A.    No.

25   Q.    Does the big investment bank charge an interest rate,

1      basically, and expect a rate on return on lending that money?

2      A.    They structured the investment with -- the investors

3      ultimately get the return, the interest rate, to lend money,

4      but, yes.

5      Q.    So not only do you have to pay back the loan, you have to

6      pay it back with interest respectively?

7      A.    Correct.

8      Q.    What would Ligand's possibility of getting debt financing,

9      what would the possibility of that had been if Ligand was

10     insolvent?

11     A.    Zero.  We would not have been able to borrow money.

12     Q.    What about if it was just near insolvent?

13     A.    Zero.  The banks have very strict lending requirements.

14            Nothing is a sure thing, but banks, particularly these

15     were some of the most credible, significant, experienced banks

16     available to a U.S. company, and for them to put their

17     reputation on the line, for them to bring their investors,

18     people who have participated in other rounds, for them to do a

19     bad deal is bad business.  Their reputation would be destroyed.

20            And so banks typically, especially for lending

21     circumstances, you know, if there's a line, should they lend or

22     not, they don't come anywhere close to the line.

23            So not only were we not insolvent, we were anywhere --

24     insolvency wasn't even on the table, it wasn't even in

25     question.  There was no diligence of these 25 people doing the

 1    work, there's never a question of can you really repay this,

 2    what is your liquidity, what is your solvency; there was no

 3    concern of that at all throughout this process.

 4    Q.   Fair to say these banks are pretty conservative about

 5    this?

 6    A.   They are very conservative.

 7    Q.   Did the debt offering actually happen?

 8    A.   Yes.

 9    Q.   Did it happen in August of 2014?

10    A.   Yes.

11    Q.   Does that mean that there was money in the bank at Ligand

12    from that loan?

13    A.   Yes.

14         MR. JONES:  Can we have Exhibit 220, Ms. Taylor.

15    Q.   Can you see that on your screen?

16    A.   Yes.

17         MR. JONES:  Members of the jury, do you have screens

18    today?

19         Excellent.

20    Q.   Is this one of those quarterly filings with the SEC that

21    we talked about earlier?

22    A.   Yes.

23    Q.   It's the Form 10-Q, that's what it means, "Q" for

24    quarterly?

25    A.   Yes.

1              MR. JONES:  Can we have page 4 of this.

2    Q.   Is this one of the pages of the financial statements of

3    Ligand?

4    A.   Correct, a balance sheet.

5    Q.   Is it accurately stated?

6    A.   Yes.

7    Q.   Is there a line for cash in the bank?

8    A.   Yes.

9    Q.   Where is it?

10   A.   It is the first line.

11   Q.   So this says 180,663.  That's what number?

12   A.   That's a number -- these numbers in this table are in

13   thousands, so 3 zeros are left off just to make the numbers

14   easier to read.

15        That is $180 million of cash.

16   Q.   You had $180 million of cash in the bank?

17   A.   Correct.

18   Q.   You could see at the top there, that's as of September 30,

19   2014, correct?

20   A.   Correct.

21   Q.   And in fact, the debt offering had finished more than a

22   month before, right?

23   A.   Correct.

24   Q.   So in August, you had more than 180 million in the bank?

25   A.   Prior to the financing, we had less cash.

1    Q.   I meant after the financing.

2    A.   Right.  After the financing, we had more cash, yes.

3    Q.   And you were starting to spend it by September.

4    A.   Yes.

5    Q.   Okay.  At the time the defendant was saying you were

6    insolvent, was this cash in the bank?

7    A.   No.

8    Q.   What about in August, after the August 14th and August

9    22nd reports came out?

10   A.   Yes.

11   Q.   So when those reports came out with the insolvency

12   statements, the $180 million was in the bank.

13   A.   Correct.

14   Q.   Was that money sort of earmarked in any sort of way?  Did

15   you have to spend it in a certain way?

16   A.   No.  Generally we describe use of proceeds.  The business

17   people would say, here's why we'd like to borrow money, we've

18   got some good ideas, we've got a good plan.  The general use of

19   proceeds we would describe, but there was no contractual

20   obligation for how we would spend that money.

21   Q.   Did you eventually spend that money?

22   A.   Yes.

23   Q.   Did you spend it on anything good?

24   A.   Yes.

25   Q.   What did you spend it on?

1    A.   Most of the proceeds went to buying an antibody company.

2    Antibodies, now in the age of COVID, we are probably all

3    familiar with antibodies, it's a protein, it's a type of

4    medicine.

5          There's a brilliant scientist who invented a way to

6    discover these drugs.  He had been around for eight years,

7    built a very, very successful company, and we knew him for a

8    while.  We realized this would be a really great partnership.

9    And with all of their investors, we negotiated a deal, it wound

10   up being a $180 million acquisition, and that's where we used

11   most of the money.

12   Q.   Got it, okay.  When was that?

13   A.   The deal closed in January of 2016.  We started

14   negotiating it probably in May of 2015.

15   Q.   Okay.  So for the latter -- for the rest of 2014 and all

16   of 2015, you had this money in the bank as well.

17   A.   Correct.

18   Q.   If you needed it, you could have used it, right?

19   A.   Yes.

20   Q.   If you needed it to pay your bills?

21   A.   Correct.

22   Q.   Did you have bills more than $180 million?

23   A.   No.

24   Q.   Okay.  I'd like to turn to the things that Father Lemelson

25   said about the insolvency of the company.

1          MR. JONES:  Could we have Exhibit 6, please.

2    Q.   Mr. Higgins, are you familiar with this document we've put

3    up here at Exhibit 6?

4    A.   Yes.

5    Q.   And is this one of the documents that Father Lemelson

6    wrote about Ligand Pharmaceuticals?

7    A.   Yes.

8    Q.   Do you see in the title it talks about that the debt

9    issuance solidifies the company's insolvency --

10          THE COURT:  Excuse me.  To help the jury, what is the

11   date that this issued?

12          MR. JONES:  Thank you.

13          I'll represent to the Court that the date of this is

14   August 14, 2014.  And this Exhibit 6.

15   BY MR. JONES:

16   Q.   As of August 14, 2014, Mr. Higgins, had the debt offering

17   taken place?

18   A.   Yes.

19   Q.   And had the money come in from that debt offering?

20   A.   Yes.

21   Q.   Okay.  So there were $180 million plus is in the bank at

22   that point?

23   A.   Correct.

24   Q.   Is the debt offering the same, as you understand it, as

25   debt issuance that's talked about here?

1    A.   Yes.

2    Q.   Is that just another way of talking about the debt

3    offering?

4    A.   Yes.

5    Q.   So did you understand Father Lemelson to be saying that

6    taking out that loan meant that the company was insolvent?

7    A.   That's what he intended to imply.

8    Q.   And was that a true statement?

9    A.   No.

10        MR. JONES:  And could we go to the next page, please.

11        And in paragraph 3, would you pull up paragraph 3.

12   Q.   It's that same report, the August 14, 2014 report,

13   supposedly about the insolvency of a company.

14        Do you see this paragraph here, Mr. Higgins?

15   A.   Yes.

16   Q.   You've seen it before?

17   A.   Yes.

18   Q.   And do you see that Father Lemelson is saying prior to

19   this August 4th release, the company's liabilities exceeded

20   tangible assets, meaning the company was insolvent?

21   A.   I see that sentence, yes.

22   Q.   Was the company insolvent at that time?

23   A.   No.

24   Q.   And then with the August 4th earning release, it says the

25   company presented tangible equity of just 21,000.

1          Is tangible equity something the company is offering

2     in its financial statements?

3     A.    No.

4     Q.    Why?

5     A.    It's irrelevant.  It excludes a very, very significant and

6     important part of our assets.

7     Q.    What's being excluded?

8     A.    Intangible assets.  There are tangible assets and

9     intangible.  Tangible, cash, of course.  But if you had

10    anything of physical size or shape that you can measure of

11    value, intangible, very common in biotech, are valuable.

12    They're contracts with partners where they have made

13    commitments to fund research and if they fund and the drug

14    works, we're entitled to get payments.  Patents, patents are

15    recipes, they're formulas for making stuff.  Trademarks,

16    there's a significant value that, especially biotech companies,

17    hold, that, unlike gold bars that you could weigh or a field

18    that you can measure in acres or size, that are a really

19    important part of our valuation and asset structure.

20          MR. JONES:  Could we have paragraph 4, please, Cole,

21    right below that.

22          Great, thank you.

23    Q.    Mr. Higgins, you've seen this paragraph before as well?

24    A.    Yes.

25    Q.    And you see here that Father Lemelson is saying that the

1     company issued $245 million in new -- excuse me.  On August

2     11th, the company announced that they would be taking on $225

3     million in new debt.  That was true, correct?  You were doing a

4     new debt offering?

5     A.   Correct.

6     Q.   And then, you see, "If this bond offering succeeds, the

7     company's liabilities will again far exceed its assets and the

8     company will be technically insolvent once more."

9           Was that true?

10    A.   No.  We were never insolvent, and this financing did not

11    make us insolvent then or again.

12    Q.   What about technically, Father Lemelson saying

13    "technically insolvent," were you technically insolvent?

14    A.   No.

15    Q.   What about practically insolvent, were you practically

16    insolvent?

17    A.   There was no reasonable way to analyze and conclude this

18    company was insolvent.  We were not insolvent.

19          MR. JONES:  Can we go to Exhibit 7, please.

20    Q.   Mr. Higgins, do you recognize Exhibit 7?

21    A.   Yes.

22    Q.   Is this another report from Father Lemelson about the

23    company?

24    A.   Yes.

25          MR. JONES:  And I'll represent to the Court this

1    report is dated, it's in the stipulations, August 22, 2014.

2    Q.   So this report comes about eight days later than the

3    previous one, right, Mr. Higgins?

4    A.   Correct.

5    Q.   And in this report -- just one moment, get it up on my pad

6    here.

7              In this report does Father Lemelson again say that the

8    company is insolvent?

9    A.   Yes.

10   Q.   And does he attribute that insolvency to, in part, the

11   debt offering?

12             MR. JONES:   Cole, can we have the last page of the

13   document?

14             And if we could blow up that first paragraph, please.

15   Q.   So this is the last page of Father Lemelson's August 22nd

16   report, Mr. Higgins.

17   A.   Correct.

18   Q.   And do you see here that Father Lemelson is saying that

19   the preferential treatment of a few large Ligand shareholders

20   further deepens the company's insolvency and likelihood of

21   liquidation or reorganization under Chapter 7 or Chapter 11 of

22   the bankruptcy code?

23             Do you see that?

24   A.   I see those words, yes.

25   Q.   Was that a true statement?

1    A.    No.

2    Q.    It talks about liquidation.  What's liquidation for a

3    company?

4    A.    Liquidation is where bond holders or lenders realize that

5    they will not get full repayment of the loan, and so they can

6    go to the courts and force the company to stop business, fire

7    all their employees, and they have a plan, often in six months,

8    to sell all of their assets.

9          The idea is that the bond holders would otherwise be

10   wiped out, and so they get a court to intervene, enforce a sale

11   on a rights sale of all the assets and shut the business down.

12   Q.    When did your lenders come to shut down the business?

13   A.    They never -- that never came about.  It was never

14   discussed; it was never an issue for Ligand.

15   Q.    Did your lenders ever call you up and say, We don't think

16   you can pay, we're shutting you down?

17   A.    Never.

18   Q.    This reorganization under Chapter 7 or Chapter 11 of the

19   bankruptcy code, is that basically a legal proceeding declaring

20   that you're bankrupt?

21   A.    Yes.  Again, the capital markets work.  There's strict

22   rules.  People on all sides abide by the rules, but this is one

23   mechanism where lenders have some security where if they invest

24   and things don't go well, they can call up the lawyers, they

25   can call up the company, they can prove, they can demonstrate

1    that this company cannot repay the loan and the courts can then

2    force a liquidation.  They can force shutting down the entire

3    operation so any remaining value can then be given back to

4    those bond holders.

5    Q.   And again, that never happened.

6    A.   That never happened.

7    Q.   Do you see here where it says "deepens the company's

8    insolvency"?

9    A.   Yes.

10   Q.   What does "deepens the company's insolvency" mean to you

11   as you read those words?

12   A.   Well, the words are saying it's bad and now it's worse.

13   It was never bad, and it was not worse.  In fact,

14   fundamentally, we were better off.  Not only was the company

15   doing well and making progress, but we had the validation by

16   banks, very sophisticated, credible banks who had done their

17   work, and now we had very substantial financing and a five-year

18   window to invest that and create more returns.

19          We had a very good track record of investing, invest a

20   dollar, it's worth $5.

21          This was an example where we could not only secure new

22   capital, we had a very good record, it actually improved our

23   outlook because we had more capital to invest in other

24   projects.

25          One thing I'll add, as I read this --

1              MR. HOOPES:  Objection, your Honor.

2              THE COURT:  Sustained.

3    BY MR. JONES:

4    Q.   Let me just ask you the next question, Mr. Higgins.

5              MR. JONES:  Cole, could you highlight the sentence

6    that goes from "remaining Ligand common shareholders" -- I

7    think the jury can see it's the last couple of lines of that.

8    Q.   Do you see that there, Mr. Higgins?

9              Cole is going to highlight it for us.

10             You see that statement?

11   A.   Yes.

12   Q.   Again, tangible equity is not something the company was

13   reporting?

14   A.   No.

15   Q.   That's something that Father Lemelson had to calculate

16   himself?

17   A.   Yes.

18   Q.   It says, "Ligand shareholders have only the protection of

19   $21,000 in tangible equity to shield them from $245 million in

20   debt."

21             Is that a true statement?

22   A.   It's absurdly false.

23   Q.   Okay.  In what ways, way or ways, is it absurdly false?

24   A.   The most obvious, it excludes the cash.  We received the

25   cash from the financing, we had already started to invest it,

1    but we had -- the vast majority of the proceeds of that

2    financing we still had in our balance sheet.  So very simply,

3    that was excluded.

4            But back to the protection, if, if there were a

5    liquidation or if we wanted to pay the bond back early, which

6    was our choice, or if investors had a right or a reasonable

7    claim to require repayment, we had many, many assets on our

8    balance sheet, some were intangible, that we could have sold,

9    generated cash to repay to those bond holders.

10           To not factor that in, to completely disregard that is

11   a very aggressive error in presentation.

12   Q.   So is part of those assets to protect common shareholders,

13   does that have anything to do with the products of the company?

14   A.   Can you restate the question?

15   Q.   Yes, I can.  I'm sorry, that was a little off there.

16           You were talking about the protections that

17   shareholders would have.  Do those protections include anything

18   about the company's technologies or products?

19   A.   Yes.

20   Q.   And in what way?

21   A.   So lenders are entitled to their interest payment.  We pay

22   interest on a regular basis, and we had financial reporting

23   obligations to show the condition of our reports.  If things

24   ever -- if we did not make payments on time or the financial

25   condition deteriorated, the shareholder -- the lenders could

1    then invoke redemption clauses.  These are standard clauses
2    where the investors can choose to redeem or to get their money
3    paid back early.
4          Those redemption clauses were never triggered.  There
5    was never any missed payment.  There was never any delinquency.
6    Again, we were never anywhere close to this bond being in
7    jeopardy.  In fact, we wound up paying the full amount off
8    early.  Our cash flows and our business was so successful, we
9    paid it off even before the five-year term had expired.
10   Q.   Did you ever miss a payment?
11   A.   No.
12   Q.   This statement is talking about common shareholders.
13   Common shareholders are just regular people holding stock,
14   right?
15   A.   Correct.
16   Q.   And were they protected from that offering debt as well?
17   A.   The lenders for any business would be first in line to be
18   repaid, and then what is left, the common shareholders would
19   share the rest.
20   Q.   Okay.  And that would be all the rest of the company, yes?
21   A.   Correct.
22   Q.   I'd like to turn to something called a going concern
23   analysis.
24         MR. JONES:  You can take that down please, Cole.
25   Thank you.

1    Q.   You're familiar with this term, "going concern"?

2    A.   Yes.

3    Q.   And we heard yesterday, see if you agree with this

4    definition, that a risk of a going concern is a risk that the

5    company will not be able to continue into the foreseeable

6    future.  Is that how you understand it?

