1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3      _____

4      SECURITIES AND EXCHANGE COMMISSION,

5                          Plaintiff,         Civil Action
                                              No. 18-11926-PBS
6      v.
                                              November 2, 2021
7      GREGORY LEMELSON,                       8:54 a.m.

8                          Defendant.
       _____
9

10

11                    TRANSCRIPT OF JURY TRIAL DAY 6

12               BEFORE THE HONORABLE PATTI B. SARIS

13                    UNITED STATES DISTRICT COURT

14               JOHN J. MOAKLEY U.S. COURTHOUSE

15                        1 COURTHOUSE WAY

16                       BOSTON, MA  02210

17

18

19

20
                     DEBRA M. JOYCE, RMR, CRR, FCRR
21                      Official Court Reporter
                     John J. Moakley U.S. Courthouse
22                   1 Courthouse Way, Room 5204
                          Boston, MA  02210
23                      joycedebra@gmail.com

24

25

 1   APPEARANCES:

 2   FOR THE PLAINTIFF:

 3   MARC J. JONES, ESQ.
     ALFRED A. DAY, ESQ.
 4   Securities and Exchange Commission
     33 Arch Street
 5   23rd Floor
     Boston, MA 02110
 6   617-573-8900
     jonesmarc@sec.gov
 7   daya@sec.gov

 8   FOR THE DEFENDANT:

 9   DOUGLAS S. BROOKS, ESQ.
     THOMAS M. HOOPES, ESQ.
10   BRIAN J. SULLIVAN, ESQ.
     Libby Hoopes Brooks, P.C.
11   399 Boylston Street, Suite 600
     Boston, MA 02116
12   617-338-9300
     dbrooks@lhblaw.com
13   thoopes@lhblaw.com
     bsullivan@lhblaw.com

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open
 3   court before the Honorable Patti B. Saris, United States
 4   District Judge, United States District Court, District of
 5   Massachusetts, at the John J. Moakley United States Courthouse,
 6   1 Courthouse Way, Boston, Massachusetts, on November 2, 2021.)
 7              THE CLERK:  All rise.
 8              THE COURT:  Good morning everyone.
 9         I understand that -- I was upstairs still working on
10   the jury instructions, but Mary Ellen tells me that the
11   exhibits are all marked -- thanks -- are the paralegals here?
12              THE CLERK:  Cara is here; Alyssa is with the SEC --
13   there she is.
14              THE COURT:  Wait a minute.  These paralegals stayed
15   late last night with Mary Ellen, applause to them.
16         All the exhibits -- they're the unsung -- actually,
17   the sung heroes of this litigation.  So it's always hard on the
18   paper end of it, and thank you.
19              THE CLERK:  Thank you.
20              THE COURT:  Now, there are some, I understand -- we're
21   diligently working on these jury instructions.  We're trying to
22   catch up with you as you keep filing new filings.  I'm not sure
23   we're totally caught up, but on what you filed last night, was
24   it, the defendants did?
25              MR. DAY:  This morning.
```

1          THE COURT:  We're not caught up yet.

2          So was there another issue with the exhibits?

3          MR. JONES:  Your Honor, there is one issue with the

4     exhibits.  It is about the Seeking Alpha commentary deletions

5     that you ruled on yesterday.

6          We had understood your Honor's ruling to say that if,

7     in fact, the text of that was copied by the defendant into his

8     emails, the texted comments that he received from people, we

9     believed that would not be redacted; defendants were under the

08:56 10    impression that they would be redacted, those comments.

11          And regardless, the Commission would say based on

12     Father Lemelson's testimony yesterday where he was talking

13     about, Oh, these comments just had my home address in them or

14     they were about threats that I was getting, the comments that

15     are in the emails that we sought to introduce have nothing to

16     do with that; they have to do with his reports.  And we would

17     ask, based on yesterday's ruling or to opening the door, that

18     the comments be included in the emails that are admitted, 249,

19     250, 251.

08:56 20          THE CLERK:  They were K, N, O, and P originally.

21          THE COURT:  Let me put it this way, I did not rule on

22     that one way or the other.  I said the separate emails from

23     other people was hearsay and weren't coming in, and I did that

24     both as hearsay and under 403 if they were inflammatory, which

25     some of them were.

```
 1              But, now, I didn't think about whether or not Father
 2    Lemelson himself quotes them, I don't know.  I didn't rule on
 3    that.  I allowed his emails to come in.
 4              So -- but I didn't focus on the fact they may have
 5    quoted other people's information within them.
 6              MR. SULLIVAN:  Your Honor, I think that goes directly
 7    to the harm that we were talking about yesterday, baked-in
 8    hearsay, some of it inflammatory, some of it factually
 9    incorrect that could confuse the jury.
08:57 10         THE COURT:  Can I see one of them?
 11              I didn't focus on that.  That's one of the flaws of
 12    handing up huge email chains.
 13              So I clearly ruled that the other people's emails were
 14    out.
 15              MR. JONES:  And we've redacted those in that set of
 16    emails, your Honor.  That's the copies that we are -- copies of
 17    the ones we sent to defendants.
 18              THE CLERK:  It was 259, 250, and 251.
 19              And you're taking N out?
08:58 20         MR. JONES:  N is out.
 21              THE COURT:  Thank you.
 22              Well, if it's his email, I'm going to let it in.
 23              I mean, and he refutes it.  He says it's ridiculous.
 24              What word he used.
 25              (Pause.)
```

```
 1              THE COURT:  I'll allow --

 2              (Pause.)

 3              THE COURT:  I'm allowing in 250 and 249.  I have to

 4      get to 251, that's much longer.

 5              MR. JONES:  Yes, your Honor.

 6              (Pause.)

 7              THE COURT:  Well, so mediation did remove it?

 8              MR. JONES:  Yes, your Honor.

 9              THE COURT:  So they agreed with him.

09:00  10       MR. JONES:  They took it down.

11              THE COURT:  Yeah, but -- it means it wasn't frivolous.

12              MR. JONES:  Your Honor, the argument is not that it's

13      frivolous.  The argument is that, as Father Lemelson said

14      repeatedly, I want to see both sides, I want to hear it all;

15      and in arguing that they're trying to silence me, Father

16      Lemelson silenced other people and didn't want to hear both

17      sides.

18              THE COURT:  Peripheral issue.

19              MR. JONES:  It is, your Honor, but it's important to

09:00  20  the defendant's intent.  It's also important to defendant's

21      arguments as they're making in the case.

22              THE COURT:  Is stuff in italics the -- what is that?

23              MR. JONES:  Your Honor --

24              MR. SULLIVAN:  Those are the comments, I believe, from

25      the third parties basically copied in for context in the email.
```

1          MR. JONES:  Right.  That context being particularly

2     important, as the defendant said the only things he tried to

3     get removed were things that gave out his home address or

4     involved threatening -- or somehow threatening him.

5          MR. SULLIVAN:  A, I think that mischaracterized the

6     testimony --

7          THE COURT:  I'm not sure that does mischaracterize it.

8     That's what he said.  He said either threatened him or violated

9     some policy, he said disjunctively.

09:01 10          MR. SULLIVAN:  Right.  But I also think the way it

11     came in, the emails were not put in front of Father Lemelson.

12          MR. JONES:  They actually were.  I actually walked

13     over to him and put them in front of him.

14          Not to mention he's a party in this case and they've

15     had the exhibits.

16          MR. SULLIVAN:  Well, there are other ones that

17     disclose his address.

18          THE COURT:  Well, the third one seems to just go on

19     and on forever, so it's three paragraphs full, as opposed to

09:02 20     the others that are really more snippets.

21          So it I'll knock out the three paragraphs in 251

22     because it just -- it's too hard to follow, it's much longer

23     and under 403.

24          But, basically, the point is, it's not about his home

25     address.

1          And so you can argue the fact that it's only -- it's

2    about discounting the author and comports to convey financial

3    information about the audit, so it's not about the home

4    address.  I think there's still enough in here to be able to

5    make that argument.

6          MR. JONES:  Thank you, your Honor.

7          THE COURT:  Thanks.

8          Listen, I've been struggling, can I say, through the

9    Advisers Act, which has never been a focus of this litigation;

09:03 10   however, it's in there.  But the complaint, as I said before,

11   the second amended complaint does use the word "negligently."

12         However, I don't agree that you can both be negligent

13   and fraudulent, you just can't be both.  D.C. Circuit ruled

14   that recently.

15         So I am trying to figure out how to charge the jury on

16   this, and I guess where I'm struggling, and maybe you can think

17   about it while we're doing it, which is why you don't have it

18   yet, theoretically anyway, they could find some of the

19   statements fraudulent and some of the statements negligent.

09:03 20   And I'm not quite sure how to present that to a jury.  Of

21   course they might find they're not liable at all.

22         Whether or not I need to go through again under the

23   Investment Advisers Act the different statements so that I

24   don't risk having someone say it's an inconsistent verdict.

25         MR. JONES:  Your Honor, it seems we could just ask

   1   them the one question --

   2        THE COURT:  It's impossible -- I don't accept the

   3   SEC's thing that you can both be fraudulent and negligent in

   4   the same swoop.  The D.C. Circuit ruled against that position.

   5        MR. JONES:  Your Honor, we could still ask them:  Do

   6   you find this by *scienter* recklessness or negligence that

   7   defendant, you know --

   8        THE COURT:  I agree with that.  I was thinking of

   9   having two questions.

09:04 10        The issue I have is you could conceivably, as I was

  11   thinking it through, answer "yes" to both.

  12        In other words, you could find, let me just say, that

  13   it was fraudulent that Mr. Voss said he agreed that the drug

  14   was going away, but find that with respect to the rest of it,

  15   it was negligent, the wrong insolvency standard, read closely

  16   enough to see someone's audited, he didn't understand that

  17   other people were going to be doing the clinical trials.

  18        You could conceivably have three that were negligent,

  19   and while it may not be critical right now, it will be critical

09:05 20   for me to understand it when I decide about the penalty stage,

  21   if there is one.

  22        MR. BROOKS:  Your Honor, can I just be heard?

  23        THE COURT:  Yes.

  24        MR. BROOKS:  Or are you done?  I'm sorry, your Honor.

  25        THE COURT:  No.

1          Is the jury here?  Do we know?

2          We don't have to play this all out now, hopefully

3    we'll do it later today, but I'm struggling with that concept.

4          MR. JONES:  Understood, your Honor.

5          MR. BROOKS:  So I think it's like the elephant in the

6    room we're missing, which is these are two entirely different

7    statutes aimed at different harms.

8          THE COURT:  Yes.

9          MR. BROOKS:  So the issue for the first one, the

09:05 10   10b-5, is whether there were fraudulent statements made to the

11   market and then made to the Ligand investors.

12         The other one has nothing to do with Ligand investors,

13   it's whether the statements were negligently made to Father

14   Emmanuel -- Father Lemelson's Amvona Fund investors.

15         THE COURT:  I agree.

16         MR. BROOKS:  They're two totally -- it's not the case

17   that you can just ask, oh, well, was he negligent in making

18   this.  It's a totally separate theory.  It's was he

19   negligent -- was it material and was it negligent to the Amvona

09:06 20   investors.

21         THE COURT:  I agree.  It's ironic.  I was focused on

22   these four questions as if they were written in the Bible

23   somewhere, these four statements; and there's this whole other

24   issue out there that I hadn't focused on.  It's in the

25   complaint, but it was never the focus really of any of my

```
 1    thought process, let's put it that way.  Because I've always --

 2    and the caselaw is quite clear that negligence is different

 3    from fraud.  And there was one judge, my great law clerk found,

 4    in the Southern District who did exactly what you said,

 5    Mr. Jones, which is asked the two separate questions, and

 6    because, the same reason, it matters in terms of the second

 7    stage of the proceedings, if there are any.

 8            So let's get the jury in.

 9            Father Emmanuel I think is up at bat still.

10            Were there any other issues?

11            MR. SULLIVAN:  Yes, the scope of testimony of Robert

12    Fields, who is the second issue witness.

13            THE COURT:  What's the issue?

14            MR. SULLIVAN:  In your order number 210, you said the

15    testimony had to be limited to the scope of deposition and that

16    the SEC had to provide a proffer.

17            The proffer they provided goes far beyond what was

18    disclosed in the deposition, which wasn't --

19            THE COURT:  I can't do that -- you want me to do that

20    now?

21            So when did you get the proffer?

22            MR. SULLIVAN:  I mean, in the middle of trial, your

23    Honor.  We did get it, you know, I think last week.  I'm losing

24    track of days at this point.

25            THE COURT:  It's not that long a trial.  I've seen
```

         1    longer.  This is only our -- anyway.

         2          But what's your big issue, because I'm not going

         3    through it line by line.

         4          MR. SULLIVAN:  The big issue is nothing was really

         5    attributed directly to Robert Fields.  And again, we just have

         6    no, you know, basis to be able to cross-examine this witness

         7    because we had no notice and, you know, there's -- particularly

         8    he's going to testify that he noted a negative reaction to the

         9    market, not mentioned in his deposition.  I thought the

09:08   10    report --

        11          THE COURT:  I thought we always had the stock market

        12    movements.  We did that two weeks ago.  Is that all you're

        13    talking about?

        14          MR. DAY:  Your Honor, we're calling Mr. Fields about

        15    his reactions to Father Lemelson's reports and what he observed

        16    about the stock --

        17          THE COURT:  His reactions, what?

        18          MR. DAY:  His reactions to Father Lemelson's reports.

        19          He read them; he thought they were important.  If

09:09   20    these allegations were true, they were important --

        21          THE COURT:  Wait a minute.  You're going to have an

        22    SEC guy say what his personal reaction was to the report?

        23          MR. DAY:  Outside investor.

        24          THE COURT:  Oh, this is an outside investor.

        25          I thought this was a summary witness, I'm sorry.  I'm

```
 1    sorry.
 2            That's what he said he was going to say.  He's going
 3    to stick with what he wrote in the emails, right?
 4            MR. DAY:  There aren't really any emails that are in
 5    evidence.
 6            THE COURT:  I'll take it one by one, question -- I
 7    don't know what the issue is.
 8            Of course, that's the whole issue about investor, did
 9    he think it was material or not.
09:09 10        MR. SULLIVAN:  Right, your Honor.  We had no notice of
11    this issue --
12            THE COURT:  I thought you did have notice of the
13    witness.
14            MR. SULLIVAN:  No, your Honor.  We filed a motion --
15            THE COURT:  Excuse me.
16            MR. DAY:  Your Honor, this was the whole issue that we
17    talked to the Court about previously, is whether there was
18    unfair surprise about this witness, and your Honor ruled that
19    there wasn't.
09:10 20        THE COURT:  Because why?  I don't remember.
21            MR. DAY:  He was discussed in depositions.
22            THE COURT:  Right.  And then you gave a proffer to
23    what he was going to say.
24            MR. DAY:  Exactly.
25            THE COURT:  All right.  I'll take it question by
```

 1   question.

 2             All right, let's get this jury, it's 10 past.

 3             THE CLERK:  All rise.

 4             (Discussion off the record.)

 5             THE COURT:  By the way, I don't have that proffer.  Do

 6   we have a copy for me?

 7             MR. SULLIVAN:  It was sent via email to me.  I don't

 8   think it's been submitted to the Court.

 9             THE COURT:  I have no way of knowing what it says,

09:11 10   so --

 11             MR. DAY:  Just was -- very briefly, your Honor, it was

 12   basically --

 13             THE COURT:  Can I have it?

 14             MR. JONES:  We can try to get it printed out for you.

 15             (Jury entered the courtroom.)

 16             THE COURT:  Good morning to everyone.

 17             Anybody speak about the case, see anything in the

 18   press, do any research or -- perfect.

 19             Okay, let's finish.

09:12 20             (Discussion off the record.)

 21             MR. SULLIVAN:  Can I proceed, your Honor?

 22             THE COURT:  Yes.

 23             MR. SULLIVAN:  Could we have Exhibit 218.

 24             GREGORY LEMELSON, having been previously duly sworn by

 25   the Clerk, was further examined and testified as follows:

FURTHER DIRECT EXAMINATION

BY MR. SULLIVAN:

Q.   Good morning, Father Lemelson.

A.   Good morning.

Q.   Now, on recross, do you recall Mr. Jones showing you this document, Exhibit 218, press release talking about how GSK had a record second quarter in 2014 with Promacta?

A.   Yes.

Q.   Did you view this press release as inconsistent with your thesis of Promacta?

A.   No.  As I testified yesterday, we modeled Promacta growth through the end of 2015, and we never gave an indication when we thought it would go away.

        But, as we subsequently learned in my seven-year dedication to this, you know, GSK and later Novartis and Ligand created a billion-dollar drug, a blockbuster, of Promacta.  But at the end of the day, they made a blockbuster and a billion dollars on a fully curable disease.  If this was fully known --

        MR. JONES:  Your Honor, we're beyond the question at this point.

BY MR. SULLIVAN:

Q.   Father Lemelson, so my question, what was the date of your first report?

A.   June 16th or 18th.

Q.   Okay.  Of 2014.

```
 1   A.   Yes.

 2   Q.   And so this press release, it happens in July, but it's

 3   referring back to a period of time from March to June of 2014?

 4   A.   That's correct.

 5   Q.   So most of this refers to a period before your reporting

 6   came out, correct?

 7   A.   That's correct.

 8   Q.   And generally, this is talking about Promacta, but did you

 9   review this press release by Ligand as misleading at all?

10   A.   Yes.

11   Q.   Why?

12   A.   Well, what Ligand was doing consistently was putting out

13   false and misleading information.  They were taking things out

14   of their financial statements, with every press release, their

15   statement of operations, their balance sheet, and they were

16   promoting non-GAAP figures.

17         In this case, they're actually promoting intraquarter.

18   They were revenue of a third-party company to make it seem as

19   if they were going to have record sales when, in fact, their

20   earnings were collapsing, 76 percent, and we forecasted that in

21   our report and it came to pass.

