1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3    SECURITIES AND EXCHANGE COMMISSION,    )
                          Plaintiff,        )
4                                           )
     vs.                                    )
5                                           )
     GREGORY LEMELSON and LEMELSON          )   NO. 18CV11926-PBS
6    CAPITAL MANAGEMENT, LLC,               )
                          Defendants,       )
7    and                                    )
                                            )
8    THE AMVONA FUND, L.P.,                 )
                          Relief Defendant.  )
9

10

11

12              BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT COURT JUDGE
                        JURY TRIAL - DAY 1
13

14

15

16         John Joseph Moakley United States Courthouse
                        Courtroom No. 19
                        One Courthouse Way
17               Boston, Massachusetts 02210

18

19                      October 26, 2021
                           10:23 a.m.

20

21

22              Kathleen Mullen Silva, RPR, CRR
                      Official Court Reporter
         John Joseph Moakley United States Courthouse
23               One Courthouse Way, Room 7209
                   Boston, Massachusetts 02210
24             E-mail: kathysilva@verizon.net

25         Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2
              United States Securities and Exchange Commission
 3            Alfred A. Day, Esq.
              Marc J. Jones, Esq.
 4            33 Arch Street, 23rd Floor
              Boston, Massachusetts 02110-1424
 5            617.573.4590
              for Plaintiff
 6

 7
              Libby Hoopes, P.C.
 8            Douglas S. Brooks, Esq.
              Thomas M. Hoopes, Esq.
 9            Brian J. Sullivan, Esq.
              399 Boylston Street, Suite 200
10            Boston, Massachusetts 02116
              617.338.9911
11            for Defendants Gregory Lemelson, Lemelson Capital
              Management, LLC, The Amvona Fund, LP
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                                    INDEX

3

4   WITNESS                                                    PAGE

5

    KEITH MARSCHKE
6
        Direct Examination By Mr. Day                            77
7       Cross-Examination By Mr. Brooks                         129

8

9                              E X H I B I T S

10

11  Exhibit No.                                            Received
        1-245        .......................................   105
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  All rise.  Court is now in session in the
 3   matter of Securities and Exchange Commission v. Gregory
 4   Lemelson, et al., Civil Action 18-11926.
 5          THE COURT:  Thank you.  Good morning to everyone.
 6          COUNSEL:  Good morning, Your Honor.
 7          THE COURT:  I understand the jury is about ready to
 8   come in but somebody wanted to ask me something.
 9          MR. BROOKS:  Good morning, Your Honor.  Doug Brooks
10   for defendants.
11          THE COURT:  By the way, where's your client?  Oh,
12   there you are.  You're blocked.  Okay.  Good.  Thank you.
13          MR. BROOKS:  Your Honor, we wanted to briefly discuss
14   the issue -- we understand that the jurors are being questioned
15   about their vaccination status, and we've spoken to our client,
16   who is vaccinated, but we would object to the ability of
17   plaintiff to be able to use a peremptory challenge based on
18   vaccination status.
19          We think sort of twofold.  One --
20          THE COURT:  Excuse me.  I've raised this in two prior
21   status conferences.  Two.  I said I was handing out this
22   questionnaire.  Indeed, I think it was Mr. Jones asked for
23   extra challenges.
24          MR. JONES:  Yes, Your Honor.
25          THE COURT:  Not once did I hear an objection, not
```

1    once, to asking them this question.  It's too late.

2          MR. BROOKS:  Okay, Your Honor.

3          THE COURT:  It's too late.  Wait, done.  I can't

4    micromanage, do like a mini Batson on why someone's objecting

5    or not objecting.  For me it's critical to understand whether

6    or not somebody is vaccinated or not because I have to decide

7    what jury room to use for them to deliberate in and to tell

8    them whether or not it's safe for them to take off their masks

9    in the jury room.  So for me it's a matter of safety.  Even

10   apart from -- not to mention people who are sitting close to

11   the jury bench.  But more importantly, it's been vetted twice.

12   I think we vetted it at the --

13         MR. HOOPES:  I need to take the fall for this, Your

14   Honor.  I understand that you were going to ask the question.

15   But we've got a different issue, which is to exercise a

16   peremptory based on that, and I hear now you're saying you

17   don't want to be doing a full *Batson*, but I think we'd be on

18   our end not handling the case properly by having discussed it

19   with the client, heard his thoughts about it, not at least

20   raising it with the court.

21         THE COURT:  Thank you.  It's just never been raised,

22   never once been raised.  I view it as waived.  As far as I'm

23   concerned, I would have just excluded unvaccinated people for

24   the safety but you objected and I deferred to your client and I

25   didn't exclude everyone.  We have a full -- I don't even know

```
 1   how many there are, but I think you've been given the names of
 2   people who are vaccinated.
 3            MR. HOOPES:  Yes, Your Honor.
 4            THE COURT:  And I don't know how you're going to use
 5   your challenges, and I don't plan to do any kind of Batson
 6   unless it's based on race, religion, national origin or the
 7   like.  So, there it is.
 8            MR. HOOPES:  And we appreciate it.
 9            THE COURT:  Okay, thank you.  The thing that's taking
10   me aback from your client, your client was even sitting here
11   when we discussed it for one of them, I think.  Was it
12   yesterday?  So --
13            MR. DAY:  Your Honor, a related issue.  We were
14   unclear on whether the court was planning to inform vaccinated
15   jurors that there may be unvaccinated jurors in the jury.
16            THE COURT:  I don't know.
17            MR. DAY:  Okay.
18            THE COURT:  Let me deal with it.
19            MR. DAY:  Okay.
20            THE COURT:  I am totally about safety here.
21            MR. DAY:  Okay.
22            THE COURT:  And we also have an issue, I spoke with
23   the clerk yesterday, about whether or not we're even going to
24   have availability of the courtroom next door to spread them
25   out.
```

```
1              THE CLERK:  We do.

2              THE COURT:  I think we do for at least a week, but I

3    don't know about the full two weeks because it may be another

4    judge is impaneling a criminal trial where there are going to

5    be 15 jurors where the jury room will be even smaller for them.

6    I'm hoping that we can use that for right now and then we'll

7    see where it goes from there.

8              MR. DAY:  The jury is about ready to come in.  Is that

9    right?

10             THE CLERK:  About five minutes, Judge.

11             THE COURT:  About five minutes before they're coming

12   up.  I think we'll go from there.  Thank you.

13             COUNSEL:  Thank you, Your Honor.

14             THE CLERK:  All rise.

15   (A recess was taken.)

16   (Jury venire enters.)

17             THE CLERK:  All rise.

18   (Court entered the courtroom.)

19       THE CLERK:  The United States District Court for the

20   District of Massachusetts, the Honorable Patti Saris presiding.

21   Court is now in session in the matter of Securities and

22   Exchange Commission v. Gregory Lemelson, et al.  Thank you.

23   You may be seated.

24             THE COURT:  Good morning to everyone.  I'm Judge Saris

25   and today we will be impaneling a jury in a civil case.  I'm
```

1    glad to see that you're all wearing your masks.  As you notice,

2    all of us are wearing our masks too, and that will be the rule

3    of the courtroom until I tell you otherwise.

4         So we are going to, as I mentioned, impanel a trial in

5    a jury case.  Before I get going on that, I'm going to ask the

6    courtroom deputy, Lisa Pezzarossi, to give you the oath.  Thank

7    you.

8         THE CLERK:  Would you all please stand and raise your

9    right hand.

10        JURY VENIRE, sworn.

11        THE CLERK:  Thank you.  You may be seated.

12        THE COURT:  Okay.  So let me tell you a little bit

13   about the case.  Anything that I say -- can you all hear me

14   because I'm sitting here -- just raise your hand or yell out if

15   you can't because we're all muffled.  I've got this mic here

16   and I'm hoping you can all hear me.  I've got a big booming

17   voice but it's still a big room.

18        So anything that I tell you about the case is not

19   evidence.  Let me give you a little snapshot about the case so

20   that you can decide whether you can serve in a fair and

21   impartial manner.  This is a civil action brought by the

22   Securities and Exchange Commission.  You may have sometimes

23   heard it referred to as the SEC or the Commission, which is a

24   federal government agency.  The SEC, Securities and Exchange

25   Commission, has sued Gregory Lemelson, also known as Father

1  Lemelson, alleging that he violated the antifraud provisions of

2  the federal securities laws.  They've also sued Lemelson

3  Capital Management LLC.

4        Lemelson ran a hedge fund that invests money in the

5  stock market on behalf of outside investors, and that's called

6  The Amvona Fund.

7        The reason I'm telling you all this is I want to make

8  sure none of you have a financial interest in this case.

9        So the issue is whether or not the defendants -- well,

10  they did take a short position in the stock of a company called

11  Ligand Pharmaceuticals.  I'm going to be asking you about that

12  company.

13        I'm going to -- a short, some of you may know

14  already -- I had to look it up to check it out to make sure I

15  understood it, but a short position or selling short is an

16  investment technique where an investor seeks to profit when the

17  price of stock falls.

18        So I'm just telling you this basic snapshot to help

19  you answer some of the following questions.

20        So let me start off by asking the attorneys and their

21  staff, I think.  We've got a large crew here.  First from the

22  SEC to please stand up, turn around, introduce yourself, and

23  I'm going to ask if you know them.  We'll start with the SEC.

24        MR. JONES:  Thank you, Your Honor.  Good morning,

25  everyone.  I'm Marc Jones.  I'm with the Securities and

1    Exchange Commission.  With me is my partner Al Day, and we have

2    Jesse Tingson, Cole Taylor and Alyssa DiPaolo with us.  Thank

3    you for being here.

4            THE COURT:  Thank you very much.

5            Does anybody -- no, not quite yet.  I'm going to do it

6    piece by piece.  You may be seated.

7            Does anyone know Mr. Jones, Mr. Day or the team,

8    anyone on the team?  All right.

9            If anyone has an affirmative answer to any of my

10   questions, I want you to raise your hand.  Remember, it's under

11   oath.  I'm going to, after all my questions, send you outside,

12   and I want you to remember whether you've raised your hand or

13   not because then I'm going to take you in one by one.  It could

14   be something as simple as, yeah, I know him.  You know, we went

15   to school together, or it could be something more complex where

16   we need to talk to you about it, but, in any event, I want you

17   to raise your hand if you have an affirmative answer to any of

18   my questions.  So, again, does anyone know any of the lawyers

19   or the staff members on the SEC team?  No hands are raised.

20           Let me just ask further, have any of you ever worked

21   for the SEC?  No hands raised.

22           Any of you have any family members or close friends

23   who work at the SEC?  All right.  No hands raised.

24           Now I'm going to ask the defendant to -- I think the

25   attorneys should stand up, introduce their client and

 1    themselves to the jury.  Thank you.

 2              MR. BROOKS:  Good morning, everybody.  My name is Doug

 3    Brooks with the law firm Libby Hoopes Brooks here in Boston.

 4    With me are my colleagues, Tom Hoopes, Brian Sullivan and Cara

 5    Murphy, and our client, Father Lemelson.

 6              THE COURT:  All right.  Thank you.  Let me start out

 7    with Father Lemelson.  Does anyone know him?  All right.

 8              Anyone ever heard of Father Lemelson one way or

 9    another either because of investing or whatever?  All right.

10    No hands raised.  Anyone here do business with or have any

11    financial interest in Lemelson Capital Management LLC?  No

12    hands raised.

13              Anyone here have any financial interest in or do

14    business with The Amvona -- by the way that's A-m-v-o-n-a --

15    The Amvona Fund?  Does anybody here have any interest

16    financially, one way or another, with respect to The Amvona

17    Fund?  Once again, does anyone know any members of the defense

18    legal team?  Mr. Brooks, Mr. Hoopes, anyone?  Okay.  No hands

19    raised.

20              All right.  So as you've heard, this case you'll hear

21    multiple company names, and I'm going to ask you now whether

22    you have any financial interest in any of these companies.

23    That could be -- let me define "financial interest."  It could

24    be stock holdings.  It could be that you've got a contract with

25    these places or it could be that you're employed by any of

1   these places or anything else that in your mind may raise an

2   issue with respect to a conflict of interest or bias or a

3   prejudice.  So let me go company by company.

4        Ligand Pharmaceuticals, L-i-g-a-n-d, Ligand

5   Pharmaceuticals.  Does anyone have a financial interest?

6   Number 40.  Okay.  Thank you.  Anybody else have any conflict

7   or relationship with that company?  All right.  No hands

8   raised.

9        Viking Therapeutics, Viking, like the Vikings, Viking

10  Therapeutics.  Does anyone have any financial interest in that

11  company?  No hands raised.

12       I've already asked you about The Amvona Fund.  And now

13  someplace called Benzinga, B-e-n-z-i-n-g-a.  Does anyone have a

14  financial interest, a conflict with that company or have any

15  bias or prejudice with respect to that place?  No hands raised.

16       GlaxoSmithKline, anyone have stock in that or work

17  there?  All right, Number 4.

18       Novartis.  Okay.  Number 40 again -- maybe 4 as well.

19  I'm sorry, I didn't see that.  Number 35.  Thank you.

20       The Lantern Foundation, lanterns, the Lantern

21  Foundation, does anyone know anything about that or have any

22  financial interest in that?  No hands raised.

23       LHA Investor Relations.  No hands raised.

24       Marcum LLP.  No hands raised.  That's M-a-r-c-u-m,

25  LLP.

```
1              Grant Thornton LLP.  Grant is the first word, Thornton
2       is the second, LLP.  No hands raised.
3              BTIG.  All right.  No hands raised.
4              All right.  So the following witnesses may be called
5       to testify at trial.  Now, some of these folks may not be
6       called.  In fact, this is going to be a brand-new case for us
7       in our district, and one of the first in the country.  Some of
8       these witnesses may actually testify by Zoom, and some of them
9       may testify by depositions.  But these are the witnesses who
10      may be giving testimony.  All right?  And I'm going to read
11      these names to you and ask you if you know any of them.
12             Dr. Erin Smith from Salt Lake City, Utah.  Catherine
13      Hyodo -- I said that wrong -- Hyodo, H-y-o-d-o, from Los
14      Angeles.  Sougata Banerjee, B-a-n-e-r-j-e-e, Banerjee, from Los
15      Angeles.  Matthew Foehr from Belmont, California -- not our
16      Belmont -- Belmont, California.  Michael Johns from
17      Pennsylvania.  Bruce Voss from Los Angeles.  Keith Marschke
18      from San Diego.  Brian Lian from California.  Nicholas Jabbour,
19      J-a-b-b-o-u-r, from Westborough, Mass.  Robert Fields from New
20      Canaan, Connecticut.  John Higgins from Minneapolis.  Joseph
21      Frohna from Wales, Michigan -- Wisconsin, Wales, Wisconsin.
22      Todd Pettingill from San Marcos, California.  And David Becker
23      from Bethesda, Maryland.  Does anyone know of those people or
24      heard of them or have any relationship with them?  All right.
25      No hands raised.
```

1           All right.  So now I'm asking a series of questions

2      which go to whether or not you can serve in a fair and unbiased

3      way, and I want to you raise your hands.  Now, sometimes you

4      may be thinking about things and then you're going to be

5      standing outside as I'm calling you in to say what's the

6      problem, you know, I know someone, whatever.  And you might

7      say, gee, I really should tell the judge about this.  Probably

8      the most important thing I can do here is impanel a fair and

9      unbiased jury.  So if there's any issue that comes up for you,

10     you need to tell me.  Because I'm going to ask you -- at the

11     end of this and we're going to put you under oath -- can you be

12     fair and impartial jurors.

13          So have you or any members of your family or close

14     friends ever been accused in a lawsuit of fraud?  30 and 6.

15     All right.

16          Have you or any members of your family or any close

17     friends ever been charged with violating any state or federal

18     securities laws?  One person.

19          Have you ever brought a lawsuit against anyone

20     alleging fraud and securities or financial fraud?  No hands

21     raised.

22          Have you or any members of your family or close

23     friends ever been the victim of a financial or investment

24     fraud?  Two people, three people, four people, five people.

25     All right.  We'll hear from you.

1          Have you or any -- I already asked you this.  Anybody

2     you know, close family members or friends, worked at the SEC or

3     a state parallel securities agency.  Number 8.  Thank you.

4          Now, have you or any members of your family ever had

5     any direct experience with the SEC?  I'm not now referring to,

6     you know, being sued for fraud or anything, but it may be that

7     you have to file forms or you have to directly deal with the

8     SEC in your business.  Is there anyone here?  Two people.

9     Thank you.  Three people.  All right.  Thank you.

10          Does anyone here have any belief, feeling or attitude

11     or bias or prejudice, either in favor of or against the SEC,

12     that would prevent you from serving in this case?  All right.

13     No hands raised.  Oh, I did get one.

14          THE CLERK:  8.

15          THE COURT:  This is a broader question.  Have you or

16     any close family members ever been employed by any state, local

17     or federal law enforcement agency?  Now, that would include

18     police, Attorney General's office, Federal U.S. Attorney's

19     office, work for law enforcement, police or -- all right.

20     Thank you.

21          All right.  Now moving on to whether or not you have

22     securities and investment backgrounds.  Have you, any members

23     of your family or very close friends ever worked for a mutual

24     fund, an investment manager, a securities trader, an investment

25     analyst, an investment banker, a stock promoter or any member

1    of the securities industry?  All right.

2            Is there anyone here who has any training or

3    experience in securities brokerage, securities laws or

4    investment banking?

5            Is there anyone here who is -- who is a regular

6    watcher or follower -- I don't know what the right word is --

7    of the website Seeking Alpha or Benzinga Premarket Prep?  Maybe

8    one person.  Thank you.

9            Is there anyone here who could not be fair and

10   impartial in a case involving short selling?  I'll just remind

11   you what that is.  An investment technique where an investment

12   profits on a decline in a company's stock.  Is there anyone who

13   could not be fair and impartial on that kind of a case?

14           Does anyone have any religious, philosophical or other

15   belief which would make you unable to find the defendant liable

16   for reasons unrelated to the law and the evidence?  For

17   example, some religions don't believe you can sit in judgment

18   of somebody else.  No hands raised.

19           Do you have any such strong feelings about the federal

20   government or in particular here the SEC, either positive or

21   negative, that you could not be fair and impartial in this case

22   or this kind of a case?

23           Is there anyone here who either themselves or any

24   close family members or friends have ever worked for a hedge

25   fund?  One person.

```
 1            Does anyone here have any positive or negative
 2     opinions about the Eastern Orthodox Church?  No hands raised.
 3            All right.  Now, I want to go through with you a
 4     little bit about the case.  Did someone -- Lisa, did you have
 5     something?
 6            THE CLERK:  No.
 7            THE COURT:  This case is likely to last approximately
 8     two weeks.  That means we think we're going to wrap up on or
 9     around November 5.  However, Murphy's Law sometimes happens.
10     We could have a hurricane.  We could have someone get sick.  We
11     could have technical difficulties as we're trying to Zoom in
12     some witnesses.  Things happen.  There's a chance it could
13     swing over into Monday or Tuesday of the -- the 5th is a
14     Friday -- Monday or Tuesday the following week.  We'll go full
15     days, and I think I spoke with the attorneys yesterday.
16     They're pretty confident we can finish it by the 5th.  We'll
17     sit from 9:00 until 4:00.  The way I work things is that we
18     take a midday break like at around 11:00.  I feed you.  We then
19     take lunch, for, you know, 45 minutes to an hour.  We come
20     back, work from 2:00 to 4:00.  Then you're gone.  I usually do
21     other court matters at the end of the day that have nothing to
22     do with this case.
23            So I will excuse people for personal hardship.  Most
24     of you received a questionnaire about COVID-related problems.
25     But I'm going to ask you that again because things happen
```

1    between the time you've filled in that questionnaire perhaps

2    and right now.

3              So let me first say that I will not excuse people for

4    mere business inconvenience.  I think a two-week trial will be

5    inconvenient in many people's lives.  It's an important trial.

6    Both sides care very strongly about their views.  I mean,

7    they're very, very engaged in this lawsuit.  I need a fair and

8    impartial jury to resolve it.  So I will not excuse people for

9    mere inconvenience.

10             Let me tell you why I will excuse you.  First, if you,

11   yourself, are feeling sick right now, I'm sorry you came in.

12   You shouldn't have.  But in any event, I'm not going to keep

13   you here if you feel sick.  If you or a close family member

14   that you're living with or someone you've been directly exposed

15   to might have COVID, I don't want you.  Please go home, be safe

16   and quarantine.  All right?  Hopefully, you've answered that

17   question truthfully, and I will -- that is a governing

18   principle throughout this trial.  We'll be keeping our masks

19   on.  As you can see here, the jury chairs are every other one,

20   so people aren't sitting so close to each other.  Nonetheless,

21   the most important touchstone here is we all have to be safe.

22   So I will not excuse -- I will excuse if you feel sick or any

23   of the other things I just said.

24             I will excuse, and I do know that childcare is

25   prohibitively expensive, and I know that many people here may

1    be responsible for their children, although most should be back

2    at school, but you never know if something goes down because of

3    a quarantine or something like that.  So if somebody does not

4    have childcare available for their children and they're

5    responsible for the childcare between 9:00 and 4:00 or roughly

6    that period of time, let's say it takes a half hour to get here

7    and half an hour to get home, although this morning was a

8    disaster, but in any event, if in general it takes you half an

9    hour to an hour to get here each way, I will excuse you if

10   there's no childcare available.

11           I will excuse you -- I will not excuse you for mere

12   business inconvenience.  I used to say I'll excuse you if you

13   have a big vacation planned, but most people aren't traveling

14   very much, and I guarantee you we will not reach Thanksgiving.

15   So we're going to be really done before Thanksgiving, long

16   before Thanksgiving.  But if you have a personal trip planned

17   or you're in college and about to leave to go -- I think most

18   college semesters have started.  If there's a reason you can't

19   sit that will cause a substantial personal hardship, I will

20   excuse you.

21           So given those parameters, for how many people serving

22   will cause a substantial personal hardship for a two-week

23   trial?  Okay.  Thank you.

24           Does anyone here have a language barrier that would

25   make it difficult for you to understand this case?  Perhaps one

```
 1    person -- given what you know about the case, we will need
 2    somebody who we can make sure can understand it all.
 3           Is there anyone here -- and we have these great little
 4    things -- who will have trouble hearing the case?  If anyone
 5    does experience any trouble hearing the case, we do have
 6    hearing aids -- you know, like the things you use at the
 7    theater that will help you hear sometimes.  So please let us
 8    know.
 9           THE CLERK:  Judge.
10           THE COURT:  One person.  Thank you for letting me
11    know.
12           Has anyone seen any press coverage about this case?
13           Does anyone know of anything that I haven't mentioned
14    that would interfere with your ability to be a fair and
15    impartial juror?
16           Is anyone -- let me just make sure I've hit
17    everything.  Has anyone sat on another case, either civil or
18    criminal, that that experience would interfere with your
19    ability to be fair and impartial in this case?  Perhaps one
20    person.  All right.
21           Okay.  Both sides gave me a ton of questions to ask.
22    I've asked the majority -- mostly everything but I didn't know
23    if there's something I missed that you care a lot about.
24           MR. HOOPES:  No, Your Honor, from this side.
25           THE COURT:  No.  Mr. Jones?
```

1          MR. JONES:  No, Your Honor.  We're satisfied.  Thank

2     you.

3          THE COURT:  Okay.  So what I'm going to ask right now,

4     and, unfortunately, this takes a little bit of time because

5     what we're going to do is we're going to ask you to go out -- I

6     think this is how we're doing it to be safe here.  We're going

7     to ask you all to leave the courtroom.

8          Mr. McAlear, you have people out there to help, right?

9          MR. McALEAR:  Yes.

10         THE COURT:  Then what we're going to do is we're going

11    to ask anyone who has raised his or her hand to come up and see

12    me.  Don't worry, we'll get to all of you.  If I excuse you,

13    you'll go back down to the jury room.  There is one other case

14    impanelling today, and it's not clear yet whether you'll be

15    needed.  Mr. McAlear will be able to control this, because he's

16    just a genius at this, let's face it.  He can get all the

17    jurors and figure out who's needed where.  So don't just

18    disappear if I've excused you.  Go back down to the jury room

19    because there is a criminal case impaneling this morning and

20    you'll be told whether you're needed anymore.

21         What we're going to do is go through you one by one.

22    In the past what we used to do is have you in a scrum and you'd

23    all come up here and we'd all huddle.  It's too dangerous right

24    now.  So at this point what I'm going to do is we're going to

25    do one by one, and we will reach all of you.  All right?  So

```
 1    I'm going to let Mr. McAlear organize how you come in.  But

 2    remember, I don't need to see you unless you raised your hand

 3    to one of my questions and unless you feel as if there might be

 4    an issue that I forgot to ask about that would interfere with

 5    your ability to be fair and impartial.

