1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3    SECURITIES AND EXCHANGE COMMISSION,    )
                          Plaintiff,         )
4                                            )
     vs.                                     )
5                                            )
     GREGORY LEMELSON and LEMELSON          )   NO. 18CV11926-PBS
6    CAPITAL MANAGEMENT, LLC,                )
                          Defendants,        )
7    and                                     )
                                             )
8    THE AMVONA FUND, L.P.,                  )
                          Relief Defendant.  )
9

10

11

12                BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT COURT JUDGE
                        JURY TRIAL - DAY 2
13

14

15

16          John Joseph Moakley United States Courthouse
                        Courtroom No. 19
                        One Courthouse Way
17                 Boston, Massachusetts 02210

18

19                      October 27, 2021
                            8:42 a.m.

20

21

22              Kathleen Mullen Silva, RPR, CRR
                     Official Court Reporter
           John Joseph Moakley United States Courthouse
23              One Courthouse Way, Room 7209
                  Boston, Massachusetts 02210
24              E-mail: kathysilva@verizon.net

25          Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2

3           United States Securities and Exchange Commission
            Alfred A. Day, Esq.
            Marc J. Jones, Esq.
4           33 Arch Street, 23rd Floor
            Boston, Massachusetts 02110-1424
5           617.573.4590
            for Plaintiff

6

7

8           Libby Hoopes, P.C.
            Douglas S. Brooks, Esq.
            Thomas M. Hoopes, Esq.
9           Brian J. Sullivan, Esq.
            399 Boylston Street, Suite 200
10          Boston, Massachusetts 02116
            617.338.9911
11          for Defendants Gregory Lemelson, Lemelson Capital
            Management, LLC, The Amvona Fund, LP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              <u>INDEX</u>

3

4   <u>WITNESS</u>                                              <u>PAGE</u>

5

KEITH MARSCHKE

6
        Redirect Examination By Mr. Jones               19
7
    MATTHEW W. FOEHR
8
        Direct Examination By Mr. Day                   22
9       Cross-Examination By Mr. Hoopes                 96
        Redirect Examination By Mr. Day                135
10      Recross-Examination By Mr. Hoopes              141

11  BRIAN LIAN, Ph.D.

12      Direct Examination By Mr. Day                  146
        Cross-Examination By Mr. Brooks                183
13      Redirect Examination By Mr. Day                210
        Recross-Examination By Mr. Brooks              216
14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2      THE COURT:  We have three emails.  Is that all the

3         disputes about documents today?  Is that right?

4      MR. DAY:  Yes, Your Honor.

5      THE COURT:  So the problem with the emails are that

6  some of them -- part of it may be admissible and not other

7  parts.  So the question is how to handle that.  So perhaps you

8  can -- is it you, Mr. Day, who's going to handle this?

9      MR. DAY:  Yes.

10     THE COURT:  Perhaps you can take the ones from

11 Mr. Foehr to Mr. Higgins.  And take the first one and maybe we

12 can talk about what it is you need in there and what the

13 objection to it is.  They do come in under state of mind but

14 the snippets, other parts, don't.  Some of the parts that don't

15 actually help the defendant.  So I wasn't sure if you'd want

16 the whole thing in.  What's the first one timingwise?

17     MR. DAY:  The first one is June 20, 2014.  It's an

18 email chain.  It should be marked H.

19     THE COURT:  All right.  So what part of it do you want

20 in?

21     MR. DAY:  Well, there are two parts, one in each

22 email.  Basically it's the, "Just met with Investco."  It's one

23 of the investors.  "They're polite not to mention Lemelson but

24 most, if not all, of their opening questions followed his

25 script."  And Mr. Foehr can explain what the "one manufacturer"

```
 1   comment is.  So this one is really --
 2            THE COURT:  Well, this one can't come in through
 3   Foehr, the top part, that's hearsay within hearsay.
 4            MR. DAY:  Because it's written by Mr. Higgins.
 5            THE COURT:  Yes.
 6            MR. DAY:  Okay.
 7            THE COURT:  The second part, which is what was
 8   forwarded from Mr. Foehr, he can authenticate.  I suppose
 9   they're bothered by Lemelson shows their state of mind.
10            MR. DAY:  Exactly, Your Honor.  And Mr. Fields from
11   Cardinal Capital will be testifying later in the case.  That's
12   the reference to "Bob at Cardinal."
13            THE COURT:  The question, though, is the rest of it is
14   more prejudicial than probative.  "He just wanted to reach out
15   to say that he feels this is a clearcut case of stock
16   manipulation."
17            MR. DAY:  Your Honor, that again goes to the --
18            THE COURT:  No, I'm not going to -- I'm not going to
19   let him put in his legal opinion on stock manipulation, unless
20   you want it because somehow it proves up defendant's point of
21   some sort of vendetta by the investors who are trying to get
22   the SEC involved.
23            MR. SULLIVAN:  Your Honor, we do not want this
24   document in.  That's why we objected to it.
25            THE COURT:  Okay.  So I would allow to put in the fact
```

1    from Mr. Foehr that they are bothered by Lemelson.  That's

2    their state of mind and then it shows a concern.  So that one

3    sentence.

4            MR. DAY:  The first two.

5            THE COURT:  What's Cardinal?

6            MR. DAY:  It's one of the investors.  It's Cardinal

7    Capital down in Greenwich.  They were at the time an investor

8    long in Ligand.

9            THE COURT:  Are they the same as Capital?  So

10   sometimes you refer to it as Capital or Cardinal, do you know?

11           MR. DAY:  It's Cardinal Capital.

12           THE COURT:  I know, but there's one --

13           MR. DAY:  Oh, another one.

14           THE COURT:  Another one of the emails refers to them

15   as Capital.  It's the same name.  It must be the same

16   organization.  But, anyway, right now I'll allow in so much

17   subject to a limiting instruction that this is only for state

18   of mind, that sentence --

19           MR. DAY:  Okay.

20           THE COURT:  -- from Mr. Foehr.  That isn't to say

21   Mr. Higgins couldn't put in what he heard.  Okay.

22           The next one is --

23           MR. DAY:  That would be August 29.

24           THE COURT:  Exhibit H was the one I just allowed in

25   subject to a limiting instruction in part.  The rest I'm

```
 1   excluding as more prejudicial than -- substantially more
 2   prejudicial than probative.  Also, it goes beyond the state of
 3   mind exception.
 4           So August 29 --
 5           MR. DAY:  Yes.
 6           THE COURT:  -- 2014.
 7           MR. DAY:  Similar email to Mr. Foehr from John
 8   Higgins.  Mr. Higgins writes that he just got a call from Peter
 9   Kipp with a generalist hedge fund in Houston.  "He wanted to
10   talk through the" -- it says "covert" but I believe that's the
11   convert debt offering.
12           THE COURT:  We won't know about that, right?  I don't
13   know what that means.
14           MR. DAY:  Not yet.  Although Mr. Foehr can address
15   that.
16           THE COURT:  That seems irrelevant so far, unless I --
17   what seems relevant was he also wanted to talk Lemelson to show
18   that he was bothered by it.
19           MR. DAY:  Yes, Your Honor.
20           THE COURT:  But how does the rest of it come in?
21           MR. DAY:  Again, Your Honor, I believe all of this
22   email really goes to how important this investor considered the
23   reports from Father Lemelson.
24           THE COURT:  Well, I agree some of it comes in.  But I
25   think that allowing he wanted to talk Lemelson -- I don't know
```

1  whether the next line, though, qualifies as state of mind.  "He

2  said he's had people post rebuttals on Seeking Alpha and has

3  considered filing a complaint himself with the SEC."  What do

4  you all think of that next line?

5       MR. SULLIVAN:  Your Honor, we think these are --

6  actually, taking a step back, we did not object to Exhibits

7  243, 244 and 245 because per your guidelines from the other day

8  we understood those were emails directly from investors.  And

9  it's silly here to say but at least it fits within the

10  guideline of that is something directly from an investor and is

11  not getting filtered through this level of totem pole hearsay,

12  which is what we have here.  In all these three examples we

13  have it is not directly from an investor.  It is an email from

14  one of the people at Ligand talking about summarizing some

15  conversation they had with some third-party investor.  So to

16  the extent that the SEC is pursuing --

17       THE COURT:  I don't think they're putting it in

18  through business records so much as -- I think Foehr is going

19  to be on the stand saying I got a call from these guys --

20  sorry, from Peter Kipp, and he also wanted to talk about

21  Lemelson.

22       MR. SULLIVAN:  Yes, Your Honor.

23       THE COURT:  Basically.  But the rest I would agree

24  with you.  I don't understand why that doesn't come in that he

25  was worried about it.  He wanted to talk about it, but a lot of

1   the rest of it, I'd have to agree with you is not -- it can't

2   come in through state of mind.  It's what he did and what

3   Ligand did.  So I think you get your point.  If you say there's

4   one, two, that's S, Q, H -- wait a minute.  H -- I guess the

5   last one is S.  And maybe you can help me through that one.

6   It's a similar kind of thing.

7           MR. DAY:  Yes.  This is October of 2014.  This is,

8   again, Cardinal Capital, Bob Fields and Gene Fox calling to --

9   or -- yes, they called Mr. Foehr to discuss Father Lemelson's

10  reports.  It's very similar to the other two emails.

11          THE COURT:  I couldn't understand it as well.  So I'm

12  -- is he the guy -- who's coming to testify?

13          MR. DAY:  Mr. Fields.

14          THE COURT:  Why don't you just put this in through

15  him?

16          MR. DAY:  Okay.

17          THE COURT:  Yes, just put this in through him.

18          Some of this is not self-explanatory.

19          MR. DAY:  Sure.

20          THE COURT:  The first line is, "Gene also shared that

21  they had not heard anything back from the SEC on their

22  submission and that he was disappointed to see another fund

23  performance press release last week."  That's not self-

24  explanatory and it's hearsay.  I don't know what it means.  So

25  I think it's safer to put it in through him if he's coming to

```
 1   testify.  You can say you got calls from these people
 2   expressing concerns.
 3           MR. DAY:  Thank you, Your Honor.
 4           THE COURT:  And I'll limit that to state of mind.
 5           So anything else we need to discuss?
 6           MR. SULLIVAN:  I don't believe there's anything for
 7   today, Your Honor, but I do want to highlight a couple things
 8   for upcoming.
 9           THE COURT:  By the way, what's your name again?
10           MR. SULLIVAN:  Brian Sullivan, Your Honor.
11           THE COURT:  All right, Mr. Sullivan.  I know the two
12   in the front row here.  Are you a -- so you're handling the
13   evidentiary things?
14           MR. SULLIVAN:  Yes.  I've been working on the case for
15   a few years now.
16           THE COURT:  Do you have any cases in terms of on the
17   state of mind investor reaction thing?  Because I was surprised
18   not to see this in any of the motions in limine.  Is there any
19   case law that you wanted to bring?
20           MR. SULLIVAN:  I don't have any, but if the court
21   wants some, I can supplement.
22           THE COURT:  I'm here now.  I'm in the middle of it.
23   So I have the state of mind exception to the hearsay rule.  I
24   know some of these cases, we looked it up, come in under like
25   trademark confusion, that kind of thing.  You can let it in for
```

```
 1    a limited purpose.  But I didn't know if you had anything --
 2    either side, actually, specifically on the investor side, on
 3    state of mind.
 4              Do you, Mr. Day?
 5              MR. DAY:  Nothing specifically in terms of case law.
 6    But it seems fairly clear under the --
 7              (Interruption.)
 8              THE COURT:  Lisa's going to see how many jurors we
 9    have in.  Is the witness here?
10              MR. JONES:  I believe so, Your Honor.
11              THE COURT:  If it's any consolation, I think the
12    airport was essentially closed last night.
13              MR. JONES:  I'm not sure that's so much a consolation
14    as a panic, Your Honor.
15              MR. DAY:  I know that our two witnesses that we're
16    planning for after Dr. Marschke are here.  They arrived last
17    night.
18              MR. JONES:  Dr. Marschke didn't leave town.  So as
19    long as he was able to make it through the wind this morning,
20    I'm sure he's out there.
21              THE COURT:  It is useful to get case law if there's a
22    hotly contested issue.
23              Long story short, I think at least part of these fall
24    within the state of mind exception for what they were worried
25    about, and that's relevant to the issue of materiality.  These
```

1    guys obviously did not rely on it.  That's why I was sort of

2    wondering partly on whether -- so what? -- the investors

3    weren't relying on it.  If anything, they wanted to go to

4    battle.  But that may go later on to -- since you don't have to

5    prove causation, it may well be relevant when more might come

6    in.  That's why I wondered, actually, whether or not you wanted

7    to put in any of it, that none of the key investor things said

8    that they believed it.  But there are others as well.  Okay.

9           MR. DAY:  Yes, Your Honor.  One question, as a

10   practical matter, for today.  I don't know that we would be

11   able to redact these in time for Mr. Foehr's testimony.  Would

12   it be acceptable to the court if I read to Mr. Foehr the

13   portions of these emails that --

14          THE COURT:  Yeah, from so and so to so and so on such

15   and such a date.  But why don't you just ask him?  He talked to

16   them.  What did they say about their state of mind involving

17   Mr. Lemelson?  And this is the document, and then you can edit

18   it later.

19          MR. DAY:  Okay.  That was my plan, Your Honor, was

20   just to use it essentially to refresh his recollection.

21          THE COURT:  It's like a business record sort of

22   reflecting the timing of everything essentially.

23          MR. DAY:  Yup.

24          THE COURT:  Okay.  I think that's it.  We haven't

25   heard yet from Lisa on how many jurors are here.  So I think

1    that's what we need to do here.

2            MR. DAY:  It sounds like Dr. Marschke is here, and are

3    the other witnesses as well?  Mr. Foehr?

4            MS. DIPAOLO:  Waiting nearby.

5            MR. SULLIVAN:  Your Honor, I just wanted to preview --

6    it does not need to be addressed today -- I just wanted to

7    preview two matters that I think will have to be addressed in

8    the next couple of days.

9            One, there's about six documents that are emails of

10   Father Lemelson, you know, seeking to remove certain comments

11   from the Seeking Alpha website.  We are challenging those

12   documents.  So I do think that will need to be addressed by the

13   court before Father Emmanuel testifies.

14           In addition --

15           THE COURT:  Why?  Aren't they admissions of a party

16   opponent?

17           MR. SULLIVAN:  I don't believe so.  The comments

18   themselves are in there.  So those are also hearsay.  I also

19   think there's prejudice with that because Seeking Alpha

20   ultimately pulled down the article.  So we do not have the

21   proper context of how many comments were on the site, what were

22   the nature of those comments.

23           THE COURT:  I have no idea what we're talking about.

24   So you'll give me those six emails.  But in general what he

25   wrote are his admissions, his statements.  There may be pieces

1    of it I would exclude as overly prejudicial.  I don't know.

2    But, I mean, what he wrote is his.

3             MR. SULLIVAN:  Yes, Your Honor.

4             MR. JONES:  Not to mention, Your Honor, the defendants

5    opened on this is America and you're allowed to say what you

6    want here, and they put it at issue, and their contention is

7    that Ligand was trying to shut Mr. Lemelson up -- Father

8    Lemelson up, my apologies -- and to the extent that Father

9    Lemelson is getting comments deleted, that's quite probative of

10   that line of attack the defendants are using.  So on the

11   prejudicial versus probative, I'm not sure that it hits the

12   scale to be prejudicial.

13            THE COURT:  It depends on what he said.  I don't know.

14            But the biggest concern is while I would certainly --

15   the presumption is anything he says comes out but if, in fact,

16   he's incorporating certain things from Alpha -- in other words,

17   saying so and so said on -- what's it, Seeking Alpha?

18            MR. JONES:  It's called Seeking Alpha, Your Honor.

19            THE COURT:  -- so and so said something horrible, it

20   can't be a backdoor way of getting in what that stranger said

21   in Seeking Alpha.  So I just have to see it.

22            MR. JONES:  Yes, Your Honor.  Well, I think that's

23   going to be a Friday issue, so.

24            THE COURT:  Are you all thinking -- since we have to

25   start putting together jury instructions, when do you think

1   realistically this -- yesterday was extremely efficient and

2   went well.  What are we thinking?  It might go to the jury,

3   say, Friday?

4           MR. JONES:  Your Honor, it would be great to have a

5   charge conference enough in advance of closing so we know --

6           THE COURT:  Yes, I agree.  I agree.

7           MR. JONES:  Maybe a charge conference on Monday.  Is

8   that possible?  It will probably go to the jury on Tuesday,

9   possibly Wednesday.  So that would give us a little time to

10  incorporate.

11          THE COURT:  That's ambitious.  What do you all think?

12          MR. HOOPES:  I think that's, frankly, the first time

13  we've heard that date.  But I think having a charge conference

14  on Monday --

15          THE COURT:  I don't know if we'll be ready by then,

16  but you're thinking Monday is --  I'll tell you what, you don't

17  have to tell me right this second but what you're signaling is

18  it's going to be early in the week and it's what's likely to be

19  needed for -- so if we got you a draft on Monday, potentially

20  Friday, but let's say Monday and the charge conference, say,

21  Tuesday-ish.  You'll let me know as we go along what you think.

22          MR. HOOPES:  For sure.

23          MR. JONES:  Without knowing exactly how long either

24  examinations or cross-examinations are going to take, better

25  safe than sorry.  Friday seems too early.  Monday seems like

1    the earliest we could probably do it.

2              THE COURT:  I'm currently thinking three questions

3    on -- at a minimum three questions on a verdict form, one

4    scheme, two statements, three investors.  And that part of the

5    statements is which one of the four, or all four, do you find

6    by a preponderance of the evidence.

7              So the question that I have been struggling with is

8    whether or not you could say none of the statements and still

9    have scheme liability.  And the way you did the opening I think

10   the answer is no.  But -- so it would be an inconsistent

11   verdict to say no on all four statements and then say yes on

12   scheme.  But I want you to think about that, because that was

13   something I raised a few days ago, and I listened carefully to

14   your opening and it does seem to hinge on the four statements.

15             MR. JONES:  Your Honor, absolutely the four statements

16   are key, although I think the way it's charged in the complaint

17   and the way we talked about it is these statements were the

18   backbone of a dishonest campaign.

19             THE COURT:  Absolutely.  You can have both.

20             MR. JONES:  But what I'm saying is that you could both

21   legally and under the way the case is charged have a scheme

22   without the four statements.  Now, I think the chances of the

23   jury doing that, it may not be worth comment.

24             THE COURT:  I think I would either be tempted to grant

25   a new trial or just say there were inconsistent verdicts and

```
 1   send them back.  I don't see how this case is being tried -- I
 2   haven't heard the whole thing yet -- how there could be a
 3   scheme with deceptive statements if they find all four were
 4   true or not intentionally misleading.  But you all haven't
 5   gotten back to me on that issue.
 6          MR. HOOPES:  We're teeing up maybe if there's an
 7   admission of a party opponent issue here with statements
 8   they've made to the court, which it was four, but I think we're
 9   crossing that bridge too early.
10          THE COURT:  I think we are crossing it too soon, but
11   the instructions won't be so hard.  It's how I word the jury
12   question.  That's what I'm thinking of.
13          The other thing is under A and C, I understand from
14   Lorenzo, the Supreme Court case, that everything is overlapping
15   and so be it, but I don't see a distinction in a way that would
16   be meaningful to a jury in the differences between A and C.
17          MR. JONES:  Generally, Your Honor, I think that's the
18   way we do it in the jury instructions.  Essentially we're
19   talking about a scheme incorporating all of the terms that are
20   either in A or in C as the way that the jury can think about a
21   scheme.
22          THE COURT:  And that's how the Supreme Court seemed to
23   say it.  So I'm not going to ask a separate question about
24   that.
25          MR. JONES:  About A and C?
```

```
 1              THE COURT:  Yeah.
 2              MR. JONES:  We would concur with that, Your Honor.
 3              THE COURT:  Hold on.  We'll go off the record, I
 4   think, because I need to find out if the jury is here.
 5              Do we know?
 6              (Discussion held off the record.)
 7              THE COURT:  Should we stand in recess until they get
 8   here?
 9              MR. DAY:  Yes, Judge.
10              MR. HOOPES:  Just to let you know one thing, Your
11   Honor, we took your words late yesterday to heart.  So we have
12   literally a binder for each one of the jurors for the exhibits
13   that were already agreed upon that we're going to focus on
14   today.  So after Mr. Foehr testifies, we'd ask your permission
15   to hand those out to the jury.
16              THE COURT:  After Mr. Foehr testifies?
17              MR. HOOPES:  After he testifies on direct.
18              THE COURT:  Okay.  Just as long as they're agreed-upon
19   exhibits, and there's nothing that I need to --
20              MR. HOOPES:  Nope.  And we'll give a copy to you.
21   Thank you.
22   (Court exits.)
23   (A recess was taken.)
24              THE CLERK:  All rise for the jury.
25   (Court and Jury enter.)
```

```
 1            THE COURT:  Good morning to everyone.
 2            Anyone speak about the case or see anything in the
 3    press?
 4            I find the jury has complied with my instructions and
 5    we're going to continue with our witness and, remember, sir,
 6    you are under oath.
 7            What's your full name?
 8            THE WITNESS:  Keith Marschke.
 9            THE COURT:  Okay.  We may all be seated.  Let's go.
10    This is redirect.
11            MR. JONES:  May I proceed, Your Honor?
12            THE COURT:  Yes.
13                 KEITH MARSCHKE, Previously sworn
14                 REDIRECT EXAMINATION
15    BY MR. JONES:
16    Q.   Thank you for coming back, Dr. Marschke.
17    A.   You're welcome.
18    Q.   Dr. Marschke, during the cross-examination yesterday, do
19    you recall that you were being asked about an off-label use of
20    Promacta?
21    A.   Yes.
22    Q.   You mentioned something during that testimony about an FDA
23    warning.  Could you explain what that FDA warning was?
24    A.   So during the studies to test Promacta, they had found
25    that there were some side effects, and so they were related to
```

1   effects on the liver.  So the FDA, when they approve a drug,

2   they put out what they call a label which describes how you can

3   use it, but also what the potential side effects are.  And one

4   of those side effects was effects on the liver.

5   Q.   When did the FDA put out that side effects warning?

6   A.   So there was a warning initially for the first approval of

7   ITP, the accelerated approval, but then it was modified as

8   other approvals came in.

9   Q.   Okay.  Did that warning involve the liver?

10  A.   Yes.

11  Q.   And what did it say?

12  A.   It said that there was a potential for liver toxicity,

13  hepatotoxicity they call it.

14  Q.   Did it relate to people who had compromised livers?

15  A.   In the initial approval it wasn't related to that because

16  it was on a treating ITP where those patients tend not to have

17  liver problems.  But as they got the approval for hepatitis C,

18  which is a liver disease, then they added that it could

19  potentially cause what they called hepatic decompensation.  It

20  just means the liver could fail at some point.

21  Q.   So if a doctor was going to prescribe -- before ITP was

22  approved for -- excuse me.

23       Before Promacta was approved for use with hepatitis C --

24  and remind us when Promacta was approved for use with hepatitis

25  C?

```
 1    A.    It was in November of 2012.

 2    Q.    So prior to November of 2012, if a doctor was going to

 3    prescribe Promacta to a hepatitis C patient, would they have to

 4    be doing it sort of despite that warning?

 5    A.    Yes.

 6    Q.    They'd have to essentially risk that liver damage to the

 7    liver compromised patient?

 8          MR. BROOKS:  Objection.  Leading.

 9          THE COURT:  Sustained.

10    Q.    Did Ligand ever receive any information that prior to

11    2012, when Promacta was approved for hepatitis C, prior to that

12    time, did Ligand ever receive information that a significant

13    portion of the sales of Promacta were from off-label uses?

14    A.    No.

15    Q.    Did you ever get any information from your partner GSK

16    that they thought that a significant portion of the sales of

17    Promacta were from an off-label use?

18    A.    No.

19    Q.    Did anyone inside Ligand suspect, if you know, that a

20    significant portion of Promacta sales were from an off-label

21    use?

22    A.    No.

23          MR. BROOKS:  Objection.

24          THE COURT:  Sustained.  Strike the answer.

25    Q.    Did you suspect that a significant portion of Promacta
```

1  sales were from an off-label use prior to that November

2  approval?

3  A.    No.

4  Q.    And why didn't you suspect that?

5  A.    Because of the approval for this rare indication and with

6  the safety label that it had, it was my impression they

7  would -- most doctors would only prescribe for that indication,

8  because safety had been established in those patients.

9  Q.    Okay.  And just to be clear, eventually was safety

10  established for Promacta's use for hepatitis C patients?

11  A.    Yes.

12  Q.    Okay.

13          MR. JONES:  Nothing further, Your Honor.

14          MR. BROOKS:  Nothing, Your Honor.  Thank you.

15          THE COURT:  Thank you very much.

16          MR. DAY:  Your Honor, the Commission calls Matt Foehr

17  as the next witness.

18          THE CLERK:  Good morning.  Please raise your right

19  hand.

20              **MATTHEW W. FOEHR, Sworn**

21          THE CLERK:  You may be seated.  Speaking into the

22  microphone, please state and spell your name for the record.

23          THE WITNESS:  Matthew William Foehr, M-a-t-t-h-e-w

24  W-i-l-l-i-a-m F-o-e-h-r.

25                    DIRECT EXAMINATION

```
 1   BY MR. DAY:
 2   Q.    Good morning, Mr. Foehr.
 3   A.    Good morning.
 4   Q.    Could you tell the jury where you are employed currently?
 5   A.    I'm employed at Ligand Pharmaceuticals.
 6   Q.    And what is your position at Ligand?
 7   A.    I am president and chief operating officer at Ligand.
 8   Q.    Could you give the jury a sense of what your day-to-day
 9   responsibilities include?
10   A.    I manage our technology development and our technology
11   licensing.  Also, our research functions and operations, as
12   well as the legal functions as well.
13   Q.    How long have you worked at Ligand?
14   A.    I joined Ligand in April of 2011.  So a little over ten
15   years.
16   Q.    What was your position when you started at Ligand?
17   A.    When I joined, I was chief operating officer.
18   Q.    So at some point you also became president?
19   A.    Correct.  I believe it was about two or three years after
20   I joined.
21   Q.    Did your responsibilities change as a result of the
22   president being added to your title?
23   A.    In some ways the title change was a reflection of the
24   growth of the business and increasing complexity around the
25   technologies we were developing and licensing to other
```

1    companies.

2    Q.   Now, we're going to get into more detail about Ligand and

3    your role there in a few minutes, but now I want to back up a

4    little bit and talk about your education and work history.

5    Okay?

6    A.   Okay.

7    Q.   Where did you go to college, sir?

8    A.   I went to Santa Clara University.

9    Q.   And when did you graduate?

10   A.   I graduated in 1994.

11   Q.   What was your degree?

12   A.   Biology.

13   Q.   What did you do after college?  What was your first job?

14   A.   My first job was working in a lab at a company called

15   Berlex Biosciences.  We were working on medicines for breast

16   cancer at that time and I worked in the protein chemistry

17   department and process department.

18   Q.   Are you familiar with the term "bench scientist"?

19   A.   Yes.

20   Q.   Is that what your role was there?

21   A.   In general, yes.

22   Q.   Okay.  Could you tell the jury what is that, a bench

23   scientist?

24   A.   Essentially you're performing experiments at a lab bench

25   at the direction of others is a general way to describe a lab.

1    Q.    How long were you at -- I think you said it was Berlex?

2    A.    I worked there prior to graduating from college.  I

3    started working there in the summers.  And then I went back

4    after I graduated, and then I can't recall exactly when I

5    switched.  Sometime within a year I got a job at a new company

6    that was just starting up, and it was a slightly bigger job.

7    So I moved to that job.

8    Q.    Okay.  And what was that company that you joined?

9    A.    That company was called LXR Biotechnology.

10   Q.    And what kind of a business was LXR?

11   A.    It was also a biotechnology company developing medicines.

12   It was focused on a very specific type of cellular death called

13   apoptosis, which was sort of new at that time.  It's much more

14   established now, but we were working on medicines for weight

15   loss and diarrhea induced by chemotherapy agents to help solve

16   that for patients.  There was also some work around heart

17   attack medicines, and I spent a lot of time on a solution used

18   to preserve organs for organ transplant.  So those were the

19   general areas of focus.

20   Q.    What was your role at LXR?

21   A.    It evolved over time.  I was there for almost five years,

22   I think.  And early it was doing research at the direction of

23   others, but then it evolved into a role of managing our

24   manufacturing of the medicines to take into clinical

25   development.  So I spent a lot of time managing our external

```
 1   operations and scaling up processes and those sorts of
 2   engineering tasks.
 3   Q.   And was that the point in your career where you moved from
 4   being a bench scientist more into the operational side of
 5   biotechnology?
 6   A.   Yes.  It was while I was at LXR that I transitioned to
 7   more operational management and people management and
 8   management of vendors and partners who were doing work for us.
 9   Q.   Now, you said you were at LXR for about five years.  What
10   did you do next?
11   A.   In 1999 I joined a company called Connetics Corporation,
12   which was a pharmaceutical company that was developing largely
13   topical medicines for dermatology diseases.
14   Q.   What was your role at Connetics?
15   A.   I think my initial title was senior manager of contract
16   manufacturing operations, and I was managing our external
17   manufacturing for a variety of medicines that were being
18   developed there.
19   Q.   How long were you at Connetics?
20   A.   I was at Connetics until the company was sold, which I
21   believe was in the 2006 time frame.
22   Q.   Did your role change between when you joined in 1999 and
23   2006 or were you doing basically the same work?
24   A.   It changed significantly.  The company grew substantially,
25   and I began to manage a lot of other elements of the business
```

```
 1    there, ultimately managing all of what were called technical
 2    operations, which included research functions, our operational
 3    functions, our external manufacturing functions both for
 4    products that were -- or medicines that were being developed in
 5    clinical trials as well as medicines that had become commercial
 6    products at that point.  So my role grew significantly as the
 7    business grew.
 8    Q.   Did Connetics manufacture its own medicines?
 9    A.   No.
10    Q.   Who manufactured the medicines for Connetics?
11    A.   We had a number of contract manufacturers for clinical
12    stage medicines.  Commercially we had a partnership with a
13    group in Texas called DPT, who manufactured our products.  Also
14    a group in Indiana called Accra Pac, who also manufactured our
15    products as well.
16    Q.   In your experience in the industry, is it typical for a
17    company like Connetics to contract out its manufacturing?
18    A.   Yes.
19    Q.   Why is that?
20    A.   It can be very expensive and complex to build a
21    manufacturing plant, and there are a number of companies who
22    service the pharmaceutical industry to provide those services.
23    So it's very common to seek out those services from those
24    vendors to do the work.
25    Q.   I have a similar question for preclinical studies and
```

1    clinical trials.  Did Connetics also contract for those

2    services?

3    A.    Yes.

4    Q.    Okay.  Any of those studies or trials performed in-house?

5    A.    We did some work in-house, but we did a lot of work with

6    vendors, who would run preclinical studies for us and then

7    report out those results, and those results were then generally

8    used for assessment or decisions around how to develop a new

9    medicine.  Then those results are sometimes submitted to the

10   FDA to explain how a medicine works, that sort of thing.

11   Q.    Same question that I asked before with respect to

12   manufacturing.  In your experience in the industry, is it

13   typical for pharmaceutical companies like Connetics to contract

14   with vendors to perform studies and trials?

15   A.    Yes, it's very typical.

16   Q.    Now, I think you mentioned that Connetics was eventually

17   bought.  And that was in about 2006.  Who was the purchaser?

