1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3    SECURITIES AND EXCHANGE COMMISSION,    )
                            Plaintiff,      )
4                                           )
     vs.                                    )
5                                           )
     GREGORY LEMELSON and LEMELSON          )   NO. 18CV11926-PBS
6    CAPITAL MANAGEMENT, LLC,               )
                            Defendants,     )
7    and                                    )
                                            )
8    THE AMVONA FUND, L.P.,                 )
                            Relief Defendant.   )
9

10

11

12                BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT COURT JUDGE
13                     JURY TRIAL - DAY 3

14

15          John Joseph Moakley United States Courthouse
                         Courtroom No. 19
16                       One Courthouse Way
                    Boston, Massachusetts 02210
17

18                       October 28, 2021
                            9:13 a.m.
19

20

21             Kathleen Mullen Silva, RPR, CRR
                    Joan Daly, RMR, CRR
22                   Official Court Reporter
            John Joseph Moakley United States Courthouse
23               One Courthouse Way, Room 7209
                    Boston, Massachusetts 02210
24               E-mail: kathysilva@verizon.net

25          Mechanical Steno - Computer-Aided Transcript

1   APPEARANCES:

2

3           United States Securities and Exchange Commission
            Alfred A. Day, Esq.
4           Marc J. Jones, Esq.
            33 Arch Street, 23rd Floor
5           Boston, Massachusetts 02110-1424
            617.573.4590
6           for Plaintiff

7

8           Libby Hoopes, P.C.
            Douglas S. Brooks, Esq.
9           Thomas M. Hoopes, Esq.
            Brian J. Sullivan, Esq.
10          399 Boylston Street, Suite 200
            Boston, Massachusetts 02116
11          617.338.9911
            for Defendants Gregory Lemelson, Lemelson Capital
12          Management, LLC, The Amvona Fund, LP

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                               INDEX

3

4    WITNESS                                              PAGE

5

     BRUCE VOSS
6
         Direct Examination By Mr. Day                        4
7        Cross-Examination By R. Hoopes                      78
         Redirect Examination By Mr. Day                    127
8

9

10                            E X H I B I T S

11

12
     Exhibit No.                                        Received
13      130A      ....................................      78

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Good morning to everyone.  You're
 3   absolutely amazing.  I felt sure that during the middle of that
 4   nor'easter one of you would be late.  Everyone was on time.  I
 5   really appreciate it.
 6            Anyone speak about the case or see anything in the
 7   press?
 8            JURORS:  No.
 9            THE COURT:  Okay.  Let's get going.  The witness was
10   able to get here too, right?
11            MR. JONES:  Yes.
12            THE COURT:  I kept watching the news last night
13   thinking we were doomed.  We're okay.
14            MR. DAY:  Your Honor, the Commission calls Bruce Voss.
15                       BRUCE VOSS, Sworn
16            THE CLERK:  Could you please state and spell your name
17   for the record.
18            THE WITNESS:  May I take the mask off?
19            THE COURT:  Yes, you may.
20            THE WITNESS:  Thank you.
21            Good morning.  First name Bruce, B-r-u-c-e, last name
22   Voss, V like Victor, o-s-s like Sam.
23                       DIRECT EXAMINATION
24   BY MR. DAY:
25   Q.   Good morning, Mr. Voss.
```

1            We're going to be talking about a number of things in

2    detail but first I want to cut to the chase.

3            You spoke with the defendant by telephone on June 18

4    of 2014, correct?

5    A.   That's correct.

6    Q.   And then the defendant gave an interview the following

7    day, June 19, is that correct, as well?

8    A.   That's also correct.

9    Q.   Let's listen to what the defendant said about your June 18

10   conversation.

11           (Audio played.)

12           MR. DAY:  Cole, pull up the transcript, Exhibit No. 3,

13   and highlight the bit that we just heard.

14   Q.   So Mr. Voss, you have in front of you a transcript of the

15   June 19 interview and the part that's called out is the bit we

16   just listened to.  Can you see that?

17   A.   No.  My screen's not working.

18           THE COURT:  Oh, your screen's not up?

19           THE WITNESS:  No, it's blank.

20           MR. DAY:  Are all of your screens working?  Terrific.

21           THE COURT:  I know for me it would be a challenge from

22   here, but from there, can you see --

23           THE WITNESS:  I can, thank you.

24           THE COURT:  All right.  Thank you.  We'll get in touch

25   with tech, hopefully.

1  Q.   So Mr. Voss, the defendant said, "I had discussions with

2  management just yesterday -- excuse me, their IR firm."  Do you

3  have an understanding what he was referring to when he said

4  "their IR firm"?

5  A.   That would be me.

6  Q.   And he goes on to say "and they basically agreed.  And

7  they said, look, we understand Promacta is going away."  Do you

8  see that?

9  A.   I do.

10 Q.   Do you understand that that quote is attributed to you?

11 A.   I do.

12 Q.   Did you say those words to the defendant?

13 A.   Absolutely not.

14 Q.   Did you say anything to that effect?

15 A.   Absolutely not.

16 Q.   Did you say something that could have been interpreted

17 that way?

18        MR. HOOPES:  Objection.

19 A.   Absolutely not.

20        THE COURT:  Overruled.  Go ahead.  When they object, I

21 have to take a second to think it through.

22 Q.   How is it that you're sure that you didn't say that to the

23 defendant?

24 A.   Because it is not a true statement.  It's not even close

25 to being a true statement.  It's nothing I would ever say.

```
 1   Q.   And why do you say that?
 2   A.   Promacta as a drug was expected at that time to become a
 3   blockbuster drug, which means sales of more than one --
 4              THE COURT:  Is this mic not working; is that it?
 5              THE WITNESS:  Hello.  Can you hear me?
 6              THE CLERK:  Pull it in closer.
 7              THE WITNESS:  Test, one, two, three.
 8              THE COURT:  Perfect.
 9              THE WITNESS:  Can you hear me now?
10              THE COURT:  Yes.
11   A.   As I was saying, Promacta at the time was expected to
12   become a blockbuster drug, and that means it would have sales
13   of one million dollars.  That's a far cry from what this quote
14   says, which is going away.
15   Q.   Thank you, Mr. Voss.  We're going to come back to this,
16   but I'd like to turn now to your professional background.
17   Where are you employed?
18   A.   I work for a firm called LHA, also known as Lippert/
19   Heilshorn & Associates.
20   Q.   What kind of business is LHA?
21   A.   We are an investor relations agency.
22   Q.   Can you explain for the jury what that means?
23   A.   It means publicly traded companies engage firms like mine
24   to handle their communications with investors and prospective
25   investors.
```

1    Q.    When did you join LHA?

2    A.    I've been with them for 24 years.

3    Q.    Prior to joining LHA, did you work in the investor

4    relations field?

5    A.    I have.  I've worked in the investor relations field since

6    about 1985.

7    Q.    So about 36 years?

8    A.    Approximately.

9    Q.    37.  Now, I'm going to refer to investor relations as IR,

10   is that okay?

11   A.    That's how we do it as well.

12   Q.    Okay.  Terrific.  Now, in those 37 years in the industry,

13   was that mostly at IR firms?

14   A.    Most of it.  A couple of years in in-house corporate

15   positions, but the vast majority was with agencies on the

16   consulting side.

17   Q.    And agencies similar to LHA?

18   A.    Some were bigger.

19   Q.    Are you familiar with the term "public company"?

20   A.    I am.

21   Q.    What does that mean?

22   A.    That means the company has issued stock, and that stock is

23   publicly traded on one of the world's stock exchanges.

24   Q.    You mentioned that you worked in-house at several

25   companies.  Were either of them public companies?

1    A.    One was.

2    Q.    And what was your role there?

3    A.    I was -- at that firm I was the director of investor

4    relations.  It was an over-the-counter diagnostics company.

5    Q.    What does that mean, over-the-counter diagnostics?

6    A.    They sold diagnostic products you could buy at Walgreens

7    or Duane Reade.  They sold a test that was a blood test for

8    total cholesterol.

9    Q.    Over the course of your approximately 37 years in the

10   investor relations field, have most of your clients been public

11   or private companies?

12   A.    They are either public or in the process of going public.

13   Q.    About how many clients have you had over the years?

14   A.    I'd be guesstimating.  It's in the hundreds.

15   Q.    I want to shift gears a little bit and talk about some of

16   the rules that apply to people who are talking to investors.

17   Are you familiar with insider trading rules?

18   A.    I am.

19   Q.    What is insider trading?

20   A.    Insider trading is when you are in possession of material

21   non-public information which is basically important information

22   that may move the price of a stock.  Insider trading would

23   involve somebody actually trading on that information before it

24   is made public.

25   Q.    And that's prohibited, right?

1    A.    It is prohibited.

2    Q.    Are you privy to material non-public information from time

3    to time as an IR professional?

4    A.    I am.

5    Q.    And are you allowed to share that with people outside the

6    company?

7    A.    We are not allowed to share that outside of the company.

8    We are not allowed, as we just discussed, to trade on it.

9    Q.    Do you have an understanding of what could happen to you

10   if you shared material non-public information outside of your

11   role as an investor relations professional?

12   A.    I do.

13   Q.    What are some of those consequences?

14   A.    You could be cited civilly as well as criminally and in

15   turn charged by the government.

16   Q.    Do you know what Reg FD is?

17   A.    I do.

18   Q.    What is Reg FD?

19   A.    "FD" stands for fair disclosure, and that is a regulation

20   that went into effect a number of years ago that basically says

21   when a publicly traded company is sharing material non-public

22   information, it needs to do so in a broad public way, not

23   selectively to certain people or certain institutions.

24   Q.    And when you say "sharing material non-public

25   information," you mean making that information generally

1    available to the public?

2    A.   It would be making it publicly available via any number of

3    means.

4    Q.   How, if at all, does Reg FD affect your work as an IR

5    professional?

6    A.   It affects my work quite a bit.  It means anything that my

7    clients are announcing that is material or potentially material

8    has to be disclosed in a very broad way simultaneously to the

9    entirety of the investment community.

10   Q.   Let's talk a little bit more about your role at LHA.  What

11   is your position there today?

12   A.   My title is managing director.

13   Q.   Can you tell the jury a little bit about your day-to-day

14   responsibilities as managing director?

15   A.   I run the firm's health care practice, which is what I

16   have done for the last 24 years.  So my day-to-day involves a

17   combination of overseeing members of my team.  I'm based in Los

18   Angeles.  Some of my team is in LA.  The rest of my team is in

19   New York.  I oversee my team and their relations with our

20   clients and there are certain clients that I handle directly

21   myself.

22   Q.   So you've been focused on the health care industry for the

23   entire time at LHA?

24   A.   And before that I focused on health care beginning in

25   about 1990, when I moved from New York to San Francisco.

```
1   Q.   Have you worked with pharmaceutical companies over the

2   course of your career?

3   A.   I have.

4   Q.   Biotech companies?

5   A.   I have.

6   Q.   Numerous?

7   A.   Numerous, yes.

8   Q.   How big was your team in 2014?

9   A.   The team has varied in size over the years between

10  approximately eight and fifteen people, and in 2014 we were

11  closer to the eight side of that.

12  Q.   If you can estimate for the jury, how many clients did you

13  have in 2014?

14  A.   I would guesstimate that we had 25-ish clients that we

15  worked on during that year.

16  Q.   And Ligand was one of those clients?

17  A.   They were.

18  Q.   For how long had you provided IR services to Ligand?

19  A.   Ligand engaged LHA in 2007.  So seven years in 2014.

20  Q.   Is Ligand still a client today?

21  A.   They are.

22  Q.   And did you work with Ligand throughout the whole period,

23  2007 to the present?

24  A.   I did.  I do.

25  Q.   And in 2014 what was your role vis-a-vis Ligand?
```

1    A.   It had changed in March of 2014.  I had a senior vice

2    president supporting me on the Ligand client relationship and

3    he left the firm in March of 2014 and I took over his duties.

4    Q.   And so from March of 2014 to the present, has it been you

5    personally providing services to Ligand?

6    A.   Correct.

7    Q.   Were you involved in the IR services that LHA provided to

8    Ligand prior to March of 2014 as well?

9    A.   Yes.  I was part of the team, but the colleague who left

10   was the day-to-day contact.

11   Q.   Now, starting in March of 2014, what type of services did

12   you provide to Ligand?

13   A.   We did a number of things on behalf of Ligand.  They

14   ranged from helping them draft their news releases, which is

15   one of the ways you can make information public.  We would help

16   support their quarterly earnings process, which is drafting the

17   financial news release that gets issued every quarter, and then

18   there's a conference call that accompanies that news release.

19   We would help drafting the prepared remarks, the script for

20   that conference call.  We would help with large produced events

21   like an annual analysts day, which is a three-hour event or

22   thereabouts, whereby management does the deep dive into the

23   story for investors and analysts, among other things.

24   Q.   Did you have occasion to communicate with Ligand

25   management over the course of your work for the company?

1    A.    We communicated frequently, yes.

2    Q.    And who is John Higgins?

3    A.    John Higgins was and is the chief executive officer.

4    Q.    Was that the case from 2007 all the way through the

5    present date?

6    A.    He joined Ligand in 2007 and engaged LHA a couple of

7    months after he joined.

8    Q.    And who is Matt Foehr?

9    A.    Matt Foehr in 2014 was the chief operating officer and he

10   currently serves as president.

11   Q.    Now, as to Mr. Higgins and Mr. Foehr, are those two of the

12   individuals you communicated with in the course of providing

13   services to Ligand?

14   A.    Yes.

15   Q.    About how frequently would you talk to Mr. Foehr and

16   Mr. Higgins in 2014?

17   A.    It varied, and when -- you used the word "talk," it would

18   include talking by phone and email.  A lot of work was done by

19   email.  But if there was something going on, if we were working

20   on a project, the communication would be frequent and other

21   times the communication would be infrequent.

22   Q.    Did you have communications with other Ligand personnel as

23   well?

24   A.    I did.

25   Q.    Again, I'm focusing on 2014.  Who else?

```
 1    A.    Their general counsel is a gentleman named Charles
 2    Berkman, and I would interact with him, and they had a woman
 3    named Erika Luib, who did a number of things at Ligand, and one
 4    of her responsibilities was serving as the investor relations
 5    contact.
 6    Q.    In 2014 was Ligand a big client of LHA?
 7    A.    Big in what regard?  Fees or market cap?
 8    Q.    No.  Fees to LHA.
 9    A.    Not particularly, no.  That's one of the reasons I did not
10    replace the senior vice president on the account when he left
11    and took the duties on myself because it wasn't that big of a
12    client or that big of a relationship.
13    Q.    Is that true today as well?
14    A.    It's pretty much the same today as it was then.
15    Q.    And even though it wasn't a big client in terms of the
16    fees that LHA was receiving, did you take your work for Ligand
17    seriously?
18    A.    I take my work for all of my clients extremely seriously.
19    Q.    In 2014 do you believe that you had a good handle on
20    Ligand's business?
21    A.    I do.
22    Q.    And how did you come to know about the details of Ligand's
23    business in 2014?
24    A.    With Ligand, as with all of our clients, when LHA is
25    engaged, one of the first steps in our engagement is to hold
```

```
 1    what we call an informational due diligence session, which is
 2    the better part of a day, where we sit with management, various
 3    members of the management team and we talk about the company
 4    and the business and the future, and to the extent the past is
 5    relevant as well.  But we will spend anywhere from five to
 6    eight hours with management learning about the company.
 7    Q.   Let's turn now to the defendant, Father Lemelson.  When
 8    was the first time that you heard of the defendant?
 9    A.   The first time I heard of the defendant was on Monday,
10    June 16, 2014.
11    Q.   And how is it that you came to know of defendant Lemelson?
12    A.   I received an email that was his report as issued earlier
13    that day.
14    Q.   And you're referring to the June 16 report?
15    A.   I am.  The report that was issued on a website called
16    Seeking Alpha.
17    Q.   And you had never heard of the defendant prior to this?
18    A.   I had not.
19    Q.   And you referred to an email.
20         MR. DAY:  Can we pull up Exhibit 125, Cole?  And let's
21    go down to --
22         THE COURT:  Can you tell us what Seeking Alpha is.
23         THE WITNESS:  Seeking Alpha is a website.  It's a
24    financial news information website.  It's somewhat of an open
25    forum where contributors can post opinion pieces or research or
```

1   reports or stories about publicly traded companies.

2          THE COURT:  So anyone can submit?

3          THE WITNESS:  So far as I know.  I don't know what

4   kind of screening mechanism they might have before somebody can

5   submit, but it is -- there are many, many people who submit to

6   that site.

7          (Zoom interruption.)

8          (Discussion held off the record.)

9          THE COURT:  It's a brave new world.  Sorry for the

10  interruption.  Go ahead.

11  Q.   So Mr. Voss, we were looking at Exhibit 125.  Can you see

12  these exhibits on the screen?

13  A.   I still have no screen.  I see it.

14  Q.   If we go down to page 2, you'll see that there's an email

15  right at the very top of the page from Charles Berkman to John

16  Higgins, Matt Foehr, Nishan de Silva, Erika Luib and you.

17  A.   Right.

18  Q.   You mentioned all these names before except Nishan de

19  Silva.  Who is that?

20  A.   Nishan at the time was the chief financial officer of

21  Ligand.

22  Q.   Did you have occasion to communicate with him from time to

23  time?

24  A.   On occasion.

25  Q.   Mr. Berkman days, "FYI - I assume we may start to get

```
 1    questions based on this."
 2              MR. DAY:  Can we scroll down, Cole, and take a look at
 3    the attachment.
 4              THE COURT:  What am I looking at?
 5              MR. DAY:  This is an exhibit from --
 6              THE COURT:  What exhibit is it?
 7              MR. DAY:  125.
 8              Scroll down a bit to the attachment.
 9    Q.   So he attaches an article "Ligand Pharmaceuticals, Severe
10    competitive threat to key royalty program and going concern
11    risk drive 100 percent downside" by Amvona.  Do you see that?
12    A.   I do.
13    Q.   Is this the June 16 report by the defendant that you're
14    referring to?
15    A.   It is.
16    Q.   Is this the email that you referred to by which you
17    received it?
18    A.   It is.
19    Q.   Now, after you received this email from Mr. Berkman, did
20    you read the report?
21    A.   I did.
22    Q.   The whole thing?
23    A.   There's -- the report is basically twice.  If you click on
24    the link to Seeking Alpha, you'll read what was posted to
25    Seeking Alpha and within that is another link where you go to
```

```
 1    the actual report.  They're basically the same thing but the
 2    actual report contains some graphics that did not appear on the
 3    website.
 4    Q.   And you reviewed the report that had those graphics?
 5    A.   I reviewed both.  Both the Seeking Alpha post and the
 6    report.
 7    Q.   Can we pull up Exhibit 1, Cole.  Is this the version of
 8    the report you were just referring to?
 9    A.   That's the actual report, yes.
10    Q.   Let's look at the bottom of the last paragraph on the
11    first page of this.
12              MR. DAY:  Can you blow that up for me, Cole?  Thank
13    you.
14    Q.   The defendant wrote, "In light of the extraordinary risks
15    associated with Ligand as a going concern, the imminent threat
16    to Promacta royalties and based on superior firms' far lower
17    valuations, Lemelson Capital believes that Ligand's fair value
18    is roughly $0 per share, or 100 percent below the current stock
19    price."  Do you recall reading this on June 16 of 2014?
20    A.   I do.
21    Q.   What was your reaction to that statement?
22    A.   I was flabbergasted.
23    Q.   Why?
24    A.   A zero dollar fair value target says clearly the company
25    is worth nothing, and Ligand at the time had a market
```

```
 1    capitalization, which is the value of its securities, they had
 2    a market capitalization of more than one billion dollars.  And
 3    putting a price target of zero on it basically says there's
 4    nothing there, and that valuation is totally not supported.
 5    Q.    Now, have you had occasion to review other analyst
 6    reports, sell-side analyst reports about Ligand prior to this?
 7    A.    I have.
 8    Q.    And since 2014, have you also seen sell-side analyst
 9    reports about Ligand?
10    A.    Yes.
11    Q.    Have you ever seen anything like this in any of those
12    reports?
13    A.    No, but I wouldn't call this a sell-side report.  There's
14    a difference between this report and what I would call a
15    traditional analyst report.  Traditional analyst reports are by
16    men and women who work for brokerage firms and they issue
17    reports about publicly traded companies.  They're typically
18    rather detailed, deeply analytical in order to determine what
19    that analyst believes is the value of that company.  This
20    report is nothing like that.  This is report is narrative
21    without financial models, without any of the in-depth analysis
22    that would go into a traditional analyst report.
23    Q.    Let's take a look at a few of the other statements in the
24    report.  On the very first page, the third paragraph from the
25    bottom that starts "Above all."  The defendant wrote, "Above
```

```
 1   all, the company faces its biggest existential threat in what
 2   is likely to be a momentous impairment of its largest royalty
 3   generating asset, Promacta, a GlaxoSmithKline therapy that as
 4   recently as Q4 2013 accounted for as much as 72 percent of all
 5   royalties received by the company."  Do you see that?
 6   A.   I do.
 7   Q.   You talked a little bit about Promacta before.  But I want
 8   to ask you again.  When you read this, what was your reaction
 9   to it?
10   A.   A momentous impairment means that that asset is going to
11   be worth far less than it is right now.  My reaction to that is
12   this simply is not true.  It is accurate Promacta was a very
13   important product for Ligand.  They received royalties on the
14   sales of that drug by the licensee, which in this case is
15   GlaxoSmithKline.
16   Q.   And you knew that information at the time that you read
17   this, right?
18   A.   I did.
19   Q.   And that was based on your communications and work for the
20   company?
21   A.   Promacta was a drug discovered at Ligand well before I
22   worked with Ligand.  So it was already part of the Ligand
23   business model when we were engaged.
24   Q.   Let's take a look at page 3.  Under "Investment" -- oh,
25   sorry.  4.  My mistake.  Under "Investment Highlights," the
```

```
 1    paragraph with the b. in front of it.
 2              MR. DAY:  Let's blow that up, Cole.
 3    Q.    The defendant wrote, "Based on recent FDA comments,
 4    Gilead's revolutionary Sovaldi drug will virtually eliminate
 5    demand for Promacta," and it goes on about the royalty
 6    generating asset from there.  I want to focus on Sovaldi.  On
 7    June 16 of 2014 had you heard of Sovaldi?
 8    A.    I had.
 9    Q.    In what context had you heard of Sovaldi?
10    A.    Sovaldi is a drug by a company called Gilead Sciences that
11    had been approved, as I recall, in late 2013.  It was an oral
12    medicine.  It was a pill for the treatment of hepatitis C.  And
13    it was an extremely effective drug at treating hepatitis C.
14    Q.    Did you have an understanding of what the potential impact
15    of Sovaldi was on Promacta sales?  Again, I'm talking about --
16              THE COURT:  At this time, in June?
17              MR. DAY:  At this time, in June of 2014.
18    A.    I didn't have an understanding of what the impact might
19    be, other than there would be an impact, and what it would be
20    was to be determined.  It was a newly launched drug.  Just to
21    put this in context, Promacta as a drug helps the body to build
22    platelets.  And people with hepatitis C previously were treated
23    with interferon before Sovaldi came to the market, and many of
24    those patients were too sick to tolerate the interferon.  So
25    they took Promacta to boost their platelets and oftentimes kept
```

```
 1    taking Promacta while they were on interferon to keep their

 2    platelets up while they were being treated for hep C.

 3    Q.   Was Promacta used for other conditions in June of 2014?

 4    A.   It was.

 5    Q.   Which other conditions?

 6    A.   In addition to hepatitis C, it was used for a condition

 7    called idiopathic thrombocytopenia and also for a condition

 8    called AA, which is aplastic anemia disorders.

 9              THE COURT:  There's a question, MaryEllen.

10              THE WITNESS:  While she reads, can I get a glass or

11    bottle of water?

12              MR. DAY:  Permission to approach the witness?

13              THE COURT:  Yes.

14              THE WITNESS:  Thank you.

15              THE COURT:  Thank you.  The request is to have a

16    little bit about your professional background.  So I think --

17    why don't I let you do that.  Where he went to school.

18              MR. DAY:  Sure.

19              THE COURT:  Specific training in the bio business,

20    that kind of thing.

