1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3   SECURITIES AND EXCHANGE COMMISSION,    )
                          Plaintiff,        )
4                                           )
    vs.                                     )
5                                           )
    GREGORY LEMELSON and LEMELSON          )   NO. 18CV11926-PBS
6   CAPITAL MANAGEMENT, LLC,               )
                          Defendants,       )
7   and                                     )
                                            )
8   THE AMVONA FUND, L.P.,                 )
                          Relief Defendant. )
9

10

11

12            BEFORE THE HONORABLE PATTI B. SARIS
             UNITED STATES DISTRICT COURT JUDGE
                     JURY TRIAL - DAY 5
13

14

15

16         John Joseph Moakley United States Courthouse
                       Courtroom No. 19
                      One Courthouse Way
17                  Boston, Massachusetts 02210

18

19                     November 1, 2021
                          8:45 a.m.

20

21

22              Kathleen Mullen Silva, RPR, CRR
                    Official Court Reporter
23         John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 7209
24                 Boston, Massachusetts 02210
                 E-mail: kathysilva@verizon.net

25         Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2
              United States Securities and Exchange Commission
 3            Alfred A. Day, Esq.
              Marc J. Jones, Esq.
 4            33 Arch Street, 23rd Floor
              Boston, Massachusetts 02110-1424
 5            617.573.4590
              for Plaintiff
 6

 7
              Libby Hoopes, P.C.
 8            Douglas S. Brooks, Esq.
              Thomas M. Hoopes, Esq.
 9            Brian J. Sullivan, Esq.
              399 Boylston Street, Suite 200
10            Boston, Massachusetts 02116
              617.338.9911
11            for Defendants Gregory Lemelson, Lemelson Capital
              Management, LLC, The Amvona Fund, LP
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

WITNESS                                                          PAGE


FATHER EMMANUEL LEMELSON

    Direct Examination By Mr. Jones                               20
    Cross-Examination By Mr. Brooks                              164
    Redirect Examination By Mr. Jones                            215



                          E X H I B I T S


Exhibit No.                                                Received
    249-252      ......................................         10

```
 1                     P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3    (Court enters.)
 4              THE COURT:  Hi.
 5              COUNSEL:  Good morning, Your Honor.
 6              THE COURT:  We have -- he's fine, but we have another
 7    problem, which is there's a juror, did you hear, who's had an
 8    acute medical emergency in the juror's family and I think she
 9    wants out.  She came in today, which was very nice of her.
10              So the question is, do you want me to interview her?
11              MR. JONES:  Your Honor, if she's having an acute
12    medical emergency already, I don't think there's any point.
13              THE COURT:  We can ask her.  I think she might be
14    prepared to be here today but she might be out tomorrow.  I
15    think -- it sounded so personal.  It's psychiatric in nature,
16    shall we say.  And I didn't want to embarrass here.
17              MR. BROOKS:  We don't think an interview is necessary
18    either, Your Honor.
19              THE CLERK:  You want to excuse her now?  You're not
20    going to make her sit here, right?
21              THE COURT:  No, no.  I thought I would excuse her.
22    Find out who it is, ask her if she wants to see me, and I will
23    excuse her if she comes in.  I think we should bring her in and
24    excuse her on the record.
25              The second thing is, as I understand it, there were
```

```
 1   some -- Father Lemelson is up next.  Is that right?

 2           MR. JONES:  That's correct, Your Honor.

 3           THE COURT:  Do I understand there are some disputed

 4   exhibits?

 5           MR. DAY:  There are four for plaintiff and one for the

 6   defendant.

 7           THE COURT:  All right.  So what are they?

 8           MR. DAY:  Your Honor, I believe we emailed them to the

 9   court yesterday, but I have some copies here.

10           THE COURT:  You know, I was here to 3:00 or 4:00

11   yesterday.  I didn't see them.  So they must have come in late.

12           MR. JONES:  I hope that's p.m., Your Honor.

13           THE COURT:  Yeah, it was.  So they came in when,

14   yesterday evening or something?

15           MR. DAY:  Yes.

16           THE COURT:  Did they --

17           MR. JONES:  We have paper, Your Honor.

18           MR. DAY:  Your Honor, these are all of the same

19   nature.  These are emails in which the defendants sought to

20   have critical comments removed from Seeking Alpha.

21           THE COURT:  I can't hear a word you're saying.

22           (Discussion held off the record.)

23           THE COURT:  I don't know that I have -- did you see --

24   Becky, did you see, were there new exhibits that were

25   submitted?
```

```
 1            LAW CLERK:  There should be two exhibits.
 2            MR. DAY:  Your Honor, these would also be in the
 3   binder of objected exhibits.
 4            THE COURT:  Oh, there they are.
 5            THE CLERK:  Are they letters?
 6            MR. DAY:  Letters.  K, N, O and P.
 7            THE CLERK:  K, N, O and P?
 8            MR. DAY:  Yup.
 9            THE CLERK:  Thank you.
10            THE COURT:  I don't think they're in here, Becky.
11            THE CLERK:  K, N, O and P.  Here, Judge.
12            MR. DAY:  Your Honor, by way of background --
13            THE COURT:  No.  Just let me read it for a second.
14            MR. DAY:  Okay.  Sorry.
15            THE COURT:  So what are you trying to put in?  Not The
16   Amvona Fund response -- excuse me -- not the Seeking Alpha
17   response, just Lemelson's --
18            MR. DAY:  Your Honor, for context, I think the whole
19   chain is, Your Honor, you know, probative.  The argument is
20   this goes to the scheme, attempting to suppress commentary
21   that's critical of the Ligand reports.  This was pled in the
22   complaint and argued on summary judgment.  This is a central
23   part of our scheme allegation.  Each of these emails goes to
24   the defendant trying to get rid of comments that are critical
25   of his commentary.
```

1          THE COURT:  Well, you can certainly ask about it.

2     It's not self-explanatory.  What's your point of view, sir?

3          MR. SULLIVAN:  Your Honor, there's just hearsay baked

4     into these comments.  These comments have factual allegations

5     based in them and then just sort of bald allegations of stock

6     manipulation.  And it's a backdoor way to get these accusations

7     in front of the jury, and we think the hearsay nature of that's

8     inappropriate.

9          THE COURT:  I'm not allowing anything from Seeking

10    Alpha to be admitted.  So now the question is -- you can ask

11    about these things.  Ask him what he did.  That's perfectly

12    good cross-examination or hostile direct examination.

13         MR. DAY:  Yes, Your Honor.  On the hearsay point,

14    these are statements of a party opponent, and the rest of it is

15    not offered for the truth.

16         THE COURT:  I'll allow you to put in -- at least on a

17    quick skim through, it's like five pages.  It's not

18    intelligible to me, but you can ask about it and you can put in

19    his statements if you want to, but I don't -- the response I'm

20    not going to allow in.

21         MR. DAY:  The response from...?

22         THE COURT:  Seeking Alpha.

23         MR. DAY:  From Seeking Alpha.  Okay.  But prior to

24    that, the comment and then the request from Father Lemelson?

25         THE COURT:  Why wouldn't that be admitted in?  That's

```
 1   Father Lemelson's statement.
 2            MR. SULLIVAN:  The comment itself, Your Honor.  The
 3   comments are from some unknown people that posted on a website
 4   and they're making these allegations of stock manipulation --
 5            THE COURT:  Excuse me.  Where are the comments on the
 6   website?
 7            MR. DAY:  If you look at Exhibit K, on the second page
 8   at the top it says, "Here is the comment again."  This is
 9   Father Lemelson's --
10            THE COURT:  We can't put in an anonymous comment.
11            MR. SULLIVAN:  Excuse me, Your Honor?
12            THE COURT:  I can't put in an unanimous comment.
13            MR. SULLIVAN:  That's exactly what we're asking for,
14   Your Honor.  That's exactly why we objected to this.
15            THE COURT:  It's an anonymous comment.  I'm not going
16   to allow that in.  It's more prejudicial than probative.  I'll
17   allow you to say there were some bad comments and you tried to
18   get them pulled down.  I'll allow you to do that.
19            What's the next thing?
20            THE CLERK:  Judge, is that just portions of K in?
21            THE COURT:  Yeah, portions of K in.
22            THE CLERK:  He'll be able to redact it?
23            THE COURT:  Yeah.
24            MR. DAY:  Your Honor, again, for the record we think
25   that without the context of what the comment was --
```

```
 1              THE COURT:  I'm not allowing in the anonymous
 2    statement and the statement from -- you can ask him about it.
 3    Did they decline?  Yes.
 4              MR. DAY:  Okay.  Thank you, Your Honor.
 5              THE CLERK:  That's Exhibit 249.
 6              MR. DAY:  249 will be?
 7              THE CLERK:  Portions of K.  It will be the new exhibit
 8    number.
 9              THE COURT:  I don't understand what the other exhibits
10    are that you want in.
11              MR. DAY:  Same thing.  K, N, O and P are all similar.
12    They're efforts by the defendant to remove critical commentary
13    from Seeking Alpha.
14              THE COURT:  Okay.
15              MR. DAY:  Okay.
16              THE COURT:  Okay.  So you'll just --
17              THE CLERK:  Allow in portions.
18              THE COURT:  So I think we resolved that.  Anything
19    that Father Lemelson wrote, and he can be asked about it.
20              MR. DAY:  Yes, Your Honor.
21              MR. SULLIVAN:  Thank you, Your Honor.
22              THE CLERK:  Counsel, just so it's on the record, N
23    would be 250, Judge, right, and that's just portions?
24              THE COURT:  Yes, just Father Lemelson's comments.
25              THE CLERK:  And then O same thing, 251.  And then P
```

1    would be 252, with portions redacted.

2          THE COURT:  Yeah.

3          **(Exhibit No. 249-252 received into evidence.)**

4          THE COURT:  You can ask -- I'm thinking out loud

5    here -- whether or not the issues were -- I suppose in some

6    ways it goes to whether the issues are material or not, whether

7    investors were worried about it, but at least right now I'm

8    just allowing in what Lemelson said in response and you can ask

9    him, you know, why was he trying to take them down and -- is

10   there anything else at this point?

11         MR. BROOKS:  Your Honor, I just want to flag a quick

12   issue.  Due to a medical condition, there's a chance that

13   Father Lemelson might need to take a break after about an hour

14   of testimony.  I'm not sure.  But I just wanted to flag that

15   issue and see how best to proceed.

16         THE COURT:  I mean, obviously.  As I said to the jury,

17   it's a constitutional right.

18         MR. BROOKS:  So I don't know if I just want to do it

19   or if there's some way I should stand up.

20         THE COURT:  It would be better to say, "Your Honor, I

21   think I need a break," and that will be the trigger for me to

22   have him --

23         MR. JONES:  Your Honor, are we talking about a

24   bathroom break or just a rest break?  What are we talking about

25   here?

```
 1          MR. BROOKS:  I don't think it's appropriate to get

 2   into any specifics.

 3          THE COURT:  What are we talking about, five minutes

 4   or ten minutes?

 5          MR. BROOKS:  Oh, no, two, very quick.  Thank you, Your

 6   Honor.

 7          THE CLERK:  Do you want me to find out if the juror is

 8   there?

 9          THE COURT:  Yes.  Can I talk to them a minute, because

10   I have started -- as I mentioned, I came in yesterday on the

11   jury instructions.

12          I'm trying to understand -- I think I've got most of

13   the claims here.  I understand them.  But the Investment

14   Advisors Act we've really heard nothing about yet and whether

15   or not your claim is one of negligence or one of fraud or both.

16   I never had one of these claims before, and there are no

17   standard Sands type jury instructions.

18          MR. JONES:  Your Honor, I think the cases that we

19   cited established that 206(4), like 206(2), is a claim of

20   negligence.

21          THE COURT:  So it's only negligence.

22          MR. JONES:  Well, you could commit it with scienter as

23   well, but, yeah, it's a minimum of negligence.

24          THE COURT:  Can I say we started doing research.  The

25   case law is not so straightforward because there were different
```

1    sections and different kinds of claims.  And one is a fiduciary

2    duty one and one's a fraud one.  So it just was, let's say, new

3    to me.

4            MR. JONES:  Yes, Your Honor.

5            THE COURT:  There are no model jury instructions.

6            MR. JONES:  Fair enough.

7            THE COURT:  So you have a claim one of negligence.

8    What's the negligence?

9            MR. JONES:  The negligence is by using the false

10   statements about how he had affected the price of the stock and

11   the false statements about the stock itself and the false

12   statements about how good he is at picking the stock,

13   essentially, and the deviation from the care that is owed from

14   an investment advisor to the investors in the pooled investment

15   vehicle.  He has deviated from those standards and committed

16   206(4)-8.

17           THE COURT:  So it was the recommendation to short

18   Ligand that was negligent in your view?

19           MR. JONES:  Was the recommendation to short Ligand --

20           THE COURT:  I don't understand the claim.  I haven't

21   focused on it.  Everything so far has been fraud, fraud, fraud.

22   So I've got to understand.  As I understand it, the only claim

23   you're pressing -- is that what you're telling me right now? --

24   is what with respect to what he told his investors?

25           MR. JONES:  Your Honor, the claim is that by using

```
 1    these reports with his investors, touting his results from his
 2    fraudulent stock process, and putting out these actual
 3    statements --
 4              THE COURT:  But there you just intertwined.  What if
 5    it wasn't fraudulent?  What if they say no to everything as a
 6    fraud?  Then a negligence claim is still, in your view,
 7    outstanding?
 8              MR. JONES:  Yes, Your Honor.
 9              THE COURT:  For example -- I'm thinking out loud --
10    suppose he -- I think Mr. Hoopes almost said it, just was
11    negligent in how he read whether it was audited or unaudited.
12    He just didn't read deeply enough.  And let's say they thought
13    it wasn't fraud.  It was just --
14              MR. JONES:  Just a deviation from the care he should
15    have given, yes.
16              THE COURT:  He should have given it more attention.
17              MR. JONES:  Right.  That would be a violation --
18              THE COURT:  So it would be if each one of the
19    statements was not fraudulent but it was negligent --
20              MR. JONES:  That would count.
21              THE COURT:  That's your argument?  Even if there was
22    no fraud at all, that he was in good faith, he just -- and is
23    it a negligent statement or negligent act?
24              MR. JONES:  It's both, Your Honor.  The statements in
25    the reports, it's the use of the reports, and the use of the
```

 1   writing about the reports in his partnership letters to keep

 2   investors and to attract prospective investors.

 3            THE COURT:  He overread the tacit agreement, those

 4   kind of things.  You're saying even if it was negligence, it

 5   would be a violation.  All right.  So what's --

 6            MR. JONES:  There's a duty to investors under

 7   206(4)-8.

 8            MR. BROOKS:  That is absolutely against the law, and

 9   it's absolutely not what they pled.  What they pled was that he

10   committed fraud, and then when he told his investors about it,

11   he was negligent somehow.  You cannot reach the 206 claim that

12   they have unless you first find there's fraud.  All they're

13   trying to do, and there's no support for this in the law, is to

14   say that we're going to take the 10b-5, which requires

15   scienter, and we're going to turn it into a negligence claim.

16   There's absolutely zero legal support for that, Your Honor.

17   And that is not what they pled.  What they pled was, again, he

18   committed fraud, and that when he didn't disclose the fraud to

19   his investors, that was negligence, and that he should be on

20   the hook for 206-8.  They absolutely can't sort of shoehorn a

21   negligence claim into their fraud claim.

22            MR. JONES:  Your Honor, that's exactly how it's pled

23   in section C of the complaint in paragraphs 55 and 56.  I mean,

24   there's no surprise here.  There has been a negligence claim

25   all along.  It's been talked about in the briefs.  It comes

1    from the fact that the defendant is an investment advisor, and

2    when you're an investment advisor, you have a duty to your

3    clients.  Under 206(4)-8 that duty is extended to the pooled

4    investment vehicle, investors and prospective investors.  If

5    you negligently make statements to someone to try to get them

6    to sign up for your fund, that is a violation of 206(4)-8.

7            THE COURT:  There's no standard jury instruction on

8    it.  The second claim for relief does use the word "negligent."

9            MR. BROOKS:  They have a negligence claim, but if you

10   find that the four -- if you take the four statements and find

11   there's no liability there, as a matter of law, you can't reach

12   their negligence claim because their entire negligence claim is

13   based on the fact that he committed fraud.  There's no way you

14   can have the 206 claim --

15           THE COURT:  I see.  You agree there's a negligence

16   claim.  You're just saying that you first have to find that

17   there was fraud.

18           MR. BROOKS:  Correct.  And there's a reason that the

19   Commission -- they've brought thousands of 206 claims in their

20   history.  They've never brought one like this because, frankly,

21   it doesn't make sense.  Because there was either fraud or there

22   wasn't.  And you can't reach the negligence claim unless you

23   first find fraud.

24           MR. JONES:  Your Honor, that's just a misstatement.

25           THE COURT:  I don't know.  There are no standard

 1    instructions on it.  I've never had a case like this.  And so

 2    we were struggling to figure out how to charge on this.

 3              MR. JONES:  Your Honor --

 4              THE COURT:  Is the jury all here?

 5              THE CLERK:  We were waiting for that one juror who has

 6    personal issues.  Lisa is about to bring her up.  She just

 7    arrived.

 8              THE COURT:  The last juror just arrived.  So I'll deal

 9    with that one juror, and then we'll go right into Father

10    Lemelson?

11              MR. JONES:  Yes, Your Honor.  On the 206(4)-8, would

12    Your Honor be willing to accept some 206(4)-8 jury charges from

13    other cases?  We have them in other cases, and we can show you

14    what other judges have done.  That's what our instruction is

15    based on.  Is that helpful?

16              THE COURT:  If someone has done it and it hasn't --

17    who's done one?

18              MR. JONES:  I think here we had it in the Present

19    case, the Howard Present case, which was the one about the

20    F-Squared case.  You may have heard about it.  I think we had

21    another case down -- I have to double-check this, Your Honor,

22    but I think we had another case down in Connecticut from a

23    couple of years ago.

24              THE COURT:  Well, if you have one, that's great.  But

25    otherwise, we're sort of closing up on the other charges.  I

1    mean, we've been working on them, but this is the one we're

2    still very much up in the air on.  I just got a brief -- was it

3    from the defense, was it?

4              MR. JONES:  We filed something last night, Your Honor.

5              THE COURT:  You filed something last night.

6              MR. BROOKS:  We both filed -- we filed something

7    specifically on this negligence thing I believe yesterday.

8              THE COURT:  It must have been late because I checked

9    the docket around 3:30.  That's okay.  You're a hardworking

10   lawyer.  I'm just saying --

11             So we'll stand in recess until we get that juror up

12   here.  I may see her privately.  Do you want to be here when I

13   see her?

14             MR. JONES:  We don't need to be, Your Honor, from our

15   perspective.

16             MR. BROOKS:  We don't need to be.

17             MR. JONES:  We can clear the courtroom if you like.

18             THE COURT:  I'll just, because I do want it on the

19   record.  I'll just do it right here at sidebar.  She can just

20   come up here and I'll just talk to her.

21             MR. JONES:  Okay, Your Honor.

22   (A recess was taken.)

23   **(SEALED SIDEBAR CONFERENCE AS FOLLOWS:**

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████████

1

2

3

4

5

6   **END OF SIDEBAR CONFERENCE.)**

7          THE COURT:  I've excused this juror for a family

8   emergency.  Thank you.

9          So they'll bring in the other jurors.

10         MR. JONES:  Judge, we're going to be handing out the

11  statements, pages, the stipulations pages and some binders for

12  the exhibits.

13         MR. HOOPES:  Are you talking about handing out the

14  PowerPoint?

15         THE COURT:  I'm sorry.  I asked if there was anything

16  else we needed to discuss.

17         MR. HOOPES:  I'm sorry.  I thought you were -- wanted

18  to hear what you wanted to hear.

19         THE COURT:  Well, I got nothing over the weekend.

20  They are all about to come in.  What's the issue?

21         MR. HOOPES:  The issue is we have no problem with page

22  1, no problem with page 2.  The issue on page 3 is a 403 issue,

23  Your Honor, which is very simply this:  You know, we're talking

24  insolvency.  I guess, quite simply put, is this document at the

25  top of it says "solidifies company' insolvency."  So we know

we're talking about insolvency.  That refers to the piece right there.  Below that -- it appears to me that those are pieces of evidence supporting the top caption.  So that you could make the same --

THE COURT:  Those are an admitted document.

MR. HOOPES:  And there's admitted documents in evidence with regard to the first page and the two portions of page 2 and 3.

THE COURT:  The objection is overruled.  All right.

So what's the story here?

THE CLERK:  We're lining the jury up.  I had to bring her downstairs to the jury assembly room, and they are lining the jurors up.

(Jury enters.)

THE COURT:  Good morning to everyone.  Sorry, it's been a rocky morning.  As you see we're down one juror, because there's a medical emergency in her family, which, by the way, had nothing to do with COVID.  I should mention when people are being excused, it doesn't mean it has anything to do with COVID.  I had a family emergency Friday afternoon.  Sorry for the delay.  And she had one over the weekend with somebody in her family.

So did anyone speak about the case?  Anyone see anything in the press or do any research?

I find the jury has complied.  We're going to get

1    going with our next witness.

2            MR. JONES:  Your Honor, the Commission calls Father

3    Emmanuel Lemelson.

4            THE COURT:  You may be seated.

5            MR. DAY:  While Father Lemelson is coming up, we have

6    a few handouts for the jury.  Just to put it on the record, we

7    have the statements that are charged in this case.  We have the

8    stipulations, the agreed-to facts between the parties, and we

9    have a set of binders that contain some of the exhibits for

10   today.

11           THE CLERK:  Father, could you please stand and raise

12   your right hand.

13           THE WITNESS:  Yes, of course.

14               **FATHER EMMANUEL LEMELSON, Sworn**

15           THE CLERK:  You may be seated.  Could you please state

16   and spell your name for the record.

17           THE WITNESS:  Father Emmanuel Lemelson.

18   E-m-m-a-n-u-e-l.

19           THE CLERK:  Thank you.

20           MR. JONES:  May I proceed, Your Honor?

21           THE COURT:  Yes.

22                       DIRECT EXAMINATION

23   BY MR. JONES:

24   Q.   Good morning.

25   A.   Good morning.

```
 1              MR. JONES:  Let me just check that everyone's screens
 2      are working this morning?  We checked them earlier, but.
 3              Father Lemelson, is your screen working this morning?
 4              THE WITNESS:  No, it's not.  It's black.
 5              THE CLERK:  It was working this morning.  I'm sorry,
 6      Judge.  I don't know what's happening.  Sorry, Father.  One
 7      second.  It says no signal again.  We had IT up and they fixed
 8      it this morning and now it defaulted again --
 9              THE COURT:  Is the public screen available?
10              MR. JONES:  Yes, it is, Your Honor.
11              THE CLERK:  We can't turn it, unless you want us to.
12      It's just going to remove you from the bench.  No one will be
13      able to see you.
14              THE COURT:  That's fine with me.
15              MR. JONES:  I'll turn it for now.  And if we can get
16      it working, we'll turn it back.
17              THE COURT:  It's better for me.  It means every time
18      you do anything someone's looking at you.
19              THE CLERK:  Just flash something up to make sure
20      Father can see.  Just test one, anything.
21              Father, is that good enough?
22              THE WITNESS:  I think so.
23              THE CLERK:  They can highlight it if they have to.
24              THE WITNESS:  A little closer, if you can turn it.
25      Very well.  Thank you.
```

```
1              MR. JONES:  Well, with that hopefully at least we're
2    temporarily resolved.  Let's get started.  Thanks, everybody.
3    BY MR. JONES:
4    Q.   Father, is Ligand Pharmaceuticals in the pharmaceutical
5    business?
6    A.   Yes.
7    Q.   I asked you about that in your deposition and you said
8    something else, didn't you?
9    A.   I may have, yes.
10             MR. JONES:  Can we play clip GL01.  This is
11   deposition day one, page 146, line 9 to 148, line 3.
12             (Video played.)
13   Q.   Father, you saw that clip, yes?
14   A.   Yes.
15   Q.   That was the answer that you gave during a deposition,
16   correct?
17   A.   Yes.
18   Q.   And during that deposition you gave the same oath to tell
19   the truth that you gave here, didn't you?
20   A.   Yes.
21   Q.   And yet you gave a different answer here this morning,
22   didn't you?
23   A.   The question was --
24   Q.   Yes or no, Father, did you give a different answer this
25   morning?
```

1    A.    I don't think I did.

2    Q.    No?  Is Ligand Pharmaceuticals in the pharmaceutical

3    business?

4    A.    That I understand to be a different question than what

5    Ligand is.

6              THE COURT:  Sir, could you please just bring in that

7    mic so we can all hear you.

8              THE WITNESS:  Of course.  Is that better?

9              THE COURT:  Yes.  Thank you.

10   Q.    Sir, back in 2014, you were convinced that Ligand was a

11   fraud, weren't you, sir?

12   A.    Yes.

13   Q.    And when you came in for testimony with the SEC staff, you

14   were convinced that Ligand was a fraud, weren't you?

15   A.    Yes.

16   Q.    When you later had your deposition in this case, after the

17   lawsuit was filed, you were convinced Ligand was nothing but a

18   fraud, correct?

19   A.    Yes.

20   Q.    And you still do, yes?

21   A.    Yes.

22   Q.    In fact, you're certain of it, aren't you?

23   A.    Yes.

24   Q.    And there's nothing that's going to change your mind?

25   A.    No.  I believe they committed fraud.

1   Q.   And in your mind Ligand must be stopped, right?

2   A.   I'm sorry.  They must be what?

3   Q.   Must be stopped.

4   A.   Fraud should be exposed.

5   Q.   In your mind, does Ligand need to be stopped?

6   A.   Yes.

7   Q.   And that's the context in which you wrote your reports,

8   correct?

9   A.   No, it's not.

10  Q.   It's not the context you wrote your reports.  When did you

11  decide Ligand was a fraud?

12  A.   I increasingly reached that conclusion over time.

13  Q.   As you wrote your reports, you became convinced?

14  A.   Yes.

15  Q.   And that's the mindset that you have today, correct, that

16  Ligand is a fraud and it must be stopped?

17  A.   I believe Ligand is a fraud.

18  Q.   And that's the context in which you're answering questions

19  for us this morning, correct?

20  A.   Yes.

21  Q.   In 2014 you ran a hedge fund called The Amvona Fund,

22  correct?

23  A.   Yes.

24  Q.   And that hedge fund shorted Ligand's stock, correct?

25  A.   Yes.

1    Q.    You began shorting in May of 2014?

2    A.    That sounds correct.

3    Q.    You built a short position through about June 16?

4    A.    Initially, and then we added to it later.

5    Q.    June 16 is when your first report came out?

6    A.    Yes.

7    Q.    And that's the day you first published that Ligand's fair

8    value was, quote, "roughly zero dollars per share or 100

9    percent below the current stock price," correct?

10    A.    Yes.

11    Q.    And, in fact, that very day, the day that you said that,

12    you shorted another 20,000 shares of Ligand, correct?

13    A.    It could be.  I don't have a specific recollection, but

14    that could be right.

15            THE COURT:  You know, sir, it's really hard to hear

16    you.

17            THE WITNESS:  Oh, I'll move it closer.  Your Honor, is

18    that better?

19            THE COURT:  Yeah, but don't forget they need to hear

20    you.

21    Q.    In fact, in the agreed-to facts between the parties, it

22    says on that day you shorted another 20,000 shares of stock?

23    A.    That sounds correct.

24    Q.    So that is correct, right, Your Honor?  Excuse me, "Your

25    Honor."  Right, Father?

1   A.   Yes, I suppose so.

2   Q.   So that day alone you put approximately 1.37 million

3   dollars more into Ligand's stock?

4   A.   We sold short an additional 1.3 million.

5   Q.   By that date your short investment had grown to about 4.6

6   million dollars, correct?

7   A.   That sounds correct.

8   Q.   That was between 65 and 70 thousand shares of Ligand,

9   correct, sold short?

10   A.   I don't recall if that's the exact share count at that

11   time.

12   Q.   But you know that those shares are in the stipulations,

13   right?

14   A.   Yes.

15   Q.   And if you total that all up it comes to between 65 and

16   70, doesn't it?

17   A.   Sounds about right, yes.

18   Q.   Now, that 4.6 million dollars, that was from The Amvona

19   Fund, wasn't it?

20   A.   Yes.

21   Q.   And The Amvona Fund has two parts, correct?  It's a

22   master-feeder fund.

23   A.   Yes.

24   Q.   And part of that is a U.S.-based fund, correct?

25   A.   Yes.

1    Q.   And then part of it is a British Virgin Islands based

2    fund, correct?

3    A.   It's a corporate entity in the British Virgin Islands,

4    yes.

5    Q.   And that's called The Amvona Fund Limited?

6    A.   Yes.

7    Q.   So for some of your investors you have them investing in

8    offshore funds?

9    A.   Yes.

10   Q.   In 2014, was your business called Lemelson Capital

11   Management?

12   A.   Yes.  I was the CIO of Lemelson Capital Management.

13   Q.   By "CIO" you mean the chief investment officer?

14   A.   Yes.

15   Q.   You made all the investment decisions for Lemelson Capital

16   Management?

17   A.   Yes.

18   Q.   And Lemelson Capital Management was what we called the

19   general partner of The Amvona Fund?

20   A.   Yes.

21   Q.   By "general partner" Lemelson Capital Management was the

22   entity that ran The Amvona Fund, correct?

23   A.   Yes.

24   Q.   And you made all the decisions for Lemelson Capital

25   Management, correct?

```
1    A.    Yes.
2    Q.    And that meant you made all the decisions for The Amvona
3    Fund, correct?
4    A.    Yes.
5    Q.    And it was that way all through 2014?
6    A.    Yes.
7    Q.    Lemelson Capital Management is not owned by you per se,
8    correct?
9    A.    No.
10   Q.    It is owned -- it's put in your wife's name, correct?
11   A.    She's the member, yes.
12   Q.    She's the what?
13   A.    She's the member.
14   Q.    The member of the corporation?
15   A.    Yes.
16   Q.    Meaning that she's the owner?
17   A.    Yes.
18   Q.    Now, The Amvona Fund in 2014, I'd like to focus on that
19   time period, if I could.
20   A.    Yes.
21   Q.    You and your family and your business made up about 34
22   percent of the assets under management of The Amvona Fund,
23   correct?
24   A.    Roughly.  Not me personally but my family and related
25   entities.
```

```
 1              MR. JONES:  Can we have Exhibit 27, please, Cole.
 2   Q.    Exhibit 27, do you recognize this, Father?
 3   A.    Yes.
 4   Q.    This is a Form ADV, correct?
 5   A.    Yes.
 6   Q.    This is a form that investment advisors are required to
 7   file with the Securities and Exchange Commission, correct?
 8   A.    Yes.
 9   Q.    And in this, this is your Form ADV.  Does "ADV" stand for
10   adviser?
11   A.    I believe so.
12   Q.    Investment advisor?
13   A.    Yes.
14   Q.    You were an investment advisor in 2014, correct?
15   A.    Yes.
16   Q.    And Lemelson Capital Management was an investment advisory
17   firm in 2014, right?
18   A.    Yes.
19   Q.    All right.
20   A.    Our exact characterization is an exempt reporting adviser,
21   but yes.
22   Q.    As an exempt reporting adviser, you understand that you're
23   bound by the laws that control investment advisors, correct?
24   A.    Of course.
25   Q.    So this Form ADV is you reporting for Lemelson Capital
```

```
 1    Management certain questions that are required to be -- certain
 2    answers that are required to be disclosed to the Securities and
 3    Exchange Commission, correct?
 4    A.   Correct.
 5              MR. JONES:  Can we have page 5, please, Cole.
 6    Q.   Do you see here question 14?  Do you see it says, "What is
 7    the approximate percentage of the private fund beneficially
 8    owned by you and your related persons"?
 9    A.   Yes.
10    Q.   And it says 34 percent?
11    A.   Correct.
12    Q.   So that 34 percent, you meant that you, your family, and
13    your business were 34 percent of the fund, correct?
14    A.   Well, not me personally but my family and the business,
15    yes.
16    Q.   And by "family" it's your immediate family, right, it's
17    your wife and children?
18    A.   Yes.
19    Q.   That's the family money that's 34 percent of the fund,
20    correct?
21    A.   Well, part of it would have been Lemelson Capital
22    Management, and part of it would have been my wife and
23    children.
24    Q.   Okay.  And the money that is Lemelson Capital, you just
25    said that your wife is the owner of that entity?
```

1    A.    Correct.

2    Q.    So that's family money too?

3    A.    Well, it's technically a separate legal entity.  So she's

4    the member.

5    Q.    So you control 34 percent of the funds in The Amvona Fund,

6    correct?

7    A.    Yes.

8    Q.    Okay.  And that's about -- in the size of the fund at the

9    time, that's about 9.7 million dollars, correct?

10   A.    That sounds about right.

11   Q.    And half of that represented money that was put in by your

12   family, correct?

13   A.    Correct.

14   Q.    And then the other half was borrowed from the broker,

15   right?

16   A.    No.  A significant part would have been from gains.

17   Q.    From gains.  Okay.  But that -- you were borrowing money

18   from the broker at the time, correct?

19   A.    We used some of that leverage, yes.

20   Q.    In fact, you used one hundred percent leverage, correct?

21   A.    That sounds about right.

22   Q.    That means for every dollar that gets put into the fund,

23   you borrow another dollar, correct?

24   A.    Well, it varied.  Sometimes it was less than that.

25   Q.    And sometimes it was actually more than a hundred percent,

1    right, Father?

2    A.    I don't recall.

3    Q.    Sometimes you got a call from your broker saying, "You're

4    over that limit.  You have to fix it," correct?

5    A.    No.  In the case of a call from the broker, it could have

6    been because of changing overnight requirements on positions.

7    Q.    So if things changed and you had borrowed more than a

8    hundred percent of the money that you put in, then you had to

9    fix it, correct?

10   A.    No, not necessarily.

11   Q.    Well, you know what a margin call is, right, Father?

12   A.    Yes.

13   Q.    What's a margin call?

14   A.    Well, a margin deficit can be generated any number of

15   ways.  One is if requirements change by the brokerage firm.

