1               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

3   SECURITIES AND EXCHANGE COMMISSION,   )
                      Plaintiff,          )
4                                         )
    vs.                                   )
5                                         )
    GREGORY LEMELSON and LEMELSON         )   NO. 18CV11926-PBS
6   CAPITAL MANAGEMENT, LLC,              )
                      Defendants,         )
7   and                                   )
                                          )
8   THE AMVONA FUND, L.P.,                )
                      Relief Defendant.   )
9

10

11

12          BEFORE THE HONORABLE PATTI B. SARIS
             UNITED STATES DISTRICT COURT JUDGE
                    JURY TRIAL - DAY 7
13

14

15

16      John Joseph Moakley United States Courthouse
                    Courtroom No. 19
                   One Courthouse Way
17              Boston, Massachusetts 02210

18

19                  November 3, 2021
                       8:50 a.m.
20

21

22          Kathleen Mullen Silva, RPR, CRR
                 Official Court Reporter
        John Joseph Moakley United States Courthouse
23             One Courthouse Way, Room 7209
                Boston, Massachusetts 02210
24           E-mail: kathysilva@verizon.net

25      Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2
             United States Securities and Exchange Commission
 3           Alfred A. Day, Esq.
             Marc J. Jones, Esq.
 4           33 Arch Street, 23rd Floor
             Boston, Massachusetts 02110-1424
 5           617.573.4590
             for Plaintiff
 6

 7
             Libby Hoopes, P.C.
 8           Douglas S. Brooks, Esq.
             Thomas M. Hoopes, Esq.
 9           Brian J. Sullivan, Esq.
             399 Boylston Street, Suite 200
10           Boston, Massachusetts 02116
             617.338.9911
11           for Defendants Gregory Lemelson, Lemelson Capital
             Management, LLC, The Amvona Fund, LP
12

13

14                        E X H I B I T S

15

16
     Exhibit No.                                        For ID
17   A              Marked for identification..............    9

18   B              Marked for identification..............   10

19   C              Marked for identification..............   10

20   D              Marked into identification............   11

21   E              Marked for identification..............   90

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S
 2           THE COURT:  Let me go on the record for a second.
 3    Before I destroy a forest, I was going to make photocopies of
 4    the verdict form.  As I understand it from my law clerk, nobody
 5    has any objection to the form of the verdict.
 6           MR. JONES:  That's right, Your Honor, we are content.
 7           THE COURT:  Let me get Lisa because I'd like to hand
 8    out the verdict forms before you do the closings, as I
 9    mentioned yesterday.
10           I understand that there were -- I never got anything
11    from the SEC last night, or at least we think we didn't, on
12    whatever that release was.  So we did the best we could with
13    Steadman, the Supreme Court case, and I've divided it out into
14    two separate questions so that the legal issue will be
15    preserved, and we can duke it out afterwards depending on how
16    the jury answers these questions.  Okay?
17           So you may notice -- it's the only thing that's of any
18    substantive change at all.  Under the negligence you still have
19    to prove that the effect was deceptive, manipulative or
20    whatever.  We got it right out of Steadman.  Since I think we
21    didn't late last night give you a red-lined version, that's
22    probably the area that I worked through there.
23           There's an issue you have for me.
24           MR. DAY:  Yes, Your Honor.  New exhibits that we were
25    alerted to last night sometime between 8:30 and 9:00, I think.
</pre>

1    There are four of them.

2            THE COURT:  New exhibits?

3            MR. BROOKS:  No, no.  No, no, no.  And we explained

4    that very carefully last night, that they're not new exhibits,

5    they're demonstratives, which are very different things

6    legally.

7            MR. DAY:  Your Honor, I respectfully disagree with

8    that characterization.  This is new evidence.  The underlying

9    documents --

10           THE COURT:  You can't pop this on them.  Is this based

11   on underlying data?

12           MR. BROOKS:  Yes.  These are all based on exhibits

13   already in and in direct response to the document that we

14   argued about yesterday, which is the exhibit that the SEC is

15   using with their summary witness that we didn't get to

16   cross-examine.

17           THE COURT:  I know, but it's a little hard for them to

18   cross-check you in, like, ten seconds.

19           MR. HOOPES:  Judge, can I just step in twice here.

20   Okay?

21           We got at 11:00 at night, we got their Voss

22   translation of his notes.  You had been all throughout the

23   trial from the beginning -- I got my instructions from

24   MaryEllen.  We were trying to work things out.  I never

25   objected to that, even though I didn't get a chance to

1   cross-check it because --

2          THE COURT:  I know, but this is the --

3          THE HOOPES:  And the pulled -- the second piece that

4   they pulled was they pulled the witness, the basis that was the

5   basis for Exhibit 8, on Sunday night.  We had agreed based on

6   that representation.  So we are defenseless, having tried to

7   follow your instructions, which is to be fair.  Now they're

8   coming in and trying to claim that we can't do it.

9          THE COURT:  I have no problem with the chalks.  I just

10  want to give them a chance to cross-check them as to whether

11  it's true or not.  When did you get these?

12         MR. JONES:  10:00 last night.

13         MR. HOOPES:  Which is three hours earlier than they

14  gave me.

15         THE COURT:  I know.  But these are the closings.  This

16  is the last word.  So I'm trying to figure out -- for sure I

17  will allow in everything like the Empire and Yellen report and

18  all that stuff.  That's fair game.

19         So then the question is the difference between the

20  price shares -- is that not true?  Do you have a reason to

21  believe any of it is false?

22         MR. DAY:  Your Honor, this is irrelevant.  It relates

23  to a period that's not when the statements were made.  This is

24  the beginning -- well, March through May of 2014.

25         MR. HOOPES:  They've opened up the entire universe

```
 1   here.
 2            THE COURT:  Excuse me.  I don't even understand this.
 3   I haven't even ever seen them.  So let me see it.
 4            MR. HOOPES:  I'm sorry.
 5            THE COURT:  It looks like it goes from June 16 to
 6   October 16 in 2014.  What's wrong with that?  Am I looking at
 7   the right thing?
 8            MR. DAY:  Sorry, we're talking about two different
 9   things.  This chart is the March through May.  This one --
10            THE COURT:  Excuse me.  I have here certain bar graphs
11   that seem to correctly and not prejudicially reflect different
12   issues, like when the Yellen report was and when the Empire
13   report was and where the stock shares were priced at, which
14   should be either -- should be objectively true or not true.
15            MR. DAY:  Your Honor, a couple things about this.  We
16   have not had an opportunity to check these percentages, but
17   more fundamentally, Yellen and the two Empire reports, there's
18   been zero evidence about when those came out and how they were
19   distributed, whether anybody saw the Empire reports.
20            THE COURT:  That is absolutely incorrect about the
21   Empire report.  I have an exhibit on it.  It's part of our
22   exhibit base as to the Empire report.  I do agree that there's
23   no specific evidence about the Yellen statement, but there's a
24   general time period.  There's a --
25            MR. JONES:  The general time period, Your Honor, is
```

1   just the summer sometime, sometime in July.

2            MR. HOOPES:  There's an email --

3            MR. BROOKS:  And Higgins testified about it --

4            (Crosstalk.  Court reporter interrupts.)

5            THE COURT:  I'm just saying that I have never seen

6   this.  They have only seen it as of 8:00 last night.  I do

7   agree that they pulled their summary witness at the last

8   minute, and I'm going to try and let you make up for that but

9   only with things that are already in evidence or objectively

10  true.

11           So let me just start with -- -- I have four pieces of

12  paper in front of me.  Multiple pieces -- four pieces of paper

13  in front of me.  So can we go through them one by one?  I have

14  a whole jury waiting out there, and I didn't plan on doing this

15  at the last minute since I was --

16           So the first one looks like a bar graph on different

17  time periods between June 16, 2014 and October 16, 2014.  This

18  is a chalk.  It will not be going to the jury.  Do we have

19  reasons to believe that this is wrong objectively?

20           MR. DAY:  Your Honor, on the Empire reports, I may

21  have misspoken to some degree.  But the point is --

22           THE COURT:  Excuse me.  Are you looking at the same

23  thing I'm looking at?

24           MR. DAY:  I think so, yeah.

25           THE COURT:  No, you're not.

```
 1          MR. DAY:  Sorry.  This one.  Yeah, I mean, we haven't
 2   had a chance to check the percentages.  We also withdrew a
 3   bunch of our exhibits yesterday thinking this wasn't going to
 4   be an issue to touch on --
 5          THE COURT:  I just want to know who did this?
 6          MR. SULLIVAN:  We assembled the data.  This is all
 7   from --
 8          THE COURT:  Who's the "we," the lawyers?
 9          MR. SULLIVAN:  Yes.
10          THE COURT:  And it says, "Plus one percent."  From
11   what?
12          MR. SULLIVAN:  So it's explained on the graph, if you
13   see the star.  The percentage change was calculated by
14   comparing the close-of-day trading price on the day the
15   statements were made with the close-of-day trading price for
16   the previous trading day.  And all the stock data is in as
17   Exhibit 96.
18          THE COURT:  It's all in Exhibit 96?
19          MR. SULLIVAN:  Yes, Your Honor.
20          THE COURT:  It's just a summary of what's already in
21   an exhibit.  I understand you've put in your -- that's fine.
22   I'm going to allow that in.  If the underlying data is in and
23   it's just a chalk, I'm going to allow that in.
24          The next one has to do with the Yellen report and the
25   Empire report.
```

```
 1              MR. DAY:  This one with the three bars?

 2              THE COURT:  Yes.  None of these are marked.  So why

 3     don't we just say -- the last one, MaryEllen, is A for

 4     identification.

 5              THE CLERK:  So this is a Ligand stock price change,

 6     nine days of public statement in 2014.  That's A.

 7              (A marked for identification.)

 8              THE COURT:  Ligand stock price comparison, and this is

 9     the one that has references to the Empire report, which is fair

10     game.  But now you're saying there was no evidence about when

11     the Yellen report came in?

12              MR. DAY:  Sorry.  Well, I don't think there was

13     evidence on Yellen, but on the Empire reports we have reports

14     with the date on them.  We have no testimony, no document

15     saying whether they were distributed to a soul on those dates.

16     We don't know.

17              THE COURT:  Let me just say I'm going to allow that.

18     When's the Yellen report?

19              MR. SULLIVAN:  It was July 15, 2014, and that's

20     Exhibit 159 that's already been agreed to on the record and the

21     date's right on it, Your Honor.

22              THE COURT:  Okay.

23              MR. DAY:  Is it the report itself --

24              MR. SULLIVAN:  Yeah.

25              MR. DAY:  -- or her statements?
```

```
 1          MR. SULLIVAN:  It's the report from the monetary
 2   policy report.
 3          THE COURT:  The issue that other reports came out
 4   simultaneously has been a defense all along.  It's not a
 5   surprise about Yellen or Empire.  So I'll allow that in
 6   numbered B.
 7          THE CLERK:  B?
 8          THE COURT:  Yes.
 9          THE CLERK:  All right.
10          (B marked for identification.)
11          THE COURT:  These are not for admissions, just chalks?
12          MR. BROOKS:  Just chalks.
13          THE COURT:  You have chalks too, right?
14          MR. DAY:  Yeah, but not the calculated stock prices
15   and summarized data.
16          THE COURT:  I understand.  But you pulled a summary
17   witness they were planning on crossing.  I allowed you to put
18   that summary in anyway.  So Empire and Yellen, I'll allow that
19   in.  That's C.
20          THE CLERK:  C.  Okay.
21          (C marked for identification.)
22          THE COURT:  Now, this is the one I'm not sure about.
23          MR. DAY:  This one?
24          THE COURT:  The thing that starts in March of 2014 and
25   goes to May 9, 2014.  Is the underlying data in evidence?
```

```
 1              MR. BROOKS:  Yes, it is.  Exhibit 96.

 2              MR. SULLIVAN:  96.

 3              THE COURT:  It goes back to March of 2014.

 4              MR. BROOKS:  So the point is they're showing a graph

 5     of what happened during the time that Father Lemelson was

 6     making his reports.  We think it's very relevant to show a

 7     graph that is almost identical from the three months before.

 8     This is what happens with their stock.  So this is just --

 9              THE COURT:  That it's volatile.

10              MR. BROOKS:  Yeah.  It fell three months before.  In

11     fact, it fell more but it kind of almost takes an eerily

12     similar shape.

13              So they're going to obviously try to have the jury

14     infer that, oh, Father Lemelson caused this.  But three months

15     before, before anyone had heard of Father Lemelson, the exact

16     same thing happened with the stock.

17              THE COURT:  Is that underlying data in evidence?

18              MR. DAY:  I believe so.

19              THE COURT:  Okay.  I'll allow it.

20              THE CLERK:  That would be D.

21              (D marked into identification.)

22              THE COURT:  But not for introduction, just as chalks.

23              THE CLERK:  And that's the Ligand historical stock

24     prices.

25              THE COURT:  Why are you objecting to their chalk?
```

```
 1              THE CLERK:  That was my mistake.  I reversed it.  I'm
 2    sorry.  I reversed it.
 3              THE COURT:  All right.  So we're going to be -- is the
 4    jury here yet?
 5              THE CLERK:  I think so.  Clary is checking.
 6              THE COURT:  We'll hand out the verdict form.  We'll
 7    have the openings.  I believe -- is JERS working now?
 8              THE CLERK:  No.  It crashed.  Chris remoted in with
 9    me.  We did it.  We did a test run Monday night.  It worked
10    beautifully.  It crashed this morning, the whole system.  Chris
11    is trying to take care of it.
12              THE COURT:  Let me just say this has not been a good
13    technology -- if JERS, which is our disk situation, is not
14    working we are nonetheless going to be handing in the paper.  I
15    would like, because there's one unvaccinated juror, I would
16    like to still keep them in that big courtroom.  I think that's
17    safer for them.  JERS works in our normal jury room but we
18    think we can get it to work over there.  We hope.
19              THE CLERK:  We hope.  It should work, Judge.  It
20    worked Monday night.  I sent it over there.  It worked.  It
21    just crashed this morning because there's 238 exhibits, and
22    it's audio, and it just --
23              THE COURT:  It will be interesting to find out how
24    this courthouse -- we're now flooded with trials.  And we
25    pretty much are not excluding unvaccinated people.  So it's
```

```
1    going to be an interesting challenge for us to get all the
2    tech. out of the jury room and into adjacent courtrooms, but
3    you are pioneers, so.
4         MR. JONES:  Lucky us.  Lucky MaryEllen also.
5         THE CLERK:  The paper goes back in general anyway in
6    case it crashes while they're in there.  So they'll always have
7    the binders with them in case in crashes in there.
8         THE COURT:  The one thing I want to warn you about is
9    what I don't like doing is breaking up someone's closing
10   statements.  So you'll go first for an hour, and you'll go
11   second for an hour.  But if you start going over an hour, I'm
12   going to give you the hook simply because otherwise they're not
13   really listening to the second statement because it's going
14   into the break, and it's unfair to the court reporter, et
15   cetera.  So I'm going to do an hour, an hour, break, and then
16   we'll do the charge.  And then you all can leave here and have
17   a lovely lunch.  We have a lunch order, right?
18        THE CLERK:  I put in lunch for 1:00.
19        THE COURT:  Okay.  Lunch for 1:00.
20        THE CLERK:  There should be a court officer up here.
21        THE COURT:  I assume you won't wear your masks when
22   you're giving the closings.
23        MR. JONES:  Yes, Your Honor.
24        MR. BROOKS:  Yes, no mask.
25        (Discussion held off the record.)
```

1          THE CLERK:  All rise for the jury.

2     (Jury enters.)

3          THE COURT:  Good morning to everyone.  I'm always

4     impressed how timely you all are.

5          Let me just say, did anyone do any research on this

6     case, see anything in the press, talk to anybody?  All right.

7     I find the jury has complied.

8          We've put on each of your chairs -- I hope you got

9     one.  I hope that's worked -- a verdict form, and I make it a

10    practice to give you -- we worked all yesterday on this -- for

11    you to see the questions that the attorneys have and which

12    you'll be expected to answer.  And so why don't you sit down

13    and read them.  You can take notes on them but at the end of

14    the day, there will only be one official verdict form.  So why

15    don't you be seated and read it first, just a couple of

16    minutes, and look up when you're done.  Then we will have the

17    closing arguments.  It will begin with the defendant, the

18    defendant Father Lemelson, and then go to the SEC.  And then

19    we'll take a break, and then we'll have the jury charge.

20    (Pause.)

21         All right.  I want to remind you these closing

22    arguments are not evidence.  They're the opportunity of the

23    attorneys to sum up the evidence based on their memory, but

24    your memory controls.  There's a general practice that people

25    don't object during the other side's closing arguments.

```
 1    Sometimes they do, but it's rare.  But it doesn't mean they
 2    agree with the other side.  You can be confident that they
 3    disagree with much of what the other side is saying, but it is
 4    not evidence.  So who's going to be going?
 5              MR. BROOKS:  Thank you.  May it please the court, Your
 6    Honor.
 7              THE COURT:  All right.
 8              MR. BROOKS:  Members of the jury, good morning.
 9              THE COURT:  Wait a minute.  Let's get that mic next to
10    you.  It's not usually a problem to hear you, but I think we
11    need to make sure that everyone can hear.
12              MR. BROOKS:  Okay.  Hopefully everyone can hear now.
13              THE COURT:  Much better.
14              MR. BROOKS:  All right.  Let me start over.  That was
15    not the start I was looking for, but.
16              Members of the jury, good morning.
17              JURORS:  Good morning.
18              MR. BROOKS:  I want to start by thanking you.  Thank
19    you very much for your service over this past week plus.  You
20    serve a very important role, and I want to thank you on behalf
21    of Father Lemelson and all of my colleagues.  As you might
22    imagine, this matter is more than important to Father Lemelson.
23    And I think the best way I can try to thank you is to make my
24    closing argument as clear and organized as possible.  I make no
25    promises, but I will do my best.
```

1          You as a jury serve a critically important role here.

2     You know, you may not be an executive at a billion-dollar

3     pharmaceutical company.  You may not be a big-wig at an

4     investor relations firm.  You may not be a scientist like some

5     of the SEC witnesses we heard.  But you all bring something

6     very important to the table and that's your common sense.

7          And the first area I'm going to ask that you use your

8     common sense involves the key question in this case: Fraud.

9     Were the four challenged statements fraud?  Were they

10    intentional lies, or did Father Lemelson say them in good

11    faith?  Not necessarily question always of right and wrong.  An

12    opinion can be right or wrong.  People can be right or wrong.

13    But were they fraud?  Were they lies?  Did Father Lemelson

14    knowingly lie to drive down the stock price of Ligand?  Now,

15    one thing I do want -- I'm not saying this happened, but it's

16    not illegal to want or hope or even to drive the stock price of

17    a company down.  It's illegal to lie in order to do it.

18          Now, before we get into that, there is one other

19    theory I want to discuss, and it's in your -- it's in the

20    verdict form that you just read today.  Specifically it starts

21    with number 3, but the key part is number 4.  And it's a claim

22    under the Advisers Act.  And if you were a little confused by

23    it in terms of what it says about negligence, you wouldn't be

24    alone, because it's really the first you would have heard of

25    this.

1           The SEC did not mention this at all in its opening.
2     This is the theory based on negligence.  During the opening --
3     we went back and counted -- the SEC mentioned lies or fraud,
4     claiming Father Lemelson lied or committed fraud, 34 times.
5     The word "negligence" did not come out of the SEC's mouth even
6     once.  So I want to be clear what this claim is.  This claim is
7     very different from the other.  This negligence claim doesn't
8     relate to Ligand stock or investors in Ligand.  This theory is
9     that Father Lemelson misled his own investors or prospective
10    investors, and that's what the SEC I anticipate will argue to
11    you when I'm done.

12          What did we hear about this at trial?  We did not
13    hear -- we did not hear a single witness -- did we? -- who was
14    a prospective investor of Father Lemelson.  Don't you think if
15    a prospective investor of Father Lemelson was misled by Father
16    Lemelson, that the SEC would have called that person as a
17    witness and said, oh, yeah, I got those reports.  Oh, I feel so
18    far misled.  That didn't happen.  And we only heard from one
19    investor.  Right?  And who was that?  Dr. Nicholas Jabbour.  He
20    testified yesterday.  Did he sound to you like he felt misled
21    by Father Lemelson?  He said the exact opposite.  Here's what
22    he said.  "We are close friends.  Father Lemelson made a lot of
23    money for me and didn't even charge me for the advice he gave."
24    Then he said, "He gave me the best advice to read The
25    Intelligent Investor.  I wish my kids would read that."  Does

1    that sound like an investor who was misled by Father Lemelson?

