**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| GREGORY LEMELSON and LEMELSON CAPITAL ) | |
| MANAGEMENT, LLC, ) | Civil Action No. 1:18-cv-11926-PBS |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE AMVONA FUND, LP, ) | |
| ) | |
| Relief Defendant ) | |
| ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION**
**<u>FOR ENTRY OF FINAL JUDGMENT</u>**

The Commission's Motion for Entry of Final Judgment ignores that after a seven-day trial, the jury *rejected* its main claim, finding Fr. Lemelson ***not liable*** for engaging in a short-and-distort scheme.  Based entirely on this faulty premise, the Commission improperly requests an injunction (so that it can follow-up and obtain a lifetime bar), disgorgement, and an eye-popping amount of civil monetary penalties.

Ignoring the jury verdict is nothing new for the Commission.  Immediately after the verdict was handed down, the Commission issued a blatantly false and misleading press release, claiming the jury found Fr. Lemelson liable for engaging in a short-and-distort scheme. Moreover, even after taking down the false press release from its website upon the urging of the undersigned, the Commission emailed it to its entire subscriber list.  As a result, multiple media outlets published articles parroting the Commission's false claims about the verdict, unfairly punishing Fr. Lemelson in the sphere of public opinion.  In addition, the Commission's press release failed to acknowledge that the jury found Fr. Lemelson not liable for three of the four questions put to it, as well as part of the fourth question, which actually contained *five* separate statements.

As such, the Commission's claim that *Fr. Lemelson* somehow misrepresented the jury's verdict is not only blatantly false but hypocritical.  Within an hour after the verdict, Fr. Lemelson issued a press release, in which he accurately described the verdict, specifically disclosing that the jury found him liable for certain of the challenged statements charged by the Commission.

As much as the Commission argues otherwise, the jury found Fr. Lemelson liable only for three discrete statements—just one of which was about Ligand—among the thousands that he has made concerning the company.  In the more than *seven and a half years* since these statements were made, Fr. Lemelson has served as an investment adviser without incident.

Accordingly, the Commission's requests for an injunction (and subsequent career-ending bar) and disgorgement are entirely unwarranted and inconsistent with the jury's verdict. Its request for civil monetary penalties is astoundingly disproportionate to what is appropriate here.

Moreover, in addition to the legal deficiencies that permeate the Commission's arguments, the *equities* favor Fr. Lemelson. The heavy-handed nature in which Ligand influenced this unprecedented enforcement action is deeply troubling. The current remedies phase impacts not just Fr. Lemelson and other potential defendants but also large corporations with limitless resources and undue influence, like Ligand, who seek to wield that influence in an effort to weaponize the Commission for their own purposes. The imposition of an injunction, bar, or disgorgement will incentivize such misconduct and have a chilling effect on analysts who publish reports critical of large and powerful corporations.

## I.    The SEC's Request for A Permanent Injunction Should Be Denied

"A permanent injunction is a ***drastic*** remedy and should not be granted lightly, especially when the conduct has ceased." *SEC v. Dibella*, 2008 WL 6965807, at *12 (D. Conn. 2008) (quotation omitted) (emphasis added). "Past violations of securities laws do not provide, *ipso facto*, a basis for issuance of an injunction, because they are not in and of themselves indicative of future misconduct." *SEC v. John Adams Trust Corp.*, 697 F. Supp. 573, 577 (D. Mass. 1988). The Court may issue an injunction only upon proof of a "reasonable likelihood" that the defendant will engage in future *securities law* violations. *SEC v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003). "The reasonable likelihood of future violations is typically assessed by looking at several factors, none of which is determinative." *Id.* Such factors include (i) the egregiousness of the violations; (ii) whether the violations were isolated or part of a pattern; (iii) the degree of scienter involved; and (iv) assurances against future violations. *Id.*; *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1228 (D.C. Cir. 1989). The Court may also consider "general equitable

concerns such as the resultant adverse impact upon the defendant's professional reputation and business activity." *SEC v. Ingoldsby*, 1990 WL 120731, at *2 (D. Mass. May 15, 1990). The circumstances of this case, involving three discrete statements that were found *not* to be part of a larger scheme (either as to Ligand or Fr. Lemelson's investors), and which took place more than seven and one-half years ago, do not warrant a permanent injunction, which the Commission only seeks as a means to an end to terminate Fr. Lemelson's career.

A.      **The Violations in this Case Were Not Egregious**

The Commission's only argument concerning the first factor, "egregiousness," is that because the jury found the three statements violated Rule 10b-5, which requires scienter, the violation *must* be egregious. ECF No. 245 at 4. The Commission provides no legal support for this argument, which is not surprising because it is ***not*** the standard and would result in *every* 10b-5 violation automatically being deemed "egregious," thus rendering this factor entirely superfluous. *See SEC v. Snyder*, 2006 WL 6508273, at *2 (S.D. Tex. Aug. 22, 2006) (rejecting Commission's contention that any violation involving false or misleading statements is *per se* egregious). The context of the statements must be independently considered.

