S-1 1 d711611ds1.htm S-1



[Table of Contents](#)

**As filed with the Securities and Exchange Commission on July 1, 2014**

Registration No. 333-

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## FORM S-1
## REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# Viking Therapeutics, Inc.
#### (Exact name of Registrant as specified in its charter)

---

| **Delaware** | **2834** | **46-1073877** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**Viking Therapeutics, Inc.**
**11119 North Torrey Pines Road, Suite 50**
**San Diego, CA 92037**
**(858) 550-7810**
(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

---

**Brian Lian, Ph.D.**
**President and Chief Executive Officer**
**Viking Therapeutics, Inc.**
**11119 North Torrey Pines Road, Suite 50**
**San Diego, CA 92037**
**(858) 550-7810**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

---

*Copies to:*

| | |
|---|---|
| **Jeffrey T. Hartlin, Esq.** | **Michael D. Maline, Esq.** |
| **Paul Hastings LLP** | **Thomas S. Levato, Esq.** |
| **1117 S. California Avenue** | **Goodwin Procter LLP** |
| **Palo Alto, California 94304** | **The New York Times Building** |
| **(650) 320-1804** | **620 Eighth Avenue** |
| | **New York, New York 10018** |
| | **(212) 813-8800** |

---

**Approximate date of commencement of proposed sale to the public**: As soon as practicable after this registration statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | |
|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer ☐ |
| Non-accelerated filer ☒  (Do not check if a smaller reporting company) | | Smaller reporting company ☐ |

---

#### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Proposed Maximum | Amount of Registration Fee(3) |
|---|---|---|

| | Aggregate Offering Price(1)(2) | |
|---|---|---|
| Common Stock, $0.00001 par value per share | $57,500,000 | $7,406 |

(1)  Estimated solely for the purpose of computing the amount of the registration fee pursuant to Rule 457(o) under the Securities Act of 1933, as amended.

(2)  Includes the aggregate offering price of additional shares that the underwriters have the option to purchase.

(3)  Calculated pursuant to Rule 457(o) under the Securities Act of 1933, as amended, based on an estimate of the proposed maximum aggregate offering price.

---

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

The information contained in this prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**Subject to Completion, Dated July 1, 2014**

## Shares



## Common Stock
## $    per share

This is an initial public offering of shares of common stock of Viking Therapeutics, Inc., a Delaware corporation. We are offering        shares.

We expect that the price to the public in this offering will be between $        and $        per share.

We intend to apply to have our shares of common stock listed on the Nasdaq Global Market under the symbol "VKTX". We are an "emerging growth company" as that term is used in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act, and, as such, we have elected to comply with certain reduced public company reporting requirements for this prospectus and future filings with the Securities and Exchange Commission.

**Investing in the common stock involves risks. See "Risk Factors" beginning on page 11.**

|  | Per Share | Total |
|---|---|---|
| Price to the public | $ | $ |
| Underwriting discount(1) | | |
| Proceeds to us, before expenses | | |

(1)   See "Underwriting" for additional disclosure regarding underwriting discounts, commissions and expenses.

We have granted an over-allotment option to the underwriters. Under this option, the underwriters may elect to purchase a maximum of        additional shares from us within 30 days following the date of this prospectus to cover over-allotments.

Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

---

## Oppenheimer & Co.                                              Roth Capital Partners

### Craig-Hallum Capital Group

**MLV & Co.**                                                        **Summer Street Research Partners**

The date of this prospectus is            , 2014

**Table of Contents**

# Table of Contents

| | Page |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 11 |
| Special Note Regarding Forward-Looking Statements | 46 |
| Industry and Market Data | 48 |
| Use of Proceeds | 49 |
| Dividend Policy | 51 |
| Capitalization | 52 |
| Dilution | 54 |
| Selected Financial Data | 56 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 58 |
| Business | 71 |
| Management | 111 |
| Executive Compensation | 121 |
| Certain Relationships and Related Party Transactions | 135 |
| Principal Stockholders | 139 |
| Description of Capital Stock | 142 |
| Shares Eligible for Future Sale | 147 |
| Material U.S. Federal Income Tax Consequences to Non-U.S. Holders | 150 |
| Underwriting | 153 |
| Legal Matters | 158 |
| Changes in and Disagreements with Independent Registered Public Accounting Firm on Accounting and Financial Disclosure | 158 |
| Experts | 158 |
| Where You Can Find Additional Information | 158 |
| Index to Financial Statements | F-1 |

―――――――――――――――

You should rely only on the information contained in this prospectus. No dealer, salesperson or other person is authorized to give information that is not contained in this prospectus. This prospectus is not an offer to sell nor is it seeking an offer to buy these securities in any jurisdiction where the offer or sale is not permitted. The information contained in this prospectus is correct only as of the date of this prospectus, regardless of the time of the delivery of this prospectus or any sale of these securities.

Until          , 2014 (25 days after the commencement of this offering), all dealers that effect transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscription.

-i-

**Table of Contents**

# Prospectus Summary

*This summary highlights selected information that is presented in greater detail elsewhere in this prospectus. Because it is only a summary, it does not contain all of the information you should consider before investing in our common stock and it is qualified in its entirety by, and should be read in conjunction with, the more detailed information included elsewhere in this prospectus. Before you decide whether to purchase shares of our common stock, you should read this entire prospectus carefully, including the sections of this prospectus entitled "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus. Unless the context otherwise requires, the terms "Viking," "we," "us" and "our" in this prospectus refer to Viking Therapeutics, Inc., and "this offering" refers to the offering contemplated in this prospectus.*

## The Company

We are a clinical-stage biopharmaceutical company focused on the development of novel, first-in-class or best-in-class therapies for metabolic and endocrine disorders. We have exclusive worldwide rights to a portfolio of five drug candidates in clinical trials or preclinical studies, which are based on small molecules licensed from Ligand Pharmaceuticals Incorporated, or Ligand. Our lead clinical program is VK0612, a first-in-class, orally available drug candidate entering a Phase 2b clinical trial for type 2 diabetes, one of the largest global healthcare challenges today. Preliminary clinical data suggest VK0612 has the potential to provide substantial glucose-lowering effects, with an attractive safety and convenience profile compared with existing type 2 diabetes therapies. Our second clinical program is VK5211, an orally available drug candidate entering a Phase 2 clinical trial for the treatment of cancer cachexia, a complex disease characterized by an uncontrolled decline in muscle mass. VK5211 is designed to selectively produce the therapeutic benefits of testosterone in muscle tissue, with improved safety, tolerability and patient acceptance compared with administration of exogenous testosterone. We expect to commence Phase 2 clinical trials for both VK0612 and VK5211 in early 2015 and to complete the clinical trials in 2016. We are also developing three preclinical programs targeting metabolic diseases and anemia. Our most advanced preclinical program is VK0214, a novel liver-selective thyroid hormone receptor beta, or TRß, agonist for lipid disorders such as dyslipidemia and nonalcoholic steatohepatitis, or NASH. We expect to file an investigational new drug application, or IND, and commence clinical trials for this program in 2015.

**VK0612 for Type 2 Diabetes**

VK0612 is a potent, selective inhibitor of fructose-1,6-bisphosphatase, or FBPase, an enzyme that plays an important role in endogenous glucose production, or the synthesis of glucose by the body. We believe the inhibition of FBPase provides an attractive approach to controlling blood glucose levels in patients with diabetes. Clinical trials have shown that VK0612 is safe, well-tolerated and leads to significant glucose-lowering effects in patients with type 2 diabetes. We intend to commence a Phase 2b clinical trial of VK0612 in approximately 500 patients with poorly-controlled type 2 diabetes, defined as having baseline fasting plasma glucose, or FPG, levels greater than or equal to 180 mg/dL. We expect to commence the clinical trial in early 2015 and to complete the clinical trial in 2016.

VK0612 has been evaluated in seven clinical trials, including one Phase 2a and six Phase 1 clinical trials. Based on these clinical and additional preclinical data, we believe VK0612 has the following important advantages over many existing type 2 diabetes therapies:

- *Greater efficacy:* Preliminary Phase 1 and 2 data suggest VK0612 could reduce plasma glycated hemoglobin A1c, or HbA1c, an important measure of long-term blood glucose levels, by 1% or more, potentially exceeding the typical anti-glycemic effects of newer drug classes.

-1-

Table of Contents

- *Encouraging safety profile:* VK0612 has demonstrated encouraging safety to date in over 250 subjects. No cases of hypoglycemia, or low blood glucose levels, lacticemia, or sustained lactic acid in the blood, or other drug-related safety issues were observed in these subjects.

- *Improved tolerability:* VK0612 has been well-tolerated at and above doses that we plan to administer in our Phase 2b clinical trial, which we expect to be at or below 300 mg, with specific doses to be chosen based on the outcome of planned pharmacokinetic and pharmacodynamic calculations.

- *Novel mechanism of action:* Based on its insulin-independent mechanism of action, we believe VK0612 lowers blood glucose levels independently of pancreatic function. We expect VK0612's novel mechanism of action to provide critical durability and combinability advantages.

    - *Durability:* Diabetes is characterized by deteriorating pancreatic beta cell function. Given VK0612's insulin-independent mechanism of action, the drug could provide a more durable therapeutic effect than many currently available type 2 diabetes therapies.

    - *Combinability:* VK0612's novel mechanism of action is expected to allow combinability with many existing type 2 diabetes therapies, leading to enhanced efficacy and potentially delaying transition to subsequent therapies.

- *Weight and lipid neutral profile:* Clinical and preclinical data suggest VK0612 has the potential to provide robust anti-glycemic effects while maintaining a weight and lipid neutral profile.

- *Once-daily convenience:* Clinical data suggest that VK0612 has the potential to lower blood glucose levels in type 2 diabetes patients as a once-daily oral therapy.

We plan to commence a Phase 2b clinical trial with VK0612 in type 2 diabetes patients in early 2015, which we expect to complete in 2016. We also plan to complete a Phase 1 drug-drug interaction clinical trial evaluating the safety and tolerability of VK0612 in combination with metformin, a generic pharmaceutical commonly prescribed for type 2 diabetes, as well as a Phase 1 clinical trial in renally-impaired type 2 diabetes patients, or patients having reduced kidney function, both within the same period. Pending clinical data from these clinical trials, we plan to commence Phase 3 clinical trials in type 2 diabetes patients either on our own or with a third party.

Diabetes is an undertreated and underdiagnosed disease of epidemic proportion. The economic burden of diabetes and its associated complications cost the U.S. healthcare system approximately $245.0 billion in 2012 according to the American Diabetes Association, or the ADA. The U.S. Centers for Disease Control and Prevention, or the CDC, estimates that, as of 2010, 6.0% of the U.S. population, or roughly 18.8 million people, have been diagnosed with diabetes, and more than 7.0 million additional people in the U.S. are undiagnosed. Type 2 diabetes is the most common form of the disease, accounting for 90% to 95% of diagnosed cases. Due to a combination of factors, including urbanization, changing diets and the rise of sedentary lifestyles, the International Diabetes Federation estimates that the prevalence of diabetes will continue to grow. The International Diabetes Federation estimates that the global prevalence of diabetes will exceed 590.0 million people by 2035.

**VK5211 for Cancer Cachexia**

Our second clinical program, VK5211 (formerly LGD-4033), is an orally available small molecule drug candidate in development for the treatment of cancer cachexia. VK5211 is a non-steroidal selective androgen receptor modulator, or SARM. A SARM is designed to selectively interact with a subset of receptors that have a normal physiologic role of interacting with naturally-occurring hormones called androgens. Broad activation of androgen receptors with drugs, such as exogenous testosterone, can stimulate muscle growth but often results in unwanted side effects, such as prostate growth, hair growth and acne. VK5211 belongs to a family of novel SARM compounds based on its effects on tissue-specific gene expression and other functional, cell-based

-2-

Table of Contents

technologies. We expect VK5211 to produce the therapeutic benefits of testosterone with improved safety, tolerability and patient acceptance due to a tissue-selective mechanism of action and an oral route of administration. In Phase 1 clinical trials, subjects treated with VK5211 experienced increases in lean body mass following 21 days of treatment. We observed positive dose-dependent trends in functional exercise and strength measures consistent with anabolic activity. In addition, no drug-related serious adverse events were reported. We plan to commence a Phase 2 proof-of-concept clinical trial in approximately 100 patients with cancer cachexia in early 2015. We expect this clinical trial to be completed in 2016. We also plan to discuss with the U.S. Food and Drug Administration, or the FDA, potential clinical development of VK5211 in acute rehabilitation settings, such as hip fracture recovery.

Approximately 2.0 million cancer patients in North America and Europe suffer from cachexia, and it is estimated that up to 20% of all cancer deaths are a direct result of cachexia. It is particularly common among patients with lung, gastric, colorectal or pancreatic cancers, with up to 80% of patients with gastric or pancreatic cancers, and approximately 50% of patients with lung or colorectal cancers, suffering from the syndrome. There are currently no approved therapies in the U.S. for cancer cachexia, and pharmacological interventions have demonstrated limited clinical benefit or expose patients to the risk of undesirable side-effects such as virilization in women and prostate growth in men. As a result, we believe the potential size of the worldwide cancer cachexia market exceeds $1.0 billion.

**Preclinical Programs**

We are also developing three preclinical programs targeting multi-billion dollar indications. Our most advanced preclinical program is VK0214, a novel liver-selective TRß agonist for lipid disorders such as dyslipidemia, a disease characterized by an elevation of lipids, such as cholesterol or triglycerides, in the bloodstream that, if left untreated, increases the risk of cardiovascular disease, heart attack or stroke, and related disorders, and NASH, a liver disease characterized by a buildup of fat in the liver. We expect to file an IND and commence clinical trials for VK0214 in 2015. Our second preclinical program is focused on identifying orally available erythropoietin receptor, or EPOR, agonists, for the potential treatment of anemia. Our third preclinical program is focused on the development of tissue-selective inhibitors of diacylglycerol acyltransferase-1, or DGAT-1, for the potential treatment of obesity and dyslipidemia.

-3-

Table of Contents

## Our Product Pipeline

The following table highlights our product pipeline:

| Program | Drug Candidate | Indication(s) | Preclinical | Phase 1 | Phase 2 | Phase 3 | Development Plans |
|---------|---------------|---------------|-------------|---------|---------|---------|-------------------|
| FBPase | VK0612 | *Type 2 Diabetes* | | | | | ▪ Plan to commence Phase 2b trial in 2015 and complete the trial in 2016 <br> ▪ Plan to commence a metformin DDI Phase 1 trial and renal insufficiency Phase 1 trial in 2015 |
| SARM | VK5211 | *Cancer Cachexia* | | | | | ▪ Plan to commence Phase 2 trial in 2015 and complete the trial in 2016 |
| TRß | VK0214 | *Dyslipidemia* <br><br> *NASH* | | | | | ▪ Plan to file an IND and initiate Phase 1 trial in 2015 |
| EPOR | | *Anemia* | | | | | ▪ Plan to conduct further preclinical studies and file an IND in 2016 |
| DGAT-1 | | *Obesity* <br> *Dyslipidemia* | | | | | ▪ Plan to conduct further preclinical studies and file an IND in 2016 |

Key: FBPase, fructose-1,6-bisphosphatase; DDI, drug-drug interaction; SARM, selective androgen receptor modulator; TRß, thyroid receptor beta; EPOR, erythropoietin receptor; DGAT-1, diacylglycerol acyltransferase-1; NASH, nonalcoholic steatohepatitis.

## Our Strategy

We intend to become a leading biopharmaceutical company focused on the development of novel, first-in-class or best-in-class therapies for metabolic and endocrine disorders. The key elements of our strategy include:

- *Advance the development of VK0612 for type 2 diabetes.* We intend to commence a Phase 2b clinical trial for VK0612 evaluating once-daily doses of VK0612 in approximately 500 patients with poorly-controlled type 2 diabetes in early 2015 and expect to complete this clinical trial in 2016. We also plan to complete a Phase 1 drug-drug interaction clinical trial evaluating the safety and tolerability of VK0612 in combination with metformin, as well as a Phase 1 clinical trial in renally-impaired type 2 diabetes patients, both within the same period. Pending clinical data from these clinical trials, we plan to commence Phase 3 clinical trials in type 2 diabetes patients either on our own or with a third party.

- *Advance the development of VK5211 for cancer cachexia and other muscle wasting disorders.* We plan to commence a Phase 2 proof-of-concept clinical trial in approximately 100 patients with cancer cachexia in early 2015. We expect this clinical trial to be completed in 2016. Pending positive data from this clinical trial, we plan to advance VK5211 in further clinical trials. We also plan to discuss with the FDA potential clinical development of VK5211 in acute rehabilitation settings, such as hip fracture recovery.

- *Advance the development of our preclinical programs.* We currently have three programs in preclinical development. Our most advanced preclinical program is VK0214, a novel liver-selective TRß agonist for lipid disorders such as dyslipidemia and NASH. We plan to complete the toxicity, pharmacology and chemistry, manufacturing and controls studies needed for an IND filing. In the event these VK0214 preclinical studies are favorable, we expect to file an IND and commence clinical trials for this program in 2015. We also plan to further advance our EPOR agonist and DGAT-1 inhibitor programs and anticipate filing INDs for these programs in 2016.

-4-

Table of Contents

- *Evaluate strategic partnership and collaboration opportunities.* We plan to selectively evaluate partnership and collaboration opportunities throughout the duration of our development programs. In addition, we may opportunistically pursue in-licensing opportunities.

## Risks Related to Our Business

Our business is subject to numerous risks and uncertainties, including those highlighted in the section of this prospectus entitled "Risk Factors," which you should read carefully before making a decision to invest in our common stock. Some of these risks include:

- We are a clinical-stage company, have a very limited operating history and are expected to incur significant operating losses during the early stage of our corporate development;

- We are substantially dependent on technologies we license from Ligand, and if we lose the right to license such technologies or the Master License Agreement with Ligand is terminated for any reason, our ability to develop existing and new drug candidates would be harmed;

- We are dependent on the success of our current drug candidates and we cannot be certain that any of them will receive regulatory approval or be commercialized;

- If development of our drug candidates does not produce favorable results, we and our collaborators, if any, may be unable to commercialize these products;

- Our efforts to discover drug candidates beyond our current drug candidates may not succeed, and any drug candidates we recommend for clinical development may not actually begin clinical trials;

- Our independent registered public accounting firm has expressed substantial doubt about our ability to continue as a going concern;

- We may need to raise additional capital after completion of this offering, which may be unavailable to us and, even if we raise capital, it may cause dilution or place significant restrictions on our ability to operate;

- We rely completely on third parties to manufacture our preclinical and clinical drug supplies, and our business, financial condition and results of operations could be harmed if those third parties fail to provide us with sufficient quantities of drug product, or fail to do so at acceptable quality levels or prices;

- The commercial success of our drug candidates depends upon their market acceptance among physicians, patients, healthcare payors and the medical community;

- We may not be successful in obtaining or maintaining necessary rights to our drug candidates through acquisitions and in-licenses;

- If we fail to comply with our obligations in the agreements under which we license intellectual property and other rights from third parties or otherwise experience disruptions to our business relationships with our licensors, we could lose license rights that are important to our business; and

- If we fail to retain current members of our senior management and scientific personnel, or to attract and keep additional key personnel, we may be unable to successfully develop or commercialize our drug candidates.

## Agreements with Ligand

On May 21, 2014, we entered into a Master License Agreement with Ligand, or the Master License Agreement, pursuant to which, among other things, Ligand granted us an exclusive worldwide license to VK0612, VK5211 and three preclinical programs. Under the terms of the Master License Agreement, we will pay Ligand an upfront fee of $29.0 million, subject to adjustment in certain circumstances, payable in equity upon the closing of this offering, in addition to development and commercial milestone payments of up to $1.54 billion, as well as single-digit royalties on future worldwide net product sales.

-5-

**Table of Contents**

In connection with entering into the Master License Agreement, we also entered into a Loan and Security Agreement with Ligand, dated May 21, 2014, or the Loan and Security Agreement, pursuant to which, among other things, Ligand agreed to provide us with loans in the aggregate amount of up to $2.5 million. The loans will be evidenced by a Secured Convertible Promissory Note, or the Note. Upon the consummation of this offering, Ligand will have the option to convert the amounts outstanding under the Note into shares of our common stock.

Further details regarding the Master License Agreement, the Loan and Security Agreement, the Note and certain other agreements we entered into with Ligand in connection with the Master License Agreement are discussed in the section of this prospectus entitled "Business – Agreements with Ligand".

### Common Stock Issuances to Ligand Upon the Consummation of this Offering

Upon consummation of this offering, we will be obligated to issue an aggregate of            shares of common stock to Ligand pursuant to the Master License Agreement, based on           shares of common stock outstanding as of immediately prior to the closing of this offering (excluding shares issued in this offering) and an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus.

Ligand has the option to convert the amounts outstanding under the Note into shares of our common stock upon the consummation of this offering. Therefore, upon the consummation of this offering, we may be obligated to issue an aggregate of           shares of common stock to Ligand pursuant to the Note, based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus.

### Corporate Information

We were incorporated under the laws of the State of Delaware on September 24, 2012. Our principal executive offices are located at 11119 North Torrey Pines Road, Suite 50, San Diego, CA 92037, and our telephone number is (858) 550-7810. Our website address is *www.vikingtherapeutics.com*. We do not incorporate the information on, or accessible through, our website into this prospectus, and you should not consider any information on, or accessible through, our website as part of this prospectus. We have included our website address in this prospectus solely as an inactive textual reference.

### Emerging Growth Company Status

We qualify as an "emerging growth company," as that term is defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. For as long as we qualify as an emerging growth company, we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that do not qualify as emerging growth companies, including, without limitation, not being required to comply with the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act of 2002, as amended, reduced disclosure obligations relating to executive compensation and exemptions from the requirements of holding advisory "say-on-pay," "say-when-on-pay" and "golden parachute" executive compensation votes.

Under the JOBS Act, we will remain an emerging growth company until the earliest of:

- the last day of the fiscal year during which we have total annual gross revenues of $1.0 billion or more;

- the last day of the fiscal year following the fifth anniversary of the completion of this offering;

- the date on which we have, during the previous three-year period, issued more than $1.0 billion in non-convertible debt; and

- the date on which we are deemed to be a "large accelerated filer" under the Securities Exchange Act of 1934, or the Exchange Act (*i.e.*, the first day of the fiscal year after we have (1) more than $700.0 million in outstanding common equity held by our non-affiliates, measured each year on the last day of our second fiscal quarter, and (2) been public for at least 12 months).

-6-

**Table of Contents**

We have elected to take advantage of certain of the reduced disclosure obligations regarding executive compensation in this prospectus and may elect to take advantage of other reduced reporting requirements in future filings with the Securities and Exchange Commission, or the SEC. As a result, the information that we provide to our stockholders may be different than the information you receive from other public reporting companies.

The JOBS Act also provides that an emerging growth company can utilize the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933, as amended, or the Securities Act, for complying with new or revised accounting standards. However, we are choosing to "opt out" of such extended transition period and, as a result, we will comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for companies that are not emerging growth companies. Section 107 of the JOBS Act provides that our decision to "opt out" of the extended transition period for complying with new or revised accounting standards is irrevocable.

## The Offering

| | |
|---|---|
| Common stock being offered by Viking Therapeutics, Inc. | shares |
| Common stock to be outstanding after this offering | shares |
| Underwriters option to purchase additional shares | The underwriters have an option, exercisable for 30 days after the date of this prospectus, to purchase up to an additional          shares from us. |
| Use of proceeds | We intend to use the net proceeds from this offering of approximately $          million, assuming an initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, to fund clinical trials for VK0612 and VK5211 and the research and development of our preclinical drug candidates and for other working capital and general corporate purposes. See the section of this prospectus entitled "Use of Proceeds" on page 49 for a more complete description of the intended use of the net proceeds from this offering. |
| Risk Factors | You should read the section of this prospectus entitled "Risk Factors" beginning on page 11 for a discussion of factors to consider carefully before deciding to invest in shares of our common stock. |
| Concentration of Ownership | Upon completion of this offering, our executive officers and directors will beneficially own, in the aggregate, approximately          % of our outstanding shares of common stock, and Ligand is expected to beneficially own, in the aggregate, approximately          % of our outstanding shares of common stock. |
| Dividend Policy | Currently, we do not anticipate paying cash dividends. |
| Proposed Nasdaq Global Market Symbol | "VKTX" |

-7-

**Table of Contents**

The number of shares of common stock that will be outstanding after this offering is based on 6,000,000 shares outstanding as of March 31, 2014, and excludes shares of common stock reserved for issuance under our 2014 Equity Incentive Plan, which will become effective upon the execution and delivery of the underwriting agreement for this offering.

Except as otherwise indicated, all information in this prospectus assumes:

- a        -for-        stock split of our common stock, which will occur prior to the effectiveness of the registration statement of which this prospectus forms a part;

- the filing of our amended and restated certificate of incorporation in Delaware and the effectiveness of our amended and restated bylaws, each of which will occur immediately prior to the completion of this offering;

- the conversion of our outstanding convertible notes in an aggregate principal amount of $310,350 and accrued interest of approximately $9,083 as of March 31, 2014 into an aggregate of                shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $        , the midpoint of the price range set forth on the cover page of this prospectus;

- the issuance of an aggregate of                shares of common stock to Ligand pursuant to the Master License Agreement, based on                shares of common stock outstanding as of immediately prior to the closing of this offering (excluding shares issued in this offering) and an assumed initial public offering price of $        , the midpoint of the price range set forth on the cover page of this prospectus;

- the issuance of an aggregate of                shares of common stock to Ligand pursuant to the Note, based on an assumed initial public offering price of $        , the midpoint of the price range set forth on the cover page of this prospectus; and

- no exercise by the underwriters of their option to purchase up to an additional                shares of common stock from us in this offering.

-8-

**Table of Contents**

### Summary Financial Data

*The following table sets forth our summary financial data as of the dates and for the periods indicated. We have derived the summary statement of operations data for the period from September 24, 2012 (Inception) through December 31, 2012 and the year ended December 31, 2013 from our audited financial statements included elsewhere in this prospectus. The summary statement of operations data for the three months ended March 31, 2013 and 2014 and the cumulative period from September 24, 2012 (Inception) through March 31, 2014, and the balance sheet data as of March 31, 2014, are derived from our unaudited financial statements included elsewhere in this prospectus. Our unaudited financial statements have been prepared on the same basis as the audited financial statements and, in the opinion of our management, include all adjustments, consisting of normal recurring adjustments and accruals, necessary for a fair statement of the information for the interim periods.*

*The historical results presented below are not necessarily indicative of the results to be expected for any future period and our interim results are not necessarily indicative of the results that may be expected for a full year. The following summaries of our financial data for the periods presented should be read in conjunction with the sections of this prospectus entitled "Risk Factors," "Selected Financial Data," "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus.*

| | Period from September 24, 2012 (Inception) through December 31, 2012 | Year Ended December 31, 2013 | Three Months Ended March 31, 2013 | Three Months Ended March 31, 2014 | Cumulative Period from September 24, 2012 (Inception) through March 31, 2014 |
|---|---|---|---|---|---|
| | | | (Unaudited) | (Unaudited) | (Unaudited) |
| **Statement of Operations** | | | | | |
| Revenue | $ — | $ — | $ — | $ — | $ — |
| Operating expenses: | | | | | |
| Research and development | 68,871 | 11,613 | 575 | 50,000 | 130,484 |
| General and administrative | 40,770 | 89,463 | 2,615 | 159,737 | 289,970 |
| Total operating expenses | 109,641 | 101,076 | 3,190 | 209,737 | 420,454 |
| Loss from operations | (109,641) | (101,076) | (3,190) | (209,737) | (420,454) |
| Other expenses: | | | | | |
| Loss from change in fair value of debt conversion feature | — | 20,622 | 37 | 10,249 | 30,871 |
| Interest expense | 1,386 | 24,549 | 1,356 | 8,955 | 34,890 |
| Total other expenses | 1,386 | 45,171 | 1,393 | 19,204 | 65,761 |
| Net loss | (111,027) | (146,247) | (4,583) | (228,941) | (486,215) |
| Basic and diluted net loss per share | $ (0.07) | $ (0.07) | $ (0.00) | $ (0.07) | $ (0.24) |
| Weighted-average shares used to compute basic and diluted net loss per share | 1,482,625 | 2,043,295 | 1,794,444 | 3,191,666 | 2,026,311 |
| Pro forma basic and diluted net loss per share (unaudited) | | $ | | $ | |
| Weighted-average pro forma shares used to compute basic and diluted net loss per common share (unaudited) | | | | | |

-9-

**Table of Contents**

| | As of March 31, 2014 | | |
| --- | --- | --- | --- |
| | Actual<br>(Unaudited) | Pro Forma(1)<br>(Unaudited) | Pro Forma as Adjusted(2)(3)<br>(Unaudited) |
| **Balance Sheet Data** | | | |
| Cash | $  78,849 | $  78,849 | |
| Working capital (deficit) | (349,912) | | |
| Total assets | 276,716 | 276,716 | |
| Convertible notes payable, current | 47,930 | — | |
| Convertible notes payable, non-current | 237,194 | — | |
| Debt conversion feature liability | 81,904 | — | |
| Common stock | 60 | | |
| Additional paid-in capital | 10,010 | | |
| Accumulated deficit | (486,215) | | |
| Total stockholders' equity (deficit) | (478,643) | | |

(1)  The pro forma column in the balance sheet data table above reflects (a) the conversion of our outstanding convertible notes in an aggregate principal amount of $310,350 and accrued interest of approximately $9,083 into an aggregate of           shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and (b) the issuance of an aggregate of           shares of our common stock to Ligand pursuant to the Master License Agreement and conversion of the Note upon the consummation of this offering, based on shares of common stock outstanding as of immediately prior to the closing of this offering (excluding shares issued in this offering) and an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus. The pro forma information is illustrative only, and we will adjust this information based on the actual initial public offering price and other terms of this offering determined at pricing.

(2)  The pro forma as adjusted column in the consolidated balance sheet data table above reflects (a) the conversion of our outstanding convertible notes in an aggregate principal amount of $310,350 and accrued interest of approximately $9,083 into an aggregate of           shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, (b) the issuance of an aggregate of           shares of our common stock to Ligand pursuant to the Master License Agreement and conversion of the Note upon the consummation of this offering, based on shares of common stock outstanding as of immediately prior to the closing of this offering (excluding shares issued in this offering) and an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and (c) the sale of           shares of common stock in this offering at an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. The pro forma as adjusted information is illustrative only, and we will adjust this information based on the actual initial public offering price and other terms of this offering determined at pricing.

(3)  Each $1.00 increase or decrease in the assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, would increase or decrease each of the pro forma as adjusted cash, additional paid-in capital, total stockholders' equity (deficit) by approximately $          million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. We may also increase or decrease the number of shares we are offering. An increase or decrease of 1.0 million in the number of shares we are offering would increase or decrease each of the pro forma as adjusted cash, additional paid-in capital and total stockholders' equity (deficit) by approximately $          million, assuming an initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. The pro forma as adjusted information is illustrative only, and we will adjust this information based on the actual initial public offering price and other terms of this offering determined at pricing.

-10-

**Table of Contents**

# Risk Factors

*Investing in our common stock involves a high degree of risk. You should consider carefully the risks and uncertainties described below, together with all of the other information in this prospectus, before making a decision to invest in our common stock. The risks and uncertainties described below may not be the only ones we face. If any of the risks actually occur, our business, financial condition and results of operations could be materially and adversely affected. In that event, the trading price of our common stock could decline, and you could lose part or all of your investment.*

### *Risks Relating to Our Business*

**We are a clinical-stage company, have a very limited operating history and are expected to incur significant operating losses during the early stage of our corporate development.**

We are a clinical-stage company. We were incorporated in, and have only been conducting operations since, September 2012. Our operations to date have been limited to raising capital, building infrastructure, obtaining the worldwide rights to certain technology from Ligand Pharmaceuticals Incorporated, or Ligand, and planning and preparing for preclinical studies and clinical trials of our drug candidates, including VK0612, which is currently in Phase 2 clinical development, VK5211, which has completed Phase 1 clinical development, and VK0214 and the EPOR and DGAT-1 programs, which are currently in preclinical development. As a result, we have no meaningful historical operations upon which to evaluate our business and prospects and have not yet demonstrated an ability to obtain marketing approval for any of our drug candidates or successfully overcome the risks and uncertainties frequently encountered by companies in the biopharmaceutical industry. We also have not generated any revenue to date, and we continue to incur significant research and development and other expenses. Our net loss for the fiscal year ended December 31, 2013 was $146,247 and for the period from September 24, 2012 (Inception) through December 31, 2012 was $111,027. Our net loss for the three months ended March 31, 2013 and 2014 was $4,583 and $228,941, respectively. As of December 31, 2013 and March 31, 2014, we had a deficit accumulated during the development stage of $257,274 and $486,215, respectively. For the foreseeable future, we expect to continue to incur losses, which will increase significantly from historical levels as we expand our drug development activities, seek regulatory approvals for our drug candidates and begin to commercialize them if they are approved by the U.S. Food and Drug Administration, or FDA, the European Medicines Agency, or EMA, or comparable foreign authorities. Even if we succeed in developing and commercializing one or more drug candidates, we may never become profitable. If we fail to achieve or maintain profitability, it would adversely affect the value of our common stock.

**We are substantially dependent on technologies we in-license from Ligand, and if we lose the right to license such technologies or the Master License Agreement is terminated for any reason, our ability to develop existing and new drug candidates would be harmed, and our business, financial condition and results of operations would be materially and adversely affected.**

Our business is substantially dependent upon technology licensed from Ligand. Pursuant to the Master License Agreement, we have been granted exclusive worldwide rights to VK0612, VK5211 and three preclinical programs. Inhibitors of the enzyme fructose-1,6-bisphosphatase, such as our lead program VK0612, are key compounds used by us in the development and commercialization of our drug candidates. All of the intellectual property related to our drug candidates is currently owned by Ligand, and we have the rights to use such intellectual property pursuant to the Master License Agreement. Therefore, our ability to develop and commercialize our drug candidates depends entirely on the effectiveness and continuation of the Master License Agreement. If we lose the right to license any of these key compounds, our ability to develop existing and new drug candidates would be harmed.

Ligand has the right to terminate the Master License Agreement under certain circumstances, including, but not limited to: (1) if, on or before April 30, 2015, we have neither (a) completed a firmly underwritten public offering pursuant to the Securities Act on Form S-1 or any successor form, nor (b) received aggregate net

-11-

Table of Contents

proceeds of at least $20.0 million in one or more private financings of our equity securities, (2) in the event of our insolvency or bankruptcy, (3) if we do not pay an undisputed amount owing under the Master License Agreement when due and fail to cure such default within a specified period of time, or (4) if we default on certain of our material obligations and fail to cure the default within a specified period of time.

**We are dependent on the success of one or more of our current drug candidates and we cannot be certain that any of them will receive regulatory approval or be commercialized.**

We have spent significant time, money and effort on the development of our core metabolic and endocrine disease assets, VK0612 and VK5211, and our earlier-stage assets, VK0214 and the EPOR and DGAT-1 programs. To date, no pivotal clinical trials designed to provide clinically and statistically significant proof of efficacy, or to provide sufficient evidence of safety to support approval, have been completed with any of our drug candidates. All of our drug candidates will require additional development, including clinical trials as well as further preclinical studies to evaluate their toxicology, carcinogenicity and pharmacokinetics and optimize their formulation, and regulatory clearances before they can be commercialized. Positive results obtained during early development do not necessarily mean later development will succeed or that regulatory clearances will be obtained. Our drug development efforts may not lead to commercial drugs, either because our drug candidates fail to be safe and effective or because we have inadequate financial or other resources to advance our drug candidates through the clinical development and approval processes. If any of our drug candidates fail to demonstrate safety or efficacy at any time or during any phase of development, we would experience potentially significant delays in, or be required to abandon, development of the drug candidate.

We do not anticipate that any of our current drug candidates will be eligible to receive regulatory approval from the FDA, EMA or comparable foreign authorities and begin commercialization for a number of years, if ever. Even if we ultimately receive regulatory approval for any of these drug candidates, we or our potential future partners, if any, may be unable to commercialize them successfully for a variety of reasons. These include, for example, the availability of alternative treatments, lack of cost-effectiveness, the cost of manufacturing the product on a commercial scale and competition with other drugs. The success of our drug candidates may also be limited by the prevalence and severity of any adverse side effects. If we fail to commercialize one or more of our current drug candidates, we may be unable to generate sufficient revenues to attain or maintain profitability, and our financial condition and stock price may decline.

**If development of our drug candidates does not produce favorable results, we and our collaborators, if any, may be unable to commercialize these products.**

To receive regulatory approval for the commercialization of our core metabolic and endocrine disease assets, VK0612 and VK5211, our earlier-stage assets, VK0214 and the EPOR and DGAT-1 programs, or any other drug candidates that we may develop, adequate and well-controlled clinical trials must be conducted to demonstrate safety and efficacy in humans to the satisfaction of the FDA, EMA and comparable foreign authorities. In order to support marketing approval, these agencies typically require successful results in one or more Phase 3 clinical trials, which our current drug candidates have not yet reached and may never reach. The development process is expensive, can take many years and has an uncertain outcome. Failure can occur at any stage of the process. We may experience numerous unforeseen events during, or as a result of, the development process that could delay or prevent commercialization of our current or future drug candidates, including the following:

- clinical trials may produce negative or inconclusive results;

- preclinical studies conducted with drug candidates during clinical development to, among other things, evaluate their toxicology, carcinogenicity and pharmacokinetics and optimize their formulation may produce unfavorable results;

- patient recruitment and enrollment in clinical trials may be slower than we anticipate;

- costs of development may be greater than we anticipate;

-12-

Table of Contents

- our drug candidates may cause undesirable side effects that delay or preclude regulatory approval or limit their commercial use or market acceptance, if approved;

- collaborators who may be responsible for the development of our drug candidates may not devote sufficient resources to these clinical trials or other preclinical studies of these candidates or conduct them in a timely manner; or

- we may face delays in obtaining regulatory approvals to commence one or more clinical trials.

Success in early development does not mean that later development will be successful because, for example, drug candidates in later-stage clinical trials may fail to demonstrate sufficient safety and efficacy despite having progressed through initial clinical trials.

We in-license all of the intellectual property related to our drug candidates from Ligand pursuant to the Master License Agreement. All clinical trials, preclinical studies and other analyses performed to date with respect to our drug candidates have been conducted by Ligand. Therefore, as a company, we do not have any experience in conducting clinical trials for our drug candidates. Since our experience with our drug candidates is limited, we will need to train our existing personnel and hire additional personnel in order to successfully administer and manage our clinical trials and other studies as planned, which may result in delays in completing such planned clinical trials and preclinical studies. Moreover, to date our drug candidates have been tested in less than the number of patients that will likely need to be studied to obtain regulatory approval. The data collected from clinical trials with larger patient populations may not demonstrate sufficient safety and efficacy to support regulatory approval of these drug candidates.

We currently do not have strategic collaborations in place for clinical development of any of our current drug candidates. Therefore, in the future, we or any potential future collaborative partner will be responsible for establishing the targeted endpoints and goals for development of our drug candidates. These targeted endpoints and goals may be inadequate to demonstrate the safety and efficacy levels required for regulatory approvals. Even if we believe data collected during the development of our drug candidates are promising, such data may not be sufficient to support marketing approval by the FDA, EMA or comparable foreign authorities. Further, data generated during development can be interpreted in different ways, and the FDA, EMA or comparable foreign authorities may interpret such data in different ways than us or our collaborators. Our failure to adequately demonstrate the safety and efficacy of our drug candidates would prevent our receipt of regulatory approval, and ultimately the potential commercialization of these drug candidates.

Since we do not currently possess the resources necessary to independently develop and commercialize our drug candidates, including our core metabolic and endocrine disease assets, VK0612 and VK5211, our earlier-stage assets, VK0214 and the EPOR and DGAT-1 programs, or any other drug candidates that we may develop, we may seek to enter into collaborative agreements to assist in the development and potential future commercialization of some or all of these assets as a component of our strategic plan. However, our discussions with potential collaborators may not lead to the establishment of collaborations on acceptable terms, if at all, or it may take longer than expected to establish new collaborations, leading to development and potential commercialization delays, which would adversely affect our business, financial condition and results of operations.

**We expect to continue to incur significant research and development expenses, which may make it difficult for us to attain profitability.**

We expect to expend substantial funds in research and development, including preclinical studies and clinical trials of our drug candidates, and to manufacture and market any drug candidates in the event they are approved for commercial sale. We also may need additional funding to develop or acquire complementary companies, technologies and assets, as well as for working capital requirements and other operating and general corporate purposes. Moreover, our planned increases in staffing will dramatically increase our costs in the near and long-term.

-13-

Table of Contents

Because the successful development of our drug candidates is uncertain, we are unable to precisely estimate the actual funds we will require to develop and potentially commercialize them. In addition, we may not be able to generate sufficient revenue, even if we are able to commercialize any of our drug candidates, to become profitable.

**Our independent registered public accounting firm has expressed substantial doubt about our ability to continue as a going concern.**

We are a clinical-stage company, and the development and commercialization of our drug candidates is uncertain and expected to require substantial expenditures. We have not yet generated any revenues from our operations to fund our activities, and are therefore dependent upon external sources for financing our operations. The audit report issued by our independent registered public accounting firm for our financial statements for the fiscal year ended December 31, 2013 states that our independent registered public accounting firm has substantial doubt in our ability to continue as a going concern due to the risk that we may not have sufficient cash and liquid assets at December 31, 2013 to cover our operating and capital requirements for the next 12 months; and if in that case sufficient cash cannot be obtained, we would have to substantially alter, or possibly even discontinue, operations. Additionally, as of March 31, 2014, we do not believe that we will have sufficient cash to meet our operating requirements for at least the next 12 months unless this offering is successfully completed and we receive the full $2.5 million loan from Ligand pursuant to the Loan and Security Agreement. Our financial statements and related notes thereto included elsewhere in this prospectus do not include any adjustments that might result from the outcome of this uncertainty.

**Given our lack of cash flow, we may need to raise additional capital after completion of this offering, which may be unavailable to us or, even if consummated, may cause dilution or place significant restrictions on our ability to operate our business.**

Since we will be unable to generate sufficient, if any, cash flow to fund our operations for the foreseeable future, we may need to seek additional equity or debt financing to provide the capital required to maintain or expand our operations. As of March 31, 2014, we had cash of $78,849.

There can be no assurance that we will be able to raise sufficient additional capital, if needed, on acceptable terms, or at all. If such additional financing is not available on satisfactory terms, or is not available in sufficient amounts, we may be required to delay, limit or eliminate the development of business opportunities and our ability to achieve our business objectives, our competitiveness, and our business, financial condition and results of operations may be materially adversely affected. In addition, we may be required to grant rights to develop and market drug candidates that we would otherwise prefer to develop and market ourselves. Our inability to fund our business could lead to the loss of your investment.

Our future capital requirements will depend on many factors, including, but not limited to:

- the scope, rate of progress, results and cost of our clinical trials, preclinical studies and other related activities;

- the timing of, and the costs involved in, obtaining regulatory approvals for any of our current or future drug candidates;

- the number and characteristics of the drug candidates we seek to develop or commercialize;

- the cost of manufacturing clinical supplies, and establishing commercial supplies, of our drug candidates;

- the cost of commercialization activities if any of our current or future drug candidates are approved for sale, including marketing, sales and distribution costs;

- the expenses needed to attract and retain skilled personnel;

- the costs associated with being a public company;

- our ability to establish and maintain strategic collaborations, licensing or other arrangements and the financial terms of such arrangements;

-14-

**Table of Contents**

- the amount of revenue, if any, received from commercial sales of our drug candidates, should any of our drug candidates receive marketing approval; and

- the costs involved in preparing, filing, prosecuting, maintaining, defending and enforcing possible patent claims, including litigation costs and the outcome of any such litigation.

If we raise additional capital by issuing equity securities, the percentage ownership of our existing stockholders may be reduced, and accordingly these stockholders may experience substantial dilution. We may also issue equity securities that provide for rights, preferences and privileges senior to those of our common stock. Given our need for cash and that equity issuances are the most common type of fundraising for companies like ours, the risk of dilution is particularly significant for stockholders of our company.

**Our drug candidates may cause undesirable side effects that could delay or prevent their regulatory approval or commercialization or have other significant adverse implications on our business, financial condition and results of operations.**

Undesirable side effects observed in clinical trials or in supportive preclinical studies with our drug candidates could interrupt, delay or halt their development and could result in the denial of regulatory approval by the FDA, EMA or comparable foreign authorities for any or all targeted indications or adversely affect the marketability of any such drug candidates that receive regulatory approval. In turn, this could eliminate or limit our ability to commercialize our drug candidates.

We are aware of several previous drug development programs targeting fructose-1,6-bisphosphatase. The most advanced of these was the small molecule inhibitor CS-917. Sankyo Company, Ltd., now Daiichi Sankyo Company, Ltd., was responsible for funding and conducting the clinical development program for CS-917. In a 12 week Phase 2 clinical trial, CS-917 showed poor efficacy in type 2 diabetes patients. In addition, toxicity was observed in a separate Phase 1 clinical trial. These issues may have contributed to the decision to discontinue development of CS-917. We believe CS-917 may have failed due to inadequate drug exposures in the Phase 2 clinical trial as well as the toxicities observed in the Phase 1 clinical trial.

Our drug candidates may exhibit adverse effects in preclinical toxicology studies and adverse interactions with other drugs. There are also risks associated with additional requirements the FDA, EMA or comparable foreign authorities may impose for marketing approval with regard to a particular disease. For example, VK0612 is in development for treatment of patients with type 2 diabetes. The FDA has issued guidance for companies developing anti-diabetic compounds that requires companies to demonstrate that use of the product will not lead to an unacceptable increased risk of cardiovascular side effects. There is a risk that our drug candidate will not show an acceptable risk level of cardiovascular side effects and the FDA may require additional studies of VK0612 before we can obtain regulatory approval.

Our drug candidates may require a risk management program that could include patient and healthcare provider education, usage guidelines, appropriate promotional activities, a post-marketing observational study, and ongoing safety and reporting mechanisms, among other requirements. Prescribing could be limited to physician specialists or physicians trained in the use of the drug, or could be limited to a more restricted patient population. Any risk management program required for approval of our drug candidates could potentially have an adverse effect on our business, financial condition and results of operations.

Undesirable side effects involving our drug candidates may have other significant adverse implications on our business, financial condition and results of operations. For example:

- we may be unable to obtain additional financing on acceptable terms, if at all;

- our collaborators may terminate any development agreements covering these drug candidates;

- if any development agreements are terminated, we may determine not to further develop the affected drug candidates due to resource constraints and may not be able to establish additional collaborations for their further development on acceptable terms, if at all;

-15-

Table of Contents

- if we were to later continue the development of these drug candidates and receive regulatory approval, earlier findings may significantly limit their marketability and thus significantly lower our potential future revenues from their commercialization;

- we may be subject to product liability or stockholder litigation; and

- we may be unable to attract and retain key employees.

In addition, if any of our drug candidates receive marketing approval and we or others later identify undesirable side effects caused by the product:

- regulatory authorities may withdraw their approval of the product, or we or our partners may decide to cease marketing and sale of the product voluntarily;

- we may be required to change the way the product is administered, conduct additional clinical trials or preclinical studies regarding the product, change the labeling of the product, or change the product's manufacturing facilities; and

- our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of the affected product and could substantially increase the costs and expenses of commercializing the product, which in turn could delay or prevent us from generating significant revenues from the sale of the product.

**Our efforts to discover drug candidates beyond our current drug candidates may not succeed, and any drug candidates we recommend for clinical development may not actually begin clinical trials.**

We intend to use our technology, including our licensed technology, knowledge and expertise to develop novel drugs to address some of the world's most widespread and costly chronic diseases. We intend to expand our existing pipeline of core assets by advancing drug compounds from current ongoing discovery programs into clinical development. However, the process of researching and discovering drug compounds is expensive, time-consuming and unpredictable. Data from our current preclinical programs may not support the clinical development of our lead compounds or other compounds from these programs, and we may not identify any additional drug compounds suitable for recommendation for clinical development. Moreover, any drug compounds we recommend for clinical development may not demonstrate, through preclinical studies, indications of safety and potential efficacy that would support advancement into clinical trials. Such findings would potentially impede our ability to maintain or expand our clinical development pipeline. Our ability to identify new drug compounds and advance them into clinical development also depends upon our ability to fund our research and development operations, and we cannot be certain that additional funding will be available on acceptable terms, or at all.

**Delays in the commencement or completion of clinical trials could result in increased costs to us and delay our ability to establish strategic collaborations.**

Delays in the commencement or completion of clinical trials could significantly impact our drug development costs. We do not know whether planned clinical trials will begin on time or be completed on schedule, if at all. The commencement of clinical trials can be delayed for a variety of reasons, including, but not limited to, delays related to:

- obtaining regulatory approval to commence one or more clinical trials;

- reaching agreement on acceptable terms with prospective third-party contract research organizations, or CROs, and clinical trial sites;

- manufacturing sufficient quantities of a drug candidate or other materials necessary to conduct clinical trials;

- obtaining institutional review board approval to conduct one or more clinical trials at a prospective site;

-16-

Table of Contents

- recruiting and enrolling patients to participate in one or more clinical trials; and

- the failure of our collaborators to adequately resource our drug candidates due to their focus on other programs or as a result of general market conditions.

In addition, once a clinical trial has begun, it may be suspended or terminated by us, our collaborators, the institutional review boards or data safety monitoring boards charged with overseeing our clinical trials, the FDA, EMA or comparable foreign authorities due to a number of factors, including:

- failure to conduct the clinical trial in accordance with regulatory requirements or clinical protocols;

- inspection of the clinical trial operations or clinical trial site by the FDA, EMA or comparable foreign authorities resulting in the imposition of a clinical hold;

- unforeseen safety issues; or

- lack of adequate funding to continue the clinical trial.

If we experience significant delays in the commencement or completion of clinical trials, our drug development costs may increase, we may lose any competitive advantage associated with early market entry and our ability to establish strategic collaborations may be delayed or limited. In addition, many of the factors that cause, or lead to, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of a drug candidate.

**We intend to rely on third parties to conduct our preclinical studies and clinical trials and perform other tasks for us. If these third parties do not successfully carry out their contractual duties, meet expected deadlines, or comply with regulatory requirements, we may not be able to obtain regulatory approval for or commercialize our drug candidates and our business, financial condition and results of operations could be substantially harmed.**

Ligand, the licensor of our development programs, has relied upon and plans to continue to rely upon third-party CROs, medical institutions, clinical investigators and contract laboratories to monitor and manage data for our licensed ongoing preclinical and clinical programs. We have relied and expect to continue to rely on these parties for execution of our preclinical studies and clinical trials, and we control only certain aspects of their activities. Nevertheless, we maintain responsibility for ensuring that each of our clinical trials and preclinical studies is conducted in accordance with the applicable protocol, legal, regulatory, and scientific standards and our reliance on these third parties does not relieve us of our regulatory responsibilities. We and our CROs and other vendors are required to comply with current requirements on good manufacturing practices, or cGMP, good clinical practices, or GCP, and good laboratory practice, or GLP, which are a collection of laws and regulations enforced by the FDA, EMA or comparable foreign authorities for all of our drug candidates in clinical development. Regulatory authorities enforce these regulations through periodic inspections of preclinical study and clinical trial sponsors, principal investigators, preclinical study and clinical trial sites, and other contractors. If we or any of our CROs or vendors fails to comply with applicable regulations, the data generated in our preclinical studies and clinical trials may be deemed unreliable and the FDA, EMA or comparable foreign authorities may require us to perform additional preclinical studies and clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with products produced consistent with cGMP regulations. Our failure to comply with these regulations may require us to repeat clinical trials, which would delay the development and regulatory approval processes.

If any of our relationships with these third-party CROs, medical institutions, clinical investigators or contract laboratories terminate, we may not be able to enter into arrangements with alternative CROs on commercially reasonable terms, or at all. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and

-17-

Table of Contents

resources to our ongoing preclinical and clinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced or if the quality or accuracy of the data they obtain is compromised due to the failure to adhere to our protocols, regulatory requirements, or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our drug candidates. CROs may also generate higher costs than anticipated. As a result, our business, financial condition and results of operations and the commercial prospects for our drug candidates could be materially and adversely affected, our costs could increase, and our ability to generate revenue could be delayed.

Switching or adding additional CROs, medical institutions, clinical investigators or contract laboratories involves additional cost and requires management time and focus. In addition, there is a natural transition period when a new CRO commences work replacing a previous CRO. As a result, delays occur, which can materially impact our ability to meet our desired clinical development timelines. Though we carefully manage our relationships with our CROs, there can be no assurance that we will not encounter similar challenges or delays in the future or that these delays or challenges will not have a material adverse effect on our business, financial condition or results of operations.

**Our drug candidates are subject to extensive regulation under the FDA, EMA or comparable foreign authorities, which can be costly and time consuming, cause unanticipated delays or prevent the receipt of the required approvals to commercialize our drug candidates.**

The clinical development, manufacturing, labeling, storage, record-keeping, advertising, promotion, export, marketing and distribution of our drug candidates are subject to extensive regulation by the FDA and other U.S. regulatory agencies, EMA or comparable authorities in foreign markets. In the U.S., neither we nor our collaborators are permitted to market our drug candidates until we or our collaborators receive approval of an NDA from the FDA or receive similar approvals abroad. The process of obtaining these approvals is expensive, often takes many years, and can vary substantially based upon the type, complexity and novelty of the drug candidates involved. Approval policies or regulations may change and may be influenced by the results of other similar or competitive products, making it more difficult for us to achieve such approval in a timely manner or at all. For example, the FDA has released draft guidance regarding clinical trials for drug candidates treating diabetes that may result in more stringent requirements for the clinical trials and regulatory approval of such drug candidates. This and any future guidance that may result from recent FDA advisory panel discussions may make it more expensive to develop and commercialize such drug candidates. Such increased expense could make it more difficult to obtain favorable terms in the collaborative arrangements we require to maximize the value of our programs seeking to develop new drug candidates for diabetes. In addition, as a company, we have not previously filed NDAs with the FDA or filed similar applications with other foreign regulatory agencies. This lack of experience may impede our ability to obtain FDA or other foreign regulatory agency approval in a timely manner, if at all, for our drug candidates for which development and commercialization is our responsibility.

Despite the time and expense invested, regulatory approval is never guaranteed. The FDA, EMA or comparable foreign authorities can delay, limit or deny approval of a drug candidate for many reasons, including:

- a drug candidate may not be deemed safe or effective;

- agency officials of the FDA, EMA or comparable foreign authorities may not find the data from non-clinical or preclinical studies and clinical trials generated during development to be sufficient;

- the FDA, EMA or comparable foreign authorities may not approve our third-party manufacturers' processes or facilities; or

- the FDA, EMA or a comparable foreign authority may change its approval policies or adopt new regulations.

Our inability to obtain these approvals would prevent us from commercializing our drug candidates.

-18-

**Table of Contents**

**Even if our drug candidates receive regulatory approval in the U.S., we may never receive approval or commercialize our products outside of the U.S.**

In order to market any products outside of the U.S., we must establish and comply with numerous and varying regulatory requirements of other countries regarding safety and efficacy. Approval procedures vary among countries and can involve additional product testing and additional administrative review periods. The time required to obtain approval in other countries might differ from that required to obtain FDA approval. The regulatory approval process in other countries may include all of the risks detailed above regarding FDA approval in the U.S. as well as other risks. Regulatory approval in one country does not ensure regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may have a negative effect on the regulatory process in others. Failure to obtain regulatory approval in other countries or any delay seeking or obtaining such approval would impair our ability to develop foreign markets for our drug candidates.

**Even if any of our drug candidates receive regulatory approval, our drug candidates may still face future development and regulatory difficulties.**

If any of our drug candidates receive regulatory approval, the FDA, EMA or comparable foreign authorities may still impose significant restrictions on the indicated uses or marketing of the drug candidates or impose ongoing requirements for potentially costly post-approval studies and trials. In addition, regulatory agencies subject a product, its manufacturer and the manufacturer's facilities to continual review and periodic inspections. If a regulatory agency discovers previously unknown problems with a product, including adverse events of unanticipated severity or frequency, or problems with the facility where the product is manufactured, a regulatory agency may impose restrictions on that product, our collaborators or us, including requiring withdrawal of the product from the market. Our drug candidates will also be subject to ongoing FDA, EMA or comparable foreign authorities' requirements for the labeling, packaging, storage, advertising, promotion, record-keeping and submission of safety and other post-market information on the drug. If our drug candidates fail to comply with applicable regulatory requirements, a regulatory agency may:

- issue warning letters or other notices of possible violations;

- impose civil or criminal penalties or fines or seek disgorgement of revenue or profits;

- suspend any ongoing clinical trials;

- refuse to approve pending applications or supplements to approved applications filed by us or our collaborators;

- withdraw any regulatory approvals;

- impose restrictions on operations, including costly new manufacturing requirements, or shut down our manufacturing operations; or

- seize or detain products or require a product recall.

**The FDA, EMA and comparable foreign authorities actively enforce the laws and regulations prohibiting the promotion of off-label uses.**

The FDA, EMA and comparable foreign authorities strictly regulate the promotional claims that may be made about prescription products, such as our drug candidates, if approved. In particular, a product may not be promoted for uses that are not approved by the FDA, EMA or comparable foreign authorities as reflected in the product's approved labeling. If we receive marketing approval for our drug candidates for our proposed indications, physicians may nevertheless use our products for their patients in a manner that is inconsistent with the approved label, if the physicians personally believe in their professional medical judgment that our products could be used in such manner. However, if we are found to have promoted our products for any off-label uses, the federal government could levy civil, criminal or administrative penalties, and seek fines against us. Such

-19-

**Table of Contents**

enforcement has become more common in the industry. The FDA, EMA or comparable foreign authorities could also request that we enter into a consent decree or a corporate integrity agreement, or seek a permanent injunction against us under which specified promotional conduct is monitored, changed or curtailed. If we cannot successfully manage the promotion of our drug candidates, if approved, we could become subject to significant liability, which would materially adversely affect our business, financial condition and results of operations.

**If our competitors have drug candidates that are approved faster, marketed more effectively or demonstrated to be more effective than ours, our commercial opportunity may be reduced or eliminated.**

The biopharmaceutical industry is characterized by rapidly advancing technologies, intense competition and a strong emphasis on proprietary products. While we believe that our technology, knowledge, experience and scientific resources provide us with competitive advantages, we face potential competition from many different sources, including commercial biopharmaceutical enterprises, academic institutions, government agencies and private and public research institutions. Any drug candidates that we successfully develop and commercialize will compete with existing therapies and new therapies that may become available in the future.

Many of our competitors have significantly greater financial resources and expertise in research and development, manufacturing, preclinical studies, clinical trials, regulatory approvals and marketing approved products than we do. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. Our competitors may succeed in developing technologies and therapies that are more effective, better tolerated or less costly than any which we are developing, or that would render our drug candidates obsolete and noncompetitive. Even if we obtain regulatory approval of any of our drug candidates, our competitors may succeed in obtaining regulatory approvals for their products earlier than we do. We will also face competition from these third parties in recruiting and retaining qualified scientific and management personnel, establishing clinical trial sites and patient registration for clinical trials, and in acquiring and in-licensing technologies and products complementary to our programs or advantageous to our business.

*VK0612*

The key competitive factors affecting the success of VK0612, if approved, are likely to be its efficacy, safety, tolerability, frequency and route of administration, convenience and price, and the level of branded and generic competition and the availability of coverage and reimbursement from government and other third-party payors.

In the U.S., there are a variety of currently marketed oral type 2 diabetes therapies, including metformin (generic), pioglitazone (generic), glimepiride (generic), sitagliptin (Merck & Co., Inc.) and canagliflozin (Johnson & Johnson). These therapies are well-established and are widely accepted by physicians, patients, caregivers and third-party payors as the standard of care for the treatment of type 2 diabetes. Physicians, patients and third-party payors may not accept the addition of VK0612 to their current treatment regimens for a variety of potential reasons, including:

- if they do not wish to incur any potential additional costs related to VK0612; or

- if they perceive the use of VK0612 to be of limited additional benefit to patients.

In addition to the currently approved and marketed type 2 diabetes therapies, there are a number of experimental drugs that are in various stages of clinical development by companies such as Eli Lilly and Company, Takeda Pharmaceutical Company Limited and TransTech Pharma, Inc.

*VK5211*

The key competitive factors affecting the success of VK5211, if approved, are likely to be its efficacy, safety, tolerability, frequency and route of administration, convenience and price, the level of branded and generic competition and the availability of coverage and reimbursement from government and other third-party payors.

-20-

**Table of Contents**

In the U.S., there are currently no marketed therapies for the treatment of cancer cachexia, though steroids such as nandrolone (generic), oxandrolone (generic) and testosterone (generic) are sometimes prescribed for the treatment of weight loss in cancer patients. There are several experimental therapies that are in various stages of clinical development by companies including GTx, Inc., Helsinn Group and Morphosys AG. In addition, nutritional and growth hormone-based therapies are sometimes used in patients experiencing muscle wasting.

*Preclinical Programs*

If any of our preclinical programs are ultimately determined safe and effective and approved for marketing, they may compete for market share with established therapies from a number of competitors, including large biopharmaceutical companies. Many therapies are currently available and numerous others are being developed for the treatment of dyslipidemia, NASH, anemia and obesity. Any products that we may develop from our preclinical programs may not be able to compete effectively with existing or future therapies.

**We are subject to a multitude of manufacturing risks, any of which could substantially increase our costs and limit supply of our drug candidates.**

The process of manufacturing our drug candidates is complex, highly regulated, and subject to several risks. For example, the process of manufacturing our drug candidates is extremely susceptible to product loss due to contamination, equipment failure or improper installation or operation of equipment, or vendor or operator error. Even minor deviations from normal manufacturing processes for any of our drug candidates could result in reduced production yields, product defects, and other supply disruptions. If microbial, viral, or other contaminations are discovered in our drug candidates or in the manufacturing facilities in which our drug candidates are made, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination. In addition, the manufacturing facilities in which our drug candidates are made could be adversely affected by equipment failures, labor shortages, natural disasters, power failures and numerous other factors.

In addition, any adverse developments affecting manufacturing operations for our drug candidates may result in shipment delays, inventory shortages, lot failures, withdrawals or recalls, or other interruptions in the supply of our drug candidates. We also may need to take inventory write-offs and incur other charges and expenses for drug candidates that fail to meet specifications, undertake costly remediation efforts, or seek more costly manufacturing alternatives.

**We rely completely on third parties to manufacture our preclinical and clinical drug supplies, and our business, financial condition and results of operations could be harmed if those third parties fail to provide us with sufficient quantities of drug product, or fail to do so at acceptable quality levels or prices.**

We do not currently have, nor do we plan to acquire, the infrastructure or capability internally to manufacture our preclinical and clinical drug supplies for use in our clinical trials, and we lack the resources and the capability to manufacture any of our drug candidates on a clinical or commercial scale. We rely on our manufacturers to purchase from third-party suppliers the materials necessary to produce our drug candidates for our clinical trials. There are a limited number of suppliers for raw materials that we use to manufacture our drugs, and there may be a need to identify alternate suppliers to prevent a possible disruption of the manufacture of the materials necessary to produce our drug candidates for our clinical trials, and, if approved, ultimately for commercial sale. We do not have any control over the process or timing of the acquisition of these raw materials by our manufacturers. Although we generally do not begin a clinical trial unless we believe we have a sufficient supply of a drug candidate to complete such clinical trial, any significant delay or discontinuity in the supply of a drug candidate, or the raw material components thereof, for an ongoing clinical trial due to the need to replace a third-party manufacturer could considerably delay completion of our clinical trials, product testing and potential regulatory approval of our drug candidates, which could harm our business, financial condition and results of operations.

-21-

Table of Contents

**We and our contract manufacturers are subject to significant regulation with respect to manufacturing our drug candidates. The manufacturing facilities on which we rely may not continue to meet regulatory requirements.**

All entities involved in the preparation of therapeutics for clinical trials or commercial sale, including our existing contract manufacturers for our drug candidates, are subject to extensive regulation. Components of a finished therapeutic product approved for commercial sale or used in late-stage clinical trials must be manufactured in accordance with cGMP. These regulations govern manufacturing processes and procedures and the implementation and operation of quality systems to control and assure the quality of investigational products and products approved for sale. Poor control of production processes can lead to the introduction of contaminants or to inadvertent changes in the properties or stability of our drug candidates that may not be detectable in final product testing. We or our contract manufacturers must supply all necessary documentation in support of an NDA or marketing authorization application, or MAA, on a timely basis and must adhere to good laboratory practice and cGMP regulations enforced by the FDA, EMA or comparable foreign authorities through their facilities inspection program. Some of our contract manufacturers may not have produced a commercially approved pharmaceutical product and therefore may not have obtained the requisite regulatory authority approvals to do so. The facilities and quality systems of some or all of our third-party contractors must pass a pre-approval inspection for compliance with the applicable regulations as a condition of regulatory approval of our drug candidates or any of our other potential products. In addition, the regulatory authorities may, at any time, audit or inspect a manufacturing facility involved with the preparation of our drug candidates or any of our other potential products or the associated quality systems for compliance with the regulations applicable to the activities being conducted. Although we oversee the contract manufacturers, we cannot control the manufacturing process of, and are completely dependent on, our contract manufacturing partners for compliance with the regulatory requirements. If these facilities do not pass a pre-approval plant inspection, regulatory approval of the products may not be granted or may be substantially delayed until any violations are corrected to the satisfaction of the regulatory authority, if ever.

The regulatory authorities also may, at any time following approval of a product for sale, audit the manufacturing facilities of our third-party contractors. If any such inspection or audit identifies a failure to comply with applicable regulations or if a violation of our product specifications or applicable regulations occurs independent of such an inspection or audit, we or the relevant regulatory authority may require remedial measures that may be costly or time consuming for us or a third party to implement, and that may include the temporary or permanent suspension of a clinical trial or commercial sales or the temporary or permanent closure of a facility. Any such remedial measures imposed upon us or third parties with whom we contract could materially harm our business, financial condition and results of operations.

If we or any of our third-party manufacturers fail to maintain regulatory compliance, the FDA, EMA or comparable foreign authorities can impose regulatory sanctions including, among other things, refusal to approve a pending application for a drug candidate, withdrawal of an approval, or suspension of production. As a result, our business, financial condition and results of operations may be materially and adversely affected.

Additionally, if supply from one manufacturer is interrupted, an alternative manufacturer would need to be qualified through an NDA supplement or MAA variation, or equivalent foreign regulatory filing, which could result in further delay. The regulatory agencies may also require additional studies or trials if a new manufacturer is relied upon for commercial production. Switching manufacturers may involve substantial costs and is likely to result in a delay in our desired clinical and commercial timelines.

These factors could cause us to incur higher costs and could cause the delay or termination of clinical trials, regulatory submissions, required approvals, or commercialization of our drug candidates. Furthermore, if our suppliers fail to meet contractual requirements and we are unable to secure one or more replacement suppliers capable of production at a substantially equivalent cost, our clinical trials may be delayed or we could lose potential revenue.

-22-

Table of Contents

**Any collaboration arrangement that we may enter into in the future may not be successful, which could adversely affect our ability to develop and commercialize our current and potential future drug candidates.**

We may seek collaboration arrangements with biopharmaceutical companies for the development or commercialization of our current and potential future drug candidates. To the extent that we decide to enter into collaboration agreements, we will face significant competition in seeking appropriate collaborators. Moreover, collaboration arrangements are complex and time consuming to negotiate, execute and implement. We may not be successful in our efforts to establish and implement collaborations or other alternative arrangements should we choose to enter into such arrangements, and the terms of the arrangements may not be favorable to us. If and when we collaborate with a third party for development and commercialization of a drug candidate, we can expect to relinquish some or all of the control over the future success of that drug candidate to the third party. The success of our collaboration arrangements will depend heavily on the efforts and activities of our collaborators. Collaborators generally have significant discretion in determining the efforts and resources that they will apply to these collaborations.

Disagreements between parties to a collaboration arrangement can lead to delays in developing or commercializing the applicable drug candidate and can be difficult to resolve in a mutually beneficial manner. In some cases, collaborations with biopharmaceutical companies and other third parties are terminated or allowed to expire by the other party. Any such termination or expiration would adversely affect our business, financial condition and results of operations.

**If we are unable to enter into agreements with third parties to sell and market our drug candidates, we may be unable to generate significant revenues.**

We do not have a sales and marketing organization, and we have no experience as a company in the sales, marketing and distribution of pharmaceutical products. If any of our drug candidates are approved for commercialization, we may be required to develop our sales, marketing and distribution capabilities, or make arrangements with a third party to perform sales and marketing services. Developing a sales force for any resulting product or any product resulting from any of our other drug candidates is expensive and time consuming and could delay any product launch. We may be unable to establish and manage an effective sales force in a timely or cost-effective manner, if at all, and any sales force we do establish may not be capable of generating sufficient demand for our drug candidates. To the extent that we enter into arrangements with collaborators or other third parties to perform sales and marketing services, our product revenues are likely to be lower than if we marketed and sold our drug candidates independently. If we are unable to establish adequate sales and marketing capabilities, independently or with others, we may not be able to generate significant revenues and may not become profitable.

**The commercial success of our drug candidates depends upon their market acceptance among physicians, patients, healthcare payors and the medical community.**

Even if our drug candidates obtain regulatory approval, our products, if any, may not gain market acceptance among physicians, patients, healthcare payors and the medical community. The degree of market acceptance of any of our approved drug candidates will depend on a number of factors, including:

- the effectiveness of our approved drug candidates as compared to currently available products;

- patient willingness to adopt our approved drug candidates in place of current therapies;

- our ability to provide acceptable evidence of safety and efficacy;

- relative convenience and ease of administration;

- the prevalence and severity of any adverse side effects;

- restrictions on use in combination with other products;

-23-

**Table of Contents**

- availability of alternative treatments;

- pricing and cost-effectiveness assuming either competitive or potential premium pricing requirements, based on the profile of our drug candidates and target markets;

- effectiveness of our or our partners' sales and marketing strategy;

- our ability to obtain sufficient third-party coverage or reimbursement; and

- potential product liability claims.

In addition, the potential market opportunity for our drug candidates is difficult to precisely estimate. Our estimates of the potential market opportunity for our drug candidates include several key assumptions based on our industry knowledge, industry publications, third-party research reports and other surveys. Independent sources have not verified all of our assumptions. If any of these assumptions proves to be inaccurate, then the actual market for our drug candidates could be smaller than our estimates of our potential market opportunity. If the actual market for our drug candidates is smaller than we expect, our product revenue may be limited, it may be harder than expected to raise funds and it may be more difficult for us to achieve or maintain profitability. If we fail to achieve market acceptance of our drug candidates in the U.S. and abroad, our revenue will be limited and it will be more difficult to achieve profitability.

**If we fail to obtain and sustain an adequate level of reimbursement for our potential products by third-party payors, potential future sales would be materially adversely affected.**

There will be no viable commercial market for our drug candidates, if approved, without reimbursement from third-party payors. Reimbursement policies may be affected by future healthcare reform measures. We cannot be certain that reimbursement will be available for our current drug candidates or any other drug candidate we may develop. Additionally, even if there is a viable commercial market, if the level of reimbursement is below our expectations, our anticipated revenue and gross margins will be adversely affected.

Third-party payors, such as government or private healthcare insurers, carefully review and increasingly question and challenge the coverage of and the prices charged for drugs. Reimbursement rates from private health insurance companies vary depending on the company, the insurance plan and other factors. Reimbursement rates may be based on reimbursement levels already set for lower cost drugs and may be incorporated into existing payments for other services. There is a current trend in the U.S. healthcare industry toward cost containment. Large public and private payors, managed care organizations, group purchasing organizations and similar organizations are exerting increasing influence on decisions regarding the use of, and reimbursement levels for, particular treatments. Such third-party payors, including Medicare, may question the coverage of, and challenge the prices charged for, medical products and services, and many third-party payors limit coverage of or reimbursement for newly approved healthcare products. In particular, third-party payors may limit the covered indications. Cost-control initiatives could decrease the price we might establish for products, which could result in product revenues being lower than anticipated. We believe our drugs will be priced significantly higher than existing generic drugs and consistent with current branded drugs. If we are unable to show a significant benefit relative to existing generic drugs, Medicare, Medicaid and private payors may not be willing to provide reimbursement for our drugs, which would significantly reduce the likelihood of our products gaining market acceptance.

We expect that private insurers will consider the efficacy, cost-effectiveness, safety and tolerability of our potential products in determining whether to approve reimbursement for such products and at what level. Obtaining these approvals can be a time consuming and expensive process. Our business, financial condition and results of operations would be materially adversely affected if we do not receive approval for reimbursement of our potential products from private insurers on a timely or satisfactory basis. Limitations on coverage could also be imposed at the local Medicare carrier level or by fiscal intermediaries. Medicare Part D, which provides a pharmacy benefit to Medicare patients as discussed below, does not require participating prescription drug plans

-24-

Table of Contents

to cover all drugs within a class of products. Our business, financial condition and results of operations could be materially adversely affected if Part D prescription drug plans were to limit access to, or deny or limit reimbursement of, our drug candidates or other potential products.

Reimbursement systems in international markets vary significantly by country and by region, and reimbursement approvals must be obtained on a country-by-country basis. In many countries, the product cannot be commercially launched until reimbursement is approved. In some foreign markets, prescription pharmaceutical pricing remains subject to continuing governmental control even after initial approval is granted. The negotiation process in some countries can exceed 12 months. To obtain reimbursement or pricing approval in some countries, we may be required to conduct a clinical trial that compares the cost-effectiveness of our products to other available therapies.

If the prices for our potential products are reduced or if governmental and other third-party payors do not provide adequate coverage and reimbursement of our drugs, our future revenue, cash flows and prospects for profitability will suffer.

**Recently enacted and future legislation may increase the difficulty and cost of commercializing our drug candidates and may affect the prices we may obtain if our drug candidates are approved for commercialization.**

In the U.S. and some foreign jurisdictions, there have been a number of adopted and proposed legislative and regulatory changes regarding the healthcare system that could prevent or delay regulatory approval of our drug candidates, restrict or regulate post-marketing activities and affect our ability to profitably sell any of our drug candidates for which we obtain regulatory approval.

In the U.S., the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, or the MMA, changed the way Medicare covers and pays for pharmaceutical products. Cost reduction initiatives and other provisions of this legislation could decrease the coverage and reimbursement rate that we receive for any of our approved products. While the MMA only applies to drug benefits for Medicare beneficiaries, private payors often follow Medicare coverage policy and payment limitations in setting their own reimbursement rates. Therefore, any reduction in reimbursement that results from the MMA may result in a similar reduction in payments from private payors.

In March 2010, President Obama signed into law the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, collectively the PPACA, intended to broaden access to health insurance, reduce or constrain the growth of healthcare spending, enhance remedies against healthcare fraud and abuse, add new transparency requirements for healthcare and health insurance industries, impose new taxes and fees on the health industry and impose additional health policy reforms. The PPACA increased manufacturers' rebate liability under the Medicaid Drug Rebate Program by increasing the minimum rebate amount for both branded and generic drugs and revised the definition of "average manufacturer price," or AMP, which may also increase the amount of Medicaid drug rebates manufacturers are required to pay to states. The legislation also expanded Medicaid drug rebates and created an alternative rebate formula for certain new formulations of certain existing products that is intended to increase the rebates due on those drugs. The Centers for Medicare & Medicaid Services, which administers the Medicaid Drug Rebate Program, also has proposed to expand Medicaid rebates to the utilization that occurs in the territories of the U.S., such as Puerto Rico and the Virgin Islands. Further, beginning in 2011, the PPACA imposed a significant annual fee on companies that manufacture or import branded prescription drug products and required manufacturers to provide a 50% discount off the negotiated price of prescriptions filled by beneficiaries in the Medicare Part D coverage gap, referred to as the "donut hole." Although it is too early to determine the full effects of the PPACA, the law appears likely to continue the downward pressure on pharmaceutical pricing, especially under the Medicare program, and may also increase our regulatory burdens and operating costs.

-25-

**Table of Contents**

Legislative and regulatory proposals have been introduced at both the state and federal level to expand post-approval requirements and restrict sales and promotional activities for pharmaceutical products. We are not sure whether additional legislative changes will be enacted, or whether the FDA regulations, guidance or interpretations will be changed, or what the impact of such changes on the marketing approvals of our drug candidates, if any, may be. In addition, increased scrutiny by the U.S. Congress of the FDA's approval process may significantly delay or prevent marketing approval, as well as subject us to more stringent product labeling and post-marketing approval testing and other requirements.

**We are subject to "fraud and abuse" and similar laws and regulations, and a failure to comply with such regulations or prevail in any litigation related to noncompliance could harm our business, financial condition and results of operations.**

In the U.S., we are subject to various federal and state healthcare "fraud and abuse" laws, including anti-kickback laws, false claims laws and other laws intended, among other things, to reduce fraud and abuse in federal and state healthcare programs. The federal Anti-Kickback Statute makes it illegal for any person, including a prescription drug manufacturer, or a party acting on its behalf, to knowingly and willfully solicit, receive, offer or pay any remuneration that is intended to induce the referral of business, including the purchase, order or prescription of a particular drug, or other good or service for which payment in whole or in part may be made under a federal healthcare program, such as Medicare or Medicaid. Although we seek to structure our business arrangements in compliance with all applicable requirements, these laws are broadly written, and it is often difficult to determine precisely how the law will be applied in specific circumstances. Accordingly, it is possible that our practices may be challenged under the federal Anti-Kickback Statute.

The federal False Claims Act prohibits anyone from, among other things, knowingly presenting or causing to be presented for payment to the government, including the federal healthcare programs, claims for reimbursed drugs or services that are false or fraudulent, claims for items or services that were not provided as claimed, or claims for medically unnecessary items or services. Under the Health Insurance Portability and Accountability Act of 1996, we are prohibited from knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private payors, or knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services to obtain money or property of any healthcare benefit program. Violations of fraud and abuse laws may be punishable by criminal or civil sanctions, including penalties, fines or exclusion or suspension from federal and state healthcare programs such as Medicare and Medicaid and debarment from contracting with the U.S. government. In addition, private individuals have the ability to bring actions on behalf of the government under the federal False Claims Act as well as under the false claims laws of several states.

Many states have adopted laws similar to the federal Anti-Kickback Statute, some of which apply to the referral of patients for healthcare services reimbursed by any source, not just governmental payors. In addition, some states have passed laws that require pharmaceutical companies to comply with the April 2003 Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers or the Pharmaceutical Research and Manufacturers of America's Code on Interactions with Healthcare Professionals. Several states also impose other marketing restrictions or require pharmaceutical companies to make marketing or price disclosures to the state. There are ambiguities as to what is required to comply with these state requirements and if we fail to comply with an applicable state law requirement we could be subject to penalties.

Neither the government nor the courts have provided definitive guidance on the application of fraud and abuse laws to our business. Law enforcement authorities are increasingly focused on enforcing these laws, and it is possible that some of our practices may be challenged under these laws. Efforts to ensure that our business arrangements with third parties will comply with applicable healthcare laws and regulations will involve substantial costs. If we are found in violation of one of these laws, we could be subject to significant civil, criminal and administrative penalties, damages, fines, exclusion from governmental funded federal or state

-26-

Table of Contents

healthcare programs and the curtailment or restructuring of our operations. If this occurs, our business, financial condition and results of operations may be materially adversely affected.

**If we face allegations of noncompliance with the law and encounter sanctions, our reputation, revenues and liquidity may suffer, and any of our drug candidates that are ultimately approved for commercialization could be subject to restrictions or withdrawal from the market.**

Any government investigation of alleged violations of law could require us to expend significant time and resources in response, and could generate negative publicity. Any failure to comply with ongoing regulatory requirements may significantly and adversely affect our ability to generate revenues from any of our drug candidates that are ultimately approved for commercialization. If regulatory sanctions are applied or if regulatory approval is withdrawn, our business, financial condition and results of operations will be adversely affected. Additionally, if we are unable to generate revenues from product sales, our potential for achieving profitability will be diminished and our need to raise capital to fund our operations will increase.

**If we fail to retain current members of our senior management and scientific personnel, or to attract and keep additional key personnel, we may be unable to successfully develop or commercialize our drug candidates.**

Our success depends on our continued ability to attract, retain and motivate highly qualified management and scientific personnel. We are highly dependent upon our senior management, particularly Brian Lian, our President and Chief Executive Officer, and Michael Dinerman, our Chief Operating Officer. The loss of any of our key personnel could delay or prevent the development of our drug candidates. These personnel are "at-will" employees and may terminate their employment with us at any time; however, our current executive officers have agreed to provide us with at least 60 days' advance notice of resignation pursuant to their employment agreements with us. The replacement of Dr. Lian or Dr. Dinerman likely would involve significant time and costs, and the loss of services of either individual may significantly delay or prevent the achievement of our business objectives. We do not maintain "key person" insurance on any of our employees.

From time to time, our management seeks the advice and guidance of certain scientific advisors and consultants regarding clinical and regulatory development programs and other customary matters. These scientific advisors and consultants are not our employees and may have commitments to, or consulting or advisory contracts with, other entities that may limit their availability to us. In addition, our scientific advisors may have arrangements with other companies to assist those companies in developing products or technologies that may compete with ours.

Competition for qualified personnel is intense, especially in the greater San Diego, California area where we have a substantial presence and need for highly skilled personnel. We may not be successful in attracting qualified personnel to fulfill our current or future needs. Competitors and others have in the past attempted, and are likely in the future to attempt, to recruit our employees. While our employees are required to sign standard agreements concerning confidentiality and ownership of inventions, we generally do not have employment contracts or non-competition agreements with any of our personnel. The loss of the services of any of our key personnel, the inability to attract or retain highly qualified personnel in the future or delays in hiring such personnel, particularly senior management and other technical personnel, could materially and adversely affect our business, financial condition and results of operations.

**We will need to increase the size of our organization and may not successfully manage our growth.**

We currently have only four full-time employees, one consultant and one part-time employee, and our management systems currently in place are not likely to be adequate to support our future growth plans. Our ability to grow and to manage our growth effectively will require us to hire, train, retain, manage and motivate additional employees and to implement and improve our operational, financial and management systems. These

-27-

Table of Contents

demands also may require the hiring of additional senior management personnel or the development of additional expertise by our senior management personnel. Hiring a significant number of additional employees, particularly those at the management level, would increase our expenses significantly. Moreover, if we fail to expand and enhance our operational, financial and management systems in conjunction with our potential future growth, it could have a material adverse effect on our business, financial condition and results of operations.

**Our management's relative lack of public company experience could put us at greater risk of incurring fines or regulatory actions for failure to comply with federal securities laws and could put us at a competitive disadvantage, and could require our management to devote additional time and resources to ensure compliance with applicable corporate governance requirements.**

Some of our executive officers have limited experience in managing and operating a public company, which could have an adverse effect on their ability to quickly respond to problems or adequately address issues and matters applicable to public companies. Any failure to comply with federal securities laws, rules or regulations could subject us to fines or regulatory actions, which may materially adversely affect our business, financial condition and results of operations. Further, since some of our executive officers have minimal public company experience, we may have to dedicate additional time and resources to comply with legally mandated corporate governance policies relative to our competitors whose management teams have more public company experience.

**We are exposed to product liability, non-clinical and clinical liability risks which could place a substantial financial burden upon us, should lawsuits be filed against us.**

Our business exposes us to potential product liability and other liability risks that are inherent in the testing, manufacturing and marketing of pharmaceutical formulations and products. In addition, the use in our clinical trials of pharmaceutical products and the subsequent sale of these products by us or our potential collaborators may cause us to bear a portion of or all product liability risks. A successful liability claim or series of claims brought against us could have a material adverse effect on our business, financial condition and results of operations.

We currently carry product liability insurance with limits of $            million in the aggregate and $            million per occurrence. Our current product liability insurance coverage may not be sufficient to reimburse us for any expenses or losses we may suffer. Moreover, insurance coverage is becoming increasingly expensive and in the future we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses due to liability. If and when we obtain marketing approval for our drug candidates, we intend to expand our insurance coverage to include the sale of commercial products. However, we may be unable to obtain product liability insurance on commercially reasonable terms or in adequate amounts. On occasion, large judgments have been awarded in class action lawsuits based on drugs that had unanticipated adverse effects. A successful product liability claim or series of claims brought against us could cause our stock price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations and business.

**Our research and development activities involve the use of hazardous materials, which subject us to regulation, related costs and delays and potential liabilities.**

Our research and development activities involve the controlled use of hazardous materials, chemicals and various radioactive compounds, and we will need to develop additional safety procedures for the handling and disposing of hazardous materials. If an accident occurs, we could be held liable for resulting damages, which could be substantial. We are also subject to numerous environmental, health and workplace safety laws and regulations, including those governing laboratory procedures, exposure to blood-borne pathogens and the handling of biohazardous materials. Additional federal, state and local laws and regulations affecting our operations may be adopted in the future. We may incur substantial costs to comply with, and substantial fines or penalties if we violate any of these laws or regulations.

-28-

**Table of Contents**

**We rely significantly on information technology and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could harm our ability to operate our business effectively.**

Despite the implementation of security measures, our internal computer systems and those of third parties with which we contract are vulnerable to damage from cyber-attacks, computer viruses, unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. System failures, accidents or security breaches could cause interruptions in our operations, and could result in a material disruption of our drug development and clinical activities and business operations, in addition to possibly requiring substantial expenditures of resources to remedy. The loss of drug development or clinical trial data could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. To the extent that any disruption or security breach were to result in a loss of, or damage to, our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability and our development programs and the development of our drug candidates could be delayed.

**Our employees and consultants may engage in misconduct or other improper activities, including noncompliance with regulatory standards and requirements.**

We are exposed to the risk of employee or consultant fraud or other misconduct. Misconduct by our employees or consultants could include intentional failures to comply with FDA regulations, provide accurate information to the FDA, comply with manufacturing standards, comply with federal and state healthcare fraud and abuse laws and regulations, report financial information or data accurately or disclose unauthorized activities to us. In particular, sales, marketing and business arrangements in the healthcare industry are subject to extensive laws and regulations intended to prevent fraud, kickbacks, self-dealing and other abusive practices. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements. Employee and consultant misconduct also could involve the improper use of information obtained in the course of clinical trials, which could result in regulatory sanctions and serious harm to our reputation. It is not always possible to identify and deter such misconduct, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations. If any such actions are instituted against us, and we are not successful in defending ourselves or asserting our rights, those actions could have a material adverse effect on our business, financial condition and results of operations, and result in the imposition of significant fines or other sanctions against us.

**Business disruptions such as natural disasters could seriously harm our future revenues and financial condition and increase our costs and expenses.**

Our corporate headquarters are located in greater San Diego, California, a region known for seismic activity. Our suppliers may also experience a disruption in their business as a result of natural disasters. A significant natural disaster, such as an earthquake, flood or fire, occurring at our headquarters or facilities or where our suppliers are located, could have a material and adverse effect on our business, financial condition and results of operations. In addition, terrorist acts or acts of war targeted at the U.S., and specifically the greater San Diego, California region, could cause damage or disruption to us, our employees, facilities, partners and suppliers, which could have a material adverse effect on our business, financial condition and results of operations.

**We may engage in strategic transactions that could impact our liquidity, increase our expenses and present significant distractions to our management.**

From time to time, we may consider strategic transactions, such as acquisitions of companies, asset purchases and out-licensing or in-licensing of products, drug candidates or technologies. Additional potential transactions that we may consider include a variety of different business arrangements, including spin-offs, strategic

-29-

[Table of Contents](#)

partnerships, joint ventures, restructurings, divestitures, business combinations and investments. Any such transaction may require us to incur non-recurring or other charges, may increase our near- and long-term expenditures and may pose significant integration challenges or disrupt our management or business, which could adversely affect our business, financial condition and results of operations. For example, these transactions may entail numerous operational and financial risks, including:

- exposure to unknown liabilities;

- disruption of our business and diversion of our management's time and attention in order to develop acquired products, drug candidates or technologies;

- incurrence of substantial debt or dilutive issuances of equity securities to pay for any of these transactions;

- higher-than-expected transaction and integration costs;

- write-downs of assets or goodwill or impairment charges;

- increased amortization expenses;

- difficulty and cost in combining the operations and personnel of any acquired businesses or product lines with our operations and personnel;

- impairment of relationships with key suppliers or customers of any acquired businesses or product lines due to changes in management and ownership; and

- inability to retain key employees of any acquired businesses.

Accordingly, although there can be no assurance that we will undertake or successfully complete any transactions of the nature described above, any transactions that we do complete may be subject to the foregoing or other risks, and could have a material adverse effect on our business, financial condition and results of operations.

**Our employment agreements with each of our executive officers may require us to pay severance benefits to any of those persons who are terminated in connection with a change in control of our company, which could harm our financial condition or results.**

All of our executive officers are parties to employment agreements that contain change in control and severance provisions providing for aggregate cash payments of up to approximately $         for severance and other benefits and acceleration of vesting of stock options with a value of approximately $         (as of March 31, 2014, based on an assumed initial public offering price of $         , the midpoint of the price range set forth on the cover page of this prospectus) in the event of a termination of employment in connection with a change in control of our company. The accelerated vesting of options could result in dilution to our existing stockholders and lower the market price of our common stock. The payment of these severance benefits could harm our financial condition and results. In addition, these potential severance payments may discourage or prevent third parties from seeking a business combination with us.

*Risks Relating to Our Intellectual Property*

**We may not be successful in obtaining or maintaining necessary rights to our drug candidates through acquisitions and in-licenses.**

We currently have intellectual property rights to develop our drug candidates through licenses from Ligand. As of March 31, 2014, we did not own any patents or have any patent applications pending. Because many of our programs require the use of proprietary rights held by Ligand, the growth of our business will likely depend in part on our ability to maintain and exploit these proprietary rights. In addition, we may need to acquire or in-license additional intellectual property in the future. We may be unable to acquire or in-license any compositions, methods of use, processes or other intellectual property rights from third parties that we identify as necessary for our drug candidates. We face competition with regard to acquiring and in-licensing third-party intellectual

-30-

Table of Contents

property rights, including from a number of more established companies. These established companies may have a competitive advantage over us due to their size, cash resources and greater clinical development and commercialization capabilities. In addition, companies that perceive us to be a competitor may be unwilling to assign or license intellectual property rights to us. We also may be unable to acquire or in-license third-party intellectual property rights on terms that would allow us to make an appropriate return on our investment.

We may enter into collaboration agreements with U.S. and foreign academic institutions to accelerate development of our current or future preclinical drug candidates. Typically, these agreements include an option for the company to negotiate a license to the institution's intellectual property rights resulting from the collaboration. Even with such an option, we may be unable to negotiate a license within the specified timeframe or under terms that are acceptable to us. If we are unable to license rights from a collaborating institution, the institution may offer the intellectual property rights to other parties, potentially blocking our ability to pursue our desired program.

If we are unable to successfully obtain required third-party intellectual property rights or maintain our existing intellectual property rights, we may need to abandon development of the related program and our business, financial condition and results of operations could be materially and adversely affected.

**If we fail to comply with our obligations in the agreements under which we in-license intellectual property and other rights from third parties or otherwise experience disruptions to our business relationships with our licensors, we could lose intellectual property rights that are important to our business.**

The Master License Agreement is important to our business and we expect to enter into additional license agreements in the future. The Master License Agreement imposes, and we expect that future license agreements will impose, various diligence, milestone payment, royalty and other obligations on us. If we fail to comply with our obligations under these agreements, or if we file for bankruptcy, we may be required to make certain payments to the licensor, we may lose the exclusivity of our license, or the licensor may have the right to terminate the license, in which event we would not be able to develop or market products covered by the license. Additionally, the milestone and other payments associated with these licenses could materially and adversely affect our business, financial condition and results of operations.

Pursuant to the terms of the Master License Agreement, Ligand may terminate the Master License Agreement under certain circumstances, including, but not limited to: (1) if, on or before April 30, 2015, we have neither (a) completed a firmly underwritten public offering pursuant to the Securities Act on Form S-1 or any successor form, nor (b) received aggregate net proceeds of at least $20.0 million in one or more private financings of our equity securities, (2) in the event of our insolvency or bankruptcy, (3) if we do not pay an undisputed amount owing under the Master License Agreement when due and fail to cure such default within a specified period of time, or (4) if we default on certain of our material obligations and fail to cure the default within a specified period of time. If the Master License Agreement is terminated in its entirety or with respect to a specific licensed program for any reason, among other consequences, all licenses granted to us under the Master License Agreement (or with respect to the specific licensed program) will terminate and we may be requested to assign and transfer to Ligand certain regulatory documentation and regulatory approvals related to the licensed programs (or those related to the specific licensed program), and we may be required to wind down any ongoing clinical trials with respect to the licensed programs (or those related to the specific licensed program). Additionally, Ligand may require us to assign to Ligand the trademarks owned by us relating to the licensed programs (or those related to the specific licensed program), and we would be obligated to grant to Ligand a license under any patent rights and know-how controlled by us to the extent necessary to make, have made, import, use, offer to sell and sell the licensed programs (or those related to the specific licensed program) anywhere in the world at a royalty rate in the low single digits.

In some cases, patent prosecution of our licensed technology may be controlled solely by the licensor. If our licensors fail to obtain and maintain patent or other protection for the proprietary intellectual property we in-license from them, we could lose our rights to the intellectual property or our exclusivity with respect to those

-31-

Table of Contents

rights, and our competitors could market competing products using the intellectual property. In certain cases, we may control the prosecution of patents resulting from licensed technology. In the event we breach any of our obligations related to such prosecution, we may incur significant liability to our licensing partners. Licensing of intellectual property is of critical importance to our business and involves complex legal, business and scientific issues. Disputes may arise regarding intellectual property subject to a licensing agreement, including, but not limited to:

- the scope of rights granted under the license agreement and other interpretation-related issues;

- the extent to which our technology and processes infringe on intellectual property of the licensor that is not subject to the licensing agreement;

- the sublicensing of patent and other rights;

- our diligence obligations under the license agreement and what activities satisfy those diligence obligations;

- the ownership of inventions and know-how resulting from the joint creation or use of intellectual property by our licensors and us and our collaborators; and

- the priority of invention of patented technology.

If disputes over intellectual property and other rights that we have in-licensed prevent or impair our ability to maintain our current licensing arrangements on acceptable terms, we may be unable to successfully develop and commercialize the affected drug candidates.

**We may be required to pay milestones and royalties to Ligand in connection with our use of the licensed technology under the Master License Agreement, which could adversely affect the overall profitability for us of any products that we may seek to commercialize.**

Under the terms of the Master License Agreement, we may be obligated to pay Ligand up to an aggregate of approximately $1.54 billion in development, regulatory and sales milestones. We will also be required to pay Ligand single-digit royalties on future worldwide net product sales. These royalty payments could adversely affect the overall profitability for us of any products that we may seek to commercialize. See the section of this prospectus entitled "Business – Agreements with Ligand".

**We may not be able to protect our proprietary or licensed technology in the marketplace.**

We depend on our ability to protect our proprietary or licensed technology. We rely on trade secret, patent, copyright and trademark laws, and confidentiality, licensing and other agreements with employees and third parties, all of which offer only limited protection. Our success depends in large part on our ability, Ligand's and any future licensor's or licensee's ability to obtain and maintain patent protection in the U.S. and other countries with respect to our proprietary or licensed technology and products. We believe we will be able to obtain, through prosecution of patent applications covering technology licensed from others, adequate patent protection for our proprietary drug technology, including those related to our in-licensed intellectual property. If we are compelled to spend significant time and money protecting or enforcing our licensed patents and future patents we may own, designing around patents held by others or licensing or acquiring, potentially for large fees, patents or other proprietary rights held by others, our business, financial condition and results of operations may be materially and adversely affected. If we are unable to effectively protect the intellectual property that we own or in-license, other companies may be able to offer the same or similar products for sale, which could materially adversely affect our business, financial condition and results of operations. The patents of others from whom we may license technology, and any future patents we may own, may be challenged, narrowed, invalidated or circumvented, which could limit our ability to stop competitors from marketing the same or similar products or limit the length of term of patent protection that we may have for our products.

The patent positions of pharmaceutical products are often complex and uncertain. The breadth of claims allowed in pharmaceutical patents in the U.S. and many jurisdictions outside of the U.S. is not consistent. For example, in many jurisdictions, the support standards for pharmaceutical patents are becoming increasingly strict. Some

-32-

Table of Contents

countries prohibit method of treatment claims in patents. Changes in either the patent laws or interpretations of patent laws in the U.S. and other countries may diminish the value of our licensed or owned intellectual property or create uncertainty. In addition, publication of information related to our current drug candidates and potential products may prevent us from obtaining or enforcing patents relating to these drug candidates and potential products, including without limitation composition-of-matter patents, which are generally believed to offer the strongest patent protection.

Our intellectual property includes licenses covering issued patents and pending patent applications for composition of matter and method of use. For VK0612, we in-license two patents in the U.S. and several other patents in certain foreign jurisdictions. For VK5211, we in-license four patents in the U.S. and several other patents in certain foreign jurisdictions. With respect to our other current drug candidates, we have a license covering several issued patents and pending patent applications both in the U.S. and in certain foreign jurisdictions. See the section of this prospectus entitled "Business – Intellectual Property" for further information about our licenses covering issued patents and patent applications.

Patents that we currently license and patents that we may own or license in the future do not necessarily ensure the protection of our licensed or owned intellectual property for a number of reasons, including without limitation the following:

- the patents may not be broad or strong enough to prevent competition from other products that are identical or similar to our drug candidates;

- there can be no assurance that the term of a patent can be extended under the provisions of patent term extension afforded by U.S. law or similar provisions in foreign countries, where available;

- the issued patents and patents that we may obtain or license in the future may not prevent generic entry into the U.S. market for our drug candidates;

- we do not at this time license or own a granted European patent or national phase patents in any European jurisdictions that would prevent generic entry into the European market for our primary drug candidate, VK0612;

- we, or third parties from who we in-license or may license patents, may be required to disclaim part of the term of one or more patents;

- there may be prior art of which we are not aware that may affect the validity or enforceability of a patent claim;

- there may be prior art of which we are aware, which we do not believe affects the validity or enforceability of a patent claim, but which, nonetheless, ultimately may be found to affect the validity or enforceability of a patent claim;

- there may be other patents issued to others that will affect our freedom to operate;

- if the patents are challenged, a court could determine that they are invalid or unenforceable;

- there might be a significant change in the law that governs patentability, validity and infringement of our licensed patents or any future patents we may own that adversely affects the scope of our patent rights;

- a court could determine that a competitor's technology or product does not infringe our licensed patents or any future patents we may own; and

- the patents could irretrievably lapse due to failure to pay fees or otherwise comply with regulations or could be subject to compulsory licensing.

If we encounter delays in our development or clinical trials, the period of time during which we could market our potential products under patent protection would be reduced.

Our competitors may be able to circumvent our licensed patents or future patents we may own by developing similar or alternative technologies or products in a non-infringing manner. Our competitors may seek to market

-33-

Table of Contents

generic versions of any approved products by submitting abbreviated new drug applications to the FDA in which our competitors claim that our licensed patents or any future patents we may own are invalid, unenforceable or not infringed. Alternatively, our competitors may seek approval to market their own products similar to or otherwise competitive with our products. In these circumstances, we may need to defend or assert our licensed patents or any future patents we may own, including by filing lawsuits alleging patent infringement. In any of these types of proceedings, a court or other agency with jurisdiction may find our licensed patents or any future patents we may own invalid or unenforceable. We may also fail to identify patentable aspects of our research and development before it is too late to obtain patent protection. Even if we own or in-license valid and enforceable patents, these patents still may not provide protection against competing products or processes sufficient to achieve our business objectives.

The issuance of a patent is not conclusive as to its inventorship, scope, ownership, priority, validity or enforceability. In this regard, third parties may challenge our licensed patents or any future patents we may own in the courts or patent offices in the U.S. and abroad. Such challenges may result in loss of exclusivity or freedom to operate or in patent claims being narrowed, invalidated or held unenforceable, in whole or in part, which could limit our ability to stop others from using or commercializing similar or identical technology and products, or limit the duration of the patent protection of our technology and potential products. In addition, given the amount of time required for the development, testing and regulatory review of new drug candidates, patents protecting such drug candidates might expire before or shortly after such drug candidates are commercialized.

**We may infringe the intellectual property rights of others, which may prevent or delay our drug development efforts and prevent us from commercializing or increase the costs of commercializing our products.**

Our commercial success depends significantly on our ability to operate without infringing the patents and other intellectual property rights of third parties. For example, there could be issued patents of which we are not aware that our current or potential future drug candidates infringe. There also could be patents that we believe we do not infringe, but that we may ultimately be found to infringe.

Moreover, patent applications are in some cases maintained in secrecy until patents are issued. The publication of discoveries in the scientific or patent literature frequently occurs substantially later than the date on which the underlying discoveries were made and patent applications were filed. Because patents can take many years to issue, there may be currently pending applications of which we are unaware that may later result in issued patents that our drug candidates or potential products infringe. For example, pending applications may exist that claim or can be amended to claim subject matter that our drug candidates or potential products infringe. Competitors may file continuing patent applications claiming priority to already issued patents in the form of continuation, divisional, or continuation-in-part applications, in order to maintain the pendency of a patent family and attempt to cover our drug candidates.

Third parties may assert that we are employing their proprietary technology without authorization and may sue us for patent or other intellectual property infringement. These lawsuits are costly and could adversely affect our business, financial condition and results of operations and divert the attention of managerial and scientific personnel. If we are sued for patent infringement, we would need to demonstrate that our drug candidates, potential products or methods either do not infringe the claims of the relevant patent or that the patent claims are invalid, and we may not be able to do this. Proving invalidity is difficult. For example, in the U.S., proving invalidity requires a showing of clear and convincing evidence to overcome the presumption of validity enjoyed by issued patents. Even if we are successful in these proceedings, we may incur substantial costs and the time and attention of our management and scientific personnel could be diverted in pursuing these proceedings, which could have a material adverse effect on us. In addition, we may not have sufficient resources to bring these actions to a successful conclusion. If a court holds that any third-party patents are valid, enforceable and cover our products or their use, the holders of any of these patents may be able to block our ability to commercialize our products unless we acquire or obtain a license under the applicable patents or until the patents expire.

-34-

**Table of Contents**

We may not be able to enter into licensing arrangements or make other arrangements at a reasonable cost or on reasonable terms. Any inability to secure licenses or alternative technology could result in delays in the introduction of our products or lead to prohibition of the manufacture or sale of products by us. Even if we are able to obtain a license, it may be non-exclusive, thereby giving our competitors access to the same technologies licensed to us. We could be forced, including by court order, to cease commercializing the infringing technology or product. In addition, in any such proceeding or litigation, we could be found liable for monetary damages, including treble damages and attorneys' fees if we are found to have willfully infringed a patent. A finding of infringement could prevent us from commercializing our drug candidates or force us to cease some of our business operations, which could materially and adversely affect our business, financial condition and results of operations. Any claims by third parties that we have misappropriated their confidential information or trade secrets could have a similar material and adverse effect on our business, financial condition and results of operations. In addition, any uncertainties resulting from the initiation and continuation of any litigation could have a material adverse effect on our ability to raise the funds necessary to continue our operations.

**Any claims or lawsuits relating to infringement of intellectual property rights brought by or against us will be costly and time consuming and may adversely affect our business, financial condition and results of operations.**

We may be required to initiate litigation to enforce or defend our licensed and owned intellectual property. These lawsuits can be very time consuming and costly. There is a substantial amount of litigation involving patent and other intellectual property rights in the biopharmaceutical industry generally. Such litigation or proceedings could substantially increase our operating expenses and reduce the resources available for development activities or any future sales, marketing or distribution activities.

In any infringement litigation, any award of monetary damages we receive may not be commercially valuable. Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during litigation. Moreover, there can be no assurance that we will have sufficient financial or other resources to file and pursue such infringement claims, which typically last for years before they are resolved. Further, any claims we assert against a perceived infringer could provoke these parties to assert counterclaims against us alleging that we have infringed their patents. Some of our competitors may be able to sustain the costs of such litigation or proceedings more effectively than we can because of their greater financial resources. Uncertainties resulting from the initiation and continuation of patent litigation or other proceedings could have a material adverse effect on our ability to compete in the marketplace.

In addition, our licensed patents and patent applications, and patents and patent applications that we may own or license in the future, could face other challenges, such as interference proceedings, opposition proceedings, re-examination proceedings and other forms of post-grant review. Any of these challenges, if successful, could result in the invalidation of, or in a narrowing of the scope of, any of our licensed patents and patent applications and patents and patent applications that we may own or license in the future subject to challenge. Any of these challenges, regardless of their success, would likely be time consuming and expensive to defend and resolve and would divert our management and scientific personnel's time and attention.

In addition, there could be public announcements of the results of hearings, motions or other interim proceedings or developments, and if securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the market price of our common stock.

**Changes in U.S. patent law could diminish the value of patents in general, thereby impairing our ability to protect our products.**

As is the case with other biopharmaceutical companies, our success is heavily dependent on intellectual property, particularly patents. Obtaining and enforcing patents in the biopharmaceutical industry involves both

-35-

Table of Contents

technological and legal complexity and is costly, time-consuming and inherently uncertain. For example, the U.S. has recently enacted and is currently implementing wide-ranging patent reform legislation. Specifically, on September 16, 2011, the Leahy-Smith America Invents Act, or the Leahy-Smith Act, was signed into law and included a number of significant changes to U.S. patent law. These included changes in the way patent applications will be prosecuted, including a transition to a "first-to-file" system for deciding which party should be granted a patent when two or more patent applications are filed by different parties claiming the same invention, and may also affect patent litigation. Under a "first-to-file" system, a third party that files a patent application with the U.S. Patent and Trademark Office, or the USPTO, before us could be awarded a patent covering an invention of ours even if we made the invention before it was made by the third party. The USPTO has developed new and untested regulations and procedures to govern the full implementation of the Leahy-Smith Act, and many of the substantive changes to patent law associated with the Leahy-Smith Act, and in particular, the "first-to-file" provisions, only became effective in March 2013. The Leahy-Smith Act has also introduced procedures that may make it easier for third parties to challenge issued patents, as well as to intervene in the prosecution of patent applications. Finally, the Leahy-Smith Act contains new statutory provisions that still require the USPTO to issue new regulations for their implementation, and it may take the courts years to interpret the provisions of the new statute. Accordingly, it is not clear what, if any, impact the Leahy-Smith Act will have on our business, the cost of prosecuting our licensed and future patent applications, our ability to obtain patents based on our licensed and future patent applications and our ability to enforce or defend our licensed or future issued patents. However, the Leahy-Smith Act and its implementation could increase the uncertainties and costs surrounding the prosecution of our licensed and future patent applications and the enforcement or defense of our licensed and future patents, all of which could have a material adverse effect on our business, financial condition and results of operations.

In addition, the U.S. Supreme Court has ruled on several patent cases in recent years, either narrowing the scope of patent protection available in certain circumstances or weakening the rights of patent owners in certain situations. In addition to increasing uncertainty with regard to our ability to obtain patents in the future, this combination of events has created uncertainty with respect to the value of patents, once obtained. Depending on decisions by the U.S. Congress, the federal courts and the USPTO, the laws and regulations governing patents could change in unpredictable ways that would weaken our ability to obtain new patents or to enforce patents that we might obtain in the future.

**We may not be able to protect our intellectual property rights throughout the world.**

Filing, prosecuting and defending patents on drug candidates throughout the world would be prohibitively expensive. Competitors may use our licensed and owned technologies in jurisdictions where we have not licensed or obtained patent protection to develop their own products and, further, may export otherwise infringing products to territories where we may obtain or license patent protection, but where patent enforcement is not as strong as that in the U.S. These products may compete with our products in jurisdictions where we do not have any issued or licensed patents and any future patent claims or other intellectual property rights may not be effective or sufficient to prevent them from so competing.

Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents and other intellectual property protection, particularly those relating to biopharmaceuticals, which could make it difficult for us to stop the infringement of our licensed patents and future patents we may own, or marketing of competing products in violation of our proprietary rights generally. Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the U.S. As a result, we may encounter significant problems in protecting and defending our licensed and owned intellectual property both in the U.S. and abroad. For example, China, where we currently have 7 licensed patents and 3 licensed patent applications, currently affords less protection to a company's intellectual property than some other jurisdictions. As such, the lack of strong patent and other intellectual property protection in China may significantly increase our vulnerability as regards unauthorized

-36-

Table of Contents

disclosure or use of our intellectual property and undermine our competitive position. Proceedings to enforce our future patent rights, if any, in foreign jurisdictions could result in substantial cost and divert our efforts and attention from other aspects of our business.

Many countries, including European Union countries, India, Japan and China, have compulsory licensing laws under which a patent owner may be compelled under certain circumstances to grant licenses to third parties. In those countries, we currently have an aggregate of 14 licensed patents and 20 licensed patent applications and may have limited remedies if patents are infringed or if we are compelled to grant a license to a third party, which could materially diminish the value of those patents. This could limit our potential revenue opportunities. Accordingly, our efforts to enforce intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that we own or license.

**We may be unable to adequately prevent disclosure of trade secrets and other proprietary information.**

In order to protect our proprietary and licensed technology and processes, we rely in part on confidentiality agreements with our corporate partners, employees, consultants, manufacturers, outside scientific collaborators and sponsored researchers and other advisors. These agreements may not effectively prevent disclosure of our confidential information and may not provide an adequate remedy in the event of unauthorized disclosure of confidential information. In addition, others may independently discover our trade secrets and proprietary information. Failure to obtain or maintain trade secret protection could adversely affect our competitive business position.

**We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties.**

We employ individuals who were previously employed at other biopharmaceutical companies. Although we have no knowledge of any such claims against us, we may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of our employees' former employers or other third parties. Litigation may be necessary to defend against these claims. There is no guarantee of success in defending these claims, and even if we are successful, litigation could result in substantial cost and be a distraction to our management and other employees. To date, none of our employees have been subject to such claims.

**We may be subject to claims challenging the inventorship of our licensed patents, any future patents we may own and other intellectual property.**

Although we are not currently experiencing any claims challenging the inventorship of our licensed patents or our licensed or owned intellectual property, we may in the future be subject to claims that former employees, collaborators or other third parties have an interest in our licensed patents or other licensed or owned intellectual property as an inventor or co-inventor. For example, we may have inventorship disputes arise from conflicting obligations of consultants or others who are involved in developing our drug candidates. Litigation may be necessary to defend against these and other claims challenging inventorship. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, valuable intellectual property. Such an outcome could have a material adverse effect on our business, financial condition and results of operations. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

**If we do not obtain additional protection under the Hatch-Waxman Amendments and similar foreign legislation extending the terms of our licensed patents and any future patents we may own, our business, financial condition and results of operations may be materially and adversely affected.**

Depending upon the timing, duration and specifics of FDA regulatory approval for our drug candidates, one or more of our licensed U.S. patents or future U.S. patents that we may license or own may be eligible for limited

-37-

**Table of Contents**

patent term restoration under the Drug Price Competition and Patent Term Restoration Act of 1984, referred to as the Hatch-Waxman Amendments. The Hatch-Waxman Amendments permit a patent restoration term of up to five years as compensation for patent term lost during drug development and the FDA regulatory review process. This period is generally one-half the time between the effective date of an investigational new drug application, or IND (falling after issuance of the patent), and the submission date of a NDA, plus the time between the submission date of a NDA and the approval of that application. Patent term restorations, however, cannot extend the remaining term of a patent beyond a total of 14 years from the date of product approval by the FDA.

The application for patent term extension is subject to approval by the USPTO, in conjunction with the FDA. It takes at least six months to obtain approval of the application for patent term extension. We may not be granted an extension because of, for example, failing to apply within applicable deadlines, failing to apply prior to expiration of relevant patents or otherwise failing to satisfy applicable requirements. Moreover, the applicable time period or the scope of patent protection afforded could be less than we request. If we are unable to obtain patent term extension or restoration or the term of any such extension is less than we request, the period during which we will have the right to exclusively market our product will be shortened and our competitors may obtain earlier approval of competing products, and our ability to generate revenues could be materially adversely affected.

### Risks Relating to this Offering and Ownership of Our Common Stock

**The market price of our common stock may be highly volatile.**

The trading price of our common stock is likely to be volatile. Our stock price could be subject to wide fluctuations in response to a variety of factors, including the following:

- any delay in filing an NDA for any of our drug candidates and any adverse development or perceived adverse development with respect to the FDA's review of that NDA;

- adverse results or delays in clinical trials, if any;

- significant lawsuits, including patent or stockholder litigation;

- inability to obtain additional funding;

- failure to successfully develop and commercialize our drug candidates;

- changes in laws or regulations applicable to our drug candidates;

- inability to obtain adequate product supply for our drug candidates, or the inability to do so at acceptable prices;

- unanticipated serious safety concerns related to any of our drug candidates;

- adverse regulatory decisions;

- introduction of new products or technologies by our competitors;

- failure to meet or exceed drug development or financial projections we provide to the public;

- failure to meet or exceed the estimates and projections of the investment community;

- the perception of the biopharmaceutical industry by the public, legislatures, regulators and the investment community;

- announcements of significant acquisitions, strategic partnerships, joint ventures or capital commitments by us or our competitors;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our licensed and owned technologies;

- additions or departures of key scientific or management personnel;

-38-

**Table of Contents**

- changes in the market valuations of similar companies;

- general economic and market conditions and overall fluctuations in the U.S. equity market;

- sales of our common stock by us or our stockholders in the future; and

- trading volume of our common stock.

In addition, the stock market, in general, and small biopharmaceutical companies, in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of these companies. Broad market and industry factors may negatively affect the market price of our common stock, regardless of our actual operating performance. Further, a decline in the financial markets and related factors beyond our control may cause our stock price to decline rapidly and unexpectedly.

**An active trading market for our common stock may not develop, and you may not be able to resell your common stock at or above the initial public offering price.**

Prior to this offering, there has not been a public market for our common stock. Although we have applied to have our common stock listed on the Nasdaq Global Market, an active trading market for our shares may never develop or be sustained following this offering. If an active market for our common stock does not develop, you may not be able to sell your shares quickly or at an acceptable price. The initial public offering price for the shares will be determined by negotiations between us and representatives of the underwriters and may not be indicative of prices that will prevail in the trading market. If no active trading market for our common stock develops or is sustained following this offering, you may be unable to sell your shares when you wish to sell them or at a price that you consider attractive or satisfactory. The lack of an active market may also adversely affect your ability to raise capital by selling securities in the future, or impair our ability to acquire or in-license other drug candidates, businesses or technologies using our shares as consideration.

**Our management owns a significant percentage of our stock and will be able to exert significant control over matters subject to stockholder approval.**

As of March 31, 2014, our executive officers, directors, 5% or greater stockholders and their affiliates and family members beneficially own 100% of our common stock. Based on the number of shares to be sold in this offering as set forth on the cover page of this prospectus, upon the closing of this offering, our executive officers, directors, 5% or greater stockholders and their affiliates and family members will beneficially own approximately         % of our outstanding common stock. Therefore, even after this offering these stockholders will have the ability to influence us through this ownership position.

This significant concentration of stock ownership may adversely affect the trading price for our common stock because investors often perceive disadvantages in owning stock in companies with controlling stockholders. As a result, these stockholders, if they acted together, could significantly influence all matters requiring approval by our stockholders, including the election of directors and the approval of mergers or other business combination transactions. These stockholders may be able to determine all matters requiring stockholder approval. The interests of these stockholders may not always coincide with our interests or the interests of other stockholders. This may also prevent or discourage unsolicited acquisition proposals or offers for our common stock that you may feel are in your best interest as one of our stockholders and they may act in a manner that advances their best interests and not necessarily those of other stockholders, including seeking a premium value for their common stock, and might affect the prevailing market price for our common stock.

**Upon completion of this offering, Ligand will be our largest stockholder, which may limit the ability of our stockholders to influence corporate matters and may give rise to conflicts of interest.**

Based on            shares of common stock outstanding as of immediately prior to the closing of this offering (excluding shares issued in this offering) and an assumed initial public offering price of $         , the midpoint of

-39-

**Table of Contents**

the price range set forth on the cover page of this prospectus, and the estimated             shares to be issued to Ligand upon the consummation of this offering pursuant to the Master License Agreement, Ligand will beneficially own approximately        % of our outstanding common stock. In addition to the above ownership, based on an assumed initial public offering price of $           , the midpoint of the price range set forth on the cover page of this prospectus, Ligand may elect to convert the amounts outstanding under the Note upon the consummation of this offering and receive an additional             shares of our common stock upon conversion of the Note. See the section of this prospectus entitled "Principal Stockholders". Accordingly, Ligand will exert significant influence over us and any action requiring the approval of the holders of our common stock, including the election of directors and the approval of mergers or other business combination transactions. This concentration of voting power may make it less likely that any other holder of our common stock or our board of directors will be able to affect the way we are managed and could delay or prevent an acquisition of us on terms that other stockholders may desire.

Furthermore, the interests of Ligand may not be aligned with our other stockholders and this could lead to actions that may not be in the best interests of our other stockholders. For example, Ligand may have different tax positions or strategic plans for us, which could influence its decisions regarding whether and when we should dispose of assets or incur new or refinance existing indebtedness. In addition, Ligand's significant ownership in us may discourage someone from making a significant equity investment in us, or could discourage transactions involving a change in control, including transactions in which our stockholders might otherwise receive a premium for their shares over the then-current market price.

Pursuant to the management rights letter between us and Ligand, dated May 21, 2014, Ligand has the right to nominate one individual for election to our board of directors. Matthew W. Foehr, Ligand's Executive Vice President and Chief Operating Officer, is the current member of our board of directors nominated by Ligand. As a result of our relationship with Ligand, there may be transactions between us and Ligand that could present an actual or perceived conflict of interest. These conflicts of interest may lead Mr. Foehr to recuse himself from actions of our board of directors with respect to any transactions involving Ligand or its affiliates.

In addition, if Ligand obtains a majority of our common stock, Ligand would be able to control a number of matters submitted to our stockholders for approval, as well as our management and affairs. For example, Ligand would be able to control the election of directors, and may be able to control amendments to our organizational documents and approvals of any merger, consolidation, sale of all or substantially all of our assets or other business combination or reorganization. In addition, if Ligand obtains a majority of our common stock, we would be deemed a "controlled company" within the meaning of the rules and listing standards of The Nasdaq Stock Market LLC. Under the rules and listing standards of The Nasdaq Stock Market LLC, a company of which more than 50% of the voting power is held by another person or group of persons acting together is a "controlled company" and may elect not to comply with certain rules and listing standards of The Nasdaq Stock Market LLC regarding corporate governance, including: (1) the requirement that a majority of our board of directors consist of independent directors, (2) the requirement that the compensation of our officers be determined or recommended to our board of directors by a compensation committee that is composed entirely of independent directors, and (3) the requirement that director nominees be selected or recommended to our board of directors by a majority of independent directors or a nominating committee that is composed entirely of independent directors.

**We are an "emerging growth company" within the meaning of the Securities Act, and if we decide to take advantage of certain exemptions from various reporting requirements applicable to emerging growth companies, our common stock could be less attractive to investors.**

For as long as we remain an "emerging growth company", as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act, we will have the option to take advantage of certain exemptions from various reporting and other requirements that are applicable to other public companies that are not "emerging growth companies," including, but not limited to, not being required to comply with the auditor attestation requirements of

-40-

**Table of Contents**

Section 404 of the Sarbanes-Oxley Act of 2002, as amended, or the Sarbanes-Oxley Act, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. We may take advantage of these and other exemptions until we are no longer an "emerging growth company".

The JOBS Act provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. However, we have chosen to "opt out" of such extended transition period, and as a result, we will comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. Our decision to "opt out" of the extended transition period is irrevocable.

We will remain an emerging growth company until the earliest of (1) the last day of the fiscal year during which we have total annual gross revenues of $1.0 billion or more, (2) the last day of the fiscal year following the fifth anniversary of the completion of this offering, (3) the date on which we have, during the previous three-year period, issued more than $1.0 billion in non-convertible debt, and (4) the date on which we are deemed to be a "large accelerated filer" under the Exchange Act (*i.e.*, the first day of the fiscal year after we have (a) more than $700.0 million in outstanding common equity held by our non-affiliates, measured each year on the last day of our second fiscal quarter, and (b) been public for at least 12 months).

Even after we no longer qualify as an emerging growth company, we may still qualify as a "smaller reporting company," which would allow us to take advantage of many of the same exemptions from disclosure requirements including exemption from compliance with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act and reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements. We cannot predict if investors will find our common stock less attractive because we may rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

**Our internal control over financial reporting does not currently meet the standards required by Section 404 of the Sarbanes-Oxley Act, and we have previously identified a material weakness, and failure to achieve and maintain effective internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act, could have a material adverse effect on our business and share price.**

As a privately held company, we were not required to evaluate our internal control over financial reporting in a manner that meets the standards of publicly traded companies required by Section 404 of the Sarbanes-Oxley Act, or Section 404. We anticipate being required to meet these standards in the course of preparing our financial statements as of and for the year ending December 31, 2015, and our management will be required to report on the effectiveness of our internal control over financial reporting for such year. Additionally, under the JOBS Act, our independent registered public accounting firm will not be required to attest to the effectiveness of our internal control over financial reporting pursuant to Section 404 until we are no longer an "emerging growth company." The rules governing the standards that must be met for our management to assess our internal control over financial reporting are complex and require significant documentation, testing and possible remediation.

In connection with the implementation of the necessary procedures and practices related to internal control over financial reporting, we may identify deficiencies or material weaknesses that we may not be able to remediate in time to meet the deadline imposed by the Sarbanes-Oxley Act for compliance with the requirements of Section 404. In addition, we may encounter problems or delays in completing the implementation of any requested improvements and receiving a favorable attestation in connection with the attestation provided by our independent registered public accounting firm. Failure to achieve and maintain an effective internal control environment could have a material adverse effect on our business, financial condition and results of operations and could limit our ability to report our financial results accurately and in a timely manner.

In the course of auditing our financial statements as of and for the year ended December 31, 2013, our independent registered public accounting firm identified a material weakness in our internal control over

-41-

**Table of Contents**

financial reporting relating to our failure to perform periodic reconciliations on various accounts. The material weakness resulted in adjusting entries to our financial statements and delays in producing such financial information to our independent registered public accounting firm. We plan to remediate this material weakness primarily by adding personnel to our accounting staff and implementing reconciliation policies and procedures, including effective review and oversight, to ensure the timely delivery and accuracy of financial information and minimize the risk of misstatement or misappropriation. These planned actions are subject to ongoing management review and the oversight of the audit committee of our board of directors. We cannot assure you that the measures we have taken to date, or any measures we may take in the future, will be sufficient to remediate the material weakness in our internal control over financial reporting or to avoid potential future material weaknesses.

**We will incur significant increased costs as a result of operating as a public company, our management has limited experience managing a public company, and our management will be required to devote substantial time to new compliance initiatives.**

As a public company and particularly after we cease to be an "emerging growth company," we will incur significant legal, accounting and other expenses that we did not incur as a private company. In addition, the Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or the Dodd-Frank Act, as well as rules subsequently implemented by the SEC and The Nasdaq Stock Market LLC have imposed various requirements on public companies. There are significant corporate governance and executive compensation related provisions in the Dodd-Frank Act that require the SEC to adopt additional rules and regulations in these areas. Stockholder activism, the current political environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which may lead to additional compliance costs and impact (in ways we cannot currently anticipate) the manner in which we operate our business. Our management and other personnel will need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations will increase our legal and financial compliance costs and will make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to incur substantial costs to maintain our current levels of such insurance coverage.

As a publicly traded company, we will incur legal, accounting and other expenses estimated to initially range from $750,000 to $1.5 million per year, associated with the SEC reporting requirements applicable to a company whose securities are registered under the Exchange Act, as well as corporate governance requirements, including those under the Sarbanes-Oxley Act, the Dodd-Frank Act and other rules implemented by the SEC and The Nasdaq Stock Market LLC. However, it is possible that our initial actual costs will be higher than we currently estimate. In addition, we expect that we will need to hire additional personnel in our finance department following this offering. The expenses incurred by public companies generally to meet SEC reporting, finance and accounting and corporate governance requirements have been increasing in recent years as a result of changes in rules and regulations and the adoption of new rules and regulations applicable to public companies.

**If you purchase our common stock in this offering, you will incur immediate and substantial dilution in the book value of your shares.**

Investors purchasing common stock in this offering will pay a price per share that substantially exceeds the pro forma as adjusted book value (deficit) per share of our tangible assets after subtracting our liabilities. As a result, investors purchasing common stock in this offering will incur immediate dilution of $     per share, based on an assumed initial public offering price of $     , the midpoint of the price range set forth on the cover page of this prospectus, and our pro forma as adjusted net tangible book value (deficit) as of March 31, 2014. For more information on the dilution you may suffer as a result of investing in this offering, see the section of this prospectus entitled "Dilution".

-42-

Table of Contents

This dilution is due to the substantially lower price paid by our investors who purchased shares prior to this offering as compared to the price offered to the public in this offering. As a result of the dilution to investors purchasing shares in this offering, investors may receive significantly less than the purchase price paid in this offering, if anything, in the event of our liquidation.

**If securities or industry analysts do not publish research, or publish inaccurate or unfavorable research, about our business, our stock price and trading volume could decline.**

The trading market for our common stock will depend, in part, on the research and reports that securities or industry analysts publish about us or our business. Securities and industry analysts do not currently, and may never, publish research on our company. If no securities or industry analysts commence coverage of our company, the trading price for our common stock would likely be negatively impacted. In the event securities or industry analysts initiate coverage, if one or more of the analysts who cover us downgrade our stock or publish inaccurate or unfavorable research about our business, our stock price would likely decline. In addition, if our operating results fail to meet the forecast of analysts, our stock price would likely decline. If one or more of these analysts cease coverage of our company or fail to publish reports on us regularly, demand for our common stock could decrease, which might cause our stock price and trading volume to decline.

**Sales of a substantial number of shares of our common stock in the public market by our existing stockholders could cause our stock price to fall.**

Sales of a substantial number of shares of our common stock by our existing stockholders in the public market, or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. We are unable to predict the effect that such sales may have on the prevailing market price of our common stock.

All of our existing stockholders are subject to lock-up agreements with the underwriters of this offering that restrict the stockholders' ability to transfer shares of our common stock for at least 180 days after the date of this prospectus. The lock-up agreements limit the number of shares of common stock that may be sold immediately following the public offering. Subject to certain limitations, including sales volume limitations with respect to shares held by our affiliates, substantially all of our outstanding shares prior to this offering will become eligible for sale upon expiration of the lock-up period, as calculated and described in more detail in the section of this prospectus entitled "Shares Eligible for Future Sale". In addition, shares issued or issuable upon exercise of options vested as of the expiration of the lock-up period will be eligible for sale at that time. Sales of stock by these stockholders could have a material adverse effect on the trading price of our common stock.

Certain holders of our securities are entitled to rights with respect to the registration of their shares under the Securities Act, subject to the 180-day lock-up arrangement described above. Registration of these shares under the Securities Act would result in the shares becoming freely tradable without restriction under the Securities Act. Any sales of securities by these stockholders, or the perception that these sales may occur, could have a material adverse effect on the trading price of our common stock.

**We are at risk of securities class action litigation.**

In the past, securities class action litigation has often been brought against a company following a decline in the market price of its securities. This risk is especially relevant for us because biopharmaceutical companies have experienced significant stock price volatility in recent years. If we face such litigation, it could result in substantial costs and a diversion of management's attention and resources, which could harm our business, financial condition and results of operations.

-43-

**Table of Contents**

**We will have broad discretion in the use of the net proceeds from this offering and may not use them effectively.**

We currently intend to use the net proceeds of this offering to fund clinical trials and the research and development of our drug candidates and for other working capital and general corporate purposes, as further described in the section of this prospectus entitled "Use of Proceeds". We will have broad discretion in the application of the net proceeds in the category of other working capital and general corporate purposes and investors will be relying on the judgment of our management regarding the application of the proceeds of this offering.

The amount and timing of our actual expenditures will depend upon numerous factors, including the results of our research and development efforts, the timing and success of preclinical studies, our ongoing clinical trials or clinical trials we may commence in the future and the timing of regulatory submissions. The costs and timing of development activities, particularly conducting clinical trials and preclinical studies, are highly uncertain, subject to substantial risks and can often change. Depending on the outcome of these activities and other unforeseen events, our plans and priorities may change and we may apply the net proceeds of this offering in different proportions than we currently anticipate.

The failure by our management to apply these funds effectively could harm our business, financial condition and results of operations. Pending their use, we may invest the net proceeds from this offering in short-term, interest-bearing, investment-grade securities or certificates of deposit. These investments may not yield a favorable return to our stockholders.

**Our ability to use our net operating loss carryforwards may be subject to certain limitations.**

At December 31, 2013, we had net operating loss carryforwards of approximately $158,000 for both federal and state tax purposes, which begin to expire in 2032. Our ability to utilize our federal net operating loss carryforwards may be limited under Section 382 of the Internal Revenue Code of 1986, as amended, or the Code. Specifically, this limitation may arise in the event of an "ownership change," which is defined by Section 382 of the Code as a cumulative change in ownership of our company of more than 50% within a three-year period. We do not believe that we have experienced an ownership change at any time in the past. However, if a taxing authority disagrees with us, or if we undergo one or more ownership changes in connection with this offering or future transactions in our stock, our ability to utilize net operating loss carryforwards to offset federal taxable income, if any, could be limited by Section 382, which could potentially result in increased future tax liability to us.

**We may never pay dividends on our common stock so any returns would be limited to the appreciation of our stock.**

We have never declared or paid any cash dividend on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any return to stockholders will therefore be limited to the appreciation of their stock.

**Provisions in our amended and restated certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult or expensive for a third party to acquire us or change our board of directors or current management.**

Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders, and may prevent attempts by our stockholders to replace or remove our current management. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

-44-

**Table of Contents**

- limiting the removal of directors by the stockholders;

- creating a classified board of directors;

- providing that no stockholder is permitted to cumulate votes at any election of directors;

- allowing the authorized number of our directors to be changed only by resolution of our board of directors;

- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- requiring the approval of the holders of at least 66 2/3% of the votes that all our stockholders would be entitled to cast to amend or repeal specified provisions of our charter documents;

- eliminating the ability of stockholders to call a special meeting of stockholders; and

- establishing advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon at stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. In addition, we are subject to Section 203 of the General Corporation Law of the State of Delaware, or the DGCL, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless such transactions are approved in advance by our board of directors or ratified by our board of directors and certain of our stockholders. This provision could have the effect of delaying or preventing a change in control, whether or not it is desired by or beneficial to our stockholders. Further, other provisions of Delaware law may also discourage, delay or prevent someone from acquiring us or merging with us. For more information regarding these provisions, see the section of this prospectus entitled "Description of Capital Stock – Anti-Takeover Provisions".

**Our amended and restated bylaws designate the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or other employees.**

Our amended and restated bylaws provide that, unless we consent in writing to an alternative forum, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for (1) any derivative action or proceeding brought on our behalf, (2) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee to us or our stockholders, (3) any action asserting a claim against us or our directors, officers or employees arising pursuant to any provision of our amended and restated bylaws, our amended and restated certificate of incorporation or the DGCL, (4) any action asserting a claim against us or our directors, officers or employees that is governed by the internal affairs doctrine, or (5) any action to interpret, apply, enforce or determine the validity of our amended and restated bylaws or our amended and restated certificate of incorporation. Any person purchasing or otherwise acquiring any interest in any shares of our capital stock shall be deemed to have notice of and to have consented to this provision of our amended and restated bylaws. This choice-of-forum provision may limit our stockholders' ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers or other employees, which may discourage such lawsuits. Alternatively, if a court were to find this provision of our amended and restated bylaws inapplicable or unenforceable with respect to one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could materially and adversely affect our business, financial condition and results of operations.

-45-

**Table of Contents**

## Special Note Regarding Forward-Looking Statements

This prospectus contains forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended, which statements involve substantial risks and uncertainties. Forward-looking statements generally relate to future events or our future financial or operating performance. In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these words or other similar terms or expressions that concern our expectations, strategy, plans or intentions. Forward-looking statements contained in this prospectus include, but are not limited to, statements about:

- risks and uncertainties associated with our research and development activities, including our clinical trials and preclinical studies;

- the timing or likelihood of regulatory filing and approvals or of alternative regulatory pathways for our drug candidates;

- the potential market opportunities for commercializing our drug candidates;

- our expectations regarding the potential market size and the size of the patient populations for our drug candidates, if approved for commercial use, and our ability to serve such markets;

- estimates of our expenses, future revenue, capital requirements and our needs for additional financing;

- our ability to develop, acquire, and advance drug candidates into, and successfully complete, clinical trials and preclinical studies;

- the implementation of our business model and strategic plans for our business and drug candidates;

- the initiation, cost, timing, progress and results of future preclinical studies and clinical trials, and our research and development programs;

- the terms of future licensing arrangements, and whether we can enter into such arrangements at all;

- timing and receipt or payments of licensing and milestone revenues, if any;

- the scope of protection we are able to establish and maintain for intellectual property rights covering our drug candidates and our ability to operate our business without infringing the intellectual property rights of others;

- regulatory developments in the United States and foreign countries;

- the performance of our third party suppliers and manufacturers;

- our ability to maintain and establish collaborations or obtain additional funding;

- the success of competing therapies that are currently or may become available;

- our expectations regarding the time during which we will be an emerging growth company under the JOBS Act;

- our use of proceeds from this offering;

- our ability to continue as a going concern;

- our financial performance; and

- developments and projections relating to our competitors and our industry.

We caution you that the forward-looking statements highlighted above do not encompass all of the forward-looking statements made in this prospectus.

-46-

**Table of Contents**

We have based the forward-looking statements contained in this prospectus primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, results of operations, and prospects. The outcome of the events described in these forward-looking statements is subject to risks, uncertainties, and other factors described in the section of this prospectus entitled "Risk Factors" and elsewhere in this prospectus. Moreover, we operate in a very competitive and challenging environment. New risks and uncertainties emerge from time to time, and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this prospectus. We cannot assure you that the results, events and circumstances reflected in the forward-looking statements will be achieved or occur, and actual results, events or circumstances could differ materially from those described in the forward-looking statements.

The forward-looking statements made in this prospectus relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this prospectus to reflect events or circumstances after the date of this prospectus or to reflect new information or the occurrence of unanticipated events, except as required by law. We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures, other strategic transactions or investments we may make.

-47-

**Table of Contents**

## Industry and Market Data

This prospectus contains statistical data, estimates, forecasts, projections and other information concerning our industry, our business and the markets for certain diseases, including data regarding the estimated size of those markets and the incidence and prevalence of certain medical conditions. Information that is based on statistical data, estimates, forecasts, projections, market research or similar methodologies is inherently subject to uncertainties and actual events or circumstances may differ materially from events and circumstances reflected in this information. Unless otherwise expressly stated, we obtained this industry, business, market and other data from reports, research surveys, medical and general publications, government data, studies and similar data prepared by market research firms and other third parties. These third parties may, in the future, alter the manner in which they conduct surveys and studies regarding the markets in which we operate our business. The market and other estimates included in this prospectus, as they relate to projections, involve numerous assumptions, are subject to risks and uncertainties, and are subject to change based on various factors, including those discussed in the section of this prospectus entitled "Risk Factors" and elsewhere in this prospectus.

-48-

[Table of Contents](#)

# Use of Proceeds

We estimate that the net proceeds to us from the sale of the common stock that we are offering will be approximately $          million (or $          million if the underwriters exercise their option to purchase additional shares in full), assuming an initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

Each $1.00 increase or decrease in the assumed initial public offering price of $          per share would increase or decrease the net proceeds to us from this offering by approximately $          million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. We may also increase or decrease the number of shares we are offering. Each increase or decrease of 1.0 million in the number of shares offered by us at the assumed initial public offering price would increase or decrease the net proceeds to us from this offering, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us, by approximately $          million.

We are undertaking this offering in order to access the public capital markets and to increase our liquidity. We intend to use the net proceeds from this offering as follows:

- approximately $          to fund the continued clinical development of our lead drug candidate, VK0612, including a randomized, double-blind, placebo-controlled, multicenter Phase 2b clinical trial to evaluate various doses of VK0612, as well as a Phase 1 drug-drug interaction clinical trial and a Phase 1 clinical trial to evaluate the effect of renal impairment on VK0612 pharmacokinetics and lactate clearance;

- approximately $          to fund the continued clinical development of VK5211, including a randomized, double-blind, placebo-controlled, multicenter Phase 2 proof-of-concept clinical trial in patients with cancer cachexia;

- approximately $          to fund the continued development of our three preclinical drug candidates, including VK0214, a novel liver-selective thyroid hormone receptor beta agonist for lipid disorders such as dyslipidemia and NASH; and

- the remainder for working capital and other general corporate purposes.

Although it is difficult to predict our liquidity requirements, based upon our current operating plan, and assuming successful completion of this offering and the receipt of the full $2.5 million loan from Ligand pursuant to the Loan and Security Agreement, we believe we will have sufficient cash to meet our projected operating requirements for at least the next 12 months, and to reach the following milestones, based on their estimated timelines, with respect to our current drug programs: complete the planned clinical trials for VK0612 and VK5211; file an IND for VK0214; establish proof-of-concept in a relevant animal model of anemia for the EPOR program, and complete the lead-optimization process for the DGAT-1 inhibitor program, in preparation for a potential IND filing. Therefore, even with the expected net proceeds from this offering and the receipt of the full $2.5 million loan from Ligand pursuant to the Loan and Security Agreement, we do not expect to have sufficient cash to complete the clinical development of any of our drug candidates or, if applicable, to prepare for commercializing any drug candidate that is approved.

Our expected use of net proceeds from this offering represents our current intentions based upon our present plans and business condition. As of the date of this prospectus, we cannot predict with complete certainty all of the particular uses for the net proceeds to be received upon the completion of this offering or the actual amounts that we will spend on the uses set forth above. The costs and timing of development activities, particularly conducting clinical trials and preclinical studies are highly uncertain, subject to substantial risks and can often change. Due to the many variables inherent to the development of our drug candidates, we cannot currently predict the stage of development we expect the net proceeds of this offering to achieve for our clinical trials, preclinical studies and drug candidates.

-49-

**Table of Contents**

Our management will have broad discretion in the application of the net proceeds in the category of other working capital and general corporate purposes. For example, if we identify opportunities that we believe are in the best interests of our stockholders, we may use a portion of the net proceeds from this offering to acquire, invest in or license complementary products, technologies or businesses, although we have no current understandings, agreements or commitments to do so. In addition, the amounts and timing of our actual expenditures will depend upon numerous factors, including the results of our research and development efforts, the timing and success of preclinical studies, our ongoing clinical trials or clinical trials we may commence in the future and the timing of regulatory submissions. Depending on the outcome of these activities and other unforeseen events, our plans and priorities may change and we may apply the net proceeds of this offering toward different uses and in different proportions than we currently anticipate.

Pending use of the proceeds from this offering as described above, we intend to invest the net proceeds of this offering in short-term, interest-bearing, investment-grade securities or certificates of deposit.

-50-

**Table of Contents**

## Dividend Policy

We have never declared or paid any cash dividends on our capital stock. We intend to retain future earnings, if any, to finance the operation and expansion of our business and do not anticipate paying any cash dividends in the foreseeable future. Any future determination to pay dividends will be made at the discretion of our board of directors or any authorized committee thereof after considering our financial condition, results of operations, capital requirements, business prospects and other factors our board of directors or such committee deems relevant, and subject to the restrictions contained in our current or future financing instruments.

-51-

**Table of Contents**

# Capitalization

The following table sets forth our cash and capitalization as of March 31, 2014:

- on an actual basis;

- on a pro forma basis to reflect (1) the conversion of our outstanding convertible notes in an aggregate principal amount of $310,350 and accrued interest of approximately $9,083 into an aggregate of          shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $    , the midpoint of the price range set forth on the cover page of this prospectus, (2) the issuance of an aggregate of          shares of our common stock to Ligand pursuant to the Master License Agreement and the Note upon the consummation of this offering, based on          shares of common stock outstanding as of immediately prior to the closing of this offering (excluding shares issued in this offering) and an assumed initial public offering price of $    , the midpoint of the price range set forth on the cover page of this prospectus, and (3) the filing of our amended and restated certificate of incorporation in Delaware, which will occur immediately prior to the completion of this offering; and

- on a pro forma as adjusted basis to give further effect to our issuance and sale of          shares of common stock in this offering at an assumed initial public offering price of $    , the midpoint of the price range set forth on the cover page of this prospectus, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

The information in this table should be read in conjunction with the sections of this prospectus entitled "Use of Proceeds," "Selected Financial Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and related notes thereto included elsewhere in this prospectus.

| | March 31, 2014 | | |
| --- | --- | --- | --- |
| | Actual (Unaudited) | Pro Forma(1) (2) (Unaudited) | Pro Forma as Adjusted(1) (2) (Unaudited) |
| Cash | $ 78,849 | $ | $ |
| Convertible notes payable, current | 47,930 | | |
| Convertible notes payable, non-current | 237,194 | | |
| Debt conversion feature liability | 81,904 | | |
| Stockholders' equity (deficit) | | | |
| Common stock, $0.00001 par value; 10,000,000 shares authorized, 6,000,000 shares issued and outstanding, actual;          shares authorized,          shares issued and outstanding, pro forma;          shares authorized,          shares issued and outstanding, pro forma as adjusted | 60 | | |
| Additional paid-in capital | 10,010 | | |
| Deficit accumulated during the development stage | (486,215) | | |
| Total stockholders' equity (deficit) | (478,643) | | |
| Total capitalization | $(111,615) | $ | $ |

(1)  The pro forma and pro forma as adjusted information is illustrative only and following the completion of this offering will be adjusted based on the actual initial public offering price and other terms of this offering determined at pricing.

(2)  Each $1.00 increase or decrease in the assumed initial public offering price of $    , the midpoint of the price range set forth on the cover page of this prospectus, would increase or decrease each of the pro forma as adjusted cash, additional paid-in capital, total stockholders' equity (deficit) and total capitalization by approximately $    million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. We may also increase or decrease the number of shares we are offering. An

-52-

**Table of Contents**

increase or decrease of 1.0 million in the number of shares we are offering would increase or decrease each of the pro forma as adjusted cash, additional paid-in capital, total stockholders' equity (deficit) and total capitalization by approximately $          million, assuming an initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

The table set forth above is based on 6,000,000 shares of our common stock outstanding as of March 31, 2014. The table does not reflect          shares of common stock reserved for issuance under our 2014 Equity Incentive Plan, which will become effective upon the execution and delivery of the underwriting agreement for this offering.

-53-

**Table of Contents**

# Dilution

If you invest in our common stock, your interest will be diluted to the extent of the difference between the initial public offering price per share and the net tangible book value per share after this offering.

As of March 31, 2014, we had net tangible book value (deficit) of approximately $(478,643), or $(0.08) per share. Net tangible book value (deficit) per share represents the amount of total tangible assets less total liabilities divided by the number of shares of our common stock outstanding.

Our pro forma net tangible book value (deficit) as of March 31, 2014 was $          , or $          per share of our common stock, after giving effect to (1) the conversion of our outstanding convertible notes in an aggregate principal amount of $310,350 and accrued interest of approximately $9,083 into an aggregate of          shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and (2) the issuance of an aggregate of          shares of our common stock to Ligand pursuant to the Master License Agreement and conversion of the Note upon the consummation of this offering, based on          shares of common stock outstanding as of immediately prior to the closing of this offering (excluding shares issued in this offering) and an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus.

After giving further effect to the sale of          shares of common stock in this offering at an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us, our pro forma as adjusted net tangible book value (deficit) as of March 31, 2014 would have been approximately $          million, or approximately $          per share. This amount represents an immediate increase in pro forma net tangible book value (deficit) of $          per share to our existing stockholders and an immediate dilution in pro forma net tangible book value (deficit) of approximately $          per share to new investors purchasing shares of common stock in this offering.

Dilution per share to new investors is determined by subtracting pro forma as adjusted net tangible book value (deficit) per share after this offering from the initial public offering price per share paid by new investors. The following table illustrates this dilution:

| | | |
|---|---|---|
| Assumed initial public offering price per share | | $ |
| Net tangible book value (deficit) per share as of March 31, 2014 | $(0.08) | |
| Increase per share attributable to the conversion of our convertible notes and issuance of shares pursuant to the Master License Agreement | | |
| Pro forma net tangible book value per share as of March 31, 2014 | _____ | |
| Increase in pro forma net tangible book value per share attributable to this offering | | |
| Pro forma as adjusted net tangible book value per share after this offering | _____ | |
| Dilution per share to new investors participating in this offering | | $ |

Each $1.00 increase or decrease in the assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, would increase or decrease the dilution per common share to new investors purchasing shares of common stock in this offering by $          per share, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. An increase or decrease of 1.0 million in the number of shares offered by us would increase or decrease the dilution per common share to new investors by $          per share, assuming an initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

-54-

**Table of Contents**

The following table sets forth, on a pro forma as adjusted basis as of March 31, 2014, the total number of shares of common stock owned by existing stockholders, and to be owned by new investors, the total consideration paid, and the average price per share paid by our existing stockholders and to be paid by new investors purchasing shares of common stock in this offering. The calculation below is based on an assumed initial public offering price of $         , the midpoint of the price range set forth on the cover page of this prospectus, before deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. As the table below shows, new investors participating in this offering will pay an average price per share substantially higher than our existing stockholders paid.

|  | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
|  | **Number** | **Percent** | **Amount** | **Percent** |  |
| Existing stockholders | 6,000,000 | % | $60,000 | % | $         0.01 |
| New investors |  | % |  | % |  |
| Total |  | 100% |  | 100% |  |

A $1.00 increase or decrease in the assumed initial public offering price would increase or decrease total consideration paid by new investors, total consideration paid by all stockholders and average price per share paid by all stockholders by $         , $         and $         per share, respectively, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us. An increase or decrease of 1.0 million in the number of shares offered by us would increase or decrease total consideration paid by new investors, total consideration paid by all stockholders and average price per share paid by all stockholders by $         , $         and $         per share, respectively, assuming an initial public offering price of $         , the midpoint of the price range set forth on the cover page of this prospectus, and after deducting the estimated underwriting discounts and commissions and estimated offering expenses payable by us.

If the underwriters exercise their option to purchase         additional shares of our common stock in this offering in full, the number of shares of common stock held by existing stockholders will be reduced to         , or     % of the total number of shares of common stock to be outstanding after this offering, and the number of shares of common stock held by investors participating in this offering will be further increased to         , or     % of the total number of shares of common stock to be outstanding after this offering.

The tables and calculations above exclude         shares of common stock reserved for issuance under our 2014 Equity Incentive Plan, which will become effective upon the execution and delivery of the underwriting agreement for this offering.

Furthermore, we will issue stock options and stock awards in connection with and following this offering and we may choose to raise additional capital through the sale of equity or convertible debt securities due to market conditions or strategic considerations even if we believe we have sufficient funds for our current or future operating plans. New investors will experience further dilution when new options are issued and exercised and stock awards are issued under our equity incentive plans or we issue additional shares of common stock or convertible debt or equity securities in the future.

-55-

**Table of Contents**

# Selected Financial Data

*The following selected statement of operations data and comprehensive loss data for each of the periods from September 24, 2012 (Inception) through December 31, 2012, the year ended December 31, 2013 and the cumulative period from September 24, 2012 (Inception) through December 31, 2013, and the selected balance sheet data as of December 31, 2013, have been derived from our audited financial statements included elsewhere in this prospectus. The following selected statement of operations data and comprehensive loss data for the three months ended March 31, 2013 and 2014, the cumulative period from September 24, 2012 (Inception) through March 31, 2014, and the selected balance sheet data as of March 31, 2014, are derived from our unaudited financial statements included elsewhere in this prospectus. Our unaudited financial statements have been prepared on the same basis as the audited financial statements and, in the opinion of our management, include all adjustments, consisting of normal recurring adjustments and accruals, necessary for a fair statement of the information for the interim periods.*

*The historical results presented below are not necessarily indicative of the results to be expected for any future period and our interim results are not necessarily indicative of the results that may be expected for a full year. You should read the selected financial and operating data for the periods presented in conjunction with the sections of this prospectus entitled "Risk Factors," "Capitalization," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus.*

| | Period from September 24, 2012 (Inception) through December 31, 2012 | Year Ended December 31, 2013 | Three Months Ended March 31, 2013 | Three Months Ended March 31, 2014 | Cumulative Period from September 24, 2012 (Inception) through March 31, 2014 |
|---|---|---|---|---|---|
| | | | (Unaudited) | (Unaudited) | (Unaudited) |
| **Statement of Operations** | | | | | |
| Revenues | $              – | $              – | $              – | $              – | $              – |
| Operating expenses | | | | | |
| Research and development | 68,871 | 11,613 | 575 | 50,000 | 130,484 |
| General and administrative | 40,770 | 89,463 | 2,615 | 159,737 | 289,970 |
| Total operating expenses | 109,641 | 101,076 | 3,190 | 209,737 | 420,454 |
| Loss from operations | (109,641) | (101,076) | (3,190) | (209,737) | (420,454) |
| Other expenses | | | | | |
| Loss from change in fair value of debt conversion feature | – | 20,622 | 37 | 10,249 | 30,871 |
| Interest expense | 1,386 | 24,549 | 1,356 | 8,955 | 34,890 |
| Total other expenses | 1,386 | 45,171 | 1,393 | 19,204 | 65,761 |
| Net loss | $  (111,027) | $  (146,247) | $   (4,583) | $ (228,941) | $ (486,215) |
| Basic and diluted net loss per share | $     (0.07) | $     (0.07) | $    (0.00) | $    (0.07) | $    (0.24) |
| Weighted-average shares used to compute basic and diluted net loss per share | 1,482,625 | 2,043,295 | 1,794,444 | 3,191,666 | 2,026,311 |
| Pro forma basic and diluted net loss per share (unaudited) | | $ | | $ | |
| Weighted-average pro forma shares used to compute basic and diluted net loss per common share (unaudited) | | | | | |

-56-

**Table of Contents**

|  | December 31, | | March 31, 2014 |
|---|---|---|---|
|  | 2012 | 2013 | (Unaudited) |
| **Balance Sheet Data** | | | |
| Cash | $ – | $ 179,619 | $ 78,849 |
| Working capital (deficit) | (54,379) | 52,128 | (349,912) |
| Total assets | – | 180,394 | 276,716 |
| Convertible notes payable, current | – | 46,894 | 47,930 |
| Convertible notes payable, non-current | 42,750 | 231,851 | 237,194 |
| Debt conversion feature liability | 8,286 | 71,655 | 81,904 |
| Accumulated deficit | (111,027) | (257,274) | (486,215) |
| Total stockholders' equity (deficit) | (105,415) | (250,604) | (478,643) |

-57-

Table of Contents

## Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the section of this prospectus entitled "Selected Financial Data" and our financial statements and related notes thereto included elsewhere in this prospectus. In addition to historical information, this discussion and analysis contains forward-looking statements that involve risks, uncertainties and assumptions. Our actual results may differ materially from these forward-looking statements as a result of certain factors. We discuss factors that we believe could cause or contribute to these differences below and elsewhere in this prospectus, including those set forth in the sections of this prospectus entitled "Risk Factors" and "Special Note Regarding Forward-Looking Statements".*

### Overview

We are a clinical-stage biopharmaceutical company focused on the development of novel, first-in-class or best-in-class therapies for metabolic and endocrine disorders. We have exclusive worldwide rights to a portfolio of five drug candidates in clinical trials or preclinical studies, which are based on small molecules licensed from Ligand. Our lead clinical program is VK0612, a first-in-class, orally available drug candidate entering a Phase 2b clinical trial for type 2 diabetes, one of the largest global healthcare challenges today. Preliminary clinical data suggest VK0612 has the potential to provide substantial glucose-lowering effects, with an attractive safety and convenience profile compared with existing type 2 diabetes therapies. Our second clinical program is VK5211, an orally available drug candidate entering a Phase 2 clinical trial for the treatment of cancer cachexia, a complex disease characterized by an uncontrolled decline in muscle mass. VK5211 is a non-steroidal selective androgen receptor modulator, or SARM. A SARM is designed to selectively interact with a subset of receptors that have a normal physiologic role of interacting with naturally-occurring hormones called androgens. Broad activation of androgen receptors with drugs, such as exogenous testosterone, can stimulate muscle growth but often results in unwanted side effects, such as prostate growth, hair growth and acne. VK5211 is expected to selectively produce the therapeutic benefits of testosterone in muscle tissue, with improved safety, tolerability and patient acceptance. We expect to commence Phase 2 clinical trials for both VK0612 and VK5211 in early 2015 and to complete the clinical trials in 2016. We are also developing three preclinical programs targeting metabolic diseases and anemia. Our most advanced preclinical program is VK0214, a novel liver-selective thyroid hormone receptor beta, or TRß, agonist for lipid disorders such as dyslipidemia and nonalcoholic steatohepatitis, or NASH. We expect to file an investigational new drug application, or IND, and commence clinical trials for this program in 2015.

We were incorporated under the laws of the State of Delaware on September 24, 2012. Since our incorporation, we have devoted substantially all of our efforts to raising capital, building infrastructure and obtaining the worldwide rights to certain technology, including VK0612 and VK5211, pursuant to an exclusive license agreement with Ligand. The terms of this license agreement are detailed in the Master License Agreement, which we entered into on May 21, 2014. See the section of this prospectus entitled "Business – Agreements with Ligand".

To date, we have not generated any revenues and have financed our operations primarily with net proceeds from private placements of our convertible promissory notes. Although it is difficult to predict our liquidity requirements, based upon our current operating plan, and assuming successful completion of this offering and the receipt of the full $2.5 million loan from Ligand pursuant to the Loan and Security Agreement, we believe we will have sufficient cash to meet our projected operating requirements for at least the next 12 months.

Our net loss was $146,247 and $228,941 for the year ended December 31, 2013 and the three months ended March 31, 2014, respectively. As of March 31, 2014, we had a deficit accumulated during the development stage of $486,215. These losses have resulted principally from costs incurred in connection with license option fees, consulting fees and general and administrative expenses, including planning for the continued clinical development of VK0612 and VK5211. We anticipate that we will continue to incur net losses for the foreseeable future as we continue the development of our clinical drug candidates and preclinical programs and incur additional costs associated with being a public company.

-58-

**Table of Contents**

**Financial Operations Overview**

*Revenues*

To date, we have not generated any revenue. We do not expect to receive any revenue from any drug candidates that we develop unless and until we obtain regulatory approval for, and commercialize, such drug candidates or enter into collaborative agreements with third parties.

*Research and Development Expenses*

We have had limited operating expenses related to research and development activities. From our inception in September 2012 through March 31, 2014, we have incurred $130,484 in research and development expenses, which have been primarily related to obtaining the option to license compounds and related intellectual property rights from Ligand, and our subsequent extension of the option term. We obtained the license to these and other intellectual property rights from Ligand in May 2014, and we expect that our ongoing research and development expenses will consist of costs incurred for the development of our drug candidates, which include:

- expenses incurred under agreements with investigative sites and contract research organizations, or CROs, which will conduct a substantial portion of our research and development activities on our behalf;

- employee and consultant-related expenses, which will include salaries, benefits and stock-based compensation, and certain consultant fees and travel expenses;

- payments to third-party manufacturers, which will produce our active pharmaceutical ingredients and finished products;

- license fees paid to third parties for use of their intellectual property; and

- facilities, depreciation and other allocated expenses, which include direct and allocated expenses for rent and maintenance of facilities and equipment, depreciation of leasehold improvements and equipment and laboratory and other supplies.

We expense all research and development costs as incurred.

The process of conducting the necessary clinical research to obtain regulatory approval is costly and time consuming and the successful development of our drug candidates is highly uncertain. Our future research and development expenses will depend on the clinical success of each of our drug candidates, as well as ongoing assessments of the commercial potential of such drug candidates. In addition, we cannot forecast with any degree of certainty which drug candidates may be subject to future collaborations, when such arrangements will be secured, if at all, and to what degree such arrangements would affect our development plans and capital requirements. We expect to incur increased research and development expenses as we commence our Phase 2 clinical trials for VK0612 and VK5211 and seek to advance our preclinical programs.

*General and Administrative Expenses*

To date, general and administrative expenses have consisted primarily of fees paid to certain consultants to help commence and continue our operations. We expect that our general and administrative expenses will increase in the future in order to support our research and development activities, including increased salaries and other related costs, stock-based compensation and consulting fees for executive, finance, accounting and business development functions. Other significant costs are expected to include legal fees relating to patent and corporate matters, facility costs not otherwise included in research and development expenses, and fees for accounting and other consulting services. We also expect general and administrative expenses to increase as we begin operating as a public company, including expenses related to compliance with the rules and regulations of the SEC and those of any national securities exchange on which our securities are traded, additional insurance expenses, investor relations activities and other administration and professional services.

-59-

**Table of Contents**

*Other Expenses*

Other expenses include the change in fair value of the debt conversion feature contained in our outstanding convertible promissory notes issued from September 2012 through June 2013, or the Convertible Notes, which accounts for non-cash interest expense associated with the increase in fair value of the debt conversion feature of the Convertible Notes, and interest expense, which consists primarily of interest accrued on the Convertible Notes, and non-cash interest related to the amortization of debt discount costs associated with the Convertible Notes.

## JOBS Act

We are an "emerging growth company" within the meaning of the rules under the Securities Act, and we will utilize certain exemptions from various reporting requirements that are applicable to public companies that are not emerging growth companies. For example, as an emerging growth company, we will not be required to provide an auditor's attestation report on our internal control over financial reporting in future annual reports on Form 10-K as otherwise required by Section 404(b) of the Sarbanes-Oxley Act. In addition, Section 107 of the JOBS Act provides that an emerging growth company can utilize the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. Thus, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have irrevocably elected to "opt out" of the extended transition period for complying with new or revised accounting standards pursuant to Section 107(b) of the JOBS Act. As a result, we will comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies.

## Critical Accounting Policies and Estimates

Our management's discussion and analysis of financial condition and results of operations is based on our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements, as well as the reported revenues and expenses during the reporting periods.

Since our incorporation, we have devoted substantially all of our efforts to raising capital, building infrastructure and obtaining the worldwide rights to certain technology from Ligand. To date, we have not generated any revenues and have financed our operations primarily with net proceeds from private placements of the Convertible Notes. Our estimates are based on historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which will form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

While our significant accounting policies are more fully described in Note 1 to our financial statements included elsewhere in this prospectus, we believe that the following accounting policies will be critical to understanding our historical and future performance, as these policies relate to the significant areas involving management's judgments and estimates in the preparation of our financial statements.

*Revenue Recognition*

We have not recorded any revenues since our inception. However, in the future we may enter into collaborative research and licensing agreements, under which we could be eligible for payments made in the form of upfront license fees, research funding, cost reimbursement, contingent event-based payments and royalties.

-60-

Table of Contents

Revenue from upfront, nonrefundable license fees is recognized over the period that any related services are to be provided by us. Amounts received for research funding are recognized as revenue as the research services that are the subject of such funding are performed. Revenue derived from reimbursement of research and development costs in transactions where we act as a principal are recorded as revenue for the gross amount of the reimbursement, and the costs associated with these reimbursements are reflected as a component of research and development expense in our statements of operations.

Financial Accounting Standards Board, or FASB, Accounting Standards Codification, or ASC, Topic 605-28, *Revenue Recognition – Milestone Method*, or ASC 605-28, established the milestone method as an acceptable method of revenue recognition for certain contingent event-based payments under research and development arrangements. Under the milestone method, a payment that is contingent upon the achievement of a substantive milestone is recognized in its entirety in the period in which the milestone is achieved. A milestone is an event (1) that can be achieved based in whole or in part on either our performance or on the occurrence of a specific outcome resulting from our performance, (2) for which there is substantive uncertainty at the date the arrangement is entered into that the event will be achieved, and (3) that would result in additional payments being due to us. The determination that a milestone is substantive is judgmental and is made at the inception of the arrangement. Milestones are considered substantive when the consideration earned from the achievement of the milestone (a) is commensurate with either our performance to achieve the milestone or the enhancement of value of the item delivered as a result of a specific outcome resulting from our performance to achieve the milestone, (b) relates solely to past performance, and (c) is reasonable relative to all deliverables and payment terms in the arrangement.

Other contingent event-based payments received for which payment is either contingent solely upon the passage of time or the results of a collaborative partner's performance are not considered milestones under ASC 605-28. In accordance with ASC Topic 605-25, *Revenue Recognition – Multiple-Element Arrangements*, or ASC 605-25, such payments will be recognized as revenue when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, price is fixed or determinable and collectability is reasonably assured. Revenues recognized for royalty payments, if any, are based upon actual net sales of the licensed compounds, as provided by the collaboration arrangement, in the period the sales occur. Any amounts received prior to satisfying our revenue recognition criteria are recorded as deferred revenue on our balance sheets.

*Research and Development*

Our historical research and development expenses have primarily related to obtaining the option to license compounds and related intellectual property rights from Ligand. We expect to begin certain clinical and preclinical efforts following acquisition of the rights from Ligand. All costs of research and development are expensed in the period incurred. Research and development costs primarily consist of fees paid to CROs and clinical trial sites, employee and consultant related expenses, which include salaries, benefits and stock-based compensation for research and development personnel; external research and development expenses incurred pursuant to agreements with third-party manufacturing organizations; license fees paid to third parties for use of their intellectual property; facilities costs; travel costs; dues and subscriptions; depreciation and materials used in preclinical studies, clinical trials and research and development.

We estimate our preclinical study and clinical trial expenses based on the services we received pursuant to contracts with research institutions and CROs that conduct and manage preclinical studies and clinical trials on our behalf. Clinical trial-related contracts vary significantly in length, and may be for a fixed amount, based on milestones or deliverables, a variable amount based on actual costs incurred, capped at a certain limit, or for a combination of these elements. We accrue service fees based on work performed, which relies on estimates of total costs incurred based on milestones achieved, patient enrollment and other events. The majority of our service providers invoice us in arrears, and to the extent that amounts invoiced differ from our estimates of

-61-

**Table of Contents**

expenses incurred, we accrue for additional costs. The financial terms of these agreements vary from contract to contract and may result in uneven expenses and payment flows. Preclinical study and clinical trial expenses include:

- fees paid to CROs, laboratories and consultants in connection with preclinical studies;

- fees paid to CROs, clinical trial sites, investigators and consultants in connection with clinical trials; and

- fees paid to contract manufacturers and service providers in connection with the production, testing and packaging of active pharmaceutical ingredients and drug materials for preclinical studies and clinical trials.

Payments under some of these agreements depend on factors such as the milestones accomplished, including enrollment of certain numbers of patients, site initiation and the completion of clinical trial milestones. To date, we have not experienced any events requiring us to make material adjustments to our accruals for service fees. If we do not identify costs that we have begun to incur or if we underestimate or overestimate the level of services performed or the costs of these services, our actual expenses could differ from our estimates which could materially affect our results of operations. Adjustments to our accruals are recorded as changes in estimates become evident. Furthermore, based on amounts invoiced to us by our service providers, we may also record payments made to those providers as prepaid expenses that will be recognized as expense in future periods as services are rendered.

*Convertible Notes Payable and Related Debt Conversion Feature Liability*

In September 2012, our board of directors authorized us to issue and sell up to an aggregate of $1.0 million in Convertible Notes to one or more accredited investors in multiple closings through September 2014. We issued Convertible Notes in an aggregate principal amount of $310,350 from our inception in September 2012 through March 31, 2014. The Convertible Notes bear interest at a rate equal to the lesser of the short-term monthly applicable federal rate as published by the Internal Revenue Service or the maximum rate permissible by law. Interest is due and payable at maturity. The cumulative accrued interest payable on the Convertible Notes as of March 31, 2014 was $9,083. Unless repaid in full or converted into shares of our capital stock in full, each Convertible Note matures two years from the date of its purchase. In the event that any principal amount due under the Convertible Note is not paid in full by the maturity date, such unpaid principal amount will bear interest at the lesser of 2% or the maximum rate permissible by law.

Pursuant to the terms of the Convertible Notes, if, prior to maturity of the Convertible Notes, we issue capital stock resulting in net proceeds of at least $5.0 million, or a Qualifying Financing, the Convertible Notes will convert automatically into shares of the capital stock issued in the Qualifying Financing. The number of shares issued upon conversion will be equal to the quotient obtained by dividing the then-outstanding loan balance by either 70% or 75%, as applicable, of the lowest purchase price per share paid by another investor in the Qualifying Financing. If, prior to the maturity of the Convertible Notes, we issue preferred stock in a financing that does not qualify as a Qualifying Financing, or a Non-Qualifying Financing, the holders of the Convertible Notes will have the option of converting their Convertible Notes into shares of the preferred stock issued in the Non-Qualifying Financing on the same terms as the investors in the Non-Qualifying Financing. In the event we undergo a change in control, as defined in the Convertible Notes, prior to the maturity date and repayment of the Convertible Notes, the holders of the Convertible Notes will have the option to either convert the loan balance into shares of our common stock or demand immediate repayment of an amount equal to 125% of the then-outstanding loan balance.

The debt conversion feature embedded in the Convertible Notes qualifies for liability accounting under FASB Accounting Standards Codification Topic 815 – *Derivatives and Hedging*. The fair value of the debt conversion feature of each Convertible Note is determined at issuance of the Convertible Note. The fair value of the debt conversion feature is then allocated from the gross proceeds of the Convertible Notes with the respective discount amortized to interest expense over the original term of the Convertible Notes using the effective interest method. The valuation of the bifurcated debt conversion feature is performed using Level 3 fair value inputs,

-62-

**Table of Contents**

requiring us to make assumptions about the probability of the occurrence of a Qualifying Financing and the Convertible Notes being converted and the terms of such conversion. Alternative probabilities may result in increases or decreases in the value of the debt conversion feature of the Convertible Notes.

*Stock-Based Compensation*

We account for stock-based compensation by measuring and recognizing compensation expense for all stock-based payments made to employees, consultants and directors based on estimated grant date fair values. From our inception on September 24, 2012 through March 31, 2014, we issued the following stock awards and did not grant any stock options or other equity awards:

- on September 26, 2012, we issued an aggregate of 5,000,000 shares of stock at a deemed fair value of $0.01 per share;

- on April 15, 2013, we issued an aggregate of 500,000 shares of stock at a purchase price of $0.01 per share;

- on July 15, 2013, we issued an aggregate of 200,000 shares of stock at a purchase price of $0.01 per share; and

- on February 20, 2014, we issued an aggregate of 1,000,000 shares of stock at a deemed fair value of $0.01 per share, or the 2014 Award.

We use the straight-line method to allocate compensation cost to reporting periods over each restricted common stockholder's requisite service period, which is generally the vesting period.

*Common Stock Fair Value*

Due to the absence of an active market for our common stock, the fair value of our common stock for purposes of determining the value of our restricted common stock issuance was determined by our board of directors, with the assistance of our management, in good faith based on a number of objective and subjective factors, including:

- our stage of development and business strategy;

- the composition of and changes to our management team;

- the market value of a comparison group of privately held biopharmaceutical companies that are in a stage of development similar to ours;

- the lack of liquidity of our common stock as a private company;

- the likelihood of achieving a liquidity event for the shares of our common stock, such as an initial public offering, given prevailing market conditions; and

- the material risks related to our business.

Based on these factors, our restricted common stock issued for the period from September 26, 2012 through March 31, 2014 was sold at a purchase price of $0.01 per share. These restricted common stock issuances are subject to time-based vesting, which generally runs three to four years, or milestone-based vesting tied to our company's achievement of specific events. If the purchaser's service with us terminates prior to the vesting of a restricted common stock award, we can repurchase any unvested shares at a price of $0.01 per share.

In connection with the preparation of the financial statements necessary for inclusion in the registration statement of which this prospectus forms a part, in 2014 we reassessed the estimated fair value of our common stock for financial reporting purposes using a retrospective valuation performed by a third party valuation specialist prepared in accordance with methodologies outlined in the *AICPA Practice Aid Valuation of Privately-Held-Company Equity Securities Issued as Compensation*, or the AICPA Guide. We reassessed the estimated fair value of our common stock for each quarterly period from our inception on September 24, 2012 through March 31,

-63-

**Table of Contents**

2014. When we performed retrospective valuation analyses for September 26, 2012, April 15, 2013 and July 15, 2013, we concluded that our common stock issued on these dates had fair values less than or equal to the then estimated fair value of common stock at the date of issuance. When we performed retrospective valuation analysis for the 2014 Award, we concluded that our common stock issued on February 20, 2014 had a deemed fair value lower than the reassessed fair value of the common stock at the date of issuance. Since the 2014 Award is subject to vesting based on two company performance milestones related to the filing of a provisional patent application and commencement of a clinical trial, we reviewed the probability of achieving these milestones at both February 20, 2014 and at March 31, 2014, and it was determined that as of each of those dates, neither of the milestones was probable of being met. Therefore, no compensation expense has been recorded for the 2014 Award through March 31, 2014. We will continue to reassess the 2014 Award at each reporting period to determine whether either of the two company performance milestones are probable of being met. If and when either of the vesting milestones are deemed probable, we will begin to record compensation expense over the estimated period for when we estimate the performance criteria will actually be met using the reassessed fair value to determine stock-based compensation expense in our financial statements.

Our analysis of stock-based compensation was based on a methodology that first estimated the fair value of our business as a whole, or enterprise value, and then allocated a portion of the enterprise value to our common stock. This approach is consistent with the methods outlined in the AICPA Guide.

The valuation methodology used in 2014 to reassess the estimates of fair value for our common stock issued on September 26, 2012, April 15, 2013 and July 15, 2013 was consistent with AICPA Guide. We relied on the capital contributions made to us as of each date as the basis for the enterprise value. We used a Monte Carlo market approach simulation method and performed an allocation of value to common stock based on the estimated time to a liquidity event. The inputs to the Monte Carlo simulation analysis included the estimated invested capital as the starting value for the enterprise, volatilities based on companies comparable to us and risk-free rates equal to the risk-free rates of U.S. Treasury Constant maturities commensurate to the expected time to liquidity. The fair value price per share of the common stock was simulated using risk-free rates and estimated volatilities.

The valuation methodology used in 2014 to reassess the estimate of the fair value for the 2014 Award relied on Probability Weighted Expected Return Method, or PWERM, which incorporates relevant events and expected future exit scenarios for the company. The exit scenarios consisted of the merger and acquisition and initial public offering scenarios. The enterprise value under each scenario was based primarily on the market approach and probability weighted expected exit values for the company under each scenario. Similar merger and acquisition transactions and publicly traded companies were used within the market approach and metrics were applied and qualitative comparable assessments were performed. The indicated value under the market approach was used as the starting aggregate value for the valuation of the 2014 Award. We utilized a Monte Carlo simulation method to determine the fair value of the performance based shares as of the measurement dates. The Monte Carlo simulation method takes into consideration the expected timing of the performance vesting milestones, probability of achieving the milestones and estimated per share common stock prices at expected vesting dates. The following outlines the key assumptions used in the Monte Carlo simulation method for the 2014 Award:

- The starting enterprise value for the 2014 Award was estimated using the market approach as of February 20, 2014 and March 31, 2014.

- Comparable company volatilities ranged from 58.3% to 70.9%.

- The risk-free rates were based on risk-free rates of U.S. Treasury constant maturity rates ranging from 0.07% to 0.10% and were commensurate with the expected vesting period for the shares under the 2014 Award.

- The expected timing of one milestone under the 2014 Award was estimated to be April 30, 2015 and the other milestone achievement was estimated to be November 31, 2015. The probability of achieving each of the two milestones was estimated to be less-than-probable as of March 31, 2014.

-64-

Table of Contents

*Stock-Based Compensation Summary*

Stock-based compensation is reported in our statements of operations as follows:

| | Period from September 24, 2012 (Inception) through December 31, 2012 | | Year Ended December 31, 2013 | | Three Months Ended March 31, 2013 | | Three Months Ended March 31, 2014 | | Cumulative Period from September 24, 2012 (Inception) through March 31, 2014 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Unaudited) | | (Unaudited) | | (Unaudited) |
| Research and development | $ | — | $ | 750 | $ | — | $ | — | $ | 750 |
| General and administrative | | 5,612 | | 2,804 | | 965 | | 904 | | 9,320 |
| Total | $ | 5,612 | $ | 3,554 | $ | 965 | $ | 904 | $ | 10,070 |

At March 31, 2014, there were 2,912,500 unvested shares and $173,547 of total unrecognized compensation costs related to the 6,000,000 shares of common stock outstanding, which is expected to be recognized over a weighted average period of 1.05 years.

## Results of Operations

### *Comparison of the Three Months Ended March 31, 2013 and 2014*

*Research and Development Expenses*

The following table summarizes our research and development expenses for the three months ended March 31, 2013 and 2014.

| | Three Months Ended March 31, | | $ Change | % Change |
|---|---|---|---|---|
| | 2013 | 2014 | | |
| | (Unaudited) | | | |
| Research and development expenses | $ 575 | $ 50,000 | $49,425 | 8,596% |

During the three months ended March 31, 2013, we incurred minimal research and development expenses, since we were in the process of negotiating to license certain technology from Ligand and had not engaged in any significant research or development during such time. During the three months ended March 31, 2014, we expensed a $50,000 payment made to Ligand to extend our option to license certain technology from Ligand.

*General and Administrative Expenses*

The following table summarizes our general and administrative expenses for the three months ended March 31, 2013 and 2014.

| | Three Months Ended March 31, | | $ Change | % Change |
|---|---|---|---|---|
| | 2013 | 2014 | | |
| | (Unaudited) | | | |
| General and administrative expenses | $2,615 | $159,737 | $157,122 | 6,008% |

The increase in general and administrative expenses was primarily due to an increase of $77,403 in legal fees and an increase in salaries and wages, including stock-based compensation expense of $29,939, during the three months ended March 31, 2014 as compared to the same period in 2013. We began paying salaries to our founders during the second half of 2013. No salaries were paid by us during the three months ended March 31, 2013. The increase also reflects $40,769 in accounting fees incurred during the three months ended March 31, 2014 as we prepared for and commenced our financial audits during the three months ended March 31, 2014, as compared to no accounting fees incurred during the three months ended March 31, 2013.

-65-

**Table of Contents**

*Other Expenses*

The following table summarizes our other expenses for the three months ended March 31, 2013 and 2014.

| | Three Months Ended March 31, | | $ Change | % Change |
|---|---|---|---|---|
| | 2013 | 2014 | | |
| | (Unaudited) | | | |
| Other expenses | $1,393 | $ 19,204 | $17,811 | 1,279% |

Other expenses increased during the three months ended March 31, 2014 primarily due to an increase in the fair value of the debt conversion feature of the Convertible Notes and an increase in interest expense under the Convertible Notes. The increase in loss from change in fair value of debt conversion feature of $10,212 during the three months ended March 31, 2014 relative to the three months ended March 31, 2013 was due primarily to our issuance of additional Convertible Notes in an aggregate principal amount of $260,350 after March 31, 2013, which carried their own additional loss from change in debt conversion feature charge. In addition, interest expense during the three months ended March 31, 2014 increased by $7,599 as compared to the same period in 2013, due primarily to an increase in amortization of the debt discount and additional interest expense accrued on Convertible Notes issued after March 31, 2013.

***Comparison of the Period from September 24, 2012 (Inception) through December 31, 2012 to the Year Ended December 31, 2013***

*Research and Development Expenses*

The following table summarizes our research and development expenses for the period from September 24, 2012 (Inception) through December 31, 2012 and the year ended December 31, 2013.

| | Period from September 24, 2012 (Inception) through December 31, 2012 | Year Ended December 31, 2013 | Increase (Decrease) | % Increase (Decrease) |
|---|---|---|---|---|
| Research and development expenses | $ 68,871 | $ 11,613 | $(57,258) | (83%) |

Research and development expenses for the period from September 24, 2012 (Inception) through December 31, 2012 related primarily to costs associated with an option to license intellectual property from Ligand and other legal costs related to negotiation discussions. We paid an option fee of $50,000 in the period ended December 31, 2012. We did not make any option or similar payments in 2013 and did not engage in significant research and development efforts during this period.

*General and Administrative Expenses*

The following table summarizes our general and administrative expenses for the period from September 24, 2012 (Inception) through December 31, 2012 to the year ended December 31, 2013.

| | Period from September 24, 2012 (Inception) through December 31, 2012 | Year Ended December 31, 2013 | Increase (Decrease) | % Increase (Decrease) |
|---|---|---|---|---|
| General and administrative expenses | $ 40,770 | $ 89,463 | $ 48,693 | 119% |

The increase in general and administrative expenses during the year ended December 31, 2013 as compared to the period from September 24, 2012 (Inception) through December 31, 2012 was primarily due to the payment of salaries and wages, including stock-based compensation expense of $53,054 in 2013, an increase in rent for

-66-

**Table of Contents**

office space of $7,237 and certain travel-related costs of $3,733, offset by a decrease in legal fees of $11,100. We did not pay wages or salaries or incur travel-related costs for the period from September 24, 2012 (Inception) through December 31, 2012.

*Other Expenses*

The following table summarizes our other expenses for the period from September 24, 2012 (Inception) through December 31, 2012 to the year ended December 31, 2013.

| | Period from September 24, 2012 (Inception) through December 31, 2012 | Year Ended December 31, 2013 | Increase (Decrease) | % Increase (Decrease) |
|---|---|---|---|---|
| Other expenses | $ 1,386 | $ 45,171 | $ 43,785 | 3,159% |

The increase in other expenses for the year ended December 31, 2013 versus the period from September 24, 2012 (Inception) through December 31, 2012 was due to an increase in loss from change in fair value of debt conversion feature of the Convertible Notes and an increase in interest expense under our outstanding Convertible Notes. The increase in loss from change in fair value of debt conversion feature of the outstanding Convertible Notes in 2013 as compared to 2012 of $20,622 was due primarily to our issuance of additional Convertible Notes in 2013, which added to the debt conversion feature charge. The increase in interest expense of $23,163 for the year ended December 31, 2013 versus the period from September 24, 2012 (Inception) through December 31, 2012 was due primarily to an increase in amortization of the debt discount caused by the issuance of additional Convertible Notes in 2013, plus a full year of interest expense incurred on the $50,000 in Convertible Notes issued in 2012 and expensed in 2013.

**Liquidity and Capital Resources**

We have incurred losses and negative cash flows from operations and have not generated any revenues since our inception. The audit report issued by our independent registered public accounting firm for our financial statements for the fiscal year ended December 31, 2013 states that our independent registered public accounting firm has substantial doubt in our ability to continue as a going concern due to the risk that we may not have sufficient cash and liquid assets at December 31, 2013 to cover our operating and capital requirements for the next 12 month period; and if in the case sufficient cash cannot be obtained, we would have to substantially alter, or possibly even discontinue, operations. Additionally, as of March 31, 2014, we do not believe that we will have sufficient cash to meet our projected operating requirements for at least the next 12 months unless this offering is successfully completed and we receive the full $2.5 million loan from Ligand pursuant to the Loan and Security Agreement. Our financial statements and related notes thereto included elsewhere in this prospectus do not include any adjustments that might result from the outcome of this uncertainty.

To date, we have funded our operations primarily with net proceeds from the issuance of the Convertible Notes in an aggregate principal amount of $310,350 as of March 31, 2014. As of March 31, 2014, we had cash of $78,849, and a deficit accumulated during the development stage of $486,215.

Our primary use of cash is to fund operating expenses, which to date have consisted of the cost to obtain an option to license intellectual property from Ligand and certain general and administrative expenses. Since we have not generated any revenues, we have incurred operating losses since our inception. Cash used to fund operating expenses is impacted by the timing of payment of these expenses, as reflected in the change in our outstanding accounts payable and accrued expenses.

-67-

**Table of Contents**

The following table summarizes our cash flows for the periods indicated below:

| | For the Period from September 24, 2012 (Inception) through December 31, 2012 | | Year Ended December 31, 2013 | | Three Months Ended March 31, 2013 | | Three Months Ended March 31, 2014 | | For the Period from September 24, 2012 (Inception) through March 31, 2014 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Unaudited) | | (Unaudited) | | (Unaudited) |
| Cash used in operating activities | $ | (50,000) | $ | (78,235) | $ | – | $ | (100,768) | $ | (229,003) |
| Cash provided by (used in) financing activities | $ | 50,000 | $ | 257,854 | $ | – | $ | (2) | $ | 307,852 |

*Cash Used in Operating Activities*

During the period from September 24, 2012 (Inception) through December 31, 2012, cash used in operating activities was $50,000. Cash used in operating activities primarily reflected our net losses for the period, offset by changes in our working capital accounts, primarily an increase in accounts payable.

During the year ended December 31, 2013, cash used in operating activities was $78,235. Cash used in operating activities primarily reflected our net losses for the period, offset by non-cash charges such as amortization of discount charged to interest expense on Convertible Notes and an increase in change in fair value of debt conversion feature as well as changes in our working capital accounts, primarily an increase in accounts payable and accrued expenses.

During the three months ended March 31, 2013, cash used in operating activities was $0. Cash used in operating activities was $0 as a result of our net losses for the period being offset by non-cash charges such as amortization of discount charged to interest expense on Convertible Notes as well as changes in our working capital accounts, primarily an increase in accounts payable and accrued expenses.

During the three months ended March 31, 2014, cash used in operating activities was $100,768. Cash used in operating activities primarily reflected our net losses for the period, offset by non-cash charges such as amortization of discount charged to interest expense on Convertible Notes and an increase in change in fair value of debt conversion feature as well as changes in our working capital accounts, primarily an increase in accounts payable and accrued expenses and an increase in deferred IPO financing costs.

During the period from September 24, 2012 (Inception) through March 31, 2014, cash used in operating activities was $229,003. Cash used in operating activities primarily reflected our net losses for the period, offset by non-cash charges such as amortization of discount charged to interest expense on convertible notes and an increase in change in fair value of debt conversion feature as well as changes in our working capital accounts, primarily an increase in accounts payable and accrued expenses and an increase in deferred IPO financing costs.

*Cash Used in Investing Activities*

We have not engaged in any investing activities since our inception.

*Cash Provided by (Used in) Financing Activities*

During the period from September 24, 2012 (Inception) through December 31, 2012, cash provided by financing activities was $50,000 and consisted of proceeds from the issuance of Convertible Notes.

During the year ended December 31, 2013, cash provided by financing activities was $257,854, which consisted of proceeds from the issuance of Convertible Notes in the amount of $260,350, offset by the repurchase of shares of restricted common stock for an aggregate purchase price of $2,503.

-68-

**Table of Contents**

During the three months ended March 31, 2014, cash used in financing activities was $2, which consisted of the repurchase of shares of restricted common stock from a former service provider at par value.

During the period from September 24, 2012 (Inception) through March 31, 2014, cash provided by financing activities was $307,852, which consisted primarily of $310,350 in proceeds from the issuance of Convertible Notes and $7 in proceeds from the issuance of common stock, offset by $2,505 paid to repurchase shares of restricted common stock from former service providers.

*Future Funding Requirements*

Based upon our current operating plan, and assuming successful completion of this offering and the receipt of the full $2.5 million loan from Ligand pursuant to the Loan and Security Agreement, we believe we will have sufficient cash to meet our projected operating requirements for at least the next 12 months.

We anticipate that we will continue to generate losses for the foreseeable future, and we expect the losses to increase materially as we continue the development of, and seek regulatory approvals for, our drug candidates, and seek to commercialize any drugs for which we receive regulatory approval. We anticipate that we will need to raise additional capital after this offering to fund our operations and complete our ongoing and planned clinical trials. Although we expect to finance future cash needs through public or private equity or debt offerings, funding may not be available to us on acceptable terms, or at all. If we are unable to raise additional capital in sufficient amounts or on terms acceptable to us, we may be required to delay, limit, reduce or terminate our drug development or future commercialization efforts or grant rights to develop and market drug candidates that we would otherwise prefer to develop and market ourselves.

Our future capital requirements will depend on many factors, including, but not limited to:

- the scope, rate of progress, results and cost of our clinical trials, preclinical studies and other related activities;

- the timing of, and the costs involved in, obtaining regulatory approvals for any of our current or future drug candidates;

- the number and characteristics of the drug candidates we seek to develop or commercialize;

- the cost of manufacturing clinical supplies, and establishing commercial supplies, of our drug candidates;

- the cost of commercialization activities if any of our current or future drug candidates are approved for sale, including marketing, sales and distribution costs;

- the expenses needed to attract and retain skilled personnel;

- the costs associated with being a public company;

- our ability to establish and maintain strategic collaborations, licensing or other arrangements and the financial terms of such agreements;

- the amount of revenue, if any, received from commercial sales of our drug candidates, should any of our drug candidates receive marketing approval; and

- the costs involved in preparing, filing, prosecuting, maintaining, defending and enforcing possible patent claims, including litigation costs and the outcome of any such litigation.

-69-

**Table of Contents**

**Contractual Obligations and Commitments**

The following table summarizes our payments due by period pursuant to our outstanding contractual obligations at March 31, 2014:

| | Total | Less than 1 Year | 1-3 Years | 4-5 Years | More than 5 Years |
|---|---|---|---|---|---|
| Convertible notes payable and estimated interest | $327,652 | $52,840 | $274,812 | $ – | $ – |
| Total | $327,652 | $52,840 | $274,812 | $ – | $ – |

**Off-Balance Sheet Arrangements**

We do not have any off-balance sheet arrangements.

**Recent Accounting Pronouncements**

In August 2013, the Financial Accounting Standards Board issued Accounting Standards Update No. 2013-11, *Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*, which sets forth circumstances in which an unrecognized tax benefit, generally reflecting the difference between a tax position taken or expected to be taken on a company's income tax return and the benefit recognized on its financial statements, should be presented in the financial statements as a reduction to a deferred tax asset for a net operating loss carryforward, a similar tax loss, or a tax credit carryforward. This guidance became effective for us beginning in fiscal year 2014 and the adoption of this standard is not expected to have a material impact on our financial statements or notes thereto.

**Quantitative and Qualitative Disclosures about Market Risk**

As of March 31, 2014, we had cash totaling $78,849, consisting of bank deposits. These cash balances are not subject to significant interest rate risk and the carrying value of our cash approximated its fair value. We also hold convertible notes payable which carry variable interest rates and the interest payments are therefore subject to interest rate risk, while the principal is not subject to interest rate risk. If the applicable federal rate were to change by 1%, thereby changing our effective borrowing rate by the same amount, interest expense related to the convertible notes payable would change by approximately $3,104 annually. Consequently, our results of operations and cash flows are not subject to significant interest rate risk related to these convertible notes payable.

We do not have any foreign currency or derivative financial instruments accounted for under hedge accounting.

-70-

Table of Contents

# Business

## Overview

We are a clinical-stage biopharmaceutical company focused on the development of novel, first-in-class or best-in-class therapies for metabolic and endocrine disorders. We have exclusive worldwide rights to a portfolio of five drug candidates in clinical trials or preclinical studies, which are based on small molecules licensed from Ligand. Our lead clinical program is VK0612, a first-in-class, orally available drug candidate entering a Phase 2b clinical trial for type 2 diabetes, one of the largest global healthcare challenges today. Preliminary clinical data suggest VK0612 has the potential to provide substantial glucose-lowering effects, with an attractive safety and convenience profile compared with existing type 2 diabetes therapies. Our second clinical program is VK5211, an orally available drug candidate entering a Phase 2 clinical trial for the treatment of cancer cachexia, a complex disease characterized by an uncontrolled decline in muscle mass. VK5211 is a non-steroidal selective androgen receptor modulator, or SARM. A SARM is designed to selectively interact with a subset of receptors that have a normal physiologic role of interacting with naturally-occurring hormones called androgens. Broad activation of androgen receptors with drugs, such as exogenous testosterone, can stimulate muscle growth but often results in unwanted side effects, such as prostate growth, hair growth and acne. VK5211 is expected to selectively produce the therapeutic benefits of testosterone in muscle tissue, with improved safety, tolerability and patient acceptance. We expect to commence Phase 2 clinical trials for both VK0612 and VK5211 in early 2015 and to complete the clinical trials in 2016. We are also developing three preclinical programs targeting metabolic diseases and anemia. Our most advanced preclinical program is VK0214, a novel liver-selective thyroid hormone receptor beta, or TRß, agonist for lipid disorders such as dyslipidemia and nonalcoholic steatohepatitis, or NASH. We expect to file an investigational new drug application, or IND, and commence clinical trials for this program in 2015.

VK0612 is a potent, selective inhibitor of fructose-1,6-bisphosphatase, or FBPase, an enzyme that plays an important role in endogenous glucose production, or the synthesis of glucose by the body. We believe the inhibition of FBPase provides an attractive approach to controlling blood glucose levels in patients with diabetes. VK0612 has demonstrated potent glucose lowering effects in diabetic animal models. Clinical trials have shown that VK0612 is safe, well-tolerated and leads to significant glucose-lowering effects in patients with type 2 diabetes. We intend to commence a Phase 2b clinical trial of VK0612 in approximately 500 patients with poorly-controlled type 2 diabetes, defined as having baseline fasting plasma glucose, or FPG, levels greater than or equal to 180 mg/dL. We expect to commence the clinical trial in early 2015 and to complete the clinical trial in 2016.

VK0612 has been evaluated in seven clinical trials, including one Phase 2a and six Phase 1 clinical trials. Based on these clinical and additional preclinical data, we believe VK0612 has the following important advantages over many existing type 2 diabetes therapies:

- *Greater efficacy:* Preliminary Phase 1 and 2 data suggest VK0612 could reduce plasma glycated hemoglobin A1c, or HbA1c, an important measure of long-term blood glucose levels, by 1% or more, potentially exceeding the typical anti-glycemic effects of newer drug classes.

- *Encouraging safety profile:* VK0612 has demonstrated encouraging safety to date in over 250 subjects. No cases of hypoglycemia, or low blood glucose levels, lacticemia, or sustained lactic acid in the blood, or other drug-related safety issues were observed in these subjects.

- *Improved tolerability:* VK0612 has been well-tolerated at and above doses that we plan to administer in our Phase 2b clinical trial, which we expect to be at or below 300 mg, with specific doses to be chosen based on the outcome of planned pharmacokinetic and pharmacodynamic calculations.

- *Novel mechanism of action:* Based on its insulin-independent mechanism of action, we believe VK0612 lowers blood glucose levels independently of pancreatic function. We expect VK0612's novel mechanism of action to provide critical durability and combinability advantages.

-71-

Table of Contents

– *Durability:* Diabetes is characterized by deteriorating pancreatic beta cell function. Given VK0612's insulin-independent mechanism of action, the drug could provide a more durable therapeutic effect than many currently available type 2 diabetes therapies.

– *Combinability:* VK0612's novel mechanism of action is expected to allow combinability with many existing type 2 diabetes therapies, leading to enhanced efficacy and potentially delaying transition to subsequent therapies.

• *Weight and lipid neutral profile:* Clinical and preclinical data suggest VK0612 has the potential to provide robust anti-glycemic effects while maintaining a weight and lipid neutral profile.

• *Once-daily convenience:* Clinical data suggest that VK0612 has the potential to lower blood glucose levels in type 2 diabetes patients as a once-daily oral therapy.

We plan to commence a Phase 2b clinical trial with VK0612 in type 2 diabetes patients in early 2015, which we expect to complete in 2016. We also plan to complete a Phase 1 drug-drug interaction clinical trial evaluating the safety and tolerability of VK0612 in combination with metformin, a generic pharmaceutical commonly prescribed for type 2 diabetes, as well as a Phase 1 clinical trial in renally-impaired type 2 diabetes patients, or patients having reduced kidney function, both within the same period. Pending clinical data from these clinical trials, we plan to hold an end-of-Phase 2 meeting with the U.S. Food and Drug Administration, or FDA, and to commence Phase 3 clinical trials in type 2 diabetes patients either on our own or with a third party. The purpose of our end-of-Phase 2 meeting is to review our data with the FDA, discuss appropriate potential Phase 3 clinical trial designs and obtain agreement between us and the FDA on Phase 3 efficacy and safety objectives.

Diabetes is an undertreated and underdiagnosed disease of epidemic proportion. The economic burden of diabetes and its associated complications cost the U.S. healthcare system approximately $245.0 billion in 2012 according to the American Diabetes Association, or the ADA. The U.S. Centers for Disease Control and Prevention, or the CDC, estimates that, as of 2010, 6.0% of the U.S. population, or roughly 18.8 million people, have been diagnosed with diabetes, and more than 7.0 million additional people in the U.S. are undiagnosed. Type 2 diabetes is the most common form of the disease, accounting for 90% to 95% of diagnosed cases. Due to a combination of factors, including urbanization, changing diets and the rise of sedentary lifestyles, the International Diabetes Federation estimates that the prevalence of diabetes will continue to grow. The International Diabetes Federation estimates that the global prevalence of diabetes will exceed 590.0 million people by 2035.

Our second clinical program, VK5211 (formerly LGD-4033), is an orally available small molecule drug candidate in development for the treatment of cancer cachexia. VK5211 is a non-steroidal selective androgen receptor modulator, or SARM. A SARM is designed to selectively interact with a subset of receptors that have a normal physiologic role of interacting with naturally-occurring hormones called androgens. Broad activation of androgen receptors with drugs, such as exogenous testosterone, can simulate muscle growth but often results in unwanted side effects, such as prostate growth, hair growth and acne. VK5211 belongs to a family of novel SARM compounds based on its effects on tissue-specific gene expression and other functional, cell-based technologies. We expect VK5211 to produce the therapeutic benefits of testosterone with improved safety, tolerability and patient acceptance due to a tissue-selective mechanism of action and an oral route of administration. In Phase 1 clinical trials, VK5211 demonstrated statistically significant increases in lean body mass among treated subjects following 21 days of treatment. Statistically significant refers to a low probability, generally regarded as less than or equal to 5%, of obtaining the observed result under a hypothesis that assumes no difference between treatment groups. We also observed positive dose-dependent trends in functional exercise and strength measures consistent with anabolic activity. In addition, no drug-related serious adverse events were reported. We plan to commence a Phase 2 proof-of-concept clinical trial in approximately 100 patients with cancer cachexia in early 2015. We expect this clinical trial to be completed in 2016. We also plan to discuss with the FDA potential clinical development of VK5211 in acute rehabilitation settings, such as hip fracture recovery.

Approximately 2.0 million cancer patients in North America and Europe suffer from cachexia, and it is estimated that up to 20% of all cancer deaths are a direct result of cachexia. It is particularly common among patients with

-72-

**Table of Contents**

lung, gastric, colorectal or pancreatic cancers, with up to 80% of patients with gastric or pancreatic cancers, and approximately 50% of patients with lung or colorectal cancers, suffering from the syndrome. There are currently no approved therapies in the U.S. for cancer cachexia, and pharmacological interventions have demonstrated limited clinical benefit or expose patients to the risk of undesirable side-effects such as virilization in women and prostate growth in men. As a result, we believe the potential size of the worldwide cancer cachexia market exceeds $1.0 billion.

We are also developing three preclinical programs targeting multi-billion dollar indications. Our most advanced preclinical program is VK0214, a novel liver-selective TRß agonist for lipid disorders such as dyslipidemia, a disease characterized by an elevation of lipids, such as cholesterol or triglycerides, in the bloodstream that, if left untreated, increases the risk of cardiovascular disease, heart attack or stroke, and related disorders, and NASH, a liver disease characterized by a buildup of fat in the liver. We expect to file an IND and commence clinical trials for VK0214 in 2015. Our second preclinical program is focused on identifying orally available erythropoietin receptor, or EPOR, agonists, for the potential treatment of anemia. Our third preclinical program is focused on the development of tissue-selective inhibitors of diacylglycerol acyltransferase-1, or DGAT-1, for the potential treatment of obesity and dyslipidemia.

We were incorporated under the laws of the State of Delaware on September 24, 2012. We have an exclusive license agreement with Ligand for worldwide rights to VK0612, VK5211 and three preclinical programs. Under the terms of the Master License Agreement, we will pay Ligand an upfront fee of $29.0 million, subject to adjustment in certain circumstances, payable in equity upon the closing of this offering, in addition to development and commercial milestone payments of up to $1.54 billion, as well as single-digit royalties on future worldwide net product sales. Further details regarding our license agreement with Ligand are discussed in the section of this prospectus entitled "– Agreements with Ligand".

**Our Product Pipeline**

The following table highlights our current product pipeline:

| Program | Drug Candidate | Indication(s) | Preclinical | Phase 1 | Phase 2 | Phase 3 | Development Plans |
|---------|----------------|---------------|-------------|---------|---------|---------|-------------------|
| FBPase | VK0612 | *Type 2 Diabetes* | | | | | ▪ Plan to commence Phase 2b trial in 2015 and complete the trial in 2016<br>▪ Plan to commence a metformin DDI Phase 1 trial and renal insufficiency Phase 1 trial in 2015 |
| SARM | VK5211 | *Cancer Cachexia* | | | | | ▪ Plan to commence Phase 2 trial in 2015 and complete the trial in 2016 |
| TRβ | VK0214 | *Dyslipidemia* | | | | | ▪ Plan to file an IND and initiate Phase 1 trial in 2015 |
| | | *NASH* | | | | | |
| EPOR | | *Anemia* | | | | | ▪ Plan to conduct further preclinical studies and file an IND in 2016 |
| DGAT-1 | | *Obesity Dyslipidemia* | | | | | ▪ Plan to conduct further preclinical studies and file an IND in 2016 |

Key: FBPase, fructose-1,6-bisphosphatase; DDI, drug-drug interaction; SARM, selective androgen receptor modulator; TRß, thyroid receptor beta; EPOR, erythropoietin receptor; DGAT-1, diacylglycerol acyltransferase-1; NASH, nonalcoholic steatohepatitis.

-73-

**Table of Contents**

## Our Strategy

We intend to become a leading biopharmaceutical company focused on the development of novel, first-in-class or best-in-class therapies for metabolic and endocrine disorders. The key elements of our strategy include:

- *Advance the development of VK0612 for type 2 diabetes.* We intend to commence a Phase 2b clinical trial for VK0612 evaluating once-daily doses of VK0612 in approximately 500 patients with poorly-controlled type 2 diabetes in early 2015 and expect to complete this clinical trial in 2016. We also plan to complete a Phase 1 drug-drug interaction clinical trial evaluating the safety and tolerability of VK0612 in combination with metformin, as well as a Phase 1 clinical trial in renally-impaired type 2 diabetes patients, both within the same period. Pending clinical data from these clinical trials, we plan to hold an end-of-Phase 2 meeting with the FDA and to commence Phase 3 clinical trials in type 2 diabetes patients either on our own or with a third party.

- *Advance the development of VK5211 for cancer cachexia and other muscle wasting disorders.* We plan to commence a Phase 2 proof-of-concept clinical trial in approximately 100 patients with cancer cachexia in early 2015. We expect this clinical trial to be completed in 2016. Pending positive data from this clinical trial, we plan to advance VK5211 in further clinical trials. We also plan to discuss with the FDA potential clinical development of VK5211 in acute rehabilitation settings, such as hip fracture recovery.

- *Advance the development of our preclinical programs.* We currently have three programs in preclinical development. Our most advanced preclinical program is VK0214, a novel liver-selective TRß agonist for lipid disorders such as dyslipidemia and NASH. We plan to complete the toxicity, pharmacology and chemistry, manufacturing and controls studies needed for an IND filing. In the event these VK0214 preclinical studies are favorable, we expect to file an IND and commence clinical trials for this program in 2015. We also plan to further advance our EPOR agonist and DGAT-1 inhibitor programs and anticipate filing INDs for these programs in 2016.

- *Evaluate strategic partnership and collaboration opportunities.* We plan to selectively evaluate partnership and collaboration opportunities throughout the duration of our development programs. In addition, we may opportunistically pursue in-licensing opportunities.

### VK0612: A Fructose-1,6-bisphosphatase (FBPase) Inhibitor for Type 2 Diabetes

*Product Summary*

Our lead clinical program is VK0612, a first-in-class orally available small molecule for type 2 diabetes. The initial IND filing for VK0612 was submitted in December 2005 by Metabasis Therapeutics, Inc. The subject of the IND was an application to begin clinical investigations of the drug substance in healthy volunteers. In Phase 1 and 2a clinical trials, VK0612 has been shown to significantly lower blood glucose levels in patients with type 2 diabetes and to be safe and well-tolerated. VK0612 is a potent, selective inhibitor of FBPase, an enzyme that plays an important role in endogenous glucose production. We believe the pharmacokinetic and pharmacodynamic profile of VK0612 suggests it has the potential to be a once-daily treatment for type 2 diabetes patients.

VK0612 has demonstrated potent glucose lowering effects in diabetic animal models. Clinical trials have shown that VK0612 is safe, well-tolerated and leads to clinically significant glucose-lowering effects in patients with type 2 diabetes, meaning the effect would be expected to have a potentially meaningful benefit on a patient's health. In Phase 1b and 2a clinical trials of patients with type 2 diabetes, VK0612 has demonstrated reductions in FPG that have exceeded 50 mg/dL. We believe the totality of existing data suggests that the inhibition of FBPase is an attractive approach to controlling blood glucose levels in patients with diabetes. We intend to commence a Phase 2b clinical trial evaluating once-daily doses of VK0612 in approximately 500 patients with poorly-controlled type 2 diabetes in early 2015 and expect to complete this clinical trial in 2016. We also plan to complete a Phase 1 drug-drug interaction clinical trial evaluating the safety and tolerability of VK0612 in combination with metformin, as well as a Phase 1 clinical trial in renally-impaired type 2 diabetes patients, both

-74-

**Table of Contents**

within the same period. Pending clinical data from these clinical trials, we plan to hold an end-of-Phase 2 meeting with the FDA and to commence Phase 3 clinical trials in type 2 diabetes patients either on our own or with a third party.

*Diabetes and the Market*

Diabetes is an undertreated and underdiagnosed disease of epidemic proportion. The International Diabetes Federation estimates that 382.0 million people currently have diabetes and that the number of people with the disease will grow to exceed 590.0 million patients worldwide by 2035. The economic burden of diabetes and its associated complications cost the U.S. healthcare system approximately $245.0 billion in 2012 according to the ADA. The CDC estimates that, as of 2010, 6.0% of the U.S. population, or roughly 18.8 million people, have been diagnosed with diabetes, and more than 7.0 million additional people in the U.S. are undiagnosed. Due to a combination of factors, including urbanization, changing diets and the rise of obesity and sedentary lifestyles, the prevalence of diabetes in the U.S. is expected to grow to exceed 44.0 million patients in 2034.

Diabetes is a complex, metabolic disorder of carbohydrate, fat and protein metabolism, resulting from a combination of deteriorating pancreatic function and insulin-resistance in peripheral tissues, such as skeletal muscle. Insulin is a hormone produced by the pancreas that plays a central role in helping the body process, convert and store energy from glucose. Between meals, when blood glucose is not being supplied by food, the liver releases glucose into the blood to sustain adequate glucose levels. Patients with diabetes suffer from an inability to properly regulate blood glucose levels. In individuals with diabetes, the relative shortage of insulin impairs the ability of glucose to enter and fuel the body's cells and, as a result, glucose builds up in the bloodstream causing high blood glucose levels, or hyperglycemia. One of the most common measures of blood glucose levels is FPG, which measures plasma glucose levels after an overnight fast and provides a measure of short-term blood glucose control. Another important measure of blood glucose levels is HbA1c, which measures long-term blood glucose levels over a preceding three month period. Patients are diagnosed with diabetes when confirmed FPG readings are greater than or equal to 126 mg/dL or HbA1c levels are greater than or equal to 6.5%. HbA1c is a particularly important measure from both a clinical and regulatory perspective as it is the standard measure accepted by the FDA and the European Medicines Agency, or EMA, for demonstrating the effectiveness of type 2 diabetes therapies in controlling blood glucose levels. According to regulatory authorities, a reduction in HbA1c indicates a beneficial effect, which is reasonably expected to lower a patient's long-term risk of complications from type 2 diabetes.

There are two major forms of diabetes, type 1 and type 2. Patients with type 1 diabetes lack the ability to produce adequate insulin, so insulin must be supplied from outside the body in order to sustain life. Type 2 diabetes is the most common form of the disease, accounting for 90% to 95% of diagnosed diabetes cases, or approximately 16.9 million patients in the U.S. as of 2010. In type 2 diabetes patients, the secretion of insulin from the pancreas and the action of insulin on tissues, such as fat and muscle, are impaired. Patients continue producing insulin, sometimes in excessive amounts, but its secretion and effectiveness in stimulating tissues to absorb glucose deteriorate over time. The CDC estimates that approximately 1.7 million new patients are diagnosed with type 2 diabetes in the U.S. each year. Type 2 diabetes is prevalent in patients with obesity; approximately 85% of people with type 2 diabetes are considered overweight and approximately 55% are considered obese. In addition, there are currently approximately 79.0 million U.S. adults over the age of 20 with pre-diabetes, a condition characterized by higher than normal blood glucose levels, though not high enough to establish a diabetes diagnosis. This condition raises the risk of developing type 2 diabetes, heart disease and stroke.

It is estimated that over half of all patients treated for type 2 diabetes fail to achieve ADA-recommended target blood glucose levels. The ADA recommends a target HbA1c level of 7%, or an estimated average glucose level of 154 mg/dL, for type 2 diabetes patients. Prolonged elevation of blood glucose levels may result in damage to the kidneys, retina and nerves, and may lead to kidney failure, blindness, permanent nerve damage, amputation and/or death. High blood glucose levels also increase the risk of cardiovascular disease, and can lead to dysregulation of plasma triglycerides, which in turn can contribute to liver diseases such as NASH.

-75-

**Table of Contents**

*Glucose Regulation*

Glucose is critical for tissue function and survival. In healthy people, glucose is provided by exogenous sources, via diet, and endogenous processes, which occur primarily in the liver. Following meals, the regulation of plasma glucose levels is the result of a complex balance of glucose processing, utilization and storage, modulated by the secretion of insulin from the pancreas. Excess glucose is stored in the form of glycogen in liver tissue and released into the bloodstream when needed, through a process known as glycogenolysis. During periods of fasting, endogenous glucose production serves to maintain adequate glucose levels. Endogenous glucose production is the result of two processes, glycogenolysis and gluconeogenesis, or the formation of glucose from smaller precursor molecules.

In healthy individuals, any changes in flux through the gluconeogenesis pathway are balanced by compensatory changes in glycogenolysis rates, through a process called hepatic autoregulation. However, in patients with type 2 diabetes, this autoregulatory mechanism becomes less effective at controlling blood glucose levels. While the glycogenolysis pathway is relatively unchanged in diabetic patients, the rate of gluconeogenesis becomes accelerated. Through the course of their disease, type 2 diabetes patients experience increasing levels of gluconeogenic output, which correlate with increased levels of FPG. This increase in activity is a significant contributor to the underlying hyperglycemia that is characteristic of diabetes. We believe the gluconeogenesis pathway therefore represents a highly therapeutically relevant target for pharmacologic intervention.

**Schematic Overview of Hepatic Gluconeogenesis**





Many steps in the gluconeogenesis pathway are the reverse of those involved in the process of glycolysis, by which glucose is metabolized to produce energy. FBPase is an important enzyme in the gluconeogenesis pathway by virtue of its position above key glucose precursor inputs, its non-reversible participation in the pathway, and its independence from glucose-6-phosphate derived from glycogenolysis. The independence from glycogenolysis potentially reduces the risk of hypoglycemia, which is a common concern for many diabetes therapies, and hypoglycemia can lead to safety issues such as loss of consciousness.

-76-

**Table of Contents**



Glycolysis and Gluconeogenesis Pathways

Many current therapies are designed to stimulate insulin production, enhance its activity, or increase tissue sensitivity to its presence. However, progression of type 2 diabetes is accompanied by a deterioration of pancreatic function and reduced insulin secretion. This diminishes the therapeutic effect of these drugs over time since their activity is dependent on pancreatic function. In contrast, FBPase is an attractive target for diabetes drug development because it not only plays an important role in glucose production, but its activity is also independent of both pancreatic function and glycogenolysis.

*Current Type 2 Diabetes Therapies and Unmet Need*

The ADA recommends that the initial management of hyperglycemia in type 2 diabetes patients be based on lifestyle interventions designed to increase physical activity, stimulate weight reduction, and provide personalized dietary advice. However, most type 2 diabetes patients cannot maintain adequate control of blood glucose levels through these modifications alone. Initial pharmacologic therapy to control a patient's blood glucose levels often begins with a single-drug regimen, such as metformin or a sulfonylurea. Subsequent drug intervention often requires transitioning patients to multi-drug regimens, which become increasingly complex as the disease progresses. Many patients ultimately transition to an insulin-based regimen, which can include combinations with one or more non-insulin therapeutics.

The CDC estimates that 58% of the 18.8 million diagnosed type 2 diabetes patients in the U.S., or approximately 10.9 million patients, receive exclusively oral medication for their disease. In addition, approximately 14% of U.S. type 2 diabetes patients, or approximately 2.4 million patients, receive a combination of oral and injectable diabetes therapies, such as insulin.

-77-

**Table of Contents**

**Overview of Treatment Regimens for Type 2 Diabetes**



- Oral medication only, 58%
- Oral and insulin combination regimen, 14%
- Insulin only, 12%
- No medication, 16%

Approximately 1.7 million new patients are diagnosed with type 2 diabetes in the U.S. each year. These newly diagnosed type 2 diabetes patients are most frequently prescribed low-cost oral therapies such as metformin or a sulfonylurea. Unfortunately, for many patients the progression of type 2 diabetes requires the addition of one or more therapies to maintain adequate control of blood glucose levels. Ultimately, many patients transition to injectable therapies, including insulin. Most oral therapies belong to one of the following drug classes:

| Class | Example | Mode of Action | Important Limitations |
|---|---|---|---|
| Insulin secretagogues | Sulfonylureas Example: *Glipizide* | Stimulate pancreatic insulin production | Durability; weight gain |
| Insulin sensitizers | Thiazolidinediones Example: *Pioglitizone* | Enhance insulin sensitivity in muscle and fat | Weight gain; cardiovascular risks; bone fractures; oncogenic risks |
| Carbohydrate metabolism blockers | Alpha-glucosidase inhibitors Example: *Acarbose* | Slow the breakdown of carbohydrates to glucose | Gastrointestinal disturbances; dosing required with meals; inconvenience |
| Incretin modulators | Dipeptidyl peptidase-4 (DPP-4) inhibitors Example: *Sitagliptin* | Inhibit the breakdown of endogenous incretins, decreasing glucagon production and increasing insulin production | Modest efficacy; durability |
| Glucose re-uptake inhibitors | Sodium-glucose co-transporter 2 (SGLT2) inhibitors Example: *Canagliflozin* | Inhibit reabsorption of glucose in renal tubules | Genital infections; increased hepatic glucose output; volume depletion; increased cholesterol |
| Other | Biguanides Example: *Metformin* | Partial inhibitors of glycogenolysis, gluconeogenesis, and insulin sensitizers in peripheral tissues | Tolerability; renal contraindications; inconvenient dosing regimens (up to 3x daily) |

Metformin is the only marketed drug that targets endogenous glucose production. Consistent with the importance of this pathway to hyperglycemia, metformin is a highly effective glucose-lowering therapy and, as such, is the most widely prescribed drug for type 2 diabetes patients. In 2012, approximately 69.0 million prescriptions were written for metformin, accounting for approximately 51% of all prescriptions for oral diabetes therapies.

-78-

Table of Contents

While metformin is often used initially as a monotherapy and later as a backbone therapy in many type 2 diabetes combination treatment regimens, it is not suitable for many patients. A significant percentage of patients are either not good candidates for metformin or fail to receive a sustained benefit from the drug. For example, approximately 5% of U.S. type 2 diabetes patients, or 545,000 patients, cannot tolerate metformin, primarily due to gastrointestinal side effects, including diarrhea and abdominal discomfort. In addition, approximately 15% of U.S. type 2 diabetes patients, or 1.6 million patients, are contraindicated for treatment with metformin due to factors such as age, renal impairment and congestive heart failure. Furthermore, multiple studies have demonstrated that metformin efficacy wanes for up to approximately 50% of U.S. type 2 diabetes patients within five years from initial treatment, which would translate into approximately 2.7 to 3.4 million existing patients. Due to one or more of the aforementioned issues, an estimated 25% to 30% of patients transition from metformin to an alternative treatment within 12 months of initiating therapy. Moreover, a recent analysis of U.S. prescribing patterns in 255,000 newly-diagnosed type 2 diabetes patients found that 35% of those initiating oral therapy did not receive metformin as first-line treatment. These prescribing data suggest that, on an annual basis, approximately 600,000 newly-diagnosed type 2 diabetes patients in the U.S. receive an oral therapy other than metformin.

We estimate that the potential market opportunity for VK0612 is approximately 4.9 million existing patients in the U.S., with approximately 880,000 new patients in the U.S. diagnosed annually. We believe the potential markets for an alternative gluconeogenesis inhibitor such as VK0612 include patients with poorly-controlled type 2 diabetes on existing regimens, patients who no longer experience a benefit from metformin-based regimens, patients switching from metformin due to dissatisfaction with its efficacy, convenience or tolerability profile, and treatment-naïve patients who prefer or require an alternative to metformin.

We also believe the opportunity for VK0612 could be expanded to include all combinations of metformin-containing regimens. We plan to complete a Phase 1 drug-drug interaction clinical trial evaluating the safety and tolerability of VK0612 in combination with metformin. Based on current epidemiologic data, this patient population would include many of the existing 10.9 million U.S. type 2 diabetes patients currently taking an all oral diabetes medication regimen. We believe both the metformin alternative market and the combination market therefore represent potentially multi-billion dollar market opportunities for new type 2 diabetes therapies.

*VK0612: A Potent Inhibitor of Gluconeogenesis*

VK0612 is designed to inhibit FBPase, a rate-controlling enzyme in gluconeogenesis. Patients with type 2 diabetes have elevated rates of gluconeogenesis, which contributes significantly to increased endogenous glucose production and fasting hyperglycemia. Metformin is currently the only marketed drug that targets hepatic gluconeogenesis, but it does so only partially and indirectly. Despite being used in the treatment of diabetes since the 1960s, the mechanism of metformin is poorly understood. Multiple studies have shown that up to 50% of patients receiving metformin become refractory, or no longer experience a benefit from the drug, within five years from initial treatment. In contrast to metformin, FBPase inhibitors directly inhibit gluconeogenesis in a highly specific manner. This direct and specific mechanism has been shown to inhibit gluconeogenesis more effectively than metformin. For example, the maximum prescribed dose of metformin inhibits the rate of gluconeogenesis by approximately 33%. However, most patients are never prescribed the maximum approved dose of metformin due to tolerability or other issues. By comparison, maximal doses of an FBPase inhibitor have been shown to inhibit approximately 80% of gluconeogenesis. As a result, we believe FBPase inhibitors may prove to be more effective at lowering plasma glucose compared with other diabetes therapies such as metformin, with a potentially improved side effect profile.

FBPase inhibitors may be particularly effective in patients with advanced type 2 diabetes because these drugs lower blood glucose levels independent of insulin. Moreover, unlike drugs that depend on pancreatic function for efficacy, the glucose lowering effect of FBPase inhibitors is expected to be independent of the deterioration in pancreatic ß-cell activity that occurs with type 2 diabetes progression. Additionally, by virtue of their novel mechanism of action, we believe FBPase inhibitors may be effective in combination with therapies that primarily affect glucose uptake and metabolism and, as such, have the potential to be used in combination with a wide variety of existing type 2 diabetes therapies.

-79-

**Table of Contents**

The rare genetic disorder known as Baker Winegrad Disease provides important insight into the long-term effects of FBPase inhibition. Patients with Baker Winegrad Disease lack functional FBPase, and are therefore unable to convert fructose-1,6- bisphosphate to glucose. Endogenous glucose production among these patients is therefore dramatically impaired. If diet and behavior are well-controlled in these patients, they do not experience problems derived from abnormal plasma glucose levels. However, hypoglycemia can occur upon prolonged fasting, which can precipitate further complications. Hypoglycemia in these patients can be reversed via treatment with glucose. Baker Winegrad Disease patients who avoid prolonged fasting and excessive alcohol consumption are known to live normal lifespans and are not known to be predisposed to elevated rates of heart attack, stroke and other significant cardiovascular risks.

We believe the underlying metabolic and physiological characteristics of Baker Winegrad Disease patients suggest that pharmacologic inhibition of FBPase can be achieved with a potentially lower risk of hypoglycemia and long-term safety issues. We believe that since FBPase in type 2 diabetes patients is not completely inhibited by VK0612, these patients are less likely to experience hypoglycemia compared to Baker Winegrad Disease patients. These characteristics provide support for our plans to develop VK0612 as a potentially effective, durable and safe therapeutic for type 2 diabetes.

*Clinical Data for VK0612*

Our lead program has been evaluated in seven clinical trials, including one Phase 2a and six Phase 1 clinical trials.

Phase 2a Proof-of-Concept Clinical Trial

The completed Phase 2a clinical trial was a randomized, double-blind, placebo-controlled clinical trial in 105 patients with type 2 diabetes. Patients received a capsule formulation of VK0612-treated or placebo-treated patients once daily for 28 days. The efficacy endpoint assessed the change from baseline in FPG compared with placebo at 28 days. In the intent-to-treat population, patients in the highest dose cohort (200 mg QD, n=23) experienced a statistically significant placebo-adjusted 28.9 mg/dL reduction in FPG at 28 days (p=0.0177). In a prospectively-defined analysis, a subset of patients with baseline FPG greater than 180 mg/dL (n=16), the placebo-adjusted difference in FPG increased to 49.7 mg/dL (p=0.0099). VK0612 was also shown to be safe and well-tolerated at all doses; no instances of hypoglycemia or lacticemia were observed, and no drug-related serious adverse events were reported. In addition, there were no differences in high-density lipoprotein, or HDL, low-density lipoprotein, or LDL, cholesterol levels, weight, heart rate or blood pressure among treated patients compared to placebo. We believe these results provide support for the thesis that FBPase inhibition represents a potentially attractive therapeutic option for patients with poorly-controlled type 2 diabetes.

Summary of Phase 2a Efficacy Data

| Patients | | | ΔFPG (mg/dL) | | Placebo-Adjusted ΔFPG | |
|---|---|---|---|---|---|---|
| Cohort | N | Baseline FPG * | Mean | 95% CI ** | Mean | 95% CI |
| Placebo | 23 | 185.0 (41.7) | 8.2 | (-8.4, 24.7) | ----- | ----- |
| 10 mg | 13 | 177.7 (46.9) | 7.4 | (-14.7, 29.5) | -0.7 | (-28.3, 26.9) |
| 50 mg | 23 | 174.8 (39.0) | 5.3 | (-11.4, 22.0) | -2.9 | (-26.4, 20.6) |
| 100 mg | 23 | 187.6 (38.0) | 8.1 | (-8.4, 24.7) | 0 | (-23.5, 23.4) |
| 200 mg | 23 | 206.4 (50.7) | -20.7 | (-37.7, -3.8) | - 28.9 *** | (- 52.6, - 5.1) |
| Prespecified subgroup with baseline ≥ 180 mg/dL | | | | | | |
| 200 mg | 16 | 230.6 (39.0) | -34.6 | (-59.1, -10.0) | - 49.7 **** | (- 87.0, - 12.5) |

\* mean (standard deviation)
\*\* confidence interval
\*\*\* p (the probability of obtaining the observed result under a hypothesis that assumes no difference between treatment groups) = 0.0177
\*\*\*\* p = 0.0099

-80-

**Table of Contents**

Phase 1b Clinical Trial in Patients with Poorly-Controlled Type 2 Diabetes

Following completion of the Phase 2a clinical trial, a 14 day Phase 1b clinical trial was successfully conducted using a new tablet formulation of VK0612 with a potentially superior pharmacokinetic profile. This clinical trial was a randomized, double-blind, placebo-controlled clinical trial in 42 patients with poorly-controlled type 2 diabetes, defined as having baseline FPG levels of at least 180 mg/dL. Patients received either 50 mg, 200 mg or 400 mg doses of VK0612 or placebo twice daily. The primary objective of the clinical trial was to examine the safety, tolerability and pharmacokinetic profile of twice-daily doses of VK0612 in patients with type 2 diabetes. Secondary endpoints assessed changes in FPG from baseline in VK0612-treated compared with placebo-treated patients at 14 days.

The efficacy data demonstrated that patients receiving 200 mg twice per day experienced a statistically significant placebo-adjusted 58.2 mg/dL reduction in FPG (p=0.01). Patients receiving 400 mg twice per day experienced a statistically significant placebo-adjusted 55.1 mg/dL reduction in FPG (p=0.03). We believe the apparent moderation of dose response at higher doses likely reflects similar exposures at the upper limits of the dose response curve. We also believe the statistical significance observed in a clinical trial of this small size (total n=42) underscores the potent impact FBPase inhibition appears to have on plasma glucose levels. Furthermore, the efficacy data from both the Phase 2a and 1b clinical trials suggest that VK0612 has the potential to reduce plasma HbA1c in excess of 1%, based on a 35 mg/dL plasma glucose to HbA1c conversion factor.

VK0612 was found to be safe and well-tolerated, with dose-limiting vomiting observed at 400 mg twice per day. No instances of hypoglycemia or lacticemia were observed, and no drug-related serious adverse events were reported. These data, combined with the drug's encouraging preliminary cardiovascular profile, provide evidence that treatment with VK0612 may result in a promising combination of safety and efficacy in patients with type 2 diabetes. We believe the drug exposures and efficacy demonstrated in the Phase 1b trial suggest that a once-daily regimen will provide adequate control of blood glucose in our planned Phase 2b clinical trial.

The following table summarizes the efficacy data from the Phase 1b clinical trial.

Summary of Phase 1b Efficacy Data

| Patients | | | ΔFPG (mg/dL) | | Placebo-Adjusted ΔFPG | |
| --- | --- | --- | --- | --- | --- | --- |
| Cohort | N | Baseline FPG * | Mean | 95% CI ** | Mean | p-value *** |
| Placebo | 10 | 245.1 (33.1) | -14.2 | (-48.0, 19.6) | ---- | ----- |
| 50 mg | 10 | 219.8 (34.6) | -30.6 | (-62.3, 1.1) | -16.4 | 0.48 |
| 200 mg | 12 | 218.3 (31.8) | -72.4 | (-102.7, -42.1) | -58.2 | 0.01 |
| 400 mg | 10 | 202.5 (34.9) | -69.3 | (-102.3, -36.2) | -55.1 | 0.03 |

\* mean (standard deviation)
\*\* confidence interval
\*\*\* the probability of obtaining the observed result under a hypothesis that assumes no difference between treatment groups

Other Clinical Trials

In addition to the Phase 2a proof-of-concept and Phase 1b clinical trials, a total of five additional Phase 1 clinical trials of VK0612 were successfully completed. These clinical trials evaluated the safety, tolerability and pharmacokinetic properties of the drug in a total of 164 healthy adult subjects. In these trials, subjects received single doses of VK0612 up to 1,000 mg, and multiple doses of up to 400 mg over 14 days, and no drug-related serious adverse events were reported. In addition, the pharmacokinetic and pharmacodynamic profile of VK0612 suggests it has the potential to be a once-daily treatment for type 2 diabetes patients.

*Prior FBPase Inhibitors*

We are aware of several previous drug development programs targeting fructose-1,6-bisphosphatase. The most advanced of these was the small molecule inhibitor CS-917. Sankyo Company, Ltd., now Daiichi Sankyo

-81-

**Table of Contents**

Company, Ltd., was responsible for funding and conducting the clinical development program for CS-917. In a 12 week Phase 2 clinical trial, CS-917 showed poor efficacy in type 2 diabetes patients. In addition, toxicity was observed in a separate Phase 1 clinical trial. These issues may have contributed to the decision to discontinue development of CS-917. We believe CS-917 may have failed due to inadequate drug exposures in the Phase 2 clinical trial as well as the toxicities observed in the Phase 1 clinical trial.

In the Phase 2 clinical trial, we believe that patients were treated with doses of CS-917 which were sub-optimal for demonstration of an anti-glycemic effect in type 2 diabetes patients. Moreover, 90% of the treated patients were less severe diabetics, as characterized by average baseline FPG (approximately 164 mg/dL) and HbA1c (approximately 7.7%) levels. As a result, we believe these patients were less likely to experience benefit from a gluconeogenesis inhibitor. In a Phase 1 clinical trial, two patients treated with CS-917 and metformin experienced lactic acidosis, characterized by investigators as drug-related serious adverse events. Subsequent mitochondrial toxicity studies found that CS-917 can be converted by N-acetyl transferase enzymes to acetylated metabolites. These metabolites were determined to be mitochondrial toxins, which we believe may have contributed to the observed lactic acidosis. In clinical trials with CS-917, plasma levels of these toxic metabolites exceeded levels of the active drug substance by a factor of 1.8x to 9x.

VK0612 is a poor substrate for N-acetyl transferase enzymes, and therefore metabolism of VK0612 does not produce meaningful levels of derivatives that may impair mitochondrial function. In studies comparing VK0612 with CS-917, VK0612 was shown to generate less than 1/100th of the corresponding N-acetylated metabolites as compared to CS-917, while producing approximately 4.5x higher amounts of active drug as compared to CS-917. To date, over 250 patients have been treated with VK0612, with no reported instances of lactic acidosis or other drug-related serious adverse events.

*VK0612 Profile Versus Existing Oral Diabetes Therapies*

We believe VK0612 has the potential to provide substantial glucose-lowering effects with an attractive safety and convenience profile compared to existing oral diabetes therapies. We also believe the effects on glycemia observed to date in type 2 diabetes patients implies that VK0612 has the potential to reduce plasma HbA1c in excess of 1%. The established relationship between plasma glucose levels and HbA1c suggests that a 35 mg/dL reduction in average plasma glucose translates to an approximately 1% reduction in HbA1c. HbA1c is a particularly important measure from a regulatory perspective as it is the standard measure of blood glucose levels accepted by the FDA and EMA for demonstrating the effectiveness of type 2 diabetes therapies. Therefore, the observed anti-glycemic effects among patients with poorly-controlled type 2 diabetes in both the Phase 2a and 1b clinical trials suggest VK0612 has a highly clinically significant impact on plasma HbA1c.

To our knowledge, VK0612 is the only clinical-stage therapy directly targeting an enzyme in the gluconeogenesis pathway. We believe VK0612 is therefore significantly differentiated relative to major marketed and experimental therapies. Current data suggest potential competitive advantages of VK0612 versus the developmental and commercial landscape in the following areas:

- *Greater efficacy:* Preliminary Phase 1 and 2 data suggest VK0612 could reduce plasma HbA1c by 1% or more, potentially exceeding the typical anti-glycemic effects of newer drug classes such as the dipeptidyl peptidase-4, or DPP-4, and sodium-glucose co-transporter 2, or SGLT2, inhibitors.

- *Encouraging safety profile:* VK0612 has demonstrated encouraging safety to date in over 250 subjects. No cases of hypoglycemia, lacticemia or other drug-related safety issues were observed in these subjects. In addition, no weight gain or adverse cardiovascular signals were observed in clinical trials to date. Existing therapies have been associated with certain safety issues, including hypoglycemia (sulfonylureas), lactic acidosis (metformin), weight gain (insulin, thiazolidinediones), elevated cardiovascular risks (thiazolidinediones, DPP-4 inhibitors), genital infections (SGLT2 inhibitors) and pancreatitis (DPP-4 inhibitors, GLP-1 agonists).

Table of Contents

- *Improved tolerability:* VK0612 has been well-tolerated at and above doses that we plan to administer in our Phase 2b clinical trial, which we expect to be at or below 300 mg, with specific doses to be chosen based on the outcome of planned pharmacokinetic and pharmacodynamic calculations. By comparison, commonly prescribed doses of metformin are associated with gastrointestinal side effects such as diarrhea and discomfort or pain in up to 30% of type 2 diabetes patients.

- *Novel mechanism of action:* Based on its insulin-independent mechanism of action, we believe VK0612 lowers blood glucose levels independently of pancreatic function. Therapies such as insulin secretagogues (sulfonylureas, DPP-4 inhibitors, GLP-1 agonists) and sensitizers (thiazolidinediones, metformin) depend at least partially on pancreatic function for their treatment effects. We expect VK0612's novel mechanism of action to provide critical durability and combinability advantages.

  – *Durability:* Diabetes is characterized by deteriorating pancreatic beta cell function. As a result, the efficacy of therapies currently available wanes with disease progression. Recent data suggest that even the recently-introduced SGLT2 inhibitor class has limited impact on HbA1c after four years, potentially due to a compensatory stimulation of glucagon secretion. Given VK0612's insulin-independent mechanism of action, the drug could provide a more durable therapeutic effect than many currently available type 2 diabetes therapies.

  – *Combinability:* VK0612's novel mechanism of action is expected to allow combinability with many existing type 2 diabetes therapies, leading to enhanced efficacy and potentially delaying transition to subsequent therapies. Preliminary clinical data have demonstrated that FBPase inhibitors can be safely combined with sulfonylureas and thiazolidinediones.

- *Weight and lipid neutral profile:* Clinical and preclinical data suggest VK0612 has the potential to provide robust anti-glycemic effects while maintaining a weight and lipid neutral profile. The preliminary data are further supported by the observation that patients with Baker Winegrad Disease, who lack functional FBPase, are not known to be predisposed to elevated cardiovascular risk or abnormal weight gain.

- *Once-daily convenience:* Clinical data suggest that VK0612 has the potential to lower blood glucose levels in type 2 diabetes patients as a once-daily oral therapy. This compares favorably to therapies such as metformin, the only approved agent targeting endogenous glucose production, which requires up to three daily doses.

-83-

**Table of Contents**

The combined efficacy and safety demonstrated by VK0612 in clinical trials conducted to date compare favorably to the existing competitive landscape.

| Drug | Target | ΔFPG[1] (mg/dL) | ΔHbA1c (%) | Trial Duration (wks) | ΔWeight | Safety, Tolerability, Other |
|---|---|---|---|---|---|---|
| VK0612 | FBPase | -50[2] to - 58[3] | Expect -1.0 or greater | 2 to 4 | Neutral | Dose limiting nausea at approximately 3x the planned daily dose for Phase 2b |
| Sitagliptin | DPP4 | -20 | -0.6 | 18 | Neutral | Modest efficacy, pancreatitis, pancreatic lesions, potential heart failure risk |
| Metformin | Unknown | -59[4] | -1.8 | 29 | Neutral | Gastrointestinal intolerance, renal contraindications, elderly, rare lactic acidosis |
| Pioglitizone | PPAR | -41[5] | -1.0 | 26 | Modest weight gain | Chronic heart failure, edema, oncogenic signal, bone fractures |
| Canagliflozin | SGLT | -43 | -1.2 | 26 | Modest weight loss | Genital infections, increased hepatic glucose output, durability, increased low-density lipoprotein, renal contraindication, bone fractures |
| Glucokinase activators[6] | Glucokinase | -9 to +10 | -0.4 to -0.7 | 14 | Modest weight gain | Lipidemia, waning efficacy, hypoglycemia, blood pressure elevation |

(1) Placebo-adjusted. (2) Baseline FPG 231 mg/dL. (3) Baseline FPG 221 mg/dL. (4) Baseline FPG 242 mg/dL. (5) 30 mg QD, baseline FPG 269 mg/dL. (6) MK-0941.

*Development Plans*

We plan to conduct three clinical trials of VK0612 in patients with type 2 diabetes. The first is a randomized, double-blind, placebo-controlled, multicenter Phase 2b clinical trial to evaluate various doses of VK0612. We expect to enroll approximately 500 patients with poorly-controlled type 2 diabetes across five arms, including three VK0612 dose cohorts, one metformin cohort and one placebo cohort. The primary endpoint will assess change in HbA1c after 12 weeks of treatment. Secondary endpoints will explore effects on body weight, lipid profiles and cardiovascular parameters. Data from this clinical trial will indicate the potential for VK0612 to provide a robust and durable reduction in HbA1c in type 2 diabetes patients. HbA1c is the standard measure accepted by the FDA and EMA for demonstrating the effectiveness of type 2 diabetes therapies with regard to blood glucose levels. We expect to initiate the Phase 2b clinical trial in early 2015 and expect to complete this clinical trial in 2016.

The second planned clinical trial is a Phase 1 drug-drug interaction clinical trial evaluating the safety and tolerability of VK0612 in combination with metformin. This clinical trial will utilize a two tier dosing strategy, evaluating low dose VK0612 and high dose VK0612, with low and high doses of metformin, respectively. Data from this clinical trial will serve to inform us of the broader market utility of VK0612 in various combination regimens employing metformin as a backbone therapy. We expect to conduct this clinical trial in North America and plan to conduct this clinical trial concurrently with the Phase 2b clinical trial and expect to complete it in 2016.

Our third planned clinical trial is a Phase 1 clinical trial to evaluate the effect of renal impairment on VK0612 pharmacokinetics and lactate clearance. This clinical trial will be a single dose pharmacokinetic study in

-84-

**Table of Contents**

approximately 30 patients with varying degrees of renal impairment. The primary objective will be to evaluate the safety and tolerability of VK0612 in renally-impaired patients. Data from this clinical trial will serve to inform us of the potential to safely dose patients with renal impairment, a population that is contraindicated for treatment with metformin. We expect to conduct this clinical trial in the U.S. and plan to conduct this clinical trial concurrently with the Phase 2b clinical trial and the Phase 1 drug-drug interaction clinical trial, and expect to complete it in 2016.

Pending clinical data from these clinical trials, we plan to hold an end-of-Phase 2 meeting with the FDA and to commence Phase 3 clinical trials in type 2 diabetes patients either on our own or with a third party.

### VK5211: A Selective Androgen Receptor Modulator (SARM) for Muscle Wasting

*Product Summary*

Our second clinical program, VK5211, is an orally available, non-steroidal selective androgen receptor modulator, or SARM, in development for the treatment of cancer cachexia. VK5211 is designed to selectively produce the therapeutic benefits of testosterone in muscle tissue with improved safety and tolerability. Tissue selectivity is critical in treating cancer cachexia. Patients suffering from cachexia experience increased rates of metabolic breakdown of muscle tissue, resulting in a loss of muscle strength and reduced body weight. Androgens, such as testosterone, are hormones that stimulate a variety of physiologic processes, including muscle, bone, hair and prostate growth. However, testosterone's lack of selectivity can produce undesirable side effects such as prostate growth in men, and hair growth and masculinization in women.

The initial IND filing for VK5211 was submitted in December 2008 by Ligand. The subject of the IND was an application to begin clinical investigations of the drug substance in healthy volunteers. In a Phase 1 clinical trial, VK5211 was shown to be safe and well-tolerated following daily oral administration for 21 days. In this clinical trial, statistically significant increases in lean muscle mass were observed in drug-treated subjects, and positive dose-dependent trends in functional exercise and strength measures were consistent with anabolic activity. No clinically significant drug-related adverse events were reported. In animal models, VK5211 has demonstrated anabolic activity in muscles, anti-resorptive and anabolic activity in bones, and robust selectivity for muscle and bone versus prostate and sebaceous glands.

We intend to commence a Phase 2 proof-of-concept clinical trial in approximately 100 patients with cancer cachexia in early 2015, and to complete this clinical trial in 2016. Pending positive data from this clinical trial, we plan to advance VK5211 in further clinical trials. We also plan to discuss with the FDA potential clinical development of VK5211 in acute rehabilitation settings, such as hip fracture recovery.

*Androgens and Androgen Receptors*

Androgens are important for the proper regulation of the reproductive system, and play critical roles in the homeostasis of the muscular, skeletal, cardiovascular, metabolic and central nervous systems. The most predominant androgen hormone is testosterone. Testosterone is predominately produced in the testes in men and in the adrenal glands and ovaries in women, albeit at lower levels than in men. Testosterone stimulates the growth of muscle and bone, also known as anabolic effects, as well as the growth of the prostate and sebaceous gland, also known as androgenic effects and, as such, testosterone is considered a non-tissue-selective androgen.

While testosterone preparations are widely used for the treatment of male hypogonadism, the androgenic activity of testosterone limits its use in women and in elderly men who have a higher risk of developing benign prostatic hyperplasia, or BPH, a benign increase in prostate size, and prostate cancer. In men, the lack of selectivity of anabolic steroids may result in side effects such as acne, hair loss, progression of BPH and/or prostate cancer. In women, exposure to exogenous testosterone can be associated with hair growth, acne and masculinization. Furthermore, testosterone must be administered by intramuscular injections, transdermal patches or gels. These routes of administration can be inconvenient or associated with potential safety issues. We believe VK5211's

-85-

**Table of Contents**

selectivity, limited off-target effects and convenient route of administration may make it superior to off-label testosterone for treating cancer cachexia and other muscle wasting disorders.

SARMs are a class of small molecules designed to elicit the benefits of androgens on tissues such as muscle and bone, without the undesirable effects on prostate and sebaceous glands, by selectively activating androgen receptors in certain tissues. We believe that, based on their robust activity on muscle and bone, SARMs can be used for the potential treatment of a number of diseases or disorders, including muscle wasting, osteoporosis, frailty and hormone deficiency in both men and women in cases where testosterone supplements or anabolic steroid treatments are ineffective or where the side effect profile is inappropriate.

Although muscle wasting associated with cancer can be partially attributed to nutritional deficiencies, the use of appetite stimulants and nutritional interventions are generally ineffective. This is likely due to the failure of these approaches to address the underlying catabolic processes contributing to muscle wasting. Additionally, cancer patients with severe weight loss, poor performance status and metastatic disease who no longer respond to therapy may be less likely to respond to single therapies designed to increase muscle mass and improve physical function. Because muscle wasting, which often leads to refractory cachexia, has significant negative impacts on patients and their families, early intervention with therapeutic agents aimed at stimulating muscle mass is critically important.

*Cachexia and Other Muscle Wasting Market Opportunities*

Cachexia is a complex disease characterized by an uncontrolled decline in muscle mass. Patients suffering from cachexia experience increased rates of metabolic breakdown of muscle tissue, resulting in a loss of muscle strength and reduced body weight. The condition is often found secondary to an underlying disease, such as cancer, chronic obstructive pulmonary disease, heart failure and HIV/AIDS. It is estimated that a combined total of approximately 9.0 million people suffer from cachexia in the U.S., Europe and Japan. A combination of factors tied to the underlying disease, including reduced growth factor production and overproduction of inflammatory and apoptosis, or cell-death, mediators, create an imbalance in muscle formation and degradation. The resulting dysregulation and associated weight loss leads to increased mortality rates in affected patients. Common clinical symptoms include decline in physical function and impaired immune function, which contribute to increased disability, fatigue, diminished quality of life and reduced rate of survival.

Approximately 2.0 million cancer patients in North America and Europe suffer from cachexia, and it is estimated that up to 20% of all cancer deaths are a direct result of cachexia. It is particularly common among patients with lung, gastric, colorectal or pancreatic cancers, with up to 80% of patients with gastric or pancreatic cancers, and approximately 50% of patients with lung or colorectal cancers, suffering from the syndrome. There are currently no approved therapies in the U.S. for cancer cachexia, and pharmacological interventions have demonstrated limited clinical benefit or expose patients to the risk of undesirable side-effects such as virilization in women and prostate growth in men. As a result, we believe the potential size of the worldwide cancer cachexia market exceeds $1.0 billion.

We plan to initially investigate VK5211 in non-small cell lung cancer, or NSCLC, patients with cachexia. According to the American Cancer Society, an estimated 224,000 patients in the U.S. are projected to be diagnosed with lung cancer in 2014, of which approximately 85% of these cases are expected to be NSCLC. At diagnosis, approximately half of NSCLC patients present with some form of muscle wasting syndrome. Muscle wasting in this population is associated with reduced strength, increased fatigue and a decrease in overall quality of life. In addition, data indicate that lean body mass may correlate with overall survival, suggesting a potential link between improvement in lean body mass and survival. We believe VK5211 may benefit a large segment of the NSCLC patient population, due to the drug's potential therapeutic benefits on muscle mass and associated functional gains.

We also intend to explore the use of VK5211 in patients recovering from surgery for hip fractures. More than 250,000 patients in the U.S. experience hip fractures each year, and approximately 50% lose the ability to live

-86-

**Table of Contents**

independently following the fracture. Due to required limitations in mobility following hip fracture, patients experience muscle atrophy, or deterioration from lack of use, which impacts the time required for rehabilitation to restore physical function. We believe VK5211's potential stimulatory effect on lean body mass could result in benefits to patients recovering from hip fracture or other conditions requiring orthopedic intervention, such as hip or knee replacement surgery.

*VK5211: A Potent, Non-Steroidal SARM*

VK5211 is an orally available, non-steroidal SARM. VK5211 is a third generation SARM with greatly improved tissue-selectivity and other characteristics relative to earlier-generation SARM-targeting drug candidates. VK5211 selectively activates androgen receptors in muscle, which stimulates muscle growth, while avoiding undesirable side effects, such as unwanted hair growth, acne or stimulation of sebaceous glands and prostate growth. We believe VK5211 is a potential best-in-class compound due to its selectivity, potency and ability to show positive effects within a short treatment duration.

*Clinical Data for VK5211*

In two Phase 1 clinical trials, VK5211 was shown to be safe and well-tolerated at all doses following daily oral administration for up to 21 days. There were no reported serious adverse events determined to be related to treatment, and no clinically significant changes in liver function tests, prostate-specific antigen, hematocrit or electrocardiogram readings were observed. Moreover, subjects treated with VK5211 demonstrated statistically significant increases in lean muscle mass, and positive dose-dependent trends in functional exercise and strength measures were consistent with anabolic activity.

The first Phase 1 clinical trial was a randomized, double-blind, placebo-controlled trial in 48 healthy male volunteers. In this clinical trial, six cohorts received an escalating single dose of VK5211 ranging from 0.1 mg to 22 mg. The primary objective of this clinical trial was to evaluate the safety and tolerability profiles following escalating single doses of VK5211 in healthy male subjects. Secondary objectives of the first Phase 1 clinical trial included a determination of the pharmacokinetics, or PK, and pharmacodynamics, or PD, of single escalating doses of VK5211 in healthy male subjects. The actual results showed that single doses at the levels administered were well-tolerated and no serious or severe adverse events were observed among subjects receiving VK5211. The PD results showed dose-related decreases in total testosterone and sex-hormone binding protein, consistent with the mechanism of action of selective androgen receptor modulation. A dose-related decrease in fasting serum HDL was also observed. VK5211 was well-tolerated and demonstrated predictable dose-proportional increases in systemic exposure.

In a subsequent Phase 1 multiple ascending dose clinical trial, 76 healthy men in three cohorts were dosed daily with placebo, 0.1 mg, 0.3 mg or 1 mg of VK5211 for 21 days. The primary objective of the second Phase 1 clinical trial for VK5211 was to assess the safety and tolerability of escalating doses of VK5211 following repeated once-daily oral administration for 21 days in healthy men. Secondary objectives included a determination of the PK and PD of VK5211 following repeated once-daily oral administration for 21 days. Exploratory objectives included a determination of the effects of 21 days of treatment with VK5211 on lean body mass measured by dual energy X-ray absorptiometry scan, maximal voluntary strength measured by the one repetition maximum method and stair climbing power. The average body mass index in all cohorts ranged from 24.6 kg/m$^2$ to 27.0 kg/m$^2$. In this clinical trial, subjects receiving 1 mg doses of VK5211 demonstrated a statistically significant 1.21 kilogram average increase in lean body mass. Positive, dose-dependent trends in strength and performance measurements were also observed. There were no significant changes or trends in fat

-87-

Table of Contents

mass across cohorts. VK5211 was shown to be safe, with a similar frequency of adverse events between the treated and placebo groups. VK5211 also displayed a favorable pharmacokinetic profile, without any changes in prostate-specific antigen.



*p = 0.047 vs. Placebo

LS-Mean (SE) Lean Mass (kg) Change from Baseline Up to Day 28          LS-Mean (SE) Leg Press Force (N) Change from Baseline Up to Day 28

*Preclinical Data*

VK5211 has also demonstrated anabolic activity in muscles, anti-resorptive and anabolic activity in bones and robust selectivity for muscle and bone verses prostate and sebaceous glands in animal models.

The tissue-selectivity of VK5211 was examined in a castrated rat model. The castrated rat model is a standard animal model for examining tissue selectivity for SARMs due to the rapid nature of muscle atrophy in castrated animals and the high sensitivity to muscle growth upon androgen-based treatment. Muscle mass can be restored with a potent androgen-receptor agonist, such as testosterone. Initially, rats are castrated or receive sham surgery. Upon recovering from the surgery, castrated and sham rats are administered either an active therapy such as VK5211 or testosterone. The effects of therapy in this model are assessed by measuring muscle and prostate tissue mass. Muscle mass in castrated animals treated with vehicle is assigned 0% relative efficacy, while muscle mass in non-castrated animals that underwent sham surgery is assigned 100% relative efficacy. For example, a castrated rat treated with a drug that demonstrates 100% relative efficacy would have equivalent tissue mass to a non-castrated rat.

In this model, VK5211 demonstrated greater than 500-fold selectivity for maintaining muscle weight at non-castrate levels relative to the effects on prostate weight. By comparison, testosterone shows similar effects on both muscle and prostate tissue. These data suggest that VK5211 is highly tissue-selective for muscle, potentially leading to an improved therapeutic profile relative to testosterone.

-88-

**Table of Contents**

**Effects of VK5211 in Muscle and Prostate Tissue in Castrated Rats**



In a primate model, VK5211 treatment resulted in a dramatic increase in muscle growth compared to a placebo group after only two weeks of daily oral treatment. VK5211 was shown to be safe and well-tolerated in this model.

*Development Plans*

We expect to develop VK5211 for potential treatment of a wide range of diseases and disorders in both men and women. Initially, we plan to commence a randomized, double-blind, placebo-controlled, multicenter Phase 2 proof-of-concept trial for muscle wasting in patients with cancer cachexia in early 2015. We expect to enroll approximately 100 patients with NSCLC who are receiving taxane-based chemotherapies. We will evaluate up to three doses of VK5211 and plan to assess changes in lean body mass among treated versus untreated patients after 12 weeks of therapy. We expect this clinical trial to be completed in 2016. Pending positive data from this clinical trial, we plan to advance VK5211 in further clinical trials. We also plan to discuss with the FDA potential clinical development of VK5211 in acute rehabilitation settings, such as hip fracture recovery.

**VK0214: A Novel Liver-Selective Thyroid Hormone Receptor-ß, or TRß, Agonist for Lipid Disorders**

VK0214 is a novel, orally available, liver-selective TRß agonist for lipid disorders such as dyslipidemia and NASH. The unique liver-targeting properties of our TRß agonists are designed to reduce or eliminate the deleterious effects of extra-hepatic thyroid receptor activation. In particular, high tissue and TRß selectivity may lead to reduced activity at the TRα receptor, which can be associated with increased respiration and cardiac tissue hypertrophy. We are advancing VK0214 for lipid disorders, such as dyslipidemia and NASH. In the U.S., the number of patients with dyslipidemia is expected to increase from 111.0 million in 2006 to 124.0 million in 2015. In the U.S., 33.5% of adults, or 71.0 million people, have high low-density lipoprotein, or LDL, cholesterol. NASH is a growing epidemic in the U.S., and is quickly becoming a leading cause of cirrhosis and liver failure. It is estimated that NASH affects 2% to 5% of Americans, or 6.0 to 15.0 million people. VK0214 is a prodrug of a potent, selective TRß agonist with liver-specific effects on TR-responsive gene expression. In a canine model of hypercholesterolemia, or high levels of cholesterol in the blood, VK0214 demonstrated

-89-

**Table of Contents**

promising reductions in plasma cholesterol with minimal effects on the thyroid hormone axis at doses effective for cholesterol reduction. We plan to complete the toxicity, pharmacology and chemistry, manufacturing and controls studies needed for an IND filing for VK0214. If the results of these preclinical studies are favorable, we expect to file an IND and commence clinical trials for VK0214 in 2015.

### EPO Receptor (EPOR) Agonist Program

We are developing small molecule agonists of the erythropoietin, or EPO, receptor, or EPOR, for the potential treatment of anemia. Anemia results from a decrease in red blood cells and is typically experienced by patients with renal complications, cancer patients and HIV/AIDS patients. These patients currently receive recombinant human EPO and other erythropoiesis-stimulating agents, or ESAs. Total worldwide sales of these agents exceeded $7.0 billion in 2012. However, these agents have a number of limitations, including cost of drug manufacturing, cost of treatment, a non-oral route of administration, and potential for immunogenicity, or possibility of inducing an immune response. Furthermore, ESA treatment is associated with an increased risk of adverse cardiovascular complications in patients with kidney disease when used to increase hemoglobin levels above 13.0 g/dL, and may be related to an increase in mortality in cancer patients. We believe that our drug candidates have the potential to treat anemia with improved safety, tolerability and route of administration. We plan to conduct further preclinical studies and file an IND with the FDA in 2016.

### Diacylglycerol Acyltransferase-1 (DGAT-1) Inhibitor Program

We are developing small molecule inhibitors of the enzyme DGAT-1 for the potential treatment of lipid disorders such as obesity and dyslipidemia. According to the CDC, approximately 36% of the adult U.S. population is obese, with the prevalence expected to exceed 40% by 2018. The World Health Organization estimates at least 500.0 million people are currently obese worldwide. DGAT-1 is a potential therapeutic target for reduction of triglyceride levels in the circulation and fat accumulation in adipose tissues. DGAT-1 null mice exhibit both reduced post-meal plasma triglyceride levels and increased energy expenditure, but have normal levels of circulating free fatty acids. Conversely, transgenic mice that overexpress DGAT-1 in adipose tissue are predisposed to obesity when fed a high-fat diet and have elevated levels of circulating free fatty acids. We have developed a series of novel compounds with tissue-targeting properties intended to mitigate potential side effects by selectively targeting the enterocyte, or intestinal absorptive cells, in the intestine, to inhibit dietary triglyceride uptake, or the liver, to inhibit *de novo* triglyceride synthesis. We plan to conduct further preclinical studies and file an IND with the FDA in 2016.

### Competition

The biopharmaceutical industry is characterized by rapidly advancing technologies, intense competition and a strong emphasis on proprietary products. While we believe that our technology, knowledge, experience and scientific resources provide us with competitive advantages, we face potential competition from many different sources, including commercial biopharmaceutical enterprises, academic institutions, government agencies and private and public research institutions. Any drug candidates that we successfully develop and commercialize will compete with existing therapies and new therapies that may become available in the future.

Many of our competitors have significantly greater financial resources and expertise in research and development, manufacturing, preclinical studies, clinical trials, regulatory approvals and marketing approved products than we do. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. Our competitors may succeed in developing technologies and therapies that are more effective, better tolerated or less costly than any which we are developing, or that would render our drug candidates obsolete and noncompetitive. Even if we obtain regulatory approval of any of our drug candidates, our competitors may succeed in obtaining regulatory approvals for their products earlier than we do. We will also face competition from these third parties in recruiting and retaining qualified scientific and management personnel, establishing clinical trial sites and patient registration for clinical trials, and in acquiring and in-licensing technologies and products complementary to our programs or advantageous to our business.

-90-

**Table of Contents**

*VK0612*

The key competitive factors affecting the success of VK0612, if approved, are likely to be its efficacy, safety, tolerability, frequency and route of administration, convenience and price, and the level of branded and generic competition and the availability of coverage and reimbursement from government and other third-party payors.

In the U.S., there are a variety of currently marketed oral type 2 diabetes therapies, including metformin (generic), pioglitazone (generic), glimepiride (generic), sitagliptin (Merck & Co., Inc.) and canagliflozin (Johnson & Johnson). These therapies are well-established and are widely accepted by physicians, patients, caregivers and third-party payors as the standard of care for the treatment of type 2 diabetes. Physicians, patients and third-party payors may not accept the addition of VK0612 to their current treatment regimens for a variety of potential reasons, including:

- if they do not wish to incur any potential additional costs related to VK0612; or

- if they perceive the use of VK0612 to be of limited additional benefit to patients.

In addition to the currently approved and marketed type 2 diabetes therapies, there are a number of experimental drugs that are in various stages of clinical development by companies such as Eli Lilly and Company, Takeda Pharmaceutical Company Limited and TransTech Pharma, Inc.

*VK5211*

The key competitive factors affecting the success of VK5211, if approved, are likely to be its efficacy, safety, tolerability, frequency and route of administration, convenience and price, the level of branded and generic competition and the availability of coverage and reimbursement from government and other third-party payors.

In the U.S., there are currently no marketed therapies for the treatment of cancer cachexia, though steroids such as nandrolone (generic), oxandrolone (generic) and testosterone (generic) are sometimes prescribed for the treatment of weight loss in cancer patients. There are several experimental therapies that are in various stages of clinical development by companies including GTx, Inc., Helsinn Group and Morphosys AG. In addition, nutritional and growth hormone-based therapies are sometimes used in patients experiencing muscle wasting.

*Preclinical Programs*

If any of our preclinical programs are ultimately determined safe and effective and approved for marketing, they may compete for market share with established therapies from a number of competitors, including large biopharmaceutical companies. Many therapies are currently available and numerous others are being developed for the treatment of dyslipidemia, NASH, anemia and obesity. Any products that we may develop from our preclinical programs may not be able to compete effectively with existing or future therapies.

**Manufacturing and Supply**

We do not have any manufacturing facilities and do not intend to develop any manufacturing capabilities. We believe that we currently possess sufficient VK0612 and VK5211 drug substance to allow for completion of our planned VK0612 and VK5211 clinical trials. Bulk active pharmaceutical ingredient, or API, and certain dosage forms are currently in storage in compliance with cGMP requirements. We believe that a majority of the existing API will be suitable for formulation into clinical trial material. We also have identified multiple contract manufacturers to provide commercial supplies of the formulated drug candidates if they are approved for marketing. We intend to secure contract manufacturers with established track records of quality product supply and significant experience with the regulatory requirements of the FDA and EMA.

-91-

**Table of Contents**

## Our History

We were incorporated under the laws of the State of Delaware on September 24, 2012. Since our incorporation, we have devoted substantially all of our efforts to raising capital, building infrastructure, obtaining the worldwide rights to certain technology from Ligand, including VK0612 and VK5211, and planning and preparing for preclinical studies and clinical trials of our drug candidates. Each of our programs is based on small molecules licensed from Ligand pursuant to the Master License Agreement, which we entered into on May 21, 2014.

## Agreements with Ligand

*Master License Agreement*

On May 21, 2014, we entered into a Master License Agreement, or the Master License Agreement, with Ligand pursuant to which, among other things, Ligand granted to us and our affiliates an exclusive, perpetual, irrevocable, worldwide, royalty-bearing right and license under (1) patents related to (a) our VK0612 program and any other compounds comprised by specified FBPase patents and derivatives of such compounds, or FBPase Compounds, (b) our VK5211 program and any other compounds comprised by specified SARM patents and derivatives of such compounds, or SARM Compounds, (c) our VK0214 program and any other compounds comprised by specified TRß patents and any derivatives of such compounds, or TRß Compounds, (d) our EPOR program and any other compounds comprised by specified EPOR patents and derivatives of such compounds, or EPOR Compounds, and (e) our DGAT-1 program and any other compounds comprised by specified DGAT-1 patents and derivatives of such compounds, or DGAT-1 Compounds, (2) related know-how controlled by Ligand, and (3) physical quantities of FBPase, SARM, TRß, EPOR and DGAT-1 Compounds, or, collectively, the Licensed Technology, to research, develop, manufacture, have manufactured, use and commercialize the Licensed Technology in and for all therapeutic and diagnostic uses in humans or animals. We have the right to sublicense these rights in certain circumstances. Pursuant to the terms of the Master License Agreement, we have the exclusive right and sole responsibility and decision-making authority for researching and developing any pharmaceutical products that contain or comprise one or any combination of an FBPase Compound, SARM Compound, TRß Compound, EPOR Compound or DGAT-1 Compound, or, collectively, the Licensed Products. We also have the exclusive right and sole responsibility and decision-making authority to conduct all clinical trials and preclinical studies that we believe are appropriate to obtain the regulatory approvals necessary for commercialization of the Licensed Products, and we will own and maintain all regulatory filings and all regulatory approvals for the Licensed Products. Additionally, pursuant to the terms of the Master License Agreement, we have the sole decision-making authority and responsibility and the exclusive right to commercialize any of the Licensed Products, either by ourselves or, in certain circumstances, through sublicensees selected by us. We also have the exclusive right to manufacture or have manufactured any Licensed Product ourselves or, in certain circumstances, through sublicensees or third parties selected by us. We will own any intellectual property that we develop in connection with the license granted under the Master License Agreement.

As partial consideration for the grant of the rights and licenses to us under the Master License Agreement, in the event we consummate a firmly underwritten public offering pursuant to the Securities Act on a Registration Statement on Form S-1 or any successor form, or an Initial Public Offering, we will issue to Ligand at the closing of the Initial Public Offering a number of shares of our common stock having an aggregate value of $29.0 million, subject to adjustment in certain circumstances. In the event we consummate a private financing of our equity securities, or a Private Financing, prior to an Initial Public Offering, Ligand has the option to receive a number of shares of the same class and type of securities issued and sold by us in the Private Financing having an aggregate value of $29.0 million, subject to adjustment in certain circumstances, or, in lieu of receiving the same class and type of shares issued in the Private Financing, to defer its right to receive equity in Viking until an Initial Public Offering or subsequent private financing of Viking. Furthermore, as partial consideration for the grant of the rights and licenses to us under the Master License Agreement, we entered into the Loan and Security Agreement with Ligand (as discussed below).

-92-

**Table of Contents**

As further partial consideration for the grant of the rights and licenses to us by Ligand under the Master License Agreement, we have agreed to pay to Ligand certain one-time, non-refundable milestone payments in connection with licensed products containing (1) VK0612 or any other FBPase Compound, in an aggregate amount of up to $60.0 million per indication (for up to a total of four indications) upon the achievement of certain development and regulatory milestones and up to $150.0 million upon the achievement of certain sales milestones, (2) VK5211 or any other SARM Compound, in an aggregate amount of up to $85.0 million per indication (for up to a total of two indications) upon the achievement of certain development and regulatory milestones and up to $100.0 million upon the achievement of certain sales milestones, (3) VK0214 or any other TRß Compound, in an aggregate amount of up to $75.0 million per indication (for up to a total of three indications) upon the achievement of certain development and regulatory milestones and up to $150.0 million upon the achievement of certain sales milestones, (4) any EPOR Compound, in an aggregate amount of up to $48.0 million per indication (for up to a total of three indications) upon the achievement of certain development and regulatory milestones and up to $50.0 million upon the achievement of certain sales milestones, and (5) any DGAT-1 Compound, in an aggregate amount of up to $78.0 million per indication (for up to a total of two indications) upon the achievement of certain development and regulatory milestones and up to $150.0 million upon the achievement of certain sales milestones. Additionally, we will pay to Ligand a one-time, non-refundable milestone payment of $2.5 million upon the occurrence of the first commercial sale of VK0612 or any other FBPase Compound by one of our sublicensees. We will also pay to Ligand royalties on aggregate annual worldwide net sales of Licensed Products by us, our affiliates and our sublicensees at tiered percentage rates in the following ranges based upon net sales: (a) upper single digit royalties upon sales of VK0612 or any other FBPase Compound, (b) upper single digit royalties upon sales of VK5211 or any other SARM Compound, (c) low-to-middle single digit royalties upon sales of VK0214 or any other TRß Compound, (d) middle-to-upper single digit royalties upon sales of any EPOR Compound, and (e) low-to-middle single digit royalties upon sales of any DGAT-1 Compound; in each case subject to reduction in certain circumstances.

The term of the Master License Agreement will continue unless the agreement is terminated by us or Ligand. Ligand has the right to terminate the Master License Agreement under certain circumstances, including, but not limited to: (1) if, on or before April 30, 2015, we have neither (a) completed an Initial Public Offering, nor (b) received aggregate net proceeds of at least $20.0 million in one or more Private Financings, (2) in the event of our insolvency or bankruptcy, (3) if we do not pay an undisputed amount owing under the Master License Agreement when due and fail to cure such default within a specified period of time, or (4) if we default on certain of our material and substantial obligations and fail to cure the default within a specified period of time. We have the right to terminate the Master License Agreement under certain circumstances, including, but not limited to: (i) if Ligand does not pay an undisputed amount owing under the Master License Agreement when due and fails to cure such default within a specified period of time, or (ii) if Ligand defaults on certain of its material and substantial obligations and fails to cure the default within a specified period of time. In addition, provisions of the Master License Agreement can be terminated on a licensed program-by-program basis under certain circumstances. In the event that the Master License Agreement is terminated in its entirety or with respect to a specific licensed program for any reason: (A) all licenses granted to us under the Master License Agreement (or with respect to the specific licensed program) will terminate and we will, upon Ligand's request (subject to Ligand assuming legal responsibility for any clinical trials of the Licensed Products then ongoing), assign and transfer to Ligand (or to such transferee as Ligand may direct), at no cost to Ligand, all regulatory documentation and all regulatory approvals prepared or obtained by us or on our behalf related to the Licensed Products (or those related to the specific licensed program), or, if Ligand does not make such a request, we will wind down any ongoing clinical trials with respect to the Licensed Products (or those related to the specific licensed program) at no cost to Ligand; (B) we will, upon Ligand's request, sell and transfer to Ligand (or to such transferee as Ligand may direct), at a price equal to 125% of our costs of goods, any and all chemical, biological or physical materials relating to or comprising the Licensed Products (or those related to the specific licensed program); (C) we will have, for a period of six months following termination, the right to sell on the normal business terms in existence before such termination any finished commercial inventory of Licensed Products (or those related to the specific licensed program) which remains on hand, so long as we pay to Ligand the applicable royalties and sales milestones; (D) Ligand has the right to require us to assign to Ligand the

-93-

Table of Contents

trademarks owned by us relating to the Licensed Products (or those related to the specific licensed program); and (E) we will grant to Ligand a non-exclusive, worldwide, royalty-bearing sublicensable license under any patent rights and know-how controlled by us to the extent necessary to make, have made, import, use, offer to sell and sell the Licensed Products (or those related to the specific licensed program) anywhere in the world at a royalty rate in the low single digits.

Under the Master License Agreement, we have agreed to indemnify Ligand for claims relating to the performance of our obligations under the Master License Agreement, any breach of the representations and warranties made by us under the Master License Agreement, clinical trials conducted by us and the research, development and commercialization of the Licensed Products by us and our affiliates, sublicensees, distributors and agents. In addition, Ligand has agreed to indemnify us for claims relating to the performance of its obligations under the Master License Agreement, its breach of representations and warranties under the agreement and its research and development of the licensed compounds before the effective date of the Master License Agreement. Each party's indemnification obligations will not apply to the extent the claims result from the negligence or willful misconduct of the indemnified party or any of its employees, agents, officers or directors or from the indemnified party's breach of its representations or warranties set forth in the Master License Agreement.

*Loan and Security Agreement*

In connection with entering into the Master License Agreement, we entered into a Loan and Security Agreement with Ligand, dated May 21, 2014, or the Loan and Security Agreement, pursuant to which, among other things, Ligand agreed to provide us with loans in the aggregate amount of up to $2.5 million. Pursuant to the Loan and Security Agreement, Ligand initially loaned $1.0 million to us on May 27, 2014 and an additional $250,000 on June 1, 2014, and has agreed to loan an additional $250,000 to us each month from July 2014 through and including November 2014. The principal amount outstanding under the loans will accrue interest at a fixed per annum rate equal to the lesser of 5% and the maximum interest rate permitted by law. In the event we default under the loans, the loans will accrue interest at a fixed per annum rate equal to the lesser of 8% and the maximum interest rate permitted by law.

The loans will be evidenced by a Secured Convertible Promissory Note, or the Note. Pursuant to the terms of the Loan and Security Agreement and the Note, the loans will become due and payable upon the written demand of Ligand at any time after the earlier to occur of an event of default under the Loan and Security Agreement or the Note, and four years from the date of the initial loan, or the Maturity Date, unless the loans are converted into equity prior to such time. Upon the consummation of the earlier to occur of (1) a bona fide capital financing transaction or series of financing transactions with one or more financial non-strategic investors with aggregate net proceeds to us of at least $20.0 million and pursuant to which we issue shares of our equity securities, or a Qualified Private Financing, and (2) an Initial Public Offering, Ligand may elect either to (a) receive such number of shares of the type of equity we issue in the Qualified Private Financing or the Initial Public Offering equal to 200% of the amount obtained by dividing the entire then-outstanding principal amount of the loans, plus all accrued and previously unpaid interest thereon, by the lowest per share price paid by investors in the Qualified Private Financing or Initial Public Offering, or (b) require us to prepay an amount equal to 200% of the principal amount of the loans then-outstanding plus all accrued and previously unpaid interest thereon, or the Prepayment. Moreover, if a Qualified Private Financing occurs prior to an Initial Public Offering and Ligand has not elected to receive shares of the type of equity we issue in the Qualified Private Financing or to receive the Prepayment, Ligand may elect to extend the Maturity Date to a date agreed upon by us and Ligand. Furthermore, if a change of control of our company occurs prior to the earlier of the Maturity Date, the closing of the Qualified Private Financing or the closing of an Initial Public Offering, Ligand may elect to either receive a specified number of shares of our securities equal to 200% of the amount obtained by dividing the entire then-outstanding principal amount of the loans, plus all accrued and previously unpaid interest thereon, by the lowest per share price set forth in the Loan and Security Agreement or require us to make the Prepayment.

We also granted Ligand a continuing security interest in all of our right, title and interest in and to our assets as collateral for the full, prompt, complete and final payment and performance when due of all obligations under the Loan and Security Agreement and the Note.

-94-

Table of Contents

Under the Loan and Security Agreement and the Note, we are subject to affirmative and negative covenants. We agreed to, among other things, deliver financial statements, forecasts and budget information to Ligand. In addition, we agreed to use the proceeds from the loans solely as working capital and to fund our general business requirements in accordance with our forecast and budget. Under the Loan and Security Agreement and the Note, we may not take certain actions without Ligand's consent, such as declare or pay dividends, incur or repay certain indebtedness or engage in certain related party transactions.

An event of default under the Loan and Security Agreement will be deemed to occur or exist upon the termination of the Master License Agreement; in the event we fail to make principal or interest payments under the Note when due; if we become insolvent or breach and fail to cure within a specified period of time any representation, warranty, covenant or agreement in the Loan and Security Agreement, the Master License Agreement, the Option Agreement, dated September 27, 2012, by and between us and Ligand, as amended, the Voting Agreement (as defined below) or the Management Rights Letter (as defined below); or upon the occurrence of certain other events.

This offering will constitute an Initial Public Offering under the Loan and Security Agreement, and Ligand has the option to convert the amounts outstanding under the Note into shares of our common stock upon consummation of this offering. Upon consummation of this offering, we may be obligated to issue to Ligand an aggregate of                shares of our common stock, assuming an initial public offering price of $            , the midpoint of the price range set forth on the cover page of this prospectus, and the Loan and Security Agreement and the Note will terminate in their entirety.

*Management Rights Letter*

As a condition to entering into the Master License Agreement, the Loan and Security Agreement and the Note, we entered into a Management Rights Letter with Ligand, dated as of May 21, 2014, or the Management Rights Letter. Pursuant to the Management Rights Letter, we agreed to: (1) expand the size of our board of directors so as to create one new directorship on our board of directors, and (2) appoint an individual named by Ligand, or the Ligand Director, to fill the newly-created directorship. Pursuant to the terms of the Management Rights Letter, the Ligand Director is entitled to receive the same compensation, including cash payments and equity incentive grants, as is provided to our other directors; however, the Ligand Director is not entitled to receive the compensation provided to our directors in their capacity as members of a committee of our board of directors. Furthermore, we agreed to provide Ligand with advance written notice of the date of the annual meeting of our stockholders for each year in which the Ligand Director is up for election so as to permit Ligand to designate the Ligand Director for election at such annual meeting, and to nominate the Ligand Director to our board of directors at each such annual meeting of our stockholders. In addition, under the Management Rights Letter, we granted Ligand certain contractual management rights in the event Ligand is not represented on our board of directors, including the right to consult with us and offer advice to our management on significant business issues and the right to receive copies of all notices, minutes, consents and other material that we provide to our directors, subject to certain exceptions. We also agreed that, upon consummation of this offering, we will appoint a Chairperson of our board of directors who is "independent" under applicable SEC rules and the rules and listings standards of The Nasdaq Stock Market LLC, or the Nasdaq rules. In accordance with the terms of the Management Rights Letter, we appointed Matthew W. Foehr to our board of directors as the Ligand Director on May 27, 2014. The Management Rights Letter will terminate upon the earliest to occur of: (a) the liquidation, dissolution or indefinite cessation of our business operations; (b) the execution by us of a general assignment for the benefit of creditors or the appointment of a receiver or trustee to take possession of our property and assets; (c) an acquisition of us by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) if our stockholders of record as constituted immediately prior to such transaction hold less than 50% of the voting power of the surviving or acquiring entity; (d) following our issuance of securities pursuant to the Master License Agreement, the date that Ligand and its affiliates collectively cease to beneficially own at least 7.5% of our outstanding voting stock; or (e) May 21, 2024.

-95-

**Table of Contents**

*Voting Agreement*

In connection with the terms of the Management Rights Letter, we, Ligand, Brian Lian, Ph.D., and Michael Dinerman, M.D., entered into a Voting Agreement dated as of May 21, 2014, or the Voting Agreement, pursuant to which each of Ligand, Dr. Lian and Dr. Dinerman agreed to vote all of his or its shares of our voting securities so as to elect the Ligand Director as a member of our board of directors, and, if requested by Ligand, to vote in favor of any removal of the Ligand Director or selection of a new Ligand Director. The Voting Agreement will terminate under the same circumstances in which the Management Rights Letter will terminate.

*Sublease Agreement*

On May 21, 2014, we entered into a Sublease Agreement with Ligand, as sublandlord, or the Sublease Agreement, for approximately 5,851 square feet of individual and shared space within the building located at 11119 North Torrey Pines, San Diego, California 92037. Under the Sublease Agreement, we are required to pay base rent in the amount of approximately $13,500 per month. We are also obligated to pay Ligand for our pro-rated portion of certain operating expenses, including, without limitation, fees for operating costs, taxes, assessments, utilities, services, repairs and maintenance. Pursuant to the Sublease Agreement, Ligand has agreed to provide us with technical and scientific, professional, human resources, administrative, information technology and general office services during some or all of the sublease term for a fee based on the number of full-time equivalents utilized by us in a given time period multiplied by $300,000 per year per full-time equivalent. The sublease commences on May 21, 2014 and expires on December 31, 2014; however, we can terminate the sublease early, without penalty, upon 30 days written notice to Ligand following the completion of this offering. We use this space as our principal executive office.

*Registration Rights Agreement*

As a condition to the parties entering into the Master License Agreement and the Loan and Security Agreement, we entered into a Registration Rights Agreement, dated May 21, 2014, with Ligand, or the Registration Rights Agreement, pursuant to which we granted certain registration rights to Ligand with respect to (1) the securities of Viking issuable pursuant to the Master License Agreement and the Note, or, collectively, the Viking Securities, (2) the shares of our common stock issued or issuable upon conversion of the Viking Securities, if applicable, and (3) the shares of our common stock issued as a dividend or other distribution with respect to, in exchange for or in replacement of the Viking Securities, or, collectively, the Registrable Securities.

Mandatory Resale Registration Rights

Pursuant to the Registration Rights Agreement, we have agreed that we will file with the SEC, by no later than the first date on which the lock-up requested by the underwriters in this offering expires or lapses with respect to Ligand (or the first business day thereafter), or the Lock-Up Expiration Date, a Registration Statement on Form S-1 under the Securities Act that covers the resale of the full amount of the Registrable Securities. We are obligated to use commercially reasonable efforts to have the Registration Statement declared effective by the SEC as soon as practicable after it is filed with the SEC, but in no event later than (1) in the event the SEC Staff does not review the Registration Statement, 60 days after the Lock-Up Expiration Date, or (2) in the event the SEC Staff reviews the Registration Statement, 120 days after the Lock-Up Expiration Date. If we do not file a Registration Statement for the resale of the Registrable Securities within the requisite time period, if such Registration Statement is not declared effective by the SEC Staff by a certain date, or if, on any day after the Registration Statement is declared effective by the SEC Staff, sales of all of the Registrable Securities required to be included in the Registration Statement cannot be made pursuant to the Registration Statement, then we will, subject to certain exceptions, be obligated to pay to Ligand an amount in cash equal to 1% of the aggregate value of the Registrable Securities, measured as of the date of their issuance, on the day of such failure or ineffectiveness of, or inability to use, the Registration Statement and on every thirtieth day thereafter (pro-rated for partial periods) until such failure or ineffectiveness of, or inability to use, the Registration Statement is cured; up to a maximum of 5% of the aggregate value of the Registrable Securities, measured as of the date of their issuance.

-96-

**Table of Contents**

Pursuant to the Registration Rights Agreement, in the event the SEC Staff takes the position that the registration of some or all of the Registrable Securities is not eligible to be made on a delayed or continuous basis under the provisions of Rule 415 under the Securities Act, or would require Ligand to be named as an "underwriter" in the Registration Statement, we have agreed to use our commercially reasonable efforts to persuade the SEC Staff that the offering contemplated by the Registration Statement is a valid secondary offering, is not made "by or on behalf of the issuer" (as defined in Rule 415 under the Securities Act) and that Ligand is not an "underwriter" for purposes of the registration. If the SEC Staff does not agree with our proposal, we will remove from the Registration Statement the portion of the Registrable Securities, and/or we and Ligand will agree to certain restrictions and limitations on the registration and resale of the Registrable Securities, as the SEC Staff may require to ensure the registration complies with Rule 415 under the Securities Act.

Pursuant to the terms of the Registration Rights Agreement, we also agreed to use our commercially reasonable efforts to keep each Registration Statement filed pursuant to the agreement effective with respect to all Registrable Securities until the earlier of (1) the date on which all shares of Registrable Securities may immediately be sold under Rule 144, as promulgated by the SEC under the Securities Act, or Rule 144, during any 90-day period, or (2) the date on which all of the Registrable Securities covered by the Registration Statement that are held by Ligand are sold.

Additionally, we have the right during certain periods after the effective date of the Registration Statement covering the resale of the Registrable Securities, to delay the disclosure of material, non-public information if, in the good faith opinion of our board of directors, it is not in our best interests to disclose the information. In addition, we have the ability to prohibit sales under the Registration Statement during certain periods, subject to certain limitations.

Form S-3 Registration Rights

The Registration Rights Agreement also provides that after the Initial Public Offering, we will use our commercially reasonable efforts to qualify for the use of Form S-3 for purposes of registering the issuance and/or resale of the Registrable Securities. Once we have qualified for the use of Form S-3, we have agreed to convert the Registration Statement on Form S-1 that is initially to be filed to register the resale of the Registrable Securities into a Registration Statement on Form S-3.

Limitation on Registration Rights

Pursuant to the terms of the Registration Rights Agreement, we have agreed that we will not, except with Ligand's prior written consent, from and after the date of the Registration Rights Agreement and prior to the date the Registration Statement covering the resale of the full amount of the Registrable Securities is declared effective by the SEC, enter into an agreement with another holder or prospective holder of our securities which provides demand registration rights that are more favorable than the registration rights provided to Ligand under the Registration Rights Agreement.

Termination of Registration Rights

Ligand's registration rights terminate upon the earlier of (1) the date on which all shares of Registrable Securities may immediately be sold under Rule 144 during any 90-day period, or (2) the date on which all of the Registrable Securities covered by the Registration Statement that are held by Ligand are sold.

Expenses

We will bear all registration expenses in connection with the mandatory resale registration rights granted pursuant to the Registration Rights Agreement, including but not limited to all registration, qualification and filing fees, except that we will not be required to pay selling expenses, fees and disbursements of counsel for the holders of our capital stock other than the fees and disbursements of one special counsel in an amount of up to $20,000.

-97-

**Table of Contents**

## Government Regulation

*FDA Regulation and Marketing Approval*

In the U.S., the FDA regulates drugs under the Federal Food, Drug, and Cosmetic Act of 1938, as amended, or FDCA, and related regulations. Drugs are also subject to other federal, state and local statutes and regulations. Failure to comply with the applicable U.S. regulatory requirements at any time during the drug development process, approval process or after approval may subject an applicant to administrative or judicial sanctions and non-approval of drug candidates. These sanctions could include the imposition by the FDA or an Institutional Review Board, or IRB, of a clinical hold on clinical trials, the FDA's refusal to approve pending applications or related supplements, withdrawal of an approval, untitled or warning letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, restitution, disgorgement, civil penalties or criminal prosecution. Such actions by government agencies could also require us to expend a large amount of resources to respond to the actions. Any agency or judicial enforcement action could have a material adverse effect on us.

The FDA and comparable regulatory agencies in state and local jurisdictions and in foreign countries impose substantial requirements upon the clinical development, manufacture and marketing of pharmaceutical products.

These agencies and other federal, state and local entities regulate research and development activities and the testing, manufacture, quality control, safety, effectiveness, labeling, packaging, storage, distribution, record-keeping, approval, post-approval monitoring, advertising, promotion, sampling and import and export of our products. Our drugs must be approved by the FDA through the new drug application, or NDA, process before they may be legally marketed in the U.S. See the section of this prospectus entitled "– The NDA Approval Process".

The process required by the FDA before drugs may be marketed in the U.S. generally involves the following:

- completion of non-clinical laboratory tests, animal studies and formulation studies conducted according to good laboratory practice or other applicable regulations;

- submission of an IND, which allows clinical trials to begin unless the FDA objects within 30 days;

- adequate and well-controlled human clinical trials to establish the safety and efficacy of the proposed drug for its intended use or uses conducted in accordance with FDA regulations, good clinical practices, or GCP, which are international ethical and scientific quality standards meant to assure that the rights, safety and well-being of trial participants are protected, and to define the roles of clinical trial sponsors, administrators and monitors and to assure clinical trial data integrity;

- pre-approval inspection of manufacturing facilities and clinical trial sites; and

- FDA approval of an NDA, which must occur before a drug can be marketed or sold.

*IND and Clinical Trials*

Prior to commencing the first clinical trial, an IND, which contains the results of preclinical studies along with other information, such as information about product chemistry, manufacturing and controls and a proposed protocol, must be submitted to the FDA. The IND automatically becomes effective 30 days after receipt by the FDA unless the FDA within the 30-day time period raises concerns or questions about the conduct of the clinical trial. In such a case, the IND sponsor must resolve any outstanding concerns with the FDA before the clinical trial may begin. A separate submission to the existing IND must be made for each successive clinical trial to be conducted during drug development. Further, an independent IRB for each site proposing to conduct the clinical

-98-

Table of Contents

trial must review and approve the investigational plan for any clinical trial before it commences at that site. Informed written consent must also be obtained from each trial subject. Regulatory authorities, including the FDA, an IRB, a data safety monitoring board or the sponsor, may suspend or terminate a clinical trial at any time on various grounds, including a finding that the participants are being exposed to an unacceptable health risk or that the clinical trial is not being conducted in accordance with FDA requirements.

For purposes of NDA approval, human clinical trials are typically conducted in sequential phases that may overlap:

- *Phase 1* – the drug is initially given to healthy human subjects or patients in order to determine metabolism and pharmacologic actions of the drug in humans, side effects and, if possible, to gain early evidence on effectiveness. During Phase 1 clinical trials, sufficient information about the investigational drug's pharmacokinetics and pharmacologic effects may be obtained to permit the design of well-controlled and scientifically valid Phase 2 clinical trials.

- *Phase 2* – clinical trials are conducted to evaluate the effectiveness of the drug for a particular indication or in a limited number of patients in the target population to identify possible adverse effects and safety risks, to determine the efficacy of the product for specific targeted diseases and to determine dosage tolerance and optimal dosage. Multiple Phase 2 clinical trials may be conducted by the sponsor to obtain information prior to beginning larger and more expensive Phase 3 clinical trials. Throughout this prospectus, we refer to our initial Phase 2 clinical trials as "Phase 2a clinical trials" and our subsequent Phase 2 clinical trials as "Phase 2b clinical trials."

- *Phase 3* – when Phase 2 clinical trials demonstrate that a dosage range of the product appears effective and has an acceptable safety profile, and provide sufficient information for the design of Phase 3 clinical trials, Phase 3 clinical trials in an expanded patient population at multiple clinical sites may be undertaken. They are performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to further evaluate dosage, effectiveness and safety, to establish the overall benefit-risk relationship of the investigational drug and to provide an adequate basis for product labeling and approval by the FDA. In most cases, the FDA requires two adequate and well-controlled Phase 3 clinical trials to demonstrate the efficacy of the drug in an expanded patient population at multiple clinical trial sites.

All clinical trials must be conducted in accordance with FDA regulations, GCP requirements and their protocols in order for the data to be considered reliable for regulatory purposes.

An investigational drug product that is a combination of two different drugs in the same dosage form must comply with an additional rule that requires that each component make a contribution to the claimed effects of the drug product. This typically requires larger studies that test the drug against each of its components. In addition, typically, if a drug product is intended to treat a chronic disease, as is the case with our products, safety and efficacy data must be gathered over an extended period of time, which can range from six months to three years or more. Government regulation may delay or prevent marketing of drug candidates or new drugs for a considerable period of time and impose costly procedures upon our activities.

*Disclosure of Clinical Trial Information*

Sponsors of clinical trials of FDA-regulated products, including drugs, are required to register and disclose certain clinical trial information. Information related to the product, patient population, phase of investigation, study sites and investigators, and other aspects of the clinical trial, is then made public as part of the registration. Sponsors are also obligated to discuss the results of their clinical trials after completion. Disclosure of the results of these trials can be delayed until the new product or new indication being studied has been approved. Competitors may use this publicly available information to gain knowledge regarding the progress of development programs.

-99-

Table of Contents

*The NDA Approval Process*

In order to obtain approval to market a drug in the U.S., a marketing application must be submitted to the FDA that provides data establishing to the FDA's satisfaction the safety and effectiveness of the investigational drug for the proposed indication. Each NDA submission requires a substantial user fee payment (currently exceeding $2.1 million for fiscal year 2014) unless a waiver or exemption applies. The application includes all relevant data available from pertinent non-clinical studies, or preclinical studies and clinical trials, including negative or ambiguous results as well as positive findings, together with detailed information relating to the product's chemistry, manufacturing, controls and proposed labeling, among other things. Data can come from company-sponsored clinical trials intended to test the safety and effectiveness of a use of a product, or from a number of alternative sources, including studies initiated by investigators that meet GCP requirements.

During the development of a new drug, sponsors are given opportunities to meet with the FDA at certain points. These points may be prior to submission of an IND, at the end of Phase 2 clinical trials, and before an NDA is submitted. Meetings at other times may be requested. These meetings can provide an opportunity for the sponsor to share information about the data gathered to date, for the FDA to provide advice and for the sponsor and the FDA to reach agreement on the next phase of development. Sponsors typically use the end-of-Phase 2 clinical trials meetings to discuss their Phase 2 clinical trials results and present their plans for the pivotal Phase 3 registration trial that they believe will support approval of the new drug.

Concurrent with clinical trials, companies usually complete additional preclinical safety studies and must also develop additional information about the chemistry and physical characteristics of the drug and finalize a process for the NDA sponsor's manufacturing the product in accordance with cGMP requirements. The manufacturing process must be capable of consistently producing quality batches of the drug candidate and the manufacturer must develop methods for testing the identity, strength, quality and purity of the final drugs. Additionally, appropriate packaging must be selected and tested and stability studies must be conducted to demonstrate that the drug candidate does not undergo unacceptable deterioration over its shelf-life.

The results of drug development, non-clinical studies and clinical trials, along with descriptions of the manufacturing process, analytical tests conducted on the chemistry of the drug, proposed labeling and other relevant information are submitted to the FDA as part of an NDA requesting approval to market the product. The FDA reviews all NDAs submitted to ensure that they are sufficiently complete for substantive review before it accepts them for filing. It may request additional information rather than accept an NDA for filing. In this event, the NDA must be resubmitted with the additional information. The resubmitted application also is subject to review before the FDA accepts it for filing. The FDA has 60 days from its receipt of an NDA to conduct an initial review to determine whether the application will be accepted for filing based on the FDA's threshold determination that the application is sufficiently complete to permit substantive review. If the NDA submission is accepted for filing, the FDA reviews the NDA to determine, among other things, whether the proposed product is safe and effective for its intended use, and whether the product is being manufactured in accordance with cGMP to assure and preserve the product's identity, strength, quality and purity. The FDA has agreed to specific performance goals on the review of NDAs and seeks to review standard NDAs within 12 months from submission of the NDA. The review process may be extended by the FDA for three additional months to consider certain late submitted information or information intended to clarify information already provided in the submission. After the FDA completes its initial review of an NDA, it will communicate to the sponsor that the drug will either be approved, or it will issue a complete response letter to communicate that the NDA will not be approved in its current form and inform the sponsor of changes that must be made or additional clinical, non-clinical or manufacturing data that must be received before the application can be approved, with no implication regarding the ultimate approvability of the application or the timing of any such approval, if ever. If, or when, those deficiencies have been addressed to the FDA's satisfaction in a resubmission of the NDA, the FDA will issue an approval letter. The FDA has committed to reviewing such resubmissions in two to six months depending on the type of information included. The FDA may refer applications for novel drug products or drug products that present difficult questions of safety or effectiveness to an advisory committee, typically a panel that

-100-

Table of Contents

includes clinicians and other experts, for review, evaluation and a recommendation as to whether the application should be approved and, if so, under what conditions. The FDA is not bound by the recommendations of an advisory committee, but it considers such recommendations carefully when making decisions.

Before approving an NDA, the FDA typically will inspect the facilities at which the product is manufactured. The FDA will not approve the product unless it determines that the manufacturing processes and facilities are in compliance with cGMP requirements and adequate to assure consistent production of the product within required specifications. Additionally, before approving an NDA, the FDA may inspect one or more clinical sites to assure compliance with GCP regulations. If the FDA determines the application, manufacturing process or manufacturing facilities are not acceptable, it typically will outline the deficiencies and often will request additional testing or information. This may significantly delay further review of the application. If the FDA finds that a clinical site did not conduct the clinical trial in accordance with GCP regulations, the FDA may determine the data generated by the clinical site should be excluded from the primary efficacy analyses provided in the NDA. Additionally, notwithstanding the submission of any requested additional information, the FDA ultimately may decide that the application does not satisfy the regulatory criteria for approval.

The FDA may require, or companies may pursue, additional clinical trials after a product is approved. These so-called Phase 4 or post-approval clinical trials may be made a condition to be satisfied for continuing drug approval. The results of Phase 4 clinical trials can confirm the effectiveness of a drug candidate and can provide important safety information. In addition, the FDA now has express statutory authority to require sponsors to conduct post-marketing trials to specifically address safety issues identified by the agency. See the section of this prospectus entitled "– Post-Marketing Requirements".

The FDA also has authority to require a Risk Evaluation and Mitigation Strategy, or a REMS, from manufacturers to ensure that the benefits of a drug outweigh its risks. A sponsor may also voluntarily propose a REMS as part of the NDA submission. The need for a REMS is determined as part of the review of the NDA. Based on statutory standards, elements of a REMS may include "dear doctor letters," a medication guide, more elaborate targeted educational programs, and in some cases elements to assure safe use, or ETASU, which is the most restrictive REMS. ETASU can include, but are not limited to, special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special monitoring and the use of patient registries. These elements are negotiated as part of the NDA approval, and in some cases if consensus is not obtained until after the Prescription Drug User Fee Act of 1992, as amended, review cycle, the approval date may be delayed. Once adopted, REMS are subject to periodic assessment and modification.

Changes to some of the conditions established in an approved application, including changes in indications, labeling, manufacturing processes or facilities, require submission and FDA approval of a new NDA or NDA supplement before the change can be implemented. An NDA supplement for a new indication typically requires clinical data similar to that in the original application, and the FDA uses the same procedures and actions in reviewing NDA supplements as it does in reviewing NDAs.

Even if a drug candidate receives regulatory approval, the approval may be limited to specific disease states, patient populations and dosages, or might contain significant limitations on use in the form of warnings, precautions or contraindications, or in the form of onerous risk management plans, restrictions on distribution or post-marketing trial requirements. Further, even after regulatory approval is obtained, later discovery of previously unknown problems with a product may result in restrictions on the product or even complete withdrawal of the product from the market. Delay in obtaining, or failure to obtain, regulatory approval for our products, or obtaining approval but for significantly limited use, would harm our business. In addition, we cannot predict what adverse governmental regulations may arise from future U.S. or foreign governmental action.

*The Hatch-Waxman Amendments*

Under the Drug Price Competition and Patent Term Restoration Act of 1984, as amended, commonly known as the Hatch-Waxman Amendments, a portion of a product's U.S. patent term that was lost during clinical

-101-

**Table of Contents**

development and regulatory review by the FDA may be restored. The Hatch-Waxman Amendments also provide a process for listing patents pertaining to approved products in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (commonly known as the Orange Book) and for a competitor seeking approval of an application that references a product with listed patents to make certifications pertaining to such patents. In addition, the Hatch-Waxman Amendments provide for a statutory protection, known as non-patent exclusivity, against the FDA's acceptance or approval of certain competitor applications.

*Patent Term Restoration*

Patent term restoration can compensate for time lost during drug development and the regulatory review process by returning up to five years of patent life for a patent that covers a new product or its use. This period is generally one-half the time between the effective date of an IND (falling after issuance of the patent) and the submission date of an NDA, plus the time between the submission date of an NDA and the approval of that application, provided the sponsor acted with diligence. Patent term restorations, however, cannot extend the remaining term of a patent beyond a total of 14 years from the date of product approval and only one patent applicable to an approved drug may be extended and the extension must be applied for prior to expiration of the patent. The United States Patent and Trademark Office, or the USPTO, in consultation with the FDA, reviews and approves the application for any patent term extension or restoration.

*Orange Book Listing*

In seeking approval for a drug through an NDA, applicants are required to list with the FDA each patent whose claims cover the applicant's product. Upon approval of a drug, each of the patents listed by the NDA holder listed in the drug's application or otherwise are then published in the FDA's Orange Book. Drugs listed in the Orange Book can, in turn, be cited by potential generic competitors in support of approval of an abbreviated new drug application, or ANDA. An ANDA provides for marketing of a drug product that has the same active ingredients in the same strengths and dosage form as the listed drug and has been shown through bioequivalence testing to be therapeutically equivalent to the listed drug. Other than the requirement for bioequivalence testing, ANDA applicants are not required to conduct, or submit results of, preclinical studies or clinical trials to prove the safety or effectiveness of their drug product. Drugs approved in this way are commonly referred to as "generic equivalents" to the listed drug, and can often be substituted by pharmacists under prescriptions written for the original listed drug.

The ANDA applicant is required to certify to the FDA concerning any patents listed for the approved product in the FDA's Orange Book. Specifically, the applicant must certify that: (1) the required patent information has not been filed; (2) the listed patent has expired; (3) the listed patent has not expired, but will expire on a particular date and approval is sought after patent expiration; or (4) the listed patent is invalid or will not be infringed by the new product. The ANDA applicant may also elect to submit a Section VIII statement certifying that its proposed ANDA label does not contain (or carves out) any language regarding the patented method-of-use rather than certify to a listed method-of-use patent. If the applicant does not challenge the listed patents, the ANDA application will not be approved until all the listed patents claiming the referenced product have expired.

A certification that the new product will not infringe the already approved product's listed patents, or that such patents are invalid, is called a Paragraph IV certification. If the ANDA applicant has provided a Paragraph IV certification to the FDA, the applicant must also send notice of the Paragraph IV certification to the NDA and patent holders once the ANDA has been accepted for filing by the FDA. The NDA and patent holders may then initiate a patent infringement lawsuit in response to the notice of the Paragraph IV certification. The filing of a patent infringement lawsuit within 45 days of the receipt of a Paragraph IV certification automatically prevents the FDA from approving the ANDA until the earlier of 30 months, expiration of the patent, settlement of the lawsuit or a decision in the infringement case that is favorable to the ANDA applicant.

An applicant submitting an NDA under Section 505(b)(2) of the FDCA, which permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by, or for, the

-102-

Table of Contents

applicant and for which the applicant has not obtained a right of reference, is required to certify to the FDA regarding any patents listed in the Orange Book for the approved product it references to the same extent that an ANDA applicant would.

*Market Exclusivity*

Market exclusivity provisions under the FDCA also can delay the submission or the approval of certain applications. The FDCA provides a five-year period of non-patent marketing exclusivity within the U.S. to the first applicant to gain approval of an NDA for a new chemical entity. A drug is a new chemical entity if the FDA has not previously approved any other new drug containing the same active moiety, which is the molecule or ion responsible for the action of the drug substance. During the exclusivity period, the FDA may not accept for review an ANDA or a 505(b)(2) NDA submitted by another company for another version of such drug where the applicant does not own or have a legal right of reference to all the data required for approval. However, an application may be submitted after four years if it contains a Paragraph IV certification. The FDCA also provides three years of marketing exclusivity for an NDA, 505(b)(2) NDA or supplement to an existing NDA if new clinical investigations, other than bioavailability studies, that were conducted or sponsored by the applicant are deemed by the FDA to be essential to the approval of the application, for example, for new indications, dosages or strengths of an existing drug. This three-year exclusivity covers only the conditions associated with the new clinical investigations and does not prohibit the FDA from approving ANDAs for drugs containing the original active agent. Five-year and three-year exclusivity will not delay the submission or approval of a full NDA; however, an applicant submitting a full NDA would be required to conduct or obtain a right of reference to all of the non-clinical studies and adequate and well-controlled clinical trials necessary to demonstrate safety and effectiveness.

*Post-Marketing Requirements*

Following approval of a new product, a pharmaceutical company and the approved product are subject to continuing regulation by the FDA, including, among other things, monitoring and record-keeping activities, reporting to the applicable regulatory authorities of adverse experiences with the product, providing the regulatory authorities with updated safety and efficacy information, product sampling and distribution requirements, and complying with promotion and advertising requirements, which include, among others, standards for direct-to-consumer advertising, restrictions on promoting drugs for uses or in patient populations that are not described in the drug's approved labeling (known as "off-label use"), limitations on industry-sponsored scientific and educational activities and requirements for promotional activities involving the internet, including social media. Although physicians may prescribe legally available drugs for off-label uses, manufacturers may not market or promote such off-label uses. Modifications or enhancements to the product or its labeling or changes of the site of manufacture are often subject to the approval of the FDA and other regulators, who may or may not grant approval, or may include in a lengthy review process.

Prescription drug advertising is subject to federal, state and foreign regulations. In the U.S., the FDA regulates prescription drug promotion, including direct-to-consumer advertising. Prescription drug promotional materials must be submitted to the FDA in conjunction with their first use. Any distribution of prescription drug products and pharmaceutical samples must comply with the U.S. Prescription Drug Marketing Act of 1987, as amended, or the PDMA, a part of the FDCA.

In the U.S., once a product is approved, its manufacture is subject to comprehensive and continuing regulation by the FDA. The FDA regulations require that products be manufactured in specific, approved facilities and in accordance with cGMP. We rely, and expect to continue to rely, on third parties for the production of clinical and commercial quantities of our products in accordance with cGMP regulations. cGMP regulations require, among other things, quality control and quality assurance as well as the corresponding maintenance of records and documentation and the obligation to investigate and correct any deviations from cGMP. Drug manufacturers and other entities involved in the manufacture and distribution of approved drugs are required to register their

-103-

**Table of Contents**

establishments with the FDA and certain state agencies, and are subject to periodic unannounced inspections by the FDA and certain state agencies for compliance with cGMP and other laws. Accordingly, manufacturers must continue to expend time, money and effort in the area of production and quality control to maintain cGMP compliance. These regulations also impose certain organizational, procedural and documentation requirements with respect to manufacturing and quality assurance activities. NDA holders using contract manufacturers, laboratories or packagers are responsible for the selection and monitoring of qualified firms and, in certain circumstances, qualified suppliers to these firms. These firms and, where applicable, their suppliers are subject to inspections by the FDA at any time, and the discovery of violative conditions, including failure to conform to cGMP, could result in enforcement actions that interrupt the operation of any such product or may result in restrictions on a product, manufacturer, or holder of an approved NDA, including, among other things, recall or withdrawal of the product from the market.

In addition, the manufacturer or sponsor under an approved NDA is subject to annual product and establishment fees, currently exceeding $104,000 per product and $554,000 per establishment for fiscal year 2014. These fees are typically increased annually.

The FDA also may require post-marketing testing, also known as Phase 4 testing, REMS to monitor the effects of an approved product or place conditions on an approval that could restrict the distribution or use of the product. Discovery of previously unknown problems with a product or the failure to comply with applicable FDA requirements can have negative consequences, including adverse publicity, judicial or administrative enforcement, untitled or warning letters from the FDA, mandated corrective advertising or communications with doctors, withdrawal of approval, and civil or criminal penalties, among others. Newly-discovered or developed safety or effectiveness data may require changes to a product's approved labeling, including the addition of new warnings and contraindications, and also may require the implementation of other risk management measures. Also, new government requirements, including those resulting from new legislation, may be established, or the FDA's policies may change, which could delay or prevent regulatory approval of our products in development.

*Reimbursement, Anti-Kickback and False Claims Laws and Other Regulatory Matters*

In the U.S., the research, manufacturing, distribution, sale and promotion of drug products and medical devices are potentially subject to regulation by various federal, state and local authorities in addition to the FDA, including the Centers for Medicare & Medicaid Services, or CMS, other divisions of the U.S. Department of Health and Human Services (*e.g.*, the Office of Inspector General), the Drug Enforcement Administration, the Consumer Product Safety Commission, the Federal Trade Commission, the Occupational Safety & Health Administration, the Environmental Protection Agency, state Attorneys General and other state and local government agencies. For example, sales, marketing and scientific/educational grant programs must comply with the federal Anti-Kickback Statute, the federal False Claims Act of 1986, as amended, or the federal False Claims Act, the privacy regulations promulgated under the Health Insurance Portability and Accountability Act of 1996, as amended, or HIPAA, and similar state laws. Pricing and rebate programs must comply with the Medicaid Drug Rebate Program requirements of the Omnibus Budget Reconciliation Act of 1990, as amended, and the Veterans Health Care Act of 1992, as amended. If products are made available to authorized users of the Federal Supply Schedule of the General Services Administration, additional laws and requirements apply. The handling of any controlled substances must comply with the U.S. Controlled Substances Act and Controlled Substances Import and Export Act. Products must meet applicable child-resistant packaging requirements under the U.S. Poison Prevention Packaging Act. All of these activities are also potentially subject to federal and state consumer protection and unfair competition laws.

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003, or the MMA, established the Medicare Part D program to provide a voluntary prescription drug benefit to Medicare beneficiaries. Under Part D, Medicare beneficiaries may enroll in prescription drug plans offered by private entities which will provide coverage of outpatient prescription drugs. Unlike Medicare Part A and B, Part D coverage is not standardized. Part D prescription drug plan sponsors are not required to pay for all covered Part D drugs, and each drug plan

-104-

Table of Contents

can develop its own drug formulary that identifies which drugs it will cover and at what tier or level. However, Part D prescription drug formularies must include drugs within each therapeutic category and class of covered Part D drugs, though not necessarily all the drugs in each category or class. Any formulary used by a Part D prescription drug plan must be developed and reviewed by a pharmacy and therapeutic committee. Government payment for some of the costs of prescription drugs may increase demand for products for which we receive regulatory approval. However, any negotiated prices for our products covered by a Part D prescription drug plan will likely be lower than the prices we might otherwise obtain. Moreover, while the MMA applies only to drug benefits for Medicare beneficiaries, private payors often follow Medicare coverage policy and payment limitations in setting their own payment rates. Any reduction in payment that results from the MMA may result in a similar reduction in payments from non-government payors.

The distribution of pharmaceutical products is subject to additional requirements and regulations, including extensive record-keeping, licensing, storage and security requirements intended to prevent the unauthorized sale of pharmaceutical products.

The American Recovery and Reinvestment Act of 2009 provides funding for the federal government to compare the effectiveness of different treatments for the same illness. A plan for the research will be developed by the Department of Health and Human Services, the Agency for Healthcare Research and Quality and the National Institutes for Health, and periodic reports on the status of the research and related expenditures will be made to Congress. Although the results of the comparative effectiveness studies are not intended to mandate coverage policies for public or private payors, it is not clear what effect, if any, the research will have on the sales of our drug candidate, if any such product or the condition that it is intended to treat is the subject of a clinical trial. It is also possible that comparative effectiveness research demonstrating benefits in a competitor's product could adversely affect the sales of our drug candidate. If third-party payors do not consider our products to be cost-effective compared to other available therapies, they may not cover our products after approval as a benefit under their plans or, if they do, the level of payment may not be sufficient to allow us to sell our products on a profitable basis.

In addition, in some foreign countries, the proposed pricing for a drug must be approved before it may be lawfully marketed. The requirements governing drug pricing vary widely from country to country. For example, the European Union provides options for its member states to restrict the range of medicinal products for which their national health insurance systems provide reimbursement and to control the prices of medicinal products for human use. A member state may approve a specific price for the medicinal product or it may instead adopt a system of direct or indirect controls on the profitability of the company placing the medicinal product on the market. There can be no assurance that any country that has price controls or reimbursement limitations for pharmaceutical products will allow favorable reimbursement and pricing arrangements for any of our products. Historically, products launched in the European Union do not follow price structures of the U.S. and generally tend to be priced significantly lower than in the U.S.

As noted above, in the U.S., we are subject to complex laws and regulations pertaining to healthcare "fraud and abuse," including, but not limited to, the federal Anti-Kickback Statute, the federal False Claims Act, and other state and federal laws and regulations. The federal Anti-Kickback Statute makes it illegal for any person, including a prescription drug manufacturer, or a party acting on its behalf, to knowingly and willfully solicit, receive, offer, or pay any remuneration that is intended to induce the referral of business, including the purchase, order or prescription of a particular drug, or other good or service for which payment in whole or in part may be made under a federal healthcare program, such as Medicare or Medicaid. Violations of this law are punishable by up to five years in prison, criminal fines, administrative civil money penalties, and exclusion from participation in federal healthcare programs. In addition, many states have adopted laws similar to the federal Anti-Kickback Statute. Some of these state prohibitions apply to the referral of patients for healthcare services reimbursed by any insurer, not just federal healthcare programs such as Medicare and Medicaid. Due to the breadth of these federal and state anti-kickback laws, the absence of guidance in the form of regulations or court decisions, and the potential for additional legal or regulatory change in this area, it is possible that our future sales and

-105-

Table of Contents

marketing practices or our future relationships with medical professionals might be challenged under anti-kickback laws, which could harm us. Because we intend to commercialize products that could be reimbursed under a federal healthcare program and other governmental healthcare programs, we plan to develop a comprehensive compliance program that establishes internal controls to facilitate adherence to the rules and program requirements to which we will or may become subject.

The federal False Claims Act prohibits anyone from knowingly presenting, or causing to be presented, for payment to federal programs (including Medicare and Medicaid) claims for items or services, including drugs, that are false or fraudulent, claims for items or services not provided as claimed, or claims for medically unnecessary items or services. Although we would not submit claims directly to payors, manufacturers can be held liable under these laws if they are deemed to "cause" the submission of false or fraudulent claims by, for example, providing inaccurate billing or coding information to customers or promoting a product off-label. In addition, our future activities relating to the reporting of wholesaler or estimated retail prices for our products, the reporting of prices used to calculate Medicaid rebate information and other information affecting federal, state and third-party reimbursement for our products, and the sale and marketing of our products, are subject to scrutiny under this law. For example, pharmaceutical companies have been found liable under the federal False Claims Act in connection with their off-label promotion of drugs. Penalties for a federal False Claims Act violation include three times the actual damages sustained by the government, plus mandatory civil penalties of between $5,500 and $11,000 for each separate false claim, the potential for exclusion from participation in federal healthcare programs and, although the federal False Claims Act is a civil statute, conduct that results in a federal False Claims Act violation may also implicate various federal criminal statutes. If the government were to allege that we were, or convict us of, violating these false claims laws, we could be subject to a substantial fine and may suffer a decline in our stock price. In addition, private individuals have the ability to bring actions under the federal False Claims Act and certain states have enacted laws modeled after the federal False Claims Act.

There are also an increasing number of state laws that require manufacturers to make reports to states on pricing and marketing information. Many of these laws contain ambiguities as to what is required to comply with the laws. In addition, as discussed below, beginning in 2013, a similar federal requirement requires manufacturers to track and report to the federal government certain payments made to physicians and teaching hospitals in the previous calendar year. These laws may affect our sales, marketing and other promotional activities by imposing administrative and compliance burdens on us. In addition, given the lack of clarity with respect to these laws and their implementation, our reporting actions could be subject to the penalty provisions of the pertinent state, and soon federal, authorities.

The failure to comply with regulatory requirements subjects companies to possible legal or regulatory action. Depending on the circumstances, failure to meet applicable regulatory requirements can result in criminal prosecution, fines or other penalties, injunctions, recall or seizure of products, total or partial suspension of production, denial or withdrawal of product approvals, or refusal to allow a company to enter into supply contracts, including government contracts.

Changes in regulations, statutes or the interpretation of existing regulations could impact our business in the future by requiring, for example: (1) changes to our manufacturing arrangements; (2) additions or modifications to product labeling; (3) the recall or discontinuation of our products; or (4) additional record-keeping requirements. If any such changes were to be imposed, they could adversely affect the operation of our business.

-106-

Table of Contents

*Patient Protection and Affordable Care Act*

In March 2010, the Patient Protection and Affordable Care Act, or the PPACA, was enacted, which includes measures that have or will significantly change the way healthcare is financed by both governmental and private insurers. Among the provisions of the PPACA of greatest importance to the pharmaceutical industry are the following:

- The Medicaid Drug Rebate Program requires pharmaceutical manufacturers to enter into and have in effect a national rebate agreement with the Secretary of the Department of Health and Human Services as a condition for states to receive federal matching funds for the manufacturer's covered outpatient drugs furnished to Medicaid patients. Effective in 2010, the PPACA made several changes to the Medicaid Drug Rebate Program, including increasing pharmaceutical manufacturers' rebate liability by raising the minimum basic Medicaid rebate on most branded prescription drugs and biologic agents to 23.1% of the average manufacturer price, or AMP, and adding a new rebate calculation for "line extensions" (*i.e.*, new formulations, such as extended release formulations) of solid oral dosage forms of branded products, as well as potentially impacting their rebate liability by modifying the statutory definition of AMP. The PPACA also expanded the universe of Medicaid utilization subject to drug rebates by requiring pharmaceutical manufacturers to pay rebates on Medicaid managed care utilization as of 2010 and by expanding the population potentially eligible for Medicaid drug benefits, to be phased-in by 2014. The CMS have proposed to expand Medicaid rebate liability to the territories of the U.S. as well. In addition, the PPACA provides for the public availability of retail survey prices and certain weighted average AMPs under the Medicaid program. The implementation of this requirement by the CMS may also provide for the public availability of pharmacy acquisition of cost data, which could negatively impact our sales.

- In order for a pharmaceutical product to receive federal reimbursement under the Medicare Part B and Medicaid programs or to be sold directly to U.S. government agencies, the manufacturer must extend discounts to entities eligible to participate in the 340B drug pricing program. The required 340B discount on a given product is calculated based on the AMP and Medicaid rebate amounts reported by the manufacturer. Effective in 2010, the PPACA expanded the types of entities eligible to receive discounted 340B pricing, although, under the current state of the law, with the exception of children's hospitals, these newly-eligible entities will not be eligible to receive discounted 340B pricing on orphan drugs when used for the orphan indication. In addition, as 340B drug pricing is determined based on AMP and Medicaid rebate data, the revisions to the Medicaid rebate formula and AMP definition described above could cause the required 340B discount to increase.

- Effective in 2011, the PPACA imposed a requirement on manufacturers of branded drugs and biologic agents to provide a 50% discount off the negotiated price of branded drugs dispensed to Medicare Part D patients in the coverage gap (*i.e.*, "donut hole").

- Effective in 2011, the PPACA imposed an annual, nondeductible fee on any entity that manufactures or imports certain branded prescription drugs and biologic agents, apportioned among these entities according to their market share in certain government healthcare programs, although this fee would not apply to sales of certain products approved exclusively for orphan indications.

- Effective in 2012, the PPACA required pharmaceutical manufacturers to track certain financial arrangements with physicians and teaching hospitals, including any "transfer of value" made or distributed to such entities, as well as any investment interests held by physicians and their immediate family members. Manufacturers are required to track this information beginning in 2013 and were required to make their first reports in March 2014. The information reported will be publicly available on a searchable website in September 2014.

- As of 2010, a new Patient-Centered Outcomes Research Institute was established pursuant to the PPACA to oversee, identify priorities in and conduct comparative clinical effectiveness research, along with funding for such research. The research conducted by the Patient-Centered Outcomes Research Institute may affect the market for certain pharmaceutical products.

-107-

**Table of Contents**

- The PPACA created the Independent Payment Advisory Board, which, beginning in 2014, has the authority to recommend certain changes to the Medicare program to reduce expenditures by the program that could result in reduced payments for prescription drugs. Under certain circumstances, these recommendations will become law unless Congress enacts legislation that will achieve the same or greater Medicare cost savings.

- The PPACA established the Center for Medicare and Medicaid Innovation within CMS to test innovative payment and service delivery models to lower Medicare and Medicaid spending, potentially including prescription drug spending. Funding has been allocated to support the mission of the Center for Medicare and Medicaid Innovation from 2011 to 2019.

Many of the details regarding the implementation of the PPACA are yet to be determined, and, at this time, the full effect of the PPACA on our business remains unclear.

*Pediatric Exclusivity and Pediatric Use*

Under the Best Pharmaceuticals for Children Act, or the BPCA, certain drugs may obtain an additional six months of exclusivity if the sponsor submits information requested in writing by the FDA, or a Written Request, relating to the use of the active moiety of the drug in children. Conditions for exclusivity include the FDA's determination that information relating to the use of a new drug in the pediatric population may produce health benefits in that population, the FDA making a written request for pediatric studies and the applicant agreeing to perform, and reporting on, the requested studies within the statutory timeframe. The FDA may not issue a Written Request for studies on unapproved or approved indications or where it determines that information relating to the use of a drug in a pediatric population, or part of the pediatric population, may not produce health benefits in that population. Applications under the BPCA are treated as priority applications, with all of the benefits that designation confers.

We have not received a Written Request for such pediatric studies, although we may ask the FDA to issue a Written Request for such studies in the future. To receive the six-month pediatric market exclusivity, we would need to receive a Written Request from the FDA, conduct the requested studies in accordance with a written agreement with the FDA or, if there is no written agreement, in accordance with commonly accepted scientific principles, and submit reports of the studies. A Written Request may include studies for indications that are not currently in the labeling if the FDA determines that such information will benefit the public health. The FDA will accept the reports upon its determination that the studies were conducted in accordance with, and are responsive to, the original Written Request or commonly accepted scientific principles, as appropriate, and that the reports comply with the FDA's filing requirements.

Under the Pediatric Research Equity Act of 2003, or the PREA, an NDA or supplement thereto must contain data that are adequate to assess the safety and effectiveness of the drug product for the claimed indications in all relevant pediatric subpopulations, and to support dosing and administration for each pediatric subpopulation for which the product is safe and effective. The PREA also authorizes the FDA to require holders of approved NDAs for marketed drugs to conduct pediatric studies under certain circumstances. With the enactment of the Food and Drug Administration Safety and Innovation Act, or the FDASIA, in 2012, sponsors must also submit pediatric study plans prior to the assessment data. Those plans must contain an outline of the proposed pediatric study or studies the applicant plans to conduct, including study objectives and design, any deferral or waiver requests, and other information required by regulation. The applicant, the FDA and the FDA's internal review committee must then review the information submitted, consult with each other and agree upon a final plan. The FDA or the applicant may request an amendment to the plan at any time.

The FDA may, on its own initiative or at the request of the applicant, grant deferrals for submission of some or all pediatric data until after approval of the product for use in adults, or full or partial waivers from the pediatric data requirements. Additional requirements and procedures relating to deferral requests and requests for extension of deferrals are contained in the FDASIA. Unless otherwise required by regulation, the pediatric data requirements do not apply to products with orphan designation.

-108-

[Table of Contents](#)

## Intellectual Property

Our portfolio of drug candidates is protected by a number of U.S. composition-of-matter patents, foreign patents and U.S. and foreign patent applications, all of which we in-license from Ligand. We plan to file additional patent applications in the U.S., E.U. and other foreign jurisdictions on our clinical and preclinical programs. Information regarding the issued patents and pending patent applications are as follows:

| Subject Matter | # Pending Applications | # Issued Patents | Geographical Scope | Nominal Patent Term |
|---|---|---|---|---|
| VK0612 | 3 | 12 | U.S., China, Hong Kong, Israel, Korea, Mexico, Indonesia and New Zealand | 2019-2020 |
| FBPase Inhibitor Combinations | 1 | 10 | U.S., India, China, Korea, Israel, Mexico, New Zealand and Russia | 2019-2021 |
| VK5211 | 11 | 4 | U.S., Europe, Chile, Argentina, Brazil, Canada, China, India, Japan, Korea, Mexico, Taiwan and Venezuela | 2025-2028 |
| Other SARM | 12 | 30 | U.S., Canada, India, Japan, Korea, Mexico, Australia, China, New Zealand, Argentina, Brazil, Europe and Israel | 2017-2026 |
| VK0214 | 1 | 1 | U.S. and India | 2024 |
| Other TRß agonists | 1 | 1 | Australia and Canada | 2026 |
| DGAT-1 Inhibitors | 2 | 0 | U.S. and Europe | 2030 |
| EPOR agonists | 12 | 1 | U.S., Australia, Canada, China, Europe, India, Japan and Korea | 2030-2031 |

## Corporate Information

We were incorporated under the laws of the State of Delaware on September 24, 2012. Our principal executive offices are located at 11119 North Torrey Pines Road, Suite 50, San Diego, CA 92037, and our telephone number is (858) 550-7810. Our website address is *www.vikingtherapeutics.com*. We do not incorporate the information on, or accessible through, our website into this prospectus, and you should not consider any information on, or accessible through, our website as part of this prospectus. We have included our website address in this prospectus solely as an inactive textual reference.

## Employees

As of June 15, 2014, we had four full-time employees, one part-time employee and one consultant, five of whom hold a Ph.D. or M.D. degree. All employees were engaged in research and development, project management, business development and finance. None of our employees is subject to a collective bargaining agreement. We have never experienced a material work stoppage or disruption to our business relating to employee matters. We consider our relationship with our employees to be good.

## Facilities

Our facilities consist of office space in San Diego, California. We lease approximately 5,851 square feet of space for our headquarters in San Diego, California under an agreement that expires December 31, 2014. We believe that our existing facilities are adequate to meet our current needs, and that suitable additional alternative spaces will be available in the future on commercially reasonable terms.

-109-

**Table of Contents**

**Legal Proceedings**

From time to time, we may be party to lawsuits in the ordinary course of business. We are not presently a party to any legal proceedings the outcome of which, if determined adversely to us, would individually or in the aggregate have a material adverse effect on our business, operating results or financial condition.

-110-

**Table of Contents**

# Management

### Executive Officers and Directors

The following table provides the names, ages, positions and descriptions of the business experience of our current executive officers and director and our directors as of June 15, 2014:

| Name | Age | Position |
|------|-----|----------|
| *Executive Officers*: | | |
| Brian Lian, Ph.D. | 48 | President, Chief Executive Officer and Interim Chairperson of the Board of Directors |
| Michael Morneau | 49 | Chief Financial Officer |
| Michael Dinerman, M.D. | 37 | Chief Operating Officer |
| Rochelle Hanley, M.D. | 62 | Chief Medical Officer |
| *Non-Employee Directors:* | | |
| Matthew W. Foehr | 41 | Director |
| Lawson Macartney, DVM, Ph.D. | 56 | Director (1), (2) |
| Matthew Singleton | 61 | Director (1), (3) |
| Stephen W. Webster | 53 | Director (1), (2), (3) |

(1)  Member of the Audit Committee.
(2)  Member of the Nominating and Corporate Governance Committee.
(3)  Member of the Compensation Committee.

*Executive Officers*

**Brian Lian, Ph.D.,** has served as our President and Chief Executive Officer and as a Director since our inception in September 2012. Dr. Lian has over 15 years of experience in the biotechnology and financial services industries. Prior to joining Viking, he was a Managing Director and Senior Research Analyst at SunTrust Robinson Humphrey, an investment bank, from 2012 to 2013. At SunTrust Robinson Humphrey, he was responsible for coverage of small and mid-cap biotechnology companies with an emphasis on companies in the diabetes, oncology, infectious disease and neurology spaces. Prior to SunTrust Robinson Humphrey, he was Managing Director and Senior Research Analyst at Global Hunter Securities, an investment bank, from 2011 to 2012. Prior to Global Hunter Securities, he was Senior Healthcare Analyst at The Agave Group, LLC, a registered investment advisor, from 2008 to 2011. Prior to The Agave Group, he was an Executive Director and Senior Biotechnology Analyst at CIBC World Markets, an investment bank, from 2006 to 2008. Prior to CIBC, he was a research scientist in small molecule drug discovery at Amgen, a biotechnology company. Prior to Amgen, he was a research scientist at Microcide Pharmaceuticals, a biotechnology company. Dr. Lian holds an MBA in accounting and finance from Indiana University, an MS and Ph.D. in organic chemistry from The University of Michigan, and a BA in chemistry from Whitman College. We believe that Dr. Lian's experience in the biotechnology industry, as well as his extensive investment banking and other experience in the financial services industry, provide him with the qualifications and skills to serve as a member of our board of directors and bring relevant strategic and operational guidance to our board of directors.

**Michael Morneau** has served as our Chief Financial Officer since May 2014. Mr. Morneau has over 20 years of accounting and financial experience at public and private companies in the biotechnology and accounting industries. Prior to Viking, from 2009 to 2014, he was VP of Finance and Chief Accounting Officer at Trius Therapeutics, Inc., a subsidiary of Cubist Pharmaceuticals, Inc., a pharmaceutical company, following Cubist's acquisition of Trius in September 2013. Prior to Trius, from 2008 to 2009, he was Director of Lilly Research Labs Finance at Eli Lilly and Company, a pharmaceutical company. Prior to Eli Lilly, from 2006 to 2008, he was Director of Finance and Accounting at SGX Pharmaceuticals, Inc., a biotechnology company, which was acquired by Eli Lilly. Prior to SGX, from 2004 to 2006, he was Controller at Momenta Pharmaceuticals, Inc., a

-111-

Table of Contents

biotechnology company. Mr. Morneau earned his MBA and MA in accounting from New Hampshire College, and a BA in mathematics from the University of New Hampshire.

**Michael Dinerman, M.D.,** has served as our Chief Operating Officer since our inception in September 2012. He also served as a member of our board of directors from our inception until May 2014. Dr. Dinerman has over seven years of experience in healthcare equity research across multiple therapeutic disciplines. From 2009 to 2013, he was a Research Analyst with Piper Jaffray & Co., an investment bank, covering the Specialty Pharmaceuticals and Medical Device industries. Prior to Piper Jaffray, he was an Associate and, most recently, a Director, at CIBC World Markets, an investment bank, covering large and small cap biotechnology companies, from 2005 to 2008. Dr. Dinerman earned his M.D. from the University of Cincinnati College of Medicine and an MBA from the Freeman School of Business at Tulane University with a focus in finance and management. Dr. Dinerman received a BS in Economics with honors from Tulane University.

**Rochelle Hanley M.D., F.A.C.P.,** has served as our Chief Medical Officer since April 2013. Dr. Hanley is Board Certified in internal medicine and clinical pharmacology and has 20 years of drug development experience, primarily in diabetes and metabolic disorders. She is a fellow of the American College of Physicians and is the recipient of several awards and honors, including the Pfizer Medical Research Merit Award in 1984, NIH Physician Scientist from 1986 to 1991, Established Investigator, American Heart Association, from 1991 to 1993, and the NIH FIRST Award from 1991 to 1993. Dr. Hanley is also a Diplomate of the American Board of Internal Medicine and a Diplomate of the American Board of Clinical Pharmacology. From 2011 to 2013, Dr. Hanley was an independent consultant to the pharmaceutical industry. Prior to that, she was Medical Director, Cardiovascular, Metabolic and Musculoskeletal Diseases at GlaxoSmithKline, or GSK, a pharmaceutical company, responsible for Asia Pacific research and development activities for albiglutide and darapladib, from 2008 to 2011. Prior to her position with GSK, from 2006 to 2008, she served as Chief Medical Officer for Quatrx Pharmaceuticals, a biotechnology company, managing the clinical program for ospemifene, for vaginal atrophy, which received U.S. approval in 2013. Prior to Quatrx, she was VP and Clinical Site Head, Ann Arbor at Pfizer, Inc., a pharmaceutical company. Prior to becoming Site Head, she was VP and Therapeutic Area Development Leader, Cardiovascular and Metabolic Diseases, Pfizer Global R&D. Prior to Pfizer, she was Senior Director, Endocrine and Diabetes Clinical Development, Parke Davis Pharmaceutical Research. Prior to Parke Davis, she was International Therapeutic Head, Metabolic Diseases, Glaxo Wellcome, a pharmaceutical company. Prior to Glaxo Wellcome, Dr. Hanley was an Assistant Professor, Division of Endocrinology, Duke University Medical Center. Dr. Hanley received her M.D. from the University of Michigan and a BA in molecular and cell biology from Smith College, and is licensed to practice medicine in Michigan and North Carolina (inactive).

*Non-Employee Directors*

**Matthew W. Foehr** has served as a member of our board of directors since May 2014. Mr. Foehr has served as Executive Vice President and Chief Operating Officer at Ligand Pharmaceuticals Incorporated since April 2011 and has 20 years of experience in the pharmaceutical industry, having managed global operations and research and development programs. From March 2010 to April 2011, he was Vice President and Head of Consumer Dermatology R&D, as well as Acting Chief Scientific Officer of Dermatology, in the Stiefel division of GSK. Following GSK's $3.6 billion acquisition of Stiefel Laboratories, Inc., a pharmaceutical company, in 2009, Mr. Foehr led the R&D integration of Stiefel into GSK. At Stiefel Laboratories, Inc., Mr. Foehr served as Senior Vice President of Global R&D Operations, Senior Vice President of Product Development & Support, and Vice President of Global Supply Chain Technical Services from January 2007 to March 2010. Prior to Stiefel, Mr. Foehr held various executive roles at Connetics Corporation, a pharmaceutical company, including Senior Vice President of Technical Operations and Vice President of Manufacturing. Early in his career, Mr. Foehr managed manufacturing activities and worked in process sciences at both LXR Biotechnology Inc. and Berlex Biosciences. Mr. Foehr is the author of multiple scientific publications and is named on numerous U.S. patents. He received his BS in Biology from Santa Clara University. We believe that Mr. Foehr's past service in executive management roles for companies in the pharmaceutical industry and related experience provide him

-112-

Table of Contents

with the qualifications and skills to serve as a member of our board of directors. Pursuant to the management rights letter between us and Ligand, dated May 21, 2014, Ligand has the right to nominate one individual for election to our board of directors, and Mr. Foehr is the current member of our board of directors nominated by Ligand.

**Lawson Macartney, DVM, Ph.D.,** has served as a member of our board of directors since May 2014. Dr. Macartney has served as President, Chief Executive Officer and a member of the board of directors of Ambrx Inc., a biopharmaceutical company, since February 2013. Prior to Ambrx, Dr. Macartney served at Shire AG, a specialty biopharmaceutical company, as Senior Vice President of the Emerging Business Unit from 2011 to 2013, where he was responsible for discovery initiatives through Phase 3 development of Shire's Specialty Pharmaceutical portfolio. Prior to joining Shire AG, he served at GSK, a pharmaceutical company, from 1999 to 2011, serving as Senior Vice President of Global Product Strategy and Project/Portfolio Management from 2007 to 2011, as Senior Vice President, Cardiovascular and Metabolic Medicine Development Center from 2004 to 2007, and as Vice President, Global Head of Cardiovascular, Metabolic and Urology Therapeutic Areas from 1999 to 2004. Prior to joining GSK, Dr. Macartney was employed at Astra Pharmaceuticals from 1998 to 1999 in leadership roles in operations, marketing and sales, and served as Executive Director, Commercial Operations at AstraMerck, Inc., a pharmaceutical company, from 1996 to 1998. Dr. Macartney received his Ph.D. from Glasgow University in Scotland in 1982, where he was a Royal Society Research Fellow, and his B.V.M.S. (equivalent to a D.V.M.) in 1979 from Glasgow University Veterinary School. He is also trained in diagnostic pathology and is a Fellow of the Royal College of Pathologists. We believe that Dr. Macartney's extensive experience in leadership positions at numerous pharmaceutical companies qualifies him to serve on our board of directors.

**Matthew Singleton** has served as a member of our board of directors since May 2014. In October 2011, Mr. Singleton retired from his position as Executive Vice President and Chief Financial Officer of CitationAir (formerly CitationShares LLC), a privately held jet services company wholly-owned by Textron Inc., a public industrial conglomerate. He had served in this position since 2000. Mr. Singleton has extensive financial, accounting and transactional experience, including through his role as Managing Director, Executive Vice President and Chief Administrative Officer of CIBC World Markets, an investment banking company, for 20 years, from 1974 to 1994, at Arthur Andersen & Co., a public accounting firm, including as Partner-in-Charge of the Metro New York Audit and Business Advisory Practice, and as a Practice Fellow at the Financial Accounting Standards Board, a private organization responsible for establishing financial accounting reporting standards. From 2003 until 2014, Mr. Singleton served as a director of Cubist Pharmaceuticals Inc., and as Audit Committee Chair beginning in 2004. Mr. Singleton previously served as an independent director of Salomon Reinvestment Company Inc., a privately held investment services company. Mr. Singleton received an AB in Economics from Princeton University and his MBA from New York University with a focus in Accounting. We believe that Mr. Singleton's financial, accounting and business expertise provide him with the qualifications and skills to serve as a member of our board of directors, and are of particular importance as we continue to finance our operations.

**Stephen W. Webster** has served as a member of our board of directors since May 2014. Mr. Webster was previously SVP and Chief Financial Officer of Optimer Pharmaceuticals, Inc., a biotechnology company, from 2012 to 2013, until its acquisition by Cubist Pharmaceuticals, Inc. Prior to joining Optimer, Mr. Webster served as SVP and Chief Financial Officer of Adolor Corporation, a biopharmaceutical company, from June 2008 until its acquisition by Cubist Pharmaceuticals, Inc. in December 2011. From 2007 until joining Adolor Corporation in 2008, Mr. Webster served as Managing Director, Investment Banking Division, Health Care Group for Broadpoint Capital Inc. (formerly First Albany Capital). Mr. Webster previously served as co-founder, President and Chief Executive Officer for Neuronyx, Inc., a biopharmaceutical company, from 2000 to 2006. From 1987 to 2000, Mr. Webster served in positions of increased responsibility, including as Director, Investment Banking Division, Health Care Group for PaineWebber Incorporated. He previously served as a Director of HearUSA (now Husa Liquidating Corporation), a public company specializing in hearing care, from 2008-2012, and he currently serves as a Director of the Pennsylvania Biotechnology Association. Mr. Webster holds an AB in Economics *cum laude* from Dartmouth College and an MBA in Finance from The Wharton School of the

-113-

[Table of Contents](#)

University of Pennsylvania. We believe that Mr. Webster's extensive experience in the biopharmaceutical industry, and in particular his prior service as chief financial officer and in other executive management roles, provide him with the qualifications and skills to serve as a member of our board of directors.

**Other Significant Employees and Consultants**

The following sets forth the names, ages, positions and descriptions of the business experience of our significant employees and consultants other than our executive officers as of June 15, 2014:

*Hiroko Masamune, Ph.D.*, age 57, has served as our Senior Vice President of Pharmaceutical Development since June 2014. Prior to joining Viking, Dr. Masamune was Vice President, Product Development at Aires Pharmaceuticals, Inc., a company focused on developing therapies for pulmonary vascular disorders, from 2010 to 2014. Before joining Aires, Dr. Masamune served as Vice President, Product Development at Palkion Inc., from 2008 to 2010. At Palkion, she was responsible for all aspects of preclinical development and served as its alliance manager. From 2005 to 2008, Dr. Masamune served as a Senior Director, Pharmaceutical Sciences at Neurogen Corp., where she oversaw two Phase 2 candidates for the treatment of insomnia and Parkinson's disease/restless leg syndrome, one Phase 1 candidate for the treatment of obesity, and a range of early development and late discovery candidates. Previously she spent 14 years in drug discovery and development at Pfizer working in the areas of cardiovascular, pulmonary and infectious diseases. She earned a BS in Organic Chemistry from the University of Wisconsin, and a Ph.D. in Organic Chemistry from the University of California, Los Angeles. Dr. Masamune completed her post-doctoral fellowship in Organic Chemistry at the Massachusetts Institute of Technology.

*Michael Bleavins, Ph.D., DABT*, age 59, has served as our Vice President of Preclinical Development in a consultant capacity since June 2014. Dr. Bleavins is currently the owner of White Crow Innovation, LLC, a pharmaceutical consulting firm, where he has served as an industry consultant since 2012. Prior to White Crow, from 2006 to 2012, he was a co-founder of Michigan Technology and Research Institute, a consulting and pharmacogenomic testing company for biopharmaceutical companies. Prior to Michigan Technology and Research Institute, he served as Executive Director, Safety Translation and Technology, Worldwide Safety Sciences, at Pfizer Inc., a pharmaceutical company, from 2000 to 2006. Prior to Pfizer, he was employed by Parke-Davis/Warner-Lambert Company, a pharmaceutical company, from 1987 to 2000 (until its merger with Pfizer), as Senior Director, Clinical and Molecular Pathology, Worldwide Preclinical Safety. Dr. Bleavins is an adjunct faculty member in the Department of Pharmaceutical Sciences at Wayne State University, and in the Department of Environmental Health Sciences at The University of Michigan. Dr. Bleavins earned an MS and Ph.D. in Environmental Toxicology at Michigan State University, and a Bachelor of Philosophy in natural science at Monteith College (Wayne State University).

*Scientific Advisors and Consultants*

From time to time, our management seeks the advice and guidance of certain scientific advisors and consultants regarding clinical and regulatory development programs and other customary matters. Our scientific advisors are experts in various areas of medicine and drug development, including physiology, biophysics, chemistry, and endocrine, metabolic and cardiovascular diseases. We refer to the following individuals as our scientific advisors and consultants:

*David Bullough, Ph.D.* VP, Preclinical Development, RaNA Therapeutics. Former Executive Director, Pfizer. Former VP, Preclinical Development, Metabasis Therapeutics, Inc.

*Alan D. Cherrington, Ph.D.* Professor of Molecular Physiology and Biophysics, Professor of Medicine, Turner Chair in Diabetes Research, Vanderbilt University Medical Center. Past President, American Diabetes Association.

-114-

Table of Contents

*G. Alexander Fleming, M.D.* CEO, Kinexum. Former Group Leader, Division of Metabolic and Endocrine Drug Products, FDA. Former member, ICH working groups E6-Good Clinical Practice; and E8-General Considerations for Clinical Trials.

*Dr. Trevor Gibbs, FRCP, MRCGP, DCH, FFPM.* Co-founder, MyMedsandMe Ltd, Founder, ClinSentry, Ltd. Chair, Cambridge Clinical Trials Unit Steering Committee. Former Head, Clinical Development, Medical Affairs, Safety, Pharmacovigilance & Medical Governance, GSK.

*Scott J. Hecker, Ph.D.* VP, Chemistry, Rempex Pharmaceuticals (a subsidiary of The Medicines Company). Former VP, Chemistry, Metabasis Therapeutics, Inc. Former VP, Chemistry, Microcide Pharmaceuticals. Former Senior Research Investigator, Discovery Research, Pfizer.

## Board of Directors

Our business and affairs are managed under the direction of our board of directors, which currently consists of five members. The primary responsibilities of our board of directors are to provide oversight, strategic guidance, counseling and direction to our management.

In accordance with our amended and restated certificate of incorporation and our amended and restated bylaws, immediately after the completion of this offering, our board of directors will be divided into three classes with staggered three-year terms. Only one class of directors will be elected at each annual meeting of our stockholders, with the other classes continuing for the remainder of their respective three-year terms. Our directors will be divided among the three classes as follows:

- our class I director will be Mr. Foehr and his term will expire at the annual meeting of stockholders to be held in 2015;

- our class II directors will be Mr. Singleton and Mr. Webster and their term will expire at the annual meeting of stockholders to be held in 2016; and

- our class III directors will be Dr. Lian and Dr. Macartney and their term will expire at the annual meeting of stockholders to be held in 2017.

At each annual meeting of stockholders after the initial classification, the successors to the directors whose term will then expire will be elected to serve from the time of election and qualification until the third annual meeting following election. In addition, the authorized number of directors may be changed only by resolution of our board of directors. Any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors. This classification of our board of directors may have the effect of delaying or preventing a change of our management or a change in control.

## Director Independence

Under the Nasdaq Rules, a majority of the members of our board of directors must satisfy the Nasdaq criteria for "independence." No director qualifies as independent under the Nasdaq Rules unless our board of directors affirmatively determines that the director does not have a relationship with us that would impair independence (directly or as a partner, stockholder or officer of an organization that has a relationship with us). Our board of directors has determined that Dr. Macartney and Messrs. Singleton and Webster are independent directors as defined under the Nasdaq Rules. Dr. Lian is not independent under the Nasdaq Rules as a result of his position as our President and Chief Executive Officer. Mr. Foehr is not independent under the Nasdaq Rules in light of the Master License Agreement and related agreements between us and Ligand and Mr. Foehr's position as an executive officer of Ligand.

-115-

Table of Contents

**Committees of the Board of Directors**

Our board of directors has established an audit committee, a compensation committee and a nominating and corporate governance committee. The composition and responsibilities of each of the committees of our board of directors are described below. Members serve on these committees until their resignation, disqualification or removal or until otherwise determined by our board of directors.

*Audit Committee*

Our audit committee is comprised of Dr. Macartney and Messrs. Singleton and Webster, with Mr. Singleton serving as Chairperson of the committee. Each member of the audit committee must be independent as defined under the applicable Nasdaq Rules and SEC rules and financially literate under the Nasdaq Rules. Our board of directors has determined that each member of the audit committee is "independent" and "financially literate" under the Nasdaq Rules and the SEC rules and that Mr. Singleton is an "audit committee financial expert" under the rules of the SEC. The responsibilities of the audit committee are included in a written charter. The audit committee acts on behalf of our board of directors in fulfilling our board of directors' oversight responsibilities with respect to our corporate accounting and financial reporting processes, the systems of internal control over financial reporting and audits of financial statements, and also assists our board of directors in its oversight of the quality and integrity of our financial statements and reports and the qualifications, independence and performance of our independent registered public accounting firm. For this purpose, the audit committee performs several functions. The audit committee's responsibilities include:

- appointing, determining the compensation of, retaining, overseeing and evaluating our independent registered public accounting firm and any other registered public accounting firm engaged for the purpose of performing other review or attest services for us;

- prior to commencement of the audit engagement, reviewing and discussing with the independent registered public accounting firm a written disclosure by the prospective independent registered public accounting firm of all relationships between us, or persons in financial oversight roles, and such independent registered public accounting firm or their affiliates;

- determining and approving engagements of the independent registered public accounting firm, prior to commencement of the engagement, and the scope of and plans for the audit;

- monitoring the rotation of partners of the independent registered public accounting firm on our audit engagement;

- reviewing with management and the independent registered public accounting firm any fraud that includes management or employees who have a significant role in our internal control over financial reporting and any significant changes in internal controls;

- establishing and overseeing procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or other auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- reviewing management's efforts to monitor compliance with our policies designed to ensure compliance with laws and rules; and

- reviewing and discussing with management and the independent registered public accounting firm the results of the annual audit and the independent registered public accounting firm's assessment of the quality and acceptability of our accounting principles and practices and all other matters required to be communicated to the audit committee by the independent registered public accounting firm under generally accepted accounting standards, the results of the independent registered public accounting firm's review of our quarterly financial information prior to public disclosure and our disclosures in our periodic reports filed with the SEC.

-116-

[Table of Contents](#)

The audit committee will review, discuss and assess its own performance and composition at least annually. The audit committee will also periodically review and assesses the adequacy of its charter, including its role and responsibilities as outlined in its charter, and recommend any proposed changes to our board of directors for its consideration and approval.

*Compensation Committee*

Our compensation committee is comprised of Messrs. Singleton and Webster, with Mr. Webster serving as Chairperson of the committee. Our board of directors has determined that each member of the committee is "independent" under the Nasdaq Rules and all applicable laws. Each of the members of this committee is also a "nonemployee director" as that term is defined under Rule 16b-3 of the Exchange Act and an "outside director" as that term is defined in Treasury Regulations Section 1.162-27(3). The compensation committee acts on behalf of our board of directors to fulfill our board of directors' responsibilities in overseeing our compensation policies, plans and programs; and in reviewing and determining the compensation to be paid to our executive officers and non-employee directors. The responsibilities of the compensation committee include:

- reviewing, modifying and approving (or, if the compensation committee deems appropriate, making recommendations to our board of directors regarding) our overall compensation strategies and policies, and reviewing and approving corporate performance goals and objectives relevant to the compensation of our executive officers and senior management;

- determining and approving (or, if the compensation committee deems appropriate, recommending to our board of directors for determination and approval) the compensation and terms of employment of our Chief Executive Officer, including seeking to achieve an appropriate level of risk and reward in determining the long-term incentive component of the Chief Executive Officer's compensation;

- determining and approving (or, if the compensation committee deems appropriate, recommending to our board of directors for determination and approval) the compensation and terms of employment of our executive officers and senior management;

- evaluating and approving (or, if it deems appropriate, making recommendations to our board of directors regarding) corporate performance goals and objectives relevant to the compensation of our executive officers and senior management;

- reviewing and approving (or, if it deems appropriate, making recommendations to our board of directors regarding) the terms of employment agreements, severance agreements, change-of-control protections and other compensatory arrangements for our executive officers and senior management;

- conducting periodic reviews of the base compensation levels of all of our employees generally;

- reviewing and approving the type and amount of compensation to be paid or awarded to non-employee directors;

- reviewing and approving the adoption, amendment and termination of our stock option plans, stock appreciation rights plans, pension and profit sharing plans, incentive plans, stock bonus plans, stock purchase plans, bonus plans, deferred compensation plans and similar programs, if any; and administering all such plans, establishing guidelines, interpreting plan documents, selecting participants, approving grants and awards and exercising such other power and authority as may be permitted or required under such plans;

- reviewing our incentive compensation arrangements to determine whether such arrangements encourage excessive risk-taking, and reviewing and discussing the relationship between our risk management policies and practices and compensation, and evaluating compensation policies and practices that could mitigate any such risk, at least annually;

- reviewing and recommending to our board of directors for approval the frequency with which we conduct a vote on executive compensation, taking into account the results of the most recent stockholder advisory vote on the frequency of the vote on executive compensation, and reviewing and approving the proposals regarding the frequency of the vote on executive compensation to be included in our annual meeting proxy statements; and

-117-

**Table of Contents**

- reviewing and discussing with management our Compensation Discussion and Analysis, and recommending to our board of directors that the Compensation Discussion and Analysis be approved for inclusion in our annual reports on Form 10-K, registration statements and our annual meeting proxy statements.

Under its charter, the compensation committee may form, and delegate authority to, subcommittees as appropriate. The compensation committee will review, discuss and assess its own performance and composition at least annually. The compensation committee will also periodically review and assess the adequacy of its charter, including its role and responsibilities as outlined in its charter, and recommend any proposed changes to our board of directors for its consideration and approval.

*Nominating and Corporate Governance Committee*

Our nominating and corporate governance committee is comprised of Dr. Macartney and Mr. Webster, with Dr. Macartney serving as Chairperson of the committee. Our board of directors has determined that each member of the committee is "independent" under the Nasdaq Rules and all applicable laws. The responsibilities of the nominating and corporate governance committee are included in its written charter. The nominating and corporate governance committee acts on behalf of our board of directors to fulfill our board of directors' responsibilities in overseeing all aspects of our nominating and corporate governance functions. The responsibilities of the nominating and corporate governance committee include:

- making recommendations to our board of directors regarding corporate governance issues;

- identifying, reviewing and evaluating candidates to serve as directors (consistent with criteria approved by our board of directors);

- determining the minimum qualifications for service on our board of directors;

- reviewing and evaluating incumbent directors;

- instituting and overseeing director orientation and director continuing education programs;

- serving as a focal point for communication between candidates, non-committee members and our management;

- recommending to our board of directors for selection candidates to serve as nominees for director for the annual meeting of stockholders;

- making other recommendations to our board of directors regarding matters relating to the directors;

- reviewing succession plans for our Chief Executive Officer and our other executive officers; and

- considering any recommendations for nominees and proposals submitted by stockholders.

The nominating and corporate governance committee will periodically review, discuss and assess the performance of our board of directors and the committees of our board of directors. In fulfilling this responsibility, the nominating and corporate governance committee will seek input from senior management, our board of directors and others. In assessing our board of directors, the nominating and corporate governance committee will evaluate the overall composition of our board of directors, our board of directors' contribution as a whole and its effectiveness in serving our best interests and the best interests of our stockholders. The nominating and corporate governance committee will also periodically review and assess the adequacy of its charter, including its role and responsibilities as outlined in its charter, and recommend any proposed changes to our board of directors for its consideration and approval.

**Board Leadership Structure**

Our amended and restated bylaws provide our board of directors with flexibility in its discretion to combine or separate the positions of Chairperson of our board of directors and Chief Executive Officer. Dr. Lian currently

-118-

[Table of Contents](#)

serves as the Interim Chairperson of our board of directors. Commencing on the closing date of this offering, an independent director will assume the role of Chairperson of our board of directors. As a general policy, our board of directors believes that separation of the positions of Chairperson of our board of directors and Chief Executive Officer reinforces the independence of our board of directors from management, creates an environment that encourages objective oversight of management's performance and enhances the effectiveness of our board of directors as a whole. We believe that this separation of responsibilities will provide a balanced approach to managing our board of directors and overseeing the company. However, our board of directors will continue to periodically review our leadership structure and may make such changes in the future as it deems appropriate.

### Role of Board in Risk Oversight Process

Our board of directors is responsible for overseeing our overall risk management process. The responsibility for managing risk rests with executive management while the committees of our board of directors and our board of directors as a whole participate in the oversight process. Our board of directors' risk oversight process builds upon management's risk assessment and mitigation processes, which include reviews of long-term strategic and operational planning, executive development and evaluation, regulatory and legal compliance, and financial reporting and internal controls.

### Executive Officers

Our executive officers are elected by, and serve at the discretion of, our board of directors. There are no familial relationships between our directors and executive officers.

### Code of Conduct and Ethics

Prior to the completion of this offering, our board of directors will adopt a code of conduct and ethics that will apply to all of our employees, officers and directors, including our Chief Executive Officer, Chief Financial Officer and other executive and senior officers. Upon completion of this offering, the code of conduct and ethics will be posted on our website. Upon adoption, the code of conduct and ethics can only be amended by the approval of our audit committee and any waiver to the code of conduct and ethics for an executive officer or director may only be granted by our audit committee and must be timely disclosed as required by applicable law. We expect that any amendments to the code of conduct and ethics, or any waivers of its requirements, will be disclosed on our website.

### Compensation Committee Interlocks and Insider Participation

None of the members of our compensation committee has at any time since our inception been one of our officers or employees. None of our executive officers currently serves, or in the last completed fiscal year has served, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving on our board of directors or compensation committee.

### Non-Employee Director Compensation

During the year ended December 31, 2013, Dr. Lian and Dr. Dinerman were our only directors. Therefore, we had no non-employee members of our board of directors during the year ended December 31, 2013.

We have approved a compensation policy for our non-employee directors that consists of annual retainer fees and long-term equity awards, which will become effective upon the effective date of the registration statement of which this prospectus forms a part. Under this policy, each non-employee director will receive an annual retainer of $33,170 for serving on our board of directors. The Chairperson of our board of directors will receive an additional annual retainer of $32,800, the chairperson of the audit committee will receive an additional annual

-119-

Table of Contents

retainer of $16,650, the chairperson of the compensation committee will receive an additional annual retainer of $11,350 and the chairperson of the nominating and corporate governance committee will receive an additional annual retainer of $9,280. Each other member of the audit committee will receive an additional annual retainer of $8,900, each other member of the compensation committee will receive an additional annual retainer of $6,750 and each other member of the nominating and corporate governance committee will receive an additional annual retainer of $4,900. All cash retainers will be earned on quarterly basis based on a calendar quarter and will be paid in arrears no later than the 30th day following the end of each calendar quarter.

In addition to cash fees, each non-employee director will receive an annual equity award having a value, as of the date of grant, equal to $55,000. If a non-employee director joins our board of directors other than at an annual meeting of our stockholders, the annual equity award would be reduced on a pro rata basis for each day prior to the date of grant that has passed since the last annual meeting. Annual equity awards will be granted on the date of each of our annual meeting of stockholders and will vest in full on the date of the first annual meeting of stockholders following the applicable date of grant, subject to the director's continuous service through such date.

In addition, each non-employee director who is providing services as a director on the effective date of the registration statement of which this prospectus forms a part will be entitled to receive a one-time initial equity award having a value, as of the date of grant, equal to $55,000. This initial equity award will vest in full on the date of our first annual meeting of stockholders following completion of this offering, subject to the director's continuous service through such date.

Each initial equity award and each annual equity award will have a maximum term of ten years and will be made in the form of nonstatutory stock options. For any non-employee director serving at the time of a change in control of our company (as defined in our 2014 Equity Incentive Plan), all then-outstanding and unvested compensatory equity awards granted under the non-employee director compensation policy would become fully vested and exercisable, if applicable, immediately prior to the change in control.

-120-

Table of Contents

# Executive Compensation

Our named executive officers for the year ended December 31, 2013, which consist of our principal executive officer and the two other most highly compensated executive officers who were serving as executive officers as of December 31, 2013, are:

- Brian Lian, Ph.D., our Chief Executive Officer;

- Michael Dinerman, M.D., our Chief Operating Officer; and

- Rochelle Hanley, M.D., our Chief Medical Officer.

**Summary Compensation Table for 2013**

The following table sets forth certain information with respect to the compensation paid to our named executive officers for the fiscal year ended December 31, 2013:

| Name and Principal Position | Salary ($) | Non-Equity Incentive Plan Compensation ($) | Stock Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Brian Lian, Ph.D. *Chief Executive Officer* | 39,500 | – | – | – | 39,500 |
| Michael Dinerman, M.D. *Chief Operating Officer* | 6,500 | – | – | – | 6,500 |
| Rochelle Hanley, M.D. *Chief Medical Officer* | – | – | – | – | |

**Narrative Disclosure to Summary Compensation Table for 2013**

*2013 Employment Agreements and Arrangements*

Pursuant to an agreement among us, Dr. Lian and Dr. Dinerman, we agreed to make monthly salary payments to each of Dr. Lian and Dr. Dinerman. Pursuant to this agreement, we agreed to pay (1) Dr. Lian a salary of $7,000 for the month of July 2013 and a salary of $6,500 per month thereafter, and (2) Dr. Dinerman a salary of $3,000 for the month of November 2013 and $3,500 per month thereafter. This agreement was terminated effective as of June 1, 2014.

**New Employment Agreements**

*Employment Agreement – President and Chief Executive Officer*

On May 21, 2014, we entered into an employment agreement with Brian Lian, Ph.D., as our President and Chief Executive Officer, or the Lian Employment Agreement, which became effective on June 2, 2014. The Lian Employment Agreement has an initial term of one year, or through June 2, 2015, subject to automatic renewal for additional one-year periods unless either party gives the other written notice of its or his election to not renew, or a Lian Non-Renewal Notice. Pursuant to the Lian Employment Agreement, we agreed to nominate Dr. Lian, and to continue to nominate him, to serve as a member of our board of directors, and Dr. Lian agreed to continue to serve as a member of our board of directors for as long as he is elected by our stockholders, until his employment with us is terminated. Pursuant to the terms of the Lian Employment Agreement, Dr. Lian's base salary is currently $193,193 per year. Commencing on the date following completion of this offering, Dr. Lian's annual base salary will increase to $386,386, subject to annual review by our board of directors or compensation committee and, if appropriate, increase (but not decrease except in certain limited circumstances). Additionally, the Lian Employment Agreement provides that Dr. Lian will be eligible to receive a target annual bonus in an

-121-

**Table of Contents**

amount equal to 40% of his base salary in effect on June 30th of each calendar year for 2015 and after (and an amount of $115,915 for 2014, pro rated from the effective date of his employment agreement), which bonus will be based on our financial performance and Dr. Lian's individual performance, in each case as determined by our board of directors or compensation committee. However, for 2014, Dr. Lian's target annual bonus will be equal to 40% of his salary in effect prior to completion of this offering, pro-rated from June 2, 2014 through December 31, 2014.

Under the Lian Employment Agreement, our board of directors will recommend to our compensation committee that, on the closing date of this offering, Dr. Lian be granted (1) a stock option to purchase 87,500 shares of our common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the option will be vested upon grant and 25% of the shares subject to the option will vest on each one-year anniversary of the date of grant for the next three years, so long as Dr. Lian continues to provide service to us on each applicable vesting date; (2) an award of 87,500 shares of common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the award will be vested upon issuance and 25% of the shares subject to the award will vest on each one-year anniversary of the date of issuance for the next three years, so long as Dr. Lian continues to provide service to us on each applicable vesting date; and (3) an additional award of shares of common stock in an amount equal to: the quotient obtained by dividing (i) the product of $289,789.74 multiplied by the number of days between the date of the closing of this offering and June 2, 2014, by (ii) the product obtained by multiplying 365 by the closing sales price of our common stock on the date of the closing of this offering, rounded down to the nearest whole share, which will be fully vested upon grant or, collectively, the Lian Awards. The Lian Awards will be issued under and subject to the terms and conditions of the 2014 Equity Incentive Plan.

Dr. Lian's employment with us is at-will, meaning either we or Dr. Lian may terminate the employment relationship at any time, with or without cause. However, Dr. Lian must provide at least 60 days' written notice of resignation. If we terminate Dr. Lian's employment, then, so long as Dr. Lian complies with certain obligations, including execution and delivery of a general release within a specified period of time, we will pay Dr. Lian: (1) his base salary as of the termination date for six months following the termination date, if such termination is pursuant to a Lian Non-Renewal Notice, disability or death, or for 12 months in the case of termination other than by Lian Non-Renewal Notice, for cause, disability or death; (2) six monthly payments if such termination is pursuant to a Lian Non-Renewal Notice, disability or death, or 12 monthly payments in the case of termination other than by Lian Non-Renewal Notice, for cause, disability or death, in each case equal to 1/12 the amount equal to Dr. Lian's target annual bonus percentage as of the termination date multiplied by Dr. Lian's base salary as of such date; and (3) subject to Dr. Lian's timely election of COBRA, the amount equal to the COBRA premiums for the lesser of (a) six months if such termination is pursuant to a Lian Non-Renewal Notice, disability or death, or 12 months in the case of termination other than by Lian Non-Renewal Notice, for cause, disability or death, or (b) until Dr. Lian becomes eligible to enroll in another employer-sponsored group health plan. Additionally, if Dr. Lian's employment is terminated by us (i) pursuant to a Lian Non-Renewal Notice, disability or death, the outstanding equity awards subject to the Lian Awards that would have vested within six months following the termination date will vest and become fully exercisable as of such termination date, and Dr. Lian will have six months from the termination date to exercise vested options under the Lian Awards (unless they terminate sooner pursuant to their terms), and (ii) other than by Lian Non-Renewal Notice, for cause, disability or death, the outstanding equity awards subject to the Lian Awards that would have vested within 12 months following the termination date will vest and become fully exercisable as of the termination date, and Dr. Lian will have 12 months from the termination date to exercise vested options under the Lian Awards (unless they terminate sooner pursuant to their terms). In each case, all other equity awards subject to the Lian Awards will terminate without compensation therefore on the termination date. Furthermore, if Dr. Lian resigns for good reason, he will be entitled to receive the same payments and accelerated vesting as if he had been terminated other than by Lian Non-Renewal Notice, for cause, disability or death, as set forth above.

In the event of a change in control of our company, 100% of the unvested outstanding equity awards granted under the Lian Awards will vest and become fully exercisable immediately prior to the change in control. Additionally, if any vested equity awards held by Dr. Lian are not assumed or substituted for in accordance with

-122-

Table of Contents

certain conditions, we will pay cash to Dr. Lian on the change in control in exchange for the satisfaction and cancellation of the outstanding equity awards. If Dr. Lian's employment is terminated within 24 months following a change in control, subject to certain conditions, he will be entitled to receive the same payments and accelerated vesting as if he had been terminated other than by Lian Non-Renewal Notice, for cause, disability or death, as set forth above; however, he will be entitled to such payments for a period of 18 months and the vesting of the Lian Awards will be accelerated by 18 months.

*Employment Agreement – Chief Financial Officer*

On May 21, 2014, we entered into an employment agreement with Michael Morneau, as our Chief Financial Officer, or the Morneau Employment Agreement, which became effective on May 21, 2014. The Morneau Employment Agreement has an initial term of one year, or through May 21, 2015, subject to automatic renewal for additional one-year periods unless either party gives the other written notice of its or his election to not renew, or a Morneau Non-Renewal Notice. Pursuant to the terms of the Morneau Employment Agreement, Mr. Morneau's base salary is currently $189,000 per year. Commencing on the date following completion of this offering, Mr. Morneau's annual base salary will increase to $270,000, subject to annual review by our board of directors or compensation committee and, if appropriate, increase (but not decrease except in certain limited circumstances). Additionally, the Morneau Employment Agreement provides that Mr. Morneau will be eligible to receive a target annual bonus in an amount equal to 30% of his base salary in effect on June 30th of each calendar year for 2015 and after (and an amount of $68,850 for 2014, pro rated from the effective date of his employment agreement), which bonus will be based on our financial performance and Mr. Morneau's individual performance, in each case as determined by our board of directors or compensation committee. However, for 2014, Mr. Morneau's target annual bonus will be equal to 30% of his salary in effect prior to completion of this offering, pro-rated from May 21, 2014 through December 31, 2014.

Under the Morneau Employment Agreement, our board of directors will recommend to our compensation committee that, on the closing date of this offering, Mr. Morneau be granted (1) a stock option to purchase 25,500 shares of our common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the option will be vested upon grant and 25% of the shares subject to the option will vest on each one-year anniversary of the date of grant for the next three years, so long as Mr. Morneau continues to provide service to us on each applicable vesting date; (2) an award of 67,000 shares of common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the award will be vested upon issuance and 25% of the shares subject to the award will vest on each one-year anniversary of the date of issuance for the next three years, so long as Mr. Morneau continues to provide service to us on each applicable vesting date; and (3) an additional award of shares of common stock in an amount equal to: the quotient obtained by dividing (i) the product of $121,500 multiplied by the number of days between the date of the closing of this offering and May 21, 2014, by (ii) the product obtained by multiplying 365 by the closing sales price of our common stock on the date of the closing of this offering, rounded down to the nearest whole share, which will be fully vested upon grant, or, collectively, the Morneau Awards. The Morneau Awards will be issued under and subject to the terms and conditions of the 2014 Equity Incentive Plan.

Mr. Morneau's employment with us is at-will, meaning either we or Mr. Morneau may terminate the employment relationship at any time, with or without cause. However, Mr. Morneau must provide at least 60 days' written notice of resignation. If we terminate Mr. Morneau's employment, then, so long as Mr. Morneau complies with certain obligations, including execution and delivery of a general release within a specified period of time, we will pay Mr. Morneau: (1) his base salary as of the termination date for three months following the termination date, if such termination is pursuant to a Morneau Non-Renewal Notice, disability or death, or for six months in the case of termination other than by Morneau Non-Renewal Notice, for cause, disability or death; (2) three monthly payments if such termination is pursuant to a Morneau Non-Renewal Notice, disability or death, or six monthly payments in the case of termination other than by Morneau Non-Renewal Notice, for cause, disability or death, in each case equal to 1/12 of the amount equal to Mr. Morneau's target annual bonus percentage as of the termination date multiplied by Mr. Morneau's base salary as of such date; and (3) subject to

-123-

Table of Contents

Mr. Morneau's timely election of COBRA, the amount equal to the COBRA premiums for the lesser of (a) three months if such termination is pursuant to a Morneau Non-Renewal Notice, disability or death, or six months in the case of termination other than by Morneau Non-Renewal Notice, for cause, disability or death, or (b) until Mr. Morneau becomes eligible to enroll in another employer-sponsored group health plan. Additionally, if Mr. Morneau's employment is terminated by us (i) pursuant to a Morneau Non-Renewal Notice, disability or death, the outstanding equity awards subject to the Morneau Awards that would have vested within three months following the termination date will vest and become fully exercisable as of such termination date, and Mr. Morneau will have three months from the termination date to exercise vested options under the Morneau Awards (unless they terminate sooner pursuant to their terms), and (ii) other than by Morneau Non-Renewal Notice, for cause, disability or death, the outstanding equity awards subject to the Morneau Awards that would have vested within six months following the termination date will vest and become fully exercisable as of the termination date, and Mr. Morneau will have six months from the termination date to exercise vested options under the Morneau Awards (unless they terminate sooner pursuant to their terms). In each case, all other equity awards subject to the Morneau Awards will terminate without compensation therefore on the termination date. Furthermore, if Mr. Morneau resigns for good reason, he will be entitled to receive the same payments and accelerated vesting as if he had been terminated other than by Morneau Non-Renewal Notice, for cause, disability or death, as set forth above.

In the event of a change in control of our company, 100% of the unvested outstanding equity awards granted under the Morneau Awards will vest and become fully exercisable immediately prior to the change in control. Additionally, if any vested equity awards held by Mr. Morneau are not assumed or substituted for in accordance with certain conditions, we will pay cash to Mr. Morneau on the change in control in exchange for the satisfaction and cancellation of the outstanding equity awards. If Mr. Morneau's employment is terminated within 24 months following a change in control, subject to certain conditions, he will be entitled to receive the same payments and accelerated vesting as if he had been terminated other than by Morneau Non-Renewal Notice, for cause, disability or death, as set forth above; however, he will be entitled to such payments for a period of 12 months and the vesting of the Morneau Awards will be accelerated by 12 months.

*Employment Agreement – Chief Operating Officer*

On May 21, 2014, we entered into an employment agreement with Michael Dinerman, M.D., as our Chief Operating Officer, or the Dinerman Employment Agreement, which became effective on June 2, 2014. The Dinerman Employment Agreement has an initial term of one year, or through June 2, 2015, subject to automatic renewal for additional one-year periods unless either party gives the other written notice of its or his election to not renew, or a Dinerman Non-Renewal Notice. Pursuant to the terms of the Dinerman Employment Agreement, Dr. Dinerman's base salary is currently $178,831 per year. Commencing on the date following completion of this offering, Dr. Dinerman's annual base salary will increase to $298,052, subject to annual review by our board of directors or compensation committee and, if appropriate, increase (but not decrease except in certain limited circumstances). Additionally, the Dinerman Employment Agreement provides that Dr. Dinerman will be eligible to receive a target annual bonus in an amount equal to 30% of his base salary in effect on June 30th of each calendar year for 2015 and after (and an amount of $71,532 for 2014, pro rated from the effective date of his employment agreement), which bonus will be based on our financial performance and Dr. Dinerman's individual performance, in each case as determined by our board of directors or compensation committee. However, for 2014, Dr. Dinerman's target annual bonus will be equal to 30% of his salary in effect prior to completion of this offering, pro-rated from June 2, 2014 through December 31, 2014.

Under the Dinerman Employment Agreement, our board of directors will recommend to our compensation committee that, on the closing date of this offering, Dr. Dinerman be granted (1) a stock option to purchase 45,000 shares of our common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the option will be vested upon grant and 25% of the shares subject to the option will vest on each one-year anniversary of the date of grant for the next three years, so long as Dr. Dinerman continues to provide service to us on each applicable vesting date; (2) an award of 105,000 shares of common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the award will be

-124-

**Table of Contents**

vested upon issuance and 25% of the shares subject to the award will vest on each one-year anniversary of the date of issuance for the next three years, so long as Dr. Dinerman continues to provide service to us on each applicable vesting date; and (3) an additional award of shares of common stock in an amount equal to: the quotient obtained by dividing (i) the product of $178,831.35 multiplied by the number of days between the date of the closing of this offering and June 2, 2014, by (ii) the product obtained by multiplying 365 by the closing sales price of our common stock on the date of the closing of this offering, rounded down to the nearest whole share, which will be fully vested upon grant, or, collectively, the Dinerman Awards. The Dinerman Awards will be issued under and subject to the terms and conditions of the 2014 Equity Incentive Plan.

Dr. Dinerman's employment with us is at-will, meaning either we or Dr. Dinerman may terminate the employment relationship at any time, with or without cause. However, Dr. Dinerman must provide at least 60 days' written notice of resignation. If we terminate Dr. Dinerman's employment, then, so long as Dr. Dinerman complies with certain obligations, including execution and delivery of a general release within a specified period of time, we will pay Dr. Dinerman: (1) his base salary as of the termination date for three months following the termination date, if such termination is pursuant to a Dinerman Non-Renewal Notice, disability or death, or for six months in the case of termination other than by Dinerman Non-Renewal Notice, for cause, disability or death; (2) three monthly payments if such termination is pursuant to a Dinerman Non-Renewal Notice, disability or death, or six monthly payments in the case of termination other than by Dinerman Non-Renewal Notice, for cause, disability or death, in each case equal to 1/12 of the amount equal to Dr. Dinerman's target annual bonus percentage as of the termination date multiplied by Dr. Dinerman's base salary as of such date; and (3) subject to Dr. Dinerman's timely election of COBRA, the amount equal to the COBRA premiums for the lesser of (a) three months if such termination is pursuant to a Dinerman Non-Renewal Notice, disability or death, or six months in the case of termination other than by Dinerman Non-Renewal Notice, for cause, disability or death, or (b) until Dr. Dinerman becomes eligible to enroll in another employer-sponsored group health plan. Additionally, if Dr. Dinerman's employment is terminated by us (i) pursuant to a Dinerman Non-Renewal Notice, disability or death, the outstanding equity awards subject to the Dinerman Awards that would have vested within three months following the termination date will vest and become fully exercisable as of such termination date, and Dr. Dinerman will have three months from the termination date to exercise vested options under the Dinerman Awards (unless they terminate sooner pursuant to their terms), and (ii) other than by Dinerman Non-Renewal Notice, for cause, disability or death, the outstanding equity awards subject to the Dinerman Awards that would have vested within six months following the termination date will vest and become fully exercisable as of the termination date, and Dr. Dinerman will have six months from the termination date to exercise vested options under the Dinerman Awards (unless they terminate sooner pursuant to their terms). In each case, all other equity awards subject to the Dinerman Awards will terminate without compensation therefore on the termination date. Furthermore, if Dr. Dinerman resigns for good reason, he will be entitled to receive the same payments and accelerated vesting as if he had been terminated other than by Dinerman Non-Renewal Notice, for cause, disability or death, as set forth above.

In the event of a change in control of our company, 100% of the unvested outstanding equity awards granted under the Dinerman Awards will vest and become fully exercisable immediately prior to the change in control. Additionally, if any vested equity awards held by Dr. Dinerman are not assumed or substituted for in accordance with certain conditions, we will pay cash to Dr. Dinerman on the change in control in exchange for the satisfaction and cancellation of the outstanding equity awards. If Dr. Dinerman's employment is terminated within 24 months following a change in control, subject to certain conditions, he will be entitled to receive the same payments and accelerated vesting as if he had been terminated other than by Dinerman Non-Renewal Notice, for cause, disability or death, as set forth above; however, he will be entitled to such payments for a period of 12 months and the vesting of the Dinerman Awards will be accelerated by 12 months.

*Employment Agreement – Chief Medical Officer*

On May 21 2014, we entered into an employment agreement with Rochelle Hanley, M.D., as our Chief Medical Officer, or the Hanley Employment Agreement, which became effective on June 2, 2014. The Hanley

-125-

Table of Contents

Employment Agreement has an initial term of one year, or through June 2, 2015, subject to automatic renewal for additional one-year periods unless either party gives the other written notice of its or her election to not renew, or a Hanley Non-Renewal Notice. Pursuant to the terms of the Hanley Employment Agreement, Dr. Hanley's base salary is currently $156,539 per year. Commencing on the date following completion of this offering, Dr. Hanley's annual base salary will increase to $223,628, subject to annual review by our board of directors or compensation committee and, if appropriate, increase (but not decrease except in certain limited circumstances). Additionally, the Hanley Employment Agreement provides that Dr. Hanley will be eligible to receive a target annual bonus in an amount equal to 30% of her base salary in effect on June 30th of each calendar year for 2015 and after (and an amount of $57,025, pro rated from the effective date of her employment agreement), which bonus will be based on our financial performance and Dr. Hanley's individual performance, in each case as determined by our board of directors or compensation committee. However, for 2014, Dr. Hanley's target annual bonus will be equal to 30% of her salary in effect prior to completion of this offering, pro-rated from June 2, 2014 through December 31, 2014.

Under the Hanley Employment Agreement, our board of directors will recommend to our compensation committee that, on the closing date of this offering, Dr. Hanley be granted (1) a stock option to purchase 30,000 shares of our common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the option will be vested upon grant and 25% of the shares subject to the option will vest on each one-year anniversary of the date of grant for the next three years, so long as Dr. Hanley continues to provide service to us on each applicable vesting date; (2) an award of 70,000 shares of common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the award will be vested upon issuance and 25% of the shares subject to the award will vest on each one-year anniversary of the date of issuance for the next three years, so long as Dr. Hanley continues to provide service to us on each applicable vesting date; and (3) an additional award of shares of common stock in an amount equal to: the quotient obtained by dividing (i) the product of $120,375 multiplied by the number of days between the date of the closing of this offering and June 2, 2014, by (ii) the product obtained by multiplying 365 by the closing sales price of our common stock on the date of the closing of this offering, rounded down to the nearest whole share, which will be fully vested upon grant, or, collectively, the Hanley Awards. The Hanley Awards will be issued under and subject to the terms and conditions of the 2014 Equity Incentive Plan.

Dr. Hanley's employment with us is at-will, meaning either we or Dr. Hanley may terminate the employment relationship at any time, with or without cause. However, Dr. Hanley must provide at least 60 days' written notice of resignation. If we terminate Dr. Hanley's employment, then, so long as Dr. Hanley complies with certain obligations, including execution and delivery of a general release within a specified period of time, we will pay Dr. Hanley: (1) her base salary as of the termination date for three months following the termination date, if such termination is pursuant to a Hanley Non-Renewal Notice, disability or death, or for six months in the case of termination other than by Hanley Non-Renewal Notice, for cause, disability or death; (2) three monthly payments if such termination is pursuant to a Hanley Non-Renewal Notice, disability or death, or six monthly payments in the case of termination other than by Hanley Non-Renewal Notice, for cause, disability or death, in each case equal to 1/12 of the amount equal to Dr. Hanley's target annual bonus percentage as of the termination date multiplied by Dr. Hanley's base salary as of such date; and (3) subject to Dr. Hanley's timely election of COBRA, the amount equal to the COBRA premiums for the lesser of (a) three months if such termination is pursuant to a Hanley Non-Renewal Notice, disability or death, or six months in the case of termination other than by Hanley Non-Renewal Notice, for cause, disability or death, or (b) until Dr. Hanley becomes eligible to enroll in another employer-sponsored group health plan. Additionally, if Dr. Hanley's employment is terminated by us (i) pursuant to a Hanley Non-Renewal Notice, disability or death, the outstanding equity awards subject to the Hanley Awards that would have vested within three months following the termination date will vest and become fully exercisable as of such termination date, and Dr. Hanley will have three months from the termination date to exercise vested options under the Hanley Awards (unless they terminate sooner pursuant to their terms), and (ii) other than by Hanley Non-Renewal Notice, for cause, disability or death, the outstanding equity awards subject to the Hanley Awards that would have vested within six months following the termination date will vest

-126-

[Table of Contents](#)

and become fully exercisable as of the termination date, and Dr. Hanley will have six months from the termination date to exercise vested options under the Hanley Awards (unless they terminate sooner pursuant to their terms). In each case, all other equity awards subject to the Hanley Awards will terminate without compensation therefore on the termination date. Furthermore, if Dr. Hanley resigns for good reason, she will be entitled to receive the same payments and accelerated vesting as if she had been terminated other than by Hanley Non-Renewal Notice, for cause, disability or death, as set forth above.

In the event of a change in control of our company, 100% of the unvested outstanding equity awards granted under the Hanley Awards will vest and become fully exercisable immediately prior to the change in control. Additionally, if any vested equity awards held by Dr. Hanley are not assumed or substituted for in accordance with certain conditions, we will pay cash to Dr. Hanley on the change in control in exchange for the satisfaction and cancellation of the outstanding equity awards. If Dr. Hanley's employment is terminated within 24 months following a change in control, subject to certain conditions, she will be entitled to receive the same payments and accelerated vesting as if she had been terminated other than by Hanley Non-Renewal Notice, for cause, disability or death, as set forth above; however, she will be entitled to such payments for a period of 12 months and the vesting of the Hanley Awards will be accelerated by 12 months.

## Potential Payments Upon Termination or Change in Control

Our executive officers will be entitled to receive certain payments and benefits upon termination of their employment or a change in control of our company, as described in the section of this prospectus entitled "– New Employment Agreements."

## Perquisites, Health, Welfare and Retirement Plans and Benefits

*Health and Welfare Benefits*

Our named executive officers are eligible to participate in all of our employee benefit plans, including our medical, dental, vision, group life and disability insurance plans, in each case on the same basis as other employees.

*Perquisites and Personal Benefits*

We do not currently provide perquisites or personal benefits to our named executive officers. We do, however, pay certain premiums for term life insurance and accidental death and dismemberment for all of our employees, including all of our named executive officers.

*Pension Benefits and Non-Qualified Deferred Compensation*

None of our named executive officers participate in or have account balances in qualified or non-qualified defined benefit plans sponsored by us.

## Outstanding Equity Awards at Fiscal Year-End 2013

None of our named executive officers held any equity awards at December 31, 2013.

## Proposed Equity Awards to Executive Officers

As provided for in the Lian Employment Agreement, our board of directors will recommend to our compensation committee that Dr. Lian be granted, on the closing date of this offering: (1) a stock option to purchase 87,500 shares of our common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the option will be vested upon grant and 25% of the shares subject to the option will vest on each one-year anniversary of the date of grant for the next three years, so long as Dr. Lian continues to provide service to us on

-127-

Table of Contents

each applicable vesting date; (2) an award of 87,500 shares of common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the award will be vested upon issuance and 25% of the shares subject to the award will vest on each one-year anniversary of the date of issuance for the next three years, so long as Dr. Lian continues to provide service to us on each applicable vesting date; and (3) an additional award of shares of common stock in an amount equal to: the quotient obtained by dividing (i) the product of $289,789.74 multiplied by the number of days between the date of the closing of this offering and June 2, 2014, by (ii) the product obtained by multiplying 365 by the closing sales price of our common stock on the date of the closing of this offering, rounded down to the nearest whole share, which will be fully vested upon grant, or, collectively, the Lian Awards. The Lian Awards will be issued under and subject to the terms and conditions of the 2014 Equity Incentive Plan.

As provided for in the Morneau Employment Agreement, our board of directors will recommend to our compensation committee that Mr. Morneau be granted, on the closing date of this offering: (1) a stock option to purchase 25,500 shares of our common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the option will be vested upon grant and 25% of the shares subject to the option will vest on each one-year anniversary of the date of grant for the next three years, so long as Mr. Morneau continues to provide service to us on each applicable vesting date; (2) an award of 67,000 shares of common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the award will be vested upon issuance and 25% of the shares subject to the award will vest on each one-year anniversary of the date of issuance for the next three years, so long as Mr. Morneau continues to provide service to us on each applicable vesting date; and (3) an additional award of shares of common stock in an amount equal to: the quotient obtained by dividing (i) the product of $121,500 multiplied by the number of days between the date of the closing of this offering and May 21, 2014, by (ii) the product obtained by multiplying 365 by the closing sales price of our common stock on the date of the closing of this offering, rounded down to the nearest whole share, which will be fully vested upon grant, or, collectively, the Morneau Awards. The Morneau Awards will be issued under and subject to the terms and conditions of the 2014 Equity Incentive Plan.

As provided for in the Dinerman Employment Agreement, our board of directors will recommend to our compensation committee that Dr. Dinerman be granted, on the closing date of this offering: (1) a stock option to purchase 45,000 shares of our common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the option will be vested upon grant and 25% of the shares subject to the option will vest on each one-year anniversary of the date of grant for the next three years, so long as Dr. Dinerman continues to provide service to us on each applicable vesting date; (2) an award of 105,000 shares of common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the award will be vested upon issuance and 25% of the shares subject to the award will vest on each one-year anniversary of the date of issuance for the next three years, so long as Dr. Dinerman continues to provide service to us on each applicable vesting date; and (3) an additional award of shares of common stock in an amount equal to: the quotient obtained by dividing (i) the product of $178,831.35 multiplied by the number of days between the date of the closing of this offering and June 2, 2014, by (ii) the product obtained by multiplying 365 by the closing sales price of our common stock on the date of the closing of this offering, rounded down to the nearest whole share, which will be fully vested upon grant, or, collectively, the Dinerman Awards. The Dinerman Awards will be issued under and subject to the terms and conditions of the 2014 Equity Incentive Plan.

As provided for in the Hanley Employment Agreement, our board of directors will recommend to our compensation committee that Dr. Hanley be granted, on the closing date of this offering: (1) a stock option to purchase 30,000 shares of our common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the option will be vested upon grant and 25% of the shares subject to the option will vest on each one-year anniversary of the date of grant for the next three years, so long as Dr. Hanley continues to provide service to us on each applicable vesting date; (2) an award of 70,000 shares of common stock (subject to adjustment for stock splits), whereby 25% of the shares subject to the award will be vested upon issuance and 25% of the shares subject to the award will vest on each one-year anniversary of the date of issuance for the next three years, so long as Dr. Hanley continues to provide service to us on each applicable vesting date; and (3) an additional award of shares of common stock in an amount equal to: the

-128-

Table of Contents

quotient obtained by dividing (i) the product of $120,375 multiplied by the number of days between the date of the closing of this offering and June 2, 2014, by (ii) the product obtained by multiplying 365 by the closing sales price of our common stock on the date of the closing of this offering, rounded down to the nearest whole share, which will be fully vested upon grant, or, collectively, the Hanley Awards. The Hanley Awards will be issued under and subject to the terms and conditions of the 2014 Equity Incentive Plan.

**2014 Equity Incentive Plan**

Our board of directors adopted the Viking Therapeutics, Inc. 2014 Equity Incentive Plan, or the 2014 Equity Incentive Plan, on            , 2014, and our stockholders approved the 2014 Equity Incentive Plan on            , 2014. The 2014 Equity Incentive Plan will become effective upon the execution and delivery of the underwriting agreement for this offering. The following is only a summary of the material terms of the 2014 Equity Incentive Plan, is not a complete description of all provisions of the 2014 Equity Incentive Plan and should be read in conjunction with the 2014 Equity Incentive Plan, which is filed as an exhibit to the registration statement of which this prospectus forms a part.

*Purpose*. The purpose of the 2014 Equity Incentive Plan is to enhance our ability to attract highly qualified personnel, to strengthen our retention capabilities, to enhance our long-term performance and competitiveness, and to align the interests of the participants of the 2014 Equity Incentive Plan with those of our stockholders.

*Plan Administration*. The 2014 Equity Incentive Plan is administered by the compensation committee, although our board of directors may at any time act in lieu of the compensation committee; however, (1) in the case of awards intended to satisfy the requirements of Section 162(m) of the Internal Revenue Code of 1986, as amended, or the Code, the committee administering such awards will consist of two or more "outside directors" within the meaning of Section 162(m) of the Code, and (2) in the case of awards made to an employee, director or consultant who is required to file reports with respect to such individual's "beneficial ownership" of our capital stock with the SEC pursuant to Section 16(a) of the Exchange Act and the rules promulgated thereunder, the committee administering such awards will consist of two or more directors who are "non-employee directors" within the meaning of Rule 16b-3. The compensation committee may also delegate to one or more of our officers the authority to (1) designate employees (other than other officers) to be recipients of certain stock awards, and (2) determine the number of shares of common stock to be subject to such stock awards, in each case subject to certain conditions. In connection with administering the 2014 Equity Incentive Plan, the compensation committee has responsibility for determining, among other things, the recipient of each award, the type of award, the number of shares, units or dollars subject to each award and the terms and conditions of each award, including the exercise or purchase price and the vesting and duration of the award, and the terms for any modification, substitution or cancellation of awards, subject to certain conditions. Pursuant to the terms of the 2014 Equity Incentive Plan, we have agreed to indemnify any individuals who take action on behalf of the 2014 Equity Incentive Plan, so long as such action is taken in good faith, for any claims, liabilities and costs arising out of such individual's good faith performance of duties on behalf of the 2014 Equity Incentive Plan, and to reimburse any such individual for all expenses incurred with respect to the 2014 Equity Incentive Plan.

*Types of Awards*. The 2014 Equity Incentive Plan provides that the compensation committee may grant or issue stock options, stock appreciation rights, restricted shares, restricted stock units and unrestricted shares, deferred share units, performance and cash-settled awards and dividend equivalent rights to participants under the 2014 Equity Incentive Plan. Under the 2014 Equity Incentive Plan, the compensation committee may establish an exchange program and grant replacement awards, in each case in accordance with the terms of the 2014 Equity Incentive Plan and applicable law (including any associated stockholder approval requirements).

*Authorized Shares*. Initially, a total of            shares of our common stock have been reserved for issuance pursuant to the 2014 Equity Incentive Plan, which number is also the limit on shares of common stock available for awards of ISOs (as described under "Stock Options" below). The number of shares available for issuance under the 2014 Equity Incentive Plan will, unless otherwise determined by our board of directors or the

-129-

**Table of Contents**

compensation committee, be automatically increased on January 1st of each year commencing on January 1, 2015 and ending on (and including) January 1, 2024, in an amount equal to 3.5% of the total number of shares of our common stock outstanding on December 31st of the preceding calendar year. The shares of common stock deliverable pursuant to awards under the 2014 Equity Incentive Plan will be authorized but unissued shares of our common stock, or shares of our common stock that we otherwise hold in treasury or in trust. Any shares of our common stock underlying awards that are settled in cash or otherwise expire, or are forfeited, terminated or cancelled (including pursuant to an exchange program established by the compensation committee) prior to the issuance of stock will again be available for issuance under the 2014 Equity Incentive Plan. In addition, shares of our common stock that are withheld (or not issued) in payment of the exercise price or taxes relating to an award, and shares of our common stock equal to the number surrendered in payment of any exercise price or withholding taxes relating to an award, will again be available for issuance under the 2014 Equity Incentive Plan.

*Eligibility.* The compensation committee will select participants from among our employees, directors and consultants, including non-employees and non-consultants to whom an offer of employment or a consulting role has been or is being extended by us. For each calendar year during the term of the 2014 Equity Incentive Plan, no participant may receive stock options, stock appreciation rights and other awards that relate to more than 25% of the maximum number of shares issuable under the 2014 Equity Incentive Plan as of its effective date, subject to adjustments as permitted in the 2014 Equity Incentive Plan, and the maximum aggregate amount of cash that may be paid to any one participant during any calendar year with respect to one or more awards intended to qualify as performance-based compensation pursuant to Section 162(m) of the Code is $1.0 million. Nevertheless, stock options, stock appreciation rights and bonus awards may be made in excess of the limits described in the preceding sentence so long as such awards are not intended to qualify as performance-based compensation and are therefore not intended to be exempt from the deduction limit imposed by Section 162(m) of the Code.

*Stock Options.* The exercise price of stock options granted under the 2014 Equity Incentive Plan must not be less than 100% of the fair market value of our common stock on the grant date, subject to two exceptions, as set forth in the 2014 Equity Incentive Plan. The term of a stock option may not exceed ten years. If a stock option or stock appreciation right is granted to an employee who is a non-exempt employee for purposes of the Fair Labor Standards Act of 1938, as amended, the stock option or stock appreciation right, as applicable, will not be first exercisable for any shares of our common stock until at least six months following its grant date (although the award may vest prior to such date). An incentive stock option, or ISO, is a stock option granted to qualify for tax treatment applicable to ISOs under Section 422 of the Code. A nonqualified stock option, or Non-ISO, is a stock option that is not subject to statutory requirements and limitations required for certain tax advantages allowed under Section 422 of the Code. An ISO may only be granted to our employees or employees of certain of our affiliates, including officers who are employees. An ISO granted to an employee who owns more than 10% of the combined voting power of all of our classes of stock must have an exercise price of at least 110% of the fair market value of our common stock on the grant date, and the term of the ISO may not exceed five years from the grant date. To the extent that the aggregate fair market value of shares of common stock with respect to which ISOs first become exercisable by a participant in any calendar year exceeds $100,000, such excess stock options will be treated as Non-ISOs. If expressly provided in a stock option award agreement, the exercise price for stock options will be equitably adjusted (in a manner that is reasonably intended to avoid triggering additional taxes under Section 409A of the Code) for some or all of the cash dividends or extraordinary capital distributions that we pay with respect to our shares of common stock during the period between the stock option's grant date and its exercise date. The compensation committee may, in its sole discretion, set forth in an award agreement that the participant may exercise unvested Non-ISOs, in which case the participant will receive shares of restricted common stock having the same vesting schedule that applied to the unvested stock options. The methods of payment of the exercise price of a stock option may include, among other things, cash, promissory note, other shares (subject to certain conditions), "net exercise", cashless exercise, as well as other forms of legal consideration that may be acceptable to the compensation committee and specified in the applicable stock option award agreement; however, our directors and executive officers may not make payment with respect to any awards granted under the 2014 Equity Incentive Plan, or continue an extension of credit with respect to such

-130-

**Table of Contents**

payment, with a loan from or arranged by us in violation of applicable securities laws. The compensation committee may establish and set forth in the applicable stock option award agreement the terms and conditions on which a stock option will remain exercisable, if at all, following termination of a participant's service. Unless an award agreement provides otherwise: (i) if termination is due to death or disability, the stock option will remain exercisable for one year after such termination of service; and (ii) if the termination is due to reasons other than for death, disability or cause, the stock option generally will remain exercisable for 30 days following termination of service. If the termination is for cause, then the stock option generally will cease to be exercisable upon termination of service or on the date when cause first existed, whichever is earlier. If there is a blackout period under our insider trading policy or applicable law that prohibits the buying or selling of shares of common stock during any part of the ten day period before the expiration of a stock option based on termination of service, the period for exercising the stock option will be extended until ten days beyond when the blackout period ends; however, no stock option will ever be exercisable after the expiration date of its original term set forth in the applicable stock option award agreement. If a participant is not entitled to exercise a stock option at the date of termination of service, or if the participant does not exercise the stock option to the extent so entitled within the time specified in the applicable stock option award agreement or in the 2014 Equity Incentive Plan, the stock option will terminate and the shares of common stock underlying the unexercised portion of the stock option will revert to the 2014 Equity Incentive Plan and become available for future awards.

*Stock Appreciation Rights (SARs)*. Stock appreciation rights, or SARs, allow the recipient to receive the appreciation in the fair market value of our common stock between the exercise date and the grant date. SARs may not have a term ending more than ten years after the grant date, and must otherwise have terms consistent with those described above for stock options. The reserve of shares of common stock available for future awards under the 2014 Equity Incentive Plan will be reduced upon each exercise of a SAR that is settled through the delivery of shares of common stock to the participant. After termination of service, a recipient of SARs may exercise the SARs for the period of time stated in the recipient's SARs award agreement, which will generally be consistent with the period of time applicable to stock option awards. Additionally, the SARs award agreement may provide for settlement either in shares of common stock, cash or in any combination of shares of common stock or cash that the compensation committee may authorize pursuant to the applicable award agreement. Subject to the terms of the 2014 Equity Incentive Plan, the compensation committee will determine the other terms of SARs; however, the award agreement for each SAR must set forth terms and conditions that are consistent with those for a stock option. The per share exercise price for the shares of common stock to be issued pursuant to the exercise of SARs must not be less than 100% of the fair market value of our common stock on the grant date.

*Restricted Shares and Restricted Stock Units (RSUs)*. Restricted share awards are grants of shares of our common stock that vest in accordance with terms and conditions established by the compensation committee and as set forth in the applicable award agreement. Restricted stock units, or RSUs, give recipients the right to acquire a specified number of shares of our common stock at a future date upon the satisfaction of certain vesting criteria established by the compensation committee and as set forth in an RSU award agreement. Unlike restricted shares, the shares underlying RSUs will not be issued until the RSUs have vested and are settled. The compensation committee may impose restrictions in the award agreement granting restricted shares or RSUs, including but not limited to restrictions concerning voting rights, transferability and receipt of dividends, which restrictions will lapse pursuant to circumstances or based upon criteria selected by the compensation committee, such as the participant's duration of continuous service, individual, group or divisional performance criteria, company performance or other criteria selected by the compensation committee. Restricted shares and RSUs may be awarded for such consideration as the compensation committee may determine, including without limitation cash, past or future services or any other form of legal consideration that may be acceptable to the compensation committee and permissible under applicable law. Except as set forth in the applicable award agreement or as determined by the compensation committee, upon termination of a participant's service for any reason, the participant will forfeit the restricted shares and RSUs to the extent the participant's interest therein has not vested on or before the termination date; however, if restricted shares are forfeited for any reason, we will return the

-131-

Table of Contents

purchase price to the participant to the extent either set forth in the applicable award agreement or required by applicable law. Unless settled for cash in lieu of shares, vested restricted shares will be settled in unrestricted shares.

*Unrestricted Shares*. Unrestricted shares will vest in full upon the grant date and therefore are not subject to forfeiture restrictions. Unrestricted shares may be granted to participants, selected by the compensation committee in its sole discretion, who elect to pay for such unrestricted shares or to receive unrestricted shares in lieu of cash bonuses that would otherwise be paid.

*Deferred Share Units (DSUs)*. Deferred share units, or DSUs, represent the right to receive shares of our common stock on a future date. The compensation committee may make DSU awards to participants pursuant to award agreements regardless of whether there is a deferral of such participants' compensation and may permit directors, members of management or "highly compensated employees" to forego the receipt of cash or other compensation (including shares settled for any RSU award) and in lieu thereof credit to an internal account for the 2014 Equity Incentive Plan a number of DSUs having a fair market value equal to the shares of common stock and other compensation deferred. Credits will be made at the end of each calendar quarter during which compensation is deferred. Unless otherwise provided in an award agreement, any shares subject to DSUs are 100% vested at all times and the DSUs are settled by our delivery of one share for each DSU, in five substantially equal annual installments that are issued before the last day of each of the five calendar years after the date on which the participant's service terminates for any reason, subject to certain conditions.

*Performance and Cash-Settled Awards*. Performance awards, including performance units, may be granted under the 2014 Equity Incentive Plan. The compensation committee may (but is not required to) designate a performance award as a "performance compensation award" that is intended to be exempt from limitations under Section 162(m) of the Code. A participant is eligible to receive payment in respect of a performance compensation award only if the performance goals for such award are achieved and the performance formula as applied against such performance goals determines that all or some portion of such participant's award has been earned for the performance period. The compensation committee will decide the length of a certain performance period, but such period may not be less than one fiscal year. The compensation committee is required under the 2014 Equity Incentive Plan to specify in writing the performance period to which the performance compensation award relates, one or more goals for the performance period and an objective formula by which to measure whether or the extent to which the award is earned on the basis of the level of performance achieved with respect to one or more performance measures. Such criteria must be specified in writing no later than the earlier of the date that is 90 days after the commencement of the performance period and the date on which 25% of the performance period elapses. Once established for a performance period, the performance goals and performance formula applicable to the award may not be amended or modified in a manner that would cause the compensation payable under the award to fail to constitute qualified performance-based compensation under Section 162(m) of the Code; however, the compensation committee may exercise negative discretion to reduce or eliminate the amount of the performance compensation award if, in its sole discretion, such reduction or elimination is appropriate. The maximum performance compensation award that any one participant may receive for any one performance period will not exceed                  shares of our common stock, subject to adjustments as permitted in the 2014 Equity Incentive Plan, or, for performance units to be settled in cash, the greater of $1.0 million or the fair market value of such number of shares of common stock on the grant date.

*Dividend Equivalent Rights*. The compensation committee may grant dividend equivalent rights either in tandem with an award (other than a stock option or SAR) or as a separate award, to participants on terms and conditions determined by the compensation committee at the time of grant and set forth in an award agreement. Unless otherwise provided in the award agreement, dividend equivalent rights will be paid out on the record date for the underlying dividends if the award occurs on a stand-alone basis, and on the vesting or later settlement date for an award if the dividend equivalent rights are granted as part of it. Dividend equivalent rights are settled in shares with cash paid in lieu of fractional shares, unless the applicable award agreement provides for settlement in cash of all or part of the dividend equivalent right.

-132-

Table of Contents

*Taxes.* Award recipients are solely responsible and liable for the satisfaction of all taxes and penalties that may arise in connection with awards granted pursuant to the 2014 Equity Incentive Plan, including any taxes arising from Section 409A of the Code (although awards are generally intended to be exempt from, or compliant with, its restrictions). Our obligation to deliver shares of common stock (or to pay cash) to an award holder is at all times subject to such person's prior or coincident satisfaction of all required withholding taxes.

*Non-Transferability of Awards.* Unless the compensation committee provides otherwise in an award agreement, or unless transferred pursuant to the terms of a domestic relations order as approved by the compensation committee, the 2014 Equity Incentive Plan generally does not allow for the transfer of awards and only the participant who is granted an award may exercise an award during his or her lifetime.

*Certain Adjustments.* In the event of certain changes in our capitalization, such as stock splits, reverse stock splits, stock dividends, combinations, recapitalizations or reclassifications with respect to our common stock, or mergers, consolidations, changes in organization form or other increases or decreases in the number of issued shares of common stock effected without receipt or payment of consideration by us, the compensation committee will equitably adjust the number and price of shares covered by each outstanding award and the total number of shares authorized for issuance under the 2014 Equity Incentive Plan to prevent diminution or enlargement of the benefits or potential benefits available under the 2014 Equity Incentive Plan. In the event of any proposed winding up, dissolution or liquidation of our company, other than as part of a change in control, we will notify each participant as soon as practicable and all awards will terminate immediately prior to the consummation of such proposed transaction.

*Change in Control.* In the event of a change in control of our company, unless otherwise provided in any award agreement or other applicable agreements between us or any of our affiliates, on the one hand, and the applicable participant, on the other hand, each outstanding award will be assigned to or assumed or substituted by the surviving or successor company or a parent or subsidiary of such company upon consummation of the change in control. Notwithstanding the foregoing, the compensation committee has the discretion to take one or more of the following actions with respect to any or all awards: (1) accelerate the vesting of the award and provide for its termination if not exercised at or prior to the effective time of the change in control; (2) arrange for the lapse of any reacquisition or repurchase right held by us; (3) arrange for the assignment of any reacquisition or repurchase rights held by us to the surviving or successor company; (4) cancel or arrange for the cancellation of the stock award in exchange for cash or other consideration; (5) make a payment equal to the excess of (a) the value of the property the participant would have received upon exercise of the stock award immediately prior to the effective time of the change in control, over (b) the exercise price payable in connection with the stock award; or (6) make such other modifications, adjustments or amendments to outstanding awards as the compensation committee deems necessary or appropriate, subject to the terms set forth in the 2014 Equity Incentive Plan. The compensation committee is not required to take the same action or actions with respect to all awards granted under the 2014 Equity Incentive Plan, or portions thereof, or with respect to all participants, and may take different actions with respect to the vested and unvested portions of any award. A change in control generally includes, among other things: (i) an acquisition by a person or entity of more than 50% of the combined voting power of our then-outstanding securities, (ii) a change in board control whereby individuals who, on the date the 2014 Equity Incentive Plan is first effective, constituted our board of directors (or their approved replacements), cease to constitute a majority of our board of directors, (iii) a merger, subject to certain exceptions, (iv) a sale of all or substantially all of our assets, or (v) a liquidation or dissolution of our company.

*Forfeiture and Recoupment.* To the extent provided in the applicable award agreement, we have the following recourse against an award recipient who does not comply with certain covenants, including non-competition, non-solicitation, confidentiality, inventions or secrecy covenants: (1) we may terminate any outstanding, unexercised, unexpired, unpaid or deferred awards; (2) we may rescind any exercise, payment or delivery pursuant to the award; or (3) we may recapture any shares of common stock (whether restricted or unrestricted) or proceeds from the award recipient's sale of shares of common stock issued pursuant to the award. Unless otherwise specifically provided in the applicable award agreement, and to the extent permitted by applicable law,

-133-

**Table of Contents**

essentially the same forfeiture and recoupment rights are available to us, in addition to a right to reimbursement for all or any portion of any awards granted under the 2014 Equity Incentive Plan, with respect to awards that are granted, vested or settled during certain periods affected by an award recipient's fraud or misconduct, or a financial restatement, and all awards are subject to any recoupment that is required under applicable law.

*Initial Public Offering-Related Restrictions*. Shares that are issued pursuant to the 2014 Equity Incentive Plan are subject to certain market stand-off restrictions during specified periods following our initial public offering.

*Amendment; Termination; Governing Law*. The 2014 Equity Incentive Plan may be amended or terminated by our board of directors as it deems advisable; however, stockholder approval is required for any change that increases the total number of shares reserved for issuance pursuant to awards. No amendment may materially and adversely impact any participant's vested rights under an award that was previously granted under the 2014 Equity Incentive Plan without the consent of either the impacted participant or participants holding a majority of awards being similarly impacted. The 2014 Equity Incentive Plan will terminate on the tenth anniversary of its effective date, if not sooner terminated by our board of directors. Delaware law will generally govern and control any issues arising under the 2014 Equity Incentive Plan and the awards issued thereunder.

We intend to file a registration statement on Form S-8 to register all of the shares of common stock reserved for issuance under the 2014 Equity Incentive Plan.

-134-

Table of Contents

## Certain Relationships and Related Party Transactions

In addition to the director and executive officer compensation arrangements discussed in the section of this prospectus entitled "Executive Compensation," the following is a summary of material provisions of transactions since our inception in September 2012 that we have been a party to and in which the amount involved exceeded or will exceed $120,000, and in which any of our directors, executive officers, beneficial owners of more than 5% of our capital stock, or their immediate family members, have had or will have a direct or indirect material interest.

### Common Stock Issuances to and Convertible Promissory Notes with Executives

In conjunction with the formation of our company, in September 2012, we issued and sold 2,650,000 shares of our common stock to Dr. Lian, our President, Chief Executive Officer and Co-Founder, and 2,100,000 shares of our common stock to Dr. Dinerman, our Chief Operating Officer and Co-Founder. These shares were issued at a deemed fair value of $0.01 per share, in each case in exchange for the contribution of certain intellectual property and assets to us having a deemed value of $26,500 and $21,000, respectively.

Also in conjunction with the formation of our company, in September 2012, we issued and sold convertible promissory notes in an aggregate principal amount of $15,000 and $20,000 to Dr. Lian and Dr. Dinerman, respectively. These convertible promissory notes have a maturity date of September 28, 2014 and bear interest at the lesser of (1) the short-term Applicable Federal Rate (for short-term loans) as published by the U.S. Internal Revenue Service, and (2) the maximum rate permissible by law. As of March 31, 2014, the aggregate principal amount, plus accrued interest, outstanding under each convertible promissory note was $15,656 and $20,875, respectively. These convertible promissory notes will, in accordance with their terms, be converted into an aggregate of          shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus.

In April 2013, we issued and sold 250,000 shares of our common stock to Dr. Hanley, our Chief Medical Officer, at a price of $0.01 per share, for an aggregate purchase price of $2,500. As partial consideration for the issuance by us of the 250,000 shares of our common stock to Dr. Hanley, Dr. Hanley issued to us a promissory note, dated as of April 15, 2013, in the aggregate principal amount of $2,497.50. Simple interest on the unpaid principal balance of the promissory note accrues at the lesser of: (1) the short-term Applicable Federal Rate, as published by the U.S. Internal Revenue Service, and (2) the highest lawful rate permissible under applicable usury laws. All unpaid principal and all accrued and previously unpaid interest under the promissory note were due and payable in full on April 15, 2016. As of March 31, 2014, approximately $2,570 in principal and interest remained outstanding under the promissory note. On May 15, 2014, we forgave all of the outstanding principal and unpaid interest under the promissory note, which totaled $2,581 as of such date.

In May 2013, we issued and sold a convertible promissory note in an aggregate principal amount of $55,350 to Dr. Lian. This convertible promissory note has a maturity date of May 15, 2015 and bears interest at the lesser of (1) the short-term Applicable Federal Rate as published by the U.S. Internal Revenue Service, and (2) the maximum rate permissible by law. As of March 31, 2014, the aggregate principal amount, plus accrued interest, outstanding under this convertible promissory note was $56,853. This convertible promissory note will, in accordance with its terms, be converted into an aggregate of          shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus.

In February 2014, we issued and sold 1,000,000 shares of our common stock to Dr. Lian at a deemed fair value of $0.01 per share in exchange for the contribution by Dr. Lian of services to us having a deemed value of $10,000.

-135-

**Table of Contents**

**Equity Awards to Executive Officers**

In connection with this offering, we expect to issue equity awards to our executive officers. Further details regarding these equity awards are discussed in the section of this prospectus entitled "Executive Compensation –Proposed Equity Awards to Executive Officers".

**Agreements with Ligand**

On May 21, 2014, we entered into the Master License Agreement with Ligand, pursuant to which Ligand granted us worldwide rights under (1) patents related to FBPase Compounds, SARM Compounds, TRß Compounds, EPOR Compounds and DGAT-1 Compounds, (2) related know-how controlled by Ligand, and (3) physical quantities of FBPase, SARM, TRß, EPOR and DGAT-1 Compounds. Under the terms of the Master License Agreement, we will pay to Ligand an upfront fee of $29.0 million, subject to adjustment in certain circumstances, payable in equity upon the closing of this offering, in addition to development and commercial milestone payments and single-digit royalties on future worldwide net product sales. In connection with the Master License Agreement, we also entered into the Loan and Security Agreement, the Note, the Sublease Agreement and the Registration Rights Agreement. Under the Sublease Agreement, we are required to pay Ligand base rent in the amount of approximately $13,500 per month, as well as our pro rata portion of certain operating expenses. Further details regarding the Master License Agreement, the Loan and Security Agreement, the Note, the Sublease Agreement and the Registration Rights Agreement are discussed in the section of this prospectus entitled "Business – Agreements with Ligand".

**Limitation of Liability and Indemnification of Officers and Directors**

Prior to the completion of this offering, we expect to adopt an amended and restated certificate of incorporation and amended and restated bylaws, which will become effective immediately prior to the completion of this offering, and which will contain provisions that limit the liability of our directors for monetary damages to the fullest extent permitted by Delaware law. Consequently, our directors will not be personally liable to us or our stockholders for monetary damages for any breach of fiduciary duties as directors, except liability for the following:

- any breach of their duty of loyalty to our company or our stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the DGCL; or

- any transaction from which they derived an improper personal benefit.

Any amendment to, or repeal of, these provisions will not eliminate or reduce the effect of these provisions in respect of any act, omission or claim that occurred or arose prior to that amendment or repeal. If the DGCL is amended to provide for further limitations on the personal liability of directors of corporations, then the personal liability of our directors will be further limited to the greatest extent permitted by the DGCL.

Our amended and restated certificate of incorporation will provide that we will, under certain circumstances, indemnify our directors, officers, employees or agents, subject to any provisions contained in our amended and restated bylaws. Our amended and restated bylaws will provide that we will indemnify, to the fullest extent permitted by law, any person who is or was or is made a party or is threatened to be made a party to, or is otherwise involved in, any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was one of our directors or officers, or is or was serving at our request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against all expense, liability and loss (including, among other things, attorney's fees and amounts paid in settlement) reasonably incurred or suffered by such director, officer, employee or agent in connection therewith, subject to certain conditions. Our amended and restated bylaws will also provide us with the power to, to the extent authorized by our board of directors, grant

-136-

**Table of Contents**

rights to indemnification and to advancement of expenses to any of our employees or agents to the fullest extent indemnification may be granted to our directors and officers. In addition, our amended and restated bylaws will also provide that we must advance expenses incurred by or on behalf of a director or officer in advance of the final disposition of any action or proceeding, subject to certain exceptions.

Further, prior to the completion of this offering, we expect to enter into indemnification agreements with each of our directors and executive officers that may be broader than the specific indemnification provisions contained in the DGCL. These indemnification agreements will require us, among other things, to indemnify our directors and executive officers against liabilities that may arise by reason of their status or service. These indemnification agreements will also require us to advance all expenses incurred by the directors and executive officers in investigating or defending any such action, suit or proceeding, subject to certain exceptions. We believe that these agreements are necessary to attract and retain qualified individuals to serve as directors and executive officers.

The limitation of liability and indemnification provisions that will be included in our amended and restated certificate of incorporation, amended and restated bylaws and in indemnification agreements that we enter into with our directors and executive officers may discourage stockholders from bringing a lawsuit against our directors and executive officers for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against our directors and executive officers even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and executive officers as required by these indemnification provisions. At present, we are not aware of any pending litigation or proceeding involving any person who is or was one of our directors, officers, employees or other agents or is or was serving at our request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, for which indemnification is sought, and we are not aware of any threatened litigation that may result in claims for indemnification.

Our amended and restated bylaws will provide that we may purchase and maintain insurance, at our expense, to protect us and any person who is or was a director, officer, employee or agent of us or is or was serving at our request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not we would have the power to indemnity such person against such expense, liability or loss under the DGCL. We will obtain prior to the closing of this offering insurance under which, subject to the limitations of the insurance policies, coverage is provided to our directors and executive officers against loss arising from claims made by reason of breach of fiduciary duty or other wrongful acts as a director or executive officer, including claims relating to public securities matters, and to us with respect to payments that may be made by us to these directors and executive officers pursuant to our indemnification obligations or otherwise as a matter of law.

Certain of our non-employee directors may, through their relationships with their employers, be insured or indemnified against certain liabilities incurred in their capacity as members of our board of directors.

The underwriting agreement provides for indemnification by the underwriters of us and our officers and directors for certain liabilities arising under the Securities Act or otherwise.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling our company pursuant to the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

-137-

**Table of Contents**

**Policies and Procedures for Related Party Transactions**

Our board of directors will adopt a written related person transaction policy to be effective upon completion of this offering to set forth the policies and procedures for the review and approval or ratification of related person transactions. This policy will cover, with certain exceptions set forth in Item 404 of Regulation S-K under the Securities Act, any transaction, arrangement, or relationship, or any series of similar transactions, arrangements, or relationships in which we were or are to be a participant, the amount involved exceeds $120,000, and a related person had or will have a direct or indirect material interest, including, without limitation, purchases of goods or services by or from the related person or entities in which the related person has a material interest, indebtedness, guarantees of indebtedness, and employment by us of a related person. A related person is any individual who is, or who has been since the beginning of our last fiscal year, one of our directors or executive officers, or a nominee to become one of our directors, or any person known to be the beneficial owner of more than 5% of any class of our voting securities, or any immediate family member of any of the foregoing persons. Additionally, any firm, corporation or other entity by which any of the foregoing persons is employed or in which such person is a general partner or principal, or in a similar position, or in which such person has a 10% or greater beneficial ownership interest, will also be deemed to be a related person. Transactions involving compensation for services provided to us as an employee, consultant or director are not considered related-person transactions under this policy. As provided by our audit committee charter to be effective upon completion of this offering, our audit committee is responsible for reviewing and approving in advance any related party transaction. Prior to the creation of our audit committee, our full board of directors will review related party transactions.

-138-

**Table of Contents**

# Principal Stockholders

The following table sets forth certain information with respect to the beneficial ownership of our common stock as of March 31, 2014, and the beneficial ownership of our common stock as adjusted to reflect the sale of common stock offered by us in this offering, for:

- each of our named executive officers;

- each of our directors;

- all of our current directors and executive officers as a group; and

- each person, or group of affiliated persons, known by us to be the beneficial owner of more than five percent of any class of our voting securities.

We have determined beneficial ownership in accordance with the rules of the SEC. We have deemed shares of our common stock subject to options that are currently exercisable or exercisable within 60 days of March 31, 2014 and convertible securities that are currently convertible or convertible within 60 days of March 31, 2014 to be outstanding and to be beneficially owned by the person holding the option for the purpose of computing the percentage ownership of that person but have not treated them as outstanding for the purpose of computing the percentage ownership of any other person.

We have based percentage ownership of our common stock before this offering on 6,000,000 shares of our common stock outstanding as of March 31, 2014, excluding the shares of common stock issuable pursuant to the conversion of outstanding convertible notes in an aggregate principal amount of $310,350 and accrued interest of approximately $9,083 and the shares of common stock issuable pursuant to the Master License Agreement and conversion of the Note.

We have based percentage ownership of our common stock after this offering on 6,000,000 shares of our common stock outstanding as of March 31, 2014, plus                shares of common stock issuable pursuant to the conversion of outstanding convertible notes in an aggregate principal amount of $310,350 and accrued interest of approximately $9,083, plus                shares of common stock issuable pursuant to the Master License Agreement, plus                shares of common stock issuable upon conversion of the Note, or the Note Shares, in each case based on an assumed initial public offering price of $        , the midpoint of the price range set forth on the cover page of this prospectus, and assuming the sale of                shares of common stock in this offering. Ligand has the option to receive a cash payment from us, in the aggregate amount of approximately $        , in lieu of receiving the Note Shares.

-139-

**Table of Contents**

Unless otherwise indicated, the address of each beneficial owner listed in the table below is c/o Viking Therapeutics, Inc., 11119 North Torrey Pines Road, Suite 50, San Diego, CA 92037. Unless otherwise indicated below, to our knowledge, the persons and entities named in the table have sole voting and sole investment power with respect to all shares that they beneficially owned, subject to community property laws where applicable.

| | Common Stock Beneficially Owned Before this Offering | | Common Stock Beneficially Owned After this Offering | | | |
| | | | Assuming No Exercise of Option to Purchase Additional Shares | | Assuming Full Exercise of Option to Purchase Additional Shares | |
| Beneficial Owner Name | Shares | Percentage | Shares | Percentage | Shares | Percentage |
|---|---|---|---|---|---|---|
| **Greater than 5% Stockholders:** | | | | | | |
| Ligand Pharmaceuticals Incorporated(1) | – | – | (2) | % | | % |
| Isabelle Dinerman(3) | 525,000 | 8.8% | | % | | % |
| **Named Executive Officers and Directors:** | | | | | | |
| Brian Lian, Ph.D. | 3,650,000 | 60.8% | (4) | % | (4) | % |
| Michael Morneau | – | – | (5) | % | (5) | % |
| Michael Dinerman, M.D. | 1,575,000 | 26.3% | (6) | % | (6) | % |
| Rochelle Hanley, M.D. | 250,000 | 4.2% | (7) | % | (7) | % |
| Matthew W. Foehr | – | – | – | – | – | – |
| Lawson Macartney, DVM, Ph.D. | – | – | – | – | – | – |
| Matthew Singleton | – | – | – | – | – | – |
| Stephen W. Webster | – | – | – | – | – | – |
| All current executive officers and directors as a group (8 persons) | 5,475,000 | 91.3% | (8) | % | (8) | % |

\*    Denotes less than 1%

(1)  Ligand Pharmaceuticals Incorporated's address is 11119 North Torrey Pines Rd., Suite 200, San Diego, CA 92037.

(2)  Consists of            shares of common stock that will be issued to Ligand upon the consummation of this offering pursuant to the Master License Agreement and            shares of common stock issuable to Ligand upon the consummation of this offering upon conversion of the Note, in each case based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus. Of these shares of common stock,            shares are beneficially owned directly by Ligand Pharmaceuticals Incorporated, and            shares owned by Metabasis Therapeutics, Inc., a wholly-owned subsidiary of Ligand Pharmaceuticals Incorporated.

(3)  Ms. Dinerman is Dr. Dinerman's sister.

(4)  Consists of: (a) 3,650,000 shares of common stock owned directly, (b)            shares of common stock issuable upon conversion of convertible notes that will be converted into shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and (c)            shares of common stock and            shares of unvested restricted common stock to be issued to Dr. Lian on the closing date of this offering in accordance with the terms of the Lian Employment Agreement. See the section of this prospectus entitled "Executive Compensation – Proposed Equity Awards to Executive Officers" for additional information regarding the shares of common stock to be issued to Dr. Lian on the closing date of this offering.

(5)  Consists of            shares of common stock and            shares of unvested restricted common stock to be issued to Mr. Morneau on the closing date of this offering in accordance with the terms of the Morneau Employment Agreement. See the section of this prospectus entitled "Executive Compensation – Proposed Equity Awards to Executive Officers" for additional information regarding the shares of common stock to be issued to Mr. Morneau on the closing date of this offering.

(6)  Consists of: (a) 1,575,000 shares of common stock owned directly, (b)            shares of common stock issuable upon conversion of a convertible note that will be converted into shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and (c)            shares of common stock and            shares of unvested restricted common stock to be issued to Dr. Dinerman on the closing date of this offering in accordance with the terms of the Dinerman Employment Agreement. See the section of this prospectus entitled "Executive Compensation – Proposed Equity Awards to Executive Officers" for additional information regarding the shares of common stock to be issued to Dr. Dinerman on the closing date of this offering.

-140-

**Table of Contents**

(7)    Consists of: (a) 250,000 shares of common stock owned directly, and (b)                shares of common stock and                shares of unvested restricted common stock to be issued to Dr. Hanley on the closing date of this offering in accordance with the terms of the Hanley Employment Agreement. See the section of this prospectus entitled "Executive Compensation – Proposed Equity Awards to Executive Officers" for additional information regarding the shares of common stock to be issued to Dr. Hanley on the closing date of this offering.

(8)    Consists of (a) 5,475,000 shares of common stock held by all of our executive officers and directors as a group, (b)                shares of common stock issuable upon conversion of convertible notes held by all of our executive officers and directors as a group that will be converted into shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $          , the midpoint of the price range set forth on the cover page of this prospectus, and (c)                shares of common stock and                shares of unvested restricted common stock to be issued to all of our executive officers and directors as a group on the closing date of this offering in accordance with the terms of our employment agreements with our executive officers. See the section of this prospectus entitled "Executive Compensation – Proposed Equity Awards to Executive Officers" for additional information regarding the shares of common stock to be issued to our executive officers on the closing date of this offering.

-141-

**Table of Contents**

# Description of Capital Stock

### General

The following description summarizes the most important terms of our capital stock, as they will be in effect upon the closing of this offering. We expect to adopt an amended and restated certificate of incorporation and amended and restated bylaws in connection with this offering, and this description summarizes the provisions that will be included in such documents. Because it is only a summary, it does not contain all of the information that may be important to you. For a complete description of the matters set forth in this "Description of Capital Stock," you should refer to our amended and restated certificate of incorporation, amended and restated bylaws and the Registration Rights Agreement, each of which will be included as exhibits to the registration statement of which this prospectus forms a part, and to the applicable provisions of Delaware law. Immediately following the closing of this offering, our authorized capital stock will consist of                shares of common stock, $0.00001 par value per share, and                shares of undesignated preferred stock, $0.00001 par value per share.

As of March 31, 2014, there were 6,000,000 shares of our common stock outstanding, held by four stockholders of record. Our board of directors is authorized, without stockholder approval except as required by the Nasdaq Rules, to issue additional shares of our capital stock.

### Common Stock

*Dividend Rights*

Subject to preferences that may apply to any shares of preferred stock outstanding at the time, the holders of our common stock are entitled to receive dividends out of funds legally available if our board of directors, in its discretion, determines to issue dividends and then only at the times and in the amounts that our board of directors may determine.

*Voting Rights*

Holders of our common stock are entitled to one vote for each share held on all matters submitted to a vote of stockholders. We have not provided for cumulative voting for the election of directors in our amended and restated certificate of incorporation. Our amended and restated certificate of incorporation establishes a classified board of directors that is divided into three classes with staggered three-year terms. Only the directors in one class will be subject to election at each annual meeting of our stockholders, with the directors in the other classes continuing for the remainder of their respective three-year terms.

*No Preemptive or Similar Rights*

Our common stock is not entitled to preemptive rights, and is not subject to conversion, redemption or sinking fund provisions.

*Right to Receive Liquidation Distributions*

If we become subject to a liquidation, dissolution or winding-up, the assets legally available for distribution to our stockholders would be distributable ratably among the holders of our common stock and any participating preferred stock outstanding at that time, subject to prior satisfaction of all outstanding debt and liabilities and the preferential rights of and the payment of liquidation preferences, if any, on any outstanding shares of preferred stock.

*Fully Paid and Non-Assessable*

All of the outstanding shares of our common stock are, and the shares of our common stock to be issued pursuant to this offering will be, fully paid and non-assessable.

-142-

**Table of Contents**

## Preferred Stock

Following this offering, our board of directors will be authorized, subject to limitations prescribed by Delaware law, to issue up to            shares of our preferred stock in one or more series, to establish from time to time the number of shares to be included in each series, and to fix the designation, powers, preferences, and rights of the shares of each series and any of its qualifications, limitations or restrictions, in each case without further vote or action by our stockholders. Our board of directors can also increase or decrease the number of shares of any series of preferred stock, but not below the number of shares of that series then outstanding, without any further vote or action by our stockholders. Our board of directors may authorize the issuance of preferred stock with voting or conversion rights that could adversely affect the voting power or other rights of the holders of our common stock. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions and other corporate purposes, could, among other things, have the effect of delaying, deferring or preventing a change in control of our company and might adversely affect the market price of our common stock and the voting and other rights of the holders of our common stock. We have no current plan to issue any shares of preferred stock.

## Equity Awards

As of March 31, 2014, we had no outstanding options to purchase shares of our common stock or other equity awards. Upon the effectiveness of the 2014 Equity Incentive Plan,            shares of our common stock will be reserved for issuance of equity awards under the 2014 Equity Incentive Plan. We will grant options to purchase an aggregate of            shares of our common stock under the 2014 Equity Incentive Plan to our non-employee directors on the effective date of this offering, and we will issue            shares of restricted common stock and grant options to purchase an aggregate of            shares of our common stock under the 2014 Equity Incentive Plan to our executive officers on the closing date of this offering. See the sections of this prospectus entitled "Executive Compensation – Proposed Equity Awards to Executive Officers" and "Management – Non-Employee Director Compensation" for additional information regarding the options and shares of restricted common stock to be issued to our directors and executive officers on and prior to the closing date of this offering.

## Convertible Notes

As of March 31, 2014, we had outstanding convertible notes in an aggregate principal amount of $310,350 and accrued interest of approximately $9,083, which will be converted into an aggregate of            shares of our common stock upon the closing of this offering, based on an assumed initial public offering price of $      , the midpoint of the price range set forth on the cover page of this prospectus.

## Ligand Convertible Note

As of            , 2014, the aggregate outstanding principal amount of the Note, plus all accrued and previously unpaid interest thereon, was approximately $      . This offering will constitute an Initial Public Offering under the Loan and Security Agreement, and Ligand has the option to convert the amounts outstanding under the Note into shares of our common stock upon the consummation of this offering. Therefore, upon the consummation of this offering, we may be obligated to issue an aggregate of            shares of common stock to Ligand pursuant to the Note, based on an assumed initial public offering price of $      , the midpoint of the price range set forth on the cover page of this prospectus. Ligand has the option to receive a cash payment from us, in the aggregate amount of approximately $      , in lieu of receiving shares issuable under the Note. See the section of this prospectus entitled "Business – Agreements with Ligand – Loan and Security Agreement" for additional information regarding the Note and the Loan and Security Agreement.

-143-

[Table of Contents](#)

**Registration Rights**

On May 21, 2014, we entered into a Registration Rights Agreement with Ligand, or the Registration Rights Agreement, pursuant to which we agreed, among other things, that we will file with the SEC, by no later than the first date on which the lock-up requested by the underwriters in this offering expires or lapses with respect to Ligand (or the first business day thereafter), a Registration Statement on Form S-1 under the Securities Act that covers the resale of the full amount of the Registrable Securities. See the section of this prospectus entitled "Business – Agreements with Ligand – Registration Rights Agreement" for a description of these registration rights.

**Anti-Takeover Provisions**

Certain provisions of Delaware law, along with our amended and restated certificate of incorporation and our amended and restated bylaws, as will take effect immediately prior to the completion of this offering, all of which are summarized below, may have the effect of delaying, deferring or discouraging another person from acquiring control of our company. These provisions are expected to discourage coercive takeover practices and inadequate takeover bids. These provisions are also designed, in part, to encourage persons seeking to acquire control of our company to first negotiate with our board of directors. However, these provisions could have the effect of delaying, discouraging or preventing attempts to acquire us, which could deprive our stockholders of opportunities to sell their shares of common stock at prices higher than prevailing market prices.

*Delaware Law*

Upon completion of this offering, we will be subject to the provisions of Section 203 of the DGCL regulating corporate takeovers. In general, those provisions prohibit a public Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years following the date that the stockholder became an interested stockholder, unless:

- the transaction is approved by the board of directors before the date the interested stockholder attained that status;

- upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced; or

- on or after the date of the transaction, the transaction is approved by the board of directors and authorized at a meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock that is not owned by the interested stockholder.

In general, Section 203 of the DGCL defines a business combination to include the following:

- any merger or consolidation involving the corporation and the interested stockholder;

- any sale, transfer, pledge or other disposition of 10% or more of the assets of the corporation involving the interested stockholder;

- subject to certain exceptions, any transaction that results in the issuance or transfer by the corporation of any stock of the corporation to the interested stockholder;

- any transaction involving the corporation that has the effect of increasing the proportionate share of the stock of any class or series of the corporation beneficially owned by the interested stockholder; or

- the receipt by the interested stockholder of the benefit of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation.

In general, Section 203 of the DGCL defines an interested stockholder as any entity or person beneficially owning, or who within three years prior to the time of determination of interested stockholder status did own,

-144-

**Table of Contents**

15% or more of the outstanding voting stock of the corporation and any entity or person affiliated with or controlling or controlled by any such entity or person.

A Delaware corporation may opt out of this provision by express provision in its original certificate of incorporation or by amendment to its certificate of incorporation or bylaws approved by its stockholders. However, we have not opted out of, and do not currently intend to opt out of, this provision. The statute could prohibit or delay mergers or other takeover or change in control attempts and, accordingly, may discourage attempts to acquire our company.

*Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws*

Our amended and restated certificate of incorporation and our amended and restated bylaws, as will take effect immediately prior to the completion of this offering, include a number of provisions that could deter hostile takeovers or delay or prevent changes relating to the control of our board of directors or management team, including the following:

- *Board of Directors Vacancies.* Our amended and restated certificate of incorporation and amended and restated bylaws authorize only our board of directors to fill vacant directorships, including newly created seats. In addition, the number of directors constituting our board of directors will be permitted to be set only by a resolution adopted by a majority vote of our entire board of directors. These provisions would prevent a stockholder from increasing the size of our board of directors and then gaining control of our board of directors by filling the resulting vacancies with its own nominees. This makes it more difficult to change the composition of our board of directors and promotes continuity of management.

- *Classified Board.* Our amended and restated certificate of incorporation and amended and restated bylaws provide that our board of directors is classified into three classes of directors. A third party may be discouraged from making a tender offer or otherwise attempting to obtain control of our company as it is more difficult and time consuming for stockholders to replace a majority of the directors on a classified board of directors. See the section of this prospectus entitled "Management – Board of Directors".

- *Stockholder Action; Special Meeting of Stockholders.* Our amended and restated certificate of incorporation provides that our stockholders may not take action by written consent, but may only take action at annual or special meetings of our stockholders. As a result, a holder controlling a majority of our capital stock would not be able to amend our amended and restated bylaws or remove directors without holding a meeting of our stockholders called in accordance with our amended and restated bylaws. Our amended and restated bylaws will further provide that special meetings of our stockholders may be called only by a majority of our board of directors, the Chairperson of our board of directors, our Chief Executive Officer or our President, thus prohibiting a stockholder (in the capacity as a stockholder) from calling a special meeting. These provisions might delay the ability of our stockholders to force consideration of a proposal or for stockholders controlling a majority of our capital stock to take any action, including the removal of directors.

- *Advance Notice Requirements for Stockholder Proposals and Director Nominations.* Our amended and restated bylaws will provide advance notice procedures for stockholders seeking to bring business before our annual meeting of stockholders or to nominate candidates for election as directors at our annual meeting of stockholders. Our amended and restated bylaws will also specify certain requirements regarding the form and content of a stockholder's notice. These provisions might preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders if the proper procedures are not followed. We expect that these provisions may also discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company.

- *No Cumulative Voting.* The DGCL provides that stockholders may cumulate votes in the election of directors if the corporation's certificate of incorporation allows for such mechanism. Our amended and restated certificate of incorporation does not provide for cumulative voting.

-145-

Table of Contents

- *Directors Removed Only for Cause.* Our amended and restated certificate of incorporation provides that stockholders may remove directors only for cause.

- *Exclusive Jurisdiction for Certain Actions.* Our amended and restated bylaws require, to the fullest extent permitted by law, that derivative actions brought in our name, actions against our directors, officers and employees for breach of fiduciary duty and other similar actions be brought only in the Court of Chancery in the State of Delaware, unless we otherwise consent. Although we believe this provision benefits us by providing increased consistency in the application of Delaware law in the types of lawsuits to which it applies, the provision may have the effect of discouraging lawsuits against our directors and officers.

- *Amendment of Charter Provisions.* Any amendment of the above provisions in our amended and restated certificate of incorporation, with the exception of the ability of our board of directors to issue shares of preferred stock and designate any rights, preferences and privileges thereto, would require approval by the affirmative vote of the holders of at least 66 2/3% of our then outstanding common stock.

- *Issuance of Undesignated Preferred Stock.* Our board of directors has the authority, without further action by the stockholders, to issue up to             shares of undesignated preferred stock with rights and preferences, including voting rights, designated from time to time by our board of directors. The existence of authorized but unissued shares of preferred stock would enable our board of directors to render more difficult or to discourage an attempt to obtain control of our company by means of a merger, tender offer, proxy contest or other means.

**Transfer Agent and Registrar**

Upon the completion of this offering, the transfer agent and registrar for our common stock will be American Stock Transfer & Trust Company, LLC. The transfer agent and registrar's address is 6201 15th Avenue, Brooklyn, New York 11219.

**Listing**

We intend to apply for the listing of our common stock on the Nasdaq Global Market under the symbol "VKTX".

-146-

**Table of Contents**

# Shares Eligible for Future Sale

Prior to this offering, there has been no public market for our common stock, and we cannot predict the effect, if any, that market sales of shares of our common stock or the availability of shares of our common stock for sale will have on the market price of our common stock prevailing from time to time. Future sales of our common stock in the public market, or the availability of such shares for sale in the public market, could adversely affect market prices prevailing from time to time. As described below, only a limited number of shares will be available for sale shortly after this offering due to contractual and legal restrictions on resale. Nevertheless, sales of our common stock in the public market after such restrictions lapse, or the perception that those sales may occur, could adversely affect the prevailing market price at such time and our ability to raise equity capital in the future.

Upon the completion of this offering, based on the number of shares of our capital stock outstanding as of March 31, 2014, we will have a total of              shares of our common stock outstanding, assuming (1) the conversion of our outstanding convertible notes in an aggregate principal amount of $310,350 and accrued interest of approximately $9,083 as of March 31, 2014 into an aggregate of              shares of our common stock upon the closing of this offering, (2) the issuance of an aggregate of              shares of common stock to Ligand pursuant to the Master License Agreement, and (3) the issuance of an aggregate of              shares of common stock to Ligand upon conversion of the Note, in each case based on an assumed initial public offering price of $     , the midpoint of the price range set forth on the cover page of this prospectus. Of these outstanding shares, all of the              shares of common stock sold in this offering will be freely tradable, except that any shares purchased in this offering by our affiliates, as that term is defined in Rule 144 under the Securities Act, would only be able to be sold in compliance with the Rule 144 limitations described below.

The remaining outstanding shares of our common stock will be deemed "restricted securities" as defined in Rule 144. Restricted securities may be sold in the public market only if they are registered or if they qualify for an exemption from registration under Rule 144 or Rule 701 under the Securities Act, which rules are summarized below. Subject to the lock-up agreements described below and the provisions of Rules 144 and 701 under the Securities Act, these shares will be available for sale in the public market as follows:

- no restricted securities will be available for sale in the public market upon the closing of this offering;

- beginning 181 days after the date of this prospectus,              shares of common stock will become eligible for sale in the public market, of which              shares will be held by affiliates and subject to the volume and other restrictions of Rule 144, as described below; and

- the remainder of the shares of common stock will be eligible for sale in the public market from time to time thereafter, subject in some cases to the volume and other restrictions of Rule 144, as described below, and the availability of a resale registration statement.

## Lock-Up Agreements

We, our executive officers directors and holders of all of our common stock and securities convertible into or exchangeable for our common stock, have agreed that, subject to certain exceptions, for a period of 180 days from the date of this prospectus, we and they will not, without the prior written consent of Oppenheimer & Co. Inc. and Roth Capital Partners, LLC, dispose of or hedge any shares or any securities convertible into or exchangeable for shares of our capital stock. Oppenheimer & Co. Inc. and Roth Capital Partners, LLC may, in their discretion, and without our consent but with advance notice to us, release any of the securities subject to these lock-up agreements at any time. Upon expiration of the "lock-up" period, we will be required to register the shares held by certain of our stockholders under the Securities Act. See the sections of this prospectus entitled "Business – Agreements with Ligand – Registration Rights Agreement", "– Registration Rights" and "Description of Capital Stock – Registration Rights".

-147-

**Table of Contents**

## Rule 144

In general, under Rule 144 as currently in effect, once we have been subject to the public company reporting requirements of Section 13 or Section 15(d) of the Exchange Act for at least 90 days, a person who is not deemed to have been one of our affiliates for purposes of the Securities Act at any time during the 90 days preceding a sale and who has beneficially owned the shares proposed to be sold for at least six months, including the holding period of any prior owner other than our affiliates, is entitled to sell those shares without complying with the manner of sale, volume limitation or notice provisions of Rule 144, subject to compliance with the public information requirements of Rule 144. If such a person has beneficially owned the shares proposed to be sold for at least one year, including the holding period of any prior owner other than our affiliates, then that person would be entitled to sell those shares without complying with any of the requirements of Rule 144.

In general, under Rule 144, as currently in effect, our affiliates or persons selling shares on behalf of our affiliates are entitled to sell upon expiration of the lock-up agreements described above, within any three-month period, a number of shares that does not exceed the greater of:

- 1% of the number of shares of our common stock then outstanding, which will equal approximately              shares as of immediately after this offering, based on the number of shares to be sold in this offering as set forth on the cover page of this prospectus; or

- the average weekly trading volume of our common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to that sale.

Sales under Rule 144 by our affiliates or persons selling shares on behalf of our affiliates are also subject to certain manner of sale provisions and notice requirements and to the availability of current public information about us. Rule 144 also provides that affiliates relying on Rule 144 to sell shares of our common stock that are not restricted shares must nonetheless comply with the same restrictions applicable to restricted shares, other than the holding period requirement.

Notwithstanding the availability of Rule 144, the holders of all of our restricted shares have entered into lock-up agreements as described below and their restricted shares will become eligible for sale at the expiration of the restrictions set forth in those agreements.

## Rule 701

Rule 701 generally allows a stockholder who purchased shares of our common stock pursuant to a written compensatory plan or contract and who is not deemed to have been an affiliate of our company during the immediately preceding 90 days to sell these shares in reliance upon Rule 144, but without being required to comply with the public information, holding period, volume limitation or notice provisions of Rule 144. Rule 701 also permits affiliates of our company to sell their Rule 701 shares under Rule 144 without complying with the holding period requirements of Rule 144. All holders of Rule 701 shares, however, are required by such rule to wait until 90 days after the date of this prospectus before selling those shares pursuant to Rule 701.

As of March 31, 2014, we had no outstanding options to purchase shares of our common stock or other equity awards issued pursuant to a written compensatory plan or contract.

## Registration Statement on Form S-8

Promptly after the completion of this offering, we intend to file a registration statement on Form S-8 under the Securities Act to register all of the shares of common stock reserved for issuance under our 2014 Equity Incentive Plan. The registration statement on Form S-8 is expected to become effective immediately upon filing, and shares covered by the registration statement will then become eligible for sale in the public market, subject to the Rule 144 limitations applicable to affiliates, vesting restrictions and applicable lock-up agreements. See the section of this prospectus entitled "Executive Compensation – 2014 Equity Incentive Plan" for a description of our equity incentive plan.

-148-

**Table of Contents**

**Registration Rights**

Pursuant to the Registration Rights Agreement, we have agreed to register an aggregate of                shares of common stock that will be issued to Ligand pursuant to the Master License Agreement, based on                shares of common stock outstanding as of immediately prior to the closing of this offering (excluding shares issued in this offering) and an assumed initial public offering price of $         , the midpoint of the price range set forth on the cover page of this prospectus. In addition, we have agreed that, if Ligand elects to convert the amounts outstanding under the Note into shares of our common stock upon the consummation of this offering, we will also register the                shares of common stock issuable to Ligand pursuant to the Note, based on an assumed initial public offering price of $         , the midpoint of the price range set forth on the cover page of this prospectus. If the offer and sale of these shares is registered, the shares will be freely tradable without restriction under the Securities Act, except for shares purchased by affiliates, and a large number of shares may be sold into the public market. Any sales of securities by these stockholders could have a material adverse effect on the trading price of our common stock. See the sections of this prospectus entitled "Business – Agreements with Ligand – Registration Rights Agreement" and "Description of Capital Stock – Registration Rights" for a description of these registration rights.

-149-

Table of Contents

## Material U.S. Federal Income Tax Consequences to Non-U.S. Holders

This section summarizes the material U.S. federal income tax consequences to a non-U.S. Holder (as defined below) of the purchase, ownership and disposition of our common stock as of the date hereof. Except where noted, this section addresses only common stock that is held as a capital asset within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended, or the Code.

For purposes of this section, a "non-U.S. holder" means a beneficial owner of our common stock (other than a partnership) that is not for U.S. federal income tax purposes any of the following:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof, or the District of Columbia;

- An estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- A trust if it (1) is subject to the primary supervision of a court within the U.S. and one or more U.S. persons have the authority to control all substantial decisions of the trust, or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

This section is based upon provisions of the Code, existing and proposed regulations, and administrative and judicial interpretations, all as currently in effect. These laws are subject to change, possibly on a retroactive basis, which may result in U.S. federal income tax consequences different from those summarized below. This section does not consider the specific facts and circumstances that may be relevant to a particular non-U.S. holder, nor does it address any estate or gift tax consequences or the treatment of a non-U.S. holder under the laws of any state, local or foreign taxing jurisdiction. In addition, it does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws (including if you are a U.S. expatriate, "controlled foreign corporation," "passive foreign investment company" or a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds our common stock, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and the tax treatment of the partnership. A partner in a partnership holding the common stock should consult its tax advisor with regard to the U.S. federal income tax treatment of an investment in the common stock.

**You should consult a tax advisor regarding the U.S. federal tax consequences of acquiring, holding and disposing of common stock in your particular circumstances, as well as any tax consequences that may arise under the laws of any state, local or foreign taxing jurisdiction.**

### Distributions on Common Stock

In general, if distributions are made with respect to our common stock, such distributions generally will constitute dividends to the extent of our current or accumulated earnings and profits as determined under U.S. federal income tax principles. Any portion of a distribution that exceeds our current and accumulated earnings and profits will first be applied against and reduce a holder's adjusted tax basis in the common stock, but not below zero, and to the extent such portion exceeds the holder's adjusted tax basis, will be treated as gain from the disposition of the common stock and will be treated as described under "Gain on Disposition of Common Stock" below.

Except as described below, if you are a non-U.S. holder of common stock, dividends paid to you are subject to withholding of U.S. federal income tax at a 30% rate or at such lower rate as may be specified by an applicable income tax treaty. However, dividends that are effectively connected with the conduct of a trade or business by

-150-

**Table of Contents**

the non-U.S. holder within the U.S. (and, if required by an applicable income tax treaty, are attributable to a permanent establishment maintained by the holder in the U.S.) are not subject to the withholding tax, provided certain certification and disclosure requirements are satisfied. Instead, such dividends are subject to U.S. federal income tax on a net income basis in the same manner as if the non-U.S. holder were a U.S. person as defined under the Code. Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

A non-U.S. holder of our common stock who wishes to claim the benefit of an applicable treaty rate for dividends will be required (1) to complete Internal Revenue Service Form W-8BEN (or other applicable form) and certify under penalties of perjury that such holder is not a U.S. person as defined under the Code and is eligible for treaty benefits, or (2) if our common stock is held through certain foreign intermediaries, to satisfy the relevant certification requirements of applicable U.S. Treasury regulations. Special certification and other requirements apply to certain non-U.S. holders that are pass-through entities rather than corporations or individuals.

If you are eligible for a reduced rate of U.S. withholding tax under a tax treaty, you may obtain a refund of any excess amounts withheld by filing an appropriate refund claim with the Internal Revenue Service.

**Gain on Disposition of Common Stock**

Subject to the below discussions of backup withholding and withholding tax relating to foreign accounts, if you are a non-U.S. holder, you generally will not be subject to U.S. federal income tax on gain that you recognize on a disposition of our common stock unless:

- the gain is "effectively connected" with your conduct of a trade or business in the U.S. (and if required by an applicable income tax treaty, is attributable to a permanent establishment that you maintain in the U.S.),

- you are an individual who is present in the U.S. for 183 or more days in the taxable year of the sale and certain other conditions exist, or

- we are or have been a U.S. real property holding corporation for federal income tax purposes and you held, directly or indirectly, at any time during the five-year period ending on the date of disposition, more than 5% of the common stock and you are not eligible for any treaty exemption.

Gain described in the first bullet point immediately above will be subject to tax on the net gain derived from the sale under regular graduated U.S. federal income tax rates. If you are a corporate non-U.S. holder, "effectively connected" gains that you recognize may also, under certain circumstances, be subject to an additional "branch profits tax" at a 30% rate, or such lower rate as may be specified by an applicable income tax treaty. An individual non-U.S. holder described in the second bullet point immediately above will be subject to a flat 30% tax on the gain derived from the sale, which may be offset by U.S. source capital losses, even though the individual is not considered a resident of the U.S.

We believe we are not and do not anticipate becoming a U.S. real property holding corporation.

**Additional Withholding Tax Relating to Foreign Accounts**

Under legislation enacted in 2010 commonly referred to as the Foreign Account Tax Compliance Act and related administrative guidance, a 30% U.S. federal withholding tax may apply to any dividends paid after June 30, 2014, and the gross proceeds from a disposition of our common stock occurring after December 31, 2016, in each case paid to (1) a "foreign financial institution" (as specifically defined in the legislation), whether such foreign financial institution is the beneficial owner or an intermediary, unless such foreign financial institution agrees to verify, report and disclose its U.S. "account" holders (as specifically defined in the legislation) and meets certain other specified requirements, or (2) a non-financial foreign entity, whether such non-financial foreign entity is

-151-

**Table of Contents**

the beneficial owner or an intermediary, unless such entity provides a certification that the beneficial owner of the payment does not have any substantial U.S. owners or provides the name, address and taxpayer identification number of each such substantial U.S. owner and certain other specified requirements are met. In certain cases, the relevant foreign financial institution or non-financial foreign entity may qualify for an exemption from, or be deemed to be in compliance with, these rules. You should consult your own tax advisor regarding this legislation and whether it may be relevant to your ownership and disposition of our common stock.

**Backup Withholding and Information Reporting**

We must report annually to the IRS and to each non-U.S. holder the amount of distributions on our common stock paid to such holder and the amount of tax withheld, if any, with respect to those distributions, regardless of whether withholding was required. This information also may be made available under a specific treaty or agreement to the tax authorities in the country in which the non-U.S. holder resides or is established.

Backup withholding may apply to distribution payments to a non-U.S. holder of our common stock and information reporting and backup withholding may apply to the payments of the proceeds of a sale of our common stock within the U.S. or through certain U.S.-related financial intermediaries, unless the non-U.S. holder furnishes to us or our paying agent the required certification as to its non-U.S. status, such as by providing a valid IRS Form W-8BEN or IRS Form W-8ECI, or certain other requirements are met. Notwithstanding the foregoing, backup withholding may apply if either we have or our paying agent has actual knowledge, or reason to know, that the holder is a U.S. person as defined under the Code.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a non-U.S. holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS. Non-U.S. holders should consult their tax advisors regarding the application of the information reporting and backup withholding rules to them.

-152-

**Table of Contents**

# Underwriting

We are offering the shares of common stock described in this prospectus through a number of underwriters. Oppenheimer & Co. Inc. and Roth Capital Partners, LLC are acting as joint book-running managers of this offering and as representatives of the underwriters. We are entering into an underwriting agreement with the underwriters with respect to the shares being offered. Subject to the terms and conditions of the underwriting agreement, we have agreed to sell to the underwriters, and each underwriter has severally agreed to purchase, at the initial public offering price less the underwriting discounts and commissions set forth on the cover page of this prospectus, the number of shares of common stock listed next to its name in the following table:

| Name | Number of Shares |
|------|-----------------:|
| Oppenheimer & Co. Inc. | |
| Roth Capital Partners, LLC | |
| Craig-Hallum Capital Group LLC | |
| MLV & Co. LLC | |
| Summer Street Research Partners | |
| Total | |

The underwriters are committed to purchase all the shares of common stock offered by us if they purchase any shares. The underwriting agreement also provides that if an underwriter defaults on its purchase commitment, the purchase commitments of non-defaulting underwriters may also be increased or this offering may be terminated.

The underwriters propose to offer the common stock directly to the public at the initial public offering price set forth on the cover page of this prospectus and to certain dealers at that price less a concession not in excess of $      per share. Any such dealers may resell shares to certain other brokers or dealers at a discount of up to $      per share from the initial public offering price. After the initial public offering of the shares, this offering price and other selling terms may be changed by the underwriters. Sales of shares made outside of the U.S. may be made by affiliates of the underwriters.

The underwriters have an option to purchase up to           additional shares of common stock from us to cover sales of shares by the underwriters which exceed the number of shares specified in the table above. The underwriters have 30 days from the date of this prospectus to exercise this option to purchase additional shares. If any shares are purchased with this option to purchase additional shares, the underwriters will purchase shares in approximately the same proportion as shown in the table above. If any additional shares of common stock are purchased, the underwriters will offer the additional shares on the same terms as those on which the shares are being offered.

The underwriting fee is equal to the public offering price per share of common stock less the amount paid by the underwriters to us per share of common stock. The underwriting fee is $      per share. The following table shows the per share and total underwriting discounts and commissions to be paid to the underwriters assuming both no exercise and full exercise of the underwriters' option to purchase additional shares.

| | Without exercise of option to purchase additional shares | With full exercise of option to purchase additional shares |
|------|---|---|
| Per Share | $ | $ |
| Total | $ | $ |

We estimate that the total expenses of this offering, including registration, filing and listing fees, printing fees and legal and accounting expenses, but excluding the underwriting discounts and commissions, will be approximately $      , which will be paid by us. This amount includes up to $      that we have agreed to reimburse the underwriters for certain of their expenses.

-153-

**Table of Contents**

A prospectus in electronic format may be made available on the web sites maintained by one or more underwriters, or selling group members, if any, participating in this offering. The underwriters may agree to allocate a number of shares to underwriters and selling group members for sale to their online brokerage account holders. Internet distributions will be allocated by the representatives to underwriters and selling group members that may make Internet distributions on the same basis as other allocations.

We have agreed that we will not, for a period of 180 days after the date of the underwriting agreement between us and the underwriters managing this offering and subject to certain exceptions, sell or register with the SEC or otherwise dispose of, directly or indirectly, any of our equity securities (or any securities convertible into, exercisable or exchangeable for our equity securities), except for the issuance of the shares of common stock being offered by this prospectus and the issuance of shares, options or equity awards pursuant to our stock incentive plans or bonus plans as described in this prospectus and in the registration statement of which this prospectus forms a part. In the event that during this 180-day period, (1) any shares are issued pursuant to our stock incentive plans or bonus plans that are exercisable during such 180-day period, or (2) any registration is effected on Form S-8 or on any successor form relating to shares that are exercisable during such 180-day period, we will obtain the written agreement of such grantee, purchaser or holder of such registered securities that, for the 180-day period, such person will not, without the prior written consent of Oppenheimer & Co. Inc. and Roth Capital Partners, LLC, offer for sale, sell, distribute, grant any option for the sale of, or otherwise dispose of, directly or indirectly, or exercise any registration rights with respect to, any shares of our common stock (or any securities convertible into, exercisable or exchangeable for any shares of our common stock) owned by such person.

Our directors and executive officers and all of our stockholders have entered into lock-up agreements with the underwriters prior to the commencement of this offering pursuant to which each of these persons or entities, with limited exceptions, for a period of 180 days after the date of this prospectus, may not, without the prior written consent of Oppenheimer & Co. Inc. and Roth Capital Partners, LLC, (1) offer, pledge, assign, encumber, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, any shares of our common stock or any securities convertible into or exercisable or exchangeable for shares of our common stock owned either of record or beneficially (as defined in the Exchange Act) by such person or entity on the date of the lock-up agreement or thereafter, or (2) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of our common stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of our common stock or such other securities, in cash or otherwise, or publicly announce an intention to do any of the foregoing.

The restrictions described in the foregoing paragraph do not apply to (1) transfers that are a bona fide gift, (2) transfers pursuant to a valid domestic order or divorce decree or settlement or by will, other testamentary document or intestate succession upon the death of the holder, (3) transfers to any family member or any trust for the direct or indirect benefit of the holder or the immediate family of the holder, so long as any such transfer does not involve a disposition for value, (4) transfers as part of a transfer or distribution by the holder to its stockholders, members, partners, beneficiaries or other equity holders, so long as the holder is a corporation, limited liability company, partnership, trust or other business, and so long as any such transfer or distribution does not involve a disposition for value, (5) transfers to us pursuant to the exercise by the holder of any equity incentive awards issued pursuant to our stock option or incentive plans as disclosed in this prospectus, on a "cashless" or "net exercise" basis; so long as the shares of our common stock received upon such exercise will remain subject to the restrictions set forth in the lock-up agreement, (6) transfers to us pursuant to any contractual arrangement that provides for the repurchase of the holder's shares of our common stock or such other securities by us or in connection with the termination of the holder's employment or other service relationship with us, or (7) transfers pursuant to a bona fide third party tender offer, merger, consolidation or other similar transaction made to all holders of our capital stock involving a change in control of our company, so long as, in the event the tender offer, merger, consolidation or similar transaction is not completed, the holder's shares of our common stock will remain subject to the restrictions set forth in the lock-up agreement and the consideration per share of common stock paid in such transaction shall be no less than the public offering price in this offering.

-154-

**Table of Contents**

In the event that any director, officer or holder of more than 1% of our common stock is permitted by the underwriters to sell or otherwise transfer or dispose of shares of our common stock for value, the underwriters will also release a pro-rata portion of the securities held by each of our other securityholders that is a party to a lock-up agreement with the underwriters.

We have agreed to indemnify the underwriters and their controlling persons against certain liabilities, including liabilities under the Securities Act.

We intend to apply for the listing of our common stock on the Nasdaq Global Market under the symbol "VKTX".

In connection with this offering, the underwriters may engage in stabilizing transactions, which involves making bids for, purchasing and selling shares of common stock in the open market for the purpose of preventing or retarding a decline in the market price of the common stock while this offering is in progress. These stabilizing transactions may include making short sales of the common stock, which involves the sale by the underwriters of a greater number of shares of common stock than they are required to purchase in this offering, and purchasing shares of common stock on the open market to cover positions created by short sales. Short sales may be "covered" shorts, which are short positions in an amount not greater than the underwriters' option to purchase additional shares referred to above, or may be "naked" shorts, which are short positions in excess of that amount. The underwriters may close out any covered short position either by exercising their option to purchase additional shares, in whole or in part, or by purchasing shares in the open market. In making this determination, the underwriters will consider, among other things, the price of shares available for purchase in the open market compared to the price at which the underwriters may purchase shares through the option to purchase additional shares. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market that could adversely affect investors who purchase in this offering. To the extent that the underwriters create a naked short position, they will purchase shares in the open market to cover the position.

The underwriters have advised us that, pursuant to Regulation M of the Securities Act, they may also engage in other activities that stabilize, maintain or otherwise affect the price of the common stock, including the imposition of penalty bids. This means that if the representatives of the underwriters purchase common stock in the open market in stabilizing transactions or to cover short sales, the representatives can require the underwriters that sold those shares as part of this offering to repay the underwriting discount received by them.

These activities may have the effect of raising or maintaining the market price of the common stock or preventing or retarding a decline in the market price of the common stock, and, as a result, the price of the common stock may be higher than the price that otherwise might exist in the open market. If the underwriters commence these activities, they may discontinue them at any time. The underwriters may carry out these transactions on the Nasdaq Global Market, in the over-the-counter market or otherwise.

Prior to this offering, there has been no public market for our common stock. The initial public offering price will be determined by negotiations between us and the representatives of the underwriters. In determining the initial public offering price, we and the representatives of the underwriters expect to consider a number of factors including:

- the information set forth in this prospectus and otherwise available to the representatives of the underwriters;

- our prospects and the history and prospects for the industry in which we compete;

- an assessment of our management;

- our prospects for future earnings;

- the general condition of the securities markets at the time of this offering;

- the recent market prices of, and demand for, publicly traded common stock of generally comparable companies; and

- other factors deemed relevant by the underwriters and us.

-155-

Table of Contents

Neither we nor the underwriters can assure investors that an active trading market will develop for our common stock, or that the shares will trade in the public market at or above the initial public offering price.

The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities. Certain of the underwriters and their affiliates have provided in the past to us and our affiliates and may provide from time to time in the future certain commercial banking, financial advisory, investment banking and other services for us and such affiliates in the ordinary course of their business, for which they have received and may continue to receive customary fees and commissions. In addition, in the ordinary course of their various business activities, the underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers, and such investment and securities activities may involve our securities and instruments. The underwriters and their respective affiliates may also make investment recommendations and publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long or short positions in such securities and instruments.

**Selling Restrictions**

Other than in the U.S., no action has been taken by us or the underwriters that would permit a public offering of the securities offered by this prospectus in any jurisdiction where action for that purpose is required. The securities offered by this prospectus may not be offered or sold, directly or indirectly, nor may this prospectus or any other offering material or advertisements in connection with the offer and sale of any such securities be distributed or published in any jurisdiction, except under circumstances that will result in compliance with the applicable rules and regulations of that jurisdiction. Persons into whose possession this prospectus comes are advised to inform themselves about and to observe any restrictions relating to this offering and the distribution of this prospectus. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities referred to by this prospectus in any jurisdiction in which such an offer or solicitation is unlawful.

This document is only being distributed to and is only directed at (1) persons who are outside the United Kingdom, (2) to investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or the Order, or (3) high net worth entities, and other persons to whom it may lawfully be communicated, falling with Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). The securities are only available to, and any invitation, offer or agreement to subscribe, purchase or otherwise acquire such securities will be engaged in only with, relevant persons. Any person who is not a relevant person should not act or rely on this document or any of its contents.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), from and including the date on which the European Union Prospectus Directive (the "EU Prospectus Directive") is implemented in that Relevant Member State (the "Relevant Implementation Date") an offer of securities described in this prospectus may not be made to the public in that Relevant Member State prior to the publication of a prospectus in relation to the shares which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the EU Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of shares to the public in that Relevant Member State at any time:

- to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

-156-

Table of Contents

- to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000; and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

- to fewer than 100 natural or legal persons (other than qualified investors as defined in the EU Prospectus Directive) subject to obtaining the prior consent of the book-running managers for any such offer; or

- in any other circumstances which do not require the publication by the Issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an ''offer of securities to the public'' in relation to any securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe for the securities, as the same may be varied in that Member State by any measure implementing the EU Prospectus Directive in that Member State and the expression EU Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

In the State of Israel, the shares of common stock sold in this offering may not be offered to any person or entity other than the following:

(1)    a fund for joint investments in trust (*i.e.*, mutual fund), as such term is defined in the Law for Joint Investments in Trust, 5754-1994, or a management company of such a fund;

(2)    a provident fund as defined in Section 47(a)(2) of the Income Tax Ordinance of the State of Israel, or a management company of such a fund;

(3)    an insurer, as defined in the Law for Oversight of Insurance Transactions, 5741-1981;

(4)    a banking entity or satellite entity, as such terms are defined in the Banking Law (Licensing), 5741-1981, other than a joint services company, acting for their own account or for the account of investors of the type listed in Section 15A(b) of the Securities Law 1968;

(5)    a company that is licensed as a portfolio manager, as such term is defined in Section 8(b) of the Law for the Regulation of Investment Advisors and Portfolio Managers, 5755-1995, acting on its own account or for the account of investors of the type listed in Section 15A(b) of the Securities Law 1968;

(6)    a company that is licensed as an investment advisor, as such term is defined in Section 7(c) of the Law for the Regulation of Investment Advisors and Portfolio Managers, 5755-1995, acting on its own account;

(7)    a company that is a member of the Tel Aviv Stock Exchange, acting on its own account or for the account of investors of the type listed in Section 15A(b) of the Securities Law 1968;

(8)    an underwriter fulfilling the conditions of Section 56(c) of the Securities Law, 5728-1968;

(9)    a venture capital fund (defined as an entity primarily involved in investments in companies which, at the time of investment, (a) are primarily engaged in research and development or manufacture of new technological products or processes and (b) involve above-average risk);

(10)    an entity primarily engaged in capital markets activities in which all of the equity owners meet one or more of the above criteria; and

(11)    this offering, in which the shareholders equity (including pursuant to foreign accounting rules, international accounting regulations and U.S. generally accepted accounting rules, as defined in the Securities Law Regulations (Preparation of Annual Financial Statements), 1993) is in excess of NIS 250 million.

Any offeree of the shares of common stock sold in this offering in the State of Israel shall be required to submit written confirmation that it falls within the scope of one of the above criteria. This prospectus will not be distributed or directed to investors in the State of Israel who do not fall within one of the above criteria.

-157-

Table of Contents

## Legal Matters

Paul Hastings LLP, Palo Alto, California, which has acted as our counsel in connection with this offering, will pass upon the validity of the shares of common stock being offered by this prospectus. The underwriters have been represented by Goodwin Procter LLP, New York, New York.

## Changes in and Disagreements with Independent Registered Public Accounting Firm on Accounting and Financial Disclosure

On March 4, 2014, we engaged MaloneBailey LLP, or MaloneBailey, to audit our financial statements as of and for the fiscal years ended December 31, 2012 and 2013. On April 7, 2014, our board of directors approved the dismissal of MaloneBailey as our independent registered public accounting firm, effective immediately.

MaloneBailey did not issue any reports with respect to our financial statements. Accordingly, there were no reports issued by MaloneBailey with respect to us that contained an adverse opinion or disclaimer of opinion and MaloneBailey did not issue any report that was qualified or modified as to uncertainty, audit scope or accounting principles.

From September 24, 2012 (Inception) through April 7, 2014: (1) there were no disagreements between us and MaloneBailey on any matters of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which, if not resolved to the satisfaction of MaloneBailey, would have caused MaloneBailey to make reference to the matter in any report they would have issued; and (2) there were no "reportable events" as that term is described in Item 304(a)(1)(v) of Regulation S-K.

We provided MaloneBailey with a copy of the foregoing disclosures and requested that MaloneBailey provide a letter addressed to the SEC stating whether it agrees with the foregoing statements. MaloneBailey furnished such a letter, dated July 1, 2014, and a copy of such letter is filed as Exhibit 16.1 to the registration statement of which this prospectus forms a part.

Effective as of April 7, 2014, our board of directors appointed Marcum LLP, or Marcum, as our independent registered public accounting firm to audit our financial statements as of and for the fiscal years ended December 31, 2012 and 2013, and for the fiscal year ending December 31, 2014. From September 24, 2012 (Inception) through April 7, 2014, neither we nor anyone on our behalf consulted with Marcum regarding (1) the application of accounting principles to a specified transaction, either completed or proposed, (2) the type of audit opinion that might be rendered on our financial statements, or (3) any matter that was either the subject of a disagreement, as described in Item 304(a)(1)(iv) of Regulation S-K and the related instructions thereto, or a "reportable event" as described in Item 304(a)(1)(v) of Regulation S-K.

## Experts

The audited financial statements for the period from September 24, 2012 (Inception) through December 31, 2012 and for the year ended December 31, 2013 have been included herein in reliance upon the report of Marcum LLP, an independent registered public accounting firm, and upon the report of such firm given upon their authority as experts in accounting and auditing.

## Where You Can Find Additional Information

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of common stock offered by this prospectus. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement, some of which is

-158-

**Table of Contents**

contained in exhibits to the registration statement as permitted by the rules and regulations of the SEC. For further information with respect to us and our common stock, we refer you to the registration statement, including the exhibits filed as a part of the registration statement. Statements contained in this prospectus concerning the contents of any contract or any other document are not necessarily complete. If a contract or document has been filed as an exhibit to the registration statement, please see the copy of the contract or document that has been filed. You may obtain copies of this information by mail from the Public Reference Section of the Securities and Exchange Commission, 100 F Street, N.E., Room 1580, Washington, D.C. 20549, at prescribed rates. You may obtain information on the operation of the public reference rooms by calling the SEC at 1-800-SEC-0330. The SEC also maintains an Internet website that contains reports, proxy statements and other information about issuers, like us, that file electronically with the SEC. The address of that website is *www.sec.gov*.

As a result of this offering, we will become subject to the information and reporting requirements of the Exchange Act and, in accordance with this law, will file periodic reports, proxy statements and other information with the SEC. These periodic reports, proxy statements and other information will be available for inspection and copying at the SEC's public reference facilities and the website of the SEC referred to above. We also maintain a website at *www.vikingtherapeutics.com*. Upon completion of this offering, you may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. Information contained on our website is not a part of this prospectus and the inclusion of our website address in this prospectus is an inactive textual reference only.

-159-

**Table of Contents**

## VIKING THERAPEUTICS, INC.

## INDEX TO FINANCIAL STATEMENTS

| | Pages |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-1 |
| Balance Sheets | F-2 |
| Statements of Operations | F-3 |
| Statements of Stockholders' Equity (Deficit) | F-4 |
| Statements of Cash Flows | F-5 |
| Notes to Financial Statements | F-6 – F-20 |

**Table of Contents**

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Board of Directors and Stockholders
of Viking Therapeutics, Inc.

We have audited the accompanying balance sheets of Viking Therapeutics, Inc. (the "Company") as of December 31, 2012 and 2013, and the related statements of operations, stockholders' equity (deficit) and cash flows for the period from September 24, 2012 (Inception) through December 31, 2012 and for the year ended December 31, 2013. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Viking Therapeutics, Inc., as of December 31, 2012 and 2013, and the results of its operations and its cash flows for the period from September 24, 2012 (Inception) through December 31, 2012 and for the year ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has had recurring net losses and has a working capital deficiency that raise substantial doubt about the Company's ability to continue as a going concern. Management's plans regarding these matters also are described in Note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Marcum LLP
Irvine, California
May 22, 2014

F-1

**Table of Contents**

# Viking Therapeutics, Inc.
## (A Development Stage Company)
### Balance Sheets

| | December 31, 2012 | December 31, 2013 | March 31, 2014 (Unaudited) |
|---|---|---|---|
| **Assets** | | | |
| Current assets | | | |
| Cash | $ – | $ 179,619 | $ 78,849 |
| Prepaids and other current assets | – | – | 7,500 |
| Total current assets | – | 179,619 | 86,349 |
| Other Assets | | | |
| Deposits | – | 775 | 775 |
| Deferred IPO financing costs | – | – | 189,592 |
| Total other assets | – | 775 | 190,367 |
| Total assets | $ – | $ 180,394 | $ 276,716 |
| **Liabilities and Stockholders' equity (deficit)** | | | |
| Current liabilities | | | |
| Accounts payable | $ 49,013 | $ 73,378 | $ 378,324 |
| Accounts payable – related party | 5,016 | 712 | 924 |
| Accrued interest | 350 | 6,507 | 9,083 |
| Convertible notes payable, current portion (net of discount of $3,106 and $2,070 at December 31, 2013 and March 31, 2014, respectively) | – | 46,894 | 47,930 |
| Total current liabilities | 54,379 | 127,491 | 436,261 |
| Long-term liabilities | | | |
| Convertible notes payable (net of discount of $7,250, $28,499 and $23,156 at December 31, 2012, December 31, 2013 and March 31, 2014, respectively) | 42,750 | 231,851 | 237,194 |
| Debt conversion feature liability | 8,286 | 71,655 | 81,904 |
| Total long-term liabilities | 51,036 | 303,506 | 319,098 |
| Total liabilities | 105,415 | 430,997 | 755,359 |
| Stockholders' equity (deficit) | | | |
| Common stock, $0.00001 par value; 10,000,000 shares authorized; 5,000,000, 5,200,000 and 6,000,000 shares issued and outstanding at December 31, 2012, December 31, 2013 and March 31, 2014, respectively | 50 | 52 | 60 |
| Additional paid-in capital | 5,562 | 11,114 | 10,010 |
| Notes receivable from stockholders | – | (4,496) | (2,498) |
| Deficit accumulated during the development stage | (111,027) | (257,274) | (486,215) |
| Total stockholders' equity (deficit) | (105,415) | (250,604) | (478,643) |
| Total liabilities and stockholders' equity (deficit) | $ – | $ 180,394 | $ 276,716 |

See accompanying notes to financial statements.

F-2

**Table of Contents**

# Viking Therapeutics, Inc.
## (A Development Stage Company)
## Statements of Operations

| | Period from September 24, 2012 (Inception) through December 31, 2012 | Year Ended December 31, 2013 | Three Months Ended March 31, 2013 (Unaudited) | Three Months Ended March 31, 2014 (Unaudited) | Cumulative Period from September 24, 2012 (Inception) through March 31, 2014 (Unaudited) |
|---|---|---|---|---|---|
| Revenues | $ — | $ — | $ — | $ — | $ — |
| Operating expenses | | | | | |
| Research and development | 68,871 | 11,613 | 575 | 50,000 | 130,484 |
| General and administrative | 40,770 | 89,463 | 2,615 | 159,737 | 289,970 |
| Total operating expenses | 109,641 | 101,076 | 3,190 | 209,737 | 420,454 |
| Loss from operations | (109,641) | (101,076) | (3,190) | (209,737) | (420,454) |
| Other expenses | | | | | |
| Loss from change in fair value of debt conversion feature | — | 20,622 | 37 | 10,249 | 30,871 |
| Interest expense | 1,386 | 24,549 | 1,356 | 8,955 | 34,890 |
| Total other expenses | 1,386 | 45,171 | 1,393 | 19,204 | 65,761 |
| Net loss | $ (111,027) | $ (146,247) | $ (4,583) | $ (228,941) | $ (486,215) |
| Basic and diluted net loss per share | $ (0.07) | $ (0.07) | $ (0.00) | $ (0.07) | $ |
| Weighted-average shares used to compute basic and diluted net loss per share | 1,482,625 | 2,043,295 | 1,794,444 | 3,191,666 | 2,026,311 |
| Pro forma basic and diluted net loss per share | | $ | | $ | |
| Weighted-average pro forma shares used to compute basic and diluted net loss per share | | | | | |

See accompanying notes to financial statements.

F-3

**Table of Contents**

**Viking Therapeutics, Inc.**
**(A Development Stage Company)**
**Statements of Stockholders' Equity (Deficit)**

| | Common Stock | | Additional Paid-In Capital | Notes Receivable from Stockholders | Deficit Accumulated During the Development Stage | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance, September 24, 2012** | – | $ – | $ – | $ – | $ – | $ – |
| Issuance of common stock to directors (founders stock) for services | 4,750,000 | 48 | 5,501 | – | – | 5,549 |
| Issuance of common stock for services | 250,000 | 2 | 61 | – | – | 63 |
| Net loss | – | – | – | – | (111,027) | (111,027) |
| **Balance, December 31, 2012** | **5,000,000** | **50** | **5,562** | **–** | **(111,027)** | **(105,415)** |
| Repurchase of common stock | (500,000) | (5) | (4,995) | 2,497 | – | (2,503) |
| Issuance of common stock for notes receivable | 700,000 | 7 | 6,993 | (6,993) | – | 7 |
| Employee stock-based compensation expense | – | – | 3,554 | – | – | 3,554 |
| Net loss | – | – | – | – | (146,247) | (146,247) |
| **Balance, December 31, 2013** | **5,200,000** | **52** | **11,114** | **(4,496)** | **(257,274)** | **(250,604)** |
| Repurchase of common stock | (200,000) | (2) | (1,998) | 1,998 | – | (2) |
| Issuance of performance based common stock | 1,000,000 | 10 | (10) | – | – | – |
| Employee stock-based compensation expense | – | – | 904 | – | – | 904 |
| Net loss | – | – | – | – | (228,941) | (228,941) |
| **Balance, March 31, 2014 (unaudited)** | **6,000,000** | **$ 60** | **$ 10,010** | **$ (2,498)** | **$ (486,215)** | **$(478,643)** |

See accompanying notes to financial statements.

F-4

**Table of Contents**

# Viking Therapeutics, Inc.
## (A Development Stage Company)
## Statements of Cash Flows

| | For the Period from September 24, 2012 (Inception) through December 31, 2012 | Year Ended December 31, 2013 | Three Months Ended March 31, 2013 (Unaudited) | Three Months Ended March 31, 2014 (Unaudited) | Cumulative Period from September 24, 2012 (Inception) through March 31, 2014 (Unaudited) |
|---|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | | |
| Net loss | $ (111,027) | $ (146,247) | $ (4,583) | $ (228,941) | $ (486,215) |
| Adjustments to reconcile net loss to net cash used in operating activities | | | | | |
| Amortization of discount charged to interest expense on convertible notes | 1,036 | 18,392 | 1,036 | 6,379 | 25,807 |
| Change in fair value of debt conversion feature | – | 20,622 | 37 | 10,249 | 30,871 |
| Stock issued for services | 5,612 | 3,554 | 965 | 904 | 10,070 |
| Changes in operating assets and liabilities | | | | | |
| Prepaids and other current assets | – | – | – | (7,500) | (7,500) |
| Deferred IPO financing costs | – | – | – | (189,592) | (189,592) |
| Deposits | – | (775) | – | – | (775) |
| Accounts payable | 49,013 | 24,366 | 1,679 | 305,657 | 379,036 |
| Accounts payable – related party | 5,016 | (4,304) | 546 | (500) | 212 |
| Accrued expenses | 350 | 6,157 | 320 | 2,576 | 9,083 |
| Net cash used in operating activities | (50,000) | (78,235) | – | (100,768) | (229,003) |
| **Cash Flows From Financing Activities:** | | | | | |
| Proceeds from issuance of common stock | – | 7 | – | – | 7 |
| Repurchase of common stock | – | (2,503) | – | (2) | (2,505) |
| Proceeds from convertible notes payable | 50,000 | 260,350 | – | – | 310,350 |
| Net cash provided by (used in) financing activities | 50,000 | 257,854 | – | (2) | 307,852 |
| Net increase (decrease) in cash | – | 179,619 | – | (100,770) | 78,849 |
| Cash, beginning of period | – | – | – | 179,619 | – |
| Cash, end of period | $ – | $ 179,619 | $ – | $ 78,849 | $ 78,849 |
| Supplemental disclosure of cash flow information | | | | | |
| Cash paid during the year for: | | | | | |
| Interest | $ – | $ – | $ – | $ – | $ – |
| Income taxes | $ – | $ – | $ – | $ – | $ – |

**Supplemental Disclosure of Non-Cash Transactions**

During the year ended December 31, 2013, the Company issued shares of its common stock in exchange for $4,496 in notes receivable and repurchased common stock through a reversal of previously recorded notes receivable. During the three months ended March 31, 2014, the Company repurchased common stock through a reversal of previously recorded notes receivable in the amount of $1,998. In addition, there was a non-cash increase in the discount on notes payable of $8,249 and $42,747 for the period from September 24, 2012 (Inception) to December 31, 2012 and for the year ended December 31, 2013, respectively.

See accompanying notes to financial statements.

F-5

**Table of Contents**

### Viking Therapeutics, Inc.
### (A Development Stage Company)
### Notes to Financial Statements

**1. Organization, Liquidity and Management's Plan, and Summary of Significant Accounting Policies**

(Information as of March 31, 2014 and thereafter and for the three months ended March 31, 2013 and 2014 is unaudited)

*The Company*

Viking Therapeutics, Inc., a Delaware corporation (the "Company"), is a clinical-stage biopharmaceutical company focused on the development of novel, first-in-class or best-in-class therapies for metabolic and endocrine disorders.

The Company was incorporated under the laws of the State of Delaware on September 24, 2012 and its principal executive offices are located in San Diego, CA.

*Development Stage*

Through March 31, 2014, the Company has devoted substantially all of its efforts to raising capital, building infrastructure and acquiring rights to intellectual property, and has not realized revenues from its planned principal operations. Accordingly, the Company is considered to be in the development stage.

*Basis of Presentation*

The accompanying financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the accompanying financial statements. Significant estimates made in preparing these financial statements relate to determining the fair value of the debt conversion liability and accounting for certain commitments. Actual results could differ from those estimates.

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to a concentration of credit risk principally consist of cash. The Company maintains its cash balances at what it believes are high credit-quality financial institutions. At times, balances at a single financial institution may exceed federally insured limits of $250,000.

*Liquidity and Management's Plan*

As of March 31, 2014, the Company did not have sufficient working capital to fund its planned operations without additional financing. These conditions raise substantial doubt about the Company's ability to continue as a going concern. The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. This basis of accounting contemplates the recovery of the Company's assets and the satisfaction of its liabilities in the normal course of business. A successful transition to attaining profitable operations is dependent upon achieving a level of positive cash flows adequate to support the Company's cost structure. In order to continue its operations, the Company must raise additional funds through equity or debt financings or generate revenues from collaborative partners. There can be no assurance that the Company will be able to obtain additional equity or debt financing on terms acceptable to the Company, or at all. If the Company is unable to obtain sufficient funding, it may be required to significantly curtail its planned operations, which may have a material, adverse impact on its ability to continue as a going concern. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should the Company be forced to take any such actions.

F-6

Table of Contents

*Unaudited Interim Financial Statements*

The financial statements as of March 31, 2014, for the three months ended March 31, 2013 and 2014, and for the cumulative period from September 24, 2012 (Inception) through March 31, 2014 are unaudited. The unaudited financial statements have been prepared on the same basis as the audited financial statements and, in the opinion of management, include all adjustments, consisting of normal recurring adjustments, considered necessary to state fairly the financial information set forth therein, in accordance with GAAP.

The results of operations for the unaudited interim period ended March 31, 2014 are not indicative of the results which may be reported for the year ending December 31, 2014.

*Fair Value of Financial Instruments*

The Company's financial instruments consist of cash, accounts payable, debt and its related debt conversion feature liability. The carrying amount reported in the accompanying balance sheets for cash and accounts payable approximates fair value because of the short-term maturity of those instruments. The Company's convertible notes are convertible into capital stock, and this debt conversion feature (see Note 2) has been recorded as a liability based on "Level 3" fair value inputs, which consist of unobservable inputs and generally reflect management's estimate of assumptions that market participants would use in pricing the liability. The fair value of the debt conversion feature required management to make assumptions about the probability of the occurrence of a Qualifying Financing and the convertible notes being converted based on the applicable conversion terms. Alternate probabilities would have resulted in increases or decreases in the fair value of the debt conversion feature. The Company did not have any assets or liabilities categorized as Level 1 or Level 2 in the fair value hierarchy as of December 31, 2012, December 31, 2013 or March 31, 2014. There have been no changes in the methodologies used at December 31, 2012, December 31, 2013 or March 31, 2014.

The fair values of the Company's financial instruments are presented below:

| | December 31, 2012 | December 31, 2013 | March 31, 2014 |
| --- | --- | --- | --- |
| | | | (Unaudited) |
| Liabilities | | | |
| Debt Conversion Feature (Level 3) | $    8,286 | $    71,655 | $  81,904 |
| Total Liabilities Measured at Fair Value | $    8,286 | $    71,655 | $  81,904 |

F-7

**Table of Contents**

The table below presents a summary of changes in the Company's debt conversion feature measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the period from September 24, 2012 (Inception) through March 31, 2014:

| | |
|---|---:|
| Balance at September 24, 2012 (Inception) | $ — |
| Additions | 8,249 |
| Adjustments Resulting from Changes In Fair Value Recognized in Earnings | 37 |
| Balance at December 31, 2012 | 8,286 |
| Additions | 42,747 |
| Adjustments Resulting from Changes In Fair Value Recognized in Earnings | 20,622 |
| Balance at December 31, 2013 | 71,655 |
| Adjustments Resulting from Changes In Fair Value Recognized in Earnings | 10,249 |
| Balance at March 31, 2014 (unaudited) | $81,904 |

*Revenue Recognition*

The Company has not recorded any revenues since its inception. However, in the future the Company may enter into collaborative research and licensing agreements, under which the Company could be eligible for payments made in the form of upfront license fees, research funding, cost reimbursement, contingent event-based payments and royalties.

Revenue from upfront, nonrefundable license fees is recognized over the period that any related services are to be provided by the Company. Amounts received for research funding are recognized as revenue as the research services that are the subject of such funding are performed. Revenue derived from reimbursement of research and development costs in transactions where the Company acts as a principal are recorded as revenue for the gross amount of the reimbursement, and the costs associated with these reimbursements are reflected as a component of research and development expense in the statements of operations.

Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 605-28, *Revenue Recognition – Milestone Method* ("ASC 605-28"), established the milestone method as an acceptable method of revenue recognition for certain contingent event-based payments under research and development arrangements. Under the milestone method, a payment that is contingent upon the achievement of a substantive milestone is recognized in its entirety in the period in which the milestone is achieved. A milestone is an event (1) that can be achieved based in whole or in part on either the Company's performance or on the occurrence of a specific outcome resulting from the Company's performance, (2) for which there is substantive uncertainty at the date the arrangement is entered into that the event will be achieved, and (3) that would result in additional payments being due to the Company. The determination that a milestone is substantive is judgmental and is made at the inception of the arrangement. Milestones are considered substantive when the consideration earned from the achievement of the milestone is (a) commensurate with either the Company's performance to achieve the milestone or the enhancement of value of the item delivered as a result of a specific outcome resulting from the Company's performance to achieve the milestone, (b) relates solely to past performance, and (c) is reasonable relative to all deliverables and payment terms in the arrangement.

F-8

**Table of Contents**

Other contingent event-based payments received for which payment is either contingent solely upon the passage of time or the results of a collaborative partner's performance are not considered milestones under ASC 605-28. In accordance with ASC Topic 605-25, *Revenue Recognition – Multiple-Element Arrangements* ("ASC 605-25"), such payments will be recognized as revenue when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, price is fixed or determinable and collectability is reasonably assured. Revenues recognized for royalty payments, if any, are based upon actual net sales of the licensed compounds, as provided by the collaboration arrangement, in the period the sales occur. Any amounts received prior to satisfying the Company's revenue recognition criteria are recorded as deferred revenue on its balance sheets.

*Research and Development Expenses*

The Company's historical research and development expenses have primarily related to obtaining the option to license compounds and related intellectual property rights from Ligand Pharmaceuticals Incorporated ("Ligand"). The Company expects to begin certain clinical and preclinical efforts following acquisition of the rights from Ligand. All costs of research and development are expensed in the period incurred. Research and development costs primarily consist of fees paid to clinical research organizations ("CROs") and clinical trial sites, employee and consultant related expenses, which include salaries, benefits and stock-based compensation for research and development personnel; external research and development expenses incurred pursuant to agreements with third-party manufacturing organizations; license fees paid to third parties for use of their intellectual property, facilities costs, travel costs, dues and subscriptions, depreciation and materials used in preclinical studies, clinical trials and research and development.

The Company estimates its preclinical study and clinical trial expenses based on the services it received pursuant to contracts with research institutions and CROs that conduct and manage preclinical studies and clinical trials on the Company's behalf. Clinical trial-related contracts vary significantly in length, and may be for a fixed amount, based on milestones or deliverables, a variable amount based on actual costs incurred, capped at a certain limit, or for a combination of these elements. The Company accrues service fees based on work performed, which relies on estimates of total costs incurred based on milestones achieved, patient enrollment and other events. The majority of the Company's service providers invoice the Company in arrears, and to the extent that amounts invoiced differ from its estimates of expenses incurred, the Company accrues for additional costs. The financial terms of these agreements vary from contract to contract and may result in uneven expenses and payment flows. Preclinical study and clinical trial expenses include:

- fees paid to CROs, consultants and laboratories in connection with preclinical studies;

- fees paid to CROs, clinical trial sites, investigators and consultants in connection with clinical trials; and

- fees paid to contract manufacturers and service providers in connection with the production, testing and packaging of active pharmaceutical ingredients and drug materials for preclinical studies and clinical trials.

Payments under some of these agreements depend on factors such as the milestones accomplished, including enrollment of certain numbers of patients, site initiation and the completion of clinical trial milestones. To date, the Company has not experienced any events requiring it to make material adjustments to its accruals for service fees. If the Company does not identify costs that it has begun to incur or if it underestimates or overestimates the level of services performed or the costs of these services, its actual expenses could differ from its estimates which could materially affect its results of operations. Adjustments to the Company's accruals are recorded as changes in estimates become evident. Furthermore, based on amounts invoiced to the Company by its service providers, the Company may also record payments made to those providers as prepaid expenses that will be recognized as expense in future periods as services are rendered.

F-9

**Table of Contents**

*Stock-Based Compensation*

The Company accounts for stock-based compensation by measuring and recognizing compensation expense for all share based payments made to employees and directors based on estimated award date fair values. These estimates are highly complex and subjective in nature. These valuations and estimates will no longer be necessary assuming the Company is successful in becoming a publicly traded company as it will then rely on the market price to determine market value for the Company's common stock. The Company uses the straight-line method to allocate compensation cost to reporting periods over each restricted award's requisite service period, which is generally the vesting period, and has estimated the fair value of restricted stock-based awards to employees and consultants using a Monte Carlo market approach simulation method and performed an allocation of value to common stock based on the estimated time to a liquidity event. In addition, the Company accounts for performance-based restricted stock awards to employees by determining the fair value of the restricted stock award at the date of issuance by using the Probability Weighted Expected Return Method ("PWERM") and then assessing at each balance sheet date the probability of the performance criteria being met. If the probability of achieving the criteria are deemed less-than-probable, then no expense is recorded. At the point where the criteria are deemed probable of being met, then the Company begins recording stock-based compensation on a straight-line basis over the remaining period for which the performance criteria are expected to be completed.

As of March 31, 2014, the Company does not have a formal stock option plan; however, the Company expects to begin issuing stock options to its employees and directors and potentially to consultants. The Company will use the straight-line method to allocate compensation cost to reporting periods over each optionee's requisite service period, which is generally the vesting period, and will estimate the fair value of share-based awards to employees and directors using the Black-Scholes option-valuation model. The Black-Scholes model requires the input of subjective assumptions, including volatility, the expected term and the fair value of the underlying common stock on the date of grant, among other inputs. Stock options granted to non-employees are accounted for using the fair value approach. Stock options granted to non-employees are subject to periodic revaluation over their vesting terms.

*Income Taxes*

The Company accounts for its income taxes using the liability method whereby deferred tax assets and liabilities are determined based on temporary differences between the basis used for financial reporting and income tax reporting purposes. Deferred income taxes are provided based on the enacted tax rates in effect at the time such temporary differences are expected to reverse. A valuation allowance is provided for deferred tax assets if it is more likely than not that the Company will not realize those tax assets through future operations.

Income tax positions must meet a more-likely-than-not recognition threshold to be recognized. Income tax positions that previously failed to meet the more-likely-than-not threshold are recognized in the first subsequent financial reporting period in which that threshold is met. Previously recognized tax positions that no longer meet the more-likely-than-not threshold are derecognized in the first subsequent financial reporting period in which that threshold is no longer met.

*Net Loss per Common Share*

Basic net loss per share is calculated by dividing the net loss attributable to common stockholders by the weighted-average number of common shares outstanding for the period, without consideration for common stock equivalents. Diluted net loss per share is computed by dividing the net loss attributable to common stockholders by the weighted-average number of common share equivalents outstanding for the period determined using the treasury-stock method. For purposes of this calculation, the Company currently does not have any deemed common share equivalents; therefore, its basic and diluted net loss per share calculations are the same.

F-10

**Table of Contents**

The following table presents the computation of basic and diluted net loss per common share:

| | Period from September 24, 2012 (Inception) through December 31, 2012 | Year Ended December 31, 2013 | Three Months Ended March 31, 2013 | Three Months Ended March 31, 2014 | Cumulative Period from September 24, 2012 (Inception) through March 31, 2014 |
|---|---|---|---|---|---|
| | | | (Unaudited) | (Unaudited) | (Unaudited) |
| Historical net loss per share | | | | | |
| Numerator | | | | | |
| Net loss attributable to common stockholders | $ (111,027) | $ (146,247) | $ (4,583) | $ (228,941) | $ (486,215) |
| Denominator | | | | | |
| Weighted-average common shares outstanding | 4,897,959 | 5,020,685 | 5,000,000 | 5,433,333 | 4,961,573 |
| Less: Weighted-average shares subject to repurchase | (3,415,334) | (2,977,390) | (3,205,556) | (2,241,667) | 2,935,262 |
| Denominator for basic and diluted net loss per share | 1,482,625 | 2,043,295 | 1,794,444 | 3,191,666 | 2,026,311 |
| Basic and diluted net loss per share | $ (0.07) | $ (0.07) | $ (0.00) | $ (0.07) | $ |

Potentially dilutive securities that are not included in the calculation of diluted net loss per share because their effect is anti-dilutive are as follows (in common equivalent shares):

| | Period from September 24, 2012 (Inception) through December 31, 2012 | Year Ended December 31, 2013 | Three Months Ended March 31, 2013 | Three Months Ended March 31, 2014 | Cumulative Period from September 24, 2012 (Inception) through March 31, 2014 |
|---|---|---|---|---|---|
| | | | (Unaudited) | (Unaudited) | (Unaudited) |
| Common stock subject to repurchase | 3,297,917 | 2,389,583 | 3,020,833 | 2,912,500 | 2,912,500 |

*Segments*

The Company operates in only one segment. Management uses cash flows as the primary measure to manage its business and does not segment its business for internal reporting or decision making.

*Recent Accounting Pronouncements*

In August 2013, the FASB issued Accounting Standards Update No. 2013-11, *Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*, which sets forth circumstances in which an unrecognized tax benefit, generally reflecting the difference between a tax position taken or expected to be taken on a company's income tax return and the benefit recognized on its financial statements, should be presented in the financial statements as a reduction to a deferred tax asset for a net operating loss carryforward, a similar tax loss, or a tax credit carryforward. This guidance becomes effective for the Company beginning in fiscal year 2014, and the adoption of this standard is not expected to have a material impact on its financial statements or notes thereto.

F-11

**Table of Contents**

## 2. Convertible Notes Payable

Long-term convertible notes payable consisted of the following at:

| | December 31, 2012 | December 31, 2013 | March 31, 2014 |
|---|---|---|---|
| | | | (unaudited) |
| Various convertible notes payable issued during 2012 with interest rates ranging from 2.16% to 3.84% annually, due during 2014 | $    50,000 | $    50,000 | $  50,000 |
| Various convertible notes payable issued during 2013 with interest rates ranging from 2.16% to 3.84% annually, due during 2015 | – | 260,350 | 260,350 |
| | 50,000 | 310,350 | 310,350 |
| Less current maturities | – | 50,000 | 50,000 |
| Less discount on notes payable | 7,250 | 28,499 | 23,156 |
| Total long-term convertible notes payable | $    42,750 | $   231,851 | $237,194 |

In September 2012, the Company's board of directors authorized the Company to issue and sell up to an aggregate of $1.0 million in convertible promissory notes (the "Notes") to accredited investors in one or more closings through September 2014 (the "Note Authorization"). The Notes bear interest at a rate equal to the lesser of the short-term monthly applicable federal rate as published by the Internal Revenue Service or the maximum rate permissible by law. Interest under the Notes is due and payable at maturity. Unless repaid in full or converted in full, each Note matures two years from its date of purchase. In the event that any principal amount due under the Notes is not paid in full by the maturity date, such unpaid principal amount will bear interest at the lesser of 2% or the maximum rate permissible by law. Principal amounts due under the Notes as of March 31, 2014 (unaudited) are $50,000 in 2014 and $260,350 in 2015.

If, prior to maturity of the Notes, the Company issues capital stock resulting in net proceeds of at least $5.0 million (a "Qualifying Financing"), the Notes will convert into shares of the capital stock issued in the Qualifying Financing. The number of shares issued upon conversion will be equal to the quotient obtained by dividing the then-outstanding loan balance by either 70% or 75%, as applicable, of the lowest purchase price paid per share paid by another investor in the Qualifying Financing. If, prior to the maturity of the Notes, the Company issues preferred stock in a financing that does not qualify as a Qualifying Financing (a "Non-Qualifying Financing"), the holders of the Notes will have the option of converting their Notes into shares of the preferred stock issued in the Non-Qualifying Financing on the same terms as the investors in the Non-Qualifying Financing. In the event the Company undergoes a change in control, as defined in the Notes, prior to the maturity date and repayment of the Notes, the holders of the Notes will have the option to either (1) convert the loan balance into shares of the Company's common stock in an amount equal to the ratio of (a) the then-outstanding loan balance over (b) the ratio of $7,500,000 divided by the number of shares of capital stock of the Company outstanding immediately prior to the change in control, or (2) demand immediate repayment of an amount equal to 125% of the then-outstanding loan balance. If the Notes are still outstanding at their maturity date, the holders of the Notes have the option to either demand immediate repayment of all outstanding principal and interest or to convert the loan balance into shares of the Company's common stock in an amount equal to the ratio of the then-outstanding loan balance over the ratio of $7,500,000 divided by the number of shares of capital stock of the Company outstanding immediately prior to the maturity date.

The debt conversion feature embedded in the Notes is accounted for under ASC Topic 815 – *Derivatives and Hedging*. At issuance, the fair value of the debt conversion feature totaled $8,286 on the Notes issued during 2012 and $42,747 on the Notes issued during 2013. The fair value of the debt conversion feature was allocated from the gross proceeds of the Notes with the respective discount amortized to interest expense over the original

F-12

Table of Contents

term of the Notes using the effective interest method. The valuation of the bifurcated debt conversion feature was performed using Level 3 inputs, requiring the Company to make assumptions about the probability of the occurrence of a Qualifying Financing and the Notes being converted based on the applicable conversion terms. Alternative probabilities would have resulted in increases or decreases in the value of the debt conversion feature. The Company amortized $1,036 and $18,392 of the discount in 2012 and 2013, respectively, and $1,036 and $6,379 for the three months ended March 31, 2013 and 2014, respectively.

Pursuant to the terms of the Note Authorization, from September 2012 through June 2013, the Company issued a total aggregate principal amount of $310,350 in Notes and recorded interest expense at interest rates ranging from 2.16% to 3.84% on an annual basis of $350, $6,157 and $2,576 for the period from September 24, 2012 (Inception) through December 31, 2012, the year ended December 31, 2013 and the three month period ended March 31, 2014, respectively. The cumulative accrued interest payable on the Notes as of March 31, 2014 was $9,083.

### 3. Stockholders' Equity

The Company is authorized to issue up to 10,000,000 shares of common stock, $0.00001 par value per share. On September 26, 2012, the Company issued 4,750,000 shares of common stock to its founders for services valued at $0.0033 per share. The shares of common stock issued to the founders are subject to a repurchase feature whereby the Company can repurchase the stock if the applicable founder's arrangements with the Company are terminated. The repurchase feature lapses over time and the repurchase option immediately ceases upon the occurrence of certain triggering events. The related expense is being charged over the requisite service period. At December 31, 2013, 2,810,417 shares were no longer subject to the repurchase option. At December 31, 2013 and March 31, 2014, there was $6,325 and $5,421, respectively, of total unrecognized compensation costs related to these shares, which are expected to be recognized over a weighted-average period of 1.75 and 1.5 years, respectively.

On September 26, 2012, the Company also issued 250,000 shares of common stock for services, valued at $0.0033 per share, to a consultant. The shares of common stock issued to the consultant were subject to a repurchase feature whereby the Company can repurchase the stock if the consultant's arrangement with the Company is terminated. The repurchase feature lapses over time. In June 2013, the Company exercised its right to repurchase all 250,000 shares of its common stock in connection with the termination of the consulting arrangement. The Company paid $2,500 in cash, representing an approximate fair value of $0.01 per share, to repurchase such shares of common stock.

During fiscal year 2013, the Company sold an additional 700,000 shares of its common stock to consultants. The purchase price of the shares of common stock was $0.01, which approximated fair value. The Company received a total of $7 in cash and $6,993 in notes receivable as consideration for the issuance of the 700,000 shares of common stock. The shares of common stock were subject to repurchase features whereby the Company can repurchase the shares from the consultants if their arrangements with the Company are terminated. The repurchase features lapse over time. In June 2013, the Company exercised its right to repurchase 250,000 shares of its common stock issued earlier in 2013 in connection with the termination of one of the consulting arrangements. The Company paid $3 in cash to refund the cash contributed by the consultant and eliminated the $2,497 note receivable issued by the consultant to the Company. In March 2014, the Company terminated another one of the consulting agreements. In conjunction with the termination of the consulting agreement, the Company exercised its right to repurchase 200,000 shares by repaying the $2 in cash contributed by the consultant and eliminating the $1,998 note receivable issued by the consultant to the Company.

In June 2013, the Company entered into a consulting agreement for research and development services. The agreement provides that the Company will pay the consultant $125 and 25 shares of its common stock per hour, for up to 100 hours of work performed during the period from June 2013 to June 2014. The shares of common stock are to be issued at the completion of the consulting term, or upon termination of the arrangement. At

F-13

Table of Contents

December 31, 2013, the Company recorded a payable in the accompanying balance sheet totaling $750, representing the fair value of the common stock earned under the agreement.

In connection with the preparation of the financial statements necessary for inclusion in this registration statement, in May 2014 the Company reassessed the estimated fair value of its common stock for financial reporting purposes. The Company reassessed the estimated fair value of its common stock for each quarterly period from its inception on September 24, 2012 through December 31, 2013. Valuation analyses were performed as of September 26, 2012, April 15, 2013 and July 15, 2013 (the respective dates of stock activity noted above). The Company concluded that its shares of common stock as of each such date had a fair value less than or equal to the then estimated fair value of common stock at the date of issuance. Therefore, no additional stock expense was required to be expensed by the Company.

In February 2014, the Company entered into a stock purchase agreement with one of its founders. The agreement provides for the purchase of 1,000,000 shares of the Company's common stock at a price per share of $0.01 in exchange for future services to be rendered to the Company as measured by certain performance criteria. The shares are subject to a repurchase option and vest in two tranches of 500,000 shares each, upon achievement of the performance target or upon a triggering event as defined.

To appropriately account for this stock purchase, the Company determined the fair value of the common stock on the date of purchase as well as the likelihood of achievement of each of the performance conditions included in the agreement. The valuation methodology utilized in determining fair value relied on the PWERM, which incorporates relevant events and expected future exit scenarios for the Company. The exit scenarios included merger and acquisition and initial public offering scenarios. The enterprise value under each scenario was based primarily on the market approach and probability-weighted expected exit values for the Company under each scenario. Similar merger and acquisition transactions and publicly traded companies were utilized within the market approach and appropriate metrics were applied to the Company along with qualitative comparable assessments. The indicated value under the market approach was used as the starting aggregate value for the valuation of these performance-based shares. The Company utilized a Monte Carlo simulation method to determine the fair value of the performance-based shares as of the issuance date. The Monte Carlo simulation method takes into consideration the expected timing of the performance milestones, probability of achieving the milestones and estimated per share common stock prices at expected vesting dates.

The Company determined that the issuance in February 2014 had a deemed fair value lower than the reassessed fair value of the common stock on the date of issuance based upon the PWERM. Since the stock issuance to the founder is tied to certain performance criteria, the Company reviewed the probability of achieving such criteria at February 20, 2014 and determined that it was not probable that the criteria would be met. Therefore, no compensation expense has been recorded for this issuance through March 31, 2014. The Company will continue to reassess at each reporting period whether it is probable that either of the two performance criteria will be met, and if and when either are deemed probable, the Company will begin to record compensation expense using the fair value to determine stock-based compensation expense in its financial statements over the period the Company estimates the performance criteria will actually be met. The Company determined that the fair value of the unrecognized expense was approximately $168,000 at March 31, 2014.

F-14

**Table of Contents**

Stock-based compensation expense includes restricted stock awards issued to employees and non-employees and has been reported in the Company's statements of operations as follows:

| | Period from September 24, 2012 (Inception) through December 31, 2012 | | Year Ended December 31, 2013 | | Three Months Ended March 31, 2013 | | Three Months Ended March 31, 2014 | | Cumulative Period from September 24, 2012 (Inception) through March 31, 2014 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Unaudited) | | (Unaudited) | | (Unaudited) |
| Research and development | $ | – | $ | 750 | $ | – | $ | – | $ | 750 |
| General and administrative | | 5,612 | | 2,804 | | 965 | | 904 | | 9,320 |
| Total | $ | 5,612 | $ | 3,554 | $ | 965 | $ | 904 | $ | 10,070 |

At March 31, 2014, there were 2,912,500 unvested shares and $173,547 of total unrecognized compensation cost related to the issuance of the 6,000,000 shares of common stock outstanding, which is expected to be recognized over a weighted average period of 1.05 years.

**4. Income Taxes**

The reconciliations of the U.S. federal statutory rate to the effective income tax rate for the years ended December 31, 2012 and 2013 are as follows:

| | December 31, | |
|---|---|---|
| | 2012 | 2013 |
| Tax provision at U.S. Federal statutory rates | 34% | 34% |
| State income taxes net of federal benefit | 4% | 6% |
| Non-deductible permanent items | – | -6% |
| Stock options | – | – |
| Other | 3% | – |
| Change in valuation allowance | -41% | -34% |
| Effective income tax rate | – | – |

Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred taxes as of December 31, 2012 and 2013 are as follows:

| | December 31, | |
|---|---|---|
| | 2012 | 2013 |
| Deferred tax assets: | | |
| Intangible assets | $ 19,401 | $ 18,086 |
| Net operating loss carryforwards | 23,376 | 64,772 |
| Share-based compensation | 2,286 | 3,747 |
| Other | 102 | 8,680 |
| Total deferred tax assets | 45,165 | 95,285 |
| Valuation Allowance | (45,165) | (95,285) |
| Net deferred tax assets | $  – | $  – |

A valuation allowance of approximately $45,000 and $95,000 at December 31, 2012 and December 31, 2013, respectively, has been recorded to offset net deferred tax assets, as the Company is unable to conclude that it is more likely than not that such deferred tax assets will be realized.

F-15

Table of Contents

At December 31, 2013, the Company had federal and state net operating loss carryforwards of approximately $158,000 and $158,000, respectively. The federal and state net operating loss carryforwards will begin to expire in 2032. The Company's ability to utilize its federal net operating loss carryforwards may be limited under Section 382 of the Internal Revenue Code of 1986, as amended (the "Code"). Specifically, this limitation may arise in the event of an "ownership change," which is defined by Section 382 of the Code as a cumulative change in ownership of the Company of more than 50% within a three-year period. If the Company undergoes one or more ownership changes in connection with any future transactions in its stock, the Company's ability to utilize net operating loss carryforwards to offset federal taxable income, if any, could potentially result in increased future tax liability to the Company.

As of December 31, 2013, the Company had no material unrecognized tax benefits, interest or penalties related to federal and state income tax matters. The Company's policy is to recognize interest and penalties accrued on any unrecognized tax benefits as a component of income tax expense.

The Company is subject to U.S. federal income tax as well as New York income tax. The Company is currently open to audit under the statute of limitations by the Internal Revenue Service and the New York Department of Taxation for the years ended December 31, 2012 and 2013.

The differences between the Company's effective income tax rate and the statutory federal rate for the period from September 24, 2012 (Inception) through December 31, 2012, the year ended December 31, 2013 and the three months ended March 31, 2014 relate primarily to losses incurred for which no tax benefit was recognized, due to the uncertainty of realization. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the period in which those temporary differences become deductible. The Company considers projected future taxable income and tax planning strategies in making this assessment. At each of December 31, 2012, December 31, 2013 and March 31, 2014, the Company provided a full valuation allowance against its deferred tax assets due to uncertainty surrounding the realization of those assets as a result of historical taxable net losses.

The Company has reviewed its operations and has not identified any material uncertain tax positions. As a result, there is no liability for uncertain tax positions in the income tax provision as of December 31, 2012, December 31, 2013 or March 31, 2014. Tax years ended December 31, 2012 and 2013 remain subject to examination by major tax jurisdictions.

## 5. Related Party Transactions

*Convertible Notes*

In conjunction with the formation of the Company, in September 2012, the Company issued and sold convertible promissory notes in an aggregate principal amount of $15,000 and $20,000 to two Company executives, respectively. These convertible promissory notes have a maturity date of September 28, 2014 and bear interest at the short-term Applicable Federal Rate (for short-term loans) as published by the U.S. Internal Revenue Service. As of December 31, 2012, December 31, 2013 and March 31, 2014, the aggregate principal amount, plus accrued interest, outstanding under the first convertible promissory note was $15,104, $15,530 and $15,654, respectively. The aggregate principal amount, plus accrued interest, outstanding as of December 31, 2012, December 31, 2013 and March 31, 2014, under the second convertible promissory note was $20,138, $20,706 and $20,872, respectively.

In May 2013, the Company issued and sold a convertible promissory note in an aggregate principal amount of $55,350 to a Company executive. This convertible promissory note has a maturity date of May 15, 2015 and bears interest at the short-term Applicable Federal Rate (for short-term loans) as published by the U.S. Internal Revenue Service. As of December 31, 2013 and March 31, 2014, the aggregate principal amount, plus accrued interest, outstanding under this convertible promissory note was $56,393 and $56,853, respectively.

F-16

**Table of Contents**

*Founder Payment of Expenses*

During the period from September 24, 2012 (Inception) through December 31, 2012, the Company's co-founder, President and Chief Executive Officer paid certain expenses on behalf of the Company totaling $5,016. During the year ended December 31, 2013, the Company's founders paid an additional $1,046 in expenses on behalf of the Company. Accounts payable to a related party of $5,350 were converted into a convertible note payable during fiscal year 2013. These amounts are included in accounts payable-related party and convertible notes on the accompanying balance sheets.

### 6. Commitments and Contingencies

In September 2012, the Company paid $50,000 for the option to potentially enter into a license agreement to develop and commercialize products. The option term extended through March 29, 2014. In March 2014, the Company paid an additional $50,000 to extend the option term through March 29, 2015. In order to exercise the option, the Company would need to deliver to the licensor a notice of exercise accompanied by a $1.0 million payment. Alternatively, the Company may deliver a notice of exercise accompanied by a $500,000 payment and 10% of the gross amount the Company received in any financing resulting in at least $1.0 million in gross proceeds to the Company. The maximum amount due to the licensor to exercise the option if the Company elects the alternative payment method is $1.5 million. In May 2014, the Company entered into a master license agreement with the licensor that included a license to the products covered by the option. See Note 7 for a description of the terms of the master license agreement.

### 7. Subsequent Events

In May 2014, the Company entered into a master license agreement with Ligand (the "Master License Agreement"), pursuant to which, among other things, the Company acquired the rights to a number of research and development programs under patents related to the Company's VK0612, VK5211, VK0214, EPOR and DGAT-1 programs, related know-how controlled by Ligand and physical quantities of VK0612, VK5211, VK0214, EPOR and DGAT-1 compounds.

Pursuant to the terms of the Master License Agreement, the Company has the exclusive right and sole responsibility and decision-making authority for researching and developing any pharmaceutical products that contain or comprise one or any combination of the technology and compounds licensed from Ligand pursuant to the Master License Agreement (the "Licensed Products"). The Company also has the exclusive right and sole responsibility and decision-making authority to conduct all clinical trials and preclinical studies that the Company believes are appropriate to obtain the regulatory approvals necessary for commercialization of the Licensed Products, and the Company will own and maintain all regulatory filings and all regulatory approvals for the Licensed Products. Additionally, pursuant to the terms of the Master License Agreement, the Company has the sole decision-making authority and responsibility and the exclusive right to commercialize any of the Licensed Products, either by itself or, in certain circumstances, through sublicensees selected by the Company. The Company also has the exclusive right to manufacture or have manufactured any Licensed Product itself or, in certain circumstances, through sublicensees or third parties selected by the Company. The Company will own any intellectual property that it develops in connection with the license granted under the Master License Agreement.

As partial consideration for the grant of the rights and licenses to the Company under the Master License Agreement, in the event the Company consummates a firmly underwritten public offering pursuant to a Registration Statement on Form S-1 or any successor form (an "Initial Public Offering"), the Company will issue to Ligand at the closing of the Initial Public Offering a number of shares of its common stock having an aggregate value of $29.0 million, subject to adjustment in certain circumstances. In the event the Company consummates a private financing of its equity securities (a "Private Financing") prior to an Initial Public Offering, Ligand has the option to receive a number of shares of the same class and type of securities issued and

F-17

**Table of Contents**

sold by the Company in the Private Financing having an aggregate value of $29.0 million, subject to adjustment in certain circumstances, or, in lieu of receiving the same class and type of shares issued in the Private Financing, to defer its right to receive equity in the Company until an Initial Public Offering or subsequent private financing of the Company. Furthermore, as partial consideration for the grant of the rights and licenses to the Company under the Master License Agreement the Company entered into the Loan and Security Agreement with Ligand (as discussed below).

As further partial consideration for the grant of the rights and licenses to the Company by Ligand under the Master License Agreement, the Company has agreed to pay to Ligand certain one-time, non-refundable milestone payments in connection with the Licensed Products of up to $1.54 billion in the aggregate upon the achievement of certain development, regulatory and sales milestones. Additionally, the Company will pay to Ligand a one-time, non-refundable milestone payment of $2.5 million upon the occurrence of the first commercial sale of VK0612 or any other FBPase compound by one of the Company's sublicensees. The Company will also pay to Ligand royalties on aggregate annual worldwide net sales of Licensed Products by the Company, its affiliates and its sublicensees at tiered percentage rates from the low-to-upper single digits based upon net sales.

The term of the Master License Agreement will continue unless the agreement is terminated by the Company or Ligand, and each of the Company and Ligand have the right to terminate the Master License Agreement in certain circumstances, including, without limitation, if the other party defaults on certain of its obligations under the Master License Agreement.

The term of the Master License Agreement will continue unless the agreement is terminated by the Company or Ligand. Ligand has the right to terminate the Master License Agreement under certain circumstances, including, but not limited to: (1) if, on or before April 30, 2015, the Company has neither (a) completed an Initial Public Offering, nor (b) received aggregate net proceeds of at least $20.0 million in one or more Private Financings, (2) in the event of the Company's insolvency or bankruptcy, (3) if the Company does not pay an undisputed amount owing under the Master License Agreement when due and fails to cure such default within a specified period of time, or (4) if the Company defaults on certain of its material and substantial obligations and fails to cure the default within a specified period of time. The Company has the right to terminate the Master License Agreement under certain circumstances, including, but not limited to: (i) if Ligand does not pay an undisputed amount owing under the Master License Agreement when due and fails to cure such default within a specified period of time, or (ii) if Ligand defaults on certain of its material and substantial obligations and fails to cure the default within a specified period of time. In addition, provisions of the Master License Agreement can be terminated on a licensed program-by-program basis under certain circumstances. In the event that the Master License Agreement is terminated in its entirety or with respect to a specific licensed program for any reason: (A) all licenses granted to the Company under the Master License Agreement (or with respect to the specific licensed program) will terminate and the Company will, upon Ligand's request (subject to Ligand assuming legal responsibility for any clinical trials of the Licensed Products then ongoing), assign and transfer to Ligand (or to such transferee as Ligand may direct), at no cost to Ligand, all regulatory documentation and all regulatory approvals prepared or obtained by the Company or on its behalf related to the Licensed Products (or those related to the specific licensed program), or, if Ligand does not make such a request, the Company will wind down any ongoing clinical trials with respect to the Licensed Products (or those related to the specific licensed program) at no cost to Ligand; (B) the Company will, upon Ligand's request, sell and transfer to Ligand (or to such transferee as Ligand may direct), at a price equal to 125% of the Company's costs of goods, any and all chemical, biological or physical materials relating to or comprising the Licensed Products (or those related to the specific licensed program); (C) the Company will have, for a period of six months following termination, the right to sell on the normal business terms in existence before such termination any finished commercial inventory of Licensed Products (or those related to the specific licensed program) which remains on hand, so long as the Company pays to Ligand the applicable royalties and sales milestones; (D) Ligand has the right to require the Company to assign to Ligand the trademarks owned by the Company relating to the Licensed Products (or those related to the specific licensed program); and (E) the Company will grant to Ligand a non-exclusive, worldwide, royalty-

F-18

Table of Contents

bearing sublicensable license under any patent rights and know-how controlled by the Company to the extent necessary to make, have made, import, use, offer to sell and sell the Licensed Products (or those related to the specific licensed program) anywhere in the world at a royalty rate in the low single digits.

Under the Master License Agreement, the Company has agreed to indemnify Ligand for claims relating to the performance of the Company's obligations under the Master License Agreement, any breach of the representations and warranties made by the Company under the Master License Agreement, clinical trials conducted by the Company and the research, development and commercialization of the Licensed Products by the Company and its affiliates, sublicensees, distributors and agents. In addition, Ligand has agreed to indemnify the Company for claims relating to the performance of its obligations under the Master License Agreement, its breach of representations and warranties under the agreement and its research and development of the licensed compounds before the effective date of the Master License Agreement. Each party's indemnification obligations will not apply to the extent the claims result from the negligence or willful misconduct of the indemnified party or any of its employees, agents, officers or directors or from the indemnified party's breach of its representations or warranties set forth in the Master License Agreement.

In connection with entering into the Master License Agreement with Ligand, the Company entered into a loan and security agreement with Ligand, dated May 21, 2014 (the "Loan and Security Agreement"), pursuant to which, among other things, Ligand agreed to provide the Company with loans in the aggregate amount of up to $2.5 million.

Pursuant to the Loan and Security Agreement, Ligand initially loaned $1.0 million to the Company on May 27, 2014 and an additional $250,000 to the Company on June 1, 2014 and has agreed to loan an additional $250,000 to the Company each month from July 2014 through and including November 2014. The principal amount outstanding under the loans will accrue interest at a fixed per annum rate equal to the lesser of 5% and the maximum interest rate permitted by law. In the event the Company defaults under the loans, the loans will accrue interest at a fixed per annum rate equal to the lesser of 8% and the maximum interest rate permitted by law. The loans are evidenced by a Secured Convertible Promissory Note (the "Ligand Note"). Pursuant to the terms of the Loan and Security Agreement and the Ligand Note, the loans will become due and payable upon the written demand of Ligand at any time after the earlier to occur of an event of default under the Loan and Security Agreement or the Ligand Note, and four years from the date of the initial loan, unless the loans are converted into equity prior to such time. Upon the occurrence of the earlier to occur of a private financing satisfying certain criteria (a "Qualified Private Financing") or the Company's initial public offering, Ligand may elect to either convert the Ligand Note into shares of the Company's capital stock or require prepayment of the Ligand Note. Moreover, if a Qualified Private Financing occurs prior to the Company's initial public offering and Ligand has not elected to receive shares of the type of equity the Company issues in the Qualified Private Financing or to require the Company to prepay the Ligand Note, Ligand may elect to extend the maturity date to a date agreed upon by the Company and Ligand. Furthermore, if a change of control of the Company occurs prior to the earlier of the maturity date, the closing of the Qualified Private Financing and the closing of the Company's initial public offering, Ligand may elect to either receive a specified number of shares of the Company's securities equal to 200% of the amount obtained by dividing the entire then-outstanding principal amount of the loans, plus all accrued and previously unpaid interest thereon, by the lowest per share price set forth in the Loan and Security Agreement or require the Company to prepay the Ligand Note.

In connection with the Loan and Security Agreement, the Company also granted Ligand a continuing security interest in all of its right, title and interest in and to its assets as collateral for the full, prompt, complete and final payment and performance when due of all obligations under the Loan and Security Agreement and the Ligand Note.

In May 2014, the Company also entered into a Management Rights Letter with Ligand that requires the Company to expand the size of the Company's board of directors to create an additional directorship on the Company's board of directors and to allow Ligand to appoint an individual to fill the new directorship. The Management

F-19

**Table of Contents**

Rights Letter will terminate upon the earliest to occur of the liquidation or indefinite cessation of the Company's business operations, the execution by the Company of a general assignment for the benefit of creditors or the appointment of a receiver or trustee to take possession of the Company's property and assets, an acquisition of the Company by means of any transaction (including, without limitation, any reorganization, merger or consolidation) if the Company's stockholders of record as constituted immediately prior to the transaction hold less than 50% of the voting power of the surviving or acquiring entity, or following the issuance of the Company's securities pursuant to the Master License Agreement, the date that Ligand ceases to beneficially own at least 7.5% of the Company's outstanding voting stock, or the date of May 21, 2024.

The Company also entered into a Registration Rights Agreement with Ligand in May 2014 for which the Company granted certain registration rights to Ligand with respect to the securities of the Company issued to Ligand pursuant to the Master License Agreement and the Ligand Note (collectively, the "Viking Securities"), the shares of the Company's common stock issued or issuable upon conversion of the Viking Securities, if applicable, the shares of the Company's common stock issued as a dividend or other distribution with respect to, in exchange for or in replacement of the Viking Securities and the shares of the Company's capital stock issued upon conversion of the Ligand Note, or collectively, the Registrable Securities.

Under the Registration Rights Agreement, the Company has agreed to file with the SEC, by no later than the first date on which the lock-up requested by the underwriters for the Company's initial public offering expires or lapses with respect to Ligand (or the first business day thereafter), a registration statement on Form S-1 under the Securities Act that covers the resale of the full amount of the Registrable Securities. The Company has agreed to use commercially reasonable efforts to have the Registration Statement declared effective by the SEC as soon as practically possible after it is filed with the SEC. There are certain cash payment penalties that the Company may need to pay to Ligand if the Company does not meet certain timelines with the SEC. The Company has also agreed to use commercially reasonable efforts to keep each Registration Statement filed pursuant to the Registration Rights Agreement effective for certain periods of time.

In May 2014, the Company entered into a Sublease Agreement with Ligand, as sublandlord, for approximately 5,851 square feet of individual and shared space within the building located at 11119 North Torrey Pines, San Diego, California 92037. Under the Sublease Agreement, the Company is required, among other things, to pay base rent in the amount of approximately $13,500 per month.

F-20

**Table of Contents**

**Shares**



# Common Stock

---

**PROSPECTUS**

---

**, 2014**

---

# Oppenheimer & Co.                    # Roth Capital Partners

### Craig-Hallum Capital Group

**MLV & Co.**                                    **Summer Street Research Partners**

---

You should rely only on the information contained in this prospectus. No dealer, salesperson or other person is authorized to give information that is not contained in this prospectus. This prospectus is not an offer to sell nor is it seeking an offer to buy these securities in any jurisdiction where the offer or sale is not permitted. The information contained in this prospectus is correct only as of the date of this prospectus, regardless of the time of the delivery of this prospectus or any sale of these securities.

Until              , 2014 (25 days after the commencement of this offering), all dealers that effect transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscription.

**Table of Contents**

# PART II

# INFORMATION NOT REQUIRED IN PROSPECTUS

### ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION.

The following table sets forth all expenses to be paid by Viking Therapeutics, Inc. (the Registrant), other than underwriting discounts and commissions, in connection with this offering. All amounts shown are estimates except for the SEC registration fee, the Financial Industry Regulatory Authority, Inc. filing fee and the Nasdaq Global Market listing fee.

| | | |
|---|---|---|
| SEC registration fee | $ | 7,406 |
| Financial Industry Regulatory Authority, Inc. filing fee | | * |
| Nasdaq Global Market listing fee | | * |
| Printing and engraving expenses | | * |
| Legal fees and expenses | | * |
| Accounting fees and expenses | | * |
| Transfer agent and registrar fees and expenses | | * |
| Blue sky fees and expenses | | * |
| Miscellaneous fees and expenses | | * |
| Total | $ | * |

\*    To be provided by amendment.

### ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS.

Section 145 of the General Corporation Law of the State of Delaware, or the DGCL, authorizes a corporation's board of directors to grant, and authorizes a court to award, indemnity to officers, directors and other corporate agents.

Prior to the completion of this offering, the Registrant expects to adopt an amended and restated certificate of incorporation and amended and restated bylaws, which will become effective immediately prior to the completion of this offering, and which will contain provisions that limit the liability of the Registrant's directors for monetary damages to the fullest extent permitted by Delaware law. Consequently, the Registrant's directors will not be personally liable to the Registrant or the Registrant's stockholders for monetary damages for any breach of fiduciary duties as directors, except liability for the following:

- any breach of their duty of loyalty to the Registrant or the Registrant's stockholders;

- any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the DGCL; or

- any transaction from which they derived an improper personal benefit.

Any amendment to, or repeal of, these provisions will not eliminate or reduce the effect of these provisions in respect of any act, omission or claim that occurred or arose prior to that amendment or repeal. If the DGCL is amended to provide for further limitations on the personal liability of directors of corporations, then the personal liability of the Registrant's directors will be further limited to the greatest extent permitted by the DGCL.

The Registrant's amended and restated certificate of incorporation will provide that the Registrant will, under certain circumstances, indemnify any director, officer, employee or agent of the Registrant, subject to any

II-1

**Table of Contents**

provisions contained in the Registrant's amended and restated bylaws. The Registrant's amended and restated bylaws will provide that the Registrant will indemnify, to the fullest extent permitted by law, each person who was or is made a party or is threatened to be made a party to, or is otherwise involved in, any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Registrant, or is or was serving at the request of the Registrant, as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against all expense, liability and loss (including, among other things, attorney's fees and amounts paid in settlement) reasonably incurred or suffered by such director, officer, employee or agent in connection therewith, subject to certain conditions. The Registrant's amended and restated bylaws will also provide the Registrant with the power to, to the extent authorized by the Registrant's board of directors, grant rights to indemnification and to advancement of expenses to any employee or agent of the Registrant to the fullest extent indemnification may be granted to the Registrant's directors and officers. In addition, the Registrant's amended and restated bylaws will provide that the Registrant must advance expenses incurred by or on behalf of a director or officer in advance of the final disposition of any action or proceeding, subject to certain exceptions.

Further, prior to the completion of this offering, the Registrant expects to enter into indemnification agreements with each of its directors and executive officers that may be broader than the specific indemnification provisions contained in the DGCL. These indemnification agreements will require the Registrant, among other things, to indemnify its directors and executive officers against liabilities that may arise by reason of their status or service. These indemnification agreements will also require the Registrant to advance all expenses incurred by the directors and executive officers in investigating or defending any such action, suit or proceeding, subject to certain exceptions. The Registrant believes that these agreements are necessary to attract and retain qualified individuals to serve as directors and executive officers.

The limitation of liability and indemnification provisions that will be included in the Registrant's amended and restated certificate of incorporation, amended and restated bylaws and in indemnification agreements that the Registrant enters into with its directors and executive officers may discourage stockholders from bringing a lawsuit against its directors and executive officers for breach of their fiduciary duties. They may also reduce the likelihood of derivative litigation against the Registrant's directors and executive officers even though an action, if successful, might benefit the Registrant and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that the Registrant pays the costs of settlement and damage awards against directors and executive officers as required by these indemnification provisions. At present, the Registrant is not aware of any pending litigation or proceeding involving any person who is or was one of its directors, officers, employees or other agents or is or was serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, for which indemnification is sought, and the Registrant is not aware of any threatened litigation that may result in claims for indemnification.

The Registrant's amended and restated bylaws will provide that the Registrant may purchase and maintain insurance, at its expense, to protect itself and any person who is or was a director, officer, employee or agent of the Registrant or is or was serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Registrant would have the power to indemnity such person against such expense, liability or loss under the DGCL. The Registrant will obtain prior to the closing of this offering insurance under which, subject to the limitations of the insurance policies, coverage is provided to the Registrant's directors and executive officers against loss arising from claims made by reason of breach of fiduciary duty or other wrongful acts as a director or executive officer, including claims relating to public securities matters, and to the Registrant with respect to payments that may be made by the Registrant to these directors and executive officers pursuant to the Registrant's indemnification obligations or otherwise as a matter of law.

The underwriting agreement filed as Exhibit 1.1 to this registration statement provides for indemnification by the underwriters of the Registrant and its officers and directors for certain liabilities arising under the Securities Act and otherwise.

II-2

**Table of Contents**

**ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES.**

Since September 24, 2012 (Inception), the Registrant has issued the following securities that were not registered under the Securities Act:

(1)   On September 26, 2012, the Registrant issued and sold an aggregate of 5,000,000 shares of the Registrant's common stock to two executive officers and one former consultant at a deemed fair value per share of $0.01 in exchange for the contribution of certain intellectual property and assets to the Registrant having a deemed value of $50,000. The Registrant repurchased 250,000 of these shares for $2,500 on June 25, 2013.

(2)   On September 26, 2012, the Registrant issued and sold an aggregate of $35,000 in convertible promissory notes to two of its executive officers.

(3)   On October 1, 2012, the Registrant issued and sold a convertible promissory note having an aggregate principal amount of $15,000 to one accredited investor.

(4)   On April 15, 2013, the Registrant issued and sold an aggregate of 500,000 shares of the Registrant's common stock to one executive officer and one former consultant at a price per share of $0.01, for an aggregate purchase price of $5,000. The Registrant repurchased 250,000 of these shares for $2,500 on June 25, 2013.

(5)   On May 15, 2013, the Registrant issued and sold a convertible promissory note having an aggregate principal amount of $55,350 to one of its executive officers.

(6)   Between May 22, 2013 and May 24, 2013, the Registrant issued and sold an aggregate of $165,000 in convertible promissory notes to five accredited investors.

(7)   On June 11, 2013, the Registrant issued and sold a convertible promissory note having an aggregate principal amount of $25,000 to one accredited investor.

(8)   On June 27, 2013, the Registrant issued and sold a convertible promissory note having an aggregate principal amount of $15,000 to one accredited investor.

(9)   On July 15, 2013, the Registrant issued and sold an aggregate of 200,000 shares of the Registrant's common stock to a former consultant at a price per share of $0.01, for an aggregate purchase price of $2,000. These shares were repurchased by the Registrant for $2,000 on March 7, 2014.

(10)   On February 20, 2014, the Registrant issued and sold an aggregate of 1,000,000 shares of the Registrant's common stock to one of its executive officers at a deemed fair value per share of $0.01 in exchange for the contribution of services to the Registrant having a deemed value of $10,000.

(11)   On May 27, 2014, the Registrant issued and a sold a convertible promissory note having an aggregate principal amount of $1,000,000 to one accredited investor. The aggregate principal amount of the convertible promissory note was increased to $1,250,000 on June 1, 2014.

The offers, sales and issuances of the securities described in each of the paragraphs above were deemed to be exempt from registration under the Securities Act in reliance upon Section 4(2) of the Securities Act as transactions by an issuer not involving any public offering. The recipients of the securities described in paragraphs (1), (2), (4), (5), (9) and (10) were the Registrant's employees or consultants and represented their intentions to acquire the securities for investment only and not with a view to or for sale in connection with any distribution thereof. Appropriate legends were affixed to the securities issued in these transactions. Each of the recipients of securities in these transactions had adequate access, through employment, business or other relationships, to information about the Registrant.

II-3

**Table of Contents**

All purchasers of securities in transactions exempt from registration pursuant to Section 4(2) of the Securities Act represented to us that they were accredited investors and were acquiring the shares for investment purposes only and not with a view to, or for sale in connection with, any distribution thereof and that they could bear the risks of the investment and could hold the securities for an indefinite period of time. The purchasers received written disclosures that the securities had not been registered under the Securities Act and that any resale must be made pursuant to a registration statement or an available exemption from the registration requirements of the Securities Act.

All of the foregoing securities are deemed restricted securities for purposes of the Securities Act. The certificates representing the issued shares of capital stock described in this Item 15 included appropriate legends setting forth that the applicable securities have not been registered and reciting the applicable restrictions on transfer. There were no underwriters employed in connection with any of the transactions set forth in this Item 15.

II-4

**Table of Contents**

**ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.**

**(a)** **Exhibits**. The following exhibits are filed herewith or incorporated herein by reference:

| Exhibit Number | Description |
| --- | --- |
| 1.1* | Form of Underwriting Agreement. |
| 3.1 | Certificate of Incorporation, as currently in effect. |
| 3.2 | Amended and Restated Bylaws, as currently in effect. |
| 3.3 | Form of Amended and Restated Certificate of Incorporation to be effective upon closing. |
| 3.4 | Form of Amended and Restated Bylaws to be effective upon closing. |
| 4.1 | Form of Common Stock Certificate. |
| 5.1* | Opinion of Paul Hastings LLP. |
| 10.1# | Form of Indemnification Agreement between Viking Therapeutics, Inc. and its directors and executive officers. |
| 10.2# | 2014 Equity Incentive Plan. |
| 10.3# | Form of Stock Option Award Agreement (2014 Equity Incentive Plan). |
| 10.4# | Form of Restricted Stock Unit Award Agreement (2014 Equity Incentive Plan). |
| 10.5# | Form of Stock Appreciation Rights Award Agreement (2014 Equity Incentive Plan). |
| 10.6# | Employment Agreement, effective as of June 2, 2014, by and between Viking Therapeutics, Inc. and Brian Lian, Ph.D. |
| 10.7# | Employment Agreement, effective as of May 21, 2014, by and between Viking Therapeutics, Inc. and Michael Morneau. |
| 10.8# | Employment Agreement, effective as of June 2, 2014, by and between Viking Therapeutics, Inc. and Michael Dinerman, M.D. |
| 10.9# | Employment Agreement, effective as of June 2, 2014, by and between Viking Therapeutics, Inc. and Rochelle Hanley, M.D. |
| 10.10# | Non-Employee Director Compensation Policy |
| 10.11 | Sublease and Services Agreement, dated May 21, 2014, by and between Ligand Pharmaceuticals Incorporated and Viking Therapeutics, Inc. |
| 10.12† | Master License Agreement, dated May 21, 2014, by and among Viking Therapeutics, Inc., Ligand Pharmaceuticals Incorporated and Metabasis Therapeutics, Inc. |
| 10.13† | Loan and Security Agreement, dated May 21, 2014, by and between Viking Therapeutics, Inc. and Ligand Pharmaceuticals Incorporated. |
| 10.14 | Convertible Note, dated May 27, 2014, issued by Viking Therapeutics, Inc. to Ligand Pharmaceuticals Incorporated. |
| 10.15 | Letter Agreement regarding board composition and management rights, dated May 21, 2014, by and between Viking Therapeutics, Inc. and Ligand Pharmaceuticals Incorporated. |
| 10.16 | Registration Rights Agreement, dated May 21, 2014, by and among Viking Therapeutics, Inc., Metabasis Therapeutics, Inc. and Ligand Pharmaceuticals Incorporated. |

II-5

Table of Contents

| Exhibit Number | Description |
|---|---|
| 10.17 | Voting Agreement, dated May 21, 2014, by and among Viking Therapeutics, Inc., Ligand Pharmaceuticals Incorporated, Metabasis Therapeutics, Inc., Brian Lian, Ph.D. and Michael Dinerman, M.D. |
| 10.18# | Founder Common Stock Purchase Agreement, dated September 26, 2012, by and between Viking Therapeutics, Inc. and Brian Lian, Ph.D. |
| 10.19# | Founder Common Stock Purchase Agreement, dated September 26, 2012, by and between Viking Therapeutics, Inc. and Michael Dinerman, M.D. |
| 10.20# | Common Stock Purchase Agreement, dated April 15, 2013, by and between Viking Therapeutics, Inc. and Rochelle Hanley, M.D. |
| 10.21#† | Common Stock Purchase Agreement, dated February 20, 2014, by and between Viking Therapeutics, Inc. and Brian Lian, Ph.D. |
| 16.1 | Letter from MaloneBailey LLP, dated July 1, 2014. |
| 23.1 | Consent of Marcum LLP, Independent Registered Public Accounting Firm. |
| 23.2* | Consent of Paul Hastings LLP (included in Exhibit 5.1). |
| 24.1 | Power of Attorney (included on the signature page to this Registration Statement). |

---

\*   To be filed by amendment.
\#   Indicates compensatory plan or arrangement.
†   Confidential treatment requested as to certain portions of this exhibit, which portions have been omitted and submitted separately to the Securities and Exchange Commission.

**(b)   Financial Statement Schedules**. All financial statement schedules are omitted because they are not applicable, the required information is not present in amounts sufficient to require submission of such schedules or the information is included in the Registrant's financial statements or notes thereto.

## ITEM 17. UNDERTAKINGS.

The undersigned Registrant hereby undertakes to provide to the underwriter at the closing specified in the underwriting agreement certificates in such denominations and registered in such names as required by the underwriter to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act of 1933 and will be governed by the final adjudication of such issue.

II-6

**Table of Contents**

The undersigned Registrant hereby undertakes that:

(a)   For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(b)   For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and this offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

II-7

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of San Diego, State of California, on July 1, 2014.

**VIKING THERAPEUTICS, INC.**

By: /s/ Brian Lian, Ph.D.
———————————————————
Brian Lian, Ph.D.
*President and Chief Executive Officer*

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Brian Lian, Ph.D. and Michael Dinerman, M.D., and each of them, as his true and lawful attorneys-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign the Registration Statement on Form S-1 of Viking Therapeutics, Inc., and any or all amendments (including post-effective amendments) thereto and any new registration statement with respect to the offering contemplated thereby filed pursuant to Rule 462(b) of the Securities Act of 1933, as amended, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this registration statement on Form S-1 has been signed by the following persons in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Brian Lian, Ph.D.<br>———————————————<br>Brian Lian, Ph.D. | President, Chief Executive Officer and Director (Principal Executive Officer) | July 1, 2014 |
| /s/ Michael Morneau<br>———————————————<br>Michael Morneau | Chief Financial Officer (Principal Accounting and Financial Officer) | July 1, 2014 |
| /s/ Matthew W. Foehr<br>———————————————<br>Matthew W. Foehr | Director | July 1, 2014 |
| /s/ Lawson Macartney, DVM, Ph.D.<br>———————————————<br>Lawson Macartney, DVM, Ph.D. | Director | July 1, 2014 |
| /s/ Matthew Singleton<br>———————————————<br>Matthew Singleton | Director | July 1, 2014 |
| /s/ Stephen W. Webster<br>———————————————<br>Stephen W. Webster | Director | July 1, 2014 |

II-8

**Table of Contents**

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 1.1* | Form of Underwriting Agreement. |
| 3.1 | Certificate of Incorporation, as currently in effect. |
| 3.2 | Amended and Restated Bylaws, as currently in effect. |
| 3.3 | Form of Amended and Restated Certificate of Incorporation to be effective upon closing. |
| 3.4 | Form of Amended and Restated Bylaws to be effective upon closing. |
| 4.1 | Form of Common Stock Certificate. |
| 5.1* | Opinion of Paul Hastings LLP. |
| 10.1# | Form of Indemnification Agreement between Viking Therapeutics, Inc. and its directors and executive officers. |
| 10.2# | 2014 Equity Incentive Plan. |
| 10.3# | Form of Stock Option Award Agreement (2014 Equity Incentive Plan). |
| 10.4# | Form of Restricted Stock Unit Award Agreement (2014 Equity Incentive Plan). |
| 10.5# | Form of Stock Appreciation Rights Award Agreement (2014 Equity Incentive Plan). |
| 10.6# | Employment Agreement, effective as of June 2, 2014, by and between Viking Therapeutics, Inc. and Brian Lian, Ph.D. |
| 10.7# | Employment Agreement, effective as of May 21, 2014, by and between Viking Therapeutics, Inc. and Michael Morneau. |
| 10.8# | Employment Agreement, effective as of June 2, 2014, by and between Viking Therapeutics, Inc. and Michael Dinerman, M.D. |
| 10.9# | Employment Agreement, effective as of June 2, 2014, by and between Viking Therapeutics, Inc. and Rochelle Hanley, M.D. |
| 10.10# | Non-Employee Director Compensation Policy |
| 10.11 | Sublease and Services Agreement, dated May 21, 2014, by and between Ligand Pharmaceuticals Incorporated and Viking Therapeutics, Inc. |
| 10.12† | Master License Agreement, dated May 21, 2014, by and among Viking Therapeutics, Inc., Ligand Pharmaceuticals Incorporated and Metabasis Therapeutics, Inc. |
| 10.13† | Loan and Security Agreement, dated May 21, 2014, by and between Viking Therapeutics, Inc. and Ligand Pharmaceuticals Incorporated. |
| 10.14 | Convertible Note, dated May 27, 2014, issued by Viking Therapeutics, Inc. to Ligand Pharmaceuticals Incorporated. |
| 10.15 | Letter Agreement regarding board composition and management rights, dated May 21, 2014, by and between Viking Therapeutics, Inc. and Ligand Pharmaceuticals Incorporated. |
| 10.16 | Registration Rights Agreement, dated May 21, 2014, by and among Viking Therapeutics, Inc., Metabasis Therapeutics, Inc. and Ligand Pharmaceuticals Incorporated. |
| 10.17 | Voting Agreement, dated May 21, 2014, by and among Viking Therapeutics, Inc., Ligand Pharmaceuticals Incorporated, Metabasis Therapeutics, Inc., Brian Lian, Ph.D. and Michael Dinerman, M.D. |

II-9

**Table of Contents**

| Exhibit Number | Description |
|---|---|
| 10.18# | Founder Common Stock Purchase Agreement, dated September 26, 2012, by and between Viking Therapeutics, Inc. and Brian Lian, Ph.D. |
| 10.19# | Founder Common Stock Purchase Agreement, dated September 26, 2012, by and between Viking Therapeutics, Inc. and Michael Dinerman, M.D. |
| 10.20# | Common Stock Purchase Agreement, dated April 15, 2013, by and between Viking Therapeutics, Inc. and Rochelle Hanley, M.D. |
| 10.21#† | Common Stock Purchase Agreement, dated February 20, 2014, by and between Viking Therapeutics, Inc. and Brian Lian, Ph.D. |
| 16.1 | Letter from MaloneBailey LLP, dated July 1, 2014. |
| 23.1 | Consent of Marcum LLP, Independent Registered Public Accounting Firm. |
| 23.2* | Consent of Paul Hastings LLP (included in Exhibit 5.1). |
| 24.1 | Power of Attorney (included on the signature page to this Registration Statement). |

---

\*  To be filed by amendment.
\#  Indicates compensatory plan or arrangement.
†  Confidential treatment requested as to certain portions of this exhibit, which portions have been omitted and submitted separately to the Securities and Exchange Commission.

II-10