## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                        )
SECURITIES AND EXCHANGE COMMISSION,)
                                        )
                 Plaintiff,             )
                                        )         Civil Action
v.                                      )         No. 18-11926-PBS
                                        )
GREGORY LEMELSON and LEMELSON           )
CAPITAL MANAGEMENT, LLC,                )
                                        )
                 Defendants,            )
                                        )
        and                             )
                                        )
THE AMVONA FUND, LP,                    )
                                        )
                 Relief Defendant.      )
_____)
```

### MEMORANDUM AND ORDER

March 30, 2022

Saris, D.J.

### INTRODUCTION

The Securities and Exchange Commission ("SEC") brought a civil enforcement action against Defendants Gregory Lemelson ("Lemelson") and Lemelson Capital Management, LP ("LCM") for violations of the Securities Exchange Act and the Investment Advisers Act of 1940 (the "Advisers Act"). Following a trial, the jury returned a mixed verdict on November 5, 2021, finding Lemelson liable for three false statements and not liable under a scheme liability theory and the Advisers Act. The SEC now

moves for entry of final judgment (Dkt. 244). The SEC requests this Court order: (1) an injunction permanently restraining and enjoining Defendants from violating Section 10(b) of the Securities Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]; (2) a $656,500 civil penalty against Lemelson; (3) a $775,000 civil penalty against LCM; (4) $656,500 in joint and several disgorgement against Lemelson and LCM; and (5) prejudgment interest of $208,624. Lemelson opposes all five components of the proposed order (Dkt. 260). After hearing, the Court enters the following final judgment: Defendants are enjoined from violating Section 10(b) of the Exchange Act and Rule 10b-5 for a period of five years, and Lemelson is ordered to pay a Tier III civil penalty in the amount of $160,000.

## FACTUAL BACKGROUND

### I.   The Charged Conduct

Lemelson served as Chief Investment Officer of LCM in 2014. Lemelson managed the Amvona Fund through LCM, and he "made all investment decisions for that fund." Dkt. 246-5 (Parties' Agreed-to Facts), ¶ 5. Beginning in May 2014, the Amvona Fund took a short position in shares of Ligand Pharmaceuticals, Inc. Lemelson and LCM took a short position on behalf of the Amvona Fund on thirteen dates between May 2014 and October 2014. The total short position from this period was $5,082,334.60. Between June and August of that year, Lemelson published five reports

concerning Ligand. In a report published July 3, 2014, Lemelson
represented that Viking Therapeutics, Inc., ("Viking"), a
company that signed a licensing deal with Ligand, "does not
intend to conduct any preclinical studies or trials and does not
own any products or intellectual property or manufacturing
abilities and leases space from Ligand." Dkt. 246-11 at 7.
Lemelson wrote that "Viking appears to be a single-purpose
vehicle created to raise more capital from public markets for
its sponsor, Ligand Pharmaceuticals." Id. In the same report,
Lemelson mused that Viking had a "curious relationship" with its
accounting firm and stated that Viking "has not yet even
consulted with the firm on any materials issues" and "[t]he
financial statements provided on the S1 accordingly are
unaudited." Id. at 9–10.

Between June and October, Lemelson also gave four
interviews on Benzinga Premarket Prep Shows ("Benzinga"). During
his interview with Benzinga on June 19, 2014, Lemelson described
a phone call with Bruce Voss, Ligand's investor relations firm
representative. Lemelson said "It's literally going to go away,
I mean, I had discussions with [Ligand] management just
yesterday – excuse me, their [Ligand's] IR [investor relations]
firm. And they basically agreed. They said, 'Look, we understand
Promacta's going away.'" Dkt. 246-5, ¶ 14. Lemelson and LCM
covered the short position on five dates, for a total of

$3,785,690.19. The Amvona Fund profited $1,296,644.41 from the short position in Ligand.

