## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| GREGORY LEMELSON and LEMELSON CAPITAL | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| THE AMVONA FUND, LP, | ) |
| | ) |
| Relief Defendant | ) |
| | ) |

Civil Action No. 1:18-cv-11926-PBS

### MEMORANDUM IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION TO STAY PENDING MOTION FOR NEW TRIAL AND/OR APPEAL AND FOR ORDER THAT THE "BAD ACTOR" CLAUSE OF REGULATION D NOT APPLY TO THIS JUDGMENT

Pursuant to Federal Rule of Civil Procedure 62(d), Defendants respectfully seek an immediate stay pending appeal of the injunction against Defendants set forth in the Court's Judgment, dated March 30, 2022 (ECF No. 274). As discussed in more detail below, the injunction will have a devastating impact on Fr. Lemelson's business, his investors and other potential prospective endeavors, even as Fr. Lemelson appeals from the judgment. On the other hand, Fr. Lemelson was never accused of violating any securities laws prior to or in the eight years since the events at issue in this litigation, and the Commission did not seek any form of preliminary injunction while the investigation and litigation have been pending. Therefore, there is no immediate threat to the public or potential for any injury to the Commission that would require allowing the injunction to take affect while Fr. Lemelson's appeal is pending.

As explained below, Fr. Lemelson's planned appeal in this case will raise serious and difficult issues of law, including (1) whether the Commission is required to prove stock price movement to establish materiality, an issue over which there is a circuit split and the First Circuit has yet to weigh in, and (2) whether two of three challenged statements constituted non-actionable statements of opinion concerning disclosed facts.  Therefore, and for the additional reasons set forth below, Defendants believe a stay pending the determination of their forthcoming motion for new trial and/or appeal is warranted.

Defendants further request that the Court issue an order that pursuant to Rule 506(d)(2)(iii), they should not be disqualified under the "bad actor" clause of Regulation D of the Securities Act of 1933.  Such relief is expressly provided for by the Rule, and for the reasons given below, is warranted in this case.

## I.     Legal Standard

There are four factors that both a district court and court of appeals consider in issuing a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill,* 481 U.S. 770, 776 (1987).  *See also Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (stating that a "party requesting injunctive relief pending appeal bears the burden of showing that the circumstances of the case justify the court's discretion" and reciting *Hilton* factors to guide whether to issue injunction pending appeal).  "The first two factors of the traditional standard are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).  However, "[w]hen the request for a stay is made to a district court, common sense dictates that the moving party need not persuade the court that it is likely to be reversed on

appeal.  Rather, with regard to the first prong of the *Hilton* test, the movant must only establish that the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear."  *Canterbury Liquors & Pantry*, 999 F. Supp. at 150 (citing *Exxon Corp. v. Esso Worker's Union, Inc.*, 963 F. Supp. 58, 60 (D. Mass. 1997)).  Moreover, "[w]here … the denial of a stay will utterly destroy the status quo, irreparably harming appellants, but the granting of a stay will cause relatively slight harm to appellee, appellants need not show an absolute probability of success in order to be entitled to a stay."  *Providence Journal Co. v. Federal Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1979); s*ee also*, *SEC v. BioChemics, Inc.*, 435 F. Supp. 3d 281, 296 (D. Mass. 2020) (same).  That is exactly the situation here.

## II.    <u>Argument</u>

### A.    **The Commission Intends to Use the Court's Five-Year Injunction to Obtain a Lifetime Bar Against Fr. Lemelson**

In its Motion for Entry of Final Judgment (ECF No. 244), the Commission asked the Court to enter a lifetime injunction against Fr. Lemelson, telegraphing that it intended to use the injunction to seek a lifetime industry bar against Fr. Lemelson.  This Court refused to enter a lifetime injunction, explaining that injunctions should not enter in every case, and that a lifetime bar is not supported under the facts of this case.  ECF No. 273 at 10.  Instead, the Court entered an injunction for five years, clearly anticipating that Fr. Lemelson—whose prayer that the Court not enter any injunction was supported by all his investors and numerous other parties—would be allowed to continue providing services to investor clients.

Since the Court's issuance of its Memorandum and Order accompanying its Judgment, however, the Commission has informed undersigned counsel for Fr. Lemelson that it intends to take the limited injunction the Court issued and use it to seek a *lifetime* industry bar against Defendants in a proceeding before an SEC Administrative Law Judge.  15 U.S.C. § 78o.  Thus,

despite this Court's rejection of a lifetime injunction, the Commission intends to use the Court's more limited injunction to seek effectively the same result.

