IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


SECURITIES AND EXCHANGE              )
COMMISSION,                          )
                                     )
              Plaintiff              )
                                     )   CA No. 18-11926-PBS
        -VS-                         )   Pages 1 - 46
                                     )
GREGORY LEMELSON, et al,             )
                                     )
              Defendants             )


**MOTION HEARING BY VIDEO**

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE







                        United States District Court
                        1 Courthouse Way
                        Boston, Massachusetts  02210
                        February 15, 2022, 2:36 p.m.







                   LEE A. MARZILLI
                OFFICIAL COURT REPORTER
             United States District Court
             1 Courthouse Way, Room 7200
                  Boston, MA  02210
                   leemarz@aol.com

1    A P P E A R A N C E S:

2         ALFRED A. DAY, ESQ. and MARC J. JONES, ESQ.,
     United States Securities and Exchange Commission,
3    33 Arch Street, 23rd Floor, Boston, Massachusetts, 02110-1424,
     for the Plaintiff.

4
         THOMAS M. HOOPES, ESQ., DOUGLAS S. BROOKS, ESQ.
5    and BRIAN J. SULLIVAN, ESQ., Libby Hoopes Brooks, P.C.,
     399 Boylston Street Suite 200, Boston, Massachusetts, 02116,
6    for the Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE CLERK:  Good afternoon, Judge.

THE COURT:  Good afternoon to everyone.

THE CLERK:  I have everybody on, so I'll call the case.  The Court calls Civil Action 18-11926, SEC v. Lemelson, et al.  Could counsel please identify themselves for the record.

MR. JONES:  Good afternoon, your Honor.  This is Marc Jones for the Securities and Exchange Commission.  With me is Al Day.

MR. BROOKS:  And good afternoon, your Honor.  On behalf of defendants, Doug Brooks, and along with me are my colleagues Brian Sullivan and Tom Hoopes.

THE COURT:  Let me ask you something.  Your client I assume is on this Zoom call somewhere?

MR. BROOKS:  Yes, he is, your Honor.

THE COURT:  All right, and I don't know if this is typical because I believe this is the first one I've actually had like this.  Usually I get these after a criminal conviction, and so it's pretty much unopposed, but this is a very, very different kind of case.  Would your client like to address the Court?

MR. BROOKS:  I mentioned that to him, your Honor.  I was thinking if he chose to, it would be -- obviously I know in a criminal case it's usually sort of after argument, but would

```
 1    you like to hear from him first, or do you want to hear from
 2    him --
 3              THE COURT:  No, last.  I would give him that right if
 4    he wanted to.  Obviously it's not a sentencing, but it affects
 5    him dramatically, so I'd be happy to hear from him.
 6              MR. BROOKS:  Okay, great.
 7              THE COURT:  All right, so you're apparently in
 8    different locations, all of you, so I don't know how you're
 9    going to communicate with him, but, in any event, just let me
10    know at the end?
11              MR. BROOKS:  Okay.
12              THE COURT:  So I'm hoping that this will take about an
13    hour or so, so maybe half an hour each side, does that make
14    sense?  And then maybe give him -- or maybe we do it a little
15    differently; each of you get twenty-five minutes and give him
16    ten minutes at the end?  How does that sound, something like
17    that?  Okay?  All right.  So the SEC should go first, I think.
18              MR. JONES:  Yes, your Honor, thank you.
19              THE COURT:  It's now about twenty of, so, you know,
20    till about five or ten past.  Okay.
21              MR. JONES:  Okay.  Your Honor, thank you.  Thank you
22    for seeing us today.  I think I'd like to start with what
23    brings us here, which is that the jury in the jury trial case
24    found three false and fraudulent statements made by
25    Defendant Lemelson and Defendant Lemelson Capital Management
```

1    for the purpose of driving down Ligand's stock to make a

2    profit, all in violation of Exchange Act, Section 10(b), and

3    Rule 10(b)(5).

4              There is a considerable amount of briefing space on

5    the part of the defendants spent to try to minimize and down-

6    play that as a finding of the jury.  From our perspective,

7    that's not what happened.  The jury found that the defendant

8    three separate times on three separate topics went out of his

9    way to fraudulently misrepresent something about Ligand

02:39 10    Pharmaceuticals with intent and without good faith.

11              This is one of the most serious things that the

12    Commission has jurisdiction over.  This kind of securities

13    fraud needs a substantial remedy in order not only to make

14    people whole, if we can, and not only to punish this behavior,

15    but to discourage this kind of behavior by the defendant and

16    others going forward.

17              Now, it is important, we think, for all three

18    components of the remedy.  That would be the injunction, the

19    penalty, and the disgorgement.  I'm happy to start with any one

02:40 20    of those three, if the Court has a preference, but if left to

21    my own devices --

22              THE COURT:  Please start with the injunction because I

23    want to understand the practical effect of that.

24              MR. JONES:  Yes, your Honor.

25              THE COURT:  Can he still practice his profession?

```
 1              MR. JONES:  Your Honor, the practical effect is this:

 2      The securities laws provide for essentially a bar proceeding.

 3      That bar proceeding was expanded essentially to various parts

 4      of the securities industry, including working as or with an

 5      investment advisor, working as or with a broker/dealer, working

 6      as or with a bond-rating organization, and a few others.  The

 7      most important one here is investment advisor because that's

 8      how Defendant Lemelson and Lemelson Capital Management are

 9      currently operating, but, you know, it would also apply to

02:41 10     those other areas of the securities law industry.

11              One of the ways, and only one of the ways, that a

12      person may be barred from the securities industry in this way

13      is, if a court enters an injunction involving the securities

14      laws, then that goes to an administrative proceeding before an

15      administrative law judge, and ultimately it's appealed to the

16      Commission, to determine whether it is in the public interest,

17      after notice and an opportunity to be heard, whether that

18      person or that entity, or both, should continue as a securities

19      law professional or to be subject to the bar that, you know,

02:41 20     was originally in the securities laws and was expanded by the

21      Dodd-Frank Act.  That bar is essentially a permanent bar, but

22      that --

23              THE COURT:  Excuse me.  Is that regardless of -- like,

24      say I decide not to do a lifetime injunction but I pick a term

25      of years -- we could debate that -- does the bar only last for
```

1   that term of years?

2       MR. JONES:  No, your Honor, the injunction depending

3   on the the bar.  However, to the extent that, and this is what

4   I was about to say, individuals who have been barred have a

5   right to reapply.  That right to reapply is essentially a

6   petition to the Commission that circumstances have changed, the

7   person has learned their lesson; they have, you know, engaged

8   in education and restorative justice.  And there's various

9   factors depending on what removed you from the securities

02:42 10  industry in the first place, but that there is a right to

11  reapply.

12      When we settle with people, sometimes we say, "You

13  have a right to reapply after one year or two years or five

14  years," or, you know, "You can reapply whenever you want, but

15  we're not going to say how many years."  That is the situation

16  we'd be in here.  The injunction would prompt an administrative

17  proceeding to bar the defendants from the securities industry.

18      Now, if there wasn't a injunction, the law still says

19  that if the administrative law judge finds that there was a

02:43 20  violation of provisions of the securities laws and if it's in

21  the public interest, then there can be a bar based on that as

22  well.  The injunction is essentially important because it's

23  essentially the Court saying, yes, you know, the Court believes

24  that there has been a violation of securities laws here, and

25  the defendant may be in a position to reoffend.  And I can go

1    through those factors if I have explained adequately the

2    process after the injunction to your Honor.

