## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| GREGORY LEMELSON and LEMELSON CAPITAL ) | Civil Action No. 1:18-cv-11926-PBS |
| MANAGEMENT, LLC, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| THE AMVONA FUND, LP, ) | |
| ) | |
| Relief Defendant ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR NEW TRIAL OR TO ALTER OR AMEND THE JUDGMENT

Pursuant to Fed. R. Civ. P. 59, Defendants Father Emmanuel Lemelson and Lemelson Capital Management (Fr. Lemelson) respectfully submit this memorandum in support of their motion for a new trial, or alternatively, to alter or amend the judgment.

The week-long trial was principally about the Commission's scheme claim and its claim that Fr. Lemelson's *five* separate statements about Ligand's insolvency were fraudulent, all of which the jury rejected.  The trial did *not* principally focus on the Benzinga statement, and the two Viking statements were a footnote; the Commission introduced scarcely any evidence that the former was material, and no evidence of materiality concerning the latter.  This is consistent with the Commission's and Ligand's approach before trial, which again focused on supposed mischaracterizations which either never were put before the jury, or that the jury rejected.  It seems likely that having found Fr. Lemelson not liable on the Commission's claims that were the focus of trial, the jury gave the Commission a win on the more trivial claims as a compromise or a consolation prize.  Yet the Commission now is attempting to use the jury's *limited* verdict to seek an extraordinary lifetime bar preventing Fr. Lemelson from any investment-related activity.

Fr. Lemelson should not be barred for life from the securities industry based on a trial that did not focus on the supposed grounds for his exclusion.  That particularly is the case given the weight of the evidence at trial, which did *not* support the Commission's claims with respect to the three statements for which he was found liable, as well as other evidentiary issues that occurred during trial.  In short, the Court should order a new trial limited to the three statements for any of several independently sufficient reasons.

*First*, the jury's verdict as to the three statements was against the weight of the evidence in three respects.  The jury's finding that the three statements were material was based on extraordinarily thin evidence, which was overwhelmed by the Commission's presentation of

1

evidence concerning its debunked scheme liability claim and the five insolvency statements for which Fr. Lemelson was not found liable, and drops in the price of Ligand stock that were never tied to the three statements.  In addition, the jury's finding that the Viking statements were not protected opinions was also against the great weight of the evidence, given that Fr. Lemelson's written statements directed readers to the source material he was characterizing, and his statements concerning Viking did not purport to comprise any non-public information.  Finally, the jury's finding as false or misleading Fr. Lemelson's statement that Viking would not be conducting preclinical studies or trials—which its CEO admitted during his testimony—was also against the weight of the evidence.

*Second*, certain evidentiary rulings were erroneous and prejudicial.  The Court should not have excluded evidence of the Commission's bias, which then allowed the Commission in its closing to bolster its own case (including with respect to materiality) by vouching for its supposed lack of bias and alleged investigatory prowess.  The Court also should not have allowed Robert Fields, the Ligand investor, to testify (including with respect to materiality) given the Commission's failure to timely disclose him as a witness; at minimum, his testimony should have been limited consistent with the Court's pre-trial ruling.  In addition, the Court should not have excluded as hearsay a letter written on behalf of Ligand by former Congressman Duncan Hunter, urging the Commission to charge Fr. Lemelson, which would have demonstrated that the Commission was not pursuing Fr. Lemelson in the unbiased manner it claimed before the jury.

*Third*, the jury should have been instructed that the Commission needed to prove the statements at issue caused the stock price of Ligand to decrease in order to prove materiality.  If

it had been, the jury could not have found Fr. Lemelson liable for the three challenged statements because the Commission has no evidence that the three statements moved the stock price.

Alternatively, this Court should amend or alter the judgment to eliminate the injunction, which is unjustified and could result in the wildly excessive penalty of Fr. Lemelson being barred from the securities industry for life.

## LEGAL STANDARD

"A district court's power to grant a motion for a new trial is much broader than its power to grant a JMOL." *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009). "[U]nlike review of JMOL, the new trial motion standard of review is concerned with whether the verdict is against the weight of the evidence, an assessment made through the lens of abuse-of-discretion review and not requiring that we take the evidence in favor of the verdict." *Id.* at 438. A "motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncam*, 311 U.S. 243, 251 (1940).

