1   (Friday, October 29, (Friday, October 29, 2021, SEC v. Gregory
2   Lemelson, jury trial day 4, Debra Joyce
3   THIS IS A ROUGH DRAFT TRANSCRIPT.
4       THIS UNCERTIFIED ROUGH DRAFT TRANSCRIPT HAS NOT BEEN
5   PROOFREAD OR CORRECTED.  EDITING WILL BE COMPLETED IN THE
6   PREPARATION OF THE CERTIFIED TRANSCRIPT, RESULTING IN
7   DIFFERENCES IN PAGE AND LINE NUMBERS, PUNCTUATION, FORMATTING,
8   SPELLINGS AND CHANGES OR CORRECTIONS, IF NECESSARY.
9       THIS UNCERTIFIED ROUGH DRAFT TRANSCRIPT OR ANY EXCERPTS
10  THEREOF CANNOT BE QUOTED IN ANY PLEADING OR FOR ANY OTHER
11  PURPOSE AND MAY NOT BE FILED WITH ANY COURT OR OTHER TRIBUNAL.
12      THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON THE CONDITION
13  THAT THE PARTY'S EXPERTS, CO-COUNSEL, AND STAFF MAY HAVE
14  LIMITED INTERNAL USE THEREOF AND, UPON RECEIPT OF THE FINAL
15  EDITED, CERTIFIED TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF
16  SHALL BE DESTROYED.
17          (Start at 9:08 a.m.)
18          THE CLERK:  All rise.
19          THE COURT:  Good morning.  The first witness is he --
20          MR. JONES:  The first witness is here, it's John
21  Higgins, the CEO of Amvona.
22          THE COURT:  Good.
23          (Jury entered the courtroom.)
24          THE COURT:  Good morning to everyone.  Anybody see
25  anything in the press, speak about the case, do any independent

1    Q.   And you talk about here the continued weakness in our
2    stock.  What are you referring to?
3    A.   The stock immediately as a result of the initial Lemelson
4    report sold off sharply, and this is now four, five months
5    later, but what's continued despite success, despite, you know,
6    good performance and a solid business, the stock was still
7    under a lot of pressure.
8            MR. JONES:  If we go down to the bottom of that part
9    of page, the email that starts Ligand board on the bottom of
10:55 10   the first paragraph there.
11   Q.   You wrote, With the recent stock weakness, it is obvious
12   we continue to be impacted by the Lemelson shorting and related
13   reports.
14            What did you mean by that statement?
15   A.   The negative claims created an air of uncertainty.
16   Investors are busy, they've got other choices to invest in, so
17   there's a reaction I'm not going to do a lot of work in this n
18   this, I don't like the way it's trading, so selling often can
19   create more selling and create a real damaging environment.  It
10:55 20   doesn't mean it's correct, it doesn't mean, you know, that this
21   was well grounded, bug there's often a market reaction, a
22   trending market reacting.  That's what we were witnessing here.
23   Q.   In 2014, Mr. Higgins, please describe overall what your
24   understanding of the effect of Father Lemelson's reports were
25   on Ligand.

```
 1   kinds of dialogues, that's what you said, right?
 2           MR. JONES:  Your Honor, I don't know what Mr. Hoopes
 3   is reading from.
 4           MR. HOOPES:  A deposition statement from this
 5   individual.
 6           THE COURT:  You need to tell him what page and line.
 7           MR. HOOPES:  Page 313, line 21 to 315, line 9.
 8           MR. JONES:  Thank you.
 9           THE COURT:  So what's the question?
10           MR. HOOPES:  That's what happened, right?  What I just
11   read.
12   A.   I got distracted by the -- was there a question?  I'm
13   sorry.
14   Q.   So let me boil it down really quick.
15           You and the board decided, right, to get the
16   assistance of a California congressman to write a letter on
17   behalf of Ligand to the SEC, right?
18   A.   Correct.
19   Q.   And you saw the letter?
20   A.
21           THE COURT:  The letter itself does --
22           MR. HOOPES:  It's not coming, all I have is one more
23   question.
24   BY MR. HOOPES:
25   Q.   You saw the letter.
```

```
 1   A.   At some point I believe I saw the letter, I'm not sure --
 2   Q.   The date of the letter?
 3              MR. JONES:  Your Honor, last question.
 4              THE COURT:  No, Mr. Jones, I said the letter itself is
 5   not admissible, it's hearsay.
 6              MR. HOOPES:  Yes, if I may, the date of the letter is
 7   the same day you went to the SEC in Washington, right?
 8   A.   I'm not aware of that.
 9   Q.   Okay.
10              Now, again, this is your second trip to the SEC, and
11   so instead of responding publicly yourself in very nice form in
12   San Diego to all these allegations, you continued paying
13   lawyers to lean on the SEC, right?
14   A.   We were confident that there was illegal stock
15   manipulation and we believed it was appropriate to discuss with
16   the enforcement division of the SEC to look into this matter.
17   Q.   What was the SEC --
18   A.   That there was a crime.
19   Q.   -- that you couldn't do on your in gazillion dollars in
20   markets cap?
21              MR. JONES:  Objection.
22              THE COURT:  Objection sustained.
23              MR. HOOPES:  I'm sorry.
24   BY MR. HOOPES:
25   Q.   You could have brought a private lawsuit, right?
```