ROUGH DRAFT

(COURT REPORTER:  Debra Joyce).

THIS IS A ROUGH DRAFT TRANSCRIPT.

THIS UNCERTIFIED ROUGH DRAFT TRANSCRIPT HAS NOT BEEN PROOFREAD OR CORRECTED.  EDITING WILL BE COMPLETED IN THE PREPARATION OF THE CERTIFIED TRANSCRIPT, RESULTING IN DIFFERENCES IN PAGE AND LINE NUMBERS, PUNCTUATION, FORMATTING, SPELLINGS AND CHANGES OR CORRECTIONS, IF NECESSARY.

THIS UNCERTIFIED ROUGH DRAFT TRANSCRIPT OR ANY EXCERPTS THEREOF CANNOT BE QUOTED IN ANY PLEADING OR FOR ANY OTHER PURPOSE AND MAY NOT BE FILED WITH ANY COURT OR OTHER TRIBUNAL.

THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON THE CONDITION THAT THE PARTY'S EXPERTS, CO-COUNSEL, AND STAFF MAY HAVE LIMITED INTERNAL USE THEREOF AND, UPON RECEIPT OF THE FINAL EDITED, CERTIFIED TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF SHALL BE DESTROYED.

THE CLERK:  All rise.

THE COURT:  Good morning everyone.

I understand that -- I was upstairs still working on the jury instructions, but Mary Ellen tells me that the exhibits are all marked -- thanks -- are the paralegals here?

THE CLERK:  Cara is here; Alyssa is with the SEC -- there she is.

THE COURT:  Wait a minute.  These paralegals stayed late last night with Mary Ellen, applause to them.

access to it.  But me at university have access to most of the journals, and that's how you start reading about the drugs and stuff.

Most of the company when they use new treatment they get approval by the FDA so they can sell it, so they do these studies that fulfill the requirement of the FDA, and then they publish the results as they go.  That's why we see them right now, for example, the COVID for the kids, Pfizer have 2,500 kids --

THE COURT:  Let's just stick to Sovaldi.

All right.  What's the next question?

MR. DAY:  I have nothing further, your Honor.  That was from the jury.

THE COURT:  Doctor, thank you for coming in.

THE WITNESS:  Can I just leave?

THE COURT:  You're welcome to stay.

THE WITNESS:  No, no, I have to go back to work.  I don't want to stay, thank you.

MR. DAY:  Your Honor, the Commission calls Robert Fields.

(Pause.)

THE COURT:  We can stand and stretch, always a good thing do.

(Pause.)

ROBERT M. FIELDS, having been duly sworn by the Clerk,

was examined and testified as follows:

      THE CLERK:  Could you please state and spell your name for the record.

      THE WITNESS:  Robert M. Fields, R-o-b-e-r-t, last name F-i-e-l-d-s.

      THE CLERK:  Thank you.  You may be seated.

DIRECT EXAMINATION

BY MR. DAY:

Q.  Good morning, Mr. Fields.

      Where do you work, sir?

A.  Cardinal Capital Management in Greenwich, Connecticut.

Q.  What is Cardinal Capital Management?

A.  It's a fundamentally orientally asset manager who manages today a little over $5 billion in assets.

Q.  And what is your role at Cardinal?

A.  Currently I am a partner and portfolio manager at the firm.

Q.  What does that mean on a day-to-day basis?

A.  I am both responsible for analyzing company's directly myself as well as participating in a unanimous process with the three other portfolio managers to decide which stocks to buy and sell.

Q.  So you provide essentially investment advice to the fund?

A.  That's correct.

Q.  What was your role at Cardinal in 2014?

ROUGH DRAFT

A.   At 2014 I was a senior analyst at the firm.

Q.   What does that mean?

A.   We have historically had both junior and senior analysts.
The senior analysts are simply the more experienced, usually
following larger positions for the firm.

