SEC v. Lemelson

THIS IS A ROUGH DRAFT TRANSCRIPT.

THIS UNCERTIFIED ROUGH DRAFT TRANSCRIPT HAS NOT BEEN PROOFREAD OR CORRECTED. EDITING WILL BE COMPLETED IN THE PREPARATION OF THE CERTIFIED TRANSCRIPT, RESULTING IN DIFFERENCES IN PAGE AND LINE NUMBERS, PUNCTUATION, FORMATTING, SPELLINGS AND CHANGES OR CORRECTIONS, IF NECESSARY.

THIS UNCERTIFIED ROUGH DRAFT TRANSCRIPT OR ANY EXCERPTS THEREOF CANNOT BE QUOTED IN ANY PLEADING OR FOR ANY OTHER PURPOSE AND MAY NOT BE FILED WITH ANY COURT OR OTHER TRIBUNAL.

THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON THE CONDITION THAT THE PARTY'S EXPERTS, CO-COUNSEL, AND STAFF MAY HAVE LIMITED INTERNAL USE THEREOF AND, UPON RECEIPT OF THE FINAL EDITED, CERTIFIED TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF SHALL BE DESTROYED.

1    inside the company.  Is he suddenly going to say the exact

2    opposite?  Does that make any sense.  And the defendant had all

3    of that information too.  He knew exactly what the companies

4    and its partners and all those analysts who wrote about GSK and

5    Ligand were saying about Promacta.  The defendant could not

6    possibly have believed that Ligand's representative was going

7    to get on the phone after all of those public statements and

8    tell him that Promacta was going away.

9         No T the defendant threw all that information away.

10   He made up his own facts.  He made up facts -- lies, let's call

11   them what they are -- that supported his thesis and would make

12   his big bet pay off.  What's that big bet.  Mr. Brooks is right

13   we've to talk now about the fact there was a 4.6 million

14   dollars investment.  4.6 million dollars of the defendant's

15   family's money and defendant's friends money all wrapped up in

16   making this pay-off.  But it's not just that.  You heard about

17   the hundred people who were interested in Amvona, interested in

18   signing up supposedly now that this Ligand thing was out there,

19   right?  In the course of that summer.  Each one of those people

20   brings more money for the defendant.  Each one of them.  You

21   heard actually that there were these big money managers, 20

22   million-dollar fund, 600 million dollars fund that the that the

23   very seem week the defendant made his first lie about Mr. Voss,

24   that was the week that he was going to meet those people.  That

25   was the week -- and if you could rock the stock, if you could

1  crash it boy wouldn't those people want to sign up?  You want
2  to sign up with a money manager like that, would want you?
3          And you heard what Father Lemelson thought was going
4  to happen.  A couple months later he goes on the radio and
5  he-says-we-expect 0 to 500 million in the next 24 months.
6  That's the mindset of the defendant when he starts to talk
7  about Ligand, when he lies about Mr. Voss.  Think about all
8  that money coming in, all those new people coming up.  And all
9  they had to do was, as the Benzinga interviewer said, rock the
10 stock.
11         So yeah when we talked about motive, that's a pretty
12 good motive.  Now, that 20 minute call -- remember we all
13 listened to that interview, it went on for a while.  Right?  It
14 was a 20 minute interview and on that interview Lemelson was
15 able to talk about explain his background where he lives what
16 he studied in school, what degrees he has, his christian
17 philosophy of investing, the Intelligent Investor Book, his WWE
18 shorts, capital allocation of stewardship.  Remember all of
19 those topics?  And he talks about Ligand and he talks about
20 many different things about Ligand all-in minutes.  Well,
21 that's the same period of time that Mr. Voss and Father
22 Lemelson are on the phone.  It's not a short call.  It's not a
23 will you change your position?  No, okay.  You're not getting
24 the call.  In fact, we know it's not a short call.  We know
25 what they talked about because of the defendant's own notes.

