```
             UNITED STATES DISTRICT COURT
                     FOR THE
              DISTRICT OF MASSACHUSETTS

  SECURITIES AND EXCHANGE        )
  COMMISSION,                    )
                                 )
               Plaintiff,        )  Case No.
                                 )  1:18-CU-11926-PBS
  vs.                            )
                                 )
  GREGORY LEMELSON and           )
  LEMELSON CAPITAL               )
  MANAGEMENT, LLC,               )
                                 )
               Defendants,       )
                                 )
  and                            )
                                 )
  THE AMVONA FUND, LP,           )
                                 )
               Relief Defendant. )



              Deposition of MATTHEW FOEHR
                 San Diego, California
                   December 5, 2019


  Reported by:
  Sheri L. Somers
  CSR No. 9734
  Job No. 10062971
```

MATTHEW FOEHR                                            December 5, 2019

Page 90

1   conversations and e-mails were included.  I'm not sure.
2       Q.   Were there any in-person meetings with
3   investors concerning Father Lemelson?
4       A.   There were certainly in-person meetings where
5   the topics raised in the reports were raised to me, and
6   I believe those may have been included in the log as
7   well.
8       Q.   Okay.  Who do you remember having an
9   in-person meeting with concerning Father Lemelson?  And
10  again, I think we're talking about investors here.
11      MR. BONDI:  Object to the form.
12      THE WITNESS:  I remember it coming up frequently
13  with investors.  I remember specific meetings with Joe
14  Frohna at 1492, who is based in Milwaukee; I remember
15  the team had Wells Fargo asking specifically; I
16  remember the team at Cardinal Capital asking
17  specifically in person.  I'm just recalling in-person
18  meetings.
19  BY MR. BROOKS:
20      Q.   Sure.
21      A.   And there were others as well.  Those are
22  just ones that come to mind.
23      Q.   What, if anything, did Joe Frohna raise
24  during your meeting with him concerning Father

1  Lemelson's statements about Viking?

2  **A.**  I believe he asked about the programs

3  themselves.  He was also very focused on the

4  misstatements and misrepresentations around Captisol,

5  very focused on Captisol.

6  **Q.**  What were the misrepresentations and

7  misstatements around Captisol that you are referring

8  to?

9  **A.**  It largely related to our supply and quality

10 and a number of other factors.

11 **Q.**  Do you remember what the misstatements were,

12 in your opinion?

13 **A.**  That our -- there was a general

14 representation or misrepresentation that our supply

15 chain was somehow tenuous or not well maintained, and I

16 was answering his questions related to that.  He was

17 satisfied with our answers given that we had multiple

18 distribution sites, multiple qualified sites.

19 **Q.**  Okay.  What, if anything, did the team at

20 Wells Fargo say to you about Father Lemelson's

21 statements concerning Viking?

22 **A.**  I believe, again, their questions were

23 related to the development programs, but -- and there

24 may have been other issues as well.  I don't recall.

MATTHEW FOEHR                                           December 5, 2019

Page 92

1    Q.   And same question.  So what, if anything, did
2    the team at Cardinal Capital say to you about Father
3    Lemelson's statements concerning Viking?
4    A.   The team at Cardinal Capital knew -- had done
5    a lot of research on Viking and knew Ligand's pipeline
6    well, and their questions were more related to how
7    something like this could be said.  They knew Viking,
8    they knew the work that Viking was doing.
9    Q.   When you say "something like this could be
10   said," what are you specifically referring to?
11   A.   Misstatements that Viking is somehow not
12   progressing programs, those kinds of things.
13   Q.   Did anyone ever say to you that they
14   understood Father Lemelson to be saying that Viking --
15   that -- strike that.
16        Did anyone ever tell you that they understood
17   Father Lemelson to be saying that preclinical studies
18   were not being conducted on the drugs that Ligand
19   licensed to Viking?
20        MR. JONES:  Objection.
21        THE WITNESS:  I don't recall.
22   BY MR. BROOKS:
23   Q.   Have you read -- or strike that.  Let me say
24   it again.

