UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.                                                        Civil Action No. 1:18-cv-11926-PBS

GREGORY LEMELSON and LEMELSON
CAPITAL MANAGEMENT, LLC,

Defendants.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR
NEW TRIAL OR TO ALTER OR AMEND THE JUDGMENT**

The Court should reject Defendants bid to overturn the jury's verdict and undo this

Court's Final Judgment.  In their motion, Defendants rehash arguments that this Court has

repeatedly rejected.  They also add a handful of alleged errors at trial that they say require a redo.

But there were no errors at trial—certainly none that require a do-over.

Defendants' contempt for this proceeding, the jury's verdict, and the Court's final

judgment is galling.  In stating that "the jury gave the Commission a win on the more trivial

claims as a compromise or consolation prize" (Br. at 1), Defendants remain unwilling to accept

the reality that the jury found them liable for securities fraud under the core antifraud provision of

the federal securities laws, Exchange Act Section 10(b).  Violations of that section are among the

most serious charges that the Commission and the United States Department of Justice pursue in

financial fraud cases.  Far from being trivial, defendants routinely face both stiff civil and criminal

sanctions for violating the statute.  Yet Defendants argue that they should face no career

consequences from their fraudulent conduct.

Defendants go on to distort the trial record to fit their misleading view of this proceeding. They say, for example, that the trial was mostly about the Commission's "scheme liability" claim under Rule 10b-5(a) and (c) and that scheme evidence "overwhelmed" evidence concerning Lemelson's false and fraudulent statements.  (Br. at 1-2.)  This is a gross mischaracterization of the trial, which was fundamentally about the four charged fraudulent statements, as to which the jury found Defendants liable for three.  Indeed, Defendants insisted throughout the trial that the misstatements were the scheme, that the two claims (scheme and misstatement) were co-extensive, and that the scheme claim could not be conceived of separately.  (*E.g.*, Ex. 1 (Tr. Nov. 2, 2021 hearing) at 86 (Mr. Brooks: "We've always talked about this as a statements case, and that really without the statements there can be no scheme.").)  Defendants' position now that scheme evidence overwhelmed misstatement evidence is quite the pivot.

Defendants' arguments all fail.  First, they rehash their flawed argument that Lemelson's fraudulent statements were opinions, materiality cannot be proven without an event study, and there was insufficient evidence of materiality.  These are dead issues in this case, having been resolved against Defendants at the motion to dismiss, motion for summary judgment, motion for directed verdict, jury verdict, and motion for judgment as a matter of law stages.

Second, Defendants say the Court got a handful on evidentiary rulings wrong.  They say that Ligand investor Robert Fields shouldn't have been allowed to testify, even though the Court ruled there was no unfair surprise and they were fully informed of the subject matter of his testimony.  They repeat their argument that irrelevant evidence about the Commission's purported "bias" should have been allowed, despite their "selective enforcement" defense having been stricken on summary judgment and despite the Court allowing substantial leeway for Defendants to question witnesses on the subject.  And, finally, they say a letter from former Rep. Duncan

2

Hunter addressed to the Commission should have been admitted into evidence, even though they were permitted to question witnesses about it.  These rulings were well within the Court's discretion.  And Defendants have made no showing that these rulings, individually or in the aggregate, had any impact on the jury's verdict.

Lastly, Defendants ask this Court to modify the judgment to scrap the five-year injunction, as they worry the injunction may result in Lemelson being barred from the industry in a separate Commission administrative proceeding.  The Commission has indeed commenced a separate action to determine what, if any, additional remedial sanctions should flow from the jury's verdict and the Court's final judgment.  This is not some vendetta, as Defendants' suggest—it is the Commission fulfilling its Congressional mandate under Advisers Act Section 203(f) to determine whether a fraudster should retain the privilege of serving as an investment adviser.  The result of that proceeding is neither imminent nor preordained and should not result in undoing the considered remedies this Court imposed.

All of Defendants' arguments fall far short of justifying a new trial or amending the judgment, and their motion should be denied.

