

PLAINTIFF'S
EXHIBIT
15
18-cv-11926-PBS

1    months the virus would go away.

2         So as those patients got better and the virus went

3    away, what we were looking to explore was eventually would that

4    liver recover, would that liver become Healey again and be able

5    to produce platelets?  If that's the case, that parents may not

6    require Promacta or may not require as much Promacta.

7         Before Sovaldi basically all these patients were

8    available to us, but now Sovaldi was doing really well in

9    helping hepatitis patients, the need for Promacta in those

10:46 10    patients would be lower potentially.  That's what we were

11    trying to explore.

12    Q.    Okay.  Could we go to the top of this email?  The top of

13    this email refers to somebody called F ball, do you see that

14    notice secretary paragraph?

15    A.    Yes.

16    Q.    Who is Afdhal?

17    A.    He's one of the top medal experts in liver disease.

18    Q.    So is the proposal here to reach out to an expert to get

19    sort of more information?

10:47 20    A.    Yes.

21    Q.    And was that part of the information gathering process you

22    described?

23    A.    Yes.

24    Q.    Okay.  Let's go on.

25         Following the issuance of Father Lemelson's June 16th

1    report and the interview on Benzinga, did you get inquiries

2    from investors about the report and the interview?

3    A.    Yes.

4    Q.    What kind of inquiries did you get?

5    A.    Almost every meeting or call that I was in a good portion

6    of that meeting or session would be spent on Lemelson.  Who is

7    this guy, why is he saying this?  What's our view of the

8    circumstance?

9         And that Friday, I had investor meetings the following

10:48 10   week, so any in-person that was already scheduled, and then

11   we'd have inbound emails, we'd have questions and emails.  So

12   there was a range of concerns and questions.

13        MR. JONES:  Your Honor, at this time there is three

14   exhibits, 246, 247 and 248 that were originally marked for

15   identification as H, Q, and S, the hearsay information has been

16   redacted at the Court's direction, and I'd like to ask that

17   those be admitted into evidence and to publish them to the jury

18   at this time.

19        THE COURT:  Yes.  And let me give a limiting

10:49 20   instruction here, which is remember I said at the start that

21   sometimes I would limit the use to which information could be

22   put.  These are investors, I think, who were communicating with

23   Ligand.  They're not here to be cross-examined, so I'm not

24   admitting them for the truth of anything they said, but only

25   for that what their state of mind was, what their concerns were

    1   when they were communicating here with Mr. Higgins or Ligand in

    2   general.

    3           So with that limitation I will allow in 246, 247, 248.

    4   I think certain information was redacted, either because it was

    5   irrelevant, I think for the most part, or not going to the

    6   state of mind of the investor.

    7           So they're admitted.

    8           (Exhibits 246, 247, 248 received into evidence.)

    9           MR. JONES:  Thank you, your Honor.

10:49 10        Could we have 246 please, Cole.

   11           And can you blow up Mr. Higgins' part of the email up

   12   at the top.

   13           THE COURT:  As you're taking notes, put a big "L"

   14   because you'll forget otherwise, limited.

   15   BY MR. JONES:

   16   Q.   So Mr. Higgins, is this you writing an email to Bruce

   17   Voss?

   18   A.   Yes.

   19   Q.   Could you tell us what you're communicating in the second

10:50 20   paragraph here?

   21   A.   Relaying that we met with an investor and just described

   22   some of the general discussion we had or did not have.

   23   Q.   Who's Invesco?

   24   A.   Invesco, they're a large investor based out of Denver,

   25   Colorado, a big national fund, one -- at the time at least one

1   of the larger investors in biotech companies.

2   Q.   Were they one of the larger investors in Ligand as well?

3   A.   At that time -- I don't think they were a top ten

4   investor, but I'm not exactly sure what their holdings were,

5   but we certainly had a relationship and met with them

6   regularly.

7   Q.   And you're saying that they were asking questions that

8   seems to be from Father Lemelson's script?

9   A.   Yes, correct.  My memory, they did not invoke his name

10:51 10   specifically, but it was clear and they knew us, we've known

11   this account for quite a while, but the order of questions and

12   the focus seemed very evidently triggered by the recent

13   publications.

14   Q.   Okay.

15        MR. JONES:  Could we have 247, please, Cole.

16   Q.   Here there's been some stuff blanked out, I want to ask

17   you about the stuff that's not blanked out here.  It talks

18   about Peter Kipp.  Who is Peter Kipp?

19   A.   Another investor, major investor at a biotech hedge fund.

10:51 20   Q.   We have a little jargon here, 250 M AUM generalist hedge

21   fund.  Can you tell us what that means?

