

PLAINTIFF'S EXHIBIT 22
18-cv-11926-PBS

access to it.  But me at university have access to most of the journals, and that's how you start reading about the drugs and stuff.

Most of the company when they use new treatment they get approval by the FDA so they can sell it, so they do these studies that fulfill the requirement of the FDA, and then they publish the results as they go.  That's why we see them right now, for example, the COVID for the kids, Pfizer have 2,500 kids --

THE COURT:  Let's just stick to Sovaldi.

All right.  What's the next question?

MR. DAY:  I have nothing further, your Honor.  That was from the jury.

THE COURT:  Doctor, thank you for coming in.

THE WITNESS:  Can I just leave?

THE COURT:  You're welcome to stay.

THE WITNESS:  No, no, I have to go back to work.  I don't want to stay, thank you.

MR. DAY:  Your Honor, the Commission calls Robert Fields.

(Pause.)

THE COURT:  We can stand and stretch, always a good thing do.

(Pause.)

ROBERT M. FIELDS, having been duly sworn by the Clerk,

was examined and testified as follows:

    THE CLERK:  Could you please state and spell your name for the record.

    THE WITNESS:  Robert M. Fields, R-o-b-e-r-t, last name F-i-e-l-d-s.

    THE CLERK:  Thank you.  You may be seated.

### DIRECT EXAMINATION

BY MR. DAY:

Q. Good morning, Mr. Fields.

    Where do you work, sir?

A. Cardinal Capital Management in Greenwich, Connecticut.

Q. What is Cardinal Capital Management?

A. It's a fundamentally orientally asset manager who manages today a little over $5 billion in assets.

Q. And what is your role at Cardinal?

A. Currently I am a partner and portfolio manager at the firm.

Q. What does that mean on a day-to-day basis?

A. I am both responsible for analyzing company's directly myself as well as participating in a unanimous process with the three other portfolio managers to decide which stocks to buy and sell.

Q. So you provide essentially investment advice to the fund?

A. That's correct.

Q. What was your role at Cardinal in 2014?

A.   At 2014 I was a senior analyst at the firm.

Q.   What does that mean?

A.   We have historically had both junior and senior analysts. The senior analysts are simply the more experienced, usually following larger positions for the firm.

Q.   I should have asked before, when did you join Cardinal Capital?

A.   April of 2013.

Q.   Could you tell the jury about your educational history.

A.   Yes.  I'm an undergraduate of Ball State University in Indiana in 1993, and I have a master's in business administration from the Wharton School at the University of Pennsylvania.  I graduated in 2000.

Q.   After you obtained your MBA, where did you go to work?

A.   I went to work for a private equity fund in Teaneck, New Jersey, by the name of BCI Partners.

Q.   What's a private equity fund?

A.   They manage money to investment in private companies for limited companies over a fixed generation.  Generally the funds have a 10-year life.

Q.   And when did you leave the private equity firm?

A.   Nine months later.

Q.   Okay.  And what year was that?

A.   2000.

Q.   Okay. What did you to between then and when you joined

Cardinal Capital in 2013?

A. From 2000, early 2001 to early 2006 I worked for an individual by the name of Michael F. Price, who was a well-known investor and self-made millionaire who opened MFP Investors, his family office.

I was responsible for general equity research as well as distressed investing during my time as an analyst there.

From 2006 to 2010, I was head of research and trading for a fund in Greenwich, Connecticut, which was an activist fund. We had a concentrated portfolio of 8 to 10 stocks, and a partner at that firm for those four years.

Q. So that took you through 2010?

A. Yes.

Q. Okay. And then from 2010 to 2013?

A. 2010 to 2012, I had my own fund with a partner. We managed roughly $50 million focused on -- we were generalists focused on equities.

Q. And then from when you left -- or stopped working with your own fund until you joined Cardinal, what did you do?

A. For that remaining year before joining Cardinal, in 2013, I sold my half of the partnership to my partner, left to purchase a business with another partner, and then after purchasing that business, he runs it day to day, I went and took a job as a senior analyst at Cardinal Capital Management.

Q. Now, you mentioned some work on distressed assets I

believe.  What is that?

