1  A.   Yes, they did.

2  Q.   And did they issue an audit opinion as to 2012 and 2013?

3  A.   Yes, they did.  It was a clear -- I forget the term --

4  comfort letter.

5  Q.   And that was incorporated into the S-1 as well?

6  A.   Correct, yes.

7  Q.   Did Viking in 2014 plan to use third party vendors to

8  conduct preclinical studies and clinical trials?

9  A.   Yes.  And that's kind of the way the business works.  You

10 hire contractors to perform your preclinical studies your

11 clinical studies so we certainly did.  80 percent of the

12 industry does their business that way.

13 Q.   Was that how Microcide operated?

14 A.   Microcide, yeah.  Well, on the manufacturing side

15 certainly.  We had manufacturing vendors.  Microcide had a lot

16 of internal workers as well.  So there was a little bit of both

17 at Microcide.

18       Now, in the 2010 and beyond range, this sort of

19 outsourcing is much more common than it was in the early 2000s,

20 late '90s.

21 Q.   Since raising money in the IOP in 2015, has Viking

22 continued development of the five programs we were just talking

23 about?

24 A.   We've continued development of four different programs --

25 so a program is kind of an umbrella term and there can be

```
 1              THE COURT:  Sustained leading.
 2   Q.   Do you have an understanding of what the bolding
 3   represents here.  It's calling out the next topic basically.
 4   Here's the risk and here are some of the details underlying
 5   that cursory risk description?
 6   Q.   Okay.  And all the risks are bolded, right?
 7   A.   Correct.
 8   Q.   Okay.  Let's about go back?
 9              MR. DAY:  Let's go back to page 21, Cole.
10   Q.   If you look at the third sentence under that bolded points
11   that Mr. Brooks was asking you about, it starts "nevertheless.
12   It's under the paragraph right under the bolded part.  The
13   third sentence I think it's the third sentence.  It start
14   "nevertheless."  Nevertheless, we," meaning Viking "maintain
15   responsibility for insuring that each of our clinical trials
16   and preclinical studies is conducted in in accordance with the
17   applicable protocol legal regulatory and scientific standards
18   and our reliance on these third parties does not relieve us of
19   our regulatory responsibilities."  Do you see that?
20   A.   Yes.
21   Q.   Is it your understanding, one way or the another, whether
22   Viking retained control and responsibilities for all of its
23   clinical trials and clinical studies?
24   A.   Yes, we do.
25   Q.   Notwithstanding hiring a vendor or using a hospital or a
```

```
 1  doctor?
 2  A.   Yeah.  And they're co-managed really.  The surrender has
 3  the facility but you're sending people there to manage and
 4  observe and correct and help run the protocol.  So that's not a
 5  handoff and then you never see them again.  It's kind of an
 6  interactive processes.
 7  Q.   Okay.  Two more topics I want to touch on briefly.  Did
 8  Father Lemelson ever conduct you before he put out his report?
 9  A.   No.
10  Q.   Ever contact anybody at the company?
11  A.   Not to my knowledge, no.
12  Q.   If he had asked you about any of these things would you
13  have provided him information about them?
14  A.   Yes, I would have.
15  Q.   Okay.  And Mr. Brooks pointed out that the S-1 became
16  public on July 1 of 2014.  Do you recall that?
17  A.   Yes.
18  Q.   And Father Lemelson's report came out on July 3, two days
19  later?
20  A.   Yes.
21  Q.   You testified about your work as an analyst for ten years
22  before you started Viking, right?
23  A.   Yes.
24  Q.   And you talked about initiating reports and all of the
25  work that goes into that, right?
```