UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| GREGORY LEMELSON and LEMELSON CAPITAL MANAGEMENT, LLC, | ) Civil Action No. 1:18-cv-11926-PBS<br>)<br>) **Leave to File Granted on May 25, 2022** |
| Defendants, | )<br>) |
| and | )<br>) |
| THE AMVONA FUND, LP, | )<br>) |
| Relief Defendant | ) |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR NEW TRIAL OR TO ALTER OR AMEND THE JUDGMENT**

The Commission's inflammatory rhetoric accusing Fr. Lemelson of having a "galling contempt for this proceeding, the jury's verdict, and the Court's final judgment" is entirely misplaced. Rule 59 allows a party to seek a new trial on numerous bases including that the jury's verdict was against the great weight of the evidence. That is precisely the situation here. Fr. Lemelson seeks a new trial in which a jury can assess the three statements for which the jury found him liable—the two Viking statements in a single report, and the two-second Benzinga clip—without the taint of the evidence from the Commission's scheme claim, investment adviser claims, and claim on Fr. Lemelson's opinion concerning Ligand's insolvency, all of which the jury rejected. Given the extraordinarily weak evidence of materiality concerning these three statements, and the compelling evidence that the two Viking statements were either true or protected opinions, there is a high probability that a jury focused on these three statements would

clear Fr. Lemelson completely. He should be given that opportunity before the Commission uses the limited injunction this Court entered to permanently destroy his lay vocation.

**I.       The "Evidence" Cited by the Commission Supports Fr. Lemelson's Argument that Evidence of the Rejected Scheme Liability Theory Overwhelmed Evidence About the Three Statements**

The Commission argues in its reply that Defendants performed "quite the pivot" by first arguing that the alleged misstatements were the scheme, but now arguing that the scheme evidence overwhelmed the trial. ECF No. 288 at 2. This mischaracterizes Fr. Lemelson's argument during this proceeding. The Commission claimed that Fr. Lemelson's reports constituted a *scheme* to drive down Ligand's stock price. ECF No. 33 at ¶ 58. In response, Fr. Lemelson argued that the Commission should not have been permitted to pursue such a claim, because outside of any intentional misstatements, publishing criticism of a public company and the value of its stock is constitutionally protected. ECF No. 140 at 4-5; ECF No 181.

At trial, the Commission—cloaked with the credibility of a government agency—was permitted to introduce evidence and argue that Fr. Lemelson's conduct and statements other than the challenged statements constituted proof that he engaged in a scheme to commit securities fraud. In its Opposition, notwithstanding the jury's rejection of its scheme claim, the Commission continues its improper reliance on evidence unrelated to the three statements to try to show the materiality of those three statements. For example, the Commission cites the title of Fr. Lemelson's June 16, 2014 report, **which contains no challenged statement**. ECF No. 288 at 5. Likewise, the Commission cites Fr. Lemelson's summary of his July 3, 2014 report, which does not include reference to either of the two Viking statements for which he was found liable, but instead summarizes his protected *opinion* about Viking generally. ECF No. 288 at 5. The Commission also references Fr. Lemelson's statements where he supposedly "took credit for his reports and public statements sinking Ligand's stock price," but Fr. Lemelson made hundreds of

assertions criticizing Ligand's business, and his claims concerning the impact on Ligand's stock price were not linked to the three statements for which he was found liable.  ECF No. 288 at 5.  The Commission also includes witness testimony and investor emails about Fr. Lemelson's reports that were not related to the three statements.  ECF No. 288 at 5-6.  The Commission's need to resort to its failed "scheme" evidence unrelated to the three statements proves Fr. Lemelson's point: the great weight of the evidence shows that those three statements were not material, and the jury likely concluded they were only because it was confused by the tidal wave of evidence that was not linked to those three statements.

The Commission's reliance in its Opposition on evidence that is not specifically linked to the three statements is not surprising because at trial, there was no evidence that any investor considered the two Viking statements material.  Likewise, other than two hearsay emails from investors who did not testify and the impermissible testimony of Mr. Fields, there was no evidence that any investor was concerned (or even heard) about the Benzinga statement as opposed to Fr. Lemelson's more general (and constitutionally protected) opinion that Promacta was going to be rendered obsolete at some unspecified future time by another product.

The Commission did not, and could not, charge Fr. Lemelson for his opinion statements that Promacta would be going away, that Ligand's stock had no value, and that Viking appeared to be a shell company that had no legitimate value.  However, the Commission argues here, as it did at trial, that investor concerns about these protected opinions constitute evidence that the separate and distinct three statements were material.  This was fundamentally unfair, and this Court should grant a new trial that can fairly focus on the three statements.

