# United States Court of Appeals
## For the First Circuit

---

No. 22-1630

US SECURITIES & EXCHANGE COMMISSION,

Plaintiff, Appellee,

v.

GREGORY LEMELSON, a/k/a Father Emmanuel Lemelson;
LEMELSON CAPITAL MANAGEMENT, LLC,

Defendants, Appellants,

THE AMVONA FUND, LP,

Defendant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Kayatta, Lynch, and Gelpí,
Circuit Judges.

---

Kevin P. Martin, with whom William E. Evans III, Goodwin Procter LLP, Douglas S. Brooks, Brian J. Sullivan, Thomas M. Hoopes, and Libby Hoopes Brooks, P.C. were on brief, for appellants.

Ezekiel L. Hill, Attorney, Securities and Exchange Commission, with whom Dan M. Berkovitz, General Counsel, John W. Avery, Deputy Solicitor, and Paul G. Alvarez, Senior Appellate Counsel, were on brief, for appellee.

Case: 1:18-cv-11926-PBS   Document 300   Filed 01/03/23   Page 2 of 83   6540956

January 3, 2023

**LYNCH**, <u>Circuit Judge</u>.  The U.S. Securities and Exchange Commission (the "SEC") brought a civil enforcement action against Gregory Lemelson, also known as Father Emmanuel Lemelson ("Lemelson"); Lemelson Capital Management, LLC; and the Amvona Fund, LP.  After trial, the jury found Lemelson liable for three untrue statements of a material fact in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  After the jury verdict and further briefing and argument, the district court judge, who had presided over the jury trial, ordered Lemelson to pay a civil penalty and enjoined him from violating Section 10(b) and Rule 10b-5 for five years.  <u>See</u> <u>SEC</u> v. <u>Lemelson</u>, 596 F. Supp. 3d 227, 238 (D. Mass. 2022).

In this appeal, Lemelson argues that his three statements were protected by the First Amendment and that the SEC failed to introduce sufficient evidence to support the jury's determination that the statements were (1) of fact rather than opinion, (2) material, and (3) made with scienter.  He also contends that the district court abused its discretion and committed an error of law in entering the injunction.  We reject Lemelson's arguments and affirm.

### I.

### A.

The following facts were presented to the jury.

While working as an investment adviser and fund manager at Lemelson Capital Management, LLC, Lemelson managed all investments for a hedge fund called the Amvona Fund. In this role, Lemelson published online reports and conducted interviews regarding companies in whose stock the Amvona Fund invested. For example, Lemelson sometimes posted his reports on Seeking Alpha, a website where contributors post opinions or reports concerning financial topics. Unlike paid portals like Bloomberg where investment analysts traditionally post their research, Seeking Alpha is a non-subscription and open-forum resource, which Lemelson selected in order to expand the audience for his reports.

In May 2014, the Amvona Fund began building a short position[1] in the stock of Ligand Pharmaceuticals, Inc. ("Ligand"), a biotechnology company. At the time, Ligand was a small "virtual company" that would discover or acquire the economic rights to new drug candidates, license those candidates to other companies for development, and partner with other entities to manufacture and market approved drugs.

Ligand's principal product in 2014 was Promacta, a drug that had been approved by the U.S. Food and Drug Administration

---

[1]    "To take a short position in a stock means to sell borrowed stock at the current price in the hope that the stock price will decline and the borrower will be able to return the borrowed stock by purchasing it at the later, lower price." Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 422 n.5 (1st Cir. 2007).

(the "FDA") and various foreign drug agencies for treatment related to several medical disorders, including hepatitis C. Ligand partnered with other companies to manufacture and market Promacta in return for royalty payments based on those sales. As of May 2014, Ligand expected Promacta royalties to be a substantial portion of its future revenues. Promacta is still on the market today.

Ligand had also recently entered a licensing agreement with Viking Therapeutics, Inc. ("Viking"), a biopharmaceutical drug development company. Under the licensing deal, Viking would develop certain Ligand drug candidates and Ligand would acquire royalty rights and equity in Viking. Viking focused on the development of novel therapies for metabolic and endocrine disorders.

Viking had exclusive rights to five drug candidates based on molecules licensed from Ligand. As of 2014, all five drug candidates were undergoing preclinical studies or clinical trials, which were required before seeking FDA approval so that the drugs eventually could be brought to market. According to Viking's Form S-1[2] (the "Viking S-1") filed on July 1, 2014, Viking

---

[2]      A Form S-1, or a "Registration Statement Under the Securities Act of 1933," is filed by a company making a public stock offering. See, e.g., Versyss Inc. v. Coopers & Lybrand, 982 F.2d 653, 654 (1st Cir. 1992).

"intend[ed] to rely on third parties to conduct [its] preclinical studies and clinical trials." (Emphasis omitted).

The Viking S-1 contained both audited and unaudited financial data about Viking. It also included a report from Marcum LLP, an accounting firm that had "audited [Viking's] . . . balance sheets . . . as of December 31, 2012 and 2013."