7    A.   Yes.

8    Q.   Did you have to participate, you, Ligand Pharmaceuticals,

9    have to analyze your business every year for a going concern?

10   A.   Yes.

11   Q.   What goes into that analysis?

12   A.   It's -- it basically -- the financial report, the annual

13   report reflects on the history of the past year, specifically

14   your reporting out.  But every report there is a test on do you

15   have enough capital to last the next 12 months.

16        So it's -- the auditors aren't making a judgment on

17   your business, they aren't getting into which medicine you

18   should fund or how you're going to pay your employees or what

19   laboratory you build, they simply look at black-and-white

20   numbers to analyze is this business a going concern.

21        The words "going" means continuing, and "concern,"

22   it's an accounting technical word, but it simply means

23   business.  A concern is a business.  Is it a going business?

24   Is it a going business?  Is it a continuing business for the

25   next 12 months?  And it is a basic analysis, but it's

1    fundamental to investors to look right in the financial

2    statements, to have third-party, independent auditors, confirm,

3    yes, this company has enough liquidity, enough financial

4    resources to be a continuing business for the next at least 12

5    months.

6              MR. JONES:  Can I have Exhibit 212, please.

7    Q.   Mr. Higgins, I'm showing you Exhibit 212.  And this is a

8    going concern analysis put together by the company, correct?

9    A.   Yes.

10   Q.   And this is what that process you were just describing,

11   you have to make that evaluation of the company?

12   A.   Yes.

13   Q.   Who does this document get sent to?

14   A.   So -- I mean, there's internal finance staff that

15   prepares, reviews; there are auditors, independent auditors, a

16   team of eight to ten people; and then the senior management.

17   Q.   So your team puts this together and sends it to the

18   auditors to check, yes?

19   A.   Yes.

20   Q.   Okay.  Do you participate in that process?

21   A.   Yes.

22   Q.   In what way?

23   A.   I'm actively involved in preparing all budgets, analyzing

24   revenue reports, reviewing the financial condition.  So I

25   obviously am intimately involved in how the business is doing

1   by report out to our board of directors regularly, and

2   specifically, when we prepare this, it's updated, the numbers

3   are reflected for the current period.  I review it, make sure

4   that it all looks in order.  If I have questions, I ask

5   questions, and then we present it to our auditors.

6              MR. JONES:  Can we have the first couple of lines of

7   the guidance section, please, that first section.

8   Q.   This talks about Section 205 requiring an auditor to

9   evaluate conditions or events discovered.  Do you see that?

10  A.   Yes.

11  Q.   Is that talking about the legal requirement to have a

12  going concern analysis?

13  A.   Yes.

14  Q.   Section 205 is part of the regulations that govern

15  auditors and public companies?

16  A.   Yes.

17  Q.   Okay.

18             MR. JONES:  Could we pop back out, Cole, and could we

19  have -- just blow up the issue here, the second part.

20  Q.   Is this issue essentially the purpose of this document?

21  A.   Yes.

22  Q.   Okay.  So this is the going concern and whether or not

23  there would have to be a paragraph in the auditors' opinion to

24  say maybe they thought you wouldn't be a going concern?

25  A.   Correct.

 1   Q.   Did Ligand ever get that paragraph where the auditors said

 2   maybe they won't be a continuing business?

 3   A.   No.

 4        MR. JONES:   Could we go to page 3 of 4.

 5   Q.   There's a table in the middle here.   If we blow that up --

 6   thank you, sir -- what's this table, Mr. Higgins?

 7   A.   It's a cash flow sources, where is cash coming in and then

 8   uses where you pay cash out for the next 12 months.

 9   Q.   Okay.   And what's the purpose of this table for this

10   analysis?

11   A.   Ultimately to summarize for all the estimated business

12   payments, your obligations and all of your existing cash or

13   expected cash in flow, what does the bottom line look like.

14   Q.   And it doesn't say it here in the table -- actually, I

15   guess it does.

16        MR. JONES:   Can you just bring -- call that down to

17   the next paragraph.   Can you expand it a little bit?

18   Q.   So this 29,139 at the bottom, is that the 29 million that

19   we're talking about at the bottom here?

20   A.   Yes.

21   Q.   Okay.   So these are in thousands.   That's 29 thousand

22   thousands or 29 million?

23   A.   Twenty-nine million, correct.

24   Q.   I often think it would just be better if we wrote million

25   and didn't have the confusion.   But it's 29 million.

1    A.   It's 29 million, yes.

2    Q.   Was this going concern analysis accepted by your auditors?

3    A.   Yes.

4    Q.   Okay.  I'd like to shift gears.

5         I'd like to take us to the time period when you first

6    found out Father Lemelson was writing reports about Ligand.

7    Was that in June of 2014?

8    A.   Yes.

9    Q.   In fact, we've seen that first report came out June 16,

10   2014?

11   A.   Correct.

12   Q.   Did you see it around that time?

13   A.   Yes.

14   Q.   Did you read it?

15   A.   Yes.

16   Q.   Did you agree with it?

17   A.   No.

18   Q.   Why not?

19   A.   In every page, maybe every paragraph, had falsehood,

20   misstatements, misleading innuendo.  It was really absurdly off

21   base.

22        MR. JONES:  Can we have Exhibit 41, please.

23   Q.   Mr. Higgins, Exhibit 41 appears to be a series of emails

24   that you are involved with also with Matt Foehr and Bruce Voss.

25   Do you see that, sir?

1    A.   Yes.

2    Q.   And you seem to be on June 17th, correct?

3    A.   Yes.

4    Q.   That's the day after Father Lemelson put out his first

5    report, correct?

6    A.   Correct.

7         MR. JONES:  And if you can go to the very bottom of

8    the document, please.  All right.  If you can blow up that

9    middle there, where it says, On June 17th, Bruce Voss -- thank

10   you.

11   Q.   All right.  And does this say to set and implement a

12   strategic response to the Lemelson situation?

13   A.   Yes.

14   Q.   What was the Lemelson situation?

15   A.   The report, the short report that he had published the

16   prior day.

17   Q.   Okay.  So at this point the company was trying to figure

18   out how to formulate a strategy around that report?

19   A.   Correct.

20   Q.   Why did you want to formulate a strategy around that

21   report?

22   A.   The claims were incredibly damaging without people

23   understanding, know who this person was or why -- why somebody

24   would be making these reports.

25         It was the first time our investors, public investors

1    were seeing these claims.  And so being able to prepare a

2    response or understand first started with getting a handle on

3    who what the background of this whole report was.

4    Q.   Okay.  And through the course of this document, is there a

5    back and forth about that strategy?

6    A.   Yes.

7    Q.   Okay.

8         MR. JONES:  Can we go to the second page, please.

9    Q.   And we're going three, two, one because that's how an

10   email goes, the earliest one is at the bottom, the newest one

11   is at the top, right?

12   A.   Yes.

13   Q.   So going forward in time a little bit, do you see an email

14   that you wrote in the middle of the page?

15   A.   Yes.

16   Q.   Okay.  And you're discussing options; is that right?

17   A.   Yes.

18   Q.   And what were the options that you were considering on how

19   to -- that you're considering here?  Can you explain that?

20   A.   Yes.  The -- we could read the report, we read what this

21   person had published.  We didn't know this person at all.  Not

22   only had we not spoken with him, it was very unusual because

23   there was very, very limited information about this person.  We

24   weren't familiar with him.  And when we had investors call or

25   ask questions and ask what was going on, very few, I'm not sure

1  if I recall any, were familiar with this person.

2     So it was do we talk to this guy, do we take the

3  call -- a call had been scheduled for the next day, I think on

4  Wednesday -- do we take the call, do we not take the call.  Are

5  we just going to create a situation where he's making more

6  false statements, more illegal claims, or do we have our

7  investment adviser, our investor relations person make the

8  call.

9     So it was just evaluating the circumstance of what the

10  right approach would be.

11  Q. You decided on one of these options?

12  A. Yes.

13  Q. Which one?

14  A. We decided while Matt, my chief operating officer, was

15  scheduled to make the call, we thought it would be better to

16  have an independent third-party contractor, Bruce, make the

17  call.

18  Q. Okay.  And that call was scheduled for the next day after

19  this email?

20  A. Correct, yes.

21     MR. JONES:  Could you blow up "on the other hand"

22  paragraph, Cole.  It's about three down from where you are.

23  Q. And this is you writing again, Mr. Higgins, right?

24  A. Yes.

25  Q. Part of that same email discussing options?

1    A.    Yes.

2    Q.    You write, "I am open to no call back at all.  The

3    rationale being this report is so absurd, and a call might be a

4    trap for him to say he talked to management and now sees some

5    value."

6          Did you write that?

7    A.    Yes.

8    Q.    What did you mean by "a trap"?

9    A.    Again, not knowing this individual or kind of his approach

10   to research, it just -- would he manipulate our words, would he

11   say that we said something but actually we didn't.

12         We've had a lot of experience with investors, with

13   analysts, with communication, but it was just really trying to

14   think through what is the appropriate way to manage this.  And

15   so that was just kind of one concept, without knowing this

16   person, without having any background, just trying to play out

17   the various scenarios.

18   Q.    And looking back on it now, was the call a trap?

19   A.    Yes.

20   Q.    In what way?

21   A.    While Father Lemelson gave time to get on a call, the call

22   was very unproductive.  You know, what was reported back to me

23   is Father Lemelson wouldn't listen, he was very stubborn, he

24   was a bully in tone.  But, ultimately, he used that dialogue to

25   make claims about the company that further weren't true and

1    then he manipulated, he twisted and mislead that dialogue.

2             MR. HOOPES:  Objection.

3             THE COURT:  Sustained.  I strike all this.

4             MR. JONES:  Going up to the second email on the first

5    page, please.  The one that says "Bruce, I have proposed."

6    Q.   Is this you going back and forth with Bruce Voss and Matt

7    Foehr about what the tone of that call should be?

8    A.   Yes.

9    Q.   And you write, "I do not think the first call should be

10   jump into content or a rebuttal."

11            What did you mean by that?

12   A.   So, again, this is just thinking through how we manage

13   relationships.  This was a dense report with a lot of content

14   that was false and misleading.  It could be a very long call to

15   unpack and discuss all those points, so it was more let's go

16   into this and just listen, let's develop a relationship, let's

17   find out a little bit more the personality, kind of the

18   background of this person.  So that was the general concept

19   there.

20   Q.   Was this an instruction to Bruce Voss not to give

21   information about the company on the call?

22            MR. HOOPES:  Objection, it's leading.

23            THE COURT:  Sustained.

24            MR. JONES:  Your Honor, it could be yes, it could be

25   no.

1          THE COURT:  Sustained.

2     BY MR. JONES:

3     Q.   What were you instructing Mr. Voss to do, if anything,

4     with this language?

5     A.   Again, we were still working up a game plan.  We wanted to

6     learn more about the situation, but we were just exploring the

7     options we have in this moment.  As of this writing, I just

8     said I think -- I think this first call ought to be more to

9     understand the person, listen to build a relationship and not

10    go into a back-and-forth analysis of our business.

11          I was confident -- in mistaken, I was confident the

12    facts would win the day.  A reasonable person would listen to

13    our story, would give us the time, and would understand how

14    baseless, how misleading the claims would be and there would be

15    a redaction, a retraction, there would be some correction.  But

16    we didn't have to do that.  We could be patient and have this

17    first call, let this third-party contractor take the call,

18    highly experienced, knows many, many people on the street, and

19    then could come back and report to us what his impression was

20    of the situation.

21    Q.   At this time, in June of 2014, for how many years had you

22    worked with Bruce Voss?

23    A.   For 15, 15 to 17 years.

24    Q.   Were you the one who decided to bring him on into Ligand

25    as the investor relations representative?

1    A.    Yes.

2    Q.    And does Mr. Voss continue to be the investor

3    representative for Ligand to this day?

4    A.    Yes, yes.  He started at Connetics.  Again, I was there

5    ten years.  We worked for probably eight or nine years at

6    Connetics, had a very good relationship and a real

7    professional.  And shortly after I joined Ligand, I believed he

8    would be a good part of our team, and I wanted to continue

9    working with him.

10   Q.    Fair to say by this point, in June of 2014, you had a

11   fairly close working relationship?

12   A.    Very, very close.  We worked well.  Again, he's a separate

13   firm.  We work on projects as needed, but we've had a long

14   working relationship and good understanding and rapport between

15   the two of us, yes.

16   Q.    Were you used to his style?

17   A.    Yes.

18   Q.    And do you believe he was used to your style?

19   A.    Yes.

20   Q.    At any point did you tell Mr. Voss not to give information

21   about Promacta on that call?

22         MR. HOOPES:  Objection, your Honor.

23         THE COURT:  Overruled.

24   A.    No.  We discussed generally let's not get into a 20-point

25   note pad back and forth.  It wasn't don't answer any questions,

1    just let's not have a full rebuttal, let's kind of size up the

2    situation, let's get a sense of who this person is, the

3    background.  Let's find out how did this person find Ligand,

4    why he is so aggressively attacking our company, making these

5    false statements.  In that you pick out what are the main

6    themes or issues he seems to be an expert on, and then we would

7    go back and prepare a response.

8           MR. JONES:  Can we go to Exhibit 46, please.

9    Q.   Mr. Higgins, while we're doing that, is it your

10   understanding that the call between Bruce Voss and Father

11   Lemelson took place?

12   A.   Yes.

13   Q.   On June 18th, did you get an email from Bruce Voss?  It's

14   the one bottom half of the page.

15          He just called me back, are you free for a debrief?

16          Do you see that?

17   A.   Yes.

18   Q.   Did you participate in a debrief on June 18th with Bruce

19   Voss?

20   A.   I believe there were some emails.  I don't believe we were

21   able to hook up by phone.

22   Q.   What did you learn from Mr. Voss following the call about

23   how it had gone -- excuse me, how it had gone?

24   A.   The -- the report -- what I heard, what Bruce told me is

25   that the call did not go well at all.  He said it was --

1          MR. HOOPES:  Objection.

2          THE COURT:  Sustained, hearsay.

3    A.   It was a very --

4    BY MR. JONES:

5    Q.   One second, Mr. Higgins.  Let me give you the next

6    question.

7          After there was information from Mr. Voss about how

8    the call had gone, was there a decision made about whether

9    Mr. Foehr should get on the phone with him, with Father

10   Lemelson, that is?

11   A.   Yes.

12   Q.   What was that decision?

13   A.   That he should not make a call.

14   Q.   Okay.  And were you part of that decision?

15   A.   Yes.

16   Q.   Why was it decided that Mr. Foehr should not get on the

17   phone with Father Lemelson?

18   A.   Bruce said the --

19          THE COURT:  Who made the decision?

20          THE WITNESS:  The three of us, Bruce, Matt, and I.

21   After hearing what Bruce told us about his experience

22   and how he was treated on the call, the three of us decided it

23   would not be worthwhile for Matt to make a follow-up call.

24   BY MR. JONES:

25   Q.   And was there something you had heard about how that call

1    went that led to that decision?

2    A.   Yes.

3    Q.   What was it?

4    A.   That --

5              MR. HOOPES:  Objection.  Objection.

6              THE COURT:  I don't -- it's hearsay what -- we already

7    heard what --

8              MR. JONES:  But, your Honor, we're not offering it for

9    it's truth, we're offering it for why the decision --

10             THE COURT:  Why don't you have not what Mr. Voss said,

11   but just what was in your mind when you decided not to have

12   Mr. Foehr call him.

13             THE WITNESS:  What was in my mind is as aggressive or

14   wrong or misleading as this report was, the person behind it

15   was a bad actor, would not listen, was obstinate, was stubborn,

16   was a bully, and it would not be productive, was what was in my

17   mind.

18   BY MR. JONES:

19   Q.   And that call was canceled?

20   A.   Correct.

21             MR. JONES:  Can we have Exhibit 214, please.

22             Can we have the bottom, please, Cole.

23   Q.   Mr. Higgins, this is an email chain on -- starting on June

24   19th into June 20th of 2014.  Do you see that?

25   A.   Yes.

1    Q.   And did there come a time that you heard that Father

2    Lemelson had appeared on the Benzinga PreMarket Prep internet

3    radio show?

4    A.   Yes.

5    Q.   Is it your understanding that he appeared on that show on

6    the morning of June 19, 2014?