22   Q.   Mr. Jones also asked you --

23         MR. SULLIVAN:  You can take this down.

24   Q.   Mr. Jones also asked you about the email that Mr. Voss

25   sent to you where he denied having agreed with you about what
```

1   he said about Promacta.  Do you recall that?

2   A.   Yes.

3   Q.   How long and after your Benzinga interview did Mr. Voss

4   send that to you?

5   A.   I think it was four days later.

6   Q.   Now, Mr. Jones pressed you on the fact that you didn't

7   include that denial, Mr. Voss' denial, in any of your later

8   reports or radio interviews, you know, despite that you had

9   previously testified that you wanted all sides to be heard.

09:15 10         Do you recall him saying that?

11  A.   Yes.

12  Q.   So why didn't you include Mr. Voss' email to you in any

13  later reports?

14  A.   I would never promote a knowing lie and a falsehood.  I

15  knew it immediately to be a lie.  And if somebody had asked me,

16  you know, what he said that was wrong, I would relay he came

17  back and lied, he changed his story.  But to knowingly promote

18  that, it doesn't make any sense.

19  Q.   Now, do you recall yesterday Mr. Jones took some shots at

09:15 20  our friend, Ben Graham --

21  A.   I was shocked.

22  Q.   -- investor.

23  A.   Yeah.

24  Q.   I believe Mr. Jones said that when Mr. Graham was alive,

25  people could still invest in the buggy whip, something like

```
 1    that?
 2    A.   Yes.
 3    Q.   So I went back and looked up that figure of speech, and I
 4    believe what Mr. Jones was saying, his point was that this book
 5    is outdated.
 6    A.   Yes, sir.
 7    Q.   So do you agree that it's outdated?
 8    A.   No.  First of all, I was shocked that Mr. Jones was
 9    criticizing actually the greatest investor and no less the
10    mentor of Warren Buffett.  I would add that though the
11    machinations of markets may change, functions evolve over time
12    and human nature certainly never changes.
13    Q.   You mentioned Warren Buffett.  Who is Warren Buffett?
14    A.   He's widely considered the greatest investor of all time.
15    Q.   Is he still alive?
16    A.   Yes.
17    Q.   And I've read at the top of this book Warren Buffett says
18    it is by far the best book on investing ever written.
19    A.   Yes, that's correct.
20    Q.   Now, do you remember we discussed Ligand's disclosure in
21    its annual report where Ligand says our stock is volatile and
22    it might be subject to sudden drops?
23    A.   Yes.
24    Q.   And on recross -- yeah, recross -- Mr. Jones pointed out
25    that one of the reasons Ligand listed of why its stock might be
```

 1  volatile was the potential for analyst reports.  Do you recall?

 2  A.   Yes.

 3  Q.   And you wrote an analyst report, right?

 4  A.   Yes.

 5  Q.   But during that time period when you were writing your

 6  report, so between June and August 2014, were you the only

 7  analyst writing negative reports about Ligand?

 8  A.   No.  So although we made 950 allegations in business

 9  accounting, securities fraud --

09:17 10  Q.   The question is just were you --

11  A.   There were other analyst reports, including Empire

12  Capital, which criticized the company essentially for

13  substantially similar allegations of ours, and nine other

14  reports making the same allegations, substantially the same.

15            MR. SULLIVAN:  Cara, can we pull up Exhibit 160.

16  Q.   Is this -- Exhibit 160, is this the report or one of the

17  reports that you were just referring to?

18  A.   Yes.

19  Q.   And if you look at the top right, you'll see it's dated

09:18 20  July 22, 2014.

21  A.   Yes.

22  Q.   And that's sort of right in the middle of the time period

23  where you were writing your reports about Ligand in 2014?

24  A.   That's correct.  And Empire is also a much larger company

25  than us.

```
 1   Q.   Empire is a much larger company at the time than Amvona
 2   you mean?
 3   A.   Yes, and Lemelson Capital.  This suggested roughly a 60
 4   percent stock price drop --
 5             MR. JONES:  Objection, your Honor.
 6             THE COURT:  Yes.
 7   BY MR. SULLIVAN:
 8   Q.   Now, this was -- it looks like this report was published
 9   the day before the press release that Ligand issued about
10   Promacta that we just looked at; is that right?
11   A.   Yes.
12   Q.   By the way, do you know what happened to Ligand's stock
13   price on July 22, 2014, the day this report was published?
14   A.   It dropped.
15   Q.   Do you know how much it dropped?
16   A.   I think it was more than 4 percent.
17   Q.   And is that more than the stock price dropped at the close
18   on any of the days of your four challenged statements?
19   A.   Yes.  On -- I think on all of those days the stock price
20   rose or moved immaterially by the close.
21             MR. SULLIVAN:  Now, Cara, can you call out the sort of
22   the quote in title at the top.
23   Q.   So you see here, Father Lemelson, Empire's title, if you
24   will, it says, "If something cannot go on forever, it will
25   stop.  Initiating coverage with a sell, $16 price target."
```

         1              Do you see that?

         2    A.   Yes.

         3    Q.   And do you recall during Mr. Higgins' testimony he was

         4    showed an email that -- where he was discussing why he didn't

         5    want Ligand management to talk to you after your first report,

         6    and one of the reasons he said he was --

         7              MR. JONES:  Your Honor, objection.

         8              THE COURT:  You know what, let him ask the question.

         9              I don't know what the question is.

09:20   10    BY MR. SULLIVAN:

        11    Q.   So Mr. Higgins indicated in the email that we saw that he

        12    was worried if Ligand talked to you, you might put a price

        13    target of $15 on the stock.  Do you remember that?

        14    A.   Yes, I do.

        15    Q.   So would you agree that this is just $1 more than that?

        16    A.   Yes, I agree with that.

        17              And I would say that it called to mind that report for

        18    me that, you know, Enron, WorldCom, Bernard Madoff, all of the

        19    great frauds had, you know, typically overwhelming positive

09:20   20    sell-side analyst coverage days before they collapsed even.

        21              MR. JONES:  Your Honor --

        22              THE COURT:  Yes, I sustain the objection.

        23              But you've got to say something, "objection," "move to

        24    strike," something.

        25              MR. JONES:  Yes, your Honor.  Move to strike.

1          THE COURT:  I strike that.

2          MR. SULLIVAN:  Cara, can you go to the second page?

3          Can we call out the first paragraph.

4    BY MR. SULLIVAN:

5    Q.   So Empire wrote, "Promacta sales grew 42 percent year over

6    year in 2013, which we believe was primarily a result of

7    Promacta's use in hep C patients.  Once the use of interferon

8    therapy in hep C patients noticeably declines (as expected by

9    our industry sources), we expect Promacta sales to also

09:21 10   decrease.  Due to the recent large increase in Promacta sales

11   from its use in hep C patients, we anticipate a comparatively

12   rapid decrease.  We do not believe Ligand's currently approved

13   products or pipeline products will be capable of generating

14   adequate revenues to offset a substantial reduction in

15   Promacta's royalty revenue."

16          Was that similar, not exact, similar to your thesis?

17   A.   It looks like it's copied and pasted out of my reports.

18          MR. SULLIVAN:  Nothing further.

19          THE COURT:  Thank you.  You may step down.

09:21 20   THE WITNESS:  Thank you, your Honor.

21          MR. DAY:  Your Honor, the Commission calls Nicholas

22   Jabbour.

23          DR. NICHOLAS JABBOUR, having been duly sworn by the

24   Clerk, was examined and testified as follows:

25          THE CLERK:  Could you please state and spell your name

 1    and then can you have a seat.

 2              THE WITNESS:  Nicholas Jabbour.

 3              THE COURT:  Why don't you take off your mask so we can

 4    hear you.

 5              Nicholas --

 6              THE WITNESS:  Jabbour, J-a-b-b-o-u-r.

 7              MR. DAY:  Could we switch the monitors.

 8              THE CLERK:  Back to you, okay.

 9                          DIRECT EXAMINATION

10    BY MR. DAY:

11    Q.   Good morning, Dr. Jabbour.

12              Are you a medical doctor, sir?

13    A.   Yes.

14    Q.   And what is your specialty?

15    A.   Organ transplantation.

16              THE COURT:  Speak right into the mic and slowly so we

17    can make sure we understand.

18    A.   Mainly transplant for surgery, but I do liver transplants

19    and pancreatic transplants as well.

09:23 20    Q.   Where did you go to medical school?

21    A.   I did my high school and medical school in Belgium,

22    university in Namur.  I did part of my surgical training in

23    Belgium, then came to New York, did my surgical training in

24    liver transplantation in Pittsburgh where I was on the staff

25    well.

```
 1    Q.   And where do you work currently?

 2    A.   Right now I am chair Department of Surgery at Bay State

 3    Medical Center at University of Massachusetts Medical School.

 4    Q.   Do you know the defendant?

 5    A.   Yes.

 6    Q.   How do you know him?

 7    A.   He was my next door neighbor in Southborough when I was

 8    working at University of Massachusetts.

 9    Q.   And when did you first meet him?

10    A.   I think I moved from Oklahoma to UMass 2010 or January of

11    2011, in that time.  And I bought the house by June 2011.  So

12    around that time.

13    Q.   Are you familiar with the Amvona Fund?

14    A.   Yes.

15    Q.   Were you an investor in the Amvona Fund?

16    A.   Yes.

17    Q.   And did you invest -- or who did you invest on behalf of?

18    A.   Myself, my kids, and my wife.

19    Q.   Do you recall about how much you had invested in the fund

20    in 2014?

21    A.   Pretty much everything I have; I think over $2 million

22    probably.

23         THE COURT:  I couldn't hear that.  How much?

24         THE WITNESS:  Sorry.  Over $2 million.  Everything I

25    had pretty much.
```

```
 1    BY MR. DAY:
 2    Q.   Now, are you still invested in the fund?
 3    A.   I took some money out, but the rest I don't know what
 4    happened to it, it's -- yes, I mean, I guess.
 5              MR. HOOPES:  Objection.
 6              THE COURT:  Well, are you still an investor, sir?
 7              THE WITNESS:  I took only some money out, the rest I
 8    don't know what the value of the money, so how do you define
 9    that?  Yes, I mean --
10              THE COURT:  Was there an objection?  No.
11              MR. HOOPES:  That was an objection.
12    BY MR. DAY:
13    Q.   In 2014, did you know that the Amvona fund had a short
14    position in Ligand Pharmaceuticals?
15    A.   I know what the media know.  Father Lemelson, he sent
16    newsletter on a regular basis and inform us on what the fund is
17    doing.
18    Q.   I want to talk a little bit about a medicine called
19    Promacta.  Do you recognize the medicine Promacta?
20    A.   Not until this case, frankly.
21              MR. DAY:  Sorry, your Honor.
22              THE COURT:  This is my problem, I'm sure, I'm just
23    having a little bit of trouble following -- and you have a
24    little bit of an accent.  I'm just trying to make sure I
25    understand -- I'm trying to understand what you're saying.
```

```
     1              What was the answer to that question?
     2              THE WITNESS:  I never heard of the drugs until I get
     3    called for deposition about Promacta.
     4              THE COURT:  You never heard of the drug.
     5              THE WITNESS:  Before that.
     6    BY MR. DAY:
     7    Q.   So in 2014 --
     8              THE COURT:  Maybe if you repeat just to make sure we
     9    all hear and understand.
09:26 10    BY MR. DAY:
    11    Q.   Okay.  So in 2014, you had never heard of the drug
    12    Promacta?
    13    A.   Correct.
    14    Q.   Okay.  So I gather you did not prescribe it either in
    15    2014?
    16    A.   Never prescribe it 2014 or any time, including up to date.
    17    Q.   In 2014, did you know what -- at the risk of asking an
    18    obvious question, did you know what Promacta was prescribed
    19    for?
09:27 20    A.   Not before this came out about the, you know, the Ligand
    21    issues.
    22    Q.   Are you a hepatologist?
    23    A.   No.  As I mentioned before, I'm a liver transplant
    24    surgeon.  But, as you know, we treat the liver, we replace the
    25    liver when the liver is failing, so we work very closely with
```

1    the hepatologist and every transplant center work in

2    combination with the hepatologist and we treat the patient

3    together.

4    Q.   But you yourself are not a hepatologist, correct?

5    A.   No.

6    Q.   Are you a hematologist?

7    A.   No.

8    Q.   And could you explain to the jury what a hematologist is?

9    A.   Again, in general, because this is public knowledge, a

09:27 10   hematologist is someone who take care of pathology disease such

11   as bone marrow issues, anemia, low platelet count, bone marrow

12   issues.  I assume -- again, that's not my specialty, but that's

13   how I see hematology.

14   Q.   Thank you, Doctor.

15        In 2014, what knowledge, if any, did you have about

16   GSK, GlaxoSmithKline's revenue from the sale of Promacta?

17   A.   None.

18   Q.   What about Ligand's royalty from the sale of Promacta?

19   A.   None.

09:28 20   Q.   Did you have any knowledge of FDA approvals related to

21   Promacta?

22   A.   No.

23   Q.   Where in terms of geographies it was approved?

24   A.   Not really.  Unless you have interest in medication, you

25   would look it up and you will know.  But, in all honesty, 80

1    percent of the drugs we prescribe are FDA approved but not

2    approved for specific indication.  So you can use it for other

3    indication if you wanted to.

4    Q.   And you can look that up from publicly available

5    information?

6    A.   Absolutely.

7              THE COURT:  Let's get to --

8              MR. DAY:  Sure.

9    BY MR. DAY:

09:29 10   Q.   Are you familiar with a drug called Sovaldi?

11   A.   Yes.  I start getting familiar with the drug, not too

12   much, in Belgium when I was head of surgery.  I was involved in

13   transplantation and the drug was new at the time and there were

14   some studies and giving some lectures about it.

15   Q.   In 2014, did you have occasion to prescribe Sovaldi?

16   A.   No.

17   Q.   Did you know in 2014 where Sovaldi was approved in terms

18   of geographies?

19   A.   Not really, because, as I mentioned, I was not prescribing

09:29 20   these drugs, and I was not directly involved in patient care at

21   that time.  I was chairman of surgery.  But I knew what's going

22   on and I would help in surgical issues.

23   Q.   Have you ever heard of a condition called ITP?

24   A.   Yes.  We study this in medical school and sometimes you

25   deal with it surgically.

```
 1   Q.    What type of surgery?

 2   A.    ITP basically is a disease where the red cells get

 3   destroyed by the spleen and you use steroids for it, but

 4   sometimes it doesn't work in everyone and you have to take the

 5   spleen out to help many kids and sometimes adults.

 6   Q.    Is ITP the same thing as hepatitis C?

 7   A.    No, nothing to do with it.

 8   Q.    Is it caused by hepatitis C?

 9   A.    No.

10   Q.    And you knew that in 2014?

11   A.    Yeah, learn this in medical school.

12            MR. DAY:  Let's take a look at Exhibit 1, Cole.  Page

13   7, please.

14   Q.    Do you see the block quote at the top of this page?

15            (Pause.)

16   A.    Yes.

17   Q.    Is your screen on the table working there?

18   A.    No, should I --

19   Q.    It's okay, we've had this problem several times now.

20            (Discussion off the record.)

21   Q.    It's okay.  Are you able to read the document on the big

22   screen?

23            This quote is attributed to chief of abdominal surgery

24   and transplantation major European University hospital.  Do you

25   see that?
```

```
 1   A.   Yes.

 2   Q.   Do you have an understanding of who that is?

 3   A.   I assumed it was me.  I mean, I don't see my name there,

 4   but --

 5   Q.   Okay.  Now, you write in here about Sovaldi and you say,

 6   "I spoke to one of my colleagues, the chief of transplant

 7   hepatology at the largest liver transplant program in the U.S.

 8   regarding the future of hep C treatment."

 9        Do you see that?

10   A.   Correct.

11   Q.   Who is that?

12   A.   Is Dr. Francisco Durazo.

13   Q.   Is he a hepatologist?

14   A.   Yes.

15   Q.   And you write, "He's very impressed by the new drug of

16   Gilead (Sovaldi) in his patients."

17        Do you see that?

18   A.   Yes.

19   Q.   Who asked to you provide this quote?

20   A.   It's not a question of quote.  I think Father Lemelson was

21   working on something and he asked me about hepatitis C and I

22   wrote it up in my own research as I do for anything.  You look

23   at connection, you ask question to people you know and you're

24   connected with, European lecture have plenty of public data

25   that you can look up.
```

1    Q.   Did you ask your colleague about Promacta?

2    A.   Yes, because I was intrigued, as I was in Pittsburgh, it

3    was a largest center in the world at that time, and we were

4    treating a lot of hepatitis C patients.  I was surprised why I

5    never heard of this drug.  So I said maybe I missed something,

6    I will ask some of my colleagues.

7    Q.   I'm sorry, I may have switched gears on you there.

8         You testified a few minutes ago that you didn't know

9    about Promacta back in 2014, right?

09:33 10    A.   That's what I said.

11        When Father Lemelson asked me, that's why I was

12   surprised how come I didn't know about the drug.  And that's

13   why I wanted to find out did I miss something or what's going

14   on basically.

15   Q.   And you're referring to Promacta, not Sovaldi.

16   A.   In a way -- yeah, Promacta because Sovaldi I heard about

17   at a conference at UCN or UCL, my university, and they show up

18   slides, like that; they were very impressed with the results.

19   Q.   Does this quote say anything about Promacta?

09:34 20   A.   No, but I think what's prompted is Promacta in a way.

21   Q.   Understood.

22        Now, at this time, did you know whether Sovaldi would

23   have any impact on sales of Promacta?

24   A.   Of course.  I mean, if Promacta is used to treat a side

25   effect of interferon, which we were using for hepatitis C at

```
      1   that time, and then if you have a new drug and then you don't
      2   have a side effect from the prior drugs, then you have no need
      3   for it.
      4   Q.   Would Sovaldi have -- or did you have an understanding of
      5   whether Sovaldi would affect sales of Promacta for other
      6   indications like ITP?
      7   A.   To be honest with you, these two are independent, it's
      8   nothing to do with each other.  But I know that ITP is not very
      9   common disease.  I mean, our hospital was, like, a thousand bed
09:35 10   hospital and we wrote a paper on ITP and it was only, like, 60
     11   or 80 patients over 10, 15 years period.
     12   Q.   Did you know in 2014 how much revenue GSK received from
     13   ITP's use in -- sorry, Promacta's use in ITP?
     14   A.   No idea.
     15   Q.   Have you heard of aplastic anemia?
     16   A.   Like any physician, yes.
     17   Q.   Same thing as hepatitis C?
     18   A.   No.
     19   Q.   Okay.  Did you know you were going to be quoted in Father
09:36 20   Lemelson's report?
     21   A.   Not really.  We talk a lot.  As I said, he was my next
     22   door neighbor.  You really not assume to be quote in such
     23   public stuff, but of course he probably will use information
     24   and write his own report if he like to, but not being quoted,
     25   quoted with my title.  But I don't see my name either, so --
```

```
 1   Q.   Does this report disclose that you were an investor in the

 2   Amvona Fund at the time of this quote?

 3   A.   Sorry, excuse me, I didn't --

 4   Q.   Does this report say that were you an investor in the

 5   Amvona Fund at the time of this quote?

 6   A.   No, it didn't.

 7   Q.   Let's take a look at Exhibit 31.

 8        This appears to be an email from you to

 9   glemelson@hotmail.com.  Do you see that?

10   A.   Yes.

11   Q.   Do you understand that to be Father Lemelson?

12   A.   Yes.

13   Q.   You're forwarding what appears to be a link to a Forbes

14   article.  Do you see that?

15   A.   Yes.

16   Q.   Let's take a look at Exhibit 26.

17        Is this the article that you were forwarding?

18   A.   Yes.

19   Q.   If you take a moment to skim this, or if you know, does

20   this article talk about Promacta?