 6              MR. McALEAR:  Okay.  Jurors, if I could have you

 7    follow me.

 8    (Jury venire exits.)

 9              THE COURT:  Let me apologize right now.  This is going

10    to go more slowly than you're used to.  It's just going to take

11    a while to bring the people in.  You all have the Whisper Tech?

12              MR. JONES:  Judge, can we just have a rundown?  You're

13    going to ask them questions, and then you want us to talk with

14    you on the Whisper Tech about what to do with them, or do you

15    want to wait until they go out in the hall?

16              THE COURT:  No, we'll hold it to the end.

17              MR. JONES:  Okay.

18              THE COURT:  It's been my practice when we were at

19    sidebar people could ask follow-up questions, which I will

20    still continue with.  So let me make sure I know how to use the

21    Whisper Tech.

22              Can you hear me?

23              MR. HOOPES:  Clear as a bell.

24              THE COURT:  Okay.  Can the court reporter hear me?

25              THE COURT REPORTER:  Yes, Your Honor.
```

1          MR. JONES:  Your Honor, one more question before we

2     start.  Sometimes you called out the number, sometimes you

3     didn't.  We're not quite sure who answered yes to which

4     question.

5          THE COURT:  That's fine.  I just tell them to come up

6     and we ask all the questions at once.

7          MR. JONES:  All of them again?

8          THE CLERK:  They'll have their number and they

9     can state --

10         THE COURT:  All right.  Go ahead.  They're not

11    necessarily coming up in order.

12         MR. JONES:  No, I just don't know what -- if they're

13    coming in, I don't know what they're coming in for.

14         THE COURT:  Well, I'll ask them.

15         MR. JONES:  Okay.

16         THE CLERK:  We've done it where you asked what did you

17    say yes to?

18         THE COURT:  Yes.

19    (Pause.)

20    **(SEALED JURY VOIR DIRE.)**

21         THE COURT:  All right.  Thank you.  Thank you very

22    much, everybody.

23         Thank you so much.  I'm going to ask Lisa to please

24    swear in the jury.

25                         **JURY sworn**

```
 1          THE COURT:  Okay.  Once again, I'm Judge Saris.  Thank
 2   you so much for coming in.  I know it's an extra special
 3   challenge these days in our COVID world.
 4          So I know you've been sitting all morning.  I think
 5   what we should do -- I need to give you some preliminary jury
 6   instructions.  I think we have a snack waiting for you.  If not
 7   momentarily.  Use the facilities.  Lisa will explain a little
 8   bit to you about your role as a juror, and then we'll figure
 9   out whether or not I should do openings as well as preliminary
10   jury instructions or not.
11          So why don't we stand in recess, and welcome.
12          THE CLERK:  All rise.
13   (Jury exits.)
14          THE COURT:  Thank you.  We will take a brief break.
15          How long is your opening?
16          MR. JONES:  It's about a half hour, Your Honor.
17          THE COURT:  How long is yours?
18          MR. HOOPES:  Twenty minutes tops.
19          THE COURT:  So if we -- is there a snack back there,
20   Clary?
21          THE CLERK:  Lisa is going to find out.
22          THE COURT:  Ideally speaking, I could do a brief jury
23   instruction, and then we can at least do the SEC's opening and
24   come back and do the defendant's opening or we can send them
25   out to lunch after my preliminary jury instructions.  I'd like
```

1    to get going.  Either way.  I don't feel strongly.

2            MR. HOOPES:  Either way, you mean --

3            THE COURT:  I don't think I'm going to be able to fit

4    in two openings given the fact it's five of 12:00.

5            MR. HOOPES:  Before lunch.  If they have a snack, we

6    could probably go until 1:15 and then just send them out.  Why

7    don't we try to do both openings at the same time and have a

8    latish lunch hour and have them come back for the first

9    witness.  Who's that again?

10           MR. JONES:  It's Dr. Marschke, Your Honor.

11           THE COURT:  Is he here right now?

12           MR. JONES:  Well, he's either here or at the hotel.

13           THE COURT:  All right.

14           MR. JONES:  We have confirmed him in town.

15           THE COURT:  All right.  Okay.

16           MR. HOOPES:  So the plan is we're taking a break and

17   then we're going to do openings?

18           THE COURT:  Yeah.  We'll take a break.  We'll come

19   back at 12:15.  I'll give my preliminary jury instructions

20   which generally don't go longer than 15 minutes.  I'm not doing

21   the whole SEC 10(b)(5) instructions.  It's more like don't read

22   the newspapers kind of thing and the burden of proof.  We'll

23   have everyone out here at 12:15.  Take a quick break.

24           MR. HOOPES:  May I ask permission -- I don't think the

25   clerk's here -- I'd like to use an easel during my opening if

```
 1    that's permitted.
 2            THE COURT:  Sure.  The problem with the easel, and I
 3    know you know this, is it's just where to put it so that
 4    everyone can see.  I'd like to see it.  So I'm always happy to
 5    stand there, but it's got to be -- it's a terrible courtroom
 6    that way.  It's got to be close enough for them to be able to
 7    see it but not so close that I can't see it.  And don't forget
 8    if you leave here, the court reporter sometimes has trouble
 9    hearing you because you're not at a mic.  So with that caveat,
10    there's that mic there.  I suggest using the easel -- the
11    lectern.
12            And, of course your team can move to see it.  Do you
13    have any chalks or summaries?
14            MR. JONES:  No, Your Honor.  It will all be on the
15    screen.
16            THE COURT:  And they've seen them?
17            MR. JONES:  Yes, Your Honor.
18            MR. HOOPES:  Yes.  We've reciprocated.
19            So you want the easel where?
20            THE COURT:  My -- the most important thing is that we
21    get a good transcript.  So you need the mic.  You need to be
22    able to speak into a mic.  And that's the mic.  I suggest what
23    we do is turn this around, the lectern around, and put the mic
24    on it.  So you can -- something.  Where is your easel?
25            MR. HOOPES:  It's right out there.
```

```
 1              THE COURT:  Why don't you go grab it.
 2              MR. HOOPES:  It's going to be a -- just for purposes
 3    of the opening, what if we put it right here?  They'll be able
 4    to see it.
 5              THE COURT:  No, they won't.
 6              MR. HOOPES:  It won't do it?
 7              THE COURT:  Maybe they all have 20-year-old vision,
 8    but.  In general people have put it right there, and that way I
 9    can walk down here and see it.  They can walk over there and
10    see it, and it's close enough for them to see it.
11              MR. HOOPES:  So can I stand where you want it?  You
12    want it right here?
13              THE COURT:  Beautiful.  Bring it right over here.
14    It's difficult to make sure that everybody can see it.
15    (Discussion held off the record.)
16              THE COURT:  We'll take our break.
17    (A recess was taken.)
18              THE CLERK:  All rise for the jury.
19    (Court and Jury enter.)
20              THE COURT:  Welcome again.  I make it a practice to
21    give you a set of preliminary jury instructions.  They're not a
22    substitute for the closing instructions of law, but they are
23    designed to give you an idea as to what to expect over the next
24    two weeks.
25              So I'm going to sit down and get going.  Just to make
```

1    sure that you can hear me, I'm going to put this on, but I want

2    to make sure -- it's a bit muffled, I have to admit, and I'm

3    going to be talking directly into a mic, but if you can't hear

4    me I will take it off.  It's more important for people to hear.

5         So what is your job?  Your job as the jury is to find

6    from the evidence what the facts are.  You and you alone are

7    the judges of the facts and you will have to apply the facts,

8    those facts, to the law as I give it to you at the end of this

9    case.  You must follow the law whether you agree with it or

10   not.  Nothing that I do or say during the course of the trial

11   is intended to indicate to you what I think the appropriate

12   outcome should be.  That's why we have you.  The verdict is

13   yours.

14        How are you going to make the decision?  You're going

15   to do it based on evidence.  Evidence consists of the testimony

16   of witnesses who will take the stand.  Now, the witnesses are

17   the only players here who will consistently not have masks on.

18   Otherwise -- that's so that you can absolutely hear the

19   witnesses and see their facial expressions.  They're going to

20   be way over here.  If for some reason you can't hear, let me

21   know, but they will not have masks on.

22        I leave it up to you, up to the attorneys, as to

23   whether or not to have masks on when they speak.  But if we

24   can't hear an attorney, I'm going to tell them to take it off

25   because it's important to be able to hear them when they ask

1    questions of witnesses.  I'll leave that up to them.  But

2    unless you're actually speaking, i.e., asking questions, a

3    witness, and sometimes me if you can't hear me, I'm going to

4    ask people to keep their masks on.  All right?

5         So the testimony consists of witnesses who will

6    testify, documents that you will get you'll see on your screen.

7    It will come with you into the jury room, and every once in a

8    while you'll have stipulations that attorneys will agree to

9    certain facts.

10        Many things happen over the course of a trial which

11   are not evidence.  You're about to hear the opening statements.

12   That's the opportunity of each attorney to give you a roadmap

13   of what to expect over the course of the trial.  But these

14   statements are not evidence.  So if you hear something in a

15   statement and it doesn't come in as evidence, you can't

16   consider the opening statement.  You'll hear closing arguments

17   at the end of the case.  Those are not evidence.  Questions by

18   lawyers aren't evidence.  Of course, there will be an

19   examination, a cross-examination, redirect, recross, but you

20   should not assume from any information contained in a question

21   that it must be so.  "So it was raining out that day, wasn't

22   it?"  You shouldn't assume it was raining or the attorney

23   wouldn't have asked the question.  It's the answer of the

24   witness that's the evidence in the case, unless there's some

25   other evidence to support what the attorney says.

1          Importantly here, objections are not evidence.  You've

2    heard some of these objections before.  Objection, hearsay;

3    objection, irrelevant; objection, leading.  Sometimes I'll

4    sustain the objection, which means I agree with it.  Sometimes

5    I'll overrule the objection.  You should treat that evidence

6    like any other.  Sometimes -- and this may happen in this

7    trial, actually -- I may allow in something as hearsay, not a

8    statement -- an out-of-court statement that's not subject to

9    cross-examination.  I'll allow it in but I'll say, I'm not

10   letting that in for the truth of what the person said but

11   simply as to another limited purpose.  For example, what the

12   recipient of that information knew when he received the

13   statement.  It will become clearer as that goes through.

14          Now, sometimes I'll exclude testimony.  You shouldn't

15   consider it.  Sometimes I'm going to not understand the basis

16   for the objection.  So we have this nifty little walkie-talkie

17   deal here.  Sometimes -- we used to stand at sidebar.  We won't

18   be doing that.  We'll be working off of the Whisper Tech is

19   what it's called.  Lisa will be putting on white noise.  So

20   they'll explain in greater depth what the objection is.  We'll

21   try and minimize that because I'll try and see the attorneys

22   every morning at 8:30 before you come in in the morning just to

23   sort of go through anything that might be an issue, but

24   sometimes it might be necessary.  So we'll use this Whisper

25   Tech technology.

1   There are two kinds of evidence that you consider.

2 There's direct evidence and there's circumstantial evidence.

3 Direct evidence is direct proof of a fact.  Someone has seen

4 something, heard something, touched something, used one of his

5 or her five senses to perceive an event and tells you about it,

6 that's direct evidence.

7   But circumstantial evidence is different.

8 Circumstantial evidence is proof from which you may infer that

9 other facts exist.  So for example, if your daughter sees the

10 letter carrier delivering the mail, that's direct evidence.

11 She's seen something.  She's telling you about it.  You may

12 think she's lying or that she wasn't wearing her glasses that

13 day, but that's direct evidence.

14   Indirect evidence is when no one has seen the letter

15 carrier deliver the mail, you come home from work, it's through

16 your mail slot.  No one has seen the letter carrier deliver the

17 mail, but how else did it get there?  Your reasonable inference

18 is he or she was there during the day.

19   So there are two kind of evidence and you can consider

20 both kinds.

21   This is a civil case, as I keep saying.  So the burden

22 here is different than a criminal case.  The burden here is

23 called preponderance of the evidence.  In other words, the

24 greater weight of the evidence.  It's not proof beyond a

25 reasonable doubt.  It's not proof beyond a reasonable doubt.

1    That's what the standard is in a criminal case.  This is a

2    civil case.  So when I think about it -- the plaintiff, here

3    the SEC, has the burden of making those scales tip, albeit

4    slightly, in the SEC's favor.  If at the end of all the

5    evidence you find it's evenly balanced, the SEC has not met its

6    burden.  So what you're going to do on the claim here is you're

7    going to find out whether the claim is -- or the elements of

8    the claim are more likely true than not true.  That's what

9    you're always asking yourself.  Is what the SEC claims more

10   likely true than not true?  I'll remind you of this burden when

11   we sit together at the end of the case.

12          Now, I want to go through the order of the case.  The

13   SEC, because it's the plaintiff, will go first.  You'll hear

14   direct examination, cross-examination, redirect, recross, next

15   witness.  It will almost never go to reredirect, rerecross.  It

16   takes a lot to get me to do that.  There must be something

17   brand new that just popped out because usually it's going to be

18   direct, cross, redirect, recross, next witness.

19          There may be an occasion that we have to take someone

20   out of order if somebody has a personal commitment or there's a

21   problem with a flight or something like that.  But in general,

22   the SEC will go first.  Then the SEC will rest, and then

23   there's the opportunity for Father Lemelson to put on any

24   witnesses that he wants.  So that's basically how the case will

25   go.

1        Sometimes there's witnesses that will serve both sides

2   and the evidence will come in rather than making someone come

3   back a second time.  So we'll see as that goes along.

4        Now, let me now talk to you about your conduct during

5   the trial.  First, you cannot talk about the case.  You can't

6   talk about it at home.  You can't talk about it obviously with

7   the press.  You can't talk about it with anybody.  As soon as

8   you do that, there's a grave risk of a mistrial.

9        I don't know if there's going to be any press

10  coverage.  There may be some limited business press coverage.

11  I don't know.  But nobody should read any article in any

12  newspaper or on any blog or whatever else, social media

13  platform or all the different ways -- WhatsApp, text messages.

14  I'm sure I'm already out of date.  No one can read anything

15  about this case and no one can communicate in any way about

16  this case.

17        Second is you can't talk about it with each other in

18  the jury room.  And you say why not?  Why, that makes no sense.

19  Because what happens is you get two people deciding after the

20  first witness and another three after the second witness.  I

21  guarantee you, you're going to be able to talk about this case

22  until you're sick of it at the end of the case during jury

23  deliberations but no discussions about this case during it.

24        Nobody should try to read or listen to anything

25  touching on the case or do their own research.  In this day of

 1   Internet research, it is critical that no one look up any of

 2   the people in this case.  It is critical that you not look up

 3   any of the companies in this case.  Don't do your own research.

 4   Don't look up anything or do anything to privately investigate

 5   this case or I will have to start all over again.

 6          Now, if you have a question, hand it up.  It's a civil

 7   case.  I'm completely content with you writing down a question.

 8   You all have your notepads.  I will hand it to the lawyers if

 9   you think some question hasn't been answered about the case.

10   They can choose to ignore it or they can choose to answer it,

11   but you can't look it up yourself.

12          Maybe you won't understand certain terms.  They're

13   going to have someone here who, for example, explains short

14   selling; but if you don't understand it, ask, say explain it

15   more or ask me to have the person explain it more; but no one

16   should be looking up any of these terms themselves.  There may

17   be certain biological terms that are being used in connection

18   with the issues in this case.  If you don't understand the drug

19   that's being referenced, ask.  That's their job to teach you.

20   But don't look it up yourself.  All right.

21          Don't form any opinion until all the evidence is in.

22   It's really -- they do all these studies in this kind of thing.

23   Oh, someone makes up their mind after the opening.  Don't you

24   dare.  There's too much that's going on here.  Make sure you

25   hear the evidence and the witnesses.  Keep that open mind

```
 1   throughout this.

 2            What about taking notes?  Please do take notes.  I

 3   take notes.  You take notes.  My notes are pathetic.  Maybe

 4   yours are too.  Don't ask me to look up the notes at the end as

 5   to what so and so said on such and such a date.  I won't have

 6   it any better than your collective set of notes.  It is true

 7   that we have a fabulous court reporter, but it takes -- at the

 8   end, if you're in the middle of deliberations and you say I'd

 9   like to know what so and so said, it takes a while.  You may

10   end up delaying your deliberations for a day.  You really want

11   to do that?  So what I'm really going to say is make sure you

12   write down the name of the person, key dates, perhaps keep a

13   timeline about when things happened.  That's always very

14   helpful to me, like a chronology of who said what, when, where

15   kind of thing, what happened.  Only then, after you've

16   exhausted all your notes, you'll come back to me during

17   deliberations and say, Hey, I want a transcript.

18            (Audio distortion interruption.)

19            Well, somebody disagreed with that comment.  I'm not a

20   hundred percent sure what that was, but there it is.

21            Let me say that trial will start at 9:00 every

22   morning.  This morning was a killer in terms of traffic.  I was

23   sitting there sweating bullets, seeing if I could get off the

24   Pike.  It literally took me an hour and it usually takes me 15

25   or 20 minutes.  Listening on the radio, the Southeast
```

1    Expressway was brutal.  Coming down from the north was brutal.

2    It was brutal this morning.  A little rain scares everyone.

3          But if you're late, we all wait.  That's the basic

4    bottom line.  I can't get started until everyone's here.  I say

5    the same to the attorneys.  So please give us -- leave plenty

6    of time to get here.  If, however, you do find yourself delayed

7    because of traffic or whatever, communicate.  I'm really not

8    asking you to violate the law, I'm not, but if you happen to

9    have a cell phone and you know that you're going to be like a

10   half hour late because of traffic, let us know, and we're not

11   sitting there worrying are you sick.  You know, so it's really

12   important to just communicate with us or the jury room.  I

13   believe you'll get a phone number.  Is that right.

14         THE CLERK:  Yes, Judge.

15         THE COURT:  So let us know whether you're going to be

16   delayed for some reason.

17         And that, of course, brings us to the whole issue of

18   COVID.  I can't guarantee that everyone in this room is

19   vaccinated.  I don't know that.  So we've seated you one seat

20   apart from everybody else.  I think all the attorneys are

21   vaccinated.  I don't know about all the witnesses.  I don't

22   know about all the people sitting here.  Okay?  But for the

23   safety of my staff and for the safety of everyone here, I have

24   implemented a rule in this courtroom that we all wear masks

25   except when speaking if there's a problem with being heard.

1          So I will start off there.  The second thing is if you

2     feel sick in the morning, don't come in.  I'm assuming everyone

3     will do that in good faith.  I mean, there's always -- you

4     know, you wake up, you have a sore throat, you feel crummy, I

5     don't want to take the risk with everyone.  Then there's, well,

6     what about a little scratchy throat.  I guess everyone's going

7     to have to use their best judgment.  If you really feel lousy,

8     maybe it's the flu, maybe it's a bad cold but maybe it's COVID,

9     and I would prefer to err on the side of being safe for all of

10    you, because you're in that courtroom over there.  I hope you

11    all stay spread out.  At least one of you is not vaccinated.  I

12    just want to make sure that everybody is safe in there.  So

13    either stay the social distance location apart or essentially

14    wear your mask.  I leave it up to you.  We're all living in a

15    society right now, everyone makes their own judgments as to how

16    to handle that.

17         We'll provide a lunch break for you.  We'll go from

18    9:00 to 11:00.  Then, as I mentioned, we'll have a quick snack

19    like you did this morning, and then we'll go until 1:00 and

20    then we'll take lunch.  You can walk around.  There are

21    fabulous, albeit expensive, restaurants in the area.  By the

22    way, our caf here is pretty great.  It's the best deal in town

23    in terms of salads and sandwiches and the like.  It's fairly

24    inexpensive.  There's a new bookstore that just opened.  It's a

25    pretty cool place just to take a walk if the weather is nice

1    but, anyway, we'll come back from 2:00 to 4:00.

2             I think at this point I'm going to turn it over to --

3             Oh, I should say another instruction is please be

4    rude.  Isn't that a weird instruction?  Please be rude.  When

5    you see all these folks, you're going to start getting to feel

6    like you know them.  You cannot talk to them in the hall.  You

7    can't talk to them in the lunch line.  You can't talk to them

8    downstairs, they can't talk to you, because as soon as someone

9    talks to someone, I guarantee you someone will see it.  They

10   come running to me and say, So and so was talking to one of the

11   jurors, and it's embarrassing for absolutely everybody.  So

12   please be rude and not talk with anyone involved, either

13   witnesses or lawyers or the team or whatever.

14            Once again, if you want to ask questions, just write

15   it out and hand it to us and I will then -- I'll ask it of the

16   witness myself or I'll hand it to the lawyers and say you need

17   to address this issue.  So I think that is addressing

18   everything.  We'll do an opening statement from the SEC.

19   Because you all had a -- you all had a snack in there, right?

20   So I might have a late lunch here, or I'll leave it up to the

21   defense as to whether they want to go right away or whether

22   they want to wait until after lunch.

23            Okay?  Done.

24            Who's going to do the opening?

25            MR. JONES:  I will, Your Honor.