18   A.    Connetics was purchased by a company called Stiefel

19   Laboratories.

20   Q.    And did you stay on at Stiefel?

21   A.    I did.

22   Q.    Similar role to what you described at Connetics?

23   A.    It actually changed a little.  It was more operational.

24   Stiefel was a much bigger company.  It was a global company

25   with multiple manufacturing plants in multiple countries spread

1   around the world, and I took on sort of a different operational

2   role that was called technical services where I interacted with

3   the various manufacturing plants.

4       I also continued to lead some elements of R&D but my role

5   changed a little bit given the needs of that business.

6   Q.   What was your title at Stiefel?

7   A.   It changed a couple of times.  I was -- I believe I was

8   vice president of technical -- global technical services, I

9   think was my title.  But it changed as the business changed

10  over those -- over that time.

11  Q.   Now, did there come a time that Stiefel was also acquired?

12  A.   Yes.

13  Q.   And who was the acquirer?

14  A.   The acquirer was GlaxoSmithKline.

15  Q.   Is that commonly referred to as GSK?

16  A.   Yes.

17  Q.   Now, we're going to hear about GSK from time to time as we

18  talk today.  Could you explain to the jury what GSK is, what it

19  does?

20  A.   GSK is a global pharmaceutical company, and they research

21  and develop and manufacture medicines on a global scale for a

22  variety of diseases.

23  Q.   And you stayed on at GSK after the acquisition?

24  A.   I did.

25  Q.   Okay.  What was your role there?

```
 1    A.    Initially I led the integration of Stiefel into GSK, which

 2    was a fairly complex process, given that Stiefel was a global

 3    company with manufacturing plants and research in multiple

 4    countries and a number of medicines that were distributed

 5    globally.  So I led that integration and for a period of time I

 6    ran the consumer dermatology portion of GSK, which was largely

 7    a legacy Stiefel business.

 8    Q.    And how long were you at GSK, approximately?

 9    A.    Approximately two years.

10    Q.    And you left GSK to go to Ligand, right?

11    A.    Correct.

12    Q.    And that was in 2011?

13    A.    Yes.

14    Q.    How did it come about that you transitioned from GSK to

15    Ligand?

16    A.    I was at the time considering a new job within GSK that

17    would have moved myself and my family to London for about two

18    years.  And so I was assessing that with my family and thinking

19    about that.  And while that was happening, I was approached by

20    a company -- by investors in a company that was forming, by

21    private investors in a company that was forming that was

22    focused on dermatology and potentially starting and running

23    that company.  And it was going to be based in the San

24    Francisco Bay area, where I live.  And so I was seriously

25    considering doing that and debating it in my mind.  And as I
```

```
 1    recall, I think my wife proposed that I reach out to John
 2    Higgins, who I had worked with previously when I was at
 3    Connetics, because he knew some of the individuals involved in
 4    this new company that was forming probably better than I did.
 5    And so I reached out to John at some point in late 2010 or
 6    early 2011 to sort of ask questions and see if he had insights
 7    on some of the individuals who were involved in this new
 8    company.
 9    Q.   Let me pause you there for one moment.  Who is John
10    Higgins?
11    A.   John Higgins is the chief executive officer at Ligand
12    Pharmaceuticals.
13    Q.   You mentioned that you had worked with him before at
14    Connetics.  What was his role there?
15    A.   At Connetics John was the chief financial officer at
16    Connetics.
17    Q.   So you get in touch with Mr. Higgins in 2011.  What
18    happened next?
19    A.   I was describing to him the two roles that I was
20    considering, potentially moving to England for a couple of
21    years or this new start-up company, and he was asking questions
22    about sort of things that interested me professionally, and so
23    we talked about that.  And then he mentioned that he would like
24    me to go under a confidentiality agreement with Ligand because
25    they were potentially considering acquiring a business that he
```

1    felt would be well matched with my expertise, and I didn't

2    expect that in the conversation, but we then entered into a

3    confidentiality agreement and began talking about a potential

4    role at Ligand.

5    Q.    Okay.  And I think you said earlier that you came on board

6    eventually, I think it was April 2011, as the chief operating

7    officer?

8    A.    That's correct.

9    Q.    Okay.  Now, I want to shift gears a little bit and talk

10   about Ligand in 2014.  So for the next bunch of questions, just

11   if I don't remember to say so, just focus on 2014.  Okay?

12   A.    Okay.

13   Q.    So what did Ligand do in 2014?

14   A.    Ligand was a company that was developing technologies that

15   are used to develop medicines and licensing those technologies

16   to other companies who are taking medicines into development.

17   We also did focused research around certain programs to answer

18   key questions -- scientific questions -- about the programs,

19   and then would license those programs to others in the

20   pharmaceutical industry who were positioned to take those

21   further into development.

22   Q.    Did you also sell some products directly?

23   A.    We also sold technology.  That would be how I would

24   describe it.  We didn't -- we don't and didn't sell

25   pharmaceutical products, medicines themselves, but we would

1    sell our technology.  We had a technology that allows drugs

2    to -- allows medicines to be developed, and we would sell that

3    as a powder, if you will, to partners who need that ingredient

4    to manufacture their medicines.

5    Q.   Is that Captisol?

6    A.   Yes, I'm referring to Captisol.

7    Q.   Now, you mentioned programs --

8            THE COURT:  Wait a minute.  I just lost that.  Was

9    that what?  Cap --

10           MR. DAY:  Captisol.

11           THE WITNESS:  Captisol.

12           THE COURT:  What is that?

13           THE WITNESS:  It's a brand name, but Captisol itself

14   is an ingredient that is used in largely intravenous medicines

15   that helps the active ingredient which is the part of the

16   medicine that causes the pharmaceutical action, Captisol helps

17   either dissolve or stabilize the active ingredients.  It's a

18   common issue in development of IV drugs that often --

19           THE COURT:  But is it a technology, or is it a

20   product?

21           THE WITNESS:  It's a technology.  And it would depend

22   on how one defines the word "product."  I had clarified that

23   it's not a product in that it's not a medicine in itself.  It's

24   an ingredient that we sell as a product to partners who use it.

25           I'm not sure if I've helped there.

```
 1          THE COURT:  A little.
 2  Q.  Let's back up a little bit.  You used the term
 3  "technologies."  Can you explain to the jury -- we just talked
 4  a bit about Captisol.  What are some of the different kinds of
 5  technologies that Ligand developed that have been licensed to
 6  other partners?
 7          THE COURT:  When you say "technology," we often think
 8  of tech as something that's -- I don't know, maybe I'm --
 9  involves computers or involves technology.  So you're using it
10  somewhat differently, right?
11          THE WITNESS:  That's correct.  Thank you.  I'm using
12  it as different -- it has nothing to do with computers or
13  anything like that.  It's -- I'm using the word "technology" to
14  describe something that's used in a very specific medical
15  setting.  So it's used to solve a problem, if you will, for
16  developing a medicine.
17          THE COURT:  So something that solves the solubility
18  problem?
19          THE WITNESS:  Correct.
20          THE COURT:  Now, remember, you can ask questions too
21  because I probably know less than many of you do.  But if you
22  don't understand, you have the right to write a note and I'll
23  send it to the person.  Okay?
24          MR. DAY:  Great.  Thank you, Mr. Foehr.
25  Q.  You also talked about programs.  Is that sort of a term of
```

1    art in the pharmaceutical industry?

2    A.    Yes, I would consider it to be that.

3    Q.    Can you explain to the jury what you mean by "programs" in

4    that context?

5    A.    In general when I'm referring to programs, I'm referring

6    to a medicine that's in development where it's being -- there's

7    an assessment ongoing either in clinical trials or in

8    preclinical trials, meaning tests on a lab bench or in animals,

9    to understand if a medicine will ultimately be safe and

10   effective.  So I'm referring to "program" in a general way that

11   way.

12   Q.    And what -- again, circa 2014, what was Ligand's role with

13   respect to these various programs?  What was Ligand doing with

14   them?

15   A.    In general we were licensing technology to partners who

16   were then taking programs through the course of development.

17   So we were licensing technology or know-how, those sorts of

18   things, to partners, and they were moving programs through

19   development.

20   Q.    We're going to talk a little bit later about a company

21   called Viking Therapeutics.  Is that an example of a partner

22   that was taking programs forward?

23   A.    Yes.

24   Q.    Okay.  We'll come back to that.

25         Now, in terms of revenue to Ligand, how did Ligand earn

1    money from the technologies and programs in 2014?

2    A.   In 2014 there were three different sources of revenue that

3    came to the company.  The first was royalty revenue, which is a

4    percent of the sales that are earned or booked by the partner

5    when they are selling a medicine.  The royalty is a portion of

6    those sales that were owed to Ligand as a result of the

7    technology that we had provided for the development of that

8    medicine.  So royalties was the first source.

9    Q.   Okay.

10   A.   The second source was what we term material sales, which

11   is the sale of the Captisol powder I was referring to earlier.

12   We sell the powder in drums to partners who then use that as an

13   ingredient to manufacture their medicines.  So that was the

14   second source of revenue.

15        And then the third source I believe is generally termed

16   "collaborative and other."  And in general, that's revenue

17   that's related to partners paying us to, in some instances, do

18   work collaboratively with them around the technologies, or I

19   believe more of it is related to milestone payments.  So

20   payments that are owed to Ligand as a program progresses

21   through development.  So as a partner would take a program,

22   say, into a Phase 1 clinical trial, if that trial was

23   successful, they may make a payment because they've now, you

24   know, progressed further through development.  That's just one

25   example of what a milestone payment might be.

1   Q.   Okay.  Thank you.

2        I want to turn now to Promacta.  Are you familiar with a

3   drug called Promacta?

4   A.   Yes.

5   Q.   Who discovered Promacta?

6   A.   Promacta was discovered through a collaboration between

7   Ligand and SmithKline, I believe, which was a predecessor

8   company that helped form GSK, GlaxoSmithKline, through a

9   purchase.

10  Q.   What was Ligand's role in that partnership?

11  A.   To be clear, this predates when I joined Ligand, but

12  Ligand was providing what were called nuclear receptor assays,

13  but specific tests or technology that allowed the screening of

14  potential medicines to find the right indications or right

15  diseases that they might be able to treat.  So it was a

16  screening collaboration technology that Ligand had developed.

17  Q.   And Promacta was ultimately marketed and used in patients,

18  right?

19  A.   Yes, and it still is today.

20  Q.   What does Promacta do?

21  A.   Promacta, in a very simple sense, helps the body create

22  platelets.  It increases the body's ability to make a certain

23  component of the blood that's called a platelet.

24  Q.   When was Promacta first approved for use in humans, if you

25  know?

1   A.   I don't know the date exactly.  I could estimate, but it's

2   a matter of public record.

3   Q.   Sure.

4   A.   It would be announced by GSK when it was first approved.

5   Q.   We'll take a look at a document in a few minutes that may

6   refresh your recollection on that.

7        In 2014 what was GSK's role with respect to Promacta?

8   A.   In 2014 GSK was the -- they were -- had developed

9   Promacta.  By that point they had taken it through development

10  and they were marketing the drug.

11  Q.   Did they manufacture it as well?

12  A.   I can't recall whether all of the manufacturing was done

13  at GSK plants.  I believe that it was, but I'm not positive.

14  Q.   But Ligand wasn't doing the manufacturing either itself or

15  through a third party, right?

16  A.   No.

17  Q.   Now, when you say GSK marketed the drug, what does that

18  mean, just at a very high level?

19  A.   It means they had managed the process of getting the drug

20  approved with the FDA and other regulatory agencies around the

21  world.  They were supporting continued development of the drug.

22  They had a sales force that was distributing information about

23  the medicine to relevant physicians, and they obviously were

24  managing the manufacturing, the pricing of the drug, the supply

25  of the drug to distribution networks and wholesalers and things

1     like that.

2            THE COURT:  One of the jurors asked a question about

3     Captisol.  Is it a method that is patented by the government?

4     Did you have a patent on it?

5            THE WITNESS:  Yes, we have patents on Captisol.

6            THE COURT:  And Ligand owned it?

7            THE WITNESS:  Ligand owns the patents on Captisol.

8            THE COURT:  Did you have patents on Promacta?

9            THE WITNESS:  So just to be clear, Promacta does not

10    and never did use Captisol.  So it's a separate technology that

11    was used for it.

12           There are patents on Promacta, but those are licensed

13    to and owned and managed by the marketer of the drug, at one

14    time was GSK.  Now that's Novartis.  So hopefully that's

15    helpful.

16           THE COURT:  Those were questions by one of the jurors.

17           Thank you for asking a question.  It was a good

18    process, and I'll jump in when we have a question.  Thank you.

19    BY MR. DAY:

20    Q.   Mr. Foehr, this may be getting a little detailed on what

21    you just testified about, but GSK, I think you said, has the

22    patents for Promacta; is that right?  And now Novartis?

23    A.   Now Novartis would be how I would clarify that.

24    Q.   Right.  Now, if the patent resides with -- at the time in

25    2014 -- GSK.  So GSK had the patent -- why was Ligand getting a

1  royalty on sales?

2  A.   Because of our license agreement that existed prior to the

3  patents, it was very clear that our technology was being used

4  to develop the medicine.  And it stipulated that they would pay

5  a royalty should a medicine be successfully developed and

6  commercialized.

7  Q.   So fair to say that Ligand put its expertise into the

8  development of the drug and the entities were to compensate

9  Ligand for that?

10 A.   Yes, that's correct.

11 Q.   On the topic of royalties, I want to --

12      Let me ask you first, are you familiar with the term

13 "tiered royalties"?

14 A.   Yes.

15 Q.   Could you explain to the jury what a tiered royalty is?

16 A.   Essentially a tiered royalty, the word "tiered" is used to

17 describe essentially steps of royalty.  And the royalty is the

18 portion of the revenue that the marketer will then pay back to,

19 in this case, Ligand.  And a tiered royalty means that at a

20 certain level of sales, they pay a certain percentage, but then

21 as the sales increase, that percentage may increase as well,

22 and it's a fairly common feature in licensing in the

23 pharmaceutical industry.  And, again, I believe other

24 industries as well.

25 Q.   So in 2014 GSK essentially would pay more royalty the more

1    they sold?

2    A.   Yes, that's correct.

3    Q.   And was Promacta a product that was subject to a tiered

4    royalty in the agreement between GSK and Ligand?

5    A.   Yes, it was.

6    Q.   In 2014, do you have an understanding of what Promacta was

7    used to treat?

8    A.   Promacta was being used to treat a disease called chronic

9    ITP, which stands for idiopathic or immune thrombocytopenia

10   purpura.  It's a lot of fancy words.

11        THE COURT:  We did go through this yesterday.

12        MR. DAY:  I'm not going to dwell on this for very

13   long.

14   A.   And it was also being used for other disease states where

15   patients may have low platelets and needed their platelets

16   boosted.  So it was in a number of clinical trials for what was

17   essentially boosting platelets in patients who were receiving

18   chemotherapy.  It was used for boosting platelets in certain

19   patients that may suffer from viral diseases.  Hepatitis C is

20   an example of that.  And it was also being used in a disease

21   called severe aplastic anemia, which is a condition where

22   multiple components of the blood are extremely low in patients.

23   Q.   In -- well, let me ask you a different question first.

24        Is ITP separate and apart from hepatitis C in terms of

25   Promacta's use?

1  A.    Yes.  It's a different disease treated by different

2  physicians.  And so it's a different condition, if that answers

3  your question.

4  Q.    Are you familiar with the term "indications"?

5  A.    Yes.

6  Q.    Okay.  What is an indication?

7  A.    An indication, when referring to a medicine, is generally

8  referencing how a medicine is used or what it's used for.  And

9  it's a regulatory or FDA term that essentially gets at what

10 it's used for in a certain condition.  Hopefully that answers

11 the question.

12 Q.    Yes, yes, it does.  So ITP was one indication for

13 Promacta?

14 A.    Yes.

15 Q.    And use in connection with hepatitis C treatment was

16 another indication?

17 A.    Yes, although it does not treat hepatitis C, to be clear.

18 Q.    Yes.  Thank you for the clarification.  Its use, in my

19 understanding, is a supportive care for patients with hepatitis

20 C?

21 A.    Yes, I think that's a fair representation.

22       MR. DAY:  Cole, can we pull up Exhibit 195 at page 2.

23       Your Honor, this is in evidence already agreed by the

24 parties.

25       Actually, can we go to page 1 just for a moment.

1    Q.   Mr. Foehr, do you recognize this type of document, board

2    of directors meeting?

3    A.   Yes.

4    Q.   And did you participate in preparing presentations to

5    Ligand's board of directors?

6    A.   Yes.

7    Q.   The date on this is June 19, 2014, correct?

8    A.   That's correct.

9         MR. DAY:  Can we go to the second page, Cole.

10   Q.   This portion of the presentation is titled "Promacta:

11   Quarterly Revenue."  Can you explain to the jury what's

12   depicted here?

13   A.   This slide is showing the GSK reported quarterly sales for

14   Promacta for the periods of 2001 through the first quarter of

15   2014, and it looks as if it's got some color coding breaking

16   down different geographies: The United States, European Union

17   and then ROW, which stands for rest of world.

18   Q.   Okay.  And this shows Promacta revenue, and it's revenue

19   to GSK increasing during the period 2011 through 2014, correct?

20   A.   Correct.

21   Q.   Okay.  Now, it looks like the revenue goes down a little

22   bit in the first quarter of 2014.  Do you recall revenue

23   dropping off a bit at that time?

24   A.   We had seen either flat or down revenue in Q1 before.  I

25   think you can kind of see that phenomena there between Q4 and

1    Q1 of the prior period.

2    Q.   Do you know why the revenue dropped off in the first

3    quarter of 2014?

4    A.   I don't specifically.

5    Q.   Now, at this time -- well, let me back up a little bit.

6         Are you familiar with a drug called Sovaldi?

7    A.   Yes.

8    Q.   What does Sovaldi do?

9    A.   Sovaldi is a direct-acting antiviral treatment.  So it's a

10   medicine that in a simple sense attacks a virus, stops it from

11   replicating.

12   Q.   Was Sovaldi targeted at a particular viral infection?

13   A.   Yes.

14   Q.   Which one?

15   A.   Hepatitis C.

16   Q.   Now, Sovaldi was approved for use in hepatitis C patients

17   in the end of 2013, right?

18   A.   That sounds about right.  I'm sure that's a matter of

19   public record as well.

20   Q.   In your mind, did the drop-off in revenue in the first

21   quarter of 2014 have any connection to Sovaldi being approved

22   and used in hepatitis C patients?

23             MR. HOOPES:  Objection.  Basis.

24             THE COURT:  I'll allow it, whether he has an opinion

25   and then let him state --

1          Do you have an opinion one way or another?

2          THE WITNESS:  I don't believe it was related to --

3          THE COURT:  Is that yes or no?  Do you have an opinion

4     as to whether it was related to Sovaldi?

5          THE WITNESS:  Yes, I have an opinion.

6     Q.   And what is your opinion, sir?

7          MR. HOOPES:  Objection as to the basis of the opinion.

8          THE COURT:  Overruled.  What's your opinion and what's

9     it based on?

10    A.   My opinion is that it was not related to Sovaldi because

11    the majority of the sales and the growth and the focus was

12    around chronic ITP.  There was a lot of work going on expanding

13    the geographies at the time in chronic ITP, and I don't believe

14    that it was related to Sovaldi.

15    Q.   And Sovaldi had been pretty recently approved at that

16    point, right?

17    A.   I believe so, yes.

18    Q.   In your experience is a drug like Sovaldi, when it first

19    hits the market, is it sort of widely used in patients who are

20    appropriate candidates for the drug, or does it take some time

21    to get out into the patient population?

22    A.   I think it depends on the situation.  In my experience

23    over the last over 20 years in the industry, it depends on what

24    data is available, what patients it's applicable to.  So I

25    think it can depend on the situation.

 1           THE COURT:  Well, let's not talk generally.  But with

 2    respect to Sovaldi, why don't you say why Sovaldi didn't make a

 3    difference.

 4           MR. HOOPES:  May I just -- is this an opinion?

 5    Q.   Well, based on your understanding of the market --

 6           THE COURT:  I don't want to talk generally about

 7    medicines.  I'd like to talk about --

 8           MR. DAY:  Sure.

 9           THE COURT:  Why don't we focus him on Sovaldi.  I'll

10    let you ask the question.

11           MR. DAY:  Sure.

12    Q.   So Sovaldi was approved in, I believe, December 2013 and

13    the first quarter revenue in 2014 is down.  So it's right on

14    the heels of Sovaldi being approved.  You had said before, and

15    correct me if I'm wrong, that your view is that Sovaldi's

16    adoption did not lead to the decrease in Promacta revenue in

17    2014.

18        My question is, would you expect, based on your experience

19    in the industry, for a drug like Sovaldi to take effect so

20    quickly?

21           THE COURT:  Let him answer the question.

22           MR. DAY:  Sure.  I'm trying to explain the premise for

23    the question.

24    Q.   But are you with me about adoption of a drug like Sovaldi

25    and the impact it would have?

1  A.    Sovaldi was obviously an important medicine in the direct-

2  acting antiviral space specific for hepatitis C.  So it was

3  clearly an important medicine for that.  I recall when data was

4  being released around the drug before it was with Gilead.  So

5  it was clearly an important portion of the medical landscape

6  for hepatitis C.  I just want to clarify -- and this may have

7  already been covered, but Promacta does not -- Promacta does

8  not treat hepatitis C and never did and wouldn't have an effect

9  on the disease.

10 Q.    Okay.  Do you have an understanding of whether Sovaldi was

11 eventually used in patients with hepatitis C?

12 A.    Yes, it was.

13 Q.    And based on your knowledge of the industry, do you know

14 when Sovaldi was, you know, used in a significant portion of

15 patients with hepatitis C?

16 A.    There are some subtleties to the questions you asked.

17 There are different strains of hepatitis C, and the data

18 related to Sovaldi came out over time over different types of

19 hepatitis C and showing its effectiveness there.  It also was

20 not launched around the world simultaneously.  There were

21 different regulatory processes that take different times and

22 different countries and different requirements.  So hopefully

23 that answers the question.

24 Q.    Yeah.  To summarize, is it fair to say it took a while for

25 Sovaldi to get out and be widely used in patients around the

 1   world?

 2              MR. HOOPES:  Objection.  Asked and answered.

 3              THE COURT:  Do you know, one way or another?

 4              THE WITNESS:  I would characterize it as yes, taking a

 5   while to spread through the different --

 6              THE COURT:  What is the basis for your knowledge as to

 7   the sales of Sovaldi?

 8              THE WITNESS:  I wasn't meaning to comment specifically

 9   on the sales of Sovaldi, more did it take a while for it to be

10   used in the various strains of hepatitis C and in multiple

11   geographies around the world.  And in my view, it took a while.

12   Those things do take time.

13              THE COURT:  Do you know -- do you, yourself, have

14   personal knowledge based on review of data about Sovaldi?

15              THE WITNESS:  I certainly attended medical conferences

16   where I recall reviewing and seeing the data as it was being

17   presented around Sovaldi, but I was not at -- I didn't review

18   every data release or that sort of thing, but I certainly do

19   recall seeing data released for Sovaldi.

20              THE COURT:  There's another question, Becky.

21              (Pause.)

22              I don't understand this question.  So maybe you could

23   ask it a different way, whoever wrote this question.  Okay.

24   It's about the -- I'm going to ask you to ask it a different

25   way.  Maybe, actually -- is this about this?

1          JUROR:  It's about the revenue.

2          THE COURT:  About the revenue from what?

3          JUROR:  I'm a little confused.  May I speak?

4          THE COURT:  Yes, ask him.

5          JUROR:  Yesterday it was stated you sold your

6    royalties for about 800 million dollars.  I didn't understand

7    when and why that was done, if that's a steady stream of

8    revenue.

9          THE WITNESS:  Yes.

10          MR. DAY:  We're jumping ahead a little bit, but go

11    ahead and answer.

12          THE WITNESS:  Yeah, so this is -- I'll speak about a

13    period that is past this, what's on this slide.

14          THE COURT:  So why don't we wait until we get there.

15    We'll finish with Sovaldi and then we'll get to the royalty

16    question.  I just didn't understand the timing.  He will get to

17    that.  All right?

18          Go ahead.  What's the next question?

19          MR. DAY:  Yeah.

20    BY MR. DAY:

21    Q.   I wanted to take a look at I believe it's page 3 of the

22    PDF.  This is captioned, "Promacta: Royalty Revenue."  Can you

23    explain what this portion of the board presentation is showing?

24    A.   Yes.  So this slide is showing the royalty payments that

25    come to Ligand from, at this time, GSK for sales of Promacta.

1    Q.   One question I forgot to ask on the prior slide.  Those

2    revenue numbers for GSK sales of Promacta, are those numbers

3    publicly available?

4    A.   Yes.

5    Q.   And how are they made public?

6    A.   GSK and then Novartis, after acquiring Promacta from GSK,

7    they report their quarterly sales once every three months, and

8    at that time they publish their total sales as a company, and

9    for both companies, they also call out Promacta by name because

10   it's a large enough contributor to their global business that

11   they call it out individually.  So those sales are reported

12   publicly by them.

13   Q.   Thank you.

14       So going back to page 3 here, the royalty revenue, and,

15   again, this shows generally speaking an upward trend in royalty

16   revenue?

17   A.   Yes.

18   Q.   Now, I notice that in Q2 of 2012, Q2 of 2013, and Q2 of

19   2014, it looks like there's a drop-off in royalty revenue.  Do

20   you see that?

21   A.   Yes, I see that.

22   Q.   Do you have an understanding of why that is?

23   A.   Yes.

24   Q.   And could you explain to the jury why the royalty revenue

25   drops off in Q2 of those three years?

1  A.   So that is related to the tiering I was referring to
2  earlier.  So there is a tiering element of the royalty on
3  higher sales.  GSK will pay a higher percent royalty.  One
4  thing I didn't mention earlier but is a feature of this
5  specific contract, and is in many, is that that tiering feature
6  resets annually.  So at the beginning of the year it resets to
7  the low tier and then it tiers up through the year.  So what's
8  seen here in the quarters that you highlighted is essentially
9  that reset of the tiering for the new year and you can see
10  evidence of that through this graph.
11  Q.   And why does that show up in Q2 and not Q1?
12  A.   At this time the accounting standards required Ligand to
13  report royalty revenue on what was called a one-quarter lag,
14  meaning the revenue in Q2 here for Ligand was actually based on
15  the revenue that was earned by GSK in the prior quarter in Q1.
16  So that's why you see it there.  And that was the requirement
17  of the accounting standards at that time.  They have
18  subsequently changed, but that's how they're reflected here.
19  Q.   Thank you.
20      MR. DAY:  Could we go to page 4 of the PDF.
21  Q.   So this is Promacta versus NPlate quarterly revenue.
22  Could you explain to the jury what NPlate is?
23  A.   NPlate is a drug that was developed and is marketed by
24  Amgen, and it is used also to boost platelets.  It's a
25  different drug.  It's an IV drug, but it's used to also boost

1    platelets.

2    Q.   At this time in 2014 was NPlate a competitor of Promacta?

3    A.   Yes.

4    Q.   And what does this slide show?

5    A.   This slide is comparing the revenue -- the quarterly

6    revenue of NPlate that was disclosed by Amgen, and it's

7    comparing it to the quarterly revenue of Promacta as disclosed

8    by GSK, and then it's calculating a percent of what's termed

9    market share.  So what percent of the total use of the two

10   drugs is attributed to Promacta.

11   Q.   Okay.  Thank you.

12        MR. DAY:  Let's go to the next page, Cole.

13   Q.   So this is titled "Promacta Projections."  And then it

14   says, "GSK sell-side analysts."  Just at a high level, what is

15   this page of the presentation showing?

16   A.   So this is showing and summarizing data, and based on the

17   footnote at the bottom from nine what are termed covering

18   analysts who are financial analysts who analyze the

19   pharmaceutical industry.  And these are ones who are analyzing

20   and offering opinions on GSK.  And it's summarizing their

21   projections for revenue of Promacta from the period of 2015

22   through 2020.

23   Q.   Now, I want to pause just for a second.  When you say "GSK

24   analysts," there's a reference to "sell-side analysts" at the

25   top of the slide.  Do you see that?

```
 1    A.    I see that.
 2    Q.    What is a sell-side analyst?
 3    A.    So these are individuals who work for banks who offer
 4    research and who research companies.  They're generally
 5    individuals who spend their time analyzing the pharmaceutical
 6    industry.  They're often either medically trained or have
 7    Ph.D.s and they write reports on pharmaceutical companies and
 8    the work that they're doing, and those reports are reviewed by
 9    investors generally.
10    Q.    And Ligand also looked at those reports for its own
11    purposes?
12    A.    We would.  And this slide is a representation of data
13    essentially being extracted out of those reports and
14    summarized.
15    Q.    Okay.  Now, there's on the right-hand side a reference to
16    high, low and average.  Could you explain how that's
17    represented in this chart?
18    A.    I think what is being shown here is the darker bar is the
19    revenue projected -- the revenue projected by the analyst who
20    has the lowest estimated sales for Promacta.  The slightly
21    lighter bar is showing the projection from the analyst that has
22    the highest.  And then the lines and the dots in the middle are
23    the average of those.
24    Q.    When you say "the average," is that the average of all
25    nine analysts referenced in the footnote?
```

1    A.    I believe that it is.

2    Q.    Now, there's a note at the bottom also, "conversion rate."

3    Can you explain to the jury what that is?

4    A.    That's referenced -- that's referencing currency

5    conversion.  I would assume that some of these analysts are

6    based in other countries and they may have been listing their

7    projections in British pounds from what this footnote says.  So

8    there's a conversion to dollars so that all of these are in

9    U.S. dollars.

10   Q.    GSK is based in England, right?

11   A.    Yes.

12   Q.    So we've seen GSK sell-side analyst projections showing

13   increased revenue from Promacta for the period 2015 through

14   2020.  My question for you is, what were the ways in which

15   Promacta sales could grow over time?

16   A.    There were a number of things that could potentially

17   contribute to that.  There was a significant focus at GSK on

18   increasing I'll term the global footprint of the medicine in

19   terms of other countries in which it was either they were

20   looking to obtain approval or launch in other countries.  There

21   was significant investment in additional data for the medicine,

22   especially around ITP, a big investment in long-term safety

23   data and understanding -- long-term safety parameters was

24   something that I believe physicians were interested in and GSK

25   was investing in.  And, of course, there were new indications

1    being pursued.

2         The chemotherapy induced thrombocytopenia was an area.

3    Use in patients with hepatitis C was an area.  Severe aplastic

4    anemia was an area as well.  And there were a number of

5    subgroups of that chemotherapy area also.

6    Q.   So new geographies, safety data and new indications?

7    A.   Yes.

8    Q.   What about market share?

9    A.   Clearly market share was important as well, as one of the

10   slides earlier showed, an increase in market share versus

11   NPlate.  NPlate, as I said, was or is an infused medicine.

12   Promacta is a once-a-day pill.  So it's a lot more convenient

13   for patients than having to frequently go into a doctor's

14   office or infusion center.  But increase in market share would

15   be important as well.

16   Q.   Approximately what percentage of Ligand's revenue was

17   attributable to Promacta royalties in 2014?

18   A.   In order to give you an accurate number, I would want to

19   reference public documents.

20   Q.   Sure.

21   A.   But --

22   Q.   Yeah, let's do that.

23        MR. DAY:  Cole, can we pull up Exhibit 14 in evidence,

24   the first page.