21              MR. DAY:  Sure.

22    Q.   Did you attend college, Mr. Voss?

23    A.   I did.

24    Q.   Do you have any advanced degrees beyond college?

25    A.   I have an MBA from New York University.
```

1    Q.    Okay.  What was your major in college?

2    A.    Undergraduate I have two degrees.  One is in business.

3    One is in theater from the University of Minnesota.

4    Q.    Now, as part of your MBA, did you become familiar with

5    general business and accounting principles?

6    A.    I did, also as an undergraduate.

7    Q.    Now, in the course of your career as an IR professional,

8    did you have occasion to learn more about the health care

9    industry, for example, through any kind of training?

10   A.    I learned about the health care industry kind of on the

11   job beginning in 1990 when I moved to San Francisco and my

12   clients at that point were primarily health care companies.

13   Q.    Thank you, Mr. Voss.

14         Going back to Promacta and Sovaldi, hoping that I'm

15   picking up in the right place, we were talking about the

16   potential impact of Sovaldi on the market for Promacta.  And

17   then we talked about ITP as another indication for Promacta,

18   right?

19   A.    Correct.

20   Q.    Okay.  So Sovaldi was approved when?

21   A.    I believe it was late 2013.

22   Q.    So pretty new at the time --

23   A.    Right.

24   Q.    -- of June 16 of 2014?

25   A.    Correct.

1    Q.    Do you recall when Promacta was approved for use in
2    connection with ITP?
3    A.    I don't.
4    Q.    Does 2008 sound about right?
5    A.    It was approved at the time for ITP.  So that is totally
6    feasible.
7    Q.    Fair to say that Promacta was a significant source of
8    revenue for Ligand for most of the time that you worked with
9    Ligand in that period from 2007 to 2014?
10   A.    During that period it was, yes.
11   Q.    And beginning in 2007, 2008 through June of 2014, were you
12   familiar with how Promacta was used to treat patients?
13   A.    I was.
14   Q.    Okay.  And that was in ITP?
15   A.    My familiarity at the time was that Promacta was used for
16   several indications or disease states with more to come, more
17   were being tested.  I also would add that Promacta was and is
18   sold globally.  So different countries around the world may
19   have approvals for different indications.  It's not like
20   there's a global approval and everyone everywhere is using the
21   drug for the same thing.  It's done on kind of a one-off basis.
22   Q.    I want to back up a little bit and talk about the
23   sell-side analyst that you referred to earlier.
24   A.    Okay.
25   Q.    Do sell-side analysts meet with management from time to

1   time?

2   A.   They meet with management all the time.  Their job is, in

3   essence, to be very, very smart about the company and to write

4   about the future prospects for that company.

5   Q.   Are you familiar with the term "initiating coverage"?

6   A.   I am.

7   Q.   What is that?

8   A.   The initiation of coverage is when an analyst issues his

9   or her first report on a company, when they begin covering that

10  company, and those reports are typically long and detailed, and

11  subsequently those analysts stock in updates which are

12  typically far shorter, but the initiation report, they could be

13  several hundred pages at times.

14  Q.   And in your experience, do analysts typically meet with

15  management or communicate with management before writing that

16  first report?

17  A.   I have never seen an analyst initiate coverage without

18  first meeting with management probably multiple times.

19  Q.   Do analysts hold positions, meaning own stock, in the

20  companies that they cover?

21  A.   I believe they're prohibited from doing so.

22  Q.   Now, you understand that at this time, June of 2014, the

23  defendant had a short position in Ligand?

24  A.   He stated that in his report, yes.

25  Q.   What is a short position?

1    A.    A short position means that the defendant in this case had

2    borrowed stock with the expectation the price of that stock

3    would go down, and then they would replace the stock at the

4    lower price and their profit would be the difference.

5    Q.    Is it your understanding that the defendant would profit

6    if the price of Ligand stock went down?

7    A.    Correct.

8    Q.    I think you said this before, but just to be clear, do you

9    consider the defendant to be an analyst?

10   A.    I don't.

11   Q.    How would you characterize his reports?

12   A.    I would call them reports.  I wouldn't characterize them

13   as an analyst report or a research report.  They are a report.

14           I would also add that traditional analysts, they

15   distribute their research via a number of portals that the

16   investment community pays to access that research.  They don't

17   distribute via Seeking Alpha.  They'll distribute via

18   Bloomberg, via First Call, via other portals that are actually

19   fairly expensive to subscribe to, but not through an open

20   website like Seeking Alpha.

21   Q.    Did you have any communications with the defendant before

22   the first report came out on June 16?

23   A.    I did not.

24   Q.    To your knowledge, did Ligand's management, Mr. Foehr or

25   Mr. Higgins, have any communications with the defendant?

1    A.    To my knowledge, they did not either.

2    Q.    Can we pull up Exhibit 41, Cole.  Now, right at the

3    beginning of my questions this morning, you acknowledged that

4    you had a conversation with the defendant on June 18, correct?

5    A.    Correct.

6    Q.    And that's 2014.  So two days after the first report came

7    out?

8    A.    Correct.

9    Q.    How did that conversation come about?

10   A.    Right when the report came out management had a decision

11   to make, namely, what do we do about it?  Do we respond?  Do we

12   not respond?  And if we do respond, how might we do that?  What

13   might we say?  All options were on the table.

14   Q.    And what course did the company ultimately take?

15   A.    The company ultimately decided not to respond publicly to

16   this report.  And by "respond publicly," I mean there was no

17   news release issued, there was no SEC filing.  There was no

18   conference call.  There was nothing done publicly to refute the

19   report.

20   Q.    And when you say "to refute the report," essentially a

21   public communication calling out the report by name?

22   A.    It would have -- that would have been one option to, in

23   essence, say this report came out.  It makes the following

24   points that are incorrect.  And here is the correct view of all

25   of those points.  That is in theory what might have been done.

1   Q.   But the company continued to make public statements about

2   Promacta and its business, right?

3   A.   They continued business as usual with this new topic

4   entering into the mix, but, as I mentioned, ultimately decided

5   not to go public with any sort of response.

6   Q.   Okay.  Why did the company choose to take that approach?

7   A.   Clearly there were errors and problems with that report.

8   So there was plenty to say if they chose to say.

9        The problem is if you go public with a response, you

10  bring more visibility to that report.  Seeking Alpha is not

11  that widely read.  Now suddenly you're making it even more

12  visible and people who hadn't seen the report are going to read

13  it and you're basically drawing attention to something that you

14  do not believe is accurate in the first place.

15       By responding publicly you also bestow credibility on

16  the report.  The mere fact that you're responding shows that

17  you take the report seriously and that in turn gives it

18  credibility and the readers may think there's something here.

19  I need to read up on this.

20       And I think the third consideration is if you respond

21  publicly, you invite a response to your response, which means

22  you're just going to continue the dialogue, which serves to

23  bring more and more attention to the report.

24  Q.   In your view, in 2014, was that approach consistent with

25  your experience as an investor relations professional?

1    A.   That approach was appropriate for this situation.   There

2    are other situations where a client would go public and would

3    go point by point and counteract the report, but with this

4    particular report, given the nature of the author and the

5    distribution route and the zero dollar price target and

6    assorted other considerations, Ligand chose to do nothing.

7    Q.   Now, you mentioned that Seeking Alpha is perhaps not the

8    most widely read platform for this type of information.   I

9    think that's roughly what you said?

10   A.   That is correct.

11   Q.   Did you nevertheless hear from investors about the report?

12   A.   I got the occasional call from investors about this

13   report, yes.

14   Q.   To your knowledge, did the company receive inquiries from

15   investors?

16   A.   They did as well.

17   Q.   And did the company, in your understanding, receive any

18   inquiries from its partners?

19   A.   I believe they did.

20   Q.   Okay.   So I wanted to talk a little bit about the timing

21   of how your call with the defendant came about.

22        MR. HOOPES:   I'm going to object, Your Honor.   We

23   agreed my client was going to be called Father Lemelson.   After

24   three days in trial he's calling him the defendant.   I don't

25   know what the purpose is, but I'd ask that he be instructed to

1    call him Father Lemelson.

2            MR. DAY:  He is the defendant.  That's often how I

3    refer to a defendant, but I'll take Your Honor's guidance.

4            THE COURT:  The defendant here is Father Lemelson.  So

5    you'll understand that sometimes he'll use one term, sometimes

6    another.  That's fine.

7    Q.   To your recollection, was there a call scheduled with a

8    member of Ligand's management for June 18?

9    A.   There was.

10   Q.   Okay.  And who was that?

11   A.   We did not know that at the time the report came out on

12   Monday, the 16th, but we subsequently learned that a call was

13   scheduled for that Wednesday, the 18th, at 1:00 Pacific time,

14   4:00 in Massachusetts, with Matt Foehr, the COO.

15   Q.   Let's take a look at the second page of Exhibit 41.  Right

16   down at the bottom Matt Foehr writes to you and John Higgins

17   both.  "I was just looking at my meeting schedule for tomorrow

18   ... (Wednesday) at 1:00 Pacific Time (it was another call that

19   was originally scheduled for Thursday with a known long-term

20   holder - both were booked earlier - unfortunate.  We can, of

21   course, huddle in advance of 1:00 p.m. Pacific Time if we

22   decide taking the call is worth doing, but I just wanted to be

23   sure to mention that."

24           Do you have an understanding of who Mr. Foehr is

25   referring to when he says he has a call scheduled for the 18th

1   at 1:00 p.m.?

2   A.   That call was scheduled with Father Lemelson.

3   Q.   And if we go up to the very top on the first page of this

4   email, Matt writes again to you and Mr. Higgins, "I looked at

5   these with Erika this morning and will forward fine details in

6   a moment.  In general, emailings on Thursday and Friday of last

7   week - Erika called him back on Friday morning to schedule a

8   time for this week for an introductory call, but his assistant

9   said he was busy and could not talk to schedule."  Do you see

10  that?

11  A.   I do.

12  Q.   Is that Erika Luib?

13  A.   It is.

14  Q.   Is it your understanding that Ms. Luib had scheduled the

15  call with Matt Foehr on Friday, that would have been the 15th

16  of June?

17  A.   Correct.

18  Q.   That's before the report came out?

19  A.   Correct.  The report came out the following Monday.

20  Q.   Why did you take the call with the defendant instead of

21  Mr. Foehr?

22  A.   There was internal discussion about how to handle the

23  scheduled call with Mr. Foehr, whether he should keep it,

24  whether he should cancel it, who else might be on the call with

25  him, whether someone might call Father Lemelson ahead of time

1   to determine whether that call even made sense to keep.

2   Q.   If we scroll down to the second page here, the sort of --

3          JUROR:  Excuse me.  Can we have somebody close that

4   door?  Thank you.

5   Q.   The email in the middle, Mr. Higgins to you and Mr. Foehr,

6   he writes, "As I see it, we have three choices:  Take the call,

7   cancel the call," or "3) have Bruce call in lieu of Matt."  Are

8   these the options that were under discussion at the time?

9   A.   Correct.

10   Q.   And you and Mr. Foehr and Mr. Higgins settled, I gather,

11   on the third option?

12   A.   We did.

13   Q.   What was the purpose of you talking to Father Lemelson in

14   advance of any communication with Mr. Foehr?

15   A.   There were a couple of purposes for that call.  The main

16   purpose was to determine whether or not Matt should keep the

17   call for later that day.  And that determination would be based

18   on my understanding of whether Father Lemelson would be open to

19   hearing the counter-arguments to the various points he made in

20   his report or whether he would not be open to hearing those

21   arguments and, therefore, it would be a waste of Matt's time

22   and in turn give Father Lemelson an opportunity to refresh his

23   report and reissue it after speaking with management.  That was

24   the primary reason.

25          Other reasons to speak with him were to find out a

1    little bit more about him and his fund because we knew
2    virtually nothing about either.  I have access to various
3    databases about investors and their funds, but Father
4    Lemelson's fund was too small in terms of dollars to be
5    included in those databases.  So we knew very little about him.
6    Q.   Mr. Voss, could you move the microphone a little closer.
7    You can actually pull it towards you if that's easier.  I just
8    want to make sure everybody can hear you clearly.
9         MR. DAY:  Cole, let's go back to Exhibit 125 for a
10   moment.
11   Q.   Now, this email at the very top here is from you to
12   Charles Berkman, Mr. Higgins, Mr. Foehr, Nishan de Silva, and
13   Erika Luib.  Do you see that?
14   A.   I do.
15   Q.   Are these essentially your initial reactions that you're
16   communicating to this group?
17   A.   As it says, yes, "I've quickly read it and here are my
18   thoughts."
19   Q.   Okay.  You in the third paragraph write, "The key issues
20   that get rehashed seem to be that Promacta is doomed because of
21   new HCV therapies."  Do you see that?
22   A.   I do.
23   Q.   What did you mean in writing this to this group?
24   A.   The purpose of this memo, among other things, was to give
25   my initial take on the report, and one of the areas I wrote

 1    about was trying to summarize what the key issues are raised in

 2    Father Lemelson's report.

 3    Q.   Now, you don't mention ITP here.  Why is that?

 4    A.   I don't believe the report even mentioned ITP, and if it

 5    did, it was not one of the key issues.

 6    Q.   But you understood at this time that ITP was a separate

 7    indication?

 8    A.   Correct.

 9    Q.   We can take down Exhibit 125.

10         Do you recall one way or another whether USA Today

11    picked up and wrote about Father Lemelson's June 16 report?

12    A.   I do.

13    Q.   Okay.  What were the circumstances around that?

14    A.   As I recall, USA Today wrote a brief report on the report,

15    a brief article on the report, and they posted that brief

16    article to their website.  It was not in the print edition of

17    the paper.  It was on their website.

18    Q.   What was your reaction to USA Today picking up or

19    reporting on Father Lemelson's report?

20    A.   When I read the brief article by USA Today, they were

21    talking about Father Lemelson's prior trades, his prior

22    positions.  One was in World Wrestling Federation.  So my take

23    of that report was they're reporting on the news.  USA Today is

24    writing about the news of Father Lemelson's report and giving a

25    little bit of context to that report.

1    Q.   Can we pull up Exhibit 225.  And let's go down to the

2    fourth page, first full paragraph.  Actually, I guess we should

3    look at page 3 first.  At the very bottom do you see writing

4    or -- I'm sorry.  Oh, yes, you're writing on June 17 I believe

5    to John Higgins based on the response right above this.  Do you

6    see that?

7    A.   I do.

8    Q.   Okay.  And then at the top of the next page is where this

9    email continues.  You write, "Regarding USA Today, I thought

10   that if we didn't participate in the article it would not move

11   forward as otherwise it's simply a mouthpiece for Lemelson."

12   You're referring to the USA Today article that you just

13   testified about?

14   A.   I am.

15   Q.   Why did you write this?

16   A.   We had -- Ligand had been given the opportunity to speak

17   with the author of that article ahead of time and declined that

18   offer.

19   Q.   Now, why did the company decline the offer?

20   A.   Well, as it says here, there's a chance without

21   management's perspective on the piece that there is no article.

22   So by not responding, the whole possibility of an article might

23   go away.

24         The other consideration that's not in this email is

25   if you grant an interview to a reporter, the article is

1  probably going to be longer, because it will include management

2  commentary, and we didn't want that either.  We didn't want an

3  article at all and we surely didn't want a longer article.

4  Q.   And you mentioned Gary Strauss here.  Who is that?

5  A.   He's the gentleman who wrote the article for USA Today.

6  Q.   Did you end up speaking with Mr. Strauss?

7  A.   I did.

8  Q.   Can you tell the jury how that conversation went?

9  A.   As I recall, I spoke with him --

10       THE COURT:  You're not going to -- I don't think it's

11  appropriate to put on what Mr. Strauss said.  You can say what

12  you told Mr. Strauss.

13       THE WITNESS:  I'm sorry.  I couldn't hear you.

14       THE COURT:  I don't blame you.  You can say what you

15  said to Mr. Strauss but not what Mr. Strauss said.

16       THE WITNESS:  Okay.

17  Q.   Let me phrase it a little differently.  What was the

18  purpose of calling Mr. Strauss?

19  A.   The purpose was, in essence, to learn why he wrote that

20  article because it seemed, as it says here -- I believe it says

21  here, a mouthpiece, that the article was in essence just

22  rehashing what Father Lemelson's report had said, which is not

23  really journalism.  That's just providing a mouthpiece to the

24  report.

25  Q.   What was the outcome of your conversation with

1   Mr. Strauss?

2   A.   As I recall, Mr. Strauss reiterated the offer to speak

3   with Ligand Management.  And if he were to speak with them, he

4   would update and repost his article.

5   Q.   Did he withdraw the article?

6   A.   To my knowledge, no.

7   Q.   Did you ask him to?

8   A.   I wouldn't have the ability to have him do that.  So no, I

9   would not ask him that.  It's inappropriate.

10  Q.   In your role as an investor relations professional, do you

11  from time to time communicate with the press?

12  A.   LHA is not a public relations agency.  We don't do media

13  relations or PR, but on occasion I do interact with the press

14  on behalf of my clients.

15  Q.   Would this be one of the situations in which you would do

16  it, where you felt there was -- well, tell me why this was a

17  situation where you felt it was appropriate to contact the

18  press.

19  A.   Right.  I would not be contacting the press to pitch a

20  story, trying to create interest in a story.  I would typically

21  be contacting the press if they called me, I'd be speaking with

22  them, or in these kind of situations.

23  Q.   Now, I'm going to get out of chronology here for a moment.

24        MR. DAY:  Can we pull up Exhibit 78.

25  Q.   Did there come a time that there was some coverage of

 1    Father Lemelson's reports in a publication called BioWorld?

 2    A.    There was.  BioWorld Today.

 3    Q.    And that was in August of 2014?

 4    A.    I believe so, yes.

 5    Q.    What is BioWorld Today?

 6    A.    It is a daily publication, as the name would suggest.  It

 7    is written for the biotechnology industry and it is a --

 8    basically a newsletter that is emailed out each day that

 9    includes a number of stories.  Everything from company news,

10    product news, executive turnover and changes, anything that

11    might relate to the biotechnology industry.

12    Q.    Now, if we go down to the third page of this document, at

13    the very bottom you write to Mr. Higgins, Mr. De Silva, and

14    Mr. Foehr, "you may have seen this already, but the Ligand

15    story starts on page 1."  Is this a reference to the BioWorld

16    story that included a reference to Father Lemelson's reports?

17    A.    Yes.

18    Q.    Mr. Higgins writes back to you above that, "BioWorld

19    putting Lemelson in print is bad news.  What do you propose

20    doing about it?"  Do you have an understanding of why

21    Mr. Higgins thought this was bad news?

22    A.    It gives added visibility to Father Lemelson 's report in

23    Ligand's industry.  This is the publication that is read by

24    investors, analysts, pharmaceutical executives, partners,

25    prospective partners.  This hits very close to home for Ligand.

1    Q.   Now, right above that at the very top of the page you

2    write, "I've tried reaching Randy a couple of times this

3    morning, but we've yet to connect.  I'll let you know when we

4    do."  Who's Randy?

5    A.   The author of that article was a gentleman named Randy

6    Osborne.

7    Q.   Well, why were you reaching out to Randy?

8    A.   As I recall, it was similar to why I reached out to USA

9    Today, to learn a little bit more about why he wrote that

10   article.

11   Q.   And did you, in fact, speak with this individual?

12   A.   I did.

13   Q.   What was the outcome of that call?

14   A.   As I recall, there was no specific outcome to the call.  I

15   spoke with him and I learned more about why he wrote this

16   article and a little bit of background on it, but there was no

17   specific outcome.

18   Q.   Let me go to the very first page of the document.  Just

19   down a little bit from the top there's an email from you

20   essentially summarizing your call.

21   A.   Right.

22   Q.   We don't need to read this into the record, but just take

23   a moment to look at it.

24            (Pause.)

25   A.   I've read it.

1    Q.    Did BioWorld withdraw the story?

2    A.    To my knowledge, no.

3    Q.    Did you ask BioWorld to do that?

4    A.    To my recollection, no.

5    Q.    You write at the bottom here, "After getting him to agree

6    not to write anything on Lemelson regardless of what he hears,

7    he's going to call Lemelson to see if as a journalist he can

8    learn more about him, his fund, his position, his alliances,

9    and will report back to me."  Did you ask him not to write

10   anything further about Father Lemelson's reports?

11   A.    I don't recall that I specifically asked.  I may have.

12   Randy and BioWorld are very pro industry.  They --

13           MR. HOOPES:  Objection.  Asked and answered.

14           THE COURT:  Yes.  Sustained.

15   Q.    Okay.  His offer, as recounted here, to call Father

16   Lemelson and report back to you, did that happen?

17   A.    I don't follow the question.  Did he call me back to

18   report on anything he might have learned from Father Lemelson?

19   Q.    Yes.

20   A.    He did not.

21   Q.    Was this his idea or yours?

22   A.    As I recall, this conversation was kind of iterative where

23   we were talking and I was explaining to Randy that we know

24   nothing about this person or this fund.  They came out of left

25   field.  And he said in essence neither do I.  And perhaps as a

1    journalist -- I probably mentioned to him I got no information

2    in speaking with Father Lemelson either about him or his fund.

3    And Randy volunteered that perhaps as a journalist --

4            MR. HOOPES:  Objection.

5            THE COURT:  Yeah.  I'll sustain that.  That's hearsay.

6            MR. DAY:  Okay.  Let's move on.

7    Q.   I want to turn now to the call that you had with Father

8    Lemelson on June 18.  Had you set up a specific time to speak

9    with the defendant?

10   A.   No.

11   Q.   How did you reach out to him on the 18th?

12   A.   The database, as I referred to previously that had very

13   little on Father Lemelson, his fund, they do include an address

14   and a phone number.  So I reached out to him by calling that

15   phone number.

16   Q.   And was that -- what time of day was that?

17   A.   As I recall, it was before 9:00 a.m. Pacific Time.

18   Q.   Did you reach Father Lemelson?

19   A.   No, not on that call.

20   Q.   Did you speak with anybody when you made that call?

21   A.   I spoke with the woman who answered the phone, explained

22   who I was and why I was calling.  She put me on hold and then

23   came back and said that, "Father Lemelson is not available,"

24   and, as I recall, I then left a voicemail message for Father

25   Lemelson.

1    Q.    And did Father Lemelson call you back?

2    A.    He did.

3    Q.    When was that?

4    A.    Approximately one hour later.

5    Q.    Where were you when he called you back?

6    A.    In my office in Los Angeles.

7    Q.    Did the call come in through a receptionist or did he call

8    you directly?

9    A.    He called me directly, as I had left my direct dial phone

10   on the voicemail.

11   Q.    Now, I want to ask you sort of an overall question about

12   the call.  Could you describe to the jury a bit the tone of the

13   call with defendant Lemelson?

14   A.    The tone I would characterize as being a freight train,

15   that -- it was talking to a person who just kept coming at you,

16   just had lots of things to say, barely came up for air, just

17   kept spewing forth various thoughts and the like, and I was on

18   the phone listening to this freight train conversation or very

19   one-sided conversation, at least at the beginning.

20   Q.    Have you ever had a call like that with any other analyst

21   or investor?

22   A.    I have not, no.

23   Q.    Did you take notes of your call with defendant Lemelson?

24   A.    I did.

25   Q.    And is it your practice generally to take notes during

1    phone calls?

2    A.   Not always, but I knew this was a call that I would be

3    reporting back to my client about it.  So I took notes so I

4    would have an accurate record of what was said, what was

5    discussed.

6             MR. DAY:  Can we pull up Exhibit 130, Cole.

7    Q.   Are these the notes of your call?

8    A.   Excuse the handwriting, but yes, those are my notes from

9    the call.

10   Q.   We'll come back to that in a moment.  Can you explain to

11   the jury what the typed part is?

12   A.   Yeah.  Going into the call, I had typed out various points

13   to make, questions to ask, topics to explore.  Not necessarily

14   an outline for the call, but just some items to refer back to

15   during that call.

16   Q.   At the very top you write, "About Lemelson Capital, AUM"

17   and "Size of short."  What's that referring to?

18   A.   That's kind of the facts and figures about Father Lemelson

19   and his fund.  "AUM" is assets under management, which is how

20   much money does he manage in that fund, what's the size of the

21   fund.  And "Size of the short" is how many shares he has

22   shorted in Ligand.

23   Q.   Did you get that information?

24   A.   I got neither.

25   Q.   You wrote something right next to that.  What does that

1  say?

2  A.   I did.  It says "Don't" -- the word "disclosed" scratched

3  out, followed by the word "divulge."  So it says "don't

4  divulge."

5  Q.   Is that something that Father Lemelson said to you?

6  A.   It is.  He told me he does not divulge the assets under

7  management.  Likewise, he does not divulge the size of his

8  short.

9       MR. DAY:  Okay, Your Honor.  We have prepared a

10  demonstrative exhibit that has the notes, the handwritten notes

11  typed out, and my understanding is that the defense does not

12  object to putting this into evidence.

13       MR. HOOPES:  We don't, Your Honor.

14       MR. DAY:  Can I publish that to the jury?

15       THE COURT:  I haven't seen it.  But is it a big poster

16  or is it --

17       MR. DAY:  This is a PowerPoint presentation.

18       THE COURT:  Oh, you'll put it on the screen?

19       MR. DAY:  It will go up on the screen, but I thought

20  it would be helpful for the jury to have a copy.

21       THE COURT:  You're going to hand it out?  That's fine.

22       MR. DAY:  Your Honor, would you like a copy as well?

23       THE COURT:  I think so.

24       MR. DAY:  I also wanted to hand out Exhibit 130 for

25  the sake of comparison.  Permission to approach?

```
 1              THE COURT:  Sure.
 2              MR. DAY:  Hopefully there are enough copies.  There
 3    are two documents, if you would pass them along.
 4              Can we pull up the demonstrative?  Okay.
 5              THE WITNESS:  Now my screen is working.  Thank you.
 6              THE COURT:  Magic.
 7    Q.   Mr. Voss, I want to focus your attention on the first
 8    called-out handwritten notes here.  The way this works is
 9    they're highlighted in blue on the full page of the document on
10    the left.  Then it's blown up at the top right.  And then we've
11    added a typewritten version of your notes.
12              So this note I believe says "6/8/14 8:44 a.m., LVM."
13    What did you mean by that?
14    A.   That means on June -- it's June 18, not 8, on June 18 at
15    8:44, and it's actually 8:55 a.m., "LVM" means left voicemail.
16              THE COURT:  Who typed this up, the SEC did?
17              MR. DAY:  It's based on the deposition testimony.
18    Your Honor, that's a typo.  We will fix it for the final
19    exhibit.
20              THE COURT:  All right.  So on June 18 was the phone
21    call.
22              MR. DAY:  Yes.
23    Q.   Then you write, "9:56 to 10:16 a.m."  Is that the duration
24    of the call?
25    A.   That's the actual call when Father Lemelson rang me back.
```

1    Q.    Then you write "number came up as private."  What did that

2    refer to?

3    A.    On my office phone I have a little screen for caller ID.

4    On that screen when Father Lemelson rang me, it said "Private."

5    Q.    Now, we already talked about this one.  Let's go to the

6    next one here.

7             You wrote "10 names as options."  What does that

8    refer to?

9    A.    This refers to one component of Father Lemelson's report

10   was making comparisons of Ligand to other companies, and the

11   argument was the valuation of Ligand is way too high when

12   compared with these other companies, but the other companies he

13   compared Ligand to were large global pharmaceutical companies

14   and not small biotechnology companies.  So this comment says,

15   "Approximately 10 names as options."  That would be ten names

16   or so that I could provide as options.

17            You see above that typed out "Your PE comes are way

18   off."  That's what this applies to.  That's a valuation.  Price

19   to earnings is "PE."  So this comment is, I have about 10 more

20   names I could give you as options that might be more

21   appropriate than the ones you used.

22   Q.    And this call lasted about 20 minutes; is that right?

23   A.    That's correct.

24   Q.    One thing I skipped over inadvertently is in your

25   typewritten notes you wrote, "Promacta is not a hepatitis drug;

1    it's supportive care to be used with other HCV drugs including

2    Sovaldi and not all patients will be on Sovaldi, especially

3    OUS."  What were you referring to there?

4    A.   In Father Lemelson's report, among other errors, he

5    occasionally talked about Promacta as if it were a treatment

6    for hepatitis C, and it's not.  As I mentioned before, it's a

7    treatment for low blood platelets, not for hepatitis C.  So it

8    needed to be clarified what Promacta is and does within the

9    realm of hepatitis C treatment.

10             And the other point -- perhaps the primary point

11   there is that not all patients on Sovaldi will -- not all

12   patients will be on Sovaldi.  It was an expensive drug at the

13   time, it still is, and in particular outside of the United

14   States where health care budgets are perhaps a little tighter.

15   Q.   Did you convey that information to defendant Lemelson in

16   the course of the call?

17   A.   Absolutely yes.  That and more.

18   Q.   Now, you write in this section, "Even BTK, Ligand price, X

19   sales, X book."  Can you explain to the jury what you meant

20   here?

21   A.   This is on that same topic of the comparative companies

22   that Father Lemelson used in his reports.  "BTK" is a biotech

23   index.  It trades on the American Stock Exchange.  That would

24   be a more appropriate comparison of Ligand versus the BTK.

25   What this also says is the Ligand share price might be looked