16   They change overnight.

17             THE COURT:  Let's start with A, B, C.  What is a

18   margin call?

19             THE WITNESS:  So a margin call, the brokerage firm

20   says you have to have this much equity in the portfolio.  It

21   could be 30 percent.  It could be 25.  A portfolio will

22   typically have 15 or 20 positions.  Overnight each security,

23   the requirements for a security, could change.  So we didn't

24   necessarily go over the limit, but the requirements could

25   change overnight.

1  Q.   Well, they change because the value of the securities

2  changed, right, Father?

3  A.   No, not necessarily.

4  Q.   You're just saying the broker arbitrarily changes its

5  percentage that it wants, and that's why you have to fix it?

6  A.   So the OC sets --

7  Q.   Is that a yes or is that a no, Father?

8  A.   No.

9  Q.   Let me ask you the next question then.  From time to time

10 in June of 2014 you had emails from your broker saying that you

11 had calls on your account, correct?

12 A.   Yes.

13 Q.   And the way to fix those calls were to either put in more

14 money or to sell some of the assets in the fund or to have the

15 value of the assets change, right, those are the three ways you

16 can fix that, correct?

17 A.   Or to cover a short position.

18 Q.   By essentially liquidating part of that short position,

19 right?

20 A.   Covering it.

21 Q.   Covering it, yes.

22 A.   Yeah.

23 Q.   So going back to the money that your family had in The

24 Amvona Fund, for every $100 The Amvona Fund made, you and your

25 family made $34, correct?

1    A.    Well, it depends.

2    Q.    Depends on what?

3    A.    Well, there was a number of restrictions on how we were

4    paid, but that's a rough appraisal.

5    Q.    Okay.  And if The Amvona Fund lost money, you and your

6    family would lose money too, correct?

7    A.    Yes.

8    Q.    So about $34 for every $100 lost in The Amvona Fund,

9    correct?

10    A.    Well, I want to clarify the previous answer.  If the value

11    of the portfolio goes down, we don't necessarily lose money.

12    We would -- there's a realized and there's an unrealized.

13    Q.    Yes, Father, but what I asked you was if The Amvona Fund

14    lost money, your family would lose money; is that correct?

15    A.    Well, we didn't consider an unrealized decline in value to

16    be a loss of money.

17    Q.    That's because you haven't sold yet?

18    A.    Or covered.

19    Q.    So if you haven't -- but when you do sell or cover, it's

20    at a loss.  Your family suffers 34 percent of that loss, right,

21    Father?

22    A.    Yes.

23    Q.    You could have lost a lot of your money, a lot of your

24    wife's and kids' money if the Ligand short went bad, right?

25    A.    It depends on how you define "a lot."  It wasn't a very

1   big position relative to some of the other positions in the

2   portfolio.

3   Q.   Well, it was a 4.6 million dollars position, correct?

4   A.   Yes.

5   Q.   And you had 34 percent of that, right?

6   A.   Yes.

7   Q.   About a third?

8   A.   Yes.

9   Q.   That's over a million dollars, isn't it, Father?

10  A.   Yes.

11  Q.   You don't consider that a lot?

12  A.   Well, at the time --

13  Q.   That's a yes or no.  Do you consider a million dollars for

14  your family a lot or not?

15  A.   Yes.

16  Q.   So because essentially the fund was a hundred percent

17  leveraged, every dollar put in is also another dollar borrowed

18  on top of that, if the fund lost money it loses money twice as

19  fast, correct?

20  A.   I don't recall if it was a hundred percent leveraged at

21  that time.  I think it may have been less, but it wouldn't have

22  been uncommon for us to be at about that leverage.

23          MR. JONES:  Can we have Exhibit 49, Cole.  Can you

24  blow up that box in the bottom right.  Before you do --

25  Q.   This is Exhibit 49, Father, and you recognize this report,

1    correct?

2    A.    It appears to be a valuation analysis from our broker,

3    BTIG.

4    Q.    So your broker was BTIG?

5    A.    Yes.

6    Q.    And they helped you buying and selling and shorting and

7    covering of assets of investments of The Amvona Fund, correct?

8    A.    Yes.

9    Q.    And you had them send you a report every day during that

10   time, 2014, about your portfolio, correct?

11   A.    That sounds familiar.

12   Q.    In fact, this is a several-page report that talks about

13   all the things going on in your portfolio, correct, the buy --

14   A.    Well, I think they sent this report automatically at the

15   end of the day is my recollection.

16   Q.    Okay.  And you got it, right?

17   A.    I believe so.

18   Q.    Now, let's look at that bottom right corner there.  It

19   says "Account Summary."  Do you see here it says "Total Gross

20   Exposure"?

21   A.    Yes.

22   Q.    Do you see there under "Percentage" it says 208 percent,

23   right?

24   A.    Yes.

25   Q.    So this is -- you're actually over a hundred percent

```
 1    leverage right now, right?
 2    A.    Yes.
 3    Q.    What date is this report, please, Cole, in the top right?
 4    Would you go all the way to the top right of the report.
 5    A.    Yes.
 6    Q.    So you're even more than a hundred percent leveraged on
 7    June 18, correct?
 8    A.    Yes.
 9    Q.    Father, June 18 is the day you talked to Mr. Voss, isn't
10    it?
11    A.    Just to clarify --
12    Q.    June 18 is the day you talked to Mr. Voss, correct?
13    A.    I believe so.
14    Q.    So at that point you're actually over your hundred percent
15    limit, correct?
16    A.    We didn't have a hundred percent limit.
17    Q.    You didn't?
18    A.    No.
19    Q.    We'll get back to that.
20          You also received fees from running the fund,
21    correct?
22    A.    Yes.
23    Q.    You got two percent of the assets that were put in by
24    people who were not your family?
25    A.    No.
```

1    Q.    You didn't get two percent?

2    A.    No.

3    Q.    You got two percent plus other stuff, correct?

4    A.    No.

5    Q.    What did you get?

6    A.    One percent and not on all of the investors.  The largest

7    investors paid zero.

8    Q.    The largest investors paid zero and everybody else paid

9    one percent?

10   A.    Yes.

11   Q.    One percent of what?

12   A.    The assets under management.

13   Q.    How often?

14   A.    Quarterly.

15   Q.    And it's one percent for the year, right, Father?

16   A.    Yes.

17   Q.    You wouldn't charge them one percent every quarter?

18   A.    No.

19   Q.    So it's one percent paid quarterly?

20   A.    Yes.

21          MR. JONES:  Your Honor, I think there's a question

22   from the jury.

23          THE COURT:  Thank you.

24          There's a request for Father Lemelson's educational

25   background.

1          MR. JONES:  Yes.

2     Q.   Father, could you tell us, starting after high school,

3     what did you do for education?

4     A.   I entered the university one year early.  I finished high

5     school a year early.

6          THE COURT:  So where did you go to the university?

7          THE WITNESS:  I went to Seattle University, which is a

8     Jesuit school in Seattle, Washington.

9          THE COURT:  So you went to Jesuit --

10         THE WITNESS:  Yes.  I studied high school in Germany.

11    And in -- yeah, I attended -- I want to say in 1994 was my

12    freshman year, which should have been my senior year in high

13    school.  And I studied international business, philosophy, and

14    theology, and German at the university level.

15         I spent five years in undergraduate as a result, and

16    then I did a master's at Holy Cross in Boston.

17    Q.   And your master's was in theology; is that correct?

18    A.   It was a master's in divinity.

19    Q.   Divinity.

20    A.   During that time I also studied business at the University

21    of Laverne, their satellite campus in Kifisia, Greece.  I also

22    studied theology at the University of Athens.

23    Q.   Father, just going back to the fees that you charged the

24    people who invested in The Amvona Fund.

25    A.   Yes.

1    Q.   In addition to the one percent management fee, you charged

2    a performance fee, correct?

3    A.   Yes.

4    Q.   The performance fee is additional fees collected by the

5    entity managing the fund if the fund performs above a certain

6    level, correct?

7    A.   Correct.

8    Q.   And if the -- excuse me --

9    A.   Not in all cases, though.  I'm sorry to interrupt.

10   Q.   I'm sorry.  We can't talk over each other.  You're going

11   to have to wait for the questions, okay?

12   A.   Sure.

13   Q.   If the firm performed over a certain level, you would

14   charge at least some of the investors 25 percent of that

15   performance, correct?

16   A.   Yes.

17   Q.   So for every $4 made, you would take one of them?

18   A.   If we got over a six percent hurdle rate.

19   Q.   Right.  If you made it over that six percent, you would

20   charge $1 of every $4 that the fund made?

21   A.   Correct.  Net of expenses.

22   Q.   And you were over that threshold in 2014, weren't you?

23   A.   I believe we probably were.

24   Q.   And part of the reason you were over that threshold for

25   the year is the Ligand short, right?

```
 1    A.    I don't have a specific recollection of that.

 2    Q.    Well, you made money on the Ligand short, right?

 3    A.    It was, I think, the minority of our gains that year.

 4    Q.    Well, Father, I didn't ask you whether it was the minority

 5    or majority of your gains.  I asked you whether you made money

 6    on the Ligand short.  Is that a yes or no?

 7    A.    We did.

 8    Q.    You made about 1.3 million dollars on the Ligand short,

 9    right?

10    A.    Yes.

11    Q.    On 4.6 million dollars in, right?

12    A.    I believe we later expanded the short position above 4.6

13    million.

14    Q.    Did you get to about 4.7 maybe?

15    A.    It may have been even larger at one point.

16    Q.    Well, what's the largest you remember it being, Father?

17    A.    It may have grown to five or six million.  I'm not totally

18    sure.  It's been seven years.

19    Q.    Father, there's a set of agreed-to facts here.  We handed

20    them out to the jury.

21          MR. JONES:  Yes, Your Honor.  Can we have those

22    stipulations up, Cole.  Do you have them?

23    Q.    Well, let me just ask you --

24          MR. JONES:  May I approach the witness, Your Honor?

25          THE COURT:  Yes.
```

1   Q.   Father, I'm handing you --

2   A.   Thank you.

3   Q.   -- the parties' agreed-to facts.  All the jurors were

4   handed them out this morning.  You agreed to all these facts,

5   right?  Right, Father?

6   A.   Yes.

7   Q.   All the facts in here you agree are true?

8   A.   Through counsel, yes.

9   Q.   Correct?  If you go to the second page, there's a whole

10  chart of what you bought -- of your short selling in the Ligand

11  position, right?

12  A.   Yes.

13  Q.   So you do know what you sold short for Ligand, right?

14  A.   Yes.

15  Q.   Okay.  And then if we turn to paragraph 10, correct --

16  excuse me -- paragraph 11, there's a chart there, too, right?

17  A.   Yes.

18  Q.   And that's what you agreed you covered, correct?

19  A.   Yes.

20  Q.   You covered some on 6/19, correct?

21  A.   Yes.

22  Q.   That was the day that you went on the Benzinga show?

23  A.   Yes.

24  Q.   And you covered some in August, correct?

25  A.   Yes.

1    Q.   And you covered some in October, correct?

2    A.   Yes.

3    Q.   But if we go back to page 2, those are all the short

4    selling that you did in Ligand stock, correct, in this time

5    period?

6    A.   Yes.

7    Q.   Okay.  So you know exactly, based on this, what you sold

8    short and what you covered, correct?

9    A.   Yes.

10   Q.   Okay.  So, Father, you bet a substantial amount of your

11   family's and your investors' money that the price of Ligand

12   would go down, correct?

13   A.   Yes.

14   Q.   You put -- people put in about 14, 15 million dollars into

15   the fund, correct?

16   A.   At that time.

17   Q.   Okay.  And you took 4.6 million and you bet it on Ligand,

18   correct?

19   A.   Yes.

20   Q.   And that's a substantial bet, correct?

21   A.   Yes.

22   Q.   If that bet doesn't pay off, your investors don't do very

23   well, correct?

24   A.   Well, just to clarify, the gross assets were more than 15

25   million.

1    Q.   Yes, because you borrowed a bunch from the broker, right?

2    A.   The leverage was considered very conservative at the

3    industry standards, not a bunch.  I wouldn't characterize it as

4    a bunch.

5    Q.   Father, I didn't ask you whether the leverage was

6    considered conservative, and I'm not sure who it's considered

7    conservative by.  My question is you borrowed a bunch of money

8    from the broker, correct?

9    A.   We borrowed money from the broker.

10   Q.   You borrowed a dollar for every dollar that somebody put

11   into the fund?

12   A.   Roughly, yes.

13   Q.   And so if, in fact, the Ligand short didn't pay off, your

14   investors could have lost a lot of money, correct?

15   A.   I don't know how to answer that question.  What's "a lot"?

16   If it had moved against us, there could be an unrealized loss,

17   yes.

18   Q.   Well, it doesn't necessarily have to be unrealized.  If

19   the price of Ligand started going up, the value of that

20   investment would have gone down, correct?

21   A.   Correct.

22   Q.   If it kept going up?

23   A.   It would keep going down.

24   Q.   Right.  And it could go all the way down, right?

25   A.   It could.

1  Q.   You could lose all the money, right?

2  A.   In a short you can, yes.

3  Q.   Yeah.  So there was a lot riding on this bet, wasn't

4  there, Father?

5  A.   It was a part of the portfolio, you know, a substantial

6  part, I guess.  Not the largest.

7  Q.   But a substantial part?  We agree on that, Father?

8  A.   Yes.

9  Q.   I'd like to focus on June of 2014, if I could.  And in

10  June of 2014 you were building up this short position in

11  Ligand, correct?

12  A.   Yes.

13  Q.   And at some point you reached out to Ligand to get some

14  more information, correct?

15  A.   Yes.

16  Q.   In fact --

17        MR. JONES:  Can we have Exhibit 34, please, Cole.

18  Q.   If you could go down to the bottom.  This is a set of

19  emails between you and a woman named Erika Luib, correct?

20        MR. JONES:  Actually, sorry.  I didn't mean all the

21  way down.  I meant to the second page of the email.  Sorry

22  about that.  Let's go one more page.  And -- let's go one more

23  page.

24  Q.   You're asking Ligand in this series of emails for some

25  information, correct?

```
 1    A.    Yes.

 2    Q.    You're asking for analyst reports about Ligand, correct?

 3    A.    I don't see that in this email.

 4    Q.    Let's put it on the next page then.  And this email is

 5    actually in the binder that was handed out to everybody this

 6    morning.  I'm trying to remember whether things are in the

 7    binder now that we have the binders.

 8            And this series of emails goes on for quite a while,

 9    doesn't it, Father?  And you say --

10    A.    I only see one page right now.

11            MR. JONES:  Cole, could I have the page SEC-Lemelson

12    E144166.  We're on 57 now.

13    Q.    This is an email from you, correct, Father?

14    A.    It appears to be.

15    Q.    Up at the top?

16    A.    Yes.

17    Q.    You're asking "We would like to receive" -- I think you

18    meant "your complete investor package, including any investor

19    presentations you may have.  Please forward by return email.

20    Thank you.  Warm regards," you, correct?

21    A.    Yes.

22    Q.    You were asking Ligand to send you the investor package,

23    correct?

24    A.    Yes.

25    Q.    And that's a bunch of information about the company,
```

1    correct?

2    A.    Yes.

3    Q.    And then if we go to 144163, three pages earlier.  There

4    we go.  Here you ask for more information from the company,

5    correct?

6    A.    Yes.

7    Q.    You ask for the analyst reports of the company, correct?

8    A.    Yes.

9    Q.    And, in fact, here in Exhibit 34 --

10              MR. JONES:  May I approach the witness, Your Honor?

11              THE COURT:  Yes.  Why do we keep doing -- give him the

12   whole book.

13              MR. JONES:  Yes.

14              THE COURT:  Okay.  That's great.

15   Q.    Father, I'm giving you the same binder of exhibits -- I

16   should have given this to you earlier.  Apologies.  It's the

17   same binder that the jury has; and you see a tab 34?

18   A.    Yes, I'm there.

19   Q.    This is Exhibit 34 of the binder.  And you can see at the

20   back of Exhibit 34 that you got those analyst reports, correct?

21   A.    It appears that there were analyst reports attached to

22   this email, yes.

23   Q.    So the company sent them along to you?

24   A.    It appears they did.

25   Q.    You also asked for a conference call with the company,

1    correct?

2    A.   Yes.

3    Q.   And that's on 144161.  It's about a page earlier than

4    we're looking at, two pages earlier.

5         And you say, "I'd like to speak with you by phone if

6    possible," correct?

7    A.   Well, that email refers to two analysts and this other

8    email I think has seven.  Yeah.  I think I called her three or

9    four times that week, I want to say.  But I'm wondering why the

10   email only says two analyst reports.

11   Q.   Well, Father, let's clear that up right now.  Let's go to

12   the first page of the email, please.  Here Ms. Luib sends you

13   all seven reports, correct?

14   A.   It appears that way, yes.

15   Q.   Okay.  So you had those reports when you were writing your

16   report, correct?

17   A.   It predates the publication of my report, the email.

18   Q.   By several days, right?  This is the 13th.  You put your

19   report out on the 16th?

20   A.   Correct.

21   Q.   And you see here on this first page also it says, "Thanks,

22   Confirming the call with Matt Foehr at 4:00 p.m. Eastern Time

23   on Wednesday"?

24   A.   Yes.

25   Q.   During the course of this set of emails there was a

1    conference call set between you and Matt Foehr, correct?

2    A.    Yes.

3    Q.    You knew Matt Foehr was the chief operating officer of

4    Ligand?

5    A.    Yes.

6    Q.    And you had asked to talk to the company in these set of

7    emails, correct?

8    A.    I believe I asked to speak with the executives, the senior

9    executives by phone a few times before this.

10   Q.    Okay.  And this is getting set up, correct?

11   A.    Yes, it appears to be.

12   Q.    In fact, you expected to talk with senior management,

13   correct?

14   A.    You mean at the time of the emails?

15   Q.    Yes.

16   A.    Or at the time of the phone calls before that?

17   Q.    At the time of the emails.

18   A.    Yeah.  A date was set.

19   Q.    And you thought it was your right to talk to those

20   executives, correct?

21   A.    Not necessarily.  It's not a right.

22   Q.    Were you upset?

23   A.    No.

24   Q.    You knew there was a pre call with Bruce Voss that came up

25   a few days later, right?

```
1   A.   After the publication of the reports, yes.

2   Q.   So you put that out.  You asked for a conversation --

3   A.   I'm sorry.

4   Q.   -- with Ligand Management, correct, on June -- this is

5   June 13 we're talking about here, right?

6   A.   Before June 13.

7   Q.   And you have it set up here on June 13?

8   A.   Yes.

9   Q.   And then that's a Friday, right?

10  A.   Yes.

11  Q.   And then you don't wait to put out your report, right?

12  A.   No.

13  Q.   You put it out on that Monday, right?

14  A.   Yes.

15  Q.   Even though you know that you're going to talk with the

16  company two days later on that Wednesday, right?

17  A.   Yes.

18  Q.   But instead of talking to the company about what your

19  thesis was, you just went ahead and published that first

20  report, didn't you?

21  A.   Yes.

22            MR. JONES:  Can we have Exhibit 90, Cole, 9-0.

23            Exhibit 90 is also in your binder.

24  Q.   This is October of 2014.  Do you see that, Father?

25  A.   Yes.
```

1    Q.   And you're writing to someone named Edward Gu.  I may be

2    pronouncing that wrong.

3    A.   It's Edward Gu.

4    Q.   And he's someone you know?

5    A.   Yes.

6    Q.   He's also an investor, an investment professional?

7    A.   Yes.  He's an activist investor.

8    Q.   He works for something called Kerrisdale Capital?

9    A.   Yes.

10   Q.   You're writing to him about something called Ligand,

11   right?

12   A.   Yes.

13   Q.   And you write to him, "Our multi-month battle with Ligand

14   has also been paying off.  Shares are now down 40 percent since

15   LCM" -- that's Lemelson Capital Management?

16   A.   Yes.

17   Q.   "Shares are now down 40 percent since Lemelson Capital

18   Management published its first of six reports"?

19   A.   Approximately 40 percent, yes.

20   Q.   Approximately 40 percent.  That's the little squiggle

21   there, approximately 40 percent?

22   A.   Yes.

23   Q.   You're telling your friend, hey, we've been having this

24   battle with Ligand, right?

25   A.   Yes.

1    Q.    A multi-month battle?

2    A.    Yes.

3    Q.    And, look, we're winning, right?  You're telling him

4    shares are down 40 percent, right?

5    A.    Yes.

6    Q.    About 40 percent?

7    A.    Yes.

8    Q.    June 16 is the day that you started that multi-month

9    battle with Ligand, isn't it, Father?

10   A.    Yes.

11   Q.    That's that day you fired that first shot right across the

12   bow of Ligand and said, "This place is a fraud," isn't it?

13   A.    I don't believe I referred to them as a fraud on June 16.

14   Q.    Father, you gave them a zero dollar price target, correct?

15   A.    No.

16   Q.    You gave them a zero value, correct, zero dollars?

17   A.    I referred to their intrinsic value as zero.

18   Q.    The company had zero dollars in value?

19   A.    Yes.

20   Q.    But you're not saying you thought they were a fraud?

21   A.    At that point it was the beginning of my work with Ligand.

22   I hadn't yet come to that conclusion fully.

23   Q.    When you say Ligand {LI-GAND} you mean Ligand {LY-GAND},

24   right?

25   A.    Ligand, Ligand.

```
 1    Q.    Just to be clear.  So you touted this battle to others,
 2    correct?
 3    A.    Well, it was in a private email to a friend of mine, yes.
 4    Q.    Well, he's another, right?
 5    A.    Yes.
 6    Q.    And you covered almost all the remaining part of your
 7    Ligand short in October 2014, correct?
 8    A.    I believe so.
 9    Q.    In that month when you're talking with Mr. Gu, you're
10    telling him shares are down around 40 percent since you
11    published your reports?
12    A.    Yes.
13              MR. JONES:  Can we have Exhibit 1, please, Cole.
14    Exhibit 1 is in your binder.  It's that first June 16 report
15    from Father Lemelson.
16    Q.    Do you see it there?
17    A.    Yes.
18    Q.    Okay.  And let's see here.  You entitled this, "Severe
19    competitive threat to key royalty program and going concern
20    risk drive 100 percent downside"?
21    A.    Yes.
22    Q.    "Key royalty program" is Promacta?
23    A.    Yes.
24    Q.    "Going concern risk" means you think there's a risk this
25    company is going out of business in the near future?
```

1    A.   Yes.

2    Q.   And the "hundred percent downside" is you think the stock

3    has a risk of going all the way down to zero?

4    A.   Yes.

5    Q.   Okay.  And in fact --

6             MR. JONES:  Can we have the last paragraph on the

7    page, Cole.

8    Q.   You say, "Lemelson Capital believes that Ligand's fair

9    value is roughly zero dollars per share," correct?

10   A.   Yes.

11   Q.   You did some analysis in this report?

12   A.   I'm sorry, the question?

13   Q.   You did an analysis in your report?

14   A.   Yes, there's analysis in my report.

15   Q.   And you came up with the idea that the company is worth

16   exactly -- roughly $0?

17   A.   That's correct.

18   Q.   That's what the facts in your report lead to?

19   A.   That's my belief.

20            MR. JONES:  Can we have the table of contents, please,

21   Cole.  There we are.  Is it possible to blow that up a little

22   bigger?  There we go.  Thank you.

23   Q.   Here's your table of contents, right, Father?

24   A.   Yes.

25   Q.   These are all the headings that you put in your report,

1    correct?

2    A.   Yes.

3    Q.   And we can see from this, you make some pretty serious

4    accusations about the company, don't you?

5    A.   I don't know how you define "serious."

6    Q.   Well, let's look at it.  Actually, let's just go to page

7    3, right?  You have, "Management's comments regarding

8    diversification and risk reduction are materially misleading,"

9    correct?

10   A.   Yes.

11   Q.   You're saying the company's making material

12   misrepresentations, correct?

13   A.   I'm saying that they're materially misleading.

14   Q.   Well, a material misrepresentation is a violation of the

15   securities laws, isn't it, Father?

16   A.   Yes.

17   Q.   You're accusing them of violating the securities laws,

18   aren't you?

19   A.   Yes.

20   Q.   And you know just by the fact that you're sitting here

21   that there could be legal consequences for making material

22   misrepresentations, correct?

23           MR. BROOKS:  Objection.

24           THE COURT:  Sustained.

25   Q.   Let's see.  You're also accusing them of suppressing

1  evidence, correct?

2  A.   Can you show me where you're referring to?

3  Q.   Yes.

4  A.   Yes.

5  Q.   You see that under "Persuasive Definitions and Suppressed

6  Evidence"?

7  A.   Yes.

8  Q.   You're accusing Ligand of suppressing evidence?

9  A.   Yes.

10 Q.   Also essentially a crime, correct?

11 A.   Not necessarily a crime.  It could be legal but unethical.

12 Q.   All right.  Well, you're accusing them -- Father, you

13 would agree you're accusing them of something pretty darn

14 serious?

15 A.   Yes.

16 Q.   All right.  And those are the accusations that you're

17 making in your first report, correct?

18 A.   Yes.

19 Q.   Before you even talked to anyone at the company about the

20 company?

21 A.   Correct.

22 Q.   And that was your mindset starting that week, June 16,

23 correct, that the company was engaged in serious wrongdoing?

24 A.   That was the result of my research, yes.

25 Q.   That the company was a bunch of liars, correct?

```
 1    A.   I don't believe I said that.

 2    Q.   You said they were being materially misleading and

 3    suppressing evidence.  Isn't that essentially lying?  Are we

 4    splitting hairs here?

 5    A.   It's manipulative.

 6    Q.   It's manipulative?

 7    A.   Yes.

 8    Q.   Manipulation is a form of lying, isn't it?

 9    A.   I suppose so.

10         MR. JONES:  In fact, let's turn to page 15.  Can we

11    have that "take a step back" paragraph blown up.

12    Q.   You say, "Take a step back from the company's glossolalia

13    and consider."  Did you write that, Father?

14    A.   Yes.

15    Q.   "Glossolalia," that's a great word, isn't it, Father?

16    A.   Yes.

17    Q.   It's from the Greek, right?

18    A.   Yes.

19    Q.   Glosso tongue, lalia speaking?

20    A.   Yes.

21    Q.   You're accusing them literally of speaking in tongues,

22    aren't you, Father?

23    A.   In the generic use of the word in English, it doesn't take

24    on the --

25         THE COURT:  Start again.  Explain that question.
```

1  Q.   Glossolalia:  Glosso tongue, lalia speaking, correct?

2  A.   Yes.

3  Q.   Speaking in tongues, correct?

4  A.   Yes.

5  Q.   That's what you're saying about the company, correct?

6           THE COURT:  What is speaking in tongues?

7           THE WITNESS:  So the word refers to the early church,

8  the first century when members of communities which were

9  disruptive would speak in tongues.  You still see this conduct

10  sometimes in various and sundry American churches in the South.

11  But in the conventional use, in American English, we don't

12  follow the etymological root from Greek.  We can use that in

13  the generic sense to mean that they're basically using a lot of

14  jargon.

15           THE COURT:  So you mean they're using jargon?

16           THE WITNESS:  Yes.

17  Q.   Back in 2014, on June 16, 2014, when you published your

18  report, you believed all these accusations were true, didn't

19  you, Father?

20  A.   Yes.

21  Q.   You believed the people who were running Ligand were

22  liars, correct?

23  A.   I believe they're very manipulative.

24  Q.   And that their public statements were lies, correct?

25  A.   I think their public statements are materially misleading.

```
 1    Q.    We just agreed before that materially misleading is a form
 2    of lying, correct?
 3    A.    Definitely a lack of integrity.
 4    Q.    You believed that the people who were representing Ligand
 5    were frauds, correct?
 6    A.    Yes.
 7    Q.    You believed that they were doing -- engaged in this
 8    glossolalia, correct?
 9    A.    Yes, in the generic use of the word.
10    Q.    And you believed they were making material
11    misrepresentations?
12    A.    Yes.
13    Q.    You believed they were violating the securities laws?
14    A.    I now believe that, yes.
15    Q.    You believed they were suppressing evidence?
16    A.    Yes.
17    Q.    You didn't believe that Ligand was telling the truth about
18    its business?
19    A.    I think that they were going out of their way to mislead
20    investors.
21    Q.    Father, you didn't believe they were telling the truth
22    about their business, correct?
23    A.    I don't think they were.
24    Q.    That's a yes or no question, Father.
25    A.    No, I don't think they were.
```

1   Q.   To this day you still don't believe they're telling the

2   truth about their business?

3   A.   Correct.

4   Q.   You're absolutely convinced about that?

5   A.   I am.

6   Q.   You didn't wait to talk to management before you put out

7   your report, correct?

8   A.   No.

9   Q.   You had the call set up at that time when you put out your

10  first report?

11  A.   Yes.

12  Q.   But you didn't wait?

13  A.   No.

14  Q.   You wouldn't even wait the two days to have the call,

15  correct?

16  A.   Well, it would have been three days.

17  Q.   You put out the report on Monday.  You would have had to

18  wait on Tuesday and talk to them on Wednesday, correct?

19  A.   Yeah.

20  Q.   All right.  You didn't really care what they had to say in

21  that call, did you, Father?

22  A.   Well, I wouldn't say I didn't care.  There's not true.

23  Q.   Well, it wasn't going to change your mind, was it?

24  A.   Not necessarily true either.

25  Q.   Well, you had already put down 4.6 million dollars of your

1   family's and your investors' money on the accusations in your

2   first report, correct?

3   A.   Yes.

4   Q.   And if the company told you something that changed your

5   mind, that bet's not going to go very well, is it, Father?

6   A.   No, I don't think so --

7   Q.   If you started putting out suddenly reports saying,

8   "Actually, I talked to the company and they had some pretty

9   good information.  Sorry, got that last report wrong," that's

10  not going to help your short position very well, is it?

11  A.   I didn't believe that.

12  Q.   You didn't believe -- you mean if you started putting out

13  reports that said that the company had good stuff, that

14  Promacta wasn't going away, you didn't believe that that was

15  going to hurt your short position?

16  A.   No.

17  Q.   You mean, if you put out good stuff about Ligand, you

18  thought it still was going to go down?

19  A.   Well, I was already quoting them from their conference

20  calls.

21  Q.   Father, Father.  I'm asking you --

22  A.   Yes.

23  Q.   -- if you had gotten information on that June 18 phone

24  call that showed you that Ligand was actually not a bad company

25  at all, that would not have helped your short position,

1   correct?

2   A.   I can't answer a hypothetical.

3   Q.   Well, yes, you can.

4   A.   The hypothetical is if they provided me information that

5   contradicted my report and showed good information?

6   Q.   Well, you understand how a short position works, right,

7   Father?

8   A.   Yes.

9   Q.   You've done it before, correct?

10  A.   Yes.

11  Q.   You put 4.6 million dollars of your clients' money into

12  this short position, correct?

13  A.   Yes.

14  Q.   So you know if the price of Ligand goes up, that short

15  position loses money, correct?

16  A.   It loses its value.

17  Q.   Right.  And if the price of Ligand goes down, it gains

18  value, correct?

19  A.   Correct.

20  Q.   So if you put out good information after the phone call

21  and the price started to go up, the value of the short goes

22  down.  We agree on that, right, Father?

23  A.   In that hypothetical, yes.

24  Q.   Okay.  I want to turn to that call.  June 18, correct?

25  A.   Yes.

1    Q.   2014?

2    A.   Yes.

3    Q.   You talked to Mr. Voss.

4    A.   Yes.

5    Q.   You were expecting to talk to Mr. Foehr, correct?

6    A.   At 4:00 p.m., yes.

7    Q.   But you actually talked to Mr. Voss earlier in the day,

8    correct?

9    A.   Yes.  He called me earlier in the day.

10   Q.   And he called and left you some messages?

11   A.   Yes.

12   Q.   And then you guys connected, correct?

13   A.   I called him back.

14   Q.   20-minute call, correct?

15   A.   That sounds about right.

16   Q.   Okay.

17        MR. JONES:  Could we have Exhibit 129, please.  Can we

18   actually have 19A.  It has the highlighting on it.

19        Ladies and gentlemen of the jury, you have this one in

20   your binder as well.

21   Q.   These are your notes, correct, Father?

22   A.   Yes.

23   Q.   You typed them up, correct?

24   A.   Yes.

25   Q.   Typed them up after that phone call?

```
1    A.    I think within minutes, yes.

2    Q.    After the phone call?

3    A.    Yes.

4    Q.    Okay.  And this is your notes of your phone call with

5    Mr. Voss, correct?

6    A.    Yes.

7    Q.    And you agreed that was a 20-minute conversation, correct?

8    A.    In the notes you mean?

9    Q.    No.  I just mean you personally, you know it was a

10   20-minute phone call, correct?

11   A.    It sounds familiar, yes.

12   Q.    All right.  And, in fact, in the agreed-to facts, you

13   agreed that on Wednesday, June 18, 2014, Bruce Voss, Ligand's

14   investor relations firm representative, and Lemelson spoke by

15   phone.  The call lasted from approximately 12:56 p.m. Eastern

16   Time until 1:16 p.m. Eastern Time.  Those are the facts as

17   you've agreed to them, right, Father?

18   A.    Yes.

19   Q.    20-minute call?

20   A.    Yes.

21   Q.    Did you try to record that call accurately when you typed

22   up these notes after the call?

23   A.    Yes.

24   Q.    You tried to remember what was on the call?

25   A.    Yes.
```

1    Q.   And you're remembering the 20-minute call and you're

2    trying to type it up after, right?

3    A.   Yes.

4    Q.   You weren't taking notes during the call, right?

5    A.   I don't think so.

6    Q.   Just trying to remember after?

7    A.   Yes.

8    Q.   So you talked about, "Received two calls from Bruce Voss

9    at PR firm for Ligand."  Do you see that, the first line?

10   A.   Yes.

11   Q.   And you actually know that Bruce Voss is an investor

12   relations professional, correct?