2          The bottom line is, you have heard absolutely zero

3    evidence that Father Lemelson misled his investors or

4    prospective investors and, therefore, I respectfully request

5    and I believe that the two -- the final two questions on that,

6    3 and 4, that's something that is brand-new in this case and

7    doesn't deserve a ton of attention.  So I'm going to move on to

8    what this case, we thought, was really about.

9          So with that new theory out of the way, let's turn to

10   what the SEC told you this case was about at the beginning, and

11   that's fraud.  But they presented no evidence of fraud.

12   There's no evidence that Father Lemelson didn't believe what he

13   said about Ligand.  Now, I feel confident, standing here today,

14   that nobody on the jury has ever committed fraud, but I think

15   we all have certain expectations of what we would think we

16   would see if somebody was committing fraud.  Right?  Common

17   sense tells us, well, what does fraud look like?  What are the

18   telltale signs when somebody's committing fraud?  So let's talk

19   about that.

20         Four is a very important number in this case.  There

21   are four challenged statements.  Ligand first, and then the SEC

22   and Ligand, have been looking for more than seven years.  And

23   all they could come up with were four challenged statements.

24   Let's put that in context, what you've seen.  Father Lemelson

25   wrote five reports on Ligand, 55 pages' worth, and he gave four

1   interviews on Benzinga, each about 20 minutes.  He made

2   hundreds, if not thousands, of statements and allegations about

3   Ligand.  And the SEC brought you here to discuss only four?

4   That's actually a huge overstatement when you think about it

5   because there's really only two statements about Ligand.

6   Right?  Two of the statements deal with Viking, which is a

7   completely separate company from Ligand.  So I think it's

8   really seven plus years, allegedly two false statements about

9   Ligand.  Does that sound to you like somebody with fraudulent

10  intent, somebody that went out with the intent to commit fraud?

11          Also, where's the motive?  What evidence have you seen

12  of a motive on Father Lemelson to lie?  Now, the SEC will

13  likely, I anticipate they'll come up here and explain to you,

14  well, Father Lemelson and his family had money invested.  They

15  were hoping to get more investors.  And his fund had leverage.

16  Remember that?  His fund had leverage.  So?  So what?  None of

17  that is unusual.  That's always the case.  And Ligand,

18  remember, was just one of 15 to 20 positions in his fund at the

19  time, both long and short.  There's no allegations that he

20  committed fraud before or after.

21          They also point to the fact that, oh, Father Lemelson,

22  he tried to get certain comments removed from Seeking Alpha.

23  But you heard Father Lemelson.  There were dozens and dozens of

24  negative comments he didn't try to have removed.  He only tried

25  to have the ones removed that he felt violated their policies.

1    There were literally dozens of articles up on Seeking Alpha
2    that were very negative to his report.  He didn't try to get
3    those removed.
4           The other thing you heard Father Lemelson say is back
5    in 2015, the SEC sent a subpoena to him for documents.  And
6    what did he do?  He literally turned over his entire hard drive
7    to the SEC, which would cover every email, every email he's
8    ever sent, every document he's ever had.  "Here, SEC, take it."
9    So, first of all, does that sound like somebody who thinks they
10   have something to hide?  But more than that, the SEC had all
11   that data.  If they had found even a shred of evidence, some
12   email which indicated, "Hey, I know what I'm doing.  I know
13   what I'm doing.  I'm going to lie to knock down Ligand's stock
14   price," don't you think they would have seen it?  And we didn't
15   seen anything like that in court this past week.
16          So the SEC wants you to believe that Father Lemelson
17   committed fraud over a two-month period, more than seven years
18   ago out of the blue for no real reason.  Does that add up?
19   Again, we ask that you use your common sense and say, "Does
20   that sounds like somebody who's a fraud?"
21          So what did happen?  What did happen?  Does it feel
22   like a fraud?  Well, again, what's rule number 1?  If you are
23   committing a fraud, I would think rule number one is you don't
24   get caught if you're doing it.  You have to do things secretly.
25   So Father Lemelson is sitting here in Massachusetts, according

1    to the SEC, and he's about to take on a billion-dollar

2    pharmaceutical company out in California.  So let's take a look

3    at his first report.

4            This is Exhibit 1.  This is his first report.  So is

5    he hiding in the shadows?  You know, I want to take down this

6    giant company's stock price.  No.  He puts his name right on

7    this report, Lemelson Capital Management.  If you were going to

8    commit a fraud, wouldn't you use a pseudonym or do something

9    anonymously?  He did the same thing on every report.  He put

10   his name on, or -- this is his good seal of approval.  He's not

11   hiding from anything.

12           So, okay, maybe you're thinking, maybe he's just not

13   really good at this fraud thing.  He forgot to hide who he was.

14   Well, he's at least going to, you know, kind of hide any bias

15   he has.  Well, no, wrong again.  The very first sentence in the

16   very first report he writes, he discloses to everyone, Lemelson

17   Capital, his company, is short shares of Ligand

18   Pharmaceuticals.  So what he's doing?  He's letting everyone in

19   the world who's going to see this know that he has a dog in the

20   fight.  So anybody looking this can take it with a grain of

21   salt, understanding, wait a minute, this guy is saying bad

22   things about Ligand but he's telling us that if he's right and

23   things go down, well, he's going to make some money.  So

24   anybody can judge it from that lens.  And he does the same

25   thing on every other report.  Does that sound like somebody

1    who's committing fraud to you?

2           Still, after the first report, Father Lemelson

3    testified the price dropped June 16, 2014.  Remember, the first

4    report comes out, price drops, you know, fairly significantly.

5    Mission accomplished, right?  This was the plan.  According to

6    the SEC, this was the plan.  He's going to publish the negative

7    things about Ligand and the stock price is going to drop

8    because he has a short position.  What would a fraudster do

9    under those circumstances?  Well, they'd quickly cover the

10   short position.  Right?  They'd make the profit before those

11   sell-side analysts -- remember, we heard all about these

12   sell-side analysts.  They come out and they start writing

13   positive things about the company.  So if you're committing a

14   fraud and you write a negative report, don't you want to cover

15   immediately?  Because once you don't, that's going to allow

16   time for the sell-side analysts to come out and start pumping

17   up the company.

18          So what does Father Lemelson do?  Does he take his

19   profit, which he could have taken?  You heard him say he could

20   have taken a sizeable profit that day.  No.  Does he cover his

21   short position?  No, he doesn't cover a single share of that

22   short position on June 16, 2014.  Again, does that sounds like

23   fraud to you?

24          There's more.  So this first report, first report, 25

25   pages' worth, if you're going to commit a fraud -- right? -- I

1    would think your opening salvo is pretty important.  Right?

2    You're going to come out and you're going to hit them hard and

3    your report is going to be chock full of lies if you're trying

4    to cause, fraudulently cause the stock price to drop.  But

5    there's exactly zero -- zero challenged statements in this

6    first report.  Twenty-five pages, the first salvo, the first

7    shot fired and there are zero challenged statements in this

8    report.

9            Finally, you know, what goes along with fraud?  I

10   mean, I would think it's typically greed.  Have you heard any

11   evidence that that fits Father Lemelson, that there's any

12   greed, any motive here that he's greedy or anything like that?

13   There's a complete absence of that.  I think it seems fair to

14   say here that there are none of the hallmarks that we would

15   expect if this was a fraud.

16           So let's talk a little bit more specifically now about

17   the four challenged statements because ultimately your job is

18   to determine if the four challenged statements are fraud, if

19   they're knowing lies.  So Judge Saris, after I'm done speaking

20   and the SEC is done speaking, Judge Saris will instruct you on

21   the law, and at the risk of stating the obvious, her words

22   control, not mine.  But let's talk big picture here.  Let's try

23   to do it in sort of laymen's terms.

24           First, the statement has to be false or misleading.

25   Okay?  Second, it needs to be material.  What does that mean?

```
 1    That means it's important.  It means would an investor really
 2    care about this?  Is this important to my decision to invest,
 3    not invest, pull my money out, or whatever.  Third is scienter,
 4    and that's a fancy Latin word that us lawyers learned in law
 5    school and throw around the courtroom, but what it means is
 6    intent.  This is the bad stuff.  This means whatever happened,
 7    it wasn't a mistake.  This meant that somebody meant to do it,
 8    that Father Lemelson intended to defraud.  Again, it's not
 9    fraudulent to try to drive down the price, whatever you think
10    of that.  That's okay.  It's only fraudulent if you lie to do
11    it.
12            In addition to those elements of the fraud that I just
13    talked about, you will hear about two very critical defenses.
14    So the first is good faith.  Good faith is an absolute defense.
15    What that means is if you decide that Father Lemelson made
16    these four statements -- again, right, wrong, opinion, you
17    can't tell -- but that he made these in good faith, that he
18    believed them, then there's no fraud here and that he's not
19    liable.
20            The second important defense that Judge Saris will
21    talk about is the First Amendment, and I think you probably
22    have all heard of the First Amendment and there's a reason it's
23    first.  It's because it's the most important one.  It's because
24    we have in this country freedom of speech.  We're allowed to
25    say things.  We don't get punished in this country for just
```

```
 1    saying things.  And there's nothing wrong in this country with
 2    having a free and open debate.  And Judge Saris will instruct
 3    you on this, and I specifically would call your attention, when
 4    you're listening to her about the First Amendment, that the
 5    last piece she's going to give you on that talks about that if
 6    you disclose -- that statements are protected by the First
 7    Amendment if you disclose your sources.  So you're not -- you
 8    know, if you're out there pretending you have information that
 9    other people don't have, that's a problem.  But if you're
10    explaining where your conclusions come from, that fits squarely
11    in the First Amendment.
12              So let's talk about the four challenged statements.
13    Okay.  The first statement, that Mr. Voss agreed Promacta was
14    going away.  So first Father Lemelson's notes.  Okay?  Father
15    Lemelson took his notes, typed them up immediately after the
16    call.  That's undisputed.  There's no dispute about that.  He
17    has a 20-minute call with Mr. Voss, and when he's done with
18    that call he does his best to type everything up, a page and a
19    half.
20              On June 18, 2014, do you really think Father Lemelson
21    had any idea that on November 3, 2021 he would be sitting here?
22    He didn't have any motive to lie in those notes.  That was his
23    best recollection at the time and he was typing them and that's
24    what he heard.  He wasn't trying to doctor anything.  In fact,
25    the SEC points to the fact that those notes aren't really one-
```

```
 1   sided.  It's not like he's typing something up just to make him
 2   look good.  In fact, what the notes show is that Mr. Voss
 3   agreed with him on Promacta but disagreed with him on
 4   everything else.  There's simply no motive to put anything in
 5   those notes unless Mr. Voss said it because he would never
 6   think he would need that again.  Those notes were taken in good
 7   faith.
 8         Now, you've had a chance to listen to the entire
 9   interview.  We heard the entire Benzinga interview.  The SEC
10   didn't play the whole interview.  They just played that tiny
11   snippet.  But that interview that we all heard was 21 minutes
12   long.  Ligand's not even mentioned until the end.  And the
13   thing he said about Mr. Voss was one of many things he said
14   about Ligand.  It took about two seconds.  He said it quickly.
15   He didn't dwell on it.  And there was absolutely no follow-up.
16   It wasn't the first thing he said about Ligand and it wasn't
17   the last thing he said about Ligand.
18         Now, you heard it.  Did that really sound -- when you
19   heard that, in the context of the whole interview, did that
20   really sound to you like Father Lemelson had fraudulent intent
21   when he put in those couple of words in the context of a
22   21-minute conversation about like ten different topics?  It
23   didn't really seem like a big deal at the time, did it?  I know
24   the interviewer didn't think it was a big deal because he
25   didn't follow up on it at all.
```

1          But it was a big deal to Mr. Higgins, wasn't it?

2    Because Mr. Higgins, he's making millions of dollars a year and

3    we see, saw his own words, transforming his pharmaceutical

4    company into what?  Into a performance-driven story on Wall

5    Street.  That's big bucks.  So John Higgins needs to stamp out

6    any threat regardless of how small.  Father Lemelson needs to

7    be silenced.  Those are his words.

8          So put yourself in Mr. Voss's position.  You've got a

9    boss who is angry because he heard that Father Lemelson said

10   that you just agreed with him about Promacta.  If you were in

11   Mr. Voss's position and you had truly been falsely accused of

12   that, what would you do?  What would you say?  Wouldn't you

13   issue a strong denial?  "I never said that.  That's

14   ridiculous."  Now, in fairness, that's what Mr. Voss told you

15   last week sitting here more than seven years later.  "Oh, I

16   never said -- that's ridiculous.  I never said that."  But

17   that's not what he said then.

18         Now, Mr. Higgins kind of ran from this a little bit.

19   You might remember during his testimony, but Mr. Hoopes pulled

20   out his deposition testimony and showed him, you know what,

21   Mr. Higgins, you spoke to Mr. Voss right after the Benzinga

22   interview.  Right?  And then you might have even spoken to him

23   more, and then there were some emails.  So there's at least one

24   phone conversation and there's a bunch of emails.  And this is

25   Mr. Voss in realtime, not with the benefit of having been

1    prepped by lawyers.  Right?  This is him in realtime telling

2    his boss effectively what happened on those calls.

3         What's Mr. Higgins's -- what's his response?  His

4    response isn't like, oh, I guess Father Lemelson's lying then,

5    don't worry about it, Bruce.  He's angry.  He's angry.  And his

6    conclusion, from whatever Mr. Voss told him -- and, of course,

7    we don't know exactly because we weren't on the phone -- is

8    that you did, in fact, agree, tacit agreement.  Why did you

9    leave him with a tacit agreement?  And by the way, this is

10   after Mr. Voss has already talked to him a couple of times and

11   knows that Mr. Higgins is pissed off.  So I think it's fair to

12   assume that Mr. Voss tried to put his best spin on it.  So

13   maybe it's a little stronger than even a tacit agreement.

14   Right?  That's not even the end of the story.

15        So Mr. Voss has had a number of conversations with

16   Mr. Higgins, and Higgins is angry.  How can you leave him with

17   an agreement?  That's crazy.  What's Mr. Voss's -- what's his

18   response then?  Again, not what it is now, not what he told you

19   now seven and a half years later.

20        Mr. Voss says, after being told a tacit agreement,

21   Mr. Voss responds, "Oh, he took it out of context."  Really?

22   Is that what you would say if somebody falsely accused you of

23   something and your boss was pissed about it?  You would say

24   "out of context."  That's not a denial.  But there's more.

25   Just think about how easy it would be to write a denial if you

1    truly believed it.  Somebody accuses you of saying something

2    and you want to put something in writing.  What do you say?  "I

3    didn't say that."  But that's not what happens.

4        What happens?  Voss, Higgins and Foehr, they get to work.

5    Why are Higgins and Foehr even involved?  They weren't on the

6    call.  Why are they editing emails back and forth that they're

7    going to send to Father Lemelson?  Why can't Voss do that on

8    his own if he really truly didn't say what Father Lemelson said

9    he said?  Think about this.  It took three people four days to

10   get the denial in the right shape so that they could send it

11   off to Father Lemelson.  It's like the old joke, how many

12   people does it take to screw in a light bulb?

13       By the way, that letter looks absolutely nothing,

14   absolutely nothing like the initial emails when they were just

15   talking amongst themselves about what really happened.  That

16   email sounds a lot more like his testimony seven and a half

17   years later, and yet the SEC, despite all of this, claims

18   Father Lemelson lacked good faith.  So in other words, Father

19   Lemelson comes to the same conclusion that Mr. Higgins comes to

20   but in his case it's bad faith.

21       So let's move on to the second statement.  Viking doesn't

22   intend to conduct preclinical studies or trials.  I'm not even

23   sure really to begin with this, since Viking itself agrees that

24   they did not intend to conduct preclinical studies or trials.

25   So let's look at -- this first is Father Lemelson's -- this is

1    challenged statement number 2.  I'm not sure if it's -- it

2    might be in a different form in your verdict form.  I'm going

3    in chronological order.

4        "Viking does not intend to conduct preclinical studies and

5    trials."  So let's see where he got that.  He repeatedly cites

6    the S-1 in his report.  You'll see there's all sorts of

7    language in the S-1.  We went over this in trial.  Viking

8    repeatedly explains it's not going to conduct preclinical

9    trials.  It's going to manage them.  It's going to administer

10   them, but it's not going to conduct them, which is exactly

11   literally the exact words that Father Lemelson said.  He just

12   said, "They're not going to conduct them," and that's what

13   Viking said.

14       But there's more than the S-1 because Dr. Lian came on and

15   testified.  Remember Dr. Lian?  He was here last Wednesday, I

16   believe, a week ago today.  He flew in from San Diego.  Seemed

17   like a nice enough guy.  What did he say about this?  The

18   court, Judge Saris, "But were you going to hire these people to

19   conduct trials in-house?"  "We were going to hire people to

20   manage the people who conduct those clinical trials.  We were

21   planning to manage the clinical trials, yes."  "So Viking was

22   going to have third parties conduct the preclinical and

23   clinical trials, right?"  "Correct."

24       So Dr. Lian admitted Viking doesn't conduct preclinical

25   studies and trials.  They manage them.  So how is it securities

1    fraud for Father Lemelson to point out Viking doesn't intend to
2    conduct preclinical studies and trials?  It's literally coming
3    out of Viking's own mouth, both in their S-1 and from their
4    CEO.  Can you imagine being accused of securities fraud for
5    saying something back in 2014, when the CEO of the company told
6    you the exact same thing just last week?  This challenged
7    statement was absolutely true.

8        So this brings us to the third statement.  This has to do
9    with the auditors.  Okay.  Father Lemelson, he explained it.
10   He made a mistake here.  He said that Viking hadn't consulted
11   with its auditors.  That was a mistake.  And, therefore, the
12   financials were unaudited.  In fact, the financials were mixed.
13   We saw there were some audited, some unaudited.  If you look at
14   the S-1 -- I wouldn't recommend it because it's 196 pages --
15   but I can represent to you, and there was testimony on this,
16   that the word "unaudited" appears 56 times and the word
17   "audited" appears seven.  So I think we can at least understand
18   why he made the mistake.

19       Mistakes happen.  Hey, look, we saw -- how much trouble
20   did we have with that screen, the witness's screen all week?
21   Was that fraud?  No.  Mistakes happen.  Mistakes are not
22   securities fraud.  And a simple good faith mistake is not even
23   negligence.  So let's take a step back.  How do we decide --
24   how do you decide how we can tell if it was a mistake or if it
25   was fraud?

1          Well, first, if somebody is going to commit fraud, do you

2     think they would cite -- literally cite to the very passage in

3     the source document that shows that they were wrong?  Would

4     they do this so anybody who's looking at what's he talking

5     about could instantly say that's not right.  Is that how you

6     commit fraud?  Because that's what Father Lemelson did.  That

7     doesn't sound like something a fraudster would do.  That sounds

8     like somebody who made a good faith mistake would do.  A

9     fraudster would hide where the truth lies.  He put it out there

10    for everyone to see.  So it's clearly a simple mistake.

11         But also, let's look at what the statement is about.

12    Audited financial statements.  So according to the SEC, there's

13    this grand scheme or plan that Father Lemelson is going to

14    illegally drive down the price of Ligand.  So he issues a

15    25-page report, no challenged statements in there.  Okay.  So

16    now he's going to issue a second report a couple weeks later.

17    Again, not a single challenged statement about Ligand, but he's

18    going to slip in a couple of false statements intentionally

19    about Viking, which is some separate company that nobody has

20    ever heard of that has a contract with Ligand?

21         Also, Father Lemelson isn't trading in Viking at this

22    time.  He's only trading in Ligand.  Why, if his goal is to

23    drive down Ligand's stock price, is he not making false

24    statements about Ligand but he's making false statements about

25    Viking?  Let's look at the statement.  If you were going to try

1    to drive down Ligand's stock price, would you really base your

2    false statement on the fact that Viking, which is like a

3    preoperational company, hasn't even started yet, that their

4    financial statements are unaudited?  Who cares?

5        But fortunately we don't need to live in the hypothetical

6    world because we have the words from Dr. Lian himself.  I asked

7    him, I said, "My question is simply nobody ever came up to you

8    and expressed exasperation like, 'How could you file an S-1

9    with unaudited financials?'"  And Dr. Lian says, "No.

10   Everybody understands an S-1 has audited financials."  This

11   wasn't a big deal.  Nobody cared.  In fact, that goes to both

12   of the statements.  You may recall that I was asking Dr. Lian

13   some questions, yes or no questions, and he wasn't really

14   giving any yes or no answers.  So Judge Saris said, "Listen to

15   his question.  Did any investor call you up or call anyone in

16   the company and say, 'I'm worried about these two statements?'"