The three statements for which the jury found liability were made on two separate days— June 19 and July 3, 2014. Exs. B, C [Trial Exs. 3, 4]. Notably, Fr. Lemelson did not cover any of his short position in Ligand on July 3, 2014—or during the following *month*. ECF No. 163-1 at 3. Fr. Lemelson actually *increased* his short position on that date. *Id.* Fr. Lemelson covered a very small portion of his short position on June 19, 2014 (less than 6% of his overall position), but he did so approximately six hours after his radio interview—and the price at which he covered was higher than it was at the close of the previous day of trading. *Compare* ECF No. 163-1 at 3 (noting Fr. Lemelson covered 4,050 shares at $65.6873) *with* Ex. D [Trial Ex. 96] at 4

(listing closing price of Ligand stock on June 18, 2014, as $65.63).  Further, Fr. Lemelson covered these shares only at the request of his broker due to a change in the overnight equity requirements on the portfolio, having nothing to do with the particular statement or interview generally.  Ex. E [Trial Ex. 199] at 5-8.  ***As the jury recognized—this is the exact opposite of a short-and-distort scheme and entirely inconsistent with the basis of the Commission's request for an injunction (<u>which it intends to use to impose a lifetime bar</u>).***

Further, while the jury found the June 19 statement violated Rule 10b-5, it is notable that the statement was made at approximately the 16-minute mark of a 22-minute interview.  *See* ECF No. 163-1 ¶¶ 13-14.  Fr. Lemelson never repeated the remark (in that interview or any of the four subsequent written reports and three radio interviews), and it generated no follow-up questions by the interviewer.  *See* Ex. B [Trial Ex. 3].  The Commission failed to offer any evidence that the statement had a material impact on Ligand's stock price.

The July 3 statements were about another company, Viking, which was non-public and whose stock Fr. Lemelson did not trade.  *See* Ex. C [Trial Ex. 4] at 7, 10; ECF No. 132 ¶ 41; Ex. F [Trial Ex. 58].  The Commission offered no evidence that Ligand's stock price was impacted by the statements.  Ex. D [Trial Ex. 96] at 4.  The CEO of Viking testified that no Viking investors or employees raised any concern about these two statements.  Ex. G [Day 2 Trial Tr. (Rough)] at 201:8-15; 201:25-202:4; 202:12-15, 203:1-4.  Moreover, the July 2014 report disclosed both the source of Fr. Lemelson's opinions and his short position in Ligand.  Ex. B [Trial Ex. 3] at 15:5-18; Ex. C (Trial Ex. 4) at 1-2; 7-12.  This is completely inconsistent with any other short-and-distort case the Commission has ever pursued.  Finally, the jury deliberated for three days on a preponderance-of-the-evidence standard and came back with a split verdict,

finding in favor of Fr. Lemelson on the majority of questions, undermining any notion that the violations here were "egregious."

**B.    The Commission Ignores that the Jury Rejected the Scheme Liability Claim to Improperly Argue that the Conduct was Repetitive**

As to the second factor, the Commission argues that the conduct was repetitive because Fr. Lemelson issued a number of reports about Ligand.  ECF No. 245 at 4-6.  In light of the jury's verdict, this actually cuts against the Commission's position, because it highlights the fact that in the five reports consisting of 56 pages and four radio interviews between June and October 2014, only three statements were found to violate Rule 10b-5.  *See* Exs. B,C, H-O [Trial Exs. 1-7, 143, 146, 149].

The Commission also ignores that Fr. Lemelson published hundreds of reports about other investments and securities with no charges ever being brought or any securities law violations being alleged.  ECF No. 128 at ¶ 4.  Three isolated statements out of thousands of pages of published work and multiple media appearances does not constitute "repeated" conduct. *See Snyder*, 2006 WL 650823, at *4 (no evidence that defendant engaged in securities violations before or after the events underlying present action and concluding that "the isolated nature of his actions weigh against" injunction).

**C.    The Verdict and Facts are More Consistent with a Finding of Recklessness Than Intentionality**

As to the third factor, courts regard recklessness a lesser degree of scienter than intent to defraud. *See SEC v. Shanahan*, 2010 WL 173819, at *14 (D. Minn. Jan. 13, 2010). Recklessness does not support an injunction. *SEC v. Freiberg*, 2007 WL 2692041, at *23 (D. Utah Sept. 12, 2007) (declining to impose permanent injunction against defendant where "the SEC has only definitively established that he acted recklessly").