## II.  **The Litigation**

The SEC charged Lemelson and LCM with violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act and Section 206(4) and Rule 206(4)-8 of the Investment Advisers Act. The jury determined that the SEC proved Lemelson "intentionally or recklessly made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" as to the Benzinga interview, the Viking audit statement, and the Viking preclinical trial statement. Dkt. 246-8 (Verdict Form) at 1-2.

The jury answered "No" for the allegedly false statements about Ligand's insolvency and found no Rule 10b-5 scheme liability. The jury also answered "No" on the two questions related to whether the SEC proved that Lemelson intentionally, recklessly, or negligently violated the Advisers Act. Id.

Over the course of this acrimonious litigation, this Court has issued opinions on a motion to dismiss (Dkt. 29), motions for summary and partial summary judgment (Dkt. 146), a motion in limine to exclude argument that the statements were opinions (Dkt. 204), and a motion for renewed judgment as a matter of law

4

(Dkt. 243), and the Court assumes familiarity with those opinions.

## DISCUSSION

I.  **Injunction**

    **A. Legal Standard**

Section 21(d) of the Exchange Act provides that the SEC may bring an action to enjoin a person "engaged or [] about to engage" in violations of the Act, and "upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 78u(d)(1). An injunction is appropriate where there is, "at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of either one of the Acts or of the regulations promulgated thereunder." SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003) (quoting Aaron v. SEC, 446 U.S. 680, 700-01 (1980)). The legal standard for issuing an injunction is "reasonable likelihood of recidivism, not an imminent threat of it." Sargent, 329 F.3d at 39. Courts assess the likelihood of recidivism through several, non-dispositive factors: "the nature of the violation, including its egregiousness and its isolated or repeated nature"; "whether the defendants will, owing to their occupation, be in a position to violate again"; and "whether the defendants have recognized the wrongfulness of their conduct." Id.

The Second Circuit has cautioned that "when defendants are active in the securities field '[a]n injunction is a drastic remedy, not a mild prophylactic.'" SEC v. Am. Bd. of Trade, Inc., 751 F.2d 529, 535-36 (2d Cir. 1984) (quoting Aaron, 446 U.S. at 703 (Burger, C.J., concurring)); see also SEC v. Johnson, 595 F.Supp.2d 40, 45 (D.D.C. 2009) (imposing a temporary injunction of five years and warning of the seriousness of a permanent injunction). One court has held that violations of securities laws are not enough on their own to satisfy egregiousness. See SEC v. Snyder, No. H-03-04658, 2006 WL 6508273, at *2 (S.D. Tex. Aug. 22, 2006).

Many district courts in this circuit have issued permanent injunctions for egregious conduct occurring over prolonged periods of time. For prolonged schemes, see SEC v. Wall, No. 2:19-cv-00139-JHR, 2020 WL 1539919, at *8 (D. Me. Mar. 31, 2020); SEC v. Chan, 465 F. Supp. 3d 18, 38 (D. Mass. 2020); SEC v. Present, No. 14-cv-14692-LTS, 2018 WL 1701972 at *1 (D. Mass. Mar. 20, 2018). For repeated conduct, see SEC v. Weed, 315 F. Supp. 3d 667, 676 (D. Mass. 2018). For egregiously fraudulent conduct, see SEC v. Cody, No. 16-cv-12510, 2019 WL 6619195 at *4 (D. Mass. Dec. 5, 2019); SEC v. Druffner, 517 F. Supp. 2d 502, 513 (D. Mass. 2007).

**B. Parties' Arguments**

The SEC seeks a permanent injunction. The SEC argues that
Defendants' violations "were deliberately calculated to strike
at the heart of Ligand's business." Dkt. 245 at 3-4. In its
view, the fraudulent statements focused on "Ligand's most
important product (Promacta) and a vital new business
relationship (Viking)." Dkt. 245 at 4. The SEC avers that the
conduct was egregious and repetitive because the jury found that
Lemelson made three separate fraudulent statements, Lemelson
never corrected the statements, and Lemelson never publicly
acknowledged that Voss denied his claim. Moreover, the SEC
contends that not only is Lemelson in a position where he could
violate again, but he likely will violate again.