### B.      Fr. Lemelson Has a Likelihood of Success on the Merits

The first element for the Court to consider—whether the forthcoming appeal raises serious and difficult questions of law in an area where the law is somewhat unclear—is plainly met here.  As Defendants have detailed throughout this litigation, the Commission's enforcement action against Fr. Emmanuel was entirely unprecedented.  While the Court declined to grant Defendants' motion for summary judgment and their post-trial motion for judgment as a matter of law, the novel nature of this matter, along with the jury's mixed verdict, signals that Defendants have viable arguments for their contemplated motion for new trial and appeal.

One such argument concerns a legal issue upon which the circuits are split and which the First Circuit has not had occasion to address:  whether, for a finding of materiality under 10(b)(5), the Commission is required to prove (through expert testimony or otherwise) that the statements at issue caused the stock price of the publicly-traded company about whom they were made (here, Ligand Pharmaceuticals) to drop.  *Compare In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock. . . . This is so because efficient markets are those in which information important to reasonable investors (in effect, the market, is immediately incorporated into stock prices")) (internal citations omitted); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (materiality "may be measured post hoc by looking to the movement ... of the price of the firm's stock."); *SEC v. Berlacher*, No. 07-3800, 2010 WL 3566790, at *7 (E.D. Pa. Sept. 13, 2010) ("As opposed to guessing what a reasonable investor would find important or what could alter the total mix of information in the market, the United States Court of Appeals for the Third Circuit has adopted a

concrete method of measuring the materiality of information... [i]f there is no movement in the stock price, then the disclosed information is immaterial as a matter of law") *with In Re Vivendi Universal, SA. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) (noting that event studies are "almost obligatory" to prove materiality); *Veleron Holding, B.V. v. Stanley*, 117 F. Supp. 3d 404 (S.D.N.Y. 2015) (highlighting that event studies are not required when plaintiff provides significant other evidence of materiality and finding plaintiff's failure to present event study not dispositive on materiality because there was significant testimony concerning non-public information used by short seller).

In addition, Fr. Lemelson has a reasonable likelihood of success in establishing that the two statements concerning Viking were protected opinions.  Specifically, because Fr. Lemelson cited publicly available sources for his conclusions, the statements were opinions protected by the First Amendment and not actionable as a matter of law.  Indeed, this Court's Memorandum and Order even recognized that Fr. Lemelson's statements were accompanied by his claimed factual underpinning and treated it as a mitigating factor.  *See* ECF No. 273 at 16, 23.  Fr. Lemelson is reasonably likely to show on appeal that this evidence not only serves to mitigate, but to foreclose, his liability for these statements.  In addition, the Commission put in no evidence at trial that the two Viking statements would have been material to investors, another ground on which Fr. Lemelson is likely to prevail with respect to those two statements on appeal.

Setting aside the Viking statements, Fr. Lemelson will have a reasonable likelihood of arguing on appeal that the Benzinga statement, standing alone, cannot support the injunction. Indeed, in its Memorandum and Order (ECF No. 273), the Court made clear that its principal basis for issuing an injunction was Fr. Lemelson's approximately one-second statement on the Benzinga webcast that Ligand's Investor Relations representative "*basically*" agreed with him

that Ligand's drug, Promacta, was "going away" (at some unspecified point of time in the future). The Commission was unable to prove this comment had any impact on Ligand's stock price, and Fr. Lemelson did not trade any Ligand stock in connection with this statement. Because precedent explains that injunctions should not enter in every case, Fr. Lemelson has a reasonably strong argument that if the ***only*** upheld violation is the one-second Benzinga statement, then even if the judgment remains in place then an injunction is inappropriate, particularly where Fr. Lemelson has never been alleged to have violated the securities laws in the approximately three years prior and eight years since the Benzinga webcast aired. *See SEC v. Dibella*, 2008 WL 6965807, at \*12 (D. Conn. 2008) ("A permanent injunction is a ***drastic*** remedy and should not be granted lightly, especially when the conduct has ceased") (emphasis added); *SEC v. John Adams Trust Corp.*, 697 F. Supp. 573, 577 (D. Mass. 1988) ("Past violations of securities laws do not provide, *ipso facto*, a basis for issuance of an injunction, because they are not in and of themselves indicative of future misconduct"). In short, the undersigned is not aware of any Court imposing an injunction on a defendant under remotely analogous facts prior to this Court doing so in its Judgment. Thus, even if some aspect of the judgment is affirmed on appeal, Fr. Lemelson has a strong likelihood of having the injunction vacated, and therefore it should be stayed pending the appeal.