3            THE COURT:  So it doesn't matter very much whether or

4    not I do five years, ten years, or life.  With any of those,

5    the SEC will go in and seek a permanent bar?  Is that what

6    you're saying?

7            MR. JONES:  Yes, your Honor, that is what I'm saying.

8    The injunction that the Commission is looking for here is

9    essentially an injunction to not violate Section 10(b) of the

02:44 10   Exchange Act in the future.  That is the triggering event that

11   is most common post-trial to engage in an administrative

12   proceeding to find whether it's in the public interest to bar

13   the defendant or defendants that are subject to the injunction.

14           You know, a five-year -- if the Court is contemplating

15   a period of years, of course that's within the Court's

16   discretion.  One could go back to the Commission later and say,

17   "Well, I'm no longer subject to the injunction, so that's a

18   factor in my reapplication to no longer be barred, or even make

19   the argument -- I haven't heard this argument, your Honor but I

02:44 20   can conceive the argument that says, "There's no longer an

21   injunction, so I should no longer be barred.  The grounds were

22   vacated."  So that happens, your Honor.

23           So, for instance, if there was an injunction here and

24   the defendants were to prevail on appeal but have been barred

25   in the meantime, then they would go back to the Commission and

1    say, "Well, that judgment and that injunction has been vacated,

2    and therefore I shouldn't be barred anymore," and the

3    Commission would say, "Yes, we agree the grounds no longer

4    exist," and it would go away.

5         Here, we believe that the injunction is absolutely

6    necessary.  This conduct falls at the upper end of bad behavior

7    in the securities industry.  There are a number of factors

8    here, but ultimately it comes down to this, your Honor, and the

9    public interest inquiry is about this too:  Should a person who

02:45 10   has willfully engaged in fraudulent misrepresentations in the

11   course of a securities transaction be a person who is

12   permitted -- and it is a permission -- being a part of the

13   securities industry is something that is permissive -- it's not

14   a matter of right -- you have to apply -- you have to be

15   subject to the regulatory regime -- should a person who has

16   multiple times engaged deliberately in fraudulent

17   misrepresentations in the course of securities transactions be

18   allowed to continue as a securities law professional?

19        And here for this Court, that's not the question that

02:46 20   this Court necessarily is looking at.  The question for this

21   court is:  Should there be an injunction in that case?  And,

22   your Honor, we believe the answer is absolutely "yes."

23        The securities laws allow for injunction in any -- any

24   case brought to the District Court can be an injunctive action

25   for, you know, for the Court to impose an injunction after a

1   finding of liability.

2          The courts, as you know and as you've seen in the

3   brief, look to a number of factors for whether or not that

4   injunction should issue.  They're essentially the same factors

5   that go into accounting determination.  They're sometimes

6   called the Steadman Factors, but they crop up in many, many

7   different cases all in the same way.

8          The first of those factors is, is this egregious

9   conduct?  Here, this is absolutely egregious conduct.  As you

02:47 10   saw in the *Chan* case, you know, there's a distinction between

11   something, you know, flagrant and deliberate versus a merely

12   technical violation.  And, remember, that egregiousness

13   determination is across the panoply of securities case.  So,

14   you, on the one hand, there may be a strict liability

15   unregistered offering of securities that somebody ran afoul of

16   and they violated the law, but do we call that egregious?

17   Technically not.

18          In the middle, there are negligence cases, and in fact

19   you can even make misrepresentations negligently under the

02:47 20   Securities Act, Section 17(a)(2) and (3).  Those fall in the

21   middle.

22          And on the most egregious end of the spectrum is

23   Section 10(b) where the jury is required to find that there was

24   scienter on a material misrepresentation.  They did find that

25   here.  They absolutely found that the conduct was intentional,

1    either with an intent to defraud or an intent to willfully

2    disregard the truth.  They found it was without good faith, or,

3    as your Honor instructed them, if they had found it was with

4    good faith, they could not find a violation of Section 10(b).

5    That's in the jury instructions.

6         And so the jury absolutely found that three times

7    Father Lemelson and Lemelson Capital Management engaged in

8    misbehavior that falls on the absolute end of the egregiousness

9    spectrum.  This is not a merely technical violation.  This is

02:48 10   not a situation where the jury found, "Hey, you ran afoul of

11   some technical securities, or even that you should have done

12   something that you didn't."  This is a case where the jury

13   found that he went off to do something intentional, whether

14   they found it with an intent to defraud or through

15   recklessness, which, as defendants argued, is a form of

16   intentional conduct.  Recklessness is as intentional as intent

17   to defraud, and so here this is an egregious case.  And the

18   courts, and as the Commission has argued, find under

19   Section 10(b), they regularly find that that is egregious.  It

02:49 20   is essentially, you know, the top charge that the SEC brings.

21        THE COURT:  That's true, but they do vary on the

22   length of it.  And what you're telling me is, regardless of

23   what I decide on the length, it almost doesn't matter because

24   the SEC will come in and do a bar, so --

25        MR. JONES:  I believe that's right, your Honor.  And

1    the other thing is, if your Honor was inclined to tailor an

2    injunction and say, "Lemelson and Lemelson Capital Management

3    can't engage in the following kinds of behaviors for four

4    years," so let's say hypothetically -- and we're not asking for

5    this by any stretch, your Honor -- "The defendants are not

6    allowed to short stocks for the next five years," okay, that's

7    a tailored injunction, and that five years makes sense.

8         If the Court were to say, "Father Lemelson and

9    Lemelson Capital Management need to not violate Securities

02:50 10   Exchange Act 10(b) and Rule 10(b)(5) for the next five years,"

11   I'm not sure what that would mean.  You know --

12        THE COURT:  Well, it's such an odd thing anyway

13   because of course you have to abide by that, regardless of

14   whether there's an injunction or not.  It's like when I say on

15   probation to someone "You have to follow the law," well, yes,

16   you do.  I mean, of course you have to follow the securities

17   laws whether I issue an injunction or not.

18        MR. JONES:  You'll get no argument from me, your

19   Honor, that a "follow the law" injunction is a weird animal.

02:50 20   It's one of those weird animals in the securities law much like

21   negligent fraud that we had to expose your Honor to during the

22   jury instructions negotiations.  But it's an animal

23   nonetheless.  It may be the platypus of the securities laws,

24   but it's still out there.  And it's important to us, it's very

25   important to us, and it's important to the securities industry

1    because it's a signal from the Court that in fact, yes, the

2    administrative proceeding should proceed, and that the SEC

3    should do the job that Congress entrusted it with to keep the

4    securities industry free of fraudsters.  And that's what we try

5    to do.  That's our whole purpose.  You know, that's what it

6    says on the seal.

7            THE COURT:  I think, just to keep this moving, we

8    should probably jump to --

9            MR. JONES:  Judge, just --

02:51 10            THE COURT:  Can we jump to disgorgement because there

11    is a recent Supreme Court case on point which creates a problem

12    for the SEC.

13            MR. JONES:  There are a few Supreme Court cases on

14    point but none of which we think cause a problem, your Honor.