## ARGUMENT

I.   **The Jury's Verdict was Against the Weight of the Evidence**

A.   **The Jury's Finding that the Three Statements Were Material was Against the Clear Weight of the Evidence**

1.    The Court should order a new trial because the great weight of the evidence at trial did not support the Commission's claim that the three statements for which the jury found Fr. Lemelson liable were material. At trial, the Commission largely focused on Fr. Lemelson's statements concerning Ligand's insolvency and broad-brush assertions about Ligand's stock

3

price movement over a period of months, when other factors were buffeting its price—including extensive analysis by Fr. Lemelson that the Commission never claimed was fraudulent.  The Commission put in scarcely any evidence that the three statements in particular were material—indeed, none with respect to the Viking statements—and other evidence at trial weighed heavily against any finding of materiality.  Even if a jury *might* have found the statements to be material, so as to satisfy the JMOL standard (which Fr. Lemelson does not believe to be the case), the great weight of the evidence is to the contrary, and so a new trial, focused on these three statements without the risk of contamination with evidence concerning other conduct for which the jury found Fr. Lemelson not liable, should be held.

To start, Ligand did not mention the Benzinga statement or either of the Viking statements in its initial presentation to the Commission, which was drafted by Ligand and its lawyers to persuade the Commission to bring an enforcement action against Fr. Lemelson.  Affidavit of Brian J. Sullivan in Support of Defendants' Motion for New Trial or to Alter or Amend the Judgment ("Sullivan Aff.") Exhibit ("Ex.") 4.  This omission weighs heavily against a finding of materiality, because "a major factor in determining whether information was material is the importance attached to it by those who knew about it."  *See SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997).  In addition, the Commission presented no evidence that any investor sold Ligand stock as a result of these three statements, another major factor in determining materiality.  *See, e.g., SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 851 (2d Cir. 1968) (noting that a "major factor in determining whether [discovery of mineral ore] was a material fact" was "the importance attached to the drilling results by those who knew about it").

With regard to the Viking statements specifically, when Ligand and its counsel made their *second* presentation to the Commission, nine months after the first had been rejected, not

only did they again fail to mention the Viking statements, but they actually *excluded* the time period of those statements from their own identification of the window in which Fr. Lemelson's statements supposedly caused Ligand's stock price to decrease.  Sullivan Aff. Ex. 5 at 55. Further, Viking's CEO testified that nobody raised any concerns to him about these statements. Sullivan Aff. Ex. 3 at 202:12-15.  And the Commission's sole investor witness notably *did not* testify that the two Viking statements were material to him.  *See generally* Sullivan Aff. Ex. 8 at 57-78.  Thus, the weight of the evidence showed that the three statements were not material.

2.      On the two days the statements were made, Ligand's stock price closed *higher* than the close of the previous trading day.  Sullivan Aff. Ex. 6 at 4.  The materiality of a statement can be determined objectively by looking *post hoc* at the stock price's movement.  *See* ECF No. 240 at 14-16.  Even if (as the Court has ruled) stock price movement is not necessarily dispositive, it is not disputed that stock price movement—or lack thereof—is at least a major factor in determining materiality.  *In re Credit Suisse-AOL Securities Litig.*, 465 F. Supp. 2d 34, 52-53 (1st Cir. 2006) (noting Supreme Court acknowledged that empirical studies have proven the commonsense presumption that material misrepresentations are reflected in stock price) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)).  Indeed, this Court cited the lack of stock price movement as *determinative* in dismissing a securities law claim in an unrelated case. *See Emerson v. Genocea Biosciences, Inc*., 353 F. Supp. 3d 28, 41 (D. Mass. 2018) (dismissing securities fraud case for lack of materiality because the "release of the negative twelve month viral shedding results without consequence [i.e., no stock price drop] is *fatal* to Plaintiff's allegations") (emphasis added).  *See also In re Biogen Sec. Litig.*, 179 F.R.D. 25, 35 (D. Mass. 1997) (noting defendants can rebut presumption of materiality if they can show "'the market price was not affected by their misrepresentations'").

Tellingly, the Commission did not present expert testimony about stock price movement, although it typically does so in alleged market-manipulation cases like the present.[1]  Instead, the only testimony the Commission presented concerning Ligand's stock price movement consisted of vague commentary from Ligand witnesses who noted that the company's stock price went down *generally* during the *extended* period of time that Fr. Lemelson issued his reports.[2]  The Commission made no effort whatsoever to tie any movements over a period of months to the three challenged statements, despite eliciting testimony like the above concerning stock price movement generally, and arguing to the jury during closing that Fr. Lemelson made $1.3 million in profit.  Sullivan Aff. Ex. 12 at 50:16-51:10, 79:3-7, 82:4-83:11.  This matters, because during the broad period of time on which the Commission focused, not only did Fr. Lemelson make hundreds of additional statements critical of Ligand that the Commission never claimed were fraudulent, but other factors too (*e.g.*, the Janet Yellen statement, and the Empire Capital short reports) weighed on the price of Ligand stock.