Q.   I should have asked before, when did you join Cardinal
Capital?

A.   April of 2013.

Q.   Could you tell the jury about your educational history.

A.   Yes.  I'm an undergraduate of Ball State University in
Indiana in 1993, and I have a master's in business
administration from the Wharton School at the University of
Pennsylvania.  I graduated in 2000.

Q.   After you obtained your MBA, where did you go to work?

A.   I went to work for a private equity fund in Teaneck, New
Jersey, by the name of BCI Partners.

Q.   What's a private equity fund?

A.   They manage money to investment in private companies for
limited companies over a fixed generation.  Generally the funds
have a 10-year life.

Q.   And when did you leave the private equity firm?

A.   Nine months later.

Q.   Okay.  And what year was that?

A.   2000.

Q.   Okay.  What did you to between then and when you joined

Cardinal Capital in 2013?

A.    From 2000, early 2001 to early 2006 I worked for an individual by the name of Michael F. Price, who was a well-known investor and self-made millionaire who opened MFP Investors, his family office.

I was responsible for general equity research as well as distressed investing during my time as an analyst there.

From 2006 to 2010, I was head of research and trading for a fund in Greenwich, Connecticut, which was an activist fund. We had a concentrated portfolio of 8 to 10 stocks, and a partner at that firm for those four years.

Q.    So that took you through 2010?

A.    Yes.

Q.    Okay. And then from 2010 to 2013?

A.    2010 to 2012, I had my own fund with a partner. We managed roughly $50 million focused on -- we were generalists focused on equities.

Q.    And then from when you left -- or stopped working with your own fund until you joined Cardinal, what did you do?

A.    For that remaining year before joining Cardinal, in 2013, I sold my half of the partnership to my partner, left to purchase a business with another partner, and then after purchasing that business, he runs it day to day, I went and took a job as a senior analyst at Cardinal Capital Management.

Q.    Now, you mentioned some work on distressed assets I

ROUGH DRAFT

believe.  What is that?

A.   So during my time working for MFP Investors, I worked on a number of distressed funds from utilities to transportation and insurance and invested throughout the capital structure both equities, preferred stock bonds, and bank debt.

Q.   And distressed assets, does that involve companies that are bankrupt or insolvent?

A.   Both.

Q.   Did you come to have an understanding of bankruptcy and insolvency as a result of your work?

A.   I believe I have a strong perspective on it, yes.

Q.   Okay.  I want to talk about Ligand Pharmaceuticals.  Was Cardinal Capital -- or did Cardinal Capital have an investment in Ligand in 2014?

A.   We did.  I believe we made the investment in late 2013.

Q.   How big an investment?

A.   I don't recall.  For our fund, a large position would be 4 percent of the overall portfolio, so it would be less than that.

Q.   And about how much is 4 percent of the portfolio back in 2014, ballpark?

A.   We mentioned roughly two to two and a half billion dollars depending on the exact time period, so 4 percent would be $80 million.

Q.   I'm sorry, 80 or 8?

A.    A 4 percent position would be roughly an $80 million position back then.  I don't remember specifically what size Ligand was.

Q.    Is Cardinal still invested in Ligand?

A.    We are today.  We have not been continuously invested it since that time.

Q.    So there were points between 2014 and the current time when you sold positions in Ligand?

A.    We exited the position early this year and reentered in the third quarter.

Q.    And when you exited the position, was that a profitable investment?

A.    Yes.  We had a 35 percent compounded IRR over seven and a half years.

Q.    What's IRR?

A.    It's our annualized rate of return, so we made 35 percent a year for seven-and-a-half years.

Q.    Let's shift gears and talk about the defendant, Father Lemelson.

          When did you first hear of him?

          MR. SULLIVAN:  Objection, your Honor.

          THE COURT:  Overruled.

          MR. SULLIVAN:  This goes to the scope issue we raised this morning.

          THE COURT:  Overruled.