1  here, the reasonable person -- that's why we've asked you to
2  come here -- you're our reasonable people.  Would a reasonable
3  investor want to know that Ligand was about to lose one of its
4  biggest sources of revenue?  Its biggest products?  Would a
5  reasonable investor think was a bad thing if Ligand was engage
6  in some shady shell deal to funnel market and pad its balance
7  sheet.  Would a reasonable investor want it?  No if the partner
8  in that was not going to get financing because they hadn't
9  gotten an audit and that they weren't going to use that money
10 to develop any drugs.  Would a reasonable investor want to
11 know -- in fact it's not even worth asking the question.  Of
12 course a reasonable investor would want to know that the
13 company they were investing in was actually insolvent and about
14 to go out of business if those things were true of course a
15 reasonable investor would want to know about it and you saw
16 Mr. Fields come here on the last day and he said, "I'm a
17 reasonable investor I'm a professional investor and we
18 invest -- it was a lot, right?  Billions.  We invest up to 80
19 million he said in Ligand and he said of course we'd want to
20 know that.  Not only do we want to know it if someone says it
21 we have to clerk this out.  We have a fiduciary duty -- that
22 fiduciary duty he talked about -- we have a fiduciary duty to
23 actually go back to the company and ask them, and not only ask
24 them but check it out independently.  Does that sound like
25 something that doesn't matter, as defendants are expecting?

1   Does that sound like something a reasonable investor doesn't
2   care about?  Insolvent, here's my money anyway.  Is that what's
3   more likely than not?  You heard Mr. Voss, Mr. Foehr,
4   Mr. Higgins all told you though heard about these reports,
5   these statements, these lies from investors.  They got calls,
6   they got emails.  Mr. Fields told you it was important.
7           Here's some of the emails they got 243, 246, 247, 248
8   all talking about investors who are either emailing or calling
9   or in per and they're asking about Father Lemelson's reports
10  and these statements.  It's not hard to conclude that they
11  cared about them because he these things were so important.
12          Now, let me tell you something that does not determine
13  materiality.  Stock price.  In fact you'll hear the judge tell
14  you in no uncertain terms that the Commission does not need to
15  prove the defendant's conduct caused the price of Ligand stock
16  to fall.  Plain and simple.  I'm not sure why we were looking
17  at all those bar charts going up and down.  We don't have to
18  prove that.  It's not necessary.  People don't have to actually
19  have sold.  Right?  We have to prove that a reasonable investor
20  would care about the statements that were made, about the
21  topics that were being lied about.
22          Now, sure, is this in evidence?  Yeah, this is a chart
23  of the stock price going down on the dates the defendant issued
24  his reports and how much money he was making.  But does that
25  determine materiality for you?  You can consider it and

1    consider whether the price goes up and down but really the
2    question you're being asked is does a reasonable person care
3    when someone says that the company they're invested in is
4    bankrupt.  Does a reasonable person care when the biggest
5    product is going away.  Those are the questions that
6    materiality is asking about.  That's what the judge is talking
7    about when she's talking about those instructions.
8            And certainly the defendant thought that his reports
9    were making a difference.  The defendant -- this is a little
10   hard to read, but this is his annual report for 2014 to his
11   investors.  The publication of the multiple research reports
12   and related short stake resulted in a loss of approximately 500
13   million dollars in market capitalization of the company.  That
14   was Exhibit 99.
15           Exhibit 63 another thing to his investors and to
16   prospective investors and we'll talk about throws folks in a
17   minutes again talking about how the stock price is going down
18   as a result of his work.  And defendant says in email after
19   email he pushed the price down.  Defendant thinks he's having
20   an effect.  Defendant thinks that investors cared about this in
21   63 and 73 and 82 and 99.
22           Don't be confused about a bar chart about surprise.
23   It's not what you're being asked to find.
24   Q.   Defendant also wants you to think that all of these facts
25   they were somehow opinions.  Now we've talked a little about

```
 1   out more reports and watch that stock price go down more.  It
 2   do want really say he was acting fraudulently.
 3              They said there was New England motive but you saw
 4   what the motive was and that motive paid off.  It paid off in
 5   1.3 million dollars of profit.  A third of that goes to the
 6   defendant and his family and then the defendant takes one out
 7   of every $4 of that profit as his fee.  It's not a bad hole.
 8   There's nothing wrong with making money in the stock marked
 9   that's what we dough.  That's what the SEC is around for.
10   That's so people can make money in the stock market if they can
11   but if you do it with lies we show up.  Let's talk about a
12   showing up for a minute.  This seems to be a lot of, for some
13   reason, a lot of talk about why is the SEC in this case?  Well,
14   as you heard at the beginning the SEC is the one who
15   investigates and prosecutes violations of securities laws and
16   you go to the SEC when you think that you've seen or witnessed
17   or been the victim of a securities law violation.  There was a
18   lot on those presentations how come this isn't in the
19   presentation how come that isn't in the presentation how come
20   they're making the allegations and they don't have facts.  You
21   know what, the one thing that SEC has that Ligand has.  It has
22   investigative powers.  You heard about that.  In fact the
23   defendant wants a lots of credit for giving over his hard
24   drive.  What but you heard what did he get?  He got a subpoena.
25   And I think you all know a subpoena is a legal requirement to
```