MATTHEW FOEHR                                          December 5, 2019

Page 284

1    **A.**   Yes.
2    **Q.**   I'd ask you to take a look and let me know if
3    you recognize that document.
4    **A.**   I reviewed it.
5    **Q.**   Who is Gene Fox and Bob Fields?
6    **A.**   Gene Fox and Bob Fields are -- I'm not sure
7    of their exact titles, but in general they are
8    portfolio managers at an institutional investor called
9    Cardinal Capital that's based in Connecticut.
10   **Q.**   And was Cardinal Capital an investor in
11   Ligand on October 6, 2014?
12   **A.**   Yes.
13   **Q.**   Are they still today?
14   **A.**   Yes.
15   **Q.**   Do you see there's a reference -- well, the
16   third line down towards the end of that line it says,
17   "Gene also shared that they have not heard anything
18   back from the SEC on their submission, and that he was
19   disappointed to see another, quote, fund performance,
20   press release last week."
21            Do you know what Mr. Fox submitted to the
22   SEC?
23   **A.**   I did not see any submission that Cardinal
24   Capital made, but I was told at some point that they

1    had made a submission.

2        Q.   Did they -- did anyone explain to you what
3    that submission consisted of?

4        A.   Not in detail, but they indicated that they
5    had submitted a notification to the SEC.  I don't know
6    how one would classify it.  I don't recall if they said
7    exactly what the submission was, but they indicated
8    that they had submitted something to the SEC regarding
9    Mr. Lemelson's reports and claims.

10       Q.   In the second-to-last line it says, "He said
11   they may get in contact with the SEC again and also may
12   consider, quote, other options, end quote."

13            Do you see that?

14       A.   I see that.

15       Q.   Did you ask -- I assume the quotes indicate
16   that those were the exact words used by Mr. Fox?

17       A.   I would assume that as well.

18       Q.   Did you ask him what "other options" meant?

19       A.   I don't recall asking him that.

20       Q.   And then it says, "Gene wanted to be very
21   clear that they are buying stock right now."

22            Do you see that?

23       A.   I see that.

24       Q.   Then he says, "But they are also worried we

1    are becoming a bit of a, quote, technical short, end
2    quote."
3            Do you see that?
4       A.   I see that.
5       Q.   What is your understanding of the term
6    "technical short"?
7       A.   I think what he was referring to was, I
8    guess, the behavior of the stock -- I don't know
9    exactly -- and how it was trading and whether that
10   would attract others to short the stock, but I don't
11   know for sure.
12      Q.   I think you said you never saw the submission
13   that Cardinal sent?
14      A.   That's correct.  I did not.
15      Q.   Did you ask Cardinal to send a submission to
16   the SEC?
17      A.   No.
18      Q.   Are you aware that -- of an article that came
19   out in the Wall Street Journal about Father Lemelson at
20   some point?
21      A.   Yes.
22      Q.   Did you have any contact with the Wall Street
23   Journal about that?
24      A.   No.

```
                                                        Page 305
 1         I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby certify:
 3         That the foregoing proceedings were taken
 4   before me at the time and place herein set forth; that
 5   any witnesses in the foregoing proceedings, prior to
 6   testifying, were duly sworn; that a record of the
 7   proceedings was made by me using machine shorthand,
 8   which was thereafter transcribed under my direction;
 9   that the foregoing transcript is a true record of the
10   testimony given.
11         Further, that if the foregoing pertains to the
12   original transcript of a deposition in a federal case,
13   before completion of the proceedings, review of the
14   transcript [ X ] was [ ] was not requested.
15
16         I further certify I am neither financially
17   interested in the action nor a relative or employee of
18   any attorney or party to this action.
19         IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21   Dated: December 19, 2019
22
23   _____
     Sheri L. Somers
24   CLR, CSR No. 9734
```