## ARGUMENT

### I.      DEFENDANTS' MOTION FOR NEW TRIAL SHOULD BE DENIED

####     A.      Defendants Cannot Meet the Standard for a New Trial

Defendants suggest that this Court has unbridled discretion to reweigh the trial evidence *de novo* in their favor.  In doing so, they fail to recognize that the First Circuit has "often emphasized that a 'district judge cannot displace a jury's verdict merely because he disagrees with it' or because 'a contrary verdict may have been equally . . . supportable.'"  *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009) (quotations omitted).  Critically, "trial judges do not sit

as thirteenth jurors, empowered to reject any verdict with which they disagree." *Id.* (citing

*Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.1982)).  For this reason, when, as here,

"a motion for new trial [is], at bottom, based on sufficiency of the evidence, the standards under

Rule 50 [JMOL] and Rule 59 [new trial] effectively 'merge.'"  *Rodriguez-Valentin v. Doctors'*

*Ctr. Hosp. (Manati), Inc.*, 27 F.4th 14, 21 (1st Cir. 2022) (quoting *Dimanche v. Mass. Bay*

*Transp. Auth.*, 893 F.3d 1, 8 n.9 (1st Cir. 2018)).

Defendants' first challenge to the jury's verdict, which found the charged statements

material, focuses entirely on the sufficiency of the evidence.  They argue that there was "scarcely

any" or "scant" or "essentially no" evidence of materiality.  (Br. at 4, 6, 8.)  While this is not in

fact true (*see* Part I.B, below), these arguments are directed at the quantum of evidence the

Commission adduced at trial, *i.e.*, whether there was sufficient evidence undergirding the jury's

verdict.  Defendants further admit the possibility that "a jury *might* have found the statements

material so at to satisfy the JMOL standard" and go on to argue that the jury should have sided

with them.  (Br. at 4.)  Defendants thus invite the Court to do exactly what the First Circuit

prohibits on a motion for a new trial—to sit as a "thirteenth juror" and "displace [the] jury's

verdict" because "'a contrary verdict may have been equally . . . supportable.'"  *Jennings,* 587

F.3d at 436 (quotations omitted).  The Court should therefore reject Defendants' sufficiency and

weight arguments, as it did in summarily denying Defendants' motion for judgment as a matter

of law.  (ECF No. 243.)

**B.      There Was Ample Evidence Supporting the Jury's Verdict**

Defendants are, in any event, wrong about the sufficiency of the evidence.  The

materiality of a misstatement is often a question for the jury, as it was here.  *Shaw v. Digital*

*Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996); *SEC v. Johnston*, 310 F. Supp. 3d 265, 270 (D.

Mass. 2018).  The materiality standard is an objective one and it is well-settled:  "[T]here must be a substantial likelihood that the [fact] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available*."  Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (cleaned up).  The jury was properly instructed on this materiality standard and, to reach their verdict, necessarily found Lemelson's fraudulent statements material.  (Ex. 2 (Jury Charge) at 18-19.)  And their verdict was grounded in ample evidence, any one category of which would have been sufficient to support the verdict:

- Lemelson's choice to include the four misstatements of fact in his reports shows that he thought these were important assertions about Ligand and its stock value.  Lemelson wrote his reports to convince others that Ligand stock was worthless.  The points he made in those reports, including the ones charged as misstatements, were there specifically to convince investors and potential investors of his thesis about Ligand stock's value.  He wouldn't have written about Promacta and Viking and featured his falsehoods about them in his reports if he didn't think these facts would be important to persuade a reasonable investor that Ligand was, as Defendants claimed, a fraud.  Indeed, the title of the June 16 report that preceded the Benzinga interview was "Severe competitive threat to key royalty program [*i.e.*, Promacta] and 'going concern' risk drive 100 percent downside" and Defendants' claims about Viking appear prominently in the summary of the July 3 report containing the falsehoods. (Exs. 3 (Trial Ex. 1), and 4 (Trial Ex. 4).)  Defendants plainly considered these subject matters material and this is itself enough for the jury to have concluded the charged statements material.

- Multiple instances in which Lemelson took credit for his reports and public statements sinking Ligand's stock price. (Exs. 5-9, Trial Exs. 51, 63, 72, 82, 90.)