22   A.   So asset under management, so basically about a quarter of

23   a billion dollars of investable assets.

24   Q.   Did he want to talk about Lemelson as well?

25   A.   Yes.

ROUGH DRAFT

1   Q.   Is that what you're writing in this email?

2   A.   Yes.

3   Q.   And did you talk with him about Lemelson?

4   A.   Yes.

5   Q.   Okay.  Did he express concerns about those reports?

6   A.   Yes.

7   Q.   And this is August 29th of 2014, correct?

8   A.   Correct.

9   Q.   So did you continue to get investor inquiries throughout

10:52 10   the summer of 2014 about the Lemelson reports?

11   A.   It was relentless.  In this era, and I was very active, as

12   I always am with investors, almost every meeting Lemelson by

13   name or by, again, the focus of questions was consumed by the

14   Lemelson reports.

15   Q.   Okay.  And can we go to 248, please.

16        This is an email from you in October of 2014; is that

17   right?

18   A.   Yes.

19   Q.   And we just talked about the summer of 2014.  Did

10:53 20   inquiries about Lemelson continue into the fall?

21   A.   Yes.

22   Q.   And this is about a Bob fields and gene Fox at capital.

23   What's that?

24   A.   It's their fund.

25   Q.   Is that called cardinal capital?

1    A.   Cardinal Cal tap, maybe cardinal is the more common name

2    in their fund, but cardinal capital, yes.

3    Q.   You're just shorthanding it here?

4    A.   Yes.

5    Q.   And did gene and Bob fields also talk to you about the

6    Lemelson reports?

7    A.   Frequently.

8    Q.   And did they want to talk about what was in those reports?

9    A.   Yes.

10:53 10   Q.   Did they have concerns about them?

11   A.   They had concerns that the faults statements were being

12   pedaled, they were a large investor in Ligand, they were

13   coverable with our business and had known us for quite

14   sometime, but they were very concerned about the aggressive

15   attack in those reports.

16   Q.   And according to this email, was part of their concern

17   about the Promacta claims that Father Lemelson was making?

18   A.   Yes.

19   Q.   Okay.

10:54 20        Last topic, Mr. Higgins.

21        MR. JONES:  Could we have Exhibit 241, please.

22   Q.   Is the email on top an email from you?

23   A.   Yes.

24   Q.   Who are you writing to?

25   A.   Our board ever directors.

1    Q.   And you talk about here the continued weakness in our

2    stock.  What are you referring to?

3    A.   The stock immediately as a result of the initial Lemelson

4    report sold off sharply, and this is now four, five months

5    later, but what's continued despite success, despite, you know,

6    good performance and a solid business, the stock was still

7    under a lot of pressure.

8              MR. JONES:  If we go down to the bottom of that part

9    of page, the email that starts Ligand board on the bottom of

10:55 10   the first paragraph there.

11   Q.   You wrote, With the recent stock weakness, it is obvious

12   we continue to be impacted by the Lemelson shorting and related

13   reports.

14             What did you mean by that statement?

15   A.   The negative claims created an air of uncertainty.

16   Investors are busy, they've got other choices to invest in, so

17   there's a reaction I'm not going to do a lot of work in this n

18   this, I don't like the way it's trading, so selling often can

19   create more selling and create a real damaging environment.  It

10:55 20   doesn't mean it's correct, it doesn't mean, you know, that this

21   was well grounded, bug there's often a market reaction, a

22   trending market reacting.  That's what we were witnessing here.

23   Q.   In 2014, Mr. Higgins, please describe overall what your

24   understanding of the effect of Father Lemelson's reports were

25   on Ligand.

ROUGH DRAFT

```
 1   A.    Very damaging.  You know, a business that was performing
 2   well financially, qualitatively, was getting very good reports
 3   from patients and our partners in terms of our medical research
 4   progress was being devastated in perception and in value by
 5   these attack reports.
 6              So distracting and consuming a lot of our time and
 7   energy, but it was having a real significant impact on our
 8   valuation and stock price.
 9   Q.    Was it affecting people within the company as well?
10   A.    Yes.
11   Q.    In what way?
12   A.    Morale, employees --
13              MR. HOOPES:  Objection, your Honor.
14              THE COURT:  Sustained.
15              MR. JONES:  I have nothing further at this time, your
16   Honor.
17              THE COURT:  For this witness?
18              MR. JONES:  Yes, that would be the end of the
19   direction examination, yes.
20              THE COURT:  All right.  We'll take our morning break.
21              MR. JONES:  Thank you, your Honor.
22              THE CLERK:  All rise.
23              (Jury left the courtroom.)
24              THE COURT:  Thank you.
25              You can step down for a minute.
```