A.   So during my time working for MFP Investors, I worked on a number of distressed funds from utilities to transportation and insurance and invested throughout the capital structure both equities, preferred stock bonds, and bank debt.

Q.   And distressed assets, does that involve companies that are bankrupt or insolvent?

A.   Both.

Q.   Did you come to have an understanding of bankruptcy and insolvency as a result of your work?

A.   I believe I have a strong perspective on it, yes.

Q.   Okay.  I want to talk about Ligand Pharmaceuticals.  Was Cardinal Capital -- or did Cardinal Capital have an investment in Ligand in 2014?

A.   We did.  I believe we made the investment in late 2013.

Q.   How big an investment?

A.   I don't recall.  For our fund, a large position would be 4 percent of the overall portfolio, so it would be less than that.

Q.   And about how much is 4 percent of the portfolio back in 2014, ballpark?

A.   We mentioned roughly two to two and a half billion dollars depending on the exact time period, so 4 percent would be $80 million.

Q.   I'm sorry, 80 or 8?

A.   A 4 percent position would be roughly an $80 million position back then.  I don't remember specifically what size Ligand was.

Q.   Is Cardinal still invested in Ligand?

A.   We are today.  We have not been continuously invested it since that time.

Q.   So there were points between 2014 and the current time when you sold positions in Ligand?

A.   We exited the position early this year and reentered in the third quarter.

Q.   And when you exited the position, was that a profitable investment?

A.   Yes.  We had a 35 percent compounded IRR over seven and a half years.

Q.   What's IRR?

A.   It's our annualized rate of return, so we made 35 percent a year for seven-and-a-half years.

Q.   Let's shift gears and talk about the defendant, Father Lemelson.

        When did you first hear of him?

        MR. SULLIVAN:  Objection, your Honor.

        THE COURT:  Overruled.

        MR. SULLIVAN:  This goes to the scope issue we raised this morning.

        THE COURT:  Overruled.

BY MR. DAY:

Q.   You can answer the question, sir.

A.   I became aware of the defendant when the first report was filed in 2014.

Q.   And that was June 16, 2014?

A.   I believe that's correct, yes.

Q.   Okay. Did you follow his coverage of Ligand during 2014?

A.   There were five or six reports that I saved copies of, made comments on at the time, and scanned into our research system, so, yes, I did follow -- it was a combination of interviews, press releases, and reports released on different sources. I don't remember specific exactly the source.

Q.   Okay. And did you listen interviews that Father Lemelson gave?

A.   I listened to one, maybe two on Benzinga.

Q.   Was one of those June 19, 2014?

A.   I believe that was the first one that was done, yes.

Q.   And you listened to it?

A.   I did.

Q.   Okay. Do you recall that Father Lemelson made claims about the drug Promacta?

A.   I remember one specific statement, yes.

Q.   Okay. What statement do you remember?

A.   That he had spoken to the investor relations at the company and that, quote, Promacta was going away.

Q. Did you agree with that based on your knowledge of Ligand's business?

A. No.

Q. Would it have been important to you as an investor in Ligand if Promacta was in fact going away?

A. Very much so.

Q. Why?

A. Promacta made up the majority of the current revenue of the company was the largest source of cash flow for the business.

Q. Would it have influenced your investment decision if Promacta was in fact going away?

A. Absolutely.

Q. Same reason?

A. Yes.

Q. Do you recall Father Lemelson making claims about a company called Viking Therapeutics?

A. I do.

Q. And what do you recall about those claims?

A. I believe in one of the reports it was referred to as a shell game.

Q. What else do you remember about Viking Therapeutics?

A. So Viking Therapeutics was a counterparty for a licensing agreement to Ligand where they carved out a number of programs, licensed them to Viking which intended to go to a public

offering to advance the development of those projects.  Those contracts were filed publicly, the economic arrangements between the two companies were filed publicly, and ultimately Viking was given the go ahead begin developing those products.

Q. If Viking had in fact been a shell -- well, let me back up.

What is your understanding of what it would mean if Viking were a shell?

A. That it would be devoid of any assets of any material value.

Q. If that had been true, would that have been important for you to know as an investor in Ligand?

A. Yes.

Q. Why?

A. The potential economic royalties that Ligand can receive from Viking numbers in the multiple billions of dollars.  Now, that's well into the future, but it potentially extremely significant source of economic value for Ligand.