## II. The Commission Misrepresents the New Trial Standard

The Commission mischaracterizes Fr. Lemelson's argument to argue that the standards

under Rules 50 and 59 effectively merge.  ECF No. 288 at 4.  Fr. Lemelson's argument is not limited to the inadequacy of the evidence, but also includes that the evidence as to the three statements was unfairly overwhelmed by evidence of the failed scheme liability claim, as well as other legal and evidentiary rulings that require a new trial.  In such circumstances, the case law is clear that "[a] district court's power to grant a motion for a new trial is **much broader than its power to grant a JMOL**." *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009) (emphasis added).  "[U]nlike review of JMOL, the new trial motion standard of review is concerned with whether the verdict is against the weight of the evidence, an assessment made through the lens of abuse-of-discretion review and not requiring that we take the evidence in favor of the verdict." *Id.* at 438.  A "motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury."  *Montgomery Ward & Co. v. Duncam*, 311 U.S. 243, 251 (1940).

## III.  Defendants Did Not Distort the Record

The Commission claims that Fr. Lemelson's motion for a new trial distorted the record with respect to the testimony of Mr. Fields.  ECF No. 288 at 6-7.  The very opposite is true. While Mr. Fields did testify at one point that he did not remember whether he bought more stock in Ligand after a certain point in time, that was only after he essentially admitted having done so upon receiving material non-public information from Ligand.  ECF No 282-8 at 73-74. Specifically, Mr. Fields admitted that Ligand privately denied the veracity of the Benzinga interview statement (at a time Ligand refused to do so publicly).  *Id.*  Mr. Fields then testified:

> Q:  And as a result of being told that [the denial of the June 19, 2014 Benzinga statement], Cardinal Capital began buying more Ligand stock, didn't they []?

> A:  We -- we considered several sources of information, including conversations with the management, so **it was not based solely on that conversation**.

ECF No. 282-8 at 75 (emphasis added).  Mr. Fields' subsequent (and convenient) lapse of memory does not change this testimony.

In a footnote, the Commission states that "Defendants do not explain how this cuts against a finding of materiality.  If Cardinal Capital ultimately believed that Ligand's stock was undervalued as a result of Defendants [*sic*] false statements, it would make sense to buy and hold until a rebound in price when the truth came out."  ECF No. 288 at 6 n.1.  This is a remarkable position for the Commission to take.  First and foremost, the Commission's statement reflects a tacit concession that the materiality of the statement would be reflected in the stock price—a position that it has fought tooth-and-nail *against* throughout this litigation.  Second, if, as the Commission argues, the Benzinga statement was material, then Ligand's private denial of that statement must also be material.  Therefore, because Ligand did not *publicly* deny the statement, its private denial necessarily consisted of **material** non-public information, and Cardinal Capital's subsequent trades would constitute illegal insider trading.

The Commission's argument that Fr. Lemelson misleadingly cited only to Ligand's first presentation to the Commission and not the second to show that Ligand did not consider the Benzinga statement material is both incorrect and revealing.  First, Fr. Lemelson unambiguously stated that Ligand did not mention the Benzinga statement in the ***initial*** presentation to the Commission while noting that Ligand also failed to mention the Viking statements in the second presentation—clearly indicating that the Benzinga statement *was* mentioned in the second presentation. ECF No. 281 at 4-5.  Second, in trying to support materiality, the Commission argues that Fr. Lemelson's opinion statement that "Promacta [is] going away" appeared on 11 pages of the first presentation—an opinion that does not form the basis of any of the three

5

statements at issue and *could only have been relevant to the Commission's failed scheme claim*. As Fr. Lemelson explained in his initial memorandum seeking a new trial, *this is the precise conflation of evidence that warrants a new trial.*

IV. **The Commission Ignores the Circuit Split Regarding the Necessity to Show Stock Price Movement to Prove Materiality**

As noted by the Commission, Fr. Lemelson's position on the need to show stock price movement to prove materiality (an argument the Commission consistently relies upon when it suits its own needs) has been briefed repeatedly in this matter.[1] However, the Commission's contention that the case law is settled that no such requirement exists (*see* ECF No. 288 at 7) ignores the clear Third Circuit authority to the contrary, which the First Circuit has cited with approval. *See In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997)) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock. . . . This is so because efficient markets are those in which information important to reasonable investors (in effect, the market, is immediately incorporated into stock prices"); *In Re Polymedica Corp. Sec. Lit.*, 432 F.3d 1, 13-14 (1st Cir. 2005) (adopting definition of efficient market from *Burlington Coat Factory*); *see also In Re Xcelera.com Securities Litig.*, 430 F.3d 503, 507 (1st Cir. 2005).