Between June and August 2014, Lemelson published reports and conducted interviews in which he criticized Ligand's finances, prospects, and management and argued that Ligand stock was vastly overvalued. As relevant here, Lemelson made statements related to both Promacta and Viking. We describe each of the three statements for which the jury found liability.

### i. The Promacta Statement

On June 16, 2014, Lemelson published his first report concerning Ligand on his website and on Seeking Alpha. The report stated that Ligand "face[d] it[s] biggest existential threat" from "what is likely to be a momentous impairment of its largest royalty generating asset, Promacta," due largely to a competitive threat from a new drug called Sovaldi.

On June 18, Lemelson discussed Promacta's future during a phone call with Bruce Voss, Ligand's investor relations representative. The next day, Lemelson gave a radio interview for the financial website Benzinga. The interview was for Benzinga's online "PreMarket Prep" show, which provides investors with

information prior to market open.  During the interview, Lemelson stated the following about Promacta:

> Promacta accounted for 72 percent of [Ligand's] royalty revenues . . . [and] is literally going to go away.
>
> I mean I had discussions with management just yesterday -- excuse me, their [investor relations] firm, and they basically agreed. <u>And they said, look, we understand Promacta is going away</u>.

(Emphasis added).  Lemelson's statement that Voss told Lemelson that Ligand understood Promacta was "going away" (the "Promacta Statement") is the first statement at issue in this appeal.

### ii.  The Viking Statements

The next two statements at issue were made about two weeks later by Lemelson in his next report concerning Ligand.  Both statements concerned Viking.

First, the report stated the following about Viking's drug development capabilities:

> <u>Viking does not intend to conduct any preclinical studies or trials</u> and does not own any products or intellectual property or manufacturing abilities and leases space from Ligand.  Viking appears to be a single-purpose vehicle created to raise more capital from public markets for its sponsor, Ligand Pharmaceuticals.

(Emphasis added).  The statement that "Viking does not intend to conduct any preclinical studies or trials" (the "Preclinical

Studies Statement") is the second statement at issue in this appeal.

Next, the report stated the following about the financial data included in the Viking S-1:

> On April 7, 2014, Viking's Board of Directors appointed Marcum LLP as an independent registered public accounting firm stating [in the Viking S-1]:
>
> > "From September 24, 2012 (Inception) through April 7, 2014, neither we nor anyone on our behalf consulted with Marcum regarding (1) the application of accounting principles to a specified transaction, either completed or proposed, (2) the type of audit opinion that might be rendered on our financial statements, or (3) any matter that was either the subject of a disagreement . . . or a 'reportable event' . . . ."
>
> In other words, Marcum was merely hired, but the company has not yet even consulted with the firm on any material issues. <u>The financial statements provided on the [Viking S-1] accordingly are unaudited</u>.

(Emphasis added). The statement that Viking's "financial statements provided on the [Viking S-1] accordingly are unaudited" (the "Audit Statement") is the third statement at issue in this appeal.

Lemelson made the Preclinical Studies Statement and the Audit Statement (collectively, the "Viking Statements") in support of his broader statement that Viking was a "single-purpose vehicle"

and a "shell company" being used by Ligand to "generate paper profits to stuff [Ligand's] own balance sheet."

In the following months, Lemelson published several more reports critical of Viking and Promacta's prospects. Lemelson continued building the Amvona Fund's short position in Ligand stock throughout this time. Ligand's stock price declined, and Lemelson covered the short position on various dates for a profit.

**B.**

On September 12, 2018, the SEC filed a complaint against Lemelson, Lemelson Capital Management, LLC, and the Amvona Fund in the U.S. District Court for the District of Massachusetts. As later amended, the complaint alleged, inter alia, that the Promacta Statement and the Viking Statements were material misstatements of fact prohibited by Section 10(b) and Rule 10b-5.[3] The case went to trial and, after both parties rested, Lemelson unsuccessfully moved for judgment as a matter of law. On November 5, 2021, the jury found Lemelson liable for the three statements.[4]

---

[3] The SEC also alleged that Lemelson (1) engaged in a fraudulent scheme and course of business in violation of subsections (a) and (c) of Rule 10b-5; (2) made other untrue statements that there were "significant concerns about Ligand's imminent insolvency" and that Ligand's "liabilities exceeded tangible assets, meaning the company was insolvent"; and (3) misled his own investors in contravention of the Investment Advisers Act.

[4] The jury found Lemelson not liable with respect to the SEC's other claims.

After the jury verdict, Lemelson renewed his motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).  Lemelson argued, inter alia, that the Viking Statements were opinions protected by the First Amendment and that the SEC failed to produce sufficient evidence that all three statements were material and made with scienter.  The district court rejected these arguments and denied the motion.