7    A.   Yes.

8    Q.   Is this email your first learning about that interview?

9    A.   Yes.

10          MR. JONES:  And if we could actually have just the

11   header of that, the header of that email on the bottom -- not

12   the -- the very bottom of the document if we could, Cole.

13          I believe page 2.

14   Q.   And do you see about halfway down the page where it says

15   "Joe Hunt"?

16   A.   Yes.

17   Q.   Exhibit 214 halfway down the page, it says, "From Joe Hunt

18   sent Thursday, June 19, 2014"?

19   A.   Yes.

20   Q.   Do you know who Joe Hunt is?

21   A.   An investor.

22   Q.   Okay.

23   A.   Yes.

24   Q.   He sends in a link to the Benzinga interview show?

25   A.   Yes.

1    Q.   And then through the course of this email, are you and

2    your executive team reacting to that interview?

3    A.   Yes.

4    Q.   Was there a particular part of the interview that was of

5    concern at Ligand?

6    A.   Yes.  I mean, the interview, it had some introductions and

7    his background, some general market talk, talked about some

8    other stocks, but specifically there was a lengthy section on

9    Ligand where he just went deeper into his false claims about

10   the business, about how Promacta wasn't a good drug, it was

11   going to go away, and then he went on to say that he talked to

12   our -- the management or the IR guy representing us and he

13   agreed with him.

14            So there were many parts of the whole program that

15   were unsettling, but that was a particularly significant

16   misrepresentation.

17            MR. JONES:  Can we go to the first page, please, Cole.

18            There's an email in the middle of the page that says

19   "at 7:59 a.m."  Could you blow that up, please.

20   Q.   Mr. Higgins, this is an email from you, yes?

21   A.   Yes.

22   Q.   And it's coming early in the morning on June 20, 2004?

23   A.   Yes.

24   Q.   Is this essentially right after you're learning about this

25   report coming out?

1    A.    Yes.

2    Q.    Essentially the night before, maybe?

3    A.    Correct.

4    Q.    You say, "Also, if he said the CEO beats his employees,

5    would you just move on because 'there were more things to

6    cover.'"

7          Why were you writing that?

8    A.    The idea that Father Lemelson would claim that somebody is

9    agreeing with this ridiculous statement made no sense at all.

10         And again, we didn't know Father Lemelson, we didn't

11   know his background.  I would presume that people who are

12   publishing or going public with a message -- and we don't

13   always have to agree -- is a reasonable person, that they have

14   some basis, they've done some research and they're a reasonable

15   person.

16         The idea that he would claim that somebody on our team

17   agreed, it made no sense at all.  And I in the moment thought

18   how -- I need more to work with Bruce.  How could this have

19   gone down?  How could you have been on a conversation and

20   somehow this guy is able to get off and have the impression

21   that you actually agreed?

22         So I was making an anecdote, often I'll do this in

23   business just to focus, I'll make an anecdote about this is so

24   ridiculously wrong, we didn't have to review every way to

25   answer a question, but just help me out here, how did this

```
 1    happen?
 2              So what I was doing was just trying to help Bruce give
 3    me more color or context for how this might have happened,
 4    because the earlier correspondence was really very brief.
 5              MR. JONES:  The last sentence of that paragraph, the
 6    one that starts "even 1 minute," can we blow that up, please.
 7    Q.   You write here, "Even 1 minute of soft info would have
 8    left him with a different impression than tacit agreement."
 9              When you wrote this, Mr. Higgins, did you know whether
10    or not Mr. Voss had provided info to Father Lemelson on the
11    call?
12    A.   No.  Not the extent --
13              MR. HOOPES:  That's yes or no.
14    A.   He had a simple email reply, we had not spoken yet, and I
15    was looking for more information.
16    Q.   Okay.  And do you know whether he had done a tacit
17    agreement here?
18    A.   No.
19    Q.   So you needed more -- this whole paragraph, you needed
20    more information?
21              MR. HOOPES:  Objection to --
22              THE COURT:  Sustained.
23    A.   Yes.
24              MR. HOOPES:  Move to strike.
25              MR. JONES:  I'll move on, your Honor.
```

1              MR. HOOPES:  May his answer be stricken?  He answered

2      after you said "sustained."

3              MR. JONES:  I'll rephrase it.

4              THE COURT:  If did he answer it after I struck it.

5              MR. JONES:  I could go on, your Honor.

6              THE COURT:  I'm not sure where -- as I read the

7      transcript what you want me to strike, but --

8              MR. HOOPES:  Anything after you said "sustained" and

9      he kept talking should go.

10             THE COURT:  I don't remember what that is, and neither

11     does the jury, so why don't we --

12     BY MR. JONES:

13     Q.   Let me ask you this way, Mr. Higgins.  What was the

14     purpose of this paragraph that we have the highlighting on?

15     A.   The purpose, it was very simply in the moment what I had

16     heard on that interview and read in the transcript, and now

17     investors, this hedge fund manager are saying this is

18     outrageous.  It's not true, it's not going away.  He's saying

19     that you guys are agreeing with him, that's not the -- so

20     there's this urgency of what is going on.

21             And we were -- this is all in six hours or 12 hours,

22     it was overnight, but it was a terribly damaging first report

23     on Monday.  And here we are now with a live radio interview,

24     and this is getting worse.  It's getting worse.  It's not only

25     pedaling the falsehoods, the narrative --

1          MR. HOOPES:  Objection.

2          THE COURT:  Sustained.  We can't have these long

3   narratives.  So what's the next question.

4   A.   So I was getting him --

5   BY MR. JONES:

6   Q.   Mr. Higgins, hold on a second.  Let me give you the next

7   question.

8          MR. JONES:  Can we have the top part of that email?

9   Q.   Do you see here Bruce Voss writes to you, "John, you're

10  going to have to trust me that I handled my conversation with

11  Lemelson appropriately"?

12  A.   Yes.

13  Q.   Do you believe that Mr. Voss handled his conversation

14  appropriately with Father Lemelson?

15          THE COURT:  Did you just object?

16          Through the mask and sitting down, I can't hear you.

17          MR. HOOPES:  So sorry.

18          I object.

19          THE COURT:  I'll allow it to his state of mind, not

20  whether, in fact, he did handle it properly or how he handled

21  it, just what he was thinking at that point.

22          MR. JONES:  Actually, I was asking about it now, your

23  Honor.

24          THE COURT:  Now, all right.

25  BY MR. JONES:

1    Q.   As you sit here today, Mr. Higgins, do you believe that

2    Bruce Voss handled his conversation with Lemelson

3    appropriately?

4            MR. HOOPES:  Objection, relevancy.

5            THE COURT:  Overruled.

6    A.   I do, I do believe Bruce --

7            THE COURT:  Yes, he does, move on.

8    BY MR. JONES:

9    Q.   What's the basis for that belief?

10   A.   Currently my relationship with Bruce, he's a real

11   professional.

12           THE COURT:  He's a professional.

13           Next question.

14           MR. JONES:  Can I have Exhibit 215, please.

15           Could I have the bottom of that section, please, from

16   Bruce Voss.

17   BY MR. JONES:

18   Q.   Mr. Higgins, later in that day, actually later in that

19   morning, was there the beginnings of a response to Father

20   Lemelson about what he had said in the interview?

21   A.   Can you repeat the question?

22   Q.   Sure.  Later in the morning from when we were just looking

23   at, did Ligand and Mr. Voss start to formulate a response to

24   Mr. Lemelson?

25   A.   Yes.

1    Q.    And was that response in the form of an email?

2    A.    Yes.

3    Q.    Did Bruce Voss here propose to you some text for an email?

4    A.    Yes.

5    Q.    Did he -- is this the first text that he's proposing to

6    you, as you understand it?

7    A.    Yes.

8    Q.    Okay.  And in that text, is he proposing -- does he write

9    that -- about the blatantly false comment that during our phone

10   call earlier this week I basically agreed that Promacta sales

11   were going away?

12   A.    I see that statement, yes.

13   Q.    And so your understanding was Bruce Voss was proposing to

14   send this, that text to Father Lemelson?

15   A.    Correct.

16   Q.    And in the course of the day, were there further drafts of

17   this email?

18   A.    Yes.

19   Q.    And did they all have this Bruce Voss language that I

20   never said what you said I said?

21   A.    Yes.

22   Q.    Okay.  Did you ever change any of that language?

23   A.    No.

24   Q.    Did you make up this language?

25   A.    No.

1    Q.    Is this Bruce Voss' language?

2    A.    Correct.

3    Q.    Why did you get involved in editing that email to send

4    back to Father Lemelson?

5    A.    A lot of the claims and discussion were very detailed or

6    technical about the business.  Bruce knows the business well,

7    but in terms of filling in specific numbers or really

8    quantifying information, we needed the company to provide

9    that -- it's a common practice where we'll go back and forth,

10   he'll take a first draft of something and then we'll layer in

11   more facts or information until we get to the final product.

12   Q.    Was there a reason that CEO of Ligand got involved in

13   responding to this?

14   A.    Yes.

15   Q.    What was it?

16   A.    It's a public message to investors.  Typically the CEO is

17   the main voice with investors, but this, without question, was

18   a crisis, somebody who is aggressively attacking the company,

19   and it needed my full attention.

20   Q.    Okay.  And the final form of that email, did that get sent

21   out the following Monday?

22   A.    Yes.

23   Q.    I'd like to shift gears and talk about Sovaldi for a

24   minute.

25            MR. JONES:  Mr. Higgins (sic.), can we have Exhibit

```
 1     223.
 2               And can you blow up the sort of from John Higgins down
 3     to the bullet points.
 4               Thank you, Cole.
 5     Q.   I'm taking you back in time, Mr. Higgins.  We're now four
 6     months earlier in February of 2014, just to set where you are.
 7     You know what Sovaldi is, right?
 8     A.   Yes.
 9     Q.   You've heard a lot about it, so I'm going to skip right
10     over that, we're going to right here, what you said about
11     Sovaldi.
12               The first is, Subject, RE: GILD.
13               What is that?
14     A.   That is a ticker for a company called Gilead Sciences.
15     Q.   That is their stock symbol?
16     A.   Yes.
17     Q.   You say, "Will any Sovaldi patients need Promacta?"
18     A.   Yes.
19     Q.   Why were you asking that question?
20     A.   Sovaldi was recently approved, and while it's a different
21     drug than Promacta, they treat different things, investors were
22     saying will Sovaldi impact the uptake of Promacta sales.  So
23     we're getting questions, and I'm on earnings call, we're
24     getting ready to answer those questions.
25     Q.   Are you in crisis mode here?
```

1    A.    No.

2    Q.    Why are you -- you have several other questions here.  Why

3    are you asking those questions?

4    A.    This is -- again, it's very, very common.  Investors, they

5    want to know about the market, they want know about your

6    projects, your contracts, and you need to be ready.

7          You may not know -- or you may not have to answer

8    every question, but it's our job to really be thoughtful, to be

9    prepared, and in our business, it's about is a drug safe, is it

10   effective, how does it compare with other medicines, is it

11   being reimbursed, are there health insurance that are

12   reimbursing, what are the prescription trends.

13         These are the sort of questions -- also, competitor

14   drugs.  These are the sort of questions we would prepare for.

15         Every earnings call we may have 40 or 50 questions

16   that we're just getting ready for in case investors have those

17   questions.

18   Q.    And is this February 1, 2014 time period, is that a time

19   period when you'd be getting ready for an investor call?

20   A.    Correct.  The year is over in December, and in this case,

21   typically our earnings call would be about five weeks later.

22   So in this case it would be early February for the end of that

23   last quarter.

24   Q.    Would it be fair to say that Ligand thought there was

25   going to be some effect on Promacta from Sovaldi?

1    A.    Sure.

2    Q.    Would it be fair to say that --

3            THE COURT:  Well, you know, ask non-leading.

4            What was going to be the effect?

5            THE WITNESS:  Sovaldi was the first drug --

6    Sovaldi treats hepatitis, Promacta boosts platelets, very

7    different drugs.  But people with hepatitis, the virus, have

8    severely damaged livers.  The organ -- the liver is where

9    platelets are produced.  So if you have the virus, not only are

10   you sick because of the virus, but also you aren't making

11   platelets, you have a risk of bleeding to death.

12           So before this drug, patients with hepatitis would

13   need either a hepatitis drug and also Promacta to be used with

14   that.

15           Sovaldi was a new drug, very good data that in some

16   patients, not all, but in some patients it had a very rapid

17   reduction of the viral load, where essentially over several

18   months the virus would go away.

19           So as those patients got better and the virus went

20   away, what we were looking to explore was eventually would that

21   liver recover, would that liver become healthy again and be

22   able to eventually produce platelets?  If that's the case, then

23   over time that patient may not require Promacta or may not

24   require as much Promacta.

25           Before Sovaldi, basically all these patients were

1    available to us, but now Sovaldi was doing really well in

2    helping hepatitis patients, the need for Promacta in those

3    patients would be lower potentially.  That's what we were

4    trying to explore.

5    Q.    Okay.  Could we go to the top of this email?

6           The top of this email refers to somebody called

7    Afdahl.  Do you see that in the second paragraph?

8    A.    Yes.

9    Q.    Who is Afdhal?

10   A.    He's one of the top medical experts in liver disease.

11   Q.    So is the proposal here to reach out to an expert to get

12   sort of more information?

13   A.    Yes.

14   Q.    And was that part of the information gathering process you

15   described?

16   A.    Yes.

17   Q.    Okay.  Let's go on.

18          Following the issuance of Father Lemelson's June 16th

19   report and the interview on Benzinga, did you get inquiries

20   from investors about the report and the interview?

21   A.    Yes.

22   Q.    What kind of inquiries did you get?

23   A.    Almost every meeting or call that I was in, a good portion

24   of that meeting or session would be spent on Lemelson.  Who is

25   this guy?  Why is he saying this?  What's our view of the

1        circumstance?

2                And that Friday, I had investor meetings the following

3        week, so any in-person that was already scheduled, and then

4        we'd have inbound emails, we'd have questions and emails.  So

5        there was a range of concerns and questions.

6                MR. JONES:  Your Honor, at this time there is three

7        exhibits, 246, 247, and 248, that were originally marked for

8        identification as H, Q, and S.  The hearsay information has

9        been redacted at the Court's direction, and I'd like to ask

10       that those be admitted into evidence and to publish them to the

11       jury at this time.

12               THE COURT:  Yes.  And let me give a limiting

13       instruction here, which is, remember I said at the start that

14       sometimes I would limit the use to which information could be

15       put.  These are investors, I think, who were communicating with

16       Ligand.  They're not here to be cross-examined, so I'm not

17       admitting them for the truth of anything they said, but only

18       for that what their state of mind was, what their concerns were

19       when they were communicating here with Mr. Higgins or Ligand in

20       general.

21               So with that limitation I will allow in 246, 247, 248.

22       I think certain information was redacted, either because it was

23       irrelevant, I think for the most part, or not going to the

24       state of mind of the investor.

25               So they're admitted.

```
 1      (Exhibits 246, 247, 248 received into evidence.)
 2                MR. JONES:  Thank you, your Honor.
 3                Could we have 246 please, Cole.
 4                And can you blow up Mr. Higgins' part of the email up
 5      at the top.
 6                THE COURT:  As you're taking notes, put a big "L"
 7      because you'll forget otherwise, limited.
 8      BY MR. JONES:
 9      Q.   So, Mr. Higgins, is this you writing an email to Bruce
10      Voss?
11      A.   Yes.
12      Q.   Could you tell us what you're communicating in the second
13      paragraph here?
14      A.   Relaying that we met with an investor and just described
15      some of the general discussion we had or did not have.
16      Q.   Who's Invesco?
17      A.   Invesco, they're a large investor based out of Denver,
18      Colorado, a big national fund, one -- at the time at least one
19      of the larger investors in biotech companies.
20      Q.   Were they one of the larger investors in Ligand as well?
21      A.   At that time -- I don't think they were a top ten
22      investor, but I'm not exactly sure what their holdings were.
23      But we certainly had a relationship and met with them
24      regularly.
25      Q.   And you're saying that they were asking questions that
```

1   seems to be from Father Lemelson's script?

2   A.   Yes, correct.  My memory, they did not invoke his name

3   specifically, but it was clear -- and they knew us, we've known

4   this account for quite a while -- but the order of questions

5   and the focus seemed very evidently triggered by the recent

6   publications.