21   A.   I did review this article yesterday.  So it raises

22   hepatitis C treatment, but it was about Sovaldi is the family

23   of drugs was originally in the way in our discipline because

24   the treatment we're using, interferon, were not very effective

25   and had a lot of side effects.  So this new drug was very well
```

```
 1    tolerated, was taken to by mouth, and literally lead to
 2    eradication of hepatitis C.  We have seen this already, right
 3    now, if you look at the rate of transplantation for hepatitis C
 4    is much slower right now than before.
 5    Q.   I understand, Doctor.
 6            My question is whether this article was about
 7    Promacta.
 8    A.   As I mentioned, it's about the treatment of hepatitis C.
 9    Promacta is part of the complication of prior drugs,
10    interferon.
11            MR. DAY:  Could we take a look at Exhibit 31.
12            Actually, I'm sorry, Cole, wrong one.
13            Exhibit 33.
14    Q.   This is an email from you to the defendant on June 12,
15    2014.
16            My only question on this is:  Does this appear to
17    contain the language that was quoted in the report?
18    A.   Yes.
19            MR. DAY:  Can we take a look at Exhibit 36.
20    Q.   This is an email from the defendant to a number of people,
21    including, if you look at the last line in the "bcc,"
22    Nicholas.Jabbour@uclouvain.  Do you see that?
23    A.   Yes.
24    Q.   Was that your email address at the time?
25    A.   Yes.
```

1    Q.   The subject is:  "Lemelson Capital Announces Short

2    Position in Ligand Pharmaceuticals, Releases Investment Report

3    Detailing 100 Percent Downside Risk."

4         Do you see that?

5    A.   Yes.

6    Q.   Is this one of the emails you were referring to where the

7    defendant provided information about investments to you?

8    A.   This is two thousand -- sorry, when is it?

9    Q.   2014.

09:39 10   A.   You know, I receive a thousand email; I don't remember the

11   exact detail.  All I know is he would send me information about

12   the fund and in these emails.

13        MR. DAY:  Can we take a look at Exhibit 50.

14   Q.   This is another email, you'll see it has the same email

15   address for you in the "bcc" section.

16        And Father Lemelson writes on June 19th, "Was invited

17   onto Benzinga's Premarket Prep show to discuss the theme of

18   capital allocation."

19        At the end of that paragraph, he says, "includes an

09:40 20   in-depth discussion of WWE and LGND."

21        Do you understand "LGND" to be Ligand?

22   A.   Yes.

23   Q.   So is this another email where Father Lemelson is

24   providing information about the Amvona Fund's investments to

25   you and other investors?

A.    Yes.  Every time he has any media appearance or anything,
he will send.  And I enjoy reading them and learning from them
in a way.

Q.    And you see towards the bottom of this blown-up section he
writes, "Shares of LGND dropped 2 percent during the
interview."

A.    Yes.

Q.    Do you have an understanding of what he meant by that?

A.    I assume every one try to attribute -- I mean causality
between effect and -- action and reaction, which is completely
wrong in the way.

       I think one of the best books I have read is Fooled by
Randomness by Nassim Taleb.  He really -- how random things are
the most general things in life.

Q.    You would agree with me he's attributing the interview to
the 2 percent drop in the stock?

A.    Wrongly or rightly, but he's -- assume probably.  That is
report was good report and people listened to it.  And as I
mentioned, we see this now is covered how many contrary
information and random things happen and attribute to sell or
things we have done or are going to do.  It's unfortunate, but
that's how it is.

Q.    You mentioned that you are -- well, let me clarify.  I
wasn't clear on it earlier.

       Are you still invested in the Amvona Fund?

```
 1                MR. BROOKS:  Objection.

 2                THE COURT:  Sustained.  Asked and answered.

 3                MR. DAY:  Okay.

 4    BY MR. DAY:

 5    Q.   How much money do you have invested in the Amvona Fund

 6    today?

 7                MR. BROOKS:  Objection.

 8                THE COURT:  Asked and answered.

 9                MR. DAY:  Let's take a look at Exhibit 106.

09:42 10   BY MR. DAY:

11    Q.   This is an email from Father Lemelson to you in 2016.  I

12    know this is after the reports in 2014.

13                There appears to be a link or attachment to answers to

14    important investor concerns about Ligand Pharmaceuticals.  Do

15    you see that?

16    A.   Yes.

17                MR. DAY:  Cole, can we go to the second page of this

18    document.

19    Q.   And this appears to be a Q and A, correct?

09:43 20   A.   Yes.

21    Q.   And you see in the first question and answer there's a

22    discussion about ITP and hepatitis C.  Do you see that?

23                MR. BROOKS:  Objection, your Honor.  This is 2016.

24                THE COURT:  Was this an agreed-upon exhibit?

25                MR. DAY:  It is.
```

```
 1              THE COURT:  Overruled.
 2    BY MR. DAY:
 3    Q.   Why were investors asking about ITP and Promacta, if you
 4    know, in 2016?
 5    A.   How would I know?  I mean, I wasn't -- frankly, I was not
 6    interested in knowing, know who was interested.
 7    Q.   Were you one of the investors who asked these questions?
 8    A.   No.
 9              MR. DAY:  I have nothing further at this time, your
10    Honor.
11              MR. HOOPES:  Thank you, your Honor.
12              Your Honor, may we have your permission to do two
13    things, ask if I turn the easel around?
14              THE COURT:  The famous easel, yes.
15              MR. HOOPES:  By now famous easel.
16              And we have just some more inserts to pass to the
17    jury.
18              THE COURT:  Okay.
19              (Discussion off the record.)
20              MR. HOOPES:  May I proceed, your Honor?
21              THE COURT:  Yes.
22                        CROSS-EXAMINATION
23    BY MR. HOOPES:
24    Q.   Good morning, Doctor.  My name is Tom Hoopes.  I represent
25    Father Lemelson.  I'd like to ask you some questions with your
```

1    permission.

2    A.   Go ahead.

3    Q.   So I'm going to try to slow it down a little bit and go

4    back to the beginning of the direct examination and just --

5    you're a medical doctor; is that correct?

6    A.   Yes.

7    Q.   And I'm just going to wait one second, your Honor.

8         I'm sorry we dumped all these exhibits on the ladies

9    and gentlemen of the jury here at one point.

09:46 10      And your education and training to be a doctor, as I

11   understood it, you -- your early high school, medical, and the

12   beginning of your surgery training was in Belgium; is that

13   correct?

14   A.   Correct.  I basically left Lebanon by boat during the war

15   in '76 to finish my education and finish high school and

16   medical school in Belgium.

17   Q.   Okay.  And then, 1987, you left, came to the U.S. for one

18   year but stayed 26 years; is that right?

19   A.   Correct.  I was elected student on the board of medical

09:46 20   school, and every time they have promotion they manage to spend

21   a few months in the U.S. or publishing in the U.S., I said let

22   me go there.

23   Q.   Just to quickly tick through these.

24        You were trained in residency at Lincoln Hospital in

25   the South Bronx and then went to Pittsburgh for a fellowship

```
 1    and were on staff at the University of Pittsburgh; is that

 2    right.

 3    A.   Correct.

 4    Q.   And then you spent 11 years at USC starting a new program

 5    with one of your friends as the associate director and

 6    co-founder of the transplant program at USC; is that correct?

 7    A.   Correct.  Actually, we open up two programs, one at L.A.

 8    hospital for children and one the USC hospital for adults.

 9    Q.   When you say "USC," that's University of Southern

10    California?

11    A.   Correct.

12    Q.   And there you were a co-founder of two new programs; is

13    that right?

14    A.   Correct, correct.

15    Q.   And that's the transplant program.  So that would be

16    transplant for the liver; is that correct?

17    A.   Liver, kidney, and also we started small bowel at general

18    hospital as well.

19    Q.   And so the medical term is "transplantation"; is that

20    correct?

21    A.   We call it abdominal organ transplantation, pretty much

22    include kidney, pancreas, liver, and small bowel.

23    Q.   And after the 11 years at the University of Southern

24    California, you spent four-and-a-half years down in Oklahoma at

25    the Baptist Medical Center there; is that correct?
```

1    A.    Correct.

2    Q.    And then you came from there up to UMass, University of

3    Massachusetts, for two years to help initiate the living donor

4    program; is that right?

5    A.    Correct.

6    Q.    So that would have been roughly 2011 to 2013; is that

7    correct?

8    A.    Correct.

9    Q.    And it was during that period that you met Father

09:48 10   Lemelson; is that correct?

11   A.    Yes.

12   Q.    And you were both living in the Southborough vicinity; is

13   that right?

14   A.    Yes.

15   Q.    And you were neighbors; is that correct?

16   A.    Yes, next door neighbors.

17   Q.    Next door neighbors.  And so you became neighborly and

18   talked as friends; is that right?

19   A.    Yes.  He has small kids also pretty much the same age.  My

09:49 20   kids now are, like, 10 and 12 until one month, and he has kids

21   same age.

22   Q.    And in addition to being friendly, you ended up talking

23   about financial matters; is that correct?

24   A.    Correct.

25   Q.    And eventually, you asked him for help with your own

```
 1   financial matters; is that correct?
 2   A.   Correct.  I mean, we are close friends, and I was under
 3   stress, we're very busy.  I had made some money from selling a
 4   house in California.
 5   Q.   You were a medical doctor, not an investor?
 6   A.   Actually, bad retirement.  My retirement zero from 20
 7   years, the money made from the house is by random.
 8   Q.   Talk a little bit slowly.
 9        You said were you -- characterized yourself as a bad
10   investor.
11   A.   Absolutely.  And the only money I made from selling the
12   house was random.  I bought the house in 2000 in California,
13   sold it by chance in 2006 when I moved to Oklahoma, it almost
14   tripled in price in six years, was unheard of.
15   Q.   So whatever you had saved in your mind, you weren't making
16   any money off of it; is that right?
17   A.   Pretty much.
18   Q.   You eventually, as you said, turned to Father Lemelson to
19   give you a hand to try to do better with your money and your
20   children's money; is that right?
21   A.   Correct.  Help me to understand about investment, stuff
22   like that, and how to invest in stock market and how to -- and
23   he gave me best advice to read The Intelligent Investor.
24   Q.   The Intelligent Investor was one of the books that he sort
25   of turned you onto and you read, right?
```

```
 1   A.    Absolutely.  It was a great book actually for everyone to
 2   read it.  I wish my kids read it.
 3   Q.    Was there one particular first investment that he
 4   recommended to you about a stock called Western Digital?
 5   A.    Yes.  And --
 6   Q.    And was that a stock where you listened to his advice?
 7   A.    Yes.  Actually, even probably before that he was writing
 8   things about investment.  And actually, I enjoyed reading his
 9   writing, he wrote very well, and about understanding values and
10   price and stuff like that.  So --
11   Q.    And this Western Digital stock, was that, in his mind, as
12   he explained it to you, undervalued?
13   A.    At that time, yes.
14   Q.    In other words, he thought it was worth more than it was
15   presently valued for?
16   A.    Exactly.  And that's kind of following, as I said, The
17   Intelligent Investor and Benjamin Graham and teaching about the
18   investing.
19   Q.    The undervalued can be overvalued, right?
20   A.    Yes.
21   Q.    And when you followed his advice with Western Digital, you
22   actually made money; is that right?
23   A.    Made a lot of money, yes.
24   Q.    You made about $380,000; is that right?
25   A.    I don't know the exact amount, but that sounds correct.
```

Q.   And he charged exactly for his advice zero dollars, right?

A.   Yes.

Q.   Now, again, you know, you wouldn't characterize yourself
as an intelligent investor, though you read the book, what was
shorting and what was going long and things like that, would
you say that you had a firm grip on what that meant or were you
largely following Father Lemelson's advice?

A.   Basically following advice but also reading and -- I mean,
actually, I was also interested in reading about investment and
finance, but was not good at it because you see so many
conflicting information, and frankly, I wish I had read this
book 20 or 30 years ago.

Q.   So you say conflicting information, you mean there are
different opinions on what you should do?

A.   Different opinion many times are contradictory and they
don't tell you exactly the basic of investing.

Q.   Now, so you were next door neighbors from 2011 to about
2013, and 2013 then you went off to -- back to Belgium for a
while; is that right?

A.   Yes, I was -- went there to be chief of surgery.  I always
wanted to go back to Belgium, had two small kids, my brother
live in Belgium, my wife from Turkey, we wanted to be close to
family; we didn't have any support here.

Q.   So from 2014 to 2016, before you came back to your present
position, again, what was your title at the hospital in

1   Belgium?

2   A.    I was chief of surgery and transplantation at

3   Universitaires Saint-Luc, which is in Brussels, actually.

4   Q.    And so even though you were there in Belgium from 2013 to

5   2016, you still stayed in touch with Father Lemelson; is that

6   correct?

7   A.    Yes.

8   Q.    And there came a time in early 2014, roughly, June 2014,

9   when you indicated to us that he asked you a question about

09:54 10   Promacta and hep C; is that right?

11   A.    Yes, something related to this fact.

12   Q.    And you did two things, as I understood it.  The first is

13   that you did some of your own research; is that correct?

14   A.    Yes.

15   Q.    But you also decided that you wanted to call somebody that

16   you viewed as more of an expert in that matter; is that right?

17   A.    Yes.  As I mentioned earlier, because I was a little bit

18   intrigued by how come I never heard of it and I'm in this field

19   for so many years.

09:54 20   Q.    And so when you wanted to contact this person, you picked

21   up the phone; is that right?

22   A.    Yes.

23   Q.    And made a phone call.

24   A.    Yes.

25   Q.    And that phone call was from Belgium to a friend of yours

```
 1    in California; is that right?

 2    A.   Yes.

 3    Q.   And his name was Dr. Frank Durazo; is that right?

 4    A.   Yes, Francisco Durazo.

 5    Q.   And am I spelling it right, D-u-r-a-z-o; is that correct?

 6    A.   Correct.

 7    Q.   And he was -- I mean, you had a relationship with him, he

 8    had been a friend and a colleague; is that right?

 9    A.   Yeah, we worked together for almost ten years at USC and

10    he went out, came to Oklahoma, I invite him to give us a

11    lecture, he came to my house, he met my wife and my kids.

12    Q.   And his title when you called him at USC was he was head

13    of something, correct?

14    A.   At USC he was just a hepatologist, but then he left and

15    moved to UCLA and became chief of hepatology at UCLA, which is

16    our competitor in a way at that time.

17    Q.   So he became the chief of that hospital; is that correct?

18    A.   The chief --

19    Q.   Not the hospital, of that program?

20    A.   Of the hepatology program.

21    Q.   So he was somebody that you not only had a relationship

22    with, but you respected his opinion for this issue; is that

23    right?

24    A.   Absolutely.

25    Q.   And you thought he was very knowledgeable in the question
```

1    you were going to ask him; is that right?

2    A.   Yes, absolutely, and he was trained by the father of

3    hepatology at USC, Telfer Reynolds, who was one of the earlier

4    in the field of hepatology.

5    Q.   And hepatology you indicated for the jury is --

6    A.   It's actually studying the liver, disease of the liver,

7    anything related to hepatitis, calling it hepatitis.

8    Q.   So you had a conversation with your friend and colleague

9    who you respected that lasted on the phone maybe five minutes,

09:56 10   ten minutes?

11   A.   Yeah, just to chat how he's doing, asked me how I'm doing,

12   and then I asked him have you -- do you know this drug, and he

13   knew it, but he said he didn't use it.

14   Q.   Promacta we're talking about.

15   A.   Yeah.

16   Q.   You asked:  Do you know Promacta?  And he says, Yes, but I

17   don't use it.

18   A.   Yeah, ask him hepatitis C, have you used drugs, it

19   doesn't -- didn't say anything about it, he said he doesn't use

09:56 20   it.  But, anyway, it's not going to be used because of the new

21   drugs right now, which is the call that I mentioned in the

22   prior exhibits.

23   Q.   And when you say it was not going to be used -- so

24   Promacta, according to this doctor, was not going to be used to

25   treat hepatitis C because there was a whole new class of drugs

```
 1    out; is that right?

 2    A.   But let make clear for the jury.  It's not Promacta that

 3    treat hepatitis C, it's actually treatment of the complication

 4    of the treatment of hepatitis C.

 5    Q.   Yes.

 6    A.   So we use the interferon to treat hepatitis C that then

 7    cause platelet count to go down, then some people will use

 8    Promacta to make the platelet go up.

 9    Q.   So if you're not going to be doing interferon treatment,

10    there's no need for Promacta; is that right?

11    A.   Correct.

12    Q.   And he explained that to you, and you, in turn, relayed

13    that information to Father Lemelson; is that correct?

14    A.   Correct.

15    Q.   And in fact, you relayed it in an email that --

16         MR. HOOPES:  Cara, could you bring up Exhibit 33,

17    please, for the jury.

18    Q.   So we can just very carefully read through this.

19         This is from you to Father Lemelson on June 12, 2014.

20         "Dear Emmanuel, I spoke to one of my colleague, (the

21    chief of transplant hepatology at the largest liver transplant

22    program in the U.S.) regarding the future of hep C treatment.

23    He is very impressed by the new drug from Gilead (Sovaldi) in

24    his patients, it is very well tolerated even in patient with

25    advanced disease (including ones with thrombocytopenia).
```

1    Though the drug is used with or without interferon currently,

2    he expect that in the near future with more drugs close to

3    being approved on the market he sees a shorter treatment cycle

4    without interferon and with even better tolerance.  The only

5    problem he expect in the future is the risk of liver cancer

6    that most likely will not be eliminated even with the cure of

7    hep C."

8            Signed Nicholas Jabbour, chief of abdominal surgery

9    and transplantation major European University Hospital.

09:59 10            That's what you wrote to Father Lemelson on that day,

11   correct?

12           MR. DAY:  Objection, hearsay.

13           THE COURT:  Is this an agreed-upon exhibit?

14           MR. HOOPES:  Yes.

15           THE COURT:  Overruled.

16   A.   Yes.

17   Q.   I'm sorry, that's what you wrote, correct?

18   A.   Correct.

19           MR. HOOPES:  And if you could please, Cara, pull up

09:59 20   from Exhibit 1, page 7.

21   Q.   And if we could look at the quote, it's at the top of

22   Father Lemelson's report issued four days after he received

23   your email.

24           It says, "I spoke to one of my colleagues (the chief

25   of transplant hepatology at the largest liver transplant

1    program in the U.S.)" et cetera, et cetera, basically repeating

2    exactly what you had relayed to him; is that right?

3    A.   Yes.

4    Q.   Now, he didn't quote the name of your colleague in there,

5    correct?

6    A.   Yes.

7    Q.   And he didn't use your name in there personally, correct?

8    A.   Yes.

9    Q.   He said major European University hospital.  There are

10:00 10    probably -- I think last count there were about 44 countries

11    under Europe, so there are a lot of European major -- major

12    European hospitals, right?

13    A.   Yes, actually, even Belgium.  It was not the biggest KUL,

14    the Flemish counterpart is bigger actually than this one.

15    Q.   But it would be fair to say, sir, I would just ask you

16    this, that you were trying to do the right thing in good faith

17    when you called your friend to answer the question, correct?

18           MR. DAY:  Objection.

19           THE COURT:  Sustained.

10:01 20    BY MR. HOOPES:

21    Q.   Well, when you got the information from Dr. Durazo, did

22    you believe that he believed what he was telling you?

23           MR. DAY:  Objection.

24    A.   There's no reason not to believe -- I'm sorry.

25           THE COURT:  Did you believe that he believed.  I'll

```
 1    allow this only as to what Dr. Jabbour's state of mind was.
 2          MR. HOOPES:  Thank you.
 3    A.   Absolutely.  I didn't tell him we're going to -- this
 4    information is for my friend and neighbor who is going to
 5    probably use it in whatever report he's doing.  All I'm asking
 6    him as a physician and friend, what does he think about this,
 7    and there's no reason not to believe him.  He's a friend of
 8    mine.  He's very --
 9          THE COURT:  Okay.  What's the next --
10    BY MR. HOOPES:
11    Q.   And in your mind, you were sharing it with Father
12    Lemelson, you expected him to believe it, too, right?  That was
13    your expectation?
14    A.   Yes.  There's no reason -- I mean, I had no other motive.
15    I was even personally interested to know about this because I
16    didn't know before.  I mean, that's how we're doing all this
17    medical research, that's how we live as a physician, to keep
18    learning things we don't know and dig deeper and find more
19    information.
20    Q.   Did I understand one last thing, sir, when Mr. Day asked
21    you a question, your personal opinion after speaking with
22    Dr. Durazo and based on your own education, training and
23    experience and your own research was that Promacta, as far as
24    hep C treatment was concerned, was going to go away?
25          MR. DAY:  Objection.
```

```
 1                THE COURT:  Overruled.