```
 1              THE COURT:  I remind you it's not evidence.
 2              MR. JONES:  Your Honor, if we could have the monitors
 3     on, that would be great.
 4              Your Honor, it's my understanding that the court wants
 5     the masks off for the opening?
 6              THE COURT:  It's up to you.  I would prefer it so
 7     people can hear, unless you don't feel --
 8              MR. JONES:  Your Honor, if you prefer it, absolutely.
 9              There's lots of rules about buying and selling and
10     writing about stocks.  A lot of them are complicated.  But many
11     of them are not.  One particular, it boils down to this:  When
12     you write about stocks, you can't lie.  That's it.  You cannot
13     lie when you write about stocks.  You're permitted to publish
14     true facts and analysis.  But if you lie, you've broken the
15     law.  And you will see that that's what happened here.
16              The defendant is a hedge fund manager.  He lied about
17     a stock to make money.  The defendant writes about stock.  In
18     2014 he decided to write about a company called Ligand
19     Pharmaceuticals.  Ligand is a company that makes medicines and
20     medical technologies.  At the time defendant was also running a
21     hedge fund and that fund is investing in what the defendant is
22     writing about.
23              The defendant's scheme, it's all about one thing.
24     Push the price of Ligand stock down as low as it could go for,
25     you see, the defendant and his hedge fund had invested in
```

1    Ligand in a way that made money when the stock price went down.

2            The defendant wrote reports and gave interviews and

3    they were all about Ligand and it was to convince everybody

4    that the stock of Ligand was worth zero, nothing, worthless.

5    But to try to convince people that he was right, he went beyond

6    true facts and analysis.  The defendant lied about Ligand.

7    Because people weren't just going to take his word for it, he

8    made up facts designed to mislead people, mislead them into

9    thinking that he was right and that Ligand's stock really was

10   worthless.  Why?  Well, to make a buck.  Actually, to make

11   about 1.3 million bucks for himself, his family and his hedge

12   fund.

13           The defendant's scheme, this dishonest campaign to

14   drive down Ligand's stock, it was backed with a string of lies.

15   The defendant lied to make a profit.  He lied so that people

16   would think he was right.  And that's what brings us here

17   today.

18           Father Lemelson is an Eastern Orthodox priest.  He's

19   also a hedge fund manager who writes about stocks.  There's two

20   parts of his life.  We're here to talk about one of those, the

21   one that writes about stocks and runs a hedge fund.  That hedge

22   fund is called The Amvona Fund.  You can see it here.  A hedge

23   fund -- we hear this term a lot -- it's basically just a bunch

24   of people who take their money and pool it together and have

25   somebody invest it for them.

1          The defendant is the one in charge of investing the

2     money in The Amvona Fund.  He's called an investment advisor,

3     someone who receives money to make investment decisions for

4     other people.  The defendant also has a firm called Lemelson

5     Capital Management.  It's an investment advisory firm, just a

6     business that does the work of the investment advising that the

7     defendant does.

8          Now, I'm Marc Jones, as you heard earlier.  This is Al

9     Day.  This is our team, Alyssa DiPaola, Cole Taylor and Jesse

10    Tingson.  We're from the SEC.  The SEC helps enforce the laws

11    that protect investors and prevent people like stock traders

12    and investment advisors from defrauding people.

13         Now, there's one more thing you need to know, it was

14    what the judge said earlier about short selling.  You remember

15    I said earlier that the defendant at his hedge fund had

16    invested in Ligand in a way that made money when the price went

17    down.  That's called short selling.  Sometimes it's just called

18    shorting.  Most of the time when you hear about investments,

19    you hear about buying a stock and you hope the stock price goes

20    up, and if it goes up, you make money.  This is just that in

21    reverse.

22         This is a way to make money when the price of the

23    stock goes down.  So when the stock price goes down, you make

24    money.  When the stock price goes up, you lose money.  When you

25    establish a short position, when you start this short selling,

1    that's called selling short.  When you finish at the end and

2    you want to take your profits and cash in or your losses and

3    cash in, that's called covering.  It's just a term we use,

4    "covering."

5           And that's what the defendant was doing.  From May and

6    June of 2014 he shorted Ligand.  You can see here to the tune

7    of about 4.6 million dollars.  From June to August for every

8    dollar that Ligand stock went down in price, the defendant and

9    his hedge fund stood to gain about $70,000.  In August, the

10   defendant covered -- that is, again, he took his profits out --

11   about half of his investments and he covered the other half in

12   October.  And when he was done, he made about 1.3 million

13   dollars for himself, his family and his hedge fund.

14          You're going to hear a lot about Ligand and you're

15   going to meet some of the people who worked there.  Ligand is a

16   company that develops medicines, medical ingredients, medical

17   technologies.  Some of those medicines they partner with a

18   large pharmaceutical company and that large pharmaceutical

19   company markets it and sells it and manufactures it.  Ligand

20   doesn't do that kind of stuff.  Some of the medicines are still

21   in research, still being developed and hopefully some day will

22   become a medicine that people take for various illnesses.

23          Back in 2014 Ligand was not a big company but it did

24   take in about 65 million dollars a year.  But what was the

25   defendant's pitch about Ligand?  Well, it was this:  The

1    defendant's pitch was that Ligand was on the verge of collapse

2    and it was about to go bankrupt, that its stock was worth zero.

3    Now, you'll meet the folks who work at Ligand and they'll give

4    you some facts that show that what the defendant wrote about

5    Ligand was, well, false and they'll explain that Ligand was

6    doing quite well in 2014 and it's doing even better today.

7        And you will see how the defendant was trying to tear

8    down what they were working for, questioning their ethics,

9    accusing them of fraud, all to make money for his hedge fund,

10   and like most people you'll see that that upset them, made them

11   angry, and in the heat of that battle, in the course of being

12   smeared for fraud and dishonesty by the defendant you'll see

13   that they called Father Lemelson some names and that they

14   thought about doing some things to stop him like maybe hiring

15   an investigator or something like that, but you'll see they

16   didn't do anything like that.  What did they actually do?

17   Well, they called the SEC, the regulator who takes care of

18   these matters.

19       So the defendant's writing his reports and his

20   interviews.  He's pushing his pitch that Ligand's stock is

21   worthless and the backbone of that dishonest campaign is a set

22   of four lies the defendant wrote or said.

23       The first lie is about something called Promacta.

24   Well, Promacta is a medicine.  It helped some people who, for a

25   variety of medical reasons, don't have enough platelets in

1    their blood.  If you don't have enough platelets, then you can

2    suffer from uncontrolled bleeding, internal bleeding.  It can

3    be quite dangerous.  So Promacta does something about that.  It

4    helps people with different medical disorders who don't have

5    enough platelets in their blood.  If you don't have enough

6    platelets, that can cause you to need a drug like Promacta.

7           In 2014 Promacta was Ligand's biggest product.  It's a

8    fact that the defendant knew very well, as you'll see.  As I

9    said, Ligand partnered with big companies to manufacture and

10   sell Promacta.  And when they did, they paid Ligand a share of

11   the money that they got from those sales.  Those payments from

12   Promacta, those payments to Ligand from those big companies,

13   were a key part of Ligand's business.  It was its bread and

14   butter.

15          And you will see that Promacta did very well.

16   Eventually Promacta became what they call a blockbuster drug.

17   Eventually it got sold off -- the rights to Promacta got sold

18   off to another company for more than 800 million dollars.  But

19   that's not what the defendant wanted people to believe.  He

20   wanted people to believe that Ligand was a fraud and that its

21   stock was worth nothing; and his number one reason for why

22   Ligand's stock was worth nothing, according to the defendant

23   Promacta was going away.  He said that the medicine was now

24   obsolete and that Ligand would lose its main way of making

25   money.

1            It's the title of his very first report.  You can see

2      it here:  Severe Competitive Threat to Key Royalty Program and

3      Going Concern Risk Drive One Hundred Percent Downside.  Now,

4      you'll have a chance to read this entire report when you

5      deliberate and during trial.  But for now let's focus on this

6      title.  This key royalty report here he's talking about,

7      Promacta is their key program.  The royalty, that's just a term

8      for the money that they would get from the bigger company who

9      was selling Promacta.  And a hundred percent downside, what

10     does that mean?  Well, that's the defendant saying that people

11     who are invested in Ligand are likely to lose all of their

12     money, that the stock will go to zero.  In other words, this is

13     a big deal.

14            The defendant is saying that people who invest in

15     Ligand risk losing all their money because Ligand's main

16     product, Promacta, is going away.  And he puts out this report

17     and he claims Promacta is going away and that Ligand will lose

18     its biggest product and he puts it out and does everything he

19     can to get it published on the web, on various investor

20     websites, in the media, and you'll see what happens next.  The

21     stock price of Ligand goes down for the next couple of days.

22     But then it starts to come back up.  And you remember when it

23     goes down, the defendant's hedge fund makes money; but when it

24     comes back up, they start to lose that money.

25            So that's a problem.  Before the defendant published

1    his lies about Ligand in this report, the defendant had asked

2    for a phone conversation with Ligand Management and he ended up

3    talking to the investor relations professional for Ligand, a

4    man named Bruce Voss, but he didn't talk to him until after he

5    published this first report.  And you'll hear on that phone

6    call that the defendant didn't really care what Ligand had to

7    say.  He only cared about really trashing the company to make

8    that stock price sink.

9         And the morning after that phone call with the

10   investor relations professional, he was scheduled to be on an

11   Internet radio show, a show called Benzinga Premarket Prep that

12   gets put up on YouTube and broadcast over the Internet.  That

13   morning Father Lemelson is the Benzinga guest interview and he

14   wasn't going to leave his Promacta claims as is.  No.  That

15   morning on the Benzinga radio show, the defendant takes the mic

16   and tells everyone listening that Ligand agreed with him.  He

17   claimed that Ligand admitted that he was right.  Let's hear his

18   exact words.

19         (Audio played.)

20         MR. JONES:  "I had discussions with management just

21   yesterday -- excuse me, their IR firm -- and they basically

22   agreed, they said, 'Look, we understand that Promacta is going

23   away.'"  What's the defendant saying here?  Well, the IR firm

24   he's referencing is the investor relations firm where that

25   gentleman he talked to on the phone worked.  These are people

1    hired by Ligand to communicate to investors for them.  And the

2    defendant is saying that just the day before Ligand, through

3    its official representative, somehow agreed that Ligand's

4    biggest product was going away.  The defendant goes on Benzinga

5    and he says that Ligand is admitting to him and him alone over

6    the phone that its biggest product will no longer be used and

7    that it is obsolete.  But ladies and gentlemen, that just

8    didn't happen.

9         You will meet the investor relations professional that

10   the defendant spoke to.  His name is Bruce Voss.  He's a

11   seasoned investor relations professional.  He's worked with

12   Ligand for years.  He knows their business inside and out.  And

13   he will tell you how the defendant talked over him, wasn't

14   interested in anything that he said, had no interest in the

15   truth.  You will hear that it was the defendant on that call

16   who said that Promacta was going away.

17        But as to the defendant's claim that the company

18   agreed and that Voss said that Promacta was going away, that

19   didn't happen.  In fact, the opposite of that happened.  And

20   you'll hear that directly from Mr. Voss and you will hear that

21   he would never have agreed with the defendant about Promacta

22   going away because he knew it wasn't true.  He knew Promacta

23   was not going away.  He knew Promacta was doing well.  It

24   contradicted everything that he knew about the company and its

25   product, the company that he had worked with for years.  And

```
 1    the evidence will show what Mr. Voss did when he heard the

 2    defendant's claim about the conversation.  You'll see this

 3    email.  Do you all have it on your screens there?

 4            Oh, are the screens off?  That's not good.  We'll fix

 5    that.

 6            THE COURT:  Have you turned them on?  Did you press

 7    the buttons?  They're like --

 8            MR. JONES:  You probably all thought that I thought

 9    your eyesight was a lot better than I thought it was.

10            THE COURT:  They're not going on?

11            MR. JONES:  They're not on.

12            THE CLERK:  They're on and it's on HDMI.  Let me

13    just --

14            MR. JONES:  Oh, we're good.  We got the thumbs up.

15            This is a lot better than it used to be.  We used to

16    bring big cardboard things and put them up on something like

17    this.

18            THE CLERK:  Still nothing?

19            MR. JONES:  Still nothing.  I'll make sure I'm reading

20    what's on the slide here and that will help.  Okay.  Everybody

21    ready?