25   Q.   Do you recognize this document?

1   A.   This is what's termed a Form 10-K filed by Ligand.  I'm

2   trying to see the period here.  It looks like for the period

3   ending December 31, 2013.

4   Q.   And what is a Form 10-K?

5   A.   It's a document filed with the Securities and Exchange

6   Commission that public companies file and disclose details

7   about their business and their audited financials and those

8   sorts of things.

9   Q.   Also known as an annual report?

10  A.   Correct.

11          MR. DAY:  Can we go to page 29, Cole.  That is not the

12  right page.  Hold on.  Sorry.  I have 29 of 96 in the PDF.  I

13  wonder if we have two different versions.

14          If we could have just one moment.

15          Apologies.  This happens from time to time.  All

16  right.

17  Q.   So do you recognize this chart, Mr. Foehr?

18  A.   In general, yes.

19  Q.   Do you see the first three rows are Royalties, Material

20  Sales, and Collaborative Research and Development and Other

21  Revenues?

22  A.   Yes, I see that.

23  Q.   And are those the three sources of revenue that you

24  testified about earlier?

25  A.   Yes.

1  Q.   So royalties totaled 23,584, and that's expressed in

2  thousands, right?

3  A.   Yes.  So that would mean it's 23 million point 584, yeah.

4  Q.   And then material sales are about 19 million dollars?

5  A.   That's correct.

6  Q.   And that's Captisol sales?

7  A.   That's entirely sales of Captisol, correct.

8  Q.   And then the last bucket is about 6 million bucks?

9  A.   Yes, that's correct.

10  Q.   Now, if we scroll down just one more row and you see total

11  revenue is about 49 million dollars?

12  A.   Yes, that's correct, 48.9 million.

13  Q.   Is it fair to say royalties account for about half of

14  Ligand's revenue in 2013?

15  A.   Yes.  I think that's fair to say for 2013.

16  Q.   A little less than half.  And within royalties, about how

17  much was attributable to Promacta sales?

18  A.   A substantial portion.  I would need to reference other

19  documents to give you an exact number, but it was a substantial

20  portion.

21  Q.   But in any event, Promacta sales accounted for less than

22  half of the total revenue of Ligand, right?

23  A.   Yes.

24  Q.   Okay.

25            MR. DAY:  Cole, we can take that down.

```
 1            THE COURT:  Before we move on, I want to make sure
 2     that juror didn't want to follow up with a question.
 3            JUROR:  That helped, Your Honor.
 4            THE COURT:  Okay.  Thank you.
 5            MR. DAY:  I can ask one more question on that.
 6     Q.    So Ligand eventually sold the rights to royalties on
 7     Promacta?
 8     A.    Yes, that's correct.
 9     Q.    When was that?
10     A.    I would want to reference the date to make sure I was
11     accurate, but it was well after this period.  It was in the
12     last few years.
13     Q.    2019 sound right?
14     A.    That sounds about right but, again, it was a matter of
15     public record, so I would refer to that.
16     Q.    And who bought the royalty rights?
17     A.    A group called Royalty Pharma based in New York City.
18     Q.    And how much did Royalty Pharma pay for the rights to
19     Promacta in 2019?
20     A.    Again, it's a matter of public record, but I believe the
21     number was 827 million dollars.
22     Q.    Why did Ligand sell the rights to Promacta royalties in
23     2019?
24     A.    We -- Promacta's royalties had grown substantially and
25     continued to grow in a fairly short period of time.  We had
```

1    been approached fairly frequently by royalty buyers over the

2    years.  There's a group -- there are groups of investors who

3    invest solely in pharmaceutical royalties, and we thought,

4    really much like Royalty Pharma, around how long the drug would

5    continue to grow, and we decided to, I'll say, get a market

6    check, talk to multiple parties about it, and ultimately

7    decided to sell the royalty because it allowed us to invest in

8    other technologies within the company, and we thought we got a

9    very good price for the royalties.  There needed to be general

10   alignment with a counterparty who was buying it on how long

11   there would be patent protection, et cetera, around the drug.

12   And ultimately we got what we thought was a very good price for

13   it and sold it.

14   Q.   Okay.  Thank you.

15        I want to turn now to what has been mentioned a few times

16   already, which is the hepatitis C related indication for

17   Promacta.  Promacta was approved with respect to -- for use in

18   connection with hepatitis C in 2012, right?

19   A.   That sounds about right.  Again, I would want to reference

20   the public documents but that sounds correct.

21   Q.   Okay.  And we heard a fair amount about this yesterday so

22   I'm going to try to move pretty quickly through this.

23             THE COURT:  How much longer do you think you have

24   here?

25             MR. DAY:  Probably about an hour.  We've been going

1    about an hour now I think.

2              THE COURT:  Yes.

3              MR. DAY:  Okay.

4    Q.   So you mentioned that Promacta is not a hepatitis C drug,

5    right?

6    A.   It is not a drug to treat hepatitis C.

7    Q.   But in certain hepatitis C patients platelets may be low,

8    and that's when Promacta might be used?

9    A.   Correct.  Hepatitis C is a disease that attacks the liver.

10   And if the liver is cirrhotic or damaged, it may lose the

11   ability to, I'll say, tell the body to make platelets, if you

12   will, speaking generally.

13   Q.   Now, in 2012 this use or indication for Promacta was a new

14   thing, right?

15   A.   Yes.

16   Q.   But the sales of Promacta we looked at already had been

17   increasing up to that point from 2008 to 2012?

18   A.   Yes, in general, the slide we looked at earlier.

19   Q.   Did the company expect that any sales in connection with

20   hepatitis C would increase revenue, royalty revenue for

21   Promacta?

22   A.   There was a general view that additional indications,

23   additional geographies would be additive to the total use and

24   then sales of Promacta.

25   Q.   And we talked a bit about Sovaldi coming on the market at

1    the end of 2013.  So late 2013, early 2014 what was the company

2    doing, if anything, to figure out what effect Sovaldi might

3    have on future sales of Promacta?

4    A.    We were continuing to monitor the landscape, the various

5    therapy area landscapes in which Promacta was relevant to, and

6    that was the case for hepatitis C.  That was the case for the

7    chemotherapy induced thrombocytopenia indications.  That was

8    the case for both ITP as well as aplastic anemia.

9    Q.    I'm sorry to do this.  It's jumping back a little bit.  We

10    talked about sell-side analyst reports projecting Promacta

11    sales.  Do you recall that?

12    A.    Yes.

13    Q.    One question on that.  Are those sell-side analyst reports

14    publicly available, to your knowledge?

15    A.    In some instances they are.  In other instances I believe

16    they are more akin to like a subscription type service, is my

17    understanding of how they work.

18    Q.    Do you know of any limitations on who can subscribe to

19    receive those?

20    A.    I don't believe there are limitations, but I'm not sure.

21    Q.    Okay.  Thank you.

22    So going back to Sovaldi and what the company was doing to

23    evaluate its potential impact on Promacta sales, can we take a

24    look at Exhibit 223.  This is an email exchange between you and

25    Mr. Higgins dated February 1, 2014.

1          MR. DAY:  And, Your Honor, this is in evidence

2    already.

3    Q.   If we scroll down a bit you'll see that you write to

4    Mr. Higgins on January 31, 2014.  So it's the first email in

5    time but the last one in the document.  Do you see that?

6    A.   Yes, I see it now.

7    Q.   Okay.  What type of information are you providing to

8    Mr. Higgins in this email here?

9    A.   I appear to be summarizing status of some clinical trials

10   that Gilead was sponsoring and running related to Sovaldi.

11   Q.   Now, Mr. Higgins writes back to you.  And in the first

12   bullet point he writes "Will any Sovaldi patients need

13   Promacta?"  Do you see that?

14   A.   I see that.

15   Q.   Do you have an understanding of why Mr. Higgins was asking

16   this question in early 2014?

17   A.   I believe, as I said earlier, we were always discussing

18   and monitoring the landscape in which Promacta operated in

19   terms of where it had applicability generally.  And I think

20   he's wanting here to get more educated, if you will, on how

21   Sovaldi may be used in the hepatitis C treatment landscape.

22   Q.   And was this part of the company assessing how Sovaldi

23   might impact Promacta sales in that indication?

24   A.   There were people in the company who were analyzing that

25   sort of thing.

1    Q.   Were you involved in that effort?

2    A.   I was.  Dr. Marschke did a lot of that sort of work in

3    terms of monitoring the scientific landscape in various areas

4    across our business.

5    Q.   Now, in your view, did Sovaldi's potential impact on

6    Promacta sales have anything to do with sales in connection

7    with the ITP indication?

8    A.   No.

9    Q.   Why do you say that?

10   A.   They're unrelated to one another.  In the way in which you

11   asked the question, they're unrelated.  There are different

12   indications.  There are different patients, different

13   physicians treat those conditions.  So they're not related.

14   Q.   Now, at this point, in 2014, early 2014, did the company

15   have a view one way or another about whether sales of Promacta

16   in the ITP indication would continue to increase?

17   A.   Yes.

18   Q.   What was that expectation?

19   A.   The expectation was that there was a focus on GSK's part

20   to increase the geographic footprint, the markets in which the

21   drug was available, the countries in which the drug was

22   available, and there was continued investment in expanding the

23   safety information around the drug.  So those are examples.

24   Q.   Yeah.  And I think you mentioned market share earlier too?

25   A.   Correct.  Obviously we were tracking the market share, the

```
 1    increase in market share of Promacta as it compared to NPlate,
 2    which can be classified as a, quote, competitor to Promacta.
 3    Q.   Again, in let's say the first half of 2014, did the
 4    company have a view one way or another about whether there was
 5    room for Promacta to grow in the hepatitis C indication?
 6    A.   Well, the fact that it was receiving an indication for
 7    certain patients in hepatitis C meant that the -- the pool of
 8    patients, if you will, that could benefit from it was being
 9    added to.  So from that perspective it was expected that it
10    could be additive in certain treatment situations.
11    Q.   Okay.
12            THE COURT:  Could you say that again.  So did you
13    think it was going to have a positive or negative effect on
14    Promacta, the approval of Sovaldi?
15            THE WITNESS:  I don't think that was the question, but
16    Promacta had been approved for patients in hepatitis C who were
17    receiving a certain type of therapy.
18            THE COURT:  Right.  So did you think Sovaldi was a
19    good or bad thing for the sale of Promacta?
20            THE WITNESS:  I think at that point it likely wasn't
21    clear.  There was a general view -- Sovaldi was initially just
22    approved for a certain set of patients.  There was a view that
23    Sovaldi's existence may increase the frequency with which
24    patients presented with hepatitis C because it would increase
25    awareness around how many patients have hepatitis C.  But
```

1    Promacta, again, was not used to treat the disease, just to

2    boost the platelets in patients that had advanced disease and

3    were being treated in a certain way.  So hopefully that answers

4    the question.

5              MR. DAY:  Okay.  Thank you.

6    Q.   All right.  I want to shift gears a little bit to Father

7    Lemelson's reports.  Are you familiar with the reports that

8    Father Lemelson put out in 2014 about Ligand?

9    A.   Yes.

10   Q.   How did you first become aware of Father Lemelson's

11   reports?

12   A.   I recall the day the first report was issued, and I saw it

13   come through a news feed on my phone.  I was in a meeting that

14   was taking place during the American Diabetes Association

15   scientific sessions, which is an annual medical meeting, that

16   that year was taking place in San Francisco.  And I was in a

17   conference room with some members of my team and a group of

18   therapy area heads and scientists from a big pharma company.

19   We were talking about licensing one of our diabetes drugs to

20   them that had had positive data earlier that week, and we were

21   looking at finding a partner to take that new diabetes drug

22   into development.

23   Q.   Did you consider this an important meeting for Ligand?

24   A.   Yes.  I had put a lot of pressure on my team to set up

25   meetings that were at the same time as the American Diabetes

1    Association.  It can be sometimes very hard to get time of the

2    right people during a medical conference like that.  So yeah,

3    we had been looking forward to those -- that meeting and those

4    meetings specifically for a while.

5    Q.    Okay.  And you said that you got notice through your phone

6    of the first report.  What happened next?

7    A.    Shortly after seeing a release that was issued about the

8    report and then trying to find the report, I recall getting a

9    phone call from an investor.  I then got a phone call from one

10   of the board -- one of our board members.  And then I believe

11   another investor as well.  So I began to -- people began to

12   reach out to me is what I recall.

13   Q.    And what did you do in response to those inquiries?

14   A.    I got up and left the meeting because I didn't want to be

15   at the table looking at my phone.  I wanted to take out my

16   laptop and read whatever this was on a large screen.  So I got

17   up and left the meeting.

18         MR. DAY:  Cole, can we pull up Exhibit 1.

19   Q.    This is Father Lemelson's June 16, 2014 report.  Is this

20   the document you were just referring to?

21   A.    Yes.

22   Q.    Did you read the document when you first pulled it up on

23   your laptop?

24   A.    Yes, I did.

25   Q.    What was your first impression, initial reaction?

1    A.   I was shocked.  There were a number of false statements

2    about the company, misleading statements, false statements

3    about the business, about -- I recall about management, about a

4    lot of things.  So I was shocked by it.

5    Q.   Let's take a look at some of the portions of this

6    document.  Right up at the top do you see the line that starts,

7    "Severe competitive threat to key royalty program and 'going

8    concern' risk drive 100 percent downside."  Do you see that?

9    A.   Yes, I see that.

10   Q.   Do you understand what the key royalty program referenced

11   there is?

12   A.   Based on what the report says, it's Promacta.

13   Q.   And Father Lemelson references "'going concern' risk."  Do

14   you have an understanding of what "going concern risk" is?

15   A.   I believe that's a term -- an accounting term

16   specifically, but my general understanding of it is that it's a

17   statement meant to indicate that a company is going to go out

18   of business, that it won't be able to continue operating.

19   Q.   Let's go to page 4 of this document.  Do you see under

20   "Investment Highlights," there's a paragraph b?

21   A.   Yes, I see that.

22   Q.   It reads, "Based on recent FDA comments, Gilead's

23   revolutionary Sovaldi drug will virtually eliminate demand for

24   Promacta, which is Ligand's largest royalty generating asset,

25   accounting for as much as 72 percent of Ligand royalty revenue

1   as recently as Q4 2013."  Do you see that?

2   A.   Yes, I see that.

3   Q.   Did you agree that Sovaldi would virtually eliminate

4   demand for Promacta?

5   A.   No.

6   Q.   Is that for all the reasons we've discussed earlier today?

7   A.   Yes.

8   Q.   Now, if we go to the next page.  In the middle of the page

9   there's a sentence that starts, "Ligand has described their

10  biggest royalty generating asset Promacta as a" -- and then

11  there's a quote, "treatment of thrombocytopenia (low blood

12  platelet counts) in patients with chronic hepatitis C to allow

13  them to initiate and maintain interferon-based therapy."  Do

14  you see that?

15  A.   I see that.

16  Q.   We've covered this already.  But I just want to ask again.

17  Was Promacta only indicated for use in hepatitis C patients?

18  A.   No.

19       MR. DAY:  Can we go to document 14 in evidence.

20  Q.   This is the Form 10-K that we looked at earlier?

21  A.   Yes.

22       MR. DAY:  Bear with me one moment.

23       Can we go to page 7, Cole.

24  Q.   Under "Promacta (GSK)" in the fourth paragraph that starts

25  "In November of 2012" --

1    A.    Yes, I see that.

2    Q.    -- do you see that the quote from Father Lemelson's report

3    appears to be this first sentence, "The FDA approved Promacta

4    for the treatment of thrombocytopenia (low blood platelet

5    counts) in patients with chronic hepatitis C"?  Then it goes

6    on.  Do you see that?

7    A.    Yes, I see that.

8          MR. DAY:  Can we put that callout down?

9    Q.    Now, in this section of the 10-K that Father Lemelson

10   appears to have been quoting from, there are other indications

11   listed here, right?

12   A.    Yes.

13   Q.    So if you look at the very first paragraph of that section

14   it talks about ITP being approved in 2008.  Do you see that?

15   A.    Yes.

16   Q.    And then in the next paragraph it's full approval for ITP

17   in 2010.

18   A.    Yes, that's correct.

19   Q.    Okay.  Sorry.  This was approval for Promacta in the EU.

20   A.    Yes.

21   Q.    I misspoke.  And then in the next paragraph it's full

22   approval for ITP in the United States.  Do you see that?

23   A.    Yes, I see that.

24         MR. DAY:  And can we go back to -- out of that.

25   Q.    And then in 2013 there's approval in Europe for treatment

1    in connection with hepatitis C.  Do you see that?

2    A.    Yes, I see that.

3    Q.    Okay.  So fair to say that the quote in Father Lemelson's

4    report was only a small portion of this section?

5    A.    Yes.

6    Q.    Were Father Lemelson's claims about Promacta, to your

7    recollection, repeated in subsequent reports?

8    A.    Yes.

9    Q.    Okay.  Now, around the time of this first report you were

10   scheduled to speak with Father Lemelson on the telephone,

11   right?

12   A.    That's correct.

13   Q.    Did that ever happen?

14   A.    No.

15         MR. DAY:  Let's go to Exhibit No. 41 also in evidence,

16   Your Honor.

17   Q.    If we go to the second page, the email at the very bottom,

18   you write to Mr. Higgins and Mr. Voss, "Both: I was just

19   looking at my meeting schedule for tomorrow and Thursday and

20   noted that Erika actually originally scheduled the" -- it says

21   "Lamelson call for tomorrow (Wednesday) at 1:00 p.m."  Do you

22   see that?

23   A.    I do see that.

24   Q.    And the date of this email is June 17, 2014.  So this is

25   the day after Father Lemelson's first report, right?

1    A.    Yes, that's correct.

2    Q.    Who's Erika?

3    A.    Erika is Erika Luib, who works at Ligand.  She works in

4    our -- works on our Captisol technology team now.  At this

5    time, I believe her responsibilities were in investor

6    relations.  She's since moved into a new role.

7    Q.    Okay.  So she scheduled a call for you with Father

8    Lemelson for Wednesday -- you said "tomorrow," so that would be

9    June 18, 2014?

10   A.    Yes, based on what this says, yes.

11   Q.    If we go to the very first email at the top of the first

12   page -- I'm sorry, last in time, first in the document.

13         You write that, "I looked at these with Erika this morning

14   and will forward fine details in a moment (Erika is pulling

15   them up)."  Do you know what you're referring to there?

16   A.    In general my recollection of this was I hadn't made a

17   connection that there was a call scheduled with Father

18   Lemelson.  I didn't recall that that had happened.  And then

19   after the report came out I sort of mentally or I guess made

20   the connection based on looking at my calendar.  And this

21   appears -- I was trying to piece together when it got scheduled

22   and how.

23   Q.    Okay.  And in the next sentence you write, "In general,

24   emailings on Thursday and Friday last week - Erika called him

25   back on Friday morning to schedule a time for this week for an

1    introductory call."  Do you see that portion of the email?

2    A.    Yes, I see that.

3    Q.    Okay.  So it sounds like Erika had scheduled the call with

4    Father Lemelson the prior week on Thursday or Friday.  So that

5    would have been the 14th or 15th of June.  Does that sound

6    right?

7    A.    That sounds right.

8    Q.    So fair to say that this call on the 18th was scheduled

9    before the June 16 report came out?

10   A.    Yes.

11   Q.    And you never ended up talking to Father Lemelson, right?

12   A.    That's correct.

13   Q.    Okay.  Who's Bruce Voss?

14   A.    Bruce Voss works for an investor relations company called

15   Lippert Heilshorn and they -- he is an investor relations

16   representative for Ligand.

17   Q.    At this time in 2014, had he worked with the company for a

18   period of years?

19   A.    Yes.

20   Q.    Was he the IR representative -- when I say "IR" I'm

21   referring to investor relations -- was he the IR rep for Ligand

22   at the time that you joined the company in 2011?

23   A.    Yes.

24   Q.    Did you personally work with Mr. Voss?

25   A.    Yes.  I did, and I also worked with Mr. Voss at my prior

```
 1    company, or when I was at Connetics.  He was also an investor
 2    relations representative for Connetics when I was there from
 3    about 1999 to 2006.  So I knew him from then as well.
 4    Q.   So focusing on 2014, do you have an impression of how well
 5    Mr. Voss knew the company's business?
 6    A.   He knew the company's business very well.
 7    Q.   Okay.  Why do you say that?
 8    A.   He would frequently attend investor meetings and
 9    conferences where the company was presenting.  He would
10    commonly forward news clips about partners or programs that
11    were related to the company.  He would meet with members of our
12    executive management team and scientific team to be sure he was
13    always up to date on what was happening at the company and
14    still is today.
15    Q.   Okay.  In 2014 did you personally have any reservations
16    about Mr. Voss communicating with investors and others on
17    behalf of the company?
18    A.   No.
19    Q.   Why not?
20    A.   I've always found Bruce to be very --
21             MR. HOOPES:  Your Honor, his character.
22             THE COURT:  Based on his experience I'll allow an
23    opinion of his ability.
24    A.   I believe he's always very thorough, very specific.  I
25    value his input on documents and those sorts of things to make
```

```
 1    sure they are communicating clearly.  He's very detail
 2    oriented.  So that's my impression.
 3              MR. DAY:  Thank you.  Your Honor, just cognizant that
 4    it's 11:00 -- oh, it looks like we have a question.
 5              THE COURT:  We'll finish the question and then we'll
 6    take our break.
 7              MR. DAY:  Okay.  Terrific.
 8              THE COURT:  The question is are sell-side analysts
 9    licensed professionals by the government or SEC or are they
10    private entities?
11              THE WITNESS:  I'm not sure how to specifically answer
12    that accurately.  I think it depends.
13              THE COURT:  Who do they usually work with, sell-side
14    analysts?
15              THE WITNESS:  The way I would describe it, they
16    generally work for what I would call banks.  So investment
17    banks.
18              THE COURT:  All right.  And it says here, are they --
19    well, I'm not going to ask the second part of it.  I'll share
20    it with the attorneys.  Okay?
21              MR. DAY:  Okay.  Thank you, Your Honor.
22              MR. JONES:  Okay.
23              THE COURT:  We'll stand in recess.
24              THE CLERK:  All rise.
25              (Technical difficulties with the security system.)
```

```
 1              (Discussion held off the record.)
 2    Q.   Mr. Foehr, we'll get back to the questions here.  I was
 3    going to switch gears a little bit to Mr. Voss speaking with
 4    Father Lemelson.  On June 18, when you had originally been
 5    scheduled to speak with Father Lemelson, did Bruce Voss reach
 6    out to him instead?
 7    A.   In general, yes.
 8    Q.   Do you have an understanding of why Mr. Voss called Father
 9    Lemelson instead of you?
10    A.   We were trying --
11              THE COURT:  Now that Clary's here, we can recess at
12    this point.  She knows the number so the whole U.S. Marshal
13    Service doesn't descend on us.
14              We can take our morning recess now.
15    (Jury exits.)
16              THE COURT:  There are a couple of things I want to
17    discuss.
18              The first is the second part of the question didn't
19    make sense to me and sometimes I'm getting questions that
20    don't.  The second part was, "Are they bound by oath to the
21    office," the sell-side analysts.  I think that would apply only
22    if they were employed by the government.  But if I'm wrong on
23    that and you want to follow up on it, you can do that.
24              The second thing I want to talk about is the fact that
25    you're now significantly over what you estimated yesterday.
```

1    You thought it would be about an hour on direct.  It's now

2    about an hour and a half on direct.  And it's going more slowly

3    than I would have ever expected and I think you expected.  So

4    you need to wrap it up by noon.

5         MR. DAY:  Okay, Your Honor.  That's fine.  Just to

6    clarify, it was Dr. Lian who I believe I said was about an

7    hour.  I think I said for --

8         THE COURT:  I have one hour and half an hour on cross.

9    Lian was about an hour and an hour.  I took the notes.  So the

10   reality is we have to keep a momentum or we'll just slow down

11   and if we start losing the jurors we're in trouble.

12        MR. DAY:  Sure.

13        THE COURT:  So we'll come back in at 11:30.  You'll be

14   done by noon on direct and then we'll go to cross.  Who's the

15   next witness?

16        MR. DAY:  Dr. Lian.

17        THE COURT:  When will Dr. Lian -- hopefully he'll be

18   starting -- it depends how much redirect and recross there is.

19   But roughly he'll be starting before lunch.  Is it he or she?

20        MR. DAY:  He.  I think it depends on cross-examination

21   of Mr. Foehr.

22        THE COURT:  But he's not Zoom?

23        MR. DAY:  No, no.  He's in person.

24        THE COURT:  I don't have to worry about getting my

25   tech people here.

```
 1              MR. DAY:  No, he's in person.
 2              THE COURT:  That's the kind of tech I'm familiar with.
 3    But I know there's also biotech.  I don't usually think of
 4    powder as tech  So that's what was confusing me.
 5              Thank you.  We stand in recess.
 6              THE CLERK:  All rise.
 7    (A recess was taken.)
 8    (Court and Jury enter.)
 9              THE COURT:  We are all set.  Let's go.
10    BY MR. DAY:
11    Q.   Okay.  Mr. Foehr, we left off talking about the period
12    right after the first report came out and your scheduled call
13    with Father Lemelson.  I think where we left off was that
14    Mr. Voss ended up speaking with the defendant rather than you,
15    right?
16    A.   That's correct.
17    Q.   Do you have an understanding of how the call between
18    Mr. Voss and the defendant went?
19    A.   My general recollection was that Mr. Voss indicated that
20    Father Lemelson was sort of entrenched in views that were false
21    about Ligand, incorrect about our products and our company.
22    That's my general recollection.
23    Q.   Now, if you take a look at Exhibit 41, and if we go to the
24    first full email on the second page, do you see that
25    Mr. Higgins writes to you and Mr. Voss on June 17?
```

1    A.    Yes, I see that.

2    Q.    And Mr. Higgins writes, "As I see it, we have three

3    options, take the call, cancel the call," or "have Bruce call

4    in lieu of Matt."  Do you see that?

5    A.    Yeah, he describes it as three choices.

6    Q.    Does that comport with your recollection about the

7    discussion internally about how to respond to the defendant?

8    A.    Yes.

9    Q.    Now, a little bit further down -- we looked at this email

10   already but it's the next one down -- you write to Mr. Higgins

11   about the scheduling of the call.  Do you see that?

12   A.    I'm still looking at an email -- there we go.

13             MR. DAY:  Sorry.  It's the one that starts "Both."

14   Yeah, down there, exactly.

15   Q.    Now, kind of in the middle of that email there's a

16   reference to -- I believe to the defendant, but it's spelled

17   L-a-m-e-l-s-o-n.  Do you see that?

18   A.    I see that.

19   Q.    Why did you write that, sir?

20   A.    I don't know.  I don't know if that was a mistake, if it

21   was intentional.  It's pretty uncharacteristic.  I'm not sure

22   why that's written that way.

23   Q.    Okay.  Okay.  Let's go to --

24             Well, let me ask you one more question about that.  You

25   said you're not sure why you wrote that.  To the extent that

1    you may have been inserting the word "lame" into the

2    defendant's name, is it fair to say you were frustrated with

3    the defendant at this point?

4    A.   I think in general we were frustrated, shocked, confused

5    as to why somebody would say these things about the company and

6    management.  That's why I say I'm not sure if it was a typo or

7    if I did it intentionally.  It's kind of uncharacteristic that

8    I would do something like that, but speaking for myself, we

9    were, or I was shocked, confused that someone would do

10   something like that.  It was very uncharacteristic, and I had

11   never seen anything like what we were witnessing.

12   Q.   Thank you.  Let's go to Exhibit No. 2.  This relates to a

13   June 19 interview that the defendant gave on the Internet radio

14   show Benzinga.  Do you recall listening to that interview?

15   A.   I do.

16        MR. DAY:  I'm going to have Cole play a clip of that

17   right now.

18        It doesn't seem to want to play.  We can use the

19   transcript.

20        THE COURT:  Do we have a transcript for the record?

21        MR. DAY:  We do, Your Honor.  It's Exhibit No. 3.

22        THE COURT:  Great.

23        (Audio played.)

24   Q.   Mr. Foehr, do you remember listening to this interview

25   after it was broadcast on June 19?

1    A.   Yes, I do.

2         MR. DAY:  Cole, can we pull up the transcript, which

3    is Exhibit 3, and go to page -- it's 5 of the PDF and page 16

4    of the transcript.  It's in the bottom right corner.  Just blow

5    up that whole page for me.

6    Q.   In the first paragraph, the defendant said, "Their key

7    royalty generating program Promacta accounted for 72 percent of

8    their royalty revenues as soon as Q4 of 2013 is literally going

9    to go away."  Was that true?

10   A.   No.

11   Q.   Is that for all the reasons we discussed earlier today?

12   A.   Yes.

13   Q.   He then goes on to say, "I mean I had discussions with

14   management just yesterday -- excuse me, their IR firm, and they

15   basically agreed.  And they said, 'Look, we understand Promacta

16   is going away.'"  Do you see that?

17   A.   Yes, I see that.

18   Q.   Do you understand the discussion with management to refer

19   to Mr. Voss's call on June 18?

20   A.   Yes.

21   Q.   And there's a reference to the IR firm, that was LHA that

22   you referenced earlier, where Mr. Voss works?

23   A.   Correct.

24   Q.   And the defendant says "and they said" referring to

25   Mr. Voss, presumably, "'Look, we understand Promacta is going

```
 1   away.'"  To your knowledge, did Mr. Voss say those words to the
 2   defendant?
 3             MR. HOOPES:  Objection.
 4             THE COURT:  Sustained.
 5             THE WITNESS:  No.
 6             THE COURT:  Strike the answer.
 7   Q.   Did you communicate with Mr. Voss --
 8             THE COURT:  Did you listen in on the call?
 9             THE WITNESS:  No, I did not.
10   Q.   Did you have communications with Mr. Voss after the call
11   on June 18?
12   A.   Yes, I believe I did.
13   Q.   And after the interview on June 19?
14   A.   Yes.
15   Q.   And did you come away with an understanding, you
16   personally, of whether Mr. Voss said this on this radio
17   interview?
18             MR. HOOPES:  Objection.  Mr. Voss --
19             THE COURT:  Sustained.  It's hearsay.  You can't ask
20   that.
21             MR. DAY:  I asked for his understanding.
22             THE COURT:  No, sustained.
23             MR. DAY:  Okay.  I'll move on.
24   Q.   Now, we talked about earlier some of the publicly
25   available materials about Promacta, and I want to ask about one
```

1    other public source about the indications that Promacta was

2    approved for.  Do you have an understanding of whether the FDA

3    approval documents are publicly available?

4    A.    There is generally a summary basis of approval that is

5    made available by the FDA.  There's also the label of the drug

6    itself.  So that's what is the package insert some would refer

7    to it as.  Those are publicly available and they indicate what

8    indications a drug is approved for.

9              MR. DAY:  Cole, can we pull up Exhibit 180.

10   Q.    We talked earlier about GSK's releases of sales of

11   Promacta.  Is this an example of one of those public releases?

12   A.    Yes.

13             MR. DAY:  Can we go to page 6 of the PDF, Cole.

14   Q.    If you look at the third paragraph under "Turnover," do

15   you see a reference to "oncology products contributed strongly

16   to the quarter"?

17   A.    Yes, I see that.

18   Q.    Was Promacta included among the oncology products marketed

19   by GSK?

20   A.    GSK chose to include it in their oncology franchise.  So

21   yes, that's where they would classify it.

22   Q.    Okay.  That sentence goes on to say, "benefitting from

23   strong performances from Votrient and Promacta," do you see

24   that?