```
 1   at in terms of a sales multiple or other multiples, a book
 2   value multiple, that Father Lemelson was focused on the PE
 3   multiple, which is earnings, and there's other ways to value
 4   biotechnology companies, the more common of which is a sales
 5   multiple.
 6   Q.   Is this information that you conveyed to Father Lemelson
 7   as well?
 8   A.   I don't recall if I actually got into this particular
 9   topic or not.
10   Q.   But you did convey to him that you felt his valuation was
11   off?
12            MR. HOOPES:  Objection.  Leading.
13            THE COURT:  Sustained.
14   Q.   Did you convey any information to him about his
15   methodology of valuing the company?
16   A.   I don't recall if I specifically went into this part of
17   his report.
18   Q.   Next there's a note that says, "I bet he doesn't want to
19   speak now, tried last."  Do you recall what this was a
20   reference to?
21   A.   I do.  I just want to flag here that these notes were
22   taken during the conversation.  So you're talking, you're
23   listening, you're thinking, you're taking notes all at the same
24   time.  So this is not a transcription of the conversation.
25   There are things maybe not in my notes.  I wrote down as much
```

1    as I could as quickly as I could and as neatly as I could,

2    believe it or not.

3          What this says is Father Lemelson told me earlier in

4    the conversation, "I bet he doesn't want to speak now, tried

5    last."  That's referring to I bet Matt Foehr doesn't want to

6    speak with me later today.  "Tried last" is probably an

7    incomplete thought, "tried last Friday" or something like that.

8    Q.   Then you write, "We think the report is factual and from

9    public information and our own research."  Do you see that?

10   A.   I do.

11   Q.   Is that something Father Lemelson said to you?

12   A.   It is, and these were the initial notes of the

13   conversation, which is -- when I mentioned before, I used the

14   term freight train, this is when Father Lemelson was saying

15   various things he wanted to say, and I was jotting them down.

16   Q.   Next you write, "Next steps depend on outcome of

17   discussions and fix errors."  What's your recollection of what

18   this refers to?

19   A.   That refers to any next steps that Father Lemelson might

20   take with the report.  Those next steps depend on the outcomes

21   of any discussions, anything he might learn, and if there are

22   errors to be fixed.

23   Q.   Did he ever publish any kind of an update to his June 16

24   report that incorporated any of the things you told him on this

25   call?

1  A.   He subsequently published several more updates or several

2  more reports but not specific to my call with him, no.

3  Q.   You wrote "Roth was Ligand's response."  What does that

4  mean?

5  A.   Just to clarify, "LGND" is the ticker symbol under which

6  Ligand trades.  So LGND and Ligand are one and the same.

7            What this is saying is that Roth was Ligand's

8  response.  Roth Capital Partners is an investment bank, and one

9  of their analysts follows Ligand, and that analyst issued a

10  report after Father Lemelson's report came out and basically

11  took Father Lemelson's work to task.

12  Q.   And was this something that Father Lemelson said to you?

13  A.   It is.  And what he's saying here is the Roth report was

14  everything Ligand would want to say otherwise, and I've seen

15  that.

16  Q.   To your knowledge --

17            THE COURT:  Wait a minute.  Are those your words or

18  are those Father Lemelson's words?

19            THE WITNESS:  Those are Father Lemelson's words.

20            THE COURT:  That's how he understood the Roth analyst

21  report?

22            THE WITNESS:  Right.

23  Q.   To your knowledge, did Ligand ask Roth to issue a response

24  to Father Lemelson?

25  A.   To my knowledge, no.  And I would add that Roth, among --

1           MR. HOOPES:  Objection.  Asked and answered.

2           THE COURT:  Yes.

3           THE WITNESS:  I'm sorry?

4           THE COURT:  What's the next question.

5           MR. DAY:  Okay.

6    Q.   You wrote, "No one has identified anything wrong with the

7    report."  Was that a statement of -- or your notes of a

8    statement by Father Lemelson?

9    A.   That is.  That is him saying that no one to date has

10   identified errors or anything wrong with his report.

11   Q.   Did you point out any errors in his report in this call?

12   A.   I pointed out a handful of them, but by no means all of

13   them.

14   Q.   You write here, "BV:  Price target of zero is very

15   egregious."  What is that referring to?

16   A.   Two thoughts here.  If you notice above that there's a

17   line, and, as I recall, I put that line when the conversation

18   shifted from what I would say was a lecture to more of a

19   discussion.  So now we're into more of a discussion mode.

20           I'm quoting myself here.  Most of my notes are things

21   Father Lemelson said to me, but every now and then I would

22   write down something I said.  So here I noted that I said a

23   price target of 0, which is the target on his report, is very

24   egregious.

25   Q.   Why did you say that?

1    A.    Because it's true.  Because, as we discussed before,

2    you're saying the company has no value and that's just mind-

3    boggling.

4    Q.    You wrote, "Analysts have vested interest."  What's that a

5    reference to?

6    A.    That's Father Lemelson saying to me that the sell-side

7    analysts have a vested interest in what they do and what they

8    write.  This likely was in response to a comment I made that

9    not only is Ligand not worth zero but the analysts who followed

10   the company in the main believe it's worth even more than it's

11   currently trading at.  So they think it's worth more and you

12   think it's worth far less.  And his comment is basically you

13   need to dismiss what analysts say and what they wrote because

14   they have a vested interest in that client relationship.

15   Q.    Do you have a view one way or another about whether

16   analysts typically have a vested interest?

17   A.    Analysts are independent researchers who put their name

18   and their reputation at risk every time they write a report.

19   Their job is to be fair and unbiased; and another part of their

20   firm may have a different kind of relationship with a client

21   company, but from the analyst perspective, they are supposed to

22   be analytical and unbiased and fair.

23   Q.    To your knowledge, do analysts receive any kind of

24   compensation from the companies that they cover?

25   A.    Years ago they did but not in quite some time.

1    Q.    Okay.  In 2014?

2    A.    All of this changed when the financial crisis hit, which

3    is roughly 2008, 2009.  Prior to that, analysts and investment

4    bankers and sales and trading and other departments, they would

5    kind of share the revenues they made off of a client

6    relationship.  That would determine their compensation.  And

7    then after the financial crisis, all of that got split up very,

8    very definitively.  And currently in the bigger banks that have

9    bigger buildings, the analysts are on a completely different

10   floor from the investment bankers.  They're on a different

11   floor from sales and trading.  They are totally physically

12   separated from one another, as well as functionally separated

13   from one another.

14   Q.    Is that a regulatory requirement, to your knowledge?

15   A.    It is now.  I don't think it's a requirement to be on

16   separate floors, but it's a requirement they don't interact.

17   Q.    I'm sorry.  I wasn't clear on that.  I meant the latter.

18          You next write "look at consistent track record, even

19   old business models."  What's this referring to?

20   A.    That's Father Lemelson saying to me that the lack of value

21   that he sees in Ligand is not just today.  If you look back at

22   their old track record, even the old business model, that he

23   didn't think there was much value in any of that.

24   Q.    "Management to consider what constitutes appropriate

25   commentary, too aggressive."  Again, is this something Father

1   Lemelson said to you?

2   A.    It is.  He's saying it's up to management to determine

3   what's appropriate, how they say it, how aggressive they are

4   with how they communicate with the investment community.

5   Q.    To your recollection, did Father Lemelson express a view

6   as to whether Ligand was overly aggressive or not aggressive

7   enough?

8   A.    As I recall, he had commented that he believed Ligand was

9   too aggressive in how they spoke about their company and their

10  prospects.

11  Q.    Backing up for one moment to the analysts who were

12  covering Ligand around this time in June of 2014, do you recall

13  where Ligand's stock was trading roughly?

14  A.    As I recall, it was in the $60, $70 range.

15  Q.    Do you recall a range of what the price targets were that

16  analysts were talking about at that time?

17  A.    As I recall, most had a price target in the 80s and 90s,

18  and there was one outlier with a price target in the 40s.

19  Q.    Do you recall about how many analysts were covering Ligand

20  at that time?

21  A.    I don't recall specifically but roughly a half a dozen.

22  Q.    You next wrote, "Your own key opinion leader's research

23  said Promacta sales heading to zero because Sovaldi won't

24  prosper under Novartis."  Can you tell the jury what this

25  refers to?

1    A.    Yes.    The first word should be "our," not "your," "Our own

2    KOL research."   What Father Lemelson is saying her is key

3    opinion leaders are -- in this case, they're physicians who

4    work in that field.   They treat those kinds of patients.

5    They're the ones who know exactly what's going on in terms of

6    prescribing behavior and patient care.   And so his own key

7    opinion leaders he had consulted with, they told him that sales

8    of Promacta are going to zero, that Promacta has no future

9    because of Sovaldi.

10             And the latter part here gets just a little bit

11    complicated, "won't prosper under Novartis."   Before this phone

12    call was held, two pharmaceutical companies, GSK and Novartis,

13    had struck a deal where they exchanged, they swapped some

14    assets.   And one of the assets GSK was swapping out to Novartis

15    was Promacta.   So Promacta, in fact, GSK's entire oncology

16    business, was going to go over to Novartis and they were

17    getting other things in return.

18    Q.   What was your reaction to these statements by Father

19    Lemelson?

20    A.   You can probably find someone to say anything.   So the

21    fact you found --

22             THE COURT:   Were these the words you said to him or

23    was this your internal reaction?

24             THE WITNESS:   The question was what was my reaction.

25    So this is my reaction.   I don't recall specifically what I

1    might have said to Father Lemelson in response to this comment.

2    Q.   You next wrote, "Ligand not now diversified, may be in

3    future, gives no credence to potential future revenues."  What

4    is this a reference to?

5    A.   The first part is, in essence, saying that Ligand is all

6    about Promacta now.  That is the major contributor to revenues.

7    That is the major value driver of the company.  They're not

8    diversified.  There's a few other things going on, but it's not

9    diversified.  And then the latter part about "gives no credence

10   to potential future revenues" is my notes that Father Lemelson

11   is not looking at what might or will happen in six months,

12   twelve months, two years, five years down the road.  He's not

13   looking at any of that.  He's not looking at any of that.  He's

14   looking at the here and now.

15   Q.   "Bird in hand versus two in bush."  What is this referring

16   to?

17   A.   He actually used that phrase in the report as well, but it

18   gets to my previous comment, which is the bird in the hand,

19   which is the current financial situation, is worth two in the

20   bush, which is the future financial performance of the company.

21   Again, he gives no credence to what might happen.

22   Q.   "Company has negative equity."

23   A.   This is another point that he makes in his -- that Father

24   Lemelson makes in his research, saying that Ligand has negative

25   equity.  Without giving a lecture in accountancy, equity is a

1  balance sheet term.  It's assets minus liabilities equals

2  equity.

3  Q.   To your knowledge, did Ligand have negative equity at this

4  time?

5  A.   I'm not sure any company has negative equity but, no,

6  Ligand did not have negative equity at that time.

7  Q.   "Not out to target anyone personally," what's that a

8  reference to?

9  A.   That's Father Lemelson saying that to me.  His report is

10  not intended to target anyone, meaning any particular executive

11  personally.

12       MR. DAY:  In the interest of time, Your Honor, I may

13  skip over a few of these, but they are in the exhibit if the

14  jury wants to review them.

15       THE COURT:  Fine.

16  Q.   You wrote "but what could they disclose to me that's not

17  public."

18  A.   Yeah.  This has to do with the primary purpose of the

19  call, which was whether or not Matt Foehr should keep the

20  1:00 p.m. call with Father Lemelson.  And his comment is what

21  could Ligand or Matt Foehr tell me that's not already public

22  and, therefore, that I don't already know, that I haven't

23  already read.

24  Q.   You wrote "Any serious investor doesn't care what analysts

25  say.  GSK analysts wrong on Promacta."

1   A.   Yeah.  This has to do with my explaining to Father

2   Lemelson that Promacta is facing a bright future and the

3   analysts who follow GSK are modeling out what they view

4   Promacta sales will look like in the future, and in turn Ligand

5   utilizes what those analysts are saying about a drug for their

6   own planning purposes, and basically model that out as the

7   likely scenario of the future of Promacta.

8          THE COURT:  So are these your words?

9          THE WITNESS:  This is Father Lemelson saying any

10  serious investor doesn't care what analysts say in response to

11  me pointing out that the GSK analysts have Promacta becoming a

12  billion-dollar drug, and then he adds, well, the GSK analysts

13  are wrong on Promacta, basically saying they don't know what

14  they're talking about, that's not going to happen.

15  A.   Both pieces are Father Lemelson's words?

16         THE WITNESS:  Correct.

17         MR. DAY:  Your Honor, just for clarity, the words that

18  are in red are statements made by Father Lemelson that Mr. Voss

19  is writing down.

20  Q.   "Hope it will be read," is that something the defendant

21  said to you?

22  A.   Yeah.  This, as I recall, is in response to my question

23  about what his plans are for his report, and his response --

24  part of his response was, "I hope it will be read."

25         And another part of his response is that "Seeking

1    Alpha" -- putting a report out on Seeking Alpha is one way to
2    do that.
3            MR. DAY:  Okay.  We can put this exhibit down, Cole.
4    Q.   A few general questions about the call.  To your
5    recollection, did you explain to Father Lemelson in the course
6    of this call that Promacta has indications beyond hep C?
7    A.   I recall quite specifically that I made those points, that
8    I explained that hep C is one indication.  There are more
9    indications where it's being sold currently, yet more
10   indications that are being tested.
11   Q.   If the company believed that Promacta was going away,
12   would that have been material non-public information?
13   A.    Absolutely.
14           MR. HOOPES:  Objection.
15           THE COURT:  Sustained.  Leading.  I think you should
16   say what exactly did you say to him about Promacta.
17           THE WITNESS:  As I recall, I made several statements
18   about Promacta.  One is if you look even at hepatitis C, there
19   will be a role for Promacta in hepatitis C.  We'll see how this
20   market plays out.  We've got a new entrant.  It's a wonderful
21   drug.  It works really, really well, but it's not going to be
22   used by every patient.  It's not going to be used in every
23   geography.  And even patients who take that drug may need
24   Promacta as well.  So hepatitis C, we'll see how it plays out.
25   Sovaldi is a new complicating factor, but we don't know how

1   much it's going to impact hepatitis C.

2          The two other indications are totally independent of

3   hepatitis C.  They have nothing to do with Sovaldi.

4          THE COURT:  You're saying this to him?

5          THE WITNESS:  Absolutely right.  Absolutely right.

6   This was kind of the core messaging on Promacta that my client

7   made public and I, in turn, was making public to Father

8   Lemelson.

9   Q.  And had Ligand made any public disclosure to the effect

10  that Promacta was going away?

11  A.  No.  Quite the contrary.  Ligand's public disclosures are

12  consistent with the analysts who followed GSK, which is this is

13  on track to become a blockbuster drug.

14  Q.  If Ligand had internally believed something other than

15  what was publicly stated, could you disclose that to one

16  investor?

17  A.  I never heard anything remotely like that from Ligand.

18  But if internally, hypothetically, they believed that, I

19  absolutely not could disclose that.  If that's material

20  information, that would have been selective disclosure, as we

21  talked about earlier.

22          MR. DAY:  Can we pull up Exhibit 129.

23  Q.  Mr. Voss, this is an exhibit that's agreed.  It's in

24  evidence.  And I'll represent to you that it is Father

25  Lemelson's notes of his conversation with you.  Have you ever

1   seen this document before?

2   A.   No.  This is the first time.

3   Q.   I want to direct your attention to the paragraph that

4   starts, "He asked."  Do you see that?  "He asked if we had

5   spoken to anyone who worked in countries where the new hep C

6   medications perhaps would not be used (perhaps because of the

7   expense)."  Does that statement comport with your recollection

8   of what you told him about the expense of Sovaldi and its use

9   outside of the U.S.?

10  A.   It's consistent that I conveyed that Sovaldi is not going

11  to be used in certain other countries.  I don't recall that I

12  ever asked him if he had fact checked that with any of his

13  sources.

14  Q.   Let's go to the second page.  The paragraph at the very

15  top that starts, "He made many mistakes on the phone."  It goes

16  on to say "like asking why we would disagree with GSK analysts,

17  and I pointed out that there was no evidence Novartis would

18  continue to invest in Promacta."  Does this comport with your

19  recollection of discussing the GSK analysts' projections about

20  Promacta's future?

21  A.   There's two thoughts here.  He's saying that one of the

22  mistakes I made was asking why they would disagree with GSK

23  analysts.  I don't recall specifically saying why would you

24  disagree with these analysts, but I do recall a conversation

25  that there are a large number of analysts who follow GSK and

1    that Ligand tends to take the average of their views of a drug

2    and uses that figure as their own.

3    Q.   He next writes, "He said the company agreed that Gilead's

4    drug would eliminate the need for Promacta and understood

5    that."  Do you see that?

6    A.   I do.

7    Q.   Did you say that?

8    A.   Absolutely not.

9    Q.   He goes on to write, "He said the company did not agree

10   with the position."  Did you express to him that you did not

11   agree with the statements in his report?

12   A.   I totally expressed that the company does not believe that

13   Promacta is doomed under the new era of Sovaldi.

14   Q.   He writes in the next paragraph, "if the company really

15   felt good about their future prospects, why would they not take

16   the call to refute the report?"  Do you recall what that is a

17   reference to?

18   A.   I presume what he's saying there, why won't they talk to

19   me.  If they have things they want to explain and they feel

20   good about the future of the company, why would they not take

21   the call, the 1:00 p.m. call.

22   Q.   And then he writes, "He wanted to press the idea of how we

23   could disagree with so many analysts."  Do you understand that

24   to be a reference to the sell-side analysts that you discussed

25   with him?

1   A.    I do.  Where is that?

2   Q.    Second-to-last paragraph.

3   A.    This apparently refers to the analysts who follow Ligand

4   and me commenting that we've got price targets in the 80s and

5   90s versus your price target of zero, and how could you

6   disagree with these analysts and their views which are so

7   different than yours.

8   Q.    So these notes appear to reflect that you told him about

9   GSK's future projections for Promacta?

10  A.    No.  I think this is about -- if you read it, he wanted to

11  press the idea of how we could disagree with so many analysts.

12  I simply pointed out that for a speculator no price is too

13  high.  I believe this refers to the analysts who follow Ligand,

14  not the analysts who follow GSK.

15  Q.    I'm sorry.  That was a bad question because I was backing

16  up a little bit, but thank you for that.

17        So this refers to you telling him that sell-side

18  analysts had generally positive views about the company, right?

19  A.    Correct.

20  Q.    Okay.  And then we looked at before, he wrote "like asking

21  why we would disagree with GSK analysts," and that reflects

22  that you told him about the future projections, right?

23  A.    Correct.

24  Q.    And yet after telling him that analysts have -- sell-side

25  analysts have a positive view about the company and that GSK is

1    predicting a blockbuster drug, he writes that you agreed that

2    Promacta was going to go away essentially, right?

3    A.   He wrote that, but it's not true.

4    Q.   It doesn't make sense in the context of referring to the

5    analysts, does it?

6              MR. HOOPES:  Objection.

7              THE COURT:  Sustained.  Strike that.

8    Q.   After you heard the June --

9              THE COURT:  Do you think you'll finish by the break?

10             MR. DAY:  I think so, Your Honor.  I think so.

11             THE COURT:  That's great.

12   Q.   After the June 19 interview, did you respond to Father

13   Lemelson?

14   A.   I did.  And I believe the interview was on the -- the

15   conversation was on the 18th.

16   Q.   The conversation with Father Lemelson was on the 18th?

17   A.   Right.

18   Q.   The interview was the 19th?

19   A.   Correct.

20   Q.   And then did you provide any response to the interview to

21   Father Lemelson?

22   A.   I did.  I sent Father Lemelson an email the following

23   Monday.

24   Q.   Let's pull up Exhibit 53.  Is this your email to Father

25   Lemelson on June 23?

A.   It is.  It's a printout of some -- some of the notations
were not in my email but it's a printout of the email.
Q.   Are you referring to what appear to be handwritten
underlines there?
A.   Yes.
Q.   You wrote, "I listened to your June 19 interview on
Benzinga, including the false comment that during your phone
call last week that I 'basically agree' that Promacta sales are
going to go away."  Do you see that?
A.   Yes.
Q.   Then you write, "To refresh your memory, you made that
comment to me followed by a rhetorical 'don't you agree?'  I
never made that statement, never agreed with that statement and
never would because it's not true."  Do you see that?
A.   I do.
Q.   What's your reference to a rhetorical "don't you agree"
there?
A.   I recall on the phone call with Father Lemelson that he
has a pattern of speech, at least on that call, where he very
regularly said, "Don't you agree?  Don't you agree?  Don't you
agree?" at the end of a statement.  It was kind of a throwaway
comment that was not a question.  It was not a legitimate
question.  It was more just a pattern of speech, kind of like
someone says "uh-huh" or something like that in their speech
pattern.

```
 1    Q.   Is what you wrote to Father Lemelson here, did that
 2    comport with your recollection at the time of how the
 3    conversation went?
 4    A.   Yeah.
 5    Q.   And to be clear, you never affirmatively said that
 6    Promacta is going away, right?
 7    A.   I never said that.  I never would.  I never would have
 8    agreed if someone made that comment and asked me, you know, is
 9    that your thought as well?  That absolutely is not true.
10    Q.   Now, why did you feel it necessary to point out this
11    rhetorical "don't you agree" in this email?
12    A.   This is -- it was a very awkward time, because there was
13    an interview with Father Lemelson whereby he said, without
14    naming me by name, but he said I agreed that Promacta is going
15    to zero, and that's absolutely not true.
16         Given that statement, I have a client on one hand,
17    who is understandably rather emotional of why would you say
18    that, "Did you say that?" all bent out of shape over the
19    interview.  And on the other hand, I have Father Lemelson who
20    is attributing that statement to me.
21         I was trying to find a way to reconcile the two.  I
22    know I didn't say it.  But, quite frankly, Father Lemelson's a
23    priest and I had a real hard time getting my arms around the
24    concept that a priest was lying and that he made something up.
25    So I was trying to reconcile this.  So I put the onus back on
```

1    me.  What might have he misconstrued?  What might have stuck in

2    his head that caused him to say this?  Because I didn't say it.

3            So I am doing this kind of internal brain battle

4    about why would he say that?  Because I didn't say it.  And my

5    conclusion was while he kept saying, "Don't you know?  Don't

6    you know?  Don't you know?" maybe he said "Don't you know"

7    after one of the references about Promacta going to zero.  I

8    never responded to those "Don't you knows."  I did not take

9    them as being legitimate questions that warranted an answer,

10   and neither did he because he kept going in the conversation.

11           So that is what I came up with as a possible

12   interpretation of our conversation that resulted in him writing

13   what is -- to use a rather pointed word, it's a lie.  I never

14   said that, I never would, yet he attributed it to me, and I'm

15   trying to figure out why.

16   Q.   You mentioned that the client was not happy about the

17   interview.  Can we take a look at Exhibit 214, please.

18           Mr. Higgins writes to you in the middle of this page.

19   It starts, "Also if he said," do you see that call?  You can

20   highlight that whole part.  "Also, if he said the CEO beats his

21   employees, would you just move on because there were more

22   things to cover?  Or would you take a moment to stick up for

23   the CEO?"

24   A.   Yeah.

25   Q.   Do you see that?

1    A.    I do.

2    Q.    Do you have an understanding of why Mr. Higgins was saying

3    this at this time?

4    A.    Well, obviously Mr. Higgins is emotional.

5              MR. HOOPES:  Objection.

6              THE COURT:  Sustained.

7              MR. DAY:  I'm asking for his understanding.

8              THE COURT:  Sustained.

9    Q.    Does this reflect in your view the frustration of

10   Mr. Higgins?

11   A.    It does, clearly.

12   Q.    Did you have subsequent communications and conversations

13   with Mr. Higgins?

14   A.    I did.

15   Q.    What were the outcomes of those conversations with respect

16   to, you know, what had actually transpired?

17   A.    One of the outcomes was the email I sent to Father

18   Lemelson the following Monday.  Another outcome of those

19   conversations or topic of conversations was, "John, you have to

20   remember what the purpose of my phone call with Father Lemelson

21   was."  The primary purpose was to determine if Matt should keep

22   the 1:00 call or not.  I was not speaking to Father Lemelson to

23   go through a point-by-point rebuttal of his report.  I wasn't

24   equipped to do that.  We didn't have every error written out

25   and every response written out to that error, and it wasn't my

1    role, and even if I had done that, it would have potentially

2    backfired by giving Father Lemelson a reason to revisit his

3    report and issue a new one.

4    Q.   Let's take a look at Exhibit 215.  In the interest of time

5    I'm going to move through these fairly quickly.  If you look at

6    the bottom of this page, you write to Mr. Higgins and

7    Mr. Foehr, "Here's a draft of an email to send to Lemelson

8    later today."  Now, this is June 20 in the morning.  So it's

9    the day after the interview.

10    A.   Right.

11    Q.   Do you recall when you first heard the interview?

12    A.   I recall that I heard it that morning, that Friday

13    morning.

14    Q.   So fair to say this was pretty close in time to when you

15    first heard what Father Lemelson said about your conversation?

16    A.   Likely yes.

17    Q.   If we scroll down further on to -- it's actually the very

18    bottom of the page you write, "I listened to your interview on

19    Benzinga including the blatantly false comment that during our

20    phone call earlier this week I 'basically agreed' that Promacta

21    sales are going to go away.  I never made that statement and

22    never would because it's not true and I request you set the

23    record straight publicly on this point.  Conversely, when we

24    discussed Promacta for use" -- we have to go to the next

25    page -- "in patients with hepatitis C, I specifically pointed

1    out that HCV is only one of several indications for the drug,

2    and that even within HCV there exists a sizable market for

3    Promacta independent of Sovaldi, noting that because of its

4    high price Sovaldi will not be used on all patients in the U.S.

5    moreover patients outside the U.S. where interferon therapy

6    will continue to be the main treatment."  Do you see that?

7    A.    I do.

8    Q.    So this was fresh in your mind.  The conversation with

9    Father Lemelson was June 18.  The interview was June 19.  And

10   this was your first reaction after hearing the interview,

11   right?

12   A.    Correct.

13   Q.    Okay.  Was it true?

14            THE COURT:  Was this what was sent?

15            THE WITNESS:  This was an initial draft.

16            THE COURT:  I see.

17            THE WITNESS:  This was proposed language for what I

18   might send.  It's not what was sent.

19   Q.    Let's go to Exhibit 229.  This is a back and forth between

20   you, Mr. Foehr and Mr. Higgins about what will ultimately be

21   sent in response to Father Lemelson's Benzinga interview.

22            Bear with me for one moment.

23            Now, the response gets longer as a result of this

24   email chain, right?

25   A.    It does.

1  Q.   Mr. Higgins suggested some additional information to

2  include in the email?

3  A.   He did.

4  Q.   Okay.  Now, if we go down to the third page of this

5  document, Mr. Higgins writes to you, Bruce, and Matt, "I

6  retooled the email and filled in the blanks."  Do you see that?

7       MR. DAY:  Oh, I may be on the wrong page, Cole.  Page

8  4, sorry.

9  Q.   So he writes in the fourth paragraph here, "These are only

10 suggestions.  Tell me what you think on the approach?  And

11 Bruce, it's your email so please make sure you are comfortable

12 with all the messages.  I was just trying to flesh out

13 concepts."  Do you see that?

14 A.   Right.

15 Q.   Were you ultimately comfortable with everything you wrote

16 in your email to Father Lemelson?

17 A.   Totally.  This iterative process is not atypical at all.

18 There's a back and forth with my clients when anything is

19 drafted, anything is issued or sent around.  This is not

20 atypical at all.

21 Q.   Did Mr. Higgins or Mr. Foehr suggest any language in your

22 response to Father Lemelson that you viewed as inaccurate?

23 A.   No.  There was nothing inaccurate.  My only concern was

24 the longer the response gets, you kind of lose the key message.

25 You dilute it.  But it's all fine.  It's all accurate.  It's

1    all appropriate.

2    Q.   Let's take one quick look at Exhibit 53 again.  And this,

3    again, is your email response that you sent on the 23rd.  That

4    was a Monday and the emails we were just looking at were on the

5    prior Friday.  Why did you wait until Monday to send this?

6    A.   As I recall, the email was not done until Friday afternoon

7    Pacific time, and as I recall, I even sent Ligand an email that

8    said it's too late in the day to send this.  It's a summer

9    Friday at 6:00 in Massachusetts.  I'm not going to send it now.

10   I'm going to wait until Monday.

11   Q.   We already read the first sentence of this, but I'll just

12   reiterate you say to him -- you characterize his statement as a

13   "false comment during our phone call last week I 'basically

14   agreed' that Promacta sales are going way."  We looked a few

15   minutes ago at your first draft of the response.  Is this

16   saying essentially the same thing that you wrote in your first

17   draft?

18   A.   It is.

19   Q.   Let's go to Exhibit 4.

20            Well, first, did Father Lemelson respond to your

21   email?

22   A.   He did not.

23   Q.   To your knowledge, did he ever publicly acknowledge that

24   you had disagreed with his statements on June 19?

25   A.   He did not publicly acknowledge that email, the content of

1    the email, and I never got a bounceback as if the email were

2    not deliverable.  In my perspective, it went through, and

3    clearly it did, because he printed it out.

4    Q.   You read the rest of his reports, right?

5    A.   The subsequent ones, yes.

6    Q.   To your recollection, was there ever any statement:  The

7    company disagrees that Promacta is going away?

8    A.   No.  That I would definitely have remembered.

9    Q.   If you look at this report, this is the July 3 report.  If

10   we go to page 3 of the document, Father Lemelson writes in the

11   middle of the page, "Once the hep C application is lost, there

12   is no evidence of a significant, commercially viable market for

13   Promacta.  ITP, which has been mentioned as an alternative

14   application, does not have significant commercial viability."

15   Do you see that?

16   A.   I do.

17   Q.   So he, notwithstanding your email to him, is doubling down

18   on his position, right?

19           MR. HOOPES:  Objection.

20           THE COURT:  Overruled.

21   A.   He's affirming what he said before.  He's not backing off,

22   and he's specifically now raising another indication and

23   dismissing that as well, saying it's small.

24   Q.   He didn't talk about ITP in his first report, did he?

25   A.   He did not.  I don't believe he did.

1    Q.   And now he's raising it for the first time about nine, ten

2    days after your -- about two weeks after your conversation with

3    him and about nine or ten days after you email him?

4    A.   Right.  And now it's being mentioned.

5    Q.   And ITP is something you specifically raised with him on

6    your phone call, right?

7    A.   It is.

8    Q.   And now he's claiming that that is not an alternative

9    application, right?

10   A.   He's raising it in order to dismiss it, but he's raising

11   it.

12          THE COURT:  What's the question?

13   Q.   He's raising ITP for the first time here?

14          THE COURT:  All right.  What's the question?

15   Q.   The question is, that's something that you specifically

16   raised with him on your June 18 call, right?

17   A.   It is, yes.

18   Q.   And this is the first mention of ITP in any of his reports

19   after your call with him, right?

20   A.   I believe so.

21   Q.   Okay.

22          MR. DAY:  One moment, Your Honor.

23          Your Honor, as promised -- I guess I'm one minute

24   late -- nothing further at this point.

25          THE COURT:  We'll stand in recess.  Great.  Thank you.

```
 1            THE CLERK:  All rise.
 2    (Jury exits.)
 3            THE COURT:  Thank you.  We'll take a break.  11:30.
 4    How long do you think you'll have on cross?
 5            MR. HOOPES:  I hope I'm done by lunch.
 6            THE COURT:  Okay.  That sounds fine.  And then
 7    hopefully, if it's possible, to be done at around quarter to
 8    1:00 so we can do redirect and recross and let him leave.  Not
 9    that he probably doesn't love it here, but the weather is
10    better in LA.
11            MR. HOOPES:  I'm going to do my best, Your Honor, I
12    certainly am, but --
13            THE COURT:  If you can't, you can't.  We'll certainly
14    finish this afternoon.
15            MR. JONES:  If, in fact, Mr. Hoopes only does an hour,
16    that would be an hour and a half, we may have ten or fifteen
17    minutes at the end of the day after we have the two other
18    witnesses.  Those witnesses may go quickly and we may finish
19    ten, fifteen minutes early.  I want to let the court know about
20    that.  Tomorrow we have Mr. Higgins.  He's going to be a three-
21    or four-hour witnesses.  He's coming in tonight.
22            MR. HOOPES:  We do have one issue, whenever you want
23    to deal with it, which is there is an issue --
24            THE COURT REPORTER:  Excuse me, counsel.  Could I ask
25    you to go in front of the mic, please.
```

```
 1              MR. HOOPES:  Oh, I'm so sorry.

 2              THE COURT:  You know what, she's been going straight

 3     for two hours.  Let's deal with this at another point.

 4              MR. HOOPES:  That's fine.

 5              THE COURT:  Okay.  Thank you.

 6     (Court exits.)

 7     (A recess was taken.)

 8              THE CLERK:  All rise.

 9     (Court and Jury enter.)

10              THE COURT:  Okay.  Let's go.

11              MR. HOOPES:  Just to alert the court, we've got an

12     easel, with your permission, placed there.

13              THE COURT:  You can, but someone would have to have

14     outstanding eyes.  I'm happy to do that.  But I'm not sure how

15     much they'll see if it's there.