13   A.   Now I know that, yes.

14   Q.   But you thought he was at a PR firm?

15   A.   Yes.

16   Q.   And can we have the paragraph that says, "He asked about

17   the WWE short."

18   A.   I just wanted to correct one thing.

19   Q.   Father, there's no question.

20        THE COURT:  He wanted to correct something.  What do

21   you want to correct?

22        THE WITNESS:  I just wanted to correct that I don't

23   believe he represented himself as an IR person because I think

24   Erika Luib had identified herself as that.

25        MR. JONES:  All right.  Father, I'm not sure what

1   question you're clarifying there but, okay, let's move on.

2   Q.   You said, "He asked about the WWE short."  Do you see

3   that?

4   A.   Yes.

5   Q.   And the WWE short, "WWE" is the wrestling company,

6   correct?

7   A.   Yes.

8   Q.   And a few months earlier you had shorted that company too,

9   right?

10  A.   Yes.

11  Q.   And you had also put out a report?

12  A.   Yes.

13  Q.   And then the price had also gone down?

14  A.   Yes.

15  Q.   And then you covered that short --

16  A.   Yes.

17  Q.   -- after that report?

18  A.   Yes.

19  Q.   Right?  And a lot of people credited you with driving down

20  the price of WWE stock, correct?

21  A.   Well, I think they credit us being prescient in our

22  reporting and being accurate.

23  Q.   You got news articles about how Lemelson puts out a report

24  and WWE goes down, correct?

25  A.   More or less, yes.

```
 1   Q.   Actually, you sent all those reports to your investors,
 2   correct?
 3   A.   I likely did.
 4   Q.   All right.  So that's what is talked about in the notes
 5   here, the WWE short is the time three months earlier when you
 6   shorted and put out a report?
 7   A.   Yes.
 8   Q.   And you said -- you responded simply that, "Anyone would
 9   hope that their investment reports were read and that's why it
10   was published on Seeking Alpha."  Do you see that?
11   A.   Yes.
12   Q.   And is that true?
13   A.   Yes.
14   Q.   You were hoping that people would read your reports?
15   A.   Yes.
16   Q.   You hoped that they would read through them and see
17   whether you were right?
18   A.   Yes.
19   Q.   These were --
20   A.   Or wrong.
21   Q.   These reports were making your case to the readers that
22   Ligand was worth intrinsic value zero?
23   A.   Yes.
24   Q.   And that's what you were hoping by putting these reports
25   out, that people would see those reports and believe it was
```

```
 1   zero, correct?
 2   A.   Well, we wanted the reports to be read, and we wanted them
 3   to be subject to scrutiny.
 4   Q.   Right.  And you wanted them to be believed?
 5   A.   Well, we wanted them to be subject to scrutiny.
 6   Q.   Are you telling me you didn't care whether people believed
 7   your reports?
 8   A.   At that time I really wanted people to poke holes in them
 9   to find out if we were wrong in our reasoning.
10   Q.   So you take a 4.6-million-dollar investment, correct?
11   A.   Yes.
12   Q.   In a short, right?
13   A.   Yes.
14   Q.   And you put out a report, right?
15   A.   Yes.
16   Q.   And you put in that report that the company was worth
17   zero?
18   A.   Their intrinsic value, yes.
19   Q.   And you've got -- 34 percent of that 4.6 million is your
20   family's money, right?
21   A.   Yes.
22   Q.   And you're telling us you didn't care whether people
23   believed that report; is that right, Father?
24   A.   We wanted our work -- I wanted my work to be subject to
25   scrutiny.
```

1   Q.   Did you care whether people believed your report or not,

2   Father?

3   A.   Not really.

4   Q.   Not really.  Okay.

5        So if everybody came along and said, "I don't believe

6   this," that would have been fine with you?

7   A.   Of course.

8   Q.   And that's why you put out five other reports, correct?

9   A.   No.

10  Q.   You didn't care?

11  A.   No.  The other --

12  Q.   That's why you went on Benzinga, you didn't care?

13       MR. BROOKS:  Can he let him finish.

14       THE COURT:  You need to let him finish the answer.

15  Q.   Did you care when you went on Benzinga?

16  A.   Whether people believed my reports?

17  Q.   Yeah.

18  A.   No.

19  Q.   Did you care when you put out your second, third, fourth,

20  fifth reports, didn't care then either, huh?

21  A.   No.  I wanted the work to be open and subject to public

22  scrutiny.

23  Q.   Public scrutiny, people saying that you were wrong, right?

24  A.   They could say that, sure.

25  Q.   Based on your report, correct?

1   A.   Yes.  I think we even quoted people who had the opposite

2   opinion in the reports.

3   Q.   You quoted them in the reports?

4   A.   I believe so.

5   Q.   We'll take a look at that later.

6        MR. JONES:  So If you would back that up for a

7   minutes, Cole, and go to the earlier part of the page.

8   Q.   So in this 20-minute call, Father, you get asked,

9   according to your notes, "He asked" --

10       MR. JONES:  Can you blow that paragraph up, Cole?

11  Q.   "He asked if we had spoken to anyone who worked in

12  countries where the new hep C medications perhaps would not be

13  used perhaps because of the expense."  Correct?

14  A.   Yes.

15  Q.   That's a conversation about Promacta, correct?

16  A.   It appears to be, yes.

17  Q.   You and Mr. Voss are talking about Promacta, correct?

18  A.   Yes.

19  Q.   And he apparently asked you if you talked to anyone who

20  worked in the country where the new hep C medication was not

21  going to be used, correct?

22  A.   Yes.  It appears that way.

23  Q.   The answer to that question is no, you hadn't, right?

24  A.   Well, not necessarily.

25  Q.   You had talked to people in countries where the hep C

1   medication would not be used?

2   A.   We had talked to at least one person outside the country.

3   Q.   Father, that's not the question, is it?  The question is,

4   had you talked to people who work in countries where the new

5   hep C medication would not be used?

6   A.   I don't believe he specified those countries in the call.

7   Q.   I didn't ask that, Father.  I asked if you had talked to

8   people who worked in countries where the new hep C medications

9   perhaps would not be used.  It's a yes or no question, Father.

10  A.   I think we did.

11  Q.   Who?

12  A.   I think it would have been Dr. Jabbour.

13  Q.   Dr. Jabbour?

14  A.   Yes.

15  Q.   In Europe?

16  A.   Yes.

17  Q.   So you thought in Europe they weren't going to be using

18  Sovaldi?

19  A.   My understanding is that Ligand intended to target --

20  Q.   That's not my question.  My question is about Sovaldi.

21  A.   Yes.

22  Q.   Did you believe, when you talked to Dr. Jabbour, that they

23  weren't going to use Sovaldi in Europe?

24  A.   I didn't have that specific thought, no.

25  Q.   You didn't know whether they were going to use Sovaldi in

1   Europe?

2   A.   I believed that Sovaldi was a cure for hepatitis C.

3   Q.   Yes, and did you believe it was going to get used in

4   Europe?

5   A.   Yes.

6   Q.   Okay.  So you didn't talk to somebody who worked in a

7   country where the new hep C medications perhaps would not be

8   used, correct?

9   A.   That's an awfully confusing question.  I'm sorry.

10   Q.   Let me try to rephrase it for you, Father.

11          Where's Dr. Jabbour working at the time?

12   A.   Belgium.

13   Q.   Did you think they were going to use Sovaldi in Belgium?

14   A.   I believed it would be used everywhere.

15   Q.   All right.  So you didn't talk to anyone who worked in

16   countries where perhaps the new hep C medications would not be

17   used, correct?

18   A.   Well, it's hard to answer that question because I believed

19   it would be used everywhere.

20   Q.   When, right away?

21   A.   Yes.

22   Q.   You knew it wasn't approved everywhere, correct?

23   A.   The research I was finding indicated that it was being

24   extremely well received by hepatologists.

25   Q.   Let's take a step back then, Father.  You at least agreed

1    that you and Mr. Voss had a conversation about the fact that

2    Sovaldi was not going to be used everywhere across the world

3    initially, correct?

4    A.   No.  I don't have a specific recollection of that

5    conversation, as you characterize it.

6    Q.   Well, your recollection are these notes, right?

7    A.   It says he asked if we had spoken to anyone who worked in

8    countries where the new hepatitis C medication perhaps would

9    not be used.  That was a question he posed.

10   Q.   Right.  And that's part of a conversation about Promacta,

11   we already agreed to that, right?

12   A.   It's a question he asked me.

13   Q.   It's a question as part of a conversation about Promacta,

14   right, Father?

15   A.   I don't know if I wrote that we had a conversation about

16   Promacta.

17   Q.   No, Father.  I'm asking you.

18           THE COURT:  Can we move this forward.

19           MR. JONES:  Yes, Your Honor.  We're trying.

20   Q.   The conversation about whether hep C medications would not

21   be used was a conversation about whether interferon would

22   continue and, therefore, Promacta would continue in those

23   countries, correct?

24   A.   I don't recall him saying that.

25   Q.   You were just randomly talking about countries who had hep

1    C; is that your interpretation, Father?

2    A.    Well, I tried to record what he asked me.

3    Q.    All right.  Well, let's try the next one.

4          MR. JONES:  Let's blow up the next paragraph, please.

5    Q.    Here you're talking about a Roth Capital report, correct?

6    A.    Yes.

7    Q.    Okay.  So you and Mr. Voss are talking about a Roth

8    Capital report, correct?

9    A.    Yes.

10   Q.    And that Roth Capital report is actually authored by

11   Joseph Pantgenis, right?

12   A.    Yes.

13   Q.    And that's the Joseph that's being talked about here?

14   A.    He seems to be referring to Joseph Pantgenis, but I didn't

15   write down the last name.

16   Q.    Joseph Pantgenis is the actual analyst for Ligand at Roth,

17   correct?

18   A.    I believe it is.

19   Q.    In fact, we could look at Exhibit 34 and see the report

20   from Joseph Pantgenis about Roth, right?

21   A.    Yes.

22   Q.    So this part --

23   A.    Can I look at the report you're referring to?

24   Q.    By all means.  Take a look -- Exhibit 34.  The Roth report

25   is right there.

A. I see the Roth report, but it doesn't say who authored it.
Q. It doesn't?
A. Not on -- at least not the email I have. Wait one moment. Let me look at the attachment.
Q. Let me turn you, Father, to SEC-Lemelson E144169. It's the first page of the Roth report.
THE COURT: Now you're losing me. Is this something they have in their binder?
MR. JONES: Yes, Your Honor. And I'm pulling it up now.
Q. It comes right after the Lemelson Capital Management page. Here it is, the Roth report, right?
A. Which exhibit is that.
Q. Part of Exhibit 34, Father.
A. 34.
MR. JONES: In fact, may I approach, Your Honor?
THE COURT: Does he not have the notebook?
MR. JONES: He seems to be having problems finding it.
THE WITNESS: It's after all the emails. I see.
MR. JONES: Oh, you have it here. See.
Q. Whose report is this in the upper right-hand corner?
A. Joseph Pantgenis.
Q. So he is the Roth analyst, correct?
A. In this report, yes.
Q. And he writes about Ligand, correct?

1   A.   Yes.

2   Q.   So this too is more conversation back on Exhibit 129.

3   You're talking about how the company is doing here, too, right?

4   A.   I'm talking about how the company is doing in that section

5   you highlighted?

6   Q.   Right.  You say, "I pointed out the updated Roth Capital

7   report," correct?

8   A.   Yes.

9   Q.   What were you pointing out about the updated Roth Capital

10  report?

11  A.   Well, when it says the "updated Roth Capital report," it

12  may have been a report published after that May 14 because it

13  is updated.

14  Q.   After the what?

15  A.   After the May 14 report.

16  Q.   That's what I'm asking you.  What are you talking about

17  with this updated Capital report?

18  A.   Probably Roth Capital's position.

19  Q.   Okay.  And Roth Capital's position was what on Ligand?

20  They were a buy, correct?

21  A.   Yes.

22  Q.   They thought that the value of Ligand was under -- rather,

23  they thought the value of Ligand was over where the stock was

24  currently trading, correct?

25  A.   Yes.

1  Q.   And part of that analysis was they thought Promacta was
2  going to grow, right?
3  A.   I have to go back and read the report again.
4  Q.   Well, Father, you listened to the earnings calls, right?
5  A.   Yes.  I read the transcripts.
6  Q.   Right.  And you saw in each of those transcripts that
7  Joseph Pantgenis would ask questions about Promacta, correct?
8  A.   After my report was issued, yes.
9  Q.   But also before your report was issued, correct?
10 A.   I belive he did.
11 Q.   So when you said "after," you meant both after and before?
12 A.   I believe he did.
13 Q.   You knew that he would ask those questions about Promacta,
14 right?
15 A.   No, I didn't know that.
16 Q.   Well, Father, didn't we just say that you would read those
17 earnings call transcripts?
18 A.   Yeah, but I didn't know in advance that he would ask those
19 questions.
20 Q.   Father, I wasn't asking in advance.  I'm asking, you knew
21 Joseph Pantgenis asked questions about Promacta during earnings
22 calls, correct?
23 A.   Yes, I knew that.
24 Q.   And then he would write about them in his report, correct?
25 A.   He may have.  I'd have to go back and check the report.

1    Q.   Here you're talking about Promacta again, correct, Father?

2    A.   Not necessarily.  I have to see the report.  It's my

3    understanding that Joe Pantgenis --

4    Q.   So you don't know what you're talking about here, Father?

5         MR. BROOKS:  He keeps interrupting the witness, who's

6    answering the question, Your Honor.

7         THE COURT:  Yes.

8         MR. JONES:  It's cross-examination.

9         THE COURT:  No.  What's the answer?

10   A.   So sitting here seven years later, no.  But I do remember

11   commentary from Joe Pantgenis that involved many different

12   aspects of the company other than Promacta.

13   Q.   And one of those aspects was Promacta, correct?

14   A.   That he covered in his reports?

15   Q.   Yes.

16   A.   It's likely.

17   Q.   Okay.  Going on, can we have the paragraph that starts

18   "Got the feeling immediately."  Here you say, "but also trying

19   to figure out if they could get me to change my position."  Do

20   you see that, Father?

21   A.   Yes.

22   Q.   So you're saying that Mr. Voss was feeling you out to see

23   whether you would change your position?

24   A.   Yes.

25   Q.   And the answer to that question was no, right?  You

1    weren't going to change your position, correct?

2    A.    No, not at all.

3    Q.    No matter what Mr. Voss said in the call --

4    A.    Don't misunderstand me.

5          THE COURT:  Wait, wait.  You know, you're speaking at

6    the same time.

7          Did you finish your answer?

8          THE WITNESS:  No.  I think it was misunderstood what I

9    said.  When I say no, I meant no, I was open to changing my

10   opinion.

11         THE COURT:  Next question.

12         THE WITNESS:  And I think he understood it to be no, I

13   wasn't open to change.

14   Q.    So you were open to changing your position?

15   A.    Yes.

16   Q.    Right after you put the 4.6-million-dollar bet down on

17   Ligand going down?

18   A.    Of course I was open to changing it.

19   Q.    You were ready to put out reports saying that it was going

20   up?

21   A.    I think I asked Mr. Voss for any errors in my report, any

22   positive news I could look at.

23   Q.    So you guys talked about the company and positive news

24   that they had?

25   A.    I don't remember the exact words.  I'm sure it's in my

1    notes.

2    Q.   Well, let's look at your notes then.  All right.  He's

3    trying to feel you out as to whether you could change your

4    position, right?

5    A.   My recollection is that he wanted me to change my

6    position.

7    Q.   Yes.  And why did he want you to change your position?

8    A.   I think he was used to only seeing positive sell-side

9    analyst reports, and I think the company very much wanted

10   positive news flow.

11   Q.   Right.  They didn't want somebody writing that Promacta

12   was going away, right?

13   A.   I think they didn't want any criticism.

14   Q.   Did they want somebody writing Promacta was going away?

15   A.   I suspect they didn't want that.

16   Q.   You write here "trying to get me to believe there was a

17   material non-public information that would prove I was wrong,"

18   correct?

19   A.   Yes.

20   Q.   Do you see that there in that paragraph just below where

21   we were looking?

22   A.   Yes.

23   Q.   So here again Mr. Voss it talking about information that

24   the company has that shows that what you've put out about

25   Ligand is wrong, correct?

1   A.   No.  So I felt he was quite disingenuous and was trying to

2   get me to believe there was material non-public information

3   that would prove I was wrong.

4   Q.   And the thing that's getting proved wrong is a report

5   about Promacta, correct?

6   A.   No.

7   Q.   Well, let's look at Exhibit 1 again, shall we?

8   A.   Not necessarily.

9   Q.   This is the report that's on the table at the time, right?

10  A.   Yes.

11  Q.   This is the one that you put out, right?  This is your

12  only public statement about Ligand so far?

13  A.   Yes.

14  Q.   Right.  And the main part of this report is about Promacta

15  going away, correct?

16  A.   No.

17  Q.   Well, let's look at the title.  "Severe competitive threat

18  to key royalty program."  You said that was Promacta, right?

19  A.   It probably referred to Promacta, yes.

20  Q.   That's your title, right?

21  A.   And "going concern risk."

22  Q.   Well, then let's look at page 4.  Could we have B on

23  "Investment Highlights."  No, that's overview.  Investment

24  highlights are up top.  Investment Highlight b.  This is kind

25  of an executive summary of your report, right, Father?

```
 1    A.    Are you in the Investment Highlights section?

 2    Q.    I am.   Investment Highlight b.

 3    A.    It's investment highlights, yes.

 4    Q.    And that highlight, the second one in your report is,

 5    let's see, "Sovaldi drug will virtually eliminate demand for

 6    Promacta," right?

 7    A.    Yes.

 8    Q.    That's -- when Mr. Voss and you were talking about you

 9    changing your position, that's what you're talking about

10    changing your position about, correct?

11    A.    Not necessarily, no.

12    Q.    Is that what your report's about?

13    A.    Well, point a. comes above that --

14    Q.    Right.

15    A.    -- which is, "Revenue and profits highly concentrated in

16    one single source product and essentially two royalties

17    agreement, one of which is set to decline precipitously."

18    Q.    Okay.  So that's about Promacta too, right?  The royalty

19    agreement that's set to decline precipitously, that's related

20    to Promacta?

21    A.    No, that's related to Captisol.

22    Q.    But you know they don't get royalties from Captisol,

23    right, Father?

24    A.    Well, they do when they add it to other companies' drugs

25    like Kyprolis.
```

1    Q.    Like Kyprolis.  But you're talking here "set to decline

2    precipitously" about Promacta?

3    A.    No.  This report covers Kyprolis and Melphalan and a few

4    other royalty programs.

5    Q.    So now you're saying this is about Kyprolis?

6    A.    The reference to single source refers to Captisol.

7              (Court reporter interrupts.)

8    A.    The clear language of "single-sourced" refers to Captisol,

9    not Promacta, and that was the first point in my report.

10   Q.    Father, look at page 5, the next page.  This is the first

11   section of your report, correct, after the overview?

12   A.    Yes.

13   Q.    And the first section of that report is about a vital

14   royalty generating program?

15   A.    Yes.

16   Q.    And it's about that royalty program facing a severe

17   competitive threat, right, Father?

18   A.    Yes.

19   Q.    And the program you're talking about there is Promacta?

20   A.    Yes.

21   Q.    That's the central part of this report, correct?

22   A.    No, I would want call it the central part.  It's a part of

23   the report.

24   Q.    Did you put it first because it wasn't important?

25   A.    I think all the aspects of the report were important.

1   Q.   Did you put it in the title because you thought it was not

2   important?

3   A.   I never said it wasn't important.  It was just part of the

4   report.

5   Q.   So when you're talking in Exhibit 129 about changing your

6   report, changing your position, part of that position is

7   Promacta, correct?

8   A.   No.  I believe they just wanted me to write a positive

9   report, and he talked quite a bit about their pipeline of what

10  they called shots on goal.

11  Q.   So Father, your position is your position was not about

12  Promacta?

13  A.   Promacta was a part of the thesis, yes.

14  Q.   Okay.  On this page in Exhibit 129 --

15       MR. JONES:  Can we go back to 129, Cole, please.

16  Q.   "He asked about AUM, long versus short in the fund, et

17  cetera.  Told him none of that information was available."  Do

18  you see that, Father?

19  A.   Yes.

20  Q.   "AUM" is assets under management?

21  A.   Yes.

22  Q.   Whether your fund is long or short, that means whether it

23  has more invested in long positions or short positions?

24  A.   Correct.

25  Q.   And then it says "et cetera, et cetera," so other

1  information about the fund?

2  A.   I believe so, yes.

3  Q.   So when Mr. Voss asked you basic questions about your

4  fund, you wouldn't give him any information, would you?

5  A.   No, it's a private fund.

6  Q.   That's indicative of how you went into that call, right,

7  that you weren't going to give up any information?

8  A.   It would be a terrible violation to reveal information

9  about our investment fund or investors.

10 Q.   Well, Father, we just looked earlier, right, at the Form

11 ADV, right?

12 A.   Yes.

13 Q.   And you have to reveal that information in that form,

14 right?

15 A.   One time a year we do.  And it changes pretty quickly

16 after that.  And we don't have to reveal in the Form ADV our

17 long-to-short ratio.

18 Q.   No, but you have to reveal your assets under management,

19 right?

20 A.   Yes.

21 Q.   So Mr. Voss asked you a basic question about the fund and

22 you won't answer it, correct?

23         MR. BROOKS:  Objection.

24         MR. JONES:  What's the objection?

25         THE COURT:  Overruled.

1  A.   I don't think that's a basic question.  It goes to our

2  strategy of the fund.  And it's confidential.

3  Q.   How much money you have goes to your strategy?

4  A.   Our long/short ratio is absolutely strategic.

5  Q.   What about the assets under management, why wouldn't you

6  tell him that?

7  A.   It's also private information.  We have to reveal it once

8  a year.  That's it.

9  Q.   So you wouldn't even tell him what it was?

10       THE COURT:  Asked and answered.  Let's go.

11  Q.   Can we look at the second page of 129, please.  You write

12  in that first paragraph, "He made many mistakes on the phone,

13  like asking why we would disagree with GSK analysts."  Right?

14  Do you see that part?

15  A.   Yes.

16  Q.   GSK.  Now, GSK has to do with Ligand because GSK is the

17  partner on Promacta, correct?

18  A.   At the time it was, yes.

19  Q.   GSK was the one who manufactured the Promacta, right?

20  A.   Yes.

21  Q.   They were the ones who did the marketing on the Promacta,

22  right?

23  A.   Yes.

24  Q.   They were the ones who sold the Promacta, right?

25  A.   I don't know if they used third parties for sales and

1  marketing or if they did it internally, but we could say they

2  sold it, yes.

3  Q.   And they set the price for Promacta?

4  A.   Yes.

5  Q.   Okay.  So when you're talking about GSK analysts, you're

6  talking about Promacta, right?

7  A.   Not -- well, yes, likely, yes.

8  Q.   Yes.  Okay.

9           So Mr. Voss is telling you about GSK analysts and

10  asking why you would disagree with what they were writing,

11  right?

12  A.   I'm not sure what the mistake refers to now seven years

13  later.

14  Q.   I'm not asking about the mistake, Father.

15  A.   Oh.

16  Q.   I'm asking about this part that says "like asking why we

17  would disagree with GSK analysts."  You agree that was a

18  conversation about Promacta, correct?

19  A.   It was a conversation about GSK analysts.

20  Q.   Right.  And what were the GSK analysts writing about in

21  reference to Ligand?

22  A.   I'd have to see those reports again.

23  Q.   What's the only thing they were going to write about with

24  respect to Ligand?

25  A.   I can't say they would only write about one thing.

1  Q.   What's the only way that GSK is connected to Ligand?  It's

2  Promacta, right?

3  A.   We're talking about the analysts, not GSK.

4  Q.   You're talking about the analysts on a phone call with

5  Ligand's investment relations professional, correct?

6  A.   Can you ask the question again?  I'm sorry.

7  Q.   Are you talking about the GSK analysts on a phone call

8  with Bruce Voss, the IR guy for Ligand?

9  A.   Well, he asked me about it.  I don't know that we were

10  talking about.

11  Q.   Right.  He asked you why you would disagree with them,

12  right?

13  A.   Apparently, yes.

14  Q.   Why you would disagree with what the GSK analysts were

15  writing about Promacta?

16  A.   I didn't write that.

17  Q.   Apparently that's what the conversation was about, wasn't

18  it, Father?

19  A.   That's not what I wrote.

20  Q.   Well, there's no reason to talk about the GSK analysts if

21  you're not talking about Promacta, correct, Father?

22  A.   That's not correct.  Analysts can cover a lot of issues in

23  their reports, as my reports covered a lot of issues other than

24  Promacta.

25  Q.   But not issues that involved GSK and Ligand?

1   A.   I'd have to see those reports.

2   Q.   In fact, even in the very next sentence you say you're

3   talking about Promacta, right?  In the very next part of the

4   sentence, "I pointed out there was no evidence Novartis would

5   continue to invest in Promacta."  Would you at least agree with

6   me there, Father, that you're talking about Promacta?

7   A.   Yes.

8   Q.   Absolutely certain?

9   A.   Yes.

10  Q.   Okay.  And you're talking about whether Novartis is going

11  to continue to market Promacta, correct?

12  A.   Correct.

13  Q.   Whether they're going to continue to sell Promacta, right?

14  A.   No.  Invest in Promacta.

15  Q.   Okay.  Invest in new indications for the drug, correct?

16  A.   It could be that.  It could be marketing.  It could be --

17  Q.   Let's take it one at a time.

18  A.   -- conferences for doctors.

19  Q.   I missed that last part, Father.

20  A.   It could be conferences for doctors, for example.

21  Q.   So invest in new uses of the drug, correct?  That's what

22  you just told me, right, Father?

23  A.   Well, this email -- I'm sorry, these notes say that

24  there's no evidence that Novartis would continue to invest in

25  Promacta.  That's what I recorded at the time.

1  Q.   Right.  And you just told us when you wrote "invest in

2  Promacta," you meant a few things, right?

3  A.   I didn't say at that time.  I said it could be in those

4  things, sitting here today.

5  Q.   Well, Father, you wrote it.

6  A.   Yes.

7  Q.   Does -- let me ask it in a different way, Father.

8  A.   Sure.

9  Q.   Does "invest in Promacta" include investing in new

10  applications for Promacta, new indications for Promacta?

11  A.   I suppose, sitting here today, it could mean that, yes.

12  Q.   Does "invest in Promacta" also mean invest in the

13  marketing of Promacta?

14  A.   It could mean that, yes.

15  Q.   So you agree you're talking to Mr. Voss about Novartis's

16  efforts to sell Promacta into the future?

17  A.   I didn't write that.  Just there was no evidence they

18  would continue to invest in Promacta.  But yes, that's a

19  reasonable inference.

20  Q.   Then you wrote, "He said the company agreed that Gilead's

21  drug would eliminate the need for Promacta and understood

22  that."

23  A.   Yes.

24  Q.   Do you see that?

25  A.   Yes.

1  Q.   And that's what you said you based your statement the next

2  day on, correct?

3  A.   Yes.

4  Q.   Let's go on to the next sentence.  "He said the company

5  did not agree with the position."  Do you see that there?

6  A.   Yes.

7  Q.   You wrote that at the time?

8  A.   Yes.

9  Q.   Was it accurate that he said that the company did not

10  agree with the position?

11  A.   Yes.

12  Q.   Okay.

13  A.   With the understanding that the position is the report.

14  Q.   With the understanding what, Father?

15  A.   That the position is the report in this case.

16  Q.   Okay.  Can we go down to the next highlighted paragraph.

17  Here you write, "I pointed out that we would be happy to learn

18  where we were wrong."  That's what you said, right, that you

19  were "happy to learn"?

20  A.   Yes.

21  Q.   Happy to lose that money for your investors?

22       MR. BROOKS:  Objection.

23       THE COURT:  Sustained.

24  Q.   "And that if the company felt very good about their future

25  prospects, why would they not take the call to refute the

1    report?"  So here you're talking about -- you're putting to the

2    company if they feel good about their prospects why don't they

3    get on the phone with you, right?

4    A.   Well, to refute any errors that may be in the report.

5    Q.   So taking the call is a reference to the call between you

6    and Matt Foehr, right?

7    A.   Or it could have been the many times I called before in

8    the prior week.

9    Q.   What times?

10   A.   Well, I called Erika Luib several times that week.

11   Q.   Right, and she sent you the reports and set up a call with

12   Matt Foehr, correct?

13   A.   Eventually, yes, after several attempts to reach the

14   executives.

15   Q.   Let's come back to that in a minute, Father.

16           And you say, "If the company felt really good about

17   their future prospects, why would they not take the call?"  So

18   at this point in the call, you're suspecting you're not getting

19   on the phone with Matt Foehr, correct?

20   A.   I don't know if that refers to the call earlier in the

21   prior week or if it refers to the call with Matthew Foehr at

22   4:00, or it could have meant that they had Bruce Voss call me

23   instead.

24   Q.   Well, if they're having Bruce Voss call you instead, then,

25   in fact, you are suspecting you're not getting on the phone

1    with Matt Foehr, correct?

2    A.   No, that's not correct.

3    Q.   Father, you write "why would they not take the call to

4    refute the report," right?

5    A.   Right.

6    Q.   So you're looking for a call with someone other than Bruce

7    Voss to refute the report, correct?

8    A.   Well, I think there's two things going on here.  One is

9    I'm probably asking why did you call me instead of them, and

10   the second thing going on is trying to find out if he at that

11   point had said that they're not going to do the 4:00 p.m. call.

12   So I don't remember the order.

13   Q.   And so here you had gotten the sense the company felt

14   really good about their future prospects, right?  That's what

15   you wrote, right?

16   A.   I said "if the company really felt good."

17   Q.   Well, you had already talked for a while at this point,

18   right?  This is over halfway through your notes.  We're more

19   than ten minutes into the call at this point, right?  If you

20   recorded it accurately, right?

21   A.   He was really pushing me to write good things.  That's the

22   thrust of what he wanted me to do.

23   Q.   And he was providing you with information to write good

24   things, right?

25   A.   I don't remember that.  I remember asking for what is the

```
 1   good things you want to write about?  And I'll consider it for
 2   sure.
 3   Q.   We've already seen multiple times you're already talking
 4   about Promacta in these notes, haven't we, Father?
 5   A.   Well, part of it.  As it relates to Novartis.
 6   Q.   All right.  Let's go down to "he was silenced by most of
 7   the responses," right?
 8   A.   Yes.
 9   Q.   Was this accurate?
10   A.   If I wrote it, it probably conveyed the substance.
11   Q.   Your responses are to what Bruce Voss was saying, correct?
12   When you say "silenced by most of my responses," you're talking
13   about you were responding to what Bruce Voss was saying?
14   A.   I was asking for errors in the report or good news I
15   hadn't covered.
16   Q.   Well, those are questions, Father.  You're talking about
17   responses here.  You're responding to things Bruce Voss is
18   telling you, correct?
19   A.   No.  I think what I'm saying there is he was silenced by
20   my responses, which were questions.
21   Q.   How can your responses be questions, Father?
22   A.   Well, because he was saying to me things like, "What can
23   we do to get you to write good things about the company?  Is
24   what happened to WWE going to happen to us?"
25   Q.   And you're talking about Promacta?
```

1    A.    And my responses were essentially if there are errors,

2    please show me where they're at, or if there's good news, show

3    me where it's at, to which the response was silence.

4    Q.    Let's look at two paragraphs down when you say the

5    response was silence.  Actually, Mr. Voss, according to your

6    notes, "wanted to press the idea of how we could disagree with

7    so many analysts," correct?

8    A.    Yes.

9    Q.    And those analysts are the analysts that you got sent from

10   Erika Luib, correct?

11   A.    He didn't specify, I don't think.

12   Q.    What analysts are you writing about here?

13   A.    Well, he wasn't specifying at that time.  I don't recall

14   him specifying which analysts.

15   Q.    Well, there are two kinds of analysts that are relevant.

16   There's the GSK analysts and how they're writing about Promacta

17   and there's the Ligand analysts and how they're writing about,

18   well, Ligand, right?  Those are the two analysts that we have

19   on the table right now?

20   A.    I didn't testify that the GSK analysts were writing about

21   Promacta.

22   Q.    Well, you testified that the business that GSK did with

23   Ligand was Promacta, right?

24   A.    They certainly did business with GSK on Promacta.

25   Q.    And you sat here through multiple people who came in from

1    Ligand who told you that the business that they did with GSK

2    was Promacta, correct?

3    A.    Yes.

4    Q.    Okay.

5    A.    But the GSK analysts could write about much more than

6    Promacta, as I did.

7    Q.    Frankly, Father, the GSK analysts could write about

8    anything in the world.

9    A.    Yes.

10   Q.    But the only reason that you're talking about it on a

11   phone call with the investment relations guy from Ligand is the

12   Promacta business, isn't it?

13   A.    I tried to record everything in my notes.  If I did not

14   write that down, I can't say here seven years later if that's

15   specifically what he was referring to in the GSK reports.

16   Q.    So as you sit here today, you don't know whether when

17   you're talking about the GSK analysts, you were talking about

18   Promacta, or you could have been talking about anything else?

19   Is that what your testimony is?

20   A.    No.  My testimony is just what I said.  That we referenced

21   Promacta as it relates to Novartis, not investing in it.  But I

22   don't recall him specifically mentioning Promacta in the

23   context of the GSK reports.

24   Q.    So let's go back to Exhibit 34.

25             MR. JONES:  You all have this in your binders as well.

1    Q.   Let's talk about what those analyst reports are.  Here are

2    the analyst reports, right?  That's what Erika Luib sends to

3    you.  "Attached are the analyst reports," correct?

4    A.   Yes.

5    Q.   Okay.  If we go to -- you read all these reports, right?

6    A.   I don't recall now sitting here if I read all of them.

7    Q.   Okay.  Let's look at Exhibit 1, page 19.  This is your

8    report, right, Father?  You wrote in your report on page 19,

9    "There are seven analysts following the company," down at the

10   bottom.  "At least six of them are producing radically

11   speculative reports with indefensible nosebleed price targets"

12   right?  And you go on to talk about the reports there, correct?