17   Dr. Lian says, "No."  Could there be any stronger evidence that

18   the Viking statements were not material than what Dr. Lian told

19   you, which is nobody cared about them?

20       So this brings us to our fourth statement.  So these are

21   the kind of group of statements about insolvency.  So what do

22   we know about insolvency?  What do we know about what it means

23   and how it applies in this case?  I don't think we know a lot,

24   and I think that's because the SEC, who has the burden, didn't

25   call in any expert witness who could kind of explain to us,

1    what is the definition of insolvency?  What does it mean?  How

2    does it apply here?  We didn't hear any of that.  Let's look at

3    what their witnesses did say.  No expert witnesses, but what

4    their witnesses did say.

5        So Katherine Hyodo, Ms. Hyodo, she was the one who was

6    nice enough to join us.  She was in Los Angeles in her office

7    by Zoom.  She, you might recall, was the auditor for Ligand at

8    the time.  That was before she was replaced after Ligand

9    repeatedly lost control of its financial statements.  I asked

10   her, I said -- because I assume she's here to talk about

11   insolvency, because that's what's at issue in the case.  Why

12   else would she be called?  I asked her, "Are you an insolvency

13   specialist?"  "No."  So then Mr. Jones asked her about

14   insolvency.  Let's take a look at what she said.

15           "ANSWER:  We do not assess insolvency.  That term is

16   not within our regulatory standards."  Then the next question

17   is mine on rerecross, or whatever, she said -- I said, "I

18   believe you testified that you don't opine, give an opinion, on

19   insolvency when you're looking at going concern; is that

20   correct?"

21           "That's correct."

22           In other words, Ms. Hyodo has absolutely no idea about

23   the question of insolvency.  I'm not sure why she testified.  I

24   don't know what the purpose of it was, but I do know the

25   purpose of it had nothing to do with the fourth challenged

1    statement because her own words say, "I don't know anything
2    about insolvency."

3           So what about Mr. Higgins?  He testified about
4    insolvency.  He's not an expert but he testified.  What did he
5    say?  Mr. Higgins said insolvency isn't a black and white
6    issue.  It's a judgment call.  In fact, his exact words after
7    those were, Mr. Higgins:  "There are many ways to consider
8    insolvency."  Ligand's own CEO, "There are many ways to
9    consider in solvency."  So if that's right, if we can believe
10   Mr. Higgins on that, how can Father Lemelson's opinion about
11   insolvency be false if the CEO of the very company admits it's
12   a judgment call?

13          I'll add -- this seems especially the case here where
14   there's really no dispute that Ligand had negative working
15   capital for three years in a row at the time Father Lemelson
16   was writing his reports and that they specifically included
17   this disclosure in their annual report.  It says, "We may" --
18   not that they are -- but "We may be required to liquidate our
19   business or file for bankruptcy protection."

20          Now, Mr. Higgins did more than just admit this is an
21   opinion, this is something that there is no absolute answer,
22   insolvency.  What he said was that he completely understood
23   Father Lemelson's math and his analysis in terms of how he got
24   there about his conclusion about insolvency.  Now, Mr. Higgins
25   didn't agree, and that's fair.  We don't all have to agree on

1    everything.  But Mr. Higgins said he understood everything but
2    that he thought Father Lemelson's methodology was unusual.
3    Unusual.  I will tell you this: When you listen to Judge
4    Saris's instructions later, you will not get an instruction
5    that being unusual is the same thing as committing securities
6    fraud.
7          So if we look at what's here, this is Mr. Higgins,
8    "Well, so also in that first PowerPoint, you noted that Father
9    Lemelson used a highly unusual definition of insolvency to
10   assert that Ligand is insolvent?"  "Yes."  "And according to
11   Lemelson liabilities exceeded tangible assets, meaning the
12   company was insolvent.  Do you remember that?"  "Yes."  "You
13   understood that this was the definition that Father Lemelson
14   was using, correct?"  "Correct."  And the SEC, by the way, the
15   SEC concludes that Father Lemelson's math was correct.  Let
16   that sink in for a minute.  Where are we?  We're not in North
17   Korea.  This is America.  We have a First Amendment.  Ligand
18   and the SEC want to tell Father Lemelson what math equations he
19   can do and what ratio he's allowed to do and kind of what books
20   he's allowed to read?  Can you imagine anything more unAmerican
21   than that?
22         So let's turn back to Ms. Hyodo.  She acknowledged, I
23   think to all our surprise, that although she's being called to
24   testify, she's not an insolvency specialist.  The SEC is
25   claiming that Father Lemelson's statement about insolvency is a

1  lie, that it was fraud.  Again, their own witnesses kind of

2  seem to contradict that -- right? -- where they say, yeah, it

3  was a judgment call, different ways to look at it.  The SEC

4  disagrees.  They say it's a lie, even they know exactly how

5  Father Lemelson got there, he explained how he got there, and

6  his math's correct.

7         So think about this:  The SEC, as you'll hear from the

8  Judge Saris, the SEC has the burden of proof here.  Why didn't

9  they present any expert evidence on insolvency?  Don't you

10 think if they could have found some insolvency expert, and you

11 heard Ms. Hyodo say there are people out there, they specialize

12 in this.  Don't you think if the SEC, who has the burden, could

13 have found someone, some expert, not the CEO of the company, to

14 come in here and tell you, yeah, look, it's an opinion but

15 that's wrong?  Don't you think they would have done that?  We

16 didn't hear from a single expert testifying about insolvency.

17 All we heard is that it is a judgment call.  We understood his

18 analysis, his math is correct.  We just disagree with his

19 conclusion.  And they want to tell you that's securities fraud,

20 that it's not good faith, that it's not protect by the First

21 Amendment?  That is absolutely not the law.

22        In sum, Father Lemelson had good faith when he made

23 all four of the challenged statements.

24        There's one other huge, huge hole before I turn my

25 attention to Ligand.  We'll talk about Ligand, but there's

1    another huge hole in the SEC's case about the four challenged
2    statements, and that's materiality.  Now, we already talked
3    about why the two Viking statements clearly aren't material
4    because Dr. Lian basically admitted that on the stand, but it
5    really applies to all four of the statements.  Now, we heard a
6    lot about Ligand's stock price.  Right?  We heard a lot about
7    Ligand's stock price.  And the SEC keeps pointing out, oh, it
8    went down from June to October, and that's when Father Lemelson
9    issued some of his reports, and he held his -- and he held --
10   you know, he held his position.  And you might see this chart.
11   This is a chart the SEC put together.  Okay?  So this is a
12   chart that shows the stock price over the time and puts on the
13   dates of some of Father Lemelson's reports.  Okay?  They may
14   show you that.  But just like their witness' testimony, it
15   leaves out a lot.  It really leaves out critical information.
16   So let's take a look at that.
17          First, I'd ask you to look at the -- look at the top
18   line graph, that's Ligand's stock price during the relevant
19   period.  So you might think, oh, well, God, I mean, it went
20   down.  Clearly it must have been caused by the reports.  So
21   let's take a look at what happened to their stock price right
22   before this time period, you know, the stuff that the SEC
23   doesn't want you to see.  Oh, that went down even more.  This
24   is before anybody had heard of Father Lemelson.  This is before
25   Father Lemelson had said or written a word about Ligand.  The

1    SEC doesn't want you to see that because it defeats their

2    entire claim that he had some kind of impact on Ligand's stock

3    price.  That's what happened to the stock price right before

4    Father Lemelson started to talk about Ligand.

5         So let's see what else we have.  Okay.  There's a

6    couple of things that aren't mentioned in the SEC's chart.  So

7    you'll see the first date here is his first report.  You'll see

8    that there's a negative -- there's so much negative impact on

9    the stock price, which we already talked about.  Of course,

10   Father Lemelson didn't cover that day.  But then you'll see the

11   stock price seems to go up every time he's talking on the days

12   it goes up -- on the days that he mentioned something, you have

13   here -- what you have is days of his reports and days that he's

14   on Benzinga.  And especially what's not on the SEC's chart, if

15   they happen to show it to you, you'll see that big line, August

16   4, 2014, Father Lemelson issues a report on Ligand.  Now, you

17   didn't hear too much about that, although I asked Father

18   Lemelson about it.  Why didn't you hear too much about it?

19   First of all, there's no challenged statements, but it's a

20   pretty negative report about Ligand and the stock price shoots

21   up that day.  Look at that, 10 percent.  It doesn't really fit

22   the SEC's narrative, does it?

23        The other thing the SEC conveniently left off of their

24   chart were what other people were saying about Ligand and the

25   industry in general.  And we've heard about this.  So you'll

1    see on July 15, Janet Yellen, and we've heard a lot about Janet

2    Yellen.  Nobody can seem to get her straight.  Everyone seems

3    to think she's Secretary of the Treasury.  She's chairman of

4    the Federal Reserve Board.  I'll be honest, I don't really know

5    the difference.  Nobody knew the difference.  But she's

6    somebody really important when it comes to when she says

7    something about stocks, people are listening.

8            So on July 15, 2014, Janet Yellen said nothing about

9    Ligand specifically but that biotech is overinflated, or

10   whatever she said, something like that, and the stock price

11   drops four percent during the time Father Lemelson is talking

12   about it.  But they don't want you to know that because that

13   doesn't fit their narrative that the entire drop is because of

14   Father Lemelson.  So then what happens?  Well, then Empire, the

15   second red bar, Empire, a much bigger outfit than Father

16   Lemelson, they issue a short report.  By the way, what do they

17   say?  They think Promacta is in big trouble too.  Right?

18   Sounded familiar.  About a month after Father Lemelson said it,

19   they said it.  Again, with all due respect to Father Lemelson,

20   this is a much bigger outfit.  What happens when they publish

21   their report?  The stock price goes down.  But that's not on

22   the SEC's chart.  Finally, you'll see the third red one, that

23   was a follow-up report by Empire and, again, the stock went

24   down.

25            Okay.  Let's talk about Ligand.  So so far I've

1    discussed why common sense tells us that Father Lemelson didn't
2    commit fraud and specifically why each of the four statements
3    cannot constitute fraud under any meaningful definition of
4    that.  So why are we here?  Why are we talking about four
5    statements that Father Lemelson made over seven years ago about
6    some company out in California?  Well, you might think we're
7    here because of the SEC.  But I don't think that's true.  We're
8    not here because of the SEC.  We're here because of Ligand and
9    because of Ligand's scheme and all of the lies that they told
10   the SEC while they pressured them again and again and again to
11   bring this case against Father Lemelson.
12          Now, Mr. Higgins took the stand and Mr. Higgins told
13   you Father Lemelson is a bully, his exact words.  John Higgins,
14   the CEO of Ligand, took the stand and told you Father Lemelson
15   was a bully.  Let's take a look at who the bully really was
16   here.
17          What is Ligand?  Ligand's a billion-dollar
18   pharmaceutical company based out in California.  And it's run
19   by John Higgins, who came in here and told you he wasn't sure
20   how much money he made.  It could have been 11 million.  It
21   could have been more.  It could have been less.  Who knows
22   these kinds of things?  In any event, what he established is
23   that Ligand has the resources, all the resources in the world,
24   to squash somebody like Father Lemelson.  Father Lemelson in
25   2014, he was just an individual out in Marlborough, Mass.

1    running a small hedge fund for his friends and his family and,

2    yet, he's the bully.

3          If Ligand really believed everything that their

4    witnesses told you during the past week, during this trial, if

5    they really believed that, what they told you seven years

6    later, do you really think they wouldn't have issued a public

7    statement in 2014?  We know they knew how, right?  There was

8    testimony that they issued more than 40 press releases, 2014.

9    These guys are pumping out a press release almost every week

10   and they couldn't just issue a press release saying, "We are

11   aware of Father Lemelson's report.  It's wrong.  Here's why

12   it's wrong," end of story.  They didn't do that?  Why?  They

13   didn't want a fair debate.  What did they want?  He needs to be

14   silenced for good.  That's what Ligand wanted.  That's an email

15   from Ligand.

16         So Father Lemelson went out -- by the way, just to be

17   clear, this is an email from a little later on from Ligand but

18   I think it speaks volumes to the attitude they had from the

19   very beginning.

20         So what did Ligand do?  Well, Ligand went out and

21   engaged in a scheme to do just that, to silence Father

22   Lemelson.  They started with the media.  Right?  We saw these

23   emails between Mr. Voss and Mr. Higgins.  They want to silence

24   BioWorld.  They want to silence USA Today.  They want to get

25   everything taken down from Seeking Alpha.  Kind of ironic that

1    they're complaining about Father Lemelson trying to take down a

2    fraction of the reports on Seeking Alpha when Ligand was doing

3    the same thing.  They're trying to shut him down.  They're

4    trying to silence him.  Mr. Higgins's own words, "You better

5    talk to him, Bruce, because otherwise I'm going to go nuclear

6    on him," talking about some poor guy from USA Today who

7    apparently had the gall to mention Father Lemelson's report in

8    one of his stories.  Ligand doesn't like that.

9          But that's not all they did, is it?  They leaned on

10   the SEC.  These are Mr. Higgins's own words explaining to

11   people, "We are leaning on the SEC," and they leaned on them

12   over and over and over again.  Those words are important, "lean

13   on the SEC."  So what is that saying?  They want to use

14   taxpayer money to silence Father Lemelson for good.

15         So what did that scheme look like?  First we heard

16   Ligand executives and its lawyers, they flew here to Boston,

17   came all the way from California to meet with the SEC in

18   Boston.  And they proceeded to lie to the SEC's face about

19   Father Lemelson.  If you're looking for a material lie in this

20   case, here it is.  But it wasn't said by Father Lemelson.

21   Ligand puts together a 60-page PowerPoint.  It's Exhibit 163,

22   if you want to take a look at it when you're deliberating, but

23   I'll point out some things in it now.

24         They falsely accused Father Lemelson of committing

25   affinity fraud, meaning taking advantage of his parishioners.

1    That is a boldfaced lie.  You heard Father Lemelson say none of

2    his parishioners are or ever have been his investors, because

3    his parishioners, by the way, he serves only the most poor

4    communities.  You heard him say that too.  Ligand is just

5    completely making this up.  No basis in fact and it's a lie.

6         It's not the only thing they lied about.  They can't

7    believe that somebody who would deign -- some small fund

8    analyst who would deign to criticize Ligand, they can't believe

9    that he would actually have a good performance in his fund.  So

10   they tell the SEC he's lying about his -- he's lying about his

11   performance.  Father Lemelson wasn't lying about his

12   performance.  Ligand lied.  They didn't do any homework and

13   they just lied to the SEC.

14        I think what's even more important -- I think what's

15   even more important perhaps than what's in there, which is a

16   pack of lies, is what's not in there.  All the stuff they're

17   talking about now with the four challenged statements.

18   Remember, we talked about materiality.  It's a 60-page

19   PowerPoint.  Ligand doesn't once, not once, mention the

20   statement from -- about Mr. Voss, that Father Lemelson went on

21   the radio.  In their first PowerPoint they never mention that,

22   oh, this was a big deal, Father Lemelson went on the radio.

23   They don't mention that once.  They don't -- they also don't

24   mention either of the Viking statements.  So here the SEC is

25   going to argue to you that these statements were material.  But

1    somehow in 2014, when they're fresh on the mind of Ligand and

2    Ligand puts together a 60-page PowerPoint presentation with the

3    help of their lawyers, they somehow forgot to mention those?

4    Does that add up to you?

5            So what else is missing?  Well, again, one of their

6    big themes, Ligand, was saying that Father Lemelson was lying

7    about Sovaldi eliminating the need for Promacta.  That was one

8    of their big pitches to the SEC.  So let's look at what they

9    didn't tell the SEC while they were meeting with them here in

10   Boston in September of 2014.  They didn't tell them that

11   Mr. Higgins himself in February of 2014 was having the same

12   questions, will any Sovaldi patients need Promacta.  They

13   didn't tell the SEC that hep C, in their mind, even though now

14   they're distancing themselves like, ah, it wasn't a big deal at

15   the time, hep C needs to be a big market for Promacta to keep

16   driving Ligand's growth.  Again, not even to drive Promacta's

17   growth.  The entire company's growth depends on that.  They

18   didn't tell the SEC that.

19           The other thing they didn't tell the SEC is anything

20   about the Empire.  Right?  Just like the SEC didn't include the

21   Empire report in their graph, Ligand didn't include anything

22   about the Empire report in their presentation.  They didn't

23   tell the SEC, you know what, this guy is lying about Promacta

24   but in fairness, you should probably investigate the fact that

25   other people are saying the same thing and having a negative

1    impact on our stock.  They didn't say that.  In fact, if you

2    remember what's really interesting about this is Empire said,

3    "We think the stock is worth $16."  And Mr. Higgins explained

4    in his email is the reason he didn't want anyone from Ligand

5    talking to Father Lemelson is because he was afraid if he did

6    that, Father Lemelson would go off and write some report and

7    say, "I'll put the target price at $15."  Meanwhile other

8    people are saying basically the same thing.

9          So they leave all of this out.  This report -- this

10   PowerPoint that they made to the SEC in September 2014 contains

11   material lies and it contains material omissions.  But that's

12   the story Ligand wanted to tell the SEC.  You know what?  Do

13   you know what the SEC's reaction was even though they had been

14   told all these lies and heard the worst things?  The SEC tells

15   them to go home.  The SEC says, "We don't have any interest.

16   Get out.  We're not taking this case."

17         But Ligand wasn't done.  Were they?  We heard about

18   this.  So they fired their lawyers.  They fired one

19   international law firm and they hired a new international law

20   firm.  They fly across the country again.  This time to

21   Washington, D.C. because when you're a billion-dollar

22   pharmaceutical company, you get a second bite at the apple.

23         And they put together another fancy PowerPoint.  This

24   time it's 62 pages.  They added a couple pages.  Once again, no

25   mention of Viking, nothing about Viking.  Once again, no

1    mention of how the company viewed Promacta and hep C at the

2    time, none of that, but this time they did have something else

3    in their pocket.  They had a trump card.  This time Ligand used

4    its political muscle.  They didn't just have fancy lawyers.

5    They had a Congressman send a letter to the SEC perfectly

6    timed.  You have to give them credit for this.  Right?  The

7    same day Ligand and its lawyers are meeting with the SEC, they

8    have a Congressman write a letter to the SEC urging action.

9              And finally, because of that, all the persistence paid

10   off.  A million-dollar pharmaceuticals company, its high-priced

11   lawyers and a Congressman who is willing to jump into the fray,

12   well, they finally get their way.  And that, members of the

13   jury, is why we're here today.  There may be a scheme here, but

14   the only one to engage in a scheme is Ligand, not Father

15   Lemelson.  And you know who's not here today as I look out?  I

16   don't see any of the Ligand witnesses.  I guess they've all

17   gone back to California.

18             In closing, Father Lemelson is not perfect.  None of

19   us are.  I know I'm certainly not.  But the evidence is clear

20   that he had a good faith belief for everything he said about

21   Ligand, including the four challenged statements, and that's

22   protected.  That's protected.  It's not fraud and it's

23   protected by the First Amendment.

24             Now, look, there's always room for disagreement on

25   whether something somebody says is right or wrong, is opinion,

1    but there has been no evidence to support the SEC's claim here

2    that Father Lemelson is a fraud.

3            I think we've seen throughout this case that

4    billion-dollar pharmaceutical companies have power, their

5    lawyers have power.  The government certainly has power, but

6    the best thing about our country is that that power is not

7    absolute.  Here today in this courtroom, Ligand does not have

8    any power, their lawyers don't have any power, and ultimately

9    the government doesn't have any power.  All of the power rests

10   with you.

11           On behalf of Father Lemelson, I humbly ask you to use

12   that power wisely, which in this case means to review all of

13   the evidence carefully.  I am confident that if you do that,

14   you will return a verdict of no on your verdict forms, meaning

15   not liable on all counts.  Thank you.

16           THE COURT:  Thank you.  Why don't we stand and stretch

17   for a second while we do the switch.

18           (Pause.)

19           Ready?  Let's go.

20           MR. JONES:  May I proceed, Your Honor?

21           THE COURT:  Yes.

22           MR. JONES:  Thank you.

23           You know, Mr. Brooks asked a very good question.  Why

24   are we here?  Why are we here?  We're here because lies do

25   damage.  They can hurt people's good names.  They can harm

1    their businesses, their reputations, the work they're trying to

2    do.  Lies, as you saw in the defendant's email, can destroy 500

3    million dollars, 500 million dollars of a company's value.