The jury here was not specifically asked to find whether it believed Fr. Lemelson acted intentionally or recklessly.  However, the fact that the jury rejected (i) the Commission's scheme liability theory, (ii) its claim related to the insolvency statements, and (iii) both its intentional and negligent Investment Advisers Act claims, is persuasive evidence that the jury did not find Fr. Lemelson acted intentionally with respect to the three statements for which it did find him liable. *See* ECF No. 232.

Moreover, the *evidence* regarding the three statements militates in favor of a finding of recklessness.  With regard to the June 19, 2014 statement, Fr. Lemelson's *contemporaneous* notes indicated that Mr. Voss stated what Fr. Lemelson claimed he did.  Ex. P [Trial Ex. 48].  Fr. Lemelson made the statement in passing and never repeated it.  *See* ECF No. 163-1 ¶¶ 13-14; Ex. B [Trial Ex. 3].  Fr. Lemelson disclosed his short position during the interview and did not cover any of his position until approximately six hours later.  ECF No. 163-1 at 3; Ex. Q [Trial Ex. 196].

Likewise, Fr. Lemelson did not cover any of his position on the day the Viking statements were made (or during the following month).  ECF No. 163-1 at 3.  Further, Fr. Lemelson's July 3, 2014 report included disclosures about his fund's short position in Ligand and specifically cited to the public filings upon which the two statements were based.  *See* Ex. C [Trial Ex. 4] at 1-2, 7, 10, 11-12.  All other "short and distort" schemes previously brought by the Commission have involved vastly different conduct.

### D.    Assurances Against Future Violations Exist

Fr. Lemelson founded several successful businesses in the 17 years prior to launching a hedge fund, continued to operate a fund during the investigation and trial, and is currently operating a thriving hedge fund.  Lemelson Aff. ¶ 2; ECF No. 163-1 ¶ 3.  Fr. Lemelson has not

been charged with any securities violations before or since the present case despite intense

scrutiny.  Among other things, the Commission has closely monitored Fr. Lemelson's

communications with investors and posts on his website for years (including having visited his

website hundreds of times since filing this lawsuit).  Lemelson Aff. ¶ 10.  Given Fr. Lemelson's

extensive activity in the securities industry for four years prior to the relevant conduct in this

case and the nearly eight years since, this Court can be assured that Fr. Lemelson will not

commit future violations.  Indeed, "it is difficult to believe that, after undergoing the present

ordeal, [Fr. Lemelson] will be tempted to do so."  *Ingoldsby*, 1990 WL 120731, at *3.

The Commission's arguments to the contrary are without merit.  The Commission points

to a dubious Wall Street Journal article that claimed Fr. Lemelson boasted about the ability to

"crash" stocks.  ECF No. 245 at 5.  Fr. Lemelson has repeatedly denied making this statement for

the past six-plus years.  Lemelson Aff. ¶ 11.  Notably, this statement did not appear in the

corresponding video of the author's interviews with Fr. Lemelson.  Further, while the article

includes a number of purported direct quotes from Fr. Lemelson, the phrase "crash stocks"

appears twice in the article, neither time in the form of a quote.  ECF No. 246-14.

The Commission also points to Fr. Lemelson's violation of a *protective order* in arguing

that Fr. Lemelson is likely to repeat violations of the *securities laws*.  ECF No. 245 at 5-7.  The

Commission cites no authority for this contention.  Fr. Lemelson admitted his violation of the

order and was sanctioned by the Court accordingly.  ECF No. 102.  To punish him again in a

completely unrelated context would be improper and unfair.

The Commission also relies on Fr. Lemelson's *counsel's* letter to an unrelated third party

as a basis for finding *Fr. Lemelson* is likely to engage in future violations of securities laws.

ECF No. 245 at 6-7.  There is no precedential support for this absurd position.  Further, in

7

making this specious argument, the Commission continues to provide the Court with a *false* narrative about the background of counsel's letter.  Fr. Lemelson's dispute with Fr. Barbas stems from Fr. Lemelson siding with a victims' rights group who called for Fr. Barbas' ouster after he covered up the actions of a pedophile priest.  ECF No. 111 ¶¶ 42-49.  In an effort to retaliate against Fr. Lemelson, Fr. Barbas lied to the Commission, claiming during a telephone call that Fr. Lemelson was not a Greek Orthodox Priest (a lie he had also previously tried to spread—thus the impetus for the demand letter sent by Fr. Lemelson's counsel).  ECF No. 111 ¶¶ 26-41.

Moreover, when the Commission brought counsel's letter to this Court's attention, the Commission *falsely* represented to the Court that the letter was improper because Fr. Barbas was a witness in the case, despite having previously made clear he was not a witness and having not included him on any of the Commission's multiple Rule 26 disclosures.  *See* ECF No. 64 at 1, 2, 5-6; Exs. R-T [SEC's three sets of Initial Disclosures].  Of course, despite its false statement to the Court that Fr. Barbas was a potential witness in this matter, the Commission *never* listed Fr. Barbas as a potential witness in its trial filings—much less actually called him as a witness at trial.  Finally, Fr. Lemelson, who has never been ecclesiastically disciplined, remains in good standing in the Greek Orthodox Church, where he serves actively as a priest, as illustrated by the supporting letters from various Greek Orthodox clergy attached hereto as Exhibit A.  Lemelson Aff. ¶ 8.