The Commission bolsters this claim by pointing to what it
describes as Lemelson's "improper behavior" during litigation
and his "minimizing and mischaracterizing the meaning and import
of the jury verdict." Id. at 5. The SEC points out that this
Court sanctioned Lemelson $100 per page of leaked material after
Lemelson violated a protective order and leaked 50 pages of
material to the press. The SEC also emphasizes that Lemelson,
through his counsel, threatened a priest, who had provided
allegedly false information about Lemelson's credentials as a
priest to the Commission, with litigation.

Lemelson opposes, emphasizing that the jury found that the three discrete statements were not part of a larger scheme and over seven years have passed since Lemelson made the statements. Lemelson contends that the violations in the case were not egregious because he did not cover any of his short position as to the statements made on July 3 about Viking, and he covered "less than 6% of his overall position" six hours after his Benzinga radio interview. Dkt. 260 at 4. Lemelson also argues that the July 3 statements were about Viking, a company whose stock Lemelson did not trade, and the SEC did not offer evidence that Ligand's stock price was impacted by the Viking statements. Lemelson next argues that the conduct was not repetitive because "[t]hree isolated statements out of thousands of pages of published work and multiple media appearances does not constitute 'repeated' conduct." Id. at 6. Lemelson further avers that the Court can be assured that Lemelson will not violate again because he has not been charged with any securities violations before or after the present case. He contends that the SEC's "improper behavior" justification is unrelated, as Lemelson was already sanctioned for violating the protective order and counsel's letter to a third-party priest cannot be used as support for the proposition that Lemelson is likely to engage in future violations. Finally, Lemelson asks that the Court consider general equity concerns. If the Court issues an

injunction, he emphasizes, the Commission will likely seek to permanently bar Lemelson from working as an investment advisor. Lemelson has provided the Court with eleven letters of support from his investors who want him to stay on as their advisor.

### C. Analysis

#### 1. Nature of the Violation

As to the nature of the violation, the jury found that Lemelson made three different material false statements. However, he was found not liable for an overarching scheme, indicating that the SEC was not able to prove that these three separate statements were connected to a scheme to defraud Ligand investors. I find that one of the three statements, that Bruce Voss agreed that Promacta, Ligand's key product, was going away, was particularly egregious. The three fraudulent statements were made on June 19 and July 3. While Lemelson engaged in a campaign to drive down Ligand's stock, the material misstatements occurred over the course of a short time period.

#### 2. Position to Violate Again

Lemelson will be able to violate again, as he continues to work as an investment adviser and recently started a new fund, Spruce Peak Fund. Investors will continue to look to his advice and rely on the truthfulness of his reports.

#### 3. Acknowledgement of Wrongdoing

Finally, Lemelson continues to unabashedly defend his actions. Lemelson does not recognize the wrongfulness of his conduct or acknowledge when he was clearly wrong (like the statements about Viking). His pugilistic approach to the litigation (e.g., the tweets and the leaked documents) indicates he has not learned his lesson.

Considering the factors laid out in Sargent and the precedent above, Lemelson's conduct merits an injunction, but his violation was not as severe as in many of the cases where courts ordered permanent injunctions. A temporary injunction is more appropriate in this case. The Court sets the injunction for a period of five years.

## II. **Civil Penalty**

### A. Legal Standard

Section 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2), and § 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3) provide that the civil penalty "shall be determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). "The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court." SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) (citing 15 U.S.C. § 77t(d)). Tier II requires "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C.

§ 77t(d)(2)(B). Tier III requires the fraud elements of Tier II plus that "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C).

Both parties consider the appropriate penalty under the following factors: "the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter involved, the defendant's cooperation with authorities or lack thereof, and the defendant's current financial condition." SEC v. Esposito, No. 16-cv-10960-ADB, 2018 WL 2012688, at *9 (D. Mass. Apr. 30, 2018) (the "Esposito factors").