### C.   Fr. Lemelson Will Be Irreparably Injured Absent a Stay

If the Commission manages to leverage this Court's limited injunction into a lifetime industry bar, it will mark the death knell for Fr. Lemelson's professional investing activities, even if he ultimately should succeed in overturning the judgment and/or the injunction on appeal. With an industry bar in place, all of Fr. Lemelson's existing clients will be forced to seek investment services from third parties. Even if Fr. Lemelson should win, there is no assurance his investors will return. In the meantime, the fact that Fr. Lemelson was made subject to a

lifetime industry bar will be public knowledge, discouraging new investors from associating with Fr. Lemelson even should he clear his name on appeal.  Affidavit of Fr. Lemelson in Support of Defendants' Emergency Motion for Stay Pending Motion for New Trial and/or Appeal and For Order that the Bad Actor Clause of Regulation D Not Apply to this Judgment ("Fr. Lemelson Aff.") at ¶¶ 3-6.

The lifetime bar the Commission intends to seek even while an appeal is pending will not only prohibit Fr. Lemelson from continuing to earn a living in his chosen career field, the securities industry (he does not, nor has he ever, drawn a salary from serving as a Greek Orthodox Priest), but it would effectively prevent him from accessing capital markets.  This would close many options outside of the securities industry that Fr. Lemelson (a long-time entrepreneur) could pursue to support his family (including four school-age children), prevent him from financing the charities to which Fr. Lemelson has given substantial amounts of his earnings, and interfere with his multiple active ministries that, at Fr. Lemelson's insistence, are typically in poor, underserved, or needy communities.

### D.    Issuance of the Stay Will Not Injure the Commission or the Public Interest

The damage the injunction will do to Fr. Lemelson even while an appeal is pending would be particularly unwarranted because Fr. Lemelson has never been *alleged* to have violated the securities laws in the eight years since the alleged actions in this case, or at any point prior— which the Court itself noted weighed against the issuance of a lifetime injunction.  *See* Transcript of February 15, 2022 Hearing on Motion for Entry of Final Judgment at 26:11-17.  If the Commission thought Fr. Lemelson posed some clear and present risk of violating the securities laws while litigation remains pending, it could have sought a preliminary injunction at any point in the last eight years; *it never even tried*.  *See* 15 U.S.C. § 78u; *SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979) (noting that even if violation of Rule 10b-5 had been found, injunction

would not be appropriate where "the SEC conceded that at no time during those seven years [after the alleged violations] did it attempt to expedite the requested injunctive relief.  Nor was there any evidence that the defendants committed any prior or subsequent violations of the securities laws").  This lack of action by the Commission evidencing there is no real threat to the public is particularly compelling considering that, during the time this litigation was pending, Fr. Lemelson remained a very vocal critic and short-seller of Ligand and Viking, and the Commission never alleged that, in all that time, a single additional statement or action was made in violation of the securities laws, *or moved for an injunction as it is authorized to do*.

The fact is that Fr. Lemelson poses no risk, and there is no reason the Commission could not wait another year for the appeal to be decided before seeking a bar.  Thus, the requested stay here is warranted because "the denial of a stay will utterly destroy the status quo, irreparably harming [Fr. Lemelson], but the granting of a stay will cause relatively slight harm to [the Commission]."  *Providence Journal Co.*, 595 F.2d at 890.

The interest of third parties also weighs in favor of the requested stay.  Fr. Lemelson's investors would be harmed if the Commission obtains a bar against Fr. Lemelson, even if the judgment or injunction is later overturned on appeal.  Fr. Lemelson Aff. at ¶ 4.  All of those investors—all of whom are by definition sophisticated, high net worth individuals—have unequivocally stated that they wish to remain in Fr. Lemelson's fund, but none of them would be able should the bar be put in place.