15    I assume you're referring to *Liu*.

16            THE COURT:  Yes.  Do you have a case in lieu of *Liu*?

17            MR. JONES:  Your Honor, the *Liu* decision says

18    essentially that the ill-gotten gains are disgorgeable by

19    the -- and, in fact, the defendants haven't even argued that

02:52 20    this is a *Liu* issue.  There is no deduction to be had here.

21    The SEC has computed disgorgement without including the things

22    that might be deductible.  We haven't counted, for instance,

23    any fees that Lemelson Capital Management collected in order to

24    manage its business.  We have included the performance fee,

25    which is essentially the extra fee that Father Lemelson got

1   when he rose above a certain performance mark.

2           And we have asked for the profit from, not the whole

3   transaction but just the profit from the tainted transaction.

4   Courts have said the profit -- you know, and this means, you

5   know, the *Teo* case and the *Whittemore* case -- that the profit

6   from a tainted transaction -- I'm sorry, your Honor.  Go ahead.

7           THE COURT:  Who would you give it to?

8           MR. JONES:  Your Honor, we would give it to the people

9   who were market participants in the Ligand -- you know, they

02:53 10   were buying and selling Ligand at the time.  Those people are

11   identifiable.  They appear on something that the SEC calls

12   "blue sheets."  They can be tracked down through their broker.

13           THE COURT:  It's like a class -- you would call it

14   like a class action.  So let's say you want 625 -- wasn't that

15   what you want?

16           MR. JONES:  656, your Honor, plus prejudgment;

17   interest.  And in this case, your Honor, it's important to

18   know, we've asked that the Fair Fund, you know, be a

19   possibility.  If in fact the defendant were to pay, we would

02:53 20   include the penalties as remedies to the fund, the people who

21   were harmed in the market as well.

22           THE COURT:  And you would just give it out

23   proportionately?  How would you do it?  It's like a class

24   action, the Fair --

25           MR. JONES:  Your Honor, proportionally, there's a

1    number of definitions of "proportional," and we try to find the

2    one that's most just, but, yes, you know, the people who

3    participate in the market or, you know, who --

4          THE COURT:  Has the SEC ever done this before, or is

5    this new after *Liu*?

6          MR. JONES:  No, your Honor.  The SEC has done this for

7    a long time.  It goes back far, far before *Liu*.  The SEC was

8    admonished by the Supreme Court to use distribution more than

9    it had been using.  That was in the *Kokesh* case and then in

02:54 10    *Liu.*  But the SEC, we have long had a Distributions Unit.  They

11    are in charge of taking the money that people actually pay and

12    getting it out to the people who have been harmed.  And, you

13    know, assuming that the numbers are -- look, there is a

14    practicality here.  If the defendant were only to pay $100,000

15    and there are, you know, 300,000 people who needed money, I

16    don't know if we would send out a check for 30 cents to

17    everyone.  But we don't anticipate that to be the circumstance

18    here.  We actually anticipate that there will be people who are

19    identifiable.

02:54 20          Now, we have to go through that feasibility analysis,

21    and we have to go through and identify all those people, and we

22    have to do it essentially after the defendant actually pays

23    because very often we have defendants who don't pay, and trying

24    to distribute the very little that they do pay can be very

25    difficult.

         1          THE COURT:  And then does the amount go back to him if

         2   you don't find investors?

         3          MR. JONES:  Does it go back to him?  No, your Honor.

         4   The whole purpose --

         5          THE COURT:  In disgorgement, they basically were

         6   trying to rein it in a bit, it seemed.

         7          MR. JONES:  Your Honor, in *Kokesh*, the Court reined it

         8   in a little bit.  In *Liu*, the Court found that disgorgement was

         9   an acceptable injunctive relief issued by the Court or by the

02:55 10   Commission.  And in fact, you know, in the National Defense

        11   Authorization Act that changed the statute of limitations, it

        12   also changed and said it was statutorily recognized as a

        13   remedy.

        14          The Supreme Court was not trying to rein in

        15   disgorgement, and in fact they said exactly the opposite.  They

        16   said the Commission is entitled to get disgorgement, and that

        17   part of disgorgement, to keep it as disgorgement, is to try to

        18   distribute it, as opposed to keeping it in the national

        19   Treasury.

02:56 20          THE COURT:  Yes, and I applaud that goal.  It's just

        21   you were very vague in the papers about actually how this would

        22   work, so --

        23          MR. JONES:  Your Honor, it's tough, and in a

        24   space-limited paper, it's hard to describe.

        25          THE COURT:  Believe me, the one thing I'd say about

1   you and the SEC is, page limitations have never been an issue.

2   But, in any event, I mean, this has been briefed ad nauseam.

3   But I've just got to make sure that you get to the issue of the

4   penalties.

5           MR. JONES:  Yes, your Honor.  Here the factors all

6   point to a substantial penalty for both Lemelson and Lemelson

7   Capital Management.  We've talked about egregiousness.

8           THE COURT:  Can I just talk about Lemelson Capital

9   Management.  That feels a little bit like piling on.  They're

02:57 10  the same entity basically.

11          MR. JONES:  Your Honor, we disagree.  Now, we agreed

12  for purposes of streamlining the trial to talk about Lemelson,

13  and Lemelson, like any corporate executive at a corporation, he

14  binds the company.  But Lemelson Capital Management is a

15  separate entity.  It files with the Commission.  It is

16  separately registered with the Commission --

17          THE COURT:  There's no separate harm.  He was the same

18  guy, agent essentially doing it for both, both himself and for

19  the company.  I don't know, I mean, I just --

02:57 20         MR. JONES:  So, your Honor, the --

21          THE COURT:  It just seems Draconian.  Let me just say,

22  to add the two together plus disgorgement seems like a lot to

23  put on --

24          MR. JONES:  Well, your Honor obviously has discretion

25  about how much to put on, but let me talk about it conceptually.

1      Imagine a large company, Acme Company, where the CEO makes a
2      fraudulent misrepresentation, right?  The company is a separate
3      company; the CEO makes the misrepresentation.  And what the
4      defendants are arguing for and what your Honor may be
5      considering is a situation where if you can point to an
6      individual to be penalized, you don't penalize the corporation
7      on whose behalf they're acting.
8              THE COURT:  Why don't I just make them jointly and
9      severally liable for whatever figure I pick?
02:58 10             MR. JONES:  Your Honor, that is often what the
11     Commission used to argue for.  The Second Circuit has now come
12     along and said, "We don't agree that there can be joint and
13     several penalties."  The Commission hasn't expressed a position
14     either way, but the SEC has been staying away from joint and
15     several penalties where they have reason.  We're trying to not,
16     you know, argue for one circuit and one --
17             THE COURT:  Because I understand that there may be
18     money in one entity that doesn't exist in the other and you
19     want a certain amount.  Do you have the name of that case deep
02:58 20     sixed the joint and several?
21             MR. JONES:  The Second Circuit case?
22             THE COURT:  You can send it along in a letter or
23     something if you don't have it.
24             MR. JONES:  We would be happy to, your Honor.  But
25     your Honor has the discretion here to issue a joint and several

1    penalty.  As a matter of policy, the Commission doesn't ask for

2    it, in part because, you know, that circuit and some others

3    have said it's disfavored or not allowed.  But the First

4    Circuit hasn't spoken either way, and you could do a joint and

5    several penalty if your Honor wanted to.  I don't know whether

6    defendants are going to be happy about that or whether that's

7    something they would challenge consistent with the other

8    circuits.