3.      The scant evidence of materiality that the Commission did present fell far short of offsetting these major factors weighing against materiality.  With regard to the Benzinga statement, there was no evidence how many people listened to that interview (or normally listen

---

[1] *SEC v. Aly*, 2018 WL 1581986, at *15-16 (S.D.N.Y March 27, 2018) (SEC permitted to present evidence of expert's event study to prove materiality); *SEC v. Mangan*, 598 F. Supp. 2d 731, 735 (W.D.N.C. 2008) (submitting expert event window analysis that concluded movement in stock price showed materiality); *SEC v. Goldstone*, 2016 WL 3135651, at *46 (D.N.M. May 10, 2016) (SEC successfully argued for its expert's event study to be admitted to prove materiality); *SEC v. Ustian,* 2020 WL 416289, at *10 (N.D. Ill. Jan. 26, 2020) (SEC successfully argued for the admission of its expert's event study to prove materiality); *SEC v. Leslie*, 2010 WL 2991038, at *11-14 (N.D. Cal. July 29, 2010) (addressing SEC's argument in favor of admitting its expert's event study to prove materiality).

[2] *E.g.*, Sullivan Aff. Ex. 3 at 88:10-13 (On the second day of trial, Foehr testified: "Q: And the stock price went down in the summer 2014 during the time that the defendant was publishing his reports, right?  A: It's a matter of public record, but yes, that's my recollection"); Day 4 Trial Tr. (Rough) at 79:23-80:8 (Higgins testified: "Q: In 2014, Mr. Higgins, please describe overall what your understanding of the effect of Father Lemelson's reports were on Ligand.  A: Very damaging.  You know, a business that was performing well financially, qualitatively, was getting very good reports from patients and our partners in terms of our medical research progress was being devastated in perception and in value by these attack reports.  So distracting and consuming a lot of our time and energy, but it was having a real significant impact on our valuation and stock price").

to such webcasts), let alone how many Ligand investors listened to it.  The statement, which lasted little more than a second, was made in passing in response to a question in the middle of a 20-plus-minute interview about a variety of subjects.  *See* Sullivan Aff. Ex. 9.  Only two trial exhibits reflected a direct complaint about the Benzinga statement.  Sullivan Aff. Ex. 10; Sullivan Aff. Ex. 11.  The Commission did not present testimony from a single investor who claimed to have sold Ligand stock based on that statement.  The only investor that the Commission called to testify, Mr. Fields, actually testified that his company *bought more* Ligand stock shortly after the Benzinga interview.  Sullivan Aff. Ex. 8 at 75.  This extremely limited evidence does not come close to outweighing the objective proof of *immateriality*; *e.g.,* the stock price increase, and Ligand's failure to identify this statement in its initial presentation.  Sullivan Aff. Ex. 6 at 4; Sullivan Aff. Ex. 4.

There was even less evidence of materiality concerning the Viking statements.  There was no evidence that any investor sold Ligand shares as a result of the statements or that any investors even raised concerns about them.  This is consistent with the testimony of Viking's CEO that no one raised any concerns about the statements to him.  Sullivan Aff. Ex. 3 at 202:12-15, 203:1-4, 201:8-15, 201:25-202:4.  Mr. Fields never mentioned the Viking statements.  His only testimony about Viking related to his alleged concern that Fr. Lemelson referred to it as a "shell company," (Sullivan Aff. Ex. 8 at 64-65) which was not a challenged statement, and which was only arguably relevant to the Commission's rejected scheme liability theory.

Further, Fr. Lemelson disclosed that he based the Viking statements on its publicly-filed S-1.  Sullivan Aff. Ex. 1.  Failing to include information available in public filings does not alter the total mix of information available to investors; *i.e.* it is immaterial as a matter of law.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (explaining that "total mix"

includes information readily available in public domain or facts known or reasonably available to shareholders); *Whitehead v. Inotek Pharmaceuticals Corp.*, 2018 WL 4732774, at *6 (D. Mass. June 27, 2018) (alleged omissions of negative results in statements about progress of clinical studies "are not 'material' as required by Section 10(b) because the statistically significant results of the Phase II trials were disclosed in the publicly available SEC filings"); *In re Seagate Tech. II Sec. Litig.*, 1989 WL 222969, at *3 (N.D. Cal. May 3, 1989) ("However, at a threshold level, if the material containing the alleged omissions, actually discloses the facts plaintiffs claim are absent, there is obviously no omission.  In a similar vein, if the information to be disclosed is already known, even if through another source, it cannot be considered material") (citation omitted).