BY MR. DAY:

Q.   You can answer the question, sir.

A.   I became aware of the defendant when the first report was filed in 2014.

Q.   And that was June 16, 2014?

A.   I believe that's correct, yes.

Q.   Okay.  Did you follow his coverage of Ligand during 2014?

A.   There were five or six reports that I saved copies of, made comments on at the time, and scanned into our research system, so, yes, I did follow -- it was a combination of interviews, press releases, and reports released on different sources.  I don't remember specific exactly the source.

Q.   Okay.  And did you listen interviews that Father Lemelson gave?

A.   I listened to one, maybe two on Benzinga.

Q.   Was one of those June 19, 2014?

A.   I believe that was the first one that was done, yes.

Q.   And you listened to it?

A.   I did.

Q.   Okay.  Do you recall that Father Lemelson made claims about the drug Promacta?

A.   I remember one specific statement, yes.

Q.   Okay.  What statement do you remember?

A.   That he had spoken to the investor relations at the company and that, quote, Promacta was going away.

ROUGH DRAFT

Q.   Did you agree with that based on your knowledge of Ligand's business?

A.   No.

Q.   Would it have been important to you as an investor in Ligand if Promacta was in fact going away?

A.   Very much so.

Q.   Why?

A.   Promacta made up the majority of the current revenue of the company was the largest source of cash flow for the business.

Q.   Would it have influenced your investment decision if Promacta was in fact going away?

A.   Absolutely.

Q.   Same reason?

A.   Yes.

Q.   Do you recall Father Lemelson making claims about a company called Viking Therapeutics?

A.   I do.

Q.   And what do you recall about those claims?

A.   I believe in one of the reports it was referred to as a shell game.

Q.   What else do you remember about Viking Therapeutics?

A.   So Viking Therapeutics was a counterparty for a licensing agreement to Ligand where they carved out a number of programs, licensed them to Viking which intended to go to a public

offering to advance the development of those projects.  Those
contracts were filed publicly, the economic arrangements
between the two companies were filed publicly, and ultimately
Viking was given the go ahead begin developing those products.

Q.   If Viking had in fact been a shell -- well, let me back
up.

       What is your understanding of what it would mean if
Viking were a shell?

A.   That it would be devoid of any assets of any material
value.

Q.   If that had been true, would that have been important for
you to know as an investor in Ligand?

A.   Yes.

Q.   Why?

A.   The potential economic royalties that Ligand can receive
from Viking numbers in the multiple billions of dollars.  Now,
that's well into the future, but it potentially extremely
significant source of economic value for Ligand.

Q.   How is Viking doing today?

       MR. SULLIVAN:  Objection, your Honor.

       THE COURT:  Sustained.

BY MR. DAY:

Q.   Do you recall Father Lemelson making some claims about
Ligand's solvency?

A.   Yes.

ROUGH DRAFT

Q.    What do you recall about that?

        MR. SULLIVAN:  Objection, your Honor.

        THE COURT:  Overruled.

A.    I believe there were two points, one pre and one post a large convertible bond offering that the company did that the potential insolvency for the business was referred to.

Q.    In what way?

A.    One post the bond offering was referring to a ratio of the debt raised to the current equity account balance of the company on their financial statements, which is nonsensical because --

        MR. HOOPES:  Objection, your Honor.

        THE COURT:  Sustained.

        What's the next one?

BY MR. DAY:

Q.    Did Father Lemelson claim that Ligand was insolvent?

A.    I believe the comment that I read was that any potential future distress would cause it to be insolvent.  But I don't remember entirely.

Q.    Would it have been important for you as an investor to know the status of Ligand's solvency in 2014?

A.    Yes.

Q.    Why?

A.    If it's insolvent, the equity is likely to be worthless.

Q.    Do you believe that Ligand was insolvent in 2014?

ROUGH DRAFT

        MR. SULLIVAN:  Objection, your Honor.

        THE COURT:  Sustained.

BY MR. DAY:

Q.    You mentioned a bond offering in 2014.  So that's Ligand

raised money through the bond offering?

A.    Ligand raised a convertible bond -- issued a convertible

bond to raise in excess of $200 million.  I don't remember the

exact figure they entered after the green chute.