1  turn over that stuff.  They want to waive it all over and say

2  he gave it all over.  He gave it over by a subpoena.  You Shaw

3  the manage, Inc. easel if all this leaning on the SEC is so

4  case how come the SEC's case as the defendant said over and

5  over how come the SEC's case has statements that aren't in

6  those PowerPoints?  Well, it's because when you go to the SEC,

7  the SEC does an investigation with those investigative powers

8  with those subpoenas and comes up with its own reasons, own

9  evidence, own theory about why the law was violated and has to

10 package it into a case that's digestible to a jury that's not

11 going to take four months and bring it to you and say we think

12 the defendant violated the law.  Here's our evidence.  That's

13 why you go to the SEC.  Somebody throws a rock through your

14 window you can go out on the street and try to figure it out

15 who it is and you can do something to them when you find them.

16 Is that what we're supposed to do.  Go seek them out and beat

17 them up in anal I didn't.  You call the cops much what's wrong

18 with that?  Why would they keep suggesting there's something

19 wrong with that.  That's what's supposed to happen.  Why do

20 they want you to focus on that and not the evidence?  Look,

21 executives are paid a lot of money.  I wish I was paid that

22 much money.  You probably wish you were paid that much money.

23 If you are paid that much money, great, but that make it more

24 or less likely that the defendant lied that Mr. Higgins gets 11

25 million dollars a year.  Why are you asking you to focus on

1  that and not the evidence?  Is it anymore likely that the

2  defendant was telling the truth because Mr. Higgins makes 11

3  million dollars a year?  And they want you to think they have a

4  financial interest.  Is that a reason to come in and permit

5  perjury on the stand?  Did you think those -- all of those

6  people were coming in to commit perjury?

7         See, this is how it goes for the defendant.  In order

8  for the defendant's story to be true, you have to believe that

9  Dr. Marschke and Dr. Lian and Mr. Higgins and Mr. Foehr and

10 Mr. Voss and Kathy Hyodo, the auditor, Mr. Benerjee in his Polo

11 shirt in his car trying to come in and give you some evidence,

12 and Bob Fields and Dr. Jabbour, they're all wrong.  They are

13 all -- or most of them are lying about him.  That's what you

14 have to believe in order to have defendant's theories to be

15 true.  Is that the more likely than not.  Is that what you got

16 the sense of when these people were testifying.  And why it was

17 analysis why it was so important and why they pursued it all

18 this time.  Why they came as witnesses.  By the way you don't

19 get a choice to come as a witness.  You get a subpoena and you

20 have to show up as a witness.  But anyway did you get the sense

21 they were all coming to you and looking you in the face and

22 balled face lying to you or when you looked at the defendant

23 and how he wouldn't answer a question straight no matter what

24 question we put to him, wouldn't answer it straight.  Which is

25 more likely than not?  Who is more likely than not telling the

1   truth here.

2            THE COURT:  You need to start wrapping it up.

3            MR. JONES:  Absolutely, Your Honor.  Last page.

4       What was the defendant really doing here.  Lemelson
5   leave you with some final thoughts on what the defendant meant
6   to do here, what his state of mind was how he meant to act
7   fraudulently intentionally.  You know what, actually scratch
8   that.  Lemelson have the defendant tell you in his own words
9   what he was doing here.  He was engaged in a multi month
10  battle.  He thought it was a battle.  He thought he was going
11  to slay the dragon.  He thought he was going to beat them.