- Testimony from multiple witnesses that Lemelson's fraudulent statements concerned important aspects of Ligand's business. (*E.g.*, Ex. 10, Tr. Trial Day 1 (Marschke) at 139:22-140:4; Ex. 11, Tr. Trial Day 2 (Foehr) at 53:25-55:12; 81:19-25; Ex. 12, Trial Ex. 34).)

- Testimony from Ligand witnesses about having received inquiries from worried investors about Lemelson's statements.  (*E.g.*, Ex. 13,

> Tr. Trial Day 2 (Foehr) at 84:16-85:16; Ex. 14, Tr. Trial Day 3
> (Voss) at 28:8-16; Ex. 15, Tr. Trial Day 4 (Higgins) at 73:25-80:8.)

- Email inquiries from worried investors about Defendants'
  falsehoods. (Exs. 16-21, Trial Exs. 243-248.)

- Testimony from a Ligand investor, Robert Fields, that Lemelson's
  reports contained misstatements that were of great concern to his
  firm. (Ex. 22, Tr. Trial Day 6 (Fields) at 57-69).)

The jury was also free to conclude under the objective "reasonable investor" standard that

Lemelson's fraudulent statements were material on their face, rendering a "sufficiency of the

evidence" inquiry irrelevant.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)

(statement material if "obviously important to an investor") (cleaned up).

The evidence Defendants cite to argue that the jury could have found for them on

materiality was all presented to and rejected by the jury.  And their efforts to minimize the

import of other evidence (*e.g.* the downplaying of the Promacta statement as unimportant

because it was in the middle of a longer interview) is nothing more than second-guessing what

the jury found.  Even if the Court were to conclude that the jury *could* have reached a different

verdict, that's no reason to grant a new trial.  *Jennings,* 587 F.3d at 436.  There was no lack of

evidence; the jury simply didn't view the evidence the same way Defendants did.

Moreover, Defendants distort the record.  For example, they say that Ligand investor

Robert Fields testified that Cardinal Capital, where Mr. Fields works, "*bought more* Ligand stock

shortly after the Benzinga interview.[1]  (Br. at 7 (emphasis in original).)  Mr. Fields said no such

thing: "Q:  You got this information [about the Benzinga interview] in June 2014, did Cardinal

---

[1] Defendants do not explain how this cuts against a finding of materiality.  If Cardinal Capital ultimately believed that Ligand's stock was undervalued as a result of Defendants false statements, it would make sense to buy and hold until a rebound in price when the truth came out.

Capital start buying more stock in Ligand?  A: *I don't remember*."  (Ex. 23 (Trial Tr. Day 6

(Fields) at 75 (objection omitted, emphasis added).)  They also insinuate that Ligand itself didn't

think the Benzinga Promacta falsehood was material (Br. at 4), citing Ligand's first PowerPoint

presentation to the Commission that actually contains 11 pages of discussion about the falsity of

Lemelson's Promacta "thesis."  (ECF No. 282-4 at 3, 40-50.)  And, while misleadingly citing to

that first presentation, Defendants gloss over the second PowerPoint, in which "Promacta going

away" features prominently in the very excerpt they attach to their motion.[2]  (ECF No. 282-5 at

2.)  Defendants record cites throughout their brief are rife with similar mischaracterizations.  (*See*

Ex. B (appendix addressing Defendants' record cites).)

Defendants also repeat their argument that the Commission was required to introduce an

event study to prove materiality.  This Court has repeatedly rejected this argument.  (ECF No.

146 at 13-20 (order denying Defendants' motion for summary judgment); ECF No. 29 (order

denying motion to dismiss in which defendants argued that statements were not material and

were protected opinions); ECF No. 243 (order denying Defendants' motion for judgment as a

matter of law.)  Indeed, the case law states that no evidence of price movement (let alone a

statistical event study) is required:  "[W]hether a public company's stock price moves up or

down or stays the same . . . does not establish the materiality of the statements made, though

stock movement is a factor the jury may consider relevant."  *United States v. Bilzerian*, 926 F.2d

1285, 1298 (2d Cir. 1991); *see SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1265 (S.D. Fla. 2011).