Q. How is Viking doing today?

MR. SULLIVAN: Objection, your Honor.

THE COURT: Sustained.

BY MR. DAY:

Q. Do you recall Father Lemelson making some claims about Ligand's solvency?

A. Yes.

Q.   What do you recall about that?

    MR. SULLIVAN:  Objection, your Honor.

    THE COURT:  Overruled.

A.   I believe there were two points, one pre and one post a large convertible bond offering that the company did that the potential insolvency for the business was referred to.

Q.   In what way?

A.   One post the bond offering was referring to a ratio of the debt raised to the current equity account balance of the company on their financial statements, which is nonsensical because --

    MR. HOOPES:  Objection, your Honor.

    THE COURT:  Sustained.

    What's the next one?

BY MR. DAY:

Q.   Did Father Lemelson claim that Ligand was insolvent?

A.   I believe the comment that I read was that any potential future distress would cause it to be insolvent.  But I don't remember entirely.

Q.   Would it have been important for you as an investor to know the status of Ligand's solvency in 2014?

A.   Yes.

Q.   Why?

A.   If it's insolvent, the equity is likely to be worthless.

Q.   Do you believe that Ligand was insolvent in 2014?

>           MR. SULLIVAN:  Objection, your Honor.
>
>           THE COURT:  Sustained.

BY MR. DAY:

Q.   You mentioned a bond offering in 2014.  So that's Ligand raised money through the bond offering?

A.   Ligand raised a convertible bond -- issued a convertible bond to raise in excess of $200 million.  I don't remember the exact figure they entered after the green chute.

Q.   As an investor, did you view the bond offering a good thing or a bad thing?

>           MR. SULLIVAN:  Objection, your Honor.
>
>           THE COURT:  Overruled.

A.   It was quite positive for the liquidity of the company.

Q.   Can you explain to the jury what you mean by that?

A.   So two sources of liquidity for a public company in general --

>           THE COURT:  He's not called as an expert.
>
>           So why did it matter to you, the debt offering?
>
>           THE WITNESS:  It provided the company with significant source of liquidity.

BY MR. DAY:

Q.   Did you talk to Ligand's management about Father Lemelson's reports?

A.   We did.

Q.   And --

>        THE COURT:  "We" means you did?
>
>        THE WITNESS:  I did, yes.
>
>        THE COURT:  You personally did.
>
>        THE WITNESS:  I personally did, yes.
>
>        THE COURT:  Okay.

BY MR. DAY:

Q.   And about how many occasions in 2014 if you recall?

A.   Specifically about his reports, maybe a half a dozen.

Q.   Okay.  Why did you talk to management about Father Lemelson's reports?

A.   We have a fiduciary duty to our clients to manage money in their best interest.  Any time the potential negative news comes out for a company we are required under our investment management contracts to fully research any allegations to make sure whether we agree or disagree with them.

Q.   In your view, did Father Lemelson's reports have an effect on Ligand's stock price?

>        MR. SULLIVAN:  Objection.
>
>        THE COURT:  Sustained.

BY MR. DAY:

Q.   What happened to Ligand's stock price over the course of the summer of 2014?

A.   From memory, the day the first report was released the stock was down 6 or 7 percent.

Q.   And what about over the course of the summer, do you

recall?

A. It continued to be weak. I don't remember numerically how much the stock was down over the course of the year.

Q. If you remember, was there any other bad news about Ligand during the course of that summer?

A. From memory, no.

    MR. DAY: Thank you, Mr. Fields. I have nothing further.

    MR. SULLIVAN: May I, your Honor?

    THE COURT: Yes.

### CROSS-EXAMINATION

BY MR. SULLIVAN:

Q. Good morning, Mr. Fields. My name is Brian Sullivan, and I represent Father Lemelson in this case.

    You just testified that you weren't aware of any bad news about Ligand in the summer of 2014; is that correct?

A. I don't remember any.

Q. So you're not aware of a report in July 2014 from a company called Empire?

A. No.

Q. Okay. And you're not aware that the stock price went down over 4 percent that day?

A. No.

Q. Okay. And are you aware of another report issued by the same company in August 2014?