V. **The Commission's Argument about Classification of Statements as "Opinions" is Irrelevant to the First Amendment Analysis of Statements Citing to Public Sources**

In response to Fr. Lemelson's First Amendment arguments, the Commission focuses on whether the statements were assertions of fact or protected opinion. ECF No. 288 at 8. This analysis is inapposite. The controlling case law is clear that any statement premised on cited public information is protected. *See Whitehead v. Inotek Pharmaceuticals Corp.*, 2018 WL

---

[1] Relatedly, Fr. Lemelson maintains that the jury should have been instructed that evidence of stock price movement was necessary to show materiality, but will not rehash those arguments here.

4732774, at *6 (D. Mass. June 27, 2018) (alleged omissions of negative results in statements about progress of clinical studies "are not 'material' as required by Section 10(b) because the statistically significant results of the Phase II trials were disclosed in the publicly available SEC filings"); *In re Seagate Tech. II Sec. Litig.*, 1989 WL 222969, at *3 (N.D. Cal. May 3, 1989) ("However, at a threshold level, if the material containing the alleged omissions, actually discloses the facts plaintiffs claim are absent, there is obviously no omission. In a similar vein, if the information to be disclosed is already known, even if through another source, it cannot be considered material"). This makes sense, because materiality is defined by whether a statement impacts the balance of information available to the market. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (explaining that "total mix" includes information readily available in public domain or facts known or reasonably available to shareholders). Indeed, as noted above, the Commission consistently relies on all information being immediately absorbed into the market (i.e. an efficient market) to make arguments that support its positions in other litigation.[2]

The cases the Commission cites in support of its contention that the public availability of accurate information elsewhere does not constitute a viable defense under the First Amendment are readily distinguishable. Unlike Fr. Lemelson, who had no relationship to Ligand whatsoever, all of the Commission's cases involved *corporate insiders* with connections to the company issuing the securities.[3] As the court explained in *SEC v. Mozilo*, 2010 WL 3656068, at *9 (C.D.

---

[2] *See, e.g., SEC v. Ustian,* No. 16 C 3885, 2019 WL 7486835, at *27 (N.D. Ill. Dec. 13, 2019) (expert retained by SEC opined that stock at issue traded in efficient market meaning any news would be reflected in stock within one day and considered whether announcement at issue had material impact); *SEC v. Garcia*, No. 10 CV 5268, 2011 WL 6812680, at *13 (N.D. Ill. Dec. 28, 2011) (SEC questioned defendant's explanations for trading activity by noting that stock traded in efficient market and so reports published before defendant made his investment and that defendant claimed to have relied upon would have already been incorporated into market price); *SEC v. Butler,* No. 00-1827*,* 2005 WL 5902637, at *11-12 (W.D. Pa. Apr. 18, 2005) (SEC argued that evidence of efficient market and quick market reaction supported finding of materiality).

[3] *See In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 49-51 (D. Mass. 2006) (insiders accused of withholding information about the risks facing the company from public disclosures); *SEC v. Reys*, 712 F. Supp. 2d 1170, 1176-77 (W.D. Wash. 2010) (alleging chairman and CEO of company withheld material information about key product);

7

Cal. Sept. 16, 2010, this is a critical distinction. "[O]missions **by corporate insiders** are not rendered immaterial by the fact that the omitted facts are otherwise available to the public. … The situation is **different in a fraud on the market case**." *Id.* (emphasis added). The court reasoned that in a fraud on the market case, the claim is based on the artificial stock price set by the market in light of the alleged misstatements and all other material public information. *Id.* "Provided that they have credibly entered the market through other means, the **facts allegedly omitted by the defendant would already be reflected in the stock's price**; the mechanism through which the market discovered the facts is not crucial." *Id.* (emphasis added). That is exactly the situation here, as Fr. Lemelson is not an insider, had no involvement in Ligand/Viking's public filings, and the Commission proceeded on a fraud on the market theory, so any information that was disclosed publicly cannot be a material omission as a matter of law.