The district court then received briefing and heard argument concerning the proper remedies for Lemelson's violations. The SEC requested, inter alia, a $656,500 civil penalty against Lemelson and an injunction permanently enjoining him from violating Section 10(b) and Rule 10b-5.  Lemelson countered that the civil penalty should be "far less" than $80,000 and that no injunction should be issued.  The district court assessed a civil penalty of $160,000 and enjoined Lemelson from violating Section 10(b) and Rule 10b-5 for five years.[5]  Lemelson, 596 F. Supp. 3d at 238.  The court rejected the SEC's contention that a permanent injunction was warranted, noting that Lemelson's "violation was

---

[5]    The injunction also applied to Lemelson Capital Management, LLC.  Lemelson, 596 F. Supp. 3d at 238.  The district court declined to (1) enter a civil penalty against Lemelson Capital Management, LLC; (2) order joint and several disgorgement of the defendants' pecuniary gain; or (3) assess prejudgment interest.  Id. at 230.  The SEC has not appealed these decisions. Nor is the amount of the civil penalty at issue in this appeal.

not as severe as in many of the cases where courts ordered permanent injunctions." Id. at 233.

Lemelson timely appealed.[6]

**II.**

We review de novo a district court's denial of a motion for judgment as a matter of law. Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas, 957 F.3d 30, 37 (1st Cir. 2020). In reviewing the record, we "construe facts in the light most favorable to the jury verdict, draw any inferences in favor of the non-movant, and abstain from evaluating the credibility of the witnesses or the weight of the evidence." Id. We "ask whether . . . a rational jury could have found in favor of the party that prevailed," Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 22 (1st Cir. 2006), and set aside the jury verdict "only if the jury failed to reach the only result permitted by the evidence," Quiles-Quiles v. Henderson, 439 F.3d 1, 4 (1st Cir. 2006).

Section 10(b) prohibits, "in connection with the purchase or sale of any security," the "use or employ[ment]" of "any manipulative or deceptive device or contrivance in contravention" of SEC regulations. 15 U.S.C. § 78j(b). Subsection (b) of Rule 10b-5 declares it "unlawful," "in connection with the

---

[6]    The district court also denied Lemelson's motion for a new trial. Because Lemelson develops no argument on appeal concerning this denial, he has waived the issue. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

purchase or sale of any security," to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b).

Lemelson argues that the jury verdict must be overturned for three reasons. First, he argues that the Viking Statements were opinions that are protected by the First Amendment and nonactionable under Section 10(b) and Rule 10b-5. Second, he contends that the SEC failed to introduce evidence sufficient to prove that the Promacta Statement and Viking Statements were material. Finally, he argues that the jury lacked a sufficient basis to find that he made the Promacta Statement and Viking Statements with scienter. We address each argument in turn.

**A.**

Lemelson first contends that the Viking Statements were statements of opinion[7] and thus were nonactionable under Rule 10b-5 and protected by the First Amendment. We disagree.

"A [Rule 10b-5] violation . . . requires a false, or misleadingly omitted, statement of fact." Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 7 (1st Cir. 2021). The "most significant difference between statements of fact and expressions of opinion is that 'a statement of

---

[7]    Lemelson does not argue that the Promacta Statement was a statement of opinion.

fact . . . expresses certainty about a thing, whereas a statement of opinion . . . does not.'" Id. (quoting Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 183 (2015)).

A reasonable jury could have concluded that the Viking Statements "expresse[d] certainty about . . . thing[s]," and thus were actionable statements of fact, for a number of reasons. Omnicare, 575 U.S. at 183. In the Preclinical Studies Statement, Lemelson wrote that "Viking does not intend to conduct any preclinical studies or trials," and in the Audit Statement, he asserted that Viking's "financial statements provided on the [Viking S-1] . . . are unaudited." Neither statement was prefaced by words like "I think" or "I believe," which "can play a role in demonstrating a lack of certainty." Carbonite, 22 F.4th at 7 (citing Omnicare, 575 U.S. at 187). Both statements were factually contradicted by the Viking S-1, which included audited financial data and stated Viking's intention to "expend substantial funds in research and development, including preclinical studies and clinical trials." Indeed, Lemelson himself in his testimony characterized the Audit Statement as a "mistake[n]" reading of the Viking S-1. And even though Viking intended to have third parties conduct preclinical studies and clinical trials on its behalf, a rational jury could have found the Preclinical Studies Statement to be, at the least, a misleading "half-truth[]" actionable under

Rule 10b-5.  SEC v. Johnston, 986 F.3d 63, 72 (1st Cir. 2021); see
also Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d
170, 175 (1st Cir. 1994) ("[T]he fact that a statement is literally
accurate does not preclude liability under federal securities
laws.").

     Lemelson cites a series of First Circuit defamation
cases for the proposition that the First Amendment generally
precludes liability "when the speaker 'outlines the facts
available to him, thus making it clear that the challenged
statements represent his own interpretation of those facts and
leaving the reader free to draw his own conclusions.'" McKee v.
Cosby, 874 F.3d 54, 61 (1st Cir. 2017) (quoting Riley v. Harr, 292
F.3d 282, 289 (1st Cir. 2002)); see also, e.g., Phantom Touring,
Inc. v. Affiliated Publ'ns, 953 F.2d 724, 730 (1st Cir. 1992).
Lemelson reasons that the Viking Statements simply "interpret[ed]"
the facts in the Viking S-1, and thus that the statements were
protected opinions.