7   Q.   Okay.

8         MR. JONES:  Could we have 247, please, Cole.

9   Q.   Here there's been some stuff blanked out.  I want to ask

10  you about the stuff that's not blanked out here.  It talks

11  about Peter Kipp.  Who is Peter Kipp?

12  A.   Another investor, major investor at a biotech hedge fund.

13  Q.   We have a little jargon here, 250M AUM generalist hedge

14  fund.  Can you tell us what that means?

15  A.   So asset under management, so basically about a quarter of

16  a billion dollars of investable assets.

17  Q.   Did he want to talk about Lemelson as well?

18  A.   Yes.

19  Q.   Is that what you're writing in this email?

20  A.   Yes.

21  Q.   And did you talk with him about Lemelson?

22  A.   Yes.

23  Q.   Okay.  Did he express concerns about those reports?

24  A.   Yes.

25  Q.   And this is August 29th of 2014, correct?

```
 1    A.    Correct.
 2    Q.    So did you continue to get investor inquiries throughout
 3    the summer of 2014 about the Lemelson reports?
 4    A.    It was relentless.  In this era, and I was very active, as
 5    I always am with investors, almost every meeting Lemelson by
 6    name or by, again, the focus of questions was consumed by the
 7    Lemelson reports.
 8    Q.    Okay.
 9          MR. JONES:  And can we go to 248, please.
10    Q.    This is an email from you in October of 2014; is that
11    right?
12    A.    Yes.
13    Q.    And we just talked about the summer of 2014.  Did
14    inquiries about Lemelson continue into the fall?
15    A.    Yes.
16    Q.    And this is about a Bob Fields and Gene Fox at Capital.
17    What's that?
18    A.    It's their fund.
19    Q.    Is that called Cardinal Capital?
20    A.    Cardinal Capital, maybe Cardinal is the more common name
21    of their fund, but Cardinal Capital, yes.
22    Q.    You're just shorthanding it here?
23    A.    Yes.
24    Q.    And did Gene and Bob Fields also talk to you about the
25    Lemelson reports?
```

1    A.   Frequently.

2    Q.   And did they want to talk about what was in those reports?

3    A.   Yes.

4    Q.   Did they have concerns about them?

5    A.   They had concerns that the false statements were being

6    pedaled.  They were a large investor in Ligand.  They were

7    comfortable with our business and had known us for quite

8    sometime, but they were very concerned about the aggressive

9    attack in those reports.

10   Q.   And according to this email, was part of their concern

11   about the Promacta claims that Father Lemelson was making?

12   A.   Yes.

13   Q.   Okay.

14            Last topic, Mr. Higgins.

15            MR. JONES:  Could we have Exhibit 241, please.

16   Q.   Is the email on top an email from you?

17   A.   Yes.

18   Q.   Who are you writing to?

19   A.   Our board of directors.

20   Q.   And you talk about here the continued weakness in our

21   stock.  What are you referring to?

22   A.   The stock immediately, as a result of the initial Lemelson

23   report, sold off sharply.  And this is now four, five months

24   later, but what's continued, despite success, despite, you

25   know, good performance and a solid business, the stock was

1    still under a lot of pressure.

2         MR. JONES:  If we go down to the bottom of that part

3    of page, the email that starts, "Ligand board" on the bottom of

4    the first paragraph there.

5    Q.   You wrote, "With the recent stock weakness, it is obvious

6    we continue to be impacted by the Lemelson shorting and related

7    reports."

8         What did you mean by that statement?

9    A.   The negative claims created an air of uncertainty.

10   Investors are busy, they've got other choices to invest in, so

11   there's a reaction, I'm not going to do a lot of work on this,

12   I don't like the way it's trading, so selling often can create

13   more selling and create a real damaging environment.

14        It doesn't mean it's correct, it doesn't mean, you

15   know, that this was well grounded, but there's often a market

16   reaction, a trending market reaction.  That's what we were

17   witnessing here.

18   Q.   In 2014, Mr. Higgins, please describe overall what your

19   understanding of the effect of Father Lemelson's reports were

20   on Ligand.

21   A.   Very damaging.  You know, a business that was performing

22   well financially, qualitatively, was getting very good reports

23   from patients and our partners in terms of our medical research

24   progress was being devastated in perception and in value by

25   these attack reports.

```
 1              Certainly distracting and consuming a lot of our time
 2      and energy, but it was having a real significant impact on our
 3      valuation and stock price.
 4      Q.   Was it affecting people within the company as well?
 5      A.   Yes.
 6      Q.   In what way?
 7      A.   Morale, employees --
 8              MR. HOOPES:  Objection, your Honor.
 9              THE COURT:  Sustained.
10              MR. JONES:  I have nothing further at this time, your
11      Honor.
12              THE COURT:  For this witness?
13              MR. JONES:  Yes, that would be the end of the direct
14      examination, yes.
15              THE COURT:  All right.  We'll take our morning break.
16              MR. JONES:  Thank you, your Honor.
17              THE CLERK:  All rise.
18              (Jury left the courtroom.)
19              THE COURT:  Thank you.
20              You can step down for a minute.
21              Where are we with those four statements, the four
22      charged statements?
23              MR. JONES:  Your Honor, we proposed to the defendant a
24      chart of the statements; they don't like it.  So they were
25      going to come up with something else, and we haven't seen it
```

 1    yet.

 2            THE COURT:  Here's my issue.

 3            I cannot tell you exactly what exhibit numbers the

 4    charged statements are, what the dates are.  So every time you

 5    have an investor call or something, part of the issue for a

 6    jury will be materiality, and it's hard -- you're jumping so

 7    fast on the chronology.

 8            MR. HOOPES:  If we can respond.

 9            We got instead of four statements, we got nine last

10    night.  So we're going to have to give you a proposed response

11    of what we think are our four, given what they said for over a

12    year here, and you're going to have to --

13            THE COURT:  I want the four statements that have been

14    focused on.

15            MR. JONES:  I can hand them up right now, your Honor.

16            MR. HOOPES:  There's nine statements, Judge.

17            THE COURT:  Excuse me.  If it's -- at least give me

18    the exhibit numbers and the dates.

19            They don't have anything.  They don't even have all

20    the exhibits in front of them.

21            MR. JONES:  Yes, your Honor.

22            THE COURT:  So let me see what you have, Mr. Jones.

23            MR. JONES:  Your Honor, we would also propose handing

24    up the stipulations to the jury and the Lemelson testimony.

25            THE COURT:  Say it again.

1          MR. JONES:  We would also propose handing out the

2    stipulations to the jury, which has the date of the report, the

3    title of the report, and the date.

4          THE COURT:  If there are stipulations, I'll allow them

5    to be handed out.

6          MR. JONES:  We're going to hand out.

7          THE COURT:  So, listen, June 19th, we understand

8    Promacta is going away.  We've always understood.

9          MR. HOOPES:  One.

10         THE COURT:  Good.

11         July 3rd, Exhibit 4, that makes sense.  They're

12   essentially unaudited, that's that comment, no problem.

13         MR. HOOPES:  Two.

14         THE COURT:  July 3, Exhibit 4, Ligand does not intend

15   to conduct any preclinical studies, good.

16         These are all the insolvency issues, that whole

17   report, that's all we've been talking about.

18         What's the problem here?

19         MR. JONES:  Yes, your Honor.

20         MR. HOOPES:  There's five statements in there, your

21   Honor.

22         So if the jury understands that there's one issue and

23   that's insolvency, that's one thing.

24         The presentation they put together makes one to lead

25   thinking there's nine statements total here, it's just --

1          MR. JONES:  Well, your Honor, we tried to address the

2     solvency --

3          THE COURT:  I am following the SEC's submission.

4          We need to make comments -- none of them are a

5     surprise.  I was afraid that some of them would pop up with a

6     different exhibit or a different issue.

7          I've reread the SEC as well.  There are four

8     statements -- I mean four issues, if you will, insolvency is at

9     the heart of one of them.  The other three are

10    non-controversial.

11         MR. HOOPES:  Yes.

12         THE COURT:  So insolvency is what I'm going to allow.

13    It's the heart of one of the key issues.  That's all we've been

14    talking about.

15         MR. JONES:  Your Honor, we've --

16         THE COURT:  There's no unfair surprise here, which is

17    my touchstone.

18         MR. HOOPES:  Well, I think there is -- I would, for

19    the record, I think there is unfair surprise in the sense that

20    all we've been talking about is insolvency.  Now is the SEC

21    going to be giving five separate ways to get to insolvency?

22         THE COURT:  We've always been talking about the

23    intangible statement.

24         MR. HOOPES:  They have, but as to one issue, is it

25    insolvency.

1          MR. JONES:  Your Honor, I went back, they're all in

2     the complaint, they're all in the summary judgment motion,

3     they're in the opening.

4          THE COURT:  There's no unfair surprise here.  What

5     would be an unfair surprise, if you popped up with new

6     documents and new issues.  As far as I'm concerned, in the

7     scheme is these four issues, these four statements.

8          So I don't know if you want to hand them out as a

9     chalk or how you want to do it, but at some point they need to

10    know at the timing, the exhibit -- should we be handing out the

11    exhibits, they don't have the exhibits yet.

12         MR. JONES:  Your Honor, we weren't doing it with

13    Higgins, with Father Lemelson we are --

14         THE COURT:  Okay, good.

15    (Recess taken.)

16         THE CLERK:  All rise.

17         MR. JONES:  Your Honor, we have Mr. Higgins on the

18    stand, is that fine?

19         THE COURT:  Yes.

20         I just want to say we went upstairs and

21    double-checked, and all of the statements regarding insolvency

22    from the August 14th -- well, I don't know, was it August 14th,

23    22nd, 2014, are those -- was there two documents?

24         MR. JONES:  It's two reports, your Honor.

25         THE COURT:  Two reports, all of those are listed in

1    the second amended complaint, all the statements.  So it's not

2    an unfair surprise there.  They're all claimed as false in the

3    second amended.

4            I have it here, Mr. Hoopes, if you want to see it.

5            MR. HOOPES:  No, I'm sure it's there.  I'm just --

6    what I'm asking is, I know it's Friday and you want them to

7    have this, all I'm asking is that you give us to the end of the

8    day or until Monday to think about intelligent response and

9    make another proposal to you.

10           I understand -- I'm just --

11           THE COURT:  If all you're asking for -- let me just

12   say this.  I've been -- if you want the difference between

13   today and Monday, yes, but the reality is it's totally fair

14   that they should point this out since every single thing here

15   has been discussed in the second amended complaint and every

16   single motion.

17           MR. JONES:  Your Honor, the difference between today

18   and Monday is today is the defendant's testimony in terms of

19   the SEC, and we'd like the jury to have it.

20           THE COURT:  You can flash it up on the screen, that's

21   different than distributing it.

22           MR. JONES:  What's the difference, your Honor?

23           THE COURT:  It's different if I'm letting them hold

24   onto it.

25           And we're now talking about this discussion.

1          MR. HOOPES:  And I appreciate that, your Honor.

2          THE COURT:  I don't understand what the problem is.

3          MR. HOOPES:  The problem is very simply this.  In

4     preparation we've been thinking four.  It feels like nine; I

5     think it's going to confuse them.  I think it's various

6     iterations to the issue.  I'd like the opportunity, given

7     what's at stake here, just to think a little more.

8          MR. JONES:  Your Honor, the time for thinking is done.

9     We opened on the four statements four days ago.

10          THE COURT:  I'll allow these four statements.  There

11     may be a better way of formatting it.

12          To be honest, I don't understand why you're upset

13     about two of them since they make your story, which is they

14     provide the mathematical algorithm.  I don't understand why

15     you're worried about the last two.

16          MR. HOOPES:  But if I got two that are good and three

17     that are bad, I'd like to think a little bit.

18          THE COURT:  I'll allow you to show them as a chalk,

19     and then we will distribute something to the jury.

20          MR. JONES:  Your Honor, can we take it back at the end

21     so they don't take it with them?

22          THE COURT:  Put it on a screen.  Or what you can do

23     is, since there's no objection to the first three, you can do

24     the first three and then worry about the last one.

25          MR. JONES:  We'll figure out a way to put it on the

1    screen.  Not sure what the big deal is, but, apparently, it's

2    very important.

3         Your Honor, just while we're waiting, it was also our

4    intention to hand out the stipulations.  We provided the right

5    exhibit numbers on there but they are the stipulations.

6    Otherwise the stipulation is filed with the Court.  So we were

7    going to do that when we started Father Lemelson's testimony as

8    well.

9         THE CLERK:  Judge, all set.

10        THE COURT:  All right.

11        (Jury entered the courtroom.)

12        THE COURT:  Okay, thank you.

13        MR. HOOPES:  May I proceed, your Honor?

14        Thank you.

15                        CROSS-EXAMINATION

16   BY MR. HOOPES:

17   Q.   Mr. Higgins, my name is Tom Hoopes.  I represent Father

18   Lemelson.

19   A.   Good morning.

20   Q.   Good morning.

21        So what brings us here started in your mind on June

22   16th of 2014, correct?  The day of Father Lemelson's first

23   report, right?

24   A.   Correct.

25   Q.   And that clearly -- you've explained this morning, that

1    report bothered you, right?

2    A.   Yes.

3    Q.   It upset you, correct?

4    A.   Yes.

5    Q.   And that sense and feeling in your mind continued

6    throughout the summer, correct?

7    A.   The concern of what that report was doing to damage the

8    company continued, yes.

9    Q.   And so by October of, early October of that year, so

10   June-July, we had a month, July-August, August-September, about

11   four months later, you and your company were ready to begin

12   leaning on the SEC to do something, correct?

13   A.   We were evaluating --

14   Q.   Just yes or no, sir.

15   A.   Yes, we talked to the SEC.

16        MR. HOOPES:  And so, Cara, if you could call up 241,

17   please.

18        And if you could go down to the bottom there.

19   Q.   And this is an email dated October 7, 2014 at 3:31 in the

20   afternoon, you to your board, right?  Correct?

21   A.   Yes.

22   Q.   Okay.  And this is the board that you report to, right?

23   A.   Yes.

24   Q.   This is a board with a number of investors on it, correct?

25   A.   Yes.

1    Q.   You were reporting to them, you said, with recent stock

2    weakness, it's obvious we continue to be impacted by the

3    Lemelson shorting and related reports.  Selling is leading to

4    more technical selling and shorting.  We continue to work -- if

5    you could highlight that -- with our attorneys to lean on the

6    SEC to get an injunction on Lemelson's activities.

7             That's what it says, right?

8    A.   Yes.

9    Q.   Okay.

10             MR. HOOPES:  Your Honor, may I approach the --

11             THE COURT:  Yes.

12             MR. HOOPES:  Thank you.

13   BY MR. HOOPES:

14   Q.   Let's just -- lean on the SEC.

15             So can you tell the ladies and gentlemen of the jury,

16   please, and her Honor, when did you first begin discussions

17   internally about leaning on the SEC?

18             By the SEC we mean not these people here, but the

19   agency, right?

20             When did you first start talking about that?

21   A.   I don't recall exactly.

22   Q.   Well, it says we continue to work with our attorneys to

23   lean on the SEC.  So it's been going on sometime before October

24   7th, right?