 2                THE WITNESS:  Can I answer it?

 3                THE COURT:  Yes, you can answer.

 4      A.    Absolutely.  I'm surprised nobody looked what happened

 5      with Promacta now.  We know that hepatitis C because rare now

 6      because new drugs work so well.  We don't use organ from

 7      hepatitis C in non-hepatitis C patient because we can treat

 8      them for hepatitis C.

 9                MR. HOOPES:  May I approach the board, please?

10:04 10          THE COURT:  Yes.

11      BY MR. HOOPES:

12      Q.    So on June 12 --

13                THE COURT:  Even low tech doesn't work sometimes.

14                MR. HOOPES:  Can you believe it?

15                THE COURT:  Let's call IT.

16                MR. HOOPES:  She'd love to come right back up.

17                We have a backup right in the courtroom.

18                Thank you very much.

19      BY MR. HOOPES:

10:04 20   Q.    As far as you were concerned --

21                THE COURT:  You know what, I would read that

22      because --

23                MR. HOOPES:  You know, so I got a C in handwriting,

24      and they can tell I can't write.

25                THE COURT:  What did you just write?
```

```
 1          MR. HOOPES:  "Promacta going away."
 2    BY MR. HOOPES:
 3    Q.   On June 12th of 2004, it was your belief Promacta for hep
 4    C was going away; is that right?
 5    A.   Again, I'm going to repeat the same thing.  The interferon
 6    treatment will go away, and the reason we use Promacta in some
 7    cases, to treat the side effect of interferon.  So we have to
 8    make it clear.  What we're saying here is the treatment with
 9    interferon most likely will go away because the new drugs are
10    so much better and don't have side effects.  And that's what
11    happened now.  I don't think anybody use interferon.  To be
12    honest with you, when I ask friends and call them, nobody use
13    interferon.  Is it being used somewhere else?  I don't know,
14    but much lower than it was, and its effect.
15          MR. HOOPES:  Thanks very much.  That's all I have.
16          MR. DAY:  Permission to approach the easel.
17          THE COURT:  You're going the easel route?
18          MR. DAY:  I am going the easel route at great peril,
19    I'm sure.
20          THE COURT:  You're going to have to really project
21    your voice.
22                      REDIRECT EXAMINATION
23    BY MR. DAY:
24    Q.   Dr. Jabbour, you were asked the questions about Promacta
25    in the hepatitis C space, right?
```

```
 1   A.   Correct.
 2   Q.   And Mr. Hoopes asked you if it was potentially going away
 3   with respect to hepatitis C, right?
 4   A.   Yes.
 5   Q.   And you weren't talking about any other indication, were
 6   you?
 7   A.   No.
 8             (Pause.)
 9   Q.   Dr. Jabbour, is interferon used anywhere other than --
10             THE COURT:  Why don't you read that, it's just --
11             MR. DAY:  Sorry.  "In hep C only" is what I wrote on
12   the easel.
13   A.   Frankly, I don't know the answer.  I'm sure, like any
14   other drug, is probably used somewhere else.  I don't use it in
15   something else, so I don't know.
16   Q.   So, in 2014, you don't know whether interferon was still
17   being used in, say, areas outside the United States.
18   A.   Again, I don't know.  You asked me for hepatitis C or for
19   other indications?
20   Q.   Sorry, I was asking about interferon for hepatitis C.  Was
21   it used anywhere?
22   A.   In the past it's been used, I assume, everywhere for
23   treatment of hepatitis C.
24   Q.   In 2014, was it used anywhere else?
25   A.   I will assume, but I don't know.
```

```
 1              THE COURT:  If you don't know, don't guess.
 2              THE WITNESS:  How would I know?
 3              THE COURT:  The jury asked:  Is Sovaldi now generic?
 4              THE WITNESS:  To be honest with you, your Honor, I
 5    don't know.
 6              MR. DAY:  Can you pull up Exhibit 33, Cole?
 7    BY MR. DAY:
 8    Q.   Now, you write here that Sovaldi is very well tolerated
 9    even in patients with advance disease including ones with
10    thrombocytopenia.
11              Do you see that?
12    A.   Yes.
13    Q.   Sovaldi is used to treat thrombocytopenia.  Do you see
14    that?
15    A.   Yes.
16    Q.   And then you go on to write, "The drug is used with or
17    without interferon."
18              Do you see that?
19    A.   As I mentioned before, on the article, what my friend was
20    telling me.  Early on it was used with or without.  But when
21    you switch from one family of drugs to the other, many times
22    you don't switch 100 percent, you try a little bit with
23    something that is standard, then you can use free.
24    Q.   And that could go on for a while after a new drug is
25    approved, right?
```

    1    A.    Depends on the results.  If the results are so
    2    outstanding, sometimes even we stop the trial if things are so
    3    much better.
    4    Q.    You don't know one way or the other with Sovaldi though,
    5    right, in 2014?
    6    A.    I know from the data they were impressive.  That's what my
    7    friend told me, that's what my university was telling me,
    8    that's what the studies were showing at the time.
    9    Q.    I understand.  But my question is whether you knew one way
10:09 10    or another in 2014 how quickly Sovaldi was being adopted
   11    anywhere in the world?
   12    A.    Nobody knows, but it could be adopted if it's so much
   13    better.
   14    Q.    Let's take a look at Exhibit 26.
   15          At the end of the first paragraph, it says, Since --
   16    referring to Sovaldi being approved -- "Since then, there has
   17    been a constant din that Sovaldi is just too expensive to
   18    afford."
   19          Do you see that?
10:10 20    A.    Yes.
   21    Q.    So Sovaldi was too expensive for some patients in 2014?
   22    A.    Many drugs were too expensive for patients.
   23    Q.    Do you know how much revenue GSK had from Promacta back in
   24    2014?
   25          MR. HOOPES:  Objection, asked and answered.

```
 1                THE COURT:  Sustained.
 2     BY MR. DAY:
 3     Q.   Any reason to believe it wasn't in the couple hundred
 4     million dollars?
 5                MR. HOOPES:  Objection.
 6                THE COURT:  Do you know one way or another?
 7                THE WITNESS:  I have no idea, frankly.
 8     BY MR. DAY:
 9     Q.   Do you know whether Novartis reported $532 million of
10:11 10     Promacta sales recently?
11                MR. HOOPES:  Objection.
12                THE COURT:  Sustained.
13     BY MR. DAY:
14     Q.   You were asked about advice you received from Father
15     Lemelson back in I think it was 2012, 2013, Western Digital.
16     Do you remember that?
17     A.   Yes.
18     Q.   You thought that was good advice?
19     A.   Yes.
10:11 20     Q.   And I think you also testified that you invested all of
21     your money with Father Lemelson; is that right?
22     A.   Pretty much.
23     Q.   What happened to your investment in 2020?
24                MR. HOOPES:  Objection.
25                THE COURT:  In what?
```

```
 1              MR. DAY:  Sorry.

 2              THE COURT:  In what?

 3              MR. DAY:  Investment in the Amvona Fund.

 4              MR. HOOPES:  Objection.

 5              THE COURT:  I'm not sure if you answered this.

 6          Do you know what happened?

 7              MR. HOOPES:  He did.  He said he didn't know, but you

 8      also I believe ruled that this was present day was not coming

 9      in.

10:11  10          THE COURT:  Yes.

11              MR. DAY:  Counsel opened the door to this by

12      suggesting that it's a good investment.

13              THE COURT:  Sustained.  I'll sustain it about today.

14              MR. DAY:  I have nothing further, your Honor.

15              THE COURT:  Another juror question.

16          Uh-oh, questions.

17          So how generally would a doctor find out about

18      industry standards, for example, a major -- or a major

19      treatment or methods that change from the normal use, for

10:12  20      example, New England Journal of Medicine.

21              THE WITNESS:  I mean, in general --

22              THE COURT:  Whoever wrote this, did I get -- okay, go.

23              THE WITNESS:  I mean, medicine and treatment are

24      always evolving.  We see vaccine, even now the vaccine for

25      COVID is not the end of what we use right now.
```

1            So when have you a new treatment, you present the

2    studies in medical meetings, there's regional meeting and

3    national meeting and international meetings.  They're published

4    in medical journals.  There's probably thousands of medical

5    journals, and you can access them on the internet, actually.

6    You just Google them.  Some of them you have to pay to get

7    access to it.  But me, at university, have access to most of

8    the journals, and that's how you start reading about the drugs

9    and stuff.

10:13 10          Most of the company when they use new treatment, they

11   get approval by the FDA so they can sell it.  So they do these

12   studies that fulfill the requirement of the FDA, and then they

13   publish the results as they go.  That's why we see them right

14   now, for example, the COVID for the kids, Pfizer have 2,500

15   kids --

16          THE COURT:  Let's just stick to Sovaldi.

17          All right.  What's the next question?

18          MR. DAY:  I have nothing further, your Honor.  That

19   was from the jury.

10:13 20          THE COURT:  Doctor, thank you for coming in.

21          THE WITNESS:  Can I just leave?

22          THE COURT:  You're welcome to stay.

23          THE WITNESS:  No, no, I have to go back to work.  I

24   don't want to stay, thank you.

25          MR. DAY:  Your Honor, the Commission calls Robert

```
 1   Fields.
 2            (Pause.)
 3            THE COURT:  We can stand and stretch, always a good
 4   thing to do.
 5            (Pause.)
 6            ROBERT M. FIELDS, having been duly sworn by the Clerk,
 7   was examined and testified as follows:
 8            THE CLERK:  Could you please state and spell your name
 9   for the record.
10:16 10          THE WITNESS:  Robert M. Fields, R-o-b-e-r-t, last name
11   F-i-e-l-d-s.
12            THE CLERK:  Thank you.  You may be seated.
13                          DIRECT EXAMINATION
14   BY MR. DAY:
15   Q.   Good morning, Mr. Fields.
16            Where do you work, sir?
17   A.   Cardinal Capital Management in Greenwich, Connecticut.
18   Q.   What is Cardinal Capital Management?
19   A.   It's a fundamentally oriented asset manager who manages
10:16 20   today a little over $5 billion in assets.
21   Q.   And what is your role at Cardinal?
22   A.   Currently I am a partner and portfolio manager at the
23   firm.
24   Q.   What does that mean on a day-to-day basis?
25   A.   I am both responsible for analyzing companies directly
```

          myself, as well as participating in a unanimous process with

          the three other portfolio managers to decide which stocks to

          buy and sell.

     Q.   So you provide essentially investment advice to the fund?

     A.   That's correct.

     Q.   What was your role at Cardinal in 2014?

     A.   In 2014, I was a senior analyst at the firm.

     Q.   What does that mean?

     A.   We have historically had both junior and senior analysts.

     The senior analysts are simply the more experienced, usually

     following larger positions for the firm.

     Q.   I should have asked before, when did you join Cardinal

     Capital?

     A.   April of 2013.

     Q.   Could you tell the jury about your educational history.

     A.   Yes.  I'm an undergraduate of Ball State University in

     Indiana in 1993, and I have a master's in business

     administration from the Wharton School at the University of

     Pennsylvania.  I graduated in 2000.

     Q.   After you obtained your MBA, where did you go to work?

     A.   I went to work for a private equity fund in Teaneck, New

     Jersey, by the name of BCI Partners.

     Q.   What's a private equity fund?

     A.   They manage money to invest in private companies for

     limited partners over a fixed duration.  Generally the funds

 1  have a 10-year life.

 2  Q.   And when did you leave the private equity firm?

 3  A.   Nine months later.

 4  Q.   Okay.  And what year was that?

 5  A.   2000.

 6  Q.   Okay.  What did you do between then and when you joined

 7  Cardinal Capital in 2013?

 8  A.   From 2000, early 2001 to early 2006, I worked for an

 9  individual by the name of Michael F. Price, who was a

10:18 10  well-known investor and self-made millionaire who opened MFP

11  Investors, his family office.  I was responsible for general

12  equity research as well as distressed investing during my time

13  as an analyst there.

14       From 2006 to 2010, I was head of research and trading

15  for a fund in Greenwich, Connecticut, which was an activist

16  fund.  We had a concentrated portfolio of eight to ten stocks,

17  and a partner at that firm for those four years.

18  Q.   So that took you through 2010?

19  A.   Yes.

10:19 20  Q.   Okay.  And then from 2010 to 2013?

21  A.   2010 to 2012, I had my own fund with a partner.  We

22  managed roughly $50 million focused on -- we were generalists

23  focused on equities.

24  Q.   And then from when you left -- or stopped working with

25  your own fund until you joined Cardinal, what did you do?

1    A.    For that remaining year before joining Cardinal, in 2013,

2    I sold my half of the partnership to my partner, left to

3    purchase a business with another partner, and then after

4    purchasing that business, he runs it day to day, I went and

5    took a job as a senior analyst at Cardinal Capital Management.

6    Q.    Now, you mentioned some work on distressed assets I

7    believe.  What is that?

8    A.    So during my time working for MFP Investors, I worked on a

9    number of distressed funds from utilities to transportation and

10:20 10   insurance and invested throughout the capital structure both

11   equities, preferred stock, bonds, and bank debt.

12   Q.    And distressed assets, does that involve companies that

13   are bankrupt or insolvent?

14   A.    Both.

15   Q.    Did you come to have an understanding of bankruptcy and

16   insolvency as a result of your work?

17   A.    I believe I have a strong perspective on it, yes.

18   Q.    Okay.  I want to talk about Ligand Pharmaceuticals.  Was

19   Cardinal Capital -- or did Cardinal Capital have an investment

10:21 20   in Ligand in 2014?

21   A.    We did.  I believe we made the investment in late 2013.

22   Q.    How big an investment?

23   A.    I don't recall.  For our fund, a large position would be 4

24   percent of the overall portfolio, so it would be less than

25   that.

          1    Q.   And about how much is 4 percent of the portfolio back in
          2    2014, ballpark?
          3    A.   We managed roughly two to two-and-a-half billion dollars
          4    depending on the exact time period, so 4 percent would be $80
          5    million.
          6    Q.   I'm sorry, 80 or 8?
          7    A.   A 4 percent position would be roughly an $80 million
          8    position back then.  I don't remember specifically what size
          9    Ligand was.
10:21    10    Q.   Is Cardinal still invested in Ligand?
         11    A.   We are today.  We have not been continuously invested it
         12    since that time.
         13    Q.   So there were points between 2014 and the current time
         14    when you sold positions in Ligand?
         15    A.   We exited the position early this year and reentered in
         16    the third quarter.
         17    Q.   And when you exited the position, was that a profitable
         18    investment?
         19    A.   Yes.  We had a 35 percent compounded IRR over
10:22    20    seven-and-a-half years.
         21    Q.   What's IRR?
         22    A.   It's our annualized rate of return.  So we made 35 percent
         23    a year for seven-and-a-half years.
         24    Q.   Let's shift gears and talk about the defendant, Father
         25    Lemelson.

1            When did you first hear of him?

2            MR. SULLIVAN:  Objection, your Honor.

3            THE COURT:  Overruled.

4            MR. SULLIVAN:  This goes to the scope issue we raised

5    this morning.

6            THE COURT:  Overruled.

7    BY MR. DAY:

8    Q.   You can answer the question, sir.

9    A.   I became aware of the defendant when the first report was

10   filed in 2014.

11   Q.   And that was June 16, 2014?

12   A.   I believe that's correct, yes.

13   Q.   Okay.  Did you follow his coverage of Ligand during 2014?

14   A.   There were five or six reports that I saved copies of,

15   made comments on at the time, and scanned into our research

16   system.  So, yes, I did follow -- it was a combination of

17   interviews, press releases, and reports released on different

18   sources.  I don't remember specific exact the source.

19   Q.   Okay.  And did you listen interviews that Father Lemelson

20   gave?

21   A.   I listened to one, maybe two on Benzinga.

22   Q.   Was one of those June 19, 2014?

23   A.   I believe that was the first one that was done, yes.

24   Q.   And you listened to it?

25   A.   I did.

1   Q.   Okay.  Do you recall that Father Lemelson made claims

2   about the drug Promacta?

3   A.   I remember one specific statement, yes.

4   Q.   Okay.  What statement do you remember?

5   A.   That he had spoken to the investor relations at the

6   company and that, quote, Promacta was going away.

7   Q.   Did you agree with that based on your knowledge of

8   Ligand's business?

9   A.   No.

10:24 10   Q.   Would it have been important to you as an investor in

11   Ligand if Promacta was, in fact, going away?

12   A.   Very much so.

13   Q.   Why?

14   A.   Promacta made up the majority of the current revenue of

15   the company, was the largest source of cash flow for the

16   business.

17   Q.   Would it have influenced your investment decision if

18   Promacta was, in fact, going away?

19   A.   Absolutely.

10:24 20   Q.   Same reason?

21   A.   Yes.

22   Q.   Do you recall Father Lemelson making claims about a

23   company called Viking Therapeutics?

24   A.   I do.

25   Q.   And what do you recall about those claims?