22            THE COURT:  There are some people watching on Zoom.

23    We may take that down and see if that's interfering with it.

24            MR. JONES:  Your Honor, I think that's fine.  In the

25    interest of time, I think I'll just forge ahead.
```

```
 1              THE COURT:  Okay.
 2              MR. JONES:  So you'll see this email, and you'll have
 3     it in the jury room, and we'll put it up during testimony.  And
 4     you'll see that Mr. Voss said to the defendant, It wasn't me
 5     who said Promacta was going away.  It was you, defendant, that
 6     said that Promacta was going away.  And then you said, Don't
 7     you agree?  And you'll hear from Mr. Voss that he did not agree
 8     and he never would have agreed because it wasn't true.  Then
 9     Mr. Voss goes on to recount what he did say, that Promacta had
10     multiple uses and would continue to be used.
11              Now, let's fast forward a couple of weeks and talk
12     about the next lie.  At that point the defendant is writing
13     about a new topic.  He opened up a new line of attack.  This
14     involves a company called Viking Therapeutics.  Now, Viking at
15     that time was a start-up company just getting off the ground.
16     It was a company that was going to develop medicines.  They
17     call it a drug discovery company.  And you'll meet the guy who
18     in 2014 or 2013 -- 2013 and 2014 was getting it off the ground,
19     getting it started.  Viking struck a deal with Ligand.  What
20     was the deal?  It was so that Viking could get a shot at
21     helping people by developing medicines that Ligand had
22     essentially sitting on the shelf undeveloped.  And you will see
23     that Viking was getting ready to sell its own stock in the
24     stock market to raise the money to do that medical research.
25              But the real Ligand/Viking partnership wasn't the kind
```

1    of story the defendant was interested in telling.  It didn't

2    fit with his campaign to drive down the price of Ligand stock.

3    No.  Instead the defendant went to work on a new story in a new

4    report.  He painted Viking as a shady shell company.  He

5    painted it as a scheme by Ligand to create paper profits and

6    stuff its balance sheets.  He insinuated the agreement was

7    illegal.  He called it alchemy and he likened it to a street

8    corner con game called three-card Monte.  He did everything he

9    could to convince people that Ligand was involved in crooked

10   financial dealings because of their partnership with Viking.

11   But just calling the Viking/Ligand partnership a bunch of

12   names, that wasn't going to drive the stock down.  No.  So once

13   again the defendant lied.  In order to make what he was saying

14   about Viking sound real, he backed it up with two statements.

15   Those statements were false and you'll see evidence that the

16   defendant knew they were false.

17          Those lies appeared in another one of the defendant's

18   reports, this one on July 3.  Here it is.  It says Lemelson

19   Capital further increases short stake and reaffirms a hundred

20   percent downside risk in Ligand Pharmaceuticals.  Again,

21   increased a short stake, that just means that the defendant and

22   his hedge fund invested more money in the price of Ligand going

23   down.  And you can see again the hundred percent downside risk

24   that the defendant is pushing.  That means the defendant is

25   telling people Ligand stock is worthless.

1            So this is the second lie of the four I told you.

2    This one is about Viking and its auditor.  Viking, like a lot

3    of companies, has an auditor.  The auditor checks their

4    finances and their financial statements to make sure they're

5    done right.  They're an independent company.  They get paid by

6    the client, but they have to stay independent, and they check

7    over those financial statements.

8            The Viking auditor was a company called Marcum.  What

9    did the defendant say about Viking and its auditor?  Well, he

10   said this:  In other words, Marcum was merely hired but the

11   company has not yet even consulted with the firm on any

12   material issues.  The financial statements provided on the S-1

13   accordingly are unaudited.

14           What does this mean?  The defendant is saying that

15   Viking hired an auditor but didn't ask them about anything

16   significant.  That's the material issues part.  And he is

17   saying that the financial statements that Viking had shown the

18   world and the SEC hadn't been checked by the auditor.  You'll

19   hear evidence that if that were true, it would have been a big

20   problem.  It would have been a problem for Viking.  It would

21   have meant that no outside independent party had reviewed

22   Viking's financial statements and determined that they were

23   done in a correct way.  And you'll hear that Viking had to get

24   its financial statements checked by an auditor, which it did,

25   in order to go public, to sell Viking stock to the public to

1     get money to develop medicine.  And if it didn't have an

2     auditor, they weren't going to do that.

3           If there was no auditor, and the defendant said there

4     wasn't, there'd be no public sale of Viking stock, no

5     medicines.  No deal, really.

6           But what the defendant wrote about Viking and its

7     auditor and its financial statements, it wasn't true.  You will

8     hear from Viking's CEO, chief executive officer, that Viking

9     had hired that national audit firm Marcum, that Marcum had

10    audited those financial statements, that it had issued a letter

11    that it had independently checked those financial statements,

12    that it had concluded that the financial statements were

13    properly prepared.  You'll also hear from one of those auditors

14    from Marcum, who will say the same thing, that his firm did

15    just that, and you will see the evidence that will show the

16    defendant knew his statement was false.

17          Right there in the document that the defendant said he

18    was relying on, that Viking S-1 form or the form that has to

19    get filed with the SEC if you want to sell stock -- we have a

20    lot of forms -- you'll see right in that form that it says,

21    Effective as of April 7, 2014, our board of directors appointed

22    Marcum LLP, or Marcum, as our independent registered public

23    accounting firm to audit our financial statements.  And in that

24    same document you'll see the letter from the auditor that says,

25    We have audited the accompanying balance sheets of Viking

1    Therapeutics as of December 31, 2012 and '13, right in the

2    document that the defendant said he had relied on.

3            Now we come to false statement number 3.  It was not

4    enough for the defendant to say that Viking didn't have audited

5    financial statements.  To really make the story stick, he

6    turned to something far more core.  He said that Viking was not

7    going to develop medicines at all.  Viking, as I mentioned,

8    reach this agreement with Ligand.  Viking took over five drugs

9    that Ligand hadn't yet developed.  They kind of had them on the

10   shelf.  They were waiting.  And Viking agreed to do the testing

11   and the analysis and the work necessary to get them approved as

12   medicines.

13           You'll hear from Viking and Ligand that for both sides

14   this was an important deal.  For Viking it was a chance to get

15   off the ground, to start an exciting set of projects that could

16   lead to profit and new medicines on the market.  And for Ligand

17   it's a chance to take some of those medicines, some of the

18   drugs that it had on the shelf and actually get them developed

19   so that they could reach the market and help sick people and,

20   yes, generate some profits for Ligand as well.

21           But that's not what the defendant told people.  That

22   wasn't part of the shell game, con game fraud that he was

23   throwing at Ligand and Viking.  Instead the defendant wrote

24   that Viking wasn't going to conduct tests or trials necessary

25   to get medicines approved.  Let's look.  Viking does not intend

1    to conduct any preclinical studies or trials.

2         But here's the thing:  The defendant knew that

3    statement was false when he wrote it.  The evidence will show

4    that it was right there on the form he said he was relying on

5    on page one in black and white.  Right there on page one it

6    talks about how there are five drug candidates in clinical

7    trials -- in clinical trials or preclinical studies.  It talks

8    about a diabetes drug entering clinical trials.  It talks about

9    two cancer drugs starting clinical trials early in 2015.  It

10   talks about a liver drug already in a study and scheduled to

11   start a preclinical trial the next year, all right there on

12   page one.  And you'll have this S-1, it's a really thick

13   document, and you'll see it says this again and again and

14   again, that this is what Viking is going to do with these

15   medicines, these studies, these trials.  But that's not what

16   the defendant wrote.  He wrote the opposite.

17        Now, let's get to the last of these, the fourth one.

18   This one is about Ligand being insolvent.  Now, during the

19   trial the evidence will show that insolvency basically means

20   for a company you can't pay your bills.  We'll get a little

21   more technical about it.  Sometimes it means that your

22   liabilities are greater than your assets.  And you'll hear from

23   the people running Ligand that they had no problem paying their

24   bills.  They didn't have any problems then and they haven't had

25   any problems since.

1           They had no problems staying in business.  The

2    business grew.  People were willing to lend them money to grow

3    even more.  No bank, no auditor, no lender ever suggested to

4    them that they were even close to insolvent.  In fact, Ligand

5    was able to get a special kind of loan from investors.  You'll

6    hear about it during the case.  Those investors were willing to

7    lend Ligand 245 million dollars.  And at the time the defendant

8    was writing Ligand still had about 160 million in the bank.

9           But the defendant declared that Ligand was insolvent.

10   He wrote that the 225 million debt issuance solidifies the

11   company's insolvency and substantially raises the specter of

12   bankruptcy.  He didn't just leave it at a flashy title.  He

13   wrote about how there was -- further deepens the already

14   significant concerns about Ligand's imminent insolvency and the

15   company's substantial risk of bankruptcy.  He wrote that the

16   company's liabilities exceeded their tangible assets, meaning

17   the company was insolvent.  And he wrote that if the bond

18   offering succeeds, the company's liability will again exceed

19   its assets and the company will be technically insolvent once

20   more.

21           You might think it would stop there, but it doesn't.

22   The defendant puts out another report.  This report on August

23   27 -- 22, excuse me.  This one is called Institutional Holders

24   Waste No Time Dumping Stock in response to mounting insolvency

25   and bankruptcy risks.  And he gives a sort of math formula

1    here.  This one says that the company revealed that it issued

2    245 million in new debt against tangible equity of just 21

3    thousand, giving rise to a debt-to-tangible-equity ratio of

4    11,667 to one.  He says that is $11,667 in debt for every

5    dollar in tangible common shareholder equity.

6         And then one more, he says that shareholders only have

7    the protection of $21,000 in tangible equity to shield them

8    from 245 million dollars in debt.  But you see, all that was

9    misleading too.  And the defendant said Ligand was insolvent

10   over and over and over when it wasn't.  And the evidence will

11   show that Ligand was anything but insolvent.  The defendant

12   said his math formula, that debt-to-tangible equity ratio, he

13   said that showed the company was insolvent, it established it,

14   when it didn't.  Why did the defendant say this?  Why

15   repeatedly write that Ligand was broke when it wasn't?  Well,

16   because Ligand's healthy financial picture wasn't going to

17   drive the price of the stock down.

18         The defendant needed something bad, some way to

19   justify saying that Ligand was worthless and that investors in

20   Ligand were going to lose all their money.  So the defendant

21   lied and said that Ligand was broke.  He misled people by

22   leaving out important facts like that 160 million dollars in

23   the bank, like the steady stream of revenue that Ligand had

24   coming in month after month, and the valuable rights to

25   research and medicines that they had.  The defendant just

1    declared all that to be, again, worthless, zero.  He didn't

2    even analyze those assets.

3           So that's the fourth of the four lies.  Here they are.

4    The Promacta statement, the Viking audit statement, the

5    clinical trial statement and the insolvency statement.

6           Defendant spread those reports and those lies as far

7    and wide as he could.  He put them on investor websites like

8    Seeking Alpha.  He did interviews like on Benzinga.  He talked

9    to reporters from USA Today and others.  And he put them out on

10   the web, including his own blog.  And when people criticized

11   him online, he'd try to get their comments deleted.  When

12   people published their own commentary, he and his partner, they

13   would accuse them of secretly colluding.

14          You will see that Ligand got calls and emails about

15   what the defendant was writing asking is this true?  Can it be?

16   And you'll hear from some professional investors who were

17   invested in Ligand at the time that the statements and the

18   topics that the defendant was lying about, those were important

19   topics to them.  If they were true, they were crucial pieces of

20   information that anybody who was invested in Ligand would need

21   to know in order to make a decision about whether to continue

22   to invest in Ligand.

23          THE COURT:  How are we doing timewise?  We're about 35

24   minutes.

25          MR. JONES:  Yes, Your Honor.

1          They felt that they had to check them out.  The whole

2     point of the defendant's scheme was to spread lies as widely as

3     possible so that people would see them, believe them, get

4     worried about investing in Ligand and cause the price of Ligand

5     stock to fall.  None of it was an accident.  He told people he

6     was a short seller, and that was not a license to lie.  He told

7     people he was writing his opinions.  But that doesn't give you

8     the power to make up facts to support those opinions.  The

9     defendant lied to convince people who heard his interviews and

10    saw his reports, convince them that he was right so that the

11    price of Ligand would fall and his hedge fund would make money.

12         Now, the defendant spread lies to another group:  His

13    hedge fund investors and people who were thinking about

14    becoming hedge fund investors.  You see, in addition to it

15    being against the law to lie about stocks, investment advisors

16    like the defendant can't lie to their investors or to potential

17    investors in that hedge fund.  Just like people can't use lies

18    to make the price of stock drop, they can't use lies to

19    convince their current investors that they're great at picking

20    good investments, and they can't use lies to make people who

21    are thinking about becoming investors, to convince them it

22    would be a good idea.  And you'll see the defendant did just

23    that.

24         He sent those reports and interviews to his hedge fund

25    investors and potential investors and bragged about the effect

1    that his reports were having on the price of Ligand stock.  And

2    he boasted about how he had brought down the price of Ligand

3    stock and he made money from Ligand short selling.  And by

4    using those lies with his investors and his potential

5    investors, the defendant, again, broke the law.

6           Those are the facts that we're going to bring you over

7    the course of the trial.  We'll show you by a preponderance of

8    the evidence that the defendant engaged in a scheme, a

9    dishonest campaign, to drive down the price of Ligand stock.

10   And when he used lies to do it, when he decided to wage that

11   dishonest campaign with statements designed to mislead people,

12   he broke the law, and he did it, all of it, to make money and

13   to succeed in his scheme.  That is a violation of the

14   securities laws.

15          After you hear all the evidence, we'll ask you to hold

16   the defendant responsible for his fraudulent scheme, for his

17   four lies and for his misrepresentations to his investors and

18   potential investors.  Thank you.

19          THE COURT:  I think -- if we can go on the Whisper

20   Tech thing for a minute.

21   **(SIDEBAR CONFERENCE AS FOLLOWS:**

22          THE COURT:  Did you want to go now or do you want

23   to -- I think we wait until after lunch, I agree.

24   **END OF SIDEBAR CONFERENCE.)**

25          THE COURT:  Let's go take our break for lunch.  Father

 1    Lemelson's attorneys will be doing their statement after lunch.

 2            I'll see you at 2:00.  You're welcome to go to Sweet

 3    Greens.  You're welcome to go downstairs.  You're welcome to go

 4    wherever you want.  I think it's miserable outside.  So you'll

 5    have to save your walk for tomorrow, but I need you back here

 6    at 2:00.  Thank you.  We're in recess.

 7            THE CLERK:  All rise.

 8    (A recess was taken.)

 9            THE CLERK:  All rise for the jury.

10    (Court and Jury enter.)

11            THE CLERK:  Thank you.  You may be seated.

12            THE COURT:  Mr. Hoopes.

13            MR. HOOPES:  Yes, Your Honor.  May I proceed, Your

14    Honor.

15            THE COURT:  Yes.

16            MR. HOOPES:  Good afternoon, ladies and gentlemen.  If

17    you remember, my name is Tom Hoopes.  And if the judge will

18    permit me to say so, it is so good to see you.  It's been a

19    long two years for our country.  It's been a long two years as

20    a trial lawyer to have this opportunity not only with you

21    individually but you as our country here today, because you

22    will form and perform an enormous service no matter how you

23    come out.  But I think you're needed in this case.

24            This case is about -- there's a story here.  And the

25    story has three characters.  One character is Ligand, one

1    character is Father Emmanuel or Father Lemelson, and the third

2    character is America and its values, and we'll talk about that

3    in a little bit; but let's talk a little bit about Ligand.

4    Ligand is a company that started out a number of years ago.

5    And it didn't do so well.  A lot of money went in.  A lot of

6    money went out.  And then two things happened.  In about 2007

7    they developed a product finally called Promacta.  And you've

8    heard about Promacta and it's a drug that helps treat issues

9    with regard to the liver which ends up producing blood

10   platelets so that people don't come down with those kinds of

11   issues.

12          And the second thing that happened is they cleaned

13   house and they brought in a number of other people, one of whom

14   was John Higgins, who's the CEO, who you'll hear about today.

15   And the company ended up rising on the back of Promacta.

16   Promacta was critical to its survival.

17          But in addition, as it grew, it tried to grow other

18   products and it had other numbers of employees, maybe 20, 25 at

19   its home base out there in California, and it decided in its

20   new model that it wasn't going to try to do everything.

21   Instead it was going to try to focus on sort of incipient

22   beginning technology and partner with big pharma.  Well, they

23   called themselves a billion-dollar company.  You'll see that in

24   the emails.  65 million dollars in revenue a year.  I don't

25   know how big you have to be to be a big pharma, but a billion

1    would seem to be about it.

2              Now, Father Lemelson is not a company.  Father

3    Lemelson is one individual.  He went to high school.  He went

4    to college.  He went to seminary and he came out as a Greek

5    Orthodox priest.

6              Now, Greek Orthodox priest, there's maybe 800 of them

7    in the country at this point, aren't maybe like the priests you

8    think about.  They can serve a parish and be paid by the

9    parish, but they can also, as many of them do, have to survive

10   on their own and also serve as a priest.  And that's what

11   Father Lemelson does.  And he'll tell you he's got a wife, four

12   children, and he needs to make a living.  And one of the things

13   he decided to do, after he'd done a couple other things in

14   addition to being a priest, to make a living was he got

15   interested in investments.  And he didn't get interested in

16   investing in investments as somebody who was trained on Wall

17   Street.  He got interested in investments like you and I might.

18   He read a book, The Intelligent Investor.  He'll tell you about

19   that.  As he got interested and gained more knowledge and more

20   acumen, he decided maybe he could start a small hedge fund.

21             So when Ligand is out with its billion dollars in

22   California, Father Lemelson is running his one-man hedge fund

23   from a small office here in Marlborough, Massachusetts.

24             Now, in addition to that, we have the -- sort of the

25   kinds of things he does with his hedge fund.  Hedge funds are

1    high-risk capital.  Not like us with our 401(k)s.  People take

2    a little money and they go a little higher risk, sort of like

3    you'll hear that Ligand does various kinds of risks.  Ligand

4    makes bets.  Father Lemelson's job or function was to take some

5    money and to invest it in ways that seemed smart.  And you

6    could do that one of two ways.  You can go long on a stock,

7    meaning you're going to bet that it's going to go up.  Or you

8    can go short on a stock, meaning you're going to bet that it's

9    going to go down.  And actually, they did more longs than they

10   did shorts.

11         It's kind of like the Chicago Futures Exchange, you

12   know, they bet on crops.  That's exactly what's kind of

13   happening here.  And his bets were based on research.  He would

14   carefully look, carefully research things, and then invest not

15   only some of his money but invest for other people who believed

16   in him and what he did, and actually did very well so that in

17   2013 he was named as one of the leading hedge fund return

18   people in the country, all of the United States.

19         So it's not like we're talking about a kook here.

20   We're talking about somebody who makes good investments and

21   sometimes hits and sometimes loses, just like Ligand, and just

22   like anybody who's in that business, because the third

23   character I told you was America.  One value we have in there

24   is the stock market.  The stock market capitalism was part of a

25   foundation for America and we all hear and read about the stock

market, and it has a huge impact on our lives.  I mean, I
wasn't around in 1929 but that's all you hear about, but we
were all around in 2008, and we all know the impacts of the ups
and downs.  But any company plays in the stock market.

And Ligand made a conscious choice that it was going
to play in the stock market.  Why?  Because it wanted money in
so that it could use the money to bet on products.  So Ligand
is in the market.  And the stock price to Ligand is important
not only as a reflection of the money that it can use, but to
attract more money and to attract more money than that so that
it can increase the number of products.  So money is the number
one thing.

And like all of us, people need to get paid, some more
than others.  And you'll hear that the Ligand executives made
money.  The investors who were sitting on the board made money,
and they had stock options.  And when you have stock options,
that means you make money when the stock goes where?  Goes up.
And they want to protect the upside, and that's it.  But they
knew the game they were in because they have the money to play.

Now, Ligand has a stock.  The stock's publicly traded.
Father Lemelson did his research and he found the stock and he
came across a lot of optimistic press releases.  He didn't
think that the numbers added up.  He didn't like the stock at
that particular price, which in America you can choose to do
that.  You see, when they want your money to buy the stock,

1    there's the other side of it, which is you can decide you like

2    it, don't like it, buy it, don't buy it, and you get to talk

3    about it on top of that.

4         And I say would in America with this is that the

5    reason this is so important today is you can see pressure

6    coming in from other countries where they don't allow that sort

7    of free exchange of ideas.  They don't allow a stock market.

8    You know, Putin isn't allowing us to do that.  China isn't

9    allowing that.  This is a repository and you are the

10   representatives of places and values where that can happen.

11        Now, he bought some of the stock.  He shorted it.  He

12   researched it.  He wrote it.  He spoke about it.  All of which

13   is legal.  And he talked about it and he did one other thing.

14   He said the magic words.  "I shorted this stock."  So when I'm

15   talking about it, "I shorted this stock."  So that everybody

16   knew where he was coming from.  It's like there's two people on

17   TV, one's a Democrat, one's a Republican.  "I'm a Democrat, I

18   say this," "I'm a Republican, I say this," just so everybody

19   knows the position.  So everybody who heard him talk or write

20   or listen knew that he was short, that his bet was that it was

21   overvalued and it was going to go down, going to go way down.

22        Now, Ligand didn't like what he said and you'll hear

23   they didn't like what he said.  But it's America.  You're big

24   boys, big women.  You know, you're in a company, you want

25   money, people get to talk about you.  But they didn't like what

1     he said.

2          So they had some options.  What are they going to do

3     with this?  Are we going to talk about it to the public?  Are

4     we going to sue?  Are we going to do something else?  And they

5     decided the first thing they were going to do was they were

6     going to call him about this report, you know, call.  Because

7     he already tried to schedule an appointment.  So the connection

8     there to ask some questions and to do it.

9          And you'll hear that first it was going to be a

10    witness you'll see tomorrow morning, Bruce Foehr was going to

11    -- Matt Foehr -- Foehr was going to talk to him.  Then they

12    changed it to Bruce Voss, who was the investor relations.  So

13    the company doesn't do the talking all the time.  They have

14    somebody who's a relationship person who does the talking.  So

15    they decided that he was going to do it.

16         So he made a call, and when he called, there were some

17    rules for the call.  The CEO -- because if you see it -- I'm

18    trying to be very careful to stay close to the mic because I've

19    been ordered to do that so that she can get the transcript.

20    The CEO's name is Mr. Higgins.  And below him is Mr. Foehr.

21    And Foehr would maybe make the call.  But below him the IR is

22    Voss.

23         But they wanted the call to be very specific.  They

24    didn't want it to be a free exchange of ideas.  They wanted him

25    to just listen.  They wanted Voss to find out what was in

1    Father Lemelson's mind.  And if you -- can I ask, are your

2    screens working?

3              THE COURT:  Are they working?

4              MR. JONES:  Great.  Thank you.

5              So you'll see.  Here's an email that you'll get,

6    here's a snippet of it.  It says from John Higgins.  It says

7    "Bruce," meaning Bruce Voss, "I proposed a narrative for a call

8    for you to have with Lemelson.  Specifically in my proposal I

9    do not think the first call should be to jump into the content

10   or rebuttal.  I'd like to feel him out first for tone and

11   approach the research and what the purpose of the call would be

12   if he is not going to update a report.  To me if we jump right

13   into the rebuttal mode without knowing our counterparty, it

14   seems to me we are less prepared for any call we could have

15   later on substance."  So what's the message to Mr. Voss, the

16   internal relations guy?  Call and listen and find out what it's

17   about and maybe we'll have another call later.  So Mr. Voss

18   made the call, and then he got off the call and reported back

19   what was said.

20             In the meantime, Father Lemelson the next day was on

21   the radio station.  It's an Internet radio station.  It's

22   called Benzinga and it may be -- who knows how many people

23   listen to Benzinga, whether it's 38 or 300.  But he was

24   interviewed on it.  And one of the things that he said in the

25   interview -- if you could bring up number 2 -- was this: --

1   among the 20 minute call -- was, "I mean, I had discussions

2   with management just yesterday.  Excuse me, their IR firm.  And

3   they basically agreed.  They said 'Look, we understand Promacta

4   is going away.'"  So Father Lemelson is saying what?  He's

5   saying that he understands that they understood that Promacta

6   was going away.

7           So what did you not hear in the opening by the

8   government?  You didn't hear about a drug called Sovaldi,

9   S-o-v-a -- Sovaldi.  What does Sovaldi do?  Sovaldi was a

10  brand-new drug, just went on the market just a few months

11  before.  And this is 2014.  At the end of 2013 Sovaldi is

12  licensed and it's been on for a little bit and it is a killer

13  of a drug because these drug companies all compete.  And they

14  use words like competitive threat and what other kind of drug

15  is going to compete.  You all know when you go out you've got

16  three different drugs you can take for whatever the doctor

17  wants.  Same thing.  And it's a business.

18          Sovaldi was a potential threat to a number of people

19  in a number of different ways.  But in this case the thesis was

20  that Sovaldi was going to cause a problem for Ligand's market

21  of Promacta, which was its cash cow.  And so when Father

22  Lemelson was talking about that, that's what he was talking

23  about.  And it was his opinion and his feeling that something

24  was going to happen significantly with that.

25          Now, Voss heard and Higgins heard and Ligand heard

1    that Father Lemelson said that on Benzinga and they were not

2    happy.  And if you look at the next, number 3, they have an

3    exchange about it.  They have a dialogue by email who said

4    what.  What does Higgins think was said?  What does Voss say

5    was said?  Voss says, "As I wrote last night, he made that

6    statement with a rhetorical 'Don't you agree,' and I moved on

7    to the next subject as we had more to cover and his statement

8    was ridiculous."  Meaning what?  Meaning that Father Lemelson

9    said, "Don't you agree that Promacta is going away?  Sovaldi's

10   going to kill it."  And he didn't respond.  He didn't answer.

11   Well, when somebody doesn't answer and somebody doesn't

12   respond, what do you think?  You think that they agree with

13   you.  Which is exactly what his CEO said right down here.

14        "Also, if he said the CEO beats his employees would

15   you just move on because there were more things to cover or

16   would you take a moment to stick up for the CEO?  Promacta's a

17   big deal and a big part of our value and our business model.

18   He knows it too.  He gave you a softball" -- this is Higgins

19   talking to this internal investor relations guy -- "and you

20   just moved on?  Even one minute of soft info would have left

21   him with a different impression."  Than what?  Than a tacit

22   agreement.  Meaning you said as much because you didn't say

23   anything when he said it.

24        So if you're in Father Lemelson's head, according to

25   the CEO of this billion-dollar company, Father Lemelson was

1    within his rights to believe that he, in fact, did agree.

2           Now, Father Lemelson, after this, doubled down on the

3    bet, and he continued some issues that he found with Ligand.

4    First he said that a company that they were using to spin off

5    some drug called Viking was sort of a shell game, as you heard.

6    But more importantly what he said was that it was not doing its

7    own clinical studies.

8           The second thing he said was that Viking was

9    unaudited.  Well, that was a mistake on his part.  He was

10   referring to a form that's called an S-1 that's 196 pages, 56

11   times, 57 times in there it said that it was, in fact,

12   unaudited and six times it said that it was audited.  So that

13   was that.  But he referenced the report so that everybody could

14   see.

15          So not only did he say that it was shorted on his part

16   as a stock recommendation for him, but at the same time that if

17   you had any questions, all you needed to do was to go look

18   there.  And the third thing he said was that -- beyond Promacta

19   was he said that Ligand was insolvent.  Again, he said he

20   thought it was insolvent and he explained exactly how he got

21   there.  He explained the math of it, which they agree he did.

22   They explained -- showed his work -- you know, in math class

23   you show your work.  He showed his work.  That was his opinion.

24   More than that, he was relying on the book that got him there

25   originally, which is The Intelligent Investor.  So that he was

1    allowing so that people could figure out these things for

2    themselves.

3              Now, that's the critical piece, which is the law here

4    is very simple.  It's America.  If you have a sincere good

5    faith belief that what you say is accurate, that's the end of

6    the case.  You're entitled to have that.  It's also the fact

7    that the burden of proof to show that you did not have that

8    good faith belief is on the government.

9              Now, in this particular case he had that good faith

10   belief as to each of these four statements that have been

11   referenced to you by the SEC.  The first of them is the

12   Voss/Higgins email.  So on that one, the evidence will be

13   that -- what? -- the evidence will be that with Promacta that

14   even Higgins thought that it was a case of -- that even Higgins

15   thought that it was a case of him being in a situation where he

16   had tacitly agreed.  As to the not doing clinical studies -- if

17   we can see number 4 -- you can see as to the clinical studies

18   even Viking says, "We intend to rely on third parties to

19   conduct our preclinical studies and clinical study trials and

20   perform other tasks."  So that even Viking is saying that, in

21   fact, we're not going to do it.  We're going to have other

22   people do it.  As to the insolvency issue, as we've said, The

23   Intelligent Investor book is there.

24             So the point is very simply this:  In this country

25   it's not the question here of right or wrong.  It's not even a

1    question of good faith belief.  It's a question of have they

2    proven that he did not have a good faith belief.

3           Now, Father Lemelson will be in front of you.  He'll

4    speak and he'll tell you his view of things.  And you may or

5    may not find him a little eccentric or you may find him

6    somebody that you think is completely credible.  But in this

7    country, he can say what his opinion is, and it's critical that

8    he can.

9           Now, the issue is not so much -- completely the four

10   statements here, but it's also Ligand in this case was angry.

11   So when they get on the witness stand and they're testifying,

12   you're going to understand that they have certain bias.  And

13   they had three choices.  They could have stayed silent, which

14   they could.  They could, again, make a statement or they could

15   sue in a private action, or they could do what they did, was

16   they went to the SEC.

17          Now, they made a choice to stand silent.  So I guess

18   the question for you, ladies and gentlemen, is why did they

19   make that choice?  Why did they choose to stand silent?  Why

20   didn't they say something?  Why didn't they talk?  Why didn't

21   they issue a public press release?  Why didn't they bring their

22   own legal action?  Why did they end up going to the SEC?  Now,

23   in this case you'll see them making disparaging remarks about

24   Father Lemelson's religion.

25          If we can see number 5.  This is from Bruce Voss.  "I

1    had to hold back from pointing out that his BA and master's are

2    in theology and religious studies and not business or finance

3    and he does not have a CFA designation, but that could simply

4    stoke the fire and invite the wrath of God or at least some

5    Eastern Orthodox leader."  They decided that they would think

6    about an investigator, which is the next -- which is -- maybe a

7    good option is to consider an investigator.

8              But ladies and gentlemen, they had something more in

9    their mind that was going on here.  They had a project about

10   Promacta that was called Project Gold Mine.  Project Gold Mine

11   was a project that was in some slides that they had.  They were

12   trying to convince their partner, who was marketing Promacta,

13   that this drug was, in fact, a gold mine.  So that's number

14   one.

15             The next slide, please.

16             Six months, eight months before this, in September of

17   2013, there was an issue of whether or not they were going to

18   take action later on here.  And so that --

19             If we can go to the next one.  Thank you.  If we go to

20   number 9, which is Project Gold Mine.  And if we could go to

21   number 10, which is the board meeting.

22             So there's a board meeting by Ligand and they're

23   talking about something very important.  They're talking about

24   transitioning to a Wall Street based approach.  Not so much to

25   the drug, but a growth performance driven thing.  And in

1    February there's an email, February 1, from Mr. Higgins.  If we

2    could go to 222.  Then the next one after that.

3              So that HCV needs to be a big market for Promacta.

4              THE COURT:  I'm losing you a little just because

5    you're not -- in terms of the mic.

6              MR. HOOPES:  I'm sorry.

7              Not only do they need Promacta but Promacta needs to

8    be the driving force here, the big market to drive the growth.

9    Now, later on in February of 2014 there is an email from

10   Mr. Higgins, who is the CEO, to Mr. Foehr, who will be

11   testifying here, who says essentially, "Is Sovaldi going to

12   kill the entire market?  Is there going to be anything else

13   that we have" --

14             Ah, here we go.  Thank you.

15             Higgins to Foehr.  "Will any Sovaldi patients need

16   Promacta?"  "Will any Sovaldi patients need Promacta?"

17             So the question is very simply this:  Why did none of

18   these appear to the SEC?  Because when Ligand's attorneys went

19   to see the SEC, they made a presentation.  Nothing about

20   Sovaldi was in there.  When they went to see the SEC again in

21   the spring, nothing about Sovaldi was in there.  Nothing about

22   the Higgins email, nothing about the earlier board

23   presentations, nothing about Benzinga, and nothing about

24   Viking.  So if there was nothing about any of those, what was

25   the problem?  Because they wanted to say that Lemelson was the

1    problem.  He was telling them exactly what they had said.  The

2    president and CEO of Ligand had both agreed, in fact, that

3    there was a concern that this drug might go away, exactly what

4    Father Lemelson said on the Benzinga station.

5            Now, the last question is really why didn't they speak

6    up?  Why didn't they issue a press release?  Why didn't they

7    hire a crisis manager?  Why didn't they simply do what they're

8    doing here, instead of bringing in the SEC?  Why didn't they

9    get private counsel to bring a suit?  What were they afraid of?

10   Those are the questions that we're going to ask, and I'm going

11   to ask you as a jury to pay attention to it to find out what

12   their answers are.  Why didn't they just speak up like we do in

13   America?  And at the end of this case we're going to ask you to

14   find Father Lemelson not liable.  Thank you.

15           THE COURT:  Thank you.

16           Let me ask, does the SEC need this easel up here?

17           MR. JONES:  No, we don't, Your Honor.

18           THE COURT:  It might be better -- maybe one of you can

19   move it away.  You might need it again, Mr. Hoopes.  Maybe move

20   it like --

21           MR. HOOPES:  Yes, Your Honor.

22           THE COURT:  Maybe if you put it beside the public

23   screen.  Yeah.  Then we can have it ready to go in case you

24   need it.

25           I forget.  Our first witness is here, right?