25   A.    Yes, I see that.

1    Q.   And this was for the first quarter of 2014, right?

2    A.   Yes.

3         MR. DAY:  Cole, let's take a look at -- bear with me.

4    I have the wrong page written down.  Let's see.  That is page

5    24 of the PDF.

6    Q.   Do you see there is a section "Oncology."  Promacta is the

7    third row down.

8    A.   Yes, I see that.

9    Q.   And this references -- I believe it's in pounds

10   sterling -- 48 million dollars in sales; is that right?

11   A.   Yes.  48 million pounds.

12   Q.   Pounds, sorry.

13   A.   Yes.

14   Q.   Then in the next column there's a percentage.  Do you know

15   what that represents?

16   A.   I believe it's percent growth over the prior comparator

17   period.

18   Q.   So that would be the first quarter of 2013?

19   A.   Yes.  That's my understanding.

20   Q.   I think you said earlier these reports come out publicly

21   every quarter?

22   A.   Yes.

23         MR. DAY:  Let's see.  Let's pull up Exhibit No. 4.

24   Q.   Mr. Foehr, this is Father Lemelson's next report, dated

25   July 3, 2014.  Do you recognize this document?

```
1    A.    Yes, I do.

2    Q.    Did you read it when it came out?

3    A.    Yes.

4    Q.    I want to focus your attention on a section about Viking

5    Therapeutics.  First we can go to page 2 of the PDF.  In the,

6    let's see, fourth bullet point Father Lemelson wrote, "The

7    company's recent and highly complex arrangement with Viking

8    Therapeutics, a subtenant in one of Ligand's buildings,

9    deserves close scrutiny since the latter of the two appears to

10   serve only as a shell for Ligand to further access public

11   markets via a 58-million-dollar IPO and an arrangement (not

12   disclosed in related press releases) to convey 50 percent of

13   Viking equity, post successful offering to Ligand."

14         First question, in 2014 what was Viking Therapeutics?

15   A.    Viking Therapeutics was a development stage pharmaceutical

16   company that was developing drugs for metabolic and endocrine

17   diseases.

18   Q.    And what are metabolic and endocrine diseases, just at a

19   very high level?

20   A.    In a general sense things like diabetes or muscle wasting,

21   diseases of the liver, things like that.

22   Q.    Was Viking a shell company?

23   A.    No.

24   Q.    What is a shell company?

25   A.    My understanding of that term is that it's meant to
```

1    describe a company that exists to maybe hide something or

2    doesn't actually have real operations.  And Viking was none of

3    those things.

4    Q.   Was Viking a start-up in 2014?

5    A.   I would describe it as a start-up, yeah.

6    Q.   So there was a transaction between Viking and Ligand.

7    Just at a very high level, what was the purpose of that

8    transaction?

9    A.   Viking was looking to build a portfolio of drugs in the

10   endocrine and metabolic space, and we licensed development

11   stage programs, development stage drugs to Viking that they had

12   planned to take into development.

13   Q.   Why didn't Ligand just develop those programs itself?

14   A.   All of the drugs required a certain set of expertise,

15   development expertise around those diseases that we didn't have

16   and don't have internally.  We were much more focused on

17   technology development, and in some cases very early stage

18   clinical work to answer questions, but these were programs that

19   really required a very specialized set of skills to put into

20   development.

21   Q.   Does Viking still exist today?

22   A.   Yes.

23   Q.   Did it develop some of those programs?

24   A.   Yes.

25   Q.   Okay.  I want to go back to the July 3 report at page -- I

1    believe it's 7 of the PDF.  There's a statement in the second

2    paragraph under "Viking Therapeutics" that I want to ask you

3    about.  The defendant wrote, "Viking does not intend to conduct

4    any preclinical studies or trials and does not own any products

5    or intellectual property or manufacturing abilities and leases

6    space from Ligand."  Do you see that?

7    A.    I see that.

8    Q.    Okay.  I want to focus on the first clause of that

9    sentence "Viking does not intend to conduct any preclinical

10   studies or trials."  Was that true?

11   A.    No.

12   Q.    Why do you say that?

13   A.    Viking had a plan for development of the medicines that

14   they licensed from Ligand.  And that development included

15   running preclinical studies as well as clinical trials.

16   Q.    Did Viking subsequently do that?

17   A.    Yes.

18   Q.    Now, you were on the board of Viking -- the board of

19   directors of Viking Therapeutics, right?

20   A.    Yes, and I still am today.

21   Q.    Okay.  Do you have an understanding of whether Viking's

22   financial statements were audited in connection with its

23   initial public offering?

24   A.    Yes.  It's a requirement when pursuing an initial public

25   offering to have audited financials.  That's my understanding.

1    Q.   Are you familiar with two additional reports that the

2    defendant published in August that had to do with a claim that

3    Ligand was insolvent or nearly bankrupt?  Does that ring a bell

4    to you?

5    A.   Yes, it does.

6    Q.   Was Ligand -- first of all, do you have an understanding

7    of what insolvency is?

8    A.   Insolvency would generally mean that you don't have the

9    means to continue to pursue your business, that you don't have

10   cash, you don't have an ability to continue your business.

11   Q.   Was Ligand insolvent at any point in 2014?

12   A.   No.

13   Q.   At any point since 2014?

14   A.   No.

15   Q.   Have you ever heard of a debt-to-tangible equity ratio,

16   other than in Father Lemelson's reports?

17   A.   I don't recall ever hearing that term until reading Father

18   Lemelson's reports.  I'm not a financial expert, but I don't

19   recall hearing that.

20   Q.   And you've worked for public companies for the bulk of

21   your career, right?

22   A.   Yes, that's correct.

23   Q.   Did Ligand ever make a public statement specifically

24   addressing Father Lemelson's reports and calling him out by

25   name?

1   A.   No, we did not.

2   Q.   Did you nevertheless talk to various individuals and

3   entities about his reports?

4   A.   From the time the first report came out, we were getting

5   an increasing number of questions about the reports from a

6   variety of individuals, investors.  Partners were asking

7   questions, some of our existing partners.  We were getting

8   questions from other companies we were working with on

9   potential licenses.  We got a fair number of questions from

10  employees who said they were also getting questions from family

11  members about Ligand based on the publicity around the reports.

12  Q.   And what kind of questions?

13  A.   I think it depended on the group, the groups that I

14  described, but investors were asking a lot of questions about

15  Promacta.  There was a lot of misinformation and false

16  statements around our Captisol technology, our Captisol

17  business, that it somehow had issues around supply and things

18  like that.  So even partners who knew the technology well and

19  knew us well and had audited our multiple manufacturing sites

20  themselves personally were calling and asking questions about

21  how stable our business was.  Existing partners, or I'll say

22  partners we were talking to about new licenses, were

23  concerned -- some of them voiced concerns about entering into

24  licenses with us because they were worried we were unstable or

25  not running a good business.  And then I think employees were

 1   getting questions from family members and others who were

 2   asking about the reports as well.

 3   Q.   Did Ligand make any public statements that addressed some

 4   of the factual misstatements in the defendant's reports?

 5   A.   I recall that around the time of the first report and

 6   maybe the second -- I would need to look at the dates -- but we

 7   had our quarterly earnings call in August of that year, and we

 8   addressed many of the topics that were raised.  That's my

 9   recollection, that we addressed many of the topics that were

10   raised during that earnings call.

11            MR. DAY:  Can we pull up Exhibit 202, Cole.  And go to

12   the first page.

13   Q.   This is the second quarter 2014 earnings call.  Is this

14   what you were just referencing?

15   A.   Generally, yes.  Yeah.

16   Q.   And what is an earnings call?

17   A.   Four times a year, once every quarter, we will host a

18   public conference call where we talk about the audited

19   financial results of the company and the business generally,

20   sometimes our plans and what we plan to do around the business.

21   So this is one example of one of those.

22            MR. DAY:  Cole, can we go to page 5.

23   Q.   It looks like towards the bottom of the page there's a

24   question from Joe -- I don't know how you pronounce the last

25   name -- from Roth Capital.  Do you see that?

1   A.   Yes, I see that.

2   Q.   Is it Pantginis?

3   A.   I believe it's Pantginis, yes.

4   Q.   And he's an analyst?

5   A.   He's a sell-side analyst as we were referring to earlier.

6   Q.   He asked a question, it looks like a question about

7   Promacta and specifically the hepatitis C market.  Do you see

8   that?

9   A.   Yes, I see that.

10  Q.   It looks like you answer his question right at the bottom

11  of the page.  You say, "Joe, this is Matt.  I can talk to that.

12  Thanks for the question.  Yes, as you say, the hepatitis C

13  indication was the second indication added on after adult ITP.

14  It's in 50 countries now.  They are continuing to expand it

15  more."  And you go on.

16      Is this an example of what you were talking about,

17  addressing some of the false statements in the defendant's

18  reports?

19  A.   Yes.  Yes.

20  Q.   Let's take a look at Exhibit 218 as well.  This is a July

21  23, 2014 press release captioned "Ligand Partner GSK Announces

22  Record Quarterly Promacta/Revolade Revenue of $92 Million."  Do

23  you see that?

24  A.   Yes, I see that.

25  Q.   Was this another effort to address the misstatements in

1    the defendant's reports?

2    A.   Yes, I believe that it was.

3    Q.   Mr. Foehr, in 2014, what did your compensation package at

4    Ligand look like, the components of it?

5    A.   So I receive a salary, a bonus based on performance, an

6    annual bonus, and stock options as well.  And then there are

7    sometimes long-term incentives based on performance of the

8    company.  But all of those are recommended by the board of

9    directors, a subgroup of the board of directors that are

10   independent directors known as the compensation committee.  So

11   they'll review elements of the compensation for executives and

12   decide on that in consultation with external advisors who

13   monitor the compensation of relevant companies or comparable

14   companies in the space.

15   Q.   And you don't set your own compensation, do you?

16   A.   No.

17   Q.   And Mr. Higgins doesn't set your compensation, does he?

18   A.   No.

19   Q.   Did you own Ligand stock in 2014?

20   A.   Yes.  My family and I owned Ligand stock in 2014, and I

21   own stock today as well.

22   Q.   And the stock price went down in the summer of 2014 during

23   the time that the defendant was publishing his reports, right?

24   A.   It's a matter of public record, but yes, that's my

25   recollection.

```
 1   Q.   And that would have affected -- or how would that affect
 2   the value of your stock?
 3   A.   For a stock that I held, obviously that would have -- the
 4   value would go down.
 5   Q.   Did you lose any money in the summer of 2014?
 6   A.   Well, I didn't lose money out of a bank account or
 7   anything like that.  The stock value obviously went down, but I
 8   didn't lose money in that sense, the way you asked the
 9   question.
10   Q.   Did the stock price rebound eventually, go back up?
11   A.   Yes.  The stock today I believe is about 138.
12            MR. HOOPES:  Objection.
13            THE COURT:  Sustained as to the stock price today.
14            MR. DAY:  Okay.
15   Q.   But the stock price did eventually recover from the level
16   it was at during the summer of 2014?
17   A.   Yes.  It depends on the time frame but yes, it did.
18   Q.   What effect, if any, does the fact that you owned Ligand
19   stock in 2014 have on the truthfulness of your testimony here
20   today?
21   A.   None.
22   Q.   Why do you say that?
23   A.   Well, I've obviously sworn to be truthful, and I take that
24   very seriously.  And stock price is not going to impact that.
25   Q.   Okay.  Why did Ligand report Father Lemelson's activities
```

1    to the SEC?

2              MR. HOOPES:  Objection.

3              THE COURT:  Overruled.

4    A.    Our view was that a crime was being committed, a

5    securities related crime, from our perspective.  What was being

6    said about us was very clearly wrong.  It was untrue.  There

7    were misrepresentations about our business, and our

8    understanding is that it's the SEC's purview to enforce

9    securities laws.  So we approached the SEC to let them know

10   what we had seen.

11   Q.    Now, other sell-side analysts we talked about earlier may

12   express views about Ligand from time to time, right?

13   A.    Yes.

14   Q.    And in 2014 were there sell-side analysts covering Ligand?

15   A.    Yes, there were.

16   Q.    Is it fair to say some were positive and some were more

17   negative?

18   A.    Yes, that's fair to say.

19   Q.    Did you have occasion to take any action against any of

20   them?

21   A.    No.

22   Q.    Why not?

23   A.    The ones that I would describe as being more negative had

24   a different way of evaluating the business.  I can think of one

25   specifically who called out in her reports that she would not

1   put value on the pipeline or portfolio programs, which is a key

2   part of our business.  It was a very different way of looking

3   at the business.  We didn't necessarily agree with that, but

4   she was open about how she valued it.  And that's one example I

5   can think of.

6   Q.   Did that report contain any false statements of fact?

7   A.   No.  I don't recall seeing any false statements of fact

8   from -- reports from the analyst I'm referring to.

9   Q.   How's Ligand doing today?

10        MR. HOOPES:  Objection.

11        THE COURT:  Sustained.

12   Q.   To your knowledge, is Promacta still being used to treat

13   patients today?

14        MR. HOOPES:  Objection.

15        THE COURT:  Overruled.

16   A.   Yes.

17        THE COURT:  Well, be specific.  What kind of patients?

18        MR. DAY:  Sure.

19   Q.   In what indications, to your knowledge?

20   A.   I would want to reference the label, but my understanding

21   is that the label here in the U.S. -- there could be

22   differences around the world -- includes adults with ITP,

23   children with ITP.  That's another area.

24        THE COURT:  So you're now just referring to the FDA

25   label, not actual sales.  You're just saying what it's

1  permitted for?

2       THE WITNESS:  Yes.

3       MR. DAY:  I'm sorry.  I thought that was Your Honor's

4  question.

5       So I had asked whether Promacta is still being used to

6  treat patients today, and -- maybe I misunderstood, but you're

7  asking what kind of patients --

8       THE COURT:  So to be specific here, where are the

9  sales of Promacta today, for what kinds of indications?  Not

10  what the FDA says.  Where are the sales?

11       THE WITNESS:  Yes.  The best way I can answer that is

12  based on public disclosures from Novartis, who markets the drug

13  today, they had a release earlier this week where they showed

14  growth of Promacta and specifically called out growth being

15  driven by use in ITP, as well as aplastic anemia.  And growth

16  in a number of other areas.  They, I think, commented on double

17  digit growth in all geographies.

18       MR. DAY:  I have nothing further at this time.

19       THE COURT:  Thank you.

20       MR. HOOPES:  Thank you, Your Honor.  If the court

21  please, could we pass out to the jury the binder that we talked

22  about?

23       THE COURT:  Yes.

24       MR. HOOPES:  Just for the record, this is a binder

25  that contains just a few of the many agreed exhibits.

```
 1              THE COURT:  So these are hard copies of some of these
 2    exhibits that we'll have you leave here and not take with you.
 3    But it's sometimes easier to follow on a hard copy.  You'll put
 4    them under your chair so you'll have them for the rest of the
 5    trial.
 6              You go back to that word tech again.  I like high
 7    tech, but sometimes low tech does the trick as well.  So we're
 8    going back to paper for a minute.  You don't have an extra one
 9    for my law clerks, do you?
10              MR. SULLIVAN:  I don't.  I will make one for tomorrow.
11              THE COURT:  Don't worry about it.  Thank you.
12              MR. HOOPES:  May I proceed, Your Honor?
13              THE COURT:  Yes.
14                            CROSS-EXAMINATION
15    BY MR. HOOPES:
16    Q.   So good morning, or good afternoon I believe now,
17    Mr. Foehr.  My name is Tom Hoopes and I represent Father
18    Lemelson.  I just have a few questions, if I might.
19         So you told the ladies and gentlemen of the jury that
20    Promacta sold -- you sold the licensing rights in 2019 for 826
21    million dollars.  Is that right?
22    A.   Yeah.  I don't recall the exact number.  I think it was
23    either 826 or 827.  It's a matter of public record.
24    Q.   Somewhere in that vicinity?
25    A.   Yes.
```

1   Q.   Okay.  And the day before you sold the stock, the value of

2   Ligand in the stock market was $122.69?

3          MR. DAY:  Objection.

4   Q.   Do you recall that?

5          THE COURT:  I'm not sure where it's going yet, but

6   overruled.  If you know.

7   A.   The question -- you mentioned selling stock.

8   Q.   The stock price on the Wall Street Stock Exchange for

9   Ligand was $122.69.  Does that sound about right to you?

10  A.   Again, that's a matter of public record.  I would --

11  Q.   Well, does it sound not right to you?

12         THE COURT:  Is it ballpark?

13  A.   It sounds about right.

14  Q.   And about four days later, after you made the sale, the

15  stock price was down to $105.93 or a thirteen percent drop in a

16  week because you sold Promacta, right?

17         MR. DAY:  Objection.

18         THE COURT:  Do you know?

19  A.   Again, I would reference a public record.

20  Q.   To the judge's point, does that sound in the ballpark?

21  A.   It generally sounds correct.

22  Q.   So that when we're talking a sale, we're talking a sale on

23  the stock market.  I mean, Ligand's listed on the market,

24  right?

25         MR. DAY:  Objection.

```
 1   A.    Your question is not clear.
 2           THE COURT:  That's a double question.  Why don't you
 3   take it --
 4   Q.    Ligand is a publicly listed stock, right?
 5   A.    Yes.
 6   Q.    And on which stock exchange, tell the ladies and gentlemen
 7   of the jury?
 8   A.    Ligand is listed on the NASDAQ stock exchange.
 9   Q.    So on the NASDAQ exchange, the price dropped by 13 percent
10   a week after you sold the licensing rights to Promacta; is that
11   right?  Does that sound about in the ballpark?
12   A.    That generally sounds about in the ballpark.
13   Q.    Okay.  And let me just ask you, did you know and expect
14   that you were going to take a hit when you sold Promacta on
15   your stock price?
16   A.    We didn't know how the stock would react when we sold
17   Promacta.  We were confident that it was a good sale price,
18   that it was a good move for the company.  It allowed us to do a
19   number of other things, add new technologies, and that was our
20   plan.
21   Q.    So if it did take a hit, you were okay with that, because
22   you were looking at it long term; is that right?
23   A.    I don't know that I would characterize it like that.
24   Q.    How would you characterize it?  Tell the ladies and
25   gentlemen of the jury.
```

1    A.   I think because it was a significant transaction, it took

2    some time for some investors to understand what our plan was

3    with the money we had gained from selling the rights of

4    Promacta.  So it took people some time to understand it.  It

5    was a major transaction.  But the general feedback on it I

6    recall on the transaction itself was quite positive.

7    Q.   You say that, but Wall Street for a week voted the other

8    way, voted thumbs down, right?  That was a 13 percent hit,

9    correct?

10   A.   I don't know that I --

11            THE COURT:  This is asked and answered.  So why don't

12   we move on.

13            MR. HOOPES:  Thank you.

14   Q.   So Wall Street was a factor -- is a factor -- let me back

15   up.

16        You list your stock on a publicly traded exchange,

17   correct, on the NASDAQ exchange, right?  Yes or no?

18   A.   Ligand stock is listed publicly on the NASDAQ exchange.

19   Q.   And you list it there because there's some value in you

20   listing it there, correct, in having a stock that people can

21   buy and people can sell?  There's a purpose that Ligand goes

22   that route rather than private investment, right?

23   A.   Not unlike a number of public companies.

24   Q.   Can you answer that yes or no, sir?  There's a reason you

25   list it on a public exchange instead of working solely through

1    private investors, right, yes or no?

2    A.    There are many reasons I think companies do that.  I

3    obviously wasn't at Ligand when the initial public offering

4    happened, but -- I can't comment on the reasons for the

5    original listing.

6    Q.    Exactly.  But it would be fair to say that Ligand as a

7    company, you as the president and CEO -- the president, excuse

8    me, and COO pay attention to the price on a given day of your

9    stock on that stock exchange, correct?

10   A.    Yes, I do pay attention to the price on the stock

11   exchange.

12   Q.    And some people call that paying attention to Wall Street,

13   right?  You would agree with that, correct?

14   A.    Some people may call it paying attention to Wall Street.

15   Q.    Okay.  So if I could direct your attention --

16        MR. HOOPES:  Cara, can you pull up page 21 of Exhibit

17   222, please.

18   Q.    So this is a snippet, a slide I think is probably a better

19   word, from a September 2013 board meeting of Ligand.  Do you

20   recall there was a September 2013 board meeting of Ligand, yes

21   or no?

22   A.    We generally do have an in-person meeting in September of

23   each year.

24   Q.    And as I heard you today, you attend those meetings as the

25   president, right, on a regular basis?

1    A.    Yes.

2    Q.    And you're involved on a regular basis in the preparation

3    of the PowerPoints like this is, correct?

4    A.    Yes.   I don't believe I would have prepared this slide,

5    but I do prepare slides for the board.

6    Q.    Okay.   Why don't you tell us what a board meeting looks

7    like for the jury and for myself.   Not having been to yours, is

8    it in person in 2019, is it a call?   How does it take place?

9              THE COURT:   In what year?

10             MR. HOOPES:   2019.

11   A.    Generally over the course of my ten plus years at Ligand,

12   we have a couple of in-person board meetings per year.   We have

13   board members that are spread around the country.   We'll

14   generally do one on the West Coast and we'll generally do one

15   on the East Coast, and then we'll have multiple telephonic

16   board meetings throughout the year, sometimes five or more.

17   And then we'll have meetings for subcommittees of the board.

18   There's a governance committee of the board, nominating and

19   governance.   There's an audit committee of the board that meets

20   at least quarterly and more than that at times.   And then

21   there's a compensation committee of the board that also meets

22   multiple times a year as well.

23   Q.    So the one that was on September 18 of 2013, can you tell

24   us, was that in person or was that by phone?   Do you have a

25   memory?   If you do, you do.   If you don't, you don't.

1   A.   I don't remember exactly.  I would need reference to a

2   document to be sure I'm accurate.

3   Q.   If a slide was in that presentation and if it was by

4   phone, then somebody must have been emailed the slide and they

5   were watching it while you were on the phone, correct?

6   A.   If it was a telephonic --

7   Q.   Yup.

8   A.   -- presentation, it would have been sent to the board

9   members and they would view it and obviously we would view it

10  as well.

11  Q.   Okay.  So it's fair to say to the ladies and gentlemen of

12  this jury that on September the 18th, the board members were

13  all likely viewing this at the same time, following it a slide

14  at a time, right?

15  A.   Yes, that would be the case, whether it was a telephonic

16  meeting or in person.  Again, that's something that's knowable

17  probably even within the rest of this stack.  I just don't know

18  whether it was in person or not.

19  Q.   We talked about a board meeting.  Why don't we get an idea

20  of who sits on the board.  How many people are on the Ligand

21  board?

22  A.   It's different from this period to today.

23  Q.   If you can, back then.

24  A.   Back then, again, it would be listed in our public proxy

25  statement.  I believe it's about nine --

1    Q.    Just give me your best estimate.

2    A.    About nine members, ten members.

3    Q.    How many of these board members held stock in Ligand?

4    A.    I believe all of them would have stock options in Ligand.

5    I don't know if all of them held stock in Ligand.

6    Q.    Well, stock option -- let me say it and you tell me if I'm

7    wrong.  Stock option, you have an option at a strike price, a

8    set price.  And then if it goes up, you can sell it at a

9    certain point and make money.  If it goes down, you lose money,

10   right?

11   A.    Um.

12   Q.    Do you want to correct that?

13   A.    Yes, I do.  A stock option is an option to purchase stock

14   at a certain price.

15   Q.    Okay.

16   A.    And the person who is granted -- and generally it vests

17   over time.

18   Q.    Yup.

19   A.    Sometimes there are stipulations how that vests over time.

20         And then the individual who is granted that stock option

21   can decide whether or not they exercise and hold that stock,

22   exercise and sell that stock; sometimes they expire, that sort

23   of thing.

24   Q.    So if you decide to exercise your option, that's maybe

25   sort of a vote of confidence in the company, right?

1   A.   It's hard to know how people will interpret activity

2   around options, but one can choose to exercise and hold.  One

3   can choose to exercise and sell.

4   Q.   So in 2014 it was you who were talking to these people on

5   the board who all have the possibility of making money, if they

6   want to, out of an increase in stock price, you had options by

7   2014, right?

8   A.   Yes, I believe I did.

9   Q.   So can you tell the ladies and gentlemen of the jury --

10  let's just tick them off.  What was your salary in 2014?  It's

11  publicly listed but can you just describe it.

12  A.   I would need to look at our proxy statement.

13  Q.   Your best guess.  Nobody's going to charge you here if

14  you're off by a few bucks.  What was your salary in 2014?

15  A.   Again, in order to be sure I respond accurately -- I worry

16  you just used the words "a few bucks."  I could be off, and I

17  would want to make sure --

18  Q.   You could be off by a hundred thousand dollars.  What's

19  the rough price, the rough salary you had in 2014?

20  A.   Again, that would be listed in our proxy.  I think my

21  base --

22  Q.   This is a very simple question.  What's your salary today?

23  A.   I think my base salary, to answer your first question, at

24  that time was above $300,000 per year.

25  Q.   And your bonus?

1  A.   My bonus -- potential bonus -- again, it's not -- it's

2  something that's reviewed annually by the compensation

3  committee and only granted if the compensation committee

4  determines it's appropriate and based on performance of the

5  company; and the bonus range at that point I believe was about

6  in the range of 30 percent of my base salary.

7  Q.   And your salary today?

8  A.   My salary today is more than $400,000 per year.

9  Q.   How much more?

10 A.   I don't know exactly.  I would need to reference

11 documents.

12 Q.   Under a million, over a million?

13 A.   Under a million.

14 Q.   And what's your bonus?

15 A.   Again, the bonus is determined by the compensation

16 committee.  And I believe it's targeted around 35 percent of my

17 salary range, but, again, the compensation committee would

18 determine that.

19 Q.   Okay.  Would it be fair to say that the compensation

20 committee wants to incentivize people for performance, right?

21 You would agree with that?

22 A.   I think the compensation committee's role --

23 Q.   That's a yes or no question.  Do you think that the people

24 on the compensation subcommittee want to incentivize Ligand

25 executives, yes or no?

1  A.   I think they both want to incentivize and retain
2  executives and also be sure that the goals of the company are
3  being met.
4  Q.   And in 2014 you said in your mind there's two categories
5  of stock options.  What was the value granted you in your stock
6  options in 2014 in both categories, if I understood you
7  correctly?
8  A.   I would need to reference documents to give you an exact
9  answer.
10  Q.   Can you tell the ladies and gentlemen of the jury a guess
11  as to what your stock option value was in 2014?
12         MR. DAY:  Objection.
13         THE COURT:  Overruled.  What's your best estimate?
14         THE WITNESS:  My best estimate is in that time frame
15  my family and I owned about 50,000 shares of Ligand stock.
16  Q.   Thank you.  Today how much?
17  A.   My best estimate is that today my family and I own about
18  130,000 shares of Ligand stock.
19  Q.   And you've sold some shares in between?
20  A.   I have exercised and sold some shares in between.  I've
21  also bought some shares, exercised and held some shares.
22  Q.   So would it be fair to say for you, for the CEO and for
23  the members of the board, a happy day in the board room would
24  be when your stock price went up on Wall Street, right?  Yes or
25  no.  That's not a hard question.  When the stock price went up

1    and it went up 13 percent, would that have made you and the CEO
2    and the board members happy that day?
3    A.   We do monitor the stock price.  I do monitor the stock
4    price and take our role in terms of working for shareholders
5    very seriously.  So that's something we monitor.  I'm very
6    happy when new drugs get approved.  That's why I got into the
7    business initially, not to watch a stock price, candidly.
8    Q.   I'm trying to ask a question to move it along.  One thing
9    would be this: which is that you and your CEO and your board
10   members all pay attention to what is happening with your stock
11   price and what's happening on Wall Street, right?
12        THE COURT:  Yes or no.  We just need to finish this.
13   A.   Yes, to varying degree.
14   Q.   So on slide 21, "Ligand transitioning to financial
15   growth/performance-driven story on Wall Street," I mean, you
16   tell me that seems to be saying just what we're talking about,
17   which is Ligand is moving to a growth/performance-driven story
18   on Wall Street.  I mean, in other words, you want a story that
19   says that you've got growth performance?
20        MR. DAY:  Objection.
21        THE COURT:  Well, sustained.  What does that mean?
22        MR. HOOPES:  Thank you.
23   Q.   What does that mean?  What did you think it meant?
24   A.   It's hard to comment on this without seeing the context of
25   other slides.

```
 1              THE COURT:  We just need to get through this.  Based
 2    on your memory, what does it mean?
 3              THE WITNESS:  It's basically talking about the fact
 4    that Ligand had had at that point, and has continued to build,
 5    a business where investors -- some investors focus on the
 6    earnings per share, the growth -- the financial growth of the
 7    company.  I believe that's what it's referring to, but I don't
 8    have much to add, other than what's on the face of the
 9    document.
10    Q.   So taking that --
11              MR. HOOPES:  Let's go to the next slide in that
12    September 18, 2013 board meeting if we can.  Cara, could you
13    pull up page 30, please.
14              MS. MURPHY:  I appear to be frozen.
15              MR. HOOPES:  Sometimes our tech works, Your Honor, and
16    sometimes it's having a cup of coffee.
17              THE COURT:  This isn't in their binder, is it?
18              MR. HOOPES:  Yes, it is.  So in the binder in tab 2.
19              THE COURT:  Why don't we just get to the hard copy.
20              MR. HOOPES:  We'll go right there.  Which is on page 3
21    in the binder.  And on your screen where it says "tab 2, page
22    3," and when you're all there, just let me know you're good.
23    Thank you.
24    Q.   So on the screen or in your binder it says "Promacta
25    Context," and this is another slide from that same presentation
```

1    to the same gathered board on that same day that says,

2    "indications beyond ITP critical for continued Promacta growth.

3    ITP estimated to be about 66 peak penetration," meaning they're

4    getting closer to peak penetration.  But the next line, "HCV

5    needs to be a big market for Promacta to keep driving Ligand's

6    growth."  Am I reading that correctly?

7    A.    The second subbullet reads, "HCV needs to be a big market

8    for Promacta to keep driving Ligand's growth."

9    Q.    Right.  So you were in the board meeting, right?

10   A.    I would have been in the board meeting.

11   Q.    So what did you take that to mean?

12   A.    Again, this is referring to different markets that --

13   Q.    No, it isn't.  It says, "HCV needs to be a big market for

14   Promacta to keep driving Ligand's growth."

15            MR. DAY:  Objection.

16   Q.    I would assume, sir, and I'm going to ask you the

17   question, and you tell me if I'm wrong, that that refers right

18   back to slide 21 which was, we've got a new growth-driven

19   narrative for Wall Street and HCV needs to be -- hep C

20   essentially -- needs to be a big market for Promacta to keep

21   driving Ligand's growth.  Is that a wrong interpretation?

22   A.    I don't necessarily see those two directly related as your

23   question implies.

24   Q.    I'd ask you why not, sir, but I think --

25            THE COURT:  No, you could.

1    Q.   So why not?

2    A.   Well, there are obviously a lot of elements to Ligand's

3    business, of course, some of which we went through earlier.

4    Three different sources of revenue, multiple indications that's

5    separate from Promacta -- specific to Promacta.  There at this

6    time were expansion of geographies, addition of new safety

7    data, continued growth in market share, which has continued to

8    grow to today.

9    Q.   But this is not about all that.  We've got one line here

10   that says, "HCV needs to be a big market."  Well, Mr. Higgins

11   was in the board meeting or on the call, right?