16              MR. HOOPES:  Do you want to start there and then if it

17     doesn't work, we'll move it?

18              MR. DAY:  One housekeeping matter.  We wanted to move

19     in evidence Exhibit 130A, the demonstrative, by agreement of

20     the parties.

21              THE COURT:  By agreement?

22              MR. HOOPES:  By agreement.

23              THE COURT:  There were certain things on there that

24     were minor but they were inaccurate.

25              MR. DAY:  We'll fix that for the final copy for the
```

```
 1    court.
 2              THE COURT:  Share it with counsel, and we'll put that
 3    in.
 4              MR. DAY:  Okay.
 5              (Exhibit 130A received in evidence.)
 6                        CROSS-EXAMINATION
 7    BY MR. HOOPES:
 8    Q.   Good morning, Mr. Voss.  My name is Tom Hoopes.  I
 9    represent Father Lemelson.  I have some questions I'd like to
10    ask you.  You're here today with counsel; is that right?
11    A.   I am, yes.  Can you hear me okay?
12              THE CLERK:  Judge, can you stop for a minute?  For
13    some odd reason the juror is on the screen and not Mr. Hoopes
14    is appearing on Zoom, as you can see on my monitor, and it
15    should be Mr. Hoopes.
16              (Discussion held off the record.)
17              THE COURT:  So there are -- you know, Zoom has changed
18    our world too.  And we're all learning how to use this hybrid
19    Zoom technology in court technology.  So unfortunately for you,
20    this may be the first civil trial we've done using the Zoom
21    technology.  So we're doing our best.  Mr. Hoopes.
22              MR. HOOPES:  Thank you very much, Your Honor.
23    Q.   And the lawyer you have with you is Mr. Bondi, sitting in
24    the back; is that right?
25    A.   That's correct, yes.
```

1    Q.   And I assume he informed you that he's representing other

2    witnesses associated with Ligand --

3    A.   He is.

4    Q.   -- in this proceeding, right?

5    A.   Correct.

6    Q.   He's representing Mr. Higgins, correct?

7    A.   So far as I know he's representing Ligand.

8    Q.   And he's representing Mr. Foehr, who was here before,

9    correct?

10   A.   As I said, I know he's representing Ligand.  I assume that

11   includes all their executives.

12   Q.   So in terms of representing Ligand, you don't work for

13   Ligand, you work for your own company; is that right?

14   A.   Correct.

15   Q.   But they're still providing you with counsel, right?

16   A.   They are.

17   Q.   And they're providing you with paid counsel?  I mean, it's

18   not your firm that's picking up the tab, right?

19   A.   That's correct.

20   Q.   Okay.  And tell me, were you prepared to testify here

21   today?

22   A.   What do you mean by "prepared"?

23   Q.   By attorneys.

24   A.   What do you mean by "prepared"?

25   Q.   Well, did the attorneys for the SEC go over what they

1    expected your testimony was going to be?

2    A.    No.  We reviewed various documents and they gave me the

3    lay of the land for how the courtroom is set up and the like.

4    Q.    So you said no, you weren't prepared but they went over

5    various documents; is that right?

6    A.    What I asked you was what you meant by "prepared."  You

7    didn't answer it.

8    Q.    Okay.  "Prepared" is did they go over any questions with

9    you that they were going to ask you?

10   A.    No.

11   Q.    Did they go over any documents that they were going to

12   show you?

13   A.    We reviewed various emails and other documents.

14   Q.    Okay.  And you've actually had this same counsel for a

15   while now, correct?

16   A.    Meaning?

17   Q.    Mr. Bondi.

18   A.    Yes, I have.

19   Q.    How long have you had Mr. Bondi?

20   A.    I'm guesstimating three years, four years.

21   Q.    Is there some reason that you have counsel or need counsel

22   here today?

23                MR. JONES:  Objection.

24                THE COURT:  Sustained.

25                MR. HOOPES:  So if we could pull up, Cara, Exhibit

1   127.

2          I apologize, Your Honor, we had a number of exhibits

3   that we wanted to add to the jury's binder.  With your

4   permission, we were going to do it during a break, but we

5   needed your authority.  So can we just hand those out?

6          THE COURT:  Sure.  Of course.  Should we wait or are

7   you going to put them on the screen and keep going?

8          MR. HOOPES:  I'm going to put them on the screen and

9   keep going.

10          MR. DAY:  This is 127?

11          MR. HOOPES:  127.

12          MR. DAY:  Okay.

13          THE COURT:  Thank you, Your Honor.

14   Q.   Now, Mr. Voss, this is an email that's dated June 17,

15   2014, correct?

16   A.   There's two emails but they're dated the 17th, yes.

17   Q.   Well, the whole document is dated June 17 with two

18   different -- at least two different emails contained within it,

19   correct?

20   A.   Correct.

21   Q.   And this is an email that at the very top the first line

22   you say, "Okay.  I'll see how forthcoming they'll be with me."

23   Is that correct?

24   A.   Yes.

25   Q.   So let's talk about what led up to that.  What led up to

1    that is you received notice, did you not, that there had been a

2    report issued on June 16, correct?

3    A.   Correct.

4    Q.   And there was discussion with you, with Mr. Foehr, with

5    Mr. Higgins about how you were going to respond to that

6    particular report by Father Lemelson; is that right?

7    A.   Not entirely.  There was discussion between us as to who

8    might call, what they might say, what might happen with the

9    prescheduled Matt Foehr call and the like.

10   Q.   And you actually had suggested that perhaps Mr. Foehr

11   could do the call rather than you, correct?

12   A.   As I recall, I suggested that Matt might do the call or I

13   might do the call with him.

14   Q.   And it ended up you were going to be the one doing the

15   call, correct?

16   A.   That's how it ended up, yes.

17   Q.   That's because there was a later call that was scheduled

18   for the afternoon, correct?

19   A.   Which afternoon?

20   Q.   The same afternoon, right, June 17, with Mr. Foehr.

21   A.   I don't know where you say there's a call --

22   Q.   I'm not looking in here.  I'm asking you from your memory,

23   from your memory, without looking at the document, was there

24   already a call with Mr. Foehr scheduled for the afternoon, and

25   the purpose of the call that you were making was to get

1   information about whether or not that call should take place;

2   is that correct?

3           MR. DAY:  Objection, Your Honor.  That was two or

4   three questions in one.

5           THE COURT:  All right.  Why don't you break it down.

6   Q.   There was a decision by Ligand that they were going to

7   maybe touch base with Father Lemelson, correct?

8   A.   There was a discussion --

9   Q.   Can you just answer yes or no, sir?

10  A.   It's not so simple.

11  Q.   Well, was there a decision made that there was going to be

12  a contact with Father Lemelson?

13  A.   Ultimately, yes.

14  Q.   Yes, okay.  And the question was was who, correct?

15  A.   The question is who made the decision?

16  Q.   No.  The question was, who was going to make the call,

17  sir?

18  A.   Yes.  We were debating who might call Father Lemelson

19  when, before the 1:00 p.m. call or otherwise.

20  Q.   And they decided that you would make the call, correct?

21  A.   That was decided by the group.

22  Q.   Well, actually, if you look at the email on 127, which,

23  you know, for the jury is tab 5, there's an email from

24  Mr. Higgins that says, "Bruce, I have a proposed narrative for

25  a call for you to have with Lemelson.  Specifically, in my

1    proposal, I do not think the first call should be to jump into

2    content or rebuttal.  I would like to feel him out first for

3    tone and approach to the research and what the purpose of a

4    call would be if he is not going to update a report.  To me, if

5    we jump right into rebuttal mode without knowing our

6    counterparty, seems to me we are less prepared for any call we

7    could have on substance."  Am I reading that correctly?

8    A.    That's correct.

9    Q.    And up at the top your response is "Okay," am I correct?

10   A.    It is.

11   Q.    So your instructions were not to engage in rebuttal.  Your

12   instructions were to gain information, essentially, correct?

13   A.    That's what the email says, yes.

14   Q.    Well, that was a communication that came to you from the

15   CEO of the company before you made the call, correct?

16   A.    Yes.  But the instructions have more than just that.  The

17   instructions are to feel him out for tone and approach to his

18   research, what the purpose of a call might be if he's going to

19   update a report.

20   Q.    Right.

21   A.    So there were several components of John's instructions or

22   request.

23   Q.    Yes, but the sentence number two is, "I don't think the

24   first call should jump into content or rebuttal."  Am I reading

25   that correctly?

1   A.   That's what John wrote.

2   Q.   So you understood your instructions were not to jump into

3   the content or rebuttal, correct?

4   A.   You have to --

5   Q.   Is that -- no, you go ahead.  Did you understand it, or

6   did you mean something different when you said "okay, I got

7   it"?

8   A.   I got it that I am not having a call with Father Lemelson

9   to go point by point through his report.  With that said, I

10  need to find out if we're keeping the appointment with Matt

11  Foehr.  So there's going to have to be something to talk about

12  in order for me to make that determination.

13  Q.   Did you understand that you were going to ignore

14  Mr. Higgins' instruction; you were going to jump into content

15  or rebuttal?

16  A.   I don't think it's an either/or.  I think what he is

17  saying is I am not going in there to have a lengthy

18  conversation with Father Lemelson to identify all the errors

19  and misstatements and the like in his report and to rebut each

20  of them.  I am going in there to learn more about him, the

21  report, his intentions, and most importantly, if Matt should

22  talk to him later that day.

23  Q.   Well, let me ask it a different way.  When you say,

24  "Okay," did you mean it, or were you thinking, "I'm going to

25  just yes you to death"?

```
1              MR. DAY:  Objection.
2              THE COURT:  Overruled.
3    A.   A call is not a script between two robots.
4    Q.   I didn't ask you that.  Did you think, yes or no, that you
5    were going to follow instructions or were you going to wing it
6    on your own?
7    A.   I think you're putting an awfully fine point on this.  As
8    I said before --
9              THE COURT:  Can you answer it the way he asked it?
10             THE WITNESS:  Yeah.
11   A.   I don't --
12   Q.   No, the question is can you answer that yes or no.
13             THE COURT:  Well, you asked it disjunctively.  So why
14   don't you rephrase it if you want a yes or no.
15             MR. HOOPES:  Thank you.
16   Q.   Did you mean what you said when you said yes?
17   A.   I'm sure I meant it at the time.  I wrote "okay."
18   Q.   Well, you had the call that you've described here, right?
19   A.   I did.
20   Q.   Okay.  You called the next morning?  This is on Tuesday,
21   June 17, right?
22   A.   Correct.
23   Q.   You were in your office on the next morning, which is
24   Wednesday, June 18, correct?
25   A.   Yes.
```

1  Q.   And you picked up the phone and you dialed up Father

2  Lemelson's number that you've described for us, correct?

3  A.   That's right.

4  Q.   And you got a secretary or somebody, correct?  You didn't

5  get him?

6  A.   A woman answered the phone.

7  Q.   And then you got a call back?

8  A.   That's right.

9  Q.   And then you've told us that that day that call lasted 20

10  minutes, correct?

11  A.   That's correct.

12  Q.   And then after the call, you let the people at Ligand know

13  that you'd made the call, right?

14  A.   I let the people at Ligand know what was discussed on that

15  call.

16  Q.   Before that, you let them know that there was a call with

17  Father Lemelson and you wanted to set up a call with them,

18  correct?

19  A.   As I recall, when my phone call ended with Father

20  Lemelson, I sent Ligand an email saying the call was done, when

21  are you free to speak.

22  Q.   So what's different about what you -- I just asked you,

23  sir, is that what you did, and you can answer that yes, that

24  you sent them an email and you were ready for a call, right?

25  A.   That's right.

1    Q.   So then you had a call with Mr. Foehr and Mr. Higgins,

2    right, about your call with Father Lemelson?

3    A.   Later that morning, yes.

4    Q.   And was that the only call with those two gentlemen on

5    that day of Wednesday, June 18, about your call with Father

6    Lemelson, or were there more than one -- was there more than

7    one call?

8    A.   I don't recall if there were more.

9    Q.   So the next day, which is Thursday -- so just to go

10   through this with the jury.  Monday is the report, right?

11   Tuesday you're deciding about the call, correct?  Wednesday you

12   make the call to Father Lemelson.  Wednesday you talk to

13   Mr. Foehr and to Mr. Higgins at least once, and then by the

14   20th, which is Friday, you had learned that there was the

15   report in -- about Benzinga, correct?

16          MR. DAY:  Objection, Your Honor.  That was I think

17   seven different questions.

18          THE COURT:  Overruled.

19   A.   On Friday I learned -- I was sent a link to the interview

20   that Father Lemelson had with Benzinga.

21   Q.   So there was no contact about the Benzinga interview on

22   the Thursday in between that you remember between you and

23   Mr. Higgins and you and Mr. Foehr?

24   A.   I don't recall if there was or was not.

25   Q.   Okay.  So early the morning of that Friday, you are

1    alerted that there's a Benzinga interview, correct?

2    A.   On Friday morning I received emails with a link to that

3    interview.

4    Q.   Okay.  And there was email communication between you,

5    Mr. Higgins and Mr. Foehr regarding that interview, correct?

6    A.   On Friday or otherwise?

7    Q.   On Friday.

8    A.   There is an email trail, and I know within that email

9    trail there is a reference to the day before.

10   Q.   But let's -- hold that issue aside.

11          MR. HOOPES:  Can we pull up Exhibit 214.  That's a

12   two-page email.  It's tab 4 for the jury.

13   Q.   On the first page there are some three separate emails.

14   And if we can look at the first email on that first page, it

15   says, "On June 20, 2014 at 9:42 a.m. Bruce Voss wrote."  Do you

16   see where it says that?

17   A.   I don't see 9:42 a.m., but go on.

18          MR. HOOPES:  If we can go down a little farther.  Yes.

19   Q.   So at the bottom there do you see where it says June 20?

20   A.   That has 9:42, yes.

21   Q.   And if you go to the bottom of that paragraph, the last

22   sentence of the first paragraph says, "As I wrote last night,

23   he made that statement with a rhetorical 'don't you agree' and

24   I moved on to the next subject as we had more to cover and his

25   statement was ridiculous."

1            Now, I take it that you're referring to there that --

2  you're talking about the claim that Promacta was going away,

3  correct?

4  A.   That's right.

5  Q.   Okay.  And so before we get to the "As I wrote last

6  night," you said in response to the claim that you said you

7  agreed or that he said that you agreed that Promacta was going

8  away, he "made that statement with a rhetorical 'Don't you

9  agree' and I moved on to the next statement as we had more to

10 cover and his statement was ridiculous."  That's what you said,

11 right?

12 A.   That's what's written, yes.

13 Q.   As I'm reading it, you didn't say anything here about any

14 kind of response you made to "don't you agree."  You simply

15 moved on to the next subject, correct?

16 A.   I believe this is what we were discussing this morning.

17 Q.   Yes.  Well, yes.  And we're going over it again.  And

18 right above that we see the response from Mr. Higgins to that,

19 correct?

20 A.   We do.

21 Q.   And he says, "Also, if he said the CEO beats his

22 employees, would you just move on because 'there were more

23 things to cover.'  Or would you take a moment to stick up for

24 the CEO?  Promacta is a big deal, and a big part of our value

25 and business model.  He knows it too.  He gave you a softball

1    and you just moved on?  Even one minute of soft information

2    would have left him with a different impression than tacit

3    agreement."

4              So when you look at the page, Higgins's email to you

5    says 7:59 a.m.  Do you see that?

6    A.    I do.

7    Q.    And the email below that says 9:42 p.m., same day,

8    correct?

9    A.    My email is 9:42 a.m.

10   Q.    It says -- I'm sorry, 9:42 a.m.  So which came first?  Is

11   your email in response to the email above?

12   A.    I don't know.  I know that Mr. Higgins works in a

13   different time zone than Pacific time.  I don't know where he

14   was when he wrote this and why it would have that time stamp.

15   Q.    Well, right.  He lives in Minneapolis, right?

16   A.    Right.

17   Q.    He lives in Minnesota, where you came from?

18   A.    Right, I used to live there.

19   Q.    Right.  So do you know whether you were responding there

20   to what he said or were you responding to something else?

21   A.    I'll have to take that the email printout is in the proper

22   chronology but the time stamps don't line up.

23   Q.    Okay.  So you think that you're responding to his comment,

24   or do you think it's the other way around?

25              MR. DAY:  Objection.

```
 1              THE COURT:  Sustained as to form.
 2    Q.   Again, which of those two do you think comes first?
 3    A.   If you could shrink this back down so I can look at the
 4    two in order.
 5              I would suggest if you read my email on the bottom at
 6    9:42, it says, "I've read some posts but not have seen the
 7    interview itself," and he says, "Please listen to the
 8    interview," that would suggest the order they were in as the
 9    order they were sent with the one on the bottom first and the
10    one above it next.
11    Q.   Okay.  So without any prompting from him, you're giving
12    your reaction to what you learned about what was said in the
13    Benzinga interview, right, which is very simply, "As I wrote
14    last night, he made that statement with a rhetorical 'don't you
15    agree' and I moved on to the next subject as we had more to
16    cover and his statement was ridiculous."  Am I reading that
17    correctly?
18    A.   That's what it says.
19    Q.   So he made a statement and you didn't respond, according
20    to this?
21    A.   Every email does not respond to every point in the
22    previous email but I don't follow your question.  His response
23    is to me, not the other way around.
24    Q.   Exactly.  My question to you is very simple.  You say to
25    Mr. Higgins, so the only thing Mr. Higgins knows is that he
```

1   made that statement, "Promacta's going away," and the company

2   agrees because you were their representative, and all you did

3   was to move on, right?  That's what you say?

4          MR. DAY:  Objection.  I'm not following the question.

5          THE COURT:  Overruled.

6          Do you understand it?

7          THE WITNESS:  Say it again.  I think I do.

8   Q.   Well, what do you think I'm asking you?

9          THE COURT:  No, no, no.  Just --

10  Q.   Let me say it again.  To the statement he said, "Don't you

11  agree," and your response was to not to say anything.  Your

12  response was to move on.

13  A.   This is not a complete recitation of my conversation with

14  Father Lemelson.

15  Q.   That's not my question.

16  A.   I hear you, but I'm answering your question as I choose

17  to.  There was a lot said about Promacta during that phone

18  call.

19  Q.   You haven't got a question in front of you, sir.

20         THE COURT:  Strike that.  He gets to ask.  They get to

21  redirect.

22         So what's the question?

23  Q.   The next question is, it appears that the response from

24  Mr. Higgins is twofold, right?  One, he asks you if the CEO

25  beats his employees question, right?

1    A.   Well, I don't think that's a question, but he wrote that,

2    yes.

3    Q.   And then his last sentence says "even one minute of soft

4    information would have left him with a different impression

5    than tacit agreement."

6    A.   Well, that's incorrect on two parts.  The first part is

7    "even one minute of soft information."  There was more than one

8    minute, and it was not soft information.  There was plenty of

9    time spent on Promacta and its future in my conversation with

10   Father Lemelson.

11          And the second part of that says that I left him the

12   impression of tacit agreement.  I don't think so.

13   Q.   All right.  You don't -- you're telling the ladies and

14   gentlemen of the jury you don't think so, but you agreed that

15   was the impression that John Higgins had because that's what he

16   wrote, right?

17   A.   As we discussed this morning --

18   Q.   Very simple question.  Did you agree that if he wrote

19   that, that was the impression he got?

20   A.   John wrote it.  So I presume that's his impression.

21   Q.   He wrote it.

22          MR. HOOPES:  May I approach the board, Your Honor?

23          THE COURT:  Yes.

24   Q.   So your CEO, Mr. Higgins, that you were communicating with

25   about this interview that he was upset about, read what you

1    said and thought that you had tacitly agreed, right?

2    A.    That seems to be his opinion, yes.

3    Q.    And you would not say that the CEO of a company that you

4    were working for was saying that in anything other than in good

5    faith, right?  I mean, he said it.  He wasn't lying about it,

6    right?

7    A.    I presume he was not lying if he wrote it.

8    Q.    Right.  So the flip side of that was he was saying it in

9    good faith.  He believed that you left the impression of tacit

10   agreement, right?

11             MR. DAY:  Objection.

12             THE COURT:  Overruled.

13   A.    He uses the words "tacit agreement."  So clearly that's

14   what he believed, and that's what he wrote.

15   Q.    So I just want to add one word, if I can, to what we have

16   here.  So if the CEO of the company that you're working for got

17   that impression, you're trying to tell the ladies and gentlemen

18   of the jury that Father Lemelson didn't get that impression?

19   A.    John Higgins was not on the call with me, with Father

20   Lemelson, so all he knows is what I told him about that call.

21   Q.    Well, you wanted to -- I mean, let's set the scene.  This

22   guy is not happy, right?

23   A.    "This guy" meaning John Higgins?

24   Q.    Yeah.

25   A.    Clearly he's not.

1    Q.    He's angry, correct?

2    A.    Seems to be.

3    Q.    Because something was said between you and Mr. -- Father

4    Lemelson, a version of which was repeated by Father Lemelson on

5    Internet radio and he's taking this to mean that you must have

6    conveyed tacit agreement, right?

7             MR. DAY:  Objection.  Multiple questions embedded in

8    that.

9             THE COURT:  Yeah, sustained.

10   Q.    You agree he's not happy?

11   A.    Based on what he wrote here, he is not happy, yes.

12   Q.    And you agree that he believed that you gave tacit

13   agreement, right?

14            MR. DAY:  Objection.  At what point in time?

15            THE COURT:  Believed what?

16            MR. HOOPES:  He believed --

17   Q.    John Higgins believed that you tacitly gave the

18   impression --

19            THE COURT:  You know, this is the fourth time that was

20   asked.  So let's move on.

21            MR. HOOPES:  Yes, Your Honor.

22   Q.    Now, in here you say, "As I wrote last night."  Now, did

23   you write another email?

24   A.    Not that I recall and not that anyone can find.

25   Q.    So if you did write an email, the email is missing?

1    A.    Or the word "wrote" is an error.

2    Q.    Meaning you said the same thing in a phone call the night

3    before?

4    A.    Potentially.

5    Q.    So it's potentially you made that same statement the night

6    before, which was he made that statement with a rhetorical

7    "don't you agree" and you moved on, correct?

8    A.    I shared that thought with my client, yes.

9    Q.    Now, you told us that you drafted some notes, correct?

10   A.    Some notes from my phone call.

11   Q.    From the phone call, right?

12   A.    Yes, we've seen that.

13   Q.    And you told us some of the notes were drafted before the

14   call, correct?

15   A.    That's right.

16   Q.    Some of them were drafted during the call, correct?

17   A.    Correct.

18   Q.    Some of them were actually drafted after the call,

19   correct?

20   A.    A little bit was after the call.

21   Q.    Yeah.  So these notes you put up there, it would be fair

22   to say that those notes don't hold -- you don't hold those

23   notes out to contain everything that Father Lemelson said,

24   correct?

25   A.    It was a 20-minute conversation and those are not 20

1    minutes' worth of notes.

2    Q.   So the short answer is they don't?

3    A.    Correct.

4    Q.   And the short answer is those notes don't contain

5    everything that you said during the call, correct?

6    A.    Correct.

7    Q.   And the short answer is that you added things later after

8    the call, correct?

9    A.   The only thing added after the call were a few of the

10   notes on the second page kind of off to the right.

11   Q.   Well, we don't know which ones you added afterwards

12   because you didn't sign, date it, note it, which ones you

13   added, correct?

14   A.   None of that was done, correct.

15   Q.   And it would be fair to say that the notes added may have

16   been after this conversation with Mr. Higgins, correct?

17           MR. DAY:   Objection.

18   A.   I did not revisit my notes after the conversation with

19   Father Lemelson.

20   Q.   You did not -- no, no, no.  I'm saying you had

21   communications after the phone call with Father Lemelson with

22   Mr. Higgins, correct?

23   A.   I did.

24   Q.   And after that you had an email exchange, at the very

25   least, with Mr. Higgins, correct?

1    A.    Correct.

2    Q.    And you may well have added the notes after the call after

3    your contact with Mr. Higgins and Mr. Foehr, correct?

4              MR. DAY:  Objection.

5              THE COURT:  Overruled.

6    A.    To be clear, you're asking me if I doctored my notes after

7    the call was concluded?

8    Q.    No, that's up to the jury to decide.  My question to you

9    is, did you add notes after the call?

10   A.    No.  The only notes I added after the call is in my

11   debrief with my client there's a couple words written off to

12   the side on the right on page 2.  That was from the debrief.

13   Otherwise, everything else was from the call.

14   Q.    Now, after your contact with Mr. Higgins about this issue

15   of tacit agreement, you decided with Mr. Foehr and with

16   Mr. Higgins that you were going to write an email response,

17   right?

18   A.    That was the decision that was ultimately made, yes.

19   Q.    And that decision, after it was made, that email went

20   through various iterations, correct?

21   A.    It did.

22   Q.    When we say "iteration," you ended up with different

23   versions and everybody contributed, correct?

24   A.    It was -- yes, various people added and took away from it.

25   Q.    And I believe we saw that as Exhibit 53.

1          MR. HOOPES:  Cara, if we could pull that up.  And can

2    we go to the last page.  Go up one if you can, please.

3    Q.   So in this paragraph that begins "As a final note," "As a

4    final note, I'd like to add that I have known and worked with

5    both the CEO and the COO of Ligand for 15 years while they

6    served at two client companies.  Both John and Matt Foehr are

7    among the most competent, hard-working and honest executives I

8    know," and you go on and on and on, right?

9    A.   Correct.

10   Q.   Who suggested that that content be with added?

11   A.   As I recall, John suggested that I might add commentary

12   about my view of he and Matt and how long we had worked

13   together and what I thought of them.

14   Q.   So prior to this call on the 18th of June, you've

15   indicated on direct examination that you were aware of the

16   nature of products that were being developed by Ligand,

17   including Promacta, correct?

18   A.   That's not quite correct, no.

19   Q.   Well, you had information about their business, correct?

20   A.   Yeah.  You said products being developed by Ligand.  When

21   Promacta was done, it was developed years earlier and licensed

22   out.

23   Q.   Yes.  Okay.  And there was continuing activity with regard

24   to Promacta, right?

25   A.   By GSK.

```
1   Q.   Yes.  But you were familiar with work that Ligand was

2   doing at the time, correct?  That was part of your job?

3   A.   Ligand wasn't doing the work.  I was familiar with the

4   work that GSK was doing.

5   Q.   No, no.  You're representing Ligand as the IR, right?

6   A.   Correct.

7   Q.   As part of representing Ligand as the IR, it was your job

8   to know what was happening inside the company, correct?

9   A.   It was my job to know -- I did not work on-site.  I didn't

10  know everything going on there.  It was my job to know what the

11  company was doing and it was my job to know what the company

12  was saying about their activities publicly.

13  Q.   Okay.  And did I mishear on direct examination you were

14  given sometimes information that wasn't public information?

15  A.   That's correct.

16        MR. HOOPES:  And so if we can go back to the jury

17  binder to tab 2, which is Exhibit 222, Cara.  And go to slide

18  21.