13   A.   Yes.

14   Q.   Are you telling me, Father, that you wrote about that in

15   your report without actually reading those reports?

16   A.   Well --

17   Q.   Father, yes or no, did you write about the analyst reports

18   in your report without actually reading them?

19   A.   No, I don't think so.

20   Q.   Do you think you did read them?

21   A.   I likely did, yes.

22   Q.   You wouldn't be so irresponsible as to write about a bunch

23   of analyst reports and not actually read them, correct?

24   A.   Well, you can scan for the price targets.  You can read

25   the headlines.  There are parts of the reports that may not

1     relate to our thesis that we may have skipped over.

2     Q.   So now I'm confused, Father, did you read the reports or

3     didn't you ride the reports?

4     A.   I believe I did.

5     Q.   Okay.  And if we look at those reports, let's see what

6     they're writing about.

7             MR. JONES:  Can we have page 18 of Exhibit 34, please.

8     Q.   This is that Roth report.  This is the Roth report about

9     Ligand, correct?

10    A.   Yes.

11    Q.   And you see down under "Impact," that last part of the

12    "Impact" paragraph?

13            MR. JONES:  No, that's the "Action" paragraph.  The

14    "Impact" paragraph right there.  Here we go.  That's good.

15    Q.   It says "and revenues driven by Promacta and Kyprolis, we

16    project continued revenue growth and sustained profitability."

17    Do you see that, Father?

18    A.   Yes.

19    Q.   So that's a Roth report about, in part, Promacta, correct?

20    A.   Yes.

21    Q.   Okay.  Let's go on to the MLV report, page 23 of the

22    document, which is -- it says 144228 at the bottom, just a

23    couple pages after where we just were.  In the MLV report, do

24    you see where it says "One quarter beat, 2014 guidance

25    reaffirmed"?  And here it's talking about Promacta too, right,

```
1    right in the middle of that paragraph?  "Revenue royalties were

2    7.9 million, up 34 percent year on year driven by Promacta."

3    Do you see that?

4    A.   Yes.

5    Q.   "Year on year" refers to the same time period the year

6    before?

7    A.   Correct.

8    Q.   That's what the "y/y" means.  The MLV people are also

9    writing about Promacta in their reports?

10   A.   Amongst other things, yes.

11   Q.   And the Craig-Hallum people on page 29 of the PDF,

12   skipping a few more pages ahead, and they actually have a

13   paragraph here, Promacta and Kyprolis update, about

14   three-quarters of the way down the page, correct?

15   A.   Yes.

16   Q.   All right.  And they're writing about Promacta, right?

17   A.   Let me finish reading it.

18   Q.   Sure.  And the question is, is this a paragraph about

19   Promacta?

20   A.   It's a paragraph about Promacta and Kyprolis.

21   Q.   Okay.  I appreciate the clarification.

22         It talks about, "We continue to believe that a high

23   ceiling exists for both of these products," correct?

24   A.   Correct.

25   Q.   So that's also about Promacta, correct?
```

```
 1    A.    Promacta and Kyprolis.

 2    Q.    Yes, Father.  Then if you skip two more pages, which is

 3    page 3 of 6 of the Craig-Hallum report, right?  Here again

 4    they're writing about revenue concentration at the bottom of

 5    the page.  They're saying the company derives a substantial

 6    portion of its revenues from Promacta, right?

 7    A.    It says "royalties associated with two projects, Promacta

 8    and Kyprolis."

 9    Q.    Yes, Father.  Right?

10          And it talks about if there are setbacks on that,

11    there could be setbacks on the company, right?

12    A.    It says that a significant setback for either of these two

13    products could have a substantial impact on the company's

14    results.

15    Q.    So yes?

16    A.    Can you ask me the question again?

17    Q.    Sure.  This sentence is about that a setback in Promacta

18    could be a setback for the company, right?

19    A.    It could be a setback for their results.  A setback in

20    Promacta and Kyprolis could be a setback in their results.

21    Q.    Are you drawing a distinction between a setback for the

22    company and a setback in their results?

23    A.    Yes.

24    Q.    What's the distinction?

25    A.    Well, the company's results is likely referring to their
```

 1    financial showings in the upcoming quarters.

 2    Q.   Okay.

 3    A.   But the company itself could have a different set of value

 4    inherent to it, other than near-term financial results.

 5    Q.   Bottom line, Father, the Craig-Hallum people are writing

 6    about Promacta too as part of their report?

 7    A.   Yes.

 8    Q.   And you knew that the other reports also write about

 9    Promacta, right, because you read them, Father, right?

10    A.   Well, sitting here seven years later I don't recall

11    everything I read, but I'd be happy to go through them again or

12    take your word for it.

13    Q.   Okay.  Well, the Griffin report talks about Promacta on

14    pages 35, 36 and 38.  We can go over to that and take a look.

15    That's the one with the griffin on the front.  Here again it

16    says, "Royalties increased rapidly," right?  Do you see that?

17    "Driven by higher sales of Promacta and Kyprolis," correct?

18    A.   Let me just finish reading, if that's okay.  So it's

19    saying, yeah, it's being driven by higher royalty rates and

20    smaller products also contributed to Duavee, which we covered

21    in our report.  Aplastic anemia, which we covered in our

22    report.  And then Lundbeck epilepsy drug, and an

23    identified product --

24    Q.   Father, you either have to keep your voice up and answer

25    or read to yourself.  We're unclear whether you're answering or

 1   not.

 2   A.    My apologies.  I'll speak louder.

 3   Q.    Let me put the question to you, Father.

 4   A.    Yes.

 5   Q.    Going back to your notes in 129, on page 2, you wrote, "He

 6   wanted to press the idea of how we could disagree with so many

 7   analysts."  These are the analysts that Bruce Voss is talking

 8   about, right, the analysts that are writing about Promacta and

 9   its impact on the company?

10   A.    It could be.  I mean, those are sell-side analysts.  It

11   could be also other analysts, such as people who publish on

12   Seeking Alpha or other places.

13   Q.    The analysts that are on the table are the seven that you

14   just got emailed a couple days before, right?

15   A.    Those have the sell-side analyst reports, yes.

16   Q.    And then the GSK analysts also writing about Promacta,

17   right?

18   A.    I'd have to see those reports to confirm that.

19   Q.    But you would agree that you and Mr. Voss are talking

20   about those analysts, correct?

21   A.    Well, he said so many analysts.  I don't know if that he

22   limited it to just those seven sell-side analysts.

23   Q.    Well, it could also be the GSK analysts, correct?

24   A.    It could be other analysts publishing, security analysts,

25   investment analysts.

1    Q.   And you thought, during the course of your call, that

2    Mr. Voss was being disingenuous?

3    A.   Yes.

4    Q.   You thought he was lying to you?

5    A.   I thought he wasn't being genuine.

6    Q.   You thought the information he was giving you was false?

7    A.   Not necessarily.  I felt that he was not being sincere,

8    that the purpose of his call he was not being forthright about,

9    that he wasn't really seeking to connect with me.

10   Q.   So you believed the information he was giving you on the

11   call?

12   A.   Well, I recorded my feelings about my impression of him.

13   Q.   Right.  And you thought he was being disingenuous?

14   A.   Yes.

15   Q.   Okay.  You disregarded what he said?

16   A.   No, I don't think I wrote that, that I disregarded what he

17   said.

18   Q.   Well, you said that he was silenced by your responses,

19   that he wasn't refuting your reports, that you thought he

20   was -- and then you just said he was being disingenuous.  Are

21   you saying that despite all that, you were taking him at his

22   word?

23   A.   Well, I was listening to what he had to say, which is why

24   I called him back.

25   Q.   Father, you disregarded what Mr. Voss told you on the

1    call, didn't you?

2    A.   No, I don't think I put that in my notes.

3    Q.   You disregarded all of those different parts in your notes

4    where your obviously were talking about Promacta, didn't you?

5    A.   I don't believe I said that in my notes.

6    Q.   You disregarded each one of those times that Mr. Voss

7    brings up something about Promacta and its uses because it

8    didn't comport with how you thought about the company and how

9    you thought Promacta was going to go, correct?

10   A.   No, that's false.

11   Q.   Despite all those times in your notes where it says you're

12   talking about Promacta, where the only logical conclusion of

13   what you wrote is that you're talking about Promacta, you

14   disregarded all of that, didn't you, Father?

15   A.   That's patently false.  In fact, it was the opposite.  I

16   really wanted him to tell me something of substance about the

17   reports, if there were errors, or if there was good news I was

18   unaware of that I'd missed.

19   Q.   And yet you won't even admit today the part of your notes

20   that talked about the GSK analysts writing about Promacta or

21   the other analysts writing about Promacta, even today you won't

22   admit that you were exchanging information with Mr. Voss about

23   Promacta, correct?

24   A.   I acknowledge Promacta was in those reports.

25   Q.   What?

1    A.    I acknowledge that Promacta was in the sell-side analyst

2    reports.

3    Q.    Let's go back.  Do you acknowledge that when you and

4    Mr. Voss are talking about those reports, you're talking about

5    Promacta?

6    A.    Not necessarily.  The reports can cover many things.  In

7    fact, the sell-side analysts do cover other things.

8              THE COURT:  Was it some of what you covered?

9              THE WITNESS:  I don't specifically remember a focus on

10   Promacta, Your Honor.  I remember that he didn't like the

11   report overall.  And he wanted us to write something positive.

12   And I think if it was focused on Promacta, I would very much

13   have put that down in my notes.

14   Q.    Well, you did, didn't you, Father?  You wrote several

15   different times about topics that only can be about Promacta.

16   In fact, at the top of the page you're talking about Promacta,

17   aren't you?

18   A.    Yes.

19   Q.    All right.  So a 20-minute call, right, Father?  Not a

20   five-minute call, right?

21   A.    Yes.

22   Q.    Not a ten-minute call?

23   A.    Yes.

24   Q.    20 minutes.  20 minutes is a long time to talk to

25   somebody, isn't it, Father?

```
 1   A.   I don't know if it's long or not.  It's a decent amount of
 2   time, I suppose.
 3   Q.   Well, it's enough time to exchange a fair bit of
 4   information, isn't it, Father?
 5             THE COURT:  Why don't you finish up this thing on --
 6   the conversation with Mr. Voss.
 7             MR. JONES:  Yes, Your Honor.
 8   A.   Well, I mostly recall him asking me questions.
 9             THE COURT:  No, we won't finish.  We'll take our break
10   this morning.
11             MR. JONES:  Very good, Your Honor.
12             THE CLERK:  All rise.
13   (Jury exits.)
14             THE COURT:  You may step down.
15             THE WITNESS:  Thank you, Your Honor.
16             THE COURT:  How much longer do you think you have?
17             MR. JONES:  Your Honor, I have a lot more.  I have at
18   least into the afternoon session.
19             THE COURT:  I'd like to see if you can wrap it up by
20   lunch.
21             MR. JONES:  I would say, Your Honor, we did put down
22   five hours.
23             THE COURT:  You did.  I grimaced when I saw that.
24             MR. JONES:  The defendants put down five hours too.
25             THE COURT:  I think some of this has been slogging.
```

1  How long do you think you're going to need?

2         MR. BROOKS:  We put down five hours, but I hear Your

3  Honor.  We will be under that.

4         THE COURT:  Yes.  So it's at least today.  Because

5  what I was hoping for -- I don't know if it's feasible to

6  finish the evidence tomorrow and have a charge conference

7  tomorrow afternoon is my thought processes.  But certainly no

8  later than Wednesday.

9         MR. HOOPES:  Tomorrow.

10        MR. JONES:  Your Honor, just on that, we have cut back

11 our number of witnesses.  We cut a couple of witnesses.  So

12 after Father Lemelson is done testifying, we'll have two short

13 witnesses.  I doubt that with direct and cross between them it

14 will be more than an hour and a half to two hours total, if

15 that.

16        MR. HOOPES:  Two hours on one total and then the

17 others very short.

18        THE COURT:  Do you have some for you?

19        MR. HOOPES:  It's still under consideration, but I

20 think the odds are pretty close to zero.

21        THE COURT:  Every time I tried to focus on what you

22 submitted last night, I didn't get very far.  So I don't think

23 we'll give you a charge today but most likely tomorrow.

24        MR. JONES:  Yes, Your Honor.

25        MR. BROOKS:  Your Honor.

```
 1            THE COURT:  I have a judges meeting tomorrow, but this
 2   seems to -- I had my issue, the juror had --  I'd like to get
 3   it to the jury if I could on Wednesday or Thursday is my goal.
 4            MR. HOOPES:  Even with your conference, depending on
 5   how Mr. Jones is today, I think we'll finish the evidence
 6   tomorrow for sure.
 7            THE COURT:  Okay.  Thanks.
 8            MR. JONES:  Thank you, Your Honor.
 9   (Court exits.)
10   (A recess was taken.)
11   (Court and Jury enter.)
12            MR. JONES:  May I proceed, Your Honor?
13            THE COURT:  Go ahead.
14   BY MR. JONES:
15   Q.   So, Father, you have this 20-minute conversation on June
16   18 with Mr. Voss, right?
17   A.   Yes.
18   Q.   By your notes, that includes a discussion with Mr. Voss
19   about Promacta, right?
20   A.   Some part of it involves Promacta, yes.
21   Q.   Okay.  You know Mr. Voss wasn't going to tell you that
22   Promacta was going away, right?
23   A.   That's what he told me.
24   Q.   You knew that that was against everything -- every piece
25   of information you had about Promacta, right?
```

```
 1    A.    No.
 2    Q.    And the next morning you went on the Benzinga Internet
 3    radio show, correct?
 4    A.    Yes.
 5    Q.    The morning of the 19th?
 6    A.    Yes.
 7    Q.    And you said this.
 8          (Audio played.)
 9    Q.    You said that, right, Father?
10    A.    Yes.
11    Q.    You didn't claim that there was some sort of tacit
12    agreement, did you?  You didn't say the words "tacit
13    agreement," did you, Father?
14    A.    I did not use the words "tacit agreement."
15    Q.    But your lawyers have used the words "tacit agreement"
16    quite a bit, right?
17    A.    Yes.
18    Q.    But you said that Mr. Voss said those words, right?
19    A.    I said that he basically agreed.
20    Q.    Father, that's not what you said.  You said, "They
21    basically agreed.  They said, 'Look, we understand Promacta's
22    going away.'"  Those are your words, right, Father?
23    A.    Yes, I think I said "basically agreed."
24    Q.    Yes, you did, Father.  You said "They basically agreed.
25    They said, 'Look, we understand Promacta is going away.'"
```

1   You're a man who chooses his words carefully, aren't you,

2   Father?

3   A.   I try to.

4   Q.   So when you say "they said," you're choosing those words.

5   You're telling everyone that Mr. Voss said Promacta is going

6   away, correct?

7   A.   Yes.  They basically agreed.

8   Q.   And that is your testimony, that he said that, right?

9   A.   That he basically agreed, yes, with that.

10  Q.   Well, Father, did you say he said that or did you not --

11          THE COURT:  Why don't you put it up on the screen

12  again.

13          MR. JONES:  Sure.  We all have it here.

14  A.   Which exhibit is it?

15          MR. JONES:  Can you put it on the screen or can we

16  switch over to the document camera for the moment.  Maybe it's

17  risky.

18          THE CLERK:  It is risky.  I'll do it.  But we're going

19  to lose everybody.  We'll lose all four blocks.

20          MR. JONES:  All right.  We all have it.  Does the jury

21  all have it?

22          THE COURT:  That's a chalk that the SEC put together

23  on the statements it's concerned about.  So you have a copy of

24  that.

25          MR. JONES:  Right.

1    Q.   On June 19 you said, "I had discussions with management

2    yesterday."  We just heard this, right, Father?  "I had

3    discussions with management just yesterday -- excuse me, their

4    IR firm, and they basically agreed.  They said, 'Look, we

5    understand Promacta is going away.'"  There's no dispute that

6    that's what you said on the radio, right?

7    A.   No.

8    Q.   Okay.  Let's turn away from what you said Mr. Voss said.

9    Let's go to what you wrote about Viking, okay?  Now I'd like to

10   focus on your second report.  It's Exhibit 4.  It's in

11   everybody's binder.  It's the July 3 report.  You should have

12   it there.  And for the section about Viking which starts on

13   page 7, you say that you're looking at the Viking S-1 for this

14   section, correct?  We talked about the Viking S-1 at the black

15   text near the bottom of the page?

16   A.   Yes.

17   Q.   And you quote the S-1 several times in this section,

18   correct?

19   A.   Yes.

20   Q.   And you read the Viking S-1, right?

21   A.   Yes.

22   Q.   You read the whole thing?

23   A.   Yes.

24   Q.   Because you were making some pretty serious allegations

25   about the Viking/Ligand partnership, right?

1    A.   Yes.

2    Q.   You said -- we saw it all in the opening, right, you said

3    it was a shady shell company, right?

4    A.   I didn't say that.

5    Q.   Well, you said that it was -- that it was going to be --

6    that the transaction was alchemy, correct?

7    A.   I don't think I said the transaction is alchemy.  Those

8    are not my words.  I used the word "alchemy," but not as you

9    described it.

10   Q.   You said, "The objectives of alchemy have no place in

11   legitimate finance," right?  That's on page 9, right in the

12   middle -- right above "A Curious Relationship" -- two

13   paragraphs right above "A Curious Relationship," please, right?

14   You said, "The objectives of alchemy have no place" --

15   A.   So it says, "The legality of such a transaction may one

16   day be challenged by shareholders in either company."

17   Q.   Let me stop you there, Father.  So you're saying this

18   transaction was probably illegal, correct?

19   A.   I'm saying that the legality may be challenged one day by

20   shareholders in either company.

21   Q.   Then you said something about the objectives of alchemy,

22   correct?

23   A.   It says, "The ethics should already be clear.  The

24   objectives of alchemy have no place in legitimate finance."

25   Q.   In the next paragraph you call it three-card Monte, don't

1    you?

2    A.   It says, "The casual observer might even mistake" --

3    Q.   Father, I didn't ask you to read it out to everybody.

4    A.   Oh.

5    Q.   I just asked you whether you called it three-card Monte?

6    A.   Let me just read it just a moment.

7              No.  I'm not calling it three-card Monte.  I'm saying

8    a casual observer might mistake it for a game of three-card

9    Monte.

10   Q.   You're saying there's a distinction there, Father?

11   A.   Well, I just want to use my exact words.

12   Q.   Let's go on.

13             You wanted people to believe that what you were

14   saying about the S-1 was reported faithfully and accurately,

15   right?

16   A.   Well, of course we want to do our best to cite the S-1.

17   Q.   That's a yes?

18   A.   Yes.

19   Q.   So you wanted them to believe you were quoting the S-1

20   accurately, right?

21   A.   Yes.

22   Q.   And you wanted them to see that you were putting in facts

23   in your report about that S-1?

24   A.   We wanted to cite accurately to the S-1, yes.

25   Q.   Okay.  And based on this report, you wanted people to read

1  your report and believe that the Viking/Ligand transaction was

2  a sham, correct?

3  A.   I had no expectation with readers.

4  Q.   You had no expectation what those readers were going to

5  think in reading your reports?

6  A.   Other than I desired their scrutiny.

7  Q.   Oh, you just wanted scrutiny on the reports?

8  A.   I believe that was what I wanted from all of my reports.

9  Q.   Okay.  Not for them to believe you?  Well, Father --

10  A.   They can -- I'm sorry.  Go ahead.

11  Q.   You wrote these analyses, right?

12  A.   Yes.

13  Q.   And you supported them with all sorts of things that you

14  were quoting from, right?

15  A.   Yes.

16  Q.   And you put in the facts that supported your arguments,

17  right?

18  A.   Yes.

19  Q.   And the purpose of making an argument based on facts is so

20  that people will read that argument and believe it, right?

21  A.   I wanted to present my opinion.

22  Q.   Right.  Your opinion that you were supporting with facts,

23  correct?

24  A.   That I was supporting the facts?

25  Q.   You just said that you put in facts to support your

1    argument.

2    A.    I cited to the source documents.

3    Q.    Okay.

4    A.    In this case the S-1.

5    Q.    So one of the source documents you just said, the S-1, and

6    the S-1 is Exhibit 58 in everybody's binder.  These are

7    excerpts from the S-1, the S-1 that you read, right, Father?

8    A.    It appears to be.

9    Q.    Okay.  And we have the cover page here, and then we go

10   actually to page 1, right?

11           MR. JONES:  Can we have page 1 of Exhibit 58.  It's

12   the second page, page 5 of 196, which is marked 1 on the

13   bottom.  We could also just use the A version here, 58A.  Okay.

14   Go to the next page, please.

15   Q.    Here you see this is page 1 of the S-1, correct?

16   A.    Yes.

17   Q.    And this talks about the company, right?

18   A.    Yes.

19   Q.    And it says, "We are a clinical-stage biopharmaceutical

20   company focused on the development of novel, first-in-class or

21   best-in-class therapies for metabolic and endocrine disorders,"

22   correct?

23   A.    Yes.

24   Q.    Then it talks, in the very next line, five drug candidates

25   in clinical trials or preclinical studies, right?

1    A.   Yes.

2    Q.   And then a few lines down from there, it talks about a

3    drug entering phase 2b clinical studies, right?

4    A.   Yes.

5    Q.   Then a few lines down from there it talks about VK5211, a

6    drug that's entering clinical trials, right?

7    A.   Yes.

8    Q.   And then a few lines down from there it talks about

9    expecting to commence phase 2 clinical trials for two other

10   drugs, right?

11   A.   Yes.

12   Q.   And then it talks about -- the bottom of the paragraph,

13   again it talks about commencing clinical trials for this

14   program in 2015, right?

15   A.   Yes.

16   Q.   And if you keep scrolling down, you can see more

17   highlighted text down where you expect to commence the clinical

18   trials in early 2015 to complete the clinical trial.  Do you

19   see that there?

20   A.   Yes.

21   Q.   Then if we could show the next page of the PDF, and that

22   paragraph is about commencing clinical trials as well, correct?

23   A.   Let me read it just a moment.

24   Q.   It says, "We plan to commence a phase 2b clinical trial,"

25   right?

1    A.    So yes, and they're speaking also about completing a study

2    in combination with metformin, another -- a generic

3    pharmaceutical company.

4    Q.    So that's talking about another trial, right?

5    A.    Yes.

6    Q.    And then actually, the last sentence in this paragraph is

7    talking about another trial, right?

8    A.    Yes.

9    Q.    Then if we keep flipping through Exhibit 58, we see more

10   paragraphs about clinical trials, don't we?  Here we have on

11   your screen coming up with more -- talking about clinical

12   trials, right?  You can see the words "phase 1 clinical trials"

13   there and "phase 2 proof of concept clinical trial," Father?

14   A.    I'm reading it.  One moment, please.  (Pause.)

15         Yes, they're referring to clinical trials.

16   Q.    On the next page there's a whole chart talking about

17   clinical trials, right, on the top?

18   A.    Yes.

19   Q.    And we're just a page --

20   A.    Well, it's talking -- yeah, clinical trials and

21   development plan.

22   Q.    And this is page 4, right?

23   A.    Yes.

24   Q.    Okay.  And you can see, as you flip through this exhibit,

25   Father, that we've highlighted a bunch of stuff in yellow.

1    Right?  You have it there on the paper in front of you?

2    A.    Yes.

3    Q.    If you flip through and you see a whole bunch of stuff in

4    yellow.  Each one of those yellow sections is about commencing

5    or designing or wrapping up or expecting to commence a clinical

6    trial or clinical study, right?

7    A.    Yes.

8    Q.    And there it is across something like 20 or more pages,

9    correct?

10   A.    I haven't counted the number of pages.

11   Q.    You can see lots of pages then, Father, all with

12   paragraphs and charts about clinical trials, right?

13            THE COURT:  He answered that.

14   Q.    Now, you were here for the opening statements, right,

15   Father?

16   A.    Yes.

17   Q.    You heard your lawyer talk about how you carefully

18   researched these reports, right?

19   A.    It sounds familiar.

20   Q.    That's true, right?  You carefully researched these

21   reports, didn't you?

22   A.    Yes.

23   Q.    And you carefully went through this S-1?

24   A.    Yes.

25   Q.    And you carefully saw page after page after page talking

1    about clinical trials and studies?

2    A.    I would have at that time.

3    Q.    And then in Exhibit 4, your July 3 report, instead you

4    wrote -- in fact, we even have it excerpted here -- "Viking

5    does not intend to conduct any preclinical studies or trials."

6    Right?  That's what you wrote?

7    A.    Yes.

8    Q.    Despite the fact that page after page of that S-1 talks

9    about them doing clinical studies, right?

10   A.    It does not talk about them doing the clinical studies.

11   Q.    Well, so, Father, let's talk about that for a minute.

12   Your lawyer says you were talking about the use of third

13   parties, right?  That's what this statement is supposed to

14   mean, the statement where you say they don't intend to conduct

15   any clinical studies?

16   A.    The overall thesis was that --

17   Q.    I'm not asking about the overall thesis, Father.  I'm

18   asking about the statement where you say, "Viking does not

19   intend to conduct any preclinical studies or trials."  Do you

20   have that in mind, Father?

21   A.    Yes.

22   Q.    Now your argument is that somehow is about the use of

23   third parties, right?

24   A.    Yes.

25   Q.    And he's taking that from the risk section of the S-1,

```
 1   right?  You saw that?
 2   A.    I believe it's in the risk section, yes.
 3   Q.    Right.  There's a risk section you understand to be a part
 4   of the S-1 where the company is required to talk about things
 5   that could go wrong so that investors are aware of them, right?
 6   A.    Well, you say "required" but only if they're real risks.
 7   Q.    Okay.  I understand, Father, but they are required, you
 8   agree, right?  If there's a risk, you need to disclose it?
 9   A.    Yes.
10   Q.    Okay.  And you weren't really writing about third parties
11   when you wrote this report, right?  Were you, Father?
12   A.    I was.
13   Q.    You weren't just making some commentary that somehow
14   outsourcing parts of a clinical trial means that this
15   transaction is a sham or a fraud, were you?
16   A.    Can you repeat that question.
17   Q.    So, Father, we looked at earlier that you said that the
18   Viking/Ligand transaction could be questioned by the -- could
19   be questioned in the future about the legality of that
20   transaction, right?
21   A.    Yes.
22   Q.    And you said it was designed to stuff the balance sheet of
23   Ligand, right?
24   A.    It later was questioned by the shareholders, actually.
25   Q.    And you said -- Father --
```

```
1    A.   Oh, I'm sorry.

2    Q.   -- did you say that it was to stuff the balance sheet of

3    Ligand, yes or no?

4    A.   Yes.

5    Q.   And you said that it was going to stuff it with paper

6    profits, right?

7    A.   I have to see which section you're referring to.

8    Q.   Okay.  This is your writing, Father.  Let's talk about

9    Exhibit 4, page 7 is where you start.  And on the bottom of

10   page 8 you write, "Ligand appears to be indirectly creating a

11   shell company through Viking to generate paper profits to stuff

12   its own balance sheet."  Do you remember that now, Father?

13   A.   Yes.

14   Q.   You wrote that, right?

15   A.   Yes.

16   Q.   Those are your words?

17   A.   Yes.

18   Q.   Okay.  And are you telling us that the reason that they

19   were -- that you said that they were generating paper profits

20   to stuff a balance sheet is because somehow Viking was going to

21   use hospitals and doctors that didn't work for it to conduct

22   its clinical trials?

23   A.   No.

24   Q.   Are you suggesting that somehow the fact that you might

25   need a lab somewhere else to contract for your clinical studies
```

1    means you weren't going to do any?

2    A.    No, that's not what the report is saying.

3    Q.    No.   It's saying that you don't think that they're going

4    to conduct any clinical trials or clinical studies, right?

5    A.    They themselves.

6    Q.    Well, let's actually look at your testimony on July 22,

7    2016.   You remember coming in for a few days of testimony with

8    the investigative staff, right, Father?

9    A.    Yes.

10   Q.    And you raised your right hand and you took an oath to

11   tell the truth, right?

12   A.    Yes.

13   Q.    The same oath that you took when you came in here, right?

14   A.    Yes.

15   Q.    Okay.

16              MR. JONES:   Could we see the testimony from pages 721

17   line 12 to 722, line 11, please:   One page earlier, please.

18   721 to 722.   No, I don't think you have the right page, Cole.

19   Q.    Father, while we're getting that up, when you testified

20   with investigative staff, you didn't know that you were under

21   investigation yet, did you?

22   A.    No.

23   Q.    In fact, you had a whole lawsuit about the fact that a

24   newspaper -- a news service said that you were under

25   investigation when you thought you weren't, right?

```
 1              MR. BROOKS:  Objection.
 2              THE COURT:  Could you rephrase that.
 3              MR. JONES:  Yes, Your Honor.
 4  Q.   You filed a lawsuit, the basis of which in part was that
 5  the Bloomberg news service said that you were under
 6  investigation when you say you weren't?
 7              MR. BROOKS:  Objection.
 8              THE COURT:  What's the timing of this?
 9              MR. JONES:  It's about a year after the report comes
10  out, Your Honor.
11              THE COURT:  Sustained.
12  Q.   When you gave this testimony, you didn't think you were
13  under investigation?
14  A.   No.
15  Q.   So from 721, line 12 --
16              MR. JONES:  Yeah, there we go.  Something's wrong.
17  Q.   Anyway, you testified under oath before the time you knew
18  you were in trouble that you were talking about the fact that
19  there was no intention at all for Viking to conduct clinical
20  trials, correct?
21  A.   I have to see what part of the testimony you're referring
22  to.
23  Q.   All right.  We'll come back to that.
24              And you remember a time when your attorneys submitted
25  a document on your behalf to try to get the Commission not to
```

1    file charges, correct?

2    A.   They suggested we file something called a pre-Wells

3    submission.

4    Q.   Right.  And in that Wells submission your attorney for

5    you --

6         MR. BROOKS:  Objection, Your Honor.

7         THE COURT:  I don't know what the question is.

8    Q.   Your attorney said for you that the statement that they

9    weren't going to conduct clinical trials was at the time

10   inaccurate, right?  It says --

11        THE COURT:  Do you know one way or another?

12        THE WITNESS:  Your Honor, my attorney made a mistake

13   in that document.  I had not reviewed it.

14   Q.   So you let your attorney send in your Wells statement

15   without actually even looking at it?

16        MR. BROOKS:  Objection, Your Honor.

17        THE COURT:  Sustained.

18   Q.   Let's turn to the audit statement for a minute.  The audit

19   statement is also in the handout here.  It's also in Exhibit 4.

20   You wrote "In other words, Marcum was merely hired, but the

21   company has not yet even consulted with the firm on any

22   material issues.  The financial statements provided on the S-1

23   accordingly are unaudited."  Correct?  That's on the top of

24   page 10.

25   A.   Yes.

1    Q.   And to be clear, you agree that this sentence is false

2    now, right?

3    A.   Part of it is partially true.  And part of it is a

4    mistake.

5    Q.   It's false, right?

6    A.   Well, the first section about audited, there were audited

7    and unaudited.

8    Q.   Okay.

9    A.   So a substantial part was unaudited.  However, I was

10   citing to the S-1 and the oversight was that after the

11   publication they had a chance to meet with their auditor.

12   Q.   After the publication of what, Father?

13   A.   Excuse me.  As of the date cited in their S-1, the April

14   date.  I think it was April 27.

15   Q.   Father, you don't say anything in here about certain

16   dates, are you?  You're saying that they haven't consulted with

17   their auditor on any material issues.  You wrote that, right?

18   A.   Yes.  I was citing the language of the S-1.

19   Q.   And you wrote that, "The financial statements provided on

20   the S-1 accordingly are unaudited," right?

21   A.   Yes.

22   Q.   And you now know there's an opinion letter right in the

23   S-1 that says there was an audit?

24   A.   Part of them were audited, part were not.

25   Q.   Well, you know -- you told me previously, Father, that you

 1    read hundreds of financial statements, correct?

 2    A.   Yes.

 3    Q.   And those financial statements come with opinion letters,

 4    right?

 5    A.   Yes.

 6    Q.   And sometimes they're about a whole year, right?

 7    A.   Yes.

 8    Q.   And then the whole year part is audited, right?

 9    A.   Typically, yes.

10    Q.   Yes.  In fact, you can't really file with the SEC unless

11    it's audited, right?

12    A.   That's correct.

13    Q.   And sometimes it's a quarter, right?

14    A.   Yes.

15    Q.   It's a short three-month period of time, right?

16    A.   Yes.

17    Q.   And you've seen that those are reviewed by auditors,

18    right?

19    A.   Yes, and sometimes they're audited.

20    Q.   Well -- and you've seen that in all of those 10-Qs the

21    auditor is reviewing it but not putting in its full year

22    opinion letters?

23    A.   This is not a Q1.

24    Q.   Yes.  It's an S-1, correct?

25    A.   Yes.

1    Q.   Right.  And the S-1 says that the full year parts are

2    audited, right?

3    A.   It does.

4    Q.   In fact, we have that in Exhibit 58, don't we?  It's here

5    in green toward the back.  If we go to page what's marked 162

6    of 196, it's the first time you'll see the green highlighting

7    in your binders there.

8            It says here right above the "Experts" paragraph, it

9    says that an auditor's been appointed, correct?  Do you see

10   that, Father?

11   A.   It says the board of directors of Marcum.

12   Q.   You understand that's an auditor, right?

13   A.   Yes.

14   Q.   And it says to audit the financial statements for fiscal

15   years ending December 31, 2012 and 2013, correct?

16   A.   Yes.

17   Q.   And for the fiscal year ending December 31, 2014, correct?

18   A.   Yes.

19   Q.   And when this is being written, it's before December 31,

20   2014, correct?

21   A.   Yes.

22   Q.   And it says before April 7 "neither we nor anybody on our

23   behalf consulted with Marcum," right?

24   A.   Yes.

25   Q.   And that's because Marcum hadn't been hired yet, correct?

1    A.    Yes.

2    Q.    Okay.  But then it says in the next paragraph under

3    "Experts," it talks about the audited financial statements,

4    correct?