4    When I say "a company's value," that's money invested by

5    regular shareholders.  People taking their retirement accounts

6    and their children's education accounts and investing it.  500

7    million dollars that the defendant crowed about how he had

8    destroyed it.

9         It's for that reason that the law makes it illegal to

10   lie about a stock.  Because a lie could mean you don't get your

11   financing and you don't get to develop those medicines and get

12   your new company off the ground.  A lie can mean that your

13   partners start to question you and your integrity and whether

14   they can do business with you.  A lie can mean that people who

15   know you start to worry about your integrity, your honesty.

16   And a lie can mean that people who thought that you'd be a good

17   safe place to invest their money now don't.

18        Here in this case, we focused on four lies that are

19   the backbone of a fraudulent scheme, a scheme to drive down the

20   price of Ligand's stock for the purpose of making a profit for

21   a hedge fund.

22        Now, you've seen this slide many times before.  Here

23   are the four lies.  Oh, and fair warning, throughout the

24   closing here I'm going to show you a lot of exhibits, refer to

25   a lot of exhibits, and you can see there's five big binders of

1    exhibits here.  Along the way I'm going to try to give you some

2    numbers for exhibits so that you know, when you go back in that

3    jury room, where we hope you'll look at that evidence.  And if

4    you wanted to look at that evidence, you can jot down those

5    numbers during the closing.

6            So let's start with Promacta.  And it's here that I

7    think I have a bit of good news for you.  You do not need to

8    figure out whether Promacta was going to sell more or less,

9    whether it was going to go down because hep C was coming along

10   or wasn't going to go down because Promacta never got to the

11   point in the first place where hep C sales were a big part of

12   Promacta sales.  You don't need to decide whether the defendant

13   was right when he said that Promacta sales would go down.

14           Now, we know Promacta sales didn't go down, but that

15   is not the question before you.  In fact, as you heard

16   Mr. Brooks say a lot, the SEC didn't pick out any statements in

17   that first report where he says Promacta's going down.  And

18   there's a reason for that.  The reason is that the statements

19   that the SEC is bringing you to consider whether or not Father

20   Lemelson lied about them are four simple factual statements

21   that we can all understand the defendant lied about and that he

22   knew he was lying at the time, four selected statements for you

23   to consider.

24           The first one of these is what Bruce Voss said on the

25   phone.  Not about whether Promacta was going up or down.  What

1   did Bruce Voss say on the phone?  What did the defendant say he

2   said?  Well, the defendant says, "They said, 'Look, we

3   understand Promacta is going away.'"  Now, whenever you heard

4   defense counsel talk about it, even in the closing, they never

5   mentioned this part down here.  They were always like, "Did you

6   basically agree?  Basically agree?"  No, that's not what the

7   defendant said.  He went on the radio and said Bruce Voss said

8   these words.

9        When you go back to the jury room and you see this

10  question on your verdict form, this is what we're talking

11  about.  Is it more likely than not that Mr. Voss said these

12  words or is it more likely that the defendant lied about what

13  Mr. Voss said?

14       The evidence showed that Mr. Voss didn't say this.  In

15  fact, when the defendant's lawyers got up in their opening

16  statement, even they didn't say Mr. Voss said it.  They didn't

17  even pretend he said these words.  They kept saying there was a

18  tacit agreement, tacit agreement.  Remember "tacit agreement"

19  was up there on the magic easel?  We talked a lot about it.  We

20  saw it in some emails.  That's not what the defendant said.  In

21  fact, it's not even what the defendant says he said.  He says

22  Mr. Voss said the words.  That's what we're talking about.

23       But Mr. Voss didn't say it.  You heard it from him.

24  You heard him say that he had all this information at his

25  fingertips, all this information in his head, all of which said

1    that Promacta was not going away.  That was the point of all

2    that information about Promacta that came in.

3           What did Mr. Voss understand?  What did he know when

4    he got on that call on June 18 with the defendant and talked

5    about Ligand?  It's not whether the defendant believed Promacta

6    was going away or not.  Maybe he did.  Maybe he lied about that

7    too.  That's not the point.  The point is, what did Mr. Voss

8    believe?  Because, as we all know, when we believe something,

9    that's what we say.  Right?  Mr. Voss doesn't get on a call

10   believing that Promacta's not going away and somehow say we

11   understand Promacta's going away.  It just didn't happen.

12          Does it make any sense that a guy who knew everything

13   that Mr. Voss knew about Promacta would actually say on the

14   phone to the defendant -- and you heard him describe how

15   unpleasant that call was, and that's where that word "bully"

16   came in, not where Mr. Brooks said it came in.  If you knew all

17   that and you had that kind of phone call, are you suddenly

18   going to admit we understand Promacta is going away when it's

19   against everything that you know?  The Ligand filings, the

20   Ligand earnings calls, the Ligand analyst reports, the GSK

21   reports, the GSK analyst reports, the FDA website, and

22   everything that Mr. Voss knew inside the company?  Is he

23   suddenly going to say the exact opposite?  Does that make any

24   sense?

25          And the defendant had all of that information too.  He

1    knew exactly what the companies and its partners and all those

2    analysts who wrote about GSK and Ligand were saying about

3    Promacta.  The defendant could not possibly have believed that

4    Ligand's representative was going to get on the phone after all

5    of those public statements and tell him that Promacta was going

6    away.

7         No.  The defendant threw all that information away.

8    He made up his own facts.  He made up facts -- lies, let's call

9    them what they are -- that supported his thesis and would make

10   his big bet pay off.  What's that big bet?  Mr. Brooks is

11   right.  We've got to talk now about the fact there was a 4.6-

12   million-dollar investment.  4.6 million dollars of the

13   defendant's family's money and defendant's friends' money all

14   wrapped up in making this pay off.

15        But it's not just that.  You heard about the hundred

16   people who were interested in Amvona, interested in signing up,

17   supposedly, now that this Ligand thing was out there --

18   Right? -- in the course of that summer.  Each one of those

19   people brings more money for the defendant.  Each one of them.

20        And you heard, actually, that there were these big

21   money managers, 20 billion-dollar fund, 600-million-dollar

22   fund.  The very same week the defendant made his first lie

23   about Mr. Voss, that was the week that he was going to meet

24   those people.  That was the week -- and if you could rock the

25   stock, if you could crash it, boy, wouldn't those people want

```
1    to sign up?  You would want to sign up with a money manager
2    like that, wouldn't you?
3              And you heard what Father Lemelson thought was going
4    to happen.  A couple months later he goes on the radio and he
5    says, "We expect 400 to 500 million in the next 24 months."
6    That's the mindset of the defendant when he starts to talk
7    about Ligand, when he lies about Mr. Voss.  Think about all
8    that money coming in, all those new people coming up.  And all
9    they had to do was, as the Benzinga interviewer said, rock the
10   stock.
11             So, yeah, when we talk about motive, that's a pretty
12   good motive.  Now, that 20-minute call -- remember, we all
13   listened to that interview.  It went on for a while.  Right?
14   It was a 20-minute interview, and on that interview Lemelson
15   was able to talk about and explain his background, where he
16   lives, where he studied in school, what degrees he has, his
17   Christian philosophy of investing, The Intelligent Investor
18   Book, his WWE shorts, capital allocation of stewardship.
19   Remember all of those topics?  And he talks about Ligand and he
20   talks about many different things about Ligand all in 20
21   minutes.  Well, that's the same period of time that Mr. Voss
22   and Father Lemelson are on the phone.  It's not a short call.
23   It's not a, "Will you change your position?"  "No, okay.
24   You're not getting the call."  In fact, we know it's not a
25   short call.  We know what they talked about because of the
```

1    defendant's own notes.

2            You have these notes.  They're Exhibit 129, and you

3    see -- and we talked about this with the defendant.  You can

4    see from the notes that Mr. Voss and Father Lemelson are

5    talking about Promacta, talking about Promacta all through the

6    call.  Here it is at the beginning talking about hep C and

7    countries that aren't going to be using Sovaldi and interferon

8    will continue and Promacta will continue.  Right?  That's about

9    Promacta.  Here's the Roth Capital report.  Remember we looked

10   at that Roth Capital report?  That was talking about Promacta.

11   Mr. Voss and Father Lemelson were talking about that.

12           Could they get me to change my position?  Remember

13   that part of the notes?  Well, what's the position?  We saw it

14   was in the title of the first report.  Key royalty generating

15   program going away.  So they're talking about it here too.  And

16   they're talking about it here too, the information that --

17   Father Lemelson says that we're talking about information that

18   would prove he was wrong.

19           What is he out there about?  What's that June 16

20   report about?  It's about Promacta going away.  So here they

21   are talking about Promacta again.  And here asking why we would

22   disagree with the GSK analysts.  Well, what did the GSK

23   analysts write about?  Well, they write about GSK, which you

24   heard there's only one thing they write about that's relevant

25   to Promacta, and that's Promacta, because they sell Promacta.

1    And the revenue for GSK is the revenue for Ligand because they

2    have those royalty payments.

3           And even here, where the defendant says Mr. Voss said

4    something, he didn't say it, but they are certainly talking

5    about Promacta there too, aren't they?  And what does -- what

6    does Father Lemelson put in the notes immediately after he says

7    that orange statement?  He said the company does not agree with

8    the position.  He puts it right there in the notes.  Does not

9    agree with that position, that Promacta's going away, and, yet,

10   that's not what he said on the radio.

11          And then one more.  The company feeling good about its

12   future prospects, again Mr. Voss and Father Lemelson are

13   talking about Promacta.

14          Finally, this last one, how could Father Lemelson

15   disagree with so many analysts?  Well, what are the analysts

16   writing about?  Well, we saw it in Exhibit 34.  Those analysts

17   are writing about Promacta as part of talking about Ligand.

18          So one, two, three, four, five, six, seven, eight --

19   nine.  Nine times, in a 20-minute call, according to Father

20   Lemelson's notes, they're talking about Promacta.  Nine times

21   at least -- this is just what Father Lemelson wrote down.  Who

22   knows what else that he didn't write down -- nine times at

23   least during the call Mr. Voss is giving him information about

24   Promacta.  Do you think that information said Promacta is going

25   away?  No, because that's not what Bruce Voss knows.  He knows

1    that Promacta sales are coming from ITP, projected to grow,

2    he's seen all those graphs that you saw.  That's what's

3    relevant about all that.  What does Mr. Voss know, and what is

4    more likely than not what he said?  Is it more likely he said

5    Promacta is going away, or is it more likely in the course of

6    these nine statements that he very carefully explained to the

7    defendant that Promacta was not going away?  Despite what

8    Father Lemelson said on the radio the next morning.

9           What would you actually have to believe for

10   defendant's story to be correct?  Well, you'd have to believe

11   that Mr. Voss disregarded his prior emails, the emails where

12   right after the June 16 report comes out he says, "Father

13   Lemelson's wrong about Promacta."  That's Exhibit 125.  You'd

14   have to believe that Mr. Voss disregarded everything that was

15   said in the Ligand filings, Exhibits 14 and 19, and in the

16   earnings calls, Exhibit 182.  You'd have to believe that Voss

17   disregarded the GSK reports, the ones that actually showed the

18   actual percentages and the actual revenue that Promacta was

19   making quarter by quarter by quarter, the ones that said our

20   results are driven by -- you'll see it in the reports -- driven

21   by strong sales of Promacta.  Mr. Voss would have had to

22   disregard that too.  And those are Exhibits 172 and 180.

23          He would have had to disregard those GSK analysts.  He

24   would have had to disregard those Ligand analysts, all those

25   people writing about it in Exhibit 34, all those reports the

1    defendant gets and has and read.  He would have to have

2    disregarded his more than two decades of experience as an

3    investor relations professional, trained and experienced in not

4    saying something entirely opposite to what the company has said

5    for years.

6         And, as you heard, he'd have to have disregarded the

7    key legal requirement, if you're an investor relations guy,

8    which is you can't come along and tell some guy on the phone a

9    statement that you haven't made publicly.  And we all know that

10   Ligand was not publicly saying that Promacta was going away.

11   Why weren't they saying that?  Because it wasn't true.

12        So for defendant's story to be true, you have to think

13   that Mr. Voss somehow -- a coronary or something -- he got on

14   the phone and forgot all of this stuff.

15        Is that what is more likely than not here?  That

16   that's what he did, to give the defendant, who everybody agrees

17   was being a bully on the phone, some piece of insider

18   information that was illegal to tell him for what reason?

19   There is none.

20        Mr. Voss was absolutely clear.  "Did you say those

21   words to the defendant?"  "Absolutely not."  It is as clear in

22   his head today as it was the day after -- the day that he heard

23   what Father Lemelson had said about him -- the day he heard the

24   lie.

25        Now, you saw some emails from Mr. Higgins, you saw

1    that tacit agreement thing.  But you heard Mr. Higgins talk

2    about the fact that when he's writing those emails, he doesn't

3    know what Voss said on the phone yet.  It's still early.  It's

4    early that morning.  Mr. Voss has just listened to the

5    interview.  Mr. Higgins barely listened to it -- had listened

6    to it, but barely, the night before, that are in the scramble

7    of emails that are flying back and forth.  That's what they

8    want to have you interpret the call between Father Lemelson and

9    Mr. Voss.  I submit to you, the easiest way to find out what

10   was on that call are the defendant's notes and what Mr. Voss

11   told you, which show you, without a doubt, that those two

12   people are talking about Promacta for a lot of that 20 minutes.

13           Now, the defendant knows -- there's no question the

14   defendant knows what was talked about there.  He didn't say he

15   was mistaken about it.  No.  He lied and he said Mr. Voss said

16   that.  There's no good faith here.  There's not mistake here.

17   It either happened or it didn't.  What's more likely than not?

18           And another way that you can tell, think about how the

19   defendant on the stand talked about Promacta.  Right?  How he

20   misrepresented what Promacta was for.  How he skipped over all

21   that part of Ligand filings where it talks about ITP, three

22   paragraphs before he gets to that paragraph about hep C.  How

23   even now he won't even admit that ITP is its own thing, its own

24   disease, despite what his friend the doctor said, totally

25   unrelated.  Hep C, ITP, unrelated.  Both can have low

1    platelets.  You've heard a lot of things can cause low

2    platelets.  They're unrelated.  The defendant won't even admit

3    it now.  Why?  Why won't he do it?  Well, because it makes it

4    more likely than what was said on the phone and what he said

5    about what was said on the phone are two different things.

6           Think about how the defendant asserts things without

7    any evidence being shown to you by defense counsel or the

8    Commission about off label uses, even though the FDA had warned

9    doctors don't do that.  It can cause liver damage.  According

10   to the defendant, oh, it was all off label uses.  Why is he

11   making up stuff like that?  What's the purpose of that?

12          Here is Mr. Voss's immediate reaction the morning he

13   hears that the defendant lied about him.  He says, "He says

14   that I basically agreed that Promacta is going away.  I could

15   send him an email that asks for proof that I said that while

16   denying I ever said it."  Right?  He denies it right after.  No

17   equivocation.  They'd like you to think he came up with this

18   denial later.  It's right after.  It's that morning, the

19   morning he hears it.

20          And he immediately starts to write a response, and you

21   saw that.  You saw the response from Mr. Voss and, yes, does

22   Mr. Voss have a client who wants to get in on responding to

23   this lie about the company?  Because, remember, Mr. Voss

24   represents that company.  And when the defendant says Mr. Voss

25   said this about the company, he's making a statement on behalf

1    of the company.  Do you think if you were running a company,

2    you'd want to get involved in that response, a response to a

3    lie that says your main product is going away?  It's like Ford

4    saying they're not going to sell cars anymore.  Do you think

5    the CEO of Ford would get involved in that response?  I think

6    he probably would.

7          And here's the response, "You made that comment, not

8    me.  I never made that statement.  I never agreed with that

9    statement and never would because it's not true."  That's what

10   Mr. Voss says right after.  That's what the letter says on the

11   23rd of June, that Monday, when they send it out.  Remember,

12   the letter is done that Friday, and it's 6:00.  We need to send

13   it out Monday.  That's what he said then and that's what he

14   came and told you here on the stand, exactly the same thing.

15   "I never said this.  The defendant is lying about me."

16         A lie that jeopardizes not just Ligand but Mr. Voss's

17   career.  Do you think you can be an IR guy if you make those

18   kind of statements for real?  Somebody believes that Mr. Voss

19   said this and you heard that people came along and asked if it

20   was true.  Mr. Voss could lose his entire 30-year career based

21   on this.  The defendants, they want you to think it doesn't

22   matter that the defendant said this.  It's a little bit

23   shocking, but you heard them say it.

24         Now, let's go to the verdict form.  As I said, this is

25   what's on the verdict form.  This is question 2.  And when

1    we're talking about this lie about what Mr. Voss said, this is

2    where you're going to mark it on the verdict form.  If you

3    think the defendant lied about what Mr. Voss said, if you think

4    the defendant lied when he said, "Look, we understand Promacta

5    is going away," those words, then we ask you to check yes here

6    on question 2A.

7            Let's go on to the Viking audit statement.  There's

8    two parts of this statement really.  The company has not yet

9    even consulted with the firm on material issues, the financial

10   statements are unaudited.  He said both of those things.

11   Neither one of them are true, obviously.  And they know it's

12   not true.  They claim it was an oops.  Lemelson got confused by

13   the word "unaudited" paragraphs in the S-1 and somehow

14   concluded from all that, all the financial statements were

15   unaudited.  And that not only that, but despite the fact that

16   the auditor had been hired, they hadn't been consulted about

17   anything.  It would be weird to hire an auditor and not

18   actually consult him about anything, but that's what the

19   defendant said.

20           But the defendant knows that's false.  Why?  Well,

21   here's that S-1.  The S-1 is Exhibit 58.  We gave you the

22   highlighted copy, and in the green there's the text of the S-1,

23   and that says -- the text of the S-1 says the financial

24   statements were audited.  It says it explicitly.  It says it in

25   black and white in exactly the place in an S-1 -- exactly the

1    place in a filing with the SEC where you're supposed to

2    indicate that your statements were audited.  And here on the

3    very first page of the financial statements of the S-1, the

4    part of the S-1 that puts out all of that financial

5    information, the very first page is that opinion letter.  That

6    opinion letter from the auditor that says yes, we have audited

7    the accompanying balance sheets of Viking Therapeutics.

8              The defendant wants you to think, oops, I guess I

9    messed up.  Is that really what's more likely than not here?

10   Or is it more likely than not that the defendant is saying this

11   S-1 -- you heard Mr. Brooks say it -- it's 200 pages.  Nobody's

12   going to go read it.  Why not just say something about it that

13   could cause a problem?  Because I have 4.6 million dollars

14   riding on it and a bunch of people looking at me.

15             You have to determine if you think the defendant

16   actually got confused.  Allow me to offer some evidence to

17   consider.  First, the defendant has told you that he's read

18   hundreds of financial statements, hundreds.  These financial

19   statements all get audited, and you have to include the

20   evidence of the audit, that opinion letter, on the top of those

21   financial statements.  If you don't do it, you can't actually

22   even file the thing with the SEC.  It won't even go through.

23   Hundreds of those, and every single one of those annual reports

24   has that opinion letter on top.  It's not hard to find.  You'll

25   actually see the table of contents in between these two green

1   pages.  It says, "Opinion letter of the auditor," page 1.  It's
2   not hard to find.
3          And you have to believe that the defendant somehow
4   missed that audit letter, or when he read it, he didn't
5   understand it, despite the fact that he's done hundreds of
6   these.  And you'd have to believe that the other part of the
7   text, where it says the auditor has done the audit right there
8   in the text of the S-1 right before the financial statements
9   where it talks about experts you'll see, you have to believe,
10  oh, he missed that too after reading hundreds of financial
11  statements.
12         And you have to believe that the defendant, despite
13  the fact he knows annual reports are always audited, somehow
14  forgot about that this time, that somehow he forgot that he
15  knew that quarterly statements, those three-month periods, that
16  those get reviewed, that auditors don't audit them, that they
17  review them but they apply, as you heard, the same audit
18  standards.  And you have to believe that the defendant, despite
19  the fact he said he's written 60 or 70 research reports about
20  companies, somehow doesn't understand audited from unaudited.
21  Is that likely?
22         Father Lemelson's touted his abilities to you and to
23  the world to analyze companies and financials and he claims he
24  was a top hedge fund manager in the world.  He makes his living
25  doing this, doing stock analysis.  Is it more likely than not

1    because the word "unaudited" appeared on certain columns of

2    those three-month periods and not on other columns that he got

3    confused?  No.