### E.    General Equity Concerns Support Rejecting an Injunction in this Case

On balance, the equity concerns weigh against issuing an injunction, which, as the Commission makes clear, it intends to use as a vehicle to bar Fr. Lemelson from working in the industry entirely.  ECF No. 245 at 7.  Barring someone from their chosen profession is an

extremely severe consequence.  The circumstances of this case do not support the imposition of this "career death penalty."

First, barring Fr. Lemelson from acting as an investment advisor would have a negative impact on his innocent investors—*all* of whom specifically want Fr. Lemelson to serve as their investment advisor, after being fully briefed on the verdict in this case.  Ex. A.  Notably, Fr. Lemelson's investors are sophisticated, including a sitting federal district court judge (The Honorable Paul Magnuson, D. Minn.), CEO's, public figures, and other notable activist investors.  Lemelson Aff. ¶ 7.  All of the investors who were able to do so (11 out of 14) have submitted letters on Fr. Lemelson's behalf.[1]  In addition, six investors in Fr. Lemelson's predecessor Fund, Amvona, also submitted letters in his support.

Second, Fr. Lemelson's assertion of a vigorous defense in this case should not be held against him.  *Ingoldsby*, 1990 WL 120731, at *3 ("Absent a showing of bad faith, the defendant should not be prejudiced for presenting a vigorous defense and requiring the SEC to meet its proper evidentiary burden both at trial and at the injunctive relief stage of the judicial proceedings"); *SEC v. Happ*, 295 F. Supp. 2d 189, 197 (D. Mass. 2003) (defendant "is not to be penalized" when his trial behavior was simply "consistent with setting forth a vigorous defense").

 Third, Fr. Lemelson did not personally benefit from the three statements and did not use any profits from the successful Ligand position to fund an extravagant lifestyle.  Drawing a modest salary of $100,000 per year from Lemelson Capital Management ("LCM"), Fr. Lemelson used a significant amount of earnings from his professional career to fund charitable endeavors,

---

[1] Judge Magnuson is unable to submit a letter due to judicial ethical considerations, another investor, who works in the securities industry, could not do so due employment guidelines, and the third has not been reachable of late due to personal issues.  Lemelson Aff. ¶ 5.

including the construction of a Church to serve a community that otherwise lacked the resources for a place of worship.  Lemelson Aff. ¶ 13.   Moreover, Fr. Lemelson's entire adult life has been spent in service to the Church, first as a layman, and later a clergyman, without any salary or benefits whatsoever.  Lemelson Aff. ¶ 9.  More generally, the undersigned have submitted a number of letters detailing Fr. Lemelson's history of charitable giving and honest character.  Ex A.

Fourth, Ligand's conduct in pressuring the Commission to bring this case was disturbing. In contrast to Fr. Lemelson's transparency, Ligand decided not to issue any public rebuttal to Fr. Lemelson's statements, or to sue him, but rather, at the behest of its well-heeled Board of Directors, privately lobbied the Commission for years to bring this unprecedented enforcement action.  After its first presentation, aided by a large international law firm, was rejected by the Commission's Boston Regional Office, the Commission fired its lawyers and hired a former high-level Commission attorney in the Washington, D.C. Office.  As a result, Ligand got a *second* meeting with the Commission's Washington Office.  On the day of that meeting, the Commission received a letter on behalf of Ligand from a sitting U.S. Congressman (later convicted on federal criminal charges before being pardoned by then-President Trump) urging the Commission to bring this enforcement action against Fr. Lemelson.  At some point thereafter, the Washington D.C. office initiated the investigation.  As this Court noted, during this time period, Ligand likely leaked news of the Commission's non-public investigation to the media. Ex. U (December 17, 2020 Summary Judgment Hearing Transcript) at 55:7-22.[2]  The leak of that information and this enforcement action had a severely negative impact on Fr. Emmanuel's

---

[2] This Court , responding to statement that the Commission could have disclosed the investigation to someone who then leaked the investigation to the media stated, "I can imagine [who] that might be, can't you?" and then stating, "Given the acrimony between Ligand and Father Emmanuel, I don't know why you'd want me to draw the inference it was the SEC who leaked it."

business.  ECF No. 88 at ¶ 27.  For a period of years following the second meeting, Ligand's politically-connected lawyer contacted the Commission countless times seeking updates and urging action.  Ultimately, Ligand got its way—the Washington Office handed the case off to Boston, and Fr. Lemelson became a defendant in this unprecedented action.