### B. Parties' Arguments

The SEC argues that Lemelson should be ordered to pay a third-tier penalty of $656,500. This amount reflects Lemelson's pecuniary interest in the approximately $1.3 million of profits gained by the Amvona Fund. The SEC calculates this amount by adding Lemelson's share of the profits based on his 34% ownership of the assets in the Amvona Fund ($442,000) plus a 25% performance fee he collected on the remaining profits of $214,000. The SEC adds that LCM should also pay a third-tier penalty of $775,000, "the amount authorized at the time of the

offending conduct against entities under Exchange Act Section
21(d)(3)(B)(iii)." Dkt. 245 at 9. The SEC argues that the Court
should impose a separate penalty for LCM "[d]espite the parties'
agreement at trial to focus on Lemelson as a proxy for LCM as to
the fraudulent conduct at issue" because LCM enabled Lemelson to
carry out the fraudulent conduct. Id.

The SEC condemns defendants' conduct as repetitive and
egregious. Further, it argues that Lemelson has failed to take
responsibility for his misconduct, the conduct involved a high
degree of scienter, and defendants' fraud created a risk of
significant losses to Ligand investors. The SEC points out that
Lemelson himself took credit for driving down Ligand's stock,
indicating that three false statements were made with scienter.
He has refused to take responsibility despite the jury's
verdict. The SEC alleges that he continues to engage in
deceitful practices, citing to a tweet that Lemelson sent out
from three accounts after the jury verdict. The tweet quotes
part of the first line of a Law360 article, saying "A Boston
federal jury on Friday absolved a Greek Orthodox priest of fraud
claims in a U.S. SEC suit alleging he launched a short-and-
distort scheme through his hedge fund . . . ." Dkt. 245 at 11.
The SEC contends that this was an effort to mislead the public
and minimize the seriousness of the jury's verdict.

Lemelson insists that the Court should impose less than the $80,000 maximum for a Tier II penalty. Tier III is inappropriate, Lemelson argues, because the SEC has not shown there was substantial loss or significant risk of such loss in the case. Lemelson contends that he never claimed that any decline in Ligand's stock price was attributable to the three statements for which he was found liable. He also calls the SEC's social media argument false and hypocritical. Lemelson "simply retweeted this article—he did not draft its language or otherwise comment on it." Dkt 260 at 18-19. Further, Lemelson calls out the SEC for their own misleading press release after the trial, entitled "SEC Wins Jury Trial Against Hedge Fund Adviser Who Ran Manipulative Short Scheme." Dkt. 260 at 19 (quoting Dkt. 261-34). Finally, Lemelson avers that the Court should not allow the SEC to "improperly double-dip" with separate civil monetary penalties for both Lemelson and LCM. Dkt. 260 at 21.

In reply, the SEC adds the expert report of its expert Dr. Erin Smith to bolster the argument that Defendants' fraud created a risk of investor loss. The SEC contends first that actual losses are not necessary; and second, even if they were necessary, their expert demonstrates that investors traded in reliance on that information on the two days on which Defendants made their fraudulent statements.

**C. Analysis**

As an initial matter, Lemelson and LCM should not face separate civil penalties. Before trial, the parties agreed that "because LCM was controlled and operated entirely by Fr. Lemelson, there would be no need for separate evidence to try to establish liability against both Fr. Lemelson and LCM." Dkt. 260 at 21. The parties' earlier agreement undercuts the SEC's argument that the entities engaged in distinct conduct for purposes of a penalty.

In asking for a Tier II violation, Lemelson essentially concedes "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B). His fraud is not in question. To enter Tier III, the SEC must show that his violations caused substantial losses or created a significant risk of substantial loss to investors. The SEC attaches Dr. Smith's expert report and a letter from Robert H. Fields of Cardinal Capital Management, LLC, who testified at trial, stating he is "confident the false and misleading statements Father Lemelson made likely artificially depressed the price of Ligand's stock, thereby harming investors." Dkt. 268-1. As to the Benzinga interview, Dr. Smith's report concludes "that the interview is associated with a -2.44% abnormal decline in Ligand's stock price, which is

statistically significant at the 90% confidence level." Dkt.