### E.    The Court's Five-Year Injunction Poses Significant Impediments to Fr. Lemelson's Ability to Continue Operating his Fund

Beyond the Commission weaponizing the Court's five-year injunction to seek an industry bar, the injunction itself will result in grave harm to Fr. Lemelson and his fund.  Specifically, Regulation D, promulgated under the Securities Act of 1933, as amended, contains "safe

harbors" under Section 4(a)(2) of the Securities Act of 1933, which exempts from registration transactions by an issuer not involving any public offering. Rule 506(b) and Rule 506(c) of Regulation D specifically are "safe harbors" that provide objective standards issuers can rely on to meet the requirements of the Section 4(a)(2) exemption. Companies conducting an offering under Rule 506(b) or Rule 506(c) can raise an unlimited amount of money and can sell securities to an unlimited number of accredited investors. According to the SEC's own report, "[d]uring 2009-2017, Rules 506(b) and 506(c) account for 99.9% of the amounts reported sold through Regulation D, including 93% of capital raised in offerings with maximum offer size of $1 million and 98% of capital raised below the amended Rule 504 offering limit threshold ($5 million), suggesting that issuers continue to value the preemption of state securities laws provided for offerings conducted pursuant to Rule 506." Scott Baugess, Rachita Gullapalli, & Vladimir Ivanov, *Capital Raising in the U.S.: An Analysis of the Market for Unregistered Securities Offerings, 2009-2017*, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission (Aug. 2018) (*available at* https://www.sec.gov/files/DERA%20white%20paper_Regulation%20D_082018.pdf).

In addition, according to the same report: "Among the other findings, the majority of the capital raised in the Regulation D market in 2017 was raised by pooled investment vehicles ($1,671 billion), while non-financial issuers raised $105 billion. Regulation D offerings are very popular with small businesses: there have been more than 100,700 issuances by non-financial issuers since 2009, with a median offer size of less than $1 million." *Id.* Regulation D, and, more specifically, Rules 506(b) and 506(c) are relied upon by the private investment fund industry (including the fund managed by Defendants) to conduct their private offerings.

Rule 506(b) and 506(c) offerings are subject to "bad actor" disqualification provisions, which are set out in Rule 506(d).  Rule 506(d) provides that"

> No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; … any investment manager of an issuer that is a pooled investment fund; … any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor: … Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice: (A) In connection with the purchase or sale of any security; (B) Involving the making of any false filing with the Commission; or (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities.

17 C.F.R. § 230.506(d).

The Rule goes on to provide, however, that the issuing court may specify that its injunction will not have that effect:

> If, before the relevant sale, the court or regulatory authority that entered the relevant order, judgment or decree advises in writing (whether contained in the relevant judgment, order or decree or separately to the Commission or its staff) that disqualification under paragraph (d)(1) of this section should not arise as a consequence of such order, judgment or decree …

17 C.F.R. § 230.506(d).

 As a result of the "bad actor" disqualification provisions, the Defendants would, without further action by the Court, be prohibited from relying upon the safe harbors in Rule 506(b) and Rule 506(c).  They would, to a great extent, be prohibited from raising additional capital for the existing managed fund.  More generally, Fr. Lemelson, who has spent his career establishing and growing multiple businesses (in addition to his role as clergy for which he is unpaid) would be prevented from raising capital for any prospective new and unrelated ventures.  In short,

Defendants would face irreparable harm even if they later succeed on their contemplated motion for new trial and appeal.

Accordingly, Defendants request that the Court issue an order that disqualification under Rule 506(d)(1) should not arise as a result of the Judgment in this case, as specifically allowed under the terms of the Rule.

## **CONCLUSION**

For the foregoing reasons, Fr. Lemelson respectfully requests that the Court stay the injunction pending determination of Defendants' forthcoming motion for new trial and/or appeal and issue an order that disqualification under Rule 506(d)(1) should not arise as a result of the Judgment in this case. The stay will prevent the irreparable harm the injunction will cause to Fr. Lemelson and his business while the significant and unresolved legal issues are determined. And neither the Commission nor the public will be impacted by the stay, as evidenced by the Commission not seeking a preliminary injunction and Fr. Lemelson not violating the securities laws in the three years prior and eight years since the relevant statements in this case. The ruling that disqualification under Rule 506(d)(1) should not arise as a result of the Judgment in this case will avoid the draconian impact of effectively preventing Fr. Lemelson from raising capital for any prospective new unrelated ventures.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
Thomas M. Hoopes (BBO No. 239340)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com
thoopes@lhblaw.com

Dated:  April 15, 2022

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(a)(2)

I hereby certify that Defendants' counsel conferred with counsel for the Securities and Exchange Commission in an attempt to resolve or narrow the issues but was unable to do so.

*/s/ Douglas S. Brooks*
Douglas S. Brooks

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on April 15, 2022.

*/s/ Douglas S. Brooks*
Douglas S. Brooks