9         THE COURT:  Well, I'll ask them, but it does seem like

02:59 10   to do a double penalty for the same act, same party.

11         MR. JONES:  But, your Honor, let me address that for a

12   minute.  Lemelson Capital Management is the publisher of these

13   statements.  All of these statements were punished under

14   Lemelson Capital Management's banner.  Lemelson Capital

15   Management --

16         THE COURT:  Excuse me, excuse me.  It's the same.  I

17   mean, it's the same entity.  Who else is there other than

18   Father Lemelson?

19         MR. JONES:  There is a CFO.  There is a compliance

02:59 20   staff.  There have been other people who have been hired,

21   either as, you know, assistants or as editors or the like.  It

22   has separate filings with the SEC.  It acts as an investment

23   advisor.  It is subject to the investment advisor rules.

24         And the statutory, you know, the Congressionally

25   approved scheme is here that both -- you know, that anyone who

1    violates the securities laws is subject to, you know, penalty

2    and disgorgement and possibility of an injunction.

3           To let Lemelson Capital Management as an entity off

4    the hook because there is Lemelson to point to is the same as

5    letting Exxon off the hook because you can point to an

6    assistant CFO who did it.

7           THE COURT:  Well, let me ask, is there a fund issue;

8    in other words, that they'd be the deep pocket?  In other

9    words, Father Lemelson may not have it, but the --

03:00 10          MR. JONES:  Your Honor, we don't have visibility into

11   that.  We're not arguing for a penalty against both because we

12   think one might have money and one doesn't.  We've asked for

13   disgorgement to be joint and several because we believe that

14   the ill-gotten gain was made by Lemelson and Lemelson Capital

15   collectively.  We have not asked for a joint and several

16   penalty because we don't ask for that.  But, again, Lemelson

17   Capital Management is the vehicle, is the instrumentality here

18   that gets used for this violation; and it is important to show

19   investment advisory firms that they are not allowed to engage

03:01 20   in this behavior.  It's not just an individual, and it's not a

21   good message to send to firms that if you can point to someone

22   inside, they'll get the penalty and the firm will skate.

23          Now, this is a smaller firm, but it's not a solo shop.

24   It's not just Lemelson.  In fact, as you saw in the letters

25   that Father Lemelson submitted on his behalf, several of the

1    people who worked with and for Father Lemelson are the people

2    who are submitting the letters saying, "Hey, please don't

3    penalize Father Lemelson too much," you know, Mr. Zaranian

4    (Phonetic) and several others, Mr. Mason through the lawyer.

5    And so I'm trying, your Honor.  I want to answer your questions

6    and still get done in the time limit.

7         THE COURT:  I know, I'm interrupting.  Why don't you

8    just finish up, and I won't ask anything else.

9         MR. JONES:  So I'm happy to take your questions, your

03:02 10   Honor.  I'd rather get to what you want to hear rather than

11   tell you what I think you want to hear.

12        THE COURT:  I understand from your pleadings why you

13   want Tier 3.

14        MR. JONES:  Yes, your Honor, we think Tier 3 is

15   appropriate here, and we think it's appropriate against both.

16   We think pecuniary gain is the proper measure for Father

17   Lemelson, and we think the statutory number is the right amount

18   for Lemelson Capital Management, mostly because Father Lemelson

19   seems to be the one generally who made the pecuniary gain, and

03:02 20   the statutory structure for deterring this kind of conduct on

21   the part of entities says that the 775 is the right amount for

22   Lemelson Capital Management.

23        Here, a few more things, your Honor.  There is a whole

24   debate about --

25        THE COURT:  But if I went separately for them, you

 1    would say pecuniary gain is what I should do for

 2    Father Lemelson, but the corporation is what?  Should I go with

 3    the corporate cap of 500?

 4            MR. JONES:  It would be the corporate penalty for a

 5    Tier 3 penalty, your Honor.  That's what we've asked.  But your

 6    Honor has the discretion to do pecuniary gain for both of them.

 7            THE COURT:  To do what?

 8            MR. JONES:  Your Honor has the discretion to do

 9    pecuniary gain for both of them.  What the Commission has asked

03:03  10    for is the pecuniary gain for Father Lemelson and the statutory

11    Tier 3 level of $775,000 for Lemelson Capital Management.

12            THE COURT:  All right.  That's a lot of money --

13            MR. JONES:  Well, your Honor --

14            THE COURT:  -- if I add that together with the

15    disgorgement.  I mean, are you essentially forcing them into

16    bankruptcy?

17            MR. JONES:  Your Honor, I don't know.  I don't have

18    that information, but here's what I do know, your Honor:

19    $1.3 million was made on this tainted transaction.  Father

03:03  20    Lemelson made -- I know Doug's shaking his head, but give me a

21    second, Doug.  $1.3 million was made on this tainted

22    transaction.  Father Lemelson and Lemelson Capital Management

23    cheated.  As a result of that cheat, at the end of the day,

24    they got $1.3 million.  That's stipulated to.  That's the

25    profit on this transaction.

1      To say that you could have a $1.3 million profit but

2   only, let's say, a $100,000 penalty, or less than $80,000 as

3   defendants have argued for, no one is going to stop doing it.

4   That's worth it.  The idea that, you know, if you got caught

5   and went all way through trial and got found liable for

6   $1.3 million, but all you have to do at the end of the day is

7   risk you have to pay an $80,000 penalty?  It's not

8   proportional.

9      The securities law penalty scheme says essentially

03:04 10   there should be a proportional punishment; it should be a

11   proportional penalty.  If you can make $1.3 million by

12   cheating, you should have a fine that's commensurate with that,

13   and you should have it for both parties that engaged in that

14   cheat, in that fraud.  And that's why we've asked for

15   essentially half -- the numbers don't quite add -- but

16   essentially half for Father Lemelson and half for Lemelson

17   Capital Management, if you look at that and say, all right,

18   let's disgorge the profit you made but then also deter this

19   through a penalty.

03:05 20      This is not some case where just we're trying to make

21   everybody whole.  We're trying to punish here, your Honor.

22   There should be a substantial punishment for cheating on a

23   transaction where you make $1.3 million.  It should convince

24   people not to do this again.

25      THE COURT:  Okay, thank you.  I think we need to move

1    to Mr. Brooks.  Thank you.

2         MR. BROOKS:  Thank you, your Honor.  Your Honor,

3    throughout this case, starting at the motion to dismiss hearing

4    three years ago, you, your Honor, consistently questioned the

5    SEC on its scheme theory.  You questioned the need for it, and

6    I think without being able to articulate why it was proceeding

7    with its scheme theory in addition to the four statements, the

8    SEC would not budge.  And I never understood why until I saw

9    their present motion because the SEC realized that without a

03:06 10   scheme theory, they're not entitled to disgorgement because the

11   undisputed facts are:  Father Lemelson did not cover his short

12   position in connection with any of the statements.  He never

13   repeated any of the three statements at issue, and therefore

14   there's no evidence -- and in fact the evidence is to the

15   contrary -- he did not profit from the three statements at

16   issue; and without any profits from the statements, as a matter

17   of law, there cannot be any disgorgement.