In sum, there was essentially no evidence that *these three statements in particular* were material, and considerable evidence they were not.  Because the great weight of the evidence did not support a finding of materiality, and the jury may have been led astray by extraneous evidence of stock price movements unrelated to these three statements, Father Lemelson should be granted a new trial, at which a jury is able to cleanly consider the materiality, or lack thereof, of the three particular statements.  *See Kearns*, 863 F.2d at 181; *Jennings*, 587 F.3d at 442-43.

### B.    The Jury's Finding that the Viking Statements Were Not Protected Under the First Amendment was Against the Clear Weight of the Evidence

Well-settled First Circuit case law demonstrates that the First Amendment bars any claim arising from the Viking statements, because Fr. Lemelson provided the factual bases underlying them and, most critically, did not lead readers of the reports to believe that he had information about Ligand/Viking that was not available to others.  *See, e.g., Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730 (1st Cir. 1992).  "A statement, even if 'couch[ed] . . . as an opinion,' will give rise to liability if it 'implies the existence of underlying [false and]

defamatory facts' as its basis; *conversely, a statement is 'immunize[d]' so long as the speaker discloses all of the facts undergirding it and none of them are both false and defamatory*." *McKee v. Cosby*, 874 F.3d at 61 (quoting *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015)) (alterations and omissions in original) (emphasis added).

Fr. Lemelson's reports were also full of hyperbole and colorful language, telltale signs of the type of writing that is immunized by the First Amendment. *See, e.g.,* July 3, 2014 Report, ECF No. 127-15 at 9 ("The casual observer might even mistake what Ligand leadership has coined a 'creative transaction' as a common game of three-card Monte, played on the street corner—shills included"). *See Riley*, 292 F.3d at 297 ("The First Amendment protects the rhetorical hyperbole and imaginative expression that enlivens writers' prose.") (internal quotations omitted). Moreover, Fr. Lemelson repeatedly quoted Ligand and others who disagreed with his views and expressly sourced the bases for his positions. *See, e.g.,* Sullivan Aff. Ex. 1 at 7. "Of greatest importance, however, is the breadth of Kelly's articles, which not only discussed all the facts underlying his views but also gave information form which readers might draw contrary conclusions." *Phantom Touring*, 953 F.2d at 730.

### C.    The Jury's Finding that the Statement Viking Did Not Intend to Conduct Preclinical Studies or Trials was False or Misleading was Against the Clear Weight of the Evidence

The great weight of the evidence also did not support the Commission's theory that the preclinical trial statement was false or misleading. The trial testimony of Viking's CEO established that Fr. Lemelson's statement that "Viking does not intend to conduct any preclinical studies or trials …" (Sullivan Aff. Ex. 1 at 7) was objectively true. *See* ECF No. 240 at 3-5. The only way to interpret this statement as false would be to claim, as the Commission has, that Fr. Lemelson's failure to specifically mention that third parties would be conducting pre-clinical studies or trials was a material omission. This contention fails because the allegedly omitted

9

information *was* included in the public disclosures that Fr. Lemelson specifically cited in his analysis.  As set forth above, this renders the alleged omitted information immaterial as a matter of law.  *See, e.g., TSC Indus., Inc.,* 426 U.S at 449; *Whitehead*, 2018 WL 4732774, at *6; *In re Seagate Tech. II Sec. Litig.*, 1989 WL 222969, at *3.

## II.     Certain Errors in Evidentiary Rulings Require a New Trial

### A.     The Testimony of Mr. Fields Should Not Have Been Allowed

A new trial is *required* if errors in evidentiary rulings "had a substantial and injurious effect or influence upon the jury's verdict."  *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 118 (1st Cir. 2003).  Mr. Fields, the only Ligand investor to testify at trial, should not have been permitted to testify at all, given the Commission's failure to identify him as a witness in a timely fashion. At minimum, his testimony should have been limited consistent with the Court's pretrial ruling that he could only testify related to topics in which his name arose during others' depositions.

### 1.     Mr. Fields Should Not Have Been Permitted to Testify

Federal Rule of Civil Procedure 26 provides that a "party must ... provide to the other parties ... the name … of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(i).  A party must supplement any Rule 26(a) disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).