Q.    As an investor, did you view the bond offering a good

thing or a bad thing?

        MR. SULLIVAN:  Objection, your Honor.

        THE COURT:  Overruled.

A.    It was quite positive for the liquidity of the company.

Q.    Can you explain to the jury what you mean by that?

A.    So two sources of liquidity for a public company in

general --

        THE COURT:  He's not called as an expert.

        So why did it matter to you, the debt offering?

        THE WITNESS:  It provided the company with significant

source of liquidity.

BY MR. DAY:

Q.    Did you talk to Ligand's management about Father

Lemelson's reports?

A.    We did.

Q.    And --

ROUGH DRAFT

THE COURT:  "We" means you did?

THE WITNESS:  I did, yes.

THE COURT:  You personally did.

THE WITNESS:  I personally did, yes.

THE COURT:  Okay.

BY MR. DAY:

Q.   And about how many occasions in 2014 if you recall?

A.   Specifically about his reports, maybe a half a dozen.

Q.   Okay.  Why did you talk to management about Father
Lemelson's reports?

A.   We have a fiduciary duty to our clients to manage money in
their best interest.  Any time the potential negative news
comes out for a company we are required under our investment
management contracts to fully research any allegations to make
sure whether we agree or disagree with them.

Q.   In your view, did Father Lemelson's reports have an effect
on Ligand's stock price?

        MR. SULLIVAN:  Objection.

        THE COURT:  Sustained.

BY MR. DAY:

Q.   What happened to Ligand's stock price over the course of
the summer of 2014?

A.   From memory, the day the first report was released the
stock was down 6 or 7 percent.

Q.   And what about over the course of the summer, do you

ROUGH DRAFT

recall?

A.   It continued to be weak.  I don't remember numerically how much the stock was down over the course of the year.

Q.   If you remember, was there any other bad news about Ligand during the course of that summer?

A.   From memory, no.

        MR. DAY:  Thank you, Mr. Fields.  I have nothing further.

        MR. SULLIVAN:  May I, your Honor?

        THE COURT:  Yes.

                    CROSS-EXAMINATION

BY MR. SULLIVAN:

Q.   Good morning, Mr. Fields.  My name is Brian Sullivan, and I represent Father Lemelson in this case.

        You just testified that you weren't aware of any bad news about Ligand in the summer of 2014; is that correct?

A.   I don't remember any.

Q.   So you're not aware of a report in July 2014 from a company called Empire?

A.   No.

Q.   Okay.  And you're not aware that the stock price went down over 4 percent that day?

A.   No.

Q.   Okay.  And are you aware of another report issued by the same company in August 2014?

ROUGH DRAFT

A.    No, I'm not familiar with that firm.

Q.    And so you're not aware that the price of Ligand stock
went down about a percent that day?

A.    No.

Q.    Are you familiar with a Janet Yellen?

A.    Janet Yellen?

Q.    Yes.

A.    Yes.

Q.    And do you know what her position was in 2014?

A.    Secretary of Treasury.

Q.    I think she was on the Federal Reserve board, but --

A.    Okay.

Q.    Do you recall a statement in 2014 in July about biotech
stocks being substantially stretched at the time?

A.    No.

Q.    You don't know that the stock price for Ligand went down
significantly the day that Janet Yellen and the federal board
of reserve made those statements?

A.    No.

Q.    Sorry, could you just answer that question.

A.    I apologize, no.

Q.    I apologize, I went a little lengthy on the question.

        You testified that you reached out to Ligand
management with your concerns regarding Father Lemelson,
correct?

ROUGH DRAFT

A.   Yes.

Q.   And his reports?

A.   Correct.

Q.   And they told you, they being Ligand management, told you
that they thought Father Lemelson's reports were wrong?

A.   We asked them specific questions, but that's the general
sense, yes.

Q.   That was important for you to hear from Ligand management,
correct?

A.   We were verifying our opinion.

Q.   Are you aware that other investors of Ligand sent
communications to Ligand management requesting that they
respond publicly to Father Lemelson's reports?