12           Here he's talking on the radio.  If there's some
13  negative news, then the stock might sell off tremendously
14  because of it.  Idea.  "I'm not convinced that groups of people
15  behave rationally most of the time" maybe they don't go back
16  and check, maybe they don't read the S-1.  Maybe if the top
17  hedge fund manager in the world writes something, they're going
18  believe it and they're going to get worried and they're not
19  going to buy stock and they're going to sell stock peak
20  paragraph back in 2014 that's what we were doing in the
21  pharmaceutical space, we were providing a catalyst.  You know a
22  catalyst is something that makes something happen takes
23  something there and makes it happen.  You heard about how he
24  bragged about crashing the price of stock.  In fact you saw him
25  brag about $500 million dollars real stockholder shareholders

```
 1   real people money that he destroyed.  He used that term
 2   "destroyed."  And of course, there's this, audio played).
 3            "Run, Bambi run, take the I shall rational people that
 4   can get scared if the top hedge fund manager in the world and
 5   tells them that this company is going to go bankrupt, go out of
 6   business is engage in shady shell companies is going to lose
 7   its biggest product and if you tell them that, they're not
 8   going to check.  They're going to run and that's what the
 9   defendant wanted and that's what he got.  That's how he made
10   1.3 million dollars by lying, by engaging in a fraudulent
11   scheme and by deceiving his investors.
12            Ladies and gentlemen of the jury there's that one
13   thing we agree on.  Weep also for all of us want to thank you
14   for being here.  It's been a long time.  It is good to be back,
15   probably better for us than you, it's good to be back.  I want
16   to thank you for your time, your patience and obvious
17   attention.  We've all been talking about.  We ask that you
18   check yes on each of the questions and finds the defendant
19   responsible for his lies, his fraudulent scheme and for
20   deceiving his investors and potential investors.  Thank you.
21            THE COURT:  All right.  Thank you we'll stand in
22   recess, take our break and then come back for the instructions.
23            THE CLERK:  All rise.
24            THE COURT:  Thank you.
25   (Jury exits.).
```

```
1              MR. DAY:  That's all Your Honor.
2              THE COURT:  Okay.  Now Father Lemelson's team.
3    Mr. Sullivan.
4              MR. SULLIVAN:  Yes, Your Honor.
5              THE COURT:  You're up at bat.
6              MR. SULLIVAN:  We have just two objections, Your
7    Honor, and one is on the materiality.  We object.
8              THE COURT:  Which exhibit, do you remember -- not
9    exhibit.  Instruction.
10             MR. SULLIVAN:  Instruction.  It's the absence of
11   our -- regarding the stock price and proof that opinion the
12   stock price --
13             THE COURT:  The third circuit issue.
14             MR. SULLIVAN:  Yes, Your Honor.
15             THE COURT:  Do you remember the name of that case so
16   that's clear?  Does anyone remember that case where the third
17   circuit sort of required.
18             MR. SULLIVAN:  I think it's Foreign V Stafford, but I
19   can --
20             THE COURT:  Anyway, it doesn't matter.  That I didn't
21   instruct that SEC has to prove -- what was the name of it, a
22   price -- there was a word the third circuit used.  A stock
23   effect.  Anyway, it's the fact I didn't say SEC has to prove
24   the stock went down as a result of the statement, right.
25             MR. SULLIVAN:  Yes, Your Honor.
```

```
 1                THE COURT:  Okay.
 2                MR. SULLIVAN:  And we also object to the -- in this
 3     case the negligence instruction, as we do not think it applies
 4     in this case.
 5                THE COURT:  Okay.
 6                MR. SULLIVAN:  And those are our two.  Thank you, Your
 7     Honor.
 8                THE COURT:  Okay.  Let me just say for the record that
 9     I found the area of negligence which I did spend a huge amounts
10     of time on yesterday difficult.  And I've deliberately flushed
11     it out.  So if I'm wrong, it does not jeopardize the entire
12     verdict.
13                MR. SULLIVAN:  Thank you, Your Honor.
14                THE COURT:  So this will not be retried in its
15     entirety.
16                MR. JONES:  Thank you, Your Honor.  We appreciate
17     that.
18                THE COURT:  Which I found pressures little case law
19     on.  A Supreme Court case cited by an SEC I was surprised to
20     see was authored by Arthur Goldberg and the D.C. circuit case
21     was almost as old.  There was very little circuit law.  Maybe
22     this will be the case that makes it up to the Supremes.  I hope
23     not.
24                Thank you very much.  I was telling my law clerks what
25     a beautifully tried case this was.  Particularly the closings
```

**UNEDITED DRAFT TRANSCRIPT**