---

[2] In denying Defendants' motion for summary judgment, the Court held that any "failure to highlight these
statements in these presentations does not render them immaterial as a matter of law" (ECF No. 146 at 19-20),
leaving it to the jury to decide the probative value of the evidence.

### C.       Lemelson's Statements about Viking Did Not Express Opinions

Defendants again argue that Lemelson's fraudulent statements about Viking[3] are not

actionable because he was allegedly expressing his opinions.  As this Court held at summary

judgment, each of the statements, on their face, were statements of existing fact concerning a

"thing happened."  (ECF No. 146 at 23-26; *see* ECF No. 29 (order denying Defendants' motion

to dismiss); ECF No. 243 (order denying Defendants' motion for judgment as a matter of law).)

Defendants offer nothing new and their "opinion" argument should be rejected.

Further, the Court put the question to the jury.  The jury was instructed, consistent with

the Supreme Court's decision in *Omnicare*, on how to determine whether a statement is an

actionable assertion of fact or a protected expression of opinion.  (Ex. 24 (Jury Charge) at 21-

23.)  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175,

190 (2015); *MAZ Partners LP v. Shear*, 218 F. Supp. 3d 132, 135-37 (D. Mass. 2016).

Significantly, Defendants did not object to the *Omnicare* instruction, in effect conceding that the

question was proper for the jury to decide.  (Ex. 25 (Rough Tr. Trial Day 6) at 105 ("we're good

with that instruction").)  Applying the *Omnicare* standard, the jury concluded that Lemelson's

three fraudulent statements were actionable.

Defendants also rehash their argument that investors could have discovered their

falsehoods by hunting around in public documents.  (Br. at 8-9.)  It is not, and has never been,

clear how this observation—which was argued to the jury—would convert a misstatement of fact

into an opinion, as the Court previously observed.  (ECF No. 146 at 26 ("Lemelson does not

show how this context might have converted his characterizations of fact about Viking's reliance

---

[3] Defendants do not argue that Lemelson's Promacta falsehood during the Benzinga interview was an opinion.

on auditors and its intent to conduct clinical trials into opinion evidence").) The fact that, in some cases, accurate information contradicting Lemelson's misstatements was available in other public documents is no defense. *See, e.g.*, *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 51 (D. Mass. 2006); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 251-52 (D. Mass. 2006); *Swack*, 383 F. Supp. 2d at 237; *SEC v. Mozilo*, No. CV 09-3994-JFW, 2010 WL 3656068, at *9 (C.D. Cal. Sept. 16, 2010); *SEC v. Reys*, 712 F. Supp. 2d 1170, 1175-76 (W.D. Wash. 2010).

Defendants' lastly argue that the jury's finding that Lemelson's two falsehoods about Viking violated Section 10(b) was "against the weight of the evidence." They argue that Lemelson's false statement that "Viking does not intend to conduct any preclinical studies or trial" is "objectively true" (Br. at 9), because, they say, third parties would be conducting such trials. The Court already rejected this argument, stating that, in context, "the jury could reasonably conclude that [Lemelson's statement about clinical trials] is a misleading half-truth." (ECF. No. 146 (summary judgment order) at 24-25.) The jury was instructed accordingly:

> The fact that a statement is literally accurate does not preclude liability. Some statements, although literally accurate, can become misleading if, in their context and manner of presentation, they would mislead investors. This includes what are sometimes called half-truth statements that are literally true but create a materially misleading impression.

(Ex. 2 (jury charge) at 18-19.) Even if the jury believed that the statement was literally accurate—which the evidence showed it was not—they could find Defendants liable nonetheless.[4]

---

[4] Viking's CEO, Brian Lian, PhD, testified that Viking's preclinical and clinical studies were conducted in collaboration with third parties pursuant to Viking's design and under its supervision, which is typical in the

## II.      THERE WERE NO EVIDENTIARY ERRORS AT TRIAL

"Unless justice requires otherwise, no error in admitting or excluding evidence . . . is

ground for granting a new trial . . . .  At every stage of the proceeding, the court must disregard

all errors and defects that do not affect any party's substantial rights[.]"  Fed. R. Civ. P. 61.