The Commission unconvincingly argues that Fr. Lemelson's statement that Viking did not intend to conduct preclinical studies and trials was false, but conspicuously fails to address the testimony of Viking's CEO that conceded it ***was true***. *See* ECF No. 281 at 9; ECF No. 240 at 3-5. The Commission's reliance on the Court's summary judgment ruling that referred to this statement as potentially reflecting a "misleading half-truth"—because Fr. Lemelson's report did not mention that *third parties* would be conducting the studies and trials—fails because that information was disclosed publicly and Fr. Lemelson's report expressly and repeatedly cited to the very public document where the information was contained. *See* ECF No. 282-1. Accordingly, the allegedly omitted information cannot, as a matter of law, be considered material. *See, e.g., TSC Indus., Inc.*, 426 U.S at 449; *Whitehead*, 2018 WL 4732774, at *6; *In re Seagate Tech. II Sec. Litig.*, 1989 WL 222969, at *3.

---

*Brumbaugh v. Wave Sys. Corp.*, 416 F. Sup. 2d 239, 250-52 (D. Mass. 2006) (alleging violations against corporate insiders); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 237 (D. Mass. 2004) (same).

## VI. Evidentiary Issues at Trial

### A. Robert Fields Should Not Have Been Permitted to Testify

The miniscule references to Mr. Fields in the vast discovery the Commission dumped on Fr. Lemelson was not adequate to put Fr. Lemelson on notice that Mr. Fields could be a potential witness. And, as evident from the Commission's repeated reliance on Mr. Fields' testimony in support of the verdict, Mr. Fields' testimony was *crucial* to the case. The Commission dismissively argues that Fr. Lemelson did not explain how his counsel was negatively impacted in their ability to prepare for cross-examination of Mr. Fields. However, it is patently clear that not being able to obtain relevant documents or depose Mr. Fields, the sole investor to testify at trial, severely limited the ability to cross-examine him. *Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (reasoning "prejudice is apparent" when failure to disclose witness until after party moved for summary judgment deprived moving party of opportunity to depose the witness, solicit expert opinions of its own in response, or conduct discovery and stating "[t]his is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate"). For example, had the Commission timely identified Mr. Fields as a witness, Fr. Lemelson would have sought documents regarding Cardinal Capital's trading history with Ligand, which would have allowed counsel to effectively cross-examine Mr. Fields' about his convenient testimony that he "did not remember" whether his company bought more Ligand stock *after* receiving material non-public information about the Benzinga statement from Ligand. Further, email communications regarding concerns (or the lack thereof) about the three statements would have allowed for a more effective and thorough cross-examination.

### B. Precluding Evidence of Commission Bias was Error

The Commission argues that its statement in its closing that the Commission's role was to objectively view the facts and decide which claims to bring was justified because the

9

Commission's witnesses and work of their agents was "attacked" by defense counsel. ECF No. 288 at 12-13. This simply ignores the Court's ruling that precluded the defense from presenting facts regarding the Commission's bias, including the Hunter letter and the relationship between Ligand's counsel, the Commission, and the media which revealed the extraordinary political pressure exerted on the Commission to bring an unprecedented action against Fr. Lemelson. This evidence would have been critical to support the defense that this was an improper effort by a large, politically-connected pharmaceutical company to influence a regulatory body of the U.S. government in an effort to, as Ligand's CEO testified, "silence" Fr. Lemelson.

## VII. The Draconian Impact of the Industry Bar Justifies Amending the Judgment

This court may grant a motion to alter judgment "to prevent manifest injustice." *A-Cal Copiers, Inc. v. North American Van Lines, Inc.*, 180 F.R.D. 183, 190 (D. Mass. 1998). Even if Fr. Lemelson is ultimately unsuccessful on a re-trial or on appeal, the prospect of losing his livelihood for three alleged misstatements that he did not trade on (two of which related to a different, pre-operational company) and for which there was no evidence of harm to Ligand's stock is manifestly unjust. This Court should exercise its discretion to alter the judgment to eliminate the injunction to prevent this injustice.

## CONCLUSION

For the foregoing reasons, and the reasons stated in Fr, Lemelson's opening motion and supporting memorandum, Fr. Lemelson respectfully requests that the Court grant his motion for a new trial or, in the alternative, amend or alter the judgment.

Respectfully Submitted,

REV. FR. EMMANUEL LEMELSON,
LEMELSON CAPITAL MANAGEMENT,
LLC, and THE AMVONA FUND, LP

By: */s/ Douglas S. Brooks*
Douglas S. Brooks (BBO No. 636697)
Brian J. Sullivan (BBO No. 676186)
Thomas M. Hoopes (BBO No. 239340)
LIBBY HOOPES BROOKS, P.C.
399 Boylston Street
Boston, MA 02116
Tel.: (617)-338-9300
dbrooks@lhblaw.com
bsullivan@lhblaw.com
thoopes@lhblaw.com

Dated: May 25, 2022

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on May 25, 2022.

*/s/ Douglas S. Brooks*
Douglas S. Brooks