     The SEC argues that the First Amendment principles at
issue are limited to the defamation context, and notes that
Lemelson has failed to cite any cases applying those principles in
the context of Section 10(b) and Rule 10b-5.  Because we determine
the Viking Statements to be statements of fact, we need not decide
whether the cases cited by Lemelson reach beyond defamation law.
Even were we to consider these cases and apply de novo review, see

Naser Jewelers, Inc. v. City of Concord, 513 F.3d 27, 32 (1st Cir. 2008), Lemelson's argument fails because the Viking Statements "reasonably would be understood to declare or imply provable assertions of fact," McKee, 874 F.3d at 60-61 (quoting Phantom Touring, 953 F.2d at 727). Far from presenting interpretations of the facts contained in the Viking S-1, the Viking Statements are flatly inconsistent with those facts. See, e.g., Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015) ("[T]he speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based." (emphasis added)); id. at 774 ("The First Amendment generally protects statements of opinion where the speaker 'outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts . . . .'" (internal quotation marks omitted) (quoting Riley, 292 F.3d at 289) (emphases added)); see also Cheng v. Neumann, 51 F.4th 438, 444 (1st Cir. 2022) (noting that "statement[s] of opinion" without "provably false factual connotation[s]" can receive First Amendment protection against defamation suits (quoting Milkovich v. Lorain J. Co., 497 U.S. 1, 20 (1990))). Further, Lemelson was "claiming to be in possession of objectively verifiable facts," not merely "expressing a subjective view" of the Viking S-1. McKee, 874 F.3d at 61 (quoting Riley, 292 F.3d at 289); see also Cheng, 51 F.4th at 444.

**B.**

Lemelson next argues that even if all three statements were untrue statements of fact, a reasonable jury could not have, on the evidence presented, concluded that the statements were material.

Liability under subsection (b) of Rule 10b-5 only lies with respect to misstatements or omissions of "<u>material</u> fact."  17 C.F.R. § 240.10b-5(b) (emphasis added).  To prove materiality, the SEC must show that there exists a "substantial likelihood" that the fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  <u>Basic Inc.</u> v. <u>Levinson</u>, 485 U.S. 224, 231-32 (1988) (quoting <u>TSC Indus., Inc.</u> v. <u>Northway, Inc.</u>, 426 U.S. 438, 449 (1976)).  The determination of materiality is typically left to the jury.  <u>In re Cabletron Sys., Inc.</u>, 311 F.3d 11, 34 (1st Cir. 2002).

We first address the Promacta Statement and then address the Viking Statements.  We conclude that the SEC introduced evidence sufficient for a rational jury to find all three statements material.

**i.**

The controversy over the Promacta Statement stemmed from the June 18 phone call between Lemelson and Voss.  No transcript of the call was introduced at trial, and Lemelson and Voss offered

different accounts of their dialogue.  According to Lemelson, Voss "said [Ligand] agreed that [Sovaldi] would eliminate the need for Promacta."  According to Voss, Lemelson himself "made th[e] comment" that "Promacta sales are going to go away" and then followed the comment with a "rhetorical 'don't you agree?'", to which Voss provided no verbal reply.  Voss testified that he had actually informed Lemelson that Promacta had a "bright future."  The jury credited Voss's account of the call, finding the Promacta Statement -- i.e., Lemelson's statement that Voss affirmatively "said" that Ligand understood Promacta was "going away" -- to be an "untrue statement of a material fact" in violation of Rule 10b-5.

     A reasonable jury could have found the Promacta Statement material.  First, the SEC introduced evidence demonstrating the importance of Promacta to Ligand's bottom line.  See Carbonite, 22 F.4th at 8 (noting that the "importan[ce] [of a] product" to a company is relevant in determining the materiality of a statement concerning that product's effectiveness).  Ligand had released positive revenue data for Promacta, noting, for example, that increased Promacta royalties contributed to aggregate royalty revenues of $7.9 million for the three months ending March 31, 2014, compared to $5.8 million for the same period in 2013.  Further, witness testimony demonstrated that investment analysts had projected augmented Promacta revenues from 2015 to

2020, that Promacta could potentially expand into new geographic markets, and that new medical applications for Promacta were being pursued.  And the jury also considered evidence that Sovaldi would not negatively impact Promacta sales to patients with certain medical conditions.  Ligand thus had "expected [Promacta royalties] to be a substantial portion of [its] ongoing revenues" and knew that setbacks for Promacta "could significantly impair [Ligand's] operating results and/or reduce the market price of [its] stock."