25   A.   Yes.

 1    Q.   Okay.  So did you start discussions about that in June or
 2    was it July?
 3    A.   I don't recall exactly.  It was before here.  It may have
 4    been July or August.  I do not recall.
 5    Q.   Okay.
 6         And so that would have begun with internal discussions
 7    within Ligand, correct?
 8    A.   Yes.
 9    Q.   And then you would have also likely discussed it with your
10    general counsel, correct?
11         MR. JONES:  Objection, your Honor.  It calls for
12    privileged communications.
13         THE COURT:  Did you discuss that topic?
14         THE WITNESS:  Internally, yes.
15    BY MR. HOOPES:
16    Q.   And then, at some point, there was discussions with
17    outside counsel, correct?
18    A.   Yes.
19    Q.   And after you discussed it with outside counsel, you began
20    to plan how you were going to lean on the SEC, right?
21    A.   Yes.
22    Q.   Now, the lead up to that effort to lean on the SEC began
23    back in June, though, right?  The events that we're talking
24    about began on or about June 16, June 17th, June 18th of 2014,
25    correct?

```
 1    A.   The initial report was June 16th.

 2    Q.   The initial report was June 16th.

 3         Did you know as you sit here today that there's

 4    nothing here being complained about by the people you leaned on

 5    about the June 16th report?

 6         MR. JONES:  Objection, your Honor, mischaracterizes

 7    the complaint.

 8         THE COURT:  Overruled.

 9    BY MR. HOOPES:

10    Q.   Did you know that?

11         THE COURT:  It's not one of the alleged false

12    statements.

13    A.   I'm aware of the case the SEC brought does not reference

14    that June 16th document.

15    Q.   Okey-doke.  So you know that there's four statements, and

16    not a one of them are contained in that June 16th report,

17    right?

18    A.   Yes.

19    Q.   Now, you planned, after internal discussion, that instead

20    of Bruce Foehr, who has been here and testified, making a call

21    to Father Lemelson, the person who was going to make the call

22    was Bruce Voss, right?

23    A.   Yes.

24    Q.   And Bruce Voss is -- he's an outside guy, but he's really

25    sort of a functioning member, important functioning member of
```

1    your team, correct?

2    A.   He's on the team, but he's a contractor.

3    Q.   Yeah, but he's a contractor, but you've known him for

4    20-some years, correct?

5    A.   Yes.

6    Q.   You've got confidence in him, right?

7    A.   Yes.

8    Q.   And he listens when you talk, right?

9    A.   Yes.

10   Q.   Now, there was some back and forth, what's our approach

11   going to be, are we going to go right at him or are we going to

12   talk to him first and find out what's on his mind.

13        As I understood it, you elected to talk to him first

14   and find out what's on his mind, correct?

15   A.   Yes.

16   Q.   And in fact, in the -- if we could call up Trial Exhibit

17   127, Exhibit 127, if you can look at that with me, sir, there's

18   a section of 127 which is you two, Mr. Voss and Mr. Foehr, on

19   the day after the report, June 17th at 4:12, so it's in the

20   afternoon.  You're in your office, wherever you are, either

21   Minneapolis or you're out there, correct?

22   A.   Correct, I was somewhere.

23   Q.   Somewhere.  And you say, Bruce, I have a proposed

24   narrative for a call for you to have with Lemelson.

25   Specifically in my proposal, I do not think the first call

```
 1    should be to jump into content or a rebuttal.  I would like to
 2    feel him out first for tone and approach to the research and
 3    what the purpose of a call would be if he is not going to
 4    update a report.  To me, if we jump right into rebuttal mode
 5    without knowing our counterparty, seems we are less prepared
 6    for any call we could have on substance.
 7             THE COURT:  Now, Mr. Hoopes, I have a court reporter,
 8    so no speed reading.
 9             MR. HOOPES:  And there's a balance between -- I know
10    you like to keep things moving.
11             I apologize.
12             THE COURT:  I do, that's fair, but she's got to get it
13    down.
14             MR. HOOPES:  I'll go slower.
15    BY MR. HOOPES:
16    Q.   That's what it says, correct?
17    A.   Correct.
18    Q.   Okay.  So what that says is you sort of thought about the
19    strategy and your idea of what the appropriate strategy was,
20    was to ask questions and find out what's on his mind, right?
21    A.   Correct.
22    Q.   And that, to you, seemed like a pretty smart strategy
23    because the question was were we going to have call number two,
24    why bother, correct?
25    A.   We wanted to have first round just to understand who this
```

1   person was better.

2   Q.   Okay.  And so you've worked with this guy for a long time,

3   right?

4   A.   Yes.

5   Q.   You trust him, right?

6   A.   Yes.

7   Q.   And so you would expect that he's going to listen to what

8   you have to say, correct?

9   A.   Yes.

10  Q.   It's not like you're going to fire him if he misstepped a

11  little bit, but you expect as the CEO of this company that he's

12  going to follow your general directive, correct?

13  A.   Yes.

14  Q.   Now, he had the call, correct, as far as you know?

15  A.   Yes, he had a call with Father Lemelson.

16  Q.   With Father Lemelson.

17       And in fact, he sent you an email saying, I had the

18  call, can we have a call, right?

19  A.   Yes.

20  Q.   And you told us this morning that there was no call that

21  day, that next communications were by email that the SEC showed

22  you this morning, right?

23  A.   After -- there was a call with Father Lemelson, first the

24  Father Lemelson call, and then there were emails.

25  Q.   You said there was no call between you and Mr. Voss and

1    Mr. Foehr later the day of that call.

2    A.   Correct.  Immediately following that call, there was

3    emails.  There wasn't a call to my recollect --

4    Q.   What call?

5    A.   To my recollection, right after the call with Father

6    Lemelson that Bruce and Father Lemelson -- I don't recall there

7    were calls; there were emails.  Eventually we had a call.

8    Q.   Exactly.  Exactly.  You had a call that very day, right?

9    A.   I don't remember exactly when the call was.  There were

10   emails initially, and then eventually we had a call.  I don't

11   recall exactly --

12   Q.   December 11, 2019, you remember being deposed, right?

13   A.   Yes.

14   Q.   Everybody came out to California, correct?

15   A.   For the deposition?

16   Q.   Yup.

17   A.   Yes.

18   Q.   You raised your right hand, solemnly swore to tell the

19   truth, nothing but the truth, so help you God, correct?

20   A.   Yes.

21   Q.   Let me read you a section of your deposition beginning on

22   page 143 and line 2.

23           THE COURT:  Slowly.

24   BY MR. HOOPES:

25   Q.   Where you say, question from Mr. Brooks:  "Okay.  Now, do

1     you recall having a phone conversation with Mr. Voss after

2     Mr. Voss had spoken to Father Lemelson?"

3              Your answer:  "Yes.

4              "Okay.  What was your understanding of how soon

5     that -- after that -- strike that.

6              "What was your understanding how soon after Mr. Voss'

7     call with Father Lemelson that you spoke with Mr. Voss?

8              "It was I'd say within an hour or two after he called.

9              "Was anyone else on the call?

10             "I believe Matt was, Matt Foehr.

11             "Okay.  Anyone else?

12             "I don't recall.

13             "Do you recall where you were during the phone call?

14             "No.

15             "But that was also on June 18th.

16             "Correct.

17             "So if I have the timeline correct, you spoke to

18    Mr. Voss on the morning of the 18th, then he spoke to Father

19    Lemelson, and then you later spoke to him about that call on

20    the same day."

21             Does that refresh your memory that, in fact, there was

22    a call on that day?

23    A.   It refreshes what I said that day, the call with Bruce and

24    Father Lemelson happened on the 18th.

25    Q.   Yes.

1    A.   When I spoke with Bruce, it may have been the 18th or the

2    19th.

3         I understand that deposition, I'm just today -- this

4    is seven years ago.  I do remember talking to Bruce and having

5    a live conversation over phone call, and I also recall emails

6    over this same 12-, 18-, 24-hour period.

7    Q.   So I'm just trying to understand.  There was a call with

8    Bruce Voss, correct?

9         MR. JONES:  Asked and answered, your Honor.

10        THE COURT:  Overruled.

11   BY MR. HOOPES:

12   Q.   There was a call with Bruce Voss?

13   A.   Yes.

14   Q.   And with Matt Foehr possibly?

15   A.   Yes.

16   Q.   And you say in the deposition that it was the same day as

17   the Father Lemelson call, correct?

18   A.   That's what I said in deposition, yes.

19   Q.   And today, seven years -- seven days or actually two years

20   later, you're not sure whether or not the call was that day?

21   A.   As I made a comment earlier, that is correct.  I'm just in

22   the moment asking that question, reliving that 24-hour period.

23   If it's a little different, I'm just simply answering I

24   remember after the call that Bruce and Father Lemelson had,

25   there was a series of emails and phone conversations.

1    Q.   So you can't say to the best of your memory whether it was

2    the 18th or not; is that what you're saying?

3    A.   At this moment, correct.

4         MR. HOOPES:   So, Cara, could you pull up 214, please.

5    Q.   So this is the email that the SEC showed you this morning

6    and about at the bottom third there's -- I'm sorry, here.

7         MR. HOOPES:   Could you go to the front part of that,

8    the first page, please, Cara.

9    Q.   So at the bottom third, it says on June 20th, Bruce Voss

10   to you.

11        It says, As I wrote last night, "He made that

12   statement with a rhetorical don't you agree, and I moved on to

13   the next subject as we had more to cover and his statement was

14   ridiculous."

15        Do you see that?

16   A.   Yes.

17   Q.   Okay.   So that was Bruce Voss saying two things to you,

18   right, one was, as I wrote last night, correct?   Have you ever

19   seen any email from him from the night before?

20   A.   Not that I recall, no.

21   Q.   Do you have any memory of a phone call from him the night

22   before in case he was mistaken about the word "wrote"?

23   A.   No.

24   Q.   Okay.

25        So he says, "He made that statement with a rhetorical

1  don't you agree, and I moved on to the next subject as we had

2  more to cover and his statement was ridiculous."

3          So as I'm reading this, and you tell me if I'm reading

4  it wrong, he's saying two things happened on the call:  Father

5  Lemelson said, Don't you agree, and he didn't answer, right?

6  A.   What he's saying, he moved on because he thought it was

7  ridiculous.

8  Q.   Yeah, meaning no words came out of his mouth, right,

9  nothing came out his lips.

10          MR. JONES:  Objection, your Honor.  This is not the

11  witness' writing.

12          THE COURT:  Sustained.

13  BY MR. HOOPES:

14  Q.   Well, you're reading it with me.  You don't see any

15  reference to any language from Mr. Voss in response, right?

16  A.   I can't conclude -- to say you move on doesn't mean he

17  didn't say anything at all, I don't know how that went down.

18  Q.   Well, let's go up to your email just above this.

19          Your sentence of response there is, "Even one minute

20  of soft info would have left him with a different impression

21  than a tacit agreement."

22          Correct?

23  A.   That's what I wrote, yes.

24  Q.   And at the time you wrote it, you meant it, correct?

25  A.   I was trying to get more information.  It was a very brief

1  email reply.  I was trying to get more color as to how this
2  conversation played out.
3  Q.   Well, were you trying to get more information or were you
4  trying to express how you felt and what you were thinking?
5  A.   I was trying to get Bruce to explain to me more exactly
6  how it went down.  Did he say a few words?  Did he not say any
7  words?  I was trying to get Bruce to give me more color than
8  just the five or six words he used earlier to describe that
9  part of the conversation.
10  Q.   Really.  Even one minute of soft info would have left him
11  with a different impression, would have left him with more than
12  a tacit agreement.  That's a question not a statement?
13  A.   I was pressing Bruce to explain more how this conversation
14  went down, how Father Lemelson could make this claim that he
15  agreed with him.
16       I was confident Bruce did not agree with him, but I
17  was pressing him to explain to give me more color than what the
18  prior email had offered.
19  Q.   So after this exchange, you move on --
20            THE COURT:  Excuse me.
21            (Discussion off the record.)
22            THE COURT:  The phone stopped, so let's keep going.
23  BY MR. HOOPES:
24  Q.   So, Mr. Higgins, after this email exchange, there was a
25  new issue on your horizon, which is the reporters.

1          THE COURT:  What --

2     BY MR. HOOPES:

3     Q.   USA Today came up as a topic of an issue, correct?

4     A.   The article.

5     Q.   The article.

6          MR. HOOPES:  Cara, if we could pull up number 39.

7     Q.   And directing your attention to the paragraph that begins,

8     "As for USA Today," I think you or Keith should call and

9     undress them.

10         And that's you speaking to Mr. Voss and Mr. Foehr,

11    correct?

12    A.   Correct.

13    Q.   Call Gary or call his boss, tell him you advised us not to

14    return the call because of the crock of shit, pardon my French,

15    was it did not warrant a reply.  That's what you said, right?

16    A.   Correct.

17         MR. HOOPES:  And if we could pull up 225.

18    Q.   And that's the same day, just a little bit later in the

19    day.  About halfway down, you say to Mr. Voss, "There's a

20    reason you make the call, I will go nuclear on this guy."

21         Those are your words, right?

22    A.   Yes.

23    Q.   So can you tell us when a CEO of a billion dollar company

24    says to an employee, contractor, that I'm going to go nuclear

25    on the guy, what do you mean by that word?  How are you going

1    to go nuclear?

2    A.   The U.S. Today, a reputable, major, mainstream newspaper,

3    put out a report completely one-sided.  In our opinion, it was

4    not researched.  It was not objective or fair and balanced.  It

5    really did not meet what we would consider the ethical

6    standards of mainstream reporting.

7              And the CEO often, while I'll deal with investors,

8    I'll deal with our partners and customers, rarely am I directly

9    involved in talking with the newspapers or editors about their

10   editorial standards.

11             I was upset.  I thought this is not only a terribly

12   damaging report, but somehow, somehow the mainstream media is

13   getting sucked into this narrative, and it was unfair.

14             So I was upset.  But I believed a correct response was

15   to have a professional or paid voice to be on the call to

16   intercede and manage this affair.

17   Q.   You were more than a little upset, you were angry, right?

18   A.   In this moment, yes.

19   Q.   And you wouldn't have used a word, I'm going to go nuclear

20   if you weren't angry, correct?

21   A.   I was upset.  I --

22   Q.   I'm trying to put myself in your shoes as the CEO of a

23   billion dollar company and understand what were you threatening

24   to do to the guy.

25             THE COURT:  The guy is who?

1            THE WITNESS:  The newspaper reporter, the person who

2     published the story.

3     BY MR. HOOPES:

4     Q.   What's the answer?  What were you threatening to do?

5     A.   I wasn't threatening to do anything to him.

6            If I got on the phone, and this is a very natural

7     response that the leadership, the responsibility that I have,

8     that CEOs have when the damage is being done, I manage the

9     situation.

10           So say to go nuclear, it is my choice of words, but

11    it's -- I'm upset and I'm going to vent.  I'm going to tell

12    this guy I think it's unethical, it's not appropriate, the

13    reporting.  You did an interview and in my judgment -- I could

14    have that natural response, but in my judgment, that would not

15    be productive for me to unload or talk to this person and argue

16    with him about his report.  I thought it was a better process

17    to have Bruce Voss, you know, an independent voice who deals

18    with the media all the time, to take the call and manage it in

19    that affair.  And it would permit me to get back to running the

20    company or doing other things instead of being mired down in

21    this particular issue with this reporter.

22    Q.   Well, I hope it's not a meaningless question, sir, because

23    about three months later, you say you're leaning on the SEC

24    with a billion dollar market cap behind your leaning.  So I'm

25    just trying to understand what it means when you say go

1    nuclear.

2              MR. HOOPES:  Can we pull up number 78, please.

3              And can we go down to page 3.

4              It's about two-thirds of the way down.

5    Q.   This is an email from you to Bruce Voss, and the date is

6    August 15, 2014, about two months later, and --

7              MR. HOOPES:  You can't hear me?

8              Mr. Jones says he can't hear me.

9              THE COURT:  Who can't?

10             MR. JONES:  I was having problems hearing Mr. Hoopes.

11             MR. HOOPES:  He's asking me to keep my voice up, I'm

12   sorry.  With all the electronics, I thought we were having

13   those kinds of problems.

14             I'll step back here, I'm sorry, Mr. Jones.

15   BY MR. HOOPES:

16   Q.   So it's about two months later, this is another press

17   issue, this is with BioWorld.

18   A.   Yes.

19   Q.   And BioWorld, just to set the context, had wanted to do an

20   interview about a number of topics with your company, correct?

21   A.   Yes.

22   Q.   And Mr. Voss had given them a limit on the topics that the

23   company would talk about, correct?

24   A.   I don't see that here specifically.

25   Q.   No -- well, do you have a memory that that was the

1    background, which is he wasn't going to talk about Father

2    Lemelson, right?

3    A.    Yes, I think that was the purpose.

4    Q.    And all of a sudden, something appeared in BioWorld which

5    was an important, as Mr. Voss explained, important media

6    vehicle to your company about Father Lemelson, correct?

7    A.    To the biotech industry, yes, biotech in general.

8    Q.    And you weren't happy about that, right?

9    A.    It was surprising, yes.

10   Q.    Well, no, you weren't happy on top of that, correct?

11   A.    Correct.

12   Q.    Because it says, This should go all the way to the top of

13   the editor staff or editorial staff at BioWorld, right?