```
 1   A.   I believe in one of the reports it was referred to as a
 2   shell game.
 3   Q.   What else do you remember about Viking Therapeutics?
 4   A.   So Viking Therapeutics was a counterparty for a licensing
 5   agreement to Ligand where they carved out a number of programs,
 6   licensed them to Viking which intended to go to a public
 7   offering to advance the development of those projects.  Those
 8   contracts were filed publicly, the economic arrangements
 9   between the two companies were filed publicly, and ultimately,
10   Viking was given the go ahead begin developing those products.
11   Q.   If Viking had, in fact, been a shell -- well, let me back
12   up.
13        What is your understanding of what it would mean if
14   Viking were a shell?
15   A.   That it would be devoid of any assets of any material
16   value.
17   Q.   If that had been true, would that have been important for
18   you to know as an investor in Ligand?
19   A.   Yes.
20   Q.   Why?
21   A.   The potential economic royalties that Ligand can receive
22   from Viking numbers in the multiple billions of dollars.  Now,
23   that's well into the future, but it's potentially an extremely
24   significant source of economic value for Ligand.
25   Q.   How is Viking doing today?
```

```
 1              MR. SULLIVAN:  Objection, your Honor.
 2              THE COURT:  Sustained.
 3    BY MR. DAY:
 4    Q.   Do you recall Father Lemelson making some claims about
 5    Ligand's solvency?
 6    A.   Yes.
 7    Q.   What do you recall about that?
 8              MR. SULLIVAN:  Objection, your Honor.
 9              THE COURT:  Overruled.
10    A.   I believe there were two points, one pre and one post a
11    large convertible bond offering that the company did that the
12    potential insolvency for the business was referred to.
13    Q.   In what way?
14    A.   One post the bond offering was referring to a ratio of the
15    debt raised to the current equity account balance of the
16    company on their financial statements, which is nonsensical
17    because --
18              MR. HOOPES:  Objection, your Honor.
19              THE COURT:  Sustained.
20              What's the next one?
21    BY MR. DAY:
22    Q.   Did Father Lemelson claim that Ligand was insolvent?
23    A.   I believe the comment that I read was that any potential
24    future distress would cause it to be insolvent.  But I don't
25    remember entirely.
```

```
 1    Q.    Would it have been important for you as an investor to
 2    know the status of Ligand's solvency in 2014?
 3    A.    Yes.
 4    Q.    Why?
 5    A.    If it's insolvent, the equity is likely to be worthless.
 6    Q.    Do you believe that Ligand was insolvent in 2014?
 7          MR. SULLIVAN:  Objection, your Honor.
 8          THE COURT:  Sustained.
 9    BY MR. DAY:
10    Q.    You mentioned a bond offering in 2014.  So that's Ligand
11    raised money through the bond offering?
12    A.    Ligand raised a convertible bond -- issued a convertible
13    bond to raise in excess of $200 million.  I don't remember the
14    exact figure they entered after the green chute.
15    Q.    As an investor, did you view the bond offering a good
16    thing or a bad thing?
17          MR. SULLIVAN:  Objection, your Honor.
18          THE COURT:  Overruled.
19    A.    It was quite positive for the liquidity of the company.
20    Q.    Can you explain to the jury what you mean by that?
21    A.    So two sources of liquidity for a public company in
22    general --
23          THE COURT:  He's not called as an expert.
24          So why did it matter to you, the debt offering?
25          THE WITNESS:  It provided the company with significant
```

```
 1    source of liquidity.
 2    BY MR. DAY:
 3    Q.   Did you talk to Ligand's management about Father
 4    Lemelson's reports?
 5    A.   We did.
 6    Q.   And --
 7              THE COURT:  "We" means you did?
 8              THE WITNESS:  I did, yes.
 9              THE COURT:  You personally did.
10              THE WITNESS:  I personally did, yes.
11              THE COURT:  Okay.
12    BY MR. DAY:
13    Q.   And about how many occasions in 2014, if you recall?
14    A.   Specifically about his reports, maybe a half a dozen.
15    Q.   Okay.  Why did you talk to management about Father
16    Lemelson's reports?
17    A.   We have a fiduciary duty to our clients to manage money in
18    their best interest.  Any time potential negative news comes
19    out for a company, we are required under our investment
20    management contracts to fully research any allegations to make
21    sure whether we agree or disagree with them.
22    Q.   In your view, did Father Lemelson's reports have an effect
23    on Ligand's stock price?
24              MR. SULLIVAN:  Objection.
25              THE COURT:  Sustained.
```

```
 1    BY MR. DAY:
 2    Q.   What happened to Ligand's stock price over the course of
 3    the summer of 2014?
 4    A.   From memory, the day the first report was released the
 5    stock was down 6 or 7 percent.
 6    Q.   And what about over the course of the summer, do you
 7    recall?
 8    A.   It continued to be weak.  I don't remember numerically how
 9    much the stock was down over the course of the year.
10    Q.   If you remember, was there any other bad news about Ligand
11    during the course of that summer?
12    A.   From memory, no.
13         MR. DAY:  Thank you, Mr. Fields.  I have nothing
14    further.
15         MR. SULLIVAN:  May I, your Honor?
16         THE COURT:  Yes.
17                        CROSS-EXAMINATION
18    BY MR. SULLIVAN:
19    Q.   Good morning, Mr. Fields.  My name is Brian Sullivan, and
20    I represent Father Lemelson in this case.
21         You just testified that you weren't aware of any bad
22    news about Ligand in the summer of 2014; is that correct?
23    A.   I don't remember any.
24    Q.   So you're not aware of a report in July 2014 from a
25    company called Empire?
```

|   |   |
|---|---|
| 1 | A.  No. |
| 2 | Q.  Okay.  And you're not aware that the stock price went down |
| 3 | over 4 percent that day? |
| 4 | A.  No. |
| 5 | Q.  Okay.  And are you aware of another report issued by the |
| 6 | same company in August 2014? |
| 7 | A.  No, I'm not familiar with that firm. |
| 8 | Q.  And so you're not aware that the price of Ligand stock |
| 9 | went down about a percent that day? |
| 10:31 10 | A.  No. |
| 11 | Q.  Are you familiar with a Janet Yellen? |
| 12 | A.  Janet Yellen? |
| 13 | Q.  Yes. |
| 14 | A.  Yes. |
| 15 | Q.  And do you know what her position was in 2014? |
| 16 | A.  Secretary of Treasury. |
| 17 | Q.  I think she was on the Federal Reserve board, but -- |
| 18 | A.  Okay. |
| 19 | Q.  Do you recall a statement in 2014, in July, about biotech |
| 10:32 20 | stocks being substantially stretched at the time? |
| 21 | A.  No. |
| 22 | Q.  You don't know that the stock price for Ligand went down |
| 23 | significantly the day that Janet Yellen and the federal board |
| 24 | of reserve made those statements? |
| 25 | A.  No. |

```
 1   Q.   Sorry, could you just answer that question.

 2   A.   I apologize, no.

 3   Q.   I apologize, I went a little lengthy on the question.

 4        You testified that you reached out to Ligand

 5   management with your concerns regarding Father Lemelson,

 6   correct?

 7   A.   Yes.

 8   Q.   And his reports?

 9   A.   Correct.

10   Q.   And they told you, they being Ligand management, told you

11   that they thought Father Lemelson's reports were wrong?

12   A.   We asked them specific questions, but that's the general

13   sense, yes.

14   Q.   That was important for you to hear from Ligand management,

15   correct?

16   A.   We were verifying our opinion.

17   Q.   Are you aware that other investors of Ligand sent

18   communications to Ligand management requesting that they

19   respond publicly to Father Lemelson's reports?

20        MR. DAY:  Objection.

21        THE COURT:  Sustained.

22   BY MR. SULLIVAN:

23   Q.   Ligand didn't make any public rebuttal, to your knowledge,

24   did they, to Father Lemelson's reports?

25   A.   They did not.
```

```
 1    Q.   You're aware that companies cannot share information with
 2    one investor that they don't share with others, right?
 3    A.   Under regulation FD, that's correct.
 4    Q.   And that's the fair disclosure regulation?
 5    A.   Correct.
 6    Q.   Didn't Ligand tell you information in rebuttal of Father
 7    Lemelson's reports that it didn't tell other investors?
 8              MR. DAY:  Objection.
 9              THE COURT:  Sustained.
10    BY MR. SULLIVAN:
11    Q.   Is it fair to say you disagreed with Father Lemelson's
12    opinion regarding Ligand's insolvency?
13    A.   Correct.
14    Q.   But you knew from reading his reports that Father
15    Lemelson's opinion was based on backing out intangible assets
16    from Ligand, correct?
17    A.   The ratio that I remember was comparing the new debt
18    offering to the equity balance on the balance sheet.
19    Q.   You don't recall that it said tangible equity?
20    A.   I did not.
21    Q.   And would you choose to use the metric of a debt to
22    tangible equity to assess a company?
23    A.   No.
24    Q.   And you personally in your analysis, you place value on
25    Ligand's intangible assets, correct?
```

```
  1   A.    Correct.

  2   Q.    And you're free to do that, right?  In your judgment, I

  3   mean, in this country you're free to have that opinion?

  4              MR. DAY:  Objection.

  5              THE COURT:  Sustained.

  6   BY MR. SULLIVAN:

  7   Q.    Well, it's your opinion that Ligand's intangible assets

  8   have value, correct?

  9              MR. DAY:  Objection, mischaracterizes the testimony.

10:35 10           THE COURT:  Is that your opinion?

 11              THE WITNESS:  Based on my analysis, yes.

 12   BY MR. SULLIVAN:

 13   Q.    But don't you agree that someone should be allowed to have

 14   the opposite opinion if they want?

 15              MR. DAY:  Objection.

 16              THE COURT:  Sustained.

 17   BY MR. SULLIVAN:

 18   Q.    On -- you said -- you testified that you listened to a

 19   June 19, 2014 interview from Father Lemelson on Benzinga?

10:35 20   A.    Correct.

 21   Q.    Do you recall on the morning of June 20, 2014 that you

 22   asked Matt Foehr about the statement that Ligand's IR firm

 23   basically agreed Promacta was going away?

 24   A.    I remember having a conversation with Matt.  I don't

 25   remember the exact timing.
```

```
 1    Q.   And do you remember that was June 20th, the day after the
 2    interview was published?
 3    A.   Again, I don't remember the specific timing.
 4    Q.   Okay.  But you did have a call with Matt Foehr, right?
 5    A.   I had communication with Matt Foehr.  I don't remember if
 6    it was a call or email or group meeting.
 7    Q.   And did Matt Foehr tell you that it was a
 8    misrepresentation of a conversation that Father Lemelson had
 9    with the IR firm?
10:36 10  A.   Something to that effect, yes.
11    Q.   And that was important for you to hear, right?
12    A.   We wanted to verify our opinion.
13    Q.   And that's all you needed to hear, was a denial from
14    Ligand, right?
15    A.   No.
16    Q.   If they didn't deny it, it would have been important to
17    you, though, correct?
18    A.   Correct.
19    Q.   And again, that denial wasn't publicly made, was it, by
10:37 20  Ligand?
21         (Pause.)
22    Q.   Let me reframe the question.
23         Ligand management never publicly issued -- never
24    issued a public statement denying the veracity of Father
25    Lemelson's June 19th statement, did they?
```

1    A.   I'm not aware of any public statements from the company in

2    regards to anything published by the defendant.

3    Q.   And so you received that information from Ligand

4    management in a conversation between you and Matt Foehr,

5    correct?

6    A.   I don't remember the style of communication, but I

7    remember that we did communicate on the topic.

8    Q.   Okay.  And as a result of being told that, Cardinal

9    Capital began buying more Ligand stock, didn't they?

10:37 10        MR. DAY:  Objection.

11        THE COURT:  Overruled.

12   A.   We -- we considered several sources of information,

13   including conversations with the management, so it was not

14   based solely on that conversation.

15   Q.   Not based solely, but it was a contributing factor in

16   Cardinal Capital's decision to go, in fact, buy more stock in

17   Ligand in June of 2014, correct?

18   A.   To clarify, we have two types of purchases in our firm,

19   one is fundamentally wanting to raise the position and the

10:38 20   other is new accounts being opened that is not a buy or sell

21   decision on our part.

22   Q.   Respectfully, Mr. Field, it's a yes-or-no question.

23        You got this information in June 2014.  Did Cardinal

24   Capital start buying more stock in Ligand?

25        MR. DAY:  Objection.

```
  1              THE COURT:  Overruled.
  2    A.    I don't remember.
  3    Q.    Do you remember telling Matt Foehr that you did?
  4    A.    No.
  5    Q.    Did anyone at Ligand ever tell that you Mr. Voss,
  6    Mr. Foehr, and Mr. Higgins had a conversation on June 18, 2014
  7    about Mr. Voss' call with Father Lemelson?
  8    A.    I don't remember.
  9    Q.    And did anyone at Ligand ever tell you that shortly after
10:39 10   Father Lemelson's June 19, 2014 Benzinga interview, Mr. Voss,
 11    Mr. Foehr, and Mr. Higgins had another call discussing the June
 12    18, 2014 conversation?
 13    A.    I don't remember.
 14    Q.    Did anyone at Ligand ever tell you that following these
 15    conversations --
 16              THE COURT:  I'm confused by the questioning.
 17              The call with one another or an earnings call?
 18              MR. SULLIVAN:  The call between Mr. Voss and Father
 19    Lemelson.
10:39 20             THE COURT:  Start again.
 21              MR. DAY:  Objection, foundation.
 22              THE COURT:  I just need the question to be clear.
 23    BY MR. SULLIVAN:
 24    Q.    Did anyone ever -- did anyone at Ligand ever tell that you
 25    following the conversations between Mr. Voss, Mr. Foehr, and
```

1    Mr. Higgins that discussed Mr. Voss' conversation on June 18,

2    2014 with Father Lemelson that Mr. Higgins wrote an email

3    telling Mr. Voss that he had left Father Lemelson with the

4    impression of a tacit agreement?

5              MR. DAY:  Objection.

6              THE COURT:  Sustained.

7              MR. DAY:  Foundation.

8              MR. SULLIVAN:  No further questions, your Honor.

9                        REDIRECT EXAMINATION

10   BY MR. DAY:

11   Q.   Mr. Fields, just one last question for you.

12             THE COURT:  There was a juror question that I don't

13   really understand.

14             MR. DAY:  Okay.

15             THE COURT:  I'm going to reframe it.

16             You talked about a fiduciary duty.  What did you mean

17   by that?

18             THE WITNESS:  Fiduciary responsibility simply means we

19   have to act in the best interest of our clients.

10:41 20          THE COURT:  Thank you.

21   BY MR. DAY:

22   Q.   And as a result of your fiduciary duty to your clients,

23   you have to check out negative information about a company?

24   A.   We have to check out all information, but, yes, including

25   negative information.

1    Q.   You were asked about the ratio that Father Lemelson used.

2    A.   Correct.

3    Q.   And I think you said that you don't use that ratio?

4    A.   Correct.

5    Q.   Why is that?

6              MR. SULLIVAN:  Objection.

7              THE COURT:  Overruled.  You opened the door.

8              Go ahead.

9    A.   To compare a liability to a balance that is already net of

10   liabilities is nonsensical to me.

11   Q.   Can you explain what that means for the jury?

12   A.   When you calculate the equity balance on a balance sheet,

13   you take total assets less total liabilities equals total

14   equity.  So to then go back and compare that result against one

15   of the components of the calculation doesn't have predictive

16   value in my mind.

17   Q.   Does it tell you anything about the health of the company?

18   A.   No.

19             MR. SULLIVAN:  Objection.

20             THE COURT:  Sustained.

21             MR. DAY:  Nothing further, your Honor.

22             THE COURT:  Anything else?

23             MR. SULLIVAN:  Nothing further, your Honor.

24             THE COURT:  Thank you.

25             MR. DAY:  Your Honor, the Commission rests.

```
 1            MR. HOOPES:  Your Honor, we have a motion for your

 2    consideration.

 3            THE COURT:  Yes, but you'll just hand it -- is it in

 4    writing?

 5            MR. SULLIVAN:  Yes.

 6            THE COURT:  And then you'll call --

 7            MR. DAY:  Your Honor, we didn't know about this and we

 8    haven't received a copy of it until right now.

 9            THE COURT:  Any witnesses?

10            MR. HOOPES:  Pending resolution of that, no witnesses,

11    your Honor.

12            THE COURT:  So the evidence is closed?

13            MR. HOOPES:  Yes, your Honor.

14            THE COURT:  Okay.

15            So I'm going to send you home.

16            What we're going to do is go -- tomorrow we're going

17    to have closing arguments and a jury charge.  We will sit from

18    9:00 until 5:00 unless that creates a huge hardship for you, in

19    which case we'll sit 9:00 to 4:00.  We'll give you lunch, but

20    as you figured out by now, there's no such thing as a free

21    lunch.

22            I'll see you tomorrow.

23            It's hard now not to talk about this case because

24    you've heard the evidence, and tomorrow I'll give you the

25    instructions of law.
```

1          Have a lovely evening.  It looks like a great day,

2    although cold, and we'll be working here trying to figure out

3    the jury instructions and the law.

4          Thank you.

5          THE CLERK:  All rise.

6          (Jury left the courtroom.)

7          THE COURT:  This actually ended even a little earlier

8    than I thought.

9          I'm going to go upstairs and get you a draft of what

10:44 10   we're thinking on the jury instructions, although we haven't

11   had the extra time that we'd thought we'd have.  I think it's

12   not worth holding you for a few hours until I make it perfect;

13   I haven't totally read what you have to say.  We're going to go

14   up and get that, so why don't you wait here.  I'm going to get

15   you at least a working draft, and then you'll have an hour or

16   so to read it, and then I'm hoping what will happen is we'll

17   come back here around 12:00 and have a charge conference so you

18   can go home and prepare your closings.  Okay?

19         So let me go upstairs right now.  Thank you.

10:45 20   We'll hand it out to you in about 15 minutes.

21         (Recess taken.)

22         THE CLERK:  All rise.

23         THE COURT:  All right, thank you.

24         Now that we no longer have the jury here with the

25   unvaccinated juror and no witnesses, my staff is completely

```
 1   vaccinated.  If you can confirm that you're all vaccinated, I
 2   don't care if anyone wears a mask.
 3           MR. HOOPES:  Everyone is good on our side, your Honor.
 4           MR. JONES:  Us, too, your Honor.
 5           THE COURT:  I still find it totally -- ignoring
 6   whoever said you're getting used to it, I wish I were you.
 7           Let's figure out tomorrow, let's script this.
 8           How long do you -- the SEC will go first.
 9           MR. JONES:  First, your Honor?
10           THE COURT:  The question is whether we do this like a
11   criminal case, first, second, with a brief opportunity for
12   rebuttal or whether we do defense first and then the SEC.
13           MR. JONES:  Your Honor, in every case I've seen the
14   SEC do or been in, we've done just second.  We haven't done
15   rebuttal.
16           THE COURT:  Okay, I'm fine with that.
17           Do you want -- defense goes first, the person with the
18   burden of proof usually has the last word so to speak.
19           MR. HOOPES:  I'm sorry, your Honor.
20           THE COURT:  SEC, defense, then rebuttal, or have you
21   go first and then them.
22           MR. HOOPES:  Can I just have one second?
23           THE COURT:  Yes.
24           MR. HOOPES:  I had something else in my head.
25           (Discussion off the record.)
```

12:05  (line 10)
12:06  (line 20)

```
 1              MR. HOOPES:  So I think, unless I misunderstood, I've
 2     always understood and I thought the standard in federal court
 3     was plaintiff, defendant, and then a rebuttal, but that's --
 4     what I thought that's what the rules provided for --
 5              THE COURT:  No, that's not what the rules provide for.
 6     They don't provide.
 7              So, generally, Mr. Jones is right.  In a civil case,
 8     frequently what happens is the defense goes first, then the
 9     plaintiff, they have the burden of proof.  Alternatively, I
10     could do the bouncing ball.
11              MR. HOOPES:  I've always done the bouncing ball, but I
12     defer.
13              THE COURT:  So we'll have go defense first.
14              And what do you want, you want to go defense first --
15              MR. JONES:  I think one time each, defense then
16     plaintiff.
17              THE COURT:  So you'll go first.  How long will you be?
18              MR. HOOPES:  Hoping shorter, but is 45 minutes too
19     long, your Honor?
20              THE COURT:  I just want to script the day.  So let's
21     say you're roughly 45 minutes.
22              How long will you be?
23              MR. JONES:  An hour, your Honor, but probably 45
24     minutes.  Just in case.
25              THE COURT:  So assuming they come in roughly on time,
```

12:06  (line 10)
12:07  (line 20)

1   there are no snafus, we'll be done by the break.  We'll take a

2   break, the charge is not a long one, as you saw, at most an

3   hour.  It means they go out at noon, just roughly speaking, if

4   everything goes as planned.

5            So I just want to get through that.

6            Now, for me, I'd like to start with the verdict form.

7   It is my practice to hand them each a verdict form and have

8   them read it before you do the closings so they have can have a

9   sense of what questions you'll be addressing.  So can we just

12:08 10  go through and see the objections.  Since I found this a harder

11   verdict form than usual to craft --

12            MR. JONES:  Your Honor, for the Commission, we just

13   actually have a couple of objections/typos.

14            On 2A, that's actually Exhibit 3, not Exhibit 36.

15            THE COURT:  You're right, I missed that, okay.

16            MR. JONES:  On 2A, B, C, D, we suggest, your Honor,

17   just for the ease of the jury, we have the page numbers for the

18   jury on which each of the statements occurred.  Will the Court

19   be willing to provide those page numbers?

12:08 20          MR. HOOPES:  We have no position on it.

21            THE COURT:  Provide the page number.  The problem is,

22   it's hard for me to turn everything around upstairs, so if you

23   got them to me by --

24            MR. JONES:  I have them now, your Honor.

25            THE COURT:  All right.