```
 1              MR. JONES:  We believe so, yes, Your Honor.

 2              THE COURT:  Okay.  Great.  Thanks.

 3              MR. DAY:  Your Honor, we've prepared an iPad for the

 4    witness.

 5              THE COURT:  I can't hear a word you're saying.

 6              MR. DAY:  We've prepared an iPad for the witness with

 7    the documents on it as a backup in case the screen isn't

 8    working, something like that.  So permission to put it at the

 9    witness table.

10              THE COURT:  Sure.  I think the tech people worked on

11    it over the lunch break so I think we should be okay.  I'm not

12    sure whether the -- anybody on Zoom can see anything, but

13    that's not my primary concern.

14              You all have the screen, right?

15              JURORS:  Yes.

16              THE COURT:  Perfect.  All right.

17                        KEITH MARSCHKE, sworn.

18              THE COURT:  Could you state and spell your name for

19    the record.

20              THE WITNESS:  Keith Marschke.

21              THE COURT:  Why don't you just take off the mask.

22    We're having trouble hearing through masks.

23              THE WITNESS:  Keith Marschke, K-e-i-t-h

24    M-a-r-s-c-h-k-e.

25              THE COURT:  Thank you.  You may be seated.
```

```
 1            MR. JONES:  May I proceed, Your Honor?

 2            THE COURT:  You may.

 3            MR. JONES:  Thank you, Your Honor.

 4            THE COURT:  Now, your call if you want to keep your

 5    mask on.  I just have to say the court reporter needs to hear

 6    you.  So if you have trouble, Clary, just poke up, and then

 7    we'll ask you to take it off.  All right?

 8            MR. JONES:  Yes, Your Honor.  I may not risk it here.

 9    I'll make sure you can hear me.

10                         DIRECT EXAMINATION

11    BY MR. DAY:

12    Q.   Good afternoon, Dr. Marschke.  How are you?

13    A.   Fine.  How are you?

14    Q.   Good.  Thank you for coming.

15             Dr. Marschke, where do you work?

16    A.   I work at Ligand Pharmaceuticals.

17            THE COURT:  No.  We'll never hear you.  You can pull

18    the mic closer.

19            Let's try that again.  Where do you work?

20            THE WITNESS:  I work at Ligand Pharmaceuticals.

21            MR. JONES:  Looks like everybody is picking you up.

22    Thank you, sir.

23    Q.   How long have you worked there?

24    A.   Over 27 years.

25    Q.   Did you have a job before that?
```

1    A.    I was doing a post-doctoral fellowship.

2    Q.    Where were you doing that?

3    A.    University of North Carolina in Chapel Hill.

4    Q.    And did you get that doctorate?

5    A.    Yes.  This was after my doctorate.

6    Q.    What was the doctorate in?

7    A.    Molecular biology.

8    Q.    What's molecular biology?

9    A.    So we study things like DNA, proteins, things that are at

10   the molecular level.

11   Q.    Okay.  Do you have undergraduate work as well in science?

12   A.    Yes.

13   Q.    What was that in?

14   A.    Just general biology degree.

15   Q.    So you spent 27 years at Ligand; is that right?

16   A.    Yes.

17   Q.    Do you have a title there now?

18   A.    Yes.  I'm senior vice president of biology and scientific

19   affairs.

20   Q.    In 2014 were you under that same title?

21   A.    No.  I was vice president.  I wasn't senior vice

22   president.

23   Q.    And were your job responsibilities the same at that point?

24   A.    Similar.

25   Q.    Okay.  In your job, do you have a staff that reports to

1    you?

2    A.    I have two associates.

3    Q.    Okay.  And what are your job responsibilities at Ligand?

4    What do you do?

5    A.    So I have sort of two major responsibilities:  One for the

6    internal programs that we work on.  I manage clinical studies

7    that we perform.  And then I also, as part of the scientific

8    affairs part of the title, we have a lot of partnerships with

9    other pharmaceutical companies and I keep track of those

10   partnerships, update management on their progress.

11   Q.    Okay.  You work at Ligand Pharmaceuticals.  What does

12   Ligand Pharmaceuticals do?

13   A.    So we are a biotech company, and we have proprietary

14   technologies that we license to other companies to use.  But

15   also those -- we use those technologies ourselves for

16   development of drugs.  So we do both research and development

17   and then also sort of partnerships with other companies.  So we

18   license technology.

19   Q.    Okay.  And the research and development, is that all about

20   developing medicines?

21   A.    Yes.

22   Q.    Okay.  You mentioned also medical technologies.  What kind

23   of medical technology?

24   A.    So one technology that we have is involved in making drugs

25   soluble.  So certain drugs may not be able to be given into

1    your veins or something.  And so this technology allows those

2    drugs to be given like intravenously.

3    Q.   Solubility, does that mean it dissolves in water or

4    something?

5    A.   Correct.  So some drugs are not soluble in water.  So this

6    technology allows them to be soluble in water.

7    Q.   Okay.  So that would be sort of a medical -- medicine

8    ingredient, right?

9    A.   Correct.

10   Q.   In 2014 -- let's talk about 2014 for a minute -- how many

11   employees did Ligand have?

12   A.   There were about 20 employees.

13   Q.   Okay.  And how about now?

14   A.   Now I think there's over 160.

15   Q.   In 2014 how big a company was Ligand?

16   A.   It was pretty small.  We were considered a virtual company

17   because --

18   Q.   What does that mean?

19   A.   So we do most of our stuff in collaboration with other

20   companies.  So we manage the effort on the computer, you know,

21   through computer technology.  And the other companies actually

22   do a lot of the work.  So we contract with them to do the work.

23   Q.   I think we've gotten a little more used to virtual

24   companies nowadays.

25              So what is the day-to-day work at Ligand?  What are

1    the people who work there doing?

2          THE COURT:  Now, or in 2014?

3          MR. JONES:  In 2014.  Thank you, Your Honor.

4    A.   So in 2014, being a small company, so like, for example,

5    my work on a daily basis I would -- as far as the clinical

6    studies that we were managing, I would, you know, write

7    protocols, follow the progress of the study, how many subjects

8    we were getting.  Then on the scientific side, I would do, you

9    know, Internet research to determine what these other companies

10   are doing, their publicly disclosed information.  Plus do

11   research, are there other areas where we might want to invest

12   or license our technology.

13   Q.   Is that research essentially sort of -- you're looking at

14   the science side of things?

15   A.   Yes.

16   Q.   Okay.  And what's the day-to-day work of Ligand now?  Is

17   it the same or has it changed?

18   A.   So for the group -- we're now sort of in five different

19   locations.  The location I'm in, we still pretty much do the

20   same thing, but the other locations, we have laboratories where

21   they actually do research at the laboratory bench.

22   Q.   Generally speaking, what are those laboratories

23   researching?

24   A.   So one is researching this formulation technology that I

25   had mentioned.  That's located in Kansas.  There's another one

1    that does monoclonal antibodies.  I think that's something

2    familiar now to a lot of people.  So that's located in the San

3    Francisco Bay area.

4    Q.   So these laboratories all do their own scientific research

5    for Ligand?

6    A.   For Ligand, but also we have partners that license that

7    research or technology.

8    Q.   You've talked about partners a few times.  Those partners

9    are other companies; is that right?

10   A.   Yes.

11   Q.   In 2014 did Ligand also work with partners?

12   A.   Yes.

13   Q.   What's Ligand's reasoning behind partnering with other

14   companies?

15   A.   So in 2014, the reason was we were a small organization.

16   We couldn't -- if we discovered a new medicine, we couldn't

17   develop it ourselves.  We just didn't have the resources.  So

18   we could license it to another company that has the resources

19   and then they would do the development.

20   Q.   Back in 2014, that's what Ligand was doing, was

21   discovering new medicines and then working with others to get

22   them developed?

23   A.   Correct, or we had technology or drugs that we had

24   discovered prior to our reduction in headcount, or we acquired

25   some drugs that other companies had developed but were no

```
 1   longer pursuing.  We acquired them, and then we could license
 2   them to another company.
 3   Q.   When you said you acquired them, what does that mean?
 4   A.   So we purchased them.  We paid a fee, licensing fee to the
 5   company.
 6   Q.   Why would Ligand do something like that?
 7   A.   Well, you know, if another company was sort of in our
 8   situation, got too small, wasn't able to develop it, we could
 9   acquire it and then do the development or have -- pay for
10   someone else to do the development.
11   Q.   So in 2014 was Ligand actively developing drugs for
12   market?
13   A.   We were.
14   Q.   Did you have a number of partners?
15   A.   We had a lot of partners, but not on the drugs we were
16   developing internally.
17   Q.   Okay.  So on one side you're developing drugs internally
18   and on the other side you have partners that you're working
19   with?
20   A.   Yes.
21   Q.   And those partners do -- well, let me ask you this: Did
22   Ligand do any manufacturing on its own in 2014?
23   A.   We don't own the manufacturing.  So we contract that out
24   to manufacturing companies.  So this formulation technology
25   gets manufactured at a facility.  So we contract with them to
```

1    do the manufacturing.

2    Q.    Okay.  Dr. Marschke, one of the things you said you were

3    working on day to day or worked on back then day to day was

4    clinical studies and protocols for clinical study.  Did I hear

5    that right?

6    A.    Yes.

7    Q.    What is a clinical study?

8    A.    So a clinical study is when you test a drug in humans.

9    You do it in a clinical setting at a hospital or some other

10   facility.

11   Q.    Is there something called a preclinical study?

12   A.    Yes.

13   Q.    And what's that?

14   A.    So that's prior to when you test it in humans, you test it

15   in animals or in experiments, laboratory experiments.

16   Q.    Sometimes with cells or something like that?

17   A.    Cells, yeah.

18   Q.    And after the clinical studies, what happens to the drugs

19   you're trying to develop?

20   A.    So if it's successful and demonstrates that it's effective

21   and safe, then you file for approval with the FDA.

22   Q.    What's the FDA?

23   A.    The Federal Drug Administration.

24   Q.    Okay.  And what does their approval mean -- if you get

25   approval from them, what does that permit?

1   A.   So that permits you to market the drug.

2   Q.   Okay.  Let me ask you about a couple of people that you

3   work with.  Do you know a man named John Higgins?

4   A.   Yes.

5   Q.   And how long have you worked with John Higgins?

6   A.   Probably 13 years, 14 years.

7   Q.   What does he do at Ligand?

8   A.   He's the chief executive officer.

9   Q.   So the top person?

10  A.   The boss, yeah.

11  Q.   Okay.  Do you work with someone named Matt Foehr?

12  A.   Yes.

13  Q.   What does Mr. Foehr do?

14  A.   He's the president and chief operating officer.

15  Q.   So you have a chief executive officer and you have a

16  president?

17  A.   Yes.

18  Q.   Is one higher than the other?

19  A.   Yes.

20  Q.   Who's higher?

21  A.   The CEO is higher.

22  Q.   Okay.  What does Mr. Foehr do at Ligand?

23  A.   So he's sort of responsible for all the management of the

24  company, what the company does.

25  Q.   Are you familiar with a man named Bruce Voss?

1    A.    Yes.

2    Q.    And who's Mr. Voss?

3    A.    He's our investor relations consultant.

4    Q.    Does he work at Ligand?

5    A.    He doesn't work for Ligand -- he doesn't work at Ligand.

6    He works for Ligand.  We contract with him to do what he does.

7    Q.    He's part of a separate business?

8    A.    Yes.

9    Q.    We talked a little bit about partnering.  In 2014 was

10   partnering part of Ligand's business model?

11   A.    Yes.  The majority of our business was through partnering.

12   Q.    Are there different ways of partnering with other

13   companies?

14   A.    Yes.

15   Q.    What are some of those ways?

16   A.    So if we had a drug that we discovered and we licensed it

17   to a company, they then become our partner and they do the

18   development and take it to market if they can.  Then it's

19   possible that they partnered with us on our technology and then

20   they use that technology to discover a drug that they develop.

21   So those would be two types of partnerships:  A technology

22   partnership and then more of a drug partnership.

23   Q.    In 2014 was Ligand engaged in both those kinds of

24   partnerships?

25   A.    Yes.

```
1   Q.   As part of those partnerships, are you licensing the
2   things that you develop?
3   A.   Yes.  Either the drug or the technology.
4   Q.   So you would license it to the partner to participate in
5   that?
6   A.   Yes.
7   Q.   You also mentioned that you were acquiring other
8   companies.  Was that happening back in 2014?
9   A.   Yes.
10  Q.   Why would Ligand acquire other companies?
11  A.   So it would be to get access to certain technologies or
12  drugs that they had developed.
13  Q.   And that was something that was going on back in 2014 as
14  well?
15  A.   Yes.
16  Q.   Is there a way to buy and sell research without buying a
17  whole company?
18  A.   Yes.
19  Q.   How does that work?
20  A.   So like what we could do, if we had discovered a drug, we
21  could license just that drug.  And we do -- like this
22  monoclonal antibody part, we license with companies to use that
23  monoclonal antibody technology, but that's all they get access
24  to within the company.
25  Q.   So just that particular technology?
```

1    A.   Right.

2    Q.   Is there some sort of contract that goes along with that?

3    A.   Yes.  There's a contract agreement that limits the scope

4    of the collaboration.

5    Q.   For all these kind of partnerships, is there sort of a

6    partnership agreement or contract that backs them all up?

7    A.   Yes.

8    Q.   So that contract defines how the companies interact?

9    A.   Yes.

10   Q.   Does Ligand actually manufacture any of its own medicines?

11   A.   Not directly.  So it's all through a contract with a

12   manufacturing company or some other chemical synthesis company.

13   Q.   Well, why don't you make it yourself?

14   A.   It's very expensive.

15   Q.   Expensive to what?

16   A.   To manufacture it.  You have to have the facilities and

17   maintain them.  At one time we tried to do that.  It was not

18   profitable to do that.

19   Q.   Does Ligand sell its own drugs, its own medicines?

20   A.   No.  We did in the past but no longer.

21   Q.   When you say in the past --

22             THE COURT:  Can we just have some guidelines.

23             MR. JONES:  Yes, Your Honor.

24   Q.   Are we always talking about 2014, or are we talking about

25   now?

```
 1              MR. JONES:  I was going to clarify that, Your Honor,
 2      absolutely.
 3      Q.   So when you say "in the past," Dr. Marschke, what time
 4      period are you referring to?
 5      A.   Prior to 2014.
 6      Q.   So prior to 2014?
 7      A.   Yes.
 8      Q.   Like back in 2007, 2008?
 9      A.   We stopped selling drugs in about 2006.
10      Q.   Okay.  Just focusing on 2014 now.  Was Ligand selling any
11      of its drugs?
12      A.   No.
13      Q.   When I say that, I mean selling those drugs itself, right?
14      So your partners --
15      A.   Correct, we were not selling drugs ourselves.
16      Q.   The partners were the ones selling it?
17      A.   Yes.
18      Q.   Are you familiar with a substance called Promacta?
19      A.   Yes.
20      Q.   What is it?
21      A.   Promacta is a drug that increases platelets.
22      Q.   What are platelets?
23      A.   Platelets are a type of blood cell that's involved in
24      clotting to prevent you from bleeding.
25      Q.   So to make your blood clot?
```

1   A.   Yes.

2   Q.   So what does Promacta do with reference to the platelets?

3   A.   So it causes the body to produce more platelets.

4   Q.   And what part of the body produces platelets?

5   A.   So the platelets are initially formed in the bone marrow.

6   Q.   Okay.  Are platelets formed in the liver?

7   A.   No.

8   Q.   If you don't have enough platelets, what can happen to

9   you?

10  A.   You can bleed.  You can have bleeding.

11  Q.   Both internal bleeding and external?

12  A.   It would be mostly internal.

13  Q.   Is that dangerous?

14  A.   Yes.

15  Q.   Why?

16  A.   Well, if it happens in the brain, you can have a stroke.

17  If it happens in certain organs, they could stop functioning.

18  Q.   So it could be fatal?

19  A.   Yes.

20  Q.   Is not having enough platelets considered a serious

21  medical problem?

22  A.   Yes.

23  Q.   Promacta, does it go by any other names?

24  A.   In the United States it's called Promacta.  Outside of the

25  United States it's called Revolade.  And then it has a generic

1    named called eltrombopag.

2    Q.   Why does it have these different names?

3    A.   So the Promacta and Revolade names are the marketing

4    names.  So that's actually the drug that the drug company

5    sells, and it's in a pill form.  It's in boxes.  You know, it's

6    what's sold.

7         The name eltrombopag is the scientific name, the

8    generic name.

9    Q.   You also said there's Revolade?

10   A.   Yes, Revolade.

11   Q.   Is that the European name?

12   A.   Yes.

13   Q.   Is there any difference between Promacta and Revolade?

14   A.   No.

15   Q.   Were both of those names being used worldwide back in

16   2014?

17   A.   Yes.

18   Q.   And Promacta, is it a pill, is it a shot?

19   A.   It's a pill.

20   Q.   I'd like to talk, Dr. Marschke, about the discovery of

21   Promacta.  Were you part of that discovery process?

22   A.   Yes.  I worked in the group in our company that was

23   involved in discovering what became Promacta.

24   Q.   So when you say it's what became Promacta, can you

25   describe to us how Promacta got discovered?

1    A.    Yeah.   So back in 1995 we partnered with a company called

2    GSK, GlaxoSmithKline, and we had a technology to discover drugs

3    that increased blood cells in the body.   So they partnered with

4    us to do the discovery part of that, and part of that program

5    was to discover things that would increase platelets.   So in

6    1998 we did what's called a screen.   So we took thousands of

7    chemicals that aren't drugs -- they're just known chemicals --

8    and we tested them in our proprietary assays, tests, to

9    determine if any of them might have the ability to increase

10   platelets.

11          So when we did that, it was incredible, within the

12   first 1,000 compounds we tested we found something that was

13   active, which suggests it might increase platelets.   But the

14   problem was it wasn't a drug because it was actually an

15   industrial chemical, a dye, purple dye.   And so we knew that it

16   couldn't be a drug, that it would have to be modified in some

17   way to eventually become a drug.   And that's what happens in

18   most drug discovery is they discover something that needs to be

19   modified in some way to eventually become a safe and effective

20   drug.

21   Q.    So it was Ligand's technology it had that led to the

22   discovery of Promacta?

23   A.    Yes.

24   Q.    You said -- there was something about assays.   Can you

25   describe -- what did that part mean?

1   A.   That's just the type of experiment that we do, defined

2   experiment.  Sort of like a recipe for making something.  It's

3   a defined experiment.

4   Q.   So Ligand had the technology to discover Promacta.  So

5   then Ligand became part of -- had the interest in the Promacta?

6   A.   Yes.

7   Q.   Okay.  And that technology was key to discovering

8   Promacta.  It wouldn't have been discovered without it?

9   A.   Correct.

10  Q.   And you said that that was with a company called GSK,

11  correct?

12  A.   Yes.

13  Q.   Is GSK still around?

14  A.   Yes.

15  Q.   What is GSK?

16  A.   It's a large pharmaceutical company that markets and

17  discovers drugs.

18  Q.   In 2014 how was GSK related to Promacta?

19  A.   So they -- because they collaborated with us in the

20  discovery, they owned the rights to develop and market that

21  drug, Promacta.

22  Q.   And as part of that partnership -- well, actually, let me

23  take a step back.  I take it GSK did successfully develop and

24  market that drug; is that correct?

25  A.   Yes.