12   A.   Yes, he would have been.

13   Q.   And he's your CEO, right?

14   A.   Correct.

15   Q.   And when somebody said this line, he didn't stop and say,

16   "Oh, no, that's wrong," correct?

17   A.   I don't recall a scenario --

18   Q.   You don't recall him --

19   A.   -- you just described.

20   Q.   You don't recall because he would have had to approve all

21   of this stuff, right?  Right?

22   A.   In general, Mr. Higgins will review all of the board

23   slides.

24   Q.   Yeah.  We can't say did he review everything, and da, da,

25   da.  But this is a big deal, right?  He's not going to say this

1    unless he's on board with the board, right?  You're having a

2    little trouble with that one.  Let's move to, if we can --

3          MR. HOOPES:  Cara, could you please pull up trial

4    Exhibit 223, which for the jury is tab 1.

5    Q.   Now, a little earlier this morning, you know, you looked

6    at this when Mr. Day asked you some questions from it.

7          Let's go right to the middle of the page where Mr. Higgins

8    says -- if we could highlight that -- "will any Sovaldi

9    patients need Promacta?"  That's what it says, right?

10   A.   Yes, that's what it states.

11   Q.   So to set the scene a little bit, you've already told us

12   we've got this new drug out called Sovaldi, right?

13   A.   Yes.

14   Q.   And that's a big time drug.  That's going to be the 800-

15   pound guerilla in the market in a way, right?  It's already

16   presold potentially billions of dollars' worth of drug, right?

17   A.   Sovaldi was or is a direct-acting antiviral specific to

18   the hepatitis C space, and it was an important development and

19   landscape.  So we were continuing to review and monitoring the

20   landscape, as we did with other elements.

21   Q.   It's a very simple question here, sir, which is reading

22   this, you would think your CEO was not a time waster and he was

23   asking what for him was a number one question on this email,

24   which was: Will any Sovaldi patients need Promacta?  He didn't

25   know the answer.  He was asking you, right?

1    A.   He was asking for the treatment paradigm that was starting

2    to be used then.

3    Q.   Sir, this says, "will any Sovaldi patients need Promacta?"

4    That's the question he asked you, right?  And you actually

5    didn't give him an answer, right?  Because if you read right

6    above, you say, "Indeed.  And I agree on all.  I will get the

7    team chugging on this.  Sovaldi is tracking to do over 5

8    billion in year one, so obviously this an important -- is the

9    important player that everyone thought it would be."  Am I

10   missing something?  He asked you a question.  You didn't have

11   the answer, right?  Not that that's a bad thing.  But just tell

12   us the truth.  You didn't have the answer?  Yes or no, you

13   didn't have the answer?

14   A.   He was asking a very specific question.

15            THE COURT:  Can you answer that yes or no?  Did you

16   know at that point?

17            THE WITNESS:  I didn't know the answer, and I said in

18   my email we will be reaching out to an expert to discuss some

19   of these topics in general.  So that was my general response to

20   your specific question.

21   Q.   So you guys or the guys who have Promacta, Sovaldi's

22   looking down at you from its barrel and you then go touch base

23   with an expert as a result of this, right?

24   A.   Well, your question made some assumptions that aren't

25   accurate.  We didn't have Promacta.  We didn't market the drug.

1    We didn't price the drug.  We didn't sell the drug.  We had a

2    royalty that was paid to us on Promacta.

3    Q.   Let me ask this a different way.  Let's see if one and one

4    are two.

5         You're trying to do a growth-driven presentation for Wall

6    Street.  Hep C is going to be a big piece of that.  And Sovaldi

7    is in your sights.  Are you saying he asked this question

8    because he wasn't worried at all about Sovaldi?

9    A.   I think it's important to point out --

10             THE COURT:  You know, this is cross -- can you answer

11   the question that way?  Do you know?

12             THE WITNESS:  The question has some assumptions in it

13   that are incorrect.

14             THE COURT:  All right.  He can't answer it that way.

15   Why don't you ask the next question.

16   Q.   So you went out -- let's go back to something that you

17   said this morning.  You told the ladies and gentlemen of the

18   jury that you all really didn't know exactly what was going to

19   happen with Promacta and Sovaldi at that point in time, in

20   September 18 of 2013, you didn't have a crystal ball for what

21   the impact was going to be, right?  Yes or no?

22   A.   I think it's important to keep in mind --

23   Q.   No, sir.  I asked you a very simple question.  You didn't

24   have a crystal ball as to whether or not or what the exact

25   impact of Sovaldi was going to be on Promacta.  Can you answer

1   that yes or no?

2   A.   No, I did not have a crystal ball and I still don't today.

3   Q.   So you're just throwing your best guess and opinion,

4   right?

5   A.   As I said earlier, we were assessing the landscape to

6   understand all of the elements that were related to many of the

7   medicines that use our technology, including Promacta.

8   Q.   And that's sort of the nature of your business, right?  I

9   mean, there's -- you have your partners and other people have

10  their partners and it's a very competitive landscape.  So

11  everybody's trying to do their best to make their best guess

12  and to make a better guess than the competitor is making,

13  correct?

14  A.   I think there are instances where that is correct.

15  Q.   Okay.  Now, in that vein, your company takes some risk,

16  right?  I mean, as little as you can, but, you know, you

17  bragged about the fact that you have partnerships with a

18  hundred different companies trying to work out development of

19  technology or other issues that you're going to have a piece of

20  one way or another, right, that's sort of your business model?

21  A.   We're quite proud of the technologies we have developed

22  and built and our partnerships.

23  Q.   And some of those have worked out and some of those have

24  failed, right?

25  A.   Yes.

1    Q.   In the case of Viking, that was a company that took a

2    technology, so to speak, or a drug that you all had sitting on

3    the shelf and they approached you and you were going to let

4    them do some development working on that, correct?

5    A.   Viking approached us to license an asset, which was a

6    diabetes asset that we were not developing nor were we

7    positioned to develop.  They had an idea and a plan to develop

8    it.  So we licensed an initial asset for them.  I'm speaking

9    about the early stages of our first license with Viking.

10   Q.   Right.  And this is a company that was sort of created a

11   little bit as an incubator with you?  I mean, you rented them

12   space, right?  Correct?

13   A.   Viking was a start-up development stage company.

14   Q.   That you rented space to.  That's a simple question.  Did

15   you rent space to them?

16   A.   At one point we did lease some vacant space to them.

17   Q.   So they were kind of living in your house a little bit,

18   right?

19   A.   I wouldn't describe it that way, but they were subleasing

20   space from us for a period of time when they moved their

21   business -- I cannot recall exactly when it was, but it was

22   when they moved their business from New York to the West Coast.

23   Q.   And you were pretty tightly bound.  Ligand put you on the

24   board, right, of Viking?  You're on the board, correct?

25   A.   Correct, I'm on the board of Viking.

 1    Q.   And you get paid for that, which is another 30,000 a year

 2    I think you said, or is it more today?

 3    A.   I do get a stipend for being on the Viking board, and I

 4    believe it's approximately $30,000 per year.

 5    Q.   And you get some stock options possibly from them too,

 6    right?

 7    A.   Yes, I do.

 8    Q.   So you being on the board, you would have seen their

 9    public filings, correct?

10    A.   Yes.

11    Q.   And you know that they said in their -- one of their

12    public filings that they intend -- they don't have the

13    experience to do the preclinical studies and they're going to

14    outsource it essentially, right?

15    A.   You're paraphrasing.  I would need to reference their

16    public filings.  I know they obviously filed what's known as an

17    S-1 when they went public.  They file quarterly audited

18    financial statements.  But you're paraphrasing something that

19    I --

20    Q.   Well, let's --

21         MR. HOOPES:  Ladies and gentlemen of the jury, it's at

22    tab 3, and the first page says Viking Therapeutics.  It's a

23    registration statement.  And then if you go to the fourth

24    page --

25         Cara, if we could go possibly to page 17.

1    Q.   But I'll keep going because I think you've heard this

2    question before.  There's a statement in there and I'll read

3    it with the jury that says -- this is Viking.

4              THE COURT:  Are you all there?  Do you have it?  Okay.

5              MR. HOOPES:  I'm so sorry.  Thank you, Your Honor.

6    Q.   "We intend to rely on third parties to conduct our

7    preclinical studies and clinical trials and perform other tasks

8    for us."  So "we intend to rely on third parties to conduct our

9    preclinical studies and clinical studies and perform other

10   tasks for us."

11        So when Mr. Day asked you this morning whether it was true

12   or not that Viking was doing its own clinical studies and you

13   said essentially that a statement that they were not was false

14   and that they were, that seems to contradict what I'm reading

15   here in black and white.  Did I miss something in your

16   testimony?

17   A.   I don't think you're characterizing my testimony

18   correctly.

19   Q.   Oh -- well, which is correct; is it what's here or

20   whatever you said before?

21             MR. DAY:  Objection.

22             THE COURT:  Sustained.

23   Q.   Is what's here correct?

24   A.   This is a correct statement in Viking's S-1.  And I'll add

25   it's very common in the pharmaceutical industry for companies

1    of any size, being start-up companies, even to the largest

2    companies, the largest pharmaceutical companies in the world

3    will contract with third parties to do studies at their

4    direction, whether those are preclinical studies in, say, rats

5    and mice, for example.

6              THE COURT:  We need to finish this today.  So this is

7    cross and the SEC will be able to redirect.

8              Okay.  So you're saying it's typical in the business.

9              So what's the next question?

10   Q.   The next question is, one of the jurors asked a question

11   that you began an answer which was about sell-side analysts.

12   So it would be fair to say, as you started with, a sell-side

13   analyst usually works for a financial house of some kind,

14   right, either a bank or somebody who gives advice in that area,

15   correct?

16   A.   I think that's correct.

17   Q.   And they have different areas of expertise and levels of

18   expertise, correct?  That would be fair too, right?

19   A.   I think it would be fair.

20   Q.   Some have Ph.D.s, some have -- I mean, you don't have a

21   Ph.D, do you?

22   A.   I do not.

23   Q.   You're like a BA in biology.  Or BS, excuse me, in

24   biology?

25   A.   Correct.  I have a BS in biology.

1    Q.   But you know you feel perfectly confident to make some

2    opinions about things like the value of Ligand even, you know,

3    whether somebody was estimating that it was going to be too low

4    a stock price or too high a stock price.  The fact that you

5    would only have a BS in biology doesn't stop you from forming

6    an opinion, right?  You don't have to have a Ph.D., right?

7    A.   I do form opinions on a variety of things.

8    Q.   Including that, right?

9    A.   In general, yes.

10   Q.   Okay.  And these people who were sell-side analysts,

11   they're just employees, right?  There's no other regulatory

12   requirement with them.  It's merely the reputation of the

13   business they're associated with, right?  Which they value

14   highly, correct?

15   A.   I'm not sure what types of licensure all of them have and

16   what requirements there may be for some of the organizations

17   that they work for.  There's probably subtleties there that I

18   don't understand.

19   Q.   You're not sure whether they take an oath to be a

20   sell-side analyst or anything like that, right?

21   A.   I don't believe that they do.

22   Q.   So let's move to another topic here.

23        You know, you were asked by Mr. Day whether or not you

24   ever made a public statement about -- which you call -- this is

25   your words, sir -- false statements, or in Mr. Jones' word

```
 1    "lies" -- but as a company, Ligand, before it went to the SEC,
 2    never made a formal public statement about anything that Father
 3    Lemelson said, correct?
 4    A.   I believe Mr. Day asked me if I -- if we made a statement
 5    referencing -- a public statement referencing Father Lemelson
 6    by name.
 7    Q.   And the answer to that is no, you did not, right?
 8    A.   And the answer to that was no.  We did address some of the
 9    misrepresentations and misinformation that was being stated
10    about --
11    Q.   So this is cross-examination, but let me ask you a very
12    open-ended question.  Why didn't you respond publicly to Father
13    Lemelson?  Why did you go finally to the SEC and use taxpayer
14    dollars to fight your fight?
15              MR. DAY:  Objection.
16              THE COURT:  Overruled.
17    A.   As I said, we addressed some of the misstatements on our
18    earnings call.  I believe that it was in the August earnings
19    call.  We did issue a press release around Promacta, and we
20    felt that securities related crimes were being committed.  So
21    we approached the SEC, who, it's their purview, as I
22    understand, to enforce the laws related to securities.
23    Q.   Right.  And you understand the difference between civil
24    and criminal.  You know we're not here on anything called
25    criminal today, right?
```

1    A.    Yes, I understand that.

2    Q.    And since you've been following all this, you know that

3    your company went to the SEC once and the SEC didn't take the

4    case.  And you had to go back a second time, right?  You know

5    that?

6    A.    I wouldn't describe it like that.

7    Q.    Well, it went through two visits, right?  One in the fall

8    of 2014 and you didn't get satisfaction.  So you went back

9    again in June of 2015, right?

10   A.    I recall two meetings, one that was here in Boston, and

11   then a second one in Washington, D.C.  But I wouldn't

12   characterize the summaries or -- I wouldn't characterize it the

13   way that you did.

14   Q.    Well, let's put it this way: You were in the meeting in

15   Boston, right?

16   A.    Yes, I was.

17   Q.    And they did a PowerPoint and a presentation.  We'll come

18   back to that.

19            THE COURT:  Wait a minute.  Who did?

20            MR. HOOPES:  There was a PowerPoint presentation by

21   Ligand.

22            THE COURT:  By Ligand.

23   Q.    And when you walked out of there, nobody said, "We're

24   doing this case from the SEC side," right?  Nobody used those

25   words before you walked out the door?

1    A.    I don't recall those words being said.

2    Q.    Yup.  And so you've told us that these were misstatements

3    and falsehoods and lies, not just opinions.  Why in God's name,

4    instead of using everybody's tax dollars here, didn't you just

5    make a public statement and issue it?

6              MR. DAY:  Objection.

7              THE COURT:  Sustained.  Why don't you rephrase that.

8              MR. HOOPES:  Thank you.

9    Q.    You're a sometimes a billion-dollar company or a billion-

10   dollar value people say sometimes in your own emails, right?

11   A.    In terms of the total market cap or valuation of Ligand,

12   that's correct.

13   Q.    You've got revenues of 60 million a year sometimes, right?

14   A.    Or more than that now.

15   Q.    Yeah.  And they're paying you and Mr. Higgins good money,

16   right?

17   A.    I would not dispute that I'm well compensated.

18   Q.    And you could hire the best crisis management PR people in

19   the country if you wanted, right?

20   A.    I don't know that we would or ever have, but -- and I

21   don't know what crisis management people would cost.

22   Q.    To you was this a crisis or wasn't it?

23   A.    I don't know that I would describe it as a crisis.

24   Q.    Okay.  So good.  You viewed it as a problem, right?

25   A.    My view was that there was someone who was spreading false

1    information about the company.

2    Q.   I understand that.  But I asked you a different question.

3    You viewed this as a problem, right?

4    A.   It was certainly disruptive to the business.  It was a

5    distraction to our partners and our employees.

6    Q.   It's a very simple question.  Are you saying you're

7    refusing to answer that yes or no, sir?

8            MR. DAY:  Objection.

9            THE COURT:  Do you have a yes or no answer?

10   A.   You used the word "problem."  What I just described one

11   could describe as a problem as well.  So I --

12   Q.   And you were on emails with Mr. Voss and Mr. Higgins where

13   you knew you had a choice, and the choices included public

14   statement, private lawsuit, pay for out of your own pocket, or

15   eventually to the SEC.  Why did you not issue a detailed public

16   response to Father Lemelson if you are so convinced and were so

17   convinced that your view was true?

18           MR. DAY:  Objection.

19           THE COURT:  Overruled.

20   A.   We were managing a lot of inbound questions from investors

21   on the misinformation that was being spread.  Some of those

22   investors offered their views that we should not go out and

23   engage by name with Father Lemelson because it would simply

24   create increased visibility to the false claims, and others --

25   Q.   What were --

1        THE COURT:  Let him finish.

2   A.   -- disagreed with that.  Other investors disagreed with

3   that.  Other investors, who were more what I would describe as

4   retail individual investors, would sometimes say we should do

5   that.  So we debated that.  We genuinely did.

6   Q.   So tell the ladies and gentlemen of the jury and Her Honor

7   and me, if you don't mind, if you had issued a public

8   statement, a point-by-point rebuttal that you believed in, what

9   was going to happen?  What was going to go wrong?  What bad

10  thing were you afraid of?

11  A.   We viewed what Father Lemelson was saying as so false and

12  we also realized that there was an entrenchment in these false

13  ideas that the thought was that doing something like that would

14  just increase the visibility and likely --

15  Q.   Likely what?

16  A.   We felt, as I said, it would simply increase the

17  visibility of these false claims.  And the fact that we had

18  determined --

19  Q.   And what would happen --

20       THE COURT:  Let him just finish the sentence.

21       MR. HOOPES:  Yes, I'm sorry, Your Honor.  Thank you.

22  A.   We had determined that there was an ability to just make

23  things up about the company from Father Lemelson that was being

24  exhibited, and that he was entrenched in these ideas.  So the

25  view was doing something like a point-by-point by name release

1  would simply increase the visibility to these false and

2  misleading statements.

3  Q.   So what were you afraid of?  That the public would decide

4  and have an opinion that you weren't accurate and that your

5  stock price might go down and be money out of your pocket?

6  A.   There was a concern that it could be a continued

7  distraction to the business and continue to harm the business.

8  Q.   Yeah.  But you could have killed all that distraction by

9  issuing a point-by-point rebuttal assuming that everything

10  you've claimed here is true, right, because it's the American

11  public, who has a pretty substantial brain in its head, that

12  would have been making the decision and voting on the stock

13  market.  Mmh, Ligand or Father Lemelson.  You guys didn't want

14  to be on that public debate stage?  Why?

15  A.   We were confident that we were running a strong business.

16  We were confident that we were being forthright in our

17  communications with investors.  And there was a general view

18  that if you get into a debate with an individual who is willing

19  to just make things up or not operate in reality and is

20  entrenched in those views, as we believed Father Lemelson was,

21  that doing something like that would simply, as I said,

22  increase the visibility and distract the business even more.

23  Q.   So you put your distraction over the taxpayer's money by

24  going in and bringing in the SEC?

25           MR. DAY:  Objection.

1          THE COURT:  I sustained the objection.  Enough.

2          MR. HOOPES:  I'll withdraw that, Your Honor.

3          THE COURT:  Are you done?

4          MR. HOOPES:  I have one more area and I'll be done.

5    Actually, I apologize.  Two, with your permission.

6          THE COURT:  Okay.

7          MR. HOOPES:  Thank you.

8    BY MR. HOOPES:

9    Q.   So you were in -- you told us you were in those two SEC

10   meetings, right, the first one and the second one, right, both

11   of them?  Both of them, one in Washington and one in Boston?

12   A.   Yes.

13   Q.   I mean, I'm not going to ask you to go through all 60

14   pages of both PowerPoints.  The jury can, but, I mean, your

15   memory -- you tell me yours -- this Viking issue, which is two

16   of the four alleged false statements, never shows up in any

17   slide in either of those presentations.  Is my memory correct?

18   A.   I would need to reference the two presentations.  I don't

19   recall everything that was in those slides.  So I would need to

20   reference those.

21   Q.   Unless the SEC has no questions when I'm done, maybe at

22   lunch you can pick through them and come back and give us an

23   answer.

24          THE COURT:  Pick through what?

25          MR. HOOPES:  The PowerPoints, which are both being

```
 1   admitted in evidence.
 2           In the meantime, Cara, could you pull up Trial Exhibit
 3   134.  And that is not in your binders, please.  Thank you.
 4           And can you start from the bottom of that one, please.
 5   Go down to the second page, I believe, if you can get it.
 6   Perfect.
 7   BY MR. HOOPES:
 8   Q.   So this is an email that is you -- it's the three of you.
 9   The guy at the top, the CEO, John Higgins, you, the president,
10   Matt Foehr, and Bruce Voss, the third of the triumvirate who's
11   your IR person, your investor relations, right?  And the first
12   person on this email is written by John Higgins.  It's on June
13   24, about a week and a day after Father Lemelson's first
14   report.  And I'm just going to read it out loud.  I'd like to
15   get your reaction.  From John Higgins, "Matt and Bruce,
16   Regarding Lemelson, I'm pondering all angles for how it
17   originated.  I still believe it's a paid hit job by somebody
18   who has lost a lot of money shorting Ligand.  What are your
19   thoughts about Lemelson, that Lemelson and Irina are
20   connected?"  Now, when he's saying "Irina" that's Irina Rifkin
21   he's referring to, right?
22   A.   I believe that it is.
23   Q.   Yeah, and she's one of the sell-side analysts, right?
24   A.   Yes.
25   Q.   And she's a sell-side analyst who didn't say things that
```

1  Mr. Higgins agreed with about your company, right?

2  A.   I think sometimes she did and sometimes she didn't.

3  Q.   We'll get to that.

4       "Lemelson is Eastern Orthodox.  Irina I believe is

5  Ukrain-yen, which I also believe is a region of EO," Eastern

6  Orthodox "faith.  Maybe they are friends or members of faith

7  together.

8       "Irina liked Ligand before she did not.  Since she has

9  not, her thesis has been to hold or sell."

10       "Hold or sell," that means to hold it or sell it, right,

11  one of the two?

12  A.   I believe this is referring to, yeah, hold a stock or sell

13  a stock in this case.

14  Q.   Not buy?

15  A.   I don't see the word "buy" here, so no.

16  Q.   "Irina has a veneer of rationality, but she always fell

17  short of lucidly explaining or really being able to put Ligand

18  in context of biotech stocks.  It seemed to drive her nuts that

19  our value increased when she could not see why.

20       "Other shorts (favis)" -- so there are other shorts out

21  there, not just Lemelson.  Right? -- "have put out big negative

22  short reports - half valuation theory, half BS.  His reports

23  never stuck or got much visibility.  But they always seemed to

24  come about the time Irina was sticking her head up.

25       "Gene Mack lost interest in Ligand a while ago (which

1  seemed mysterious) but he always liked Ligand management.  At

2  times it seemed he was confiding in us that there were short

3  investors who really had it in for Ligand and he more or less

4  said we need to look out for Irina.  His behavior was almost

5  mafia like, where his own would continue to support her but

6  seemed to get scared or at least talked to by somebody that he

7  needed to get away from Ligand as the 'job' got underway."

8      "Irina has been very quiet on Ligand in the past few

9  months.  The theory being she knew Lemelson was working to get

10  in gear."

11      So his theory -- this is your CEO, making millions of

12  dollars a year, has a conspiracy theory that Father Lemelson is

13  somehow connected to this sell-side negative analyst on Ligand.

14  Am I reading that correctly?

15  A.   There were a lot of communications at this time.  Multiple

16  people within Ligand were trying to figure out who Father

17  Lemelson was, and that sort of thing, and I think this sort of

18  falls within that, as I read it.

19  Q.   So let's move up to the next email, which is your

20  response.

21          THE COURT:  Why don't you just finish this line of

22  questioning because we have hit the lunch spot.

23          MR. HOOPES:  If the court pleases, I'd like to just go

24  another five minutes.  But I don't want to hold anybody up.

25          THE COURT:  Five minutes is fine.  Don't go much more

1   beyond that.  Rumblings of stomachs will overwhelm.

2           MR. HOOPES:  You're right.  An empty stomach has no

3   ears, Your Honor.  I know for sure.

4           So if we can go up.

5   Q.   This is you responding.  "I've been thinking about

6   potential connections as well - your connection seems

7   plausible."  That's you, right?

8   A.   Yes.  This appears to be an email from me.  The stamping

9   here is a little strange, but this looks like an email from me.

10  Q.   And Bruce Voss chimes in, and then John Higgins chimes in.

11  "Thanks for your perspective on stock surveillance, and

12  possibly a good option to consider the private investigator."

13  You're going to sic a private investigator on Father Lemelson,

14  right?  That was a thought?

15  A.   You asked a question of me.  I didn't --

16  Q.   Am I reading this correctly?

17  A.   This is an email from this.

18  Q.   Your CEO is thinking about putting a private investigator

19  on Father Lemelson?

20  A.   He uses the word "possibly" there, but yes.

21  Q.   The thought was in his head, right?

22  A.   It appears it was.

23  Q.   Instead of making a simple complete detailed public

24  statement that you would have confidence in, right?

25  A.   I don't know that he was comparing those two directly as

1    your question implies, but there was a consideration here as is

2    stated in the email.

3    Q.    Well, I'm sorry.  You didn't make a public statement

4    because you didn't have confidence in your position or you did

5    have confidence in your position, but you didn't trust the

6    American public.  Which is it?

7              MR. DAY:  Objection.

8              THE COURT:  Sustained.

9              MR. HOOPES:  Withdrawn.  That's it.  Thank you very

10   much, Your Honor.

11             THE COURT:  Thank you.

12             So we'll be back here at 2:00.  I don't know if the

13   northeaster is still going on, but you're welcome to bring back

14   food to the room or you're welcome to just take a walk in the

15   wind.  All right.

16             We stand in recess.

17             THE CLERK:  All rise for the jury.

18   (Jury exits.)

19             THE COURT:  Thank you.  Mr. Day, redirect?

20             MR. DAY:  Your Honor, I do think I have literally

21   about two questions, unfortunately.

22             THE COURT:  Well, that's fine.  That's what redirect

23   is for.  All right.  So if we come back at 2:00.

24             Is the next witness the Zoom witness?

25             MR. JONES:  No, Your Honor.  Dr. Lian first.

```
 1          THE COURT:  I just need to schedule the tech person.

 2          MR. JONES:  We may not reach the Zoom witnesses today.

 3   The Zoom witnesses are also available for tomorrow afternoon if

 4   we need to.

 5          THE COURT:  We're going a little behind.  But in

 6   fairness to Mr. Day, I acknowledged in the pretrial report you

 7   did say two hours.

 8          MR. DAY:  Thank you, Your Honor.

 9          THE COURT:  So that is consistent with that.

10          I have a little bit of a problem I wanted to confer

11   with you.  One of these jurors has really taken to heart asking

12   questions, and I have two pages full of questions here.  I

13   thought I would just share them with you.  Some of them I

14   understand and some of them I don't.  Some of them are quite

15   simple, like what does this term mean, or things that perhaps

16   we've all taken for granted.  For example, does Gilead

17   basically consist of a reference to Sovaldi?  So some of us may

18   be doing shorthand on some of it.  Why don't you take a look at

19   the questions and maybe you can just clean it up.

20          Otherwise, I will see you at 2:00, and I'm a little --

21   just because I need to schedule Phil from tech.  Do you think

22   at best when would he be needed, if we did anything with the

23   Zoom?

24          MR. DAY:  Doug or Tom, do you have a sense of cross

25   for Lian?
```

```
 1              MR. BROOKS:  We'll try to do our best to keep within
 2    the hour estimate.
 3              THE COURT:  At this point I'm literally -- it's a
 4    scheduling issue.  When do I tell our tech person to come up
 5    here to address the Zoom?  Mr. Jones says it may not happen at
 6    all.  So I don't want to have him sitting here waiting.  At
 7    best we're talking really about 3:30 -- 3:00 or 3:30, right?
 8              MR. JONES:  Yes.
 9              THE COURT:  And we can text him around that time?
10              MR. JONES:  Your Honor, can we just confer for one
11    second?
12              THE COURT:  Yes.
13              MR. JONES:  Your Honor, if, in fact, the estimates are
14    true and that Mr. Day has an hour and Mr. Brooks has an hour,
15    then we won't get to Mr. Banerjee today.  We have him on
16    standby in case we have that little bit of a stub.  He's not a
17    long witness.  He'll probably be -- I don't know if you have
18    cross for him, but we'll have about 20 minutes of questions.
19              THE COURT:  I'll tell you what, We'll just have him on
20    text call, rather than have him come up here.
21              MR. JONES:  I think that makes sense.  Thank you.
22              THE COURT:  One thing I wanted to mention.  I think
23    it's very unclear to the jury as to what are the four
24    statements in play and what's the timing of them.  Perhaps we
25    could -- because you can't figure out the chronology
```

```
 1   necessarily at the board meetings and the various statements
 2   without knowing exactly when the statements were made and what
 3   specifically is being challenged here.  So I didn't know if you
 4   could work on like a little chalk or a chart or something they
 5   could have.  Here are the four charged statements and here are
 6   their dates.
 7            MR. HOOPES:  So we can discuss and work it out.
 8            THE COURT:  It doesn't have to happen today.  You're
 9   in the middle of all of this.  But one thing I've been noticing
10   is -- you, of course, said it in your openings, but we're now
11   in the nitty-gritty of it.  So it might make sense to circle
12   back.
13            MR. DAY:  Yes, Your Honor.
14            THE COURT:  All right.  Have a good lunch.
15   (Court exits.)
16   (A recess was taken.)
17   (Court and jury enter.)
18            THE COURT:  I did want to mention someone -- I'm not
19   sure if it was a group that wrote questions or one person but,
20   in any event, I've handed them to the lawyers to ask if they
21   will.  But there were so many questions I didn't want to do a
22   serial line of questions.  So why don't I -- do you want to do
23   redirect?
24            MR. DAY:  Yes, Your Honor.
25            THE COURT:  Who has the questions?
```

```
 1              MR. JONES:  I believe they've been handed back to the

 2    clerk, Your Honor.

 3              THE COURT:  Okay.  I just want to keep a record of all

 4    of the questions.  Thank you.

 5                         REDIRECT EXAMINATION

 6    BY MR. DAY:

 7    Q.   Mr. Foehr, I have just a few more questions for you.

 8    Hopefully we'll keep this around five minutes or so.

 9              MR. DAY:  Can we pull up Exhibit 134, please.

10    Q.   Mr. Foehr, you were asked some questions about this

11    earlier.  In particular, Mr. Hoopes asked you about the third

12    paragraph up from the bottom.  It starts, "If we'd like."

13    Mr. Higgins wrote, "If we'd like to consider it, there's always

14    the option of engaging a private investigator to check out

15    Emmanuel, Lemelson Capital and Lantern."  Do you see that?

16    A.   Yes, I see that.

17    Q.   Do you remember being asked some questions about that?

18    A.   Yes.

19    Q.   Did Ligand, in fact, hire a private investigator at any

20    time, to your knowledge?

21    A.   No.

22    Q.   Now, we also talked earlier about sell-side analysts, some

23    of whom have negative reports about Ligand and some of whom

24    have positive reports about Ligand, correct?

25    A.   Yes.
```

```
 1   Q.   Did Ligand ever consider hiring a private investigator to
 2   look into any of those sell-side analysts?
 3   A.   No.
 4   Q.   Why is that?
 5   A.   It's not something we've done, and not something that I
 6   recall anyone ever considering.
 7   Q.   And is that because Father Lemelson's reports were of a
 8   different nature than a typical analyst report?
 9   A.   Yes.  I would describe them as a different nature.
10   Q.   And how were they different?
11   A.   They were -- they included false and misleading
12   information about the company, and they were of very different
13   nature in terms of the things that they were saying.
14   Q.   Now, if you look a little further up in this email
15   chain -- actually, the next email up -- there's a paragraph
16   that starts "The questions or comments aren't subsiding."  Do
17   you see that?
18   A.   Yes, I see that.
19   Q.   Mr. Higgins writes, "Last night at dinner with a German
20   fund that owns Ligand, we spent 20 minutes talking about the
21   report and 'who is this guy' type questions."  Do you see that?
22   A.   Yes.
23   Q.   And the next email above that, Mr. Voss writes, "I'm
24   getting a number of calls from shareholders as well, who
25   basically want assurance that the report is not sound."  Do you
```

1  see that?