19  Q.   If you could look at that on your screen, sir.  And where

20  it says about two-thirds of the way down, "Ligand transitioning

21  to final growth -- financial growth/performance-driven story on

22  Wall Street," do you see where it says that?

23  A.   I do.

24  Q.   Now, I represent that this is a slide taken from a board

25  meeting several months before June of 2018.  The date actually
```

 1    was September 18 of 2013.  And it was part of a board

 2    presentation.  So based on your contact with the company, were

 3    you aware that Ligand's intent was to transition to a financial

 4    growth/performance-driven story on Wall Street?

 5              MR. DAY:  Objection, foundation.

 6              THE COURT:  Overruled.

 7    A.    When John Higgins came on board.

 8    Q.    Just yes or no.  Were you aware?

 9    A.    It's not so simple.  John Higgins came on board in 2007

10    and Ligand was being completely remade, and that's why he was

11    hired, and they completely changed the business model.  So when

12    I read this now, my view is that John is talking about the

13    transition that started in 2007 when he was hired.  Ligand used

14    to be a traditional pharmaceutical company that developed

15    products, manufactured them and sold them.  And they left that

16    business model and they went to a new business model under

17    John's leadership that was primarily based on partnerships and

18    licensing agreements and the like.

19    Q.    That was a long answer to my question, which is, were you

20    aware, sir, that Ligand was transitioning in September of 2013

21    to a financial growth/performance-driven story on Wall Street?

22              MR. DAY:  Objection.  Asked and answered.

23    Q.    Yes or no, please.

24              THE COURT:  Yes or no.

25    A.    It's transitioning -- I think the point I want to put on

```
 1   this --
 2          THE COURT:  No, you can't.  This is cross.
 3   A.    Then the answer is maybe.
 4          THE COURT:  Maybe.  All right.  Next question.
 5   Q.    So if we can turn to the next slide on that same exhibit,
 6   which is 30.
 7          Now, in the second bold line, it says, "Indications
 8   beyond ITP critical for continued Promacta growth."  The second
 9   line says, "HCV needs to be a big market for Promacta to keep
10   driving Ligand's growth."
11          Were you aware that the plan by the board and
12   Mr. Higgins was to drive Ligand's growth by making HCV, the hep
13   C market a big market for Promacta?
14          MR. DAY:  Objection.
15          THE COURT:  Overruled.
16   A.    You said Ligand making HCV a big --
17   Q.    We understand there were other people that are doing the
18   job, right.  But the word here is that HCV needs to be, right?
19   "Needs to be."  Were you aware that their opinion, and
20   Mr. Higgins's in particular opinion, was that HCV needed to be
21   a big market for Promacta?
22   A.    I can't say that I was, no.
23   Q.    Well, then let's go to tab 1 before that, which is Exhibit
24   223, and go about halfway down the page, and then, if you can
25   look at this, this is an email from John Higgins to Matt Foehr
```

```
 1    and it's on February 1, four or five months after the board
 2    presentation.  And it says, Higgins to Foehr, "Thanks.  We'll
 3    start prep for our call next week.  This is an important topic.
 4    General things we should flesh out are, will any Sovaldi
 5    patients need Promacta?"  Do you see that?
 6              MR. DAY:  Objection, foundation --
 7    A.   I do.
 8              MR. DAY:  -- on this document generally.
 9              THE COURT:  Overruled.
10    Q.   So were you aware on June 18, when you were speaking to
11    Father Lemelson, that the CEO of Ligand had asked that
12    question, "Will any Sovaldi patients need Promacta"?
13    A.   I had not seen this email.  I was not on this email.
14    Q.   So you're not on it, but you're their investor relations
15    person.  Had Mr. Higgins ever disclosed to you that he had this
16    thought, "Will any Sovaldi patients need Promacta"?
17    A.   That had not been disclosed to me.
18    Q.   And you would agree with me that you've known John Higgins
19    for years, right?
20    A.   I have.
21    Q.   How many years?
22    A.   Since 2001.
23    Q.   And worked together with him for now it's 20 years, right?
24    A.   That's right.
25    Q.   And if he asked a question like that, you think he's a
```

1    pretty good executive?

2    A.   I don't follow you.  I think he's a good executive because

3    he asked this question, or do I think he's a good executive in

4    general?

5    Q.   Well, let's do the first part.  You think he's a pretty

6    good executive, right?

7    A.   I do.

8    Q.   And so if he had this question, then he must have a reason

9    for asking it, right, because he thought it was a good question

10   to ask?

11   A.   My understanding --

12   Q.   Yes or no, sir.

13   A.   It's John's email, so I presume he meant what he wrote.

14   Q.   Yeah.  He believed it was a good question, right?

15          MR. DAY:  Objection.

16          THE COURT:  Well --

17   A.   You'd have to ask him.

18   Q.   Now, after this exchange with Father Lemelson and after

19   the Benzinga interview and after you sent the email to Father

20   Lemelson, Ligand had an opportunity, if it wanted, to issue a

21   response, right, publicly?

22   A.   They always had that opportunity, yes.

23   Q.   And, in fact, you were involved with this matter as it

24   continued through June and through July and through August,

25   through September, correct?

1   A.   To this very day.

2   Q.   And throughout that period Ligand never issued a

3   statement, right, in response directly to Father Lemelson?

4   A.   They issued various statements that contained arguments

5   against Father Lemelson's report.  But those statements never

6   said Father Lemelson said A and we say B.  It was never calling

7   him out by name but it was putting forth information that then

8   refuted what Father Lemelson wrote or said.

9   Q.   But you know that Ligand felt as though people were still

10  asking questions based on Father Lemelson's reports, right?

11  A.   During what time frame?

12  Q.   June, July, August.

13  A.   Of 2014?

14  Q.   Correct.

15  A.   They were getting questions.  I was getting questions.

16  Q.   And an option is to simply say "this is our rebuttal,"

17  right?

18  A.   That is an option.

19  Q.   And, in fact, you had developed a rebuttal, right?

20  A.   No.  I developed a very rough first draft to get the ball

21  rolling.

22  Q.   Well, let's start with that.  You did get the ball

23  rolling, right?  You did a draft of what the rebuttal would be,

24  right?

25  A.   I did a draft to -- I did several different documents but

1    a draft that outlined the facts of the circumstances, what

2    happened and when it happened, did a draft of some key messages

3    that might be made in conversations or phone calls or

4    otherwise, and did a draft of some questions that the client

5    was likely to get in order to prepare answers.

6    Q.    And I know, sir, most of your experience has been in

7    investor relations but you worked at one point for some pretty

8    big PR companies, correct?

9    A.    I did.

10   Q.    So you sort of understand how a press release could be put

11   together, right?

12   A.    Investor relations drafts press releases as well.  So

13   that's part of my job.

14   Q.    If you had wanted to, you could have, correct?

15   A.    I could have drafted anything.

16   Q.    Certainly.  And it could have been the content that you

17   created and turned into a press release, right?

18   A.    I think we've established that a press release was an

19   option that we chose not to pursue.

20   Q.    Why?

21   A.    The content of any hypothetical press release is largely

22   the same content of what we would like to have at our

23   fingertips in answering phone calls and speaking with people.

24   Q.    Why did you not issue a press release?

25   A.    For reasons described previously.  We didn't want to call

1    attention to the report.  We didn't want to give it

2    credibility.  We didn't want to invite a response to our

3    response.

4    Q.   If any of those three things happened, so what?

5    A.   If any of those three things were to happen, it might

6    negate the value of issuing the press release in the first

7    place.

8    Q.   Well, if what you said in the press release was true,

9    don't you think that the public readers would have decided that

10   what you were saying was true?

11   A.   You're ignoring the point about bestowing credibility on

12   the report.  You're ignoring the point about bringing added

13   visibility to the report.  Those were very real concerns.

14   Q.   No, no.  So as I understand it, Ligand felt that the issue

15   of Father Lemelson didn't go away, right?  They continued to

16   discuss this issue, press release, no press release, right?

17   A.   The first part is true, the latter part is not.  The issue

18   did not go away.  It continued to come up in phone calls and

19   meetings.  I don't recall that we continued to debate the news

20   release topic.  I think we debated that early on and decided

21   not to pursue it.  I don't recall that that was the boomerang

22   topic that kept coming back.

23   Q.   You would agree that somebody else in press relations

24   could have recommended a different choice, correct?

25             MR. DAY:  Objection.

```
 1              THE COURT:  Sustained.
 2    Q.    You could have recommended a different choice, correct?
 3    A.    As I recall, we discussed the various options and the pros
 4    and cons of each and we chose the option of not responding
 5    publicly.
 6    Q.    With your help Ligand has, in 2014, issued many press
 7    releases, right?
 8    A.    It depends what you mean by "many" but they issue a number
 9    of news releases throughout the course of a year.
10    Q.    A rough count was 40 in 2014?
11    A.    That sounds high, but maybe you know better than me.
12    Q.    Now, Ligand had the option of issuing a press release,
13    engaging in some kind of private legal action, or going to the
14    SEC, right?
15              MR. DAY:  Objection.
16              THE COURT:  Overruled.
17    Q.    Right?
18    A.    I presume Ligand had those options as a company.  I only
19    work with them on the investor-facing side of their business.
20    Q.    And if they had issued the press release and the public
21    had agreed with them, that would be it, right, in 2014?
22              MR. DAY:  Objection.  Hypothetical.
23    A.    I can't imagine that issuing a press release, no matter
24    how well drafted it was and how concise it was, I can't imagine
25    that would have been the end of the conversation.
```

1    Q.   You've been in the business 37 years, did I understand

2    that correctly?  And after 37 years you do not think that the

3    American public knows -- can be counted on to make a decision

4    what's true and what's not?

5                MR. DAY:  Objection.

6                THE COURT:  Sustained.

7    Q.   Well, what you just told us was you don't have any

8    confidence, right, that a press release would do the job,

9    right?

10               MR. DAY:  Objection.

11   A.   No.  What I said was I didn't have confidence that the

12   press release would be the end of this topic.

13   Q.   Well, the question then is if Father Lemelson said

14   something, all you cared about was did anybody pay attention,

15   right?

16   A.   That was part of it.

17   Q.   So if you had issued a press release and he responded and

18   nobody paid attention, you're home free, right, Ligand is home

19   free, that's the end of it?

20   A.   I don't follow what you mean by they're home free.

21   Q.   Well, it would seem to me that what they care about are

22   their stock price, right?

23   A.   With all due respect, your view of this is way too

24   simplistic.  It's not a question of the mole comes up and you

25   whack it and it goes away.  The mole comes up, you whack it,

1    and it comes up somewhere else.  Then you end up playing

2    whack-a-mole for months or years.

3    Q.    That's your belief as a PR person, right?

4    A.    I've seen that in the past.

5    Q.    Not all PR people would agree with you, correct?

6         MR. DAY:  Objection.

7         THE COURT:  Sustained.

8    Q.    So your feeling is -- you're telling the ladies and

9    gentlemen of the jury that if Ligand had simply issued a press

10   release, your view is that no good for Ligand would have come

11   out of that?

12        MR. DAY:  Objection.

13        THE COURT:  Sustained.  Asked and answered.  We need

14   to move on.

15   Q.    Now, Mr. Day asked you about a couple of different news

16   articles.  One he asked you about was this issue of USA Today,

17   correct?

18   A.    Right.

19   Q.    And USA Today was a situation where USA Today saw the

20   report by Father Lemelson and wrote a story, correct?

21   A.    They saw Father Lemelson's report, yes.

22   Q.    Yes.  And then they wrote a story?

23   A.    Correct.

24   Q.    And as a result of that, there was some back and forth

25   with you and Mr. Higgins, correct?

1    A.    There was.

2          MR. HOOPES:  And if you could pull up, please, Cara --

3    first, if you could pull up Exhibit 39.

4    Q.    This is an email from you to -- from Mr. Higgins to you,

5    dated June 17, correct?

6    A.    Correct.

7    Q.    One day after the report was issued, correct?

8    A.    That's correct.

9    Q.    And Mr. Higgins says to you, "Bruce, I understand you are

10   still pondering how to reply.  Maybe you reply to both Lemelson

11   and USA Today."  And there's a piece about "for Lemelson," and

12   then's a piece for, "As for USA Today, I think you or Keith

13   should call and undress them."  That's what he says, right?

14   A.    That's what's written.

15   Q.    "Call Gary," who's the reporter, correct?

16   A.    That's right.

17   Q.    "Or call his boss," right?

18   A.    That's right.

19   Q.    He's asking you to call the reporter's boss, right?

20   A.    He's making that suggestion.

21   Q.    "Tell them you advised us not to return the call because

22   of the crock of shit the report was," pardon me, "did not

23   warrant a reply.  We are a busy legitimate team.  Serious

24   reporters can't expect us to chase down crap short calls ,"

25   excuse me, "zero dollars per share value.  Give me an F'ing

1    break.  And unicorns are real and Elvis is still alive."

2           Next paragraph.  "It is total BS that USA Today ran

3    the story and put a headline on this."

4           So Mr. Higgins is unhappy that USA Today decided to

5    run a story about the report, correct?

6    A.   He was, yes.

7    Q.   And he was demanding that you call either the reporter or

8    his boss, right?

9    A.   He was.

10           MR. DAY:  Objection.

11   A.   Or suggesting, actually.  He wasn't demanding it.

12           THE COURT:  If you don't stand up, I don't hear you.

13           MR. DAY:  Okay.  Sorry.  I'm trying to talk into the

14   microphone.  What was the question again?  I'm sorry.

15           THE COURT:  I'm sorry, I totally missed --

16           MR. DAY:  We got cut off.

17   Q.   Mr. Higgins wanted you to call either the reporter or the

18   boss, right?

19   A.   He wrote that as an option.  It wasn't an instruction.  He

20   said "I think."

21   Q.   I think, I think, right?  He's upset?  He's angry again,

22   right?

23   A.   Clearly.

24   Q.   Clearly.  So if we can pull up Exhibit 225 halfway down,

25   Higgins to you.  The tone has changed a little bit during the

1    course of the same day, right?  "There's a reason you make the

2    call.  I will go nuclear on this guy."  Am I reading that

3    correctly?

4    A.   That's what it says.

5    Q.   And as a result of him telling you that he'll go nuclear

6    on the guy, you made the call, correct?

7    A.   I made the call.  Whether or not it's because John

8    commented he might go nuclear, I made the call.

9    Q.   Well, if you go to the next page, same email, Mr. Higgins

10   writes -- he doesn't call him Mr. Lemelson.  He calls him

11   Lamelson -- "calls us frauds and says we're worth zero.  Why

12   should USA Today write on that?  Bruce - not clear you got out

13   of Gary what we needed.  Maybe we go higher.  I am pissed."

14   Pardon my word.  "They should admit it was schlockey of them to

15   run a report."  Right?

16   A.   That's what it says.

17   Q.   Do you think having seen this -- I mean, so the events

18   that preceded this were that you got a call from the reporter

19   earlier on asking for comment, did you?

20   A.    I don't recall if I got the call or if Erika got the call,

21   but I guess the reporter had reached out --

22   Q.   Somebody calls?

23   A.   -- to see if Ligand wanted to speak with him.

24   Q.   And they said no, correct?

25   A.   The call did not take place, that's correct.

1    Q.   Yeah.  And as a result they got a story that they didn't

2    like, correct?

3    A.   John is comparing a known with an unknown.  The known is

4    the story they got.  The unknown is what the story might have

5    been if they had participated.  And I feel strongly that

6    unknown would have been at least longer, if not more damaging

7    to Ligand, than the little blurb that we got.  And I would also

8    add that if you have a policy not to be talking publicly about

9    the report, you don't talk about it publicly, in a news release

10   or otherwise.  You can't kind of pick and choose where you want

11   to talk about it.  Either you follow the strategy or you don't.

12   Q.   Well, he wasn't happy about the story, right?

13   A.   No.  But I would add --

14   Q.   It's a simple question.

15   A.   -- this is one of the reasons I have --

16        THE COURT:  No, no.  This is cross.  He runs the show.

17   They can ask more on redirect.

18        THE WITNESS:  Okay.  Pardon me.

19   Q.   He wasn't happy, correct?

20   A.   He was using very colorful language.

21   Q.   Very colorful language to show that he's angry, correct?

22   A.   Correct.

23   Q.   And even having seen this, you stuck with your strategy,

24   which was to not issue a simple press release, correct?

25   A.   Correct.  And you'll recall from my conversation with

 1    Gary -- I believe we talked about this, now maybe we will --
 2    the article he posted had very few clicks, very little
 3    readership on it.
 4    Q.    Yes.  In fact, you wrote an email saying just that, right,
 5    that it was on online.  It wasn't the whole USA Today that you
 6    see in a hotel?  Right?
 7    A.    That's correct.
 8    Q.    And you thought Mr. Higgins was overreacting, correct?
 9    A.    I wouldn't say I thought he was overreacting.  He's
10    clearly passionate about his company and their products.
11    Q.    Getting emotional, correct?
12    A.    There is clearly an emotional response, yes.
13    Q.    Now, the same issue came up just a few days later, Mr. Day
14    raised this question about BioWorld, right?  Not actually a few
15    days.  August, correct?
16    A.    Yes.
17    Q.    If we could pull up Exhibit 78.  And if we can go down
18    three pages deep.  There's an email from Higgins to you.  It
19    says, "Bruce, BioWorld putting Lemelson in print is bad news.
20    What do you propose to do about it?  If someone says Berkshire
21    Hathaway was going to go bankrupt, do you think the Wall Street
22    Journal would print that garbage?  This is a bigger deal than a
23    USA Today blogger making a comment about Lemelson.  Please take
24    them to task on this.  Just because there is something that
25    exists in the blogosphere does not mean it should be reprinted.

1  This should go all the way to the top of the editor at

2  BioWorld."  Am I reading that right?

3  A.   That's what it says.

4  Q.   Yeah.  So he wanted you to call the reporter's boss,

5  correct, and complain, correct?

6  A.   It wasn't a request or an instruction.  It was a comment.

7  Q.   Well, it was definitely a good faith thought in his mind,

8  right?

9           MR. DAY:  Objection.

10          THE COURT:  Sustained.

11 Q.   That was clearly a thought that he had, right, for you to

12 make a call over his head, right?

13          MR. DAY:  Objection.

14          THE COURT:  Sustained.  This speaks for itself.

15 Q.   Now, in fact, you did end up calling the reporter, right?

16 A.   I did.

17 Q.   And you explained what the concerns were, right?

18 A.   As I recall, yes.

19 Q.   Did you explain that your boss wanted him to go -- wanted

20 you to go over his head too?

21 A.   I don't believe I said that, no.

22 Q.   Do you see your response here on the first page on August

23 19 where you talk to the reporter and the reporter said about

24 ten lines down, he said, "I rely on readers to sort these

25 things out, the opinions of others, and have often quoted

1    dubious others in the past," correct?

2    A.   That's what it says, yes.

3    Q.   Yeah.  He relies on readers to sort these things out.

4         Having read this, did that change your strategy about

5    issuing a simple press release?

6    A.   No.

7    Q.   Well, Ligand had you on retainer at the time, correct?

8    A.   They did.

9    Q.   I think you said about $8,000 to $12,000 a month?

10   A.   That has been the range of their retainer over the years.

11   I don't remember what it was in 2014.

12   Q.   Ballpark, $100,000 a year, right?

13   A.   Roughly.

14   Q.   And there's at least a chance that if you had just turned

15   the content that you had drafted into the form of a press

16   release and sent it out that your retainer alone would have

17   been the end of the case, correct?

18        MR. DAY:  Objection.

19        THE COURT:  Sustained.

20   Q.   Well, if the case had ended -- if the issue with Father

21   Lemelson had ended after you issued a press release, there

22   would have been nothing further, no private lawsuit, no effort

23   to go to the SEC, nothing?  Your actions would have killed the

24   problem, right?

25        MR. DAY:  Objection.

```
 1              THE COURT:  Sustained.
 2    Q.    Now, if we could go to No. 92, Exhibit 92.  So can you
 3    look at that email?
 4    A.    Yes.
 5    Q.    That's an email from you to Jody Burfening, right?
 6    A.    That's correct.
 7    Q.    And that's on November 17, 2014, right?
 8    A.    That's right.
 9    Q.    And who is Jody Burfening?
10    A.    She's one of my colleagues in my firm's New York office.
11    Q.    And she was asking you a question, right?
12    A.    My email is responding to an email she had sent.
13    Q.    And she asked you, you know, essentially have you ever
14    dealt with the activist investor issue, correct?
15    A.    You'd have to show it.  I think that's roughly what she
16    asked.
17    Q.    Okay.  So that's roughly what she asked, right?
18              So reading your response, your response was, "The
19    closest we have is with Ligand and an activist named Emmanuel
20    Lemelson, who manages a hedge fund of undisclosed size and has
21    published some very negative research, Seeking Alpha, news
22    releases, gone on media programs to espouse his thesis,
23    including Benzinga.  His thesis is the company is worth zero,
24    not 1.1 billion, and he's so ludicrous we're not engaging in
25    public dialogue with him.  I spoke with him once, and it became
```

1    clear immediately he had no interest in what I was saying, the

2    facts or another way to look at things -- hence the silent

3    treatment by management.  We didn't want to stoke him and give

4    him another reason to speak publicly as to his view.

5              "We never wrote out formal rules but rather we just

6    agreed to that strategy.  Lemelson came out with his view when

7    the stock was at a frothy peak."  What did you mean when you

8    said that, "frothy peak"?

9    A.   As I recall, at that time, in roughly the early summer of

10   2014, valuations -- the value of biotechnology companies

11   overall had run up over the previous few months.

12   Q.   So by "frothy peak," are you indicating that you think

13   that that whole market, biotech, was a little high?

14   A.   Biotech as an industry has wide swings in it.  When things

15   are good, they're very, very good, and when things are bad,

16   they are very, very bad.  Oftentimes activities outside of a

17   particular company will influence them.  For example, if

18   there's a lot of M and A transactions going on, then everybody

19   gets the benefit of that.  If there are a lot of clinical trial

20   failures going on, then everybody gets punished by that.

21   Q.   And, in fact, you say as much.  "It has since come down

22   quite a bit, high 70s down to low 50s, though it's hard to say

23   how much with Lemelson, Janet Yellen talking about overpriced

24   biotech or something else."  Who's Janet Yellen?

25   A.   You don't know?

1          At the time Janet Yellen was chairman or chairperson

2     of the Federal Reserve.

3     Q.   And you're referring to a statement that -- right?

4     A.   As I recall, Janet Yellen had made a statement about

5     overpriced biotech companies, and the biotech indexes went down

6     sharply after she made that statement.  She carries a very big

7     stick.

8     Q.   Okay.  So you're expressing the fact that it's kind of

9     hard to say what causes the downturn in the stock, right?

10    A.   I'm saying there were a number of factors going on, yes.

11    Q.   Hard to say which one, right?

12    A.   That's almost always the case with stocks.

13    Q.   "By the way, Lemelson is an ordained Eastern Orthodox

14    priest, constantly photographed in his priestly robes and

15    collar.  It would be funny if it wasn't my client.  He's not

16    seeking control of the company;" in your view, "he just wants

17    to make money on his short position."

18         MR. HOOPES:  Next paragraph, please.

19    Q.   Now, you told us this morning, when you were being asked

20    some questions, that it was a crime to be disclosing material

21    information possibly, right?

22    A.   It's not a crime to disclose it.  It's a crime to act on

23    it.

24    Q.   Ah.  So you think disclosing private information was okay?

25    A.   I would never do that because you don't know if the person

1   on the other side is going to act on it or not.

2   Q.   So in this paragraph you say, "Between us and not to be

3   shared with your client naming names, Ligand approached the

4   Boston SEC, Lemelson is based in Mass., and following a lengthy

5   meeting involving outside counsel, there seems to be an

6   investigation underway on a number of fronts I'm not fully

7   aware of, including stock manipulation.  If your client might

8   go that route, I can hook them up with the Latham & Watkins

9   guys in San Diego who spearheaded the effort."  Did your

10  client, Mr. Higgins, know that you were disclosing this kind of

11  information?

12  A.   He did not know I sent this email to my colleague.

13  Q.   And as you sit here today, do you know -- did you know

14  that portions of it are absolutely incorrect?

15          MR. DAY:  Objection.

16          THE COURT:  Sustained.

17  Q.   Did you know that any portion of that paragraph is

18  incorrect?

19  A.   I presume on the day I wrote this, I believed it all was

20  correct.

21  Q.   You had a good faith belief that this was true, correct?

22  A.   I wouldn't have written it if I didn't.

23  Q.   Exactly.  And the fact is is that there was no

24  investigation underway on a number of fronts at that point,

25  correct?

1    A.    I don't know.  I don't know all the back story and the

2    history of investigations, who and when.

3    Q.    Okay.  And if we could pull up No. 215, please.  And at

4    the top in the first paragraph there's a discussion about an

5    option between you and Mr. Higgins and Mr. Foehr about you

6    going to Seeking Alpha to see if you could get Mr. Lemelson's

7    post taken down, right?

8    A.    Correct.

9    Q.    I guess my question is, what were you afraid of, that you

10   would go to that kind of length?

11   A.    I don't think it's a question of being afraid of.  I think

12   the issue is the report was so egregious, so full of errors,

13   that Seeking Alpha very well may take it down if they knew that

14   the report was much more fiction than fact.

15   Q.    Can you go to 229, please.  This is an email exchange

16   between you and Mr. Higgins and Mr. Foehr on June 20, 2014.

17   About eight lines down you say, "Yes, I completely agree with

18   the content and the plan to send the email.  I had to hold back

19   from pointing out that his BA and master's are in theology and

20   religious studies and not business or finance, and that he does

21   not have a CFA designation.  But that would simply stoke the

22   fire and invite the wrath of God, or at least some Eastern

23   Orthodox leader."  You wrote that?

24   A.    I did.

25   Q.    Were you sincere when you wrote that, or are you just

1    trying to curry favor with Mr. Higgins?

2    A.    I think I was trying to be funny.

3    Q.    Oh, you think someone who's Eastern Orthodox would think

4    that's funny?

5    A.    I have total respect for his faith and his position.  This

6    has nothing to do with his religion.  It has to do with a

7    priest who also is a hedge fund manager or vice versa and his

8    academic credentials.

9    Q.    Can you pull up 239, please.  This is Mr. Higgins to a

10   number of people, you're one of them, talking about a report by

11   Father Lemelson, and he says, "should we try to edit this, or

12   otherwise try to get Wikipedia to delete it?  I am not familiar

13   with how that works or if Ligand will have visibility in the

14   process.  Are there firms we can hire to edit WikiLeaks?

15   Should we have investors edit the page?"  Do you understand him

16   to be suggesting that Father Lemelson has a page and somebody

17   is going to surreptitiously edit the page?

18   A.    Wikipedia, which is better established now than it was

19   then, Wikipedia invites group editing.  It is kind of an open

20   source dictionary where people can add and correct and footnote

21   sources and the like.  So by design it's editable.

22   Q.    So in other words, you're saying that's a reason for

23   Ligand to go edit his Wiki page?

24   A.    I didn't say anything like that.

25   Q.    Do you think it's proper if they had gone through with

1   that to edit his Wiki page?

2   A.   I don't believe I ever responded to this email.

3   Q.   I'm just asking you, do you think that would have been

4   proper to do that?

5   A.   I think it's an option.  You can edit any Wikipedia page,

6   my understanding is, if you're not affiliated with that entity.

7   Q.   That's not my question.  My question is, do you think it

8   was ethical to go edit somebody's Wiki page?

9           MR. DAY:  Objection.

10          THE COURT:  Overruled.  Well, first of all, did it

11   happen?

12          THE WITNESS:  It depends how you would edit -- to my

13   knowledge it didn't happen.  It didn't happen from me.  I don't

14   know if it happened from anybody else.

15          MR. HOOPES:  May I have just one moment, Your Honor?

16          THE COURT:  How are you timewise?

17          MR. HOOPES:  I think about two minutes.  All right.

18   If I can just have two minutes here.

19   Q.   Do you remember, sir, when the issue first arose advising

20   there shouldn't be any public response unless the errors were

21   egregious or there was significant reaction by the stock, in

22   essence?

23   A.   That was in my emails I wrote, yes.

24   Q.   And that was your advice at the time?

25   A.   That was -- as I recall, that email started something

```
 1    like, "I've read the report quickly, and here are my initial
 2    thoughts."
 3    Q.   So has to be egregious, has to have an impact on the
 4    stock.  Otherwise, we're sticking with our strategy, no press
 5    release, right?
 6    A.   I think there was a phrase that also said "and even then."
 7    Q.   And even then?
 8    A.   There was a continuation to that thought.
 9    Q.   And even then, no press release?
10    A.   That's not what it said, but there's more to the statement
11    than you're conveying.
12    Q.   No, no.  But that was your position throughout, no press
13    release, right?  Yes or no, sir.
14    A.   My position throughout was we need to look at options and
15    we need to monitor the situation to see if how we look at those
16    options might change.
17    Q.   And at no time did the situation change so that you would
18    have okayed for a press release, right?
19    A.   At no time did we issue a press release.
20              MR. HOOPES:  Thank you.  That's all I have.
21              THE COURT:  Let me ask.  It's five of.
22              MR. DAY:  Your Honor, it's probably more than five
23    minutes of redirect.  I would prefer to do it after the break.
24              THE COURT:  Why don't you take the five minutes, and
25    then we'll break at 1:00.  Never waste a minute.
```

1          MR. DAY:  Okay.  With the understanding I may be able
2     to do a few more minutes afterwards.
3          THE COURT:  All right.  Don't worry.  The hook won't
4     come.
5          Do you all have screens up?  Okay.
6                    REDIRECT EXAMINATION
7     BY MR. DAY:
8     Q.   Could we pull up Exhibit 127.  Mr. Voss, Mr. Hoopes asked
9     you some questions about this document and in particular the
10    paragraph towards the bottom that says, "Bruce, I have proposed
11    a narrative for a call for you to have with Lemelson."  And
12    there was some suggestion, as I read the questions, that this
13    was a directive to you to do exactly this.  Did you feel that
14    you had some leeway in how to handle the call with Father
15    Lemelson?
16    A.   I did feel I had leeway, and I also felt that once a call
17    starts, you've got to be nimble and respond to the reality of
18    that call.
19    Q.   Let's pull up Exhibit 214.  It might take me a moment to
20    find the right place here.  Bear with me.
21          Okay.  Right in the middle of the page in
22    Mr. Higgins's email, there's a statement, "Even one minute of
23    soft info would have left him with a different impression than
24    tacit agreement."  Do you see that?
25    A.   I do.