5    A.    Yes.

6    Q.    Okay.  And then we go to the next page, page 164 of 196,

7    and it talks about a report of independent registered public

8    accounting firm there, right?

9    A.    Yes.

10   Q.    And then if we go to 165 of 196, the next page in your

11   binder, here's the opinion letter, right?

12   A.    Yes.

13   Q.    And the next page, 167 of 196, the financial statement

14   part, scroll one more page, and the columns that are the full

15   years are not marked, and then the short periods, the three-

16   month periods are marked unaudited, right?

17   A.    Yes.

18   Q.    And you know that to do an audit --

19   A.    Excuse me.  I'm sorry.  I want to correct that.  So the

20   two quarterlies for 2013/2014 were unaudited, but also the

21   cumulative period from September 24, 2012, the inception,

22   through March 31, 2014 were also unaudited.

23   Q.    You know, Father, that in order to do an audit, you have

24   to consult with your auditor on material issues, correct?

25   A.    Yes.

1   Q.   So if even part of this has been audited, the company has

2   consulted with its auditors on material issues, hasn't it?

3   A.   Yes.

4   Q.   And yet you stated it hadn't?

5   A.   It was a mistake.

6   Q.   It's a mistake made by a guy who's read hundreds of

7   financial statements, correct?

8   A.   Yes.

9   Q.   And a guy who is rock solid on accounting issues, right?

10  A.   Well, this is not an accounting issue per se.

11  Q.   Well, auditing and accounting, right?  Those go together,

12  right?

13  A.   Well, this is a mis-cite to an audit letter.  It's not an

14  accounting issue per se.

15  Q.   Father, it says multiple times in here that they have

16  audited and they have unaudited statements.  Is it a mis-cite.

17  Or did you write it hadn't been audited because you wanted

18  people to believe that this was a sham transaction?

19  A.   No, that's not correct.  That's totally false.  I think it

20  says in here 67 times it's unaudited versus six or seven for

21  the audit.  And further --

22  Q.   Let me stop you right there, Father.

23  A.   Go ahead.

24  Q.   That citation, it says the word "unaudited," right?

25  A.   67 times you mean?

```
 1    Q.    Right.  And you know, Father, that that's to draw the
 2    distinction between the full-year audit, for which there's an
 3    opinion letter in the financial statements, and additional
 4    information that is also being provided in the S-1?  You know
 5    that's the distinction being drawn there?
 6    A.    There's a heavy reliance on the unaudited statements
 7    because --
 8    Q.    Father, I didn't ask you if there was reliance.  I asked
 9    you if you knew that the unaudited parts were in addition to
10    the audited parts.  Are they?
11    A.    They are in addition.
12    Q.    Okay.  It would have made it harder to call Viking a sham
13    in your report if you had admitted that there was an
14    independent check on their finances, wouldn't it?
15    A.    I don't believe I called them a sham.
16    Q.    It would have been hard to say that the legality of that
17    transaction was going to be questioned if there was no audit,
18    right?  If there was an audit, excuse me.
19    A.    No, no, that's not true.
20    Q.    Well, you put in it was unaudited, right?
21    A.    Yes.
22    Q.    And it was part of your thesis that this was a sham
23    transaction, correct?
24    A.    I didn't call it a sham transaction.
25    Q.    You said it was a single purpose vehicle designed to stuff
```

1   the balance sheets with paper profits.  That's not a sham,

2   Father?

3   A.   I have to see that exact quote to see if it's accurate.

4   Q.   Father, we looked at it earlier, do you remember?

5   Generate paper profits, stuff the balance sheet?

6   A.   Now I remember it, yes.

7   Q.   You remember that, right?

8   A.   Yes.

9   Q.   That was your thesis about Ligand to Viking?

10  A.   It still is.

11  Q.   Okay.  Let's talk about insolvency for a minute.  So you

12  made several statements in your August 14 and August 22 reports

13  about Ligand being insolvent, correct?

14  A.   I believe so.

15  Q.   And they're all listed here on the last page of the

16  handout for the jury.  You can all see them.  When you were

17  talking about insolvency, you were trying to compare assets and

18  liabilities, right?

19  A.   Partly.

20  Q.   Okay.  Can we have clip AR3, please.  This is part of

21  Exhibit 143.

22          (Video played.)

23  Q.   You wanted everybody to believe that taking out this debt

24  meant that the company was on the brink of collapse, correct?

25  A.   I believe they were on the brink of collapse before taking

1  out the debt.

2  Q.   So then after you really wanted them to believe it was on

3  the brink of collapse, right?

4  A.   They certainly increased their going concern risk,

5  bankruptcy risk.

6  Q.   You said that that loan was very, very scary, right?

7  A.   Not the loan.  Their activities overall would be very

8  scary to take out more debt.

9  Q.   Including that debt financing?

10  A.   Yes.

11  Q.   You knew that Ligand got the debt financing, right, that

12  it actually got the money?

13  A.   Yes.  They didn't get 225 million.  I'm sorry.

14  Q.   Well, they got it and had to spend some of it on the

15  transaction?

16  A.   80 million to insure it, yes.

17  Q.   Well, you heard Mr. Higgins testify they had money in the

18  bank, right?

19  A.   They did.

20  Q.   They had 180 million dollars in the bank, right?

21  A.   After the bond offering, yes.

22  Q.   You didn't figure that money in at all into your

23  declaration that the company was insolvent, did you?

24  A.   Sure, I did.

25  Q.   Oh, you did?

1    A.    Yes.

2    Q.    So you thought they were insolvent even though they had

3    180 million dollars in the bank?

4    A.    But their liabilities were far greater than that after the

5    bond offering.

6    Q.    At no point did you stop to say, hey, this company has 180

7    million dollars in the bank from a loan and it's not due for

8    five years and they could pay their bills with it if they

9    needed.  Did you ever stop to think about that?

10   A.    On the face of the note, it would have immediately led to

11   their liquidation.  The company later had to illegally backdate

12   the bond indenture to avoid liquidation, which is exactly what

13   the bondholders accused them of when they sued them for 3.9

14   million dollars.

15   Q.    Father, you know that bondholder suit was, first of all,

16   dismissed, correct, thrown out, right?

17   A.    The allegations were never denied by the company that they

18   backdated it illegally, and they failed to report it to the

19   SEC.

20             MR. JONES:  Your Honor, move to strike.

21             THE COURT:  Yes, I'll strike it.

22   Q.    You didn't stop to think that about the big sophisticated

23   investors who loaned the money to Ligand, did you?

24   A.    Well, that was their common shareholders that they were

25   taking out in the private transaction.  So I did think of them

1    and I listed them.

2    Q.   You knew those big sophisticated shareholders looked at

3    Ligand and decided that it was worthy to give them that 225-

4    million-dollar loan, right?

5              MR. BROOKS:  Objection.

6              THE COURT:  Sustained.

7    A.   My recollection is that --

8              THE COURT:  No.  Sustained means you don't have to

9    answer.

10   Q.   You knew that transaction went through, correct?

11   A.   Yes.

12   Q.   And to do that, did there have to be some sort of analysis

13   of the company, whether it could pay it back?  You knew that,

14   right, Father?

15   A.   Not necessarily, actually, because these were insiders

16   holding the stock who were exchanging in a private transaction

17   their equity for secured notes.

18   Q.   But your testimony here today, Father, is people who

19   loaned 225 million dollars to Ligand did nothing to check out

20   whether Ligand would be able to pay it back?  Is that what you

21   want us to believe?

22   A.   The lenders in this case are investment banks.  It's not

23   actually their money.  It's other people's money that they're

24   lending to Ligand.

25   Q.   Right.  Their clients, right?

1    A.   And they're getting an enormous fee.  80 million out of

2    the 225 million went to banking fees and other fees.  It was

3    very good business for the investment bankers to make that loan

4    with other people's money.

5    Q.   But you know that they have to get that money back,

6    correct?

7    A.   Yes, the bond indenture requires them to pay the money

8    back.

9    Q.   Right.  And the people lending the money want the money

10   bank, right?

11   A.   I personally think the investment bankers in this case

12   wouldn't really care if the investors lost money because they

13   already got their fees.

14   Q.   So you think that you can just give out 225 million

15   dollars and not care whether you're getting it back, that's how

16   investment banks work?  Is that your testimony?

17   A.   Investment banks lose investors' money all the time.  The

18   bank did very well on that transaction.  That was not going to

19   change whether Ligand paid it back or not.

20   Q.   And the investors got paid back too, didn't they, and they

21   got paid back with interest, didn't they?

22   A.   They got paid back a fraction of what they were expecting.

23   Q.   They got paid back with interest, according to the note,

24   didn't they?

25            Let's go on.

1    A.   In their mind, they felt they did not get paid back.

2            THE COURT:   I think this is a side issue, the bond

3    issue.

4    Q.   Father, when you were doing your math formula here that we

5    see --

6    A.   I also just wanted to say one other thing.

7            THE COURT:   No.   Your attorneys will be redirecting.

8            THE WITNESS:   All right.

9    Q.   You did a math formula to try to determine -- to state

10   that the company was insolvent, correct?

11   A.   Yes.

12   Q.   And you say that this math formula shows the company's

13   insolvent, right?

14   A.   Basically.

15   Q.   Basically insolvent or insolvent?

16   A.   Basically they were insolvent, yeah.

17   Q.   You write that that is based on a tangible equity to -- a

18   debt-to-tangible-equity ratio, correct?

19   A.   Yes.

20   Q.   Now, when you did your debt-to-tangible-equity ratio you

21   mixed together different information from different time

22   periods, didn't you?

23   A.   Well, we used the information at the year end, 2013, and

24   then we used information in Q-1, but we primarily relied on

25   year-end 2013.

1    Q.   And you don't tell people where you're using that

2    information from, right?  You don't tell them you're taking

3    some from column A and some from column B, right?

4    A.   No.  We had to estimate because they hadn't released their

5    Q-2 report yet.

6    Q.   And you don't tell people you were estimating, do you?

7    A.   Well, I think our math was actually quite correct based on

8    available information.

9    Q.   But Father, I didn't ask you whether your math was

10   correct.  I absolutely believe you can do math.

11        My question is, you didn't tell people you were

12   making some sort of estimate here, did you?  You put down

13   numbers that you say were the numbers, not your estimates,

14   right?

15   A.   I stand by those numbers.

16   Q.   Because you're putting them down as fact?  That's why you

17   stand by them?

18   A.   Those were the numbers we got off the balance sheet.

19   Q.   You say as a matter of fact this formula says the company

20   is insolvent?

21   A.   That was my opinion, yes.

22   Q.   Well, Father, you're writing a math formula that says this

23   math formula says the company is insolvent, right?

24   A.   Yes.

25   Q.   And you said it five times at least in the August 14 and

1    August 22 reports, correct?

2    A.   It could be.  I haven't checked.  I don't count the number

3    of times.

4    Q.   And you didn't figure in the revenues that Ligand was

5    getting from Promacta sales, right, when you decided it

6    couldn't cover its bills?

7    A.   Well, you'd be moving to the statement of operations then

8    from the balance sheet.

9    Q.   Well, but I'm asking you, Father, in the inquiry about

10   whether or not the company was going to be able to pay its

11   bills, you didn't take into account the fact that they had

12   revenue coming in from Promacta sales, did you?

13   A.   The fact is when you look at the insolvency, there's two

14   prongs used in that report.  The first deals with negative net

15   working capital, which was about minus 4 million.  On the

16   balance sheet, that's a snapshot in time.  So by definition

17   they could not pay their bills for the next 12 months.

18           Secondarily, we looked at it from what's called

19   technical insolvency, which is the liabilities if they exceeded

20   the assets, after we looked at an appraisal of the intangibles.

21           So we looked at it from a two-pronged approach.  When

22   we were charged, the SEC believed that the proceeds from that

23   offering would be in equity, but that was false.

24           MR. JONES:  Your Honor, we're beyond the question at

25   this point.  Can I ask another question?

1          THE COURT:  I'm not sure whether we are or we're not.

2     So why don't you ask another question.

3          MR. JONES:  Thank you.

4     Q.   Father, when you were determining whether or not the

5     company would be able to continue --

6     A.   Yes.

7     Q.   -- whether it would be able to cover its bills, you didn't

8     figure in the 180 million dollars it had in the bank, did you?

9     Yes or no.

10    A.   When you're looking technical insolvency, you do not --

11    Q.   I didn't ask about technical insolvency.

12         THE COURT:  No, Let him answer this.  This is one of

13    the charged statements.  Go ahead.

14    A.   So the mistake that the SEC made was including proceeds

15    from the bond offering in the equity.  That was a mistake.  And

16    the SEC initially accused me of doing that calculation wrong.

17         THE COURT:  Not what the SEC did or didn't do.

18         THE WITNESS:  I'm sorry.  Okay.

19         THE COURT:  Tell us why you felt -- you put down that

20    the company was insolvent.

21         THE WITNESS:  Yes, Your Honor.

22    A.   So there was a two-pronged approach.  There was the Q-1

23    financials but they cite to the year-end 2013.

24         THE COURT:  Not "they cite."  You.  You.

25    A.   So I cited to the 2013 annual report, and in that they had

1    negative net working capital, which means -- that is very

2    frequently used -- is one definition of insolvency.  So the

3    current assets were 4 million less than their current

4    liabilities.  That means they cannot pay their bills by

5    definition.

6              THE COURT:  What kind of assets?

7              THE WITNESS:  Liquid assets.  So cash, inventory,

8    short-term investments, anything that could be liquidated --

9              THE COURT:  Tangible?

10             THE WITNESS:  Tangible, yes.  Current assets are

11   always tangible.

12             THE COURT:  You were only looking at tangible assets?

13             THE WITNESS:  I looked at both in this case.  So I

14   looked at it from first prong, which is called very often an

15   equity approach to insolvency.  That's in the report.

16             And the second prong, looked at what's called

17   technical insolvency.  For that, I said, look, I can't ascribe

18   value to these intangible.  So once you back these out, they're

19   technically insolvent as well.

20             Whatever revenues --

21             THE COURT:  All right.  Enough.  Go ahead.

22             MR. JONES:  Your Honor --

23   Q.   Father Lemelson, you don't talk about working capital

24   anywhere in these statements, do you?

25   A.   We do in the report.

1    Q.   You talk about debt to tangible equity, correct?

2    A.   Yes.

3    Q.   That's the formula you're using to determine the company

4    is insolvent, right?

5    A.   It's the same method used by the Office of the Comptroller

6    of the Currency of the United States.

7    Q.   Father, is the Office of the Comptroller of Currency a

8    stock analyst?

9    A.   They control all banking in the United States, and they

10   use the same measure to determine solvency that I used, which

11   is debt to tangible equity.

12   Q.   Debt to tangible equity, you're taking out all of the

13   intangibles, right?

14   A.   Yes.

15   Q.   And a company like Ligand, those intangibles include

16   things like its research, correct?

17   A.   It wasn't clear what was included in it.

18   Q.   It includes research, right?  Research is not a tangible

19   asset, right?

20   A.   The intangibles in a company should be productive assets.

21   And in our estimation --

22   Q.   I'm asking --

23        THE COURT:  He gets to ask the question, and then your

24   lawyers can ask questions.

25        THE WITNESS:  I'm sorry, Your Honor.

1           THE COURT:  Does intangible include the research done
2    by the company?
3           THE WITNESS:  It could, yes.
4           THE COURT:  All right.  Next question.
5    Q.   Does the intangibles include things like the brand names
6    of the company?
7    A.   Yes, it could.
8    Q.   Does the intangibles also include things like formulas and
9    technology of the company?
10   A.   It could, yes.
11   Q.   Does the intangibles include lots of different things that
12   are actually valuable to a pharmaceutical drug discovery
13   company?
14   A.   They may or they may not be valuable.
15   Q.   In this case they're valuable, aren't they, Father?
16   A.   No, they're not.
17   Q.   In fact, they were listed on the balance sheet as
18   valuable, correct?
19   A.   The company appraised them as valuable.
20   Q.   Right.  And the auditor checked that appraisal, correct?
21   A.   I don't believe she opined on the company's approach to
22   valuing the intangibles.
23   Q.   But you heard the auditor say, Ms. Hyodo, that the company
24   had to submit the valuation and its methodologies and get it
25   checked by the auditor before they could use it in their

1  financial statements, right?

2  A.   I don't --

3  Q.   You heard Ms. Hyodo say that, didn't you?

4  A.   No, I don't believe she checked the veracity of that.

5  Q.   Well, I think the jury may --

6  A.   She testified that they made mistakes and the auditor had

7  to withdraw it, including overstating the assets.

8  Q.   And you know that you took out all the value of that,

9  right, when you were doing the insolvency determination?

10  A.   The intangibles, yes.

11  Q.   And you didn't take into account the money in the bank,

12  right?

13  A.   I did.

14       THE COURT:  You did or did not?

15       THE WITNESS:  I did, Your Honor.

16  Q.   Despite the fact that there was 180 million dollars in the

17  bank, you say they're insolvent?

18  A.   So the money in the bank doesn't affect equity.

19  Q.   I didn't ask whether it affects equity.  Insolvency is

20  being able to pay your bills, right?  If you're insolvent, you

21  can't pay your bills?

22  A.   Well, there's two approaches to insolvency.  And it's a

23  very subjective measure, notoriously subjective.

24       THE COURT:  Is that one measure, whether you can pay

25  your bills?

1              THE WITNESS:  That's one measure, Your Honor, yes.

2     Q.   And a company that can pay its bills is not insolvent,

3     correct?

4     A.   There's multiple measures, and it's really quite

5     subjective, the analysis.

6     Q.   Well, a company that can pay its bills is not insolvent,

7     correct?

8     A.   Not necessarily.

9     Q.   So a company that can pay its bills is insolvent?

10    A.   It depends on how you look at it.  Again, there's two

11    approaches.  There's a third approach, if you use the OCC

12    definition.  But I would say on 180 million in the bank that if

13    you get 165 million from the bond offering but you get 245

14    million in debt, it's pointless to look at the 165 million

15    coming into the checking account without talking about the 245

16    million in debt the common shareholders were saddled with.

17    Q.   You say that the company was about to go bankrupt, right,

18    raises the specter of bankruptcy?

19    A.   They were at risk of liquidation bankruptcy, yes.

20    Q.   But that never happened, did it?

21    A.   Because of their fraudulent representations, it did not.

22    Q.   Well, they were able to pay back the loan, right?

23    A.   After backdating the bond indenture.

24    Q.   And they were able to pay it back with interest, correct?

25    A.   They did not pay back what they promised to pay back.  But

1    yes, they paid back a different modified amount.

2    Q.   And they paid it back early, right?

3    A.   I don't recall that specifically.  What I recall was a

4    multi-year litigation.

5    Q.   Father, there's no question right now.

6    A.   Okay.

7    Q.   Father, you claimed credit for driving down the price of

8    Ligand's stock, didn't you?

9    A.   The price of Ligand stock fell after we shorted Ligand.

10   Q.   And you pointed that out frequently to lots of different

11   people, right?

12   A.   We always like to go back and backdate and test how our

13   investment thesis worked.

14           MR. JONES:  And if we could see Exhibit 63, page 2,

15   please.

16   Q.   And you say, "Finally, the 25-page research report and

17   follow-on 12-page appendix have begun to be proven correct.

18   The shares are down 30 percent, roughly 30 percent."  You said

19   that, right?

20   A.   Yes.

21   Q.   You sent this letter out to your investors in The Amvona

22   Fund, correct?

23   A.   Yes.

24   Q.   Okay.  And you did it again in Exhibit 82, correct?

25           THE COURT:  Wait a minute.  This is going fast at this

```
 1   point.  These are letters to the investors?
 2              MR. JONES:  Yes, Your Honor, to the investors.
 3              THE COURT:  These are not reports.  They're letters to
 4   investors.
 5   Q.   In Exhibit 82, this was a presentation to your investors
 6   in The Amvona Fund, correct?
 7   A.   I don't know if it went to my investors in The Amvona
 8   Fund.  It may have.
 9   Q.   It says "Investor Presentation," correct?
10   A.   Yeah, but I don't know if it was distributed.
11   Q.   You don't know.  Page 11 of that report you say "Ligand
12   shares drop about 16 percent within six trading dates.
13   Lemelson Capital is credited with the drop in market cap by USA
14   Today, ValueWalk, Benzinga, Seeking Alpha and others," correct?
15   A.   Correct.
16   Q.   So you're telling your investors there too that the stock
17   price went down based on your reports, right?
18   A.   I'm saying those media outlets credited us with it.
19   Q.   Okay.
20   A.   I can't control the media.
21   Q.   Well, how about Exhibit 99.
22              MR. JONES:  Exhibit 99's also in your binder.  It's
23   probably the last one.  And on page 7 of that report --
24              THE COURT:  Wait a minute.  That's a report handed out
25   to your investors, is that it?
```

```
 1            THE WITNESS:  Yes, Your Honor.
 2  Q.   In d), on page 7, d), you tell your investors, "The
 3  publication of multiple research reports beginning on June 16,
 4  2014 and related short stake taken in shares of Ligand
 5  Pharmaceuticals that resulted in a loss of approximately 500
 6  million, approximately 38 percent, in market capitalization of
 7  the company over the ensuing 115 days."  That's what you wrote
 8  to your investors, Father?
 9  A.   Yes.
10  Q.   You're crowing about the fact that you brought down 500
11  million dollars in market capitalization, correct?  That's what
12  you wrote there, right, Father?
13  A.   Yes.
14  Q.   And you're attributing it -- you're saying it resulted
15  from your reports, right?
16  A.   Well, I'm not sure.
17  Q.   Right, Father?
18  A.   No, I'm not sure if the publication of multiple research
19  reports refers to my reports or all the reports published
20  during that time.
21  Q.   What's June 16?  That's the date of your first report,
22  right?
23  A.   We were the first one to put out a report, yes.
24  Q.   And the related short stake, that's the short stake that
25  you took out, right?
```

1    A.   Yes.

2    Q.   And that resulted in the loss that you're talking about

3    here, right?

4    A.   Yes.  But I just don't know.

5    Q.   Father, let's look at Exhibit 211.  Before we get to 211,

6    just hit pause for one second.

7              Your reports, they were intended to make the price of

8    Ligand fall, correct?

9    A.   No.

10   Q.   They were supposed to be a catalyst for that drop in

11   price, right?

12   A.   No.  No.

13   Q.   You wanted to catalyze, you wanted to bring about that

14   drop in price, right?

15             MR. BROOKS:  Objection.

16             THE COURT:  Sustained.  Asked and answered.

17             MR. JONES:  Exhibit 211, if we could play that for the

18   jury, please.

19             (Video played.)

20   Q.   That's you, right, Father?

21   A.   Yes.

22   Q.   That's you talking to a bunch of investors, making a

23   presentation to them?

24   A.   Yes.

25   Q.   And that's up on your YouTube channel, correct?

1    A.    Yes.

2    Q.    And you're answering questions from people there, right?

3    A.    Yes.

4    Q.    And you say that you're talking about how short sellers

5    want a catalyst, right?

6    A.    Yes.

7    Q.    And then you say that that's what you were doing in the

8    accounting -- in the pharmaceutical industry in 2014, right?

9    A.    No.  I think you're misunderstanding the commentary.

10   Q.    But we all heard it, Father.  You said that's what we were

11   doing in 2014.  That's what you said, right?

12   A.    Exposing impropriety?

13   Q.    Providing that catalyst, the catalyst that you were just

14   talking about --

15         MR. Brooks:  Objection.

16   Q.    -- for the price to fall?

17         THE COURT:  Sustained.

18         MR. BROOKS:  Mischaracterized what we just heard.

19   Q.    You're talking about Ligand when you're talking about

20   2014, right?

21   A.    I'm talking about exposing impropriety in pharmaceutical

22   companies.

23   Q.    Right.  And the impropriety you're talking about is

24   Ligand, right?  You're saying you were providing the catalyst?

25   A.    I did not say that, and that's not what that clip said.

1   Q.   In fact, you didn't just want to provide a catalyst, did

2   you, Father, you wanted to crash the price of that stock,

3   didn't you?

4   A.   No.

5   Q.   We looked at a bunch of places where you take credit that

6   your reports resulted in 500 million dollars in market

7   capitalization going away, right?

8   A.   If they were proven correct.  I never sought to crash a

9   stock.

10  Q.   Well, Father, in 2015 you were approached by the Wall

11  Street Journal, correct?

12  A.   Yes.

13  Q.   And you know what the Wall Street Journal is, right,

14  Father?

15  A.   Yes.

16  Q.   It's one of the most prominent newspapers in the financial

17  world, right?

18  A.   I believe it is.

19  Q.   And they wanted to do a story on you, right?

20  A.   Yes.

21  Q.   And this is great, right?  This is publicity money can't

22  buy, correct?

23  A.   I didn't ask for it.

24  Q.   Well, you agreed to this interview, right?

25  A.   Yes.

1    Q.   And, in fact, they came to your home, right?

2    A.   Yes.

3    Q.   And they took video of you too, right?

4    A.   Yes.

5    Q.   And they interviewed you, correct?

6    A.   Yes.

7    Q.   And they interviewed you for a while, right?

8    A.   Well, actually the reporter never -- well, he interviewed

9    me for a short period of time over lunch, actually.

10   Q.   And they followed you around --

11   A.   Not for a long time.

12   Q.   -- to various parts of your life, right?

13   A.   For many months he followed me.

14   Q.   Okay.  And in that interview you bragged about crashing

15   the price of stocks, didn't you?

16   A.   No, I did not.

17   Q.   In fact, the Wall Street Journal when it wrote its article

18   said --

19             MR. BROOKS:  Objection, your Honor.

20             THE COURT:  Sustained.

21        Why don't you see if you can refresh his recollection

22   to see if they agree because this is hearsay unless he agrees

23   with it.

24             MR. JONES:  May I approach, Your Honor?

25             THE COURT:  Go ahead.

```
 1   Q.    Father, this is the Wall Street Journal, right?

 2   A.    Yes.

 3   Q.    And this is the Wall Street Journal dated -- let's see

 4   here, October 27, 2015?

 5   A.    Yes.

 6   Q.    All right.  And this is the money and investing section?

 7   A.    Yes.

 8   Q.    And you see here it says "priest"?

 9         MR. BROOKS:  Objection, Your Honor.  I thought this

10   was for refreshing his recollection.

11         THE COURT:  Why don't you read that and see if it

12   refreshes your recollection.

13         THE WITNESS:  I'm familiar with the article, Your

14   Honor.

15         THE COURT:  And did --

16         THE WITNESS:  I never said that to the reporter.

17   Q.    The article says that you bragged about crashing stocks.

18         MR. BROOKS:  Objection, Your Honor.

19         THE COURT:  It's not admitted for the truth of it.

20   It's whether or not he's saying something inconsistent or not.

21         THE WITNESS:  I published two public rebuttals to that

22   article.  The author threatened me before publishing it that if

23   I didn't disclose the name of my investors, he would write an

24   article so terrible that it would destroy my reputation.

25         THE COURT:  Wait, wait.  So you don't agree you said
```

```
 1    that to the reporter?
 2            THE WITNESS:  I never said that to the Wall Street
 3    Journal, and it's in my public rebuttals.
 4    Q.   You didn't say that you boasted of your ability to crash
 5    stocks?
 6            MR. BROOKS:  Objection, Your Honor.
 7            THE COURT:  Sustained.  Asked and answered.  He didn't
 8    say it.
 9    A.   No, I never said it.
10    Q.   Does the Wall Street Journal have it in for you too,
11    Father?
12            MR. BROOKS:  Objection.
13            THE COURT:  Sustained.
14    A.   Actually --
15    Q.   Wait, Father.  You have to wait for a question.
16            THE WITNESS:  Can I answer that question?
17            THE COURT:  Nope.
18            THE WITNESS:  Okay.
19    Q.   Now, Father, when you were giving investigative testimony,
20    you told us that your reports were factual, right?
21    A.   Parts of them are factual, yes.
22    Q.   Parts of them are factual.  It was based on objective
23    evidence?
24    A.   We tried to locate good source material.
25    Q.   Right.  And you said that they were accurate, correct?
```

1    A.    Tried to make them accurate.

2    Q.    In fact, could we have investigative testimony page 375,

3    line 4.  It's INV 6.  You were asked this, right?  You were

4    asked in testimony under oath, "Your recollection is that these

5    research reports include facts, not opinions?"  And you said,

6    "That's my recollection," correct?  That was your testimony at

7    the time?

8    A.    I need to say what's above and below it.  It includes

9    facts and opinions, and I gave a lot of testimony on those

10   things.

11   Q.    Father, this is under oath here.  You're asked point

12   blank --

13           THE COURT:  I will be instructing you on this issue on

14   facts and opinions.  So it's actually a fairly complex area.

15           MR. JONES:  Yes.

16   Q.    And when you're asked about that, right?  We asked you in

17   the investigation about various things, right?

18   A.    Yes.

19   Q.    You had testimony under oath?

20   A.    Yes.

21   Q.    And you were asked whether or not your reports include

22   facts, not opinions, and you say that's your recollection,

23   right?

24           Let's actually look at another one.  Page 680, this

25   is INV 7, please.  You were asked about the Benzinga interview

1    too.  "You think all of your interviews with Benzinga were

2    simply objective recountings of fact?"  And you say, "They're

3    me sharing my research that I conducted and how I saw that

4    research."  And you were asked, "Your facts, the facts that you

5    found?"  And you say, "Well, yes.  I mean, I always want my

6    research to be based on facts and to be objective."  You

7    testified to that too, right, Father?

8    A.    There was a thousand pages of testimony.  I said a lot of

9    about facts and opinions in there.

10   Q.    Right.  Including the fact your reports were based on

11   facts, right, Father?

12   A.    I'm sure there's other commentary below that and above

13   that.

14   Q.    Your answer to the question is, yes, I always want my

15   research to be based on facts?  Right?

16   A.    Yes.  But they can't all be based on facts.  It's

17   impossible.

18   Q.    Let's try to move forward here.  Let's do Exhibit 130A.

19   Exhibit 130A, you'll recall, was Mr. Voss interpreting his

20   handwriting for the notes, right?  These are the notes that he

21   took of the call.  Can we have page 7, please.  And you

22   actually told even Mr. Voss in that call, that 20-minute phone

23   call, "We think the report is factual and from public info and

24   our own research," right?  You're not telling him it's opinion.

25   You're telling him it's fact, right?  Is that what you said?

1    A.   Well, there's three things being said there, but that's

2    his notes, not my notes.  I don't know that that appears in my

3    notes.

4    Q.   But you did tell him that, didn't you?

5    A.   I'd have to see my notes.  It says, "This report is

6    factual and from public info and our own research."  But I

7    don't recall that in my notes.

8    Q.   So facts from public info you write -- facts from public

9    info, you tell Mr. Voss, and facts from your own research,

10   right?

11   A.   That's what he wrote.

12   Q.   Okay.  Father, when people wrote negative things about you

13   on Seeking Alpha, you would try to get some of those comments

14   removed, wouldn't you?

15   A.   No.

16   Q.   You wouldn't?

17   A.   Only those that disclosed where I lived or violated

18   Seeking Alpha's comment policy.

19   Q.   And violated the policy you were trying to get -- when

20   people would write things that you didn't like, you would try

21   to get it eliminated, right?

22   A.   No.

23   Q.   In fact, you tried to get comments eliminated on June 22,

24   five comments -- right? -- June 23, June 24, August 4, two

25   comments, two separate accounts, August 23, 2014, two separate

1    comments, two separate accounts, August 26 and May 1, 2015?

2    All those times you tried to get comments about your reports

3    removed, didn't you?

4    A.   No, they're not about my reports, and many of them are

5    from the same commenter.

6    Q.   So, Father, you tried to get those comments deleted,

7    right?  In fact, you were successful in getting them deleted,

8    correct?

9    A.   We were trying to comply with Seeking Alpha's policies

10   that asked us to report comments that violated their policies,

11   including those that disclosed personal information like where

12   I lived.

13   Q.   So you went to Seeking Alpha and you got other people's

14   commentary taken down, correct?

15   A.   It wasn't commentary on my reports.  It was revealing

16   personal information.  If it was simply a comment on my

17   article, I would have invited it.  In fact, there were dozens

18   that were critical of my articles.

19   Q.   Email from you reporting on July 8, 2014 asking to get a

20   comment taken down, correct?

21   A.   I have to see it.

22   Q.   You say that that is -- that it's offensive because it's

23   an allegation of bad faith, correct?

24   A.   I have to see the comment in the email.

25            MR. JONES:  May I approach, Your Honor?

```
 1              THE COURT:  Yes.
 2              MR. BROOKS:  Can we ask what Mr. Jones is reading
 3      from?
 4              MR. JONES:  249.
 5              MR. BROOKS:  Thank you.
 6      Q.   Father, do you see here that you write to the moderator?
 7      Do you see that there, Father, where I pointed out?
 8      A.   It says that it violates Seeking Alpha's policy.
 9      Q.   I'm just ask whether you wrote to the moderator?
10      A.   Yes.  It says, "Normal priority," addressed to moderation.
11      Q.   You make the allegation that the comment says that you
12      acted in bad faith?
13      A.   So what it's writing actually is the exact language, it
14      looks like --
15              THE COURT:  You know, Mr. Jones, if you're not on a
16      mic it will be hard for the court reporter to hear you.
17              MR. JONES:  I'll get to the mic, Your Honor.
18      A.   It's the exact language of the Seeking Alpha policy, not
19      my language per se.  They're saying if it's an allegation of
20      bad faith, quote, if it's unrelated to the topic under
21      discussion, and if it's a blanket dismissal of someone else's
22      ideas.
23      Q.   All right.  So you asked Seeking Alpha to take the comment
24      down because it's a blanket dismissal of your ideas, right?
25      A.   Because it violated their policies.
```

1   Q.   And you asked them to take it down because you say it was

2   in bad faith, right?

3   A.   Because they encouraged us to submit those on the site if

4   it violates their policies.

5   Q.   And you tried to get other comments taken down too, right?

6   A.   I'd have to look at them, but, as I said before, many of

7   them were from the same commenter and revealed my personal

8   address.  At the time we were getting death threats.  So it was

9   pretty serious.