4           Instead, he's bargaining on the fact that it's 200

5    pages, nobody's skipping to the 156th page to check.  Not the

6    kind of people he's talking to, not the people he wants to

7    panic into saying if there's no audit, there's no S-1.  If

8    there's no S-1, there's no financing.  If there's no financing,

9    there's no medicines developed.  We'll get to that in a minute.

10   And if there's no medicines developed, then Ligand and Viking

11   have just entered a deal that the defendant says is a sham.

12   And as an investor in Ligand, I better be worried about that.

13   Isn't that the more likely based on the facts that you have.

14           So if you believe the defendant was actually lying

15   when he said that the financial statements were unaudited, if

16   you believe he was lying when he said the auditor hasn't even

17   been consulted because, by the way, you heard the testimony you

18   can't actually have an audit without consulting about material

19   issues -- right?  There's no reason to think that happened.

20   You've heard no evidence that substantiated why the defendant

21   thought that they hadn't even been consulted.  They just kind

22   of left that part out.  Didn't they?  If you think the

23   defendant was lying about these two parts of the audit, we ask

24   here on 2(b) you check yes.

25           Let's talk about the preclinical trials.  Context.

1    Context is important.  What is the defendant actually trying to
2    say?  Let's look at the context of what he was saying and you
3    saw this in the opening.  We talked about it.  Shell company,
4    paper profits, stuffing the balance sheet, the legality of the
5    transaction would be challenged.  It's illegal.  It's
6    objectives of alchemy.  It's three-card Monte.  The very next
7    sentence of the report, after he says they're not going to do
8    clinical trials, is "Viking appears to be a single purpose
9    vehicle created to raise more capital from public markets."

10          In other words, the defendant is saying -- and you can
11   see it right in that report, right in Exhibit 4, right after he
12   says they're not doing clinical trials, that Viking was created
13   just so Ligand could have this accounting public markets dodge
14   and get more money.  He's not saying, oh, by the way, they're
15   going to work with the oncology department or lab.  He's saying
16   those clinical trials, those clinical studies are not going to
17   happen.  And don't let them twist those words into something
18   else.  You'll see from the document what Father Lemelson was
19   trying to say.

20          Now, you heard Dr. Lian.  And he explained, of course,
21   Viking is a separate company.  We negotiated a deal.  We had
22   these medicines.  We got an auditor.  We were going to do
23   trials.  We had people already working on trials.  We had
24   trials in the works.  And I hope you got a sense from Dr. Lian
25   that he actually was pretty excited about it at this point.  He

1    had escaped Wall Street.  He had gone back to his science

2    background.  He was living his dream.  He had started a company

3    to develop medicines and the company today is developing

4    medicines.

5            But that doesn't help the defendant's thesis.  That

6    doesn't help him crash the stock, does it?  You need to say, if

7    you want to crash the stock, that this is some shady shell, a

8    sham company, an illegal arrangement, and that's why he's

9    saying they're not going to do clinical trials.  Not because

10   they were going to hire an oncology department or a doctor or

11   lab or someplace that can make the powder that the medicine

12   actually is, because of course they were, because that's how

13   the industry works.  He was saying they're not going to do any

14   of that because they're a sham.  They're a front.  There's no

15   there there.  You'll see that right in the report.  That's what

16   the defendant is saying.  That's what the defendant is lying

17   about.  Don't let them twist it.

18           The defendant seized on this language about third

19   parties.  But think about their interpretation.  Is that how

20   people talk?  If your neighbor says to you on the street, "Hey,

21   we're renovating our kitchen."  You say, "Oh, that's great."

22   Did you think your neighbor was doing all the plumbing and the

23   electrical and the tiling and putting in the oven and hooking

24   up the gas?  Did you think he was doing all that himself when

25   he said, "We're renovating our kitchen"?  Of course not.

 1    That's not how people talk.  Words mean something.

 2          The defendant talks that way too.  Remember, we asked

 3    him about GSK and does GSK sell Promacta, and he said something

 4    like, "They may have sold it through third parties, but I guess

 5    you could say they sold it."  This is how people talk.  We use

 6    words to mean something and sometimes a lawyer or defendant can

 7    put a nice spin on it, make it mean something else.  But when

 8    the defendant says that Viking won't conduct clinical trials,

 9    make no mistake, he's saying those tests and trials aren't

10    happening.

11          And isn't that a false statement of fact?  To say

12    someone won't do something when they plainly will?  And how do

13    you -- even if you think he was talking about third parties,

14    this explanation they're giving, isn't he leaving something

15    out?  And you'll hear the judge talk about that not only can

16    you lie affirmatively but if you leave out the important stuff,

17    that material information, and it makes what you're saying

18    misleading, that's another way to violate the securities laws,

19    and that happened here too.

20          Even if he was saying they don't intend to conduct

21    clinical trials, didn't he need to say, in order for people not

22    to be misled, not to lead to this kind of thing, they don't

23    conduct it, but they have all these plans that they've laid out

24    all in their S-1, and they intended to do it, but they're going

25    to use third parties.  Does he say anything about that?  No.

1    That doesn't support his shady sham shell company idea.

2          And you're going to see, as we showed you during

3    Dr. Lian's testimony, across the S-1 on page after page after

4    page, each one of these yellow highlights is a reference to the

5    plans to do clinical trials and studies.  They're repeated over

6    and over.  Trust me, I had to read all of those 200 pages.

7    They repeat it over and over.  You can't miss it.  The

8    defendant leaves it all out.  Because what he wants you to

9    believe is not that some oncology department is going to be in

10   the loop, but that they're not going to do anything.  That all

11   this money they want people to invest will just go into

12   Ligand's pocket and be stolen.  That's what the defendant is

13   saying about illegal arrangement.

14         So if you think that the defendant lied when he said

15   that they will not conduct those clinical trials and studies,

16   we ask that here on question 2(c) you check yes.

17         Let's go to insolvency.  Insolvency, you always hear a

18   little sigh in my voice.  Insolvency has a lot to do with

19   financials and things like that.  But it's important.  What is

20   insolvency?  You heard the testimony.  "Insolvency" means you

21   can't pay your bills.  You can't continue as a business.  If

22   you're an investor, it's the thing you care about most.  Am I

23   investing my money in a company that's about to go out of

24   business?  That's what defendant wants people to believe.

25   That's what -- that's why he put a price target of zero on it

1    and said the company was worth zero dollars.  He wants people

2    to worry.  I'm going to invest in this.  I'm going to buy it

3    with my retirement savings, my kids' education savings and it's

4    going to be gone.  Because, ladies and gentlemen, that's how

5    you crash a stock.  You crash a stock with a statement like

6    that.  You're about to invest in a business that's going out of

7    business.

8           Insolvency has a meaning.  It means the company can't

9    pay its bills, it's unable to meet its obligations.  And you

10   have these statements in Exhibits 6 and 7, and you'll see in

11   the verdict form not only does it say Exhibits 6 and 7.  We've

12   given you the page number for each of these statements, and you

13   can see exactly what defendant is saying.  He's saying the

14   company is insolvent.  He's not saying it's my judgment.  He's

15   not saying "I think."  He's saying the company is insolvent.

16          You know, you heard some testimony and highlighted by

17   the defendants appropriately, insolvency can involve judgment.

18   And that's true.  In a close case things can involve judgment,

19   right?  You can have a glass of water or a water bottle and it

20   can be half full or half empty, and we can debate and use our

21   judgment is it half full or half empty.  But if it's full, you

22   can't say it's empty.  That's not judgment.  That's lying.  And

23   that's what he's doing here.  When he leaves out -- again,

24   remember, leaving out important things is also a way to lie.

25   You'll hear the judge talk about it as either a misleading half

1  truth or misleading omission.  And you should listen carefully

2  to those instructions and follow exactly what the judge says

3  about them.

4       When the defendant leaves out that 180 million dollars

5  in the bank, the steady stream of royalty revenue coming in

6  from the defendants -- excuse me, coming in from Ligand's

7  businesses, the Captisol revenue, and the real actual value of

8  those intangible assets, the assets of a pharmaceutical drug

9  discovery company, the research, the technology, the trade

10 names, et cetera, when you ignore all that and you just leave

11 it out and you say the company's insolvent, you're calling

12 something that is full, you're calling it empty.  That's a lie.

13 That's a lie about a fact.  We can debate if it's halfway up or

14 halfway down, but if it's full, it's not judgment to call it

15 empty.  It's not your opinion.

16       Also, the defendant is representing here to everyone

17 that he's doing some sort of analysis.  Right?  He's saying

18 that he actually looked at these intangible assets and he

19 excluded them and did an analysis and came up with a reason why

20 those assets were worth exactly zero dollars.  But there's no

21 analysis.  You didn't see them bring any analysis.  The

22 defendant just decided.  You heard him tell you.  He just

23 decided they were worth zero.  I decided they weren't worth

24 anything, and that's when I decided it was insolvent.  And this

25 math ratio, this math formula, when you put a formula in, isn't

1    that actually saying this is a fact?  I did the math for you.
2    The math shows insolvent.  Doesn't that show you what the
3    defendant was trying to do here?  State a fact, a false fact, a
4    lie, that the company was insolvent.
5            And if you believe that the defendant was lying when
6    he said that these statements about the company being
7    insolvent, if you think that he left out the key pieces of
8    information that would make what he was saying not misleading,
9    I'd ask you that you also check on 4(d) yes and find him liable
10   for lying about and omitting the material information that was
11   necessary to understand his statements about the company.
12           On your verdict form you see we were talking about
13   question 2.  There's question 1 also.  Question 1 is about a
14   fraudulent scheme.  If you take all these statements and you
15   take that other conduct that the defendant engaged in,
16   mischaracterizing the S-1, mischaracterizing the Form 10-K,
17   Exhibit 14 -- the S-1 is Exhibit 58 -- the taking of the short
18   position to drive -- you know, with the intent to drive the
19   price of the stock down, the dissemination, the doing
20   everything he did to spread those lies around on the web and
21   with the reporters and with news releases and with interviews.
22   And the trying to silence his critics by getting negative
23   comments about his reports taken down from Seeking Alpha.  And
24   when you get back in the jury room, I ask that you to take a
25   look at 249 and 251.  You heard a little about it.  It went by

1    pretty quick.  But the defendant said, oh, I was just getting

2    things down that had threats in them or had my home address.

3    Take a look at what's actually in those exhibits and ask

4    yourself why would the defendant lie to you about that.  Why

5    would he say that these comments were about something when they

6    were actually about criticisms of his report?

7           And why did the defendant quote Dr. Jabbour in his

8    report, Exhibit 1, about Promacta and never tell anyone that

9    Dr. Jabbour was his good friend, his neighbor and his largest

10   investor?  If you're reading a report about Promacta, don't you

11   want to know if the person it's talking to you about is

12   actually the largest investor in a bet that the company's stock

13   price is going to go down?  No disclosure of that either.  And

14   that that goes into this fraudulent scheme.

15          If you find that the defendant intentionally or

16   recklessly engaged in this scheme, either he intended to do it

17   or he got so extremely careless in engaging in this scheme by

18   mischaracterizing the documents, by ignoring or omitting on

19   purpose all the parts where they talk about ITP, all of that

20   stuff together, we ask that you take question 1, which asks you

21   if the defendant has engaged in a fraudulent scheme or course

22   of business, and if you think that he has, we ask you that

23   check yes on question 1.

24          And the second question is, of course, about those

25   four lies.  We've talked about that.  We've talked about how

1   each statement was false, how the defendant knew the statements

2   were false.

3          The next part is easy.  The judge is going to tell you

4   that the false statements have to be made in connection with

5   the purchase or sale of securities.  Well, you saw the

6   defendant was engaged in a short sale of Ligand's stock.

7   That's what the judge is talking about there when we're talking

8   about in connection with the purchase or sale of securities, it

9   was in connection with his investment in the short -- the short

10  investment in Ligand's stock.

11         Finally, materiality.  We talked a lot about that

12  already.  Would these statements matter to a reasonable

13  investor?  That's what "materiality" means.  You'll hear the

14  judge instruct you.  Listen closely about what you need to

15  find.  You need to find that a reasonable investor would take

16  into account -- not decide based on, but take into account

17  information like this.  So you're going to consider what would

18  a reasonable investor want to know about these things that the

19  defendant was lying about?

20         And here, the reasonable person -- that's why we've

21  asked you to come here -- you're our reasonable people -- would

22  a reasonable investor want to know that Ligand was about to

23  lose one of its biggest sources of revenue, its biggest

24  products?

25         Would a reasonable investor think it was a bad thing

1   if Ligand was engaged in some shady shell deal to funnel

2   markets and pad its balance sheet?  Would a reasonable investor

3   want to know if the partner in that was not going to get

4   financing because they hadn't gotten an audit and that they

5   weren't going to use that money to develop any drugs?  Would a

6   reasonable investor want to know -- in fact, it's not even

7   worth asking the question.  Of course a reasonable investor

8   would want to know that the company they were investing in was

9   actually insolvent and about to go out of business.  If those

10  things were true, of course a reasonable investor would want to

11  know about it.

12          And you actually saw Mr. Fields come here on the last

13  day and he said, "I'm a reasonable investor.  I'm a

14  professional investor.  And we invest" -- it was a lot, right?

15  Like a billion, in the billions.  Right?  "We invested up to 80

16  million," he said in Ligand.

17          And he said, "Of course we'd want to know that.  Not

18  only do we want to know it, if someone says it we have to check

19  this out.  We have a fiduciary duty" -- that fiduciary duty he

20  talked about -- "we have a fiduciary duty to actually go back

21  to the company and ask them," and not only ask them but check

22  it out independently.  Does that sound like something that

23  doesn't matter, as defendants are expecting?  Does that sound

24  like something a reasonable investor doesn't care about?

25  Insolvent, oh, here's my money anyway.  Is that what's more

1    likely than not?

2          You heard Mr. Voss, Mr. Foehr, Mr. Higgins all told

3    you they heard about these reports, these statements, these

4    lies, from investors.  They got calls, they got emails.

5    Mr. Fields told you it was important.

6          Here's some of the emails they got.  243, 246, 247,

7    248, all talking about investors who are either emailing or

8    calling or in person and they're asking about Father Lemelson's

9    reports and these statements.  It's not hard to conclude that

10   they cared about them because he these things were so

11   important.

12         Now, let me tell you something that does not determine

13   materiality.  Stock price.  In fact, you'll hear the judge tell

14   you in no uncertain terms that the Commission does not need to

15   prove the defendant's conduct caused the price of Ligand stock

16   to fall.  Plain and simple.  I'm not sure why we were looking

17   at all those bar charts going up and down.  We don't have to

18   prove that.  It's not necessary.  People don't have to have

19   actually have sold.  Right?  We have to prove that a reasonable

20   investor would care about the statements that were made, about

21   the topics that were being lied about.

22         Now, sure, is this in evidence?  Yeah, this is a chart

23   of the stock price going down on the dates the defendant issued

24   his report and how much money he was making.  But does that

25   determine materiality for you?  You can consider it and

1    consider whether the price goes up and down, but really the

2    question you're being asked is does a reasonable person care

3    when someone says that the company they're invested in is

4    bankrupt?  Does a reasonable person care when the biggest

5    product is going away?  Those are the questions that

6    materiality is asking about.  That's what the judge is talking

7    about when she's talking about those instructions.

8            And certainly the defendant thought that his reports

9    were making a difference.  The defendant -- this is a little

10   hard to read, but this is his annual report for 2014 to his

11   investors.  The publication of multiple research reports and

12   related short stake resulted in a loss of approximately 500

13   million dollars in market capitalization of the company.  That

14   was Exhibit 99.

15           Exhibit 63, another thing to his investors and to

16   prospective investors, and I'm going to talk about those folks

17   in a minute.  Again, talking about how the stock price is going

18   down as a result of his work.  And defendant says in email

19   after email he pushed the price down.  Defendant thinks he's

20   having an effect.  Defendant thinks that investors cared about

21   this in 63 and 72 and 82 and 99.  Don't be confused about a bar

22   chart about stock price.  It's not what you're being asked to

23   find.

24           Defendant also wants you to think that all of these

25   facts, they were somehow opinions.  Now, we've talked a little

1    about that.  But when you look at these statements, does it

2    seem like the kind of thing that you would have called an

3    opinion before you walked in here?  In fact, what did the

4    defendant say about his reports?  He said he put in facts that

5    supported his arguments, yes.  "The purpose of making an

6    argument based on facts is so that the people will read that

7    argument and believe it."  Right?  "I wanted to present my

8    opinion."  "Your opinion that you were supporting with facts,

9    correct?"  "That I was supporting with facts, the facts."

10   Right?  Are there opinions in those reports?  Of course there

11   are.  Are those opinions supported with facts?  Yes.  Why?

12   Because if you just put your opinions out, people aren't going

13   to believe you.

14        Now, we had a lot about oh, why would the defendant

15   put his name on it?  Why would the defendant say he invested in

16   Ligand if he wanted people to be it -- if he wanted it to be

17   fraud?  That's the only way this fraud works.  If I put out --

18   I wouldn't do that.  If someone put out a report on the

19   Internet that was anonymous and said all these bad things about

20   Ligand, do you think people are going to believe that?  Are

21   they going to panic based on that?  No, this is an anonymous

22   report.  I have no idea who this person is, where they're

23   coming from or what their interests are.

24        You need to put all that stuff down.  Otherwise the

25   scam doesn't work.  Right?  You need to put down that you've

1    invested money because then people believe you.  You've got a

2    stake.  You need to put down that it's you.  Remember, when he

3    puts down that it's him, it's the him that's one of the top

4    hedge fund managers month after month -- you have these

5    exhibits -- month after month on the top of the Barron's list.

6    This is not some schmo.  This is a top hedge fund manager with

7    top results in the world.  Putting down his name is the key.

8    People believe him, the hedge fund priest that gets written up

9    in the paper all the time who gets results.  People believe

10   him.  Apparently those results are based on lies, but people

11   believe him when he says stuff.  That's the key part of this

12   scheme.

13        The judge is going to tell you that a fact is

14   something done or existing.  Right?  Are those four statements

15   a fact done or existing?  We've seen each one of them.  They

16   don't say, "I think."  They don't say, "This is my opinion."

17   They say a fact, a fact that supports his argument, a fact that

18   he wants people to believe, a false fact, a lie, a lie he wants

19   people to believe in order to believe his thesis and get

20   worried about the stock and either not invest in it or sell it,

21   because that's what makes the stock price go down and that's

22   what makes his profits go up.  It's not a complicated scheme if

23   you're a top hedge fund manager who people believe.  And when

24   you say things, they think you're telling the truth.

25        And even if you thought they were opinions, and I

1    think when you look back at these statements, you're going to

2    probably conclude they're not, but even if you thought they

3    were, didn't the defendant misleadingly exclude facts that made

4    what he was saying misleading?  And you'll hear the judge talk

5    about that when she talks about opinions.  You can have an

6    opinion but you can't leave out facts.  And you can't state

7    false facts in support of that opinion.  And that's exactly

8    what the defendant did here, mischaracterizing documents,

9    misquoting people, all of that.  Even if they were opinions,

10   they're not protected opinions.

11        We heard a lot -- there was a lot of flag waving.  You

12   know, we heard a lot about North Korea and Putin for some

13   reason and how sacred the First Amendment is, and it is.  But,

14   you know what, the securities laws say that you can't lie about

15   stock.  That's not protected by the First Amendment.  That's

16   why we're here.  If that was protected by the First Amendment,

17   frankly we wouldn't have a stock market.  Why is the defendant

18   focused so much on North Korea and the flag and taxpayer

19   dollars and wrapping this all up like that?  Is it because

20   they'd like you to focus on that instead of the evidence here?

21        Defendant says he was putting out facts, facts, not

22   opinions.  "Your recollection is that these research reports

23   include facts, not opinion?"  "That's my recollection."  "You

24   think all your interviews with Benzinga were simply objective

25   recountings of fact?"  "They're me sharing my research that I

1    conducted and how I saw that research."  "Your facts, the facts

2    that you found?"  "Well, yes."  Back then, back remember the

3    defendant said he didn't know he was under investigation then.

4    Back then he said it was facts.  Now they're playing a

5    different tune.

6              So the defendant distributed all of these

7    misrepresentations to investors and prospective investors.  Now

8    I ask if you're interested in seeing him distributed all those

9    to the investors and prospective investors, and here we're

10   talking about investors and prospective investors in The Amvona

11   Fund.

12             Why are we talking about that?  Because I told you --

13   remember, I opened on this.  I said there was another way that

14   you can violate the securities laws.  I said it right from the

15   beginning.  Right?  That's by lying to The Amvona Fund

16   prospective investors, people who were interested in investing

17   in The Amvona Fund and the investors in The Amvona Fund, the

18   actual clients.  If you lie to those people, you violate the

19   Advisers Act.

20             The Advisers Act is something the judge is going to

21   instruct you about, and it's actually questions 3 and 4 on your

22   jury verdict form for that claim.  Because there's two ways you

23   can violate it.  You're going to see the defendant did violate

24   that here.