## II.     Disgorgement is Not Appropriate in this Case

The Supreme Court recently held that the amount of disgorgement cannot exceed a defendant's net profits.  *Liu v. SEC*, 140 S.Ct. 1936, 1940 (2020).  Further, the Commission must show that the net profits to be disgorged were connected to the particular wrongdoing.  *Id.* at 1945.[3]  By seeking disgorgement based on an argument that Fr. Lemelson's wrongdoing consisted of a months-long *scheme*—the very argument the jury rejected—the Commission tacitly acknowledges that disgorgement is not warranted here.

First, as set forth above, the Commission provided no evidence that Fr. Lemelson profited (he did not) from the three statements for which he was held liable.  Put simply, the Commission has not demonstrated that the profit made on the Ligand short position (resulting almost entirely from covers made on August 22, August 26, October 10, and October 13) can be attributed to the three statements made on June 19 and July 3, 2014.  Indeed, such a position runs counter to the Commission's position in numerous other cases, and the position taken by the Commission's rebuttal expert during discovery in this case that the impact of an allegedly false statement is almost immediate (within minutes).[4]

---

[3] The only exception, which is not applicable here, is "when the 'entire profit of a business or undertaking' results from the wrongful activity."  *Id.* (quoting *Root v. Lake Shore & M.S. Ry. Co.*, 105 U.S. 189, 203 (1881)).
[4] *See, e.g.,* Complaint, *SEC v. Berliner*, No. 1:08-cv-03859-JES (S.D.N.Y. Apr. 24, 2008) (SEC alleged defendant acted intentionally because he sold short 10,000 shares of stock "within minutes" of disseminating false information); *SEC v. Aly*, 2018 WL 1581986, at *23 (S.D.N.Y March 27, 2018) (establishing scienter based on temporal proximity of defendant filing Schedule 13D with false information and then selling his call options within 10 minutes); *SEC v. Dubovoy*, 2016 WL 5745099, at *2, 5 (D.N.J. Sept. 29, 2016) (finding intent to trade on hacked information supported by temporal proximity of closing positions within minutes or hours after information released publicly); ECF No. 133-5 at 11 (expert report of Dr. Smith criticizing Fr. Lemelson's expert for not using intraday

Second, in effectively claiming Fr. Lemelson was *entirely* responsible for Ligand's stock price decline between June and October 2014, the Commission ignores the historical volatility of Ligand's stock. Ex. V [Trial Ex. 13] at 32. For example, in the months *immediately preceding* Fr. Lemelson's first short report about Ligand (March 18 to May 10, 2014), Ligand's stock price fell $16.81 per share, a loss of more than 21%. *See* Ex. D [Trial Ex. 96] at 4-5. In addition, when the Commission brought this case in September 2018, it touted in its Complaint the fact that Ligand was trading in the $250/share range. ECF No. 1 at ¶ 8. During the pendency of the case, despite the Commission trying to pump up Ligand's stock price by including ***false statements*** in the Complaint about Ligand's financial condition, *see* ECF No. 1 ¶ 52 (falsely claiming Ligand's debt to-equity ratio was close to 1:1, a *drastic* overstatement), Ligand's stock lost nearly 80% of its value at one point, destroying more than ***$4 billion*** of shareholder value. Ex. W at 1, 19 (falling from a high of $278.62 on October 1, 2018 to a low of $57.24 on March 17, 2020). Moreover, since the verdict in this case, Ligand's stock has plummeted by approximately ***26%.*** Ex. W at 1-2 (closing at $153.21 on November 5, 2021, and closing at $113.68 today).[5] Clearly, Ligand's stock has been extremely volatile both before and after Fr. Lemelson's reports. This volatility is especially notable when placed in the context of the broader market, where, since the inception of this case, Ligand has underperformed the S&P 500 index by 111.3% and underperformed the NYSE Arca Biotechnology Index by 52.67%. Lemelson Aff. ¶ 18. Accordingly, for the Commission to cavalierly assert that Fr. Lemelson is responsible for the entirety of the drop in Ligand's stock price between June and October 2014 (or *any* of it for that matter), is absurd.

---

method and stating that the method that should have been used "is based on the finding that stocks react to news very quickly, typically within five to fifteen minutes of the announcement").

[5] For its part, as of today's close, Viking's stock has dropped ***over 82%*** from its high, which occurred one week after the Commission brought this case ($22.16 on September 19, 2018, to $3.95 on January 20, 2022). Ex. VV at 1, 19.