266-1 at 13. As to the July report containing the statements
about Viking, she "estimated that Ligand's stock price declined
by -1.95%, which is statistically significant at the 99%
confidence level." Dkt. 266-1 at 14. Dr. Smith further found
that, after Newswire distributed Lemelson's July 3 report about
Viking on July 7, Ligand's stock price declined by -3.97%,
statistically significant at the 99% confidence level.

While Lemelson focuses on actual losses, the SEC is correct
that a significant risk of substantial loss is enough to qualify
a violation for Tier III penalties. Courts have differed on what
is required to show a significant risk of loss, however. Some
courts have not required concrete evidence that any investors
traded (or were at risk of trading) in reliance on such
statements. See SEC v. Monterosso, 557 F. App'x 917, 929 (11th
Cir. 2014) (holding that a significant risk of substantial loss
to investors exists wherever the fraudulent statements at issue
"would have been important to any reasonable shareholder"); SEC
v. SeeThruEquity, LLC, No. 18 Civ. 10374 (LLS), 2022 WL 171196,
at *2 (S.D.N.Y. Jan. 19, 2022) ("Disseminating such materially
false information into the market created a significant risk of
substantial loss to the investing public.") (citing SEC v.
Universal Express, Inc., 646 F. Supp. 2d 552, 568 (S.D.N.Y.
2009) (explaining that a defendant's mere "dissemination of

materially false information create[d] a significant risk of substantial loss to the investing public")).

Other courts have refused to infer a "significant risk of substantial losses" in the absence of proof that such a risk existed. See SEC v. Madsen, No. 17-CV-8300 (JMF), 2018 WL 5023945, at *4 (S.D.N.Y. Oct. 17, 2018) ("Although all Section 10(b) or Rule 10b-5 frauds could be said to create some 'risk' of some 'harm' to investors, the Remedies Act reserves third-tier civil penalties for those frauds that create a significant risk of substantial losses.") (internal citations omitted); SEC v. Eiten, No. No. 11-12185-GAO, 2014 WL 4965102, at *2 (D. Mass. Sept. 30, 2014) ("The SEC argues that Eiten's false reports could have resulted in investor losses, but has not demonstrated any amount of actual losses that were substantial."); SEC v. Todt, No. 98 Civ. 3980 (JGK), 2000 WL 223836, at *12 (S.D.N.Y. Feb. 25, 2000) (refusing to impose a third-tier penalty without evidence that any investors "ever seriously entertained" transacting based on the fraud).

Based on the verdict and evidence, I find that at least one of the statements, the Promacta remark in the Benzinga interview, would have been extremely important to a reasonable investor and created a significant risk of substantial loss. A reasonable investor hearing that a company's key product is "going away" would be influenced to sell. Lemelson himself

bragged that he was responsible for Ligand losing $500 million in market capital. Further, Dr. Smith's analysis provides persuasive evidence that investors traded in reliance on all three statements. Dr. Smith found that the radio interview and the July 3 report are associated with abnormal declines in Ligand's stock price. While the amount of actual loss attributable to the three false statements over the entire period of time when Lemelson engaged in his campaign against Ligand between June and October is unclear, Lemelson's violations created a significant risk of substantial losses to investors. Therefore, a Tier III penalty is appropriate.