18         And the other reason the SEC clearly believed it

19   needed a scheme theory is because without it, the request for

03:06 20   an injunction, which to their credit they made clear they

21   intend to use to bar Father Lemelson from being an investment

22   advisor for life, without a scheme theory, it doesn't make any

23   sense.  We're talking about three discrete statements made

24   nearly eight years ago that Father Lemelson never repeated in

25   any of his subsequent reports about Ligand, in his letters to

1   Congress, or any other statements he ever made about Ligand.

2          And this isn't just speculation.  We don't need to

3   speculate on the Commission's overreliance on its scheme theory

4   because the proof is in the pudding.  Within minutes of the

5   jury's verdict in this case, in which the jury found

6   Father Lemelson not liable for engaging in a scheme to defraud,

7   the SEC issued a press release claiming that the jury found

8   Father Lemelson had engaged in a scheme to defraud.  And

9   although the SEC grudgingly took that press release down, they

03:07 10   continue to maintain it was somehow accurate.  So the decision

11   on the specific remedies that the Commission is asking for

12   today really just boils down to whether we're going to ignore

13   the jury's verdict as to the scheme liability claim and whether

14   we're not.

15          In terms of the specific things that they are looking

16   for --

17          THE COURT:  You know, given the factors you're

18   supposed to consider for an injunction, it does seem like it

19   checks all the boxes for an injunction.  I may not go for a

03:07 20   full lifetime injunction, partly because there was a mixed

21   verdict here, but, I mean, it -- right?  It was intentional

22   misrepresentation.  He's never acknowledged, or at least so far

23   he hasn't, that he did anything wrong.  There is a risk of

24   recidivism.  I -- I -- because he's unabashed that he was going

25   to crash the stock.

1          MR. BROOKS:  Well, I don't think he was unabashed that

2    he was going to crash the stock.

3          THE COURT:  Didn't he brag about it?

4          MR. BROOKS:  Your Honor, he talked about that as a

5    result of -- since his reports came out, the price went down.

6    There was never any argument that -- he never said, "Oh, it's

7    because of these three statements."  Again, that would make

8    sense if we were talking about a scheme to defraud.  The jury

9    specifically found he did not engage in a scheme to defraud.

03:09 10   That needs to mean something.

11          And the First Circuit in *Sargent* talks about an

12   injunction can only issue upon proof of a reasonable likelihood

13   the defendant will engage in future securities laws violations.

14   Where is the proof of that?  It's been eight years, eight

15   years, and there's been no securities violations.

16          THE COURT:  Well, that does help mitigate against a

17   lifetime bar, but it's of some concern.  I saw him on the

18   stand.  I've seen his conduct over the course of this

19   litigation.  There's some concern that he doesn't get it.

03:09 20         MR. BROOKS:  Well, your Honor, I'll say this:  I mean,

21   again, we're talking about three discrete statements, and, you

22   know -- and if you balance all of the equities here -- so,

23   first of all, the egregiousness, okay, so that's one of the

24   factors to look at; and what the SEC is saying is, oh, because

25   it's a 10(b)(5) case, that puts it on the high end of

1   egregiousness.  That can't be the law because if it was, we

2   wouldn't need to look at the factors.  It would just be like,

3   oh, okay, so it was a 10(b)(5), so of course we're going to

4   issue an injunction.  That's not the law.  And if you look at

5   this case, in terms of 10(b)(5) cases, he was fully transparent

6   as to his identity, unlike all the other cases ever brought.

7   He disclosed his short position, unlike all the other cases

8   ever brought.  And, most importantly, he did not cover his

9   position when he made the three statements at issue.  And,

03:10  10   again, it's been eight years.

11           And if we look at the general equity concerns, another

12   factor for the Court, I mean, who's going to be harmed by his

13   injunction?  It's going to be his investors, his investors, all

14   of whom provided statements to your Honor.  These are very,

15   very sophisticated people.  He's not out there, you know, with

16   people who don't know what they're doing.  They understand.

17   They've been fully briefed.  He's got to be the most transparent

18   investment advisor in the history of the world.  He literally

19   tells his investors everything in realtime.  He told them all

03:11  20   about the SEC case.  They all had full knowledge of that when

21   they invested.  They all know about the jury verdict.  They all

22   want to continue investing with him.

23           And, again, the SEC took its shot and charged him

24   under the Advisors Act, which the SEC is now ignoring.  They

25   charged him with defrauding his investors, and the jury

1    rejected that claim, again, something else you won't see in

2    their papers or in their press release.

3         And, your Honor, you asked Mr. Jones the practical

4    impact of an injunction.  And, I mean, I'd say it's sort of a

5    crystal ball but it's not because I've done enough digging.  If

6    you issue an injunction, they will get a permanent bar, and he

7    will never be allowed to be an investment advisor again.

8    Frankly, that's almost certainly the case, even if the

9    administrative law judge rejected what the Commission is going

03:12 10    to ask for, which is not going to happen, but even if they

11    rejected it and said, "Okay, we'll just give him a five-year

12    bar," the Commission is never going to reinstate him.  So this

13    is a death penalty case on facts that are so unprecedented that

14    not a single case cited by the SEC even comes close to it.

15         THE COURT:  So you agree with Mr. Jones, but I'm

16    unlikely to give a lifetime bar, a lifetime injunction.  It was

17    a short period of time and there are three statements.  But the

18    one that really hit me was the Promacta comment.  There's no

19    way that that polished PR guy said what he said that he said.

03:12 20    And he sort of never acknowledged, "Well, gee, maybe I took it

21    down wrong," or, "Gee, maybe I made a mistake."  Nothing.  It

22    was he -- I mean, he basically, that was a pretty serious

23    statement to say the company's major product was going to go

24    away.  That's the one that really hit me because the one on

25    Vikings, I'm not sure that -- I mean, that wasn't one that

1    Ligand even came to the SEC with that comment, but the Promacta

2    one was big.

3            MR. BROOKS:  So, your Honor, and I understand the jury

4    found him liable for that --

5            THE COURT:  Yes.

6            MR. BROOKS:  -- but how does that translate into --

7    and, again, he never repeated a thing of that.  After that, he

8    wrote four reports on Ligand, wrote letters about Ligand.  He

9    never once repeated that.  So this is not a case -- the SEC is

03:13 10    citing all these cases --

11            THE COURT:  But he didn't retract it.  He didn't say,

12    "Whoops, it's possible I misheard him," or, "Maybe I was wrong

13    in how I understood how he phrased something," nothing.

14            MR. BROOKS:  But how does that -- and I understand,

15    the jury found him liable -- how does that equate to issuing an

16    injunction eight years later that he can't violate the

17    securities laws?

18            THE COURT:  Eight years later because it took so long

19    to litigate.  I mean, you know, like, it was COVID, et cetera.

03:14 20    I mean, that's not totally fair.

21            MR. BROOKS:  Well, but that is a factor to look at.

22    In fact, all of the factors are tied up, as the First Circuit

23    made clear, on a reasonable likelihood of repeated -- of

24    another violations of the securities laws.  And because he made

25    a two-second statement in the middle of a radio interview

1    where, again, he never repeated that statement, I don't see any

2    way that that can serve as the basis to find that he's

3    reasonably likely to again violate the securities laws?  That's

4    what it's saying.  I don't see that, and I think --

5           THE COURT:  All right, I think we've got to keep

6    going, but you basically agree with Mr. Jones that even if I

7    just gave, let's say, a five-year injunction, it doesn't really

8    matter?