Notwithstanding these Rules, the Commission did not disclose Mr. Fields in any of its *three* separate initial disclosures.  Sullivan Aff. Exs. 14, 16 & 23.  The Commission likewise

failed to identify Mr. Fields in any of its discovery responses, including in response to an interrogatory that specifically asked the Commission to "[i]dentify all fact witnesses You intend to call as witnesses at trial in the Action and provide a summary of the anticipated testimony of each such fact witness." Sullivan Aff. Ex. 24. Instead, the Commission *objected* to that Interrogatory, asserting, *inter alia*, it was "seeking information that is redundant in light of the Initial Disclosures already made." *Id.*

Further, in Fr. Lemelson's summary judgment papers, filed nearly a year before trial, Fr. Lemelson explained that the Commission's reliance on certain deposition testimony of Ligand employees was inadmissible hearsay "about what other investors [said to the Ligand employees], many of whom are unidentified and **not listed as potential witnesses for the Commission**." ECF No. 141 at ¶ 146 (emphasis added). Despite this *direct* objection to the lack of disclosure, the Commission unjustifiably waited nearly a year before identifying Mr. Fields as a witness— well *after* the close of discovery—knowing that such late disclosure would preclude Fr. Lemelson from seeking relevant discovery about him. This should have resulted in exclusion of Mr. Fields' testimony. *See Harriman v. Hancock County*, 627 F.3d 22, 30-31 (1st Cir. 2010) (affirming exclusion of witness affidavits where party had no reason for delay in identifying witnesses after discovery had closed and after summary judgment motion filed, and commenting that such prejudice was more significant "if trial were looming"); *Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49, 59-60 (1st Cir. 2001) (affirming trial court's disregard of expert witness affidavit submitted after the close of discovery and fewer than three weeks before the scheduled final pretrial conference and describing it as "nothing short of a sneak attack").

In opposition to Fr. Lemelson's motion *in limine* seeking to preclude Mr. Fields' testimony, the Commission argued, and the Court agreed, that Fr. Lemelson was on notice of Mr.

Fields' status as a witness because his name appeared on documents produced in discovery.  ECF No. 185 at 2-3.  However, only 18 of the more than 100,000 documents, which total more than *1.2 million* pages of discovery, referenced Mr. Fields.  Sullivan Aff. ¶ 26.  This statistically insignificant number of documents was wholly inadequate to provide the requisite fair notice of a potential witness—especially given the Commission's wholesale violations of the Federal Rules of Civil Procedure, discussed above.  *See Osburn v. Hagel*, 2014 WL 4635447, at *3 (M.D. Ala. Sept. 15, 2014) (rejecting argument that party was on notice of potential witness from production of emails involving that witness where he was not listed in party's initial disclosures).  Indeed, the Commission's massive document dump here contained references to *hundreds* of individuals; nothing particular called out Mr. Fields as a potential witness.  *See Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings*, 2010 WL 11646584, at *2 (D. Minn. Aug. 16, 2010) (excluding witness testimony because "[w]hile Defendant produced some documents and emails that included or mentioned [the witness], hundreds of individuals are named or referenced in the voluminous discovery produced by Defendant in this case").

Given the central importance of Mr. Fields' testimony as the *only* Ligand investor from whom the jury heard, as evidenced by the Commission holding him out as the example of a reasonable Ligand investor in its closing argument (Sullivan Aff. Ex. 12 at 71:10-72:6), and his specific testimony that the Benzinga statement was material (again, he did not say the Viking statements were), the Court should grant a new trial at which Mr. Fields is not permitted to testify.

### 2. Mr. Fields was Improperly Permitted to Testify Beyond the Parameters of the Court's Pre-Trial Ruling

While permitting Mr. Fields to testify over Fr. Lemelson's objection, the Court ruled that his testimony would be limited to what was said about him during depositions. ECF No. 210; Sullivan Aff. Ex. 2 at 33:3-34:9.

The deposition testimony about Mr. Fields consisted only of the following:

- Matthew Foehr, Ligand's CFO, mentioned that Mr. Fields worked at Cardinal Capital. Mr. Foehr testified that he knew that Cardinal Capital was a Ligand investor, and that it made a submission to the Commission regarding Fr. Lemelson's reports, which Mr. Foehr did not see. Mr. Foehr also testified that Cardinal Capital (not Mr. Fields individually) raised questions about Fr. Lemelson's commentary on Viking, but those questions were not related to the two Viking statements charged by the Commission. Sullivan Aff. Ex. 13 at 90:2-18, 92:1-12, 284:5-286:17.