        MR. DAY:  Objection.

        THE COURT:  Sustained.

BY MR. SULLIVAN:

Q.   Ligand didn't make any public rebuttal, to your knowledge,
did they, to Father Lemelson's reports?

A.   They did not.

Q.   You're aware that companies cannot share information with
one investor that they don't share with others, right?

A.   Under regulation FD, that's correct.

Q.   And that's the fair disclosure regulation?

A.   Correct.

Q.   Didn't Ligand tell you information in rebuttal of Father

ROUGH DRAFT

Lemelson's reports that it didn't tell other investors?

       MR. DAY:  Objection.

       THE COURT:  Sustained.

BY MR. SULLIVAN:

Q.   Is it fair to say you disagreed with Father Lemelson's opinion regarding Ligand's insolvency?

A.   Correct.

Q.   But you knew from reading his reports that Father Lemelson's opinion was based on backing out intangible assets from Ligand, correct?

A.   The ratio that I remember was comparing the new debt offering to the equity balance on the balance sheet.

Q.   You don't recall that it said tangible equity?

A.   I did not.

Q.   And would you choose to use the metric of a debt to tangible equity to assess a company?

A.   No.

Q.   And you personally in your analysis, you place value on Ligand's intangible assets, correct?

A.   Correct.

Q.   And you're free to do that, right?  In your judgment, I mean, in this country you're free to have that opinion?

       MR. DAY:  Objection.

       THE COURT:  Sustained.

BY MR. SULLIVAN:

Q.   Well, it's your opinion that Ligand's intangible assets have value, correct?

     MR. DAY:  Objection, mischaracterizes the testimony.

     THE COURT:  Is that your opinion?

     THE WITNESS:  Based on my analysis, yes.

BY MR. SULLIVAN:

Q.   But don't you agree that someone should be allowed to have the opposite opinion if they want?

     MR. DAY:  Objection.

     THE COURT:  Sustained.

BY MR. SULLIVAN:

Q.   On -- you said -- you testified that you listened to a June 19, 2014 interview from Father Lemelson on Benzinga?

A.   Correct.

Q.   Do you recall on the morning of June 20, 2014 that you asked Matt Foehr about the statement that Ligand's IR firm basically agreed Promacta was going away?

A.   I remember having a conversation with Matt.  I don't remember the exact timing.

Q.   And do you remember that was June 20th, the day after the interview was published?

A.   Again, I don't remember the specific timing.

Q.   Okay.  But you did have a call with Matt Foehr, right?

A.   I had communication with Matt Foehr.  I don't remember if it was a call or email or group meeting.

ROUGH DRAFT

Q.   And did Matt Foehr tell you that it was a
misrepresentation of a conversation that Father Lemelson had
with the IR firm?

A.   Something to that effect, yes.

Q.   And that was important for you to hear, right?

A.   We wanted to verify our opinion.

Q.   And that's all you needed to hear, was a denial from
Ligand, right?

A.   No.

Q.   If they didn't deny it, it would have been important to
you, though, correct?

A.   Correct.

Q.   And again, that denial wasn't publicly made, was it, by
Ligand?

         (Pause.)

Q.   Let me reframe the question.  (Put in?

         Ligand management never publicly issued -- never
issued a public statement denying the veracity of Father
Lemelson's June 19th statement, did they.

A.   I'm not aware of any public statements from the company in
regards to anything published by the defendant.

Q.   And so you received that information from Ligand
management in a conversation between you and Matt Foehr,
correct?

A.   I don't remember the style of communication, but I

ROUGH DRAFT

remember that we did communicate on the topic.

Q.   Okay.  And as a result of being told that, Cardinal

Capital began buying more Ligand stock, didn't they in?

           MR. DAY:  Objection.

           THE COURT:  Overruled.

A.   We -- we considered several sources of information,

including conversations with the management, so it was not

based solely on that conversation.