Evidentiary rulings are governed by the "abuse of discretion" standard and even if "an abuse of

discretion occurred, we will not order a new trial unless we also find that the error in admitting

evidence had a substantial and injurious effect on the jury's verdict."  *In re PHC, Inc.*

*Shareholder Litig.*, 894 F.3d 419, 439 (1st Cir. 2018) (new trial not required after district court

admitted stock price evidence over R. 403 objection).  Here, Defendants identify no abuse of

discretion and no substantial and injurious effect.  They instead merely disagree with the Court's

evidentiary rulings, which is insufficient to establish error.  *U.S. v. Ayer*, 770 F.3d 83, 95 (1st

Cir. 2014) (that "reasonable minds could disagree" about an evidentiary ruling "cannot be an

abuse of discretion") (citation omitted).

### A.      The Court Did Not Abuse Its Discretion in Allowing Ligand Investor Robert Fields to Testify

Defendants' contend that the Court erred in permitting Ligand investor Robert Fields of

Cardinal Capital to testify.  They first complain that the Commission did not disclose Mr. Fields

as a potential witness until after the close of discovery.  (Br. at 10-12.)  This issue was

extensively briefed in connection with Defendants' motion in limine to exclude Mr. Fields'

testimony.  In short, Defendants claimed unfair surprise and the Commission argued that

Defendants were well aware of Mr. Fields, having asked several witnesses about him during

---

industry.  (*E.g.*, Ex. 26, Tr. Trial Day 2 (Lian) at 176:7-17, 208:10-209:6.); *see* ECF No. 214 at 24-25 (citing Dr. Lian's deposition testimony that "the model of Viking, and 75% of the industry, is to hire third parties to conduct their experiments.").)

depositions.  (*See* ECF Nos. 179 (Defendants' motion) and 185 (Commission's opposition).  The

Court denied Defendants' motion because Defendants had sufficient notice the Ligand investors

might testify.  (ECF No. 210.)  Defendants offer nothing new here, so there is no reason for the

Court now to reverse its prior ruling.

Defendants also falsely claim that "counsel had no prior notice [of the scope of Mr.

Fields' testimony], negatively impacting counsel's ability to prepare for cross examination."[5]

(Br. at 14.)  At the October 14, 2021 pretrial conference, the Court directed Commission counsel

to make a proffer to Defendants' counsel as to the scope of Mr. Fields testimony.  Commission

counsel did so on October 18:

> Mr. Fields is expected to testify about their Cardinal Capital's
> position in Ligand in 2014, when and how he became aware of
> Defendants' public statements about Ligand in 2014, his reaction to
> those statements (including whether they considered the subject
> matters of the statements as having the potential to significantly alter
> total mix of information available to Ligand investors), and
> communications with Ligand personnel and others about
> Defendants' statements.  Mr. Fields will testify that:
>
> - He was a senior analyst at Cardinal Capital in 2014 responsible
>   for Cardinal's long position in Ligand;
>
> - He is now a partner;
>
> - He became aware of Defendants after reading the June 16, 2014
>   report when it came out;
>
> - He noted a negative market reaction to the first report;
>
> - He considered Defendants' report to be replete with factual
>   misstatements;
>
> - He considered important Defendants' claims about Promacta,
>   Viking, intangible assets having no value, the 2014 debt
>   offering, and insolvency;
>
> - He discussed Defendants' reports with Ligand management
>   approximately eight times.

---

[5] Defendants do not explain how they were "negatively impacted" in their ability to prepare for cross examination.

(Ex. 27, October 18, 2021 email from Day to Sullivan.)  Each allegedly "undisclosed" topic

Defendants list (Br. 13-14) is disclosed in the Commission's proffer.  Defendants never

responded to the proffer and Commission counsel had no reason to believe that any of the

proffered topics were off limits.

**B.       There Was No Error in Limiting Defendants' Claim of Commission Bias**

Defendants claim that (i) the Commission improperly "vouched" in closing argument and

(ii) more evidence[6] of "Commission bias" should have been allowed.  As an initial matter,

Defendants never objected to any purported vouching.  Their claim of error is thus waived.  *U.S.*

*v. Coady*, 809 F.2d 119, 123-24 (1st Cir. 1987) (claim of error waived absent timely objection to

summation).