The SEC also produced evidence demonstrating investors' alarm and concern about the Promacta Statement and that they communicated those concerns to Ligand.  For example, one Ligand shareholder emailed Ligand about the Benzinga interview and stated that the Promacta Statement "seem[ed] to [the shareholder] to be a flat out falsehood" that warranted "legal action."  Ligand's President, Matthew Foehr, wrote an email the day after the interview stating that Foehr was "fielding questions from pretty major [share]holders" about the interview.  Further, the SEC introduced the testimony of Robert Fields, a portfolio manager who testified that it "[w]ould . . . have been important to [him] as an investor in Ligand if Promacta was, in fact, going away" because

Promacta "made up the majority of the current revenue of [Ligand]"
and was Ligand's "largest source of cash flow."[8]

The jury also considered evidence that Lemelson himself
took credit for the decline in Ligand's stock value in the summer
of 2014. For example, in an email to another investment adviser
in October 2014, Lemelson wrote that his "multi-month battle with
[Ligand]" was "paying off" because it resulted in Ligand's shares
being "down ~40% since [Lemelson] published" his first report on
June 16. A reasonable jury could infer that Lemelson himself
believed that the Promacta Statement, which was a substantial part
of his "battle" with Ligand, would be material to investors.

Lemelson contends that the Promacta Statement cannot
have been material given that Voss signaled at least "tacit
agreement" by failing to respond to Lemelson's comment that
Promacta was "going to go away." But this argument does not
confront the fact that during his interview with Benzinga, Lemelson
stated that Voss affirmatively "said" that Promacta was going away.

---

[8]     The presence of Fields' testimony distinguishes this
case from United States v. Bingham, 992 F.2d 975 (9th Cir. 1993),
a case cited by Lemelson in support of his argument that the SEC
failed to prove the Promacta Statement's materiality. There, the
defendant failed to disclose that he was an officer and director
of the issuer of stock he was selling, and the government's sole
materiality evidence was broker testimony that brokers "would
always find a buyer's or seller's status as a corporate officer to
be of interest." Id. at 976. In contrast with the "abstract"
testimony in Bingham, id., Fields' testimony was specific to Ligand
and the Promacta Statement.

Voss testified that he "[a]bsolutely [did] not" say those words or "anything to that effect." A rational jury could have found Voss's account of the phone call more credible than Lemelson's. See Suero-Algarín, 957 F.3d at 37 (noting that when adjudicating a motion for judgment as a matter of law, the court must "abstain from evaluating the credibility of the witnesses"). A rational jury could also find that investors would likely react much more adversely to news that Ligand said Promacta was going away than they would to news that a Ligand representative said nothing when Lemelson so claimed, while also saying that Promacta had a "bright future."

### ii.

A rational jury also could find the Viking Statements material. As with Promacta, the SEC introduced evidence demonstrating the importance of the Viking deal to Ligand. See Carbonite, 22 F.4th at 8. For example, Foehr testified that Ligand needed Viking's "development expertise" because Ligand did not have that expertise "internally," and Fields attested that "[t]he potential economic royalties that Ligand [could] receive from Viking number[ed] in the multiple billions of dollars."

Further, a reasonable jury could have inferred that investors were concerned about the Viking Statements. Foehr testified that Ligand received "an increasing number of questions about [Lemelson's] reports from a variety of individuals,

- 20 -

investors," and "other companies" with whom Ligand was "working . . . on potential licenses." And importantly, Fields testified that it would "have been important for [him] to know as an investor" if "Viking were a shell." Although Fields did not specifically identify the Viking Statements, Lemelson himself acknowledges that he made the Preclinical Studies Statement "to support his opinion that Viking [was] a single-purpose vehicle/shell company." Drawing all inferences in the SEC's favor, see Suero-Algarín, 957 F.3d at 37, a reasonable jury could have viewed the Viking Statements as important parts of Lemelson's broader argument that Viking was a shell company, which Fields believed was material.

Lemelson argues that the public availability of the Viking S-1 precludes a jury from finding his statements material. Because the Viking S-1 reported audited financial results and detailed Viking's intentions to manage preclinical studies and clinical trials, Lemelson contends, his false statements to the contrary cannot have altered the "total mix" of information available to investors. We disagree. Lemelson is not helped by his reference to our statement that it is "not a material omission to fail to point out information of which the market is already aware." Thant v. Karyopharm Therapeutics Inc., 43 F.4th 214, 222 (1st Cir. 2022) (emphasis added) (quoting Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004)). We have never held that it cannot be a

material misstatement to flatly contradict publicly available facts. _See, e.g._, _Ponsa-Rabell_ v. _Santander Sec. LLC_, 35 F.4th 26, 34 (1st Cir. 2022) (distinguishing "omissions" from "affirmative misrepresentations"); _Johnston_, 986 F.3d at 72 (bypassing dispute about duty to disclose because defendant "chose to make statements"). Indeed, Lemelson's position would risk foreclosing Rule 10b-5 liability for all untrue statements belied by public securities filings.[9]