14   A.    Yes.

15   Q.    So you were telling Mr. Voss that he should be going all

16   the way to the top about this reporter's story, right?

17   A.    Yes.

18   Q.    Was that your version of going nuclear with BioWorld

19   reporter?

20   A.    No, it's -- it's thinking through -- our belief is that

21   there was illegal stock manipulation going on.  There was a

22   narrative based on falsehoods and lies about the company, and

23   the -- a journal, like BioWorld, who covers the biotech

24   industry appropriately, should spend more time looking at the

25   story.  And so the idea of this doesn't make sense, I make an

1     analogy of Berkshire Hathaway going bankrupt, they ought to be

2     more thorough.

3              So the idea of talk to the journalist or talk to the

4     editorial staff, that's a very appropriate way to think about

5     this.

6              It's not to dictate what their story would be, just to

7     make sure that they're engaged and hear both sides of the

8     circumstance.

9     Q.   Well, they did ask to hear both sides, you wouldn't tell

10    them both sides, you wouldn't talk about Lemelson, right?

11    A.   With BioWorld?

12    Q.   Yes.

13    A.   Bruce was going to have a call with BioWorld.

14    Q.   But we just went through this.  I just asked you, you were

15    going to give a call, let him have a call with BioWorld, but

16    Lemelson was off limits as a topic, right?

17    A.   Bruce was going to talk about the substance of the report

18    about Promacta, about the sales, about the use of the medicine.

19    So there's a lot to cover that could directly speak to the

20    substance of Lemelson's report without talking about Lemelson

21    directly.

22    Q.   So later on in this email, this reporter says, as quoted

23    by Mr. Voss, that I, the reporter, like to put in information

24    from both sides and let the reader decide.

25              Do you agree with that approach or disagree with that

1    approach?

2    A.   Generally I think that's how journalism should work, yes.

3    Q.   Okay.  So -- but in this situation, they printed a story,

4    gave you an opportunity for your side, and you were unhappy

5    about that, right?

6    A.   I'm going off of just this.  I don't remember more around

7    this particular time, just reacting to this particular email

8    that you pulled out.

9    Q.   Okay.

10         MR. HOOPES:  So if we could pull up number 55.

11   Q.   So from June until you began discussions internally about

12   leaning on the SEC, there was a constant communication, right,

13   between you, Mr. Voss and Mr. Foehr about this Father Lemelson

14   issue, correct?

15   A.   Not constant, but we had frequent interaction on this

16   topic, yes.

17   Q.   Well, not constant.  Well, was it a crisis or wasn't it a

18   crisis?

19   A.   Yes, we viewed this as a public relations crisis that was

20   very damaging to the company.

21   Q.   Well, we'll come back to that.

22         But in the meantime, you three are trying to decide

23   what this is all about, right?  What is -- what's behind Father

24   Lemelson writing these things other than it was his good faith

25   belief and opinion, was there something else, right?  That's

1   the subject of the discussion.

2   A.   What we're trying to understand, the basis of the report,

3   where the information would be coming from that would permit

4   him or motivate him to write these claims, these false claims.

5   Q.   So if we can go to the very beginning string on number 55.

6        At the very bottom, it's on page 2.

7        And it's you on June 24, 2014, 6:43 at night.  You're

8   writing to Mr. Foehr and Mr. Voss, and this is eight days after

9   Father Lemelson's first report came out, right?

10  A.   Correct.

11  Q.   And you say, Matt and Bruce, regarding Lemelson, I am

12  pondering all angles for how it originated.  I still believe

13  it's a paid hit job by somebody who has lost a lot of money

14  shorting Ligand.

15       What are your thoughts that Lemelson and Irina are

16  connected?

17       Who's Irina?

18  A.   Irina Rivkind was an analyst, outside analyst, at another

19  bank.

20  Q.   And she's probably the one analyst who didn't think that

21  Ligand was the be all or come all, right?  She kind of came in

22  at a very different view and price point for the stock than

23  many of the other analysts, right?

24  A.   Not entirely, no.

25       She initiated -- it was like the story, like the

1    program, the assets, she had a buy rating on the stock.  The

2    stock -- the valuation over two or three years doubled or

3    tripled in value, and then her view changed.  And she thought

4    the outlook for the company may not be as promising as she

5    originally thought, so her view evolved.  She was not always

6    negative.  She had kind of an evolution of her research thesis.

7    Q.   It wasn't always negative, but it was negative here in

8    June of 2014, right?

9    A.   Correct.

10   Q.   Yeah.  And because you go on to say, Here's a theory.

11   Lemelson is Eastern Orthodox.  Irina, I believe, is a

12   Ukraine-yen, which I also believe is a -- cut off there just a

13   little bit --

14              THE COURT:  Region maybe.

15              MR. HOOPES:  Region, thank you very much, your Honor.

16   BY MR. HOOPES:

17   Q.   -- which is a region of EO -- is that Eastern Orthodox --

18   faith?

19   A.   Yes.

20   Q.   Maybe they are friends or members of faith together.

21              Are you suggesting there to Mr. Voss and to Mr. Foehr

22   that maybe Father Lemelson and this by then negative sell-side

23   analyst are in cahoots?

24   A.   We were just trying to -- not having any background or

25   knowledge of Father Lemelson, we're just trying to understand

1    who we might know or who we might be talking to in a Wall

2    Street business community to get information to draw these

3    reports up.

4    Q.   Let's drop down a little bit in the email.  The jury can

5    read the rest.

6            There's a section further on where it says, Irina has

7    been very quiet on Ligand the past few months, theory being she

8    knew Lemelson was working to get in gear.

9            And final point, I checked Irina Google, she reported

10    her hold on Ligand in December on Benzinga, I think the same

11    site Lemelson did his interview on.

12            Meaning, you're suggesting that maybe part of their

13    conspiracy together is because they share using Benzinga,

14    right?

15    A.   We were just trying to understand -- trying to get any

16    information we could on the background of Father Lemelson.  He

17    was unknown to us, and in speaking with investors, investors

18    weren't familiar with him either, his background reports, his

19    activity or experience in the biotech space.

20            So we were just trying to understand who he might know

21    or what business communities he may associate with.

22    Q.   Did you share with any of these investors that you were

23    speaking with your conspiracy theories about the sell-side

24    analyst and Father Lemelson?

25    A.   I don't recall specifically.  Investors would ask why is

1    this guy doing it?  Why is he making up these lies?  Where is

2    it coming from?  And we did not know, but I don't recall

3    specifically discussing --

4    Q.    -- discussing conspiracy theories.

5          Well, you told us this morning that you started

6    blaming Father Lemelson for what was happening with the Ligand

7    stock in the summer of 2014, right?

8    A.    Yes.

9    Q.    Yeah.  And it would be fair to say, before we get to that,

10   that the Ligand stock, is to use the word "volatile," right?

11   Up and down, different times in its history, correct?

12   A.    The stock, like I think any stock, they move up or down.

13   So, yeah --

14   Q.    "Volatile" has a different meaning.  "Volatile" means up

15   and down erratically, volatile with extremes, right?  Do you

16   agree with that?

17   A.    I don't think erratically.  I think stocks can move on

18   major news, major positive news; in the event there's a

19   disappointment, a stock can move down.  That creates

20   volatility, but it's not necessarily erratic.

21   Q.    Well, you blamed Father Lemelson this morning in 2014 --

22   you weren't sure what was causing the stock to have issues

23   during the summer of 2014, correct?

24   A.    I believe it was Father Lemelson, and he takes credit for

25   it as well.

1    Q.   Well, whether he takes credit for it or not, you didn't

2    give him full credit, right?

3              MR. HOOPES:  Can you pull up 92, please.

4    Q.   In this one, Bruce Voss is talking, and in the second

5    paragraph he says, "Lemelson came out with his view when the

6    stock was at a frothy peak and it has since come down quite a

7    bit, though it's hard to say how much was Lemelson, Janet

8    Yellen talking about overpriced biotech or something else."

9              Did you agree with his statement?

10             MR. JONES:  Objection, your Honor, foundation.

11   Mr. Higgins is not on this email.

12             MR. HOOPES:  I'm just asking if he agrees with this

13   theory.

14             THE COURT:  Do you agree with that assessment?

15             I'll allow that.

16   A.   I'm reading it now.  I was on the first paragraph.

17   Q.   I'm sorry, second paragraph, sir.  Take your time.

18             (Pause.)

19   A.   Do I agree with --

20   Q.   Do you agree with that statement, that it's hard to say

21   how much was Lemelson, how much was Janet Yellen talking about

22   overpriced biostock or something else?  Do you agree with that?

23   A.   Actually, I'm not familiar with this email.  I don't know

24   the context or what Bruce is saying.  I don't know who Jody

25   Burfening is, right?

```
1    Q.    But you know who Bruce Voss is, right?

2    A.    Yes.

3    Q.    And you told us this morning you thought he was

4    knowledgeable and trustworthy, right?

5    A.    Yes.

6    Q.    And he was well versed in the biotech world, particularly

7    he understood your stock and your business, right?

8    A.    Yes.

9    Q.    And he made this statement on November 17, 2014, talking

10   about possible issues with the stock and causes of the stock

11   price issues, correct?  Do you agree with what he said?

12   A.    That's what Bruce is saying.

13   Q.    Do you agree with it?

14   A.    I think Bruce is --

15   Q.    No, very simple question.  Yes or no, sir, do you agree

16   with what he said?

17   A.    I -- I believe Bruce could not exactly quantify how much,

18   but I think he's responsibly explaining that there are factors

19   that may be other factors so you can't directly quantify.  But

20   we knew that it was a single biggest factor impacting our stock

21   over this period of time.

22   Q.    You did.

23   A.    Yes.

24         MR. HOOPES:  So can you pull up number 64, please.

25   Q.    I mean, let's read this carefully.
```

1          Friday, July 18, 2014.  Down low a little bit below

2     where it says -- you writing to Matt Dormer, Matt Foehr, Nishan

3     de Silva, -- he was your CFO, right?

4          And you say, "Matt, we are aware of the short report.

5     It's been uniformly dismissed as absurd.  Investors are telling

6     us that directly and other analysts who cover us have put out

7     notes with that message."

8          Meaning -- just in plain English would you translate

9     that as nobody's paying attention to it?

10    A.   People were definitely paying attention to it.  They were

11    concerned about it.  They were asking us questions.  They

12    thought it was so aggressively different than what their

13    expectation was.  People were definitely paying attention to

14    it, but we definitely felt there was a concern, and I'll say an

15    obsession with these reports.

16    Q.   Let's go to the next paragraph.

17    A.   Dismissing them as --

18    Q.   Let's go to the next paragraph.

19         You say, "We understand trading trends and how

20    computers can take over when you break technical levels.

21    Obviously the remarks this week by Yellen and now the Ukraine

22    mess is impacting biotech stocks."

23         I mean, these are your words, right?

24    A.   Yes.

25    Q.   So you're pointing out Yellen, that's -- you know who

1      you're referring to there, right?  What's her title again,

2      Ms. Yellen?

3      A.   At the time I believe she was secretary of Treasury.  Or

4      perhaps she was head of the Federal Reserve.

5                THE COURT:  At the time she was Federal Reserve.

6                THE WITNESS:  Head of the Federal Reserve.

7      BY MR. HOOPES:

8      Q.   Yeah, so this is the woman, who the Federal Reserve bank,

9      right, which is -- runs half of our life these days, right,

10     she's saying -- she makes a comment, and you astutely point it

11     out, I don't see Father Lemelson's name in that paragraph,

12     right?

13     A.   The -- this was a response to Matt Dormer asking about the

14     Lemelson report and how do we feel about the week's trading.

15     And I'm saying, Look, there's a lot going on.  We believe the

16     sell-off is unwarranted, the past few weeks during this period

17     since the first Lemelson report.  I'm describing the positive

18     developments, the success we've had in that period of time.

19                It was a response also to the analysts or this banker

20     saying, Look, this is difficult because Carol, the analyst at

21     this bank, knows Ligand, and if you're getting questions -- and

22     he was basically saying we're getting a lot of questions from

23     investors.  The analysts often had the knowledge --

24     Q.   I didn't ask you a two-paragraph question.  Very simple,

25     called only for a yes-or-no answer.

1          You referenced Ms. Yellen in here, who was the head of

2     the Federal Reserve bank in the United States of America.  You

3     didn't say anything about Lemelson in here.

4     A.   It was in response to a Lemelson-related question, yes.

5          THE COURT:  Are you just asking whether his name is in

6     that paragraph?

7          MR. HOOPES:  Yes.

8          THE COURT:  It's not in that paragraph, is it?

9          THE WITNESS:  No, Father Lemelson's name is not in

10    that paragraph.

11    MR. HOOPES:

12    Q.   Now, you told us this morning when you were being asked

13    questions by the SEC that you were afraid that the call with

14    Father Lemelson was a trap, right?  That's the words you used.

15    A.   That was --

16    Q.   This was --

17    A.   It could be a trap, yes.

18    Q.   And you said it turned out to be a trap, right?

19    A.   The way he manipulated the interview.

20    Q.   Oh, well, as I understand it, you were calling to ask

21    questions to get information and you got information and it was

22    reported back to you, right?

23    A.   Yes.

24    Q.   And one of the things that you said in the -- in your

25    discussion was that he might -- it might be a trap and share

1    price -- he might say, Oh, I got some information, it's not a

2    complete bust, it's not zero, it's only $15, right, should

3    only -- instead of being 60 or whatever, it should only be $15,

4    correct?

5    A.    I made an example like that.

6    Q.    Yeah, like that.  And you used the word "$15," right,

7    which was a long way from where it was trading at the time,

8    right?

9    A.    Yes.

10   Q.    Okay.

11           MR. HOOPES:  And so if we can go to Exhibit 160,

12   please.

13   Q.    This is an investment report by Empire Asset Management

14   Company, correct?

15   A.    Yes.

16   Q.    Okay.  And Empire Asset Management Company is a company,

17   as far as you know, that has no connection whatsoever to Father

18   Lemelson, right?

19   A.    I'm not aware of any connection.

20   Q.    Yeah.  And so on July 22nd of 2014, about five weeks after

21   Father Lemelson's report, Empire Asset Management did an

22   analysis and issued a recommendation on a price target,

23   correct?

24   A.    Correct.

25   Q.    And a price target is essentially what they believe should

1    be the fair price for that stock.  Could you agree with that?

2    A.    That is correct.

3    Q.    And they said five weeks after Father Lemelson's report,

4    We are initiating coverage of Ligand Pharmaceuticals with a

5    sell rating and price target of $16.

6              That's the first line in that report, right?

7    A.    Yes.

8    Q.    Okay.  So they're not issuing a recommendation that says

9    buy, they're not issuing a recommendation that says hold, they

10   say sell and its fair value is $16, right?

11   A.    Correct.

12   Q.    That's one dollar difference than you were calling

13   Lemelson's trap, right?

14   A.    By the math, correct.

15   Q.    In fact, the stock price of Ligand at that time in the

16   week of July 15th had been about $60, by then it was about $50,

17   $51.45.  That's a huge drop that they're talking about, right?

18   They're talking about going from 51 to 16, right?

19   A.    That is a big difference between those two numbers.

20   Q.    Yeah.  And you tell me, sir, but if you had a thousand

21   shares of Ligand at 51 bucks and these people are right and it

22   goes down to $16, you'd feel like you just got hit with zero,

23   you lost a ton of money, right?

24              MR. JONES:  Objection, compound.

25              THE COURT:  Yes.  Why don't you reask it.

```
1              MR. HOOPES:  Thank you, your Honor.
2     BY MR. HOOPES:
3     Q.   The difference between 51 and 16 is about $35, right?
4     A.   Correct.
5     Q.   If you had a thousand shares of Ligand and it dropped from
6     51 to 16, would your stomach drop, too?
7     A.   Would my what?
8              THE COURT:  Stomach.
9     A.   Stomach.
10    Q.   Would it make you a little sick to lose that amount of
11    money?
12    A.   I don't think I would get sick.
13    Q.   Well, not your money, right?  I mean, suppose you were --
14    not a lot of money to you.
15    A.   That's a loss.  I'm just -- if you're asking me would I
16    literally get sick, no, I don't think I would, but it is a
17    lower amount of money, yes.
18    Q.   Now, there's a June 16th report by Father Lemelson and
19    then there was another report, right, on July 3, correct?
20    A.   There was one in early July, yes.
21    Q.   And I assume you read all his reports?
22    A.   Yes.
23    Q.   And that report, for the first time he mentions you by
24    name, right?
25    A.   I believe it was that report in early July.
```

1    Q.   Yeah, so on page 3 of Exhibit 4.

2         MR. HOOPES:  If we could pull up Exhibit 4, and go

3    down to page -- I'm sorry, page 4.