```
 1              Exhibit 3 page --

 2              MR. JONES:  -- 16.

 3              THE COURT:  Yup.

 4              MR. JONES:  Exhibit 4, page 10.

 5              THE COURT:  Yes.

 6              MR. JONES:  Exhibit 5, page 7.

 7              Exhibit 6, pages 1 and 2.

 8              Exhibit 7, pages 3 and 6.

 9              And, your Honor, a related question on that.

12:09 10        THE COURT:  Yes.

11              MR. JONES:  The handout that you approved to go to the

12        jury, will that go back with them?

13              THE COURT:  No, that's a chalk.

14              MR. JONES:  Stipulations that we handed out.

15              THE COURT:  You agreed to that, right?  I'm fine with

16        that.

17              The only problem I have with your stipulations, I have

18        to say, is it may be confusing that you included Amvona Fund on

19        the heading.  I didn't notice that before.

12:10 20        MR. JONES:  Your Honor, we can strip it off -- shall

21        we also strip off Lemelson Capital Management?

22              MR. HOOPES:  That was my -- it's still on -- I thought

23        we had agreed that we would take it out of the caption.

24              THE COURT:  I'm happy to do whatever you want to do.

25              MR. HOOPES:  It's just easier.
```

```
 1              THE COURT:  So we're going to take out Gregory
 2    Lemelson from the caption --
 3              MR. HOOPES:  No, Lemelson Capital Management.
 4              THE COURT:  Excuse me, Lemelson Capital Management.
 5              And then I don't need the instruction on that or I
 6    still do, do you think?
 7              MR. JONES:  Your Honor, I believe you do not.
 8              MR. HOOPES:  I don't think you do.
 9              MR. JONES:  I think that's instruction 20.
12:10 10        THE COURT:  I may not get to it but it will mean on
11    the jury charge as I read it, it will say defendants.  I'll
12    make it singular.
13              MR. JONES:  The one that you didn't need, your Honor,
14    is instruction number 20, that's the one that talks about the
15    business' state of mind as the defendant's state of mind.
16              THE COURT:  Okay, good.
17              Okay.  So anything else before I go to defendant,
18    singular?
19              MR. JONES:  No, your Honor.
12:11 20        It appears in the instruction the jury can answer yes
21    or no to both questions 3 and 4, and as long as that is a
22    consistent verdict in the eyes of everyone, we're good with
23    that.
24              THE COURT:  It is a consistent verdict.  I have to
25    tell you I think it makes it unnecessarily complicated, that
```

```
 1  said, it is the law, negligence is included.
 2          MR. JONES:  You will get no argument that rewriting
 3  these laws would be a good idea, your Honor.
 4          THE COURT:  They're terrible.
 5          MR. JONES:  It's not Congress' finest moment, or
 6  perhaps the rule writer's finest moment either.
 7          THE COURT:  The final piece is easy, but many -- not
 8  that I'm judging my sister and brother judges, but many of the
 9  discussions just seem to conflate the negligence and the fraud,
10  and that's impossible.
11          Anyway, clearest thing I found was Judge Rogers'
12  opinion from the D.C. Circuit.
13          MR. JONES:  We're talking about the jury instructions;
14  we have a couple of points on them, your Honor.
15          THE COURT:  Go ahead.
16          MR. SULLIVAN:  Your Honor, we would request that the 1
17  and 2 be flipped.  We've always talked about this as a
18  statements case, and that really without the statements, there
19  can be no scheme.  So we were thinking that the statements
20  would be number 1 and even if they find -- the jury finds that
21  there was no -- that none of the statements are fraud, that
22  they would be instructed that they can't find a scheme, not
23  that that's the law, but in this case there's no -- there's no
24  scheme beyond the four statements.  So we thought that those
25  would be flipped and that would be the instruction.
```

```
 1              MR. JONES:  Your Honor, on that, first of all, time
 2      and time again we've said that it's not just the four
 3      statements and the scheme; we've highlighted for defendants and
 4      for the Court that there are a lot of other conduct.  But the
 5      defendants can, and we'll talk about this in the injury
 6      instructions if we need, the jury could find, for instance,
 7      that all four statements are not material, for instance, but
 8      that the defendant in the aggregate entered into a scheme to
 9      mislead people about the value of stock using things like these
12:13 10     statements.
11              So it isn't the case that a finding on B dictates a
12      finding on A and C, they're independent.  We would ask that the
13      jury form -- the verdict form stay the way it is.  We think
14      it's a proper statement of the law as it is now.  They can find
15      on A and C, they can find on B, those aren't interdependent.
16              THE COURT:  I'm going to leave it the way it is.
17              Is there anything else that's wrong here?
18              MR. SULLIVAN:  No, your Honor.
19              THE COURT:  Okay.
12:13 20         So now let's go into the --
21              MR. JONES:  Your Honor, actually, I'm sorry.  We have
22      one more on the verdict form
23              THE COURT:  What?
24              MR. JONES:  This really goes to the jury instructions.
25              Your Honor is making a distinction between the two
```

 1   parts of the Rule 206(4)-8 charge and you're saying one of them

 2   has to be fraudulently and one can be negligently.  They can

 3   both be negligent.  Do you want to hear about that now or do

 4   you want to do that in the jury instructions?

 5          THE COURT:  I'll do that in the jury instructions.

 6   That's the part of the law I found difficult, how do you do

 7   negligently fraudulent.

 8          MR. JONES:  Supreme Court's ruling in Capital Gains

 9   Research Bureau where they essentially created negligent fraud,

12:14 10   and they say specifically that the language --

11          THE COURT:  Capital Gains, what's that --

12          MR. JONES:  It is 375 U.S. 180, and on -- forgive me,

13   your Honor, I only have the slip opinion here but there's a

14   paragraph immediately before Section 2 of the opinion, and it

15   says, The foregoing analysis of the judicial treatment of

16   common law fraud reinforces our conclusion that Congress in

17   empowering the courts to enjoin any practice which operates,

18   quote, as a fraud or deceit upon a client did not intend to

19   require proof of intent to injure, an actual injury to the

12:15 20   client.

21          It says, Congress intended the Investment Advisers Act

22   to be construed like other securities legislation enacted for

23   the purpose of avoiding frauds, not technically and

24   restrictively, but flexibly.

25          And you'll see in Capital Gains, it's about 206(2),

```
 1    your Honor, which is the same section of the Advisers Act, and

 2    the law under the Advisers Act is Section 206(1) requires

 3    scienter, Sections 206(2) and (4) do not.  And the Supreme

 4    Court essentially says, Despite the fact that --

 5              THE COURT:  (2) was the material -- you know, I

 6    actually printed it out because I keep getting -- (2) is the

 7    one is the misstatement, no?

 8              MR. JONES:  So, your Honor, I'm mixing -- it's

 9    confusing because I'm mixing statute and the rule.

10              In the statute there's a 206 Section 1, 206 Section 2,

11    there's a 206(4), you don't need to worry about 206(4).

12              206(1) is essentially -- it's equivalent to 10b, it's

13    a fraud, it requires scienter.  206(2) allows negligence, as

14    does 206(4).

15              The rule, 206(4)-8, which as your Honor has in her

16    jury instructions, the Rule 206(4)-8 was promulgated under Rule

17    206(4).  You can find both Capital Gains Research Bureau and

18    the Commission's authorizing release, the rule release when it

19    issued the rule, and that is --

20              THE COURT:  Do you have a copy of the release?

21              MR. JONES:  I don't, your Honor.  I have it here on

22    the my iPad.  I do have a citation for you.  Investment

23    Advisers Act Release No. 2628.  And when we get to a working

24    email, your Honor, we can email these to the to Court if that's

25    your preference.
```

12:15 (line 10)
12:16 (line 20)

 1              THE COURT:  I'll read it.

 2              Candidly, my thought was if I don't understand it, how

 3    on earth how would a jury understand negligent fraud?

 4              MR. JONES:  The thing to understand is essentially if

 5    it has -- if he has that -- if he does something that could

 6    operate as a fraud negligently, yes, well, that's the way the

 7    statute is constructed, your Honor.  If you do something that

 8    could operate as a fraud but you do it negligently with respect

 9    to your investors or your prospective investors, fraud

12:17 10   damage --

11              THE COURT:  Fraud means intent to deceive or high

12    degree of recklessness.

13              I don't understand it; I'll look at your case.

14              MR. JONES:  Please, your Honor.

15              THE COURT:  The only way I could make sense of it is

16    because it doesn't have the intent to defraud under

17    misstatements.  That was the only way I could make sense of it.

18    So if any of the statements are negligent, it could be a

19    violation under the rule under the Advisers Act.  That's clear

12:17 20   under the law.

21              And also, if there is an intent to defraud, it can be

22    under the last section, which is an act that we all know what

23    that is.  But I don't see how you can have negligent under the

24    fraud.

25              MR. JONES:  That Capital Gains case I think will clear

```
 1    it up for you.
 2            THE COURT:  I'll read it.  If I understand it, maybe
 3    I'll change my mind.
 4            MR. JONES:  That's the Supreme Court talking; they're
 5    a little clearer than I am.
 6            THE COURT:  Okay.
 7            MR. JONES:  On that, your Honor, we would object to
 8    the way that 3 and 4 are currently constituted to make that
 9    distinction.
10            THE COURT:  Okay, of the verdict form.
11            MR. JONES:  Yes, your Honor.
12            THE COURT:  Okay.
13            So on the -- anything else -- let's just go through
14    these, I'll start with the introductory, really which we just
15    took as boiler plates from things I've pretty much done before.
16            Part 1, does anyone have any objections?
17            MR. HOOPES:  No, your Honor.
18            MR. DAY:  I'm sorry, we're going through --
19            THE COURT:  Pages 1 through 18.
20            MR. DAY:  Yes.  On page 17, we have one comment, the
21    third paragraph regarding the burden of proof, and there's a
22    reference to speculating, guessing or imagining.
23            Some concern that that might cause confusion with
24    respect to drawing inferences, you know, speculating, drawing
25    an inference --
```

            1            THE COURT:  Well, you've got to say you can't
            2   speculate, that's boilerplate.  So is there --
            3            MR. DAY:  Your Honor, can we just add a sentence that
            4   says, You are, however, allowed to draw reasonable inferences
            5   from the evidence.  Just to make clear that's something that
            6   not only they can but they should be doing.
            7            THE COURT:  I talk about reasonable inferences when
            8   there's a difference between direct and circumstantial
            9   evidence.
12:19   10            MR. DAY:  You do, your Honor, this paragraph comes
           11   along later.
           12            THE COURT:  I'm not going to, but you can highlight
           13   that, a reasonable inference I talk about direct and
           14   circumstantial, they can draw it.  So I'm not going to
           15   eliminate discussion of speculation.
           16            MR. JONES:  Your Honor, we're not asking to have it
           17   eliminated, we're just asking a further sentence added that
           18   that says, as I said before, You can draw a reasonable
           19   inference from the evidence.
12:20   20            MR. HOOPES:  I don't think that's necessary.
           21            THE COURT:  I think I've said you can argue it.
           22            Specific instructions, any problem with instruction
           23   number 11?
           24            MR. HOOPES:  No, your Honor.
           25            MR. JONES:  No, your Honor.

```
 1              THE COURT:  12.

 2              MR. JONES:  Yes, your Honor.

 3              Your Honor, it's not really -- I believe that the

 4    parties have stipulated as to instrumentality of interstate

 5    commerce, so we would just suggest --

 6              THE COURT:  Why don't I just add that the parties have

 7    stipulated to this element.

 8              MR. JONES:  I would just suggest deleting it.  The

 9    less to worry about, the better.  The defendant -- the

10    defendant added in exact --

11              THE COURT:  I don't have a problem with that.

12              MR. HOOPES:  I don't think so.  So long as we keep in

13    the second part where it says, In connection with the purchase

14    or sale of the security.  We stipulated instrumentality so we

15    can get rid of that interstate.

16              THE COURT:  You didn't stipulate it's in connection

17    with purchase or sale of a security?

18              MR. HOOPES:  No, your Honor.

19              THE COURT:  The defendants -- what would I say?

20              MR. JONES:  You just say the defendants acted in

21    connection with the purchase or sale of securities.

22              THE COURT:  Is that acceptable to you?

23              MR. DAY:  Or conduct was in connection.

24              THE COURT:  First of all, it's singular, but --

25              Just that they stipulated there was an instrumentality
```

 1    of interstate commerce.

 2              MR. HOOPES:  That works.

 3              (Pause.)

 4              THE COURT:  Good, all right.

 5              All right, page 13.

 6              Well, why don't we just say instruction number 13, I'm

 7    sorry.

 8              MR. JONES:  Your Honor, the Commission's next comment

 9    is on instruction 16.

12:22 10          THE COURT:  Okay.

11              MR. BROOKS:  We have a comment on 13.

12              THE COURT:  Okay.

13              MR. BROOKS:  In connection with the definition of

14    "materiality."

15              THE COURT:  Okay.

16              MR. BROOKS:  We had some language in our proposed jury

17    instructions that we wanted.

18              THE COURT:  What would you like me to add?

19              MR. BROOKS:  So the first is material information is

12:22 20   not any and all additional information that a particular

21    investor might have liked to have had.  It is not sufficient

22    that a particular investor might have considered the

23    misrepresentation or omission important or something that he or

24    she would have preferred to have known.  Insignificant or

25    trivial misstatements are not material.  Stated another way,

```
 1    the mere fact that an investor might find information
 2    interesting or desirable is not sufficient to make it material.
 3            And that comes from Lucia v. Prospect Street High
 4    Portfolio, Inc. 36 F.3d 170 --
 5            THE COURT:  Say it again, thirty --
 6            MR. BROOKS:  36 F.3d 170, pincite's 175, and it's a
 7    1st Circuit case from 1974.
 8            So that's the first --
 9            THE COURT:  I'm not going to do that whole long ting,
10    but I'll put in there something about the mere fact that it
11    might be interesting to an investor.
12            MR. BROOKS:  Okay.
13            THE COURT:  Suffice to make it material or something
14    like that.
15            MR. BROOKS:  Thank you, your Honor.
16            MR. JONES:  For the record, your Honor, can we reserve
17    until we see the language?
18            THE COURT:  I need to look at it myself.  Why don't I
19    say something, the mere fact that investor might --
20            (Pause.)
21            THE COURT:  I'll try to work in something along the
22    lines of -- I need to read the case -- the mere fact that an
23    investor might find information interesting does not suffice to
24    make it material.
25            And then add, you know, the statement, it's got to be
```

```
  1    a substantial likelihood that they'd change it.
  2           MR. BROOKS:  Okay.  And just for the record, your
  3    Honor, to preserve the issue, we had included a request for a
  4    materiality instruction concerning stock price.  It's on page
  5    35 of our --
  6           THE COURT:  Let me just --
  7           I have just taken them out.
  8           MR. BROOKS:  I'm referring to ECF No. 176.
  9           THE COURT:  Which instruction are you looking for?
 10    MR. BROOKS:  So at 176 -- so we're still on
 11    materiality, and I'm talking about page 35 of our proposed jury
 12    instructions, 176.
 13           And basically starting at the paragraph, rather to the
 14    bottom of the page, but specifically we cite the 3rd Circuit
 15    caselaw, your Honor, which I understand you have rejected, so
 16    we understand you're not going --
 17           THE COURT:  I see.
 18           MR. BROOKS:  -- you're not going to include it, we
 19    just want to preserve for the record we think there should be
 20    that the SEC has to have proven stock price change.  But
 21    that's, again, just for the record.
 22           THE COURT:  I already rejected that.
 23           But don't forget -- I don't remember where the current
 24    state of the law is with the 1st Circuit, but they're like
 25    guillotine masters.  If you forget to object after the
```

12:25 (line 10)
12:25 (line 20)

          1   instructions -- actually -- so I think this is not going to

          2   preserve it, at least as the last time --

          3           MR. BROOKS:  It's just the first step of preservation.

          4   It's the first preservation.

          5           THE COURT:  That's okay, all right.

          6           MR. JONES:  It's the embalming part.

          7           THE COURT:  Okay.

          8           So I think -- anything else on materiality,

          9   Mr. Brooks?

   12:26  10           MR. BROOKS:  No, I think that's it, your Honor.

         11           THE COURT:  By the way, I just noticed Father Lemelson

         12   wasn't here -- oh, there you are.  He's been assiduous at being

         13   at every proceeding, so I just wanted to make sure that he knew

         14   about it.

         15           Instruction 14.

         16           MR. BROOKS:  We do have one, one objection, your

         17   Honor.  So on page 24, between -- there's about, I don't know,

         18   a third of the way down, it says, For reckless conduct to

         19   exist, there must be a highly unreasonable omission or

   12:27  20   misrepresentation, and then it says, an extreme departure.

         21           And we had in our proposed jury instructions on page

         22   38, we had the language from the caselaw in between those that

         23   says it involves not merely simple or even inexcusable

         24   negligence, but is closer to being a lesser form of intentional

         25   conduct.