```
 1   Q.   In 2014 was Promacta out being sold on the market?
 2   A.   Yes.  It got FDA approval in 2008.  So it had been on the
 3   market for six years.
 4   Q.   Was it also selling in Europe at that point?
 5   A.   Yes.
 6   Q.   Was it selling under the name Revolade at that point in
 7   Europe?
 8   A.   Yes.
 9   Q.   Okay.  So in this partnership, it's Ligand on one side and
10   GSK on the other, correct?
11   A.   Yes.  We were in partnership, but.
12   Q.   Okay.  Sorry.
13            And which of the partners set the price for Promacta?
14   A.   GSK.
15   Q.   And did Ligand get any sort of say in what the price was
16   going to be of Promacta?
17   A.   No.
18   Q.   Which company did the marketing for Promacta?
19   A.   GSK.
20   Q.   Did Ligand get any say in how that medicine was marketed
21   to people?
22   A.   No.
23   Q.   And I take it you said Ligand's not doing any
24   manufacturing.  So is GSK doing the manufacturing as well?
25   A.   Yes.
```

1    Q.    In 2014, had that relationship been sort of the same in

2    terms of sales and pricing and manufacturing, had it been that

3    way for a while?

4    A.    Yes.

5    Q.    Let me talk about a couple other products at Ligand.  Is

6    there a product call Kyprolis?

7    A.    Yes.

8    Q.    What's that?

9    A.    That's a drug to treat a form of cancer that occurs in the

10   blood.  It's called multiple myeloma.

11   Q.    And is that a medicine that Ligand developed or helped

12   develop?

13   A.    No.

14   Q.    How did Kyprolis become part of Ligand's story?

15   A.    So it's one of those drugs that's not soluble in water.

16   So the company that was developing this drug came to Ligand and

17   licensed the technology that we have for solubilizing drugs,

18   and they used that in Kyprolis.  Then based on the agreement we

19   had with that company, we get milestones and royalties.

20   Q.    You said you get milestones and royalties.  So remind us,

21   the royalties are what?

22   A.    A royalty is like a percentage of the sales of drug that

23   the company would pay to Ligand.

24   Q.    So for every -- I guess it comes probably in a box.  For

25   every box of Kyprolis that's sold, Ligand gets some money?

```
1    A.    Yes.
2    Q.    Just like for every box of Promacta that's sold, Ligand
3    gets some money?
4    A.    Yes.
5    Q.    You said that part of Kyprolis, you have an ingredient in
6    that, right?
7    A.    Yes.
8    Q.    Is that Captisol?
9    A.    Yes.
10   Q.    What is Captisol, is that the solubility thing you told us
11   about?
12   A.    Yes.
13   Q.    So Ligand does get money because you can't have Kyprolis
14   without Captisol?
15   A.    Yes.
16   Q.    Dr. Marschke, are you familiar with the term indication?
17   A.    Yes.
18   Q.    What's an indication?
19   A.    So it's the specific type of disease that you are going to
20   try to develop a drug to treat.  So an example would be like
21   multiple myeloma for Kyprolis.  That's the indication that it's
22   used in.
23   Q.    So as we think about it, indication is essentially a kind
24   of disease; is that right?
25   A.    Yes.  It's a form of a disease.
```

1    Q.    Form of a disease.

2    A.    Mm-hmm.

3    Q.    Are you familiar with an indication or disease called ITP?

4    A.    Yes.

5              MR. JONES:  Your Honor, if we could have the screens

6    on.  I just want to put a demonstrative on the screen that the

7    defendants have agreed to have.  If that could be published to

8    the jury.

9    Q.    So if you see it on your screen, is this ITP,

10   Dr. Marschke?

11   A.    Yes.

12   Q.    So I'll let you attempt the first pronunciation of all the

13   words.  So why don't you tell us, what does ITP mean?

14   A.    So it's immune -- it used to be called idiopathic.  So

15   that's why there's the parentheses there -- thrombocytopenic

16   purpura.

17   Q.    Okay.  Let's break that down.  So the first thing,

18   "chronic," what's chronic mean?

19   A.    So "chronic" means that it exists for a long time, you

20   know, more than -- an acute would be, you know, short-lived.

21   This is something that lasts a long time.

22   Q.    People who have ITP, do they essentially have it for their

23   whole lives?

24   A.    Some people do.  Adults, often it's chronic.  Children can

25   have it sort of chronically for a while but then it seems to go

1    away.

2    Q.   They can grow out of it?

3    A.   I guess you'd call it that, yeah.

4    Q.   And so "immune," what's the immune part referring to here?

5    A.   So what causes this disease is that your body kind of

6    treats the platelets as foreign.  So you build antibodies

7    against your own platelets.  So that's the immune part of it.

8    It's an immune disease.

9    Q.   So is that saying your body's antibodies are essentially

10   killing off your own platelets?

11   A.   Well, they attach to the platelets and then your body

12   clears those away.  So it destroys those immune -- the

13   platelets that have an immune response have an antibody

14   attached to them.  Your body will clear those away, thinking

15   it's foreign.

16   Q.   Thinking it's getting rid of a germ or a foreign body?

17   A.   Correct, yes.

18   Q.   Idiopathic.  You said it used to be called idiopathic.

19   What is idiopathic?

20   A.   Idiopathic means you're not sure what's causing it.  But

21   as they did more research on it, they came to understand that

22   it was an immune disease where before they weren't quite sure

23   what was causing it.

24   Q.   Let's focus on 2014.  Did they know at that point whether

25   it was an immune problem or they didn't know; it was an

1  idiopathic problem?

2  A.   They knew then it was an immune problem but because the

3  term was used for so long, I think they kept the vestige of

4  that to make sure people understood what they were talking

5  about.

6  Q.   I got it.  So 2014 everybody knows it's an immune problem,

7  right?

8  A.   Yes.

9  Q.   The idiopathic part of the name kind of hung on for a

10 while?

11 A.   Yes.

12 Q.   Now the part I've been dreading.  Thrombocytopenic.  Did I

13 get that right, Dr. Marschke?

14 A.   Yes.

15 Q.   Thrombocytopenic, what does that mean?

16 A.   So a thrombus means clot.  So that's a thrombus.

17 So when you're thrombocytopenic, the blood that forms the clot

18 are low.  "Penic" means low.  So you have low platelets.

19 Q.   Is there something just called -- apart from ITP, is there

20 something called thrombocytopenia?

21 A.   Yes, that's a more general term.

22 Q.   What does thrombocytopenia mean?

23 A.   So that would mean anything that's causing low platelets.

24 So if someone showed up to the doctor's office and they

25 measured their platelets and they were low, they may not know

1    what's causing them.  So they would say they're

2    thrombocytopenic.

3    Q.    ITP is a kind of thrombocytopenia?

4    A.    Yes.

5    Q.    And there are other kinds as well?

6    A.    Yes.

7    Q.    Sometimes a thrombocytopenia like ITP can be life-

8    threatening?

9    A.    Yes.

10   Q.    Are other kinds of thrombocytopenia not life-threatening?

11   A.    It just depends on the -- yeah, the degree to which you

12   have low platelets.  If it gets too low, then it's life-

13   threatening.

14   Q.    Okay.  The "purpura," what is the "purpura" referring to?

15   A.    So patients that have this, they show up with small red

16   spots usually.  That's where there's been some bleeding that's

17   occurred, and that's called purpura.

18   Q.    So purpura is sort of when the patient comes in, you can

19   see the spots and that's the term that refers to that?

20   A.    Yeah.  So a long time ago that's kind of how they would

21   diagnose people that had -- they would see this, they'd say,

22   oh, they have low platelets.

23   Q.    Is ITP an indication for Promacta?

24   A.    Yes.

25   Q.    Let's break that down.  When something is an indication

1    for something, what does that mean?

2    A.   So that means that's what the drug has been approved to

3    treat, or, you know, before approval it's how it's being

4    tested, in what patients.

5    Q.   So when we say that ITP is an indication for Promacta, are

6    we saying that Promacta is a medicine that treats the disease

7    ITP?

8    A.   Yes.

9    Q.   And you talked about it being approved.  What kind of

10   approval are you talking about?

11   A.   So that's the FDA approval, or in Europe they have an EMA.

12   Q.   Do you have to get the drug approved in order to be able

13   to give it to patients?

14   A.   Yes.  In order to market it.

15   Q.   Okay.

16   A.   In clinical trials, you can give it to people in clinical

17   trials.

18   Q.   You can give it during the testing phase?

19   A.   Yes.

20   Q.   Then when you're going to market it and give it out to

21   doctors, that's when you have to get the FDA to approve,

22   correct?

23   A.   Yes.

24   Q.   Okay.  And as of 2014, was Promacta approved by the FDA

25   for ITP?

1    A.    Yes.

2    Q.    And when did that happen?

3    A.    2008.

4    Q.    Was that the first approval of Promacta?

5    A.    Yes.

6    Q.    After 2008, were there other approvals of Promacta?

7    A.    Yes.

8    Q.    What were they, if you remember?

9    A.    So it was approved in 2012 for treating patients that have

10   hepatitis C but are not able to be treated with interferon.   So

11   it was supportive care for patients that were going to receive

12   interferon for hepatitis C.

13          Later it was approved for pediatric use in ITP.   So

14   initially the approval was just for adults.   Then it received

15   use in pediatric patients.

16          It's also been approved for severe aplastic anemia.

17   Q.    What's that?

18   A.    So that's another sort of one of these penic diseases,

19   where you have low red blood cells but also low white blood

20   cells and low platelets.   The anemia part -- the red blood cell

21   part is the most critical part of it.

22   Q.    And Promacta is a drug that the FDA has approved to help

23   with that?

24   A.    Yes.

25   Q.    Now, the FDA, that's a United States government agency,

1    right?

2    A.   Yes.

3    Q.   So when you're marketing Promacta, or when GSK is

4    marketing Promacta, is it just doing it in the United States?

5    A.   No.  In Europe and outside.  It's approved in Japan and

6    other Asian countries; around the world, essentially.

7    Q.   Are all those different approvals in Europe and Japan and

8    other places, are those separate approvals from the FDA

9    approval?

10   A.   Yes.

11   Q.   So a medicine like Promacta to be used in Europe has to be

12   approved by a European agency?

13   A.   Yes.

14   Q.   And same thing in Japan?

15   A.   Yes.  All the countries have their own drug agencies that

16   regulates the use in those countries.

17   Q.   Okay.  And is that approval process something that your

18   partners for Promacta, the GSK partner, did in terms of getting

19   approvals?

20   A.   Yes.

21   Q.   Does Ligand play a role in getting of approvals?

22   A.   Sometimes we might have to write up a section of a report

23   or something that would go into the submission documents.

24   Q.   Okay.  But for the most part, that process of getting

25   approvals --

1    A.    Is managed by the partner.

2    Q.    Got it.

3          MR. JONES:  Could we see Exhibit 14, please.

4    Q.    Dr. Marschke, I'm showing you Exhibit 14.  It says at the

5    top, "United States Securities and Exchange Commission Form

6    10-K."  Do you see that?

7    A.    Yes.

8    Q.    Do you know what this form is basically, Dr. Marschke?

9    A.    It's something that Ligand is required to submit to the

10   Securities and Exchange Commission to report on our business

11   activity, finances, what we've been doing.

12   Q.    Okay.  And this particular one about a couple inches down

13   it says "For the fiscal year-ended December 13 -- December 31,

14   2013."  Do you see that?

15   A.    Yes.

16         MR. JONES:  It's up a little more.  There we go.

17         THE COURT:  Can we deem this admitted or...

18         MR. JONES:  Your Honor, my understanding is these

19   were -- if it can be deemed admitted, we would appreciate it.

20   These are all agreed-to exhibits.

21         MR. BROOKS:  Yes, Your Honor.  That's fine with us.

22         THE COURT:  So at some point maybe, so we don't have

23   to do this every single time, you'll just give us a list of the

24   agreed-upon exhibits.

25         Do we already have that?

1             THE CLERK:  Yes, we have a joint list.

2             THE COURT:  All right.  Those are deemed admitted and

3   you don't have to move them in.

4             MR. JONES:  Thank you, Your Honor.

5             (Exhibits 1-245 received in evidence.)

6             MR. JONES:  Could you go to page 7, please, Cole.

7   Q.   The form that we were just looking at, Dr. Marschke,

8   there's a lot of information about Ligand in there?

9   A.   Correct.

10  Q.   And this is information that Ligand is required to file

11  with the SEC, right?

12  A.   Yes.

13  Q.   Okay.  And part of the requirement is to describe your

14  business, right?

15  A.   Yes.

16  Q.   So here on page 7 of this form, there's a talk about

17  Promacta; is that right?

18  A.   Yes.

19  Q.   And in parentheses it says "GSK."  Does that mean that GSK

20  is the partner for Promacta?

21  A.   Yes.

22  Q.   Okay.  Here the three paragraphs that Cole has blown up

23  for us, what are these paragraphs describing?

24  A.   So it's just generally describing, you know, what Promacta

25  is, when it was approved, what it's being used for, how GSK --

1    what GSK is doing with Promacta.

2    Q.   Okay.  In the second sentence, second line into the third

3    line it says, "In late 2008 the U.S. Food and Drug

4    Administration," or FDA, "granted accelerated approval of

5    Promacta."  What's accelerated approval?

6    A.   So as some people might be familiar now with these

7    emergency use authorizations for the COVID, it's something

8    similar to that.  So it hadn't completed all of the studies

9    that might be necessary for approval, but it had done enough to

10   convince the FDA that it was safe and effective for use in

11   these patients.

12   Q.   And does the FDA sort of hurry the approval process along

13   so that patients who really need it can get it earlier?

14   A.   Yes.  But there's a requirement that you have to get full

15   approval to continue to market it.

16   Q.   You have to get that sometime later?

17   A.   Yes.

18   Q.   I imagine it requires you to submit more data?

19   A.   Yes.

20   Q.   Okay.  But in 2008, the FDA had decided it was safe enough

21   that it should get to patients who really needed it?

22   A.   Yes.

23   Q.   Okay.  Here it says for the treatment of thrombocytopenia,

24   that was the low platelet count --

25   A.   Yes.

 1   Q.    -- in patients with chronic ITP.  Then it says, "Who have

 2   had an insufficient response to corticosteroids,

 3   immunoglobulins or splenectomy."  What's being described in

 4   that part of the sentence?

 5   A.    So those are the other treatments that are used to treat

 6   patients with this disease.

 7   Q.    So some people who have ITP, this is -- these other

 8   things, the corticosteroids and the like, doctors try that

 9   first; is that right?

10   A.    Yes.  The corticosteroids and immunoglobulins, certainly

11   they would try those first.  Splenectomy is the removal of your

12   spleen.  So they would try to do other things first before they

13   would come to that.

14   Q.    Try to do things like give you Promacta?

15   A.    Right.  But in Europe the approval was dependent on their

16   having been in a splenectomy.

17   Q.    Then the next paragraph talks about 2010.  What's being

18   described here in the second paragraph?

19   A.    So this is the approval in Europe.  So the approval for

20   Revolade, which is the European name for Promacta.

21   Q.    Okay.  And how about the third paragraph, what's that

22   telling us about?

23   A.    So this is talking about the full approval.  So as I

24   mentioned, an accelerated approval almost certainly requires

25   that you get a full approval.  And this was granted in 2011.

1   Q.   Okay.  And that allowed sort of the continued marketing

2   and sale and use of Promacta?

3   A.   Yes.

4   Q.   And it took three years to get full approval.  Is that

5   unusual, Dr. Marschke?

6   A.   No.

7   Q.   It's just a long process?

8   A.   Yes.  It usually requires much larger clinical studies,

9   many more patients.  So it just takes time to conduct those.

10   Q.   So a larger clinical study is just you're testing it out

11   on more people?

12   A.   Yes.

13   Q.   When I say "testing it out," you already tested to make

14   sure it was safe at that point?

15   A.   Yes.

16   Q.   So you were just doing a sort of is it effective kind of

17   test?

18   A.   It relates a lot to safety to make sure you've treated

19   enough of a diverse population of people so if there was some

20   side effect that was rare it might show up.

21   Q.   Got it.

22        MR. JONES:  Could we have the next paragraph, please,

23   the fourth paragraph and the fifth.

24   Q.   So you mentioned hepatitis C at one point, Dr. Marschke;

25   is that right?

1    A.    Yes.

2    Q.    Is hepatitis C an indication for Promacta?

3    A.    Yes.

4    Q.    Now, I want to be careful about this.  Does Promacta cure

5    hepatitis C?

6    A.    No.

7    Q.    Does Promacta sort of cure hepatitis C?

8    A.    No.

9    Q.    When you take Promacta, does anything happen to your

10   having hepatitis C?

11   A.    No.

12   Q.    So how is hepatitis C and Promacta related?

13   A.    So hepatitis C is a viral infection in your liver.  So

14   many people who have hepatitis C have low platelets because the

15   natural protein in your body that causes your body to make more

16   platelets is made in the liver.  So if your liver isn't

17   functioning well, you may have low platelets because that

18   protein isn't being made.  So Promacta, because it raises

19   platelets, could raise platelets in people that have hepatitis

20   C.

21   Q.    And that's -- it can be a common effect of hepatitis C is

22   to have low platelets?

23   A.    Yes.

24   Q.    Is there also something called interferon therapy?

25   A.    Yes.

Case 1:18-cv-11926-PBS   Document 251   Filed 01/06/22   Page 110 of 152

1-110

1    Q.    What is interferon therapy, if you know?

2    A.    Interferon is a naturally occurring protein in your body

3    but its function is to stimulate your body to fight a viral

4    infection.  So that's now used to -- or at that time, in 2014,

5    it was being used -- or 2012, I guess this is referring to, it

6    was being used to treat patients with hepatitis C to try to

7    fight their viral infection.  But a consequence of using

8    interferon is that it also causes platelets to go down.  So

9    people who are on interferon treatment usually have low

10   platelets.

11   Q.    So unlike Promacta, the interferon is the thing dealing

12   with the hepatitis C itself; is that right?

13   A.    Yes, sort of indirectly because it's causing your body to

14   fight the viral infection.

15   Q.    So Promacta can help hepatitis C patients in a couple of

16   ways; is that right?  One with their liver and one as a result

17   of the interferon medicine that they may be taking?

18   A.    Yes.

19   Q.    So here in this paragraph, in the form that Ligand filed

20   with the SEC, it's talking about the approval of Promacta for

21   that?

22   A.    Yes.

23   Q.    And is that a separate approval process from the approval

24   process for ITP?

25   A.    Yes.  GSK would have been required to submit separate

1    documents on studies that were conducted in hepatitis C

2    patients.

3    Q.    So as of November 2012, doctors could prescribe Promacta

4    for patients who had low blood platelets because they were on

5    interferon or because their liver was damaged?

6    A.    I'm sorry, prior to 2012?

7    Q.    No, after November 2012.

8    A.    After, yes.  Then there's an authorized approval for that

9    indication.

10   Q.    Okay.  Does that mean -- you know, is it like as soon as

11   it gets approved, suddenly every patient gets it right away, or

12   is there a lead-up time?

13   A.    There's usually a lead-up time.

14   Q.    What causes that lead-up time?

15   A.    Well -- so GSK has to make sure there's enough supply to

16   treat patients.  They have to reach doctors and tell them about

17   it and have them prescribe the medication.  Hospitals have to

18   bring it in if they are treating them in the hospital, or

19   pharmacies if it's out in the public.

20   Q.    So it could be several months before the new indication

21   starts to catch on?

22   A.    Yes.  That and just how fast the company itself pushes it

23   to get it out there.

24   Q.    Okay.  And does a company like GSK generally know when

25   their medicine is going to get approved or is it sort of --