2  A.   Yes.

3  Q.   Mr. Voss writes, "They are all in agreement with the

4  approach not to elevate this debate publicly as it will simply

5  give undue credibility to the report."  Did I read that right?

6  A.   Yes, that's what it states.

7  Q.   Then you write, in the very top email, "I agree.  Every

8  investor call I have had this week has at least had one element

9  of the Lemelson topic included in it."  Do you see that?

10  A.   Yes.

11  Q.   Does this reflect what you have testified to earlier that

12  you were hearing from numerous investors and other constituents

13  about Lemelson's reports?

14  A.   Yes.

15  Q.   I want to talk just briefly again about Viking

16  Therapeutics.  Did Viking have anything to do at all with

17  Promacta?

18  A.   No.

19  Q.   Okay.  They didn't develop Promacta, sell it, license it,

20  anything like that?

21  A.   No.

22  Q.   Sovaldi we talked about earlier too.  What company

23  developed and marketed Sovaldi?

24  A.   There are two questions within that.  Originally it was

25  developed by a company called Pharmasset, who did the initial

1    clinical trials in hepatitis C.  They were then acquired by

2    Gilead, who ultimately completed the development with the FDA

3    and other regulatory agencies and now market the drug.

4    Q.   Thank you.  I'd like to turn to Exhibit 222.  This is the

5    2013 board of directors meeting that you were asked some

6    questions about earlier.  If we go to page 30 of the document,

7    Mr. Hoopes asked you some questions about this, and I want to

8    focus your attention on the bullet "Indications beyond ITP,"

9    the third dash under that says, "Oncology related label

10   expansion is 3 years away."  Do you see that?

11   A.   Yes, I see that.

12   Q.   What is that a reference to?

13   A.   Earlier today I was referencing other therapeutic settings

14   where Promacta could be used, and one of them was in boosting

15   platelets in patients who are receiving chemotherapy.

16   Chemotherapy can lead to decreased platelets, and both GSK and

17   Novartis were pursuing indications for what was generally

18   referred to as oncology related thrombocytopenia or sometimes

19   further on the slides it says "HORT," which is hematology

20   oncology related.

21   Q.   And the reference to three years away, what does that

22   mean?

23   A.   I believe it's a reference to the point that at this time

24   clinical trials were still ongoing.  So in that setting.  So

25   data would need to be obtained to confirm that the drug would

1    be safe and effective in that setting, and then that would need

2    to be submitted to regulatory bodies like the FDA and others to

3    then -- before it would be commercially available, if you will.

4    Q.   Thank you.

5              MR. DAY:  Let's take a look at Exhibit 223.

6    Q.   Mr. Hoopes asked you a few questions about this document

7    as well, particularly the portion where Mr. Higgins writes,

8    "Will any Sovaldi patients need Promacta?"  Do you recall that?

9    A.   Yes.

10   Q.   Mr. Higgins goes on to ask a number of other questions

11   presumably about the hep C indication for Promacta.  Do you see

12   that?

13   A.   Yes.

14   Q.   And there's a reference in the second sentence, I believe,

15   to "SVR."  What is that?

16   A.   "SVR" is an abbreviation, which I believe in this case is

17   referring to sustained virologic response, which is meaning

18   that the amount of virus is reduced and then is sustained at a

19   low -- a certain low level.

20   Q.   He then writes, "How long does it take for the liver to

21   return to normal with platelet production?"  Do you see that?

22   A.   Yes.

23   Q.   What's the significance of how long it might take for a

24   liver to return to normal?

25   A.   So if a liver is damaged, or cirrhotic is the term that's

 1    used medically, then it cannot produce platelets; and a variety

 2    of things can cause a cirrhotic liver.  People commonly think

 3    of alcohol as one cause, but viral infection and other

 4    infections can cause that and other things as well.

 5         The question I think he's raising here is that if a liver

 6    is damaged, despite there being no virus detectable, it still

 7    takes a while for the liver to recover and, therefore, there

 8    will be a period of time or could be a period of time where the

 9    liver has to come back and -- I'm using simple words, but be

10    able to create platelets again.  And I think that's the

11    question he's getting at.

12    Q.   And Promacta might still be used during that period before

13    the liver recovers?

14    A.   That's the case, yes.

15    Q.   Okay.  Last question on this.  There's a bullet two points

16    down from what we were just looking at.  "Has price been a

17    deterrent for patients to go on the drug?" presumably

18    referencing Sovaldi.  Do you know what that's a reference to?

19    A.   Not really beyond what it says.  There was a lot of

20    discussion around the pricing of Sovaldi within the industry at

21    that time.  And there was questions about what it would be

22    priced at, both within the U.S. and outside the U.S., whether

23    or not the drug would be available in other countries outside

24    of the U.S. and Europe and when, and how it would be priced in

25    those various places.  So I think it's a reference to that.

1    Q.    Okay.  In the first half of 2014, was it true that
2    Promacta was going away?
3    A.    No.
4    Q.    Was it true that Viking didn't intend to conduct
5    preclinical studies or clinical trials?
6    A.    No.
7    Q.    Was it true that Viking's financial statements were
8    unaudited?
9    A.    No.  They had audited financials.
10   Q.    And was it true that Ligand was insolvent at any time in
11   2014?
12   A.    No.  Ligand was not insolvent in 2014 or any time
13   subsequent.
14           MR. DAY:  Thank you, sir.  I have nothing further.
15           MR. HOOPES:  If I may, Your Honor.
16           THE COURT:  Yes, sir.
17                 RECROSS-EXAMINATION
18   BY MR. HOOPES:
19   Q.    Mr. Foehr, you're a BS in biology, you're not a
20   certificated public accountant?
21   A.    Correct.
22   Q.    So the various definitions of what is technically
23   insolvency and that sort of thing, that's a little over your
24   scope of expertise, right?
25   A.    When I referenced that, I referenced it as to my

1   understanding of that.

2   Q.   Right.  Okay.  Hence, we should be looking to other people

3   who have that education, training and experience on that

4   question, I would think, to be fair, right?

5        MR. DAY:  Objection.

6        THE COURT:  Overruled.

7   A.   There are certainly people who are far more trained in

8   financial terms and financial elements than I am.

9   Q.   And did you tell the SEC, Mr. Day, that before you

10  answered a question like that, that you should ask somebody who

11  knows?

12       MR. DAY:  Objection.

13       THE COURT:  Sustained.

14  Q.   So Mr. Day asked you about -- it's in your tab 2.  It's

15  page 3, it's slide 30.  And he referenced that particular

16  slide.

17       MR. HOOPES:  Cara, could you call it up, please, so

18  the witness --

19  Q.   So Mr. Foehr, if you read the bottom line, it's slide 30,

20  it says, "Pricing of 20,000 a patient with annual inflation

21  growth," that refers to the pricing of Promacta in 2014, I take

22  it, right?

23  A.   I believe that it is.  It's not clear what treatment

24  regimens that's referring to.  It's hard to comment exactly

25  what it's referring to without seeing --

1    Q.    So it could go up a little, go down a little.  It depends

2    on -- that's a rough estimate, right, 20,000 per patient?

3    A.    I don't know what treatment regimen it's referring to, but

4    it is an estimate.

5    Q.    Okay.  On your own independent knowledge as president of

6    Ligand, would you say that the average annual cost or the

7    annual treatment cost for a patient with Promacta was about

8    $20,000?

9    A.    We at Ligand did not ever price the drug or distribute the

10   drug.  So we weren't responsible for that.  So any estimate was

11   based on publicly available information but there is -- it's

12   very difficult to know.

13           THE COURT:  Based on that, based on your

14   understanding, basically what it was costing a year for a

15   patient?

16           THE WITNESS:  That's an estimate we used internally.

17           MR. HOOPES:  Thank you, Your Honor.

18   Q.    So this was primarily at the time the ITP market, correct?

19   In other words, that was the estimate based on most of the

20   patients that were being treated with Promacta at the time,

21   right, with ITP, correct?

22   A.    Correct.  Most of the patients treated at this time were

23   being treated for ITP.  That's my recollection.

24   Q.    And the ladies and gentlemen of the jury heard yesterday

25   that the market for ITP inside the United States was around

1    20,000 to 30,000, maybe some subset of that specifically for

2    Promacta, from Dr. Marschke.  Do those numbers sound about

3    right?

4              MR. DAY:  Objection, Your Honor.

5              THE COURT:  Overruled.  If you know.

6    A.   There's subtlety to that question that I don't know which

7    patient groups you're referring to exactly.

8    Q.   It could have been 20, 30, it could have been less, you

9    mean?

10   A.   It depends on which geographic regions you're referring to

11   and a host of other factors, adults or pediatrics, things like

12   that.

13   Q.   Well, do you have sufficient knowledge to agree with me

14   that the hep C market was -- there are millions of people

15   worldwide who have hep C?

16   A.   Again, Promacta doesn't treat hep C.  It doesn't treat the

17   virus.  It's not a drug for hepatitis C.

18   Q.   Well, you say that but right above it says, "HCV needs to

19   be a big market for Promacta to keep driving Ligand's growth."

20   That's what the slide says, right?

21             MR. DAY:  Your Honor, I'm going to object at this

22   point.  We're way beyond the scope of the redirect.

23             THE COURT:  Overruled on that.

24   A.   I see where the slide states that.

25             MR. HOOPES:  I only have one more question.

1  Q.   So it's pretty obvious to the ladies and gentlemen of the

2  jury that 20,000 a year in a smaller market is not the same as

3  $20,000 a year for potentially millions, right?  Do you think

4  that's what Mr. Higgins was driving at?  Yes or no?

5  A.   I think the markets or the patient populations for which

6  Promacta is applicable are mischaracterized in your question.

7  Again, Promacta does not treat hepatitis C.  It wouldn't treat

8  a virus.

9  Q.   No, that's not my question.  My question is --

10          THE COURT:  Listen to his question.  We're just trying

11  to finish this up.  Ask the question again.

12  Q.   Do you think that that's what Mr. Higgins, your CEO, was

13  driving at when he put this in this slide, this point?

14          MR. DAY:  Objection.

15          THE COURT:  That's sustained because that's hearsay.

16  Q.   Well, did you agree with what's in there, "HCV needs to be

17  a big market for Promacta to keep driving Ligand's growth"?

18  A.   I don't know that I did.

19  Q.   You don't know that you agreed with your CEO, the

20  president of the company?

21          MR. DAY:  Objection.

22          THE COURT:  Sustained.

23          MR. HOOPES:  No other questions.  Thank you.

24          THE COURT:  You may step down.  Thank you.

25          Who's the next witness?

 1          MR. DAY:  Your Honor, the Commission calls Dr. Brian

 2    Lian.

 3                  **BRIAN LIAN, Ph.D., Sworn**

 4          THE CLERK:  You may be seated.  Speaking into the

 5    microphone, could you please state and spell your name for the

 6    record.

 7          THE WITNESS:  Yes.  My name is Brian --

 8          THE COURT:  You can take your mask off as a witness.

 9    The rest of us are going to keep them on unless we're speaking.

10    Thank you, sir.

11          THE WITNESS:  My name is Brian Lian.  Brian is

12    B-r-i-a-n.  Lian is spelled L-i-a-n.

13                  DIRECT EXAMINATION

14    BY MR. DAY:

15    Q.   Good afternoon, Dr. Lian.

16          MR. DAY:  Before I get into my questions, could we

17    switch the monitors over to -- is it HDMI 2 -- 3, sorry.

18          Thank you.

19    Q.   Dr. Lian, where do you work?

20    A.   I work at Viking Therapeutics.

21    Q.   What is your position there?

22    A.   I'm the president and CEO.

23    Q.   How long have you held that position at Viking?

24    A.   I founded the company in 2012 and have held the position

25    since that time.

1  Q.   Before we get into more details about Viking, I want to

2  talk a little bit about your educational and work history.

3  Could you tell the jury where you went to college?

4  A.   I went to undergraduate at a place called Whitman College

5  in Washington State and after that I went to the University of

6  Michigan and got a Ph.D. in organic chemistry.  After that I

7  went to Indiana University and got a master's degree in

8  accounting and finance.

9  Q.   After your Ph.D. from Michigan, what was your first job?

10 A.   I worked at a company called Microcide Therapeutics in the

11 San Francisco Bay area.  It was a small company.  It focused on

12 antibiotics, trying to identify new classes of antibiotics.

13 Q.   What was your role at Microcide?

14 A.   My role was research scientist doing preclinical research.

15 We were working in a collaboration, a partnership with Pfizer

16 to try to identify new classes of antibiotics.  And so we

17 looked at all of the molecules Pfizer had in their drug library

18 and all the molecules Microcide had in its drug library to find

19 new types of antibiotics.

20 Q.   What is a drug library?

21 A.   A drug library is whenever a company makes a new medicine,

22 the medicine that they actually take into commercialization as

23 a result of thousands of potential drugs that kind of get

24 winnowed out through the development course, but all of those

25 potential drugs are stored in a library for future reference.

1    If they want to work on a different target, say it started in

2    cancer and they wanted to work on Alzheimer's, the first thing

3    they'll do oftentimes is take all the stuff they did in cancer

4    and look at it in Alzheimer's and see if there's some effect

5    there.

6    Q.   Dr. Lian, I'm going to ask you to maybe slow down a little

7    bit for the sake of the court reporter.  I know I have a

8    tendency to talk fast too.

9         So that was a partnership between Microcide and Pfizer,

10   you said?

11   A.   That's right.

12   Q.   And what is Pfizer?

13   A.   Pfizer is a global pharmaceutical company.

14   Q.   And some of the drug candidates belonged to Pfizer and

15   some belonged to Microcide?

16   A.   Most of them belonged to Pfizer, and a smaller fraction

17   belonged to Microcide.  Pfizer has a lot longer track record,

18   bigger library, bigger programs.

19   Q.   Based on your experience in the industry, is it pretty

20   common for pharmaceutical companies to partner in the manner

21   you've suggested here?

22   A.   Yes.  It's very common for those sorts of collaborations.

23   It happens all the time.

24   Q.   We heard a term earlier today "bench scientist."  Was that

25   your role at Microcide?

1    A.    Yes.  I was a bench scientist.  Yes.  I was a bench

2    scientist.  The bench scientist actually performs the

3    experiments and submits the drugs through testing and evaluates

4    the data through the testing.

5    Q.    What kind of testing are you talking about?

6    A.    Several different types.  Initially if you know of an

7    enzyme or a receptor on a cell that you want to target the drug

8    against, you will use your drug in an assay that tests how well

9    it binds to that receptor, how well it interacts with that

10   receptor or cell surface.  Other times testing would be

11   administration of the drug into rodents or monkeys or dogs to

12   understand how the drug behaves in a living system.

13   Q.    And is that a preclinical study?

14   A.    Yes, all of those are referred to as preclinical

15   evaluations, yes.

16   Q.    Then there are clinical trials as well in drug

17   development, right?

18   A.    That's correct.  Generally clinical trial is any study of

19   a drug in a human being.  Preclinical, in my view, is anything

20   before you get to that stage.  So animals, formation testing,

21   cell-based testing, all that kind of falls into this

22   preclinical bucket.

23   Q.    Now, you left Microcide -- well, let me back up.  You were

24   at Microcide from about 1997 to '99; is that right?

25   A.    That's correct, yes.

1    Q.   Where did you go next?

2    A.   I went to a company called Amgen.  It's a biotechnology

3    company on the West Coast in the Los Angeles area.

4    Q.   What did Amgen do at that time, 1999?

5    A.   Amgen had several approved drugs for patients with cancer

6    and kidney disease.  And they were just growing their drug

7    development franchise at the time.

8    Q.   Did you work in a particular area at Amgen?

9    A.   Yeah.  I worked in an area call small molecule drug

10   development.  These are typically the types of drugs you take

11   in a pill form.  Amgen had previously done mostly injectables,

12   bigger protein-based therapeutics that you inject.  So they

13   were growing out their small molecule group.

14   Q.   What is a small molecule?

15   A.   Small molecule is a chemical substance that the

16   individual -- the smallest component is small.  It can be

17   absorbed in your stomach.  It's considered lighter weight as

18   opposed to a large molecule.  And a large molecule is just as

19   it sounds.  It's a much heavier, much larger discrete chemical

20   entity.  Those are often only dosed as an injection because

21   they don't cross your stomach well or your intestinal wall.

22   Q.   Were you also performing bench scientist type services at

23   Amgen?

24   A.   Yes, I was.  We were looking at cancer and osteoporosis

25   projects.

1   Q.   Now, you left Amgen in about 2001; is that right?

2   A.   That's correct, yeah.

3   Q.   What did you do after that?

4   A.   Then I went to business school and got an M.B.A. in

5   finance.

6   Q.   So Dr. Lian, after getting a Ph.D. and working in

7   pharmaceuticals for a while, what prompted you to go to

8   business school?

9   A.   Well, as a bench scientist you're focused on a pretty tiny

10  part of the drug development industry.  A lot of times you're

11  focused on what temperature you do a chemical reaction and

12  things like that.  I wanted to see more of the drug development

13  spectrum and at the time -- this was late 2000, early 2001 --

14  Amgen had an internal hiring freeze because they had multiple

15  drugs under review with the FDA and they didn't know how that

16  was going to turn out, so they froze internal hiring, or

17  internal transfers, so I couldn't transfer from research to

18  clinical development.  So I thought, well, I didn't take any

19  business in college and so I thought one way to learn about

20  business is to go get an MBA, and that's what I did.

21  Q.   And when did you graduate from Indiana University with

22  your MBA?

23  A.   In the spring of 2003.

24  Q.   So what type of work did you do after you got your MBA?

25  A.   I took a job at an investment bank in New York as a

1    biotechnology industry analyst.

2    Q.   Now, you said before that you founded Viking in 2012.  So

3    for the period from 2003 to 2012, is it fair to say you were

4    working in the finance industry?

5    A.   Yes.  In the investment research industry, yes, in the

6    finance industry, yes.

7    Q.   You said you were an analyst in that first job.  Were you

8    an analyst throughout that period of about nine, ten years?

9    A.   Yes.  Yes.  I was an analyst covering biotechnology

10   companies.

11   Q.   What is it that an analyst does?

12   A.   An analyst at an investment bank generally covers an

13   industry, and within that industry they generally cover ten to

14   20 stocks very, very closely.  So if a company that you're

15   covering has a piece of news, you will often publish a report

16   describing for investors your thoughts on that piece of news.

17   Q.   And how do you go about researching the company and coming

18   to your point of view?

19   A.   We would write what are called initiation reports.  Once

20   we selected a company that we were interested in, we would

21   prepare an exhaustive report on the company called an

22   initiation report, and that went through its technology, its

23   financial status, its prospects, market opportunities for its

24   drugs, that sort of thing.  It became sort of the bible of each

25   company.

1   Q.   Now, this initiation report, in preparing that, was it

2   common for you to speak with management at the company?

3   A.   Yes.  We never wrote one without speaking with a

4   management team.

5   Q.   And did you sometimes speak to the management team

6   multiple times?

7   A.   Every time we spoke multiple times with the management

8   team.

9   Q.   Did you consider that an important part of your initiation

10  report?

11  A.   Yes.  Yes.

12  Q.   And why is that?

13  A.   Because you want to make sure you got it right.  You want

14  to make sure that you are not misunderstanding something that

15  the company's doing.  And if you don't understand something,

16  it's helpful to have the management team explain it to you.

17  You want to make sure you understand the market opportunity for

18  the company, all of those things.  And if you disagree with

19  something at the company, you can air the disagreement with the

20  management team and hear their response.

21  Q.   Now, did you have an area of specialization or an industry

22  that you focused on during your time as an analyst?

23  A.   Yeah.  I covered companies that developed drugs for

24  metabolic disorders, things like diabetes and obesity,

25  companies developing drugs for cancer, companies developing

1    antibiotics, because I had experience there, and companies

2    developing drugs for central nervous system diseases like

3    Alzheimer's disease.

4    Q.   I think you mentioned analysts often work for investment

5    banks.  Did I get that right?

6    A.   Correct.

7    Q.   What is an investment bank?

8    A.   Investment bank, the part that I'm familiar with anyway,

9    is basically split into two halves.  One half is sort of the

10   research component where you do what I did, research on

11   companies, on bonds, on stocks.  The other part is the money

12   raising part, the capital raising part.  That's where the

13   investment bankers connect companies with investors to help

14   them raise money to start and help support their operations.

15   Q.   And those two components of investment banking, do the

16   personnel work together or are they kind of separate?

17   A.   You're supposed to be separate because you're not supposed

18   to be influenced by an investment banking opportunity.  But

19   many companies, once the bank does a transaction for a company,

20   they'll cover them on their research team.

21   Q.   Once the transaction is done?

22   A.   Upon completion of the transaction sometime later, yes.

23   Q.   Now as you continue to cover a company after that

24   initiation report, do you also from time to time talk to

25   management?

1    A.   All the time, yes.  Every -- four times a year public

2    companies have to release their earnings, so to speak, and so

3    they'll often have an earnings call.  You ask questions on the

4    call.  We would often have one-on-one calls with management

5    teams after their earnings report.  So at any time during the

6    quarter if they had news, we often talked to company management

7    teams as well.

8    Q.   Now, you mentioned before that you covered some companies

9    that were involved in developing antibiotics because you had

10   some experience in that area.

11   A.   Mm-hmm.

12   Q.   What are some other ways that you might decide to cover a

13   particular company?

14   A.   Well, I was interested in Alzheimer's, a personal interest

15   there.  I wanted to learn more about Alzheimer's.  Metabolic

16   diseases like diabetes, I was really interested in because it

17   affects so many people.  And oncology is probably the biggest

18   part of the biotech industry.  So I thought -- and I had some

19   experience in oncology from Amgen.  So I thought that also

20   would be an area to do research in.

21   Q.   Oncology refers generally to cancer?

22   A.   Generally to cancer, yes.

23   Q.   During the course of that nine, ten years that you were in

24   the financial analyst world, about how many companies did you

25   cover at any given time?

1   A.   Anywhere from seven to 40.  My first job was on a big team

2   when we covered 43 companies.  When I was at a smaller bank, I

3   covered seven or eight.  So it ranged.

4   Q.   What's a price target?

5   A.   A price target, it's where you think the fair value of the

6   stock is -- most of the places I worked it was in the next 18

7   months.  So it may not be today's price target but where you

8   think the stock's going to grow to or price it will achieve in

9   the next 12 to 18 months.

10  Q.   And that price target, that's based on all the research

11  and conversations with management we were just talking about?

12  A.   Yes.  And modeling what is the disease that's being

13  treated, how many patients would be treated, how long would

14  they be treated, what's the cost of the drug?  All of those

15  things go into a model and you run it out many years and you

16  then calculate what you think the stock price is worth.

17  Q.   In your experience, are analysts at investment banks

18  licensed in any way?

19  A.   Yes.  We had to have four licenses called the Series 7,

20  63, I think it was the 26 and 27 or 27 and 28, something like

21  that, yeah, four different securities licenses.

22  Q.   At a high level, what are those licenses about?

23  A.   Those licenses are to ensure that you know how to read a

24  financial statement, that you are qualified to speak with an

25  institutional investor, so a mutual fund manager, hedge fund

1   manager, that sort of thing, and just to make sure that you

2   understand the way securities trade, understand options, things

3   like that.  General education.

4   Q.   Now, if you know -- before I ask that question --

5        Was this something you had to keep up with over time to

6   update your license?

7   A.   Yes.  You had to do -- and I can't remember the frequency,

8   but you did have to keep your sort of continuing education

9   current, and if you were out of a job for two years, you had to

10  go back and take them all over again.

11  Q.   If you know, do you know who the licensing authority was

12  for those particular --

13  A.   I think it's always the FINRA, the Financial Industry

14  Regulatory Authority.

15  Q.   Not the SEC, right?

16  A.   I don't think so, but I'm not sure.  My understanding is

17  it was always FINRA.

18  Q.   Did you ever have any interactions in connection with

19  licensing or your job responsibilities as an analyst, did you

20  have any interactions with the SEC?

21  A.   No.

22  Q.   All right.  So in 2012 you found the company Viking.  What

23  prompted you to do that?

24  A.   So I was an analyst at a company called Suntrust Robinson

25  Humphrey, and this was in January of 2012, January or February.

1    I got a call from someone at an investor relations firm asking

2    if I would be interested in meeting with the management team

3    from Ligand Pharmaceuticals.  I had never met them.  So I said

4    yeah, sure, I'll meet them.  It's part of the job, you always

5    get calls from investor relations firms.  So I took the meeting

6    with Ligand.  I met with the Ligand management team, CEO, the

7    chief financial officer, and I think the chief operating

8    officer.  One of the reasons I wanted to meet with them was

9    during the financial crisis Ligand had actually acquired three

10   companies that I had previously covered as an analyst.  So I

11   thought, oh, I'd love to know what they're doing with these

12   companies they acquired because I liked the companies.

13       So we met, and we ended up focusing a lot on a company

14   called Metabasis, which was a company that I really liked.

15   Ligand had acquired all of their assets.  They had a diabetes

16   drug that I really thought was interesting.  So I asked what

17   was the status of this diabetes drug, and they said it was

18   still available for licensing.  They had acquired all these

19   assets during the financial crisis and they were trying to

20   license them to other pharmaceutical companies.  I thought that

21   was interesting because I covered the company and knew the

22   company pretty well, and I thought it was amazing that that

23   drug was available for licensing.  And so --

24   Q.   Let me stop you there for a moment.  This meeting is

25   February 2012, I think?

1    A.    Late January, early February, sometime in there, yeah.

2    Q.    Okay.  You said that was with the CEO of Ligand.  Is that

3    John Higgins?

4    A.    Yes.

5    Q.    And who's the chief financial officer?

6    A.    The chief financial officer at the time was a guy named

7    Nishan de Silva.

8    Q.    And then the chief operating officer, was that Matt Foehr?

9    A.    That was Matt Foehr, yes.

10   Q.    So you talked about Metabasis and this diabetes drug.

11   What happened next after that 2012 meeting?

12   A.    After that, it piqued my interest.  And because I had

13   covered Metabasis as an analyst, I knew a lot of the former

14   employees.  And in particular the head of their chemistry

15   department was actually my first boss at Microcide when I

16   graduated from Michigan.  So I emailed him and said, "Hey, can

17   you tell me about this diabetes program?"  And he emailed me

18   about a minute later and said, "It's too much to talk about by

19   email.  So let me call you."  So he called me and we had a

20   pretty long conversation about the diabetes program and he gave

21   it a really glowing review.  He told me the breakthroughs that

22   they had made --

23              MR. DAY:  I'm sorry.

24              THE COURT:  Maybe jump forward a little.

25              MR. DAY:  Sure.

1    Q.   So you were interested in the diabetes program as

2    something to potentially develop yourself?

3    A.   Yes.  I thought it was really interesting.  I talked to

4    them, a number of the other former senior staff at Metabasis,

5    and I thought it would be a really interesting drug to try and

6    develop.

7    Q.   So what happened next in terms of moving towards

8    developing that drug?

9    A.   Well, I spoke with all the former Metabasis management

10   team.  They all gave it the same sort of positive review.  I

11   then, in the summer of 2012, I signed a confidentiality

12   agreement with Ligand so that I could see a lot of the

13   confidential data around the diabetes program.  I liked the

14   data that I saw.  And so I thought this would be interesting to

15   try to -- I was still an analyst at Suntrust.  So I thought it

16   would be interesting to try to lock it up so no one else could

17   license it.

18        So what I did was I proposed an option to a license for

19   this drug.  I proposed that to Ligand.  So an option would give

20   me the right to license the drug over the next 30 months at

21   some time and it would prevent somebody else from coming in and

22   taking the drug.  In that time I planned, well, then I'll set

23   up a company, I'll set up a management team, and we'll launch a

24   company.  And so --

25   Q.   Let me stop you there for a second.  And did you, in fact,

1    get a management team together and start making plans for the

2    company?

3    A.   Yes.  First, I thought, you know, it couldn't be Brian

4    Lian licensing the drug.  So we set up -- with our corporate

5    law firm, we set up a corporation.  We called it Viking

6    Therapeutics.  And Viking Therapeutics then licensed the

7    diabetes assets.  We locked it up.  That cost me $50,000.

8         Then I went about identifying prospective employees.  So a

9    chief medical officer, someone who could do the preclinical

10   development, people with expertise in diabetes drug

11   development, all of those types of things.

12   Q.   You did, in fact, enter into the option with Ligand

13   sometime in 2012, was it?

14   A.   2012.  August or September Viking Therapeutics then signed

15   an option agreement with Ligand Pharmaceuticals, yes.

16   Q.   Now, I want to fast forward a little bit to 2013, 2014.

17   Did there come a time that you engaged with Ligand about the

18   possibility of licensing additional programs?

19   A.   Yes.  This was in early 2014.  I met with a person on the

20   Ligand business development team in San Francisco at a

21   conference and he expressed that Ligand might be interested in

22   licensing more assets to Viking or, you know, discussing it

23   anyway.  And so that began a conversation that took place

24   through the first half of 2014.  I thought it would be

25   interesting because a lot of investors didn't like diabetes.

1    So I thought if we had some other programs that weren't

2    diabetes, maybe we could attract a wider audience of investors.

3    So in the first half of 2014 I met with Ligand and went through

4    their portfolio, the collection of drugs that they had bought

5    from other companies, and we selected five different programs

6    that would come into Viking in a master license agreement.

7    Q.    And did you ultimately enter into a master license

8    agreement with Ligand?

9    A.    We did.  We did.  We signed that in May of 2014.

10   Q.    Now, between the time you founded Viking and May of 2014,

11   just at a very high level, what were you doing in terms of

12   planning and getting the business up and running?

13   A.    Well, to even engage in the discussions around license I

14   had to tell them what I was going to do with the programs.

15   They weren't just going to give them to me.  So I had to come

16   up with timelines, diseases that I wanted to study, costs,

17   employees that would come into the company, that sort of thing.

18   So we met and discussed several times what those plans would

19   be.

20   Q.    And what was the plan for funding Viking once these five

21   programs were in place under the master license agreement?

22   A.    The plan was to do an IPO, initial public offering, of

23   stock.

24   Q.    What's the purpose of an IPO?

25   A.    To issue stock to investors in exchange for their

1    investment money.

2    Q.    It's a way to fund the company?

3    A.    A way to fund the company and the programs, yes.

4    Q.    And are you familiar with a form, an SEC form called an

5    S-1?

6    A.    Yes.

7    Q.    What is that?

8    A.    The S-1 is sort of the reference document that is filed

9    with the Securities and Exchange Commission that really

10   describes the company and its business and the financial

11   models.  It has the management background in it.  So it's

12   really a useful reference document.

13   Q.    And that's kind of what gets the IPO process rolling,

14   right?

15   A.    Yeah.  You file that and -- yeah, it starts the clock.

16   And then when the SEC clears the document, says it's okay, then

17   you can go out and start talking to investors.

18   Q.    And did Viking ultimately file an S-1 with the SEC?

19   A.    We did.  We filed that the day or maybe the next day after

20   we signed the master license agreement.