```
 1   Q.   Okay.  Now, this exchange is in the morning on June 20,
 2   the day after the interview, right?
 3   A.   Right.
 4   Q.   And these are some of the initial communications that
 5   you're having with Mr. Foehr and Mr. Higgins?
 6   A.   Correct.
 7   Q.   Okay.  And at this point I don't think you'd even listened
 8   to the interview yet, right?
 9   A.   Apparently not.
10   Q.   All right.  Did Mr. Higgins have, to your knowledge, a
11   full and complete understanding of your recollection of all the
12   details of that 20-minute conversation that you had with Father
13   Lemelson?
14            MR. HOOPES:  Objection.
15            THE COURT:  Sustained.  Hearsay.
16   Q.   I asked his understanding.
17            Well, okay.  Had you conveyed to Mr. Higgins at this
18   point in the morning of June 20, when you hadn't even listened
19   to the interview yet, did you convey to him every detail that
20   you had remembered about that conversation on the 18th?
21   A.   No.  I summarized the conversation to him.
22   Q.   Okay.  Now, there's this comment that Mr. Hoopes asked you
23   about one minute of soft information.  Do you have an
24   understanding of what soft information is?
25   A.   I'm not sure what he meant.  But likely he meant --
```

```
 1              MR. HOOPES:  Objection.  Asked and answered.
 2    A.   The answer is no.  I --
 3              THE COURT:  Is there a meaning in the trade about what
 4    soft information is.
 5              THE WITNESS:  It's not like a term of art in the
 6    trade.  I don't know what it means.
 7              THE COURT:  What's the next question?
 8    Q.   In the 20-minute conversation that you had with Father
 9    Lemelson, you provided a lot of information to him that we
10    talked about this morning, right?
11              MR. HOOPES:  Objection.
12    A.   I did, yes.
13              THE COURT:  You know, you've got to pop up, because I
14    can barely hear you.
15              MR. HOOPES:  Objection.  Asked and answered.
16              THE COURT:  Not on those grounds.  It's leading.
17    Sustained.
18    Q.   You testified this morning, I believe, that you provided
19    quite a lot of information to Father Lemelson in the course of
20    the 20-minute call with him, correct?
21    A.   I did.
22    Q.   What information, if any, did you provide about Promacta
23    and its various indications?
24              MR. HOOPES:  Objection.
25              THE COURT:  Overruled.
```

```
 1    A.   As I recall, the information I provided about Promacta and
 2    its future had to do with hepatitis C, as well as ITP, aplastic
 3    anemia, and as I discussed earlier, within hep C the discussion
 4    included commentary that we don't know what Sovaldi is going to
 5    do to this market.  But even with Sovaldi, there will be a role
 6    for Promacta, maybe on patients with Sovaldi, maybe on patients
 7    who are still on interferon.  Then I also raised the topic that
 8    there are two other approved indications and more in the
 9    pipeline.
10    Q.   And you referenced GSK?
11              THE COURT:  Excuse me.  I think it's 1:00 right now.
12    Do you want to break?
13              MR. DAY:  Sure.  That's fine, Your Honor.
14              THE COURT:  Okay.  So we'll take a break.  I'll see
15    you at 2:00.
16    (Jury exits.)
17              MR. HOOPES:  Can the witness be excused?
18              THE COURT:  Yes.
19              How much longer do you think you have?
20              MR. DAY:  Maybe ten minutes.  It's really not long.
21              THE COURT:  Ten?
22              MR. HOOPES:  Two.
23              THE COURT:  So that will bring us to, say, 2:15-ish.
24    Who's the next witness?
25              MR. DAY:  Mr. Banerjee from Marcum, the auditor.
```

```
 1              MR. HOOPES:  There's an issue.  And the issue is, as I
 2    understand it -- I haven't had a chance yet to speak with
 3    Mr. Jones -- that there's a potential that one of these
 4    witnesses was on Zoom.
 5              THE COURT:  As I understand it --
 6              MR. HOOPES:  Maybe not.
 7              THE COURT:  -- there was a mistake made by my staff.
 8    Is it a he or she?  I don't even know.
 9              MR. JONES:  He, Your Honor.
10              THE COURT:  He was sitting in the wait room and they
11    thought it was somebody else.  They didn't realize.  And the
12    person was brought in for about like a minute, a short period
13    of time.  You can ask about it -- you can ask about it, but I
14    think it's an auditor, right?
15              MR. HOOPES:  Yes.
16              THE COURT:  So I'm not even sure it matters.
17              MR. HOOPES:  We're just trying to understand the
18    facts.  I think you've just relayed it.
19              THE COURT:  It was my team.
20              MR. HOOPES:  And it was 60 seconds.
21              THE COURT:  I think it was really quick.  They weren't
22    really paying such close attention.  You realize it wasn't
23    somebody trying to get in to watch.  It was somebody who was a
24    witness.  I think the witness -- I won't speak for her.  I
25    understand it was very brief.
```

```
 1            MR. BROOKS:  Okay.

 2            THE COURT:  You can ask about it maybe even out in the

 3   hall and find out exactly how long it was.  Because that wasn't

 4   really the focus at the time.

 5            MR. HOOPES:  We understand.

 6            MR. JONES:  Just on that, Your Honor, just so

 7   everybody knows, mostly for the staff and the court, but there

 8   will be two witnesses back to back on Zoom today.  So there

 9   will just have to be a careful cutoff of one and bringing the

10   other one in.  They'll both be sort of tied into that same

11   Zoom, one in the wait room hopefully and one testifying.

12            THE COURT:  You mean, there might be another mistake?

13   We might bring in two again?

14            MR. JONES:  I don't think that will happen again, Your

15   Honor.  But I figured everyone knowing what's happening is the

16   right way to go.

17            THE COURT:  Could you correspond with them and say

18   it's only supposed to be one at a time?

19            MR. JONES:  Yes, Your Honor.  We'll double check on

20   that and just say if somebody is testifying, you know, hang up

21   or something.

22            THE COURT:  Okay.  Thank you.

23            MR. JONES:  Thank you, Your Honor.

24   (A recess was taken.)

25
```

```
 1    AFTERNOON SESSION
 2            THE COURT:  Do you need to see me?
 3            MR. JONES:  Your Honor, we have a scheduling issue.
 4    We have two Zoom witnesses.  We have one ready to go as soon as
 5    Mr. Voss is done.  The second is the general counsel of his
 6    firm, but he is AWOL.
 7            THE COURT:  He's AWOL?
 8            MR. JONES:  He was the one on the Zoom yesterday.  So
 9    it's not like he's refusing to testify.  It's like something
10    happening that we don't know what it is.  It could cause us a
11    hole after Ms. Hyodo.
12            THE CLERK:  I'm sure he'll show up.
13            MR. JONES:  That's our expectation too especially
14    because we told his counsel he'd better show up.  We don't have
15    him yet.
16            THE COURT:  You don't have your summary witness
17    around, do you?
18            MR. JONES:  No, Your Honor.  She's in Utah.
19            THE COURT:  I mean available.
20            MR. JONES:  No, I don't think so, Your Honor.
21            THE COURT:  Well, let's finish Mr. Voss so he can get
22    out of here.  Do you have a flight?
23            THE WITNESS:  I do.  I was expecting to be here
24    tomorrow as well.  So my flight is not an issue.
25            THE COURT:  Take your time.
```

```
 1            MR. JONES:  We'll go back and do a few more hours, I
 2    hope it's okay.
 3            THE CLERK:  Judge, I'm waiting for IT to come up
 4    because we'll need a little break in between to get set up for
 5    the one Zoom witness that is going to appear.  Right after
 6    this --
 7            THE COURT:  We're not all going to leave.  We'll just
 8    wait --
 9            THE CLERK:  You should probably break for --
10            THE COURT:  This is going to take three minutes.  So I
11    think we need to get her now.
12            THE CLERK:  I asked her to come up at 2:05.
13            MR. JONES:  Which is now.
14            THE COURT:  Okay.  Let's get the jury here.
15            (The jury enters the courtroom.)
16            MR. JONES:  May I proceed, Your Honor?  Mr. Voss,
17    welcome back.  Sorry we weren't able to conclude this before
18    lunch.  Just have a few minutes of questions for you.  I think
19    we need to switch the screen.
20            THE CLERK:  Do you want me to switch up here?  Is it
21    up?  It should be.
22                    CONTINUED REDIRECT EXAMINATION
23    BY MR. JONES:
24    Q.   Mr. Voss, you were asked some questions about this board
25    of directors meeting PowerPoint earlier today.  Do you recall
```

1    that?

2    A.    I do.

3    Q.    The date is Wednesday, September 18, 2013.

4    A.    It is.

5    Q.    Did you attend this board of directors?

6    A.    I did not.

7    Q.    Have you seen this document before today?

8    A.    I have not.

9    Q.    Did you write or review any of the context of this meeting

10   presentation?

11   A.    No.

12   Q.    Can we pull up 223, please.  Mr. Hoopes asked you a few

13   questions about this document which appears to be an email

14   exchange between Matt Feuhr and John Higgins.

15          Do you recall that?

16   A.    I do.

17   Q.    There's one part in the middle where Mr. Hoopes asked you

18   about where Mr. Higgins wrote any SOVALDI patients need

19   Promacta.

20          Do you see that?

21   A.    I do.

22   Q.    My first question is, you weren't on this email chain,

23   right?

24   A.    No.

25   Q.    Have you seen it before today?

1    A.   No.

2    Q.   One quick question for you.  It appears that Mr. Higgins

3    goes on to ask a number of other questions about SOVALDI.

4              Do you see that it?

5    A.   I do.

6    Q.   It wasn't just this one question about will any of the

7    Sovaldi patients need Promacta?

8    A.   No.

9    Q.   You can turn that off.  You were asked a few questions, I

10   don't think we need to look at the documents about an email

11   concerning edits to a Wikipedia page.

12             Do you remember that?

13   A.   I do.

14   Q.   To your knowledge did that ever happen?  Did anybody ever

15   try to edit a Wikipedia page?

16   A.   No.

17   Q.   You didn't, right?

18   A.   I did not.

19   Q.   Similar questions about an email discussing potentially

20   contacting seeking Alpha about I gather about Father Lemelson's

21   reports.

22             Do you remember that?

23   A.   I do.

24   Q.   Do you remember whether that happened or not?

25   A.   Not by me.  I don't know if it happened at all.

1    Q.    Do you have any reason to believe that it did?

2    A.    I never heard that it was down or had been removed, but I

3    don't know.

4    Q.    Cole, can we pull up Exhibit 3, the transcript of the

5    Benzinga interview and go to page 16.  Sorry.  It's page 5, the

6    pdf.  I'll get that right one of these days.  Can you highlight

7    that whole section.

8          We've talked about this at some length today.  I just

9    want to focus your attention in light of Mr. Hoopes' cross

10   examination again on what Father Lemelson said about your

11   conversation.  He wrote, "And they said", referring to you,

12   "look, we understand Promacta is going away."

13         Did you say those words or anything like it?

14   A.    Absolutely not.

15   Q.    And you'd agree with me here that this doesn't say

16   anything about tacit agreement, does it?

17   A.    It does not.

18   Q.    Did any stock in Ligand at this time in June of 2014?

19   A.    I did not.

20   Q.    You understood that the defendant had a multimillion

21   dollar short position at this time?

22   A.    I didn't know the size of the position, but I knew he had

23   a short position.

24   Q.    So he had a lot of reasons to lie about what he said.

25               MR. HOOPES:  Objection.

1           THE COURT:  Sustained.

2           MR. JONES:  Nothing further, Your Honor.

3           MR. HOOPES:  Can I ask do you want the questions from

4    here?

5           THE COURT:  You can go over to the podium.  We just

6    can't see you.  If you go over there.

7           MR. HOOPES:  Some people might not miss you.

8           THE CLERK:  Stay right there.

9                      REDIRECT EXAMINATION

10   BY MR. HOOPES:

11   Q.   Just a couple of questions.  You had told the jury that

12   you thought that the June 16 rather by Father Lemelson, you

13   found it egregious I think is the word you used, right?

14   A.   Yes.

15   Q.   Did you know sitting here today that of the four

16   statements that are alleged at issue by the SEC that none of

17   them relate to the June 16 report?

18   A.   I didn't compare the SEC issue with the report.

19   Q.   So the short answer is no?

20   A.   Correct.

21   Q.   So as to the four that they have alleged, which is whether

22   or not Father Lemelson had a good-faith belief that you said

23   something like Promacta is going away, there was no press

24   release issued about that, right?

25           MR. JONES:  Objection.  Mischaracterizes testimony.

```
 1              THE COURT:  Asked and answered.  There were no press
 2    releases.
 3    BY MR. HOOPES:
 4    Q.   About anything beyond anything.  No press releases.
 5    A.   There was no press release issued that related
 6    specifically to Father Lemelson and --
 7    Q.   June 16 or any statements thereafter?
 8    A.   Nothing that specifically said this is related to Father
 9    Lemelson's report.
10              MR. HOOPES:  Thank you.
11              THE COURT:  Thank you.  You may step down.  Enjoy your
12    trip home.
13              THE WITNESS:  Thanks very much.
14              MR. JONES:  Your Honor, the Commission calls Catherine
15    Hyodo.
16              THE COURT:  Hopefully that will just take a minute to
17    set up.
18              MR. JONES:  Ms. Hyodo, can you hear us?
19              THE WITNESS:  I can.
20              THE CLERK:  I have to use her mike.
21              THE WITNESS:  Sound check.  One, two.
22              MR. JONES:  Can you see me?  I'm this one.
23              THE WITNESS:  I cannot see anybody but the Judge.
24              MR. JONES:  I'm in a small screen and waving my arms
25    like an idiot.
```

```
 1              THE WITNESS:  Okay.

 2              MR. JONES:  The most important is that you can hear

 3    me.  You can hear me okay?

 4              THE WITNESS:  I can.

 5              THE COURT:  Face her more to the jury and also so she

 6    can see Mr. Jones and later whoever is doing the cross.

 7              THE WITNESS:  Yes, I can see him.

 8              THE COURT:  Do you want to administer the oath,

 9    please, Maryellen?

10              THE CLERK:  Sure.  Can you please raise your right

11    hand?

12              (CATHERINE HYODO, duly sworn by the Deputy Clerk.)

13              THE WITNESS:  C-A-T-H-E-R-I-N-E.  Last name H-Y-O-D-O.

14              MR. JONES:  May I proceed, Your Honor?

15              THE COURT:  You may.

16                        DIRECT EXAMINATION

17    BY MR. JONES:

18    Q.   Good morning, Ms. Hyodo.  It's morning where you are,

19    right?

20    A.   Yes.

21    Q.   Where are you calling us from?

22    A.   Los Angeles.

23    Q.   Thank you for joining us.  I hope the Zoom works out well.

24    If at any point you can't hear me or I lose you, just wave your

25    arms around and let us know and we'll fix it.  Let's start out
```

1    with what do you do for a living, Ms. Hyodo.

2    A.    I'm an audit partner in a public accounting firm.

3    Q.    What's the name of that accounting firm where you're an

4    audit partner?

5    A.    Grant Thornton.

6    Q.    Do you have a title at Grant Thornton?

7    A.    I am an assurance partner.  I am also the office managing

8    partner for Los Angeles.

9    Q.    Let's start with Grant Thornton.  Is that a local auditing

10   form, or is it larger?  How big is it?

11   A.    It's a global accounting and advisory firm.  Depending on

12   the information out there to in the public, we are one of the

13   eight largest public accounting firms in the world.

14   Q.    How many offices around the world do you have?

15   A.    We're in over 130 countries.

16   Q.    About how many people work for Grant Thornton?

17   A.    In the U.S. alone we are over 8,000, and globally it's

18   over 22-25 possibly.  I don't know the exact number.

19   Q.    You said you were the managing director of the Los Angeles

20   office?

21   A.    Managing partner.

22   Q.    What does that mean?

23   A.    I oversee the office for all service lines which means

24   auditing, tax, and consulting practice.  And I manage the

25   office operations and am primarily in charge of the revenue for

1    the office.

2    Q.   So would it be fair to say that you are one of the people

3    who runs the Los Angeles office?

4    A.   Correct.

5    Q.   Okay.  And how large is that office?

6    A.   We are just shy of 200 people.

7    Q.   You said you were also an assurance partner.  Is that

8    right?

9    A.   That's correct.

10   Q.   And what does that mean?

11   A.   That is the other term used for audit partner in the

12   industry.

13   Q.   What is an audit partner?

14   A.   An audit partner is one that provides adaptation or

15   assurance, that's why they're interchangeable, on information

16   and governed by certain regulatory bodies.

17   Q.   The information you're providing assurance about, what

18   kind of insurance is being assured?

19   A.   It depend on the nature of the request, but we provide

20   assurance or attestation as well on financial information of

21   companies.

22   Q.   Okay.  And is that assurance process, is that sometimes

23   called an audit?

24   A.   Yes.

25   Q.   As part of your work, do you audit companies?

1    A.    We do.

2    Q.    And do you personally do it?

3    A.    I do, yes.

4    Q.    Do you audit what are called public companies?

5    A.    I do.  But I currently am not assigned to one as of today.

6    Q.    Okay.  In 2014 did you audit public companies?

7    A.    I did.

8    Q.    Those companies, are they often referred to as the clients

9    of the audit firm?

10   A.    Yes.

11   Q.    Okay.  Now, by calling them clients, do you work for the

12   companies that hire you, or is it somehow separate?

13   A.    No.  We are engaged by the audit committee members, an

14   audit committee of a public company.

15   Q.    Is that audit committee part of a board of directors?

16   A.    Yes.  It is inclusive of certain members of the board of

17   directors.

18   Q.    Does that audit committee, is that required to be

19   independent members of the board of directors?

20   A.    Yes.  They do.  Under the SEC regulations.

21   Q.    And when we say independent members of the board of

22   directors, can you explain what that means?

23   A.    I don't know the exact definition, but not management

24   individuals.  Public companies do have and are required to have

25   independent directors and members who are not material owners

1   within the company or part of the management group.

2   Q.   So your firm gets hired by that committee of the board of

3   directors; is that right?

4   A.   That's correct.

5   Q.   Is there something called auditor independence?

6   A.   Yes.  That's within our professional standards.

7   Q.   Let me get to the professional standards in one minute.

8   Can you just give us a general definition of what auditor

9   independence means?

10  A.   As an auditor, we must be free and clear and independent

11  of the clients and dealing, and there is a host of regulations

12  and requirements that we have to follow to ensure that we are

13  independent.

14  Q.   And those regulations and requirements, those are legal

15  requirements that are imposed on auditors?

16  A.   Umm, I guess they're legal in the sense that they are by

17  regulatory bodies and they're assigned them and issued by

18  regulatory bodies whereby we have to follow an order to ensure

19  that we are in compliance with those standards.

20  Q.   And one of those regulatory bodies, is it the SEC?

21  A.   One of the regulatory bodies, yes.

22  Q.   In 2014 did you have any dealings with a company called

23  Ligand Pharmaceuticals?

24  A.   I did.

25  Q.   Was Ligand Pharmaceuticals one of your clients?

1    A.    Yes, they were.

2    Q.    And did you personally serve on a team that did work on

3    the Ligand Pharmaceuticals -- on Ligand Pharmaceuticals?

4    A.    Yes.

5    Q.    In 2014 what role did you play on that team for auditing

6    Ligand Pharmaceuticals?

7    A.    I was the audit partner on that engagement.

8    Q.    Will you tell us what an audit partner is?

9    A.    I am responsible and oversee the entire audit.  I am also

10   the individual who is signing the opinion that is filed with

11   the public filing.

12   Q.    Okay.  So as the audit partner, do you work -- let me be

13   specific to 2014.

14           As the audit partner for Ligand Pharmaceuticals in

15   2014, did you work with a team of other people?

16   A.    Yes, I did.

17   Q.    Were those people also auditors?

18   A.    Yes, they were.

19   Q.    How big a team were you working with approximately?

20   A.    Over ten individuals.

21   Q.    And those people are all working on preparing an audit of

22   Ligand Pharmaceuticals in that time period?

23   A.    In that time period, yes, different aspects of the audit.

24   Q.    Different people on the team do different parts of the

25   audit?

```
1    A.    That's correct.

2    Q.    Prior to 2014, had you worked with Ligand Pharmaceuticals?

3    A.    Only the year before that.

4    Q.    So you were part of an audit team in 2013 as well?

5    A.    That's correct.

6    Q.    After 2014, did you continue to have Ligand

7    Pharmaceuticals as one of the audit clients that you were

8    performing services about?

9    A.    Yes.  Until they selected another auditor.

10   Q.    And in what year was that?

11   A.    I believe that was 2016.

12   Q.    Okay.  So you had 2013, 2014, 2015, and 2016 you served as

13   the audit partner all four years?

14   A.    Not '16, just part of '16.  I did not opine on the '16

15   year.  They switched in one of the quarters.

16   Q.    Okay.  To be an auditor for a public company, to be an

17   audit partner for a public company, are there certain

18   credentials or training that go along with that?

19   A.    Yes.  To be licensed as a CPA and to be an audit partner,

20   our firm, as well as just the state licensing board, have

21   minimum requirements to maintain your license.  We also have

22   internal requirements when it comes to education hours.

23   Q.    You use the term CPA.  Probably everybody knows what that

24   is, but just for the record, what is a CPA?