10  Q.   Exhibit 250?

11  A.   I'd have to see it.

12  Q.   Exhibit 250, you're also trying to get comments removed,

13  correct?

14  A.   I'd need a moment to read this.

15  Q.   I'll leave you 251 also.

16  A.   Thank you.  (Pause.)

17  Q.   In both of those emails someone writes something bad about

18  your report.

19  A.   I just need another moment to read this, if that's okay.

20  I'm sorry.  (Pause.)

21       So it says I would not report a comment that wasn't a

22  violation of Seeking Alpha's policy.

23  Q.   Yes, but, Father, that's not the question.  The question

24  is --

25  A.   I don't see an actual report of the commentary.

1   Q.   Father, let me give you the question, and then you can

2   answer it.

3   A.   Yeah.

4   Q.   The question is, in both of those emails are you trying to

5   get a comment about your reports taken down?

6   A.   I don't see that in this exhibit.  I don't see a comment

7   I'm trying to get deleted.  I see a discussion with some people

8   at Seeking Alpha.

9   Q.   Right, about deleting comments and getting people banned,

10  right?

11  A.   No.  I never asked that.  There's no specific comment on

12  here that I can see.  And then I'll look at this one as well.

13  Q.   And on all of those dates that I said earlier, Father, you

14  tried to get comments about your reports taken down, correct?

15  A.   Can I have a moment to read this?

16  Q.   Well, actually, I'm asking a different question now,

17  Father.

18  A.   Because the exhibit you just put in front of me doesn't

19  have an actual comment to be deleted.  I think you listed maybe

20  like ten comments.  So I can't say that that's true.

21  Q.   And you don't know whether you got comments deleted on

22  Seeking Alpha?

23  A.   We did.  Some were deleted.  The ones that violated their

24  policies and disclosed my residential address.

25  Q.   Okay.  Let's move on.

```
 1              There's no residential address in any of those
 2    exhibits, is there?
 3    A.   They do disclose where I live in those comments that were
 4    deleted.
 5    Q.   In those exhibits?
 6    A.   I haven't finished looking at the third one, but I will.
 7    Q.   Father, I'd like to move on now.
 8    A.   In this exhibit I also don't see a comment.
 9    Q.   Father, I'd like to move on now to talking about your
10    intention in these reports.
11    A.   I just want to make clear two of these three exhibits do
12    not show a comment that was deleted.
13    Q.   Father, you've just got to wait for the question.
14    A.   So I was just going to finish the last question.
15    Q.   Father, just to wait for the question, please.
16              THE COURT:  What's the question?
17              THE WITNESS:  It's the last question I was trying to
18    answer.
19    Q.   Father, when you wrote your reports, you were trying to
20    drive the stock price down, right?
21    A.   No.
22    Q.   You were trying to get a bunch of investors who were not
23    as sophisticated as you to sell off their Ligand stock, right?
24    A.   No.
25    Q.   And you were trying to get a bunch of investors who might
```

```
 1   otherwise have bought Ligand stock to not buy it?
 2   A.    No.
 3   Q.    That's how you drive down the price of stock, right?
 4   A.    That's patently false.
 5   Q.    You scare a bunch of people with information that you put
 6   in your reports, right?
 7   A.    No, patently false.
 8   Q.    In fact, you go on the radio when you saw it and you
 9   talked about it being very, very scary, right, what was going
10   on with Ligand?
11   A.    The debt offering.
12   Q.    So that was another part.  And it was scary that they were
13   insolvent, right, according to you?
14   A.    No.  I said the debt offering should be scary.
15   Q.    But you also said they were insolvent, right?
16   A.    Yes.
17   Q.    You said that was a fact about them too, they were
18   insolvent?
19   A.    Yes.
20   Q.    Right?  And you said that they don't intend -- that Viking
21   doesn't have an auditor, right?
22   A.    No, I did not say that Viking did not have an auditor.  I
23   did not say that.
24   Q.    That the Viking financial statements are not audited,
25   right?
```

1   A.   Many of them were not audited, that's correct.

2   Q.   You said that they weren't audited, right?  You didn't say

3   "many," right?

4   A.   It could have been clearer.

5   Q.   It could have been clearer.  Yes, I agree.  It should have

6   been clearer.  It should have actually been factual, shouldn't

7   it?  In fact --

8           THE COURT:  Well, strike that.  What's the next

9   question?

10  Q.   You also said that Viking didn't intend to conduct any

11  clinical trials, right?

12  A.   They didn't.

13  Q.   But you saw 20 plus pages of S-1 where they talked about

14  conducting clinical trials?

15  A.   Viking did not conduct clinical studies or trials.  They

16  had no resources to do so.

17  Q.   And you said it was a fact that Mr. Voss told you that the

18  company agreed that they basically -- they basically agreed,

19  they said, "Look, we understand Promacta is going away"?

20          MR. BROOKS:  Objection.  We've been over this a dozen

21  times.

22          THE COURT:  Yes, sustained.  Asked and answered.

23          MR. JONES:  Can we have Exhibit 143, clip AR02 I

24  believe it is.

25          (Audio played.)

```
 1   Q.   All right.  So here you're saying, "Run, Bambi, run,"
 2   aren't you, Father?
 3   A.   Yes.
 4   Q.   And that's what you're trying to do with your report, just
 5   scare a bunch of innocent deer into running away so the stock
 6   price goes down, right?
 7   A.   No.  I was warning common shareholders and the stock
 8   subsequently fell precipitously.
 9   Q.   You said, "Run, Bambi, run"?
10   A.   Yes.
11            MR. JONES:  Nothing further at this time, Your Honor.
12            THE COURT:  Thank you.
13            THE CLERK:  Cara, do you want me to switch over?
14            MS. MURPHY:  Yes, please.
15            MR. BROOKS:  May I begin, Your Honor?
16            THE COURT:  Sure.
17                         CROSS-EXAMINATION
18   BY MR. BROOKS:
19   Q.   Good afternoon, Father Lemelson.
20   A.   Good afternoon.
21   Q.   Not to dwell on it, but a little bit of your background
22   which we didn't get into in cross.
23            So in 2014 when you were writing about Ligand, where
24   did you live, sir.
25   A.   Southborough, Massachusetts.
```

```
 1   Q.   And who did you live with at the time?
 2   A.   My wife and children.
 3   Q.   And you still live with your wife and children?
 4   A.   Yes.
 5   Q.   Where do you live now?
 6   A.   We live in Vermont.
 7   Q.   And back in 2014 where was your parish?
 8   A.   Just a couple blocks from here on D Street.
 9   Q.   And you're a Greek Orthodox priest, correct?
10   A.   Yes.
11   Q.   Just for some of us who might be more familiar with how it
12   works with Catholic priests, can you briefly explain the
13   differences between a Catholic priest and a Greek Orthodox
14   priest?
15   A.   Sure.  So after the 7th Century --
16   Q.   Very briefly.
17   A.   -- the western church forbade priests to marry.  In the
18   eastern churches, we continued the tradition of married clergy.
19   There are still some priests married in the Catholic church,
20   but it's rare.
21   Q.   As a priest, what is your salary?
22   A.   Zero.
23   Q.   Do all Greek Orthodox priests make no salary?
24   A.   No.
25   Q.   But you don't?
```

```
1   A.   No, I don't.

2   Q.   And why is that?

3   A.   I just prefer to go where there's the greatest need.

4   Q.   I'm sorry.  Can you repeat that.

5   A.   I prefer to go where there's the greatest need.

6   Q.   How do you support yourself?

7   A.   Through my lay vocation.

8   Q.   And what is that?

9   A.   As a fund manager.

10  Q.   And by the way, you were in the courtroom, were you not,

11  when Mr. Higgins testified?

12  A.   Yes.

13  Q.   So you heard that back in 2014, when Ligand and its

14  lawyers met with the SEC, they accused you of affinity fraud?

15  A.   Yes.

16  Q.   Do you know what affinity fraud it?

17  A.   Yes.

18  Q.   What is it?

19  A.   Typically it's when a person in a position of trust, like

20  a priest, uses that position of trust to exploit vulnerable and

21  unsophisticated investors, like parishioners in that example.

22  Q.   Have you ever engaged in affinity fraud?

23  A.   Never.

24  Q.   Have any of your parishioners ever invested money with

25  you?
```

1    A.    No.

2    Q.    Never?

3    A.    No.

4    Q.    So none of your investors are your parishioners?

5    A.    No.

6    Q.    Despite what Ligand said?

7    A.    Yes, that's correct.

8    Q.    So how did you start getting into, you know, your lay

9    vocation, as you put it?

10   A.    I was always interested in public markets from a young

11   age.  I studied things for a long time.  But there was a

12   turning point when I read the work of Benjamin Graham, who is

13   the mentor of Warren Buffett.  He had two seminal works, The

14   Intelligent Investor and Security Analysis.  And reading those,

15   it was like getting struck by lightning.  It brought everything

16   into focus.  It gave me a very clear framework for allocating

17   capital.

18   Q.    I see a copy on counsel table, there's a copy of a book.

19   Is that one of the books you're talking about?

20   A.    Yes.

21   Q.    We've heard about, obviously, your reports on Ligand.

22   Were your reports on Ligand the first time that you had ever

23   written about a specific company or a specific security?

24   A.    No.

25   Q.    When did you start doing that?

1    A.    2010.

2    Q.    So four years before?

3    A.    Yes.

4    Q.    So how many companies did you write about before Ligand?

5    A.    Maybe 60 or 70 by that time.

6    Q.    Now, let me ask you this: In terms of your writing, when

7    you wrote about Ligand, did you follow the philosophy that you

8    learned from the books that you've testified about?

9    A.    Yeah.  So I would be classified as a value investor.

10   Q.    What is a value investor?

11   A.    A value investor is someone that looks at a security and

12   asks a very important question.  What's the margin of safety

13   for the common shareholder?  That's very different than a

14   speculator, who speculates on the future price regardless of

15   the security interest.

16         In layman's terms you might say if I buy a house for

17   $500,000, is the house worth more than that the value or less?

18   So price and value are two different things.  We cannot say a

19   company's value is the price on the stock market.  That's part

20   of the framework that Ben Graham laid out 70 or 80 years ago.

21   Q.    Did you follow that framework when you were analyzing

22   Ligand back in 2014?

23   A.    Absolutely.

24   Q.    Now, we've heard a lot in this case so far about sell-side

25   analysts.  Do you recall that?

1    A.    Yes.

2    Q.    Are you familiar with what a sell-side analyst is?

3    A.    Yes.

4    Q.    Are you a sell-side analyst?

5    A.    No.

6    Q.    What is a sell-side analyst?

7    A.    A sell-side analyst is someone employed by investment

8    banks to put out ratings or price targets or research reports,

9    but unofficially they're there to drum up business for the

10   investment side of the bank.  So very often, almost every

11   time -- I mean, very, very often, they have a financial

12   interest in the company they're covering.

13          MR. JONES:  Your Honor, objection.  Foundation.

14          THE COURT:  Overruled.

15   A.    As a result, something like 90 or 95 percent of all

16   sell-side analyst reports are positive in the market.  There's

17   very few holds, very few sells, and no sell shorts.

18   Q.    So how, if at all, do you differ from a sell-side analyst?

19   A.    Well, the sell-side analyst is not interested in the

20   common shareholders or the investors.  They're interested in

21   drumming up business from the company they're covering.  The

22   true investment manager, in my opinion, I should say the value-

23   oriented investor is interested in are the common shareholders

24   safe.  So they're looking at the interests of the common

25   shareholder.  The sell-side analysts will get business whether

 1  their reports turn out to be true or not.

 2          MR. JONES:  Objection, Your Honor, speculation.

 3          THE COURT:  Overruled.  I'll allow this.  It's his

 4  views of the background of the sell-side analysts.

 5  A.   For example --

 6          THE COURT:  But not on and on.  What's the next

 7  question?

 8  Q.   Father Lemelson, you distributed your reports about Ligand

 9  through Seeking Alpha?

10  A.   Correct.

11  Q.   And just briefly, because we've heard about it.  I just

12  want to make sure everybody understands.  What is Seeking

13  Alpha?

14  A.   Seeking Alpha is probably the leading site online for

15  analysts and investors, professional investors, hedge fund

16  managers, to publish their research, their opinions.

17  Q.   Do people have to pay to read what somebody publishes on

18  Seeking Alpha?

19  A.   For the most part they do now.  At the time they did not

20  have to.

21  Q.   Okay.  So Mr. Voss commented that traditional analysts

22  don't distribute their reports through Seeking Alpha but

23  instead via a number of portals that the investment community

24  pays to access the research.  Is that true?

25  A.   Yes.  Well, not always.  You can get a sell-side analyst

1    report sometimes if you go through an IR department like I did,

2    for example.

3    Q.   Why did you publish your reports through a public medium

4    as opposed to some kind of subscription service?

5    A.   When I began writing about security analysis in 2010, I

6    told myself I wanted all of our work to be totally transparent

7    and subject to public scrutiny, and it's everything I wrote

8    from that point on.  I wanted complete transparency.

9    Q.   Okay.  So stepping back, let's focus on The Amvona Fund.

10   Okay?

11   A.   Yes.

12   Q.   When did you create The Amvona Fund?

13   A.   We formed it, I want to say, in August 2012 and we

14   launched September 1, 2012.

15   Q.   So just to put everything into context, that's a little

16   less than two years before your first report on Ligand?

17   A.   Yes.

18   Q.   So, again, let's try to keep it brief, but what -- how

19   would you describe The Amvona Fund?  What does it do?

20   A.    It's an alternative investment.  It's a long/short equity

21   fund.  Meaning we go long or short, but primary long.  It was a

22   long-biased fund.  So we might be 75 or 85 percent long,

23   meaning we own the stock, we're going to hold it for a long

24   time, and maybe 25 or 30 percent short.  We try to hold those

25   for quite a long time as well.

1  Q.   Just to clarify, when you're talking about a long

2  position, that's where your fund makes money if the stock

3  increases in price, right?

4  A.   Correct.

5  Q.   So leading up to the first report in Ligand, how did The

6  Amvona Fund do in 2012 and 2013?

7  A.   It did very well.

8  Q.   What do you mean by "very well"?

9  A.   We were consistently a top ranked fund, at least in the

10  United States, maybe globally.

11  Q.   So in 2014, again the year that we're talking about, how

12  many investors did The Amvona Fund have?

13  A.   We may have had 15, perhaps.  I'm not sure of the exact

14  number, something like that.  Ten, 15.

15  Q.   Okay.  And by "fund," from a perspective of funds, is that

16  a small fund, a medium fund, or large fund, or somewhere in

17  between?

18  A.   It's very small.

19  Q.   Did you know all of the investors personally in 2014?

20  A.   I can't say I knew them all very well.  I'm sure I had

21  some contact with them.  Most of them I knew.

22  Q.   So Ligand is a company based across the country out in

23  California, right?

24  A.   Yes.

25  Q.   So back in 2014, when you were living in Massachusetts,

1    how does Ligand get on your radar as a company that you start

2    looking into?

3    A.   The markets had gone up for five years and there were some

4    bubbles emerging.  And in our screeners they came up, a company

5    with outrageous valuation metrics, their price.

6    Q.   Let me just stop you there.  Because I don't know, and I'm

7    assuming the jury doesn't know.  What is a screener?

8    A.   Well, we can screen for securities and we can put in

9    criteria, what we're looking for.  So we can say we're looking

10   for companies that are radically overvalued, something like

11   that, in relation to their revenue or their assets, things like

12   that.  There's almost limitless ways you can analyze a

13   security.

14   Q.   So literally Ligand pops up on your screen one day as a

15   company?

16   A.   Yes.

17   Q.   What is your process from there?

18   A.   Well, I wanted to dig in.  So I started looking at the

19   annual reports.  And I wanted to find out why this company was

20   so richly valued.  And that's how it began.

21   Q.   Okay.  Before we get into Ligand specifically, you had

22   talked about how you'd written about other securities before.

23   A.   Yes.

24   Q.   Before that June 16, 2014 report on Ligand, had you ever

25   written a report about a company that you were short before

1    that?

2    A.   Yes.

3    Q.   And what company was that?

4    A.   It was World Wrestling Entertainment, WWE.

5         MR. BROOKS:  Cara, can we pull up Exhibit 15.

6    Q.   So this is Exhibit 15.  And, Father Lemelson, does this

7    look like --

8         MR. BROOKS:  And if you can maybe scroll through just

9    to see.

10   Q.   -- does this look like the first report you wrote on WWE?

11   A.   Yes.

12   Q.   Okay.  And it -- it looks like it follows sort of the same

13   format as what you did with Ligand?

14   A.   More or less.

15   Q.   Okay.  What, if any, reaction did WWE have after you

16   issued your report?

17        MR. JONES:  Objection.  Relevance.

18        THE COURT:  Sustained.

19   Q.   Let's pull up Exhibit 1, which is the June 16, 2014

20   report.  So this is the June 16, 2014 report that we've talked

21   about?

22   A.   Yes.

23   Q.   And you're aware, sir, that there are four challenged

24   statements in this case, right?

25   A.   Yes.

1    Q.   And are you aware of how many of those challenged

2    statements appear in this first report?

3    A.   None.

4    Q.   All right.  So did you publish this report under your own

5    name?

6    A.   Yes.

7    Q.   Why?

8    A.   Complete transparency.  We wanted -- it's like putting our

9    signature on it saying this is our view.  This is how we're

10   getting at it.  This is what we're relying on.  And this is how

11   our company approaches the security.  This is our analysis or

12   the appraisal of the value.

13   Q.   Okay.  So during cross, Mr. Jones pulled up the title of

14   this.

15        MR. BROOKS:  I'd like, Cara, if you could pull up the

16   first sentence under the title where it says "Lemelson Capital

17   is short shares."

18   Q.   So the first sentence, the first words of this report

19   after the title say "Lemelson Capital is short shares of Ligand

20   Pharmaceuticals."  Do you see that?

21   A.   Yes.

22   Q.   Why would you disclose that?

23   A.   It's very important to disclose to the reader what your

24   financial interest, if anything, is.

25   Q.   Why?

```
1    A.    In the issue you're covering.

2    Q.    Why?

3    A.    Well, I think it would be dishonest not to, but it also

4    sends the message you're not a totally disinterested party

5    either.  I wish that when companies put out their press

6    releases maybe they would do the same thing when they own

7    shares in a company.  It would perhaps temper people's

8    perception of their press releases and their reports.

9    Q.    Now, you --

10          THE COURT:  Mr. Brooks, it's 1:00 right now.  Do you

11   want to finish this document or jump for lunch?

12          MR. BROOKS:  Probably jump for lunch, Your Honor.

13          THE COURT:  Okay.  See you at 2:00.

14          MR. BROOKS:  Thank you.

15          THE CLERK:  All rise.

16   (Jury exits.)

17          THE COURT:  Thank you.  Mr. Brooks, about how much

18   longer do you have for cross?  Do you think the whole

19   afternoon?  I'm trying to figure out if we need another witness

20   here.

21          MR. BROOKS:  Probably.  I will finish this afternoon.

22          THE COURT:  That's fine.  I just want to know, does

23   the SEC need another witness here?  You don't think so?

24          MR. BROOKS:  I don't think so, especially I'm assuming

25   there will be some recross.
```

```
 1              MR. JONES:  I was thinking there would be, Your Honor.

 2              THE COURT:  Let's assume they don't need to have

 3     anyone here.  Is that right?

 4              MR. BROOKS:  Yes, Your Honor.

 5              THE COURT:  Tomorrow, I'm sorry, I'm still up in the

 6     air.  If we're able to finish all the testimony tomorrow

 7     morning, I could break and then maybe do a charge conference

 8     later in the afternoon.  Is that feasible?

 9              MR. HOOPES:  Can I ask one question?  The investor

10     relations, how long will that person go -- not the investor

11     relations.  The investor.  How long?

12              MR. DAY:  Not very long.  Maybe half an hour or so.

13              MR. HOOPES:  My personal estimate, based on what they

14     said, I think the total evidence is between an hour and a half

15     and two hours.

16              THE COURT:  Tomorrow.

17              MR. BROOKS:  Yes.

18              THE COURT:  Perfect.  So we definitely are not going

19     to the jury tomorrow.  I was hoping to work on the charge this

20     evening.  I have a plea, unfortunately, at --

21              THE CLERK:  4:15.

22              THE COURT:  -- 4:15, which is going to be a hard one.

23     So I probably -- I don't know what time I'll get it to you, but

24     at least tomorrow morning and then hopefully you'd have maybe

25     an hour to look at it.  And then we could have a charge
```

1    conference later in the day, depending on how soon I finish the

2    verdict form and the charge.  There's some complicated areas.

3    I will be giving a charge on fact versus opinion.  Good luck

4    trying to explain that to a jury, but also on good faith and

5    the First Amendment, but also on negligence.  I looked and it

6    was charged in the complaint.  So there's some fairly

7    complicated areas there.

8         Two questions I have for the SEC.  Are you also

9    charging fraud as a violation under the Investment Advisers Act

10   or just negligence?

11        MR. JONES:  Your Honor, the defendant can violate

12   either by --

13        THE COURT:  I know.  I just want to know.

14        MR. JONES:  Yes, Your Honor.

15        THE COURT:  Both?

16        MR. JONES:  Both.

17        THE COURT:  So I will be asking two questions, and

18   then we have the four statements, and the question is with

19   respect to the last statement, is it all four statements or

20   just the insolvency statement?  None of these are a surprise.

21   They're all mentioned in the second amended complaint, and

22   we've litigated them to death about the mathematical equation,

23   but I want to know what is it that you're claiming is false and

24   misleading.

25        MR. JONES:  All of the statements that appear on the

```
 1    last page of this --
 2              THE COURT:  All of them.  Okay.
 3              MR. JONES:  Yes.  These are all false statements of
 4    insolvency, Your Honor.
 5              THE COURT:  I just want to know.
 6              MR. JONES:  That's what we're claming.
 7              THE COURT:  The truth is none of them are a big
 8    surprise to the defendants.  That's it.  Some of them are
 9    mathematically correct.
10              MR. JONES:  Yes, Your Honor, that's true.
11              THE COURT:  So you're claiming that is only a half
12    truth.  Is that the theory?
13              MR. JONES:  Essentially, yes.
14              THE COURT:  Okay.  So I'm going to probably word it to
15    the jury the statements about insolvency, rather than ask about
16    each separate one.  I'm working this all through as I come to
17    understand various theories.
18              MR. BROOKS:  Can I ask, Your Honor, the 206 Advisers
19    Act, again, there's a negligence standard but in this
20    particular case you can only reach that if he committed fraud.
21              THE COURT:  No, you can't, because he just said he
22    made a mistake.
23              MR. BROOKS:  But that doesn't go to the Advisers Act.
24    That can only go to 10b-5.
25              THE COURT:  No, that's not accurate.
```

```
 1              MR. BROOKS:  There's no case law --
 2              THE COURT:  He mistakenly told his investors that it
 3   was unaudited or he mistakenly used the wrong standard because
 4   of this book or something.  Even if it was total good faith, it
 5   could be negligence because he didn't check with a bankruptcy
 6   expert or something.  I mean, I don't agree with that.  And I'm
 7   going to ask both theories.
 8              MR. JONES:  Yes, Your Honor.
 9              THE COURT:  I imagine one comes with a lot less of a
10   punch than other ones, because eventually I'm the one who
11   decides.  Right?
12              MR. JONES:  You are the one who decides, Your Honor.
13              THE COURT:  So if it's negligence and not fraud,
14   that's a much better place for Father Lemelson.  So I'm
15   surprised that the SEC is pressing that point.  It's almost
16   like a lesser included or something.  So in any event, I will
17   be asking both theories.
18              MR. JONES:  Your Honor, just on that, the person could
19   act both negligently and with fraudulent intent at the same
20   time.
21              MR. BROOKS:  I think the case law is to the contrary.
22              MR. JONES:  The case law is that it's not a lesser
23   included.
24              THE COURT:  No, no.  That's not happening in this
25   court.  It's too confusing for a jury.  I will ask them about
```

1   whether there was fraud and I'm going to ask them whether there

2   was negligence, and that's how I'm going to do it.

3           MR. BROOKS:  Understood, Your Honor.

4           MR. HOOPES:  Thank you, Your Honor.

5   (Court exits.)

6   (A recess was taken.)

7           THE COURT:  Let me ask while we're waiting.  It

8   strikes me that Father Lemelson and Lemelson Capital Management

9   Company are the exact same thing.  I don't know why I need two

10  questions.  I don't know why I can't just say the defendants,

11  both of them, as one question unless you can think of something

12          MR. JONES:  Your Honor, I believe the parties agreed

13  to that before trial started.

14          THE COURT:  But you persisted in a verdict form that

15  has two separate questions.  I want to make sure that I

16  don't --

17          MR. DAY:  I'm sorry, Your Honor.  That was probably my

18  fault.  I attached the original verdict form.

19          THE COURT:  Okay.

20          THE CLERK:  All rise for the jury.

21  (Jury enters.)

22          MR. DAY:  May I proceed?

23          THE COURT:  Yes.

24          MR. DAY:  Thank you, Your Honor.

25          THE COURT:  Father, is your screen still working?

```
 1              THE WITNESS:  Finally it's still working.
 2              THE COURT:  Some poor person from tech. spent lunch
 3    hour on this.  Let's hope it sticks.
 4    BY MR. DAY:
 5    Q.   Father Lemelson, before the lunch break we were talking
 6    about your first report, Exhibit 1, do you recall?
 7    A.   Yes.
 8    Q.   And at some point on June 16, 2014 you published this
 9    report, right?
10    A.   Yes.
11    Q.   And at some point, did it get published on Seeking Alpha?
12    A.   I believe later in the day.
13    Q.   Okay.  And what happened to Ligand's stock, if anything,
14    after this report was published on Seeking Alpha late in the
15    day?
16    A.   I believe the stock price went down.
17              THE COURT:  You have to keep your voice up.  I know
18    it's the end of the day, but.
19              So the stock went down?
20              THE WITNESS:  I believe so.
21              THE COURT:  All right.
22    Q.   Do you recall, did it go down like a cent or did it have a
23    drop?
24    A.   It went down, I recall, quite a bit.  I think six or seven
25    percent, something like that.
```

1    Q.   Did you cover any of your short position in Ligand when

2    the stock price of Ligand dropped after you published your

3    first report?

4    A.   No.

5              THE COURT:  Why don't you remind everyone what "cover"

6    means.

7    A.   So when you sell short, you have to buy the shares back.

8    So "cover" just means you bought the shares back.

9    Q.   So in terms of your investment, your short position, I

10   should say, in Ligand, what would have happened had you covered

11   during that period where the stock price dropped after your

12   report was issued?

13   A.   We would have made a significant profit.

14   Q.   Why didn't you cover then?

15   A.   Well, we don't dance in and out of stocks, and the report

16   was new.  We wanted the market time to digest it, to get

17   feedback.  You know, we plan -- usually we hold things for

18   quite some time.  We're not really out for a quick profit.

19   That's not what we do.

20   Q.   Do you recall on direct Mr. Jones asking you questions

21   along the lines of that, you know, you didn't want to have --

22   you didn't want to know information contrary to your reports

23   because that wouldn't be good for your thesis?

24   A.   Yes.

25   Q.   Is that accurate?

1    A.    No.

2    Q.    Why not?

3    A.    Well, of course, we want to know as much information as

4    possible.  That's why we're reading the reports, trying to talk

5    to management.  When we publish research, the number one

6    question on my mind is where am I wrong?  That's usually what

7    I'm asking myself.  On the long or the short side?

8    Q.    So let's take a look at this first report.

9          First of all, at the time you published this report

10   on June 16, 2014, did you believe everything you were saying in

11   that report?

12   A.    Yes.

13   Q.    How about sitting here today?

14   A.    Yes.  I think Ligand is a great stock fraud.

15   Q.    We talked right before the break about the short and you

16   explained why you included that.  Can we go to page 2.  So

17   there's a disclaimer there.  Why do you include the

18   disclaimer -- first of all, do you always include the

19   disclaimer like this in all of your reports?

20   A.    I believe so, yes.

21   Q.    Why?

22   A.    Well, we want the reader to know we're not a disinterested

23   party and, to use the colloquial expression, we're putting our

24   money where our mouth is.  So we stand behind this report.  We

25   put our name on it.  We're saying, Look, we don't just go out

1    and give opinions.  Win, lose or draw, we're putting capital

2    behind this, our capital.

3    Q.   Is it fair to say that in your first report you kind of

4    laid out your general thesis about Ligand?

5    A.   Yes.

6    Q.   And can you briefly summarize what that thesis was?

7    A.   The company was a financial conduit to move capital from

8    common shareholders to the executives, and that they were

9    exploiting loopholes -- accounting loopholes and regulatory

10   loopholes, but they weren't really creating any real enduring

11   value for the common shareholders.  So the general thesis was

12   that this company existed to increase the compensation of the

13   top management, not in the interest of the shareholders.  The

14   company does not belong to Mr. Higgins and Mr. Foehr.  It

15   belongs to the shareholders.

16   Q.   When you say that, you mean that's how it's supposed to

17   work?  Is that what you mean?

18   A.   That's good corporate governance.

19        MR. BROOKS:  Cara, can we go to page 4.

20   A.   I believe the other day Mr. Foehr --

21   Q.   There's no question.  It will move quicker if we just

22   go with questions.

23   A.   My apologies.

24   Q.   So if we could -- yeah.  So under "Investment Highlights,"

25   we looked at part of this anyway on direct.  If we could just

```
 1   call out subsection c.  So you wrote, "When backing out
 2   intangibles" --
 3              And that's intangible assets?
 4   A.   Yes.
 5   Q.   -- "from the balance sheet, net shareholder equity is
 6   approximately minus 4 million dollars"?
 7   A.   Correct.
 8   Q.   First of all, was that a true statement?
 9   A.   Yes.
10   Q.   And we don't need to go there, but do you recall you said
11   it later in the report as well?
12   A.   Yes.  I also point out their net working capital is also
13   minus 4 million.  So not to confuse those two things.  I
14   pointed them both out.
15   Q.   Why did you back out intangibles?
16   A.   Assets should be productive.  A company should be
17   productive.  When you're making an investment, you are buying a
18   productive asset.  In the 27 years this company existed, it
19   lost almost 700 million dollars of investor capital.  It had
20   never really produced a return for investors.  It only produced
21   losses.  You couldn't say those assets were productive given
22   the reality of the financial statements.
23              MR. BROOKS:  Cara, can we go to page 21.
24   Q.   So do you see the paragraph that starts, "The balance
25   sheet is approximately 66 percent intangibles"?
```

1    A.    Yes.

2    Q.    Is this where you're explaining why you're backing out the

3    intangibles?

4    A.    Yes.

5    Q.    Let me ask you this:  So when you're analyzing companies,

6    -- again, Ligand is not the only company you've ever analyzed?

7          THE COURT:  I'm sorry.  What are we looking at now?

8    Which date?  Is this Exhibit --

9          MR. BROOKS:  I'm sorry.  This is Exhibit 1, still the

10   first report.

11         THE COURT:  All right.

12   Q.    Just stepping back.  You've said this is not the first

13   company you've ever analyzed?

14   A.    No.

15   Q.    Not the last?

16   A.    Oh, no.

17   Q.    Do you always back out intangibles when you're analyzing

18   company's financials?

19   A.    No.  I've done the opposite sometimes.

20   Q.    Again, that's something you thought was appropriate here?

21   A.    Yes.

22   Q.    For the reasons you've testified about and are in the

23   report?

24   A.    When you're doing an appraisal of the economic value of

25   the company, you have to say what has it produced for the

1    owners, the common shareholders.  If it were an apartment

2    building, we could say this apartment has lost 700 million

3    dollars in rental income in the last 27 years.  We cannot say

4    it's a valuable investment property.

5    Q.   In addition to the intangibles, you also discussed in this

6    report, as part of your thesis, Promacta that we've heard so

7    much about, right?

8    A.   Yes.

9    Q.   And how it might be impacted by this new drug Sovaldi?

10   A.   Correct.

11   Q.   So can we go to the bottom of page 7 and the top of page

12   8.  So the bottom paragraph on page 7, you wrote, "On February

13   28, 2013 GSK submitted NDA for Promacta after the FDA granted

14   breakthrough therapy designation for Promacta in patients with

15   severe aplastic anemia."  So I guess why were you explaining,

16   while we were talking about Promacta going away, why were you

17   explaining to the reader that GSK was actually seeking a new

18   indication?

19   A.   We need to present all sides of the argument.  Everyone's

20   voice needs to be heard.  The other analysts, the company, what

21   GSK was doing.  We're trying to look at it from all sides.

22   Q.   And is it fair to say that although you were presenting

23   this, you didn't give that much weight to the severe aplastic

24   anemia indication?

25   A.   That's correct.

1   Q.   Why is that?

2   A.   Well, Matthew Foehr, the CO, his own comments indicated it

3   was a niche indication.  It was fewer than 10,000 patients.

4   Q.   I don't think we have to call them out, but throughout

5   this report you repeatedly quote Ligand's CEO John Higgins,

6   right?

7   A.   Correct.

8   Q.   Were those quotes from publicly available sources or some

9   kind of private thing?

10   A.   Yes.  All of them were public.

11   Q.   All of them were public.

12   A.   I wanted to add on aplastic anemic, if I might, that the

13   orphan drug designation by definition --

14        MR. JONES:  Objection, Your Honor.  There's no

15   question.

16        THE COURT:  Yes, strike that.  There's no question.

17   Q.   So when you quoted Mr. Higgins, his statements that he's

18   making, they're not consistent with your theory that's

19   contained in this report, are they?

20   A.   No.

21   Q.   So why did you include them?

22   A.   Well, the reader should hear his opinion.  They should

23   hear what he has to say about the company.

24   Q.   Can we go to page 19.

25        So if we go -- there's a graph, and then if we can go

1    to the -- if we can call out the paragraph that starts "There

2    are seven analysts."

3              So you see where it says, "There are seven analysts

4    following the company.  At least six of them are producing

5    radically speculative reports with indefensible nosebleed price

6    targets."  So those are the sell-side analysts that we talked

7    about before?