25             I'm going to ask you to take a look at how he

1   distributed those same misrepresentations to his investors and

2   people who were interested in investing in his funds.  Look

3   what I can do.  Look what I've got.  Look at my analysis.  Look

4   how good I am.  Look at my results.  Look at the stuff going

5   down over time.  Stay invested with me.  Invest with me.

6          That's a separate violation of the law.  It's just the

7   way it works.  When you misrepresent yourself to those people,

8   it's a separate violation.  In fact, because being an

9   investment advisor, because getting paid to manage someone's

10  money is a special status under the law, it's not just being

11  intentional, although here I would submit to you the defendant

12  was absolutely acting intentionally.  But you can't be reckless

13  either.  And you can't be negligent.

14         Even if you just didn't do the stuff you were supposed

15  to do, that a reasonably careful person would do, and you sent

16  that all out and you made those representations to your

17  clients, your investors, your prospective investors, even if

18  you just didn't do the things that a reasonably careful person

19  would do, like maybe looking at the S-1 and seeing it was

20  audited, like maybe looking at all those pages of the S-1 and

21  seeing all the times they described they're going to do

22  clinical trials, if you didn't do something that a reasonable

23  person would do, that's also a way.  So you can violate it if

24  you're doing it intentionally, which I think here he was.  And

25  you can also violate it if you were doing it negligently.

1    That's called negligence.  You didn't do something a reasonably

2    careful person would do.

3           Question 3 is about whether he did that intentionally

4    or recklessly.  And question 4 is about whether he did it

5    negligently.

6           Now, let's talk about a couple of things the

7    defendants asked you to focus on.  They said, well, he could

8    have taken his profit right at beginning or he could have put

9    out more reports and watched that stock price go down more.  It

10   doesn't really say that he was acting fraudulently.

11          They said there was not motive, but you saw what the

12   motive was, and that motive paid off.  It paid off in 1.3

13   million dollars of profit.  A third of that goes to the

14   defendant and his family, and then the defendant takes one out

15   of every $4 of that profit as his fee.  It's not a bad hole.

16   There's nothing wrong with making money in the stock market.

17   That's what we do.  That's what the SEC is around for, so

18   people can make money in the stock market if they can, but if

19   you do it with lies, we show up.

20          Let's talk about us showing up for a minute.  There

21   seems to be a lot of, for some reason, a lot of talk about why

22   is the SEC in this case?  Well, as you heard at the beginning,

23   the SEC is the one who investigates and prosecutes violations

24   of securities laws, and you go to the SEC when you think that

25   you've seen or witnessed or been the victim of a securities law

1    violation.

2           There was a lot on those presentations.  How come this

3    isn't in the presentation?  How come that isn't in the

4    presentation?  How come they're making these allegations and

5    they don't have facts?  You know what?  There's one thing that

6    the SEC has that Ligand doesn't have.  It has investigative

7    powers.  You heard about that.  In fact, the defendant wants a

8    lot of credit for giving over his hard drive.  But you heard,

9    what did he get?  He got a subpoena.  And I think you all know

10   a subpoena is a legal requirement to turn over that stuff.

11   They want to wave it around.  Oh, look, he gave all this over.

12   He got a subpoena.  The SEC issues subpoenas to people to

13   investigate.

14          You saw this magic easel here.  If all this leaning on

15   the SEC was so great, how come the SEC's case -- as the

16   defendant said over and over, how come the SEC's case has

17   statements that aren't in those PowerPoints?  Well, it's

18   because when you go to the SEC, the SEC does an investigation

19   with those investigative powers, with those subpoenas, and

20   comes up with its own reasons, own evidence, own theory about

21   why the law was violated, and has to package it into a case

22   that's digestible to a jury that's not going to take four

23   months and bring it to you and say, "We think the defendant

24   violated the law.  Here's our evidence."

25          That's why you go to the SEC.  Somebody throws a rock

1    through your window, yeah, you can go out on the street and try

2    to figure out who it is and you can do something to them when

3    you find them.  Is that what we're supposed to do?  Go seek

4    them out on the street and beat them up in alley, or are you

5    supposed to call the cops?  What's wrong with that?  Why do

6    they keep suggesting there's something wrong with that?  That's

7    what's supposed to happen.  Why do they want you to focus on

8    that and not the evidence.

9         Look, executives are paid a lot of money.  I wish I

10   was paid that much money.  You probably wish you were paid that

11   much money.  If you are paid that much money, great, but does

12   that make it any more or less likely that the defendant lied,

13   that Mr. Higgins gets 11 million dollars a year?  Why are they

14   asking you to focus on that and not the evidence?  Is it any

15   more likely that the defendant was telling the truth because

16   Mr. Higgins makes 11 million dollars a year?  And they want you

17   to think, oh, look, they have this financial interest.  Is that

18   a reason to come in and commit perjury on the stand?  Did you

19   think all of those people were coming in to commit perjury?

20        See, this is how it goes for the defendant.  In order

21   for the defendant's story to be true, you have to believe that

22   Dr. Marschke and Dr. Lian and Mr. Higgins and Mr. Foehr and

23   Mr. Voss and Kathy Hyodo, the auditor, Mr. Banerjee in his polo

24   shirt in his car trying to come in and give you some evidence,

25   and Bob Fields and Dr. Jabbour, they're all wrong.  They are

1    all, or at least most of them, are lying about him.  That's

2    what you have to believe in order to have defendant's theories

3    to be true.

4            Is that the more likely than not?  Is that what you

5    got the sense of when these people were up here testifying

6    about what this thing meant to them and why it was false, why

7    it was so important and why they pursued it all this time, why

8    they've come as witnesses?  By the way, you don't get a choice

9    to come as a witness.  You get a subpoena.  You have to show up

10   as a witness.

11           But, anyway, did you get the sense they were all

12   coming here and looking you in the face and bald-face lying to

13   you?  Or when you looked at the defendant and how he wouldn't

14   answer a question straight, no matter what question we put to

15   him, wouldn't answer it straight.  Which is more likely than

16   not?  Who is more likely than not actually telling the truth

17   here.

18           THE COURT:  You need to start wrapping it up.

19           MR. JONES:  Absolutely, Your Honor.  Last page.

20           What was the defendant really doing here?  Let me

21   leave you with some final thoughts on what the defendant meant

22   to do here, what his state of mind was, how he meant to act

23   fraudulently and intentionally.  You know what, actually,

24   scratch that.  Let me have the defendant tell you in his own

25   words what he was doing here.  He was engaged in a multi-month

1    battle.  He thought it was a battle.  He thought he was going

2    to slay the dragon.  He thought he was going to beat them.

3            Here he's talking on the radio.  If there's some

4    negative news, then the stock might sell off tremendously

5    because of it.  Idea.  "I'm not convinced that groups of people

6    behave rationally most of the time."  Maybe they don't go back

7    and check, maybe they don't read the S-1.  Maybe if the top

8    hedge fund manager in the world writes something, they're going

9    believe it and they're going to get worried and they're not

10   going to buy stock and they're going to sell their stock.

11           Back in 2014 that's what we were doing in the

12   pharmaceutical space.  We were providing a catalyst.  You know

13   a catalyst is something that makes things happen.  Takes

14   something that's there and makes it happen.  You heard about

15   how he bragged about crashing the price of stock.  In fact, you

16   saw him brag about 500 million dollars in real stockholder/

17   shareholder, real people money that he destroyed.  He used that

18   term, "destroyed."  And of course, there's this.  (Audio

19   played.)

20       "Run, Bambi, run."  Take the irrational people that can

21   get scared if the top hedge fund manager in the world comes

22   along and tells them that this company is going to go bankrupt,

23   go out of business, is engage in shady shell companies, and is

24   going to lose its biggest product.  And if you tell them that,

25   they're not going to check, they're going to run.  And that's

1    what the defendant wanted and that's what he got.  That's how

2    he made 1.3 million dollars, by lying, by engaging in a

3    fraudulent scheme and by deceiving his investors.

4        Ladies and gentlemen of the jury, there's one thing we

5    agree on.  We also, for all of us, want to thank you for being

6    here.  It's been a long time.  It is good to be back, probably

7    better for us than you, but it's good to be back.  I want to

8    thank you for your time, your patience, and obvious attention.

9    We've all been talking about.

10       We ask that you check yes on each of the questions and

11   find the defendant responsible for his lies, his fraudulent

12   scheme, and for deceiving his investors and potential

13   investors.  Thank you.

14            THE COURT:  All right.  Thank you.  We'll stand in

15   recess, take our break, and then come back for the

16   instructions.

17            THE CLERK:  All rise.

18            THE COURT:  Thank you.

19   (Jury exits.)

20            THE COURT:  A couple of things.  First is, did we make

21   a decision about -- they have all these notebooks and binders

22   and --

23            MR. JONES:  Your Honor, I think the parties are agreed

24   that to the extent they have notebooks and hand-outs, they

25   should take it back with them both because I think they were

```
1    probably expecting that.  There's a lot of evidence here, and
2    they may have taken notes on that.
3              THE COURT:  Yes, I agree with that.
4              MR. HOOPES:  We agree, except for the chalk that you
5    designated -- you said is not going in.
6              MR. JONES:  Your Honor, they may have taken notes on
7    it.  We all agree those are the statements that --
8              MR. HOOPES:  The court said specifically --
9              THE COURT:  That was just a chalk.  He didn't let them
10   send in their chalk.  I'm not letting you send in your chalk.
11             MR. HOOPES:  Thank you.
12             THE COURT:  Now, the second thing is your closing,
13   Mr. Jones, had lots of exhibit tags on them --
14             MR. JONES:  Yes, Your Honor.
15             THE COURT:  -- that they saw.  I just think we should
16   keep a record of that, just like we did with the chalks there.
17   Do your paralegals or anyone have something you can mark as a
18   --
19             MR. JONES:  I have the entire closing with all the
20   tabs.
21             THE COURT:  That would be terrific.
22             MR. HOOPES:  There's a little problem here, which is
23   he referenced in exhibit numbers that you only let in for
24   cross, not for substantive purposes, to refresh recollection
25   and that sort of stuff, 243, 246, 247 --
```

```
 1              THE COURT:  I'm not giving it to them.  I'm keeping it
 2      for a record.
 3              MR. HOOPES:  I see.  I apologize, Your Honor.
 4              THE COURT:  It's just like your chalks I'm not going
 5      to send in.
 6              MR. HOOPES:  I understand.
 7              THE COURT:  I just want to --
 8              MR. JONES:  May I, Your Honor?
 9              THE COURT:  Yes, thank you.
10              MR. HOOPES:  I misunderstood.
11              THE COURT:  Just mark it as A, B, C -- E for
12      identification as the slides that the SEC put up in front of
13      the jury.
14              (Exhibit E, marked for identification.)
15              MR. JONES:  Your Honor, are we going to do the same
16      for the defendant's slide?
17              THE COURT:  I thought we did.  I thought we marked
18      them A, B, C, D.
19              MR. BROOKS:  I think she marked them this morning.
20              MR. JONES:  But I meant the entire presentation.
21              THE COURT:  Yeah, we can do the whole --
22              MR. JONES:  We might as well.
23              MR. HOOPES:  We'll have one printed out.
24              MR. BROOKS:  Oh, the -- I'm sorry.
25              MR. JONES:  That's what we're marking.
```

1          THE CLERK:  They're just chalks.

2          MR. BROOKS:  We don't have a hard copy of it.  Should

3     we email it or print it out?

4          THE CLERK:  Print it out, if you can.

5          MR. BROOKS:  Of course.

6          THE COURT:  The only reason I say that is you were

7     referencing them and if this should ever go up on appeal,

8     someone might not understand it without seeing the slide that

9     went with the comment.

10          Otherwise, enjoy.  You all deserve it.  I'll see you

11     at 11:30.

12          MR. JONES:  Thank you for cranking that out last

13     night.

14          THE COURT:  Hopefully I got it to you all in time.

15     Thank you.

16     (Court and Jury enter.)

17          THE COURT:  The jury shall remain standing.  Everyone

18     else shall be seated.  Good morning still.

19          JURORS:  Good morning.

20          THE COURT:  There's an old tradition in this court and

21     the courts of our Commonwealth that at this stage of the

22     proceeding the judge faces the jury and the jury faces the

23     judge.  This is the best way that I know how to symbolize the

24     important role that we both play in this process.

25          My job has been threefold.  The first was to impanel a

1    fair and impartial jury.  On behalf of everyone in this

2    courtroom, we thank you so much for coming in, for serving, for

3    swearing that you can be fair and impartial.  There's a long

4    line of people who couldn't or wouldn't serve.  You have agreed

5    to serve in one of the most important functions we have under

6    the Constitution, serving as a jury.  So thank you.

7         My second job was to rule on evidentiary objections.

8    Sometimes we did that -- we actually had a whole hearing on

9    that before the trial started -- we did it in front of you, and

10   sometimes we did it before you came in in the morning.

11   Sometimes I ruled right in front of you.

12        And my third and final task is to give you these

13   instructions of law.  You must follow these instructions

14   whether you agree with them or not.

15        My charge will be divided into three portions.  The

16   first portion is very general.  You may not even remember the

17   first day now -- it seems so long ago -- where I talked about

18   the burden of proof and the different kinds of evidence that

19   you can consider.

20        The second section is very specific to that jury form

21   that you got that I handed out before the closing arguments.  I

22   will address the law that governs how you will go about

23   answering those questions, so a very specific legal analysis.

24        And the third and final portion will be about the

25   mechanics of deliberations.  How you choose a foreperson.  I

1    tell you right now, there are no alternates.  You are all going
2    to go back there to deliberate because this is a civil case,
3    not a criminal case.  Therefore, there are no alternates in
4    this case.  So all of you need to take notes, which brings me
5    to the issue of note taking.
6            We will have a tape recording of the charge that will
7    come in afterwards.  And if the deliberations go for longer
8    than a day, we will try and get you a transcript of the charge.
9    However, I strongly encourage you to take notes about the
10   charge for two reasons.  One is, it will help you find -- like
11   you may say what did she say about this issue?  It will help
12   you in your notes to figure out what I said or to find out
13   where I said it so you can go back and listen to it on the tape
14   recorder.
15           The second is -- this has been a long few weeks -- so
16   you won't daydream.  When you take notes, you'll get it down so
17   you can remember the key parts.  Sometimes I'll repeat a
18   section if I'm actually giving you the precise law on
19   something.  That doesn't mean that section is more important.
20   It just means that I want to make sure you get it down
21   correctly because I'm citing to you a specific, like for
22   example, the words of a statute or a rule.
23           So let's get going.  You can take notes on the
24   verdict form I handed out, but I remind you at the end whoever
25   the foreperson is will sign and date an official verdict form.

1    I don't need seven verdict forms floating around.  Let's sit

2    down and get going.

3         Let me begin by discussing the role of the court.

4    These instructions are about the law you must apply.  I do not

5    mean any of my instructions to be understood by you as a

6    comment by me on the facts or on the evidence in this case.

7    You are the judges of the facts and the sole judges of the

8    credibility of the witnesses.  You must be guided only by the

9    instructions of the law as I state them.  You should consider

10   them as a whole.  All of my instructions are equally important.

11   Even if you disagree with some of the rules of law or you don't

12   understand the reasons for them, you are bound to follow them

13   as jurors in this case.  This is a fundamental part of our

14   system of government by law, rather than by the individual

15   views of the judge and the jurors who have the responsibility

16   for deciding a case.

17        To the extent I say something different from what the

18   attorneys said, you must follow these instructions of law.

19        However, I emphasize that I am not the judge of the

20   facts.  I have no opinion as to the appropriate outcome of this

21   case.  You must disregard any facial expressions I may have

22   made during the course of the trial.  Although I feel silly

23   now, I have to say, doing that instruction because no one could

24   see my facial expressions.  I was wearing a mask the whole

25   time.  Nonetheless, I will sometimes ask questions to clarify

1    certain points.  Nothing I say is designed to indicate what I

2    think the appropriate outcome of the case is.  Also, if I ever

3    refer to evidence differently from the way you remember it,

4    it's your memory that controls here.

5           So what is your job as the jury?  You are the sole and

6    exclusive judges of the facts.  You decide the weight, effect,

7    and value of the evidence.  You also decide the credibility or

8    believability of the witnesses.  Once you determine the facts,

9    it is your duty to apply those facts to the law as I explain it

10   to you.

11          You must determine the facts without prejudice, fear,

12   favor, bias, or sympathy.  You also may not consider any

13   personal feelings you may have about the race, religion,

14   national origin, sex, or age of any witness who has testified

15   before the -- during the trial.  You must determine the facts

16   based solely on a fair consideration of the evidence.  If you

17   were to let fear, favor, prejudice, bias, or sympathy enter

18   into your deliberations, there is a great risk you will not

19   arrive at a true and just verdict.

20          You are not to decide the case based on what you may

21   have read or heard outside the courtroom.  You can't speculate

22   or guess as to what might or might not have happened.  Instead

23   you must confine your deliberations to the evidence and nothing

24   but the evidence.

25          The lawyers are allowed to comment during the trial

1    both on the evidence and on the rules of law, but if what they

2    say about the evidence differs from your memory, let your

3    collective memory control.  If what they've said about the law

4    seems to have a different meaning in any way from what I've

5    said, be guided by these instructions.

6            Now I'm going to go to the issue of so what is

7    evidence?  Evidence consists of the sworn testimony of the

8    witnesses who took the stand and testified.  All exhibits

9    received in evidence, you'll have those in the bound copies

10   that will come in.  Hopefully it will work.  We haven't been so

11   great with the tech.  There's something called the JERS system

12   and you'll be able to flash it up on the screen, and I think

13   you have some binders with exhibits in them.  Anything admitted

14   into evidence and received a number you can consider.  All

15   facts that have been admitted or stipulated to you may

16   consider.  I believe what's been submitted to you is a

17   stipulation of fact.  You may consider all of those facts in

18   reaching your verdict because it's an agreement between the

19   parties that a certain fact is true.

20           However, the mere number of witnesses or length of the

21   testimony or number of exhibits has no bearing on what weight

22   you give to the evidence or whether you find that a party's

23   burden of proof has been met.  Weight does not mean the amount

24   of the evidence.  It means your judgment about the credibility

25   and importance of the evidence.

1              Many things happened over the course of this trial

2      which are not evidence.  Let me go through them.  The opening

3      statements were not evidence.  Closing arguments that you just

4      heard are not evidence.  Questions that were not answered or as

5      to which objections were sustained are not evidence in the

6      case.  The function of lawyers in making their arguments is to

7      point out those things that are most significant or helpful to

8      their side of the case and in so doing to call your attention

9      to certain facts or inferences that might otherwise escape your

10     notice.  In the final analysis, however, it's your recollection

11     and interpretation of the evidence that controls in this case.

12     Once again, as I told you in the beginning, the information in

13     questions is not the evidence.  It's the answers.  And if I've

14     sustained the objection, you cannot consider it.

15             You may remember that there were many objections over

16     the course of the trial.  When I sustained the objection, don't

17     try and guess what the answer might have been.  Sometimes they

18     did answer.  You notice that?  And sometimes question,

19     objection, sustained, and the answer came in.  You cannot

20     consider that answer either.  Similarly, if I struck an answer,

21     hopefully you struck it from your notes, but don't consider it.

22             I also a few times allowed in evidence that was

23     hearsay, which means a statement made out of court not subject

24     to cross-examination, but I allowed it in for a limited purpose

25     like what was someone's state of mind or sometimes for context,

1    but I'm telling you now that information is only admitted for
2    the purpose I limited it to and you should only consider it for
3    that purpose.
4         As I mentioned before, I occasionally said things to
5    lawyers or asked a question.  You shouldn't infer from that
6    that I have any opinion about the appropriate outcome of the
7    case.
8         There are two kinds of evidence that you can consider.
9    Remember I talked to you about direct evidence and
10   circumstantial evidence.  Direct evidence is where a witness
11   testifies directly about a fact that is to be proved based on
12   what he or she claims to have seen or heard or felt with his
13   own senses.  Circumstantial evidence is different.
14   Circumstantial evidence is where no witness can testify
15   directly about the fact that is to be proved but you are
16   presented with evidence of other facts and then asked to draw
17   reasonable inferences from them about the fact which is to be
18   proved.
19        The law allows both types of proof in a civil trial.
20   While you may rely entirely on circumstantial evidence, any
21   inferences or conclusions which you draw must be reasonable and
22   natural based on your common sense and experience of life.  In
23   a chain of circumstantial evidence, it is not required that
24   each one of your inferences and conclusions be inevitable, but
25   it is required that each of them be reasonable.