Third, the Commission's disgorgement argument ignores the negative impact on Ligand's stock price caused by other short reports, as well as other market factors between June and October 2014. *See, e.g.,* Exs. X-Z [Trial Exs. 159-161] (Empire Capital reports regarding Ligand and Monetary Policy Report of Board of Governors of the Federal Reserve System (chaired by now Treasury Secretary Janet Yellen) questioning value of biotech stocks); *See* Exs. B, C, H-O [Trial Exs. 1-7, 143, 146, 149]. Indeed, unlike the situation with Fr. Lemelson, these statements actually corresponded with significant decreases in Ligand's stock prices. *See* Ex. D [Trial Ex. 96] at 3 (4.6% decrease in Ligand stock price on the day of the Yellen statements; 4.5% and 2.2% decreases on the days of the Empire Reports). Notably, Fr. Lemelson was not alone in his view on Ligand; from 2014 to the present, Ligand has maintained an extraordinarily large percentage of its float as sold short (approximately 20% during the period of Fr. Lemelson's reports), and in late 2020 and early 2021, it became ***the second most shorted stock on all public US markets.*** Exhibit FF, GG.

Moreover, the *Liu* Court also held that disgorgement can only be awarded if it benefits victims. 140 S.Ct. at 1940. The Commission makes no attempt to identify any alleged victim or suggest a process to identify such alleged victims. Instead, in a footnote, the Commission posits establishing a "Fair Fund" and then at some unspecified future time determining the feasibility of identifying alleged victims and distributing the funds to alleged victims. ECF No. 245 at 13 n.3. As noted in *Liu*, "[i]t is an open question whether, and to what extent, that practice nevertheless satisfies the SEC's obligation to award relief 'for the benefit of investors' and is consistent with the limitations of § 78u(d)(5)." 140 S.Ct. at 1948. It certainly is not appropriate here.

## III.   Prejudgment Interest is Inapplicable

The Commission also seeks $208,624 in prejudgment interest on disgorgement. ECF No. 245 at 14-15. Because disgorgement is not warranted, prejudgment interest is not applicable.

Moreover, in light of the delays in this case, which were not caused by Fr. Lemelson, it would be unfair for him to incur charges for interest for the entire time period. The Commission offers no explanation for the inordinate delay between 2014, when Ligand first lobbied for an investigation (*see* Ex. AA [Trial Ex. 163] dated September 25, 2014), and September 2018 when it filed the Complaint (ECF No. 1). Additionally, this case was significantly delayed by COVID-19.

## IV. The Commission's Argument Concerning Civil Monetary Penalties Has No Merit

### A. Third-Tier Penalties Are Not Appropriate

Tier III penalties are only appropriate if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "such violation directly or indirectly resulted in **substantial losses or created a significant risk of substantial losses to other persons**." 15 U.S.C. § 77t(d)(2)(C) (emphasis added). There was no substantial loss or significant risk of such a loss in this case.

Courts have consistently rejected Tier III penalties when the Commission has failed to provide evidence of actual losses or risk of loss, and the same result should apply here. *See, e.g., SEC v. Eiten*, 2014 WL 4965102, at *1 (D. Mass. Sept. 30, 2014) (rejecting Tier III losses requested by Commission because the Commission "has not demonstrated any amount of actual losses that were substantial. The degree of exposure to risk is also a matter for speculation on the existing record."); *SEC v. Locke Cap. Mgmt., Inc.,* 794 F. Supp. 2d 355, 370 (D.R.I. 2011) (denying request for Tier III civil penalties because the Commission did "not detail how [defendant's] conduct caused substantial loss, or the risk thereof, to others. Rather, the Commission states only that [defendant's] egregious and fraudulent conduct substantially expanded Locke's business. The Commission therefore has failed to demonstrate that third-tier sanctions are appropriate."); *SEC v. Madsen*, 2018 WL 5023945, at *3 (S.D.N.Y. Oct. 17, 2018) (denying Tier III penalties for defendant who committed a "pump and dump" scheme because

"the Commission has offered no evidence that the Mona Lisa press releases were successful in inducing reliance by potential investors."). *See also SEC v. Todt*, 2000 WL 223836, at *12 (S.D.N.Y. Feb. 25, 2000) (declining to impose a third-tier penalty in the absence of evidence that any investors "ever seriously entertained" transacting based on the fraud). The Commission's argument here suffers from the same defects present in those cases.

The Commission argues that the risk of harm is established by Ligand's market capitalization loss of $500 million between June and October 2014. ECF No. 245 at 3. However, the Commission does not even attempt to argue that any amount of this loss—much less the *full* amount—was attributable to the three statements for which the jury found Fr. Lemelson liable.

The Commission further relies on its allegation that Fr. Lemelson took credit for Ligand losing $500 million in market capitalization during the period of his reports. ECF No. 245 at 12. In doing so, it ignores the internal Ligand emails demonstrating that the company itself did not believe Fr. Lemelson was responsible for the drop in stock price. *See, e.g.,* Ex. CC, DD [Trial Ex. 64, 233]. Notably, Ligand did not even mention any of the three statements in its initial presentation to the Commission urging enforcement, which Ligand prepared with assistance of counsel (and further did not mention the July 3, 2014 statements in its second presentation). *See* Exs. AA, BB [Trial Exs. 163, 166]. In any event, neither Fr. Lemelson nor anyone else attributed the loss in market capitalization to any *particular* statement.