A third-tier violation is capped at the greater of "the gross amount of pecuniary gain to such defendant as a result of the violation" or $160,000 when the statute is adjusted for inflation. See 15 U.S.C. § 77t(d)(2)(c); Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2022), SEC (Jan. 15, 2022), https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm. The SEC proffers that $656,500 is the appropriate penalty as it represents Lemelson's pecuniary gain over the entire short campaign. But the statute requires that the pecuniary gain be a result of the violation, and the SEC has not shown that Lemelson's entire gain is a reasonable approximation for the amount of money he gained as a result of

his three false statements. Remember, the jury found that
Lemelson was not liable for a short-and-distort scheme, so it is
not correct that the entire short campaign is a proxy for
Lemelson's violation. The SEC ignores the other negative reports
published at the same time, the volatility of the stock before
and after the events, and their expert's view on assessing
causal impact. Dr. Smith explains that "stocks react to news
very quickly, typically within five to fifteen minutes of the
announcement," and "the impact of an event on the stock price
can be measured by the change in the stock price immediately
surrounding the announcement." Dkt. 266-1 at 11. Looking to the
expert's intraday event study, the price of Ligand stock fifteen
minutes prior to the radio interview was $66.59. Fifteen minutes
after the interview, the price dropped to $64.47. This drop of -
2.44% is the "abnormal return" that the expert associates with
the statement, though the expert hedges that "[w]hile the price
reaction measured from the close on the previous day to 15
minutes after the statement is statistically significant at the
90% level, it is not statistically significant when I use
alternative estimation windows (1 minute before to 15 minutes
after and 1 minute before to 5 minutes after)." Id. at 13 n.49.
The SEC expert therefore cautions that "this result should be
considered as weak evidence of an effect." Id. Noticeably absent

from the expert report is an attempt to calculate the pecuniary gain connected to each false statement.

The SEC has not demonstrated that Lemelson's misstatements were reflected in the price months later, as opposed to "confounding news and trading noise irrelevant to the event." Id. at 11. Because the SEC has proposed a penalty based on an overarching scheme and has not reduced the penalty to reflect factors outside of the statement, the Court adopts the statutorily set penalty of $160,000.

## III. **Disgorgement**

### A. Parties' Arguments

The SEC next requests disgorgement of Defendants' pecuniary gain from the short campaign, $656,500. The SEC also asks that the disgorgement be ordered to be joint and several, citing several recent District of Massachusets cases that have ordered the entity and the entity's sole owner jointly and severally liable. See Esposito, 2018 WL 2012688, at *9 (ordering managing director and entity jointly and severally liable for total disgorgement and prejudgment interest); SEC v. Locke Capital Mgmt., Inc., 794 F. Supp. 2d 355, 369 (D.R.I. 2011) (holding entity and entity's sole owner jointly and severally liable for disgorgement); SEC v. Tropikgadget FZE, 146 F. Supp. 3d 270, 282 (D. Mass. 2015) (holding defendants jointly and severally liable for disgorgement amount with prejudgment interest).

Lemelson stresses that the Supreme Court's recent decision in Liu v. SEC, 140 S. Ct. 1936 (2020), explains why disgorgement is inappropriate in this case. Lemelson points out that the Liu Court held that disgorgement can only be awarded if it benefits victims. Lemelson notes that the Commission "makes no attempt to identify any alleged victim or suggest a process to identify such alleged victims." Dkt. 260 at 14. Instead, in a footnote, the SEC said that the Commission could establish a Fair Fund to determine the feasibility of identifying victims.

**B. Analysis**

In Liu, the Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." Liu, 140 S. Ct. at 1940. Liu first discusses longstanding equitable principles, where equity courts "limited awards to the net profits from wrongdoing." Id. at 1945. While the Court "has carved out an exception when the 'entire profit of a business or undertaking' results from the wrongful activity,'" aside from that exception, "courts consistently restricted awards to net profits from wrongdoing after deducting legitimate expenses." Id. at 1945-46 (quoting Root v. Lake Short & M.S. Ry. Co., 105 U.S. 189, 203 (1881)). The Court also clarified the purpose of disgorgement. Section 78u(d)(5) restricts equitable relief to

"that which 'may be appropriate or necessary for the benefit of investors.'" Id. at 1947 (quoting 15 U.S.C. § 78u(d)(5)). The Court rejected the Government's position that the "primary function of depriving wrongdoers of profits is to deny them the fruits of their ill-gotten gains, not to return the funds to victims as a kind of restitution." Id. at 1948. Rather, "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." Id.