9           MR. BROOKS:  If you gave an injunction for two

03:14 10   seconds, he will be barred.  As a matter of fact, the SEC will

11   turn that around and get a lifetime bar against him, and all of

12   his investors --

13          THE COURT:  I hadn't understood that.

14          MR. BROOKS:  And all of his investors who want to

15   invest with him, who are doing so with eyes wide open, the fact

16   that he hasn't, again, done anything in the last eight years,

17   none of that will be taken into account.  And, frankly, your

18   Honor, respectfully, we don't think that's a just result in a

19   case like this, which, again, is completely unprecedented.  The

03:15 20   SEC has never ever, ever brought a case that even remotely --

21   we went through all the factors ad nauseam, I won't repeat them

22   there, but, frankly, I think they all, all of those factors

23   that are present in every other market manipulation case weigh

24   in favor of not having an injunction here.

25          THE COURT:  Okay.  So as I was doing with Mr. Jones, I

1    need to move you along a little bit here.  So the penalties.

2    MR. BROOKS:  Yes, so one thing I would like to say is,

3    so on the double-dipping issue, you know, again, we feel that

4    they're double-dipping here, your Honor.  And I'd like to read

5    what the SEC said.  When the SEC was asking not to have to go

6    through the whole rigmarole at trial of kind of proving a

7    separate case against Lemelson Capital Management, at the final

8    pretrial conference the SEC said, "Father Lemelson's wife owns

9    Lemelson Capital Management, but he controls it.  He is the

03:16 10   sole employee.  He's the manager."  And now they're claiming

11   the exact opposite, and that's just not right.  That's not

12   fair.  They specifically made that presentation --

13   THE COURT:  Suppose I imposed a penalty, do you agree

14   that there's a question about whether I can do joint and

15   several?

16   MR. BROOKS:  Yeah, my understanding, your Honor, is

17   that's something of an open issue.  But, again, it's sort of

18   like they shouldn't be able to have their cake and eat it to.

19   They wanted to present --

03:16 20   THE COURT:  But what if Lemelson doesn't have it and

21   the LCM does?  Someone should pay a penalty.  Some thing should

22   pay a penalty here.  Something bad happened here.  So even

23   under your theory, there's a penalty.  So you're saying I can't

24   sort of have -- if I do it against Father Lemelson and he

25   doesn't have any money, then the LCM gets off scot-free if it's

1    got, you know, tons of assets?

2         MR. BROOKS:  Well, I'm not.  That's not my point, your

3    Honor.  My point is that the Commission specifically made a

4    presentation to you and made the whole point of, "Oh, it's

5    really the same, it's really the same," because they wanted to

6    save time at trial.  And that was allowed, and we had a

7    streamlined trial, and I think we're all grateful for that, but

8    they shouldn't be able to backtrack now.

9         But, in any event, I mean, to be honest, your Honor, I

03:17 10    don't know.  My understanding is on the joint and several that

11    it's a bit of an open issue.  I'm not a hundred percent sure.

12         THE COURT:  Okay.

13         MR. BROOKS:  What I can say --

14         THE COURT:  My dad always said, "When you don't know,

15    just say 'I don't know,'" because I hadn't even thought of

16    joint and several before, I mean, but I do get the issue, which

17    is, they are one and the same pretty much.  That's why we tried

18    it the way we tried it.  But I would hate to see that all the

19    assets were in one entity under one, and then it's, "Whoops,

03:18 20    I'm sorry.  You only imposed this against Father Lemelson."

21    There's a practical problem there.

22         So, anyway, I'll think about that.  Are there any

23    cases you want me to read?

24         MR. BROOKS:  The point in our papers certainly wasn't,

25    you know, aimed at that issue.  It was really aimed that it

1    felt like, you know, kind of double-dipping.

2         On the issue about the tier of the penalties, you

3    know, for the reasons we stated, Tier 3 penalties just aren't

4    appropriate here.  There's no evidence that -- again, and it's

5    clear you have to look at the violations.  So the jury found

6    violations of three discrete statements, and there's no

7    evidence that those three statements created risk of

8    substantial losses.  There just was no -- there was no evidence

9    of that.  And the cases, again, because there are no --

03:19 10      THE COURT:  Did you see the report that was submitted,

11   I think stapled to the reply brief, over the expert who

12   effectively said that when they looked at intraday trades, I

13   guess, that there was some decrease as a result of the

14   statements?  Maybe I got that wrong, but --

15        MR. BROOKS:  No, no, no, that's right, your Honor.  So

16   a rebuttal expert that they decided not to even call, she was

17   supposed to be their summary witness who was going to do

18   things.  And so they didn't have an affirmative expert, they

19   had a rebuttal expert, and then they decided not to call her as

03:19 20   a summary witness afterwards.  So I don't think it's really

21   proper to rely on what she's saying where there was, you know,

22   no evidence of that, no evidence of that at trial.  And even if

23   that's the case, even if that's the case, there would still --

24   you know, in terms of really it's such a -- they don't ever

25   sort of say, but what was that?  You know, they just want you

1    to look at the entire period.  They don't ever say, like, "Oh,

2    this was what happened with respect to these specific

3    statements."

4         Plus, even if you credit what she's saying, your

5    Honor, she does not tie the fall in the stock price to those

6    specific statements.  And, again, here's another difference

7    with this case.  Those statements, the statement as to Mr. Voss

8    was one of, I don't know, dozens, if not hundreds, of

9    statements he made about Ligand during that interview; and,

03:20 10   likewise, the statements about Viking were just a small part of

11   his report that day.  So their expert cannot and does not even

12   try to tie any decrease in the stock price -- again something

13   they didn't present at trial -- but she doesn't try to tie it

14   to those specific statements.

15        And, again, had the Commission prevailed on its scheme

16   theory, this would be a very different argument, but they

17   didn't.  And, again, the jury's verdict has to mean something.

18   The jury found that there wasn't a scheme, and their whole

19   argument makes no sense without that.

03:21 20        THE COURT:  Couldn't you argue that saying that "The

21   company's main product is going to go away, I heard it from

22   their key guy," whose name I forget -- I hope he's not

23   insulted -- anyway, "is going to go away," isn't that a

24   substantial risk of harm to the investors in Ligand?

25        MR. BROOKS:  You can look at it.  The stock went up

1    that day.  I mean, how many people were --

2           THE COURT:  I thought they looked at the -- that

3    Dr. Smith looked at it, and it went down after that statement.

4           MR. BROOKS:  It went down for a couple of minutes, and

5    then it went back up.

6           THE COURT:  Oh, I see.

7           MR. BROOKS:  That's why submitting that as proof that

8    this specific statement caused a temporary dip is ridiculous,

9    your Honor.  This is something, if they wanted to, they should

03:22 10    have put on at trial, and they didn't.  They chose not to.  As

11    we point out in our papers, they present this kind of evidence

12    all the time in market manipulation cases.

13           THE COURT:  Excuse me.  This is helpful.  So you're

14    saying that even though there was a brief dip after that

15    Benzinga interview, it went up the next day?

16           MR. BROOKS:  It went up that day, and he never covered

17    during it; he didn't take advantage of any brief fix.  And,

18    your Honor, we did in our papers and we showed at trial, this

19    stock goes like this every single day.  I mean, it drops.  It's

03:22 20    dropped over 50 percent since the SEC brought this case.  The

21    idea of trying to tie Father Lemelson's, anything he did, much

22    less the three specific statements --

23           THE COURT:  Where is that in the record that it's

24    dropped that much?