- Todd Pettingill, a Ligand employee, had no specific recollection of discussing Fr. Lemelson with Mr. Fields, and, if he did, any such conversation took place after the relevant time period. Sullivan Aff. Ex. 15 at 122:24-123:12.

Notably, these *extremely limited* references to Mr. Fields did not relate to any of the three statements for which Fr. Lemelson was found liable, and contain no mention of Mr. Fields' view of the Benzinga statement's materiality.

Despite the Court's ruling limiting Mr. Fields' testimony, he was allowed, over objection, to testify well beyond this scope, and in doing so, provided impermissible support to the Commission's otherwise failed materiality case. Among other things, Mr. Fields testified about the following, none of which were referenced in the depositions: (i) his understanding of bankruptcy and insolvency, (ii) the size of his company's investment in Ligand, (iii) his awareness of Fr. Lemelson's reports and interviews, (iv) why certain statements, including the Benzinga statement, were important to him, (v) his understanding of what a shell company was, (vi) his concern that Fr. Lemelson referred to Viking as a shell company, (vii) his views on a Ligand bond offering that Fr. Lemelson had critiqued, (viii) a half dozen conversations he

allegedly had with Ligand about Fr. Lemelson's reports, (ix) his recollection of Ligand's stock performance in 2014, and (x) whether there was any "bad news" about Ligand during the period of the alleged "scheme" other than Fr. Lemelson's reports.  Sullivan Aff. Ex. 8 at 58-69.  Fr. Lemelson's counsel had no prior notice that Mr. Fields would testify about any of these topics, negatively impacting counsel's ability to prepare for cross examination.

Mr. Fields' testimony was undoubtedly crucial to the Commission's case.  Again, he was the *only* Ligand investor witness to testify, and the Commission emphasized his testimony in its closing, urging the jury to adopt it as the belief of a reasonable investor concerning materiality as to the Benzinga statement.  Sullivan Aff. Ex. 12 at 71:10-72:6.  Being unfairly surprised and therefore deprived of the opportunity to prepare for a thorough cross-examination of Mr. Fields was extremely prejudicial to Fr. Lemelson's defense and had a substantial and injurious influence upon the jury's verdict.  In short, without Mr. Fields' impermissible testimony, the Commission would not have been able to convince a jury that the Benzinga statement was material.  For this reason too, this Court should grant Fr. Lemelson's motion for a new trial.

### B.   Evidence of the Commission's Bias was Improperly Excluded, Especially Where the Commission Vouched for its Own Independent Investigation

The Court ruled that Fr. Lemelson could not introduce evidence of the Commission's bias against him.  Sullivan Aff. Ex. 2 at 17:21-19:10.  The Court's ruling excluding evidence of the Commission's bias was improper because bias is always relevant.[3]

Further, the Commission made the bias issue particularly relevant in this case when it improperly touted *its* role as a purported independent investigatory body in order to counter

---

[3] *See DiBenedetto v. Hall*, 272 F.3d 1, 10 (1st Cir. 2001) ("Bias is always relevant as discrediting the witness[es] and affecting the weight of [their] testimony").

evidence that Ligand and Viking did not believe the three statements at issue were material.[4]  *See United States v. Robinson*, 473, F.3d 387, 396 (1st Cir. 2007) ("Improper vouching occurs when the government . . . implies 'that the jury should credit the government's evidence simply because the government can be trusted.'" (citing *United States v. Perez-Ruiz*, 33 F.3d 1, 9 (1st Cir. 2003)); *United States v. Goff*, 847 F.2d 149, 163 (5th Cir. 1988) ("We have previously held that it is particularly improper, indeed, pernicious, for a prosecutor to seek to invoke his personal status as the government's attorney or the sanction of the government itself as a basis for convicting a criminal defendant."); *United States v. Williams*, 97 F.3d 240, 245 (8th Cir. 1996). ("An argument will be deemed improper vouching when it 'puts the prosecutor's own credibility before the jury'") (citation omitted).  The Commission's argument bolstering its own materiality case (notably, the *last word* in front of the jury) would have been far less impactful if the jury had been allowed to hear and see evidence of the Commission's bias, which could have included, *inter alia*:

- the Commission knowingly including false allegations in the publicly-filed Amended Complaint;

- the Commission falsely alleging in its *initial* Complaint that Fr. Lemelson miscalculated Ligand's debt-to-tangible-equity ratio, when his calculation was correct;

- the Commission's role—even if indirect—in having its confidential, non-public investigation into Fr. Lemelson leaked to the media; and

---

[4] *See* Sullivan Aff. Ex. 12 at 80:3-13 ("[I]f all this leaning on the SEC is so case how come the SEC's case as the defendant said over and over how come the SEC's case has statements that aren't in those PowerPoints? Well, it's because when you go to the SEC, the SEC does an investigation with those investigative powers with those subpoenas and comes up with its own reasons, own evidence, own theory about why the law was violated and has to package it into a case that's digestible to a jury that's not going to take four months and bring it to you and say we think the defendant violated the law. Here's our evidence. That's why you go to the SEC.").