Q.   Not based solely, but it was a contributor factor in

Cardinal Capital's decision to go in fact buy more stock in

Ligand in June of 2014, correct?

A.   To clarify, we have two types of purchases in our firm,

one is fundamentally wanting to raise the position and the

other is new accounts being opened that is not a buy or sell

decision on our part.

Q.   Respectfully, Mr. Field, it's a yes-or-no question.

           You got this information in June 2014, did Cardinal

Capital start buying more stock in Ligand?

           MR. DAY:  Objection.

           THE COURT:  Overruled.

A.   I don't remember.

Q.   Do you remember telling Matt Foehr that you did?

A.   No.

Q.   Did anyone at Ligand ever tell that you Mr. Voss,

Mr. Foehr and Mr. Higgins had a conversation on June 18, 2014

about Mr. Voss' call with Father Lemelson?

A.    I don't remember.

Q.    And did anyone at Ligand ever tell you that shortly after Father Lemelson's June 19, 2014 Benzinga interview, Mr. Voss, Mr. Foehr and Mr. Higgins had another call discussing the June 18, 2014 conversation?

A.    I don't remember.

Q.    Did anyone at Ligand ever tell you that following these conversations --

        THE COURT:  I'm confused by the questioning.

        The call with one another or an earnings call?

        MR. SULLIVAN:  The call between Mr. Voss and Father Lemelson.

        THE COURT:  Start again.

        MR. DAY:  Objection, foundation.

        THE COURT:  I just need the question to be clear.

BY MR. SULLIVAN:

Q.    Did anyone ever -- did anyone at Ligand ever tell that you following the conversations between Mr. Voss, Mr. Foehr and Mr. Higgins that discussed Mr. Voss' conversation on June 18, 2014 with Father Lemelson that Mr. Higgins wrote an email telling Mr. Voss that he had left Father Lemelson with the impression of a tacit agreement?

        MR. DAY:  Objection.

        THE COURT:  Sustained.

ROUGH DRAFT

                    MR. DAY:  Foundation.

                    MR. SULLIVAN:  No further questions, your Honor.

                         REDIRECT EXAMINATION

BY MR. DAY:

Q.   Mr. Fields, just one last question for you.

                    THE COURT:  There was a juror question that I don't

really understand.

                    MR. DAY:  Okay.

                    THE COURT:  I'm going to reframe it.

                    You talked about a fiduciary duty, what did you mean

by that?

                    THE WITNESS:  Fiduciary responsibility simply means we

have to act in the best interest of our clients.

                    THE COURT:  Thank you.

BY MR. DAY:

Q.   And as a result of your fiduciary duty to your clients,

you have to check out negative information about a company?

A.   We have to check out all information, but, yes, including

negative information.

Q.   You were asked about ratio that Father Lemelson used.

A.   Correct.

Q.   And I think you said that you don't use that ratio?

A.   Correct.

Q.   Why is that?

                    MR. SULLIVAN:  Objection.

ROUGH DRAFT

THE COURT:  Overruled.  You opened the door.

Go ahead.

A.   To compare a liability to a balance that is already net of liabilities is nonsensical to me.

Q.   Can you explain what that means for the jury?

A.   When you calculate the equity balance on a balance sheet, you take total assets less total liabilities equals total equity.  So to then go back and compare that result against one of the components of the calculation doesn't have predictive value in my mind.

Q.   Does it tell you anything about the health of the company?

A.   No.

MR. SULLIVAN:  Objection.

THE COURT:  Sustained.

MR. DAY:  Nothing further, your Honor.

THE COURT:  Anything else?

MR. SULLIVAN:  Nothing further, your Honor.

THE COURT:  Thank you.

MR. DAY:  Your Honor, the Commission rests.

MR. BROOKS:  Your Honor, we have a motion your consideration.

THE COURT:  Yes, but you'll just hand it -- is it in writing?

MR. SULLIVAN:  Yes.

THE COURT:  And then you'll call --