In any event, there was no vouching.  The portion of the Commission's summation to

which Defendants untimely object was a response to their argument at trial and in their closing

argument that the alleged omissions in Ligand's presentation meant that Lemelson's falsehoods

were not material.  (*E.g.*, Ex. 31, Tr. Trial Day 7 at 41:25-42:14.)  Counsel noted that the

Commission does its own investigation and charges what it charges, irrespective of what a third

party did or did not tell it.  (ECF No. 282-12 at 80 ("the SEC does an investigation. . . and comes

up with its own reasons, own evidence, own theory why the law was violated").)  This is not

vouching because it is not commentary on counsel's own or a witness's credibility.  *U.S. v.*

*Williams*, 97 F.3d 240, 245 (8th Cir. 1996) (cited by Defendants at page 15 of their brief).

Further, "'[w]here the prosecutor, his witnesses, or the work of the government agents is

---

[6] While the Court excluded evidence of Commission "bias" generally, it allowed Defendants to introduce evidence of Ligand witnesses' alleged bias and, to the extent that evidence also went to the Commission's alleged bias, it was allowed.  (Ex. 28 (Tr. Final Pretrial Conference) at 17-19.)

attacked [by defense counsel], counsel is entitled to make a fair response and rebuttal.'" *Id.*

(quoting *United States v. Lee*, 743 F.2d 1240, 1253 (8th Cir.1984).  That's exactly what

happened here.  From opening statements to closing arguments, Defendants' counsel repeatedly

insinuated that Ligand was engaged in some un-American effort to "silence" Lemelson using the

Commission as its puppet.  (*E.g.*, Ex. 29, Tr. Trial Day 1 at 88:17-25 (Defendants' opening

statement:  "Why didn't they just speak up like we do in America?"); Ex. 30, Tr. Trial Day 7 at

34:5-10 (Defendant's summation: "We're not in North Korea.").)  Counsel specifically called out

the alleged omission of the Promacta and Viking statements from Ligand's presentations to the

Commission, the precise argument addressed by Commission counsel in closing.  (*E.g.*, Ex. 29,

Tr. Trial Day 1 at 88:4-16; Ex. 31, Tr. Trial Day 7 at 41:25-42:14.)

## C.    The Hunter Letter Was Properly Excluded

Defendants next claim that the Court should have admitted a letter addressed to the

Commission composed by former Rep. Duncan Hunter.  (ECF No. 282-17.)  The letter contained

certain allegations about Defendants' conduct and encouraged the Commission to investigate.

(*Id.*)  The Court excluded the letter itself but allowed Defendants to question witnesses about it.

(Ex. 32, Tr. Final Pretrial Conference at 79.)  And Defendants' counsel did in fact cross examine

Ligand CEO John Higgins about the letter.  (*E.g.*, Ex. 33, Tr. Trial Day 4 at 130:9-132:9.)

Defendants now claim that "the effectiveness of the examination was severely diminished

as the witness testified he did not remember" certain specifics about the letter, including the date

it was sent.  (Br. at 16.)  They claim this resulted in "the jury [hearing] only ambiguous

testimony about a letter it did not get to see."  (*Id.*)  But nothing prevented counsel from

refreshing the witness's recollection with the letter to establish both the date it was sent, to whom

it was addressed, and its contents.  Defendants chose not to do so at trial and cannot now be

13

heard to complain that they were hamstrung in presenting their case.

## III.   THERE WAS NO ERROR IN COURT'S INSTRUCTION TO THE JURY ON MATERIALITY

Defendants argue that the Court's jury charge on materiality was erroneous because it did

not instruct the jury that the Commission was required to introduce an event study to prove

materiality.  As noted above, this Court found no merit to Defendants' event study argument—

repeatedly.[7]  (ECF No. 146 at 13-20 (order denying Defendants' motion for summary judgment);

ECF No. 230 (order denying Defendants' motion for judgment as a matter of law.)  No event

study is required to prove materiality:  "[W]hether a public company's stock price moves up or

down or stays the same . . . does not establish the materiality of the statements made, though

stock movement is a factor the jury may consider relevant."  *United States v. Bilzerian*, 926 F.2d

1285, 1298 (2d Cir. 1991); *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1265 (S.D. Fla. 2011)

(same).  An event study may be probative but it is not dispositive.  (ECF No. 146 (order denying

Defendants' motion for summary judgment) at 17.)  Defendants' arguments will eventually be

addressed in the Court of Appeals.  In the meantime, Defendants offer no new reason that the

Court should reverse course and grant a new trial on this basis.