Lemelson cites _Teamsters Local 282 Pension Trust Fund_ v. _Angelos_, 762 F.2d 522 (7th Cir. 1985), and _Phillips_ v. _LCI International, Inc._, 190 F.3d 609 (4th Cir. 1999). He misleadingly argues that these cases hold that "even lies are not actionable" when an investor "possesses information sufficient to call the [mis]representation into question." _Teamsters_, 762 F.2d at 529-30; _see also_ _Phillips_, 190 F.3d at 617. In _Teamsters_, the Seventh Circuit addressed not the materiality element, but rather the "reliance" element in a private (not brought by the SEC) securities enforcement suit, noting (in dicta) that a plaintiff investor

---

[9]     Lemelson is correct that public SEC filings, like the Viking S-1, are part of the "total mix" of information available to investors. _See, e.g._, _United States_ v. _Contorinis_, 692 F.3d 136, 143 (2d Cir. 2012). But he cites no cases holding that a statement contradicting such filings could not be "viewed by [a] reasonable investor as having significantly altered th[at] 'total mix.'" _Basic_, 485 U.S. at 231-32 (quoting _TSC Indus._, 426 U.S. at 449). Similarly, we reject Lemelson's contention that his statements were rendered categorically immaterial by his identifying himself as a short seller in his reports.

cannot "claim . . . that he relied on or was deceived by [a] lie"
if he in fact "knows enough so that the lie . . . still leaves him
cognizant" of the truth.  762 F.2d at 530.  But in an enforcement
action brought by the SEC, the SEC need not prove any individual
investor's reliance.  See SEC v. Tambone, 597 F.3d 436, 447 n.9
(1st Cir. 2010) (en banc).  In Phillips, which also involved a
private suit, the Fourth Circuit found not actionable an
executive's statement, after merger negotiations had recently
taken place, that "[w]e're not a company that's for sale"; the
court emphasized that the executive "did not deny present or future
merger negotiations" and "actually indicated that there would be
mergers in the company's future."  190 F.3d at 619 (alteration in
original).  Here, in contrast, Lemelson specifically stated that
Viking was unaudited and would not conduct preclinical studies or
trials.

## c.

Finally, Lemelson contends that even if all three
statements were "untrue statement[s] of a material fact" under
Rule 10b-5, a reasonable jury could not have found that he made
the statements with the requisite scienter.

Evidence of scienter is required to establish violations
of Section 10(b) and Rule 10b-5.  Johnston, 986 F.3d at 74.  Proof
of scienter requires "a showing of either conscious intent to
defraud or 'a high degree of recklessness.'"  SEC v. Ficken, 546

F.3d 45, 47 (1st Cir. 2008) (quoting ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008)). A "high degree of recklessness" entails "'a highly unreasonable omission,' one that not only involves 'an extreme departure from the standards of ordinary care,' but also 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" Johnston, 986 F.3d at 74 (quoting Corban v. Sarepta Therapeutics, Inc., 868 F.3d 31, 37 (1st Cir. 2017)).

First addressing the Promacta Statement and then examining the Viking Statements, we find the evidence sufficient to support the jury's finding that Lemelson made all three statements with scienter.

### i.

As to the Promacta Statement, a reasonable jury could have credited Voss's testimony that he "[a]bsolutely [did] not" say that Promacta was going away or "anything to that effect." Rather, Voss told Ligand leadership that he "represented [Ligand] forcefully" during his call with Lemelson and "pointed out that [hepatitis C] is only one of several indications for [Promacta], and that even within [hepatitis C] there exists a sizeable market for Promacta independent of Sovaldi." Voss testified that he informed Lemelson of these views and that Promacta had a "bright future."

A rational jury could find that Lemelson knew Voss's account of the call to be accurate, yet intentionally or recklessly chose to misconstrue the conversation. See Johnston, 986 F.3d at 74 ("[A] defendant's publication of statements when that defendant 'knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter.'" (quoting Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002))). Indeed, Voss emailed Lemelson after the Benzinga interview, writing that Voss "never made th[e] statement [that Promacta was going away], never agreed with that statement[,] and never would because it's not true," but Lemelson never responded to the email or "publicly acknowledge[d]" Voss's competing interpretation of the call.

### ii.

The SEC also introduced sufficient evidence for the jury to find that Lemelson made the Viking Statements with scienter. In particular, a reasonable jury could infer that Lemelson understood from the Viking S-1 that Viking had audited financials and that Viking intended to manage preclinical studies and trials, yet intentionally or recklessly made statements to the contrary.

Lemelson held himself out as a sophisticated investor who had been "featured, quoted or cited in substantially every major global financial news media outlet." He made all the investment decisions for the Amvona Fund, which he touted as "one

of the world's top-performing hedge [f]unds." He also testified
to having read "hundreds of financial statements."