4    Q.   And at the top there, he says, in the sentence above the

5    box, At an analyzed royalty rate of $4,080,000 there's no

6    indication Kyprolis royalties will even cover Ligand's CEO's

7    ever-increasing compensation.

8         And then he references you, correct?

9         And he says your compensation totalled in 2013 was 3

10   million and change; 2012, it was 2,371,000; 2011, 1,633,156.

11        So his report is essentially that your compensation is

12   bleeding investor money, right?

13   A.   That is what his report implies.

14   Q.   And you read that, correct?

15   A.   Yes.

16   Q.   And nobody that I know of from the SEC has challenged

17   those figures, right?

18   A.   The numbers, no.

19   Q.   Do you challenge the numbers?

20   A.   Not the numbers, the implication.

21   Q.   Okay, but the numbers are okay.

22        And in 2014, what was your compensation, sir?

23        You described the categories this morning when the SEC

24   asked you.  What -- so what was your salary, what was your

25   bonus, and what are your stock options?

1    A.   I don't recall exactly right off those numbers.

2    Q.   Okay.  And today what is your salary, what is your

3    bonus --

4              MR. JONES:  Objection, your Honor, relevance.

5              MR. HOOPES:  I think Mr. Foehr already testified to

6    his, your Honor.

7              MR. JONES:  Same objection, your Honor.

8              THE COURT:  Overruled.

9    BY MR. HOOPES:

10   Q.   What's your salary, please?

11   A.   Cash salary, a little over $600,000.

12   Q.   And bonus?

13   A.   It's a bonus of 75 percent of base salary.

14   Q.   And the stock options in both categories?

15   A.   So there's -- there's stock and options, I believe about 1

16   and a half million of stock value that vests over time and 3

17   million or so of option value that vests over time.

18   Q.   So a story in a San Diego magazine that pegged your

19   compensation at $11 million is a little high, right, for the

20   last year, 2020?

21   A.   For last year.

22             I thought you were describing 2021.

23   Q.   That was another question, which is that question?

24   A.   Yeah, I'm describing my numbers today.

25             If San Diego reported that, I don't remember that from

1    last year, but I'm describing the numbers today.

2    Q.   Okay.  So 11 million for last year is a little high?

3    A.   I don't -- high compared to what?

4    Q.   Is it a high number?

5    A.   Oh, higher than --

6    Q.   Higher than reality?

7             THE COURT:  Than what?

8             MR. HOOPES:  Higher than it really was.

9    A.   I don't -- if you're saying there was a report, I don't

10   know if I ever saw that report, so I can't comment if it was

11   higher or lower.

12   Q.   Okay.  Take the report aside.  Is the number 11 million

13   too high?  That's simple, that's it, and we'll move on.

14   A.   I don't -- right now -- I wasn't prepared.  I don't know

15   exactly what the numbers were for last year, so I want to be

16   accurate in the answer.  And I don't have -- I just wasn't

17   prepared for that question right now.

18   Q.   So -- well, let's move on.

19             Let's talk about -- you said this morning that you

20   believed that it was -- that it was a crisis, and then I asked

21   you the question, you changed it to -- it was a PR crisis, was

22   it?

23   A.   It was a very damaging, the lies --

24   Q.   Just --

25             THE COURT:  On cross.

1         Just so we can try to finish this today, was it a PR
2    crisis?
3         THE WITNESS:  It was a crisis of many, many magnitude.
4    It was a relationship crisis, it was a valuation crisis, it was
5    a reputation crisis.
6         We're at the moment talking about the media, so
7    there's a public relations; it had lot of dimensions to it.
8         Even this report of this other analyst, it creates an
9    environment where other analysts can ride the coattails and put
10   out other false reports.
11        The collateral damage from these false reports and the
12   lies was multifaceted.
13   BY MR. HOOPES:
14   Q.   So here's what we're trying to understand, sir.
15        Okay.  You've leaned on the SEC and the SEC is here
16   today and it's asking these ladies and gentlemen of the jury to
17   decide something, right?
18   A.   Correct.
19   Q.   And you know that they're not deciding whether things are
20   true or false, they're deciding whether or not Father Lemelson
21   had a good faith belief in the matters that he stated, right?
22        MR. JONES:  Your Honor, objection.  Your Honor, this
23   mischaracterizes the entire case.
24        It also is a legal conclusion that he's asking --
25        THE COURT:  Yes, I'll sustain that.

1    BY MR. HOOPES:

2    Q.   You are familiar with a NASDAQ rule that permits you in

3    certain circumstances for a company to -- it may also be

4    appropriate to publicly deny false or inaccurate rumors which

5    are likely to have or have had an effect on trading in its

6    securities or would likely have an influence on investment

7    decisions.  You're familiar with that rule, are you not, sir?

8    A.   Yes.

9    Q.   And you want to explain what NASDAQ is to the ladies and

10   gentlemen of the jury?

11   A.   It's a stock exchange.  There's the New York Stock

12   Exchange, NASDAQ is another exchange where companies are listed

13   and stocks trade.

14   Q.   And according to that rule, back in June or July or

15   August, you could have responded publicly, correct?

16   A.   We could have, yes.

17   Q.   I mean, no offense, but you're a pretty articulate guy.

18   You've said all these things here today.  Why couldn't you have

19   just said that publicly back in June, July or August and killed

20   whatever you thought was a crisis?

21   A.   Why couldn't we have said what?

22   Q.   Just what you said today when the SEC was asking you

23   questions.  You said that you thought --

24            THE COURT:  There's multiple questions, start again.

25            What's the question?

1    BY MR. HOOPES:

2    Q.   The question is very simple.

3         Let's assume the following:  You're the CEO of Ligand,

4    correct?

5    A.   Yes.

6    Q.   Okay.  You seem pretty comfortable in explaining yourself

7    and speaking in public, right?

8    A.   I can handle questions, yes.

9    Q.   Yeah.  So why didn't you get on TV or get in front of a

10   public bunch of investors and say exactly in response -- you

11   could have called Mr. Jones, they asked you the questions, why

12   didn't you say that back in June?

13        THE COURT:  Again, there was again, five or six

14   questions there.

15   BY MR. HOOPES:

16   Q.   Why didn't you say that all back in June?

17        THE COURT:  Excuse me.

18        Why didn't you express your concerns in June publicly?

19        THE WITNESS:  We did.  We were very active in

20   answering questions, in meetings, on earnings calls.  Our

21   public disclosures not only correctly, accurately reflected our

22   financials, but we would respond to these other questions in

23   our narrative in Qs and Ks in addressing -- we may not have

24   called Father Lemelson out by name, but we did publicly address

25   disclosure around liquidity, insolvency, about the health of

1    the Promacta business.  And so we did publicly address this.

2    BY MR. HOOPES:

3    Q.   So, to be clear, picking up on what you said, you never

4    said Father Lemelson said X but the truth is Y, right?

5    Correct?

6    A.   Correct.

7    Q.   Okay.  And you also could have brought your own lawsuit

8    back then, right?  They talked about that, you're a private

9    entity, you've got the right to initiate litigation, right?

10   A.   Correct.

11   Q.   Instead of having the taxpayers pay for this, you could

12   have done it, right?

13              MR. JONES:  Objection, your Honor.

14              THE COURT:  Sustained.

15   BY MR. HOOPES:

16   Q.   And you said in that first email, 241, We continue to work

17   with our attorneys to lean on the SEC to get an injunction on

18   Lemelson's activities.

19              You wanted an injunction, right?

20   A.   Yes.

21   Q.   You wanted to essentially silence Father Lemelson, right?

22   A.   We wanted to stop the illegal stock trading.

23   Q.   Well, if one of your employees used "silence for good,"

24   would you agree that is what you desired?

25   A.   The -- yes, we wanted him to stop pedaling lies and false

1    and misleading statements about the company.

2    Q.   So when one of your employees used the phrase "silence for

3    good," you agreed?

4              MR. JONES:  Objection, your Honor, asked and answered.

5              THE COURT:  Agree, is that what you wanted to do,

6    silence him?

7              THE WITNESS:  We wanted Father Lemelson to stop saying

8    lies about the company.

9    BY MR. HOOPES:

10   Q.   No, that's not the question.  Do you agree silence for

11   good, that was your effort?

12   A.   Stop for good saying lies about the company.

13   Q.   Now, you told us earlier that you, in fact, did speak

14   internally about going to the SEC, and then you, in fact, did

15   hire outside counsel to approach the SEC, right?

16   A.   Correct.

17   Q.   And in fact, that firm that you hired was Latham &

18   Watkins, right?

19   A.   Yes.

20   Q.   Yeah, that's a big, international law firm, right?

21   A.   Yes.

22   Q.   It's got offices all over the country, right?

23   A.   Yes.

24   Q.   And you were certainly willing to spend the money to do

25   that piece of it, right, to hire them?

1    A.    They were our corporate counsel.  They were already

2    working with us on all sorts of business.

3    Q.    They didn't do this for free.

4    A.    We paid them to work for us, yes.

5    Q.    In fact, they actually arranged for a meeting with the SEC

6    here in Boston in September of 2014, right?

7    A.    Correct.

8    Q.    June to July, July to August, August to September, three

9    months or so later, right?

10   A.    Correct.

11   Q.    And you sat with them and made a PowerPoint presentation,

12   right?

13   A.    Yes.

14   Q.    And you were in the meeting, right?

15   A.    Yes.

16   Q.    Other members of your team were in the meeting, correct?

17   A.    Correct.

18   Q.    And also the Latham & Watkins attorney was in the meeting,

19   correct?

20   A.    Yes.

21   Q.    And you gave them a PowerPoint that had been prepared for

22   them, right?

23   A.    Yes.

24   Q.    And you went through the PowerPoint presentation with

25   them, right?

1 A. Yes.

2 Q. And then left the meeting, right?

3 A. Yes.

4 Q. And you learned later that they were not going to take the

5 case, right?

6 A. I don't know if we learned that specifically.  There was

7 no action or follow-up.

8 Q. By the SEC at that time, correct?

9 A. At the time, correct.

10 Q. Well -- and you kept Latham & Watkins, and they contacted

11 the Washington office of the SEC, correct?

12 A. I believe that's what happened, yes.

13 Q. And they were told by the Washington office that the case

14 was dead, there was no case going, they weren't going to do it,

15 right?

16 A. I don't recall that.  We contacted a different office.  We

17 wanted to make the case that there was stock manipulation going

18 on, and we wanted to get another hearing.

19 Q. Well, after the SEC didn't do what you wanted the first

20 time, you went out and hired new lawyers, right?

21 A. Yes.

22 Q. Yeah, in fact, Mr. Bondy's firm right here, right?

23 A. Correct.

24 Q. Who's been representing all your employees, correct, in

25 this whole process?

 1    A.   His firm represents Ligand, yes.

 2    Q.   And Mr. Voss, right?

 3    A.   Correct.

 4    Q.   And hired him to have another meeting with the SEC in

 5    Washington this time instead of in Boston, right?

 6    A.   Correct.

 7    Q.   And in fact, you actually had another meeting with the SEC

 8    in Washington, D.C. on June 8, 2015, mmm, seven, eight, months

 9    later, correct?

10    A.   Correct.

11    Q.   And you were, again, at the second meeting, right?

12    A.   Yes.

13    Q.   There was another PowerPoint, correct?

14    A.   Yes.

15    Q.   A different lawyer with you, right?

16    A.   Correct.

17    Q.   And different people from the SEC, right?

18    A.   Correct.

19    Q.   And there was one more thing that you did, right, which

20    is, you sought the assistance of a California congressman to

21    write the SEC, right?  Correct?

22    A.   Correct.

23    Q.   And that California congressman actually wrote a letter,

24    right, on your behalf, correct?

25    A.   Yes.

```
1              MR. JONES:  Your Honor, I think this line is not
2      consistent with your Honor's previous rulings prior to court.
3              MR. HOOPES:  No, I'm staying far away from --
4              THE COURT:  What's the next question?
5      BY MR. HOOPES:
6      Q.   And that letter happened after extensive discussion with
7      the board about how we could get a government review of what we
8      saw as illegal stock manipulation, I know some board members
9      who reside in California that felt that, you know, to use
10     relationships, government officials, to help try to create
11     those kinds of dialogues.  That's what you said, right?
12             MR. JONES:  Your Honor, I don't know what Mr. Hoopes
13     is reading from.
14             MR. HOOPES:  A deposition statement from this
15     individual.
16             THE COURT:  You need to tell him what page and line.
17             MR. HOOPES:  Page 313, line 21 to 315, line 9.
18             MR. JONES:  Thank you.
19             THE COURT:  So what's the question?
20     BY MR. HOOPES:
21     Q.   That's what happened, right?  What I just read.
22     A.   I got distracted by the -- was there a question?  I'm
23     sorry.
24     Q.   So let me boil it down really quick.
25             You and the board decided, right, to get the
```

1    assistance of a California congressman to write a letter on

2    behalf of Ligand to the SEC, right?

3    A.    Correct.

4    Q.    And you saw the letter?

5              THE COURT:  The letter itself does --

6              MR. HOOPES:  It's not coming, all I have is one more

7    question.

8    BY MR. HOOPES:

9    Q.    You saw the letter.

10   A.    At some point I believe I saw the letter.  I'm not sure --

11   Q.    The date of the letter is --

12             MR. JONES:  Your Honor, last question.

13             THE COURT:  No.  Mr. Jones, I said the letter itself

14   is not admissible, it's hearsay.

15   BY MR. HOOPES:

16   Q.    Yes, if I may, the date of the letter is the same day you

17   went to the SEC in Washington, right?

18   A.    I'm not aware of that.

19   Q.    Okay.

20             Now, again, this is your second trip to the SEC, and

21   so instead of responding publicly yourself in very nice form in

22   San Diego to all these allegations, you continued paying

23   lawyers to lean on the SEC, right?

24   A.    We were confident that there was illegal stock

25   manipulation, and we believed it was appropriate to discuss

1    with the enforcement division of the SEC to look into this

2    matter --

3    Q.   What was the SEC going to do --

4    A.   -- that there was a crime.

5    Q.   -- that you couldn't do on your own with your gazillion

6    dollars in market cap?

7            MR. JONES:  Objection.

8            THE COURT:  Objection sustained.

9            MR. HOOPES:  I'm sorry.

10   BY MR. HOOPES:

11   Q.   You could have brought a private lawsuit, right?

12   A.   Yes.

13   Q.   Could have sought an injunction, correct?

14   A.   Yes.

15   Q.   Now, in the two PowerPoints --

16           THE COURT:  How are you doing timewise?

17           MR. HOOPES:  I think I am 10 minutes, 15 minutes.

18           THE COURT:  Thank you.

19           MR. HOOPES:  Yes.

20   BY MR. HOOPES:

21   Q.   In those two PowerPoints that you -- there were two

22   PowerPoints, right?  One for the Boston SEC, and then a revised

23   one for the Washington SEC, right?

24   A.   Reflecting other things that happened over the following

25   seven months.

1    Q.   And modifying -- it didn't work the first time, so you're

2    going to change it up a little bit so it works the second time,

3    right?

4              MR. JONES:  Objection.

5              THE COURT:  Sustained.

6    BY MR. HOOPES:

7    Q.   And so some things were different from the first to the

8    second PowerPoints, correct?

9    A.   Correct.

10   Q.   And so that there was some things that were in the first

11   that were not in the second.  For example, in the first one,

12   you accused Father Lemelson of what's called affinity fraud,

13   and that dropped out, right?  So what did you mean by "affinity

14   fraud"?  Was that that he was somehow misusing his priestly

15   status?  Is that what the accusation was?

16   A.   The -- affinity fraud is a pattern of behavior that some

17   people employ to use their community, whatever it might be, to

18   get people to participate in illegal schemes.  It's not a word

19   that we coined, but it was a question that we were asking

20   ourselves.