```
 1              THE COURT:  Where does that come from?
 2              MR. BROOKS:  So that comes from, I believe, Fire &
 3    Police Pension Ass'n of Colo. v. Abiomed, 778 F.3d 228, 240
 4    (1st Cir. 2015); Greebel v. FTC Software, Inc., 194 F.3d 185,
 5    188 (1st Cir. 1999); and Novak v. Kasaks, 216 F.3d 300, 312
 6    (2nd Cir. 2000).
 7              THE COURT:  What's the language in your request?
 8              MR. BROOKS:  The language that is not in the draft but
 9    was in ours it -- so after "reckless" -- so the language is
12:28 10   both, there's reckless disregard for the truth must be a highly
11    unreasonable omission or misrepresentation, period.
12              Then we'd like to add a sentence that says, It
13    involves not merely simple or even inexcusable negligence, but
14    is closer to being a lesser form of intentional conduct.
15              MR. JONES:  Your Honor, we would object to that.
16              We're not explaining enough to the jury for them to
17    actually understand what that sentence means.  This is part of
18    a -- I assume quoted, but paraphrased out of some judicial
19    decision.  But to the extent that, you know, the jury has to
12:28 20   now draw a difference between simple or inexcusable negligence
21    or lesser form of intentional conduct, we think the instruction
22    as it is comports with the accepted way to explain recklessness
23    to a jury.  It's not Model Jury Instructions, as your Honor has
24    taken, and to start to go down this road is really going to
25    confuse the jury.
```

 1          THE COURT:  I agree about simple or inexcusable

 2   negligence, but I do think it's important to distinguish

 3   between negligence -- I don't think I quite did that here.

 4          Well, you do mention -- it does say it's not enough to

 5   be negligent.

 6          MR. BROOKS:  The language that's key is, It's closer

 7   to being a lesser form of intentional conduct.  That's what the

 8   courts have defined it as, and we respectfully don't think that

 9   that's --

12:29 10          THE COURT:  If I find that language in the caselaw, I

 11   will say it.

 12          MR. BROOKS:  Thank you, your Honor.

 13          MR. JONES:  Your Honor, I would object to that.  The

 14   jury is not going to understand what is a closer form of

 15   intentional conduct.  What does that mean to a juror?  How do

 16   they understand that?  You already have mistaken or

 17   negligently.

 18          MR. BROOKS:  I'm not sure why that would be any more

 19   understandable to a juror than the language we're proposing.

12:30 20          MR. JONES:  Well, what is close to intentional

 21   conduct?  Define that for me.

 22          MR. BROOKS:  The 1st Circuit --

 23          THE COURT:  The SEC has no standing given the way the

 24   Investment Bankers Advisement Act --

 25          MR. JONES:  We didn't draft the Act, your Honor, in

```
 1    fairness, that was 1940 Congress.  We did draft the rule,
 2    however.  Put we put a whole rule release out about it, and it
 3    explains all of it.
 4              (Pause.)
 5              THE COURT:  Lesser, I'll probably add something like
 6    that, I'll just look at the cases.
 7              Okay.  So that's instruction number 14.
 8              15.
 9              MR. BROOKS:  Nothing, your Honor.
12:31 10         THE COURT:  16.
11              Here we are, Mr. Day, it's your --
12              MR. DAY:  Good faith.  Yes, your Honor.
13              THE COURT:  Mr. Day, you had your great moment today
14    with the easel move.
15              MR. DAY:  Thank you.  Except that --
16              THE COURT:  Co-opting the easel.
17              MR. DAY:  You apparently couldn't read it, but other
18    than that.
19              THE COURT:  All right, Mr. Day, go for it.
12:31 20         MR. DAY:  Your Honor, this is drawn from criminal jury
21    instructions.  I've never seen this given in the context of a
22    securities case.  The instruction --
23              THE COURT:  Of course good faith -- of course good
24    faith would defeat intentional.
25              MR. DAY:  I think it should say that it's something
```

1    the jury can consider.

2           Nowhere in the statute -- you draw the contrast with

3    Section 20A of the Exchange Act where good faith actually is a

4    statutory defense, not 10b, not any other section that I'm

5    aware of in the securities laws.

6           So to the extent this is an evidentiary issue, I think

7    it's something the jury could consider, but it is not a defense

8    under the securities laws.

9           THE COURT:  I'm going to be giving a good faith

12:32 10   instruction.  The only thing that I --

11          MR. BROOKS:  It doesn't sound like we need it.  We

12   have caselaw, I think the issue, not necessarily -- we don't

13   have the burden --

14          THE COURT:  No.

15          MR. BROOKS:  In terms of it being a defense, we don't

16   have the burden, it's a --

17          THE COURT:  It's not like a safe harbor situation.

18          I mean, if he's acting in complete good faith -- all

19   right.  I mean, I don't mean any disrespect, he in good faith

12:32 20   believes this guy Graham should have been the Dean of Harvard

21   Business School, he's just so brilliant and he follows that

22   model and even if it's dead wrong, that might be good faith.  I

23   mean, that's what I'm sort of thinking.  He loves this book,

24   his own little red book, right, so -- what can we say.

25          MR. DAY:  Your Honor, we would just reiterate --

          1            THE COURT:  You're objecting, that's fine.

          2            MR. DAY:  -- covered by the intent instruction.

          3            THE COURT:  Statements of opinion, this is the one I

          4     struggled the most with.  This is the one I struggled through

          5     both in summary judgment and in here.  I think it's incredibly

          6     difficult law, and I look forward your input on it.

          7            MR. JONES:  Your Honor, stop me -- stop me when you

          8     want to discuss particular parts.

          9            THE COURT:  Okay.

12:33    10            MR. JONES:  We think the first two sentences are

         11     unnecessary.  There's already been enough effort to wrapping

         12     the flag, you know, the actions and the statements of the

         13     defendant that we believe you can start with a defendant can be

         14     liable under the securities laws for an opinion if the opinion

         15     dot dot dot.  There's no reason to talk about the First

         16     Amendment.  The jury is not here to arbitrate the First

         17     Amendment.  They are to determine whether these are facts and

         18     opinions, and we should just start there.

         19            THE COURT:  Okay.  I'm going to keep the first two

12:34    20     sentences.

         21            MR. JONES:  Well, your Honor, just on this, when

         22     Omnicare talks about this --

         23            THE COURT:  What?

         24            MR. JONES:  -- they don't talk about it in terms of

         25     the First Amendment.  They talk about -- the Supreme Court

1   talks about it in terms of determining whether it's a fact or

2   opinion.

3          The First Amendment -- First Amendment we get into is

4   this first amendment commerce speech, it's at the lowest level

5   of scrutiny, it's securities -- we're wrapping a lot in, and

6   what the juries know about the First Amendment is not enough

7   for them to interpret here what the Court is trying to tell

8   them.

9          The Court is signalling to them by saying the 1st

12:34 10   Circuit -- the First Amendment, that these are somehow exalted

11   statements.  That's not the case.

12          The First Amendment certainly plays in here on

13   opinions, but this is commercial speech.  It's the lowest level

14   of scrutiny.  It's enough to instruct them without wrapping it

15   up in the First Amendment.  It's enough to instruct them that

16   they need to determine between fact and opinion.

17          To call it First Amendment tilts for the jury and

18   you're basically signalling to them, your Honor, these

19   statements have some sort of status that they don't have.  And

12:35 20   we think it would be improper --

21          THE COURT:  What I could have, if you think it's too

22   tilted, is something along the lines of, However, a defendant

23   is not protected by the First Amendment and can still be liable

24   under the securities laws for an opinion.  That would make that

25   clear.

          1            MR. BROOKS:  I think that's in here already.  That's

          2    the last sentence in the first paragraph.

          3            THE COURT:  Right, but I don't say not protected by

          4    the First Amendment.

          5            MR. BROOKS:  Oh, I see.

          6            MR. JONES:  Your Honor, we would ask for the first two

          7    sentences to be deleted and we won't need to talk about the

          8    First Amendment.  But if the Court is going to deny that, then

          9    that language would be preferable if the Court's going --

12:36    10            THE COURT:  I think that would make it stronger.  It's

         11    not protected by the First Amendment and is liable under the

         12    securities law for an opinion if the opinion itself constitutes

         13    a factual misstatement or the statement omits facts, et cetera.

         14            Okay.  What's the next issue?

         15            MR. JONES:  Your Honor, we would like some language in

         16    this that says that it's not enough to put magic words into --

         17    one second, your Honor, I'll pull it up.

         18            THE COURT:  You mean the disclaimer.  I think that's

         19    correct.

12:36    20            MR. JONES:  Your Honor, the case, Omnicare, says, you

         21    know, magic words such as "we believe" or "we think" do not

         22    change the statutory requirement.  Magic words can preface

         23    nearly any conclusion or preface --

         24            THE COURT:  You're going way too fast if the court

         25    reporter has to get it down.

1          Let's just -- is it specific words out of Omnicare
2     you're quoting?
3          MR. JONES:  Yes, your Honor.  This is Omnicare, 557
4     U.S. 175, 192-193.
5          THE COURT:  I have it.  So you want magic words --
6          MR. JONES:  Some sort of statement --
7          THE COURT:  I get the disclaimer.  I understand what
8     you're trying to get at.
9          MR. JONES:  That actually parallels what the
12:37 10     Commission put in its ECF number -- it put in its opposition to
11     summary judgment at page 9, but we can also --
12          THE COURT:  We'll add a magic words statement.
13          MR. JONES:  Yes, your Honor.
14          THE COURT:  I'll wave my wand.
15          Okay.  So if it's right out of Omnicare, it comes in
16     right here.  So I will quote as closely as I can to that.
17          MR. BROOKS:  If that's coming in, this case is
18     inapposite to Omnicare.
19          This case is more applicable to the cases your Honor
12:37 20     cites at the bottom of page 28, all these 1st Circuit cases,
21     the McKee v. Cosby, Piccone, earlier Phantom Touring.
22          Those are the cases that basically say, Look, you've
23     got to look at the -- you've got to figure out if the First
24     Amendment applies, you've got to look at the entire -- you
25     know, the entire report, and the most important thing is

```
 1   whether the author is -- whether the author is implying he has
 2   information that the reader doesn't.
 3          So it's not -- and it's this -- it's the last
 4   statement, it's the last statement of the --
 5          THE COURT:  I don't understand what you want.
 6          MR. BROOKS:  -- of the paragraph.
 7          I think we just want -- if we're going to add that,
 8   then like on this last paragraph that you've written, a
 9   statement, even if understood to be an opinion, on page 28,
12:38 10  that we think the First Amendment should be wrapped up in that
11   as well.
12          THE COURT:  I've mentioned the First Amendment enough.
13          MR. BROOKS:  Then we're good with that instruction.
14          THE COURT:  You've wrapped yourself up in the --  take
15   it down.
16          MR. BROOKS:  Because you won't let me use the easel.
17          MR. JONES:  Your Honor, we have a few more.
18          THE COURT:  Are we talking about number 17?
19          MR. JONES:  We are, your Honor, yes.
12:39 20         THE COURT:  Okay.
21          MR. JONES:  So first we think in the 1, 2, 3, 4,
22   spanning pages 27 and 28.
23          THE COURT:  Yeah --
24          MR. DAY:  -- and I got to get you a case on this
25   because I couldn't get WestLaw to work.
```

```
 1              THE COURT:  1, 2, 3, and 4 -- I don't think I have a

 2    4.

 3              MR. JONES:  I'm suggesting a 4, your Honor.

 4              THE COURT:  I see.

 5              MR. JONES:  In addition to implying facts, you can

 6    imply an analysis, that you've done an analysis.  Omnicare

 7    starts to talk about that.  I think there's another case out

 8    there that I've got to find for your Honor, but if you imply

 9    that you've done an analysis to get to that opinion and you

12:39 10   haven't, that's also a misstatement, and we think that should

11    be covered as well.

12              MR. BROOKS:  I don't -- we would object because I

13    don't think there's any evidence of that with the four

14    challenged statements.

15              THE COURT:  Well, why isn't that 3?  That you omitted

16    facts that you never did an analysis so you never made a call

17    or you never -- or that you made up the standard for

18    insolvency.  Why isn't that covered?

19              MR. JONES:  I see what you're saying, your Honor.  If

12:40 20   amid material facts could include doing an analysis, I suppose

21    that is covered, but it's not specified for the jury and I

22    don't think they understand it, then as long as we can argue

23    it, that's enough.

24              THE COURT:  Well, I don't exactly know what you want

25    or the case, but I think you could argue the material facts
```

```
 1    like that isn't the standard for insolvency --
 2              MR. JONES:  Yes, your Honor.
 3              THE COURT:  -- is the one I'm thinking of right now.
 4              MR. JONES:  Your Honor, a couple of more on the last
 5    paragraph.
 6              So particularly, the last statement, the last
 7    sentence, it talks about if the defendants disclose the facts
 8    that led to the challenged statement and none of those facts
 9    are false, I think here we have to reiterate that none of the
10    other embedded facts or analysis are false either.
11              So if you, you know, drop a source but you've left out
12    or you've embedded facts, you can either omit other facts or
13    you could embed other facts without actually talking about
14    them, and if those are false, it's also an actionable
15    misstatement.
16              THE COURT:  So what do you want to say?
17              MR. JONES:  I think it should say something like, If
18    the defendants disclosed the facts that led to the challenged
19    statement and none of those facts or any other embedded facts
20    or analysis --
21              THE COURT:  I don't know what embedded facts or
22    analysis are.
23              MR. JONES:  What did you say, your Honor?
24              THE COURT:  I don't understand -- is that out of a
25    case?
```

1          MR. JONES:  Embedded comes right out of Omnicare, yes,

2     that embedded can have -- an opinion can have embedded facts.

3          THE COURT:  So you want to say if the defendant

4     disclosed facts and --

5          MR. JONES:  None of those facts --

6          THE COURT:  Yeah.

7          MR. JONES:  Or any other fact embedded in the

8     statement or omitted from the statement -- you know, embedded

9     in the statements are false --

12:42 10          THE COURT:  I think that's -- the embedded -- or any

11     omitted statements.

12          MR. JONES:  The omitted statements would necessarily

13     be false.  That's why I'm getting hung up.

14          THE COURT:  And none of those facts are false and no

15     material facts are omitted.

16          MR. JONES:  Yes, your Honor.  So none of those facts

17     or any other embedded facts are false and no facts are omitted,

18     no material facts are omitted, excuse me.  We would just want

19     somehow both of those concepts added.

12:42 20          THE COURT:  Give me an idea of an embedded fact.  I

21     don't know what an embedded fact is.

22          MR. BROOKS:  I can give it to you from Omnicare, it's

23     just not applicable here, which is why I don't think it should

24     be here.

25          In Omnicare, what they were saying the embedded fact

```
 1    was, and I'm paraphrasing, it's my opinion we have the best
 2    TVs, that's an opinion.  It's my opinion we have the best TVs
 3    because we are the only ones with this patented technology.  If
 4    that's a lie, if you're not the only ones with the patented
 5    technology, it's no longer an opinion.
 6            None of these statements have anything to do --
 7            THE COURT:  That's not -- what do you mean, Mr. Jones?
 8    What's an embedded fact?
 9            If I say and none of these facts are false, what's an
12:43 10   embedded fact and a fact?
11            MR. JONES:  An embedded fact is any fact that you're
12    implying but not specifically stating that is to your opinion.
13            So it's not enough just to say --
14            THE COURT:  Why don't I say no other material facts
15    are omitted.
16            MR. JONES:  Because omitted becomes tricky, your
17    Honor, if the jury sees that the fact is sort of inherent in
18    the statement being made but not explicit.
19            THE COURT:  Give me what you're talking about.
12:43 20        MR. JONES:  I'm sorry, your Honor, I'm not coming up
21    with an example right way.
22            THE COURT:  I'm tell you what, I'm going to do an
23    omission piece if you can come up with an example of embedded.
24            MR. JONES:  I'll come up with it.
25            THE COURT:  I dare you to say that to the jury,
```

 1    because they're going to look at you like what?  An embedded

 2    fact and a fact.

 3         So, like, we're the best TV shop in town but it turns

 4    out there were no other TV shops in town?

 5         MR. JONES:  Yes, your Honor.

 6         THE COURT:  That's an omitted fact.

 7         MR. BROOKS:  That's not Omnicare.

 8         THE COURT:  Anyway, see if you can come up with an

 9    example.

12:44 10   MR. JONES:  Also in that sentence, your Honor,

11    conversely a statement, we believe it should say an opinion

12    statement.  If it's a factual statement, this analysis doesn't

13    come into play.

14         THE COURT:  Yes, yes.

15         MR. BROOKS:  That's not true under the 1st Circuit.

16         MR. JONES:  Yes, it is.

17         THE COURT:  I'm going to say statement of opinion is

18    immunized from liability if they disclose the facts.

19         MR. BROOKS:  But, conversely, a statement is immunized

12:45 20   from --

21         THE COURT:  A statement of opinion is immunized.

22    We're talking about opinions here.

23         MR. BROOKS:  But those cases say that it's not facts

24    and opinion, that's what those cases hold is that's like a kind

25    of a false premise.  That's what all those 1st Circuit cases

```
 1    hold, is that you can't really look at it as fact opinion, you
 2    have to look at the whole thing and decide whether or not the
 3    author is implying that he has information that the reader
 4    doesn't.
 5          THE COURT:  I don't -- I'm talking about statements of
 6    opinion throughout this thing, so I don't see adding statement
 7    of opinion is changing anything.
 8          MR. JONES:  Well, your Honor, we would ask for it
 9    because of the very argument Mr. Brooks is making, somehow if
10    you make a statement of fact, it's somehow immunized.  It's not
11    what those cases that are cited by the defendant or cited --
12          THE COURT:  This is the opinion section, so in any
13    event.
14          In any event, now we're onto Advisers.
15          MR. BROOKS:  One more on that.  So you seem to have --
16          THE COURT:  I don't understand what you're talking
17    about.  Assumed I was talking about statement of opinion.
18          MR. BROOKS:  That's fine, your Honor, I understand.  I
19    just want to add one other thing.
20          So you've sort of tilted in -- we would like something
21    since you've added that you may find -- when you're talking
22    about those three things is that defendant did not subjectively
23    believe but that the jury can take into consideration things in
24    the report such as the fact that he disclosed his short, that
25    that -- and that -- the disclaimer.  So those are things that
```