```
 1   A.    Yeah, they're usually gearing up.
 2         MR. BROOKS:  Objection, your Honor.
 3         THE COURT:  Just ask about this company.
 4   Q.    So from your experience with Ligand --
 5         THE COURT:  While we're at it, how much longer do you
 6   think you have with this witness?
 7         MR. JONES:  I don't know, 15 minutes, Your Honor, 20
 8   minutes.
 9         THE COURT:  Do you think you'll finish?
10         MR. JONES:  It's my goal to try to have enough time
11   for Dr. Marschke to finish today.
12         THE COURT:  It depends on how long the cross is going
13   to be, but we need to move it along if we're going to finish
14   him.
15         MR. JONES:  Yes, Your Honor.
16   Q.    Then you said in 2015 Promacta was approved for ITP in
17   children, Dr. Marschke?
18   A.    Yes.
19   Q.    Approximately how many people in the United States have
20   ITP?
21   A.    About 20,000 to 30,000 people at a given time.
22   Q.    Most of those people will have ITP their whole life?
23   A.    The adults, yes.
24   Q.    Do you have any idea worldwide how many people have ITP?
25   A.    It's probably about three times that number.
```

1    Q.    Okay.

2          MR. JONES:  If we could go down to the paragraph where

3    your cursor is resting there.

4    Q.    So at the end of 2013, how many countries had approved

5    Promacta for use?

6    A.    It says 95 countries.

7    Q.    Were you aware of GSK trying to expand it to even more

8    countries at that time?

9    A.    Yes.

10   Q.    Do you know what an orphan drug is, Dr. Marschke?

11   A.    Yes.

12   Q.    What is an orphan drug?

13   A.    So that's a designation the FDA gives to a drug that will

14   treat a small number of patients that have a particular disease

15   or indication.

16   Q.    All right.  So you said a small number of patients.  So

17   you said that ITP is 20,000 or 30,000 people in the United

18   States?

19   A.    Yes.

20   Q.    Is that generally considered a small number?

21   A.    Yes.

22   Q.    Does that compare to something like millions of people

23   having diabetes?

24   A.    Yes.

25   Q.    Is there an advantage to having your drug designated an

 1  orphan drug?

 2  A.   Yes.

 3  Q.   What's the advantage?

 4  A.   Well, one, you're doing benefit to those patients that

 5  have a rare disease.  And second, the FDA gives you some

 6  priority in evaluating them.  I think there's a tax benefit as

 7  well.  And you're given some exclusivity.  So you are able to

 8  market it for a longer period of time than you would if you

 9  didn't have that orphan designation.

10  Q.   It's kind of a competitive advantage for the drug?

11  A.   Right.  It's sort of like an incentive the FDA is giving

12  for companies to develop drugs for rare indications.

13  Q.   Okay.  So just turning back to the exhibit on the screen

14  which is Exhibit 14, so you're describing Promacta in your form

15  with the SEC; is that right?

16  A.   Yes.

17          MR. JONES:  If we could go to the next page.

18  Q.   Then you were also describing some of your other medicines

19  in this form; is that right?

20  A.   Yes.

21  Q.   Okay.  And this, as far as you know, this is a form that's

22  distributed to the public, right?  It's published by the SEC?

23  A.   Yes.

24  Q.   Okay.

25          MR. JONES:  Could we have Exhibit 222, please.

1    Q.    Dr. Marschke, Exhibit 222 appears to be a board of

2    directors meeting slide show from September 18, 2013.  Do you

3    sometimes help pull together slides for presentations to the

4    board of directors?

5    A.    Yes.  I also present to the board.

6    Q.    Okay.  When you present to the board, what do you present

7    about?

8    A.    It's usually the programs that I am working on.

9    Q.    Was it the same thing in 2014; you did it back then too?

10   A.    Yes.

11   Q.    Did you help create this slide deck here?

12   A.    There may have been slides that I was responsible for.

13   Q.    Okay.

14         MR. JONES:  Can we go to page 30, please, Cole.

15   Q.    So this is a slide that's entitled "Promacta Context."  Is

16   this one of the slides that you would play a role in preparing,

17   Dr. Marschke?

18   A.    I would probably be fact checking to make sure it was

19   accurate.

20   Q.    I didn't mean that you were like sitting down at the

21   computer, but you were providing information for this slide?

22   A.    Yes.

23   Q.    Do you see there in the second bullet it says "indications

24   beyond ITP critical for continued Promacta growth."

25   A.    Yes.

1    Q.   What does that mean?

2    A.   So because Promacta was approved for this small

3    indication, if we -- at that time the understanding was for

4    there to be much more sales growth or use of the drug, it would

5    probably have to expand to other indications.

6    Q.   Okay.  And the second sort of line under there says "HCV

7    needs to be a big market for Promacta to keep driving Ligand's

8    growth."  What does that mean?

9    A.   So at the time we knew that there are many more people

10   that have hepatitis C than have ITP.  So that would be a way

11   that Promacta growth could be achieved, was if we -- if more

12   people used it for that than are using it for ITP.

13   Q.   Prior to Promacta being used for hepatitis C, it was used

14   for ITP, right?

15   A.   Yes.

16   Q.   And it was selling to people who needed to take it for

17   ITP?

18   A.   Yes.

19   Q.   And was there anything about the fact that it could now be

20   used for hepatitis C that changed who was using it for ITP?

21   A.   No.

22   Q.   The people who were using it for ITP used it for ITP

23   regardless of the hepatitis C designation?

24   A.   Yes.

25   Q.   And the first line here it says "ITP estimated to be about

1    66 percent of peak penetration."  What does that mean?

2    A.   So if you estimated all the possible people that might

3    take Promacta for not only ITP but for other indications, that

4    ITP would represent about that.

5    Q.   Okay.  So this is another way that Promacta might sell

6    more as more ITP patients could be using it?

7    A.   Yes.  That would be another way.

8    Q.   Okay.  Then what's that third line there, "oncology

9    related expansion"?

10   A.   So certain chemotherapy treatments for cancer will also

11   lower platelets.  So Promacta could be used to raise platelets

12   in those patients.

13   Q.   So that was another possibility for growth in Promacta at

14   that time, right?

15   A.   Yes.

16   Q.   So in 2013, when you're doing this chart, are you familiar

17   with a substance called Sovaldi?

18   A.   Yes.

19   Q.   And what was Sovaldi?

20   A.   So Sovaldi is a treatment for hepatitis C but it's what's

21   called a direct acting treatment.  So it actually works on the

22   virus itself to stop the virus from replicating.

23   Q.   Okay.  And was it possible that Sovaldi was going to take

24   hepatitis C patients that might otherwise be taking Promacta

25   and they wouldn't have to take Promacta anymore?

1   A.   Well, it's more that they wouldn't be taking interferon.

2   If Sovaldi could be used in patients that were taking

3   interferon, there would be less use of interferon, then less

4   use of Promacta.

5   Q.   So here in 2013, one of the ways you thought that Promacta

6   would grow in sales, make more sales, is from HCV, correct?

7   A.   Yes.

8   Q.   HCV, that's the virus that causes hepatitis C; is that

9   right?

10  A.   Yes.

11  Q.   So they're one and the same, basically?

12  A.   Yes.

13  Q.   Okay.  I probably offended the science.

14  A.   Hepatitis C is the type of virus that causes hepatitis C.

15  There's B and A, different forms.  Other viruses that cause a

16  similar condition.

17  Q.   Okay.  So these are three ways that the Promacta was going

18  to grow, correct?  When you're making these predictions, you

19  already knew Sovaldi was coming along?

20  A.   Yes.

21  Q.   And, in fact, it had already been approved, correct?

22  A.   In September, yes, of 2013.

23  Q.   Right.  Because it had been approved at the end of 2012,

24  correct?

25  A.   Yes.  No.  It was approved in December of 2013.  I'm

```
 1    sorry.  Promacta was approved in 2012.  Sovaldi was approved in
 2    December of 2013.
 3    Q.   And for people in the pharmaceutical world, was there a
 4    lot of anticipation that Sovaldi was coming along?
 5    A.   Yes.  By that time the results of the clinical trials in
 6    hepatitis C had been reported.  So people knew that it was an
 7    effective drug for hepatitis C.
 8    Q.   So when you and your team were putting together this slide
 9    that talked about hepatitis C being a market, you already knew
10    that Sovaldi was coming along, correct?
11    A.   Yes.
12            MR. JONES:  Can you go to the fourth bullet point.
13    Q.   This talks about a generated separate analysis for key
14    Promacta indications.  These three lines under this, can you
15    tell us what's being related here?  What's the information
16    that's being said?
17    A.   So I think this is relating to -- we did sort of an
18    internal analysis to determine how Promacta could be used in
19    other indications.
20    Q.   Okay.  And so you're looking at other ways or other parts
21    of the market for Promacta in this?
22    A.   Yes, just kind of reevaluating that initial assessment
23    above.
24    Q.   Was there a concern at Ligand in 2014 that Sovaldi would
25    stop Promacta from being sold?
```

A.   Well, we knew that there'd probably be less potential for sales because at this time it had only been approved for about a year.  So the potential for sales would probably be less as Sovaldi gained market share.

Q.   Okay.  So Sovaldi would mean that you could have grown this much but you'd grow a little less or grow somewhat less because Sovaldi was coming out?

A.   Yes.

Q.   But Promacta would still be sold for ITP?

A.   Yes.

Q.   And Promacta would still be sold for aplastic anemia?

         MR. BROOKS:  Objection.

         THE COURT:  Sustained.  Leading.

Q.   Without the hepatitis C, what would cause the sales of Promacta?

A.   So it was being marketed for ITP.  And then it was approved for severe aplastic anemia.  So that would be a market as well.

Q.   Around 2014 did a company called Novartis come into the picture?

A.   Yes.

Q.   How is Novartis related to Promacta?

A.   So GSK and Novartis agreed to -- came to an agreement where Novartis would take some of GSK's assets and market and sell them.

1    Q.   Okay.  When you say that Novartis would take some of GSK's

2    assets, does that mean medicines?

3    A.   Yes.  It was mostly the drugs that were used for cancers

4    predominantly, but Promacta was part of that agreement.

5    Q.   And when you say they would take them, was it a sale?

6    A.   Yeah.  It was -- yes, I think they paid for that.

7    Q.   It wasn't just that GSK gave it away or something?

8    A.   No.  No.  I'm just not certain of the details of what was

9    involved.

10   Q.   Understood.

11        Within Ligand in 2014 how was the feeling about the

12   move from GSK to Novartis for Promacta?

13   A.   We were excited, encouraged by that.

14   Q.   Why?

15   A.   Because Novartis had a larger reputation for drugs in this

16   type of use for Promacta.  So it's called hematology.  It's

17   related to blood cells.  And Novartis already had drugs in that

18   area.  So they had a sales force marketing in place, where GSK

19   did not have that large of a group in that area.

20   Q.   So within Ligand in 2014 what was the expectation would

21   happen to Promacta as it moved to Novartis?

22   A.   That sales would likely increase in Promacta for the ITP

23   use.

24   Q.   And does Novartis still sell Promacta?

25   A.   Yes.

1    Q.   Have they continued to sell Promacta?

2    A.   Yes.

3    Q.   How do they do?

4    A.   They do very well.

5    Q.   Has Promacta grown or shrunk?

6    A.   It's grown significantly.

7    Q.   At Ligand was there something called Project Gold Mine?

8    A.   Yes.

9    Q.   And could we have Exhibit 104, please.  Did you

10   participate in putting together a presentation about Project

11   Gold Mine?

12   A.   Yes.

13   Q.   Here we see an email.  It's the first page of Exhibit 104.

14   This is an email from Matt Foehr to John Higgins and Charles

15   Berkman.  Who's Charles Berkman?

16   A.   He's our chief legal counsel at Ligand.

17   Q.   So as far as you know -- some of this email seems to be

18   blanked out, correct?

19   A.   Yes.

20   Q.   Is it blanked out because it involves talking with your

21   lawyer?

22   A.   Probably.

23   Q.   Okay.  Can we go to the next page, please.  So this is

24   Project Gold Mine.  What was Project Gold Mine?

25   A.   So after GSK was developing Promacta in the clinic -- so

1    they started doing clinical studies -- we had the rights to go

2    back and do other research.  So we discovered another drug that

3    was similar to Promacta ourselves and we were developing it.

4    But then because of our small resources, we licensed it to GSK,

5    and they decided not to do anything with it after we licensed

6    it.

7              THE COURT:  When you say "licensed it," do you mean a

8    patent?  What are you talking about?

9              THE WITNESS:  So we discovered a new drug that was

10   similar to Promacta but had some differences ourselves.  And

11   then we licensed it to GSK.  So GSK got the rights to develop

12   and market that drug.  But they decided not to do anything with

13   it.  And so this was an effort to try to encourage them to --

14   well, encourage Novartis.  So when it was sold to Novartis,

15   Novartis decided not to do anything with it.  So it was our

16   effort to try to encourage them to do something with it.

17   Q.   Most of the slide deck is about a medicine different from

18   Promacta?

19   A.   Yes.

20             MR. JONES:  Can we go to Exhibit page 3, please.

21             THE COURT:  What exhibit is this?

22             MR. JONES:  This is Exhibit 104, Your Honor.  Would

23   you like to pause, Your Honor, or do you have it?

24             THE COURT:  That's fine.  Just so they can get it.

25             MR. JONES:  Absolutely, Your Honor.

1    Q.    What are we seeing here, Dr. Marschke?

2    A.    So this is a graph of the quarterly revenue.  And it's the

3    revenue of Promacta.  So the sales of Promacta based on the

4    quarter in which it was sold.  So a quarter represents three

5    months out of the year.

6    Q.    Okay.  And we actually saw that -- you're putting this

7    presentation together for September 2015, right?

8    A.    Yes.

9    Q.    So this is after that 2014 period we've been talking

10   about.  You have 2015 data on here as well, correct?

11   A.    Yes.

12   Q.    What is this orange bar showing?

13   A.    So that's the first full quarter where Novartis was

14   selling Promacta.

15   Q.    And it says that -- there's something like 110, 115

16   million dollars in sales that quarter of Promacta?

17   A.    Yes.

18   Q.    And that was, of course, after Sovaldi had come out,

19   right?

20   A.    Yes.

21   Q.    In fact, this is almost a year and a half after Sovaldi

22   had come out?

23   A.    Yes.

24   Q.    And these blue bars and the orange bar that are going up,

25   that shows Promacta being sold more and more during that time

1    period?

2    A.    Yes.

3    Q.    Can you go to the next slide, please.  And this is

4    Promacta versus Nplate.  What's Nplate?

5    A.    So Nplate is another drug, a different drug that is used

6    to treat low platelets.

7    Q.    Is it a competitor for Promacta?

8    A.    Yes, and it's approved for ITP.

9    Q.    Is Sovaldi a competitor for Promacta?

10   A.    No.

11   Q.    Because they don't treat the same thing?

12   A.    Correct.

13   Q.    Got it.  This is just showing -- it says Promacta is now

14   approaching 50 percent market share.  What's market share

15   talking about there?

16   A.    So it's the percentage of the total sales of the two drugs

17   together.

18   Q.    So you're getting almost half of that at that point?

19   A.    Yes.

20   Q.    And this also shows Promacta becoming more and more used

21   in the market, correct?

22   A.    Yes.

23   Q.    Okay.  Could I have page 6.  This is a slide you put

24   together about recent data for Promacta?

25   A.    Yes.

1   Q.   What's generally being shown on this slide?

2   A.   So this would be the other like events that have happened.

3   So Novartis would be reporting out results from clinical trials

4   or other things they were doing with Promacta, and they would

5   report them in the press or go to scientific conferences and

6   report them.

7   Q.   Okay.  So these are all other ways that Promacta is

8   reaching -- trying to reach the market, scientific studies and

9   the like?

10   A.   Yes, or approvals.  There's a couple statements about

11   approvals for different indications.

12   Q.   Right.  And those approvals allow you to sell Promacta for

13   a new use?

14   A.   Yes.

15        MR. BROOKS:  Objection.

16        THE COURT:  Sustained.  Leading.

17   Q.   What did an approval allow you to do vis-a-vis Promacta?

18   A.   So it would allow the marketing for that indication.  So

19   for pediatric ITP, you get an approval, now you can market it

20   for use in pediatric patients.

21   Q.   Did Promacta sales continue to grow since 2014?

22   A.   Yes.

23   Q.   Could you describe that growth?  Where's Promacta in sales

24   today?

25        MR. BROOKS:  Objection.

1                THE COURT:  Sustained.

2    Q.   Well, how much did Promacta sales grow after 2014?

3                MR. BROOKS:  Objection.

4                THE COURT:  Overruled, but cabin it in terms of what

5    time period.

6                Within a year after 2014 how did it do?

7                THE WITNESS:  It continued to grow about 30 percent

8    every quarter, based on the previous -- on the quarter from the

9    previous year.

10   Q.   Dr. Marschke, are you familiar with the term "blockbuster

11   drug"?

12   A.   Yes.

13   Q.   What does "blockbuster drug" mean?

14   A.   It's a term that's used for drugs that sell over a billion

15   dollars in a year.

16   Q.   Did Promacta become a blockbuster drug?

17   A.   Yes.

18   Q.   Does Ligand still get royalty payments from Promacta?

19   A.   No.

20   Q.   Is that because Promacta went away?

21   A.   No.

22   Q.   Why don't they get payments anymore?

23   A.   In 2019 we did an agreement with a company that purchased

24   our royalty rights.

25   Q.   By purchasing the royalty rights, that meant that every

```
 1    time a box of Promacta got sold, someone else would get paid?
 2    A.   Yes.
 3    Q.   Okay.  And who bought the rights?
 4    A.   It's a company called Royalty Pharma, and that's their
 5    business model is to purchase royalty rights to drugs.
 6    Q.   Was it a sale of those royalty rights to --
 7    A.   Yes.
 8    Q.   How much did it sell for?
 9    A.   It was around 827 million dollars.
10    Q.   And has Ligand received the money from that sale?
11    A.   Yes.
12    Q.   How's Ligand been using the money from that sale?
13    A.   So we've been reinvesting into the company.
14    Q.   Does that mean also getting new research and new
15    technologies for bringing medicines to the market?
16    A.   Yes.
17              MR. JONES:  Nothing further at this time, Your Honor.
18              THE COURT:  While you're moving over there, let's
19    stand and stretch.  As it gets late in the afternoon, I feel
20    the need to anyway.
21              (Pause.)
22              THE COURT:  Are you all set?
23              MR. BROOKS:  Yes, Your Honor.
24              THE COURT:  We'll stop about 4:00.  I don't know if we
25    can finish by then.  But you do what you have to do.
```

```
 1              MR. BROOKS:  I'll try.  Your Honor, if the clerk could
 2    switch over the controls for displaying exhibits.
 3              MS. MURPHY:  It's HDMI 1 on Table 4.
 4              MR. BROOKS:  Thank you, Your Honor.
 5              MS. MURPHY:  Thank you.
 6                        CROSS-EXAMINATION
 7    BY MR. BROOKS:
 8    Q.   Good afternoon, Dr. Marschke.  You testified on direct
 9    that in 2014 Ligand was a small company; is that right?
10    A.   Yes.
11    Q.   Okay.  And leaving aside the value, which we'll get into
12    later, at the time Ligand was a billion-dollar company on paper
13    at least, correct?
14    A.   Yes.  I was referring to the number of employees.
15    Q.   Now, you testified that the first indication that Promacta
16    was approved for was low platelets counts due to ITP?
17    A.   Yes.
18    Q.   And ITP is considered a rare disease?
19    A.   Yes.
20    Q.   I believe you said that somewhere between 20,000 or 30,000
21    people in the U.S. have ITP?
22    A.   Yes.
23    Q.   Again, as far as diseases go, that's technically
24    considered very rare, right?
25    A.   It's rare, yes.
```

1    Q.    And when Promacta was approved to treat ITP, it was only

2    approved for a certain type of ITP, right?

3    A.    For chronic ITP.

4    Q.    I think the label says persistent or chronic ITP; is that

5    right?

6    A.    Yes.

7    Q.    And there's two categories of ITP, right?

8    A.    Yes.

9    Q.    There's the persistent and chronic type that Promacta is

10   approved for, correct?

11   A.    Yes.

12   Q.    And then there's the acute type for which it's not?

13   A.    Yes.

14   Q.    So Promacta was approved for some subset of people with

15   this rare disease, ITP?

16   A.    Correct.

17   Q.    And, in fact, persistent and chronic ITP is a smaller

18   subset of ITP; isn't that correct?

19   A.    Yes.  I think it is a smaller subset.

20   Q.    Right.  Meaning more people of the 20,000 to 30,000 have

21   acute than they do chronic or persistent, right?

22   A.    Correct.  But I don't know the exact difference in the

23   percentages.

24   Q.    So fewer than half of the people with this rare condition

25   of ITP have the type of ITP that Promacta's approved for?

```
 1    A.    Yes.
 2    Q.    Okay.  And what's more, Promacta isn't approved for all of
 3    those people with persistent and chronic ITP, right?
 4    A.    At that time, when it was first approved.
 5    Q.    Right.  Because it was only approved for people with
 6    persistent or chronic ITP after they'd already been given
 7    another treatment that had failed, right?
 8    A.    Yes.
 9    Q.    Because if the first treatment works, they don't get
10    Promacta?
11    A.    Correct.
12    Q.    All right.  So at least initially Promacta's approved for
13    a subset of a subset of a really rare disease, right?
14    A.    Yes, but the acute form can become the chronic form.
15    Q.    Mm-hmm.  But the bottom line is that most people with ITP
16    don't need Promacta?
17    A.    Initially.
18    Q.    And certainly not everyone in the U.S. who even would
19    qualify for an approved use of Promacta who has ITP would be
20    prescribed the drug, right?
21    A.    I'm sorry.  Say that again.
22    Q.    Yeah.  Not everybody who qualifies for Promacta with ITP,
23    not all of those people are going to get it, right?
24    A.    Yes.  That's --
25    Q.    Because I think we looked at some charts.  I mean,
```

```
1    Promacta had competitors, right?

2    A.   Yes.

3    Q.   And so at least like half of those people would get its

4    competitor NPlate, it looked like, if I understood that chart?

5    A.   Yes.

6    Q.   So at least as far as Promacta goes at the time, ITP was a

7    small patient population, right?