21   Q.    Does July 1, 2014 sound right?

22   A.    I think that's when it became public.  We had filed it in

23   May.  But it became publicly viewable in July, yes.

24   Q.    Okay.  Understood.  Okay.

25         Were you involved in drafting the S-1?

```
 1   A.    Yes.

 2   Q.    Who else was involved in that?

 3   A.    Our corporate attorneys -- Paul Hastings is the name of

 4   the law firm -- the investment bankers that we were working

 5   with -- we were working with Oppenheimer -- and a company

 6   called Roth Capital Markets, and that was about it, really.

 7   Q.    In terms of employees and consultants around this time of

 8   the filing of the S-1, who was on the Viking team?

 9   A.    So it was myself.  It was Misha Dinerman, Michael

10   Dinerman.  He was also a co-founder of the company.  He was an

11   M.D. with an lot of equity research experience.  We had

12   Rochelle Hanley as our chief medical officer.  She had spent

13   about 20 years between Pfizer and GlaxoSmithKline, GSK.  We had

14   a guy named Michael Bleavins as a VP of preclinical

15   development.  He was also from Pfizer, had about 20 years of

16   experience.  Then we had a whole range of consultants to help

17   us with specific questions.

18   Q.    Okay.  What kind of consultants?

19   A.    So we had consultants -- since we were looking at

20   diabetes, we had a lot of diabetes consultants.  We had the

21   former president of the American Diabetes Association.  His

22   name was Alan Cherrington, great expert with diabetes.  We had

23   a person from the FDA named Alexander Fleming.  He was the

24   principal reviewer for a drug called metformin, which is the

25   most widely prescribed diabetes drug right now, and he was a
```

1    consultant.  A guy named Trevor Gibbs, former head of global

2    safety at GlaxoSmithKline.

3         (Stenographer interrupts.)

4         THE COURT:  You have to slow down because she has to

5    get the transcript.

6    A.   The last one is Trevor Gibbs, and he was a safety person.

7    Q.   And you mentioned the two employees who had experience at

8    Pfizer and GSK; that was Ms. Hanley, then I'm not sure I caught

9    the name of the second but had been at Pfizer as well?

10   A.   Yeah, Mike Bleavins.  Hiroko Masamune was also a person

11   who came from Pfizer, as well as some smaller companies.

12   Q.   Did these individuals have experience designing and

13   executing preclinical studies?

14   A.   Yes.

15   Q.   And what about clinical trials?

16   A.   Yes.

17   Q.   And how would you characterize that experience, a lot, a

18   little?

19   A.   Yeah.  Pretty in depth experience.  All of them had done

20   that as their career and each of them had probably, I don't

21   know, a minimum of 15 years of experience in the pharmaceutical

22   industry.

23        MR. DAY:  Cole, can we pull up Exhibit 58, please.

24        THE COURT:  So how many employees did it have?

25        THE WITNESS:  We had maybe five at that time.

1    THE COURT:  And the rest you were describing were

2  consultants?

3    THE WITNESS:  Yes.  Yeah.

4  Q.   Do you recognize this document, Dr. Lian?

5  A.   Yes.

6  Q.   What is it?

7  A.   This is the S-1 that was filed with the Securities and

8  Exchange Commission.

9  Q.   Okay.  Now, before we get into some of the details about

10  the S-1, did there come a time that Viking first attempted an

11  IPO?

12  A.   Yeah.  That was this -- with this filing, yeah.

13  Q.   And when was the IPO first attempted?

14  A.   We commenced the IPO process -- the go out and talk to

15  investors process right after Labor Day in 2014.

16  Q.   And what happened with that effort to do an IPO at that

17  time in 2014?

18  A.   We didn't get what's called an anchor investor.  So the

19  IPO was deferred.  An anchor investor is critical because a lot

20  of smaller hedge fund and small institutional investors,

21  they'll want Fidelity to come in and take 10 percent of the IPO

22  or T. Rowe Price.  You know, they want a big flagship fund.  We

23  couldn't get one on board, so all the follow-on guys were less

24  interested.  It was called -- we couldn't get someone to set

25  the price.

```
 1    Q.   Do you have an understanding of why Viking was unable to
 2    find an anchor investor at that time in 2014?
 3    A.   It's hard to speculate because investors don't share with
 4    you why they don't want to invest typically.  They don't share
 5    with our bankers, salespeople.  It's kind of a secretive
 6    process.  In my experience they're not eager to share stuff
 7    like that.
 8         We sensed that maybe there was a lack of an appetite for a
 9    small company going after diabetes.  It's just a huge market.
10    It's very expensive.  So maybe that weighed in a little bit,
11    but we didn't get like a detailed rundown of what was the
12    problem.
13    Q.   Did there come a time that Viking, in fact, closed an IPO?
14    A.   Yes.  We went back out to redo the IPO in late March of
15    2015, and the IPO was successfully completed at the end of
16    April in 2015.
17    Q.   About how much money was raised through the IPO in 2015?
18    A.   It was about 26 million or so.
19    Q.   What did you do with that money?
20    A.   With that money we initially put our plans in motion.  We
21    did two clinical studies with this bone drug -- well, it's a
22    muscle drug to treat patients who had fractured their hip to
23    help them grow their muscle and bone back.  We started those
24    studies almost right away.
25    Q.   Did any of the money raised in the IPO go over to Ligand?
```

1    A.   We paid Ligand in stock.  So there wasn't -- we thought it

2    was foolish to pay them in money because we need the money.  So

3    we paid them in stock.  We did -- they had loaned us -- when we

4    signed the license agreement back in May of 2014, they had

5    loaned us two and a half million to get through the IPO, and so

6    there may have been -- I don't think so, but we may have paid a

7    little bit of that back then, but I don't think we paid.  I

8    think we paid at a later date.

9    Q.   Did Viking rent or lease space from Ligand at some point?

10   A.   We did.  We had three offices at Ligand, and then we were

11   leasing some lab space there too.

12   Q.   Okay.  And was that negotiated as part of the master

13   license agreement?

14   A.   It was all in the master license agreement, yes.

15   Q.   One thing I didn't ask you before, prior to meeting with

16   Ligand management in the winter of 2012, did you know

17   Mr. Higgins, Mr. Foehr or Mr. De Silva?

18   A.   No.

19   Q.   Did you ever cover Ligand as an analyst?

20   A.   Never covered Ligand.

21   Q.   Would you describe the negotiation of the master license

22   agreement with Ligand as an arm's length transaction?

23   A.   It was a horrible experience.  I don't know arm's length.

24   I don't know the technical definition of that, but it was a

25   pretty contentious, ugly, argumentative, combative process.

```
 1   Q.   So heavily negotiated?

 2   A.   Heavily negotiated, yes.

 3   Q.   There were things that Ligand wanted that you weren't

 4   happy about?

 5              MR. BROOKS:  Objection.

 6              THE COURT:  Sustained.

 7   Q.   Could you tell the jury what led to the negotiations being

 8   contentious?

 9   A.   Well, first, I think Ligand, their expectations for

10   payment were far out of line with what, you know, we were

11   comfortable with paying.  I don't remember the number.  They

12   probably wanted about 80 million or so for the programs, not in

13   cash, but in stock.  And that was just not -- you know, I'd

14   covered the industry so I knew what companies were paying for

15   programs like this and that was not something we were

16   interested in.

17        They also didn't want -- initially they didn't want Viking

18   management to have any equity, and I thought that was crazy.

19   So we fought about that.

20   Q.   And did management at Viking end up with an equity stake

21   in the company?

22   A.   We did, yes, yeah, because we told them we weren't going

23   to proceed if they didn't.

24   Q.   And you mentioned that Ligand took an ownership position

25   in Viking after the closing of the IPO.
```

1      Why was Ligand getting an equity position as part of this

2  deal?

3  A.   This was their compensation for licensing the programs to

4  us.  We agreed to pay them 29 million dollars in stock for five

5  different drug development programs.

6  Q.   So could you just at a very high level --

7          THE COURT:  Were they majority owners?

8          THE WITNESS:  No, it was designed to keep them at 49.9

9  percent ownership of the company, no more than that.

10  Q.   Is Ligand still invested in the company today?

11  A.   Yes, I think today they are probably a 10 percent

12  ownership, thereabouts.

13  Q.   Did Viking enter into subsequent financings?

14  A.   Yes.  We've since the IPO probably raised around 350

15  million dollars.

16  Q.   And, again, at the risk of asking an obvious question,

17  what did you do with that money from the follow-on financings?

18  A.   We initiated further clinical studies, hired more people,

19  and commenced development of two additional programs, actually.

20  Q.   Let's take a look at Exhibit 58.  This is the S-1 filing

21  with the SEC from 2014.  I want to go to page 5 of the PDF.

22  You see there's a section here called "The Company"?  This is

23  right at the beginning of the document.  Did you have a role in

24  drafting this section?

25  A.   Yes.

1    Q.    Okay.  Now, it says here, "We are a clinical-stage

2    biopharmaceutical company focused on the development of novel,

3    first-in-class or best-in-class therapies for metabolic and

4    endocrine disorders."  Do you see that?

5    A.    Yes.

6    Q.    What does that mean?

7    A.    Well, the clinical stage means you're developing drugs,

8    and your latest stage program, your most advanced program, is

9    developing drugs in human beings.  That's what "clinical"

10   means.  And the development of novel means that they're new and

11   original, no one else has them.  First-in-class or best-in-

12   class, there's no other similar drug or no drug that's superior

13   in its class.  And metabolic and endocrine disorders, those are

14   diseases like diabetes, high LDL, muscle wasting.  Those are

15   sort of endocrine -- obesity, endocrine disorders.

16   Q.    A little bit further down there's a sentence that starts,

17   "Our lead clinical program is VK0612."  Do you see that?

18   A.    Yes.

19   Q.    What was VK0612?

20   A.    This was the diabetes program that I originally really

21   liked.  I called it 0612 because June of 2012 is when we signed

22   our confidentiality agreement with Ligand.

23   Q.    And "VK" refers to Viking?

24   A.    "VK" refers to Viking, yes.  That's a common prefix in

25   drugs.

1    Q.   You say here that that drug is entering a phase 2b

2    clinical trial for Type 2 diabetes, one of the largest global

3    health care challenges today.  Do you see that?

4    A.   Yes.

5    Q.   What is a phase 2b clinical trial?

6    A.   So clinical trials, there are three trials, phase 1

7    studies, phase 2 studies, and phase 3 studies.  Phase 2 is the

8    middle step where you're usually first treating patients with

9    the disease that you're planning to develop the drug for.  So

10   in a phase 2 program for diabetes, that typically would be the

11   first time you'd start treating diabetics with the drug.  Phase

12   1 is all your safety, how safe is the drug, what dose can you

13   go to, how is it metabolized?  In phase 2 you start treating

14   the diabetes.

15   Q.   Now, this document goes on to talk about the five

16   programs.  The first one is VK0612.  Do you see the bolded

17   heading there a little further down the page?

18   A.   Oh, yes.

19   Q.   Okay.  It goes on for a little over a page about VK0612.

20   If we go to the -- just past the bullet points on the next page

21   there's a paragraph that starts, "We plan to commence a phase

22   2b clinical trial."  Is that what you were discussing a moment

23   ago?

24   A.   Yes.  That's when we mapped out multiple different types

25   of studies.  Depending on the money we raised in the IPO, we

1    had multiple different trials that we could pursue, size and

2    duration, that sort of thing.

3    Q.    The next program listed at the bottom of this page is

4    VK5211 for cancer cachexia.  I hope I got that right.

5    A.    You did.

6    Q.    What is cancer cachexia?

7    A.    Cachexia is a muscle wasting disease.  So a lot of cancer

8    patients, they don't die because of their cancer.  They die

9    because they waste away.  So this is a drug to stimulate muscle

10   growth in cancer patients to hopefully prolong their life and

11   improving their quality of life.

12   Q.    Was Viking at this time planning preclinical studies and

13   clinical trials for this drug?

14   A.    Yes.  We were planning to do a clinical study in patients

15   with lung cancer.

16   Q.    If we go to page 8 of this document, there's a chart at

17   the top of the page that is captioned "Our Product Pipeline."

18   Could you explain to the jury what's represented here?

19   A.    Yes.  What is listed on the far left is each program.  So

20   FBPase was the diabetes program.  And the lead molecule or lead

21   drug candidate there was VK0612.  The disease we were studying

22   is called the indication, the disease Type 2 diabetes, and then

23   that middle section is what the stage of development it was in,

24   preclinical, phase 1, phase 2, phase 3.  Then on the far right

25   is the development plan, and it just goes through each of the

1    programs like that.

2    Q.    And this is page 8 of the S-1, right?

3    A.    Yes.  It's blown up here, but yes.

4    Q.    And the same for the rest of the indications, that --

5    A.    Yes.

6    Q.    -- this chart is showing where they are in development and

7    plans for the future?

8    A.    That's right, yes.

9    Q.    The next section under this is "Our Strategy," and just at

10   a very high level, looking at the headings here, you say,

11   "Advance the development of VK0612, Advance the development of

12   VK5211," et cetera.  Does this section summarize the company's

13   plans for bringing these programs into development?

14   A.    Yes, it does.

15   Q.    Let's pull up Exhibit No. 242.  We can go to the very

16   first page here.  This appears to be an email from you to a

17   number of people, I'll ask you who they are, with the subject

18   "Ligand story."  Do you see that?

19   A.    Yes.

20   Q.    Do you recognize this document?

21   A.    Yes, I do, yeah.

22   Q.    Who are the people that you're sending this email to?

23   A.    So Misha Dinerman was our sort of co-founder, the person I

24   described earlier, medical doctor.  Michael Morneau was our

25   chief financial officer.  Rochelle Hanley was our chief medical

1    officer.  Mike Bleavins was our head of the preclinical

2    development.  And Hiroko Masamune was the formulations and

3    manufacturing person.

4    Q.    And these are all employees of Viking?

5    A.    At the time, yes.

6    Q.    Now, you write to them, "FYI, below please find Seeking

7    Alpha story someone forwarded today."  Do you recall who

8    forwarded this to you?

9    A.    No.

10   Q.    Okay.  "While primarily about Ligand it also contains a

11   discussion of Viking.  Most of the points are incorrect or

12   intentionally misleading."  Do you see that?

13   A.    Yes, I do.

14   Q.    You see down below you're forwarding an article captioned,

15   "Ligand Pharmaceuticals:  Appendix (LGND)."  Do you understand

16   that to be one of the reports the defendant wrote about Ligand?

17   A.    Yes.

18   Q.    Did you read it at the time that you first became aware of

19   it?

20   A.    I read the Viking parts.  I didn't read every detail about

21   the Ligand parts.

22   Q.    And you say here that, "Most of the points are incorrect

23   or intentionally misleading."  Was that your belief after

24   reading it?

25   A.    Yes.

1    Q.   Let's scroll down a little to page 5 of the PDF.  There's

2    a section that starts "Viking Therapeutics" down towards the

3    bottom of the page.  Do you see that?

4    A.   Yes.

5    Q.   In the second paragraph defendant writes, "Viking does not

6    intend to conduct any preclinical studies or trials."  Do you

7    see that?

8    A.   Yes.

9    Q.   Was that true?

10   A.   No.

11   Q.   Is that for all the reasons we discussed just a moment

12   ago?

13   A.   Yes, that's right.

14   Q.   And it was, as we saw a few minutes ago, your plans for

15   clinical trials and preclinical studies were laid out right at

16   the very beginning of this document or the S-1?  I'm sorry.

17   A.   That's correct.

18   Q.   He goes on to write that Viking "does not own any products

19   or intellectual property or manufacturing abilities."  First

20   with respect to owning any products or intellectual property,

21   was that right?

22   A.   No.  We had signed the master license agreement which gave

23   us an exclusive license to the five programs.  So we -- no one

24   else could -- they were ours.  No one else could use them.

25   Q.   And there's a reference to Viking not having any

1    manufacturing abilities.  Did Viking manufacture its own drugs

2    at this point in 2014?

3    A.   No.  Small companies don't make their own stuff.  That's a

4    bigger company.  Generally smaller companies hire manufacturing

5    companies to supply their drug product.

6    Q.   Okay.

7    A.   So we didn't have any, correct.

8    Q.   The next sentence says, "Viking appears to be a single-

9    purpose vehicle created to raise more capital from public

10   markets for its sponsor, Ligand Pharmaceuticals."  What was

11   your reaction to that statement?

12   A.   That was just silly.  I mean, untrue and totally

13   misleading and just categorically false.

14   Q.   If we go to the next page, the fourth paragraph down

15   reads, "Our independent registered public accounting firm has

16   expressed substantial doubt about our ability to continue as a

17   going concern."  Do you see that?

18   A.   Yes.

19   Q.   Do you have an understanding of what a going concern is?

20   A.   Yeah.  So a going concern is a label typically used for a

21   company that doesn't have enough money to run for the next

22   twelve months.  And so accounting firms require companies, and

23   I think the Securities and Exchange Commission also requires if

24   you don't think you've got enough money on hand to support your

25   company for the next twelve months, you have to put a going

1    concern statement in your financial statements.

2    Q.    In your experience covering early stage biopharmaceutical

3    companies, is it common or uncommon for a pre-IPO company to

4    have a going concern designation from an accounting firm?

5    A.    It's very common pre IPO.  It's very common post IPO.

6    It's so common that we never even care if a company has going

7    concerns.  Companies often are going concerns.

8    Q.    There's a paragraph that says, "In fact, Ligand had to

9    loan Viking 2.5 million in order to get it to take programs

10   that it did, meaning that it literally had to pay the partner

11   in this instance to take on the programs."  It goes on from

12   there.  But what was your reaction to this statement back in

13   2014?

14   A.    Well, it's totally incorrect and we had to pay 29 million

15   once we got the IPO done.  They loaned us two and a half

16   million to get the IPO done, and then we paid them 29 million

17   in stock.  So, I mean, there's -- it's very misleading to say

18   that.

19   Q.    If we go to the next page, there's a paragraph near the

20   top, "Ligand appears to be indirectly creating a shell company

21   through Viking to generate paper profits to stuff its own

22   balance sheet."  Do you see that?

23   A.    Yes.

24   Q.    Was Viking a shell company?

25   A.    No.  I don't even know what that means.  No.

1   Q.   Was its purpose to create paper profits for Ligand?

2   A.   No.  No.

3   Q.   If we go down to the bottom of this page, there's a

4   section that starts, "A curious relationship."  Do you see

5   that?

6   A.   Yes.

7   Q.   And it starts, "On April 7, 2014 Viking suddenly

8   terminated its relationship with its independent registered

9   public accounting firm and auditor, MaloneBailey, just one

10  month after it had engaged them."  Do you see that?

11  A.   Yes.

12  Q.   Why did Viking switch auditors in April of 2014?

13  A.   Yeah.  So in April of 2014 we had just -- we were in the

14  process of getting our banks lined up to do the IPO,

15  Oppenheimer, Roth, and three other banks, and Roth called me

16  and said, "MaloneBailey's on our blacklist.  You can't use

17  MaloneBailey."  And I said, "Why?"  And they said, "Because

18  they've been involved with some Chinese companies that were

19  accused of fraud, and they were the auditors, so they're on the

20  Roth blacklist."  So they said, "We can't work on your IPO if

21  MaloneBailey is going to be your auditor."  So we had to switch

22  auditors.

23  Q.   Did you retain an auditor subsequent to that?

24  A.   We did.  We retained a firm called Marcum out in Irvine,

25  California.

1    Q.   If you go to the top of the next page, there's a long
2    paragraph that starts, "From September 24, 2012 to inception."
3    Do you see that?
4    A.   Mm-hmm.  Yes.
5    Q.   "Through April 7, 2014."  So it's talking about this
6    period, 2012 to 2014.  It's a long paragraph, but take a moment
7    to read it, and I'm going to ask you if I kind of get the point
8    of it right.  Let me know when you're ready.
9    A.   (Pause.)  Okay.
10   Q.   The gist of this paragraph is the company hadn't consulted
11   with Marcum prior to Marcum being retained on April 7, 2014?
12   A.   That's right.  Yeah, we didn't --
13   Q.   So they weren't your auditor until April 7, 2014, right?
14   A.   Right.  That's correct.
15   Q.   Did you subsequently have discussions with Marcum and work
16   with them on an audit of Viking's financial statements?
17   A.   Yes.  They did the audit.  MaloneBailey actually did the
18   audit first, and we found out we had to drop them, and we had
19   to switch over to Marcum.  So they did it again.  So we had two
20   audits.
21   Q.   Do you have an understanding of whether an audit firm can
22   issue an audit opinion as to a partial year of financial
23   statements, or whether it's only as to the full year?
24   A.   My understanding is that an audit opinion is given on a
25   full-year basis, but they definitely look at the quarter and

1    they would never give you a clean go ahead if the quarter had a

2    problem.  So, I mean, technically they only look at the year

3    but really they look at the quarters.

4    Q.   Okay.  And did Marcum, in fact, audit the period from

5    inception of the company in 2012 through the first quarter of

6    2014?

7    A.   Yes, they did.

8    Q.   And did they issue an audit opinion as to 2012 and 2013?

9    A.   Yes, they did.  It was a clear -- I forget the term --

10   comfort letter.

11   Q.   And that was incorporated into the S-1 as well?

12   A.   Correct, yes.

13   Q.   Did Viking in 2014 plan to use third-party vendors to

14   conduct preclinical studies and clinical trials?

15   A.   Yes.  And that's kind of the way the business works.  You

16   hire contractors to perform your preclinical studies, your

17   clinical studies.  So we certainly did.  Eighty percent of the

18   industry does their business that way.

19   Q.   Was that how Microcide operated?

20   A.   Microcide, yeah.  Well, on the manufacturing side

21   certainly.  We had manufacturing vendors.  Microcide had a lot

22   of internal workers as well.  So there was a little bit of both

23   at Microcide.  More now.  In the 2010 and beyond range, this

24   sort of outsourcing is much more common than it was in the

25   early 2000s, late '90s.

1  Q.   Since raising money in the IPO in 2015, has Viking

2  continued development of the five programs we were just talking

3  about?

4  A.   We've continued development of four different programs.

5  So a program is kind of an umbrella term, and there can be

6  multiple drug candidates underneath that umbrella.  So one of

7  the programs we have two different drug candidates in different

8  trials ongoing today.  In the muscle wasting program, we

9  completed two studies there.  And we've done some preclinical

10  studies in animals with a couple of the other programs as well.

11  Q.   How would you characterize the outcome of some of those

12  studies that you were just talking about?

13  A.   The two human studies, the big human studies that we

14  conducted were the most successful studies of their kind ever

15  reported.  So we looked at hip fracture patients.  We treated

16  them with a drug called VK5211.  It stimulates muscle growth.

17  And we showed the largest increase in muscle mass of any oral

18  agent ever reported.  We had ladies who had broken their hip

19  who had 15 pounds of muscle added and less fat.  So it was

20  fantastic data.

21      Then we did a study with a different drug, a drug called

22  VK2809, in patients with fatty liver disease, and we had the

23  largest reduction in liver fat content ever reported from an

24  oral agent.  So fantastically successful studies.

25  Q.   Are any of these drugs commercially available and being

1  used in patients today?

2  A.    No.  They're still in the so-called development stage.

3  Q.    Is it unusual for a company in sort of an early

4  development phase, biotechnology company, to not have a

5  commercial product -- I guess it's about six years into its

6  life?

7  A.    Sure, sure.  There are companies much older than that that

8  don't have -- development cycles take a long time and a lot of

9  failures.  So there are companies that are 15 years old that

10  don't have revenue, so to speak.

11        MR. DAY:  Thank you, Dr. Lian.  I have nothing further

12  at this time.

13                    CROSS-EXAMINATION

14  BY MR. BROOKS:

15  Q.    Good afternoon, Dr. Lian.

16  A.    Good afternoon.

17  Q.    You mentioned Viking's IPO, initial public offering, that

18  was in 2015?

19  A.    It was concluded in 2015, yes.

20  Q.    And that was a year after Father Lemelson's report about

21  Viking, right?

22  A.    Nine months or so, yeah.

23  Q.    Okay.  And you said you -- I believe Viking raised 29

24  million in that IPO?

25  A.    I think we raised about 26 or 27.

1    Q.    26 or 27.

2    A.    We paid Ligand 29 million for the drugs.

3    Q.    Okay.  And the offering price, if I'm correct, was $8 a

4    share?

5    A.    That's correct.

6    Q.    So the value of Viking shares has -- it's lost about 28

7    percent of its value since 2015; is that fair?

8    A.    Whatever the stock price is today, yes.  You could

9    probably calculate it.

10   Q.    It's down a few cents but I didn't want to check during

11   your testimony.  But it's about 5.82?

12   A.    Sure.

13   Q.    Now, you created Viking in September 2012?

14   A.    That's correct.

15   Q.    And both you personally and Viking are located in

16   California?

17   A.    Yes.  When I founded the company I was in New York, but

18   then moved to California in 2015.

19   Q.    So in September 2012, if I understood correctly, Viking

20   signed an option agreement with Ligand?

21   A.    That's correct.

22   Q.    And if we fast forward to May 2014, Viking signed its

23   master license agreement with Ligand, right?

24   A.    That's right, yes.

25   Q.    So effectively Viking decided it was going to exercise

1    that option?

2    A.   Yes, the option went into the master license agreement,

3    yes.

4    Q.   Okay.  And the result of that is that Viking got a license

5    related to certain drugs from Ligand?

6    A.   Yes, that's correct, yeah.

7    Q.   Okay.  And the idea, if I understood it, basic terms, was

8    Viking was going to come in and develop a bunch of drugs that

9    at the time belonged to Ligand?

10   A.   We were going to license them.  So they didn't really

11   belong to Ligand anymore.  If we licensed them, they'd belong

12   to us.

13   Q.   After the license?

14   A.   After the license.  I got you.  That's right.

15   Q.   Okay.  At the time Viking did this, Viking basically

16   didn't have any money, right?

17   A.   We were a start-up.  So we had -- no, we didn't have --

18   this is why we're doing the IPO, to raise the finances to go

19   out and do the clinical trials.

20   Q.   At the time, May 2014, of the master license agreement

21   Viking didn't actually pay Ligand for the licenses, right?

22   A.   In May 2014 we paid Ligand -- May 2014.  No, we did not

23   pay Ligand in May of 2014.

24   Q.   In fact, the money went the other way, Ligand loaned

25   Viking two and a half million as part of that deal, right?

1    A.    Ligand loaned us two and a half million that would be
2    repaid post IPO.
3    Q.    Without Ligand's money, Viking couldn't have continued
4    operating at that point, right?
5    A.    No, no, that's not true.  We were in multiple discussions
6    in the first half of 2014 with other investors in the event
7    Ligand -- you know, there was a problem there.  So I had been
8    out talking to venture capitalists and what I call crossover
9    funds, mutual funds, trying to raise money alone in parallel
10   with the Ligand conversations.
11        We paused those conversations once we got really far along
12   in the Ligand conversations, but had those conversations
13   terminated, we would have gone back to the parties that we were
14   speaking with beforehand.
15   Q.    It was probably a bad question.  Viking needed somebody's
16   money to continue operating, right?
17   A.    Correct.  We needed to finance the programs, yes.
18   Q.    Now, are you aware, Dr. Lian, that two of the four
19   statements that the SEC is challenging that Father Lemelson
20   made relate to Viking, your company, and not Ligand?
21   A.    I know there are statements.  I don't know the numbers,
22   but they refer to us, yes.
23   Q.    Are you aware that one of the statements that the SEC is
24   challenging is that Father Lemelson said Viking does not intend
25   to conduct any preclinical studies or trials?  Are you aware

1   that that's one of the statements?

2   A.   Yes.

3         MR. BROOKS:  Can we pull up Exhibit 4.  Okay.  Can we

4   go to the first page just so everybody can see what it is.

5   Q.   You'd agree that -- you'd agree that this is -- I believe

6   it was shown to you or maybe in a different form, but that this

7   is the report that Father Lemelson wrote on July 3, 2014?

8   A.   Yes.

9   Q.   And as far as you're aware, this is the only report that

10  mentions Viking?

11  A.   It's the only one I think I've seen.

12  Q.   I think you said you weren't aware, but two of the four,

13  so 50 percent of the challenged statements in this case, come

14  from this report, okay?

15  A.   Okay.

16  Q.   All right.  So let's go to -- I think it's page 7.  Do you

17  see the second paragraph.  You were shown this on direct.

18  "Viking does not intend to conduct any preclinical studies or

19  trials."  Do you see that, the first part of that sentence?

20  A.   Yes.

21  Q.   And I believe you testified on direct that it's your

22  opinion that statement was false?

23  A.   That is false.  We planned to conduct -- and "conduct"

24  here it's sort of understood, in a small biotech company

25  "conduct" means you're going to contract somebody to perform

1    those for you.  So they're one and the same in the small cap,

2    small biotechnology universe.

3    Q.    Let's explore that a little bit then.  Can we look at

4    Exhibit 58.  I believe you were also shown this.  This is the

5    S-1 statement that you testified about, right?

6    A.    That's correct, yes.

7    Q.    And I think you referred to this as a really useful

8    reference document?

9    A.    Yes.

10   Q.    Okay.  And Viking publicly filed it anyway?  It might have

11   been filed earlier, but as far as the public was concerned,

12   this was filed on July 1, 2014?

13   A.    That's correct.

14   Q.    That's two days before Father Lemelson's report, right?

15   A.    I suppose so, yes.

16   Q.    And you worked with lawyers from the law firm called Paul

17   Hastings?

18   A.    Correct.

19   Q.    And that's a large international law firm?

20   A.    That's right.

21   Q.    And while they don't have an office here in Boston, they

22   have offices all across the country, right?

23   A.    Mm-hmm.

24   Q.    Including a few in California where you're from?

25   A.    They have them in -- yeah.  Yes.  San Francisco.

1    Q.   Is it fair to say Paul Hastings is a good law firm?

2    A.   Yes.

3    Q.   And lawyers there know what they're doing?

4    A.   As far as I'm aware, yes.

5    Q.   Not the first time they filed an S-1, right?

6    A.   Correct.

7    Q.   In your role as Viking's CEO, you reviewed this S-1 before

8    it was filed?

9    A.   Yes.  Everybody reviewed it, yeah.

10   Q.   Yeah.  And obviously you wouldn't allow an S-1 to be filed

11   if you thought something in it wasn't true?

12   A.   Correct.  We would probably want to address it, yeah.

13   Q.   Okay.  If we could turn to page 11.  All right.  So page

14   11, do you see at the top where it says "Risk Factors"?

15   A.   Yes.

16   Q.   I'm sorry, I believe for the jury -- I'm sorry, I should

17   have mentioned it.  I believe at least some of this is in the

18   binder at tab 3, if anyone's interested, if it's easier to

19   follow.  Okay.  So "Risk Factors," these were things that you

20   wanted people to know about Viking, right?

21   A.   These were -- a lot of these were sort of boilerplate type

22   of statements that the law firm had a big template of risk

23   factors for biotech companies.  So we used that as a template

24   to, you know, describe some of our programs as they fit into

25   various risk factors in the biotech industry.

1    Q.   My question was whether you wanted people to know.  So

2    you're saying you didn't want people to know the risk factors?

3    A.   We definitely wanted people to know.  That's why we

4    published them.

5    Q.   Right.  And specifically you want people that might invest

6    in Viking to know about these risk factors, right?

7    A.   That's correct, yes.

8    Q.   Meaning people that you hoped would give Viking money in

9    the future?

10   A.   Yes, we thought it was fair to inform people of the

11   potential risks of investing in the company.

12   Q.   You'd agree it's important to make sure that investors

13   know the risks associated with a company before they invest in

14   it?

15   A.   I would hope so, yes.

16   Q.   So certainly Viking isn't going to mislead investors in

17   its risk statement, is it?

18   A.   Not intentionally, no.

19   Q.   And there's a bunch of risks here and, don't worry, we're

20   not going to go through all of them, but I do want to ask you

21   about a few that seem relevant to the reason why we're all here

22   in the courtroom together today.  So if we could turn to page

23   13, the second full paragraph.