25   A.    Certified Public Accountant.
```

1   Q.   Is that a license that is granted by the state in which

2   you're doing the accounting work?

3   A.   Yes, it is.

4   Q.   Is it hard to get a CPA?

5   A.   You do have to pass a rigorous exam, perform a certain

6   amount of hours, and then file for licensure with the state as

7   well as complete in California, as well as complete an ethics

8   exam, and then they will approve that based on the information

9   submitted.

10  Q.   Once you become a CPA, do you have to do additional work

11  to stay a CPA?

12  A.   Yes, you do.  There's a minimum number of hours of

13  educational credits varying between years and multiple years.

14  Q.   Since 2014, have you maintained your CPA, your

15  professional licensure?

16  A.   Yes, I have.

17  Q.   You're a CPA today?

18  A.   Yes, I am.

19  Q.   Okay.  When Grant Thornton, when you are doing an audit,

20  and we'll be specific to 2014, are there a set of standards

21  that need to be applied to that work that dictate what you are

22  looking at and what work you're doing?

23  A.   As an auditor, we are required to follow general

24  accounting auditing standards.

25  Q.   What were the generally accepted accounting standards?

1    A.    Those are standards that guide an auditor with regards to

2    procedures and basic processes that need to be considered when

3    completing an audit.

4    Q.    So would it be fair to say that's a set of standards that

5    need to be applied whether you're auditing a public company?

6    A.    There's those standards as well as other regulatory bodies

7    that oversee public companies as well.

8    Q.    So you have essentially multiple sets of standards that

9    you need to adhere to when doing that audit; is that right?

10    A.    That's correct.

11    Q.    Okay.  When you do audit work and you finish the audit, is

12    there sort of a final step to that audit?

13    A.    Are you asking me internally?  May I clarify?  Are you

14    asking the internal process or the company filing their public

15    documents?

16    Q.    I appreciate you asking for the clarification.  I meant a

17    final step with the company and their filing that signifies

18    that the audit has been complete.

19    A.    We do and are required to communicate with the audit

20    committee our findings and results prior to the company filing

21    their 10K.

22    Q.    After you consult with the audit committee, is there a

23    letter issued about the audit?

24    A.    There's not a letter, but there is typically a

25    presentation that is presented to the audit committee.

1    Q.   And then -- please go ahead.  I didn't mean to cut you

2    off.  I think we Zoom-missed each other.

3    A.   No.  But there are some other documents that we provide

4    that are obtained from the company, but those are all part of

5    standard auditing procedures.

6    Q.   And is there a document that the auditor provides to the

7    public accounting client that the public company files to show

8    that its audit has been completed?

9    A.   We issue our signed audit opinion.

10   Q.   Is that sometimes called an Opinion Letter?

11   A.   Correct.

12   Q.   And what is an Opinion Letter?  What's in it?

13   A.   You'll see it within the filing at the forefront of the

14   financial information that indicates our responsibility, the

15   scope, the period in which we're providing our opinion on which

16   financial information titles we're opining on and the period in

17   which we're opining on and our conclusion as well that's been

18   reached.

19   Q.   You said that actually appears at the front of the filed

20   financial statements?

21   A.   Correct.  Usually it's filed in section I think it's item

22   8.

23   Q.   I didn't quiet catch that.

24   A.   I think it's item or section 8.

25   Q.   Item 8 of a filing is the financial statements part of the

1  filing?

2  A.   That's usually, yes, where they put all the financial

3  statements information.

4  Q.   So each year you're doing the audit, you have to, if the

5  audit is completed, you have to give an Opinion Letter for the

6  company to file with its financial statements, correct?

7  A.   Yes, that's correct.

8  Q.   And does that audit letter say whether or not the

9  company's financials are in the opinion of the auditing firm,

10  your firm, prepared in accordance with the standards you talked

11  about?

12  A.   Yes.  They're prepared in accordance with the standards,

13  correct, yes, that I referred to.

14  Q.   Is it possible to get an Opinion Letter if the financial

15  statements are not done in the right way?

16  A.   If they're not completed and we have not completed our

17  procedures, we would not issue that letter that's executed and

18  signed, and the company would not be permitted to file that.

19  Q.   So the company, they have nothing to file if you don't

20  give them that Opinion Letter?

21  A.   Well, the company can file all the other information.  We

22  only govern the financials but would not be able to include our

23  opinion.

24  Q.   Got it.  When we talk about an audit, is that an annual

25  thing?

1    A.    Audits -- public companies are required to file annual

2    audited financial statements.

3    Q.    Is there something also called a quarterly review?

4    A.    Yes, there is.

5    Q.    What is a quarterly review?

6    A.    A quarterly review are interim reports and financial

7    information filed by a company typically once every quarter,

8    which is three months, and filed as a public document for

9    investors to look at and others to look at with regard to the

10   status of the company throughout the year.

11   Q.    What's the difference between a quarterly review and an

12   annual audit?

13   A.    A quarterly review is substantially less in scope than an

14   annual audit.  We perform inquiries, procedures, discussions

15   with management.  We read documents.  We perform some

16   analytical procedures which are high level comparisons.  And

17   our responsibility is to look to see if there is anything in

18   there that would be inconsistent or not in accordance with US

19   GAAP regulatory requirements.

20   Q.    And that GAAP again is the generally accepted accounting

21   principles?

22   A.    Yes, it is.

23   Q.    Is that essentially the same as the generally accepted

24   accounting standards that we talked about before?

25   A.    Well, the GAAP is how the financial statements in

1   accounting should be presented.  The auditing standards is

2   governing the audit and the procedures we need to perform to

3   issue our opinion.

4   Q.   So the GAAP, G-A-A-P, covers the way the financial

5   statements need to be presented, and the standards are the ones

6   that actually apply to the audit form and the people working

7   for it.

8           Is that right?

9   A.   That's correct.

10  Q.   Is a quarterly review subject to the same accounting

11  principles, that generally accepted accounting principle, that

12  annual financial statements are required to follow?

13  A.   Yes, they are.

14  Q.   The same rules apply to a presentation of financial

15  statements for a quarter as apply to the financial statements

16  for a year; is that right?

17  A.   That's correct.

18  Q.   Okay.  Are you familiar with something called a Going

19  Concern Analysis?

20  A.   I am.

21  Q.   When we say a Going Concern Analysis, we're talking about

22  a going concern.  What is a going concern?

23  A.   Yes.  There is a going concern assumption that is applied

24  to all companies that the company can continue on financially,

25  you know, and in the foreseeable future.  And the financial

1    statements are prepared on a going concern basis.

2    Q.   You said there's a presumption that companies can continue

3    to function for the foreseeable future; is that right?

4    A.   That's correct.

5    Q.   And if they can't, how do we describe what that means?

6    A.   Well, if they cannot, and we see indication or the company

7    does, reminder management must first make their own assessment.

8    If there are any plans, if there's anything that could impact

9    that, then they would be required to assess whether the

10   financial statements can be presented on a going concern, or if

11   there would need to be disclosures and/or adjustments made to

12   their financial statements.

13   Q.   Great stuff there.  Let me unpack it a little bit.  First

14   you said the company has to do a Going Concern Analysis itself?

15   A.   Correct.

16   Q.   What goes into that analysis done by the company?

17   A.   Many different considerations can be taken into account.

18   There's judgment involved here.  But, for example, things could

19   be taken into consideration if the company intends to curb

20   substantial amounts of their business.  If there's extra

21   external factors that could impact them; if there are other

22   examples could be a company has significant impact from a

23   supplier.  Things like that.

24          They have to assess and take a look at it as a whole

25   to assess whether they have any concerns about continuing as a

1   going concern.

2   Q.   So you said they have to?

3   A.   It's required that the management take that first step.

4   And as auditors, we audit management's assertions.

5   Q.   So the first step, management has to do it, right?

6   A.   Yes.

7   Q.   And then second step, they have to give it to you, the

8   auditors, to check on it, right?

9   A.   Yes.

10  Q.   What goes into checking it to make sure it's okay?

11  A.   There's a lot of different factors.  With our knowledge,

12  our experience, with the industry or that company, we would

13  take that information such as their financial status, their

14  understanding of the business, our understanding of the

15  industry, and we would look at their analysis.  And if there's

16  information from numbers that they're providing or impacts of

17  certain things I mentioned earlier, then we would take a look

18  at that and see if their conclusion is reasonable.

19  Q.   Okay.  And so if the auditing firm finds that the

20  company's analysis is not adequate, what happens?

21  A.   We would ask the company to go back and take a look again.

22  But we would also then perform an assessment based on our

23  judgment and our knowledge.  And we would then make a

24  conclusion as to whether our opinion can support management's

25  assertion.

1    Q.   If the companies, if management's Going Concern Analysis

2    is adequate, what happens then?

3    A.   We would document that, put that the in our files and

4    complete our audit work and documentation.

5    Q.   If your audit team thinks that the company can't continue

6    as a going concern in the foreseeable future, what step is

7    taken then?

8    A.   We will be required under the standards to modify our

9    opinion or include an extra explanatory paragraph within the

10   opinion that discusses that and describes that.

11   Q.   So within that Opinion Letter there would be a paragraph

12   about going concern?

13   A.   Yes.  If that was the case and we concluded that there was

14   some -- the company could not continue as a going concern.

15   Q.   Okay.  And so in the Opinion Letter, that paragraph you're

16   talking about going concern, does it only appear if the auditor

17   feels there is a problem with the company continuing as a going

18   concern for the foreseeable future?

19   A.   We would include that if we feel that the company could

20   not continue as a going concern.  There would be that emphasis

21   paragraph in the opinion.

22   Q.   Okay.  So let me take it the other way.  If the auditor

23   does not have a concern -- I used concern.  Sorry.  Does not

24   have a worry essentially that the company is going to be able

25   to continue, is there no paragraph in the Opinion Letter?

1   A.   If there are no indicators that the company could not

2   continue, then there would not be an emphasis paragraph in the

3   opinion.

4   Q.   So fair to say essentially on the going concern, no news

5   is good news?

6   A.   If you consider that good news.

7   Q.   Well, the good news being the auditor thinks the company

8   can continue into the foreseeable future.  If there's nothing

9   in the letter about it, then the auditor doesn't see a problem

10  with the company continuing into the foreseeable future?

11  A.   Based on the requirements that we're required to take a

12  look at and consider, our judgment would be that there wouldn't

13  be a going concern if it's not in that opinion.

14  Q.   Got it.  In 2014, did your audit team from Grant Thornton

15  issue an Opinion Letter for Ligand Pharmaceuticals?

16  A.   Yes, we did.

17  Q.   And was that Opinion Letter the result of audit work done

18  at Ligand Pharmaceuticals?

19  A.   Yes, it was.

20  Q.   And just give me a sense, ballpark, how long does it

21  actually take to get this annual audit done?  A day?  A couple

22  weeks?

23  A.   Not a day.  It's several weeks.  I just don't remember the

24  number of hours.

25  Q.   Okay.

1    A.   And as I indicated there's over ten members on the

2    engagement team.

3    Q.   So you have up to ten auditors for several weeks checking

4    over the financial statements and other information about

5    Ligand Pharmaceuticals?

6    A.   Auditors and specialists as well, correct.

7    Q.   And that's in addition to the work that you've done each

8    quarter prior to that, each three months prior to that?

9    A.   That's correct.

10   Q.   And you do that every year?

11   A.   Annually.

12   Q.   Do you just take last year's and say, ahh, it looks the

13   same?

14   A.   As a licensed CPA, that would not be within my license --

15   I would be called upon, and we would not be following our

16   standards of regulatory bodies.  And therefore we are not

17   allowed to do that.

18   Q.   Safe to say for the four years that you served as an

19   auditor for Ligand Pharmaceuticals, Grant Thornton followed all

20   the standards it was supposed to follow to perform the audit in

21   the quarterly reviews?

22   A.   Can I clarify that?  I only opined on three years.

23   Q.   Yes.  I'm sorry.  I meant the team, not you specifically,

24   but the team at Grant Thornton.

25   A.   Can you just repeat that again?

1    Q.    I sure can.  I think we got a little lag there.  Let's

2    just take the years that you opined on.  For the years that you

3    were the engagement team, the audit team leader, and you issued

4    an Opinion Letter, did Grant Thornton follow all the standards

5    it was required to follow in order to get that audit work done?

6    A.    Yes, we did.

7    Q.    Okay.  And you issued opinion letters each year?

8    A.    Yes.  For my years, yes.

9    Q.    Did any of those opinion letters in 2013, 2014, and 2015,

10   did they include that going concern paragraph in the Opinion

11   Letter?

12   A.    They did not.

13   Q.    So does that mean that in 2013, 2014, and 2015, that you

14   and your audit team did not determine that there was a risk

15   that the company was going out of business in the foreseeable

16   future?

17   A.    Our only requirement is to assess if the company can

18   continue on a going concern, for a going concern for the

19   foreseeable future.

20   Q.    Right.  So foreseeable future, is there a guideline, rule

21   of thumb, about what the foreseeable future is?

22   A.    Typically it's, it's not written in black and white

23   anywhere, but under industry standards, there's general

24   guidance that you would look out 12 months.

25   Q.    So let's just think about the 2013 audit.  When is that

1    being performed?

2    A.    That is being performed, the procedures begin before the

3    year end around typically October, November, December.  And

4    then continue on until the filing date which is the first of

5    the following year.

6    Q.    I think I talked over you.  Did you say the filing date

7    was early the following year?

8    A.    Correct.

9    Q.    So the year ends for Ligand Pharmaceuticals, the year

10   you're talking about ends, sounds stupid, December 31, 2013?

11   A.    Correct.

12   Q.    And the reason why I'm asking you that for some companies

13   they don't operate on a calendar year, right?  They operate on

14   some other fiscal year?

15   A.    That's right.

16   Q.    But for Ligand the audit work is being done in the fall,

17   early winter of 2013 for the 2013 audit?

18   A.    It goes through the early part of 2014 as well.

19   Q.    So there's work being done in January and into February

20   2014?

21   A.    Yes.

22   Q.    So you're issuing your Opinion Letter some time early

23   February 2014?

24   A.    It depends.  The SEC has guidelines as to when the filing

25   dates, the company is required to meet those dates.

1   Q.   You issued your Opinion Letter some time early 2014 for

2   the 2013 year?

3   A.   I have to go back and see when we issued 2013 opinion.

4   '14 opinion I know that we issued it in February 23 of 2015.

5   Q.   And then the following year you said also for the 2015 you

6   issued an audit Opinion Letter in early 2016?

7   A.   Yes.  Some time in February of 2016.

8   Q.   Got it.  I think for our purposes, the specific date is

9   not important.  Just the general time period.

10          In each of those audit opinion letters -- Let me put

11   it this way:  In any of those audit opinion letters, did Grant

12   Thornton and your team express any concern that Ligand

13   Pharmaceuticals would be unable to continue into the

14   foreseeable future?

15   A.   We did not add an emphasis paragraph to our opinion in any

16   of them.

17   Q.   In every one of those audits for 2013, 2014, 2015, did

18   Grant Thornton accept the analysis done by management that they

19   thought also they could continue their business into the

20   foreseeable future?

21   A.   Well, we take their analysis and we audit that

22   information, and we use our judgment and knowledge that we have

23   as well and draw a conclusion.

24   Q.   And that conclusion was for each of the years that the

25   company -- there was not a substantial risk that they would not

1  continue into the future?

2  A.   Right.  Under the standards which means that we did not

3  have to -- there was no requirement to add a modification

4  paragraph or added paragraph to our opinion.

5  Q.   Got it.  One second.  Ms. Hyodo, I think that is it for my

6  questions, but hold on because defense counsel is going to want

7  to ask you some questions, too.

8  A.   Thank you.

9                    CROSS EXAMINATION

10  BY MR. BROOKS:

11  Q.   Good morning, good afternoon, Ms. Hyodo.  Can you hear me?

12  A.   I can.

13  Q.   My name is Doug Brooks.  I represent Father Lemelson in

14  this case.  My first question is we had emailed a document to

15  your attorney to provide to you.

16            Do you have that document?

17  A.   I do.

18  Q.   Okay.  Great.  We'll get to that in a minute, but we're

19  off to a great start.  I'd like to briefly ask you about the

20  role of an auditor like yourself.  When you conduct an audit of

21  a public company like Ligand, you're auditing their financial

22  statements, right?

23  A.   Correct.

24  Q.   Okay.  And for those of us without a degree in accounting,

25  that's the balance sheets, right?

1    A.   Our audit opinion has that scope, which includes the

2    balance sheet, the statement of operation, the statement of

3    stockholders equity, the cash flows, and the notes that go

4    along with those statements.

5    Q.   And as the auditor, you express an opinion that the

6    financial statements fairly present the financial condition of

7    a company in accordance with the accounting principles

8    generally accepted in the United States, right?  That's the

9    language?

10   A.   Our language, I believe, is specifically free of

11   material -- I don't want to improperly speak here.  But yes.

12   We express an opinion that indicates that the information is

13   presented fairly in all respects under the conformity of

14   accounting principles accepted in the United States of America.

15   Q.   And notwithstanding that opinion, the financial statements

16   themselves are the responsibility of the company, here Ligand,

17   the management of that company, right?

18   A.   That's correct.

19   Q.   And it's 100 percent Ligand's responsibility, not yours;

20   is that correct?

21   A.   It is 100 percent that they do present their information

22   fairly, yes.

23   Q.   When you do an audit in let's say the year 2013, that's a

24   snapshot in time, right, as of December 31, 2013?

25   A.   It is a point-in-time opinion, correct.

1    Q.    So it's not December 30, it's not January 1, it's that

2    year end date, right?

3    A.    Correct.

4    Q.    Mr. Jones asked you several questions about a going

5    concern; is that right?

6    A.    Yes.

7    Q.    And I believe you said that there's judgment involved with

8    a going concern?

9    A.    Yes.

10   Q.    And I think you also said a going concern is not black and

11   white; is that right?

12   A.    That's correct.

13   Q.    Okay.  I know you talked about your credentials as a CPA.

14   I think we can all agree it's not an easy thing to get.  But

15   you're not an insolvency specialist, are you?

16   A.    No, I'm not.

17   Q.    You've heard of the Association of Insolvency and

18   Restructuring Advisors or AIRA, right?

19   A.    I have.

20   Q.    And you're not a member of that association?

21   A.    I am not.

22   Q.    And so you haven't been certified as an insolvency and

23   restructuring advisor, CIRA?

24   A.    Correct.

25   Q.    And do you understand that in order to get certified, that

1    requires somebody to take three different course parts?

2    A.   I don't know the requirements.

3    Q.   But you haven't taken those courses, and you haven't taken

4    any exams, correct?

5    A.   Correct.

6    Q.   Do you understand, you know, people with such

7    certifications are often hired as expert witnesses to come into

8    court and testify about insolvency?  Are you aware of that?

9    A.   I am not.  Since I'm not that specialist, I don't know

10   what they are engaged to do.

11   Q.   Okay.  But as you testified, these things are not

12   always -- they involve some judgment, and they're not always

13   black and white, correct?

14   A.   If you're referring to the going concern assessment,

15   correct.

16   Q.   Okay.  I think you said you were the audit partner for the

17   audits ending in the years 2013, 2014, and 2015; is that right?

18   A.   Yes.

19   Q.   I'd like first just to talk a little bit about what

20   happened in 2015.  If I understand it, with respect to Ligand,

21   for the 2015 audit, you originally issued a --

22             THE COURT:  Let me be clear about that.  Is that for

23   the fiscal year 2015?

24             MR. BROOKS:  Yes.  I'm talking fiscal year 2015.

25   BY MR. BROOKS:

1    Q.   So if I understand it correctly, you originally issued

2    what is called an unqualified or clean opinion on the 2015

3    financial statements; is that right?

4    A.   We issued an unqualified opinion.

5    Q.   And then those financial statements Ligand later had to

6    restate those, correct?

7    A.   Yes.  I believe so, yes.  Correct.

8    Q.   I think that means that your first opinion, unqualified

9    clean opinion, that was wrong, right?

10          MR. JONES:  Objection.  Foundation.

11          THE COURT:  If you know.  You were in charge then,

12   right?  Were you the audit partner at that point?

13          THE WITNESS:  Yes.  I didn't know if that was directed

14   to me.

15          THE COURT:  Why was it restated?

16          THE WITNESS:  It was restated specifically related to

17   a tax matter.

18   BY MR. BROOKS:

19   Q.   But just to be clear, as part of that, Ligand had to

20   publicly disclose that they had failed to maintain adequate

21   internal control over their financial reporting, right?

22          MR. JONES:  Your Honor, relevance.

23          THE COURT:  Overruled.

24   BY MR. BROOKS:

25   Q.   Do you want me to repeat that?  Should I repeat it?

1          THE COURT:  Do you know what the problem was?  What

2     weren't they doing?

3          THE WITNESS:  Yes.  Typically when you do have a

4     restatement, they are required to disclose what that

5     restatement is regarding.  And then the auditor is required to

6     assess whether controls or there was a deficiency in controls

7     that would have led to that potential restatement.

8          THE COURT:  What was the lack of control there?

9          THE WITNESS:  Yes.  Their assessment initially of a

10    position related to a deferred tax in a tax position was not

11    properly stated.  And therefore they lacked the control to make

12    that accurate assessment.

13    BY MR. BROOKS:

14    Q.   And that was missed by the ten or so people at Grant

15    Thornton that were auditing the financial statements when

16    Ligand first presented them to you, correct?

17    A.   This was a very complex tax position that dated way back

18    for many many years, and it did end up involving several

19    individuals, not just the ten people on the audit, but the new

20    auditors as well as the current auditors, specialists in

21    national office, discussion of a very complex position.

22    Q.   And as a result of this complex position, it is that

23    originally Ligand had overstated its assets in its financial

24    statements, right?

25    A.   I can't answer that.  I don't recall the exact direction

1    in which it went.

2    Q.   Okay.  But regardless, that's something that Ligand had

3    done incorrectly, right, on their financial statements?

4    A.   That particular item that's been disclosed is the Ligand

5    mistake.

6    Q.   And again all the people at Grant Thornton, you missed

7    that, too, so you gave a clean audit.  Then you had to withdraw

8    that audit opinion, right?

9    A.   Based on discussions with national office, we did withdraw

10   the initial opinion and reissued it, correct.

11   Q.   Okay.  And fair to say that during your time working with

12   public companies, they don't like to restate their financial

13   statements under such circumstances; is that right?

14   A.   I think that's generally a feeling.

15   Q.   And it's also the case that auditors like Grant Thornton

16   don't like to have to withdraw a clean audit opinion that they

17   gave to a company, right?

18   A.   Correct.

19   Q.   And so after the statement Ligand fired you as the

20   company's auditors, right?

21   A.   No.  The decision to change auditors was completed prior

22   to that.

23   Q.   Okay.  But they did terminate you the year of that

24   restatement, right?

25   A.   I don't know exactly the timing of each one.  So I can't

1    answer that.

2    Q.   And 2015 wasn't the first time while Grant Thornton was

3    auditing Ligand's financial statements that Ligand had failed

4    to maintain adequate internal control over their financial

5    reporting, right?

6    A.   I don't recall since I was the audit partner for just the

7    three years but not during my --

8    Q.   So let's take a look then.  This is for the jury.  This

9    should be tab 6.  So the document that was sent to you,

10   Ms. Hyodo, I believe it's Exhibit 14 here.  I'll ask you to

11   talk a look and see.  Is this the 10K or annual report from

12   fiscal year 2013 that would contain your audit opinion as well

13   as the financial statements that you audited?  Because this was

14   during your time period, I believe.

15   A.   It appears to be the filing, yes.

16   Q.   So I think you have the -- Let's see how we do.  I think

17   this is the first time I'm doing this over Zoom.  At the

18   bottom, hopefully everyone has the same version.  It should be

19   page 27 of the pdf.  It should say 27 out of 119.

20        MR. JONES:  Your Honor, a question.  Does the witness

21   have the whole document or just the excerpts that we've been

22   given?

23   BY MR. BROOKS:

24   Q.   Should be the whole.  Do you have the whole document,

25   Ms. Hyodo?

1    A.    I have a lengthy document, yes.  You're saying 27?

2    Q.    First all, do you recognize this as the 10K that would

3    partially reflect the audit that you did for fiscal year 2013

4    for Ligand?

5    A.    This appears to be the filing that's --

6    Q.    You have to repeat your answer, Ms. Hyodo.

7    A.    What you sent me appears to be filed.

8    Q.    If you're on, hopefully this works, page 27, do you see

9    there's some bold, maybe a third of the way down that starts

10   "Although we have recently remediated"?

11   A.    Yes.

12   Q.    And so that says, "Although we have recently remediated a

13   material weakness in our internal control over financial

14   reporting, if we are unable to maintain the effectiveness of

15   our internal controls, our financial results may not be

16   accurately reported."

17              And then it goes on to say, "Management's assessment

18   of the effectiveness of our internal control over financial

19   reporting as of December 31, 2012, reported a material weakness

20   in our internal control as a result of improper accounting for

21   nonroutine transactions and the controls over the determination

22   of fair value of contingent liabilities as described in our

23   annual report on form 10K for the year ended December 31,

24   2012."

25              So that means at some point in 2012 Ligand also lost

```
 1   control over their financial reporting just like they did in
 2   2015, right?
 3            MR. JONES:  Your Honor, it's beyond the scope.
 4   There's no foundation for this, and it's not relevant because
 5   we're talking about a period outside the time period of the
 6   case.
 7            THE COURT:  This is 2012?
 8            MR. BROOKS:  This is 2012.  But this is in the 2013,
 9   there's language in the 2013 10K that she worked on.
10            THE COURT:  I'll let you answer about the internal
11   controls.  Is there a problem with the internal controls in
12   2012?
13            THE WITNESS:  I can't answer that.  This is part of
14   MD&A that we do not opine on these areas of the filings.
15            THE COURT:  It's part of what?
16            THE WITNESS:  The management discussion and analysis,
17   the forefront to the regulatory filing.
18            THE COURT:  What's the next question?
19   BY MR. BROOKS:
20   Q.   Now, in terms of this, the audit, so the one for this year
21   2013, I think you said you didn't know exactly when you would
22   have completed that, but probably around 2014.
23            Does that sound right?
24   A.   Well, the date is on the filing, and our opinion date is
25   included in the filing.
```

1   Q.   I believe it was February 2014.  In any event, if I can
2   ask you to turn to page 37 of this document.  Again it's on the
3   bottom right for those with hard copies, 37 out of 119.
4           Do you see it it's the consolidated balance sheet
5   data.  Do you see that, Ms. Hyodo?
6   A.   I need to -- because the pdf page on the paper is
7   sometimes different.
8   Q.   This is the pdf paper I'm talking about.
9   A.   Is this the contents and consolidated balance sheet?
10  Q.   Yes.  Consolidated balance sheet data.  Okay.
11  A.   Yes.
12  Q.   Great.  So if I'm reading this -- So, first of all, these
13  are financial statements that you audited or a snippet of the
14  financial statements that you audited?
15  A.   We tie these to the -- just for consistency to ensure that
16  information here is consistent with what we are opining on.
17  Q.   Am I reading it correctly so that at the end of 2013,
18  Ligand's working capital was negative a little more than 4
19  million?
20  A.   That's what's reported here.
21  Q.   What that means is that the company's current assets were
22  less than its current liabilities, right?
23  A.   I believe that's the calculation.
24  Q.   Okay.  And current assets are cash and things that can
25  easily be converted into cash, right?

1   A.   They usually have current maturities or can be converted

2   within a year.

3   Q.   Then it looks like at the end of 2012, Ligand's working

4   capital is actually negative 11.6 million, right?

5   A.   That's what the company has reported here.

6   Q.   And then in 2011 it was negative 11.4 million, right?

7   A.   That's in the filing here.

8   Q.   So for three years in a row as of this time at the end of

9   the year the company had less in current assets than it had in

10  current liabilities, is that right?

11  A.   That's what the working capital says, if that's what

12  you're reading.

13  Q.   Can I ask you to flip back to page 30 on the pdf.  So 30

14  of 119.  First of all, is this a section of the annual report

15  that you as Ligand's auditors would review?

16  A.   We would only read it for inconsistencies with what we are

17  reporting on.

18  Q.   Okay.  And do you see that there's little more than

19  halfway down there's a paragraph that starts "Our cash and cash

20  equivalents"?

21  A.   Yes, I do.

22  Q.   If you go down five lines from that, do you see a sentence

23  starting "Our inability"?

24  A.   Yes, I do.

25  Q.   There Ligand wrote, "Our inability to obtain additional

```
 1   financing could adversely affect our business.  Financings may
 2   not be available at all or on terms favorable to us.  In
 3   addition, these financings, if completed, may not meet our
 4   capital needs and could result in substantial dilution to our
 5   stockholders.  If adequate funds are not available, we may be
 6   required to delay, reduce the scope of, or eliminate one or
 7   more of our research or drug development programs.  We may also
 8   be required to liquidate our business or file for bankruptcy
 9   protection."
10            Do you see that language on those pages?
11   A.   I see it.
12   Q.   Is that something that was shown to you in 2013?
13   A.   We read through them.
14   Q.   Did you have any role as the auditors in valuing Ligand's
15   intangible assets for 2013?
16   A.   We do not value.  We audit the valuation that the company
17   obtains and presents.
18   Q.   Would you agree that valuing intangible assets can be a
19   complex process?
20   A.   Yes.
21   Q.   And there's necessarily some discretion involved, right?
22   A.   Yes.
23   Q.   And in the context of a liquidation or bankruptcy
24   proceeding, intangible assets aren't treated the same as
25   tangible assets, are they?
```

1  A.   I can't answer that because I don't get involved when

2  there's liquidation or bankruptcy proceedings.

3  Q.   Do you have any knowledge of what constituted Ligand's

4  intangible assets?

5       THE COURT:  Can we back up for a minute?  What is an

6  intangible asset?

7       THE WITNESS:  Intangible asset is -- There's two types

8  of assets, tangible and intangible.  Tangible assets are one

9  that you can also physically touch.  For example, property and

10 equipment, buildings, cash, things that clearly they refer to

11 as tangible.

12      Intangible assets are assets that are derived and have

13 value such as patents, licensing rights, things like that that

14 could yield future revenue streams.

15 BY MR. BROOKS:

16 Q.   Am I right, though, that the revenue streams themselves

17 are tangible?  That would be a tangible asset?

18 A.   That's correct.

19      THE COURT:  I'm sorry.  I interrupted your question.

20 What was your question so we can make it clear?

21      MR. BROOKS:  I think I'll have to start over.  I don't

22 know what the last question was.

23      THE COURT:  You were asking about intangible assets,

24 which is when I jumped in.

25      MR. BROOKS:  Yes.

1  BY MR. BROOKS:

2  Q.   I think what I was going to ask is when you audited

3  Ligand's financial statements for year 2013, would you have had

4  an understanding of what the intangible assets were?

5  A.   Yes.

6  Q.   Sitting here today do you have any idea?

7  A.   It's over seven years ago, but I recall they had

8  intangible assets including good will, which is an intangible

9  asset as well.

10  Q.   Let's take a look if we can then at page 55.  If you go

11  down under assets, do you see towards the bottom there is a

12  line for intangible assets net?

13  A.   Yes.

14  Q.   It looks like that's been valued at almost 53.1 million?

15  A.   Yes.

16  Q.   So if you're not doing that valuation, who is defining

17  that value?  Who is coming up with that number?

18  A.   That's management's responsibility to fairly state their

19  assets and liabilities and financial information.

20  Q.   All right.  And then it looks like good will is another 12

21  million?

22  A.   Yes.

23  Q.   And are commercial license rights, is that what you were

24  talking about earlier with the potential revenue streams?

25  A.   That's another that, yes, has future revenue streams.

1    Q.   And that's about four and a half million.  And then

2    there's something called long term position of co-promote

3    termination payments receivable 7.4.

4              Is that also in the intangible category as opposed to

5    tangible?

6    A.   No.  I believe that's not -- I'd have to go back and take

7    a look.  But I don't recall that as an intangible.

8    Q.   Do you see anything else, other than those three

9    categories that we read which were intangible assets net, good

10   will, commercial license rights, do you see any other

11   intangible assets listed on page 55 period of time Ligand's

12   annual report that you audited?

13   A.   I don't.

14   Q.   Okay.  So if my math is correct, that's about 70 million

15   total from those three?

16   A.   Well, the commercial licensing rights, if you look in the

17   footnote, are actually -- I wouldn't say they're intangible.

18   They are royalty payment rights that could come to them if they

19   reach certain milestones.

20   Q.   So those are actually not, those are not intangible?

21   A.   Right.  Correct.

22   Q.   So there's only 65 million or so of actual intangible

23   assets on this balance sheet, right?

24   A.   Yes.

25   Q.   And sitting here today you're not positive of what that

1  all represents, right?

2  A.   It's in the footnote.  It would be disclosed and --

3  Q.   Ms. Hyodo, I interrupted you accidentally.  Please finish.

4  A.   I just said in the footnotes it would have a breakdown of

5  what those intangible assets represent.

6  Q.   Can I ask you to turn to page 69 of the pdf.

7  A.   Okay.

8  Q.   Do you see that the second paragraph on that page, do you

9  see where it says in January 2011 the company completed its

10  acquisition of Sydex?

11  A.   Yes, I do.

12  Q.   It says, "As a result of the transaction the company

13  recorded 47.5 million of intangible assets with definite lives,

14  the weighted average amortization period for the identified

15  intangible assets with definite lives is 20 years.  In addition

16  the company recorded 3.2 million of acquired in-process

17  research and development and 11.5 million of good will."

18  Right?

19  A.   Yes.

20  Q.   And that looks like if you add all of those up from that

21  transaction, it's a little over 60 million, is that right, in

22  intangible?  Am I reading that correctly?

23  A.   At the date of acquisition.

24  Q.   Right.  And this is two years later.  So would it be a

25  little less at that point?  Is that how it works usually?

1  A.   Yes.  You would amortize those intangible assets.

2  Q.   But how much do you think, do you know how much was

3  amortized of that in the two-year period, how much of that 62

4  million was amortized?

5  A.   I don't recall.

6  Q.   But does it appear given the numbers that we're looking at

7  that virtually all of the intangibles that Ligand listed were

8  from that one transaction, the acquisition of Sydex?

9  A.   Without looking at the further details, I can't speak to

10  that.

11        MR. BROOKS:  I have nothing further, Your Honor.

12

13                    REDIRECT EXAMINATION

14  BY MR. JONES:

15  Q.   Ms. Hyodo, it's Mark Jones.  Hopefully you can see me.

16        THE COURT:  Take off your mask.  It's too hard.

17        MR. JONES:  You're absolutely right, Your Honor.  I

18  forgot.

19  BY MR. JONES:

20  Q.   Ms. Hyodo, can I have you go back to that page that

21  Mr. Brooks was asking you about.  It was page 37.  It's the one

22  that had the working capital on it.  Let me know when you're

23  there.

24  A.   Just a second, please.  Yes, I'm here.

25  Q.   Do you recall Mr. Brooks asked you about this working

1    capital number, correct?

2    A.    Yes.

3    Q.    And that was negative?

4    A.    Yes.

5    Q.    What's the very next line on this table?

6    A.    Total assets.

7    Q.    Total assets?

8    A.    Yes.

9    Q.    For the year ending 2013, what were the total assets of

10   Ligand Pharmaceuticals?

11   A.    It's $104,713.

12   Q.    So fair to say at the end of 2013 Ligand Pharmaceuticals

13   reported it had more than $100 million in assets, correct?

14   A.    That's what it's reporting here.

15   Q.    All right.  And just going back to page 55, the next page

16   that the jury has, but for you page 55 of the pdf which is the

17   consolidated balance sheets?

18   A.    Yes.

19   Q.    Is there a line here for total assets?

20   A.    Yes, there is.

21   Q.    Where is it?

22   A.    Right in the middle of the page labeled total assets.

23   Q.    Right above where it says liabilities and stockholders

24   equity?

25   A.    Yes.