8    A.   Yes.

9    Q.   Okay.  So those -- at least six of them, are you saying

10   here they disagreed with you?

11   A.   Oh, completely.

12   Q.   What's the point of putting that in your report?

13   A.   To show that this is one perspective, and here's this

14   group of people with a totally different perspective.  Again,

15   it's important for the reader to hear what everyone has to say.

16   Q.   So in this report you also -- you refer on a number of

17   occasions to Ligand's 10-K or the annual report for the prior

18   year ended December 31, 2013?

19   A.   Yes.

20   Q.   Okay.  And that would be the most recent annual report

21   that Ligand had at this time?

22   A.   Correct.

23   Q.   And is that document publicly available?

24   A.   Yes.

25   Q.   Does that mean that anybody reading your report could also

1    go look at that?

2    A.    Yes.

3    Q.    What, if anything, do you recall sticking out to you that

4    was in there -- that was in Ligand's annual report for

5    year-ending 2013?

6    A.    They mentioned going concern issues, and they spoke

7    specifically about the risk of liquidation and bankruptcy.

8    Q.    Okay.  Can we get --

9    A.    Also, their net working capital being negative jumped out

10   at me, that they essentially wouldn't be able to pay their

11   bills.

12          MR. BROOKS:  Can we go to Exhibit 14.

13   Q.    Just to make sure we're all talking about the same thing,

14   it probably would be easier to look at it here.  PDF page 37

15   out of 119.  Is this a page in this 119-page document that

16   references the negative working capital you were just talking

17   about?

18   A.    It appears to be.

19   Q.    What, if anything, did that mean to you, that Ligand had

20   negative working capital?

21   A.    So really, by definition, when you're looking at a balance

22   sheet.  So this is the balance sheet.  There's three financial

23   statements.  Statement of operations, balance sheet and

24   statement of cash flow.  It's always a snapshot in time.  So

25   over the next 12 months they did not have enough cash to pay

1  their obligations, their debts.  That's what it means.

2  Q.   If we could quickly go to page 30.  Okay.  If we could go

3  to the second paragraph from the bottom, third line from the

4  bottom where it starts, "We may also."

5       MR. BROOKS:  Can we call that out, Cara?

6  Q.   Is this the language you were just talking about with

7  bankruptcy, where it says, "We may also be required to

8  liquidate our business or file for bankruptcy protection"?

9  A.   Yes.

10 Q.   You've testified you reviewed a lot of annual reports from

11 public companies; is that right?

12 A.   Yes.

13 Q.   So does every single public company have to include this

14 language?

15 A.   Oh, no.

16 Q.   Is this a risk disclosure that is mandatory for every

17 company?

18 A.   Oh, no, not at all.

19 Q.   So this meant something to you when you saw it?

20 A.   It should mean something to everyone who reads it.  No

21 company would put that in there unless it was a real risk.

22 You're not going to find that in --

23      MR. JONES:  Objection, Your Honor.  No foundation.

24      THE COURT:  Yes.  Sustained.

25      MR. BROOKS:  Can we go to page 32.

1    Q.   At the top where it's in bold, it says, "Our stock price

2    has been volatile and could experience a sudden decline in

3    value."  Just to reiterate, this is a document that was

4    publicly filed before you started writing about Ligand, right?

5    A.   Correct.

6    Q.   So we've heard a lot about -- we've heard a lot of the

7    Ligand people blaming you for the stock price drop, right?

8          MR. JONES:  Your Honor, Mr. Brooks is leading his

9    witness.

10         THE COURT:  Overruled.

11         MR. BROOKS:  Okay.

12   Q.   But this, this is -- just to be clear, this is Ligand

13   writing this where it says "Our stock price has been volatile

14   and could experience a sudden decline in value"?

15   A.   Yes, that's correct.

16   Q.   Just to be clear, was this before or after you started

17   writing about Ligand?

18   A.   Before.

19   Q.   Let me ask you this, just so we can finish up the first

20   report:  On June 16, when you published your first report, did

21   you know you were going to write additional reports on Ligand?

22   A.   I hadn't planned on it.

23   Q.   So I think the next thing that happens in the chronology

24   that we've been discussing over the last week, you have a phone

25   call with Mr. Voss?

```
 1    A.    Yes.

 2    Q.    And who is Mr. Voss?

 3    A.    He's their third-party outsourced IR rep.

 4    Q.    By "IR," that's investor relations?

 5    A.    Yes.

 6    Q.    Are you familiar with what an investor relations firm is

 7    or does?

 8    A.    Yes, but at the time it was unclear if he was doing PR for

 9    them or IR.  So they did have an internal IR person as well.

10    Q.    Do you have an IR firm?

11    A.    No.

12    Q.    Why didn't you talk to somebody directly at Ligand instead

13    of their kind of third-party IR guy?

14    A.    I tried to.  I called repeatedly.

15    Q.    So just generally, because I think we've heard a lot about

16    that call, but what were your impressions?  Tell the jury what

17    your impressions were of the call you had with Mr. Voss?

18    A.    That he was not being genuine with me.  I didn't get the

19    feeling that this was really an attempt to connect with me, but

20    rather it was sort of a fishing expedition, and I just didn't

21    get a good feeling from him.  I didn't think he could be

22    trusted, what he was saying on the phone.

23    Q.    So you're aware that the first challenged statement in

24    this case is when you attributed to Mr. Voss that he basically

25    agreed and said, you know, look, we understand Promacta is
```

```
 1   going away.  You understand that, right?

 2   A.   Yes.

 3   Q.   Was that a true statement when you made it?

 4   A.   Yes.

 5   Q.   Sitting here today, do you still believe it to be true?

 6   A.   Yes.

 7   Q.   So the day after your --

 8          THE COURT:  So what words did he use?

 9          THE WITNESS:  Well, I took the notes, Your Honor,

10   immediately after the phone call, and I tried to record as much

11   of the phone call as I could.  That's why it's almost two

12   pages.  And I believe I recorded the substance of what he told

13   me as accurately as possible.

14          THE COURT:  I'm just trying to understand.  Did he say

15   Promacta is going away?

16          THE WITNESS:  I suspect that he said that, because

17   that --

18          THE COURT:  No, no.  I'll strike that.

19          What do you remember now?  Do you remember his exact

20   words?

21          THE WITNESS:  I don't remember his exact words, no,

22   seven years later, just what I have in my notes.  But I know

23   I'm a judicious note taker and I try to record accurately.

24          THE COURT:  Okay.  You've answered.  Go ahead.

25   Q.   Let me just follow up on that.  I mean, I think it would
```

```
 1   be a little bit odd if you could remember his exact words seven
 2   years later.
 3              THE COURT:  I'll strike that.  Just ask him.
 4   Q.   Do your notes, to the best of your memory, reflect the
 5   substance of what Mr. Voss said about Promacta?
 6   A.   Yes.
 7   Q.   Now, you went on an Internet radio -- I don't know --
 8   station called Benzinga the next day?
 9   A.   Yes.
10   Q.   For the chronology, that's June 19, 2014?
11   A.   Yes.
12   Q.   The day after you spoke with Mr. Voss?
13   A.   Yes.
14   Q.   Again, we just talked about seven years, but at the time,
15   was that conversation more fresh in your mind than it is today?
16   A.   It would have been, of course.
17   Q.   How did your radio interview, how did that get scheduled?
18   A.   They would have contacted me earlier, probably a few weeks
19   earlier, a month earlier to schedule it.
20   Q.   Okay.  Just to be clear, was that radio interview
21   scheduled before or after you issued your first report on
22   Ligand?
23   A.   Before.
24   Q.   Had you been on that show before?
25   A.   I believe I had been.
```

```
 1    Q.   And when you're on that show, do you know what questions
 2    they're going to ask you before they ask you?
 3    A.   No.  No.
 4    Q.   Did you know going in that the interviewer would ask about
 5    Ligand?
 6    A.   No.
 7    Q.   Is that typical when you go on this Benzinga show, that
 8    you don't know what they're going to ask about?
 9    A.   Yes.
10    Q.   Okay.
11             MR. BROOKS:  So we have heard a very, very tiny
12    snippet of that so far.  So I'd like to put it in context, Your
13    Honor, and play the entire interview.  It's about -- I'll say
14    this.  It's about 20 minutes, but I promise it will not impact
15    my ability to finish significantly before 4:00 today.
16             MR. JONES:  Your Honor, I would just state for the
17    record there are significant portions of this that are not
18    about Ligand at all.
19             MR. BROOKS:  I think the entire context of the
20    interview is very important to get the --
21             THE COURT:  All right.  Play it.
22             (Recording played.)
23             THE COURT:  Can I just ask as a housekeeping measure,
24    do we have that in as an exhibit?
25             MR. BROOKS:  Yes.
```

```
 1              THE COURT:  The full --
 2              MR. BROOKS:  We have both the audio and a written
 3     transcript.  What are the numbers of those?
 4              MR. SULLIVAN:  2 and 3.
 5              MR. BROOKS:  2 and 3.
 6              THE WITNESS:  Your Honor, forgive me.  Could I take a
 7     short break for two or three minutes?
 8              THE COURT:  Yeah.  We could stand and stretch for a
 9     minute.
10              THE WITNESS:  Thank you.
11     (A recess was taken.)
12              THE WITNESS:  Thank you, Your Honor.
13              THE COURT:  Okay.  You're okay?
14              THE WITNESS:  Yes.  Thank you, Your Honor.
15     Q.   Father Lemelson, do you know what, if anything, happened
16     to Ligand's stock price during that interview?
17     A.   I believe it declined.
18     Q.   Did you cover any of your short position during that
19     decline?
20     A.   No.
21     Q.   Why not?
22     A.   Well, we -- like I said before, we don't dance in and out
23     of positions.  We hold them for quite a long time.  So we're
24     really not interested in short-term price movements.  We're not
25     interested in short-term profits either, for that matter.
```

```
 1   Q.   That interview took place in the morning, correct?

 2   A.   Yes.

 3   Q.   Later in the day at some point, did you cover any of your

 4   short positions?

 5   A.   I believe we did, yes.

 6   Q.   What was the stock price -- compared to the morning, what

 7   was the stock price at the time that you covered?

 8   A.   I believe it went up again towards the end of the day.

 9   Q.   Meaning it was bad for the cover?

10   A.   It wasn't ideal.

11   Q.   Why did you cover some of your position on that day?

12   A.   I believe the brokerage firm had changed their

13   requirements on the position and had asked us to trim it.

14   Q.   Now, the statement you made referring to Mr. Voss in the

15   interview, did you ever include that in any of your later

16   written reports?

17   A.   No.

18   Q.   Why not?

19   A.   Well, we had a lot of people contacting us at that time

20   telling us a lot of negative things, and we just didn't include

21   them because they were hard to verify.  So we had some people

22   telling us that they had visited Ligand's offices and observed

23   certain things.  We had other people making certain allegations

24   against the company, but we didn't take that into account.  We

25   just primarily looked at it as a lot of hearsay.
```

1    Q.    Did Mr. Voss, to your knowledge, ever issue any kind of a

2    public response saying that he didn't make that statement?

3    A.    No.

4              MR. BROOKS:  Can we pull up Exhibit 4.

5    Q.    Okay, Exhibit 4, am I correct that this is your second

6    report on Ligand dated July 3, 2014?

7    A.    Yes.

8    Q.    And this report is the one that contains the two

9    challenged statements about Viking, right?

10   A.    Yes.

11   Q.    And those are two of the four challenged statements

12   overall?

13   A.    Yes.

14   Q.    Okay.  Can we go to the next page.  Okay.

15             Before we get into the Viking statements, this was

16   shown to Mr. Voss.  There was a reference to ITP.  Do you

17   recall that --

18   A.    Yes.

19   Q.    -- in this report?

20             What was your thesis about ITP and how it related to

21   hep C as it related to Promacta?

22   A.    Then and now it's that the people suffering from ITP had

23   thrombocytopenia because they had hepatitis C.  Hepatitis C was

24   causing their liver to be diseased, the virus, and as a result

25   they couldn't produce platelets.

1          THE COURT:  Excuse me.  Is this your medical opinion?

2          THE WITNESS:  As a result of my research, Your Honor.

3          MR. JONES:  Lacks foundation, Your Honor.

4          THE COURT:  Let me put it this way:  I'm not allowing

5     this in as whether it's true or not true.  I'll allow it in as

6     to what he believed at that moment in time.

7     Q.   Let me ask it like this:  You wrote that ITP did not have

8     commercial viability.  What did you mean by that?

9     A.   Right.  So it was an orphan drug.  Promacta had an orphan

10    drug designation.  And part of the definition of orphan drug

11    designation is there's no reasonable likelihood of

12    profitability.

13    Q.   Can we go to page 6.  Okay.

14          It's the second paragraph up from the bottom.  You

15    reference Mr. Pantgenis.  I think you testified about him

16    during your cross today.  Do you recall that?

17    A.   Yes.

18    Q.   He's one of the sell-side analysts?

19    A.   Yes.

20    Q.   What report was Mr. Pantgenis referring to when he said it

21    was foolish?

22    A.   Our first report.

23    Q.   So that refers to your first report?

24    A.   Yes.

25    Q.   Why were you writing in your second report that one of the

1   sell-side analysts referred to your first reported as foolish?

2   A.   Again, we want the readers to hear everyone's opinions and

3   everyone's voice.  And that would have been the same report

4   that the Ligand exec who testified was full of errors.

5   Q.   Let's go to the next page because that's Viking and that's

6   why we're here.  How did you hear about Viking?

7   A.   From Ligand's commentary.

8   Q.   And before you wrote this, what, if anything, had you read

9   about Viking?

10  A.   Well, I had read their S-1, and I had also read the

11  company making allusions to it.  I believe it was in conference

12  calls.

13  Q.   Was this the only report you ever mentioned Viking in?

14  A.   Yes.

15  Q.   Now, at the top you wrote, and we've talked about this so

16  we'll go over it briefly, in the second paragraph do you see,

17  "Viking does not intend to conduct any preclinical studies or

18  trials."

19  A.   Yes.

20  Q.   At the time you wrote that did you believe it to be true?

21  A.   Yes.

22  Q.   Sitting here today do you believe it to be true?

23  A.   Yes.

24  Q.   Based on what?

25  A.   The S-1.

1    Q.   Can we go to the bottom of page 9.  So at the bottom of

2    page 9 is a direct quote from the S-1.  Is that right?

3    A.   Yes.

4    Q.   Okay.  And then can we go to the top of the next page.

5    Okay.  So you then write, "In other words."  What were you

6    referring to when you wrote, "In other words"?

7    A.   The S-1.

8    Q.   The language that you had just quoted?

9    A.   Yes.

10   Q.   You wrote, "Marcum was merely hired, but the company has

11   not yet even consulted with the firm on any material issues."

12   Was that true?

13   A.   No.

14   Q.   When you wrote that, did you know it was not true?

15   A.   No.  I was just transcribing off the S-1, but there was an

16   oversight that they had enough time since then to meet with

17   them.

18   Q.   Okay.  And then based on that, you write, "The financial

19   statements provided on the S-1 accordingly are unaudited."  Do

20   you see that?

21   A.   Yes.

22   Q.   And those are the statements we looked at earlier that's a

23   combination of audited and unaudited?

24   A.   Right, but there's heavy reliance on the unaudited

25   statements in that report.

1    Q.   By the way, when you published this on July 3, 2014, did
2    you cover any portion of your short on the day that you issued
3    this report?
4    A.   No.
5    Q.   Can we pull up Exhibit 5.  Okay.  And so just kind of
6    going through time, is this the third report you wrote on
7    Ligand dated August 4, 2014?
8    A.   Yes.
9    Q.   And what, if any, challenged statements are contained in
10   this report, if you know?
11   A.   I don't know.  I don't think there are any in this report,
12   if memory serves me correctly.
13   Q.   By the way, do you know what happened to Ligand's stock on
14   August 4, 2014, the day you published this report?
15   A.   I believe it went up.
16   Q.   Do you know how much?
17   A.   I recall it was substantial.
18   Q.   So we're not going to play it, but do you recall giving
19   another Benzinga radio interview of about the same length on
20   August 13, 2014?
21   A.   Yeah, it sounds familiar.
22   Q.   Was some portion of that you discussing Ligand?
23   A.   Yes.
24   Q.   Okay.  And to your understanding, are any of the
25   challenged statements contained in that radio interview?

```
 1   A.   I don't believe so.
 2        MR. BROOKS:  Can we turn to Exhibit 6.
 3   A.   Could I point something out on the previous report?  Do I
 4   have to wait for the next question?  Can I point something out
 5   on the previous report?
 6   Q.   I think we should just stick to the questions.
 7   A.   Okay.
 8   Q.   So we have talked about this report.  This is your fourth
 9   report dated August 14, 2014?
10   A.   Yes.
11   Q.   Again, like the others, you see it's -- you publish it
12   under your own name?
13   A.   Yes.
14   Q.   And in the first sentence you reference a short stake?
15   A.   Yes.
16   Q.   And that's for the reason you previously testified about?
17   A.   Yes.
18   Q.   If we can go to the last paragraph on that first page, you
19   reference an August 11, 2014 announcement.  Was that the basis
20   for this report?
21   A.   Yes.
22   Q.   And what -- generally, what did that announcement have to
23   do with?
24   A.   It had to do with their proposed bond offering, their
25   raising of new debt.
```

```
 1    Q.   Okay.  And you spoke about it on direct, so I don't want
 2    to belabor -- or cross, so I don't want to belabor the point,
 3    but you were critical of that offering, correct?
 4    A.   Yes.  And in this particular paragraph you highlight, the
 5    company indicated at the time that they would use the capital
 6    to buy out large institutional investors and do a share
 7    buyback, which was totally contradicted by the CEO's testimony
 8    yesterday or on Friday.
 9         MR. JONES:  Objection, Your Honor.
10         THE COURT:  Sustained.
11    Q.   Did the share buyback happen?
12    A.   No, not really, no.
13         MR. BROOKS:  Can we go to the second page of this
14    report.  All right.
15    Q.   I want to focus on the paragraph that's numbered 3,
16    "Tangible equity."
17    A.   Yes.
18    Q.   What is tangible equity?
19    A.   So tangible equity, or tangible net worth as it's
20    sometimes referred to, is a common conservative measure of the
21    equity in a company.  I removed the intangibles.  There's been
22    a lot of discussion about that.  Ligand, on the other hand, was
23    removing a lot of other things in their non-GAAP earnings.  So
24    we were taking a conservative approach to the financial
25    statements.  As I said earlier, the same one that the Office of
```

 1     the Comptroller of the Currency uses for the United States

 2     government to assess solvency.

 3              So we wanted to look at it from a conservative

 4     measure.  What do the common shareholders actually have?  So

 5     this is non-GAAP, this measure, but everything Ligand was

 6     releasing was also non-GAAP.  They were removing a lot of

 7     expenses that they claimed didn't apply, so to speak.

 8     Q.   If we could go to the second sentence in this paragraph.

 9     First of all, tangible equity, where did you learn what that

10     was?

11     A.   Well, I had built several companies when I was younger.

12     But it really came into sharper focus -- I was always involved

13     in the accounting departments in the companies I ran, but

14     Benjamin Graham really helped to focus in my mind in a very

15     important way as a common shareholder, this is really what you

16     have, a tangible equity.  And it's generally thought -- I would

17     say certainly amongst the value investing community -- that the

18     intangibles may have no value at all in a liquidation.

19     Q.   So if we look at the second sentence of this paragraph,

20     you wrote, "Prior to this August 4 release, the company's

21     liabilities exceeded tangible assets, meaning the company was

22     insolvent."  Is that the definition of insolvency?

23     A.   Well, there's several definitions, but that's how I saw

24     it, that's my assessment, that they were essentially insolvent

25     at that point.

```
 1   Q.   So Mr. Higgins testified that he believed it was an
 2   unusual definition.  Do you agree with that?
 3   A.   Oh, no.  As I said, if the U.S. government uses that same
 4   measure to determine solvency, the Office of the Comptroller of
 5   the Currency, in fact.
 6   Q.   The date your fourth report came out, did you cover any of
 7   your short position?
 8   A.   On August 4?
 9   Q.   I believe this one was August 14.
10   A.   No.
11   Q.   Can we go to Exhibit 7, which is the fifth and final
12   report.
13        It looks like -- if I look at the bottom paragraph,
14   it looks like you're linking your previous reports?
15   A.   Yes.
16   Q.   Why did you do that?
17   A.   To ensure that the readers had access to the previous
18   commentary to help place this in context.
19   Q.   Okay.
20        MR. BROOKS:  If we go to the top of page 3.  All
21   right.
22   Q.   Now, you wrote on the top of page 3, "On August 18, Ligand
23   filed a Form 8-K with the SEC revealing that the company had
24   issued 245 million dollars in new debt against the company's
25   tangible equity of just 21,000, giving rise to a
```

1    debt-to-tangible-equity ratio of 11,667-to-one.  That is to say

2    $11,667 in debt for every $1 in tangible common shareholder

3    equity."  Was your mathematical calculation correct?

4    A.   Yes.  Initially the Commission thought it was incorrect.

5    They thought --

6              MR. JONES:  Objection, Your Honor.

7              THE COURT:  Sustained.

8    Q.   So my question was just, was that calculation correct?

9    A.   Yes.

10   Q.   And you don't understand that the Commission is

11   challenging that, right?

12   A.   They're no longer challenging it.  I believe they changed

13   that claim.

14   Q.   Okay.

15             MR. JONES:  Your Honor, I move to strike.

16             THE COURT:  No, that's irrelevant here.  This is the

17   claim right now is what you've got.

18   Q.   Now, did you -- this was your last report.  Did you cover

19   some portion of your short in Ligand on this day?

20   A.   Is this the August 22 report?

21   Q.   This is the August 22 report.

22   A.   Yes.

23   Q.   Why did you cover some of it that day?

24   A.   Well, honestly, it was exhausting.  Every time we pointed

25   out what should have been obvious, the company would come out

1    with a flurry of press releases, and I realized there was a lot

2    of entrenched interests.  Investment banks, sell-side analysts,

3    insiders who were -- they were going to have their day in the

4    sun with Ligand's stock price.  And it was just exhausting to

5    keep revealing what they were doing.

6    Q.    Did any of those press releases address your reports?

7    A.    No.

8    Q.    Did any of those press releases address the comment that

9    you made about Mr. Voss on Benzinga?

10   A.    No.

11   Q.    Did any of those press releases address anything you said

12   about Viking?

13   A.    No.  I don't think they ever mentioned Sovaldi either,

14   which at the time I found deafening, the silence.

15   Q.    Again, we're not going to listen to it, but you also did a

16   radio interview discussing Ligand on September 16, 2014; is

17   that right?

18   A.    Yes.

19   Q.    Okay.  And then I believe it's been established you

20   covered most of your -- almost all of the rest of your position

21   on Ligand on October 13, 2014.  So a couple of months after

22   your last report?

23   A.    Yes.

24   Q.    And is the reason you finished -- you covered the

25   remaining shares basically the same reason you just gave us or

1   something different?

2   A.   Yes.

3   Q.   Same reason?

4   A.   Yes.

5   Q.   Okay.  Now, at the time you shorted Ligand in 2014, was

6   that the only holding in The Amvona Fund?

7   A.   Oh, no.  We probably had 15 or 20 positions.  It wasn't by

8   any means our largest position either.

9   Q.   I'm sorry.  I just heard -- how many positions did you

10  have?

11  A.   We probably had 15 or 20 would be my guess.

12  Q.   Did The Amvona Fund profit when you covered the short in

13  Ligand?

14  A.   Yes.

15  Q.   Do you have any idea of what percentage of the fund's

16  profits in 2014 are attributable to the Ligand short?

17  A.   So, yes.  Inception to date it was about seven percent of

18  our profits.

19  Q.   Seven?

20  A.   Yeah.  I believe there was about 15 million in profits at

21  that point.

22  Q.   Okay.

23           THE COURT:  Was that 1-5 or 5-0?

24           THE WITNESS:  It was about 15 million in profits.  So

25  Ligand was about seven percent.

1    Q.    Father Lemelson, you were asked, and I think even shown
2    some deposition testimony from 2016.
3    A.    Yes.
4    Q.    That's before this lawsuit was filed?
5    A.    Yes.
6    Q.    Okay.  And Mr. Jones asked you if you thought you were
7    under investigation at that time?
8    A.    Yes.
9    Q.    You said no?
10   A.    Yes.
11   Q.    Okay.  At some point did you provide documents to the SEC
12   during the investigation phase?
13   A.    Yes.  In September or October 2015.  Late September, early
14   October.
15   Q.    What did you provide them?
16           MR. JONES:  Objection, Your Honor.  Relevance.
17           THE COURT:  I don't know.
18   Q.    What did you provide them?
19   A.    My whole hard drive.
20   Q.    Your entire hard drive?
21   A.    Yes.
22   Q.    Why did you do that?
23   A.    I was excited, actually.  I thought the SEC would get
24   involved in stopping this multi-year fraud that lost investors
25   billions of dollars and put patients at risk.  So I said is it

1    okay if I just give you my whole hard drive.  I didn't want to
2    go through the whole thing.
3    Q.   And when Mr. Jones asked you about your testimony --
4    again, during the investigation part of this -- you were
5    deposed?
6    A.   Yes.  Yes.  Well, initially by phone we had a conversation
7    with the SEC.
8    Q.   I'm talking more about your deposition.  Where did your
9    deposition take place?
10   A.   In Washington, D.C.
11   Q.   How long did that last?
12   A.   It was three days.
13   Q.   Three days.
14   A.   About 24 hours, I think, maybe more, 27.
15   Q.   Were those consecutive days or did you take breaks?
16   A.   It was really very few breaks.  It was consecutive.  It
17   was a lot.
18   Q.   So Mr. Jones also asked you about taking down certain
19   comments to Seeking Alpha?
20   A.   Yes.
21   Q.   Do you recall that?
22        Were the ones he asked you about, were those the only
23   negative comments regarding your short position in Ligand at
24   all that were on Seeking Alpha?
25   A.   Oh, no.  There were dozens.  It was heavy criticism.  I

1    just didn't want the ones revealing the town we lived in.  We
2    were getting death threats.
3    Q.   So you didn't try to take down every single negative
4    commentary about your reports on Ligand?
5    A.   Oh, no.  I'm sure there's thousands of comments about
6    reports online.  I don't think I could possibly do that.
7    Q.   Okay.  So Mr. Jones also asked you -- he was asking you
8    about your fees, performance fees, management fees, do you
9    recall that?
10   A.   Yes.
11   Q.   Based on your knowledge of the industry, how do your fees
12   stack up against industry standard?
13   A.   They're low.  The management fee, where we charged it, was
14   about half of what the industry standard is.  So Mr. Jones
15   asked about two percent.  That's industry standard.  We charged
16   either zero or one percent.
17            Then the performance allocation, the 25 percent,
18   other managers that produce better than average returns can
19   charge up to 50 percent.
20   Q.   By the way, in 2014, were you the only -- to your
21   knowledge, were you the only person or fund that was short
22   Ligand?
23   A.   No.  No.  In fact, Ligand has since become the number one
24   most shorted stock in all markets.
25   Q.   The number one most shorted stock in all markets?

1    A.    Yeah, all markets.  There have been I think nine short

2    reports published accusing them of fraud, substantially similar

3    to our reports, eleven class action lawsuits, 3.9-billion-

4    dollar bondholder/shareholder lawsuits, delistings.

5         MR. JONES:  Your Honor, we're far beyond any relevant

6    time period here.

7         THE COURT:  Are you objecting?

8         MR. JONES:  Yes.

9         THE COURT:  Sustained.

10   Q.   Now, Mr. Jones also showed you a large number of

11   references in Viking's S-1 showing that there were plans for

12   clinical studies or preclinical studies and clinical trials.

13   Do you recall that?

14   A.    Yes.

15   Q.   Based on your reading of the S-1, did Viking ever claim

16   that it was going to conduct any of those studies or trials?

17   A.    No.  They said the opposite, in fact.

18        MR. BROOKS:  I have nothing further at this time, Your

19   Honor.

20        MR. JONES:  Your Honor, I'll have redirect but I have

21   to have three minutes to get organized before we start.

22        THE COURT:  Sure.  You can stand and stretch again.

23        I'm hoping we can finish the testimony of Father

24   Lemelson today.

25                      REDIRECT EXAMINATION

```
 1    BY MR. JONES:
 2    Q.   I'd like to start with this book, Father.  This is The
 3    Intelligent Investor, correct?
 4    A.   Yes.
 5    Q.   This is the book you said is the basis for what you're
 6    doing analyzing stocks, correct?
 7    A.   Yeah.  I testified that it brought it into clearer focus.
 8    Q.   You testified to Mr. Brooks that this is a book that
 9    helped you clarify how to do insolvency analysis for a company,
10    right?
11    A.   I didn't testify to that.
12    Q.   So this doesn't have anything to do with doing an
13    insolvency analysis?
14    A.   I testified there were two seminal works, The Intelligent
15    Investor and Security Analysis.
16    Q.   Because this book, it says the word "insolvent" or
17    "insolvency" one time in the text, right?
18    A.   The Intelligent Investor deals with --
19    Q.   Father, does it say it one time in the text?
20           THE COURT:  Well, do you know how often it was
21    mentioned?
22           THE WITNESS:  I don't recall.
23    Q.   In fact, "insolvency," if you look back here, is not even
24    in the index, right?
25    A.   I have to see the index.
```

1    Q.   It goes Inflation, Initial Public Offerings, let's see,

2    Interest, Investors.

3              THE COURT:  We'll take your word for it.  It's not in

4    there.

5    Q.   It goes from Investors to IPOs to IRA Accounts to ITI

6    Corporation, right?

7    A.   I have to see it.

8              MR. BROOKS:  Your Honor, since he didn't testify that

9    he learned anything about insolvency in this, I'm not really

10   sure this is related to the direct.

11             THE WITNESS:  In fact, I testified to two books.

12             THE COURT:  That comment is struck.

13   Q.   This book doesn't talk really about tangible equity

14   either, does it?

15   A.   So I testified to two books I --

16   Q.   Father, does the book talk about tangible equity?

17             THE COURT:  Do you remember?

18   A.   Yes, it does.

19   Q.   It says the words "tangible equity" three times in the

20   text, right?

21   A.   I believe so.  I'm not sure.  I'd have to review it.

22   Q.   It never says the words "tangible equity" in comparison to

23   debt, right?

24   A.   I don't know.  I --

25   Q.   It never makes it a part of a determination of insolvency,

```
 1   right?
 2               THE COURT:  You need to let him answer.
 3               MR. JONES:  I thought he did.
 4   Q.   Father, it never says --
 5   A.   What I wanted to say --
 6   Q.   -- tangible equity in relation to insolvency, right?
 7   A.   I'd have to check.
 8   Q.   You don't know?
 9   A.   So Benjamin Graham published two seminal works.
10   Q.   Father, do you know?
11   A.   If it references tangible equity in reference to debt?
12   Q.   Right.
13   A.   I'd have to check.
14   Q.   So you didn't get your formula from this book, right?
15   A.   I don't recall now.
16   Q.   You don't recall whether you got your formula from this
17   book?
18   A.   What I recall is that the second work I mentioned, The
19   Security Analysis, deals with the interpretation of financial
20   statements.  The Intelligent Investor deals with the psychology
21   of investment.  They're different works.
22               (Court reporter interrupts.)
23   A.   I testified there were two books I read from Benjamin
24   Graham.  The first was The Intelligent Investor, which deals
25   with the psychology of investment.  The second is Security
```

1    Analysis, his other seminal work, which deals with the
2    interpretation of financial statements.
3    Q.   I'm confused, Father.  Didn't your lawyer pick up this
4    book and show it to us all just about 15 minutes ago?
5              MR. BROOKS:  Objection.
6              THE COURT:  Sustained.  Let's move on.
7    Q.   And Mr. Graham, he was born in 1894, right?
8    A.   Yes.
9    Q.   He entered the stock industry in 1914, right?  Right?
10   A.   He entered early, yes.
11   Q.   You could still invest in a buggy whip in 1914, right?
12   A.   I don't know.
13   Q.   You're not sure?
14             THE COURT:  Come on.
15   Q.   All right.  So this is the book you're holding up on
16   intangible assets, huh?
17   A.   I didn't testify to that.
18   Q.   Now, we listened to that interview, right, and, actually,
19   the transcript of that interview, that 20 minutes -- oh,
20   actually, that interview we listened to, 21 minutes, right?
21   Exhibit 2, it ran 21 minutes, correct?
22   A.   I didn't check the time.
23   Q.   Well, we can actually look at Exhibit 2 and show from the
24   timer --
25             MR. JONES:  Just pull up Exhibit 2.  And show us all

1   that familiar YouTube thing where we see how long that

2   interview was.  Don't play the whole thing again, please.  Just

3   show me the timer on the bottom.

4   Q.   It shows 21 minutes, correct?  We can't show that part?

5   21 minutes.  We sat here --

6   A.   I don't see where it says 21 minutes.

7   Q.   We're showing you right on the bottom.

8   A.   Yes.

9   Q.   21 minutes 40 seconds, right?

10   A.   Yes.

11   Q.   That's how long we sat here and listened to your interview

12   on Benzinga?

13   A.   Yes.

14   Q.   That's how long -- you talked about a lot of topics,

15   right?

16   A.   Yes.

17   Q.   You talked about your Christian philosophy of investing,

18   correct?

19   A.   Christian philosophy of investment, yes.

20   Q.   You talked about your WWE short?

21   A.   Yes.

22   Q.   Talked about your Ligand?

23   A.   Ligand short, yes.

24   Q.   Yup.  And you talked about the different parts of your

25   Ligand short, right?  You talked about the Promacta part, the

1   part that you're being charged with here, right?

2   A.   In the statement that Mr. Voss made to me?

3   Q.   The statement that you say Mr. Voss made to you, you

4   talked about that, right?

5   A.   Yes.

6   Q.   And you talked about other parts of your Ligand thesis

7   there too?

8   A.   Yes.

9   Q.   And then there was some other stuff there at the end, your

10  sort of general outlook on the markets, right?