1          Direct and circumstantial evidence have equal standing
2     in the law.  That is, with respect to what weight shall be
3     given to the evidence before you, the law makes no difference
4     between direct and circumstantial evidence.  No greater
5     certainty is required of circumstantial evidence than of direct
6     evidence.  You are to consider all the evidence in the case and
7     give each item of evidence the weight you believe it deserves.
8          Now, let me talk about the credibility of witnesses.
9     As jurors, your function is to evaluate the evidence that has
10    been introduced and to determine the credibility of witnesses'
11    testimony.  Credibility, of course, is simply another word for
12    believability.  It is your function to determine the
13    believability of witnesses who testified.  You're free to
14    decide to believe all of what a witness told you, none of what
15    the witness told you, or just some of what the witness told
16    you.  You are free to do that in accordance with your
17    collective judgment as to the believability of what it was that
18    the witness told you.
19         Neither I nor anyone else can tell you all the ways to
20    go about assessing credibility.  It's really the true genius of
21    the jury system, that you pool your collective common sense and
22    your experiences to make these assessments of credibility.  But
23    I am suggesting certain things that you may want to think about
24    when you're deciding if a witness is credible or not credible.
25         You should consider the demeanor and conduct of the

1    witness while testifying, the frankness or lack of frankness

2    that the witness showed while testifying, the reasonableness or

3    unreasonableness of the witness's testimony, the probability or

4    improbability of that testimony, the opportunity or lack of

5    opportunity that the witness had to see and know the facts

6    about which he was testifying, the accuracy of the witness's

7    recollection, the degree of intelligence shown by the witness,

8    the witness's prior conduct and -- conduct for truthfulness,

9    and whether the witness has attempted to fill in gaps in his or

10   her memory of the events with information he or she obtained

11   after the event.

12            You also may consider whether the witness has a motive

13   for testifying and the interest or lack of interest that the

14   witness may have had in the outcome of the case.  You may take

15   into consideration the character and the appearance of the

16   witness at trial and any bias he has shown in his testimony.

17   This list is not exhaustive, rather it is a list of examples of

18   factors that you may take into account and should take into

19   account in making this credibility judgment.

20            You may consider inconsistencies in evidence.  You may

21   consider inconsistencies or differences as you weigh evidence,

22   but you do not have to discredit testimony merely because there

23   are inconsistencies or differences in the testimony of a

24   witness or between the testimonies of different witnesses.  Two

25   or more persons witnessing an incident or transaction may see

1    or hear it differently.  In weighing the effect of any

2    inconsistency or difference, you may consider whether it

3    concerns a matter of importance or an unimportant detail and

4    whether it results from innocent error or intentional

5    falsehood.

6              You're not required to accept testimony even if it is

7    not contradicted.  You may decide because of the witness's

8    bearing and demeanor, or because of inherent improbability, or

9    for other reasons sufficient to you, that the testimony is not

10   worthy of belief.

11             I want to talk to you about impeachment by prior

12   inconsistent statements.  You have heard evidence at some

13   earlier time witnesses have said or done something that counsel

14   argues is inconsistent with the witness's trial testimony.

15   Evidence of a prior inconsistent statement is not to be

16   considered by you as affirmative evidence in determining

17   liability.  Sometimes it was deposition questions.  You know,

18   you said something now and didn't you say something before that

19   was different.  Evidence of a prior inconsistent statement was

20   placed before you for the more limited purpose of helping you

21   decide whether to believe the trial testimony of the witness

22   who contradicted himself.  If you find that a witness made an

23   earlier statement, like I said -- whether it's in a document or

24   deposition or something else that you have in front of you --

25   that conflicts with the trial testimony, you may consider that

1    fact in deciding how much of the trial testimony, if any, to

2    believe.

3           In making this determination, you may consider whether

4    the witness purposely made a false statement or whether it was

5    an innocent mistake, whether the inconsistency concerns an

6    important fact or whether it had to do with a small detail,

7    whether the witness had an explanation for the inconsistency

8    and whether that explanation appealed to your common sense.

9           It is exclusively your duty, based on all the evidence

10   and your own good judgment, to determine whether the prior

11   statement was inconsistent and if so, how much, if any, weight

12   to give to the prior inconsistent statement in determining

13   whether to believe all or part of a witness's testimony.

14          I am turning now to the issue of burden of proof.  On

15   all of the issues you're deciding -- and you have that whole

16   questionnaire in front of you -- the standard of proof you will

17   apply is preponderance of the evidence.  That's a legal term,

18   preponderance of the evidence.  The SEC has the burden of proof

19   in this case on all of the questions and all of the elements

20   that I will describe for you.

21          What does preponderance of the evidence mean?  It

22   means the fact to be proven is more likely true than not true.

23   That's always what you're going to be asking yourself.  Did the

24   SEC prove that this element or this claim is more likely true

25   than not?  In other words, that the evidence in favor of that

1    fact being true is sufficient to tip the scale, albeit

2    slightly, in its favor.

3           But the burden of proof has not been carried if, after

4    considering all the evidence, you find that you must speculate,

5    guess or imagine that one or more necessary facts is true.

6           The standard is different from what you may have heard

7    about in criminal proceedings.  As you now know, this is not a

8    criminal proceeding.  In criminal proceedings a fact must be

9    proven beyond a reasonable doubt.  Reasonable doubt requires a

10   higher degree of certainty than the standard in this case.

11   Once again, the standard in this case is the SEC has a burden

12   of proving its claims by a preponderance of the evidence.

13          You must base your decision only on the evidence

14   presented here.  The plaintiff in this case is the Securities

15   and Exchange Commission or the SEC.  The SEC is an independent

16   agency of the federal government charged with regulating the

17   securities industry.  The defendant is Gregory Lemelson, also

18   known as Father Lemelson.  We've been calling him Father

19   Lemelson.

20          The fact that a government agency is involved as a

21   party must not affect your decision in any way.  A governmental

22   agency and all people, all other persons stand equal before the

23   law.  You should consider and decide this case as a dispute

24   between persons of equal standing in the community of equal

25   worth and of holding the same or similar stations in life.

1          Okay.  Now, we're going to stand up and stretch

2    because I'm about to hit Part II, the really difficult

3    standards that govern in this case, and I need you to pay full

4    attention, as you have been all along.

5          I am going to read twice to you the federal law that

6    governs this case, what's called Rule 10(b)-5, and it's a

7    federal rule that was issued under the Securities Exchange Act

8    of 1934.  Okay.  I'm going to now read to you Rule 10(b)-5.

9    I'm going to read it through twice to make sure you get it.

10   Okay?

11         It shall be unlawful for any person, directly or

12   indirectly, by the use of any means or instrumentality of

13   interstate commerce or of the mails or of any facility of any

14   national securities exchange:

15         (a) To employ any device, scheme, or artifice to

16   defraud,

17         (b) To make any untrue statement of a material fact or

18   omit to state a material fact necessary in order to make the

19   statements made, in the light of the circumstances under which

20   they were made, not misleading, or

21         (c) To engage in any act, practice, or course of

22   business which operates or would operate as a fraud or deceit

23   upon any person in connection with the purchase or sale of any

24   security.

25         I'm going to read that again, and as you notice I've

1    repeated some of the language in the questions -- in the jury

2    questionnaire as well.

3          10(b)-5 provides: It shall be unlawful for any person,

4    directly or indirectly, by the use of any means or

5    instrumentality of interstate commerce or of the mails or of

6    any facility of any national securities exchange -- and I'm

7    going to go through the A, B, Cs.

8          (a) To employ any device, scheme, or artifice to

9    defraud,

10         (b) To make any untrue statement of a material fact or

11   omit to state a material fact necessary in order to make the

12   statements made in the light of the circumstances under which

13   they were made, not misleading, or

14         (c) To engage in any act, practice or course of

15   business which operates or would operate as a fraud or deceit

16   upon any person in connection with the purchase or sale of any

17   security.

18         You may notice that question 1 combines (a) and (c).

19   And question 2 talks about the allegations with respect to

20   material facts and omissions.

21         So now what I'm going to do is I'm going to go through

22   the elements that the SEC must prove.

23         In order to meet its burden of proof, the SEC must

24   establish by a preponderance of the evidence each of the

25   following three elements:

1          First, that the defendant, that is, Father Lemelson,

2    engaged in fraudulent conduct, which can be satisfied by

3    proving that the defendant did any of the following things.

4    Once again, I'm going to read those.

5          1. employed a device, scheme, or artifice to defraud;

6          2. made an untrue statement of a material fact or

7    omitted to state a material fact which made what was said under

8    the circumstances misleading; or

9          3. engaged in a fraudulent act, practice, or course of

10   business.

11         That's the first element.

12         The second element, the SEC must prove that the

13   defendant acted with the intent to deceive, manipulate, or

14   defraud, meaning that Father Lemelson knew his conduct,

15   statements, or omissions were deceptive or that he acted with a

16   high degree of recklessness.

17         Third, that the defendant used an instrumentality of

18   interstate commerce in connection with the purchase or sale of

19   a security.

20         As you'll see in the stipulation, the parties have

21   stipulated to the use of an instrumentality of interstate

22   commerce.  So you don't have to resolve that question.

23         All right.  Now, let me go back through some of this

24   again.  I will now explain the first element, fraudulent

25   conduct.  There are three ways in which the SEC can show

```
 1    fraudulent conduct.  With respect to the first kind of
 2    fraudulent conduct, the SEC must prove defendant employed a
 3    device, scheme, or artifice to defraud.  What's a device?  A
 4    device in this context means a trick or a fraud.  What's a
 5    scheme?  A scheme is a design or a plan formed to accomplish
 6    some purpose.  Thus the phrase "scheme to defraud" means that
 7    the defendant employed a manipulative or deceptive device for
 8    the purpose of defrauding or misleading investors.
 9         All right.  What's the second kind of fraudulent
10    conduct?  The SEC must prove that the defendant made untrue
11    statements of material fact or omissions of material fact.  The
12    SEC must prove that Father Lemelson committed fraud by making
13    one or more statements that were not true when they were made.
14    For the SEC to prevail on the second kind of fraudulent
15    conduct, that is, untrue statements of material fact, you must
16    unanimously agree on which statement was untrue and find that
17    the untrue statement was material.  And as you know by now, I
18    went through all four statements in the question form.  That's
19    all in 2A, B, C and D.  Those are the alleged false and
20    misleading statements.
21         So what does "material" mean?  It must be a material
22    false statement or omission.  What does "material" mean?  A
23    fact is material if there is a substantial likelihood that a
24    reasonable investor, that a reasonable investor, would consider
25    the factor important when making a decision about whether to
```

1    invest his or her money in a particular security.

2         With respect to omissions of material fact, a

3    statement leaves out a material fact if there is a substantial

4    likelihood that a reasonable investor would view the absent

5    fact as significantly altering the total mix of the information

6    available.  That an investor might be interested in the

7    information is not enough.  There must be a substantial

8    likelihood that a reasonable shareholder -- that's your test --

9    a reasonable shareholder would consider the fact important to

10   the investment decision.

11        The fact that a statement is literally accurate does

12   not preclude liability.  Some statements, although literally

13   accurate, can become misleading if, in their context and manner

14   of presentation, they would mislead investors.  This includes

15   what are sometimes called half truth statements that are

16   literally true but create a materially misleading impression.

17        So now I'm going on to the third kind.  The third kind

18   of fraudulent conduct is a fraudulent act, practice or course

19   of business which operates or would operate as a fraud or a

20   deceit upon any person.  The phrase has a similar meaning to a

21   scheme to defraud that I previously mentioned.  However, "would

22   operate" -- that word "would operate" -- means the act,

23   practice or course of business has the capacity to defraud but

24   it is not necessary that anyone was actually defrauded.

25        There may be some overlap between the different kinds

1    of alleged fraudulent conduct that would make a defendant

2    liable under Section 10(b)-5, that rule I just read to you.

3    For example, misleading statements which form the basis for

4    liability in the second kind of fraudulent conduct may also

5    qualify as a scheme to defraud if the statements were made as

6    part of a broader fraudulent scheme, practice or course of

7    business.  You'll notice you are asked two separate questions.

8    One is allegations about a scheme.  One is the alleged material

9    misstatements or omissions.

10           Now I'm moving on to the second element, state of

11    mind.  The SEC must prove by a preponderance of the evidence

12    that Father Lemelson acted with the required state of mind.

13    The SEC must show an intent to deceive, manipulate, or defraud.

14    To meet this burden, the SEC must prove Father Lemelson had

15    actual knowledge of the false or misleading nature of the

16    statements, meaning that he had the conscience -- excuse me --

17    conscious intent to defraud.

18           The SEC can also prevail on this element if it proves

19    that Father Lemelson acted with a high degree of recklessness.

20    For reckless conduct to exist, there must be a highly

21    unreasonable omission or misrepresentation.  It is an extreme

22    departure from the standards of ordinary care and presents a

23    danger of misleading buyers or sellers which is either known to

24    the defendant or is so obvious that the defendant must have

25    been aware of it.  It is not enough for the SEC to show that

1    the defendant acted accidentally, mistakenly, or negligently.

2    The standard is not simple or even inexcusable negligence.  The

3    standard here is closer to a lesser form of intentional

4    conduct.

5         Father Lemelson's state of mind can be proven by

6    either direct evidence or circumstantial evidence.  Thus, you

7    may infer defendant's state of mind from the defendant's acts

8    and words given all the surrounding circumstances at the time.

9         The third element is in connection with the purchase

10   or sale of securities.  Finally, to find the defendant liable

11   on the Exchange Act claims, 10(b)-5 claim, the SEC must prove

12   by a preponderance of the evidence that the deceptive conduct

13   was in connection with the purchase or sale of securities.  "In

14   connection with" means that there was some connection or

15   relationship between the alleged deceptive conduct and the

16   purchase or sale of securities.

17        Good faith.  A statement made with a good faith belief

18   in the accuracy does not amount to a fraudulent statement.

19   This is so even if the statement is, in fact, erroneous.  The

20   defendant does not bear the burden of establishing good faith,

21   rather the SEC bears the burden of establishing that the

22   defendant acted with the intent to defraud or with a high

23   degree of recklessness.

24        Let me talk to you about opinions.  You heard a lot

25   about opinions.  The First Amendment of the United States

1    Constitution protects the freedom of expression.  The First

2    Amendment's protection of freedom of expression applies to

3    statements of opinion.

4          Liability for untrue statements under federal law --

5    here we're talking about the Exchange Act and I'll later talk

6    to you about the Advisers Act.  Liability for untrue statements

7    under federal law is limited to untrue statements of material

8    fact.  However, a defendant is not protected by the First

9    Amendment and can still be liable under the securities laws for

10   an opinion if the opinion itself constitutes a factual

11   misstatement or the statement omits facts that render the

12   opinion misleading.

13         It is up to you to decide whether each of the

14   statements -- and you've got the four of them -- represents a

15   statement of fact or opinion.  The dictionary definition of a

16   fact is a thing done or existing or an actual happening.  An

17   opinion is a belief, a view or a sentiment which the mind forms

18   about persons or things.

19         If you determine that any of the challenged statements

20   are opinions, you should consider then if the statement of

21   opinion is false or misleading in the context in which the

22   statement was made.  You may find that a statement of opinion

23   is false or misleading -- and there are three separate ways,

24   and I'm going to read them and repeat them.  You may find that

25   a statement of opinion is false or misleading if:

1          1. Defendant did not subjectively believe the
2    statement was true and it was objectively untrue.  1. Defendant
3    did not subjectively believe the statement was true and it was
4    objectively untrue;
5          2. A statement of material fact within the opinion was
6    untrue.  A statement of material fact within the opinion was
7    untrue,
8          3. Defendant omitted material facts that made the
9    statement misleading to a reasonable investor.  3. Defendant
10   omitted material facts that made the statement misleading to a
11   reasonable investor.
12         In determining whether an opinion is misleading, you
13   should consider the statement within the context in which it
14   was made.  The statement must be misleading from the
15   perspective of the reasonable investor.  Words like "I believe"
16   or "I think" are not enough to shield a statement from
17   liability.  A statement, even if understood to be an opinion,
18   gives rise to liability if it implies the existence of false
19   facts as its basis.
20         Conversely, a statement is immunized from liability if
21   the defendant disclosed the facts that led to the challenged
22   statement and none of those facts are false nor were material
23   facts omitted.
24         Okay.  I've now gone through questions number 1 and
25   number 2, a little follow-up on something.  Now I'm moving on

1    to questions 3 and 4, the Advisers Act, the Investment Advisers

2    Act.  Okay.

3         To prove that Father Lemelson violated the Advisers

4    Act, the SEC must show by a preponderance of the evidence --

5    there's that burden of proof again, still the preponderance of

6    the evidence, more likely true than not true, the SEC must show

7    by a preponderance of the evidence that Father Lemelson:

8         1. -- once again, I'm going to read these and repeat

9    them -- made an untrue statement of a material fact or omitted

10   a statement of material fact necessary to make the statements

11   made, in the light of the circumstances under which they were

12   made, not misleading, to an investor or a prospective investor

13   in The Amvona Fund.

14        Let me pause for a second.  This is different.  This

15   isn't general investors.  This is specifically focused on the

16   investors in The Amvona Fund.  Okay.  Let me read that again.

17        That Father Lemelson made an untrue statement of a

18   material fact or omitted a statement of material fact necessary

19   to make the statements made, in the light of the circumstances

20   under which they were made, not misleading, to an investor or

21   prospective investor in The Amvona Fund.

22        Second, that Father Lemelson otherwise engaged in any

23   act, practice or course of business that is fraudulent,

24   deceptive, or manipulative to an investor or prospective

25   investor in The Amvona Fund.  Second, that Father -- that the

1    SEC must prove by a preponderance that Father Lemelson

2    otherwise engaged in any act, practice or course of business

3    that is fraudulent, deceptive, or manipulative to an investor

4    or prospective investor in The Amvona Fund.

5            I've already explained to you definitions of untrue

6    statement.  I've already explained to you what "material" means

7    and what the omission of a material fact means and I'm not

8    going to repeat them.  You should use the same definitions

9    here.

10           As I just stated, this claim involves investors and

11   prospective investors in The Amvona Fund, not investors in

12   Ligand.  Thus the SEC must prove allegedly misleading

13   statements were material to an investor or a potential investor

14   in The Amvona Fund.

15           If you find that the defendant engaged in any of the

16   above acts of prong one, prong two that I just read to you, if

17   you find that the defendant engaged in either of the above acts

18   with intent to defraud the Amvona investors and prospective

19   investors, he's liable under the Advisers Act.

20           I previously described the state of mind required,

21   that is, the intent to deceive or a high degree of

22   recklessness, and that is question 3.

23           An investor --

24           Father Lemelson can also be liable under the Advisers

25   Act if he commits the above acts negligently with respect to

1     The Amvona Fund investors or potential investors.  We're now

2     talking question 4.  A defendant acts negligently when he fails

3     to exercise ordinary care.  Ordinary care is the care a

4     reasonably prudent person exercises.  A person is negligent if

5     he does something that a reasonably prudent person would not do

6     or if he does not do something that a reasonably prudent person

7     would do, that would create an unreasonable risk of injury

8     given the circumstances.

9             So to prove that Father Lemelson violated the Advisers

10    Act, the SEC may prove the defendant made statements or acted

11    negligently rather than with the intent to defraud or

12    recklessness.  Negligence is a different standard.  If you find

13    defendant acted with the intent to defraud or recklessly with a

14    high degree of recklessness, he did not act negligently.

15    Conversely, if the defendant acted negligently, he did not act

16    fraudulently.  However, even if the defendant acted

17    negligently, in order to find him liable on this negligence

18    claim, you must find that the effect of the conduct was

19    fraudulent, deceptive, or manipulative with respect to Amvona

20    Fund investors.  You must find that the effect of the conduct

21    was fraudulent, deceptive or manipulative with respect to

22    Amvona Fund investors.

23            I've asked two questions to address these issues under

24    the Advisers Act.  One is about an intent to defraud, that's

25    question 3.  Question 4 is negligence.  If you find that, for

1    example, that some statements were made negligently and others

2    fraudulently, you could answer both questions affirmatively,

3    both 3 and 4.  You should answer both questions in the

4    negative, though, if you find that Father Lemelson was neither

5    acting fraudulently nor negligently.  However, whatever you do,

6    your verdict must be unanimous on this point, as on all points.