The Commission's argument as to the specific figure of its proposed disgorgement also fails. The Commission argues that Fr. Lemelson should disgorge $656,500—the amount it alleges to be his pecuniary gain, because that is the share of the profit attributable to Fr. Lemelson's family members, together with the performance fee, from the Ligand short. The

Commission's position misses the mark because it again rests entirely upon the scheme theory that the jury rejected.

### B.   The *Esposito* Factors Demonstrate That Something Far Less than the Maximum Tier-Two Penalty is Appropriate

Under the circumstances here, including the lack of any pecuniary gain, the Court should impose something far less than the Tier-II maximum amount of $80,000 in civil monetary penalties.  15 U.S.C. § 77t(d)(2)(B).  Factors that courts have considered in determining the appropriate civil fine include "the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter involved, the defendant's cooperation with authorities or lack thereof, and the defendant's current financial condition."  *SEC v. Esposito*, 2018 WL 2012688, at *9 (D. Mass. Apr. 30, 2018).  A number of these factors are repetitive of the factors addressed above regarding the injunction, and Fr. Lemelson incorporates his above arguments herein.

With regard to the first factor, as noted above, this case did not involve "egregious" violations of securities laws.  The Commission argues that the statements were egregious because Fr. Lemelson never corrected them.  Ex. OO. ECF No. 245 at 10.  However, Fr. Lemelson was never asked to correct these statements.  In fact, Ligand's CEO specifically instructed Mr. Voss not to request that Fr. Lemelson correct the June 19, 2014 statement.  Ex. EE at 3 [Trial Ex. 133].

The Commission also argues egregiousness based on Fr. Lemelson taking credit for his reports driving down Ligand's stock price.  ECF No. 245 at 12.  Notably, this was the Commission's main argument for its scheme liability theory that was rejected by the jury. Further, Fr. Lemelson never attributed any decline in Ligand's stock price to the three statements for which he was found liable.

The Commission also tries to apply the same misleading logic in arguing that Fr. Lemelson continued to engage in misconduct "after the relevant period."  ECF No. 245 at 10. Again, this ignores that the jury rejected the Commission's scheme theory.  Moreover, the Commission ignores that Fr. Lemelson **never repeated <u>the three statements</u> in any of his subsequent commentary**.

With regard to "taking responsibility for his actions," Fr. Lemelson never denied making the statements.  Fr. Lemelson should not be penalized for asserting a vigorous defense.  *See Ingoldsby*, 1990 WL 120731, at *3;  *Happ*, 295 F. Supp. 2d at 197*, supra.*  The Commission argues that Fr. Lemelson "maintained his position despite extensive evidence that his statements about Promacta and Viking were false, material, and fraudulent."  ECF No. 245 at 11.  The Commission's claim of "extensive evidence" is refuted by the jury's lengthy deliberations and split verdict, which demonstrate that Fr. Lemelson asserted valid defenses.  Fr. Lemelson should not be punished merely for exercising his constitutional right to trial and his constitutional right to speak out against Ligand generally.

### C.     The Commission's Arguments Regarding Fr. Lemelson's Social Media Posts are Hypocritical and Misleading

The Commission accuses Fr. Lemelson of misleading the public about the jury's verdict and argues this shows the need for specific deterrence.  ECF No. 245 at 11-12.  This argument is both false and hypocritical, as the Commission issued a patently false and misleading press release in the immediate aftermath of the trial.

In alleging wrongdoing, the Commission notes that Fr. Lemelson retweeted a Law360 article with the headline, "A Boston Federal Jury on Friday absolved a Greek Orthodox priest of fraud claims in a U.S. SEC suit alleging he launched a short-and-distort scheme through his hedge fund."  ECF Nos. 246-25; 246-26; 246-27.  Fr. Lemelson simply retweeted this article—he

17

did not draft its language or otherwise comment on it.  Fr. Lemelson's re-tweeting an article written by an objective third party, even though that third party put the full article behind a paywall, does not amount to an attempt to mislead the public.  Further, the article's language is accurate, because the jury *did* clear Fr. Lemelson of engaging in a short and distort scheme.

Moreover, the press release that *Fr. Lemelson* himself drafted about the verdict was accurate.  That press release explicitly stated that the jury found Fr. Lemelson liable for certain of the challenged statements.  ECF No. 246-28.  In order to bolster its meritless argument about Fr. Lemelson's statements concerning the verdict, the Commission—as it has done throughout this case—creates a completely false statement out of whole cloth.  The Commission alleges, without citation, that Fr. Lemelson "amplified" his message about the verdict on the investor website, Seeking Alpha.  (ECF No. 245 at 12).  This allegation is false, as Fr. Lemelson posted nothing on Seeking Alpha or any other investor website.