"The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." SEC v. MacDonald, 699 F.2d 47, 54 (1st. Cir 1983) (en banc) (quoting SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978)). In MacDonald, the First Circuit, sitting en banc, was asked

> whether, where [a defendant] fraudulently purchased
> company shares "while in possession of material non-
> public information [he should be required, in an action
> brought by the Commission,] to disgorge the entire
> profits he realized from his subsequent sale of those
> securities about a year later, rather than limiting
> disgorgement to an amount representing the increased
> value of the shares at a reasonable time after public
> dissemination of the information."

699 F.2d at 52. The court focused on whether the later profits were "causally related" to the wrongdoing. Id. at 54. After the investing public learned of the information and the market

responded, any "subsequent profits" were "purely new matter" and not subject to disgorgement. Id. at 54-55. The court explained that "[t]here should be a cut-off date" in cases where "the sellers have an opportunity to take remedial action." Id. at 54.

"[I]n order to establish a proper disgorgement amount, 'the party seeking disgorgement must distinguish between the legally and illegally derived profits.'" SEC v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013) (quoting CFTC v. British Am. Commodity Options Corp., 788 F.2d 92, 93 (2d Cir. 1986)). While private enforcement suits are different from SEC suits, that difference "does not entirely eliminate the need for proof of a causal connection between the securities violation and the disgorged funds." SEC v. Teo, 746 F.3d 90, 103 (3rd Cir. 2014). This Court "may exercise its equitable power only over property that is causally related to the wrongdoing." SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989). Though disgorgement "may well be a key to the SEC's efforts to deter others from violating the securities laws, [it] may not be used punitively." Id. The burden initially rests with the SEC to "establish[] a reasonable approximation of the profits causally related to the fraud." Razmilovic, 738 F.3d at 31.

In light of the volatility of the stock price, the jury's lack of a finding of scheme liability, and the SEC's lack of

adequate discussion of victims, the Court will not order
disgorgement in this case. The Supreme Court recently made clear
that disgorgement is a tool intended to benefit investors, not
to further punish the defendant. See Liu, 140 S. Ct. at 1948.
While the SEC seeks to argue that stock volatility and
confounding events are irrelevant, it is difficult to see how
Lemelson is responsible for the entirety of the drop in Ligand's
stock price between June and October 2014. Without scheme
liability, it seems that the defendant's "wrongdoing" would be
more properly limited to profits that resulted from his three
specific false statements. Moreover, the investing public had
access to information about at least two of the statements—that
Viking was audited and that it would have third parties conduct
preclinical trials—and therefore could take remedial action. As
discussed above, the SEC has not presented a reasonable
approximation of the pecuniary gain from these three statements.
Moreover, the SEC has not provided any evidence that it could
identify victims and has left open whether it is feasible to
create a Fair Fund. See Dkt. 245 at 13 n.3 ("The Commission
desires to distribute collected civil penalties, disgorgement,
and prejudgment interest to affected investors via a Fair Fund
established pursuant to Section 308(a) of the Sarbanes-Oxley
Act, if feasible. Once the Defendants pay the ordered
disgorgement and penalties, the Commission will determine the

feasibility of a distribution and petition this Court to establish the Fair Fund."). The Court declines to impose disgorgement; therefore, there is no need to discuss prejudgment interest.

**ORDER**

For the reasons stated above, the Court orders the following final judgment:

Defendants are enjoined from violating Section 10(b) of the Exchange Act and Rule 10b-5 for a period of five years, and Lemelson is ordered to pay a Tier III civil penalty in the amount of $160,000 forthwith.

SO ORDERED.

/s/ PATTI B. SARIS
_____

Hon. Patti B. Saris

United States District Judge