25           MR. BROOKS:  It's in -- we put it in -- I don't have

1  the exhibit number, but it's cited in and we talked about it in

2  these papers, your Honor, and we can certainly follow up with

3  the specific exhibit numbers.  And it was referenced in

4  the -- the exhibits were also referenced in the closing

5  argument.  But we can get you the exhibits, but it's in our

6  opposition in this case, your Honor, in connection with this

7  motion.

8         THE COURT:  All right, I'll just look it up again

9  because it's also relevant on the disgorgement point.

03:23 10         MR. BROOKS:  And do you want me to turn to the

11  disgorgement, your Honor?

12         THE COURT:  Yes, I do.

13         MR. BROOKS:  The reason we're not relying, as

14  Mr. Jones put it, we're not relying just on *Liu* is because this

15  case doesn't even come close.  There is not a single case that

16  holds what the SEC wants you to say, which is, there was no

17  profit here based on the violation.  Again, violation, three

18  discrete statements.  Whether or not, even if you credited

19  Dr. Smith's sort of, you know, report, which is just attached

03:23 20  as an exhibit to the reply, he did not cover his position

21  during this, so he didn't trade on those statements.

22         So what Dr. Smith says is, oh, any statement he made,

23  to have an effect, the effect you have to look at is within

24  fifteen minutes of his statement.  That's what Dr. Smith says.

25  And, again, we have a lot of problem with Dr. Smith's report,

1   but if they're going to rely on it, he never covered during

2   those, you know, quick drops, even if it could be attributed --

3   so you have to jump:  Could it be attributed to him and then

4   attributed to those specific statements?  But for this purpose,

5   let's assume, yeah, it can be attributed to those three

6   statements.  Even if it could, he never covered his position.

7   And Dr. Smith says, "Oh, don't worry about the fact

8   that the stock went up because everything is done within

9   fifteen minutes.  It's an efficient market."  So how did he

03:24 10   profit?  He didn't profit.  In fact, on July 3, the day of two

11   of the statements, he increased his short position, which is

12   the exact opposite you would do if you were running a scheme.

13   So there is no profit here, no matter what.  Even if

14   you credit everything Dr. Smith says, he did not profit on the

15   three statements at issue, and Dr. Smith never claimed he did.

16   Again, her whole report is based on --

17   THE COURT:  What would you say about the fact, though,

18   that Father Lemelson bragged that he caused the stock to drop?

19   MR. BROOKS:  So we have a much different view of that,

03:25 20   but let's just hypothetically --

21   THE COURT:  I forget what it was, but there were

22   constant quotes that he had, you know.

23   MR. BROOKS:  He talked about that -- what he said was

24   that his reports, his reports were working, he thought, in

25   terms of people reading them and deciding that, like him,

1    people thought Ligand was overvalued.  But let's say it could

2    be attributable to him, even though, by the way, Ligand's own

3    emails said they didn't think it was him, but even if it could

4    be, he didn't profit off of the three statements at issue.

5          The law is clear.  We've cited the cases.  It's based

6    on the violation, your Honor, and he wasn't found liable of a

7    scheme.  There's not a case.  The cases that the SEC cites,

8    they're totally inapposite.  There is no case saying that he

9    can be held -- that he has to disgorge things that weren't

03:26 10   directly attributable to the violations at issue.  There is

11   literally zero grounds.

12         And, again, your Honor, this is the exact reason why,

13   when you asked them, "Why are you proceeding on this scheme

14   theory?  I don't really understand it," they wouldn't get rid

15   of the scheme theory, and it's because they wanted disgorgement.

16   And now that they lost on the scheme theory, they still want

17   disgorgement, and it makes no sense because they have

18   presented, both at trial and now, they have presented no

19   evidence that Father Lemelson profited off of the three

03:26 20   statements at issue.  They have presented no evidence.  Their

21   argument is, "We don't have to tie it to that," and they can't

22   cite a single case because there isn't a single case that would

23   hold that.

24         The *Liu* case is directly to the contrary.  It says you

25   have to tie it to the profits made by the defendants, and

1    defendants here made absolutely zero profits as a result of the

2    three statements for which they were found liable.  And, again,

3    the cases, if you go back and read the cases that the SEC

4    cited, none of them, none of them support what they're saying.

5    In fact, some of them are directly to the contrary.

6              THE COURT:  Thank you.  We've hit 3:30.  Does your

7    client want to say something?

8              MR. JONES:  Your Honor, while Mr. Brooks is

9    communicating with his client, the Commission would appreciate

03:27 10    the chance to rebut some of those points.  I think we're

11    diametrically opposed on a lot of that stuff, and we would

12    appreciate a chance to rebut some of that.

13              THE COURT:  Well, I could do a five-minute rebuttal if

14    you want.  Did you hear back from Father Lemelson?  I just need

15    to do the timing on all this.

16              MR. BROOKS:  I could say a few words after Mr. Jones.

17    I'd like to make a brief statement, your Honor, yes.

18              THE COURT:  Whether you want to, or does Father Lemelson

19    want to say --

03:27 20              MR. BROOKS:  Father Lemelson would like to make

21    a brief statement.

22              THE COURT:  Fine, so five minutes for Mr. Jones and

23    then Father Lemelson.

24              MR. JONES:  All right, your Honor, I'll try to talk

25    fast on that in that case.  Mr. Brooks is in the wrong sort of

1    regime of how to think about this.  This is a case where a

2    securities transaction is tainted.  Where a securities action

3    is tainted, the measure of the profits from that transaction is

4    the measure of the disgorgement.  You see it in *Teo*, you see it

5    in *Whittemore*, you see it in *Chan*, you see it in *Ahmed*.  And

6    this is a common occurrence in the securities law.  In the

7    insider trading case, the insider trader isn't someone who

8    causes the price to go up or down, but they treat it in their

9    transaction and they may have to give up their profit.  And in

03:28 10    their offering fraud, it doesn't cause the price to go up or

11    down --

12          THE COURT:  My concern is that Ligand was having

13    trouble anyway.

14          MR. JONES:  Well, your Honor, Ligand --

15          THE COURT:  Can I just finish.  Ligand was -- while I

16    don't believe for a second that that man said Promacta is going

17    away, I do think that there were challenges to Ligand, and it

18    was -- I saw the stock swing on it, so it's hard to pin that

19    whole thing on him.

03:29 20          MR. JONES:  But, your Honor, that's not the measure of

21    disgorgement.  The measure of disgorgement is, what did he get

22    by cheating on the transaction?  It's not a measure of harm.

23    It's not a measure of, did he affect the price of the stock?

24    It's what did he get by cheating in the transaction?  It's a

25    tainted transaction.  When you cheat in making a transaction,

securities law is, you have to give up your profits.  That's

the disgorgement.  It's the measure of -- it's what's given up

because you're not supposed to cheat in the course of a

transaction.  It's not an investor harm.  In fact, *Liu* comes

along and the cases we present to you say disgorgement is not a

measure of investor harm in any way, and so the Commission does

not need to show that the price moved.