- the Commission's inappropriate focus on Fr. Lemelson's religious affiliation and status as a Greek Orthodox Priest during both the investigation and litigation phases of this case.

*See* ECF No. 134 at 3, 9-10, 11-12.  It was fundamentally unfair that Fr. Lemelson was precluded from presenting evidence of the Commission's bias, but the Commission was allowed to argue and vouch for its supposed lack of bias to prove materiality.

### C.    The Duncan Hunter Letter was Improperly Excluded

This Court did not allow Father Lemelson to admit a letter from then-Congressman Duncan Hunter to the Commission, in which, on the very same day that Ligand made its second presentation to the Commission, the Congressman urged the Commission to charge Fr. Lemelson.  Sullivan Aff. Ex. 2 at 79:7-17.  The Court's ruling that the letter constituted hearsay was erroneous as a matter of law.  Fr. Lemelson was clearly not offering the letter for the truth of the matter asserted, as the letter alleged that Fr. Lemelson had violated the securities laws.  *See* Sullivan Aff. Ex. 17.  The letter instead was offered with respect to the mindset of Ligand and the Commission, as it showed the lengths to which the company was going, in their own words, to "*silence*" Fr. Lemelson, and the significant political pressure on the Commission to charge Fr. Lemelson after initially declining to do so.  Sullivan Aff. Ex. 7 at 131:15-132:8.  While the Court permitted Fr. Lemelson's counsel to ask limited questions about the Hunter letter, the effectiveness of the examination was severely diminished as the witness testified he did not remember if it was sent the same day as Ligand's second presentation to the Commission (it was).  Sullivan Aff. Ex. 7 at 131:15-132:8.  Rather than being able to use documents to show Ligand's multi-pronged effort to pressure the Commission, the jury heard only ambiguous testimony about a letter it did not get to see.  This unfair result had a substantial influence on the jury's verdict, again in light of the Commission's emphasis on its own supposed neutrality.

16

* * *

Finally, even if the Court finds that the individual evidentiary ruling did not have a substantial impact on the jury's verdict, the *accumulation* of errors requires a new trial here. *See Gomez*, 344 F.3d at 118.

### III. The Jury Should Have Been Instructed that the Commission's Failure to Prove that Fr. Lemelson's Statements Negatively Impacted Ligand's Stock Price was Fatal to its Claims

Fr. Lemelson should receive a new trial for the additional reason that the Court failed to instruct the jury that the Commission needed to show negative stock price movement to prove materiality. When challenging a properly preserved objection to the failure to give a requested jury instruction, the First Circuit "conducts de novo review as to 'whether a given instruction is, in substance, legally correct.'" *McDonald v. Town of Brookline*, 863 F.3d 57, 63 (1st Cir. 2017) (quoting *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 47 (1st Cir. 2015)). Here, Fr. Lemelson proposed an instruction that stated, "in a case like the present where the SEC has alleged fraud on the market in connection with a public company, the SEC is obligated to produce evidence to show by a preponderance of the evidence that the alleged false statements caused a decrease in the stock price." ECF No. 176 at 35. The Court rejected this instruction, and Fr. Lemelson properly preserved his objection. Sullivan Aff. Ex. 12 at 122:6-123:1.

This instruction should have been provided, because materiality "may be measured post hoc by looking to the movement ... of the price of the firm's stock." *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000); *see also, In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock. . . . This is so because efficient markets are those in which information important to reasonable investors (in effect, the market, is immediately incorporated into stock prices"). This reasoning is particularly compelling here,

17

where (as discussed above) Ligand and Viking did not consider the three statements at issue to be material, and the stock prices on the days of the statements closed higher than at the end of the previous trading days.  Sullivan Aff. Ex. 6 at 4.  This stock price evidence becomes especially notable when compared with the significant decreases on days where others made statements during the relevant time period, including the comments of the Federal Reserve Board on July 15, 2014 (Sullivan Aff. Ex. 18) and reports published by Empire on July 22, 2014 and August 5, 2014 (Sullivan Aff. Ex. 19 & Sullivan Aff. Ex. 20).[5]