## IV.   THE COURT SHOULD NOT AMEND THE FINAL JUDGMENT

Defendants lastly ask the Court to vacate the five-year injunction it imposed as part of the

final judgment in this case.  (Br. at 19.)  As in their motion to stay the judgment, Defendants

claim that the Commission seeks to "weaponize" the injunction to seek additional remedies in a

separate administrative proceeding.  (*Id.*)  Defendants already made this argument in opposition

---

[7] This issue has been repeatedly briefed and argued throughout this case, most extensively in the context of Defendants motion for summary judgment. (*See* ECF Nos. 125 (Defendants' brief in support of motion for summary judgment), 131 (Commission's opposition), and 138 (Defendants' reply).)  The Commission will not repeat the parties' argument in detail here.

to the Commission's motion for entry of final judgment and it was the subject of extended

discussion at the remedies hearing.  (ECF No. 260 at 8-11 (arguing that no injunction should

enter because it may lead to an industry bar).)  The Court issued the five-year injunction with full

knowledge of the potential consequences in a separate Commission administrative proceeding.

There is no reason for the Court to reverse its prior ruling now.

Further, as explained in the Commission's opposition to Defendants' motion to stay the

final judgment, Congress expressly authorized follow-on proceedings against investment

advisers arising from an injunction.  *See* 15 U.S.C. § 80b-3(e)(4).  While that separate

proceeding before the Commission may result in Lemelson being barred from serving as an

investment adviser, that is only one of the possible sanctions the Commission could impose.  15

U.S.C. § 80b-3(e) (authorizing Commission to "censure or place limitations on the activities of . .

. or suspend . . . or bar" an enjoined investment adviser).  The Order Instituting Proceedings is

thus silent as to the remedy the Commission may ultimately impose.  (ECF No. 282-22.)

Further, any sanction that might be imposed in those follow-on proceedings is not preordained

and would only be imposed "after notice and opportunity for hearing" that the sanction was

appropriate and in the public interest.  *See* 15 U.S.C. § 80b-3(e).  Defendants also would have the

opportunity to seek judicial review of any final Commission order imposing any sanction.  *See*

15 U.S.C. § 78y(a)(1).  A potential industry bar at some future date is not a reason to vacate the

Court's injunction now.

## CONCLUSION

Defendants remain unwilling to accept that the jury found them liable for securities fraud

under the core antifraud provision of the federal securities laws, Exchange Act Section 10(b).

There are consequences that flow from being found to have committed fraud, particularly when

the fraudster is a fiduciary.  Defendants plainly disagree with the jury's verdict and certain of the

Court's rulings, but offer no real grounds for a new trial.  The Commission therefore asks the

Court to deny Defendants' Motion for New Trial.

Dated:  May 11, 2022                          Respectfully submitted,

                                              **SECURITIES AND EXCHANGE**
                                              **COMMISSION**

                                              By its Attorneys,

                                              */s/ Alfred A. Day*
                                              Alfred A. Day (Mass. Bar #654436)
                                              Marc J. Jones (Mass. Bar #645910)
                                              Boston Regional Office
                                              33 Arch Street
                                              Boston, MA  02110
                                              (617) 573-4537 (Day direct)
                                              daya@sec.gov
                                              jonesmarc@sec.gov

**CERTIFICATE OF SERVICE**

        I certify that on May 11, 2022, a copy of the foregoing was electronically filed through
the ECF system and will be sent electronically to all persons identified in the Notice of
Electronic Filing and that paper copies will be sent to those indicated as non-registered
participants.

                                              */s/ Alfred A. Day*