Lemelson admitted that he read and "carefully
researched" the Viking S-1. The Viking S-1 extensively detailed
Viking's intentions to manage preclinical studies and clinical
trials, and it included various audited financial data. Given
Lemelson's financial expertise and his testimony that he closely
reviewed the Viking S-1, a reasonable jury could conclude that
Lemelson "knew facts suggesting the [Viking] [S]tatements were
inaccurate or misleadingly incomplete." Johnston, 986 F.3d at 74
(quoting Aldridge, 284 F.3d at 83); see also Geffon v. Micrion
Corp., 249 F.3d 29, 36 (1st Cir. 2001) (noting that "disregard of
current factual information acquired prior to the statement at
issue" can be evidence of scienter). Indeed, Lemelson testified
that he knew a Form S-1 cannot be filed without audited financial
data, a fact also mentioned by Foehr in his testimony. And even
if the Preclinical Studies Statement were taken as literally true
because Viking planned to hire third parties to conduct studies
and trials on its behalf, a rational jury could conclude that
Lemelson presented the statement as a misleading "half-truth[],"
supporting an inference of scienter. Johnston, 986 F.3d at 72.
Whether or not a reasonable jury could have concluded that the
Viking Statements were intentional misstatements to investors, a
rational jury could find that Lemelson made the statements with a

- 26 -

"high degree of recklessness," <u>Ficken</u>, 546 F.3d at 47 (quoting <u>ACA Fin. Guar. Corp.</u>, 512 F.3d at 58), particularly given that he published the statements two days after the Viking S-1 became public and without first contacting anyone at Viking for comment.

Further, the importance of the Ligand short position to Lemelson could lead a reasonable jury to infer that he would investigate Viking thoroughly. Lemelson testified that the short position comprised a "substantial part" of the Amvona Fund's portfolio and that 34 percent of the invested funds was his "family's money." Although the fact that Lemelson "stood to benefit from wrongdoing" does not itself necessarily prove scienter, <u>Kader</u> v. <u>Sarepta Therapeutics, Inc.</u>, 887 F.3d 48, 60 (1st Cir. 2018) (quoting <u>Greebel</u> v. <u>FTP Software, Inc.</u>, 194 F.3d 185, 197 (1st Cir. 1999)), a reasonable jury could infer that Lemelson would have carefully researched Viking and thus been aware of the misleading nature of his statements, <u>cf.</u> <u>Carbonite</u>, 22 F.4th at 9 ("[T]he importance of a particular item to a defendant can support an inference that the defendant is paying close attention to that item . . . ." (internal quotation marks omitted) (quoting <u>Loc. No. 8 IBEW Ret. Plan & Tr.</u> v. <u>Vertex Pharms., Inc.</u>, 838 F.3d 76, 82 (1st Cir. 2016))).

We reject Lemelson's challenge to the jury's scienter finding and, as noted, reject Lemelson's other challenges to the jury verdict. We affirm the jury verdict.

III.

Lemelson argues that the district court abused its discretion and committed an error of law in enjoining him from violating Section 10(b) and Rule 10b-5 for five years. We disagree.

In an SEC enforcement action, we review the district court's decision to enter an injunction for abuse of discretion. SEC v. Sargent, 329 F.3d 34, 38 (1st Cir. 2003). Abuse of discretion occurs "when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the [district] court makes a serious mistake in weighing them." Id. (quoting Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988)). "[A] district court [also] abuses its discretion if it incorrectly applies the law to particular facts." Id. (quoting Am. Bd. of Psychiatry & Neurology, Inc. v. Johnson-Powell, 129 F.3d 1, 3 (1st Cir. 1997)).

Congress authorized the SEC to seek injunctive relief to prevent violations of securities laws. See 15 U.S.C. § 78u(d)(1). A district court may enter such an injunction "where there is, 'at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of either [the Securities Act of 1933 or the Securities Exchange Act of 1934] or of the regulations promulgated thereunder.'" Sargent, 329 F.3d at 39 (quoting Aaron

- 28 -

v. SEC, 446 U.S. 680, 700-01 (1980)).  The legal standard for issuance of the injunction is a "reasonable likelihood of recidivism," which is assessed by looking at "several factors, none of which is determinative."  Id.  These factors include, inter alia, (1) the "nature of the violation, including its egregiousness and its isolated or repeated nature," (2) "whether the defendants will, owing to their occupation, be in a position to violate again," and (3) "whether the defendants have recognized the wrongfulness of their conduct."  Id.

The district court properly weighed these three factors and considered no improper ones.  First, it examined the "nature of the violation" and found that the Promacta Statement was "particularly egregious."  Lemelson, 596 F. Supp. 3d at 233.  As the district court emphasized, Promacta was "Ligand's key product."  Id.  The jury determined that Lemelson falsely told the public that Voss said Promacta was "going away," when in fact Voss said just the opposite: that Promacta had a "bright future."  And Lemelson "derived a[] direct personal profit" from the misstatement by cashing in his short position.  Sargent, 329 F.3d at 39.

Next, the district court noted that Lemelson would be in a position to violate again owing to his occupation as an investment adviser and management of a new hedge fund called the Spruce Peak Fund since early 2021.  Lemelson, 596 F. Supp. 3d at

233.    In  contrast  with  the  two  defendants'  occupations  in
Sargent  --  webcasting  and  dentistry,  respectively,  see  Sargent,
329 F.3d at 39-40 -- Lemelson's continued position as a hedge fund
manager and investment adviser would readily allow him to benefit
from future material misstatements concerning investments.