21   Q.   Okay.  So it was a question.  But you didn't have any

22   evidence to support that allegation in there, right?

23             MR. JONES:  Objection, your Honor.

24   A.   We were raising facts about our company, quantitative and

25   other business facts that we knew were certain; and we were

1    also sharing with the SEC other information that we gathered

2    from looking at the internet, talking to people, just to share

3    what we knew about --

4    Q.    You put that PowerPoint together to convince them to take

5    your case, which they didn't do the first time, and in there

6    you put affinity fraud and you didn't have any evidence to

7    support that, correct?

8    A.    It wasn't -- we were making --

9    Q.    Yes or no, you didn't have any evidence to support that,

10   yes or no?

11   A.    No.

12   Q.    Thank you.

13           And you also accused him of performance fraud, meaning

14   that he didn't deserve to be Barron's top rated 2013 investment

15   adviser, right?  You thought that was maybe questionable, in

16   fact, when it was true.  So you didn't have any evidence to

17   support your suggestion or allegation on that, right?

18   A.    We -- it looked very suspicious.  Investors --

19   professional investors who manage money raised these questions

20   with us.  It looked suspicious, so it was -- we were certain of

21   lies against our company, and there were other things that were

22   suspicious.  And so we were just framing for the enforcement

23   division to consider our --

24   Q.    You framed things that turned out to be untrue, right?

25   A.    It was worth asking the question, worth framing it.

1    Whether the SEC would pursue it or not, it was obviously their

2    decision.

3    Q.   Well -- so also in that first PowerPoint you noted that

4    Father Lemelson uses a highly unusual definition of insolvency

5    to assert that Ligand is insolvent.   Remember that?

6    A.   Yes.

7    Q.   And according to Lemelson, liabilities exceeded tangible

8    assets, meaning the company was insolvent.   Do you remember

9    that?

10   A.   Yes.

11   Q.   You understood that this was the definition that Father

12   Lemelson was using, correct?

13   A.   Correct.

14   Q.   And you knew that -- you knew that because he had

15   disclosed that to the entire world in his reports, right?

16   That's where you got that information from, right?

17   A.   He was cherry-picking his numbers to create a bogus

18   formula --

19   Q.   He laid out all the numbers, right?  So you disagreed with

20   his conclusion, right, but he didn't hide the way he was

21   getting there, right?

22   A.   He created a formula that isn't relevant for our industry,

23   and then he drew a conclusion that was false.  And he tried to

24   peddle this as this a legitimate formula that is used and the

25   conclusion, math -- it's not opinion based, it's conclusion.

1    Q.   Well, his math was correct, right?

2    A.   And he concluded that we were insolvent.

3    Q.   The question is:  Could he use or suggest that

4    formulation, and --

5              MR. JONES:  Objection, your Honor.

6              THE COURT:  What's the next question?

7    BY MR. HOOPES:

8    Q.   Let me ask you.  Do you agree with this:  Your auditor

9    yesterday testified that whether or not a company is insolvent

10   can involve a judgment call.  Do you agree with that?

11   A.   Yes.

12   Q.   Now, in light of these presentations, and the jury

13   themselves, instead of taking their time now, can look at

14   Exhibits 163, which is the September 25, 2014 --

15             MR. JONES:  Your Honor, are we asking questions.

16             MR. HOOPES:  We're going to ask -- if you let me

17   finish, Mr. Jones, I'll get there.

18             THE COURT:  What's the question?

19   BY MR. HOOPES:

20   Q.   The question is very simply this:  In neither of these

21   presentations did you ever raise the issue of Viking, correct?

22   A.   Do we raise the issue of --

23   Q.   You never raised any issue concerning Viking, right?

24   A.   In these two presentations, no.

25   Q.   So you were in front of the Boston SEC on September 25,

1    2014, and the Washington division of the SEC on June 8, 2015,

2    and your company with its international lawyers never called to

3    their attention that there was any issue with Viking, correct?

4    A.    In these two presentations the Viking is not mentioned,

5    no.

6    Q.    And in fact, in the first presentation there was not one

7    thing about the Benzinga interview and Promacta going away,

8    right?

9    A.    There were so many issues, our time is limited.  We had to

10   be focused in the presentation.  Every report had dozens of

11   issues and complaints.  So not everything was covered over all

12   these pages of report.

13   Q.    That's not my question.

14          This jury has four statements in front of it --

15          MR. JONES:  Objection, your Honor.  The jury also has

16   a scheme plan in front of it, I'll appreciate not leaving that

17   out.

18          THE COURT:  I'll strike those comments.

19          In any event, you will be asked about four statements

20   made by Mr. Lemelson, the ones about basically go away, the two

21   Viking statements, and the last one having to do -- the set of

22   comments about insolvency.  That's what you're going to be

23   asked about.

24          So now with that in mind, go ahead.

25   BY MR. HOOPES:

1    Q.    There was nothing in that first presentation about a

2    Benzinga interview, right?

3    A.    I don't believe so.

4    Q.    And in neither of those presentations did you ever show

5    them that email from you where you say, Mr. Voss, you tacitly

6    agreed, right?  You didn't flash that email to the SEC.

7    A.    I don't believe we showed any emails to the SEC.

8    Q.    No emails to the SEC.

9    A.    During these presentations, it was an hour,

10   hour-and-a-half focused meeting, PowerPoint presentation.  We

11   weren't going through emails or files about the company.

12   Q.    So if you didn't show that, then you also didn't show your

13   email of February 1, 2014 where you raised this issue of what's

14   going to happen with Sovaldi and Promacta, right?

15   A.    No, we did not show emails --

16        MR. HOOPES:  Can we pull up 223, please.

17   Q.    Now, you'd agree with me just before we look at this

18   email, that in September of 2013, about eight months before

19   there was a board presentation by you where you said, We need

20   to become a growth-driven company, a Wall Street narrative of a

21   growth-driven company, right?

22        Do you want me -- should we show you that?

23   A.    Sure, if you want to.

24   Q.    So maybe we can go first to 222, page 21.  Slide 21.

25        At the bottom, Ligand transitioning to financial

1    growth/performance-driven story on Wall Street.

2           That was part of your presentation to the board back

3    in September of 2013, correct?

4    A.   This was -- yeah, I mean, in context of this analysis, we

5    were just framing for the board how the business was a research

6    stage kind of investment over the prior years, but now there

7    are multiple drugs approved and revenues were growing, so now

8    instead of just looking at research data, clinical trial data,

9    now it's a financial story.

10   Q.   Really?  Multiple drugs approved.

11          MR. HOOPES:  Can you show slide 30, please.

12   Q.   You weren't focused on multiple drugs approved.  You were

13   focused on in the fifth line.  It says, HCV -- let me back up.

14          Indications beyond ITP critical for continued Promacta

15   growth.

16          And you say, First ITP estimated to be about 66

17   percent of peak penetration.

18          And then you say HCV, hep C, needs to be a big market

19   for Promacta to keep driving Ligand's growth.

20          Right?

21   A.   That's what that says, yes.

22   Q.   Yeah.

23          So if we can go back to 223, this isn't just you

24   saying will any Sovaldi patients need Promacta, you told us

25   this morning investors were asking the same question, right?

 1    A.   Investors were asking how the market was evolving with

 2    this new drug.

 3    Q.   In other words, they were wondering what impact is Sovaldi

 4    going to have on Promacta, right?

 5    A.   Yes.

 6    Q.   And if I were you, one and one are two, which is if

 7    Promacta is going to have a problem from Sovaldi, what's going

 8    to happen to our growth-driven Wall Street narrative, right?

 9    And you wanted to have an answer to that.

10              THE COURT:  Two questions.

11              Would the impact of Sovaldi affect the growth

12    narrative?

13              THE WITNESS:  The impact -- we wanted to understand

14    how many patients could be on Sovaldi, how large Sovaldi would

15    be, and if that would impact the use of Promacta.

16              Again, they're different medicines, but we wanted to

17    understand what percent of the market would be on Sovaldi, what

18    percent of the market would not be on Sovaldi, and those who

19    are on Sovaldi, how would their liver recover, how would their

20    liver get healthy again and how long.

21    BY MR. HOOPES:

22    Q.   Because you were trying to be a good CEO, right?  You

23    wanted to project as best you could what was coming next,

24    right?

25    A.   We wanted to understand the market and have information to

```
 1    answer questions so people could understand and do analysis on
 2    the growth over the next few years.
 3    Q.   And the question you and your investors had was exactly
 4    the same question that Father Lemelson expressed, right, except
 5    he gave an answer to it, which was, mmm, because of Sovaldi,
 6    Promacta was going away.  But it was the same question, right?
 7    A.   No.
 8    Q.   No.  No.
 9         So whether Promacta was going to go away or at least
10    your Wall Street narrative was going to go away was not a
11    question?
12              MR. JONES:  Again, compound, your Honor.
13              THE COURT:  Overruled.
14    A.   Father Lemelson --
15              THE COURT:  Rephrase the question, please.
16    BY MR. HOOPES:
17    Q.   Are you saying that that was not an issue?
18              MR. JONES:  What's the issue, your Honor?
19              THE COURT:  Overruled.
20    A.   Father Lemelson said Promacta was going to go away and he
21    said it doesn't work for hepatitis, and both were false
22    statements.
23         Promacta was already approved for other indications,
24    so the idea it goes away, how big the market is for one
25    indication we were looking to do analysis around.  That would
```

1        have zero impact on the other approved indications, which it's

2        still -- it's growing significantly.

3              And it also was false to say the drug doesn't work for

4        hepatitis.  It's not -- it's not indicated for hepatitis.

5        Q.   This jury can listen.

6              You said on slide 30 that you were focused on hep C

7        and your concern was that Sovaldi was going to impact Promacta

8        on hep C, yes or no?

9        A.   We were doing analysis on how --

10             THE COURT:  Yes or no?

11             THE WITNESS:  What was --

12             MR. HOOPES:  Yes or no, that's the Judge's question

13       and mine.

14             THE WITNESS:  What was the question again?

15             MR. HOOPES:  If that's a problem, I'll ask it again.

16       A.   We were analyzing how big the hepatitis implication would

17       be on Promacta.

18             THE COURT:  Where are you on --

19             MR. HOOPES:  Last question.

20             THE COURT:  Yes.

21       BY MR. HOOPES:

22       Q.   My very last question, sir.

23             Do I understand it correctly you're asking the ladies

24       and gentlemen of this jury to handle what you could have

25       handled all by yourself?

```
 1              MR. JONES:  Objection, your Honor.

 2              THE COURT:  Sustained.

 3              MR. HOOPES:  No other questions, thank you.

 4              THE COURT:  Do you have any questions?

 5              MR. JONES:  Your Honor, can I confer with my

 6     co-counsel over the break?

 7              THE COURT:  Why don't you ask now just so --

 8              MR. JONES:  Your Honor, I may have more than the two

 9     minutes we have before lunch.

10              THE COURT:  Excuse me?

11              MR. JONES:  I said I may have more than two minutes of

12     questions.

13              THE COURT:  Let me just --

14              (Discussion off the record.)

15              MR. JONES:  Your Honor, I'm going to take this easel

16     down; it's been up the whole time.

17                         REDIRECT EXAMINATION

18     BY MR. DAY:

19     Q.   Mr. Hoopes asked a lot of questions about leaning on the

20     SEC, didn't he?

21     A.   Yes.

22     Q.   And he also asked a lot of questions about making

23     presentations to the SEC, right?

24     A.   Yes.

25     Q.   And he asked a lot of questions about hiring lawyers to
```

```
 1      help you make presentations to the SEC?
 2              MR. HOOPES:  Objection.  I know you're trying to move
 3      things along, but that's -- the leading is --
 4              THE COURT:  I'm trying to move things along.
 5      BY MR. JONES:
 6      Q.   Mr. Higgins, are you aware of any connection between how
 7      Ligand went to the SEC and whether or not Father Lemelson lied
 8      about the company?
 9      A.   No.
10              MR. HOOPES:  Objection.
11              THE COURT:  Sustained.
12      BY MR. JONES:
13      Q.   Mr. Hoopes asked you about the presentations and whether
14      they contained Viking, correct?
15      A.   Correct.
16      Q.   Is it your understanding that the SEC does an
17      investigation in a case that's brought to it?
18      A.   Yes.
19      Q.   Did Ligand control that investigation?
20      A.   No.
21      Q.   Is it possible that the SEC in its investigation found
22      other things other than the presentation --
23              THE COURT:  Sustained, sustained, sustained.
24      BY MR. JONES:
25      Q.   You were asked about the Empire Capital reports, correct?
```

1    A.   Yes.

2    Q.   And those were other reports from short sellers about the

3    company, correct?

4    A.   Yes.

5    Q.   Did you go to the SEC about those reports?

6    A.   No.

7    Q.   Why not?

8    A.   We -- we see all sorts of reports, and this one did not

9    have lies in it.  It drew a conclusion; it was different in our

10   view.  It was different than most of all the other analysts who

11   covered us, but we did not see lies in it, we did not see

12   misstatements, and there was no evidence that there was

13   behavior to manipulate the stock to make illegal profit.

14   Q.   And you were asked a lot of questions about how you

15   handled the press around this, correct?

16   A.   Yes.

17   Q.   Do you understand what the connection is between that and

18   the claims in this case?

19   A.   Do I understand the relationship between the press and

20   Father Lemelson?

21        MR. HOOPES:  Objection.

22        THE COURT:  Sustained.

23   BY MR. JONES:

24   Q.   What was the purpose of going to the SEC, Mr. Higgins?

25   A.   We believed the reports were damaging our companying and

1      it was driving illegal stock manipulation.  And we're a highly

2      regulated company by the FDA, by the SEC.  We believe for the

3      markets to work, people need to follow the laws, the rules, and

4      we wanted the SEC to be aware of this --

5              MR. HOOPES:  Objection, move to strike.

6              THE COURT:  Sustained.  Move on to the next one.

7      BY MR. JONES:

8      Q.   What's your understanding of what the SEC does around the

9      securities laws?

10             MR. HOOPES:  Objection.

11             THE COURT:  Sustained.

12             MR. JONES:  Can we have Exhibit 1, please.

13             Could you go down to page I think it is 4.

14             I'm sorry, it should be 4 of the -- actually, scroll a

15     couple more pages, please.  Cool.

16     BY MR. JONES:

17     Q.   Now, Mr. Hoopes told you that the July 3 report was the

18     first time you got mentioned in one of Father Lemelson's

19     reports, correct?

20     A.   Correct.

21     Q.   But you -- looking at page 8, please, I'm sorry.

22             So this is the Exhibit 1, the June 16th report, right,

23     the first report?

24     A.   Yes.

25     Q.   So when Mr. Hoopes told you that the July 3rd report was

 1    the first report you were mentioned in, that's not accurate, is

 2    it?

 3    A.   No.

 4             MR. JONES:  Nothing further, your Honor.

 5             THE COURT:  Thank you.

 6             MR. HOOPES:  Nothing further.

 7             THE COURT:  Thank you.  We stand in recess.

 8             THE CLERK:  All rise.

 9             THE COURT:  You may step down, have a good trip home.

10             MR. JONES:  Thank you, Mr. Higgins.

11             THE COURT:  I'll just speak to you for a minute for

12    one second at sidebar, not necessarily on the record.

13             (Discussion off the record.)

14             (Court adjourned at 1:05 p.m.)

15                        - - - - - - - - - - - -

16                        CERTIFICATION

17             I certify that the foregoing is a correct transcript

18    of the record of proceedings in the above-entitled matter to

19    the best of my skill and ability.

20

21

22

23    /s/Debra M. Joyce                    January 6, 2022
      Debra M. Joyce, RMR, CRR, FCRR       Date
24    Official Court Reporter

25

1                                   INDEX

2

3       WITNESS                                                        PAGE

4

        JOHN HIGGINS
5
            Direct Examination                                           4
6           By Mr. Jones
            Cross-Examination                                           90
7           By Mr. Hoopes
            Redirect Examination                                       147
8           By Mr. Day

9

10                          E X H I B I T S

11

12      Exhibit No.            Description                        Received

13
            246, 247, 248                                              78
14

15

16

17

18

19

20

21

22

23

24

25