```
 1    aren't dispositive, but they can be taken into account.
 2             MR. JONES:  Your Honor, it would seem things that are
 3    dispositive that can be taken into account --
 4             THE COURT:  Earlier I say no magic words and then I
 5    say, however, you can consider that.
 6             MR. BROOKS:  I've just confirmed the language that you
 7    were going too add opinion, that language is not -- this is
 8    directly from the 1st Circuit case in the case McKee v. Cosby.
 9    It says, Conversely, a statement is immunized as long as the
12:47 10    speaker discloses all of the facts undergirding it and none of
11    them are both false and defamatory.
12             So the whole point is what those cases say is, Look,
13    an opinion isn't absolutely protected, but regardless of
14    whether you look at it as an opinion or fact, it is absolutely
15    protected as long as you disclose your source, which is what
16    we've been saying.
17             So I think you probably took this language from our
18    proposal.  We cut and pasted it from the 1st Circuit opinion.
19    This wasn't just us making it up.
12:47 20             THE COURT:  I'll go back and look at McKee.
21             MR. JONES:  Your Honor --
22             THE COURT:  I'll go back and look at McKee.  I think
23    you're fighting over nothing.
24             This is about statements of opinion.  I'm adding the
25    SEC's request that material facts were omitted.  I'm not
```

|  | talking embedded facts because I don't understand it and this |
|---|---|

1    talking embedded facts because I don't understand it and this

2    is all about opinions at this point.

3             All right, Advisers Act.

4             MR. JONES:  Yes, your Honor.

5             On the top of page 30, the second page of the

6    instruction, this is what we were talking about earlier.  We

7    think it is incorrect that one section requires *scienter* and

8    one section is negligence.  Both Capital Gains Research Bureau

9    and the cases that come after it, as well as Advisers Release

12:48 10   2628 explain that the negligence is the applicable standard to

11   all of Rule 206(4)-8.

12            THE COURT:  What's the cite again?

13            MR. JONES:  The Investors Act Release 2628, IA --

14            THE COURT:  That's your SEC release.

15            MR. JONES:  Yes, your Honor.

16            THE COURT:  Why is that binding on me?

17            MR. JONES:  First of all, because the agency is

18   granted deference in the interpretation of its rules.

19            THE COURT:  But not when it makes no sense.

12:48 20            But, anyway, you're going to email it to me.

21            MR. JONES:  We will email that to you.

22            But, your Honor, I'm holding up in part because we are

23   entitled to that deference but also in part because that

24   release explains why, in fact, that is -- the negligence is the

25   applicable standard here, and I think it's imperative.  This is

1    the Capital Gains Research Bureau issue that we talked about

2    before.  The Supreme Court finds that certain sections of the

3    Advisers Act are subject to negligence and that the language

4    that your Honor has focused on in that particular part of Rule

5    206(4)-8 should not be interpreted to require fraudulent

6    intent.  That's what the Supreme Court said.

7         THE COURT:  I'll tell you, I will read the case, but

8    I'm persuaded by the plain language of the statute so that

9    misstatements do not get qualified by fraud, and I'm going to

12:49 10   allow a claim of negligence, which is primarily what your case

11   is about anyway, are the four statements, and the scheme that

12   went with it is the fraudulent piece of it which you'll win if

13   you win the 10b-5.

14        So --

15        MR. JONES:  Your Honor, I just would say.

16        THE COURT:  You object, fine.  If I read the case, if

17   I'm persuaded, I'll let you know before your closing

18   statements.

19        MR. JONES:  Negligent fraud is tricky, but it is

12:50 20   pretty firmly entrenched in the caselaw at this point.

21        THE COURT:  I have not found one case that has said

22   that.

23        MR. BROOKS:  Your Honor, we need to preserve our

24   objection to this.

25        We agree, as I mentioned briefly yesterday, that there

  1   is a negligence standard.  However, this statute simply doesn't

  2   apply here.  It's never, ever been brought in a case like this.

  3        206 is intended for when a fund, an investment adviser

  4   or fund manager is defrauding his own investors or lying about

  5   the fund.

  6        The reason it's so hard to get our hands around this

  7   is it was just never meant to apply in a situation like this.

  8   It makes no sense, this charge, in connection with a statement

  9   about a company that then the defendant sends an article to his

12:51 10   investors.  That is not what this statute was meant to be, and

 11   it makes no sense under these circumstances.  We don't

 12   understand what he's being -- what the negligence is.  How does

 13   the -- if he made a negligent statement about Ligand, how is

 14   that material or how does that impact his investors?

 15        So, again, we just don't think this statute applies

 16   here.

 17        THE COURT:  All right, so play this out.

 18        He's negligent in how he is discussing solvency.  We

 19   heard that that's a material fact as to whether or not the --

12:51 20   he's shorting it because he believed it was insolvent without

 21   looking up the standard under the bankruptcy code or looking up

 22   the standard in any -- it's never been cited from the Graham

 23   book.  The last minute he shot off the controller of the -- I

 24   couldn't find it, I did my Google search, I couldn't find a

 25   separate standard.  There are basically -- so let's say he was

1    negligent in how he discusses solvency.  He was sloppy, let's

2    say.  I think there's more than enough evidence to think that

3    would be material to his investors as to whether or not it was

4    correct to short -- why isn't that material to the investor?

5            I agree.  Actually, from your motion I actually took

6    language it has to be material to the investor.  I think that's

7    a good amplification.

8            MR. JONES:  We agree, your Honor.

9            THE COURT:  I could see it, you see a father, a

12:52 10    priest, let's assume he's a man of God.  Let's assume they

11    agree with that whole description of himself and Benzinga and

12    they say he didn't intentionally do this, that's just how he

13    saw this because of the tangibles; he thought they wouldn't be

14    able to pay their debts.  It turns out to be dead wrong and the

15    stock did terrifically as we've heard.  Doesn't make it him a

16    fraud, but it could have been negligent.

17            MR. BROOKS:  But I just don't see where -- it has to

18    be misleading to his investors; that was misleading to the

19    market.

12:53 20            THE COURT:  Yeah, you're the nice doctor who lives

21    next door who loses in every investment he's ever had.  He

22    hears, like most doctors and dentists, and they basically --

23    they're not business people, they're good docs, and they

24    basically -- he says, Oh, geez, this company is on the verge of

25    bankruptcy, I'm going to -- I'm going to increase my stake in

```
 1    Amvona, all $2 million of my money.

 2           He was actually a very sympathetic witness from both

 3    points of view, actually.  Nice hearing from him once I got

 4    through the accent, once I understood him.  I think he was

 5    helpful to both sides, actually.

 6           So, there.  Is that it?

 7           MR. BROOKS:  Well, the last point is that -- and you

 8    said, again, that's -- that theory that you just said, which

 9    would be it's interesting and first of its kind, never been

12:54 10    raised before, that's not how it was pled in the complaint.

11           The way it was pled in the complaint was that he was

12    negligent because he didn't tell his investors that the entire

13    short was based on fraud.  There was never this understanding

14    that the statements themselves were negligent.

15           So if the benchmark is unfair surprise, the first we

16    heard of this, the first we understood this was

17    either yesterday, was Monday -- was yesterday.  That has never

18    been -- we've briefed the issue, we've continually breached the

19    issue of saying, Well, we're sort of putting it on hold because

12:54 20    it all depends on the 10b-5.  I don't understand that this all

21    of a sudden turned into, well, it's sort of a backdoor way to

22    get in these statements, as you said, it's now a lesser

23    included, I don't know, maybe it's a benefit.

24           THE COURT:  At least different, at least different.

25           MR. BROOKS:  But that's not the way it was pled.
```

```
 1              MR. JONES:  Your Honor, it's in paragraphs 55 and 56
 2     of the amended complaint.  It is the way it's pled.
 3              THE COURT:  It is the way it's pled, but it hasn't --
 4     I have to agree on one thing, which I at least didn't focus on
 5     it in the beginning, but it is pled.  So it's --
 6              MR. JONES:  Your Honor, one more thing on page 30, the
 7     last paragraph.  Because it's all stipulated to, we could just
 8     delete.
 9              THE COURT:  Say it again.
10              MR. JONES:  The last paragraph on page 30, all that is
11     stipulated; we can just save that time.
12              THE COURT:  Good.
13              All right.
14              My practice, as I mentioned is to -- let me make one
15     thing clear for the record, which is another reason I want to
16     deal with the negligence point and not merge the two questions,
17     is if, in fact, they do find he was only negligent and all the
18     fraud is wiped out, it really will make a huge difference for
19     me on what relief is appropriate.
20              MR. JONES:  Understood, your Honor.
21              THE COURT:  By the way, what is -- I actually don't
22     know the answer to this.  Does the Amvona Fund still exist?
23              MR. BROOKS:  I'm not sure.  I assume -- it still
24     exists as a legal entity.
25              MR. JONES:  The issue of whether or not we're going to
```

1   be able to get money out of the Amvona Fund as a relief

2   defendant is a live issue.  It seems like somehow Father

3   Lemelson -- well, without attributing cause, all of the money

4   in the Amvona Fund is gone as far as we can tell.  And so after

5   we get this and if there's a finding of liability, we'll have

6   to do some -- make even some discovery to determine --

7           THE COURT:  Let me ask you the flip side.  What

8   happened with Promacta?

9           MR. JONES:  Promacta was sold off to a company called

12:56 10  Royalty Pharma, they buy royalty streams --

11          THE COURT:  Didn't, in fact, most of the royalties

12  come from these other indications rather than -- just

13  curious -- rather than --

14          MR. JONES:  Your Honor, there's not a huge amount of

15  information, but Promacta has continued to grow in revenues

16  both through GSK and then through Novartis.

17          THE COURT:  From these new indications or was it from

18  the --

19          MR. BROOKS:  Jacking up the sales price, your Honor.

12:57 20        THE COURT:  It's all from jacking up the sales price.

21          MR. JONES:  It's actually not, although the defendants

22  would like it to be.  There have been indications over the

23  years.

24          THE COURT:  I think the relevant thing is whatever it

25  was, it wasn't from hep C.

         1          MR. JONES:  Your Honor, as far as we can tell, there
         2    were hep C -- first of all, we're talking a time period where
         3    Sovaldi is being adopted worldwide, so 2015, 2016, 2017, 2018,
         4    all over the world people are still using these interferon
         5    treatments and still using Promacta along with it.  So from
         6    that sense --
         7          THE COURT:  What you're saying is it just took a while
         8    to roll out.
         9          MR. JONES:  Yeah, your Honor, and other indications
12:57 10    and, yes, probably some price increases, in fact, increased the
        11    revenue.
        12          THE COURT:  It quadrupled.
        13          MR. JONES:  It didn't quadruple from that, worldwide
        14    sales.
        15          In fact, you saw, your Honor --
        16          THE COURT:  I was just curious.
        17          MR. JONES:  We're going to say to your Honor that's
        18    actually not the question for the jury.  The question is
        19    whether Mr. Voss said what he said, what he's alleged to have
12:58 20    said.
        21          THE COURT:  What's the next question with respect
        22    to -- any other issues before I come in tomorrow?
        23          MR. BROOKS:  Just same preservation on instruction --
        24          THE COURT:  Oh, there is one thing.  I deny the motion
        25    for a directed verdict.  It's an excellent closing statement,

```
 1   and obviously, if you lose any part of it, there will be a
 2   motion at the close of all the evidence.  It will be
 3   effectively maybe the same thing, but it's basically what
 4   I've -- other than the Investment Advisers Act, which I keep
 5   repeating I haven't really focused on before, the other issues
 6   I've teased out both in the motion to dismiss and the motion
 7   for summary judgment.
 8           So, for the record, that's denied.  I read it, I don't
 9   want argument on it.
12:59 10         MR. JONES:  Yes, your Honor.
11           MR. BROOKS:  Just on instruction 21, again, for the
12   record, there's a statement the SEC does not need to prove the
13   defendant's conduct caused the price of Ligand's stock to fall.
14           THE COURT:  Oh, yes, we've been through that.
15           MR. BROOKS:  Just in case 1st Circuit is listening,
16   that's the only reason I'm saying it.
17           THE COURT:  Do it again, Mr. Brooks.  Do it again.
18           MR. BROOKS:  And that's it for us on the jury
19   instructions.
12:59 20         Maybe it's not.
21           (Discussion off the record.)
22           MR. BROOKS:  I'm sorry, I forgot one.
23           In the negligence one, I'm sorry, your Honor,
24   instruction 19, it might be elsewhere, but just to remind the
25   jury that the negligence only applies to statements made to
```

 1    Amvona Fund investors, not -- because I think the jury is going

 2    to get -- our concern is the jury is going to get confused and

 3    they are going to think it's the same -- it's just 10b-5

 4    without the *scienter*; and again, it's a totally different group

 5    of people, totally different fact set.

 6              THE COURT:  Yes, I think -- so must prove defendants

 7    made statements negligently to -- I like that, investors.

 8              MR. JONES:  Your Honor, wherever you add "investors"

 9    you have to also add "prospective investors."

01:00 10             THE COURT:  Yes, yes.

11             Okay.

12             Good.  Okay, thank you.  Anything --

13             MR. DAY:  Your Honor, on the negligence instruction,

14    the last sentence of the -- I guess it's the second paragraph

15    that starts "To prove that defendants" --

16             THE COURT:  Say again, I'm sorry.

17             MR. DAY:  Sure, the second paragraph that starts "To

18    prove that defendants violated the Advisers Act" --

19             THE COURT:  Yes.

01:01 20             MR. DAY:  -- the last sentence there, If you find

21    defendants acted with intent to defraud or recklessly, they did

22    not act negligently, it goes on.  I think -- I'm concerned that

23    that's a little bit confusing for the jury.

24             I think that's covered in the next paragraph where it

25    says you can find either/or.

```
 1                THE COURT:  Yes.
 2                (Pause.)
 3                THE COURT:  I think that is, but I don't know what you
 4      want me to say.
 5                MR. DAY:  I would remove the last two sentences of
 6      that paragraph before I have asked you two questions.
 7                I think the two questions address that same concept --
 8                THE COURT:  I think I'll keep it in.
 9                MR. DAY:  Thank you.
01:02 10          THE COURT:  Okay, thank you.
11                MR. JONES:  Your Honor --
12                THE COURT:  You know what, I need to --
13                MR. JONES:  On instruction 18, there's two places
14      where it talks about investors and the Amvona Fund, I can just
15      point that out to the Court now.
16                THE COURT:  Instead of adding "prospective investor."
17                MR. JONES:  Twice in the paragraph on the bottom of
18      29.
19                THE COURT:  Okay.
01:02 20          MR. BROOKS:  Your Honor, we have -- if we're done with
21      the jury instructions, before you leave, we have an issue with
22      two exhibits you wanted to raise.
23                THE COURT:  Quick at this point because I need to go
24      fix this, and then I have the meeting with the court at 1:30.
25                MR. BROOKS:  It's Exhibits 8 and 9.  We agree to those
```

```
 1    operating under good faith that the SEC was going to call their

 2    summary witness who was the one who created and was going to

 3    testify -- these are charts, these aren't real-time documents,

 4    they are charts.

 5         So we agreed in good faith that we weren't going to

 6    object to these with the understanding that we would get to

 7    cross-examine this --

 8         THE COURT:  Can I see them?  I think you handed them

 9    to me.

01:03 10        I actually thought they were going to --

11        MR. HOOPES:  They were going to call --

12        THE COURT:  There was going to be a summary witness.

13        MR. HOOPES:  There was, and our issue with this is

14   that now there are these charts in where the underlying data is

15   not in and we didn't have a chance to cross-examine this

16   witness, so it's completely unfair.  I mean, these charts --

17   it's cherry-picked data, and again, we agreed because we were

18   going to get a chance to cross-examine and now we don't, and

19   that's the not the way a summary witness is supposed to work.

01:03 20        THE COURT:  Can I see them?

21        Did you represent to them that you were going to put

22   them in through a summary witness, it's on the list.

23        MR. DAY:  Two things, your Honor.  We're not using

24   Exhibit 9, so we don't have to worry about that.

25        THE COURT:  So 9A, B --
```

1              9 is gone.

2              THE CLERK:  It has five sections to it.

3              THE COURT:  9 is gone.

4              Now, with respect to 8.

5              MR. DAY:  8 is a Rule 1006 summary of evidence --

6              THE COURT:  How can you call it "Lemelson's Short

7    Campaign"?  That's not a summary.

8              MR. DAY:  We can change the --

9              THE COURT:  No, we knock out the heading of it at the

01:04 10   very least, and this is just the stock price.

11             MR. DAY:  These are facts well-known to the parties.

12             THE COURT:  And you criticize the witness they didn't

13   put anyone in.  You heard there were other negative things,

14   they didn't correlate it, you can attack it.  But I would put

15   it in as undisputed and -- what can I say.

16             MR. BROOKS:  It's a little unfair because, again, we

17   obviously wouldn't have agreed to this knowing they weren't

18   going to call Dr. Smith because the whole point, we would have

19   a chance to cross-examine him in front of the jury to show why

01:04 20   that chart is completely inappropriate.

21             THE COURT:  What is inappropriate about it?  You

22   agreed to it.

23             MR. BROOKS:  Well, we agreed to it -- we agreed to it

24   but there's cherry-picked data, there's data that we were

25   not -- well, I don't want to rehash it --

```
 1           THE COURT:  I don't know why you agreed to it.
 2           MR. BROOKS:  We agreed to the data so we could see how
 3    other things would fit into that.  I just don't think it's fair
 4    to say that that's a chart that was effectively created by a
 5    summary witness and then you don't call the summary witness.
 6    You know, again, in good faith we because to avoid fights --
 7           THE COURT:  It's too late now, because if you had
 8    raised this before everybody rested, I could have made them put
 9    in a witness, but it's too late now.
01:05 10          But I will let them take out "Lemelson's Short
11    Campaign," that's no summary.  You're going to have to wipe
12    that out.
13          The other thing I'll let you put it up and say there's
14    no witness here and they didn't point out that Empire was right
15    there right after the July 3rd report, that's when it dropped
16    the 4 percent.
17          MR. BROOKS:  It just would have been more fun to do
18    that on cross-examination, your Honor.
19          THE COURT:  It would have been, but I'm doing it for
01:05 20    you, and there's no rebuttal to it.
21          MR. BROOKS:  Thank you, your Honor.
22          MR. SULLIVAN:  Your Honor, I think it will be ten
23    seconds, I don't think it will be controversial.
24          I think 105 is in in error.  You ruled the Bloomberg
25    article is out.  No one's used it, so I think we should just
```

1    take that out so it doesn't get in front of the jury.

2              MR. JONES:  As far as we know, 105 is an agreed-to

3    exhibit.

4              THE COURT:  I already said I wouldn't allow the

5    Bloomberg article.

6              THE CLERK:  It was in there.

7              THE COURT:  I've excluded information about the

8    Bloomberg article.

9              THE CLERK:  I pulled it out.

01:06 10         MR. JONES:  Your Honor, this is actually a set of

11   emails about that, which, in fact, they redacted to according

12   to the instructions of the Court.

13             THE COURT:  The article cannot come in.  So I don't

14   know what the emails do.  That's the problem with doing a

15   document dump through agreed-upon exhibits.

16             Where are the emails?  Someone want to hand it to me?

17   This is sort of late to be doing this.

18             MR. JONES:  We didn't know we were going to do that.

19   Exhibit 105 is the emails.

01:07 20         MR. SULLIVAN:  No one's used it; I thought it was in

21   error.  But I -- so I apologize.  I didn't think this would be

22   an issue.

23             (Discussion off the record.)

24             MR. JONES:  Your Honor, we'll withdraw that exhibit,

25   no one cares.

```
 1              THE COURT:  Okay.  Done.  Done.

 2              I got to go upstairs, I got to look up this stuff.

 3              Tomorrow morning I would get here at 8:30 in case

 4     there's an issue, but if you both find there's no issue, I'm

 5     happy to be here at 9:00 since it's still pitch black outside.

 6     So could you email each other and Mary Ellen, I'll probably be

 7     here at 8:30 in case something comes up.  I think the jury has

 8     been terrific, so unless one of them gets sick.

 9              MR. JONES:  Don't say that.

10              THE COURT:  All right.  Even if one of them gets sick,

11     we still have enough.

12              Okay, good, thank you.

13              (Court adjourned at 1:08 p.m.)

14                    - - - - - - - - - - - -

15                        CERTIFICATION

16              I certify that the foregoing is a correct transcript

17     of the record of proceedings in the above-entitled matter to

18     the best of my skill and ability.

19

20

21

22     /s/Debra M. Joyce                    January 6, 2022
       Debra M. Joyce, RMR, CRR, FCRR       Date
23     Official Court Reporter

24

25
```

INDEX

WITNESS                                                          PAGE


GREGORY LEMELSON

    Further Direct Examination                                    15
    By Mr. Sullivan

DR. NICHOLAS JABBOUR

    Direct Examination                                            23
    By Mr. Day
    Cross-Examination                                             38
    By Mr. Hoopes
    Redirect Examination                                          53
    By Mr. Day

ROBERT M. FIELDS

    Direct Examination                                            60
    By Mr. Day
    Cross-Examination                                             71
    By Mr. Sullivan
    Redirect Examination                                          79
    By Mr. Day