8    A.   Yes.

9    Q.   And from 2008 until 2012, ITP was the only disease

10   Promacta was approved for, right?

11   A.   Yes.

12   Q.   All right.  And in 2012, Promacta gets approved for low

13   platelet counts for a subset of people with hepatitis C who are

14   undergoing that interferon therapy that you talked about?

15   A.   Yes.

16   Q.   And that was a big deal for Ligand, right?

17   A.   Yes.

18   Q.   I believe when that -- when the news came out Ligand's

19   stock price jumps up, right?

20   A.   I'm not certain of that -- of the details of that.

21   Q.   But it was good news.  It was a good day for Ligand?

22   A.   Yes.  Unfortunately, sometimes when we have good news the

23   stock price doesn't go up.

24   Q.   That is very true.  That is very true.

25             But unlike ITP, a lot of people have hepatitis C,
```

1    right?

2    A.   Yes.

3    Q.   I mean instead of 20 to 30 -- I mean, there's millions of

4    people I think just in the U.S., at least at the time in 2012,

5    who had hep C, right?

6    A.   Yes.

7    Q.   And also just to be clear, doctors are allowed to

8    prescribe drugs to patients for diseases other than what it's

9    approved for?

10   A.   Yes.

11   Q.   That's what they call off-label?

12   A.   Yes.

13   Q.   And so Mr. Jones asked you, I believe, that after 2012

14   doctors could then prescribe Promacta for people with hepatitis

15   C but, actually, doctors could have been prescribing Promacta

16   for people with hepatitis C before it got the approval, right?

17   A.   It's legal to do that, yes.

18   Q.   In fact, that was happening, right?  Because in 2010 the

19   FDA and GSK issued a warning to health care professionals about

20   some risks associated with prescribing off-labeled people with

21   chronic liver disease such as hep C, right?

22   A.   That was due to some results from a clinical trial that

23   showed that Promacta may harm people that have liver disease.

24   Q.   Right.  But the fact that the notice went out, right, kind

25   of shows that at least some doctors at the time, even before it

1    was approved, some population of the people getting Promacta it

2    was already because of hep C, right?

3    A.   We don't know that.

4    Q.   Okay.  Now, turning your attention to 2013, if we could --

5    can we go to the same exhibit I think that you were shown

6    before, 222.  Again, the first -- this was dated September 18,

7    2013?

8    A.   Yes.

9    Q.   Is that right?  I think there was some confusion -- at

10   least -- it might have just been on my end.  But I thought

11   Mr. Jones asked you -- and it said at this point Sovaldi had

12   already been approved, but at this point Sovaldi had not been

13   approved, am I right?

14   A.   That's right.  It was approved in December.

15   Q.   People had kind of heard of this miracle drug but it

16   hadn't been approved yet?

17   A.   Correct.

18   Q.   A few months away.

19         By the way, at the time did you know that Sovaldi was

20   going to get approved in 2013 or was that still up in the air?

21   A.   Based on the information that was released, it was likely

22   it was going to be approved.

23   Q.   All right.  Again, this is just -- just so I understand,

24   this is an internal presentation that Ligand put together for

25   its board of directors, is that right?

1    A.   Yes.

2         MR. BROOKS:   If we could go to page 30.

3    Q.   Again, we looked at this before but if we could look at

4    that second bullet point.  So you see this is indications

5    beyond ITP critical for continued Promacta growth.  Do you see

6    that?

7    A.   Yes.

8    Q.   So you knew that if Promacta was going to grow, you had to

9    get beyond ITP because that's a really rare disease, right?

10   A.   Yes, that was our company's perception.

11   Q.   And if we can look at the second dash underneath that

12   bullet point, HCV, which we discussed, is the virus that causes

13   hepatitis C, "needs to be a big market for Promacta to keep

14   driving Ligand's growth."  Do you see that?

15   A.   Yes.

16   Q.   So first of all, it's not saying hep C is going to be a

17   big market, right?  It needs to be, right?  Am I reading that

18   correctly?

19   A.   Yeah.  It's for the use of Promacta in HCV.

20   Q.   Needs to be a big market?

21   A.   For there to be a driving of Ligand's growth.

22   Q.   Right.  So just to be clear, we're not just talking about

23   the growth of Promacta.  You're saying here that hepatitis C

24   needs to be a big market to keep driving Ligand's growth as a

25   company?

```
 1    A.    As it relates to Promacta, yes.
 2    Q.    Well, okay.
 3          But it appears here, right, that -- you're realizing
 4    that for Ligand to grow as a company, you need hepatitis C to
 5    be a big market for Promacta?
 6    A.    I would say that it's specific to the Promacta.  So we get
 7    royalties from Promacta in 2014 --
 8    Q.    Right.
 9    A.    -- or 2013, at this time.  So in order to drive those
10    royalties, it was at that time thought that hepatitis C needs
11    to be a big market.  We did other things besides Promacta.
12    Q.    Right.  You did other things; but clearly here you think
13    if the hep C isn't big, there's not enough other things that
14    Ligand would continue to grow.  Isn't that what it says?
15    A.    Well, this is taken in context.  I take this in context
16    because it's related to Promacta context.  In context to
17    Promacta royalties, we thought at that time HCV needs to be a
18    big market.
19    Q.    Let's talk about the context.  Do you see the bullet point
20    how it says that you need indications beyond ITP for Promacta
21    to continue to grow?
22    A.    Yes.
23    Q.    And then later you say you need hepatitis C to be a big
24    market not for Promacta to grow but for actually the entire
25    company, Ligand, to grow, do you see that?
```

```
1    A.    Yeah.  I think this is relating to our royalty revenue --
2    in the context of this slide being presented to the board,
3    they're talking about Ligand's royalty revenue from Promacta.
4    Q.    Right.  At the time a huge portion of Ligand's revenue
5    came from Promacta, right?
6    A.    Yeah.  For the royalty revenue, yeah.
7    Q.    But for all revenue, right?
8    A.    No.
9    Q.    No?  Now, as we discussed, about four months after this or
10   so, the FDA approved Sovaldi, right?
11   A.    Yes.
12   Q.    And Ligand did not manufacture -- have any affiliation
13   with Sovaldi?
14   A.    Yes.
15   Q.    And Sovaldi was a very effective drug in terms of treating
16   hepatitis C, right?
17   A.    Yes.
18   Q.    In fact, some people -- I'm not sure about the scientific
19   cause, but it's been referred to as a cure for hepatitis C,
20   right?
21   A.    Yes.
22   Q.    Some people refer to that.
23         So Sovaldi caused some concern at Ligand, didn't it?
24   A.    Well, we knew that it -- as far as this indication, it was
25   going to affect the use of Promacta in that indication.
```

1    Q.   Right.  Because -- well, curing hep C, while that would

2    certainly be a good thing for the world, that's not necessarily

3    a good thing for Ligand, right?

4    A.   Well, in context of Promacta sales, yes.

5    Q.   Right.  And nobody had a crystal ball, but when Sovaldi

6    was approved, it was unclear what the landscape would look like

7    for Promacta after that, right?

8    A.   Correct, because it was uncertain how much interferon use

9    would go down.

10   Q.   Yeah.  Again, that's why within Ligand there was some

11   concern at the time because nobody knew what would happen,

12   right?

13   A.   Well, there was just -- yeah.

14   Q.   In August of 2014 which was two months after Father

15   Lemelson's first report, Promacta received another approval,

16   didn't it?

17   A.   Yes.

18   Q.   And that was for severe aplastic anemia?

19   A.   Yes.

20   Q.   And aplastic anemia is a very rare disease, right?

21   A.   Yes.

22   Q.   Even more rare than ITP?

23   A.   Yes.

24   Q.   I believe only two people in every one million people have

25   it?

1   A.    It's very, very rare, yes.

2   Q.    Again, some smaller number, only the people with -- of

3   those two in every million only if you get the severe variety

4   is Promacta approved for you, right?

5   A.    Yes.

6   Q.    So the aplastic anemia indication that Promacta gets in

7   August '14 wouldn't make up for any loss in the hepatitis C

8   market, right?

9   A.    Yeah.  You could compare -- as far as the number of

10  patients that are -- could be treated.

11          THE COURT:  Why don't you ask the question again so

12  it's clear what the answer is.

13  Q.    I think the question was, the aplastic anemia -- or the

14  severe aplastic anemia indication wouldn't make up for any loss

15  in the hepatitis C population in terms of Promacta sales,

16  right?

17  A.    I think you could expect that, yes.

18  Q.    Okay.  Now, on direct you were asked about something

19  called Project Gold Mine; is that right?

20  A.    Yes.

21  Q.    And was it your testimony that Project Gold Mine was not

22  related to Promacta?

23  A.    No.  It wasn't related to Promacta.  But the project

24  itself, the main goal, was to try to get Novartis to start

25  developing this other drug.  But we knew Promacta was going to

1    be part of the story because they would be -- they both would

2    be treating similar indications or could be used for other

3    indications.  So it wasn't just related to this other drug or

4    just Promacta.

5    Q.   Okay.  So it was related to Promacta and another drug?

6    A.   Yes.

7    Q.   Okay.  And I believe -- well, we'll get to that in a

8    second.

9            First I want to talk about the cost of Promacta.  You

10   saw a -- there was a graph shown to you on direct where it

11   looked like revenues from Promacta were going up from and then

12   in 2015 had higher than 2014; is that right?

13   A.   Yes.

14   Q.   And I believe you were asked a question.  So sales were

15   going up.  But in terms of the revenues, you don't know if

16   that's because there were more prescriptions written for

17   Promacta or whether it's because the price of Promacta went up,

18   right?  You don't have that data?

19   A.   I don't have that data, no.

20   Q.   And because, for the most part, Promacta is approved for

21   rare diseases, it's really expensive, isn't it?

22   A.   I don't know what you mean by "really expensive."

23   Q.   Fair enough.  Would you consider it expensive?

24   A.   No.  I mean, but I live in the drug pharmaceutical world,

25   so.

1    Q.   Sure.

2    A.   So relative to other drugs.

3    Q.   I know there's a lot of variations --

4         THE COURT:  How much does it cost?

5         THE WITNESS:  In 2014 I'm not certain of the numbers,

6    but it was probably around $5,000 a month.

7    Q.   And it's a lot more than that now, right?

8    A.   I think it's about twice that now.

9    Q.   Really?  It's not more than -- I know it varies on

10   dosages.  But it's not more than like $15,000 for a one-month

11   supply now?

12   A.   It depends on where you get it.

13   Q.   Okay.  But as you just mentioned, since -- so it was

14   $5,000, according to you, a month for one person in 2014,

15   right?

16   A.   Yes.

17   Q.   And it's at least, according to you, it's at least doubled

18   since then, right?

19   A.   Yes.

20   Q.   And you'd agree that the people who are prescribed

21   Promacta, they're very sick, right?

22   A.   Well, they have a serious condition, yes.

23   Q.   Nonetheless, though, the effort, talking about Project

24   Gold Mine, is it correct to say that Project Gold Mine was --

25   that Ligand embarked on Project Goal Mine in 2010?

1    A.    It's possible, yes.

2    Q.    And the goal was to elevate GSK, who at the time was the

3    one responsible for selling it, to elevate their clinical and

4    commercial commitment to the drug, right?

5    A.    Yes.  We were trying to encourage them to...

6    Q.    Okay.  And the reason it's called Project Gold Mine is

7    because you wanted to make a lot of money, right?

8    A.    Well, in the agreement there was a milestone that would be

9    paid if they developed this second drug.

10   Q.    But the name Project Gold Mine reflects that even though

11   Promacta only serves a small population, especially back in

12   2010, because of how much it cost, it had the potential to be a

13   gold mine if it was priced high enough for the people that need

14   it, right?

15   A.    I don't think the gold mine was related to the price of

16   Promacta.

17   Q.    Okay.  Nothing to do with that at all?

18   A.    Not -- no, I don't think we -- like I answered previously,

19   we have no control over what the price of Promacta is.

20              MR. BROOKS:  Okay.  Nothing further, Your Honor.

21              THE COURT:  Your call.  Your witness.  We've had a

22   long day, so I can't go much longer.  So if you want to do

23   redirect, we're going to have to wait for tomorrow.

24              MR. JONES:  I'll wait for tomorrow, Your Honor.

25              THE COURT:  Okay.  If there's a northeaster outside.

1    Some of you have probably been here since 7:30, 8:00.  Get

2    home, be safe.  See you tomorrow morning at 9:00.  Remember,

3    don't talk about the case, don't read anything about it in the

4    press.  And let us know if there's a delay getting in here.

5    Thank you very much for coming in.  Thank you.

6              (Jury exits.)

7              THE COURT:  You can step down, sir.  Remember not to

8    talk about your -- well, actually --

9              MR. HOOPES:  I apologize, Your Honor.  We were going

10   to raise the request for an oral sequestration.

11             THE COURT:  Yes.  You shouldn't talk to anyone else or

12   anyone about this testimony.

13             MR. HOOPES:  That applies both to counsel and to

14   personal counsel, I would assume, Your Honor.

15             THE COURT:  Yes.  I wanted to talk about -- what did

16   you say, counsel and...

17             MR. HOOPES:  Well, we have counsel here and everybody

18   from Ligand has their --

19             THE COURT:  No, you shouldn't talk to anyone about

20   your testimony.

21             MR. BROOKS:  I think the issue is that all of the

22   Ligand and Viking and all of them have the same counsel.  I

23   think the sequestration order, as we understand it, would mean

24   that counsel isn't allowed to tell somebody what somebody else

25   testified to.

```
 1            THE COURT:  Yes.  I was going to ask you about

 2   sequestration.  But let him go.  Goodbye.  See you tomorrow.

 3            MR. BROOKS:  I'm sorry.  I did not mean to hold that

 4   up.

 5            THE COURT:  Okay.  So there are a bunch of things --

 6            First of all, have you handed in all your

 7   questionnaires from this morning from the jury?

 8            MR. HOOPES:  They were all collected, Your Honor.

 9            MR. BROOKS:  No.  I have not.

10            MR. JONES:  We have one more too, Your Honor.  I

11   apologize.

12            THE COURT:  Anna will take them.  Good.

13            Okay.  That was number one.  Number two, did any of

14   you get all the vaccination questionnaires or did just I get

15   those?  I just have those.  I'll preserve those.  It's my

16   understanding that only one of the jurors is unvaccinated.  The

17   others are vaccinated, but I'm not going to obviously tell the

18   jury who's who.  I just wanted to state that for the record.

19            Why don't we sit down because you're probably tired

20   too.

21            The next thing is, Mr. Jones, I had a little trouble

22   following some of the testimony.  Even though all these

23   documents are in, when you're referencing the documents, it's

24   important for us to say -- when, let's say -- is it the

25   paralegal, whoever it is, is putting the document on the slide,
```

1    this is Exhibit 222, or whatever, how are the jurors going to

2    find it otherwise?  And how's the record going to reflect what

3    you're reading?  I'm not quite sure how you want to do that.

4         MR. JONES:  I thought I had been calling out the

5    numbers.  I'll call them out louder.

6         THE COURT:  But also as you stick with the document,

7    the same would be true with you, they don't have them to mark

8    them up or put stickies on them.  I'm sorry.  Go ahead.

9         MR. BROOKS:  No, no, no.  I didn't know what you meant

10   until, but you're talking about they can't mark it up because

11   it's on the thing.

12        THE COURT:  So all they're seeing is snippets being

13   flashed on screen and off again.  For them to find it, we at

14   least have to have the record be clear.  But more importantly,

15   I would suggest for both sides on the key document hand out

16   something in writing that they can keep because otherwise it's

17   just -- this is a long trial.  I don't know how they're

18   going --

19        MR. JONES:  You would let them keep paper copies

20   through the trial, Your Honor?

21        THE COURT:  Yes, I would, or a little notebook.

22   Aren't you going to give them a notebook anyway for the

23   distance witnesses?

24        MR. JONES:  I think for the distance witnesses we'll

25   have one or two things on paper.

```
1              THE COURT:  I would not let you give them all -- I
2    don't know how many exhibits there are all together.  If
3    there's a key document, either side could introduce it and have
4    people mark it up.  This particular board of directors meeting
5    bullet may have some significance, for example.  But the most
6    important thing -- you do your strategy the way you want -- is
7    just to make it clear on the record where you're reading from.
8              MR. JONES:  Yes, Your Honor.
9              THE COURT:  Especially since they don't really have a
10   timeline if they're not flagging this is three months before
11   Sovaldi came out, you don't quite get it.  Just to flag it in
12   terms of just having them follow.
13             The next witness is going to be who?
14             MR. DAY:  The next witness will be Matt Foehr.
15             THE COURT:  How's he going to be, by Zoom?
16             MR. DAY:  He'll be here tomorrow.
17             THE COURT:  Are there any disputed documents with
18   respect to him?  Is he the one with all the emails?
19             MR. DAY:  Yeah.  There are a handful that are disputed
20   still related to --
21             THE COURT:  I know -- it's killer hard to set up for a
22   trial, but this was the issue that came up the other day.
23             MR. DAY:  Yes.  We reached agreement on I think three
24   documents but there are an additional three that I had proposed
25   agreement to that I don't see a meaningful distinction between
```

1    the ones that they did agree to and the three, but they didn't.

2    And I would like to use them with Mr. Foehr.

3            THE COURT:  Can you give me copies of what they are?

4    Do I have them?

5            MR. BROOKS:  We can certainly get you copies, yes.

6            THE COURT:  The key is I don't want to do it on the

7    fly.

8            MR. DAY:  Okay.  Is it something you'd like to address

9    it now or in the morning?

10           THE COURT:  I do not want to address it now.

11           MR. DAY:  Okay.

12           THE COURT:  I want to read them first.  So that's --

13   I'm assuming that whoever's examining, doing the redirect on

14   this gentleman will only have a few minutes left.  Probably

15   fifteen, fifteen -- so we're going to be right into -- how long

16   do you think direct will be on Foehr?

17           MR. DAY:  Probably around an hour and a half.

18           THE COURT:  So that will bring us right to the break.

19   How long do you think on cross?

20           MR. HOOPES:  Half hour tops.

21           MR. DAY:  I'm sorry?

22           MR. HOOPES:  Thirty minutes.

23           THE COURT:  Half an hour on cross.  Good.  So that

24   will bring us to the 11:00 break or a little beyond.  Maybe

25   then to noon.

1              Then who is the next witness?

2              MR. DAY:  That will be Dr. Brian Lian.

3              THE COURT:  How long will he be?

4              MR. DAY:  I think less than an hour in all likelihood.

5      There are not many documents.  So it should go pretty quickly.

6              THE COURT:  So there are no documents.

7              MR. DAY:  There are some, not many.

8              THE COURT:  Are there any disputed?

9              MR. DAY:  No.

10             THE COURT:  Is he remote or is he here?

11             MR. DAY:  He will be here.

12             THE COURT:  Okay.  And cross?

13             MR. BROOKS:  For -- I'm only taking a little bit of --

14     the cross may depend on the direct.  Did you say an hour you

15     thought?

16             MR. DAY:  About an hour, yeah.

17             MR. BROOKS:  I would think an hour, hour and a half

18     for cross.

19             THE COURT:  So that's putting us to, say, 3:00-ish.

20     There may be time for another witness.  Who would that be?

21             MR. DAY:  That would be Mr. Banerjee.

22             MR. JONES:  Mr. Banerjee, who is the auditor from

23     Marcum for Viking.  So that's the first Zoom witness.

24             THE COURT:  So Banerjee is on Zoom.  Are there

25     documents?

1           MR. JONES:  There's just that S-1 document, Your

2      Honor.

3           THE COURT:  Okay.  So we have tomorrow quite full.

4           MR. DAY:  Yes.

5           THE COURT:  Okay.  So the only documents that I know I

6      have to deal with are these emails, and I don't know what they

7      are.  Is this the issue of state of mind investor emails?

8           MR. DAY:  Yes, Your Honor.

9           MR. BROOKS:  Yes, Your Honor.  We agreed to half of

10     them, but obviously we still -- we thought that would be enough

11     but obviously not.  We thought splitting the baby would work,

12     but.

13          THE COURT:  You thought it would be enough.

14          MR. BROOKS:  Right.  We do have a principal grounds

15     that we can explain in the morning if you want to get into it,

16     Your Honor.

17          THE COURT:  I want to read them so I can understand

18     your arguments.

19          That having been said, why don't you come in at 8:30

20     and we can go through this or any other issues that come up

21     overnight.

22          MR. JONES:  Does the court want separate copies of

23     those or do you want us to point them out in the binders that

24     we have for you?  Do you have a preference?

25          THE COURT:  That's down there?

1          MR. JONES:  Yes.  We'll hand up copies.  It will be

2     easier.

3          THE COURT:  I don't care, either/or.  That's a really

4     good point.  I don't even have them.  Are those binders for me

5     or are those the court copies?

6          MR. JONES:  We have a set for each, Your Honor.  We

7     haven't set out another set for you, but we have several more

8     sets that -- we can do whatever you want, Your Honor.

9          THE COURT:  That would be useful to have because I

10    myself keep my own chronology and have found it a little hard

11    to figure out and it's going to be key on some of this.  So

12    those are the court copies.  Is that right?

13         MR. JONES:  Yes.

14         THE COURT:  And those are for the jury, what I'll send

15    in.  So you can either give me all my own, but at least on

16    these three emails if you could just give me separate copies,

17    that would be great.

18         (Mr. Jones handing.)

19         Look at this.  So efficient.

20         MR. JONES:  This is great, huh?

21         THE COURT:  I don't know if this helps or hurts.

22         Okay.  Thank you.  Anything else, other than I'll see

23    you tomorrow morning?  I plan on a full day tomorrow.  I

24    thought the impanelment went extremely well.  Thank you.  It

25    was very efficiently done by our jury team.  Just if we go off

1    the record for one thing.

2              (Discussion held off the record.)

3              THE COURT:  We'll stand in recess.

4    (Proceedings adjourned at 4:12 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings taken October 26, 2021 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    1/6/22

16

17   Kathleen Mullen Silva, RPR, CRR            Date
     Official Court Reporter
18

19

20

21

22

23

24

25