24            MR. DAY:  You mean 13 of the S-1 or the PDF?

25            MR. BROOKS:  Okay.  That's correct.  Sorry.

1  Q.   So if you go to the -- that's the one I wanted pulled up.

2  So do you see, Dr. Lian, if I can bring your attention to the

3  second sentence there, three lines down, it says, "Therefore,

4  as a company, we do not have any experience in conducting

5  clinical trials for our drug candidates."  Do you see that?

6  A.   Yes, I see that.

7  Q.   Specifically do you see the word "conducting"?

8  A.   Yes.

9  Q.   And that's the exact same word Father Lemelson used,

10  right?

11  A.   Uh.  I'd have to see his statement again, but we were a

12  start-up biotech company.  So this statement applied to any

13  start-up biotech company that hadn't been in existence in the

14  past to conduct a study.  So we hadn't conducted any clinical

15  trials, but we had the staff that had 25 years of experience

16  per person in conducting --

17  Q.   Let's talk about that.  You then write in the very next

18  sentence, "Since our experience with our drug candidates is

19  limited, we will need to train our existing personnel and hire

20  additional personnel in order to successfully administer and

21  manage our clinical trials and other studies as planned."  Do

22  you see that?

23  A.   Yes.

24  Q.   Okay.  Those words here, "administer and manage" -- right?

25  A.   Yes.

1   Q.   -- you said absolutely nothing about needing to hire

2   people to conduct your preclinical studies and trials, right?

3   A.   We didn't need to hire anybody to conduct those.  We were

4   going to hire contractors to conduct those studies.  So we had

5   the staff on hand.

6   Q.   Well, you said you're going to need staff on hand to

7   administer and manage, right?

8   A.   Yes.  I mean, we'd have to grow.  As different programs

9   matured -- we were only five people.  So we were going to have

10  to grow to help manage some of the external vendors, yes,

11  absolutely.

12  Q.   I think we're saying the same thing here.  So you didn't

13  say, as you just acknowledged, that you were going to hire

14  people in-house to actually conduct the studies.  In fact, you

15  said the exact opposite in this document, right, if we to page

16  17?

17         MR. DAY:  Objection.

18  A.   It says we hire additional personnel.  That means us, too.

19  I mean, everybody, external, internal.  We were going to grow.

20         THE COURT:  But were you going to hire these people to

21  conduct trials in-house?

22         THE WITNESS:  We were going to hire people to manage

23  the vendors that conduct those clinical trials.  We don't -- I

24  mean, small companies typically don't conduct trials.

25         THE COURT:  Right.  I'm just asking what you meant

```
 1   here.
 2            THE WITNESS:  Well, it meant we would --
 3            THE COURT:  Did you mean here you were going to hire
 4   your own people to do it in-house or you were going to hire
 5   your own people to do it --
 6            THE WITNESS:  We were going to hire people in-house to
 7   manage the external vendors that would conduct the studies.
 8   Q.   I think we're getting there.  So Dr. Lian, if you look on
 9   the page that's up on the screen, do you see about halfway down
10   there's a paragraph in bold.
11   A.   Yeah.
12   Q.   So it says, "We intend to rely on third parties to conduct
13   our preclinical studies and clinical trials and perform other
14   tasks for us."  Do you see that?
15   A.   Yes.
16   Q.   Again, there's that word "conduct," which was the word
17   that Father Lemelson used in his report, correct?
18   A.   Correct.
19   Q.   And you'd agree that by putting this -- by putting this
20   language in bold, it was signified to be important, right?
21   A.   Yes, but in this context --
22   Q.   Well, is it important or not?
23            MR. DAY:  Objection.  Your Honor, he should be able to
24   finish his answers.
25            THE COURT:  No, we're on cross.  Why did you bold it?
```

1          THE WITNESS:  Well, the law firm bolded it because it

2     was part of their standard risk factor disclosures.  I think

3     this risk factor is in every public company's S-1.  Most public

4     companies do rely on third parties to conduct preclinical

5     studies.

6          When you describe it publicly we did the study, we

7     conducted a phase 2 trial, it means you hired a contractor that

8     conducted the phase 2 trial at your direction.  So they're kind

9     of one and the same.

10    Q.   Well, if everybody does it, then why would any reader of

11    this need to be alerted to it as a risk factor?

12    A.   Because something could happen at one of those companies

13    that screws up the process that's out of your hands.  A fire

14    could happen or something.

15    Q.   You'd agree this is the only bolded language on the entire

16    page?

17    A.   Okay.

18    Q.   Right?

19    A.   Yeah.  Every page had some bolded.

20    Q.   I'm just talking about that page.

21    A.   Sure, sure.  Uh-huh.

22    Q.   Right?  The only bolded language.

23         Again, I think we've established -- I mean, you're in

24    corporate America, right?  Usually when something is in bold

25    it's because it's more important than the things not in bold,

1   to at least whoever is the author?

2   A.   Typically it's highlighting something, yes.

3   Q.   So whose idea was it to put it in bold?  Was that your

4   idea or the lawyer's idea?

5   A.   That was from the law firm Paul Hastings.

6   Q.   Again, you're not saying the lawyers at Paul Hastings

7   didn't know what they were doing, are you?

8   A.   No, I think they knew what they were doing.

9   Q.   You don't think they bolded the wrong language by

10  accident?

11  A.   I hope not.  No, I don't think so.

12  Q.   So focusing on this language again, it's fair to say that

13  Viking itself did not intend to conduct preclinical studies and

14  preclinical trials, right?

15  A.   Well, we were going to manage and --

16  Q.   Yeah, manage and administer.  My question is conduct.  It

17  says right here, right, Viking did not intend to conduct

18  preclinical studies and trials.  It intended to manage and

19  administer them.  Different things, right?  Is that a yes or

20  no?

21  A.   I do not think it's a yes or no question.  It's a very

22  gray area.

23  Q.   Okay.

24  A.   When a small company conducts a clinical trial, it

25  conducts -- you hire somebody to do it.  When a company says,

1    "We made a drug substance," well, that most likely means they

2    hired Patheon or Charles River or one of these companies to

3    make the drug substance for them, but they don't say, "We hired

4    Charles River to make our drug substance."  They don't say, "We

5    hired so and so to conduct this animal study."  They say, "We

6    conducted them," because that's just the way the language is

7    used.

8    Q.   With all due respect, I'm not interested in any of those

9    other companies.  I'm interested in the fact that in 2014

10   Viking clearly indicated that it was going to rely on third

11   parties to conduct its preclinical studies and trials and its

12   own role would be to manage and administer those third parties,

13   right?

14   A.   We were planning to manage the clinical trials, yes.

15   Q.   Okay.  I mean, in terms of conducting clinical trials,

16   Viking didn't have employees walking around in white lab coats

17   and injecting syringes into rats.  Right?  That's not what

18   Viking was?

19   A.   We didn't have those.

20   Q.   You didn't have wet labs to actually conduct those kinds

21   of trials?

22   A.   We didn't at this time, no.

23   Q.   The space Viking did have, it was office space?

24   A.   No, we did have some lab space at Ligand.  We didn't use

25   it, but we had it.

1   Q.   Right, you didn't use it.  You rented some out, but you
2   only used office space, correct?
3   A.   That's correct, yes.  Yeah.
4   Q.   In fact, the space you used, you rented that from Ligand?
5   A.   That's correct, yeah.
6   Q.   And you paid Ligand with the money that Ligand had
7   actually loaned to you, right?
8   A.   It was a mix of some of the friends and family money that
9   we raised initially and also their money as well.
10  Q.   So in other words, Ligand gave you two and a half million
11  dollars, and then you funneled some of that back to pay the
12  rent, right?
13  A.   We paid the rent in accordance with the lease.
14  "Funneling" has sort of a negative connotation.
15  Q.   Is it fair to say Viking needed a loan from Ligand to be
16  able to afford the rent, right?
17  A.   At the time of the master license agreement, yes.
18  Q.   In terms of the space Viking rented, I mean, it wasn't a
19  big office space, right?
20  A.   It was three offices and then some lab space.
21  Q.   I think total it was 5,851 square feet, correct?
22  A.   It could have been, yeah.
23  Q.   And all of that wasn't even Viking's.  That included some
24  shared space that you had with Ligand?
25  A.   That was some shared lab space, yes.

1    Q.   If we could go back to 17.  If we could just look at the

2    language on this page under the bold.

3            THE COURT:  Now, what are we looking at?

4            MR. BROOKS:  I'm sorry.  We're on page 17 of the same

5    exhibit that's been up.  It's the language right under the bold

6    that we read before.  And it says, "Ligand, the licensor of our

7    development programs, has relied upon and plans to continue to

8    rely upon third-party CROs, medical institutions, clinical

9    investigators and contract laboratories to monitor and manage

10   data for our licensed ongoing preclinical and clinical

11   programs."  Do you see that?

12   A.   Yes.

13   Q.   Okay.  And a little further down you wrote, "We have

14   relied and expect to continue to rely on these parties for

15   execution of our preclinical studies and clinical trials, and

16   we only control certain aspects of their activities."  So you

17   plan to rely on the same exact third parties that Ligand had

18   been relying on?

19   A.   Some were the same, some were different.  It wasn't a

20   hundred percent overlap there.

21   Q.   And just -- what we just read, you wrote that you were

22   going to rely on them for the "execution of our preclinical

23   studies and clinical trials," right?

24   A.   That's right.

25   Q.   So Viking was going to have third parties conduct the

1    preclinical and clinical trials, right?

2    A.   Correct.

3    Q.   And these third parties were also going to execute the

4    preclinical and clinical trials?

5    A.   Yes.  So it's a little bit of a mix there.  I mean, when

6    you conduct a study, the design element, the -- you'll talk to

7    a vendor during the study, you know, if a dose needs to be

8    changed, if a dose needs to be increased.  So there's

9    definitely co-management during a study of any kind.  When we

10   had our vendors make drug substance, we always had a person on

11   site to help them with the specific steps.

12   Q.   Yet Paul Hastings didn't see the need to include any of

13   that in this document, right?

14   A.   Well, I think that would be several hundred pages long.

15   Q.   Right.  So if they had several hundred pages to include

16   that, what you just testified to, and yet they didn't feel the

17   need, although they did feel the need to put in bold that you,

18   Viking yourself, was not going to conduct the preclinical

19   studies and trials; is that correct?

20         MR. DAY:  Objection.

21         THE COURT:  Sustained.  Asked and answered.

22   Q.   Just to make sure I understand all of this.  So, one, at

23   the time Viking entered into the master license agreement,

24   Viking had virtually no money, right?

25   A.   We were -- yeah, we were pretty thin on cash at that time,

1    yes.

2    Q.   And two, because Viking had almost no money, Ligand had to

3    loan Viking two and a half million as part of the deal where

4    Viking would be obtaining a license to develop Ligand's drugs?

5    A.   Yes.  That is part of the license agreement.  They loaned

6    us two and a half million, that's correct.

7    Q.   And, three, because Viking didn't have any office space,

8    it took part of the money that Ligand gave it and gave it right

9    back to Ligand to rent part of Ligand's office space?

10   A.   Well, we had office space in New York, but since two of

11   our staff was in -- were in San Diego, they offered the space

12   to us and we took it, just one less thing to worry about.  So

13   we did have office space in New York.

14   Q.   And fourth, Viking only rented office space, or at least

15   it only used office space.  It didn't rent any space that it

16   would use to actually conduct the clinical studies, right?

17   A.   No.  We didn't conduct the studies in the offices, that's

18   correct.

19   Q.   And Viking's personnel had no experience conducting

20   clinical studies on the drugs it was licensing?

21        MR. DAY:  Objection.

22        THE COURT:  Overruled.

23   A.   The employees were new to the start-up.  So they hadn't

24   previously worked on the programs that we had licensed, that's

25   correct.  They worked on a lot of other programs.

1    Q.    So as a result, Viking had to go out and hire the same
2    third parties to conduct clinical studies that Ligand had used
3    for the same exact purpose?
4    A.    Some of the same vendors, but not all of the same vendors
5    were used, yes.
6    Q.    Okay.  Switching gears a little bit, you're represented by
7    attorneys in this matter, correct, not the SEC, your own
8    private attorneys?
9    A.    Correct.
10   Q.    And those are the same attorneys that represent Ligand,
11   right?
12   A.    Correct.
13   Q.    And Ligand is paying for your attorneys, right?
14   A.    I don't know who's paying for our attorneys.
15   Q.    Do you think you'd know if you were?
16   A.    I'm sorry?
17   Q.    Do you think you would know if you were paying?
18              THE COURT:  Who are you referring to?
19   Q.    Well, who are your attorneys in this matter?
20   A.    Cahill.
21   Q.    Cahill Gordon law firm?
22   A.    Yes.
23   Q.    And you're not paying Cahill Gordon?
24   A.    We're not paying Cahill Gordon, no.
25   Q.    Do you think anyone else is paying Cahill Gordon besides

1   Ligand?

2   A.   I assume they're getting paid.  I don't know if the SEC is

3   paying them, if Ligand is paying them.  I'm sure they're

4   getting paid.

5   Q.   Okay.  Now, while all of the stuff we've been talking

6   about in 2014 was going on, you hired an audit company called

7   MaloneBailey to conduct an audit of Viking's financial

8   statements, right?

9   A.   That's right.

10  Q.   And at that time Viking had been in existence for, I don't

11  know, a year and a half or so?

12  A.   Yes.

13  Q.   And during that time it hadn't generated anything in

14  revenue, right?  It had no revenue?

15  A.   We had no revenue at that time, no.

16  Q.   And MaloneBailey, I believe you testified, actually

17  completed the audit of Viking?

18  A.   Yeah.  They completed it, and that's when they got black-

19  flagged.

20  Q.   Right.  And that was because Roth Capital told you you had

21  to fire MaloneBailey?

22  A.   Well, they didn't say it that way.  They said that, "We

23  can't work with MaloneBailey."  It's implicit if you want to

24  work with us, you're going to have to change your auditor.

25  Q.   So you had to choose between MaloneBailey and Roth?

1    A.    Well, we had to choose between a timeline to get the IPO

2    done and Roth was an integral part of that timeline.  So we

3    chose to swap out Malone for another auditor.

4    Q.    Incidentally, when you chose Roth over MaloneBailey, you

5    were also choosing what ends up being a sell-side analyst that

6    we've heard a lot about today for Ligand.  Right?  Roth was a

7    sell-side analyst for Ligand?

8    A.    I don't know if Roth was covering Ligand.  I guess they

9    were at the time, yeah.

10   Q.    Okay.  But that had nothing -- and MaloneBailey had

11   already finished their audit, right?

12   A.    That's right, yes.  MaloneBailey finished their audit,

13   yeah.

14   Q.    You had to choose MaloneBailey, who had already done all

15   the work, who got the audit done, or Roth Capital, who happens,

16   coincidentally, to be a sell-side analyst for Ligand; is that

17   right?

18   A.    Well, that's technically correct.

19   Q.    Okay.

20   A.    But we were going to use -- we needed to switch out -- we

21   couldn't use MaloneBailey if Roth was going to be involved.

22   Q.    Right.

23   A.    And we already set up the IPO to go.

24   Q.    But you also already completed the audit with

25   MaloneBailey, right?

1   A.   Well, we figured that if there was problem with

2   MaloneBailey --

3   Q.   But had you completed the audit with MaloneBailey?

4        THE COURT:  We've been through this.  How much longer

5   do you have?

6        MR. BROOKS:  I will finish by 4:00, I promise,

7   especially since you're moving me along on that line.

8        THE COURT:  Well, I have a sentencing this afternoon

9   having nothing to do with this.  But I need to actually leave.

10  I don't have leeway after that.

11       MR. BROOKS:  Okay.  We'll be done.

12  Q.   If we could pull up page 9 of the S-1, and I apologize, I

13  don't think this is in your binders.  But if we could pull it

14  up.

15       So this is the work -- this is what's in the S-1.  So this

16  is not the work of MaloneBailey.  It's the work of Marcum,

17  right?

18  A.   Yes.

19  Q.   Okay.  And these are part of -- for those of us without a

20  degree in accounting, these are part of financial statements

21  that we're looking at?

22  A.   Yes.

23  Q.   And if you look at them, you'll see that it looks like

24  there's five columns.  Is that right?

25  A.   Yes.

1    Q.   All right.

2    A.   No, six.

3         MR. DAY:  I'm not sure what page of the document this

4    is.  It says 13 and 9 and I'm having trouble finding it.

5         THE COURT:  Let's start with basics.  This is which

6    exhibit?

7         MR. BROOKS:  This is the S-1, which is 58.

8         THE COURT:  So we're back at the S-1.

9         MR. BROOKS:  Yeah.  And page 13 of the PDF, page 9 on

10   the bottom of the actual document.  And as I believe the

11   witness just testified, it's part of the financial statements

12   put together by MaloneBailey's successor, a company called

13   Marcum, right?

14   A.   That's correct, yes.

15   Q.   And you'll see that the last three columns, do you see

16   those, those columns all contain the word "unaudited."  Do you

17   see that?

18   A.   I do see that, yes.

19   Q.   And you've mentioned before the S-1 is a very long

20   document.  I think it's about 200 pages.  Does that sound

21   right?

22   A.   I don't know.

23   Q.   I'm not sure.  It's long, though, right?

24   A.   It's long, yes.

25   Q.   And I don't know if you've counted, but does it sound

1    right that the word "unaudited" appears 56 times in that

2    document and the word "audited" appears only seven?

3              MR. DAY:  Objection.

4              THE COURT:  Overruled.  Do you know?

5              THE WITNESS:  I don't know.

6    Q.   All right.  Now, you testified earlier that you read

7    Father Lemelson's -- the part of Father Lemelson's report dated

8    July 3, 2014 that refers to Viking, right?

9    A.   Yes.

10   Q.   Okay.  Have you read the rest of it?

11   A.   I haven't read the Ligand details, no.  No.

12   Q.   Okay.  Now, you've never spoken in depth with any of

13   Viking's investors about Father Lemelson's reports, right?

14   A.   No.  No.

15   Q.   Okay.  I mean, no one has -- none of the investors ever

16   said to you, "Whoa, stop.  Look, how come there aren't going to

17   be any clinical trials done on the drugs?"  Right?  Nobody

18   expressed that concern to you, did they?

19   A.   The way that that report was ever -- whenever it was

20   brought up, it was brought up I saw this report on Seeking

21   Alpha published.  It talked about Ligand or Viking being a

22   fraud or stuff like that.  It just came up in that context.  It

23   wasn't anybody talking about specifics in the report.

24   Q.   Right.  So nobody, as far as you knew, misunderstood and

25   said, "Oh, my God, these drugs are going to go to market and no

1    one's going to have done any trials on them."  Right?

2    A.   No one would ever think that.  They could never get to

3    market.

4    Q.   It would be impossible.  It would be physically

5    impossible.  That could never happen?

6    A.   I think it's legally impossible.

7    Q.   Maybe a better term.  It would never happen, it has never

8    happened.  You're in this industry.  You've never heard of such

9    a thing, correct?

10   A.   Not recently, no.

11   Q.   And nobody ever came up to you and said, "Whoa, why are

12   your financial statements in the S-1 unaudited?  How could you

13   do such a thing?"  Nobody ever expressed such a concern to you,

14   did they?

15   A.   Well, the quarters in that document are unaudited because

16   they don't audit the quarters.  They audit the years, so.

17   Q.   We're on the same page.  My question is simply, nobody

18   ever came up to you and expressed exasperation like, "How could

19   you file an S-1 with unaudited financials?"  Right?  Nobody

20   ever expressed that concern to you?

21   A.   No.  Everybody understands an S-1 has audited financials.

22   Q.   Okay.  So as far as you know, nobody cared about the two

23   statements that the SEC is challenging in Father Lemelson's

24   July 3, 2014 report about Viking, correct?

25   A.   I don't know, as I sit here --

1   Q.   I'm just asking as far as you know.

2   A.   I don't know what drove investor decisions, if it was

3   something in the report --

4        THE COURT:  Listen to his question.  Did any investor

5   call you up or call anyone in the company and say, "I'm worried

6   about these two statements"?

7        THE WITNESS:  No.

8   Q.   Okay.  When you became aware of Father Lemelson's report

9   in July of 2014, we saw you forwarded it to the people you

10  worked with at Viking, right?

11  A.   That's right.

12  Q.   And none of the people you worked with at Viking ever

13  expressed any concern about that report?

14  A.   Well, because I told them don't worry about it basically.

15  I did that to head off any potential concerns because some of

16  these people hadn't worked in the equities industry or a

17  startup or anything like that.  So I wanted to head off --

18  Q.   My question is simply, after you forwarded them the

19  report, nobody you worked with ever expressed any concern to

20  you about it, correct?

21  A.   After I forwarded the report, they did not.

22  Q.   Right.  And that was the first time they saw the report,

23  right, as far as you know?

24  A.   As far as I know, yeah.

25  Q.   Right.  And you personally weren't concerned about Father

1    Lemelson's report that mentioned Viking, right?

2    A.    Well, I knew the facts.  So I wasn't concerned.

3    Q.    Right.  And Viking never issued any kind of public

4    statement that Father Lemelson's statements in this report were

5    false, did it?

6    A.    As a private company, you typically wouldn't issue a

7    rebuttal.

8    Q.    So is that a no?

9    A.    We did not issue any statement about it.

10   Q.    Now, Ligand -- Ligand issued a lot of press releases in

11   2014, right?  You were following Ligand?

12   A.    Not really closely, no, I was not.

13   Q.    Do you know whether Ligand issued any press releases?

14   A.    I'm sure they issued press releases.  I'm not on their

15   subscription list.

16   Q.    They issued more than 40 press releases in 2014, right?

17   A.    I don't know.

18   Q.    I mean, they were spitting out almost one a week in 2014,

19   right?

20   A.    I don't know.

21   Q.    Okay.  But you do know that of those almost one a week

22   press releases, not a single one mentioned any of the Father

23   Lemelson statements about Viking, correct?

24   A.    I don't know -- as I said, I don't get their press

25   releases.  I don't read their press releases.  I don't know if

1  they ever mentioned Father Lemelson.

2  Q.   So Mr. Lian, you flew to Boston from San Diego, right?

3  A.   I did, yes.

4  Q.   And actually ended up flying into a nor'easter?

5  A.   Yes, I did, yes.

6  Q.   So if I have this straight, you flew from San Diego to

7  Boston, in a nor'easter of all things, to talk about two

8  statements that were made over seven years ago that nobody

9  cared about.  Is that a fair assessment?

10            MR. DAY:  Objection.

11            THE COURT:  Sustained.

12            MR. BROOKS:  I have no further questions, Your Honor.

13            MR. DAY:  Redirect, Your Honor.

14            THE COURT:  Yes, five and five.

15            MR. DAY:  Okay.  I'll be quick.

16                     REDIRECT EXAMINATION

17  BY MR. DAY:

18  Q.   Dr. Lian, with respect to preclinical studies and clinical

19  trials, who designs the protocols for that?

20  A.   We do.

21  Q.   Who oversees the studies to make sure that they're

22  following those protocols and designs?

23  A.   We do.  We're very intensive.  Like I said a minute ago,

24  we follow and direct changes and manage the trials pretty

25  intensively.

1  Q.   Are clinical trials sometimes carried out in hospitals?

2  A.   Yes, they are.

3  Q.   Do pharmaceutical companies typically own hospitals?

4  A.   No, they don't.

5  Q.   Are clinical trials sometimes carried out by -- do

6  doctors, M.D.s, at the hospital participate in those clinical

7  trials?

8  A.   Yes, they do.

9  Q.   How many pharmaceutical companies keep an oncology

10  department on staff?

11         THE COURT:  No.  I don't think we don't have time for

12  that.

13         MR. DAY:  Okay.

14  Q.   With respect to Roth Capital, were you aware at the time

15  in 2014 that Roth Capital covered Ligand?

16  A.   You know, I guess I did.  It never came up in any

17  conversations, but I know that analyst was covering Ligand.  I

18  just never --

19  Q.   You testified earlier that with investment banks analysts

20  are typically walled off, not involved with the investment

21  banking side?

22  A.   That's correct, yes.

23  Q.   Do you have any reason to believe that the analyst who was

24  covering Ligand had anything at all to do with Roth's role in

25  your IPO?

```
1    A.   I have no reason to believe that.
2    Q.   Did you ever hear that Ligand was somehow pushing Roth to
3    cause you to switch auditors?
4    A.   Oh, no, no.  No.  It was Roth's decision entirely because
5    of their problem with MaloneBailey.
6    Q.   Did Ligand, to your knowledge, have any role in selecting
7    Marcum after --
8    A.   No, no.
9    Q.   -- MaloneBailey -- I'm sorry.  Go ahead.
10        Now, you were asked questions about whether Viking
11   investors in July of 2014 called you up about Father Lemelson's
12   reports, right?
13   A.   Right.
14   Q.   Was Viking a public company in July of 2014?
15   A.   No, we were not.
16   Q.   Okay.  As a private pre-IPO company, would there have been
17   any reason for you to issue a press release to the investing
18   public about a report that was critical of your company?
19   A.   No.  That would have been -- it just would have been silly
20   to do that.
21   Q.   I want to take a look at the S-1, which is Exhibit 58.
22   And you have to bear with me a moment to get to the right page.
23   I believe it's page 17 of the S-1, which may be I think page
24   21 -- yes, 21 of the PDF.
25        Now, Mr. Brooks made a point repeatedly of the middle
```

```
 1   paragraph here being bolded.  Right?

 2   A.   Mm-hmm.  Yes.

 3   Q.   Now, the paragraphs that come after that talk about third

 4   parties in clinical trials and clinical studies, right?

 5   A.   Yes.

 6   Q.   And they go into more detail about it; is that fair?

 7   A.   Yes.

 8   Q.   Now, Cole, if you could just scroll a couple pages to

 9   either side slowly.  Let's see if there's any other bolded

10   information.  Keep going to page 18.  Do you see a bolded

11   portion here?  "Our drug candidates are subject to extensive

12   regulation," et cetera.

13        If you go a little further down, keep going, there's

14   another bolded part.  "Even if our drug candidates receive

15   regulatory approval in the U.S."  Do you see that?  There's

16   another one.  "Even if any of our drug candidates receive

17   regulatory approval," et cetera.

18   A.   Yes.

19   Q.   I'll represent to you that there are a whole lot of bolded

20   portions of this risk factor section, and they're all followed

21   by more detail about the bolded part.  Do you have an

22   understanding of what the bolding means here?  Isn't it just a

23   section header?

24             MR. BROOKS:  Objection.

25             THE COURT:  Sustained, leading.
```

1   Q.   Well, do you have an understanding of what the bolding

2   represents here?

3   A.   It's calling out the next topic basically.  Here's the

4   risk and here are some of the details underlying that cursory

5   risk description.

6   Q.   Okay.  And all the risks are bolded, right?

7   A.   Correct.

8   Q.   Okay.

9         MR. DAY:  Let's go back to page 21, Cole.

10  Q.   If you look at the third sentence under that bolded point

11  that Mr. Brooks was asking you about, it starts,

12  "Nevertheless."  It's in the paragraph right under the bolded

13  part, the third sentence.  I think it's the third sentence.  It

14  start, "Nevertheless."  "Nevertheless, we," meaning Viking,

15  "maintain responsibility for ensuring that each of our clinical

16  trials and preclinical studies is conducted in accordance with

17  the applicable protocol, legal, regulatory, and scientific

18  standards and our reliance on these third parties does not

19  relieve us of our regulatory responsibilities."  Do you see

20  that?

21  A.   Yes.

22  Q.   Is it your understanding, one way or the another, whether

23  Viking retained control and responsibility for all of its

24  clinical trials and clinical studies?

25  A.   Yes, we do.

1    Q.    Notwithstanding hiring a vendor or using a hospital or a

2    doctor?

3    A.    Yeah.  And they're co-managed, really.  The vendor has the

4    facility but you're sending people there to manage and observe

5    and correct and help run the protocol.  So it's not a handoff

6    and then you never see them again.  It's kind of an interactive

7    process.

8    Q.    Okay.  Two more topics I want to touch on briefly.  Did

9    Father Lemelson ever contact you before he put out his report?

10   A.    No.

11   Q.    Ever contact anybody at the company?

12   A.    Not to my knowledge, no.

13   Q.    If he had asked you about any of these things, would

14   you have provided him information about them?

15   A.    Yes, I would have.

16   Q.    Okay.  And Mr. Brooks pointed out that the S-1 became

17   public on July 1 of 2014.  Do you recall that?

18   A.    Yes.

19   Q.    And Father Lemelson's report came out on July 3, two days

20   later?

21   A.    Yes.

22   Q.    You testified about your work as an analyst for ten years

23   before you started Viking, right?

24   A.    Yes.

25   Q.    And you talked about initiating reports and all of the

1    work that goes into that, right?

2    A.   Yes.  Yes.

3    Q.   Have you ever, in your career, ten years on Wall Street,

4    seen somebody put out a report on a company in two days without

5    talking to management?

6    A.   I have not, no.

7            MR. DAY:  I have nothing further.

8            THE COURT:  Anything?

9            MR. BROOKS:  Very, very briefly.

10           THE COURT:  Yes.

11                     RECROSS-EXAMINATION

12   BY MR. BROOKS:

13   Q.   Dr. Lian, Mr. Day just asked you -- he just read to you,

14   and you agreed, that Viking was going to, quote, "retain

15   responsibility and control over the preclinical and clinical

16   studies," right?

17   A.   Yes.

18   Q.   Did Father Lemelson's report ever say that Viking wasn't

19   going to do so?

20   A.   I don't know if he said that or not.

21           MR. BROOKS:  Nothing further, Your Honor.

22           THE COURT:  Thank you very much.  See you tomorrow.

23           THE CLERK:  All rise for the jury.

24   (Jury exits.)

25           THE COURT:  So tomorrow, are they the Zoom witnesses?

1           MR. JONES:  Your Honor, so I think the plan tomorrow
2     is we will start the day with Mr. Voss because the two Zoom
3     witnesses are on the West Coast and we might as well have them
4     at the end of the day rather than the start of the day at
5     6:00 a.m.
6           THE COURT:  I just need to figure out when I need the
7     tech people to help on it.
8           MR. JONES:  We believe it's probably a couple hours on
9     direct and a couple hours on cross, if I'm representing what
10    Doug told me correctly.  So the Zoom witnesses would then be
11    the last hour, last hour and a half of the day.
12          THE COURT:  You mean in the afternoon?
13          MR. JONES:  Yes, I do, Your Honor.
14          THE COURT:  Okay.  So that's good to know.
15          MR. JONES:  That should give us time to set it up
16    during the day.
17          THE COURT:  All right.  Any documents in dispute
18    tomorrow?
19          MR. HOOPES:  I think not, as far as we know right now.
20          MR. DAY:  I don't think so.
21          THE COURT:  Perfect.  Okay.  All right.  Thank you.
22    See you then.  I need to --
23          MR. HOOPES:  8:30 or 9:00?
24          THE COURT:  I don't really need you unless something
25    comes up, you know.  It was useful this morning to go through

1   the documents, but if there are no documents, perhaps you

2   could --

3           MR. HOOPES:  I didn't want to be late.

4           THE COURT:  I don't need you here earlier and the

5   traffic has been a killer.

6           MR. DAY:  It was better this morning, Your Honor.

7           MR. HOOPES:  Much better.

8   (Proceedings adjourned at 3:59 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken October 27, 2021 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    1/6/22

16   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
17

18

19

20

21

22

23

24

25