```
 1   Q.   Again for the year ending December 31, 2013, what does the
 2   company have for total assets?
 3   A.   $104,713.
 4   Q.   And what does it have for total liabilities?
 5   A.   $55,100,000.
 6   Q.   Where does that appear on the page?
 7   A.   Further down, almost near the bottom.
 8   Q.   So about four or five lines from the bottom it says total
 9   liabilities?
10   A.   Yes.
11   Q.   So rather than saying 104 million in total assets, 55
12   million in total liabilities, right?
13   A.   Yes.
14   Q.   Of course 104 million is more than 55 million, right?
15   A.   Yes.
16   Q.   I'm sorry.  CPA is probably not required for that one.
17   Mr. Brooks asked you a bunch about intangible assets.  Do you
18   remember that?
19   A.   Yes.
20   Q.   You said that the company has to value its intangible
21   assets?
22   A.   Correct.
23   Q.   Can the company just decide these intangible assets are
24   worth, $250 million?
25   A.   No.
```

1    Q.   How do they have to value them?

2    A.   They would use -- they could use different models

3    depending on what type of assets that has been acquired or

4    developed.  And typically the company has either individuals

5    internally who are specialized or would engage third party

6    specialists to value them for them.

7    Q.   What if the company just made up its intangible asset

8    value?  Is that okay with the audit --

9                MR. BROOKS:  Objection.

10                THE COURT:  Sustained.

11   BY MR. JONES:

12   Q.   Can a company make up its intangible asset values?

13   A.   We would be required under our standards to audit

14   information that's provided and ensure that it is in accordance

15   with GAAP.

16   Q.   So the company has to actually submit its valuations to

17   its auditor, is that right?

18                MR. BROOKS:  Objection.

19                THE COURT:  Overruled.  Did you get these intangible

20   asset valuations?

21                THE WITNESS:  Yes, we did.

22   BY MR. JONES:

23   Q.   Did you audit them?

24   A.   Yes, we did.

25   Q.   Did you have to determine that they were following,

1    according to the accounting principles?

2    A.    Yes, we did.

3    Q.    Did the company pull one over on you, or did they value

4    the assets according to those principles?

5              MR. BROOKS:  Objection.

6              THE COURT:  Sustained.

7    BY MR. JONES:

8    Q.    Did the company in the opinion of its auditor, you and

9    your colleagues, value the assets in accordance with accounting

10   principles?

11   A.    We concluded as our opinion indicates that there's no

12   material misstatement.

13   Q.    All right.  And so you didn't find anything materially

14   wrong with the valuation of those assets?

15   A.    Correct.

16   Q.    And again you're not just taking the company's word for

17   it.  That's an independent check on the company, correct?

18   A.    We are the independent auditors performing our procedures.

19   Q.    In valuing intangible assets, is it appropriate to a say

20   they're not worth anything and present that in the financial

21   statements?

22             MR. BROOKS:  Objection.

23             THE COURT:  Why don't we back up a little.  What are

24   the standards for evaluating intangible assets like a patent?

25             THE WITNESS:  Well, we have to audit the information

1    of how the value was derived.  Many different types of

2    intangibles have different methodologies that is accepted, and

3    an industry practice has guidance in the use of models as to

4    what is acceptable for those assets.  And we would take a look

5    at that.  And we internally as part of our team have

6    specialists as well that would look at that information.

7    BY MR. JONES:

8    Q.    Ms. Hyodo, that working capital number, that negative

9    working capital number, did that figure into your Going Concern

10   Analysis at all?

11   A.    I don't recall.  It could be a measurement, but I don't

12   recall.  We look at a number of different items in our

13   judgment.

14   Q.    For Ligand Pharmaceuticals, was there anything about that

15   working capital number that gave you, the auditor, any concern

16   that the company wouldn't be able to continue as a business for

17   the foreseeable future?

18   A.    I don't recall that we looked at that.  I can't say yes or

19   no that it was included in our analysis.

20   Q.    Despite that number, the company and the auditor both

21   concluded that it would be able to continue as a business for

22   the foreseeable future, correct?

23   A.    Yes.

24   Q.    Mr. Brooks went on about a restatement about a tax issue.

25   Do you recall being asked about that?

```
 1   A.   Yes.

 2   Q.   Are these tax issues sometimes complicated?

 3   A.   That particular one was very complicated.

 4   Q.   What made it so complicated?

 5   A.   It was a position that was taken many many years ago and

 6   as well required even both firms national office tax

 7   specialists who were even writers of the rules to get together

 8   to discuss it.

 9   Q.   It involved when the company had to pay a particular task?

10   A.   I don't recall that detail.

11   Q.   Was there anything about that tax issue or that tax

12   restatement that in retrospect you said, oh, we really should

13   have figured that in as to whether or not the company would be

14   able to continue as a business?

15   A.   It did not come -- it wasn't factored in.

16   Q.   So it's not relevant to the idea that the company can

17   continue as a business?

18             MR. BROOKS:  Objection.

19             THE COURT:  Sustained.  Leading.  Did it have any

20   bearing one way or another on going concern?

21             THE WITNESS:  Not in our assessment it did not.

22             THE COURT:  Is that it?

23             MR. JONES:  One more, Your Honor.  Just one second.

24   One more.

25   BY MR. JONES:
```

1    Q.    Mr. Brooks asked about some deficiencies in internal

2    controls.  Did you remember that part of the testimony?

3    A.    I do.

4    Q.    Was there anything about internal controls that gave you

5    the auditor a concern about whether the company would be able

6    to continue as a business?

7    A.    No, it did not.

8    Q.    Mr. Brooks asked you about I think it was the Association

9    of Insolvency Experts.  Do you know what that organization is?

10   A.    No, I don't.

11   Q.    Is that something that figures into auditing work?

12   A.    Not that I'm aware of.

13   Q.    For the auditor to make this Going Concern Analysis, do

14   they have to go hire somebody from the Association of

15   Insolvency Experts, or is that something the auditor can do?

16   A.    We do not assess insolvency.  That term is not within our

17   regulatory standards.

18   Q.    Okay.  In assessing going concern about whether a company

19   can continue as a business, do you have to go hire somebody

20   from the Association of Insolvency business?

21   A.    I have not.

22   Q.    The Association of Insolvency Experts really people who --

23            THE COURT:  She doesn't know what they are.  Let's

24   move on.

25   BY MR. JONES:

```
1    Q.   Last question, Ms. Hyodo.  You were asked about some of
2    these risk factors here in the 10K.  Is that right?
3    A.   Yes.  Those earlier pages you referred to.
4    Q.   Are those a set of standard -- are they a set of factors
5    that a company has to disclose to tell investors what the sort
6    of worst case scenario can be?
7              MR. BROOKS:  Objection.
8              THE COURT:  Overruled.
9    A.   There's requirements under SK from the SEC that companies
10   are required to disclose certain risk factors are indicated
11   that need to be disclose, but we do not opine on those.
12   BY MR. JONES:
13   Q.   Okay.  As far as you understand it, these risk factors are
14   required to be disclosed by people like us, the SEC?
15   A.   Different risk factors are.  Companies are required to
16   disclose risk factors.
17             MR. JONES:  Nothing further, Your Honor.  Thank you.
18             MR. BROOKS:  Briefly.
19                        FURTHER EXAMINATION
20   BY MR. BROOKS:
21   Q.   Ms. Hyodo, Ligand is not the only public account you've
22   ever done an audit for, right?
23   A.   Correct.
24   Q.   You recall we looked at a specific risk factor where
25   Ligand disclosed if certain things that happened happened they
```

1    may have to file for bankruptcy.  Do you see that?

2    A.   I remember that one, yes.

3    Q.   And that's not something that's contained in every single

4    annual report of a public company, is it?

5    A.   Not every single one.

6    Q.   I believe you testified that you don't opine, give an

7    opinion on insolvency when you're looking at going concern.  Is

8    that correct?

9    A.   That's correct.

10            MR. BROOKS:  Nothing further, Your Honor.

11            THE COURT:  Thank you.  Thank you very much.

12            MR. JONES:  Thank you, Ms. Hyodo.

13            THE CLERK:  She can log out.

14            THE COURT:  There we go.  I think we should stand and

15    stretch.

16            A JUROR:  Your Honor, could I have a restroom break?

17            THE COURT:  Yes.

18            MR. JONES:  Mr. Banerjee, this is Mr. Jones.  Do you

19    see me here?

20            THE WITNESS:  Yes.

21            MR. JONES:  Do you have a copy of the S1 you were

22    sent?

23            THE WITNESS:  Yes.

24

25            MR. JONES:  We just lost you there.

```
 1              THE WITNESS:  I'm on my phone.  So I'm having to
 2    switch.
 3              THE COURT:  It looks like you're in a car.  Are you
 4    driving or pulled over?
 5              THE WITNESS:  I'm pulled over.
 6              THE COURT:  Good.  Go ahead, Mary Ellen.
 7              THE CLERK:  Could you raise your right hand, please.
 8              (Sougata Banerjee, duly sworn by the Deputy Clerk.)
 9              THE CLERK:  Could you please state and spell your name
10    for the record.
11              THE WITNESS:  Yes.  It's S-O-U-G-A-T-A.  Last name
12    B-A-N-E-R-J-E-E.
13              MR. JONES:  May I proceed, Your Honor?
14              THE COURT:  Yes.
15              MR. JONES:  Before I start.  We handed out something
16    to the jurors.  Did every juror get one?  Great.  Thank you.
17    For the record we've handed out excerpts from Exhibit 58,
18    Viking Therapeutics S1.
19                        DIRECT EXAMINATION
20    BY MR. JONES:
21    Q.   Mr. Banerjee, do you also have possession of that exhibit
22    at least electronically at this point.  Yes?
23    A.   Yes.
24    Q.   Mr. Banerjee, where are you calling us from today?
25    A.   I'm in the car in Orange County, California.
```

1  Q.   Thank you for joining us.  Where do you work, sir?

2  A.   Markham LLP.

3  Q.   What is Markham LLP?

4  A.   It's a public accounting firm.  We do audits, taxes,

5  accounting services, and all other services that typically a

6  CPA firm would provide.

7  Q.   Is that an international auditing firm?

8  A.   No.  We are mostly based in the U.S.  We do audits of

9  international companies, but we are based in the U.S.  We do

10  have operations in China as well as in Ireland and Cayman

11  Islands.

12  Q.   Are there about 30 offices of Markham LLP in the United

13  States?

14  A.   Yes.  Roughly, yes.

15  Q.   And where is yours?

16  A.   Mine is in Orange County, close to Mesa.

17  Q.   Close to Mesa, California.  How long have you worked

18  there?

19  A.   Since 2014.

20  Q.   What is your title there, sir?

21  A.   I am a partner in the audit assurance practice and also in

22  charge of the assurance practice in California.  So I am in

23  charge of the audit practice for the four offices that we have

24  in California.

25  Q.   The jury has heard a little bit about this before.  It's

1   the part of the firm that does audits, yes?

2   A.   Yes.

3   Q.   Are you a CPA?

4   A.   Yes.

5   Q.   Have you worked with a company called Viking Therapeutics?

6   A.   Yes.  I'm currently the audit partner -- I'm currently the

7   audit partner on that audit.

8   Q.   For how long have you worked with Viking therapeutics?

9   A.   From day one that I joined Markham.  From June of 2013.

10  Q.   Viking Therapeutics was the first client with Markham LLP?

11  A.   Yes.

12  Q.   That wasn't your first day as an auditor, right?

13  A.   No.

14  Q.   How long have you been an auditor?

15  A.   It's about 20 plus years, probably close to 25 plus years.

16  Prior to Markham I was with Price Waterhouse Coopers.  Do you

17  want me to go into a little bit detail of my career?

18  Q.   Just a little bit.  Mr. Banerjee, for how long have you

19  been auditing public companies?

20  A.   I've been in the U.S. since 2005, and I've been auditing

21  public companies since 2005 in the U.S.  And prior to that I

22  have audited private companies in the U.S. but from other

23  locations outside the U.S.  So I've had close to 25 years of

24  audit experience.  And for public companies I would say

25  starting in 2005.

1   Q.   The company Viking Therapeutics, were you -- you said it

2   was your first client at Markham.  Did you work at Viking

3   Therapeutics when it was doing its registration with the SEC to

4   sell its stock?

5   A.   Yes.  So the exhibit that I have in my possession, that

6   was filed on July 1.  I joined on July 7, and I took over from

7   the first amendment to that exhibit that was filed some time

8   after that.  The July 1 was the one that I wasn't personally

9   involved with.  But subsequent to that, all other exhibits I

10  was personally involved with.

11  Q.   That S1, that contains financial statements, correct?

12  A.   Yes.

13  Q.   And those financial statements, were they reviewed by

14  Markham LLP?

15        MR. BROOKS:  Objection.  Foundation.  He wasn't the

16  guy on it.

17        THE COURT:  If you know.

18  A.   Yes.

19        THE COURT:  If you know.

20  A.   Sorry.  Say that again.

21        MR. JONES:  May I put a question to him, Your Honor?

22        THE COURT:  Yes.

23  BY MR. JONES:

24  Q.   Mr. Banerjee, as part of your work with Viking

25  Therapeutics, did you come to know whether the financial

1    statements in the Viking S1 were audited?

2    A.    There were some financials that were audited.  Those would

3    be the 2012 and 2013 financials.  And then the interim

4    financial for March 2013 would have been reviewed.

5    Q.    What is an interim financial?

6    A.    Interim financial is something that is not a full annual

7    financial, not for the full year or from a period of inception

8    to year end.  Viking's year end is December 31.  From inception

9    to December 31, 2012, and from January 1, 2013, to December 31,

10   2013, those would have been the annual financials.  From

11   January 31, 2014, to March 31, 2014.

12          THE COURT:  Excuse me.  A court reporter has to take

13   this down.  If you can just slow the pace a little bit.

14   BY MR. JONES:

15   Q.    Let me just walk you through that one piece at a time.

16   You said the 2012 financials were audited, correct?

17   A.    Correct.

18   Q.    And the 2013 financials were audited, correct?

19   A.    Correct.

20   Q.    And then you said part of the year for 2014, that had been

21   reviewed, right?

22   A.    Yes.

23   Q.    Why wasn't there an audit for part of the year 2014?

24          MR. BROOKS:  Objection.

25          THE COURT:  Overruled.

1    BY MR. JONES:

2    Q.    You may answer, sir.

3    A.    That's because SEC rules require us to do a review, not an

4    audit, for interim periods.  We are only required to do an

5    audit for annual periods.

6    Q.    All right.  So when we see the financial statements in the

7    S1, if it says unaudited, that means it was reviewed, that

8    quarterly review you were talking about; is that right?

9    A.    That is correct.

10   Q.    And if it doesn't say unaudited, does that mean it was

11   audited?

12   A.    That is correct.

13   Q.    And in your experience in 25 years of auditing public

14   companies, is that sort of the standard notation, if you have a

15   financial statement that is audited, you don't need to put the

16   word audited?

17   A.    Usually yes.  Occasionally once the company becomes public

18   and when we file their quarterly reviewed financials,

19   occasionally they will label the audited column as audited.

20   But it's not necessarily required.  However, if it's not

21   audited, we will have a label unaudited.

22   Q.    So a reader of a financial statement filed with the SEC

23   can assume that if it doesn't say unaudited, it's been audited,

24   correct?

25          MR. BROOKS:  Objection.

```
 1              THE COURT:  Sustained.
 2    BY MR. JONES:
 3    Q.   In the notation used in your business, Mr. Banerjee, if
 4    the financial statement is audited, you're saying it doesn't
 5    need to have the word "audited" to indicate that, correct?
 6              MR. BROOKS:  Objection.
 7              THE COURT:  Overruled.  Under your industry standards.
 8    A.   That is correct.  And it would be covered by our audit
 9    report as well as in the consent that was issued.
10    BY MR. JONES:
11    Q.   And how many years have you worked with Viking
12    Therapeutics?
13    A.   Since 2015.  Sorry.  2014.
14    Q.   2014.  Has Viking Therapeutics gotten an audit of its
15    financial statements every year?
16    A.   Every year since then.
17    Q.   And those quarters that come in between the annual audits,
18    have there been a review of those every year?
19    A.   Yes.
20    Q.   In an audit do you have to consult with a company on
21    material issues?
22    A.   Yes.  Absolutely.
23    Q.   You can't conduct an audit and not consult on material
24    issues; is that right?
25    A.   Correct.  Management, if it's a material matter,
```

1    management will have to come up with position papers and then

2    we will have to audit those.

3    Q.   So when you do an audit, you're sort of looking over all

4    the issues that come up with the financial statements and the

5    financial presentation of the company?

6    A.   Correct.

7    Q.   And all of that happened for the financial statements that

8    were audited in the form S1 that you have in Exhibit 58,

9    correct?

10            MR. BROOKS:  Objection.

11            THE COURT:  Overruled.

12    A.   Yes.

13    BY MR. JONES:

14    Q.   In conducting a quarterly review --

15            THE COURT:  I take his point that that was leading.

16    So you need to --

17            MR. JONES:  I'll move it along.  Time is short.

18            THE COURT:  I understand.

19    BY MR. JONES:

20    Q.   In conducting a quarterly review, can you tell us whether

21    or not an auditor has to consult with the company's management

22    on any material issues?

23    A.   Yes.  We typically do.

24            MR. JONES:  Your Honor, nothing further.

25                          CROSS EXAMINATION

1    BY MR. BROOKS:

2    Q.   Good afternoon, Mr. Banerjee.  My name is Doug Brooks.  I

3    represent Father Lemelson in this matter.  Just to be clear, so

4    you did not get involved with Viking until after this

5    Exhibit 58 was filed; is that right?

6    A.   That is correct.

7    Q.   So everything you know that Markham had anything to do

8    with related to this document, you're getting that information

9    from somebody else, right?

10   A.   Not necessarily.  I did look at the audit file and the

11   review files because I had to take ownership of those effective

12   after this filing.  So I did look at those.

13   Q.   So you've read this document, right?

14   A.   Yes.

15   Q.   Okay.  And some of the other things in the file.  But you

16   weren't directly involved with this Exhibit 58.  Fair?

17   A.   That is correct.

18        MR. BROOKS:  Nothing further, Your Honor.

19                     REDIRECT EXAMINATION

20   BY MR. JONES:

21   Q.   Mr. Banerjee, just clarify for us.  How do you know that

22   the financial statements in Exhibit 58 were audited?

23   A.   Because we have an audit file that I had looked at when I

24   took over this client.  And there was an audit file that

25   covered the 2012 and 2013 financials that were audited as well

1    as a review file of the 2014 March financials.
2    Q.   Can you describe that file for us?  Is it like a little
3    file folder, or is it a whole set of papers?
4    A.   It's a whole set of papers.  It's electronic.  It's a
5    whole set of papers that goes through our normal audit process.
6    Somebody will prepare all the audit papers.  Somebody will
7    review it.  And typically the audit partner will review as
8    well.  And then it will go through our engagement quarterly
9    review process as well.  A partner would have reviewed that
10   audit file as well the document you're talking about.
11   Q.   You've seen those audit papers in your electronic system?
12   A.   Yes.
13   Q.   And you saw that they went through the approval process
14   that you just saw?
15            MR. BROOKS:  Objection.
16            THE COURT:  Sustained.  Leading.
17   BY MR. JONES:
18   Q.   What did you see about the approval process in reference
19   to those work papers?
20   A.   I did see sign-offs, a preparer sign-off and reviewer
21   sign-offs as well as the final reviewer sign-offs from the
22   partner and the EQR.  We at Markham also have a couple of
23   documents, one we call a routing slip and one we call a EQR
24   memo, and those summarize what those review sign-offs mean.
25   When the routing slip is signed off, that means the partner at

1    EQR has completely signed off and the work is done

2    appropriately.

3              THE COURT:  What's an EQR again?

4              THE WITNESS:  It's engagement quality review partner,

5    EQR partner.

6    BY MR. JONES:

7    Q.   What is the role of the engagement quality review partner?

8    A.   To ensure that the work is done with the appropriate level

9    of quality as required by PCOB.  PCOB meaning the public

10   council oversight board that oversees the whole audit process

11   for public companies.  The EQR will ensure that the audit has

12   been done in accordance with the PCOB auditing standards from

13   the quality standpoint as well as based on firm standards.

14   Also the EQR will review the document to make sure the document

15   is consistent with GAAP as well as with SEC requirements around

16   disclosures.

17             Now, it is primarily the audit partners

18   responsibility, but the EQR is one level of oversight that the

19   firm also requires.

20   Q.   So that engagement quality review partner is actually a

21   double check on the entire auditing to make sure things are

22   done right?

23             MR. BROOKS:  Objection.

24             THE COURT:  Sustained.

25   BY MR. JONES:

1  Q.   Does the engagement quality review partner double check

2  that the work was done correctly?

3  A.   Yes.  To the extent that anything is material.

4  Q.   That's checking on all the materials that we talked about

5  earlier?

6  A.   Yes.

7         MR. JONES:  Nothing further, Your Honor.

8         THE COURT:  Nothing further.  Thank you very much.

9  Enjoy the sunshine.

10         MR. JONES:  Just log out when you can,

11  Mr. Banerjee.

12         THE COURT:  There he goes.  You know how I hate to

13  lose a minute, but we're early.  So I'll see you tomorrow

14  morning.

15         THE CLERK:  All rise.

16         (The jury exits the courtroom.)

17         THE COURT:  Who is tomorrow?

18         MR. JONES:  Tomorrow, Your Honor, we expect to start

19  with Mr. Higgins.  After Mr. Higgins we'll go to the defendant.

20  I expect Mr. Higgins will go -- well, I think probably three

21  hours between the parties.  And then we'll have Mr. Lemelson in

22  the afternoon, Father Lemelson in the afternoon.

23         MR. HOOPES:  I think maybe a little earlier than 1:00.

24  We'll see.

25         THE COURT:  Just give me a sense of the timing.

1    Assuming that Father Lemelson goes on, you may reserve the

2    right to come back again if you need to.  Let's assume most of

3    what Father Lemelson is going to say, he's going to say -- it

4    will go tomorrow afternoon, potentially into Monday morning.

5    And then what?

6            MR. JONES:  Your Honor, I do.  I expect the direct of

7    Father Lemelson to take tomorrow afternoon and then a portion

8    of the morning on Monday.  Then my understanding is the

9    defendants have up to five hours of time reserved to do their

10   direct of their defendant.  That should take us through --

11   depending on --

12           THE COURT:  Monday into Tuesday.  I'm just getting a

13   feel for this.  Monday into Tuesday.

14           MR. JONES:  And then we have a series of short

15   witnesses including our summary witness, a couple of investor

16   witnesses.  Dr. Devor.

17           THE COURT:  Tuesday is taken.

18           MR. JONES:  Your Honor, I think depending on how

19   long -- it could be part of Monday into Tuesday.  It could be

20   all of Tuesday.  But I think by the end of Tuesday, we're sort

21   of getting to --

22           THE COURT:  The SEC rests.

23           MR. JONES:  Yes, Your Honor.

24           THE COURT:  And then what does the defense do?

25           MR. HOOPES:  Shorting it.

```
 1              THE COURT:  You're shorting it.

 2              MR. HOOPES:  We can long it if you'd like, but I know

 3    you don't.  Half a day tops.

 4              THE COURT:  Tuesday and potentially into Wednesday

 5    morning.  As a practical matter, the charge conference is

 6    likely to be Wednesday afternoon, going to the jury on

 7    Thursday.  Does that sound right?

 8              MR. HOOPES:  There might be some space in there, but

 9    it's up to you with the schedule.  But that makes sense to me.

10              THE COURT:  Potentially we could finish Tuesday.

11              MR. HOOPES:  We could finish Tuesday afternoon.  We

12    could have very little on Monday.  We'll have to see how it

13    goes.

14              THE COURT:  It's the judges' meeting.  So I may or may

15    not go.

16              MR. JONES:  Judge, on the judges' meeting, there are a

17    series of short witnesses, probably an hour each really.  To

18    the extent we're going into Wednesday anyway.  We can do it on

19    Wednesday as well.

20              THE COURT:  We're going to shoot to get you a charge

21    Monday or Tuesday.  So we'll be prepared to do a charge

22    conference on Tuesday/Wednesday with the thought of going to

23    the jury on Thursday or potentially Wednesday afternoon.  We

24    can keep revisiting this as things happen.  I've been very

25    impressed with the northeaster, we've been able to keep
```

1    witnesses on time and that none of the jurors have been unable

2    to attend for sicknesses or weather.  So far it's been going

3    perfectly which I thank you all for.

4         The things I still need from you are on a verdict

5    form.  I will ask about the four separate statements because

6    that's a second theory.  I will also ask about scheme liability

7    and the investor liability.  You seem to disagree, and I wanted

8    to ask defendants to do a little legal research on this.  SEC

9    takes the position that the standard of proof for the investor

10   count, the last we don't talk very much about, is negligence.

11   You didn't really address the scienter in your jury

12   instructions.

13        What's your position on what it has to be for the

14   investor liability count?  You didn't really address it.  You

15   objected to theirs.  I wasn't very sure where you were going.

16   I just need a little work on that.

17        MR. JONES:  Your Honor, also after Your Honor's

18   opinion and the motions in limine, the Commission would like to

19   submit opinion jury instructions.  It's not something that we

20   submitted originally.

21        THE COURT:  I need to do something about, A, opinions;

22   B, First Amendment; C, good faith.  I also need to answer this

23   question, which I'm not prepared to right now.  My law school

24   question is if all four questions are deemed not to be

25   materially misleading, is there anything left to the scheme

1    liability or I guess the last count.  I'm thinking about that

2    because there are certain statements as you put out in

3    Exhibit 1 which are arguably misleading.

4           On the other hand, it's not been a theory well

5    developed.  Let's put it that way.  So I'm not really sure what

6    it would be.  And I hope never to get there.  I don't know what

7    the answer is.  I'm still mulling that question.

8           MR. HOOPES:  Yes.  And again to flag, it's an

9    evidentiary issue as opposed to a legal instruction issue.  I

10   do think there's an argument that we'd be entitled to evidence

11   of the statement of a party opponent that they have said to

12   this Court on numerous occasions there's only four statements

13   in question.  You can obviously instruct however you want.  But

14   I would think that --

15          THE COURT:  There are only four questions under the

16   material statements, but I'm a little less certain to myself is

17   the scheme issue.

18          MR. HOOPES:  You asked directly what do you have for

19   scheme, and they said four, and there was something with a

20   little change.  They're bound by that.  However you instruct,

21   if that's what we're going to be, then we're entitled to argue.

22          MR. JONES:  Your Honor, Mr. Hoopes is

23   mischaracterizing the motion to dismiss hearing that we had

24   three years ago at this point.

25          THE COURT:  Whatever.  I'm not sure what the right

1    answer is.  I just don't know what the right answer is on that.

2    And I would hate after this long trial and so much money that's

3    being spent to have an inconsistent verdict.  I'm not sure what

4    to do.

5         MR. JONES:  Your Honor, I know you're not giving any

6    rulings now, but just think about the real difficulty with this

7    four questions and scheme is that the law is on the four

8    misstatements, they'd have to be unanimous as to which

9    misstatements.  But on the scheme they don't.  It's an

10   instruction issue there, too.  The brute facts of the scheme --

11   So, here's the scenario, Your Honor, where four think statement

12   A, four think statement B, but they all agree there were

13   deceptive things done in the course of a scheme, that's an A

14   charge under the law in the First Circuit.  That's something to

15   think about.

16        THE COURT:  That even scares me more than my analysis.

17        MR. JONES:  Me too, Your Honor, which is why we went

18   with the questions 10B --

19        THE COURT:  That's wrong.  You have different theories

20   of liability.  I'm going to ask three different questions about

21   the scheme, the statements with parts A, B, C, D and then the

22   investor one.  You're going to do some research on what you

23   think state of mind is.  You're going to think about that

24   question about whether you want to bite off that legal issue on

25   scheme.  So that's one thing.  Was there anything else?  I

1    think that's pretty much all at this point.

2            Oh, I know.  You were going to actually -- and I keep

3    bugging you.  I feel like I'm nagging.

4            MR. JONES:  We have, Your Honor.  We haven't had a

5    chance.

6            MR. HOOPES:  We volunteered.  They got started.  We

7    have looked at it for two seconds.

8            THE COURT:  Because I'm going to reference those in

9    the verdict form.  Perfect.  Have a lovely evening.  Do you

10   need me at 8:30.  Have we resolved all the documents?

11           MR. BROOKS:  We probably do because I think pretty

12   much all of the unresolved documents relate to Father Lemelson.

13   So we probably do need to.

14           THE COURT:  I don't know what to say about that.  I'm

15   not prepared right now.  I think we're all tired.  Do you want

16   to meet tomorrow morning at 8:30?  Maybe you confer on what the

17   issues are.

18           MR. HOOPES:  We're going to go tomorrow.  We're

19   definitely going a minimum of two or maybe four on Higgins and

20   there will be a window in there.  However you want to do it.

21           THE COURT:  I think you probably prefer to get here at

22   9.  It's so dark when you get up that early.  Is this the

23   weekend they shift the clock?

24           MR. JONES:  I hope so.  I also believe to the extent

25   that -- We'll confer, but I think it can probably be deferred

1    until Monday morning because the defendant can still be on

2    direct and we can do the documents then.

3              THE COURT:  It sounds good.

4              MR. HOOPES:  But I have to say that this is the very

5    first Zoom in a courtroom with a guy in a car.

6              (Court recessed at 3:55 p.m.)

1                    - - - - - - - - - - -

2                       CERTIFICATION

3

4          We certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of our skill and ability?

7

8

9     /s/ Kathleen I. Silva

10    Kathleen I. Silva, RPR, CRR

11

12    /s/ Joan M. Daly                    January 6, 2022

13    _____          _____

14    Joan M. Daly, RMR, CRR                     Date
      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25