11  A.   Commentary on the market, yes.

12  Q.   Right?  That was 21 minutes?

13  A.   Yes.

14  Q.   That's the same amount of time, that entire time, that you

15  actually talked to Mr. Voss on the phone, wasn't it, 20

16  minutes?

17  A.   That's what I'm told, yes.

18  Q.   Yeah.  It's a long call, isn't it?

19  A.   I don't know if I would characterize it as long.

20  Q.   Mmh?

21  A.   I don't know if I would characterized it necessarily as

22  long.

23          MR. JONES:  Can we have Exhibit 3, please, Cole.

24  Q.   Now, Exhibit 3 is just the transcript of the interview

25  that we heard, right, Father?

1    A.   I'll take your word for it.  I don't have it in front of
2    me.
3    Q.   Is it not up on the screen?  Is it not up on your screen,
4    Father?
5    A.   Oh, yeah.
6    Q.   Okay.  It says "Benzinga Interview 2014619."  Do you see
7    that?
8    A.   Yes.
9    Q.   That's the date you were on the Benzinga show, right?
10   A.   Yes.
11   Q.   That's the date that you said what you said about
12   Mr. Voss, right?
13   A.   When I related what he told me, yes.
14   Q.   You told us when Mr. Brooks was asking you questions that
15   you don't communicate ahead of time with them about what the
16   topics are, right?
17   A.   That's correct.
18           MR. JONES:  Can we have page 11, please.  It's pages 9
19   through 12 of the document.  It should be the third page,
20   please, fourth page, rather.  Excuse me.
21   Q.   This is page 11, right?  It says -- so "MR. LEMELSON,"
22   that's you, Father Lemelson, right?  And "MALE SPEAKER,"
23   that's Joel Elconin who's interviewing you, right?
24   A.   Yes.
25   Q.   And Joel says to you, "You wanted to discuss capital

```
 1   allocation as stewardship.  Do you want to elaborate on that?"
 2   He says that, right?
 3   A.   Yes.
 4   Q.   So you did talk ahead of time about what you were going to
 5   talk about on this show, didn't ou?
 6   A.   No.  Actually, when I called in in the morning, he asked
 7   me is there anything -- he wouldn't tell me the questions.  He
 8   would just say, "Is there anything you want to discuss?"  And,
 9   of course, I wanted to discuss --
10   Q.   Right.  And you told him this was one of the things you
11   wanted to discuss, right?
12   A.   Yeah, if he would make time for it.
13          MR. JONES:  If we could go back to page 9 for a
14   minute.  Blow that up, please.
15   Q.   Right there on lines 7 and 8 you say, "I'm not convinced
16   that groups of people behave rationally most of the time."  Do
17   you see that?
18   A.   Yes.
19   Q.   That was a true statement, right?  You didn't lie on
20   Benzinga, did you?
21   A.   It's neither true nor false.  It's an opinion.  I say,
22   "I'm not convinced."
23   Q.   Well, do you believe that groups of people behave
24   rationally most of the time?
25   A.   I said I'm not convinced.
```

1    Q.    Okay.  You also said down here on 21 and 22, lines 21 and

2    22, "If there's some negative news, then a stock might sell off

3    tremendously because of it."  You said that on the radio,

4    right?

5    A.    Yes.

6    Q.    We talked a little about the risk disclosure, right, the

7    risk disclosure about the stock price could go down?

8    A.    Yes.

9    Q.    And that's --

10   A.    But the volatility of the stock --

11   Q.    And that's Exhibit 14, right?  Could we have -- so this

12   is --

13         You were talking at that point about the 10-K or the

14   annual report for Ligand, right?

15   A.    I believe so.

16         MR. JONES:  If we could have page 32, please.

17   Q.    It says, "Our stock price has been volatile and could

18   experience a sudden decline in value," right?

19   A.    Yes.

20   Q.    And you were saying, oh, look at this.  They're saying

21   their stock price could go down a lot in value, right?

22   A.    Yes.  In fact --

23   Q.    You were pointing to this risk factor, right?  A risk

24   factor that the company is required to give.  They're required

25   to give the possible risks of investing in their company,

1    right?  We've talked about this before.

2    A.    So counsel pointed it out, but they're not required to

3    give that foreclosure.

4    Q.    Let's actually look at it.  These risks factors are

5    supposed to be what could possibly happen to their price of

6    stock, right?

7    A.    It's a factor that that company, specific to that company

8    believes is a risk.

9    Q.    All right.  Let's see.  If we go down one, two, three,

10   four, five, six, seven, do you see the one that starts

11   "innovations" there?

12   A.    Yes.

13   Q.    Could you blow up those two sentences.  One of the reasons

14   that the company says the price may go down is, "comments or

15   opinions by the securities analysts or major stockholders."  Do

16   you see that, sir?

17   A.    Yes.

18   Q.    Apparently they were right.  You came along with your

19   comments and you had the stock price go way down, right?

20   A.    We don't know if I'm the cause of that decline.

21   Q.    Well, you claim credit for it, right?  You said your

22   reports resulted in that stock price decline.  In fact, you

23   said your reports were responsible -- resulted in 500 million

24   dollars reduction in the value of that business, right?

25   A.    Well, the market capitalization, not the value.

1   Q.   So the value of the market cap, right?  The value of all

2   the stock down 500 million you said resulting from your

3   reports.

4   A.   I believe that's what my annual report said.

5   Q.   And that's your idea of protecting shareholders, right?

6   That's what you said you were doing, protecting shareholders?

7   A.   Well, protecting shareholders is to elucidate their

8   security interest.

9   Q.   I see.

10  A.   In fact, this document --

11  Q.   Father, you have to wait for a question.

12  A.   I was going to continue my answer to that question, but.

13  Q.   I think we're done.  Let's go on to the next question.

14  Exhibit 4, please.  Now, you don't mention ITP in your first

15  report, right, in your June 16 report, right?

16  A.   Correct.

17  Q.   And you don't mention it when you're on the Benzinga show,

18  right?  We heard you talk about hep C, right?

19  A.   Yes.

20  Q.   You didn't talk about ITP, right?

21  A.   Yes, I believe that's correct.

22  Q.   So this July 3 report is the first time you're mentioning

23  ITP, correct?

24  A.   Yes.

25  Q.   And that comes after your 20-minute call with Bruce Voss,

```
 1    right?
 2    A.   It also comes after --
 3    Q.   After, okay.
 4    A.   Yes.  It also comes after the company's commentary with
 5    analysts.
 6    Q.   So you put out a report, it doesn't mention ITP.  You do
 7    an interview, you don't mention ITP, right?  But you had a call
 8    with Mr. Voss and suddenly you're mentioning ITP in your
 9    report, right?
10    A.   Well, as I testified, ITP in my mind, in my opinion
11    resulted -- and also based on the company's own commentary
12    resulted from hepatitis C.  This was indistinguishable.  The
13    genius of the company is to make it sound like it's two
14    different indications.
15    Q.   Let's go back to Exhibit 3.  In Exhibit 3 you're
16    talking -- this is back on your interview, right?
17    A.   Yes.
18    Q.   In Exhibit 3 on page 16 of the transcript -- let's blow
19    that up, please.  This is where you make your statement about
20    Mr. Voss, right?  You said, "I mean I had discussions with
21    management just yesterday -- excuse me, their IR firm, and they
22    basically agreed.  And they said, look, we understand Promacta
23    is going away."  Correct?
24    A.   Yes.
25    Q.   And then a couple lines down you're talking about hep C?
```

1   A.   Yes.

2   Q.   You're saying hep C is cured with what Gilead's new drug

3   is doing.  Gilead's new drug is Sovaldi, right?

4   A.   Yes.

5   Q.   So you're saying, just as you put in your report, the fact

6   that Sovaldi has come along means that Ligand will not earn

7   revenue from Promacta anymore, right?

8   A.   Yes.

9        MR. JONES:  Can we go to Exhibit 4, please.  Can I

10  have page 2, please.  Up at the top -- actually, let's start

11  back one page.  I've cut the beginning of the sentence off

12  there.

13  Q.   You say, "There is no evidence of a significant market for

14  Promacta outside of hepatitis C indications."  Correct?

15  A.   Yes.

16  Q.   "And suggestions that idiopathic thrombocytopenic purpura

17  is a commercially viable alternative application are false."

18  Right?

19  A.   Yes.

20  Q.   So you're actually drawing a distinction there.  You have

21  inside hepatitis C indications and outside hepatitis C

22  indications there, correct?

23  A.   Actually, I'm doing the opposite there.

24  Q.   Well, you said, Father --

25  A.   I'm saying there's no distinction because the idiopathic

```
 1   part, which means unknown, those patients in all of the

 2   research I did then and now, overwhelmingly the evidence leads

 3   me to the conclusion that they all had hepatitis C, almost all

 4   of them.

 5   Q.   I'm sorry, Father.  Are you a doctor?

 6   A.   No.

 7   Q.   Not a hard question, right?  You're not a medical doctor?

 8   A.   No.

 9   Q.   You're not a scientist?

10   A.   No.

11   Q.   You're not a chemist?

12   A.   No.

13   Q.   You're not a biologist?

14   A.   No.

15   Q.   Right.  We heard from people who have degrees like that

16   over the last few days, didn't we?  Did we or didn't we?

17   A.   John Higgins was an MBA, not a biologist, not a doctor.

18   No, John Higgins was not any of those things that we heard

19   from.

20   Q.   I understand John Higgins wasn't, but --

21   A.   The CEO of Ligand.

22   Q.   But Dr. Lian said he was, right?

23   A.   Dr. Lian was an MBA.

24   Q.   And Matt Foehr --

25              Dr. Lian also has a Ph.D., does he not, in chemistry?
```

```
 1   A.   Yes.  I recall he -- chemistry, right.  But not biology
 2   and not a doctor.  You're right.
 3   Q.   I'm not sure why you're fighting me on this, Father.
 4   A.   I don't mean to.  I'm just trying to remember.
 5   Q.   You heard from people who said they had degrees in
 6   science, right?
 7   A.   Yes.  Chemistry is a science, but he's not a doctor.
 8   Q.   Right.  Biology is a science also?
 9   A.   Yes.
10   Q.   Okay.  What the company was saying is ITP is an indication
11   for Promacta, right?
12   A.   That's not actually what they were saying at the time.
13   Q.   Okay.  Let's take a look at Exhibit 14.  We're back to the
14   10-K, right?
15   A.   Yes.
16   Q.   Okay.  Now, if we could just go to page 7 of the PDF.
17   Okay?  This is actually page 3, because there's a lot of table
18   of contents pages.
19        MR. JONES:  You all have this in your binders as well.
20   It's Exhibit 14.  It's about the seventh page in.
21   Q.   There's a section here on Promacta, right?
22   A.   Yes.
23   Q.   And you had this report when you wrote about Promacta,
24   right?
25   A.   Yes.
```

1    Q.    You had it when you wrote your June 16 report, right?

2    A.    Yes.

3    Q.    You had it when you went on the Benzinga Internet radio

4    show?

5    A.    Yes.

6    Q.    And you had it when you wrote your July 3 report?

7    A.    Yes.

8    Q.    So if you could give me the first four paragraphs of that

9    section, please.  Let's start with the first three paragraphs

10   of the section.  Okay.  So the first paragraph here in the 10-K

11   talking about Promacta says that it's for patients with chronic

12   immune idiopathic thrombocytopenia purpura, correct?

13   A.    Correct.

14   Q.    And the second paragraph says that in Europe, Revolade can

15   be used for ITP, right?

16   A.    Yes.

17   Q.    And you know that's the same product, Promacta and

18   Revolade?

19   A.    Yes.

20   Q.    Okay.  And then the third paragraph talks again about

21   Promacta for ITP, right?

22   A.    Yes.

23   Q.    Let's go back to your report.  Let's look at Exhibit 1.

24   And you say on the fifth page, you go right to, "Ligand has

25   described their biggest royalty generating asset Promacta as a

1    treatment of thrombocytopenia in patients with chronic

2    hepatitis C."  You wrote that, right?

3    A.   Yes.

4    Q.   In writing that somehow you skipped over those three

5    paragraphs that came before it about chronic ITP, didn't you?

6    A.   No, I didn't.

7    Q.   There were three paragraphs in the document that you were

8    quoting from, the 10-K, that talked about it being used for

9    ITP, but you leave that part out, don't you?

10   A.   No, I didn't.

11   Q.   You go right here.  They describe -- you say they describe

12   their asset Promacta as treatment of thrombocytopenia in

13   patients with chronic hepatitis C?

14   A.   I did not exclude that.  The company defined in their

15   conference calls every time, in Q-1 and Q-2, they always

16   related ITP to hepatitis C.  And, in fact, GSK, as early as

17   2006, defined it that way as well.  There's an indication for

18   hepatitis C.

19   Q.   Do you know what ITP is, Father?

20   A.   Yes.

21   Q.   And you sat here and you heard it described, right?

22   A.   Yes.

23   Q.   The guy who helped invent Promacta described it to you,

24   right?

25   A.   I don't recall if he gave a description, but it sounds

1    likely.

2    Q.    He said it can boost your platelets, right?

3    A.    Yes.

4    Q.    And he said the first indication that it got approved for

5    was ITP, right?

6    A.    Correct.

7    Q.    It wasn't approved for hepatitis C at that point, right?

8    A.    That's right, it wasn't.

9    Q.    Not for several years later would it be approved for

10   hepatitis C, right?

11   A.    That's right.  They had to prescribe it off label for

12   hepatitis C.

13   Q.    You're characterizing this document as only hep C.  You

14   don't even mention ITP in this report, do you?

15   A.    Because GSK was prescribing it off label for people with

16   hepatitis C.

17   Q.    Father, you have absolutely no evidence for that, do you?

18   A.    I do.

19   Q.    You say you have evidence of that.  Did you produce it?

20   Did you give it to me?

21   A.    I don't know if it's in the production because I wasn't

22   allowed to see the production.

23   Q.    I thought you said you gave us everything, Father.  Your

24   lawyer asked you, did you give over everything?  And you said,

25   yes, we gave over our entire hard drive.  Do you remember that

```
 1   part?

 2   A.   Then it must be on the hard drive.

 3   Q.   It must be, huh?

 4   A.   Yes.

 5   Q.   Where?

 6            THE COURT:  All right.  We need to finish this.

 7            MR. JONES:  Yes, Your Honor.

 8            THE COURT:  How much more do you have?

 9   A.   In fact, Matthew Foehr described it as a drug that was

10   always understood it should be hep C.

11            THE COURT:  Oh, there's nothing on the table.  Strike

12   that.

13            What's the next question.

14            MR. JONES:  Yes, Your Honor.

15   Q.   Now, you said on the Benzinga radio show that there was no

16   indication that Novartis was going to invest in Promacta,

17   correct?

18   A.   Yes.  No evidence I think I said.

19   Q.   But you know that Novartis acquired the GSK oncology

20   program, the one that included Promacta, they acquired it for

21   16 billion dollars, right?  You know that, right?

22   A.   I don't recall the exact number now.

23            MR. JONES:  Could we look at Exhibit 179, please.

24   Q.   And here is the press release for GSK announcing a major

25   three-part transaction with Novartis, right?
```

1    A.    Yes.

2    Q.    And you were aware that GSK -- I mean, you talked about it

3    in your interview.  You knew that GSK was transferring its

4    oncology business to Novartis and Novartis was transferring

5    other stuff back to GSK, right?

6    A.    That GSK was liquidating, yes.

7    Q.    And you wouldn't have talked about that if you didn't

8    understand what the deal was, right?

9    A.    Well, I understood they were liquidating the assets,

10   Novartis was the buyer, and that there was no evidence that

11   Novartis would continue to invest in Promacta.

12   Q.    So can we go to the second page, please.  On that first

13   bullet point, you knew that there was a cash consideration for

14   that business of 16 billion dollars, right?

15   A.    If that's what it says, that must have been the

16   transaction amount.

17   Q.    It does say that, right?

18   A.    Yes.

19   Q.    But it was your theory --

20   A.    Can I read this?  I'm sorry.

21   Q.    It was your theory that despite the fact --

22   A.    Can I just read this a moment.

23   Q.    I'm just trying to move this along.

24         THE COURT:  Hold on a second.  He wants to read it.

25   (Pause.)

```
1    A.   So it's saying that GSK will --
2    Q.   Father, let me ask the question first.
3         THE COURT:  No.  What's the next question?
4    Q.   You knew that the oncology business that Novartis had paid
5    16 billion for it, right?
6    A.   No, that's not what it says.
7    Q.   "For future oncology products to Novartis for an aggregate
8    cash consideration of 16 billion."
9    A.   It says, "Oncology portfolio, related R&D activities and
10   rights to its AKT inhibitor" --
11   Q.   And you knew Promacta was part of that business, right?
12   A.   -- "and also grant commercialization partner rights to
13   future oncology products," which Promacta is not part of,
14   Novartis.
15   Q.   And all of that went for 16 billion?
16   A.   Yes.
17   Q.   Because that's what it says here, right?
18   A.   Yes.
19   Q.   Part of that was Promacta, right?
20   A.   No.  Promacta is not an oncology drug.
21   Q.   Father, are you telling us you didn't know GSK had
22   Promacta as part of its oncology department?
23   A.   It did have it as part of their oncology, but I'm just
24   saying it wasn't an oncology drug.
25   Q.   But it is part of this portfolio, correct?
```

1    A.    Yes.

2    Q.    So, Father, when you said you wanted to present all sides

3    of the argument, remember you told your lawyer you wanted to

4    present all sides of the argument?

5    A.    I think I said I wanted everyone's voice to be heard.

6    Q.    Okay.  So when Mr. Voss wrote you an email on June 23

7    saying you said something that -- you said I said something

8    that I didn't say, you didn't publish that, did you?

9    A.    My immediate impression was it was completely

10   disingenuous.

11   Q.    You said you wanted to publish all sides of the argument,

12   remember?  You were very earnest and you said, "I wanted to

13   everybody to hear all sides of the argument," right?

14   A.    Yes.

15   Q.    But when Mr. Voss said, "You misquoted me.  You lied about

16   me," you didn't tell anybody, did you?

17   A.    If someone asked me, I would have immediately told them

18   what happened, if there was an opportunity for that, if someone

19   said, "Tell us about that phone call again."

20   Q.    If someone had asked, that's what --

21   A.    Well, if Benzinga had asked.

22   Q.    That's what you meant when you said present both sides of

23   the argument, if somebody had asked you?

24   A.    Well, there has to be an opportunity to describe it.

25   Q.    How many reports did you publish after your June 16

1    report?

2    A.    Four.

3    Q.    And how many interviews did you do after your June 16

4    report?

5    A.    Well, there was four.

6    Q.    Okay.  So maybe there was an opportunity, right, Father?

7    A.    So I don't think there was an opportunity, no.  There's

8    just no way for me to go out and recite something that's

9    totally disingenuous that somebody tells me, just like the

10   other negative comments --

11              THE COURT:  No.  We're finishing this today.

12              MR. JONES:  Your Honor, I'm trying.

13              THE COURT:  Yes, I know.

14   Q.    You also said that you want to present all sides of the

15   argument, but when there's three full paragraphs in the 10-K

16   about the use of Promacta for ITP, that's nowhere in your

17   report either, is it, Father?

18   A.    It is.  I understood those all to relate to hepatitis C,

19   and I still hold that position.

20              (Court reporter interrupts.)

21   A.    It is in my reports because I always held those to be

22   related to hepatitis C, as the company described them in their

23   own conference calls, and I hold that position today.

24   Q.    Actually, when we got to your report, you're presenting

25   them as two different things in Exhibit 4.

1  A.   No, that's not what I testified.

2  Q.   "There is no evidence of a significant market for Promacta

3  outside of hepatitis C indications," and "suggestions that

4  idiopathic thrombocytopenia purpura ITP is a commercially

5  viable alternative application are false," right?  So when you

6  wrote the report, at least, you had them separate?

7  A.   No, I'm saying that's false.

8  Q.   Now you're putting them together?

9  A.   No, no, no.  I'm saying they're false in that statement.

10  I'm saying separating them is false.  I'm saying exactly what

11  I'm saying today.

12  Q.   Father, I think the jury will make up its mind about that

13  one.

14          MR. BROOKS:  Objection, your Honor.

15          THE COURT:  Sustained.

16  Q.   The debt-to-tangible-equity ratio, that's not anywhere in

17  the generally accepted accounting principles, right?  Do you

18  agree with that?  Just a yes or no.

19  A.   Well, it's a non-GAAP measure, that's correct.

20  Q.   It's not part of the generally accepted accounting

21  principles?

22  A.   Right.

23  Q.   Okay.

24  A.   And if --

25  Q.   I just wanted a yes or no or that one.  The judge is

1   saying we have to finish up.

2          So when you're saying that you wanted to just sort of

3   put the true information out there into the world, during the

4   course of your multi-month battle with Ligand, Ligand put out

5   additional information, didn't it?

6   A.   They continued --

7   Q.   Yes or no.

8   A.   They continued to put out false and misleading statements,

9   yes.

10   Q.   They also published --

11   A.   And non-GAAP numbers.

12   Q.   -- another quarter of results, right?

13   A.   They promoted non-GAAP earnings, yes.

14   Q.   Father, did they publish another quarter of results?

15          THE COURT:  Just answer the question yes or no.

16   A.   Yes.  Yes.

17          THE COURT:  All right.  Next question.

18   Q.   And you read that?

19   A.   Yes.

20   Q.   And you saw the results, right?

21   A.   Yes.

22   Q.   And you saw that they had done very well?

23   A.   No, they were not doing well.

24   Q.   You saw that they actually -- actually, let's take a look

25   at this.  Exhibit 218.  July 23, 2014, that's in the middle of

1    your second and third reports, right?  It comes right about in

2    the middle?

3    A.    Where do you want me to look?

4    Q.    I'm in the top left corner where it says "July 23."

5    A.    Yes.

6    Q.    That's the middle of your reports, right?

7    A.    Yes.

8    Q.    And this press release talks about record quarterly

9    Promacta revenue, correct?

10   A.    That's for GSK, yes.

11   Q.    And you know, because you understood it at the time --

12   right? -- that Ligand gets a royalty.  So if Promacta has

13   record sales at GSK, then the percentage that Ligand gets,

14   that's probably a record too, isn't it?

15   A.    Yeah, but that's just one part of their earnings.  Their

16   earnings actually declined 76 percent.

17   Q.    Father, I'm asking you about the record -- you didn't put

18   out anywhere that, Hey, I said a few weeks ago that Promacta is

19   going away but, actually, there's record sales.  You didn't put

20   that anywhere, did you?

21   A.    That didn't prevent the company from having a huge

22   collapse in earnings.

23             THE COURT:  Yes or no.  Did you disclose this revenue

24   in any of your reports?

25             THE WITNESS:  I don't think I did.  I disclosed their

1    overall earnings for that quarter, which had collapsed 76

2    percent.

3    Q.    Father, you put out a thesis that said Promacta was going

4    away.  Promacta has a record quarter.  You say nothing.  Right?

5    That's the sequence?

6    A.    Actually, what I said in the reports was we could project

7    Promacta sales growing through the end of 2015 and that we

8    could model that, what that revenue would look like, an

9    increase.

10   Q.    So Promacta was not going away?  Which was it, Father?

11   Was Promacta going away or was Promacta not going away?

12   A.    So definitely going to go away, going to go to zero.  But

13   we actually modeled an increase in Promacta sales through the

14   end of 2015.

15   Q.    You had a model?

16   A.    Yes.

17   Q.    You had a mathematical model?

18   A.    We forecast what would that look like, the value of the

19   shares, assuming growth in sales of Promacta.

20   Q.    Who's "we," Father?

21   A.    Lemelson Capital Management.  Well, I have an editor and I

22   have some other people helping me.

23   Q.    You said you were doing all the investing for Lemelson

24   Capital Management, right?

25   A.    I was making the decisions, yes.

1    Q.    You said that you covered on August 22, 2014, correct?

2    A.    Part of the shares, yes.

3    Q.    Right.  Part of the shares.  And you said the reason was

4    that it was exhausting and the company had come out with a

5    flurry of press releases, and you couldn't counter them all, so

6    you covered, right?

7    A.    Well, it was an elaborate stock promotion, yes.

8    Q.    Father, I'm just asking you, was your motivation for

9    covering what you said, which is the company was putting out a

10   lot of press releases and you couldn't compete with them all?

11   A.    No, not the press releases.  It was an entire machine,

12   really, of investment bankers, sell-side analysts, insiders who

13   were constantly putting out false information to hide their

14   losses, to hide the decline in earnings.

15   Q.    When you said -- when your lawyer said all those questions

16   about, oh, Ligand never put out any information to counter

17   these reports, they could have, but they didn't, your reason

18   for covering was that they were putting out information, right?

19          MR. BROOKS:  Objection.  Mischaracterizes.

20          THE COURT:  It's getting late and I just missed the

21   whole thing.

22   Q.    Your Honor, let's go on to the next question here.

23          Let me end with this, Father:  In June of 2014, you

24   said you were a small fund, right?

25   A.    Yes.

1   Q.   But you were expecting to grow quite a bit, didn't you?

2   A.   Yes.

3   Q.   In fact, you emailed and you said that you thought you

4   were going to get many more subscribers, correct?

5   A.   Something like that.

6   Q.   All right.

7   A.   I'd have to see the exact email.

8   Q.   In fact, you were getting introduced to money managers who

9   might want to invest in The Amvona Fund, right?

10  A.   We had been contacted often.

11  Q.   Right.  And that very week that you went on the Benzinga

12  radio show, you got contacted by -- you were going to have an

13  introduction to Atlantic Trust Private Wealth Management,

14  right?

15  A.   I don't recall.

16  Q.   Let's put up Exhibit 184, please, page 4.  And this was

17  talking about, "Hey, Father Emmanuel, I hope you are having a

18  nice week.  Atlantic Trust would like to learn more about The

19  Amvona Fund."  Right?  See that, sir?

20  A.   Yes.

21  Q.   And, in fact, the Atlantic Trust Fund is apparently a 20-

22  billion-dollar fund -- right? -- a 20-billion-dollar AUM.  That

23  means assets under management, right?

24  A.   Yes.

25  Q.   If we go to page 14 of this document, this is another one,

1    the Spring Mountain Fund -- right? -- down at the bottom of the

2    page?  You're getting an introduction to them as well?

3    A.    Yes, it appears that way.  I didn't see they sent the

4    email, though.

5    Q.    And if we could flip to the next page, they have 600

6    million dollars in assets, right?

7    A.    It appears that way, yes.

8    Q.    Right.  And you were also talking at that time to a

9    company called Race Rock Capital, correct?

10   A.    Yes.

11   Q.    And they make introductions to other money managers for

12   funds like yours?

13   A.    I'm sorry.  I know Race Rock Capital.  I don't know if I

14   was talking to them at that time.

15   Q.    Well, let's look at Exhibit 194.  Here's you talking to

16   Rich Bartels at Race Rock Capital, right?

17   A.    Yes.

18   Q.    And you tell him, when he asks you how big the fund is,

19   that it's 16 to 17 million dollars this month but it's likely

20   to jump next month.  Do you see that, sir?

21   A.    Yes.

22   Q.    And you say "expecting many new subs" subscribers, right?

23   A.    Yes.

24   Q.    So you tell Rich Bartels at Race Rock Capital that you're

25   expecting to get many new subscribers, correct?

```
 1   A.   Yes.

 2   Q.   And that's next month, right?

 3   A.   Yes.

 4   Q.   Because you had just put out your Ligand report there,

 5   right?

 6   A.   I don't think it was because of the Ligand report.

 7   Q.   Well, it's the day before you put out the Ligand report,

 8   right?

 9   A.   No.  Those subs usually contact us months in advance.

10   Q.   Well, you don't have them signed up, do you?

11   A.   Typically it takes months.

12           THE COURT:  How are we doing timewise?

13           MR. JONES:  We're going to finish, Your Honor.

14           THE COURT:  Yeah, I know, but I have to give them

15   time.

16           MR. JONES:  We're not going to finish in time for

17   that, Your Honor.

18   Q.   So you were expecting that your fund was going to grow a

19   lot during the time period that you were writing about Ligand,

20   didn't you, Father?

21   A.   Well, we were growing a lot before that.  We grew every

22   month almost.

23   Q.   So you're at 17 million.

24           MR. JONES:  Let's hear clip CLO1.  This is Exhibit

25   146.
```

```
 1              (Audio played.)
 2              MR. JONES:  All right.  Can we have clip 2 of Exhibit
 3     146 as well.
 4              (Audio played.)
 5     Q.   Okay.  So this is your September interview on Benzinga,
 6     right?
 7     A.   If you say so.  I don't see a date.
 8     Q.   September -- it's actually September 16, 2014 --
 9     A.   Oh, yes.
10     Q.   -- you were on the Benzinga show, right?
11     A.   Yes.
12     Q.   And you tell the host that more than a hundred people are
13     expressing interest in the fund, right?
14     A.   Yes.
15     Q.   And that's sort of -- you've been writing your reports.
16     You wrote your five reports.  And now you're on the Benzinga
17     show, and you say a hundred people have been expressing
18     interest in the fund, right?
19     A.   I think we posted 70 reports by that time, approximately.
20     Q.   All right.  You had written five about the Ligand short,
21     right?
22     A.   Yes, by that time five were on Ligand.
23     Q.   Right.  And you say it takes several months for people to
24     come to fruition in the fund, right?
25     A.   Typically.
```

1    Q.    So a hundred people during those three months that you're

2    writing the reports are interested in you, right?

3    A.    No.  I think that's a mischaracterization.

4    Q.    You said a hundred people were interested in joining the

5    fund, right, that's what you said on the radio?

6    A.    I didn't say during those three months, though.

7    Q.    But You said at that moment.  On September 16, you said,

8    "We've had more than a hundred people expressing interest in

9    the fund."  You also said you expected to get to 400 to 500

10   million in the next couple of years, right, Father?

11   A.    Yes.

12   Q.    And if you fell on your face with the Ligand investment,

13   you weren't going to get to 400 or 500 million, were you?

14         MR. BROOKS:  Objection.

15         THE COURT:  Sustained.

16   Q.    Father, do people sign up for funds that don't do well?

17         MR. BROOKS:  Objection.

18         THE COURT:  Sustained.

19   Q.    You didn't get the 400 to 500 million, did you?

20   A.    No.

21   Q.    But that's what you thought was going to happen at the

22   time, right?

23   A.    Yes.

24   Q.    And the major thing that you had going on in the three

25   months before this interview, this interview where you say,

```
 1   we're going to get 100 new people and we're going to get 400 to
 2   500 million dollars, was the Ligand short?
 3   A.   No.
 4          MR. JONES:  Nothing further, Your Honor.
 5          THE COURT:  Here's the thing:  You, of course, have an
 6   opportunity to recross, but the question is whether I do it
 7   tomorrow or -- I have another hearing in a few minutes.  So how
 8   long do you think you're going to be?
 9          MR. BROOKS:  Five.
10          THE COURT:  Five I'm willing to deal with, but I don't
11   want you to be rushed.  It's an important thing.  Do you want
12   to just wait until tomorrow morning?
13          MR. BROOKS:  That's fine, Your Honor.
14          THE COURT:  Okay.  That's what we'll do.
15          MR. JONES:  Thank you, Your Honor.
16          THE CLERK:  All rise.
17          THE COURT:  Wait.  I want to say something to the jury
18   first.  Just as a little report card on how we're doing.  We're
19   actually quite on time.  We will likely finish the evidence
20   tomorrow, short of Murphy's law if something goes wrong.  And
21   my thought is we'll go to -- we'll instruct and send this to
22   you potentially on Wednesday.  Now, even if this should slide,
23   something goes differently than we anticipated, whatever, it
24   will certainly go to you by Thursday.  As soon as we finish the
25   evidence tomorrow, if we do, I'll send you home because we need
```

```
 1   to talk about things like jury instructions and stuff.  But
 2   it's possible it will go another day.  I don't want to get your
 3   hopes up, but it's certainly on time and we expect you'll get
 4   it no later than Thursday.  So anything can go wrong.  We could
 5   have another nor'easter, whatever, things go wrong.  But I'm
 6   hoping that that's the timeline that we're talking about.  You
 7   may finish a little early tomorrow.  Okay.  Thank you.
 8            MR. JONES:  Thank you, Your Honor.
 9            MR. BROOKS:  Thank you, Your Honor.
10            THE CLERK:  All rise.
11   (Jury exits.)
12            THE COURT:  I have a question before I let you go --
13            MR. JONES:  Yes, Your Honor.
14            THE COURT:  -- because it took me by surprise.
15            Is there a standard in the Office of the Comptroller
16   of the Currency on insolvency?
17            MR. JONES:  Your Honor, the Office of the Comptroller
18   of the Currency regulates banks.  They do stress testing of
19   banks, and they can sometimes use this, but not to analyze
20   securities or analyze insolvency.  It's about bank stress
21   testing.
22            THE COURT:  I see.  So you're saying it's not a
23   relevant standard?
24            MR. JONES:  No, Your Honor.
25            THE COURT:  Because there are no intangibles in a
```

1    bank?

2            MR. JONES:  I'd have to think about that.

3            It's for a different question, Your Honor.  It's not

4    about insolvency of anything.  It's about a bank and its

5    stresses.

6            THE COURT:  I thought you would touch on that and you

7    didn't.  But in any event --

8            MR. JONES:  The time was short, Your Honor.

9            THE COURT:  The time was short but it was mentioned

10   maybe three times.  But anyway, just it was a new one for me,

11   let's just put it that way.  I don't remember it being

12   discussed.

13           MR. JONES:  Anywhere before, yeah.

14           THE COURT:  There's been a lot of briefing.

15           MR. JONES:  There was some pretty good web surfing

16   there during that testimony to try to figure out where we were

17   going with this because we hadn't heard about it before.

18           THE COURT:  So you were as well.  I couldn't find it.

19   Anyway, that's fine.  See you tomorrow morning.

20           MR. JONES:  Thank you.

21           MR. BROOKS:  Thank you, Your Honor.

22   (Proceedings adjourned at 4:03 p.m.)

23

24

25

1                C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS    )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken November 1, 2021 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    1/6/22

16

17   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
18

19

20

21

22

23

24

25