7    It can't be a split.

8          I want to talk to you about reliance, harm, or loss

9    causation.  The SEC is not required to prove that investors

10   relied on defendant's conduct or that investors suffered actual

11   damages as a result of that conduct.  Specifically, the SEC

12   does not need to prove the defendant's conduct caused the price

13   of Ligand's stock to fall.  The SEC only needs to prove that

14   the allegedly false statements or omissions were material.

15   When you consider whether defendant committed the fraud

16   violations alleged by the SEC, you should not consider or

17   speculate about whether his conduct caused economic harm or

18   other harm to other people.

19         You are to determine the answers to these questions on

20   the verdict form only whether the defendant violated the

21   federal securities laws as I've described them to you.  If you

22   find that the SEC has proved one or more of its claims against

23   Father Lemelson, I alone as the court will later determine what

24   the remedy or remedies to be imposed are.  You should not

25   speculate about that.

1          All right.  Now I'm going to -- wait a minute.  Let's

2     stand and stretch.  I'm going to hit the easy part, Part III.

3          Okay.  Let's sit down.  This part I'm going to remain

4     standing for.  All right.

5          This is what I called before the mechanics of

6     deliberation.  So when you go back into that jury room, you

7     have several things that you need to accomplish.  The first is

8     you need to pick a foreperson.  I used to think I was so smart

9     and I would sit and look at who took notes and who came in

10    early and that sort of thing.  I now have since learned, since

11    I've been doing this a long time, that you're best at

12    determining who your foreperson is.  So you go back there and

13    decide who is going to lead this discussion.  But I want to

14    emphasize that the foreperson is not more equal than the rest.

15    You heard both sides say we are content with this jury.  They

16    were content with all of you, and you all have an equal say in

17    the deliberative process.  So the foreperson may be leading the

18    discussion or helping out with the discussion, but has the

19    exact same vote as everybody in the room.

20          The foreperson, though, has certain obligations to me.

21    The first will be to ask me questions if you have questions.

22    We actually spent most of yesterday and actually some of the

23    earlier few weeks trying to sort through some of these very

24    difficult questions of law.  You may have a question about the

25    law.  The first thing to do is look at your notes and see if

 1   you can figure it out from there.  The second thing is listen

 2   to this tape recording, and, as I mentioned, we will try and

 3   get a charge to you if you are still deliberating tomorrow or

 4   the next day.  First go back to the charge, but if that doesn't

 5   answer your question, the foreperson has a right to ask me a

 6   question on a piece of paper.

 7          I notice you were all good -- or at least some of you

 8   were terrific at asking questions.  MaryEllen will give you a

 9   form.  You will write down the question.  The foreperson will

10   sign it.  I'll gather the troops together and try and answer

11   the question.  If it's something short and easy, I'll just

12   write down the answer on a piece of paper and send it back in.

13   However, if it's a more complicated thing it will take a little

14   longer.  We'll figure out an answer and I will call you back in

15   here to give you a supplemental charge.  So the first thing the

16   foreperson does is ask me questions.

17          There are certain things I don't ever want a question

18   about.  What did so and so say on such a such a date?  I don't

19   remember.  I took notes, some of you took notes.  My notes are

20   no better than your collective notes.  In fact, they're

21   probably worse.  Then somebody says, Can I have a transcript of

22   so and so's testimony?  Right?  I understand that.  It takes at

23   least a day to put together a transcript that is then

24   certifiable and then the attorneys have a chance to review.  We

25   can do it.  We will do it.  It's just not an ATM machine.  It's

1    not like this wonderful court reporter here just presses a

2    button and it spits out.  Just understand that your best

3    approach is to look at your collective memory and your

4    collective notes, and only if it's critical to your

5    deliberations, then make a calculus, do we want to take the

6    time to get the transcript of the testimony.

7            The third thing that -- the other thing is I never

8    want a question that sounds like this: Well, we're at 4-3,

9    moving to 5-2.  I don't want to know.  I don't want a split.  I

10   don't want to know who's arguing about what.  I'll tell you in

11   a minute about unanimity but I don't want to know until you

12   have a unanimous verdict what any kind of split is.

13           Of course we'll get you things like easels or paper

14   or -- do they still call them Flairs? -- magic markers,

15   whatever, we'll get you those.  But on the substance, you need

16   to write down everything.

17           The second thing -- so the first thing the foreperson

18   does is lead the discussion.  The foreperson asks any

19   questions.  The foreperson will sign and date the verdict form

20   and will certify that it is unanimous.  It must be unanimous.

21   It cannot be a split.  It must be unanimous on each statement,

22   on each claim of the SEC.  It must be all of you.

23           And the final thing that the foreperson does is

24   announce the verdict in court.  You'll hear MaryEllen say, "So

25   say you, Mr. Foreperson, so say you, Madam Foreperson, so say

1    you, all members of the jury," and you all have to ratify that

2    it is a unanimous verdict.  It's sometimes a little scary but

3    it's not the foreperson announcing that person's views.  It's

4    the foreperson announcing what the unanimous verdict is of the

5    jury.

6            Now, how do you go about this task of deliberating?

7    I've never been on a jury.  I did go in and was struck, but

8    judges can go in.  In fact, Supreme Court justices have gone

9    in.  But I do know that I meet with all my juries afterwards.

10   I say "my juries" because I start feeling like I know you when

11   I look out across the abyss.  And I do know how seriously you

12   all take it.  And that's important.  You see how important this

13   is to everybody in here.  This is important to both sides.

14           So when you go in there, no one should go in there

15   like this:  I know what I'm going to do and no one is going to

16   change my mind.  That's not what it means to deliberate.

17   You're all going to go in there with your sense of truth and

18   who's telling the truth and your sense of justice, and you're

19   probably thinking -- your mind is whirling as you hear the jury

20   charge and stuff, but people should go in there with an open

21   mind to listen to what other good and true citizens in our

22   community feel about the claims here and the evidence and the

23   credibility.

24           Now, that said, no one should change their mind to

25   reach a unanimous verdict because I'm sick of being here, you

1    know, I've got to go back to work, I've got my kids, I'm just

2    sick of the issue.  Nobody.  Because the reality is it means

3    too much to everyone.  So when you have come in here and you're

4    certifying that your verdict is unanimous, own it in your

5    heart.  Own it.  Right?

6            So what I'm going to do is, as you know we're going to

7    give you lunch.  You can deliberate over lunch.  We are going

8    to give you all the exhibits.  We're not giving you what we

9    quaintly call chalks, which is an old-fashioned term, for

10   things like the easel or the pretty pictures that you were

11   handed out or fancy -- if they didn't come into -- if they

12   weren't marked as an exhibit, it is not coming with you into

13   the jury room.  They were just visual aids, if you will, to

14   help you remember a particular piece of a document or to help

15   you visualize something.  But if it didn't come with you into

16   the jury room, please don't ask for it, I'm not going to give

17   it to you.  So you'll get all of the documents in there.

18           Now, at this point we're doing something a little

19   different than we do in other trials because of COVID.  We have

20   you deliberating in the courtroom because there's more space,

21   it's more spread out instead of what you probably saw in the

22   movies and all those crowded jury rooms.  I didn't want to do

23   that.  So you're spread out in the courtroom.

24           The negative of that is there's actually bathrooms in

25   the jury rooms and not bathrooms in the courtroom.  If you have

1    to exercise that constitutional right, please don't be

2    deliberating while people are out of the room.  You have to

3    have all people in the room at all times.  But you can

4    certainly deliberate with snacks and lunch and all that kind of

5    thing.

6           Now, I have to give the attorneys a chance to ask --

7    help me a little bit here, actually, clarify something or

8    correct something in my charge.  I may have stumbled over

9    something or missed something that we agreed to.  You know,

10   they're working so hard.  I don't even want to ask what time

11   they all went to bed last night.

12          What I'd like to do is I'm going to send you out.

13   It's possible the lunch is even already there.  Do we know?

14          THE CLERK:  I don't know.  I ordered it for 1:00.

15          THE COURT:  Sometimes they come early.  The caf is so

16   happy to have business.  We're all just coming back in.  So

17   I'll send you out there.  You'll get lunch when you get it.  I

18   may have to bring you back in here again if I blew something, I

19   didn't say it clearly or something like that.  But right now

20   I'm going to send you out and give them an opportunity to, you

21   know, suggest improvements, and then if I have to, I'll bring

22   you back.

23          Now, at that point we'll bring back the -- once I've

24   figured that out with the lawyers, we'll bring back the tape

25   recorder, we'll bring back the exhibits, and that's it.

1          No, no questions -- if you have a question, you'll

2     write it down or ask Mem.

3          THE CLERK:  You can write it down and hand it to me

4     and I'll hand it to the judge.

5          THE COURT:  At this point I need to -- though your

6     questions were terrific, I just at this point need to make sure

7     that I first talk to them, and then come back in, because you

8     can't ask questions at this point about the instructions.

9     Okay?  Thank you.

10         THE CLERK:  All rise.

11         THE COURT:  Can I add one more thing.  We usually

12    leave at 4:00.  I am certainly willing to stay until 5:00 if

13    you all want to.

14         THE CLERK:  They can write me a note.

15         THE COURT:  Write her a note as to when you want to

16    leave.  Maybe you want a fresh day tomorrow.  We're not trying

17    to rush you.  You've got that room for as long as you want.

18    Okay.

19    (Jury exits.)

20         THE COURT:  I normally do this at sidebar, and I keep

21    them here, but we're in a COVID world.  So why don't you --

22    first, I'll go through the SEC.  Any objections?

23         MR. DAY:  Yes, Your Honor.  We object to instructions

24    14, 16, 17 and 19.

25         THE COURT:  That's not good enough.

1              MR. DAY:  I'm sorry.

2              THE COURT:  What are you --

3              MR. DAY:  Too fast?

4              THE COURT:  14.

5              MR. DAY:  Yeah, number 14.  Specifically in 14 the

6     second paragraph, last sentence.  I believe we discussed this

7     yesterday.  The standard being closer to a lesser form of

8     intentional conduct was the language that we had suggested

9     should be otherwise.

10             THE COURT:  All right.  What's the next one?

11             MR. DAY:  Okay.  16, good faith.  As we also

12    discussed, I believe it was yesterday, we had suggested that

13    the instruction should be that good faith can be considered,

14    not that it's a --

15             THE COURT:  Wait a minute.  So that's not 15.  Number

16    what?

17             MR. DAY:  16, I'm sorry.

18             THE COURT:  16.  You oppose any good faith

19    instruction?

20             MR. DAY:  Right.

21             THE COURT:  Okay.  What's the next one?

22             MR. DAY:  Okay.  This is the opinion instruction,

23    number 17, and it was the last paragraph that we objected to,

24    specifically that a statement is immunized from liability if

25    the defendant disclosed the facts that led to the challenged

1   statement.

2          THE COURT:  Okay.

3          MR. DAY:  Okay.  And then let's see.  So negligence,

4   number 19.  Again, it was the same issue we discussed

5   yesterday.

6          THE COURT:  No.  This was all radically changed.  So I

7   have no idea what you're referring to.  Not radically changed,

8   but I went back into -- let's put it this way: substantially

9   changed.

10          MR. DAY:  It's the last paragraph on the first page,

11   page 33.  The statement that, "If you find defendant acted with

12   the intent to defraud or recklessly, he did not act

13   negligently" and conversely, that portion of it.  It's our

14   position that negligence and scienter can co-exist.

15          THE COURT:  Okay.

16          MR. DAY:  That's all, Your Honor.

17          THE COURT:  Okay.  Now Father Lemelson's team.

18   Mr. Sullivan.

19          MR. SULLIVAN:  Yes, Your Honor.

20          THE COURT:  You're up at bat.

21          MR. SULLIVAN:  We have just two objections, Your

22   Honor, and one is on the materiality.  We object.

23          THE COURT:  Which exhibit, do you remember -- not

24   exhibit -- instruction.

25          MR. SULLIVAN:  Instruction.  It's the absence of

```
 1   our -- regarding the stock price and proof that the stock
 2   price didn't move.
 3            THE COURT:  The Third Circuit issue.
 4            MR. SULLIVAN:  Yes, Your Honor.
 5            THE COURT:  Do you remember the name of that case so
 6   that's clear?  Does anyone remember that case where the Third
 7   Circuit sort of required --
 8            MR. SULLIVAN:  I think it's Oran v. Stafford, but I
 9   can --
10            THE COURT:  Anyway, it doesn't matter.  That I didn't
11   instruct that SEC has to prove -- what was the name of it, a
12   price -- there was a word the Third Circuit used.  A stock
13   effect.  Anyway, it's the fact I didn't say SEC has to prove
14   the stock went down as a result of the statement, right?
15            MR. SULLIVAN:  Yes, Your Honor.
16            THE COURT:  Okay.
17            MR. SULLIVAN:  And we also object to the -- in this
18   case, the negligence instruction, as we do not think it applies
19   in this case.
20            THE COURT:  Okay.
21            MR. SULLIVAN:  And those are our two.  Thank you, Your
22   Honor.
23            THE COURT:  Okay.  Let me just say for the record that
24   I found the area of negligence, which I did spend a huge amount
25   of time on yesterday, difficult.  And I've deliberately flushed
```

```
 1    it out.  So if I'm wrong, it does not jeopardize the entire

 2    verdict.

 3              MR. SULLIVAN:  Thank you, Your Honor.

 4              THE COURT:  So this will not be retried in its

 5    entirety --

 6              MR. JONES:  Thank you, Your Honor.  We appreciate

 7    that.

 8              THE COURT:  -- at least on the negligence issue,

 9    which I found precious little case law on.  A Supreme Court

10    case cited by the SEC I was surprised to see was authored by

11    Arthur Goldberg and the D.C. Circuit case was almost as old.

12    There's just very little case law.  So maybe this will be the

13    case that makes it up to the Supremes.  I hope not.

14              MR. JONES:  We do too, Your Honor.

15              THE COURT:  All right.  Thank you very much.  I was

16    telling my law clerks what a beautifully tried case this was,

17    particularly the closings were amazing.  It's two different

18    narratives.  So we'll see what the jury does with it.  It's a

19    good jury.

20              So have a wonderful lunch.  I will not call on you,

21    but make sure you have the cell phones for Mem in case they

22    have a question.  My practice is to bring you all in.  If you

23    could possibly say for the record -- I know it's been mostly

24    the paralegals but -- once again the unsung heroes of this

25    trial -- but is the SEC content with the form of the exhibits?
```

```
 1              MR. JONES:  Based on the sound advice of our
 2      paralegal, Your Honor, we are content.
 3              THE COURT:  Defendants?
 4              MR. SULLIVAN:  Yes, your Honor.  We are content.
 5              THE COURT:  Okay.  Think about this.  Cart them in,
 6      Mem, and my law clerks will help.  We'll bring in the tape
 7      recording.  We'll not take questions over lunch.  Stay tuned
 8      about when they want to leave.  I don't require that you stay
 9      in the building, but let me ask you this:  If they want to
10      leave, do you want to be here when I let them go?
11              MR. HOOPES:  Your call as far as we're concerned.
12              MR. BROOKS:  We don't have a position, Your Honor.
13              MR. HOOPES:  If you want us here, we'll be here.  If
14      you don't --
15              MR. JONES:  We'll follow your practice, Your Honor.
16              THE COURT:  Why don't I do this -- the one thing I
17      don't want is one side here and not the other side.  So I'm
18      going to assume that unless you talk to your client and there's
19      a different point of view, what we'll do is you won't be here
20      if I'm just letting them go.  I'll let them go at 4:00, remind
21      them not to talk about the case.  They may want to stay until
22      5:00.  You can just touch base with them.  Obviously if they're
23      going to return a verdict, I'll wait until everyone is here,
24      including Father Lemelson.  I don't know about your --
25      actually, I don't know this.  Have Ligand been watching?
```

```
 1            MR. JONES:  Have they been watching, Your Honor?
 2            THE COURT:  Yes.
 3            MR. JONES:  You mean online?  No.  I believe the only
 4   people who have been watching related to the SEC are the two
 5   SEC attorneys working on the case.
 6            THE COURT:  I may not wait until they get here.
 7            MR. JONES:  No, Your Honor.  They're observers and you
 8   wouldn't wait for them.
 9            THE COURT:  I will certainly wait for Father Lemelson
10   for any verdict.
11            Now, I will ask the court reporter if --
12            Let me ask you this:  How long would it take to do
13   that?
14            (Discussion held off the record.)
15            THE COURT:  So she's going to have a charge by the end
16   of the day, and so we can -- if they do span over -- as soon as
17   it's ready, I'll want you to read it to make sure there wasn't
18   a typo or something.
19            MR. JONES:  Yes, Your Honor.
20            THE COURT:  I think -- is there anything else, other
21   than --
22            THE CLERK:  I just need telephone numbers, keep their
23   cells on.  Are they going back to their office or staying here?
24            THE COURT:  They can do whatever they want.
25            MR. HOOPES:  We'll let you know what we're doing.
```

1          MR. JONES:  I think we're going to stay close, Your

2     Honor.

3          THE COURT:  You know, there's a library that no one

4     uses.

5          MR. JONES:  Is that up on 9?

6          THE COURT:  There's a library that's terrific.  Not to

7     mention the fact that hardly anyone's in the caf either.

8          MR. JONES:  I'm not sure I could read anything more at

9     this point.  Thank you, Your Honor.

10          THE CLERK:  Lunch from 1:00 to 2:00.

11          THE COURT:  Lunch from 1:00 to 2:00, so no questions.

12          (Jury deliberating 12:45 to 4:54 p.m.)

13     (Court enters.)

14          THE COURT:  I'm so thankful to Kathy, who got us this

15     transcript.  My law clerk saw two minor typos of no

16     significance.  Does anyone want to go through it?

17          MR. DAY:  We read through it quickly and it seems

18     accurate.

19          MR. SULLIVAN:  I'm still going through it, but I

20     haven't seen anything that raises any alarms on our side yet.

21     I'm on page 26.

22          THE COURT:  What I'm planning on doing is I will give

23     it to them first thing in the morning.  If anyone sees

24     something major, let me know.  Otherwise, I'm just going to

25     hand it to them.

1            MR. JONES:  Yes, Your Honor.

2            MR. BROOKS:  Appreciate it, Your Honor.

3            THE COURT:  They're working away.  They asked for

4    paper and markers.

5            MR. JONES:  They've been diligent from the start.

6    They are keeping diligent now.

7            THE COURT:  We won't address the question today, but

8    I'll show it to you after they leave.

9    (Jury enters.)

10           THE COURT:  Good afternoon.  Please don't be seated.

11   Good-bye.  I got your note and question.  I'll address it

12   tomorrow morning.  Also, tomorrow morning we'll have a copy of

13   the transcript of the jury charge.  So you'll have a full

14   transcript.  Kathy's been working all day and we are very

15   thankful to her.

16           Please don't start deliberating until I send you out.

17   As soon as there are seven people in there, MaryEllen comes and

18   gets me.  I ask my usual, did you read anything in the press,

19   et cetera.  Maybe I'll have an answer by then but if not, soon

20   thereafter.  Have a lovely evening.  See you tomorrow and

21   thanks for working so hard.

22           THE CLERK:  Good night.

23   (Jury exits.)

24           THE COURT:  Question 2C:  "Can we consider the context

25   of the whole report or just the statement in question, Exhibit

1    4, page 7?"  Here:  I do not plan to discuss it right now.

2    It's been an exhausting day for everybody.  But what I was

3    hoping we could do -- could we meet at -- I hate to do this

4    because it's still so dark out in the morning and I know you

5    want to sleep in.  But the reality is I think we should

6    probably meet around quarter of 9:00.  If you can agree on an

7    answer, that's fine.  I can write it on the slip and send it

8    back or I could just instruct them as they walk in the door.

9         MR. HOOPES:  We'll be here at quarter of 9:00.  We'll

10   try to work it out before.

11        MR. JONES:  Will do, Your Honor.

12        THE CLERK:  I can scan and send that to you.

13        MR. HOOPES:  That'd be great.

14        MR. JONES:  Thanks.

15   (Court exits.)

16   (Adjourned at 5:04 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8            I certify that the foregoing is a correct transcript

 9    from the record of proceedings taken November 3, 2021 in the

10    above-entitled matter to the best of my skill and ability.

11

12

13

14

15    /s/ Kathleen Mullen Silva                    1/6/22

16

17    Kathleen Mullen Silva, RPR, CRR             Date
      Official Court Reporter
18

19

20

21

22

23

24

25
```