In contrast to the *truthful* press release that Fr. Lemelson issued, the Commission issued a false and misleading press release with the headline: "SEC Wins Jury Trial Against Hedge Fund Adviser Who Ran Manipulative Short Scheme."  Ex. HH [SEC Press Release].  It was patently false for the Commission to claim that Fr. Lemelson ran a *manipulative short **scheme*** after the jury found him ***not liable*** for engaging in such a scheme.  The body of the Commission's press release was no better than its false headline.  The release stated that Fr. Lemelson had been charged with a scheme, but incredibly failed to explain that the jury rejected this theory.  *Id.* Indeed, the Commission failed entirely to mention the jury's verdict with respect to *any* of the claims on which it found in Fr. Lemelson's favor against the Commission *i.e.,* the short-and-distort scheme claim, the Investment Advisors Act claims, and the five separate statements concerning Ligand's insolvency.

Moreover, even after removing its false press release from its website, the Commission distributed it via mass-email.  Ex. II.  The Commission's conduct post-verdict is yet one more example of the unprecedented nature of its enforcement action against Fr. Lemelson.  Notably, multiple journalists, including at least one global financial news outlet, pointed out the false and misleading nature of the Commission's press release.  Ex. JJ, KK.  (Barron's reporting: "The SEC's comments on the verdict might confuse the historical record.  Its press release headline reads: 'SEC Wins Jury Trial Against Hedge Fund Adviser Who Ran Manipulative Short Scheme.' But the jury's very first vote was a finding that the agency didn't prove its allegations of a 'scheme.'"; Law360 reporting: "The SEC said in a press release Friday that it won the trial, without mentioning the claims the jury rejected.").  Unfortunately, however, the Commission's false press release had the predictable result; other publications unwittingly repeated the falsehoods from the Commission's press release and erroneously reported that Fr. Lemelson was found liable for engaging in a short-and-distort scheme.  Ex. LL-NN, QQ.

The Commission's false press release also included a purported quote from one of Fr. Lemelson's reports that was not actually contained in it: "Ligand's most profitable drug was on the brink of obsolescence."  Ex. OO.  Fr. Lemelson never made such a statement, which comes from a *draft* report that the Commission erroneously included in the Complaint.  (*See* ECF No. 1 at ¶ 24).  Fr. Lemelson's counsel has repeatedly pointed out this error to the Commission, along with a litany other objectively false allegations in the Complaint, none of which the Commission ever sought to correct in the public record (including in the Amended Complaint)—which is ironic considering it attempts to disparage Fr. Lemelson for the same conduct.  *See, e.g.* ECF No. 11 at 5.  Nevertheless, the Commission continues to make this false accusation (among others)

without facing any consequences, while it simultaneously argues the Court should impose drastic and likely career-ending consequences on Fr. Lemelson for his statements at issue.

### D.      The Court Should Not Assess Penalties to Both Fr. Lemelson and LCM

The Commission attempts to improperly double-dip by advocating that both Fr. Lemelson and LCM be assessed separate civil monetary penalties.  The Commission seeks to have its cake and eat it too.  Prior to trial, Defendants agreed that because LCM was controlled and operated entirely by Fr. Lemelson, there would be no need for separate evidence to try to establish liability against both Fr. Lemelson and LCM.  Therefore, the parties agreed that there would be no need to include separate questions about Fr. Lemelson and LCM on the verdict form.  Now, when it seeks civil monetary penalties, the Commission argues that LCM is distinct, and the civil monetary penalties should be more than doubled because LCM is owned by Fr. Lemelson's wife, it paid consultants for finance and compliance work, and it employed an editor. ECF No. 245 at 9.  This argument is disingenuous.  Fr. Lemelson's wife plays no active role in the operation or management of the business.  Lemelson Aff. ¶ 12.  The editor that the Commission referenced was never an LCM employee, but merely a consultant that was paid a grand total of approximately $20,000 over three years.  Ex. PP (Dep. Tr. of Michael Johns) at 115:5-13.  As a matter of equity, any civil monetary penalty should be limited to Fr. Lemelson.

### CONCLUSION

For the foregoing reasons, the Court should not impose an injunction or disgorgement. Any civil monetary penalty should be Tier II, applied only to Fr. Lemelson, and in an amount far less than the maximum of $80,000.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
Thomas M. Hoopes (BBO No. 239340)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com
thoopes@lhblaw.com

Dated:  January 20, 2022

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on January 20, 2022.

*/s/ Douglas S. Brooks*
Douglas S. Brooks