And Mr. Brooks is fond of saying, "Oh, look, it

dropped 50 percent, it dropped --"  Ligand is trading higher

today than it was trading in 2014.  You know, it does go up and

down.

THE COURT:  I remember the stock --

MR. JONES:  Sure, your Honor, the stock goes up and

down.  You know, it's a biopharmaceutical company whose -- but

the regime that the defendants are arguing for is one that

says, "Hey, if you commit your fraud on a day that has

confounding information that makes an event study hard, hey,

keep your profits."  That can't be the regime.  That's not

what's contemplated by the statutory scheme or any of the cases

interpreting it.  When you make a cheat --

THE COURT:  Yes, but what about you make a bad

statement; your expert says it drops 2 percent, okay, something

like that, some percent it drops immediately, but then it zooms

up again, and then he doesn't trade for six days, you would say

that's a tainted transaction?

1          MR. JONES:  Yes, your Honor.  It's like saying, "We

2    only cheated in the first quarter of the game, and we went on

3    to play regular quarters and we won."  You don't get to keep

4    the championship if you cheated in the first quarter.  It

5    doesn't matter that you may have continued to play the game.

6    If you cheat in a securities transaction, you're supposed to

7    give up the profit.  If you can keep the profit by continuing

8    to play, a lot of people are just going to continue to play so

9    they can keep their profits at the end of the day.  The measure

03:31 10   of the disgorgement is supposed to be the profit.  That's what

11   *Liu* says.  That's what *Kokesh* says.  It's supposed to be, what

12   is your ill-gotten gain?  When you cheat and make a fraudulent

13   statement, or in this case three fraudulent statements, in the

14   course of a short position, you have to give up the money in

15   the short position.  And it doesn't matter that you went on and

16   made other statements.  It doesn't matter that other things

17   affected the securities, it affected the price of Ligand.  What

18   matters is you cheated.  And, you know, Father Lemelson cheated

19   in the first quarter and went on to play three more quarters,

03:31 20   but that doesn't mean he gets to keep the money that he made.

21   That's not how disgorgement works, and to suggest otherwise is

22   to suggest a regime that essentially has all these negative

23   incentives in it to continue along and to cheat and the

24   whole -- that's not how it works.

25          Now, is there a risk of loss here?  Sure, there's a

risk of loss.  First of all, you got a letter today from Ligand

talking about all the losses that it suffered as a result of

Father Lemelson's behavior.  But even more importantly, it's

about the people in the market who, you know, the jury found

that these statements were material, that they went into a

reasonable investor's decision about the stock.  Every person

who sold when they shouldn't have, every person who didn't buy

when they could have, the stock was going to go up, those

people are harmed, and that's what the securities laws are

03:32 10   trying to show.

THE COURT:  Thank you.  At this point, does

Father Lemelson want to speak?

FATHER LEMELSON:  Yes, your Honor, I'll speak.

THE COURT:  Do you want to come on the Zoom?  I mean,

I don't see you.

FATHER LEMELSON:  I'm here at the top left corner.

THE COURT:  Are you?  I'm not seeing you.

Now I'm seeing you.  All right, go ahead.

FATHER LEMELSON:  I spoke the truth about Ligand

03:33 20   Pharmaceuticals and Ligand Therapeutics.  I made 950

allegations of business accounting and securities fraud about

these companies, 947 unchallenged.  Two were about a company

that wasn't even publicly traded.  I wrote down the pure

inaccuracy that Bruce Voss told me on the phone.  Only he and I

were on that call, nobody else.  His business partner, Michael

1    Lucarelli, went to jail for exactly the same type of lying that

2    Mr. Voss engaged in.  John Higginson's partner, Mark Scully, is

3    in jail as we speak.

4          THE COURT:  I actually don't -- I don't remember

5    much -- why is this relevant?

6          FATHER LEMELSON:  Because this is a bunch of criminals

7    who prey on the sick and the weak in society to turn Promacta

8    into a billion-dollar drug.  John Higginson said himself,

9    shortly after my comments, quote, "Promacta is going to zero."

03:33 10          I never lied.  I had no reason to lie, and I would

11   never lie.

12          Ligand Pharmaceuticals has paid $12.2 million for

13   securities fraud.  They've been delisted from the NASDAQ.

14   They've had eleven class action lawsuits from investors.

15   They've restated their financial statements fourteen times.

16   Their auditor has the largest fine in the history of the PCAOB

17   (Inaudible) faulty audit statements.

18          I've never issued a financial statement myself.  I've

19   never lost an investor or had an investor who thought I

03:34 20   committed fraud.  I've consistently outperformed the indexes.

21   Why would I need to commit fraud?  Ligand investors collectively

22   lost over $5 billion in (Inaudible) capital since I wrote those

23   reports, the other short sellers who issued reports making the

24   same allegations of business accounting and securities fraud

25   against the companies.  As I speak, Viking is down 82 percent.

 1    Ultimately both companies will collapse under the weight of

 2    their own fraud, regardless of the outcome today.

 3            I want the Court to know, and whoever else is on this

 4    call, I always spoke the truth.  I revealed the fraud that I

 5    saw.  The SEC through Virginia (Indiscernible) leaked this

 6    so-called investigation to a contributor for Bloomberg, Brad

 7    Bondi, Ligand's counsel.  We have that email.  They wrote a hit

 8    piece on me.  They put crucifixes at the top of that article.

 9    That is extraordinary religious bigotry.

03:35 10            Literally everyone involved in this case is a criminal

11    on the other side, and I think that time will reveal truth and

12    justice in this case, and I have no doubt about anything I did.

13            The same people I go to the hospital to serve and

14    cater to, the sick, the dying and most vulnerable of society,

15    Ligand through its project gold mine, and together with their

16    Ligand team, decided they could make a billion-dollar drug by

17    misrepresentations, by lying; and they co-opted the U.S.

18    government to carry out that dirty business.  I'll never regret

19    the things I did.

03:35 20            THE COURT:  Okay, thank you.  So I will take this

21    under advisement and think about everything that you've said to

22    me.  I think the only thing I'm waiting for is this joint and

23    several.  And I don't want a brief, essentially a letter apiece

24    on any cases I should look at because the biggest concern I

25    have is in imposing a penalty.  I'm not going to double -- you

said double hit; I said piling on.  I'm unlikely to double the

penalty, but I do want to make sure that whatever I do should

be borne jointly.  I mean, all I can think of is the word

"joint and several."  That's what comes to mind because they're

the same actor essentially.  So, anyway, if you can help me on

that legal issue, it would be great.

Thank you very much, and other than that, I don't want

any more briefing unless there's a particular case that comes

down, you know, with supplemental authority or that sort of

thing.

All right, so thank you very much.

MR. BROOKS:  Thank you, your Honor.

MR. JONES:  Thank you, your Honor.

(Adjourned, 3:37 p.m.)

1                    C E R T I F I C A T E

2


3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6


7            I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 46 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 18-11926-PBS,

11  Securities and Exchange Commission v. Gregory Lemelson, et al,

12  and thereafter by me reduced to typewriting and is a true and

13  accurate record of the proceedings.

14           Dated this 11th day of April, 2022.

15

16

17

18

19           /s/ Lee A. Marzilli
             _____
20           LEE A. MARZILLI, CRR
             OFFICIAL COURT REPORTER
21

22

23

24

25