While the First Circuit has not directly addressed whether a showing of stock price movement is required in cases like the present alleging fraud on the market through publicly issued statements, it has cited *Burlington Coat Factory*, *supra*, with approval.  *See In Re Polymedica Corp. Sec. Lit*., 432 F.3d 1, 13-14 (1st Cir. 2005) (adopting definition of efficient market from *Burlington Coat Factory*); *see also In Re Xcelera.com Securities Litig*., 430 F.3d 503, 507 (1st Cir. 2005) ("In an efficient market, the defendant's misrepresentations are absorbed into, and reflected by, the market price").  Further, multiple decisions of this District have followed this principle.  *See Emerson*, 353 F. Supp. 3d at 41; *Brumbaugh v. Wave Systems Corp.,* 416 F. Supp. 2d 239, 254-55 (D. Mass. 2006) ("'[t]he concept of materiality translates into information that alters the price of the firm's stock'") (quoting *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)).

The Court's failure to provide the requested instruction prejudiced Fr. Lemelson, both because the lack of stock price movement proves that the actual investing public did *not* consider the statements material, and because the Commission was allowed to argue in its closing that it did not need to prove such stock price movement.  Sullivan Aff. Ex. 12 at 72:12-73:7.  Further,

---

[5] Ligand's stock price decreased 4.6% ($2.71/share), 4.5% ($2.31/share), and 2.2% ($1.18/share) on those dates, respectively.  *See* Sullivan Aff. Ex. 6 at 3-4.

the evidence about stock price movement was tainted by the Commission eliciting and relying on

evidence about the stock price movement during the alleged (and rejected) scheme period

*without any connection to the three statements*.  Therefore, to avoid a miscarriage of justice, Fr.

Lemelson should be granted a new trial.  *See SEC v. Yun*, 327 F.3d 1263, 1282 (11th Cir. 2003)

(having "little difficulty in concluding that the [improper jury instruction] materially prejudiced

the appellants such that they are entitled to a new trial" where the SEC relied on the erroneous

instruction in its closing argument, thus likely removing the issue from the jury's deliberation).

## IV.   The Judgment Should be Altered or Amended, Because Issuance of the Injunction Was Improper and Will Result in Draconian Penalties

If the Court does not grant Fr. Lemelson a new trial then, in the alternative, the Judgment

should be altered or amended to avoid the draconian result of Fr. Lemelson receiving a lifetime

industry bar.  The Commission's purpose in seeking an injunction was to weaponize it into a

lifetime bar against Fr. Lemelson from serving as an investment adviser.  Sullivan Aff. Ex. 21 at

26:11-30:13.  The Commission has since initiated such a proceeding.  Sullivan Aff. Ex. 22.

"This court may grant a motion to alter judgment in one of the following circumstances:

(1) To account for an intervening change in controlling law; (2) To account for newly discovered

evidence; (3) To correct clear legal error; or (4) To prevent manifest injustice."  *A-Cal Copiers,*

*Inc. v. North American Van Lines, Inc.*, 180 F.R.D. 183, 190 (D. Mass. 1998).  Here, the issuance

of the injunction could result in the manifest injustice of an industry bar.  The Court rejected the

Commission's request for a lifetime injunction, specifically finding that Fr. Lemelson's conduct

was not as severe as the conduct in cases where such permanent penalties have been imposed.

ECF No. 273 at 10.  Nevertheless, the Commission is now seeking, based on the Court's more

limited injunction, to obtain *lifetime* relief.  Further, the Commission is doing so despite Fr.

Lemelson not having violated any securities laws for the *three years prior* and nearly *eight years*

since the statements at issue, during which time he has produced a prolific body of work as a writer, speaker, and activist investor.  *See SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979) (noting that even if violation of Rule 10b-5 had been found, injunction would not be appropriate where "the SEC conceded that at no time during those seven years [after the alleged violations] did it attempt to expedite the requested injunctive relief.  Nor was there any evidence that the defendants committed any prior or subsequent violations of the securities laws").  To avoid this result, the Court should alter or amend the judgment in this case and remove the five-year injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, Fr. Lemelson respectfully requests that the Court grant his motion for a new trial or, in the alternative, amend or alter the judgment.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
Thomas M. Hoopes (BBO No. 239340)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com
thoopes@lhblaw.com

Dated:  April 27, 2022

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on April 27, 2022.

                                           */s/ Douglas S. Brooks*
                                           Douglas S. Brook