        Lemelson  argues  that  the  district  court  committed  an
error  of  law  by  issuing  an  injunction  on  the  basis  of  a  mere
possibility,  rather  than  a  likelihood,  of  future  violations.    He
relies  on  the  fact  that  the  district  court  wrote  that  Lemelson
"will  be  able  to  violate  again."    Lemelson,  596  F. Supp. 3d  at
233.    Although  Lemelson  is  correct  that  the  legal  standard  is  a
"reasonable  likelihood  of  recidivism,"  Sargent,  329  F.3d  at  39
(emphasis  added),  not  a  mere  possibility  of  future  violations,  he
takes  the  district  court's  language  out  of  context.    The  district
court's  statement  that  Lemelson  "will  be  able  to  violate  again"
was  made  when  applying  the  factor  from  Sargent  concerning  "whether
the  defendant[]  will,  owing  to  [his]  occupation,  be  in  a  position
to  violate  again."    Id.  (emphasis  added).    The  court  correctly
quoted  this  factor  and  ultimately  applied  the  "reasonable
likelihood of recidivism" standard.    Lemelson,  596  F. Supp. 3d  at
231.    No legal error occurred.

        Finally,  the  district  court  determined  that  Lemelson  had
failed  to  "recognize  the  wrongfulness  of  his  conduct."    Id.  at
233.    The  court  referenced  the  fact  that  Lemelson  incurred

sanctions by violating a protective order and leaking confidential material related to the litigation to the press. Id. at 232-33. Further, when the district judge heard post-verdict argument on whether to impose an injunction, she allowed Lemelson to speak and Lemelson said he would "never regret the things [he] did." Also, Lemelson's lack of regret and remorse is highlighted by the fact that even after Voss emailed Lemelson that Voss had never said Promacta was going away, Lemelson never took steps to inform the public of Voss's disagreement with Lemelson's account of what was said. Lemelson had opportunities to correct his misstatements and took advantage of none of them.

That there was no abuse of discretion is further evidenced by the district court's careful rejection of the SEC's request for a permanent injunction. The court contrasted Lemelson's case with various cases that each involved "egregious conduct occurring over prolonged periods of time." Id. at 231-32; see, e.g., SEC v. Wall, No. 19-cv-00139, 2020 WL 1539919, at *8 (D. Me. Mar. 31, 2020) (violations spanning more than four years); SEC v. Chan, 465 F. Supp. 3d 18, 38 (D. Mass. 2020) (scheme lasting nearly two years); SEC v. Present, No. 14-cv-14692, 2018 WL 1701972, at *1, *5 (D. Mass. Mar. 20, 2018) (twenty-one violations over multiple years). The court concluded that Lemelson's "violation was not as severe as in many of the cases where courts ordered permanent injunctions" and enjoined Lemelson

for only five years. Lemelson, 596 F. Supp. 3d at 233. That this was within the district court's discretion is consistent with case law in other circuits. See, e.g., SEC v. Levine, 517 F. Supp. 2d 121, 147 (D.D.C. 2007), aff'd, 279 F. App'x 6 (D.C. Cir. 2008) (ten-year injunction); SEC v. Johnson, 595 F. Supp. 2d 40, 45 (D.D.C. 2009) (five-year injunction); SEC v. Spartan Sec. Grp., No. 19-cv-448, 2022 WL 3224008, at *5 (M.D. Fla. Aug. 10, 2022) (same).[10]

Lemelson notes that the SEC did not seek any injunctive relief until 2021. Even so, there was no abuse of discretion in the district court's view that there still existed a "reasonable likelihood of recidivism." Sargent, 329 F.3d at 39. Indeed, the district court acknowledged during the motion hearing that the lack of violations since 2014 "mitigate[d] against a lifetime bar" and accordingly chose to enter a five-year injunction instead. Doing so was not an abuse of discretion. See Negrón-Almeda v. Santiago, 528 F.3d 15, 21 (1st Cir. 2008) ("Under [abuse of discretion review], we may not reverse a determination simply

---

[10] Lemelson objects to the SEC's use of the injunction to seek a lifetime associational bar against him under 15 U.S.C. § 80b-3. As Lemelson notes, when the district court later denied Lemelson's motion to amend the judgment, the court "agree[d] [that] a lifetime ban would be excessive." Nevertheless, only the five-year injunction is on appeal here, and the district court was within its discretion in imposing that injunction. If the SEC imposes an associational bar, Lemelson may appeal that decision in a separate action. See, e.g., Kornman v. SEC, 592 F.3d 173, 175, 181 (D.C. Cir. 2010).

because we, if sitting as a court of first instance, would have weighed the relevant considerations differently.").

**IV.**

For the foregoing reasons, the judgment of the district court is <u>affirmed</u>.